## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation, | Civil Action No.: |

    Plaintiffs,

   v.

ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida; JONI ALEXIS POITIER, in her official capacity as Commissioner of the Florida Elections Commission; JASON TODD ALLEN, in his official capacity as Commissioner of the Florida Elections Commission; JOHN MARTIN HAYES, in his official capacity as Commissioner of the Florida Elections Commission; KYMBERLEE CURRY SMITH, in her official capacity as Commissioner of the Florida Elections Commission; and PATRICK GILLESPIE, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services,

    Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs NetChoice, LLC ("NetChoice") and Computer & Communications Industry Association ("CCIA")—trade associations of online businesses that share the goal of promoting and protecting free speech and free enterprise on the Internet— jointly bring this Complaint for declaratory and injunctive relief against the Defendants in their official capacities, to enjoin the enforcement of Florida's S.B. 7072, 2021 Leg. (Fla. 2021) (hereinafter, the "Act"),[1] which infringes on the rights to freedom of speech, equal protection, and due process protected by the First and Fourteenth Amendments to the U.S. Constitution.  The Act also exceeds the State of Florida's authority under the Constitution's Commerce Clause and is preempted by Section 230 of the Communications Decency Act.  Because the Act violates the constitutional rights of Plaintiffs' members and contravenes federal law, it should be promptly enjoined before it takes effect on July 1, 2021.

### Overview

1.     The Act, a first-of-its-kind statute, was enacted on May 2, 2021 and signed into law on May 24, 2021 to restrict the First Amendment rights of a targeted selection of online businesses by having the State of Florida dictate how those businesses must exercise their editorial judgment over the content hosted on their

---

[1] The Act is codified in scattered sections of the Florida Statutes, including §§ 106.072, 287.137, 501.2041, 501.212.  Below, the Act's specific provisions are identified by Section (*e.g.*, "Act § 2"), as well as the provision of the Florida Statutes where they will be codified (*e.g.*, "§ 106.072").

privately owned websites.  The Act discriminates against and infringes the First Amendment rights of these targeted companies, which include Plaintiffs' members, by compelling them to host—and punishing them for taking virtually any action to remove or make less prominent—even highly objectionable or illegal content, no matter how much that content may conflict with their terms or policies.

2.     These unprecedented restrictions are a blatant attack on a wide range of content-moderation choices that these private companies have to make on a daily basis to protect their services, users, advertisers, and the public at large from a variety of harmful, offensive, or unlawful material:  pornography, terrorist incitement, false propaganda created and spread by hostile foreign governments, calls for genocide or race-based violence, disinformation regarding Covid-19 vaccines, fraudulent schemes, egregious violations of personal privacy, counterfeit goods and other violations of intellectual property rights, bullying and harassment, conspiracy theories denying the Holocaust or 9/11, and dangerous computer viruses. Meanwhile, the Act prohibits only these disfavored companies from deciding how to arrange or prioritize content—core editorial functions protected by the First Amendment—based on its relevance and interest to their users.  And the Act goes so far as to bar those companies from adding their own commentary to certain content that they host on their privately owned services—even labeling such

commentary as "censorship" and subjecting the services to liability simply for "post[ing] an addendum to any content or material posted by a user."

3.     Under the Act, these highly burdensome restrictions apply only to a select group of online businesses, leaving countless other entities that offer similar services wholly untouched by Florida law—including any otherwise-covered online service that happens to be owned by The Walt Disney Company ("Disney") or other large entities that operate a "theme park."  This undisguised singling out of disfavored companies reflects the Act's true purpose, which its sponsors freely admitted: to target and punish popular online services for their perceived views and for certain content-moderation decisions that state officials opposed—in other words, to retaliate against these companies for exercising their First Amendment rights of "editorial discretion over speech and speakers on their property." *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931 (2019).

4.     Rather than preventing what it calls "censorship," the Act does the exact opposite:  it empowers government officials in Florida to police the protected editorial judgment of online businesses that the State disfavors and whose perceived political viewpoints it wishes to punish.  This is evident from Governor Ron DeSantis' own press release that touts the Act as a means to "tak[e] back the virtual public square" from "the leftist media and big corporations," who supposedly

"discriminate in favor of the dominant Silicon Valley ideology."[2]  The Governor's press release also leaves no doubt about the Legislature's unconstitutional viewpoint discrimination:  quoting a state legislator, it proclaims that "our freedom of speech as conservatives is under attack by the 'big tech' oligarchs in Silicon Valley.  But in Florida, [this] … will not be tolerated."[3]

5.     Although the Act uses scare terms such as "censoring," "shadow banning," and "deplatforming" to describe the content choices of the targeted companies, it is in fact the Act that censors and infringes on the companies' rights to free speech and expression; the Act that compels them to host speech and speakers they disagree with; and the Act that engages in unconstitutional speaker-based, content-based, and viewpoint-based preferences.  The legislative record leaves no doubt that the State of Florida lacks any legitimate interest—much less a compelling one—in its profound infringement of the targeted companies' fundamental constitutional rights.  To the contrary, the Act was animated by a patently unconstitutional and political motive to target and retaliate against certain companies based on the State's disapproval of how the companies decide what content to display and make available through their services.

---

[2] Press Release, *Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech* (May 24, 2021) ("May 24, 2021 Gov. DeSantis Press Release"), www.flgov.com/2021/05/24/governor-ron-desantis-signs-bill-to-stop-the-censorship-of-floridians-by-big-tech (last accessed May 26, 2021).
[3] *Id.*

6.     The Act is a frontal assault on the First Amendment and an extraordinary intervention by the government in the free marketplace of ideas that would be unthinkable for traditional media, book sellers, lending libraries, or newsstands.  Could Florida require that the *Miami Herald* publish, or move to the front page, an op-ed or letter to the editor that the State favored, or demand that the *Herald* publish guest editorials in a state-sanctioned sequence?  The answer is obviously no—as the Supreme Court unanimously held five decades ago in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974).  Yet the State now seeks to repeat that history—and to go even further by, for example, compelling the targeted companies to alter and disclose their editorial standards and to provide "detailed" information about the algorithms they use to curate content.

7.     The Act is so rife with fundamental infirmities that it appears to have been enacted without any regard for the Constitution.  The Act imposes a slew of hopelessly vague content-based, speaker-based, and viewpoint-based restrictions on the editorial judgments and affirmative speech of the selected online businesses that it targets.  These include the following unconstitutional provisions (the "Moderation Restrictions"), all of which facially violate the First Amendment:

a.     Through its unprecedented "deplatforming" provision, the Act prohibits targeted online services from terminating or suspending the accounts of

"candidate[s]" for state or local political office.[4]  This ban applies no matter how egregious or illegal the candidate's conduct on a platform is—and regardless of whether that conduct violates the online businesses' terms of use and community standards.  Its prohibition on the use of judgment over the display of content favored by the Legislature is backed by draconian fines of $250,000 per day.[5]

b.    The Act simultaneously bans the use of algorithms to organize, prioritize, or otherwise curate "content and material posted by *or about*" anyone paying the filing fee necessary to qualify as a political candidate.[6]  Under this sweeping moderation restriction, any post that even mentions a candidate is virtually immune from algorithmic moderation.  This provision makes it unlawful for covered online businesses to use their editorial discretion to curate content posted by or about candidates in ways that respond to their users' interests.  It would even prevent them from removing defamatory statements or "deepfake" falsifications of a candidate's words or movements.  One Florida legislator who voted for the Act succinctly describes the issue: "My concern is about potential

---

[4] Act § 2 (adding § 106.072(2)). The Act adopts the preexisting definition of "candidate" under Florida's election laws, *id.* (adding § 106.072(6)), which includes (among other things) "[a] person who files qualification papers and subscribes to a candidate's oath as required by law." F.S. § 106.011(3)(e).  To qualify as a candidate for certain offices, the filing fee is only $25.  F.S. § 99.061(3); *see also* Florida Dep't of State, Elections Div., *2020 State Qualifying Handbook* 17 (2020), files.floridados.gov/media/702970/state-qualifying-handbook-2020-20200408.pdf (last accessed May 26, 2021).

[5] Act § 2 (adding § 106.072(2)).

[6] Act § 4 (adding § 501.2041(2)(h)) (emphasis added).

candidates, about crazy people, Nazis and child molesters and pedophiles who realize they can say anything they want . . . if all they do is fill out those two pieces of paper."[7]

      c.    The Act bans covered online businesses from engaging in a broad range of constitutionally protected moderation activities—not only removing or taking down content, but also editing content and even "post[ing] an addendum to any content" (*i.e.*, engaging in their own affirmative speech)—with respect to the novel and loosely defined concept of a "journalistic enterprise."[8]  The term "journalistic enterprise" reaches far beyond traditional media outlets (sweeping in online propaganda outlets and conspiracy theorists, among others), without affording protections to prevent imposters, foreign agents, or insurrectionists from exploiting these rigid content-based mandates.  And these mandates make no exception for violent, sexually explicit, fraudulent, or otherwise unlawful content.[9]

      d.    The Act establishes a vague and unworkable requirement that covered online businesses, which moderate billions of posts from billions of users

---

[7] Steven Lemongello & Gary Rohrer, *Florida law seeks to rein in large social media companies*, S. Fla. Sun Sentinel (May 24, 2021), www.sun-sentinel.com/news/politics/os-ne-desantis-signs-big-tech-bill-20210524-dvycnrscjjbfnnh7vbs3wimv5q-story.html (last accessed May 26, 2021) (statement of Rep. Fine).

[8] Act § 4 (adding § 501.2041(2)(j)).

[9] *Id.*

around the world every day, apply nearly all content decisions "in a consistent manner"—a term not defined or clarified in any way, but that necessarily requires reference to the underlying content and thus is content-based.[10]  Even if this mandate were sufficiently clear and administrable (which it is not), this is yet another example of the State dictating how online businesses exercise their discretion in organizing and displaying content on their private websites.  Like the provisions discussed above, the chilling effect on speech is amplified by a new private right of action authorizing awards of up to $100,000 in statutory damages per claim and potential "punitive damages."[11]

    e.    The Act compels covered online businesses to allow users to "opt out" of algorithms governing content moderation altogether[12]—again without regard to the egregious, unlawful, or dangerous nature of the content—and requires targeted businesses to publicly disclose and justify their exercise of curatorial judgment, including revealing highly confidential and proprietary methodologies used to moderate content.[13]  The Act further prohibits covered online businesses from changing their editorial policies more than once every 30

---

[10] *Id.* (adding § 501.2041(2)(b)).

