### DECLARATION OF MATTHEW SCHRUERS

I, Matthew Schruers, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am President of the Computer & Communications Industry Association (CCIA). I have worked at the organization for nearly sixteen years. Upon joining the Association, I focused on legal, legislative, and policy matters, before taking on the roles of Chief Operating Officer and President. In each of these capacities, I have worked closely and communicated often with CCIA members regarding how public policy proposals affect their businesses, operations, and relationships with their users.

2.      Trust and safety operations, and online content moderation specifically, is an important area of CCIA's work and a constant focus for many of our members. As a result, I spend significant time understanding the content moderation policies and practices of CCIA's members, as well as monitoring and analyzing the legislative or policy proposals that affect this critical business function. I also interact regularly with trust and safety experts throughout the industry, and have an understanding of the challenges faced by trust and safety professionals. I have been tracking and evaluating Florida Senate Bill 7072 since before its passage so as to advise CCIA members on its provisions and impact on their businesses.

3.      The statements contained in this declaration are made upon my personal knowledge. I am over 18 years of age, and am competent to make the statements set forth herein.

**CCIA and Its Work on Content Moderation**

4.      CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet, information technology, and telecommunications industries. For nearly fifty years, CCIA has promoted open markets, open

systems, and open networks, and advocated for the interests of the world's leading providers of technology products and services before governments and the courts.

5.     CCIA's membership includes computer and communications companies, equipment manufacturers, software developers, service providers, re-sellers, integrators, and financial service companies. Currently, CCIA's members include: Amazon, BT Group (British Telecommunications), Cloudflare, Dish Network, eBay, Eventbrite, Facebook, Google, Intel, Intuit, McAfee, Mozilla, Newfold Digital, Pinterest, Rakuten, Red Hat, Samsung, Shopify, Stripe, Twitter, Uber, Verizon Media, Waymo, Wolt, and Zebra.

6.     Because of the broad definition of "social media platform" within S.B. 7072, a number of these members would qualify even though their services would not be considered as such by the general public. Such members span various sectors and products, and enable billions of users around the world to create and share content on their services, whether to facilitate work, study, prayer, socialization, commerce, or communications. These companies moderate and curate content as a vital part of operating their services, and some must manage a massive and constantly expanding amount of content in order to provide valuable products and tools for their users.

7.     Because content moderation is central to the operations of these members, issues surrounding content moderation constitute a significant part of CCIA's policy and advocacy work. To that end, among our other endeavors and programs in this area, CCIA is currently incubating a new non-profit organization called the Digital Trust & Safety Partnership.[1] The

---

[1] Digital Trust & Safety Partnership, https://dtspartnership.org/

members of this new partnership include CCIA members and others dedicated to identifying and preventing harmful content online.[2]

8.       This new organization aims to develop and iterate upon industry best practices for, among other things, the moderation of third-party content and behavior, with the goal of ensuring a safer and more trustworthy Internet. The Partnership's objectives include the facilitation of internal assessments, and subsequently independent third-party assessments, of participants' implementation of identified best practices for promoting the safety of their users and the online communities that they maintain. The organization balances these collective goals with the recognition that each of its member companies has its own values, product aims, digital tools, and human-led processes for moderating the extremely broad range of human expression they facilitate.

**Content Moderation: How It Works and Why It Matters**

9.       The online services provided by many CCIA members host or support a wide variety of user-created content in myriad forms—including text, videos, audio clips, and photographs. The scale of users and activity on these services is significant. Facebook[3] and YouTube[4] each has over two billion users. Every day, users watch over a billion hours of video on YouTube.[5] Over 100 billion messages are shared every day on Facebook.[6] Billions of searches are run on Google every day.[7] More than 500 hours of content are uploaded to YouTube every *minute*.[8] Pinterest's visual discovery engine draws more than 440 million

---

[2] *Tech giants list principles for handling harmful content*, Axios, https://www.axios.com/tech-giants-list-principles-for-handling-harmful-content-5c9cfba9-05bc-49ad-846a-baf01abf5976.html
[3] *Hearing Before The United States Senate Judiciary Committee Subcommittee on Privacy, Technology, and the Law*, https://www.judiciary.senate.gov/imo/media/doc/Bickert%20Testimony.pdf
[4] *YouTube has over 2 billion monthly logged-in users*, YouTube, https://blog.youtube/press/
[5] *Id.*
[6] *Company Info*, Facebook, https://about.facebook.com/company-info/
[7] *Zeitgeist 2012*, Google, https://www.internetlivestats.com/google-search-statistics/
[8] *YouTube has over 2 billion monthly logged-in users*, YouTube, https://blog.youtube/press/

visitors per month.[9] Uber, a ride-sharing platform, connects 3.9 million drivers with 91 million active consumers to serve their transportation needs, which translates into 14 million trips completed each day.[10] Amazon has more than 1.9 million small- and medium-sized businesses selling on its online store,[11] and millions of user-generated reviews are posted on the listings for the products of those businesses and others.[12]

