IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| **NetChoice, LLC** d/b/a NetChoice, a District of Columbia organization; and **Computer & Communications Industry Association** d/b/a CCIA, a Virginia corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>**Ashley Brooke Moody**, in her official capacity as Attorney General of the State of Florida; **Joni Alexis Poitier**, in her official capacity as Commissioner of the Florida Elections Commission; **Jason Todd Allen**, in his official capacity as Commissioner of the Florida Elections Commission; **John Martin Hayes**, in his official capacity as Commissioner of the Florida Elections Commission; **Kymberlee Curry Smith**, in her official capacity as Commissioner of the Florida Elections Commission; **Barbra Stern**, in her official capacity as Commissioner of the Florida Elections Commission; and **Patrick Gillespie**, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services,<br><br>*Defendants*. | Civil Action No.: 4:21-cv-00220-RH-MAF |

## DECLARATION OF NETCHOICE, LLC
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
## INJUNCTION

I, **Carl Szabo**, declare as follows:

1. I am the Vice President and General Counsel of NetChoice, LLC ("NetChoice"). I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2. In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet.

3. Plaintiff NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and "engages at the local, state, national, and international levels to ensure a bright digital future."[1] In particular, we are dedicated to preserving the Internet as a vibrant

---

[1] *Home,* NetChoice, https://perma.cc/3NPH-KH2T.

1

marketplace for communication, commerce, and the exchange of ideas. When online businesses are free to make their own moderation decisions, they create choices for users and advertisers alike—for example, Floridians looking for an unmoderated experience can use social media platforms like Parler; those looking for more family-friendly services can find options from several NetChoice members. All in all, we strongly believe in giving users and advertisers choices in how they use the Internet.

4. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services and platforms, including: Airbnb, Alibaba.com, Amazon.com, AOL, DJI, DRN, eBay, Etsy, Expedia, Facebook, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Nextdoor, Lyft, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, TikTok, Travelocity, TravelTech, Trivago, Turo, Twitter, Verisign, VRBO, Vigilant Solutions, VSBLTY, Waymo, Wing, and Yahoo!.[2]

5. As described in our Complaint,[3] several of NetChoice's members are subject to Florida's new law, S.B. 7072, 2021 Leg. (Fla. 2021) (the "Act"), because they meet the statutory definition of a covered "social media platform" under the

---

[2] *About Us*, NetChoice, https://perma.cc/4NPV-PLU7.
[3] Complaint, *NetChoice v. Moody*, No. 4:21-cv-00220-RH-MAF (N. D. Fla. Tallahassee Div.).

2

Act: they (i) allow users to post or upload content onto their platforms; (ii) are incorporated legal business entities; (iii) do business in the State of Florida; (iv) meet the Act's revenue or user-based thresholds; and (v) are not exempted under the exception for certain operators of theme parks. *See* Act § 4 (adding § 501.2041(1)(g)). Several of these NetChoice members have submitted declarations attesting to the irreparable harms they will suffer if the Act is allowed to go into effect.[4]

6.  NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that this Act, should it take effect, would irreparably harm our members and their business models by repelling users and advertisers and creating long-term, adverse impacts when it comes to our members' reputations. This is attested to by similarly situated technology-focused trade associations.[5]

7.  These negative effects of the Act are associative and enduring, and thus irreparable. Once the public associates an online business with harmful or offensive

---

[4] Potts Decl. (June 3, 2021); Veitch Decl. (June 3, 2021); Pavlovic Decl. (June 3, 2021).
[5] Schruers Decl. ¶ 29-39 (June 3, 2021); Esparza Decl. ¶ 4-8 (June 3, 2021).

content, it is nearly impossible to undo that association. Indeed, what common sense suggests and evidence confirms is that users and advertisers prefer not to see harmful or objectionable content online and will strongly associate that content with the platform on which they saw it.[6]

8. That is because online services, like most businesses, rely on their reputations—which they have often spent many years diligently cultivating and protecting—to gain and maintain users and advertisers.[7] By hosting harmful or objectionable content, as the Act would force them to do, online services would suffer enduring reputational harm. Many long-time users and advertisers will likely quit or reduce use of these online services should their websites become polluted with offensive content. This content is also likely to repel potential users and turn off potential advertisers by greatly deteriorating the value and usability of these services.[8] And, as experience has shown, these deleterious effects would likely lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.

