DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation, <br><br> Plaintiffs, <br><br> v. <br><br> ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida; JONI ALEXIS POITIER, in her official capacity as Commissioner of the Florida Elections Commission; JASON TODD ALLEN, in his official capacity as Commissioner of the Florida Elections Commission; JOHN MARTIN HAYES, in his official capacity as Commissioner of the Florida Elections Commission; KYMBERLEE CURRY SMITH, in her official capacity as Commissioner of the Florida Elections Commission; and PATRICK GILLESPIE, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services, <br><br> Defendants. | Civil Action No.: 4:21-cv-00220-RH-MAF <br><br> **DECLARATION OF NEIL POTTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

I, Neil Potts, declare as follows:

1.     I am currently a Vice President, Trust & Safety Policy, at Facebook, Inc. ("Facebook"), and have been employed there since April 2016. I am over the age of 18 years and maintain an office at 1601 Willow Road, in Menlo Park, California. I make this Declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. I have personal knowledge of the matters set forth in this Declaration and if called as a witness, I could and would testify under oath as follows.

2.     In my role at Facebook, I am familiar with Facebook's content policies and practices, including Facebook's Terms of Service and Community Standards.

## Background

3.     Facebook was founded in 2004. Its products enable more than 3 billion people around the world to share ideas, offer support, and discuss important issues, including politics, public health, and social issues. Users of Facebook's products share over a billion stories and over 100 billion messages, every day.

4.     On Facebook, people can share status updates, photos, videos, and links (among other types of content) with family and friends. People can also follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content, as well as join Groups or attend Events

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

that relate to topics of interest to them. These are some of the many ways in which people can share and interact with others on Facebook.

5.    The average person could be flooded with millions of posts each day from people all over the world, but most people do not have time (or interest) to look at all of their available content. As a result, Facebook has invested significant resources to develop systems to "rank" content that users are most likely to find relevant and meaningful. The rankings are unique to each user and are informed by their individual choices and actions (both historical and real-time).

6.    Facebook displays ranked content in News Feed, a feature it launched in 2006. News Feed uses algorithms to show a constantly updated and personalized list of stories--for example, vacation pictures from friends, videos from family gatherings, articles from local or national news outlets, and much more.

### Content Moderation

7.    Facebook's mission is to empower people to build community and bring the world closer together.

8.    Facebook has invested substantial resources to maintain a safe experience for its community. People will not use Facebook if they do not feel safe. Similarly, advertisers will not advertise on Facebook if they believe it is not effective at removing harmful or offensive content. Users and advertisers have stopped using Facebook for this very reason.

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

9.    Facebook has long recognized the importance of giving its users a voice and allowing debate on topics about which people may disagree. But content that harasses, threatens, seeks to defraud, or violates the rights of other users makes the community less safe and/or puts people at risk of harm.

10.    Facebook has over many years developed robust policies and practices relating to content moderation. Facebook continues to refine these policies and practices based on its experience, evolving societal norms, extraordinary current events, and input from external stakeholders and experts (among others). Moderating speech often involves difficult judgment calls--a task further complicated by the sheer volume of content appearing online, global reach of Facebook's products, and absence of vital context typically accompanying speech in the offline world.

11.    Facebook's publicly available Terms of Service[1] (to which people must agree to use the service) and Community Standards[2] (which people agree not to violate) describe what content is acceptable. Facebook has had terms and policies like these in place for many years, though the specific requirements have evolved.

---

[1] Facebook's Terms of Service is available at: https://www.facebook.com/terms.php.
[2] Facebook's Terms of Service is available at: https://www.facebook.com/communitystandards/.

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

12.     The Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights, including their intellectual property rights."

13.     The Community Standards provide details about what content is not allowed on Facebook. The Community Standards are organized into five categories: (i) violence and criminal behavior, (ii) safety, (iii) objectionable content, (iv) integrity and authenticity, and (v) respecting intellectual property. Within each of those five categories, the Community Standards identify additional subcategories, such as "adult nudity and sexual activity" or "hate speech." Users can see Facebook's policy rationale for prohibiting each category of content and examples. For example, the Community Standards explain that "hate speech" is not allowed on Facebook. Notwithstanding, Facebook recognizes that people sometimes share content that includes someone else's hate speech to condemn it or raise awareness. In other cases, speech that might otherwise violate our standards can be used self-referentially or in an empowering way.  Facebook's policies are designed to allow room for these types of speech. The Community Standards also include information about when content may be accompanied by a sensitivity warning.

