IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE, a District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a Virginia corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida; JONI ALEXIS POITIER, in her official capacity as Commissioner of the Florida Elections Commission; JASON TODD ALLEN, in his official capacity as Commissioner of the Florida Elections Commission; JOHN MARTIN HAYES, in his official capacity as Commissioner of the Florida Elections Commission; KYMBERLEE CURRY SMITH, in her official capacity as Commissioner of the Florida Elections Commission; BARBRA STERN, in her official capacity as Commissioner of the Florida Elections Commission; and PATRICK GILLESPIE, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services.<br><br>Defendants. | Civil Action No.: |

# DECLARATION OF TECHNOLOGY NETWORK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Servando Esparza, declare as follows:

1.  I am the Executive Director of Texas and the Southeast at TechNet. As TechNet's executive director for Texas and the Southeast, I develop and manage TechNet operations in the Southeast region of the United States, coordinating with TechNet members, TechNet's vice president of state policy and government relations, and other TechNet staff. I work closely, in a bipartisan fashion, with state legislators and their senior staff, policymakers in the executive branch of state governments and at state regulatory bodies, and TechNet members to lobby and advocate on behalf of TechNet's agenda before state legislatures.

2.  Technology Network (dba TechNet) is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies on the planet and represents more than three and a half million employees and countless customers in the fields of information technology, e-commerce, the sharing and gig economies, advanced energy, cybersecurity, venture capital, and finance. TechNet is a 501(C)(6) trade association based in Washington, DC. TechNet represents its members at the state

and federal levels of government by advocating for or against legislation that affects its members.

3. TechNet's work is guided by our federal and state policy principles, which cover a broad set of policy issues. At the state level, these include privacy and security, energy, education and workforce development, financial technology, diversity, and inclusion, new technologies and the future of work, automated vehicles, procurement, smart infrastructure, and taxation. TechNet's policy principles are decided by TechNet members on an annual basis and outlined on TechNet's website[1]. TechNet represents more than 80 companies including Facebook, Google, Amazon, eBay, Apple, AT&T, DoorDash, Dell, HP, Lyft, Uber, and many others. Social media platforms as defined in S.B. 7072, 2021 Leg. (Fla. 2021) ("the Act") would include several TechNet members including Facebook, Google, and Amazon ("affected TechNet members").

4. Social media platforms understand that they have an obligation to remove objectionable content, otherwise their users will be subjected to dangers like images of child endangerment, financial scams, spam, and other harmful links. Companies take this responsibility seriously, removing harmful content in an unbiased manner while keeping their services open to a broad range of ideas. In the overwhelming number of cases, removal of offensive content is accomplished as

---

[1] See www.technet.org.

intended. However, the sheer volume of content – hundreds of millions of posts per day – ensures that both artificial intelligence and human reviewers at companies cannot get it right 100 percent of the time. Billions of transactions, after all, will inevitably lead to errors. The Act will allow users to sue social media platforms merely for enforcing their content policies – standards that are laid out in detail on the platforms' websites.

5. The Act perversely creates an incentive for affected TechNet members to not prohibit and remove any objectionable content on their social media platforms in order to avoid being accused of violating F.S. § 501.2041 (h)(2)(d) and being sued by a user. Florida Statutes § 501.2041 (h)(2)(d) would prohibit affected TechNet members from taking any moderation action (which the Act includes in broadly defined categories named "censor" or "shadow ban") against a user's content or material or "deplatforming" a user from the social media platform except if the material is "obscene" as defined by F.S. §847.001. Content including threatening or intimidating messages, conspiracy theories, anti-vaccine misinformation, Holocaust denial content and content promoting white supremacy do not fall under the definition of obscene and thus could not be without violating the Act. This would cause real-world, irreversible harm in Florida's communities and beyond.

6. Florida Statutes §106.072 (d)(2) prohibits affected TechNet members from deplatforming a candidate for state office, therefore providing preferential

3

treatment only for candidates for office even if a candidate blatantly violates the platform's terms of service or posting guidelines. The Act would prevent social media companies from removing content by candidates even if that content was obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable. For instance, a candidate for office in Florida could post conspiracy theories and promote racist content that blatantly violate affected TechNet member's content guidelines, however the Act prevents an affected TechNet member from either removing content from that candidate or removing the candidate from the platform.

7. Content moderation is at the core of the business models for social media platforms because it is critical for their business that the platforms are safe and family- and workplace-friendly. If affected TechNet members are unable to maintain a family- and workplace-friendly platform, it will affect their ability to attract advertisers who will not want to be associated with objectionable content. Additionally, users may decide to leave the platform if objectionable content that they report is not removed. Losing users and advertisers will have a negative financial impact on affected TechNet members.

8. The Act runs counter to the American free speech law governing content liability on the internet, Section 230 of the federal Communications Decency Act ("Section 230"). Since its enactment in 1996, Section 230's two key provisions

have empowered online intermediaries to remove harmful content while providing them with the immunity that commonly exists in other real world offline contexts – for example, not holding a bookseller liable for libelous books, but rather the individual who committed the libel. Due to Section 230, American companies have the right to curate information on their service to meet the needs and expectations of their customers. Section 230 has supported innovation across the internet while also encouraging companies to be "Good Samaritans" by allowing them to "to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."

9. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of June, 2021 in Austin, Texas.

_____
Servando Esparza
Executive Director, Texas & Southeast
TechNet