# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

NETCHOICE, LLC d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization; and
COMPUTER & COMMUNICATIONS INDUS-
TRY ASSOCIATION d/b/a CCIA, a 501(c)(6)
non-stock Virginia corporation,

**Civil Action No.
4:21-cv-00220-RH-MAF**

      Plaintiffs,

v.

ASHLEY BROOKE MOODY, in her official ca-
pacity as Attorney General of the State of Florida;
JONI ALEXIS POITIER, in her official capacity as
Commissioner of the Florida Elections Commis-
sion; JASON TODD ALLEN, in his official capac-
ity as Commissioner of the Florida Elections Com-
mission; JOHN MARTIN HAYES, in his official
capacity as Commissioner of the Florida Elections
Commission; KYMBERLEE CURRY SMITH, in
her official capacity as Commissioner of the Flor-
ida Elections Commission; and PATRICK GIL-
LESPIE, in his official capacity as Deputy Secre-
tary of Business Operations of the Florida Depart-
ment of Management Services,

      Defendants.

_____

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
## <u>FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ....................................................................................... 1

BACKGROUND ......................................................................................... 5

    A.    Plaintiffs' Members Engage in Content Moderation That Is Vital to Their Services' Operation and Their Users' Protection .......... 5

    B.    In Intent and Operation, the Act Proscribes and Burdens a Wide Range of Moderation Judgments ............................................................. 8

        1.    The Act's Improper Purpose. ...................................................... 9

        2.    The Act Purports to Cover Nearly All Types of Moderation Choices. ............................................................... 10

        3.    The Act Prohibits and Burdens Content Moderation. .............. 11

        4.    The Act's Broad Enforcement Powers and Draconian Sanctions. ................................................................................ 16

ARGUMENT ............................................................................................ 18

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............. 18

    A.    The Act Violates the First Amendment. ......................................... 19

        1.    The First Amendment Protects Private Online Services' Right to Make Editorial Judgments About Content Moderation. ............................................................................. 19

        2.    The Act Is Subject to Strict Scrutiny on Multiple Independent Grounds. ............................................................. 23

            a.    The Act Imposes Impermissible Content and Speaker-Based Restrictions on the Targeted Services' Protected Speech. ........................................ 24

            b.    The Act Unconstitutionally Targets a Select Group of "Social Media" Entities for Their Protected Speech and Perceived Ideology. ...................................... 29

        3.    The Act Fails Strict Scrutiny. ................................................... 32

            a.    The State Has No Legitimate Interest in Overriding the Content Moderation Choices of Private Online Services. ................................................. 32

i

           b.     The Act Is Not Narrowly Tailored to Meet Whatever Purpose the State Might Advance to Support It. .......................................................37

    B.     The Act Is Unconstitutionally Vague...................................41

    C.     The Act Is Preempted by Section 230..................................45

II.    PLAINTIFFS' MEMBER COMPANIES FACE IRREPARABLE INJURY..............................................................................................49

III.   THE BALANCE OF EQUITIES FAVORS AN INJUNCTION..................51

IV.   AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST...............52

CONCLUSION ......................................................................................54

LOCAL RULE 7.1(B) CERTIFICATION ............................................54

LOCAL RULE 7.1(F) CERTIFICATION..............................................55

CERTIFICATE OF SERVICE ..............................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013)..................................................................................27

*Almeida v. Amazon.com, Inc.*,
  456 F.3d 1316 (11th Cir. 2016) .............................................................46

*Am. Orient Exp. Ry. Co. v. Surface Transp. Bd.*,
  484 F.3d 554 (D.C. Cir. 2007)................................................................36

*Ark. Educ. TV Comm'n v. Forbes*,
  523 U.S. 666 (1998).................................................................................20

*Arkansas Writers' Project v. Ragland*,
  481 U.S. 221 (1987)................................................................................30

*Barnes v. Yahoo*,
  570 F.3d 1096 (9th Cir. 2009) ...............................................................46

*Barr v. Am. Ass'n of Political Consultants*,
  140 S. Ct. 2335 (2020).............................................................................25

*Bartnicki v. Vopper*,
  532 U.S. 514 (2002).................................................................................21

*Ben Ezra, Weinstein, & Co. v. America Online Inc.*,
  206 F.3d 980 (10th Cir. 2000) ...............................................................45

*Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*,
  151 F. Supp. 3d 1294 (M.D. Fla. 2015)...............................................36

*Broward Coal. of Condominiums, Homeowners Associations & Cmty.*
  *Organizations Inc. v. Browning*,
  2008 WL 4791004 (N.D. Fla. Oct. 29, 2008)......................................45

*Brown v. Entm't Merch. Ass'n*,
  564 U.S. 786 (2011)................................................................32, 35, 37

iii

*Buckley v. Valeo*,
   424 U.S. 1 (1976) ................................................................................ 34

*City of Ladue v. Gilleo*,
   512 U.S. 43 (1994) .............................................................................. 41

*Daniels v. Alphabet*,
   2021 WL 1222166 (N.D. Cal. Mar. 31, 2021) .................................... 48

*Davison v. Facebook, Inc.*,
   370 F. Supp. 3d 621 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162 (4th
   Cir. 2019) ........................................................................................... 22

*Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996) (plurality opinion) ............................................. 20

*Doe v. Am. Online, Inc.*,
   783 So. 2d 1010 (Fla. 2001) .......................................................... 45, 48

*Domen v. Vimeo, Inc.*,
   991 F.3d 66 (2d Cir. 2021) ....................................................... 4, 46, 48

*e-Ventures Worldwide, LLC v. Google, Inc.*,
   2017 U.S. Dist. LEXIS 88650 (M.D. Fla. Feb. 8, 2017) ............... 22, 36

*Elrod v. Burns*,
   427 U.S. 347 (1976) (plurality opinion) ....................................... 49, 50

*FCC v. Fox TV Stations, Inc.*,
   567 U.S. 239 (2012) .......................................................... 41, 42, 44

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
   866 F.3d 1290 (11th Cir. 2017) ................................................... 49, 52

*Florida Star v. BJF*,
   491 U.S. 524 (1991) ........................................................................... 41

*Gentile v. State Bar of Nev.*,
   501 U.S. 1030 (1991) ......................................................................... 44

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ............................................................. 46

iv

*Harrell v. Fla. Bar*,
608 F.3d 1241 (11th Cir. 2010) ...........................................................42

*Hias, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) ...............................................................47

*Howard v. America Online, Inc.*,
208 F.3d 741 (9th Cir. 2000) ...............................................................37

*Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp.*,
515 U.S. 557 (1995).....................................................................*passim*

*Interstate Circuit, Inc. v. Dallas*,
390 U.S. 676 (1968).............................................................................44

*Jysk Bed'N Linen v. Dutta-Roy*,
810 F.3d 767 (11th Cir. 2015) ...........................................................51

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006) ........................................49, 50, 51, 52

*La'Tiejira v. Facebook*,
272 F. Supp. 3d 981 (S.D. Tex. 2017) .................................................23

*Langdon v. Google*,
474 F. Supp. 2d 622 (D. Del. 2007).....................................................23

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019).........................................................21, 33, 36

*McMahon v. City of Panama City Beach*,
180 F. Supp. 3d 1076 (N.D. Fla. 2016) ...............................................52

*Mezey v. Twitter, Inc.*,
2018 WL 5306769 (S.D. Fla. July 19, 2018) ......................................47

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)......................................................................*passim*

*Minneapolis Star & Tribune Co. v. Minn. Comm'r*,
460 U.S. 575 (1983)............................................................................30

*Mishkin v. New York*,
   383 U.S. 502 (1966)........................................................................38

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021) ........................................................47, 48

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018)...........................................................27, 28, 30

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ..................................................*passim*

*Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n*,
   475 U.S. 1 (1986)...........................................................19, 20, 26, 34

*Police Dep't. of Chicago v. Mosley*,
   408 U.S. 92 (1972)..........................................................................23

*Prager Univ. v. Google LLC*,
   951 F.3d 991 (9th Cir. 2020) ........................................................33

*Publius v. Boyer–Vine*,
   237 F. Supp. 3d 997 (E.D. Cal. 2017) ...........................................23

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)........................................................................32

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)...................................................................*passim*

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997)...........................................................22, 37, 54

*Republican Party of Minn. v. White*,
   536 U.S. 765 (2002).......................................................................39

*Riley v. Nat'l Fed'n of the Blind*,
   487 U.S. 781 (1988)........................................................................27

*Robinson v. Att'y Gen.*,
   957 F.3d 1171 (11th Cir. 2020) ....................................................18

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
141 S. Ct. 63 (2020) (per curiam) ....................................................49

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .........................................................................32

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ........................................................52

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
144 F. Supp. 3d 1088 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526
(9th Cir. 2017) ..................................................................................47

*Solomon v. Gainesville*,
763 F.2d 1212 (11th Cir. 1985) ........................................................42

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ....................................................................*passim*

*Thomas v. Review Bd.*,
450 U.S. 707 (1981) ..........................................................................35

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994) ...................................................................20, 35

*United States v. Alvarez*,
132 S. Ct. 2537 (2012) ......................................................................40

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .............................................................23, 29, 37, 39

*Video Software Dealers v. Webster*,
968 F.3d 684 (8th Cir. 1992) ............................................................38

*Warner Cable Cmmc'ns v. Niceville*,
911 F.2d 634 (11th Cir. 1990) ..........................................................21

*Washington Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) ...............................................25, 27, 28

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017) (en banc) .............................42, 44, 45

*Zeran v. America Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ...................................................................4, 19, 46

*Zhang v. Baidu.com, Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) ......................................................22

**Statutes**

47 U.S.C. s. 230(e)(3) ................................................................................47

47 U.S.C. § 230 ....................................................................................4, 45, 48

47 U.S.C. § 230(b)(2)..................................................................................46

47 U.S.C. § 230(c)(2)(A), and (ii) .............................................................47

47 U.S.C. § 230(e)(3), S.B. 7072 ..............................................................47

Fla. Stat. § 99.061(3)..................................................................................38

Fla. Stat. § 106.011(3)(e) ...........................................................................12

