# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

NETCHOICE, LLC d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization; and
COMPUTER & COMMUNICATIONS INDUS-
TRY ASSOCIATION d/b/a CCIA, a 501(c)(6)
non-stock Virginia corporation,

                    Plaintiffs,

    v.

ASHLEY BROOKE MOODY, in her official ca-
pacity as Attorney General of the State of Florida;
JONI ALEXIS POITIER, in her official capacity as
Commissioner of the Florida Elections Commis-
sion; JASON TODD ALLEN, in his official capac-
ity as Commissioner of the Florida Elections Com-
mission; JOHN MARTIN HAYES, in his official
capacity as Commissioner of the Florida Elections
Commission; KYMBERLEE CURRY SMITH, in
her official capacity as Commissioner of the Florida
Elections Commission; and PATRICK GILLES-
PIE, in his official capacity as Deputy Secretary of
Business Operations of the Florida Department of
Management Services,

                    Defendants.

Civil Action No.
4:21-cv-220-RH-MAF

Hon. Robert L. Hinkle

Magistrate Judge Hon. Mar-
tin A. Fitzpatrick

## *AMICUS CURIAE* BRIEF OF TECHFREEDOM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

TechFreedom respectfully submits this brief as *amicus curiae* in support of Plaintiffs' motion for a preliminary injunction.

## DISCLOSURE STATEMENT OF *AMICUS CURIAE* TECHFREEDOM

*Amicus Curiae* TechFreedom is a non-profit organization that is not a subsidiary or affiliate of any publicly owned corporation and has not issued shares or debt securities to the public. Therefore, no publicly held corporation holds ten percent of its stock. Amicus is not aware of any publicly owned corporation that has a financial interest in the outcome of this litigation and has not cooperated with any such corporation.

None of the counsel for the parties in this litigation has authored this brief, in whole or in part. Furthermore, no party, party's counsel, or outside organization has funded the research, writing, preparation, or submission of this brief.

## INTEREST OF *AMICUS CURIAE*

TechFreedom is a 501(c)(3) nonprofit, nonpartisan think tank based in Washington, D.C. We promote technological progress that improves the human condition. We advance public policy that makes experimentation, entrepreneurship, and investment possible.

Government over-regulation of online speech is a major threat to free expression, free association, and the open Internet. Florida's new online speech code, SB 7072, is the most flagrant government over-regulation of online speech in recent memory. Accordingly, TechFreedom has carefully studied the law. See, e.g., Corbin Barthold & Berin Szóka, *No, Florida Can't Regulate Online Speech*, Lawfare, https://bit.ly/2T61jTj (Mar. 12, 2021) (cited in this action's complaint, Dkt 1, p. 19 n.26); Corbin Barthold & Berin Szóka, *Florida's History of Challenging the First Amendment Shows DeSantis' 'Tech Transparency' Bill Is Doomed*, Miami Herald (Mar. 25, 2021); Ari Cohn, *Governor's Social Media Bill Is Unconstitutional and Unwise*, Tallahassee Democrat, https://bit.ly/3g6UA4J (April 30, 2021).

By claiming that social media platforms should be treated like common carriers, SB 7072 raises another topic of great importance to TechFreedom. A well-known authority in the net neutrality debate, TechFreedom has been publishing and arguing about telecommunications law and common carriage for many years. See, e.g., *In re Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) (FCC's order repealing net neutrality, which cites comments submitted by TechFreedom 29 times).

Recently, TechFreedom has been writing about the misguided notion, now implemented in SB 7072, that common carriage duties might somehow be imposed on social media platforms. See Berin Szóka & Corbin Barthold, *Justice Thomas's Misguided Concurrence on Platform Regulation*, Lawfare, https://bit.ly/3g3dzNf (April 14, 2021). That topic is central to this brief.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

"Every day, they act as the proverbial 'Big Brother,' and 2021 looks an awful lot like the fictitious *Nineteen Eighty-Four*." Governor Ron DeSantis thus denounced social media platforms as he signed SB 7072. See NBC2 News, *Gov. DeSantis Speaking in Miami*, https://bit.ly/34VOu0m (May 24, 2021). Such flourishes of hyperbole by DeSantis and other Florida politicians not only confirm, but also compound, SB 7072's deep flaws. They *confirm* that Florida seeks to curtail private social media websites' control over their own speech—their control, that is, over how they curate and edit content on their platforms. And they *compound* that First Amendment violation by establishing,

unequivocally, that SB 7072 aims to punish those websites for their perceived failure to curate and edit content as the government wants them to.

