# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization,
and COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a CCIA, a
501(c)(6) non-stock Virginia corporation,

      Plaintiffs,

v.

ASHLEY BROOKE MOODY, in her official
capacity as Attorney General of the State of
Florida, *et al*.,

      Defendants.

_____/

**Civil Action No.
4:21-cv-00220-RH-MAF**

### *PROPOSED*
### BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS, CONNECTED COMMERCE COUNCIL, CTA®, ENGINE ADVOCACY, INFORMATION TECHNOLOGY & INNOVATION FOUNDATION, NATIONAL BLACK JUSTICE COALITION, PROGRESSIVE POLICY INSTITUTE, TECHNET, AND WASHINGTON CENTER FOR TECHNOLOGY POLICY INCLUSION IN SUPPORT OF <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF AMICI CURIAE .............................................................1

SUMMARY OF ARGUMENT ................................................................5

ARGUMENT .........................................................................................7

    I.     THE ACT HARMS CONSUMERS .....................................7

        A.     THE ACT PROHIBITS ACTIONS THAT PROTECT
                CONSUMERS ..........................................................11

        B.     THE ACT BURDENS ACTIONS THAT PROTECT
                CONSUMERS ..........................................................15

        C.     THE ACT INTRODUCES RISK THAT CHILLS
                PROVIDER AND CONSUMER ACTIONS INTENDED
                TO PROTECT CONSUMERS ..................................22

    II.    AN INJUNCTION IS NECESSARY TO PROTECT
        CONSUMERS......................................................................25

CONCLUSION .....................................................................................26

# <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ........................................................................7

<u>Statutes</u>

Fla. Stat § 99.061 ........................................................................................14

Fla. Stat. § 847.001 ......................................................................................11

Fla. S.B. 7072

    § 106.072.............................................................................................11

    § 106.072(2).........................................................................................14

    § 106.072(3).........................................................................................14

    § 106.072(5).........................................................................................11

    § 501.2041(1)(b)...................................................................................11

    § 501.2041(1)(d)(2) ..............................................................................12

    § 501.204(1)(d)(4) ................................................................................13

    § 501.2041(1)(j) ............................................................................. 11-12

    § 501.2041(2)(b)...................................................................................22

    § 501.2041(2)(j) ...................................................................................13

<u>Other Authorities</u>

Facebook Transparency Report, available at
https://transparency.fb.com/data/community-standards-enforcement....................15

Facebook Transparency Report, available at
https://transparency.fb.com/data/community-standards-
enforcement/spam/facebook#CONTENT_ACTIONED..........................................19

*Factbox: The Nuts and Bolts of Roblox*, Reuters, Nov. 19, 2020,
https://www.reuters.com/article/us-gaming-roblox-factbox/factbox-the-nuts-and-
bolts-of-roblox-idUSKBN27Z1FZ .........................................................................13

Katherine Fung, *Florida Gov. Ron DeSantis Blames COVID on Chinese Communist Party, Signs Bill Thwarting Chinese Influence in Schools*, Newsweek, June 7, 2021, https://www.newsweek.com/florida-gov-ron-desantis-blames-covid-chinese-communist-party-signs-bills-thwarting-chinese-1598214. ........................21

Google Transparency Report, available at https://transparencyreport.google.com/youtube-policy/removals?hl=en ..........15, 19

M. McArdle, *We Finally Know For Sure That Lies Spread Faster Than the Ttruth. This Might be Why,* Wash. Post, Mar. 14, 2018, https://www.washingtonpost.com/opinions/we-finally-know-for-sure-that-lies-spread-faster-than-the-truth-this-might-be-why/2018/03/14/92ab1aae-27a6-11e8-bc72-077aa4dab9ef_story.html...............................................................15

Nat'l Inst. of Justice, "Ranking Needs for Fighting Digital Abuse: Sextortion, Swatting, Doxing, Cyberstalking, and Nonconsensual Pornography," Nov. 29, 2020, https://nij.ojp.gov/topics/articles/ranking-needs-fighting-digital-abuse-sextortion-swatting-doxing-cyberstalking .............................................................24

News Release: Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://www.flgov.com/2021/05/24/governor-ron-desantis-signs-bill-to-stop-the-censorship-of-floridians-by-big-tech/ ......................................................................6

