# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION
### Civil Action No. 4:21-cv-00220-RH-MAF

NETCHOICE, LLC d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation,

       Plaintiffs,

       v.

ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida; JONI ALEXIS POITIER, in her official capacity as Commissioner of the Florida Elections Commission; JASON TODD ALLEN, in his official capacity as Commissioner of the Florida Elections Com- mission; JOHN MARTIN HAYES, in his official capacity as Commissioner of the Florida Elections Commission; KYMBERLEE CURRY SMITH, in her official capacity as Commissioner of the Florida Elections Commission; and PATRICK GILLESPIE, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services,

       Defendants.

_____/

## BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION AND PROTECT DEMOCRACY PROJECT, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES .............................................................. iii

INTERESTS OF AMICI CURIAE ...................................................... 1

INTRODUCTION ................................................................................ 2

ARGUMENT........................................................................................ 4

I.   INTERNET USERS ARE BEST SERVED BY THE
     AVAILABILITY OF BOTH UNMODERATED AND
     MODERATED PLATFORMS ...................................................... 4

     A.   Moderated Platforms Serve the Interests of Users and the
          Public Generally ............................................................... 4

     B.   In Praise of Unmoderated Platforms ................................. 5

II.  CURRENT CONSTITUTIONAL LAW SUPPORTS THE
     COEXISTENCE OF UNMODERATED AND MODERATED
     PLATFORMS............................................................................... 9

     A.   The First Amendment Protects A Service's Right to Curate
          The Users' Speech That It Publishes on its Site ................. 9

     B.   Online Services Function Similarly to Newspapers' Opinion
          Pages That Were Subject to the Right-of-Reply Law in
          *Tornillo* ............................................................................ 15

III. S.B. 7072 FORCES ONLINE SERVICES TO FAVOR
     POLITICAL CANDIDATES AND OTHERS' SPEECH OVER
     EVERYDAY INTERNET USERS .............................................. 18

     A.   Compelling Platforms to Privilege Certain Speakers Online
          Speech Over Others Violates the First Amendment ........... 20

     B.   S.B. 7072's Legally Compelled Favoritism for Certain
          Speakers Also Raises Distinct Human Rights Concerns By

Giving Already Powerful Speakers Additional Legal
Protections ........................................................................25

IV.   INTERNET USERS ARE BEST SERVED BY A VOLUNTARY
HUMAN RIGHTS FRAMEWORK FOR CONTENT
MODERATION ....................................................................26

CONCLUSION ....................................................................30

CERTIFICATE OF COMPLIANCE....................................................31

CERTIFICATE OF SERVICE............................................................33

# TABLE OF AUTHORITIES

**Page**

*Cases*

*Assocs. & Aldrich Co. v. Times Mirror Co.*,
   440 F.2d 133 (9th Cir. 1971) ..........................................................................12

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ........................................................................................17

*Biden v. Knight First Amendment Institute at Columbia University*,
   141 S. Ct. 1220 (2021)..................................................................................18

*Brown v Entertainment Merchants Ass'n*,
   564 U.S. 786 (2011) ......................................................................................23

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ......................................................................................19

*Davison v. Facebook, Inc.*,
   370 F. Supp. 3d 621 (E.D. Va. 2019)............................................................14

*Davison v. Plowman*,
   715 F. App'x 298 (4th Cir. 2018) ..................................................................18

*DJ Lincoln Enterprises v. Google, LLC*,
   2021 WL 184527 (S.D. Fla. Jan. 19, 2021)...................................................14

*Dreamstime.com, LLC v. Google, LLC*,
   No. C 18-01910 WHA, 2019 WL 2372280 (N.D. Cal. June 5, 2019) ...............14

*Elonis v. U.S.*,
   135 S. Ct. 2001 (2015)................................................................................... 5

*e-ventures Worldwide, LLC v. Google, Inc.*,
   No. 214CV646FTMPAMCM, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017)......15

*Freedom Watch, Inc. v. Google, Inc.*,
   368 F. Supp. 3d 30 (D.D.C. 2019),
   *affirmed*, 816 Fed. App'x 497 (D.C. Cir. 2019) .................................................15

*Green v. YouTube, LLC*,
  2019 WL 1428890 (D.N.H. Mar. 13, 2019) ........................................................15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ........................................................................................13

*Janus v. American Federation of State, County,
& Municipal Employees, Council 31*,
  138 S.Ct. 2448 (2018) ......................................................................................13

*Knight First Amendment Institute at Columbia University v. Trump*,
  320 F. Supp. 2d 541 (S.D.N.Y. 2018) ................................................................18

*La'Tiejira v. Facebook, Inc.*,
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ...............................................................14

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ..................................................................14

*Los Angeles v. Preferred Comms., Inc.*,
  476 U.S. 488 (1986) ........................................................................................10

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019) .....................................................................................10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018) .....................................................................................13

*Miami Herald Co. v. Tornillo*,
  418 U.S. 241 (1974) .................................................................................*passim*

*National Inst. of Family Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) .....................................................................................13

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................................17

*Nyabwa v. FaceBook*,
  2018 WL 585467 (S.D. Tex. Jan. 26, 2018) .......................................................15

*Packingham v. North Carolina*,
  582 U.S. ___, 137 S.Ct. 1730, 1737 (2017) ......................................................17

iv

*Prager University v Google LLC*,
   951 F.3d 991 (9th Cir. 2020) ...........................................................................15

*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015) ..............................................................................19, 21

*Reno v. Am. Civil Liberties Union*,
   521 U.S. 844 (1997) .................................................................................. 5

*Smith v. California*,
   361 U.S. 147 (1959) .................................................................................17

*The Florida Star v. B.J.F.*,
   491 U.S. 524 (1989) ..............................................................................23, 24

*Turner Broadcasting System, Inc. v. FCC*,
   512 U. S. 622 (1994) ................................................................................20

*U.S. v. Alvarez*,
   567 U.S. 709 (2012) .................................................................................. 5

