## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization; and
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a CCIA, a
501(c)(6) non-stock Virginia corporation,

        **Civil Action No.**
        **4:21-cv-00220-RH-MAF**

    Plaintiffs,

v.

ASHLEY BROOKE MOODY, in her official
capacity as Attorney General of the State of
Florida; JONI ALEXIS POITIER, in her official
capacity as Commissioner of the Florida
Elections Commission; JASON TODD ALLEN,
in his official capacity as Commissioner of the
Florida Elections Commission; JOHN MARTIN
HAYES, in his official capacity as Commissioner
of the Florida Elections Commission;
KYMBERLEE CURRY SMITH, in her official
capacity as Commissioner of the Florida
Elections Commission; and PATRICK GIL-
LESPIE, in his official capacity as Deputy
Secretary of Business Operations of the Florida
Department of Management Services,

    Defendants.

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE
PRESS, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL
LIBERTIES UNION OF FLORIDA, AUTHORS GUILD INC., CENTER
FOR DEMOCRACY & TECHNOLOGY, MEDIA LAW RESOURCE
CENTER, INC., AND PEN AMERICAN CENTER, INC. AS AMICI
CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

[Caption continued on next page]

Deanna K. Shullman (FBN 514462)
dshullman@shullmanfulgate.com
Shullman Fugate PLLC
2101 Vista Parkway, Suite 4006
West Palm Beach, FL 33411
Tel: (561) 429-3619

*Counsel for amici curiae*

## DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The American Civil Liberties Union ("ACLU") and the American Civil Liberties Union of Florida are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in amici curiae ACLU or ACLU of Florida.

The Authors Guild Inc. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

The Center for Democracy & Technology has no parent corporation and, because it is a non-stock corporation, no publicly held corporation owns 10% or more of its stock.

The Media Law Resource Center has no parent corporation and issues no stock.

PEN American Center, Inc. has no parent or affiliate corporation.

No party's counsel has authored this brief, in whole or in part. Furthermore, no party or party's counsel, other than proposed amici, their members, or their counsel, has funded the research, writing, preparation, or submission of this brief.

## TABLE OF CONTENTS

**DISCLOSURE STATEMENT** ............................................................... iii

**TABLE OF AUTHORITIES** .................................................................v

**INTEREST OF AMICI CURIAE** .........................................................1

**SUMMARY OF ARGUMENT** ..............................................................4

**ARGUMENT** ..........................................................................................8

*I.   The must-carry provision for political candidates violates First Amendment protections for the free flow of information to the public.* ....................................8

*II.  The "journalistic enterprise" carve-out is unconstitutional because it is contrary to Tornillo and impairs newsgathering rights.* ....................................14

**CONCLUSION**........................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Associated Press v. United States*,
  326 U.S. 1 (1945)................................................................................8

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
  412 U.S. 94 (1973)..............................................................................6

*e-ventures Worldwide, LLC v. Google, Inc.*,
  No. 2:14-cv-646, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ..........................12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995)......................................................... 12, 13

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ....................................... 6, 11, 12

*La'Tiejira v. Facebook, Inc.*,
  272 F. Supp. 3d 981 (S.D. Tex. 2017)................................................12

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007)...................................................13

*Miami Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241, 258 (1974) ("*Tornillo*")……………………..…………..passim

*Meyer v. Grant*,
  486 U.S. 414 (1988)................................................................................8

*Mills v. Alabama*,
  384 U.S. 214 (1966)..................................................... 10, 11

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964)..................................................... 10, 13

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971)................................................................................9

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) ..........................................................................11

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
   413 U.S. 376 (1973) ................................................................................8

*Reno v. ACLU*,
   521 U.S. 844 (1997) ..............................................................................11

*Search King, Inc. v. Google Tech., Inc.*,
   No. CIV-02-1457, 2003 WL 21464568 (W.D. Okla. May 27, 2003) ..................12

**Statutes**

2021 Fla. Sess. Law Serv. Ch. 2021-32, § 4 (S.B. 7072) ............................. 7, 14, 15

**Other Authorities**

Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974,
   https://perma.cc/2W2J-AJ65 ....................................................................9

David McCabe, *Florida, in a First, Will Fine Social Media Companies That Bar
   Candidates*, N.Y. Times (May 24, 2021), https://perma.cc/
   6QM6-N78P ..........................................................................................10

Lucas A. Powe, Jr., The Fourth Estate and the Constitution (1992) ........................9

