# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

NETCHOICE, LLC, et al.,

         *Plaintiffs,*

  v.

ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida, et al.,

         *Defendants.*

Civil Action No.
4:21-cv-220- RH-MAF

## BRIEF OF INTERNET ASSOCIATION
## AS AMICUS CURIAE IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Patrick J. Carome (*pro hac vice* pending)
  (D.C. SBN 385676)
Paul R.Q. Wolfson (*pro hac vice* pending)
  (D.C. SBN 414759)
Ari Holtzblatt (*pro hac vice* pending)
  (D.C. SBN 1009913)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

Peter W. Homer
  (FL SBN 291250)
HOMER BONNER
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
(305) 350-5139

## DISCLOSURE STATEMENT OF AMICUS CURIAE
## INTERNET ASSOCIATION

Amicus Curiae Internet Association is not a publicly held corporation, does not have a parent corporation, and has not issued stock. Therefore, no publicly traded corporation owns ten percent or more of its stock.

None of the counsel for the parties in this litigation has authored this brief, in whole or in part. Furthermore, no party, party's counsel, or outside organization has funded the research, writing, preparation, or submission of this brief.

/s/ Peter W. Homer
Peter W. Homer

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT OF AMICUS CURIAE INTERNET
ASSOCIATION................................................................................i

TABLE OF AUTHORITIES ..................................................................iv

SUMMARY OF ARGUMENT .................................................................1

BACKGROUND ....................................................................................4

ARGUMENT ........................................................................................11

I.      S.B. 7072's Requirement For "Consistent" Moderation Is
        Impossible To Meet And Would Force Many Platforms To
        Curtail Their Beneficial Moderation Efforts .................................11

        A.     The Sheer Volume Of Content On Most Online
               Platforms Makes "Consistent" Moderation Impossible.....................11

        B.     "Consistency" Is Subjective And Elusive ...........................................14

II.     Barring Platforms From Making Frequent Changes To Their
        Moderation Policies Would Prevent Them From Responding
        Constructively To Rapidly-Evolving Social Crises .......................16

III.    S.B. 7072's Consistency Requirement And Ban On Frequent
        Policy Changes Would Fundamentally And Deeply Violate
        Platform Operators' First Amendment Rights .............................22

IV.     Congress Enacted Section 230 To Preempt Burdensome State
        Laws Like S.B. 7072, That Would Discourage Content
        Moderation.................................................................................25

        A.     Section 230 Preempts S.B. 7072, Which Extensively
               Regulates Online Services..................................................27

        B.     Section 230 Was Enacted To Encourage Online Services
               To Self-Regulate Content On Their Platforms, But S.B.
               7072 Would Prohibit Them From Doing So.........................30

CONCLUSION ......................................................................................34

CERTIFICATE OF COMPLIANCE .......................................................36

CERTIFICATE OF SERVICE ...............................................................37

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Attwood v. Clemons*, No. 18-cv-38, 2021 WL 1020449 (N.D. Fla. Mar. 17, 2021) ............................................................... 32

*Bennett v. Google, LLC*, 882 F.3d 1163 (D.C. Cir. 2018) ....................................... 32

*Boggs v. Boggs*, 520 U.S. 833 (1997) ....................................................... 26

*Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242 (S.D. Fla. 2020) ...................... 27

*Domen v. Vimeo, Inc.*, 991 F.3d 66 (2d Cir. 2021) .............................................. 12, 33

*e-ventures Worldwide, LLC v. Google, Inc.*, No. 14-cv-646, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) .................................................... 24

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020) ......................................................... 2, 30

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992) .................................................................. 26, 34

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Group*, 515 U.S. 557 (1995) ........................................................... 23

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018) ........................................ 25

*Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ...................... 24

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) .................. 4, 22, 23

*Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41 (1987) ....................................... 26

*Reno v. ACLU*, 521 U.S. 844 (1997) ....................................................... 23

*Stratton Oakmont, Inc. v. Prodigy Service Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) ........................................ 7, 30, 31

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) .................................................................. 25

iv

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) .........12, 26, 27, 28, 32

## STATUTORY PROVISIONS

47 U.S.C. § 230 ................................................................................*passim*

Fla. Stat. § 501.2041 (added by Fla. S.B. 7072, § 4 (2021)) ..........................1, 3, 16

## LEGISLATIVE MATERIALS

H.R. Rep. No. 104-458 (1996) (Conf. Rep.) ............................................31

H.R. Rep. No. 115-572 (2018) ...............................................................30

*Online Sex Trafficking and the Communications Decency Act:*
   *Hearing Before the Subcommittee on Crime, Terrorism, et al. of*
   *the House Committee on the Judiciary*, 115th Cong., 1st Sess. 7
   (2017) ...................................................................................30

141 Cong. Rec. 21,999 (1995) ........................................................28, 31

Fla. S.B. 7072 (2021) ..........................................................................*passim*

## OTHER AUTHORITIES[*]

*15th Transparency Report: Increase in Proactive Enforcement on*
   *Accounts*, TWITTER (Oct. 31 2019), https://blog.twitter.com/
   en_us/topics/company/2019/twitter-transparency-report-
   2019.html ................................................................................9

Alexander, Julia, *YouTube Claims its Crackdown on Borderline*
   *Content is Actually Working*, THE VERGE (Dec. 3, 2019),
   https://www.theverge.com/2019/12/3/20992018/youtube-
   borderline-content-recommendation-algorithm-news-
   authoritative-sources ................................................................19

*An Update on Our Continuity Strategy During COVID-19*, TWITTER
   (Mar. 16, 2020; updated Apr. 1, 2020), https://blog.twitter.com/
   en_us/topics/company/2020/An-update-on-our-continuity-
   strategy-during-COVID-19 ........................................................20

---

[*]    All URLs visited on June 14, 2021.

*Appealed Content*, *Transparency Center*, FACEBOOK (Jun. 1, 2021), https://transparency.fb.com/policies/improving/appealed-content-metric/ ...................................................................................11

*Authenticity*, *Community Standards*, AIRBNB, https://www.airbnb.com/trust/standards ................................................................................7

*Bullying and Harassment*, *Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/bullying .........................................7

*Community Guidelines*, PINTEREST, https://policy.pinterest.com/en/community-guidelines ......................................................................5

*Community Guidelines Strike Basics*, YOUTUBE, https://support.google.com/youtube/answer/2802032?hl=e ..................................................11

*Community Guidelines*, YOUTUBE, https://www.youtube.com/about/policies/#community-guidelines ....................................................6

*Community Policy*, Etsy, https://www.etsy.com/legal/community/ ..........................4

*Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/ ...................................................................6

*Community Standards Enforcement Report*, Transparency Center, FACEBOOK (May 2021), https://transparency.fb.com/data/community-standards-enforcement/ ...........................................13

*Content Guidelines*, YELP, https://www.yelp.com/guidelines..................................7

*Coronavirus: Staying Safe and Informed on Twitter*, *Broadening our guidance on unverified claims*, TWITTER (Apr. 22, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate..........................................21

*Coronavirus: Staying Safe and Informed on Twitter*, *COVID-19 account verification*, TWITTER (Mar. 20, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate ....................................21

*Coronavirus: Staying Safe and Informed on Twitter*, *COVID-19 tab in Explore*, TWITTER (May 18, 2020), https://blog.twitter.com/ en_us/topics/company/2020/covid-19.html#misleading informationupdate ..................................................................................21

*Coronavirus: Staying Safe and Informed on Twitter*, *Global Expansion of the COVID-19 Search Prompt*, TWITTER (Mar. 4, 2020), https://blog.twitter.com/en_us/topics/company/2020/ covid-19.html#misleadinginformationupdate .............................................20

