# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC et al.,

        Plaintiffs,

v.                              CASE NO. 4:21-cv-00220-RH-MAF

ASHLEY BROOKE MOODY et al.,

        Defendants.

_____

## DEFENDANTS' RESPONSE IN OPPOSITION
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION AND BACKGROUND .............................................................1

LEGAL STANDARD.............................................................................................3

ARGUMENT ..........................................................................................................3

I.      Plaintiffs Are Unlikely to Succeed on the Merits of Their Claim that the Act Is
Preempted by Section 230. .........................................................................................3

      A.      Section 230(c)(1) Does Not Shield Social Media Platforms from Liability for
Unlawfully Removing Content, and Most of the Act Survives Even Under
Plaintiffs' More Sweeping Interpretation of Section 230(c)(1)...............................5

      B.      None of the Act's Provisions Are Facially Preempted by Section 230(c)(2)(A). ...8

      C.      The Court Should Construe Section 230 Narrowly to Avoid the Serious
First Amendment Problems that Would Be Presented if Federal
Law Preempted the Act ............................................................................................11

II.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Claim that the Act Violates
the First Amendment...................................................................................................14

      A.      The Act Does Not Interfere with First Amendment Rights by Requiring Social
Media Platforms to Host Certain Speech.................................................................14

            1.   There Is No Risk that Listeners Will Confuse Users' Speech for that
of the Social Media Platforms......................................................15

            2.   Social Media Platforms Remain Able to Speak and Dissociate
Themselves from User Speech......................................................17

            3.   Social Media Platforms Generally Do Not Curate Content to
Contribute to a Common Theme...................................................21

      B.      The Act Permissibly Treats Social Media Platforms Like Common Carriers.......23

      C.      If Any First Amendment Scrutiny Applies, Then at Most it Should Be Intermediate
Scrutiny .....................................................................................................................29

      D.      The Act Satisfies Intermediate Scrutiny. ...............................................................34

            1.   The Act Furthers Substantial Governmental Interests. .................34

i

2. The Governmental Interests the Act Furthers Are Unrelated to the Suppression of Free Expression.....................................................42

3. The Act Does Not Burden Substantially More Speech than Is Necessary to Further Florida's Legitimate Governmental Interests .................................................................43

E. The Challenged Provisions of the Act Are Not Unconstitutionally Vague..........46

III. The Remaining Preliminary Injunction Factors Are Not Satisfied....................................50

CONCLUSION....................................................................................................................52

# TABLE OF AUTHORITIES

**Case**             **Page**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........................13, 14

*Almeida v. Amazon.com, Inc.*, 456 F.3d 1316 (11th Cir. 2006)..................................................5, 6

*Ashwander v. Tennessee Valley Authority*, 287 U.S. 288 (1936) ....................................................3

*Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335 (2020)......................................................52

*Barrett v. Rosenthal*, 146 P.3d 510 (Cal. 2006) ............................................................................ 6

*Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220 (2021).....................................2, 24, 25, 28, 33

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011)......................................................................50

*Burroughs v. United States*, 290 U.S. 534 (1934) .........................................................................35

*CIR v. Fink*, 483 U.S. 89 (1987) ...................................................................................................48

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ..............................................................10

*Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1 (1st Cir. 1994)........................................35

*Curry v. Baker*, 802 F.2d 1302 (11th Cir. 1986)...........................................................................35

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) ..........................28

*e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ........6, 7

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157
    (9th Cir. 2008)........................................................................................................................4

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)..........................................................20

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)........................................................................46

*Hill v. Colorado*, 530 U.S. 703 (2000) ..........................................................................................47

*HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) ...............................7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)..............................................................15, 16, 17, 18, 21, 33

*In re Lewis*, 401 B.R. 431 (Bankr. C.D. Cal. 2009)......................................................................48

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974).....................................................................12

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ..............................................................................11

*Jones v. United States*, 529 U.S. 848 (2000) ................................................................................48

*Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783
    (E.D. Va. 1998)......................................................................................................................10

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020)........................6, 7

*Maryland v. King, 567 U.S. 1301, 1303 (2012)*............................................................................51

*Med. Transp. Mgmt. Corp. v. Comm'r*, 506 F.3d 1364 (11th Cir. 2007) .....................................48

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ...................................................21

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976)............................25

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018).................................19, 32

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)..................................................................35

*Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986)......21

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ...............................................................27

*Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422 (1859) ......................................................................25, 26

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980) ...................................2, 14, 18, 21

*Puente Ariz. v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016).......................................................9, 10, 11

*Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941)...............................................................45

*Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956)..............................................13

*Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) ......................................................................29

*Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003) ..................................................................12

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) .........................2, 14, 15, 16, 17, 19, 20, 21, 22, 23, 31, 32

*Shively v. Bowlby*, 152 U.S. 1 (1894) ..........................................................................................24

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ...................................................................3, 50

*Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602 (1989).............................................................12

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456
   (D.N.J. May 4, 2020) ...................................................................................................................9

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710
   (N.Y. Sup. Ct. May 24, 1995)......................................................................................................4

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985) .............................................11

*Turner Broad. Sys., Inc. v. FCC* ("*Turner*"), 512 U.S. 622 (1994) ....26, 29, 30, 32, 33, 34, 35, 42,
   44

*Turner Broad. Sys., Inc. v. FCC* ("*Turner II*"), 520 U.S. 180 (1997)...............................34, 36, 44

*United States v. Caniff*, 955 F.3d 1183 (11th Cir. 2020) .............................................................49

*United States v. DBB, Inc.*, 180 F.3d 1277 (11th Cir. 1999) ......................................................49

*United States v. O'Brien*, 391 U.S. 367 (1968) ...........................................................................31

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................................46, 47

*U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674 (D.C. Cir. 2016).............24, 25, 27

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...............................................................21, 46

*West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943)..........................................19

*Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017).......................................................46

*Wooley v. Maynard*, 430 U.S. 705 (1977) ...............................................................19

*Young v. N.Y.C. Transit Auth.*, 903 F.2d 146 (2d Cir. 1990) ...........................34, 42

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985)......20

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ......................................6, 7, 8

## Constitutions and Statutes

U.S. CONST. amend. I ...............................................................................................13

47 U.S.C.

    § 230(b)(q) ............................................................................................................5

    § 230(c)(1) ........................................................................................................5, 6, 7

    § 230(c)(2)(A) ..........................................................................................6, 8, 10, 12

    § 230(e)(3) ............................................................................................................3

    § 230(f)(3) ............................................................................................................7

FLA. STAT. § 501.204 .............................................................................................35

2021 FLA. SESS. LAW SERV. 2021-32 ("SB 7072")

    § 1(3) .................................................................................................................35

    § 1(4) .................................................................................................................35

    § 1(5) ............................................................................................................24, 35

    § 1(6) ............................................................................................................24, 35

    § 1(7) ...................................................................................................................9

    § 1(8) ...................................................................................................................9

    § 1(9) .................................................................................................................36

    § 1(10) ...............................................................................................................35

    § 2(2) ............................................................................................................41, 45

    § 2(4) ...................................................................................................................7

    § 4(1)(c) .............................................................................................................45

    § 4(1)(e) .............................................................................................................49

    § 4(1)(g) .............................................................................................................46

    § 4(2)(a) .........................................................................................................7, 40

    § 4(2)(b) .........................................................................................40, 44, 45, 47

    § 4(2)(c) .............................................................................................................40

    § 4(2)(d)–(g) ......................................................................................................40

    § 4(2)(d)(1) ........................................................................................................41

    § 4(2)(e) .............................................................................................................40

    § 4(2)(f) .............................................................................................................40

    § 4(3) ..................................................................................................40, 41, 45

    § 4(2)(f)(2) ........................................................................................................48

    § 4(2)(h) .......................................................................................................41, 45

    § 4(2)(j) ........................................................................................................41, 45

    § 4(6)(d) .............................................................................................................10

    § 6 ................................................................................................................46, 52

**<u>Legislative Authorities</u>**

*Senate Committee on Governmental Oversight and Accountability Meeting*, FLA. SENATE (Apr. 6, 2021), https://bit.ly/3wJhjte ......................................................................................................43

*Senate Committee on Appropriations Meeting*, FLA. SENATE (Apr. 19, 2021), https://bit.ly/3vG24jm.............................................................................................................30, 43

**<u>Other Authorities</u>**

*5/24/21 Signing of SB 7072 – Social Media Platforms*, at 18:03–09, THE FLA. CHANNEL (May 24, 2021), https://bit.ly/3q7uWzY ..............................................................................................43

Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 YALE J. L. & TECH. 391 (2020) ............................................................26, 28

*Consistent*, OXFORD ENGLISH DICTIONARY ONLINE (June 2021).................................................48

*Liable*, BLACK'S LAW DICTIONARY (11th ed. 2019)....................................................................10

Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 VA. L. REV. 947 (1995) .............................................................................................................................25, 28

Eugene Volokh, *Might Federal Preemption of Speech-Protective State Laws Violate the First Amendment?*, REASON (Jan. 23, 2021), https://bit.ly/2TKfPQO .............................................13

Eugene Volokh, *The Law of Compelled Speech*, 97 TEX. L. REV. 355 (2018).......................22, 23

Tim Wu, *Machine Speech*, 161 U. PA. L. REV. 1495 (2013)..................................................18, 23

Benjamin C. Zipursky, *Online Defamation, Legal Concepts, and the Good Samaritan*, 51 VAL. U.L. REV. 1, 35–39 (2016)................................................................................................4, 25

# INTRODUCTION AND BACKGROUND

After years of unprecedented growth by social media platforms, Florida enacted a first-of-its-kind consumer protection law, Senate Bill 7072 (the "Act"), which takes aim at unfair and deceptive business practices by these platforms. The public record is replete with instances of their arbitrary and bad faith content moderation, only some of which are documented in the appendix to this brief. Moreover, the social media behemoths' power to silence both on their platforms and throughout society has given rise to a troubling trend where a handful of corporations control a critical chokepoint for the expression of ideas. Such unprecedented power of censorship is especially concerning today, when most individuals use social media to obtain their news and government officials harness such mediums to reach the public. The Act seeks to rein in abuse of this power and ensure the widespread dissemination of information from a multiplicity of sources—a governmental objective of the highest order that promotes values central to the First Amendment.