[11] *Id.* (adding § 501.2041(6)).

[12] The Act requires covered businesses to allow all users to opt out of the presentation of content that the websites normally offer, and to "allow sequential or chronological posts and content."  *Id.* (adding § 501.2041(2)(f)(2)).

[13] *Id.* (adding § 501.2041(2)(a) & (d), (3), (8)).

days, even in response to changed circumstances, newly discovered threats, or local or national emergencies.[14]

8.     The Act further violates the First Amendment and Equal Protection Clause by (i) targeting only larger digital services and social media companies, while (ii) irrationally exempting Disney and Universal Studios (owned by Comcast Corporation) from its scope, simply because they own well-attended "theme parks" in Florida.[15]   The Act's legislative sponsors acknowledged that they chose this protectionist carveout to ensure that companies with especially large economic footprints in Florida—like Disney—are not "caught up in this."[16]   None of the Moderation Restrictions apply to traditional media or non-digital hosts of third-party material (such as book publishers or businesses that use traditional bulletin boards). Nor do they apply to online businesses that offer the same types of services, but do not meet the arbitrary statutory requirements of having $100 million in annual revenues or 100 million users anywhere in the world and thus qualifying as covered "social media platforms."[17]   None of these arbitrary distinctions are supported by any legislative findings, or anything other than the impermissible desire to punish

---

[14] *Id.* (adding § 501.2041(2)(c)).

[15] *Id.* (adding § 501.2041(1)(g)).

[16] Jim Saunders, *Florida's 'Big Tech' crackdown bill goes to DeSantis, but with a special exemption for Disney*, CL Tampa Bay (Apr. 30, 2021), www.cltampa.com/news-views/florida-news/article/21151908/floridas-big-tech-crackdown-bill-goes-to-desantis-but-with-a-special-exemption-for-disney (last accessed May 26, 2021).

[17] Act § 4 (adding § 501.2041(1)(g)(4)).

specific, disfavored online services.  This underscores that the Act unconstitutionally discriminates against only certain speakers, that it is gravely under- and overinclusive, that it is neither narrowly tailored nor closely drawn, and that it is not justified by any legitimate (much less compelling) governmental interest.

9.    The Act doubles down on its unconstitutional singling out of "social media platforms" (a misleading term that also covers other digital services) by allowing the State Attorney General to create a blacklist of companies (and a broad range of related persons) that may be banned from bidding on or doing business with the State merely because they are *accused* of violating state or federal antitrust laws.[18]  This blacklist applies only to targeted "social media platforms"—not to any other kind of business that may have been accused of violating or found to have actually violated antitrust laws.  The legislative and public record of the Act shows that this punitive provision, like the rest of the Act, was designed to retaliate against the targeted digital companies precisely because of their exercise of core First Amendment free speech rights, including their perceived political viewpoints, their prior exercise of editorial judgment, and their alleged views on particular political candidates and office holders.  The statements about the Act by the Governor of Florida and the law's sponsors confirm that its passage was motivated by retaliatory and discriminatory animus, including their characterizations of Plaintiffs' members

---

[18] Act § 3 (adding § 287.137(2)(a)-(b)).

-11-

as part of "leftist media" that are advancing a supposedly "dominant Silicon Valley ideology."[19]

10.     The Act is also unconstitutionally vague and overbroad.  It fails to define with sufficient definiteness what conduct is punishable.  It sets nebulous standards for enforcement that encourage arbitrary and discriminatory enforcement of the law.  And its astronomical fines and punitive damages for violations of these opaque provisions will inevitably chill constitutionally protected practices and the availability of protected expression.[20]

11.     The Act exceeds the limitations on state authority under federal law by seeking to regulate wholly extraterritorial conduct in ways prohibited by the Constitution's Commerce and Due Process Clauses. First, the Act impermissibly engages in protectionist discrimination *against* online businesses—and at the same time, discrimination *in favor of* major Florida-based businesses and Florida candidates.  Second, the Act regulates large swaths of content-moderation decisions that have no meaningful connection to (and indeed nothing at all to do with) the State of Florida, based on business operations and transactions conducted outside of Florida.

---

[19] May 24, 2021 Gov. DeSantis Press Release.
[20] Act § 2 (adding § 106.072(2)), § 4 (adding § 501.2041(6)).

12.     On top of all these constitutional infirmities, the Act's restrictions on content moderation conflict with Section 230 of the Communications Decency Act, a federal statute enacted with the specific goal of protecting the decisions of online services from state-based regulation and liability.  As Congress intended, Section 230 affords online service providers the freedom to make their own decisions about whether and how to restrict objectionable content.[21]  Because the Act purports to apply "to the extent not inconsistent with federal law," including Section 230, its limitations on content moderation are not only preempted by federal law, but also rendered unenforceable under the Act itself.  And given the vague sweep of the Act and its harsh penalties, its inclusion of a one-line claim that it, in effect, does not do any of the things it otherwise purports to do will not avoid its chilling effect on the moderation of content protected by the U.S. Constitution and federal law.

13.     For all these reasons, and as described further below, Plaintiffs seek (1) an order declaring the Act unconstitutional on its face and (2) a preliminary and permanent injunction enjoining its enforcement.[22]

---

[21] *See* 47 U.S.C. § 230(c)(2), (e)(3).

[22] Plaintiffs separately reserve all rights to challenge the lawfulness of the Act under the Florida Constitution in the state courts of Florida.  This Complaint is limited to claims arising under federal law, and it does not raise issues of state constitutional law.

## Jurisdiction

14.     This Court has jurisdiction over this federal civil rights action under 28 U.S.C. § 1331 because the claims in this action arise under the U.S. Constitution and federal law.  Plaintiffs' claims arise under the First and Fourteenth Amendments, and seek to invalidate certain provisions of the Act based on federal preemption under the Constitution's Supremacy Clause.

15.     This Court has authority to grant relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Civil Rights Act, 28 U.S.C. 1343(a), 42 U.S.C. § 1983.

16.     In addition, this Court has authority to issue injunctive relief under the All Writs Act, 28 U.S.C. § 1651.

17.     This Court's jurisdiction is properly exercised over the Defendants in their official capacities, *Ex parte Young*, 209 U.S. 123 (1908), as Plaintiffs are seeking declaratory and injunctive relief.

18.     There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of Plaintiffs' members to warrant relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202.  The harm to Plaintiffs' members as a direct result of the actions and threatened actions of Defendants is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief.

19.     The restrictive and discriminatory provisions of the Act will become law effective July 1, 2021.  Plaintiffs' members will then become subject to the risk of liability, as described more fully below.

20.     Plaintiffs' members include online businesses, online social media platforms, online marketplaces, and e-commerce businesses and range from well-known online businesses to individual users of e-commerce services.[23]

21.     As private businesses, Plaintiffs' members have the right to decide what content is appropriate for their sites and platforms.   Those decisions are a constitutionally protected form of speech.

22.     Plaintiffs' members are the direct targets of the Act, engage in content-moderation activities that are covered by the Act, and will face serious legal consequences from failing to comply with its requirements.  These members meet the statutory definition of a covered "social media platform" under the Act, because they (i) allow users to post or upload content onto their platforms, (ii) are incorporated legal business entities, (iii) do business in the State of Florida, (iv) meet the Act's revenue or user-based thresholds, and (v) are not exempted under the

---

[23] Members of one or both Plaintiff organizations include Airbnb, Alibaba.com, Amazon.com, AOL, DJI, DRN, eBay, Etsy, Expedia, Facebook, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Nextdoor, Lyft, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, TikTok, Travelocity, TravelTech, Trivago, Turo, Twitter, Verisign, VRBO, Vigilant Solutions, VSBLTY, Waymo, Wing, and Yahoo!. *See* NetChoice, www.netchoice.org/about; & CCIA,  www.ccianet.org/about/members.  Collectively, these members employ tens of thousands of Floridians.

exception for certain operators of theme parks. *See* Act § 4 (adding § 501.2041(1)(g)). Accordingly, the members have standing to challenge the Act.

23. In addition, the Act's Moderation Restrictions compel members to host content or speakers contrary to their policies and community standards, require that they fundamentally change the types of content available on their privately owned platforms, and force them to subject certain of their users and posters to arbitrary and irrational disfavored treatment because of the content- and speaker- based restrictions that the State of Florida has imposed. These requirements will have long-term reputational effects on Plaintiffs' members, which are enduring and thus irreparable. Failure to comply would expose members to severe penalties, including civil and administrative actions by the Attorney General, fines of $250,000 per day by the Florida Elections Commission, as well as private rights of action that include up to $100,000 in statutory damages per claim, "[a]ctual damages," "equitable relief," and potential "punitive damages." *Id.* (adding § 501.2041(6)). That risk casts a serious chilling effect on activity protected by the First Amendment, including both members' content-moderation practices and their own speech concerning user-generated content.

24. Given the Act's inevitable and imminent impact on Plaintiffs' members' ability to engage in their moderation practices consistent with their terms of service and community standards, the Act will harm Plaintiffs' members in

numerous ways, including by (i) interfering with their content judgments on their privately owned sites, (ii) exposing them to potential liability at the hands of the State Attorney General and Florida Elections Commission, (iii) exposing them to potential liability under the new private right of action discussed above, (iv) subjecting them to unlawful compelled disclosure of private, competitively sensitive and proprietary business information, and (v) making it harder for them to provide high-quality services to their users and customers. Specifically, the Act would compel Plaintiffs' members to degrade the services they provide and the content they host on their private platforms: the Act requires members to display and prioritize user-generated content that runs counter to their terms, policies, and business practices; content that will likely offend and repel their users and advertisers; and even content that is unlawful, dangerous to public health and national security, and grossly inappropriate for younger audiences.