10.     The material uploaded to these services comes from all over the world and is incredibly diverse. The services enable and provide a forum for the height of human thought and creativity: material that is culturally significant, highly informative, brilliantly funny or satirical, and politically engaging. To raise just a few examples of notable uses of members' services during the ongoing public health crisis:

a.  When the COVID-19 pandemic struck, and communities implemented stay-at-home orders, many small businesses turned to social media services and online tools to continue operations, engage current and prospective customers, and cultivate loyalty in a socially distant context.[13] After using Facebook Live "weekly" through the pandemic, the Tampa mayor encouraged small businesses to do the same to reach and grow their customer base.[14] Many small businesses

---

[9] *Transparency report*, Pinterest, https://policy.pinterest.com/en/transparency-report
[10] *Company Info*, Uber, https://www.uber.com/newsroom/company-info/
[11] *2020 Letter to Shareholders*, Amazon, https://www.aboutamazon.com/news/company-news/2020-letter-to-shareholders
[12] *Update on customer reviews*, Amazon, https://www.aboutamazon.com/news/innovation-at-amazon/update-on-customer-reviews
[13] *5 Small Business Owners Reveal How They Are Marketing On Social Media During COVID-19*, US Chamber, https://www.uschamber.com/co/good-company/growth-studio/promoting-business-on-social-media-during-pandemic
[14] *'Boost with Facebook' to host virtual event in Tampa Thursday to help small businesses*, Florida Politics, https://floridapolitics.com/archives/419768-boost-with-facebook-to-host-virtual-event-in-tampa-thursday-to-hep-small-businesses/

who succeeded in the "shut-in economy"[15] did so by embracing social media

services and digital tools, including those offered by Florida providers.[16]

b.  Amid a quarantine of indeterminate length, schools and public services both

turned to social media tools to meet the needs of distance-education students and

citizens with special needs, such as by offering live captions at local government

press conferences on public health via Facebook Live,[17] and live captions for

remote learning via Google Meet and Zoom.[18] These virtual tools helped make

life during social distancing more accessible and inclusive for people who are

deaf or English-language learners,[19] as well as generally helping families

communicate when they are apart.[20]

c.  Social media and digital services are also a critical tool as learning returns to the

classroom. Volunteers in Leon County, Florida, including educators and parents,

"through the power of social media" created a "Stock our Schools: Leon County"

Facebook group with more than 4000 members[21] to help get teachers school and

cleaning supplies for their classrooms through public online wish lists and

---

[15] *As COVID-19 Continues, Online Commerce Rises*, Project Disco, https://www.project-disco.org/competition/121420-as-covid-19-continues-online-commerce-rises/
[16] *Small Businesses in Florida, Georgia and New York Ready for Post-Covid Economy*, Small Business Trends, https://smallbiztrends.com/2021/04/small-business-reopening-plan.html
[17] https://tech.fb.com/powered-by-ai-new-automated-captions-are-helping-people-receive-news-and-critical-updates/
[18] *Google Meet expands live captions to 4 more languages, extends unlimited meetings*, ZDNet, https://www.zdnet.com/article/google-meet-expands-live-captions-to-4-more-languages-extends-unlimited-meetings/
[19] *Live captions come to Meet in four new languages*, Google, https://blog.google/products/meet/live-captions-new-languages/
[20] *A CODA story: Why accessible technology matters*, Google, https://blog.google/outreach-initiatives/accessibility/tonys-story-accessibility-features/
[21] *Stock our Schools: Leon County*, Facebook, https://www.facebook.com/groups/leoncountystockourschools/

contactless delivery from community volunteers.[22] The group has extended to

Florida "teachers all across the Big Bend and South Georgia."[23]

d.   While Twitter has long been used by Florida sports franchises like the

Jacksonville Jaguars, Tampa Bay Rays, and Miami Heat to share game highlights

and scores, and connect with and inform fans,[24] Florida municipalities took to

using Twitter last year at the height of the pandemic to inform residents about

safety and social distancing measures. For example, Miami Beach partnered with

Twitter to encourage mask use,[25] and Leon County memorably tweeted that

residents should "keep at least 1 large alligator between you and everyone else."[26]

Other localities also reached out via other social media, like the City of

Tallahassee, whose YouTube video in April, 'Stay at home, Tallahassee',

received over 25,000 views.[27] Nor were such efforts limited to Florida; New York

and many other states used services like Instagram and Snapchat to provide

critical messages to young people and LinkedIn and NextDoor to keep residents

informed with updates.[28]