9. In fact, the World Federation of Advertisers—a leading global trade association for advertisers—is adamant that online services must moderate user-

---

[6] *See, e.g.*, Tiffany Hsu & Eleanor Lutz, *More Than 1,000 Companies Boycotted Facebook. Did it Work?*, N.Y. Times (last updated Nov. 17, 2020), https://perma.cc/EL62-NCDP.
[7] Veitch Decl. ¶¶ 8, 21-35 (June 3, 2021); Potts Decl. ¶ 30 (June 3, 2021).
[8] Veitch Decl. ¶ 8 (June 3, 2021)

4

generated content to prevent exposure to objectionable or offensive content.[9] "The issue of harmful content online," WFA's CEO Stephan Loerke explains, "has become one of the challenges of our generation. As the primary monetization mechanism of the online ecosystem, advertisers have a critical role to play in driving positive change [. . .]. A safer social media environment will provide huge benefits not just for advertisers and society but also to the platforms themselves."[10] Not only does this risk immediate financial harm to online businesses if the Act takes effect, it risks permanent, irreparable harm should any of those users or advertisers decide never to return to our members' sites based on their past experience or the detrimental feedback they have heard from others.

10.  Because many online businesses (not just social media platforms, but also online exchanges and websites that allow users to post reviews) rely on advertising as a necessary mechanism to remain in business, the decisions of advertisers to take their business elsewhere have very serious consequences for these businesses, including lost revenue and long-term reputational damage. Not only will advertisers pull their ads and funding immediately after the Act takes effect and force our members to host objectionable content, advertisers will be hesitant to return to these businesses in the future. Consider that WFA's call for advertisers to "driv[e]

---

[9] *See, e.g., WFA and Platforms Make Major Progress to Address Harmful Content*, World Federation of Advertisers (Sept. 23, 2020), https://perma.cc/YC3N-738F.
[10] *Id.*

positive change" reveals an implicit truth about online services and digital platforms: their advertising space is valuable only if it is not displayed next to harmful and offensive content that users do not want to see and advertisers do not want to be associated with. This Act, as discussed, makes our members more vulnerable to advertiser boycotts, which directly hurts their revenue and reputation. In the long run, this loss of a quintessential monetization mechanism could jeopardize the very business model on which so many of these digital services rely.

11. Being able to moderate, organize, curate, and otherwise prioritize content is critical to our members—especially search engines, social media platforms, and other digital services that retrieve and present information responsive to user requests—so that they can deliver users and advertisers the high-quality services they demand.[11] As noted above, it is essential for our members to be able to develop a brand and customer experience that allows them to avoid exposing their users to objectionable, offensive, harmful, or unlawful content. It is also essential that our members be able to organize and curate content in a way that is useful to users. For example, an online marketplace that displayed items in purely chronological order (rather than categorizing them by product type) would be far less helpful in connecting users with the products they are looking for. Similarly, a

---

[11] Potts Decl. ¶¶ 20-30 (June 3, 2021); Veitch Decl. ¶ 21-27 (June 3, 2021); Pavlovic Decl. ¶ 10-14 (June 3, 2021).

social media platform that is forced to deliver content in purely chronological order may cause its users to miss out on more relevant content. This Act would deny our members the ability to organize and display content in ways that best serve the needs of their users.

12. If the Act takes effect on July 1, 2021, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt. NetChoice members would also be harmed by the Act's severe restrictions on their ability to moderate content (action that is protected under the First Amendment) and its provisions exposing our members to potential draconian fines and a new private right of action if they do not comply with these onerous restrictions.

13. The Act will also limit user choice and would pollute family-friendly websites with highly offensive and objectionable content and products, greatly reducing the value of the services for both users and advertisers. Most users do not want to see harmful content such as advocacy of white supremacy, advocacy of extremism and terrorism, medical disinformation like so-called miracle cures for Covid-19, bullying and harassment, and other highly objectionable content. Advertisers likewise do not want their names and products displayed alongside such content. Users and advertisers would likely abandon online businesses that are no longer permitted to moderate offensive and harmful content.