14.     Facebook relies on both automated and human review to enforce its terms and policies at scale. For many categories, Facebook's artificial intelligence

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

systems find more than 90% of the content it removes before anyone reports it. Facebook also has over 35,000 people working on safety and security. Teams across the company work together to, for example, prevents millions of attempts to create fake Facebook accounts and remove million pieces of content containing adult nudity, sexual activity, bullying and harassment, child nudity and sexual exploitation of children, and hate speech, content shared by terrorist and organized hate groups, and content that violates intellectual property rights. Facebook publicly shares information about its enforcement efforts in its Transparency Center.[3]

15.     Facebook regularly publishes updates about its efforts to remove harmful content and protect its community. For example, in September 2018, Facebook published an article on how it uses artificial intelligence on Facebook to help suicide prevention efforts.[4] In October 2019, Facebook published an article about the substantial efforts it had undertaken to protect against efforts to interfere with the 2020 U.S. election.[5] In June 2020, Facebook published an article related to labels it would add to content and ads from entities believed to be state-controlled media; in February 2021, Facebook announced it would add informational labels to

---

[3] Facebook's Transparency Center is available at: https://transparency.fb.com/data/.
[4] https://about.fb.com/news/2018/09/inside-feed-suicide-prevention-and-ai/.
[5] https://about.fb.com/news/2019/10/update-on-election-integrity-efforts/.

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

some posts related to climate change.[6] In May 2021, Facebook published a threat report on efforts it is taking to protect against influence operations aimed at manipulating or corrupting public debate on Facebook by governments, commercial entities, politicians, and conspiracy and fringe political groups.[7]

16.     Facebook has had to implement changes to its policies and practices in response to extraordinary situations. For example, following Myanmar's military coup in February 2021, Facebook reduced the distribution of misinformation shared by the Myanmar military but also protected content, including political speech, that allowed "the people of Myanmar to express themselves."[8] Facebook also revised its policies as information emerged during the COVID-19 pandemic.[9]

17.     Facebook has an appeals process for users to request review of most of its enforcement decisions. If Facebook determines it made an incorrect judgment, it will restore the content. In May 2020, Facebook established an external Oversight Board to review some of the most difficult enforcement decisions; the Oversight Board's decisions are binding on Facebook. Facebook also relies on independent, third-party fact-checkers to help identify and review certain types of content. If a

---

[6] https://about.fb.com/news/2020/06/labeling-state-controlled-media/;
https://about.fb.com/news/2021/02/connecting-people-with-credible-climate-change-information/.
[7] https://about.fb.com/news/2021/05/influence-operations-threat-report/.
[8] https://about.fb.com/news/2021/02/an-update-on-myanmar/.
[9] https://about.fb.com/news/2020/04/covid-19-misinfo-update/.

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

fact-checker determines a particular post contains false information, Facebook will label the content and reduce its distribution.

18.     Facebook also has tools that enable users to curate their own News Feeds-- for example, choosing a list of "Favorite" friends and pages to feature, and blocking content from certain users or Pages or reporting content they believe is inappropriate. Facebook has rolled out other features in response to feedback, such as the ability to turn off a counter displaying how many people have "liked" a post or photo.

19.     Facebook has implemented a number of changes over the years to the way it ranks and prioritizes content in News Feed. For example, in January 2018, Facebook announced changes to prioritize content from friends, family, and Groups in News Feed. Facebook recognized this change would likely decrease the amount of time users spent on Facebook, which it did, but believed it would be good for the community and its business over the long term. Facebook also announced recently that users were requesting to see less political content in their News Feeds and so it was studying ways to reduce the prominence of such posts.[10]

---

[10] https://about.fb.com/news/2021/02/reducing-political-content-in-news-feed/.