Fla. Stat. § 106.072(2)..........................................................................12, 24

Fla. Stat. § 287.137(1)(c), (2)(a)-(b), (5) .................................................16

**Other Authorities**

Ashley Moody (@AG Ashley Moody), Twitter (May 27, 2021,
   5:15PM),
   https://twitter.com/AGAshleyMoody/status/139802501444899635
   8...................................................................................................................17

Facebook Transparency Report,
   https://transparency.fb.com/data/community-standards-
   enforcement/spam/facebook ...................................................................53

Frank Cerabino, *Could Gov. DeSantis' Trumpy attack on Big Tech
   lead to new Florida theme park?*, The Palm Beach Post (May 26,
   2021) ............................................................................................................2

House Staff Analysis, H.B. 7013, pp. 16-17 (Mar. 15, 2021) ...................9

Jim Saunders, *Florida's "Big Tech" Crackdown Bill Goes to
   DeSantis, but with a Special Exemption for Disney* (Apr. 30, 2021),
   https://www.cltampa.com/news-views/florida-
   news/article/21151908/floridas-big-tech-crackdown-bill-goes-to-
   desantis-but-with-a-special-exemption-for-disney ..............................................2

News Release: Governor Ron DeSantis Signs Bill to Stop the
   Censorship of Floridians by Big Tech (May 24, 2021),
   https://www.flgov.com/2021/05/24/governor-ron-desantis-signs-
   bill-to-stop-the-censorship-of-floridians-by-big-tech/ ..........................................9

Senate Analysis, S.B. 7072, pp. 22-23 (Apr. 16, 2021)............................................8

YouTube Transparency Report,
   https://transparencyreport.google.com/youtube-
   policy/removals?hl=en ..........................................................................................53

**INTRODUCTION**

S.B. 7072 strips online service providers of their First Amendment right to exercise editorial judgment over speech on their private property. Enacted on May 24, this new law (the "Act") compels those providers to host content that violates their policies and community standards. It broadly prohibits them from removing or even limiting exposure of material posted by a loosely defined set of "journalistic enterprises," or material "by or about" anyone who files papers to run as a political candidate in Florida. It dictates how they must arrange and prioritize content. And it imposes an unintelligible mandate of "consistent" moderation that invites arbitrary, standardless enforcement. In short, the Act undermines these companies' vital efforts to protect themselves and their users from an almost unimaginable variety of harmful, offensive, and unlawful material: terrorist propaganda, child sexual abuse imagery, hostile foreign governments' disinformation about U.S. politics or public health, fraudulent schemes, bullying aimed at teenagers, calls for genocide or racist violence, and useless and annoying "spam"—to give just a few examples.

Statements from Florida officials make clear that the Act was adopted specifically to retaliate against certain technology companies, based on the belief that those companies' content-moderation decisions are driven by an objectionable political "ideology." That is why the Act's restrictions target a group of "social media platforms," leaving other entities providing similar services untouched. And that is

why the Legislature—to ensure that favored businesses like Disney and Universal Studios are not "caught up in this"—redefined "social media platform" at the eleventh hour to exclude any service controlled by an entity that "owns and operates a theme park." Ch. 2021-32, § 501.2041(1)(g), at 9-10, Laws of Fla. (hereinafter "Sec.").[1] But even the Act's supporters recognized the dangers of the State's approach. As one legislator put it: "My concern is about potential candidates, about crazy people, Nazis and child molesters and pedophiles who realize they can say anything they want—and by the way it can't even be deprioritized under this bill, it's got to be at the top of the page—if all they do is fill out those two pieces of paper [to qualify as a candidate]."[2]

\*   \*   \*

Plaintiffs are two leading trade associations whose members include companies that qualify as "social media platforms" under the Act and now face broad liability for their editorial decisions. Schruers ¶6; Szabo ¶5. Because the Act will

---

[1] Jim Saunders, *Florida's "Big Tech" Crackdown Bill Goes to DeSantis, but with a Special Exemption for Disney* (Apr. 30, 2021), https://www.cltampa.com/news-views/florida-news/article/21151908/floridas-big-tech-crackdown-bill-goes-to-desantis-but-with-a-special-exemption-for-disney.

[2] Frank Cerabino, *Could Gov. DeSantis' Trumpy attack on Big Tech lead to new Florida theme park?*, The Palm Beach Post (May 26, 2021), https://www.palm-beachpost.com/story/news/columns/2021/05/26/cerabino-how-can-big-tech-side-step-new-florida-law-build-theme-park/7433683002/.

profoundly harm these members' everyday content-moderation efforts, restricting their speech and threatening the very nature of their online communities, Plaintiffs seek to enjoin its enforcement before it takes effect on July 1, 2021. Plaintiffs meet all the requirements for obtaining a preliminary injunction.

*First*, Plaintiffs are likely to succeed on the merits. Disguised as an attack on "censorship" and "unfairness," the Act in fact mounts a frontal attack on the targeted companies' core First Amendment right to engage in "editorial control and judgment." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). The Act imposes a slew of content-, speaker-, and viewpoint-based requirements that significantly limit those companies' right and ability to make content-moderation choices that protect the services and their users—and that make their services useful. The State has no legitimate interest, much less a compelling one, in bringing about this unprecedented result. Moreover, the law is anything but narrowly tailored: its blunderbuss restrictions do nothing to protect consumers or prevent deceptive practices, but instead throw open the door to fraudsters, spammers, and other bad actors who flood online services with abusive material. In short, the Act runs afoul of the basic First Amendment rule prohibiting the government from "[c]ompelling editors or publishers to publish that which reason tells them should not be published." *Id.* at 256, 258.

3

The Act is also preempted by the Communications Decency Act ("Section 230")—a federal law that specifically protects online service providers' right to engage in "private blocking and screening of offensive material" and expressly prohibits States from adopting conflicting regulations. 47 U.S.C. § 230. Congress enacted Section 230 in part "to encourage service providers to self-regulate the dissemination of offensive material over their services," *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), and to allow "computer service providers to establish standards of decency without risking liability for doing so," *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021) (citation omitted). Florida's new law would impose liability for precisely the editorial choices that Section 230 was designed to protect.

*Second*, if the Act were allowed to go into effect as scheduled, Plaintiffs' member companies would immediately face an impossible choice: forgo exercising their First Amendment rights to moderate content, or violate the law and expose themselves to investigation, enforcement action, and massive statutory fines and penalties. This loss of First Amendment rights is a paradigmatic irreparable injury. *See, e.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). And that injury runs parallel to the immense practical harm that the Act would inflict on Plaintiffs' member companies if they are unable to meet the expectations of their

4

users both to provide relevant and useful information and to protect them from objectionable or dangerous content.

*Third*, the balance of equities and public interest tilt heavily in favor of injunctive relief. It is well settled that neither the State nor the public has any interest in enforcing an unconstitutional law. Here, moreover, the public would affirmatively benefit from an injunction. If allowed to take effect, Florida's radical attack on content moderation would have a devastating effect not just on the operations and design of the covered online services, but also on those hundreds of millions of users who would face a much more dangerous and toxic online experience. Plaintiffs respectfully ask the Court to enjoin enforcement of the Act while the merits of their full challenge is resolved.

## BACKGROUND

A.  **Plaintiffs' Members Engage in Content Moderation That Is Vital to Their Services' Operation and Their Users' Protection.**

Plaintiffs' members operate services that make available a wide spectrum of user-created content, including text, videos, audio, and photographs. Veitch ¶3; Potts ¶4; Pavlovic ¶2.  Because humans are humans, these communications comprise the best and the worst of human thought, and everything in between. The best includes material that is culturally significant, highly informative, brilliantly funny, and politically engaging. Schruers ¶10. But unfortunately, any online service that allows

5

users to upload material will find some percentage of users attempting to post dangerous, illegal, or offensive content. Rumenap ¶¶3-5.

Without sustained effort to restrict such content—and users who disseminate it—many online services would be flooded with objectionable material, drowning out good content and making their services far less enjoyable, useful, and safe. Schruers ¶12; Rumenap ¶5. That is why many of Plaintiffs' members have rules governing what kinds of material and uses are and are not permitted. And that is why these companies have invested untold time, resources, and people in moderating such content. These significant editorial efforts reflect the sheer volume of the user-generated content posted online. Schruers ¶9; Veitch ¶6; Pavlovic ¶8.

Content moderation takes many forms, including both human review and automated processes that moderate content on a large scale. Schruers ¶14; Veitch ¶14; Potts ¶14. Sometimes it involves removing objectionable content or terminating the accounts of users who post it. Other times it involves decisions about how to arrange or prioritize content, whether to recommend it to users, and how easy it should be to find. Moderation also includes "age-gating," which makes certain content accessible only to adults or teenagers. Schruers ¶15; Veitch ¶11. In addition, moderation means giving users tools to decide for themselves what content they wish to avoid (e.g., by blocking other users), making content inaccessible to their children, or allowing users to block material that offends their sensibilities. Schruers ¶16; Veitch ¶30;

Potts ¶18. Moderation can also involve affirmative speech by service providers, such as warning labels, disclaimers, or commentary informing users, for example, that certain material has not been verified by official sources or may contain upsetting imagery. Schruers ¶17; Veitch ¶13.

Moderation is equally necessary for even the most basic online functions, like searching for local businesses, shopping in an online store, or arranging material by topic. Schruers ¶18; Pavlovic ¶¶10-13. Without prioritizing and ordering the near-infinite volume of online content, online services would have no practical way to deliver the content users want—or need—to see. For search engines, social media, and many other digital services, the ability to curate information and target messages most relevant to the user may be their most important feature, valued by users, communicators, and advertisers alike. Szabo ¶11; Veitch ¶¶30, 34.

In addition to preserving a safe and useful online environment, content moderation is one vital way that certain digital services create community norms. Pavlovic ¶¶6-8.  Moderation rules and enforcement actions reflect a service's commitment to build and preserve the online environment users experience. Choices about whether to allow pornography, depictions of violence, virulent hate speech, disinformation, get-rich-quick scams, and "quack" medical cures, for example, all reflect the kind of online community the service wishes to foster and what speech and speakers it wishes to avoid. Schruers ¶19; Veitch ¶¶9-10. Indeed, many users

7

choose to use online services based on their content moderation policies and practices, which vary from service to service depending on its particular norms, standards, and commitments.