SB 7072 is, in short, a First Amendment train wreck. It is hardly surprising, therefore, that the Florida legislature has, in SB 7072's legislative "findings," floated several legal theories that (the legislature appears to hope) could enable the law to circumvent the First Amendment altogether. One such theory is that social media platforms are similar to common carriers.

After succinctly reviewing why social media platforms are indeed protected by the First Amendment, we will explore three of the most glaring ways that SB 7072's common-carriage theory is wrong:

- Common carriage is about just that: carriage. At its core, it is a mode of regulating *transportation*. The point of social media is not to carry material along a pathway, as a truck goes along a roadway, or a telephone call along a wire. It is, rather, to offer a diverse array of differentiated media products (microblogs, videochats, photo streams, etc.).

- Common carriage is about the carriage of uniform *things*—people, commodities, and private information parcels. Social media, by contrast, is about sharing manifold, typically public, *speech*. Social media products are expressive, like newspapers and parades. They fit squarely within a First Amendment framework, not a common-carriage one.

- Common carriage is *common*: it is offered to the public indiscriminately. Social media is not, and has never been, offered on such terms. It is—and, to be usable, *must* be—curated and edited. Like good gardeners, the providers of social media are constantly intervening—promoting one thing, demoting another, excluding yet another—to shape and maintain an appealing product.

Having refuted the idea that social media platforms might be like common carriers, we will turn to addressing three Supreme Court cases—*Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980); *Rumsfeld v. FAIR*, 547 U.S. 47 (2006); and *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994)—that have been cited, by commentators, as vindicating that idea. None of them can. Indeed, none comes

5

close. The principal difference between those cases and this one is that, unlike any of the regulated entities in those cases, social media platforms curate and edit the expression that they host. Curation and editing of expression is, quite simply, antithetical to the concept of common carriage.

Finally, we will explain why most, if not all, of SB 7072 would remain unconstitutional even if the platforms *were* similar to common carriers. No common carrier has ever had to serve customers utterly blind to their behavior. Such carriers have always been entitled to refuse service, or bar entry, to anyone who misbehaves, disrupts the service, harasses other patrons, and so on. Because SB 7072 tries to force platforms to serve *even* such people, it is not itself a proper common carriage regulation.

Because SB 7072 blatantly violates the First Amendment, there is no need to reach the topic of common carriage. If that topic *is* reached, however, this brief explains in detail why they are not, and why the Florida legislature's attempt to treat them as though they were is a dead end.

## ARGUMENT

### I.   In Flagrant Violation of the First Amendment, SB 7072 Controls How Social Media Curate and Edit Content.

An intermediary's decisions about how to curate, edit, and present others' speech is itself a core form of speech protected by the First Amendment. Although a robust body of law stands behind this principle, two cases stand out. The first, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), involved another overreaching Florida law. That law gave political candidates a right to reply to critics, free of charge, in the newspaper that published the criticism. But "the choice of material to go into a newspaper," says *Miami Herald*, "constitute[s] the exercise of editorial control and judgment." *Id.* at 258. And a publication, *Miami Herald* holds—even one in a highly concentrated local market—has a First Amendment right to exercise such control and judgment as it sees fit.

The second case, *Hurley v. Irish-American Gay, Lesbian Bisexual Group*, 515 U.S. 557 (1995), addressed whether a state could dictate, by law, which signs and messages a private organization must allow in a St. Patrick's Day parade. The parade, a group seeking to march in it argued, was "merely a 'conduit' for the speech of participants," and not

"'itself a speaker,'" *id.* at 575; but the Supreme Court disagreed. The parade's viewers, Hurley concludes, were likely to believe that the message of each parade participant had been deemed "worthy of presentation," and "quite possibly support as well," by the parade's organizers. *Id.* at 575. That being the case, the organizers had a "fundamental" First Amendment right to "the autonomy to choose the content of [their] own message." *Id.* at 573.

As the plaintiffs explain at length, the principle that curation and editing are themselves First Amendment speech "has been applied in countless contexts involving a wide range of entities." Dkt 30 at CM/ECF pp. 29-33. And social media platforms are among that "wide range of entities" that perform curatorial and editorial functions protected by the First Amendment. *Id.* at CM/ECF pp. 32-33 (discussing court decisions holding so).