A. Smith, S. Toor, P. Van Kessel, Pew Research Ctr., *Many Turn to Youtube for Children's Content, News, How-To Lessons*, (Nov. 7, 2018), https://www.pewresearch.org/internet/2018/11/07/many-turn-to-youtube-for-childrens-content-news-how-to-lessons/ ..............................................................13

Tripadvisor, Traveler Review Guidelines, https://www.tripadvisorsupport.com/hc/en-us/articles/200614797-Traveler-review-guidelines ...........................................................................................................10

Twitter Transparency Report, available at https://transparency.twitter.com/en/reports/removal-requests.html#2020-jan-jun  15

Twitter Transparency Report, available at https://transparency.twitter.com/en/reports/platform-manipulation.html#2020-jan-jun..............................................................................................................................19

Wikipedia, The Free Encyclopedia, List of social media platforms with at least 100 million active users, https://en.wikipedia.org/wiki/List_of_social_platforms_with_at_least_100_million_active_users .........................................................................................................17

## INTEREST OF AMICI CURIAE

Chamber of Progress is a center-left tech industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It is an industry organization that backs public policies that will build a fairer, more inclusive country in which all people benefit from technological leaps. It seeks to protect Internet freedom and free speech, promote innovation and economic growth, and empower customers and users. Its work is supported by corporate partners, many of whom will be subject to the law at issue, though its partners do not sit on its board of directors and do not have a vote on or veto over its positions.[1]

The Connected Commerce Council (3C) is a nonprofit membership organization with a single goal: to promote small businesses' access to essential digital technologies and tools. 3C provides small businesses with access to the market's most effective digital tools available, provides coaching to optimize growth and efficiency, and works to cultivate a policy environment that considers and respects the interests of today's small businesses.

As North America's largest technology trade association, CTA® is the tech sector. Our members are the world's leading innovators – from startups to global

---

[1] Chamber of Progress' Partners are available at: https://progresschamber.org/.

brands – helping support more than 18 million American jobs. CTA owns and produces CES® – the most influential tech event in the world.[2]

Engine Advocacy ("Engine") is a nonprofit technology policy, research, and advocacy organization that bridges the gap between policymakers and startups. Engine works with government representatives and a community of high-technology, growth-oriented startups across the nation to support the development of technology entrepreneurship. Engine conducts research, organizes events, and spearheads campaigns to educate elected officials, the entrepreneur community, and the public on issues vital to fostering technological innovation.

Founded in 2006, Information Technology & Innovation Foundation (ITIF) is an independent 501(c)(3) nonprofit, nonpartisan research, and educational institute—a think tank. Its mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity to spur growth, opportunity, and progress. ITIF's goal is to provide policymakers around the world with high-quality information, analysis, and recommendations they can trust.

Since 2003, the National Black Justice Coalition (NBJC) has been America's leading national civil rights organization dedicated to the empowerment of Black lesbian, gay, bisexual, transgender, queer+, and same gender loving

---

[2] A complete list of the Consumer Technology Association's members is available at http://cta.tech/Membership/Membership-Directory.aspx.

(LGBTQ+/SGL) people, including people living with HIV/AIDS through coalition building, federal policy change, research, and education. Our mission is to end racism, homophobia, and LGBTQ+/SGL bias and stigma. NBJC supports Black individuals, families, and communities in strengthening the bonds and bridging the gaps between the movements for racial justice and LGBTQ+/SGL equity.

The Progressive Policy Institute (PPI) is a catalyst for policy innovation and political reform based in Washington, D.C. Its mission is to create radically pragmatic ideas for moving America beyond ideological and partisan deadlock.

TechNet is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies on the planet and represents over four million employees and countless customers in the fields of information technology, e-commerce, the sharing, and gig economies, advanced energy, cybersecurity, venture capital, and finance.

The Washington Center for Technology Policy Inclusion (WashingTECH), a nonpartisan, nonprofit 501(c)(3) corporation, is an advocacy platform committed to civil rights, empowerment, justice, and inclusion in technology public policy making. As America's "inclusive voice of tech policy," WashingTECH's mission is

3

to convene diverse technology public policy professionals to defend America's rich diversity with programs that promote an inclusive narrative about technology's impact on society.