*United States v. Playboy Entm't Group, Inc.*,
   529 U.S. 803 (2000) .................................................................................19

*Zhang v. Baidu.com, Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014)...............................................................14

**Statutes**

Fla. S.B. 7072

   § 501.2041...................................................................................5, 12, 21, 22

   § 106.072.................................................................................................20

**Other Authorities**

Dan Christensen, *Newspaper sales in Florida are eroding faster than the national average*, Florida Bulldog (Oct. 11, 2018) ..........................................................22

*EFF and Coalition Partners Push Tech Companies To Be More Transparent and Accountable About Censoring User Content*, EFF Press Release (May 7, 2018) ......................................................................................................28

*Facebook's Third-Party Fact-Checking Program*, Facebook ................................23

Kevin Anderson, YouTube suspends Egyptian blog activist's account, The Guardian (Nov. 28, 2007) ...................................................... 8

Kit Walsh and Jillian C. York, *Facebook Shouldn't Give Politicians More Power Than Ordinary Users*, EFF Deeplinks (Oct. 6, 2019).........................................25

Malachy Browne, YouTube Removes Videos Showing Atrocities in Syria, New York Times (Aug. 22, 2017)................................................. 8

Martin Belam, Twitter under fire after suspending Egyptian journalist Wael Abbas, The Guardian (Dec. 18, 2017) ............................................. 8

Megan Farokhmanesh, YouTube is still restricting and demonetizing LGBT videos—and adding anti-LGBT ads to some, The Verge (June 4, 2018)............. 8

Michael J. Socolow, *A Profitable Public Sphere: The Creation of the New York Times Op-Ed Page*, Communication and Journalism Faculty Scholarship .........16

*Most popular YouTube channels as of May 2021, ranked by number of subscribers*, statista ..................................................................................22

Natt Garun, *How to switch your Twitter feed to a chronological timeline*, The Verge (March 6, 2020) .........................................................21

*Op-Ed*, Wikipedia ................................................................16

*Reddiquette*, Reddit..............................................................21

Ryan Mac, *Instagram Censored Posts About One of Islam's Holiest Mosques, Drawing Employee Ire*, BuzzFeed News (May 12, 2021) .................................. 7

Sam Levin, Julia Carrie Wong, Luke Harding, *Facebook backs down from "napalm girl" censorship and reinstates photo*, The Guardian (Sept. 9, 2016)... 7

Samuel Gibbs, Facebook bans women for posting "men are scum" after harassment scandals, The Guardian (Dec. 5, 2017)............................................ 7

Taylor Wofford, Twitter was flagging tweets including the word "queer" as potentially "offensive content," Mic (June 22, 2017)......................................... 8

*Washington Post Media Kit* .........................................................12

**INTERESTS OF AMICI CURIAE**[1]

The Electronic Frontier Foundation (EFF) is a member-supported, nonprofit civil liberties organization that has worked for 30 years to protect free speech, privacy, security, and innovation in the digital world. EFF, with over 30,000 members, represents the interests of technology users in court cases and broader policy debates surrounding the application of law to the Internet and other technologies.

The Protect Democracy Project, Inc., is a nonpartisan, nonprofit organization dedicated to preventing our democracy from declining into a more authoritarian form of government. It engages in litigation and other advocacy to protect elections and voting rights, as well as to protect the public sphere and to enable dissent. Protect Democracy's work recognizes the particular threat that disinformation poses to a functioning democracy.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amici curiae* or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties consent to *amicus* filing of this brief.

## INTRODUCTION

Whatever the debate might be over the role social media companies play in controlling public expression on their respective online platforms, the Florida Legislature is wrong to address them with this unconstitutional law. Any such concerns do not justify S.B. 7072's unconstitutional interference with the free speech rights of disfavored social media users. And they do not justify violating the First Amendment rights of social media companies to determine whether and how to host their users' speech, as every court to have considered the issue since the advent of social media has recognized that they possess. These services' exercise of their First Amendment rights ultimately best serves users' interests.

Although it may seem to some counterintuitive, on balance, the answer to Florida lawmakers' concerns about how to best protect Internet users' rights is to preserve the constitutional status quo, whereby private parties who operate speech platforms have a First Amendment right to edit and curate their sites, and thus exclude whatever other private speakers or speech they choose. To reverse the application of the First Amendment—that is, to make online platforms no longer *protected* by the First Amendment but instead *bound* by it so as to be compelled to publish another's speech—would undermine Internet users' interests.

Under Florida S.B. 7072, a broad swath of online platforms (unless they own a Florida theme park), would be prohibited from deprioritizing posts from electoral

candidates or deactivating their accounts when candidates violate a service's rules, even though such content moderation can be valuable to many internet users when it is carefully implemented. The law forces platforms to publish without qualification certain preferred speakers' online speech, and forbids them from adding their own commentary to it, exacerbating existing power disparities between certain speakers and average internet users, while also creating speaker-based distinctions that are anathema to the First Amendment.

Inconsistent and opaque private content moderation can be a problem for users. Although the First Amendment prevents government from dictating content moderation practices, internet platforms should voluntarily adopt content moderation practices that follow a reasonable human rights framework appropriate for the given platform.

The decisions by social media platforms to cancel accounts and deprioritize posts may well be scrutinized in the court of public opinion. But these actions, as well as the other moderation techniques barred by S.B. 7072, are constitutionally protected by binding Supreme Court precedent, and the state cannot prohibit, proscribe, or punish them any more that states can mandate editorial decisions for news media. This Court should thus grant the plaintiffs' motion for a preliminary injunction.

3

## ARGUMENT

### I.   INTERNET USERS ARE BEST SERVED BY THE AVAILABILITY OF BOTH UNMODERATED AND MODERATED PLATFORMS

Internet users are best served under current law, where the First Amendment creates legal space for the emergence of a competitive landscape with both unmoderated and highly moderated platforms.