News Release, Governor Ron DeSantis Signs Bill to Stop the Censorship of
   Floridians by Big Tech (May 24, 2021), https://perma.cc/
   5A2C-79ZG ............................................................................................5

Zechariah Chafee, Government and Mass Communications (1947) ................ 11, 16

## INTEREST OF AMICI CURIAE

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated non-profit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources.  Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization. The ACLU of Florida is a state affiliate of the ACLU. Both organizations are dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws and, for decades, have been at the forefront of efforts nationwide to protect the full array of civil rights and liberties, including freedom of speech and freedom of the press online. The ACLU and the ACLU of Florida have frequently appeared before courts throughout the country in First Amendment cases, both as direct counsel and as amici curiae.

The Authors Guild, Inc. was founded in 1912, and is a national non-profit association of more than 9,000 professional, published writers of all genres. The Guild counts historians, biographers, academicians, journalists and other writers of nonfiction and fiction as members. The Guild works to promote the rights and

1

professional interests of authors in various areas, including defending their right of freedom of expression. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business and other areas; they are frequent contributors to the most influential and well-respected publications in every field.

Center for Democracy & Technology ("CDT") is a non-profit public interest organization. For more than 25 years, CDT has represented the public's interest in an open, decentralized internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates in support of the First Amendment and protections for online speech before legislatures, regulatory agencies, and courts.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative, and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals and speaks to the press and public on media law and First Amendment issues. It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV

and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field. The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

PEN American Center, Inc. ("PEN America" or "PEN") is a nonprofit organization that represents and advocates for the freedom to write and freedom of expression, both in the United States and abroad. PEN America is affiliated with more than 100 centers worldwide that comprise the PEN International network. Its membership includes more than 7,500 journalists, novelists, poets, essayists, and other professionals. PEN America stands at the intersection of journalism, literature, and human rights to protect free expression. PEN champions the freedom of people everywhere to write, create literature, convey information and ideas, and express their views, recognizing the power of the word to transform the world. PEN America supports the First Amendment and freedom of expression in the United States.

Amici collectively represent the First Amendment interests of media outlets and communication platforms across all technologies and the public's interest in receiving and disseminating information free from government censorship or control. Amici submit this brief because they are concerned that S.B. 7072 violates

fundamental First Amendment rights that animate and preserve robust public debate across all media.

## SUMMARY OF ARGUMENT

S.B. 7072 compels private communications platforms to carry speech by others that they would otherwise not host, and it allows the State to directly regulate how private communications platforms curate, edit, or comment on that speech. Any law that permits the state to police the content of lawful speech on a private communications platform could permit government officials to force platforms to carry speech perceived as favorable to the government or to pressure platforms to remove speech perceived as unfavorable. S.B. 7072, therefore, vests the State of Florida with the pure power of the censor, and it poses an acute threat to essential First Amendment protections for the press and public.

Amici the Reporters Committee, MLRC, and PEN America take no position on technology platforms' content moderation policies or practices; other Amici, including the ACLU and CDT, have expressed an array of views on the public policy implications of how and when platforms moderate content by public officials or others. All Amici are, however, united in their position that the curation of lawful content online constitutes an exercise of "editorial control and judgment," which cannot be regulated by the state "consistent with First

Amendment guarantees." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("*Tornillo*").

Accordingly, Amici write to address the following two points in support of Plaintiffs' motion for a preliminary injunction.

*First*, government efforts to force online platforms to carry the speech of particular speakers, including political candidates, contravene the rule articulated by the Supreme Court in *Tornillo*. Under *Tornillo*, it is impermissible for the government, regardless of motive, to mandate that a private editor "publish that which reason tells [it] should not be published." *Id.* at 256 (internal quotation marks omitted). Similarly, the danger in a legally enforceable mandate that platforms exercise their editorial discretion "consistently" is manifest; it would permit the state to control what information flows to the public and when. *See id.* at 260 (White, J., concurring) ("[A]ny . . . system that would supplant private control of the press with the heavy hand of government intrusion . . . would make the government the censor of what the people may read and know.").

Here, S.B. 7072 forces online platforms to carry the speech of political candidates, and it additionally prohibits them from curating (i.e., prioritizing or "shadowbanning") that speech, or any speech *about* those candidates. In addition, Florida officials have explicitly stated that S.B. 7072's goal is to address perceived bias on platforms. *See, e.g.*, News Release, Governor Ron DeSantis Signs Bill to

Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://perma.cc/
5A2C-79ZG ("If Big Tech censors enforce rules inconsistently, to discriminate in
favor of the dominant Silicon Valley ideology, they will now be held
accountable.").