*Coronavirus: Staying Safe and Informed on Twitter*, *Launch of a New Dedicated #KnowTheFacts Search Prompt*, TWITTER (Jan. 29, 2020), https://blog.twitter.com/en_us/topics/company/2020/ covid-19.html#misleadinginformationupdate .............................................20

*Coronavirus: Staying Safe and Informed on Twitter*, *Our ads policy for COVID-19*, TWITTER (Apr. 2, 2020), https://blog.twitter. com/en_us/topics/company/2020/covid-19.html#misleading informationupdate ..................................................................................21

*Coronavirus: Staying Safe and Informed on Twitter*, *Updating our approach to misleading information*, TWITTER (May 11, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate..........................................................21

Cox, Joseph & Jason Koebler, *'FIND THIS F---': Inside Citizen's Dangerous Effort to Cash In On Vigilantism*, VICE (May 27, 2021), https://www.vice.com/en/article/y3dpyw/inside-crime-app-citizen-vigilante ..................................................................................6

Dean, Brian, *Reddit Usage and Growth Statistics*, BACKLINKO (Feb. 25, 2021), https://backlinko.com/reddit-users ...............................................13

*Developing Policies*, YOUTUBE, https://www.youtube.com/how youtubeworks/policies/community-guidelines/#developing-policies (last visited June 8, 2021) ..................................................................9

*Does Facebook Allow Photos of Mothers Breastfeeding?*, FACEBOOK, https://www.facebook.com/help/340974655932193.....................................16

Douek, Evelyn, *COVID-19 and Social Media Content Moderation*, LAWFARE (Mar. 25, 2020), https://www.lawfareblog.com/ covid-19-and-social-media-content-moderation ..........................................22

*Facebook Reports First Quarter 2021 Results*, Investor Relations, FACEBOOK (Apr. 28, 2021), https://investor.fb.com/investor- news/press-release-details/2021/Facebook-Reports-First- Quarter-2021-Results/default.aspx ...............................................................12

Frankel, Rafael, *An Update on the Situation in Myanmar*, FACEBOOK (Feb. 24, 2021), https://about.fb.com/news/2021/02/an-update- on-myanmar/.................................................................................................18

*Housing Data*, *Inventory*, ZILLOW, https://www.zillow.com/research/ data/.............................................................................................................13

Kosseff, Jeff, *Defending Section 230: The Value of Intermediary Immunity*, 15 J. Tech. L. & Pol'y 123 (2010)....................................27, 33, 34

Kosseff, Jeff, *The Gradual Erosion of the Law That Shaped the Internet: Section 230's Evolution over Two Decades*, 18 Colum. Sci. & Tech. L. Rev. 1 (2016) ........................................................................26

*LinkedIn Professional Community Policies*, LINKEDIN, https://www. linkedin.com/help/linkedin/answer/34593/linkedin-professional -community-policies?lang=en; ........................................................................6

Newton, Casey, *YouTube Says it Will Recommend Fewer Videos About Conspiracy Theories*, THE VERGE (Jan. 25, 2019), https:// www.theverge.com/2019/1/25/18197301/youtube-algorithm- conspiracy-theories-misinformation.............................................................19

Nguyen, Kelly, *The Students and Stans Saving K-pop Idols from Deepfake Porn*, VICE (June 2, 2021), https://i-d.vice.com/ en_uk/article/k78zzy/k-pop-deepfake-porn-idols-cyber- investigation....................................................................................................6

*Number of Active Etsy Sellers from 2012 to 2020*, STATISTA (Mar. 11, 2021) https://www.statista.com/statistics/409374/etsy-active- sellers/ .........................................................................................................13

*Platform Manipulation and Spam Policy*, *General Guidelines and Policies*, TWITTER, https://help.twitter.com/en/rules-and-policies/platform-manipulation ........................................................8

*Policies and Guidelines*, PINTEREST, https://policy.pinterest.com/en ......................6

*Prohibited Items Policy*, ETSY, https://www.etsy.com/legal/prohibited/ ..................5

Purnell, Newley, *After Myanmar Coup, Facebook Removes National Military TV Network's Page*, WALL STREET JOURNAL (Feb. 2, 2021) ...................................................................................18

Rainey, James, *"Wikitorial" Pulled Due to Vandalism*, L.A. TIMES (June 21, 2005, 12:00 AM), https://www.latimes.com/archives/la-xpm-2005-jun-21-na-wiki21-story.html ......................................8

*Reddit Content Policy*, REDDIT, https://www.redditinc.com/policies/content-policy; ..........................................................................5, 6

*Reporting Inappropriate Content*, YOUTUBE, https://support.google.com/youtube/answer/2802027?hl=en&ref_topic=9387085 ...........................9

Robertson, *Facebook Designates Myanmar a 'Temporary High-Risk Location' After Coup*, THE VERGE (Feb. 3, 2021), https://www.theverge.com/2021/2/3/22264180/facebook-myanmar-coup-response-temporary-high-risk-location ......................................18

Shenkman, Carey, et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy & Technology (May 20, 2021), https://cdt.org/insights/do-you-see-what-i-see-capabilities-and-limits-of-automated-multimedia-content-analysis/ ....................................................14

*Spending 2020 Together on Twitter, Insights*, TWITTER, https://blog.twitter.com/en_us/topics/insights/2020/spending-2020-together-on-twitter.html ........................................................................13

Subramanian, Courtney, *Facebook is Officially OK with (Some) Mastectomy Photos*, TIME (June 13, 2013), https://newsfeed.time.com/2013/06/13/facebook-is-officially-ok-with-some-mastectomy-photos/ .........................................................16

*The Twitter Rules*, TWITTER, https://help.twitter.com/en/rules-and-
        policies/twitter-rules ................................................................6

Thomas, Zoe, *Facebook Content Moderators Paid To Work from
        Home*, BBC (Mar. 18, 2020), https://www.bbc.com/news/
        technology-51954968 ...........................................................10

Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine
        Information*, TWITTER (Dec. 16, 2020), https://blog.twitter.com/
        en_us/topics/company/2020/covid19-vaccine.html .....................22

Twitter Safety, *Updates to Our Work on COVID-19 Vaccine
        Misinformation*, TWITTER (Mar. 1, 2021), https://blog.twitter.
        com/en_us/topics/company/2021/updates-to-our-work-on-
        covid-19-vaccine-misinformation.html .......................................22

Van Zuylen-Wood, Simon, *'Men Are Scum': Inside Facebook's War
        on Hate Speech*, VANITY FAIR (Feb. 26, 2019), https://www.
        vanityfair.com/news/2019/02/men-are-scum-inside-facebook-
        war-on-hate-speech................................................................9

*YouTube for Press*, YOUTUBE, https://blog.youtube/press/ .....................12

## SUMMARY OF ARGUMENT

Amicus urges the Court to grant plaintiffs' motion for a preliminary injunction and to strike down S.B. 7072 in its entirety. For the reasons articulated in plaintiffs' motion, with which Amicus agrees and fully supports, S.B. 7072 violates the First Amendment, is preempted by Section 230 of the Communications Decency Act, and is unconstitutionally vague. Amicus writes separately to highlight the extreme practical problems, and especially grave legal defects, inherent in two particular provisions of S.B. 7072: its mandate for "consistent" moderation, § 501.2041(2)(b), and its limitation on rule changes "more than once every 30 days," § 501.2041(2)(c). While this brief focuses on these two provisions, Amicus also endorses plaintiffs' view that S.B. 7072 is riddled with other fatal legal defects.