In seeking the extraordinary remedy of a pre-enforcement preliminary injunction, Plaintiffs ask the Court to grant them a First Amendment right to disable Florida from even starting the work of preserving the First Amendment rights of its citizens through this law. But the First Amendment leaves the government significant latitude to regulate the manner in which Plaintiffs' members wield their massive economic and social power over the free flow of information in this

1

country—latitude that the Supreme Court has recognized even when the stakes were less high than they are here. *See Rumsfeld v. FAIR*, 547 U.S. 47, 63 (2006); *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980). Consistent with those precedents, the Act does not suppress, but rather promotes, speech: It leaves users free to speak, to share, or to block any content they do not wish to see. The law merely prevents online platforms from using their vast powers to distort and suppress the messages of those speakers, leaving platforms free to speak with their own voices and largely free to adopt terms of service as they wish, requiring only that they enforce those terms consistently. Indeed, given the massive power that social media companies wield over the speech of their users, Florida's efforts to prevent them from suppressing the speech of Florida's citizens is little different from traditional common carrier regulation long thought to be constitutionally permissible. *See Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring). Nor is the Act preempted by Section 230 of the Communications Decency Act; Plaintiffs grossly overread that provision as establishing a law-free zone over the entire Internet, even where the regulation in question would promote rather than restrict free expression.

For these and many other reasons set forth below, Plaintiffs have not made the showing necessary to justify the extraordinary remedy of a pre-enforcement preliminary injunction, and the motion should be denied.

## **LEGAL STANDARD**

A plaintiff seeking a preliminary injunction must demonstrate: (1) "it has a substantial likelihood of success on the merits"; (2) "irreparable injury will be suffered unless the injunction issues"; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party"; and (4) "if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## **ARGUMENT**

## I.   **Plaintiffs Are Unlikely to Succeed on the Merits of Their Claim that the Act Is Preempted by Section 230.**

Although Plaintiffs devote most of their presentation to the First Amendment, longstanding principles of judicial restraint require the Court to start with the statutory basis upon which Plaintiffs say the Act should be enjoined. *See Ashwander v. Tennessee Valley Authority*, 287 U.S. 288, 347 (1936) (Brandeis, J., concurring). But before considering the particulars of Plaintiffs' preemption claim, two overarching observations about Section 230 deserve consideration. First, the only provision of Section 230 that speaks directly to the relationship between this federal statute and state law expressly *preserves* the states' authority to "enforc[e] any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). In fact, the wording of this provision—which is expressly tied to particular actions "enforcing" the law in question, *id.*—disfavors preemption challenges in this pre-enforcement posture.

3

In conformity with that provision and the well-established presumption against preemption, the Court should construe the rest of Section 230 narrowly and in a manner that allows federal and state law in this area to coexist.

Second, it is widely acknowledged that the enactment of Section 230 was prompted by *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at *3–4 (N.Y. Sup. Ct. May 24, 1995), in which a New York trial court held the owner of an internet message board liable for defamatory content posted by an unidentified commenter. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). The defendant in *Stratton Oakmont* was treated as a "publisher" for purposes of a defamation claim—even though it was little more than a passive conduit for the content in question—because it had held itself out as a family-friendly service provider that took down offensive content. *See Stratton Oakmont*, 1995 WL 323710, at *3–4. In repudiating that result, Congress provided in Section 230(c)(1) that an interactive computer service cannot be "treated" as the "speaker or publisher" of content posted by someone else. And in Section 230(c)(2)(A), Congress provided that this result does not change "on account of" the computer service's good faith decision to moderate certain content on clearly delineated grounds. *See* Benjamin C. Zipursky, *Online Defamation, Legal Concepts, and the Good Samaritan*, 51 VAL. U.L. REV. 1, 35–39 (2016). The legislation Plaintiffs ask the Court to enjoin is far afield from the narrow problem

these provisions address, as the Act does not subject computer services to tort liability for passively hosting content posted by others but seeks to empower users by limiting how content may be censored. *See* 47 U.S.C. § 230(b)(2) (describing congressional purpose to ensure that users retain "a great degree of control over the information that they receive").

As the following sections explain, a careful reading of Section 230's text confirms what these preliminary points suggest: Congress has not preempted Florida's authority to regulate the content moderation decisions of social media platforms.

**A.    Section 230(c)(1) Does Not Shield Social Media Platforms from Liability for Unlawfully Removing Content, and Most of the Act Survives Even Under Plaintiffs' More Sweeping Interpretation of Section 230(c)(1).**

1. To the extent Plaintiffs' preemption argument rests on 47 U.S.C. § 230(c)(1), it is unavailing. Section 230(c)(1) says: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." This provision is "phrased as a definition" and, at most, limits the liability of interactive computer services when they in certain circumstances "*refrain* from filtering or censoring the information on their sites." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006) (emphasis added). The statute's text and structure make clear that Section 230(c)(2)(A)—not Subsection 230(c)(1)—addresses interactive computer

5

services' liability "based on their efforts to *screen* content," *id.* (emphasis added);

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 16–17 (2020)

(Thomas, J., statement respecting the denial of certiorari); *Barrett v. Rosenthal*, 146

P.3d 510, 519 (Cal. 2006). Because the Act regulates taking down or actively

altering or promoting content rather than leaving it up, Section 230(c)(1) does not

apply.

To be sure, some courts have read Section 230(c)(1) to confer immunity

whenever an interactive computer service exercises any of a publisher's "traditional

editorial functions—such as deciding whether to publish, withdraw, postpone or

alter content." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). But the

text of Section 230(c)(1) addresses when an internet company may be treated as

having "publish[ed]" content rather than when a company may be sued for removing

or moderating it. 47 U.S.C. § 230(c)(1). Reading Section 230(c)(1) to provide an

additional broad immunity for content moderation—even if done completely in bad

faith—would "eviscerate" the narrower and more specific language in Section

230(c)(2), *Malwarebytes*, 141 S. Ct. at 16. By its terms, Section 230(c)(2) addresses

when an interactive computer service may be held liable for "restrict[ing] access to

or availability of material." 47 U.S.C. § 230(c)(2)(A). That specific language

clarifies the more general language in Section 230(c)(1), and the Court should refuse

to interpret the statute in a way that would render Section 230(c)(2) superfluous. *See*

*e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *3 (M.D. Fla. Feb. 8, 2017).

Plaintiffs' broader reading of Section 230(c)(1) is also self-defeating. If an internet platform "alter[s] content" posted by a user, *Zeran*, 129 F.3d at 330, then the platform becomes an "information content provider" and loses any protection that Section 230(c)(1) would otherwise confer. *See Malwarebytes*, 141 S. Ct. at 16; 47 U.S.C. § 230(c)(1), (f)(3). It thus makes nonsense of Section 230(c)(1) to read it broadly to provide immunity for all "editorial decisions," for an interactive computer service that makes such decisions cannot in any event claim protection under Section 230(c)(1).

2. Even construing Section 230(c)(1) more broadly to protect a publisher's "traditional editorial functions," *Zeran*, 129 F.3d at 330, most of the Act's provisions would still not be preempted. Many of the provisions that Plaintiffs challenge require only that social media platforms disclose information about their practices and conduct. *See, e.g.*, 2021 FLA. SESS. LAW SERV. 2021-32 § 2(4) ("SB 7072") (platform that willfully provides free advertising to a candidate for public office must tell the candidate); *id.* § 4(2)(a) (platform must publish the standards it uses to decide when to censor, deplatform, or shadow ban a user). A mandate to disclose information to better inform and protect consumers does nothing to impede the "traditional editorial functions" of a publisher.

7

A similar analysis applies to provisions of the Act that regulate the *procedures* social media platforms must follow when deciding which material to display. As described by *Zeran*, "traditional editorial functions" relate to content: namely, "deciding whether to publish, withdraw, postpone or alter content." 129 F.3d at 330; *cf. HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (ordinance that did "not require the Platforms to monitor third-party content" was not preempted). The Act's mandate that social media platforms apply their standards for deplatforming, censorship, post-prioritization, and shadow-banning in a consistent manner limits *how* a social media platform decides "whether to publish, withdraw, postpone or alter content," but the ultimate content standards—and thus the exercise of any "traditional editorial functions"—remain entirely up to the platform. *See Zeran*, 129 F.3d at 682.