25.     In addition, Plaintiffs' members will be required to expend time and substantial resources to change the operations of and redesign their privately owned services and platforms to comply with numerous arbitrary and State-mandated requirements. These include obligations to (i) "[c]ategorize algorithms used for post-prioritization and shadow banning," Act § 4 (adding § 501.2041(2)(f)(1)); (ii) develop processes and procedures to track and manage user opt-outs, *id*. (adding § 501.2041(2)(f)(2)); (iii) "allow a user who has been deplatformed to access or

retrieve all of the user's information, content, material, and data for at least 60 days" after receipt of notice, *id.* (adding § 501.2041(2)(i)); (iv) "[p]rovide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts," *id*. (adding § 501.2041(2)(e)(1)); and (v) "[p]rovide, upon request, a user with the number of other individual platform participants who were provided or shown content or posts," *id.* (adding § 501.2041(2)(e)(2)). And if Plaintiffs' members do not comply with these highly burdensome obligations, they face the imminent threat of massive penalties under an unconstitutional and federally preempted law. Plaintiffs' members will thus suffer an immediate injury or would be threatened by one if the Act were allowed to stand. Plaintiffs anticipate that their members will face enforcement actions, brought by the Attorney General or by private litigants, immediately after the law goes into effect because they are engaging in and intend to continue engaging in moderation activity that is covered by the Act and that the Attorney General would likely allege to be a violation of the Act.

26.     Because the statute so clearly targets, and was specifically intended to target, Plaintiffs' members and their activities, this fear is well-founded and credible. The statements of Governor Ron DeSantis and the law's sponsors demonstrate that Defendants and the State of Florida plan to target Plaintiffs' members in state proceedings to enforce the Act's unconstitutional restraint of their

editorial judgment, content-moderation practices, and First Amendment rights.  For example, Governor DeSantis proclaimed in his May 24 press release that "[i]f Big Tech censors enforce rules inconsistently, to discriminate in favor of the dominant Silicon Valley ideology, they will now be held accountable."[24]  Similarly, on February 2, 2021, Governor DeSantis stated that "if a technology company uses their content- and user-related algorithms to suppress or prioritize the access of any content related to a political candidate or cause on the ballot, that company will also face daily fines," and added that "[t]he message is loud and clear: When it comes to elections in Florida, Big Tech should stay out of it."[25]  Governor DeSantis also declared that Florida was "going to take aim at those companies," which include Plaintiffs' members.[26]

27.     Plaintiffs have associational standing to bring this suit on behalf of their members.  As described above, Plaintiffs' members have standing to challenge the statute.  *See supra* ¶¶ 20-26.  Further, the Act is fundamentally at odds with Plaintiffs' policy objectives, and challenging the Act is germane to Plaintiffs'

---

[24] May 24, 2021 Gov. DeSantis Press Release.

[25] Michael Moline, *Gov. DeSantis pushing to punish 'Big Tech' companies that 'censor' political speech*, Florida Phoenix (Feb. 2, 2021), www.floridaphoenix.com/2021/02/02/gov-desantis-pushing-to-punish-big-tech-companies-that-censor-political-speech-such-as-trump-speech   (last accessed May 26, 2021).

[26] Corbin Barthold & Berin Szóka, *No, Florida Can't Regulate Online Speech*, Lawfare (March 12, 2021) www.lawfareblog.com/no-florida-cant-regulate-online-speech (last accessed May 26, 2021); *see also* Gov. Ron DeSantis, Facebook, www.facebook.com/GovRonDeSantis/posts/3849516841773014 (last accessed May 26, 2021).

respective missions. *See supra* ¶¶ 32-34. The claims and relief sought do not require proof specific to particular members and, in any event, Plaintiffs are able to provide evidence about the Act's impact on the companies they represent. The members' individual participation is thus not required.

28.    This Court's immediate review of the Act's constitutionality is necessary to prevent an imminent infringement of Plaintiffs' members' fundamental constitutional rights.

29.    Under these circumstances, judicial intervention is warranted to resolve a genuine case or controversy within the meaning of Article III of the U.S. Constitution regarding the constitutionality and legality of the Act.

30.    A declaration that the Act is unconstitutional and preempted by federal law would definitively resolve that controversy for the parties.

## **Venue**

31.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)-(2). The Defendants are considered to reside in the Northern District of Florida because this is where they perform their official duties. 28 U.S.C. § 1391(b)(1). Additionally, the Attorney General of Florida, in her official capacity, regularly conducts business and proceedings in her offices in this District, and the events giving rise to Plaintiffs' claims occurred in this District.

## The Parties

### Plaintiffs

32.     Plaintiff NetChoice is a national trade association of online businesses who share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

33.     For over two decades, NetChoice has worked to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses that are making the Internet more accessible and useful.

34.     Plaintiff CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet, information technology, and telecommunications industries.   CCIA is a 501(c)(6) trade association headquartered in Washington, D.C.   For almost fifty years, CCIA has promoted open markets, open systems, and open networks.

### Defendants

35.     Defendant Ashley Brooke Moody is the Attorney General of the State of Florida.  She is the State's chief law enforcement officer and representative of the State in "all suits or prosecutions, civil or criminal or in Empowerment," brought or opposed by the State.  F.S. §§ 16.01, *et. seq*.  In her official capacity, Ms. Moody oversees the Florida Department of Legal Affairs, which is responsible for enforcing

Section 4 of the Act.   Section 4 expressly authorizes the Attorney General to "investigate" a "suspect[ed] violation" of that section of the Act and "to bring a civil or administrative action under this part."   Section 3 instructs the Attorney General to determine whether "there is probable cause that a person has likely violated the underlying antitrust laws," and, if so, to initiate procedures for temporarily placing that person on the Antitrust Violator Vendor List.   Defendant Moody is sued for declaratory and injunctive relief in her official capacity as the Attorney General of the State of Florida.

36.   Defendant Joni Alexis Poitier is a Commissioner of and the Vice Chair of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act.[27]   Section 2 expressly authorizes the Elections Commission to find a violation of subsection (2) of that Section and to assess fines of up to $250,000 per day for "deplatforming" a candidate for statewide office, and of $25,000 per day for "deplatforming" a candidate for any other office.   Ms. Poitier is sued for declaratory and injunctive relief in her official capacity as Florida Elections Commission Commissioner and Vice Chair.

---

[27] The term of service for each of the Commissioners of the Florida Elections Commission has expired.  However, the named individuals are still serving as Commissioners and will continue to do so until Florida's Governor makes new appointments to their positions.

37.     Defendant Jason Todd Allen is a Commissioner of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act.  Mr. Allen is sued for declaratory and injunctive relief in his official capacity as Florida Election Commissions Commissioner.

38.     Defendant John Martin Hayes is a Commissioner of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act. Mr. Hayes is sued for declaratory and injunctive relief in his official capacity as Florida Elections Commission Commissioner.

39.     Defendant Kymberlee Curry Smith is a Commissioner of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act. Ms. Smith is sued for declaratory and injunctive relief in her official capacity as Florida Elections Commission Commissioner.

40.     Defendant Patrick Gillespie is the Deputy Secretary of Business Operations of the Florida Department of Management Services (the "Department").

Under Florida law, the Department is responsible for developing and overseeing the procedures under which the State and its agencies purchase commodities and services.  The Act tasks the Department and the Deputy Secretary with enforcing Section 3 of the Act by, among other things, creating and maintaining the "Antitrust Violator Vendor List."  In February 2021, the Secretary of the Department resigned, and Governor DeSantis has not appointed a replacement.  Accordingly, Deputy Secretary Gillespie is currently responsible for enforcing Section 3 of the Act.

41.     The above-identified Defendants (collectively, the "Defendants") are charged with enforcing the provisions of the Act challenged by this action.  The Defendants have the authority under the Act to investigate, fine, and otherwise penalize Plaintiffs' members for exercising their constitutional rights under the First and Fourteenth Amendments to the U.S. Constitution.

42.     The Defendants are charged to act—and would continue to act if not enjoined—under color of state law.

43.     Plaintiffs sue the Defendants here in their official capacities to prevent imminent violations of the constitutional rights of Plaintiffs' members.

## Plaintiffs' Members Engage In Beneficial Content Moderation That Is Directly Restricted By The Act

44.     Plaintiffs' members operate online services that host and publish an enormous amount and variety of user-generated content, including text, videos, audio clips, and photographs.  The material that is uploaded to these services comes

from all over the world and is unfathomably diverse.   These online services showcase the best of human thought:  material that is endlessly creative, humorous, intellectually stimulating, educational, and politically engaging.   Unfortunately, however, some of the material submitted to these services is none of these things. The openness of the Internet is a magnet for some of the best and worst aspects of humanity, and any online service that allows users to easily upload material will find some of its users attempting to post highly offensive, dangerous, illegal, or simply unwanted content.  This content may be problematic in a variety of ways, including (among other things) featuring hardcore and illegal "revenge" pornography, depictions of child sexual abuse, terrorist propaganda, efforts by foreign adversaries to foment violence and manipulate American elections, efforts to spread white supremacist and anti-Semitic conspiracy theories, misinformation disseminated by bot networks, fraudulent schemes, malicious efforts to spread computer viruses or steal people's personal information, spam, virulent racist or sexist attacks, death threats, attempts to encourage suicide and self-harm, efforts to sell illegal weapons and drugs, pirated material that violates intellectual property rights, and false and defamatory statements.

45.   Without serious and sustained effort by online services to stop, limit, and control such content—and the people or entities who seek to disseminate it—

these services could be flooded with abusive and objectionable material, drowning out the good content and making their services far less enjoyable, useful, and safe.

46.    That is why Plaintiffs' online service members—and nearly every online service that is open to hosting user-generated content—have rules and policies setting out what content and activities are, and are not, permitted on their services.  And it is why those services devote enormous amounts of time, resources, personnel, and effort to engaging in content moderation.  As is clear from the above discussion of their moderation practices, Plaintiffs' members make individualized decisions and do not serve the public indiscriminately.  They are private speech forums operated by private companies that "exercise editorial control over speech and speakers on their properties or platforms." *Manhattan Community Access Corp.*, 139 S. Ct. at 1932.