---

[22] *Leon County moms help 'Stock our Schools'*, WCTV, https://www.wctv.tv/2020/07/26/leon-county-moms-help-stock-our-schools/
[23] *Id.*
[24] Jaguars, Twitter, https://twitter.com/Jaguars; Tampa Bay Rays, Twitter, https://twitter.com/RaysBaseball;  Miami HEAT, Twitter, https://twitter.com/MiamiHEAT.
[25] *Amid 'caution fatigue,' a new social media-inspired mask campaign is heading to South Florida*, South Florida Sun Sentinel, https://www.sun-sentinel.com/coronavirus/fl-ne-twitter-billboard-mask-miami-20200924-zgtwh3wiafbw7mb4jlmyj7qaai-story.html
[26] Leon County, FL, Twitter, https://twitter.com/LeonCounty/status/1245796313658163201
[27] *Stay at home, Tallahassee*, YouTube, https://www.youtube.com/watch?v=Kp2AfBH7eDA
[28] *Amid Ongoing COVID-19 Pandemic, Governor Cuomo Launches Multi-Platform, Multi-Language Education and Awareness Campaign to Reach All New Yorkers Across the State in All Zip Codes and Communities*, New York State, https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-launches-multi-platform-multi-language-education

11.     By contrast, some of the material posted on online services is the polar opposite. Because almost anyone can create an account and post content on certain social media services, users can attempt to submit content ranging from dangerous, illegal, and abusive, to things that are just undesirable or annoying. A few examples of content shared on the darker side of the Internet, which trust and safety teams work around the clock to address, include:

    a.   Video footage of the mass shootings targeting two mosques in Christchurch, New Zealand that was recorded by the gunman and broadcast online, which despite being removed within minutes, resurfaced on various other services, leading to extensive efforts across the industry to remove the videos.[29]

    b.   Videos and propaganda posted by ISIS to recruit American teenagers or otherwise persuade them to adopt its extremist ideology.[30]

    c.   Fraud schemes that specifically target older adults online; for instance, by contacting a senior through social media, building a relationship, and then asking for money.[31]

    d.   Sexual, graphic, or otherwise disturbing content that is lawful but may be inappropriate for certain audiences or contexts, such as on gaming platforms used by children.[32]

---

[29] *Update on New Zealand*, Facebook, https://about.fb.com/news/2019/03/update-on-new-zealand/; *Six months after Christchurch shootings, videos of attack are still on Facebook*, NBC News, https://www.nbcnews.com/tech/tech-news/six-months-after-christchurch-shootings-videos-attack-are-still-facebook-n1056691.

[30] *This Is How ISIS Uses Social Media to Recruit American Teens*, Teen Vogue, https://www.teenvogue.com/story/isis-recruits-american-teens

[31] *Common Scams That Target the Elderly*, Senior Living, https://www.seniorliving.org/research/common-elderly-scams/

[32] *Roblox tries to deal with adult content on a platform used by many kids (2020)*, Trust & Safety Foundation, https://www.tsf.foundation/blog/roblox-tries-to-deal-with-adult-content-on-a-platform-used-by-many-kids-2020

e. Content that promotes or glorifies self-harm, including suicide, or that encourages young people to engage in dangerous conduct, such as consuming detergent pods or other bizarre behavior.[33]

12. The companies my association represents, and many others like them, therefore have an obvious business need to address certain kinds of content and behavior, as well as to take action against abusive users who repeatedly or flagrantly violate their rules or post illegal, dangerous, or offensive material. Without the ability to respond to that content per the company's stated policies and terms of service (along with limiting the ability of repeat offenders to continue abusing the company's services), many services would be flooded with abusive, objectionable, and in some cases unlawful material, drowning out the good content and making their services far less enjoyable, useful, and safe.

13. For that reason, CCIA members have rules governing what kinds of material and uses are, and are not, permitted.[34] That is also why these services put significant amounts of time, resources, personnel, and effort into developing sophisticated trust and safety operations to protect users and the public. The scope of these editorial efforts reflects the sheer scale and volume of user-generated content posted on popular online services.

14. Content moderation takes many forms, including both human review and the use of digital tools that rely in part on algorithms (or other automated sorting). Moderation

---

[33] *YouTube is taking down Tide Pod Challenge videos and oh my god don't eat laundry pods*, The Verge, https://www.theverge.com/2018/1/17/16902990/youtube-tide-pod-challenge-video-take-down-community-guidelines-removal

[34] *E.g., Amazon Community Guidelines*, Amazon, https://www.amazon.com/gp/help/customer/display.html?nodeId=GLHXEX85MENUE4XF; *eBay Member Behavior Policies*, eBay https://www.ebay.com/help/policies/member-behaviour-policies/member-behaviour-policies?id=4209; *Pinterest Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines; *Facebook Community Standards*, Facebook, https://www.facebook.com/communitystandards/; *The Twitter Rules*, Twitter, https://help.twitter.com/en/rules-and-policies/twitter-rules; *YouTube Community Guidelines*, YouTube, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/.