14. Such an outcome would greatly harm our members by directly and

durably undermining their business models. Perhaps more concerning, advertisers and users would associate this content with our members themselves, creating irreparable damage to our members' reputations and harming them well into the future. We have already seen this loss of revenue happen when advertisers removed millions of dollars' worth of ads due to the presence of "extremist content."[12] NetChoice members moved quickly to rectify the situation, but even in this short instance, NetChoice members lost millions.[13]

15.  For example, in 2017 Google's wholly owned subsidiary YouTube lost millions of dollars in advertising revenue after a number of major corporations including Walmart, Verizon, Johnson & Johnson, and Pepsi took down their ads after seeing them distributed next to videos containing extremist content and hate speech.[14] Similarly, in 2020 Facebook saw a nearly identical response as some of the largest businesses in the world including Coca-Cola, Microsoft, Starbucks, Target, Hershey, Honda, and Unilever all pulled their ads and boycotted Facebook citing concerns of third parties' use of the website to spread hate speech and

---

[12] *See, e.g.*, Olivia Solon, *Google's Bad Week: YouTube Loses Millions as Advertising Row Reaches US*, The Guardian (Mar. 25, 2017), https://perma.cc/YWQ5-BXGB; Kim Lyons, *Coca-Cola, Microsoft, Starbucks, Target, Unilever, Verizon: All the Companies Pulling Ads from Facebook*, The Verge (Jul. 2, 2020), https://perma.cc/LTC2-HKFW.
[13] *Id.*
[14] Olivia Solon, *Google's Bad Week: YouTube Loses Millions as Advertising Row Reaches US*, The Guardian (Mar. 25, 2017), https://perma.cc/YWQ5-BXGB.

misinformation.[15] While the short-term loss of revenue resulting from these examples was already substantial, it pales in comparison to the long-term reputational loss this Act will inflict on YouTube and Facebook's overall brand—not to mention the fact that such third-party content runs counter to these companies' policies and standards. Once harmful or offensive content is associated with a business, it is nearly impossible to undo the harm. The content will forever be intertwined with a user or advertiser's perception of the underlying business.

16. Under the Act, NetChoice members will have to host content that they would otherwise remove or restrict because it violates their terms of service and moderation policies, including the harmful and objectionable forms of content referenced above. Under the Act, these online services would be significantly constrained in their ability to remove harmful content that offends their users and advertisers. For example, these online services would be prohibited from removing almost all forms of content originating from any "journalistic enterprise"[16] as defined in the Act. As a result, NetChoice members would be forced to host harmful and offensive content including but not limited to:

---

[15] Kim Lyons, *Coca-Cola, Microsoft, Starbucks, Target, Unilever, Verizon: All the Companies Pulling Ads from Facebook*, The Verge (Jul. 2, 2020), https://perma.cc/LTC2-HKFW.

[16] Fl. Stat. § 501.2041(1)(d)) (defining "journalistic enterprise" to include entities doing business in Florida that "[p]ublishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users" or "[p]ublishes 100 hours of audio or video available online with at least 100 million viewers annually").

9

- Racial epithets;[17]

- Nazi antisemitism;[18]

- Pornographic images and videos;[19]

- Aggressive homophobia and transphobia;[20]

- Harassment and revenge porn;[21]

- Medical misinformation and harmful at-home "remedies";[22]

- Dangerous conspiracy theories;[23] and

- Cyberbullying.[24]

17. The Act would also leave children vulnerable to predators and would tie NetChoice members' hands in trying to protect children and stop predators from using their services to harm children.[25] As Stop Child Predators points out in its

---

[17] *See* Cheyenne MacDonald, *These Abhorrent Images From Parler Show Why Apple Upheld its Ban*, Input (Mar. 10, 2021), https://perma.cc/H7GV-ZFZQ.

[18] *See* Nathan Grayson, *Valve Removes Nazi Steam Profiles After German Complaints*, Kotaku (Dec. 11, 2019), https://perma.cc/6L8E-E7NB; Brianna Sacks, *Reddit Is Removing Nazi And Alt-Right Groups As Part Of A New Policy And Some Users Are Confused*, BuzzFeed News (Oct. 25, 2017), https://perma.cc/W7NL-CKGN.

[19] *See* Craig Timberg, Drew Harwell & Rachel Lerman, *Parler's Got a Porn Problem: Adult Businesses Target Pro-Trump Social Network*, The Washington Post (Dec. 2, 2020), https://perma.cc/2ATC-Z8SQ.