## S.B. 7072's Impact on Facebook

20.     I understand that on or around May 25, 2021, the State of Florida enacted
S.B. 7072, 2021 Leg. (Fla. 2021) (the "Act"), which is set to go into effect on July
1, 2021.  I understand Facebook's products will be subject to the Act.

21.     The Act will significantly undermine, if not outright prevent, Facebook from
enforcing its content policies and will require substantial and burdensome changes
to the design and operation of its products. I will describe some examples below.

22.     I understand the Act will severely restrict Facebook's ability to enforce its
policies against people or entities that qualify as "journalistic enterprises." To the
extent Facebook can know who even qualifies, this requirement apparently will
force Facebook to carry content posted by any entity meeting this definition,
regardless of whether they post hate speech, or sexually explicit or graphic content.
Nor apparently could Facebook remove content from a "journalistic enterprise"
engaged in U.S. election interference. This provision also seemingly prevents
Facebook from adding labels to content from media companies Facebook believes
are controlled by foreign governments.

23.     I understand the Act will prohibit services like Facebook from terminating or
suspending the accounts of "political candidates," no matter how egregious or
illegal the candidate's conduct. Likewise, Facebook apparently could not remove a

8

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

candidate's account even if she or he were believed to be a foreign operative interfering in U.S. elections.

24.     Further, I understand the Act will prevent Facebook from enforcing its policies against content anyone might post "about" such candidates.  This provision apparently would prevent Facebook from removing hate speech or violent threats directed at a candidate and labelling content believed to be an AI-modified video, or a "deep fake."

25.     I understand the Act mandates enforcement of content policies in an undefined "consistent manner." I understand Facebook could face liability if, for example, it removed or reduced the distribution of content posted by one user, but not similar content posted by another user, regardless of where such users resided and/or shared the content and regardless of vital context. Because Facebook users reside throughout the world and can share content with anyone, and Facebook enforces its policies globally, the Act effectively will impact more than 2 billion Facebook users around the world.

26.     Furthermore, given the sheer volume of content posted on Facebook every day, and because the service is personalized based on what individual users want to see, it will be near impossible for Facebook to treat similar content "consistently" in every instance (even though it endeavors to do so). Facebook will face the impossible choice of ceasing enforcement of its policies and no longer

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

personalizing the product experience, or incurring potentially significant liability from treating allegedly similar content differently, even if inadvertently. Facebook apparently will be precluded from shielding teens from content containing violence or nudity. And Facebook will be forced to consider extraordinary changes to its algorithms and other ranking systems, to mitigate the risk that it is charged with treating similar content "inconsistently."

27.     I understand the Act will restrict Facebook's ability to label content, given the potential charge that labels are applied "inconsistently." Facebook effectively will be precluded from warning users, including teens, before viewing graphically-violent content or about content independent fact-checkers have determined is false.

28.     I understand the Act will impose disclosure obligations every time Facebook removes content that violates its policies or, potentially, when Facebook prioritizes content (which happens every time a user loads her or his News Feed since our product experiences are personalized). Given the extraordinary scale of Facebook's systems and enforcement efforts, as described above and in Facebook's transparency reports, this provision would impose an enormous burden on Facebook, to the extent compliance is even feasible. The Act would also give bad actors a roadmap for evading Facebook's enforcement efforts and make it harder to keep harmful content off Facebook.

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

29.    I understand the Act requires Facebook to "categorize algorithms used for post-prioritization and shadow banning." Though the Act does not explain what information is sufficient to satisfy these requirements, it seemingly requires Facebook to disclose non-public, sensitive information regarding how its algorithms and internal processes operate, which would cause substantial competitive harm to Facebook.

30.    In short, if the Act's restrictions go into effect, it will, among other things, force Facebook to display, arrange, and prioritize content it would otherwise remove, restrict, or arrange differently; it will chill Facebook's own speech; it will lead some users and advertisers to use Facebook less or stop use entirely; it will force Facebook to substantially modify the design and operation of its products; it will force Facebook to disclose highly sensitive, business confidential information; and it will impose excessive burdens on Facebook to notify users every time their content is removed, restricted, or labeled.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 3rd day of June, 2021, in Fall Church, Virginia.

DocuSigned by:

381E463703AB4BC

Neil Potts

11