To serve these goals in the face of a massive and ever-changing body of content requires judgment—normative, context-specific choices about which people can (and do) disagree. Schruers ¶23; Pavlovic ¶8. That is especially true for Plaintiffs' members, some of whom are called upon to make moderation determinations on a vast scale, sometimes billions of times each day. Esparza ¶4. To do so, services must have freedom to adopt (and adapt) policies that allow them to provide a

convenient, safe, and free community for users. Schruers ¶25; Veitch ¶21.

B.    **In Intent and Operation, the Act Proscribes and Burdens a Wide Range of Moderation Judgments.**

S.B. 7072 aims squarely at the content-moderation choices and judgments of Plaintiffs' member companies. Compl. ¶4. In enacting the law—which was signed on May 24, 2021 and is set to take effect on July 1, 2021—the Legislature and Governor ignored the constitutional concerns flagged in two legislative reports. Senate Analysis, S.B. 7072, pp. 22-23 (Apr. 16, 2021);[3] House Staff Analysis, H.B.

---

[3] *Available at* https://www.flsenate.gov/Session/Bill/2021/7072/ Analyses/2021s07072.pre.ap.PDF

7013, pp. 16-17 (Mar. 15, 2021).[4] Indeed, the Act seems purpose-built to infringe the targeted companies' constitutional rights.

        1.     <u>The Act's Improper Purpose</u>.

The Act's supporters made no secret of their goal: to retaliate against a set of online services (pejoratively labelled "Big Tech") for the judgments expressed through their content-moderation decisions, which those supporters consider politically distasteful. Compl. ¶5. As Governor DeSantis officially announced upon signing the bill: "If Big Tech censors enforce rules inconsistently, to discriminate in favor of the dominant Silicon Valley ideology, they will now be held accountable."[5] The same Signing Statement was littered with similar declarations admitting— indeed celebrating—the effort to attack the perceived ***political viewpoints*** of the tar- geted companies. *See id.* (Statement of Lt. Gov. Nunez: touting the Act as intended to "tak[e] back the virtual public square" from "the leftist media and big corporations"); *id*. (Statement of Rep. Ingoglia: expressing a similar intent to protect "our freedom of speech as conservatives"). In short, the statute's avowed purpose is

---

   [4] *Available at* https://www.myfloridahouse.gov/Sections/Documents/load-doc.aspx?FileName=h7013a.APC.DOCX&DocumentType=Analysis&Bill-Number=7013&Session=2021

   [5] News Release: Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://www.flgov.com/2021/05/24/gover-nor-ron-desantis-signs-bill-to-stop-the-censorship-of-floridians-by-big-tech/ ("Signing Statement") (hereinafter "Signing Statement")

to punish disfavored, out-of-state businesses and to stop or deter them from exercising their First Amendment rights in ways the State dislikes. Compl. ¶3.

        2.   The Act Purports to Cover Nearly All Types of Moderation Choices.

The Act applies to "social media platforms," but that poorly defined term would seem to cover nearly any online service that meets certain numerical thresholds for annual gross revenue ($100 million) or monthly users (100 million). Sec. 501.2041(1)(g). At a minimum, the term sweeps in many of Plaintiffs' members whom nobody would think of as "Big Tech," including for example, Etsy (an e-commerce site focused on handmade or vintage items and craft supplies) and Pinterest (a visual discovery engine for finding ideas). Pavlovic ¶¶2, 5.

For covered services, the law regulates four broad categories of content moderation—ominously (but misleadingly) labeled "censorship," "deplatforming," "shadow banning," and "post-prioritization." Compl. ¶¶5, 25, 68a & n.37. Taken together, these categories reach virtually anything a digital service could do with its content—not just removing content or users, but taking any action to "restrict," "regulate," "inhibit the publication," or "limit or eliminate the exposure" of content (Sec. 501.2041(1)(b), (c), (e), (f))—actions that many users would consider essential aspects of these services. *See, e.g.*, Rumenap ¶6; Esparza ¶7; Szabo ¶11. The Act's definition of "censor" further includes "post[ing] an addendum to any content or material posted by a user" (Sec. 501.2041(1)(b))—that is, the service's own

affirmative speech. The definition of "shadow ban" is equally sweeping: it includes any "action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate exposure of a user or content or material posted by a user to other users." Sec. 501.2041(1)(f). This appears to encompass providers' countless choices to restrict (or not recommend) material based on the user's age, interests, or sensitivities. Compl. ¶47; Veitch ¶¶29-30; Potts ¶¶26-27. And the Act's restrictions on "post-prioritization" algorithms will frequently require online services to display content in "sequential or chronological" order—effectively prohibiting displays of content based on, for example, relevance, usefulness, or interest to particular users, including in response to search queries. Sec. 501.2041(1)(e); Pavlovic ¶13.

        3.     The Act Prohibits and Burdens Content Moderation.

Using these broad definitions of its scare-terms, the Act imposes sweeping new mandates on a vast array of content-moderation judgments.

*All-Out Ban on Moderating Content Posted by "Journalistic Enterprises."* The Act prohibits virtually all moderation of content posted by so-called "journalistic enterprises." Compl. ¶7c. This expansive category reaches far beyond traditional news outlets. It includes any entity "doing business in Florida" that operates under an FCC broadcast license, operates a cable channel, or simply meets certain minimum audience and publication or production thresholds—covering

anyone from celebrity influencers to recognized hate groups. Sec. 501.2041(1)(d). When it comes to such entities, "a social media platform may not take any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." Sec. 501.2041(2)(j). There is a single content-based exception—for "obscene" material. *Id*. Thus, if any "journalistic enterprise" posts material that is fraudulent on its face, openly embraces ethnic cleansing or white supremacy, or otherwise clearly violates a service's rules, the provider is categorically barred from removing it—or even making it less visible or adding a warning or label. Veitch ¶34; Potts ¶22; Pavlovic ¶11. And since the provision contains no scienter requirement, services can violate it without knowing that they are moderating content from a "journalistic enterprise." Compl. ¶102; Veitch ¶34.

*Broad Prohibitions on Content Moderation of Political "Candidates."* The Act imposes similar restrictions on content associated with political candidates—a term including anyone "who files qualification papers and subscribes to a candidate's oath as required by law." Fla. Stat. § 106.011(3)(e). First, a "social media platform" "may not willfully deplatform a candidate for office who is known by the social media platform to be a candidate"—by, for example, suspending the account of a user who repeatedly violates the website's policies. Fla. Stat. § 106.072(2). The provision essentially immunizes any candidate from whatever content and conduct rules apply to all other users. Second, during election cycles,

"[a] social media platform may not apply or use post-prioritization or shadow banning algorithms for content and material posted by *or about* a user who is known by the social media platform to be a candidate." Sec. 501.2041(2)(h) (emphasis added). Together with the statute's broad definitions of "shadow banning" and "post-prioritization," this provision essentially prohibits applying automated moderation tools to any material from—or merely *mentioning*—a Florida candidate. Compl. ¶7b. Covered services may not "limit" the "exposure" of such content—or even "place" such content "ahead of, or below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." Sec. 501.2041(1)(e), (f). That prohibition applies no matter how dangerous, egregious, or illegal the content is; it protects, for example, deliberate disinformation about public health, threats or graphic depictions of violence, and misleading "deep fakes." Compl. ¶7b; Potts ¶¶23-24; Veitch ¶33; Pavlovic ¶¶ 10-12.

*Mandate for "Consistent" Moderation.* Next, the Act imposes a broad, undefined consistency mandate across all moderation: "A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users." Sec. 501.2041(2)(b). The Act does not define "consistent" application, and it offers no guidance on when a service's millions or billions of users or posts are comparable enough to require similar treatment, or when changed circumstances, new insights, or updated policies might permit different treatment.

13

Compl. ¶7d; Veitch ¶27-28; Potts ¶¶26-27. The Act further limits services' ability to react to new threats by arbitrarily prohibiting rule changes "more than once every 30 days," and requiring notice of all rule changes before they may be enforced. Sec. 501.2041(2)(c); *see* Szabo ¶23; Potts ¶28.

*Requirement to Allow Opt-Outs of Algorithms.* Due to their scale, many online services use algorithms for a large number of content moderation decisions. *See* Schruers ¶¶23, 29; Veitch ¶¶15-16. Yet the Act limits services from using algorithms for content moderation if the user objects. Services must annually "[a]llow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." Sec. 501.2041(2)(f)(2). This new right gives every user the power to constrain how online services moderate, arrange, and present content on their private services. Compl. ¶7e.

*Compelled Speech Obligations, including Detailed Justifications for Every Moderation Action.* The Act includes numerous compelled speech mandates that further burden content moderation. For example, a covered service must provide a "mechanism" for requesting, and "upon request, [provide] a user with[,] the number of other platform participants who were provided or shown content or posts." Sec. 501.2041(2)(e). Further, the Act prohibits actions to "censor" or "shadow ban" any content, or to "deplatform" any user, without "notifying the [affected] user." Sec. 501.2041(2)(d)(1). This user- and content-specific notice must be provided within 7

14

days, and it must take a specific written form: a "thorough rationale explaining the reason" for the moderation, as well as "a precise and thorough explanation of how the service became aware" of the content at issue, including a "thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable." Sec. 501.2041(3). In addition, services must "categorize algorithms used for post-prioritization and shadow banning" and annually notify users "on the use of algorithms." Sec. 501.2041(2)(f), (2)(g). Finally, the Act vaguely requires services to disclose to candidates that they have "willfully provide[d] free advertising for a candidate." Sec. 106.072(4); *see also* Compl. ¶69. These provisions not only compel speech, and potentially provide a roadmap to allow bad actors to escape detection (Rumenap ¶10; Potts ¶28), but, given the scale of the content moderation efforts at issue, they cumulatively impose an effectively impossible burden on many of Plaintiffs' members. Veitch ¶32; Potts ¶¶28-30.