Without extensive content moderation, the platforms would be flooded with spam, porn, hate speech, and other unwanted content. *Id.* at CM/ECF pp. 16-18. The platforms' products would become unsafe and all but unusable. *Id.* They would also cease to be the kind of speech environments the platforms seek to cultivate. *Id.* And as we'll discuss

below, they would be widely seen as responsible for the speech they al-
lowed. The platforms thus have a First Amendment right, under *Miami
Herald* and *Hurley* (among other cases), to curate and edit the content
on their sites.

## II. Common-Carriage Rules Do Not Apply (And Would Not Save The Florida Law If They Did).

Even the legal commentators who want to regulate online speech
seem, on the whole, to understand that the First Amendment, as ap-
plied in decisions such as *Miami Herald* and *Hurley*, stands in their
way. Searching for a path around the platforms' constitutional free-
speech protection, some commentators have claimed that the platforms
are common carriers. See, e.g., Clare Morell & Adam Candeub, *How to
Apply Non-Discrimination to Digital Platforms via Common Carriage*,
EPPC, https://bit.ly/3ioDdxJ (May 25, 2021).

SB 7072 alludes, in passing, to this novel theory. "Social media
platforms," it declares, have "become as important" as "public utilities,"
and "should be treated similarly to common carriers." SB 7072 §1(5),
(6). But this "common carrier" theory is a fig leaf for the real goal: retal-
iating against a select group of websites for their perceived political

9

views. Dkt 30 at CM/ECF p. 19 (collecting Florida politicians' statements on the law); see, e.g., Morell & Candeub, *supra* ("few can ignore the clear bias and discrimination on the part of the major Big Tech platforms"). It's no exaggeration to say that, in its quest to "punish" "Big Tech," the Florida legislature has simply tried to slap the label "common carrier" on entities that are nothing of the sort.

The legislature made no effort to *show* that the platforms are common carriers. Moreover, it seems to have given no thought to what it would mean (and not mean) if they *were*. The kind of speech that platforms moderate is often colloquially referred to as "lawful but awful." Common carriers have never been required to tolerate "lawful but awful" behavior.

## A. Social Media Platforms Are Not Common Carriers.

"A common carrier is generally defined as one who, by virtue of his calling and as a regular business, undertakes to transport persons or commodities from place to place, offering his services to such as may choose to employ him and pay his charges." *McCoy v. Pac. Spruce Corp.*, 1 F.2d 853, 855 (9th Cir. 1924). As its name suggests, in other words,

"common carriage" is about offering, to the *public at large* and on *indiscriminate* terms, to carry generic *stuff* from point A to point B.

Social media websites fulfill none of these elements. They are not interchangeable carriers of generic materials. They are, rather, innovative and highly differentiated facilitators of diverse *expression*. Nor do they, or have they ever, held themselves out as serving the public indiscriminately. On the contrary, since their inception, social media websites have cultivated distinct expressive communities.

### 1. Social Media Is Not "Carriage": It Is a Diverse and Evolving Product Unto Itself.

Lumber is lumber. Once it has arrived at a construction site, one two-by-four is generally as good as another. How the wood *got* to the site is, for purposes of the construction itself, irrelevant. Putting common carriage in its proper historical context begins with this fundamental point. The "business of common carriers" is, at its core, "the transportation of property." *German Alliance Ins. Co. v. Kansas*, 233 U.S. 389, 406 (1914).

True, the "transmission of intelligence," has sometimes been treated as "of cognate character" to traditional common carriage. *Id.* at

406-07. But that "cognate character" arose in fields, such as telegraphy and telephony, where information was treated as a commodity product to be purveyed through some sort of (typically scarce) public thorough-fare. See *id.* at 426-27 (Lamar, J., dissenting). The key is that, like traditional common carriage, "they all ha[d] direct relation to the business or facilities of *transportation*" itself. *Id.* at 426 (emphasis added). Although it doubtless contains a message, a telegram could be thought of as a widget of information conveyed along "public ways," *id.*, by a commodity carrier.