Amici[3] have a substantial interest in ensuring that consumers can enjoy a healthy online environment where they can effectively and efficiently work, play, learn, shop, connect, and express themselves without harassment, disinformation, and incendiary content. Online services moderate content in order to enhance users' experiences and have adopted policies and enforcement procedures against these types of behaviors because they understand such policies and procedures are necessary to ensure that all online users have the opportunity and comfort to express themselves online. For that reason, Amici have a substantial legal interest in the laws that govern these types of content moderation, including laws that have the potential to interfere, restrain, or impose liability for activities online services engage in to protect consumers.

Florida's S.B. 7072, 2021 Leg. (Fla. 2021) (the "Act") affects Amici's interests by imposing restrictions and liability on various online providers for actions that they routinely take to protect their users and the public and to ensure

---

[3] The term "Amici" includes Chamber of Progress, 3C, CTA®, Engine, ITIF, NBJC, PPI, TechNet, and WashingTECH.

continued access to properly functioning services.[4] Along with irreparable harm to online providers, the Act will irreparably harm **consumers** by depriving them of the protections that they have come to expect as part of their online experiences, making them vulnerable to malicious and harmful actors and content, and denying them the healthy online environment that is essential to performing myriad tasks of everyday life from work to school to staying in touch with family and friends.

Given that the Act is purportedly intended to benefit consumers,[5] the actual effect on consumers should be a central consideration for this court in determining whether to enjoin the Act. Amici believe that the equities weigh in favor of the enjoining the Act given the resultant harm to users that would inevitably flow should it take effect.

## SUMMARY OF ARGUMENT

Amici urge the Court to enter a preliminary injunction to prevent the Act from taking effect on July 1, 2021. Doing so will prevent immediate, irreparable harm to the consumers of online services subject to the Act. Plaintiffs Netchoice LLC and Computer & Communications Industry Association ("Plaintiffs") have shown that all the factors for entering a preliminary injunction are satisfied. They

---

[4] Many content moderation actions are essential for online services to operate properly and to allow consumers the ability to perform critical tasks.
[5] *See, e.g.*, SB 7072, Section 1(10)-(11) referencing the need for the state to protect Floridians from social media companies.

have shown likelihood of success on the merits of their complaint for declaratory relief; irreparable harm, including violations of their First Amendment rights and beyond; the State of Florida has no interest in enforcing an unconstitutional law; and that the public interest is best served by enjoining the law to protect consumers of online services and the public from the consequences of the Act.

Amici seek to support these arguments by providing additional context on why the compelling public interest in protecting consumers requires the Act be enjoined. The Act impacts a broad range of online services and the millions of actions, including content moderation, they take every day to enable consumers to effectively utilize their services and to protect them from harm, by: (1) forbidding moderation, except under strict, content-based exceptions; (2) imposing undue burdens on such actions; and (3) subjecting providers to exorbitant legal risks and penalties for violating the Act's draconian rules.

The Act will decrease  content moderation efforts[6] and increase consumer exposure to dangerous and harmful content.  If enforced, it will create a serious risk that consumers will, contrary to the intent of the bill, have fewer options for expressing themselves online because providers will be effectively be forced to

---

[6] Not only is this the natural result of the Act, it is the intended result. *See* News Release: Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://www.flgov.com/2021/05/24/governor-ron-desantis-signs-bill-to-stop-the-censorship-of-floridians-by-big-tech/

make product changes to limit liability risks.  And providers who offer services to large numbers of users, without correspondingly large revenue, may be forced to close their virtual doors because of the obligations and costs. Even if there were any legitimate consumer benefit that might be expected from the Act taking effect—and there is not—that benefit would not outweigh the countervailing public interest in protecting consumers. The Act must be enjoined to avoid this irreparable harm.

## ARGUMENT

Plaintiff easily satisfies the four-part test for determining whether to enjoin the Act. A plaintiff seeking a preliminary injunction must show that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020) (citations omitted). Amici's more thorough examination of the impact on the Act on consumers further strengthens Movant's application to the Court for the requested relief.

## I.    THE ACT HARMS CONSUMERS

The Act, if not enjoined, will have deleterious consequences for the public and consumers who use online services. The Act's provisions will cause this harm

in three, immediate ways: (1) prohibiting actions a provider may take to protect consumers or to make their services more effective for users; (2) hindering provider actions intended to protect consumers; and (3) imposing substantial legal uncertainty, litigation risk, through potentially crippling damages and penalties if providers' take certain efforts to protect consumers. Despite the Act's stated intention to benefit consumers it does nothing of the sort. To the contrary, consumers stand to lose protections they currently enjoy.