#### A.   Moderated Platforms Serve the Interests of Users and the Public Generally

Many internet users greatly benefit from moderated platforms. Users may prefer to use online platforms that endeavor to shield them from certain kinds of legal speech. Moderation allows online platforms to limit content in order to create affinity or niche communities dedicated to certain subject matters or viewpoints, or to remove hateful or harassing speech that may hinder the ability of targeted users to engage with the platform, or to stem what they perceive as harmful misinformation.

But Florida S.B. 7072 would make such moderation illegal, subject to draconian and onerous fines and numerous civil actions, and force platforms to forgo many of their standard moderation practices with respect to certain privileged users: Florida electoral candidates and large "journalistic enterprises." Indeed, on the face of the law it is unclear whether sites like Facebook, YouTube, Twitter, Pinterest, or any other large social media platform not owned by a company that also owns and operates a theme park in Florida, could even

deprioritize illegal content that falls outside the protection of the First Amendment; the law only specifically allows moderation to remove obscenity.[2] And such platforms, while promoting diverse content and views, would *not* be able to remove, for example, protected speech that they nevertheless found undesirable on their sites: non-obscene nudity; non-threatening violent content; false but non-harmful or non-defamatory content; or any content that is contrary to the platform host's or its community's values, but is nevertheless protected by the First Amendment.[3] Finally, S.B. 7072 would be a major setback to efforts to combat spam, for every action to limit the spread of spam messages would fall under the statute's definition of a "shadow ban." § 501.2041(f).[4]

## B.   In Praise of Unmoderated Platforms

Nevertheless, unmoderated platforms, where the platform operator plays little to no role in selecting the content or ordering its presentation, also benefit

---

[2] *See* § 501.2041(2)(j). Obscenity is, of course, just one of the categories of speech that is unprotected by the First Amendment. *See U.S. v. Alvarez*, 567 U.S. 709, 717, 724 (2012).

[3] *See, e.g., Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (non-obscene but indecent sexual content is protected by First Amendment); *Elonis v. U.S.*, 135 S. Ct. 2001, 2012 (2015) (certain threatening speech is protected by First Amendment); *Alvarez*, 567 U.S. at 723 (certain non-harmful false speech is protected by First Amendment).

[4] S.B. 7072 definition of "social media platforms" does not exclude email services or limit the covered services to social media posts. § 501.2041(f).

internet users and the public generally by inhibiting the creation of silos and, instead, allowing users to engage in free-form discussions, participate in debates of their choosing, and find unexpected sources of ideas and information. Users need not fear that their communications are actively monitored, nor that they may accidentally run afoul of content rules—both of which can inhibit free speech. Unmoderated platforms can be of special value to political dissidents and others who may be targeted for censorship by governments and private actors. They provide an accessible forum for speech that is unpopular, disfavored, or inadvertently suppressed.

One of the chief advantages of unmoderated platforms is that they minimize or eliminate the millions of impossible moderation decisions that would otherwise have to be made. Platforms that do actively moderate, even when based on a set of rules or "community standards," can often struggle to draw definitive lines between speech that is and is not permitted. This is, in fact, most of the dominant social media platforms.

Facebook provides examples of these content moderation struggles. For example, in 2017, Facebook decided, in the midst of the #MeToo movement, that the statement "men are scum" and similar statements constituted hate speech

6

according to its then-existing policies.[5] In January 2021, Facebook's updated policy to remove "harmful conspiracy theories" resulted in the service disabling a punk rock band's page because its name, Adrenochrome, is a chemical that has become a central part of the QAnon conspiracy theory.[6] Just last month, Facebook-owned Instagram removed posts about one of Islam's holiest mosques, Al Aqsa, because its name shares words with the name of a designated terrorist organization.[7] And Facebook's ban on nudity has repeatedly resulted in it taking down a famous Vietnam war photo.[8]

Examples abound across the other major platforms, too. Twitter disabled the

---

[5] Samuel Gibbs, *Facebook bans women for posting "men are scum" after harassment scandals*, The Guardian (Dec. 5, 2017), https://www.theguardian.com/technology/2017/dec/05/facebook-bans-women-posting-men-are-scum-harassment-scandals-comedian-marcia-belsky-abuse.

[6] *Facebook Treats Punk Rockers Like Crazy Conspiracy Theorists, Kicks Them Offline*, TOSsed Out, EFF, https://www.eff.org/takedowns/facebook-treats-punk-rockers-crazy-conspiracy-theorists-kicks-them-offline (last visited June 8, 2021).

[7] Ryan Mac, *Instagram Censored Posts About One of Islam's Holiest Mosques, Drawing Employee Ire*, BuzzFeed News (May 12, 2021), https://www.buzzfeednews.com/article/ryanmac/instagram-facebook-censored-al-aqsa-mosque.

[8] Sam Levin, Julia Carrie Wong, Luke Harding, *Facebook backs down from "napalm girl" censorship and reinstates photo*, The Guardian (Sept. 9, 2016), https://www.theguardian.com/technology/2016/sep/09/facebook-reinstates-napalm-girl-photo.

verified account of a prominent Egyptian journalist and human rights activist,[9] and marked tweets containing the word "queer" as offensive.[10] YouTube has also removed videos documenting atrocities in Syria and elsewhere under its graphic violence policy,[11] and has been accused of restricting and demonetizing LGBTQ content.[12]

As explained below, *see infra* Section II.A., these online platforms have the legal right to makes these decisions. But they can have consequences for online speech—and some users have grown concerned about how social media platforms enforced their content rules. Given the centrality of the Internet to modern

---

[9] Martin Belam, *Twitter under fire after suspending Egyptian journalist Wael Abbas*, The Guardian (Dec. 18, 2017), https://www.theguardian.com/media/2017/dec/18/twitter-faces-backlash-after-suspending-egyptian-journalist-wael-abbas.

[10] Taylor Wofford, *Twitter was flagging tweets including the word "queer" as potentially "offensive content,"* Mic (June 22, 2017), https://mic.com/articles/180601/twitter-was-flagging-tweets-including-the-word-queer-as-potentially-offensive-content#.kUbwJTI0E.