S.B. 7072 violates the First Amendment in that it undermines the necessary
protections for public discourse established in *Tornillo* for other forms of media,
including traditional news organizations. *Cf. Columbia Broad. Sys., Inc. v.
Democratic Nat'l Comm.*, 412 U.S. 94, 144–45 (1973) (Stewart, J., concurring)
(noting concern that requiring broadcast licensees to carry paid editorial
advertising could erode editorial autonomy of print media). For precisely that
reason, courts have extended the *Tornillo* rule—a "virtually insurmountable barrier
[against] . . . government tampering . . . with news and editorial content," 418 U.S.
at 259 (White, J., concurring)—to online communications platforms such as search
engines and social media, *see, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d
433, 443 (S.D.N.Y. 2014) ("In short, Plaintiffs' efforts to hold [search engine]
Baidu accountable in a court of law for its editorial judgments about what political
ideas to promote cannot be squared with the First Amendment."). By forcing
communications platforms to carry political speech they otherwise would not, or
prohibiting platforms from, for instance, adding commentary to third-party posts,
S.B. 7072 clearly violates the rule articulated in *Tornillo*.

***Second***, S.B. 7072 prohibits platforms from moderating any content from "journalistic enterprises," including entities that publish a certain number of words or host a certain number of hours of video online. At first blush, this provision could be seen as a salutary protection for the covered entities; yet, if allowed to stand, it would in practice gravely injure First Amendment rights. The journalistic enterprise provision bars platforms from "edit[ing]" or "post[ing] an addendum to any content or material." 2021 Fla. Sess. Law Serv. Ch. 2021-32, § 4 (S.B. 7072). In other words, the provision itself acts as a prior restraint on a technology platform's own speech. Protections for editing, adding a disclaimer, or similar types of speech are central to press freedom, and permitting censorship by the state in this manner would significantly erode the rule articulated in *Tornillo* that has been applied to an array of media and expressive activity beyond print in later cases.

For these reasons, Amici respectfully urge the Court to grant Plaintiffs' motion for a preliminary injunction.

**ARGUMENT**

**I.   The must-carry provision for political candidates violates First Amendment protections for the free flow of information to the public.**

Private curation of content online—especially content related to public affairs and government officials—is an inextricable component of much modern public discourse.[1]  Such private curation necessarily entails making decisions about what material is allowed or disallowed on a platform—including statements of or about political candidates. In 1974, the Supreme Court unanimously affirmed that the First Amendment forbids governmental interference in editorial decisions by the print media when it held unconstitutional Florida's "right of reply" statute,

---

[1]      Amici emphasize that the online content regulated under S.B. 7072 is core political speech, "an area in which the importance of First Amendment protections is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (invalidating Colorado prohibition on paid petition circulators as violative of First Amendment) (internal quotation marks omitted). The restrictions on moderating political candidates, "journalistic enterprises," and the requirement that moderation policies be applied "consistently," all trench on the ability of communications platforms to lawfully curate speech on their platforms, in a manner directly analogous to the right-of-reply statute in *Tornillo*. This is not a regulation concerning "a classic example of commercial speech," *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973), nor does it involve the application of a generally applicable law like antitrust against a private speaker, *see Tornillo*, 418 U.S. at 254 (distinguishing *Associated Press v. United States*, 326 U.S. 1 (1945), and noting that *Associated Press* Court clarified that district court decree pursuant to Sherman Act "does not compel AP or its members to permit publication of anything which their 'reason' tells them should not be published" (quoting 326 U.S. at 20 n.18)). Rather, S.B. 7072 directly interferes with the ability of communications platforms to present core political speech in the manner that their "reason" dictates.

which "grant[ed] a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper." *Tornillo*, 418 U.S. at 243, 258.

The Court in *Tornillo* made clear that government regulation of the "choice of material" to include in a newspaper cannot be "exercised consistent with First Amendment guarantees." *Id.* at 258. This conclusion applies when such decisions deal with the "treatment of public issues and public officials—whether fair or unfair." *Id*. Indeed, press autonomy in decisions "about what and what not to publish" has been described as "absolute." *See* Lucas A. Powe, Jr., The Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is indivisible, it must be absolute."); *see also Tornillo*, 418 U.S. at 259 (White, J., concurring) ("According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned." (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971))).