Amicus's members include online platforms through which users can share news and opinions, advertise goods, rate and review service businesses and vendors, search for housing, and interact with individuals around the globe. Especially in a time when travel is restricted due to a global pandemic, these online services connect people with loved ones, friends, and colleagues in ways that are essential and that would otherwise not be possible. In offering these and a myriad of other services, these providers adopt policies and employ a wide variety of techniques, often tailored to their particular purposes and audiences, to affect what sorts of content do and do not appear, or are or are not prominently highlighted and featured, on their

platforms. These techniques include a variety of curatorial and editorial policies, standards, and processes, as well as manual and automated mechanisms for filtering, screening, or otherwise preventing users from posting material that violates the provider's content rules, often referred to as "[c]ommunity [s]tandards." *Force v. Facebook, Inc.*, 934 F.3d 53, 59-60 & n.5 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020).

The content policies and community standards of Amicus's members vary significantly depending on each platform's functions and purposes, and may include, for example, prohibiting hate speech and bullying, requiring sellers to provide accurate information about their products, or penalizing users for artificially amplifying the significance of their posts (*e.g.*, by using fake accounts to increase the number of times a post is "liked"). *See id*. at 60. Without the ability to prevent unwanted or offensive content, the services that Amicus's members provide could become unsafe, unreliable, or unable to perform the functions on which their users, the public, and the global economy have come to rely.

S.B. 7072 would fundamentally disrupt platform operators' ability, and deeply infringe upon their rights, to develop and enforce standards for the content they disseminate, to organize and curate that content, to comment on or contextualize content, and to provide their audiences with an online experience consistent with their unique norms and standards. S.B. 7072 mandates that providers moderate

content "in a consistent manner among its users on the platform." § 501.2041(2)(b).

The sheer volume of internet content and number of users, however, make that

standard impossible to satisfy.  The inherent ambiguity and subjectivity implicated

by S.B. 7072's "consistency" requirement means complying with the law is even

more unworkable.  Faced with those practical realities, the only way to guarantee

consistent content moderation—and thereby avoid significant penalties—would be

to do no moderation at all.

S.B. 7072 would also prevent platforms from changing their "user rules,

terms, and agreements … more than once every 30 days." § 501.2041(2)(c).  That

restriction would drastically hinder providers' ability to move rapidly to moderate

content in response to new developments and current events.  Indeed, providers'

recent responses to unforeseen events—from the COVID-19 pandemic to the coup

in Myanmar—have highlighted the need to quickly develop and adjust moderation

policies, sometimes through iterative processes.  S.B. 7072 would foreclose that

essential flexibility.

Both the consistency requirement and the 30-day freeze on rule changes (like

S.B. 7072's other content moderation provisions) violate providers' fundamental

First Amendment rights.  The Supreme Court has long recognized that the First

Amendment protects the right to engage in "editorial control and judgment," which

prohibits the government from "[c]ompelling editors or publishers to publish that

which reason tells them should not be published." *Miami Herald Publ'g. Co. v. Tornillo*, 418 U.S. 241, 256, 258 (1974) (quotations omitted). Yet S.B. 7072 attempts to do just that. Moreover, both provisions—along with the remainder of the law—are expressly and impliedly preempted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230. Congress enacted Section 230 to limit government regulation and to encourage providers to self-regulate content on their platforms. By taking a diametrically opposite approach—intensively regulating providers' efforts to moderate content for the benefit of their users—S.B. 7072 both violates Section 230's express ban on inconsistent state legislation and conflicts with Section 230's core purposes.

## BACKGROUND

Content moderation is integral to the vitality of online services and communities of all sizes. It allows providers to protect their users and platforms from a range of attacks—from financial scams and hacking attempts to abuse, threats of violence, and graphic or obscene imagery. It affords providers flexibility to tailor their standards to meet the needs of their community of users—which in turn allows diverse and engaging content to flourish. And it allows providers to distinguish themselves from others and create unique communities of users. Etsy, an online marketplace that connects sellers of unique and creative goods to buyers around the world, has a "zero tolerance policy for prohibited items, particularly those that

promote, support or glorify hatred, those that promote, support or glorify violence, or are unlawful," which includes a community of sellers who "find inspiration, share knowledge, discuss ideas, and build relationships that help them grow their businesses."[1]   Pinterest, an image-sharing and social media company, prohibits "antagonistic, explicit, false or misleading, harmful, hateful, or violent content or behavior" in order to serve its mission of "bring[ing] everyone the inspiration to create a life they love."[2]   And Reddit's content policy is intended to "shape[]" the "culture" of the "vast network of communities" that exist on the platform and ensure that "no community [is] used as a weapon" and all users "have an expectation of privacy and safety."[3]

To ensure that their platforms meet users' needs, online services of every stripe have issued community standards prohibiting various forms of objectionable material from their websites.   Content posted to the internet reflects the complete spectrum of human expression—from informative articles, insightful commentary, and moving artwork to appalling content such as nonconsensual deepfake

---

[1]      *Prohibited Items Policy*, ETSY, https://www.etsy.com/legal/prohibited/; *Community Policy*, ETSY, https://www.etsy.com/legal/community/.

[2]      *Community Guidelines*, PINTEREST, https://policy.pinterest.com/en/community-guidelines.

[3]      *Reddit Content Policy*, REDDIT, https://www.redditinc.com/policies/content-policy.

pornography,[4] vigilante groups initiating manhunts,[5] and gender- and race-based harassment. Many providers have determined that allowing objectionable or harmful content to appear on their platforms would degrade the quality of their platforms. Common examples of material prohibited by community policies include abusive imagery, incitements to violence, fraudulent schemes, virulent hate speech, material that advertises the sale of illegal goods and services, misleading commercial content, and content that endangers or exploits minors.[6]

Beyond these very common prohibitions, community standards reflect the diversity of the internet itself, with different platforms adopting standards specifically tailored to the platform's business and purposes and the preferences or

---

[4]     *See* Nguyen, *The Students and Stans Saving K-pop Idols from Deepfake Porn*, VICE (June 2, 2021), https://i-d.vice.com/en_uk/article/k78zzy/k-pop-deepfake-porn-idols-cyber-investigation.

[5]     *See* Cox & Koebler, *'FIND THIS F---': Inside Citizen's Dangerous Effort to Cash In On Vigilantism*, VICE (May 27, 2021), https://www.vice.com/en/article/y3dpyw/inside-crime-app-citizen-vigilante.

[6]     *See, e.g.*, *The Twitter Rules*, TWITTER, https://help.twitter.com/en/rules-and-policies/twitter-rules; *Community Guidelines*, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#community-guidelines; *Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/; *Reddit Content Policy*, REDDIT, https://www.redditinc.com/policies/content-policy; *LinkedIn Professional Community Policies*, LINKEDIN, https://www.linkedin.com/help/linkedin/answer/34593/linkedin-professional-community-policies?lang=en; *Policies and Guidelines*, PINTEREST, https://policy.pinterest.com/en.

needs of its particular community of users.[7]  In order to tailor their platform to a particular community, some providers may disallow content that other providers would find acceptable.  For example, a family-oriented website might categorically prohibit violent or graphic content, while other providers might allow such content for educational or newsworthy purposes.[8]  Social network platforms might implement protections to prevent harassment of younger users given that such content can "have more of an emotional impact on minors."[9]  Retail and rental platforms might prohibit users from posting inaccurate product information given the importance of buyers knowing what they are purchasing.[10]  Platforms that compile user reviews might prohibit users from posting anonymous or irrelevant reviews, or might prevent users from reviewing their own, friends' or relatives' businesses.[11]  And platforms frequented by influential figures might prohibit users

---

[7]     *E.g.*, Veitch Decl. ¶ 3 ("YouTube strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem."); Pavlovic Decl. ¶ 6 ("Etsy prohibits certain types of items from our platform because they are inconsistent with Etsy's values and 'the spirit of Etsy,' including items that are high risk, potentially harmful to our members, or unlawful.").