**B.    None of the Act's Provisions Are Facially Preempted by Section 230(c)(2)(A).**

Subsection (c)(2)(A) is the only provision of Section 230 that in any way limits state liability for an interactive computer service's efforts to *screen* content. That provision says an interactive computer service cannot be "held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A).

Plaintiffs bring a facial, pre-enforcement challenge to the Act, and to prevail on the merits of that claim they must show that there is "no set of circumstances" under which the Act can be enforced consistent with Section 230(c)(2)(A). *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010); internal quotation marks omitted). For at least two reasons, Plaintiffs cannot make the necessary showing.

First, Section 230(c)(2)(A) does not provide blanket immunity. It only applies when an interactive computer service acts in "good faith" to remove certain categories of offensive material, and one of the principal evils at which the Act is aimed is social media platforms' "bad faith" enforcement of content moderation policies. SB 7072 § 1(8). While the parameters of "good faith" immunity under Section 230(c)(2)(A) are not well-defined in the caselaw, courts might ultimately conclude that a social media platform's failure to follow its own content moderation standards or failure to explain removal of content is relevant to whether the platform acted in "good faith." *See Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2010 WL 1799456, at *7 (D.N.J. May 4, 2020). It is also far from clear that Section 230(c)(2)(A) protects arbitrary *viewpoint*-based discrimination— another target of Florida's Act. *See* SB 7072 § 1(7). Although Section 230(c)(2)(A) allows for screening of "otherwise objectionable" material, this catchall phrase must be read alongside the other terms in the same list, which delineate specific kinds of

harmful *content*, not viewpoint. 47 U.S.C. § 230(c)(2)(A) ("obscene, lewd, lascivious, filthy, excessively violent, harassing"); *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (applying *ejusdem generis* canon of interpretation). Accordingly, it cannot be said in this facial, pre-enforcement challenge that there is no set of circumstances under which the Act could be enforced consistent with Section 230(c)(2)(A).

Second, Section 230(c)(2)(A) is best read to provide immunity only from *damages* and other monetary remedies—not from other remedies such as declaratory and injunctive relief. The phrase "held liable"—as in, "[n]o provider . . . of an interactive computer service shall be held liable," 47 U.S.C. § 230(c)(2)(A)—most naturally means an order mandating relief for a past violation (a remedy at law), not an order preventing a future violation (a remedy in equity). *See Liable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. Responsible or answerable in law; legally obligated . . . . 2. Subject to or likely to incur a fine, penalty, etc."). After all, it is common to say that someone has been "held liable" for damages, but unusual to say that someone has been "held liable" for damages they were enjoined from causing. Equitable relief, including injunctive relief, is available under the Act. *See* SB 7072 § 4(6)(d). Whenever such relief is sought, the Act can be enforced consistently with Section 230(c)(2). *See Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 2 F. Supp. 2d 783, 790 (E.D. Va. 1998). That is another significant "set of

circumstances" under which the Act could be enforced consistent with the federal statute. *Puente Arizona*, 821 F.3d at 1104.

Ultimately, this is not the case to resolve questions about whether particular attempts to enforce the Act would be consistent with Section 230(c)(2)(A). Whatever the meaning of "good faith," "otherwise objectionable," and "held liable" in the federal statute, it is enough for present purposes to say that there are at least some circumstances when the Act can be enforced consistent with Section 230. To go further in this pre-enforcement challenge would "entangl[e]" the Court "in abstract disagreements" about "contingent future events that may not occur as anticipated." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985) (internal quotation marks omitted).

### C. The Court Should Construe Section 230 Narrowly to Avoid the Serious First Amendment Problems that Would Be Presented if Federal Law Preempted the Act.

Construing Section 230 to preempt the Act, which is designed to protect Florida consumers and safeguard their free speech rights, would also raise serious doubts about Section 230's constitutionality under the First Amendment. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (discussing constitutional avoidance canon). It is indisputable that much of the speech that internet platforms have censored, and that the Act seeks to protect, is also protected by the First Amendment. Indeed, Section 230 authorizes (good-faith) censorship of certain

speech "*whether or not* such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A) (emphasis added).

Plaintiffs will no doubt respond that social media platforms are private actors that need not honor their users' First Amendment rights. But if Plaintiffs were correct that Section 230 creates a broad law-free zone in which internet companies can censor however they like, even in bad faith, then serious questions would arise about whether their censorship constitutes state action. *See Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 615 (1989) (finding state action where the government "removed all legal barriers" to private companies drug-testing their employees and "made plain . . . its strong preference for testing"). At the very least, Plaintiffs' reading of Section 230 would create "a sufficiently close nexus between" Congress and social-media platforms engaged in censorship to support a finding of state action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This analysis is powerfully reinforced by the history of the First Amendment, for censorship by nominally private actors with monopoly power over an important form of communication was the precise evil that the founding generation had in mind when the First Amendment was ratified. *See Rossignol v. Voorhaar*, 316 F.3d 516, 526–27 (4th Cir. 2003). These constitutional concerns are good reason to avoid reading Section 230 in the expansive fashion Plaintiffs propose.

Moreover, even if the Court rejects the argument that social media platforms are themselves state actors, there is nevertheless state action to whatever extent Section 230 preempts Florida law. The Supreme Court found state action under analogous circumstances in *Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956), which concerned federal preemption of a state statute that entitled workers not to join a union as a condition of employment. The *Hanson* Court said that "justiciable questions under the First and Fifth Amendments were presented" because "the federal statute is the source of the power and authority by which any private rights are lost or sacrificed." *Id.* at 231–32. Likewise here, a question under the First Amendment would be presented if Section 230 preempted the Act because a federal statute would be "the source of the power and authority by which" users' speech rights would be lost. *See* Eugene Volokh, *Might Federal Preemption of Speech-Protective State Laws Violate the First Amendment?*, REASON (Jan. 23, 2021), https://bit.ly/2TKfPQO.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend. I. Serious questions under the First Amendment would arise if, in this pre-enforcement facial challenge, the Court were to construe Section 230 to preempt Florida's effort to promote the freedom of speech. *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (discussing when conditions on federal funding "result in an

unconstitutional burden on First Amendment rights"). Accordingly, the Court should not lightly conclude that Congress made a law that not only allows unbridled censorship, but also prevents states from doing anything about it.

## II. Plaintiffs Are Unlikely to Succeed on the Merits of Their Claim that the Act Violates the First Amendment.

### A. The Act Does Not Interfere with First Amendment Rights by Requiring Social Media Platforms to Host Certain Speech.

The First Amendment does not categorically prohibit the government from forcing someone "to host or accommodate another speaker's message." *Rumsfeld v. FAIR*, 547 U.S. 47, 63 (2006). In *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), the Court ruled that the First Amendment was no obstacle to a California mandate that the owner of a shopping center allow petitioners to seek signatures and distribute handbills on shopping center property—even if the shopping center had a policy against such expressive activity. *Id.* at 86–88. Reaffirming *PruneYard*'s central holding, all participating Justices unanimously found no First Amendment right against Congress's mandate that law schools "afford equal access to military recruiters." *FAIR*, 547 U.S. at 60–68. Chief Justice Roberts explained, "[a]s a general matter, the [law] regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60 (emphasis in original). The law schools' First Amendment arguments to the

14

contrary were unavailing. So too are Plaintiffs' First Amendment arguments against the Act.

In the main, the Act regulates the conduct of social media platforms with respect to their users' engagement with their sites. Social media platforms must refrain from conduct that deplatforms, shadow bans, censors, and prioritizes posts under certain conditions. Plaintiffs make a variety of arguments for why such provisions constitute compelled speech and thus merit strict scrutiny. But these arguments fail at the outset because "accommodation" of users' speech "is not compelled speech" when "the accommodation does not sufficiently interfere with any message" of the social media platforms. *FAIR*, 547 U.S. at 64. The Supreme Court's precedents provide three guiding principles to assess whether speech-hosting requirements impermissibly interfere with hosts' speech: (1) the risk of listener confusion, (2) the ability of the host to speak and dissociate from hosted speakers, and (3) whether the host curates speech to communicate or contribute to a common theme. All these principles confirm that the Act causes no such interference and therefore does not violate the First Amendment.

## 1. There Is No Risk that Listeners Will Confuse Users' Speech for that of the Social Media Platforms.

First, the Supreme Court considers the extent to which a listener may (mis)identify the hosted speaker's views with those of the host. *FAIR*, 547 U.S. at 65. For example, in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,

515 U.S. 557, 564 (1995), the Supreme Court assessed a public accommodation law mandating that organizers of a parade include floats with messages the organizers did not wish to convey. The Court found that each individual presentation in a parade would be "perceived by spectators as part of the whole," such that there was a risk of identifying each presentation as part of the "parade's overall message." *Id.* at 576–77. By contrast, in *PruneYard*, "there was little likelihood that the views of those engaging in the expressive activities would be identified with the owner" of the shopping center. *FAIR*, 547 U.S. at 65. Or in *FAIR* with the law schools hosting military recruiters. *Id*.