47.    Content moderation can take many different forms, involving both human review and algorithmic or other automated moderation tools.  Sometimes, content moderation involves removing objectionable or unlawful content or terminating the accounts of users who post such material.  Sometimes it is more nuanced, involving decisions about how to arrange and display content, what content to recommend to users based on their interests, and how easy or difficult it should be to find or search for certain kinds of content.  Content moderation sometimes can take the form of "zoning" or "age-gating," whereby certain content is made

accessible to adults but not minors, or to teenagers but not younger children.  In other instances, content moderation involves empowering users with tools so they can decide for themselves what content to avoid, such as by blocking or muting others, making certain content inaccessible to their children, or opting into special sections of an online service that exclude material likely to offend or upset especially sensitive users.  Content moderation can also involve direct speech by service providers themselves, in the form of warning labels, disclaimers, or commentary appended to certain user-submitted material.  For example, an online service provider might inform users that the relevant content was posted by a hostile foreign government, that it has not been verified by official sources, that the information has been found to be false, or that it contains sensitive or potentially upsetting imagery that is not appropriate for everyone.  It would then be up to the user to decide whether to review the content.  Content moderation is even necessary for the most basic online functions that users may take for granted, like searching for local businesses, movie showtimes, or weather reports.  Without organizing and curating the unfathomable volume of online content, online services would have no way to identify and deliver to users the content that they want—or may critically need—to see.

48.     Content moderation, in these myriad forms, serves many significant functions.  *First*, it is the means by which the online service expresses itself.  Just as

a newspaper or magazine has the freedom to choose a cover story, leave out certain letters to the editor, or ban profanity from its pages, an online service performs the same curation function according to its terms and policies.  At the same time, a service's policies concern more than just what is does or does not publish:  they influence the kind of online community, environment, and atmosphere that users experience.  A website aiming to be family-friendly, for example, cannot produce that experience for its users if it is prevented from limiting or removing graphic or viscerally offensive posts.  Content moderation thus goes to the heart of their editorial judgment, just as it does when a newspaper like the *Miami Herald* decides whether to publish a letter to the editor.

49.    *Second*, moderating content on services open to billions of users, including families and children, is essential to ensure safer communities online.  For instance, restricting access for younger users to adult content is analogous to applying age-based ratings to movies or scheduling mature programming for later hours.   To constrain how the online service can manage offensive content, conspiracy theories, incitements to violence, and other egregious forms of content is to require them, against their will, to offer their virtual tools and space for unintended uses that endanger the public.

50.    *Third*, aside from public safety, State-mandated controls on how platforms must permit, organize, and present content also renders an online service

less useful and undermines Plaintiffs' members' core business models. Imagine if a search engine or social media company returned its results in a random or purely chronological order instead of prioritizing what is most helpful or relevant to the user based on her own activities and demonstrated preferences. As a result, the user might miss content from her close friends and family and instead see a slew of more recent, but less *relevant* content. Or imagine if an e-commerce website presented a random assortment of products or listings instead of those for which the user is searching. The main value many online services offer is curating, sorting, and displaying the vast amount of information available online.

51. Florida's Act directly targets—and would profoundly disrupt—these vital, and constitutionally protected, content moderation efforts. As discussed below, the Act's expansive restrictions constrain and burden nearly every type of content moderation activity that is critical to online services' ability to express their editorial judgments; protect users from offensive, harmful or dangerous material; and provide useful online tools on which billions of people rely every day. The Act applies not merely to decisions removing content or users from a service. It equally covers—in some instances outright prohibits—more fine-grained approaches, such as limiting the exposure of younger or more sensitive users to potentially upsetting content. The Act goes so far as to control how the services can use automated processes like algorithms to arrange and curate content, and it seeks to limit these

services' own direct speech by prohibiting them from posting warning labels or commentary.  In short, the Act subjects nearly every content-moderation judgment a covered service might make to the State's regulatory control, saddling those judgments with burdensome new obligations, restrictions, and the ever-present threat of government or private enforcement action.  The Act thus threatens not just the types of experience and community those services can offer, but also how they fundamentally operate.

### Florida's Unconstitutional Act

52.     The Act was enacted by the Florida Legislature on May 2, 2021, signed into law by Governor DeSantis on May 24, 2021, and goes into effect on July 1, 2021.  Act § 7.

53.     The Act's legislative history, as well as public statements by state legislators and public officials, make clear that the Act was motivated by animus toward popular technology companies—animus specifically driven by disapproval of the companies' perceived political and other viewpoints.  *See supra* ¶¶ 3-4.  One of the Act's sponsors declared during the signing ceremony, "[D]o not think a handful of kids behind a desk in Silicon Valley get to be the arbiter of what free speech is … it's about time someone took them head on."[28]  Lieutenant Governor

---

[28] *Governor Ron DeSantis press conference in Miami*, YouTube (May 24, 2021), www.youtube.com/watch?v=O67BF-2IWiY, at 18:08 (last accessed May 26, 2021) (statement of Rep. Ingoglia).

Jeanette Nuñez agreed, condemning what she characterized as "an effort to silence, intimidate, and wipe out dissenting voices by the leftist media and big corporations."[29]  And Governor DeSantis praised the Act as a way to "tak[e] back the virtual public square" from "the leftist media and big corporations."[30]

54.     This animus toward disfavored online businesses is well documented in the public record.  When discussing the proposed legislation in February 2021, Governor DeSantis described online businesses targeted by the Act as "big brother," because of his stated view that these companies are "tougher on those on the political right than left."[31]  Speaker of the Florida House of Representatives, Chris Sprowls, has expressed similar sentiments.[32]

i.     "Social Media Platforms"

55.     The Act targets various online businesses (including operators of social media platforms, search engines, and online marketplaces) that the Florida Legislature sweeps under the misleading term, "social media platforms."

56.     Consistent with the legislative history described above, the Act was drafted to target popular technology companies, while carving out Florida-based

---

[29] May 24, 2021 Gov. DeSantis Press Release.

[30] *Id.*

[31] John Kennedy, *Gov. DeSantis says 'big tech' looks like 'big brother'*, Sarasota Herald-Tribune (Feb. 2, 2021), www.heraldtribune.com/story/news/politics/2021/02/02/ron-desantis-backing-effort-stop-tech-censorship/4352705001 (last accessed May 26, 2021).

[32] May 24, 2021 Gov. DeSantis Press Release.

Disney and Universal Studios.  To single out these targeted companies, the Act applies its Moderation Restrictions, onerous affirmative obligations, and antitrust blacklist *only* to the defined "social media platforms."  And the Act limits these covered online businesses to those that host third-party content and have either (i) "annual gross revenues in excess of $100 million, as adjusted in January of each odd-numbered year to reflect any increase in the Consumer Price Index" or (ii) "at least 100 million monthly individual platform participants globally"—subject to an arbitrary exception (*see infra* ¶ 57) for powerful and influential Florida-based businesses.  Act § 4 (adding § 501.2041(1)(g)).  Nothing in the Act, including the legislative findings, explains how or why the perceived problems that the statute supposedly addresses is limited to these entities.

57.    For openly protectionist reasons, the Act excludes companies that are politically influential in Florida from its definition of "social media platform," even when those companies operate online services that would otherwise meet the statutory definition.  The Act carves out companies that own and operate well-attended theme parks—an exemption that conveniently covers Disney and Universal Studios (owned by Comcast Corporation).[33]   No legitimate government interest

---

[33] Under the law, "social media platform" does not include any "information service, system, Internet search engine, or access software provider operated by a company that owns and operates a theme park or entertainment complex as defined in s. 509.013."  Act § 4 (adding § 501.2041(1)(g)).

could be advanced by such an exemption, nor was any such interest identified. Rather, as one of the law's sponsors remarked, the exemption was added with the undisguised objective of ensuring that certain companies with big economic footprints in Florida—like Disney—are not "caught up in this."[34]  The decision to exempt those major companies confirms that the law's true objective is to control the private speech of politically disfavored companies who have online platforms, but not to control the speech of similarly situated but politically favored companies with power and influence in the State of Florida.

58.    As explained above (*see supra* ¶¶ 20-22 & n.23), several of Plaintiffs' members fall within the statutory definition of "social media platform," and do not "own and operate a theme park or entertainment complex."

59.    The Act infringes on the rights of Plaintiffs' members in numerous ways.  Key provisions of the Act are summarized below.

## ii.    Ban on Restricting Postings by Candidates (Section 2)

60.    Section 2 of the Act prohibits any "social media platform" from "willfully deplatforming a candidate for office who is known by the social media platform to be a candidate, beginning on the date of qualification and ending on the

---

[34] Jim Saunders, *Florida's 'Big Tech' crackdown bill goes to DeSantis, but with a special exemption for Disney*, CL Tampa Bay (Apr. 30, 2021), www.cltampa.com/news-views/florida-news/article/21151908/floridas-big-tech-crackdown-bill-goes-to-desantis-but-with-a-special-exemption-for-disney (last accessed May 26, 2021).

date of the election or the date the candidate ceases to be a candidate." Act § 2 (adding § 106.072(2)). Section 2 further requires covered online businesses to "provide each user a method by which the user may be identified as a qualified candidate and which provides sufficient information to allow the platform to confirm the user's qualifications." *Id.*

61. Under the Act, "deplatform" is broadly defined to mean the "action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days." Act § 4 (adding § 501.2041(1)(c)); *cf.* Act § 2 (adding § 106.072(1)(b)).

62. The Act inexplicably contains exemptions that allow online businesses to favor *paid* content by third parties or candidates over *unpaid* content—seemingly in violation of the "post-prioritization" and "shadow banning" prohibitions. Act § 4 (adding § 501.2041(1)(e)-(f), (2)(d)).

63. The Florida Elections Commission is vested with jurisdiction to determine whether Section 2 has been violated, and to impose fines as high as $250,000 per day for violations involving candidates for statewide office (and $25,000 per day for candidates for other offices). Act § 2 (adding § 106.072(3)).

64. The Act provides that Section 2 may not be enforced if it is inconsistent with federal law or 47 U.S.C. 230(e)(3). *Id.* (adding § 106.072(5)). Section 2 is

inconsistent with the First and Fourteenth Amendments of the U.S. Constitution, and other federal law, for the reasons explained below.