sometimes requires removing objectionable or illegal content or terminating the accounts of users who post it. But far more frequently, it involves context-specific decisions about how to arrange and display content, how best to recommend content to users based on their interests, and how easy it should be to access certain kinds of content. Instagram, for example—an image- and video-sharing service popular with younger users (which is owned by CCIA member Facebook)—has made it harder to search for graphic images involving suicide attempts and self-harm, and taken steps to stop recommending such content to users.[35]

15.     Another example of moderation is "age-gating," whereby certain content is made accessible only to adults or teenagers but not to younger children. YouTube, for example, does this extensively.[36] Content that may be age-restricted includes: videos about a cannabis dispensary; material featuring people in sexually provocative poses; material using vulgar language; or videos that show violent or gory imagery.[37]

16.     In other circumstances, moderation includes giving users tools to decide for themselves what content they wish to avoid, such as by obscuring potentially upsetting but clearly newsworthy information, blocking or muting other users (meaning that they no longer see that user's content), making certain content inaccessible to their children, or shielding themselves from material that is likely to offend sensitive users. For instance, YouTube provides a Restricted Mode that users (or institutions such as libraries and schools) can choose to activate in order to avoid such material.[38] Likewise, on Instagram, users have a variety of

---

[35] *Tightening Our Policies and Expanding Resources to Prevent Suicide and Self-Harm*, Facebook, https://about.fb.com/news/2019/09/tightening-our-policies-and-expanding-resources-to-prevent-suicide-and-self-harm/
[36] *Age-restricted content*, YouTube, https://support.google.com/youtube/answer/2802167?hl=en ("Sometimes content doesn't violate our policies, but it may not be appropriate for viewers under 18. In these cases, we may place an age-restriction on the video.").
[37] *See id.*
[38] *Disable or enable Restricted Mode*, YouTube, https://support.google.com/youtube/answer/174084?co=GENIE.Platform%3DAndroid&hl=en.

tools for controlling how they interact with other users' content, including blocking accounts or commenters, muting an account (which stops content from that user from showing up in a feed), and creating lists of words or emojis that the user does not wish to see in the comments on his or her posts.[39]

17.   Moderation can also include direct speech by service providers. Sometimes the services engage in direct speech when they have made a considered determination that particular material conveyed via their service is questionable. For example, services may decide to attach warning labels, disclaimers, or general commentary informing users that certain user-submitted content has either not been verified by official sources or may contain upsetting imagery:

   a.   Facebook adds "warning screens" over potentially sensitive content such as violent or graphic imagery, nudity, and posts related to suicide or suicide attempts.[40] Similarly, Twitter requires users who may legitimately intend to share violent or abusive but newsworthy content (such as news media, bloggers, or citizen journalists) to mark their accounts as sensitive, so that media can be placed behind interstitial warnings. This ensures unsuspecting users are not suddenly confronted with sensitive media, such as violent news coverage from war zones or mass shootings.[41]

---

[39] *Keeping Instagram a safe and supportive place*, Instagram, https://about.instagram.com/community/safety.
[40] *Providing context on sensitive or misleading content*, Facebook, https://transparency.fb.com/enforcement/taking-action/context-on-sensitive-misleading-content/
[41] *Sensitive media policy*, Twitter, https://help.twitter.com/en/rules-and-policies/media-policy

    b.  YouTube adds labels to content by state-supported media channels, including flagging sources of funding—such as for videos sponsored by the Russian government.[42]

    c.  During the 2020 election, Twitter added warning labels to Tweets making claims about election results that had not been verified by official sources.[43]

18.    Other times, however, moderation is necessary so that even the most basic online functions, like shopping or searching for local businesses or having material arranged by topic or geography, work as intended. Without prioritizing, classifying, and ordering the never-ending volume of online content, online services would have no way to deliver the content users want—or even critically need—to see. This, for example, is the essential function of Internet search engines like Google.[44] The ability to search is also an essential function of many other online services. Customers rely on services like eBay and Amazon to search for products they want to buy, and to provide helpful information and reviews about those products; users on Facebook want and expect to be able to search for people they might know; users on Pinterest want and expect to be able to search for recipes and design inspiration according to their taste and preferences.

19.    These content moderation efforts serve at least three distinct vital functions. *First*, moderation is an important way that some online services express themselves and effectuate their community standards, thereby delivering on commitments that they have made to their

---

[42] *Greater transparency for users around new broadcasters*, YouTube, https://blog.youtube/news-and-events/greater-transparency-for-users-around; *State media warning can counteract the effects of foreign misinformation*, Harvard Kennedy School Misinformation Review, https://misinforeview.hks.harvard.edu/article/state-media-warning-labels-can-counteract-the-effects-of-foreign-misinformation/

[43] *Additional steps we're taking ahead of the 2020 US Election*, Twitter, https://blog.twitter.com/en_us/topics/company/2020/2020-election-changes.html ("Tweets which include premature claims will be labeled and direct people to our official US election page.").