[20] *See Removing Harassing Subreddits*, Reddit (Jun. 10, 2015), https://perma.cc/65FF-TPVC.

[21] *See Removing Harassing Subreddits*, Reddit (Jun. 10, 2015), https://perma.cc/63AH-S3LP; Olivia Solon, *Inside Facebook's Efforts to Stop Revenge Porn Before it Spreads*, NBC News (Nov. 18, 2019), https://perma.cc/L44B-3PB3.

[22] *See* Beth Mole, *Facebook Bans Health and Conspiracy Site Natural News [Updated]*, ARS Technica (Jun. 10, 2019), https://perma.cc/2875-RCYS.

[23] *See* Marianna Spring, *The Casualties of This Year's Viral Conspiracy Theories*, BBC News (Dec. 26, 2020), https://perma.cc/XAD2-3528.

[24] *See* Alexandria Ingham, *7 Real Life Cyberbullying Horror Stories*, Family Orbit Blog (Nov. 11, 2018), https://perma.cc/52DW-B3JN.

[25] Rumenap Decl. ¶¶ 7-11 (June 3, 2021).

10

declaration, the Act would:

- "[R]equire online platforms to host content—legal or not—from 'journalistic enterprises'";
- "[P]rohibit[] them from using algorithms in ways that could flag, remove, restrict, or demote harmful content, including [Child Sexual Abuse Material]";
- "[A]ll but guarantee[] that the online platforms will be [hamstrung] in responding to new threats to children's online safety and to new methods of distributing or soliciting photos and videos of child sexual abuse";
- "[H]inder their ability to adapt to predators' schemes"; and
- "[G]ive child predators a roadmap to escape detection" by forcing platforms to disclose "how algorithms and content moderation work in detail."[26]

18. The Act's harmful effects on online platforms' efforts to combat child predation and CSAM are particularly concerning given the magnitude of harm involved. With few exceptions, no business wants to be associated with material harmful to children, let alone material of child sexual abuse. And certainly no NetChoice member wants child predators to use its service or product to prey on

---

[26] Rumenap Decl. ¶¶ 8-11 (June 3, 2021).

children. That is why, for example, NetChoice members take seriously their responsibility to police their platforms in ways that protect children. And, as Stop Child Predators notes, those efforts resulted in over 45 million referrals to law enforcement of suspected child abuse and child exploitation in 2018 alone.[27] But under this Act, online businesses will have a far more challenging time in policing their services (i) to detect, remove, and report CSAM, (ii) to suspend or block accounts from child predators who meet the criteria for the Act's "journalistic enterprise" or "political candidate" definitions, and (iii) to use algorithms to help protect children from predation and to remove CSAM.

19.    As common sense suggests, NetChoice members do not want to host such content. Nor do they want to aid child predators. But under this Act, they would unfortunately have to do just that. The potential for reputational harm is staggering. And the potential to repel users and advertisers is even worse: Trust between NetChoice members and their users and advertisers would evaporate and be difficult to regain—and understandably so. Society, online and off, has an obligation to protect the most vulnerable among us. And to prevent or at least mitigate harm to children, which is often recurring—each time an image or video is shared, the child

---

[27] Rumenap Decl. ¶ 5 (June 3, 2021) (citing Katie Benner & Mike Isaac, *Child-Welfare Activists Attack Facebook Over Encryption Plans*, N.Y. Times (Feb. 5, 2020), https://perma.cc/E6DD-M562).

suffers again—and often permanent.[28]

20. Further, given the sweepingly broad and vague definition of "journalistic enterprise," this moderation restriction would also elevate and protect, for example, foreign propaganda posted by RT, a cable and satellite TV channel that transmits Russian government propaganda.[29] It would also include the InfoWars website, which has more than 100,000 monthly active users and carries miracle cure ads for products such as "Super Male Vitality," which it touts with the following disclaimer:

> *These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. If you are pregnant, nursing, taking medication, or have a medical condition, consult your physician before using this product.*[30]

21. Some Neo-Nazi websites like Stormfront would also likely meet the definition of a "journalistic enterprise" as they have surpassed the required number