> *Arbitrary and Selective Prohibitions on State Contracting and Benefits.*

Section 287.137 of the Act imposes unique impairments on covered media services found liable for—or ***even accused of***—violating any federal or state antitrust law. Compl. ¶72. Companies in every other industry may violate (or be accused of violating) antitrust laws without consequence under these provisions. But if the offending person or entity "operates as a social media platform," the online service (as well as a broad array of "affiliates" of any entity found liable) can be blacklisted

as an "antitrust violator vendor," barred from contracting with the State, and made ineligible for a host of other widely available tax and economic benefits. Fla. Stat. § 287.137(1)(c), (2)(a)-(b), (5).

*Theme-Park Exemption.* When faced with imposing these unprecedented burdens on a few favored entities with substantial Florida ties, the State balked. Compl. ¶3. To ensure that those entities—most notably, The Walt Disney Company and Comcast Corporation, which owns Universal Studios—were not "caught up" in its effort to punish "Silicon Valley," the Legislature carved out of its definition of "social media platform" any service "operated by a company that owns and operates a theme park or entertainment complex." Sec. 501.2041(1)(g); Saunders, *supra* at 2. Not surprisingly, this last-minute exemption comes with no explanation of why affiliation with a theme park warrants exclusion from the Act's onerous requirements. Compl. ¶117. But that is self-evident: Florida's undisguised favoritism for politically favored entities with major footprints in the State underscores the law's arbitrary scope and standards.

    4.   The Act's Broad Enforcement Powers and Draconian Sanctions.

The Act's sweeping restrictions are backed by the threat of lawsuits and draconian penalties, and they empower state authorities to conduct unprecedented investigations and enforcement actions, thus chilling private services' exercise of editorial judgment. Compl. ¶¶10, 23; Rumenap ¶11; Potts ¶22. The Attorney General

may investigate any suspected violation of Section 501.2041, "subpoena any algorithm used by a social media platform related to any alleged violation," and bring civil or administrative enforcement actions. Sec. 501.2041(5). Further, the Act creates a private right of action: any "user" may sue if she (1) believes moderation standards were not applied "in a consistent manner" or (2) did not receive the required notice following a moderation action. Sec. 501.2041(6). Courts may award up to ***$100,000 in statutory damages per violation***, plus actual and potentially punitive damages. *Id*. For the Act's provision barring "deplatforming" of candidates, the Florida Elections Commission can seek penalties of $250,000 per day for statewide candidates and $25,000 per day for other candidates. Sec. 106.072(3). This threat is imminent. The Governor's official press release promised to hold the covered online businesses "accountable," to "stand up to these technological oligarchs," and ensure that "real Floridians" are "guaranteed protection against the Silicon Valley elites." Signing Statement; Compl. ¶26. The Attorney General has similarly threatened aggressive enforcement under the Act.[6]

Plaintiffs filed suit almost immediately after S.B. 7072 was signed, and now seek a preliminary injunction enjoining enforcement of its operative provisions, which violate the First Amendment and are expressly preempted by federal law.

---

[6] Ashley Moody (@AG Ashley Moody), Twitter (May 27, 2021, 5:15PM), https://twitter.com/AGAshleyMoody/status/1398025014448996358

## ARGUMENT

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020). A plaintiff seeking a preliminary injunction must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Otto*, 981 F.3d at 860 (citations omitted). Plaintiffs easily meet each requirement here.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

S.B. 7072 is a frontal attack on the federal constitutional and statutory rights of Plaintiffs' member companies. The Act strips those companies of the right to decide whether to host or moderate specific categories of speech and speakers, forces them to guess what amounts to "consistent" treatment of billions of online posts, affirmatively compels them to engage in speech, and threatens them with state-driven investigations and stringent statutory damages if they fail to comply—all in violation of bedrock First Amendment principles. The Act serves no legitimate governmental interest, let alone a "compelling" one, and it cannot survive any degree of constitutional scrutiny, much less the strict scrutiny that is required. Moreover, the Act is preempted by the Communications Decency Act, as it seeks to impose

18

liability on interactive computer service providers for engaging in the "editorial and self-regulatory functions" that Congress enacted Section 230 to protect. *Zeran*, 129 F.3d at 331.

A.     **The Act Violates the First Amendment.**

At its core, S.B. 7027 upends the rights of a targeted group of online services to decide what material to display and how that material should be presented. In other words, the Act takes away these private companies' ability to make editorial judgments—a fundamental component of the "freedom of speech" protected by the First Amendment. Indeed, the Act is *designed* to single out certain online services for special limits on their speech because of the State authorities' open hostility to their perceived political views and "ideology." The law is blatantly unconstitutional.

1.     The First Amendment Protects Private Online Services' Right to Make Editorial Judgments About Content Moderation.

A wealth of precedent confirms that "compelling a private corporation to provide a forum for views other than its own may infringe the corporation's freedom of speech." *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 9 (1986).

In *Tornillo*, the Supreme Court invalidated an earlier effort by the State of Florida to interfere with the editorial judgments of private entities. In the name of eliminating perceived bias in news coverage, Florida compelled newspapers to publish political candidates' responses to criticism appearing in the newspapers. 418 U.S. at 250, 258. In rejecting this law, the Court explained that "the choice of

material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment" protected by the Constitution. *Id*. Specifically, "[t]he Florida statute operate[d] as a command in the same sense as a statute or regulation forbidding appellant to publish specified matter. Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." *Id*. at 256. Simply put, "the Florida statute fail[ed] to clear the barriers of the First Amendment because of its intrusion into the function of editors." *Id*. at 258.

Since *Tornillo*, this principle—that "the editorial function itself is an aspect of 'speech,'" *Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 737–38 (1996) (plurality opinion)—has been applied in countless contexts involving a wide range of entities. *E.g.*, *Ark. Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity."). In *Pacific Gas*, for example, the Court invalidated a state law compelling a heavily regulated private utility to include objectionable third-party speech in its billing envelopes. 475 U.S. at 20-21; *see also Turner Broad. Sys. v. FCC*, 512 U.S. 622, 636 (1994) (First Amendment protects cable companies' right to "transmit speech," including by "exercising editorial discretion over which stations or programs to

include in its repertoire"); *accord Warner Cable Cmmc'ns v. Niceville*, 911 F.2d 634, 637 (11th Cir. 1990) (cable operator has First Amendment interest in "its editorial discretion over which stations or programs to include in its repertoire") (citation omitted).

These principles are not "restricted to the press"; they are "enjoyed by business corporations generally and by ordinary people engaged in unsophisticated expression as well as by professional publishers." *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp.*, 515 U.S. 557 (1995) (invalidating Massachusetts public-accommodation law as to a parade organizer that wished to exclude groups whose message it rejected). That is because "a private speaker does not forfeit constitutional protection simply by combining multifarious voices." *Id.* at 569-70. Rather, "the presentation of an edited compilation of speech generated by other persons … fall[s] squarely within the core of First Amendment security." *Id.* at 570 (giving as examples cable operators' selection of programming, newspaper op-ed pages, and "the simple section of a paid noncommercial advertisement for inclusion in a daily paper") (citations omitted); *accord Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("dissemination of information" is "speech within the meaning of the First Amendment" (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2002) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category") (cleaned up)); *cf. Manhattan Cmty.*

*Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) ("when a private entity provides a forum for speech," it may "exercise editorial discretion over the speech and speakers in the forum").

Recognizing that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied" to the Internet, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997), courts applying these principles have consistently rejected efforts to impose liability on online services (including Plaintiffs' members) for their judgments in moderating content. *See, e.g.*, *e-Ventures Worldwide, LLC v. Google, Inc.*, 2017 U.S. Dist. LEXIS 88650, at *11 (M.D. Fla. Feb. 8, 2017) ("Google's actions in formulating rankings for its search engine and in determining whether certain websites are contrary to Google's guidelines and thereby subject to removal are the same as decisions by a newspaper editor regarding which content to publish… The First Amendment protects these decisions[.]"); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit."), *aff'd*, 774 F. App'x 162 (4th Cir. 2019); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 437, 440 (S.D.N.Y. 2014) ("the Government may not interfere with the editorial judgments of private speakers on issues of public concern" and "there can be no disagreement" that an internet search engine "is engaged in and transmits speech" and may "exercise editorial discretion over its search results"). In short,

Plaintiffs' members have a "First Amendment right to decide what to publish and what not to publish on [their] platform[s]." *La'Tiejira v. Facebook*, 272 F. Supp. 3d 981, 991-92 (S.D. Tex. 2017); *see also, e.g.*, *Publius v. Boyer–Vine*, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017); *Langdon v. Google*, 474 F. Supp. 2d 622, 629 (D. Del. 2007).

As explained below, a straightforward application of these established principles demonstrates that S.B. 7072 violates the First Amendment. "What the Constitution says is that these judgments are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority. Technology expands the capacity to choose; and it denies the potential of this revolution if we assume the Government is best positioned to make these choices for us." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000).

> 2. The Act Is Subject to Strict Scrutiny on Multiple Independent Grounds.

Under the First Amendment, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Yet that is exactly what the Act here does—in myriad ways that cover an immense volume of expressive activity. The Act is a quintessential example of a presumptively unconstitutional speech restriction subject to strict scrutiny.

23

a.     *The Act Imposes Impermissible Content and Speaker-Based Restrictions on the Targeted Services' Protected Speech.*

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).   Likewise, "[b]ecause speech restrictions based on the identity of the speaker are all too often simply a means to control content, the Supreme Court has insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (internal citations omitted). Multiple provisions of the Act evince improper content- and speaker-based preferences.

*Journalistic Enterprises and Candidate Provisions.* Sections 106.071 and 501.2041 impose special restrictions on covered services' editorial judgments concerning "journalistic entities" and political "candidates." These sweeping provisions categorically prohibit a "social media platform" from: (1) taking any action to remove, sequence, and provide more or less prominence to content (broadly and misleadingly termed "censor," "deplatform," and "shadow ban") posted by "journalistic enterprises" (expansively defined) "based on the content of its publication or broadcast," Sec. 501.2041(2)(j); (2) "willfully" terminating or suspending the account of any "candidate" for longer than 14 days, Sec. 106.072(2);

24

and (3) using content-moderation algorithms or automated processes "for content and material posted by or about" a candidate, Sec. 501.2041(2)(h).