Social media platforms are nothing like this. They are not inter-changeable carriers of information widgets. The core aspect of their product, in fact, is not *transportation* at all. What the platforms offer is a wide array of differentiated—and rapidly evolving—forms of public-facing communication. Twitter's main product is a microblog. Instagram is primarily a photo-sharing service. TikTok is centered around short videos. Snapchat's main feature is the evanescence of posts. Clubhouse focuses on providing oral chatrooms. Facebook, which has embraced several of these other forms, has recently recommitted to fostering

group pages. When it comes to social media, Marshall McLuhan's aphorism rings true: the medium is the message.

The FCC has long recognized that "data *transport*" is the essence of telecommunications common carrier service, but that "any offering over the telecommunications network which is more than a basic transmission service" is not. *Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd 11501, 11513, ¶ 25 (1998) (*Stevens Report*) (emphasis added); see generally *Computer III Phase I Order*, 104 FCC. 2d 958, 968, ¶ 10 (1986); *Stevens Report*, 11511-15, ¶¶ 22-32 (summarizing the FCC's treatment of "data processing" since 1966). Indeed, because the bar for qualifying as "more than a basic transmission service" is low, even some services that are far closer to pure information "transport" than social media are not common carriers. Although telephony, which connects users without any intervention by the carrier, is common carriage, even simple text messaging, which requires the carrier to undertake some information processing during transmission, is not. See *In re Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 FCC Rcd. 12075 (2018).

Indeed, even some services that are much closer to pure information "transport" are not common carriers. The FCC treats only "basic" services (later codified as "telecommunications" services) as common carriers. See, e.g., *Computer III Phase I Order*, 104 FCC. 2d 958, 968, ¶ 10 (1986). Services that require even small amounts of intervention by the carrier are "enhanced" services (later codified as "information" services) that do not qualify as common carriage. So although telephony, which connects users without any intervention by the carrier, is common carriage, even simple text messaging, which requires the carrier to undertake some information processing during transmission, is not. See *In re Petitions for Declaratory Ruling on Regulatory Status of Wireless Messaging Service*, 33 FCC Rcd. 12075 (2018).

SB 7072's legislative findings imply that social media offer undifferentiated transportation of information widgets by two carriers, Twitter and Facebook. This is a gross distortion. The social media market is vibrant, diverse, and fast-moving. Social media platforms constantly create new forms of information content. They compete in the market for media products. And that market is abundant and thriving. What

social media websites do *not* do is just passively act as "carriers" of information.

### 2. Social Media Is Not "Carriage": It Is Fundamentally Expressive.

Again, common carriage involves the transportation of people and commodities. Telegraphy and telephony press the boundaries of that core, transportational conception of common carriage. One message, after all, is not interchangeable with another. There is, however, a key sense in which a telegram or a telephone call is indeed just a widget of information: such communications are usually private. And being private, they are usually treated as strictly between the individual sender and recipient. Cf. 18 U.S.C. § 2511 (criminal penalties for intercepting a wire or secretly recording a call). This means that a carrier is entitled to transmit a telegram or a call while remaining indifferent to its content.

Once a "telephone company becomes a medium for public rather than private communication," however, "the fit of traditional common carrier law becomes much less snug." *Carlin Commc'ns, Inc. v. Mountain States Tel. Tel. Co.*, 827 F.2d 1291, 1294 (9th Cir. 1987). While transmitting a private telegram or call can be thought of as carrying an

information widget,[1] transmitting a public-facing call is clearly about *broadcasting* a particular *message*. *Id*. It is fundamentally a mode of expression, *not only* by the direct speaker, *but also* by the purveyor of the speech.[2] "Mass-media speech," in short, "implicates a broader range of free speech values" than does "person-to-person" speech. Christopher S. Yoo, *Free Speech and the Myth of the Internet as an Unintermediated Experience*, 78 Geo. Wash. L. Rev. 697, 701 (2010).

Seeking to evade the "fundamental rule of protection under the First Amendment" that "a speaker has the autonomy to choose the content of his own message," *Hurley*, 515 U.S. at 573, SB 7072 declares that social media platforms are "similar" to "common carriers." Like newspapers or parades, however, platforms present a collection of messages to a wide audience. This public-facing expression is incompatible

---

[1] The non-public nature of the communication is a necessary, but not sufficient, element of common carriage. Again, text messaging, while private, is not a common carriage service today. Nor would Internet-based messaging services such as WhatsApp be.