Online providers engage content moderation activities every day. While some content moderation improves users' experiences by showing them what they want or is most relevant to them, other kinds of content moderation remove, restrict, or prevent harmful content and malicious activity. Online providers have an imperative to develop services that keep their users happy with the quality of their experiences, thereby making those users loyal consumers who continue to use the service. To do so, they must make judgments about the types of content and activities that will disrupt the online experience they are trying to deliver to consumers and force them to seek out other choices. This also incentivizes online services to engage in activities covered by the Act that are designed to deliver users the content that is the most likely to be relevant to them individually. The imperative to create a healthy online environment operates to the benefit of consumers by reducing the amount of illegal, "lawful but awful," irrelevant, low

quality, and nuisance content they must wade through to conduct their daily activities, whether research for work or school or planning travel, a big purchase, or where to eat that night.

To create such a healthy and safe environment, just some of the actions providers take include:

- screening for SPAM, viruses, and malware, phishing scams and affiliated URLs, child sexual abuse imagery (CSAM), terrorist propaganda and activity, coordinated inauthentic activity by hostile nation states and organized crime, and many of the harmful types of content listed below;

- responding to reports from the public, users, and trusted partners about the content and activities described above, as well as, abusive or harassing content, impersonation, invasions of privacy through acts such as posting non-consensual intimate images (NCII) or doxxing, predatory grooming of minors, bullying, promotion of suicide and self-harm (e.g., cutting or disordered eating);

- labeling, filtering, posting warnings, rating, or otherwise identifying content that may not be appropriate for certain audiences, content that users have expressed a desire to avoid, or that is suspected of violating the provider's policies but has not yet been removed; and

- removing, demoting, or limiting the spread of content that the service has identified in its policies as being inappropriate and disruptive to the type of environment they want to provide to their users, including content that violates policies on incitement to violence, hate speech, and Holocaust Denial, misinformation, and disinformation, and content that may be simply irrelevant to the function of the service.[7]

The Act also hurts the small businesses that rely on these services for critical exposure that drives potential customers to their online and offline locations. Small businesses may find it harder to be noticed by consumers, without paid advertising, because of the deluge of SPAM that is likely to overtake many online services. Consumers will become inured to commercial content, regardless of quality or relevance. Consumers, on guard against scams and phishing, may view all commercial content with skepticism. Even if small businesses can elevate their content through paid placements and other advertising, their ads are more likely to appear next to offensive content which will likely cause the consumer to either ignore the ad or view the advertising negatively because of the adjacent content.

---

[7] For example, TripAdvisor's Traveler Review Guidelines require that reviews avoid including unnecessary information unrelated to the experience with the business being reviewed. *See* https://www.tripadvisorsupport.com/hc/en-us/articles/200614797-Traveler-review-guidelines.

This negative impact on small businesses is an important factor when considering the public interests related to the Act.

### A. THE ACT PROHIBITS ACTIONS THAT PROTECT CONSUMERS

Several provisions of the Act prohibit or discourage online providers from engaging in content moderation, because doing so will cause them to face significant penalties. Section 2 of the Act, which creates a new Fla. Stat. 106.072, bars a covered platform from "deplatforming a candidate." "Deplatform" is defined, in Section 4, to include permanently deleting or banning a user, or doing so for any period exceeding 14 days. There are no exceptions for especially harmful online activity, other than a statement in Section 106.72(5), consistent with the Supremacy Clause, that this shall not be enforced if inconsistent with federal law.[8] Much like candidates for public office, "journalistic enterprises" are protected from deplatforming, as well as "censoring." Act, Section 4. "Censor" is defined in Section 501.2041(1)(b) to include acts such as removing, deleting, and suspending the ability to post content. The only exception to the prohibition on

---

[8] Unlike journalistic enterprises, candidates' protections from deplatforming are not subject to an exception for obscenity. *See* Section 501.2041(j). This reinforces that the Legislature has chosen to make political candidates immune from the rules for online conduct, even when engaged in activity that may be illegal under Florida law. Section 847.001.

removing a journalistic enterprise's content is for obscenity. Section 501.2041(1)(j).