[11] Malachy Browne, *YouTube Removes Videos Showing Atrocities in Syria*, New York Times (Aug. 22, 2017), https://www.nytimes.com/2017/08/22/world/middleeast/syria-youtube-videos-isis.html; Kevin Anderson, *YouTube suspends Egyptian blog activist's account*, The Guardian (Nov. 28, 2007), https://www.theguardian.com/news/blog/2007/nov/28/youtubesuspendsegyptianblog.

[12] Megan Farokhmanesh, *YouTube is still restricting and demonetizing LGBT videos—and adding anti-LGBT ads to some*, The Verge (June 4, 2018), https://www.theverge.com/2018/6/4/17424472/youtube-lgbt-domentization-ads-alogrithm.

communication, however, a world without unmoderated online platforms would in reality be an impoverished one.

But S.B. 7072 will not produce unmoderated platforms. Instead, it would create platforms where Florida political candidates' speech is less moderated than that of other speakers, even when they seek to address the same issues. The resulting asymmetry – political candidates get to speak about themselves and issues even if they violate a platform's rules, but their detractors and supporters who are not candidates do not – denies users the benefits of unmoderated platforms.

## II.   CURRENT CONSTITUTIONAL LAW SUPPORTS THE CO-EXISTENCE OF UNMODERATED AND MODERATED PLATFORMS

The law in its current state, without jettisoning years of binding precedent that upholding the Florida law would require, supports the co-existence of both unmoderated and moderated online platforms. As the plaintiffs correctly argue in their motion for preliminary injunction, the First Amendment shields platforms from being forced to publish any content that they would otherwise choose not to publish.

### A.   The First Amendment Protects A Service's Right to Curate The Users' Speech That It Publishes on its Site

Every court that has considered the issue, dating back to at least 2007, has rightfully found that private entities that operate online platforms for speech and

9

that open those platforms for others to speak enjoy a First Amendment right to edit and curate that speech.

The Supreme Court has long held that private publishers have a First Amendment right to control the content of their publications. *Miami Herald Co. v. Tornillo*, 418 U.S. 241, 254 (1974); *see also Los Angeles v. Preferred Comms., Inc.*, 476 U.S. 488, 494 (1986) (recognizing cable television providers' First Amendment right to "exercise[e] editorial discretion over which stations or programs to include in its repertoire"); *cf. Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) (reaffirming that "when a private entity provides a forum for speech," "[t]he private entity may . . . exercise editorial discretion over the speech and speakers in the forum"). An intrusion into the functions of editors remains *per se* unconstitutional even if the compelled publication of undesired content would not cause the publisher to bear additional costs or forgo publication of desired content. *Tornillo*, 418 U.S. at 258.

The parallels between *Tornillo* and the present case are striking.

Both concern Florida state laws that require private companies to publish the speech of political candidates. In *Tornillo*, the law required newspapers that endorsed a candidate for elected office to publish a response from the endorsed candidate's opponents. *Id*. at 245. S.B. 7072 is even broader, requiring large social media companies to maintain candidates' accounts, even if specific content they

publish repeatedly violates the platform's rules, which would otherwise result in the service deactivating the candidates' account and thus the content not being published.

And the arguments made to justify the laws are also eerily similar.

S.B. 7072 is based on the legislative findings that social media platforms inconsistently and in bad faith manipulate the posts on their sites and deprive Floridians of political communications: "Floridians increasingly rely on social media platforms to express their opinions"; "Social media platforms should not take any action in bad faith to restrict access or availability to Floridians." Section 1(3), (8).

In *Tornillo*, the Supreme Court rejected "vigorous" arguments that "the government has an obligation to ensure that a wide variety of views reach the public." *Id.* at 248. Similar to the legislative findings that support S.B. 7072, the plaintiff had argued that the press in 1974 bore little resemblance to the one known to the ratifiers of the First Amendment: because of a "concentration of control of outlets to inform the public," the news media had "become big business," and "noncompetitive and enormously powerful and influential in its capacity to manipulate popular opinion and change the course of events." *Id.* at 248-49. Supporters of the law overturned in *Tornillo* had argued that:

> The result of these vast changes has been to place in a few hands the power to inform the American people and share public opinion. . . .

11

> The abuses of bias and manipulative reportage are, likewise, said to be
> the result of vast accumulations of unreviewable power in the modern
> media empires. In effect, it is claimed the public has lost any ability to
> respond or contribute in a meaningful way to the debate on the issues.
> . . . The First Amendment interest of the public in being informed is
> said to be in peril because "marketplace of ideas" is today a monopoly
> controlled by the owners of the market.

*Id.* at 250.

Although the *Tornillo* Court agreed that these concerns were valid, it

nevertheless found that governmental interference with editorial discretion was

antithetical to the First Amendment and the broader principles of freedom of

speech and the press. *Id.* at 254. The remedy for these concerns must instead be

found through "consensual mechanisms," not governmental compulsion. *Id. See*

*also Assocs. & Aldrich Co. v. Times Mirror Co*., 440 F.2d 133, 134 (9th Cir. 1971)

(rejecting argument that the *Los Angeles Times*' "semimonopoly and quasi-public

position" justified order compelling to publish certain advertisements).