Notably, the unanimous *Tornillo* decision came at the height of fallout from Watergate and shortly after a request by President Richard Nixon that the Justice Department explore the need for a federal right-of-reply statute because of press coverage perceived as critical of public officials in the press. Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974, at E2, https://perma.cc/ 2W2J-AJ65 ("Overhanging the debate is the reality of Watergate, where a vigorous

press broke through repeated official White House denials of wrongdoing.").

Today, government actions like S.B. 7072 are being considered and enacted

against a similar backdrop of claims by politicians that they are being silenced by

social media companies, and a flood of legislative proposals similar to S.B. 7072

that are often expressly described as efforts to counter perceived "bias" in content

moderation practices. David McCabe, *Florida, in a First, Will Fine Social Media*

*Companies That Bar Candidates*, N.Y. Times (May 24, 2021), https://perma.cc/

6QM6-N78P ("More than a hundred bills targeting the companies' moderation

practices have been filed nationwide this year, according to the National

Conference of State Legislatures."). But the Supreme Court has made clear that

"any . . . compulsion to publish that which reason tells [the press] should not be

published is unconstitutional." *Tornillo*, 418 U.S. at 256 (citation and marks

omitted). Such laws "operate[ ] as a command in the same sense as a statute or

regulation forbidding [platforms] to publish specified matter." *Id.*

Chief Justice Burger's opinion for the Court in *Tornillo* emphasized two

inevitable consequences of permitting the government to mandate access to print

media. *Id.* at 254. First, a "[g]overnment-enforced right of access inescapably

'dampens the vigor and limits the variety of public debate,'" *id.* at 257 (quoting

*New York Times Co. v. Sullivan*, 376 U.S. at 279), which "of course includes

discussions of candidates," *id.* (quoting *Mills v. Alabama*, 384 U.S. 214, 218

(1966)). Second, must-carry provisions "intru[de] into the function of editors," including choices they would otherwise make about "the material to [publish]" and "the treatment of public issues and public officials." *Id.* at 258. In other words, an enforceable right of access poses the threat of direct press censorship:  "[L]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." *Id.* at 258 n.24 (quoting Zechariah Chafee, Government and Mass Communications 633 (1947)). This holds for S.B. 7072, which would rob online platforms—and therefore their users—of any choice in whether, and how, to publish—or interact with—content by political candidates.

While the *Tornillo* Court confronted these issues in the context of print media, the Supreme Court has since recognized that the internet as a communications medium is entitled to full First Amendment protection. *Reno v. ACLU*, 521 U.S. 844, 870 (1997); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (holding unconstitutional a governmental ban on access to social media, and finding that "social media users employ these websites to engage in a wide array of protected First Amendment activity"). The Court has also recognized the application of *Tornillo* "well beyond the newspaper context," including new communications mediums. *Jian Zhang*, 10 F. Supp. 3d at 437. Further, as the Court has since explained, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to

11

edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569–70 (1995).

Applying those principles, courts have held that online platform decisions about what lawful content to host on their sites receive First Amendment protection. *See Jian Zhang*, 10 F. Supp. 3d at 438 (holding that, in the context of search engine results, the government "may not tell a private speaker what to include or not to include in speech about matters of public concern" and recognizing that "a search engine's editorial judgment is much like many other familiar editorial judgments, such as the newspaper editor's judgment of which wire-services stories to run and where to place them in the newspaper" (citation and marks omitted)); *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("A search engine is akin to a publisher, whose judgments about what to publish and what not to publish are absolutely protected by the First Amendment."); *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568, at *2–4 (W.D. Okla. May 27, 2003) (search rankings are protected opinion). Further, these protections apply equally to decisions to remove or exclude content. *See, e.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (holding Facebook could decide whether to take down or leave up a post because of "Facebook's First

12

Amendment right to decide what to publish and what not to publish on its platform"); *Langdon v. Google, Inc*., 474 F. Supp. 2d 622, 629–30 (D. Del. 2007) (holding First Amendment right extends to decisions to exclude content from search platform). Crucially, these protections apply irrespective of the government's intention in seeking to intervene in these decisions. *See Jian Zhang*, 10 F. Supp. 3d at 438 ("Put simply, '[d]isapproval of a private speaker's statement'—no matter how justified disapproval may be—'does not legitimize use of the [Government's] power to compel the speaker to alter the message by including one more acceptable to others.'" (quoting *Hurley*, 515 U.S. at 581)).