[8]     *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710, at *2-3 (N.Y. Sup. Ct. May 24, 1995).

[9]     *Bullying and Harassment*, *Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/bullying.

[10]    *Authenticity*, *Community Standards*, AIRBNB, https://www.airbnb.com/trust/standards.

[11]    *Content Guidelines*, YELP, https://www.yelp.com/guidelines.

from misleadingly impersonating such figures, which could deceive other users or disrupt financial markets.[12]

These sorts of community standards are essential to providers' ability to offer secure, desirable, and functional services. Without them, forums would become overrun with objectionable, abusive, or offensive content that swamps constructive speech and causes others to abandon the platform. Indeed, past attempts by some providers to minimize content moderation have quickly been reversed for that very reason.[13] Providers thus devote enormous resources to crafting and enforcing these community standards.[14] Some providers have entire teams and expert consultants

---

[12]   *Platform Manipulation and Spam Policy*, *General Guidelines and Policies*, Twitter, https://help.twitter.com/en/rules-and-policies/platform-manipulation.

[13]   *See, e.g.*, Rainey, *"Wikitorial" Pulled Due to Vandalism*, L.A. Times (June 21, 2005, 12:00 AM), https://www.latimes.com/archives/la-xpm-2005-jun-21-na-wiki21-story.html (describing the *Los Angeles Times*' attempt to launch a feature that allowed readers to post unmoderated content; editors "ordered the feature shut down" within days because "readers were flooding the site with inappropriate material").

[14]   *E.g.*, Veitch Decl. ¶ 4 (explaining that "YouTube has always had policies that govern how people may use the service, including restrictions on the types of content that they may post," and that [t]hese policies are designed and regularly updated to make YouTube a safer and more enjoyable place for users and creators"); Potts Decl. ¶¶ 8, 10 (explaining that "Facebook has invested substantial resources to maintain a safe experience for its community" by "over many years develop[ing] robust policies and practices relating to content moderation").

devoted to figuring out what their rules should be and where to draw the lines.[15]  And providers deploy even more resources to enforce their rules and standards, with many providers combining manual and automated review systems.  Many services allow users to flag potentially objectionable material, which is then manually reviewed by the provider.[16]  Some have dedicated teams that proactively monitor the platform; others deploy sophisticated algorithms to help identify and block objectionable content.[17]   At larger providers, the scale of these moderation operations requires a massive investment of resources.  YouTube and Facebook, for

---

[15]    *See, e.g.*, Van Zuylen-Wood, *'Men Are Scum': Inside Facebook's War on Hate Speech*, VANITY FAIR (Feb. 26, 2019), https://www.vanityfair.com/news/2019/02/men-are-scum-inside-facebook-war-on-hate-speech; *Developing Policies*, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#developing-policies.

[16]    *E.g.*, *Reporting Inappropriate Content*, YOUTUBE, https://support.google.com/youtube/answer/2802027?hl=en&ref_topic=9387085 (describing the various procedures and options users have "to report content that they find inappropriate" for review).

[17]    *E.g.*, *15th Transparency Report: Increase in Proactive Enforcement on Accounts*, TWITTER (Oct. 31 2019), https://blog.twitter.com/en_us/topics/company/2019/twitter-transparency-report-2019 (noting that "more than 50% of Tweets [Twitter] take[s] action on for abuse are now proactively surfaced using technology").

example, employ thousands of staff to review material and apply content-moderation policies.[18]

While Amicus's members may differ in precisely how they craft and enforce their community standards, they are uniform in their desire that their standards be fairly enforced. Amicus's members voluntarily go to great lengths to publish and explain to their users what content is and is not permitted.[19] These standards are conveyed in clear language and are readily accessible on platforms' websites. And providers generally give warnings before permanently terminating access to a user's account. YouTube, for example, uses a "three strikes" policy, where a user receives a warning, but *no* penalty for the first detected violation. After that one-time warning, three violations within the same 90-day period will result in permanent account suspension, preceded by a one-week suspension for the first strike, and a two-week suspension for the second strike (with occasional bypassing of the strike

---

[18]    *E.g.*, Thomas, *Facebook Content Moderators Paid To Work from Home*, BBC (Mar. 18, 2020), https://www.bbc.com/news/technology-51954968 (noting Facebook "has approximately 15,000 content moderators in the US"); Veitch Decl. ¶ 6 (noting YouTube "has hired over 10,000 people who are responsible for moderating content on YouTube").

[19]    *E.g.*, Veitch Decl. ¶ 9 & n.3 (explaining that YouTube's "Community Guidelines provide clear, public-facing guidance on types of content not allowed on the platform" and that the company "communicate[s] [its] practices to all users through YouTube's Community Guidelines"); Potts Decl. ¶ 13 (explaining that Facebook's Community Standards "provide details about what content is not allowed on Facebook" and allow users to "see Facebook's policy rationale for prohibiting each category of content and examples").

system for channels dedicated to violating policies or a single case of "severe" abuse).[20]  Many providers also voluntarily give users mechanisms to appeal their content-moderation decisions.[21]  These procedures are intended to promote clarity, transparency, and fairness while allowing online speech to thrive.

## ARGUMENT

## I.  S.B. 7072's Requirement For "Consistent" Moderation Is Impossible To Meet And Would Force Many Platforms To Curtail Their Beneficial Moderation Efforts

S.B. 7072 provides:  "A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform."  § 501.2041(2)(b).  The Court should not be misled by the statute's deceptively simple appeal to "consistency."  In fact, this consistency requirement is impossible to satisfy and lacking in any understandable or objective definition.  If allowed to take effect, it would broadly stifle content moderation and make the platforms far less hospitable to the users and audiences platforms seek to attract.

### A. The Sheer Volume Of Content On Most Online Platforms Makes "Consistent" Moderation Impossible

No matter how hard providers work to apply their standards fairly across the board, compliance with S.B. 7072's consistency requirement would be virtually

---

[20]  *Community Guidelines Strike Basics*, YOUTUBE, https://support.google.com/youtube/answer/2802032?hl=en

[21]  *See, e.g.*, *id.*; *Appealed Content*, *Transparency Center*, FACEBOOK (Jun. 1, 2021), https://transparency.fb.com/policies/improving/appealed-content-metric/.

impossible.  Courts have repeatedly recognized the difficulties platforms face moderating third-party content given the enormous volumes of content they carry. For example, in *Domen v. Vimeo, Inc.*, 991 F.3d 66 (2d Cir. 2021), the Second Circuit recognized: "Given the massive amount of user-generated content available on interactive platforms, imperfect exercise of content-policing discretion does not, without more, suggest that enforcement of content policies was not done in good faith." *Id.* at 73.  The Fourth Circuit recognized this same reality in 1997, when the internet was still, relatively speaking, in its nascency:  "The amount of information communicated via interactive computer services is … staggering. … It would be impossible for service providers to screen each of their millions of postings for possible problems." *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

The volume of content has skyrocketed since then.  On Google's YouTube platform, for example, more than 500 hours of content are uploaded every minute— or more than 720,000 hours each day.[22]  Facebook has more than a billion active users every day.[23]  And Twitter hosted, in 2020, more than 700 million Tweets about elections; more than 2 billion Tweets about sports, and more than 7,000 Tweets *per*

---

[22]     *YouTube for Press*, YOUTUBE, https://blog.youtube/press/.