Here, a reasonable user of a typical regulated social media platform would not identify the views expressed on the platform as those of the platform itself. As Facebook CEO Mark Zuckerberg explained in a 2019 speech, his platform is focused on "giving everyone a voice." App.919. Zuckerberg did not claim that all those whom Facebook gives voices to are aggregated to become Facebook's voice. Instead, these many voices remain distinct on the platform. And when users view this content on Facebook and other platforms, they are normally "apprised of the identity of the" speaker. *Hurley*, 515 U.S. at 576. Regardless of whether Facebook or any other social media platform applauds or rejects such speech, no reasonable listener thinks that Facebook is the entity *speaking*. As the Supreme Court has reiterated, there is no interference with a host's speech when observers "can

appreciate the difference" between speakers whom a host *endorses* and speakers whom a host "*permits* because legally required to do so, pursuant to an equal access policy." *FAIR*, 547 U.S. at 65.

> **2.** **Social Media Platforms Remain Able to Speak and Dissociate Themselves from User Speech.**

Second, in cases like this one the Supreme Court considers whether the property owner can "dissociate" itself from the expressive activities of those it is required to host. As the Court explained in *FAIR*, "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the [challenged law] restricts what the law schools may say about the military's policies." 547 U.S. at 65. The owner of the shopping center in *PruneYard* could likewise "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." 447 U.S. at 87. By contrast, the same could not be said about parades, which lacked a "customary practice whereby private sponsors disavow any identity of viewpoint between themselves and the selected participants." *Hurley*, 515 U.S. at 576.

The Act leaves social media platforms free to speak on their own behalf and make clear their own views. Consider the Act's provision that restricts the ability of social media platforms to "deplatform" candidates. This provision does not restrict social media platforms' ability to criticize or dissociate themselves from any particular candidate. Social media platforms are free to tell their users and the public

at large that hosted candidates "are communicating their own messages by virtue of state law." *PruneYard*, 447 U.S. at 87. And social media platforms remain free to speak with their own voice on any issue or candidate.

Moreover, it is the "customary practice" of Plaintiffs' members to explicitly dissociate themselves from the user content on their sites. *Hurley*, 515 U.S. at 576. Facebook states in Section 4.3 of its Terms of Service, "We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content)." App.531. Section 3 of Twitter's provides similarly: "We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services . . . All Content is the sole responsibility of the person who originated such Content." App.548; *see* Tim Wu, *Machine Speech*, 161 U. PA. L. REV. 1495, 1505 (2013) (observing that Twitter "does not usually enjoy much First Amendment protection" because "the company does not . . . take responsibility for the creative choices of its users"). Etsy goes even further in its Terms of Service, under the heading, "*Your* Content." Etsy tells its users that "Content that you post using our Services is your content (so let's refer to it as 'Your Content'). We don't make any claim to it, which includes anything you post using our Services (like shop names,

profile pictures, listing photos, listing descriptions, reviews, comments, videos, usernames, etc.)." App.541. These statements make explicit what every reasonable user already understands intuitively: the platforms are *not* responsible for the content posted by their users. The Act does nothing to change that.

The ability of social media platforms to distance themselves from user speech is further apparent because the Act "does not dictate the content of [any] speech at all" and does not "compel[]" social media platforms "'to affirm a belief in any governmentally prescribed position or view.'" *FAIR*, 547 U.S. at 62, 65 (quoting *PruneYard*, 447 U.S. at 88) (brackets omitted). The Supreme Court's compelled speech precedents "have established the principle that freedom of speech prohibits the government from telling people what they must say." *Id.* at 61. For instance, California's "government-drafted script about the availability of state-sponsored [health] services," *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018), West Virginia's mandate to recite the Pledge of Allegiance, *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), and New Hampshire's mandate to motorists to display the state motto on their license plates, *Wooley v. Maynard*, 430 U.S. 705, 717 (1977), were all unconstitutional. In contrast, Florida's Act "does not require any similar expression" by social media platforms. *FAIR*, 547 U.S. at 61.

Plaintiffs argue that the Act's requirement that a social media platform notify users when it takes steps to silence them is a form of compelled speech. But, as in *FAIR*, this disclosure requirement is "plainly incidental" to the regulation of conduct. Notice is only "compelled if, and to the extent" that a social media platform decides to censor or shadow ban a user's content. *FAIR*, 547 U.S. at 61–62. Moreover, this is nothing like a "government-mandated pledge or motto." *Id.* at 62. All this provision establishes is minimum standards of disclosure of the social media platform's own conduct. "[I]t has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).[1]

---

[1] Even if the Court disagrees, the notice requirements are subject only to scrutiny under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (disclosure requirements are consistent with First Amendment "as long as [they] are reasonably related to the State's interest in preventing deception of consumers"). The notice requirements survive *Zauderer* because they alert users if platforms are failing to follow their own content moderation policies—"the terms under which [their] services will be available." *Id.* Without that notice, platforms could deceive users by representing that the users' content is available for others to see, but then shadow banning, deprioritizing, or censoring that content for arbitrary (and unexplained) reasons. Plaintiffs additionally argue that the Act limits their "affirmative speech" by limiting the circumstances in which a social media platform can "censor" a post by "post[ing] an addendum to any content or material posted by a user." Pls.' Mem. Of Law in Support of Mot. for Prelim. Inj., Doc. 30, 10–11 (June 3, 2021) ("Pls.' Br."). This is similarly incidental to the regulation of social media platform's conduct. But, even if not, this provision is at most a content neutral restriction on the *manner* or *place* of one form of social

### 3. Social Media Platforms Generally Do Not Curate Content to Contribute to a Common Theme.

The Supreme Court has also placed significant weight on whether a mandate to host a third party's speech interferes with the host's ability to present speech that "comports with" or "contribute[s] something to a common theme." *Hurley*, 515 U.S. at 574, 576; *accord FAIR*, 547 U.S. at 63–64. For example, mandates to accommodate speech in a parade, *id.* at 566, a utility newsletter, *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 20–21 (1986) (plurality op.); *id.*, at 25 (Marshall, J., concurring in judgment), or a newspaper, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974), are unconstitutional.

On the other hand, mandates to host speech in areas without curated contributions to a common theme are generally constitutional. Thus, the Supreme Court upheld mandates requiring the hosting of other speakers' messages in shopping centers, *PruneYard*, 447 U.S. at 88, and on law school campuses, *FAIR*, 547 U.S. at 65. The *PruneYard* Court explained that "obviously" the "intrusion into the function of editors" was "not present [t]here." *PruneYard*, 447 U.S. at 88. This was also true in *FAIR* even though "law schools 'expressed' their disagreement with the military by treating military recruiters different from other recruiters." 547 U.S.

---

media platform's speech and subject only to time, place, and manner scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

at 66. Although that *specific* conduct may have been intended to "send[] the message" that the law schools found something wrong with the military's policy, the *general* activity involved—providing recruiting services to law students—"lack[ed] the expressive quality of a parade, a newsletter, or the editorial page of a newspaper; [the school's] accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school." *FAIR*, 547 U.S. at 64–65. As the *FAIR* Court emphasized, "[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in [federal law] restricts what the law schools may say about the military's policies." *Id.* 65. So too with respect to social media platforms and their users. Indeed, this distinction makes sense because law schools "will usually take any recruiter who shows up, regardless of the recruiter's message." Eugene Volokh, *The Law of Compelled Speech*, 97 Tex. L. Rev. 355, 366 (2018). By contrast, "[n]ewspapers are highly selective about what they let in." *Id.*

Whatever the specifics of the content moderation strategy of a particular social media platform, such policies generally lack the highly selective nature of newspaper editing or even a parade. As in *FAIR*, the specific conduct that these platforms use to silence particular users, presumably to avoid "be[ing] viewed as sending the message that they see nothing wrong with the [user's content]," does not change the fact that the overall blend of user-generated material that social media platforms host

lacks the expressive quality necessary under the First Amendment to make this material the platform's own "speech" or otherwise interfere with the platform's own message. *FAIR*, 547 U.S. at 64–65. There is no common theme in a user's newsfeed on a social media platform—much less the material on a social media platform that a user can view by seeking it out. In the lively cacophony of online exchange, billions of individuals discuss, post, and share unceasingly about innumerable topics—the only commonality is the happenstance of daily life.

Moreover, social media platforms disavow censorship of user speech on the basis that it interferes with the platform's own speech, claiming to "giv[e] everyone a voice," App.919, "regardless of the [user's] message," Volokh, *supra*, 97 TEX. L. REV. at 366. Social media platforms may rank and order user posts to generate more clicks and engagement, but the aggregate of this content does not reflect a real selection to create a theme or message. *See* Wu, *supra*, 161 U. PA. L. REV. at 1529. And even if social media platforms could in theory make such a selection by thematically curating the material they host, Plaintiffs have not demonstrated that their members actually do so. The theoretical possibility that a social media platform *could* curate user material to convey a message is thus not a basis for sustaining Plaintiffs' facial constitutional challenge.

## B. The Act Permissibly Treats Social Media Platforms Like Common Carriers.

The Court's scrutiny of the Act must also recognize that the Act treats

regulated social media platforms akin to common carriers. Plaintiffs' First Amendment claims must be assessed based on the circumscribed First Amendment rights those carriers enjoy when transmitting the speech of others.