### iii.    Additional Moderation Restrictions (Section 4)

65.    Section 4 of the Act is a frontal attack on the constitutional rights of Plaintiffs' members to make editorial judgments about speech hosted on their property.   It directly restricts and burdens the content moderation judgments of covered online businesses.  In particular, Section 4 enacts restrictions that effectively ban most, if not all, moderation of content posted "by or about" political candidates. And it severely restricts and burdens moderation practices with respect to postings or content from a loosely defined category of "journalistic enterprises." These provisions compel a disfavored group of private businesses to host—and dramatically limit their ability to restrict, decide how to display, or even offer their own commentary on—highly objectionable or even illegal content, such as sexually explicit material, user posts that incite or glorify violence and acts of terrorism, online harassment and bullying, anti-Semitic and racist hate speech, defamation, and misinformation (such as hoaxes involving public health issues).

66.    Section 4 also imposes on covered online businesses a broad, but wholly undefined, mandate to apply any possible editorial judgments they might make about the virtually unlimited amount of content they host "in a consistent manner among [their] users"—an obligation that is all but impossible to understand,

much less comply with. And Section 4 imposes onerous notice and other affirmative requirements regarding the editorial judgments made by these businesses. The notice requirements are particularly burdensome and problematic because by prescribing specific disclosures about the reason for the removal of virtually any category of content, covered online businesses would be providing a host of bad-faith actors (from terrorists to hostile foreign governments and spammers) a roadmap for how to post unwanted, harmful content by circumventing the protections currently in place.

67. In sum, Section 4 impermissibly subordinates covered businesses' judgments about what content to display on their services and in what manner to the State's fiat. This is the modern-day equivalent of the unconstitutional attempt to force the *Miami Herald* to publish a letter affording a "right of reply," which the Supreme Court soundly rejected in *Tornillo*. And it is eerily reminiscent of efforts by authoritarian regimes around the world to control private online services and force them to conform to a state-approved message. As just one example, Human Rights Watch has noted Russia's enactment of "increasingly oppressive" laws targeting social media platforms that "forc[e] them" to alter their moderation practices concerning "online content deemed illegal by the government."[35] A

---

[35] *See Russia: Social Media Pressured to Censor Posts*, Human Rights Watch (Feb. 5, 2021), www.hrw.org/news/2021/02/05/russia-social-media-pressured-censor-posts (last accessed May

Russian bill currently under consideration "proposes fines for social media companies that 'illegally block users,'" and "aims to prevent the potential blocking of Russian politicians' social media profiles."[36]

68.    Section 4 specifically delineates a list of "[u]nlawful acts and practices by social media platforms," Act § 4 (adding § 501.2041), all of which seek to deprive covered online businesses of their editorial discretion and replace it with state-compelled speech by prohibiting numerous activities protected by the First Amendment.  For example:

a.    Covered online businesses must not edit the content of a "journalistic enterprise," "post an addendum to" any content of such an enterprise, or "deplatform" the enterprise based on "the content of its publication or broadcast." *Id*. (adding § 501.2041(2)(j), (1)(b)).[37]   A "journalistic enterprise" is broadly

---

26, 2021).  For instance, one recently enacted law "empower[s] the authorities to block websites" that restrict access to "Russian state media content."  *Id*.

[36] *Id.*; *see also* Adam Satariano & Oleg Matsnev, *Russia Raises Heat on Twitter, Google and Facebook in Online Crackdown*, N.Y. Times (May 26, 2021), www.nytimes.com/2021/05/26/technology/russia-twitter-google-facebook-censorship.html (last accessed May 26, 2021).

[37] While "censorship" is traditionally used to refer to the actions of government officials to limit free expression, the Act uses the misleading scare-terms "censorship" and "shadow banning" to cover routine moderation practices, such as editing objectionable content.  *See* Act § 4 (adding § 501.2041(1)(b) (defining "censor" as "any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user.  The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform."); *see also id.* (adding § 501.2041(1)(f)) (defining "shadow ban" as "action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform.").  Under these definitions, a decision that sexually

defined as "an entity doing business in Florida" that (1) publishes more than 100,000 words online and has at least 50,000 paid subscribers or 100,000 monthly active users; (2) publishes online at least 100 hours of audio or video and has at least 100 million viewers annually; (3) "operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable television subscribers"; *or* (4) "[o]perates under a broadcast license issued by the Federal Communications Commission." *Id.* (adding § 501.2041(1)(d)).  This sweeping definition would shield many outlets that publish foreign propaganda and conspiracy theories.

b.     Covered online businesses must not use any algorithms to curate and arrange "content and material posted by or about" a candidate. *Id.* (adding § 501.2041(2)(h)) (characterizing actions as "post-prioritization" and "shadow banning").

c.     Covered online businesses must not edit a user's content or "deplatform" the user, unless the social media platform gives the user detailed written notice, including "a thorough rationale" justifying such actions, a "precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms

---

explicit or violent content should be restricted to users above the age of 18 would potentially constitute forbidden "shadow banning."

used, if any, to identify or flag the user's content or material as objectionable." *Id*. (adding § 501.2041(2)(d), (3)) (characterizing actions as "censoring" and "shadow banning"). This obligation to thoroughly justify content decisions applies even if the online business takes action to protect its users from highly objectionable material posted by terrorist groups or hostile foreign governments.

      d.    Covered online businesses must not use algorithms that arrange content other than in chronological order if the user has opted out of such algorithms under the mandatory opt-out provision. *Id*. (adding § 501.2041(2)(f)(2)).

      e.    Covered online businesses must not change editorial policies more than once every 30 days, even if responding to new and changed circumstances and threats. *Id*. (adding § 501.2041(2)(c)).

    69.    Section 4 also includes the vague mandate that these censorship, deplatforming, and shadow banning standards be implemented in a "consistent manner" among users on the platform. Act § 4 (adding § 501.2041(2)(b)). This subjective standard is not defined in the Act and may serve as the basis for a private cause of action by users with statutory damages of $100,000 per day, actual damages, and "punitive" damages. *Id*. (adding § 501.2041(6)). The Act also includes the vague requirement that covered websites must "[c]ategorize algorithms used for post-prioritization and shadow banning." *Id*. (adding § 501.2041(2)(f)(1)).

Similarly vague is the requirement that covered online businesses "inform" a candidate if they have "willfully provide[d] free advertising for" the candidate, in which case the Act treats this "free advertising" (an undefined concept) as an "in-kind contribution" for purposes of Florida's election laws.   Act § 2 (adding § 106.072(4)).[38]

70.   In addition, the Act places numerous affirmative burdens on covered online businesses to:

a.   "inform each user about any changes to its user rules, terms, and agreements before implementing the changes" (in addition to the ban on changes more frequent than once a month).  *Id*. (adding § 501.2041(2)(c)).

b.   "provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning and reoffer annually the opt-out opportunity in subparagraph (f)2."  *Id*. (adding § 501.2041(2)(g)).

c.   "allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after the user receives the notice required under subparagraph (d)1."   *Id*. (adding § 501.2041(2)(i)).

---

[38] The Act merely states that certain things will *not* be deemed free advertising, without specifying what *will* be considered to fall within that category.  *See id.* ("Posts, content, material, and comments by candidates which are shown on the platform in the same or similar way as other users' posts, content, material, and comments are not considered free advertising.").

     d.     "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." *Id*. (adding § 501.2041(2)(a)).

     e.     "provide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts." *Id*. (adding § 501.2041(2)(e)(1)).

     f.     "[p]rovide, upon request, a user with the number of other individual platform participants who were provided or shown content or posts." *Id*. (adding § 501.2041(2)(e)(2)).

71.     A covered online business that fails to comply with Section 4 is deemed to have committed "an unfair or deceptive act or practice as specified in [§] 501.204," and is subject to an investigation by the Department of Legal Affairs and civil or administrative enforcement action. *Id*. (adding § 501.2041(5)). The Act also empowers the State to use its subpoena power to intrusively investigate the highly confidential and competitively sensitive methodologies online companies use to exercise their content judgment. *Id*. (adding § 501.2041(8)). Finally, the Act creates a private right of action against any platform that (i) applies its "censorship, deplatforming, and shadow standards in an [in]consistent way," or that (ii) "censor[s] or shadow ban[s] a user's content or material" without giving written notice of its reasons for doing so. *Id*. (adding § 501.2041(6)).

iv.   **Antitrust Blacklist (Section 3)**

72.    Section 3 of the Act creates a new statutory provision, F.S. § 287.137, that imposes state contracting restrictions for covered online businesses that are alleged to have violated antitrust laws and placed on a newly established "Antitrust Violator Vendor List."  Act § 3 (adding § 287.137(2)(a)-(b)).  The targeted "social media platforms" are the *only* businesses that may be placed on the antitrust vendor list.  *Id*. (adding § 287.137(1)(b), (1)(f)).   Again, other large businesses—including the favored theme-park owners—are exempted.

73.    Section 3 is another example of the Act's irrational targeting of a select, disfavored group of online businesses.   Although federal antitrust laws—and Florida's counterpart statutes—apply across different industries, Section 3 irrationally singles out only the defined "social media platforms" for disfavored treatment because of their role in hosting and moderating online content.   *Id*. Section 3 establishes an "Antitrust Violator Vendor List" of companies and individuals subject to an absolute contracting bar with the State of Florida.   *Id*. (adding § 287.137(3)(b)).  These persons and affiliates are also prohibited from receiving "economic incentives" such as "state grants, cash grants, tax exemptions, tax refunds, tax credits, state funds, and other state incentives" under Florida law. *Id.* (adding § 287.137(5)).

74.   The Antitrust Violator Vendor List may include those merely "*accused of*" violations by the Florida "Attorney General," "a state attorney," or federal authorities (subject to a cumbersome and inadequate process for contesting the Attorney General's decision before a state administrative law judge).   The Act empowers the Florida Attorney General to place an accused company "temporarily" on the Antitrust Violator Vendor List upon a finding of mere "probable cause that a person has likely violated the underlying antitrust laws."   *Id*. (adding § 287.137(3)(d)(1)).   The absolute state contracting bar extends to an ill-defined group of officers, directors, shareholders, and even employees involved in "management" of a company placed on the List, as well as a broad group of "affiliates" of companies that are permanently placed on the List.   *Id*. (adding § 287.137(1)(a), (f)-(g)).