[44] *How Google Search works*, Google, https://www.google.com/search/howsearchworks/.

communities. Content moderation rules and enforcement actions reflect normative judgments about what will best foster the kind of environment that companies have promised to their users. Choices about whether to allow pornography, depictions of violence, or certain kinds of offensive language, for example, are all expressions of the service's own preferences—important statements about the kind of online community it wishes to foster and what speech and speakers the company wishes to associate with or avoid.

20.   *Second*, moderating content is often a matter of ensuring online safety. Some content posted online unfortunately can be highly dangerous, whether to specific individuals or to the public at large. Social media companies regularly engage in content moderation to remove material such as illegal non-consensual intimate imagery (sometimes referred to as "revenge pornography"), depictions of child sexual abuse, calls for genocide, efforts to steal people's personal information, attempts to encourage teens to commit suicide, attempts to sell illegal weapons and drugs, content that aids counterfeiting, and efforts by foreign adversaries to manipulate the American public. Any effort that hamstrings how online services respond to these egregious communications threatens the safety of those services, their users, and the public.

21.   *Third*, moderation facilitates the organization of content, rendering an online service more useful. Imagine if a search engine presented results in a random or purely chronological order—instead of prioritizing what is most relevant. Or if an online store presented a random assortment of products or listings—instead of those products the user actively sought out. For many digital services, the main utility they offer to users is the organizing, sorting, and presenting of the vast amount of information available online.

**The Importance of Curatorial Discretion**

22.     A daily challenge facing many CCIA members is pursuing these goals—
expressing the service's curatorial judgment, protecting users, and offering value—while
addressing a massive and ever-changing body of content that users generate. Each piece of
content involves different circumstances and different potential risks, which often requires an
individualized judgment by the service regarding whether it calls for moderation.

23.     Normative judgments about how content is moderated within the bounds of a
service's policies frequently involve matters of opinion and values about which people could
very well disagree. The choice of whether a violent but newsworthy video should be removed,
left up, or obscured behind an interstitial warning pursuant to a service's policy on sensitive
media is equally as expressive as a newspaper's calls about which stories make the front page,
which editorials appear in the opinion column, and what is newsworthy, as a general matter.
The difference is that online service providers are called upon to make moderation decisions on
a vast scale for immense volumes of content:

    a.   Facebook is a community of over three billion people, and over one billion
         "stories" (audio or video clips) are shared on its service every day.[45] As one
         would expect, that means that Facebook has to remove millions of pieces of
         content each year to ensure that its service is safe and enjoyable for users. In the
         first quarter of 2021, Facebook removed 8.8 million pieces of "bullying and
         harassment content," 9.8 million pieces of "organized hate content," and 25.2
         million pieces of "hate speech content."[46]

---

[45] *Company Info*, Facebook, https://about.facebook.com/company-info/
[46] *Id.*; *Community Standards Enforcement Report, First Quarter 2021*, Facebook,
https://about.fb.com/news/2021/05/community-standards-enforcement-report-q1-2021/

b. Over 500 million accounts are active daily on Instagram, where they view and/or post photos, stories, and "reels." To keep the service safe and usable, Instagram removed 5.5 million pieces of "bullying and harassment content," 324,500 pieces of "organized hate content," and 6.3 million pieces of "hate speech content" in the first quarter of 2021.[47]

c. There are more than 300 billion "pins" or pieces of posted content on Pinterest. Because the Pinterest community is not welcoming to pornography,[48] between October and December 2020, the service took down over 2.1 million distinct images containing adult content, which amounted to nearly 50 million pins (meaning that some images were pinned by users multiple times). In addition, Pinterest removed over 1.3 million discrete images or 3.4 million pins containing spam.[49]

d. In the first six months of 2020, Twitter took action against 1.9 million accounts, suspended over 900,000 accounts, and removed 1.9 million pieces of content. With respect to the removed content, the top three categories were (1) "hateful conduct," which includes the promotion of violence against people on the basis of race, gender, age, and other protected characteristics (approx. 955,000 instances); (2) "abuse/harassment" (approx. 609,000 instances); and (3) "sensitive media," including graphic violence and adult content (approx. 171,000 instances).[50]

---

[47] *Tell your brand story your way with Instagram*, Facebook, https://www.facebook.com/business/marketing/instagram; *Community Standards Enforcement Report, First Quarter 2021*, Facebook, https://about.fb.com/news/2021/05/community-standards-enforcement-report-q1-2021/
[48] *Community guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines
[49] *Transparency report*, Pinterest, https://policy.pinterest.com/en/transparency-report
[50] Twitter Transparency Report, *Rules for Enforcement*, Twitter, https://transparency.twitter.com/en/reports/rules-enforcement.html#2020-jan-jun.