---

[28] *See Paroline v. United States*, 572 U.S. 434, 457 (2014); *id.* at 468-69 (Roberts, J., dissenting); *id.* at 474-75 (Sotomayor, J., dissenting) (citation omitted) ("Congress found, for example, that the 'continued existence' and circulation of child pornography images 'causes the child victims of sexual abuse continuing harm by haunting those children in future years.'").
[29] *See Where to Watch, USA*, Russia Today, https://web.archive.org/web/20201127200231/https://www.rt.com/where-to-watch/USA/ (listing carriage on, among others, Buckeye CableSystem, DISH Network, and DirecTV); *see also* Russell Goldman, *Russia's RT: The Network Implicated in U.S. Election Meddling*, N.Y. Times (Jan. 9, 2017), https://perma.cc/9BR6-VDF7.
[30] Super Male Vitality, InfoWars, https://web.archive.org/web/20210419191038/https://www.infowarsstore.com/super-male-vitality.

13

of average monthly users consistently in the past.[31] As such, social media sites would have to host virtually all of the content published by these types of sites, regardless of how patently offensive or even dangerous the content may be for certain groups and the general public.

22. The Act would also prohibit many NetChoice members from suspending the account of any "candidate"—a qualification that can be satisfied just by paying a candidate filing fee (for some offices, a fee as low as $25)[32]—regardless of the justification for the suspension decision.

23. The Act would also harm NetChoice members by prohibiting them from changing their content-moderation standards or policies more than once every 30 days.[33] This would stop them from quickly and effectively responding to dangerous or harmful trends as they emerge and before they spread virally, such as:

- The "Tide Pod challenge" (teens recording themselves eating Tide laundry detergent pods on video and then challenging friends to do the

---

[31] *See* Josh Harkinson, *White Supremacist Sites Claim Their Traffic Is Booming. Actually, No.*, Mother Jones (Nov. 23, 2016), https://perma.cc/URY6-5AZ9.
[32] Fl. Stat. § 106.011(3)(e)) (defining "candidate" as a person who "seeks to qualify for nomination or election by means of the petitioning process," or "seeks to qualify for election as a write-in candidate," or "receives contributions or makes expenditures, or consents for any other person to receive contributions or make expenditures, with a view to bring about his or her nomination or election to, or retention in, public office," or "appoints a treasurer and designates a primary depository," or "files qualification papers and subscribes to a candidate's oath as required by law.").
[33] *Id.* at § 501.2041(2)(c); Veitch Decl. ¶ 21-24 (June 3, 2021).

14

same);[34]

- The "Knockout game" (people recording themselves attempting to "knock out" an unsuspecting victim with a single strike to the head);[35]

- "Swatting" instigation;[36]

- "Deep fakes" (edited and misleading photos and videos that appear real);[37]

- Election disinformation; and

- Medical disinformation.

24. As stated in other sworn declarations,[38] NetChoice members would incur substantial, unrecoverable costs in complying with the Act's overly burdensome requirements. These costs could not be recouped if Plaintiffs' challenge to the Act is ultimately successful on the merits.

\*   \*   \*

I, **Carl Szabo**, declare under penalty of perjury under the laws of the United

---

[34] Lindsey Bever, *Teens are Daring Each Other to Eat Tide Pods. We Don't Need to Tell you That's a Bad Idea.*, The Washington Post (Jan. 17, 2018), https://perma.cc/65X3-V44L.
[35] Gene Demby, *'The Knockout Game': An Old Phenomenon With Fresh Branding*, NPR (Nov. 27, 2013), https://perma.cc/5H35-F6XS.
[36] See Nichole Manna, *Call of Duty Gaming Community Points to 'Swatting' in Deadly Wichita Police shooting*, The Wichita Eagle (Dec. 29, 2017), https://web.archive.org/web/20210513003321/https://www.kansas.com/news/local/crime/article192111974.html; Michael Kunzelman, *Man has Plea Deal over Neo-Nazi Group's 'Swatting' Calls*, ABC News (Apr. 13, 2020), https://perma.cc/8B6P-ZZHQ.
[37] Ian Sample, *What are Deepfakes – and How Can You Spot Them?*, The Guardian (Jan. 13 2020), https://perma.cc/B2CR-HUTS.
[38] Potts Decl. (June 3, 2021); Veitch Decl. (June 3, 2021); Pavlovic Decl. (June 3, 2021).

15

States that the foregoing is true and correct. Executed this 3rd day of June, 2021 in Washington, D.C.

_____
Carl Szabo
Vice President and General Counsel
NetChoice, LLC d/b/a NetChoice