By their terms, these provisions "regulate[] speech by particular subject matter" and "communicative content." *Reed*, 576 U.S. at 163. The Act subjects speech "by or about" political candidates to different rules than other speech. Likewise, the Act restricts digital services from moderating content posted by a "journalistic enterprise" "based on the content" of the post—unless it is "obscene." Sec. 501.2041(2)(j). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2346 (2020); *accord Washington Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (law that "singles out one... [type of] campaign-related speech—for regulatory attention" is "content-based"). These provisions also play favorites among classes of speakers, giving two preferred groups—but not other speakers—a right to categorically override the editorial judgments of online services. These content- and speaker-based restrictions strike at the heart of the targeted companies' First Amendment rights; after all, "[f]orbidding the government from choosing favored and disfavored messages is at the core of the First Amendment's free-speech guarantee." *Otto*, 981 F.3d at 861.

By imposing these preferences, the Act interferes with private entities' rights to associate with types of expression they find appropriate and to create communities for those interested in the content authorized by their policies. Pavlovic ¶¶ 9-12;

Potts ¶¶ 22-30; Veitch ¶¶ 33-34. The Act compels association with both government-favored parties and their speech, even where that speech violates the businesses' rules and community standards. The Act does not merely preclude "social media platforms" from terminating the accounts of candidates or removing content posted by "journalistic enterprises"; it even forbids companies from posting their own responses to government-favored speech. Sec. 501.2041(1)(b), (2)(j). Such "forced associations that burden protected speech are impermissible." *Pacific Gas & Elec. Co.*, 475 U.S. at 12.

*"Consistency" Provision"*. The Act does not just play favorites based on content and speakers. Section 501.2041 imposes an even broader mandate: virtually every moderation decision by a covered service must be executed "in a consistent manner among its users." Sec. 501.2041(2)(b). This "consisten[cy]" requirement is facially content-based: it "target[s] speech based on its communicative content" and "cannot be justified without reference to the content of the regulated speech." *Reed*, 576 U.S. at 164. "One reliable way to tell if a law restricting speech is content-based is to ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated." *Otto*, 981 F.3d at 862 (citation and quotation omitted). That is certainly true here. To the extent that this consistency mandate is even intelligible (*infra* at 43-44), evaluating whether a moderation decision is "consistent" requires comparing the content at issue to other

content that was moderated differently (or not at all) and assessing the substance of the service's editorial judgment. "Consistent" content moderation is legal; "inconsistent" content moderation is not. That is anything but content-neutral.

*Compelled Speech Provisions.* "Time and again, the Supreme Court has made clear that it makes little difference for First Amendment purposes whether the government acts as censor or conductor." *McManus*, 944 F.3d at 514-15 (citation and quotation omitted); *accord Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("freedom of speech prohibits the government from telling people what they must say"). This rule applies "equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573; *accord Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 797-98 (1988). And because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," *Riley*, 487 U.S. at 795, compelled speech requirements are necessarily content-based, "presumptively unconstitutional," and subject to strict scrutiny, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

The Act compels "social media platforms" to speak in various ways—most obviously through its mandatory notice provisions. Unless the subject content is legally "obscene," Sec. 501.2041(4), every single time a covered service removes, limits exposure to, sequences content, or suspends a "user"—or, to use the Act's

expansive scare-terms, "censors," "shadow bans," or "deplatforms"—the Act compels the service to send a detailed written notice including:

- "a thorough rationale" explaining why the moderation action was taken;

- "how" the service learned of the material; and

- a "thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable." Sec. 501.2041(3)(a)-(d).

While these facially content-based compelled speech obligations would themselves trigger strict scrutiny, the need for exacting scrutiny is compounded because the duty to speak is triggered by the covered service's *own speech*. A service that does not act to curate user content, or that posts no response to that content, need not provide these notices. But every time a service exercises its First Amendment rights in those ways, it faces an onerous duty to speak in the specific manner the State has directed—powerfully chilling its curatorial and affirmative speech.

"Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 556; *accord Becerra*, 138 S. Ct. at 2378 (invalidating "an unduly burdensome disclosure requirement that will chill [] protected speech"); *McManus*, 944 F.3d at 518 (affirming preliminary injunction against state law requiring digital platforms to make certain factual disclosures about published political advertisements, for "intrud[ing] into the function of editors and forc[ing] news publishers to speak in a way they would not otherwise"). That is why

"content-based burdens must satisfy the same rigorous scrutiny as... content-based bans." *Playboy*, 529 U.S. at 812.

 *Additional Content-Moderation Restrictions.* On top of the provisions discussed above, the Act burdens protected editorial judgments in various additional ways, including by:

- limiting rule changes to once every 30 days and requiring prior notice of any changes before taking action (Section 501.2041(2)(c); *see* Veitch ¶21);

- allowing users to "opt out" of algorithms used to order, curate, and regulate content (Section 501.2041(2)(f)(2); *see* Veitch ¶20);

- requiring services to inform users of such minutiae as the number of other users who have been shown their content (Section 501.2041(2)(e)); and

- mandating that services must put their content-moderation algorithms into categories (Section 501.2041(2)(f)(1); *see* Potts ¶29).

Each of these provisions is designed to increase the burdens (and costs) associated with every content moderation decision, making each one so onerous that the service avoids it. These restrictions, and their corresponding chilling effects on protected speech, further require strict scrutiny.

  b. *The Act Unconstitutionally Targets a Select Group of "Social Media" Entities for Their Protected Speech and Perceived Ideology.*

 The Act warrants strict scrutiny for yet another overarching reason: Its purpose and effect is to single out a particular class of "social media" entities for special, speaker-based restrictions on their speech—and worse, precisely because the State disfavors their perceived political viewpoints. The Supreme Court's "precedents are

29

deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Becerra*, 138 S. Ct at 2378. Because "either singling out [media entities] as a whole or targeting individual [media entities] … poses a particular danger of abuse," *Arkansas Writers' Project v. Ragland*, 481 U.S. 221, 231 (1987), laws that do so are "presumptively unconstitutional," *Minneapolis Star & Tribune Co. v. Minn. Comm'r*, 460 U.S. 575, 583 (1983). Such "[s]peaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Becerra*, 138 S. Ct at 2378 (quoting *Sorrell*, 564 U.S. at 580); *accord Reed*, 576 U.S. at 170 ("a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny").

That is exactly the situation here. The Act singles out particular "social media platforms," saddling them—and only them—with a slew of onerous new burdens. Much like a tax that "targets a small group within the press," *Ragland*, 481 U.S. at 229, Florida's selectively imposed restrictions target particular online media services (defined principally based on size), thus triggering strict scrutiny. *See Minneapolis Star*, 460 U.S. at 591 (invalidating size- and revenue-based taxation of newspapers).

Strict scrutiny would be required even if there were "no evidence of an improper censorial motive." *Ragland*, 481 U.S. at 228. But the record here is packed with such evidence. As the Governor's signing statement confirms, the Act was

overtly intended to target particular "social media" companies based on their perceived political viewpoints—to hold these companies "accountable" because they supposedly "discriminate in favor of the dominant Silicon Valley ideology." The Lieutenant Governor echoed the same theme, heralding the Act for fighting against "the leftist media and big corporations" that "censor if you voice views that run contrary to their radical leftist narrative." And one of the Act's chief legislative sponsors celebrated "this historic piece of legislation" as targeting the supposed "biased silencing" of "conservatives" by "Silicon Valley." Signing Statement.

This viewpoint-based hostility pervades the Act—with its extensive attacks on the targeted services' editorial decision-making, its grant of broad new investigatory and enforcement powers to the Attorney General (including an express power to subpoena "any algorithm used by a social media platform"), sec. 501.2041(8), its new private right of action, backed by penalties of $100,000 in statutory damages and punitive damages, sec. 501.2041(6), and its politically motivated theme-park exception, sec. 501.2041(1)(g). The State's speaker- and viewpoint-based retaliation is also powerfully reflected in Section 287.137 of the Act, which subjects "social media platforms" alone to new antitrust blacklists that categorically bar them, ***and any affiliates***, from doing business with the state or receiving various state benefits.

31

"Just as the inevitable effect of a statute on its face may render it unconstitutional, a statute's stated purposes may also be considered." *Sorrell*, 564 U.S. at 565 (citation omitted). And here those improper purposes are clear. Few things are more plainly unconstitutional than this "blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168. Indeed, "there is an argument that such regulations are unconstitutional per se." *Otto*, 981 F.3d at 864. As the Supreme Court has held: "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *accord R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) ("the government may not regulate use based on hostility—or favoritism—towards the underlying message expressed").

3.     The Act Fails Strict Scrutiny.

For all these reasons, the State has the burden to "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (citation omitted). "Laws or regulations almost never survive this demanding test." *Otto*, 981 F.3d at 862; *accord Brown v. Entm't Merch. Ass'n*, 564 U.S. 786, 799 (2011). This case is no exception.

a.     *The State Has No Legitimate Interest in Overriding the Content Moderation Choices of Private Online Services.*

The State cannot identify a legitimate—much less compelling—interest in countermanding the protected editorial and curatorial speech of the targeted "social media platforms." The Act hints at several such interests, but none satisfy the First Amendment.