[2] Congress considered, and rejected, proposals to declare broadcasting a common carrier service in the Radio Act of 1927, and explicitly declared that broadcasting is *not* a common carrier service in the Communications Act of 1934. *Columbia Broadcasting v. Democratic Comm.*, 412 U.S. 94, 105 (1973); see 47 U.S.C. § 153(h).

with—indeed, contradictory to—the concept of common carriage. Calling the platforms "common carriers" anyway doesn't make it so. The Florida legislature could not overturn *Miami Herald* or *Hurley* simply by declaring that newspapers or parades are "common carriers." The same holds true here.

"[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's [First Amendment] right to autonomy over the message is compromised." *Hurley*, 515 U.S. at 576. That is the overriding principle SB 7072 flouts. "Common carriage" is not a magic label that can make this First Amendment violation go away.

### 3. Social Media Is Not "Common": It Is Not Offered Indiscriminately.

At the signing ceremony for SB 7072, Gov. DeSantis claimed that the platforms "evade accountability" by "claiming they're just neutral platforms." NBC2 News, *supra*. To the extent it implies that the platforms offer their services indiscriminately—that they are indifferent to what speech they carry and amplify—this statement is false.

An edited product is, inherently, not common carriage. Although the FCC has waffled over whether most Internet service providers are common carriers, for instance, what's clear is that if an Internet service provider explicitly "hold[s] itself out as providing something other than a neutral, indiscriminate pathway," it is not a common carrier. *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 389 (D.C. Cir. 2017) (Srinivasan, J., concurring in the denial of rehearing en banc). So long as it's up front about what it's doing, a provider that wants to engage in "editorial intervention"—and, thus, not common carriage—is free to do so. *Id.*

All prominent social media platforms engage in such intervention. Twitter, for example, has rules that seek to "ensure all people can participate in the public conversation freely and safely." Twitter, *The Twitter Rules*, https://bit.ly/3cpc75S (last accessed June 7, 2021). "Violence, harassment and other similar types of behavior discourage" such conversation, and are therefore barred by Twitter's rules. Not surprisingly, bans on things like harassment and hate speech are common among online platforms. See, e.g., Facebook*, Community Standards*, https://bit.ly/3g2IUzX (last accessed June 7, 2021); YouTube, *Rules and Policies: Community Guidelines*, https://bit.ly/34UyxaS (last accessed

June 7, 2021); Snap Inc., *Community Guidelines*, https://bit.ly/3w5A1Li (last accessed June 7, 2021).

What's more, they have always been common. "You agree not to use the Web site," Facebook's terms of service said in 2005, to post "any content that we deem to be harmful, threatening, abusive, harassing, vulgar, obscene, hateful, or racially, ethnically or otherwise objectionable." Wayback Machine, *Facebook Terms of Use*, https://bit.ly/3w1gYC5 (Nov. 26, 2005). Indeed, one can go back much farther than that. As early as 1990, Prodigy, one of the first social networks, made its curation function a central part of its marketing strategy. "'We make no apology for pursuing a value system that reflects the culture of the millions of American families we aspire to serve,'" it declared. *Stratton Oakmont, Inc. v. Prodigy Servs.*, 1995 WL 323710 at *3 (N.Y. Sup. Ct. May 24, 1995). "'Certainly no responsible newspaper does less when it chooses the type of advertising it publishes, the letters it prints, the degree of nudity and unsupported gossip its editors tolerate.'" *Id*.

That social media platforms have always engaged in curation and editing should come as no surprise, given that curation and editing are a fundamental aspect of the service those platforms exist to provide.

Without intermediaries, the Internet would be a bewildering flood of disordered information. By organizing that information, intermediaries enable users to "sift through the ever-growing avalanche of desired content that appears on the Internet every day." Yoo, *supra*, 78 Geo. Wash. L. Rev. at 701. Indeed, "social media" could not exist if intermediaries did not play this role. It is only after a platform engages in curation that a mass of "social" media becomes navigable by the average user. More than that, such curation and editing is necessary to make social media a pleasant experience worth navigating. "[T]he editorial discretion that intermediaries exercise" enables users to avoid "unwanted speech" and "identify and access desired content." *Id*.