As a result of these restrictions, the Act essentially gives these categories of users, political candidates, and journalistic enterprises a free pass to do as they like on any online service that qualifies under the broad and vague definition of a "social media platform."  As but one example of the absurd results the Act creates, as written, it would require child-friendly online games to treat popular pornographic sites as newsworthy sources that are much more difficult to moderate. "Social Media Platforms, " on its face, could cover everything from Wikipedia to the child-friendly gaming app Roblox.  Likewise, the term "journalistic enterprise," as drafted, creates the potential for widespread abuse. The Act does not define the term by reference to journalistic activity, but by the amount of content the site publishes and the number of users. The popular pornography site PornHub easily qualifies as a "journalistic enterprise" under the act.[9]

Such a result creates immediate harm.  Parents and adult caregivers frequently seek out safe spaces online that the children in their care can visit

---

[9] Under Section 501.2041(1)(d)(2), an entity qualifies as a journalistic enterprise if it "publishes 100 hours of audio or video available online with at least 100 million viewers annually." PornHub easily surpasses this mark, with an estimated 7,000 years of video online with about 3 hours posted every second and 130 million daily users. https://www.pornhub.com/insights/tech-review.

without constant supervision or worry about exposure to content that may not be

appropriate for children's age or the family's values.[10] The Act undermines this by

preventing sites that are geared toward children from screening out pornographic

content posted by a "journalistic enterprise," unless it meets the high constitutional

bar for what qualifies as "obscenity."[11]

This is just one extreme example. This Act's free pass for popular websites

would apply to all forms of content and activity that are not obscene or obvious

violations of federal law—extremist propaganda, defamation, NCII, harassment,

doxxing, impersonation, cyberbullying, just to name a few. This free pass is also

not limited to journalistic enterprises with a nexus to the United States,[12] leaving an

open door for foreign state-owned media to capitalize on the exception to advance

their agendas and sow discord, spread disinformation, and engage in social

engineering and phishing to fuel state-sponsored cyberespionage and hacking.

---

[10] Millions of parents and caregivers regularly allow the children in their care to visit or use sites and apps such as Youtube and Roblox. *See* A. Smith, S. Toor, P. Van Kessel, Pew Research Ctr., *Many Turn to Youtube for Children's Content, News, How-To Lessons*, (Nov. 7, 2018), https://www.pewresearch.org/internet/2018/11/07/many-turn-to-youtube-for-childrens-content-news-how-to-lessons/; *Factbox: The Nuts and Bolts of Roblox*, Reuters, Nov. 19, 2020, https://www.reuters.com/article/us-gaming-roblox-factbox/factbox-the-nuts-and-bolts-of-roblox-idUSKBN27Z1FZ.
[11] SB 7072, Section 501.204(2)(j).
[12] The only one of the four criteria in the definition of a journalistic enterprise with a U.S. nexus is the one criterion for entities with a broadcast license from the Federal Communications Commission. SB 7072, Section 501.204(1)(d)(4).

The restriction on deplatforming a candidate for office is equally harmful. The burden to become a candidate for office is often minimal[13] and poses no meaningful hurdle to obtaining free rein to post as one likes.  But making matters worse,  the Act's text leaves open the possibility that imposters and impersonators will have a window of opportunity to post tantalizing allegations about another candidate, or the candidate an impersonator claims to be, with sufficient time for the post to go viral before a provider can take any action. Section 106.072(2) prohibits a social media platform from "willfully" deplatforming a user that is "known by the social media platform to be a candidate" and requires that social media platform provide a mechanism for candidates to identify themselves as such. Yet liability for deplatforming a candidate is not limited to only those candidates who alert a social media platform that they are a candidate through the required mechanism. The platform will be liable if they remove a user "willfully," meaning they know the user is a candidate, and the user is in fact a candidate. Knowledge is not defined or otherwise contingent on verification of candidacy and so a user profile that contains content merely asserting that a user is a candidate could easily trigger the penalties of $250,000 per day for candidates for statewide office. Section 106.072(3). This will give providers pause and bad actors an opportunity.

---

[13] *See* Section 99.061, Florida Statutes.

Lies travel faster than the truth offline and online.[14] This opening can easily be leveraged to spread lies about candidates that cannot be undone later—depriving the public of fair and honest elections.

Today, some online service providers remove millions (and in some cases billions) of pieces of content for violating policies every year.[15] Even if it were possible to comply with the Act only within the State of Florida (and it is unclear how that could be done), it is hard to see how Florida consumers would benefit from even a fraction of such content being available on the platforms they use for work, school, keeping up with friends and family, and getting news or entertainment.