It makes no difference that S.B. 7072 targets social media platforms, as

opposed to newspapers.[13] As the plaintiffs correctly explain in their motion for

_____

[13] To the extent that a newspaper had either $100 million in annual revenue or 100
million monthly "platform participants" for its online services, it would be covered
by S.B. 7072's broad definition of social media platform, which includes "any
information service" that meet this test. § 501.2041(1)(g). The *Washington Post*,
for example, claims 104 million monthly visitors and the Washington Post
Company (NYSE:WPO) is a billion dollar company. *See Washington Post Media
Kit*, https://www.washingtonpost.com/mediakit/ (visited June 9, 2021). "Platform
participants" is not defined by the law.

preliminary injunction, though phrased in terms of traditional print newspaper publishers, *Tornillo* has been applied in a variety of speech contexts, including thrice in the 2018 Supreme Court term. *See Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S.Ct. 2448, 2463 (2018); *National Inst. of Family Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1745 (2018) (Thomas, J., concurring). In one noteworthy non-press setting, the Supreme Court applied *Tornillo*, among other authorities, in holding that the organizers of a parade had a First Amendment right to curate its participants, and thus could not be required to include a certain message, even if the parade was perceived as generally open for public participation. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569–70 (1995). As the *Hurley* Court explained, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech. Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication." *Id.*

    Nor does it matter whether a site publishes its own content or provides a

platform for the user's content.[14] Every court that has considered the issue has

applied *Tornillo* to social media platforms and search engines that primarily, if not

exclusively, publish user-generated content. *See, e.g., Davison v. Facebook, Inc.*,

370 F. Supp. 3d 621 (E.D. Va. 2019); *DJ Lincoln Enterprises v. Google, LLC*,

2021 WL 184527 *8 (S.D. Fla. Jan. 19, 2021); *La'Tiejira v. Facebook, Inc.*, 272 F.

Supp. 3d 981, 991 (S.D. Tex. 2017); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433,

437 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D.

Del. 2007); *Dreamstime.com, LLC v. Google, LLC*, No. C 18-01910 WHA, 2019

WL 2372280 (N.D. Cal. June 5, 2019); *e-ventures Worldwide, LLC v. Google, Inc.*,

---

[14] S.B. 7072's definition of "social media platform" does not require a covered entity to allow publication of user generated content, applying to any information service that "[p]rovides or enables computer access by multiple users to a computer server," and meets the revenue or user threshold.  § 501.2041(1)(g)(1),(4).

No. 214CV646FTMPAMCM, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017).[15]

**B.    Online Services Function Similarly to Newspapers' Opinion Pages That Were Subject to the Right-of-Reply Law in *Tornillo***

But even if the Supreme Court and courts following it had not applied

*Tornillo* to a full range of private actors that speak by curating and editing the

speech of others, it would still be the most appropriate precedent in this case.

---

[15] A separate, but related line of cases has rejected the argument that social media platforms are state actors limited in their ability to exercise content and viewpoint discrimination in curating the user speech on their sites. *See, e.g.*, *Prager University v Google LLC*, 951 F.3d 991, 995 (9th Cir. 2020) ("Despite YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a public forum subject to judicial scrutiny under the First Amendment."); *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019) ("Facebook and Twitter ... are private businesses that do not become 'state actors' based solely on the provision of their social media networks to the public."), *affirmed*, 816 Fed. App'x 497 (D.C. Cir. 2019); *Green v. YouTube, LLC*, 2019 WL 1428890, at *4 (D.N.H. Mar. 13, 2019) (there is no "state action giving rise to the alleged violations of [the plaintiff's] First Amendment rights" by YouTube and other platforms that are "all private companies"); *Nyabwa v. FaceBook*, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018) ("Because the First Amendment governs only governmental restrictions on speech, [the plaintiff] has not stated a cause of action against FaceBook."); *Shulman v. Facebook.com*, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017) (Facebook is not a state actor); *Forbes v. Facebook, Inc.*, 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) ("Facebook is a private corporation" whose actions may not "be fairly attributable to the state"); *Doe v. Cuomo*, 2013 WL 1213174, at *9 (N.D.N.Y. Feb. 25, 2013) (Facebook is not a state actor under the joint action test); *Wilson v. Twitter*, No. 20-CV-00054, 2020 WL 3410349, at *1, *4-5 (S.D.W. Va. May 1, 2020) ("While Twitter no doubt provides a valuable public forum … this alone is insufficient to establish that Twitter is a state actor."); *Tulsi Now, Inc. v. Google, LLC*, No. 19-CV-06444, 2020 WL 4353686 at *1 (C.D. Cal. Mar. 3, 2020) ("Google is not now, nor … has it ever been, an arm of the United States government."); *Perez v. LinkedIn Corp.*, No. 20-CV-07238, 2021 WL 519379 at *1, *4 (N.D. Cal. Feb. 5, 2021) ("Courts across the country have found social media companies are private, not state actors.").

Although analogizing social media platforms to prior forms of media can often be unproductive—and is certainly not necessary for established legal doctrine to apply—there are notable similarities between the opinion pages of a newspaper, as was targeted by the Florida right of reply law struck down in *Tornillo*, and social media sites.

Like social media sites, newspaper opinion pages traditionally involved a mix of original writing and items written by others: opinion pieces, syndicated and wire service articles, letters to the editor, and advertisements, and often editorial cartoons, both syndicated and original.[16] *See* Michael J. Socolow, *A Profitable Public Sphere: The Creation of the New York Times Op-Ed Page*, Communication and Journalism Faculty Scholarship;[17] *Op-Ed*, Wikipedia.[18]

And although newspapers are traditionally associated with being vehicles for original reporting, they also have a well-established role as an intermediary for the writing of others via wire service articles, syndicated news service articles, comics

---

[16] *See* Jack Shafer, *The Op-Ed Page's Back Pages: A press scholar explains how the New York Times op-ed page got started*, Slate (Sept. 27, 2010) (describing how the pages opposite newspapers' editorial pages became a forum for outside contributors to express views different from those expressed by the paper's editorial board), available at https://slate.com/news-and-politics/2010/09/a-press-scholar-explains-how-the-new-york-times-op-ed-page-got-started.html>

[17] Available at https://digitalcommons.library.umaine.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1001&context=cmjfacpub (last visited June 9, 2021).

[18] Available at https://en.wikipedia.org/wiki/Op-ed (last visited June 9, 2021).

and cartoons, letters to the editor, opinion pieces, and advertisements. Indeed, perhaps the most powerful pronouncement of the freedom of the press in Supreme Court jurisprudence, *New York Times v. Sullivan*, 376 U.S. 254 (1964), centered on the *Times* hosting a paid advertisement authored, not by the *Times* itself, but by the Committee to Defend Martin Luther King and the Struggle for Freedom in the South.