The animating concern in *Tornillo*—that the power to compel or silence speech on a communications medium would allow the government to improperly skew public discussion of its policies through mandates, chill, or direct suppression—applies when the government seeks to dictate what appears online, whether on social media platforms or search engines. Vesting the censorial power in the government to interfere with online platforms' exercise of editorial control and judgment is antithetical to the public's interest in freely receiving and disseminating information. Government intrusion into such decisions "dampens the vigor and limits the variety of public debate." *Tornillo*, 418 U.S. at 257 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)).

13

In short, if a major purpose of the First Amendment is to allow public discourse to "serve as a powerful antidote to any abuses of power," *Tornillo*, 418 U.S. at 260 (White, J., concurring) (citation omitted), the First Amendment must protect how private actors choose to relay speech by the public and by candidates concerning government affairs. S.B. 7072 squarely interferes with the exercise of that discretion, and, worse, it does so in an explicit effort to force platforms to carry the speech of political candidates and police "bias" online, powers that the *Tornillo* Court categorically denied the government. *See id.* at 256 ("A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated.").

## II.    The "journalistic enterprise" carve-out is unconstitutional because it is contrary to Tornillo and impairs newsgathering rights.

S.B. 7072 creates a new Section 501.2041(j) in the Florida Statutes that prohibits a "social media platform" from taking any action to "censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast."  2021 Fla. Sess. Law Serv. Ch. 2021-32, § 4 (S.B. 7072). A "journalistic enterprise" is defined as an entity doing business in Florida that publishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users; publishes 100 hours of audio or video available online with at least 100 million viewers annually; operates a cable channel that provides more than 40 hours of content per week to more than

14

100,000 cable subscribers; or holds a broadcast license from the Federal Communications Commission. *See id.* (creating new § 501.2041(d)).

Taken together, S.B. 7072's prohibition on "censoring, deplatforming, or shadow banning" effectively precludes an affected communications platform from moderating any content created by an entity that qualifies under the definition of "journalistic enterprise," including removal of the content for violating platform policies or even the addition of commentary by the platform to a post.

This moderation ban also violates the central principle underpinning *Tornillo*. A news organization must be free to exercise editorial discretion not just in terms of what content it decides to publish, but also in terms of how it presents that content (by appending disclaimers to advertising, as just one example). Likewise, *Tornillo* makes clear that when a communications platform speaks in its own voice by curating or commenting on content on its platform, First Amendment protections apply. *Tornillo*, 418 U.S. at 258.

Further, the provision is not saved by its preclusion of "content-based" moderation by the platforms (that is, platforms may not moderate based on "the content of [the enterprise's] publication or broadcast"). By purporting to prohibit content-based "censorship" by the platform, S.B. 7072 vests the state with the power to determine when a platform has engaged in such "censorship," which necessarily turns the state into the censoring party. *See Tornillo*, 418 U.S. at 254

("However much validity may be found in the[ ] argument [that fairness and accuracy can only be achieved through accountability imposed through government action]," if the mechanism used "is governmental coercion, this at once brings about a confrontation with the express provisions of the First Amendment"). This is because "[a] journal does not merely print observed facts the way a cow is photographed through a plateglass window." *Id*. at 258 n.24 (quoting Zechariah Chafee, Government and Mass Communications 633 (1947)). Rather, "you have interpretation and you have selection, and editorial selection opens the way to editorial suppression." *Id.* In other words, "how can the state force abstention from discrimination in the news without dictating selection?" *Id.*

Public officials will be tempted to use that authority to punish moderation decisions that they perceive as unfavorable, while ignoring decisions perceived as favorable. That is one of the central dangers identified by the *Tornillo* Court—the government's ability to skew public discourse in the name of combatting "bias." *See Tornillo*, 418 U.S. at 256. As such, this provision, if allowed to stand, poses the same risk articulated above; it would weaken *Tornillo*'s protections for everyone, across all media. That violates the First Amendment.

## CONCLUSION

For all of these reasons, Amici respectfully urge the Court to grant Plaintiffs' motion for a preliminary injunction.

Dated: June 14, 2021

Respectfully submitted,

**_/s/ Deanna K. Shullman_**
Deanna K. Shullman (FBN No. 514462)
dshullman@shullmanfulgate.com
Shullman Fugate PLLC
2101 Vista Parkway, Suite 40006
West Palm Beach, FL 33411
Tel: (561) 429-3619

*Counsel for Amici Curiae*

17