[23]     *Facebook Reports First Quarter 2021 Results*, Investor Relations, FACEBOOK (Apr. 28, 2021), https://investor.fb.com/investor-news/press-release-details/2021/Facebook-Reports-First-Quarter-2021-Results/default.aspx.

*minute* about television and movies.[24]  Even on "smaller" platforms, the amount of user-generated content is still staggering; for example, the real estate website Zillow featured 949,788 active listings in April 2021,[25] the independent seller platform Etsy hosted more than 4.3 million sellers in 2020,[26] and Reddit has more than 430 million monthly active users.[27]  And although the relative portion of potentially violative content is small, in absolute numbers it is very large.  In the first quarter of 2021, Facebook took action on 8.8 million pieces of content for bullying and harassment, 5 million pieces of content for child nudity and sexual exploitation, 9 million pieces of content for terrorism, 9.8 million pieces of content for organized hate, and 1.3 billion fake accounts.[28]

There is simply no way for a platform to review every one of these posts to ensure consistent application of a platform's rules or standards.  Providers often rely on other users to report community standards violations—but users inevitably report

---

[24]  *Spending 2020 Together on Twitter, Insights*, TWITTER, https://blog.twitter.com/en_us/topics/insights/2020/spending-2020-together-on-twitter.

[25]  *See Housing Data*, *Inventory*, ZILLOW, https://www.zillow.com/research/data/ (inventory Excel linked for download).

[26]  *Number of Active Etsy Sellers from 2012 to 2020*, STATISTA (Mar. 11, 2021) https://www.statista.com/statistics/409374/etsy-active-sellers/.

[27]  Dean, *Reddit Usage and Growth Statistics*, BACKLINKO (Feb. 25, 2021), https://backlinko.com/reddit-users.

[28]  *Community Standards Enforcement Report,* Transparency Center, FACEBOOK (May 2021), https://transparency.fb.com/data/community-standards-enforcement/.

only a small fraction of all violations. Some companies employ automated technology to flag as much violative content as they can, but automated tools lack the ability to discern context and sometimes fail to distinguish content that is welcome from content that violates community standards. Nor are automated tools always capable of detecting and blocking unanticipated or new forms of abusive content.[29] Even when users and technology flag possible violations, and even when platforms have clear standards and excellent training on their implementation, the standards are still subject to the human fallibility of the reviewer; no one person could possibly review every content violation, and different people may apply the same standard differently. The only way to avoid those moderation shortfalls—and engage in "consistent" moderation—would be to avoid any moderation at all.

## B. "Consistency" Is Subjective And Elusive

A second problem with S.B. 7072's demand for "consistent" content moderation is that, at least in this context, what qualifies as "consistent" is highly nebulous. As an initial matter, the Florida legislature did not even attempt to define the term. Must a platform take precisely the same enforcement action against users who publish the same exact content or category of content, does a sliding scale apply,

---

[29] *See* Shenkman, et al., *Do You See What I See? Capabilities and Limits of Automated Multimedia Content Analysis*, Center for Democracy & Technology (May 20, 2021), https://cdt.org/insights/do-you-see-what-i-see-capabilities-and-limits-of-automated-multimedia-content-analysis/.

or is there some other measure of consistency?  Must content moderation be perfectly consistent or is there some numerical formula (*i.e.*, 95% consistent)?  Is there some objective standard of consistency (and if so, what?) or does a regulator's subjective view of consistency govern?  The law answers none of these questions.

However "consistent" might be interpreted, it would be very difficult, if not impossible, to apply any rule of consistency to activities and decisions that are as varied and subjective as organizing, contextualizing, moderating, and curating the unimaginably diverse types of content that are constantly disseminated through online platforms.   As with all human communication, context matters, and something that is offensive or hateful in one setting may be empowering or educational in another.  Any attempt to moderate has the potential to be deemed "inconsistent."

Providers, for instance, may generally prohibit nudity but choose to allow posts that depict, for example, nude ancient statues or nudity that educates users about breastfeeding or childbirth; users may generally avoid a platform that contains nudity in a sexual context, but the same users may appreciate educational or artistic nudity.   And what one person *interprets* as sexual may be purely artistic or educational for another.   In one real-life example, Facebook generally prohibits nudity, but it allows users to post images of breasts to increase awareness and community in the context of breast cancer or breastfeeding.   Facebook allows

mastectomy photos because "undergoing a mastectomy is a life-changing experience and … sharing photos can help raise awareness about breast cancer and support the men and women facing a diagnosis, undergoing treatment, or living with the scars of cancer."[30] Similarly, Facebook believes that "breastfeeding is natural and beautiful" and "it's important for mothers to share their experiences with others on Facebook."[31] But it is not clear, under Florida's law, whether creating exceptions for nudity related to breastfeeding or breast cancer would be considered not "consistent" and thereby subject a platform that made that reasonable choice to enforcement proceedings, penalties, and civil liability.

## II. Barring Platforms From Making Frequent Changes To Their Moderation Policies Would Prevent Them From Responding Constructively To Rapidly-Evolving Social Crises

S.B. 7072's prohibition of online platforms changing their "user rules, terms, and agreements ... more than once every 30 days," § 501.2041(2)(c), would severely hinder their ability to react and adapt to new and unanticipated problems that may rapidly emerge on the internet, and thereby leave platforms incapable of appropriately protecting the wellbeing and safety of the communities they serve.

---

[30] *See* Subramanian, *Facebook is Officially OK with (Some) Mastectomy Photos*, TIME (June 13, 2013), https://newsfeed.time.com/2013/06/13/facebook-is-officially-ok-with-some-mastectomy-photos/.

[31] *See Does Facebook Allow Photos of Mothers Breastfeeding?*, FACEBOOK, https://www.facebook.com/help/340974655932193.

Providers would also be prevented from efficiently responding to user or expert feedback on newly introduced policies—for example, when a new policy prohibits more speech than originally planned or has other unintended consequences.

Online platforms must be able to act nimbly to adapt and respond to developments in this highly dynamic—and content-rich—space. Online services often allow users to post and share news content and information about current events. These services, however, are also sometimes used to post and share information about dangerous, illegal, or offensive activities—including information that could be used to coordinate dangerous plans or violent plots.

These sorts of dynamic moderation practices—which greatly benefit users across the globe—would be rendered useless if laws were to limit the frequency with which online platforms may change their policies or practices. Under S.B. 7072, each policy change would restart an arbitrary 30-day clock, freezing the entire set of policies in place; during that time, platforms could not respond to changing global conditions, user feedback, or crisis events. And whenever any changes that were delayed by the law were ultimately made, a new 30-day freeze would then set in, again delaying changes to address other emerging problems. The problematic cycle might never cease.

The February 1, 2021 coup in Myanmar exemplifies the need for quick and nimble responses to rapidly changing conditions. One day after the coup, Facebook

designated Myanmar a "temporary high-risk location" and announced that it would "remove 'any calls to bring armaments' and protect posts criticizing the country's military."[32] On February 24, 2021, Facebook further updated its content-moderation policies in response to the coup, banning Myanmar's military and "military-controlled state and media entities from Facebook."[33] Facebook acted due to the "clear risk of future military-initiated violence," "[o]ngoing violations by the military and military-linked accounts and Pages since the February 1 coup, including ... content that violates [its] violence and incitement and coordinating harm policies, which [it] removed," as well as the fact that "[t]he coup greatly increases the danger posed by the[se] [on-platform] [behaviors] ... and the likelihood that online threats could lead to harm offline." Facebook explained that it was "continuing to treat the situation in Myanmar as an emergency and ... remain[ed] focused on the safety of [its] community," adding that it would "take additional measures if necessary to keep people safe."[34]  Had it been in effect, S.B. 7072's 30-day freeze might have

---

[32]    Robertson, *Facebook Designates Myanmar a 'Temporary High-Risk Location' After Coup*, THE VERGE (Feb. 3, 2021), https://www.theverge.com/2021/2/3/22264180/facebook-myanmar-coup-response-temporary-high-risk-location; Purnell, *After Myanmar Coup, Facebook Removes National Military TV Network's Page*, WALL STREET JOURNAL (Feb. 2, 2021), https://www.wsj.com/articles/after-myanmar-coup-facebook-bans-national-military-tv-networks-page-11612272870.