In Section 1 of the Act, the Florida Legislature found that "[s]ocial media platforms have become as important for conveying public opinion as public utilities are for supporting modern society," and they "hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers." SB 7072 § 1(5), 1(6). In fact, as Justice Thomas recently explained, "[i]n many ways, digital platforms that hold themselves out to the public resemble traditional common carriers." *Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring).

The law is well-established that "[t]he basic characteristic of common carriage is the requirement to hold oneself out to serve the public indiscriminately." *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 740 (D.C. Cir. 2016) (cleaned up). For centuries, companies "clothed and superinduced with a *jus publicum*" or public trust, *Shively v. Bowlby*, 152 U.S. 1, 12 (1894), have been subjected to "special regulations" on account of their public concern and at times (but not always) their "substantial market power." *Knight*, 141 S. Ct. at 1222–23 (Thomas, J., concurring). Among these regulations was that common carriers could not "make unreasonable discriminations between persons soliciting its means of

conveyance, as by refusing them on account of personal dislike, their occupation, condition in life, complexion, race, nativity, political or ecclesiastical relations." Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 VA. L. REV. 947, 981 (1995) (cleaned up).

While common carrier status began with those physically transporting wares, this doctrine was long ago extended to certain carriers of communications. As the California Supreme Court wrote in declaring the telegraph to be a common carrier, "[t]he rules of law which govern the liability of telegraph companies are not new. They are old rules applied to new circumstances. Such companies hold themselves out to the public as engaged in a particular branch of business, in which the interests of the public are deeply concerned." *Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422, 424 (1859). The framework provided by the common law has since provided a template for legislative designation of certain telephonic and internet activities to be classified as common carriers. *See Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601, 608–09 (D.C. Cir. 1976); *U.S. Telecom Ass'n*, 825 F.3d at 710–11. And the common law does not treat common carriers like traditional publishers. *See* Zipursky, *supra*, at 21 & nn.136, 137. "[I]t stands to reason that if Congress may demand that telephone companies operate as common carriers, it can ask the same of" social media platforms. *Knight*, 141 S. Ct. at 1226 (Thomas J., concurring) (quoting *Turner*

*Broad. Sys., Inc. v. FCC* ("*Turner*"), 512 U.S. 622, 684 (1994) (op. of O'Connor, J.)).

The Florida Legislature permissibly determined that the "old rules" applicable to common carriers should be applied to the "new circumstances" of social media. *See Parks*, 13 Cal. at 424. The social media platforms covered by the Act have significant market power within their domains, and they hold themselves out to the public when trafficking in important public goods. *See* SB 7072 § 4(1)(g) (defining "social media platform"); Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 YALE J. L. & TECH. 391, 399 (2020). Indeed, some of Plaintiffs' members "have dominant market share," and there is evidence that the network effects of their large user bases establishes "substantial barriers to entry." *Knight*, 141 S. Ct. at 1224 (Thomas, J., concurring). "Certain features of digital markets—such as network effects, switching costs, the self-reinforcing advantages of data, and increasing returns to scale—make them prone to winner-take-all economics" and thus these markets often "'tip' in favor of one or two large companies." App.110.

Social media platforms also exert "enormous control over speech." *Knight*, 141 S. Ct. at 1224. These platforms can "steer[] users away from certain content" through a variety of means. *Id.* at 1225. This power to steer is all the more significant because of how important social media platforms are to communication in today's

America. As the Supreme Court has said, "the vast democratic forums of the Internet, and social media in particular" have become "the most important places . . . for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (cleaned up). According to the Pew Research Center, 71% of Americans get news from social media. App.534. It is not surprising then that news publishers feel "increasingly beholden" to digital platforms. App.90.

Section 230 further reinforces the reasonableness of treating social media platforms as common carriers. Even when that statute is appropriately read to do little more than overturn the result in *Stratton Oakmont*, there is no doubt that Section 230 helped clear the path for the development of this industry—as the government did generations ago when it used eminent domain to help establish railroads and telegrams. The recipients of this publicly conferred benefit can justifiably be required to serve all comers.

Treating social media platforms as common carriers means that they are "prevent[ed] . . . from 'mak[ing] individualized decisions, in particular cases, whether and on what terms to deal.'" *U.S. Telecom Ass'n*, 825 F.3d at 740 (quoting *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979)). Plaintiffs resist the notion that they should be treated as common carriers for just this reason, claiming their content moderation policies allow for individualized content decisions. Pls.' Br. 36–37. But such features do not preclude common carrier treatment. For instance, a

railroad could refuse carriage to those who did not "comply[] with its reasonable regulations, or whose improper behavior—as by their drunkenness, obscene language, or vulgar conduct—renders them an annoyance to other passengers." McConnell, *supra*, 81 VA. L. REV. at 981. Nevertheless, "the essential element of common carriage [is] that the carrier holds itself out as providing the services to the public" at large. By inviting the public trust, the government is enabled to impose special regulations, including the terms upon which the common carrier may deal. Candeub, *supra*, 22 YALE J. L. & TECH. at 409 n. 63; *Knight*, 141 S. Ct. at 1222 (Thomas J., concurring).

The broad standard to serve the public indiscriminately leads to the conclusion that there is an "absence of any First Amendment concern" with the Act. *U.S. Telecom Ass'n*, 825 F.3d at 740; *id.*; *see also Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 739 (1996) (plurality op.) (noting the "relatively weak" "speech interests" of "common carriers"). After all, there is "the understanding that such entities, insofar as they are subject to equal access mandates, merely facilitate the transmission of the speech of others rather than engage in speech in their own right." *U.S. Telecom Ass'n*, 825 F.3d at 741; *see* McConnell, *supra*, 81 VA. L. REV. at 981.

## C. If Any First Amendment Scrutiny Applies, Then at Most it Should be Intermediate Scrutiny.

As the above sections explain, the Act does not implicate Plaintiffs' First Amendment rights. But, if the Court disagrees, then the appropriate level of review is intermediate scrutiny. For substantially the same reasons that the Supreme Court articulated in *Turner*, the Act "do[es] not pose such inherent dangers to free expression, or present such potential for censorship or manipulation, as to justify application of the most exacting level of First Amendment scrutiny." 512 U.S. at 661.[2]

The Supreme Court relied on several reasons to apply intermediate scrutiny in *Turner.* Three are of particular relevance here. *First*, the Act is "not designed to favor or disadvantage speech of any particular content"—its protections extend to all users, no matter the content of their speech. *See Turner*, 512 U.S. at 652. Plaintiffs argue that the Act has an alleged preference for speech by journalistic enterprises, which triggers strict scrutiny. *See* Pls.' Br. 24–25. But the Supreme Court rejected just such a speaker-based argument in *Turner* when it explained that speaker

---

[2] An independent ground to uphold the Act is the Supreme Court's decision in *Red Lion Broad. Co. v. FCC*, which held that more intrusive government regulation of broadcast carriers was constitutionally permissible. The Court explained that "differences in the characteristics of new media justify differences in the First Amendment standards applied to them." 395 U.S. 367, 386 (1969). The court does not need to reach this point because the legislation is permissible on the grounds otherwise set forth in this brief.

preferences are only subject to strict scrutiny "when the legislature's speaker preference reflects a content preference." *Turner*, 512 U.S. at 658. The provision at issue in *Turner* benefited broadcasters not because of anything broadcasters said but rather because "the services provided by broadcast television [had] some intrinsic value, and, thus, are worth preserving against the threats posed by cable." *Id.* at 648. Florida made a similar determination. As the Act's Senate sponsor said during committee testimony, the Act followed "[o]ur Founding Fathers," who "believed that the free flow of news was important to the strengthening of democracy." *Senate Committee on Appropriations*, at 3:12:05–24, FLA. SENATE (Apr. 19, 2021), https://bit.ly/3vG24jm. As in *Turner*, any alleged preference for journalistic enterprises was enacted in the face of a threat—namely, "the dominance on the production and availability of trustworthy sources of news" by digital platforms' market power. App.90; *Senate Committee on Appropriations*, at 3:41:30–52 (referencing U.S. House Subcommittee's Report on digital platforms' market power.). Under *Turner*, this recognition of the intrinsic value of journalistic enterprises in the Act is similarly content neutral. 512 U.S. at 648.

Plaintiffs also claim that the Act's consistency provision is "anything but content-neutral." Pls.' Br. 26–27. But that provision is essentially a nondiscrimination requirement in the conduct of social media platform's moderation policies—like the nondiscrimination provision upheld in *FAIR*, it affects what social

media platforms "must do" in applying those policies, "not what they may or may not say." *FAIR*, 547 U.S. at 60. For similar reasons, Plaintiffs' arguments about the Act's restriction on applying post-prioritization or shadow banning algorithms for content and material posted by or about a candidate are unavailing. Post-prioritization and shadow banning are not protected speech at all. The Supreme Court has long rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968); *accord FAIR*, 547 U.S. at 65–66.