*          *          *

75.   The Act is a smorgasbord of constitutional violations.   Sections 2, 3, and 4—specifically, those provisions adding F.S. §§ 106.072, 287.137 and 510.2041(2)(a)-(j)—violate the First Amendment, due process, and equal protection principles, and run afoul of the Commerce Clause and Supremacy Clause.

**COUNT I**
**(42 U.S.C. § 1983)**
**Violation of Free Speech and Free Press Rights Under the First and**
**Fourteenth Amendments to the Constitution of the United States**
<u>**(Challenge to Sections 2, 3, and 4 of the Act)**</u>
<u>**(As to All Defendants)**</u>

76.    Plaintiffs incorporate by reference paragraphs 1 to 75 above as if fully

and separately set forth herein.

77.    Sections 2 and 4 of the Act—specifically, those sections adding F.S.

§§ 106.072 and 510.2041(2)(a)-(j)—violate the First and Fourteenth Amendments.

As discussed above, in numerous, interrelated ways, all of the Moderation

Restrictions, as well as the affirmative obligations discussed above,[39] impose

content-based, viewpoint-based, and speaker-based restrictions and burdens on

covered online businesses' speech rights and editorial judgment entitled to full First

---

[39] This includes the requirements to (i) "inform" a candidate if the covered online business "willfully provide[d] free advertising for" the candidate, Act § 2 (adding § 106.072(4)); (ii) provide users with a "a thorough rationale explaining the reason" for a covered online business' moderation decision, including a "precise and thorough explanation of how the [business] became aware of the … content or material" and "a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable," Act § 4 (adding § 501.2041(3)); (iii) "inform each user about any changes to its user rules, terms, and agreements before implementing the changes," *id*. (adding § 501.2041(2)(c)); (iv) "provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning and reoffer annually [an] opt-out opportunity," *id*. (adding § 501.2041(2)(g)); (v) "allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after the user receives the [mandated] notice," *id*. (adding § 501.2041(2)(i)); (vi) "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban," *id*. (adding § 501.2041(2)(a)); (vii) "[p]rovide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts," *id*. (adding § 501.2041(2)(e)(1)); and (viii) "[p]rovide, upon request, a user with the number of other individual platform participants who were provided or shown content or posts," *id*. (adding § 501.2041(2)(e)(2)).

-44-

Amendment protection. These provisions also unconstitutionally compel covered online businesses to speak in ways that significantly burden and chill their constitutionally protected content judgments and speech. In addition, the provisions lack the scienter requirements that the First Amendment demands, effectively imposing a set of strict-liability speech bans and mandates. Separately and collectively, these provisions single out the covered online businesses for disfavored treatment. Because Sections 2 and 4 restrict speech based on its content and based on its speaker, they are subject to strict scrutiny and are presumptively unconstitutional. Further, the Act authorizes the State to engage in highly intrusive investigations of content moderation processes and judgments, separately burdening speech. Because the State has no legitimate (much less compelling) governmental interest that supports these provisions, and because none of the provisions are narrowly tailored, they do not survive strict scrutiny. Indeed, they would fail under any standard of review.

78.    Plaintiffs' members include online businesses subject to the Act. They are private companies that have the right to choose what content they host on their platforms and how to arrange, display, organize, and curate such content, irrespective of the platforms' popularity. The operative provisions of Sections 2 and 4 of the Act violate those rights.

79.    Government action that compels speech by forcing a private social media platform to carry content that is against its policies or preferences violates the First Amendment.

80.    The First Amendment is not limited to traditional forms of media and expression, but applies with equal force to modern media, technology, and communications.  Online businesses that make editorial decisions regarding what content to publish, including content created or posted by third parties, engage in speech that is fully protected by the First Amendment.  *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997).

81.    In addition to prohibiting the government from directly restricting speech, the First Amendment prohibits the government from *compelling* a person or business to communicate a message (including host a third party's message).  In other words, it "prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Inst. Rights*, 547 U.S. 47, 61 (2006).  A State may not require an online or other business to host or promote another's speech unless it meets the extraordinarily demanding standard of "strict scrutiny."  *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988).

82.    A compelled-speech edict is presumptively invalid unless the State can show that its regulation is necessary to advance a "compelling" governmental interest, is narrowly tailored to serve that interest, and is the least restrictive means

available for establishing that interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *United States v. Playboy Entm't Grp*., 529 U.S. 803, 813 (2000). Unless a State can satisfy this extremely demanding standard, it may not interfere with a private company's choices about what to say or not to say, and what content to distribute or not to distribute. *See, e.g., Tornillo*, 418 U.S. at 258. These settled principles apply with full force to protect the rights of online businesses, including "social media platforms" as defined in the Act.

83.    Laws that regulate speech (1) based on its content *or* (2) based on the identity of the speaker are presumptively unconstitutional under the First Amendment. *Reed*, 576 U.S. at 163, 170. Moreover, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

84.    Further, where, as here, a regulation elevates certain speakers over others and disfavors the latter, it "suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively

unconstitutional." *Minneapolis Star & Tribune Co.*, 460 U.S. 575, 585, 592–93 (1983); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987).

85.    Content-based, viewpoint-based, and speaker-based discrimination can be discerned from both the text of the statute and evidence of the State's purposes in enacting the statute. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–65 (2011). Thus, where, as here (*see supra* ¶¶ 3-4, 53), a statute is animated by a desire to target selected speakers for disfavored treatment, and especially where the motive is to punish or retaliate against private parties for their perceived political or ideological viewpoints, evidence of that improper motive can further confirm that the statute amounts to impermissible speech regulation. *Sorrell*, 564 U.S. at 564–65.

86.    First Amendment rights "'are protected not only against heavy-handed frontal attack, but also from . . . more subtle governmental interference.'" *Gibson v. Fla. Legislative Investigation Comm.*, 372 U.S. 539, 544 (1963) (citation omitted). Thus, a requirement that a company publish and disclose the rationale, processes, data, or methods concerning its editorial decisions runs afoul of the First Amendment. *United States v. Rumely*, 345 U.S. 41, 57 (1953) (Douglas, J., joined by Black, J., concurring). "It is the presence of compulsion from the state itself that compromises the First Amendment," which "extends 'not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid.'" *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019)

(quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995)).

87.     These principles—both collectively and individually—establish that Sections 2 and 4 of the Act violate the First Amendment.

88.     Sections 2 and 4 force covered online businesses to host content they otherwise would not allow under their policies and standards, or do not wish to feature, organize, display, or prioritize in the way that the Act mandates.  No one, not even someone who has paid a filing fee to run for office, has a First Amendment right to compel a private actor to carry speech on their private property. On the contrary, the online businesses subject to the Act (including Plaintiffs' members) have a First Amendment right to free speech—and may therefore decide whom they will and will not host and with which speakers and speech they wish to associate (or not associate).

89.     Sections 2 and 4 also limit and burden the exercise of covered online business' judgments about the display of content in myriad ways—including, but not limited to, by restricting their ability to (i) edit, remove, organize, de-prioritize, or prioritize certain third-party content or postings, (ii) to add commentary on or advisories or warnings to accompany such content or postings (e.g., flagging unverified factual claims), or (iii) curate or filter content so it is appropriate for certain audiences (e.g., restricting access to adult content based on parental settings).

90.    Sections 2 and 4 also unconstitutionally restrict, burden, compel, and otherwise regulate speech based on its content.  These sections reflect legislative preferences for certain types of content (*i.e.*, postings by or about political candidates and by certain "journalistic enterprises," as well as paid versus unpaid content).  This triggers strict scrutiny.

91.    The Act is also motivated by a viewpoint-based attack on the "social media platforms" it targets.  As the Act's champions trumpeted when the bill was signed into law, the core goal of the Act was to punish the targeted companies specifically because the Legislature and Governor dislike the perceived political and ideological viewpoints that those private businesses supposedly express through their content judgments.   This is the essence of impermissible viewpoint-discrimination, and it violates the First Amendment.

92.    Strict scrutiny also applies on the independent ground that the Act engages in speaker-based discrimination and targets a discrete category of speakers for disfavored treatment.  The speech restrictions and compelled-speech requirements under Sections 2 and 4 apply only to covered online businesses that qualify as "social media platforms," but do *not* apply to (a) non-digital hosts of third-party content with large audiences (such as certain book publishers or hosts of traditional bulletin boards); (b) online businesses that provide the same types of services but do not meet the arbitrary thresholds to qualify as a "social media

platform" under the Act; and (c) any business that would otherwise be subject to the Act except that it also happens to own and operate a large "theme park or entertainment complex" (defined to include Disney and Universal Studios). This speaker-based discrimination is also evidenced by the legislative history and public record discussed above.

93.    By forcing covered online businesses to prioritize postings by or about candidates and content from the loosely defined category of "journalistic enterprises," the Act further exacerbates the speaker-based discrimination, including in an area (political speech) where the covered online businesses' First Amendment protections are strongest.

94.    The Act compounds these First Amendment violations by authorizing the State to conduct highly intrusive investigations into how the targeted companies organize and select content for inclusion on their private platforms, which separately burdens First Amendment rights.

95.    For each of these independent reasons, Sections 2 and 4 are presumptively unconstitutional, and the State bears the burden of establishing that these requirements satisfy strict scrutiny.

96.    Section 3—which adds F.S. § 287.137—also violates the First and Fourteenth Amendments. As discussed above, that section singles out certain speakers and online media businesses—covered "social media platforms"—for

discriminatory treatment, including prohibiting covered entities from contracting with the State and from receiving tax breaks, refunds, and other economic incentives. And the Act's irrational exceptions for favored entities show that "the State has left unburdened" other, favored speakers, in violation of the First Amendment. *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quoting *Sorrell*, 564 U.S. at 580). For each of those reasons, Section 3 is presumptively unconstitutional and subject to strict scrutiny.