e. YouTube sees 500 hours of content uploaded to its platform every minute and has a community of over 2 billion users.[51] In the last three months of 2020 alone, YouTube removed just over 2 million channels and over 9 million videos for violations of its policies, the majority of which had fewer than ten views each at the time of removal due to the use of automated processes for reviewing and removing violative content.[52]

24.    The sheer number of decisions that online services are forced to make is often matched by the degree of difficulty and nuance involved in the hardest judgment calls. For certain pieces of content, there is simply no right answer as to whether and how to moderate, and any decision holds significant consequences for the service's online environment, its user community, and the public at large. To raise a few examples of such cases:

a. Facebook generally aims to remove content that advertises marijuana. But for some pieces of content, it can be difficult to determine whether the material in question actually *is* advertising marijuana—such as when the product is obscured by packaging or resembles other products.[53]

b. YouTube generally attempts to remove content that supports Nazi ideology or white supremacism. However, its policies on restricting such content are tested by material where it is not obvious whether the content is actually supporting Nazism or, instead, historical or informative in nature. For those videos, YouTube must determine whether ambiguous discussions regarding Nazism or interviews with

---

[51] *YouTube for Press*, YouTube, https://www.youtube.com/intl/en-GB/about/press/.
[52] YouTube Transparency Report, *YouTube Community Guidelines enforcement*, YouTube, https://transparencyreport.google.com/youtube-policy/removals?hl=en.
[53] *F8 2019 Day 2 keynote and session videos*, Facebook, https://engineering.fb.com/2019/05/01/ai-research/f8-2019-day-2/

white supremacists serve an educational function or, instead, glorify those ideologies.[54]

    c.   Given my role within the industry, I am aware that companies beyond CCIA's membership frequently face similar problems. For example, Spotify previously announced that it would try to harmonize its values with the artists that it promoted. In practice, this included moderating or removing the portfolios of artists that engaged in reprehensible conduct, such as sexual assault. These judgment calls, however, are sensitive in nature, and prompt comparisons to other artists that are also accused of or found responsible for misconduct.[55]

25.    To make reasonable decisions about such content, a service needs flexibility to craft policies and rules that reflect their commitment to users and to adapt those policies to the ever-changing circumstances presented by user content. It goes without saying that no service is able to anticipate unexpected forms of content *and* decide how to moderate each instance *in advance*. It is for that very reason that these services develop policies and rules that act as guidelines for their future moderation decisions—and within which each service has the ability to exercise discretion in specific instances.

26.    The content that many of CCIA's members moderate does not exist in a vacuum; it is also affected by societal circumstances and/or the service's own attitudes. Because those circumstances and attitudes also evolve over time, adapting to changed circumstances, services

---

[54] *YouTube's new policy on Nazi content results in removal of historical and education videos (2019)*, Trust & Safety Foundation, https://www.tsf.foundation/blog/youtube-s-new-policy-on-nazi-content-results-in-removal-of-historical-and; https://blog.youtube/inside-youtube/look-how-we-treat-educational-documentary-scientific-and-artistic-content-youtube/

[55] *Spotify enforces hateful conduct policy, removing artists from its platform for off-platform behavior (2018)*, Trust & Safety Foundation, https://www.tsf.foundation/blog/spotify-enforces-hateful-conduct-policy-removing-artists-from-its-platform

may view their content moderation policies differently as they gain experience and encounter new material:

    a.  Facebook, for example, has placed a greater emphasis in its content moderation on identifying and proactively suppressing racist content (such as depictions of blackface) and antisemitic content (such as content that denies the Holocaust or encourages the idea that Jews control the world), as it encounters more and more examples of that kind of content.[56]

    b.  Similarly, content moderation policies on Facebook, Instagram, Twitter, and YouTube have increasingly attempted to limit material that would encourage eating disorders or other forms of destructive self-harm.[57]

    c.  As yet another example, YouTube recently took action to limit the influence of the military in Myanmar after the military launched a coup that captured control of the government. As a result of the changing circumstances and the military's violence, YouTube prevented five television channels run by the military from conveying content via its service.[58]

    d.  Twitter's "hateful conduct policy" was updated to include "targeted misgendering or deadnaming of transgender individuals." Twitter made that change as part of a broader change to its policy on "dehumanizing language," which was expanded

---

[56] *Measuring Our Progress Combating Hate Speech*, Facebook, https://about.fb.com/news/2020/11/measuring-progress-combating-hate-speech/
[57] *Tightening Our Policies and Expanding Resources to Prevent Suicide and Self-Harm*, Facebook, https://about.fb.com/news/2019/09/tightening-our-policies-and-expanding-resources-to-prevent-suicide-and-self-harm/; *Taking More Steps To Keep The People Who Use Instagram Safe*, Instagram, https://about.instagram.com/blog/announcements/more-steps-to-keep-instagram-users-safe; *Suicide and Self-harm Policy*, Twitter, https://help.twitter.com/en/rules-and-policies/glorifying-self-harm; *Suicide & self-injury policy*, YouTube, https://support.google.com/youtube/answer/2802245
[58] *YouTube Bans Myanmar Military Channel as Violence Rises*, New York Times, https://www.nytimes.com/2021/03/05/business/youtube-myanmar.html; https://www.reuters.com/article/us-myanmar-politics-youtube/youtube-removes-five-myanmar-tv-channels-from-platform-idUSKBN2AX0BQ