*Protecting "Free Speech."* The Act's "Findings" assert that "social media platforms have transformed into the new public town square" and hold a "unique place" in "preserving first amendment protections for all Floridians." S.B. 7072 § 1(4), (6). But the private forums targeted by the Act—however popular they might be—are not state actors, and thus cannot violate *anyone's* First Amendment rights. *See Prager Univ. v. Google LLC*, 951 F.3d 991, 994 (9th Cir. 2020) ("Despite YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a public forum subject to judicial scrutiny under the First Amendment."). In *Halleck*, the Supreme Court confirmed the importance of this rule in protecting "a robust sphere of individual liberty" (139 S. Ct. at 1934):

> If the rule were otherwise, all private property owners and private lessees who open their property for speech would be subject to First Amendment constraints and would lose the ability to exercise what they deem to be appropriate editorial discretion within that open forum. ***Private property owners and private lessees would face the unappetizing choice of allowing all comers or closing the platform altogether.***

*Id*. at 1930-31 (emphasis added). The State's purported "free speech" justification thus turns the First Amendment on its head. It impermissibly seeks to "expand governmental control while restricting individual liberty and private enterprise." *Id*.

at 1934. But even beyond that, the "State cannot advance some points of view by burdening the expression of others." *Pacific Gas*, 475 U.S. at 20; *accord Sorrell*, 564 U.S. at 578-79 ("The State may not burden the speech of others in order to tilt public debate in a preferred direction."). "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976).

*Mandating "Consistent" and "Fair" Editorial Judgments.* The Act likewise asserts that the State "has a substantial interest in protecting its residents from inconsistent and unfair actions by social media platforms." Sec. 1(10). This too fails as a compelling interest. While dressed up in the language of "protecting" consumers, this finding simply confirms the State's intent to override private entities' protected editorial and curatorial judgments. The State apparently believes these companies have exercised their First Amendment rights in "unfair," "inconsistent," or biased ways, and aims to combat their perceived political viewpoints, which the government finds distasteful. Signing Statement. But this very idea "grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression." *Hurley*, 515 U.S. at 579. "Disapproval of a private speaker's statement *does not legitimize* use of the [State's] power to compel the speaker to alter the message by including one more acceptable to others." *Id.* at

34

581 (emphasis added); *accord Tornillo*, 418 U.S. at 256 ("press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated"); *Otto*, 981 F.3d at 859 ("the First Amendment has no carveout for controversial speech").

The same is true of the Act's demand for "consistency." That the government might believe a private party has exercised its speech rights in inconsistent ways does not authorize the government to declare such inconsistency illegal—and threaten the speaker with enforcement actions and statutory penalties. "[B]eliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981). The purpose of protecting editorial judgment is to allow private entities to make such decisions for themselves. *See Turner*, 512 U.S. at 641. That includes the right to make difficult or context-specific decisions in ways that might seem inconsistent, or simply to modify or refine community standards and their application over time, as the services deem appropriate in the face of new challenges. After all, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communications appears." *Brown*, 564 U.S. at 790.

In short, Florida has neither legitimate nor compelling interests in imposing its own views of "consistent" editorial judgments—or in otherwise tying the hands

of private online services, for example by prohibiting them from changing their policies more than once every 30 days. Sec. 501.2041(2)(c). That holds true no matter how "fair or unfair" those judgments might seem to government officials. *Tornillo*, 418 U.S. at 258; *accord e-Ventures*, 2017 U.S. Dist. LEXIS 88650, at *12 (same). Put simply, the State "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579.

   *Common Carrier Treatment.* The legislative "findings" also suggest that "[s]ocial media platforms" should be "treated similarly to common carriers." Section 1(6). But these services are nothing of the sort. "To be a common carrier, a company [must] serve the public indiscriminately and not 'make individualized decisions, in particular cases, whether and on what terms to deal.'" *Am. Orient Exp. Ry. Co. v. Surface Transp. Bd.*, 484 F.3d 554, 557 (D.C. Cir. 2007); *see also, e.g.*, *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 151 F. Supp. 3d 1294, 1308 (M.D. Fla. 2015). But just as "Benjamin Franklin did not have to operate his newspaper as 'a stagecoach, with seats for everyone,'" *Halleck*, 139 S. Ct at 1931 (citation omitted), online services like Plaintiffs' members need not be—and have never been— indiscriminately open to all or indifferent about who uses them and for what purpose. Rather, they maintain detailed content standards, and they enforce them daily by making individualized and content-based decisions about what speech and speakers

are, or are not, welcome. *E.g.*, *Howard v. America Online, Inc.*, 208 F.3d 741, 753 (9th Cir. 2000) (AOL was not a "common carrier" because it "does not act as a mere conduit for information"; exchanged messages were "under AOL's control and may be reformatted or edited"). Florida has no valid interest in trying to transform these services into something akin to common carriers. *Reno*, 521 U.S. at 868-69 (explaining that "the vast democratic forums of the Internet" have never "been subject to the type of government supervision and regulation that has attended the broadcast industry").

> b.   *The Act Is Not Narrowly Tailored to Meet Whatever Purpose the State Might Advance to Support It.*

While the Court need go no further to find Plaintiffs likely to succeed on the merits, it is equally clear that the Act fails the First Amendment's narrow tailoring requirement. "[I]t is not enough for the defendants to identify a compelling interest. To survive strict scrutiny, they must prove that the [Act] 'furthers' that compelling interest and [is] 'narrowly tailored to that end.'" *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 171). The "government carries the burden of proof and, 'because it bears the risk of uncertainty, ambiguous proof will not' satisfy the 'demanding standard' it must meet." *Id.* (quoting *Brown*, 564 U.S. at 799-800). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813.

Even assuming, arguendo, the State had any legitimate interest to advance, the Act is anything but narrowly tailored—it is a broad-based infringement of First Amendment rights.

_Journalistic Enterprises and Candidate Provisions._ First, the Act's expansive "journalistic enterprise" and "political candidate" provisions prohibit essentially *all* moderation of these favored speakers' speech, no matter how minor—or justified— the editorial decision may be. Under the Act, Plaintiffs' members are categorically prohibited from exercising any editorial judgment over (non-obscene) material posted by any "journalistic enterprise," and from terminating the account of a "candidate" no matter the circumstances.[7] That means that anyone from a grand wizard of the Ku Klux Klan to a foreign intelligence agent is immune from having their account terminated after paying the modest filing fee to run for state office. Fla. Stat. § 99.061(3). Likewise, if a "journalistic enterprise" posted graphic images of the killing of American soldiers, a covered service would violate Florida law if it

---

[7] Making matters even worse, there is no requirement that the service provider have any idea that content was posted by a "journalistic enterprise" in the broad and unusual way the Act defines that term. Sec. 501.2041(1)(d), (2)(j). This lack of any knowledge requirement could transform an ordinary moderation decision into a violation of Florida law simply because—unbeknownst to the service—the user in question happened to qualify as a "journalistic enterprise." "Any statute that chills the exercise of First Amendment rights must contain a knowledge element," *Video Software Dealers v. Webster*, 968 F.3d 684, 690 (8th Cir. 1992), but that is simply missing here. *Accord Mishkin v. New York*, 383 U.S. 502, 511 (1966).

"restrict[ed]" who could see those images or otherwise "limit[ed]" their exposure—*or even if it appended a label warning users that the post may contain upsetting material*. These examples only scratch the surface of the countless ways that these provisions "unnecessarily circumscribe protected expression." *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002); Pavlovic ¶11; Potts ¶¶15, 22-24.

*"Consistency" Provision*. Likewise, the "consistency" provision applies to nearly every conceivable class of moderation decisions, including regulating, restricting, editing, inhibiting the publication of content—or even limiting its exposure or posting an addendum to it. Sec. 501.2041(1)(b), (2)(b); Potts ¶26; Veitch ¶28; Schruers ¶33. And it provides no exceptions. A service provider would apparently violate this mandate where it was undisputed that its decision to moderate a given piece of content was "correct"—for example, because the material was pornography that plainly violated the service's rules, or was a known password phishing ploy or "spam"—if the user could point to arguably similar material that the provider had not (yet) removed. The State cannot explain why anything like that is necessary—much less that it is "the least restrictive means for addressing a real problem." *Playboy*, 529 U.S. at 827.

*Compelled Notice Provisions*. So too for the notice requirements—which demand the same detailed notice for *every* instance of moderation, whatever its type or significance. Any act to "limit" the "exposure" of user content or to "regulate"

such content in any way is treated exactly the same. Sec. 501.2041(1)(b), (1)(f), (2)(d). Complying would require covered services to send potentially millions of notices each day. Veitch ¶32. And each notice must include "precise" and "thorough" explanations, along with disclosures of potentially sensitive internal information, regardless of how minor or routine the moderation—and even where it was occasioned by the misconduct of fraudsters, spammers, terrorists, child pornographers, or sex traffickers. Sec. 501.2041(3). In that regard, the Act's mandate is as dangerous as it is overbroad, giving bad actors detailed insights into internal content moderation systems and practices that can help them circumvent or defeat the efforts to address abusive and harmful content. *See, e.g.*, Rumenap ¶10; Potts ¶28. "The First Amendment requires that the Government's chosen restriction on the speech at issue be actually necessary to achieve its interest." *United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012). Florida's rigid, one-size-fits-all compelled speech regime fails that test. Its unnecessarily burdensome provisions seem *designed* to deter covered services from making editorial judgments.

*Theme-Park Exception*. Finally, the arbitrary "theme park" exception underscores that the Act cannot survive any level of First Amendment scrutiny. Sec. 501.2041(1)(g). In addition to the other ways in which the Act is fatally underinclusive (*see* Compl. ¶¶56-57, 92), this politically motivated carveout both "diminish[es] the credibility of the government's rationale for restricting speech in

the first place," and reflects an impermissible "attempt to give one side of a debatable public question an advantage in expressing its views to the people." *City of Ladue v. Gilleo*, 512 U.S. 43, 51-53 (1994). It also renders the Act fatally underinclusive, as a "law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172; *cf. Florida Star v. BJF*, 491 U.S. 524, 540 (1991).

In sum, the Act is fundamentally at odds with the First Amendment. Its content-, speaker-, and viewpoint-based obligations do not advance any legitimate, much less compelling, government interest; and even if they did, they are not remotely narrowly tailored. Instead, the Act serves only to retaliate against selected private speakers for their protected expression, and to deter the exercise of their First Amendment rights. "The Speech Clause has no more certain antithesis." *Hurley*, 515 U.S. at 579.