Not only do platforms refuse to host content indiscriminately; they are widely expected not to do so. Everyone from advertisers to civil rights groups to the media holds the platforms responsible for what they elect to host and amplify. See u/DubTeeDub, "Open Letter to Steve Huffman and the Board of Directors of Reddit, Inc.—If You Believe in Standing up to Hate and Supporting Black Lives, You Need to Act," posted on *r/AgainstHateSubreddits*, reddit, https://bit.ly/3xef0hW (June 8, 2020) (post, up-voted by more than 29,000 users, objecting to reddit's

"supporting and providing a platform for racist users and hateful communities"). In a short span during the middle of last year, for example, Facebook had to deal with a congressional hearing, an advertiser boycott, and a civil rights audit, all of it arising from a widespread perception that Facebook must do more to limit the spread of hate speech. Tiffany Hsu & Elanor Lutz, *More Than 1,000 Companies Boycotted Facebook. Did It Work?*, NY Times, https://nyti.ms/3gjyryR (Aug. 1, 2020); see Dkt 24-1 (Szabo Decl.) ¶¶ 7-10. The underlying assumption is that Facebook can, and should, intervene, extensively, in its own product, to ensure that it is free, so far as possible, of toxic content.

### B. Cases Cited as Potentially Supporting the Social Media-as-Common Carriage Theory Are Inapposite.

We are aware of three cases Florida might raise, in an effort to justify treating social media platforms as common carriers. None of the three is pertinent, however.

### 1. *Pruneyard Shopping Center v. Robins.*

At issue in *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980), was whether a shopping mall could be forced, under the California Constitution, to let students protest on its private property. Yes,

*Pruneyard* says, it could. In so saying, however, *Pruneyard* distinguishes *Miami Herald*. That case involved "an intrusion into the function of editors," *Pruneyard* notes—a "concern" that "obviously" was "not present" for the mall. *Id.* at 88. Here, by contrast, that concern obviously *is* present, as explained above. "Intru[ding]" into social media platforms' "function" as "editors" is what SB 7072 is all about.

What's more, *Pruneyard* announces that "the views expressed by members of the public" on the mall's property would "not likely be identified with that of the owner." *Id.* at 87. Even if that evidence-free declaration was true, at the time, of the mall (we have our doubts), it is certainly not true today of social media platforms. Those platforms *are* "identified" with the speech they host. They are held responsible for it by politicians, civil society groups, and the public at large. A platform that hosts a certain speaker is widely considered to have deemed that speaker "worthy of presentation," and "quite possibly of support as well." *Hurley*, 515 U.S. at 575.

The mall also challenged the speech-hosting obligation under the Takings Clause. On its way to rejecting that challenge, *Pruneyard* makes further findings pertinent to this case. The students, *Pruneyard*

notes, "were orderly," and the mall remained free to impose "time, place, and manner regulations" on others' speech that would "minimize any interference with its commercial functions." 447 U.S. at 83-84. This makes *Pruneyard* nothing like the case here, in which Florida seeks to make platforms host hostile, abusive, highly disruptive speech. In effect, SB 7072 requires the platforms to host *disorderly* conduct, and it *bars* them from imposing reasonable time, place, and manner regulations.

## 2. *Rumsfeld v. FAIR.*

In protest of the military's "Don't ask, don't tell" policy, various law schools stopped allowing military recruiters on their campuses. Let the recruiters in, Congress responded, in a law known as the Solomon Amendment, or lose government funding. *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), rejected an association's contention that the Solomon Amendment violates the First Amendment.

Distinguishing *Miami Herald* and *Hurley*, *FAIR* concluded that "accommodating the military's message d[id] not affect the law schools' speech." *Id.* at 63-64. Unlike "a parade, a newsletter, or the editorial page of a newspaper," *FAIR* explains, "a law school's decision to allow

recruiters on campus is not inherently expressive." *Id*. at 64. The pertinent distinction between job-recruitment meetings, on the one hand, and parades, newsletters, and newspapers, on the other, is not hard to divine. One-on-one recruitment meetings are akin to telegraphic or telephonic communication—the passage of private information widgets— and not at all like the public-facing expression of views undertaken by a parade, a publication, or a platform.

SB 7072 requires social media to platform various speakers, and to spread and amplify, far and wide, almost anything those speakers wish to say. It thus looks nothing like the law at issue in *FAIR*, a case about *direct* communication between a recruiter willing to talk and a law student willing to listen. For *FAIR* to resemble *this* case, Congress would have had to pass a law altogether different from the Solomon Amendment. Picture a law requiring law schools to let neo-Nazis maraud their halls toting signs and bullhorns. *That* is the equivalent of what SB 7072 requires of select social media platforms.