## B. THE ACT BURDENS ACTIONS THAT PROTECT CONSUMERS

Along with the prohibitions on content moderation, the Act contains several provisions that act as constructive prohibitions by restricting the content

---

[14] M. McArdle, *We Finally Know For Sure That Lies Spread Faster Than the Truth. This Might be Why,* Wash. Post, Mar. 14, 2018, https://www.washingtonpost.com/opinions/we-finally-know-for-sure-that-lies-spread-faster-than-the-truth-this-might-be-why/2018/03/14/92ab1aae-27a6-11e8-bc72-077aa4dab9ef_story.html.

[15] *See generally* Facebook Transparency Report, available at https://transparency.fb.com/data/community-standards-enforcement; Twitter Transparency Report, available at https://transparency.twitter.com/en/reports/removal-requests.html#2020-jan-jun; Google Transparency Report, available at https://transparencyreport.google.com/youtube-policy/removals?hl=en.

moderation activities of "social media platforms" or imposing undue burdens on their activities, making it impossible for providers to engage in the full range of policy setting and enforcement necessary to protect consumers.

The Act imposes new burdens on content moderation activity that will make it impossible for many entities who might be considered "social media platforms" to afford to comply with the new requirements or—because of the high volume of content on their sites—are unable to satisfy the requirements for all types of content moderation actions and product features covered by the Act. These service providers will face stark choices, the consequences of which will flow directly or indirectly to consumers. Platforms may choose to stop moderating content altogether unless required by law or scale down their content moderation policies and enforce such policies only against the worst of the worst of policy violations. Or platforms committed to providing safe online environments for their users may choose to change aspects of how their service operates.  Those patforms may collect more personal information from consumers for identity verification or charging a fee for the service to reduce risk of inappropriate behavior or to cover the increased cost of offering the services. Each platform will have to determine what path forward will best serve their users and maintain their ability to offer consumers the quality of service they have come to expect. Indeed, many platforms will not be able to adapt and their services will degrade as a result.

Consumers will be disadvantaged by these consequences in multiple ways, such as by losing the:

- variety of online services that they can choose from,[16] as high compliance costs and significant legal risks make it more difficult for small and medium-sized sites to continue to operate and create a barrier to entry for new services that will have to comply when they revenue or usership thresholds;

- low friction to using many online services which have no registration requirement, or registration with minimal collection of personal information, which provide opportunities to speak anonymously or pseudonymously. This low friction helps a more diverse set of communities have access to online services than would if, for example, providers were to seek to verify identities through processes that require credit cards;

- wide access to free services as companies seek to cover the costs of compliance and address the increased risk of business-ending

---

[16] One source has identified 32 social network sites alone that have 100 Million or more users, and the bill's definition of covered services implicates many other types of services. Wikipedia, The Free Encyclopedia, List of social media platforms with at least 100 million active users, https://en.wikipedia.org/wiki/List_of_social_platforms_with_at_least_100_million_active_users (last visited June 9, 2021).

litigation or liability. Being able to offer certain services without cost
is vital to ensure online services are available not just to those who
can afford to pay;

- protection against spam and phishing content, requiring users to wade
through dangerous content that could cause serious harm, such as
through installation of ransomware or harmful financial scams or
incitement to offline violence that ends in serious injury or death.

The Act also encourages online services to shy away from content
moderation by making moderation highly onerous. The Act's burdens include
requirements for: (1) detailed user notices with explanations of content moderation
activity covered by the Act; (2) notices to users of enforcement actions with a
"thorough explanation" how the users' content was identified; (3) a mechanism to
allow users to request "the number of other individual platform participants who
were provided or shown content or posts"; (4) an opt-out mechanism to allow users
to choose not to use the service's algorithms to deliver content; and (5) the ability
for a de-platformed user to retrieve all of the user's information and content from
the platform for a period of 60 days after notice. All of these requirements
discourage moderation. The Act also, practically speaking, requires online service
providers to determine whether a user is a candidate or journalistic enterprise under
the Act and therefore potentially barred from having their content acted on by the

provider. The only exception to the notice requirement is for content removed because it is "obscene."