This intermediary role that the *Times* played was a critical one: as the Court explained, newspapers are "an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities— who wish to exercise their freedom of speech even though they are not members of the press." *Id*. at 266.[19] More recently, the Court recognized that social media sites now play that very role by providing "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 582 U.S. ___, 137 S.Ct. 1730, 1737 (2017).

In *Tornillo*, the Supreme Court did not hesitate to recognize the First Amendment right of the opinion page editors to endorse candidates and exclude replies from opponents even though the press in 1974 was much different than that

---

[19] The *Sullivan* Court also bolstered its actual malice rule by reference to earlier cases dealing with another type of intermediary, booksellers. *Id*. at 278-79 (citing *Smith v. California*, 361 U.S. 147 (1959); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)).

of our nation's Founders. This Court should not hesitate to apply the same rule to

social media sites even if they are not identical to the opinion pages of 1974.

Applying *Tornillo*, it is clear that S.B. 7072 violates the First Amendment.

Whatever its motivation, and however valid the concerns about the dominant role

of large social media companies in our national discourse, S.B. 7072's means are

unconstitutional.[20]

## III. S.B. 7072 FORCES ONLINE SERVICES TO FAVOR POLITICAL CANDIDATES AND OTHERS' SPEECH OVER EVERYDAY INTERNET USERS

In addition to intruding on information services' First Amendment rights to

decide how they will host user speech and what speech they will allow and

prioritize, S.B. 7072 also runs afoul of the First Amendment by mandating

---

[20] The situation presented in this case, the State of Florida forcing a social media platform to publish certain speech, is distinct from the situation in which the government uses a privately owned social media platform for governmental purposes and then blocks users from commenting upon or seeing its speech. When the government uses a privately owned social media platform like YouTube, Facebook, or Twitter, the government is a state actor and the interactive spaces of the social media platforms it uses for governmental business are often public forums. *See, e.g., Knight First Amendment Institute at Columbia University v. Trump*, 320 F. Supp. 2d 541 (S.D.N.Y. 2018) (finding the interactive spaces created by President Trump's tweets to be designated public forums), *affirmed* 928 F.3d 226 (2d Cir. 2019), *vacated sub nom. Biden v. Knight First Amendment Institute at Columbia University*, 141 S. Ct. 1220 (2021); *Davison v. Plowman*, 247 F.Supp.3d 767 (E.D. Va. 2017) (finding the comment section on a public official's Facebook page to be a limited public forum), *aff'd per curiam by Davison v. Plowman*, 715 F. App'x 298 (4th Cir. 2018).

favoritism for certain speakers' online content, a benefit other internet user are denied. S.B. 7072 demands that online services treat the speech of Florida political candidates and highly popular "journalistic enterprises" appearing on their platforms differently, and more preferentially, than an average internet user's posts.

These are impermissible speaker-based distinctions that cannot survive strict scrutiny and thus violate the First Amendment. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Because "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," laws that compel "distinguishing among different speakers, allowing speech by some but not others" are presumptively unconstitutional. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Thus, "laws favoring some speakers over others demand strict scrutiny when the [government's] speaker preference reflects a content preference." *Reed*, 576 U.S. at 170; *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000) ("Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles."). As the Supreme Court held while reviewing federal must-carry

provisions imposed on cable companies, even though the government may permissibly require common carriers to treat certain speakers differently, those laws are subject to strict scrutiny when "the legislature's speaker preference reflects a content preference." *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 658 (1994).

### A.   Compelling Platforms to Privilege Certain Speakers Online Speech Over Others Violates the First Amendment

S.B. 7072 privileges the online speech of political candidates for public office in a variety of ways. § 106.072 (1)(a). The statute prevents online services from banning political candidates from their platforms at any point before an election, even when candidates repeatedly violate the service's policies or engage in unlawful speech or conduct. § 106.072(2). The prohibition on removing a political candidate from a service is backed by draconian fines that the Florida Election Commission can assess against services to the tune of $250,000 per day for candidates for statewide office and $25,000 per day for candidates for other Florida offices. § 106.072(3). The prohibition and accompanying penalties effectively give political candidates a green light to violate any platform's rules with impunity, even when it results in abuse, harassment, or spreads harmful misinformation, and even when the speech is unprotected by the First Amendment. Users who are not running for office, on the other hand, enjoy no similar privilege. S.B. 7072's political candidate preference is thus aimed at favoring the content of

political candidates' speech, unconstitutionally prioritizing it over other users' speech and the platforms' enforcement of their own policies. *Reed*, 576 U.S. at 170.

S.B. 7072 unconstitutionally privileges political candidates' speech in other ways, too. The statute prevents online services from using algorithms to curate, arrange, or present "content and material posted by or about" a political candidate. § 501.2041(2)(h). This exceedingly vague prohibition limits online services from applying even the most innocuous aspects of their content moderation policies, such as using automated means to present user-generated content in any way other than chronological order. Twitter, for example, allows users to choose whether they would like to view content of users they follow chronologically or via the service's ranking algorithm. Natt Garun, *How to switch your Twitter feed to a chronological timeline*, The Verge (March 6, 2020).[21] S.B. 7072 requires Twitter to disable its own algorithm with respect to political candidates and to force every user to view candidates' tweets chronologically, even if the user does not want to. The prohibition would also appear to limit even community moderators and other users on certain services from down-ranking a political candidate's speech they do not like. *See Reddiquette*, Reddit (describing how users and community moderators

---

[21]  Available at https://www.theverge.com/2020/3/6/21167920/twitter-chronological-feed-how-to-ios-android-app-timeline.

can mass downvote posts).[22]

S.B. 7072 also provides similar privileges for certain speakers that meet the statute's both sharply underinclusive and overinclusive definition of a "journalistic enterprise," which wisely avoids the state defining what journalism is, but is left as only a measure of popularity, with thresholds for various forms of media. § 501.2041(1)(d).[23] In addition to restrictions on a platforms ability to curate those entities' posts or remove news media users that violate a platform's policies, S.B. 7072 prevents online services from "post[ing] an addendum to" any posts from such "journalistic enterprises." § 501.2041(2)(j). The law thus provides more power and protection to the already popular media, prohibiting a platform from providing additional fact-checking or supplemental views on these users' posts,

---

[22] https://reddit.zendesk.com/hc/en-us/articles/205926439-Reddiquette (last visited June 4, 2021).