[33]    Frankel, *An Update on the Situation in Myanmar*, FACEBOOK (Feb. 24, 2021), https://about.fb.com/news/2021/02/an-update-on-myanmar/.

[34]    *Id.*

prevented Facebook from taking these steps to rapidly update its rules in response to a dynamic real-world crisis—a delay that might well have cost lives.

Moreover, the need for online platforms to develop and modify their policies, sometimes through iterative processes reflecting their experience, is incompatible with S.B. 7072's cyclical imposition of 30-day bans on policy changes.  In early 2019, for example, YouTube began to adjust one of its algorithms to avoid recommending certain conspiracy-related videos that it deemed "borderline content."  In all, it made more than 30 incremental changes to its formula for recommending videos between late January and early December 2019.[35]  Some platforms' vast user bases, the complexity of their systems, and users' creativity in evading platforms' content-moderation efforts can make such iterative policy changes essential.  But platforms would not be permitted to take such steps if S.B. 7072 were permitted to go into effect.

The need for, and benefit of, rapid and iterative changes and adjustments to content-moderation policies and practices was illustrated again even more recently

---

[35]     Newton, *YouTube Says it Will Recommend Fewer Videos About Conspiracy Theories*, THE VERGE (Jan. 25, 2019), https://www.theverge.com/ 2019/1/25/18197301/youtube-algorithm-conspiracy-theories-misinformation; Alexander, *YouTube Claims its Crackdown on Borderline Content is Actually Working*, THE VERGE (Dec. 3, 2019), https://www.theverge.com/ 2019/12/3/20992018/youtube-borderline-content-recommendation-algorithm-news-authoritative-sources.

as platforms confronted the worldwide COVID-19 pandemic. As the pandemic progressed in 2020, "YouTube updated its policies related to medical misinformation alone more than ten times." Veitch Decl. ¶ 21. Similarly, Twitter first implemented a policy on COVID-19 misinformation very shortly after the pandemic began, and since then it repeatedly updated that policy and its methods for moderating the flow of COVID-19-related posts throughout the pandemic.

- In January 2020, Twitter launched a #KnowTheFacts search prompt that would ensure that when users sought information about COVID-19, they were "met with credible, authoritative information first."[36] In the United States, people who search for key terms on Twitter are directed to the dedicated website on coronavirus and COVID-19 administered by the Centers for Disease Control and Prevention (CDC).

- On March 4, 2020, the search prompt was expanded globally.[37]

- On March 16, 2020, Twitter announced new enforcement guidance, broadening its definition of harm to address content related to COVID-19 that goes directly against guidance from authoritative sources of global and local public health information. Twitter required individuals to remove violative Tweets in a variety of contexts with the goal of preventing offline harm.[38]

---

[36] *Coronavirus: Staying Safe and Informed on Twitter*, *Launch of a New Dedicated #KnowTheFacts Search Prompt*, TWITTER (Jan. 29, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19#misleadinginformationupdate.

[37] *Coronavirus: Staying Safe and Informed on Twitter*, *Global Expansion of the COVID-19 Search Prompt*, TWITTER (Mar. 4, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate.

[38] *An Update on Our Continuity Strategy During COVID-19*, TWITTER (Mar. 16, 2020; updated Apr. 1, 2020), https://blog.twitter.com/en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.

- On March 20, 2020, it announced that it had begun to verify accounts that provided credible COVID-19 updates.[39]

- On April 2, 2020, Twitter published a new policy governing the permissible and restricted content of ads referencing COVID-19.[40]

- Less than three weeks later, on April 22, 2020, Twitter announced that, "[g]oing forward and specific to COVID-19," it might consider "unverified claims that have the potential to incite people to action, could lead to the destruction or damage of critical infrastructure, or cause widespread panic/social unrest" to be "in violation of [its] policies."[41]

- Again within less than three weeks, on May 11, 2020, Twitter further updated its content-moderation policy to "introduc[e] new labels and warning messages that will provide additional context and information on some Tweets containing disputed or misleading information related to COVID-19.[42]  A week later, on May 18, 2020, it added a new tab that "include[d] curated pages" on COVID-19.[43]

---

[39]     *Coronavirus: Staying Safe and Informed on Twitter*, *COVID-19 account verification*, TWITTER (Mar. 20, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate.

[40]     *Coronavirus: Staying Safe and Informed on Twitter*, *Our ads policy for COVID-19*, TWITTER (Apr. 2, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate.

[41]     *Coronavirus: Staying Safe and Informed on Twitter*, *Broadening our guidance on unverified claims*, TWITTER (Apr. 22, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate.

[42]     *Coronavirus: Staying Safe and Informed on Twitter*, *Updating our approach to misleading information*, TWITTER (May 11, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate.

[43]     *Coronavirus: Staying Safe and Informed on Twitter*, *COVID-19 tab in Explore*, TWITTER (May 18, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid-19.html#misleadinginformationupdate.

- As vaccines became available to the public, Twitter announced in December 2020 that it would "prioritize the removal of the most harmful misleading information" surrounding vaccination.[44]

- In March 2021, Twitter began "applying labels to Tweets that may contain misleading information about COVID-19 vaccines."[45]

As these examples of platforms' rapidly evolving efforts to address public health challenges or other societal crises amply demonstrate, the freedom to alter course and revise policies in the face of changing circumstances allows online services to better protect their online communities, and the general public, in ways that best serve their specific communities.[46]

## III. S.B. 7072's Consistency Requirement And Ban On Frequent Policy Changes Would Fundamentally And Deeply Violate Platform Operators' First Amendment Rights

The First Amendment precludes S.B. 7072's consistency and 30-day no-rule-change requirements. As the Supreme Court held in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), the First Amendment protects the right to engage

---

[44]    Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine Information*, TWITTER (Dec. 16, 2020), https://blog.twitter.com/en_us/topics/company/2020/covid19-vaccine.

[45]    Twitter Safety, *Updates to Our Work on COVID-19 Vaccine Misinformation*, TWITTER (Mar. 1, 2021), https://blog.twitter.com/en_us/topics/company/2021/updates-to-our-work-on-covid-19-vaccine-misinformation.    Twitter also introduced a "strike system that determines when further enforcement action is necessary" and serve to "help educate the public on [its] policies." *Id.*

[46]    *See* Douek, *COVID-19 and Social Media Content Moderation*, LAWFARE (Mar. 25, 2020), https://www.lawfareblog.com/covid-19-and-social-media-content-moderation.

22

in "editorial control and judgment" over what third-party content to disseminate.  *Id.* at 258.  This right prohibits the government from "[c]ompelling editors or publishers to publish that which reason tells them should not be published."  *Id.* at 256 (quotations omitted).  And it applies not just to traditional publishers, editors, and bookkeepers, but to any private actor curating or providing a platform for content. *See Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp.*, 515 U.S. 557, 566, 575 (1995) (recognizing that parade organizers exercise the same "editorial control and judgment").