The First Amendment protects only conduct that is "inherently expressive," *FAIR*, 547 U.S. at 66 (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)), and post-prioritization and shadow banning do not qualify. In *FAIR*, the Supreme Court explained that when conduct requires "explanatory speech," that is "strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id.* If a social media platform engages in post-prioritization or shadow banning to express disfavor of any given post, the user has "no way of knowing whether" they are not seeing the post because the platform disapproves the post, their feed is full of other, perhaps more recent, content, or the author of the post took some action to prevent its transmission to the user. *Id.* Only when the social media platform *explains* that it shadow-banned or deprioritized the post would the user

know why he or she fails to see it. That is "strong evidence" such actions are not expressive conduct protected by the First Amendment. *Id.* But even if such actions were "inherently expressive," the Act's requirements regulating such conduct would at most be subject to intermediate scrutiny. *See id.*[3]

*Second*, the Court in *Turner* considered whether the provision in question compelled the transmission of speech or otherwise altered the content of the cable operators' own messages. *See Turner*, 512 U.S. at 653, 656. As explained at length above, there is no compelled speech here and no interference with any speech by the social media platforms themselves. But to the extent the Court disagrees, the incidental interference with social media platforms' speech is no different from that experienced by the cable operators in *Turner*, which could not carry the full stable of channels they preferred due to the mandate to carry broadcast stations. 512 U.S. at 643–45.

*Third*, the Act's "regulations are broad based, applying to almost all [social media platforms] in the country" and are justified by "the special characteristics of" social media platforms. *Turner*, 512 U.S. at 623, 661. In *Turner*, the Court was particularly attuned to Congress's interest in "prevent[ing] cable operators from

---

[3] Even if the Court disagrees and decides that this part (or another) of the Act is a content-based restriction, the application of strict scrutiny would be limited to that content-based provision. Different provisions of the same act may be subject to different levels of scrutiny. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2372, 2377.

exploiting their economic power to the detriment of broadcasters." 512 U.S. at 649. In particular, when a subscriber signed up for cable, the cable operator became a "bottleneck, or gatekeeper" with "control over most (if not all) of the television programming that [was] channeled into the subscriber's home." 512 U.S. at 656. This role in the home meant "[a] cable operator, unlike speakers in other media," could "silence the voice of competing speakers with a mere flick of the switch." *Id.* As discussed below, the same phenomenon occurs with social media platforms that can and do silence voices with mere keystrokes. As was true with a cable provider in *Turner*, a social media platform has a "monopolistic opportunity to shut out some speakers." *Hurley*, 515 U.S. at 577. This is all the more troubling because, as was also true of the cable industry reviewed by *Turner*, social media is a significant means of communication today with vast economic power. *See Knight*, 141 S. Ct. at 1224 (Thomas, J., concurring). While in *Turner* 60% of American households with televisions had a cable subscription, *id.* at 633, today nearly 70% of individual Americans report using a social media site. App.64. "The First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas." 512 U.S. at 657.

**D.     The Act Satisfies Intermediate Scrutiny.**

Content-neutral restrictions that impose an incidental burden on speech are constitutional if they satisfy intermediate scrutiny, which requires that: (1) the law "furthers an important or substantial governmental interest"; (2) the governmental interest be "unrelated to the suppression of free expression"; and (3) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest," *Turner*, 512 U.S. at 662 (cleaned up), *i.e.*, that the "means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests,'" *id.* (quoting *Ward*, 491 U.S. at 799). Intermediate scrutiny is a "more lenient level of judicial scrutiny" that requires the Court "to weigh the extent to which expression is in fact inhibited against the governmental interest in proscribing particular conduct." *Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 157 (2d Cir. 1990); *see also Turner Broad. Sys., Inc. v. FCC* ("*Turner II*"), 520 U.S. 180, 195 (1997) (internal quotation marks omitted).

**1.     The Act Furthers Substantial Governmental Interests.**

SB 7072 furthers three substantial governmental interests. First, the Act "promote[s] the widespread dissemination of information from a multiplicity of sources," an interest that the Supreme Court in *Turner* had "no difficulty concluding" was "an important governmental interest." *Turner*, 512 U.S. at 662–63. Ensuring that the public "has access to a multiplicity of information sources," the

Court explained, "is a governmental purpose of the highest order, for it promotes values central to the First Amendment." *Id.* at 663. Second, Florida has a substantial interest in protecting its residents from unfair or deceptive acts or practices in commerce. *See* FLA. STAT. § 501.204; *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 12 (1st Cir. 1994). Third, it also has a compelling interest in preserving the democratic process and ensuring fair elections. *Burroughs v. United States*, 290 U.S. 534 (1934); *Curry v. Baker*, 802 F.2d 1302, 1317 (11th Cir. 1986).

SB 7072 recognizes these substantial interests as motivating factors of the Act, asserting that "[t]he state has a substantial interest in protecting its residents from inconsistent and unfair actions by social media platforms." SB 7072 § 1(10). The Act explains that the Legislature found that "Floridians increasingly rely on social media platforms to express their opinions" and that those platforms "have become as important for conveying public opinion as public utilities are for supporting modern society." *Id.* § 1(3), (5). The Legislature determined that "[s]ocial media platforms have transformed into the new public town square," that they "hold a unique place in preserving [F]irst [A]mendment protections for all Floridians," and that, therefore, they "should be treated similarly to common carriers." *Id.* § 1(4), (6). But the Legislature also found that social media platforms have "unfairly censored, shadow banned, deplatformed, and applied post-prioritization algorithms to

Floridians." *Id.* § 1(9). The Legislature thus designed SB 7072 to combat that inconsistent and unfair behavior, promote the widespread dissemination of information from a multiplicity of sources, and ensure fair elections. The Act reflects a regulatory choice that this Court cannot displace with its own because the law is "grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination." *Turner II*, 520 U.S. at 224.

The issues the Legislature identified are not mere hypothetical possibilities—the public record is replete with examples evincing social media companies' sustained campaign of inconsistently and unfairly censoring, shadow banning, deplatforming, and deprioritizing Floridians, including journalistic enterprises and candidates for public office. The sheer volume of such incidents, documented in part in the appendix to this brief, underscores the reasonableness of the Florida Legislature's judgment. *See* App.569–1541. For example, *The Babylon Bee*, a conservative Christian news satire website headquartered in Jupiter, Florida that publishes satirical articles on religion, politics, and current events has repeatedly been the target of social media platforms' inconsistent and unfair behavior. In 2018, *The Babylon Bee's* Facebook page was threatened with removal and demonetization after one of its satirical articles titled "'CNN Purchases Industrial-Sized Washing Machine to Spin News Before Publication' was 'fact-checked.'" App.789. Facebook later apologized and explained that it had made a "mistake." App.1539. In 2020, *The*

*Babylon Bee* posted a story titled "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch," referencing the comedy *Monty Python and the Holy Grail*. App.792. Facebook demonetized *The Babylon Bee*'s Facebook page and stuck to its determination that the article "incited violence" due to its reference to burning witches, reversing its decision only after numerous media outlets lambasted Facebook for its censorship. Also in 2020, Twitter briefly suspended *The Babylon Bee*'s page for being "spam," reversing the suspension shortly thereafter and explaining that *The Babylon Bee* had "mistakenly" been caught in a spam filter. App.1037.

The *New York Post* has received a similar treatment for some of its stories. Twitter locked the *New York Post*'s account and demanded that it delete six tweets that linked to the *Post*'s exposé on Hunter Biden in the fall of 2020. App.1042, 1045; *see also* App.795; App.1048. Facebook reduced the distribution of the story on its site. App.1045. Twitter CEO Jack Dorsey later called the move a "total mistake," describing it as the result of a "process error." App.1042. In April 2021, Facebook disallowed its users from sharing the *New York Post*'s story about a Black Lives Matter co-founder's expensive real estate purchases, citing the story as against its "community standards." App.801.

Individuals and journalistic enterprises alike have had to grapple with social media platforms' inconsistent and unfair practices regarding COVID-19. In

February 2021, Facebook announced that it would expand its content moderation on COVID-19 to include "false" and "debunked" claims such as that "COVID-19 is man-made or manufactured." App.804. It blocked the *New York Post*'s article written that month suggesting that the virus could have leaked from a Chinese virology lab. App.801. But now, given "ongoing investigations into the origin of COVID-19 and in consultation with public health experts," Facebook has decided that it will no longer "remove the claim that COVID-19 is man-made or manufactured." App.804.

The social media platforms' behavior has also affected politicians. YouTube removed a video of Governor Ron DeSantis holding a panel with pandemic health experts for allegedly violating community standards regarding COVID-19 medical information. App.1208. YouTube stated that the video included information on mask-wearing that "contradicts the consensus of local and global health authorities." *Id.* In April 2020, Twitter terminated the account of Howie Hawkins, a Green Party candidate for President, for allegedly violating its rule on "impersonation." App.1052. And in early 2021, Facebook, Twitter, Instagram, and YouTube banned President Trump in the wake of the January 6 Capitol riot out of concerns that he would encourage violence on their platforms, while taking no action against Representative Maxine Waters for her statements to protestors during Derek Chauvin's trial for the murder of George Floyd. App.807, 889.