97. Additionally, as discussed above, Section 3 burdens "affiliates" of companies placed on an antitrust blacklist, where "affiliates" is defined to include any entities controlled by agents who are active in the management of the blacklisted company. If a company is blacklisted, its affiliates are subject to blacklisting as well, and a showing that the entity is an affiliate "constitutes a prima facie case" that blacklisting is warranted for the affiliate. An affiliate on the list may not bid on or be awarded any work under a public contract, or transact business with the State, and it may be ineligible for economic incentives. Section 3's use of guilt by association violates the First Amendment rights of Plaintiffs, as well as their affiliates. It is not an "appropriate requirement" for the State to require disaffiliation in order to access public contracting and benefits.

98. The State of Florida's decision to subject "social media platforms" (as defined in the Act) to "differential treatment, unless justified by some special

-52-

characteristic of [their services], suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Minneapolis Star*, 460 U.S. at 585.  Section 3's imposition of non-generally applicable burdens on "social media platforms," including Plaintiffs' members, is not justified by any special characteristic of their services, and therefore triggers strict scrutiny.

99.     Sections 2, 3, and 4 do not meet the requisite standard of strict scrutiny (and would fail any standard of constitutional review).

100.   First, the State cannot show that there is any real problem in need of solving and that these statutory provisions further a "compelling" governmental interest (or even any legitimate governmental interest).

101.   Second, the State cannot show that Sections 2, 3, and 4 are narrowly tailored to meet the State's asserted interest.  To the contrary, these provisions are both over- and underinclusive in numerous respects.  *See supra* ¶¶ 56-57.  Among other fatal defects, they arbitrarily and punitively target speech by some companies with larger platforms, but not other companies that the Legislature favors.

102.   Additionally, Section 4 of the Act regulates the speech of covered online businesses without the necessary scienter protections required by the First Amendment.  For example, while the Act broadly prohibits covered businesses from "deplatforming," "censoring," or "shadow banning" a "journalistic enterprise," there

is no requirement that the business know (or have reason to know) that the content at issue was posted by such an enterprise.  Thus, a covered business that removes or posts an addendum to a video (even one posted by a propaganda outlet) could be held strictly liable and subject to severe penalties if it turns out that, unbeknownst to the provider, the video was posted by an entity deemed to be a "journalistic enterprise."  The chilling effect of the lack of a scienter requirement is exacerbated by the breadth and vagueness of the Act's terms.

103.   The same is true of the Act's notice provisions, which apply only where actions are taken with respect to a poster or content provider "who resides in or is domiciled in Florida."  There is no requirement that the covered online business know, or have reason to know, where that person actually lives.  Nor is this residency information something that many covered online businesses should be expected to have.  As a result, a covered business that takes moderation actions concerning an account could face strict liability if it turns out that, unbeknownst to the business, the person happens to live in Florida.  The First Amendment forbids such strict-liability speech regulations.

104.   Unless they are enjoined, Sections 2, 3, and 4 will operate to unlawfully deprive Plaintiffs' members of their fundamental First Amendment rights, including the chilling of Plaintiffs', their members', and their affiliates' exercise of associational freedoms.

## COUNT II
## (42 U.S.C. § 1983)
## Violation of Due Process Rights Under the Fifth and Fourteenth Amendments to the Constitution of the United States
## <u>(Challenge to Sections 2 and 4 of the Act)</u>
## <u>(As to the Commissioners of the Florida Elections Commission</u>
## <u>and the Florida Attorney General)</u>

105.   Plaintiffs incorporate by reference paragraphs 1 to  75 above as if fully and separately set forth herein.

106.   The U.S. Constitution guarantees all persons the right to due process. U.S. Const. amend. V.  The Fifth Amendment's guarantee of due process applies to state governments through the Fourteenth Amendment.  U.S. Const. amend. XIV.

107.   The Act violates due process because it fails to provide fair warning of what conduct is being regulated.  *FCC v.  Fox Television Stations, Inc.*, 567 U.S. 239 (2012).  A law is unconstitutionally vague when people "of common intelligence must necessarily guess at its meaning," *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926), or where the law lacks definite and explicit standards thereby encouraging "arbitrary and discriminatory" application, *Kolender v. Lawson*, 461 U.S. 352 (1983).

108.   These concerns are especially acute where, as here, the Act both regulates the content of speech and permits state enforcement actions.  *See Reno*, 521 U.S. at 871.

109.   Various provisions of the Act, including Sections 2 and 4, regulate speech in vague terms that do not give businesses subject to the Act reasonable and fair notice of the conduct that is expected of them and the conduct that may be subject to penalties.   The Act is also riddled with such vague terms that it invites arbitrary and discriminatory enforcement, including the arbitrary imposition of draconian civil penalties.   These infirmities include, but are not limited to, the following:

a.   The Act establishes an undefined requirement that a social media platform engage in content moderation "in a consistent manner among its users on the platform."  Act § 4 (adding § 501.2041(2)(b)).  In addition to facing "civil or administrative action" by the Florida Attorney General for an alleged violation of this provision, the Act provides a private cause of action for violations of this requirement, with statutory damages of $100,000 per claim and potential punitive damages.  *Id*. (adding § 501.2041(6)(a)).

b.   The Act prohibits "censoring," "deplatforming," or "shadow banning" of "a journalistic enterprise," but employs a vague and amorphous definition to describe what entities qualify as a "journalistic enterprise."  *Id*. (adding § 501.2041(2)(j), (1)(d)).   This vagueness places covered online businesses in the impossible position of having to conduct extensive and costly investigations to determine whether the State might consider a poster to be a

"journalistic enterprise"—all without any clear understanding of what that definition actually covers.

      c.    The Act requires covered online businesses to "inform" a candidate if they have "willfully provide[d] free advertising for" the candidate, in which case the Act treats this "free advertising" as an "in-kind contribution" for purposes of Florida's election laws.  Act § 2 (adding § 106.072(4)).  But, other than a confusing definition of what does *not* count as "free advertising," *id.*, the Act provides no guidance as to what will fall within that vague category triggering election-law compliance requirements.[40]

      d.    The Act prohibits applying or using any "post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a candidate." *Id.* (adding § 501.2041(2)(h)).  The definition of "post-prioritization" covers any "action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results."  It is impossible to understand what this provision allows and does not allow.  Read according to its terms, the provision

---

[40] If the Florida Elections Commission construed the Act to govern candidates for *federal* office, *see* Act § 2 (adding § 106.072(6), adopting the definition of "candidate" in F.S. § 106.011(3)(e)), that would raise additional federal preemption concerns given the comprehensive regulation of in-kind contributions involving such candidates under the Federal Election Campaign Act.  *See* 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. § 109.20(a); *see also Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 516 (1992).

would suggest that a search engine is forbidden from placing content "by or about" a political candidate (whether or not it is defamatory or otherwise illegal or objectionable) ahead of—or below—any other content.  It forbids placing such content in a more prominent position—or a less prominent position—than other content.  Due process does not allow the State to enforce such a paradoxical, self-defeating, and incomprehensible prohibition.

110.   Because covered businesses lack fair notice about what conduct is allowed and what is prohibited—subject to exposure to potentially massive penalties, including fines of $250,000 per day—these provisions of the Act violate basic principles of due process.  *Id*. (adding § 106.072(3)).

111.   Vagueness is also rife in other aspects of the Act, including its key definitions of concepts such as "shadow banning," "deplatforming," and "censoring."  Because these are the operative provisions under Sections 2 and 4, they render the entirety of those Sections void for vagueness under due process protections.

112.  Unless it is enjoined, the Act will operate to unlawfully deprive Plaintiffs' members of their fundamental due process rights.

**COUNT III**
**(42 U.S.C. § 1983)**
**Violation of Equal Protection Rights Under the Fourteenth**
**Amendment to the Constitution of the United States**
**(Challenge to Sections 2, 3, and 4 of the Act)**
**(As to All Defendants)**

113.   Plaintiffs incorporate by reference paragraphs 1 to 75 above as if fully and separately set forth herein.

114.   The Fourteenth Amendment to the United States Constitution guarantees to all citizens "equal protection of the laws," and it forbids any state government from denying that protection "to any person within its jurisdiction[.]" U.S. Const. amend. XIV.  At a minimum, it forbids state governments from engaging in arbitrary discrimination against its citizens.  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

115.   Distinctions "affecting fundamental rights," including the exercise of First Amendment rights, trigger strict scrutiny under the Equal Protection Clause, even if the distinctions do not themselves constitute suspect or invidious classifications.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972).

116.   Sections 2, 3, and 4 of the Act all purport to regulate the conduct of "social media platforms."   The Act's definition of that term is arbitrary and discriminatory, thereby rendering Sections 2, 3, and 4 in violation of basic equal protection principles.

117.   First, the Act's carveout for companies that own large theme parks violates equal protection.   Whether or not a company owns a theme park has no conceivable bearing on whether that company's social media platform presents the purported risks against which the Act was designed to protect.   The Act would not apply to a targeted company that, for example, bought a zoo or other "theme park or entertainment complex" that met the following statutorily defined criteria: "a complex comprised of at least 25 contiguous acres owned and controlled by the same business entity and which contains permanent exhibitions and a variety of recreational activities and has a minimum of 1 million visitors annually."   F.S. § 509.013(9); *see* Act § 4 (adding § 501.2041(1)(g)).   These specific thresholds have nothing to do with any government interest in free speech or online policy.   Nor is there any reason to believe that the State's purported interest in protecting against "unfair" conduct from social media platforms is furthered by protecting theme park operators (specifically including Disney and Universal Studios).

118.   Second, the definition of businesses that *are* subject to the Act further irrationally discriminates against larger and more popular websites and social media

companies by targeting them for restrictions and disfavored governmental treatment. It targets only select companies that have either (i) at least $100 million in annual gross revenues, or (ii) over 100 million monthly participants, while irrationally excluding other companies. *See supra* ¶¶ 8, 56-57. Such arbitrary distinctions demonstrate that the Act unconstitutionally discriminates against the speech of certain speakers, that it is gravely under- and over-inclusive, and that it is not justified by any legitimate (much less compelling) governmental interest.

119. Because the definition of "social media platforms" is both arbitrary and discriminatory, Sections 2, 3, and 4 will operate to unlawfully deprive Plaintiffs' members of their fundamental equal protection rights.

120. Additionally, Section 4 establishes multiple new affirmative and onerous obligations that would impact Plaintiffs' members, but irrationally exclude other, favored entities. *See supra* ¶¶ 56-57, 65-71. This separately violates equal protection.