"to include content that dehumanizes others based on their membership in an identifiable group, even when the material does not include a direct target."[59]

27.     Furthermore, many digital services are "multi-sided markets," meaning that their business model unites distinct constituencies in transactions. Users, therefore, are not the only community whose interests these services must seek to safeguard. For ad-supported, free-to-the-user services, advertisers constitute another critical constituency. These advertisers are wary of what some refer to as "brand damage" should their products be advertised in proximity to problematic content. As a result, advertisers work closely with social media companies and other digital services to reduce the chance that their advertising dollars are perceived to support potentially harmful content or behavior.[60]

28.     Content moderation is therefore far from static. Instead, it is a dynamic process in which the service has to account for its own values and opinions, user preferences, and what is happening in the world. Succeeding at that delicate balancing act requires companies to have the freedom to change how they moderate content over time, both to best serve the needs of their users and to protect the online environment that they are curating. Limiting changes to content moderation policies to, at most, once a month is wholly impractical. Both the online and real world change from second to second, and each company must be able to respond to those changes in real time to protect its service and users.

---

[59] *Hateful conduct policy*, Twitter, https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy; *see How Twitter's Ban on 'Deadnaming' Promotes Free Speech*, New York Times, https://www.nytimes.com/2018/11/29/opinion/twitter-deadnaming-ban-free-speech.html; *Creating new policies together*, Twitter, https://blog.twitter.com/official/en_us/topics/company/2018/Creating-new-policies-together.html.
[60] *Advertisers agree deal with social media on steps to curb harmful content*, Reuters, https://www.reuters.com/article/tech-advertising/advertisers-agree-deal-with-social-media-on-steps-to-curb-harmful-content-idUSKCN26E1O1; *Facebook to develop tools for advertisers to tackle harmful content*, Reuters, https://www.reuters.com/article/us-facebook-advertising/facebook-to-develop-tools-for-advertisers-to-tackle-harmful-content-idUSKBN29Y1UJ

**The Burdens Posed by S.B. 7072**

29.     Compliance with the content moderation provisions of S.B. 7072 would be unduly burdensome at a minimum, and may not be technically feasible at all. Due to the scale at which the covered online services operate, much of their moderation work must be done algorithmically—or at least with the assistance of algorithms or automated processes—in order to function. Complying with the statute's restrictions on algorithmic content moderation would require CCIA members to cease or limit the operation of automated tools used to block and remove harmful, dangerous, and unlawful material. At the least, this would substantially degrade the users' experience, but it may also place users or others at risk from dangerous, illegal, or abusive content.

30.     The capacity to make moderation decisions algorithmically in the first instance is vitally important to many services offered by CCIA members. Not only do these tools facilitate the moderation of the incalculable volume of content online, but for some of the content that requires moderation or removal—such as graphically violent, sexual, or criminal content—time is of the essence. An important aspect of the goodwill that many members have built up with their users over time is the ability of moderators to respond quickly to halt the spread of dangerous, illegal, or otherwise inappropriate content before it becomes widespread. Making certain moderation decisions algorithmically in the first instance allows the services to respond to objectionable content in a way that preserves the user experience, promotes online safety, and helps ensure that the communications that our members' services disseminate reflect their community values.

31.     Millions of Floridians, and billions of people worldwide, use CCIA members' services. And even if CCIA members could comply with S.B. 7072's content moderation

requirements (which they cannot), members generally have no way to determine whether a user either resides in Florida or claims a Florida domicile,[61] as they would need to, to ensure they are complying with the onerous procedures required with respect to such users. And it would be effectively impossible to comply with these procedures solely as to Floridians, while maintaining sufficiently economical and effective moderation and content prioritization for the services' many users outside Florida.

32.      Decisions to remove a particular item of content uploaded by a user, or to temporarily or permanently remove a user's ability to upload content to the service, serve different purposes within our members' businesses. These decisions often need to strike a balance between limiting the detrimental effects of objectionable content on the services and preserving open access. Having a full panoply of moderation tools available enables CCIA member companies to strike an appropriate balance in each situation. S.B. 7072's requirements would remove the services' ability to use some of these moderation tools in certain circumstances and would upset the delicate balance between openness and responsibility that makes many members' services usable and enjoyable by a wide variety of users.