B.   **The Act Is Unconstitutionally Vague.**

The Act's attack on protected speech suffers from another constitutional infirmity. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc*., 567 U.S. 239, 253 (2012). The rule "requires the invalidation" of any law that fails "to provide a person of ordinary intelligence fair

notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id*. "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id*. As the Eleventh Circuit has explained: "Standards of permissible statutory vagueness are strict in the area of free expression," *Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc), because "vague measures regulating first amendment freedoms enable low-level administrative officials to act as censors, deciding for themselves which expressive activities to permit." "The very existence of this censorial power, regardless of how and whether it is exercised, is unacceptable." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010) (citation omitted).

The Act fails this test, most palpably in its "consistency" requirement. Sec. 501.2041(2)(b). The key statutory term ("consistent manner") is "in no way defined." *Solomon v. Gainesville*, 763 F.2d 1212, 1214 (11th Cir. 1985). This leaves covered "social media platforms" to guess what decisions may (or may not) be deemed "consistent." There is no way to know what that means in the context of online services that host an incalculable variety of content. A vague consistency requirement would chill any number of judgment calls that depend on context or require educational, scientific, or artistic evaluations. For example, imagine two posts containing the same "threatening" language, where one is a direct comment

42

and the other takes the form of song lyrics. Would it violate the Act to remove the former but not the latter? If a covered service permits commentary critical of immigration, is it allowed under the Act to remove comments attacking immigrants? Must it apply its hate-speech rules to gender-based content in the same way as it does to posts about race or religion? Countless similar examples abound, and the Act sheds no light on any of the endless real-world choices that service providers confront every day. Potts ¶¶26-27.

Equally opaque is the Act's provision allowing users to "opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." Sec. 501.2041(2)(f)(2). It is entirely unclear what this means. Does it give content-creators the right to opt out of how the service arranges their content, or does it allow viewers to demand to see posts in "sequential and chronological" order? And how are covered services supposed to comply? "Post-prioritization" is defined to include any action placing "certain content or material ***ahead of, below***, or in a ***more or less prominent*** position than others in a newsfeed, a feed, a view or search results." Sec. 501.2041(1)(e) (emphasis added). But how could a search engine possibly stop placing some content ahead of—or below—other content? Veitch ¶33; Potts ¶5. How could a service delivering a news feed avoid making some content "more" or "less" prominent than other content? The First Amendment—and due process—demand that Florida make clear to regulated

parties "what is required of them so they may act accordingly." *Fox*, 132 S. Ct. at 2317. The Act provides nothing but confusion.

"In this quintessential First Amendment area, the State may not hinge liability on a phrase so ambiguous in nature. And it most certainly may not do so when devastating consequences attach to potential violations." *Wollschlaeger*, 848 F.3d at 1337. Here, those who run afoul of the Act face "civil or administrative action," and any user claiming a failure to apply moderation standards "in a consistent manner" may bring a private cause of action in which the court can award "up to $100,000" per violation and even punitive damages. Sec. 501.2041(5), (6). By leaving services, regulators, and users to subjectively decide what is "consistent" (and thus lawful) or inconsistent (and thus illegal), the Act all but "encourage[s] erratic administration." *Interstate Circuit, Inc. v. Dallas*, 390 U.S. 676, 685 (1968). Yet "[t]he prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991).

This creates a profound chilling effect. Faced with an amorphous legal requirement, backed by a strict-liability rule, services may reasonably conclude that the only practical way to protect themselves from legal sanctions based on alleged inconsistency is to forgo content moderation, even of highly offensive or objectionable material. In fact, that seems to be the State's goal. With its vague

mandate, coupled with threats of endless enforcement, wide-ranging investigations, and draconian liability, the Act appears designed not to regulate actual inconsistency or "unfairness," but rather to create so much uncertainty that the targeted online services will simply give up on—or at least greatly curtail—their editorial and curatorial efforts. "This vagueness is inconsistent with the command of the First Amendment." *Wollschlaeger*, 848 F.3d at 1137 (affirming grant of preliminary injunction against state law banning doctors from "unnecessarily harassing a patient"); *accord Broward Coal. of Condominiums, Homeowners Associations & Cmty. Organizations Inc. v. Browning*, 2008 WL 4791004, at *12 (N.D. Fla. Oct. 29, 2008) (granting preliminary injunction on vagueness grounds where "it is impossible to know—in advance—whether the law will apply to a particular communication about candidates").

> C.    **The Act Is Preempted by Section 230.**

Apart from its First Amendment infirmities, S.B. 7072 is expressly preempted by Section 230 of the Communications Decency Act. Congress enacted Section 230 to protect the "editorial and self-regulatory functions" of online services. *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000). Section 230's title is "Protection for private blocking and screening of offensive material." 47 U.S.C. § 230. Among its core purposes was to "encourage service providers to self-regulate the dissemination of offensive material over their services." *Doe v. Am.*

*Online, Inc.*, 783 So. 2d 1010, 1014 (Fla. 2001). Section 230 thus provides online service providers "with the discretion to identify and remove what they consider objectionable content from their platforms without incurring liability." *Domen*, 991 F.3d at 68. Under Section 230, state efforts "to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330; *accord Barnes v. Yahoo*, 570 F.3d 1096, 1110 (9th Cir. 2009) (explaining that Section 230 "shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties").

In creating this "broad federal immunity," *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2016), Congress gave statutory form to the core First Amendment right to editorial judgment. *See Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) ("First Amendment values … drive the CDA."). At the same time, Section 230 was intended to set a uniform federal Internet policy that protects online services from a quagmire of potentially conflicting state laws. *See* 47 U.S.C. § 230(b)(2); 141 Cong. Rec. H-8640-01, 8670 (statement of Rep. Cox) ("we do not wish to have" an "army of bureaucrats regulating the Internet"). Conflicting state laws are expressly and categorically preempted: "[N]o liability may be imposed

under any State or local law that is inconsistent with this section." 47 U.S.C.
§ 230(e)(3).[8]

The operative provisions of Section 230(c) immunize providers of "interactive
computer services"—a term that includes all of Plaintiffs' members, and covers
"social media platforms" as defined in the Act—from liability for (i) "any action
voluntarily taken in good faith to restrict access to or availability of material that the
provider or user considers to be … objectionable, whether or not such material is
constitutionally protected," 47 U.S.C. § 230(c)(2)(A), and (ii) any other state-law
effort to treat providers as the "publisher or speaker" of others' content, *id*.
§ 230(c)(1).[9] S.B. 7072 runs headlong into these federal protections.

---

[8] S.B. 7072 states that it "may only be enforced to the extent not inconsistent
with federal law and 47 U.S.C. s. 230(e)(3)." Sec. 106.072(5); 501.2041(9). But
this provision only restates what the Supremacy Clause—and Section 230's
preemption provision—already make clear. It certainly does not save the Act from
preemption. Indeed, it confirms that the Act is unenforceable even on its own
terms. *Cf. Hias, Inc. v. Trump*, 985 F.3d 309, 324-25 (4th Cir. 2021) (rejecting
government's effort to rely on similar saving clause to avoid judicial review).

[9] Applying Section 230(c)(1) specifically, courts have held that a wide range of
editorial judgments—including removing user content, suspending or terminating
user accounts, and restricting access to user content—are immune. *See, e.g.*, *Mezey
v. Twitter, Inc*., 2018 WL 5306769, at *1 (S.D. Fla. July 19, 2018); *Sikhs for
Justice "SFJ", Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1095-96 (N.D. Cal.
2015), *aff'd*, 697 F. App'x 526 (9th Cir. 2017); *Murphy v. Twitter, Inc*., 60 Cal.
App. 5th 12, 27 (2021).

By dictating when and how covered services may remove, restrict, or limit the exposure of third-party content in all the ways described above, the Act exposes online services to liability for exactly what Section 230(c) immunizes: "restrict[ing] access to or availability of" content that the service may deem objectionable. *See, e.g.*, *Domen*, 991 F.3d at 68, 72 (Section 230 immunized online service for deleting account that posted sexual-orientation conversion therapy videos); *Daniels v. Alphabet*, 2021 WL 1222166, at *11-13 (N.D. Cal. Mar. 31, 2021) (same for YouTube's removal of conspiracy-theory videos); *Murphy*, 60 Cal. App. 5th at 27 (same for Twitter's suspension of an account for violations of its hateful conduct rules). Similarly, whereas Section 230 confers "significant subjective discretion" on service providers and does not "mandate perfect enforcement of a platform's content policies," *Domen*, 991 F.3d at 68, 72-73, the Act purports to prohibit "inconsistent" moderation, making illegal under state law a vast set of editorial judgments protected by federal law.

As the Florida Supreme Court has recognized, "Congress' clear objective in passing § 230 ... was to encourage the development of technologies, procedures and techniques by which objectionable material could be blocked or deleted either by the interactive computer service provider itself or by the families and schools receiving information via the Internet." *Doe*, 783 So. 2d at 1016 (citation omitted). Florida's effort to make such technologies, procedures, and techniques illegal—and to

48

threaten online services providers with broad liability for applying them—is unequivocally preempted by Section 230.

## II.   PLAINTIFFS' MEMBER COMPANIES FACE IRREPARABLE INJURY.

Because Plaintiffs are likely to succeed on the merits of their First Amendment and preemption challenge to the Act, "they also meet the remaining [preliminary injunction] requirements as a necessary legal consequence." *Otto*, 981 F.3d at 870; *see also FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271 (11th Cir. 2006) (the "remaining injunction considerations" are "easily satisfied" in case challenging law on First Amendment grounds); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

The first non-merits factor, irreparable injury, exists in spades here. Should the law be allowed to take effect, Plaintiffs' member companies will suffer an immediate loss of critical First Amendment rights, which the Supreme Court and Eleventh Circuit have consistently made clear is sufficient, standing alone, to constitute irreparable harm. *Otto*, 981 F.3d at 870 ("Because the ordinances are an unconstitutional direct penalization of protected speech, continued enforcement, even for minimal periods of time, constitutes a per se irreparable injury."); *FF Cosmetics FL*, 866 F.3d at 1298 ("[A]n ongoing violation of the First Amendment

constitutes an irreparable injury."); *KH Outdoor*, 458 F.3d at 1271 (same); *accord Elrod*, 427 U.S. at 373 (plurality opinion).