### 3. *Turner Broadcasting System v. FCC.*

In the 1992 Cable Act, Congress imposed "so-called must-carry provisions" that "require[d] cable operators to carry the signals of a

specified number of local broadcast television stations." *Turner Broad-casting System, Inc. v. FCC*, 512 U.S. 622, 630 (1994). While concluding that cable operators engage in speech protected by the First Amendment, *id*. at 636, *Turner* subjects the must-carry provisions merely to intermediate, rather than to strict, scrutiny. *Turner* is positively brimming, however, with distinctions that render it inapplicable to social media platforms.

*First*, like traditional common carriers, see *German Alliance*, 233 U.S. at 426-27 (Lamar, J., dissenting), cable systems use "physical in-frastructure"—"cable or optical fibers"—that require "public rights-of-way and easements." *Id*. at 627-28. This setup "gives the cable operator bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home." *Id*. at 656. This means that "a cable operator, *unlike speakers in other media*," can "silence the voice of competing speakers with a mere flick of the switch." *Id*. (emphasis added). On precisely this ground, *Turner* distinguishes *Miami Herald*, notwithstanding the fact that a "daily newspaper" may "enjoy monopoly status in a given locale." *Id*. "A daily newspaper," after all, "no matter how secure its local monopoly, does not possess the

power to obstruct readers' access to other competing publications." *Id.*
Just the same can be said of social media platforms. Whatever the level
of their market control—it's not much, in our view (see our discussion
above of diverse and proliferating social media products)—they do not,
when "assert[ing] exclusive control over [their] own … copy," thereby
"prevent other[s]" from "distribut[ing]" competing products "to willing
recipients." *Id.*

*Second*, "cable personnel" generally "do not review any of the ma-
terial provided by cable networks," and "cable systems have no con-
scious control over program services provided by others." *Id.* at 629
(quoting Daniel Brenner, *Cable Television and the Freedom of Expres-
sion*, 1988 Duke L.J. 329, 339 (1988)). Cable operators are thus, "in es-
sence," simply "conduit[s] for the speech of others." *Id*. They generally
transmit speech "on a continuous and unedited basis to subscribers." *Id.*
This makes sense, given that most broadcast television content is com-
paratively sanitized and, certainly when compared to the worst online
speech, uncontroversial. *Turner* concludes, therefore—again while dis-
tinguishing *Miami Herald*—that "no aspect of the must-carry provisions
would cause a cable operator or cable programmer to conclude that 'the

safe course is to avoid controversy,' and by so doing diminish the free flow of information and ideas." *Id*. at 656 (quoting *Miami Herald*, 418 U.S. at 257). This is the precise opposite of the situation with social media platforms. The platforms are not simply "conduits," they are provided on a curated and edited basis, and they do sometimes take "the safe course" and "avoid controversy." Witness, for instance, Twitter's decision to stop hosting political advertisements. See *Wash. Post v. McManus*, 944 F.3d 506, 517 n.4 (4th Cir. 2019).

Third, and relatedly, *Turner* declares—again while distinguishing *Miami Herald* (and it could have added *Hurley* to boot)—that there was "little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator." *Id*. at 655. This, again, because of the cable operators' "long history of serving" merely "as a conduit for broadcast signals." *Id*. The cable operators did not even contest this point; they did "not suggest" that "must-carry" would "force" them "to alter their own messages to respond to the broadcast programming they [we]re required to carry." *Id*. As we've explained, the "long history" behind social media could not

be more different. Naturally, given that history, the platforms vigorously contend that they would have to "respond" to certain messages they might be required "to carry."

If more support were needed for the distinction between cable and the Internet, Section 230 provides it. *Turner* addresses a law declaring cable operators to be mere conduits. In Section 230, by contrast, Congress declares that websites shall not "be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Congress thus endorsed the notion that websites should curate and edit content on their platforms, free (in most cases) of the concern that doing so could trigger liability. See *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997).