These requirements should be considered in the contexts in which they will apply. The notices the Act requires, detailing how content tripped a given provider's safeguards, would give spammers and scammers information that would allow them to circumvent those safeguards. For example, if a post was tagged as SPAM because it was directed at over 50 users unconnected to the poster, the spammer will know to limit future SPAM to 49 users. In addition, the volume of SPAM activity platforms have actioned demonstrates the burden associated with providing notices for each action taken with a detailed explanation including how the SPAM was flagged for review. In a single quarter, Facebook removes between one to three billion of pieces of SPAM;[17] in a six-month period Twitter challenged 135 million suspected SPAM accounts;[18] and in one quarter YouTube removed over 1.8 million channels and 470 million comments for violations related to SPAM.[19]

---

[17] Facebook Transparency Report, available at https://transparency.fb.com/data/community-standards-enforcement/spam/facebook#CONTENT_ACTIONED.

[18] Twitter Transparency Report, available at https://transparency.twitter.com/en/reports/platform-manipulation.html#2020-jan-jun.

[19] Google Transparency Report, available at https://transparencyreport.google.com/youtube-policy/removals?hl=en.

The Act explicitly limits the use of various safety tools, such as downranking, interstitials, and labels that are built into products. The Governor's and Legislature's hyper-focus during the drafting of the law on the labeling Twitter applied to President Donald Trump's tweets leads to significant collateral damage beyond the activity that they sought to prevent.[20] This also captures a broad range of other actions taken to benefit consumers:

- Screening, labeling, or providing an interstitial before sensitive content.[21] "Sensitive" is a broad label and can apply to graphic photos of terrorist attacks, pornography, or other adult content. Users who post content can often identify it as sensitive or "Not Safe for Work," appropriate for only users of a specific age or age-range,[22] or otherwise limit access.[23] Providers may also identify content that, under their rules, must be labelled.

- Labeling "State-owned Media" as such to help users evaluate content from sources like RT America, which users may not recognize as part of the

---

[20] This should not be viewed as suggesting that it would be in any way appropriate if government officials had been able to draft a law prohibiting only the behavior they intended to target. As Plaintiffs explain in their Complaint, this alone raises significant First Amendment concerns.

[21] https://help.twitter.com/en/rules-and-policies/media-policy

[22] https://help.twitter.com/en/safety-and-security/age-verification

[23] In fact, for a mobile application to be included in Apple's App store, this is a required feature.

media operation funded and controlled by the Russian government and formerly known as Russia Today.[24]

- Flagging content that has been determined by a fact-checking organization to be false or surfacing additional information to provide context to users when they encounter misinformation or disinformation.

- Downranking content of a lesser quality, that is duplicative, irrelevant links, or subject to a high number of takedown requests from copyright holders. For example, Google's Search Algorithm downranks websites that are not user-friendly because of factors like being slow to load, having intrusive interstitials, not providing security, and a variety of other quality factors designed specifically to help consumers find what they are looking for and to avoid negative and potentially harmful sites.[25]  Online commerce sites may also engage in similar activities to surface the most useful consumer reviews to help other shoppers.

---

[24] *See, e.g.*, https://help.twitter.com/en/rules-and-policies/state-affiliated. This free pass for state-owned media is surprising given Gov. DeSantis' concern over undue foreign influence and Legislature's passage of two bills targeting China passed in the same session as SB 7072. *See*, Katherine Fung, *Florida Gov. Ron DeSantis Blames COVID on Chinese Communist Party, Signs Bill Thwarting Chinese Influence in Schools*, Newsweek, June 7, 2021, https://www.newsweek.com/florida-gov-ron-desantis-blames-covid-chinese-communist-party-signs-bills-thwarting-chinese-1598214.
[25] https://developers.google.com/search/docs/advanced/guidelines/.

Under the Act, these activities are all either "censorship" or "shadow banning" and are subject to the same burdensome obligations as other content moderation decisions.

### C. THE ACT INTRODUCES RISK THAT CHILLS PROVIDER AND CONSUMER ACTIONS INTENDED TO PROTECT CONSUMERS

The Act's "consistent" moderation requirement further chills provider speech and actions that safeguard consumers. While the Act requires providers to moderate content in a consistent manner, Sec. 501.2041(2)(b), it fails to define what constitutes "consistent" moderation. Thus, the Act would expose providers to liability with no possibility of knowing what is prohibited or permissible. As written, the Act seemingly subjects a provider to potential liability any time an adverse content moderation action was taken against a user when, unbeknownst to the provider, another user had similarly violated the provider's rules but not yet been subject to enforcement. The provision also fails to recognize that while users may engage in similar activities in one particular instance, those two users may not be similarly situated. For example, one user may receive a warning of the violation but face no other penalty and the other user may have their account closed because they have already received multiple warnings. The Act also gives no guidance on what kinds of content are equivalent so that the same kind of moderation could be applied without risk of liability. Would it be consistent if a provider takes down a

22

post with CSAM material but not a post doxxing a private citizen? Would it be consistent to suspend a user who SPAMs other users but not a user who posts NCII? Would it be consistent to ban a user who repeatedly attempts to incite violence but not a user who posts a single ill-considered comment? These are issues and questions on which reasonable people can come to different conclusions. Yet the Act gives no guidance. It simply injects the risk of liability and costly litigation into these and millions of other judgment calls that providers must make every day.