[23] The law's "journalistic enterprise" definition is overinclusive because any entity that publishes 100 hours of audio or video with an audience of more than 100 million users qualifies as news media. § 501.2041 (1)(d)(2). That definition would appear to include many non-news media YouTube channels, such as Cocomelon, which produces children's nursery rhyme music videos and has 112 million subscribers. *See Most popular YouTube channels as of May 2021, ranked by number of subscribers*, statista, available at https://www.statista.com/statistics/277758/most-popular-youtube-channels-ranked-by-subscribers/ (last visited June 9, 2021). The law is underinclusive because its high audience and viewership thresholds excludes smaller news media, including newspapers with less than 50,000 subscribers. *See* Dan Christensen, *Newspaper sales in Florida are eroding faster than the national average*, Florida Bulldog (Oct. 11, 2018), available at https://www.floridabulldog.org/2018/10/newspaper-sales-in-florida-are-eroding-faster-than-national-average/ (showing how several Florida newspapers have circulations of less than 50,000).

frustrating efforts by both platforms and their users to, among other things, advise readers to consult additional sources, counter lies, or provide opposing views. *See Facebook's Third-Party Fact-Checking Program*, Facebook (describing how Facebook applies warning labels or appends links to fact-checking content of specific posts that it identifies as misinformation).[24]

S.B. 7072 reflects the state's preference for certain content online—political speech about and by Florida candidates—rendering the law unconstitutional. S.B. 7072's content-based restrictions cannot survive strict scrutiny, for all the reasons Plaintiffs explain. Mot. at 37-41.

Strict scrutiny requires that the speech restriction be neither underinclusive nor overinclusive, *see Brown v Entertainment Merchants Ass'n*, 564 U.S. 786, 805 (2011), and S.B. 7072's selective speaker-based privileges render the law facially underinclusive in at least three respects. This defect "raises serious doubts about whether Florida is, in fact, serving, with this statute the significant interests" lawmakers claim. *The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

*First*, S.B. 7072 deliberately excludes all other internet users besides political candidates and "journalistic enterprises" from its unconstitutional must-carry provisions, even though the speech of other users may be important for both

---

[24] Available at https://www.facebook.com/journalismproject/programs/third-party-fact-checking (last visited June 4, 2021).

electoral debates and political discourse in general.

*Second*, the law inexplicably excludes social media platforms owned by companies that also own theme parks in Florida with no explanation as to why those social media platforms do not cause the same purported harms as the ones bound by the law. While Florida may have an interest in protecting its theme park businesses, this puzzling exclusion contradicts its arguments that it has a compelling interest in protecting candidate speech on platforms.

*Third*, the law's coercive and punitive provisions for online social media that moderate others' speech fails to account for the fact that many other entities—most notably, print and broadcast media that do not meet the monthly user or subscriber thresholds—also make decisions to edit, to not publish, or to otherwise distribute political candidates' speech. In this respect, S.B. 7072 is akin to yet another prior Florida law struck down by Supreme Court. The law in *The Florida Star* case criminalized the disclosure of sexual assault victims' names by an "instrument of mass communication," but not by any other speaker, even though such disclosures could result in equal or greater harm than media disclosure; this underinclusivity rendered the law unable to satisfy First Amendment strict scrutiny. *Id.* S.B. 7072 targets its speech compulsions and restrictions to only a subset of social media platforms and does not impose similar burdens or punishment on any other entity that may host or distribute a political candidate's speech. Yet those untargeted

speakers' editorial choices could result in equal or greater harm to a candidate's chances at public office, including critical news coverage or editorial endorsements.

**B.     S.B. 7072's Legally Compelled Favoritism for Certain Speakers Also Raises Distinct Human Rights Concerns By Giving Already Powerful Speakers Additional Legal Protections**

Reinforcing its constitutional failings, S.B. 7072 is bad policy that will inhibit the public's ability to engage in diverse and wide-ranging debate about political candidates and their public acts, all while giving those candidates much greater power online. S.B. 7072's requirements that platforms must carry, and cannot moderate, political candidates' speech reinforces existing discrepancies in power, resources, and the ability to disseminate speech that political candidates already enjoy over the general public. *See* Kit Walsh and Jillian C. York, *Facebook Shouldn't Give Politicians More Power Than Ordinary Users*, EFF Deeplinks (Oct. 6, 2019).[25]

Facebook's recent decision to abandon its special rules for political officials' speech on its platforms further underscores the folly of S.B. 7072's must-carry provisions. Alex Heath, *Facebook to end special treatment for politicians after*

---

[25] Available at https://www.eff.org/deeplinks/2019/10/facebook-shouldnt-give-politicians-more-power-ordinary-users.

*Trump ban*, The Verge (June 3, 2021).[26] Until earlier this month, Facebook exempted certain politicians' posts from its fact-checking and hate speech rules, resulting in the platform hosting speech that Facebook may have otherwise edited, removed, or may have resulted in the platform deactivating the politicians' account. *Id*. Facebook's previous policies held political officials' speech to a *lower* standard than every other user, a preference that EFF argued exacerbated certain officials and government-sanctioned speech and views over other speakers lacking political power. *See* Corynne McSherry and Jillian C. York, *Facebook's Policy Shift on Politicians Is a Welcome Step*, EFF Deeplinks (June 7, 2021).[27] In abandoning those rules for politicians' speech, Facebook, as it has a legal right to do, made a policy decision that those individuals will be subject to the same content policies that Facebook applies to all its users.