First Amendment protections are no less fundamental on the internet.  The Supreme Court has explicitly held that its "cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."  *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  And for good reason:  as the Court explained in *Reno*, unlike broadcast media—which the government is allowed to regulate because of technological constraints limiting the number of available licensees—"the Internet can hardly be considered a 'scarce' expressive commodity."  *Id.*  Rather, "[t]hrough the use of chat rooms, any person with a phone line can become a town crier …. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer."  *Id.*  Moreover, the internet is not owned exclusively by any particular provider or platform.  If a person's content violates one platform's community standards—or even most platforms' community standards—

the person still has many other ways to express that content on the internet, whether on an independent website or a platform with different standards.  Courts have accordingly held that the First Amendment fully protects the rights of online providers to decide what content to display and prioritize on their platforms.  *See, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 435 (S.D.N.Y. 2014); *e-ventures Worldwide, LLC v. Google, Inc.*, No. 14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017).

S.B. 7072 would vitiate platforms' First Amendment right to engage in "editorial control and judgment"—which they exercise by developing and enforcing content-moderation policies.  The only way to try to achieve full consistency in content moderation would be for platforms to do much less moderation, or perhaps virtually none at all.  For example, a YouTube representative explained that the "'consistency requirement' would burden YouTube's decisions to protect its communities from harm by removing violative videos quickly," resulting in "a significantly higher proportion of content being available on YouTube that violates the Community Guidelines."  Veitch Decl. ¶ 28. The 30-day freeze on rule changes would likewise trample providers' First Amendment editorial rights.  Again, providers have described these effects: Etsy's representative stated that the 30-day requirement "would prevent us from swiftly responding to new trends in the marketplace, a new law or judicial ruling, or regulatory requests from Federal and

24

state agencies (such as attempted sales of counterfeit goods, responding to bad actors taking advantage of a fast-moving news story, or sales of contraband)." Pavlovic Decl. ¶ 14.

Forcing online providers to host material that they would rather remove—even if they may remove it after 30 days—would be a clear violation of their right to editorial discretion. Indeed, "[w]henever … a State … compels [individuals] to voice ideas with which they disagree, it undermines [free speech's many] ends." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2464 (2018). Compelled speech inflicts "additional damage" compared to speech restrictions because "individuals are coerced into betraying their convictions," and "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Id.*; *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Yet S.B. 7072 would, for cyclical periods of up to 30-days each, effectively compel online platforms to publish content that they deem offensive or otherwise inappropriate.

## IV. Congress Enacted Section 230 To Preempt Burdensome State Laws Like S.B. 7072, That Would Discourage Content Moderation

Even beyond its First Amendment violations, S.B. 7072 is independently unlawful because it is both expressly and impliedly preempted by Section 230 of the Communications Decency Act. Titled "Protection for private blocking and screening of offensive material," Section 230 provides that "[n]o provider or user of

25

an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" or " held liable on account of," as relevant here, "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c). In enacting this provision, Congress sought both to preserve the internet as a medium for free expression without heavy government regulation and to encourage internet platforms to self-regulate and police the types of content that became available on their sites.[47]   Moreover, Congress expressly preempted all state laws that are "inconsistent" with Section 230.   *See id.* § 230(e)(3). S.B. 7072 is also "[in]consistent with the structure and purpose" of Section 230 and is therefore implicitly preempted as well. *See Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (O'Connor, J., plurality op.) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 51, (1987)), *accord Boggs v. Boggs*, 520 U.S. 833, 844 (1997).

---

[47]   *Zeran*, 129 F.3d at 330; *see also* Kosseff, *The Gradual Erosion of the Law That Shaped the Internet: Section 230's Evolution over Two Decades*, 18 Colum. Sci. & Tech. L. Rev. 1 (2016) (explaining Section 230's "twin goals" were promoting both internet "innovation and voluntary content moderation").

## A. Section 230 Preempts S.B. 7072, Which Extensively Regulates Online Services

In enacting Section 230, Congress preempted state legislation that undermined its goal of "maintain[ing] the robust nature of Internet communication" by providing platforms immunity for nearly all content posted by third parties on their sites. *Zeran*, 129 F.3d at 330; *see also Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1247 (S.D. Fla. 2020). "Congress was concerned with any government actors—including the judicial system—burdening the growth of the internet" and therefore chose to confer immunity on providers and preempt contrary state and local legislation.[48]

Section 230's text and legislative history evidence this goal. The preamble of the statute itself sets forth Congress's finding that "the Internet and interactive computer services 'have flourished, to the benefit of all Americans, *with a minimum of government regulation.*'" *Zeran*, 129 F.3d at 330 (quoting 47 U.S.C. § 230(a)(4)). Congress also explained that "it is 'the policy of the United States ... to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation.*'" *Id.* (quoting 47 U.S.C. § 230(b)(2)). And one of the bill's cosponsors explained the "message" from Congress was that it "embrac[ed] this new

---

[48] Kosseff, *Defending Section 230: The Value of Intermediary Immunity*, 15 J. Tech. L. & Pol'y 123, 130-31 (2010).

technology" and "welcome[d] the opportunity for education and political discourse that it offers for all of us." 141 Cong. Rec. 21,999, 22,045 (1995) (statement of Rep. Cox). Section 230 sought to "help it along" by taking the "Government … out of the way and let[ting] parents and individuals control it rather than Government doing that job for us." *Id.* In short, Congress did not want an "army of bureaucrats regulating the Internet." *Id.* S.B. 7072, which enlists such an army, is preempted.

Section 230's drafters also understood that the quantity of content on the internet—which has far exceeded congressional expectations in 1996—counseled against allowing government internet regulation. One Section 230 co-sponsor explained that platforms could not possibly "take the responsibility to edit out information that is going to be coming into them from all manner of sources…. We are talking about something that is far larger than our daily newspaper … [and] is going to be thousands of pages of information every day, and to have that imposition imposed on them is wrong." 141 Cong. Rec. at 22,046 (statement of Rep. Goodlatte). In light of the "obvious chilling effect" posed by online services' potential tort liability for the "staggering" amount of content on their sites, "Congress considered the weight of the speech interests implicated and chose to immunize service providers" to disincentivize them from "severely restrict[ing] the number and type of messages posted." *Zeran*, 129 F.3d at 331.

Congress thus enacted Section 230 to encourage the growth of the internet—an aspiration that has been an undeniable success.  The exponential growth of the internet and online services since 1996 has only reinforced Congress's judgment that imposing liability on platforms for perceived content-moderation failures would seriously impair that success.  The scale and magnitude of the task of content moderation far exceeds anything Congress could have anticipated.  *See supra* pp.12-13.  It would be impossible for internet services to provide users access to this vast sea of valuable content while simultaneously moderating it in accordance with government regulations and facing possible sanctions should they fail to do so.