Social media platform users are not always notified that they have been deplatformed or given an explanation for how they violated the platforms' content guidelines. When a social media platform shadow bans a user, that user is still able to access the platform, post content, and comment on others' posts, but their actions are invisible to all other normal users. App.1352. The user is not notified of the shadow ban. In one instance, a user was shadow banned from Reddit but continued to spend four to five hours a day posting content for weeks before realizing that the content was invisible to all other normal users. *Id.*

These examples of social media platforms' inconsistent and unfair practices are further evidenced by systematic examinations of how the platforms implement their own content guidelines. Social media platforms apply their content guidelines differently to posts with similar content, App.892, and some suspend the accounts of right-leaning individuals at a higher rate than left-leaning individuals, App.1055. Officials of the platforms themselves have admitted that employees in charge of content moderation "could be biased and pursuing their own political agendas." App.884.

The social media platforms' inconsistent treatment of user content would be bad enough if they were transparent about how they make moderation decisions. But some of the most important platforms are notoriously secretive about such matters, *see* App.569, even while publicly claiming—contrary to the public record—that they

apply their policies "in a way that is fair and consistent to all," App.737 (quoting prior version of Facebook report on enforcement of community standards). Perhaps most notoriously, senior Google executives have publicly claimed that the company does not manually alter search results despite public reporting to the contrary. *See* App.1446; App.1478.

In light of these facts, the Act furthers Florida's interests and justifiably protects its residents in a number of ways. First, the Act requires social media platforms to publish the standards they use, including detailed definitions, for determining how to censor, deplatform, and shadow ban. SB 7072 § 4(2)(a). The Act requires that these standards be applied "in a consistent manner among its users on the platform," *id.* § 4(2)(b), and that the social media platform inform each user about any changes to its user rules, terms, and agreements before implementing the changes and not make changes more than once every 30 days, *id.* § 4(2)(c).

Second, the Act requires social media platforms to provide certain tools and notices to its users. *Id.* § 4(2)(d)–(g), (3). The social media platforms must provide a process through which users can request information on the number of other individual platform participants who were provided or shown the user's content or posts. *Id.* § 4(2)(e). The platforms must categorize the algorithms they use for post-prioritization and shadow banning and allow a user to opt out of them to allow sequential or chronological viewing of content. *Id.* § 4(2)(f). And the platforms must

40

provide detailed, written notifications explaining the rationale for why the platform censored a user and how the platform became aware of the censored content. *Id.* § 4(2)(d)(1), (3).

Third, SB 7072 prohibits social media platforms from willfully deplatforming a known candidate for public office. SB 7072 § 2(2). Social media platforms may not apply post-prioritization or shadow banning algorithms to content "posted by or about" a candidate. *Id.* § 4(2)(h).

Fourth, the Act disallows social media platforms from censoring, deplatforming, or shadow banning a journalistic enterprise "based on the content of its publication or broadcast." *Id.* § 4(2)(j).

Through these provisions, SB 7072 will further Florida's substantial governmental interests. It will protect Floridians from social media platforms' inconsistent and unfair conduct by requiring those platforms to disseminate detailed content guidelines, apply those guidelines consistently to all users, and thoroughly inform users of the nature of their violations of the guidelines. The publication of detailed guidelines will also allow Floridians to make an informed decision about whether to become a user of a social media platform. In addition, the Act will protect the integrity of elections by prohibiting the platforms from deplatforming, deprioritizing, or shadow banning candidates for public office. And together, the

Act's provisions will ensure that social media platforms do not unfairly restrict the widespread dissemination of information from a multiplicity of sources.

> **2.** **The Governmental Interests the Act Furthers Are Unrelated to the Suppression of Free Expression.**

The substantial governmental interests that SB 7072 furthers are unrelated to the suppression of free expression. First, in *Turner*, the Supreme Court concluded that promoting the widespread dissemination of information from many sources was unrelated to the suppression of free expression or to the content of any speakers' messages. *Turner*, 512 U.S. at 662.

Second, Florida's interests in protecting its citizens from social media platforms' inconsistent and unfair conduct and in ensuring the integrity of elections are unrelated to the suppression of free expression. SB 7072 proscribes conduct "for reasons completely unrelated to the alleged communicative impact of the conduct." *Young*, 903 F.2d at 159. Instead, it proscribes conduct to safeguard its residents from unfair or deceptive acts or practices and to ensure fair elections. Despite the out-of-context statements by a handful of elected officials that Plaintiffs quote, Pls.' Br. 30–31, nothing in the record even remotely suggests that Florida's interests embodied in the Act arise because Florida "objects to a particularized idea or message," *Young*, 903 F.2d at 159. Proponents of the bill repeatedly stated that SB 7072 would prevent social media platforms from "enforc[ing] rules inconsistently" and "unfair[ly] and arbitrar[ily] discriminat[ing]," and would promote "fair and

transparent" treatment of users. App.1211. The Act's main House sponsor described it as a "consumer protection bill."[4] The Act's main Senate sponsor repeatedly described the bill as addressing transparency, ensuring that social media platforms apply their standards consistently, and protecting consumers from unfair and deceptive conduct.[5] He also described the bill as addressing the effective monopolies social media companies possess in the market and referred to the recent hearings and report on the topic by the U.S. House Judiciary Committee's Antitrust Subcommittee.[6] Furthermore, the Act on its face is both content and viewpoint neutral.

Accordingly, just as the government's interests embodied in the must-carry provisions at issue in *Turner* were found to be unrelated to the suppression of speech, so too are Florida's governmental interests embodied in the Act.

### 3. The Act Does Not Burden Substantially More Speech Than Is Necessary to Further Florida's Legitimate Governmental Interests.

Plaintiffs complain that, in their view, SB 7072 burdens more speech than is

---

[4] *5/24/21 Signing of SB 7072 – Social Media Platforms*, at 18:03–09, THE FLA. CHANNEL (May 24, 2021), https://bit.ly/3q7uWzY.

[5] *Senate Committee on Governmental Oversight and Accountability Meeting*, at 13:00–30, FLA. SENATE (Apr. 6, 2021), https://bit.ly/3wJhjte; *Senate Committee on Appropriations Meeting*, at 2:53:30, 3:06:30, FLA. SENATE (Apr. 19, 2021), https://bit.ly/3vG24jm.

[6] *Id.* at 3:41:00–43:07.

necessary to further Florida's legitimate governmental interests. Pls.' Br. 37–41. But under intermediate scrutiny, Florida need not demonstrate that the Act is the least speech-restrictive means of advancing its interests. *Turner*, 512 U.S. at 662. Content-neutral regulations are not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." *Turner II*, 520 U.S. at 217 (internal quotation marks omitted). Instead, this requirement is satisfied so long as the law "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Turner*, 512 U.S. at 662 (internal quotation marks omitted). The Supreme Court has explained that content-neutral laws "do not pose the same inherent dangers to free expression that content-based regulations do, and thus are subject to a less rigorous analysis, which affords the [g]overnment latitude in designing a regulatory solution." *Turner II*, 520 U.S. at 213 (internal quotation marks omitted). The Act satisfies this requirement.

As an initial matter, Plaintiffs and their declarants greatly exaggerate the effects of SB 7072. The Act does not prohibit content moderation by social media platforms; it merely requires them to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." SB 7072 § 4(2)(b). Moreover, under the Act social media platforms can still take appropriate measures if candidates violate the platforms' content guidelines; the platforms simply cannot apply post-prioritization or shadow banning algorithms to content

posted by or about candidates, *id.* § 4(2)(h), or delete or ban a candidate for a period exceeding 14 days, *id.* § 4(1)(c); *id.* § 2(2). If the Court concludes these questions turn on the interpretation of the Act, it should either read the Act to avoid any alleged constitutional problems or abstain until the Florida courts have had an opportunity to enforce it. *See Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).

Contrary to Plaintiffs' contentions, the Act does not burden substantially more speech than is necessary to further Florida's governmental interests. For example, without the provision prohibiting social media platforms from censoring, deplatforming, or shadow banning journalistic enterprises based on the content of their publications or broadcasts (with an exception for obscene material), SB 7072 § 4(2)(j), the platforms could endlessly cast these entities' content as against the platforms' guidelines. The requirement that social media platforms provide detailed explanations for why they censored specific content, *id.* § 4(3), is equally necessary; without the provision, social media platforms could provide cursory notifications that provide little guidance on the infringing nature of the censored content to obscure the fact that they are applying their guidelines inconsistently and unfairly. And the provision requiring platforms to apply their guidelines consistently, *id.* § 4(2)(b), is clearly not more burdensome than is necessary—to ensure that social

media platforms do not treat Floridians inconsistently and unfairly, it is logical to require them to treat Floridians consistently with other users.[7]

### E. The Challenged Provisions of the Act Are Not Unconstitutionally Vague.

"[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To pass muster, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent "arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who apply them." *Id.*; *accord Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017). Although greater clarity is necessary when a statute regulates expression, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989); *see also Grayned*, 408 U.S. at 110 ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Furthermore, "the mere fact that close cases can be envisioned" does not "render[] a statute vague." *United States v. Williams*, 553 U.S. 285, 305 (2008).

---

[7] The Act's exception for entities that operate theme parks only applies to a handful of entities, none of which operates a social media platform of significant size. *See* S.B. 7072 § 4(1)(g); App.165–66. The narrow exception survives intermediate scrutiny, and in any event should be severed from the rest of the Act if the Court deems it unconstitutional. *See* S.B. 7072 § 6.