121. Similarly, the antitrust provisions in Section 3 suffer from the same flaws by irrationally targeting the covered online businesses, but not other companies. *See supra* ¶¶ 72-74.

122. The State cannot show any rational basis for crafting this statutory scheme—much less satisfy strict scrutiny—and, accordingly, the statutory

provisions discussed above violate the equal protection rights of Plaintiffs' members.

**COUNT IV**
**(42 U.S.C. § 1983)**
**Violation of the Commerce Clause of the Constitution of the United States**
**and the Due Process Clause of the Fourteenth Amendment**
**to the Constitution of the United States**
**(Challenge to Sections 2, 3, and 4 of the Act)**
**(As to All Defendants)**

123.   Plaintiffs incorporate by reference paragraphs 1 to 75 above as if fully and separately set forth herein.

124.   The U.S. Constitution entrusts the regulation of commerce "among the several States" to the federal government.  U.S. Const. art. I., § 8, cl. 3.  Thus, an individual State may not usurp this authority by regulating interstate commerce unilaterally.  *See, e.g.*, *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994).

125.   "[T]he Commerce Clause by its own force restricts state protectionism."  *Tennessee Wine & Spirits Retailers Assoc. v. Thomas*, 139 S. Ct. 2449, 2460 (2019).  "[I]f a state law discriminates against … nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advance a legitimate local purpose.'"  *Id.* at 2461 (cleaned up).

126.   The Commerce Clause also prohibits any "state regulation that 'discriminates against or *unduly burdens* interstate commerce and thereby imped[es]

free private trade in the national marketplace.'" *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (citation omitted) (emphasis added).

127.   Courts have long recognized that state laws that attempt to regulate the inherently global communications medium that is the Internet must respect the constitutional limits on state authority under the Commerce Clause. *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 169,173-74 (S.D.N.Y. 1997); *Am. Booksellers Found. v. Dean,* 342 F.3d 96, 103-104 (2d Cir. 2003).

128.   The Act violates the Commerce Clause by imposing uniquely burdensome operational requirements on businesses headquartered (and with substantial business operations) outside of Florida, while expressly exempting favored in-state businesses through a status-based "theme park" ownership exemption that is based on economic protectionism. *Cf. Tennessee Wine & Spirits*, 139 S. Ct. at 2472-74.   Both on its face and in its practical effects, the Act impermissibly discriminates against out-of-state businesses, and favors in-state businesses.   The Act also imposes onerous and undue burdens on interstate commerce by predominantly targeting online businesses headquartered outside the State.   Florida has no legitimate reason for discriminating against interstate commerce—and in favor of companies with in-state theme parks—and the burden on interstate commerce is clearly excessive in relation to any of the purported

benefits that the State claims will result from the Act.  The State cannot show that its stated goals could not be served by other available nondiscriminatory means.

129.   In addition, the Act regulates wholly out-of-state conduct because there is no requirement that the moderation take place in Florida or that the content being moderated is posted in Florida.  Such extraterritorial regulation is forbidden by the Commerce Clause and Due Process Clause of the Fourteenth Amendment.

130.   Unless enjoined, Sections 2, 3, and 4 of the Act will operate to unconstitutionally burden interstate commerce and effect extraterritorial regulation in violation of the Commerce Clause and Due Process Clause.

**COUNT V**
**(Declaratory Judgment Act)**
**(42 U.S.C. § 1983)**
**Preemption under the Supremacy Clause of the Constitution**
**of the United States and 47 U.S.C. 230(e)(3)**
**<u>(Challenge to Sections 2 and 4 of the Act)</u>**
**<u>(As to the Commissioners of the Florida Elections Commission</u>**
**<u>and the Florida Attorney General)</u>**

131.   Plaintiffs incorporate by reference paragraphs 1 to 75 above as if fully and separately set forth herein.

132.   Section 2 of the Act permits the Florida Elections Commission to impose fines of up to $250,000 per day against any "social media platform" that chooses to "permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days," if that user is a candidate for statewide public office.  Act § 2 (adding § 106.072(2)).  The Commission may

impose fines of up to $25,000 per day against a platform that bans the account of a candidate for a local public office.  *Id.*

133.   Section 4 of the Act permits any private individual to bring a cause of action against a platform that has applied its "censorship" standards inconsistently, and/or against a platform that has "censor[ed]" or "shadow ban[ned]" a user without providing adequate notification.  Act § 4 (adding § 501.2041(2)(b), (d)(1)).  Such a civil action could, for instance, be brought against a platform that removed content posted by one user, but not similar content posted by another user.

134.   Section 4 also permits the Department of Legal Affairs to bring "a civil or administrative action" against any platform suspected of violating any provision of Section 4.  *Id.* (adding § 501.2041(5)).  Such violations include the decision to "censor, deplatform or shadow ban a journalistic enterprise," or to "shadow ban[]" a candidate for elected office.  *Id.* (adding § 501.2041(2)(h), (2)(j)).  They also include violations of the other Moderation Restrictions and affirmative obligations contained in Section 4.

135.   Under 47 U.S.C. § 230, it is federal policy "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."  47 U.S.C. § 230(b)(1), (2).  Among the important

purposes advanced by Section 230, Congress sought "to encourage service providers to self-regulate the dissemination of offensive material over their services." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (*en banc*). This is its principal purpose. *Id.* at n.12.

136. Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). Under Section 230, laws or claims that "seek[] to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330.

137. Moreover, under Section 230, "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2).

138.   Section 230 similarly prohibits liability for "any action taken to enable or make available to information content providers or others the technical means to restrict access to material" that falls within the Section 230(c)(2) category above. *Id.* § 230(c)(2)(B).  This provision applies to tools that online service providers make available to users to help them avoid or limit their exposure to potentially objectionable content.

139.   For purposes of Section 230, an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." *Id.* § 230(f)(2).  The "provider" of such a service includes those who own or operate websites, such as social media platforms, and therefore covers Plaintiffs' members who are subject to the Florida Act.

140.   Section 230 expressly provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).  This provision expressly preempts inconsistent state laws that seek to hold online service providers liable for engaging in content moderation covered by Section 230(c).  Preemption applies equally to private causes of action and public enforcement actions.

141.   Sections 2 and 4 of the Act are inconsistent with Section 230 and therefore are expressly preempted because they (i) purport to impose liability on

"social media platforms" covered by Section 230 for taking actions protected by Sections 230(c)(1) and (c)(2), and (ii) would impermissibly treat the platforms as publishers of third-party content. *Id.* § 230(c)(1) & (2)(A).

142. Sections 2 and 4 are also preempted under the principles of implied preemption and "obstacle preemption." Sections 2 and 4 frustrate and undermine the basic purposes and policy goals of Section 230. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000).

143. The Court should issue a declaration confirming that preemption applies to the Act.

## PRAYER FOR RELIEF

Plaintiffs request the following relief:

(1) An order declaring the Act unconstitutional on its face for violating Plaintiffs' members' rights under the First and Fourteenth Amendments to the Constitution of the United States (including the Fourteenth Amendment's due process and equal protection requirements) and for violating the Commerce Clause and the Fourteenth Amendment's Due Process Clause;

(2) An order declaring Sections 2 and 4 of the Act preempted by federal law, including 47 U.S.C. § 230(e)(3) and principles of implied preemption;

(3) An order preliminarily and permanently enjoining the defendants from enforcing Sections 2, 3, and 4 of the Act;

(4)     An order for costs incurred in bringing this action;

(5)     An order for reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

(6)     Such other relief as the Court deems appropriate.

Respectfully submitted,

Date: May 27, 2021

Brian M. Willen
   (*pro hac vice* forthcoming)
Steffen N. Johnson
   (*pro hac vice* forthcoming)
**WILSON SONSINI GOODRICH &
ROSATI, P.C.**
1700 K St NW
Washington, DC 20006
Phone: (202) 973-8800
Email:    bwillen@wsgr.com
              sjohnson@wsgr.com


Lauren Gallo White
   (*pro hac vice* forthcoming)
Meng Jia Yang
   (*pro hac vice* forthcoming)
**WILSON SONSINI GOODRICH &
ROSATI, P.C.**
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Phone: (415) 947-2000
 Email:  lwhite@wsgr.com
              mjyang@wsgr.com

/s/ *Christopher G. Oprison*
Christopher G. Oprison
   Florida Bar No. 0122080
J. Trumon Phillips
   Florida Bar No. 84568
**DLA PIPER LLP (US)**
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Phone: 305-423-8500
Fax:  305-675-6366
Email:  chris.oprison@dlapiper.com
            trumon.phillips@dlapiper.com
            sheila.hall@dlapiper.com


Peter Karanjia (*pro hac vice*
   forthcoming)
James J. Halpert (*pro hac vice*
   forthcoming)
**DLA PIPER LLP (US)**
500 Eighth Street, NW
Washington, DC  20004
Phone:  202-799-4000
Fax:  202-799-5000
Email:  peter.karanjia@dlapiper.com
            jim.halpert@dlapiper.com

Douglas L. Kilby
  Florida Bar No. 0073407
Glenn Burhans, Jr.
  Florida Bar No. 0605867
Bridget Smitha
  Florida Bar No. 0709581
Christopher R. Clark
  Florida Bar No. 1002388
**Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.**
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
Phone: (850) 580-7200
Email:  dkilby@stearnsweaver.com
        gburhans@stearnsweaver.com
        bsmitha@stearnsweaver.com
        cclark@stearnsweaver.com

Ilana H. Eisenstein (*pro hac vice*
  forthcoming)
Ben C. Fabens-Lassen (*pro hac vice*
  forthcoming)
Danielle T. Morrison (*pro hac vice*
  forthcoming)
Jonathan Green (*pro hac vice*
  forthcoming)
**DLA PIPER LLP (US)**
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA  19103-7300
Phone:  215-656-3300
Fax:  215-656-3301
Email:  ilana.eisenstein@dlapiper.com
        ben.fabens-lassen@dlapiper.com
        danielle.morrison@dlapiper.com
        jonathan.green@dlapiper.com

*Attorneys for Plaintiffs NetChoice, LLC
and Computer & Communications
Industry Association*