33.      The vague requirement of consistency would make moderation by CCIA's members impossible at the scale required. At $100,000 in statutory damages per violation, the risk that any two moderation decisions will be deemed subjectively "inconsistent", along any one of multiple possible lines of comparison, by an observer with the benefit of hindsight, will make it very difficult to justify removing or moderating any content at all. Moreover, S.B. 7072

---

[61] While some services may be able to form inferences about a user's location based on information like IP addresses, such information may be unreliable, and does not substitute for knowing a user's state of residence or state of domicile. While some services may have physical addresses for users, many do not. And even those services that do possess such data cannot be certain whether the user *resides or is domiciled* at the provided address for purposes of Florida law.

makes no distinction between moderation decisions in terms of the application of the consistency requirement—whether temporary and permanent, whether a removal or a decision to make content less visible, or less readily searchable, or simply to append the service's own commentary to a given piece of content—all of these decisions must be "consistent" under S.B. 7072. Once any decision to moderate is made, every other decision to moderate or not moderate might be challenged for inconsistency with the first decision—even when failures to moderate are based on the limited capacity of the service's human moderators, and even where capacity may be reduced due to a public health emergency that prevents individual moderators from accessing the machines that they use to review and moderate content.

34.     The notice requirement that applies whenever a Florida user is "censored" or "shadow banned" would likely result in the services sending millions of such notices per day. The breadth of the statutory definitions of these terms would cause them to apply to moderation decisions that remove clearly unacceptable material, as notice is required as to every kind of content that is not considered "obscene" under state law. Each notice must also include a "thorough rationale" of why the content was moderated and a "precise and thorough explanation" of how the content came to the service's attention—again with the threat of massive statutory damages if any of these explanations is ruled deficient in hindsight by a court. Since the penalty for not sending such a notice is so significant, the services will have to err on the side of preparing and sending a notice whenever content potentially could have been submitted by a Florida resident, creating significant waste and inefficiencies. Even beyond not knowing what users reside in Florida, services will also face the risk of significant penalties whenever a user disputes the level of precision or thoroughness of a given explanation.

35.     The opt-out requirements would also require many member companies to create new metrics for sorting content on their services that do not currently exist and are not congruent with the way users actually use online services. Few if any search engines allow sorting by "most recently crawled" or "most recently changed." Furthermore, allowing users to opt out of "post-prioritization" to produce chronological posts and content would greatly increase the moderation burden for the vast majority of online services that enable their users to search for content relevant to their interests, and that strive to deliver content that users want or need to see. The services' reputations, and their ability to ensure that the content they are conveying to their users is not inconsistent with their values, would inevitably suffer as a result.

36.     The requirement not to "deplatform" political candidates, nor to apply various standard operations (which S.B. 7072 implausibly defines as "shadow banning"), nor perform "post-prioritization" to content by or about candidates, would similarly undermine the services' ability to do a wide swath of moderation activity. Taken together, due to the sweeping definition of "shadow ban" in the statute, these requirements make content supplied by broadly defined political "candidates" virtually immune to moderation except by unaided human review. The requirement that content "about" candidates similarly not be subject to algorithmic moderation or "post-prioritization" creates an additional vagueness problem, as it will not always be apparent whether a given piece of content is "about" a political candidate. Moreover, requiring that "post-prioritization" not be applied to such content creates nonsensical obligations for some services, such as search engines, and search features within certain member services, which must apply some method of organizing search results by relevance (rather than chronology), and that will necessarily fall within the definition of "post-prioritization" (in order for the search results to be usable).

37.     It hardly requires stating that the requirement not to moderate "journalistic enterprises" based on content (aside from obscenity) would likewise create serious problems for many members' ability to maintain their community standards for content. Moreover, member services have no way to determine with confidence whether a user is a "journalistic enterprise" within the meaning of the statute. The threat of liability under this requirement with respect to users that might or might not qualify as "journalistic enterprises" would only exacerbate the problem of requiring the covered services to host content that violates their community standards, by adding to the number of users who might be virtually immune to moderation.

38.     If these provisions were to go into effect, they would seriously undermine the safety and utility of the members' services. The risk of liability on the basis of various provisions of S.B. 7072 would require many member services to substantially cut back on their moderation efforts, with the foreseeable results of (1) leaving offensive and dangerous content accessible to the public via the services; (2) making maintenance of family-friendly, curated collections of user-uploaded content nigh impossible; and (3) making the services less useful for their intended purposes.

39.     For many services, a substantial proportion of the value provided to users is the service's arrangement of relevant, useful, or entertaining information in a way that provides the sort of content and experience that the user is seeking. These ways of organizing information on a service can fall afoul of the statute's definitions despite being wholly conventional and benign. The statute's broad and vague descriptions of what practices are prohibited leave a number of questions unanswered, and the provisions that are comprehensible impose practices that would severely undermine the services' value to their users.

23

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3rd, 2021 in Washington D.C.

Matthew Schruers