Although no further injury is needed, the Act's unconstitutional requirements would also inflict immense practical harms on Plaintiffs' members. As discussed above, each time one of those companies moderates *any* content possibly involving a Florida user, it risks violating the law—and facing both a possible enforcement action by the Attorney General or Florida Elections Commission, and private lawsuits by users whom the Act arms with the right to seek ***$100,000 in statutory damages*** for every proven claim. Sec. 501.2041(5), (6). Indeed, the State has trumpeted plans to begin aggressive enforcement of the Act imminently. Thus, unless the Act is enjoined, those companies will face a perilous choice between exposing themselves to massive liability for their speech, or abandoning or drastically curtailing their constitutionally protected content moderation efforts. Veitch ¶20; Potts ¶¶21, 30.

That would come at a massive cost. In addition to the *per se* harm from the loss of First Amendment rights, an online service that forgoes efforts to moderate hosted content faces the prospect of allowing all manner of illegal, dangerous, and highly objectionable material to proliferate on its system. Schruers ¶20; Pavlovic ¶8; Veitch ¶¶16-17; Potts ¶14. That, in turn, will inevitably tarnish the services' brands, reputations, and the online environments they have carefully cultivated. Schruers

¶¶27, 35; Pavlovic ¶¶11-12; Potts ¶30; Veitch ¶8. Users, including families and minors, who frequently choose these services *because* they safely moderate content, will instead be exposed to content that does not belong there. Potts ¶¶26-27; Veitch ¶30. Advertisers may find their ads adjacent to content they find abhorrent and withdraw from the services. Szabo ¶¶6-9; Potts ¶8. Users will also lose the features and functionalities on which they have come to rely: accessing the organized content that they find most useful, relevant, entertaining, or interesting. Pavlovic ¶13. All of this will irreparably damage the goodwill that the services have built, over decades of work, with their hundreds of millions of users. *See, e.g.*, *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 780 (11th Cir. 2015) ("[T]he loss of customers and goodwill is an irreparable injury."). These immediate and irreparable harms further warrant injunctive relief.

III.  **THE BALANCE OF EQUITIES FAVORS AN INJUNCTION.**

The balance of equities tilts just as decisively in favor of injunctive relief, as confirmed by Eleventh Circuit decisions granting preliminary injunctions in First Amendment challenges to state and local laws. As the court explained in *KH Outdoor*, for example, "the threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the [government]. As noted, even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the [government] has no legitimate interest in enforcing an

unconstitutional ordinance." 458 F.3d at 1272; *accord Otto*, 981 F.3d at 870; *FF Cosmetics FL*, 866 F.3d at 1298; *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1111 (N.D. Fla. 2016).

## IV.   AN INJUNCTION WOULD SERVE THE PUBLIC INTEREST.

Finally, the Eleventh Circuit has made clear that, in cases like this, where the government is the "nonmovant," the "third and fourth requirements … can be consolidated. It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance." *Otto*, 981 F.3d at 870; *accord Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law."); *KH Outdoor*, 458 F.3d at 1272 (same); *McMahon*, 180 F. Supp. 3d at 1111 ("[I]t is always in the public interest to protect First Amendment liberties.").

While the Court need go no further, the public interest here would be affirmatively advanced by an injunction preventing enforcement of the Act, as the statute threatens serious harm to a wide range of Internet users. The Act immediately ties the hands of many of the largest online services in limiting the reach of illegal and dangerous content—including material that seeks to recruit American teenagers to join terrorist organizations, glorifies child abuse, aims to defraud seniors out of their retirement savings, or tries to humiliate or threaten people by posting their private information online. Schruers ¶20; Rumenap ¶¶3, 8-11; Veitch ¶¶20-22; Potts

¶¶14, 30; Pavlovic ¶10. This is no small issue. In the first three months of 2021 alone, over five million videos were removed from YouTube to ensure child safety.[10] Nearly 1.5 million videos were removed for violent or graphic content. In the same time frame, Facebook took action against 905 million posts containing spam.[11]

Of course, the Act does not limit only removals of objectionable content; in many instances, it prevents covered services from taking ***any*** action to limit exposure, age-restrict, or even add warning labels to user material. Veitch ¶30; Potts ¶¶26-27; Rumenap ¶8. That is a gift to scammers, spammers, pornographers, sex traffickers, agents of foreign governments, and violent extremists—all of whom will exploit the Act's vague restrictions and massive statutory damages provision to threaten online services and deter them from exercising their First Amendment rights to limit abusive and antisocial behavior on their private property. Veitch ¶20; Potts ¶30; Pavlovic ¶¶8-12. In short, by proscribing and burdening everyday content moderation and curation efforts by leading online services, the Act disserves the public.

---

[10] YouTube Transparency Report, https://transparencyreport.google.com/youtube-policy/removals?hl=en

[11] Facebook Transparency Report, https://transparency.fb.com/data/community-standards-enforcement/spam/facebook

**CONCLUSION**

When the Supreme Court invalidated Congress's first effort to restrict online speech, it explained that the First Amendment does not allow the government to "burn[] the house to roast the pig." *Reno*, 521 U.S. at 882. Like that law, S.B. 7072 "threatens to torch a large segment of the Internet community." *Id*. Plaintiffs respectfully ask that the Court enjoin enforcement of the Act pending a final ruling on the merits.

**LOCAL RULE 7.1(B) CERTIFICATION**

Undersigned Counsel for Plaintiff Computer & Communications Industry Association certifies that he conferred with counsel for Defendants Ashley Brooke Moody, in her official capacity as Attorney General of the State of Florida, and for Joni Alexis Poitier, Jason Todd Allen, John Martin Hayes, and Kymberlee Curry Smith, in their official capacities as Commissioners of the Florida Elections Commission, in a good faith effort to resolve the issue set forth herein. Those Defendants do not consent to the relief requested herein. On June 2, 2021, Counsel for Plaintiff conferred with counsel for Defendant Patrick Gillespie, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services, but such counsel has not responded as to her client's position at the time of filing this Motion.

## LOCAL RULE 7.1(F) CERTIFICATION

Undersigned counsel for Plaintiff Computer & Communications Industry Association certifies that this motion contains 12,489 words, not including the Table of Contents and Table of Authorities.

Respectfully submitted,

*/s/ Douglas L. Kilby*

| | |
|---|---|
| Ilana H. Eisenstein (pro hac vice forthcoming) | Douglas L. Kilby |
| | Florida Bar No. 0073407 |
| Ben C. Fabens-Lassen (pro hac vice forthcoming) | Glenn Burhans, Jr. |
| | Florida Bar No. 0605867 |
| Danielle T. Morrison (pro hac vice forthcoming) | Bridget Smitha |
| | Florida Bar No. 0709581 |
| Jonathan Green (pro hac vice forthcoming) | Christopher R. Clark |
| | Florida Bar No. 1002388 |
| DLA PIPER LLP (US) | STEARNS WEAVER MILLER |
| One Liberty Place | WEISSLER ALHADEFF & SITTERSON, P.A. |
| 1650 Market Street, Suite 5000 | |
| Philadelphia, PA 19103-7300 | Highpoint Center |
| Phone: 215-656-3300 | 106 East College Avenue, Suite 700 |
| Fax: 215-656-3301 | Tallahassee, FL 32301 |
| Email: ilana.eisenstein@dlapiper.com | Phone: (850) 580-7200 |
| ben.fabens-lassen@dlapiper.com | Email: dkilby@stearnsweaver.com |
| danielle.morrison@dlapiper.com | gburhans@stearnsweaver.com |
| jonathan.green@dlapiper.com | bsmitha@stearnsweaver.com |
| | crclark@stearnsweaver.com |

Christopher G. Oprison
Florida Bar No. 0122080
J. Trumon Phillips
Florida Bar No. 84568
DLA PIPER LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Phone: 305-423-8500
Fax: 305-675-6366
Email: chris.oprison@dlapiper.com
trumon.phillips@dlapiper.com
sheila.hall@dlapiper.com

Peter Karanjia (pro hac vice
forthcoming)
James J. Halpert (pro hac vice
forthcoming)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Phone: 202-799-4000
Fax: 202-799-5000
Email: peter.karanjia@dlapiper.com
jim.halpert@dlapiper.com


*Attorneys for Plaintiff NetChoice, LLC*

Lauren Gallo White
(pro hac vice forthcoming)
Meng Jia Yang
(pro hac vice forthcoming)
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Phone: (415) 947-2000
Email: lwhite@wsgr.com
mjyang@wsgr.com

Brian M. Willen
(pro hac vice forthcoming)
Steffen N. Johnson
(pro hac vice forthcoming)
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K St NW
Washington, DC 20006
Phone: (202) 973-8800
Email: bwillen@wsgr.com
sjohnson@wsgr.com


*Attorneys for Plaintiff Computer &*
*Communications Industry Association*

**CERTIFICATE OF SERVICE**

Counsel certifies that the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 3rd day of June, 2021.   In addition, because counsel for Defendants have not yet appeared in this case, I caused a copy of this filing to be delivered today via e-mail to the following, by agreement with counsel:

Blaine H. Winship
Office of the Florida Attorney General
The Capitol
400 S Monroe St., Ste PL-01
Tallahassee, FL 32399-6536
blaine.winship@myfloridalegal.com
*Counsel for Defendants Ashley B. Moody, in her official capacity as Florida Attorney General, and for Joni Alexis Poitier, Jason Todd Allen, John Martin Hayes, And Kymberlee Curry Smith, in their official capacities as Commissioners of the Florida Elections Commission*

Rebekah A. Davis
Deputy General Counsel - Litigation
Florida Department of Management Services
4050 Esplanade Way, Suite 280
Tallahassee, FL 32399-0950
rebekah.davis@dms.fl.gov
*Counsel for Defendant Patrick Gillespie In his official capacity as Deputy Secretary of Business Operations, Florida Department of Management Services*

Respectfully submitted,

*/s/ Douglas L. Kilby*