Fourth, we arrive at last at the central issue in *Turner*: the purported content-neutrality of the must-carry provisions. "Broadcasters, which transmit over the airwaves, are favored," *Turner* acknowledges, "while cable programmers, which do not, are disfavored." *Id.* at 645. But this distinction, *Turner* concludes, did not make the must-carry provisions a content-based law subject to strict scrutiny. According to

28

*Turner*, "Congress' overriding objective … was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free [broadcast] television programming." *Id*. at 646. In other words, the law was purely about "economic incentive[s]." *Id*. at 646. The cable operators, for their part, did little to argue otherwise, raising only "speculati[ve]" "hypothes[es]" about "a content-based purpose" for the law. *Id*. at 652. Here, by contrast, SB 7072 "is riddled with [content-based] distinctions." Eric Goldman, *Florida Hits a New Censorial Low in Internet Regulation (Comments on SB 7072)*, Technology & Marketing Law Blog, https://bit.ly/2T8R5BC (June 3, 2021) (analyzing SB 7072's "many discriminatory classifications").

### C. The Burdens Imposed by Florida's Law Go Far Beyond Common Carriage

Florida's law effectively compels social media services to host all users, however obnoxious their behavior. This is not what common carriage meant at common law. "An innkeeper or common carrier has always been allowed to exclude drunks, criminals and diseased persons[.]" *Lombard v. Louisiana*, 373 U.S. 267, 280 (1963) (Douglas, J., concur-

ring) (citing Bruce Wyman, *Public Service Corporations* (1911), available at https://bit.ly/3wb5c84). "It is not the mere intoxication that disables the person from requiring service; it is the fact that he may be obnoxious to the others." Wyman, *supra*, ch. 18 § 632. "Telegraph companies likewise need not accept obscene, blasphemous, profane or indecent messages." *Id*. § 633; see also *id*. § 639 (discussing a carrier's right to set restrictions on the transport of "insane persons").

In short, common carriers enjoyed broad discretion to "restrain" and "prevent" "profaneness, indecency, [and] other breaches of decorum in speech or behavior." *Id*. § 644. They were not even "bound to wait until some act of violence, profaneness or other misconduct had been committed" before expelling those whom they suspected to be "evil-disposed persons." *Id*.

True, there were limits. A telegraph company that refused to carry an "equivocal message"—one whose offensiveness was debatable—did so "at its peril." *Id*. § 632. Although a telephone service could "cut off" a "habitually profane" subscriber, it had to show some tolerance to someone who "desisted from objectionable language upon complaint being

made to him." *Id*. And regulators could (and in some areas still can) assess whether certain of a common carrier's rules and prohibitions are "just and reasonable." See, e.g., 47 U.S.C. §§ 201(b), 202(a). But in general, the "principle of nondiscrimination does not preclude distinctions based on reasonable business classifications." *Carlin*, 827 F.2d at 1293. Thus, a telephone company could refuse to carry all price advertising in its yellow pages directory (a common carrier service) even though this was an "explicit content-based restriction." *Id*.

SB 7072 cannot qualify as a proper common-carriage law, because it makes a hash of these important distinctions. Above all, of course, it bars social media from setting reasonable rules governing "indecent messages." Wyman, *supra*, § 633.

## CONCLUSION

The motion for preliminary injunction should be granted.

June 11, 2021                Respectfully Submitted,

/s/Lawrence G. Walters

Lawrence G. Walters
(Florida Bar No. 776599)
Walters Law Group
195 W. Pine Ave.
Longwood, FL 32750
Phone: (407) 975-9150
Email: larry@firstamendment.com
         paralegal@firstamendment.com

Berin M. Szoka (*pro hac vice forthcoming*)
(D.C. Bar No. 496094)
TECHFREEDOM
110 Maryland Ave. NE, Suite 205
Washington, DC 20002
Phone: (202) 803-2867
Email: mail@techfreedom.org

*Counsel for Amicus Curiae TechFreedom*

32

## STATEMENT OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and N.D. FL Local Rule 7.1(F) because it contains 5,786 words, including the supporting Motion but excluding the parts of the brief exempted by Fed. R. App. P. 32(a) and Local Rule 7.1(F), and the type style requirements of Fed. R. App. P. 32(a) because this brief has been prepared in a proportionally spaced typeface (Century Schoolbook 14-point type) using Microsoft Word.

/s/ Lawrence G. Walters

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed through the CM/ECF system on this 11th day of June, 2021, which will serve a copy by email on all counsel of record.

/s/ Lawrence G. Walters