The Act also creates substantial confusion and poses a serious risk of harm to consumers by failing to consider the interaction between the restrictions on content moderation with the operation of safety tools that online services make available to their users. Many platforms allow users to customize what they do or do not see on the platform, as well as who may view the information that they post. For example, Twitter allows users to "mute" a person or a topic. Facebook similarly allows users to "unfollow" another user or a group.[26]   These are moderation decisions users make, but providers enable and execute. Allowing users to tailor their experience using these kinds of tools may violate the Act. That risk necessarily discourages providers from offering users any tool that could be

---

[26] https://www.facebook.com/help/190078864497547.

considered to "censor" or "shadowban" or from recognizing users' stated preferences.

The effect of providers withdrawing these tools or ignoring user safety settings could be catastrophic. The National Institute of Justice has recognized the profound impact that cyberstalking and other technology-enabled abuse has on victims, including the link between online stalking and offline violence.[27] Despite the risks of using online services, many survivors must be online for work, school, or other reasons. To minimize risks, experts on domestic violence recommend to survivors that they use the tools available on online platforms to protect their safety and privacy while online. For example, the National Network to End Domestic Violence has partnered with Twitter and Facebook to publish guides to educate survivors on how to use the safety tools these services offer.[28] Tools such as blocking prevent abusers from seeing a survivor's content which may be a critical protection to prevent the abuser from discovering the survivor's location. Without the safety tools, survivors may find themselves with fewer options for safely using

---

[27] *See* Nat'l Inst. of Justice, "Ranking Needs for Fighting Digital Abuse: Sextortion, Swatting, Doxing, Cyberstalking, and Nonconsensual Pornography," Nov. 20, 2020, https://nij.ojp.gov/topics/articles/ranking-needs-fighting-digital-abuse-sextortion-swatting-doxing-cyberstalking. This article also notes that "major social media platforms have adopted policies to help curb abusive practices."
[28] See Online Safety, https://www.techsafety.org/resources-survivors.

online services or worse confronted with serious risks to their physical and emotional safety.

All of the Act's burdens would be enforced through both private rights of action and state enforcement actions, backed by harsh penalties including a shocking $100,000 in statutory damages per violation. These penalties heighten the chilling effect on providers, causing similar harms to those from direct prohibitions and burdens that flow to consumers.

## II.   AN INJUNCTION IS NECESSARY TO PROTECT CONSUMERS

If allowed to take effect, the Act is very likely to quickly change the way hundreds of millions consumers experience the internet, exposing consumers to scams, fraud, and other harmful content which is now subject to moderation efforts. The nature of the internet makes it impossible to confine the Act to only Florida users. And Florida is the third largest state in the Union by population, meaning it is large enough to exert so much market pressure that the Act will force providers to change the way they moderate content with respect to all users in the United States.

An injunction preserves the current state of the internet, including all the actions that providers currently take and to which consumers are accustomed, at least until the Court can determine whether the Act passes Constitutional muster.

25

## CONCLUSION

For these reasons, Amici Curiae support Plaintiffs' Complaint and their

Motion for Preliminary Injunction.

### RULE 7.1 (F) CERTIFICATION

This Amicus Brief contains a total of 5,482 words.


  /s/ Nury Siekkinen
Nury Siekkinen
Florida Bar No. 1015937
**ZWILLGEN PLLC**
1900 M Street NW, Suite 250
Washington, DC 20036
Telephone: (202) 296-3585
Facsimile:  (202) 706-5298
Email: nury@zwillgen.com

*Attorney for Amici Curiae Chamber of
Progress, Connected Commerce Council,
CTA®, Engine Advocacy, Information
Technology & Innovation Foundation,
National Black Justice Coalition,
Progressive Policy Institute, TechNet,
Washington Center for Technology Policy
Inclusion*