## IV.   INTERNET USERS ARE BEST SERVED BY A VOLUNTARY HUMAN RIGHTS FRAMEWORK FOR CONTENT MODERATION

There is a policy solution to the concerns expressed by the state that preserves the careful balance created by the First Amendment. Rather than laws compelling some speech and banning other speech on private online platforms, Internet users are best served by "consensual mechanisms," in the words of the

---

[26] Available at https://www.theverge.com/2021/6/3/22474738/facebook-ending-political-figure-exemption-moderation-policy.

[27] Available at https://www.eff.org/deeplinks/2021/06/facebooks-policy-shift-politicians-welcome-step.

Supreme Court in *Tornillo*, particularly the voluntary adoption by the large platforms of a human rights framework for content moderation.

The large platforms that currently dominate social media, both in the United States and worldwide, undeniably play an outsize role in what we can and cannot say on the internet. The content moderation practices in which these companies engage have serious human rights implications, especially in countries where the platforms are the only effective means of communicating to the public outside the government's control.

The issue is not that these large, general purpose online platforms moderate their users' content at all; that is undeniable and unlikely to change. The issue is that they do so without proper consideration for human rights.

Internet users should strongly urge the companies owning and maintaining these online platforms to employ "consensual mechanisms" to ensure that content removals or account suspensions follow a framework consistent with human rights.

Specifically, internet users should demand increased accountability, clear and consistent takedown rules, and robust due process that includes a fair and transparent removal process.

The Santa Clara Principles, endorsed by a broad range of civil society

27

groups, including *amicus* EFF, offer one model.[28] The model's principles include:

*First*, companies should publish the number of posts removed and accounts permanently or temporarily suspended, demonetized, or otherwise downgraded, due to violations of their content rules. At a minimum, this information should include the total number of discrete posts and accounts flagged and the total number of posts and accounts removed or otherwise downgraded. These numbers should be reported by category or term of service violated, by source of the downgrade request (company, government, users, etc.), and by location of the downgrade requester. This data should be reported at least quarterly.

*Second*, the companies should provide clear notice to all users about what types of content are prohibited, and clear notice to each affected user about the reason for the limitations placed on their content or account. In general, companies should provide detailed guidance to the community about what content is prohibited, including examples of permissible and impermissible content and the rules or guidance followed by reviewers. Companies should also provide an explanation of how automated detection is used across each category of content. When providing a user with notice about why her post was removed or why her

---

[28] *See EFF and Coalition Partners Push Tech Companies To Be More Transparent and Accountable About Censoring User Content*, EFF Press Release (May 7, 2018)), https://www.eff.org/press/releases/eff-and-coalition-partners-push-tech-companies-be-more-transparent-and-accountable; https://santaclaraprinciples.org/.

account was limited, the company should indicate the specific policy violated, how the offending content was detected and flagged, and an explanation of the process by which the user can appeal the action.

*Third*, companies should enable users to engage in a meaningful and timely appeals process for any content removals or account limitations. At a minimum, an appeals process should include human review by a person or panel of persons that was not involved in the initial decision, an opportunity to present additional information that will be considered in the review, notification of the results of the review, and a statement of the reasoning sufficient to allow the user to understand the final decision.

S.B. 7072 does attempt to turn versions of some of these best practices into legal mandates that might be appropriate as part of a carefully crafted legislative scheme that was not riddled with ambiguity and favoritism. User control, notice to affected users, content preservation and retrieval, and clear standards that will not surprise users when applied may possibly be incorporated into law which carefully considered and accommodated the competing constitutional concerns.

But S.B. 7072 is not such a carefully crafted regulatory scheme. The user-focused protections are not severable, instead they are inextricably embedded within the framework of the law's speaker-bias, theme-park-bias, and other glaring constitutional errors.

"Consistency" in the application of one's rules, for example, may be an appropriate aspiration. But it is a vague and uncertain standard to enforce as law under the threat of serious penalties. The law itself is internally inconsistent in that it requires "consistent" treatment of all users, yet by its own terms sets out two categories of users for inconsistent special treatment.

As the Supreme court recognized in *Tornillo*, the desired "consensual mechanisms" may raise constitutional concerns when imposed by law, as is the case here.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court grant plaintiffs' motion for a preliminary injunction.

## CERTIFICATE OF WORD COUNT

This brief complies with the word limit of Local Rule 7.1(F) because it contains 6,717 words, excluding the portions of the brief exempted by Local Rule 7.1(F). This brief has been prepared using a proportionally spaced typeface (Times New Roman 14-point type) using Microsoft Word.

/s/*Christopher B. Hopkins*
Christopher B. Hopkins, Esq

Dated: June 14, 2021

Respectfully submitted,

/s/*Christopher B. Hopkins*
Christopher B. Hopkins, Esq.
Florida Bar No. 116122

McDonald Hopkins LLC
505 S. Flagler Drive, Sute #300
West Palm Beach, FL 33401
Email: chopkins@mcdonaldhopkins.com
Phone: (561) 847-2346
Fax: (561) 472-2122

*Counsel for Amici Curiae*
*Electronic Frontier Foundation and*
*Protect Democracy Project, Inc*

and

    Aaron Mackey
    (*pro hac vice forthcoming*)
    David Greene
    (*pro hac vice forthcoming*)
    Kurt Opsahl
    (*pro hac vice forthcoming*)

    Electronic Frontier Foundation
    815 Eddy Street
    San Francisco, CA 94109
    amackey@eff.org
    davidg@eff.org
    kurt@eff.org
    (415) 436-9333 phone
    (415) 436-9993 fax

    *Counsel for Amicus Curiae*
    *Electronic Frontier Foundation*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following to all counsel of record.

/s/ *Christopher B. Hopkins*
Christopher B. Hopkins, Esq.