Moreover, permitting Florida and other states to enact distinct regulatory regimes governing online services would result in a complex and unworkable patchwork of varied and conflicting legal obligations.  Imagine Georgia were to enact the very same statute mandating consistency in moderation, but that Georgia and Florida courts had different ideas of what types of content moderation are consistent with one another.  Platforms' content-moderation decisions in compliance with S.B. 7072 might violate the identical Georgia law, and vice versa.  Congress intended to avoid such a situation when it enacted Section 230, which expressly provides that "no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  If ever a change were to be made to this regime, Congress—not state legislatures—would be the appropriate

body to enact it.  But Section 230's drafters clearly contemplated and rejected the possibility of state laws encroaching on platforms' control over their site, stating that the "policy of the United States" is to keep the internet as "unfettered by Federal or *State* regulation." *Id.* § 230(b)(2) (emphasis added).  To allow enforcement of S.B. 7072 would fly in the face of Congress's clear intent.[49]

### B. Section 230 Was Enacted To Encourage Online Services To Self-Regulate Content On Their Platforms, But S.B. 7072 Would Prohibit Them From Doing So

Congress enacted Section 230 in response to a 1995 New York state court decision holding online providers potentially liable for third-party content on their platforms.  *See Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995); *see Force v. Facebook, Inc.*, 934 F.3d 53, 63-64 & n.16 (2d Cir. 2019).  In *Stratton*, the defendant online provider, Prodigy, operated a platform for two million users, each of whom could post content to its "bulletin boards." *Stratton*, 1995 WL 323710, *1-2.  Prodigy held itself out as operating a "family

---

[49]    Congress has reaffirmed its commitment to national uniformity when amending Section 230.  When enacting the Fight Online Sex Trafficking Act, Congress removed a proposed exception to Section 230 for state-law civil claims that had been included in the original bill.  That removal happened immediately after hearing testimony about the need to maintain a "uniform national policy," rather than a "patchwork of 50 different laws."  *Online Sex Trafficking and the Communications Decency Act: Hearing Before the Subcomm. on Crime, Terrorism, et al. of the H. Comm. on the Judiciary* ("CDA H. Comm. Hrg."), 115th Cong., 1st Sess. 7, 9 (2017) (testimony of C. Cox & J. Kosseff); *see also* H.R. Rep. No. 115-572, at 9-10 (2018) (describing the goal of avoiding a "patchwork of various state laws").

oriented" website and, in pursuit of that goal, issued "content guidelines" and used screening software to remove offensive or objectionable content. *Id.* at *2-3. But Prodigy's efforts to address problematic content backfired. The New York court ruled that Prodigy could be liable for third-party content on its bulletin boards because, rather than allowing all messages, Prodigy had made "decisions as to content" by "actively utilizing technology and manpower to delete notes from its computer bulletin boards on the basis of offensiveness and bad taste." *Id.* at *4 (citations and quotations omitted). In short, *Stratton* held that online providers that voluntarily moderate *some* third-party content could be held liable for *all* content that remains, while providers who engage in no content moderation avoid liability entirely.

The following year, Congress enacted Section 230 to reject the "massive disincentive" that the state court in *Stratton* had created for online providers to regulate content on their platforms. 141 Cong. Rec. at 22,045 (statement of Rep. Cox). The legislation's sponsors explained that "[o]ne of [its] specific purposes" was to overrule *Stratton* and instead immunize providers for "restrict[ing] access to objectionable material," even if, like Prodigy, they did not manage to remove all of it. H.R. Rep. No. 104-458, at 194 (1996) (Conf. Rep.). Section 230 thus created a national regime that avoided the perverse incentives under *Stratton*, whereby only

those platforms that made efforts to engage in socially responsible content moderation could be held liable for third-party content on their sites.

Section 230's text reflects Congress's goal of promoting self-regulation.  The statute recognizes, for example, that it was meant "to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer devices."  47 U.S.C. § 230(b)(3)); *see also id*. § 230(b)(4) ("It is the policy of the United States … to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material").  Given that clear expression of congressional intent, courts have recognized that Congress enacted Section 230 to "'encourage service providers to self-regulate the dissemination of offensive material over their services.'" *Bennett v. Google, LLC*, 882 F.3d 1163, 1164 (D.C. Cir. 2018) (quoting *Zeran*, 129 F.3d at 331); *see also Attwood v. Clemons*, No. 18-cv-38, 2021 WL 1020449, at *9 (N.D. Fla. Mar. 17, 2021) ("Congress has chosen to allow *private* companies and *private* users to censor.").

Congress also explicitly granted platforms considerable latitude to make their own independent decisions regarding which content to host and which to moderate, instead of requiring them to adhere to a one-size-fits-all standard.  Section 230

broadly immunizes platforms from liability related to publishing third-party content, *see* 47 U.S.C. § 230(c)(1), as well as "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user *considers to be* obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected," *id.* § 230(c)(2) (emphasis added). As the Second Circuit recently observed, by referring to content that the provider "considers to be" objectionable, rather than attempting to define objectionable content, the statutory text "[n]otably … grant[s] significant subjective discretion" to platforms to determine what content is "objectionable." *Domen*, 991 F.3d at 72.

Just as Congress intended, many platforms voluntarily engage in socially beneficial content moderation.[50] And by allowing platforms to police themselves rather than having the government set their standards, platforms with different values and user bases may choose to employ distinct content-moderation approaches.[51] Under this free-market approach to content moderation, platforms "seek to please

---

[50]     *See* Kosseff, 15 J. Tech. L. & Pol'y at 154-55 (surveying platforms' prohibitions on offensive content).

[51]     *Id.* at 153-55 (contrasting CNN's terms of use with MySpace's); *see also* Douek, *supra* n.46 ("trade-offs between accuracy, comprehensive enforcement and speed are inherent in *every* platform rule").

their customers" and therefore "are more likely than courts to develop content standards that conform to basic community values."[52]

S.B. 7072 would turn this congressionally-mandated approach on its head. As described above, *supra* pp.24-25, S.B. 7072 threatens to force providers to curtail and possibly even to abandon moderation efforts altogether. Indeed, that is the *only* way to guarantee compliance with S.B. 7072's "consistency" requirement, given the volume of content and variety of contexts in which it can be used. *See supra* pp.12-13. Rather than encouraging varied approaches to content moderation, S.B. 7072 would effectively mandate a uniform approach to content moderation: none. That outcome is entirely inconsistent with Section 230's "object and policy," and S.B. 7072 is therefore preempted. *See Gade*, 505 U.S. at 98 (O'Connor, J., plurality op.).

## CONCLUSION

For the foregoing reasons, S.B. 7072's mandate for "consistent" moderation and limitation on rule changes "more than once every 30 days" are unworkable, unconstitutional, and preempted by federal law. Further, for the reasons articulated in plaintiffs' motion, S.B. 7072 violates the First Amendment, is preempted by Section 230, and is unconstitutionally vague. Amicus respectfully requests that the Court grant plaintiffs' motion for preliminary injunction.

---

[52]    Kosseff, 15 J. Tech. L. & Pol'y at 153.

Respectfully submitted,

|  | /s/ Peter Homer |
| Patrick J. Carome (*pro hac vice* pending) | Peter W. Homer |
| (D.C. SBN 385676) | (FL SBN 291250) |
| Paul R.Q. Wolfson (*pro hac vice* pending) | HOMER BONNER |
| (D.C. SBN 414759) | 1200 Four Seasons Tower |
| Ari Holtzblatt (*pro hac vice* pending) | 1441 Brickell Avenue |
| (D.C. SBN 1009913) | Miami, Florida 33131 |
| WILMER CUTLER PICKERING | (305) 350-5139 |

Patrick J. Carome (*pro hac vice* pending)
  (D.C. SBN 385676)
Paul R.Q. Wolfson (*pro hac vice* pending)
  (D.C. SBN 414759)
Ari Holtzblatt (*pro hac vice* pending)
  (D.C. SBN 1009913)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

/s/ Peter Homer
Peter W. Homer
  (FL SBN 291250)
HOMER BONNER
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
(305) 350-5139

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 7.1(F) because it contains 7,677 words, excluding the parts of the brief exempted by that rule. This brief also complies with the format requirements of Local Rule 5.1(C) because it is double-spaced, in 14-point Times New Roman font, with one-inch margins and numbered pages.

/s/  Peter W. Homer
Peter W. Homer

## CERTIFICATE OF SERVICE

The foregoing was filed this 14th day of June, 2021, through this Court's Electronic Filing System. Parties will be served and may obtain copies electronically, through the operation of the Electronic Filing System.

/s/  Peter W. Homer
Peter W. Homer