Plaintiffs attack as void for vagueness the requirement that covered social media platforms "apply censorship, deplatforming, and shadow banning standards in a consistent manner," SB 7072 § 4(2)(b), but Plaintiffs' litany of edge cases regarding the line between allowed and disallowed forms of user speech are precisely the kind of "close cases" that the Supreme Court has said courts should not rely on. *See Williams*, 553 U.S. at 306; *Hill v. Colorado*, 530 U.S. 703, 733 (2000). More fundamentally, Plaintiffs misread the consistency provision's substantive requirements. Section 501.2041(2)(b) must be read in conjunction with the immediately preceding provision, Section 501.2041(2)(a), which provides that a covered social media platform "must publish the standards, including detailed definitions, *it uses or has used* for determining how to censor, deplatform, and shadow ban" (emphasis added). Plaintiffs argue that the Act is vague because it "sheds no light on any of the endless real-world choices that service providers confront every day." Pls.' Br. 43. But the Act does not purport to offer such substantive guidance. Rather, the consistency provision requires only that social media platforms adhere to their *own* announced content moderation standards. They are free to make any "educational, scientific, or artistic evaluations," *id.* at 42, they choose so long as they do so "in a consistent manner," SB 7072 § 4(2)(b).

Plaintiffs object that the phrase "consistent manner" is not defined by the Act. But lack of a statutory definition is not fatal; courts must give undefined terms their

ordinary meaning. *See Jones v. United States*, 529 U.S. 848, 855 (2000). Here, "consistent" and "consistent manner" have ordinary meanings that courts may use to reasonably construe the statute. *Cf. CIR v. Fink*, 483 U.S. 89, 104 (1987) (Scalia, J., concurring in the judgment) (discussing benefits of interpreting statutes "in a consistent manner"). The Oxford English Dictionary defines "consistent" as "[a]greeing or according in substance or form; congruous, compatible" and "self-consistent" as "having its parts or elements in agreement." *Consistent*, OXFORD ENGLISH DICTIONARY ONLINE (June 2021); *see also In re Lewis*, 401 B.R. 431, 446 (Bankr. C.D. Cal. 2009). From these definitions and ordinary usage, the Court can derive the guiding principle that the Act requires faithful adherence to the social media platform's own stated moderation rules—a mandate that can be readily understood and applied. This mandate is anything but vague.

Plaintiffs also challenge the Act's requirement that users of covered platforms be given an option to opt-out of "post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." SB 7072 § 4(2)(f)(2). Plaintiffs argue that the opt-out requirement is vague because the Act does not clarify whether the option to opt-out applies to "content-creators" or to "viewers." But that is at most an argument that the provision is *ambiguous* rather than *vague*. *See Med. Transp. Mgmt. Corp. v. Comm'r*, 506 F.3d 1364, 1368 (11th Cir. 2007). And regardless, statutory context resolves the ambiguity—the provision

requires allowing *viewers* of content to opt-out of post-prioritization algorithms. The statutory definition of "post-prioritization" references the arrangement of content "in a newsfeed, a feed, a view, or in search results," words which speak to the acts of accessing and viewing content, rather than producing or posting it. SB 7072 § 4(1)(e).

The Act's supposed vagueness as it relates to the requirements of the post-prioritization opt-out is similarly resolved when we "do not look at one word or term in isolation, but instead [] look to the entire statutory context." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). The list of verbs constituting a "post-prioritization" action is: "place, *feature*, or *prioritize*." SB 7072 § 4(1)(e) (emphases added). The verbs "feature" and "prioritize" serve to cabin the definition of the broader word "place." *See United States v. Caniff*, 955 F.3d 1183, 1190 (11th Cir. 2020) (applying *noscitur a sociis* canon). To "feature" or to "prioritize" content requires such content to be "ahead of, below, or in a more or less prominent position than other[]" content, SB 7072, § 4(1)(e), for a *special reason* that differs from the otherwise default presentation. Taken together, then, the statutory provision requires covered platforms to allow users to elect to view platform content strictly in chronological order of posting, without overlaying any other special arrangement scheme—a clear standard of conduct.

Finally, the Court should not credit Plaintiffs' speculative warning that in response to the Act's supposed vagueness "services will simply give up on—or at least greatly curtail—their editorial and curatorial efforts." Pls.' Br. 45. One of the challenged provisions merely asks platforms to comply in good faith with *their own* standards for content moderation. And indeed, at least two platforms likely covered by the Act *already* purport to comply with the other supposedly vague provision by offering a de-prioritized, chronological ordering of their services. *See* App.1534; App.565.

## III. The Remaining Preliminary Injunction Factors Are Not Satisfied.

Plaintiffs' failure to show a substantial likelihood of success on the merits alone suffices to deny their motion for a preliminary injunction. *Bloedorn v. Grube*, 631 F.3d 1218, 1242 (11th Cir. 2011). The remaining factors—irreparable injury, balance of the equities, and the public interest—compel the same outcome.

First, Plaintiffs have not established irreparable injury. Plaintiffs' members are not threatened with a denial of their First Amendment rights. *See supra* Section II. Plaintiffs remaining claims to irreparable harm are not "actual and imminent," but "remote [and] speculative." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Plaintiffs' motion and supporting affidavits marshal an impressive parade of horribles—terrorism, child abuse, senior fraud, sex trafficking, and more—which they claim are likely consequences of enforcement of the Act. *See* Pls.' Br. 50, 52–

53. This is simply not so. The Act does not categorically outlaw content moderation, contrary to the declarants' repeated assertions. It outlaws only *inconsistent* content moderation.

The remaining factors—balance of the equities and the public interest—also favor the State. It is *the State* that will suffer irreparable injury if enforcement of the Act is enjoined. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The Act also serves multiple important governmental interests, as described in the Act's first section and documented above. *See supra* Section II.D.1. In fact, many of the Act's requirements closely resemble principles of digital due process long championed by internet and free speech academics and activists. *See* Br. of *Amici Curiae* Electronic Frontier Foundation and Protect Democracy Project, Inc. in Support of Pls.' Mot. for Prelim. Inj., Doc. 91 at 28–29 (June 17, 2021). Ultimately, the State's purported infringement on platforms' rights is exceedingly small when compared to the Act's facilitation of the free expression of political candidates, journalists, and ordinary Floridians.

Moreover, the facial pre-enforcement posture of this case is an important equitable factor counseling against imposition of a preliminary injunction. As we have explained, some of the legal issues in this case turn on the facts, including the nature of the policies of Plaintiffs' members, as well as their size and market power.

These issues would be best fleshed out in the context of a concrete case, rather than in the abstract.

Finally, to the extent the Court concludes that any of the Act's provisions are preempted or unconstitutional, it should only enjoin enforcement of those provisions that it deems inconsistent with federal law. The Act includes a severability clause that this Court must honor. S.B. 7072 § 6; *see Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2349 (2020). Apart from their meritless claim that the entire Act was passed for an impermissible purpose, Plaintiffs' motion does not even offer a substantive argument that some of its most significant provisions are preempted or unconstitutional—perhaps most notably Section 3 of the Act, which concerns state contracting with entities that appear on an antitrust violator vendor list. The Court should only enjoin enforcement of those provisions of the Act that it deems inconsistent with federal law and, even then, only apply the injunction to Plaintiffs and their members.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: June 21, 2021                     Respectfully submitted,

/s/Blaine H. Winship                     /s/Charles J. Cooper
Blaine H. Winship                        Charles J. Cooper (248070DC)
Florida Bar No. 356913                   David H. Thompson (450503DC)
Chief Assistant Attorney General         Brian W. Barnes*

Complex Litigation Bureau

Daniel W. Bell
Florida Bar No. 1008587
Chief Deputy Solicitor General

Office of the Attorney General of
Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Blaine.winship@myfloridalegal.com
Daniel.bell@myfloridalegal.com

*Attorneys for Defendants Ashley
Moody, in her official capacity as
Attorney General of Florida; Joni
Alexis Poitier, in her official capacity
as Commissioner of the Florida
Elections Commission; Jason Todd
Allen, in his official capacity as
Commissioner of the Florida Elections
Commission; John Martin Hayes, in
his official capacity as Commissioner
of the Florida Elections Commission;
and Kymberlee Curry Smith, in her
official capacity as Commissioner of
the Florida Elections Commission*

Joseph O. Masterman (Florida Bar
No. 1004179)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
   *Admitted *pro hac vice*

James W. Uthmeier
Florida Bar No. 113156
General Counsel
Raymond F. Treadwell
Florida Bar No. 93834
Chief Deputy General Counsel
EXECUTIVE OFFICE OF GOVERNOR RON
DESANTIS
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
James.Uthmeier@eog.myflorida.com
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant Patrick
Gillespie, in his official capacity as
Deputy Secretary of Business
Operations of the Florida Department
of Management Services*

## LOCAL RULE 7.1(F) CERTIFICATION

Undersigned counsel certifies that this Response in Opposition to Plaintiffs'

Motion for Preliminary Injunction contains 12,484 words, complying with LR 7.1(F)

and this Court's Order, Doc. 7 (June 3, 2021).

/s/Charles J. Cooper
Charles J. Cooper

*Attorney for Defendant Patrick*
*Gillespie, in his official capacity as*
*Deputy Secretary of Business*
*Operations of the Florida Department*
*of Management Services*