**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

NETCHOICE, LLC et al.,

        Plaintiffs,

v.                                        CASE NO. 4:21-cv-00220-RH-MAF

ASHLEY BROOKE MOODY et al.,

        Defendants.

_____

**<u>DEFENDANTS' APPENDIX
VOLUME 1</u>**

# TABLE OF CONTENTS

## LEGISLATIVE MATERIALS

House of Representatives Staff, *HB 7013 Final Bill Analysis* (May 20, 2021).....................App. 1

Professional Staff of the Committee on Appropriations, *SB 7072 Bill Analysis and Fiscal Impact Statement* (Apr. 16, 2021)..........................................................................................App. 18

SB 7072: Social Media Platforms Bill History, FLA. SENATE (last visited June 21, 2021), https://www.flsenate.gov/Session/Bill/2021/7072...................................................App. 42

Fla. House of Representatives SB 7072 Third Reading Vote (Apr. 28, 2021)....................App. 47

Fla. House of Representatives SB 7072 Passage Vote (Apr. 29, 2021) ..............................App. 48

Fla. Senate SB 7072 Third Reading Vote (Apr. 26, 2021).................................................App. 49

Fla. Senate SB 7072 Returning Messages Vote (Apr. 29, 2021).........................................App. 50

Senate Bill No. 7072, Fla. Laws Ch. 2021-32 (May 24, 2021) ...........................................App. 51

## OTHER MATERIALS

Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, PEW RSCH. CTR. (Apr. 7, 2021), https://pewrsr.ch/3gL9HQf .................................................................................App. 64

STAFF OF SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY, 116TH CONG., INVESTIGATION OF COMPETITION IN DIGITAL MARKETS (2020), *available at* https://bit.ly/3xtL6WS...............................App. 74

*Terms of Service*, FACEBOOK (Oct. 22, 2020), https://bit.ly/3gPVAJk..............................App. 524

Elisa Shearer & Amy Mitchell, *News Use Across Social Media Platforms in 2020*, PEW RSCH. CTR. (Jan. 12, 2021), https://pewrsr.ch/3cWi1eP ..................................................App. 534

*Terms of Use*, ETSY (Jan. 19, 2021), https://etsy.me/3iWwI5E.........................................App. 539

*Terms of Service*, TWITTER (June 18, 2020), https://bit.ly/3xBaREU ...............................App. 547

*About Your Twitter Timeline*, TWITTER HELP CTR. (last visited June 19, 2021), https://bit.ly/3xE8wJr ........................................................................................App. 565

Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 HARV. L. REV. 1598 (2018) ...........................................................................App. 569

Edward Lee, *Moderating Content Moderation: A Framework for Nonpartisanship in Online Governance*, 70 AM. U. L. REV. 913 (2021) ...........................................................App. 642

Tom Parker, *Facebook Soft-Censors The Babylon Bee, Starts Forcing Users to Confirm That They Actually Want to Share Posts*, RECLAIM THE NET (May 27, 2020), https://bit.ly/3wFEZ1G ........................................................................................App. 789

i

Kyle Mann, Opinion, *Facebook Has No Sense of Humor*, WALL ST. J. (Oct. 21, 2020),
    https://on.wsj.com/35FLPbL.................................................................App. 792

Shannon Bond, *Facebook and Twitter Limit Sharing 'New York Post' Story About Joe Biden*,
    NPR (Oct. 14, 2020), https://n.pr/3gOG00P.........................................................App. 795

Post Editorial Board, Editorial, *Social Media Again Silences The Post for Reporting the News*,
    N.Y. POST (Apr. 16, 2021), https://bit.ly/3xyfKi2.................................................App. 801

The Editorial Board, Opinion, *Facebook's Lab-Leak About Face*, WALL ST. J. (May 27, 2021),
    https://on.wsj.com/3j0FkIa ..............................................................................App. 804

Rachel Bovard, Opinion, *Facebook's Oversight Board Ban of Donald Trump Is Totally Arbitrary
    and Ideological*, USA TODAY (May 5, 2021), https://bit.ly/3cT1MPS .................App. 807

Baynard Woods, *Facebook Deactivated Korryn Gaines' Account During Standoff, Police Say*,
    GUARDIAN BALT. (Aug. 3, 2016), https://bit.ly/3iUuKT3 .....................................App. 810

Nancy Flanders, *Mark Zuckerberg Admits Facebook Chose to Ban Foreign Pro-Life Ads in
    Ireland Before Abortion Vote*, LIVEACTION (July 3, 2019),
    https://bit.ly/2UlNf8U ...................................................................................App. 815

George Upper, *Confirmed: Facebook's Recent Algorithm Change Is Crushing Conservative
    Sites, Boosting Liberals*, WESTERN J. (Mar. 13, 2018), https://bit.ly/3cSm7ow.....App. 820

Susan Michelle-Hanson, *Facebook Holds Live Action Videos, Allows Planned Parenthood to
    Promote Sex to Kids*, LIVEACTION (June 13, 2018), https://bit.ly/3cXGQXM.......App. 828

Michael Van Der Galien, *Facebook Blocks Bridget Phetasy's Podcast with Glenn Beck: 'Against
    Community Standards'*, PJ MEDIA (Sept. 4, 2019), https://bit.ly/3zHNJGm .........App. 835

Calvin Freiburger, *Facebook Blocks Pregnancy Site Articles on Fetal Development, Abortion
    Pill Reversal*, LIFESITE (Mar. 12, 2019), https://bit.ly/3iVhspG ...........................App. 838

Natasha Lennard, *Facebook's Ban on Far-Left Pages Is an Extension of Trump Propaganda*,
    THE INTERCEPT (Aug. 20, 2020), https://bit.ly/3ddJwkv .......................................App. 841

Chris Pandolfo, *Clay Travis to Congress: Facebook Censorship Removed 68% of Outkick's
    Audience*, THE BLAZE (Mar. 12, 2021), https://bit.ly/3iUV3IQ ............................App. 846

Jeff Horwitz, *Facebook Has Made Lots of New Rules This Year. It Doesn't Always Enforce
    Them.*, WALL ST. J. (Oct. 15, 2020), https://on.wsj.com/3zHI8zS ........................App. 850

Andre Damon, *Facebook Restores Service to Socialist Pages, Claiming the Purge Was an
    "Automation Error"*, WORLD SOCIALIST WEB SITE
    (Jan. 26, 2021), https://bit.ly/3xB7y0s...................................................................App. 856

Jon Miltimore, *Facebook Locks Out Ron Paul Following Column Criticizing Big Tech
    Censorship, Cites 'Error'*, FEE (Jan. 11, 2021), https://bit.ly/2SQfyf7.................App. 858

Akin Olla, Opinion, *Facebook Is Banning Leftwing Users Like Me – And It's Going Largely Unnoticed*, THE GUARDIAN (Jan. 29, 2021), https://bit.ly/3iRl5Ne .......................App. 864

Brian Freeman, *Facebook Censors BLM Criticism After Company Co-founder Donated Millions to Activist Group*, NEWSMAX (Apr. 19, 2021), https://bit.ly/3iTh9eJ .....................App. 868

James Anthony, *Facebook Censors and Punishes The Babylon Bee for Mocking Rioters*, PM. (Apr. 24, 2021), https://bit.ly/2SEzkdJ ..................................................................App. 871

Charles Jackson Paul, *Back at it: Facebook Censors the Babylon Bee*, TEX. HORN (May 4, 2021), https://bit.ly/3gQy0wp ..................................................App. 875

Augusto Zimmermann, *Why Is Facebook Censoring a Conference on Christianity and Religious Freedom*, SPECTATOR (Apr. 9, 2019), https://bit.ly/2Ub1qNQ...............................App. 877

EJ Dickson, *Why Did Facebook Take Down a Fact-Check of an Anti-Abortion Video*, ROLLING STONE (Sept. 13, 2019), https://bit.ly/3cUOT81......................................................App. 881

Jonathan Bucks & Daniel Bates, *Facebook 'Fact-Checkers' Could Be Politically Biased Themselves, Admits the Tech Giant's Vice-President Nick Clegg*, DAILY MAIL (June 13, 2021), https://bit.ly/3xzwJAA..................................................................................App. 884

Michael Ginsberg, *Facebook, Twitter Do Not Censor Video of Maxine Waters Encouraging Protesters 'To Get More Confrontational'*, DAILY CALLER (Apr. 19, 2021), https://bit.ly/3iPmB2p.................................................................................................App. 889

Ariana Tobin, Madeleine Varner & Julia Angwin, *Facebook's Uneven Enforcement of Hate Speech Rules Allows Vile Posts to Stay Up*, PROPUBLICA (Dec. 28, 2017), https://bit.ly/3iPmxzH................................................................................................App. 892

Kari Paul, *Facebook Under Fire as Human Rights Groups Claim 'Censorship' of Pro-Palestine Posts*, THE GUARDIAN (May 26, 2021), https://bit.ly/3xypI2P...............................App. 899

Cristiano Lima, *Facebook No Longer Treating Man-Made Covid as a Crackpot Idea*, POLITICO (May 27, 2021), https://politi.co/3gPKcNE..........................................................App. 903

Sam Biddle, *Facebook's Secret Rules About the Word "Zionist" Impede Criticism of Israel*, THE INTERCEPT (May 14, 2021), https://bit.ly/3xzEWVo..............................................App. 908

Salvador Rodriguez, *Facebook Says Donald Trump to Remain Banned for Two Years, Effective from Jan. 7*, NBC (June 4, 2021), https://cnb.cx/3cXkiGH....................................App. 916

Tony Romm, *Zuckerberg: Standing For Voice and Free Expression*, WASH. POST (Oct. 17, 2019), https://wapo.st/3cV2eNg.........................................................................App. 919

Queenie Wong, *Is Facebook Censoring Conservatives or Is Moderating Just Too Hard?*, CNET (Oct. 29, 2019), https://cnet.co/3cSqDmY..................................................App. 928

Michael Nunez, *Former Facebook Workers: We Routinely Suppressed Conservative News*, GIZMODO AU (May 10, 2016), https://bit.ly/3zDhA2X.....................................App. 939

Rachel Sandler, *Conservatives Blast Facebook For Removing Trump Interview With Daughter-In-Law*, FORBES (Mar. 31, 2021), https://bit.ly/3xEtBDx......................................App. 945

Katie Cox, *Facebook Pulls Trump Campaign Ads for Fake Census Claims*, ARS TECHNICA (Mar. 6, 2020), https://bit.ly/3gLPKc5 ..........................................App. 948

Joseph A. Wulfsohn, *Facebook Censors New York Post Report on BLM Co-Founder's Pricey Property Purchases*, FOX NEWS (Apr. 15, 2021), https://fxn.ws/3xxQrwq ...........App. 952

Bobby Allyn, *Facebook Removes Trump Ads With Symbol Used By Nazis. Campaign Calls It An 'Emoji'*, NPR (June 18, 2020), https://n.pr/2UlRAsI..............................................App. 957

Sydney Bauer, *Facebook Axes Political Ad Saying Trans Athletes Will 'Destroy Girls Sports'*, NBC NEWS (Sept. 18, 2020), https://nbcnews.to/3zEplW9....................................App. 963

Melissa Nann Burke, *Zuckerberg: Nesbitt Ad Rejection Possible 'Mistake'*, DETROIT NEWS (Apr. 11, 2018), https://bit.ly/3zGH13p ...........................................................App. 966

Hope Kirwan, *Facebook Restricts La Crosse County Republican Party Page, Pulls Ads*, WIS. PUB. RADIO, NPR (Oct. 21, 2020), https://bit.ly/3cV2X0W ..................................App. 969

Elizabeth Culliford, *Facebook Removes Video of Trump Interview with Daughter-in-Law Lara, Citing Ban*, REUTERS (Mar. 31, 2021), https://reut.rs/3gGx1i8..............................App. 972

Jack Brewster, *The Extremists, Conspiracy Theorists, And Conservative Stars Banned From Social Media Following The Capitol Takeover*, FORBES (Jan. 12, 2021), https://bit.ly/3iRp9wY ......................................................................................App. 975

*Trump Covid Post Deleted by Facebook and Hidden by Twitter*, BBC NEWS (Oct. 6, 2020), https://bbc.in/3zEXMMz.............................................App. 979

Joseph Cox, *Leaked Documents Show Facebook's 'Threshold' for Deleting Pages and Groups*, VICE (July 18, 2018), https://bit.ly/2SPs7aH.........................................App. 983

Barbara Ortutay & David Klepper, *Facebook Bans Big 'Stop the Steal' Group for Sowing Violence*, ASSOCIATED PRESS (Nov. 5, 2020), https://bit.ly/3zEpEjL ....................App. 987

Thomas Barrabi, *Facebook Ends Ban on Posts Claiming COVID-19 Is Man-Made*, FOX BUS. (May 26, 2021), https://fxn.ws/3gJxjVv..................................................App. 991

Jane Coaston, *The Facebook Free Speech Battle, Explained*, VOX (May 14, 2019), https://bit.ly/3zCV2iF ................................................................................App. 993

Bill Donohue, *Does Facebook Hate Catholics?*, CATHOLIC LEAGUE (Apr. 12, 2018), https://bit.ly/3vCwGm0 .........................................................................App. 1003

Amy Gesenhues, *Facebook Removes 5k Targeting Filters to Keep Advertisers from Discriminating Against Ethnic & Religious Groups*, MARTECH (Aug. 21, 2018), https://bit.ly/2SEDzWH.......................................... App. 1009

The Associated Press, *Facebook Says Blackburn Anti-Abortion Ad Mistakenly Removed*, KSL.COM (Nov. 2, 2018), https://bit.ly/3gDzs6i ...................................................App. 1012

Ryan Moore, *Op-ed: Social Media Giants Discriminate Against Conservative Views*, INDYSTAR. (June 17, 2021), https://bit.ly/3cV2mMK..............................................................App. 1013

Ryan Moore, Opinion, *Don't Let Social Media Corporations Deny Free Speech to Conservatives*, DES MOINES REG. (Sept. 26, 2019), https://bit.ly/3wI5CD7 ........App. 1015

Christie-Lee McNally, Opinion, *Big Tech's Censorship of Conservative Users is Alive and Well*, THE HILL (July 14, 2018), https://bit.ly/3wHFfxm .................................................App. 1017

Joe Concha, *Diamond and Silk Slam Facebook After Company Deems their Rhetoric 'Unsafe to the Community'*, THE HILL (Apr. 9, 2018), https://bit.ly/3gHtLnL ......................App. 1020

Sarah Frier & Kurt Wagner, *Facebook Needs Trump Even More Than Trump Needs Facebook*, BLOOMBERG BUSINESSWEEK (Sept. 17, 2020), https://bloom.bg/2SJMia6 ..........App. 1022

Olivia Solon, *Sensitive to Claims of Bias, Facebook Relaxed Misinformation Rules for Conservative Pages*, NBC NEWS (Aug. 7, 2020), https://nbcnews.to/2TPoP7B..................................................................................App. 1031

Joseph Wulfsohn, *Twitter Apologizes After Briefly Suspending The Babylon Bee's Account*, FOX NEWS (Aug. 17, 2020), https://fxn.ws/3qcxZqU ...................................................App. 1037

Noah Manskar, *Jack Dorsey Says Blocking Post's Hunter Biden Story Was 'Total Mistake'—But Won't Say Who Made It*, N.Y. POST (Mar. 25, 2021), https://bit.ly/3gOrDJE .....App. 1042

Noah Manskar, *Twitter, Facebook Censor Post Over Hunter Biden Exposé*, N.Y. POST (Oct. 14, 2020), https://bit.ly/3wJ7LOS.................................................................................App. 1045

Arthur Herman, *Twitter, Facebook and Amazon Censorship of Conservatives Harms Social Media Giants*, HUDSON INST. (Oct. 21, 2020), https://bit.ly/2U7Sed5.................App. 1048

David Doonan, *Twitter Terminates Account of Howie Hawkins, Green Party Candidate for President*, GREEN PARTY US (Apr. 19, 2020), https://bit.ly/3gJjWom ................App. 1052

Richard Hanania, *It Isn't Your Imagination: Twitter Treats Conservatives More Harshly Than Liberals*, QUILLETTE (Feb. 12, 2019), https://bit.ly/3gMUs9s..............................App. 1055

Sarah Taylor, *Daily Wire president suspended from Twitter – over brussels sprouts*, THE BLAZE (Jan. 3, 2019), https://bit.ly/3xw3fn5...................................................................App. 1063

Sara Ashley O'Brien, *Twitter user suspended for 'calling out bigotry'*, CNN BUS. (Jan. 9, 2017), https://cnn.it/3iRPM4L..................................................App. 1069

*Al-Jazeera Twitter account temporarily 'suspended'*, ARAB NEWS (June 17, 2017), https://bit.ly/3gLDZ5w..........................................App. 1072

Kevin Robillard, *Twitter pulls Blackburn Senate ad deemed 'inflammatory'*, POLITICO (Oct. 9, 2017), https://politi.co/3xEqTxR ........................................................ App. 1078

Megan Keller, *Conservative commentator back on Twitter after controversial suspension*, THE HILL (Nov. 27, 2018), https://bit.ly/3cUPYg5 ...................................... App. 1080

Victor Morton, *David Horowitz Twitter account suspended*, WASH. TIMES (May 7, 2019), https://bit.ly/35FAEzD ......................................... App. 1083

Ben Tobin & Phillip M. Bailey, *McConnell's campaign locked out by Twitter for posting critic's profanity-laced video*, COURIER JOURNAL (Aug. 7, 2019), https://bit.ly/3vOnEmc ............................................................................ App. 1086

Bruce Haring, *'Fox And Friends' Host Pete Hegseth Banned From Twitter For Saudi Manifesto Post*, DEADLINE (Dec. 8, 2019), https://bit.ly/35AQNqh .................................... App. 1088

Andrew Whalen, *What Did Twitter Do to James Woods? The Story Behind the Trend*, NEWSWEEK (Mar. 25, 2020), https://bit.ly/2TSwHF2 ......................................... App. 1091

Kaelan Deese, *Commentator Candace Owens says her Twitter account was suspended following tweet about Whitmer*, THE HILL (May 2, 2020), https://bit.ly/3gHElLD ............. App. 1099

*Twitter temporarily suspends Hungarian government's account*, ASSOCIATED PRESS (Sept. 30, 2020), https://bit.ly/3zGE2YL ............................. App. 1102

Matthew Holroyd, *Twitter suspends Hungarian pro-government media account*, EURONEWS (Feb. 10, 2020), https://bit.ly/3gOkVU6 ............................................ App. 1104

James Crump, *Charlie Kirk: Trump supporter has Twitter account locked for spreading misinformation about mail-in voting*, THE INDEP. (Oct. 19, 2020), https://bit.ly/3zHJACk ............................................................................ App. 1107

Elizabeth Lopatto, *In its latest confusing decision, Twitter reinstates The New York Post*, THE VERGE (Oct. 30, 2020), https://bit.ly/3zHcnXW ................................... App. 1111

Lindsey Ellefson, *Fox News' Dan Bongino Won't Return to Twitter After Suspension: 'F- You'*, YAHOO ENT. (Jan. 7, 2021), https://yhoo.it/2Ukbfcx ........................................... App. 1114

Brian Fung, *Twitter bans President Trump's account*, CNN (Jan. 9, 2021), https://cnn.it/3zCSMbb ...................................................................... App. 1116

Nate Gartrell, *California court rules Twitter can ban users, rejects appeal by writer banned for 'hateful' tweets about transgender women*, MERCURY NEWS (Feb. 16, 2021), https://bayareane.ws/2SNVSsf ...................... App. 1119

Brian Fung, *Twitter permanently bans Project Veritas account*, CNN (Feb. 11, 2021), https://cnn.it/3gPLEzA ...................................... App. 1121

*Covid: Twitter suspends Naomi Wolf after tweeting anti-vaccine misinformation*, BBC NEWS (June 6, 2021), https://bbc.in/3gLFz7s ............................................... App. 1122

*Twitter's purge of the anti-woke satirists*, SPIKED (Aug. 18, 2020),
  https://bit.ly/3zEnAbv ............................................................................App. 1124

Anugrah Kumar, *Bethel Music's Sean Feucht calls out Instagram, Twitter for censoring Bible verses, worship videos*, CHRISTIAN POST
  (June 27, 2020), https://bit.ly/3cXEx7k ...............................................App. 1127

Anna Hopkins, *PragerU accuses Twitter, YouTube of censoring ads and vides, founder calls out 'assault' on free speech*, FOX NEWS (June 26, 2019), https://fxn.ws/3iV1Hig ....App. 1133

Emma Colton, *Jason Whitlock locked out of Twitter account after criticizing Black Lives Matter founder home purchase*,
  WASH. EXAMINER (Apr. 13, 2021), https://washex.am/3cT2gp0 ........................App. 1136

BVN, *Congressional Candidate Aja Smith Charges "Shadow Banning" by Social Media Outlets*,
  BVN (Oct. 19, 2020), https://bit.ly/3xA4pxT ........................................App. 1140

Jason Murdock, *Conservatives Complain About Losing Twitter Followers Amid QAnon Purge*,
  NEWSWEEK (Jan. 12, 2021), https://bit.ly/3xzxgCl................................App. 1148

Eric Paulson, *Blocking Political Ads Favors Liberal Elites*, WALL ST. J. (Nov. 12, 2019),
  https://on.wsj.com/3iQUZde....................................................................App. 1155

Jessica Guynn & Kevin Crowe, *Trump allies and Republican lawmakers lost thousands of followers in Twitter purge after Capitol riots*, USA TODAY (Jan. 15, 2021),
  https://bit.ly/2UeY4tb ...........................................................................App. 1157

Abby Ohlheiser, *Twitter's ban almost doubled attention for Biden story*, MT TECH. REV. (Oct. 16, 2020), https://bit.ly/3zC1qH0 .........................................................App. 1162

Shannon Bond, *Twitter Expands Warning Labels To Slow Spread of Election Misinformation*,
  NPR (Oct. 9, 2020), https://n.pr/3cVg96b ............................................App. 1165

Linda Givetash, *Laura Loomer banned from Twitter after criticizing Ilhan Omar*,
  NBC (Nov. 22, 2018), https://nbcnews.to/3cUmrTD ............................App. 1171

Donie O'Sullivan, *MyPillow CEO Mike Lindell has been banned from Twitter*,
  CNN BUS. (Jan. 26, 2021), https://cnn.it/3gKpZsB ...............................App. 1175

Ben Collins & Brandy Zadrozny, *Twitter Bans Michael Flynn, Sidney Powell in QAnon Account Purge*, NBC (Jan. 8, 2021), https://nbcnews.to/3gGyiWs....................................App. 1177

Kate Sullivan, *Republican running to challenge Rep. Ilhan Omar has Twitter account permanently suspended*, CNN (Nov. 29, 2019), https://cnn.it/3iZnS71...............App. 1171

Patrick Marley, *Taxpayers to give up $200,000 because Republican lawmakers blocked a liberal group on Twitter*, MILWAUKEE J. SENTINEL (Aug. 16, 2019),
  https://bit.ly/3gL7W5N ..........................................................................App. 1184

Ben Shapiro, *Viewpoint Discrimination with Algorithms*,
　　Nat'l Rev. (Mar. 7, 2018), https://bit.ly/3cVPINM ............................................App. 1186

Grace Panetta, *Twitter Reportedly Won't Use an Algorithm to Crack Down on White
　　Supremacists Because Some GOP Politicians Could End Up Getting Barred Too*,
　　Insider (Apr. 25, 2019), https://bit.ly/2Up3IJu......................................................App. 1191

Niam Yaraghi, *Twitter's Ban on Political Advertisements Hurts Our Democracy*,
　　Brookings (Jan. 8, 2020), https://brook.gs/35DosiP............................................App. 1195

Kate Conger & Mike Isaac, *Twitter Permanently Bans Trump, Capping Online Revolt*,
　　N.Y. Times (Jan. 12, 2021), https://nyti.ms/2TRTy3A .........................................App. 1199

Evelyn Douek, *Trump Is Banned. Who Is Next?*,
　　The Atlantic (Jan. 9, 2021), https://bit.ly/35DAlFN .........................................App. 1202

Kirby Wilson & Allison Ross, *YouTube Removes Video of DeSantis Coronavirus Roundtable*,
　　Tampa Bay Times (Apr. 9, 2021), https://bit.ly/3vHkDni...................................App. 1208

News Release, *Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big
　　Tech*, Fla. Governor (May 24, 2021), https://bit.ly/3xvIhEQ ...........................App. 1211

*PragerU Takes Legal Action Against Google and YouTube for Discrimination*,
　　Prager Univ. (last visited June 20, 2021), https://bit.ly/3zGFbj1 .......................App. 1213

Mike Snider, *YouTube to ban videos about gun sales and modification*,
　　USA Today (Mar. 22, 2018), https://bit.ly/3xCX28G...........................................App. 1217

Dan Sanchez, *YouTube's Censorship of Dissenting Doctors Will Backfire*,
　　 FEE (Apr. 30, 2020), https://bit.ly/3xxajzO ........................................................App. 1219

Tobias Hoonhout, *Rep. Banks Demands Answers from Google over Alleged YouTube Censorship
　　of CCP Criticism*, Nat'l Rev. (May 26, 2020), https://bit.ly/3qeo6ZO .............App. 1227

David Harsany, *Israel-Video Crackdown Shows YouTube Does Not 'Carefully' Review Content*,
　　Nat'l Rev. (June 3, 2021), https://bit.ly/3xzGAGy.............................................App. 1230

Emily Jashinsky, *Exclusive: Man Tried To Share His Regrets About Transgender Life. YouTube
　　Censored It*, The Federalist (last visited June 20, 2021),
　　https://bit.ly/3wNHrTW....................................................................................App. 1234

The Editorial Board, Opinion, *YouTube's Political Censorship*,
　　Wall St. J. (Sept. 14, 2020), https://on.wsj.com/3cTOOBt ................................App. 1237

Ashley Gold, *YouTube temporarily suspends, demonetizes OANN*,
　　Axios (Nov. 24, 2020), https://bit.ly/3iWvR4W...................................................App. 1240

Mike Snider, *YouTube ban: Google extends suspension of former President Trump's channel*,
　　USA Today (Jan. 26, 2021), https://bit.ly/3xtKBMu ...........................................App. 1248

Ron Johnson, Opinion, *YouTube Cancels the U.S. Senate*,
WALL ST. J. (Feb. 2, 2021), https://on.wsj.com/3xEUgQB .................................App. 1250

Alan Macleod, *"At First I Thought it Was a Joke": Academic Media Censorship Conference Censored by YouTube*, MPN NEWS (Feb. 1, 2021), https://bit.ly/3cTOX7Z........App. 1253

CNA Staff, *LifeSiteNews' permanent ban by YouTube raises censorship alarms*,
THE B.C. CATHOLIC (Feb. 20, 2021), https://bit.ly/3gDy43A ..............................App. 1260

Kristine Frazao, *YouTube accused of 'censorship' for removing Senate hearing video*,
FOX 11 NEWS (Feb. 4, 2021), https://bit.ly/3gKKkya...........................................App. 1264

Mike Robert Lee, *YouTube Censorship Continues: Video Platform Takes Down Newsmax Trump Interview*, THE DAN BONGINO SHOW (Feb. 22, 2021), https://bit.ly/3xtKH6O....App. 1270

Jake Stofan, *DeSantis fires back after YouTube removes COVID-19 roundtable clip*,
NEWS4JAX (Apr. 13, 2021), https://bit.ly/2TJHEca.............................................App. 1274

Sean Hollister, *YouTube has removed Steven Crowder from its Partner Program indefinitely*,
THE VERGE (Mar. 30, 2021), https://bit.ly/3vHvePl ............................................App. 1278

Brett Molina, *YouTube bans channel of former Trump aide Sebastian Gorka over election claims*, USA TODAY (Apr. 14, 2021), https://bit.ly/2SdCYLb ............................App. 1280

Ann Doss Helms & Steve Harrison, *YouTube Deletes Union School Board Video Over Mask Comments, Then Reverses Itself*, WFAE 90.7
(May 13, 2021), https://bit.ly/3qaGEdj...............................................................App. 1282

Amanda Prestigiacomo, *YouTube Places Ban On Steven Crowder Over Ma'Khia Bryant Video; Crodwer: Look What YouTube Does Allow*,
DAILY WIRE (May 13, 2021), https://bit.ly/3gHsaON.........................................App. 1289

*YouTube bans US Sen. Ron Johnson from posting videos for 7 days*,
WISN ABC (June 11, 2021), https://bit.ly/3qkbYGE ..........................................App. 1294

Valerie Richardson, *'They whacked us': YouTube cancels Christian author Eric Metaxas*, WASH.
TIMES (June 2, 2021), https://bit.ly/3iW9Pir ......................................................App. 1297

William Turton, *Gun vloggers are flipping out at YouTube's crackdown on their videos*,
VICE (Apr. 23, 2018), https://bit.ly/2UfIptH........................................................App. 1301

Ben Tobin, *YouTube censors Rand Paul by removing Trump impeachment question, and he's not happy*, COURIER J. (Feb. 13, 2020), https://bit.ly/2SPtS7N .................................App. 1305

Dartunorro Clark, *YouTube suspends GOP Sen. Ron Johnson's account, says he violated Covid-19 policy*, NBC (June 11, 2021), https://nbcnews.to/3zC1Qx4............................App. 1307

Kenneth Rapoza, *YouTube Takes Action Against Chinese Blogger's Post On Coronavirus Origins*, FORBES (May 8, 2020), https://bit.ly/3zFsxRy .......................................App. 1310

Sam Dorman, *YouTube faces mass backlash after claiming it acted without 'political bias'*, FOX NEWS (June 26, 2019), https://fxn.ws/3xuM1pW ................................................. App. 1321

Pete Baklinski, *Youtube banned this powerful pro-life music video. Then the artist sued.*, LIFESITE (Dec. 18, 2015), https://bit.ly/3xEXwLP ............................................... App. 1326

Jay Peters, *Inexplicably, YouTube says extremely racist Steven Crowder video isn't hate speech*, THE VERGE (Mar. 18, 2021), https://bit.ly/3ddPYIf ........................................... App. 1333

Emily Birnbaum, *YouTube blocks controversial conservative from making money off ads*, THE HILL (June 5, 2019), https://bit.ly/2SMU5Ur ................................................. App. 1336

Rachel E. Greenspan, *YouTube bans far-right channels for hate speech including those of Richard Spencer, David Duke, and Stefan Molyneux*, INSIDER (June 29, 2020), https://bit.ly/3zDSP6E ........................................................................ App. 1339

Jane Coaston, *YouTube, Facebook, and Apple's ban on Alex Jones, explained*, VOX (Aug. 6, 2018), https://bit.ly/3cUVgrX ...................................................... App. 1344

Natalie Frank, *If You Are Going to Ban Someone Have the Courage to Do It in the Light Not the Shadows*, MEDIUM (Nov. 19, 2019), https://bit.ly/3zFVcG0 ............................... App. 1352

Rishika Pardikar, *Social Media Companies Like Instagram Are Censoring Dissent*, JACOBIN (June 1, 2021), https://bit.ly/3zEll85 ................................................... App. 1362

Doree Lewak, *How Social Media Censorship 'silences' conservative thoughts*, N.Y. POST (Oct. 10, 2020), https://bit.ly/3zHUs34 ............................................. App. 1368

Omar Zahzah, *Digital apartheid: Palestinians being silenced on social media*, AL JAZEERA (May 13, 2021), https://bit.ly/3zz7DDH .......................................... App. 1371

Audrey Conklin & Sasha Savitsky, *Users on Instagram, Twitter, TikTok decry censorship of Israel posts*, FOX BUS. (May 14, 2021), https://fxn.ws/2SGAfKG ...................... App. 1380

NMOGHAL, *Julio Gonzalez said Amazon censored his coronavirus book*, BOOK PUBL'G (June 10, 2020), https://bit.ly/3cSpZ92 ......................................... App. 1385

Sarah Perez & Brian Heater, *Apple Suspends Parler from App Store*, TECH CRUNCH (Jan. 9, 2021), https://tcrn.ch/3vJMPpE ................................................................. App. 1388

Cristiano Lima, *Snapchat stokes GOP ire for refusing to promote Trump's account*, POLITICO (June 3, 2020), https://politi.co/3gFETS1 ............................................. App. 1391

New Guard Staff, *TikTok Targets Conservatives: No Transparency, Vague Guidelines*, YOUNG AMERICA'S FOUND. (Feb. 8, 2020), https://bit.ly/3vD8EHr ..................... App. 1397

Sarah Favot, *Dark money Influencers Are Placing Political Ads on TikTok, Mozilla Says*, DOT.LA (June 3, 2021), https://bit.ly/3wMFfMC ................................................. App. 1401

Scaachi Koul, *Conservative Teens On TikTok Are Going Though Some Growing Pains*, BUZZFEED.NEWS (July 1, 2020), https://bit.ly/3gFEWxb......................................App. 1404

Jack Morse, *Discord bans Reddit-linked pro-Trump server tied to attack on the U.S. Capitol*, MASHABLE (last visited June 20, 2021), https://bit.ly/3gFnjh1 ...........................App. 1419

Danny Sullivan, *Google says it's not deliberately filtering "Crooked Hillary" suggested search to favor Clinton*, SEARCH ENGINE LAND (June 4, 2016), https://bit.ly/3zyfRf8 ...App. 1421

Allana Akhtar, *Google isn't blocking searches for the 'lab leak' theory as the coronavirus' origin is being investigated, but it prioritizes 'authoritative' results to avoid leading users to misinformation*, INSIDER (June 10, 2021), https://bit.ly/3xrwyHo....................App. 1430

KUSI Newsroom, *Breitbart Senior Tech Correspondent details Facebook and Google's censorship of conservative news*, KUSI (July 30, 2020), https://bit.ly/35HcG7j.App. 1435

Lucas Matney, *Parler removed from Google Play store as Apple App Store suspension reportedly looms*, TECH CRUNCH (Jan. 8, 2021), https://tcrn.ch/3wLlIvP............App. 1437

John Crudele, *LinkedIn has discriminated against me because of my politics*, N.Y. POST (Jan. 18, 2020), https://bit.ly/3zErn8J .................................................App. 1439

Bradford Betz, *LinkedIn removes training seminar telling people to be 'less white', following Coca-Cola backlash*, FOX NEWS (Feb. 23, 2021), https://fxn.ws/3xymUCF .......App. 1441

Donald Trump Jr., *If Big Tech Can Censor Me, Think What It Can Do To You*, REAL CLEAR POLITICS (Feb. 22, 2019), https://bit.ly/3zEriSt.....................................................App. 1444

Kirsten Grind, *How Google Interferes with its Search Algorithms and Changes Your Results*, WALL ST. J. (Nov. 15, 2019), https://on.wsj.com/31GLTXx................................App. 1446

Kate Conger, *Google C.E.O. Denies Allegations of Political Bias in Search Results*, N.Y. TIMES (Sept. 21, 2018), https://tinyurl.com/y8hwo4rr................................App. 1478

Allum Bokhari, *Election Interference: Google Purges Breitbart From Search Results*, BREITBART (July 28, 2020), https://bit.ly/2Z803zp ...............................................App. 1479

Eric Goldman, *Google Must Answer Lawsuit for Manually Removing Websites from Its Search Index*, FORBES (May 17, 2016), https://bit.ly/3vJPdNs .......................................App. 1487

Kay C. James, *Amazon Doubles Down on Excluding Some Conservatice Nonprofits From Customer Donations*, THE HERITAGE FOUND. (June 17, 2020), https://herit.ag/3h2CjVx........................................................................................App. 1491

Cameron Hilditch, *Amazon's Foolish Collaboration with the Southern Poverty Law Center*, NAT'L REV. (June 24, 2020), https://bit.ly/3xzg2oD ...........................................App. 1494

Avery Hartmans, *Jeff Bezos hinted Amazon might split from the SPLC over designation of extremist groups after pressure from a GOP lawmaker*, INSIDER (July 29, 2020), https://bit.ly/3xBq2xE.................................................App. 1498

Kevin Michael Biscoe, *Amazon Banned, Un-Banned Documentary About Michael Brown's Death Indicts 'American liberalism'*, ZENGER NEWS (Nov. 18, 2020), https://bit.ly/3xxSwse.................................................................................App. 1505

Brian Flood, *Amazon bans 'What Killed Michael Brown?' Documentary, director says*, FOX NEWS (Oct. 14, 2020), https://fxn.ws/3gLJ5Pc......................................................App. 1515

Ryan T. Anderson, Opinion, *When Amazon pulled my book on transgender issues, it tried to shut down debate*, USA TODAY (Mar. 19, 2021), https://bit.ly/3gHuKTQ..................App. 1520

Kim Lyons, *Parler is gone for now as Amazon terminates hosting*, THE VERGE (Jan. 11, 2021), https://bit.ly/3iVDybi ...............................................App. 1524

Jason L. Riley, Opinion, *Why Did Amazon Cancel Justice Thomas?*, WALL ST. J. (Mar. 2, 2021), https://on.wsj.com/3iZob1F ....................................................................App. 1530

Ramya Sethuraman, *More Control and Context in News Feed*, FACEBOOK NEWSROOM (Mar. 31, 2021), https://bit.ly/3cQf1R5 ..............................................................................App. 1534

Erik Wemple, Opinion, *Facebook Admits Mistake in Flagging Satire About CNN Spinning the News With a Washing Machine*, WASH. POST (Mar. 2, 2018), https://wapo.st/3d1SJMp ....................................................................................App. 1539

**HOUSE OF REPRESENTATIVES STAFF FINAL BILL ANALYSIS**

**BILL #:**     HB 7013     PCB COM 21-01    Technology Transparency
**SPONSOR(S):** Commerce Committee, Ingoglia and others
**TIED BILLS:** CS/HB 7015  **IDEN./SIM. BILLS:**   SB 7072

---

**FINAL HOUSE FLOOR ACTION:**  **77 Y's**     **38 N's**     **GOVERNOR'S ACTION:**  Approved

---

### SUMMARY ANALYSIS

HB 7013 passed the House on April 28, 2021, as SB 7072 as amended. The bill was amended in the Senate on April 29, 2021, and was returned to the House. The House concurred in the Senate amendment and passed the bill as amended on April 29, 2021.

Section 230 of the Federal Communications Decency Act (Section 230) provides immunity from liability for information service providers and social media platforms that, in good faith, remove or restrict from their services information deemed "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." While this immunity has fostered the growth of certain parts of the internet, recently, there have been criticisms of the broad federal immunity provision due to actions taken or not taken regarding the censorship of users by internet platforms. Government regulators have also recently investigated and initiated cases against certain platforms for antitrust activities.

The bill provides that a social media platform must:
- Publish standards used for determining how to censor, deplatform, and shadow ban users, and apply such standards in a consistent manner
- Inform each user about any changes to its user rules, terms, and agreements before implementing the changes and not make changes more than once every 30 days
- Notify a user in a specified manner within 7 days of censoring or deplatforming the user
- Allow a user to request the number of other individuals who were shown the user's content or posts, and provide such information upon such request by the user
- Provide users with an option to opt out of post-prioritization and shadow banning algorithms to allow sequential or chronological posts and content
- Ensure that posts by or about candidates for office in Florida are not shadow banned
- Ensure that journalistic enterprises are not censored, deplatformed, or shadow banned

A social media platform that fails to comply with these requirements may be found in violation of the Florida Deceptive and Unfair Trade Practices Act by the Department of Legal Affairs (DLA). Additionally, a user may bring a private cause of action against a social media platform for failing to consistently apply certain standards and for censoring or deplatforming without proper notice.

The bill prohibits social media platforms from deplatforming candidates for political office, and allows the Florida Elections Commission to fine a social media platform $250,000 per day for deplatforming statewide candidates and $25,000 per day for deplatforming all other candidates. If a social media platform knowingly provides free advertisements for a candidate, such ads are treated as an in-kind contribution and the candidate must be notified.

If a social media platform has been convicted of or held civilly liable for state or federal antitrust violations, such platform, or an affiliate thereof, may be placed on the Antitrust Violator Vendor List (list) by the Department of Management Services and is then prohibited from contracting with public entities. In certain circumstances, DLA may temporarily place a social media platform on the list.

The bill has no fiscal impact on DMS. The DLA has indicated that additional resources will be needed to implement the bill. See *Fiscal Analysis & Economic Impact Statement*.

The bill was approved by the Governor on May 24, 2021, ch. 2021-32, L.O.F., and will become effective on July 1, 2021.

---

**This document does not reflect the intent or official position of the bill sponsor or House of Representatives.**
**STORAGE NAME**: h7013z.DOCX
**DATE:** 5/20/2021

App. 1

# I. SUBSTANTIVE INFORMATION

A.  EFFECT OF CHANGES:

## Social Media Platforms - Current Situation

### Section 230

The federal Communications Decency Act (CDA) was passed in 1996 "to protect children from sexually explicit Internet content."[1] 47 U.S. Code § 230 (Section 230) was later added to the CDA to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."[2]

Section 230 states that "[i]t is the policy of the United States—(1) to promote the continued development of the Internet and other interactive computer services and other interactive media; [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[3] To accomplish these goals, Section 230 states that no provider or user of an interactive computer service may be held liable on account of any action:[4]

- Voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
- Taken to enable or make available to information content providers or others the technical means to restrict access to material from any person or entity that is responsible for the creation or development of information provided through any interactive computer service.

Section 230 also "assuaged Congressional concern regarding the outcome of two inconsistent judicial decisions,[5] both of which "appl[ied] traditional defamation law to internet providers."[6] The first court held that an interactive computer service provider could not be liable for a third party's defamatory statement, but the second court imposed liability where a service provider filtered content in an effort to block obscene material.[7] To resolve the inconsistency, Section 230 specifies that "[n]o provider ... of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[8] In light of Congress's objectives, the judicial circuits are in general agreement that this provision should be construed broadly in favor of immunity.[9]

Additionally, Section 230 specifically addresses how the federal law affects other laws, prohibiting all inconsistent causes of action and liability imposed under any State or local law.[10] However, Section 230 does not affect federal criminal law, intellectual property law, the Electronic Communications Privacy Act of 1986, or sex trafficking laws.

---

[1] *Force v. Facebook, Inc.*, 934 F.3d 53, 63 (2d Cir. 2019) (citing *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (citing 141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) (statement of Sen. Exon)).

[2] *Force*, 934 F.3d at 63 (quoting *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

[3] 47 U.S.C. § 230(b)(1)–(2).

[4] 47 U.S.C. § 230(c).

[5] *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991) and *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

[6] *Force*, 934 F.3d at 63 (quoting *LeadClick*, 838 F.3d at 173).

[7] *Force*, 934 F.3d at 63 (quoting *LeadClick*, 838 F.3d at 173 (citing 141 Cong. Rec. H8469-70 (daily ed. Aug. 4, 1995) (statement of Rep. Cox)).

[8] 47 U.S.C. § 230(c)(1).

[9] *Force*, 934 F.3d at 63 (quoting *LeadClick*, 838 F.3d at 173).

[10] 47 U.S.C. § 230(e).

While Section 230 immunity has fostered the free flow of ideas on the Internet, critics have argued that Section 230 shields publishers from liability for allowing harmful content.[11] Recently, there have also been criticisms of the broad immunity provisions or liability shields which allow individuals unhappy with third-party content to sue the user who posted it but not the platform hosting it. Both sides of the political aisle have claimed that internet platforms engage in political censorship and unduly restrict viewpoints.[12]

Congressional and executive proposals to limit immunity for claims relating to platforms purposefully hosting content from those engaging in child exploitation, terrorism, and cyber-stalking have been introduced.[13] Bills have also been filed that would require internet platforms to have clear content moderation policies, submit detailed transparency reports, and remove immunity for platforms that engage in certain advertising practices.[14] Further, legislative proposals have been offered to limit the liability shield for internet providers who restrict speech based on political viewpoints.[15]

### *Internet and Social Media Platforms*

Individuals access computer systems and interact with such systems and other individuals on the Internet in many ways, including through:

- Social media sites, which are websites and applications allowing users to communicate informally with others, find people, and share similar interests;[16]
- Internet platforms, which are servers used by an Internet provider to support Internet access by their customers;[17]
- Internet search engines, which are computer software used to search data (such as text or a database) for specified information;[18] and
- Access software providers, which are providers of software or enabling tools for content processing.[19]

Such platforms earn revenue through various mechanisms, including:

- Data monetization,[20] a mechanism in which data that is gathered and stored on the millions of users that spend time on free content sites can be sold and used to help e-commerce companies tailor their marketing campaigns to a specific set of online consumers.[21]

---

[11] Zoe Bedell and John Major, *What's Next for Section 230? A Roundup of Proposals* Lawfare, (July 29, 2020) https://www.lawfareblog.com/whats-next-section-230-roundup-proposals (last visited Feb. 25, 2021).

[12] For example, on May 28, 2020, an executive order was issued by President Trump suggesting that websites "should properly lose" their "limited liability shield" whenever they "remove or restrict access to content" not in good faith. Bedell, s*upra* note 11; Exec. Order No.13925, 85 Fed. Reg. 34079 (May 28, 2020).

[13] *Id*; United States Department of Justice, Department of Justice's Review of Section 230 of the Communications Decency Act of 1996, https://www.justice.gov/archives/ag/department-justice-s-review-section-230-communications-decency-act-1996 (last visited Feb. 25, 2021); EARN IT Act of 2020, S.3398, 116th Cong. (2020).

[14] Bedell, s*upra* note 11; PACT Act, S.4066, 116th Cong. (2020); BAD ADS Act, S.4337, 116th Cong. (2020).

[15] Bedell, s*upra* note 11; Limiting Section 230 Immunity to Good Samaritans Act, S.3983, 116th Cong. (2020).

[16] DelValle Institute Learning Center*, Social Media Platforms*, https://delvalle.bphc.org/mod/wiki/view.php?pageid=65 (last visited Feb. 24, 2021).

[17] IGI Global, *Internet Platform*, https://www.igi-global.com/dictionary/internet-platform/15441 (last visited Feb. 24, 2021).

[18] Merriam Webster, *Search Engine*, https://www.merriam-webster.com/dictionary/search%20engine (last visited Feb. 24, 2021).

[19] Cornell Law School, Legal Information Institute, *Access Software Provider*, https://www.law.cornell.edu/definitions/uscode.php?width=840&height=800&iframe=true&def_id=47-USC-629364878-1237841280&term_occur=1&term_src=title:47:chapter:5:subchapter:II:part:I:section:230#:~:text=(4)%20Access%20software%20provider%20The,C)%20transmit%2C%20receive%2C%20display (last visited Feb. 24, 2021).

[20] The Alexander von Humboldt Institute for Internet and Society, *How do digital platforms make their money?*, July 29, 2019, https://www.hiig.de/en/how-do-digital-platforms-make-their-money/ (last visited Feb. 27, 2021).

[21] Data gathered may include specific user locations, browsing habits, buying behavior, and unique interests. Investopedia, *How Do Internet Companies Profit with Free Services?*, https://www.investopedia.com/ask/answers/040215/how-do-internet-companies-profit-if-they-give-away-their-services-free.asp#:~:text=Profit%20Through%20Advertising,content%20is%20through%20advertising%20revenue.&text=Each%20of%20these%20users%20represents,and%20services%20via%20the%20Internet. (last visited Feb. 27, 2021).

- Subscription or membership fees, a mechanism in which users pay for a particular or unlimited use of the platform infrastructure.[22]
- Transaction fees, a mechanism in which platforms benefit from every transaction that is enabled between two or more actors.[23]

**The Florida Deceptive and Unfair Trade Practices Act**

The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) is a consumer and business protection measure that prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in trade or commerce.[24] The FDUTPA is based on federal law.[25]

For example, Florida has determined that the following acts or practices are unfair or deceptive:
- Imposing unconscionable prices for the rental or lease of any dwelling unit or self-storage facility during a period of declared state of emergency.[26]
- Failing to abide by storage requirements for personal information and notice requirements for data breaches of such information,[27] and
- Failing to abide by requirements for weight-loss programs.[28]

The state attorney or the Department of Legal Affairs (DLA) may bring FDUTPA actions when it is in the public interest on behalf of consumers or governmental entities.[29] The Office of the State Attorney (SAO) may enforce FDUTPA violations occurring in its jurisdiction. DLA has enforcement authority if the violation is multi-jurisdictional, the state attorney defers in writing, or the state attorney fails to act within 90 days after a written complaint is filed.[30] Consumers may also file suit through private actions.[31]

DLA and the SAO have powers to investigate FDUTPA claims, which include:[32]
- Administering oaths and affirmations;
- Subpoenaing witnesses or matter; and
- Collecting evidence.

DLA and the SAO, as enforcing authorities, may seek the following remedies:
- Declaratory judgments;
- Injunctive relief;
- Actual damages on behalf of consumers and businesses;
- Cease and desist orders; and
- Civil penalties of up to $10,000 per willful violation.[33]

---

[22] HIIG, *supra* note 20.

[23] *Id.* An example is AirBnB charging a fee to users transacting on the site.

[24] Chapter 73-124, L.O.F., and s. 501.202, F.S.

[25] D. Matthew Allen, et. al., *The Federal Character of Florida's Deceptive and Unfair Trade Practices Act*, 65 U. Miami L. Rev. 1083 (Summer 2011).

[26] S. 501.160, F.S.

[27] S. 501.171, F.S.

[28] S. 501.0579, F.S.

[29] S. 501.207(1)(c) and (2), F.S.; *see* s. 501.203(2), F.S. (defining "enforcing authority" and referring to the office of the state attorney if a violation occurs in or affects the judicial circuit under the office's jurisdiction; or the Department of Legal Affairs if the violation occurs in more than one circuit; or if the office of the state attorney defers to the department in writing; or fails to act within a specified period.); *see also* David J. Federbush, *FDUTPA for Civil Antitrust: Additional Conduct, Party, and Geographic Coverage; State Actions for Consumer Restitution*, 76 Florida Bar Journal 52, Dec. 2002 (analyzing the merits of FDUPTA and the potential for deterrence of anticompetitive conduct in Florida), *available at* http://www.floridabar.org/divcom/jn/jnjournal01.nsf/c0d731e03de9828d852574580042ae7a/99aa165b7d8ac8a485256c8300791ec1!OpenDocument&Highlight=0,business,Division* (last visited on Feb, 21, 2021).

[30] S. 501.203(2), F.S.

[31] S. 501.211, F.S.

[32] S. 501.206(1), F.S.

[33] Ss. 501.207(1), 501.208, and 501.2075, F.S. Civil Penalties are deposited into general revenue. Enforcing authorities may also request attorney fees and costs of investigation or litigation. S. 501.2105, F.S.

FDUTPA actions may not be applicable to or brought against certain entities.[34]

### *Freedom of Speech*

The First Amendment of the United States Constitution protects the right to freedom of expression from government interference. The First Amendment applies to the federal government, and, under the Due Process Clause of the Fourteenth Amendment, to state governments.[35]

The most basic component of freedom of expression is the right to freedom of speech, which right may be exercised by words or actions, and applies to online speech.[36] The United States Supreme Court (Supreme Court) requires the government to provide a compelling state interest for the interference with the right of free speech where it attempts to regulate the speech's content.[37]

Businesses have some of the same First Amendment rights as individuals.[38] Generally, a business cannot be compelled to host speech with which it disagrees absent a mandate with a narrowly tailored means of serving a compelling state interest.[39] Businesses also have a right to unrestricted independent expenditures for political communications and elections as a form of corporate speech.[40]

### *Supremacy Clause*

Article VI, Paragraph 2 of the United States Constitution, commonly referred to as the Supremacy Clause, establishes that the federal constitution, and federal law generally, take precedence over state laws and constitutions. The Supremacy Clause also prohibits states from interfering with the federal government's exercise of its constitutional powers, and from assuming any functions that are exclusively entrusted to the federal government. It does not, however, allow the federal government to review or veto state laws before they take effect.[41]

### <u>Social Media Platforms - Effect of the Bill</u>

The bill makes the following Legislative findings:
- Social media platforms represent an extraordinary advance in communication technology for Floridians.
- Users should be afforded control over their personal information related to social media platforms.
- Floridians increasingly rely on social media platforms to express their opinions.
- Social media platforms have transformed into the new public town square.
- Social media platforms have become as important for conveying public opinion as public utilities are for supporting modern society.
- Social media platforms hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers.
- Social media platforms that unfairly censor, shadow ban, deplatform, or apply post-prioritization algorithms to Florida candidates, Florida users, or Florida residents are not acting in good faith.

---

[34] S. 501.212(4), F.S.

[35] Cornell Law School, Legal Information Institute, *First Amendment*, https://www.law.cornell.edu/wex/first_amendment (last visited Feb. 23, 2021); *Santa Clara v. Southern Pacific Railroad Co.*, 118 U.S. 394 (1886).

[36] *Reno v. ACLU*, 521 U.S. 844 (1997); Jason Kelley, *Section 230 is Good, Actually*, Electronic Frontier Foundation (de. 3, 2020) https://www.eff.org/deeplinks/2020/12/section-230-good-actually (last visited Feb. 25, 2021).

[37] Cornell Law School, *supra* note 34.

[38] *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010).

[39] *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530 (1980); *First National Bank of Boston v. Belliotti*, 438 U.S. (1978); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974); *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986).

[40] *Citizens United, supra* note 38.

[41] Cornell Law School, Legal Information Institute, *Supremacy Clause*, https://www.law.cornell.edu/wex/supremacy_clause (last visited Feb. 23, 2021).

**App. 5**

- Social media platforms should not take any action in bad faith to restrict access or availability to Floridians.
- Social media platforms have unfairly censored, shadow banned, deplatformed, and applied post-prioritization algorithms to Floridians.
- The state has a substantial interest in protecting its residents from inconsistent and unfair actions by social media platforms.
- The state must vigorously enforce state law to protect Floridians.

The bill defines:
- "Social media platform" as any information service, system, Internet search engine, or access software provider that:
    o Provides or enables computer access by multiple users to a computer server, including an Internet platform and/or a social media site;
    o Operates as a sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity;
    o Does business in the state; and
    o Satisfies at least one of the following thresholds:
        ▪ Annual gross revenues in excess of $100 million, as adjusted in January of each odd-numbered year to reflect any increase in the Consumer Price Index.
        ▪ At least 100 million monthly individual platform participants globally.
    o The term does not include any information service, system, Internet search engine, or access software provider operated by a company that owns and operates a theme park or entertainment complex as defined in s. 509.013, F.S.[42]
- "User" as a person who resides or is domiciled in the state and who has an account on a social media platform, regardless of whether the person posts or has posted content or material to the social media platform.
- "Algorithm" as a mathematical set of rules that specify how a group of data behaves and that will assist in ranking search results and maintaining order or that is used in sorting or ranking content or material based on relevancy or other factors instead of using published time or chronological order of such content or material.
- "Censor" to include any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. This term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform.
- "Deplatform" as the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days.
- "Post-prioritization" as action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, feed, view, or search results. The term does not include post-prioritization of content and material of a third party, including other users, based on payments by that third party, to the social media platform.
- "Shadow ban" as action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other platform users. This term includes acts of shadow banning by a social media platform that are not readily apparent to a user.
- "Journalistic enterprise" as an entity doing business in Florida that:
    o Publishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users;

---

[42] S. 509.013(9), F.S. ("Theme park or entertainment complex" means a complex comprised of at least 25 contiguous acres owned and controlled by the same business entity and which contains permanent exhibitions and a variety of recreational activities and has a minimum of 1 million visitors annually.)

- o Publishes 100 hours of audio or video available online with at least 100 million viewers annually;
- o Operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable television subscribers; or
- o Operates under a broadcast license issued by the Federal Communications Commission.

The bill requires a social media platform to:

- Publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban users, and apply such standards in a consistent manner among users on the platform.
- Inform each user about any changes to its user rules, terms, and agreements before implementing the changes and not make such changes more than once every 30 days.
- Provide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts, and provide that information upon request.
- Categorize algorithms used for post-prioritization and shadow banning and provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning. Users must be able to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content, and this opt-out opportunity must be reoffered annually.
- Allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after being deplatformed.

The bill prohibits a social media platform from:

- Censoring or shadow banning a user's content or material or deplatforming a user from the social media platform in a way that would otherwise violate FDUTPA, or without notifying the user who posted or attempted to post the content or material, which notification must:
  - o Be in writing;
  - o Be delivered via electronic mail or direct electronic notification to the user within 7 days of the censoring action;
  - o Include a thorough rationale explaining the reason that the social media platform censored the user; and
  - o Include a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable.
- Applying or using post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a candidate for office in Florida,[43] beginning on the date of qualification and ending on the date of the election or the date the candidate ceases to be a candidate.
  - o Post-prioritization of certain content or material from or about a candidate for office based on payments to the social media platform by such candidate for office or a third party is not a violation.
  - o Social media platforms must provide users with a method to identify themselves as qualified candidates, and may confirm such qualification by reviewing the website of the Division of Elections of the Department of State or the website of the local supervisor of elections.
- Taking any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast.
  - o Post-prioritization of certain journalistic enterprise content based on payments to the social media platform by such journalistic enterprise is not a violation.
  - o Social media platforms may censor, deplatform, or shadow ban a journalistic enterprise for obscene content or material.

---

[43] S. 106.011 (3)(e)(A candidate is a person who files qualification papers and subscribes to a candidate's oath as required by law.)

The bill also provides that a social media platform is not required to notify a user of a censoring action if the censored content or material is obscene, meaning content or material that:

- The average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest;
- Depicts or describes, in a patently offensive way, sexual conduct as specifically defined herein; and
- Taken as a whole, lacks serious literary, artistic, political, or scientific value.[44]

If a social media platform fails to comply with any of the foregoing requirements, the bill provides that the social media platform commits an unfair or deceptive trade act or practice in violation of FDUTPA. If DLA, by its own inquiry or as a result of a complaint, suspects that such a violation is imminent, occurring, or has occurred, DLA may investigate the suspected violation in accordance with FDUTPA. In an investigation by DLA into alleged violations, DLA's investigative powers include, but are not limited to, the ability to subpoena any algorithm used by a social media platform related to any alleged violation.

Although actions may be brought under FDUTPA, the bill places certain limitations on the application of s. 501.211, F.S., and the bill does not follow FDUTPA's applicability provisions in s. 501.212, F.S., and is, therefore, more broad in application.

A individual user may only bring a private cause of action against a social media platform for failing to:

- Notify such user of an act of censoring or deplatforming, or
- Apply censorship, deplatforming, and shadow banning standards in a consistent manner.

In such an action, the court may award the following remedies to the user:

- Up to $100,000 in statutory damages per proven claim;
- Actual damages;
- If aggravating factors are present, punitive damages;
- Other forms of equitable relief, including injunctive relief; and
- If the user was deplatformed, costs and reasonable attorney fees.

Each failure to comply with the individual requirements in the bill are a separate violation, act, or practice by the social media platform. However, the bill provides that these provisions may only be enforced to the extent they are not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

For purposes of bringing an action in accordance with the bill, a social media platform that censors, shadow bans, deplatforms, or applies post-prioritization algorithms to candidates and users in the state is conclusively presumed to be both engaged in substantial and not isolated activities within the state and operating, conducting, engaging in, or carrying on a business, and doing business in this state, and is therefore subject to the jurisdiction of the courts of the state.

### Antitrust Laws, and State Contracts and Incentives - Current Situation

#### *Antitrust Law*

Healthy competition in economic markets keeps prices low and quality high for consumers. When one entity becomes too strong, it can stifle competition, leading to higher prices and harm to consumers.

Antitrust law exists to protect competition, but not necessarily individual competitors, in economic markets, based on the idea that an unregulated market will lead to the creation of coercive

---

[44] S. 847.011(10), F.S.

monopolies.[45] Federal antitrust law includes the Sherman Antitrust Act, the Clayton Act, and the Federal Trade Commission Act. These laws are enforced in federal district court[46] by the U.S. Department of Justice (DOJ), the Federal Trade Commission (FTC), state Attorneys General, and private plaintiffs. Antitrust case law is well-developed, and it is often difficult to distinguish aggressive, pro-competitive conduct—which is legal—from predatory, anti-competitive conduct.[47]

The Clayton Act[48] prohibits specific business actions, including mergers and acquisitions, which may substantially lessen competition. To determine whether a merger violates the Clayton Act, a court must decide whether the merger is likely to create an appreciable danger of anticompetitive effects. The plaintiff must establish a prima facie case that a transaction is anticompetitive, such as by showing that an acquisition will significantly increase market concentration and lessen competition.[49] The burden then shifts to the defendant to rebut the prima facie case, such as by introducing evidence casting doubt on the plaintiff's prediction of anticompetitive effects.[50] If the defendant rebuts the prima facie case, the plaintiff has the final burden to demonstrate an antitrust violation.[51] If the plaintiff prevails, the customary remedy is for the court to order divestiture and unwind the merger.[52]

The Sherman Antitrust Act[53] prohibits any attempt to restrain trade or form a monopoly. A monopoly has two elements: (1) monopoly power and (2) willful acquisition or maintenance of that power, as opposed to power naturally resulting from a superior product, acumen, or historic accident. Stated differently, a plaintiff must prove the defendant acquired the monopoly power in a "predatory" manner. Penalties for violating the Sherman Act include up to ten years' imprisonment and a fine up to $100 million for a corporation or $1 million for any other person.[54]

The Florida Antitrust Act of 1980[55] is intended to complement federal antitrust law in order to foster effective competition. Implemented by the Office of the Attorney General (OAG), the Act essentially mirrors the federal Sherman Act, and prohibits:[56]
- Every contract, combination, or conspiracy in restraint of trade or commerce;[57] and
- Monopolization or attempted monopolization of any part of trade or commerce.[58]

A Florida antitrust law violation is punishable by up to three years' imprisonment and fines up to $1 million for a corporation and $100,000 for any other person.[59] There is also a private right of action for any person injured by certain antitrust violations.[60]

Florida law does not provide a corollary to the federal Clayton Act, which specifically targets mergers and acquisitions that may lessen competition. However, the Attorney General considers the Florida Antitrust Act of 1980 and FDUTPA broad enough to encompass those types of violations.[61]

---

[45] John J. Miles, *Antitrust Primer*, 20140513 AHLA Seminar Papers 1 (2014) (stating the purpose of antitrust law is to "protect and promote competition as the primary method by which this country allocates scarce resources to maximize the welfare of consumers.").
[46] Steven Fox, *Litigation Under Florida's Deceptive and Unfair Trade Practices Act, the Florida Antitrust Act, or Federal Antitrust Statutes*, The Florida Bar, Business Litigation in Florida (2017) (federal district courts have exclusive jurisdiction over federal antitrust actions).
[47] Animesh Ballabh, *Antitrust Law: An Overview*, 88 J. Pat. & Trademark Off. Soc'y 877 (2006); John J. Miles, Antitrust Primer, 20140513 AHLA Seminar Papers 1 (2014).
[48] 15 U.S.C. s. 18.
[49] *Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993) (discussing how plaintiff's establishment of a prima facie case on statistical evidence is first step in analysis); *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008).
[50] Id.
[51] *Chicago Bridge & Iron*, 534 F.3d at 423.
[52] *St. Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, 778 F.3d 775, 792 (9th Cir. 2015).
[53] 15 U.S.C. ss. 1 et seq.
[54] 15 U.S.C. s. 1.
[55] Ss. 542.15 – 542.36, F.S.
[56] S. 542.16, F.S.
[57] S. 542.18, F.S.
[58] S. 542.19, F.S.
[59] S. 542.21, F.S.
[60] Ss. 542.21 and 542.22, F.S.
[61] Florida Attorney General, *Antitrust*, http://myfloridalegal.com/antitrust (last visited Feb 23, 2021).

*Antitrust Actions Against Internet Platforms*

Critics have argued for years that internet platforms like Google, Apple, Facebook and Amazon improperly built empires over commerce, communications and culture, and then abused their power. Recently, federal and state regulators investigated and brought antitrust cases against these platforms.[62] For example, the FTC and over 40 states, including Florida, have brought an action against Facebook for allegedly buying smaller rivals to maintain market dominance.[63] Also, DOJ and 11 states, including Florida, have brought an action against Google for allegedly manipulating search engine results.[64]

### Procurement of Commodities and Services

Chapter 287, F.S., regulates state agency[65] procurement of personal property and services. Depending on the cost and characteristics of the needed goods or services, agencies may utilize a variety of procurement methods that include:

- Single source contracts, which are used when an agency determines that only one vendor is available to provide a commodity or service at the time of purchase;
- Invitations to bid, which are used when an agency determines that standard services or goods will meet needs, wide competition is available, and the vendor's experience will not greatly influence the agency's results;
- Requests for proposals, which are used when the procurement requirements allow for consideration of various solutions and the agency believes more than two or three vendors exist who can provide the required goods or services; and
- Invitations to negotiate, which are used when negotiations are determined to be necessary to obtain the best value and involve a request for highly complex, customized, mission-critical services.[66]

For contracts for commodities or services in excess of $35,000, agencies must utilize a competitive solicitation process.[67] However, specified contractual services and commodities are not subject to competitive solicitation requirements.[68]

The Department of Management Services (DMS) is statutorily designated as the central executive agency procurement authority and its responsibilities include overseeing agency implementation of the procurement process,[69] creating uniform agency procurement rules,[70] implementing the online procurement program,[71] and establishing state term contracts.[72] The agency procurement process is partly decentralized in that agencies, except in the case of state term contracts, may procure goods and services themselves in accordance with requirements set forth in statute and rule, rather than placing orders through DMS.

---

[62] David McCabe, Cecilia Kang, and Daisuke Wakabayashi, *Google's Legal Peril Grows in Face of Third Antitrust Suit*, New York Times (Dec. 17, 2020), https://www.nytimes.com/2020/12/17/technology/google-antitrust-monopoly.html (last visited Feb. 25, 2021).

[63] *Id; Federal Trade Commission v. Facebook, Inc.*, No. 1:20-cv-03590 (D.C. Cir. 2020).

[64] McCabe, supra note 59; *United States Department of Justice v. Google LLC*, No. 1:20-cv-03010 (D.C. Cir. 2020).

[65] S. 287.012(1), F.S., defines the term "agency" as any of the various state officers, departments, boards, commissions, divisions, bureaus, and councils and any other unit of organization, however designated, of the executive branch of state government. "Agency" does not include the university and college boards of trustees or the state universities and colleges.

[66] *See ss.* 287.012(6) and 287.057(1), F.S.

[67] S. 287.057(1), F.S., requires all projects that exceed the Category Two threshold amount ($35,000) contained in s. 287.017, F.S., to be competitively procured.

[68] *See* s. 287.057(3)(e), F.S.

[69] *See* ss. 287.032 and 287.042, F.S.

[70] *See* ss. 287.032(2) and 287.042(3), (4), and (12), F.S.

[71] *See* s. 287.057(23), F.S.

[72] *See* ss. 287.042(2), 287.056, and 287.1345, F.S.

**App. 10**

Certain persons and their affiliates are prohibited from contracting with public entities for services and goods, with certain exceptions, if they have been identified by DMS as violating certain restrictions and have been placed on one of the following lists:[73]

- Convicted Vendor List,
- Discriminatory Vendor List,
- Scrutinized Companies with Activities in Sudan List,
- Scrutinized Companies with Activities in the Iran Petroleum Energy Sector List, and
- Scrutinized Companies that Boycott Israel List.

### Economic Incentives

The Department of Economic Opportunity (DEO) advances Florida's economy by championing the state's economic development vision and by administering state and federal programs and initiatives to help visitors, citizens, businesses, and communities.[74] Enterprise Florida, Inc. (EFI) is a nonprofit corporation established by the Legislature to serve as the state's main economic development organization.[75] EFI is required to enter into a performance-based contract with DEO.[76]

EFI works with businesses and economic development partners to determine whether projects are eligible for state economic development incentives. A project must be vetted by EFI and EFI must determine that incentives are necessary to secure a deal in order for an incentive package to be developed and sent to DEO for further review. Once the incentive package is finalized, DEO and other appropriate state bodies issue formal approvals.

Florida has a number of incentive programs intended to promote economic development in the state. These programs come in a variety of forms including tax refunds, tax credits, tax exemptions, and cash grants under ch. 288, F.S. Businesses interested in expanding or relocating in Florida learn about the state's economic incentive programs through several channels, including EFI, state and local economic development organizations, and private site selection consultants. Businesses can apply for more than one incentive to support their expansion or relocation projects.[77]

Once a company begins the application process, EFI notifies the division so that it may begin the formal due diligence process to determine the business's statutory eligibility and financial standing. When due diligence and the application are complete, EFI determines what incentives and associated amounts may be available to the applicant and makes an approval or disapproval recommendation to DEO's executive director. If the business is approved, DEO will develop a contract or agreement with the applicant that specifies the total incentive amount, performance conditions that must be met to receive payment, payment schedule, and sanctions for failure to meet performance conditions.[78]

### Antitrust Laws and State Contracts and Incentives - Effect of the Bill

The bill defines:

- "Person" as a natural person or an entity organized under the laws of any state or of the United States who operates as a social media platform, with the legal power to enter into a binding contract and which bids or applies to bid on contracts let by a public entity, or which otherwise transacts or applies to transact business with a public entity. The term includes those officers,

---

[73] Ss. 287.133-135, F.S.
[74] S. 20.60(4)(b)(f), F.S.; Florida Department of Economic Opportunity, *About Us*, https://floridajobs.org/about-us (last visited Feb. 22, 2021).
[75] S. 288.901, F.S. Chapter 92-277, Laws of Fla., created EFI, while ch. 96-320, Laws of Fla, established EFI as a public-private partnership.
[76] S. 20.60(1), F.S., requires DEO to "establish annual performance standards for Enterprise Florida, Inc., CareerSource Florida, Inc., the Florida Tourism Industry Marketing Corporation, and Space Florida and report annually on how these performance measures are being met."
[77] OPPAGA, Report No. 16-09, p. 50-51.
[78] *Id.*

**App. 11**

directors, executives, partners, shareholders, employees, members, and agents who are active in management of an entity.

- "Affiliate" as:
  - A predecessor or successor of a person convicted of or held civilly liable for an antitrust violation; or
  - An entity under the control of any natural person who is active in the management of the entity and who has been convicted of or held civilly liable for an antitrust violation. The term includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in the management of an affiliate. The term also includes a person who knowingly enters into a joint venture with a person who has violated an antitrust law during the preceding 36 months.
- "Antitrust violation" as any failure to comply with state or federal antitrust law as determined in a civil or criminal proceeding brought by the Attorney General, a state attorney, a similar body or agency of another state, the Federal Trade Commission, or the United States Department of Justice.
- "Convicted or held civilly liable" as a criminal finding of responsibility or guilt or conviction, with or without an adjudication of guilt, being held civilly responsible or liable, or having a judgment levied for an antitrust violation, in any federal or state trial court of record relating to charges brought by indictment, information, or complaint on or after July 1, 2021, as a result of a jury verdict, nonjury trial, or entry of a plea of guilty or nolo contendere or other order finding responsibility or liability.
- "Public entity" as the state and any of its departments or agencies.

### Antitrust Violator Vendor List

If a person has been convicted of or held civilly liable for antitrust violations, the bill allows DMS to place such person, or an affiliate of such person, on the Antitrust Violator Vendor List (list). A person or affiliate placed on the list may not:
- Submit a bid, proposal, or reply for any new contract to provide any goods or services to a public entity;
- Submit a bid, proposal, or reply for a new contract with a public entity for the construction or repair of a public building or public work;
- Submit a bid, proposal, or reply on new leases of real property to a public entity;
- Be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a new contract with a public entity; or
- Transact new business with a public entity.

The bill prohibits a public entity from accepting a bid, proposal, or reply from, awarding a new contract to, or transacting new business with any person or affiliate on the list unless that person or affiliate has been removed from the list. This prohibition does not apply to contracts that were awarded or business transactions that began before a person or an affiliate was placed on the list or before July 1, 2021, whichever date occurs later.

DMS must maintain the list with the names and addresses of the people or affiliates who have been disqualified from the public contracting and purchasing process. DMS must electronically publish the initial antitrust violator vendor list on January 1, 2022, and publish an updated version of the list quarterly thereafter. A person or affiliate on the list is disqualified as of the date the final order placing them on the list is entered.

After receiving a notice of a judgment, sentence, or order from any source that a person was convicted or held civilly liable for antitrust violations, DMS must investigate and verify the information. If the information is verified, DMS must immediately notify the person or affiliate in writing of its intent to place the name of that person or affiliate on the list, and of the person's or affiliate's right to a hearing, the procedure that must be followed, and the applicable time requirements. If the person or affiliate does not request a hearing, DMS must enter a final order placing the name of the person or affiliate on the

list. A person or affiliate may not be placed on the list without receiving an individual notice of intent from DMS.

The bill allows a person or affiliate to dispute placement on the list. After receipt of the notice of intent, the person or affiliate may file a petition for a formal hearing under the Administrative Procedures Act to determine whether it is in the public interest for the person or affiliate to be placed on the list. In a formal hearing, DMS must prove that it is in the public interest for the person or affiliate to be placed on the list. Proof that a person was convicted or was held civilly liable for antitrust violations, or that an entity is an affiliate of such a person constitutes a prima facie case that it is in the public interest for the person or affiliate to be put on the list. Status as an affiliate must be proven by clear and convincing evidence. The ownership by one person of shares constituting a controlling interest in another person, or a pooling of equipment or income among persons when not for fair market value under an arm's length agreement, is a prima facie case that one person controls another person.

In determining whether it is in the public interest to place a person or affiliate on the list, the bill requires the administrative law judge to consider:
- Whether the person or affiliate was convicted or held civilly liable for antitrust violation.
- The nature and details of the antitrust violation.
- The degree of culpability of the person or affiliate proposed to be placed on the antitrust violator vendor list.
- Reinstatement or clemency in any jurisdiction in relation to the antitrust violation at issue in the proceeding.
- The needs of public entities for additional competition in the procurement of goods and services in their respective markets.
- The effect of the antitrust violations on Floridians.

Upon establishment of a prima facie case that it is in the public interest for the person or affiliate to whom DMS has given notice to be put on the list, the person or affiliate may prove by a preponderance of the evidence that it would not be in the public interest to put them on the list, based upon evidence addressing the factors above.

### *Temporary List Placement Procedure*

The bill allows any person charged or accused of any state or federal antitrust law in a civil or criminal proceeding brought by the OAG, a state attorney, the Federal Trade Commission, or the United States Department of Justice on or after July 1, 2021, to be placed on the list temporarily by the OAG. The OAG may make a finding of probable cause that a person has likely violated the underlying antitrust laws and temporarily place such person on the list until such proceeding has concluded. However, affiliates may not be placed on the list under this temporary procedure.

If the OAG determines that probable cause exists, the OAG must notify the person in writing of its intent to temporarily place the person on the list, and of the person's right to a hearing, the procedure that must be followed, and the applicable time requirements. If the person does not request a hearing, the OAG must enter a final order temporarily placing the person on the list. A person may not be placed on the list without receiving a notice of intent from the OAG.

After receipt of the notice of intent, the person may file a petition for a formal hearing under the Administrative Procedures Act to determine whether it is in the public interest for the person to be temporarily placed on the list. In determining whether it is in the public interest to temporarily place a person on the list, the administrative law judge must consider the:
- Likelihood the person will be convicted or held civilly liable for the antitrust violation.
- Nature and details of the antitrust violation.
- Degree of culpability of the person proposed to be placed on the list.

**App. 13**

- Needs of public entities for additional competition in the procurement of goods and services in their respective markets.
- Effect of the antitrust violations on Floridians.

The OAG has the burden to prove that it is in the public interest to place the person on the temporary antitrust violator vendor list. Unless the administrative law judge determines that it is in the public interest to temporarily place a person on the antitrust violator vendor list, that person may not be placed on the list.

### Removal from the List

The bills allows a person or affiliate to petition for removal from the list no sooner than 6 months after the date a final order is entered, but if the petition is based upon a reversal of the conviction or liability on appellate review or pardon, the person may petition at any time. The petition must be filed with DMS.

A person or affiliate may be removed from the list under the terms and conditions prescribed by the administrative law judge upon a determination that removal is in the public interest. In determining whether removal would be in the public interest, the administrative law judge must consider any relevant factors. However, upon proof that a person was found not guilty or not civilly liable for the antitrust violation, the antitrust violation case was dismissed, the court entered a finding in the person's favor, the person's conviction or determination of liability has been reversed on appeal, or that the person has been pardoned, the administrative law judge must determine that removal of the person or an affiliate from the list is in the public interest.

If the petition for removal is denied, the person or affiliate may not petition for another hearing on removal for a period of 9 months after the date of denial, unless the petition is based upon a reversal of the conviction on appellate review or a pardon. DMS may petition for removal before the expiration of such period if it determines that removal would be in the public interest.

### Economic Incentives and Exceptions

The bill excludes a person or entity who has been placed on the list from being a qualified applicant for economic incentives,[79] and such person or entity is not qualified to receive such economic incentives. However, placement on the list does not affect any rights or obligations under any contract, franchise, or other binding agreement predating such placement.

This exclusion does not apply to any activities regulated by the Public Service Commission or to the purchase of goods or services made by any public entity from the Department of Corrections, from the nonprofit corporation organized to operate correctional work programs, or from any accredited nonprofit workshop designed to assist blind and other severely handicapped individuals to achieve maximum personal independence. The exclusion also does not apply to any contract with a public entity to provide any goods or services for emergency response efforts related to a state of emergency declaration issued by the Governor.

These limitations may only be enforced to the extent not inconsistent with federal law, and notwithstanding any other provision of state law.

### Candidates for Office and In-kind Contributions – Current Situation

### Violations of Florida Election Law

---

[79] "Economic incentives" means state grants, cash grants, tax exemptions, tax refunds, tax credits, state funds, and other state incentives under chapter 288 or administered by Enterprise Florida, Inc.

The Division of Elections (division) under the Florida Department of State ensures compliance with election laws, provides statewide coordination of election administration, and promotes public participation in the electoral process. The division consists of three bureaus - the Bureau of Election Records, the Bureau of Voter Registration Services, and the Bureau of Voting Systems Certification.[80]

The Florida Elections Commission (commission) has the sole civil jurisdiction to investigate and determine violations of the portion of the Florida Election Code in Chapters 104 and 106, Florida Statutes, but only after receiving either a legally sufficient sworn complaint or information from the division. The commission determines probable cause based on the investigator's report, the recommendation of counsel for the commission, the complaint, and staff recommendations, as well as any written statements submitted by the respondent and any oral statements made at the hearing.[81] If probable cause has been found by the commission, a respondent may agree to a consent order, elect to have a formal administrative hearing conducted by an administrative law judge in the Division of Administrative Hearings, or to elect to have a formal or informal hearing conducted before the commission.[82]

In order to carry out its responsibilities, the commission may subpoena any person in the state, doing business in the state, or who has filed or is required to have filed any application, document, papers, or other information with an office or agency of this state or a political subdivision thereof, and require the production of any papers, books, or other records relevant to any investigation, including the records and accounts of any bank or trust company doing business in this state.[83]

Actions for violation of chapters 104 and 106, Florida Statutes, must be commenced within two years from the violation date.[84] Civil penalties for such violations are generally limited to not more than $1,000 per count or violation.[85] Other penalties may include permanent or temporary injunctions, and restraining orders.[86] Any civil penalty or fine assessed is deposited into the General Revenue Fund.[87]

### *In-kind Contributions to Candidates*

"Candidate" means a person who:[88]
- Seeks to qualify for nomination or election by means of the petitioning process;
- Seeks to qualify for election as a write-in candidate;
- Receives contributions or makes expenditures, or consents for any other person to receive contributions or make expenditures, with a view to bringing about his or her nomination or election to, or retention in, public office;
- Appoints a treasurer and designates a primary depository; or
- Files qualification papers and subscribes to a candidate's oath as required by law.

Generally, "political committee" means a combination of two or more individuals, or a person other than an individual, that, in an aggregate amount in excess of $500 during a single calendar year:
- accepts contributions for the purpose of making contributions to any candidate, political committee, affiliated party committee, or political party;
- accepts contributions for the purpose of expressly advocating the election or defeat of a candidate or the passage or defeat of an issue;

---

[80] Florida Department of State, Division of Elections, *About Us,* https://dos.myflorida.com/elections/about-us/ (last visited Feb. 21, 2021).
[81] S. 106.25(4), F.S.
[82] S. 106.25(5), F.S.
[83] S. 106.26(1), F.S.
[84] S. 106.28, F.S.
[85] S. 106.265(1), F.S.
[86] S. 106.27, F.S.
[87] S. 106.265(4), (5), F.S.
[88] S. 106.011(3), F.S.

- makes expenditures that expressly advocate the election or defeat of a candidate or the passage or defeat of an issue; or
- makes contributions to a common fund, other than a joint checking account between spouses, from which contributions are made to any candidate, political committee, affiliated party committee, or political party.[89]

Candidates and political committees must report all contributions, loans, expenditures, distributions, and transfers, regardless of the amount.[90] They must report the full name and address of each person making the contribution or receiving the expenditure and, for contributions over $100, the occupation.[91]

An in-kind contribution[92] is anything of value except money made for the purpose of influencing the results of an election.[93] The valuation of an in-kind contribution is fair market value, and in-kind contributions are subject to the same contribution limitations as money.[94]

## **Candidates for Office and In-kind Contributions – Effect of the Bill**

The bill provides that a social media platform may not willfully deplatform a candidate for office who is known by the social media platform to be a candidate, beginning on the date of qualification and ending on the date of the election or the date the candidate ceases to be a candidate.[95]

A social media platform must provide each user a method by which the user may be identified as a qualified candidate and which provides sufficient information to allow the social media platform to confirm the user's qualification by reviewing the division's website or the website of the local supervisor of elections.

If the commission finds that a social media platform has willfully deplatformed a candidate, the social media platform may be fined $250,000 per day for deplatforming a statewide candidate and $25,000 per day for deplatforming all other candidates.

The bill also provides that if a social media platform willfully provides free advertisement to a candidate, it must be reported as an in-kind contribution to the candidate. Free advertising does not include posts, content, material, and comments made on the social media platform that are shown in the same or similar way as those from other users.

For the purposes of this section, the bill defines:
- "Candidate" as a person who files qualification papers and subscribes to a candidate's oath as required by law.[96]
- "Deplatform" and "social media platform" as having the same meaning as in the newly created s. 501.2041, F.S., related to unfair and deceptive trade practices by social media platforms.

The bill provides that this provision may only be enforced to the extent not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

The bill has an effective date of July 1, 2021.

---

[89] S. 106.11(16)(a), F.S.
[90] Ss. 106.011(5) and 106.07(1), F.S.
[91] S. 106.07(4)(a), F.S.
[92] Examples of in-kind contributions include food provided for a fundraiser free of charge, donated tickets to an event, and certain kinds of free advertisement. DE 04-06 Fla. Op. Dept. of State, Div. of Elections (2004). https://opinions.dos.state.fl.us/searchable/pdf/2004/de0406.pdf.
[93] Florida Department of State, Division of Elections, *Campaign Finance*, https://dos.myflorida.com/elections/candidates-committees/campaign-finance/ (last visited Feb. 21, 2021).
[94] Ss. 106.011(5) and 106.055, F.S.
[95] The bill creates s. 106.072, F.S., entitled Social media deplatforming of political candidates, within Chapter 106, Campaign Financing, F.S.
[96] S. 106.011 (3)(e), F.S.

**App. 16**

## II.  FISCAL ANALYSIS & ECONOMIC IMPACT STATEMENT

A.  FISCAL IMPACT ON STATE GOVERNMENT:

1.  Revenues:

The bill may increase state revenues related to fines or civil penalties collected for violations included in the bill. The estimated impact is indeterminate.

2.  Expenditures:

DMS has indicated the department will not need additional resources to implement the bill.[97]

DLA has indicated that additional resources will be needed to implement the bill including one paralegal, one attorney, and a total of $177,608 in budget authority from the Legal Affairs Revolving Trust Fund.[98] However, as of March 12, 2021, the DLA/OAG has 202 vacant positions including 128 vacant over 180 days.[99]

B.  FISCAL IMPACT ON LOCAL GOVERNMENTS:

1.  Revenues:

None.

2.  Expenditures:

None.

C.  DIRECT ECONOMIC IMPACT ON PRIVATE SECTOR:

The bill will require social media platforms to implement systems in conformance with the bill that will help protect Florida consumers and businesses using such platforms.

D.  FISCAL COMMENTS:

None.

---

[97] Email from Tami Fillyaw, Chief of Staff, DMS, FW: HB 7013, (Mar. 12, 2021).
[98] Email from Sarah Nortelus, Deputy Director of Administration, OAG, Draft Amount, (Mar. 12, 2021).
[99] Vacancy Report, Mar. 12, 2021, on file with the House Appropriations Committee.

**App. 17**

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

Prepared By: The Professional Staff of the Committee on Appropriations

BILL:        SB 7072

INTRODUCER:  Governmental Oversight and Accountability Committee

SUBJECT:     Social Media Platforms

DATE:        April 16, 2021        REVISED:        4/21/21

| | ANALYST | STAFF DIRECTOR | REFERENCE | | ACTION |
|---|---|---|---|---|---|
| 1. | Ponder | McVaney | | | **GO Submitted as Comm. Bill/Fav** |
| **2.** | Smith | Sadberry | AP | | **Favorable** |

## I.  Summary:

SB 7072 establishes a violation for social media deplatforming of a political candidate or journalistic enterprise and requires a social medial platform to meet certain requirements when they restrict speech by users.

The bill prohibits social media platforms from deplatforming candidates for political office and allows the Florida Elections Commission to fine a social media platform $100,000 per day for deplatforming statewide candidates and $10,000 per day for deplatforming all other candidates, in addition to the remedies provided in chapter 106, Florida Statutes, relating to campaign financing. Additionally, if a social media platform knowingly provides free advertisements for a candidate, such advertisement is deemed an in-kind contribution, and the candidate must be notified.

The bill establishes restrictions for receiving economic benefits or contracting with public entities for certain social media platforms who have violated antitrust laws and who have been placed on the Antitrust Violator Vendor List. The Department of Management Services (DMS) is required to maintain the Antitrust Violator Vendor List (list) of the names and addresses of the people or affiliates who have been disqualified from the public contracting and purchasing process. The bill outlines the process for placing such person or affiliates on the list, and the process for a person or affiliates to appeal the decision to place such person or affiliate on the list. The bill provides for exceptions from the applicability of the antitrust violator provisions.

The bill requires a social media platform to:
- Publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban;
- Apply censorship, deplatforming, and shadow banning standards in a consistent manner among users on the platform;
- Inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days;

- Provide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts, and provide that information upon request;
- Categorize algorithms used for post-prioritization and shadow banning and allow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content (the opt-out opportunity must be reoffered annually);
- Provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning; and
- Allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after being deplatformed.

The bill establishes that a social media platform that fails to comply with these requirements may be found in violation of the Florida Deceptive and Unfair Trade Practices Act by the Department of Legal Affairs (DLA). Additionally, a user may bring a private cause of action against a social media platform for failing to apply consistently certain standards and for censoring or deplatforming without proper notice.

The DMS and DLA may experience increased workloads and associated costs in carrying out the duties and responsibilities placed on the agencies in this bill.

The bill expressly provides that if any provision of the act or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared severable.

The bill takes effect July 1, 2021.

## II. Present Situation:

### Candidates for Office and In-Kind Contributions

#### *Violations of Florida Election Law*

The Division of Elections (division) is created within the Florida Department of State.[1] The division must ensure compliance with election laws, provides statewide coordination of election administration, and promotes public participation in the electoral process.

The Florida Elections Commission (Elections Commission) is created within the Department of Legal Affairs (DLA) of the Office of Attorney General. The Elections Commission is composed of nine members appointed by the Governor.[2] For purposes of the Elections Commission jurisdiction, a "violation" means the willful performance of a prohibited act or the willful failure to perform a required act.[3] Willfulness is a determination of fact; however, at the request of the

---

[1] Section 20.10(2)(a), F.S.
[2] Section 106.24(1)(b), F.S.
[3] Section 106.25(3), F.S.

respondent at any time after probable cause is found, willfulness may be considered and determined in an informal hearing before the Elections Commission.[4]

The Elections Commission determines probable cause based on the investigator's report, the recommendation of counsel for the Elections Commission, the complaint, and staff recommendations, as well as any written statements submitted by the respondent and any oral statements made at the hearing.[5] If probable cause has been found by the Elections Commission, a respondent may agree to a consent order, elect to have a formal administrative hearing conducted by an administrative law judge in the Division of Administrative Hearings, or elect to have a formal or informal hearing conducted before the Elections Commission.[6]

In order to carry out its responsibilities, the Elections Commission may subpoena any person in the state, doing business in the state, or who has filed or is required to have filed any application, document, papers, or other information with an office or agency of this state or a political subdivision thereof, and require the production of any papers, books, or other records relevant to any investigation, including the records and accounts of any bank or trust company doing business in this state.[7]

Civil penalties are generally limited to not more than $1,000 per count or violation.[8] Other penalties include permanent or temporary injunctions, and restraining orders.[9] Any civil penalty or fine assessed is deposited into the General Revenue Fund.[10]

Actions for a violation of ch. 104 or 106, F.S., (the elections code and campaign financing, respectively) must be commenced before two years have elapsed from the date of the violation.[11]

### *In-kind Contributions to Candidates*

Section 106.011(3)(e), F.S., defines the term "candidate" to mean a person to whom any of the following applies:
- A person who seeks to qualify for nomination or election by means of the petitioning process;
- A person who seeks to qualify for election as a write-in candidate;
- A person who receives contributions or makes expenditures, or consents for any other person to receive contributions or make expenditures, with a view to bring about his or her nomination or election to, or retention in, public office;
- A person who appoints a treasurer and designates a primary depository; or
- A person who files qualification papers and subscribes to a candidate's oath as required by law.

---

[4] *Id.* This section further provides that the Elections Commission may not by rule determine what constitutes willfulness or further define the term "willful" for purposes of election law.
[5] Section 106.25(2), F.S.
[6] Section 106.25(5), F.S.
[7] Section 106.26(1), F.S.
[8] Section 106.265, F.S.
[9] Section 106.27, F.S.
[10] Section 106.265(4), (5), F.S.
[11] Section 106.28, F.S.

Generally, a "political committee" means a combination of two or more individuals, or a person other than an individual, that, in an aggregate amount in excess of $500 during a single calendar year:

- Accepts contributions for the purpose of making contributions to any candidate, political committee, affiliated party committee, or political party;
- Accepts contributions for the purpose of expressly advocating the election or defeat of a candidate or the passage or defeat of an issue;
- Makes expenditures that expressly advocate the election or defeat of a candidate or the passage or defeat of an issue; or
- Makes contributions to a common fund, other than a joint checking account between spouses, from which contributions are made to any candidate, political committee, affiliated party committee, or political party.

Candidates and political committees must report all contributions, loans, expenditures, distributions, and transfers, regardless of the amount.[12] They must report the full name and address of each person making the contribution or receiving the expenditure and, for contributions over $100, the occupation.[13]

An in-kind contribution[14] is anything of value except money made for the purpose of influencing the results of an election.[15] The valuation of an in-kind contribution is fair market value, and in-kind contributions are subject to the same contribution limitations as money.[16]

### Freedom of Speech and Internet Platforms

#### Section 230

The federal Communications Decency Act (CDA) was passed in 1996 "to protect children from sexually explicit Internet content."[17] 47 U.S. Code § 230 (Section 230) was added as an amendment to the CDA to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."[18]

Congress stated in Section 230 that "[i]t is the policy of the United States—(1) to promote the continued development of the Internet and other interactive computer services and other interactive media; [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."[19]

---

[12] Sections 106.011(5) and 106.07(1), F.S.

[13] Section 106.07(4)(a), F.S.

[14] Florida Department of State, Division of Elections,  *Advisory Opinion (2004) DE04-06*, available at: https://www.dos.myflorida.com/elections/laws-rules/advisory-opinions/advisory-opinions-by-year/ (last visited April 19, 2021)

[15] Florida Department of State, Division of Elections, *Campaign Finance*, https://dos.myflorida.com/elections/candidates-committees/campaign-finance/ (last visited April 2, 2021)

[16] Sections 106.011(5) and 106.055, F.S.

[17] *Force v. Facebook, Inc.*, 934 F.3d 53, 63 (2d Cir. 2019) (citing *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (citing 141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) (statement of Sen. Exon))).

[18] *Force*, 934 F.3d at 63 (quoting *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)).

[19] 47 U.S.C. § 230(b)(1)–(2).

Specifically, Section 230 states that no provider or user of an interactive computer service may be held liable on account of:[20]

- Any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
- Any action taken to enable or make available to information content providers or others the technical means to restrict access to material from any person or entity that is responsible for the creation or development of information provided through any interactive computer service.

Section 230 "assuaged Congressional concern regarding the outcome of two inconsistent judicial decisions,[21] both of which "appl[ied] traditional defamation law to internet providers."[22] The first decision held that an interactive computer service provider could not be liable for a third party's defamatory statement ... but the second imposed liability where a service provider filtered content in an effort to block obscene material."[23] To provide clarity, Section 230 provides that "[n]o provider ... of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.[24] In light of Congress's objectives, the Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity.[25]

Section 230 specifically addresses how the federal law affects other laws. Section 230 prohibits all inconsistent causes of action and prohibits liability imposed under any State or local law.[26] Section 230 does not affect federal criminal law, intellectual property law, the Electronic Communications Privacy Act of 1986, or sex trafficking law.

Recently, there have been criticisms of the broad immunity provisions or liability shields which force individuals unhappy with third-party content to sue the user who posted it. While this immunity has fostered the free flow of ideas on the Internet, critics have argued that Section 230 shields publishers from liability for allowing harmful content.[27] Congressional and executive proposals to limit immunity for claims relating to platforms purposefully hosting content from those engaging in child exploitation, terrorism, and cyber-stalking have been introduced.[28] Bills have been filed that would require internet platforms to have clear content moderation policies,

---

[20] 47 U.S.C. § 230(c).

[21] *Cubby, Inc. v. CompuServe, Inc*., 776 F. Supp. 135 (S.D.N.Y. 1991) and *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

[22] *Force*, 934 F.3d at 63 (quoting *LeadClick*, 838 F.3d at 173).

[23] *Force*, 934 F.3d at 63 (quoting *LeadClick*, 838 F.3d at 173 (citing 141 Cong. Rec. H8469-70 (daily ed. Aug. 4, 1995) (statement of Rep. Cox))).

[24] 47 U.S.C. § 230(c)(1).

[25] *Force*, 934 F.3d at 63 (quoting *LeadClick*, 838 F.3d at 173).

[26] 47 U.S.C. § 230(e).

[27] Zoe Bedell and John Major, *What's Next for Section 230? A Roundup of Proposals* Lawfare, (July 29, 2020) https://www.lawfareblog.com/whats-next-section-230-roundup-proposals (last visited Feb. 25, 2021).

[28] *Id*; United States Department of Justice, Department of Justice's Review of Section 230 of the Communications Decency Act of 1996, https://www.justice.gov/archives/ag/department-justice-s-review-section-230-communications-decency-act-1996 (last visited Feb. 25, 2021); EARN IT Act of 2020, S.3398, 116th Cong. (2020).

submit detailed transparency reports, and remove immunity for platforms that engage in certain behavioral advertising practices.[29] Proposals have also been offered to limit the liability shield for internet providers who restrict speech based on political viewpoints.[30]

### Internet and Social Media Platforms

There are many ways in which individuals access computer systems and interact with systems and other individuals on the Internet. Examples include:

- Social media sites, which are websites and applications, that allow users to communicate informally with others, find people, and share similar interests;[31]
- Internet platforms, which are servers used by an Internet provider to support Internet access by their customers;[32]
- Internet search engines, which are computer software used to search data (such as text or a database) for specified information;[33] and
- Access software providers, which are providers of software (including client or server software) or enabling tools for content processing.[34]

Such platforms earn revenue through various modes and models. Examples include:

- Data monetization.[35] This uses data that is gathered and stored on the millions of users that spend time on free content sites, including specific user location, browsing habits, buying behavior, and unique interests. This data can be used to help e-commerce companies tailor their marketing campaigns to a specific set of online consumers. Platforms that use this model are typically free for users to use.[36]
- Subscription or membership fees. This model requires users pay for a particular or unlimited use of the platform infrastructure.[37]
- Transaction fees. This model allows platforms to benefit from every transaction that is enabled between two or more actors. An example is AirBnB, where users transacting on the site are charged a fee.[38]

---

[29] Bedell, s*upra* note 27; PACT Act, S.4066, 116th Cong. (2020); BAD ADS Act, S.4337, 116th Cong. (2020).

[30] Bedell, s*upra* note 27; Limiting Section 230 Immunity to Good Samaritans Act, S.3983, 116th Cong. (2020)

[31] DelValle Institute Learning Center, *Social Media Platforms*, https://delvalle.bphc.org/mod/wiki/view.php?pageid=65 (last visited Feb. 24, 2021).

[32] IGI Global, *Internet Platform*, https://www.igi-global.com/dictionary/internet-platform/15441 (last visited Feb. 24, 2021).

[33] Merriam Webster, *Search Engine*, https://www.merriam-webster.com/dictionary/search%20engine (last visited Feb. 24, 2021).

[34]  47 U.S.C. § 230(f)(4) (defining "access software provider to mean a provider of software (including client or server software), or enabling tools that do any one or more of the following: (i) filter, screen, allow, or disallow content; (ii) pick, choose, analyze, or digest content; or (iii) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

[35] The Alexander von Humboldt Institute for Internet and Society, *How do digital platforms make their money?*, July 29, 2019, https://www.hiig.de/en/how-do-digital-platforms-make-their-money/ (last visited Feb. 27, 2021).

[36] Investopedia, *How Do Internet Companies Profit with Free Services?*, https://www.investopedia.com/ask/answers/040215/how-do-internet-companies-profit-if-they-give-away-their-services-free.asp#:~:text=Profit%20Through%20Advertising,content%20is%20through%20advertising%20revenue.&text=Each%20o f%20these%20users%20represents,and%20services%20via%20the%20Internet. (last visited Feb. 27, 2021).

[37] HIIG, *supra* note 35.

[38] *Id.*

### The Florida Deceptive and Unfair Trade Practices Act

The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) exists "to protect the consuming public and legitimate business enterprises from those who engage in (1) unfair methods of competition; or (2) unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."[39] The FDUTPA is modeled after the federal statute that authorizes the Federal Trade Commission.[40]

Florida has determined that the following acts or practices are unfair or deceptive:
- Imposing unconscionable prices for the rental or lease of any dwelling unit or self-storage facility during a period of declared state of emergency;[41]
- Failing to abide by storage requirements for personal information and notice requirements for data breaches of such information;[42] and
- Failing to abide by requirements for weight-loss programs.[43]

The state attorney or the Department of Legal Affairs (DLA) may bring FDUTPA actions when it is in the public interest on behalf of consumers or governmental entities.[44] The Office of the State Attorney (SAO) may enforce FDUTPA violations occurring in its jurisdiction. DLA has enforcement authority if the violation is multi-jurisdictional, the state attorney defers in writing, or the state attorney fails to act within 90 days after a written complaint is filed.[45] Consumers may also file suit through private actions.[46]

DLA and the SAO have powers to investigate FDUTPA claims, which include:[47]
- Administering oaths and affirmations;
- Subpoenaing witnesses or matter; and
- Collecting evidence.

DLA and the State Attorney, as enforcing authorities, may seek the following remedies:
- Declaratory judgments;
- Injunctive relief;
- Actual damages on behalf of consumers and businesses;
- Cease and desist orders; and

---

[39] Section 501.202(2), F.S.
[40] 15 U.S.C. § 45.; *See* D. Matthew Allen, et. al., *The Federal Character of Florida's Deceptive and Unfair Trade Practices Act*, 65 U. MIAMI L. REV. 1083 (Summer 2011).
[41] Section 501.160, F.S.
[42] Section 501.171, F.S.
[43] Section 501.0579, F.S.
[44] Section 501.207(1)(c) and (2), F.S.; *see* s. 501.203(2), F.S. (defining "enforcing authority" and referring to the office of the state attorney if a violation occurs in or affects the judicial circuit under the office's jurisdiction; or the Department of Legal Affairs if the violation occurs in more than one circuit; or if the office of the state attorney defers to the department in writing; or fails to act within a specified period.); *see also* David J. Federbush, *FDUTPA for Civil Antitrust: Additional Conduct, Party, and Geographic Coverage; State Actions for Consumer Restitution*, 76 FLORIDA BAR JOURNAL 52, Dec. 2002 (analyzing the merits of FDUPTA and the potential for deterrence of anticompetitive conduct in Florida), *available at* http://www.floridabar.org/divcom/jn/jnjournal01.nsf/c0d731e03de9828d852574580042ae7a/99aa165b7d8ac8a485256c8300 791ec1!OpenDocument&Highlight=0,business,Division* (last visited on Feb, 21, 2021).
[45] Section 501.203(2), F.S.
[46] Section 501.211, F.S.
[47] Section 501.206(1), F.S.

- Civil penalties of up to $10,000 per willful violation.[48]

### Freedom of Speech

The First Amendment of the United States Constitution protects the right to freedom of expression from government interference. The First Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment.[49] "[T]he First Amendment assures the broadest tolerable exercise of free speech, free press, and free assembly, not merely for religious purposes, but for political, economic, scientific, news, or informational ends as well."[50] "[O]nline speech is equally protected under the First Amendment as there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech."[51]

It is well established that a government regulation based on the content of speech is presumptively invalid and will be upheld only if it is necessary to advance a compelling governmental interest, precisely tailored to serve that interest, and is the least restrictive means available for establishing that interest.[52] The government bears the burden of demonstrating the constitutionality of any such content-based regulation.[53]

The United States Supreme Court has recognized that First Amendment protection extends to corporations.[54] "This protection has been extended by explicit holdings to the context of political speech."[55] Under these precedents, it is well settled that political speech does not lose First Amendment protection "simply because its source is a corporation."[56] Generally, the government may not require a corporation to host another's speech absent a showing of a compelling state interest.[57]

### Supremacy Clause

It is a basic tenet of "Our Federalism"[58] that where federal and state law conflict, state law must yield.[59] This principle is captured in Article VI of the Constitution, known as the Supremacy Clause, which reads: "This Constitution, and the Laws of the United States … shall be the

---

[48] Sections 501.207(1), 501.208, and 501.2075, F.S. Civil Penalties are deposited into general revenue. Enforcing authorities may also request attorney fees and costs of investigation or litigation. S. 501.2105, F.S.

[49] See *De Jonge v. Oregon*, 299 U.S. 353, 364–65(1937)(incorporating right of assembly); *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (incorporating right of freedom of speech).

[50] *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 179, (1943) (Jackson, J., concurring in result).

[51] *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997))

[52] *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665-66 (2004).

[53] *Id.* at 660.

[54] *Citizens United v. Federal Election Commission*, 558 U.S. 310, 342 (2010).

[55] *Id.* (citing *NAACP v. Button v. 371 U.S.415*, 428-429 (1963); *Grosjean v. American Press Co.*, 297 U.S. 233, 244 (1936)).

[56] *Id.* (citing *First Nat. Bank of Boston v. Bellotti*, 435 U.S. at 784 (1978); see *Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 8, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion) ("The identity of the speaker is not decisive in determining whether speech is protected. Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster" (quoting *Bellotti, 435 U.S., at 783*)).

[57] *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530 (1980); *First National Bank of Boston v. Belliotti*, 438 U.S. (1978); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974); *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986).

[58] See *Younger v. Harris*, 401 U.S. 37, 44–45 (1971).

[59] *Denson v. United States*, 574 F.3d 1318, 1345 (11th Cir. 2009).

supreme Law of the Land …, any Thing in the … Laws of any State to the Contrary notwithstanding."[60] The United States Supreme Court has explained that the Supremacy Clause was designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law.[61] The framers of the Constitution rejected a proposal to allow a federal veto of state laws "in favor of allowing state laws to take effect, subject to a later challenge under the Supremacy Clause."[62] Outside the strictures of the Supremacy Clause, the States retain broad autonomy in structuring their governments and pursuing legislative objectives."[63]

**Antitrust Laws, and State Contracts and Incentives**

***Antitrust Law***

Healthy competition in economic markets keeps prices low and quality high for consumers. When one entity becomes too strong, it can stifle competition, leading to higher prices and harm to consumers.

Antitrust law exists to protect competition, but not necessarily individual competitors, in economic markets, based on the idea that an unregulated market will lead to the creation of coercive monopolies.[64] Federal antitrust law includes the Sherman Antitrust Act, the Clayton Act, and the Federal Trade Commission Act. These laws are enforced in federal district court[65] by the U.S. Department of Justice (DOJ), the Federal Trade Commission (FTC), state Attorneys General, and private plaintiffs. Antitrust case law is well-developed, and it is often difficult to distinguish aggressive, pro-competitive conduct—which is legal—from predatory, anti-competitive conduct.[66]

The Sherman Antitrust Act[67] prohibits any attempt to restrain trade or form a monopoly. A monopoly has two elements: (1) monopoly power and (2) willful acquisition or maintenance of that power, as opposed to power naturally resulting from a superior product, acumen, or historic accident. Stated differently, a plaintiff must prove the defendant acquired the monopoly power in a "predatory" manner. Penalties for violating the Sherman Act include up to ten years' imprisonment and a fine up to $100 million for a corporation or $1 million for any other person.[68]

---

[60] U.S. Const. art. VI, cl 2.

[61] *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 436, (1819); *see also Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 211, (1824) (Marshall, C.J.) ("[A]cts of the State Legislatures ... [that] interfere with, or are contrary to the laws of Congress [are to be invalidated because] [i]n every such case, the act of Congress ... is supreme, and the law of State, though enacted in the exercise of powers not controverted, must yield to it.").

[62] *Shelby County v. Holder,* 133 S. Ct. 529, 543 (2013).

[63] *Id.*

[64] John J. Miles, Antitrust Primer, 20140513 AHLA Seminar Papers 1 (2014) (stating the purpose of antitrust law is to "protect and promote competition as the primary method by which this country allocates scarce resources to maximize the welfare of consumers.").

[65] Steven Fox, Litigation Under Florida's Deceptive and Unfair Trade Practices Act, the Florida Antitrust Act, or Federal Antitrust Statutes, The Florida Bar, Business Litigation in Florida (2017) (federal district courts have exclusive jurisdiction over federal antitrust actions).

[66] Animesh Ballabh, Antitrust Law: An Overview, 88 J. Pat. & Trademark Off. Soc'y 877 (2006); John J. Miles, Antitrust Primer, 20140513 AHLA Seminar Papers 1 (2014).

[67] 15 U.S.C. §§. 1 et seq.

[68] 15 U.S.C. §1.

The Clayton Act[69] prohibits specific business actions, including sales, or setting a price, discount or rebate on condition that the buyer not deal with competitors of the seller where the effect may be to substantially lessen competition in interstate commerce.[70] Those types of practices have been held to violate s. 1 of the Sherman Act.[71] The Clayton Act also prohibits prospective corporate mergers and other asset acquisitions whose effects may substantially lessen competition.[72] To determine whether a merger violates the Clayton Act, a court must decide whether the merger is likely to create an appreciable danger of anticompetitive effects. The plaintiff must establish a prima facie case that a transaction is anticompetitive, such as by showing that an acquisition will significantly increase market concentration and lessen competition.[73] The burden then shifts to the defendant to rebut the prima facie case, such as by introducing evidence casting doubt on the plaintiff's prediction of anticompetitive effects.[74] If the defendant rebuts the prima facie case, the plaintiff has the final burden to demonstrate an antitrust violation.[75] If the plaintiff prevails, the customary remedy is for the court to order divestiture and unwind the merger.[76]

In enacting the Florida Antitrust Act of 1980,[77] the Legislature expressly stated its "intent … that, in construing this chapter, due consideration and great weight given to the interpretations of the federal courts relating to comparable federal antitrust statutes."[78] The standing requirements for a private cause of action under the Florida Antitrust Act parallel the standing requirements of Section 4 of the Clayton Act.[79] Implemented by the Office of the Attorney General (OAG), the Florida Antitrust Act essentially mirrors the federal Sherman Act, and prohibits:[80]

- Every contract, combination, or conspiracy in restraint of trade or commerce;[81] and
- Monopolization or attempted monopolization of any part of trade or commerce.[82]

A Florida antitrust law violation is punishable by up to three years imprisonment and fines up to $1 million for a corporation and $100,000 for any other person.[83] There is also a private right of action for any person injured by certain antitrust violations.[84]

---

[69] 15 U.S.C. § 18.
[70] 15 U.S.C. § 14.
[71] *See, e.g.*, U.S. v. Microsoft Corp., 87 F. Supp. 2d 30, 47, 51 (D.D.C. 2000), *aff'd, in part, rev'd in part, remanded in part on other grounds*, 253 F.3d 34 (D.C. Cir. 2001).
[72] 15 U.S.C. § 18.
[73] *Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993) (discussing how plaintiff's establishment of a prima facie case on statistical evidence is first step in analysis); *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008).
[74] Id.
[75] *Chicago Bridge & Iron*, 534 F.3d at 423.
[76] *St. Alphonsus Med. Ctr. v. St. Luke's Health Sys.*, 778 F.3d 775, 792 (9th Cir. 2015).
[77] Sections 542.15 – 542.36, F.S.
[78] Section 542.32, F.S.
[79] *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 102 (Fla. 1st DCA 1996).
[80] Section 542.16, F.S.
[81] Section 542.18, F.S.
[82] Section 542.19, F.S.
[83] Section 542.21, F.S.
[84] Sections 542.21 and 542.22, F.S.

### Antitrust Actions against Internet Platforms

Critics have argued for years that internet platforms like Google, Apple, Facebook and Amazon improperly built empires over commerce, communications and culture, and then abused their power. Recently, federal and state regulators investigated and brought antitrust cases against these platforms.[85] For example, the FTC and over 40 states, including Florida, have brought an action against Facebook for allegedly buying smaller rivals to maintain market dominance.[86] Also, DOJ and 11 states, including Florida, have brought an action against Google for allegedly manipulating search engine results.[87]

### Procurement of Commodities and Services

Chapter 287, F.S., regulates state agency[88] procurement of personal property and services. Depending on the cost and characteristics of the needed goods or services, agencies may utilize a variety of procurement methods that include:

- Single source contracts, which are used when an agency determines that only one vendor is available to provide a commodity or service at the time of purchase;
- Invitations to bid, which are used when an agency determines that standard services or goods will meet needs, wide competition is available, and the vendor's experience will not greatly influence the agency's results;
- Requests for proposals, which are used when the procurement requirements allow for consideration of various solutions and the agency believes more than two or three vendors exist who can provide the required goods or services; and
- Invitations to negotiate, which are used when negotiations are determined to be necessary to obtain the best value and involve a request for highly complex, customized, mission-critical services. [89]

For contracts for commodities or services in excess of $35,000, agencies must utilize a competitive solicitation process.[90] However, specified contractual services and commodities are not subject to competitive solicitation requirements.[91]

The Department of Management Services (DMS) is statutorily designated as the central executive agency procurement authority and its responsibilities include overseeing agency implementation of the procurement process,[92] creating uniform agency procurement rules,[93]

---

[85] David McCabe, Cecilia Kang, and Daisuke Wakabayashi, *Google's Legal Peril Grows in Face of Third Antitrust Suit*, New York Times (Dec. 17, 2020), https://www.nytimes.com/2020/12/17/technology/google-antitrust-monopoly.html (last visited Feb. 25, 2021).
[86] *Id*; *Federal Trade Commission v. Facebook, Inc*., No. 1:20-cv-03590 (D.C. Cir. 2020).
[87] McCabe, supra note 59; *United States Department of Justice v. Google LLC*, No. 1:20-cv-03010 (D.C. Cir. 2020).
[88] Section 287.012(1), F.S., defines the term "agency" as any of the various state officers, departments, boards, commissions, divisions, bureaus, and councils and any other unit of organization, however designated, of the executive branch of state government. "Agency" does not include the university and college boards of trustees or the state universities and colleges.
[89] *See* Sections 287.012(6) and 287.057(1), F.S.
[90] Section 287.057(1), F.S., requires all projects that exceed the Category Two threshold amount ($35,000) contained in s. 287.017, F.S., to be competitively procured.
[91] *See* Sections 287.057(3)(e), F.S.
[92] *See* Sections 287.032 and 287.042, F.S.
[93] *See* Sections 287.032(2) and 287.042(3), (4), and (12), F.S.

**App. 28**

implementing the online procurement program,[94] and establishing state term contracts.[95] The agency procurement process is partly decentralized in that agencies, except in the case of state term contracts, may procure goods and services themselves in accordance with requirements set forth in statute and rule, rather than placing orders through DMS.

Certain persons and their affiliates are prohibited from contracting with public entities for services and goods, with certain exceptions, if they have been identified by DMS as violating certain restrictions and have been placed on one of the following lists:[96]

- Convicted Vendor List;
- Discriminatory Vendor List;
- Scrutinized Companies with Activities in Sudan List;
- Scrutinized Companies with Activities in the Iran Petroleum Energy Sector List; and
- Scrutinized Companies that Boycott Israel List.

### Economic Incentives

The Department of Economic Opportunity (DEO) advances Florida's economy by championing the state's economic development vision and by administering state and federal programs and initiatives to help visitors, citizens, businesses, and communities.[97] Enterprise Florida, Inc. (EFI) is a nonprofit corporation established by the Legislature to serve as the state's main economic development organization.[98] EFI is required to enter into a performance-based contract with DEO.[99]

EFI works with businesses and economic development partners to determine whether projects are eligible for state economic development incentives. A project must be vetted by EFI and EFI must determine that incentives are necessary to secure a deal in order for an incentive package to be developed and sent to DEO for further review. Once the incentive package is finalized, DEO and other appropriate state bodies issue formal approvals.

Florida has a number of incentive programs intended to promote economic development in the state. These programs come in a variety of forms including tax refunds, tax credits, tax exemptions, and cash grants under chapter 288, Florida Statutes. Businesses interested in expanding or relocating in Florida learn about the state's economic incentive programs through several channels, including EFI, state and local economic development organizations, and private site selection consultants. Businesses can apply for more than one incentive to support their expansion or relocation projects.[100]

---

[94] See Section 287.057(23), F.S.
[95] See Sections 287.042(2), 287.056, and 287.1345, F.S.
[96] Sections 287.133-135, F.S.
[97] Section 20.60(4)(b)(f), F.S.; Florida Department of Economic Opportunity, About Us, https://floridajobs.org/about-us (last visited Feb. 22, 2021).
[98] Section 288.901, F.S. Chapter 92-277, Laws of Fla., created EFI, while ch. 96-320, Laws of Fla, established EFI as a public-private partnership.
[99] Section 20.60(1), F.S., requires DEO to "establish annual performance standards for Enterprise Florida, Inc., CareerSource Florida, Inc., the Florida Tourism Industry Marketing Corporation, and Space Florida and report annually on how these performance measures are being met."
[100] OPPAGA, Report No. 16-09, p. 50-51.

Once a company begins the application process, EFI notifies the division so that it may begin the formal due diligence process to determine the business's statutory eligibility and financial standing. When due diligence and the application are complete, EFI determines what incentives and associated amounts may be available to the applicant and makes an approval or disapproval recommendation to DEO's executive director. If the business is approved, DEO will develop a contract or agreement with the applicant that specifies the total incentive amount, performance conditions that must be met to receive payment, payment schedule, and sanctions for failure to meet performance conditions.[101]

### III.  Effect of Proposed Changes:

The bill provides the following definitions:

- "Affiliate" means:
  - A predecessor or successor of a person convicted of or held civilly liable for an antitrust violation; or
  - An entity under the control of any natural person who is active in the management of the entity and who has been convicted of or held civilly liable for an antitrust violation. The term includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in the management of an affiliate. The term also includes a person who knowingly enters into a joint venture with a person who has violated an antitrust law during the preceding 36 months.
- "Algorithm" means a mathematical set of rules that specify how a group of data behaves and that will assist in ranking search results and maintaining order or that is used in sorting or ranking content or material based on relevancy or other factors instead of using published time or chronological order of such content or material
- "Antitrust violation" means any state or federal antitrust law as determined in a civil or criminal proceeding brought by the Attorney General, a state attorney, a similar body or agency of another state, the Federal Trade Commission, or the United States Department of Justice.
- "Antitrust violator vendor list" means the list required to be kept by the department (DMS) as a new provision of the bill. The list identifies any person or affiliate convicted or being held civilly liable for an antitrust violation.
- "Candidate" has the same meaning as in s. 106.011(3)(e), F.S. (a person who files qualification papers and subscribes to a candidate's oath as required by law).
- "Censor" includes any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. This term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform.
- "Convicted or being held civilly liable" or "convicted or held civilly liable" means a criminal finding of guilt or conviction, with or without an adjudication of guilt, being held civilly liable, or having a judgment levied for an antitrust violation, in any federal or state trial court of record relating to charges brought by indictment, information, or complaint on or after July 1, 2021, as a result of a jury verdict, nonjury trial, or entry of a plea of guilty or nolo contendere or other order finding liability.

---

[101] *Id.*

**App. 30**

- "Deplatform" has the same meaning as in the new provision of the bill addressing censorship, s. 501.2041, F.S. That is, the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 60 days.
- "Economic incentives" means state grants, cash grants, tax exemptions, tax refunds, tax credits, state funds, and other state incentives under ch. 288, F.S., or administered by Enterprise Florida, Inc.
- "Journalistic enterprise" means an entity that:
    - o Publishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users;
    - o Publishes 100 hours of audio or video available online with at least 100 million viewers annually;
    - o Operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable television subscribers; or
    - o Operates under a broadcast license issued by the Federal Communications Commission.
- "Person" means a natural person or an entity organized under the laws of any state or of the United States *who operates as a social media platform*, with the legal power to enter into a binding contract and which bids or applies to bid on contracts let by a public entity, or which otherwise transacts or applies to transact business with a public entity. The term includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in management of an entity.
- "Post-prioritization" means action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, feed, view, or search results. The term does not include post-prioritization of content and material based on payments by a third party, including other users, to the social media platform.
- "Public entity" means the state and any of its departments or agencies.
- "Shadow ban" means action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform. This term includes acts of shadow banning by a social media platform that are not readily apparent to a user.
- "Social media platform" means any technology platform or access software provider that does business in the state and provides or enables computer access by multiple users in a public digital forum for the primary purpose of connecting with other users and creating and sharing user generated content over the Internet. The internet platform or social media site may be a sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity, that does business in this state and that satisfies at least one of the following thresholds:
    - o Has annual gross revenues in excess of $100 million, as adjusted in January of each odd-numbered year to reflect any increase in the Consumer Price Index.
    - o Has at least 100 million monthly individual platform participants globally.
- "User" means a person who resides or is domiciled in this state and who has an account on a social media platform, regardless of whether the person posts or has posted content or material to the social media platform.

**Section 1** creates s. 106.072, F.S., to provide requirements for candidates and social media platforms related to social media deplatforming of political candidates. This section provides that a social media platform may not knowingly deplatform a candidate. Upon a finding of a violation of this section by the Elections Commission, in addition to the remedies provided in ss. 106.265 and 106.27, F.S., the social media platform may be fined $100,000 per day for deplatforming a statewide candidate, and $10,000 per day for deplatforming all other candidates.

This section provides that if a social media platform knowingly provides free advertising for a candidate must inform the candidate of such in-kind contribution. Posts, content, material, and comments by candidates which are shown on the platform in the same or similar way as other users' poses, content, material, and comments are not considered free advertising.

This section provides that this provision may only be enforced to the extent not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

**Section 2** creates 287.137, F.S., to establish restrictions for contracting with public entities for certain social media platforms who have violated antitrust laws. This section provides that a person or affiliate who has been placed on the antitrust violator vendor list following a conviction or being held civilly liable for an antitrust violation may not:

- Submit a bid, proposal, or reply for any new contract to provide any goods or services to a public entity;
- Submit a bid, proposal, or reply for a new contract with a public entity for the construction or repair of a public building or public work;
- Submit a bid, proposal, or reply on new leases of real property to a public entity;
- Be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a new contract with a public entity; or
- Transact new business with a public entity.

This section prohibits a public entity from accepting a bid, proposal, or reply from, awarding a new contract to, or transacting new business with any person or affiliate on the list unless that person or affiliate has been removed from the list. This prohibition does not apply to contracts that were awarded or business transactions that began before a person or an affiliate was placed on the list on or before July 1, 2021.

This section provides that beginning July 1, 2021, all invitations to bid, requests for proposals, and invitations to negotiate, as those terms are defined in s. 287.012, F.S., and any contract document described in s. 287.058, F.S., must contain a statement informing persons of the public contracting and purchasing disqualifications imposed upon being placed on the antitrust vendor list.

The department must maintain an antitrust violator vendor list of the names and addresses of the people or affiliates who have been disqualified from the public contracting and purchasing process. DMS must publish the initial antitrust violator vendor list on January 1, 2022, and must update and electronically publish the list quarterly thereafter. A person or an affiliate disqualified from the public contracting and purchasing process is disqualified as of the date the final order is entered.

This section requires DMS to investigate, upon receiving reasonable information from any source, that a person was convicted or held civilly liable for antitrust violations, and determine whether good cause exists to place that person or an affiliate of that person on the list. If good cause exists, DMS must notify the person or affiliate in writing of its intent to place the name of that person or affiliate on the list, and of the person's or affiliate's right to a hearing, the procedure that must be followed, and the applicable time requirements. If the person or affiliate does not request a hearing, DMS must enter a final order placing the name of the person or affiliate on the list. A person or affiliate may not be placed on the list without receiving an individual notice of intent from DMS.

This section allows a person or affiliate to dispute placement on the list. Within 21 days after receipt of the notice of intent, the person or affiliate may file a petition for a formal hearing under the Administrative Procedures Act (ss. 120.569 and 120.57(1), F.S.) to determine whether it is in the public interest for the person or affiliate to be placed on the list. A person or affiliate is prohibited from filing a petition for an informal hearing under s. 120.57(2), F.S.

This section specifies that the procedures of the Administrative Procedures Act apply to any formal hearing, except, within 30 days after the formal hearing or receipt of the hearing transcript, whichever is later, the administrative law judge (ALJ) must enter a final order that consist of findings of fact, conclusions of law, interpretation of agency rules, and any other information required by law or rule to be contained in the final order. The final order must direct the DMS to place or not place the person or affiliate on the antitrust violator vendor list. The final order of the administrative law judge is final agency action for purposes of s. 120.68, F.S.

This section provides that any person or affiliate who has been notified by the DMS of its intent to place his or her name on the antitrust violator vendor list may offer evidence on any relevant issue. An affidavit alone does not constitute competent substantial evidence that the person has not been convicted or is not an affiliate of a person convicted or held civilly liable.

This section provides that, in a formal hearing, DMS must prove that it is in the public interest for the person or affiliate to be placed on the list. Proof that a person was convicted or was held civilly liable for antitrust violations, or that an entity is an affiliate of such a person constitutes a prima facie case that it is in the public interest for the person or affiliate to be put on the list. Status as an affiliate must be proven by clear and convincing evidence. If the ALJ determines that the person was not convicted or that the person was not civilly liable or is not an affiliate of such person, that person or affiliate may not be placed on the antitrust violator list.

This section provides that in determining whether it is in the public interest to place a person or affiliate on the list, the bill indicates that the ALJ must consider the following factors:
• Whether the person or affiliate committed an antitrust violation.
• The nature and details of the antitrust violation.
• The degree of culpability of the person or affiliate proposed to be placed on the antitrust violator vendor list.
• Reinstatement or clemency in any jurisdiction in relation to the antitrust violation at issue in the proceeding.
• The needs of public entities for additional competition in the procurement of goods and services in their respective markets.

Upon establishment of a prima facie case that it is in the public interest for the person or affiliate to whom the DMS has given notice to be put on the list, the person or affiliate may prove by a preponderance of the evidence that it would not be in the public interest to put him or her on the antitrust violator vendor list, based upon evidence addressing the factors listed above.

This section permits the Attorney General to temporarily place any person charged or accused of any state or federal antitrust law in a civil or criminal proceeding brought by the Attorney General, a state attorney, the Federal Trade Commission, or the United States Department of Justice on or after July 1, 2021, on the list. The Attorney General may make a finding of probable cause that a person has likely violated the underlying antitrust laws, and temporarily place such person on the antitrust violator vendor list until such proceeding has concluded. Affiliates may not be placed on the list under this temporary procedure.

If probable cause exists, the Attorney General must notify the person in writing of its intent to temporarily place the name of that person on the antitrust violator vendor list, and of the person's right to a hearing, the procedure that must be followed, and the applicable time requirements. If the person does not request a hearing, the Attorney General must enter a final order temporarily placing the name of the person on the antitrust violator vendor list. A person may not be placed on the antitrust violator vendor list without receiving an individual notice of intent from the Attorney General.

Within 21 days after receipt of the notice of intent, the person may file a petition for a formal hearing under the Administrative Procedures Act to determine whether it is in the public interest for the person to be temporarily placed on the antitrust violator vendor list. A person may not file a petition for informal hearing.

In determining whether it is in the public interest to temporarily place a person on the antitrust violator vendor, the ALJ must consider the following factors:
- The likelihood the person committed the antitrust violation.
- The nature and details of the antitrust violation.
- The degree of culpability of the person proposed to be placed on the list.
- The needs of public entities for additional competition in the procurement of goods and services in their respective markets.

This section specifies that the temporary removal procedure does not apply to affiliates.

Section 2 also allows a person or affiliate to petition for removal from the antitrust violator vendor list no sooner than six months after the date a final order is entered. If the petition is based upon a reversal of the conviction or liability on appellate review or pardon, then they may petition at any time. The petition must be filed with the DMS. A person or affiliate may be removed from the list subject to such terms and conditions as prescribed by the ALJ upon a determination that removal is in the public interest. In determining whether removal would be in the public interest, the ALJ must consider any relevant factors.

This section provides that upon proof that a person was found not guilty or not civilly liable, the antitrust violation case was dismissed, the court entered a finding in the person's favor, the

person's conviction or determination of liability has been reversed on appeal, or that the person has been pardoned, the ALJ must determine that removal of the person or an affiliate from the list is in the public interest.

If the petition for removal is denied, the person or affiliate may not petition for another hearing on removal for a period of nine months after the date of denial, unless the petition is based upon a reversal of the conviction on appellate review or a pardon. The DMS may petition for removal before the expiration of such period if it determines that removal would be in the public interest.

This section provides that the conviction of a person or a person held civilly liable for an antitrust violation, or placement on the antitrust violator vendor list, does not affect any rights or obligations under any contract, franchise, or other binding agreement that predates such conviction or placement on the antitrust violator vendor list.

This section provides that a person who has been placed on the antitrust violator vendor list is not a qualified applicant for economic incentives under ch. 288, F.S., and such entity shall not be qualified to receive such economic incentives.

This section specifies that the provision regarding the antitrust violator vendor list does not apply to any activities regulated by the Public Service Commission or to the purchase of goods or services made by any public entity from the Department of Corrections, from the nonprofit corporation organized under ch. 946, F.S., or from any qualified nonprofit agency for the blind or any qualified nonprofit agency for other severely handicapped persons under ss. 413.032-413.037, F.S..

The bill expressly provides that the antitrust violator vendor list may only be enforced to the extent not inconsistent with federal law and notwithstanding any other provision of state law.

**Section 3** creates s. 501.2041, F.S., to establish unlawful acts and practices by social media platforms. This section requires a social media platform to:

- Publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban;
- Apply censorship, deplatforming, and shadow banning standards in a consistent manner among users on the platform;
- Inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days;
- Provide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts, and provide that information upon request;
- Categorize algorithms used for post-prioritization and shadow banning and allow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content (the opt-out opportunity must be reoffered annually);
- Provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning; and
- Allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after being deplatformed.

**App. 35**

This section prohibits a social media platform from censoring a user's content or material or deplatforming a user from the social media platform in a way that would otherwise violate FDUTPA, or without notifying the user who posted or attempted to post the content or material. The notification must:

- Be in writing;
- Be delivered via electronic mail or direct electronic notification to the user within 30 days of the censoring action;
- Include a thorough rationale explaining the reason that the social media platform censored the user; and
- Include a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable.

This section also prohibits a social media platform from:

- Applying or using post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a candidate for office in Florida, beginning from the date of qualification and ending on the date of the election or the date such candidate for office ceases to be a candidate before the date of election. Post-prioritization of certain content or material from or about a candidate for office based on payments to the social media platform by such candidate for office or a third party is not a violation. Social media platforms must provide users with a method to identify themselves as qualified candidates, and may confirm such qualification by reviewing the website of the Division of Elections of the Department of State.
- Taking any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast. Post-prioritization of certain journalistic enterprise content based on payments to the social media platform by such journalistic enterprise is not a violation.

This section provides that a social media platform is not required to notify a user of a censoring action if the censored content or material is obscene (as defined in s. 847.001, F.S.), which means content or material that:

- The average person, applying contemporary community standards, would find, taken as a whole, appeals to the prurient interest;
- Depicts or describes, in a patently offensive way, sexual conduct as specifically defined herein; and
- Taken as a whole, lacks serious literary, artistic, political, or scientific value.

If a social media platform fails to comply with any of the foregoing requirements, the bill provides that the social media platform commits an unfair or deceptive trade act or practice. If the DLA, by its own inquiry or as a result of a complaint, suspects that a violation is imminent, occurring, or has occurred, DLA may investigate the suspected violation in accordance with FDUTPA. In an investigation by DLA into alleged violations of this section, DLA's investigative powers include, but are not limited to, the ability to subpoena any algorithm used by a social media platform related to any alleged violation.

A user may bring a private cause of action against a social media platform for failing to:
- Notify such user of an act of censoring or deplatforming; or
- Apply censorship, deplatforming, and shadow banning standards in a consistent manner.

The court may award the following damages to the user:
- Up to $100,000 in statutory damages per proven claim;
- Actual damages;
- If aggravating factors are present, punitive damages;
- Other forms of equitable relief; and
- If the user was deplatformed, costs and reasonable attorney fees.

Each failure to comply with each of the individual requirements in the bill are treated as a separate violation, act, or practice by the social media platform.

The bill provides that its provisions may only be enforced to the extent they are not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

**Section 4** amends s. 501.212, F.S., to update a cross reference.

**Section 5** expressly provides that if any provision of this act or the application thereof to any person or circumstance is held invalid, the invalidity must not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared severable.

**Section 6** provides the bill take effect July 1, 2021.

## IV. Constitutional Issues:

A. Municipality/County Mandates Restrictions:

The mandate restrictions do not apply because the bill does not require counties and municipalities to spend funds, reduce counties' or municipalities' ability to raise revenue, or reduce the percentage of state tax shared with counties and municipalities.

B. Public Records/Open Meetings Issues:

None.

C. Trust Funds Restrictions:

None.

D. State Tax or Fee Increases:

None.

E.   Other Constitutional Issues:

**Jurisdiction**

For a court to exercise jurisdiction over a respondent, it must have subject matter jurisdiction and personal jurisdiction. The circuit courts of Florida are courts of general jurisdiction.[102] Subject matter jurisdiction is conferred upon a court by the Constitution or statute, or both.[103]

The Florida Supreme Court set forth the two-prong test for personal jurisdiction: first, the complaint must allege sufficient jurisdictional facts to come within Florida's long-arm statute[104] (s. 48.193, F.S.); and second, the nonresident defendant must have minimum contacts with Florida to satisfy federal due process requirements.[105] The constitutional "minimum contacts" prong "is controlled by United States Supreme Court precedent interpreting the Due Process Clause and imposes a more restrictive requirement" than the long-arm statute.[106]  Both prongs must be satisfied in order to exercise personal jurisdiction over a non-resident defendant.[107]

The long arm statute confers jurisdiction over parties who are "[o]perating, conducting, engaging in, or carrying on a business or business venture in [Florida] or having an office or agency in [Florida]."[108] "In order to establish that a defendant is 'carrying on business' for the purposes of [Florida's] long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit."[109] Courts consider the following factors in analyzing whether a non-resident defendant is engaged in "a general course of business activity": (1) "the presence and operation of an office in Florida"; (2) "the possession and maintenance of a license to do business in Florida"; (3) "the number of Florida clients served"; and (4) "the percentage of overall revenue gleaned from Florida clients."[110]

[102] *N.B. v. Dep't of Children of Families,* 274 So. 3d 1163, 1167 (Fla. 3d DCA 2019)(quoting *Curtis v. Albritton,* 101 Fla. 853, 861 (1931); *see also* Art. V, § 5(b), Fla. Const.; s. 26.012, F.S.

[103] *Lovett v. Lovett,* 112 So. 768, 775 (Fla. 1927)(explaining that subject-matter jurisdiction includes both the "jurisdictional power to adjudicate the class of cases to which such case belongs" and the requirement "that its jurisdiction has been invoked in the particular case by lawfully bringing before it the necessary parties to the controversy").

[104] A long-arm statute is a statutory device by which a state obtains jurisdiction over certain causes of action involving parties or events (or both) outside that state. It is called a long-arm statute because it allows a state court to reach parties located outside the state and even possibly for events which occurred outside the state. In essence, it allows the state to reach its "long arm" outside the state.

[105] *Venetian Salami Co. v. Parthenais,* 554 So. 2d 499, 502 (Fla. 1989).

[106] *Execu-Tech Bus. Sys. v. New Oji Paper Co.,* 752 So. 2d 582, 584 (Fla. 2000); *see also Internet Sols. Corp. v. Marshall,* 39 So.3d 1201, 1207 (Fla. 2010) (explaining that Florida's long-arm statute "bestows broad jurisdiction" whereas "United States Supreme Court precedent interpreting the Due Process Clause ... imposes a more restrictive requirement.").

[107] *Rollet v. de Bizemont,* 159 So. 3d 351, 356 (Fla. 3d DCA 2015).

[108] Section 48.193(1)(a)1., F.S.

[109] *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.,* 421 F.3d 1162, 1167 (11th Cir. 2005)(citation omitted).

[110] *Id.*

Whether a nonresident defendant has those requisite minimum contacts to satisfy constitutional due process requirements is a fact specific inquiry.[111] "Factors that go into determining whether sufficient minimum contacts exist include the foreseeability that the defendant's conduct will result in suit in the forum state and the defendant's purposeful availment of the forum's privileges and protections."[112] A nonresident's occasional physical presence in Florida to attend trade shows, or "to make a one-off corporate solicitation" of a company whose office is in Florida has been found insufficient to comport with the constitutional due process requirements.[113] Minimum contacts may be satisfied, however, when a non-resident defendant enters into a contract with a Florida party for substantial services performed in Florida and agrees to make payment in Florida.[114]

Whether a Florida court would have personal jurisdiction over a nonresident internet or social media platform defendant involves a fact specific inquiry to be decided by a court on a case-by-case basis.

**Freedom of Speech**

First Amendment protection extends to corporations.[115] Corporations and other associations, like individuals contribute to the "discussion, debate, and the dissemination of information and ideas" that the First Amendment seeks to foster.[116] Corporations also have a right to unrestricted independent expenditures for political communications and elections as a form of corporate speech.[117]

The bill permits the state attorney and citizens to sue a social media platform if the company does not consistently apply its user standards or do not give required notice. Additionally, the bill protects political candidates by exempting a candidate's posts from being promoted or shadow banned during an election.  Because these provisions may be read to regulate speech or interfere with the editorial discretion of a private company[118] (Twitter, Facebook, etc.), the First Amendment may be implicated.

---

[111] *See Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 500 (Fla. 1989) (relying on *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174 (1985), for the proposition that whether the minimum-contacts requirement has been satisfied depends upon the facts of each case).

[112] *Georgia Insurers Insolvency Pool v. Brewer*, 602 So.2d 1264, 1268 (Fla.1992)(citation omitted).

[113] *See Piazenko v. Pier Marine Interiors GMBH*, 2020 WL 6751314 (Fla. 3d DCA Nov. 18, 2020); *see also Price v. Point Marine, Inc.*, 610 So. 2d 1339, 1342 (Fla. 1st DCA 1992) (affirming dismissal for lack of jurisdiction over non-resident defendant where, "absent a continued and sustained effort to procure business, or actual procurement of business, these activities are insufficient to constitute substantial activities within the state of Florida").

[114] *Smith Architectural Grp., Inc. v. Dehaan*, 867 So.2d 434, 436 (Fla. 4th DCA 2004); *see also Stomar, Inc. v. Lucky Seven Riverboat Co.*, 821 So.2d 1183 (Fla. 4th DCA 2002) (allegation that owner of vessel breached agreement with Florida ship broker by failing to pay commission owed to broker in Florida sufficient to satisfy first prong of jurisdictional inquiry).

[115] *Citizens United*, 558 U.S. at 342.

[116] *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Cal.*, 475 U.S. 1, 8 (1986), quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

[117] *Id.* at 340.

[118] *Miami Herald Publishing Co. v. Tornmillo*, 418 U.S. 241 (1974)(striking down a Florida statute requiring newspapers that print editorials critical of a political candidate to print a reply by the candidate).

### Supremacy Clause

As discussed above, the Supremacy Clause was designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law.[119]

The bill may implicate the Supremacy Clause by attempting to regulate in an area that may be preempted by federal law.[120]

## V.   Fiscal Impact Statement:

### A.   Tax/Fee Issues:

None.

### B.   Private Sector Impact:

A person or affiliate may experience an indeterminate fiscal impact if such party is disqualified from state term contract eligibility upon removal from the vendor list as specified within the bill.

### C.   Government Sector Impact:

The Department of Management Services has indicated no additional resources are needed to implement the bill.[121]

The Department of Legal Affairs has indicated additional resources would be need for investigating violations as directed in the bill, specifically one senior level attorney and on paralegal specialist, for a total of $177,608.[122]

## VI.   Technical Deficiencies:

Lines 71 to 76 provide:

A social media platform may not *knowingly* deplatform a candidate. Upon a finding of a *violation* of this section by the Elections Commission, in addition to the remedies provided in ss. 106.265 and 106.27, F.S., the social media platform … (emphasis added).

Section 106.25(3), F.S., provides that:

---

[119] *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436, (1819); *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, (1824) (Marshall, C.J.) ("[A]cts of the State Legislatures ... [that] interfere with, or are contrary to the laws of Congress [are to be invalidated because] [i]n every such case, the act of Congress ... is supreme, and the law of State, though enacted in the exercise of powers not controverted, must yield to it.").

[120] 47 U.S.C. § 203(e).

[121] Email from Tyler Jefferson, Legislative Affairs Coordinator, DMS, to Christina Smith, Chief Analyst, Florida Senate (April 13, 2021) (on file with the Senate Committee on Appropriations)

[122] Email from Sarah Nortelus, Deputy Director of Administration, DLA, to Christina Smith, Chief Analyst, Florida Senate (April 13, 2021) (on file with the Senate Committee on Appropriations)

> For the purposes of commission jurisdiction, a *violation* shall mean the *willful performance* of an act prohibited by this chapter or chapter 104 or the willful failure to perform an act required by this chapter or chapter 104. The commission may not by rule determine what constitutes willfulness or further define the term "willful" for purposes of this chapter or chapter 104. *Willfulness* is a determination of fact; however, at the request of the respondent at any time after probable cause is found, willfulness may be considered and determined in an informal hearing before the commission.

The bill creates a violation that is based on acting "knowingly" while the same chapter defines a violation to be a "willful act." The term "willful" is generally taken to cover not only knowing violations of a standard, but reckless ones as well.[123] The use of the term "knowingly" suggests that a defendant acts with actual knowledge or awareness that the act he or she performs is unlawful. The Legislature may want to consider an amendment to align these provisions to the same standard.

## VII.   Related Issues:

None.

## VIII.   Statutes Affected:

This bill substantially amends section 501.212 of the Florida Statutes.

This bill creates the following sections of the Florida Statutes: 106.072, 287.137, and 501.2041.

## IX.   Additional Information:

A.   Committee Substitute – Statement of Changes:
(Summarizing differences between the Committee Substitute and the prior version of the bill.)

None.

B.   Amendments:

None.

---

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.

---

[123] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).

# The Florida Senate

## SB 7072: Social Media Platforms

GENERAL BILL by Governmental Oversight and Accountability ; (CO-INTRODUCERS)
Rodriguez

Social Media Platforms; Prohibiting a social media platform from willfully deplatforming a candidate; providing requirements for public contracts and economic incentives related to entities that have been convicted or held civilly liable for antitrust violations; providing that social media platforms that fail to comply with specified requirements and prohibitions commit an unfair or deceptive act or practice; authorizing the Department of Legal Affairs to investigate suspected violations under the Deceptive and Unfair Trade Practices Act and bring specified actions for such violations, etc.

**Effective Date:** 7/1/2021
**Last Action:** 5/25/2021 - Chapter No. 2021-32
**Bill Text:** Web Page | PDF

**Senate Committee References:**

1. Appropriations (AP)

## Bill History

| Date | Chamber | Action |
|------|---------|--------|
| 4/1/2021 | Senate | • Submitted for consideration by Governmental Oversight and Accountability<br>• On Committee agenda-- Governmental Oversight and Accountability, 04/06/21, 4:00 pm, 37 Senate Building |
| 4/6/2021 | Senate | • Submitted as Committee Bill and Reported Favorably by Governmental Oversight and Accountability; YEAS 3 NAYS 2 |
| 4/7/2021 | Senate | • Filed |
| 4/8/2021 | Senate | • Referred to Appropriations -SJ 409<br>• Introduced -SJ 408 |
| 4/14/2021 | Senate | • On Committee agenda-- Appropriations, 04/19/21, 10:00 am, 412 Knott Building |
| 4/19/2021 | Senate | • Favorable by- Appropriations; YEAS 10 NAYS 9 -SJ 472 |
| 4/20/2021 | Senate | • Placed on Calendar, on 2nd reading<br>• Placed on Special Order Calendar, 04/22/21 -SJ 642 |
| 4/22/2021 | Senate | • Read 2nd time -SJ 616<br>• Placed on 3rd reading |
| 4/26/2021 | Senate | • Read 3rd time -SJ 666<br>• Passed; YEAS 22 NAYS 17 -SJ 666 |

| Date | Chamber | Action |
|------|---------|--------|
| 4/26/2021 | House | • In Messages<br>• Bill referred to House Calendar<br>• Bill added to Special Order Calendar (4/27/2021)<br>• 1st Reading (Original Filed Version)<br>• Amendment 942955 filed |
| 4/27/2021 | House | • Read 2nd time<br>• Amendment 942955 adopted<br>• Placed on 3rd reading<br>• Added to Third Reading Calendar |
| 4/28/2021 | House | • Read 3rd time<br>• Passed as amended; YEAS 78, NAYS 41 |
| 4/28/2021 | Senate | • In returning messages |
| 4/28/2021 | House | • Message sent to senate |
| 4/29/2021 | Senate | • Amendment(s) to House amendment(s) adopted (811008) -SJ 951<br>• Concurred in House amendment(s) as amended (942955) -SJ 951<br>• Passed as amended; YEAS 23 NAYS 17 -SJ 951 |
| 4/29/2021 | House | • In Messages<br>• Added to Senate Message List<br>• Amendment 811008 Concur<br>• Concurred in Senate amendment(s) to House amendment(s)<br>• Passed as amended; YEAS 77, NAYS 38 |
| 4/29/2021 | Senate | • Ordered engrossed, then enrolled -SJ 958 |
| 4/29/2021 | House | • Message sent to senate |
| 5/20/2021 | | • Signed by Officers and presented to Governor |
| 5/24/2021 | | • Approved by Governor |
| 5/25/2021 | | • Chapter No. 2021-32 |

## Related Bills

| Bill Number | Subject | Filed By | Relationship | Last Action and Location | Track Bills |
|-------------|---------|----------|--------------|--------------------------|-------------|
| S 7074 (er) | Public Records/Social Media Platform Activities | Governmental Oversight and Accountability | Linked | Last Action: 5/25/2021 Chapter No. 2021-33 | 🔆 |
| H 7013 | Technology Transparency | Commerce Committee | Similar | Last Action: 4/27/2021 H Laid on Table, refer to SB 7072 | 🔆 |

**App. 43**

| Bill Number | Subject | Filed By | Relationship | Last Action and Location | Track Bills |
|---|---|---|---|---|---|
| H 7015 (c1) | Public Records | Commerce Committee | Compare | Last Action: 4/27/2021 H Laid on Table, refer to SB 7074 | ☀ |
| S 520 | Social Media Websites | Burgess | Compare | Last Action: 4/30/2021 S Died in Judiciary | ☀ |

## Bill Text

| Version | Posted | Format | |
|---|---|---|---|
| S 7072 pb | 4/1/2021 3:03 PM | Web Page | PDF |
| S 7072 Filed | 4/7/2021 5:21 PM | Web Page | PDF |
| S 7072 e1 | 4/30/2021 6:05 PM | Web Page | PDF |
| S 7072 er | 5/2/2021 12:24 PM | Web Page | PDF |

## Committee Amendments

| S 7072 pb | | | | |
|---|---|---|---|---|
| Amendment | Sponsor | Filed | Last Committee Action | Format |
| 828884 - Amendment Delete lines 388 - 392 and insert: | Governmental Oversight and Accountability (Rodrigues) | 4/5/2021 3:39 PM | Favorable 4/6/2021 | Web Page PDF |

## Floor Amendments

| S 7072 Filed | | | | |
|---|---|---|---|---|
| Amendments | Sponsor | Filed | Last Floor Action | Format |
| 942955 - Strike All Amendment Remove everything after the enacting clause and insert: | Ingoglia | 4/26/2021 10:55 PM | Senate: Concurred as Amended 4/29/2021 | PDF |
| ↳ 374338 - S Amend. to H Amend. (942955) Between lines 68 and 69 insert: | Polsky | 4/28/2021 2:46 PM | Senate: Withdrawn 4/29/2021 | Web Page PDF |
| ↳ 242480 - S Amend. to H Amend. (942955) Between lines 68 and 69 insert: | Jones | 4/28/2021 2:59 PM | Senate: Withdrawn 4/29/2021 | Web Page PDF |
| ↳ 165084 - S Amend. to H Amend. (942955) Delete lines 406 - 407 and insert: | Rodrigues | 4/28/2021 4:10 PM | Senate: Withdrawn 4/29/2021 | Web Page PDF |

| Amendments | Sponsor | Filed | Last Floor Action | Format |
|---|---|---|---|---|
| ↳ 811008 - S Amend. to H Amend. (942955) Delete lines 411 - 412 and insert: | Rodrigues | 4/29/2021 4:47 PM | House: Concur 4/29/2021 | Web Page PDF |

## Bill Analyses

| Type | Analysis | Author | Posted | Format |
|---|---|---|---|---|
| Bill Analysis | S 7072 | Governmental Oversight and Accountability (Pre-Meeting) | 4/5/2021 2:12 PM | PDF |
| Bill Analysis | S 7072 | Governmental Oversight and Accountability (Post-Meeting) | 4/7/2021 4:43 PM | PDF |
| Bill Analysis | S 7072 | Appropriations (Pre-Meeting) | 4/16/2021 11:04 AM | PDF |
| Bill Analysis | S 7072 | Appropriations (Post-Meeting) | 4/21/2021 1:35 PM | PDF |
| House Message Summary | S 7072 | Senate | 4/28/2021 2:13 PM | PDF |

## Vote History - Committee

| Version | Committee | Date | Result |
|---|---|---|---|
| S 7072 pb | Governmental Oversight and Accountability | 4/6/2021 4:00 PM | 3 Yeas - 2 Nays |
| S 7072 Filed | Appropriations | 4/19/2021 10:00 AM | 10 Yeas - 9 Nays |

## Vote History - Floor

| Vote | Date | Chamber | Result |
|---|---|---|---|
| S 7072 Filed | 4/26/2021 12:05 PM | Senate | 22 Yeas - 17 Nays |
| S 7072 Filed | 4/28/2021 11:15 AM | House | 78 Yeas - 41 Nays |
| S 7072 Filed | 4/29/2021 5:37 PM | Senate | 23 Yeas - 17 Nays |
| S 7072 Filed | 4/29/2021 7:56 PM | House | 77 Yeas - 38 Nays |

## Citations - Statutes (4)

| Citation | Catchline | Location in Bill **Location In Bill Help** |
|---|---|---|
| 106.072 | | Page 4 (PDF) |
| 287.137 | | Page 5 (PDF) |
| 501.2041 | | Page 14 (PDF) |
| 501.212 | Application. | Page 21 (PDF) |

## Citations - Constitution (0)

No Constitutional citations.

## Citations - Chapter Law (0)

No Chapter Law citations.

Disclaimer: The information on this system is unverified. The journals or printed bills of the respective chambers should be consulted for official purposes.

Copyright © 2000- 2021  State of Florida.

Sequence:  342
Session Day:  58
Calendar Page:

**The Florida House of Representatives**
2021 Regular Session

Date:  04/28/2021
Time:  11:15 AM

SB 7072
Passage
Third Reading

Yeas - 78          Nays - 41          Not Voting - 1

**Presiding - Avila**

| | | | | | |
|---|---|---|---|---|---|
| N | Alexander-8 | Y | Garrison-18 | Y | Perez-116 |
| Y | Aloupis-115 | N | Geller-100 | Y | Persons-Mulicka-78 |
| Y | Altman-52 | Y | Giallombardo-77 | Y | Plakon-29 |
| Y | Andrade-2 | N | Goff-Marcil-30 | N | Plasencia-50 |
| N | Arrington-43 | N | Gottlieb-98 | N | Rayner-70 |
| Y | Avila-111 | Y | Grall-54 | Y | Renner-24 |
| Y | Barnaby-27 | Y | Grant-75 | Y | Rizo-110 |
| N | Bartleman-104 | Y | Gregory-73 | Y | Roach-79 |
| Y | Bell-56 | N | Grieco-113 | N | Robinson, F.-102 |
| Y | Beltran-57 | Y | Hage-33 | Y | Robinson, W.-71 |
| N | Benjamin-107 | Y | Harding-22 | Y | Rodriguez-118 |
| Y | Borrero-105 | N | Hardy-88 | Y | Rommel-106 |
| Y | Botana-76 | N | Hart-61 | Y | Roth-85 |
| Y | Brannan-10 | Y | Hawkins-42 | Y | Sabatini-32 |
| N | Brown-45 | N | Hinson-20 | Y | Salzman-1 |
| Y | Buchanan-74 | N | Hunschofsky-96 | Y | Shoaf-7 |
| Y | Burton-40 | Y | Ingoglia-35 | N | Silvers-87 |
| Y | Busatta Cabrera-114 | N | Jenne-99 | Y | Sirois-51 |
| Y | Bush-109 | N | Joseph-108 | N | Skidmore-81 |
| Y | Byrd-11 | Y | Killebrew-41 | N | Slosberg-91 |
| Y | Caruso-89 | Y | Koster-64 | N | Smith, C.-49 |
| N | Casello-90 | Y | LaMarca-93 | Y | Smith, D.-28 |
| N | Chambliss-117 | Y | Latvala-67 | Y | Snyder-82 |
| | Chaney-69 | N | Learned-59 | Y | Sprowls-65 |
| Y | Clemons-21 | Y | Leek-25 | Y | Stevenson-17 |
| N | Daley-97 | Y | Maggard-38 | N | Tant-9 |
| N | Davis-13 | Y | Maney-4 | N | Thompson-44 |
| N | Diamond-68 | Y | Mariano-36 | Y | Toledo-60 |
| Y | DiCeglie-66 | Y | Massullo-34 | Y | Tomkow-39 |
| Y | Drake-5 | Y | McClain-23 | Y | Trabulsy-84 |
| N | Driskell-63 | Y | McClure-58 | Y | Truenow-31 |
| N | DuBose-94 | N | McCurdy-46 | Y | Trumbull-6 |
| Y | Duggan-15 | Y | McFarland-72 | Y | Tuck-55 |
| N | Duran-112 | Y | Melo-80 | N | Valdés-62 |
| N | Eskamani-47 | Y | Mooney-120 | N | Willhite-86 |
| Y | Fabricio-103 | N | Morales-48 | N | Williams-92 |
| Y | Fernandez-Barquin-119 | N | Nixon-14 | Y | Williamson-3 |
| Y | Fetterhoff-26 | Y | Omphroy-95 | N | Woodson-101 |
| Y | Fine-53 | Y | Overdorf-83 | Y | Yarborough-12 |
| Y | Fischer-16 | Y | Payne-19 | Y | Zika-37 |

Y=Yea          N=Nay          EX=Excused          AV=Abstain

**App. 47**

Sequence:  433  
Session Day:  59  
Calendar Page:

**The Florida House of Representatives**

2021 Regular Session

Date:  04/29/2021  
Time:  07:56 PM

SB 7072  
Passage

|  | Yeas - 77 |  | Nays - 38 |  | Not Voting - 5 |
|---|---|---|---|---|---|

**Presiding - Avila**

| | | | | | |
|---|---|---|---|---|---|
| N | Alexander-8 | Y | Garrison-18 | Y | Perez-116 |
| Y | Aloupis-115 | N | Geller-100 | Y | Persons-Mulicka-78 |
| Y | Altman-52 | N | Giallombardo-77 | Y | Plakon-29 |
| Y | Andrade-2 | N | Goff-Marcil-30 | N | Plasencia-50 |
| N | Arrington-43 | N | Gottlieb-98 | N | Rayner-70 |
| Y | Avila-111 | Y | Grall-54 | Y | Renner-24 |
| Y | Barnaby-27 | Y | Grant-75 | Y | Rizo-110 |
| N | Bartleman-104 | Y | Gregory-73 | Y | Roach-79 |
| Y | Bell-56 | N | Grieco-113 | N | Robinson, F.-102 |
| Y | Beltran-57 | Y | Hage-33 | Y | Robinson, W.-71 |
| | Benjamin-107 | Y | Harding-22 | Y | Rodriguez-118 |
| Y | Borrero-105 | N | Hardy-88 | Y | Rommel-106 |
| Y | Botana-76 | N | Hart-61 | Y | Roth-85 |
| Y | Brannan-10 | Y | Hawkins-42 | Y | Sabatini-32 |
| N | Brown-45 | N | Hinson-20 | Y | Salzman-1 |
| Y | Buchanan-74 | N | Hunschofsky-96 | Y | Shoaf-7 |
| Y | Burton-40 | Y | Ingoglia-35 | N | Silvers-87 |
| Y | Busatta Cabrera-114 | N | Jenne-99 | Y | Sirois-51 |
| Y | Bush-109 | N | Joseph-108 | N | Skidmore-81 |
| Y | Byrd-11 | Y | Killebrew-41 | N | Slosberg-91 |
| Y | Caruso-89 | Y | Koster-64 | N | Smith, C.-49 |
| N | Casello-90 | Y | LaMarca-93 | Y | Smith, D.-28 |
| N | Chambliss-117 | Y | Latvala-67 | Y | Snyder-82 |
| | Chaney-69 | Y | Learned-59 | Y | Sprowls-65 |
| Y | Clemons-21 | Y | Leek-25 | Y | Stevenson-17 |
| N | Daley-97 | Y | Maggard-38 | N | Tant-9 |
| | Davis-13 | Y | Maney-4 | N | Thompson-44 |
| N | Diamond-68 | Y | Mariano-36 | Y | Toledo-60 |
| Y | DiCeglie-66 | Y | Massullo-34 | Y | Tomkow-39 |
| Y | Drake-5 | Y | McClain-23 | Y | Trabulsy-84 |
| N | Driskell-63 | Y | McClure-58 | Y | Truenow-31 |
| N | DuBose-94 | N | McCurdy-46 | Y | Trumbull-6 |
| Y | Duggan-15 | Y | McFarland-72 | Y | Tuck-55 |
| | Duran-112 | Y | Melo-80 | N | Valdés-62 |
| N | Eskamani-47 | Y | Mooney-120 | N | Willhite-86 |
| Y | Fabricio-103 | N | Morales-48 | N | Williams-92 |
| Y | Fernandez-Barquin-119 | N | Nixon-14 | Y | Williamson-3 |
| Y | Fetterhoff-26 | | Omphroy-95 | N | Woodson-101 |
| | Fine-53 | Y | Overdorf-83 | Y | Yarborough-12 |
| Y | Fischer-16 | Y | Payne-19 | Y | Zika-37 |

| | | | | | |
|---|---|---|---|---|---|
| Y=Yea | | N=Nay | | EX=Excused | | AV=Abstain |

**App. 48**

Sequence: 11
Session Day: 56
Calendar Page: 6

**The Florida Senate**
2021 Regular Session

Date: 04/26/2021
Time: 12:05 PM

SB 7072
Third Reading

Yeas - 22          Nays - 17          Not Voting - 1

**Presiding - Bean**

| | | | | | |
|---|---|---|---|---|---|
| Y | Albritton-26 | Y | Diaz-36 | N | Polsky-29 |
| N | Ausley-3 | N | Farmer-34 | N | Powell-30 |
| | Baxley-12 | Y | Gainer-2 | Y | Rodrigues-27 |
| Y | Bean-4 | Y | Garcia-37 | Y | Rodriguez-39 |
| N | Berman-31 | N | Gibson-6 | N | Rouson-19 |
| N | Book-32 | Y | Gruters-23 | Y | Stargel-22 |
| Y | Boyd-21 | Y | Harrell-25 | N | Stewart-13 |
| N | Bracy-11 | Y | Hooper-16 | N | Taddeo-40 |
| Y | Bradley-5 | Y | Hutson-7 | N | Thurston-33 |
| N | Brandes-24 | N | Jones-35 | N | Torres-15 |
| Y | Brodeur-9 | Y | Mayfield-17 | Y | Wright-14 |
| Y | Broxson-1 | Y | Passidomo-28 | Y | President Simpson-10 |
| Y | Burgess-20 | Y | Perry-8 | | |
| N | Cruz-18 | N | Pizzo-38 | | |

Votes after roll call:
     Baxley—Yea

Y=Yea          N=Nay          EX=Excused          AV=Abstain

**App. 49**

Sequence:  43                          **The Florida Senate**                    Date:  04/29/2021
Session Day:  59                        2021 Regular Session                   Time:  05:37 PM
Calendar Page:

SB 7072
Returning Messages

Yeas - 23                    Nays - 17                  Not Voting - 0

**Presiding - President Simpson**

| | | | | | |
|---|---|---|---|---|---|
| Y | Albritton-26 | Y | Diaz-36 | N | Polsky-29 |
| N | Ausley-3 | N | Farmer-34 | N | Powell-30 |
| Y | Baxley-12 | Y | Gainer-2 | Y | Rodrigues-27 |
| Y | Bean-4 | Y | Garcia-37 | Y | Rodriguez-39 |
| N | Berman-31 | N | Gibson-6 | N | Rouson-19 |
| N | Book-32 | Y | Gruters-23 | Y | Stargel-22 |
| Y | Boyd-21 | Y | Harrell-25 | N | Stewart-13 |
| N | Bracy-11 | Y | Hooper-16 | N | Taddeo-40 |
| Y | Bradley-5 | Y | Hutson-7 | N | Thurston-33 |
| N | Brandes-24 | N | Jones-35 | N | Torres-15 |
| Y | Brodeur-9 | Y | Mayfield-17 | Y | Wright-14 |
| Y | Broxson-1 | Y | Passidomo-28 | Y | President Simpson-10 |
| Y | Burgess-20 | Y | Perry-8 | | |
| N | Cruz-18 | N | Pizzo-38 | | |

Y=Yea                  N=Nay                  EX=Excused                  AV=Abstain

**App. 50**

CHAPTER 2021-32

Senate Bill No. 7072

An act relating to social media platforms; providing legislative findings; creating s. 106.072, F.S.; defining terms; prohibiting a social media platform from willfully deplatforming a candidate; providing fines for violations; authorizing social media platforms to provide free advertising for candidates under specified conditions; providing enforcement authority consistent with federal and state law; creating s. 287.137, F.S.; defining terms; providing requirements for public contracts and economic incentives related to entities that have been convicted or held civilly liable for antitrust violations; prohibiting a public entity from entering into any type of contract with a person or an affiliate on the antitrust violator vendor list; providing applicability; requiring certain contract documents to contain a specified statement; requiring the Department of Management Services to maintain a list of people or affiliates disqualified from the public contracting and purchasing process; specifying requirements for publishing such list; providing procedures for placing a person or an affiliate on the list; providing procedural and legal rights for a person or affiliate to challenge placement on the list; providing a procedure for temporarily placing a person on an antitrust violator vendor list; providing procedural and legal rights for a person to challenge temporary placement on the list; specifying conditions for removing certain entities and affiliates from the list; authorizing a person, under specified conditions, to retain rights or obligations under existing contracts or binding agreements; prohibiting a person who has been placed on the antitrust violator vendor list from receiving certain economic incentives; providing exceptions; providing enforcement authority consistent with federal and state law; creating s. 501.2041, F.S.; defining terms; providing that social media platforms that fail to comply with specified requirements and prohibitions commit an unfair or deceptive act or practice; requiring a notification given by a social media platform for censoring content or deplatforming a user to contain certain information; providing an exception to the notification requirements; authorizing the Department of Legal Affairs to investigate suspected violations under the Deceptive and Unfair Trade Practices Act and bring specified actions for such violations; specifying circumstances under which a private cause of action may be brought; specifying how damages are to be calculated; providing construction for violations of certain provisions of this act; granting the department specified subpoena powers; providing enforcement authority consistent with federal and state law; amending s. 501.212, F.S.; conforming a provision to changes made by the act; providing for severability; providing an effective date.

Be It Enacted by the Legislature of the State of Florida:

Section 1.   <u>The Legislature finds that:</u>

1

CODING: Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.

**App. 51**

(1) Social media platforms represent an extraordinary advance in communication technology for Floridians.

(2) Users should be afforded control over their personal information related to social media platforms.

(3) Floridians increasingly rely on social media platforms to express their opinions.

(4) Social media platforms have transformed into the new public town square.

(5) Social media platforms have become as important for conveying public opinion as public utilities are for supporting modern society.

(6) Social media platforms hold a unique place in preserving first amendment protections for all Floridians and should be treated similarly to common carriers.

(7) Social media platforms that unfairly censor, shadow ban, deplatform, or apply post-prioritization algorithms to Florida candidates, Florida users, or Florida residents are not acting in good faith.

(8) Social media platforms should not take any action in bad faith to restrict access or availability to Floridians.

(9) Social media platforms have unfairly censored, shadow banned, deplatformed, and applied post-prioritization algorithms to Floridians.

(10) The state has a substantial interest in protecting its residents from inconsistent and unfair actions by social media platforms.

(11) The state must vigorously enforce state law to protect Floridians.

Section 2.    Section 106.072, Florida Statutes, is created to read:

106.072   Social media deplatforming of political candidates.—

(1) As used in this section, the term:

(a) "Candidate" has the same meaning as in s. 106.011(3)(e).

(b) "Deplatform" has the same meaning as in s. 501.2041.

(c) "Social media platform" has the same meaning as in s. 501.2041.

(d) "User" has the same meaning as in s. 501.2041.

(2) A social media platform may not willfully deplatform a candidate for office who is known by the social media platform to be a candidate, beginning on the date of qualification and ending on the date of the election or the date the candidate ceases to be a candidate. A social media platform must provide

2

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

**App. 52**

each user a method by which the user may be identified as a qualified candidate and which provides sufficient information to allow the social media platform to confirm the user's qualification by reviewing the website of the Division of Elections or the website of the local supervisor of elections.

(3)   Upon a finding of a violation of subsection (2) by the Florida Elections Commission, in addition to the remedies provided in ss. 106.265 and 106.27, the social media platform may be fined $250,000 per day for a candidate for statewide office and $25,000 per day for a candidate for other offices.

(4)   A social media platform that willfully provides free advertising for a candidate must inform the candidate of such in-kind contribution. Posts, content, material, and comments by candidates which are shown on the platform in the same or similar way as other users' posts, content, material, and comments are not considered free advertising.

(5)   This section may only be enforced to the extent not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

Section 3.   Section 287.137, Florida Statutes, is created to read:

287.137   Antitrust violations; denial or revocation of the right to transact business with public entities; denial of economic benefits.—

(1)   As used in this section, the term:

(a)   "Affiliate" means:

1.   A predecessor or successor of a person convicted of or held civilly liable for an antitrust violation; or

2.   An entity under the control of any natural person who is active in the management of the entity that has been convicted of or held civilly liable for an antitrust violation. The term includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in the management of an affiliate. The ownership by one person of shares constituting a controlling interest in another person, or a pooling of equipment or income among persons when not for fair market value under an arm's length agreement, is a prima facie case that one person controls another person. The term also includes a person who knowingly enters into a joint venture with a person who has violated an antitrust law during the preceding 36 months.

(b)   "Antitrust violation" means any failure to comply with a state or federal antitrust law as determined in a civil or criminal proceeding brought by the Attorney General, a state attorney, a similar body or agency of another state, the Federal Trade Commission, or the United States Department of Justice.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(c)   "Antitrust violator vendor list" means the list required to be kept by the department pursuant to paragraph (3)(b).

(d)   "Conviction or being held civilly liable" or "convicted or held civilly liable" means a criminal finding of responsibility or guilt or conviction, with or without an adjudication of guilt, being held civilly responsible or liable, or having a judgment levied for an antitrust violation in any federal or state trial court of record relating to charges brought by indictment, information, or complaint on or after July 1, 2021, as a result of a jury verdict, nonjury trial, or entry of a plea of guilty or nolo contendere or other finding of responsibility or liability.

(e)   "Economic incentives" means state grants, cash grants, tax exemptions, tax refunds, tax credits, state funds, and other state incentives under chapter 288 or administered by Enterprise Florida, Inc.

(f)   "Person" means a natural person or an entity organized under the laws of any state or of the United States which operates as a social media platform, as defined in s. 501.2041, with the legal power to enter into a binding contract and which bids or applies to bid on contracts let by a public entity, or which otherwise transacts or applies to transact business with a public entity. The term includes those officers, directors, executives, partners, shareholders, employees, members, and agents who are active in the management of an entity.

(g)   "Public entity" means the state and any of its departments or agencies.

(2)(a)   A person or an affiliate who has been placed on the antitrust violator vendor list following a conviction or being held civilly liable for an antitrust violation may not submit a bid, proposal, or reply for any new contract to provide any goods or services to a public entity; may not submit a bid, proposal, or reply for a new contract with a public entity for the construction or repair of a public building or public work; may not submit a bid, proposal, or reply on new leases of real property to a public entity; may not be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a new contract with a public entity; and may not transact new business with a public entity.

(b)   A public entity may not accept a bid, proposal, or reply from, award a new contract to, or transact new business with any person or affiliate on the antitrust violator vendor list unless that person or affiliate has been removed from the list pursuant to paragraph (3)(e).

(c)   This subsection does not apply to contracts that were awarded or business transactions that began before a person or an affiliate was placed on the antitrust violator vendor list or before July 1, 2021, whichever date occurs later.

CODING: Words stricken are deletions; words underlined are additions.

(3)(a)   Beginning July 1, 2021, all invitations to bid, requests for proposals, and invitations to negotiate, as those terms are defined in s. 287.012, and any contract document described in s. 287.058 must contain a statement informing persons of the provisions of paragraph (2)(a).

(b)   The department shall maintain an antitrust violator vendor list of the names and addresses of the persons or affiliates who have been disqualified from the public contracting and purchasing process under this section. The department shall electronically publish the initial antitrust violator vendor list on January 1, 2022, and shall update and electronically publish the list quarterly thereafter. Notwithstanding this paragraph, a person or an affiliate disqualified from the public contracting and purchasing process pursuant to this section is disqualified as of the date the department enters the final order.

(c)1.   After receiving notice of a judgment, sentence, or order from any source that a person was convicted or held civilly liable for an antitrust violation and after the department has investigated the information and verified both the judgment, sentence, or order and the identity of the person named in the documentation, the department must immediately notify the person or affiliate in writing of its intent to place the name of that person or affiliate on the antitrust violator vendor list and of the person's or affiliate's right to a hearing, the procedure that must be followed, and the applicable time requirements. If the person or affiliate does not request a hearing, the department shall enter a final order placing the name of the person or affiliate on the antitrust violator vendor list. A person or affiliate may be placed on the antitrust violator vendor list only after the department has provided the person or affiliate with a notice of intent.

2.   Within 21 days after receipt of the notice of intent, the person or affiliate may file a petition for a formal hearing under ss. 120.569 and 120.57(1) to determine whether good cause has been shown by the department and whether it is in the public interest for the person or affiliate to be placed on the antitrust violator vendor list. A person or an affiliate may not file a petition for an informal hearing under s. 120.57(2). The procedures of chapter 120 shall apply to any formal hearing under this paragraph except, within 30 days after the formal hearing or receipt of the hearing transcript, whichever is later, the administrative law judge shall enter a final order that shall consist of findings of fact, conclusions of law, interpretation of agency rules, and any other information required by law or rule to be contained in the final order. The final order shall direct the department to place or not place the person or affiliate on the antitrust violator vendor list. The final order of the administrative law judge is final agency action for purposes of s. 120.68.

3.   In determining whether it is in the public interest to place a person or an affiliate on the antitrust violator vendor list under this paragraph, the administrative law judge shall consider the following factors:

a.   Whether the person or affiliate was convicted or held civilly liable for an antitrust violation.

b.   The nature and details of the antitrust violation.

c.   The degree of culpability of the person or affiliate proposed to be placed on the antitrust violator vendor list.

d.   Reinstatement or clemency in any jurisdiction in relation to the antitrust violation at issue in the proceeding.

e.   The needs of public entities for additional competition in the procurement of goods and services in their respective markets.

f.   The effect of the antitrust violations on Floridians.

4.   After the person or affiliate requests a formal hearing, the burden shifts to the department to prove that it is in the public interest for the person or affiliate to whom it has given notice under this paragraph to be placed on the antitrust violator vendor list. Proof that a person was convicted or was held civilly liable or that an entity is an affiliate of such person constitutes a prima facie case that it is in the public interest for the person or affiliate to whom the department has given notice to be put on the antitrust violator vendor list. Status as an affiliate must be proven by clear and convincing evidence. Unless the administrative law judge determines that the person was convicted or that the person was civilly liable or is an affiliate of such person, that person or affiliate may not be placed on the antitrust violator vendor list.

5.   Any person or affiliate who has been notified by the department of its intent to place his or her name on the antitrust violator vendor list may offer evidence on any relevant issue. An affidavit alone does not constitute competent substantial evidence that the person has not been convicted or is not an affiliate of a person convicted or held civilly liable. Upon establishment of a prima facie case that it is in the public interest for the person or affiliate to whom the department has given notice to be put on the antitrust violator vendor list, the person or affiliate may prove by a preponderance of the evidence that it would not be in the public interest to put him or her on the antitrust violator vendor list, based upon evidence addressing the factors in subparagraph 3.

(d)1.   Upon receipt of an information or indictment from any source that a person has been charged with or accused of violating any state or federal antitrust law in a civil or criminal proceeding, including a civil investigative demand, brought by the Attorney General, a state attorney, the Federal Trade Commission, or the United States Department of Justice on or after July 1, 2021, the Attorney General must determine whether there is probable cause that a person has likely violated the underlying antitrust laws, which justifies temporary placement of such person on the antitrust violator vendor list until such proceeding has concluded.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

2.  If the Attorney General determines probable cause exists, the Attorney General shall notify the person in writing of its intent to temporarily place the name of that person on the antitrust violator vendor list, and of the person's right to a hearing, the procedure that must be followed, and the applicable time requirements. If the person does not request a hearing, the Attorney General shall enter a final order temporarily placing the name of the person on the antitrust violator vendor list. A person may be placed on the antitrust violator vendor list only after being provided with a notice of intent from the Attorney General.

3.  Within 21 days after receipt of the notice of intent, the person may file a petition for a formal hearing pursuant to ss. 120.569 and 120.57(1) to determine whether it is in the public interest for the person to be temporarily placed on the antitrust violator vendor list. A person may not file a petition for an informal hearing under s. 120.57(2). The procedures of chapter 120 shall apply to any formal hearing under this paragraph.

4.  In determining whether it is in the public interest to place a person on the antitrust violator vendor list under this paragraph, the administrative law judge shall consider the following factors:

a.  The likelihood the person will be convicted or held civilly liable for the antitrust violation.

b.  The nature and details of the antitrust violation.

c.  The degree of culpability of the person proposed to be placed on the antitrust violator vendor list.

d.  The needs of public entities for additional competition in the procurement of goods and services in their respective markets.

e.  The effect of the antitrust violations on Floridians.

5.  The Attorney General has the burden to prove that it is in the public interest for the person to whom it has given notice under this paragraph to be temporarily placed on the antitrust violator vendor list. Unless the administrative law judge determines that it is in the public interest to temporarily place a person on the antitrust violator vendor list, that person shall not be placed on the antitrust violator vendor list.

6.  This paragraph does not apply to affiliates.

(e)1.  A person or an affiliate may be removed from the antitrust violator vendor list subject to such terms and conditions as may be prescribed by the administrative law judge upon a determination that removal is in the public interest. In determining whether removal is in the public interest, the administrative law judge must consider any relevant factors, including, but not limited to, the factors identified in subparagraph (c)3. Upon proof that a person was found not guilty or not civilly liable, the antitrust violation case was dismissed, the court entered a finding in the person's favor, the person's

7

conviction or determination of liability has been reversed on appeal, or the person has been pardoned, the administrative law judge shall determine that removal of the person or an affiliate of that person from the antitrust violator vendor list is in the public interest. A person or an affiliate on the antitrust violator vendor list may petition for removal from the list no sooner than 6 months after the date a final order is entered pursuant to this section but may petition for removal at any time if the petition is based upon a reversal of the conviction or liability on appellate review or pardon. The petition must be filed with the department, and the proceeding must be conducted pursuant to the procedures and requirements of this subsection.

2.   If the petition for removal is denied, the person or affiliate may not petition for another hearing on removal for a period of 9 months after the date of denial unless the petition is based upon a reversal of the conviction on appellate review or a pardon. The department may petition for removal before the expiration of such period if, in its discretion, it determines that removal is in the public interest.

(4)   The conviction of a person or a person being held civilly liable for an antitrust violation, or placement on the antitrust violator vendor list, does not affect any rights or obligations under any contract, franchise, or other binding agreement that predates such conviction, finding of civil liability, or placement on the antitrust violator vendor list.

(5)   A person who has been placed on the antitrust violator vendor list is not a qualified applicant for economic incentives under chapter 288, and such person shall not be qualified to receive such economic incentives. This subsection does not apply to economic incentives that are awarded before a person is placed on the antitrust violator vendor list or before July 1, 2021.

(6)   This section does not apply to:

(a)   Any activity regulated by the Public Service Commission;

(b)   The purchase of goods or services made by any public entity from the Department of Corrections, from the nonprofit corporation organized under chapter 946, or from any qualified nonprofit agency for the blind or other severely handicapped persons under ss. 413.032-413.037; or

(c)   Any contract with a public entity to provide any goods or services for emergency response efforts related to a state of emergency declaration issued by the Governor.

(7)   This section may only be enforced to the extent not inconsistent with federal law and notwithstanding any other provision of state law.

Section 4.   Section 501.2041, Florida Statutes, is created to read:

501.2041   Unlawful acts and practices by social media platforms.—

(1)   As used in this section, the term:

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

**App. 58**

(a)  "Algorithm" means a mathematical set of rules that specifies how a group of data behaves and that will assist in ranking search results and maintaining order or that is used in sorting or ranking content or material based on relevancy or other factors instead of using published time or chronological order of such content or material.

(b)  "Censor" includes any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform.

(c)  "Deplatform" means the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days.

(d)  "Journalistic enterprise" means an entity doing business in Florida that:

1.  Publishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users;

2.  Publishes 100 hours of audio or video available online with at least 100 million viewers annually;

3.  Operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable television subscribers; or

4.  Operates under a broadcast license issued by the Federal Communications Commission.

(e)  "Post-prioritization" means action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results. The term does not include post-prioritization of content and material of a third party, including other users, based on payments by that third party, to the social media platform.

(f)  "Shadow ban" means action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform. This term includes acts of shadow banning by a social media platform which are not readily apparent to a user.

(g)  "Social media platform" means any information service, system, Internet search engine, or access software provider that:

1.  Provides or enables computer access by multiple users to a computer server, including an Internet platform or a social media site;

9

CODING: Words stricken are deletions; words underlined are additions.

2. Operates as a sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity;

3. Does business in the state; and

4. Satisfies at least one of the following thresholds:

a. Has annual gross revenues in excess of $100 million, as adjusted in January of each odd-numbered year to reflect any increase in the Consumer Price Index.

b. Has at least 100 million monthly individual platform participants globally.

The term does not include any information service, system, Internet search engine, or access software provider operated by a company that owns and operates a theme park or entertainment complex as defined in s. 509.013.

(h) "User" means a person who resides or is domiciled in this state and who has an account on a social media platform, regardless of whether the person posts or has posted content or material to the social media platform.

(2) A social media platform that fails to comply with any of the provisions of this subsection commits an unfair or deceptive act or practice as specified in s. 501.204.

(a) A social media platform must publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban.

(b) A social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform.

(c) A social media platform must inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days.

(d) A social media platform may not censor or shadow ban a user's content or material or deplatform a user from the social media platform:

1. Without notifying the user who posted or attempted to post the content or material; or

2. In a way that violates this part.

(e) A social media platform must:

1. Provide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts.

2.   Provide, upon request, a user with the number of other individual platform participants who were provided or shown content or posts.

(f)   A social media platform must:

1.   Categorize algorithms used for post-prioritization and shadow banning.

2.   Allow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content.

(g)   A social media platform must provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning and reoffer annually the opt-out opportunity in subparagraph (f)2.

(h)   A social media platform may not apply or use post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a candidate as defined in s. 106.011(3)(e), beginning on the date of qualification and ending on the date of the election or the date the candidate ceases to be a candidate. Post-prioritization of certain content or material from or about a candidate for office based on payments to the social media platform by such candidate for office or a third party is not a violation of this paragraph. A social media platform must provide each user a method by which the user may be identified as a qualified candidate and which provides sufficient information to allow the social media platform to confirm the user's qualification by reviewing the website of the Division of Elections or the website of the local supervisor of elections.

(i)   A social media platform must allow a user who has been deplatformed to access or retrieve all of the user's information, content, material, and data for at least 60 days after the user receives the notice required under subparagraph (d)1.

(j)   A social media platform may not take any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast. Post-prioritization of certain journalistic enterprise content based on payments to the social media platform by such journalistic enterprise is not a violation of this paragraph. This paragraph does not apply if the content or material is obscene as defined in s. 847.001.

(3)   For purposes of subparagraph (2)(d)1., a notification must:

(a)   Be in writing.

(b)   Be delivered via electronic mail or direct electronic notification to the user within 7 days after the censoring action.

(c)   Include a thorough rationale explaining the reason that the social media platform censored the user.

CODING: Words ~~stricken~~ are deletions; words underlined are additions.

(d)   Include a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable.

(4)   Notwithstanding any other provisions of this section, a social media platform is not required to notify a user if the censored content or material is obscene as defined in s. 847.001.

(5)   If the department, by its own inquiry or as a result of a complaint, suspects that a violation of this section is imminent, occurring, or has occurred, the department may investigate the suspected violation in accordance with this part. Based on its investigation, the department may bring a civil or administrative action under this part. For the purpose of bringing an action pursuant to this section, ss. 501.211 and 501.212 do not apply.

(6)   A user may only bring a private cause of action for violations of paragraph (2)(b) or subparagraph (2)(d)1. In a private cause of action brought under paragraph (2)(b) or subparagraph (2)(d)1., the court may award the following remedies to the user:

(a)   Up to $100,000 in statutory damages per proven claim.

(b)   Actual damages.

(c)   If aggravating factors are present, punitive damages.

(d)   Other forms of equitable relief, including injunctive relief.

(e)   If the user was deplatformed in violation of paragraph (2)(b), costs and reasonable attorney fees.

(7)   For purposes of bringing an action in accordance with subsections (5) and (6), each failure to comply with the individual provisions of subsection (2) shall be treated as a separate violation, act, or practice. For purposes of bringing an action in accordance with subsections (5) and (6), a social media platform that censors, shadow bans, deplatforms, or applies post-prioritization algorithms to candidates and users in the state is conclusively presumed to be both engaged in substantial and not isolated activities within the state and operating, conducting, engaging in, or carrying on a business, and doing business in this state, and is therefore subject to the jurisdiction of the courts of the state.

(8)   In an investigation by the department into alleged violations of this section, the department's investigative powers include, but are not limited to, the ability to subpoena any algorithm used by a social media platform related to any alleged violation.

12

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

(9)  This section may only be enforced to the extent not inconsistent with federal law and 47 U.S.C. s. 230(e)(3), and notwithstanding any other provision of state law.

Section 5.    Subsection (2) of section 501.212, Florida Statutes, is amended to read:

501.212    Application.—This part does not apply to:

(2)  Except as provided in s. 501.2041, a publisher, broadcaster, printer, or other person engaged in the dissemination of information or the reproduction of printed or pictorial matter, insofar as the information or matter has been disseminated or reproduced on behalf of others without actual knowledge that it violated this part.

Section 6.    If any provision of this act or the application thereof to any person or circumstance is held invalid, the invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared severable.

Section 7.    This act shall take effect July 1, 2021.

Approved by the Governor May 24, 2021.

Filed in Office Secretary of State May 24, 2021.

Social Media Use in 2021 | Pew Research Center



# Pew Research Center

RESEARCH TOPICS ▾     ALL PUBLICATIONS   METHODS   SHORT READS   TOOLS & RESOURCES   EXPERTS   ABO

Home  ›  Research Topics  ›  Internet & Technology  ›  Platforms & Services  ›  Social Media

PEW RESEARCH CENTER  |  APRIL 7, 2021

   

# Social Media Use in 2021

*A majority of Americans say they use YouTube and Facebook, while use of Instagram, Snapchat and TikTok is especially common among adults under 30.*

BY **BROOKE AUXIER** AND **MONICA ANDERSON**

How we did this 

Despite a string of controversies and the public's relatively negative sentiments about aspects of social media, roughly seven-in-ten Americans say they ever use any kind of social media site – a share that has remained relatively stable over the past five years, according to a new Pew Research Center survey of U.S. adults.

Beyond the general question of overall social media use, the survey also covers use of individual sites and apps. YouTube and Facebook continue to dominate the online landscape, with 81%

**App. 64**

and 69%, respectively, reporting ever using these sites. And YouTube and Reddit were the only two platforms measured that saw statistically significant growth since 2019, when the Center last polled on this topic via a phone survey.

When it comes to the other platforms in the survey, 40% of adults say they ever use Instagram and about three-in-ten report using Pinterest or LinkedIn. One-quarter say they use Snapchat, and similar shares report being users of Twitter or WhatsApp. TikTok – an app for sharing short videos – is used by 21% of Americans, while 13% say they use the neighborhood-focused platform Nextdoor.



**Growing share of Americans say they use YouTube; Facebook remains one of the most widely used online platforms among U.S. adults**

*% of U.S. adults who say they ever use …*

YouTube 81
Facebook 69
Instagram 40
Pinterest 31
LinkedIn 28
Snapchat 25
Twitter 23
WhatsApp 23
TikTok 21
Reddit 18
Nextdoor 13

Note: Respondents who did not give an answer are not shown. Pre-2018 telephone poll data is not available for YouTube, Snapchat and WhatsApp; pre-2019 telephone poll data is not available for Reddit. Pre-2021 telephone poll data is not available for TikTok. Trend data is not available for Nextdoor.
Source: Survey of U.S. adults conducted Jan. 25-Feb. 8, 2021.
"Social Media Use in 2021"

**PEW RESEARCH CENTER**

Even as other platforms do not nearly match the overall reach of YouTube or Facebook, there are certain sites or apps, most notably Instagram, Snapchat and TikTok, that have an especially strong following among young adults. In fact, a majority of 18- to 29-year-olds say they use Instagram (71%) or Snapchat (65%), while roughly half say the same for TikTok.

These findings come from a nationally representative survey of 1,502 U.S. adults conducted via telephone Jan. 25-Feb.8, 2021.

**With the exception of YouTube and Reddit, most platforms show little growth since 2019**

YouTube is the most commonly used online platform asked about in this survey, and there's evidence that its reach is growing. Fully 81% of Americans say they ever use the video-sharing site, up from 73% in 2019. Reddit was the only other platform polled about that experienced statistically significant growth during this time period – increasing from 11% in 2019 to 18% today.

Facebook's growth has leveled off over the last five years, but it remains one of the most widely used social media sites among adults in the United States: 69% of adults today say they ever use the site, equaling the share who said this two years prior.

Similarly, the respective shares of Americans who report using Instagram, Pinterest, LinkedIn, Snapchat, Twitter and WhatsApp are statistically unchanged since 2019. This represents a broader trend that extends beyond the past two years in which the rapid adoption of most of these sites and apps seen in the last decade has slowed. (This was the first year the Center asked about TikTok via a phone poll and the first time it has surveyed about Nextdoor.)

**Adults under 30 stand out for their use of Instagram, Snapchat and TikTok**

When asked about their social media use more broadly – rather than their use of specific platforms – 72% of Americans say they ever use social media sites.

In a pattern consistent with past Center studies on social media use, there are some stark age differences. Some 84% of adults 18 to 29 say they ever use any social media sites, which is similar to the share of those ages 30 to 49 who say this (81%). By comparison, a somewhat smaller share of those ages 50 to 64 (73%) say they use social media sites, while fewer than half of those 65 and older (45%) report doing this.

These age differences generally extend to use of specific platforms, with younger Americans being more likely than their older counterparts to use these sites – though the gaps between younger and older Americans vary across platforms.

Majorities of 18- to 29-year-olds say they use Instagram or Snapchat and about half say they use TikTok, with those on the younger end of this cohort – ages 18 to 24 – being especially likely to report using Instagram (76%), Snapchat (75%) or TikTok (55%).[1] These shares stand in stark contrast to those in older age groups. For instance, while 65% of adults ages 18 to 29 say they use Snapchat, just 2% of those 65 and older report

**App. 66**

using the app – a difference of 63 percentage points.

Additionally, a vast majority of adults under the age of 65 say they use YouTube. Fully 95% of those 18 to 29 say they use the platform, along with 91% of those 30 to 49 and 83% of adults 50 to 64. However, this share drops substantially – to 49% – among those 65 and older.

By comparison, age gaps between the youngest and oldest Americans are narrower for Facebook. Fully 70% of those ages 18 to 29 say they use the platform,



**Age gaps in Snapchat, Instagram use are particularly wide, less so for Facebook**

*% of U.S. adults in each age group who say they ever use ...*

Note: All differences shown in DIFF column are statistically significant. The DIFF values shown are based on subtracting the rounded values in the chart. Respondents who did not give an answer are not shown.
Source: Survey of U.S. adults conducted Jan. 25-Feb. 8, 2021.
"Social Media Use in 2021"

**PEW RESEARCH CENTER**

and those shares are statistically the same for those ages 30 to 49 (77%) or ages 50 to 64 (73%). Half of those 65 and older say they use the site – making Facebook and YouTube the two most used platforms among this older population.

Other sites and apps stand out for their demographic differences:

- **Instagram:** About half of Hispanic (52%) and Black Americans (49%) say they use the platform, compared with smaller shares of White Americans (35%) who say the same.[2]

- **WhatsApp:** Hispanic Americans (46%) are far more likely to say they use WhatsApp than Black (23%) or White Americans (16%). Hispanics also stood out for their WhatsApp use in the Center's previous surveys on this topic.

- **LinkedIn:** Those with higher levels of education are again more likely than those with lower levels of educational attainment to report being LinkedIn users. Roughly half of adults who have a bachelor's or advanced degree (51%) say they use LinkedIn, compared with smaller shares of those with some college experience (28%) and those with a high school diploma or less (10%).

- **Pinterest:** Women continue to be far more likely than men to say they use Pinterest when compared with male counterparts, by a difference of 30 points (46% vs. 16%).

- **Nextdoor:** There are large differences in use of this platform by community type. Adults living in urban (17%) or suburban (14%) areas are more likely to say they use Nextdoor. Just 2% of rural Americans report using the site.



**Use of online platforms, apps varies – sometimes widely – by demographic group**

*% of U.S. adults in each demographic group who say they ever use …*

|  | YouTube | Facebook | Instagram | Pinterest | LinkedIn | Snapchat | Twitter | WhatsApp | TikTok | Reddit | Nextdoor |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 81 | 69 | 40 | 31 | 28 | 25 | 23 | 23 | 21 | 18 | 13 |
| Men | 82 | 61 | 36 | 16 | 31 | 22 | 25 | 26 | 17 | 23 | 10 |
| Women | 80 | 77 | 44 | 46 | 26 | 28 | 22 | 21 | 24 | 12 | 16 |
| White | 79 | 67 | 35 | 34 | 29 | 23 | 22 | 16 | 18 | 17 | 15 |
| Black | 84 | 74 | 49 | 35 | 27 | 26 | 29 | 23 | 30 | 17 | 10 |
| Hispanic | 85 | 72 | 52 | 18 | 19 | 31 | 23 | 46 | 31 | 14 | 8 |
| Ages 18-29 | 95 | 70 | 71 | 32 | 30 | 65 | 42 | 24 | 48 | 36 | 5 |
| 30-49 | 91 | 77 | 48 | 34 | 36 | 24 | 27 | 30 | 22 | 22 | 17 |
| 50-64 | 83 | 73 | 29 | 38 | 33 | 12 | 18 | 23 | 14 | 10 | 16 |
| 65+ | 49 | 50 | 13 | 18 | 11 | 2 | 7 | 10 | 4 | 3 | 8 |
| <$30K | 75 | 70 | 35 | 21 | 12 | 25 | 12 | 23 | 22 | 10 | 6 |
| $30K-$49,999 | 83 | 76 | 45 | 33 | 21 | 27 | 29 | 20 | 29 | 17 | 11 |
| $50K-$74,999 | 79 | 61 | 39 | 29 | 21 | 29 | 22 | 19 | 20 | 20 | 12 |
| $75K+ | 90 | 70 | 47 | 40 | 50 | 28 | 34 | 29 | 20 | 26 | 20 |
| HS or less | 70 | 64 | 30 | 22 | 10 | 21 | 14 | 20 | 21 | 9 | 4 |
| Some college | 86 | 71 | 44 | 36 | 28 | 32 | 26 | 16 | 24 | 20 | 12 |
| College+ | 89 | 73 | 49 | 37 | 51 | 23 | 33 | 33 | 19 | 26 | 24 |
| Urban | 84 | 70 | 45 | 30 | 30 | 28 | 27 | 28 | 24 | 18 | 17 |
| Suburban | 81 | 70 | 41 | 32 | 33 | 25 | 23 | 23 | 20 | 21 | 14 |
| Rural | 74 | 67 | 25 | 34 | 15 | 18 | 18 | 9 | 16 | 10 | 2 |

Note: White and Black adults include those who report being only one race and are not Hispanic. Hispanics are of any race. Not all numerical differences between groups shown are statistically significant (e.g., there are no statistically significant differences between the shares of White, Black or Hispanic Americans who say the use Facebook). Respondents who did not give an answer are not shown.

Source: Survey of U.S. adults conducted Jan. 25-Feb. 8, 2021.

"Social Media Use in 2021"

**PEW RESEARCH CENTER**

## A majority of Facebook, Snapchat and Instagram users say they visit these platforms on a daily basis

While there has been much written about Americans' [changing relationship with Facebook](), its users remain quite active on the platform. Seven-in-ten Facebook users say they use the site daily, including 49% who say they

**App. 68**

use the site several times a day. (These figures are statistically unchanged from those reported in the [Center's 2019 survey](#) about social media use.)

Smaller shares – though still a majority – of Snapchat or Instagram users report visiting these respective platforms daily (59% for both). And being active on these sites is especially common for younger users. For instance, 71% of Snapchat users ages 18 to 29 say they use the app daily,



**Seven-in-ten Facebook users say they visit site daily**

*Among U.S. adults who say they use \_\_\_, % who use that site …*

| | Several times a day | About once a day | Less frequently | NET Daily |
|---|---|---|---|---|
| Facebook | 49 | 22 | 29 | 70 |
| Snapchat | 45 | 14 | 40 | 59 |
| Instagram | 38 | 21 | 41 | 59 |
| YouTube | 36 | 18 | 45 | 54 |
| Twitter | 30 | 16 | 53 | 46 |

Note: Respondents who did not give an answer are not shown. "Less frequently" category includes users who visit these sites a few times a week, every few weeks or less often.
Source: Survey of U.S. adults conducted Jan. 25-Feb. 8, 2021.
"Social Media Use in 2021"

**PEW RESEARCH CENTER**

including six-in-ten who say they do this multiple times a day. The pattern is similar for Instagram: 73% of 18- to 29-year-old Instagram users say they visit the site every day, with roughly half (53%) reporting they do so several times per day.

YouTube is used daily by 54% if its users, with 36% saying they visit the site several times a day. By comparison, Twitter is used less frequently, with fewer than half of its users (46%) saying they visit the site daily.

<div style="background:#eee;padding:1em;text-align:center">Next: Methodology</div>

← PREV PAGE     **1**   2   3     NEXT PAGE →

1. Due to a limited sample size, figures for those ages 25 to 29 cannot be reported on separately. ↵
2. There were not enough Asian American respondents in the sample to be broken out into a separate analysis. As always, their responses are incorporated into the general population figures throughout this report. ↵



**Facts are more important than ever**

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD    NEWSLETTERS    DONATE    MY ACCOUNT



Pew Research Center

Search pewresearch.org...

RESEARCH TOPICS ▾    ALL PUBLICATIONS    METHODS    SHORT READS    TOOLS & RESOURCES    EXPERTS    ABO

Home  >  Research Topics  >  Social Media Use in 2021

PEW RESEARCH CENTER  |  APRIL 7, 2021

  

SOCIAL MEDIA USE IN 2021

# Methodology

BY **BROOKE AUXIER** AND **MONICA ANDERSON**

The analysis in this report is based on telephone interviews conducted Jan. 25-Feb. 8, 2021, among a national sample of 1,502 adults, 18 years of age or older, living in all 50 U.S. states and the District of Columbia (300 respondents were interviewed on a landline telephone, and 1,202 were interviewed on a cellphone, including 845 who had no landline telephone). The survey was conducted by interviewers under the direction of Abt Associates. A combination of landline and cellphone random-digit-dial samples were used; both samples were provided by Dynata according to Abt Associates specifications. Interviews were conducted in English and Spanish. Respondents in the landline sample were selected by randomly asking for the youngest adult male or female who is now at home. Interviews in the cell sample were conducted with the person who answered the phone, if that person was an adult 18 years of age or older. For detailed information about our survey methodology, see: https://www.pewresearch.org/methodology/u-s-survey-research/

The combined landline and cellphone sample are weighted using an iterative technique that matches gender, age, education, race, Hispanic origin and nativity and region to parameters from the U.S. Census Bureau's 2019 American Community Survey one-year estimates and population density to parameters from the decennial census. The sample

also is weighted to match current patterns of telephone status (landline only, cellphone only, or both landline and cellphone), based on extrapolations from the 2019 National Health Interview Survey. The weighting procedure also accounts for the fact that respondents with both landline and cellphones have a greater probability of being included in the combined sample and adjusts for household size among respondents with a landline phone. The margins of error reported and statistical tests of significance are adjusted to account for the survey's design effect, a measure of how much efficiency is lost from the weighting procedures.

The following table shows the unweighted sample sizes and the error attributable to sampling that would be expected at the 95% level of confidence for different groups in the survey:

| Group | Unweighted sample size | Plus or minus ... |
|---|---|---|
| Total sample | 1,502 | 2.9 percentage points |
| Ages 18-29 | 220 | 7.3 percentage points |
| 30-49 | 416 | 5.2 percentage points |
| 50-64 | 382 | 5.8 percentage points |
| 65+ | 429 | 5.8 percentage points |

Sample sizes and sampling errors for other subgroups are available upon request.

In addition to sampling error, one should bear in mind that question wording and practical difficulties in conducting surveys can introduce error or bias into the findings of opinion polls.

Pew Research Center undertakes all polling activity, including calls to mobile telephone numbers, in compliance with the Telephone Consumer Protection Act and other applicable laws.

Pew Research Center is a nonprofit, tax-exempt 501(c)(3) organization and a subsidiary of The Pew Charitable Trusts, its primary funder.

Next: Acknowledgments

← PREV PAGE    1  **2**  3    NEXT PAGE →



NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD   NEWSLETTERS   |   DONATE   |   MY ACCOUNT

# Pew Research Center

Search pewresearch.org...

RESEARCH TOPICS ▾   ALL PUBLICATIONS   METHODS   SHORT READS   TOOLS & RESOURCES   EXPERTS   ABO

Home  ›  Research Topics  ›  Social Media Use in 2021

PEW RESEARCH CENTER   |   APRIL 7, 2021

 

SOCIAL MEDIA USE IN 2021

# Acknowledgments

BY **BROOKE AUXIER** AND **MONICA ANDERSON**

This report is a collaborative effort based on the input and analysis of the following individuals. Find related reports online at [pewresearch.org/internet](pewresearch.org/internet).

**Primary researchers**

Brooke Auxier, *Former Research Associate*
Monica Anderson, *Associate Director, Research*

**Research team**

Lee Rainie, *Director, Internet and Technology Research*
Andrew Perrin, *Research Analyst*
Emily A. Vogels, *Research Associate*

**Editorial and graphic design**

Margaret Porteus, *Information Graphics Designer*
David Kent, *Senior Copy Editor*

**App. 72**

**Communications and web publishing**

Haley Nolan, *Communications Associate*

Kelsey Beveridge, *Communications Associate*

Sara Atske, *Associate Digital Producer*

In addition, the project benefited greatly from the guidance of Pew Research Center's methodology team: Courtney Kennedy, Andrew Mercer, Nick Bertoni, Dorene Asare-Marfo, Nick Hatley, Ashley Amaya and Arnold Lau.

Back to Overview

← PREV PAGE          1  2  3          NEXT PAGE →



## Sign up for our Internet, Science & Tech newsletter

New findings, delivered monthly

Email address

SIGN UP

REPORT MATERIALS



Complete Report PDF



Topline Questionnaire



Social Media Fact Sheet

TABLE OF CONTENTS

**App. 73**

# INVESTIGATION OF COMPETITION IN DIGITAL MARKETS

————

## MAJORITY STAFF REPORT AND RECOMMENDATIONS

## SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW OF THE COMMITTEE ON THE JUDICIARY

————

Jerrold Nadler, Chairman, Committee on the Judiciary

David N. Cicilline, Chairman, Subcommittee on Antitrust, Commercial and Administrative Law



UNITED STATES
2020

**MAJORITY STAFF**

**SUBCOMMITTEE ON ANTITRUST, COMMERCIAL AND ADMINISTRATIVE LAW**

**SLADE BOND**
Chief Counsel

| **LINA KHAN** | **AMANDA LEWIS** |
|---|---|
| Counsel | Counsel on Detail, Federal Trade Commission |
| **PHILLIP BERENBROICK** | **ANNA LENHART** |
| Counsel | Technologist |
| **JOSEPH EHRENKRANTZ** | **CATHERINE LARSEN** |
| Special Assistant | Special Assistant |

**JOSEPH VAN WYE**
Professional Staff Member

**COMMITTEE ON THE JUDICIARY**

| **PERRY APELBAUM** | **AMY RUTKIN** | **JOHN DOTY** |
|---|---|---|
| Staff Director and Chief Counsel | Chief of Staff | Senior Advisor |
| **AARON HILLER** | **JOHN WILLIAMS** | **DAVID GREENGRASS** |
| Deputy Chief Counsel | Parliamentarian | Senior Counsel |
| **SHADAWN REDDICK-SMITH** | **DANIEL SCHWARZ** | **ARYA HARIHARAN** |
| Communications Director | Director of Strategic Communications | Deputy Chief Oversight Counsel |
| **JESSICA PRESLEY** | **MOH SHARMA** | **MATTHEW ROBINSON** |
| Director of Digital Strategy | Director of Member Services and | Counsel |
| **MADELINE STRASSER** | Outreach & Policy Advisor | **KAYLA HAMEDI** |
| Chief Clerk | | Deputy Press Secretary |

| **NATHAN ADAL** | **BENJAMIN FEIS** | **ARMAN RAMNATH** |
|---|---|---|
| Legal Fellow | Legal Fellow | Legal Fellow |
| **KARNA ADAM** | **CORY GORDON** | **REED SHOWALTER** |
| Legal Fellow | Legal Fellow | Legal Fellow |
| **WILLIAM BEKKER** | **ETHAN GURWITZ** | **JÖEL THOMPSON** |
| Legal Fellow | Legal Fellow | Legal Fellow |
| **KYLE BIGLEY** | **DOMENIC POWELL** | **KURT WALTERS** |
| Legal Fellow | Legal Fellow | Legal Fellow |
| **MICHAEL ENSEKI-FRANK** | | **KRYSTALYN WEAVER** |
| Legal Fellow | | Legal Fellow |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 6

  A.   Chairs' Foreword ........................................................................................ 6

  B.   Executive Summary .................................................................................... 9

    1.   Subcommittee's Investigation ............................................................. 9

    2.   Findings ............................................................................................. 10

    3.   Recommendations ............................................................................. 19

II.   THE INVESTIGATION OF COMPETITION IN DIGITAL MARKETS .................. 21

  A.   Requests for Information and Submissions ............................................... 21

    1.   First-Party Requests for Information ................................................. 21

    2.   Process for Obtaining Responses to First-Party Requests ................. 25

    3.   Third-party Requests for Information ................................................ 26

    4.   Antitrust Agencies Requests for Information .................................... 28

  B.   Hearings ..................................................................................................... 29

  C.   Roundtables ............................................................................................... 31

  D.   Prior Investigations ................................................................................... 32

III.  BACKGROUND ................................................................................................ 36

  A.   Overview of Competition in Digital Markets ............................................ 36

    1.   The Role of Competition Online ....................................................... 36

    2.   Market Structure ............................................................................... 37

    3.   Barriers to Entry ............................................................................... 40

  B.   Effects of Platform Market Power ............................................................ 46

    1.   Innovation and Entrepreneurship ..................................................... 46

    2.   Privacy and Data Protection ............................................................. 51

    3.   The Free and Diverse Press .............................................................. 57

    4.   Political and Economic Liberty ........................................................ 73

IV.  MARKETS INVESTIGATED .............................................................................. 77

  A.   Online Search ............................................................................................ 77

  B.   Online Commerce ...................................................................................... 84

  C.   Social Networks and Social Media ........................................................... 88

    1.   Social Networks are Distinguishable from Social Media .................. 90

    2.   Market Concentration ....................................................................... 92

  D.   Mobile App Stores .................................................................................... 93

  E.   Mobile Operating Systems ........................................................................ 100

3

**App. 76**

F.    Digital Mapping .................................................................................. 107

G.    Cloud Computing .............................................................................. 109

H.    Voice Assistant ................................................................................. 120

I.    Web Browsers ................................................................................... 126

J.    Digital Advertising ........................................................................... 129

V.    DOMINANT ONLINE PLATFORMS ...................................................... 132

    A.    Facebook .......................................................................................... 132

        1.    Overview ................................................................................... 132

        2.    Social Networking .................................................................... 133

        3.    Digital Advertising ................................................................... 170

    B.    Google .............................................................................................. 174

        1.    Overview ................................................................................... 174

        2.    Search ....................................................................................... 176

        3.    Digital Advertisements ............................................................. 206

        4.    Android and Google Play Store ................................................ 211

        5.    Chrome ..................................................................................... 223

        6.    Maps ......................................................................................... 230

        7.    Cloud ........................................................................................ 245

    C.    Amazon ............................................................................................ 247

        1.    Overview ................................................................................... 247

        2.    Amazon.com .............................................................................. 254

        3.    Fulfillment and Delivery .......................................................... 302

        4.    Alexa's Internet of Things Ecosystem ...................................... 305

        5.    Amazon Web Services .............................................................. 316

    D.    Apple ............................................................................................... 330

        1.    Overview ................................................................................... 330

        2.    iOS and the App Store .............................................................. 334

        3.    Siri Intelligent Voice Assistant ................................................ 373

VI.    RECOMMENDATIONS ............................................................................ 376

    A.    Restoring Competition in the Digital Economy ............................... 377

        1.    Reduce Conflicts of Interest Thorough Structural Separations and Line of Business Restrictions ........................................................................... 378

        2.    Implement Rules to Prevent Discrimination, Favoritism, and Self-Preferencing ............. 382

        3.    Promote Innovation Through Interoperability and Open Access ...................................... 384

        4.    Reduce Market Power Through Merger Presumptions .................................................... 387

5. Create an Even Playing Field for the Free and Diverse Press .............................. 388

6. Prohibit Abuse of Superior Bargaining Power and Require Due Process ........................ 389

B. Strengthening the Antitrust Laws ................................................................ 391

1. Restore the Antimonopoly Goals of the Antitrust Laws ....................................... 391

2. Invigorate Merger Enforcement ............................................................... 392

3. Rehabilitate Monopolization Law ............................................................. 395

4. Additional Measures to Strengthen the Antitrust Laws ....................................... 398

C. Strengthening Antitrust Enforcement ............................................................. 399

1. Congressional Oversight ..................................................................... 399

2. Agency Enforcement .......................................................................... 401

3. Private Enforcement ......................................................................... 403

VII. APPENDIX: MERGERS AND ACQUISITIONS BY DOMINANT PLATFORMS ................. 406

A. Amazon ........................................................................................ 406

B. Apple ......................................................................................... 414

C. Facebook ...................................................................................... 423

D. Google ........................................................................................ 431

**App. 78**

I.   INTRODUCTION

A.   Chairs' Foreword

In June 2019, the Committee on the Judiciary initiated a bipartisan investigation into the state of competition online, spearheaded by the Subcommittee on Antitrust, Commercial and Administrative Law. As part of a top-to-bottom review of the market, the Subcommittee examined the dominance of Amazon, Apple, Facebook, and Google, and their business practices to determine how their power affects our economy and our democracy. Additionally, the Subcommittee performed a review of existing antitrust laws, competition policies, and current enforcement levels to assess whether they are adequate to address market power and anticompetitive conduct in digital markets.

Over the course of our investigation, we collected extensive evidence from these companies as well as from third parties—totaling nearly 1.3 million documents. We held seven hearings to review the effects of market power online—including on the free and diverse press, innovation, and privacy—and a final hearing to examine potential solutions to concerns identified during the investigation and to inform this Report's recommendations.

A year after initiating the investigation, we received testimony from the Chief Executive Officers of the investigated companies: Jeff Bezos, Tim Cook, Mark Zuckerberg, and Sundar Pichai. For nearly six hours, we pressed for answers about their business practices, including about evidence concerning the extent to which they have exploited, entrenched, and expanded their power over digital markets in anticompetitive and abusive ways. Their answers were often evasive and non-responsive, raising fresh questions about whether they believe they are beyond the reach of democratic oversight.

Although these four corporations differ in important ways, studying their business practices has revealed common problems. First, each platform now serves as a gatekeeper over a key channel of distribution. By controlling access to markets, these giants can pick winners and losers throughout our economy. They not only wield tremendous power, but they also abuse it by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on them. Second, each platform uses its gatekeeper position to maintain its market power. By controlling the infrastructure of the digital age, they have surveilled other businesses to identify potential rivals, and have ultimately bought out, copied, or cut off their competitive threats. And, finally, these firms have abused their role as intermediaries to further entrench and expand their dominance. Whether through self-preferencing, predatory pricing, or exclusionary conduct, the dominant platforms have exploited their power in order to become even more dominant.

To put it simply, companies that once were scrappy, underdog startups that challenged the status quo have become the kinds of monopolies we last saw in the era of oil barons and railroad tycoons. Although these firms have delivered clear benefits to society, the dominance of Amazon, Apple, Facebook, and Google has come at a price. These firms typically run the marketplace while

**App. 79**

also competing in it—a position that enables them to write one set of rules for others, while they play by another, or to engage in a form of their own private *quasi* regulation that is unaccountable to anyone but themselves.

The effects of this significant and durable market power are costly. The Subcommittee's series of hearings produced significant evidence that these firms wield their dominance in ways that erode entrepreneurship, degrade Americans' privacy online, and undermine the vibrancy of the free and diverse press. The result is less innovation, fewer choices for consumers, and a weakened democracy.

Nearly a century ago, Supreme Court Justice Louis Brandeis wrote: "We must make our choice. We may have democracy, or we may have wealth concentrated in the hands of a few, but we cannot have both." Those words speak to us with great urgency today.

Although we do not expect that all of our Members will agree on every finding and recommendation identified in this Report, we firmly believe that the totality of the evidence produced during this investigation demonstrates the pressing need for legislative action and reform. These firms have too much power, and that power must be reined in and subject to appropriate oversight and enforcement. Our economy and democracy are at stake.

As a charter of economic liberty, the antitrust laws are the backbone of open and fair markets. When confronted by powerful monopolies over the past century—be it the railroad tycoons and oil barons or Ma Bell and Microsoft—Congress has acted to ensure that no dominant firm captures and holds undue control over our economy or our democracy. We face similar challenges today. Congress—not the courts, agencies, or private companies—enacted the antitrust laws, and Congress must lead the path forward to modernize them for the economy of today, as well as tomorrow. Our laws must be updated to ensure that our economy remains vibrant and open in the digital age.

Congress must also ensure that the antitrust agencies aggressively and fairly enforce the law. Over the course of the investigation, the Subcommittee uncovered evidence that the antitrust agencies failed, at key occasions, to stop monopolists from rolling up their competitors and failed to protect the American people from abuses of monopoly power. Forceful agency action is critical.

Lastly, Congress must revive its tradition of robust oversight over the antitrust laws and increased market concentration in our economy. In prior Congresses, the Subcommittee routinely examined these concerns in accordance with its constitutional mandate to conduct oversight and perform its legislative duties. As a 1950 report from the then-named Subcommittee on the Study of Monopoly Power described its mandate: "It is the province of this subcommittee to investigate factors which tend to eliminate competition, strengthen monopolies, injure small business, or promote undue

**App. 80**

concentration of economic power; to ascertain the facts, and to make recommendations based on those findings."[1]

Similarly, the Subcommittee has followed the facts before it to produce this Report, which is the product of a considerable evidentiary and oversight record. This record includes: 1,287,997 documents and communications; testimony from 38 witnesses; a hearing record that spans more than 1,800 pages; 38 submissions from 60 antitrust experts from across the political spectrum; and interviews with more than 240 market participants, former employees of the investigated platforms, and other individuals totaling thousands of hours. The Subcommittee has also held hearings and roundtables with industry and government witnesses, consultations with subject-matter experts, and a careful—and at times painstaking—review of large volumes of evidence provided by industry participants and regulators.

In light of these efforts, we extend our deep gratitude to the staff of the Subcommittee and Full Committee for their diligent work in this regard, particularly during the COVID-19 pandemic and other challenging circumstances over the past year.

Finally, as an institutional matter, we close by noting that the Committee's requests for information from agencies and any non-public briefings were solely for the purpose of carrying out our constitutionally based legislative and oversight functions. In particular, the information requested was vital to informing our assessment of whether existing antitrust laws are adequate for tackling current competition problems, as well as in uncovering potential reasons for under-enforcement. The Report by Subcommittee staff is based on the documents and information collected during its investigation, and the Committee fully respects the separate and independent decisional processes employed by enforcement authorities with respect to such matters.

Although the companies provided substantial information and numerous documents to the Subcommittee, they declined to produce certain critical information and crucial documents we requested. The material withheld was identified by the Committee as relevant to the investigation and included, primarily, two categories of information: (1) documents the companies' claimed were protected by common law privileges; and (2) documents that were produced to antitrust authorities in ongoing investigations, or that related to the subject matter of these ongoing investigations.

Institutionally, we reject any argument that the mere existence of ongoing litigation prevents or prohibits Congress from obtaining information relevant to its legislative and oversight prerogatives. We strongly disagree with the assertion that any requests for such materials and any compliance with those requests interfere with the decisional processes in ongoing investigations. Furthermore, while Congress is fully subject to constitutional protections, we cannot agree that we are bound by common

---

[1] H. Rep. No. 255, at 2 (1951) (Aluminum: Report of the Subcomm. On Study of Monopoly Power of the H. Comm. on the Judiciary).

law privileges as asserted by the companies. While we determined that insufficient time exists to pursue these additional materials during this Congress, the Committee expressly reserves the right to invoke other available options, including compulsory process, to obtain the requested information in the future.

The views and conclusions contained in the Report are staff views and do not necessarily reflect those of the Committee on the Judiciary or any of its Members.

<div align="center">B.      Executive Summary</div>

1. Subcommittee's Investigation

On June 3, 2019, the House Judiciary Committee announced a bipartisan investigation into competition in digital markets,[2] led by the Subcommittee on Antitrust, Commercial and Administrative Law.[3] The purpose of the investigation was to: (1) document competition problems in digital markets; (2) examine whether dominant firms are engaging in anticompetitive conduct; and (3) assess whether existing antitrust laws, competition policies, and current enforcement levels are adequate to address these issues.[4] The Committee initiated the investigation in response to broad-ranging investigative reporting, and activity by policymakers and enforcers, that raised serious concerns about the platforms' incentives and ability to harm the competitive process.[5]

---

[2] Press Release, H. Comm. on the Judiciary, House Judiciary Committee Launches Bipartisan Investigation into Competition in Digital Markets (June 3, 2019), https://judiciary.house.gov/news/press-releases/house-judiciary-committee-launches-bipartisan-investigation-competition-digital.

[3] We extend our sincere thanks to Peter Karafotas, Rich Luchette, and Francis Grubar, in the Office of Congressman David N. Cicilline, for their relentless work and selfless devotion throughout the investigation. We would also like to recognize the following staff for their significant contributions during the investigation: Dick Meltzer, Michael Tecklenburg, Kenneth DeGraff, and Victoria Houed in the Office of the Speaker of the U.S. House of Representatives; Daniel Flores, former Minority Chief Counsel, Subcommittee on Antitrust, Commercial and Administrative Law; Danny Johnson, former Minority counsel, Committee on the Judiciary; Jacqui Kappler, Legislative Director, the Honorable Henry "Hank" Johnson, Jr.; Devon Ombres, Legislative Counsel, the Honorable Jamie Raskin; Elly Kugler, Senior Counsel, the Honorable Pramila Jayapal; Jennifer Chan, Legislative Director, the Honorable Pramila Jayapal; Stuart Styron, Senior Legislative Assistant, the Honorable Val Demings; Keanu Rivera, Legislative Assistant, the Honorable Mary Gay Scanlon; Lindsey Garber, Legislative Counsel, the Honorable Joe Neguse; Miya Patel, former Legislative Assistant, the Honorable Joe Neguse; and Natalie Knight, Legislative Counsel, the Honorable Lucy McBath. Staff would also like to thank Matthew Bisenius in the Office of F. James Sensenbrenner, as well as Garrett Ventry in the Office of Congressman Ken Buck, for their commitment to bipartisan cooperation. We also thank Hillary Marston, Legal Intern for the Committee on the Judiciary, for her assistance. Finally, we thank Clare Cho and Mari Lee at the Congressional Research Service for their support, as well as graphics and data visualization used within this Report.

[4] Press Release, H. Comm. on the Judiciary, House Judiciary Committee Launches Bipartisan Investigation into Competition in Digital Markets (June 3, 2019), https://judiciary.house.gov/news/press-releases/house-judiciary-committee-launches-bipartisan-investigation-competition-digital.

[5] See, e.g., Meehreen Khan, *EU Targets Tech Giants over Unfair Business Practices*, Fin. Times (Apr. 25, 2018), https://www.ft.com/content/d7228bec-4879-11e8-8ee8-cae73aab7ccb; Adam Satariano, *Google is Fined $57 Million Under Europe's Data Privacy Law*, N.Y. Times (Jan. 21, 2019), https://www.nytimes.com/2019/01/21/technology/google-europe-gdpr-fine.html; Richard Waters et al., *Global Regulators' Net Tightens Around Big Tech*, Fin. Times, (June 5, 2019), https://www.ft.com/content/973f8b36-86f0-11e9-97ea-05ac2431f453.

As part of the investigation, the Subcommittee held seven oversight hearings that provided Members of the Subcommittee with an opportunity to examine the state of competition in digital markets and the adequacy of existing antitrust laws. A diverse group of witnesses offered testimony on topics related to the effects of market power on the free and diverse press, on innovation, and on privacy. Other witnesses who testified included executives from businesses with concerns about the dominance of the investigated firms. The hearings also provided an opportunity for key executives from Facebook, Google, Amazon, and Apple—including the Chief Executive Officers of these firms—to address evidence that was uncovered during the investigation in a public-facing venue. After each of the hearings, Members of the Subcommittee submitted questions for the record (QFRs) to the witnesses.

The Committee requested information from the dominant platforms, from market participants, from the Federal antitrust agencies, and from other relevant parties, for the purpose of obtaining information that was not otherwise publicly available but was important to assembling a comprehensive record. The Committee also sent requests for submissions to various experts in the field, including academics, representatives of public interest groups, and practicing antitrust lawyers. The responses to these requests were indispensable to staff's ability to complete this Report and its recommendations for congressional oversight of the antitrust agencies and legislative action.

This Report is intended to provide policymakers, antitrust enforcers, market participants, and the public with a comprehensive understanding of the state of competition in the online marketplace. The Report also provides recommendations for areas of legislative activity to address the rise and abuse of market power in the digital economy, as well as areas that warrant additional congressional attention.

2. <u>Findings</u>

   a. <u>Overview</u>

The open internet has delivered significant benefits to Americans and the U.S. economy. Over the past few decades, it has created a surge of economic opportunity, capital investment, and pathways for education. The COVID-19 pandemic has underscored the importance of internet access that is affordable, competitive, and widely available for workers, families, and businesses.

The online platforms investigated by the Subcommittee—Amazon, Apple, Facebook, and Google—also play an important role in our economy and society as the underlying infrastructure for the exchange of communications, information, and goods and services. As of September 2020, the combined valuation of these platforms is more than $5 trillion—more than a third of the value of the S&P 100. As we continue to shift our work, commerce, and communications online, these firms stand to become even more interwoven into the fabric of our economy and our lives.

**App. 83**

Over the past decade, the digital economy has become highly concentrated and prone to monopolization. Several markets investigated by the Subcommittee—such as social networking, general online search, and online advertising—are dominated by just one or two firms. The companies investigated by the Subcommittee—Amazon, Apple, Facebook, and Google—have captured control over key channels of distribution and have come to function as gatekeepers. Just a decade into the future, 30% of the world's gross economic output may lie with these firms, and just a handful of others.[6]

In interviews with Subcommittee staff, numerous businesses described how dominant platforms exploit their gatekeeper power to dictate terms and extract concessions that no one would reasonably consent to in a competitive market. Market participants that spoke with Subcommittee staff indicated that their dependence on these gatekeepers to access users and markets requires concessions and demands that carry significant economic harm, but that are "the cost of doing business" given the lack of options.

This significant and durable market power is due to several factors, including a high volume of acquisitions by the dominant platforms. Together, the firms investigated by the Subcommittee have acquired hundreds of companies just in the last ten years. In some cases, a dominant firm evidently acquired nascent or potential competitors to neutralize a competitive threat or to maintain and expand the firm's dominance. In other cases, a dominant firm acquired smaller companies to shut them down or discontinue underlying products entirely—transactions aptly described as "killer acquisitions."[7]

In the overwhelming number of cases, the antitrust agencies did not request additional information and documentary material under their pre-merger review authority in the Clayton Act to examine whether the proposed acquisition may substantially lessen competition or tend to create a monopoly if allowed to proceed as proposed. For example, of Facebook's nearly 100 acquisitions, the Federal Trade Commission engaged in an extensive investigation of just one acquisition: Facebook's purchase of Instagram in 2012.

During the investigation, Subcommittee staff found evidence of monopolization and monopoly power. For example, the strong network effects associated with Facebook has tipped the market toward

---

[6] Catherine Fong et al., *Prime Day and the broad reach of Amazon's ecosystem*, McKinsey & Co. (Aug. 2, 2019), https://www.mckinsey.com/business-functions/marketing-and-sales/our-insights/prime-day-and-the-broad-reach-of-amazons-ecosystem ("This ecosystem strategy in particular has significant competitive implications because McKinsey estimates that in ten years, 30 percent of the world's gross economic output will be from companies that operate a network of interconnected businesses, such as those run by Amazon, Alibaba, Google, and Facebook.").

[7] Colleen Cunningham, Florian Ederer & Song Ma, *Killer Acquisitions*, 1 (Yale Sch. of Mgmt. Working Paper, Mar. 2019), https://perma.cc/L6YL-YL8K (describing the practice of "acquir[ing] innovative targets solely to discontinue the target's innovative projects and preempt future competition."). *See also* C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. Pa. L. Rev. (forthcoming 2020) (manuscript at 2), https://perma.cc/62HH-34ZL ("A nascent competitor is a firm whose prospective innovation represents a serious future threat to an incumbent.").

**App. 84**

monopoly such that Facebook competes more vigorously among its own products—Facebook, Instagram, WhatsApp, and Messenger—than with actual competitors.

As demonstrated during a series of hearings held by the Subcommittee and as detailed in this Report,[8] the online platforms' dominance carries significant costs. It has diminished consumer choice, eroded innovation and entrepreneurship in the U.S. economy, weakened the vibrancy of the free and diverse press, and undermined Americans' privacy.

These concerns are shared by the majority of Americans. On September 24, 2020, Consumer Reports (CR) published a survey titled "Platform Perceptions: Consumer Attitudes on Competition and Fairness in Online Platforms."[9] Among its findings:

- 85% of Americans are concerned—either very concerned or somewhat concerned— about the amount of data online platforms store about them, and 81% are concerned that platforms are collecting and holding this data in order to build out more comprehensive consumer profiles.

- 58% are not confident that they are getting objective and unbiased search results when using an online platform to shop or search for information.

- 79% say Big Tech mergers and acquisitions unfairly undermine competition and consumer choice.[10]

- 60% support more government regulation of online platforms, including mandatory interoperability features, to make it easier for users to switch from one platform to another without losing important data or connections.

b.  <u>Facebook</u>

Facebook has monopoly power in the market for social networking. Internal communications among the company's Chief Executive Officer, Mark Zuckerberg, and other senior executives indicate that Facebook acquired its competitive threats to maintain and expand its dominance. For example, a senior executive at the company described its acquisition strategy as a "land grab" to "shore up" Facebook's position,[11] while Facebook's CEO said that Facebook "can likely always just buy any

---

[8] *See infra* Section V.

[9] CONSUMER. REPS., PLATFORM PERCEPTIONS: CONSUMER ATTITUDES ON COMPETITION AND FAIRNESS IN ONLINE PLATFORMS (2020), https://advocacy.consumerreports.org/wp-content/uploads/2020/09/FINAL-CR-survey-report.platform-perceptions-consumer-attitudes-.september-2020.pdf.

[10] *Id.*

[11] Production from Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045388 (Feb. 18, 2014), https://judiciary.house.gov/uploadedfiles/0004538800045389.pdf ("[W]e are going to spend 5-10% of our market cap every

**App. 85**

competitive startups,"[12] and agreed with one of the company's senior engineers that Instagram was a threat to Facebook.[13]

Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms. In 2012, the company described its network effects as a "flywheel" in an internal presentation prepared for Facebook at the direction of its Chief Financial Officer.[14] This presentation also said that Facebook's network effects get "stronger every day."[15]

More recent documents produced during the investigation by Facebook show that it has tipped the social networking market toward a monopoly, and now considers competition within its own family of products to be more considerable than competition from any other firm. These documents include an October 2018 memorandum by Thomas Cunningham, a senior data scientist and economist at Facebook,[16] for Mr. Zuckerberg and Javier Olivan, Facebook's Director of Growth.[17] Among other things, the Cunningham Memo found that the network effects of Facebook and its family of products are "very strong,"[18] and that there are strong tipping points in the social networking market that create competition for the market, rather than competition within the market.[19]

According to a former senior employee at Instagram who was involved in the preparation of this document for review by Mr. Zuckerberg and Mr. Olivan, the Cunningham Memo guided Facebook's growth strategy, particularly with regard to Instagram.[20] They explained:

> The question was how do we position Facebook and Instagram to not compete with each other. The concern was the Instagram would hit a tipping point . . . There was brutal in-fighting between Instagram and Facebook at the time. It was very tense. It was back when Kevin Systrom was still at the company. He wanted Instagram to grow

---

couple years to shore up our position . . . I hate the word 'land grab' but I think that is the best convincing argument and we should own that.").

[12] *Id.* at FB-HJC-ACAL-00067600 (Apr. 9, 2012), https://judiciary.house.gov/uploadedfiles/0006760000067601.pdf.

[13] *Id.*

[14] *Id.* at FB-HJC-ACAL-00049006 (Apr. 18, 2012) (on file with Comm.) ("Network effects make it very difficult to compete with us - In every country we've tipped we are still winning.")

[15] *Id.*

[16] *Id.* at FB-HJC-ACAL-00111406 (Oct. 2018) [hereinafter Cunningham Memo] ("Facebook has high reach and time-spent in most countries. User growth is tracking internet growth: global reach is roughly stable.").

[17] *Id.*

[18] *Id.* at 11.

[19] *Id.* at 9.

[20] *Id.*

**App. 86**

naturally and as widely as possible. But Mark was clearly saying "do not compete with us." . . . It was collusion, but within an internal monopoly. If you own two social media utilities, they should not be allowed to shore each other up. It's unclear to me why this should not be illegal. You can collude by acquiring a company.[21]

Facebook has also maintained its monopoly through a series of anticompetitive business practices. The company used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms. Once dominant, Facebook selectively enforced its platform policies based on whether it perceived other companies as competitive threats. In doing so, it advantaged its own services while weakening other firms.

In the absence of competition, Facebook's quality has deteriorated over time, resulting in worse privacy protections for its users and a dramatic rise in misinformation on its platform.

c. <u>Google</u>

Google has a monopoly in the markets for general online search and search advertising. Google's dominance is protected by high entry barriers, including its click-and-query data and the extensive default positions that Google has obtained across most of the world's devices and browsers. A significant number of entities—spanning major public corporations, small businesses, and entrepreneurs—depend on Google for traffic, and no alternate search engine serves as a substitute.

Google maintained its monopoly over general search through a series of anticompetitive tactics. These include an aggressive campaign to undermine vertical search providers, which Google viewed as a significant threat. Documents show that Google used its search monopoly to misappropriate content from third parties and to boost Google's own inferior vertical offerings, while imposing search penalties to demote third-party vertical providers. Since capturing a monopoly over general search, Google has steadily proliferated its search results page with ads and with Google's own content, while also blurring the distinction between paid ads and organic results. As a result of these tactics, Google appears to be siphoning off traffic from the rest of the web, while entities seeking to reach users must pay Google steadily increasing sums for ads. Numerous market participants analogized Google to a gatekeeper that is extorting users for access to its critical distribution channel, even as its search page shows users less relevant results.

A second way Google has maintained its monopoly over general search has been through a series of anticompetitive contracts. After purchasing the Android operating system in 2005, Google used contractual restrictions and exclusivity provisions to extend Google's search monopoly from desktop to mobile. Documents show that Google required smartphone manufacturers to pre-install and give default status to Google's own apps, impeding competitors in search as well as in other app

---

[21] Interview with Former Instagram Employee (Oct. 2, 2020).

**App. 87**

markets. As search activity now migrates from mobile to voice, third-party interviews suggest Google is again looking for ways to maintain its monopoly over search access points through a similar set of practices.

Since capturing the market for online search, Google has extended into a variety of other lines of business. Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. Through Chrome, Google now owns the world's most popular browser—a critical gateway to the internet that it has used to both protect and promote its other lines of business. Through Google Maps, Google now captures over 80% of the market for navigation mapping service—a key input over which Google consolidated control through an anticompetitive acquisition and which it now leverages to advance its position in search and advertising. And through Google Cloud, Google has another core platform in which it is now heavily investing through acquisitions, positioning itself to dominate the "Internet of Things," the next wave of surveillance technologies.

Internal communications also reveal that Google exploits information asymmetries and closely tracks real-time data across markets, which—given Google's scale—provide it with near-perfect market intelligence. In certain instances, Google has covertly set up programs to more closely track its potential and actual competitors, including through projects like Android Lockbox.

Each of its services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online ads. Through linking these services together, Google increasingly functions as an ecosystem of interlocking monopolies.

   d. <u>Amazon</u>

   Amazon has significant and durable market power in the U.S. online retail market. This conclusion is based on the significant record that Subcommittee staff collected and reviewed, including testimonials from third-party sellers, brand manufacturers, publishers, former employees, and other market participants, as well as Amazon's internal documents. Although Amazon is frequently described as controlling about 40% of U.S. online retail sales, this market share is likely understated, and estimates of about 50% or higher are more credible.

   As the dominant marketplace in the United States for online shopping, Amazon's market power is at its height in its dealings with third-party sellers. The platform has monopoly power over many small- and medium-sized businesses that do not have a viable alternative to Amazon for reaching online consumers. Amazon has 2.3 million active third-party sellers on its marketplace worldwide, and a recent survey estimates that about 37% of them—about 850,000 sellers—rely on Amazon as their sole source of income.[22]

---

[22] JUNGLESCOUT, THE STATE OF THE AMAZON SELLER 2020 4 (2020), https://www.junglescout.com/wp-content/uploads/2020/02/State-of-the-Seller-Survey.pdf.

**App. 88**

Amazon achieved its current dominant position, in part, through acquiring its competitors, including Diapers.com and Zappos. It has also acquired companies that operate in adjacent markets, adding customer data to its stockpile and further shoring up its competitive moats. This strategy has entrenched and expanded Amazon's market power in e-commerce, as well as in other markets. The company's control over and reach across its many business lines enable it to self-preference and disadvantage competitors in ways that undermine free and fair competition. As a result of Amazon's dominance, other businesses are frequently beholden to Amazon for their success.

Amazon has engaged in extensive anticompetitive conduct in its treatment of third-party sellers. Publicly, Amazon describes third-party sellers as "partners." But internal documents show that, behind closed doors, the company refers to them as "internal competitors." Amazon's dual role as an operator of its marketplace that hosts third-party sellers, and a seller in that same marketplace, creates an inherent conflict of interest. This conflict incentivizes Amazon to exploit its access to competing sellers' data and information, among other anticompetitive conduct.

Voice assistant ecosystems are an emerging market with a high propensity for lock-in and self-preferencing. Amazon has expanded Alexa's ecosystem quickly through acquisitions of complementary and competing technologies, and by selling its Alexa-enabled smart speakers at deep discounts. The company's early leadership in this market is leading to the collection of highly sensitive consumer data, which Amazon can use to promote its other business, including e-commerce and Prime Video.

Finally, Amazon Web Services (AWS) provides critical infrastructure for many businesses with which Amazon competes. This creates the potential for a conflict of interest where cloud customers are forced to consider patronizing a competitor, as opposed to selecting the best technology for their business.

e. Apple

Apple has significant and durable market power in the mobile operating system market. Apple's dominance in this market, where it controls the iOS mobile operating system that runs on Apple mobile devices, has enabled it to control all software distribution to iOS devices. As a result, Apple exerts monopoly power in the mobile app store market, controlling access to more than 100 million iPhones and iPads in the U.S.

Apple's mobile ecosystem has produced significant benefits to app developers and consumers. Launched in 2008, the App Store revolutionized software distribution on mobile devices, reducing barriers to entry for app developers and increasing the choices available to consumers. Despite this, Apple leverages its control of iOS and the App Store to create and enforce barriers to competition and discriminate against and exclude rivals while preferencing its own offerings. Apple also uses its power

to exploit app developers through misappropriation of competitively sensitive information and to charge app developers supra-competitive prices within the App Store. Apple has maintained its dominance due to the presence of network effects, high barriers to entry, and high switching costs in the mobile operating system market.

Apple is primarily a hardware company that derives most of its revenue from sales of devices and accessories. However, as the market for products like the iPhone has matured, Apple has pivoted to rely increasingly on sales of its applications and services, as well as collecting commissions and fees in the App Store. In the absence of competition, Apple's monopoly power over software distribution to iOS devices has resulted in harm to competitors and competition, reducing quality and innovation among app developers, and increasing prices and reducing choices for consumers.

f.  Effects of Market Power

The Subcommittee also examined the effects of market power in digital markets on the free and diverse press, innovation, privacy and data, and other relevant matters summarized below for ease of reference.

As part of this process, the Subcommittee received testimony and submissions showing that the dominance of some online platforms has contributed to the decline of trustworthy sources of news, which is essential to our democracy.[23] In several submissions, news publishers raised concerns about the "significant and growing asymmetry of power" between dominant platforms and news organizations, as well as the effect of this dominance on the production and availability of trustworthy sources of news. Other publishers said that they are "increasingly beholden" to these firms, and in particular, to Google and Facebook.[24] Google and Facebook have an outsized influence over the distribution and monetization of trustworthy sources of news online,[25] undermining the quality and availability of high-quality sources of journalism.[26] This concern is underscored by the COVID-19 pandemic, which has laid bare the importance of preserving a vibrant free press in both local and national markets.

---

[23] *Online Platforms and Market Power, Part 1: The Free and Diverse Press: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. 1–3 (2019) [hereinafter Free and Diverse Press Hearing] (statement of David Pitofsky, Gen. Counsel, News Corp).

[24] Submission from Source 53 to H. Comm. on the Judiciary, 7 (Oct. 14, 2019) (on file with Comm.) Although Apple News and Apple News Plus are increasingly popular news aggregators, most market participants that the Subcommittee received evidence from during the investigation do not view it as a critical intermediary for online news at this time. Some publishers raised competition concerns about the tying of payment inside Apple's news product. Others, however, did raise concern about Apple News and Apple News Plus, noting that it is "not creating any original journalism itself" and competes "against publishers' news products . . . for subscription revenues." *Id.* at 6.

[25] Submission of Source 52 to H. Comm. on the Judiciary, 12 (Oct. 30, 2019) (on file with Comm.).

[26] Free and Diverse Press Hearing at 3 (statement of David Chavern, Pres. & CEO, News Media Alliance) ("In effect, a couple of dominant tech platforms are acting as regulators of the digital news industry.").

**App. 90**

The rise of market power online has also materially weakened innovation and entrepreneurship in the U.S. economy.[27] Some venture capitalists, for example, report that there is an innovation "kill zone" that insulates dominant platforms from competitive pressure simply because investors do not view new entrants as worthwhile investments.[28] Other investors have said that they avoid funding entrepreneurs and other companies that compete directly or indirectly with dominant firms in the digital economy.[29] In an interview with Subcommittee staff, a prominent venture capital investor explained that due to these factors, there is a strong economic incentive for other firms to avoid head-on competition with dominant firms.[30]

Additionally, in the absence of adequate privacy guardrails in the United States, the persistent collection and misuse of consumer data is an indicator of market power online.[31] Online platforms rarely charge consumers a monetary price—products appear to be "free" but are monetized through people's attention or with their data.[32] In the absence of genuine competitive threats, dominant firms offer fewer privacy protections than they otherwise would, and the quality of these services has deteriorated over time. As a result, consumers are forced to either use a service with poor privacy safeguards or forego the service altogether.[33]

Finally, the market power of the dominant platforms risks undermining both political and economic liberties. Subcommittee staff encountered a prevalence of fear among market participants

---

[27] *Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary,* 116th Cong. 1 (2019) [hereinafter Innovation and Entrepreneurship Hearing] (statement of Timothy Wu, Julius Silver Prof. of Law, Columbia Law Sch.); *Online Platforms and Market Power, Part 3: The of Role of Data and Privacy in Competition: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary,* 116th Cong. 1–3 (2019) [hereinafter Data and Privacy Hearing] (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.).

[28] Raghuram Rajan, Sai Krishna Kamepalli & Luigi Zingales, *Kill Zone* (Becker Friedman Inst. Working Paper No. 2020-19), https://ssrn.com/abstract=3555915.

[29] *See generally* United States Department of Justice Antitrust Division Public Workshop on Venture Capital and Antitrust (Feb. 12, 2020) [hereinafter Venture Capital and Antitrust Workshop], https://www.justice.gov/atr/page/file/1255851/download; CHICAGO BOOTH STIGLER CTR. FOR THE STUDY OF ECON. & STATE, STIGLER CMTE. ON DIG. PLATFORMS 9 (2019) [hereinafter Stigler Report], https://www.chicagobooth.edu/-/media/research/stigler/pdfs/digital-platforms---committee-report---stigler-center.pdf.

[30] *See* Interview with Source 146 (May 28, 2020).

[31] Howard A. Shelanski, *Information, Innovation, and Competition Policy for the Internet,* 161 U. PA. L. REV. 1663, 1689 (2013) ("One measure of a platform's market power is the extent to which it can engage in [privacy exploitation] without some benefit to consumers that offsets their reduced privacy and still retain users.").

[32] Data and Privacy Hearing at 3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.); Data and Privacy Hearing at 4–5 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.).

[33] DIG. COMPETITION EXPERT PANEL, UNLOCKING DIGITAL COMPETITION 43 (2019) ("[T]he misuse of consumer data and harm to privacy is arguably an indicator of low quality caused by a lack of competition,") [hereinafter Dig. Competition Expert Panel Report]; Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy,* 16 BERKELEY BUS. L.J. 39, 88 (2019) ("Consumers effectively face a singular choice—use Facebook and submit to the quality and stipulations of Facebook's product or forgo all use of the only social network.").

**App. 91**

that depend on the dominant platforms, many of whom expressed unease that the success of their business and their economic livelihood depend on what they viewed as the platforms' unaccountable and arbitrary power. Additionally, courts and enforcers have found the dominant platforms to engage in recidivism, repeatedly violating laws and court orders. This pattern of behavior raises questions about whether these firms view themselves as above the law, or whether they simply treat lawbreaking as a cost of business. Lastly, the growth in the platforms' market power has coincided with an increase in their influence over the policymaking process. Through a combination of direct lobbying and funding think tanks and academics, the dominant platforms have expanded their sphere of influence, further shaping how they are governed and regulated.

3. <u>Recommendations</u>

As part of the investigation of competition in digital markets, the Subcommittee conducted a thorough examination of the adequacy of current laws and enforcement levels. This included receiving submissions from experts on antitrust and competition policy who were selected on a careful, bipartisan basis to ensure the representation of a diverse range of views on these matters. The Subcommittee also received other submissions from leading experts—including Executive Vice President Margrethe Vestager of the European Commission and Chair Rod Sims of the Australian Competition and Consumer Commission—to inform this inquiry. Most recently, on October 1, 2020, the Subcommittee held an oversight hearing on "Proposals to Strengthen the Antitrust Laws and Restore Competition Online" to examine potential solutions to concerns identified during the investigation to further inform the Report's recommendations.

Based on this oversight activity, Subcommittee Chairman Cicilline requested that staff provide a menu of reforms to Members of the Subcommittee for purposes of potential legislative activity during the remainder of the 116th Congress and thereafter. As he noted in remarks to the American Antitrust Institute in June 2019:

> [I]t is Congress' responsibility to conduct oversight of our antitrust laws and competition system to ensure that they are properly working and to enact changes when they are not. While I do not have any preconceived ideas about what the right answer is, as Chairman of the Antitrust Subcommittee, I intend to carry out that responsibility with the sense of urgency and serious deliberation that it demands.[34]

In response to this request, Subcommittee staff identified a broad set of reforms for further examination by the Members of the Subcommittee for purposes of crafting legislative responses to the findings of this Report. These reforms include proposals to: (1) address anticompetitive conduct in

---

[34] Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Keynote Address at American Antitrust Institute's 20th Annual Policy Conference (June 20, 2019), https://cicilline.house.gov/press-release/cicilline-delivers-keynote-address-american-antitrust-institute%E2%80%99s-20th-annual-policy.

digital markets; (2) strengthen merger and monopolization enforcement; and (3) improve the sound administration of the antitrust laws through other reforms. We intend these recommendations to serve as a complement to vigorous antitrust enforcement. Consistent with the views expressed by Chairman Nadler and Subcommittee Chairman Cicilline in the Foreword to this Report, we view these recommendations as complements, and not substitutes, to forceful antitrust enforcement.

For ease of reference, these recommendations for further examination are summarized below.

a.  <u>Restoring Competition in the Digital Economy</u>

- Structural separations and prohibitions of certain dominant platforms from operating in adjacent lines of business;

- Nondiscrimination requirements, prohibiting dominant platforms from engaging in self-preferencing, and requiring them to offer equal terms for equal products and services;

- Interoperability and data portability, requiring dominant platforms to make their services compatible with various networks and to make content and information easily portable between them;

- Presumptive prohibition against future mergers and acquisitions by the dominant platforms;

- Safe harbor for news publishers in order to safeguard a free and diverse press; and

- Prohibitions on abuses of superior bargaining power, proscribing dominant platforms from engaging in contracting practices that derive from their dominant market position, and requirement of due process protections for individuals and businesses dependent on the dominant platforms.

b.  <u>Strengthening the Antitrust Laws</u>

- Reasserting the anti-monopoly goals of the antitrust laws and their centrality to ensuring a healthy and vibrant democracy;

- Strengthening Section 7 of the Clayton Act, including through restoring presumptions and bright-line rules, restoring the incipiency standard and protecting nascent competitors, and strengthening the law on vertical mergers;

- Strengthening Section 2 of the Sherman Act, including by introducing a prohibition on abuse of dominance and clarifying prohibitions on monopoly leveraging, predatory pricing, denial of

**App. 93**

essential facilities, refusals to deal, tying, and anticompetitive self-preferencing and product design; and

- Taking additional measures to strengthen overall enforcement, including through overriding problematic precedents in the case law.

c. Reviving Antitrust Enforcement

- Restoring robust congressional oversight of the antitrust laws and their enforcement;

- Restoring the federal antitrust agencies to full strength, by triggering civil penalties and other relief for "unfair methods of competition" rules, requiring the Federal Trade Commission to engage in regular data collection on concentration, enhancing public transparency and accountability of the agencies, requiring regular merger retrospectives, codifying stricter prohibitions on the revolving door, and increasing the budgets of the FTC and the Antitrust Division; and

- Strengthening private enforcement through elimination of obstacles such as forced arbitration clauses, limits on class action formation, judicially created standards constraining what constitutes an antitrust injury, and unduly high pleading standards.

## II.   THE INVESTIGATION OF COMPETITION IN DIGITAL MARKETS

### A.  Requests for Information and Submissions

1. First-Party Requests for Information

On September 13, 2019, the Committee sent bipartisan requests for information (RFIs) to each of the four investigated platforms: Alphabet,[35] Amazon, Apple, and Facebook. For each company, the RFI asked for a comprehensive set of information about each of the company's products and services. In addition, the RFI asked the company to submit communications among high-level executives relating to various potentially anticompetitive acquisitions and conduct. The Committee requested that the platforms respond to the RFIs by October 14, 2019.

---

[35] In 2015, Google reorganized under a new name and parent company, Alphabet, separated various businesses, and placed Sundar Pichai as chief executive of Google. Larry Page, chief executive of Google, became head of Alphabet with Sergey Brin. *See* Conor Dougherty, *Google to Reorganize as Alphabet to Keep Its Lead as an Innovator*, N.Y. TIMES (Aug. 10, 2015), https://www.nytimes.com/2015/08/11/technology/google-alphabet-restructuring.html.

**App. 94**

a. <u>Alphabet</u>

The Committee's RFI to Alphabet, the parent company of Google, asked for information necessary to understand how the company operates and its role in the digital marketplace.[36] For example, in Request A, the RFI asked for detailed financial statements and a description of Alphabet's relevant products and services, including Google Ads, Google Search, YouTube, and Waze. In addition, the RFI asked for information helpful for determining whether Alphabet has monopoly power for any of its products or services, including for each product or service: (i) a list of Alphabet's top ten competitors; and (ii) internal or external analyses of Alphabet's market share relative to its competitors. Request A also asked for copies of documents and information that Alphabet had submitted to any U.S. or international antitrust enforcement agency for antitrust investigations that took place in any of those agencies within the past decade.[37]

Request B asked for all communications from high-level executives, including former CEO Larry Page and current CEO Sundar Pichai, relating to a number of Alphabet's key acquisitions and potentially anticompetitive conduct, most of which have been widely reported in the news.[38] The RFI asked for communications, including, but not limited to, discussions relating to the deal rationale and any competitive threat posed by the acquired company for the following acquisitions: Google/Android in 2005, Google/YouTube in 2006, Google/DoubleClick in 2007, Google/AdMob in 2009, and Google's acquisition of a minority stake in Vevo in 2013. Request B of the Alphabet RFI also requested executive communications relating to certain categories of potential anticompetitive conduct.[39]

In response to this request, Alphabet produced 1,135,398 documents, including strategy memoranda, presentations, and materials produced in prior investigations. Although Google produced a significant amount of material, Subcommittee staff did not view this volume as a proxy for quality.

---

[36] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Larry Page, CEO, Alphabet Inc. (Sept. 13, 2019) [hereinafter Committee Request for Information, Alphabet], https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/alphabet%20inc.%20rfi%20-%20signed%20(003).pdf.

[37] *Id.* at 1–4.

[38] The Alphabet RFI defines the term "Relevant Executives" as Larry Page, Sergey Brin, Ruth Porat, David Drummond, Eric Schmidt, Sundar Pichai, Susan Wojcicki, Philipp Schindler, Prabhakar Raghavan, Thomas Kurian, Hiroshi Lockheimer, Rishi Chandra, Keith Enright, and Kent Walker. *See id.* at 4.

[39] *Id.* at 4–9.

**App. 95**

b.   Amazon

The Committee's RFI to Amazon asked for similar types of information helpful for understanding the competitive dynamics of the digital marketplace and the company's role.[40] For example, in Request A, the RFI asked for detailed financial statements and a description of Amazon's relevant products and services, including Alexa, Amazon Marketplace, Amazon Prime, and Amazon Web Services (AWS). In addition, the RFI asked for information helpful for determining whether Amazon has monopoly power for any of its products or services, including for each product or service: (i) a list of Amazon's top ten competitors; and (ii) internal or external analyses of Amazon's market share relative to its competitors. Request A also asked for copies of documents and information that Amazon had submitted to any U.S. or international antitrust enforcement agency for antitrust investigations that took place in any of those agencies within the past decade.[41]

Request B asked for all communications from high-level executives, including CEO Jeff Bezos and Jay Carney, Senior Vice President for Global Corporate Affairs, relating to a number of Amazon's key acquisitions and potentially anticompetitive conduct, most of which have been widely reported in the news.[42] The RFI asked for communications, including, but not limited to, discussions relating to the deal rationale and any competitive threat posed by the acquired company for the following acquisitions: Amazon/Audible in 2008, Amazon/Zappos in 2009, Amazon/Quidsi (Diapers.com) in 2010[43], Amazon/Whole Foods in 2017, and Amazon/Ring in 2018. Request B of the Amazon RFI also requested executive communications relating to certain categories of potential anticompetitive conduct.[44]

In response to the Committee's requests, Amazon produced 24,299 documents, including internal emails among the company's senior executives, memoranda, presentations, and other materials.

---

[40] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Jeff Bezos, CEO, Amazon.com, Inc. (Sept. 13, 2019) [hereinafter Committee Request for Information, Amazon], https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/amazon%20rfi%20-%20signed.pdf.

[41] *Id.* at 1–3.

[42] The Amazon RFI defines the term "Relevant Executives" as Jeff Bezos, Jeff Wilke, Andy Jassy, Jeff Blackburn, Dave Limp, Brian Olsavsky, David Zapolsky, and Jay Carney. *See id.* at 3.

[43] Amazon acquired "Quidsi, the e-commerce company that runs Diapers.com" in 2010. Claire Cain Miller, *Amazon Has a Reported Deal to Buy Parent of Diapers.com*, N.Y. TIMES (Nov. 7, 2010), https://www.nytimes.com/2010/11/08/technology/08amazon.html.

[44] Committee Request for Information, Amazon at 3–7.

c.  <u>Apple</u>

The Committee's RFI to Apple also asked for information helpful for understanding the company's role in the digital marketplace. For example, in Request A, the RFI asked for detailed financial statements and a description of Apple's relevant products and services, including the iPhone, App Store, and Apple Pay.[45] In addition, the RFI asked for information helpful for determining whether Apple has monopoly power for any of its products or services, including for each product or service: (i) a list of Apple's top ten competitors; and (ii) internal or external analyses of Apple's market share relative to its competitors. Request A also asked for copies of documents and information that Apple had submitted to any U.S. or international antitrust enforcement agency for antitrust investigations that took place in any of those agencies within the past decade.[46]

Request B asked for all communications from high-level executives, including CEO Tim Cook and Eddy Cue, Senior Vice President of Internet Software and Services, relating to potentially anticompetitive conduct, most of which has been widely reported in the news.[47] The RFI asked for communications, including, but not limited to, discussions relating to certain categories of potentially anticompetitive conduct.[48]

In response to the Committee's requests, Apple produced 2,246 documents. These documents include internal communications among the company's senior executives describing governance of the App Store, as well as the company's internal deliberations and strategy responding to recent controversies.

d.  <u>Facebook</u>

The Committee's RFI to Facebook also asked for information helpful for understanding how the company operates and its role in the digital marketplace.[49] For example, in Request A, the RFI

---

[45] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Tim Cook, CEO, Apple Inc. (Sept. 13, 2019) [hereinafter Committee Request for Information, Apple], https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/apple%20rfi%20-%20signed.pdf.

[46] *Id.* at 1–3.

[47] The Apple RFI defines the term "Relevant Executives" as Tim Cook, Katherine Adams, Eddy Cue, Philip Schiller, Johny Srouji, Dan Riccio, Jonathan Ive, Craig Frederighi, Luca Maestri, Jeff Williams, Steve Dowling, Tor Myhren, Lucas Maestri, and Jane Horvath. *See id.* at 3.

[48] *Id.* at 3–6.

[49] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Mark Zuckerberg, CEO, Facebook, Inc. (Sept. 13, 2019) [hereinafter

24

asked for detailed financial statements and a description of Facebook's relevant products and services, including Facebook, Instagram, and WhatsApp. In addition, the RFI asked for information helpful for determining whether Facebook has monopoly power for any of its products or services, including for each product or service: (i) a list of Facebook's top ten competitors; and (ii) internal or external analyses of Facebook's market share relative to its competitors. Request A also asked for copies of documents and information that Facebook had submitted to any U.S. or international antitrust enforcement agency for antitrust investigations that took place in any of those agencies within the past decade.[50]

Request B asked for all communications from high-level executives, including Founder and CEO Mark Zuckerberg and Sheryl Sandberg, Chief Operating Officer, relating to a number of Facebook's key acquisitions and potentially anticompetitive conduct, most of which have been widely reported in the news.[51] The RFI asked for communications, including, but not limited to, discussions relating to the deal rationale and any competitive threat posed by the acquired company for the following acquisitions: Facebook/Instagram in 2012, Facebook/Onavo in 2013, and Facebook/WhatsApp in 2014. Request B of the Facebook RFI also requested executive communications relating to certain categories of potentially anticompetitive conduct.[52]

In response to the Committee's requests, Facebook produced 41,442 documents, including documents produced in response to prior investigations into Facebook's acquisitions and into whether it had abused its dominance. Facebook also produced 83,804 documents in connection with litigation in an ongoing matter. Among other items, these documents include internal communications among the company's senior executives describing Facebook's acquisition and overall competition strategy. In response to supplemental requests by Subcommittee staff, Facebook produced internal market data over a multi-year period, as well as a memorandum prepared by a senior data scientist and economist at the company related to competition among Facebook's family of products and other social apps.

2. <u>Process for Obtaining Responses to First-Party Requests</u>

After sending the RFIs, Subcommittee staff invested considerable time and resources in making themselves available for calls with the platforms to answer any questions the platforms had about responding to the requests, on a nearly weekly basis from October 2019 through March 2020. On these calls, staff addressed a range of issues, including clarifying the meaning and intent of language in the

---

Committee Request for Information, Facebook],
https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/facebook%20rfi%20-%20signed.pdf.

[50] *See id.* at 1–2.

[51] The Facebook RFI defines the term "Relevant Executives" as Mark Zuckerberg, Sheryl Sandberg, Jennifer Newstead, Javier Olivan, Chris Cox, Mike Schroepfer, David Wehner, Colin Stretch, Will Cathcart, Adam Mosseri, Stan Chudnovsky, Fidji Simo, Chris Daniels, Erin Egan, and Kevin Martin. *See id.* at 2–3.

[52] *See id.* at 2–5.

request; maintaining the confidentiality of sensitive business information; and, where appropriate, narrowing requests in an effort to balance the Committee's need for relevant information against the platforms' burden of production. Each of the investigated platforms failed to meet the October 14, 2019 deadline, citing various difficulties.

On December 4, 2019, nearly three months after the deadline for submitting the RFI responses, the Committee sent a letter to the platforms' CEOs pointing out their failure to comply. The Committee stated its expectation that the platforms would complete production by December 18, 2019 for Request A and January 2, 2020 for Request B, to avoid the need to invoke other processes and procedures to obtain the requested materials.[53]

After the platforms failed to meet the revised deadlines, in early February 2020, staff asked for the companies' outside counsel to attend in-person meetings to discuss the substantial gaps in production that remained, and to identify ways to address any obstacles the platforms identified to filling those gaps. Despite the Committee's best efforts to address those obstacles—and allowing substantial time for the platforms to navigate delays relating to the COVID-19 pandemic—staff again had to reach out to the platforms regarding the deficiency of their responses. On June 9, 2020, in a final effort to avoid resorting to issuing subpoenas to the platforms to compel the production of documents and information, staff requested that the platforms voluntarily provide information responsive to a reduced list of targeted requests by June 22, 2020.

3.  Third-party Requests for Information

As part of the investigation, the Subcommittee collected a large amount of information from market participants, including customers and competitors of Amazon, Apple, Facebook, and Google. Staff also received information and analysis from other third parties, including academics, former antitrust government officials, public interest organizations, and trade associations.

a.  Market Participants

In September, the Committee sent a request for information to over 80 market participants. The RFI asked the recipient to voluntarily provide information regarding the state of competition in the digital marketplace for various products and services, including number and identity of market participants, market shares, and barriers to entry. These third-party RFIs also asked for a description of any conduct by Amazon, Apple, Facebook, or Google that raises competition concerns, and the impact of such conduct on the recipient's business. The Committee also sought to gather information through

---

[53] *See e.g.*, Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Mark Zuckerberg, CEO, Facebook, Inc. (Dec. 4, 2019) (on file with Comm.).

**App. 99**

these RFIs regarding broader questions based on the recipient's experience in the digital marketplace, including (i) whether market participants are able to compete on the merits of their goods and services; (ii) the adequacy of antitrust enforcement relating to merger review and anticompetitive conduct; (iii) the adequacy of current antitrust law to address anticompetitive mergers and anticompetitive conduct; and (iv) suggestions for improving enforcement of antitrust law and making changes to antitrust law itself, statutory or otherwise.

On January 7, 2020, the Committee sent a second round of RFIs to 29 market participants. These RFI recipients consisted of additional businesses and individuals that staff had identified during the first half of the investigation as likely to have relevant information and an interest in sharing that information with the Committee. These RFIs asked for similar information to the September RFIs and provided staff with additional valuable information and insights into the functioning and challenges of operating in the digital marketplace.

Unfortunately, some market participants did not respond to substantive inquiries due to fear of economic retaliation. These market participants explained that their business and livelihoods rely on one or more of the digital platforms. One response stated, "Unfortunately, [the CEO] is not able to be more public at this time out of concern for retribution to his business," adding, "I am pretty certain we are not the only ones that are afraid of going public."[54] Another business that ultimately declined to participate in the investigation expressed similar concerns, stating, "We really appreciate you reaching out to us and are certainly considering going on the record with our story. . . . Given how powerful Google is and their past actions, we are also quite frankly worried about retaliation."[55] Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, similarly testified that many businesses have a fear of speaking out about Amazon, stating, "I spend a lot of time interviewing and talking with independent retailers, manufacturers of all sizes. Many of them are very much afraid of speaking out publicly because they fear retaliation."[56]

b. Antitrust Experts

The Committee's final round of outreach to third parties involved sending letters on March 13, 2020, soliciting insights and analysis from several dozen antitrust experts who were identified on a bipartisan basis and whose submissions represent a diverse range of experience and perspectives. In support of the investigation's objective to assess the adequacy of existing antitrust laws, competition

---

[54] Email from Source 685 to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary (July 11, 2020) (on file with Comm.).

[55] Email from Source 147 to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary (July 15, 2019) (on file with Comm.).

[56] Innovation and Entrepreneurship Hearing at 250 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

**App. 100**

policies, and current enforcement levels, the Committee invited submissions on three main topics. The first topic covered the adequacy of existing laws—case law and statutes—that prohibit monopolization and monopolistic conduct. The second topic similarly dealt with the adequacy of existing law, but focused on its sufficiency to address anticompetitive mergers and acquisitions, including vertical and conglomerate mergers, serial acquisitions, data acquisitions, and strategic acquisitions of potential competitors. Third, the Committee sought feedback on whether the institutional structure of antitrust enforcement is adequate to promote the robust enforcement of the antitrust laws, including current levels of appropriations to the antitrust agencies, existing agency authorities, and congressional oversight of enforcement.

c.   Additional Outreach and Submissions

In addition to sending the RFIs in September and January, Subcommittee staff engaged in extensive outreach to additional third parties based on public reports and non-public information gathered throughout the investigation, suggesting that such entities had relevant information.

Subcommittee staff also received submissions from numerous individuals and businesses throughout the course of the investigation. These submissions came from a wide range of sources and in a variety of forms. For example, an anonymous source sent thumb drives to the Committee's main office in the Rayburn House Office Building. Other examples included former or current employees submitting tips to the Subcommittee's investigation email address, or through the form for anonymous submissions posted on the Subcommittee's investigation website.

4.   Antitrust Agencies Requests for Information

As part of the Committee's September 2019 efforts to gather information, the Committee also sent requests for information to the Federal Trade Commission and the Department of Justice. In part, the Committee sought this information to carry out its function as the principal oversight authority for the Department of Justice, including its component agencies, its personnel, and its law enforcement activities.[57] Similarly, the Committee's jurisdiction extends to the FTC's antitrust-related work, and to administrative practice and procedure, including at the FTC.[58] The Committee's RFIs requested documents relating to the agencies' decisions to open or close investigations into potential violations of antitrust law in digital markets, decisions to challenge mergers or conduct in federal district court or in administrative action, and decisions to forego litigation in favor of a settlement agreement.[59] Senior

---

[57] *Government Oversight*, U.S. HOUSE OF REPRESENTATIVES JUDICIARY COMMITTEE, https://judiciary.house.gov/issues/government-oversight/.

[58] RULES OF THE HOUSE OF REPRESENTATIVES, 116th Cong., lst Sess., Rule X, cl. (1)(1)(2) (2019), http://clerk.house.gov/legislative/house-rules.pdf.

[59] Subcommittee staff recognizes that publication of these documents could cause competitive injury to firms that cooperated with prior investigations or in ongoing investigations. Where possible, this Report summarizes or draws conclusions from these sources without reproducing them.

**App. 101**

officials from the FTC and the Antitrust Division also provided several briefings to Members of the Subcommittee and staff in response to the requests of the Subcommittee Chairman and Ranking Member. These briefings served as an opportunity for Members to obtain information and updates about the current state of antitrust law and enforcement in digital markets.

<div align="center">

B.      Hearings

</div>

On June 11, 2019, the Subcommittee held part one of its series of investigation hearings titled "Online Platforms and Market Power, Part 1: The Free and Diverse Press." At this hearing, the Subcommittee heard testimony from the following Majority witnesses: David Chavern, President of the News Media Alliance; Gene Kimmelman, President and CEO of Public Knowledge; Sally Hubbard, Director of Enforcement Strategy at Open Markets Institute (OMI); and Matthew Schruers, Vice President for Law and Policy at Computer and Communications Industry Association (CCIA). The Minority witnesses were David Pitofsky, General Counsel for News Corp; and Kevin Riley, Editor of the *Atlanta-Journal Constitution*.[60]

On July 16, 2019, the Subcommittee held its second hearing, a two-paneled hearing titled "Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship." On the first panel, the Subcommittee heard testimony from the following: Adam Cohen, Director of Economic Policy at Google; Nate Sutton, Associate General Counsel, Competition, at Amazon; Matt Perault, Head of Global Policy Development at Facebook; and Kyle Andeer, Vice President and Corporate Law and Chief Compliance Officer at Apple. On the second panel, the Subcommittee heard testimony from the following Majority witnesses: Timothy Wu, Julius Silver Professor of Law, Science and Technology at Columbia Law School; Fiona Scott Morton, Theodore Nierenberg Professor of Economics at Yale University School of Management; and Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance. On the second panel, the Minority witnesses were Maureen Ohlhausen, Partner at Baker Botts and former Commissioner and Acting Chairwoman of the Federal Trade Commission; Morgan Reed, Executive Director of The App Association; and Carl Szabo, Vice President and General Counsel at NetChoice.[61]

On October 18, 2019, the Subcommittee held its third hearing titled "Online Platforms and Market Power, Part 3: The Role of Data and Privacy in Competition." At this hearing, the Subcommittee heard testimony from the following Majority witnesses: the Honorable Rohit Chopra, Commissioner at the Federal Trade Commission; Dr. Jason Furman, Professor of the Practice of Economic Policy at Harvard Kennedy School and former Chairman of the Council of Economic Advisers (CEA); and Dr. Tommaso Valletti, Professor of Economics and Head of the Department of

---

[60] Free and Diverse Press Hearing, https://judiciary.house.gov/legislation/hearings/online-platforms-and-market-power-part-1-free-and-diverse-press.

[61] Innovation and Entrepreneurship Hearing, https://judiciary.house.gov/legislation/hearings/online-platforms-and-market-power-part-2-innovation-and-entrepreneurship.

<div align="center">

29

</div>

<div align="right">

**App. 102**

</div>

Economics & Public Policy at Imperial College Business School and former Chief Competition Economist of the European Commission's Directorate General for Competition (DG-Comp). The Minority witness at the hearing was Dr. Roslyn Layton, Visiting Scholar at the American Enterprise Institute.[62]

On November 13, 2019, the Subcommittee held its fourth hearing titled "Online Platforms and Market Power, Part 4: Perspectives of the Antitrust Agencies." At this hearing, the Subcommittee heard testimony from the following witnesses: the Honorable Makan Delrahim, Assistant Attorney General for the Antitrust Division at the Department of Justice; and the Honorable Joseph J. Simons, Chairman of the Federal Trade Commission.[63]

On January 17, 2020, the Subcommittee held its fifth hearing titled "Field Hearing: Online Platforms and Market Power, Part 5: Competitors in the Digital Economy." At this hearing, which took place in the congressional district of Subcommittee Vice Chairman Joe Neguse (D-CO) at the University of Colorado School of Law, the Subcommittee heard testimony from the following Majority witnesses: Patrick Spence, Chief Executive Officer of Sonos; David Barnett, Founder and Chief Executive Officer of PopSockets; and Kirsten Daru, Vice President and General Counsel at Tile. The Minority witness at the hearing was David Heinemeier Hansson, Cofounder and Chief Technology Officer of Basecamp.[64]

On July 29, 2020, the Subcommittee held its sixth hearing titled "Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google." At this hearing, the Subcommittee heard testimony from the following witnesses: Jeff Bezos, Chief Executive Officer at Amazon; Sundar Pichai, Chief Executive Officer at Alphabet and Google; Tim Cook, Chief Executive Officer at Apple; and Mark Zuckerberg, Chief Executive Officer at Facebook.[65]

On October 1, 2020, the Subcommittee held its seventh hearing titled "Proposals to Strengthen the Antitrust Laws and Restore Competition Online." The Majority witnesses at the hearing included: William Baer, Visiting Fellow, Brookings Institution, and former Associate Attorney General, Department of Justice; Zephyr Teachout, Associate Professor of Law, Fordham University School of Law; Michael Kades, Director of Markets and Competition Policy, Washington Center for Equitable

---

[62] Data and Privacy Hearing, https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2248.

[63] *Online Platforms and Market Power, Part 4: Perspectives of the Antitrust Agencies: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2019) [hereinafter Antitrust Agencies Hearing], https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2287.

[64] *Online Platforms and Market Power, Part 5: Competitors in the Digital Economy: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2020) [hereinafter Competitors Hearing], https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=2386.

[65] *Online Platforms and Market Power, Part 6: Examining the Dominance of Amazon, Apple, Facebook, and Google: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2020) [hereinafter CEO Hearing], https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=3113.

**App. 103**

Growth; Sabeel Rahman, Associate Professor of Law, Brooklyn Law School and President, Demos; and Sally Hubbard, Director of Enforcement Strategy, Open Markets Institute. The Minority witnesses at the hearing were Christopher Yoo, John H. Chestnut Professor of Law, Communication, and Information Science, University of Pennsylvania Carey Law School; and Rachel Bovard, Senior Director of Policy, Conservative Partnership Institute; and Tad Lipsky, Antonin Scalia Law School, George Mason University.[66]

<p style="text-align:center;">C.     Roundtables</p>

In addition to holding public hearings, the Subcommittee also held a series of bipartisan roundtables for Members of the Subcommittee and staff to provide Members with an opportunity to conduct further oversight of: (1) the state of competition and problems in digital markets; (2) whether dominant firms have engaged in anticompetitive conduct; and (3) if antitrust laws, competition policies, and current enforcement levels are adequate to address these issues. In total, the Subcommittee held twelve briefings and roundtables in Washington, D.C.; four roundtables in Boulder, Colorado; and a virtual roundtable with stakeholders from Rhode Island and elsewhere in New England.[67]

The Subcommittee hosted multiple briefings and roundtables with experts on the digital economy on a range of topics. Experts included state antitrust enforcers, former officials from the Antitrust Division of the Department of Justice and the Federal Trade Commission, former technology industry executives, small business owners, representatives from the news industry, entrepreneurs, antitrust scholars, representatives from civil society, and representatives from libraries.

The briefings and roundtables covered a broad array of topics related to competition in the digital marketplace. These topics included:

- The effect that small algorithm changes by dominant platforms can have on small businesses that rely on the platform;

- The data advantages that dominant online platform companies have over smaller competitors and startups, and how those data advantages can reinforce dominance and serve as a barrier to entry;

---

[66] *Online Platforms and Market Power, Part 7: Proposals to Strengthen the Antitrust Laws and Restore Competition Online: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. (2020) [hereinafter Remedies Hearing], https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=3367.

[67] This roundtable was originally scheduled to take place physically as a field hearing in Providence, Rhode Island, but was held virtually due to the COVID-19 pandemic.

**App. 104**

- The effect of dominant online platform company power and practices on a free and diverse press and the local newsgathering and reporting;

- The impact of dominant online platform company power and practices on investment in startups by venture capital firms;

- The fear of economic retaliation by dominant platforms against smaller companies that raise concerns about anticompetitive conduct in the digital marketplace;

- Other features of digital markets—including, but not limited to, network effects, economies of scale and scope, and barriers to entry—that make them prone to high concentration and monopolization;

- Enforcement of the antitrust laws; and

- Modernization of antitrust statutes and competition policy.

Additionally, the Subcommittee held briefings also allowed representatives from Google, Amazon, Facebook, and Apple to make their own presentations to Subcommittee staff and to answer questions and provide details regarding their companies' business practices, structures, and strategies in the marketplace.

D.      Prior Investigations

The Subcommittee's current review of competition in the digital marketplace continues a long oversight tradition. Over many decades, the House Judiciary Committee and its antitrust subcommittee have conducted careful, fact-based inquiries into industrial sectors showing signs of undue concentration and anticompetitive conduct. As a 1951 report from the then-named Subcommittee on the Study of Monopoly Power described its mandate, "It is the province of this subcommittee to investigate factors which tend to eliminate competition, strengthen monopolies, injure small business, or promote undue concentration of economic power; to ascertain the facts, and to make recommendations based on those findings."[68]

The Subcommittee followed the same process "to ascertain the facts" in this investigation. It has included hearings with industry and government witnesses, consultations with subject-matter experts, and a careful—and at times painstaking—review of large volumes of evidence provided by industry participants and regulators. Recognizing that antitrust investigations are by their nature fact-

---

[68] H. REP. NO. 255, at 2 (1951) (Aluminum: Report of the Subcomm. On Study of Monopoly Power of the H. Comm. on the Judiciary).

**App. 105**

dependent, teams of investigators invested significant resources to study the structure of the relevant markets and the important firms in those markets.[69]

The purpose of these exercises was not to supersede the activities of antitrust enforcers such as the Federal Trade Commission (FTC) and the Department of Justice (DOJ), but to compile the Committee's own record about current market conditions; to assess how antitrust laws and principles are being applied in the current business environment; and to determine whether revised laws, or new laws, or better enforcement are needed to protect competition.

While the Committee's investigations were not intended to interfere with the enforcement activities of antitrust enforcers or regulators, they often conducted inquiries into the same sectors and issues that DOJ, the FTC, the Federal Communications Commission (FCC), and other agencies with authority over competition policy or enforcement were also examining. As Members and staff of the Committee charged with the "protection of trade and commerce against unlawful restraints and monopolies,"[70] these investigators exercised their legislative authority to probe any aspect of antitrust that they deemed warranted attention.

These investigations were guided by the principle that "[h]istory has proven that the most conducive environment for innovation and new product availability is a competitive market,"[71] and that a "free competitive economy" is an important American value.[72] It was a value that had been formally embedded in our economy and society by the Sherman Act of 1890, "the peculiarly American charter of economic freedom."[73] In a 1958 report on the airline industry, the then-named Antitrust Subcommittee explained that Americans' social and political freedoms depended on "opportunity for market access and market rivalries in a private-enterprise economy."[74] The "freedom of entry into any industry or field of endeavor," a 1962 Subcommittee report explained, is a cornerstone of U.S. antitrust policy that has "encouraged extensive individual proprietorship . . . and has made our free enterprise system great and strong."[75] A 1992 Committee report recommended restrictions on the monopolistic

---

[69] See, e.g., H. REP. NO. 1419, at 2 (1962) (The Ocean Freight Industry: Report of the Antitrust Subcomm. of the H. Comm. on the Judiciary) [hereinafter 1962 Ocean Freight Industry Report] (describing how Subcommittee staff spent more than nine months examining "tens of thousands of documents in the files of over 50 ocean-freight conferences" and other materials).

[70] RULES OF THE HOUSE OF REPRESENTATIVES, 116th Cong., lst Sess., Rule X, cl. (1)(1)(16) (2019), http://clerk.house.gov/legislative/house-rules.pdf.

[71] H. REP. NO. 102-850, at 15 (1992) (Report on Antitrust Reform Act of 1992, H. Comm. on the Judiciary) [hereinafter Antitrust Reform Act of 1992].

[72] H. REP. NO. 1217, at 1 (1951) (The Mobilization Program: Report of the Subcomm. on Study of Monopoly Power of the H. Comm. on the Judiciary) [hereinafter 1951 Mobilization Program Report].

[73] Id. at 2.

[74] H. REP. NO. 1328, at 1 (1958) (The Airlines Industry: Report of the Antitrust Subcomm. of the H. Comm. on the Judiciary) [hereinafter 1958 Airlines Industry Report].

[75] 1962 Ocean Freight Industry Report at 394.

**App. 106**

Regional Bell Operating Companies (RBOCs) "[f]or the sake of the democratic economic and political values which depend on the preservation of free markets."[76]

In some cases, antitrust investigations exposed antitrust problems that the Committee concluded required attention from regulators. For example, a 1958 Antitrust Subcommittee report on the rapidly growing domestic airline industry exposed the behind-the-scenes anticompetitive campaign that incumbent air carriers and their advocacy group, the Air Transport Association of America (ATA), had been waging to prevent the Civil Aeronautics Board (CAB) from approving market entry by new air carriers (known at the time as "nonskeds").[77] The Committee found the conduct of the ATA so egregious that it recommended an investigation by the DOJ Antitrust Division.[78] As for international air transportation, the report concluded that Pan American's dominance in the market was the "result of its use of devices to foreclose competition in order to secure and maintain control over markets in which it does business," and recommended that the CAB undertake a broad investigation of the company.[79]

In other cases, the Committee investigated matters that were currently under review by antitrust enforcers. In a 1957 report on the broadcast television industry, which was quickly reshaping Americans' consumption of news and entertainment, the then-named Antitrust Subcommittee described the anticompetitive tactics CBS and NBC were using to promote their own content at the expense of independent content producers.[80] According to the report, networks were improperly using their power as vertical distributors of content to extract financial concessions from independent competitors seeking to place their programming on network affiliates.[81] There was also evidence that the networks were using their substantial power with advertisers to unfairly favor their own content.[82] After praising the DOJ Antitrust Division's "alertness to vindicate the competitive dictates of the antitrust laws," the Subcommittee urged the Division to press its investigation into this conduct with "vigor and dispatch."[83]

In the case of the Committee's inquiry into the RBOCs' conduct in the aftermath of the 1984 breakup of AT&T, we concluded that federal courts and regulators were not adequately protecting competition in the telecommunications marketplace and that new legislation was necessary. A 1992

---

[76] Antitrust Reform Act of 1992 at 10.

[77] Airlines Industry Report at 268–69.

[78] *Id.* at 272.

[79] *Id.* at 278.

[80] H. REP. NO. 607, at 143 (1957) (The Television Broadcasting Industry: Report of the Antitrust Subcomm. of the Comm. on the Judiciary).

[81] *Id.*

[82] *Id.*

[83] *Id.*

Committee report reviewed the long, troubled history of attempts by DOJ and the FCC[84] to check the monopolistic power of AT&T, culminating in the famous Modified Final Judgment (the "MFJ") that Judge Harold Greene approved in August 1982 to break up the company.[85] But even after the MFJ, the report found, the FCC had failed to prevent the RBOCs from using their local monopolies to commit a number of anticompetitive violations, "many eerily reminiscent of pre-divestiture Bell System abuses."[86] We were also critical of the DOJ's actions to water down the MFJ's procompetitive line-of-business restrictions on the RBOCs. Describing the massive lobbying campaign that the RBOCs were waging to enter the business lines the MFJ had opened up to competitors, we observed, "The thousands upon thousands of competitive enterprises now thriving in information service, telecommunications equipment, and long distance markets face the prospect of their future prosperity being decided by the self-interested designs of a monopoly with 'bottleneck' control over the local telephone exchange on which they all depend."[87] In light of the antitrust agencies' demonstrated failure to protect competition, the Committee approved legislation that would codify the MFJ's line-of-business restrictions into law.[88]

Finally, in these prior investigations, the Committee has not hesitated to recommend that antitrust authorities further investigate suspicious conduct. After examining the conduct of the Air Transport Association of America, the industry group representing the established passenger airline carriers in the 1950s, the Antitrust Subcommittee recommended that the Antitrust Division of the Department of Justice further investigate the "serious antitrust problems" it had identified.[89]

---

[84] Antitrust Reform Act of 1992 at 39 ("The FCC, while claiming boldly to be a forum where complaints about monopolistic practices would be received and vigorously pursued had, instead, become a regulatory 'graveyard' for telecommunications competition policy, characterized by inaction and equivocation.").

[85] Id. at 45.

[86] Id. at 51.

[87] Antitrust Reform Act of 1992 at 10. The report explained that the RBOCs' bottleneck, in antitrust terminology, functioned as an "essential facility," which gave them "an inherent ability and – for activities in which they are engaged themselves – a natural incentive to impede competition in lines of business dependent upon that essential facility." Id. at 13.

[88] H.R. 5096 (102nd Cong.); H.R. 3626 (103rd Cong.); see H. REP. NO. 103-559, pt. II at 25 (1994) (Report on Antitrust and Communications Reform Act of 1994, H. Comm. on the Judiciary) ("The Judiciary Committee has resolved that the Government not lose its nerve once again and allow an industry born in monopoly to be reborn in monopoly.") The pro-competitive policies proposed in this legislation later became law, in modified form, as part of the Telecommunications Act of 1996. P.L. 104-104, 110 Stat. 56, §§271-6 (codified at 47 U.S.C., §§ 271-76).

[89] Airlines Industry Report at 272.

**App. 108**

III.   BACKGROUND

A. Overview of Competition in Digital Markets

1. The Role of Competition Online

At a fundamental level, competition has been a key engine of economic activity in the United States,[90] resulting in the "pioneering of entire industries that, in time, come to employ millions and generate trillions."[91] This is especially true in the digital economy. As in other industries, competition in digital markets incentivizes incumbent firms and new entrants to build new technologies and improve business processes.[92] It spurs capital investment and incentivizes firms to improve the quality of their offerings.[93] In its absence, incumbent firms lack the incentive to invest in research and development.[94] This in turn slows the rate of innovation across the industry.[95] Disruptive new products or services are replaced with slow, incremental alterations[96] "designed to protect [incumbent firms'] existing revenue streams."[97] Slowly but surely, venture capitalists lose the incentive to invest in new

---

[90] Innovation and Entrepreneurship Hearing at 1 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. School of Law).

[91] *Id.* at 1; Roger McNamee, Cofounder and Managing Dir., Elevation Partners, Remarks at U.S. Dep't of Justice Antitrust Div. Public Workshop on Venture Capital and Antitrust 34 (Feb. 12, 2020), https://www.justice.gov/atr/page/file/1255851/download ("[T]here is a case that antitrust has in fact been a major catalysis of growth in every wave of technology.").

[92] Antitrust Agencies Hearing at 8 (statement of Makan Delrahim, Ass't Att'y Gen., U.S. Dep't of Justice, Antitrust Div.) ("Competition also promotes improvements and upgrades to the quality and functionality of existing offerings."); Jeffrey A. Rosen, Deputy Att'y Gen., U.S. Dep't of Justice, Speech at the Free State Foundation's 12th Annual Telecom Policy Conference (Mar. 10, 2020), https://www.justice.gov/opa/speech/deputy-attorney-general-jeffrey-rosen-speaks-free-state-foundations-12th-annual-telecom; Giulio Federico, Fiona Scott Morton & Carl Shapiro, *Antitrust and Innovation: Welcoming and Protecting Disruption* 1 (Nat'l Bur. of Econ. Res. Working Paper No. 26005, June 2019), https://www.nber.org/papers/w26005.pdf.

[93] Innovation and Entrepreneurship Hearing at 4 (statement of Maureen K. Ohlhausen, Partner, Baker Botts L.L.P.) ("Antitrust law's focus on protecting the competitive process does not mean that it cannot reach many of the competitive concerns. . . [that] may include price effects, reductions in quality, and impacts on innovation, as well as the ability of a dominant player to acquire and neutralize a nascent competitor."); Innovation and Entrepreneurship Hearing at 2 (statement of Fiona Scott Morton, Theodore Nierenberg Prof. of Econs., Yale Sch. of Mgmt.) ("The harms from insufficient competition appear in prices that are higher than competitive prices, quality that is lower than competitive quality, and less innovation than consumers would benefit from in competitive markets.").

[94] Innovation and Entrepreneurship Hearing at 2 (statement of Fiona Scott Morton, Theodore Nierenberg Prof. of Econs, Yale Sch. of Mgmt.).

[95] *See generally* Jeffrey A. Rosen, Deputy Att'y Gen., U.S. Dep't of Justice, Speech at the Free State Foundation's 12th Annual Telecom Policy Conference (Mar. 10, 2020), https://www.justice.gov/opa/speech/deputy-attorney-general-jeffrey-rosen-speaks-free-state-foundations-12th-annual-telecom. (referencing research by economist Kenneth Arrow.).

[96] Data and Privacy Hearing at 3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.).

[97] Innovation and Entrepreneurship Hearing at 4 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. Sch. of Law).

**App. 109**

entrants willing to challenge the dominance of incumbent firms through direct competition.[98] What we are left with are so-called "kill zones"— the near-complete absence of competition.

The benefits of robust competition in the digital economy go beyond innovation and productivity. It can also spur firms to compete along other dimensions such as privacy and data protection. As a general matter, inadequate competition not only leads to higher prices and less innovation in many cases, but it can also reduce the quality of goods and services.[99] Given that many digital products do not charge consumers directly for services, these firms often compete on quality.[100] Along these lines, lack of competition can result in eroded privacy and data protection.[101] Growing evidence indicates that a lack of competition goes hand in hand with just such quality degradation.[102]

### 2.  Market Structure

#### a.  Winner-Take-All Markets

Certain features of digital markets—such as network effects, switching costs, the self-reinforcing advantages of data, and increasing returns to scale—make them prone to winner-take-all economics.[103] As a result, many technology markets "tip" in favor of one or two large companies,[104] shifting the "the competitive process from competition *in* the market to competition *for* the market."[105] In turn, high barriers to entry may diminish the ability of new firms to challenge incumbent firms, further undermining the competitive process and protecting

---

[98] Innovation and Entrepreneurship Hearing at 2 (statement of Fiona Scott Morton, Theodore Nierenberg Prof. of Econs., Yale Sch. of Mgmt.). *See also* Sai Krishna Kamepalli, Raghuram Rajan & Luigi Zingales, *Kill Zone* (Univ. of Chicago, Becker Friedman Inst. for Econ. Working Paper No. 2020-19, Apr. 2020), https://ssrn.com/abstract=3555915.

[99] Data and Privacy Hearing at 4 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.) ("Quality, choice, and innovation are also important aspects for competition and for consumer welfare."); Innovation and Entrepreneurship Hearing at 2–4 (statement of Maureen K. Ohlhausen, Partner, Baker Botts L.L.P.).

[100] *Id.* at 3 (statement of Rohit Chopra, Comm'r, Fed. Trade Comm'n) ("These services do have a price, and you are paying for them with your data."); Data and Privacy Hearing at 3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.) ("Consumers may think they are receiving 'free' products but they are paying a price for these products in a number of ways.").

[101] Innovation and Entrepreneurship Hearing at 4 (statement of Maureen K. Ohlhausen, Partner, Baker Botts L.L.P.); Data and Privacy Hearing at 3–4 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.); 1 (statement of George Slover, Justin Brookman & Jonathan Schwantes) ("[A] dominant platform can disregard the interests of consumers in protecting their privacy, and design their platform to maximize its ability to monitor, monetize, and manipulate our personal interactions as consumers and as citizens.").

[102] Data and Privacy Hearing at 5 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.).

[103] *Id.* at 2 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.) Other anticompetitive practices in digital markets—such as product design, self-preferencing, and anti-competitive contracting, among others—may also contribute to barriers that impede entry by rivals or new firms. While these issues are also present in other markets, they are much more pronounced in digital markets.

[104] *Id.*

[105] Stigler Report at 29, 35.

**App. 110**

the dominance of existing firms.[106] As the United Kingdom's Competition and Markets Authority explains:

> [I]f potential competitors face substantial barriers to entry and expansion, such that the market is no longer properly contestable, then a high market share can translate into market power, giving the platform the opportunity to increase prices, reduce quality or leverage market power to undermine competition in potentially competitive markets and deny innovative rivals the chance to bring new services to market.[107]

b. <u>Market Concentration</u>

Consistent with winner-take-all dynamics, the digital economy is highly concentrated.[108] A number of key markets online—such as social media, general online search, and online advertising—are dominated by just one or two firms.[109] In some instances, this concentration is the result of a high volume of acquisitions by the dominant digital platforms. Together, the largest technology firms have acquired hundreds of companies in the last ten years.[110] Antitrust enforcers in the United States did not block any of these transactions,[111] many of which eliminated actual or potential competitors.[112] In some instances these acquisitions enabled the dominant firm to neutralize a competitive threat; in other instances, the dominant firm shut down or discontinued the underlying product entirely—transactions aptly described as "killer acquisitions."[113]

---

[106] Data and Privacy Hearing at 2–3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.).

[107] COMPETITION & MKTS. AUTH., ONLINE PLATFORMS AND DIGITAL ADVERTISING, MARKET STUDY FINAL REPORT 10–11 (2020) [hereinafter Competition & Mkts. Auth. Report].

[108] Data and Privacy Hearing at 1 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.).

[109] *Id.* at 2; Innovation and Entrepreneurship Hearing at 3 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. Sch.of Law).

[110] Tim Wu & Stuart A. Thompson, *The Roots of Big Tech Run Disturbingly Deep*, N.Y. TIMES (June 7, 2019), https://www.nytimes.com/interactive/2019/06/07/opinion/google-facebook-mergers-acquisitions-antitrust.html; *see "Visualizing Tech Giants' Billion-Dollar Acquisitions,"* CB INSIGHTS (May 5, 2020) https://perma.cc/KJD9-HT3Z.

[111] Although several transactions, including Google's acquisition of ITA in 2010, were subject to settlements, U.S. antitrust enforcers did not attempt to prevent the consummation of these transactions.

[112] Tim Wu & Stuart A. Thompson, *The Roots of Big Tech Run Disturbingly Deep*, N.Y. TIMES (June 7, 2019), https://www.nytimes.com/interactive/2019/06/07/opinion/google-facebook-mergers-acquisitions-antitrust.html; Carl Shapiro, *Antitrust in a Time of Populism*, 61 INT'L J. INDUS. ORG. 714, 739–40 (2018), https://faculty.haas.berkeley.edu/shapiro/antitrustpopulism.pdf.

[113] Colleen Cunningham, Florian Ederer & Song Ma, *Killer Acquisitions* 1 (Yale Sch. of Mgmt. Working Paper, 2020), https://ssrn.com/abstract=3241707 (describing the practice whereby "an incumbent firm may acquire an innovative target and terminate the development of the target's innovations to preempt future competition"). *See also* C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. PA. L. REV. (forthcoming 2020) (manuscript at 2), https://perma.cc/62HH-34ZL ("A nascent competitor is a firm whose prospective innovation represents a serious future threat to an incumbent.").

**App. 111**

Evidence also suggests that the venture capital industry, which plays a critical role in funding innovative startups, contributes to market consolidation by encouraging startups to exit via a sale to an incumbent firm.[114] As initial public offerings (IPOs) have become more expensive and time-consuming in recent decades, venture capitalists have shown a preference for realizing their investments through acquisitions rather than through public markets.[115]

c.  The Role of Online Platforms as Gatekeepers

As Amazon, Apple, Facebook, and Google have captured control over key channels of distribution, they have come to function as gatekeepers. A large swath of businesses across the U.S. economy now depend on these gatekeepers to access users and markets. In interviews with Subcommittee staff, numerous businesses described how dominant platforms exploit this gatekeeper power to dictate terms and extract concessions that third parties would not consent to in a competitive market.[116] According to these companies, these types of concessions and demands carry significant economic harm but are "the cost of doing business" given the lack of options.

Their role as gatekeepers also gives the dominant platforms outsized power to control the fates of other businesses. Reflecting this fact, several major publicly owned firms that rely on the dominant platforms have noted in investor statements that this dependent relationship creates an inherent risk to their businesses.[117] For example, Lyft, a ride-sharing company, has cited its use of Amazon's cloud services and Google Maps as a potential risk to its business model.[118] As Lyft stated in a filing, "Some of our competitors or technology partners may take actions which disrupt the interoperability of our platform with their own products or services."[119] Pinterest, a photo-sharing service, likewise noted in a financial filing that changes to Google's search algorithm may harm Pinterest. As it noted, Pinterest's "ability to maintain and increase the number of visitors directed to our service from search engines is not within our control. Search engines, such as Google, may modify their search algorithms and policies or enforce those policies in ways that are detrimental to us."[120] In submissions and interviews with Subcommittee staff, many companies reiterated the general concern that a single act or decision by one of the dominant platforms could wreck their businesses.

---

[114] Mark Lemley & Andrew McCreary, *Exit Strategy* at 24–45 (Stanford Law & Econs. Olin Working Paper No. 542, 2020), https://ssrn.com/abstract=3506919.

[115] *Id.*

[116] *See infra* Section V.

[117] Gerrit De Vynck, *The Power of Google and Amazon Looms Over Tech IPOs*, BLOOMBERG (July 1, 2019), https://www.bloomberg.com/news/articles/2019-07-01/google-s-and-amazon-s-power-looms-over-procession-of-tech-ipos (noting that 17 of 22 initial public offerings by technology companies cited online platforms as competitors or risks to their businesses).

[118] *Id.*

[119] *Id.*

[120] *Id.*

**App. 112**

Since the dominant platforms in many cases have also integrated into adjacent lines of business, these firms operate both as key intermediaries for third-party companies as well as direct competitors to them. Numerous entrepreneurs, small businesses, and major companies told Subcommittee staff that the dominant platforms' dual role raises significant competition concerns.[121] In recent years, significant reporting has documented how the dominant platforms can exploit this dual role, through data exploitation,[122] self-preferencing,[123] appropriation of key technologies,[124] and abrupt changes to a platform's policies.[125] The Subcommittee's investigation uncovered numerous examples of this exploitative conduct, suggesting that these are increasingly systemic, rather than isolated, business practices.

3. Barriers to Entry

   a. Network Effects

Digital markets tend to be characterized by strong network effects, making them prone to concentration and monopolization.[126] There are two types of network effects: direct and indirect. In markets with direct network effects, the more people who use a product or service, the more valuable that product or service becomes to other users.[127] By contrast, indirect network effects arise when greater use of a product or service forms a new type of standard and increases the incentive for third parties to invest in developing compatible technologies, which in turn reinforces the popularity of the original product or service with users.[128]

---

[121] *See infra* Section V.

[122] *See* Press Release, Eur. Comm'n, Antitrust: Commission opens investigation into possible anti-competitive conduct of Amazon (July 17, 2019), https://ec.europa.eu/commission/presscorner/detail/en/IP_19_4291 ("Based on the Commission's preliminary fact-finding, Amazon appears to use competitively sensitive information – about marketplace sellers, their products and transactions on the marketplace.").

[123] Tripp Mickle, *Apple Dominates App Store Search Results, Thwarting Competitors*, Wall St. J. (July 23, 2019), https://www.wsj.com/articles/apple-dominates-app-store-search-results-thwarting-competitors-11563897221.

[124] Jack Nicas & Daisuke Wakabayashi, *Sonos, Squeezed by the Tech Giants, Sues Google*, N.Y. Times (Jan. 7, 2020), https://www.nytimes.com/2020/01/07/technology/sonos-sues-google.html.

[125] Reed Albergotti, *Apple says recent changes to operating system improve user privacy, but some lawmakers see them as an effort to edge out its rivals*, Wash. Post (Nov. 26, 2019), https://www.washingtonpost.com/technology/2019/11/26/apple-emphasizes-user-privacy-lawmakers-see-it-an-effort-edge-out-its-rivals/; Jason Del Rey, *An Amazon revolt could be brewing as the tech giant exerts more control over brands*, Vox: Recode (Nov. 29, 2018), https://www.vox.com/2018/11/29/18023132/amazon-brand-policy-changes-marketplace-control-one-vendor.

[126] Jay Shambaugh, Ryan Nunn, Audrey Breitwiser & Patrick Liu, Brookings Inst., The State of Competition and Dynamism: Facts about Concentration, Start-Ups, and Related Policies, 10 (June 2018), https://www.brookings.edu/wp-content/uploads/2018/06/ES_THP_20180611_CompetitionFacts_20180611.pdf.

[127] *See* Luigi Zingales & Guy Rolnik, *A Way To Own Your Social-Media Data*, N.Y. Times (June 30, 2017), https://www.nytimes.com/2017/06/30/opinion/social-data-google-facebook-europe.html.

[128] Maurice E. Stucke & Allen P. Grunes, Big Data and Competition Policy 163 (2016).

**App. 113**

Online platforms display strong network effects because they connect disparate market segments. For example, online commerce platforms like Amazon connect buyers and sellers. Just as with social networks, the value of Amazon Marketplace increases as more users—both sellers and buyers—engage with the platform.[129] Similarly, the value of online platforms that facilitate advertising, such as Google, increases with the number of users, as advertisers gain access to a larger consumer base and therefore to a larger trove of consumer data.[130]

Similarly, social networks like Facebook exhibit powerful direct network effects because they become more valuable as more users engage with the network—no person wants to be on a social network without other users.[131] Meanwhile, once a firm captures a network it can become extremely difficult to dislodge or replace. As Mark Zuckerberg explained to then-CFO David Ebersman the benefits that would accrue to Facebook from acquiring Instagram:

> [T]here are network effects around social products and a finite number of different social mechanics to invent. Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product.[132]

Strong network effects serve as a powerful barrier to entry for new firms to enter a market and displace the incumbent.[133] When combined with other entry barriers such as restrictions on consumers or businesses easily switching services, network effects all but ensure not just market concentration but durable market power.[134]

b. <u>Switching Costs</u>

Switching costs present another barrier for potential market entrants. In many cases, large technology firms can maintain market power in part because it is not easy for users to switch away from the incumbent's technology. A market exhibits "lock-in" when switching costs are sufficiently high that users stay with an incumbent firm rather than switch to a firm whose product or service they

---

[129] *Id.*

[130] *Id.*

[131] Stigler Report at 38.

[132] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00063222 (Feb. 27, 2012), https://judiciary.house.gov/uploadedfiles/0006322000063223.pdf.

[133] *See* Stigler Report at 40.

[134] *See* Dig. Competition Expert Panel Report at 35.

41

**App. 114**

would prefer.[135] Over time, lock-in tends to reduce competition, deter market entry, and may even worsen data privacy.[136]

High switching costs are a central feature of digital search and social media platforms, such as Google and Facebook, where users contribute data to the platform but may not be able to migrate that data to a competing platform. For example, a user may upload a variety of data to Facebook, including photos and personal information, but may not be able to easily download that data and move it to another social media site; instead, the user would have to start from scratch, re-uploading her photos and re-entering her personal information to the new platform.[137] An online seller who has generated hundreds of product reviews and ratings on Amazon may face a similar challenge when considering migrating to a different platform. Other significant factors that contribute to switching costs in digital markets include anticompetitive contracting terms, default settings, product design that favor dominant platforms.[138]

c.  Data

The accumulation of data can serve as another powerful barrier to entry for firms in the digital economy. Data allows companies to target advertising with scalpel-like precision, improve services and products through a better understanding of user engagement and preferences, and more quickly identify and exploit new business opportunities.[139]

Much like a network effect, data-rich accumulation is self-reinforcing. Companies with superior access to data can use that data to better target users or improve product quality, drawing more users and, in turn, generating more data—an advantageous feedback loop.[140] In short, new users and greater engagement bring in more data, which enables firms to improve user experiences and develop new products—in turn capturing more data.[141] While data is non-rivalrous—meaning that one party's

---

[135] MAURICE E. STUCKE & ALLEN P. GRUNES, BIG DATA AND COMPETITION POLICY 159 (2016).

[136] Id.

[137] Data and Privacy Hearing at 3 (statement of Dina Srinivasan, Fellow, Yale Thurman Arnold Project).

[138] Dig. Competition Expert Panel Report at 36. Unlike the European Union, which provides internet users with a right to data portability, the U.S. does not have any law requiring online platforms to make data portable. Platforms like Google and Facebook are therefore largely uninhibited in imposing switching costs for users, hurting competition in the process. Allen St. John, *Europe's GDPR Brings Data Portability to U.S. Consumers*, CONSUMER. REPS. (May 25, 2018), https://www.consumerreports.org/privacy/gdpr-brings-data-portability-to-us-consumers; *see* Chris Dixon, *The Interoperability of Social Networks*, BUS. INSIDER (Nov. 10, 2010), https://www.businessinsider.com/the-interoperability-of-social-networks-2011-2; Josh Constine, *Friend Portability Is the Must-Have Facebook Regulation*, TECHCRUNCH (May 12, 2019), https://technologycrunch.com/2019/05/12/friends-wherever.

[139] Dig. Competition Expert Panel Report at 23.

[140] Maurice E. Stucke, *Should We Be Concerned About Data-opolies?,* 2 GEO. L. TECH. REV. 275, 323 (2018) (discussing the dynamics of data-driven network effects).

[141] MAURICE E. STUCKE & ALLEN P. GRUNES, BIG DATA AND COMPETITION POLICY 36–50 (2016); PATRICK BARWISE & LEO WATKINS, *The Evolution of Digital Dominance: How and Why We Got to GAFA*, *in* DIGITAL DOMINANT: THE POWER

**App. 115**

use does not prevent or diminish use by another—firms may nonetheless exclude rivals from using their data through technical restrictions and legal contracts.[142] These exclusionary tactics can close off markets and shield incumbents from competition.[143]

In addition to serving as a barrier to entry, superior access to data can enable and exacerbate anticompetitive conduct in digital markets. This is particularly true when a dominant platform operates as both a marketplace for third-party goods as well as a seller of its own products on that same marketplace.[144] Through this dual role, a dominant platform can mine commercially valuable information from third-party businesses to benefit its own competing products.[145] Additionally, a dominant platform can use its market power to extract more data from users, undermining their privacy.[146]

Persistent data collection can also create information asymmetries and grant firms access to non-public information that gives them a significant competitive edge. These insights include information on user behavior as well as on broader usage trends that enable the dominant platforms to track nascent competitive threats. In an interview with Subcommittee staff, a senior executive at a social media company referred to this ability as akin to having "a spy camera on the production floor" of a competitive threat.[147] Roger McNamee, the Co-Founder of Elevation Partners, has noted that the dominant platforms' role as digital infrastructure gives them both leverage and insights that other competitors lack:

> Essentially, the interplay of Google's dominant position in … infrastructure elements [such as] ad tech infrastructure, Chrome browser, [and Nest] … collectively provide leverage over other market participants, which include not just startups, but also advertisers, and other would-be competitors. And the key thing is, it's not just about Google's infrastructure. When you add in Gmail, Search, Maps, apps, and all the other things that Google does so well … [t]hey provide further levels of user lock-in—further protective modes that really limit the opportunity of competitors and even, frankly,

---

OF GOOGLE, AMAZON, FACEBOOK, AND APPLE 28–29 (2018), http://www.lse.ac.uk/law/Assets/Documents/orla-lynskey/orla-3.pdf.

[142] MAURICE E. STUCKE & ALLEN P. GRUNES, BIG DATA AND COMPETITION POLICY 23–34 (2016).

[143] *Id.* at 34 (2016).

[144] JACQUES CRÉMER, YVES-ALEXANDRE DE MONJOYE & HEIKE SCWHEITZER, EUR. COMM'N, COMPETITION POLICY FOR THE DIGITAL ERA 66–67 (2019) [hereinafter Eur. Comm'n Competition Report].

[145] *Id.* at 66.

[146] *See* Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy*, 16 BERKELEY BUS. L.J. 39, 70 (2019); Data and Privacy Hearing at 1 (statement of Dina Srinivasan, Fellow, Yale Thurman Arnold Project).

[147] Interview with Source 247 (June 4, 2020).

**App. 116**

suppliers and advertisers, to do the things that they should be able to do in a freely competitive economy.[148]

This significant data advantage also enables dominant platforms to identify and acquire rivals early in their lifecycle. Leading economists and antitrust experts have expressed concern that serial acquisitions of nascent competitors by large technology firms have stifled competition and innovation.[149] This acquisition strategy exploits dominant firms' information advantages in order to acquire rapidly growing companies just before those companies become true threats.[150] Lacking access to this same information or failing to appreciate its significance, enforcers may fail to identify these acquisitions as anticompetitive. This is more likely when the dominant platform buys a nascent threat before it has fully developed into a rival.

In a briefing before Members of the Subcommittee, Jonathan Sallet, former Deputy Assistant Attorney General at the Antitrust Division, explained that data-driven acquisitions of nascent or potential rivals can significantly undermine competition while systematically evading antitrust scrutiny.[151] One reason is that upstart competitors are often data-rich but cash-poor, a combination that is unlikely under a price-centric framework to trigger antitrust scrutiny if the acquisition is priced below the relevant threshold for merger review.[152] For example, had Microsoft sought to exploit its monopoly power in the market for personal computer operating systems by *acquiring* Netscape— rather than by foreclosing it—it is unlikely that antitrust enforcers would have taken action. He noted that this type of acquisition can tip the market in favor of a dominant firm, having the same ultimate effect as monopolistic conduct but escaping the antitrust enforcement that monopolistic conduct has triggered in the past.[153]

---

[148] Roger McNamee, Co-Founder and Managing Dir., Elevation Partners, Remarks at U.S. Dep't of Justice Antitrust Div. Public Workshop on Venture Capital and Antitrust 30 (Feb. 12, 2020), https://www.justice.gov/atr/page/file/1255851/download.

[149] *See, e.g.*, Stigler Report at 74, 87.

[150] *See* Maurice E. Stucke, *Should We Be Concerned About Data-opolies?*, 2 GEO. L. TECH. REV. 275, 309 (2018) (discussing the growing concern with "kill zone" tactics and the chilling effect on "entrepreneurism and autonomy").

[151] Briefing by Jonathan Sallet, Deputy Ass't Att'y Gen., U.S. Dep't of Justice, Antitrust Div. (July 11, 2020).

[152] Colleen Cunningham, Florian Ederer & Song Ma, *Killer Acquisitions* at 53 (Yale Sch. of Mgmt. Working Paper, Apr. 2020), https://ssrn.com/abstract=3241707 (finding that killer acquisitions "routinely avoid regulatory scrutiny" because they "disproportionately occur just below [HSR] thresholds for antitrust scrutiny").

[153] Jonathan Sallet, *Competitive Edge: Five Building Blocks For Antitrust Success: The Forthcoming FTC Competition Report*, WASH. CTR. FOR EQUITABLE GROWTH (Oct. 1, 2019), https://equitablegrowth.org/competitive-edge-five-building-blocks-for-antitrust-success-the-forthcoming-ftc-competition-report/.

**App. 117**

### d. Economies of Scale and Scope

Increasing returns to scale are another feature of technology markets that make them prone to tip towards concentration and monopolization.[154] In markets with increasing returns to scale, as sales increase, average unit cost decreases.[155] Because entry into these markets requires significant up-front costs, the market favors firms that are already large, making it difficult for new firms to enter the market and challenge large incumbents.[156]

Likewise, a dominant firm that enjoys economies of scope can extend its reach across adjacent markets through an expansive ecosystem of its own products while incurring relatively low cost.[157] For example, if a firm has sufficient technical expertise or access to consumer data, the cost of applying this resource into a new market is relatively low.

Businesses that specialize in providing information, such as Google, frequently benefit from increasing returns to scale.[158] These businesses require high upfront fixed costs, but then may scale with relatively low increases in cost. For example, "Google can update Google Calendar for 100 million users with similar fixed expenses as would be needed for only a fraction of such users."[159] Facebook is another company that benefits from increasing returns to scale.[160] Although building the Facebook platform required a large upfront investment, the platform was able to grow exponentially with relatively little increase in costs. With the benefit of increasing returns to scale, Facebook was able to grow from one million users in 2004, the year of its founding, to more than 350 million users in only five years.[161]

Recent economic evidence indicates that economies of scale achieved through data collection allow platforms to get more out of consumers than consumers get out of platforms.[162] In exchange for "free" services, users provide valuable *social* data—information that may also shed light on other people's behavior—in addition to their own *personal* information. For instance, a person's location

---

[154] Innovation and Entrepreneurship Hearing at 81 (statement of Fiona Scott Morton, Theodore Nierenberg Prof. of Econs., Yale Sch. of Mgmt.); Dig. Competition Expert Panel Report at 32; Stigler Report at 13; *see also* JAY SHAMBAUGH, RYAN NUNN, AUDREY BREITWIESER & PATRICK LIU, THE BROOKINGS INST., THE STATE OF COMPETITION AND DYNAMISM: FACTS ABOUT CONCENTRATION, START-UPS, AND RELATED POLICIES 10 (June 2018), https://www.brookings.edu/wp-content/uploads/2018/06/ES_THP_20180611_CompetitionFacts_20180611.pdf

[155] Stigler Report at 36.

[156] Dig. Competition Expert Panel Report at 32.

[157] *Id.*

[158] Stigler Report at 37.

[159] *Id.*

[160] *Id.*

[161] *Id.* at 36–37.

[162] *See generally* Dirk Bergemann, Alessandro Bonatti & Tan Gan, *The Economics of Social Data* (Cowles Foundation Discussion Paper No. 2203R, Sept. 2019), https://ssrn.com/abstract=3459796.

**App. 118**

history using Google Maps reveals valuable and sensitive information about others as well—such as traffic patterns and other data. According to Professors Dirk Bergemann, Alessandro Bonatti, and Tan Gan, the creation of this "data externality" means that, for firms like Google, Amazon, and Facebook, "the cost of acquiring … individual data can be substantially below the value of the information to the platform."[163] In other words, notwithstanding claims that services such as Google's Search or Maps products or Facebook are "free" or have immeasurable economic value to consumers,[164] the social data gathered through these services may exceed their economic value to consumers.

<div align="center">

### B.   Effects of Platform Market Power

</div>

### 1.  Innovation and Entrepreneurship

Competition is a critical source of innovation, business dynamism, entrepreneurship, and the "launching of new industries."[165] Vigorously contested markets have been a critical competitive asset for the United States over the past century.[166] While large firms with significant resources may invest in research and development for new products and services, competition forces companies to "run faster" in order to offer improved products and services.[167] Without competitive pressure, some level of innovation may still occur, but at a slower, iterative pace than would be present under competitive market conditions.[168]

In recent decades, however, there has been a sharp decline in new business formation as well as early-stage startup funding.[169] The number of new technology firms in the digital economy has declined,[170] while the entrepreneurship rate—the share of startups and young firms in the industry as a

---

[163] *Id.* at 4.

[164] *See, e.g.*, Erik Brynjolfsson & Avinash Collis, *How Should We Measure the Digital Economy?*, HARV. BUS. REV. (Nov.–Dec. 2019), https://hbr.org/2019/11/how-should-we-measure-the-digital-economy.

[165] Innovation and Entrepreneurship Hearing at 1 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. Sch. of Law).

[166] *Id.*

[167] Stigler Report at 74.

[168] Innovation and Entrepreneurship Hearing at 1 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. Sch. of Law).

[169] This is trend is also present in the broader U.S. economy as well. *See, e.g.*, Ufuk Akcigit & Sina T. Ates, *Knowledge in the Hands of the Best, Not the Rest: The Decline of U.S. Business Dynamism*, VOXEU (July 4, 2019), https://voxeu.org/article/decline-us-business-dynamism.

[170] IAN HATHWAY, EWING MARION KAUFFMAN FOUND., TECH STARTS: HIGH-TECHNOLOGY BUSINESS FORMATION AND JOB CREATION IN THE UNITED STATES 5 (2013), https://www.kauffman.org/-/media/kauffman_org/research-reports-and-covers/2013/08/bdstechnologystartsreport.pdf.

**App. 119**

whole—has also fallen significantly in this market.[171] Unsurprisingly, there has also been a sharp reduction in early-stage funding for technology startups.[172]

The rates of entrepreneurship and job creation have also declined over this period. The entrepreneurship rate—defined as the "share of startups and young firms" in the industry as a whole—fell from 60% in 1982 to a low of 38% as of 2011.[173] As entry slows, the average age of technology firms has skewed older.[174] Job creation in the high-technology sector has likewise slowed considerably.[175] In 2000, the job creation rate in the high-technology sector was approaching 20% year-over-year. Within a decade, the rate had halved to about 10%.[176] Although the job creation rate in the high-technology sector has fallen substantially since the early 2000s, the job destruction rate in 2011 was roughly unchanged from 2000.[177] As a result, in 2011 the rate of job destruction in the high-technology sector was higher than the rate of job creation, a reversal from the year 2000, when the job-creation rate far outpaced the job-destruction rate.[178]

In line with this trend, there is mounting evidence that the dominance of online platforms has materially weakened innovation and entrepreneurship in the U.S. economy.[179] Some venture capitalists, for example, report that they avoid funding entrepreneurs and other companies that compete directly with dominant firms in the digital economy.[180]

Often referred to as an innovation "kill zone," this trend may insulate powerful incumbent firms from competitive pressure simply because venture capitalists do not view new entrants as good

---

[171] *Id.*

[172] The number of technology startup financings fell from above 10,000 startup financings in 2015 to just above 6,000 in 2018. In 2014, startups closed 4,255 deals in which they raised seed money from investors. By 2018, however, that figure had dropped by nearly a half, to 2,206. Gené Teare, *Decade in Review: Trends in Seed- and Early-Stage Funding*, TECHCRUNCH (Mar. 13, 2019), https://technologycrunch.com/2019/03/16/decade-in-review-trends-in-seed-and-early-stage-funding. *See also American Technology Giants Are Making Life Tough for Startups*, THE ECONOMIST (June 2, 2018), https://www.economist.com/business/2018/06/02/american-technology-giants-are-making-life-tough-for-startups.

[173] John Haltiwanger, et al., *Declining Business Dynamism in the U.S. High-Technology Sector* at 8, EWING MARION KAUFFMAN FOUND. (Feb. 2014), https://www.kauffman.org/~/media/kauffman_org/research-reports-and-covers/2014/02/declining_business_dynamism_in_us_high_technology_sector.pdf.

[174] *Id.*

[175] *Id.*

[176] *Id.* at 4.

[177] *Id.* at 5.

[178] *Id*. at 4.

[179] Innovation and Entrepreneurship Hearing at 1 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. School of Law); Data and Privacy Hearing at 1–3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.).

[180] *See generally* Venture Capital and Antitrust Workshop; Stigler Report at 9.

**App. 120**

investments.[181] Albert Wenger, the managing partner of Union Square Ventures, commented that the "scale of these companies and their impact on what can be funded, and what can succeed, is massive."[182] Paul Arnold, an early-stage investor and founder of Switch Ventures, commented at the Justice Department's recent workshop on the intersection between venture capital and antitrust law that he considers markets dominated by large platforms to be kill zones.[183] He explained:

> [T]here's an incredibly, concentrated market share because of the economies of scale or because of network effects, it's a really hard barrier to overcome. And sometimes there's an answer and often, that will kill things. And I think that that's my view, that's my, sort of, lived experience as a venture investor, but I think it's a common view of a lot of venture investors.[184]

In the same vein, Mr. Arnold said in a submission to the Subcommittee that:

> Venture capitalists are less likely to fund startups that compete against monopolies' core products … As a startup investor, I see this often. For example, I will meet yet another founder who wants to disrupt Microsoft's LinkedIn. They will have a clever plan to build a better professional social network. I always pass on the investment. It is nearly impossible to overcome the monopoly LinkedIn enjoys. It is but one example of an innovation kill zone.[185]

For example, the entrenched power of firms with weak privacy protections has created a kill zone around the market for products that enhance privacy online.[186] To the extent that a firm successfully offers a service to give people tools to control their privacy, "Google or Facebook are going to want to pull that back as fast as they possibly can. They don't want you aggressively limiting their extremely valuable information collection."[187]

Other prominent venture capitalists, such as Roger McNamee, the Co-Founder of Elevation Partners, have commented that these trends harm more than just startups. The advantages of dominant

---

[181] Raghuram Rajan, Sai Krishna Kamepalli & Luigi Zingales, *Kill Zone* (Becker Friedman Institute Working Paper No. 2020-19, 2020), https://ssrn.com/abstract=3555915.

[182] Asher Schechter, *Google and Facebook's "Kill Zone": "We've Taken the Focus Off of Rewarding Genius and Innovation to Rewarding Capital and Scale,"* PROMARKET (May 25, 2018), https://promarket.org/2018/05/25/google-facebooks-kill-zone-weve-taken-focus-off-rewarding-genius-innovation-rewarding-capital-scale/.

[183] Venture Capital and Antitrust Workshop Transcript at 24 (statement of Paul Arnold, Founder & Partner, Switch Partners).

[184] *Id.*

[185] Submission from Paul Arnold, General Partner, Switch Ventures, to H. Comm. on the Judiciary, 2 (Sept. 3, 2020) (on file with Comm.).

[186] Venture Capital and Antitrust Workshop Transcript at 24 (Paul Arnold, Founder & Partner, Switch Partners).

[187] *Id.*

**App. 121**

firms online—access to competitively significant sources of data, network effects, intellectual property, and excess capital—are "a barrier to a wide range of activities, not just startups, but actually a lot of other market participants."[188]

Merger activity may be another contributor to reduced venture capital investment of startups. In a recent study, several leading economists and researchers at the University of Chicago—Raghuram G. Rajan, Luigi Zingales, and Sai Krishna Kamepalli—found that major acquisitions by larger firms in sectors of the digital economy led to significantly less investment in startups in this same sector.[189] As they note, in the wake of an acquisition by Facebook or Google, investments in startups in the same space "drop by over 40% and the number of deals falls by over 20% in the three years following an acquisition."[190]

The threat of entry from a large platform has had significant effects on other firms' incentives to innovate,[191] while the actual entry of the larger online platform can result in less innovation and an additional increase in prices.[192] During the investigation, Subcommittee staff interviewed a prominent venture capital investor in the cloud marketplace who explained that this power imbalance creates a strong economic incentive for other firms to avoid head-on competition. As he noted:

> I think of Amazon as the sun. It is useful but also dangerous. If you're far enough away you can bask. If you get too close you'll get incinerated. So, you have to be far enough from Amazon and be doing something that they wouldn't do. If you're a net consumer of Amazon's infrastructure, like Uber, then you're okay. As long as Amazon doesn't want to get into ridesharing. But it's hard to predict what Amazon wants to get into. If they were going to stop at retail and computing, you're safe. But you can't know.[193]

As discussed in this Report, other behavior by dominant firms—such as cloning the products of new entrants—may also undermine the likelihood that new entrants will be able to compete directly or that early adopters will switch to a new entrant's product, lowering the valuation of these companies as well as their profitability.[194]

---

[188] *Id.* at 29 (statement of Roger McNamee, Cofounder & Managing Dir., Elevation Partners).

[189] Raghuram Rajan, Sai Krishna Kamepalli & Luigi Zingales, *Kill Zone* 5 (Becker Friedman Inst. Working Paper No. 2020-19, 2020), https://ssrn.com/abstract=3555915.

[190] *Id.*

[191] *See* Wen Wen & Feng Zhu, *Threat of Platform-Owner Entry and Complementor Responses: Evidence from the Mobile App Market*, 40 STRATEGIC MGMT. J. 1336 (2019); Feng Zhu & Qihong Liu, *Competing with Complementors: An Empirical Look at Amazon.com*, 39 STRATEGIC MGMT. J. 2618 (2018).

[192] *Id.*

[193] Interview with Source 146 (May 28, 2020).

[194] Raghuram Rajan, Sai Krishna Kamepalli & Luigi Zingales, *Kill Zone* 5 (Becker Friedman Inst. Working Paper No. 2020-19, 2020), https://ssrn.com/abstract=3555915.

**App. 122**

In July 2019, the Subcommittee held a hearing to examine the effects of market power on innovation and entrepreneurship. There, a panel of experts noted that the lack of competitive pressure in the U.S. economy has reduced innovation and business formation, while also allowing dominant firms to control innovation.[195] Professor Tim Wu of Columbia Law School, a pioneer in internet policy, said that there is:

> [N]o question as to whether there were barriers to entry and whether the tech economies have, in fact, become a very difficult place for people to get started . . . the decline in the number of startups, almost unthinkable in the United States, which has always had a comparative advantage in being the place where startups will get their start.[196]

Professor Fiona Scott Morton of the Yale University School of Management reinforced this concept in her testimony, noting that insufficient competition has given dominant firms the ability to channel innovation in the direction they prefer "rather than being creatively spread across directions chosen by entrants."[197]

In addition to innovation harms in the digital marketplace, Stacy Mitchell, the Co-Director of the Institute for Local Self Reliance, explained that entrepreneurism among locally owned businesses has also suffered as a result of this power. As she noted, "Local businesses are disappearing and, with them, a pathway to the middle class. Producers are struggling to invest in new products and grow their companies. New business formation is down to historic lows."[198]

At the Subcommittee's field hearing, senior executives representing different businesses across the economic spectrum offered similar testimony about the effects of market power on innovation and entrepreneurship. Patrick Spence, the CEO of Sonos, testified that the lack of fair competition diminishes innovation, particularly for firms that cannot afford to sell products at a loss.[199] He explained:

> These companies have gone so far as demanding that we suppress our inventions in order to work with them. The most recent example of this is Google's refusal to allow

---

[195] Innovation and Entrepreneurship Hearing at 81 (statement of Fiona Scott Morton, Theodore Nierenberg Prof. of Econs., Yale Sch. of Mgmt.).

[196] *Id.* at 74 (statement of Tim Wu, Julius Silver Prof. of Law, Columbia Univ. Sch. of Law).

[197] *Id.* at 81 (statement of Fiona Scott Morton, Theodore Nierenberg Prof. of Econs, Yale Sch. of Mgmt.); Data and Privacy Hearing at 3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.) ("[M]ajor platforms have reduced incentives to innovate and incumbents have distorted incentives to make more incremental improvements that can be incorporated into the dominant platforms rather than more paradigmatic changes that could challenge these platforms.").

[198] Innovation and Entrepreneurship Hearing at 187 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance ).

[199] Competitors Hearing at 7 (statement of Patrick Spence, CEO, Sonos, Inc.).

**App. 123**

us to use multiple voice assistants on our product simultaneously. . . . I think the whole spirit of trying to encourage small companies, encourage new innovations and new startups is at risk, given how dominant these companies are.[200]

Furthermore, the ability of a dominant firm to extract economic concessions from smaller companies that rely on it to reach the market can also depress innovation. David Barnett, the CEO and Founder of PopSockets, testified at the field hearing that Amazon required his company "to pay almost two million in marketing dollars in order to remove illegal product from the Amazon marketplace."[201] In response to questions from Representative Ken Buck (R-CO) on the effect of this policy on innovation, Mr. Barnett testified that this money could have been used to double the number of employees dedicated to developing innovative products at the company.[202]

2.  Privacy and Data Protection

The persistent collection and misuse of consumer data is an indicator of market power in the digital economy.[203] Traditionally, market power has been defined as the ability to raise prices without a loss to demand, such as fewer sales or customers.[204] Scholars and market participants have noted that even as online platforms rarely charge consumers a monetary price—products appear to be "free" but are monetized through people's attention or with their data[205]—traditional assessments of market power are more difficult to apply to digital markets.[206]

The best evidence of platform market power therefore is not prices charged but rather the degree to which platforms have eroded consumer privacy without prompting a response from the market.[207]

---

[200] *Id.*

[201] Competitors Hearing at 3 (statement of David Barnett, Founder & CEO, PopSockets LLC).

[202] *Id.* at 57.

[203] Howard A. Shelanski, *Information, Innovation, and Competition Policy for the Internet,* 161 U. PA. L. REV. 1663, 1689 (2013) ("One measure of a platform's market power is the extent to which it can engage in [privacy exploitation] without some benefit to consumers that offsets their reduced privacy and still retain users.").

[204] W. KIP VISCUSI ET AL., ECONOMICS OF REGULATION AND ANTITRUST 164 (3d ed. 2000).

[205] Data and Privacy Hearing at 3 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.); 5 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.).

[206] Howard A. Shelanski, *Information, Innovation, and Competition Policy for the Internet,* 161 U. PA. L. REV. 1663, 1687 (2013) ("While increased competition, at least on its own, will not always cause firms to better use or protect customer information, any competitive effects analysis that misses these two nonprice dimensions of platform market performance will be incomplete and could be biased toward underenforcement.").

[207] *See, e.g.,* Makan Delrahim, Assistant Attorney General, U.S. Dep't of Justice Antitrust Div., Remarks for the Antitrust New Frontiers Conference (June 11, 2019), https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-new-frontiers ("It is well-settled, however, that competition has price and non-price dimensions."); Maurice E. Stucke & Ariel Ezrachi, *When Competition Fails to Optimize Quality: A Look at Search Engines,* 18 YALE J.L. & TECH. 70, 103 (2016); ELEONORA OCELLO & CRISTINA SJOODIN, EUR. COMM'N, COMPETITION

**App. 124**

As scholars have noted, a platform's ability to maintain strong networks while degrading user privacy can reasonably be considered equivalent to a monopolist's decision to increase prices or reduce product quality.[208] A firm's dominance can enable it to abuse consumers' privacy without losing customers.[209] In the absence of genuine competitive threats, a firm offers fewer privacy protections than it otherwise would. In the process, it extracts more data, further entrenching its dominance.[210] When paired with the tendency toward winner-take-all outcomes, consumers are forced to either use a service with poor privacy safeguards or forego the service altogether.[211] As the United Kingdom's Competition and Markets Authority observes, "The collection and use of personal data by Google and Facebook for personalised advertising, in many cases with no or limited controls available to consumers, is another indication that these platforms do not face a strong enough competitive constraint."[212]

Given the increasingly critical role platforms play in mediating access to everyday goods and services, users are also far more likely to surrender more information than to cease using the service entirely.[213] Without adequate competition, firms are able to collect more data than a competitive market would allow,[214] further entrenching their market power while diminishing privacy in the process.[215]

---

MERGER BRIEF: MICROSOFT/LINKEDIN: BIG DATA AND CONGLOMERATE EFFECTS IN TECH MARKETS 5 (2017), http://ec.europa.eu/competition/publications/cmb/2017/kdal17001enn.pdf.

[208] Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy*, 16 BERKELEY BUS. L.J. 39, 44 (2019) ("Facebook is a monopolist, and what Facebook extracts overtly from consumers today, from a quality perspective, is a direct function of Facebook's monopoly power."); *see also* Katharine Kemp, *Concealed Data Practices and Competition Law: Why Privacy Matters* (UNSW Law Research Paper No. 19-53, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3432769; OECD, BIG DATA: BRINGING COMPETITION POLICY TO THE DIGITAL ERA (2016), https://one.oecd.org/document/DAF/COMP(2016)14/en/pdf.

[209] Data and Privacy Hearing at 5 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.); Dig. Competition Expert Panel Report at 42–45.

[210] David N. Cicilline & Terrell McSweeny, *Competition Is at the Heart of Facebook's Privacy Problem*, WIRED (Apr. 24, 2018), https://www.wired.com/story/competition-is-at-the-heart-of-facebooks-privacy-problem.

[211] Dig. Competition Expert Panel Report at 43 ("[T]he misuse of consumer data and harm to privacy is arguably an indicator of low quality caused by a lack of competition."); Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy*, 16 BERKELEY BUS. L.J. 39, 40 (2019) ("Consumers effectively face a singular choice—use Facebook and submit to the quality and stipulations of Facebook's product or forgo all use of the only social network.").

[212] Competition & Mkts. Auth. Report at 318.

[213] Giuseppe Colangelo & Mariateresa Maggiolino, *Data Protection in Attention Markets: Protecting Privacy through Competition?*, 8 J. OF EUR. COMPETITION L. & PRACTICE 363, 365 (2017).

[214] Data and Privacy Hearing at 4 (statement of Dina Srinivasan, Fellow, Yale Thurman Arnold Project); Innovation and Entrepreneurship Hearing at 82 (Fiona Scott Morton, Theodore Nierenberg Prof. of Econs., Yale Sch. of Mgmt.).

[215] Data and Privacy Hearing at 2 (statement of Jason Furman, Prof. of the Practice of Econ. Pol'y, Harvard Kennedy Sch.); Data and Privacy Hearing at 5 (statement of Tommaso Valletti, Prof. of Econs., Imperial College Bus. Sch.); Dig. Competition Expert Panel Report at 4 ("It can be harder for new companies to enter or scale up."); Giuseppe Colangelo & Mariateresa Maggiolino, *Data Protection in Attention Markets: Protecting Privacy through Competition?*, 8 J. OF EUR. COMPETITION L. & PRACTICE 363, 365 (2017) ("Similarly, in such a market, a dominant firm could abuse its power to exclude a rival producing privacy-friendly goods that consumer would otherwise prefer."); Stigler Report at 67 ("When

Because persistent data collection online is often concealed,[216] it is more difficult to compare privacy costs across different products and services.[217] Consumers are largely unaware of firms' data collection practices, which are presented in dense and lengthy disclosures.[218] The use of manipulative design interfaces has also become a pervasive tool "to increase the likelihood of users consenting to tracking."[219] These behavioral nudges—referred to as dark patterns—are commonly used in online tracking and advertising markets to enhance a firm's market power and "maximize a company's ability to extract revenue from its users."[220] And in e-commerce, Jamie Luguri and Lior Strahilevitz observe that dark patterns "are harming consumers by convincing them to surrender cash or personal data in deals that do not reflect consumers' actual preferences and may not serve their interests. There appears to be a substantial market failure where dark patterns are concerned—what is good for ecommerce profits is bad for consumers."[221]

More recently, as remote work became commonplace during the COVID-19 pandemic, Google attempted to manipulate users into using its Google Meet videoconferencing tool instead of upstart competitor Zoom. As Zoom emerged as the market leader during the early stages of the pandemic, Google introduced a new widget for Meet inside Gmail. A similar message could be found inside Google Calendar, which prompted users to "Add Google Meet video conferencing" to their appointments. "For people with the Zoom Video Communications Inc. extension on their Chrome browsers, the prompt sits directly above the option to: 'Make it a Zoom Meeting.'"[222]

---

facing a zero-money price, and when quality is difficult to observe, consumers are not receiving salient signals about the social value of their consumption because the price they believe they face does not reflect the economics of the transaction, and they are ignorant of those numbers.").

[216] Data and Privacy Hearing at 4–5 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.).

[217] Maurice E. Stucke, *Should We Be Concerned About Data-opolies?*, 2 GEO. L. TECH. REV. 275, 311 (2018).

[218] *See, e.g.*, Paul Hitlin & Lee Rainie, *Facebook Algorithms and Personal Data*, PEW RES. CTR. (Jan. 16, 2019), https://www.pewinternet.org/2019/01/16/facebook-algorithms-and-personal-data/. *See* AUSTL. COMPETITION & CONSUMER COMM'N, DIG. PLATFORMS INQUIRY FINAL REPORT 11 (2019) [hereinafter Austl. Competition & Consumer Comm'n Report]; Ryan Calo & Alex Rosenblat, *The Taking Economy: Uber, Information, and Power*, 117 COLUM. L. REV. 1623 (2017); Dina Srinivasan, *The Antitrust Case Against Facebook: A Monopolist's Journey Towards Pervasive Surveillance in Spite of Consumers' Preference for Privacy*, 16 BERKELEY BUS. L.J. 39, 41 (2019) ("[A]ccepting Facebook's policies in order to use its service means accepting broad-scale commercial surveillance.").

[219] Arvind Narayanan, Arunesh Mathur, Marshini Chetty & Mihir Kshirsagar, *Dark Patterns: Past, Present, and Future*, 18(2) ACM QUEUE 67, 77 (2020) https://queue.acm.org/detail.cfm?id=3400901.

[220] *Id.* at 77 (2020); NORWEGIAN CONSUMER COUNCIL, DECEIVED BY DESIGN (June 27, 2018) (describing the use of "dark patterns"), https://fil.forbrukerradet.no/wp-content/uploads/2018/06/2018-06-27-deceived-by-design-final.pdf.

[221] Jamie Luguri & Lior Strahilevitz, *Shining a Light on Dark Patterns* 29 (Univ. of Chicago Public Law Working Paper No. 719, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3431205.

[222] Mark Bergen, *Google Really Wants You to Try Its New Video Tool*, BLOOMBERG (May 19, 2020), https://www.bloomberg.com/news/newsletters/2020-05-19/google-really-wants-you-to-try-its-new-video-tool.

**App. 126**

To the extent that consumers are aware of data collection practices, it is often in the wake of scandals involving large-scale data breaches or privacy incidents such as Cambridge Analytica.[223] As Dina Srinivasan notes, "Today, nuances in privacy terms are relegated to investigative journalists to discover and explain. When the media does report on them—as they did around Google's practice of letting employees and contractors read Gmail users' emails—consumers often switch to a competitor that offers a better product or service."[224] The opacity of data collection and use contributes to consumer confusion and the misperception that consumers do not care about their privacy—the so-called privacy paradox—simply because they use services that have become essential.[225]

While insufficient competition can lead to reduced quality in many markets, the loss of quality due to monopolization—and in turn, privacy and data protection—is even more pronounced in digital markets because product quality is often the "relevant locus of competition."[226] Without transparency or effective choice, dominant firms may impose terms of service with weak privacy protections that are designed to restrict consumer choice,[227] creating a race to the bottom.[228] As David Heinemeier Hansson, the Co-Founder and Chief Technology Officer of Basecamp,[229] explained in his testimony before the Subcommittee:

> When businesses do not have to account for the negative externalities they cause, it's a race to the bottom. The industrial-scale exploitation of privacy online is much the same. Facebook and Google have built comprehensive dossiers on almost everyone, and they can sell incredibly targeted advertisement on that basis. When Facebook knows you're pregnant, or worse, thinks it knows when you're pregnant, they can target ads for baby clothes or strollers with striking efficiency. But doing so represents an inherent violation of the receiver's privacy. Every ad targeted using personal information

---

[223] Dig. Competition Expert Panel Report at 45; David N. Cicilline & Terrell McSweeny, *Competition Is at the Heart of Facebook's Privacy Problem*, WIRED (Apr. 24, 2018), https://www.wired.com/story/competition-is-at-the-heart-of-facebooks-privacy-problem.

[224] Data and Privacy Hearing at 4 (statement of Dina Srinivasan, Fellow, Yale Thurman Arnold Project).

[225] Brooke Auxier, et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RES. CTR. (Nov. 15 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/; Daniel J. Solove, *The Myth of the Privacy Paradox*, 89 GEO. WASH. L. REV. (forthcoming 2021).

[226] Data and Privacy Hearing at 4 (statement of Tommaso Valletti, Prof. of Econs., Imperial Coll. Bus. Sch.).

[227] *Id.*

[228] Competitors Hearing at 11 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp); Dig. Competition Expert Panel Report at 6 ("[W]ell-functioning competitive digital markets have the potential to develop new solutions and increased choice for consumers, where privacy and quality of service can be differentiating factors."); Howard A. Shelanski, *Information, Innovation, and Competition Policy for the Internet,* 161 U. PA. L. REV. 1663, 1691 (2013) ("Competition, however, may drive platforms to adopt and adhere to stronger privacy policies, making it worthwhile for a platform to advertise such policies to consumers in order to differentiate itself from its competitors.").

[229] Basecamp is an internet software firm based in Chicago, Illinois, that sells project-management and team-collaboration tools. Competitors Hearing at 2 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

**App. 127**

gathered without explicit, informed consent is at some level a violation of privacy. And Facebook and Google are profiting immensely by selling these violations to advertisers. Advertisers who may well feel that purchasing these violations go against their ethics, but see no choice to compete without participating.[230]

In addition to creating a race to the bottom, this same dynamic can also prevent new firms from offering products with strong privacy protections or reduce the incentive of new entrants or rivals to compete directly.[231] Roger McNamee, the Co-Founder and Managing Director of Elevation Partners, has also explained that to the extent there is direct competition between a firm with a privacy-centric business model, such as DuckDuckGo's search engine, they can "still have trouble applying different business models once they're not compatible with the business models that have made the Internet platforms so successful."[232]

Conversely, without adequate safeguards in place, measures that appear to improve privacy for consumers may also have anticompetitive effects. Kirsten Daru, Chief Privacy Officer and General Counsel of Tile, told the Subcommittee: "Apple has used the concept of privacy as a shield by making changes in the name of privacy that at the same time give it a competitive advantage."[233] In particular, she testified at the Subcommittee's field hearing:

> Apple has attempted to justify its own collection of sensitive information and disparate treatment of competitors because FindMy is 'part of the OS,' as well as due to a need for enhanced consumer privacy. But the changes don't meaningfully improve or enhance privacy of third-party app developers.[234]

Ram Shriram, a prominent investor who is a founding board member of Google, noted that "[p]rivacy does impact how you think about dominance, for example, in a market because Google and Apple both eliminated third-party cookies, which then makes your data a little more private. But it ironically will hurt the young companies that are trying to build digital advertising businesses while improving user privacy.[235]

---

[230] Competitors Hearing at 11 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

[231] Data and Privacy Hearing at 3–4 (statement of Dina Srinivasan, Fellow, Yale Thurman Arnold Project); Venture Capital and Antitrust Workshop at 24 (Paul Arnold, Founder & Partner, Switch Partners).

[232] Venture Capital and Antitrust Workshop at 30 (statement of Roger McNamee, Cofounder & Managing Dir., Elevation Partners).

[233] Competitors Hearing at 3 (response to Questions for the Record of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

[234] Competitors Hearing at 2 (statement of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

[235] Venture Capital and Antitrust Workshop at 36 (Ram Shriram, Managing Partner, Sherpalo Ventures LLC).

**App. 128**

The Subcommittee held several hearings during the investigation that examined the role of competition and privacy online.

In September 2016, the Subcommittee held a hearing on the role of data and privacy in competition. There, Federal Trade Commissioner Rohit Chopra testified that dominant firms have the ability to impose "complex and draconian" terms of service that can change suddenly "to collect and use data more expansively and more intensely."[236] As he noted, this behavior is the equivalent of a price hike that would be difficult to impose unilaterally in a competitive marketplace.[237] Without sufficient competition, however, "companies can focus on blocking new entrants and limiting choice to protect their dominance and pricing power."[238] Tommaso Valletti, the former Chief Competition Economist for the European Commission, noted that it is "self-evident that data is key to digital platforms, and that some applications imply real-time knowledge of consumer behaviour as well as cross linkages across apps that only very few digital players have access to."[239] And finally, Jason Furman, the former Chairman of the Council of Economic Advisers and an author of the "Unlocking Digital Competition" report, said that "the misuse of consumer data and harm to privacy is arguably an indicator of low quality caused by a lack of competition."[240]

At the Subcommittee's oversight hearing in November 2019, Makan Delrahim, the Assistant Attorney General of the Justice Department's Antitrust Division, testified that because privacy is a dimension of quality, protecting competition "can have an impact on privacy and data protection."[241] And finally, Maureen Ohlhausen, the former Acting Chair of the FTC, echoed this point at the Subcommittee's hearing on innovation and entrepreneurship, noting that quality reductions online could "include factors such as reduced features, restricted consumer choice, or lessened control over privacy."[242]

Leading international antitrust enforcers offered similar testimony before the Subcommittee. Margrethe Vestager, the European Union's Competition Commissioner, testified that due to the Commission's finding that data protection is an important dimension of competition that could be undermined by certain merger activity, the Commission "has … integrated, where appropriate, data protection as a quality parameter for the assessment of merger cases."[243] Similarly, Rod Sims, the

---

[236] Data and Privacy Hearing at 3 (statement of Rohit Chopra, Comm'r, Fed. Trade Comm'n).

[237] *Id.*

[238] *Id.*

[239] Data and Privacy Hearing at 2 (statement of Tommaso Valletti, Prof. of Econs., Imperial College Bus. Sch.).

[240] Dig. Competition Expert Panel Report at 43.

[241] Antitrust Agencies Hearing at 15 (statement of Makan Delahim, Assistant Attorney General, United States Dep't of Justice, Antitrust Div.).

[242] Innovation and Entrepreneurship Hearing at 4 n.14 (statement of Maureen K. Ohlhausen, Partner, Baker Botts, L.L.P.).

[243] Data and Privacy Hearing at 4 (statement of Margrethe Vestager, then-Eur. Comm'r for Competition).

**App. 129**

Chair of the Australian Competition and Consumer Commission, told the Subcommittee that the ACCC's "Digital Platforms Inquiry" report recommends "[u]pdating Australia's merger law to incorporate … the nature and significance of assets, including data and technology, acquired through a merger."[244]

3. The Free and Diverse Press

A free and diverse press is essential to a vibrant democracy. Whether exposing corruption in government, informing citizens, or holding power to account, independent journalism sustains our democracy by facilitating public discourse.

Since 2006, newspaper advertising revenue, which is critical for funding high-quality journalism, fell by over 50%.[245] Despite significant growth in online traffic among the nation's leading newspapers,[246] print and digital newsrooms across the country are laying off reporters or folding altogether.[247] As a result, communities throughout the United States are increasingly going without sources for local news. The emergence of platform gatekeepers—and the market power wielded by these firms—has contributed to the decline of trustworthy sources of news.[248]

a. Journalism in Decline

Since 2006, the news industry has been in economic freefall, primarily due to a massive decrease in advertising revenue. Both print and broadcast news organizations rely heavily on advertising revenue to support their operations, and as the market has shifted to digital platforms, news organizations have seen the value of their advertising space plummet steeply.[249] For newspapers, advertising has declined from $49 billion in 2006 to $16.5 billion in 2017.[250] This decrease has been

---

[244] *Id.* at 8 (statement of Rod Sims, Chair, Austl. Competition & Consumer Comm'n).

[245] Noah Smith, Opinion, *Goodbye, Newspapers. Hello, Bad Government.*, BLOOMBERG (June 1, 2018), https://www.bloomberg.com/opinion/articles/2018-06-01/goodbye-newspapers-hello-bad-government.

[246] Free and Diverse Press Hearing at 2 (statement of David Chavern, Pres. & CEO, News Media Alliance).

[247] Douglas McLennan & Jack Miles, Opinion, *A Once Unimaginable Scenario: No More Newspapers*, WASH. POST: THE WORLDPOST (Mar. 21, 2018), https://www.washingtonpost.com/news/theworldpost/wp/2018/03/21/newspapers/?utm_term=.c1b57c9efcd7.

[248] Free and Diverse Press Hearing at 2–3 (statement of David Pitofsky, Gen. Counsel, News Corp).

[249] eMarketer estimates that Google's and Facebook's U.S. ad revenues will be $39.58 billion and $31.43 billion, respectively, in 2020. EMARKETER, *Google Ad Revenues to Drop for the First Time* (June 23, 2020). According to BIA, local TV and radio station ad revenues (counting both their OTA and much more limited digital revenues) will total $31.3 billion this year. *See* BIA Advisory Services, *BIA Revises Local Radio Advertising Estimates Down to $12.8B in 2020 Due to Pandemic* (June 25, 2020); BIA Advisory Services, *BIA Lowers 2020 Local Television Station Advertising Revenue Forecast to $18.5B* (May 21, 2020).

[250] Michael Barthel, *Despite Subscription Surges for Largest U.S. Newspapers, Circulation and Revenue Fall for Industry Overall*, PEW RES. CTR.: FACTTANK (June 1, 2017), https://www.pewresearch.org/fact-tank/2017/06/01/circulation-and-

**App. 130**

felt by national and local news sources alike. As total annual advertising revenues have fallen over 62% across the industry since 2008, one major national newspaper told the Subcommittee that its annual advertising revenue has fallen 48% over that period.[251] Additionally, ethnic news outlets have suffered from the shift from broadcast and print ads to digital ads.[252] Regarding television and radio broadcast news, the National Association of Broadcasters told the Subcommittee, "[T]his year, the U.S. advertising revenue of a single company—Google—are projected to exceed the *combined* ad revenue of *all* TV and radio stations in the country by over $8 billion."[253]

While the decline of advertising revenue has most severely affected local news publishers, prominent digital publishers have also been affected. In January 2019, Buzzfeed announced layoffs of 220 employees, about 15% of its workforce, due to advertising losses.[254] Jonah Peretti, the Chief Executive Officer of BuzzFeed, commented prior to the layoffs that consolidation of digital publishers into a single large digital media company may be the only path forward for profitability, suggesting that publishers' lack of bargaining power in negotiations with online platforms is the central obstacle to long-term survival.[255]

Despite a recent boost in the number of digital subscriptions and the level of online traffic for the top newspapers in the United States, these increases did not offset losses in online advertising or circulation in the industry overall.[256] As one news publisher told the Subcommittee, "For the vast majority of news publishers, digital subscription revenues remain a minor revenue stream and do not appear to be on a path to replace the decline in print subscriptions."[257] Over the past two decades,

---

revenue-fall-for-newspaper-industry; *Newspapers Fact Sheet*, PEW RES. CTR. (June 13, 2018), https://www.journalism.org/fact-sheet/newspapers.

[251] Submission from Source 220, to H. Comm. on the Judiciary, 7 (Oct. 14, 2019) (on file with Comm.).

[252] *See* PENELOPE MUSE ABERNATHY, UNIV. N.C. SCH. OF MEDIA AND JOURNALISM, NEWS DESERTS AND GHOST NEWSPAPERS: WILL LOCAL NEWS SURVIVE 45 (2020), https://www.usnewsdeserts.com/wp-content/uploads/2020/06/2020_News_Deserts_and_Ghost_Newspapers.pdf.

[253] Submission from Nat'l Ass'n of Broads., to H. Comm. on the Judiciary, 2 (Oct. 14, 2019), http://www.nab.org/documents/newsRoom/pdfs/09220_HJC_Local_Journalism_At_Risk_Submission.pdf.

[254] Oliver Darcy & Tom Kludt, *Media Industry Loses About 1,000 Jobs as Layoffs Hit News Organizations*, CNN (Jan. 24, 2019), https://edition.cnn.com/2019/01/24/media/media-layoffs-buzzfeed-huffpost-gannett/index.html; Edmund Lee, *Founder's Big Idea to Revive BuzzFeed's Fortunes? A Merger with Rivals*, N.Y. TIMES (Nov. 19, 2018), https://www.nytimes.com/2018/11/19/business/media/buzzfeed-jonah-peretti-mergers.html.

[255] Edmund Lee, *Founder's Big Idea to Revive BuzzFeed's Fortunes? A Merger with Rivals*, N.Y. TIMES (Nov. 19, 2018), https://www.nytimes.com/2018/11/19/business/media/buzzfeed-jonah-peretti-mergers.html.

[256] Michael Barthel, *Despite Subscription Surges for Largest U.S. Newspapers, Circulation and Revenue Fall for Industry Overall*, PEW RES. CTR.: FACTTANK (June 1, 2017), https://www.pewresearch.org/fact-tank/2017/06/01/circulation-and-revenue-fall-for-newspaper-industry/; *Newspapers Fact Sheet,* PEW RES. CTR. (July 9, 2019), https://www.journalism.org/fact-sheet/newspapers; David Chavern, Opinion, *Protect the News From Google and Facebook*, WALL ST. J. (Feb. 25, 2018), https://www.wsj.com/articles/protect-the-news-from-google-and-facebook-1519594942.

[257] Submission from Source 220, to H. Comm. on the Judiciary, 7 (Oct. 14, 2019) (on file with Comm.).

hundreds of local news publishers have been acquired or gone bankrupt.[258] In some cases, private equity firms and hedge funds have purchased major regional chains and newspapers, resulting in mass layoffs of journalists and increased debt burdens for publishers.[259]

In recent years, news consumption has largely shifted to a model of content aggregation, through which platforms consolidate content from multiple news sources.[260] In submissions to the Subcommittee and public statements, publishers across the spectrum say they have little choice but to participate in content aggregation, particularly those run by dominant platforms because the aggregators' "use of news publishers' content does send substantial traffic to news publishers."[261] But this can also prevent traffic from flowing to newspapers. As some publishers have noted, news aggregators package and present content to users using attention-grabbing quotes from high points of stories, which can make it unnecessary for the user to click through to the publisher's website.[262] As these publishers noted, this dynamic forces news organizations to effectively compete with their own content, lowering the potential revenue from user traffic to news organizations' websites.[263]

As a result of falling revenues, newspapers and broadcast stations are steadily losing the ability to financially support their newsrooms, which are costly to maintain but provide immense value to their communities.[264] A robust local newsroom requires the financial freedom to support in-depth, sometimes years-long reporting, as well as the ability to hire and retain journalists with expertise in fundamentally local issues, such as coverage of state government.[265]

The societal value of local news is significant. As noted by the National Association of Broadcasters, local broadcast stations provide on-the-air programming which is "rooted in localism and the public interest," offering content which "[is] still free to the public and accessible to all Americans."[266] Kevin Riley, the editor of *The Atlanta Journal-Constitution*, similarly testified before

---

[258] PENELOPE MUSE ABERNATHY, UNIV. N.C. SCH. OF MEDIA AND JOURNALISM, THE EXPANDING NEWS DESERT 33 (2018), https://www.cislm.org/wp-content/uploads/2018/10/The-Expanding-News-Desert-10_14-Web.pdf.

[259] Alex Shephard, *Finance Is Killing the News*, NEW REPUBLIC (Apr. 18, 2018), https://newrepublic.com/article/148022/finance-killing-news.

[260] Lesley Chiou & Catherine Tucker, *Content Aggregation by Platforms: The Case of the News Media* (NBER Working Paper No. 21404, 2015), https://www.nber.org/papers/w21404.pdf.

[261] NEWS MEDIA ALLIANCE, HOW GOOGLE ABUSES ITS POSITION AS A MARKET DOMINANT PLATFORM TO STRONG-ARM NEWS PUBLISHERS AND HURT JOURNALISM 2 (2020), http://www.newsmediaalliance.org/wp-content/uploads/2020/06/Final-Alliance-White-Paper-June-18-2020.pdf.

[262] *Id.* at 12.

[263] *Id.* at 12–14 (2020).

[264] Submission from the Nat'l Ass'n of Broads., to H. Comm. on the Judiciary, 9 (Sept. 2, 2020), http://www.nab.org/documents/newsRoom/pdfs/09220_HJC_Local_Journalism_At_Risk_Submission.pdf.

[265] Free and Diverse Press Hearing at 3–4 (statement of Kevin Riley, Editor, The Atlanta Journal-Constitution).

[266] Submission from the Nat'l Ass'n of Broads., to H. Comm. on the Judiciary, 1 (Sept. 2, 2020), http://www.nab.org/documents/newsRoom/pdfs/09220_HJC_Local_Journalism_At_Risk_Submission.pdf.

**App. 132**

the Subcommittee that "it would be impossible to even put a cost estimate on the work" of local journalists.[267]

The COVID-19 pandemic has particularly highlighted the importance of local news sources. Despite taking major revenue losses,[268] local journalists have provided valuable reporting on the transmission of the novel coronavirus, particularly for underserved and vulnerable communities.[269] For example, PBS New Mexico provided an in-depth focus on the effects of the coronavirus on Native Americans "dealing with scarce resources as they respond to novel coronavirus outbreaks on tribal lands."[270] Apart from serving their communities, local news stories bring national attention to these critical issues.[271] In addition to news coverage, the National Association of Broadcasters aired public-service announcements in response to the pandemic "more than 765,000 times for an estimated ad value of more than $156,500,000," a number which "do[es] not include the likely much greater number of other coronavirus-related PSAs" aired by local television and radio stations across the United States.[272]

To run a new operation, broadcast stations must be able to sustain "the basic costs of running a station, including engineering, sales, [and] programming" costs, and must make significant capital expenditures in equipment, such as satellite trucks.[273] These expenses must be satisfied before broadcast stations can invest in improvements to keep pace with changing technologies, "including ultra-high definition programming, better emergency alerting, mobile services, interactivity, hyper-local content and more."[274]

The costs of news production add up. From 2003 to 2013, these costs "accounted for nearly 24 percent of TV stations' total expenses (and nearly 26 percent of the total expenses of ABC/CBS/Fox/NBC stations)."[275] In light of the expenses associated with producing high-quality

---

[267] Free and Diverse Press Hearing at 2 (statement of Kevin Riley, Editor, The Atlanta Journal-Constitution).

[268] Sara Fischer & Margaret Harding McGill, *Coronavirus Sends Local News Into Crisis,* AXIOS (Mar. 21, 2020), https://www.axios.com/coronavirus-local-news-853e96fa-51aa-43cc-a990-eb48cc896b17.html.

[269] Mark Glaser, *6 Ways Local News Makes a Crucial Impact Covering COVID-19*, KNIGHT FOUND. (Apr. 20, 2020), https://knightfoundation.org/articles/6-ways-local-news-makes-a-crucial-impact-covering-covid-19/.

[270] *COVID-19 Response from Native Tribes*, NEW MEXICO PBS (Mar. 30, 2020), https://www.newmexicopbs.org/productions/newmexicoinfocus/covid-19-response-from-native-tribes/.

[271] *See, e.g.*, Bill Chappell, *Coronavirus Cases Spike In Navajo Nation, Where Water Service Is Often Scarce*, NPR (Mar. 26, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/26/822037719/coronavirus-cases-spike-in-navajo-nation-where-water-service-is-often-scarce.

[272] Submission from the Nat'l Ass'n of Broads., to H. Comm. on the Judiciary, 2 (Sept. 2, 2020), http://www.nab.org/documents/newsRoom/pdfs/09220_HJC_Local_Journalism_At_Risk_Submission.pdf.

[273] *Id.* at 4, 7 n.16.

[274] *Id.* at 7.

[275] *Id.* at 4 (citing NAB Television Financial Reports 2004–19)

60

**App. 133**

journalism, declining revenue has major implications for the maintenance—let alone enrichment—of quality news production.

Budget cuts have also led to a dramatic number of newsroom job losses. This decline has been primarily driven by a reduction in newspaper employees, who have seen employment fall by half over a recent eight-year period, from 71,000 in 2008 to 35,000 in 2019.[276] In 2019 alone, 7,800 media industry employees were laid off.[277] The Bureau of Labor Statistics estimates that the total employment of reporters, correspondents, and broadcast news analysts will continue to decline by about 11% between 2019 and 2029.[278]

Researchers at the University of North Carolina School of Media and Journalism found that the United States has lost nearly 1,800 newspapers since 2004 either to closure or merger, 70% of which were in metropolitan areas.[279] As a result, the majority of counties in America no longer have more than one publisher of local news, and 200 without any paper.[280] At the Subcommittee's hearing on online platforms' effects on a free and diverse press, Mr. Riley described this new media landscape characterized by digital platform dominance and disappearing local newspapers:

> We produce journalism that is distinguished by its depth, accuracy and originality. That costs money and is expensive, but if the system works correctly, it also makes money that the paper uses to investigate and develop the next story or cover the next local event. If others repackage our journalism and make money off it, yet none of that money makes its way back to the local paper, then it makes breaking that next story or exposing the next scandal more challenging. If that cycle continues indefinitely, quality local journalism will slowly wither and eventually cease to exist.[281]

---

[276] Elizabeth Grieco, *U.S. newspapers have shed half of their newsroom employees since 2008*, PEW RES. CTR: FACTTANK (Apr. 20, 2020), https://www.pewresearch.org/fact-tank/2020/04/20/u-s-newsroom-employment-has-dropped-by-a-quarter-since-2008/.

[277] Benjamin Goggin, *7,800 People Lost Their Media Jobs in a 2019 Landslide*, BUS. INSIDER (Dec. 10, 2019), https://www.businessinsider.com/2019-media-layoffs-job-cuts-at-buzzfeed-huffpost-vice-details-2019-2#spin-media-group-29-jobs-september-and-january-18.

[278] *Occupational Outlook Handbook: Reporters, Correspondents, and Broadcast News Analysts*, U.S. DEP'T OF LABOR: BUR. OF LABOR STATS. (last modified Apr. 12, 2019), https://www.bls.gov/ooh/media-and-communication/reporters-correspondents-and-broadcast-news-analysts.htm.

[279] PENELOPE MUSE ABERNATHY, UNIV. N.C. SCH. OF MEDIA AND JOURNALISM, THE EXPANDING NEWS DESERT 10-11 (2018), https://www.cislm.org/wp-content/uploads/2018/10/The-Expanding-News-Desert-10_14-Web.pdf.

[280] *Id.* at 8, 10.

[281] Free and Diverse Press Hearing at 3 (statement of Kevin Riley, Editor, The Atlanta Journal-Constitution)

**App. 134**

This cycle has a profoundly negative effect on American democracy and civic life. Communities without quality local news coverage have lower rates of voter turnout.[282] Government corruption may go unchecked, leaving communities vulnerable to serious mismanagement.[283] Relatedly, these communities see local government spending increase.[284] Towns without robust local news coverage also exhibit lower levels of social cohesion, undermining a sense of belonging in a community.[285] As fewer publishers operate in local markets, local news is supplanted by aggregation of national coverage, reducing residents' knowledge of local happenings and events, and generally leaving them less connected to their communities.[286]

Compounding this problem, the gap created by the loss of trustworthy and credible news sources has been increasingly filled by false and misleading information. Once communities lack a local newspaper source, people tend to get their local news from social media. As local news dies, it is filled by unchecked information, some of which can spread quickly and can have severe consequences.

b.   The Effect of Market Power on Journalism

During the Subcommittee's investigation, news publishers raised concerns about the "significant and growing asymmetry of power" between dominant online platforms and news publishers, as well as the effect of this dominance on the production and availability of trustworthy sources of news. In interviews, submissions, and testimony before the Subcommittee, publishers with distinct business models and distribution strategies said they are "increasingly beholden" to these firms, and in particular, Google and Facebook.[287] As a result, several dominant firms have an outsized

---

[282] Matthew Gentzkow, et al., *The Effects of Newspaper Entry and Exit on Electoral Politics*, 101 Am. Econ. Rev. 2980 (2011) ("We find that newspapers have a robust positive effect on political participation, with one additional newspaper increasing both presidential and congressional turnout by approximately 0.3 percentage points.").

[283] Mary Ellen Klas, *Less Local News Means Less Democracy*, Nieman Reps. (Sept. 20, 2019), https://niemanreports.org/articles/less-local-news-means-less-democracy/.

[284] Noah Smith, Opinion, *Goodbye Newspapers. Hello, Bad Government*, Bloomberg (June 1, 2018), https://www.bloomberg.com/opinion/articles/2018-06-01/goodbye-newspapers-hello-bad-government ("[T]he authors show that without local newspapers, local governments tend to engage in more inefficient or dubious financing arrangements.").

[285] Amy Mitchell, et al., *Civic Engagement Strongly Tied to Local News Habits*, Pew Res. Ctr. (Nov. 3, 2016), https://www.journalism.org/2016/11/03/civic-engagement-strongly-tied-to-local-news-habits.

[286] Danny Hayes & Jennifer L. Lawless, *As Local News Goes, So Goes Citizen Engagement: Media, Knowledge, and Participation in U.S. House Elections*, 77 J. Pol. 447, 447 (2014).

[287] Submission from Source 220, to H. Comm. on the Judiciary, 7 (Oct. 14, 2019) (on file with Comm.). Although Apple News and Apple News Plus are increasingly popular news aggregators, most market participants interviewed by Subcommittee staff do not view it as a critical intermediary for online news at this time, although some publishers raised concerns about the tying of payments inside Apple's news product.

**App. 135**

influence over the distribution and monetization of trustworthy sources of news online,[288] undermining the availability of high-quality sources of journalism.[289]

### i.   Distribution of News Online

Several dominant platforms function as intermediaries to news online. Due to their outsized role as digital gateways to news, a change to one of these firm's algorithm can significantly affect the online referrals to news publishers,[290] directly affecting their advertising revenue.[291] One news publisher stated in its submission to the Subcommittee that it and other news organizations "depend on a few big tech platforms to help them distribute their journalism to consumers."[292]

In submissions to the Subcommittee, several news publishers noted that the dominance of Google and Facebook allows them to "pick winners" online by adjusting visibility and traffic.[293] For example, an update to Google's search algorithm in June 2019 decreased a major news publisher's online traffic "by close to 50%" even as their referrals from other sources—such as their home page and apps—grew during the same period.[294] As they noted, a "smaller business would have been crushed" by this decline.[295]

Similarly, news organizations were negatively affected when, in January 2018, Facebook adjusted its News Feed algorithm to prioritize content based on audience engagement.[296] According to an internet analytics firm, these changes significantly affected the visibility of news content on Facebook, resulting in a 33% decrease in referral traffic from Facebook to news publishers' sites.[297] As one publisher noted in its submission to the Subcommittee, this change "was made without notice,

---

[288] Submission of Source 955, to H. Comm. on the Judiciary, 12 (Oct. 30, 2019) (on file with Comm.).

[289] Free and Diverse Press Hearing at 3 (statement of David Chavern, Pres. & CEO, News Media Alliance) ("In effect, a couple of dominant tech platforms are acting as regulators of the digital news industry.").

[290] *See, e.g.*, Submission of Source 140, to H. Comm. on the Judiciary, 2 (Oct. 15, 2019) (on file with Comm.) ("Facebook's decision, announced in June 2016, to make significant changes to its algorithm to [favor] content from friends and family, which was made without notice, consultation or warning to the market, and which led to significant disruption for a range of businesses.").

[291] Submission of Source 114, to H. Comm. on the Judiciary, 12 (Oct. 2, 2019) (on file with Comm.); Data and Privacy Hearing at 6 (statement of Rod Sims, Chair, Austl. Competition & Consumer Comm'n).

[292] Submission of Source 220, to H. Comm. on the Judiciary, 3 (Mar. 10, 2020) (on file with Comm.).

[293] Submission of Source 955, to H. Comm. on the Judiciary, 12 (Oct. 15, 2019) (on file with Comm.).

[294] *Id.* at 17.

[295] *Id.*

[296] Adam Mosseri, *Bringing People Closer Together*, FACEBOOK: NEWSROOM (Jan. 11, 2018), https://newsroom.fb.com/news/2018/01/news-feed-fyi-bringing-people-closer-together.

[297] *How Much Have Facebook Algorithm Changes Impacted Publishers?*, MARKETING CHARTS (Apr. 4, 2019), https://www.marketingcharts.com/digital/social-media-107974.

**App. 136**

consultation or warning to the market, [leading] to significant disruption for a range of businesses."[298] Nicholas Thompson, the Editor-in-Chief of *Wired* magazine, and *Wired* contributing editor Fred Vogelstein described the relationship between publishers and Facebook as being "sharecroppers on Facebook's massive industrial farm," writing that:

> Even at the best of times, meetings between Facebook and media executives can feel like unhappy family gatherings. The two sides are inextricably bound together, but they don't like each other all that much. . . . And then there's the simple, deep fear and mistrust that Facebook inspires. Every publisher knows that, at best, they are sharecroppers on Facebook's massive industrial farm. The social network is roughly 200 times more valuable than the *Times*. And journalists know that the man who owns the farm has the leverage. ***If Facebook wanted to, it could quietly turn any number of dials that would harm a publisher—by manipulating its traffic, its ad network, or its readers***.[299]

The Subcommittee has also received evidence that the dominance of several online platforms has created a significant imbalance of bargaining power. In several submissions, news publishers note that dominant firms can impose unilateral terms on publishers, such as take-it-or-leave-it revenue sharing agreements.[300] A prominent publisher described this relationship as platforms having a "finger on the scales" with the ability to suppress publishers that do not "appease platforms' business terms."[301]

During the Subcommittee's hearing on the effects of market power on journalism,[302] several witnesses also testified about the lack of equal bargaining power between news publishers and dominant platforms.[303] At the Subcommittee's hearing on market power and the free and diverse press, Sally Hubbard, Director of Enforcement Strategy at the Open Markets Institute, testified that the lack of competition online has led to diminished bargaining power among news publishers. Consequently, in response to changing terms and algorithmic treatment by platforms, "publishers have little choice but to adapt and accommodate regardless of how the changes may negatively affect their own

---

[298] Submission from Source 140, to H. Comm. on the Judiciary, 2 (Oct. 15, 2019) (on file with Comm.).

[299] Nicholas Thompson & Fred Vogelstein, *Inside the Two Years That Shook Facebook—and the World*, WIRED (Feb. 12, 2018), https://www.wired.com/story/inside-facebook-mark-zuckerberg-2-years-of-hell/ (emphasis added).

[300] *See, e.g.*, Submission of Source 140, to H. Comm. on the Judiciary, 2 (Oct. 15, 2019) (on file with Comm.) ("Apple's decision to tie all payments made through iOS apps to its own payment system, which takes a 30% share of any contributions and subscriptions made to news [publishers] through news apps downloaded from the Apple store.").

[301] Submission of Source 114, to H. Comm. on the Judiciary, 12 (Oct. 2, 2019) (on file with Comm.).

[302] Free and Diverse Press Hearing.

[303] Data and Privacy Hearing at 4 (statement of Rod Sims, Chair, Austl. Competition & Consumer Comm'n) (testifying that the power of dominant platforms "creates an imbalance of bargaining power between digital platforms and news media businesses, meaning that agreements they reach are likely much different to those that would be reached in a competitive market").

**App. 137**

profitability."[304] David Chavern, President of the News Media Alliance, similarly testified that publishers have a "collective action problem," stating that "no news organization on its own can stand up to the platforms. The risk of demotion or exclusion from the platforms is simply too great."[305]

In June 2020, the News Media Alliance published a white paper examining the relationship between news publishers and Google based on interviews with its members over the course of more than a year.[306] As it notes, "Google has exercised control over news publishers to force them into several relationships that benefit Google at the publishers' expense."[307] In the context of Google's placement of news on accelerated mobile pages (AMP)—a format for displaying web pages on mobile devices—publishers raised concerns that "Google effectively gave news publishers little choice but to adopt it," requiring the creation of parallel websites "that are hosted, stored and served from Google's servers rather than their own."[308]

While this format has benefits in terms of loading information quickly on mobile devices, publishers argue that these benefits "could have been achieved through means that did not so significantly increase Google's power over publishers or so favor its ability to collect data to foster its market domination."[309] And when a publisher attempts to avoid this cost by moving its content behind a paywall, its rise in subscriptions was offset by declines in traffic from Google and other platforms.[310] Referring to this tradeoff as a "Hobson's choice," the News Media Alliance explained:

> Newspapers such as *The Wall Street Journal* employ a highly customized paywall on their websites, significantly varying the number of free articles that a user is permitted to read before being asked to subscribe to the newspaper. This flexibility is highly beneficial, allowing them to maximize engagement and increase subscriptions. For AMP articles, however, Google restricts the paywall options. Unless publishers rebuild their paywall options and their meters for AMP, they can only provide *all* of their content for free or *none* of their content for free. The only other option is to use Subscribe with Google, which has many benefits for Google and downsides for news publishers.[311] Accordingly, unless they invest in building another and separate paywall,

---

[304] Free and Diverse Press Hearing at 8 (statement of Sally Hubbard, Dir. of Enforcement Strategy, Open Mkts. Inst.).

[305] *Id.* at 5 (statement of David Chavern, Pres., News Media Alliance).

[306] NEWS MEDIA ALLIANCE, HOW GOOGLE ABUSES ITS POSITION AS A MARKET DOMINANT PLATFORM TO STRONG-ARM NEWS PUBLISHERS AND HURT JOURNALISM (2020), http://www.newsmediaalliance.org/wp-content/uploads/2020/06/Final-Alliance-White-Paper-June-18-2020.pdf.

[307] *Id.* at 1.

[308] *Id.* at 5.

[309] *Id.* at 7.

[310] *Id.* at 6.

[311] *Id.* at 8 n.14 ("These include the following: (1) Google gets the subscriber data; (2) the user must use Google Wallet or Google Pay, instead of providing its credit card to the news publisher and establishing a direct relationship with the publisher; and (3) Google takes a 5-15% cut. *See* Nushin Rashidian, George Civeris & Pete Brown, *Platforms and*

**App. 138**

news publishers who do not want to use Subscribe with Google have a *de facto* all-or-nothing choice regarding the imposition of a paywall, which lowers subscriber conversion rates.[312]

Google has responded to this concern by noting that AMP does not prevent publishers from placing ads on AMP pages, but restricting the number of ads "leads to improved page load times, increased site traffic, superior ad engagement, and thus typically increases advertising revenue overall."[313] Google also said in its responses to Subcommittee Chairman Cicilline's questions for the record that it "does not privilege publishers who use AMP over publishers that adopt non-Google technical solutions that would also guarantee fast-loading pages."[314]

Finally, because news is often accessed online through channels other than the original publication—including search results, voice assistants, social platforms, or news aggregators—journalism has increasingly become "atomized" or removed from its source and placed alongside other content.[315] In the context of audio news, one market participant noted that aggregating different news sources can create a bad experience for users.[316] The aggregation of different news sources without editorial oversight can also cause reputational harm to news publishers, such as when highly credible reporting appears alongside an opinion-based news source.[317]

Indirectly, the atomization of news may increase the likelihood that people are exposed to disinformation or untrustworthy sources of news online. When online news is disintermediated from its source, people generally have more difficulty discerning the credibility of reporting online. This

---

*Publishers: The End of an Era,* COLUM. JOURNALISM REV. (Nov. 22, 2019), https://www.cjr.org/tow_center_reports/platforms-and-publishers-end-of-an-era.php.")).

[312] *Id.* at 8.

[313] Submission from Google Australia Pty. Ltd., to Austl. Competition & Consumer Comm'n, 45–46 (Feb. 18, 2019), https://www.accc.gov.au/system/files/Google%20%28February%202019%29.PDF. *But see* Austl. Competition & Consumer Comm'n Report at 240 ("[T]here is a broader issue about the extent to which Google, by way of AMP, retains users within its ecosystem and reduces monetisation opportunities for media businesses outside of AMP. That is, rather than directing users to the websites of media businesses, AMP's design encourages users to stay within the Google ecosystem. As a result, media businesses are less likely to monetise content on their own properties, either through advertising or subscription revenue.").

[314] Innovation and Entrepreneurship Hearing at 27 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[315] Austl. Competition & Consumer Comm'n at 297 (describing atomization as "the process by which news is 'decoupled from its source' and consumed on a 'story-by-story basis."); Free and Diverse Press Hearing at 3 (statement of David Chavern, Pres., News Media Alliance) ("These tech giants use secret, unpredictable algorithms to determine how and even whether content is delivered to readers. They scrape news organizations' content and use it to their own ends, without permission or remuneration for the companies that generated the content in the first place. They also suppress news organizations' brands, control their data, and refuse to recognize and support quality journalism.").

[316] Submission of Source 114, to H. Comm. on the Judiciary, 12 (Oct. 2, 2019) (on file with Comm.);

[317] Interview with Source 114 (Oct. 2, 2019).

**App. 139**

process may also "foster ambivalence about the quality and nature of content that garners users' attention," particularly among young people.[318]

For example, during the Subcommittee's sixth hearing, Subcommittee Chairman David N. Cicilline presented Facebook CEO Mark Zuckerberg with evidence of a Breitbart video that claimed that "you don't need a mask and hydroxychloroquine is a cure for COVID."[319] As he noted, within the first five hours of this video being posted, it had nearly "20 million views and over 100,000 comments before Facebook acted to remove it."[320] Mr. Zuckerberg responded that "a lot of people shared that, and we did take it down because it violate[d] our policies."[321] In response, Chairman Cicilline asked if "20 million people saw it over the period of five hours . . . doesn't that suggest, Mr. Zuckerberg, that your platform is so big that, even with the right policies in place, you can't contain deadly content?"[322] Mr. Zuckerberg responded by claiming that Facebook has a "relatively good track record of finding and taking down lots of false content."[323]

Moreover, because there is not meaningful competition, dominant firms face little financial consequence when misinformation and propaganda are promoted online.[324] Platforms that are dependent on online advertising have an incentive to prioritize content that is addictive or exploitative to increase engagement on the platform.[325] And the reliance on platforms by advertisers has generally diminished their ability to push for improvements in content standards. As a news publisher explained in a submission to the Subcommittee:

> As advertisers have become more reliant on dominant search and social platforms to reach potential consumers, they have lost any leverage to demand change in the policies or practices of the platforms. In the era of newspapers, television, radio, or indeed direct sales of digital advertising online, there was a connection between advertising and the

---

[318] Submission of Source 140, to H. Comm. on the Judiciary, 2 (Oct. 15, 2019) (on file with Comm.).

[319] CEO Hearing Transcript at 143 (statement of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[320] *Id.*

[321] *Id.* (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[322] *Id.* at 143–144 (statement of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[323] *Id.* at 144 (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[324] Free and Diverse Press Hearing at 8 (statement of Sally Hubbard, Dir. of Enforcement Strategy, Open Mkts. Inst.); Charlie Warzel, Opinion, *Facebook Can't Be Reformed*, N.Y. TIMES (July 1, 2020), https://www.nytimes.com/2020/07/01/opinion/facebook-zuckerberg.html.

[325] Conversely, the decline of trustworthy sources of news due to rising market power and declining ad revenue has also contributed to this harm. Competition & Mkts Auth. Report at 9 ("[C]oncerns relating to online platforms funded by digital advertising can lead to wider social, political and cultural harm through the decline of authoritative and reliable news media, the resultant spread of 'fake news' and the decline of the local press which is often a significant force in sustaining communities.").

**App. 140**

content it funds, creating a high degree of accountability for both parties in that transaction. This maintained high content standards, and enabled advertisers to demand or pursue change from publishers whose content standards fell. While many high-quality publishers continue to operate stringent policies in relation to the digital advertising that they permit to appear within their services, in a world of programmatic audience trading that self-regulated compact between advertisers and platform does not exist.[326]

During the Subcommittee's sixth hearing, Representative Jamie Raskin (D-MD) raised this concern. As he noted, in July 2020, Facebook faced an advertiser boycott by hundreds of companies.[327] This effort, which has been spearheaded by the Stop Hate for Profit campaign, a coalition of civil rights groups organizing in protest of "the rapid spread of hate messages online, the presence of boogaloo and other right-wing extremist groups trying to infiltrate and disrupt Black Lives Matter protests and the fact that alt-right racists and anti-Semitic content flourishes on Facebook."[328]

As a result of this campaign, more than a thousand major companies—including Disney, Coca-Cola, and General Motors—announced that they would pull $7 billion in advertisements on Facebook as part of the Stop Hate for Profit boycott.[329] But as Representative Raskin pointed out during the hearing Facebook does not "seem to be that moved by their campaign."[330]

Representative Pramila Jayapal (D-WA) also noted during the hearing that Mr. Zuckerberg reportedly told Facebook's employees at an internal meeting that the company is "not gonna change our policies or approach on anything because of a threat to a small percent of our revenue, or to any percent of our revenue."[331] During that meeting, Mr. Zuckerberg reportedly acknowledged that the boycott "hurts us reputationally," but said that the company was insulated from threats by large advertisers due to advertising revenue from small businesses.[332] In response to this report, Ms. Jayapal asked Mr. Zuckerberg whether Facebook is "so big that you don't care how you're impacted by a

---

[326] Submission of Source 140, to H. Comm. on the Judiciary, 5 (Oct. 15, 2019) (on file with Comm.).

[327] CEO Hearing Transcript at 57 (Rep. Jamie Raskin (D-MD), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[328] *Id.* Stop Hate for Profit was established by the Anti-Defamation League, the NAACP, Color of Change, and other civil rights groups in the wake of the May 2020 police killing of George Floyd, an unarmed black man, in Minneapolis and the ensuing national protests. Shirin Ghaffary & Rebecca Heilweil, *Why Facebook Is "The Front Line in Fighting Hate Today,"* Vox: Recode (July 15, 2020), https://www.vox.com/recode/2020/7/15/21325728/facebook-stop-hate-for-profit-campaign-jonathan-greenblatt-anti-defamation-league.

[329] Steven Levy, *Facebook Has More to Learn From the Ad Boycott*, Wired (Aug. 6, 2020), https://www.wired.com/story/rashad-robinson-facebook-ad-boycott/.

[330] CEO Hearing Transcript at 57 (statement of Rep. Jamie Raskin (D-MD), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[331] *Id.* (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[332] *Id.*

**App. 141**

major boycott of 1,100 advertisers?"[333] Mr. Zuckerberg responded that "[o]f course we care. But we're also not going to set our content policies because of advertisers. I think that that would be the wrong thing for us to do."[334]

Since then, the civil rights groups have said that although Facebook made some changes in response to the boycott—such as the creation of a position within the company dedicated to overseeing civil rights and algorithmic bias—it ultimately has not made meaningful changes at scale, and "lags competitors in working systematically to address hate and bigotry on their platform."[335]

The group organized further action in September 2020, when it called for companies and public figures to stop posting on Instagram beginning September 16th.[336] This protest, aimed again at Facebook's treatment of hate groups, was spurred by the police shooting of Jacob Blake in Kenosha, Wisconsin.[337] In the aftermath, Facebook failed to remove a group promoting the coalescence of an armed militia in the streets of Kenosha, despite numerous users reporting the page.[338] Mr. Zuckerberg called this failure an "operational mistake."[339]

### ii.   Monetization

The rise of market power online has severely affected the monetization of news, diminishing the ability of publishers to deliver valuable reporting.[340]

The digital advertising market is highly concentrated, with Google and Facebook controlling the majority of the online advertising market in the United States,[341] capturing nearly all of its growth

---

[333] *Id.* at 216 (question of Rep. Pramila Jayapal (D-WA), Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[334] *Id.* at 216 (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[335] *Statement from Stop Hate For Profit on July 2020 Ad Pause Success and #StopHateForProfit Campaign*, STOP HATE FOR PROFIT (July 30, 2020), https://www.stophateforprofit.org/.

[336] Donie O'Sullivan, *Group That Led Facebook Boycott Is Back With New Action*, CNN BUSINESS (Sept. 14, 2020), https://www.cnn.com/2020/09/14/tech/facebook-boycott-return/index.html.

[337] *Id.*

[338] Brian Fung, *Facebook CEO Admits 'Operational Mistake' In Failure To Remove Kenosha Militia Page*, CNN BUSINESS (Sept. 4, 2020), https://www.cnn.com/2020/08/28/tech/zuckerberg-kenosha-page/index.html.

[339] *Id.*

[340] *See, e.g.*, Austl. Competition & Consumer Comm'n Report at 7; David Chavern, Opinion, *Protect the News from Google and Facebook*, WALL ST. J. (Feb. 25, 2018), https://www.wsj.com/articles/protect-the-news-from-google-and-facebook-1519594942; *infra* section II.C.3.

[341] *See e.g.*, Hamza Shaban, *Digital Advertising To Surpass Print and TV for the First Time, Report Says*, WASH. POST: TECH. (Feb. 20, 2019), https://www.washingtonpost.com/technology/2019/02/20/digital-advertising-surpass-print-tv-first-time-report-says/.

**App. 142**

in recent years.[342] Although Amazon has grown its digital advertising business to become the third largest competitor in the market,[343] it still accounts for a relatively small percentage.[344]

News publishers have raised concerns that this significant level of concentration in the online advertising market—commonly referred to as the digital ad duopoly—has harmed the quality and availability of journalism.[345] They note that as a result of this dominance, there has been a significant decline in advertising revenue to news publishers,[346] undermining publishers' ability to deliver valuable reporting, and "siphon[ing] revenue away from news organizations."[347]

Jason Kint, the CEO of Digital Content Next, a trade association that represents both digital and traditional news publishers, notes that there is "a clear correlation between layoffs and buyouts with the growth in market share for the duopoly—Google and Facebook."[348] David Chavern, the President and CEO of the News Media Alliance, has likewise said that "[t]he problem is that today's internet distribution systems distort the flow of economic value derived from good reporting."[349] The effects of this revenue decline are most severe at the local level, where the decimation of local news sources is giving rise to local news deserts.[350]

Other news publishers have expressed concerns about the dual role of platforms as both intermediaries and platforms for people's attention.[351] By keeping people inside a "walled garden," platforms can monetize their attention through ads, creating a strong economic incentive to minimize

---

[342] Sarah Sluis, *Digital Ad Market Soars To $88 Billion, Facebook And Google Contribute 90% Of Growth*, AD EXCHANGER (May 10, 2018), https://adexchanger.com/online-advertising/digital-ad-market-soars-to-88-billion-facebook-and-google-contribute-90-of-growth.

[343] Jean Baptiste Su, *Amazon Is Now The #3 Digital Ad Platform In The U.S. Behind Google And Facebook, Says eMarketer*, FORBES (Sept. 20, 2018), https://www.forbes.com/sites/jeanbaptiste/2018/09/20/amazon-is-now-the-3-digital-ad-platform-in-the-u-s-behind-google-and-facebook-says-emarketer/#333342de3926.

[344] *Id.*

[345] *See, e.g.*, Shannon Bond, *Google and Facebook Build Digital Ad Duopoly*, FIN. TIMES (Mar. 14, 2017), https://www.ft.com/content/30c81d12-08c8-11e7-97d1-5e720a26771b; John Diaz, Opinion, *How Google and Facebook Suppress the News*, S.F. CHRON. (Apr. 5, 2019), https://www.sfchronicle.com/opinion/diaz/article/How-Google-and-Facebook-suppress-the-news-13745431.php.

[346] Data and Privacy Hearing at 5 (statement of Rod Sims, Chair, Austl. Competition & Consumer Comm'n); Free and Diverse Press Hearing at 3 (statement of David Pitofsky, Gen. Counsel, News Corp).

[347] Free and Diverse Press Hearing at 3 (statement of David Chavern, Pres., News Media Alliance).

[348] Daniel Funke, *What's Behind the Recent Media Bloodbath? The Dominance of Google and Facebook*, POYNTER (June 14, 2017), https://www.poynter.org/business-work/2017/whats-behind-the-recent-media-bloodbath-the-dominance-of-google-and-facebook.

[349] David Chavern, Opinion, *How Antitrust Undermines Press Freedom*, WALL ST. J. (July 9, 2017), https://www.wsj.com/articles/how-antitrust-undermines-press-freedom-1499638532.

[350] PENELOPE MUSE ABERNATHY, UNIV. N.C. SCH. OF MEDIA AND JOURNALISM, THE EXPANDING NEWS DESERT 33 (2018), https://www.cislm.org/wp-content/uploads/2018/10/The-Expanding-News-Desert-10_14-Web.pdf.

[351] Submission of Source 140, to H. Comm. on the Judiciary, 11 (Oct. 15, 2019) (on file with Comm.); Submission of Source 114, to H. Comm. on the Judiciary, 13 (Oct. 2, 2019) (on file with Comm.).

**App. 143**

outbound referrals that lead to a decline in users' attention and engagement. In turn, this diminishes the incentives of publishers to invest in high-quality journalism.[352] David Pitofsky, the General Counsel of NewsCorp, described this as a free-riding problem in his testimony before the Subcommittee, explaining that platforms:

> [D]eploy our highly engaging news content to target our audiences, then turn around and sell that audience engagement to the same advertisers news publishers are trying to serve. Dominant platforms take the overwhelming majority of advertising revenue without making any investment in the production of the news, all while foreswearing any responsibility for its quality and accuracy. As a result, one of the pillars of the news industry's business model, advertising revenue, is crumbling.[353]

c.   International Scrutiny

Several of the concerns regarding the distribution and monetization of news through platform intermediaries were raised as part of a comprehensive inquiry by the Australian Competition and Consumer Commission (ACCC). Over the span of several years, the Commission collected evidence from more than a hundred market participants and organizations as part of its review. Following its publication of a Preliminary Report in December 2018 and an Issues Paper in February 2018, the ACCC issued an extensive Final Report spanning more than 600 pages and including submissions from more than 100 market participants.[354]

Among its findings, the ACCC concluded that Facebook and Google have significant and durable market power over the distribution of news online.[355] As the ACCC noted, "Google and Facebook are the gateways to online news media for many consumers," accounting for a significant amount of referral traffic to news publishers' websites.[356] As a result, news publishers are reliant on these platforms for reaching people online, which affects publishers' ability to monetize journalism, particularly on formats such as Google's Accelerated Mobile Pages (AMP).[357]

---

[352] Competition & Mkts Auth. Report at 319.

[353] Free and Diverse Press Hearing at 2 (statement of David Pitofsky, Gen. Counsel, News Corp).

[354] Press Release, Austl. Competition & Consumer Comm'n, Holistic, Dynamic Reforms Needed to Address Dominance of Digital Platforms (July 26, 2019), https://www.accc.gov.au/media-release/holistic-dynamic-reforms-needed-to-address-dominance-of-digital-platforms.

[355] Austl. Competition & Consumer Comm'n Report at 226.

[356] *Id.* at 296.

[357] *Id.* at 206, 247 (concluding that AMP is a "must have" product for publishers).

**App. 144**

The ACCC made 23 recommendations to address concerns across a broad range of issues, including antitrust, privacy, and consumer protection.[358] Within the context of addressing the effects of market power on the news industry—particularly as it relates to the imbalance of bargaining power between platforms and publishers—the Commission recommended developing "a code of conduct to govern the relationship between media businesses and digital platforms [which] seeks, among other things, to address this imbalance."[359]

On July 31, 2020, the Commission released a draft code to address a "fundamental bargaining power imbalance" between news publishers and dominant platforms that has led to "news media businesses accepting less favourable terms for the inclusion of news on digital platform services than they would otherwise agree to in response to a request by the Australian government."[360]

Under this code, Facebook, Google, and other platforms with significant bargaining power designated by Australia's Treasurer must negotiate with covered news publishers "in good faith over all issues relevant to news on digital platform services."[361] News publishers may negotiate either individually or collectively over a three-month period, allowing local and rural publishers "to negotiate from a stronger position than negotiating individually."[362]

If publishers are unable to reach an agreement during the mediated negotiation period, they may bring the dispute to compulsory arbitration. As part of this process, the arbitrator must consider the parties' final offers covering: (1) the benefits of news content to the platform; (2) the costs of producing news by the publisher; and (3) whether a payment model would unduly burden the commercial interests of the platform.[363] The arbitrator must choose one of the parties' proposals, encouraging both parties to make reasonable offers.[364]

Facebook and Google have responded to the draft code by warning that they may no longer display news on their respective platforms in Australia. Despite an "unprecedented surge in audiences

---

[358] Press Release, Austl. Competition & Consumer Comm'n, ACCC Commences Inquiry Into Digital Platforms (Dec. 4, 2017), https://www.accc.gov.au/media-release/accc-commences-inquiry-into-digital-platforms.

[359] Austl. Competition & Consumer Comm'n Report at 245.

[360] AUSTL. COMPETITION & CONSUMER COMM'N, DRAFT NEWS MEDIA BARGAINING CODE, https://www.accc.gov.au/focus-areas/digital-platforms/draft-news-media-bargaining-code (last visited on Sept. 27, 2020).

[361] AUSTL. COMPETITION & CONSUMER COMM'N, Q&AS: DRAFT NEWS MEDIA AND DIGITAL PLATFORMS MANDATORY BARGAINING CODE 7 (July 2020), https://www.accc.gov.au/system/files/DPB%20-%20Draft%20news%20media%20and%20digital%20platforms%20mandatory%20bargaining%20code%20Q%26As.pdf.

[362] Id. at 6.

[363] Id. at 9.

[364] Id.

**App. 145**

for news websites and TV news,"[365] Google claims that the draft code does not reflect the "more than $200 million in value that Google provides to publishers each year by sending people to their websites."[366] Facebook described the draft code as "unprecedented in its reach," notwithstanding similar proposals in other countries, including France,[367] as well as the United States.[368]

In response to Google's threat to boycott journalism in Australia, ACCC Chair Rod Sims said that Google's statement contained "misinformation" about the draft code, asserting that the draft code responds to "a significant bargaining power imbalance between Australian news media businesses and Google and Facebook."[369] Australia's Treasurer, Josh Frydenberg, similarly said that the country would not "respond to coercion or heavy-handed threats wherever they come from."[370]

## 4.   Political and Economic Liberty

During the investigation, the Subcommittee examined the effects of market power on political and economic liberty. Concerns about the democratic effects of private monopolies trace back to the foundational antitrust statutes, where lawmakers worried that monopolies were "a menace to republican institutions themselves."[371] The Subcommittee's examination of these matters follows a long tradition of congressional attention to this issue.[372]

---

[365] Amanda Meade, *News Corp To Suspend Print Editions Of 60 Local Newspapers As Advertising Revenue Slumps*, THE GUARDIAN (Mar. 31, 2020), https://www.theguardian.com/media/2020/apr/01/news-corp-to-suspend-print-editions-of-60-local-newspapers-as-advertising-revenue-slumps.

[366] *Update To Our Open Letter to Australians*, GOOGLE, https://about.google/google-in-australia/an-open-letter/ (last visited Oct. 5, 2020).

[367] Natasha Lomas, *France's Competition Watchdog Orders Google To Pay For News Reuse*, TECHCRUNCH (Apr. 9, 2020), https://techcrunch.com/2020/04/09/frances-competition-watchdog-orders-google-to-pay-for-news-reuse/.

[368] Ashley Cullins, *National Association of Broadcasters Warns Congress Tech Giants Could Kill Local Journalism*, HOLLYWOOD REPORTER (Sept. 3, 2020), http://www.hollywoodreporter.com/thr-esq/national-association-of-broadcasters-warns-congress-tech-giants-could-kill-local-journalism.

[369] Naaman Zhou, *Google's Open Letter To Australians About News Code Contains 'Misinformation', ACCC Says*, THE GUARDIAN (Aug. 17, 2020), https://www.theguardian.com/technology/2020/aug/17/google-open-letter-australia-news-media-bargaining-code-free-services-risk-contains-misinformation-accc-says.

[370] Jamie Smyth & Alex Barker, *Battle Lines Drawn As Australia Takes On Big Tech Over Paying For News*, FIN. TIMES (Sept. 2, 2020), https://www.ft.com/content/0834d986-eece-4e66-ac55-f62e1331f7f7.

[371] 21 CONG. REC. 3146 (1890) (statement of Sen. Hoar).

[372] *Id*. at 2459 (statement of Sen Sherman); *see* 95 CONG. REC. 11486 (statement of Rep. Celler) ("[B]usiness concentration is politically dangerous, leading inevitably to increasing Government control."); also 96 CONG. REC. 16,452 (1950) (statement of Rep. Kefauver) ("[T]he history of what has taken place in other nations where mergers and concentrations have placed economic control in the hands of a very few people is too clear to pass over easily. A point is eventually reached, and we are rapidly reaching that point in this country, where the public steps in to take over when concentration and monopoly gain too much power. The taking over by the public through its government always follows one or two methods and has one or two political results. It either results in a Fascist state or the nationalization of industries and thereafter a Socialist or Communist state.").

**App. 146**

Based on interviews and submissions from market participants, along with other evidence examined by the Subcommittee, there are several ways in which the market power of the dominant platforms affects political and economic power.

First, the Subcommittee encountered a prevalence of fear among market participants who depend on the dominant platforms. Repeatedly, market participants expressed deep concern that speaking about the dominant platforms' business practices—even confidentially without attribution—would lead a platform to retaliate against them, with severe financial repercussions. The source of this fear was twofold. Some firms were so dependent on the platform that even potentially risking retaliation caused alarm. Others had previously seen a platform retaliate against someone for raising public concerns about their business practices and wanted to avoid the same fate.

Several market participants told the Subcommittee that they "live in fear" of the platforms. One said, "It would be commercial suicide to be in Amazon's crosshairs . . . If Amazon saw us criticizing, I have no doubt they would remove our access and destroy our business."[373] Another told the Subcommittee, "Given how powerful Google is and their past actions, we are also quite frankly worried about retaliation."[374] An attorney representing app developers said they "fear retaliation by Apple" and are "worried that their private communications are being monitored, so they won't speak out against abusive and discriminatory behavior."[375]

Market participants also expressed unease about the success of their business and their economic livelihood depending on the decision-making of the platforms. A single tweak of an algorithm, intentional or not, could cause significant costs if not financial disaster—with little recourse. Market participants routinely characterized the platforms as having arbitrary and unaccountable power—the same forms of undue power that antitrust laws were designed to prevent. As Senator John Sherman (R-OH) explained, antitrust was essential to preserve liberty "at the foundation of the equality of all rights and privileges" because concentrations of power outside of democratic institutions were a "kingly prerogative, inconsistent with our form of government."[376]

Additionally, courts and regulators have found that several of the dominant platforms have engaged in recidivism. For example, Facebook settled charges brought in 2012 by the Federal Trade Commission (FTC) that it had "deceived consumers by telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[377] As part of this

---

[373] Interview with Source 636 (Mar. 11, 2020).

[374] Submission from Source 147 (on file with Comm.).

[375] Submission from Source 88 (on file with Comm.).

[376] 21 CONG. REC. 2457 (1890) (statement of Sen. Sherman).

[377] Press Release, Federal Trade Comm'n, Facebook Settles FTC Charges That It Deceived Consumers By Failing To Keep Privacy Promises (Nov. 29, 2011) (proposed settlement), https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep.

**App. 147**

settlement, Facebook agreed to abide by an administrative order requiring that Facebook not misrepresent its privacy protections.[378] Seven years later, the FTC concluded that Facebook had almost immediately begun violating that order following its adoption.[379] Ruling on the FTC's subsequent settlement with Facebook, District Court Judge Timothy Kelley wrote that "the unscrupulous way in which the United States alleges Facebook violated both the law and the administrative order is stunning."[380] The FTC has similarly sanctioned Google on several occasions for privacy violations.[381] In 2010, Apple settled charges it had entered into no-poach agreements with six other technology companies.[382] Two years later, Apple was found guilty of orchestrating a price-fixing conspiracy.[383] In that case, the presiding judge stated that the record "demonstrated a blatant and aggressive disregard" by Apple "for the requirements of the law," noting that the conduct "included Apple lawyers and its highest level executives."[384]

  Lastly, the growth in the platforms' market power has coincided with an increase in their influence over the policymaking process. Over the past decade, the dominant online platforms have significantly increased their lobbying activity,[385] which tends to create a feedback loop for large

---

[378] *Id.*

[379] United States v. Facebook, Inc., No. CV 19-2184 (TJK), 4 (D.D.C. 2020), https://www.courtlistener.com/opinion/4748088/united-states-v-facebook-inc/ ("The United States now alleges that Facebook violated the 2012 Order by "subvert[ing] users privacy choices to serve its own business interests" in several ways, starting almost immediately after agreeing to comply with the 2012.").

[380] *Id.* at 1.

[381] Press Release, Federal Trade Comm'n, FTC, Google and YouTube Will Pay Record $170 Million for Alleged Violations of Children's Privacy Law (Sept. 4, 2019), https://www.ftc.gov/news-events/press-releases/2019/09/google-youtube-will-pay-record-170-million-alleged-violations.

[382] Press Release, Dep't of Justice, Justice Department Requires Six High Tech Companies to Stop Entering into Anticompetitive Employee Solicitation Agreements (Sept. 24, 2010), https://www.justice.gov/opa/pr/justice-department-requires-six-high-tech-companies-stop-entering-anticompetitive-employee.

[383] United States v. Apple Inc., 952 F. Supp. 2d 638, 644 (S.D.N.Y. 2013) (No. 12-cv-2826), *aff'd*, 791 F.3d 290 (2d Cir. 2015).

[384] Hr'g Tr. at 17:1-6, United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y., August 27, 2013) (No. 12-cv-2826). During the investigation, the Subcommittee also encountered instances in which the platforms did not appear fully committed to telling lawmakers the truth, including one incident in which members of the Subcommittee were forced to question whether Amazon had committed perjury. Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, et al., to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020), https://judiciary.house.gov/uploadedfiles/2020-05-01_letter_to_amazon_ceo_bezos.pdf.

[385] *See e.g.*, Spencer Soper et al., *Amazon's Jeff Bezos Can't Beat Washington, So He's Joining It: The Influence Game*, BLOOMBERG, (Feb. 14, 2018), https://www.bloomberg.com/graphics/2018-amazon-lobbying/. This is a trend for the industry. The total reported lobbying expenditures by digital platforms increased from $1,190,000 a year in 1998, to $74,285,000 in 2019 as the industry consolidated and gained market power. LOBBYING SPENDING DATABASE, CTR. FOR RESPONSIVE POLITICS, https://www.opensecrets.org/lobby/top.php?indexType=i&showYear=2019 (last visited on Sept. 27, 2020).

**App. 148**

companies. More money spent on lobbying may deliver higher equity returns and market share,[386] which, in turn, may spur more lobbying.

Outside of traditionally reported and regulated lobbying, firms with market power and dispensable income fund think tanks and nonprofit advocacy groups to steer policy discussion. For example, Facebook, Google, and Amazon reportedly donated significant amounts to the American Enterprise Institute (AEI), which, in turn, has argued that antitrust critiques of the big platforms are "astonishingly weak."[387] More recently, Google and Amazon have contributed significant funding to the Global Antitrust Institute at the George Mason University's Antonin Scalia School of Law, which advocates against antitrust scrutiny of the dominant platforms.[388] By funding academics and advocacy groups, the dominant platforms can expand their sphere of influence, further shaping how they are governed and regulated.

At several hearings, Members of the Subcommittee noted that the outsized political influence of dominant firms has adverse effects on the democratic process. At the Subcommittee's field hearing in Colorado, Representative Ken Buck (R-CO) asked each of the witnesses about this issue.[389] As Representative Buck noted, the dominant platforms are generally well represented in the policymaking process:

> Part of what we are dealing with here is the reality that [dominant firms] walk into our offices and they tell us their side of the story and we very rarely hear the other side of the story, and somehow part of this solution has to be that public policymakers elected, appointed, have to have access to that kind of information. So I thank you for being here and I also would encourage you to make sure that, you know, we are accessible. We are trying our best to make sure that we continue to create the environment for your kinds of companies.[390]

During the Subcommittee's sixth hearing, Subcommittee Chairman David N. Cicilline (D-RI) noted the democratic stakes of the Subcommittee's work. He said, "Because concentrated economic power

---

[386] *See* J.H. Kim, *Corporate Lobbying Revisited*, 10 BUS. AND POL, 1 (2008) (analyzing lobbying's effect on equity returns); Brian Shaffer et al., *Firm Level Performance Implications of Nonmarket Actions*, 39 BUS. AND SOC. 126 (2000) (analyzing lobbying's effect on market share).

[387] Andrew Perez and Tim Zelina, *Facebook, Google, Amazon are ramping up their secretive influence campaigns in D.C.*, FAST CO. (Oct. 31, 2019), https://www.fastcompany.com/90424503/facebook-google-amazon-are-ramping-up-their-secretive-influence-campaigns-in-dc.

[388] Daisuke Wakabayashi, *Big Tech Funds a Think Tank Pushing for Fewer Rules. For Big Tech.*, N.Y. TIMES (July 24, 2020), https://www.nytimes.com/2020/07/24/technology/global-antitrust-institute-google-amazon-qualcomm.html.

[389] Competitors Hearing at 57 (question of Rep. Ken Buck (R-CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm on the Judiciary).

[390] *Id.*

76

**App. 149**

also leads to concentrated political power, this investigation also goes to the heart of whether we, as a people, govern ourselves, or whether we let ourselves be governed by private monopolies."[391]

## IV.   MARKETS INVESTIGATED

### A.  Online Search

Online search engines enable users to retrieve webpages and information stored on the Internet. After a user enters a query into the search engine, the search provider returns a list of webpages and information that are relevant to the search term entered.

There are two types of search engines: horizontal and vertical. Horizontal search engines are designed to retrieve a comprehensive list of general search results. Vertical search engines are designed to retrieve a narrower category of content, such as photo images (e.g., Dreamstime) or travel (e.g., Expedia). The majority of general search engines monetize the service through selling ad placements rather than charging search users a monetary price. The overwhelmingly dominant provider of general online search is Google, which captures around 81% of all general search queries in the U.S. on desktop and 94% on mobile. Other search providers include Bing, which captures 6% of the market, Yahoo (3%), and DuckDuckGo (1%).[392]

---

[391] CEO Hearing Transcript at 7 (statement of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin Law of the H. Comm. on the Judiciary).

[392] *Search Engine Market Share United States of America: Sept. 2019–Sept. 2020*, STATCOUNTER, http://gs.statcounter.com/search-engine-market-share/all/united-states-of-america (last visited Oct. 3, 2020).

**App. 150**



**U.S. Desktop and Mobile Search Market Share**[393]

Online search is comprised of three distinct activities. First, an engine must "crawl" the Internet by using an automated bot to collect copies of all of the webpages it can find. Once a crawler has recorded all of this material, it must be collated and organized into an "index," or a map of the Internet that can be searched in real-time. Indexing organizes the information into the formats and databases required for the querying function. When a user enters a query into the search engine, the engine draws from the index to pull a list of responsive websites, ordered in terms of relevance. The relevance, in turn, is determined by the search algorithm applied by the search engine. A search engine can function only if it has access to an index, and an index can exist only once web pages have been crawled and collated into a repository.[394] Indexing has high fixed costs and requires significant server storage and

---

[393] Prepared by the Subcomm. based on *Desktop & Mobile Search Engine Market Share United States Of America, January 2009 to September 2020,* STATCOUNTER https://gs.statcounter.com/search-engine-market-share/desktop-mobile/united-states-of-america/#monthly-200901-202009. The "Other" category includes AOL, Ask Jeeves, DuckDuckGo, MSN, Webcrawler, Windows Live, AVG Search, Baidu, Comcast, Babylon, Dogpile, Earthlink, Norton Safe Search, and YANDEX RU. *Id.*

[394] Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000017 (Nov. 21, 2011) (on file with Comm.) According to one market participant, "[t]he greatest challenges in building a search index are finding the URLs for documents stored on the Web and then being able to parse the best URLs and documents to include in the index. Overcoming these challenges requires massive amounts of data on user interactions with websites to discover new URLs and then filter down to the 5% of known URLs [the search engine] uses to determine which documents to index, and how frequently these documents should be refreshed."

**App. 151**

compute power.[395] The ability to invest heavily in computing power and storage yields a significant advantage.[396]

Several online search features tilt the market towards the dominant incumbent and make entry by new market participants difficult. First, web crawling is costly and strongly favors first-movers.[397] In a submission to the Subcommittee, one expert described how Google's early efforts have locked in its dominance.[398] In particular, Google was the first company to crawl the entirety of the Internet, a feat motivated in part due to its PageRank algorithm, which used links between pages to identify the most relevant webpages for specific topics and queries. Unlike most search engine algorithms at the time, the quality of PageRank results improved with more webpages, incentivizing Google to crawl a greater portion of the web.

The web has grown exponentially over the last two decades, [399] which means the cost of crawling the entire Internet has increased too, despite advances in crawling technology. Today several major webpage owners block all but a select few crawlers, in part because being constantly crawled by a large number of bots can hike costs for owners and lead their webpages to crash. The one crawler that nearly all webpages will allow is Google's "Googlebot," as disappearing from Google's index would lead most webpages to suffer dramatic drops in traffic and revenue.[400] Any new search engine crawler, by contrast, would likely be blocked by major webpage owners unless that search engine was driving significant traffic to webpages—which a search engine cannot do until it has crawled enough webpages.[401]

---

[395] Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000016–19 (July 26, 2011) (on file with Comm.).

[396] Submission from Source 209, to H. Comm. on the Judiciary, Source 209-000537–38 (Aug. 24, 2009) (on file with Comm.) ("Comprehensiveness, freshness, and responsiveness are all directly related to the amount of computing power and storage capacity brought to bear on the problem of crawling and indexing the web. It would therefore be implausible to attribute Google's massive search advantage to superior technology. Rather, the main driver of search performance is scale. Scale is driven primarily by the level of financial investment in search infrastructure.").

[397] *See, e.g.*, Submission from Source 534, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.) ("[The Company] does not own its own search index and is not planning to invest into building an own index because of the high investment costs."; Google Search (Shopping) Commission Decision (non-confidential version), European Commission 66 (June 27, 2017); Submission from Source 481, to H. Comm. on the Judiciary ("Bing and Google each spend hundreds of millions of dollars a year crawling and indexing the deep Web. It costs so much that even big companies like Yahoo and Ask are giving up general crawling and indexing. Therefore, it seems silly to compete on crawling and, besides, we do not have the money to do so.").

[398] Submission from Zack Maril, to H. Comm. on the Judiciary (Sept. 30, 2019) (on file with Comm.).

[399] *Total Number of Websites*, INTERNET LIVE STATS, https://www.internetlivestats.com/total-number-of-websites (last visited Oct. 3, 2020) (In 2000, the Internet had around 17,000 websites; today, it has more than 1.8 billion. Internet Live Stats, Total Number of Websites.).

[400] Submission from Submission from Zack Maril, to H. Comm. on the Judiciary (Sept. 30, 2019) (on file with Comm.); *see also* Submission from Source 481, to H. Comm on the Judiciary (Feb. 20, 2020) (on file with Comm.); Innovation and Entrepreneurship Hearing at 2 (statement of Megan Gray, Gen. Counsel & Pol'y Advocate, DuckDuckGo).

[401] Submission from Submission from Zack Maril, to H. Comm. on the Judiciary (Sept. 30, 2019) (on file with Comm.).

**App. 152**

The high cost of maintaining a fresh index and the decision by many large webpages to block most crawlers significantly limits new search engine entrants. In 2018, Findx—a privacy-oriented search engine that had attempted to build its own index—shut down its crawler, citing the impossibility of building a comprehensive search index when many large websites only permit crawlers from Google and Bing.[402] Today the only English-language search engines that maintain their own comprehensive webpage index are Google and Bing.[403] Other search engines—including Yahoo and DuckDuckGo—must purchase access to the index from Google and/or Bing through syndication agreements that provide syndicated search engines with access to search results and search advertising.[404] While Yahoo previously maintained an independent index, it entered a deal with Microsoft in 2009 to integrate search technologies—a move driven by the two firms' belief that combining was necessary to provide a real alternative to Google.[405]

A second major competitive advantage enjoyed by search engine incumbents is their access to voluminous click-and-query data. This data, which tracks what users searched for and how they interacted with the search results, benefits search engines in several key ways.[406] First, search engines rely on click-and-query data to guide their search index's upkeep, as this data helps identify which webpages are most relevant and should be most regularly updated in the index.[407] Second, click-and-query-data is used to refine the search algorithm and the relevance of search results, as past user interactions improve the algorithm's ability to predict future interactions.[408] In particular, data on "tail"

---

[402] Findx, *Game over* (Sept. 21, 2019), https://web.archive.org/web/20190921180535/https://privacore.github.io ("Many large websites like LinkedIn, Yelp, Quora, Github, Facebook and others only allow certain specific crawlers like Google and Bing to include their webpages in a search engine index. . . . That meant that the Findx search index was incomplete and was not able to return results that were likely both relevant and good quality. When you compare any independent search engine's results to Google for example, they have no chance to be as relevant or complete because many large websites refuse to allow any other search engine to include their pages."); Submission from Source 407, to H. Comm. on the Judiciary, Source 407-000024 (Nov. 21, 2011) (on file with Comm.); Competition & Mkts. Auth. Report at 91.

[403] Competition & Mkts. Auth. Report at 89.

[404] Innovation and Entrepreneurship Hearing at 3 (statement of Megan Gray, Gen. Counsel & Pol'y Advocate, DuckDuckGo) (noting that alternatives to serving ads through Google or Microsoft, such as only showing product ads from Amazon or travel ads from Booking.com, as "not sufficiently lucrative to cover the costs of purchasing organic links," which means "an aspiring search engine start-up today (and in the foreseeable future) cannot avoid the need to sign a search syndication contract").

[405] Submission from Source 209 to H. Comm. on the Judiciary, Source 209-0000346 (Aug. 24, 2009) (on file with Comm.).

[406] Competition & Mkts. Auth. Report at 11–12.

[407] Submission from Source 26, to H. Comm. on the Judiciary, Source 26-000016 (Nov. 21, 2011) (on file with Comm.) ("Queries are a critical component of the user data necessary to identify and rank URLs and documents for inclusion in a search index. Fewer queries mean fewer opportunities to identify relevant URLs and documents, which ultimately means a smaller usable search index."); rep-000026 (Nov. 21, 2011) ("Index freshness also is an important factor in the quality of a search engine's result . . . A [] survey found that a lack of freshness was a significant driver of dissatisfaction among users searching in the Entertainment and News categories.").

[408] *Id.* at Source 531-000015 ("The more user queries the search engine handles, the more data it obtains to improve the relevance of the search results it serves."); Source 531-000060 ("The secret to successful algorithmic search matching algorithms is user feedback . . . Ultimately this feedback helps the engine improve core relevance and other experience factors—driving higher engagement."); Innovation and Entrepreneurship Hearing at 3 (statement of Megan Gray, Gen.

(or rare) queries enable a search engine to offer relevant results across a higher set of potential queries—improving the overall quality of the search engine—and Google's internal documents show that the company recognizes its long-tail advantage.[409] And third, increased query scale increases advertiser engagement rates, given that more user queries generally translate to more advertisement clicks, generating greater revenue for advertisers.[410]

Overall there are significant advantages to scale in click-and-query data, though the marginal benefit of additional data on tail queries is higher than the marginal benefit of additional data on "head" (or relatively common) queries.[411] Some market participants also stated that the benefits of scale diminish once a search engine reaches a certain size.[412] The benefits of scale create a feedback loop, where access to greater click-and-query data improves search quality, which drives more usage and generates additional click-and-query data.

A third barrier to competition in general online search is that Google has established extensive default positions across both browsers and mobile devices. Among desktop browsers, Google enjoys default placement in Chrome (which captures 51% of the U.S. market), Safari (31%), and Firefox (5%)—or 87% of the browser market.[413] Meanwhile, Microsoft's Edge, which captures 4% of the desktop browser market, sets Bing as its search default, leaving little opening for independent search

---

Counsel & Pol'y Advocate, DuckDuckGo) ("Another barrier facing a start-up search engine is that it needs data, such as the most commonly clicked links for a particular query, in order to produce a useful ranking of organic links, i.e., what organic link is first, second, etc."); Submission from Source 209, to H. Comm. on the Judiciary, Source 209-0000346–52 (Aug. 24, 2009) (on file with Comm.) ("Increased search traffic brings more indications of user intent, facilitating more experimentation and allowing a search platform to generate more relevant natural and paid search results."); *see also* D. Kannan, et al., '*Scale Effects in Web Search*', *International Conference on Web and Internet Economics*, 294–310 (2017).

[409] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-03815864 (Apr. 23, 2010) ("Google leads competitors. . . Our long-tail precision is why users continue to come to Google. Users may try the bells and whistles of Bing and other competitors, but Google still produces the results. As soon as this ceases to be the case, our business is in jeopardy."); Competition & Mkts. Auth. Report Appendix I at 15 ("[A]round 1% of Google 'tail' search events are for queries which are seen by Bing," whereas "31% of Bing 'tail' search events are for queries which are seen by Google." Furthermore, "0.8% of Google's 'tail' distinct queries are seen by Bing, whereas 30% of Bing's 'tail' distinct queries are seen by Google."); *see also* Submission from Source 209, to H. Comm. on the Judiciary, Source 209-0000532 (Feb. 17, 2011) (on file with Comm.) ("[W]ithout strong tail performance, a horizontal search engine cannot compete against Google."); Source 209-0000535–36 ("[P]oor search engine performance in the tail means overall weak search engine performance.").

[410] *See, e.g.*, Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000056 (July 11, 2011) (on file with Comm.) (stating that query scale increases advertiser engagement, since at scale the platform "makes better matches, has higher value generation").

[411] *See* Competition & Mkts. Auth. Report Appendix I at 18.

[412] Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000874 (May 5, 2011) (on file with Comm.) ("As a platform gains more and more scale, the associated benefits begin to taper off such that eventually additional scale provides only modest returns."); Source 531-000025 (Nov. 21, 2011) (on file with Comm.) ("Above 30 billion documents, user satisfaction improves rapidly with increased index size; above 90 billion documents, it still continues to improve albeit at a slower rate.").

[413] Innovation and Entrepreneurship Hearing at 5 (statement of Megan Gray, Gen. Counsel & Pol'y Advocate, DuckDuckGo).

**App. 154**

engines.[414] In mobile, Google Search is primarily the default on Android and on Apple's iOS mobile operating system—together Android and iOS account for over 99% of smartphones in the United States.[415] This default position provides Google with a significant advantage over other search engines, given users' tendency to stick with the default choice presented. Moreover, market participants identified several ways Google dissuades even those users who do attempt to switch default search engines on Chrome.[416]

Google won itself default placement across the mobile and desktop ecosystem through both integration and contractual arrangements. By owning Android, the world's most popular mobile operating system, Google ensured that Google Search remained dominant even as mobile replaced desktop as the critical entry point to the Internet. Documents submitted to the Subcommittee show that at certain key moments, Google conditioned access to the Google Play Store on making Google Search the default search engine, a requirement that gave Google a significant advantage over competing search engines.[417] Through revenue-sharing agreements amounting to billions of dollars in annual payments, Google also established default positions on Apple's Safari browser (on both desktop and mobile) and Mozilla's Firefox.[418]

In public statements, Google has downplayed the significance of default placement, claiming that "competition is just a click away."[419] However, Google's internal documents show that when Google was still jostling for search market share, Google executives closely tracked search defaults on Microsoft's Internet Explorer and expressed concern that non-Google defaults could impede Google Search.[420] In an internal presentation about Internet Explorer's default search selection, Google recommended that users be given an initial opportunity to select a search engine and that browsers minimize the steps required to change the default search engine.[421] These discussions—along with the steep sums Google pays Apple and various browsers for default search placement—further highlight the competitive significance of default positions.

---

[414] *Id.*

[415] *Mobile Operating System Market Share in United States Of America – September 2020*, STATCOUNTER, https://gs.statcounter.com/os-market-share/mobile/united-states-of-america (last visited Oct. 3, 2020).

[416] Submission from Source 534, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.).

[417] *See infra* Section V.

[418] Innovation and Entrepreneurship Hearing at 12 (response to Questions for the Record of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.).

[419] *See, e.g.*, Adam Kovacevich, *Google's approach to competition*, GOOGLE PUBLIC POL'Y BLOG (May 8, 2009), https://publicpolicy.googleblog.com/2009/05/googles-approach-to-competition.html.

[420] *See, e.g.*, Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01196214 (May 31, 2005) (on file with Comm.).

[421] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01680749 (February 16, 2006) (on file with Comm.) (identifying several recommendations, including, "[f]ewest clicks required to change default, which promotes search innovation by facilitating the user's ability to switch.").

**App. 155**

Independent search engines told the Subcommittee that because they are not set as the default search engine on popular browsers, they face significant business challenges. As a result, DuckDuckGo said it was compelled to invest in browser technology, including creating its own browser for Android and iOS and various browser extensions.[422] It noted, however, that "the same default placement challenges exist in the browser market, just one level up – with the device makers requiring millions or billions of dollars to become a default browser on a device."[423]

A fourth challenge facing upstart search engines is the growing number of features and services that a general search provider must offer to be competitive with Google. Through the mid-2000s, a general search engine could compete through providing organic links alone. Since Google and Bing now incorporate information boxes and various specialized services directly onto their general search results page, a market entrant would similarly need to provide a broader set of search features and services. One market participant told the Subcommittee that this set of "mandatory high-quality search features" includes maps, local business answers, news, images, videos, definitions, and "quick answers."[424] Delivering this variety of features requires access to various sources of data, raising the overall costs of entry.

Vertical search providers differ from horizontal search engines in several ways. By offering specialized search focused on a particular topic or activity, they fulfill a separate role and require distinct tools and expertise. The necessary inputs vary by search vertical. Flight search, for example, requires access to flight software and data, whereas certain local search providers rely on user-generated content such as reviews. Many vertical providers use structured data feeds that pull from third-party databases, rather than from a general index.

A significant challenge for vertical providers is reaching users. Although they serve distinct needs, most vertical search providers still depend on horizontal search engines—and specifically on Google—to reach users.[425] In submissions to the Subcommittee, even some of the largest and most well-known verticals stated that they depend on Google for up to 80–95% of their traffic.[426] Since Google now also provides vertical search services, it has the incentive and ability to use its dominance in horizontal search to disfavor vertical providers that compete with its own vertical search services. Internal documents from Google show that it has used its dominance in general search to closely track

---

[422] Innovation and Entrepreneurship Hearing at 5 (statement of Megan Gray, Gen. Counsel & Pol'y Advocate, DuckDuckGo).

[423] *Id*. at 5–6.

[424] *Id.* at 1.

[425] Submission from Source 564, to H. Comm. on the Judiciary, 5 (Nov. 12, 2019) (on file with Comm.) ("The most important source of traffic for local search services are general search websites.").

[426] Submission from Source 564, to H. Comm. on the Judiciary, 5 (Nov. 12, 2019) (on file with Comm.); Submission from Source 115, to H. Comm. on the Judiciary, 19 (Dec. 27, 2019) (on file with Comm.); Submission from Source 887, to H. Comm. on the Judiciary, 3 (Oct. 28, 2019) (on file with Comm.); Submission from Foundem, to H. Comm. on the Judiciary, 9 (Dec. 12, 2016) (on file with Comm.).

**App. 156**

traffic to competing verticals, demanding that certain verticals permit Google to scrape their user-generated content and demote several verticals. Several market participants told the Subcommittee that Google's preferential treatment of its own verticals, as well as its direct listing of information in the "OneBox" that appears at the top of Google search results, has the net effect of diverting traffic from competing verticals and jeopardizing the health and viability of their business.[427]

Google's internal documents and submissions from third-party market participants suggest that verticals are both a complement to horizontal search as well as a competitive threat to it. One market participant explained that while vertical search providers can increase demand for horizontal search engines in the short-term, they can divert traffic from horizontal search providers in the long-term, as the growing popularity of a vertical may lead users to navigate to it directly.[428] Diverting traffic from general search providers, in turn, would deprive them of both advertiser revenue as well as valuable click-and-query data. Given these dynamics, a dominant horizontal search provider that also enters vertical search faces a significant conflict of interest that can skew search results to the detriment of third-party businesses and users alike.

B.    Online Commerce

Online commerce, also known as e-commerce, is the activity of buying or selling products or services using the Internet.[429] E-commerce transactions take place through a variety of channels, including online marketplaces like Amazon Marketplace, where a wide variety of brands and products from different sellers are sold in one place, or a business's direct to consumer website like Nike.com. In 2019, the U.S. Census Bureau estimated e-commerce retail sales to be about $600 billion,[430] compared to just under $33 billion in 2001.[431] As the COVID-19 pandemic pushes more American shoppers online, e-commerce growth has exploded.[432] This is particularly true for online marketplaces,

---

[427] Submission from Source 564, to H. Comm. on the Judiciary, 5 (Nov. 12, 2019) (on file with Comm.); Submission from Source 115, to H. Comm. on the Judiciary, 19 (Dec. 27, 2019) (on file with Comm.); Submission from Source 887, to H. Comm. on the Judiciary, 3 (Oct. 28, 2019) (on file with Comm.); Submission from Foundem, to H. Comm. on the Judiciary, 9 (Dec. 12, 2016) (on file with Comm.).

[428] Submission from Source 407, to H. Comm. on the Judiciary, Source 407-000071 (Nov. 12, 2019) (on file with Comm.).

[429] Press Release, U.S. Dep't of Commerce, U.S. Census Bur., Retail E-Commerce Sales in Fourth Quarter 2001 Were $10.0 Billion, Up 13.1 Percent from Fourth Quarter 2000, Census Bureau Reports (Feb. 20, 2002), https://www2.census.gov/retail/releases/historical/ecomm/01q4.pdf (defining e-commerce as "sales of goods and services where an order is placed by the buyer or price and terms of sale are negotiated over an Internet, extranet, Electronic Data Interchange (EDI) network, electronic mail, or other comparable online system. Payment may or may not be made online").

[430] Press Release, U.S. Dep't of Commerce, U.S. Census Bur., Quarterly Retail E-Commerce Sales 4th Quarter 2019, https://www2.census.gov/retail/releases/historical/ecomm/19q4.pdf.

[431] Press Release, U.S. Dep't of Commerce, U.S. Census Bur., Retail E-Commerce Sales in Fourth Quarter 2001 Were $10.0 Billion, Up 13.1 Percent from Fourth Quarter 2000, Census Bureau Reports (Feb. 20, 2002). https://www2.census.gov/retail/releases/historical/ecomm/01q4.pdf.

[432] Gayle Kesten, *As Online Prices Increase, Consumers' Purchasing Power Declines*, ADOBE: RETAIL (July 13, 2020), https://blog.adobe.com/en/2020/07/13/as-online-prices-increase-consumers-purchasing-power-declines.html#gs.dv6lwa ("[T]otal online spending of $73 billion in June marked a 76.2 percent increase year-over-year."); *see also* ANDREW

**App. 157**

where sales for essential items like groceries, masks, and electronics for home offices increased sharply in the wake of the pandemic.[433]

An online marketplace's most basic function is to serve as a platform that connects buyers and sellers. Marketplaces include product listings from a variety of sellers. Some online marketplaces, such as Amazon and eBay, aim to be fully integrated, multi-category e-commerce sites. Other marketplaces, however, operate as vertical, single-category sites, such as Newegg.com, for computer hardware and consumer electronics. The primary customers of e-commerce marketplaces are customers looking to buy an item or service online, and businesses looking to sell goods or services to customers online. Because of this, a successful marketplace must be attractive to consumers and third-party sellers.

The consumer-facing side of the marketplace allows users to search for and purchase products. Most online marketplaces offer features that enable users to compare competing products based on details like their price, popularity, and customer satisfaction reviews. Amazon is by far the largest marketplace.[434] Other marketplaces that are popular with consumers include eBay, Walmart, and Wayfair.[435]

Online marketplaces also serve third-party sellers. Third-party sellers have needs that are distinct from consumers visiting the marketplace to make a purchase. The seller-facing side of the business consists of providing third-party sellers with a platform to list their products for consumers to purchase. Often, the marketplace will supply vendors with services such as inventory tracking and pricing recommendations. Online marketplaces usually offer additional paid services to third-party sellers such as advertising and fulfillment services, consisting of warehousing, packing, and shipping.

The businesses that own and operate e-commerce marketplaces may host only independent, third-party seller listings, or list their own items for sale alongside third-party sellers. Amazon

---

LIPSMAN, EMARKETER, US ECOMMERCE BY CATEGORY 2020: HOW THE PANDEMIC IS RESHAPING THE PRODUCT CATEGORY LANDSCAPE (July 22, 2020), https://www.emarketer.com/content/us-ecommerce-by-category-2020 ("US ecommerce sales will surge 18.0% to $709.78 billion, while brick-and-mortar retail sales will experience a historically significant decline of 14.0% to $4.184 trillion.").

[433] FEEDVISOR, 2020 Q4 TRENDS AND PROJECTIONS: THE DIGITAL REVOLUTION OF RETAIL AND E-MARKETPLACES at 2–3, 5 (2020) (showing that Grocery and Gourmet sales on Amazon and Walmart were up 91% and 46% over the months of March and April 2020, respectively, compared to February); s*ee also* Giselle Abramovich, *How COVID-19 is Impacting Online Shopping Behavior*, ADOBE: COVID-19 (Mar. 26, 2020), https://blog.adobe.com/en/2020/03/26/how-covid-19-is-impacting-online-shopping-behavior.html#gs.dv63z7 (reporting that after the COVID-19 outbreak, "purchases for cold, cough & flu products increased 198%, while online purchases for pain relievers increased 152%").

[434] *See, e.g.*, ANDREW LIPSMAN, EMARKETER, TOP 10 US ECOMMERCE COMPANIES 2020 (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020 (forecasting Amazon's e-commerce market share for 2020 at 38.7%, compared to second-place Walmart at 5.3% and third-place eBay at 4.7%); *see also* Production of Amazon, to H. Comm. on the Judiciary, AMAZON_HJC_00061156 (Oct. 30, 2019) (on file with Comm.) (showing that Amazon.com was about five times larger than eBay in 2018, its next closest marketplace competitor at the time).

[435] ANDREW LIPSMAN, EMARKETER, TOP 10 US ECOMMERCE COMPANIES 2020 (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020.

**App. 158**

Marketplace is an example of the latter, in that customers view Amazon Retail offers for its own private-label brands, such as AmazonBasics,[436] alongside independent, third-party seller offers. Amazon Retail also acts as a reseller of brand-name items, purchasing items like Levi's jeans from a wholesaler, and then reselling them on the marketplace. In these circumstances, third-party sellers are both customers and competitors of online marketplaces.

Marketplace operators benefit financially from the sale of services to third-party sellers and consumers.[437] On the seller-facing side of their business, marketplaces usually take a cut of third-party sales and charge fees for sales-related services like fulfillment, payment, and advertising. If the marketplace operators also sell products on their own platforms, they make money like a typical retailer from the difference between the wholesale and retail price. Marketplaces may also make money from fees paid by customers to participate in membership programs. For example, Amazon offers Amazon Prime for $119 per year as a paid membership program that provides customers with benefits such as unlimited free shipping on eligible items and digital streaming video.[438] Other revenue sources for marketplaces may include credit card and gift card services that are tied to the platform.[439]

A few large companies dominate the e-commerce industry, and Amazon is the clear leader among them. The market research company eMarketer estimates that Amazon is about eight times larger than eBay and Walmart in terms of market share.[440] Other metrics further demonstrate Amazon's role as a gatekeeper for e-commerce. Amazon is the most-visited website globally for e-commerce and shopping,[441] and recent analyses suggest that over 60% of all online product searches in the U.S. begin on Amazon.com.[442]

---

[436] Production of Amazon, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.) ("AmazonBasics is an Amazon private brand that launched in 2009. The brand offers a number of products, including electronics accessories, luggage, and office products.").

[437] *See, e.g.*, Amazon.com, Inc., Quarterly Report (Form 10-Q) 18 (July 31, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/a77b5839-99b8-4851-8f37-0b012f9292b9.pdf (showing net sales for third-party seller services increased from $23 billion in the first six months of 2019 to $32 billion in the first six months of 2020).

[438] Production of Amazon, to H. Comm. on the Judiciary, 1–2 (Oct. 14, 2019) (on file with Comm.).

[439] *See, e.g.*, Amazon.com, Inc., Annual Report (Form 10-K) 23, 47 (Jan. 31, 2017), https://www.sec.gov/Archives/edgar/data/1018724/000101872417000011/amzn-20161231x10k.htm.

[440] ANDREW LIPSMAN, EMARKETER, TOP 10 US ECOMMERCE COMPANIES 2020 (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020.

[441] *Worldwide E-Commerce and Shopping Category Performance*, SIMILARWEB (July 2020), https://pro.similarweb.com/#/industry/overview/E-commerce_and_Shopping/999/1m/?webSource=Total (showing that Amazon had 2.6 billion visits compared to 940.8 million for eBay in July 2020).

[442] Lucy Koch, *Looking for a New Product? You Probably Searched Amazon*, EMARKETER (Mar. 31, 2019), https://www.emarketer.com/content/looking-for-a-new-product-you-probably-searched-amazon (last visited Oct. 3, 2019) (citing FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 14 (2019))*; see also* WUNDERMAN THOMPSON COMMERCE, THE FUTURE SHOPPER REPORT 2020, 11 (2020) (on file with Comm.).

**App. 159**

Amazon's dominance in e-commerce extends to its role as a marketplace operator and its relationship with sellers. Because of its size and scale, no other marketplace comes close to providing sellers with access to such a large pool of buyers, as well as sales-related services. There are over 112 million Prime members in the United States—about 44% of the adult population. The number of Prime members has doubled since reaching 50 million members in 2015, with Amazon projecting additional growth.[443] Amazon.com has 2.3 million active sellers on its marketplace worldwide.[444] In comparison, Amazon's closest e-commerce competitor, Walmart, has roughly 54,000 sellers on its marketplace.[445] In general, the more sellers a platform has, the more buyers it can attract and vice versa.[446] According to a competing online marketplace, sellers feel forced to be on Amazon because that is where the buyers are.[447]

If current trends continue, no company is likely to pose a threat to Amazon's dominance in the near or distant future. Although some alternatives to Amazon have experienced growth during the pandemic, there is still a massive gap between the market leader and its competitors.[448] Several factors privilege Amazon as the dominant e-commerce marketplace, and also make entry or expansion by a challenger unlikely. While some of these barriers to entry are inherent to e-commerce—such as economies of scale and network effects—others result from Amazon's anticompetitive conduct. As discussed elsewhere in the Report, Amazon's acquisition strategy and many of its business practices were successfully designed to protect and expand its market power. An Amazon executive referred to some of these tactics as the company's "Big Moats," and suggested "doubl[ing] down" on them in a business strategy document.[449] Similarly, in 2018, an investment analyst report expressed skepticism

---

[443] Press Release, Consumer Intelligence Res. Partners, LLC, U.S. Amazon Prime Members – Slow, Steady Growth (Jan. 16, 2020), https://files.constantcontact.com/150f9af2201/9f9e47b4-0d66-4366-ad76-552ae3daa4f0.pdf (last visited Oct. 3, 2020); *see* Todd Bishop, *Amazon Tops 150M Paid Prime Subscribers Globally After Record Quarter for Membership Program*, GEEKWIRE (Jan. 30, 2020) https://www.geekwire.com/2020/breaking-amazon-tops-150m-paid-prime-members-globally-record-quarter/; Parkev Tatevosian, *Will Amazon Prime Reach 200 Million Members by the End of 2020?*, MOTLEY FOOL (July 18, 2020), https://www.fool.com/investing/2020/07/18/will-amazon-prime-reach-200-million-members-by-the.aspx (noting a 29% increase in Amazon's revenue in the second quarter of 2020 versus the same quarter in 2019, primarily as a result of COVID-19).

[444] *Number of Sellers on Amazon Marketplace*, MARKETPLACE PULSE, https://www.marketplacepulse.com/amazon/number-of-sellers (last visited Oct. 3, 2020).

[445] *Walmart's Fulfillment Service for Sellers Not Seeing Adoption*, MARKETPLACE PULSE, (Sept. 1, 2020), https://www.marketplacepulse.com/articles/walmarts-fulfillment-service-for-sellers-not-seeing-adoption.

[446] Stigler Report at 38 (describing indirect, multi-sided network effects in e-commerce, noting that "in ecommerce platforms, which intermediate trade between sellers and buyers, a buyer does not directly benefit from the presence of other buyers but does benefit from the presence of more sellers—who are in turn attracted by the presence of the buyers").

[447] Submission from Source 718, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

[448] ANDREW LIPSMAN, EMARKETER, TOP 10 US ECOMMERCE COMPANIES 2020 (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020 (illustrating that although Walmart's increased share of the U.S. retail e-commerce market will allow it to overtake eBay for second place, it will remain a distant second to Amazon).

[449] Production of Amazon, to H. Comm. on the Judiciary, AMAZON_HJC_00068510 (Sep. 8, 2010) (on file with Comm.).

**App. 160**

about Walmart's ability to challenge Amazon, commenting, "[W]e are concerned Amazon's Prime membership program is fortifying an impenetrable moat around its customers."[450]

## C.    Social Networks and Social Media

Social media products and services include social networking, messaging, and media platforms designed to engage people by facilitating sharing, creating, and communicating content and information online.[451] Although the boundaries of the social media market are imprecise,[452] social media platforms generally allow users on their networks to interact with people or groups they know, display content through linear feeds, or otherwise add socially layered functionality for services online, usually through a mobile app. In response to the Committee's requests for information, several market participants said they view social media as driven by networks, while many social media products and services include common functionalities, such as public profiles, curated feeds, followers, messaging, and other use cases.[453] Others focus on certain aspects of public and private communications.[454]

A principal feature of social media platforms is that they typically offer their services for a zero monetary price to the platform's users.[455] The platform develops a service it hopes will attract a critical mass of users to then attract advertisers to the platform.[456] Some social media companies offer additional services to users for a price or allow users to pay for additional functionality. For example, LinkedIn Premium provides users with an option to pay for additional features, such as their network and in-app messaging insights.[457]

---

[450] *See* Lydia Ramsey Pflanzer, *Walmart's talks with an insurance giant could be part of an assault on Amazon Prime*, BUS. INSIDER (Apr. 3, 2018), https://www.businessinsider.com/morgan-stanley-why-walmart-could-bid-on-humana-2018-4.

[451] Competition & Mkts. Auth. Report at 53.

[452] Jan H. Kietzmann, Kristopher Hermkens, Ian P. McCarthy & Bruno S. Silvestre, *Social Media? Get Serious! Understanding the Functional Building Blocks of Social Media*, 54 BUS. HORIZONS 241 (2011), http://summit.sfu.ca/system/files/iritems1/18103/2011_social_media_bh.pdf.

[453] Submission from Source 247, to H. Comm. on the Judiciary, Source 247-0000000006 (Oct. 23, 2019) (on file with Comm.); Competition & Mkts. Auth. Report at 53.

[454] Submission from Source 471, to H. Comm. on the Judiciary, 4 (Oct. 15, 2019) (on file with Comm.) ("[T]here are a number of other competitors who focus on different or additional aspects of public and private communication. For example, some competitors focus on sharing and expression though images and other media (e.g., Instagram, YouTube, and Pinterest). Some companies focus more on private communications (e.g., WhatsApp, Snap (for the most part), Facebook, Signal, and Telegram). Other companies focus on communications about specific topics (e.g., Discord for gaming and Slack for workplace communications).").

[455] Submission from Source 164, to H. Comm. on the Judiciary, Source 164-000015 (Oct. 28, 2019) (on file with Comm.) (describing how online advertising requires building an ad product, a sales team to sell that product, the engineering and product capacity to target and measure the effectiveness of those ads.).

[456] FIONA M. SCOTT MORTON & DAVID C. DINIELLI, OMIDYAR NETWORK, ROADMAP FOR AN ANTITRUST CASE AGAINST FACEBOOK 3 (June 2020) [hereinafter Omidyar Network Report] https://www.omidyar.com/wp-content/uploads/2020/06/Roadmap-for-an-Antitrust-Case-Against-Facebook.pdf.

[457] LINKEDIN PREMIUM, https://premium.linkedin.com/ (last visited Oct. 3, 2020).

**App. 161**

Social media platforms with a larger network of users are more likely to attract users and advertisers.[458] In a briefing to Subcommittee members and staff, Brad Smith, the President of Microsoft, described this value:

> You don't always need to have a proven business model to attract capital. You just need an idea that will get a lot of users. And then people assume you'll find a way to turn that usage into a business model that will produce revenue. That's been very important for the US. It distinguishes us and allows venture funding. There's something magical about 100 million active monthly users (MAU) in the United States. At that level a company becomes a force unto themselves. If you see a company acquire another company that's in the same product market and is on the path to reach 100 million MAU, that's more likely to raise a competitive concern. Historically, I think regulators were slow to notice that issue.[459]

As another market participant describes it, "attracting a critical mass of users is essential to delivering a viable social network, as there is no reason for users to start using a social network if there is no one there with whom they can connect."[460]

Social media companies may also focus on attracting particular types or groups of consumers to differentiate themselves from larger companies.[461] Many of the top-ranking apps on iOS are complementary to popular social media applications. For example, Dazz Cam, a vintage-inspired photo-editing app used with TikTok, was popular in the U.S. in 2020.[462] Similarly, Lens is a popular iOS app that allows users to browse, like, and comment on photos and videos on Instagram using the Apple Watch.[463]

---

[458] Production from Facebook, to H. Comm. on the Judiciary, FB_HJC_ACAL_00059100 (Apr. 6, 2012) (on file with Comm.) ("Advertising is a scale thing, it wasn't until we reached 350 million users did we become interesting to big brands.").

[459] Briefing with Brad Smith, President, Microsoft, in Washington, D.C. (June 23, 2020).

[460] Submission from Source 164, to H. Comm. on the Judiciary, Source 164-000014 (Oct. 28, 2019) (on file with Comm.). *But see* Bundeskartellamt, B6-22/16, Case Summary, *Facebook, Exploitative business terms pursuant to Section 19(1) GWB for inadequate* data processing, 8 (Feb. 15, 2019), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Missbrauchsaufsicht/2019/B6-22-16.pdf?__blob=publicationFile&v=4 ("At least as far as the services affected in this case are concerned, it is not sufficient to have a 'critical mass' of users or technical, financial and personal expertise in order to be able to enter neighbouring markets and be as successful as on the original market. As the example of Google+ has shown, a service cannot expect to have the same reach when providing a different type of service, due to strong direct network effects.").

[461] Competition & Mkts. Auth. Report at 115.

[462] Michelle Santiago Cortes, *These Are the TikTok Editing Apps You've Been Seeing on Your 'For You' Page*, Refinery29 (Mar. 25, 2020), https://www.refinery29.com/en-us/tik-tok-editing-apps (last visited Oct. 3, 2020).

[463] Zac Hall, *Lens Is a Modern and Feature-Packed Instagram App for Apple Watch that Works Without the iPhone*, 9to5Mac (Apr. 24, 2019), https://9to5mac.com/2019/04/24/lens-instagram-for-apple-watch/ (last visited Oct. 3, 2020).

**App. 162**

Due to network effects in the social media market, new entrants may choose to begin as a complement by relying on the incumbent platform's application programming interfaces (APIs) such as Facebook's Open Graph or Twitter's search API.[464] However, because incumbent platforms control access to these APIs and can foreclose access to a complementary app that is successful or gaining users,[465] some market participants view relying on these platforms to reach users as a constant business risk.[466] One market participant noted that in addition to harming their business, these actions also "restrict users' ability to multi-home and increase barriers to entry, including network effects and switching costs."[467]

Given Facebook's dominance, the primary way for new entrants to compete is to attract a subgroup or niche.[468] One market participant explained, "competitors may be limited to niche strategies that do not challenge the incumbent directly. For example, Facebook (including Instagram) is by far the most popular social networking platform. Although there are several competitors, such as LinkedIn, and fast-growing new entrants, such as TikTok, most or all employ niche strategies to varying degrees, and most have far less user engagement, attention, and data and a smaller share of advertising revenue than Facebook."[469]

1.  Social Networks are Distinguishable from Social Media

While a broad view of the social media market is useful for considering the wider landscape for social data and online advertising,[470] it is important to focus on the actual use, demand, and substitutability of social products when examining competition among social platforms online.[471] The critical distinction between social networking and social media markets is how people use the

---

[464] Omidyar Network Report at 22.

[465] *Id.* at 22–25; Submission from Source 471, to H. Comm. on the Judiciary, 8 (Oct. 15, 2019) (on file with Comm.) ("In or around 2010, [Source 471] restricted the access of our API by some third-party developers because we had significant concerns regarding some third-party developers use of [Source 471]'s private data. In order to protect private data, [Source 471] determined such changes were necessary to ensure that these data were not used improperly.").

[466] Submission from Source 164, to H. Comm. on the Judiciary, Source 164-00023 (Oct. 28, 2019) (on file with Comm.); Submission from Source 471, to H. Comm. on the Judiciary, 10 (Oct. 15, 2019) (on file with Comm.) ("[Our company's] business would be affected if other social networking networks were to disallow cross-posting . . . to their platforms or discontinue APIs central to the functionality of our products or services.").

[467] Submission from Source 471, to H. Comm. on the Judiciary, 10 (Oct. 15, 2019) (on file with Comm.).

[468] Omidyar Network Report at 16.

[469] Submission from Source 407, to H. Comm. on the Judiciary, 4 (Nov. 1, 2019); Competition & Mkts. Auth. Report at 55 ("Differentiation can incentivise consumers to access multiple platforms, allowing for the co-existence of platforms.").

[470] Submission from Source 164, to H. Comm. on the Judiciary, Source-32-000014 (Oct. 28, 2019) (on file with Comm.) (discussing how they see "social media sites" as competitors for ads even though they don't think they are in that market.).

[471] *See* United States v. Microsoft Corp., 253 F.3d 34, 51–52 (D.C. Cir. 2001) ("[T]he relevant market must include all products 'reasonably interchangeable by consumers for the same purposes.'") (quoting United States v. Du Pont & Co., 351 U.S. 377, 395 (1956)); *see also* Competition & Mkts. Auth. Report at 117–18 ("[T]he closeness of competition between different platforms depends on the degree to which consumers consider them substitutes, rather than the extent to which they share common functionalities.").

**App. 163**

platform. As Germany's Federal Cartel Office (Bundeskartellamt) and the United Kingdom's Competition and Markets Authority (CMA) have noted, the specific demand for social networks "is fundamentally different from the demand for other social media."[472]

Social network platforms facilitate their users finding, interacting, and networking with other people they already know online, and by providing a "rich social experience" through features on their products.[473] People regularly use social network platforms to exchange "experiences, opinions and contents among specific contacts which the users define based on identity."[474]

In contrast, social media platforms principally facilitate the distribution and consumption of content. Much of the content on YouTube, for example, can be enjoyed by users with a wide range of relationships to the person posting, including by strangers.[475] Similarly, TikTok describes itself as a "global platform for users to express their ideas by sharing videos with a broader community."[476] In light of this distinction, the CMA concluded that YouTube is focused on offering content and does not compete with Facebook, facilitating communication and sharing content among groups of friends who choose each other and enjoy content in large part because of those relationships.[477]

In sum, social networking sites have a robust social graph, whereas content-centric sites do not.[478] Although users can share videos or stream events on Facebook and YouTube in similar ways, there is a fundamental difference between sharing a video among a person's social network on Facebook, Instagram, or WhatsApp—such as a child's first steps—and broadcasting it publicly on YouTube. While people may spend significant time on both YouTube and Facebook,[479] these firms provide distinct services to their users, and including both in the same market would be inconsistent with how users engage with each platform.

---

[472] Competition & Mkts. Auth. Report at 54 (citing Bundeskartellamt (Feb. 6, 2019), B6-22/16, para. 249, https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Entscheidungen/Missbrauchsaufsicht/2019/B6-22-16.pdf?__blob=publicationFile&v=5).

[473] *Id.*

[474] *Id.*

[475] Omidyar Network Report at 6.

[476] Letter from Michael Beckerman, Vice Pres., Head of U.S. Public Pol'y, TikTok, to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary & Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary (July 29 2020) at 1, https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-20200729-SD005.pdf.

[477] Omidyar Network Report at 6.

[478] THOMAS CUNNINGHAM, POSSIBLE END STATES FOR THE FAMILY OF APPS (2018) (on file with Comm.) (discussing social networking platforms with comparable and orthogonal social graphs.).

[479] *Average Time Spent Daily on Social Media (Latest 2020 Data)*, BROADBAND SEARCH, https://www.broadbandsearch.net/blog/average-daily-time-on-social-media#post-navigation-4 (last visited Oct. 3, 2020).

**App. 164**

2. <u>Market Concentration</u>

Social platforms that are within a broad definition of social media include YouTube, Facebook and its family of products—Instagram, Messenger, and WhatsApp—as well as TikTok, Twitter, LinkedIn, Pinterest, Reddit, and Tumblr.[480] According to Facebook's internal market data, YouTube and Facebook's family of products were by far the most popular social media sites by Monthly Active Persons (MAP) as of December 2019.[481]

**Social Media Companies by Monthly Active Persons (MAP) in Millions[482]**



The social network marketplace is highly concentrated. Facebook (1.8 billion users) and its family of products—WhatsApp (2.0 billion users), Instagram (1.4 billion users)— have significantly more users and time spent on its platform than its closest competitors, Snapchat (443 million users) or Twitter (582 million users).[483] TikTok is growing quickly and is often referenced as evidence that the

---

[480] Competition & Mkts. Auth. Report at 115 n.140 (indicating that there are several other smaller firms that conform to this definition of social media but lack a significant user base).

[481] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-00086585 (Jan. 2020) (on file with Comm.).

[482] Prepared by the Subcomm. based Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-00086585 (Jan. 2020) (on file with Comm.). (metrics collected by Facebook, Inc.).

[483] THOMAS CUNNINGHAM, POSSIBLE END STATES FOR THE FAMILY OF APPS (2018) (on file with Comm.) (discussing social networking platforms with comparable and orthogonal social graphs.).

**App. 165**

social media landscape is competitive.[484] Although it meets the broad definition of social media as a social app for distributing and consuming video content, TikTok is not a social network.

<div align="center">

D.      Mobile App Stores

</div>

Mobile application stores (app stores) are digital stores that enable software developers to distribute software applications (apps) to mobile device users.[485] A mobile app is a standardized piece of software optimized for use on a mobile device. Users can install this software to access digital content or services, share content, play games, or make transactions for physical goods and services. Apps are configured to run on a device's operating system as "native apps." These apps may be pre-installed on a mobile device as a component of the operating system or by the device manufacturer, downloaded from an app store, or loaded directly from the web using a browser—a process referred to as sideloading. Software developers upload apps and updates to app stores, and mobile device users can then install apps by downloading them from the app store to their device.

App stores include free and paid apps that charge a fee. In addition to allowing users to install apps, app stores enable users to search, browse, and find reviews for apps, as well as remove apps from their devices.[486] The leading app stores also offer tools and services to support developers to building apps for the app store.[487] App stores have rules that govern the types of apps permitted in the app store, conduct of app developers, how users pay for apps, the distribution of revenue between the app and the app store, and other details regarding the relationship between the app store operator and the app developers that distribute apps through the store.[488]

App stores provide mobile device users with a sense of trust and security that the apps they install from an app store have been reviewed, will not harm the user's mobile device, will function as

---

[484] *See* Alex Sherman, *TikTok reveals detailed user numbers for the first time*, CNBC (Aug. 24, 2020), https://www.cnbc.com/2020/08/24/tiktok-reveals-us-global-user-growth-numbers-for-first-time.html.

[485] *See e.g.*, Production of Apple, to H. Comm. on the Judiciary, HJC_APPLE_000003 (Oct. 14, 2019) (on file with Comm.); Letter from Executive at Source 736, to Members of the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 4 (Oct. 31, 2019) (on file with Comm.); BRICS COMPETITION, INNOVATION, LAW & POL'Y CTR, DIGITAL ERA COMPETITION: A BRICS VIEW 347 (2019), http://bricscompetition.org/upload/iblock/6a1/brics%20book%20full.pdf.

[486] NETH. AUTH. FOR CONSUMERS & MKTS. MARKET STUDY INTO MOBILE APP STORES 20 (2019), https://www.acm.nl/sites/default/files/documents/market-study-into-mobile-app-stores.pdf [hereinafter Neth. Auth. for Consumers & Mkts Study].

[487] *Id.*

[488] *See Apple App Store Review Guidelines*, APPLE, https://developer.apple.com/app-store/review/guidelines/#legal; *Apple Developer Program License Agreement*, APPLE, https://developer.apple.com/services-account/agreement/XV2A27GUJ6/content/pdf; *Google Play Developer Policy Center*, GOOGLE, https://play.google.com/about/developer-content-policy/; *Google Play Developer Distribution Agreement*, GOOGLE, https://play.google.com/intl/ALL_us/about/developer-distribution-agreement.html .

<div align="right">

**App. 166**

</div>

intended, and will not violate user privacy.[489] App stores also reduce customer acquisition costs for app developers by allowing developers to reach an extraordinarily large consumer base—every mobile device user in the U.S. is addressable by developing for the Apple App Store and the Google Play Store. By reducing the costs of app developers, app stores help make software applications more affordable for consumers.[490]

Deloitte has explained that app stores provide developers with various benefits, including providing a consistent interface and experience for users on a mobile operating system, a secure platform for apps, storage systems for hosting apps and managing downloads and updates, and billing and payment management systems that can reduce overhead for developers.[491] Apple and Google also provide developers with software-development tools to create, test, and publish apps; technical support and analytics tools; and tutorials.[492]

The mobile operating system on a device determines which app stores the user can access. The provider of the mobile operating system determines which app stores may be pre-installed on devices running the operating system, and whether and how additional app stores may be installed. As discussed elsewhere in the Report, both Apple and Google have durable and persistent market power in the mobile operating system market; iOS and Android run on more than 99% of mobile devices in the U.S. and globally.[493] There are high switching costs in the mobile operating system market and high barriers to entry. Due to their dominance in the mobile operating system market, Apple and Google have the power to dictate the terms and extent of competition for distributing software on to mobile devices running their respective mobile operating systems.[494]

The Google Play Store is the primary app store installed on all Android devices. The Apple App Store is the only app store available on iOS devices.[495] Apps are not interoperable between operating systems—native apps developed for iOS only work on iOS devices, and native apps

---

[489] *See* CEO Hearing Transcript at 3 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.) https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-20200729-QFR054.pdf; *See also* JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 1, 5, 18 (2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf.

[490] Production of Apple, to H. Comm. on the Judiciary, HJC_APPLE_000003 (Oct. 14, 2019) (on file with Comm.); Neth. Auth. for Consumers & Mkts. Study at 108.

[491] DELOITTE, THE APP ECONOMY IN THE UNITED STATES 8 (2018), https://www.ftc.gov/system/files/documents/public_comments/2018/08/ftc-2018-0048-d-0121-155299.pdf

[492] Neth. Auth. for Consumers & Mkts. Study at 29.

[493] *Id.* at 15.

[494] *See* Data and Privacy Hearing at 15 (statement of Maurice E. Stucke, Prof. of Law, Univ. of Tennessee, and Ariel Ezrachi, Slaughter and May Prof. of Competition Law, Univ. of Oxford, Fellow, Pembroke Coll., Dir., Oxford Ctr. For Competition Law and Pol'y), https://docs.house.gov/meetings/JU/JU05/20191018/110098/HHRG-116-JU05-20191018-SD010.pdf.

[495] Neth. Auth. for Consumers & Mkts. Study at 4, 21.

**App. 167**

developed for Android only work on Android devices.[496] The App Store and the Play Store do not compete against one another. Android users cannot access the Apple App Store, and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa.[497]

Statista reports that in the first quarter of 2020 there were approximately 2.56 million apps available in the Google Play Store and 1.847 million apps available in Apple's App Store.[498] Apple's App Store is the only means to distribute software on iOS devices.[499] The Google Play Store is the dominant app store on Android devices; however, Google does permit users to sideload alternative app stores. Some Android device partners, such as Samsung, pre-install their own app stores on their devices.[500] Leading alternative Android app stores include Amazon's Appstore, Aptoide, F-Droid, and the Samsung Galaxy Store.[501] App developers who want to reach the entire addressable market of U.S. or global smartphone users must have an app in both the App Store and the Play Store.[502] Apple and Google also determine the terms and conditions app developers must agree to in order to distribute software through the App Store and Play Store, respectively. As a result, app developers and industry observers agree that Apple and Google control the app distribution market on mobile devices.[503]

---

[496] *See* Interview with Source 407 (Sept. 10, 2020); Interview with Source 143 (Aug. 27, 2020); Neth. Auth. for Consumers & Mkts. Study at 51–52, 67, 73.

[497] *See* Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine (July 18, 2018) https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581; Letter from Executive at Source 181, to Members of the Subcomm.on Antitrust, Commercial and Admin. Law, 4 (Oct. 31, 2019) (on file with Comm.); Submission from Source 301, to H. Comm. on the Judiciary, 5, 7 (Oct. 15, 2019) (on file with Comm.).

[498] *Number of Apps Available in Leading App Stores as of 1st Quarter 2020,* STATISTA, https://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/ (last visited Oct. 5, 2020).

[499] Neth. Auth. for Consumers & Mkts. Study at 50; Interview with Source 766 (July 2, 2020).

[500] Neth. Auth. for Consumers & Mkts. Study at 50. *See* Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 (explaining that worldwide, excluding China, "the Play Store accounts for more than 90% apps downloaded on Android devices").

[501] Joe Hindy, *10 Best Third Party App Stores for Android and Other Options Too*, Android Authority (Aug. 28, 2020), https://www.androidauthority.com/best-app-stores-936652/.

[502] Neth. Auth. for Consumers & Mkts. Study at 15.

[503] *See e.g.*, Interview with Source 143 (Aug. 27, 2020); Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045377 (Feb. 14, 2014) (on file with Comm.) (demonstrating that Facebook COO Sheryl Sandberg explained to Facebook's Board of Directors that Apple and Google's positions as dominant mobile operating system and app store operators posted a "significant strategic threat" to Facebook's business and adding another popular mobile app to Facebook's suite of apps "would make it more difficult for operating system providers to exclude the Company's mobile applications from mobile platforms."); Letter from Executive at Source 181, to Members of the Subcomm. on Antitrust, Commercial and Admin. Law, 4 (Oct. 31, 2019) (on file with Comm.); Kara Swisher, *Is It Finally Hammer Time for Apple and Its App Store*, N.Y. TIMES (June 19, 2020), https://www.nytimes.com/2020/06/19/opinion/apple-app-store-hey.html?referringSource=articleShare.

**App. 168**

There is no method for a third-party app store to challenge the App Store on iOS devices. Apple CEO Tim Cook told the Subcommittee that Apple has no plans to open iOS to alternative app stores.[504] For a third-party app store to successfully challenge the Play Store, consumers must be able to install the app store and the store must have popular apps that users want. As with mobile operating systems, network effects create momentum so that as more consumers install software from the app store, more developers will build apps for the app store, increasing the value of the app store for users and attracting more consumers. Once users have migrated to a large platform—such as an operating system and its app store, it is difficult for smaller competitors to attract users and app developers.[505]

The United Kingdom's Competition and Markets Authority observed that "almost all mobile app downloads are made through the App Store, on iOS devices, or Google Play, on Android devices."[506] Alternatives app distribution methods such as third-party app stores, gaming platforms, or sideloading are often irrelevant to the mobile applications market, not always practical options for users, have significant disadvantages compared to the pre-installed app stores, and offer only limited functionality.[507]

Web sites and web apps are not competitively significant alternatives to the dominant app stores on iOS and Android devices for distributing software to mobile devices. Apps provide a deeper, richer user experience and can provide additional functionality by accessing features within the mobile device's hardware and operating system, such as a camera or location services.[508] Web apps and browsers are also reliant on the device being connected to the Internet. Native apps can continue to work even when a device loses access to the Internet.[509] Apple's App Store Review Guidelines differentiate apps from websites, explaining that apps submitted to the App store "should include

---

[504] CEO Hearing at 3 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[505] Data and Privacy Hearing at 5 (statement of Maurice E. Stucke, Prof. of Law, Univ. of Tennessee, and Ariel Ezrachi, Slaughter and May Prof. of Competition Law, Univ. of Oxford, Fellow, Pembroke Coll., Dir., Oxford Ctr. For Competition Law and Pol'y).

[506] Competition & Mkts. Auth. Report at 29; see also Japan Fair Trade Commission, Press Release, Report Regarding Trade Practices on Digital Platforms: Business-to-Business Transactions on Online Retail Platform and App Store 24–25 (Oct. 2019), https://www.jftc.go.jp/en/pressreleases/yearly-2019/October/191031Report.pdf (explaining that consumers rely on pre-installed app stores to install apps, so developers believe they "have no choice but to use the app store services" to reach consumers).

[507] See Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00068877 (Feb. 21, 2012) (on file with Comm.) ("Native apps will dominate over mobile-web for a long time (maybe forever) and we cannot prop up HTML-5 / are not strong enough to lead a shift - The mobile OS makers have a strong incentive in native apps performing better / working better than the web? so theory / what is possible aside, native apps will work better & be better experiences than the mobile web."); Neth. Auth. for Consumers & Mkts. Study at 42–51, 69.

[508] See Letter from Executive at Source 181, to Members of the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 1 (Oct. 31, 2019) (on file with Comm.); Neth. Auth. for Consumers & Mkts. Study at 59, 81.

[509] See Interview with Source 88 (May 12, 2020).

**App. 169**

features, content and [a user interface] that elevate [the app] beyond a repackaged website."[510] Curation and centralized review of apps is an advantage touted by app store operators. Apple CEO Tim Cook explained to the Subcommittee that on iOS devices, Apple's control of software installation through the App Store ensures downloaded apps "meet our high standards for privacy, performance, and security," which is important for maintaining user trust.[511] Additionally, distributing software via app stores lowers customer acquisition costs for software developers.[512]

Consumers do access content on their mobile devices via the open Internet. However, mobile apps are the primary way users access content and services on mobile devices and have become integral in Americans' daily lives for basic communication, business transactions, entertainment, and news. In the U.S., nearly 90% of the time users spend online on mobile devices occurs in apps.[513] Software distribution via web apps or through a website accessible on a browser is not a competitively significant alternative to distributing apps through the dominant app store on a mobile device and does not discipline the market power of the dominant app stores controlled by Apple and Google.

Similarly, the ability for consumers to sideload apps—installing apps without using an app store—does not discipline the dominance of Apple and Google in the mobile app store market. Apple does not permit users to sideload apps on iOS devices, and few consumers have the technical savvy to "jailbreak" an iOS device to sideload apps.[514] Google does permit sideloading on Android devices, but developers find that given the option, consumers prefer to install apps from app stores and few opt for sideloading.[515] Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading.[516] Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their

---

[510] *App Store Review Guidelines, § 4.2*, APPLE, https://developer.apple.com/app-store/review/guidelines/#design (last visited Oct. 4, 2020).

[511] CEO Hearing at 3 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[512] *See* Production of Apple, to H. Comm. on the Judiciary, HJC_APPLE_000003 (Oct. 14, 2019) (on file with Comm.); Neth. Auth. for Consumers & Mkts. Study at 102.

[513] COMSCORE, 2019 REPORT GLOBAL STATE OF MOBILE 7 (2019); s*ee also* Letter from Executive at Source 181, to Members of the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 1 (Oct. 31, 2019) (on file with Comm.); Submission from Source 301, to H. Comm. on the Judiciary, 7 (Oct. 15, 2019) (on file with Comm.).

[514]Neth. Auth. for Consumers & Mkts. Study at 45–46; Submission from Source 736, to H. Comm. on the Judiciary, Source 736-00000166 (July 1, 2019).

[515] Interview with Source 59 (May 13, 2020).

[516] Interview with Source 83 (June 30, 2020).

**App. 170**

apps.[517] Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores.

There are no competitive constraints on the power Apple and Google have over the software distribution marketplace on their mobile ecosystems. The core benefit of mobile app stores—centralizing and curating software distribution—also gives Apple and Google control over which apps users discover and can install.[518] As the gateways to the primary way users access content and services on mobile devices, the App Store and the Play Store can extract revenue from and exercise control over everything users do on their devices.[519] This dominance enables Apple and Google to establish terms and conditions app developers have to comply with, leaving developers with the choice of complying or losing access to consumers. The terms and conditions app stores impose include requirements regarding app functionality, content, interactions with consumers, collection, and distribution of revenue between the app and app store.[520]

Mobile app stores charge app developers commissions on sales of paid apps through the app store. Apple and Google, along with other mobile app stores on Android devices, charge a 30% commission when users install the app.[521] Apple established its 30% commission on paid apps in 2009 with the introduction of the App Store, and that rate has become the industry standard.[522]

Apple and Google have both developed mechanisms for collecting payments from users for purchases within applications—these transactions are called in-app purchases (IAP). Apple and Google both charge developers a standard 30% for IAP.[523] In collecting IAP, Apple and Google collect user personal and payment information, process the payment, and then remit the payment to the app developer, minus a processing fee or commission.[524] Developers selling digital content through their

---

[517] *See* Neth. Auth. for Consumers & Mkts. Study at 48; JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 44 (June 2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf; Interview with Source 83 (June 30, 2020).

[518] *See* JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 19 (2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf.

[519] *See id.* at 7, 19.

[520] *See* Neth. Auth. for Consumers & Mkts. Study at 3, 15.

[521] *See* ANALYSIS GROUP, APPLE'S APP STORE AND OTHER DIGITAL MARKETPLACES: A COMPARISON OF COMMISSION RATES 4–6 (July 22, 2020), https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf.

[522] *See id.* at 4.

[523] *See* Neth. Auth. for Consumers & Mkts. Study at 23, 29, 86, 89.

[524] *See e.g.*, Letter from Executive at Source 181, to Members of the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3, 5–6 (Oct. 31, 2019) (on file with Comm.); Submission from Source 736, to H. Comm. on the Judiciary, Source 736-00000009 (on file with Comm.); Submission from Source 304, to H. Comm. on the Judiciary, 7–8 (Sept. 3, 2020); *see also* Reed Albergotti & Tony Romm, *Tinder and Fortnite criticize Apple for its 'App Store*

**App. 171**

apps on iOS and Android devices are required to use the app store operator's IAP.[525] For subscription services, like news apps or streaming media, the commission is 15% for the second year and thereafter.[526] IAP systems provide mobile device users with convenience by allowing consumers to make transactions in their apps and only enter their payment details a single time, and protects user privacy by limiting sharing of sensitive financial information.[527] However, developers have noted that lack of competition in pricing by app stores, particularly given the scale the App Store and Play Store have achieved since introducing their standard commission rates for paid apps and in-app purchases, demonstrates the lack of competition in the software distribution market on both the iOS and Android ecosystems.[528] Developers have also said that the 30% commissions charged by app stores have led them to increase prices for consumers and diminished innovation by software developers.[529]

Apple and Google also develop and distribute apps that directly compete against third-party developers in their app stores.[530] This dynamic, coupled with the fact that App Store and Play Store are dominant distribution channels and can exert gatekeeper power over their platforms, has the potential to distort competition, lead to discrimination and higher entry barriers for third-party developers, and result in the app store operator self-preferencing its own apps, harming consumers and competition.[531]

New app stores face high barriers to entry. It is unlikely that a third strong mobile app ecosystem can emerge. To offer a new mobile app store that is compelling to consumers, the app store must have a built-in customer base to attract developers to build apps for the store and must have popular apps to attract customers. Before the introduction of the App Store, third-party apps were not a central component of the user experience on mobile devices. New entrants, such as Apple, could disrupt the mobile device and operating system market by offering superior handset design, user interface, and first-party applications. Now, third-party apps are critical to the success of any mobile ecosystem. Millions of apps are developed for iOS and Android, and leading device manufacturers have built their device ecosystems around those operating systems. As a result, it is unlikely that a new

---

*monopoly'*, WASH. POST (June 16, 2020), https://www.washingtonpost.com/technology/2020/06/16/apple-antitrust-european-commission/.

[525] *See* Neth. Auth. for Consumers & Mkts. Study at 29.

[526] *Id.* at 29.

[527] *Id*. at 7.

[528] *See* Interview with Source 83 (June 30, 2020); Competitors Hearing at 8 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

[529] *See* Letter from Executive at Source 181 to Members of the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 9–10 (Oct. 31, 2019) (on file with Comm.) (internal citations omitted); Submission from Source 736, Source 736-00000236 (Oct. 23, 2019) (on file with Comm.).

[530] Japan Fair Trade Comm'n, Press Release, Report Regarding Trade Practices on Digital Platforms: Business-to-Business Transactions on Online Retail Platform and App Store 21 (Oct. 2019), https://www.jftc.go.jp/en/pressreleases/yearly-2019/October/191031Report.pdf.

[531] *See e.g.*, Neth. Auth. for Consumers & Mkts. Study at 22, 31–32, 69, 89–90, 95–99.

**App. 172**

mobile operating system entrant can disrupt the current market dynamics.[532] Because of the control that Apple and Google exert over software distribution on their mobile ecosystems and the unlikelihood of entry by a new competitive mobile operating system, it is unlikely that a new, competitive app store will be able to successfully challenge the existing, dominant app store operators.

<div align="center">E.      Mobile Operating Systems</div>

A mobile operating system (OS) provides a mobile device with its underlying functionality, such as user interface, motion commands, button controls, and facilitates the operation of the device's features, such as the microphone, camera, and GPS. The mobile OS is the interface between the mobile device hardware, such as the smartphone handset or tablet, and the applications that run on the device, like email or streaming apps. The mobile OS is pre-installed on mobile devices; an alternative mobile OS cannot be installed or substituted. The characteristics of the mobile OS determine aspects of the mobile device's performance and functionality, including the app stores and apps that can run on the device. The mobile OS also determines which company's ecosystem of products and services the device is integrated with.[533]

Google's Android and Apple's iOS are the two dominant mobile operating systems.[534] Combined, they run on more than 99% of all smartphones in the world.[535] The third-largest mobile operating system is KaiOS, which runs on feature phones (i.e., non-smartphone mobile devices).[536] Apple's mobile devices run on Apple's proprietary iOS operating system, while other leading handset manufacturers, such as Samsung, LG, and Motorola, run on Android.[537] iOS is not available on non-Apple devices.

---

[532] Dig. Competition Expert Panel Report at 29–30.

[533] *See* Steven Böhm, Fabian Adam & Wendy Colleen Farrell, *Impact of the Mobile Operating System on Smartphone Buying Decisions: A Conjoint-Based Empirical Analysis*, MOBILE WEB AND INTELLIGENT INFORMATION SYSTEMS 198 (Muhammad Younas, Irfan Awan & Massimo Mecella eds., 2015), https://doi.org/10.1007/978-3-319-23144-0_18.

[534] *See* GSMA INTEL., GLOBAL MOBILE TRENDS 2020: NEW DECADE, NEW INDUSTRY?, 6, 26 (2019), https://data.gsmaintelligence.com/api-web/v2/research-file-download?id=47743151&file=2863-071119-GMT-2019.pdf.

[535] Neth. Auth. for Consumers & Mkts. Study at 15; *see also* Dig. Competition Expert Panel Report at 29 ("However market shares are measured, Google (Android) and Apple (iOS) have a global duopoly over mobile phone operating systems."); Michael Muchmore, *Android vs. iOS: Which Mobile OS Is Best?*, PC MAG (Aug. 11, 2020), https://www.pcmag.com/comparisons/android-vs-ios-which-mobile-os-is-best ("[W]e're locked in a duopoly when it comes to mobile operating system choice").

[536] *A Short History of KaiOS*, KAIOS, https://developer.kaiostech.com/introduction/history (last visited Oct. 4, 2020); Stephen Shankland, *Mozilla helps modernize feature phones powered by Firefox tech*, CNET (Mar. 11, 2020), https://www.cnet.com/news/mozilla-helps-modernize-feature-phones-powered-by-firefox-tech/.

[537] *See* Production of Apple, to H. Comm. on the Judiciary, HJC_APPLE_000021 (Oct. 14, 2019) (on file with Comm.) ("Many smartphone brands around the world compete with iPhone on the basis of price, performance, features, and design. These smartphones generally incorporate Google's Android operating system.").

**App. 173**

**Mobile OS Market Share Worldwide**[538]

Over the past decade, once-strong competitors have exited the mobile OS market, and Google and Apple have built dominant positions that are durable and persistent.[539] While there are other mobile OSs—such as Tizen, Sailfish OS, and Ubuntu Touch—those OSs make up less than 1% of the global mobile OS market.[540]

---

[538] Prepared by the Subcomm. based on Felix Richter, *The Smartphone Market: The Smartphone Duopoly*, STATISTA (July 27, 2020), https://www.statista.com/chart/3268/smartphone-os-market-share/ (citing *Mobile Operating System Market Share Worldwide*, STATCOUNTER GLOBALSTATS StatCounter "calculates the data based on more than 1.7 billion page views per month worldwide. StatCounter defines a mobile device as a pocket-sized computing device. As a result, tablets are not included . . . Nokia devices (including some S40 devices) had been grouped largely under Symbian OS.").

[539] *See* Felix Richter, *The Smartphone Market: The Smartphone Duopoly*, STATISTA (July 27, 2020), https://www.statista.com/chart/3268/smartphone-os-market-share/ (citing citing *Mobile Operating System Market Share Worldwide*, STATCOUNTER GLOBALSTATS) ("Having started out as a multi-platform market, the smartphone landscape has effectively turned into a duopoly in recent years, after Apple's iOS and Google's Android crowded out any other platform including Microsoft's Windows Phone, BlackBerry OS and Samsung's mobile operating system called Bada."); Data and Privacy Hearing at 7 (statement of Maurice E. Stucke, Prof. of Law, Univ. of Tennessee, and Ariel Ezrachi, Slaughter and May Prof. of Competition Law, Univ. of Oxford, Fellow, Pembroke Coll., Dir., Oxford Ctr. For Competition Law and Pol'y) ("The mobile operating system market went from multiple competitors in 2010 (with Google and Apple collectively accounting for 39 percent of unit sales), to a duopoly eight years later."); Matthew Feld, *Microsoft Is Finally Killing Off the Windows Phone*, The TELEGRAPH (Oct. 9, 2017), https://www.telegraph.co.uk/technology/2017/10/09/microsoft-finally-killing-windows-phone/; Arjun Kharpal, *TCL Launches New $549 Smartphone Under BlackBerry's Banner, Featuring Android Software*, CNBC (Feb. 25, 2017), https://www.cnbc.com/2017/02/25/blackberry-keyone-launch-physical-keyboard-android-specs-price.html); Jack Schofield, *Can I Buy a Phone that Doesn't Use Anything from Google or Apple?*, THE GUARDIAN (July 4, 2019), https://www.theguardian.com/technology/askjack/2019/jul/04/can-i-buy-a-phone-that-does-not-use-anything-from-google-or-apple.

[540] *See, e.g.*, Simon O'Dea, *Market Share of Mobile Operating Systems in the United States from January 2012 to December 2019*, STATISTA (Feb. 27, 2020), https://www.statista.com/statistics/272700/market-share-held-by-mobile-operating-systems-in-the-us-since-2009/.

**App. 174**

**Market Share of Mobile Operating Systems in the U.S.**[541]



Although both Google Android and Apple iOS both have dominant positions in the mobile OS market, high switching costs and a lack of on-device competition mean that neither firm's market power is disciplined by the presence of the other. The European Commission's investigation into Google's Android platform found that because iOS is not available on non-Apple devices, it cannot constrain Google's dominance in the mobile OS market.[542] Conversely, Android is not available on Apple devices and does not constrain Apple's dominant position and conduct on Apple mobile devices. An investment research firm recently noted that switching costs were high for Apple users because iOS is not available on non-Apple devices.[543]

There are significant barriers to switching between the dominant mobile operating systems. As a general matter, consumers rarely switch mobile operating systems. SellCell's 2019 survey found that more than 90% of users with iPhones tend to stick with Apple when they replace their current

---

[541] Prepared by Subcomm. based on S. O'Dea, *Market share of mobile operating systems in the United States from January 2012 to December 2019*, STATISTA (Feb. 27, 2020), https://www.statista.com/statistics/272700/market-share-held-by-mobile-operating-systems-in-the-us-since-2009/ (citing *Mobile Operating System Market Share in United States Of America*, STATCOUNTER).

[542] Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine (July 18, 2018) https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

[543] MORNINGSTAR EQUITY ANALYST REPORT, APPLE INC 1 (Aug. 6, 2020) (on file with Comm.).

**App. 175**

device.[544] In 2018, Consumer Intelligence Research Partners reported that more than 85% of iOS users who purchased a new device purchased another iOS device, and more than 90% of Android users who bought a new device purchased a new Android device.[545] A 2017 study from Morgan Stanley found that 92% of iPhone owners intending to buy a new mobile device planned to buy another iPhone.[546] Mobile carriers—a main retail distribution channel for mobile devices—agreed that it is rare for customers to switch from one mobile OS because once customers are used to the mobile OS they generally do not switch.[547] App developers also said in interviews with Subcommittee staff that they observed minimal customer switching between iOS and Android.[548]

In addition to the cost of buying a new mobile device, consumers encounter other costs to switch to a new operating system. Android and iOS have different operating concepts, user interface designs, and setting and configuration options. As a result, instead of switching operating systems, "users pick one, learn it, invest in apps and storage, and stick with it."[549]

Other barriers to switching include the loss of compatibility with other smart devices designed to work in conjunction with the mobile device and its OS, the hassle of porting data from one OS to another, re-installing apps and configuring settings, and learning an unfamiliar user interface.[550] Apple's co-founder and former CEO Steve Jobs advocated this approach, noting Apple should "[t]ie all of our products together, so we further lock customers into our ecosystem."[551] Recently, Morningstar observed that people using Apple's other products such as the Apple Watch and AirPods

---

[544] *iPhone vs. Android – Cell Phone Brand Loyalty Survey 2019*, SELLCELL (Aug. 20, 2019), https://www.sellcell.com/blog/iphone-vs-android-cell-phone-brand-loyalty-survey-2019/; *see also* MORNINGSTAR EQUITY ANALYST REPORT, APPLE INC. 2 (Aug. 6, 2020) (on file with Comm.) ("Recent survey data shows that iPhone customers are not even contemplating switching brands today. In a December 2018 survey by Kantar, 90% of U.S.-based iPhone users said they planned to remain loyal to future Apple devices.").

[545] Press Release, Consumer Intel. Res. Partners, LLC, Mobile Operating System Loyalty: High and Steady, (Mar. 8, 2018), http://files.constantcontact.com/150f9af2201/4bca9a19-a8b0-46bd-95bd-85740ff3fb5d.pdf.

[546] Martin Armstrong, *Most iPhone Users Never Look Back*, STATISTA (May 22, 2017), https://www.statista.com/chart/9496/most-iphone-users-never-look-back/.

[547] Interview with Source 72 (June 23, 2020).

[548] Interview with Source 83 (June 30, 2020).

[549] Press Release, Consumer Intel. Res. Partners, LLC, Mobile Operating System Loyalty: High and Steady (Mar. 8, 2018), http://files.constantcontact.com/150f9af2201/4bca9a19-a8b0-46bd-95bd-85740ff3fb5d.pdf.

[550] *See* Neth. Auth. for Consumers & Mkts. Study at 55–56; Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581; *see also iPhone vs. Android – Cell Phone Brand Loyalty Survey 2019*, SELLCELL (Aug. 20, 2019), https://www.sellcell.com/blog/iphone-vs-android-cell-phone-brand-loyalty-survey-2019/ (finding "21% of iPhone users might be tempted to switch if they weren't too tied into the Apple Ecosystem or it wasn't so much hassle changing operating system from iOS to Android" and "13% of Samsung users might be tempted to switch if they weren't too tied into the Google/Android Ecosystem or it wasn't so much hassle changing operating system").

[551] Don Reisinger, *Steve Jobs wanted to 'further lock customers' into Apple's 'ecosystem'*, CNET (Apr. 2, 2014), https://www.cnet.com/news/steve-jobs-wanted-to-further-lock-customers-into-apples-ecosystem/.

**App. 176**

"lose significant functionality when paired with a smartphone other than the iPhone," locking iPhone users into the iOS ecosystem.[552] Competition regulators in the Netherlands explained that this strategy creates "path dependency" for consumers. Although mobile devices have a limited lifespan and consumers might be expected to "break the lock-in cycle" when it is time to upgrade to a new device, consumers often have software, data and files, and other hardware and accessories that are only compatible with one product ecosystem, making it unlikely they switch to a non-compatible mobile device.[553]

There are significant entry barriers in the mobile operating system market. One former mobile OS competitor observed that its experience showed that it was doubtful that a new, competitive mobile OS will emerge in the U.S.[554] Another former mobile OS provider explained that it exited the market after concluding "the market for mobile operating systems was too established for a new entry."[555] To compete, a new OS must offer a superior product packaged in an attractive handset, as well as a fully realized suite of apps and compatible devices comparable to what Apple and Google (and Google's hardware partners) currently offer. Industry experts have testified before the Subcommittee that the "reality is that it would be very difficult for a new mobile phone operating system today" to compete with Apple and Google, "even if it offered better features."[556] Investment analysts agree, noting it is likely Android and iOS "will continue to power nearly every smartphone around the world in the long run."[557]

The mobile OS market is also characterized by strong network effects. In short, a new mobile OS must have a sufficiently large user base to attract app developers to build apps to run on the OS. An OS with an insufficient number of users and developers is unlikely to receive support from mobile device manufacturers that will install the OS on their devices, or mobile network operators that will support those devices on their networks.[558]

The most important factor that developers consider before building apps for an OS is the install base of the OS—how many users have devices running the OS that can install the app. Developers will

---

[552] MORNINGSTAR EQUITY ANALYST REPORT, APPLE INC 2 (Aug. 6, 2020) (on file with Comm.).

[553] Neth. Auth. for Consumers & Mkts. Study at 21, 55–56.

[554] Interview with Source 407 (Sept. 10, 2020).

[555] Submission from Source 385, to H. Comm. on the Judiciary, 2 (Sept. 18, 2020) (on file with Comm.).

[556] Data and Privacy Hearing at 8 (statement of Maurice E. Stucke, Prof. of Law, Univ. of Tennessee, and Ariel Ezrachi, Slaughter and May Prof. of Competition Law, Univ. of Oxford, Fellow, Pembroke Coll., Dir., Oxford Ctr. For Competition Law and Pol'y); *see also* Richard Trenholm, *Elegant Ubuntu Touch OS Impresses for Phones and Tablets (Hands-On)*, CNET (Feb. 28, 2013), https://www.cnet.com/reviews/ubuntu-touch-preview/; Adrian Covert, *The Ubuntu Smartphone (Which No One Will Use) Is a Glimpse of the Future*, CNN BUS. (Jan. 2, 2013), https://money.cnn.com/2013/01/02/technology/mobile/ubuntu-smartphone-linux/ (explaining success in the mobile market required more than merely building a superior OS to Android or iOS, it also requires a robust app ecosystem).

[557] MORNINGSTAR EQUITY ANALYST REPORT, APPLE INC 3 (Aug. 6, 2020) (on file with Comm.).

[558] Interview with Source 407 (Sept. 10, 2020).

**App. 177**

not build apps for an OS with few users.[559] This reinforces the power of dominant mobile operating systems. The more consumers use the OS, the more developers will build apps for the OS, increasing the value of the OS for users and attracting more consumers.[560] Consumers are unlikely to purchase a device with an OS that cannot run the most popular apps and lacks a robust app ecosystem comparable to what is offered by iOS and Android. Due to the dominance of Apple and Google in the mobile OS and app store markets, "there is little incentive for app developers to go the trouble and expense of ensuring their apps work on any smaller rival operating systems," because the user base would be too small.[561]

Additionally, the third-party app ecosystem advantages of iOS and Android make new market entry unlikely. The U.K.'s Competition and Markets Authority explained that, before the iPhone, third-party apps were not part of the mobile experience. As a result, new entrants like Apple could enter the market and compete by offering a superior product. But now, there are "millions of apps that have been written for Apple's iOS and Google's Android, making it hard for a new entrant mobile operating system to offer a competitive and attractive product."[562] The European Commission (E.C.) has similarly observed that strong network effects have created high entry barriers in the mobile OS market.[563]

Over the past decade, several large technology companies have attempted and failed to leverage their large user bases to compete against Apple and Google in the mobile OS market.[564] Facebook and Amazon both tried to enter the market with variants of Google's Android OS. Both companies quickly exited the market because consumers were mostly accessing Facebook and Amazon content through apps on iOS and Android devices.[565] Technology reviewers also expressed disappointment that

---

[559] *Id.*

[560] MORNINGSTAR EQUITY ANALYST REPORT, APPLE INC 3 (Aug. 1, 2020) (on file with Comm.).

[561] Dig. Competition Expert Panel Report at 29.

[562] *Id.* at 40.

[563] *See* Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine (July 18, 2018) https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

[564] *See* GSMA INTEL., GLOBAL MOBILE TRENDS 2020: NEW DECADE, NEW INDUSTRY? 26 (2019), https://data.gsmaintelligence.com/api-web/v2/research-file-download?id=47743151&file=2863-071119-GMT-2019.pdf; Interview with Source 83 (June 30, 2020).

[565] *See* Ryan Mac, *What Amazon Can Learn from The Failed Facebook Phone*, FORBES (Jun. 17, 2014), https://www.forbes.com/sites/ryanmac/2014/06/17/what-amazon-can-learn-from-the-failed-facebook-phone/#7f7d402f47de; Roger Cheng, *Here's Why the Facebook Phone Flopped*, CNET (May 8, 2013), https://www.cnet.com/news/heres-why-the-facebook-phone-flopped/; Marcus Wohlsen, *The Amazon Fire Phone Was Always Going to Fail*, WIRED (Jan. 6, 2015), https://www.wired.com/2015/01/amazon-fire-phone-always-going-fail/; Austin Carr, *The Inside Story of Jeff Bezos' Fire Phone Debacle*, FAST CO. (Jan. 6, 2015), https://www.fastcompany.com/3039887/under-fire.

**App. 178**

Amazon's Fire Phone did not offer the same extensive library of apps and services as iOS or Android devices.[566]

Companies like Mozilla and Alibaba have also attempted to enter the mobile OS market. Mozilla unveiled its Firefox OS in 2013 and exited the market altogether by 2016.[567] In 2012, Chinese tech giant Alibaba developed a mobile OS called Aliyun for the Chinese market. However, Acer, Alibaba's hardware partner, abruptly canceled its collaboration with Alibaba before the launch of Acer's device running the OS[568]

Over the past decade, once-competitive mobile operating systems like Nokia, BlackBerry, and Microsoft struggled to survive as Apple and Google grew more dominant, eventually exiting the marketplace altogether. BlackBerry—once a leading mobile OS developer—now licenses the BlackBerry name to TCL to market TCL's smartphones. TCL's BlackBerry phones run on Android.[569] In the last quarter of 2016, Windows devices accounted for less than half of 1% of new smartphone sales.[570] In 2017 Microsoft abandoned its mobile OS business, and by that time, more than 99% of all new smartphones were running on iOS or Android and market observers expressed no confidence that new competition would emerge.[571] One key factor leading to Microsoft's withdrawal from the mobile

---

[566] *See* Austin Carr, *The Inside Story of Jeff Bezos' Fire Phone Debacle*, FAST CO. (Jan. 6, 2015), https://www.fastcompany.com/3039887/under-fire.

[567] *See* J. Sullivan, *Firefox OS: Looking Ahead*, MOZILLA BLOG (Jan. 6, 2014), https://blog.mozilla.org/blog/2014/01/06/firefox-os-looking-ahead/; Ingrid Lunden, *Mozilla Will Stop Developing And Selling Firefox OS Smartphones*, TECHCRUNCH (Dec. 8, 2015), https://techcrunch.com/2015/12/08/mozilla-will-stop-developing-and-selling-firefox-os-smartphones/; Chris Hoffman, *Mozilla Is Stopping All Commercial Development on Firefox OS*, PC WORLD (Sept. 28, 2016), https://www.pcworld.com/article/3124563/mozilla-is-stopping-all-commercial-development-on-firefox-os.html.

[568] *See* Don Reisinger, *Acer Taps Alibaba's Aliyun OS for New Smartphone*, CNET (Sept. 12, 2012), https://www.cnet.com/news/acer-taps-alibabas-aliyun-os-for-new-smartphone/; Edward Moyer, *Alibaba: Google Just Plain Wrong About Our OS*, CNET (Sept. 15, 2012), https://www.cnet.com/news/alibaba-google-just-plain-wrong-about-our-os/ ; Roger Cheng, *Alibaba: Google Forces Acer to Drop Our New Mobile OS*, CNET (Sept. 13, 2012), https://www.cnet.com/news/alibaba-google-forced-acer-to-drop-our-new-mobile-os/; T.C. Sottek, *Acer Cancels Phone Launch with Alibaba, Allegedly in Response to Threats from Google*, THE VERGE (Sept. 13, 2012), https://www.theverge.com/2012/9/13/3328690/acer-google-alibaba-phone; Dieter Bohn, *Google Explains Why It Stopped Acer's Aliyun Smartphone Launch (Updated)*, THE VERGE (Sept. 14, 2012), https://www.theverge.com/2012/9/14/3335204/google-statement-acer-smartphone-launch-aliyun-android; Jon Brodkin, *Google Blocked Acer's Rival Phone to Prevent Android "Fragmentation"*, ARS TECHNICA (Sept. 14, 2012), https://arstechnica.com/gadgets/2012/09/google-blocked-acers-rival-phone-to-prevent-android-fragmentation/.

[569] *See* Arjun Kharpal, *TCL Launches New $549 Smartphone Under BlackBerry's Banner, Featuring Android Software*, CNBC (Feb. 27, 2017), https://www.cnbc.com/2017/02/25/blackberry-keyone-launch-physical-keyboard-android-specs-price.html.

[570] *See* Press Release, Gartner, Gartner Says Worldwide Sales of Smartphones Grew 7 Percent in the Fourth Quarter of 2016 (Feb. 15, 2017), https://www.gartner.com/en/newsroom/press-releases/2017-02-15-gartner-says-worldwide-sales-of-smartphones-grew-7-percent-in-the-fourth-quarter-of-2016).

[571] Tom Warren, *Windows Phone Dies Today*, THE VERGE (July 11, 2017), https://www.theverge.com/2017/7/11/15952654/microsoft-windows-phone-end-of-support; *see also* Press Release, Gartner, Gartner Says Worldwide Sales of Smartphones Grew 7 Percent in the Fourth Quarter of 2016 (Feb. 15, 2017), https://www.gartner.com/en/newsroom/press-releases/2017-02-15-gartner-says-worldwide-sales-of-smartphones-grew-7-

**App. 179**

marketplace was that developers were reluctant to develop apps for a third mobile operating system when already building apps for iOS and Android.[572] These market dynamics remain in place today.

### F.    Digital Mapping

Digital mapping provides users with virtual maps of the physical world. There are two sets of customers for mapping services: consumers, who use map products for navigation, and businesses, who use underlying mapping libraries and design tools to produce customized maps. With the proliferation of smart devices, digital mapping has become a critical resource for users and businesses alike.

The essential input for both types of services is a digital-map database. Mapping data can be gathered in a few ways, including through the collection of imagery from satellites and streets, the tracking of global positioning system (GPS) traces, and the collation of public domain mapping data. Building a digital map database is costly and time-intensive, requiring significant investment in mapping technologies and data collection.[573] The leading provider of digital mapping data is Google. Smaller providers include HERE and TomTom, as well as open-source providers like OpenStreetMap (OSM).[574] Waze, which developed navigable maps by relying on driver-generated live maps and crowd-sourced updates, was an additional mapping provider purchased by Google in June 2013.

Consumer-facing providers of mapping services license map databases and layer search and traffic technologies atop of the map data. Consumers use these search and traffic tools either through a standalone turn-by-turn navigation service that licenses the underlying data—like MapQuest or Bing Maps—or through a vertically integrated provider, like Google Maps, Waze, or Apple Maps.[575] The dominant providers of consumer mapping applications are Google Maps and Google-owned Waze, followed by Apple Maps and MapQuest.[576] Google and Apple set their mapping products as the default

---

percent-in-the-fourth-quarter-of-2016; James Vincent, *99.6 Percent of New Smartphones Run on Android or iOS*, THE VERGE (Feb. 16, 2017), https://www.theverge.com/2017/2/16/14634656/android-ios-market-share-blackberry-2016.

[572] Dig. Competition Expert Panel Report at 40.

[573] Innovation and Entrepreneurship Hearing at 6 (response to Questions for the Record by Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.); Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04208423 (on file with Comm.) (showing that prior to being acquired by Google, a Waze presentation stated, "There are very few companies in the world that are making navigable maps, and the process is very expensive."); Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000628 (on file with Comm.).

[574] Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000628 (on file with Comm.).

[575] Although Apple Maps licensed U.S. mapping data from TomTom upon launching in 2012, in 2015 it began developing its own map database by deploying cars with cameras and sensors to collect images and mapping data that it could combine with anonymized iPhone data to create an independent underlying base map. Lauren Goode, *The Biggest Apple Maps Change Is One You Can't See*, WIRED (Jan. 31, 2020), https://www.wired.com/story/apple-maps-redesign/.

[576] Submission from Source 572, to H. Comm. on the Judiciary, 1 (Oct. 29, 2019) (on file with Comm.) ("For vehicle navigation, and excluding OEM-provided in-console automotive systems, Google's Waze and Google Maps are currently

**App. 180**

options on Android and iOS products—their respective devices—which also enables them to maintain and expand their market position.

These providers of consumer mapping services generally do not charge users a monetary fee. Instead, they monetize maps through selling location-based advertisements or by subsidizing consumer-facing mapping with enterprise contracts or other lines of business. Although data on the value of the consumer-facing digital mapping industry is not publicly available, analysts have estimated that Google Maps earned Google around $2.95 billion in revenue last year and that the standalone product is worth up to $60 billion.[577]

Business-facing providers serve map design tools and mapping libraries required to produce customized maps. The leading providers of business-to-business mapping software are Google, HERE, Mapbox, and TomTom, followed by Apple Maps, Bing, ESRI, Comtech, and Telenav.[578] Some of these providers operate in more specialized markets. For example, HERE and TomTom primarily serve automotive customers, while ESRI provides desktop GIS software used by governments and spatial analysts.[579]

Market participants cite several factors that privilege dominant digital map incumbents and impede entry. First is the capacity of dominant firms to invest heavily in creating mapping databases and technology without needing to turn a profit. For example, prior to its acquisition by Google, Waze executives observed that Google Maps had "disrupted the market" primarily through "financial disruption," namely that it had "unlimited funds" and was giving away Google Maps to users for free.[580] Startups seeking to enter this market yet lacking the financial cushion that permits them to incur losses while developing the product will be at a relative disadvantage.

Another factor is that incumbents that are integrated can collect relevant map and location data from across complementary lines of business, feeding this data back into mapping. For example, one market participant noted that Google "collects an unparalleled amount of data used in digital mapping from users of its dominant search engine and Android smartphone OS."[581] Another market participant

---

the most used consumer apps by a wide margin."); Submission from Source 333, to H. Comm. on the Judiciary, 2 (Oct. 21, 2019) (on file with Comm.).

[577] Daniel Schaal, *Google Maps Poised to Be an $11 Billion Business in 4 Years*, Skift (Aug. 30, 2019), https://skift.com/2019/08/30/google-maps-poised-to-be-an-11-billion-business-in-4-years/; Ross Sandler, Barclays, Alphabet Inc., Steady Compounder, With Plenty of Innovation Ahead 20 (Mar. 28, 2017) (on file with Comm.).

[578] Submission from Source 572, to H. Comm. on the Judiciary, 1 (Oct. 29, 2019) (on file with Comm.).

[579] *Id.*

[580] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04209630 (Nov. 2012) (on file with Comm.)

[581] Submission from Source 531, to H. Comm. on the Judiciary, Source 531-000624 (on file with Comm.); Production of Google, H. Comm. on the Judiciary, GOOG-HJC-04211078 (July 24, 2013) (on file with Comm.) Google made a similar observation in July 2013. In a letter responding to the FTC's request for information relating to its acquisition of Waze,

**App. 181**

stated that Google's dominant position in search and advertising incentivizes businesses to closely monitor and maintain the accuracy of their information in Google's systems, "leading to a dynamic by which Google enjoys a free, crowdsource effort to improve and maintain their data's quality," thereby improving the quality of Google Maps.[582] Firms without concurrent positions in web search and the smartphone market are comparatively disadvantaged.

A third factor is the superior distribution that integrated firms in maps-adjacent lines of business can provide their own mapping product at the expense of third-party mapping products. Google gives Google Maps default placement on its Android devices, while Apple does the same with Apple Maps on iOS devices. Together, Android and iOS account for 99% of the smartphone operating systems in the United States.[583]

Market participants explained that the default placement of Google Maps on Android devices also disadvantages third-party mapping providers technologically. If a developer chooses a third-party mapping provider when building an app, downloading that app on Android would involve downloading both the app features and the mapping functionality. Choosing to develop the app with Google Maps, by contrast, would reduce the app's file size on Android, as Google Maps is already on the device.

Lastly, incumbents benefited from a lack of prohibitions on collecting location data—an advantage that startups today lack given the passage of new data restrictions that limit the development of digital mapping technology. Notably, many of these rules came into existence following public outrage prompted by Google Street View. By the time these rules were implemented, Google had already mapped out most of the planet.

Except for Apple's independent mapping database, there has been no recent entry in the market for underlying mapping data. Similarly, the list of leading providers of consumer mapping services and business-to-business services has mostly been unchanged since 2013.

<p style="text-align:center">G.     Cloud Computing</p>

Cloud computing refers to the service that enables remote storage and software programs on demand through the Internet. Prior to cloud computing, data was stored locally on a computer's hard drive, in a local server room, or remote data center where companies managed all of the I.T.

---

Google wrote, "Apple has access to as much or more US GPS traffic data than Google does, with tens of millions of Apple iOS users potentially providing Apple with real-time traffic speed and flow information throughout the country.".

[582] Submission from Source 572, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

[583] Neth. Auth. for Consumers & Mkts. Study at 15.

**App. 182**

services.[584] Today, companies can essentially rent "network access to a shared pool of configurable computing resources . . . [including] networks, servers, storage, applications and services."[585] As a result of the convenience and cost savings associated with the ability to scale up or down on demand, cloud computing has grown into one of the technology sector's largest and most lucrative businesses.[586] It has enabled the growth of enterprise businesses such as Netflix, Airbnb, Lyft, Slack, and the Weather Channel, as well as new startups that are not yet household names.

Cloud computing is a critical input to many of the digital markets the Subcommittee investigated, providing infrastructure for online commerce, social media and networking, digital advertising, voice assistants, and digital mapping—technologies that benefit from dynamic storage and computational power. In a future with smart homes, autonomous vehicles, and artificial intelligence applications in nearly every sector from agriculture to healthcare, understanding the dynamics of the cloud market becomes critical. These ground-breaking technologies work because they can access and analyze massive amounts of data in real time, companies looking to innovate in these spaces will struggle to rely solely on traditional I.T. and will likely turn to public cloud vendors. The testimony of Morgan Reed on behalf of ACT, the App Association, illustrates how important "continuous cloud access [is] to create custom software solutions that adapt quickly and rival the products and services of larger SaaS companies."[587]

Cloud computing service models vary by vendor, and new models are being developed continually. The Subcommittee's investigation focused on the dynamics between the three models most referenced and defined by the National Institute of Standards and Technology.

---

[584] *See generally* HEIDI M. PETERS, CONG. RESEARCH SERV., R45847, THE DEPARTMENT OF DEFENSE'S JEDI CLOUD PROGRAM (2019).

[585] *See* NAT'L INST. OF STANDARDS AND TECH, THE NIST DEFINITION OF CLOUD COMPUTING 2 (Sept. 2011), https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf.

[586] MARKET SHARE ANALYSIS; IAAS AND IUS, WORLDWIDE (July 5, 2019); Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00219352 (on file with Comm.).

[587] Innovation and Entrepreneurship Hearing at 7 (statement of Morgan Reed, Pres., ACT | The App Ass'n).

**App. 183**

**Cloud Computing Services**[588]



In the Software as a Service (SaaS) model, the user accesses applications from various client devices "through either a thin client interface, such as a web browser, or a program interface."[589] Common examples include Google Docs, Slack, and Mailchimp. In the Platform as a Service (PaaS) model, the user, most often a cloud application developer, builds new applications by accessing programming languages, libraries, services, and tools supported by the cloud provider.[590] Common PaaS tools include AWS Elastic Beanstalk, Google App Engine, and Salesforce's Heroku. In the Infrastructure as a Service (IaaS) model, the user, most often an engineer, can deploy and run software, which can include operating systems and applications while the cloud provider provisions fundamental computing resources including processing, storage, and network applications.[591] Common IaaS tools include Amazon Elastic Compute Cloud (EC2), Google Compute Engine, and Microsoft Azure.[592]

---

[588] Prepared by the Subcomm. based on data from Nat'l Inst. of Standards and Tech.

[589] NAT'L INST. OF STANDARDS AND TECH., THE NIST DEFINITION OF CLOUD COMPUTING 2 (Sept. 2011), https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-145.pdf.

[590] *Id.* at 2.

[591] *Id.* at 3.

[592] HEIDI M. PETERS, CONG. RESEARCH SERV., R45847, THE DEPARTMENT OF DEFENSE'S JEDI CLOUD PROGRAM 1 (2019).

**App. 184**

SaaS, PaaS, and IaaS can be deployed through several different models.[593] Subcommittee staff focused primarily on the market for public cloud services in which the cloud provider provisions infrastructure for open use by the general public. The infrastructure resides on the premise of the cloud provider.[594]

To review market dynamics, Subcommittee staff examined two types of cloud service providers. The first type is infrastructure providers. Amazon Web Services (AWS), Microsoft Azure, and Google Cloud Platform (GCP) are the most common domestic infrastructure providers. They offer customers IaaS, PaaS, and SaaS offerings through their customer consoles or portals, but are distinct in their ability to offer IaaS at scale. This Report refers to them as infrastructure providers. They also operate online marketplaces for third-party software vendors to list cloud offerings that integrate with their infrastructure services.

The second type is third-party software vendors, sometimes referred to as Independent Software Vendors (ISVs). Companies such as Salesforce, MariaDB, and The Apache Foundation provide operating systems, databases, security, and applications. Third-party software can be delivered as a packaged software or managed service. When a third party provides packaged software, it can be installed onto a customer's existing cloud infrastructure. The packaged software can be listed on the infrastructure provider's marketplace or through a third-party vendor's website.

When third-party software is sold as a managed service, the customer pays a subscription based on the number of services used, and the third-party software vendor manages all the underlying infrastructure.[595] In this scenario, the software has become a cloud offering sold "as-a-service." The underlying infrastructure can be owned and managed by the third-party software vendor or the third-party software vendor may have contracts with an infrastructure provider, and in some cases, the software vendor uses a combination of owned and rented servers. For example, Salesforce's Heroku—a PaaS product—is built using AWS IaaS offerings.[596] When a company purchases a Heroku license, Salesforce's use of AWS is included in the price. In the case that a PaaS or SaaS offering uses its own infrastructure, it is likely it will need to be able to integrate with products managed by the infrastructure providers as it grows and, to expand to new regions, it will need to contract with infrastructure providers.[597]

---

[593] NAT'L INST. OF STANDARDS AND TECH., THE NIST DEFINITION OF CLOUD COMPUTING 3 (Sept. 2011).

[594] Id.

[595] Id.

[596] See e.g., Kelly Cochran, Simplify Your Customer Engagement with AWS and Salesforce Heroku, AWS PARTNER NETWORK (APN) BLOG (June 9, 2017), https://aws.amazon.com/blogs/apn/simplify-your-customer-engagement-with-aws-and-salesforce-heroku/.

[597] Mark Innes, Salesforce is live on AWS Cloud Infrastructure in Australia, SALESFORCE BLOG (Oct. 17, 2017), https://www.salesforce.com/au/blog/2017/10/salesforce-is-live-on-aws-cloud-infrastructure-in-australia.html. For example, for many years Salesforce.com's CRM ran on self-managed infrastructure but when the company expanded to Australia in 2007, they entered into a contract with AWS.

**App. 185**

In 2018, public cloud services, including IaaS, PaaS, SaaS, and management services, accounted for $182.4 billion of the overall $3.7 trillion information technology (I.T.) infrastructure spending worldwide—less than 1%.[598] Despite being a small fraction of I.T. spending, Gartner projects the market size of the cloud services industry to increase at nearly three times the rate of overall I.T. services through 2022, to reach $331 billion.[599] AWS is the market leader, capturing approximately 24% of the U.S. spend on cloud computing in 2018.[600]

Amazon—the leading cloud platform—is dominant in the cloud market due to the concentration of the IaaS market.[601] According to Gartner, "the worldwide IaaS market grew 31.3% in 2018 to total $32.4 billion, up from $24.7 billion in 2017."[602] As seen in the chart below, AWS is the unquestioned leader in the cloud computing infrastructure market, with triple the market share of Microsoft. Alibaba, Google, and Microsoft are growing at the fastest rates—rates double that of Amazon. Gartner expects the IaaS Worldwide Public Cloud Service Revenue to grow faster than any other set of services, and to be worth $76.6 billion in 2022.[603]

---

[598] Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 6 (July 26, 2019) (on file with Comm.).

[599] Press Release, Gartner, Gartner Says Global IT Spending to Reach $3.7 Trillion in 2018 (July 29, 2019), https://www.gartner.com/en/newsroom/press-releases/2019-07-29-gartner-says-worldwide-iaas-public-cloud-services-market-grew-31point3-percent-in-2018.

[600] Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 6 (July 26, 2019) (on file with Comm.).

[601] Submission from Source 170 to H. Comm. on the Judiciary, 6 (Nov. 21, 2011) (on file with Comm.).

[602] Press Release, Gartner, Gartner Forecasts Worldwide Public Cloud Revenue to Grow 17.5 Percent in 2019 (Apr. 2, 2019), https://www.gartner.com/en/newsroom/press-releases/2019-07-29-gartner-says-worldwide-iaas-public-cloud-services-market-grew-31point3-percent-in-2018.

[603] *Id.*

**App. 186**



**IaaS Worldwide Public Cloud Services Revenue (Millions of US Dollars)[604]**

Industry reports suggest that the cloud computing market is consolidating around three providers domestically—AWS, Microsoft Azure, and Google Cloud Platform.[605]

Market leaders benefit from early-mover advantage coupled with network effects and high switching costs that lock-in customers. AWS pioneered cloud computing, launching officially in March 2006 with Simple Storage Service (S3) and Elastic Compute Cloud (EC2), two fundamental IaaS offerings.[606] Microsoft announced Azure in October 2008 along with core services that made up the "Azure Services Platform."[607] Google's first public cloud service, App Engine, a PaaS offering, was released in 2008.[608] Google's Compute Engine, an AWS Elastic Compute Cloud and Microsoft Azure Virtual Machines competitor, went live as a preview in June 2012.[609]

---

[604] Prepared by Subcomm. based on Press Release, Gartner, Gartner Forecasts Worldwide Public Cloud Revenue to Grow 17.5 Percent in 2019 (Apr. 2, 2019), https://www.gartner.com/en/newsroom/press-releases/2019-07-29-gartner-says-worldwide-iaas-public-cloud-services-market-grew-31point3-percent-in-2018.

[605] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00219350 (July 5, 2019) (on file with Comm.).

[606] *What's New*, AMAZON (Oct. 4, 2006) https://aws.amazon.com/about-aws/whats-new/2006/.

[607] Press Release, Microsoft, Microsoft Unveils Windows Azure at Professional Developers Conference (Oct. 27, 2008), https://news.microsoft.com/2008/10/27/microsoft-unveils-windows-azure-at-professional-developers-conference/#IP8XlBTCMpvORgaV.97.

[608] Paul McDonald, *Introducing Google App Engine + our new blog*, GOOGLE DEVELOPER BLOG (Apr. 7, 2008), http://googleappengine.blogspot.com/2008/04/introducing-google-app-engine-our-new.html.

[609] Ryan Lawler, *Google Launches Computer Engine to Take on Amazon Web Services*, TECHCRUNCH (June 28, 2012), https://techcrunch.com/2012/06/28/google-compute-engine/.

**App. 187**

A 2010 Google strategy document predicted that the cloud computing market would concentrate. An internal document titled "Where Industry is Headed in 5 Years," stated that there would be some concentration in the market within five years, with cloud service providers consisting of Google, Amazon, Microsoft, and a hybrid of Cisco and VMWare.[610] According to this document, each company would offer cloud-based apps and other tools.[611] Later, in a 2018 strategy document, Google emphasized the importance of first-mover advantage in the space, writing "AWS and Azure have had more years to gain customers, and cloud customers typically grow [in] scale over time; in contrast" reiterating the tendency for cloud customers to choose a single vendor as their primary cloud service provider.[612] In a roundtable held by Subcommittee Chairman Cicilline, Mark Tracy, the CEO of Cloudacronomics, described these concerns:

> We pull down terabytes of data, and they have to upload it to the cloud to improve farmers practices. The two cloud providers are AWS and Azure. Since so many businesses and so much value can be extracted by improving health and data, this concentration of cloud services is a concern.[613]

As seen in the figure below, IaaS prices have decreased over time, with the three dominant U.S. providers able to price their services at less than $30/GB RAM according to a 2018 RBC Capital Markets report.[614] Market participants reference economies of scale and a focus on increasing revenue from PaaS and SaaS offerings, as opposed to IaaS offerings, as an explanation for this trend. IaaS vendors benefit from economies of scale both with regards to the size of the datacenters and the ability to operate multiple data centers across the globe. To enter the market and reach the economies of scale needed to compete with the incumbents, infrastructure providers must invest significant capital and be able to offer competitive prices to lure customers.

---

[610] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01777633 (on file with Comm.).

[611] *Id.*

[612] *Id.* at GOOG-HJC-04167638–66 (June 3, 2019).

[613] Rhode Island Roundtable (Mar. 17, 2020) (statement of Mark Tracy, CEO, Cloudacronomics) (on file with Comm.).

[614] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00183326 (Dec. 4, 2018) (on file with Comm.) (showing a 2018 RBC Capital Markets Report which analyzed the cost of IaaS across five usage scenarios: Standard, High Compute, High Memory, High Storage, High Input/Output (I/O) and three workload sizes, small, medium and large, to create 15 cases).

**App. 188**



Average Monthly Costs Per GB RAM Across 15 Use Cases[615]

The "cloud" is a system of cables connected to a wide network of data centers—all underground, underwater, or in large industrial buildings. Building data centers in dozens of regions worldwide costs billions of dollars.[616] Market participants described the investment as "bigger than building a cellular network" and only "for countries and major companies."[617]

Two additional inputs that can provide a barrier to becoming a leading infrastructure provider are compliance certifications and reputation. Federal Risk and Authorization Management Program (FedRAMP) authorization is required for any service that holds U.S. federal data.[618] The

---

[615] Prepared by Subcomm. based Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00183326 (Dec. 4, 2018) (on file with Comm.) (2018 RBC Capital Markets Report which analyzed the cost of IaaS across five usage scenarios: Standard, High Compute, High Memory, High Storage, High Input/Output (I/O) and three workload sizes, small, medium and large, to create 15 cases).

[616] Submission from Source 170, to H. Comm. on the Judiciary, 8 (Nov. 21, 2011) (on file with Comm.).

[617] Interview with Source 144 (April 17, 2020).

[618] OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, SECURITY AUTHORIZATION OF INFORMATION SYSTEMS IN CLOUD COMPUTING ENVIRONMENTS (2011), https://www.fedramp.gov/assets/resources/documents/FedRAMP_Policy_Memo.pdf.

**App. 189**

FedRAMP authorization process can be resource and time-intensive as vendors have to undergo a process of technical and security reviews and audits.[619]

When a customer chooses to use cloud computing, they must trust that their data will be secure and available to access quickly. The leading cloud infrastructure providers are major technology companies that handle massive amounts of data and run large technical operations before offering managed services. Market participants have shared with Subcommittee staff that a smaller company attempting to enter the IaaS market to contest these firms must convince large customers that they can provide a reliable service that is compliant with industry-specific regulations.[620]

Market participants and industry reports highlight that IaaS offerings have become commoditized. To compete, infrastructure providers must offer a range of PaaS and SaaS services to attract users and developers to their platform.[621] First-party PaaS and SaaS offerings are made available in the infrastructure provider's console. As of this Report, AWS, Azure, and GCP all list over 100 first-party cloud offerings.[622] Each cloud infrastructure provider has taken its own approach to building its platform, but all involve acquisitions, in-house software development, and the use of open-source software. Google and Azure have also relied on their company's existing products—Microsoft leveraging its Office 360 Suite and Google leveraging its collection of APIs.[623]

In the case that a new entrant can overcome this entry barrier, it must also invest substantial resources to overcome network effects within the market. Infrastructure providers benefit from network effects—the more customers on a platform, the more third parties build services that integrate well with that platform leading to more services to attract customers. Amazon, Microsoft, and Google all have hundreds of products listed in their third-party marketplace, while Amazon lists 9,250.[624] In interviews with Subcommittee staff, third-party software vendors said that they had little choice but to integrate their products with the incumbents, most notably, AWS.

Cloud infrastructure providers also need to ensure that the knowledge and expertise of their platform's technology are available to their customers. To achieve this, cloud infrastructure providers launch partner networks that include consulting firms trained to help enterprise customers move to the

---

[619] *Get Authorized: Joint Authorization Board*, FedRAMP, https://www.fedramp.gov/jab-authorization/ (last visited on Sept. 26, 2020).

[620] Interview with Source 407 (Sept. 10, 2020).

[621] Submission from Source 264, to H. Comm. on the Judiciary, 58 (Nov. 21, 2011) (on file with Comm.).

[622] *AWS Marketplace*, Amazon https://aws.amazon.com/marketplace (last visited on Oct. 4 2020); *Find solutions to support innovation*, Microsoft Azure https://azure.microsoft.com/en-us/marketplace/ (last visited on Oct. 4, 2020); Google Cloud Platform, https://console.cloud.google.com/marketplace (last visited on Oct. 4, 2020).

[623] Submission from Source 170, to H. Comm. on the Judiciary (Nov. 21, 2011) (on file with Comm.); Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02456801 (2010) (on file with Comm.).

[624] *AWS Marketplace*, Amazon https://aws.amazon.com/marketplace (last visited on Oct. 4, 2020).

**App. 190**

public cloud, such as AWS Partner Network (APN) Consulting Partners[625] and Microsoft Solution Providers.[626] Cloud infrastructure providers also offer trainings and exams to certify members of the workforce as proficient in various uses of their technology. Additionally, infrastructure providers have programs to support third-party software vendors working to integrate with the infrastructure provider's cloud.

Many market participants interviewed by Subcommittee staff believe that surpassing the incumbents in the market will be challenging because of the potential for vendor lock-in. Other evidence reviewed by Subcommittee staff bolsters this concern, suggesting that lock-in exists because switching costs for cloud computing customers are high.[627]

Subcommittee staff has identified several common techniques infrastructure providers use to initially lock-in customers, including contract terms, free tier offerings, and egress fees. The first is long-term contracts. In several responses to the Committee's requests for information, third parties explained they have contracts lasting from 3-to-5 years with the infrastructure providers.

Another common technique is using free tier products, where each cloud platform offers a free tier of services ranging from always free to trial offers.[628] Market participants suggest that while the free tier products vary slightly among the major firms, they are relatively similar. When a customer's free trial expires, it is faced with switching to another provider or starting to pay for service. Switching requires an investment of time and resources to adapt to the new service provider, as well as possibly paying egress fees to the prior vendor. As a result, customers may decline to switch at the conclusion of free trials.

Whether a customer begins using cloud on free tier products or not, once they have substantially built and migrated to a platform, they face high switching costs in the form of fees to move the data, along with the technical and labor costs associated with switching the data. When a company moves data into the cloud from hard drives or private servers, they are often charged ingress fees, which are generally low or free.[629] When a company, however, chooses to move data to another infrastructure provider, they are charged an egress fee. Egress fees vary slightly by company and region.

---

[625] *Partners*, AMAZON, https://aws.amazon.com/partners/ (last visited on Sept. 26, 2020).

[626] *Solution Providers*, MICROSOFT, https://www.microsoft.com/en-us/solution-providers/home (last visited on Oct. 4, 2020).

[627] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04215099 (Dec. 31, 2018) (on file with Comm.).

[628] *See, e.g.*, *AWS Free Tier*, AMAZON, https://aws.amazon.com/free/ (last visited on Oct. 4, 2020).

[629] *All Network Pricing*, GOOGLE CLOUD, https://cloud.google.com/vpc/network-pricing (last visited on Oct. 4, 2020).

Market participants explain that egress fees are often not transparent and are sometimes charged even when data is not leaving the datacenter.[630] One market participant said that these fees "can create significant financial barriers to migrating away from particular cloud storage providers."[631]

Additionally, when a customer decides to move any of its operations to a different infrastructure provider, it often must overcome technical design challenges. Several market participants spoke to the challenges of finding cloud developers that know the underlying technology of multiple cloud infrastructures as a barrier to both switching, either from one cloud to another or to set up multi-cloud operations. As one third party describes, "businesses often have to calibrate a complex set of technical frameworks, settings, and customized interfaces to adapt their business to the potentially unique way the cloud storage provider has chosen to operate their service."[632] For example, in an investor statement in 2020, Snap explained:

> [T]he vast majority of our computing [runs] on Google Cloud and AWS, and our systems are not fully redundant on the two platforms. Any transition of the cloud services currently provided by either Google Cloud or AWS to the other platform or to another cloud provider would be difficult to implement and will cause us to incur significant time and expense.[633]

When asked about lock-in, many market participants discussed how in response to the rise of a few dominant platforms in the cloud market, new strategies have emerged to increase portability between vendors and allow customers to use multiple clouds. Market participants note, however, that today interoperability is a challenge, and it is unclear how cooperative dominant cloud infrastructure providers will be in supporting partnerships and standards to facilitate these strategies. Given the current trends towards concentration in the cloud infrastructure market, further scrutiny of the role standards play toward decreasing switching costs and enabling portability and interoperability is warranted.

Finally, Subcommittee staff interviewed market participants about related competition concerns facing third-party software vendors. Many third-party software vendors compete with first-party products listed in the infrastructure provider's console. Market participants explain that these competitive offerings are often the first products customers see because they are displayed within the customer's existing console in a format that makes it easier for users to add to their existing cloud

---

[630] Interview with Source 465 (May 27, 2020).

[631] Submission from Source 264, to H. Comm. on the Judiciary, 6 (Nov. 21, 2011) (on file with Comm.).

[632] *Id.* at 5.

[633] Snap Inc., Annual Report (Form 10-K) 11 (Dec. 31, 2019), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001564408/0cfebc98-816e-44ac-8351-5067b4f88f0c.pdf.

**App. 192**

stack, seamlessly including the product in their billing and licenses and with minimal technical set-up.[634]

As a result, it is difficult for customers to compare prices and features included in the offerings when they are not listed side-by-side. Although third-party vendors can sell their service directly to consumers through their own websites, many smaller cloud vendors use the marketplaces of the dominant infrastructure providers to reach customers, which require fees and are subject to competition concerns that are similar to other marketplaces examined by Subcommittee staff during the investigation. Market participants have raised concerns that cloud infrastructure providers can preference their own offerings, or offer these products with exceedingly steep discounts, making it difficult for third-party software vendors with fewer products to compete.[635]

Significantly, because the leading infrastructure providers have access to competitively significant data in the marketplace, they have insight into usage metrics regarding any managed service that runs on their infrastructure.[636] Market participants told the Subcommittee that they have concerns that this data can be used by infrastructure providers to make decisions regarding which types of software to acquire or replicate to offer through their first-party console.[637]

<div align="center">

### H.   Voice Assistant

</div>

Voice assistants act as a user interface that enables exchanges between computing devices through a person's voice.[638] Today users can ask their electronic devices to play the morning news or start a conference call.[639] When combined with smart speakers, voice assistants can become a gateway to the internet, and can also be used to connect other "smart" devices, such as lighting, thermostats, security monitors, and even kitchen appliances.[640] While voice assistants began as mobile phone apps, they have become integrated into other devices, including cars and homes.[641]

---

[634] *Getting Started*, AMAZON WEB SERVICES, https://docs.aws.amazon.com/awsaccountbilling/latest/aboutv2/billing-getting-started.html (last visited on Oct. 4, 2020).

[635] Submission from Source 170, to H. Comm. on the Judiciary, 7 (Oct. 18, 2019) (on file with Comm.).

[636] Innovation and Entrepreneurship Hearing at 93 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC), 44–45 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[637] *See* Alistair Barr, *Amazon Finds Startup Investments in the 'Cloud*,*'* REUTERS (Nov. 9, 2011), http://www.reuters.com/article/amazon-cloud-idUSN1E7A727Q20111109.

[638] Submission from Source 301, to H. Comm. on the Judiciary, Source 301-00000080 at 2 (Oct. 15, 2019) (on file with. Comm.).

[639] Submission from Source 918, to H. Comm. on the Judiciary, 2 (Nov. 4, 2019) (on file with. Comm.).

[640] *Id.* at Source 918-0002029.

[641] Submission from Source 711, to H. Comm. on the Judiciary, Source 711-00000080 at 13 (Oct. 15, 2019) (on file with. Comm.).

**App. 193**

There are two types of voice assistants on the market: general and specialized. General voice assistants—such as Siri, Alexa, and Google Assistant—can respond to queries and interact with a range of applications. Specialized voice assistants focus on a specific vertical—such as healthcare or banking—where there is a limited vocabulary universe and more specific responses.[642] For example, Snips, a privacy-centric voice assistant owned by Sonos, specializes in commands for playing music on smart speakers.[643]

Today, voice assistants interact with humans by receiving specific requests and sending feedback through a voice response. The first step is to deliver the "wake word"—such as "hey, Siri" on iPhones—designed to activate the system. Once activated, a voice assistant can execute a command, which triggers a voice application.[644]

**Voice Assistant Ecosystem[645]**



Although there are multiple types of voice assistants within the ecosystem, Subcommittee staff focused primarily on voice assistant platform vendors and third-party hardware manufacturers, including smart speaker manufacturers and Internet of Things (IoT) compatible device manufacturers. The business model for these two groups varies. A Voice assistant platform vendors can monetize its platform by using its ecosystem to drive revenue to complementary lines of business such as e-

---

[642] *Id.*

[643] Thomas Ricker, *Sonos buys Snips, a privacy-focused voice assistant*, THE VERGE (Nov. 21, 2019), https://www.theverge.com/2019/11/21/20975607/sonos-buys-snips-ai-voice-assistant-privacy.

[644] Hyunji Chung, Jungheum Park & Sangjin Lee, *Digital Forensic Approaches for Amazon Alexa Ecosystem*, DFRWS (2017), https://arxiv.org/ftp/arxiv/papers/1707/1707.08696.pdf

[645] Prepared by the Subcomm. based on Hyunji Chung, Jungheum Park & Sangjin Lee, *Digital Forensic Approaches for Amazon Alexa Ecosystem,* DFRWS (2017), https://arxiv.org/ftp/arxiv/papers/1707/1707.08696.pdf

**App. 194**

commerce, search, or entertainment.[646] It can also charge voice-application developers to be the recommended application for a specific command.[647] As they become widely adopted, stores on voice assistant platforms—such as the "Alexa Skills Store"—can offer premium content and collect revenue share on payments.[648] Third-party hardware manufacturers generate income by selling hardware, and in some cases, by offering subscription services such as home monitoring.[649]

Voice assistants have grown in popularity over recent years due to technological advancements in natural language processing. Although the market is nascent, market participants and industry experts view voice-enabled devices as an opportunity to lock consumers into information ecosystems. The smartphone and smart speaker are the two main portals for voice assistants. Apple and Google lead in the smartphone market, and Amazon leads in the smart speaker market.[650] According to one consulting firm, of the 1.1 billion shipments of virtual assistants in 2019, Apple's Siri (35%) has the highest market share globally, followed by Google Assistant (9%) and Amazon Alexa (4%).[651] Although a significant share of shipments is attributed to Microsoft Cortana (22%) because of the popularity of Windows PCs globally, Cortana is generally not considered a voice assistant platform.[652]

Market participants emphasize that smart speakers represent an essential "hub" or gateway for smart homes and are driving voice-assistant adoption.[653] Smart speakers are estimated to currently have 35% U.S. household penetration, which is predicted to grow to 75% by 2025.[654] As of January 2019, Amazon had a significant lead in the U.S. market at 61.1%, followed by Google at 23.8%, Apple at 2.7%, and Sonos at 2.2%.[655]

---

[646] Production from Google, to H. Comm. on the Judiciary, GOOG-HJC-04257931 (Mar. 9, 2017) (on file with Comm.).

[647] Id.

[648] Id.

[649] Alison DeNisco Rayome, *How to Monetize Your IoT Project*, TECHREPUBLIC (June 20, 2018), https://www.techrepublic.com/article/6-steps-to-monetizing-your-iot-project/.

[650] Submission from Source 918, to H. Comm. on the Judiciary, Source 918-0002763 (Nov. 4, 2019) (on file with Comm.).

[651] Press Release, Futuresource Consulting, Virtual Assistants to Exceed 2.5 Billion Shipments in 2023 (Dec. 18, 2019) https://www.futuresource-consulting.com/press-release/consumer-electronics-press/virtual-assistants-to-exceed-25-billion-shipments-in-2023/.

[652] Id. Mary Jo Foley, *Microsoft CEO Nadella makes it official: Cortana is an app, not a standalone assistant*, ZDNET (Jan. 18, 2019), https://www.zdnet.com/article/microsoft-ceo-nadella-makes-it-official-cortana-is-an-app-not-a-standalone-assistant/.

[653] Production from Google, to H. Comm. on the Judiciary, GOOG-HJC-04258666 (Jan. 28, 2019) (on file with Comm.) ("Speakers still going to be very important. [company] cited stats that suggested that only 20% of their "smart home" customers are new to the category. And it's fair to say that many/most of these existing smart home customers started with sound.").

[654] *See generally* Submission from Source 918, to H. Comm. on the Judiciary (Nov. 4, 2019) (on file with Comm.).

[655] Id. at 7.

**App. 195**

A voice assistant platform vendor can expand its ecosystem by adding IoT devices and voice applications. Both IoT devices and voice applications can be first-party—owned by the voice assistant platform vendor—or third-party, if the vendor has set up services to allow for manufacturers to create voice assistant-enabled devices. Amazon's Alexa ecosystem, measured in terms of compatible IoT devices and voice applications, is the largest of the three primary ecosystems. In 2017, voice assistants made their first serious moves beyond smart speakers into other product categories.[656] The voice assistant-compatible device market is vast and includes kitchen appliances, security cameras, and even trash cans.[657]

Market participants suggest there are several barriers to entry to compete with general voice assistant platforms. These include overcoming the network effects early entrants have benefited from, including financial investment in hardware, software, and infrastructure, and the ability to sell voice assistant-enabled devices at a discount.

Like many platform-based businesses, the voice assistant market benefits from network effects. The more users on a platform, the more third-party devices and applications become available, which attracts more users to the platform.[658] These network effects for voice assistant platforms are amplified by machine learning and artificial intelligence (AI). Improvements in Natural Language Processing (NLP) and AI are expected to improve the quality of voice assistants and contribute to wider adoption.[659] Voice assistant technology improves at a faster rate when there are more users providing the voice samples needed to train AI. In testimony to the Subcommittee, Professors Maurice Stucke and Ariel Ezrachi describe this a "Learning-by-Doing." As they note:

> Learning–by–doing network effect is not limited to online searches, but will be present in any environment in which algorithms evolve and adapt based on experience, such, for example, the development of voice recognition or other instances based on machine learning.[660]

---

[656] Submission from Source 918, to H. Comm. on the Judiciary, Source 918-0002024 (Nov. 4, 2019) (on file with Comm.).

[657] *See, e.g.*, Christopher Mims, *All Ears: Always-On Listening Devices Could Soon Be Everywhere*, WALL ST. J. (July 12, 2018), https://www.wsj.com/articles/all-ears-always-on-listening-devices-could-soon-be-everywhere-1531411250.

[658] Submission of Source 918, to H. Comm. on the Judiciary, Source 918-0002025 at 12 (Oct. 15, 2019) (on file with Comm.).

[659] Submission of Source 711, to H. Comm. on the Judiciary, Source 711-00000080 at 12 (Oct. 15, 2019) (on file with Comm.).

[660] Data and Privacy Hearing at 6–7 (statement of Maurice E. Stucke, Prof. of Law, Univ. of Tennessee, and Ariel Ezrachi, Slaughter and May Prof. of Competition Law, Univ. of Oxford, Fellow, Pembroke Coll., Dir., Oxford Ctr. For Competition Law and Pol'y).

**App. 196**

The scale of users generating data is arguably the most important asset in terms of AI.[661] The incumbents have access to large data sets that—when combined with machine learning and AI—position them to benefit from economies of scope in the smart home.[662]

Competing as a voice assistant platform also requires significant financial resources. A firm must make significant investments to design and train a voice assistant, as well as acquiring the physical infrastructure: hardware and cloud computing. Additionally, incumbents have also acquired various firms that specialize in voice recognition and natural language processing, a functionality that is used in their voice assistants. For example, both Apple and Amazon acquired companies to develop their core voice recognition technologies, and every incumbent has continually invested in AI startups to improve their voice assistant ecosystem.[663]

Currently, voice assistant software is built on cloud computing infrastructure. In the case of Amazon Alexa and Google Assistant, the voice assistant platforms also own the underlying cloud infrastructure, AWS, and GCP, respectively. Market participants note that advancements in voice assistant ecosystems are beginning to rely on edge computing technology, which brings the computation and data storage closer to the device and is a technology in which the incumbent cloud market leaders have a head start.[664]

Market participants have also raised concerns about incumbent firms offering voice-enabled hardware—specifically hubs such as smart speakers—to both collect large amounts of personal user data and strengthen other lines of business. At the Subcommittee's field hearing, Sonos CEO Patrick Spence explained:

> Google and Amazon have flooded the market with dramatically price-subsidized products. Indeed, they make no pretense of the fact that the products themselves are money losers and they routinely give them away at steep discounts, even for free. It is difficult to predict the impact that voice assistants will have on search and e-commerce, but voice activated speakers have the potential to dramatically alter the way that consumers interact with the internet. We believe that Google and Amazon have been willing to forgo profits in smart speakers for this reason, in addition to their ability to monetize the valuable household data that these products vacuum up. And if voice purchasing and voice search do become the next big thing, they will own the market because their strategy is succeeding. Those two companies now control roughly 85% of

[661] Submission of Source 918, to H. Comm. on the Judiciary, Source 918-0002763 at 12 (Oct. 15, 2019) (on file with Comm.).

[662] Submission of Source 918, to H. Comm. on the Judiciary, 37 (Sept. 1, 2019) (on file with Comm.).

[663] *See, e.g.*, *How Big Tech Is Battling To Own the $49B Voice Market*, CB INSIGHTS (Feb. 13, 2019), https://www.cbinsights.com/research/facebook-amazon-microsoft-google-apple-voice/.

[664] FUTURE TODAY INST., 2020 TECH TRENDS REPORT (2020), https://futuretodayinstitute.com/2020-tech-trends/.

**App. 197**

the U.S. smart speaker market . . . It's not because their hardware businesses are profitable in and of themselves.[665]

As the voice assistant market expands, it may be difficult for users to switch between platforms. Because voice assistant platforms are not always interoperable, users would incur costs to purchase one or more new devices. Moreover, voice assistant technology is designed to learn its user's preferences over time. These preferences range from settings like billing information and default services for responding to music commands to more advanced learning like past voice commands and shopping history. As a voice assistant improves its "understanding" of its user, it may increase the costs associated with switching to another platform. As one market participant noted in a submission to the Subcommittee, "the user may become more dependent on that particular voice assistant and be far less likely to use a rival voice assistant that has not yet 'caught up' with the user's preferences."[666]

The design of most voice assistants—specifically on screenless devices—amplifies the ability of voice assistant platforms to favor their services as a default or as a response with limited choice.[667] This dynamic makes it easier for popular voice assistants to favor their first-party services.

There is also a significant potential for misuse of data to harm competition or consumers. Similar to other platforms, such as cloud and operating systems, voice assistant platforms collect and store users' interactions with the voice assistant.[668] During the investigation, several companies shared concerns that voice assistant platforms would be able to use this vantage to glean competitive insights from third-party voice applications or smart appliances that are performing well. As a result, platforms could use that data to acquire competitive threats or integrate their features into the company's product.

Privacy and data experts have also commented that the smart home ecosystem is some of the most sensitive data that can be collected.[669] Voice assistant platforms not only record voice interactions, but also receive information about the skills used—"whether a light is on or off. Or, if a customer links Alexa to a third-party calendar skill, Alexa may receive information about the events on the customer's calendar."[670] This raises significant concerns regarding whether a person has provided consent to data collection. Voice assistants not only collect information on the primary user, but also people in their environment, including children.

---

[665] Competitors Hearing at 3 (statement of Patrick Spence, CEO, Sonos, Inc.).

[666] Submission of Source 711, to H. Comm. on the Judiciary, Source 711-00000080 at 20 (Oct. 15, 2019) (on file with Comm.).

[667] *Id.* at 17.

[668] Innovation and Entrepreneurship Hearing at 86–87 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[669] *See generally* SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM (2019).

[670] Innovation and Entrepreneurship Hearing at 40 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

Finally, leaders in the voice assistant ecosystem set the rules for third parties. To make a voice assistant enabled device, market participants must comply with voice assistant platform vendor specifications. As Mr. Spence of Sonos noted in his testimony before the Subcommittee:

> To gain access to their platforms and integrate with their services, these companies issue all manner of take-it-or-leave-it demands, from early and technically detailed access to our product roadmaps, to proprietary business data, including sales forecasts, to waivers of essential contractual rights.[671]

The Subcommittee also heard from multiple voice assistant developers that have struggled to gain access to key functionality needed to build their applications, such as the unprocessed user commands.[672] While still developing, the voice assistant market shows early signs of market concentration.

## I.      Web Browsers

A web browser is software that retrieves and displays pages from the Internet. People often use browsers to navigate to and spend time on websites and to search the web. Most other activities online, whether it is on a mobile phone or a television screen, are made possible through a browser.[673]

Behind every browser is a "browser engine," also known as a layout engine or rendering engine. A browser engine is the central software component of a web browser, transforming content hosted on web servers into a graphic depiction that people can interact with. Browsers interpret control codes within web pages, which indicate the structure of the data, such as the beginning and end of an item, and the way to present it to the user, such as headings, paragraphs, lists, or embedded images. The browser engine takes this code to "draw the web page" on the user's screen and noting which parts of it are interactive. The non-engine components of the browser typically include the menus, toolbars, and other user-facing features, which are layered over top of the engine.[674]

Browsers abide by standards to ensure that anyone can properly use features within a website on any browser. For example, standards such as CSS and XML help ensure that a website functions the same in every browser.[675] Web browser standards organizations include the World Wide Web Consortium (W3C), Web Hypertext Application Technology Working Group (WHATWG), and

---

[671] Competitors Hearing at 4 (2020) (statement of Patrick Spence, CEO, Sonos, Inc.).

[672] Submission of Source 301, to H. Comm. on the Judiciary, Source 301-00000080 at 23 (Oct. 15, 2019) (on file with Comm.).

[673] Submission from Source 385, to H. Comm. on the Judiciary, 3 (Oct. 11, 2019) (on file with. Comm.).

[674] *Id.* at 4.

[675] *Standards*, W3C, https://www.w3.org/standards/ (last visited on Sept. 26, 2020).

**App. 199**

Internet Engineering Task Force (IETF). Through these organizations, stakeholders work in partnership to ensure that browser engines and web pages are interoperable.[676] W3C has become one of the most important organizations for browser standards. W3C standards undergo a rigorous review process prior to implementation.[677]

Browser vendors monetize their access to users, usually through search royalties. For example, whenever someone types a search query into the search bar on Firefox, Google records that action, and the Mozilla corporation receives a royalty.[678] Browsers also bring in ad revenues. For example, Brave sells advertisers the option to run desktop notification ads to users who choose to see ads.[679]

The browser market is highly concentrated. Google's Chrome and Apple's Safari control roughly 80% of the browser market.[680] As of August 2020, Chrome is the leader in the U.S. desktop browser market (58.6%), followed by Safari (15.8%), Edge (8.76%), Firefox (7.6%), and Internet Explorer (5.36%).[681] On mobile devices, Safari (55.5%) and Chrome (37.4%) have significant leads on their rivals, such as Samsung Internet (5.01%), Firefox (0.77%), and Opera (0.44%).[682] Additionally, the browser market has concentrated around three browser engines: Gecko, WebKit, and Blink, used in Firefox, Apple's Safari, and Google's Chrome, respectively.[683]

Google's hold on the browser market extends beyond Chrome. Google releases the code base used to make the Chrome browser as the free, open-source project Chromium.[684] Chromium is used in Microsoft's Edge browser, Amazon's Silk browser, Opera, and other browsers that are often referred to as "Chromium-based."[685] Similarly, Apple extends its power by mandating that all browser applications on the iPhone use Apple's browser engine, WebKit.[686]

---

[676] Submission from Source 993, to H. Comm. on the Judiciary (Oct. 11, 2019) (on file with. Comm.).

[677] *Process for 2020*, W3C, https://www.w3.org/wiki/Process2020 (last visited on Sept. 26, 2020).

[678] Innovation and Entrepreneurship Hearing at 42 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[679] *Expand your business with Brave Ads*, BRAVE, https://brave.com/brave-ads-waitlist/ (last visited on Sept. 26, 2020).

[680] *U.S. Browser Market Share*, STATCOUNTER https://gs.statcounter.com/browser-market-share/all/united-states-of-america (last visited on Sept. 26, 2020).

[681] *U.S. Desktop Market Share*, STATCOUNTER https://gs.statcounter.com/browser-market-share/desktop/united-states-of-america (last visited on Sept. 26, 2020).

[682] *U.S. Mobile Market Share*, STATCOUNTER, https://gs.statcounter.com/browser-market-share/mobile/united-states-of-america (last visited on Sept. 26, 2020).

[683] Submission from Source 993, to H. Comm. on the Judiciary, 5 (Oct. 11, 2019) (on file with. Comm.).

[684] THE CHROMIUM PROJECTS, https://www.chromium.org/.

[685] Submission from Source 993, to H. Comm. on the Judiciary, 3 (Oct. 11, 2019) (on file with. Comm.).

[686] Innovation and Entrepreneurship Hearing at 1–2 (response to Questions for the Record of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.).

**App. 200**

Browser competition has also led to the creation of a browser extension submarket. A browser extension adds additional features to a web browser, including user interface modifications and ad-blocking. They can also provide for niche browser customization and experimentation of new functionality before it is implemented into the main browser functionality.[687] Popular add-ons include ad blockers, LastPass, and Grammarly.[688]

Competition in this market is important to promoting innovation online. In a submission to the Subcommittee, a market participant explained:

> Competing browser engines push each other for innovations in raw performance in several respects, including faster rendering, greater reliability, and a number of other technical improvements; this competition is qualitatively different from, and greater than, competition over just the browser product.[689]

Browser diversity is also important for ensuring an open internet and reduces the risk that web developers will build sites optimized for the leading engine as opposed to web standards.[690] Moreover, as developers work on advancing browser engine technology, they create technologies that can improve the overall internet ecosystem. For example, Rust is a programming language that Mozilla engineers developed while writing the Servo layout technology for browser engines.[691] Developers use Rust for other applications today, including gaming, operating systems, and other new software applications.[692] There is a general concern that without vibrant competition this form of innovation will suffer, discouraging the development of new browser engine technology.[693]

Browsers protect their dominance through default settings, which create a barrier to entry.[694] Defaults exist in both desktop and mobile markets. Although users can set different browsers more easily for desktop computers than on mobile devices, "settings can impact the stickiness over time," such as when a software update overrides a user's preference, requiring them to take "complex steps to restore their browser choice."[695] In some cases, consumers are unable to delete the preloaded browser. For example, on Apple iOS devices and Facebook's Oculus, users are unable to delete the preloaded

---

[687] Interview with Source 27 (June 29, 2020).

[688] Tyler Lacoma, *The best Google Chrome extensions*, DIG.TRENDS (Apr. 4, 2020), https://www.digitaltrends.com/computing/best-google-chrome-extensions/.

[689] Submission from Source 993, to H. Comm. on the Judiciary, 5 (Oct. 11, 2019) (on file with. Comm.).

[690] *Id.*

[691] *Rust language*, MOZILLA RESEARCH, https://research.mozilla.org/rust/ (last visited on Sept. 26, 2020).

[692] *Id.*

[693] Interview with Source 481 (July 2, 2020).

[694] Submission from Source 993, to H. Comm. on the Judiciary, 10–11 (Oct. 11, 2019) (on file with. Comm.); Submission from Source 269, to H. Comm. on the Judiciary, 2–3 (July 23, 2019) (on file with. Comm.).

[695] Submission from Source 993, to H. Comm. on the Judiciary, 10 (Oct. 11, 2019) (on file with. Comm.).

**App. 201**

browser. Some popular mobile applications can preset webpage links to a predetermined browser, such as the Apple Mail App (Safari) and the Search widget on an Android device (Chrome).[696]

### J.      Digital Advertising

There are two principal forms of digital advertising: search advertising and display advertising. Search advertising refers to digital ads on desktop or mobile search engines, such as the Google.com homepage, displayed via "search ad tech" alongside search engine results. Search advertising is often bought and sold via real-time bidding (RTB) auctions among advertisers, where advertisers set the prices they are willing to pay for a specific keyword in a query.[697] Display advertising refers to the delivery of digital ad content to ad space on websites and mobile apps, which is referred to as "inventory." Like search advertising, buying and selling display ads often involves real-time bidding.[698]

Within display advertising, there are two separate "ad tech" markets that Subcommittee staff reviewed during the investigation: first-party and third-party. "First-party" platforms refer to companies such as Facebook, Twitter, and Snap, which sell ad space on their own platforms directly to advertisers. Google also uses first-party ad tech to sell display ads on its own properties, most notably YouTube. Third-party display ad tech platforms are run by intermediary vendors and facilitate the transaction between third-party advertisers, such as the local dry cleaner or a Fortune 500 company, and third-party publishers, such as *The Washington Post* or a blog.[699] Third-party ad tech providers include Google, Flashtalking, Sizmek (owned by Amazon), and the Trade Desk, among others.[700]

Software in display ads is programmatic, meaning that specialized software automates the buying and selling of digital ads. Market participants explain that this automated approach provides greater liquidity, better return-on-investment metrics, more precise ad targeting, and lower transaction costs. One major drawback, however, is that this process lacks transparency.[701] Google, specifically, "does not disclose to the publishers on the other ends of these trades what their space ultimately sold for and how much Google keeps as its share."[702] As another market participant told Subcommittee

---

[696] *Id.* at 5; Submission from Source 269, to H. Comm. on the Judiciary, 2 (July 23, 2019) (on file with. Comm.).

[697] Submission from Source 465, to H. Comm. on the Judiciary, 6 (June 3, 2019) (on file with Comm.).

[698] *Id.*

[699] *Id.* at 5.

[700] Competition & Mkts. Auth. Report at 266.

[701] Dina Srinivasan, *Why Google Dominates Advertising Markets*, 24 STAN. TECH. L. REV. (forthcoming 2020) (manuscript at 7–8), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3500919.

[702] *Id.* at 8.

**App. 202**

staff, Google could make the process "more transparent," but given Google's financial stake in maintaining secrecy, "there is no incentive to."[703]

**The Ad-Tech Suite[704]**



Ad exchanges refer to the "ad trafficking system that connects advertisers looking to buy inventory with publishers selling inventory."[705] Sales on ad exchanges occur primarily through: (1) open real-time bidding auctions; (2) closed real-time bidding auctions; or (3) programmatic direct deals.[706]

Sell-side software includes publisher ad servers.[707] The primary function of a publisher ad server is to fill ad space on a publisher's website that is personalized to the interests of a specific website viewer.[708] Sell-side software also includes ad networks, which aggregate ad inventory from many different publishers and divide that inventory based on user characteristics—such as age or location. Ad networks sell the pool of inventory through ad exchanges or demand-side platforms (DSPs).[709]

Buy-side software includes advertiser ad servers, software that stores, maintains, and delivers digital ads to the available inventory. Ad servers facilitate the programmatic process that makes instantaneous decisions about which ads to display on which websites to which users and helps executes to display the ad on that site. Ad servers collect and report data, such as ad impressions and

---

[703] Interview with Source 004 (Apr. 23, 2020).

[704] Prepared by Subcomm. based on Dina Srinivasan, *Why Google Dominates Advertising Markets*, 23 STAN. TECH. L. REV. (forthcoming 2020) (manuscript at 15), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3500919.

[705] Submission from Source 465, to H. Comm. on the Judiciary, 9 (June 3, 2019) (on file with Comm.).

[706] *Id.*

[707] Competition & Mkts. Auth. Report at 263.

[708] Submission from Source 465, to H. Comm. on the Judiciary, 8 (June 3, 2019) (on file with Comm.).

[709] *Id.* at 9.

**App. 203**

clicks, for advertisers to monitor ad performance and track conversion metrics.[710] Buy-side software also includes demand-side platforms, software that allows advertisers to buy advertising inventory from a range of publishers. Demand-side platforms use data to create targeted ad audiences and engage in purchasing and bidding.[711]

The ad tech suite also includes analytics tools that allow advertisers and publishers to measure ad campaign efficiency, including consumers' interactions with an ad. Similarly, data management platforms (DMPs) aggregate and store consumer data from various sources and process the data for analysis. Advertisers and publishers use data management platforms to track, partition, and target consumer audiences across websites.[712]

Over the last decade, the digital advertising market has experienced double-digit year-over-year growth. The market, however, has become increasingly concentrated since the advent of programmatic trading. In 2017, *Business Insider* reported that Google and Facebook accounted for 99% of year-over-year growth in U.S. digital advertising revenue.[713] Today, advertisers and publishers alike have few options when deciding how to buy and sell online ad space.[714]

Market participants suggest this concentration likely exists in part due to high barriers to entry. Google and Facebook both have a significant lead in the market due to their significant collection of behavioral data online, which can be used in targeted advertising. Additionally, Google and Facebook do not provide access to this unique data in open data exchanges. Advertisers' only access to this information is indirect—through engagement with Google and Facebook's ad tech.[715]

Amazon's advertising business is starting to obtain a portion of the U.S. year-over-year digital advertising revenue growth.[716] Amazon has been able to enter the market because it has its own trove of user data—namely, competitively significant first-party data related to retail searches and purchases. Moreover, Amazon's 50% penetration across U.S. households and its reach with high-income customers are likely to help drive its ad revenue growth.[717] While Amazon can leverage its ecosystem to overcome some of the barriers to entry in ad tech, the recent U.K. Competition and Markets

---

[710] Competition & Mkts. Auth. Report at 263.

[711] Submission from Source 888, to H. Comm. on the Judiciary, 8 (June 3, 2019) (on file with Comm.).

[712] *Id.* at 10.

[713] Alex Heath, *Facebook and Google Completely Dominate the Digital Ad Industry*, BUS. INSIDER (Apr 26, 2017), https://www.businessinsider.com/facebook-and-google-dominate-ad-industry-with-a-combined-99-of-growth-2017-4.

[714] Dina Srinivasan, *Why Google Dominates Advertising Markets*, 23 STAN. TECH. L. REV. (forthcoming 2020) (manuscript at 4–5), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3500919.

[715] *Id.* at 92.

[716] Kiri Masters, *What's Driving Amazon's $10 Billion Advertising Business*, FORBES (July 26, 2019), https://www.forbes.com/sites/kirimasters/2019/07/26/whats-driving-amazons-10bn-advertising-business/#4cc9c84aa043.

[717] *Id.*

131

**App. 204**

Authority report found that, as of today, Amazon's ad tech likely only has advantages in the retail sector.[718]

## V.   DOMINANT ONLINE PLATFORMS

### A.  Facebook

#### 1.  Overview

Founded in 2004 by Mark Zuckerberg, Eduardo Saverin, Chris Hughes, and Dustin Moskowitz,[719] Facebook is the largest social networking platform in the world. Its business operates around five primary product offerings, including: (1) Facebook, a social network platform; (2) Instagram, a social network app for photos and videos; (3) Messenger, a cross-platform messaging app for Facebook users; (4) WhatsApp, a cross-platform messaging app; and (5) Oculus, a virtual reality gaming system.

Facebook reported in July 2020 that its platform includes 1.79 billion daily active users (DAUs),[720] 2.7 billion monthly active users (MAUs),[721] and an average revenue per user (ARPU) of $7.05.[722] Last year, Facebook's businesses collected about $70 billion in revenue—a 27% increase from the prior year—earning about $24 billion in income from its operations.[723] Facebook reported that its family of products—including Facebook, Instagram, Messenger, and WhatsApp—includes 2.47 billion daily active people (DAP),[724] 3.14 billion monthly active people (MAP), and a family average revenue per person (ARPP) of $6.10.[725]

In addition to the Subcommittee's investigation of Facebook's monopoly power, state and federal antitrust authorities are investigating Facebook for potential violations of the U.S. antitrust laws. In July 2019, Facebook disclosed that the Federal Trade Commission (FTC) had opened an

---

[718] Competition & Mkts. Auth. Report at 282.

[719] STEVEN LEVY, FACEBOOK: THE INSIDE STORY 65–69 (2020).

[720] Facebook, Inc., Quarterly Report (Form 10-Q) 29 (July 31, 2020), https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=14302237.

[721] *Id.* at 30.

[722] *Id.* at 32.

[723] *Id.* at 35. *See generally* Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, 68 U. CHI. L. REV. 1, 6 (2001) ("High profit margins might appear to be the benign and necessary recovery of legitimate investment returns in a Schumpeterian framework, but they might represent exploitation of customer lock-in and monopoly power when viewed through the lens of network economics.").

[724] Facebook, Inc., Quarterly Report (Form 10-Q) 25 (July 31, 2020), https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=14302237.

[725] *Id.* at 35.

**App. 205**

antitrust investigation of Facebook in June 2019.[726] Facebook also disclosed that in July 2019 the Department of Justice announced that it would begin an antitrust review of market-leading online platforms.[727] In September 2019, New York Attorney General Letitia James announced that she joined with eight other attorneys general to lead a multistate investigation of Facebook, Inc.[728] In October 2019, Attorney General James reported that the investigation into Facebook grew to include 47 attorneys general.[729]

## 2.  Social Networking

### a.  Market Power

Facebook has monopoly power in the market for social networking.[730] According to internal documents produced by Facebook to the Committee, it has high reach, time-spent, and significantly more users than its rivals in this market. Despite significant changes in the market—such as the advent of mobile devices, applications, and operating systems—Facebook has held an unassailable position in the social network market for nearly a decade, demonstrating its monopoly power.[731]

Facebook's monopoly power is firmly entrenched and unlikely to be eroded by competitive pressure from new entrants or existing firms. Documents produced during the investigation by Facebook, including communications among its senior executives on market strategy, as well as a memorandum by a senior data scientist and economist at Facebook,[732] support the conclusion that Facebook's monopoly is insulated from competitive threats. The social network market has high entry barriers—including strong network effects, high switching costs, and Facebook's significant data advantage—that discourage direct competition by other firms to offer new products and services.[733]

---

[726] Facebook, Inc., Quarterly Report (Form 10-Q) 42 (July 24, 2019), https://investor.fb.com/financials/sec-filings-details/default.aspx?FilingId=13550646.

[727] *Id.* at 53.

[728] Press Release, N.Y. Attorney General, AG James Investigating Facebook For Possible Antitrust Violations (Sept. 6, 2009), https://ag.ny.gov/press-release/2019/ag-james-investigating-facebook-possible-antitrust-violations.

[729] Press Release, N.Y. Attorney General, Attorney General James Gives Update On Facebook Antitrust Investigation (Oct. 22, 2019), https://ag.ny.gov/press-release/2019/attorney-general-james-gives-update-facebook-antitrust-investigation.

[730] Facebook has argued to other antitrust enforcement bodies that limiting the product market to social networks at the exclusion of other markets, such as user attention, "would be artificial and would not reflect the competitive realities," and that "competitive pressures to which Facebook reacts are global in nature." *See, e.g.*, Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00012074 (2016) (White Paper on Relevant Markets and Lack of Dominance for Federal Cartel Office) (on file with Comm.).

[731] Omidyar Network Report.

[732] Cunningham Memo ("Facebook has high reach and time-spent in most countries. User growth is tracking internet growth: global reach is roughly stable.").

[733] Instead of competing directly with Facebook, such as Google attempted but failed to do with Google+, other social platforms provide niche products with social graphs that are orthogonal to Facebook's graph. *See id.* at 4; FB-HJC-ACAL-

**App. 206**

Facebook has also maintained and expanded its dominance through a series of acquisitions of companies it viewed as competitive threats, and selectively excluded competitors from using its platform to insulate itself from competitive pressure. Together, these factors have tipped the social networking market toward a monopoly.[734]

Several antitrust enforcement agencies have examined Facebook's monopoly in recent years and reached similar conclusions. In July 2020, the United Kingdom's Competition and Markets Authority (CMA) found that Facebook is dominant in the markets for social networks and digital display ads, and that its market power "derives in large part from strong network effects stemming from its large network of connected users and the limited interoperability it allows to other social media platforms."[735] In July 2019, Germany's Federal Cartel Office (Bundeskartellamt) found that "Facebook is the dominant company in the market for social networks," and that in Germany's social network market, "Facebook achieves a user-based market share of more than 90%."[736] And in June 2019, the Australian Competition & Consumer Commission (ACCC) found that "Facebook has substantial market power in a number of markets and that this market power is unlikely to erode in the short to medium terms."[737]

Facebook's responses to the Committee's requests for information claimed that it competes in a "rapidly evolving and dynamic marketplace in which competition is vigorous," citing Twitter, Snapchat, Pinterest, and TikTok as examples of competition Facebook faces for "every product and

---

00111394 ("Linkedin, and Nextdoor coexist in the US with similar userbases but orthogonal graphs: Facebook connects friends and family, LinkedIn connects coworkers, Nextdoor connects neighbors.").

[734] *See* Bundeskartellamt, B6-22/16, Case Summary, *Facebook, Exploitative business terms pursuant to Section 19(1) GWB for inadequate* data processing, 8 (Feb. 15, 2019) ("The facts that competitors can be seen to exit the market and that there is a downward trend in the user-based market shares of the remaining competitors strongly indicate a market tipping process which will result in Facebook.com becoming a monopolist."), https://www.bundeskartellamt.de/SharedDocs/Entscheidung/EN/Fallberichte/Missbrauchsaufsicht/2019/B6-22-16.pdf?__blob=publicationFile&v=4.

[735] Competition & Mkts. Auth. Report at 26.

[736] In addition to Facebook's high market share, the Bundeskartellamt also found that Facebook has market power based on other measures, including its "access to competitively relevant data, economies of scale based on network effects, the behaviour of users who can use several different services or only one service and the power of innovation-driven competitive pressure were seen as relevant factors of market power." Press Release, Bundeskartellamt, Bundeskartellamt prohibits Facebook from combining user data from different sources 4 (Feb. 7, 2019), https://www.bundeskartellamt.de/SharedDocs/Publikation/EN/Pressemitteilungen/2019/07_02_2019_Facebook_FAQs.pdf?__blob=publicationFile&v=6. The Bundeskartellamt also noted that in terms of assessing market share by time spent on the network, "the Facebook group would have a combined market share far beyond the market dominance threshold pursuant to Section 18(4) GWB, even if YouTube, Snapchat, Twitter, WhatsApp, and Instagram were included in the relevant market." *Id.* at 6.

[737] Austl. Competition & Consumer Comm'n Report at 9; 78 (adopting a broader view on Facebook's product market to include Twitter and Snapchat).

**App. 207**

service" that it offers.[738] According to Facebook, its users "have many choices and can leave Facebook if they're not happy,"[739] allowing people to quickly abandon it. The ability of users to "explore the myriad other options available . . . creates strong competition for every product and service Facebook offers, as well as pressure to develop new products to attract and retain users."[740]

In response to other antitrust inquiries, Facebook said that it competes for users' attention broadly.[741] In a 2016 white paper prepared in response to an investigation by Germany's Federal Cartel Office, Facebook stated that it "faces intense competition for user attention and engagement at every level," listing companies as diverse as Candy Crush and Clash of the Clans—popular mobile gaming apps—along with YouTube, Twitter, Pinterest, Snapchat and others as competitors for users' attention.[742] Facebook similarly submitted to the ACCC that if the company does not compete vigorously, users will go to other "platforms, websites, apps, and other services—not just social media services—that compete for their attention."[743] In an interview conducted by Subcommittee staff, a former employee explained that as a product manager at Facebook, "your only job is to get an extra minute. It's immoral. They don't ask where it's coming from. They can monetize a minute of activity at a certain rate. So the only metric is getting another minute."[744]

Facebook describes a diverse list of other firms as competitive substitutes for Facebook, including Microsoft's Bing, a search engine; Yelp, a publisher of crowd-sourced business reviews; and BuzzFeed, a digital news publisher.[745] According to Facebook, these firms exert competitive pressure on Facebook in the market for users' attention.[746] Most recently, in response to an inquiry by the United Kingdom's Competition and Markets Authority, Facebook calculated its market share as "time captured by Facebook as a percentage of total user time spent on the internet, including social media, dating, news and search platforms."[747] Based on these measures, Facebook concluded that it lacks monopoly power.

---

[738] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-APP0004 (Oct. 14, 2019); Innovation and Entrepreneurship Hearing at 1 (statement of Matt Perault, Dir. of Public Pol'y, Facebook, Inc.), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-Wstate-PeraultM-20190716.pdf.

[739] Innovation and Entrepreneurship Hearing at 1 (response to Questions for the Record of Matt Perault, Dir. of Public Pol'y, Facebook, Inc.).

[740] *Id.*

[741] *See, e.g.*, Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00012074 (2016) (on file with Comm.).

[742] *Id.*

[743] FACEBOOK, FACEBOOK'S RESPONSE TO THE DIGITAL PLATFORMS INQUIRY FOR AUSTRALIAN COMPETITION AND CONSUMER COMMISSION 25 (Sept. 12, 2019), https://fbnewsroomus.files.wordpress.com/2019/09/facebook-submission-to-treasury-on-digital-platforms-inquiry.pdf.

[744] Interview with Former Instagram Employee (Oct. 2, 2020).

[745] *Id.*

[746] *Id.*

[747] Competition & Mkts. Auth. Report at 121 n.152.

**App. 208**

Facebook's position that it lacks monopoly power and competes in a dynamic market is not supported by the documents it produced to the Committee during the investigation. Instead, Facebook's internal business metrics show that Facebook wields monopoly power. In response to a supplemental information request by Subcommittee staff,[748] Facebook produced industry updates prepared in the ordinary course of business by Facebook's Market Strategy team.[749] It has described these reports as both "internal competitive metrics" and as a "competitive survey regularly prepared for Facebook's management team [that] tracks a variable set of competitors not by specific products or features, but by the degree of user attention and engagement that they command in terms of monthly active users ('MAU') and daily active users ('DAU')."[750]

Facebook's industry updates were shared internally with senior executives, including Mark Zuckerberg, Facebook's CEO.[751] Facebook used data collected through Onavo, a virtual private network (VPN) app, to provide detailed competitive insights into the usage and engagement of other firms.[752] Facebook also relied on this data in response to inquiries by the European Commission and the Bundeskartellamt,[753] as well as to prepare detailed internal reports on market strategy.[754]

### i.  Usage and Reach

Facebook has monopoly power in the social networking market. Based on its internal documents, Facebook and its family of products—Facebook, Instagram, Messenger, and WhatsApp—control a significant share of users and high reach in the social networking market.[755] Facebook's family of products includes three of the seven most popular mobile apps in the United States by monthly active persons, reach, and percentage of daily and monthly active persons.[756]

---

[748] Subcommittee staff made a supplemental request after identifying Facebook's industry updates during the review of documents produced in response to the Committee's September 2019 request for information.

[749] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-000025 (Mar. 5, 2020) (on file with Comm.).

[750] *Id.* at *FB*-HJC-ACAL-00012074, FB-HJC-ACAL-00012090 (2016) (on file with Comm.).

[751] *Id.* at FB-HJC-ACAL-00054944 (Apr. 27, 2012) (on file with Comm.).

[752] Although it does not include data from users of Apple's iMessage, which is relevant for purposes of usage on WhatsApp and Messenger, Facebook's documents note that iMessage's growth is limited by the adoption of iPhones, whereas Facebook's products can be used across different devices. *See generally* Cunningham Memo at 15.

[753] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00012090 (2016) (on file with Comm.).

[754] Cunningham Memo at 9 (citing data from MINT, another name used for Onavo within Facebook, Inc.).

[755] *Id.* at 2, 16 ("Facebook has high reach and time-spent in most countries. User growth is tracking internet growth: global reach is roughly stable.").

[756] Production of Facebook, to Comm. on the Judiciary, 38 (Jan. 2020) (Monthly Update for December 2019) (based on Facebook's internal calibrations of App Annie data) (on file with Comm.). According to Facebook, monthly active persons (MAP) is "based on the activity of users who visited at least one of Facebook, Instagram, Messenger, and WhatsApp (collectively, our 'Family' of products) during the applicable period of measurement." *See* Facebook, Inc., Quarterly Report (Form 10-Q) 29 (Apr. 30, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001326801/bfe31518-2e18-48fb-8d98-5e8b07d94b2a.pdf-.

**App. 209**

As a standalone product, the Facebook app had *the third highest reach* of all mobile apps,[757] with 200.3 million users in the United States, reaching 74% of smartphone users as of December 2019.[758] Facebook Messenger had the *fourth highest reach*, with 183.6 million monthly active persons, reaching 54.1% of U.S. smartphone users.[759] Finally, Instagram had the *sixth highest reach,* with 119.2 million users, reaching 35.3% of smartphone users.[760] In contrast, Snapchat, the mobile app with the seventh highest reach, had 106.5 million users in the United States, reaching 31.4% of smartphone users.[761]

Facebook's maintenance of these high market shares over a long time period demonstrates its monopoly power.[762] From September 2017 to September 2018, Facebook reached more than 75% of users internationally with at or near 100% market penetration in nine of the twenty most populous countries in the world.[763] In the United States, Facebook alone reached more than 75% of internet users during this period, while Messenger and Instagram both achieved significant reach as well.[764] According to a white paper prepared by a senior data scientist and economist at Facebook, the Facebook app has high reach in most countries, and its growth is in line with that of the Internet, whereas Instagram and WhatsApp are still growing "very rapidly."[765] For Instagram, "there appear to be *no* countries in which growth has hit a ceiling."[766]

Facebook's family of products are more immersive of users' attention.[767] According to Facebook's internal market data, its users spend significantly more time on its family of products than

---

[757] Interview with Former Instagram Employee (Oct. 2, 2020) ("Reach is closer to market penetration [than usage and engagement]. It applies to the number of internet users we think are in that country, how many use a Facebook Family app and have taken one meaningful action. What people forget is that Facebook believes its total addressable market being anyone that has access to the internet.").

[758] Production of Facebook, to H. Comm. on the Judiciary, 38 (Jan. 2020) (on file with Comm.) (Monthly Update for December 2019) (on file with Comm.); Production of Facebook, to H. Comm. on the Judiciary, 32 (Oct. 2019) (on file with Comm.) (Monthly Update for September 2019, based on Facebook's internal calibrations of App Annie data).

[759] *Id.*

[760] *Id.*

[761] *Id.*

[762] *See generally* Omidyar Network Report at 11.

[763] Cunningham Memo at 2.

[764] *Id.*

[765] *Id.* at 12.

[766] *Id.* at 16. (emphasis added).

[767] *Id.* ("Facebook has high reach and time-spent in most countries. User growth is tracking internet growth: global reach is roughly stable.").

**App. 210**

on competing services. For example, social media users spent more time on Facebook (48.6 minutes) than on Snapchat (21 minutes) or Twitter (21.6 minutes) in 2018.[768]

Since at least 2012, Facebook's documents show that Facebook believed it controlled a high share of the social networking market.[769] In a presentation prepared for Sheryl Sandberg, Facebook's Chief Operating Officer, to deliver at a large telecommunications firm, Facebook said that it controlled "95% of all social media" in the United States in terms of monthly minutes of use—as compared to Twitter, Tumblr, Myspace, and all other social media—and noted that the "industry consolidates as it matures."[770]

**Facebook Investor Presentation**[771]



A 2012 investor presentation prepared for Facebook described it as having an "enduring competitive advantage" similar to other historically dominant firms.[772] According to this document, which was reviewed and edited by Facebook's Chief Financial Officer to present to investors,[773] Facebook had nearly 100% market penetration among 25-34 year-olds in the United States.[774] It also

---

[768] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00086798 (Aug. 22, 2020) (Monthly Update for August 2018) (on file with Comm.).

[769] Id. at FB-HJC-ACAL-00057113; FB-HJC-ACAL-00049006 (Jan. 28, 2012) (on file with Comm.).

[770] Id. at FB-HJC-ACAL-00057113, https://judiciary.house.gov/uploadedfiles/00057113_picture.pdf.

[771] Prepared by Subcommittee based on id.

[772] Id. at FB-HJC-ACAL-00049006 (Apr. 30, 2012) (on file with Comm.).

[773] Id. at FB-HJC-ACAL-00064320 (Apr. 18, 2012).

[774] Id. at FB-HJC-ACAL-00049006 (Apr. 30, 2012).

**App. 211**

had more than 85% penetration in certain countries.[775] As noted in the presentation, "In every country we've tipped, we have maintained that penetration."[776] This point was underscored by a suggestion in the presentation that within a decade, it would be doubtful that entrepreneurs could compete with Facebook.[777]

At the Subcommittee's sixth hearing, Subcommittee Vice Chairman Joe Neguse (D-CO) asked Mr. Zuckerberg about Facebook's monopoly power.[778] As Mr. Neguse noted, based on this evidence, "most folks would concede Facebook was a monopoly as early as 2012."[779] Since then, he added that Facebook's strategy has been to "protect what I describe as a monopoly" by acquiring, copying, or eliminating its competitors.[780] Mr. Zuckerberg responded by characterizing the social networking market as "a very large space."[781] However, Facebook did not corroborate this claim through the evidence it produced during the investigation.

Lastly, after reviewing relevant market data and documents provided during the investigation, the Subcommittee found that there are distinct, relevant markets for social networking and social media. Facebook proposes that online services with social functions, such as YouTube, are social networks that compete in the same product market as Facebook and its other products for user attention.[782] For example, in a white paper submission, Facebook compares its News Feed, which includes a stream of posts and videos uploaded by users, as similar to the content feed that users encounter on YouTube.[783] However, longstanding antitrust doctrine describes relevant product markets as those that are "reasonably interchangeable by consumers for the same purposes."[784] Although YouTube is a dominant social app, it is primarily used to consume video content online. It does not provide the core functionality of Facebook or its family of products, such as Pages, Marketplace, or limited sharing within a person's network.

---

[775] *Id.*

[776] *Id.*

[777] *Id.* ("Imagine 10 years from now . . . [a] [l]ocal TV show asking an entrepreneur how he can hope to compete with Facebook.").

[778] CEO Hearing Transcript at 85 (question of Rep. Joe Neguse (D-CO), Vice Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm on the Judiciary).

[779] *Id.* at 86.

[780] *Id.*

[781] *Id.* (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[782] FACEBOOK, SUBMISSION TO AUSTL. COMPETITION AND CONSUMER COMM'N 13 (Sept. 12, 2019), https://assets.publishing.service.gov.uk/media/5e8c827ae90e070774c61fdb/Facebook_response_to_interim_report_with_cover_letter.pdf.

[783] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00012074 (2016) (on file with Comm.).

[784] *See* United States v. Microsoft Corp., 253 F.3d 34, 51–52 (D.C. Cir. 2001); *see also* Competition & Mkts. Auth. Report at 117–18 ("[T]he closeness of competition between different platforms depends on the degree to which consumers consider them substitutes, rather than the extent to which they share common functionalities.").

**App. 212**

The United Kingdom's Competition and Markets Authority reached a similar conclusion, finding that YouTube is primarily a market for consuming video content rather than a market for communication.[785] As it noted, "consumers seem to access YouTube for particularly distinctive reasons . . . YouTube does not currently appear to compete closely with Facebook's platforms, despite its comparable reach and levels of consumer engagement."[786] Internal documents produced to the United Kingdom bolstered this finding, indicating "that the most common reasons consumers in the UK access YouTube are for entertainment and to view 'how-to' videos on the platform."[787]

### ii. Barriers to Entry

Facebook's persistently high market share is not contestable due to high barriers to entry that discourage competition. These barriers to entry include its strong network effects, high switching costs for consumers, and data advantages.

#### 1) Network Effects

Facebook's significant reach among users, and high levels of engagement, create very strong network effects.[788]

As a result, Facebook has tipped the market in its favor,[789] primarily facing competitive pressure from within its ***own*** family of products—such as through Instagram competing with Facebook or WhatsApp competing with Messenger—rather than actual competition from other firms in the market.[790] This finding is supported by Facebook's documents and internal analysis. These include a

---

[785] Competition & Mkts. Auth. Report at 126 ("[T]here are particularly important differences between YouTube, which most consumers use for video streaming, and platforms such as those of Facebook, which focus more on consumer needs related to social networking.").

[786] *Id.* at 127.

[787] *Id.*

[788] *See* United States v. Microsoft Corp., 84 F. Supp. 2d 9, 20 (D.D.C. 1999) ("A positive network effect is a phenomenon by which the attractiveness of a product increases with the number of people using it."). Conversely, a negative or reverse network effect exists when the attractiveness of a product decreases as less people use it, which can tip the market in favor of another firm if there are low entry barriers. Dig. Competition Expert Panel Report at 35.

[789] *See generally* Omidyar Network Report at 18.

[790] *See, e.g.*, Cunningham Memo at 7 ("Messenger and WhatsApp clearly compete for time-spent."). While Facebook's overall penetration and network effects are high in the United States and across many other large countries, Facebook appears to have intermediate reach in some countries due to differing levels of adoption among users of certain ages. *Id.* at 12 ("In Japan and South Korea Facebook has significantly higher penetration among youth than among elderly. The role of an intergenerational social network is partly filled by other apps (LINE and Kakao).").

**App. 213**

memorandum on Facebook's family of products prepared in October 2018 by Thomas Cunningham, a senior data scientist and economist,[791] as well as communications among senior executives.[792]

Mr. Cunningham's 2018 memorandum on "Possible End States for the Family of Apps" is an analysis of user trends among Facebook's products and other competitors.[793] It is based on the company's Onavo data from September 2017 to September 2018.[794] It was prepared for review by Facebook's senior executives, including Mr. Zuckerberg and Mr. Olivan, Facebook's Director of Growth.[795] The Subcommittee's staff interviewed a former senior employee at the company who attended meetings preparing the document for presentation to Mr. Zuckerberg and Mr. Olivan. The former employee noted that "this specific working group—and Tom Cunningham's work in particular—was guiding Mark's views" on the company's growth strategy.[796] The former employee explained the purpose of the Cunningham Memo:

> The question was how do we position Facebook and Instagram to not compete with each other. The concern was that Instagram would hit a tipping point . . . There was brutal in-fighting between Instagram and Facebook at the time. It was very tense. It was back when Kevin Systrom was still at the company. He wanted Instagram to grow naturally and as widely as possible. But Mark was clearly saying "do not compete with us." . . . It was collusion, but within an internal monopoly. If you own two social media utilities, they should not be allowed to shore each other up. It's unclear to me why this should not be illegal. You can collude by acquiring competitors and forbidding competition.[797]

The Cunningham Memo characterized the network effects of Facebook, WhatsApp, and Messenger are "very strong."[798] The memorandum notes that social apps have tipping points such that "either everyone uses them, or no-one uses them."[799] Importantly, it distinguishes between apps with a social graph that are used for broadcast sharing and messaging—Facebook, Instagram, Messenger,

---

[791] Subcommittee staff requested the 2018 memorandum prepared by Tom Cunningham on July 1, 2020 in response to earlier reporting about the memorandum. *See* Alex Heath, *Facebook Secret Research Warned of 'Tipping Point' Threat to Core App*, THE INFO. (July 23, 2020), https://www.theinformation.com/articles/facebook-secret-research-warned-of-tipping-point-threat-to-core-app. Subcommittee staff appreciates that Facebook cooperated with this supplemental request.

[792] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00063222 (Feb. 27, 2012), https://judiciary.house.gov/uploadedfiles/0006322000063223.pdf.

[793] Cunningham Memo at 1, 3.

[794] During this period, Facebook referred to data derived from Onavo as MINT data.

[795] Interview with Former Instagram Employee (Oct. 2, 2020).

[796] *Id.*

[797] *Id.*

[798] Cunningham Memo at 11.

[799] *Id.* at 9.

**App. 214**

WhatsApp, and Snapchat—and social apps for music or video consumption, such as YouTube or Spotify.[800] In contrast, non-social apps "can exist along a continuum of adoption."[801]

Network effects and tipping points are particularly strong in messaging apps. Because WhatsApp and other regional messaging apps have bimodal distribution of reach in countries—an all-or-nothing reach at above 90% or below 10%—messaging tends toward consolidation and market tipping.[802] Most countries have a single messaging app or protocol because they cannot support multiple messaging apps."[803] As a result of this dynamic, there are "tradeoffs in time-spent between Messenger and WhatsApp,"[804] demonstrating "very strong tipping points."[805]

Facebook already has high reach in many countries,[806] including the United States, so a primary concern addressed in Mr. Cunningham's "Possible End States" memorandum is whether cross-app sharing among Facebook's family of products poses a competitive threat to its flagship product, the Facebook app.[807] While the Cunningham Memo concluded that it is unclear whether Instagram and Facebook can coexist, it is much less concerned with Facebook's user loss due to cannibalization by Instagram than with market tipping (i.e., Instagram tipping the market in its favor and Facebook rapidly losing value due to negative or reverse network effects). It notes:

> The most important concern should be network effects, not within-user cannibalization. We have reviewed many studies which estimate cannibalization among apps for individual users, all of which find positive incrementality across the family: i.e. when a user increases their use of one app, they tend to decrease their use of other apps, but the total family effect is positive. This should not be surprising - it is unlikely that any of

---

[800] To underscore this point, the Cunningham Memo does not characterize YouTube as a direct competitor, noting that YouTube would only be a danger if it "becomes more social." Cunningham Memo at 16.

[801] *Id.* at 9.

[802] *Id.* at 10, 14 ("Most countries have a single messaging app with 70%+ daily reach. The most common app is WhatsApp. Others include Messenger, LINE, and Kakotalk.").

[803] *Id.* at 3.

[804] *Id.*

[805] *Id.* at 12 ("WhatsApp does very well when it is the market-leader (in many Latin American countries WhatsApp has nearly 90% daily reach and users spend 60 minutes/day), this suggests that it would be worth a substantial investment to try to push WhatsApp over its tipping point in other countries."). An exception to this trend appears to be where a messaging app exists as part of a social network—such as messaging services on Snapchat—but these apps operate with reduced reach. Another exception is in markets with high penetration by Apple's iPhone, but this growth is limited by adoption of iPhones since iMessage is its native app. *Id.* at 15.

[806] *Id.* at 16 ("Facebook has high reach and time-spent in most countries. User growth is tracking internet growth: global reach is roughly stable. DAP is showing weakness in developed countries and especially teens.").

[807] The Cunningham Memo refers to Facebook's flagship product as "Facebook-Blue" or "Blue" as a reference to the app's color. *Id.* at 15. There is overlap and cross-use among Facebook's products in the United States. While 40% of Instagram users' friends are also their friends on Facebook, only 12% of Facebook users' friends are "reciprocal follows" on Instagram. *Id.* at 9.

**App. 215**

our apps are perfect substitutes for an individual user. However a serious concern is network effects: when you use an app less, that makes it less appealing to other people, and at certain times and places those effects could be very large.[808]

As a result of this dynamic, even though there may be several social apps that exist in an ecosystem, they are unlikely to gain traction among users once a firm has tipped the market in their favor or is otherwise dominant. As the study notes, while mobile phone users tend to use five different social maps in a month, they only use "1.5 messaging apps and 1 social app, out of 10 total apps per day."[809]

Facebook's executives—including Mr. Zuckerberg—have extensively discussed the role of network effects and tipping points as part of the company's acquisition strategy and overall competitive outlook. For example, Mr. Zuckerberg told the company's Chief Financial Officer in 2012 that network effects and winner-take-all markets were a motivating factor in acquiring competitive threats like Instagram. He said:

> [T]here are network effects around social products and a finite number of different social mechanics to invent. Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product . . . one way of looking at this is that what we're really buying is time. Even if some new competitors springs[sic] up, buying Instagram now . . . will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.[810]

Mr. Zuckerberg also stressed the competitive significance of having a first-mover advantage in terms of network effects prior to acquiring WhatsApp.[811] In the context of market strategies for Messenger competing with WhatsApp, Mr. Zuckerberg told the company's growth and product management teams that "being first is how you build a brand and a network effect."[812] He also told

---

[808] *Id.* at 9.

[809] *Id.* at 6. A recent investor report similarly noted that although "many users access more than one social network per day, it does not appear to be at the cost of declining users or user engagements within the Facebook ecosystem." MORNINGSTAR EQUITY ANALYST REPORT, FACEBOOK INC 3 (Aug. 3, 2020) (on file with Comm.).

[810] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00063222 (Feb. 28, 2012), https://judiciary.house.gov/uploadedfiles/0006322000063223.pdf.

[811] *Id.* at FB-HJC-ACAL-00046826–34 (Dec. 13, 2013) (on file with Comm.).

[812] *Id.*

**App. 216**

them that Facebook has "an opportunity to do this at scale, but that opportunity won't last forever. I doubt we have even a year before WhatsApp starts moving in this direction."[813]

In 2012, the company described its network effects as a "flywheel" in an internal presentation prepared for Facebook at the direction of its Chief Financial Officer.[814] This presentation also said that Facebook's network effects get "stronger every day."[815] Around that time, prominent investors similarly noted that the social networking market had "extreme network effects," making it "increasingly hard to see a materially successful new entrant, even with all of Google's resources."[816]

### 2) Switching Costs

In addition to the competitive insulation resulting from strong network effects, Facebook is also unlikely to face direct competition from other firms or new entrants due to the high costs for users to switch from Facebook to a competing social network.[817]

Other social network platforms are not interoperable with Facebook. Facebook users invest significant time building their networks on Facebook. This investment includes uploading and curating photos, engaging with their friends, other users, and businesses, and otherwise interacting with their social graph.[818] To switch to another platform, Facebook users have to rebuild their social graph elsewhere. In the process, they lose access to their data—including photos, posts, and other content—

---

[813] *Id.*

[814] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00049006 (Apr. 18, 2012) (on file with Comm.) ("Network effects make it very difficult to compete with us - In every country we've tipped we are still winning.").

[815] *Id.*

[816] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00086834–38 (Apr. 3, 2012) (on file with Comm.) (Citi Summary of Investment Outlook). Comscore noted in 2012 that "Facebook has proven to be a dominant global force in social networking that shows no immediate signs of slowing down." According to Comscore, Facebook was the "third largest web property in the world . . . and accounted for approximately 3 in every 4 minutes spent on social networking sites and 1 in every 7 minutes spent online around the world." FB-HJC-ACAL-00051905 (Mar. 12, 2012) (Comscore 2012 Report).

[817] Omidyar Network Report at 11 ("A very significant reason that Facebook has market power is that a user cannot change platforms and expect to be able to stay in contact with her friends. Because Facebook has a near monopoly, the vast majority of the people with whom they want to exchange feeds are likely on Facebook already. The switching cost for any one user is therefore enormous.").

[818] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045349 (Feb. 15, 2014) (on file with Comm.).

144

**App. 217**

along with other elements of their social graph.[819] They also have to learn how to use a new service and rebuild their network.[820] As a result, Facebook's users are effectively "locked in" to its platform.[821]

Facebook's internal documents and communications reveal that Facebook employees recognize that high switching costs insulate Facebook from competition. In 2014, Facebook's Chief Financial Officer told the company's director of growth that investors like this quality about Facebook and "the idea is that after you have invested hours and hours in your friend graph or interest graph or follower graph, you are less likely to leave for a new or different service that offers similar functionality."[822] Similarly, an internal survey prepared for Facebook's senior management team about Google+ explained that "[p]eople who are big fans of G+ are having a hard time convincing their friends to participate because . . . switching costs would be high due to friend density on Facebook."[823] And in 2012, the company indicated that people's significant time investment on Facebook building their identity and connections on the platform increased the company's "stickiness."[824]

In contrast to its public statements, Facebook has not done enough to facilitate data portability for its consumers. Facebook offers a tool called "Download Your Information," which provides users with a limited ability to download their data and upload it elsewhere. But in practice, this tool is unusable for switching purposes given that it allows users to do little other than move their photos from Facebook to Google Photos. Another barrier for switching associated with this tool is that Facebook's users can only download their data in PDF or .zip format. The result is that, while Facebook publicly claims to support data portability,[825] its users seldom leave Facebook due to the challenges of migrating their data. An interview with a former employee at the company reinforces this conclusion. As the former employee noted, this tool is behind a series of menu, explaining:

> If you hide something behind more than one menu, no one sees it and they know it. Then they advertise features that they don't expect anyone to find or use. They say: "It's data portable, you can send it to Google drive?" But who cares? They've just done it to

---

[819] *See, e.g.*, Nicole Nguyen, *If You Created A Spotify Account With Facebook, It Is Forever Tied To Facebook*, Buzzfeed (Oct. 3, 2018), https://www.buzzfeednews.com/article/nicolenguyen/disconnect-facebook-account-from-spotify.

[820] *See, e.g.*, Danny Crichton, *Why no one really quits Google or Facebook*, Techcrunch (Feb. 4, 2019), https://techcrunch.com/2019/02/04/why-no-one-really-quits-google-or-facebook/ ("I have 2,000 contacts on Facebook Messenger — am I just supposed to text them all to use Signal from now on? Am I supposed to completely relearn a new photos app, when I am habituated to the taps required from years of practice on Instagram?"); United States v. Microsoft Corp., 84 F. Supp. 2d 9, 15 (D.D.C. 1999) (noting that switching costs include "the effort of learning to use the new system, the cost of acquiring a new set of compatible applications, and the work of replacing files and documents that were associated with the old applications").

[821] *See generally* Austl. Competition & Consumer Comm'n Report at 99; Dig. Competition Expert Panel Report at 42.

[822] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045349 (Feb. 15, 2014) (on file with Comm.).

[823] *Id.* at FB-HJC-ACAL-00048755–57 (Dec. 14, 2011).

[824] *Id.* at FB-HJC-ACAL-00049006 (Apr. 18, 2012).

[825] *See, e.g.*, Data Transfer Project, https://datatransferproject.dev/ (last visited on Sept. 28, 2020).

**App. 218**

generate talking points. They are not allowing you to export your social graph, which is actually valuable.[826]

Leaving Facebook may create additional costs in other key respects. Switching from Facebook may degrade a person's other social apps that integrate with Facebook's Platform APIs. For example, Spotify users who signed up with Facebook "can't disconnect it."[827] To leave Facebook, they must set up a new account on Spotify.[828] In the process, they lose access to their playlists, listening history, social graph of other friends on Spotify, and their other data on the app.[829]

People who leave Facebook may also lose access to popular features on Facebook that, due to its scale and network effects, are not available on other social apps (e.g., events, marketplace, and groups).[830] For example, a church may actively maintain a Facebook page for its parishioners and not on other social apps. Furthermore, some Facebook users who believe they are switching from the company's platform may nevertheless continue using its family of products, such as Instagram or WhatsApp.[831] As the United Kingdom's Competition and Markets Authority noted, this reinforces Facebook's market power.[832]

In response to the concern about switching costs, Facebook replied that its users have meaningful choices and alternatives to Facebook.[833] Additionally, Facebook notes that its users have been able to download their data since 2010.[834] The company describes its users' ability to download their data as a "robust portability tool."[835] However, in March 2019, Mr. Zuckerberg explained that a

---

[826] Interview with Former Instagram Employee (Oct. 2, 2020).

[827] *Facebook Login Help*, SPOTIFY, https://support.spotify.com/us/article/using-spotify-with-facebook/ (last visited Oct. 5, 2020).

[828] *Id.*

[829] Spotify users can manually attempt to recreate playlists or request that Spotify transfer their data, but this is not intuitive. Samantha Cole, *How to Unlink Spotify from Your Facebook Account*, VICE (Dec. 21, 2018), https://www.vice.com/en_us/article/wj3anm/how-to-unlink-spotify-from-your-facebook-account.

[830] *See* Cunningham Memo at 3.

[831] *See, e.g.*, Tiffany Hsu, *For Many Facebook Users, a 'Last Straw' That Led Them to Quit*, N.Y. TIMES (Mar. 21, 2018), https://www.nytimes.com/2018/03/21/technology/users-abandon-facebook.html#:~:text=In%20the%20wake%20of%20the,easy%20as%20pressing%20%E2%80%9Cdelete.%E2%80%9D ("The Cambridge Analytica scandal led her to remove the Facebook app from her phone . . . But she is keeping the messaging function open for professional purposes and will continue using Instagram.").

[832] Competition & Mkts. Auth. Report at 179, 256.

[833] Innovation and Entrepreneurship Hearing at 1 (response to Questions for the Record of Matt Perault, Dir. of Public Pol'y, Facebook, Inc.).

[834] Erin Egan, *Charting a Way Forward*, FACEBOOK 6 (Sept. 2019), https://about.fb.com/wp-content/uploads/2020/02/data-portability-privacy-white-paper.pdf.

[835] *Id.*

**App. 219**

Facebook user's ability to download their data is not "[t]rue data portability."[836] Instead, he said its users should be able to sign in to other services in "the way people use our platform to sign into an app."[837]

Currently, Facebook's users lack the ability to port their social networks to a different platform. To switch social networking platforms, a Facebook user can import their contacts from their mobile devices, such as email addresses or phone numbers, to build a network on a different platform. But importing contacts is not a substitute for a person's social graph and, as the CMA concluded, this method is likely limited to a person's close friends.[838] In recognition of this, Javier Olivan, Facebook's Director of Growth, told the company's senior management team that information from a person's address book on their mobile device is "incomplete" because people typically only store limited information in their contacts (e.g., a person's first name, last name, and their phone number).[839] In contrast, Facebook users "have a much richer profile—which creates a much richer experience (we have data that shows how . . . profile pictures make for better / more functional [user interfaces]."[840]

### 3)   Access to Data

Facebook has a significant data advantage in the social networking market. While data may be non-rivalrous—meaning users can provide the same piece of data to more than one platform—it creates another entry barrier, reinforcing Facebook's monopoly power.

Subcommittee staff conducted interviews with market participants that described Facebook as having nearly perfect market intelligence. Facebook's data dominance creates self-reinforcing advantages through two types of "feedback loops."[841] First, by virtue of its significant number of users, Facebook has access to and collects more user data than its competitors.[842] And second, Facebook uses this data to create a more targeted user experience, which in turn attracts more users and leads those users to spend more time on the platform.[843] In contrast, smaller platforms with less access to data must compete by providing a different user experience with less targeting capacity. Facebook's data advantage is thus compounded over time, cementing Facebook's market position and making it even more difficult for new platforms to provide a competitive user experience.

---

[836] Mark Zuckerberg, *The Internet Needs New Rules*, WASH. POST (Mar. 29, 2019), https://www.washingtonpost.com/opinions/mark-zuckerberg-the-internet-needs-new-rules-lets-start-in-these-four-areas/2019/03/29/9e6f0504-521a-11e9-a3f7-78b7525a8d5f_story.html.

[837] *Id.*

[838] Competition & Mkts. Auth. Report at 137.

[839] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045364 (Feb. 4, 2014) (on file with Comm.).

[840] *Id.*

[841] Dig. Competition Expert Panel Report at 33.

[842] Competition & Mkts. Auth. Report at 143–44.

[843] *Id.*

**App. 220**

Facebook's data advantages also provide a monetization feedback loop. Revenue generated through targeted advertising to existing users can be reinvested into the platform, thereby attracting more users. Facebook's ability to provide targeted advertising is highly valuable to advertisers and allows Facebook to monetize its service. Meanwhile, smaller entrants are less attractive to advertisers since "no de novo entrant [has] access to anywhere near the volume or quality of data" as Facebook.[844] As with its user feedback loop, Facebook's monetization feedback loop creates a runaway virtuous circle that serves as a powerful barrier to entry.

Facebook's data also enables it to act as a gatekeeper because Facebook can exclude other firms from accessing its users' data.[845] Beginning in 2010, Facebook's Open Graph provided other companies with the ability to scale through its user base by interconnecting with Facebook's platform. Some companies benefited immensely from this relationship, experiencing significant user growth from Open Graph and in-app signups through Facebook Connect, now called Facebook Login.[846] Around that time, investors commented that Open Graph gave some companies "monstrous growth," referring to it as "steroids for startups."[847] For example, documents produced by Facebook indicate that it was the top referrer of traffic to Spotify, driving 7 million people "to install Spotify in the month after [Facebook] launched Open Graph."[848] At one point, nearly all of Spotify's growth originated from Facebook, while Pinterest "grew to 10 million users faster than any standalone site in the history of the Internet."[849]

Conversely, interconnecting with the Facebook Platform also gave the company the ability to prioritize access to its social graph—effectively picking winners and losers online.[850] These tools also gave Facebook advanced data insights into other companies' growth and usage trends. For example, a daily report on metrics for Facebook Login included daily and monthly active users for companies interconnecting with Facebook, referral traffic, and daily clicks, among other metrics. As this report

---

[844] Omidyar Network Report at 18.

[845] *See, e.g.*, Maurice Stucke & Allen Grunes, Big Data and Competition Policy 46 (2017).

[846] Also referred to as Facebook login, Facebook Connect allowed its users to connect their Facebook identity—their profile, friends, and other data—to other social apps through Facebook's APIs. The company explained in 2008 that "[w]ith Facebook Connect, users can bring their real identity information with them wherever they go on the Web, including: basic profile information, profile picture, name, friends, photos, events, groups, and more." Dave Morin, *Announcing Facebook Connect*, Facebook (Mar. 9, 2008), https://developers.facebook.com/blog/post/2008/05/09/announcing-facebook-connect/.

[847] Ben Popper, *Startup steroids: Pinterest feels the burn of Facebook's Open Graph*, The Verge (May 3, 2012), https://www.theverge.com/2012/5/3/2993999/pinterest-burn-facebook-open-graph-startup-steroids.

[848] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00049471 (Script of Keynote for Mobile World Congress (on file with Comm.).

[849] *Id.*

[850] *See, e.g.*, Maurice Stucke & Allen Grunes, Big Data and Competition Policy 46 (2017).

**App. 221**

noted, 8.3 million distinct sites used Facebook Connect on a monthly basis in March 2012.[851] Facebook was also able to exclude others from accessing this data.[852] As the United Kingdom's Competition and Markets Authority observed, "the inability of smaller platforms and publishers to access user data creates a significant barrier to entry."[853]

b.  Relevant Acquisitions

i.  Overview

Since its founding in 2004, Facebook has acquired at least 63 companies.[854] The majority of these acquisitions have involved software firms, such as Instagram, WhatsApp, Face.com, Atlas, LiveWire, and Onavo.[855] Facebook has also acquired several virtual reality and hardware companies, such as Oculus.[856] More recently, the company has acquired several niche social apps,[857] a blockchain platform,[858] Oculus game developers,[859] and a prominent GIF-making and sharing company.[860]

Facebook's internal documents indicate that the company acquired firms it viewed as competitive threats to protect and expand its dominance in the social networking market. As discussed earlier in this Report, Facebook's senior executives described the company's mergers and acquisitions strategy in 2014 as a "land grab" to "shore up our position."[861] In 2012, Mr. Zuckerberg told

---

[851] Production of Facebook, to H. Comm. on the Judiciary, FB_FTC_CID_00364078–147 (Mar. 24, 2012) (email on Daily Metrics Report) (on file with Comm.).

[852] *See* Stigler Report at 43.

[853] Competition & Mkts. Auth. Report at 15.

[854] *See* Aoife White, *Facebook Told by U.K. Watchdog to Monitor Giphy Independence*, BLOOMBERG (Aug. 10, 2020), https://www.bloomberg.com/news/articles/2020-08-10/facebook-told-by-u-k-watchdog-to-monitor-giphy-independence.

[855] *Id.*; BERKELEY, THE ACQUISITION TAKEOVER BY THE 5 TECH GIANTS, http://people.ischool.berkeley.edu/~neha01mittal/infoviz/dashboard/ (last visited on Sept. 28, 2020).

[856] *See, e.g.*, Josh Constine, *Facebook's $2 Billion Acquisition Of Oculus Closes, Now Official*, TECHCRUNCH (July 21, 2014), https://techcrunch.com/2014/07/21/facebooks-acquisition-of-oculus-closes-now-official/.

[857] *See, e.g.*, Jacob Kastrenakes, *Facebook is shutting down a teen app it bought eight months ago*, THE VERGE (July 2, 2018), https://www.theverge.com/2018/7/2/17528896/facebook-tbh-moves-hello-shut-down-low-usage.

[858] Stan Schroeder, *Facebook acquires team behind blockchain startup Chainspace*, MASHABLE (Dec. 5, 2019), https://mashable.com/article/facebook-acquires-blockchain-team-chainspace/.

[859] Dean Takahashi, *Facebook acquires Lone Echo VR game maker Ready At Dawn*, VENTURE BEAT (June 22, 2020), https://venturebeat.com/2020/06/22/facebook-acquires-lone-echo-vr-game-maker-ready-at-dawn/; Lucas Matney, *Facebook acquires the VR game studio behind one of the Rift's best titles*, TECHCRUNCH (Feb. 25, 2020), https://techcrunch.com/2020/02/25/facebook-acquires-the-vr-game-studio-behind-one-of-the-rifts-best-games/.

[860] Chaim Gartenberg, *Facebook is buying Giphy and integrating it with Instagram*, THE VERGE (May 15, 2020), https://www.theverge.com/2020/5/15/21259965/facebook-giphy-gif-acquisition-buy-instagram-integration-cost.

[861] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045388 (Feb. 18, 2014), https://judiciary.house.gov/uploadedfiles/0004538800045389.pdf ("[W]e are going to spend 5-10% of our market cap every couple years to shore up our position . . . I hate the word 'land grab' but I think that is the best convincing argument and we should own that."). Mr. Wehner is currently Facebook's Chief Financial Officer. He replaced David Ebersman, Facebook's

**App. 222**

Facebook's former Chief Financial Officer that the purpose of acquiring nascent competitors like Instagram was to neutralize competitive threats and to maintain Facebook's position. Documents show that when Facebook acquired WhatsApp, Mr. Zuckerberg and other senior executives, as well as data scientists, viewed WhatsApp as a potential threat to Facebook Messenger, as well as an opportunity to further entrench Facebook's dominance. Facebook used critical acquisitions to increase the adoption of its social graph and expand its reach in markets. Finally, Facebook's serial acquisitions reflect the company's interest in purchasing firms that had the potential to develop into rivals before they could fully mature into strong competitive threats.[862]

ii. Instagram

Instagram was founded in February 2010 by Kevin Systrom and Mike Krieger.[863] Originally launched as Burbn, a location-sharing social app,[864] the company released Instagram as a photo-sharing app for Apple iPhones in October 2010,[865] and released its app in the Google Play Store on April 3, 2012.[866]

On April 9, 2012, Facebook proposed its acquisition of Instagram for approximately $1 billion.[867] Facebook formally acquired Instagram in August 2012.[868] The Federal Trade Commission (FTC) opened an investigation into the acquisition but closed it in August 2012 without taking

---

former Chief Financial Officer, in June 2014. David Cohen, *Facebook CFO David Ebersman Leaving Company; David Wehner To Assume Post June 1*, ADWEEK (Apr. 23, 2014), https://www.adweek.com/digital/cfo-david-ebersman-leaving-david-wehner/.

[862] Austl. Competition & Consumer Comm'n Report at 81 ("While any of these acquisitions may not have amounted to a substantial lessening of competition, there appears to be a pattern of Facebook acquiring businesses in related markets which may or may not evolve into potential competitors, which has the effect of entrenching its market power.").

[863] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00087590 (July 19, 2011) (on file with Comm.) (Valuation of Burbn, Inc. as of May 31, 2011).

[864] *Id.*

[865] MG Siegler, *Instagram Launches With The Hope Of Igniting Communication Through Images*, TECHCRUNCH (Oct. 6, 2010), https://techcrunch.com/2010/10/06/instagram-launch/. The company received $500,000 in seed funding in March 2010 from Baseline Ventures and Andreesen Horowitz. It later received $7 million in another round of financing in December 2010 primarily from Benchmark Capital and Baseline Ventures. Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00101426 (Dec. 5, 2011) (on file with Comm.) (Instagram Financial History and Projections).

[866] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00106124 (Apr. 13, 2012) (on file with Comm.) (Instagram Chat Log); *see also* Matt Burns, *Instagram's User Count Now at 40 Million, Saw 10 Million New Users in Last 10 Days*, TECHCRUNCH (Apr. 13, 2012), *https://techcrunch.com/2012/04/13/instagrams-user-count-now-at-40-million-saw-10-million-new-users-in-last-10-days/*.

[867] The transaction's value was approximately $300 million in cash and roughly $700 million in shares of Facebook at the time of the transaction. Due to changes in the company's value following the launch of its IPO, the final transaction value was worth about $300 million in cash and $460 million in Facebook stock. *See* Facebook, Inc., Quarterly Report (Form 10-Q) 9 (Sept. 30, 2012), https://www.sec.gov/Archives/edgar/data/1326801/000132680112000006/fb-9302012x10q.htm.

[868] Facebook, Inc., Annual Report (Form 10-K) 5 (Dec. 31, 2012), https://www.sec.gov/Archives/edgar/data/1326801/000132680113000003/fb-12312012x10k.htm.

**App. 223**

action.[869] According to the FTC, "Upon further review of this matter, it now appears that no further action is warranted by the Commission at this time."[870] The letter added that the FTC's closing of the investigation "is not to be construed as a determination that a violation may not have occurred . . . . The Commission reserves the right to take such further action as the public interest may require."[871]

In the context of reports that Facebook was planning to integrate Whatsapp, Instagram, and Facebook Messenger,[872] and concerns about the company's motives for doing so,[873] a former employee of Instagram explained the ease with which Facebook and Instagram came together—and could potentially be pulled apart. They explained:

> Why can't Facebook fork the backend of the product? Facebook makes an odd argument that they use the same system. But you can just copy and paste code, make a copy of the system, and give it to the new company. If you can put them together, you can pull them apart. Facebook can always pull out the data that Instagram would not need. They spent the last year pushing the two products together, it just simply doesn't make sense that they can't work back to where they were in 2019. It's not like building a skyscraper and then suddenly needing to knock the building down again. They can just roll back the changes they've been making over the past year and you'd have two different apps again. It's not about the pipeline. It's an intangible object. You can just copy and paste. Right now, they have a switch inside the app. They could just change something from true to false and it would work. It's not building a skyscraper; it's turning something on and off.[874]

According to Facebook's internal documents, Facebook acquired Instagram to neutralize a nascent competitive threat. In 2012, Mark Zuckerberg wrote to several Facebook executives citing concerns that Instagram posed a risk to Facebook. In February 2012, he said to David Ebersman, Facebook's Chief Financial Officer, that he had "been thinking about . . . how much [Facebook] should be willing to pay to acquire mobile app companies like Instagram . . . that are building networks that

---

[869] Letter from April Tabor, Acting Sec. of the Fed. Trade Comm'n, to Thomas Barnett (Aug. 22, 2012), https://www.ftc.gov/sites/default/files/documents/closing_letters/facebook-inc./instagram-inc./120822barnettfacebookcltr.pdf.

[870] *Id.*

[871] *Id.*

[872] *See, e.g.*, Mike Isaac, *Zuckerberg Plans to Integrate WhatsApp, Instagram and Facebook Messenger*, N.Y. TIMES (Jan. 25, 2019), https://www.nytimes.com/2019/01/25/technology/facebook-instagram-whatsapp-messenger.html?auth=login-facebook.

[873] *See, e.g.*, Makena Kelly, *Facebook's messaging merger leaves lawmakers questioning the company's power*, THE VERGE (Jan. 28, 2019), https://www.theverge.com/2019/1/28/18200658/facebook-messenger-instagram-whatsapp-google-congress-markey-blumenthal-schatz-william-barr-doj-ftc.

[874] Email from Former Instagram Employee (Oct. 4, 2020).

are competitive with our own."[875] Mr. Zuckerberg told Mr. Ebersman that these "businesses are nascent but the networks are established, the brands are already meaningful and if they grow to a large scale they could be very disruptive to us."[876]

In response, Mr. Ebersman asked Mr. Zuckerberg whether the goals of the acquisition would be to: (1) neutralize a potential competitor; (2) acquire talent; or (3) integrate Instagram's product with Facebook's to improve its service.[877] Mr. Zuckerberg replied that a purpose of the transaction would be to neutralize Instagram, saying that the goals of the deal were "a combination of (1) and (3)." He explained:

> One thing that may make (1) more reasonable here is that there are network effects around social products and a finite number of different social mechanics to invent. Once someone wins at a specific mechanic, it's difficult for others to supplant them without doing something different. It's possible someone beats Instagram by building something that is better to the point that they get network migration, but this is harder as long as Instagram keeps running as a product.[878]

Mr. Zuckerberg wrote that acquiring Instagram would allow Facebook to integrate the product to improve its service. But, he added, that "in reality we already know these companies' social dynamics and will integrate them over the next 12-24 months anyway."[879] He explained:

> By a combination of (1) and (3), one way of looking at this is that **what we're really buying is time**. Even if some new competitors springs [sic] up, buying Instagram, Path, Foursquare, etc [sic] now will give us a year or more to integrate their dynamics before anyone can get close to their scale again. Within that time, if we incorporate the social mechanics they were using, those new products won't get much traction since we'll already have their mechanics deployed at scale.[880]

In March 2012, Mr. Zuckerberg told Mike Schroepfer, Facebook's Chief Technology Officer,[881] that acquiring Instagram would provide the company with "[i]nsurance" for Facebook's

---

[875] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00063220–23 (Feb. 27, 2012) (on file with Comm.).

[876] *Id.*

[877] *Id.*

[878] *Id.*

[879] *Id.*

[880] *Id.* (emphasis added).

[881] Mr. Schroepfer was Facebook's Vice President of Engineering at the time of the Instagram acquisition. He was elevated to Chief Technology Officer in March 2013. *See* Tomio Geron, *Facebook Names Mike Schroepfer CTO*, FORBES (Mar. 15, 2013), https://www.forbes.com/sites/tomiogeron/2013/03/15/facebook-names-mike-schroepfer-cto/#1a88880b20e3.

**App. 225**

main product.[882] Mr. Schroepfer agreed, responding that "not losing strategic position in photos is worth a lot of money."[883] He added that the "biggest risk" would be if Facebook were to "kill" Instagram "by not investing in the company and thereby opening a window for a new entrant."[884]

In a message to another Facebook employee on April 5, 2012, Mr. Zuckerberg said that "Instagram can hurt us meaningfully without becoming a huge business."[885] In contrast, he did not view other smaller firms, such as Pinterest and Foursquare, as comparable competitive threats.[886] As he noted, if these companies "become big we'll just regret not doing them . . . Or we can buy them then, or build them along the way."[887] In an all-hands meeting the following day, Mr. Zuckerberg responded to a question about Instagram's rapid growth by saying that "we need to dig ourselves out of a hole." [888] He also told employees at the company that Instagram is "growing really quickly" and that it would be "tough to dislodge them."[889]

Following the announcement of the transaction, Mr. Zuckerberg said internally that Facebook "can likely always just buy any competitive startups," and agreed with one of the company's senior engineers that Instagram was a "threat" to Facebook.[890] Mr. Zuckerberg concluded that "[o]ne thing about startups though is you can often acquire them."[891]

At the Subcommittee's sixth hearing, Judiciary Committee Chairman Jerrold Nadler (D-NY) asked Mr. Zuckerberg about his characterization of Instagram as a competitive threat prior to the acquisition.[892] In response, Mr. Zuckerberg said that Facebook has always viewed Instagram as "both a

---

[882] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00063184–85 (Mar. 9, 2012), https://judiciary.house.gov/uploadedfiles/0006318000063197.pdf. These documents are consistent with reporting. Following the acquisition, Gregor Hochmuth, an Instagram engineer, was reportedly told by employees on the Facebook Camera team that "our job was to kill you guys." Following the acquisition, Instagram's employees were also reportedly told by Facebook's growth team "Instagram wouldn't get any help adding users unless they could determine, through data, that the product wasn't competitive with Facebook." SARAH FRIER, NO FILTER 90 (2020).

[883] Id. at FB-HJC-ACAL-00063180, https://judiciary.house.gov/uploadedfiles/0006318000063197.pdf.

[884] Id. at FB-HJC-ACAL-00063184–85, https://judiciary.house.gov/uploadedfiles/0006318000063197.pdf.

[885] Id. at FB-HJC-ACAL-00063319, https://judiciary.house.gov/uploadedfiles/0006331600063321.pdf.

[886] Id. at FB-HJC-ACAL-00063319–20 (Apr. 5, 2012), https://judiciary.house.gov/uploadedfiles/0006331600063321.pdf.

[887] Id.

[888] Id. at FB-HJC-ACAL-00047340 (Apr. 6, 2012) (on file with Comm.).

[889] Id.

[890] Id. at FB-HJC-ACAL-00067600 (Apr. 9, 2012), https://judiciary.house.gov/uploadedfiles/0006760000067601.pdf.

[891] Id. at FB-HJC-ACAL-00063341 (Apr. 9, 2012), https://judiciary.house.gov/uploadedfiles/0006334000063341.pdf

[892] CEO Hearing Transcript at 43 (question of Rep. Jerrold Nadler (D-NY), Chairman, H. Comm. on the Judiciary).

**App. 226**

competitor and as a complement to our services."[893] He added that at the time of the transaction, Instagram was a competitor in mobile photos and camera apps.[894]

Chairman Nadler also asked that if this "was an illegal merger at the time of the transaction, why shouldn't Instagram now be broken off into a separate company?"[895] In response, Mr. Zuckerberg said that "with hindsight, it probably looks obvious that Instagram would have reached the scale that it has today."[896] But he elaborated:

> It was not a guarantee that Instagram was going to succeed. The acquisition has done wildly well, largely because not just of the founders' talent but because we invested heavily in building up the infrastructure and promoting it and working on security and working on a lot of things around this, and I think that this has been an American success story.[897]

This response, however, is not consistent with many of the documents Facebook provided to the Subcommittee.[898]

Instagram was growing significantly at the time of the transaction. In December 2011, with only 13 employees, Instagram already had 14 million users.[899] Instagram's internal financial history and projections noted that it did not plan to charge for its app or for downloading filters due to its "rapid user growth" and "implied network value."[900] Instagram's internal market projections showed the company growing to nearly 20 million users by January 2012 with a 22% monthly growth rate.[901] By March 31, 2012, Instagram had 30.2 million users and a 17% user growth rate.[902] After releasing its

---

[893] *Id.* at 44 (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[894] *Id.* (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[894] *Id.*

[895] *Id.* at 45 (question of Rep. Jerrold Nadler (D-NY), Chairman, H. Comm. on the Judiciary).

[896] *Id.* at 46 (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[897] *Id.* (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

[898] *Id.* at 46 (statement of the Rep. Jerrold Nadler (D-NY), Chairman, H. Comm. on the Judiciary) ("Facebook, by Mr. Zuckerberg's own admission and by the documents we have from the time, Facebook saw Instagram as a threat that could potentially syphon business away from Facebook. And so, rather than compete with it, Facebook bought it. This is exactly the type of anticompetitive acquisition that the antitrust laws were designed to prevent. This should never have happened in the first place. It should never have been permitted to happen, and it cannot happen again.").

[899] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00101426 (Dec. 5, 2011) (on file with Comm.) (Instagram Financial History and Projections).

[900] *Id.*

[901] *Id.* at FB-HJC-ACAL-00101473 (Dec. 5, 2011) (Instagram Budget).

[902] *Id.* at FB-HJC-ACAL-0110268 (2012) (Instagram Growth and Projections).

**App. 227**

app in the Google Play Store on April 3, 2012, Instagram added ten million users within ten days,[903] growing to nearly 50 million users by April 30, 2012,[904] and 100 million users by the time the acquisition closed in August 2012.[905]

Instagram's growth also appeared to be sustainable. In an email between senior executives at both companies on April 16, 2012, Instagram's head of business operations said that Instagram had not had difficulties with scaling or cloud storage availability, noting that "[s]caling has been really easy" despite the need to "keep adding machine capacity."[906] They also noted that user uptake on Android devices exceeded the company's expectations, but did not raise concerns about their ability to scale in response to this demand.[907]

Facebook's support of Instagram's growth after acquiring it is overstated. Before acquiring Instagram, Mr. Zuckerberg said that Facebook should "invest a few more engineers in it" but let Instagram "run relatively independently."[908] Prior to being acquired, Instagram's internal projections showed the company gaining nearly 88 million users by January 2013,[909] and that its growth trajectory would not be significantly affected by the transaction.[910]

### iii. WhatsApp

#### 1) Overview

WhatsApp was founded in February 2009 by Jan Koum and Brian Acton.[911] Originally designed to allow users to provide temporary updates to their contacts,[912] WhatsApp is a cross-platform messaging and calling service.[913] Unlike traditional text and multimedia messages sent over a

---

[903] *Id.* at FB-HJC-ACAL-00106124 (Apr. 13, 2012) (Instagram Chat Log).

[904] *Id.* at FB-HJC-ACAL-00106131 (Apr. 30, 2012).

[905] Facebook, Inc., Annual Report (Form 10-K) 5 (Dec. 31, 2012), https://www.sec.gov/Archives/edgar/data/1326801/000132680113000003/fb-12312012x10k.htm.

[906] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00110279 (Apr. 16, 2012) (on file with Comm.) (Instagram's Growth Projections); *see generally* SARAH FRIER, NO FILTER (2020) ("Every hour, Instagram seemed to grow faster. D'Angelo eventually helped the company transition to renting server space from Amazon Web Services instead of buying their own.").

[907] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00110279 (Apr. 16, 2012) (on file with Comm.) (Instagram's Growth Projections).

[908] *Id.* at FB-HJC-ACAL-00063184–85 (Mar. 9, 2012), https://judiciary.house.gov/uploadedfiles/0006318000063197.pdf.

[909] *Id.* at FB-HJC-ACAL-0110268 (2012) (on file with Comm.) (Instagram's Growth Projections).

[910] *Id.*

[911] STEVEN LEVY, FACEBOOK: THE INSIDE STORY 317–18 (2020).

[912] *Id.* at 319.

[913] Letter from Reginald Brown and Jon Yarowsky to H. Comm. on the Judiciary (Oct. 14, 2019), FB-AJC-ACAL-APP00003.

**App. 228**

cellular network at the time, WhatsApp messages and calls do not require a cellular connection, and are transmitted by an internet connection.[914] A main distinction between Facebook Messenger and WhatsApp is the network that people are able to communicate with on each messaging service. A Facebook user can only send messages to other Facebook users on the Messenger app, whereas a WhatsApp user can send messages to other people based on contacts on their mobile device.[915]

Until 2016, WhatsApp monetized its service through subscriptions for a nominal fee after the first year of use.[916] Around that time, WhatsApp was the only messaging app that competed using this business model.[917] Importantly, WhatsApp's founders strongly opposed an advertisement-based business model. In June 2012, they wrote that "when advertising is involved **you the user** are the product," explaining:

> Advertising isn't just the disruption of aesthetics, the insults to your intelligence and the interruption of your train of thought. At every company that sells ads, a significant portion of their engineering team spends their day tuning data mining, writing better code to collect all your personal data, upgrading the servers that hold all the data and making sure it's all being logged and collated and sliced and packaged and shipped out.[918]

WhatsApp also maintained robust privacy policies. In its June 2012 privacy policy, WhatsApp stated that it does not collect names, emails, location data, or the contents of messages sent through WhatsApp.[919] According to its policy, "WhatsApp is currently ad-free and we hope to keep it that way forever."[920]

---

[914] *Id.* Although WhatsApp originally charged a subscription fee after the first year of use, it removed fees in January 2016. *See also Making WhatsApp free and more useful*, WHATSAPP (Jan. 18, 2016), https://blog.whatsapp.com/making-whats-app-free-and-more-useful.

[915] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00042171 (2014) (on file with Comm.).

[916] STEVEN LEVY, FACEBOOK: THE INSIDE STORY 320 (2020) ("'We were building a communication service,' says Acton. 'You pay forty bucks a month to Verizon for their service, I figured a dollar a year was enough for a messaging service.'").

[917] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00042157 (2014) (on file with Comm.) ("To the best of WhatsApp's knowledge, Threema is the only other provider that has adopted a model based on usage fees. In contrast to WhatsApp's subscription model, users of Threema pay a one-time fee for a life-time service.").

[918] *Why we don't sell ads*, WHATSAPP (June 18, 2012), https://blog.whatsapp.com/why-we-don-t-sell-ads. ("Advertising has us chasing cars and clothes, working jobs we hate so we can buy shit we don't need.").

[919] *Privacy Notice,* WHATSAPP (July 7, 2012), https://www.whatsapp.com/legal?doc=privacy-policy&version=20120707.

[920] *Id.*

**App. 229**

### 2)  Acquisition Review

On February 19, 2014, Facebook announced its proposed acquisition of WhatsApp for approximately $16 billion at the time of the announcement.[921] Following the transaction, WhatsApp's co-founder wrote that the company would "remain autonomous and operate independently" from Facebook, and that "nothing" will change for users because there "would have been no partnership between our two companies if we had to compromise on the core principles that will always define our company, our vision and our product."[922] Mr. Zuckerberg said that "[w]e are absolutely not going to change plans around WhatsApp and the way it uses user data."[923]

The Federal Trade Commission opened an initial investigation into the proposed transaction on March 13, 2014. On April 10, 2014, the FTC's Director of the Bureau of Consumer Protection sent a letter advising the companies that WhatsApp "must continue to honor" its privacy data security commitments to its users, and that "a failure to keep promises made about privacy constitutes a deceptive practice under section 5 of the FTC Act."[924] The Commission did not initiate a full-phase investigation into the acquisition.

In September 2014, the European Commission initiated a review of Facebook's proposed acquisition of WhatsApp.[925] At the time of the transaction, Facebook calculated that the combined share of Facebook Messenger and WhatsApp in February 2014 was approximately 36% of the European Economic Area (EEA) market.[926] In a filing in support of the transaction, Facebook told the European Commission that multi-homing—the use of multiple apps with similar features—was a key characteristic of the messaging market, saying that "approximately 70% of consumers use at least two, and 43% use at least three, communications apps in parallel."[927] Facebook characterized the WhatsApp

---

[921] The transaction included $4 billion in cash and approximately $12 billion of Facebook shares. *Facebook to Acquire WhatsApp*, FACEBOOK (Feb. 19, 2014), https://about.fb.com/news/2014/02/facebook-to-acquire-whatsapp/. The final value of WhatsApp exceeded $21 billion due to changes in the value of Facebook's stock during the transaction and due to the addition of granting $3 billion in Facebook shares following the closing of the transaction. Sarah Frier, *Facebook $22 Billion WhatsApp Deal Buys $10 Million in Sales,* BLOOMBERG (Oct. 29, 2014), https://www.bloomberg.com/news/articles/2014-10-28/facebook-s-22-billion-whatsapp-deal-buys-10-million-in-sales.

[922] *Facebook*, WHATSAPP (Feb. 19, 2014), https://blog.whatsapp.com/facebook ("Here's what will change for you, our users: nothing.").

[923] Jessica Guynn, *Mark Zuckerberg: WhatsApp worth even more than $19 billion*, L.A. TIMES (Feb. 24, 2014), https://www.latimes.com/business/la-xpm-2014-feb-24-la-fi-tn-mark-zuckerberg-whatsapp-worth-even-more-than-19-billion-20140224-story.html.

[924] Letter from Jessica Rich, Dir., Bur. of Consumer Protection of the Fed. Trade Comm'n, to Erin Egan, Chief Privacy Officer, Facebook, Inc., & Anne Hoge, Gen. Counsel, WhatsApp, 1–2 (Apr. 10, 2014), https://www.ftc.gov/system/files/documents/public_statements/297701/140410facebookwhatappltr.pdf.

[925] Facebook noticed the proposed transaction to the European Commission on August 29, 2014. Press Release, Eur. Comm'n, Mergers: Commission approves acquisition of WhatsApp by Facebook (Oct. 3, 2014), https://ec.europa.eu/commission/presscorner/detail/en/IP_14_1088.

[926] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00042161 (on file with Comm.).

[927] *Id.* at FB-HJC-ACAL-00042160.

**App. 230**

product market as being distinct from the social networking market because WhatsApp "does not offer social features," and represented that it had "no plans to make changes to WhatsApp's current strategy" after closing the proposed acquisition.[928]

On October 3, 2014, the European Commission approved the proposed transaction, finding that "Facebook Messenger and WhatsApp are not close competitors and that consumers would continue to have a wide choice of alternative consumer communications apps after the transaction."[929] Although the European Commission noted that the messaging apps are characterized by network effects, it concluded that Facebook would "continue to face sufficient competition after the merger."[930] The Commission acknowledged that there is overlap between social networking and messaging apps. As it noted, the distinction between these apps is "becoming blurred and each of these services adopts traditional functionalities of the other." [931] However, the Commission concluded that social networking services generally provide more social features than messaging apps—such as commenting on or "liking" other users' posts and photos—whereas messaging apps had more limited functionality that is focused on real-time communication.[932]

In 2016, the European Commission fined Facebook after it concluded that Facebook provided "incorrect or misleading information" during the Commission's review of the transaction.[933] In its Statement of Objections to Facebook, the Commission concluded that Facebook provided misleading evidence on whether the company could match its users' accounts with those of WhatsApp's users.[934] In August 2016, WhatsApp had updated its policies to allow the linking of Facebook user identities with WhatsApp user phone numbers.[935] As discussed below, Facebook intended to create this functionality at the time of the transaction.[936]

Documents obtained by the Subcommittee indicate that Facebook acquired WhatsApp to expand its dominance. Prior to acquiring WhatsApp, Facebook viewed the acquisition as providing an opportunity to expand its reach in countries with intermediate levels of penetration.[937] Facebook's

---

[928] *Id.* at FB-HJC-ACAL-00042173.

[929] Press Release, Eur. Comm'n, Mergers: Commission approves acquisition of WhatsApp by Facebook (Oct. 3, 2014), https://ec.europa.eu/commission/presscorner/detail/en/IP_14_1088.

[930] *Id.*

[931] Facebook/WhatsApp Android (Case M.7217) Commission Decision No. 139/2004 [2014], para. 52, https://ec.europa.eu/competition/mergers/cases/decisions/m7217_20141003_20310_3962132_EN.pdf.

[932] *Id.* at para. 54.

[933] Press Release, Eur. Comm'n, Mergers: Commission fines Facebook €110 million for providing misleading information about WhatsApp takeover (May 18, 2017), https://ec.europa.eu/commission/presscorner/detail/en/IP_17_1369.

[934] *Id.*

[935] *Id.*

[936] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045364 (Feb. 4, 2014) (on file with Comm.).

[937] *Id.*

**App. 231**

internal documents at the time of the transaction reveal that WhatsApp had already tipped markets in its favor where it had high penetration.[938]

In an internal email to Facebook's management team, Facebook Director of Growth Javier Olivan wrote that WhatsApp had higher levels of reach and usage than Facebook in countries that it had penetrated. For example, based on Facebook's internal data, WhatsApp reached 99.9% of the smartphone population in Spain, or as Mr. Olivan described it, "literally everyone."[939] By purchasing WhatsApp, Mr. Olivan suggested that they could "grow Facebook even further" by exposing new users to Facebook.[940] Additionally, by bundling free services with WhatsApp and Facebook's other services, the transaction could serve as another mechanism to expand Facebook's reach among WhatsApp users.[941] Mr. Zuckerberg responded supportively, saying that "I really agree with this analysis."[942]

In an email to David Ebersman, Facebook's Chief Financial Officer, Mr. Olivan wrote that WhatsApp's "reach amongst smartphone users is actually bigger than ours . . . we have close to 100% overlap, our user-base being a subset of theirs."[943] He explained that "in markets where they do well, they literally reach 100% of smartphone users—which is a big part of the population."[944] In the company's internal documents describing the transaction rationale, there was a heavy emphasis on WhatsApp's growth and usage—450 million users, a clear path to a billion users, and adding one million new users every day with no marketing—and expanding Facebook's social graph to phones.[945] Prior to the acquisition, Mr. Zuckerberg had requested a list of all mobile apps with more than 100 million daily and monthly active users globally.[946] Facebook's data showed that WhatsApp had the second most daily active users and fourth most monthly active users of any freestanding mobile app.[947]

Finally, a week after announcing the transaction, David Wehner, then-Vice President of Corporate Finance and Business Planning at Facebook, said to Mr. Ebersman that "we are going to spend 5-10% of our market cap every couple years to shore up our position."[948] Mr. Wehner said that

---

[938] *See, e.g., id.*

[939] *Id.*

[940] *Id.*

[941] *Id.*

[942] *Id.* at FB-HJC-ACAL-00045363.

[943] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045388 (Feb. 18, 2014), https://judiciary.house.gov/uploadedfiles/0004538800045389.pdf.

[944] *Id.*

[945] *Id.* at FB-HJC-ACAL-00045379–87 (Feb. 19, 2014) (on file with Comm.).

[946] *Id.*

[947] *Id.*

[948] *Id.* at FB-HJC-ACAL-00045388 (Feb. 18, 2014), https://judiciary.house.gov/uploadedfiles/0004538800045389.pdf.

**App. 232**

"I hate the word 'land grab' but I think that is the best convincing argument and we should own that."[949]

Other documents indicate that Facebook viewed WhatsApp as a maverick competitor. In December 2013, Mr. Zuckerberg sent an email to Facebook's management team on competitive issues facing the company. In this email, he called attention to a feature that WhatsApp had implemented on its platform, and warned that Facebook should move quickly:

> I want to call out two competitive near term issues we face. The first is WhatsApp adding a feature like this for public figures . . . If the space is going to move in this direction, being the leader and establishing the brand and network effects matters a lot. This alone should encourage us to consider this soon. . . . When the world shifts like this, being first is how you build a brand and network effect. We have an opportunity to do this at scale, but that opportunity won't last forever. I doubt we even have a year before WhatsApp starts moving in this direction.[950]

Facebook's documents also indicate that the company monitored WhatsApp closely to determine whether it was a threat to the Messenger app. Prior to consummating the merger, Facebook's data scientists used Onavo data to model WhatsApp's engagement and reach to determine whether it was "killing Facebook Messenger,"[951] as well as how its usage trends compared to Snapchat.[952]

c.  Conduct

In addition to protecting and expanding its dominance by acquiring firms that Facebook identified as competitive threats over the past decade, Facebook abused its monopoly power to harm competition in the social networking market. Facebook used its data advantage to create superior market intelligence to identify nascent competitive threats and then acquire, copy, or kill these firms. Once dominant, Facebook selectively enforced its platform policies based on whether it perceived other companies as competitive threats. In doing so, it advantaged its own services while weakening other firms.

i.  Facebook's Use of Non-Public Data to Identify Competitive Threats

Prior to Facebook's acquisition of Instagram, Facebook used internal data to track the growth of Instagram and other popular apps. While this data was probative for companies that interconnected

---

[949] *Id.*

[950] *Id.* at, FB-HJC-ACAL-00046826–34 (Dec. 13, 2013) (on file with Comm.).

[951] *Id.* at FB-HJC-ACAL-00014564–74 (Mar. 27, 2014).

[952] *Id.* at FB-HJC-ACAL-00014575.

**App. 233**

with Facebook through Open Graph, it was incomplete for studying mobile app usage trends across the entire mobile ecosystem. In April 2012, Facebook's Director of Growth Javier Olivan emailed Mr. Zuckerberg and Facebook Chief Product Officer Chris Cox, about improving Facebook's "competitive research."[953] He said that "getting our data in great shape is going to require effort."[954] Although the company had made "some good progress" using data from Comscore, a data analytics and measurement firm, Mr. Olivan said that with a significant investment, Facebook could build its own custom panel for mobile data that would "allow us to get 10x better at understanding" the mobile ecosystem:

> I keep seeing the same suspects (instagram, pinterest, …) [sic] both on our competitive radar / platform strategy as wins . . . I think having the exact data about their users [sic] engagement, value they derive from [Facebook] . . . would help us make more bold decisions on whether they are friends or foes. Back to your thread about "copying" vs. "innovating" we could also use this info to inspire our next moves.[955]

Mr. Zuckerberg responded: "Yeah, let's do it. We can find some time periodically during my weekly reviews to go over this stuff."[956]

A year later, on October 14, 2013, Facebook acquired Onavo, a virtual private network (VPN), for $115 million and other consideration.[957] In an email to Facebook's board, Facebook's Vice President and Deputy General Counsel said the purpose of the acquisition was to "enhance our analytics related to cross-app user engagement data, as well as user behavior and market trends, and also to improve advertising effectiveness through demand data and audience targeting in the long term."[958] Importantly, Facebook planned to place the incoming Onavo employees, including its cofounder, Guy Rosen, under Facebook's Growth team reporting to Javier Olivan.[959]

Facebook's acquisition of Onavo provided the company with the ability to track potential competitors through non-public, real-time data about engagement, usage, and how much time people spend on apps. Following this acquisition, Facebook used Onavo data as an "early bird warning

---

[953] *Id.* at FB-HJC-ACAL-00068928 (Apr. 3, 2012).

[954] *Id.*

[955] *Id.*

[956] *Id.* at FB-HJC-ACAL-00068929.

[957] Hayley Tsukayama, *Facebook acquires Israeli start-up Onavo to bolster data compression and mobile tech*, WASH. POST (Oct. 14, 2013), https://blogs.wsj.com/digits/2013/10/14/facebook-deal-gives-it-office-in-israel/.

[958] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00072168 (Oct. 9, 2013) (on file with Comm.).

[959] *Id.*

**App. 234**

system,"[960] identifying fast-growing apps that could potentially threaten Facebook's market position or enable it to protect and expand its dominance. For instance, days prior to Facebook's acquisition of WhatsApp in 2014, Facebook senior executives provided Mark Zuckerberg with a list of all mobile apps with greater than 90 million monthly active users—WhatsApp, one of the only top mobile apps not owned at the time by either Facebook or Google, was fourth on the list.[961]

In August 2018, Apple removed Onavo from its app store following reporting that Facebook was using the app to track users and other apps.[962] An Apple spokesperson said the company intended to make "it explicitly clear that apps should not collect information about which other apps are installed on a user's device for the purposes of analytics or advertising/marketing and must make it clear what user data will be collected and how it will be used."[963] In January 2019, Apple removed Facebook's functional successor to Onavo, the Facebook Research app, following reports by *TechCrunch* that Facebook paid "teenagers and adults to download the Research app and give it root access to network traffic in what may be a violation of Apple policy so the social network can decrypt and analyze their phone activity."[964]

Most recently, Facebook acquired Giphy, a platform for sharing GIFs online and through messaging apps, for $400 million in May 2020.[965] As several reporters have noted, this transaction would give Facebook competitive insights into other messaging apps. One commenter said, "While you may successfully block trackers like the Facebook ad pixel following you around online, or even delete your Facebook account, the majority of us wouldn't suspect we're being monitored when we're sending funny images to friends."[966]

---

[960] Betsy Morris & Deepa Seetharaman, *The New Copycats: How Facebook Squashes Competition From Startups*, WALL ST. J. (Aug. 9, 2017), https://www.wsj.com/articles/the-new-copycats-how-facebook-squashes-competition-from-startups-1502293444.

[961] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00045412–14 (Feb. 16, 2014), https://judiciary.house.gov/uploadedfiles/0004541200045414.pdf.

[962] Deepa Seetharaman, *Facebook Removes Data-Security App From Apple Store*, WALL ST. J. (Aug. 22, 2018), https://www.wsj.com/articles/facebook-to-remove-data-security-app-from-apple-store-1534975340.

[963] Taylor Hatmaker, *Apple removed Facebook's Onavo from the App Store for gatherine app data*, TECHCRUNCH (Aug. 22, 2018), https://techcrunch.com/2018/08/22/apple-facebook-onavo/.

[964] Josh Constine, *Facebook pays teens to install VPN that spies on them*, TECHCRUNCH (Jan. 29, 2019), https://techcrunch.com/2019/01/29/facebook-project-atlas/; Josh Constine, *Apple bans Facebook's Research app that paid users for data*, TECHCRUNCH (Jan. 30, 2019), https://techcrunch.com/2019/01/30/apple-bans-facebook-vpn/.

[965] Kurt Wagner & Sarah Frier, *Facebook Buys Animated Image Library Giphy for $400 Million*, BLOOMBERG (May 15, 2020), https://www.bloomberg.com/news/articles/2020-05-15/facebook-buys-animated-image-library-giphy-to-boost-messaging; *see, e.g.*, Vivek Karuturi (@VivekxK), TWITTER (May 15, 2020, 11:43 AM), https://twitter.com/VivekxK/status/1261321201210626048.

[966] Owen Williams, *How Facebook Could Use Giphy to Collect Your Data*, ONEZERO (May 15, 2020), https://onezero.medium.com/how-facebook-could-use-giphy-to-collect-your-data-70824aa2647b.

**App. 235**

ii.  Facebook's Strategy to Acquire, Copy, or Kill Competitors

Facebook's internal documents indicate that once it identified a competitive threat, it attempted to buy or crush them by cloning their product features or foreclosing them from Facebook's social graph. Facebook took these steps to harm competitors and insulate Facebook from competition, not just to grow or offer better products and services.

In a March 2012 email to other senior executives at Facebook, Mr. Zuckerberg wrote that cloning other apps could help Facebook move faster by "building out more of the social use cases ourselves and prevent our competitors from getting footholds."[967] Other senior employees at Facebook agreed with this strategy. Sheryl Sandberg, Facebook's Chief Operating Officer, said that "it is better to do more and move faster, especially if that means you don't have competitors build products that takes some of our users." Sam Lessin, Facebook's Product Management Director, added, "I would love to be far more aggressive and nimble in copying competitors. . . Let's 'copy' (aka super-set) Pinterest!"[968] Another senior executive responded, "I've been thinking about why we haven't moved faster on Roger and Snap . . . I'm increasingly concerned as I watch startups siphon our graph and create awesome new experiences faster than we can."[969]

Prior to its acquisition of Instagram in 2012, Facebook's senior executives had identified Instagram as a growing threat. Mr. Zuckerberg told employees at an internal meeting that the "bad news is that [Instagram is] growing really quickly, they have a lot of momentum, and it's going to be tough to dislodge them."[970] One engineer wrote in an internal company chat that "Instagram is eating our lunch. We should've owned this space but we're already losing quite badly."[971] In response, another engineer asked, "Isn't that why we're building an Instagram clone?" referencing Facebook's development of Facebook Camera, a standalone photo app.[972]

During negotiations to acquire Instagram, Mr. Zuckerberg referenced Facebook's development of a similar app to Kevin Systrom, Instagram's Chief Executive Officer.[973] In messages between Mr. Zuckerberg and Mr. Systrom, Mr. Systrom said that it was difficult to evaluate the transaction independently of reports that Facebook was developing a similar product. He told Mr. Zuckerberg that

---

[967] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00053511–16 (Mar. 30, 2012) (on file with Comm.).

[968] *Id.*

[969] *Id.* at FB-HJC-ACAL-00067549 (Apr. 3, 2012).

[970] *Id.* at FB-HJC-ACAL-00047340 (Apr. 6, 2012).

[971] *Id.* at FB-HJC-ACAL-00063367 (Jan. 26, 2012), https://judiciary.house.gov/uploadedfiles/0006336700063373.pdf.

[972] Josh Constine, *FB launches Facebook Camera—An Instagram-Style Photo Filtering, Sharing, Viewing iOS App*, TECHCRUNCH (May 24, 2012), https://techcrunch.com/2012/05/24/facebook-camera/.

[973] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00091648–50 (Mar. 20, 2012) (on file with Comm.).

**App. 236**

he "wouldn't feel nearly as strongly [about the acquisition] if independently you weren't building a mobile photos app that makes people choose which engine to use."[974] Similarly, Mr. Zuckerberg suggested that refusing to enter into a partnership with Facebook, including an acquisition, would have consequences for Instagram, referencing the product Facebook was developing at the time:

> At some point soon, you'll need to figure out how you actually want to work with us. This can be an acquisition, through a close relationship with Open Graph, through an arms length relationship using our traditional APIs, or perhaps not at all. . . Of course, at the same time we're developing our own photos strategy, so how we engage now will determine how much we're partners vs. competitors down the line—and I'd like to make sure we decide that thoughtfully as well.[975]

In an earlier conversation with Matt Cohler, an Instagram investor and former senior Facebook adviser, Mr. Systrom asked whether Mr. Zuckerberg would "go into destroy mode if I say no" to being acquired, saying that the companies "have overlap in features."[976] Mr. Cohler responded "probably" and that Mr. Zuckerberg would "conclude that it's best to crush [I]nstagram."[977]

Facebook's approach towards rival social networking app Snapchat is another case study in how Facebook enters "destroy mode" when its market position is threatened. In 2013, as the company was growing rapidly, Snapchat co-founder Evan Spiegel turned down an offer from Mr. Zuckerberg to acquire the company for $3 billion.[978] Thereafter, Instagram—owned by Facebook—introduced the Instagram Stories feature, which allows users to post content that is available for only 24 hours, and which was "nearly identical to the central feed in Snapchat, which [was] also called Stories."[979]

Less than a year after its introduction, Instagram Stories had more daily active users (200 million) than Snapchat Stories (161 million).[980] By 2018, Instagram Stories had doubled the number of

---

[974] *Id.*

[975] *Id.*

[976] *Id.* at FB-AJC-ACAL-0010438 (Feb. 13, 2012), https://judiciary.house.gov/uploadedfiles/0010143800101441.pdf.

[977] *Id.*

[978] Evelyn Rusli & Douglas MacMillan, *Messaging Service Snapchat Spurned $3 Billion Facebook Bid*, WALL ST. J. (Nov. 13, 2013), https://www.wsj.com/articles/messaging-service-snapchat-spurned-facebook-bid-1384376628.

[979] Casey Newton, *Instagram's new stories are a near-perfect copy of Snapchat stories*, THE VERGE (Aug. 2, 2016), https://www.theverge.com/2016/8/2/12348354/instagram-stories-announced-snapchat-kevin-systrom-interview.

[980] Kaya Yurieff, *Instagram's Snapchat clone is more popular than Snapchat*, CNN BUS. (Apr. 13, 2017), https://money.cnn.com/2017/04/13/technology/instagram-stories-snapchat/index.html.

**App. 237**

Snapchat Stories daily users.[981] When discussing Instagram's decision to clone the Snapchat feature, Instagram VP of Product Kevin Weil remarked: "This is the way the tech industry works."[982]

In another example, Facebook executives approached Houseparty, a social networking app,[983] about a potential acquisition. Houseparty's founders turned down Facebook's offer, and released the product they referred to as "the internet's living room."[984] Shortly thereafter, Facebook announced that its Messenger app would become a "virtual living room."[985] Houseparty's active user base fell by half between 2017 and 2018.[986]

At the Subcommittee's sixth hearing, Representative Henry C. "Hank" Johnson, Jr. (D-GA) asked Mr. Zuckerberg about Facebook's use of data to identify competitive threats. Representative Johnson noted that "over nearly a decade, Mr. Zuckerberg, you led a sustained effort to surveil smaller competitors to benefit Facebook. These were steps taken to abuse data, to harm competitors, and to shield Facebook from competition."[987] He asked Mr. Zuckerberg whether Facebook used Onavo data to purchase WhatsApp. Mr. Zuckerberg responded:

> I think every company engages in research to understand what their customers are enjoying so they can learn and make their products better. And that's what we were trying to do. That is what our analytics team was doing. And I think, in general, that allowed us to make our services better for people to be able to connect in a whole lot of different ways, which is our goal. . . . [Onavo] was one of the signals that we had about WhatsApp's trajectory, but we didn't need it. Without a doubt, it was pretty clear that WhatsApp was a great product.[988]

---

[981] *Id.*

[982] Josh Constine, *Instagram on copying Snapchat: "This is the way the tech industry works,"* TECHCRUNCH (May 16, 2017), https://techcrunch.com/2017/05/16/to-clone-or-not-to-clone/.

[983] Betsy Morris & Deepa Seetharaman, *The New Copycats: How Facebook Squashes Competition From Startups,* WALL ST. J. (Aug. 9, 2017), https://www.wsj.com/articles/the-new-copycats-how-facebook-squashes-competition-from-startups-1502293444.

[984] *Id.*

[985] *Id.*

[986] Mansoor Iqbal, *Houseparty Revenue and Usage Statistics* (2020) (June 23, 2020), https://www.businessofapps.com/data/houseparty-statistics/.

[987] CEO Hearing Transcript at 149–50 (question of Rep. Henry C. "Hank" Johnson, Jr. (D-GA), Chairman, Subcomm. on Courts & Intellectual Property, H. Comm. on the Judiciary).

[988] *Id.* (statement of Mark Zuckerberg, CEO, Facebook, Inc.).

**App. 238**

### iii. Facebook Weaponized Access to its Platform

Internal communications by Facebook's senior executives and interviews with former employees at the company indicate that Facebook selectively enforced its platform policies based on whether it perceived other companies as competitive threats.

Facebook developed the Facebook Platform to connect other applications to Facebook's social graph. In an interview in 2007, Mr. Zuckerberg described the goals of the Facebook Platform as making "Facebook into something of an operating system so you can run full applications."[989] A year later, in an email to senior executives at Facebook, Mr. Zuckerberg described Facebook Platform as key to the company's long term success:

> Platform is key to our strategy because we believe that there will be a lot of different social applications and ways that people communicate and share information, and we believe we can't develop all of them ourselves. Therefore, even though it's a challenge for us to get this right, it's important for us to focus on it because the company that defines this social platform will be in the best position to offer the most good ways for people to communicate and succeed in the long term.[990]

Over the next few years, Facebook recognized that access to its social graph provided other applications with a tool for significant growth. In exchange, Facebook hosted content that kept users engaged on its social graph, and considered other ways to monetize this relationship, such as through revenue sharing or advertisements.

By 2012, however, Facebook's senior executives realized that apps could use the Facebook Platform to build products that were competitive with Facebook and "siphon our users."[991] Mike Vernal, Facebook's Vice President of Product and Engineer, described this dynamic to Doug Purdy, Facebook's Director of Product Management:

> When we started Facebook Platform, we were small and wanted to make sure we were an essential part of the fabric of the Internet. We've done that—**we're now the biggest service on earth**. When we were small, apps helped drive our ubiquity. **Now that we are big, (many) apps are looking to siphon off our users to competitive services**. We

---

[989] David Kirkpatrick, *Facebook's plan to hook up the world*, CNN Money (May 29, 2007), https://money.cnn.com/2007/05/24/technology/facebook.fortune/.

[990] Production of Facebook, to H. Comm. on the Judiciary, FB_FTC_CID_00072185–88 (Feb. 14, 2008) (on file with Comm.).

[991] *Id.* at FB_FTC_CID_00072020–23 (Feb. 14, 2013) (emphasis added).

**App. 239**

need to be more thoughtful about what integrations we allow and we need to make sure that we have sustainable, long-term value exchanges.[992]

In another conversation between Sam Lessin, Facebook's Director of Product Engagement, and other executives, Facebook's senior employees agreed that competitive apps used Facebook Platform to "steal our engagement" and "could be viewed as replacing Facebook functionality," adding that they planned to raise this concern with Mr. Zuckerberg.[993] Mr. Lessin raised these concerns with Mr. Zuckerberg in October 2012. In response, Mr. Zuckerberg agreed with this conclusion:

> Reading your responses, I do think you are right . . . I would be more comfortable with competition if I thought we knew better how to leverage our scale asset (and if scale weren't becoming cheaper and cheaper to achieve every day). What I think is that we should effectively not be helping our competitors more / much more than how they could get help from elsewhere in the market. They can acquire users in ways other than us so obviously we shouldn't be failing to take their money when they will just give it to someone else and get the same outcome. I do, however, again think that we want as much control here as we can get. I agree we shouldn't help our competitors whenever possible. **I think the right solution here is to just be a lot stricter about enforcing our policies and identifying companies as competitors.**[994]

Recognizing that some social apps had grown too popular and could compete with Facebook's family of products, Facebook cut off their access to Facebook's social graph.[995]

In 2013, Facebook claimed that the short-form video app Vine, a video-sharing app that Twitter acquired in 2012, "replicated Facebook's core News Feed functionality."[996] In response, Facebook cut off Vine's access to Facebook APIs.[997] In doing so, "Facebook was able to degrade consumers'

---

[992] *Id.*

[993] *Id.* at FB_FTC_CID_0008058182 (Sept. 15, 2012).

[994] *Id.* at FB_FTC_CID_00491746–63 (Oct. 27, 2012) (emphasis added); (Elena Botella, *Facebook Earns $132.80 From Your Data per Year*, SLATE (Nov. 15, 2019), https://slate.com/technology/2019/11/facebook-six4three-pikinis-lawsuit-emails-data.html.

[995] Olivia Solon & Cyrus Farivar, *Mark Zuckerberg Leveraged Facebook User Data to Fight Rivals and Help Friends, Leaked Documents Show*, NBC NEWS (Apr. 16, 2019), https://www.nbcnews.com/tech/social-media/mark-zuckerberg-leveraged-facebook-user-data-fight-rivals-help-friends-n994706.

[996] Innovation and Entrepreneurship Hearing at 3 (response to Questions for the Record of Matt Perault, Dir. of Public Pol'y, Facebook, Inc.).

[997] Rachel Kraus, *Mark Zuckerberg gave the order to kneecap Vine, emails show*, MASHABLE (Dec. 5, 2018), https://mashable.com/article/mark-zuckerberg-helped-thwart-vine/.

**App. 240**

experience of Vine and reduce the platform's competitive threat."[998] Twitter shut down Vine in 2016.[999]

Facebook's actions in the wake of the Cambridge Analytica scandal raise concerns about pretextual anticompetitive enforcement in the name of privacy. In 2019, Facebook cut off marketing firm Stackla's access to its APIs "due to data scraping, which violates [Facebook's] policies."[1000] Damien Mahoney, the Chief Executive Officer of Stackla, denied these allegations.[1001] In an interview with the Subcommittee, Mr. Mahoney explained the economic harm of the company's foreclosure from the Facebook Platform:

> What we went through with Facebook was company altering, and if not for the resolve of our team and board, would have destroyed it. We had to lay off half our team. We made huge investments in the company in the previous 12 months, having raised $4m to increase our sales capacity by 160% and other functions in the business, then this occurred. It was a critical blow that almost forced us to close the doors. We were approaching 75 employees and 30% growth after 8 long years of toil. Now we have 26 employees, declining revenue and ongoing collateral damage that we continue to sink time and money into. While we try and stabilize, and get the company back to a position of growth, it's a long way off as we continue, to this very day, deal with the after-effects. The fact this all resulted from a single erroneous and factually incorrect news article, combined with zero consultation from Facebook prior to their damaging actions, remains baffling and completely unfair.[1002]

Around that time, Facebook became aware of MessageMe, a fast-growing app that used Facebook graph data to support its "Find Friends" feature. Recognizing that MessageMe could compete with Facebook Messenger, Facebook's then-director of platform partnerships cut off the app's access to Facebook's Graph API.[1003]

In a submission to the Subcommittee, a former Facebook employee who handled platform management at the company said that Facebook unevenly enforced its platform policies based on the

---

[998] Competition & Mkts. Auth. Report at at 141.

[999] Casey Newton, *Why Vine died*, THE VERGE (Oct. 28, 2016), https://www.theverge.com/2016/10/28/13456208/why-vine-died-twitter-shutdown.

[1000] Innovation and Entrepreneurship Hearing at 3 (statement of Matt Perault, Dir. of Public Pol'y, Facebook, Inc.).

[1001] Rob Price, *Facebook is reviewing hundreds of its official 'Facebook Marketing Partners' over Instagram data-scraping issues*, BUS. INSIDER (Aug. 23, 2019), https://www.businessinsider.com/facebook-review-all-marketing-partners-instagram-data-scraping-2019-8.

[1002] Interview with Damien Mahoney, CEO, Stackla (Apr. 14, 2020).

[1003] Olivia Solon & Cyrus Farivar, *Mark Zuckerberg Leveraged Facebook User Data to Fight Rivals and Help Friends, Leaked Documents Show*, NBC NEWS (Apr. 16, 2019), https://www.nbcnews.com/tech/social-media/mark-zuckerberg-leveraged-facebook-user-data-fight-rivals-help-friends-n994706.

**App. 241**

degree of another firm's competition with Facebook and whether it could extract concessions from other firms. According to this former employee, Facebook was primarily concerned with whether a company was "a competitive threat," and it "was biasing its enforcement actions against [firms] they saw as competitors."[1004] In a submission to the Subcommittee, the former Facebook employee provided an example:

> [I]n one Facebook Messages conversation involving the CEO, Mr. Zuckerberg, and various executives in mid-2012, Mr. Zuckerberg expressed concern about an app called Ark that was accessing large amounts of user data in a way that could enable showing user content to people who didn't have permission to see the content. An investigation was conducted, and it was determined that Ark was violating Facebook's platform policies regarding the use of data from friends of Facebook users. Ultimately, leadership decided to terminate Ark's access to Facebook's APIs and ban Ark from the platform for six months. This was a harsh punishment relative to other developers conducting similar activity—indeed, Mr. Zuckerberg had been informed on the thread that "tons" of other apps were acquiring data the same way and there was not further investigation or action taken against those apps. Other apps that had been accused of violating data policies similarly had been treated much more leniently. **It seemed clear that leadership imposed the more severe punishment against Ark because Mr. Zuckerberg viewed Ark as competitive with Facebook, as Facebook was exploring an acquisition of Ark at the same time as it was being investigated for policy violations.**[1005]

In contrast to punishing rivals, according to the former employee and other market participants interviewed by the Subcommittee, Facebook used "whitelists" to give preferential treatment to friends of the company.[1006] For example, in a report published by NBC, Facebook gave Amazon extended API access because Amazon was spending money on advertising and partnering with Facebook on the launch of its Fire smartphone. Facebook's Director of Business Development asked, "Remind me, why did we allow them to do this? Do we receive any cut of purchases?" In response, a Facebook employee who worked with Facebook's "strategic partners" responded, "No, but Amazon is an advertiser and supporting this with advertisement . . . and working with us on deeper integrations for the Fire."[1007]

In response to these concerns, Facebook told the Subcommittee that it "does not restrict access to its Platform APIs simply because an app competes with a Facebook product or service; but

---

[1004] Interview with Former Facebook Employee (Jan. 14, 2020).

[1005] Submission from Former Facebook Employee, to H. Comm. on the Judiciary, 2 (Apr. 2, 2020) (on file with Comm.).

[1006] *Id.*

[1007] Olivia Solon & Cyrus Farivar, *Mark Zuckerberg Leveraged Facebook User Data to Fight Rivals and Help Friends, Leaked Documents Show*, NBC NEWS (Apr. 16, 2019), https://www.nbcnews.com/tech/social-media/mark-zuckerberg-leveraged-facebook-user-data-fight-rivals-help-friends-n994706.

**App. 242**

Facebook will restrict apps that violate its policies."[1008] This is, however, inconsistent with the company's internal communications and other evidence examined by the Subcommittee during the investigation.

3.  Digital Advertising

  a.  Overview

Facebook monetizes its platform through the sales of digital advertising.[1009] Facebook garnered over $70 billion in revenue in 2019, a nearly 27% increase from 2018.[1010] It generates this revenue predominately from selling advertisement placements.

Facebook has monopoly power in online advertising in the social networking market.[1011] Notwithstanding Google's dominance, Facebook also has a significant share of revenue and growth in online advertising with many market participants referring to them as duopolies in this broad market. Some market participants interviewed by the Subcommittee consider Facebook "unavoidable" or "must have" due to the reach and scale of its platform. In particular, some businesses consider Facebook's identity product—its ability to persistently track users' online and offline conduct to serve tailored ads—as a unique feature.[1012] For example, at the Subcommittee's fifth hearing, David Heinemeier Hansson, the Chief Technology Officer and Cofounder of Basecamp, testified that the nature of Facebook's targeted advertising makes it difficult to replace, saying:

> At Basecamp, we ultimately ended up swearing off the use of targeted advertisement based on the exploitation of personal data. Facebook's record of protecting people's privacy, and gathering their consent in the exploitation of their data for advertisement purposes, is atrocious, and we decided that we wanted no part of it. But choosing to opt out of targeted advertisement on the internet is like competing with one arm behind your back. It is very clear why most companies feel compelled to do this kind of advertisement, even if it's a violation of their ethics. If their competitors are doing it, they're at a significant disadvantage if they don't. And the same is true for us. We have

---

[1008] Innovation and Entrepreneurship Hearing at 3 (response to Questions for the Record of Matt Perault, Dir. of Public Pol'y, Facebook, Inc.).

[1009] *Transcript of Mark Zuckerberg's Senate hearing*, WASH. POST (Apr. 10, 2018) ("'Senator, we run ads,' Zuckerberg replied."), https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing.

[1010] *Id.*

[1011] Competition & Mkts. Auth. Report at 211.

[1012] Competitors Hearing at 10 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

**App. 243**

undoubtedly given up growth to competitors because we've refrained from pursuing targeted ads.[1013]

Facebook's advantages in terms of access to data and its reach contribute to its ability to earn higher revenue per user than other firms in the social networking market.[1014] Facebook reported an average revenue per user (ARPU) of $7.05 worldwide and $36.49 in the United States and Canada in July 2020.[1015] It has also averaged significant annual growth—26% on average over the past five years.[1016] In contrast, its closest competitor, Snap, reported in July 2020 that its ARPU "remained flat" at $1.91 worldwide and $3.48 in North America.[1017] A recent investment report underscored this point, noting that Facebook enjoys a significant economic moat illustrated by the inability of Snap and other firms to meaningfully challenge its dominance.[1018] As a result, entry or success by other firms is unlikely:

> With more users and usage time than any other social network, Facebook provides the largest audience and the most valuable data for social network online advertising. Facebook's ad revenue per user is growing, demonstrating the value that advertisers see in working with the firm . . . Facebook has also expanded its user base in the growing mobile market, which positively affected the network effect as it became more valuable to advertisers, and resulted in more ad revenue growth. The main drivers behind growth in online advertising have been growths in the mobile ad market and the video ad format. Most Facebook users are now accessing Facebook and its apps via mobile devices.[1019]

Facebook's internal documents reinforce this finding. In a presentation prepared to deliver to investors ahead of the company's initial public offering, Facebook characterized its advertising product as having a significant advantage over the industry average in accuracy and narrowly targeted campaigns due to its reach, engagement, and using people's "real identity—people as their real

---

[1013] *Id.*

[1014] Competition & Mkts. Auth. Report at 211.

[1015] FACEBOOK, FACEBOOK Q2 2020 RESULTS (July 31, 2020), https://s21.q4cdn.com/399680738/files/doc_financials/2020/q2/Q2-2020-FB-Earnings-Presentation.pdf.

[1016] MORNINGSTAR EQUITY ANALYST REPORT, FACEBOOK INC 2 (Aug. 3, 2020) (on file with Comm.) ("The value of such data and advertisers' willingness to use it is demonstrated by the 26% average annual growth of Facebook's average ad revenue per user, or ARPU, during the past five years, which we view as indicative of the price that advertisers pay Facebook for ad placement. During the same period, Facebook's monthly average users have grown 12% annually.").

[1017] Snap, Inc., Quarterly Report (Form 10-Q) 25, 27 (June 30, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001564408/9aacfdca-55a1-4928-9a31-c2462d2386c0.pdf.

[1018] MORNINGSTAR EQUITY ANALYST REPORT, FACEBOOK INC 1–2 (Aug. 3, 2020) (on file with Comm.).

[1019] *Id.*

**App. 244**

selves."[1020] In comparison to television broadcasters, the company noted that in the United States, "everyday on Facebook is like the season finale of American idol—the most popular show on TV—times two."[1021]

These findings are also consistent with those of Australian,[1022] British,[1023] French,[1024] and German antitrust authorities, which conducted an extensive examination of Facebook's market power in the social networking market and in digital advertising. For example, the United Kingdom's Competition and Markets Authority (CMA) found in July 2020 that Facebook and Instagram generated over half of display advertising revenues in 2019" in the United Kingdom, which it found to be a relevant market.[1025] In contrast to other firms in the same market, Facebook's lead was significantly larger than its closes competitor, YouTube, which "earned between 5 and 10%."[1026] In June 2019, the Australian Competition and Consumer Commission (ACCC) found that Facebook has "substantial market power in the supply of display advertising in Australia."[1027] Similar to the CMA's findings, the ACCC concluded that the share of the display advertising market controlled by Facebook and Instagram is significant—more than half—and growing, while the rest of the market is highly fragmented.[1028]

b. Relevant Acquisitions

On February 27, 2013, Facebook executed an agreement to purchase Atlas, an advertiser-side platform to manage and measure ad performance, from Microsoft for $100 million.[1029]At the time of the transaction, Atlas captured data to track conversions—when a specific action is taken in response to an ad, such as making a purchase—through clicks and impressions.[1030] In other words, if someone saw a BestBuy ad, Atlas enabled serving the ad, recording the user seeing the ad via a browser identifier, and recorded the impression as well as if the person clicked on the ad. Later, if the same user

---

[1020] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00054106 (Apr. 9, 2012) (on file with Comm.).

[1021] *Id.*

[1022] Competition & Mkts. Auth. Report at 9.

[1023] *Id.* at 11–12, 211.

[1024] FRENCH AUTORITÉ DE LA CONCURRENCE & BUNDESKARTELLAMT, COMPETITION LAW AND DATA (2016), https://www.bundeskartellamt.de/SharedDocs/Publikation/DE/Berichte/Big%20Data%20Papier.pdf;jsessionid=D86CD9D1 3899F2590F84E82092187858.2_cid362?__blob=publicationFile&v=2.

[1025] Competition & Mkts. Auth. Report at 10.

[1026] *Id.*

[1027] Austl. Competition & Consumer Comm'n Report at 97.

[1028] *Id.*

[1029] Production of Facebook, to H. Comm. on the Judiciary, FB-HJC-ACAL-00043659 (Mar. 2013) (on file with Comm.).

[1030] *Id.*

**App. 245**

bought the item from BestBuy.com, Atlas recognized the user through their browser and would record the conversion if the user purchased the item advertised.

Prior to the acquisition, Amin Zoufonoun, Facebook's Vice President for Corporate Development, described the "primary thesis" of the acquisition to Sherly Sandberg as giving Facebook "immediate scale to retarget, provide premium insights, do look-alike modeling, prove and measure efficacy of [Facebook] as a marketing medium, [and] enhance custom audiences and associated revenue."[1031] Facebook's primary strategic rationale for integrating Atlas into its ad product was to improve its ability to measure ad performance and use identity-based targeting through Facebook Identity—its unique identifier for Facebook users across all browsers and devices—to serve highly targeted ads.[1032] Facebook described the value of Facebook Identity as its ability to "target *people* across browsers and devices" and to "activate offline data to enrich online targeting," among other features.[1033] The company believed that its "unique data" and "unique reach and engagement (across devices and platforms)" would boost its value to advertisers.[1034]

Facebook also noted in its summary of the deal at the time of the transaction that the major opportunities of the transaction were: (1) to become the "buy-side desktop tool that media planners fire up first thing in the day;" and (2) to acquire "a deep installed base of pixels which we can immediately turn on to power conversion tracking and attribution of ads across offerings."[1035]

Absent the transaction, Facebook raised concerns that Google's "lead in this market may become insurmountable" and limit Facebook's ads in other ways.[1036] The company also raised concerns that Facebook's Custom Audiences tool would not be able "to scale beyond click-oriented advertisers."[1037] Among other potential risks of the deal, such as rebuilding the product on Facebook's ad stack, the company identified "[m]anaging perceptions around privacy" as an area of concern.[1038]

---

[1031] *Id.* at FB-HJC-ACAL-00043509 (Oct. 18, 2012) (internal punctuation omitted).

[1032] *Id.* at FB-HJC-ACAL-00043660.

[1033] *Id.* at FB-HJC-ACAL-00043680 (emphasis in original).

[1034] *Id.* at FB-HJC-ACAL-00043705.

[1035] *Id.* at FB-HJC-ACAL-00043710.

[1036] *Id.* at FB-HJC-ACAL-00043660.

[1037] *Id.* at FB-HJC-ACAL-00043697.

[1038] *Id.* at FB-HJC-ACAL-00043658.

**App. 246**

B.      Google

1.  <u>Overview</u>

Google was launched in 1998 as a general online search engine.[1039] Founded by Larry Page and Sergey Brin, the corporation got its start by serving users web results in response to online queries. Google's key innovation was its PageRank algorithm, which ranked the relevance of a webpage by assessing how many other webpages linked to it.[1040] In contrast with the technology used by rival search engines, PageRank enabled Google to improve the quality of its search results even as the web rapidly grew. While Google had entered a crowded field, by 2000 it had become the world's largest search engine.[1041] Later that year Google launched AdWords, an online advertising service that let businesses purchase keywords advertising to appear on Google's search results page—an offering that would evolve to became the heart of Google's business model.[1042]

Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital mapping, email, cloud computing, and voice assistant services, alongside dozens of other offerings. Nine of Google's products—Android, Chrome, Gmail, Google Search, Google Drive, Google Maps, Google Photos, Google Play Store, and YouTube—have more than a billion users each.[1043] Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online ads.

In several markets, Google established its position through acquisition, buying up successful technologies that other businesses had developed. In a span of 20 years, Google purchased well over 260 companies—a figure that likely understates the full breadth of Google's acquisitions, given that many of the firm's purchases have gone unreported.[1044] Documents collected by the Subcommittee

---

[1039] Google Inc., Registration Statement (Form S-1) 1 (Apr. 29, 2004), https://www.sec.gov/Archives/edgar/data/1288776/000119312504073639/ds1.htm.

[1040] *Id.* at 65 ("PageRank is a query-independent technique for determining the importance of web pages by looking at the link structure of the web.").

[1041] Press Release, Google,  Google Launches World's Largest Search Engine (June 26, 2000), http://googlepress.blogspot.com/2000/06/google-launches-worlds-largest-search.html (stating that Google had indexed over 1 billion webpages).

[1042] Press Release, Google, Google Launches Self-Service Advertising Program (Oct. 23, 2000), http://googlepress.blogspot.com/2000/10/google-launches-self-service.html.

[1043] Harry McCracken, *How Google Photos joined the billion-user club*, FAST CO. (July 24, 2019), https://www.fastcompany.com/90380618/how-google-photos-joined-the-billion-user-club.

[1044] *See infra* Appendix; Leena Rao, *Google Spent Nearly $2 Billion on 79 Acquisitions in 2011*, TECHCRUNCH (Jan. 27, 2012), https://techcrunch.com/2012/01/27/google-spent-nearly-2-billion-on-79-acquisitions-in-2011/ ("As of Q3, Google

**App. 247**

reveal that executives recognized as early as 2006 that Google's "tremendous cash resources" could be deployed to help execute Google's "strategic plan."[1045]

Google is now one of the world's largest corporations. For 2019, Google reported total revenues of $160.7 billion—up 45% from 2017—and more than $33 billion in net income.[1046] Although Google has diversified its offerings, it generates the vast majority of its money through digital ads, which accounted for over 83% of Google's revenues in 2019.[1047] Search advertising, in particular, is critical to Google, accounting for approximately 61% of its total sales.[1048] In recent months Google reported a drop in ad revenue due to pandemic-related cuts in spending, though the company partly made up for the decline through revenue growth in Google Cloud, Google Play, and YouTube.[1049] Google has enjoyed strong and steady profits, with profit margins greater than 20% for nine out of the last 10 years, close to three times larger than the average for a U.S. firm.[1050] Financial analysts predict that Google is well positioned to maintain its dominance, noting that "Alphabet has established unusually deep competitive moats around its business."[1051]

In 2015 Google underwent a reorganization, introducing Alphabet as a parent company under which Google would reside as a wholly owned subsidiary.[1052] Alphabet also houses the company's non-search ventures, such as Calico, the biotech company focused on longevity, and Waymo, which develops self-driving cars.[1053] In December 2019, Page and Brin stepped down from their management

---

had spent over $1.4 billion on 55 acquisitions for the year. Google ended 2011 spending $1.9 billion (including cash and stock) on completing 79 acquisitions during the entirety of the year.").

[1045] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04232284 at 2 (Sept. 25, 2006) (on file with Comm.) (stating that Google viewed transactions as falling into three categories: (1) bolt-on; (2) outside existing efforts; and (3) around existing efforts).

[1046] Alphabet Inc., Annual Report (Form 10-K) 26–30 (Feb. 3., 2020), https://www.sec.gov/Archives/edgar/data/1652044/000165204420000008/goog10-k2019.htm.

[1047] *Id*. at 30.

[1048] *Id.*

[1049] Alphabet Inc., Quarterly Report (Form 10-Q) (June 30, 2020) https://abc.xyz/investor/static/pdf/20200731_alphabet_10Q.pdf?cache=f16f989; *Alphabet Q2 Earnings Call* (July 30, 2020), https://abc.xyz/investor/static/pdf/2020_Q2_Earnings_Transcript.pdf?cache=6bfce23.

[1050] Alphabet Inc., Annual Report (Form 10-K) (2009–2019)

[1051] Marc S.F. Mahaney, Royal Bank of Canada, Digging For Buried Treasure – The Google Maps Opportunity 2 (Sept. 23, 2019) (on file with Comm.) [hereinafter Royal Bank of Canada Report].

[1052] Letter from Larry Page, CEO, Alphabet Inc., and Sundar Pichai, CEO, Google LLC (2015), https://abc.xyz/investor/founders-letters/2015/index.html#2015-larry-alphabet-letter.

[1053] *Id.*

**App. 248**

roles at Alphabet, though they remain on the board and together control approximately 51.3% of the voting power.[1054] Sundar Pichai now serves as the CEO of both Google and Alphabet.[1055]

For years Google has been the subject of antitrust investigations and enforcement actions around the world. From 2011 to 2013, the Federal Trade Commission investigated Google's role in search and advertising markets, culminating in a staff recommendation to file a complaint against Google—although the Commission ultimately decided not to do so. At various points over the last decade, Mississippi, Missouri, and Texas have each separately investigated Google for antitrust violations, and, in September 2019, attorneys general from 50 U.S. states and territories announced that they were opening a fresh antitrust inquiry into the search and advertising giant.[1056] The Department of Justice has also been investigating Google since the summer of 2019, and recent news reports state that a lawsuit may be imminent.[1057] These ongoing U.S. investigations follow multiple antitrust inquiries worldwide, as well as antitrust-related penalties levied on Google by the European Commission, France, India, and Russia.[1058]

2.  Search

    a.  Market Power

Google overwhelmingly dominates the market for general online search. Publicly available data suggest the firm captures over 87% of U.S. search and over 92% of queries worldwide.[1059] Despite

---

[1054] Alphabet Inc., Quarterly Report (Form 10-Q) 60 (June 30, 2020) https://abc.xyz/investor/static/pdf/20200731_alphabet_10Q.pdf?cache=f16f989 ("The concentration of our stock ownership limits our stockholders' ability to influence corporate matters… Through their stock ownership, Larry and Sergey have significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or our assets, for the foreseeable future.").

[1055] Letter from Larry Page, CEO, Alphabet Inc., and Sundar Pichai, CEO, Google LLC (2015), https://abc.xyz/investor/founders-letters/2015/index.html#2015-larry-alphabet-letter.

[1056] Tony Romm, *50 US states and territories announce broad antitrust investigation of Google*, WASH. POST (Sept. 9, 2019), https://www.washingtonpost.com/technology/2019/09/09/states-us-territories-announce-broad-antitrust-investigation-google/.

[1057] Alphabet Inc., Annual Report (Form 10-Q) (July 30, 2020), https://abc.xyz/investor/static/pdf/20200731_alphabet_10Q.pdf?cache=f16f989; Leah Nylen, *Trump administration to launch antitrust suit against Google as soon as next week*, POLITICO (Oct. 2, 2020), https://www.politico.com/news/2020/10/02/trump-doj-google-antitrust-lawsuit-425617.

[1058] Aditya Kalra and Aditi Shah, *Exclusive: Google faces antitrust case in India over payments app – sources*, REUTERS (May 27, 2020), https://www.reuters.com/article/us-india-google-antitrust-exclusive/exclusive-google-faces-antitrust-case-in-india-over-pagos-app-sources-idUSKBN2331G3; Thomas Grove, *Russia Fines Google $6.75 Million in Antitrust Case*, WALL ST. J. (Aug. 11, 2016), https://www.wsj.com/articles/russia-fines-google-6-75-million-in-antitrust-case-1470920410; Charles Riley and Ivana Kottasová, *Europe hits Google with a third, $1.7 billion antitrust fine*, CNN (Mar. 20, 2019), https://www.cnn.com/2019/03/20/tech/google-eu-antitrust/index.html; Natasha Lomas, *France slaps Google with $166M antitrust fine for opaque and inconsistent ad rules*, TECHCRUNCH (Dec. 20, 2019) https://techcrunch.com/2019/12/20/france-slaps-google-with-166m-antitrust-fine-for-opaque-and-inconsistent-ad-rules/.

[1059] *Search Engine Market Share Worldwide*, STATCOUNTER, https://gs.statcounter.com/search-engine-market-share (last visited Sept. 29, 2020).

**App. 249**

notable changes in the market—such as the switch from desktop to mobile—Google has maintained this dominance for more than a decade, a period during which its lead over its most significant competitors has only increased.[1060] Over that time, Google benefited from economies of scale and the self-reinforcing advantages of data, as well as from aggressive business tactics that Google wielded at key moments to thwart competition. The combined result is that Google now enjoys durable monopoly power in the market for general online search.

Several factors render Google's power in online search generally immune to competition or threat of entry. General online search strongly favors scale due to: (1) the high fixed costs of servers needed for crawling and indexing the entire web; and (2) the self-reinforcing advantages of click-and-query data, which let a search engine constantly improve the relevance of search results. Even an upstart that was able to secure the necessary capital to invest heavily in computing infrastructure would find itself at a considerable disadvantage given that Google's search algorithm has been refined through trillions upon trillions of queries.[1061] Meanwhile, steps that website owners take to block non-Google crawlers have rendered the task of creating an independent comprehensive index extremely challenging, if not effectively impossible.

Even search engines that choose to syndicate their search results rather than create their own index and algorithm face major obstacles. This is primarily because Google—through both integration and contractual agreements—has established itself as the default search provider on 87% of desktop browsers and the vast majority of mobile devices. Specifically, Google used its search dominance to promote the use of its Chrome browser on laptops, personal computers, and workstations, which sets Google Search as its default. For mobile devices, Google imposed a set of restrictive contractual terms effectively requiring manufacturers of devices that used its Android operating system to pre-install both Chrome and Google Search. Additionally, Google pays Apple an undisclosed amount, estimated

---

[1060] Enforcers and courts have held that Google dominates the market for online search in various cases stretching back over a decade. *See, e.g.*, Press Release, U.S. Dep't of Justice, Yahoo! Inc. and Google Inc. Abandon Their Advertising Agreement (Nov. 5, 2008), https://www.justice.gov/archive/opa/pr/2008/November/08-at-981.html ("The Department's investigation revealed that Internet search advertising and Internet search syndication are each relevant antitrust markets and that Google is by far the largest provider of such services, with shares of more than 70 percent in both markets."); Press Release, U.S. Dep't of Justice, Statement of the Department of Justice Antitrust Division on Its Decision to Close Its Investigation of the Internet Search and Paid Search Advertising Agreement Between Microsoft Corporation and Yahoo! Inc. (Feb. 18, 2010), https://www.justice.gov/opa/pr/statement-department-justice-antitrust-division-its-decision-close-its-investigation-internet ("The proposed transaction will combine the back-end search and paid search advertising technology of both parties. U.S. market participants express support for the transaction and believe that combining the parties' technology would be likely to increase competition by creating a more viable competitive alternative to Google, the firm that now dominates these markets."); Author's Guild v. Google, No. 05 Civ. 8136 (DC), 2011 WL 986049, *12 (S.D.N.Y. Mar. 22, 2011) (recognizing "Google's market power in the online search market").

[1061] *See* Innovation and Entrepreneurship Hearing at 1 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC) ("Google Search responds to trillions of user queries from around the world every year."); *see also* MAURICE E. STUCKE & ALLEN P. GRUNES, BIG DATA AND COMPETITION POLICY 12.10 (2016) ("Entry barriers into the search engine market are already high. Microsoft reportedly invested in 2010 'more than $4.5 billion into developing its algorithm and building the physical capacity necessary to operate Bing.'").

**App. 250**

to be $12 billion per year, to secure the search default across iOS devices.[1062] In general, users tend to stick with the default presented.[1063] Moreover, Google takes steps to hamper and dissuade even those users that do attempt to switch search engines on Chrome.[1064] With these factors combined, Google's conduct significantly impedes other search providers from reaching users at scale—and further expands and entrenches Google's dominance.

In submissions to the Committee, Google states that Google Search "operates in a highly competitive environment," facing a "vast array of competitors" in general online search, including Bing, DuckDuckGo, and Yahoo!.[1065] Google also claims that for any given search query, Google competes against a "wide range of companies," including Amazon, eBay, Kayak, and Yelp.[1066] Google argues that this broader set of competitors means that public estimates of its share of general online search "do not capture the full extent of Google's competition in search."[1067]

Despite these statements, Google failed to provide the Subcommittee with contemporary market share data that would corroborate its claims. In response to the Committee's written request for market share data, combined with several follow-ups from Subcommittee staff, Google stated that the company "doesn't maintain information in the normal course of business about market share in its products."[1068] After the Subcommittee identified communications where Google executives had discussed regularly tracking search market share data and further developing internal tools for doing so, Google told the Subcommittee that this data is either no longer collected or no longer used for examining site traffic.[1069] It added, "[W]hile Google may have examined certain 'shares' of usage,

---

[1062] Lisa Marie Segarra, *Google to Pay Apple $12 Billion to Remain Safari's Default Search Engine in 2019: Report*, FORTUNE (Sept. 29, 2018), https://fortune.com/2018/09/29/google-apple-safari-search-engine/.

[1063] Competition & Mkts. Auth. Report at 194.

[1064] *See, e.g.*, Submission from Source 481 to H. Comm. on the Judiciary (Jan. 30, 2020) (on file with Comm.).

[1065] Production of Google, to H. Comm. on the Judiciary, A-11 (Nov. 22, 2019) (on file with Comm.).

[1066] *Id.*; *see also* Innovation and Entrepreneurship Hearing at 6 (statement of Adam Cohen, Dir. of Econ. Pol'y, Google LLC). Although the specialized search providers that Google lists as competitors may, in some instances, compete with Google for queries, "[t]he competition between Google and vertical search engines" is "to some extent asymmetrical. From a user's point of view, a generalist search engine that fully covers a given vertical can be a complete substitute for the vertical search engine, while the reverse is not generally true. Consequently, Google imposes more significant competitive constraints on a vertical search engine than vice versa." *See* Submission from Source 209, to H. Comm. on the Judiciary, Source 209-0000540 (Feb. 17, 2011) (on file with Comm.).

[1067] Production of Google, to H. Comm. on the Judiciary, A-11 (Nov. 22, 2019) (on file with Comm.). In certain regards, Google's argument echoes the claim Microsoft made when it contested the district court's decision to exclude "middleware" from its definition of the relevant market. The court found that although it was true that middleware could "usurp the operating system's platform function and might eventually take over other operating system functions," it was also true that no middleware product "could now, or would soon, expose enough APIs to serve as a platform for popular applications, much less take over all operating system functions." United States v. Microsoft Corp., 253 F.3d 34, 53–54 (D.C.C. 2001). Similarly, although certain vertical search providers could under certain circumstances "usurp" the horizontal provider's platform function, no vertical provider does or would soon serve this function.

[1068] Meeting with Google (Feb. 10, 2020).

[1069] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01967913 (Jan. 27, 2007) (on file with Comm.) ("Each quarter we gather comprehensive search and market share data even though we NOT share it with the board

**App. 251**

clicks, queries, or traffic in limited and incomplete data sets over time, we do not believe any of this constitutes 'market share' analysis."[1070]

Market share information that Google did provide from over a decade ago reveals that Google viewed itself as a leader in general search as early as 2007. One slide deck tracking search query volume and revenues stated that "[c]ontinued leadership in search underpins the whole business."[1071] In 2009, a top executive circulated market share analysis documenting that Google captured 71.5% of general search in the United States, followed by Yahoo with 17%, and Bing with 7.5%.[1072] And in 2010, one Google employee observed, "Google leads competitors. This is our bread-and-butter. Our long-tail precision is why users continue to come to Google. Users may try the bells and whistles of Bing and other competitors, but Google still produces the best results."[1073] Noting that Bing was "making clear, significant progress" on "bringing the two search engines closer to parity," the employee stated it was "critical to redouble our efforts to maintain our lead."[1074]

The Subcommittee has not seen any compelling evidence to suggest that Google's dominance over the last decade has diminished; to the contrary, there is compelling evidence that Google has only strengthened and solidified what was already a leading market position. For example, in 2009, Microsoft and Yahoo!—Google's closest competitors—entered an agreement to integrate their search platforms, an effort to team up to tackle Google's dominance.[1075] A decade later, the two collectively have a lower share of the general search market than they did at the time of their deal, whereas Google's share has increased.[1076] As of 2016, Google employees were calculating that Bing had suffered a 30% year-over-year decline in query volume and that Bing's revenue per million impressions (RPM) was "70-77% lower" than Google's own U.S. search RPM.[1077] More recently, the United Kingdom's Competition and Markets Authority found that Google's index of the web is anywhere from three to five times the size of Bing's.[1078] Furthermore, the fact that no new general

---

anymore. I am pleased to say that we've finally turned the corner on getting decent data of our own rather than ComScore….Next steps include further work on internal sources such as the toolbar and AFC referrals which we believe will give us more data to model and help us adjust for the biases of external sources."); GOOG-HJC-01529590 (Oct. 11, 2011) (listing "internal US search share metrics" for Q2 2011); Email from Google to Staff of the H. Comm on the Judiciary (Apr. 16, 2020) (on file with Comm.).

[1070] Email from Google to Staff of the H. Comm. on the Judiciary (Apr. 16, 2020) (on file with Comm.).

[1071] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04231168 at 2 (on file with Comm.).

[1072] *Id.* at GOOG-HJC-01207063 (Oct. 27, 2009) (attachment to email from Marissa Mayer).

[1073] *Id.* at GOOG-HJC-03815864 (Apr. 23, 2010).

[1074] *Id*.

[1075] Submission from Source 209, to H. Comm. on the Judiciary, Source 209-0000346 at 351–52 (Aug. 24, 2009) (on file with Comm.).

[1076] *Search Engine Market Share Worldwide*, STATCOUNTER, https://gs.statcounter.com/search-engine-market-share (last visited Sept. 29, 2020).

[1077] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04259758–59 (Apr. 20, 2016) (on file with Comm.).

[1078] Competition & Mkts. Auth. Report at 89.

**App. 252**

search entrant over the last decade has ever accounted for more than 1% of all U.S. searches in any given year further confirms that Google's monopoly power is durable and its lead insurmountable.[1079]

Google's claim that it "operates in a highly competitive environment" is also at odds with the lived reality of market participants. Numerous companies—spanning major public corporations, small businesses, and upstart entrepreneurs—told the Subcommittee that they overwhelmingly depend on Google for traffic and that no alternate search engine even remotely approaches serving as a substitute. For example, J&J Smith, a printer repair shop based in Rhode Island, stated, "Google is our lifeblood."[1080] Foundem, a UK-based comparison shopping search provider, has noted that Google's "overwhelming global dominance" of horizontal search creates for most websites an "uncomfortable but unavoidable reliance on Google."[1081] Many other companies described their dependence on Google in similar terms.

Furthermore, some of the same specialized search providers that Google identifies as competitors stated that their own businesses heavily rely on Google, in some cases for up to 80% of traffic on both desktop and mobile devices.[1082] One specialized search provider wrote that Google's business practices "have a very material effect on [our] business, but due to Google's monopoly power in search, there is nowhere else for [us] to turn for additional search traffic. The company is beholden to how Google decides to structure its search results page and algorithm."[1083] Another told the Subcommittee, "From [our] perspective, there are no adequate substitutes for Google,"[1084] and, "[T]hanks to its monopoly in general internet search, Google has become the gatekeeper for vertical search rivals."[1085] One specialized search provider said that 97.6% of its traffic comes from Google; another said that Google accounted for such an outsized share of traffic that "we don't even track non-Google sources."[1086]

At the Subcommittee's field hearing in January 2020, David Heinemeier Hansson, Cofounder and Chief Technology Officer of Basecamp, testified that Google increasingly functions as "the front door of the internet."[1087] He noted, "[Google is] the start page for millions. It's a form of navigation around the internet. People these days rarely bother to remember the specific internet address of a

---

[1079] Submission from Source 115, to H. Comm. on the Judiciary, 6 (Oct. 22, 2019) (on file with Comm.).

[1080] Interview with J&J Smith (Aug. 24, 2020).

[1081] Submission from Foundem, to H. Comm. on the Judiciary, 4 (Jan. 21, 2018) (on file with Comm.).

[1082] Submission from Source 564, to H. Comm. on the Judiciary, 5 (Nov. 13, 2019) (on file with Comm.); Submission from Source 3, to H. Comm. on the Judiciary, 34 (Nov. 22, 2019) (on file with Comm.).

[1083] Submission from Source 887, to H. Comm. on the Judiciary, 4 (Oct. 28, 2019) (on file with Comm.).

[1084] Submission from Source 626, to H. Comm. on the Judiciary, 2 (Oct. 15, 2019) (on file with Comm.).

[1085] Submission from Source 972, to H. Comm. on the Judiciary, 10 (Dec. 9, 2019) (on file with Comm.).

[1086] Interview with Source 147 (June 26, 2019).

[1087] Competitors Hearing at 3 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

**App. 253**

company they want to do business with, they just google it."[1088] Commenting on the stark asymmetry in the general search market, Hansson stated that Yahoo, Bing, and DuckDuckGo all "could drop [Basecamp] from their listings tomorrow and we'd barely notice," but "[w]e lose our listing in Google and we may go out of business."[1089]

Google obtained default placement across the mobile and desktop ecosystem through both integration and contractual arrangements. Through owning Android, the world's dominant mobile operating system, Google was able to ensure that Google Search remained dominant even as mobile replaced desktop as the critical entry point to the Internet. As discussed elsewhere in the Report, documents submitted to the Subcommittee show that, at certain key moments, Google conditioned access to the Google Play Store on exclusively pre-installing Google Search, a requirement that gave Google a significant advantage over competing search engines. Through revenue-sharing agreements amounting to billions of dollars in annual payments, Google also established default positions on Apple's Safari browser (on both desktop and mobile) and on Mozilla's Firefox.[1090]

In public statements, Google has downplayed the significance of default placement, claiming that "competition is just a click away."[1091] However, Google's internal documents show that, at a time when Google was still jostling for search market share, Google executives closely tracked search defaults on Microsoft's Internet Explorer and expressed concern that non-Google defaults could impede Google Search.[1092] In an internal presentation about Internet Explorer's default search selection, Google recommended that users be given an initial opportunity to select a search engine and that browsers minimize the steps required to change the default search provider.[1093] These discussions, as well as the steep sums Google pays Apple and various browsers for default search placement, further highlight the competitive significance of default positions.

Independent search engines told the Subcommittee that the lack of defaults available to them creates significant business challenges. DuckDuckGo said this lack of options compelled it to invest in browser technology, including the creation of its own browser for Android and iOS and various browser extensions.[1094] It noted, however, that "the same default placement challenges exist in the browser

---

[1088] *Id.*

[1089] *Id.*

[1090] Innovation and Entrepreneurship Hearing at 12 (response to Questions for the record by Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.).

[1091] *See, e.g.*, Adam Kovacevich, *Google's approach to competition*, GOOGLE PUBLIC POL'Y BLOG (May 8, 2009), https://publicpolicy.googleblog.com/2009/05/googles-approach-to-competition.html.

[1092] *See, e.g.*, Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01196214 (May 3, 2005) (on file with Comm.).

[1093] *Id.* at GOOG-HJC-01680749 (2006) (identifying several recommendations, including "Fewest clicks required to change default, which promotes search innovation by facilitating the user's ability to switch.").

[1094] Innovation and Entrepreneurship Hearing at 5 (statement of Megan Gray, Gen. Counsel & Pol'y Advocate, DuckDuckGo).

**App. 254**

market, just one level up – with the device makers requiring millions or billions of dollars to become a default browser on a device."[1095]

Lastly, the Subcommittee's findings are consistent with conclusions reached by several enforcement bodies that recently have investigated Google's market dominance. For example, in July 2020 the United Kingdom's Competition and Markets Authority found that "Google has significant market power in the general search sector," a position maintained through "three key barriers to entry: economies of scale in developing a web index; access to click-and-query data at scale; and Google's extensive default positions."[1096] In July 2019, the Australian Competition and Consumer Commission (ACCC) found that Google has "substantial market power in supplying general search services," and that it is "likely to retain its dominant share of the market at least in the short- to medium-term."[1097] And in two separate enforcement actions in 2017 and 2018, the European Commission found that Google possessed market power in the market for online general search.[1098] While each of these enforcers focused on their respective national and regional markets, Google has failed to identify any factors that would compel the Subcommittee to reach a different conclusion for the U.S. market.

b. Conduct

i. Google Leverages Dominance Through Data Misappropriation and Self-Preferencing

When Google launched in 1998, the search listings it delivered were "ten blue links," or a set of organic results that guided users off Google's webpage to locate relevant information. In the years since, Google, as well as Bing, has evolved to displaying blue links alongside a variety of Google's own content as well as "information boxes" that list responses directly on the search results page.

While this model may, in certain instances, provide users with direct information more quickly, documents collected by the Subcommittee show that Google built some of these features through aggressive tactics that exploited its search dominance. Google's conduct helped maintain its monopoly in online search and search advertising while dissuading investment in nascent competitors, undermining innovation, and harming users and businesses alike.

---

[1095] *Id*. at 5.

[1096] Competition & Mkts. Auth. Report at 73.

[1097] Austl. Competition & Consumer Comm'n Report at 58.

[1098] *Google Search (Shopping)* (Case AT.39740) Comm'n Decision of 27/6/2017 [2017], para. 271, https://ec.europa.eu/competition/antitrust/cases/dec_docs/39740/39740_14996_3.pdf [hereinafter Google Search (Shopping) Comm'n Decision] ("The Commission concludes that Google holds a dominant position in each national market for general search services since 2008, apart from in the Czech Republic, where Google holds a dominant position since 2011."); *Google Android* (Case AT.40099) Comm'n Decision of 18/7/2018 [2018], para. 439, https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf [hereinafter "Google Android Comm'n Decision"] ("[T]he Commission concludes that Google holds a dominant position in the following relevant markets since 2011: . . . (3) each national market for general search services in the EEA.").

**App. 255**

According to internal documents, Google executives recognized as early as 2005 that specialized—or "vertical"—search engines could pose a threat to Google's long-term dominance. That year one program manager wrote:

> [W]hat is the real threat if we don't execute on verticals?
> (a) loss of traffic from google.com because folks search elsewhere for some queries
> (b) related revenue loss for high spend verticals like travel
> (c) missing [opportunity] if someone else creates the platform to build verticals
> (d) if one of our big competitors builds a constellation of high quality verticals, we are hurt badly[1099]

Google's apprehension about vertical search providers persisted. For example, a 2006 strategy memo identifying challenges asked, "How do we deal with the problem of 'proliferating verticals?'"[1100] Another message noted, "Vertical search is of tremendous strategic importance to Google. Otherwise, the risk is that Google is the go-to place for finding information only in the cases where there is sufficiently low monetization potential that no niche vertical search competitor has filled the space with a better alternative."[1101] In short, Google executives feared that vertical search providers would build direct relationships with users, thereby bypassing Google Search and diverting traffic, valuable data, and ad revenue. While vertical search providers were complements to Google in the short term, Google recognized their potential for disintermediating Google and therefore viewed them as a major competitive threat. The fact that several of these verticals specialized in commercial queries that were among the most valuable for Google further raised the stakes.[1102]

Documents show that Google developed a multi-pronged strategy to thwart the threat. Two of these tactics included: (1) misappropriating third-party content; and (2) privileging Google's own services while demoting those of third parties. Through these practices, Google exploited its dominance to weaken potential rivals and boost its search advertising revenue.

### 1)  Misappropriating Third-Party Content

In the years following 2005, Google invested in building out its own vertical services. Documents reveal that Google partly did so through lifting content directly from third-party providers to bootstrap Google's own vertical services. In the process, Google leveraged its search dominance—demanding that third parties permit Google to take their content, or else be removed from Google's search results entirely.

---

[1099] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04137557 (Nov. 29, 2005) (on file with Comm.).

[1100] *Id.* at GOOG-HJC-01099230 (Oct. 20, 2006).

[1101] *Id.* at GOOG-HJC-03815865 (Apr. 23, 2010).

[1102] *Id.* at GOOG-HJC-04276684–87 (Sept. 21, 2012).

**App. 256**

For example, after identifying local search as a "particularly important" vertical to develop, Google built Google Local, which licensed content from local providers, including Yelp.[1103] In 2010 Google rolled out a service directly competing with Yelp, even as Google continued to license Yelp's content—prompting Yelp's CEO to request that Google immediately remove Yelp's proprietary content from Google's own service.[1104] At a time when Google Local was failing to gain momentum, Google told Yelp that the only way to have its content removed from Google's competing product was to be removed from Google's general results entirely.[1105] Yelp relied so heavily on Google for user traffic that the company could not afford to be delisted—a fact that Google likely knew.[1106] In short, Google weaponized its search dominance, demanding that Yelp surrender valuable content to Google's competing product or else risk heavy losses in traffic and revenue.

Evidence gathered by the Subcommittee identifies additional instances in which Google has intercepted traffic from third-party websites by forcibly scraping their content and placing it directly on Google's own site. For example, a submission from entrepreneur Brian Warner described how he built a database from scratch and developed it into a sustainable and growing business—only to watch Google lift his content and sink his traffic.[1107] Warner, the founder of Celebrity Net Worth, told the Subcommittee that in 2012 the content he had initially developed as a side-project had such high demand that Warner was able to quit his day job and hire 12 staff members. In 2014 Google contacted Warner to ask if he would provide Google with an API that would display his webpage's content in an "answer box" that would appear directly on Google's search results page. Warner declined, observing that handing over his company's "most valuable asset" would "cause a catastrophic drop in traffic."[1108]

---

[1103] *Id.* at GOOG-HJC-03665122–26 (Apr. 24, 2007) (internal Google discussion noting the strength of Yelp's local product) ("[T]here is nothing else 'yelp like' in our current lineup," and also noting that "[Yelp's CEO] just contacted the account manager here and asked that their contract be revised so that they could cancel it immediately if we launch reviews, that doesn't mean that they would do it, but clearly this is a big deal to them.").

[1104] *Id.* at GOOG-HJC-03249494 (Aug. 10, 2010) ("Given that this App directly competes with the Yelp App and offers little value to Yelp we cannot allow Google to continue leveraging our content in this way. We've communicated to Patrick and Carter that your team needs to remove our content within the next week. Since you already communicated to me that it would be un-Googley to not remove our content when requested, I'm confident your team will do the right thing.").

[1105] *See, e.g., id.* at GOOG-HJC-03255279 (Oct. 28, 2010) ("[I] want to tell you that my feelings are really hurt by the 'local is a failure' stuff that Nikesh has been lobbing around"); GOOG-HJC-03790807–08 (Apr. 24, 2007) ("[W]e are still waiting to be removed from Places (while remaining in organic and local merge results), which you initially agreed to (but more recently pulled away from)."); GOOG-HJC-01234494–96 (Aug. 10, 2011) ("I was surprised to find that by opting out of Google's local product, Yelp was automatically opted out of portions of Google's search results. Carter Maslan and John Hanke last year said they couldn't/wouldn't remove content from Google's local product because local was powered by the same index as web search, sounds like this was never really the case."); *see* GOOG-HJC-01234494–96 ("To be able to reference Yelp's content in the parts of search results we discussed, our local service needs to be at least aware of the existence of Yelp pages. Since we stopped using any crawled Yelp pages for our local services in response to your request, this currently isn't possible. That said, I think that the approach we discussed, with Google making limited use of Yelp data in the ways you described, is a constructive way to get a comprehensive view for our users.").

[1106] *See, e.g., id.* at GOOG-HJC-03664462 (Apr. 23, 2007) ("78% of their uniques come from google. if they are acquired, i [sic] would assume that they wouldn't turn us off.").

[1107] *See generally* Innovation and Entrepreneurship Hearing (statement of Brian Warner, Founder, Celeb. Net Worth).

[1108] *Id.* at 4.

**App. 257**

Within two years, Google began populating its answer boxes with Celebrity Net Worth's content anyway—displaying net worth results for each of the 25,000+ celebrities from Warner's database directly on Google's search results page.[1109]

Combined with changes that pushed Warner's webpage from the top of organic listings to the middle of the second page, Google's scraping caused traffic to Celebrity Net Worth to drop by 50% overnight.[1110] Warner wrote, "With the flip of a switch, Google turned our original content into its own content. And with that move, Google would keep the searcher within its walled garden indefinitely. That is far more valuable to Google than taking a small cut of our AdSense revenue."[1111] Today Celebrity Net Worth's traffic is down 80% from 2014, and—due to the resulting drop in revenue— Warner has had to lay off half of his staff.[1112]

In a submission to the Subcommittee, lyrics site Genius described similar misappropriation by Google. Genius noted that it has invested "a decade and millions of dollars" developing a lyrics repository that relies on user-generated content as well as partnerships with songwriters.[1113] For years, however, Google has copied lyrics from Genius's website and displayed them in information boxes that it places at the top of its search results page.[1114] Although Genius shared with Google evidence showing that the platform was scraping lyrics directly from Genius, Google for two years "did nothing to address the issue."[1115] It was only after the *Wall Street Journal* published Genius's claims that Google responded, taking steps to remove the evidence that Google had copied the lyrics but leaving the lyrics in place.[1116] Google later announced that it would attribute lyrics placed in the information box to the underlying content provider. "This would be encouraging," Genius wrote, "except for the fact that all of the lyrics we flagged for Google as featuring our watermark—and thus clearly copied from Genius—are currently attributed to another company."[1117]

At the Subcommittee's hearing on July 29, 2020, multiple members questioned Mr. Pichai about Google's misappropriation of third-party content. Subcommittee Chairman David N. Cicilline (D-RI) recounted Google's scraping of Celebrity Net Worth, asking, "[W]hy does Google steal content

---

[1109] *Id*. Because Warner had added several conjured celebrities to his site to gauge whether Google was scraping his content or lifting it from elsewhere, he was able to determine that Google was sourcing its answers directly from Celebrity Net Worth.

[1110] *Id*. at 5.

[1111] *Id*.

[1112] *Id*.

[1113] Innovation and Entrepreneurship Hearing at 1 (statement of Ben Gross, Chief Strategy Officer, Genius).

[1114] *Id.* at 2.

[1115] *Id.*

[1116] *Id.*

[1117] *Id*.

from honest businesses?"[1118] Mr. Pichai responded that he "disagree[d] with that categorization." Representative Ken Buck (R-CO) followed up by noting that Genius seemed to have collected clear evidence of Google's misappropriation:

> When Genius suspected this corporate theft was occurring, the company incorporated a digital watermark in its lyrics that spelled out red-handed in Morse code. Google's lyric boxes contained the watermark showing that your company stole what you couldn't or didn't want to produce yourself. After Google executives stated that they were investigating this problematic behavior, Genius created another experiment to determine the scope of the misappropriation. It turns out that, out of 271 songs where the watermark was applied, 43 percent showed clear evidence of matching. Your company, which advertises itself as a doorway to freedom, took advantage of this small company, all but extinguishing Genius' freedom to compete."[1119]

Mr. Pichai responded that Google "license[s] content from other companies," and that this issue was "a dispute between Genius and other companies in terms of where the source of the content is."[1120] In its response to Questions for the Record from the Subcommittee, Google also stated that it now gives webpage owners the ability to exclude certain content from appearing in information boxes on Google's search results page.[1121] However, multiple webpage publishers stated that, in practice, this option fails to mitigate the harm given that Google will continue to source and display content from others, thereby still intercepting traffic and displacing organic listings. One publisher described Google's claim to give webpage owners more control as "an empty offering."[1122]

In an interview with Subcommittee staff, one webpage owner stated that he felt deceived by Google's decision to use its crawling advantages to misappropriate third-party content. The webpage owner said:

> A major violation occurred when Google used robotic information scraped by its crawler to create content of its own which is displayed in the search result page. We never would have created sitemaps for Google if those were the terms. Google wouldn't have had sitemaps from every website on earth feeding it content if those were the terms from the beginning. They would have been forced to create a new system in order

---

[1118] CEO Hearing Transcript at 36 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm on the Judiciary).

[1119] *Id.* at 48–49 (Rep. Ken Buck (R-CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1120] *Id.* at 49.

[1121] Innovation and Entrepreneurship Hearing at 8 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC) (Sept. 13, 2019).

[1122] Interview with Source 489 (Sept. 19, 2020).

**App. 259**

to convince sites to comply or a new search service would have been born that had different options.[1123]

Google's practice of misappropriating third-party content to bootstrap its own rival search services and to keep users on Google's own webpage is further evidence of its monopoly power and an example of how Google has abused that power. Google seized value from third-party businesses without their consent. These businesses had no effective choice but to allow Google's misappropriation to continue, given Google's search dominance. In this way, Google leveraged its search dominance to misappropriate third-party content, free-riding on others' investments and innovations.

2)   Self-Preferencing

Evidence shows that once Google built out its vertical offerings, it introduced various changes that had the effect of privileging Google's own inferior services while demoting competitors' offerings. This conduct has undermined the vertical search providers that Google viewed as a threat. It has also boosted Google's ad revenue by keeping users on Google's domains for longer and by compelling demoted firms to pay Google more ad fees to reach users.

In 2007 Google introduced "Universal Search," which presented users with search results that integrated Google's various specialized search services, including Google Images, Google Local, and Google News.[1124] Universal Search was designed to improve users' search experience, as well as to increase traffic to Google's own offerings—even when those offerings weren't the best or most relevant for users.[1125] Google's documents suggest that shortly after launching Universal Search, traffic to Google's own vertical services increased.[1126] Even early in its conception, Google executives were exploring how Universal Search could be used to show a "results page promo" to "bootstrap traffic" to Google's other products.[1127]

---

[1123] *Id.*

[1124] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01230600 (Dec. 8, 2004) (on file with Comm.) ("Googlers have long argued for some type of 'universal' search that integrates all of Google's indices, including those that contain different media, like Images, and those that contain structured data, like Local and Froogle"); GOOG-HJC-03815864–65 (Apr. 23, 2010) (noting that universal search marked a shift to "increase our ability to provide new types of media in search results").

[1125] *Id.* at GOOG-HJC-02734893 (Dec. 15, 2006) (introducing Universal Search to help solve the problem that "Google search user experience has been internally and externally perceived as stagnant for the last 7 years").

[1126] *Id.* at GOOG-HJC-03804474 (May 23, 2007) (on file with Comm.) (noting "large increases in absolute coverage for all five purposes," including a 4.5% increase in News and 4% increase in Local Search").

[1127] *Id.* at GOOG-HJC-01230599 (Dec. 8, 2004) (on file with Comm.) ("Including some of Urs ideas around promoting the Labs property on the Google.com results pages for some subset of users ("New! Try your search on the next version of Google"). Urs main concern was that Lab gets limited traffic, and the set of users is not representative of Google's user base. He didn't mind the idea of a Labs launch in principle, but he suggested we show a results page promo for some small percentage of users to bootstrap traffic to the property with a more diverse set of users.").

**App. 260**

When Google launched Universal Search, it gave prominent placement to Google's vertical content over superior, more relevant competitors' products. Google's documents show that Google adjusted its search algorithm to automatically elevate the ranking of some of Google's services above those offered by rivals.[1128] These perks are generally not available to competing verticals, placing them at an instant disadvantage.[1129] Given that the likelihood that a user will click on a listing sharply declines with each drop in placement, traffic to rivals demoted by Google has fallen significantly.[1130] The effect is magnified on mobile search, where the small screen means fewer results are displayed on the first page of results.[1131]

In a submission to the Subcommittee, one vertical search provider described the practical effects of Google's discriminatory treatment:

> When the Local OneBox appears on the page, links to [the company's] website with highly relevant [results] get pushed down the page into the lower section for organic search results. This demotion puts [the company] at a competitive disadvantage relative to Google's local search results and jeopardizes the health of [our] business—and this problem is further exacerbated in the growing mobile context where links to [our] website may be pushed off the small screen or the first page of search results altogether. In evaluating options to reduce this harm, [the company] has reached out to Google to explore whether [we] or [our] providers' listings on [our] website could be included in Google's local search results, but Google has either refused outright or taken no steps to allow such inclusion.[1132]

A submission from another vertical search provider stated that once Google began automatically placing its own competing service at the top of its search results page, the vertical provider's organic search traffic fell by approximately 20%.[1133] The vertical provider observed that Google's service is worse for users—showing higher prices and fewer choices than Google's

---

[1128] *See, e.g.*, *id.* at GOOG-HJC-01081099 (Oct. 11, 2007) ("We added a "cooccurring sites" signal to bias ourselves towards triggering when a local-oriented aggregator site (i.e. Citysearch) shows up in the web results.").

[1129] Submission from Source 564, to H. Comm. on the Judiciary, 9 (Nov. 13, 2020) (on file with Comm.).

[1130] Matt Southern, *Over 25% of People Click the First Google Search Result*, SEARCH ENGINE J. (July 14, 2020) https://www.searchenginejournal.com/google-first-page-clicks/374516/#close.

[1131] *Why Page 2 of Google Search Results Is the Best Place to Hide a Dead Body*, DIG. SYNOPSIS (Oct. 29, 2019) https://digitalsynopsis.com/tools/google-serp-design/ (stating that the first organic result on the first search engine results page receives around 32.5% of overall click-based traffic, the second result receives around 17.6%, and the seventh receives 3.5%).

[1132] Submission from Source 887, to H. Comm. on the Judiciary, 4 (Oct. 28, 2019) (on file with Comm.).

[1133] Submission from Source 925, to H. Comm on the Judiciary, 11 (Nov. 4, 2019) (on file with Comm.).

**App. 261**

competitors.[1134] However, Google continues to give its service top placement, occupying close to 100% of the above-the-fold mobile search results page and around 25% of desktop.[1135]

Additional market participants echoed the view that Google's self-preferencing comes at the expense of users. One search provider stated that Google prohibits it from displaying live prices on Google's results page, even as Google's own competing service is permitted to do so. Stating that there was no pro-competitive justification for this differential treatment, the firm also noted that Google's limits on rival vertical search providers likely prevent consumers from seeing the cheapest or best-valued prices.[1136]

In addition to placing its vertical offerings at the top of the search results page, Google has also actively demoted certain rivals through imposing algorithmic penalties. For example, in 2007 and in 2011, Google launched an algorithm that demoted sites that Google considered "low quality."[1137] Among the websites especially hit were comparison shopping providers, which enable users to compare product offers from multiple merchant websites.[1138] In a submission to the Subcommittee, one publisher stated that Google's algorithmic penalty caused search leads and revenues to its website to fall by 85%.[1139] Kelkoo, previously a leading comparison shopping site, explained that Google's demotion set off a "cyclic trend" whereby a reduction in traffic leads to fewer consumers, which leads to fewer listings and less revenue, which leads to reduced investment—which, in turn, contributes to a further decline in traffic, a "network effect in reverse."[1140]

In external messaging, Google justified the algorithmic penalties it imposed on third-party sites as a response to users' desire to see less "low quality" sites in their search results.[1141] However, Google did not subject its own vertical sites to the same algorithmic demotion, even though Google's vertical services aggregated and copied content from around the web—just like the third-party sites that Google had demoted.[1142] Indeed, Google's documents reveal that employees knew Google's own

---

[1134] *Id.*

[1135] *Id.* at 9.

[1136] Submission from Source 3, to H. Comm. on the Judiciary, 32 (Oct. 29, 2019) (on file with Comm.).

[1137] Amit Singhal & Matt Cutts, *Finding more high-quality sites in search*, GOOGLE: OFFICIAL BLOG (Feb. 24, 2011), https://googleblog.blogspot.com/2011/02/finding-more-high-quality-sites-in.html (defining "low-quality sites" as those that are "low-value add for users, copy content from other websites or sites that are just not very useful" and defining "high-quality sites" as "sites with original content and information such as research, in-depth reports, thoughtful analysis and so on").

[1138] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC- 00090248-49 (Jan 27, 2011) (on file with Comm.).

[1139] Submission from Kelkoo, to H. Comm. on the Judiciary, Kelkoo-0032 at 6 (Nov. 4, 2019) (on file with Comm.).

[1140] Submission from Kelkoo, to H. Comm. on the Judiciary, Kelkoo-0006 at 6 (Nov. 4, 2019) (on file with Comm.); Kelkoo-0044 at 19 (Nov. 4, 2019).

[1141] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-00632668 (on file with Comm.).

[1142] *Id.* at GOOG-HJC-02507422 (Apr. 4, 2006) (on file with Comm.) ("Keep in mind that, as we discussed, most of the information that is on pages that we create is aggregated from various sources, and those sources often have that material

189

**App. 262**

vertical sites would likely fit the demotion criteria that Google applied to other sites. When one employee suggested that Google index its comparison shopping site, Froogle, another responded that it was unlikely Froogle would get crawled "without special treatment," noting, "We'd probably have to provide a lot of special treatment to this content in order to have it be crawled, indexed, and rank well."[1143]

Despite the fact that Google's own comparison shopping service was of such low quality that Google's product team couldn't even get it indexed, Google continued to give Froogle top placement on its search results page, listing its results in the OneBox, a display box that Google populates with information on its search results page.[1144] Bill Brougher, a product manager, acknowledged that Google was privileging low-quality content, writing:

> Our algorithms specifically look for pages like [Froogle's] to either demote or remove from our index, and there are active projects to improve the integration into web search. The bigger problem these projects have is to improve their own result quality. For instance with Froogle, the onebox trigger is now very good and relevant, but the three results we show from Froogle in that onebox generally rate very low in our search quality evaluation. It is often the same with Local.[1145]

Another Google team member replied: "Yes, you're right that the Onebox result items often stink."[1146] A few years later, a Google employee again acknowledged that if Google ranked its own content according to the same criteria that it applied to competitors, "it will never rank."[1147]

In an interview with Subcommittee staff, one vertical site stated that Google had not only demoted the firm but had at least one instance removed it from Google's index entirely.[1148] The search provider stated that after Google purchased its rival, Google demoted the provider in search rankings while vaulting those of its rival.[1149] The search provider observed that Google's demotions sometimes followed favorable press that highlighted the search provider's popularity with users. "There was an

---

online already. Because of this, the search quality team has some concerns as to if/when this Google-created content will be indexed. And once it is indexed, it is unlikely to appear high in the search results.").

[1143] *Id.*

[1144] *Id.*

[1145] *Id.*; *see also* GOOG-HJC-03201904 (Mar. 22, 2006) (on file with Comm.) ("Generally we like to have the destination page in the index, not the aggregated pages. So if our local pages are lists of links to other pages, its [sic] more important that we have the other pages in the index. In addition, our pages would probably not rank well because of this.").

[1146] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02507420 (Apr. 5, 2006) (on file with Comm.).

[1147] *Id.* at GOOG-HJC-01069289 (May 6, 2009) (on file with Comm.) ("From a principal perspective it would be good if we could actually just crawl our product pages and then have the rank organically. Problem is that today if we crawl it will never rank.").

[1148] Interview with Source 147 (June 2019).

[1149] *Id.*

**App. 263**

article that came out in the press that painted [us] in a positive light and quoted an executive noting that [we are] the top result when a user searches [for a particular search term]. The next day, Google de-indexed [us] for [that search term]."[1150]

In July, the *Wall Street Journal* reported that Google also gives preferential treatment to YouTube.[1151] Tests conducted by the *Journal* found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement. Reflecting interviews with those familiar with the matter, the piece stated that Google engineers:

> [M]ade changes that effectively preference YouTube over other video sources. Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos." [1152]

In response to Questions for the Record from Subcommittee Chairman David N. Cicilline (D-RI), the company denied that Google Search is designed to favor YouTube. Although Google stated that it disagreed with the methodology used by the *Journal*, Google did not provide the Subcommittee with any data or internal reports that would support its claim.[1153]

Numerous market participants noted that Google's favoring of its own sites and demoting those of third parties has effectively increased their cost of distribution. Since demoted sites can generally only recover traffic through advertising on Google, the platform "essentially requires competitors to pay for their websites to appear above Google's own links," according to one market participant.[1154] Another business recalled that in 2016 Google demoted one of its vertical offerings, citing a policy of diversifying content.[1155] The firm stated that once it was penalized in organic rankings, it "could not get an appropriate customer service response for months" and ultimately "had to increase [marketing spend on Google] to regain lost traffic—a win-win for Google but a loss for [our business] and its users."[1156]

---

[1150] *Id.*

[1151] Sam Schechner, Kristen Grind & John West, *Searching for Video? Google Pushes YouTube Over Rivals*, WALL ST. J. (July 14, 2020), https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

[1152] *Id.*

[1153] Innovation and Entrepreneurship Hearing at 13 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[1154] Submission from Source 3, to H. Comm. on the Judiciary, 32 (Oct. 29, 2019) (on file with Comm.).

[1155] Submission from Source 972, to H. Comm. on the Judiciary, 9 (Dec. 9, 2019) (on file with Comm.).

[1156] *Id.*

**App. 264**

Meanwhile, Google's own competing vertical "is always listed at the top" of search results.[1157] The incident highlights how demoting rivals can enrich Google in two ways: first, through diverting greater traffic and business to its own products; and second, through earning ad revenues from the penalized sites that are subsequently scrambling to recover their search placement. When demoting firms that Google views as actual or potential competitive threats, Google is effectively raising rivals' costs.

Another firm noted that demoted vertical providers that go on to buy ads on Google not only feed revenue to a potential or actual competitor in specialized search, but also risk handing Google more commercially sensitive information. The market participant wrote:

> Google thus deceptively siphons internet traffic away from its vertical competitors in online travel and forces them to pay more for [search engine monetization] and [] Ads in order to get meaningful placement on Google's [search engine results page]. Importantly, Google also requires its vertical competitors to provide their inventory feed to populate the ads, allowing Google to appropriate vertical service providers' valuable inventory data.[1158]

A significant number of the website publishers that the Subcommittee interviewed noted the outsized effect that a single algorithmic change by Google can have on their business. Brian Warner, Celebrity Net Worth founder, stated, "All website owners live in constant fear of Google's algorithm updates. Without explanation or recourse, Google can deliver a fatal blow to a website's search ranking visibility."[1159] Foundem, the UK-based comparison shopping site, wrote, "An unjustified Google search penalty, whether imposed anticompetitively or in error, has the power to cause grave and irreparable harm to virtually any online business."[1160]

### 3)  Threatening Innovation and the Open Internet

Through misappropriating third-party content and giving preferential treatment to its own vertical sites, Google abused its gatekeeper power over online search to coerce vertical websites to surrender valuable data and to leverage its search dominance into adjacent markets. Google's conduct both thwarted competition and diminished the incentive of vertical providers to invest in new and innovative offerings.

---

[1157] *Id.*

[1158] Submission from Source 115, to H. Comm. on the Judiciary, 16 (Oct. 22, 2019) (on file with Comm.).

[1159] Submission from Celebrity Net Worth, to H. Comm. on the Judiciary, 10 (Oct. 14, 2019) (on file with Comm.).

[1160] Submission from Foundem, to H. Comm. on the Judiciary, 42 (Oct. 22, 2019) (on file with Comm.). Foundem was the lead complainant in the European Commission's antitrust investigation and case on Google Shopping.

**App. 265**

In an interview with the Subcommittee, one market participant observed that Google's conduct has sapped investment, as "investors don't want to invest in companies that are producing content that relies on Google traffic," resulting in "less capital invested in companies reliant on traffic from Google."[1161] The website noted that Google's business practices have also skewed the website's own investment decisions, leading it to allocate the vast majority of its revenue to creating "news-like temporary content" rather than "evergreen content."[1162] It added, "If we could trust that Google was not engaging in unfair search practices, we would be producing different content."[1163]

A vertical provider, meanwhile, said that Google's conduct had held the firm's growth "at bay" and risks reducing innovation over the long term, as providers whose growth is capped by Google may be more reluctant to invest and expand.[1164] It added:

> Competitors are not the only ones who have a reduced incentive to innovate as a result of Google's conduct. The anticompetitive effects reduce Google's own incentives to improve the quality of its services, because it does not need to compete on the merits with rival services.[1165]

To illustrate this point, Yelp offers a contrast between its own efforts to maintain high-quality user reviews and Google's efforts. It states that of the approximately 150 million user reviews submitted to Yelp since 2005, Yelp has displayed only 72% of them to users, while flagging 21% as "not recommended."[1166] Yelp cites investment research noting that Google, by contrast, does not invest in curating its reviews: "25% of Google's reviews have zero characters and are simply Netflix-style one-click star ratings from which the user can derive few, if any, insights about the trustworthiness of the submission."[1167]

Several market participants told the Subcommittee that Google's business practices in online search have already foreclosed opportunity. In a submission, Celebrity Net Worth founder Brian Warner wrote:

> It is my view that Google has removed essentially all of the oxygen from the open internet ecosystem. There is no longer any incentive or even basic opportunity to innovate as I did back in 2008. If someone came to me with an idea for a website or a

---

[1161] Interview with Source 507 (July 10, 2019).

[1162] *Id*.

[1163] *Id.*

[1164] Submission from Source 564, to H. Comm. on the Judiciary, 4 (Nov. 13, 2019) (on file with Comm.).

[1165] *Id.*

[1166] PiperJaffray, Introducing Review Growth for Yelp vs. Google Plus, (Apr. 16, 2014) (on file with Comm.).

[1167] *Id*.

**App. 266**

web service today, I would tell them to run. Run as far away from the web as possible. Launch a lawn care business or a dog grooming business—something Google can't take away as soon as he or she is thriving.[1168]

More broadly, market participants expressed concern that Google has evolved from a "turnstile" to the rest of the web to a "walled garden" that increasingly keeps users within its sites.[1169] Many observers have noted that when Google filed its initial public offering, Google co-founder Larry Page identified the company's mission as the following: "We want you to come to Google and quickly find what you want…We want you to get you out of Google and to the right place as fast as possible."[1170] In recent years, however, studies have shown that more than half of all queries on Google either terminate on Google or result in a click to Google's own properties—a share that is growing over time.[1171] In July, *The Markup* published results showing that Google allocated 41% of the first search results page on mobile devices to Google's own content."[1172]

On several occasions over the course of the investigation, Subcommittee Chairman David N. Cicilline (D-RI) asked Google about this trend.[1173] At the Subcommittee's July 16, 2019 hearing, Google's Director of Economic Policy, Adam Cohen, stated that Google's goal is "to provide users information as quickly and efficiently as possible," adding that he was "not familiar" with studies showing that a majority of queries now terminate on Google.[1174] In its July 26, 2019 response to a follow-up letter from Chairman Cicilline, Google wrote that it strives to "give users the most relevant, highest quality information as quickly as possible," a goal that Google claims is "[c]onsistent with Mr. Page's comments in 2004."[1175] When asked whether it was true that less than 50% of all searches on Google resulted in clicks to non-Google websites, Google responded that it "has long sent large

---

[1168] Innovation and Entrepreneurship Hearing at 6 (statement from Brian Warner, Founder, Celeb. Net Worth).

[1169] *See, e.g.*, Submission from Source 972, to H. Comm. on the Judiciary, 9 (Dec. 9, 2019) (on file with Comm.) ("As opposed to cataloguing the internet and sending travelers to the most relevant websites, Google is instead creating a walled garden, using its place at the top of the internet funnel to ensure that the majority of users transact on Google's own pages and products.").

[1170] Google Inc., Registration Statement, (Form S-1) B-6 (2004), https://www.sec.gov/Archives/edgar/data/1288776/000119312504139655/ds1a.htm .

[1171] Rand Fishkin, *Less Than Half of All Google Searches Now Result in a Click*, SPARKTORO (Aug. 13, 2019), https://sparktoro.com/blog/less-than-half-of-google-searches-now-result-in-a-click/.

[1172] Adrianne Jeffries & Leon Yin, *Google's Top Search Result? Surprise! It's Google*, THE MARKUP (July 28, 2020), https://themarkup.org/google-the-giant/2020/07/28/google-search-results-prioritize-google-products-over-competitors.

[1173] *See, e.g.*, Innovation and Entrepreneurship Hearing at 38–40 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC); CEO Hearing Transcript at 1 (response to Questions for the Record from Sundar Pichai, CEO, Alphabet Inc.).

[1174] Innovation and Entrepreneurship Hearing at 38–40 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC); 42 (statement of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[1175] Letter from Kent Walker, Senior Vice Pres., Global Affairs & Chief Legal Officer, Google, to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 1 (July 26, 2019).

**App. 267**

amounts of traffic to other sites."[1176] In response to the Subcommittee's request for query metrics that would document the underlying trends, however, Google did not produce the relevant data.[1177]

Several enforcement bodies have examined these business practices. Between 2011 and 2013, the Federal Trade Commission pursued an inquiry into Google's data misappropriation and self-preferencing, among other conduct. Staff at the Bureau of Competition concluded that "the natural and probable effect" of Google's misappropriation was "to diminish the incentives of vertical websites to invest in, and to develop, new and innovative content."[1178] On Google's self-preferencing, staff concluded that Google's conduct had "resulted in anticompetitive effects,"[1179] but that Google had offered "strong procompetitive justifications."[1180] In 2017, the European Commission concluded that Google's self-preferencing in comparison shopping services constituted an illegal abuse of dominance and ordered Google to implement a remedy of "equal treatment."[1181] The European Commission stated that Google had not "provided verifiable evidence to prove that its conduct is indispensable" to any procompetitive effects.[1182]

### ii. Google Increased Prices for Market Access and Degraded Search Quality

In 2000, Google launched AdWords, which allowed advertisers to pay for keyword-based ads that would appear to the right of Google's search results.[1183] In the years since, Google has changed the display of the ads on its search engine results page in several ways, most notably by (1) increasing the number of ads placed above organic search results, and (2) blurring the distinction between how ads and organic listings are presented on Google's search results page. These changes have effectively raised the price that businesses must pay to access users through Google. Market participants told the Subcommittee that Google's conduct has undermined competition, misled consumers, and degraded the overall quality of Google's search results—all while enabling Google to further exploit its monopoly over general online search.

---

[1176] *Id.* at 2.

[1177] In a September 2020 response to Chairman Cicilline on this same question, Google disputed Fishkin's analysis of the data. Google wrote "The fact that a user does not click on a link on a Google Search results page does not mean that the user has been "kept" on Google properties. Searches on Google may result in zero website clicks for many reasons, which is not discernable without directly asking the user why they did not click a link." CEO Hearing at A-2 (response to Questions for the Record of Sundar Pichai, CEO, Alphabet Inc.).

[1178] FED. TRADE COMM'N, THE FTC REPORT ON GOOGLE'S BUSINESS PRACTICES iii (Aug. 8, 2012), in WALL ST. J. (Mar. 24, 2015), http://graphics.wsj.com/google-ftc-report/.

[1179] *Id.* at 80.

[1180] *Id.* at 86.

[1181] Google Search (Shopping) Comm'n Decision at para. 671.

[1182] Summary of Google Search (Shopping) Comm'n Decision at O.J. C 9/13, para. 26 (Dec. 1, 2018), https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52018XC0112(01)&from=EN.

[1183] Press Release, Google, Google Launches Self-Service Advertising Program (Oct. 23, 2000), http://googlepress.blogspot.com/2000/10/google-launches-self-service.html.

**App. 268**

Google's clear dominance in online search also gives it significant control over the search advertising market. Publicly available data suggests Google captured around 73% of the search advertising market in 2019.[1184] Submissions from market participants show that many firms spend the vast majority of their ad budgets on Google. For example, one major vertical provider spent significantly more than half of its total ad spend on Google each year from 2016 to 2019, with the second top provider receiving less than 15%.[1185] Public reporting suggests that, as of 2019, Google had increased the price of search ads by about 5% per year, exceeding the U.S. inflation rate at that time of 1.6%.[1186]

Several market participants told Subcommittee staff that their ad spend on Google has increased in large part because Google has made it more difficult for businesses to obtain organic traffic. Partly this follows from Google's preferencing of its own products, which compels demoted firms to pay Google for ad placement as a way to regain visibility. Another notable factor has been Google's decision to increase the number of ads posted above organic search results.

Prior to 2016, Google's design of its search results page placed 8 ads to the right of organic search listings and 3 ads above them.[1187] Google's internal communications show that, as of 2011, the rate of user engagement with right-hand side ads was declining.[1188] Since Google made money from search ads only when users clicked on them, less user engagement meant those ads were becoming less valuable to Google. In February 2011, Sridhar Ramaswamy, senior vice president of ads at Google, noted that "users are no longer looking at the [right-hand side ads]," and stated that Google either needed to "retrain people to look there by putting really good stuff there," or "live with the fact that users are going to stop looking there."[1189] By August 2011, a team at Google known as "Project

---

[1184] Submission from Source 115, to H. Comm. on the Judiciary, 6 (Oct. 22, 2019) (on file with Comm.) (citing Megan Graham, *Amazon Is Eating into Google's Most Important Business: Search Advertising,* CNBC (Oct. 15, 2019), https://www.cnbc.com/2019/10/15/amazon-is-eating-into-googles-dominance-in-search-ads.html).

[1185] Submission from Source 3, to H. Comm. on the Judiciary, 8 (Oct. 29, 2019) (on file with Comm.).

[1186] Alistair Barr & Garrit De Vynck, *Airlines, Hotels and Other Brands Are Tired of Paying Google for Their Own Names,* BLOOMBERG (Mar. 9, 2019); *see also* Mark Irvine, *Average Cost Per Click by Country: Where in the World Are the Highest CPCs?,* WORDSTREAM BLOG (Nov. 8, 2018) https://www.wordstream.com/blog/ws/2015/07/06/average-cost-per-click (showing that the cost-per-click that Google charges search advertisers in the United States is notably higher than the rate it charges in countries where Google faces more competition).

[1187] Dr. Peter J. Meyers, *Four Ads on Top: The Wait Is Over,* MOZ (Feb. 19, 2016), https://moz.com/blog/four-ads-on-top-the-wait-is-over.

[1188] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02981172–73 (Aug. 12, 2011) (on file with Comm.) ("RHS CTR has been steadily dropping over time to today's level…For the best ads on the RHS, some indication that CTR is lower than quality would suggest it should be"); GOOG-HJC-02983169–93 (Aug. 12, 2011) (stating that RHS is 16.5% of search revenue, 26% of queries have a RHS ad, and "Opportunity is accelerating due to declining RhsCTR").

[1189] *Id.* at GOOG-HJC-02983830 (Feb. 16, 2011).

**App. 269**

Manhattan" was working on a redesign of Google's desktop search results page that focused on reducing or eliminating right-hand side ads.[1190]

In 2016, Google rolled out the redesigned page, which eliminated the right-hand side ads while adding a fourth ad above organic listings and 3 at the bottom of the page.[1191] The practical effect of adding a fourth ad at the top of the search results page was to push organic listings further down, requiring users to scroll down further before reaching a non-paid result. According to *Bloomberg*, when Google tested the addition of a fourth ad, some employees objected on the grounds that the fourth ad would be of lower quality than the first organic result, but Google altered the search results page anyway.[1192]

Google's decision to monetize a fourth ad at the expense of an organic listing fits a broader pattern of steps taken by Google to rank search results based on what is best for Google, rather than what is best for search users—be it preferencing its own vertical sites or allocating more space for ads. Several market participants noted that Google could afford to make these changes only once it had achieved a dominant position in the market for general search and search advertising.[1193] Now that Google is "unconstrained by competitors," one market participant noted, it "consistently reserves the top of the [search engine results page] for its own vertical products or advertisements paid for through search engine marketing, pushing its rivals' organic results to the bottom, regardless of how relevant or useful they might be."[1194]

Internal data shown by one market participant to the Subcommittee demonstrates that "organic search listings have been pushed down over time, and 'click-throughs' (clicking to visit a site) on the first organic results have decreased by two-thirds over the past 3 years."[1195] The market participant's analysis also shows that the first organic listing on mobile now appears on the bottom of the third search results screen, which "effectively forces advertising customers to bid for a paid advertisement listing if they want their service or product to meaningfully reach consumers in a mobile search."[1196]

---

[1190] *Id.* at GOOG-HJC-00482674–76 (Aug. 18, 2011).

[1191] Matt McGee, *Confirmed: Google To Stop Showing Ads On Right Side Of Desktop Search Results Worldwide*, SEARCH ENGINE LAND (Feb. 19, 2016), https://searchengineland.com/google-no-ads-right-side-of-desktop-search-results-242997.

[1192] Gerrit De Vynck, *Google Search Upgrades Make It Harder for Websites to Win Traffic*, BLOOMBERG (July 13, 2020) https://www.bloomberg.com/news/articles/2020-07-13/how-google-search-changes-make-it-more-expensive-to-win-traffic.

[1193] *See, e.g.*, Submission from Source 972, to H. Comm. on the Judiciary, 14 (Dec. 9, 2019) (on file with Comm.); Submission from Source 115, to H. Comm. on the Judiciary, 10 (Oct. 22, 2019) (on file with Comm.); Submission from Source 3, to H. Comm. on the Judiciary, 34 (Oct. 29, 2019) (on file with Comm.); Competitors Hearing at 3 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

[1194] Submission from Source 972, to H. Comm. on the Judiciary,14 (Dec. 9, 2019) (on file with Comm.).

[1195] Submission from Source 3, to H. Comm. on the Judiciary, 33 (Oct. 29, 2019) (on file with Comm.).

[1196] *Id.*

**App. 270**

**Google Search on Desktop Ad Placement**[1197]



[1197] Prepared by the Subcomm.

198

**App. 271**

## Google Search on Mobile Phone[1198]



---

[1198] Prepared by the Subcomm.

**Google Search on Desktop**[1199]



---

[1199] Prepared by the Subcomm.

**App. 273**

**Google Search on Mobile Phone**[1200]



One result of these changes is that users click less on organic search results. As Google has reduced the share of top real estate that it devotes to organic listings, studies show that organic click-through as a share of all click-through plus zero-click searches has fallen.[1201] According to an analysis by Rand Fishkin, the trend is especially pronounced in mobile, where organic click-through rates fell by more than 30% between January 2016 and June 2019, while paid click-through rates over that same period more than tripled.[1202]

For businesses that depend on Google to reach users, these trends amount to a toll hike, as traffic that firms could previously draw through organic listings is now increasingly pay-for-play. Instead of competing for users by offering high-quality webpages and services that should lead to

---

[1200] Prepared by the Subcomm.

[1201] Rand Fishkin, *Less than Half of Google Searches Now Result in a Click*, SPARKTORO (Aug. 13, 2019) https://sparktoro.com/blog/less-than-half-of-google-searches-now-result-in-a-click/.

[1202] *Id.* (showing organic fell from 41.1% in January 2016 to 26.68% in June 2019, a period over which paid click-through rates increased from 3.29% to 11.38%).

**App. 274**

better organic search listings, these businesses must now compete for users based on how much money they pay Google. Several market participants analogized Google to a gatekeeper that is extorting users for access to its critical distribution channel.

At the Subcommittee's January 2020 field hearing in Colorado, David Heinemeier Hansson, chief technology officer and co-founder of Basecamp, testified that Google's decision to increase the number of ads listed above organic search results has hurt search users.[1203] Expanding on his criticism, Hansson stated that Google's decision to sell ad placement against a company's brand names is another way that Google extracts revenue from dependent businesses.

Hansson said, "Google uses this monopoly to extort businesses like ours to pay for the privilege that consumers who search for our trademarked brand name can find us because if we don't they will sell our brand name as misdirection to our competitors."[1204] He noted that while Google purports to recognize trademark law by prohibiting the use of trademark terms in ad copy, Google "puts the onus of enforcement on victims and does nothing to stop repeat offenders, unless, of course, the trademark terms are belonging to Google itself."[1205] Hansson added, "You will find no competitor ads for any of Google's own important properties."[1206]

**Basecamp's Ad**[1207]



Other market participants generally echoed these views in submissions to the Subcommittee. One wrote that Google "effectively forces its advertising customers to pay for the ability to reach

---

[1203] Competitors Hearing Transcript at 62 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp) ("Today, if a consumer goes to Google on their mobile device and search [sic] for Basecamp, the first thing that they will find is whoever bought that trademark term, which is usually one of our competitors. Ergo, consumers are not finding what they are looking for . . . . They are being presented with an ad and that is the tollbooth that [Google is] erecting.").

[1204] *Id.* at 23.

[1205] *Id.*

[1206] *Id*.

[1207] Jason Fried (@jasonfried), TWITTER (Sep. 3, 2019, 4:39 PM), https://twitter.com/jasonfried/status/1168986962704982016?lang=en.

**App. 275**

consumers who are searching specifically for the customer's brand."[1208] The business added, "Facing no remotely comparable advertising and search engine alternative, Google has the ability to charge potentially inflated prices for its advertising services by forcing customers to increase their bids in order to receive a more favorable position."[1209]

A second factor that several third parties cited as contributing to both higher ad prices and the degradation of search for users is Google's effort over the years to blur the distinction between organic listings and paid ads.

**Google's Ad Shading and Labeling: 2007–2013**[1210]



The diagram above depicts Google's practice between 2007 and 2013 of labeling its paid ads with a shaded background. As shown below, in 2013, Google abandoned the shaded background and instead inserted a small yellow square that states "Ad." Since 2016, Google has made various changes that make ads more subtle, culminating in a label that renders the overall appearance of paid ads much more similar to organic listings. Market participants have noted that Google also neglects to label some

---

[1208] Submission from Source 3, to H. Comm. on the Judiciary, 32 (Oct. 29, 2019) (on file with Comm.).

[1209] Id.

[1210] Ginny Marvin, *A Visual History of Google Ad Labeling in Search Results,* SEARCH ENGINE LAND, (Jan. 28, 2020). https://searchengineland.com/search-ad-labeling-history-google-bing-254332.

**App. 276**

paid ads entirely, particularly those that appear in Google's vertical search offerings, such as listings for hotels that appear alongside maps.[1211]

**Google's Ad Shading and Labeling: 2013–2019[1212]**



The natural result of Google's decision to blur the distinction between paid ads and organic listings is that users click on more ads and less organic search results. This misleading practice has likely contributed to the growth of paid click-through rates on Google. One study found that over 59% of consumers were not aware of the difference between organic results and paid ads on Google, and about 34% of those who did recognize paid ads said they would deliberately avoid clicking on them.[1213] The Federal Trade Commission has recognized that search engines that fail to "prominently

---

[1211] *Google Hotel Ads*, GOOGLE, https://ads.google.com/hotels/ (last visited Oct. 5, 2020) (offering paid listings to hotels, but neglecting to designate these listings as "ads" on the search results page).

[1212] Ginny Marvin, *A Visual History of Google Ad Labeling in Search Results,* SEARCH ENGINE LAND, (Jan. 28, 2020). https://searchengineland.com/search-ad-labeling-history-google-bing-254332.

[1213] Mark Jones, *Two-thirds of people don't know the difference between Google paid and organic search results,* MARKETING TECH NEWS (Sept. 6, 2018) https://marketingtechnews.net/news/2018/sep/06/two-thirds-people-dont-know-difference-between-google-paid-and-organic-search-results/.

**App. 277**

distinguish" paid ads from organic listings could be liable for deceiving consumers under Section 5 of the FTC Act.[1214]

Making ads less conspicuous makes it more likely that users will unwittingly click on them. Market participants note that, like Google's decision to increase the number and prominence of paid ads, Google's decision to blur the distinction between paid listings and organic results deceives consumers and compels businesses to purchase ads from Google in order to be located by users.[1215]

In submissions and interviews with Subcommittee staff, businesses noted that higher advertising costs come at the expense of investments in innovation and consumer benefits.[1216] One vertical search provider stated:

> If the search market were fair, the internet would have four times more content on it, dramatically improving the web for consumers. Google's gatekeeper power allows it to show more advertisements for search queries with higher commercial intent. . . . The harm to consumers is not necessarily a lack of content, but a lack of quality content (requiring money to produce).[1217]

At the Subcommittee's January 2020 field hearing, Hansson testified that Google's conduct, which harms business customers and users alike, is enabled by its dominance:

> Google's monopoly on internet search must be broken up for the sake of a fair marketplace. Google would never be able to get away with such a user-hostile design as showing a full-page ad for something other than what you were searching for, if it had real competition. They would never have been able to establish their monopoly if this had been the design from the get-go. These are the monopoly spoils of complete domination.[1218]

At the Subcommittee's sixth hearing, Subcommittee Chairman David N. Cicilline (D-RI) noted that Google's search results page now features more ads and more of Google's own sites and asked

---

[1214] Letter from Mary K. Engle, Assoc. Dir. for Advert. Practices, Fed. Trade Comm'n (June 24, 2013), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-consumer-protection-staff-updates-agencys-guidance-search-engine-industryon-need-distinguish/130625searchenginegeneralletter.pdf.

[1215] Submission from Source 115, to H. Comm. on the Judiciary, 10-12 (Oct 22, 2019) (on file with Comm.); Submission from Source 972, to H. Comm. on the Judiciary, 21 (Dec. 9, 2019) (on file with Comm.); Submission from Source 3, to H. Comm. on the Judiciary (Oct. 29, 2019) (on file with Comm.).

[1216] Submission from Source 3, to H. Comm. on the Judiciary 32 (Oct. 29, 2019) (on file with Comm.).

[1217] Interview with Source 507 (July 10, 2019).

[1218] Competitors Hearing at 7 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

**App. 278**

Google CEO Sundar Pichai whether this trend highlights a misalignment of Google's incentives.[1219] He asked, "Isn't there a fundamental conflict of interest between serving users who want to access the best and most relevant information and Google's business model, which incentivizes Google to sell ads and keep users on Google's own sites?"[1220] In response, Mr. Pichai stated that Google has "always focused on providing users the most relevant information," and stated that Google shows ads "only for a small subset of queries where the intent from users is highly commercial."[1221] However, Mr. Pichai did not explain why the percentage of queries for which Google shows ads would implicate whether or not Google's business model compromises the integrity of its search results. Google also failed to produce data that would enable the Subcommittee to make an independent assessment of Pichai's assertion.

3. <u>Digital Advertisements</u>

   a. <u>Overview and Dominance</u>

Google makes the vast majority of its revenue by selling advertising placement across the internet. In 2019, Google's ad revenue accounted for approximately 83.3% of Alphabet's overall sales.[1222] Google is a prominent player in both search advertising and digital display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place ads. Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trade on the exchange.[1223]

Internationally, antitrust enforcers are currently investigating Google's dominance in digital advertising, including the United Kingdom's Competition and Markets Authority (CMA),[1224] and the Australian Competition and Consumer Commission (ACCC).[1225] In July 2020, the CMA concluded

---

[1219] CEO Hearing Transcript at 37 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm on the Judiciary); Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01099375 (Mar. 30, 2012) (on file with Comm.); Sergey Brin & Larry Page, *The Anatomy of a Large-Scale Hypertextual Search Engine*, http://infolab.stanford.edu/~backrub/google.html (expressing reservations about an ad-based business model, noting that "the goals of the advertising business model do not always correspond to providing quality search to users," and given the conflicting motives that a search engine might face between serving users the most relevant information and selling more ads, arguing that "advertising funded search engines will be inherently biased towards the advertisers and away from the needs of the consumers.").

[1220] CEO Hearing Transcript at 37 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1221] *Id.* (statement of Sundar Pichai, CEO, Alphabet Inc.); Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01099375 (Mar. 30, 2012) (on file with Comm.).

[1222] Alphabet Inc., Annual Report (Form 10-K) 10 (Feb. 3, 2020), https://www.sec.gov/Archives/edgar/data/1652044/000165204420000008/goog10-k2019.htm.

[1223] Competition & Mkts. Auth. Report at 10.

[1224] *Id.*

[1225] *See generally* Austl. Competition & Consumer Comm'n Report.

**App. 279**

that Google has "significant market power" in search advertising and its market power had enabled it to charge prices 30-40% higher than those set by Bing.[1226] In September 2020, the Senate Judiciary Committee held a hearing on the effects of Google's dominance in digital ads, where members expressed bipartisan concern that Google's market power across the ad tech stack was enabling anticompetitive conduct and harming publishers and advertisers alike.[1227] Lastly, public reports note that both the Justice Department and several state attorney generals are investigating Google's market power and conduct in digital ads, with reports that a lawsuit may be imminent.[1228] In light of the extensive attention already given to this issue, a comprehensive examination of the digital advertising market is beyond the scope of this Report.

Market participants and Google's documents suggest that Google is likely to maintain its lead in search and display advertising due to high entry barriers. Most critically, as other sections of this Report found, Google can mine its ecosystem—including Search, Chrome, Android, and Maps—to combine a unique set of user data points and build troves of online behavioral data that drive its ad business. Furthermore, its dominance across markets increasingly enables Google to set the terms of commerce. One third party described:

> Google is now not only a seller and broker of digital advertising across the Internet, but they now also control significant portions of the web browsers, operating systems, and platforms upon which these digital ads are delivered. This gives Google the ability to single-handedly shift an entire ecosystem in nearly any direction they decide, based simply on their scale. Google can then use its dominance to demand a higher share of ad revenues from buyers and sellers, and there is little leverage available to counteract this position in a negotiation.[1229]

One key factor that market participants and industry experts cite when accounting for why Google is likely to maintain its dominance in digital ads is its conflict of interest. With a sizable share in the ad exchange market, ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits.[1230] At the Subcommittee's sixth hearing,

---

[1226] Competition & Mkts. Auth. Report at 211.

[1227] *Stacking the Tech: Has Google Harmed Competition in Online Advertising? Hearing Before S. Subcomm. on Antitrust and Consumer Rights of the S. Comm. on the Judiciary*, 116th Cong. (2019).

[1228] Sara Forden & David McLaughlin, *DOJ Scrutinizes Google Advertising, Search in Antitrust Probe*, BLOOMBERG (Aug. 8, 2019), https://www.bloomberg.com/news/articles/2019-08-08/doj-scrutinizes-google-advertising-search-in-antitrust-probe.

[1229] Submission from Source 688, to H. Comm. on the Judiciary, 2 (Oct. 24, 2019) (on file with Comm.).

[1230] Dina Srinivasan, *Why Google Dominates Advertising Markets*, 24 STAN. TECH. L. REV. (forthcoming 2020) (manuscript at 10–11), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3500919.

Representative Pramila Jayapal (D-WA) questioned Google CEO Sundar Pichai about this conflict of interest:

> So [Google is] running the marketplace, it's acting on the buy side, and it's acting on the sell side at the same time, which is a major conflict of interest. It allows you to set rates very low as a buyer of ad space from newspapers, depriving them of their ad revenue, and then also to sell high to small businesses who are very dependent on advertising on your platform. It sounds a bit like a stock market, except, unlike a stock market, there's no regulation on your ad exchange market.[1231]

Mr. Pichai responded by citing the sums that Google has paid to publishers, describing it as a "low-margin business" for Google that it pursues "because we want to help support publishers."[1232] Google's overall margins have averaged over 20% for nine of the last ten years.[1233]

b.  <u>Merger Activity</u>

Google came to control a sizable market share across the ad tech stack through acquisitions. Google acquired DoubleClick in 2007 for $3.1 billion.[1234] At the time of the acquisition, *The New York Times* described DoubleClick as a "Nasdaq-like exchange for online ads," and Google's own early description of DoubleClick describes it as "a stock exchange," such as "the NYSE."[1235] Google purchased DoubleClick to enter the display advertising market, a segment that Google's internal documented calculated at around $4.3 billion in 2006—and an area where Google at the time noted it "has no meaningful presence."[1236] A presentation from July 2006 included a slide titled "Build a Self-Reinforcing Online Ads Ecosystem," which noted that acquiring DoubleClick or Atlas could create these "self-reinforcing benefits" for Google's ecosystem.[1237] The slide asked, "[I]s there some framework we have to demonstrate the synergies/inter-relationships from owning all these pieces?"[1238] Nine months later, Google announced its bid to buy DoubleClick.

---

[1231] CEO Hearing Transcript at 169 (Rep. Pramila Jayapal (D-WA), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm on the Judiciary).

[1232] *Id*. at 170.

[1233] Data compiled by Cong. Research Serv. (on file with Comm.).

[1234] Louise Story & Miguel Helft, *Google Buys DoubleClick for $3.1* Billion, N.Y. TIMES (Apr. 14, 2007), https://www.nytimes.com/2007/04/14/technology/14DoubleClick.html.

[1235] *Id. See also The DoubleClick Ad Exchange,* GOOGLE, https://static.googleusercontent.com/media/www.google.com/en//adexchange/AdExchangeOverview.pdf.

[1236] Submission from Google, to H. Comm. on the Judiciary, GOOG-HJC-04189346 (July 26, 2006) (on file with Comm.).

[1237] *Id.* at GOOG-HJC-04189347.

[1238] *Id*.

**App. 281**

When reviewing the deal, the Federal Trade Commission assessed both horizontal and non-horizontal theories of harm and noted that, prior to announcing the acquisition, Google had been planning to enter the market and compete against DoubleClick directly.[1239] Ultimately the Commission concluded that the display advertising market was highly competitive, and therefore the loss of Google's potential entry would not be competitively significant.[1240] Examining the potential effects of the deal on privacy, the FTC said it found no evidence that competition between Google and DoubleClick affected their respective privacy policies.[1241] In December 2007, the FTC approved the acquisition.[1242]

In 2010, Google acquired AdMob, the leading mobile ad network at the time. In the FTC's approval of the merger, it stated that "the combination of the two leading mobile advertising networks raised serious antitrust issues," but that these concerns were "overshadowed by recent developments in the market, most notably a move by Apple Computer Inc. – the maker of the iPhone – to launch its own competing mobile ad network."[1243] The Commission's assumption that Apple would continue to build its presence in the mobile ad market prompted it to approve the deal.[1244] In the coming years, however, Apple's product never fully took off and in 2016, Apple abandoned the effort completely.[1245]

In 2011 Google also acquired AdMeld, a leading supply-side platform.[1246] The Justice Department's Antitrust Division investigated the acquisition and concluded that the deal was "unlikely to cause consumer harm."[1247]

---

[1239] Press Release, Fed. Trade Comm'n, Federal Trade Commission Closes Google/DoubleClick Investigation (Dec. 20, 2007), https://www.ftc.gov/news-events/press-releases/2007/12/federal-trade-commission-closes-googledoubleclick-investigation.

[1240] Id.

[1241] Id.

[1242] Id.

[1243] Press Release, Fed. Trade Comm'n, FTC Closes its Investigation of Google AdMob Deal (May 21, 2010), https://www.ftc.gov/news-events/press-releases/2010/05/ftc-closes-its-investigation-google-admob-deal.

[1244] Id.

[1245] About the iAd App Network Shutdown, APPLE DEVELOPER (Dec. 31, 2016), https://developer.apple.com/support/iad/.

[1246] Press Release, Fed. Trade Comm'n, FTC Closes its Investigation of Google AdMob Deal (May 21, 2010), https://www.ftc.gov/news-events/press-releases/2010/05/ftc-closes-its-investigation-google-admob-deal.

[1247] Press Release, U.S. Dep't of Justice, Statement of the Department of Justice's Antitrust Division on Its Decision to Close Its Investigation of Google Inc.'s Acquisition of Admeld Inc. (Dec. 2, 2011) https://www.justice.gov/opa/pr/statement-department-justices-antitrust-division-its-decision-close-its-investigation-google.

**App. 282**

c.  <u>Conduct</u>

    i.  <u>Combination of Data</u>

When Google purchased DoubleClick, it told Congress and the FTC that it would not combine the data collected on internet users via DoubleClick with the data collected throughout Google's ecosystem.[1248] In 2016, however, Google reversed this commitment and subsequently combined DoubleClick data with personal information collected through other Google services—effectively combining information from a user's personal identity with their location on Google Maps, information from Gmail, and their search history, along with information from numerous other Google products. At the Subcommittee's sixth hearing, Representative Val Demings (D-FL) asked Mr. Pichai about his direct involvement in the decision to renege on Google's commitment to lawmakers:

> When Google proposed the merger[,] alarm bells were raised about the access to data Google would have, specifically the ability to connect to users' personal identity with their browsing activity. Google, however, committed to Congress and to the antitrust enforcers that the deal would not reduce user privacy. Google's chief legal adviser testified before the Senate Antitrust Subcommittee that Google wouldn't be able to merge this data even if it wanted to, given contractual restrictions. But in June of 2016, Google went ahead and merged its data anyway, effectively destroying anonymity on the internet . . . Did you sign off on this decision to combine the sets of data with—that Google had told Congress would be kept separate?[1249]

Mr. Pichai confirmed that he approved the deal, claiming that "Today [we] make it very easy for users to be in control of their data."[1250] Representative Demings also noted that at the time of the transaction, DoubleClick executives had noted that Google's founders were concerned that combining the data in this way—through a cross-site cookie—would lead to a privacy backlash. She stated:

> So, in 2007, Google's founders feared making this change because they knew it would upset their users, but in 2016, Google didn't seem to care. Mr. Pichai, isn't it true that what changed between 2007 and 2016 is that Google gained enormous market power. So. While Google had to care about user privacy in 2007. It no longer had to in 2016? Would you agree that what changed was Google gained enormous market power?[1251]

---

[1248] Dina Srinivasan, *Why Google Dominates Advertising Markets*, 24 STAN. TECH. L. REV. (forthcoming 2020) (manuscript at 24), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3500919.

[1249] CEO Hearing Transcript at 73–74 (Rep. Val Demings (D-FL), Member, Subcomm. on Antitrust, Commercial and Admin Law of the H. Comm. on the Judiciary).

[1250] *Id*. at 75.

[1251] *Id*. at 74–75

**App. 283**

She closed by noting she was concerned that Google's "bait-and-switch" was "part of a broader pattern where Google buys up companies for the purposes of surveilling Americans, and because of Google's dominance users have no choice but to surrender."[1252] In recent months, Google's reversal on this commitment has become salient for enforcers now assessing Google's bid to purchase FitBit.[1253]

### ii. Other Areas of Concern

While a comprehensive examination of this market is beyond the scope of this Report, the Subcommittee heard from numerous market participants about a set of alleged practices by Google that invite investigation. These include:

- Depriving advertisers and publishers of key market and pricing information and maintaining market opacity;

- Leveraging its market power in search advertising to compel advertisers to use Google's products in the display market;

- Leveraging control over YouTube to foreclose competition in digital video ad serving, in part by excluding rival ad servers from having access to YouTube;

- Inhibiting interoperability between Google's ad platforms and non-Google ad platforms; and

- Using its search dominance to impose standards like AMP that, by further depriving publishers of user data, benefit Google's ad business.

## 4. Android and Google Play Store

### a. Android

#### i. Overview

Android is a dominant mobile operating system, running on approximately 75% of the world's mobile devices.[1254] In the United States, the only alternative to Android is Apple's iOS. Android

---

[1252] *Id.* at 75.

[1253] CEO Hearing at 32 (response to Questions for the Record of Sundar Pichai, CEO, Alphabet Inc.), https://docs.house.gov/meetings/JU/JU05/20200729/110883/HHRG-116-JU05-20200729-QFR051-U1.pdf.

[1254] Felix Richter, *The Smartphone Market: The Smartphone Duopoly*, STATISTA (July 27, 2020), https://www.statista.com/chart/3268/smartphone-os-market-share/ (citing *Mobile Operating System Market Share Worldwide*, STATCOUNTER GLOBALSTATS).

**App. 284**

captures about 47% of the U.S. mobile operating system market, and Apple captures about 52% of it.[1255]

Google acquired Android in July 2005 for an estimated $50 million.[1256] Since then, Google has purchased a set of technologies to strengthen its mobile ecosystem, including both software and hardware.[1257] Notably, Google purchased Motorola Mobility in 2011 for $12.5 billion, the largest acquisition in Google's history.[1258]

Google describes Android as "a free, open-source mobile operating system" that is available to anyone to download and modify on a royalty-free basis.[1259] Indeed, Android is unique in that Google does not generally monetize its operating system by selling proprietary hardware or demanding licensing fees. In practice, however, smartphone manufacturers that seek to use Android must sign Google's licensing agreements, as Google limits the functionality of non-licensed usage. Only through Google's licensing agreements can smartphone manufacturers access Google's proprietary apps, such as Gmail, YouTube, Chrome, Google Maps, and Google Play Store.[1260] In return, Google requires that certain apps must be pre-installed and must receive prominent placement on mobile devices.[1261] Device manufacturers must also enter an agreement that prevents them from customizing Android,[1262] and

---

[1255] S. O'Dea, *Market share of mobile operating systems in the United States from January 2012 to December 2019*, STATISTA (Feb. 27, 2020), https://www.statista.com/statistics/272700/market-share-held-by-mobile-operating-systems-in-the-us-since-2009/ (citing *Mobile Operating System Market Share in United States Of America*, STATCOUNTER GLOBALSTATS).

[1256] Farhad Manjoo, *A Murky Road Ahead for Android, Despite Market Dominance*, N.Y. TIMES (May 27, 2015), https://www.nytimes.com/2015/05/28/technology/personaltech/a-murky-road-ahead-for-android-despite-market-dominance.html.

[1257] *See infra* Appendix.

[1258] *Google Buys Motorola Mobility For $12.5B, Says "Android Will Stay Open,"* TECHCRUNCH (Aug. 15, 2011), https://techcrunch.com/2011/08/15/breaking-google-buys-motorola-for-12-5-billion/ (reporting that Google purchased Motorola primarily to protect the Android ecosystem from patent litigation). In 2014, Google sold Motorola to Lenovo. *Facts about Google's acquisition of Motorola*, GOOGLE, https://www.google.com/press/motorola/) (lasted visited Oct. 4, 2020).

[1259] Production of Google, to H. Comm. on the Judiciary, A-6 (Nov. 22, 2019) (on file with Comm.) Android is managed by the Open Handset Alliance, a group of more than eighty hardware, software, and mobile network operators, including Samsung, LG, HTC, and Lenovo. *See Members*, OPEN HANDSET ALLIANCE, https://www.openhandsetalliance.com/oha_members.html (last visited Oct. 4, 2020); *Licenses*, ANDROID OPEN SOURCE PROJECT, https://source.android.com/setup/start/licenses (last visited Oct. 4, 2020) (stating that the Android source code is freely available for use under an open-source license).

[1260] *See* Google Android Comm'n Decision at paras. 160–63.

[1261] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02393308 (Mar. 11, 2011) (on file with Comm.) (The Mobile Application Distribution Agreement (MADA) is an agreement that specifies which apps Google requires hardware manufacturers to pre-install and where on the phone the apps should be placed.).

[1262] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02393318 (Feb. 25, 2011) (Google's Antifragmentation Agreement).

**App. 285**

from building an Android fork that would make the version of Android running on a device incompatible with apps built for the Android ecosystem.[1263]

The Subcommittee's investigation revealed that Google has used Android to entrench and extend its dominance in a host of ways that undermine competition. These include: (1) using contractual restrictions and exclusivity provisions to extend Google's search monopoly from desktop to mobile and to favor its own applications; and (2) devising Android Lockbox, a covert effort to track real-time data on the usage and engagement of third-party apps, some of which were Google's competitors. Additionally, Google's Play Store now functions as a gatekeeper, which Google is increasingly using to hike fees and favor its own apps. Overall, Android's business practices reveal how Google has maintained its search dominance through relying on various contractual restrictions that blocked competition and through exploiting information asymmetries, rather than by competing on the merits.

### ii.   Using Contracts to Extend Google's Search Monopoly and Self-Preference

Early communications within Google show that it began investing in the mobile ecosystem because it recognized that the rise of smartphone usage threatened to disintermediate Google Search. Since losing its monopoly on search would mean losing its valuable trove of user data, maintaining dominance over search access points was paramount.

To maintain its search dominance, Google invested in Android, which it recognized it could use to extend its search dominance onto mobile devices.[1264] Google required that any smartphone manufacturer seeking to license Android preinstall Google Search and Google Play Store, alongside a host of other rotating apps selected by Google.[1265] Google also offered mobile device manufacturers revenue-share agreements, under which smartphone manufacturers would receive a cut of the search advertising revenue that Google made from the use of Google's apps on their devices,[1266] as well as a cut of Play Store revenues.[1267] In return, however, manufacturers had to not only carry Google's apps, but also ensure that Google Search was the default *and* exclusive search app pre-installed on the manufacturers' devices. For example, one revenue share agreement reviewed by the Subcommittee stated that hardware manufacturers shall not "pre-install, install, or incorporate on any Covered Device

---

[1263] *Id.*; Google Android Comm'n Decision at paras. 170–71; *see also Device compatibility overview*, ANDROID DEVELOPERS, https://developer.android.com/guide/practices/compatibility (last visited Oct. 4, 2020). In 2017, Google released an alternative to its Antifragmentation Agreement called the Android Compatibility Commitment (ACC), which "would permit OEMs to manufacture incompatible Android devices for a third party that are marketed under a third-party brand." Google Android Comm'n Decision at paras. 170–71.

[1264] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04216470 (May 2009) (on file with Comm.).

[1265] *Id.* at GOOG-HJC-02393308 (Mar. 11, 2011) (on file with Comm.) (Mobile Application Distribution Agreement).

[1266] *Id.* at GOOG-HJC-00660371 (Apr. 11, 2011).

[1267] *Id.* at GOOG-HJC-04216470 (May 2009).

**App. 286**

any application which is the same or substantially similar to a Google Search Client or the Google Search Services."[1268]

Documents show that Google executives knew that conditioning access to Android and to Google's suite of apps on the prominent placement of Google Search would disrupt existing partnerships between mobile network operators and rival search engines. For example, a 2009 slide deck stated that "[p]artners may have deals in place with other search providers," and noted that "T-Mobile and AT&T have closed deals with Yahoo…Verizon has tight relationship with MSFT re: search…Expect MSFT & Yahoo to aggressively pursue 'pre-load' deals on Android phones."[1269] Google's strategy of licensing Android for free to hardware partners and conditioning access to Google's must-have apps on favorable treatment for Google Search enabled Google to box out rivals in mobile search and other markets. Google's strategy was successful. These agreements, which were reached with the leading smartphone providers, solidified Google Search as the default search option on a majority of the world's smartphones.

As Android gained market share, its demands grew and hardened. The European Commission found that between 2009 and 2014, Google increased the number of pre-installed Google apps that it required from 12 to 30.[1270] Documents submitted to the Subcommittee also show that instructions to heavily push Google Search were coming from the company's top management. Summarizing a meeting with Sundar Pichai, then-Vice President of Product Development, Director of Engineering for Android Patrick Brady recalled, "His main feedback was . . . Search is sacred, must be front and center."[1271] He added, "Our proposal covers that through more prescriptive search placement requirements."[1272]

Google's licensing agreement gave Google the right to amend the list of apps it required device manufacturers to pre-install.[1273] Documents show that market participants expressed frustration at Google's ability to set the terms and also change them routinely. Explaining the situation, Mr. Brady wrote, "Some OEMs . . . do not like the idea of signing up to undefined requirements, but most of our partners are somewhat used to this as the [c]ompatibility requirements evolve with each release, and our [Google Mobile Services] suite expands (incl. mandatory apps) over time."[1274] When one hardware manufacturer attempted to secure additional rights, Google pushed back. In 2014, John Lagerling, Senior Director of Android Global Partnerships, responded to such an effort:

---

[1268] *Id.* at GOOG-HJC-00660364 (Apr. 11, 2011).

[1269] *Id.* at GOOG-HJC-04217467 (May 2009) (on file with Comm.).

[1270] Google Android Comm'n Decision at para. 182.

[1271] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-00050146 (May 23, 2013) (on file with Comm.).

[1272] *Id.*

[1273] *See* Google Android Comm'n Decision at para. 183.

[1274] *Id.* at GOOG-HJC-00050145 (May 23, 2013).

**App. 287**

In your redlines on [the contract], you are suggesting [OEM] approves any new additions to GMS. This has never been the case in our past history[,] and I think it is the wrong message for [OEM] to send Google. We just spent some hours explaining . . . that one of the main reasons we do Android is in order to secure distribution of Google services.[1275]

Other smartphone manufacturers also attempted to resist Google's terms, noting that the requirements were crowding out placement for other apps while also taking up significant memory. For example, in 2014 one hardware manufacturer requested that Google "reduce the number of preloaded apps on the device . . . so that we don't clutter our products with apps that may not be necessary for the majority of users and we give them as much space as possible," adding that this would also "help us deal with complaints from governments, NGOs and end users."[1276] Forwarding the email to others at Google, Mr. Langerling noted that the manufacturer's grievance was "not about clutter but about system memory," adding that "[u]sers have been complaining to [the device maker] that [it] sells them a 16Gb phone and delivers something that only has 7-8Gb free."[1277]

Despite complaints that Android's pre-install conditions favored Google's products at the expense of user experience, Google maintained its requirements. Interviews with market participants suggest that Google's ability to set the terms of commerce hurt mobile device manufacturers as well as third-party developers, both of which had their own apps they were seeking to distribute. In a submission to the Subcommittee, one third party recalled being informed by a device manufacturer "that it could not provide home screen placement for our preloaded app due in part to contractual agreements to preload [Google's competing app]."[1278]

Market participants noted that pre-installation on devices can be critical for successful distribution. One developer explained that "integration into the initial device setup," in particular, can "meaningfully drive the acquisition of new users."[1279] Google's documents show that it recognized the importance of pre-installation, with one internal presentation stating that "activation and defaults are a known issue that we should explore, as OEM/carrier pre-installed apps are among the most used."[1280]

Documents also show that Google uses its leverage to push hardware manufacturers to privilege Google's products over the manufacturers' products. Discussing the agenda for an upcoming

---

[1275] *Id.* at GOOG-HJC-04300658 (Jan. 21, 2014).

[1276] *Id.* at GOOG-HJC-04308614 (Jan. 17, 2014).

[1277] *Id.*

[1278] Submission from Source 104, to H. Comm. on the Judiciary, Source 104-00000439 (Jan. 18, 2019) (on file with Comm.).

[1279] *Id.* at Source 104-00000437 (Jan. 8, 2019).

[1280] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04200778 (May 25, 2017) (on file with Comm.).

**App. 288**

meeting with a hardware manufacturer, one Google manager noted that the manufacturer should discourage the use of its email client for Gmail accounts, stating, "They should use Gmail native app."[1281] In a separate discussion in 2016, Google employees explained how Android Pay, a predecessor to Google Pay, would be given preferential treatment over the manufacturer's own mobile payment app.[1282] Recent reporting that Google is pressuring Samsung to promote Google apps over those offered by Samsung is consistent with the company's past conduct.[1283]

Lastly, Google appears to use its licensing agreements to deter mobile device manufacturers from collaborating with alternative mobile operating system providers. In 2012, for example, Acer, a hardware manufacturer, and Alibaba had planned to release a variant of Android, called Aliyun OS.[1284] Reporting suggests that Google threatened to terminate its partnership with Acer in retaliation, leading Acer to cancel the launch of devices running on the Aliyun OS.[1285] Google also requires hardware partners to agree that they will not run unsanctioned versions of Android on other hardware products, with the understanding that any manufacturer who violates this condition risks losing access to the Google Play Store and other popular apps across all of the manufacturer's devices.[1286]

After investigating Google's licensing agreements, the European Commission concluded in 2018 that Google's conduct had illegally benefited Google's own services while blocking the rise of rival operating systems.[1287] Although Google argued that users were free to download other apps and that Google's own apps were superior, the Commission determined that "users who find search and

---

[1281] *Id.* at GOOG-HJC-04204875 (Jan. 18, 2014).

[1282] *Id.* at GOOG-HJC-04299009 (Feb. 4, 2016) (discussing how the manufacture's mobile payment app would be placed inside of an apps folder while Google's mobile payment app would be placed more prominently outside the folder of Google apps).

[1283] *See, e.g.*, Mark Bergen & Sohee Kim, *Google in Talks to Take Over More Search Tasks on Samsung Phones*, BLOOMBERG (July 28, 2020), https://www.bloomberg.com/news/articles/2020-07-29/google-in-talks-to-take-over-more-search-tasks-on-samsung-phones; Paresh Dave & Hyunjoo Jin, *Samsung weighs dropping Bixby as Google dangles new mobile apps deal*, REUTERS (July 29, 2020), https://www.reuters.com/article/us-google-samsung/samsung-weighs-dropping-bixby-as-google-dangles-new-mobile-apps-deal-idUSKCN24U0TF.

[1284] *See, e.g.*, Dieter Bohn, *Google explains why it stopped Acer's Aliyun smartphone launch (updated)*, THE VERGE (Sept. 14, 2012), https://www.theverge.com/2012/9/14/3335204/google-statement-acer-smartphone-launch-aliyun-android; Roger Cheng, *Alibaba: Google forced Acer to drop our new mobile OS*, CNET (Sept. 13, 2012), https://www.cnet.com/news/alibaba-google-forced-acer-to-drop-our-new-mobile-os/; T.C. Sottek, *Acer cancels phone launch with Alibaba, allegedly in response to threats from Google*, THE VERGE (Sept. 13, 2012), https://www.theverge.com/2012/9/13/3328690/acer-google-alibaba-phone.

[1285] *Id.*

[1286] *See e.g.*, Janko Roettgers, *How Google kneecapped Amazon's smart TV efforts*, PROTOCOL (Mar. 11, 2020), https://www.protocol.com/google-android-amazon-fire-tv; James Brumley, *Google Just Made Sure It's Going to Win the Smart TV War*, MOTLEY FOOL (Mar. 20, 2020) https://www.fool.com/investing/2020/03/20/google-just-made-sure-its-going-to-win-the-smart-t.aspx.

[1287] Press Release, Eur. Comm'n, Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581.

browser apps pre-installed on their devices are likely to stick to these apps."[1288] Responding to Google's claims that its tying agreements were necessary in order for Google to be able to monetize its investment in Android, the European Commission stated:

> Google achieves billions of dollars in annual revenues with the Google Play Store alone, it collects a lot of data that is valuable to Google's search and advertising business from Android devices, and it would still have benefitted from a significant stream of revenue from search advertising without the restrictions.[1289]

### iii. Accessing Real-Time Market Data

The Subcommittee's investigation also revealed that Android gives Google unparalleled access to data on its users and developers. This includes information that Google can monetize through its ad business, as well as strategic intelligence that lets Google track emerging competitors and general business trends.

Android's dominance in the mobile operating system market enables it to extensively surveil its users. This surveillance is partly enabled through Google's technology. In key ways Google also uses its dominance and its integration across markets to increase the number of touchpoints from which it is constantly mining user data.

Google's documents show that it has used its leverage over hardware manufacturers to demand that they structure their devices in ways that facilitate Google's data collection efforts. Google's agreements with device manufacturers, for example, require that manufacturers configure a "Client ID," which is a unique alphanumeric code incorporated in the smartphone that enables Google to combine metrics tracked via the hardware with all the other data Google collects on users.[1290] Additionally, Google's own documents also show that it has asked device manufacturers to use a Google Account as their identifier rather than a non-Google account—a way of ensuring that Google can capture a broader picture of its users.[1291] On the Play Store, meanwhile, Google does not permit users to download apps unless they have a Google Account, further funneling users into the Google ecosystem.[1292] Combined with location data, which Android also extensively collects, Google can build sophisticated user profiles reflecting a person's demographic, where they are, and where they go, as well as which apps they use at what time and for how long.[1293] These intimate user profiles,

---

[1288] *Id.*

[1289] *Id.*

[1290] Google Android Comm'n Decision at para. 187.

[1291] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04204875 (Jan. 18, 2014) (on file with Comm.).

[1292] Innovation and Entrepreneurship Hearing at 76 (response to Questions for the Record of Adam Cohen, Dir. Of Econ Pol'y, Google LLC).

[1293] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04198806–55 (Jan. 13, 2017) (on file with Comm.).

**App. 290**

spanning billions of people, are a key source of Google's advantage in its ad business. In this way, Android's location data feeds into Google's dominance in ads.

Documents and information reviewed by Subcommittee staff also show that Google has used Android to closely monitor competing apps, data that amounts to near-perfect market intelligence. Since at least 2012, Google has collected installation metrics for third-party apps,[1294] which it combined with data analyzing search queries.[1295] These early documents outline the early stages of Google's "Lockbox," a project to collate data that provided Google with a range of competitor insights and market intelligence, ranging from an understanding of how installation of the Amazon app corresponded to a trend in Amazon shopping queries[1296] to a close tracking of trends relating to Candy Crush and Angry Birds.[1297]

While Lockbox began as a way to collect data on the installation of apps, Google quickly realized it could harness it to yield other insights as well. One document from 2013 identified a list of additional data points that the company desired, including "[m]ore signals (including uninstalls and device app mapping)" and "reliable and long term app usage data," for which the document noted Google Play Services could help.[1298] In short, Google began seeking out ways to collect specific usage data that enabled Google to track not just which apps a user has, but also how frequently they use the apps and for how long.

Documents obtained by the Subcommittee suggest that by 2015, Google's Lockbox data had succeeded in tracking more than just install rates.[1299] Google's internal reports show that Google was tracking in real-time the average number of days users were active on any particular app,[1300] as well as their "total time spent" in first- and third-party apps.[1301] Google subsequently used this data to benchmark the company's first-party apps against third-party apps, suggesting that Google was using Lockbox data to assess the relative strengths and weaknesses of its own offerings.[1302] Google's documents show how Lockbox furnishes Google with near-perfect market intelligence, which Google has used to inform strategic moves and potential business transactions.[1303] Recent reporting by *The*

---

[1294] *Id.* at GOOG-HJC-00055102 (Nov. 2013).

[1295] *Id.* at GOOG-HJC-02598471 (June 6, 2010).

[1296] *Id.* at GOOG-HJC-00055102 (Nov. 2013).

[1297] *Id.*

[1298] *Id.*

[1299] Alex Heath, Nick Bastone & Amir Efrati, *Internal Google Program Taps Data on Rival Android Apps*, THE INFO. (July 23, 2020), https://www.theinformation.com/articles/internal-google-program-taps-data-on-rival-android-apps.

[1300] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04198806–55 (Jan. 13, 2017) (on file with Comm.).

[1301] *Id.* at GOOG-HJC-04198814 (Jan. 13, 2017).

[1302] *Id.* at GOOG-HJC-04198812. (Jan. 13, 2017).

[1303] *Id.* at GOOG-HJC-04199726. (Jan. 13, 2017).

**App. 291**

*Information* documented how YouTube employees used Lockbox data to track TikTok usage in India as Google was developing and planning its own rival to TikTok.[1304]

During the Subcommittee's sixth hearing, Subcommittee Vice Chairman Joe Neguse (D-CO) asked Mr. Pichai about allegations that Google had used Android to surveil rival apps and develop competing products.[1305] Mr. Pichai responded, "Congressman, because we try to understand what's going on in [the] market and we are aware of, you know, popularity of apps," adding, "But, in general, the primary use for that data is to improve the health of Android."[1306]

In follow-up questions to Mr. Pichai, Google was asked to identify all acquisitions or product decisions that had been informed by data from Android Lockbox. Google's answer was not responsive to the question.[1307]

b.  Play Store

The Play Store is the dominant app store on Android devices. Early documents reviewed by the Subcommittee show that Google chose for a single app store to control software distribution on the Android ecosystem, with one executive noting that "we would strongly prefer to have one Market that everyone focuses on."[1308]

Because Google's Play Store is the primary way that users install applications on Android devices, the Play Store effectively functions as a gatekeeper for software distribution on a majority of the world's mobile devices. The Subcommittee's investigation reveals that Google uses this gatekeeper power in several key ways.

First, Google uses its Play Store gatekeeper power to charge high fees to mobile developers. Amazon, Spotify, Netflix, Epic Games, and Tinder have all expressed public concerns about Google's app store fees, along with Apple.[1309] As a lawsuit recently filed by Epic Games stated, "Google has thus installed itself as an unavoidable middleman for app developers who wish to reach Android users and vice versa. Google uses this monopoly power to impose a tax that siphons monopoly profits for

---

[1304] Alex Heath, Nick Bastone & Amir Efrati, *Internal Google Program Taps Data on Rival Android Apps*, THE INFO. (July 23, 2020), https://www.theinformation.com/articles/internal-google-program-taps-data-on-rival-android-apps.

[1305] Jon Porter, *Google reportedly keeps tabs on usage of rival Android apps to develop competitors*, THE VERGE (July 24, 2020), https://www.theverge.com/2020/7/24/21336946/google-android-lockbox-data-rival-apps-antitrust-scrutiny.

[1306] CEO Hearing Transcript at 196 (statement of Sundar Pichai, CEO, Alphabet Inc.).

[1307] CEO Hearing at A-10 (response to Questions for the Record of Sundar Pichai, CEO, Alphabet Inc.).

[1308] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04218465 (Nov. 26, 2009) (on file with Comm.).

[1309] *See infra* Section V.

**App. 292**

itself every time an app developer transacts with a consumer for the sale of an app or in-app digital content."[1310]

Although Google doesn't block off all alternative channels for accessing apps—allowing, for example, both some app stores and sideloading—in practice, these options do not provide meaningful alternatives to the Google Play Store. In contrast, the dual dominance of the Play Store and the Android ecosystem enables Google to exert control and engage in conduct that harms competition by exploiting, excluding, and discriminating against rivals.

Google charges developers of paid apps a 30% commission for downloads from the Play Store.[1311] Google also charges developers a 30% fee for in-app purchases.[1312] According to documents obtained by the Subcommittee, from 2011 to 2015, revenue from the Play Store accounted for 85% of Google's total revenue from the Android operating system, hardware sales, and the Play Store."[1313]

Third-party apps can also avoid the Play Store's commissions and fees by directing consumers to sideload the app, that is, to install the app using a browser, outside of an app store. Rival app stores that are not pre-installed on the device, such as the Amazon Appstore, must be sideloaded. Although sideloading is technically an option for rival app stores and app developers, market participants explained that Google goes out of its way to make sideloading difficult. Epic's recent lawsuit against Google alleges:

> Google ensures that the Android process is technically complex, confusing and threatening, filled with dire warnings that scare most consumers into abandoning the lengthy process. For example, depending on the version of Android running on a mobile device, downloading and installing *Fortnite* on an Android device could take as many as 16 steps or more, including requiring the user to make changes to the device's default settings and manually granting various permissions while being warned that doing so is dangerous.[1314]

Additionally, Epic's complaint notes that when it attempted to work with LG, another Android device manufacturer, LG told Epic that it had a contract with Google "to block side downloading off

---

[1310] Complaint for Injunctive Relief at 2, Epic Games, Inc. v. Google LLC, No. 3:20-cv-05671 (N. D. Cal., Aug. 13, 2020).

[1311] *Play Console Help: Service* Fees, GOOGLE, https://support.google.com/googleplay/android-developer/answer/112622?hl=en (last visited Oct. 4, 2020).

[1312] *Transaction fees for merchants*, GOOGLE PAYMENTS HELP CENTER, https://support.google.com/paymentscenter/answer/7159343?hl=en#:~:text=The%20transaction%20fee%20for%20all,distribution%20partner%20and%20operating%20fees (last visited Oct. 4, 2020).

[1313] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04217474 (on file with Comm.).

[1314] Complaint for Injunctive Relief at 7, Epic Games, Inc. v. Google LLC, No. 3:20-cv-05671 (N.D. Cal., Aug. 13, 2020).

**App. 293**

Google Play Store this year."[1315] If a user is able to install the competing app store, Google blocks them "from offering basic functions, such as automatic updating of apps in the background, which is available for apps downloaded from the Google Play Store."[1316]

The Play Store's dominance over app distribution on Android devices has enabled Google to begin to require the use of its in-app payment system (IAP). As a result, Google has become the middleman between app developers and their customers. This was not always the case. Market participants explain that Google has changed its stance and re-interpreted policies over time to require more app developers to use Google Pay. Beginning in 2014, for example, Google designated specific categories of applications—including mobile games—that would be required to use Google Play In-App Billing.[1317] Recently, however, several market participants have informed the Subcommittee that Google has begun insisting that a broader category of apps will be required to use Google IAP exclusively, no longer allowing the option of a third-party payment processor.[1318]

In interviews with Subcommittee staff, developers state that one way Google exercises its gatekeeper power over third-party app developers is through its arbitrary and unaccountable enforcement of Play Store policies. One developer that spoke with the Subcommittee described Google's Play Store policies as an "opaque system [that] threatens the ability of app developers to develop and compete in the market for consumers, who should ultimately determine which apps they use."[1319] Another developer explained, "When apps allegedly violate Google Play Store standards, Google does not ever explain how, other than to quote the policy above and attach pictures of the allegedly violating image. When the imagery does not fit the above definitions, app publishers such as [third party] are put in a position of having to guess how to apply these standards."[1320]

Developers also alleged that Google uses control over the Play Store to protect the dominance of its own services and stifle rivals. For example, Callsome, a mobile app that provided productive follow-up to phone calls or text messages, such as prompting a calendar entry or a reminder to text back, has sued Google and claimed it was banned from the Google Play store for "Ad Policy" violations only to later learn that a "fundamentally identical product" was able to stay and thrive in the

---

[1315] *Id.* at 28.

[1316] *Id.* at 7.

[1317] Innovation and Entrepreneurship Hearing at 85 (response to Questions for the Record of Adam Cohen, Dir. Of Econ Pol'y, Google LLC).

[1318] Submission from Source 736, to H. Comm. on the Judiciary (Sept. 25, 2020) (on file with Comm.).

[1319] Submission from Source 62 to H. Comm. on the Judiciary, 1 (July 31, 2020) (on file with Comm.)

[1320] Submission from Source 685, to H. Comm. on the Judiciary, 8 (Oct. 15, 2019) (on file with Comm.).

**App. 294**

Play Store.[1321] Callsome believes it was banned because of its partnership with StartApp, which—at the time—was widely considered a nascent but rising rival to Google in the Russian search market.[1322]

Subcommittee staff also spoke with several market participants that said Google has abused its control of the Play Store by using rule violations as a pretext for retaliatory conduct. For example, one third party described how soon after it ceased using Google's AdMob, an in-app ads monetization tool,[1323] Google began sending the third-party notifications of policy violations related to content the third party had included in its app for years.[1324]

In response to questions from the Subcommittee, Google stated that it "only suspends apps from the Google Play Store if it finds the app in violation of Google Play Program Policies . . . or in violation of the Developer Distribution Agreement."[1325] Google also stated that it gives developers opportunities to address what they may view as incorrect enforcement decisions of Play Store policies, adding that a "developer can easily contact the Policy Support Team (Appeals) in order to challenge the enforcement decision or receive additional clarification on the infraction."[1326]

App developers, in contrast, said that challenging a Play Store decision was like navigating a black box. One third party explained that it "tried for over a month through several channels to get a full explanation from Google of the problem and resolve it amicably. Google responded with silence, then roadblocks and runarounds."[1327] However, one third party told the Subcommittee:

> When apps allegedly violate Google Play Store standards, Google does not ever explain how, other than to quote the policy above and attach pictures of the allegedly violating image. When the imagery does not fit the above definitions, app publishers such as [third party] are put in a position of having to guess how to apply these standards.[1328]

In theory, one way that app developers could avoid Google's commissions and fees would be to negotiate with a mobile device manufacturer to have the app pre-installed on the device. In practice, however, Google's restrictive contracts with smartphone manufacturers have strictly limited—if not excluded—third-party apps from being pre-installed. In this way, Google's licensing agreements not

---

[1321] Submission from Callsome, to H. Comm. on the Judiciary, 3 (Apr. 28, 2020) (on file with Comm.).

[1322] *Id.* at 7.

[1323] *Google AdMob*, GOOGLE, https://admob.google.com/home/ (last visited Oct. 4 2020).

[1324] Submission from Source 685, to H. Comm. on the Judiciary (on file with Comm.).

[1325] Innovation and Entrepreneurship Hearing at 83 (response to Questions for the Record of Adam Cohen, Dir. Of Econ Pol'y, Google LLC).

[1326] *Id.* at 84.

[1327] Submission from Callsome, to H. Comm. on the Judiciary, 5 (Apr. 28, 2020) (on file with Comm.).

[1328] Submission from Source 685, to H. Comm. on the Judiciary, 12 (Oct. 15, 2019) (on file with Comm.).

**App. 295**

only preclude the vast majority of third-party apps from being pre-installed, but they also funnel those apps into the Google Play Store, subject to Google's commissions and arbitrarily enforced policies.

5. Chrome

   a. Overview

Google launched its web browser, Google Chrome, in 2008.[1329] Chrome makes a significant portion of its underlying code base available through the open-source Chromium Project,[1330] which has been used to build a series of "chromium-based" browsers such as Microsoft Edge and Opera.[1331] In 2010, Google introduced the Chrome web store, which enables users to access and install browser extensions, such as Easy Ad Blocker, Grammarly, and Netflix Party.[1332]

Prior to Chrome's launch, Internet Explorer, Firefox, and Safari were the most popular browsers. Firefox leaned heavily on a partnership with Google Search, which documents show enabled Google to closely track Firefox's growth.[1333]

Chrome initially set itself apart by offering an address bar that also functioned as a Google search bar, and by enabling users to sign in to the browser, offering a faster browsing experience compared to other browsers.[1334] Chrome was also integrated with other Google products. By signing in to the browser, Chrome automatically signed users into Gmail, YouTube, and additional Google services when users visited those sites, while also allowing users to sync their bookmarks, passwords, and other browser settings.[1335] While automatic sign-in provided a more streamlined user experience, it also helped Google build more detailed user profiles by connecting activity data to the user's Google Account.[1336]

---

[1329] *Google Chrome: A New Take on the Browser*, GOOGLE PRESS (Sept. 2, 2008), http://googlepress.blogspot.com/2008/09/google-chrome-new-take-on-browser_02.html.

[1330] THE CHROMIUM PROJECTS, https://www.chromium.org/Home (last visited on Oct. 4, 2020).

[1331] Catalin Cimpanu, *All the Chromium-based browsers*, ZDNET (Jan. 29, 2019), https://www.zdnet.com/pictures/all-the-chromium-based-browsers/4/.

[1332] *An update on Chrome, the Web Store and Chrome OS*, CHROME BLOG (Dec. 7, 2010), https://chrome.googleblog.com/2010/12/update-on-chrome-web-store-and-chrome.html.

[1333] Submission from Google, to H. Comm. on the Judiciary, GOOG-HJC-00125917–29, GOOG-HJC-00125937 (April 25, 2005) (on file with Comm.).

[1334] Trefis Team, Great Speculations, *Rising Chrome Use Means Search Advertising Growth for Google*, FORBES (Aug. 23, 2012) https://www.forbes.com/sites/greatspeculations/2012/08/23/rising-chrome-use-means-search-advertising-growth-for-google/#579c604f2d66; MG Siegler, *Here It Is: Google's Kick-Ass Chrome Speed Test Video*, TECHCRUNCH (May 5, 2010) https://techcrunch.com/2010/05/05/google-chrome-video-test/.

[1335] *Turn sync on and off in Chrome,* GOOGLE CHROME HELP, https://support.google.com/chrome/answer/185277?co=GENIE.Platform%3DDesktop&hl=en (last visited on Oct. 4, 2020).

[1336] *Google Privacy Policy*, GOOGLE PRIVACY AND TERMS, https://policies.google.com/privacy (last visited on Oct. 4, 2020) ("When you're signed in, we also collect information that we store with your Google Account.").

**App. 296**

In a 2019 presentation to the Justice Department's Antitrust Division, Google explained that it had launched Chrome as a defensive move to protect users' access to Google's products.[1337] Internally, however, Google frequently referred to Chrome as part of Google's growth strategy. For example, in 2010, one of Google's strategy documents listed Chrome as a driver of "significant value,"[1338] and Eric Schmidt gave a company-wide speech stating that the rise of cloud computing meant that the browser—the primary way users access cloud—would be increasingly critical to Google's success.[1339]

Perhaps most critically, Chrome serves as a way for Google to control the entry points for its core markets: online search and online advertising.[1340] Chrome uses Google Search as its default search engine, a default setting that market participants say Google makes it difficult to change.[1341] Chrome also provides Google with another source of user data that the company can feed into its ad business to offer behavioral ads.[1342]

b.  <u>Market Power</u>

Chrome became a leading web browser as early as 2012.[1343] In the U.S. market, Chrome captures an estimated 59% of desktop browser usage and 37% of mobile browser usage,[1344] while capturing an estimated 66% of overall browser usage worldwide.[1345]

---

[1337] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04214204 (Sept. 17, 2019) (on file with Comm.) ("Alternatives to IE (Firefox, Opera, Safari) proved unattractive: Google initially partnered with Mozilla, but Firefox had technical limitations and faced uncertain prospects, Apple launched Safari for Windows in 2007. If Firefox was displaced by Safari, Apple could further constrain user access to Google.").

[1338] *Id.* at GOOG-HJC-00005661.

[1339] *Id.* at GOOG-HJC-00086891 (Jan. 24, 2011).

[1340] Competition & Mkts Auth. Report at 18–19.

[1341] Submission from Source 534, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.).

[1342] *Google Privacy Policy*, GOOGLE PRIVACY AND TERMS, https://policies.google.com/privacy (last visited on Sept. 29, 2020) ("We collect information to provide better services to all our users . . . which ads you'll find most useful . . . which YouTube videos you might like."). At the Subcommittee's sixth hearing, Committee Chairman Jerrold Nadler (D-NY) asked Google CEO Sundar Pichai to explain how Google uses data on browsing activity, asking "Does Google use that data for its own purposes, either in advertising or to develop and refine its algorithms?" Mr. Pichai responded that Google uses data "to improve our products and services for our users." CEO Hearing Transcript at 73 (statement of Sundar Pichai, CEO, Alphabet Inc.).

[1343] *Id;* Trefis Team, Great Speculations, *Rising Chrome Use Means Search Advertising Growth for Google*, FORBES, (Aug. 23, 2012) https://www.forbes.com/sites/greatspeculations/2012/08/23/rising-chrome-use-means-search-advertising-growth-for-google/#579c604f2d66. (observing that Google captured 67% of desktop searches across all browsers and 95% of shares conducted on Chrome, noting "This large discrepancy in search market share, depending on which browser is used, is one of the reasons why we think that the Chrome browser has helped increase Google's revenues.").

[1344] *Desktop Browser Market Share in the United States*, STATCOUNTER, https://gs.statcounter.com/browser-market-share/desktop/united-states-of-america (last visited Sept. 27, 2020); *Mobile Browser Market Share in the United States*, STATCOUNTER, https://gs.statcounter.com/browser-market-share/mobile/united-states-of-america (last visited Sept. 27, 2020).

[1345] *Browser Market Share*, STATCOUNTER, https://gs.statcounter.com/browser-market-share/all/united-states-of-america (last visited Sept. 27, 2020).

**App. 297**

Several factors suggest that Google is likely to maintain its lead in the browser market. First, Google has established Chrome as the default browser on the majority of Android devices, which make up around 75% of smartphones globally.[1346] While Google does allow users to change default browsers on Android, in practice users rarely do. As the United Kingdom's Competition and Markets Authority recently found, even platforms that do provide users with options often end up using "defaults and choice architecture that make it difficult for consumers to exercise this choice."[1347]

Second, Chrome is likely to remain dominant because it benefits from network effects. Web developers design and build for the Chrome browser because it has the most users, and users, in turn, are drawn to Chrome because webpages work well on it. And third, Chrome is likely to maintain its lead because Google can leverage the popularity of its apps to favor Chrome. Specifically, Google's documents show that the company has focused on designing Chrome features to provide a better experience of apps like YouTube and Search, advantages that other browsers lack.

c.   Conduct

Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business. Reciprocally, Chrome's dominance in the browser market gives it significant gatekeeper power over managing and monitoring users' browsing activity—power Google can wield to shape outcomes across markets for search, mobile operating systems, and digital advertising. These advantages across markets feed back into and reinforce one another, advantages that standalone browsers lack.

i.   Exploiting Information Asymmetries

Even before it developed Chrome, Google's search business and popular web-based applications gave it unique insights into the browser market. Because Google.com is accessible through all browsers, Google Search usage data includes data on the browser where the search query began. Documents show that Google used search origination trends as early as 2004 to track Firefox's growth—and Internet Explorer's decline—in the browser market. [1348] Google's collection of Google Apps has also enabled it to monitor browser growth and performance. For example, in 2009 a Chrome team member explained:

> I've looked at the Gmail numbers a little—enough to know that we have per-browser breakdowns of performance already. In the Gmail case, it's quite clear which browsers

---

[1346] *Mobile operating systems' market share worldwide from January 2012 to July 2020,* STATISTA (July 2020), https://www.statista.com/statistics/272698/global-market-share-held-by-mobile-operating-systems-since-2009/.

[1347] Competition & Mkts Auth. Report at 149.

[1348] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-00126978–85 (November 2004) (on file with Comm.).

**App. 298**

are faster. There are a zillion numbers we collect, including Gmail startup times. I am confident that the other Google Apps teams also have numbers. We could pull together a collection of 2-3 stats from each app, normalize the scores somehow, and produce a number.[1349]

This data from Google's adjacent lines of business helped the Chrome team track their performance against competitors. Most of Chrome's competitors then and now lack access to this type of data at Google's scale.

    ii.   <u>Favoring Google's Products in Adjacent Markets</u>

Through design choices and default settings, Google can use its dominance in any one market to favor its other lines of business. For example, when Chrome launched in 2008, Google Search was already the most popular search engine in the world.[1350] Shortly after releasing Chrome, Google began promoting the browser in the top corner of the Google.com homepage. The display was referred to internally as the "Google Chrome Promotion," and it was frequently discussed by Google's Chrome team within the company.[1351] Internet Explorer users that visited Google's home page would see the Google Chrome installation button in the top-right corner, as shown below:

**Google Chrome Promotion on Google.com Homepage**[1352]



---

[1349] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04214714 (Jan. 4, 2009) (on file with Comm.).

[1350] Danny Sullivan, *Search Market Share 2008: Google Grew, Yahoo & Microsoft Dropped & Stabilized,* SEARCH ENGINE LAND (Jan. 26, 2009), https://searchengineland.com/search-market-share-2008-google-grew-yahoo-microsoft-dropped-stabilized-16310.

[1351] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01465906 (Apr. 22, 2009) (on file with Comm.). ("We've been experimenting with some novel homepage promos for Chrome in preparation for the IE8 autoupgrade [sic]. Using 0.1% experiments, we found a few that performed very well. The promo on the homepage right now should be running for IE users only."); GOOG-HJC-01164689 (Apr. 23, 2009).

[1352] Christopher Williams, *Google Chrome takes second place from Firefox*, THE TELEGRAPH (Dec. 2, 2011), https://www.telegraph.co.uk/technology/news/8930759/Google-Chrome-takes-second-place-from-Firefox.html.

**App. 299**

At the time, several Google employees expressed concerns internally that this promotion strategy was unfairly harnessing Google's search dominance to boost Chrome. In an email among Chrome employees in 2009, one employee wrote, "I find the very, very high-profile promotion of Google Chrome on Google.com quite frankly, startling."[1353] Senior executives at the company pushed to continue this strategy. For example, in 2009, Sundar Pichai, then-Vice President of Product Development, encouraged the Chrome team to "promote through Google.com" and to push users to set Chrome as their default browser.[1354]

This strategy drove significant growth to Chrome. In 2009, Director of Product Management Brian Rakowski informed his team that the promotion was "performing exceptionally well" and was "driving tremendous number of downloads."[1355] When Google halted the promotion, Chrome's growth rate dropped. In 2011, Chrome employees noted that "organic growth slowed a bit because our homepage promo was down for a couple of weeks."[1356]

Market participants view this behavior as an example of how Chrome does not compete on the merits. One firm stated, "Google has abused its dominant position in the search space to build up another dominant position in the browser space."[1357] In response to questions about this use of Google's search page, Google told the Subcommittee that these "promotional campaigns on Google.com on Internet Explorer have been run for over a decade."[1358]

Google has reinforced its market power in the browser market through its dominance in the mobile operating system market. Chrome is preinstalled on every mobile device that runs Google's Android operating system, and Android powers approximately 75% of the world's mobile devices. Beginning in 2014, Google mandated that Chrome be pre-installed and prominently placed on all certified Android devices that had entered a Mobile Application Distribution Agreement (MADA), which grants smartphone manufacturers access to Google's Play Store and other proprietary Google applications.[1359] During negotiations with Android manufacturers for revenue share agreements, meanwhile, Google required that Chrome be set as the default browser.[1360]

---

[1353] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-01465903 (Apr. 22, 2009) (on file with Comm.) ("I find the very, very high profile promotion of Google Chrome on Google.com quite frankly, startling.").

[1354] *Id.* at GOOG-HJC-04214743 (Apr. 03, 2009).

[1355] *Id.* at GOOG-HJC-01465906 (Apr. 22, 2009).

[1356] *Id.* at GOOG-HJC-04195391 (Mar. 4, 2011) ("[O]rganic growth slowed a bit because our homepage promo was down for a couple of weeks due to a change in the HPP system. It's back up now.").

[1357] Submission from Source 534, to H. Comm. on the Judiciary, 2 (Oct. 14, 2019) (on file with Comm.).

[1358] CEO Hearing at A-12 (response to Questions for the Record by Sundar Pichai, CEO, Alphabet Inc.).

[1359] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02393308 (Mar. 1, 2011) (on file with Comm.).

[1360] *See generally* Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion For Illegal Practices Regarding Android Mobile Devices To Strengthen Dominance Of Google's Search Engine (July 17, 2018), https://europa.eu/rapid/press-release_IP-18-4581_en.htm.

**App. 300**

For the remaining portion of the global mobile phone market—Apple iOS—Google uses the popularity of its mobile applications to promote Chrome installations. Although Apple does not permit Chrome to be set as the default browser on an iPhone, Google provides users the option to use Chrome whenever a user selects a link within a Google application, such as Gmail or YouTube.[1361]

While Apple requires that Safari also be included as a choice,[1362] Google does not allow any other browser to be listed. If the user has not previously installed the Chrome browser, then the menu displays a "Get" button that prompts the user to install Google's browser.[1363]

Similarly, Google privileges its own line of businesses by setting Google Search as the default in Chrome. Although users can change this setting, the process is not intuitive and involves multiple steps, including:

1.  At the top right, click More  ⋮  ›  **Settings**.
2.  Under "Search engine," click **Manage search engines**.
3.  Find "Other search engines."
    - **Add**: To the right of "Other search engines," click **Add**. Fill out the text fields and click **Add**.
    - **Set as default**: To the right of the search engine, click More  ⋮  ›  **Make default**.
    - **Edit**: To the right of the search engine, click More  ⋮  ›  **Edit**.
    - **Delete**: To the right of the search engine, click More  ⋮  ›  **Remove from list**.[1364]

One third party told the Subcommittee that in some cases, Google prompts users to change their default search engine back to Google Search even after they have switched:

After a user installs the extension, Chrome is showing continuous warning prompts which ask users to restore their search settings back to Google. In user tests, we observe that most people are very confused about this prompt and often click "restore settings" even though they actually want to keep using [our search engine]. In many Chrome versions the button "restore settings" is even highlighted which makes it highly likely that users will click this button and thereby completely remove [our search engine] from

---

[1361] Submission from Source 269, to H. Comm on the Judiciary, 3 (July 23, 2019) (on file with Comm.).

[1362] *Id.*

[1363] *Id.*

[1364] *Set your default search engine*, GOOGLE CHROME HELP, https://support.google.com/chrome/answer/95426?co=GENIE.Platform%3DDesktop&hl=en (last visited Oct. 2, 2020).

**App. 301**

their computers. We believe that we have already lost millions of users because of this prompt.[1365]

### iii. Unilaterally Setting Standards

By virtue of its dominance in the browser market, Google can effectively set standards for the industry in two ways.

First, changes to Chrome's functionality create *de facto* standards. Market participants must adhere to these standards or risk their technology no longer being compatible with most websites. Market participants explain that Google will often build features quickly without using the standard-setting process or giving smaller browsers time to implement new features. Once web developers start building to these specifications, however, smaller browsers are under pressure to quickly implement these changes, often with little notice.[1366] If smaller browsers cannot keep up, users are flooded with "[b]rowser not supported" messages on webpages that have already been built to Chrome's specifications.[1367] Several market participants told the Subcommittee that they felt "bullied" by this process.[1368]

Second, Google has an outsized role in the formal stakeholder standards-making processes. As explained earlier in this Report, the World Wide Web Consortium (W3C) is one of the leading standards organizations in the browser market. Its stated mission is to be "open and collectively empowering."[1369] Other market participants believe that Google is significantly overrepresented in the W3C web platform incubator community group (WICG). They note that Google's employees comprise 106 members, more than eight times the number of employees from Microsoft, the next largest stakeholder represented. Most companies, meanwhile, have only one representative.[1370] One market participant said:

> Though standards bodies like the W3C give the impression of being a place where browser vendors collaborate to improve the web platform; in reality Google's monopoly position and aggressive rate of shipping non-standard features frequently reduce standards bodies to codifying web features and decisions Google has already made.[1371]

---

[1365] Submission from Source 534, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.).

[1366] Submission from Source 269, to H. Comm. on the Judiciary (Jan. 2020) (on file with Comm.).

[1367] Martin Brinkmann, *The new Skype for Web does not work in Firefox or Opera*, GHACKS.NET (Mar. 8, 2019), https://www.ghacks.net/2019/03/08/the-new-skype-for-web-does-not-work-in-firefox-or-opera/.

[1368] Interview with Source 482 (July 2, 2020).

[1369] *W3C Mission*, W3C https://www.w3.org/Consortium/mission (last visited on Oct. 4, 2020).

[1370] Submission from Source 269, to H. Comm. on the Judiciary, 4 (July 23, 2019) (on file with Comm.).

[1371] *Id.* (Apr. 1, 2020).

**App. 302**

Recent events underscore how Google's ad-based business model can prompt questions about whether the standards Google chooses to introduce are ultimately designed primarily to serve Google's interests. In January 2020, Google announced that it plans to phase out third-party cookies in Chrome within two years.[1372] Unlike other browsers that have limited cross-site tracking, Google's decision appears to be motivated by "trying to cut down on tracking without kneecapping revenue for websites."[1373]

Several observers have noted that this change would have the likely effect of reinforcing Google's power and harming rivals, shifting more advertisers toward Google.[1374] In particular, market participants are concerned that while Google phases out third-party cookies needed by other digital advertising companies, Google can still rely on data collected throughout its ecosystem.

During the Subcommittee's sixth hearing, Representative Kelly Armstrong (R-ND) asked Mr. Pichai, "[D]o you have other ways of collecting it [data] through Gmail or consumer facing platforms?"[1375] Mr. Pichai responded, "[T]o the extent on the services where we provide ads and if users have consented to ads personalization, yes, we do have data."[1376]

## 6. Maps

### a. Overview

Google dominates the market for digital maps with over a billion users.[1377] Between Google Maps and Waze—which Google also owns—the corporation captures an estimated 80% of the navigation app market.[1378] Financial analysts have described navigation maps as a "utility" that people cannot do without,[1379] and one bank estimated that if Google Maps were a standalone product, its market capitalization would hit $61.5 billion.[1380]

---

[1372] Sarah Sluis, *Google Chrome Will Drop Third-Party Cookies in 2 Years*, AD EXCHANGER (Jan. 14, 2020), https://www.adexchanger.com/online-advertising/google-chrome-will-drop-third-party-cookies-in-2-years/.

[1373] Dieter Bohn, *Google to 'phase out' Third-party cookies in Chrome, but not for two years*, THE VERGE (Jan. 14, 2020), https://www.theverge.com/2020/1/14/21064698/google-third-party-cookies-chrome-two-years-privacy-safari-firefox.

[1374] Nick Bastone, *In Ironic Twist, Google's Pro-Privacy Move Boosted U.S. Antitrust Probe*, THE INFO. (Sept. 18, 2020), https://www.theinformation.com/articles/in-ironic-twist-googles-pro-privacy-move-boosted-u-s-antitrust-probe.

[1375] CEO Hearing Transcript at 125 (question of Rep. Kelly Armstrong (R-ND), Member, Subcomm. on Antitrust, Commercial & Admin. Law of the H. Comm on the Judiciary).

[1376] *Id.* (statement of Sundar Pichai, CEO, Alphabet Inc.).

[1377] Ethan Russell, *9 things to know about Google's maps data: Beyond the Map*, GOOGLE CLOUD (Sept. 30, 2019), https://cloud.google.com/blog/products/maps-platform/9-things-know-about-googles-maps-data-beyond-map.

[1378] Royal Bank of Canada Report at 5.

[1379] *Id*.

[1380] ROSS SANDLER, BARCLAYS, ALPHABET INC., STEADY COMPOUNDER, WITH PLENTY OF INNOVATION AHEAD 20 (Mar. 28, 2017) (on file with Comm.).

**App. 303**

Google Maps can be traced to a series of acquisitions. In September 2003, Google Labs launched "Search by Location," a feature that sought to filter search results based on a user's geographic location.[1381] Because Google lacked mapping data, however, the feature stalled.[1382] In October 2004, a few months after Google's IPO, Google acquired Where 2 Technologies, an Australian startup that created web-based dynamic maps.[1383] Google soon followed this acquisition with two additional purchases: Keyhole, a firm that used satellite images and aerial photos to create digital-mapping software, and ZipDash, a provider of real-time traffic information captured through GPS.[1384] In February 2005, Google launched Google Maps.[1385]

The following year, Google introduced Google Maps API, which enabled developers to use and build on top of its digital maps.[1386] In 2008, it launched "Ground Truth," a project devoted to assembling and refining underlying mapping data and images.[1387] This effort included Google Street View Cars, which drove around the country—and, eventually, the world—taking pictures of the surrounding buildings and landscapes, and delivering Google structured data that it could use to create digital maps.[1388] As part of Project Ground Truth, Google also obtained mapping information from satellite and aerial imagery, as well as from public databases.[1389]

A 2008 budget request for Ground Truth stated that the goal of the project was "long term independence from Tele Atlas and Navteq," two sources of mapping data that Google had been using at the time and that were owned by TomTom and Nokia, respectively.[1390] The presentation stated that achieving independence would take several years and requested a 5- to 7-year renewal of the Tele

---

[1381] Scarlett Pruitt, *Google Test Drives New Search Tool*, PC WORLD (Sept. 23, 2003), https://www.pcworld.com/article/112604/article.html.

[1382] Google Maps, ACQUIRED (Aug. 26, 2019), https://www.acquired.fm/episodes/google-maps.

[1383] *Id*.

[1384] *Google Acquires Keyhole*, WALL ST. J.: NEWS ROUNDUP (Oct. 27, 2004); Michael Bazeley, *Google acquires traffic info start-up ZipDash*, VENTUREBEAT (Mar. 30, 2005) https://venturebeat.com/2005/03/30/google-acquires-traffic-info-start-up-zipdash/#:~:text=According%20to%20the%20company's%20web,the%20GPS%20in%20their%20phones.

[1385] Elizabeth Reid, *A look back at 15 years of mapping the world*, THE KEYWORD (Feb. 6, 2020), https://blog.google/products/maps/look-back-15-years-mapping-world/.

[1386] *Id.*

[1387] Frederic Lardinois, *Google's Ground Truth Initiative for Building More Accurate Maps Now Covers 50 Countries*, TECHCRUNCH (Sept. 3, 2014), https://techcrunch.com/2014/09/03/googles-ground-truth-initiative-for-building-more-accurate-maps-now-covers-50-countries/.

[1388] Greg Miller, *The Huge, Unseen Operation Behind the Accuracy of Google Maps*, WIRED (Dec. 8, 2014), https://www.wired.com/2014/12/google-maps-ground-truth/ ("As of December 2014, Google's "Street View cars ha[d] driven over 7 million miles, including 99 percent of the public roads in the U.S.").

[1389] *Id.*

[1390] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-03386002 (Dec. 6, 2007) (on file with Comm.).

**App. 304**

Atlas contract to help Google bridge "between now and completion of Google Truth initiatives."[1391] Although Google Maps was not generating revenues, Google was investing in it heavily. Google's documents show that from 2008 to 2009, the company spent $32 million on the Street View program and $88.7 million on Ground Truth overall.[1392] When Google launched Google Maps in 2005, MapQuest had been the "king of Internet-based maps and driving directions," with Yahoo gearing up to heavily compete.[1393] By 2008, Google's internal documents show that Google was "#1 in Maps usage" as well as at the top in capturing online local search.[1394]

In 2009, Google introduced Google Maps for Mobile, a navigation service featuring turn-by-turn directions, live traffic updates, and automatic rerouting.[1395] Whereas market leaders TomTom and Garmin sold navigation services through subscriptions, Google was offering its service for free[1396]—a fact widely seen as disfavoring the incumbents, whose stock prices fell upon Google's announcement.[1397] As one analyst noted at the time, "If it's free and a good service, why would you pay for something you can get for free?"[1398]

As smartphones overtook personal navigation devices, Google Maps further eclipsed TomTom and Garmin.[1399] When asked in 2015 what had accounted for TomTom's decline, its CEO cited two factors: the 2008 economic crisis and the fact that "Google began offering navigation for free."[1400]

Some market participants at the time questioned whether Google was using its search dominance to give Google Maps a boost. In 2009, one publisher noted that "61% of visits to Google

---

[1391] *Id*.

[1392] *Id.* at GOOG-HJC-04211018 (Oct. 17, 2010).

[1393] Chris Gaither, *Overtaking MapQuest a Challenge for Yahoo*, L.A. TIMES (Jan. 10, 2005), https://www.latimes.com/archives/la-xpm-2005-jan-10-fi-maps10-story.html.

[1394] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-03610422 (Oct. 28, 2008) (on file with Comm.).

[1395] *Announcing Google Maps Navigation for Android 2.0*, GOOGLE OFFICIAL BLOG (Oct. 28, 2009), https://googleblog.blogspot.com/2009/10/announcing-google-maps-navigation-for.html.

[1396] Jenna Wortham & Miguel Helft, *Hurting Rivals, Google Unveils Free Phones GPS*, N.Y. TIMES (Oct. 28, 2009), https://www.nytimes.com/2009/10/29/technology/companies/29gps.html.

[1397] Arik Hesseldahl, *Garmin, TomTom Slash Prices Amid Google Threat*, BLOOMBERG (Dec. 8, 2009), https://www.bloomberg.com/news/articles/2009-12-08/garmin-tomtom-slash-prices-amid-google-threat (stating that upon Google's announcement, Garmin stock dropped around 16% and TomTom stock fell by around 29%).

[1398] Jenna Wortham & Miguel Helft, *Hurting Rivals, Google Unveils Free Phones GPS*, N.Y. TIMES (Oct. 28, 2009), https://www.nytimes.com/2009/10/29/technology/companies/29gps.html (internal quotation marks omitted).

[1399] Kevin J. O'Brien, *Smartphone Sales Taking Toll on G.P.S. Devices*, N.Y. TIMES (Nov. 14, 2010), https://www.nytimes.com/2010/11/15/technology/15iht-navigate.html.

[1400] Charles Arthur, *Navigating decline: what happened to TomTom?*, THE GUARDIAN (July 21, 2015), https://www.theguardian.com/business/2015/jul/21/navigating-decline-what-happened-to-tomtom-satnav.

**App. 305**

Maps came directly from Google," giving it an advantage over MapQuest.[1401] The publisher wrote, "As long as Google dominates search, MapQuest will face a tough battle for visits."[1402] A few years later, Consumer Watchdog wrote a letter to the Antitrust Division noting that Google "was able to muscle its way to dominance by unfairly favoring its own service ahead of such competitors as Mapquest in its online search results."[1403]

In 2013, Google purchased Waze, an Israeli crowd-sourced mapping provider, for $1.3 billion.[1404] The acquisition solidified Google's dominance in turn-by-turn navigation, eliminating its only meaningful competitive threat.

While Google captured the navigation market by offering Google Maps for free, even as it generated no revenue, Google now monetizes both Waze and Google Maps through selling ads. In 2013 Google introduced a limited form of maps advertising, and in recent years it has expanded the program, allowing local businesses to purchase advertising on maps to maximize foot traffic.[1405] Research by Google shows that 76% of users who search for locations nearby end up visiting a related business within a day and that 28% of those searches ultimately lead to a purchase.[1406] This high conversion rate leads analysts to believe that Google Maps alone could help drive between $1.9 billion and $3.7 billion of incremental revenue by 2021.[1407] Commenting on the value of Google Maps to the Google ecosystem, one analyst noted:

> [Google Maps'] user base has been impressive for years, crossing 1B a few years ago, but monetization is just getting started … Maps is the closest thing to a platform that Google has at the application layer, with three stakeholders in the ecosystem: 1) users; 2) publishers; and 3) advertisers. The importance of Maps to mobile, including both the advertising and transportation-on-demand spaces, is one of the biggest potential markets Google is servicing in the future.[1408]

---

[1401] Experian Marketing Services, *Google Maps Edges Closer to Mapquest*, EXPERIAN BLOG (Feb. 11, 2009), http://www.experian.com/blogs/marketing-forward/2009/02/11/google-maps-edges-closer-to-mapquest/.

[1402] *Id.*

[1403] Letter from John M. Simpson, Privacy Project Dir., Consumer Watchdog, to William J. Baer, U.S. Dep't of Justice, Ass't Att'y Gen., Antitrust Div. (June 12, 2013), https://www.consumerwatchdog.org/resources/cltrdojwaze061213.pdf.

[1404] Brian McClendon, *Google Maps and Waze, outsmarting traffic together*, GOOGLE BLOG (June 11, 2013), https://googleblog.blogspot.com/2013/06/google-maps-and-waze-outsmarting.html; Vindu Goel, *Google Expands Its Boundaries, Buying Waze for $1 Billion*, N.Y. TIMES (June 11, 2013), https://bits.blogs.nytimes.com/2013/06/11/google-expands-its-boundaries-buying-waze-for-1-billion/.

[1405] Royal Bank of Canada Report at 10–11.

[1406] *How Mobile Search Connects Users to Stores*, THINK WITH GOOGLE (May 2016), https://www.thinkwithgoogle.com/marketing-strategies/app-and-mobile/mobile-search-trends-consumers-to-stores/.

[1407] *See, e.g.*, Royal Bank of Canada Report at 20.

[1408] ROSS SANDLER, BARCLAYS, ALPHABET INC., STEADY COMPOUNDER, WITH PLENTY OF INNOVATION AHEAD 20 (Mar. 28, 2017) (on file with Comm.).

**App. 306**

b. <u>Market Power</u>

Google Maps is the dominant provider of mapping data and turn-by-turn navigation services. The company declined to provide the Committee with information about the market share captured by Google Maps.[1409] According to a third-party estimate, however, Google Maps combined with Waze captures 81% of the market for turn-by-turn navigation services.[1410] One market participant, meanwhile, estimated that Google Maps API captures over 90% of the business-to-business market.[1411]

Several developers stated that Google Maps introduced greater licensing restrictions as it gained a stronger market position. One noted that Google's control over what now serves as a key mapping technology has allowed Google to call all the shots.[1412] "We license Google Maps and it's essentially a contract of adhesion. It's full of restrictions and we aren't able to negotiate any changes," the developer said.[1413] The developer added that they have explored switching to alternative mapping providers, but that no other provider has the same geographic depth and coverage as Google Maps. "Other providers still value us and want to know how they can accommodate us," they said. "With Google, we just have to comply with all their restrictions."[1414]

Several factors suggest that Google Maps is well-positioned to maintain its dominance. The high fixed costs of creating mapping data pose a significant barrier to entry. Apple, which recently built its mapping database from the ground up, told the Subcommittee that the effort required billions of dollars.[1415] Google, moreover, also benefits from an enormous lead in the tracking and processing of location data, as well as from the prevalence of tracking-enabled Android devices.[1416] Commenting on

---

[1409] Production of Google, to H. Comm. on the Judiciary, A-4 (Nov. 22, 2019) (on file with Comm.) ("Google Maps has a number of features, including maps, turn-by-turn navigation and directions, Street View, and information on local businesses (such as restaurants and services)and travel destinations (such as hotels and tourist spots) that are also offered by competitors. These competitors include Apple Maps, Bing Maps, TomTom, Yelp, TripAdvisor, Angie's List, and Facebook . . . . All of these competitors are widely used, with some having a strong presence on key platforms: for example, one report from 2015 estimated that iPhone users use Apple Maps three times more than Google Maps. However, we are not aware of any public market share estimates that reflect the frequency of multi-homing among users or that account for competitors like TripAdvisor, OpenTable, Yelp, or directory apps such as Yellow Pages that overlap with many of the features of Google Maps, which would reflect the full range of robust competition in maps that drives Google to continually invest and innovate in the Google Maps product.").

[1410] Royal Bank of Canada Report at 4.

[1411] Submission from Source 564, to H. Comm. on the Judiciary, 2 (Nov. 13, 2019) (on file with Comm.).

[1412] Interview with Source 703 (June 22, 2020).

[1413] *Id.*

[1414] *Id.*

[1415] Innovation and Entrepreneurship Hearing at 6 (response to Questions for the record from Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.).

[1416] Royal Bank of Canada Report at 10–11.

**App. 307**

its monetization potential, an analyst recently wrote that Google Maps has "reasonably sustainable moats."[1417]

Certain businesses have made public disclosures about their reliance on Google Maps. For example, in 2019, Uber disclosed that it relies on Google Maps for "the mapping function that is critical to the functionality" of its platform.[1418] It added, "We do not believe that an alternative mapping solution exists that can provide the global functionality that we require to offer our platform in all of the markets in which we operate."[1419] Uber disclosed that between January 1, 2016 and December 31, 2018, the company paid Google $58 million for use of Google Maps.[1420]

In a submission to the Subcommittee, one market participant who uses Google Maps to power its reservation system, website, and mobile app, stated that there are no alternatives to using Google Maps. It wrote, "Local businesses are most likely to use Google's tools to index their websites because Google controls the search engine space, which has the ability to deliver—or restrict—whether these websites appear in corresponding links in consumer search results."[1421] The market participant added that this dependence reinforces Google's market power, as it "provides Google with another opportunity to monetize companies' supply chains and leverage its pricing power over companies that need to promote their businesses and/or purchase ad space to grow."[1422] This business predicted that "the data advantages that Google incorporates into its tools will only grow with time, making it impossible for a new player to ever achieve the scale, user base, or database necessary to compete."[1423]

c.  <u>Merger Activity</u>

Google has made several acquisitions related to digital mapping: Where2Technologies (2004); Keyhole (2004); Skybox (2011); and Waze (2013). Of these acquisitions, only Waze—for which Google paid $1.1 billion—was subject to an antitrust investigation. Although Google did not originally report the Waze transaction, both the Federal Trade Commission and the United Kingdom's Office of Fair Trading (OFT) reviewed the deal.[1424] Both enforcers initially approved the transaction but have

---

[1417] *Id.* at 1.

[1418] Uber Technologies, Inc., Registration Statement (Form S-1) 46 (Apr. 11, 2019), https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm.

[1419] *Id.* It is unclear whether Uber pays Google for the underlying maps data or for the place search function, both of which are part of "Google Maps Core Services."

[1420] *Id.* at 254.

[1421] Submission from Source 333, to H. Comm. on the Judiciary, 5 (Oct. 21, 2019) (on file with Comm.).

[1422] *Id.*

[1423] *Id.*

[1424] Mark Bergen & Ben Brody, *Google's Waze Deal Is a Likely Target in FTC Antitrust Sweep*, BLOOMBERG (Feb. 14, 2020), https://www.bloomberg.com/news/articles/2020-02-14/google-s-waze-deal-is-a-likely-target-in-new-ftc-antitrust-sweep.

**App. 308**

since revisited the decision. In 2019 the OFT commissioned a study reviewing its past merger cases, including Google/Waze, and the FTC is reportedly examining the Waze deal as part of its broader review of previous tech mergers.[1425]

Materials that the FTC produced to the Subcommittee suggest that the Commission's analysis of the Google/Waze deal was limited. A document from the FTC shows that the agency focused on assessing the quality of Waze's data and concluded that its maps were "not a Google maps replacement."[1426] It is unclear if or how closely the agency considered that Google was acquiring Waze not for its mapping features (which Google's own documents had suggested were inferior to Google's), but in order to eliminate an independent source of mapping data.[1427]

In acquiring Waze, Google bought out one of the few companies in the world making navigable maps while also providing turn-by-turn navigation service.[1428] Founded in Israel, Waze had entered the U.S. market by initially relying on public domain public data, which it refined through input from drivers.[1429] Waze's model has relied on user-generated maps, whereby drivers using Waze's app feed real-time data back into the app, and volunteer "editors" proactively fine-tune the maps by fixing street names, adding businesses, and making other updates. Waze's documents reveal that through 2012 the firm had prioritized achieving growth and attracting users over earning revenue, although it had begun to monetize its navigation app through location-based advertising.[1430]

Internal Waze presentations stated that its crowd-sourced data was one of the company's defining features. One presentation stated, "The DNA of the company is of a social network, and user generated, we are merely the stage, and not the performers."[1431] In a 2013 document, Waze identified its two main competitive advantages: first, the fact that Waze was a real-time map with fresh data, accounting for updates such as car accidents and road closures; and, second, that its business involved "zero cost."[1432]

Google's documents reveal that by 2012, Google Maps was the top provider of digital maps in desktop, mobile, and API,[1433] and it was closely tracking Waze's fast growth. One Google presentation

---

[1425] *Id.*

[1426] *Id.*

[1427] *Id.*

[1428] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04208423 (June 2013) (on file with Comm.)

[1429] *Id.* at GOOG-HJC-04211080 (Jul 24, 2013) (citing the U.S. Census Bureau's TIGER mapping data as one source).

[1430] *Id.* at GOOG-HJC-04208066 (June 2013) (Waze was "earning $250k in revenue in January 2013 and less than $1 million in revenue in 2012").

[1431] *Id.* at GOOG-HJC-04208423 (June 2013).

[1432] *Id.*

[1433] *Id.* at GOOG-HJC-04208281 (May 2012).

**App. 309**

in 2012 noted that Waze was the most-downloaded app in the navigation category, and that it was seeing a 30% increase in daily downloads and averaging around 100,000 downloads a day.[1434] Google also honed in on the fact that Waze was the only other mapping provider that was vertically integrated across the full stack, spanning the provider, application, map, traffic, and search layers.[1435]

In an internal presentation, Google identified several strategic rationales for acquiring Waze.[1436] These included obtaining a "highly-engaged community of map contributors and expertise" in order to "nurture/grow communities," which Google said it struggled with; achieving a "scalable solution" for maintaining a fresh map with "real-time incident data"; using Waze as a "sandbox" to "test map/navigation features"; and acquiring a "highly-talented team" with "deep experience in maps."[1437] Google also ranked Waze poorly on several metrics, including the accuracy of its results in smaller cities and its limited map search capabilities.[1438] Commenting on Waze's mapping tiles, Google wrote, "[D]ata is missing and rendering is overly simple and missing detail."[1439] Meanwhile, Google described Waze's future financial projections as "highly speculative,"[1440] and noted that its purchase price of just under $1 billion was "expensive for a company with < $1 million in 2012 revenue."[1441]

In its correspondence with the FTC, Google stated that "there is no shortage of full-featured navigation alternatives for users," which it said reflected the "low (and continually decreasing) barriers to entry."[1442] Google emphasized Waze's entry, in particular, focusing on how Waze "spent far less than $20 million *for all purposes* in the two years preceding its US launch" and noting that it was able to enter the market using only public domain data.[1443]

In contrast, market participants viewed Google and Waze as close competitors in a "highly concentrated" market for navigable digital map databases and turn-by-turn navigation applications. Prior to the transaction, Waze had observed that it and Google were "the only vertically integrated stacks."[1444] One market participant told antitrust enforcers that it viewed Waze as "Google's closest competitor for real-time, updated [turn-by-turn] navigation services" and that Waze "was the digital-

---

[1434] *Id.* at GOOG-HJC-04208072 (Nov. 2012).

[1435] *Id.* at GOOG-HJC-04209632. (Nov. 2012).

[1436] *Id.* at GOOG-HJC-04208127 (May 2013)

[1437] *Id.*

[1438] *Id.* at GOOG-HJC-04208140 (May 2013)

[1439] *Id*.

[1440] *Id.* at GOOG-HJC-04213996 (June 2013).

[1441] *Id.* at GOOG-HJC-04208047. (June 2013).

[1442] *Id.* at GOOG-HJC-04211046 (July 24, 2013).

[1443] *Id.* at.GOOG-HJC-04211080 (July 24, 2013).

[1444] *Id.* at GOOG-HJC-04208696.

**App. 310**

map competitor with the best opportunity to overcome Google's significant data and funding advantage."[1445]

Market participants cited a few reasons the transaction would undermine competition. First, they noted that barriers to entry in the market for turn-by-turn navigation providers were high and that it would be difficult for new firms to enter. One market participant stated, "Navigable digital map databases contain far more information than maps and addresses. For example, Google's database includes a range of other information, including traffic, conditions and rerouting information, interior and exterior photographs, reviews, commentary from Google+ friends."[1446] And Waze, in particular, had a unique crowd-sourced model that would be difficult for other firms to replicate. Although Waze had secured a "first-mover advantage" and acquired a "critical mass of users," the group of self-selected volunteers who edited Waze's maps were "unlikely to fill such a role (without payment) for more than one set of mapping data."[1447] The market participant added, "Once those editors provide the benefit of their input into Waze they create a powerful map that passive Waze users will turn to as well given the lack of other real-time-updated maps of comparable quality. As a result, passive Waze users likely will have no incentive to multi-home."[1448]

Second, market participants pointed to the fact that Waze was the only firm meaningfully positioned to dislodge Google Maps because it—like Google—lacked financial pressures. One entrepreneur noted, "Google and Waze do not care how much it costs to keep the maps up-to-date. Google because it has a lot of money, and Waze because it relies on the community."[1449] One market participant stated:

> The acquisition would effectively lead to the elimination of Waze as a market disrupting force that would otherwise be capable of challenging the model adopted by Google's dominant Google Maps. In essence, Google's acquisition of Waze is defensive - seeking to remove a disruptive force from the market.[1450]

Several market participants and advocates who opposed the deal noted that Waze's own CEO, Noam Bardin, had recently stated that Waze was "the only reasonable competition" to Google Maps, which would suggest that Google may have been pursuing the acquisition in efforts to quash its most significant competitor.[1451]

---

[1445] Submission from Source 26, to H. Comm. on the Judiciary, Source 26-000622 (Sept. 21, 2013) (on file with Comm.).

[1446] *Id. See also* Interview with Source 572 (Sept. 24, 2020).

[1447] Interview with Source 572 (Sept. 24, 2020).

[1448] *Id.*

[1449] *Id.*

[1450] *Id.*

[1451] Letter from John M. Simpson, Privacy Project Dir., Consumer Watchdog, to William J. Baer, Ass't Att'y Gen., U.S. Dep't of Justice, Antitrust Div. (June 12, 2013), https://www.consumerwatchdog.org/resources/cltrdojwaze061213.pdf.

**App. 311**

And third, market participants argued that the acquisition would give Google both the incentive and ability to foreclose rivals, including those apps that offer mobile navigation and social networking services. Seeking to mitigate this concern, Google's letter to the FTC emphasized the "numerous providers who license mapping, traffic, and incident" data for use in mobile apps.[1452]

Today, the Google Maps and Waze teams remain separate. Analysts have reported that Google has used Waze as a tool to "test and iterate on monetizing Navigation without disrupting its much larger Google Maps asset."[1453] One market participant stated, "Google has used Waze as an ads guinea pig,"[1454] noting that Waze has released efficacy reports of location-tailored ads, information that seems to have informed Google Maps' recent expansion of advertising.[1455]

Since completing the Waze acquisition, Google has reportedly come to capture 81% of the market for navigation mapping services.[1456] Despite Google's claims that entry barriers were low and alternate offerings abundant, no meaningful competitor has emerged since Google acquired Waze. Based on the materials the FTC provided to the Subcommittee, it is unclear whether the Commission fully assessed the barriers to entry. It instead appears the FTC primarily took a static view—focusing on the existing quality of Waze's maps—rather than assessing the dynamic effects of the acquisition.

#### d.  Conduct

##### i.  Raising Prices

For years, Google offered a free tier of the Maps API, incentivizing developers to build their apps with Google Maps. In 2018, however, Google Maps introduced a single "pay-as-you-go" pricing plan for the core mapping APIs.[1457] This shift dramatically reduced the number of free Maps API calls a firm could make—from 25,000 per day to around 930 per day.[1458] Developers stated that the change amounted to a price increase of 1,400%.[1459]

---

[1452] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04211030 (July 24, 2013) (on file with Comm.).

[1453] Royal Bank of Canada Report at 14.

[1454] Interview with Source 572 (Sept. 24, 2020).

[1455] *Id.*

[1456] Royal Bank of Canada Report at 5.

[1457] Jagmeet Singh, *Google Maps API Price Hike is Threatening the Future of Some Companies*, GADGETS 360 (Aug. 28, 2018), https://gadgets.ndtv.com/apps/features/google-maps-apis-new-pricing-impact-1907242.

[1458] *Id.*

[1459] Ishveena Singh, *Insane, shocking, outrageous: Developers react to changes in Google Maps API*, GEO AWESOMENESS (May 3, 2018), https://geoawesomeness.com/developers-up-in-arms-over-google-maps-api-insane-price-hike/ ("The Standard (no access to customer support) and Premium plans are being merged into one pay-as-you-go pricing plan. And the new fee structure is not pretty. Google is raising its prices by more than 1,400%. Obviously, no direct comparison

**App. 312**

In a submission to the Subcommittee, one market participant said that Google instituted this price hike after "gaining dominance."[1460] Since becoming a Google Maps customer, the market participant's costs "have increased over 20x" and "there are no viable alternatives."[1461] Another developer stated that the 2018 pricing change "took our bill from $90/month in October to $20,000/month in December."[1462] The developer stated that it was able to subsequently reduce its bill through making a change that enabled the location-retrieval function to occur directly on a user's device—a change that gave Google a "greater ability to identify and track" the device user.[1463]

Several developers expressed their frustrations publicly, noting that Google's decision to hike prices so sharply, and without giving developers significant notice, underscored its power to set the terms of commerce. One developer stated:

> I understand that Google wants to make this into a line of business. But it feels like they're taking advantage of us. They know that they're the best, and that no one else is even close. Instead of just giving us Maps for free or very cheap, in exchange for collecting all our usage data, they now feel they need to charge really high prices.[1464]

In effect, Google makes market participants pay twice to access Google Maps—first by giving Google their valuable usage data and then again by paying Google's volume-based fees for API calls.

    ii.  <u>Tying</u>

Business-facing mapping products usually consist of a core set of features to provide greater mapping functionality. For example, the "Google Maps Platform" offers developers traffic data and places data (also known as place search) as well as map data.[1465] Some developers choose to mix and match, using map data from one firm but placing data from another. Google, however, prohibits developers from using any part of its mapping tools alongside any non-Google mapping features. Until April 2020, Google's Maps Platform Terms of Service included the following provision:

---

figures of old and new prices have been provided by Google, but that's the average surge that is being reported by developers.").

[1460] Submission from Source 564, to H. Comm. on the Judiciary, 2 (Nov. 13, 2019) (on file with Comm.).

[1461] *Id.* at 4.

[1462] Submission from Source 685, to H. Comm. on the Judiciary, 4 (Oct. 15, 2019) (on file with Comm.).

[1463] *Id.*

[1464] Jagmeet Singh, *Google Maps API Price Hike is Threatening the Future of Some Companies*, Gadgets 360 (Aug. 28, 2018), https://gadgets.ndtv.com/apps/features/google-maps-apis-new-pricing-impact-1907242.

[1465] *Google Maps Platform Terms of Service, 21. Definitions*, Google, https://cloud.google.com/maps-platform/terms (last visited on Oct. 3, 2020) ("'Google Maps Content' means any content provided through the Service (whether created by Google or its third-party licensors), including map and terrain data, imagery, traffic data, and places data (including business listings).").

**App. 313**

(e) <u>No Use With Non-Google Maps</u>. Customer will not use the Google Maps Core Services in a Customer Application that contains a non-Google map. For example, Customer will not (i) display Places listings on a non-Google map, or (ii) display Street View imagery and non-Google maps in the same Customer Application.[1466]

In April 2020, Google amended the language slightly:

(e) No Use With Non-Google Maps. To avoid quality issues and/or brand confusion, Customer will not use the Google Maps Core Services with or near a non-Google Map in a Customer Application. For example, Customer will not (i) display or use Places content on a non-Google map, (ii) display Street View imagery and non-Google maps on the same screen, or (iii) link a Google Map to non-Google Maps content or a non-Google map.[1467]

Both versions of this provision prohibit developers from using *any* component of the Google Maps Core Service with mapping services provided by non-Google firms. The April 2020 change to the terms of service is even more restrictive: it prohibits developers from even displaying any component of Google Maps "near" any other map. In practice, Google's contractual provision has led several major companies to switch entirely to Google's ecosystem, even in cases where they preferred mapping services from a non-Google provider, such as Mapbox.

Through interviews with market participants, the Subcommittee learned that Google now enforces this provision aggressively. According to one firm, Google closely tracks and pressures developers who use Google's place data in conjunction with mapping data from a non-Google firm, effectively forcing them to choose whether they will use all of Google's mapping services or none of them.[1468] One firm described Google's coercive tactics, stating, "It's a bigger player putting a gun to our head saying 'switch or else.'"[1469]

Because Google's monopoly in online search has furnished it with a trove of data, as well as a robust index, its place search feature is also seen by many market participants effectively as a must-have. One market participant that has lost business partnerships due to Google's coercive restrictions stated that Google is "using access to its dominant search products as leverage to intimidate businesses

---

[1466] *Id.* at 3.2.2(e).

[1467] *Id.*

[1468] Interview with Source 572 (Sept. 24, 2020).

[1469] Interview with Source 157 (Sept. 25, 2020).

**App. 314**

out of working with other map providers."[1470] He noted that Google's conduct now threatens his firm's survival, saying, "This is existential for us."[1471]

Google was asked to identify and justify any limits it places on the ability of app developers who use the Google Maps Platform to use non-Google mapping services.[1472] Google responded that it does "restrict developers from incorporating Google Maps Core Services into an application that uses a non-Google map" in order to "prevent brand confusion and other negative user experiences."[1473] As described above, Google subsequently changed its terms of service to mirror its response to the Subcommittee's question. However, developers and mapping providers questioned Google's rationale, noting that developers were the ones best positioned to determine whether combining mapping services from multiple providers created a "negative user experience." One provider added, "The developers we partner with are extremely sophisticated. They're not confused."[1474]

Google has also used its dominance in mapping to acquire cloud computing customers for its Google Cloud Platform (GCP). Specifically, in 2018, Google implemented a change requiring all API calls to use a valid API key, which must be linked to a Google Cloud Platform account. All keyless calls to the Maps JavaScript API and Street View API trigger low-resolution maps that are watermarked with "for development purposes only."[1475] Developers who do not have a Google Cloud account, and therefore do not have an API key, are effectively locked out of Google Maps. Even if an application is built on a non-Google cloud platform, developers are forced to use GCP for the Maps API portion of their app.[1476] By one estimate, revenue from Google Cloud Platform has more than tripled since 2017, the year before Google began tying access to Google Maps to Google Cloud Platform.[1477]

### iii.  Self-Preferencing through Contractual Restrictions

Some developers told the Subcommittee that Google uses its control over digital mapping to favor its own products in other lines of business. Since Google provides mapping services but also

---

[1470] Interview with Source 572 (Sept. 24, 2020).

[1471] *Id.*

[1472] Innovation and Entrepreneurship Hearing at 29 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[1473] *Id.*

[1474] Interview with Source 572 (Sept. 24, 2020).

[1475] *Guide for Existing Users*, GOOGLE CLOUD, https://cloud.google.com/maps-platform/user-guide (last visited Oct. 3, 2020).

[1476] Daria Bulatovych, *Mapbox as a Worthy Alternative to Google Maps Price Hike*, YALANTIS, https://yalantis.com/blog/mapbox-maps-ready-mobile-apps/ (last visited Oct. 5, 2020).

[1477] Larry Dignan, *Top cloud providers in 2020: AWS, Microsoft Azure, and Google Cloud, hybrid, SaaS players*, ZDNET (Oct. 1, 2020), https://www.zdnet.com/article/the-top-cloud-providers-of-2020-aws-microsoft-azure-google-cloud-hybrid-saas/.

**App. 315**

offers non-mapping products that use mapping as an input, Google can selectively degrade access for third parties that rely on its mapping product to disfavor them as competitors to its non-mapping products. For example, market participants noted that Google has added various restrictions to the license agreement for Google Maps API—restrictions that apply to third-party developers but not to Google's own competing products.

One example is unequal rights to map caching. Map caching occurs when a server stores copies of map images that it can speedily distribute when next recalled. Without caching, a map is drawn each time it is requested, a much slower process.[1478] Although previous versions of the Google Maps API agreement permitted caching by developers, the recent versions prohibit caching of maps with limited exceptions.[1479] Third-party apps built on Google Maps API can no longer store a map cache. Market participants note, however, that Google's own products built on Google Maps—ranging from its local search service to its hotel finder—face no similar restrictions, enabling them to load faster than those run by third parties.

Commenting on the asymmetry, one market participant stated that Google's decision to deny third parties caching "denigrates the service that our maps can provide compared to Google's."[1480] They added, "[T]hat's why we can't create an app that provides directions as well as Google or we can't update a user's location as quickly as Google."[1481]

iv.  Strategic Platform Mismanagement

Although Google's responses to the Subcommittees' questions about its conduct regarding Google Maps emphasized "quality" and "user experience,"[1482] public reporting has documented that Google Maps' listings are "overrun with millions of false business addresses and fake names."[1483] A fake listing can occur when a business creates a fake listing or when a fraudulent business hijacks the name of a legitimate business on Google Maps, diverting user calls or visits from the legitimate business to a fraudulent one. A survey of experts conducted by the *Wall Street Journal* estimated that

---

[1478] WHAT IS MAP CACHING?, ARCGIS ENTERPRISE, https://enterprise.arcgis.com/en/server/latest/publish-services/linux/what-is-map-caching-.htm (last visited Oct. 3, 2020).

[1479] *Places API Policies, Google Maps Platform*, GOOGLE, https://developers.google.com/places/web-service/policies (last visited Oct. 3, 2020) (stating "that you must not pre-fetch, index, store, or cache any Content except under the limited conditions stated in the terms").

[1480] Interview with Source 521 (June 22, 2020).

[1481] *Id.*

[1482] Innovation and Entrepreneurship Hearing at 8 (response to Questions for the Record of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

[1483] Rob Copeland & Katherine Bindley, *Millions of Business Listings on Google Maps Are Fake—and Google Profits*, WALL ST. J. (June 20, 2019), https://www.wsj.com/articles/google-maps-littered-with-fake-business-listings-harming-consumers-and-competitors-11561042283.

**App. 316**

Google Maps hosts around 11 million falsely listed businesses on any given day.[1484] The same experts stated that "a majority" of the listings on Google Maps for businesses such as "contractors, electricians, towing and car repair services, movers and lawyers," as well as others, are not actually located at the location given by Google Maps.[1485]

These fake listings endanger consumer safety, giving rise to situations where users of Google Maps have unknowingly requested home repairs and other services from fraudulent providers, ultimately, paying inflated prices for shoddy work.[1486] The fraudulent listings also disadvantage legitimate businesses, both those whose listings have been hijacked as well as those whose own listings appear below those of sham businesses. Marketers have weaponized this problem to demand ransom payments from businesses under the threat of wiping out their listings through a flood of fake businesses. When the listing of one auto junkyard fell from the first to the second page of Google Maps results, the owner's income fell by half and pushed him to the edge of closing shop entirely.[1487]

Legitimate businesses hurt by fake listings say that contacting Google to report the situation generally fails to resolve the problem. In practice, the only way legitimate businesses can shield themselves from fake listings is to buy ads from Google. Ad prices for categories that are most susceptible to ad fraud have increased more than 50% over the last two years.[1488]

The Subcommittee asked Google about this practice on several occasions. At the Subcommittee's July 16, 2019 hearing, Congresswoman Lucy McBath (D-GA) asked Adam Cohen, Google's director of economic policy, what steps Google was taking to identify and remove fraudulent listings on Google Maps.[1489] She added, "Is it a lack of competition in online search that allows Google to be so complacent by addressing this problem head on?"[1490] Mr. Cohen responded that he was "not familiar" with the relevant facts.[1491] In response to a follow-up letter sent by Chairman Cicilline, Google wrote that it has "no evidence" that the number of fake listings on Google Maps is around 10

---

[1484] *Id*.

[1485] *Id.*

[1486] *Id.* (reporting that a 67-year-old-woman contacted a local home repair service she found through Google, only to be serviced by a man who was pretending to be from the company she had hired. The man charged almost twice the cost of previous repairs and demanded a personal check or cash. The woman told the *Wall Street Journal*, "I'm at my house by myself with this guy. He could have knocked me over dead.").

[1487] *Id*.

[1488] *Id.*

[1489] Innovation and Entrepreneurship Hearing at 67 (question of Rep Lucy McBath (D-GA), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1490] *Id*.

[1491] *Id.* (statement of Adam Cohen, Dir. of Econ. Pol'y, Google LLC).

**App. 317**

million.[1492] Google stated that, as of July 2019, it had taken down more than 3 million fake business profiles and that it has "implemented strict policies and created tools that enable people to flag false content."[1493]

Both digital advertisement experts and individuals engaging in fraudulent activity believe that Google has turned a blind eye to the problem. According to the *Wall Street Journal*, one ad specialist who was invited by Google to help root out the problem left after concluding that Google "has obviously chosen not to solve the problem."[1494] A business owner who helps facilitate the fake listings says his activity leaves a "huge footprint" and yet Google is "just letting it happen." He added, "I know Google knows."[1495]

7.   Cloud

Google Cloud Platform (GCP) is Google's suite of public cloud computing services that first launched in 2008.[1496] Today, Google Cloud is Alphabet's fastest-growing line of business, with revenues in Q1 2020 hitting $2.78 billion, up 52% from $1.83 billion in Q1 2019.[1497] Documents provided to the Subcommittee make clear that the cloud market is a priority for the company.[1498] GCP is the third largest provider of IaaS services in the United States and has a year-over-year growth rate twice that of Amazon Web Services—the current market leader.[1499] Today, GCP boasts long term contracts with data-intensive companies such as SNAP, Spotify and TikTok.[1500]

---

[1492] Letter from Kent Walker, Senior Vice Pres., Global Affairs and Legal Officer, Google to the Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary (July 26, 2019), https://judiciary.house.gov/sites/democrats.judiciary.house.gov/files/documents/07.26.19%20-%20google%20response.pdf.

[1493] *Id*.

[1494] Rob Copeland & Katherine Bindley, *Millions of Business Listings on Google Maps Are Fake—and Google Profits*, WALL ST. J. (June 20, 2019), https://www.wsj.com/articles/google-maps-littered-with-fake-business-listings-harming-consumers-and-competitors-11561042283 (internal quotation marks omitted).

[1495] *Id*. (internal quotation marks omitted).

[1496] Michael Arrington, *Google Jumps Head First Into Web Services With Google App Engine,* TECHCRUNCH (Apr.8, 2008), https://techcrunch.com/2008/04/07/google-jumps-head-first-into-web-services-with-google-app-engine/ (reporting that GCP's first public cloud offering, App Engine, launched as a private preview for developers in April 2008).

[1497] Benjamin Pimentel, *Google just reported cloud revenue for the first time ever, showing that it's growing fast but nowhere close to Amazon Web Services*. BUS. INSIDER (Feb 3, 2020), https://www.businessinsider.com/google-cloud-revenue-first-time-thomas-kurian-2020-2.

[1498] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04266215 (on file with Comm.).

[1499] GCP's position in the cloud market is explained in the cloud computing market overview section. *See infra* Section IV.

[1500] Snap Inc., Annual Report (Form 10-K) 11 (Feb 4, 2020) (indicating that Snap had committed to spend $2.0 billion with Google Cloud over five years beginning January 2017); Kevin McLaughlin and Amir Efrati, *TikTok Agreed to Buy More Than $800 Million in Cloud Services From Google*, THE INFO. (July 14, 2020), https://www.theinformation.com/articles/tiktok-agreed-to-buy-more-than-800-million-in-cloud-services-from-google (reporting that TikTok signed a three-year agreement with GCP in 2019, with a minimum commitment of $800 million over the time-period).

**App. 318**

Subcommittee staff reviewed internal documents that outline Google's plans to invest significantly in acquisitions.[1501] To date, these acquisitions include Orbitera,[1502] Cask Data, Velostrata, and Elastifile, among others.[1503] Most recently, Google purchased Looker for $2.6 billion to "add a new analytics tool for Google Cloud's customers."[1504] In some instances, Google acquired firms that were multi-cloud solutions but, after acquisition, Google made them compatible only with Google's cloud infrastructure, at times integrating them into first-party PaaS and SaaS offerings only available through the Google Cloud Portal.[1505]

According to interviews with market participants and Google's internal documents, Google employs two strategies that raise concerns about potential anticompetitive conduct. First, Google appears to leverage its dominant business lines, including popular APIs such as Google Search and Maps, along with machine learning services, to attract customers to its platform through discounts and free tier services.[1506] For example, according to internal strategy documents, in 2018, Google "launched a program with the Play team to provide GCP credits to game developers based on their Play Store spend, to increase focus on Play and incentivize migration to GCP."[1507] By harnessing Google's advantages in existing markets, GCP is undermining competition on the merits.

Second, Google's documents suggest the company is considering bundling its popular machine learning service with other services that Google is seeking to promote. One recent Google cloud pricing strategy document explains, "the question that we need to think about is whether we use our entry point with Big Query to get a customer to use all the services such as Data Proc, Data Flow, as a suite and give them a price break on the Analytics Suite because it will be much harder for them to migrate away from us if they use all the other services."[1508] The document goes on to describe potential

---

[1501] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04266215 (on file with Comm.).

[1502] Nan Boden, *Orbitera joins the Google Cloud Platform team*, GOOGLE (Aug. 8, 2016), https://cloud.google.com/blog/products/gcp/orbitera-joins-the-google-cloud-platform-team (noting that GCP leveraged Orbitera technology to offer automated test drives and lead management, custom pricing and billing, cloud cost visibility and control, self-serve onboarding to be fully integrated into the GCP console).

[1503] Ingrid Lunden, *Google acquires Cask Data to beef up its tools for building and running big data analytics*, TECHCRUNCH (May 16, 2018), https://techcrunch.com/2018/05/16/google-acquires-cask-data-to-beef-up-its-tools-for-building-and-running-big-data-analytics/.

[1504] Lauren Feiner & Jordan Novet, *Google cloud boss Thomas Kurian makes his first big move -- buys Looker for $2.6 billion*, CNBC (June 6, 2019), https://www.cnbc.com/2019/06/06/google-buys-cloud-company-looker-for-2point6-billion.html.

[1505] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04167298–381. (July 2, 2019) (on file with Comm.). *See also*, Donna Goodison, *Google Cloud's New Alooma Migration Service Won't Accept New AWS, Microsoft Azure Customers*, CRN (Feb 20, 2019) https://www.crn.com/news/cloud/google-cloud-s-new-alooma-migration-service-won-t-accept-new-aws-microsoft-azure-customers.

[1506] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-02456801 (on file with Comm.). *See also* GOOG-HJC-04214427 (Aug 4, 2016).

[1507] *Id.* at GOOG-HJC-04266213 (May 23, 2018).

[1508] *Id.* at GOOG-HJC-04215099 (December 31, 2018).

**App. 319**

discounts and ultimately a plan to have "a pricing model that makes it advantageous for customers to put 80% of their workload on GCP."[1509] As described elsewhere in this Report, absent interventions, the barriers to entry and network effects in this market mean there is a high potential for single-homing and an overall concentrated market.[1510] As Google grows in this space, regulators and enforcers should be watchful for potential anticompetitive conduct.

<div align="center">C.     Amazon</div>

## 1. Overview

Amazon.com, Inc. was founded in 1994 as an online bookseller.[1511] Today, it is one of the largest companies in the world. Based in Seattle, Amazon is estimated to be the second-largest private employer in the United States, with over 500,000 employees.[1512] The company operates across a wide range of direct-to-consumer and business-to-business markets, including e-commerce, consumer electronics, television and film production, groceries, cloud services, book publishing, and logistics. Amazon went public in 1997 but did not post its first full-year profit until 2003.[1513] This is partly because Amazon's business strategy has generally focused on long-term growth over short-term profits.[1514] Amazon is currently one of the most valuable companies in the world, and its CEO, Jeff Bezos, is reported to be the wealthiest person in the world.[1515]

---

[1509] *Id.*

[1510] *See infra* Section IV.

[1511] Amazon.com, Inc., Annual Report (Form 10-K) 3 (Jan. 31, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/4d39f579-19d8-4119-b087-ee618abf82d6.pdf.

[1512] Press Release, Amazon, Amazon.com Announces Second Quarter Results 2 (July 30, 2020), https://s2.q4cdn.com/299287126/files/doc_financials/2020/q2/Q2-2020-Amazon-Earnings-Release.pdf; Charles Duhigg, *Is Amazon Unstoppable?*, THE NEW YORKER (Oct. 21, 2019), https://www.newyorker.com/magazine/2019/10/21/is-amazon-unstoppable.

[1513] Amazon.com, Inc., Annual Report (Form 10-K) 83–84 (Mar. 9, 2005), https://www.annualreports.com/HostedData/AnnualReportArchive/a/NASDAQ_AMZN_2004.pdf; Saul Hansell, *Amazon Reports First Full-Year Profit*, N.Y. TIMES (Jan. 28, 2004), https://www.nytimes.com/2004/01/28/business/technology-amazon-reports-first-full-year-profit.html.

[1514] *See, e.g.*, CEO Hearing at 3 (statement of Jeff Bezos, CEO, Amazon.com, Inc.) ("As I have said since my first shareholder letter in 1997, we make decisions based on the long-term value we create . . ."); Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00035545 (July 14, 2010) (on file with Comm.) ("Membership programs are created with a long-term, company-wide perspective with the goal of increasing loyalty and cross-category shopping behavior. The programs do not optimize for short-term gain or profitability in a single category.").

[1515] *See, e.g.*, Annie Palmer, *Jeff Bezos is Now Worth More than $200 Billion*, CNBC (Aug. 26, 2020), https://www.cnbc.com/2020/08/26/amazon-ceo-jeff-bezos-worth-more-than-200-billion.html.

<div align="right">**App. 320**</div>

**Amazon's Annual Revenue, Operating Expenses, and Profits**[1516]



Amazon reports financial information for three business segments: North America, International, and Amazon Web Services (AWS), Amazon's cloud services business.[1517] Despite the fact that Amazon is already so large that it dominates several important industries, it continues to report strong and steady growth—as well as increasing profits. For 2019, Amazon reported total revenue of about $280 billion, up 20% from the previous year, and a net income of over $11 billion.[1518] AWS's revenue increased by 37% in 2019 to $35 billion.[1519] Retail operations continue to be the platform's largest source of revenue, but AWS is a key source of its overall profits.[1520] In 2019, Amazon's cloud business contributed over 60% of Amazon's total operating income, despite accounting for only 12.5% of its total revenue.[1521]

Sales on Amazon.com fall into one of two categories. First-party sales are those where Amazon retails its own private-label products or sources products wholesale from a vendor or manufacturer. Third-party sales, in contrast, refer to sales by independent merchants who sell through the Amazon

---

[1516] Prepared by Subcomm. based on Amazon.com, Inc., Annual Reports (Form 10-K) (1997–2019).

[1517] Amazon.com, Inc., Annual Report (Form 10-K) 3 (Jan. 31, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/4d39f579-19d8-4119-b087-ee618abf82d6.pdf.

[1518] *Id.* at 18.

[1519] *Id.* at 24.

[1520] *Id.* at 3; *see also* Nathan Reiff, *How Amazon Makes Money*, INVESTOPEDIA (Aug. 12, 2020), https://www.investopedia.com/how-amazon-makes-money-4587523 ("Retail remains Amazon's primary source of revenue, with online and physical stores accounting for the biggest share.").

[1521] Amazon.com, Inc., Annual Report (Form 10-K) 24–25 (Jan. 31, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/4d39f579-19d8-4119-b087-ee618abf82d6.pdf.

Marketplace. When a consumer visits Amazon.com, Amazon's private-label products, such as AmazonBasics or its Kindle E-Readers, are listed for sale alongside independent merchants' offers.

One of the unique features of Amazon's e-commerce site is its fast and free shipping on an extremely broad selection of products. Amazon Prime Members can choose from over 100 million items that are available for free two-day delivery in the continental United States. Walmart, by contrast, has only single-digit millions of products eligible for free two-day shipping.[1522] In response to questions from the Subcommittee, Amazon represented that it offers approximately 158,000 private-label products across 45 in-house brands, not including some additional private-label products sold through Amazon Fresh.[1523] Amazon also hosts 2.3 million active third-party sellers from around the world,[1524] about 45 times more than the 52,000 third-party sellers that Walmart hosts on its marketplace.[1525] A recent survey estimated that about 37% of Amazon's third-party sellers, representing over 850,000 sellers, rely on Amazon as their sole source of income.[1526]

Amazon does not limit the number of sellers that can offer the same product for sale on its platform. Because of this, the same product may be sold by multiple sellers, as well as by Amazon. Each time a consumer clicks on a product, Amazon chooses a single seller from all the vendors offering that product to display as the featured offer in the "Buy Box."[1527] In its response to questions from the Subcommittee, Amazon stated that the featured merchant algorithm, also commonly referred to as the Buy Box algorithm, is designed to predict the offer that consumers would choose after comparing all the available offers in detail.[1528]

---

[1522] J.P. MORGAN, RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD (2020), https://markets.jpmorgan.com/research/email/-lbk68f4/Alp1kP9tQUPS29jlzW_bOg/GPS-3397412-0.

[1523] Innovation and Entrepreneurship Hearing at 3 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1524] *Number of Sellers on Amazon Marketplace*, MARKETPLACE PULSE, https://www.marketplacepulse.com/amazon/number-of-sellers (last visited Sept. 25, 2020); *see also* CEO Hearing at 5 (statement of Jeff Bezos, CEO, Amazon.com, Inc.) ("There are now 1.7 million small and medium-sized businesses around the world selling in Amazon's stores.").

[1525] *Number of Sellers on Amazon Marketplace*, MARKETPLACE PULSE, https://www.marketplacepulse.com/amazon/number-of-sellers (last visited on Oct. 5, 2020).

[1526] JUNGLESCOUT, THE STATE OF THE AMAZON SELLER 2020 4 (2020), https://www.junglescout.com/wp-content/uploads/2020/02/State-of-the-Seller-Survey.pdf.

[1527] Innovation and Entrepreneurship Hearing at 2 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1528] *Id.*

**App. 322**

The *Amazon Buy Box Playbook*, a well-known guide for sellers, explains this in lay terms:

> When a shopper lands on a product detail page, Amazon chooses one seller whose details appear in the Buy Box—the white box on the right hand side of the page. When a customer clicks on the "Add to Cart" button, the sale goes to the seller in this box.[1529]

Industry experts estimate that about 80% of Amazon sales go through the Buy Box, and the percentage is even higher for mobile purchases.[1530] In response to a question from the Subcommittee, Amazon provided only high-level information about how it chooses which offer will win the Buy Box, stating that the algorithm considers criteria such as price, delivery speed and cost, Prime eligibility, and seller performance.[1531] Despite the importance of winning the Buy Box to sellers on its platform, only Amazon knows exactly how its featured merchant algorithm works.

As Amazon's e-commerce business has grown, it has also developed a significant logistics business providing fulfillment and delivery services to third-party sellers through its Fulfillment by Amazon (FBA) program. Nearly 85% of the top 10,000 Amazon Marketplace sellers reportedly rely on this program to fulfill and deliver their orders.[1532] Third-party sellers that use FBA keep their inventory in Amazon's fulfillment centers.[1533] After a consumer places an order online, Amazon does the picking, packing, and shipping, and provides customer service to complete the order.[1534] The figure below explains the different types of sellers on Amazon.com and the various modes of delivery and fulfillment they use.

---

[1529] FEEDVISOR, THE AMAZON BUY BOX PLAYBOOK FOR SELLERS AND RETAILERS 4 (2020).

[1530] *Id.* at 5.

[1531] CEO Hearing at 3 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1532] *FBA Usage Among Amazon Marketplace Sellers*, MARKETPLACE PULSE, https://www.marketplacepulse.com/amazon/fulfillment-by-amazon-fba (last visited Oct. 5, 2020).

[1533] *Fulfillment by Amazon*, AMAZON, https://sell.amazon.com/fulfillment-by-amazon.html (last visited Sept. 28, 2020).

[1534] *Id.*

**App. 323**

**Types of Sellers on Amazon and Shipping Options**[1535]



Amazon generates a significant amount of revenue from the fees that it charges third-party sellers. According to a recent SEC filing, net sales for services provided to third-party sellers increased from $23 billion in the first six months of 2019 to $32 billion over the same period in 2020—an increase of 39%.[1536] For the ability to sell a product on the platform, a seller might pay the company a monthly subscription fee, a high-volume listing fee, a referral fee on each item sold, and a closing fee on each item sold.[1537] Amazon charges additional fees for fulfillment and delivery services, as well as for advertising.[1538]

AWS, the company's cloud services business, offers digital infrastructure services to businesses that require increased computing infrastructure, such as increased capacity for servers to host or store data. Amazon is the dominant provider of infrastructure as a service. AWS accounts for close to half of all global spending on cloud infrastructure services, and the business has three times

---

[1535] Prepared by the Subcomm. based on *Amazon 1P vs. 3P: What Are the Differences?*, FEEDVISOR, https://feedvisor.com/university/amazon-1p-vs-3p/ (last visited Sept. 24, 2020).

[1536] Amazon.com, Inc., Quarterly Report (Form 10-Q) 18 (July 31, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/a77b5839-99b8-4851-8f37-0b012f9292b9.pdf.

[1537] *Selling on Amazon Fee Schedule*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/200336920 (last visited Sept. 25, 2020).

[1538] *Pricing Overview,* AMAZON SELLER CENTRAL (2020), https://sell.amazon.com/pricing.html (last visited Sept. 25, 2020); *see also* Production of Amazon, to H. Comm. on the Judiciary, 12 (Oct. 14, 2019) (on file with Comm.) (noting that advertising revenue is not included in seller services).

251

**App. 324**

the market share of Microsoft, its closest competitor.[1539] Cloud services are an essential and increasingly expensive line item for many companies. Given AWS's role as a dominant cloud provider, some of Amazon's competitors in other business lines often end up dependent on the platform. For example, Netflix, a competitor of Amazon Prime Video, paid AWS $500 million in 2018 to store its streaming video library.[1540]

While the pandemic has harmed many businesses, Amazon has experienced a surge in sales.[1541] The company's operating profit of $5.8 billion during the second quarter of 2020 significantly outperformed the -$1.5 billion to +$1.5 billion projection that Amazon had issued to investors.[1542] One analyst described the magnitude of Amazon's recent sales growth outperformance as a "paradigm-shifting update."[1543] In October 2020, Amazon's stock price was about $3,000, giving it a market valuation of about $1.5 trillion[1544]—greater than that of Walmart, Target, Salesforce, IBM, eBay, and Etsy combined.[1545] The company is consistently one of the highest-priced stocks on Wall Street,[1546] which is a clear indication investors expect Amazon to maintain and expand its market power.

The Subcommittee initiated its investigation of Amazon's market power and its role as a gatekeeper for digital markets in June 2019. Before and concurrent with the Subcommittee's investigation, many international and U.S. enforcement authorities also opened antitrust investigations

---

[1539] Press Release, Gartner, Gartner Says Worldwide IaaS Public Cloud Services Market Grew 31.3% in 2018 (July 29, 2019), https://www.gartner.com/en/newsroom/press-releases/2019-07-29-gartner-says-worldwide-iaas-public-cloud-services-market-grew-31point3-percent-in-2018; *see also* Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary at 6 (July 26, 2019) (on file with Comm.).

[1540] Kevin McLaughlin, *Amazon's Cloud King: Inside the World of Andy Jassy*, THE INFO. (Jan. 23, 2019), https://www.theinformation.com/articles/amazons-cloud-king-inside-the-world-of-andy-jassy.

[1541] *See, e.g.*, Alana Semeuls, *Many Companies Won't Survive the Pandemic. Amazon Will Emerge Stronger Than Ever*, TIME (July 28, 2020), https://time.com/5870826/amazon-coronavirus-jeff-bezos-congress/ ("Consumer spending on Amazon between May and July was up 60% from the same time frame last year.").

[1542] MORNINGSTAR EQUITY ANALYST REPORT, AMAZON.COM INC. 6 (Aug. 27, 2020) (on file with Comm.); Press Release, Amazon, Amazon.com Announces First Quarter Results (Apr. 30, 2020), https://s2.q4cdn.com/299287126/files/doc_financials/2020/Q1/AMZN-Q1-2020-Earnings-Release.pdf.

[1543] MORNINGSTAR EQUITY ANALYST REPORT, AMAZON.COM INC. 6 (Aug. 27, 2020) (on file with Comm.).

[1544] *Amazon.com, Inc. Common Stock (AMZN),* NASDAQ https://www.nasdaq.com/market-activity/stocks/amzn (last visited Oct. 3, 2020).

[1545] *See Walmart, Inc. Common Stock (WMT),* NASDAQ https://www.nasdaq.com/market-activity/stocks/wmt (last visited Oct. 5, 2020) ($398 billion); *Target Corp. Common Stock (TGT)*, NASDAQ https://www.nasdaq.com/market-activity/stocks/tgt (last visited Oct. 5, 2020) ($79.6 billion); *Salesforce.com Inc. Common Stock (CRM),* NASDAQ https://www.nasdaq.com/market-activity/stocks/crm (last visited Oct. 5, 2020) ($225.5 billion); *Int'l Bus. Machines Corp. Common Stock (IBM)*, NASDAQ https://www.nasdaq.com/market-activity/stocks/ibm (last visited Oct. 5, 2020) ($107 billion); *eBay, Inc. Common Stock (EBAY),* NASDAQ https://www.nasdaq.com/market-activity/stocks/ebay (last visited Oct. 5, 2020) ($36.2 billion); *Etsy, Inc. Common Stock (ETSY),* NASDAQ https://www.nasdaq.com/market-activity/stocks/etsy (last visited Oct. 3, 2020) ($16.7 billion).

[1546] *See, e.g.*, Gabe Alpert, *Top 5 Highest Priced Stocks in America*, INVESTOPEDIA (May 19, 2020), https://www.investopedia.com/financial-edge/0711/the-highest-priced-stocks-in-america.aspx.

252

**App. 325**

into Amazon's business practices. Some of these investigations have led to Amazon making policy changes.[1547] The European Commission began its in-depth antitrust investigation of Amazon on July 17, 2019.[1548] According to Executive Vice President Margrethe Vestager, the European Commission's investigation "focuses on the use by Amazon of accumulated, competitively sensitive information about marketplace sellers, their products and transactions on the Amazon marketplace, which may inform Amazon's retail business decisions."[1549] In the United States, the Federal Trade Commission (FTC) is investigating Amazon's past acquisition activity.[1550] The FTC is also reportedly investigating Amazon's treatment of third-party sellers and its cloud services business.[1551] Additionally, Amazon reportedly faces antitrust scrutiny by state attorneys general offices in California, Washington, and New York.[1552]

During the course of the investigation, Amazon displayed a lack of candor to the Subcommittee in response to questions about its business practices. As Chairman Nadler, Subcommittee Chairman Cicilline, and Ranking Member Sensenbrenner, along with other members of the Committee, wrote to Mr. Bezos in a bipartisan letter in May of this year, the Subcommittee was troubled that some of the "statements Amazon made to the Committee about the company's business practices appear to be

---

[1547] *See, e.g.*, Data and Privacy Hearing at 3 (statement of Margrethe Vestager, then-Eur. Comm'r for Competition) ("[I]n 2017 we accepted commitments from Amazon not to introduce or enforce what are sometimes called 'most-favoured nation' clauses in the e-books market."); Press Release, Bundeskartellamt, Bundeskartellamt obtains far-reaching improvements in the terms of business for sellers on Amazon's online marketplaces (July 17, 2019), https://www.bundeskartellamt.de/SharedDocs/Meldung/EN/Pressemitteilungen/2019/17_07_2019_Amazon.html ("In response to the competition concerns expressed by the Bundeskartellamt, Amazon is amending its terms of business for sellers on Amazon's online marketplaces."); *Amazon online retailer: investigation into anti-competitive practices*, Competition & Mkts. Auth. (Oct. 1, 2013), https://www.gov.uk/cma-cases/amazon-online-retailer-investigation-into-anti-competitive-practices ("In light of [Amazon's] decision to remove the price parity policy and subsequent steps to implement that decision . . . the [Office of Fair Trading] has decided to close its investigation on administrative priority grounds.").

[1548] Press Release, Eur. Comm'n, Antitrust: Commission Opens Investigation into Possible Anti-competitive Conduct of Amazon (July 17, 2019), https://ec.europa.eu/commission/presscorner/detail/en/IP_19_4291.

[1549] Submission from Margrethe Vestager, Exec. Vice-Pres., Eur. Comm'n, to H. Comm. on the Judiciary, 4 (July 24, 2020) (on file with Comm.).

[1550] Press Release, Fed. Trade Comm'n, FTC to Examine Past Acquisitions by Large Technology Companies (Feb. 11, 2020), https://www.ftc.gov/news-events/press-releases/2020/02/ftc-examine-past-acquisitions-large-technology-companies.

[1551] Jason Del Rey, *Amazon May Soon Face an Antitrust Probe. Here are 3 Questions the FTC is Asking About It.*, Vox: Recode (June 4, 2019), https://www.vox.com/recode/2019/6/4/18651694/amazon-ftc-antitrust-investigation-prime; Dina Bass, David McLaughlin & Naomi Nix, *Amazon Faces Widening U.S. Antitrust Scrutiny in Cloud Business*, Bloomberg (Dec. 4, 2019), https://www.bloomberg.com/news/articles/2019-12-04/amazon-faces-widening-u-s-antitrust-scrutiny-in-cloud-business.

[1552] Tyler Sonnemaker, *Amazon is Reportedly Facing a New Antitrust Investigation into its Online Marketplace Led by the FTC and Attorneys General in New York and California*, Bus. Insider (Aug. 3, 2020), https://www.businessinsider.com/amazon-antitrust-probe-ftc-new-york-california-online-marketplace-2020-8; Karen Weise & David McCabe, *Amazon Said to Be Under Scrutiny in 2 States for Abuse of Power*, N.Y. Times (June 12, 2020), https://www.nytimes.com/2020/06/12/technology/state-inquiry-antitrust-amazon.html.

**App. 326**

misleading, and possibly criminally false or perjurious."[1553] In light of this concern, Subcommittee staff views Amazon's other claims and representations with a degree of skepticism in instances where they conflict with credible sources, such as investigative reporting, interviews with market participants, or other evidence uncovered by Subcommittee staff during the investigation.

2. Amazon.com

   a. Market Power

Amazon has significant and durable market power in the U.S. online retail market.[1554] The company's actual share of U.S. e-commerce is unknown outside of Amazon because it does not report the gross merchandise volume of third-party sales made on its marketplace. A frequently cited analysis by market research company eMarketer estimates that Amazon's share in this market is 38.7%.[1555] eMarketer's estimate, however, is likely understated because its definition of e-commerce is overly broad. For example, under eMarketer's approach to e-commerce, the Auto and Parts category includes online sales of cars.[1556] In contrast, marketing analytics company Jumpshot estimates that Amazon captures an average of 74% of digital transactions across a wide range of product categories.[1557] The Jumpshot analysis may overstate Amazon's share because it calculates market share as a percentage of transactions made on well-known market participants' websites, like Amazon, Walmart, and Target, but excludes small, online retailers.[1558] Based on the information Subcommittee staff gathered during its investigation, estimates that place Amazon's share of U.S. e-commerce at about 50% or higher are more credible than lower estimates of 30-40%.[1559]

---

[1553] Bipartisan Letter from the Chairman, Ranking Member, and Members of H. Comm. on the Judiciary to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020), https://judiciary.house.gov/uploadedfiles/2020-05-01_letter_to_amazon_ceo_bezos.pdf.

[1554] *See generally* Dig. Competition Expert Panel Report at 30 (finding that recent financial indicators suggest Amazon's "dominan[ce] in a meaningfully distinct sector of online retail" will endure and that "investors are expecting it to retain its dominant position, and to earn significantly higher profits in future"); Stigler Report at 78 ("[T]he evidence thus far does suggest that current digital platforms face very little threat of entry . . . . [T]he key players in this industry remained the same over the last two technology waves, staying dominant through the shift to mobile and the rise of AI. In the past, dominant business found it difficult to navigate innovation or disruption waves. By contrast, Facebook, Google, Amazon, Apple, and even Microsoft were able to ride these waves without significant impact on market share or profit margins.").

[1555] ANDREW LIPSMAN, TOP 10 US ECOMMERCE COMPANIES 2020, eMARKETER (Mar. 10, 2020), https://www.emarketer.com/content/top-10-us-ecommerce-companies-2020.

[1556] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206583 (2019) (on file with Comm.) (eMarketer Inc. – Global Ecommerce 2019 Report).

[1557] *See* Kimberly Collins, *Google + Amazon: Data on Market Share, Trends, Searches from Jumpshot*, SEARCH ENGINE WATCH (Aug. 1, 2019), https://www.searchenginewatch.com/2019/08/01/amazon-google-market-share/.

[1558] *See id.*

[1559] *See* Submission from Source 11, to H. Comm. on the Judiciary, 2 (Oct. 14, 2019) (on file with Comm.) ("Amazon has amassed at least a 50% share of the ecommerce market and continues to expand, both its market share and the breadth of its offerings."); PYMNTS.COM, WALMART VS. AMAZON, WHOLE PAYCHECK TRACKER: BATTLE FOR THE DIGITAL FIRST CONSUMER 6 (2020), https://securecdn.pymnts.com/wp-content/uploads/2020/09/Amazon-Walmart-Whole-Paycheck-092020.pdf (estimating Amazon's market share at 51.2% in Q1 2020 and 44.4% in Q2 2020, but noting U.S. e-commerce

**App. 327**

In a number of key product categories, ranging from household essentials to sports, fitness and outdoors, Amazon is reported to account for well over 50% of online sales.[1560] The platform also has significant market power over the entire book industry, including sales, distribution, and publishing. In the U.S. market, Amazon accounts for over half of all print book sales and over 80% of e-book sales.[1561]

Amazon is the dominant online marketplace. It reportedly controls about 65% to 70% of all U.S. online marketplace sales.[1562] The platform's market power is at its height in its dealings with third-party sellers, as well as many of its suppliers, which Amazon refers to as vendors. Increasingly, Amazon is also gaining market power in certain business-to-business (B2B) online markets through Amazon Business, its B2B marketplace.[1563]

In response to the Committee's requests for information, Amazon claims that "estimates of total retail share are the most appropriate and relevant method of estimating" Amazon's market share.[1564] This approach is inconsistent with evidence gathered by Subcommittee staff, conventional antitrust analysis of relevant product markets, and common sense. In a recent investigation, for example, the FTC concluded that a "relevant market may be divided by channel of sale, resulting in separate markets for brick-and-mortar sales and online sales."[1565] Illustrating the extent of Amazon's overly broad approach to identifying the relevant market and its top competitors, in response to the

---

increased by 44% over the same period, and that "[f]or Amazon to drop only 7 percent in total eCommerce share with that kind of overall increase is actually quite an achievement.").

[1560] *See, e.g.*, Kimberly Collins, *Google + Amazon: Data on Market Share, Trends, Searches from Jumpshot*, SEARCH ENGINE WATCH (Aug. 1, 2019), https://www.searchenginewatch.com/2019/08/01/amazon-google-market-share/; *see also* J.P. MORGAN REPORT: RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD 13 (Amazon's market share of online sales of Books & Magazines is 75%).

[1561] *See, e.g.*, Ben Evans, *What's Amazon market share?*, BENEDICT EVANS https://www.ben-evans.com/benedictevans/2019/12/amazons-market-share19#:~:text=Amazon%20has%2050%25%20or%20more,it%20has%20over%2050%25 ("Amazon has 50% or more of the US print book market"); Submission from Source 17, to H. Comm. on the Judiciary, 33 (Nov. 14, 2019) (on file with Comm.) ("Amazon accounts for roughly 83 percent of all e-book sales, about 90 percent of online print sales, and about 90 percent of digital audiobook sales."); Dig. Competition Expert Panel Report at 30 ("In the e-book market, Amazon was reported in February 2017 to account for around 88% of total annual unit sales.").

[1562] Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 26 (Oct. 26, 2019) (on file with Comm.) (citing DIG. COMMERCE 360, 2019 ONLINE MARKETPLACES REPORT).

[1563] *See* MARKETPLACE PULSE, MARKETPLACES YEAR IN REVIEW 48 (2019), https://cdn.marketplacepulse.com/misc/marketplaces-year-in-review-2019.pdf ("Amazon's 'business-to-business', or B2B, marketplace is gaining market share faster than its retail operation."); Phone Interview with Nat'l Ass'n of Wholesaler-Distributors (Sept. 3, 2020); STACY MITCHELL & OLIVIA LAVECCHIA, REPORT: AMAZON'S NEXT FRONTIER: YOUR CITY'S PURCHASING 4 (2018), https://ilsr.org/amazon-and-local-government-purchasing/ ("Amazon is leveraging its growing relationship with local governments to induce more businesses to join its Marketplace.").

[1564] Production of Amazon, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019).

[1565] *See* Complaint at 4, In the Matter of Edgewell Personal Care Co.& Harry's Inc., No. 9390 (F.T.C., Feb. 2, 2020), https://www.ftc.gov/system/files/documents/cases/public_p3_complaint_-_edgewell-harrys.pdf.

**App. 328**

Committee's request for "A list of the Company's top ten competitors," Amazon identified 1,700 companies, including Eero (a company Amazon owns), a discount surgical supply distributor, and a beef jerky company.[1566]

Amazon also included single-category companies in response to the Committee's request for a list of Amazon's top ten competitors. Yet documents produced by Amazon suggest that even in its early days it did not view such retailers as direct competitors. For instance, a recap of an Amazon marketing presentation identified one of its key points as: "No direct competitors, closest competitors would be what you refer to as category driven i.e. Best Buy, Barnes and Noble...etc."[1567]

Regardless of the precise boundaries of e-commerce or online marketplaces, the sum of evidence that Subcommittee staff examined demonstrates that Amazon functions as a gatekeeper for e-commerce. Amazon is the most-visited website in the world for e-commerce and shopping.[1568] In a submission to the Committee, an e-commerce market participant said that "many of the 64% of American households that have Prime memberships are effectively locked into Amazon for their online shopping."[1569] Meanwhile, recent market analysis suggests that over 60% of all online product searches in the U.S. begin on Amazon.com.[1570]

At the Subcommittee's hearing on innovation and entrepreneurship, Stacy Mitchell, the Co-Director of the Institute for Local Self-Reliance, described one independent retailer's attempt to survive in e-commerce independent of Amazon:

As its customers moved online, so too did the company. Gazelle Sports built a robust e-commerce site. With scores of enthusiastic reviews on Google and Yelp, the site came right up in online searches, yielding a brisk stream of customers and sales.

But, in 2014, sales began to decline. The problem was that many people in Michigan and across the country were no longer starting their online shopping on a search engine, where they might find Gazelle Sports. Instead, they were going straight to Amazon. By

---

[1566] *See* Production of Amazon, to H. Comm. on the Judiciary, 17 (Oct. 14, 2019) (on file with Comm.).

[1567] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-0059575 (Nov. 22, 2010) (on file with Comm.).

[1568] SIMILARWEB, WORLDWIDE E-COMMERCE AND SHOPPING CATEGORY PERFORMANCE (July 2020), https://pro.similarweb.com/#/industry/overview/E-commerce_and_Shopping/999/1m/?webSource=Total (Amazon had 2.6 billion visits in July 2020 compared to 940.8 million visits for eBay).

[1569] Submission from Source 11, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

[1570] Lucy Koch, *Looking for a New Product? You Probably Searched Amazon*, EMARKETER (Mar. 31, 2019), https://www.emarketer.com/content/looking-for-a-new-product-you-probably-searched-amazon (citing FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 14 (2019)); *see also* WUNDERMAN THOMPSON, THE FUTURE SHOPPER REPORT 2020 11 (2020), https://insights.wundermanthompsoncommerce.com/hubfs/@UK/Landing%20Pages/2020/The%20Future%20Shopper%20 2020/WTC%20-%20The%20Future%20Shopper%20Report%202020.pdf?hsCtaTracking=24d37c38-db5d-4797-bd6c-2ea35127ad21%7C70cdff40-3236-48fb-a2ec-c4b298453df9.

**App. 329**

2016, the share of online shoppers bypassing search engines and beginning their product search on Amazon had grown to 55 percent. With sales flagging and staff reductions underway, the owner of Gazelle Sports . . . made what seemed like a necessary decision: Gazelle Sports would join Amazon Marketplace, becoming a third-party seller on the digital giant's platform. "If the customer is on Amazon, as a small business you have to say, 'That is where I have to go,'" he explained. "Otherwise, we are going to close our doors."[1571]

Interviews with sellers, as well as documents that Subcommittee staff reviewed, make clear that Amazon has monopoly power over most third-party sellers and many of its suppliers.[1572] Numerous sellers told Subcommittee staff in interviews that they cannot turn to alternative marketplaces, regardless of how much Amazon may increase their costs of doing business or how badly they are treated. David Barnett, the CEO and Founder of PopSockets, a former third-party seller and current Amazon supplier, testified about Amazon's coercive tactics at one of the Subcommittee's hearings:

> I suspect that Amazon is accustomed to behaving this way because most brands cannot afford to leave Amazon. They evidently have no choice but to endure tactics that would be rejected out of hand in any ordinary relationship whereby the two parties enter into the relationship by preference rather than necessity.[1573]

Sellers feel forced to be on Amazon because that is where the buyers are.[1574] At the Subcommittee's sixth hearing, Representative Lucy McBath (D-GA) noted that the evidence the Subcommittee collected is at odds with how Amazon describes its relationship with third-party sellers. She asked Mr. Bezos:

> [Y]ou referred to third party sellers today as "Amazon's partners" and that your success depends on their success. But, over the past year, we've heard a completely different story. As part of this investigation, we've interviewed many small businesses, and they use the words like "bullying," "fear," and "panic" to describe their relationship with Amazon. . . . . You said that sellers have many other attractive options to reach customers, but that's not at all what we found in our investigation . . . . If Amazon

---

[1571] Innovation and Entrepreneurship Hearing at 3–4 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[1572] *See, e.g.*, Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 49 (Oct. 26, 2019) ("98% of all of Top Shelf's transaction has taken place on Amazon's platform."); *see also* Dig. Competition Expert Panel Report at 30 ("Regardless of the view on dominance over a particular defined market, it is clear that for thousands of smaller independent online sellers in particular, Amazon's marketplace is a strategically important gateway to consumers.").

[1573] Competitors Hearing at 3 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1574] Submission from Source 11, to H. Comm. on the Judiciary, 5 (Oct. 14, 2019) (on file with Comm.).

**App. 330**

didn't have monopoly power over these sellers, do you think they would choose to stay in a relationship that is characterized by bullying, fear, and panic?"[1575]

Mr. Bezos responded that "there are a lot of options" for sellers, and that "[t]here are more and more every day."[1576] This claim is inconsistent with the Subcommittee's investigative record. In a submission to the Committee, the Online Merchants Guild, a trade association for small and medium-sized online sellers, said that its members who try to diversify sales across multiple platforms often report that they are unable to generate many sales outside of Amazon.[1577]

An important limit on a seller's ability to switch from selling on Amazon to selling on its own site or a competing platform is that Amazon generally forbids sellers from contacting their customers.[1578] The packaging and even the order confirmation email for third-party sales feature the Amazon brand prominently and do not reference the seller. A typical Amazon customer is unaware of the source of the sale.[1579] According to the Online Merchants Guild, "Many Amazon sellers use websites such as Shopify to try and establish their own eCommerce presence, but without the ability to market to their supposed core customer base, their Amazon customers, it's pretty futile."[1580]

Subcommittee staff heard from several market participants that Amazon also has significant market power over suppliers. For example, third-party sellers told Subcommittee staff that Amazon frequently ignores manufacturer policies that bind sellers.[1581] For example, brand manufacturers may establish minimum advertised pricing guidelines (MAP) to prevent online retailers from freeriding off brick-and-mortar stores' investments in product display or expertise—such as how to fit a running shoe. Amazon's leverage over suppliers gives it the ability to "break" minimum advertised pricing

---

[1575] CEO Hearing Transcript at 88–89 (question of Rep. Lucy McBath (D-GA), Member, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1576] *Id.* at 91 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1577] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 4 (Oct. 23, 2019) (on file with Comm.) ("Members who sell across multiple platforms often report the amount of revenue generated outside of Amazon including their own eCommerce site, is insignificant, with over 90% of their sales being generated on the platform."); *see also* Submission from Top Shelf Brands, to H. Comm. on the Judiciary, 60–61 (Oct. 26, 2019) (explaining that it has "no viable alternatives" to Amazon, where 98% of its transactions have taken place on Amazon's platform, eBay accounts for 1% of its income, and Walmart accounts for less than 1%).

[1578] *Selling Polices and Seller Code of Conduct*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/G1801?language=en_US&ref=efph_G1801_cont_200386250 (last visited Sept. 28, 2020); *see also* Submission from Source 100, to H. Comm. on the Judiciary (Sept. 26, 2020) (raising concerns that Amazon permits itself to contact customers about negative reviews for Amazon branded products, while third-party sellers are largely barred from customer engagement).

[1579] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 4 (Oct. 23, 2019) (on file with Comm.); *see also* Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.) (explaining that "[w]henever an order is shipped through [Fulfillment by Amazon], even if the purchase is made through another marketplace, it is likely to arrive in an Amazon-branded box, creating confusion" for customers).

[1580] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 5 (Oct. 23, 2019) (on file with Comm.).

[1581] *See, e.g.*, Phone Interview with Source 84 (Mar. 4, 2020).

**App. 331**

rules and undercut competing sellers on price. In contrast, third-party sellers must abide by the rules. As a former third-party seller explained, "Given Amazon's immense clout, we believe that suppliers have no realistic threat to stop selling on Amazon in response to Amazon 'breaking' MAP."[1582] Amazon's internal documents suggest that it does not fear any consequences for failing to comply with most vendor policies.[1583]

Another way that Amazon leverages its market power is to force certain brand manufacturers that would prefer to be third-party sellers into being wholesalers. A discussion among Amazon executives suggests that certain brands may only be allowed to have a wholesale relationship with Amazon even if the brand would prefer to be a third-party seller. In 2016, Sebastian Gunningham, then senior vice president of Amazon Marketplace, commented on a list of proposed seller tenets, "I would add that there are x,000 suppliers around the world that do not get this choice... I am talking about the apple, nikes and p&g, etc... We don't want to open that door, relationship has to be reseller."[1584] Consistent with this stance, Popsockets CEO and Founder David Barnett testified that Amazon attempted to force him into maintaining a wholesale relationship with Amazon Retail despite his preference to be a third-party seller or make sales on the marketplace through an authorized distributor.[1585] A former Amazon employee confirmed that it was not uncommon for Amazon to use its brand standards policy to shut down a brand's third-party seller account and force brands into an exclusive wholesaler relationship.[1586]

Amazon also enjoys significant market power over online consumers. Amazon uses Prime and its other membership programs to lock consumers into the Amazon ecosystem. According to an internal analysis, Amazon was willing to pay a credit card company a significant sum in 2013 for signing up new Prime members under the assumption that each new member would contribute $527 to Amazon's gross merchandise sales and $46 of gross profit.[1587] Amazon estimated that the deal had a five-year net present value of $17 million, assuming that it delivered 100,000 paid Prime members.[1588]

---

[1582] Submission from Source 48, to H. Comm. on the Judiciary, 8 (Nov. 8, 2019) (on file with Comm.).

[1583] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00151722 (Feb. 9, 2009) (on file with Comm.) ("[P]lease audit that we are price matching . . . any diapers.com pricing. If this puts us in the soup with P&G on their pampers map price, so be it."); AMAZON-HJC-00206714 (Mar. 8, 2018) ("Why did Walmart break MAP and we didn't?").

[1584] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00190108 (June 6, 2016) (on file with Comm.).

[1585] Competitors Hearing at 3 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1586] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 22, 2020) (on file with Comm.).

[1587] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00199845 (Oct. 23, 2013) (on file with Comm.).

[1588] *Id.*

**App. 332**

Once Prime members pay the upfront annual membership fee, they are likely to concentrate their online purchases with Amazon.[1589] According to a recent survey, Prime members spend an average of $1,400 annually on Amazon, versus $600 for non-members.[1590] As one market participant observed, "Prime members will continue to use Amazon and not switch to competing platforms, despite higher prices and lower-quality items on Amazon compared to other marketplaces, and despite recent increases in the price of a Prime membership."[1591]

Other retailers are unable to match Amazon on its ability to provide free and fast delivery for such a large volume and inventory of products. Even Walmart, with its extensive national distribution network, does not come close to matching Amazon on this measure.[1592] Amazon currently offers Prime members free, next-day delivery on over 10 million items anywhere in the continental United States.[1593] Walmart, by contrast, has only about 200,000 products eligible for two-day shipping in select markets.[1594]

Amazon's market power is durable and unlikely to erode in the foreseeable future. There are several factors that make successful entry or expansion by a challenger to Amazon unlikely. Barriers to entry include: (1) network effects, which make it difficult for another marketplace to achieve a comparable number of buyers and sellers; (2) switching costs associated with consumers shopping outside of the Amazon ecosystem; and (3) the steep costs of building a logistics network comparable in size and scope to Amazon's massive international footprint in fulfillment and delivery. Amazon's internal documents recognize that entry into online commerce "require[s] significant incremental investments in brand development, inventory, and marketing/customer acquisition."[1595] Further,

---

[1589] *See* Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.) ("Amazon has been quite frank about the reality that once consumers invest in Prime, they do most of their online shopping on Amazon in order to gain value from the investment in shipping, whereas they might otherwise multisource.").

[1590] Tonya Garcia, *Amazon Prime membership exceeds 100 million*, MARKETWATCH (Jan. 17, 2019), https://www.marketwatch.com/story/amazon-prime-membership-exceeds-100-million-2019-01-17; *see also* Brian Olsavsky, Sr. Vice Pres. and Chief Fin. Officer, Amazon.com, Inc., *Q1 2020 Earnings Call* (Apr 30, 2020, 5:30 PM) ("We see our Prime customers are shopping more often and they have larger basket sizes.").

[1591] Submission from Source 11, to H. Comm. on the Judiciary, 3 (Oct. 14, 2019) (on file with Comm.).

[1592] *See* J.P. MORGAN, RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD (2020), https://markets.jpmorgan.com/research/email/-lbk68f4/Alp1kP9tQUPS29jlzW_bOg/GPS-3397412-0 ("We believe there are no comparable unlimited free shipping offerings available at scale, with Amazon's large and growing infrastructure investments serving as a significant barrier to entry.")

[1593] *Prime*, AMAZON, https://www.amazon.com/b?ie=UTF8&node=15247183011 (last visited Sept. 28, 2020) ("Free One-Day Delivery . . . Available coast-to-coast on more than 10 million items with no minimum purchase.").

[1594] Press Release, Marc Lore, Pres. & CEO, Walmart eCommerce US, Free NextDay Delivery Without a Membership Fee (May 14, 2019), https://corporate.walmart.com/newsroom/2019/05/14/free-nextday-delivery-without-a-membership-fee; *Walmart Help Center: NextDay Delivery*, https://www.walmart.com/help/article/nextday-delivery/fd3f1c5cf0ec4682abca8c83f5f0e977 (last visited Sept. 28, 2020) ("Currently, NextDay Delivery is only available in select markets.").

[1595] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00154659 (Nov. 23, 2010) (on file with Comm.).

**App. 333**

Amazon expanded its market power by avoiding taxes, extracting state subsidies, and engaging in anticompetitive conduct—tactics that have given the company an unfair advantage over actual and potential competitors.

As the COVID-19 pandemic pushes more American shoppers online, Amazon's market power has grown. Evidence shows that Amazon is willing to use its increased market power in e-commerce during this crisis to exert pressure on suppliers and favor its own first-party products over those sold by third-party sellers. Amazon initially responded to the sudden surge in sales by refusing to accept or deliver non-essential supplies from its third-party sellers—a stance that would seem reasonable except that Amazon continued to ship its own non-essential products while restricting third-party sellers' ability to use alternative distribution channels to continue selling through Prime.[1596] As for suppliers, Subcommittee staff heard concerns that the platform used its power as a large buyer to pressure suppliers into prioritizing Amazon over other retail customers such as independent grocers.[1597] Meanwhile, numerous reports suggest that Amazon is in talks to convert real estate in vacated malls into additional Amazon distribution centers, further highlighting how it will continue to amass further scale even as its brick-and-mortar counterparts crater.[1598]

### b. Merger Activity

Amazon's acquisition strategy has primarily focused on purchasing its competitors and companies that operate in adjacent markets, providing access to additional valuable customer data. This strategy has effectively protected and expanded Amazon's market power in e-commerce and helped Amazon extend that power to other markets.

Over the past two decades, Amazon has acquired at least 100 companies.[1599] It has been particularly aggressive over the past few years, making deals that are bigger and more ambitious

---

[1596] Ron Knox & Shaoul Sussman, *How Amazon Used the Pandemic to Amass More Monopoly Power*, THE NATION (June 26, 2020), https://www.thenation.com/article/politics/amazon-bezos-pandemic-monopoly/.

[1597] Phone Interview with Nat'l Grocers Ass'n (May 28, 2020) (raising concerns that Amazon and some Big Box retailers may have used their buyer power over suppliers during the pandemic to secure inventory at the expense of smaller businesses); Letter from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union & Change to Win to Comm'rs of the Fed. Trade Comm'n, 6 (July 23, 2020) (stating that if seller reports are true, "Amazon's hold over sellers effectively took food from the shelves of neighborhood grocery stores . . . and moved it to Amazon's own warehouses, where it earned fees for Amazon."); *see also* Renee Dudley, *The Amazon Lockdown: How an Unforgiving Algorithm Drives Suppliers to Favor the E-Commerce Giant Over Other Retailers*, PROPUBLICA (Apr. 26, 2020), https://www.propublica.org/article/the-amazon-lockdown-how-an-unforgiving-algorithm-drives-suppliers-to-favor-the-e-commerce-giant-over-other-retailers.

[1598] Esther Fung & Sebastian Herrera, *Amazon and Mall Operator Look at Turning Sears, J.C. Penney Stores Into Fulfillment Centers*, WALL ST. J. (Aug. 9, 2017), https://www.wsj.com/articles/amazon-and-giant-mall-operator-look-at-turning-sears-j-c-penney-stores-into-fulfillment-centers-11596992863.

[1599] *See infra* Appendix.

**App. 334**

relative to its historical approach.[1600] In 2017, the company made its largest acquisition to date by purchasing Whole Foods for $13.7 billion.[1601] Amazon's other large purchases include Ring, which it bought for $1.2 billion in 2018; PillPack, which it bought for $1 billion in 2018; and Zappos, which it bought for $1.2 billion in 2009.[1602] Over the years, Amazon has acquired an assortment of highly recognizable companies, including IMDB.com, which it bought in 1998; Audible, which it bought in 2008; Goodreads, which it bought in 2013; and Twitch, which it bought in 2014.[1603]

Amazon's acquisition strategy has led to fewer choices for consumers in terms of differentiated online retail channels, as well as reduced competitive pressure in terms of price and quality. Additionally, Amazon's expansion into a diverse array of business lines—from brick-and-mortar supermarkets to home security—has reinforced its significant stockpile of consumer data. With more data about online and offline consumer behavior, Amazon's acquisitions set in motion a self-reinforcing cycle, creating an ever-widening gap between the platform and its competitors. As one former Amazon employee told Subcommittee staff, "Amazon is first and foremost a data company, they just happen to use it to sell stuff."[1604]

Over its history, Amazon has acquired a number of its rivals.[1605] A decade ago, Amazon acquired two of its direct competitors: Zappos and Quidsi.[1606] Documents reviewed by Subcommittee staff show that Amazon viewed both online retailers as competitive threats prior to acquiring them.

Amazon's 2009 acquisition of Zappos, an online shoe-retailer, marked the company's first $1 billion-plus purchase.[1607] Acquiring Zappos provided Amazon with two important advantages. First, it

---

[1600] *Infographic: Amazon's Biggest Acquisitions,* CB INSIGHTS (June 19, 2019), https://www.cbinsights.com/research/amazon-biggest-acquisitions-infographic/.

[1601] *Id.*

[1602] *Id.*

[1603] *Amazon Acquisitions*, MICROACQUIRE, https://acquiredby.co/amazon-acquisitions/ (last visited Oct. 3, 2020).

[1604] Interview with Source 91 (May 8, 2020); *see also* Submission from Artist Rights Alliance, to H. Comm. on the Judiciary, 2 (July 31, 2019) (on file with Comm.) ("With respect to the music world, at the heart of this problem lies a simple, economic truth – companies like . . . Amazon are not music businesses. They are advertising platforms and data machines. As our then-President, Melvin Gibbs, told the *New York Times* back in 2017, 'None of these companies that are supposedly in the music business are actually in the music business. They are in the data-aggregation business. They're in the ad-selling business. The value of music means nothing to them.'").

[1605] *See* Stigler Report at 75 n.152 ("The number of potential competitors purchased by the tech giants is large. For example, Amazon has purchased Zappos, Fabric, CDNow, Quorus, Audible, Goodreads, and Quidsi"); TIM WU, THE CURSE OF BIGNESS: ANTITRUST IN THE NEW GILDED AGE 124 (Columbia Global Reports ed., 2018) ("Amazon acquired would-be competitors like Zappos, Diapers.com, and Soap.com.").

[1606] *Amazon Closes Zappos Deal, Ends Up Paying $1.2 Billion*, TECHCRUNCH (Nov. 2, 2009), https://techcrunch.com/2009/11/02/amazon-closes-zappos-deal-ends-up-paying-1-2-billion/; *Confirmed: Amazon Spends $545 Million on Diapers.com Parent Quidsi*, TECHCRUNCH (Nov. 8, 2010, 9:04 AM), https://techcrunch.com/2010/11/08/confirmed-amazon-spends-545-million-on-diapers-com-parent-quidsi/.

[1607] Eric Engleman, *Amazon and Zappos, Six Months Later: How They're Fitting Together*, PUGET SOUND BUS. J. (May 21, 2010), https://www.bizjournals.com/seattle/blog/techflash/2010/05/amazon_and_zappos_how_theyre_fitting_together.html.

**App. 335**

enabled Amazon to add significant selection to its category of shoes and other fashion-related items at a time when expanding its selection was critical to the company's success.[1608] The added selection included access to "hold-out" brands, which had previously refused to sell on Amazon.com or Amazon's other online retail store Endless.com.[1609] Second, Zappos' unique approach to customer service, marked by "a deeply felt connection with customers," added an emotional and psychological element to Amazon's relationship with consumers.[1610] An Amazon internal planning document from 2008 referred to Zappos as one of Endless's "primary competitors," and notes that "Zappos offers the largest selection of brands and styles and carries all of our top holdouts including Nike, Merrell, Keen, Cole Haan and Michael Kors."[1611]

About a year later, Amazon acquired Quidsi, the parent company of Diapers.com and Soap.com, for about $540 million.[1612] Prior to buying it, Amazon identified Diapers.com as its "largest and fastest growing competitor in the on-line diaper and baby care space,"[1613] and its "#1 short term competitor."[1614] Amazon's internal documents said that Diapers.com "keep[s] the pressure on pricing on us" and provided extremely high customer service levels, which—prior to the merger—had forced Amazon to up its game.[1615] Amazon executives took swift and predatory action in response to this competitive threat. As Representative Mary Gay Scanlon (D-PA) summarized at the Subcommittee's sixth hearing, Amazon's internal documents "show that Amazon employees began strategizing about ways to weaken this company, and, in 2010, Amazon hatched a plot to go after Diapers.com and take it out."[1616] Specifically, Amazon's documents show that the firm entered into an aggressive price war, in which Amazon was willing to bleed over $200 million in losses on diapers in one month.[1617] Addressing Mr. Bezos, Representative Scanlon added, "Your own documents make clear that the price

---

[1608] Bill Taylor, *Amazon and Zappos: A Savvy Deal*, Harv. Bus. Rev. (July 23, 2009), https://hbr.org/2009/07/a-savvy-deal-from-amazon-to-za.

[1609] Alistair Barr, *Amazon to Close Fashion Website endless.com*, Reuters: Indus., Materials and Utils. (Sept. 18, 2012), https://www.reuters.com/article/amazon-endless/amazon-to-close-fashion-website-endless-com-idUSL1E8KINKD20120918 (quoting an Amazon spokesman who stated that Amazon shut down Endless.com as an independent site in 2012 and incorporated it into Amazon's main website, Amazon.com, "in order to focus on the Amazon Fashion experience").

[1610] Bill Taylor, *Amazon and Zappos: A Savvy Deal*, Harv. Bus. Rev. (July 23, 2009), https://hbr.org/2009/07/a-savvy-deal-from-amazon-to-za.

[1611] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00170649 (Sept. 23, 2008) (on file with Comm.).

[1612] Claire Cain Miller, *Amazon Has a Reported Deal to Buy Parent of Diapers.com*, N.Y. Times (Nov. 7, 2010), https://www.nytimes.com/2010/11/08/technology/08amazon.html.

[1613] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00142833 (May 12, 2009) (on file with Comm.).

[1614] *Id.* at AMAZON-HJC-00151722 (Feb. 9, 2009).

[1615] *Id.* at AMAZON-HJC-00151722–24 (Feb. 9, 2009).

[1616] CEO Hearing Transcript at 81–82 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1617] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00057007 (Apr. 5. 2010) (on file with Comm.).

**App. 336**

war against Diapers.com worked, and within a few months it was struggling, and so then Amazon bought it."[1618]

In 2017, Amazon shut down Diapers.com, citing profitability issues, though some industry experts questioned the legitimacy of this rationale.[1619] In shutting down the company, Amazon eliminated a differentiated online retailer that consumers loved[1620]—reducing the number of online options for consumers in the diaper and baby care markets. Further, it eliminated a potential competitor in other verticals such as household goods, toys, and pets.[1621]

More recently, Amazon acquired Whole Foods, a strategic move to acquire both a competitor,[1622] and a new source of customer data.[1623] Amazon purchased Whole Foods at around $13.7 billion, more than 10 times the cost of its second-most expensive acquisition.[1624] In addition to bolstering its position in the grocery market, Amazon's purchase of Whole Foods expanded its touchpoints with Prime members and gave it access to a unique set of customer information.[1625] Specifically, the deal enabled Amazon to monitor and compile data on how the same person shops

---

[1618] CEO Hearing Transcript at 82–83 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1619] *See, e.g.*, Jason Del Rey, *Why Amazon's Explanation for Shutting Down Diapers.com and Quidsi Stunned Employees*, VOX: RECODE (Apr. 2, 2017), https://www.vox.com/2017/4/2/15153844/amazon-quidsi-shutdown-explanation-profits.

[1620] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00034097 (Nov. 8, 2010) (on file with Comm.) (email from Diapers.com founder Vinit Bharara forwarding a customer testimonial in the form of a poem titled "An Ode to Diapers.com," beginning, "Oh how do I love thee, my Diapers.com?" and ending with "Don't ever leave me, my Diapers.com").

[1621] *Id.* at AMAZON-HJC-00154656 (noting that "[a]lthough Quidsi is still primarily an online baby care specialty retailer, it has recently begun selling new items such as household goods and personal-care products with the launch of Soap.com . . . . In the future, management intends to launch additional vertical shopping categories such as beauty, toys and pets."); AMAZON-HJC-00132026 (June 8, 2010) (email from Doug Herrington, Vice President of Consumables, to Jeff Bezos stating, "While we find no evidence that alice.com has gotten traction with vendors or customers, and can't see an economic model for them that pencils out, soap.com feels like a more credible threat").

[1622] *Id.* at AMAZON-HJC-00172932 (June 22, 2017) (showing analysis that for Amazon Fresh customers who don't do 100% shopping on Amazon Fresh, Whole Foods is consistently among the top 5 stand-alone national chains where Amazon Fresh customers do their grocery shopping).

[1623] Lauren Hirsch, *A year after Amazon announced its acquisition of Whole Foods, here's where we stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[1624] *Infographic: Amazon's Biggest Acquisition*, CB INSIGHTS (June 19, 2019), https://www.cbinsights.com/research/amazon-biggest-acquisitions-infographic/.

[1625] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172090 (June 22, 2017) (on file with Comm.) ("[A] survey said about 45% of WFM customers are Prime; and about 20% of Prime members shop at [Whole Foods Market]."); Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00173652 (June 23, 2017) (on file with Comm.) ("Based on our survey results, we estimate that approximately 46% of Prime members have shopped at a [Whole Foods] store in the last four weeks.").

**App. 337**

both online and in person, data that is particularly useful for targeted advertising and promotional campaigns.[1626]

While the deal was under review by the FTC, then-Ranking Member Cicilline raised concerns that "the proposed acquisition w[ould] result in additional consolidation in the retail sector, erode American jobs through increased automation, and threaten local communities through diminished economic opportunity for hardworking Americans."[1627] Amazon's acquisition of Whole Foods has added to the platform's market power in retail by increasing its buyer power over suppliers,[1628] adding to the platform's capabilities in online grocery, and expanding the company's brick-and-mortar retail footprint. In addition, it appears that concerns about diminished economic opportunities may have been well-founded as Amazon reportedly plans to implement cashier-less technology across all of its Whole Foods stores.[1629]

In recent years, Amazon has also made several significant acquisitions of home security companies, further expanding its reach and visibility into Americans' homes. An Amazon executive described the company's in-home strategy by noting, "Two senses matter – eyes and ears."[1630] In 2017, Amazon paid $90 million to acquire Blink, a home security camera company whose technology and energy-efficient chips could be used by Amazon in its Echo speakers and other products.[1631] In 2018, Amazon spent $1.2 billion to acquire Ring, a home-security system spanning cameras, doorbells, and floodlights.[1632] Ring's "eyes and ears" add significant value to Amazon's smart home, allowing customers to virtually interact with Amazon delivery personnel and instruct them on where to drop off Amazon packages.[1633] Amazon's significant investments in the Internet of Things ecosystem and its strategy, centered on Amazon's voice assistant, Alexa, are discussed in other parts of this Report.

---

[1626] Lauren Hirsch, *A Year After Amazon Announced Its Acquisition of Whole Foods, Here's Where We Stand*, CNBC (June 15, 2018), https://www.cnbc.com/2018/06/15/a-year-after-amazon-announced-whole-foods-deal-heres-where-we-stand.html.

[1627] Letter from Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary to Hon. Bob Goodlatte, Chairman, H. Comm. on the Judiciary, Hon. Tom Marino, Chairman, Subcomm. on Regulatory Reform, Commercial and Antitrust Law, 3 (July 13, 2017), https://cicilline.house.gov/sites/cicilline.house.gov/files/images/Amazon_Whole_Foods_Acquistion.pdf.

[1628] *See, e.g.*, Interview with Source 153 (May 11, 2020); Interview with Nat'l Grocers Ass'n (May 28, 2020).

[1629] Taylor Lyles, *Amazon Go's Cashierless Tech May Come to Whole Foods As Soon As Next Year*, THE VERGE (Aug. 24, 2020), https://www.theverge.com/2020/8/24/21399607/amazon-cashierless-go-technology-whole-foods-2021-rumor.

[1630] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00170877 (Oct. 11, 2017) (on file with Comm.).

[1631] Jeffrey Dastin, *Amazon Quietly Dropped $90 Million on a Camera Startup Last Year to Acquire its Unique Chip Technology*, BUS. INSIDER (Feb. 12, 2018), https://www.businessinsider.com/amazon-blink-camera-maker-acquisition-2018-2.

[1632] Dennis Green, *Amazon's $1 Billion Acquisition of the Door Camera Startup Ring is the Company Doing What It Does Best – and it Should Terrify Every Other Retailer*, BUS. INSIDER (Mar. 3, 2018), https://www.businessinsider.com/why-amazon-acquired-ring-2018-3.

[1633] *Id.*

**App. 338**

Other notable acquisitions include Kiva Systems in 2012, which provided Amazon with a robotics company that accelerated its ability to streamline picking, packing, and shipping e-commerce products;[1634] and PillPack in 2018, which equips Amazon with an online pharmacy and marks its entry into the pharmaceutical market.[1635]

Amazon's acquisition of Kiva gave it power over an important input for competitors. When Amazon bought the robotics company, Kiva was supplying technology to a large number of retailers, including Gap, Staples, and Walgreens.[1636] Many of these customers had invested a sunk cost of $4 million to $6 million per warehouse in order to make use of Kiva's technologies.[1637] Kiva had promised to keep shipping its technology to non-Amazon customers—regardless of whether they competed with Amazon—but in 2015, Amazon rebranded the company as Amazon Robotics and announced it would stop servicing other firms.[1638] Amazon stated that retailers seeking to use Kiva's robots would need to use Amazon Services to fulfill orders with Amazon's technology in Amazon's warehouses.[1639]

Documents Subcommittee staff reviewed relating to the PillPack deal, meanwhile, give insight into how Amazon views some acquisitions as opportunities to collect additional customer data and to cross-sell across its different business lines. One Amazon executive summarized a potential upside of the PillPack deal, asking, "Is there a cross-selling opportunity with amazon.com based on known maladies from prescriptions? Or is this prohibited by privacy law? My understanding is there is a number of different ways we could cross-sell customers in both directions (Rx<>non-Rx)."[1640] Though it is unclear whether and the extent to which Amazon implemented this strategy, the exchange reveals how Amazon assesses potential acquisitions and the cross-business opportunities they create, suggesting that the firm views its vast operations in a highly integrated manner.

---

[1634] Leena Rao, *Amazon Acquires Robot-Coordinated Order Fulfillment Company Kiva Systems For $775 Million In Cash*, TECHCRUNCH (Mar. 19, 2012), https://techcrunch.com/2012/03/19/amazon-acquires-online-fulfillment-company-kiva-systems-for-775-million-in-cash/.

[1635] Christina Farr, *The Inside Story of Why Amazon Bought PillPack in its Effort to Crack the $500 Billion Prescription Market*, CNBC (May 13, 2019), https://www.cnbc.com/2019/05/10/why-amazon-bought-pillpack-for-753-million-and-what-happens-next.html.

[1636] Evelyn M. Rusli, Amazon.com to Acquire Manufacturer of Robotics, N.Y. TIMES: DEALBOOK (Mar. 19, 2012), https://dealbook.nytimes.com/2012/03/19/amazon-com-buys-kiva-systems-for-775-million/.

[1637] Mick Mountz, *Kiva the Disrupter*, HARV. BUS. REV. (Dec. 2012), https://hbr.org/2012/12/kiva-the-disrupter.

[1638] Adam Putz, M&A flashback: Amazon announces $775M Kiva Systems acquisition, PITCHBOOK (Mar. 19, 2018), https://pitchbook.com/news/articles/ma-flashback-amazon-announces-775m-kiva-systems-acquisition.

[1639] *Id.*

[1640] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172665 (May 23, 2018) (on file with Comm.).

**App. 339**

The FTC investigated several of these transactions, including Amazon's acquisition of Quidsi, the parent company of Diapers.com,[1641] and Whole Foods.[1642] The agency declined, however, to challenge any of them as a violation of antitrust law despite: (1) strong evidence, in some cases, of direct head-to-head competition on price and quality between the merging firms; and (2) evidence that many of these mergers would enable Amazon to expand or entrench its market power, particularly in e-commerce. For most, if not all, of the acquisitions discussed in this Report, the FTC had advance notice of the deals but did not attempt to block any of them.

In addition to eliminating competitive threats, Amazon's acquisition strategy has expanded and protected the company's dominance. The company's significant expansion into new markets, paired with Amazon's wealth of data from its retail business, has fueled the platform's increasing market power. Amazon Associate General Counsel Nate Sutton testified at the Subcommittee's hearing last July that "Amazon is proud to be a company of builders and we have built our company from within, not through acquisitions."[1643] But the evidence examined during the investigation demonstrates that Amazon's acquisitions—including acquisitions of its direct competitors—have been key to Amazon's attainment, maintenance, and expansion of market power.

c.  Conduct

    i.  Treatment of Third-Party Sellers

        1)  Bullying

While Amazon has referred to third-party sellers on its Marketplace as "partners," and "customers,"[1644] numerous small and medium-sized businesses told the Subcommittee that Amazon routinely bullies and mistreats them. The Online Merchants Guild, a trade association representing the interests of sellers engaged in online commerce, stated that they "have seen Amazon use their position of strength to take advantage of sellers."[1645]

Underlying Amazon's public-facing rhetoric is the reality that it views many of the sellers on its platform as competitors. In its internal documents, Amazon refers to third-party sellers as "internal

---

[1641] Letter from April Tabor, Acting Sec. of the Fed. Trade Comm'n, to Thomas Barnett (Aug. 22, 2012).

[1642] Press Release, Fed. Trade Comm'n, Statement of Federal Trade Commission's Acting Director of the Bureau of Competition on the Agency's Review of Amazon.com, Inc.'s Acquisition of Whole Foods Market Inc. (Aug. 23, 2017), https://www.ftc.gov/news-events/press-releases/2017/08/statement-federal-trade-commissions-acting-director-bureau.

[1643] Innovation and Entrepreneurship Hearing Transcript at 39 (statement of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1644] See, e.g., CEO Hearing at 44 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.) ("Amazon makes significant investments to support Amazon's selling partners."); 41 ("Amazon recognizes that third-party sellers are our customers too, and their trust is critical to Amazon's success.").

[1645] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

**App. 340**

competitors."[1646] At the Subcommittee's sixth hearing, Subcommittee Chairman Cicilline asked Mr. Jeff Bezos about Amazon's apparent doublespeak.[1647] In response, Mr. Bezos conceded, "[I]t wouldn't surprise me. In some ways, we are competing."[1648]

Over the course of the investigation, the Subcommittee heard from numerous sellers who described abusive tactics or mistreatment by Amazon in a variety of circumstances. For example, at the Subcommittee's fifth hearing, CEO and Founder of PopSockets David Barnett testified about Amazon's bullying tactics, which he said were enabled by "the asymmetry in power between Amazon and its partners."[1649] He stated that after the two companies decided on a minimum price at which Amazon would sell PopSockets, Amazon sold the products for a lower price and then demanded that PopSockets pay for the lost margin.[1650] As a result, PopSockets decided to end its relationship with Amazon Retail.[1651] When PopSockets communicated this intent to Amazon, its response was, "No, you are not leaving the relationship."[1652] PopSockets did sever its relationship with Amazon Retail for a period of time, but reestablished it about a year later.[1653] Mr. Barnett estimates that in 2019 his company incurred losses of $10 million in revenue from when he stopped selling to Amazon Retail and Amazon blocked one of his authorized distributors from selling on the marketplace.[1654]

Subcommittee staff learned about numerous other instances of Amazon employing strong-arm tactics in negotiations. A company that conducts business with multiple divisions of Amazon described how the platform leveraged its dominance in e-commerce to force acceptance of certain terms and conditions during negotiations over a different part of its business.[1655] According to this company, Amazon knows the power they have as a retailer. In the midst of negotiations, the platform repeatedly referenced its power to destock the company's products on Amazon.com as a "bargaining chip to force terms" unrelated to retail distribution on the company.[1656] The company added, "Amazon know[s] they

---

[1646] *See, e.g.*, Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206715 (Mar. 8, 2016) (on file with Comm.) (describing change to manual Pricing Rules when Amazon offer is competing with "internal 3P competitor" offers); AMAZON-HJC-00038917 (Sept. 2009) (describing proposal on "how to treat FBA sellers differently from other Buy Box (BB) eligible 3P sellers when we're matching *internal* competitors for non-media categories."); AMAZON-HJC-00142724 (defining Amazon's "Standard Price Matching Policy," and conditions when "Internal competitors (3P merchants) are matched" on price").

[1647] CEO Hearing Transcript at 93 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1648] *Id.* (statement of Jeff Bezos, CEO, Amazon, Inc.)

[1649] Competitors Hearing at 5 (statement of David Barnett, CEO & Founder, Popsockets LLC),

[1650] *Id.* at 22 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1651] *Id.*

[1652] *Id.* at 23.

[1653] *Id.* at 3–4 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1654] *Id.* at 4 (statement of David Barnett, CEO & Founder, Popsockets LLC).

[1655] Interview with Source 148 (Aug. 26, 2020).

[1656] *Id.*

**App. 341**

have a lot of power [in retail e-commerce] and they are not afraid to use it to get terms they want in other markets."[1657]

Book publishers described a similar asymmetric power dynamic with Amazon. According to one publisher, "Amazon has used retaliation . . . to coerce publishers to accept contractual terms that impose substantial penalties for promoting competition" with Amazon's rivals.[1658] The publisher added that the platform's retaliatory conduct shows "Amazon's ability and willingness to leverage its market power to prevent publishers from working effectively with rival e-book retailers and, thereby, maintain and enhance its dominance in e-book distribution."[1659] Amazon's retaliatory tactics against publishers include removing the "buy" button, which blocks a customer's ability to purchase a publisher's current titles;[1660] and removing the "pre-order" button, which eliminates the ability for a consumer to pre-order a publishers' forthcoming titles.[1661] Another form of retaliation that Amazon reportedly engaged in was showing publishers' titles as out of stock or with delayed shipping times.[1662] According to credible reports, Amazon used these tactics in its public battle with Hachette Book Group in 2014 over e-book pricing,[1663] and has used them or threatened to use them in more recent negotiations.[1664] Publishers, authors, and booksellers have "significant fear" because of Amazon's dominance.[1665]

Amazon can treat sellers in this manner because it knows that sellers have no other realistic alternatives to the platform. As Mr. Barnett noted in his testimony:

> When there is bullying by an extremely successful company with all these partners that continue to do business with it, one has to ask how is it that such a successful business maintains partnerships with so many companies while bullying them. It is because of the power asymmetry . . . that companies tolerate this.[1666]

---

[1657] *Id.*

[1658] Submission from Source 17, to H. Comm. on the Judiciary, 13 (Nov. 14, 2019) (on file with Comm.).

[1659] *Id.* at 3 (Sept. 22, 2020) (on file with Comm.).

[1660] *See, e.g.*, David Streitfeld, *Amazon Pulls Thousands of E-Books in Dispute*, N.Y TIMES: Bits (Feb. 22, 2012), https://bits.blogs.nytimes.com/2012/02/22/amazon-pulls-thousands-of-e-books-in-dispute/?hpw.

[1661] *See, e.g.*, Polly Mosendz, *Amazon Blocks Pre-orders Of Hachette Books*, THE ATLANTIC (May 23, 2014), https://www.theatlantic.com/business/archive/2014/05/amazon-blacklists-hachette-books/371545/.

[1662] *See, e.g.*, David Streitfeld, *Writers Feel an Amazon-Hachette Spat*, N.Y. TIMES (May 9, 2014), https://www.nytimes.com/2014/05/10/technology/writers-feel-an-amazon-hachette-spat.html.

[1663] *Id.*

[1664] *See* Interview with Source 155 (Sept. 29, 2020); Submission from Source 17, to H. Comm. on the Judiciary, 13–18 (Nov. 14, 2019) (on file with Comm.).

[1665] Interview with Ass'n of Am. Publishers, Authors Guild & Am. Booksellers Ass'n (Aug. 26, 2020).

[1666] Competitors Hearing at 23 (statement of David Barnett, CEO & Founder, Popsockets LLC).

**App. 342**

A recent complaint filed against Amazon described the situation as follows, "From the third-party retailers' perspective, Amazon Marketplace is like Hotel California, a lovely place to start or expand an online retail business, but check out from Amazon Marketplace and you can quickly find your business in bankruptcy."[1667] Additional comments from sellers that Subcommittee staff interviewed include, "We're stuck. We don't have a choice but to sell through Amazon,"[1668] and, referring to Amazon, "They've never been a great partner, but you have to work with them."[1669]

As Stacy Mitchell, Co-Director of the Institute for Local Self-Reliance, noted during the Subcommittee's hearing on Innovation and Entrepreneurship, "Among the most egregious examples of Amazon's arbitrary treatment of sellers are its abrupt suspensions of their accounts, frequently made without explanation."[1670] Once Amazon suspends a seller's account or delists its products, the business is left with largely ineffective remedies as they watch their sales disappear. Sellers shared with Subcommittee staff that communications to Amazon's Seller Support Central generally prompt automated, unhelpful responses, which may be entirely unrelated to the specific case, question, or concern raised by the seller.[1671]

The founder of an infant product sold on Amazon told Subcommittee staff that after her products were mistakenly delisted, "[i]t would take weeks of repeated calls—at least 10 or 15 contacts with Seller Support—before somebody inside would determine that it was a mistake and error," and take action to fix the problem.[1672] She stated that this happened at least six times, and that in each instance her listings would be down for two to three weeks at a time.[1673] Describing how Amazon's mistakes can threaten a new business's survival, this small-business owner said:

> When you're a new company and Amazon suddenly delists you, it creates fear in the customer. "Where did it go? Is there something wrong with the product? What happened?" If a customer searched and it's no longer there, they're unlikely to ever come back and buy it . . . You've probably lost that customer for good.[1674]

---

[1667] Class Action Complaint at 20, Frame-Wilson v. Amazon.com, Inc., No. 20-cv-00424 (W.D. Wash., Mar. 9, 2020).

[1668] Interview with Source 150 (July 11, 2020).

[1669] Interview with Source 151 (July 2, 2020).

[1670] Innovation and Entrepreneurship Hearing at 9 (statement of Stacy F. Mitchell, Co-Dir., Inst. for Local Self-Reliance).

[1671] Interview with Source 125 (Jan. 9, 2020); see also Submission from Joel Hellmann, to H. Comm. on the Judiciary (July 31, 2019) (on file with Comm.) (responding to automated messaged, "If you were a person and not a robot you would have read that I already tried this and it failed.").

[1672] Interview with Source 149 (July 22, 2020).

[1673] Id.

[1674] Id.

**App. 343**

In another example, a third-party bookseller told Subcommittee staff that Amazon delisted 99% of his business's inventory in September 2019.[1675] The bookseller requested that Amazon return its products, which were stored in Amazon's warehouses.[1676] As of July 2020, Amazon had only returned a small fraction of the bookseller's inventory and continued to charge him storage fees.[1677] Amazon blocked the bookseller both from selling its products on its marketplace and retrieving its inventory, precluding the seller from trying to recover some of his losses by making sales through another, albeit lesser, channel. At the Subcommittee's sixth hearing, Representative Lucy McBath (D-GA) presented the bookseller's story to Mr. Bezos, who responded that this treatment is "not the systematic approach that [Amazon] take[s]."[1678] However, evidence Subcommittee staff collected through extensive seller interviews shows that Amazon's poor treatment of sellers is far from an isolated incident—a fact supported both by public posts on Amazon's Seller Central forum,[1679] as well as pleas for help routinely sent directly to Mr. Bezos.[1680]

Because of the severe financial repercussions associated with suspension or delisting, many Amazon third-party sellers live in fear of the company.[1681] For sellers, Amazon functions as a "quasi-state," and many "[s]ellers are more worried about a case being opened on Amazon than in actual court."[1682] This is because Amazon's internal dispute resolution system is characterized by uncertainty, unresponsiveness, and opaque decision-making processes.

---

[1675] Interview with Source 125 (July 7, 2020).

[1676] *Id.*

[1677] *Id.*

[1678] CEO Hearing Transcript at 89 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1679] *See, e.g.*, iNOVATECH_MEDICAL, *Inventory being held hostage by Amazon for 3 months*, AMAZON SERVICES SELLER FORUMS (Apr. 8, 2020, 10:30 PM), https://sellercentral.amazon.com/forums/t/inventory-being-held-hostage-by-amazon-for-3-months/607892.

[1680] *See* Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."); Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[1681] *See, e.g.*, Submission from Source 125, to H. Comm. on the Judiciary (July 17, 2020) (on file with Comm.) ("My pregnant wife had to visit the ER due to increased anxiety and fear for the future . . . . Due to Amazon's stature, influence, and bullying nature, we are afraid of retaliation."); Interview with Source 154 (July 2, 2019) ("[Amazon] know[s] that small sellers have no power and no ability to avoid them," because "they are the powerhouse giant in the transaction and they could crush us."). *See also* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary, 3 (July 22, 2020) (on file with Comm.) ("Small businesses that depend upon Amazon for access to their markets, including many of our members, fear retribution by Amazon if they speak up.").

[1682] Josh Dzieza, *Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace*, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement.

**App. 344**

Additionally, the sellers interviewed by Subcommittee staff generally indicated that Amazon's customer service and treatment towards them have declined significantly in recent years. One business owner, who has been selling on Amazon for over a decade, told Subcommittee staff that in the past, a seller could get meaningful assistance by talking to an Amazon representative over the phone.[1683] He said, "I used to think that Amazon was a partner," but, now, "I don't think they care about the third party seller . . . . They treat us as a commodity."[1684] Internal Amazon documents suggest that the company's hyper-focus on a cost-cutting strategy to adopt automated processes for nearly everything—which Amazon refers to as "HOTW" or "Hands off the wheel"[1685]—combined with the platform's monopoly power over sellers may be to blame for Amazon's atrocious levels of customer service for sellers.

Amazon has recently monetized the degradation of its seller services, rolling out a program where sellers can pay an extra fee for a dedicated account representative. Sellers are supposed to pay for representatives to help them solve the very problems that Amazon created in the first place. Many sellers say, however, that even with paid Amazon account managers they are often unable to get their issues resolved. One seller told Subcommittee staff, "It [i]s a problem that an algorithm can make a decision that just shuts off my income stream and there's nothing I can do to get it back . . . . The only thing I can do to get it back is pay $6,000 a month for a dedicated rep and even then, it doesn't always work."[1686]

The last resort for sellers facing these circumstances is the "Jeff Bomb," or "Jeff Letter," in which a seller sends an email to Mr. Bezos to plead their case.[1687] As the Online Merchants Guild explained in its submission, "a 'Jeff Letter' is almost like a Writ of Certiorari within Amazon's internal kangaroo court system."[1688] But by the time this point is reached, "a seller could be locked out of their account, or denied funds, for weeks, losing hundreds of thousands of dollars even if the mistake was

---

[1683] Interview with Source 152 (Sept. 18, 2020).

[1684] Id.

[1685] See, e.g., Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00227277 (on file with Comm.) ("The implementation of Hands Off the Wheel in [Site Merchandising] will mean that through automation . . . there is less work for humans. . . . Project Tiger combines all Hands off the Wheel (HOTW) programs and Amazon spans of control guidelines."); AMAZON-HJC-00227278 (Apr. 27, 2017) ("We are pursuing three tracks to drive Productivity savings: 1) FCF initiatives; 2) HOTW; and 3) Defect Reduction & Catalog Improvement.").

[1686] Interview with Source 149 (July 22, 2020). See also Submission from Source 100, to H. Comm. on the Judiciary (identifying one concern with Amazon's treatment of sellers as, "Pay or Die - Forcing sellers to pay for their support services to correct Amazon's wrong doings").

[1687] Josh Dzieza, Prime and Punishment: Dirty Dealing in the $175 Billion Amazon Marketplace, THE VERGE (Dec. 19, 2018), https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement ("Emailing the richest man in the world is actually the standard method of escalating an Amazon seller appeal. It's called a Jeff Bomb, or . . . a Jeff Letter."). See also Interview with Chris McCabe, Founder, ecommerceChris LLC (Dec. 30, 2019) ("Out of desperation, some sellers try to email Jeff Bezos directly."); Submission from Source 125, to H. Comm. on the Judiciary (Jan. 27, 2020) (on file with Comm.); Submission from Source 150, to H. Comm. on the Judiciary (Aug. 16, 2017) (on file with Comm.).

[1688] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

**App. 345**

Amazon's."[1689] Because of the large volume of sellers who reach this point of last resort, sending a "Jeff Letter" is not a realistic avenue for most sellers to get their issues addressed.

### 2) Forced Arbitration

All of Amazon's third-party sellers and most of its vendors are subject to a pre-dispute, binding ("forced") arbitration clause,[1690] requiring them to sign away the right to their day in court if a dispute with Amazon arises. Subcommittee staff heard from sellers who said that if it were not for Amazon's market power over them, they would not agree to this term.[1691] As noted by the Online Merchants Guild, "Through arbitration, Amazon knows it holds all the cards, and in many ways has the final say whenever there is a dispute."[1692] As a result, sellers rarely initiate arbitration actions against Amazon. Between 2014 and 2019, even as the number of Amazon sellers continued to grow by hundreds of thousands per year, only 163 sellers and 16 vendors initiated arbitration proceedings.[1693] Because sellers are generally aware that the process is unfair and unlikely to result in a meaningful remedy, they have little incentive to bring an action.

As extensive scholarship has shown, forced arbitration often fails to provide a legitimate forum for resolving disputes and instead usually serves to insulate those engaging in wrongdoing from liability.[1694] The case of Amazon sellers is no different. In practice, arbitration functions as a way for Amazon to keep disputes within its control, with the scales tipped heavily in its favor. As such, Amazon can withhold payments from sellers, suspend their accounts without cause, and engage in other abusive behavior without facing any legal consequences for its actions.[1695]

### 3) Seller Fee Increases

Amazon's treatment of sellers indicates that it sees them as a source of profit, rather than "Amazon's treatment of sellers indicates that it sees them as a source of profit, rather than

---

[1689] *Id.*

[1690] Data and Innovation Hearing at 49–50 (response to Questions for the Record, Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.); *Amazon Services Business Solutions Agreement*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/G1791 (last visited Sept. 29, 2020).

[1691] *See, e.g.*, Interview with Source 125 (Jan. 9, 2020) (explaining reason for agreeing to Amazon's terms, "What can I do? They don't give me much choice. You are so small that you don't have any leverage.").

[1692] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

[1693] Data and Innovation Hearing at 49–51 (response to Questions for the Record, Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1694] *See* Cynthia Estlund, *The Black Hole of Mandatory* Arbitration, 96 N.C. L. REV. 679, 684 (2018) (stating that mandatory arbitration "effectively enables employers to nullify employee rights and to insulate themselves from the liabilities that back up crucial public policies"); see *also* Judith Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 YALE L.J. 2804, 2873 (2015) ("Mandated arbitration is also common in web-based sales.").

[1695] *See* Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 3 (Oct. 29, 2019) (on file with Comm.).

**App. 346**

"partners."[1696] Individuals and small businesses who depend on access to the platform to make sales report that Amazon has raised seller fees significantly over the past decade. Over the past five years, a recent Institute for Local Self-Reliance report estimates that Amazon added an extra 11% to its cut of third-party sales.[1697] The platform now takes an average of 30% of each sale compared to 19% in 2015.[1698] In 2018, third-party sellers paid Amazon $39.7 billion in fees, which totaled about 25% of Amazon's $160 billion in Gross Merchandise Volume.[1699] This amount includes commissions, fulfillment and shipping fees, and other third-party seller services, but does not include revenue from the advertising fees for third-party sellers,[1700] which are often substantial.[1701] An internal Amazon document suggests the company can increase fees to third-party sellers without concern for them switching to another marketplace. The document notes that the amount of "seller attrition as a result of [2018] fee increases" for its Fulfillment by Amazon program was "[n]othing significant."[1702]

Amazon's pattern of exploiting sellers, enabled by its market dominance, raises serious competition concerns. For many sellers, there is no viable alternative to Amazon, and a significant number of sellers rely on its marketplace for their entire livelihood.[1703]

### 4)   Appropriation of Third-Party Seller Data

One of the widely reported ways in which Amazon treats third-party sellers unfairly centers on Amazon's asymmetric access to and use of third-party seller data.[1704] During the investigation, the Subcommittee heard repeated concerns that Amazon leverages its access to third-party sellers' data to

---

[1696] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206936 (Nov. 8, 2013) (on file with Comm.) ("Seems like we should be making more on the seller loans. . . . Net takeaway is that sellers may be getting too good of a deal… There are different ways to fix… commitment fees, higher rates, etc.. We should get rewarded for satisfying a timing spike like this.").

[1697] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 3 (2020), https://ilsr.org/amazons_tollbooth/.

[1698] *Id. See also* Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) (estimating that most sellers are currently paying an average of 35% in fees to Amazon when you add up the referral fees and payments for ads based on his experience).

[1699] MARKETPLACE PULSE, MARKETPLACES YEAR IN REVIEW 4 (2019), https://cdn.marketplacepulse.com/misc/marketplaces-year-in-review-2019.pdf.

[1700] *Id.*

[1701] *See, e.g.*, Interview with Top Shelf Brands (Sept. 29. 2020) (estimating Top Shelf paid Amazon over $1 million in fees for advertising in one year); Submission from Top Shelf, to H. Comm. on the Judiciary, Ex. 1 (Oct. 26, 2019) (on file with Comm.).

[1702] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00186540 (Jan. 30, 2018) (on file with Comm.).

[1703] *See, e.g.*, JUNGLESCOUT, THE STATE OF THE AMAZON SELLER 2020 4 (2020), https://www.junglescout.com/wp-content/uploads/2020/02/State-of-the-Seller-Survey.pdf ("More than a third (37%) of sellers [surveyed] earn income from Amazon sales alone.").

[1704] Innovation and Entrepreneurship Hearing at 5 (statement of Stacy Mitchell, Co-Dir., Inst. for Local Self-Reliance) ("Amazon's [gatekeeper power] allows it to maintain a God-like view of the transactions of rival businesses and customers, and use this data to move into new markets with a built-in advantage.").

**App. 347**

identify and replicate popular and profitable products from among the hundreds of millions of listings on its marketplace.[1705] Armed with this information, it appears that Amazon would: (1) copy the product to create a competing private-label product[1706]; or (2) identify and source the product directly from the manufacturer to free ride off the seller's efforts, and then cut that seller out of the equation.[1707]

Amazon claims that it has no incentive to abuse sellers' trust because third-party sales make up nearly 60% of its sales, and that Amazon's first-party sales are relatively small.[1708] Amazon has similarly pointed out that third-party listings far outnumber Amazon's first-party listings.[1709] In a recent shareholder letter, CEO Jeff Bezos wrote, "Third-party sellers are kicking our first-party butt. Badly."[1710] In response to a question from the Subcommittee, however, Amazon admitted that by percentage of sales—a more telling measure—Amazon's first-party sales are significant and growing in a number of categories. For example, in books, Amazon owns 74% of sales, whereas third-party sellers only account for 26% of sales.[1711] At the category level, it does not appear that third-party sellers are kicking Amazon's first-party butt. Amazon may, in fact, be positioned to overtake its third-party sellers in several categories as its first-party business continues to grow.

---

[1705] *See, e.g.*, Interview with Source 158 (July 2, 2020); Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[1706] *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[1707] *See, e.g.*, Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.).

[1708] CEO Hearing at 23 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1709] *Id.* at 24.

[1710] Jeff Bezos, *2018 Letter to Shareholders*, THE AMAZON BLOG: DAY ONE (Apr. 11, 2019), https://blog.aboutamazon.com/company-news/2018-letter-to-shareholders.

[1711] CEO Hearing at 25 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

**App. 348**



Amazon recognizes that it competes against many of its third-party sellers.[1713] In response to concerns about its unfair use of third-party seller data, Amazon points to its Seller Data Protection Policy, which it instituted in 2014.[1714] According to the company:

> Amazon recognizes that third-party sellers are our customers too, and their trust is critical to Amazon's success. In an effort to further this partnership, Amazon decided years ago to take additional voluntary steps to protect seller data by instituting its voluntarily-adopted Seller Data Protection Policy, which prohibits Amazon Retail teams from using non-public seller-specific data to compete against third-party sellers.[1715]

Following up on public reporting and information collected during the investigation suggesting that Amazon might be abusing its access to third-party sellers' data, Representative Pramila Jayapal (D-WA) asked Amazon lawyer Nate Sutton about this precise issue at a Subcommittee hearing in July 2019. Sutton testified: "We do not use [third-party sellers'] individual data when we're making decisions to launch private brands."[1716]

---

[1712] *Id.* at 24–25 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1713] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00142724 (on file with Comm.).

[1714] CEO Hearing at 2 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1715] *Id.* at 41 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1716] Innovation and Entrepreneurship Hearing Transcript at 51 (statement of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

**App. 349**

Since the July 2019 hearing, public reporting has made clear that, contrary to its own internal policy and testimony before Congress, Amazon routinely appropriates seller data to benefit its own private-label and retail businesses. After the hearing, according to a July 2019 report, a former employee who worked in product management told *The Capitol Forum*, "I used to pull sellers' data to look at what the best products were when I was there … That was my job."[1717] In September 2019, employees reported to *Yahoo Finance* that access to data is a "free-for-all" and that Amazon Retail and Marketplace teams "share the same access to the data warehouse, which makes it possible for the retail team to use the data from marketplace sellers to develop private labels."[1718]

Earlier this year, in a groundbreaking article, the *Wall Street Journal* reported that executives in Amazon's private-label division "had access to data containing proprietary information that they used to research bestselling items they might want to compete against, including on individual sellers on Amazon's website."[1719] In one case, Amazon employees reportedly used non-public sales data about a third-party seller of car-trunk organizers named Fortem to develop an Amazon private-label version of the very same product.[1720]

In light of the April 2020 report from the *Wall Street Journal*, the Committee requested that Jeff Bezos testify before Congress to address the possibility that Amazon's lawyer had misled Congress.[1721] Despite significant public reporting on the issue and references to it in Amazon's internal documents, Mr. Bezos claimed to be unaware of these practices. According to Mr. Bezos, "Amazon first learned about the alleged violations of Amazon's voluntarily adopted Seller Data Protection Policy recently reported in the *Wall Street Journal* from the *Wall Street Journal*."[1722] When Representative Pramila Jayapal (D-WA) again asked in July 2020 about whether Amazon uses third-party seller data to benefit its private-label products, Bezos could only respond: "I can't answer that

[1717] *Amazon: Former Employee Challenges Executives' Denial About Company's Use of Sellers' Data*, THE CAPITOL FORUM (July 18, 2019).

[1718] Krystal Hu, *Amazon Uses Third-Party Seller Data to Build a Private Label Juggernaut*, YAHOO FIN. (Sept. 27, 2019), https://finance.yahoo.com/news/amazon-uses-thirdparty-sellers-data-to-build-private-labels-145813238.html.

[1719] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

[1720] *Id*.

[1721] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Joe Neguse, Vice-Chair, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Pramila Jayapal, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. Ken Buck, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Matt Gaetz, Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc. (May 1, 2020) (on file with Subcomm.).

[1722] CEO Hearing at 1 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

**App. 350**

question yes or no . . . we have a policy against using seller-specific data to aid our private-label business, but I can't guarantee you that that policy has never been violated."[1723]

Representative Ken Buck (R-CO) similarly raised this issue with Mr. Bezos, stating, "I'm concerned that you've used Amazon's dominant market position to unfairly harm competition. We've heard from a number of companies that Amazon uses proprietary data from third-party companies to launch its own private-label products."[1724] Later in the hearing, Representative Kelly Armstrong (R-ND) described this as an "important issue," and asked whether "Amazon is conducting an internal investigation into the use of third-party data," to which Mr. Bezos answered in the affirmative. Mr. Bezos agreed to inform the Subcommittee of the outcome of that investigation.

In October 2020, approximately six months after Amazon said that it had initiated the investigation,[1725] the company informed the Committee that it had completed it.[1726] According to Amazon's Vice President of Public Policy, Brian Huseman, "Amazon's records of past data queries related to the two products cited in the *Wall Street Journal* report show that a single former employee pulled and analyzed only aggregate data for both products in compliance with the Seller Data Protection Policy."[1727] The results of this limited investigation do not alter the views of Subcommittee staff on Amazon's use of third-party seller data as set forth in this Report.

Subcommittee staff uncovered evidence in interviews with former Amazon employees, as well as current and former sellers, that is consistent with the public reporting about Amazon's misuse of seller data.[1728] In a submission to the Subcommittee, a former employee said:

> In 2010, I started working on the Amazon marketplace team … It was widely known that many (10+) of my peers were running very successful [third-party] accounts, where they were pulling private data on Amazon seller activity, so they could figure out

---

[1723] CEO Hearing Transcript at 66 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1724] *Id.* at 128 (question of Rep. Ken Buck (R-CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1725] Amazon Policy (@amazon_policy), TWITTER (Apr. 24, 2020, 3:36 PM), https://twitter.com/amazon_policy/status/1253769684425625601.

[1726] Letter from Brian Huseman, Vice Pres., Public Pol'y, Amazon.com, Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary (Oct. 4, 2020) (on file with Comm.).

[1727] *Id.*

[1728] *See* Submission from Nat'l Ass'n of Wholesaler-Distributors, to H. Comm. on the Judiciary (July 22, 2020) (on file with Comm.) (describing a member's experience in which Amazon allowed a distributor to sell a product for about a year, "then went out and replicated the product and began selling their own branded product, terminating the distributor . . . Amazon became the winner and the distributor was left empty handed").

**App. 351**

market opportunity, etc. Totally not legitimate, but no one monitored or seemed to care.[1729]

Referring to accessibility of third-party seller data, the same individual told Subcommittee staff, "It's a candy shop, everyone can have access to anything they want," and added, "There's a rule, but there's nobody enforcing or spot-checking. They just say, don't help yourself to the data … it was 'wink wink,' don't access."[1730]

Subcommittee staff interviewed a third-party seller who described how Amazon uses a request for proof of authenticity to collect proprietary information about a seller's business. According to the seller, Amazon will submit a product authenticity claim to sellers, forcing the retailer to submit their original sales receipts as proof that the items are authentic.[1731] Although a seller is supposed to be able to black out price information, sometimes the platform will reject a submission on the basis that is an "altered document."[1732] With insight into the seller's costs and supplier, combined with its knowledge of the seller's retail price among a virtually unfathomable amount of other data, it appears that Amazon Retail can easily replicate the seller's listing to offer a competing product.

A former third-party seller and retired U.S. Marine told Subcommittee staff about several instances over his seventeen years as a seller when Amazon leveraged his work, undercut him on price, and eventually drove him out of business. In each instance, he had to change his business model after Amazon took over the Buy Box for his listings, "killing" his sales.[1733] On at least two different occasions, his company did all the legwork to create a new, top-selling product or product line, as well as creating the product listings, only to have Amazon copy the idea and offer a competing product. Amazon used different tactics each time, but the result was always the same: Amazon profited from his work and made it impossible for him to fairly compete.[1734]

As part of his last attempt to sell on Amazon, his business created its own line of table game products with a unique design and color palette. Once these products became top sellers, Amazon again swooped in to reap the rewards of his work. Amazon copied his designs, down to the color palette, and started selling their competing products at unsustainable prices. Ultimately, he exited his seller business, gave up on trying to bring new products to consumers, and founded a consulting agency for Amazon sellers.[1735]

---

[1729] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) (on file with Comm.).

[1730] Id.

[1731] Interview with Source 154 (July 2, 2019).

[1732] Id.

[1733] Interview with Jason Boyce, Founder & CEO, Avenue7Media (Sept. 15, 2020).

[1734] Id.

[1735] Id.

**App. 352**

In addition to its private-label business, Amazon also uses third-party seller data to benefit its Amazon Retail business, where the company functions more like a retailer. At the Subcommittee's sixth hearing, Chairman David N. Cicilline (D-RI) asked Mr. Bezos about this conduct, recounting the story that a former third-party seller shared with Subcommittee staff:

> During this investigation, we have heard so many heartbreaking stories of small businesses who sunk significant time and resources into building a business and selling on Amazon, only to have Amazon poach their best-selling items and drive them out of business.
>
> So I want to talk to you about one company that really stood out from the rest. I want you to pay close attention to how they described your partnership, Mr. Bezos. We heard from a small apparel company that makes and sells what they call "useful apparel" for people who work on their feet and with their hands, like construction workers and firefighters.
>
> This particular business discovered and started selling a unique item that had never been a top seller for the brand. They were making about $60,000 a year on just this one item. One day, they woke up and found that Amazon had started listing the exact same product, causing their sales to go to zero overnight. Amazon had undercut their price, setting it below what the manufacturer would generally allow it to be sold so that, even if they wanted to, they couldn't match the price.[1736]

Amazon has tried to draw a meaningful distinction between individual and aggregate data, but this is largely beside the point when it comes to the concerns that Subcommittee members have about the platform's conduct and its effect on competition. Amazon says it only uses "aggregate" seller data across multiple sellers, not "individual" data about any specific seller.[1737] Importantly, though, it chooses how those terms are defined and uses various methods to deem seller data as aggregate rather than individual. According to the *Wall Street Journal* report, because Fortem accounted for 99.95% of total sales in the car-trunk organizer product category, not 100%, Amazon considered that data aggregate rather than individual.[1738] And at the Subcommittee's hearing in July 2020, Bezos confirmed that Amazon indeed allows the use of aggregate data to inform private-label brands when there are

---

[1736] CEO Hearing Transcript at 117 (question of Rep. David N. Cicilline (D-RI), Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1737] Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary (July 26, 2019) (on file with Comm.).

[1738] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

**App. 353**

only two or three sellers of a product.[1739] Separately, if there is only one seller of an item, and Amazon is selling returned or damaged versions of that item through its Amazon Warehouse Deals program, that data is considered aggregate.[1740]

An Amazon "Frequently Asked Questions" (FAQ) document from 2014 suggests that Amazon was aware that the Seller Data Protection Policy had significant loopholes. For example, the document indicates that even seller-specific data can be used for "strategic business decision at the category level or above."[1741] The answer to an FAQ also makes clear that the line between "aggregated" data and "Seller-specific" data is fuzzy: "As a general rule, if information isn't directly tied or easily attributed to a specific Seller, it can be considered aggregated and non-Seller-specific." As to how aggregated information attributed to a small group of Sellers should be treated, the guidance is also ambiguous: "This is a high judgment area. If Seller-specific information could be easily derived from aggregated information, it should be treated as Seller-specific."[1742]

In addition to collecting data relating to sales, Amazon may also be able to reverse engineer third-party sellers' cost structures through the tools that it offers sellers to track profits, costs, ad spend, and other expenses, as well as fulfillment services through Fulfillment by Amazon (FBA). An internal document suggests that Amazon may use its FBA service as an avenue to identify popular third-party seller items and gather competitively sensitive information about them.[1743] FBA provides another avenue for Amazon to access competing sellers' third-party data.

The documents and information that Subcommittee staff reviewed suggest that instances of Amazon's data misappropriation go beyond what is in the public domain. Furthermore, Subcommittee staff rejects Amazon's contention that Amazon's use of third-party seller data is no different from a traditional brick-and-mortar retailer's use of data. Subcommittee staff also does not believe that the marketplace-derived data the platform uses to inform Amazon Retail's product pipeline, among other decisions, is equally available to all Amazon Marketplace sellers.

On many fronts, Amazon makes inconsistent arguments depending on the forum and issue in support of its attempts to escape liability. In the context of lawsuits regarding liability for counterfeits

---

[1739] CEO Hearing Transcript at 155 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1740] Dana Mattioli, *Amazon Scooped Up Data From Its Own Sellers to Launch Competing Products*, WALL ST. J. (Apr. 23, 2020), https://www.wsj.com/articles/amazon-scooped-up-data-from-its-own-sellers-to-launch-competing-products-11587650015.

[1741] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00221869 (June 30, 2014) (on file with Comm.).

[1742] *Id.*

[1743] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00207035–36 (Sept. 19, 2013) (on file with Comm.) ("On the top selling Owl necklace . . . we should go deep and see what we can learn including how much it would costs [sic] to manufacture this?").

**App. 354**

and unsafe products sold on its site, Amazon insists it is a marketplace and not a retailer.[1744] By contrast, in his testimony before the Subcommittee, Mr. Bezos referred to Amazon as a "store" and a "retailer."[1745] Similarly, when Nate Sutton testified before the Subcommittee, he stated, "Amazon is one of the leading retailers."[1746] In response to price gouging allegations, Amazon switches back to the position that it is just a marketplace. As Public Citizen observed in a recent report titled *Prime Gouging*:

> Amazon is trying to have the best of both worlds by enabling third-party sellers to exploit the crisis (and benefiting from facilitating those sales), but also seeking to immunize itself from responsibility for directly engaging in price gouging by shifting the focus on to the unscrupulous actions of third-party sellers, not only in the eye of the public but also in the eye of the law.[1747]

Amazon identified a few types of non-public seller data that it has access to, but which are supposed to be protected by its Seller Data Protection Policy.[1748] It is obvious from this small glimpse into the data Amazon has at its disposal that the type and scope of data the platform can access is very different from the information available to traditional brick-and-mortar stores. Physical stores have much less detailed information about the competing products they offer for sale alongside their private-label items. Physical stores also have far less information about customers' shopping habits and preferences.[1749]

    5)  <u>Self-Preferencing</u>

By virtue of its role as an intermediary in the marketplace, Amazon can give itself favorable treatment relative to competing sellers. It has done so through its control over the Buy Box, as well as by granting itself access to data and tools that are off-limits for third-party sellers. Most recently, there have been reports that Amazon has given preferential treatment to its own non-essential products over competitors' non-essential products during the pandemic.

---

[1744] *See* Colin Lecher, *How Amazon escapes liability for the riskiest products on its site*, THE VERGE (Jan. 28, 2020), https://www.theverge.com/2020/1/28/21080720/amazon-product-liability-lawsuits-marketplace-damage-third-party.

[1745] *See generally* CEO Hearing (statements of Jeff Bezos, CEO, Amazon.com, Inc.).

[1746] *See generally* Innovation and Entrepreneurship Hearing (statements of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1747] PUBLIC CITIZEN, PRIME GOUGING: HOW AMAZON RAISED PRICES TO PROFIT FROM THE PANDEMIC 5 (2020), https://www.citizen.org/article/prime-gouging/ (also noting "a pattern of significant price increases on essential products sold directly by Amazon, as well as price gouging by third-party sellers").

[1748] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00221867 (June 30, 2014) (on file with Comm.) (listing information protected by the Seller Data Protection policy as "Seller pricing plans (e.g., future promotions), Seller inventory levels, Seller sourcing information, Seller sales (e.g., unit sales, GMS), [and] Seller performance (e.g., non-public metrics)").

[1749] *See* Stigler Report at 45 ("Traditional brick-and-mortar stores and online platforms differ greatly in their advertising and personalization capabilities.").

**App. 355**

a) Critical Inputs

Amazon has control over critical inputs for competing sellers and other types of competitors—including consumer data, fulfillment and delivery services, and advertising and other marketing tools—that give it the ability to advantage itself over rivals. During the investigation, Subcommittee staff conducted numerous interviews with market participants that, along with credible public reporting and Amazon's documents, confirm that Amazon employed this business strategy as early as 2009 and continues to do so today.

b) Access to Market Data

Amazon has access to data that gives it greater insight into consumer behavior and preferences than competing sellers on its platform. A former Amazon employee that Subcommittee staff interviewed summarized the significance of this information asymmetry:

> It's important to understand that Amazon has access to every piece of data on what products each customer has searched and purchased [or] not purchased. . . . With information about what customers have searched, Amazon is able to create customized marketing [and] targeting of products for the individual customer. "Is Amazon using a particular [third-party] seller's data here? No," but it is using all of the aggregate site data to develop a highly targeted marketing plan for each customer. Should Amazon choose to use that targeting information to focus [on] its own products, it can, while [third-party] sellers don't have access to similar data.[1750]

Although Amazon provides its sellers with access to some helpful data and tools—which is a key differentiator from other marketplaces with no or limited seller tools—there is a large amount of data that is off-limits, only available at a largely prohibitive cost, or unhelpful because it is outdated or inaccurate. One paid service that Amazon offered sellers was called Amazon Retail Analytics Premium. Sellers who paid extra to participate in this program could access some, but not all, of the data Amazon collected on marketplace activity. But the program was expensive: vendors reportedly had to pay a minimum of $30,000 to get access to this database.[1751]

Another example of this asymmetric access to data is evident from an Amazon internal email discussion. The discussion began with a consultant alerting Amazon employees about a problem with its Marketplace Web Services APIs that caused it to report information to sellers that is "disconnected

---

[1750] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 22, 2020) (on file with Comm.).

[1751] Robyn Johnson, *Amazon Just Made the $30k Amazon Retail Analytics Premium Data Free*, SEARCH ENGINE J. (Feb. 26, 2020), https://www.searchenginejournal.com/amazon-retail-analytics-premium-data-free/350692.

**App. 356**

from the reality and often misleading."[1752] According to the representative, "This is a huge issue and causes sellers losses and inconvenience."[1753] In response, an Amazon employee said that there was not a problem with the API functionality; rather, the Pricing APIs just do not provide sellers with information at the level of granularity requested. Further, she explained that this is "a feature request for adding location aware information to the Pricing APIs," which is "currently below the line for 2018 for the pricing team."[1754]

c)  Marketing Tools

One tool that Amazon Retail uses to benefit its own business is Amazon Vine, a review-generating program.[1755] In interviews with market participants, many sellers said that good reviews are critical for a product to be successful online.[1756] Accordingly, sellers aim to obtain as many positive reviews as possible early in a product's life cycle. At one time, it was permissible for Amazon sellers to provide incentives such as free samples to reviewers. However, in 2016, it was widely reported that some sellers were generating fake reviews.[1757] In response to these reports, Amazon announced that it would ban incentivized reviews except for those obtained through its own incentivized review program, Amazon Vine.[1758] As a result, sellers lost access to this program, regardless of whether they were engaged in bad conduct or not.

For many years, including after the incentivized-reviews ban, the Amazon Vine program was not available to third-party sellers, while Amazon continued to enjoy the program's ability to "minimize marketing costs associated with generating awareness early in a product's lifecycle," among other benefits.[1759] An Amazon internal document describes other advantages of the program as,

---

[1752] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00188405–06 (Dec. 14, 2017) (on file with Comm.).

[1753] *Id.*

[1754] *Id.* at AMAZON-HJC-00188536 (Dec. 15, 2017).

[1755] Innovation and Entrepreneurship Hearing at 13 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1756] *See, e.g.*, Interview with Source 125 (July 7, 2020) (explaining that the inability to move customer reviews from Amazon to other marketplaces is a barrier to use of other marketplaces, due to the importance of customer feedback for seller reputation).

[1757] Elizabeth Weise, *Amazon Bans 'Incentivized' Reviews*, USA TODAY (Oct. 3, 2016), https://www.usatoday.com/story/tech/news/2016/10/03/amazon-bans-incentivized-reviews/91488702/.

[1758] *Id.*

[1759] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00146732 (Dec. 14, 2017) (on file with Comm.); Spencer Soper, *Amazon Doles out Freebies to Juice Sales of Its Own Brands*, BLOOMBERG NEWS (Oct. 16, 2018), https://www.bloomberg.com/news/articles/2018-10-16/amazon-doles-out-freebies-to-juice-sales-of-its-own-brands.

**App. 357**

"[d]rive conversion and sales with more insightful reviews on detail pages," and "can contribute to higher order counts and sales."[1760]

By both banning incentivized reviews and excluding third-party sellers from the Amazon Vine program, Amazon allocated to itself a significant marketing advantage over the other businesses with which it competes on its platform.

Amazon's dual position as both operator and seller on its online marketplace also provides it with the ability to disadvantage competitors that seek to sell or advertise on its platform. One way that Amazon does this is by limiting certain rivals' ability to buy Amazon.com search advertising—ads that present products at the top of the search results when consumers enter specific search terms or a product name. Although "search advertising is a lucrative part of the company's business," Amazon "won't let some of its own large competitors buy sponsored-product ads tied to searches for Amazon's own devices."[1761] The *Wall Street Journal* reported this month that Roku, Inc. "can't even buy [] Amazon ads tied to its own products."[1762] Consistent with this report, a competitor of Amazon that manufacturers voice-enabled devices told Subcommittee staff that Amazon prohibited it from buying ads on Amazon.com.[1763] The competitor expressed concerns about the harm this could cause consumers, who may be confused or deceived when they receive ads promoting Amazon products even when they specifically search for a competitor's product on Amazon.com.[1764]

The Subcommittee's investigation also uncovered internal documents showing that Amazon executives have long understood the competitive advantage Amazon wields due to the company's control over search advertising on Amazon.com. In an internal email describing an ad block against Groupon and other "deal site ecommerce competitors,"[1765] an Amazon executive wrote that "Groupon is blocked + let's keep a clear line on this. No deal site ecommerce competitors allowed to advertise on amazon.x sites."[1766]

Similarly, an email discussion in 2009 among high-level Amazon executives discussed the possibility of implementing an ad block against Diapers.com, saying:

---

[1760] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00146732 (Dec. 14, 2017) (on file with Comm.); *see also* AMAZON-HJC-0059576 (Nov. 22, 2010) (describing program as "[g]reat for new product launches - good for seeding").

[1761] Dana Mattioli, et al., *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertising-competitor-device-makers-roku-arlo-11600786638.

[1762] *Id.*

[1763] Interview with Source 148 (Aug. 26, 2020).

[1764] *Id.*

[1765] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00129156 (Dec. 14, 2017) (on file with Comm.).

[1766] *Id.*

**App. 358**

Do we really think it is ok that Diapers.com flipped from selling on the platform to being a large scale user of Product Ads totally unscrrutinized [sic]? I don't. . . . We're under no obligation to allow them to advertise on our site. I'd argue we should block them from buying Product Ads immediately or at minimum price those ads so they truly reflect the opportunity cost of a lost diaper buyer (or to reflect the true value of a new customer to such a competitor.).[1767]

The executive suggests that Amazon should maintain a "watch list" of strategic competitors and set up "[a]n automatic trigger when a merchant on [the] watch list . . . attempts to launch a significant quantity of product ads-with escalated approval required to allow their ads to launch."[1768] The *Wall Street Journal* report, based on discussions with Amazon employees, confirms that Amazon ultimately implemented a plan of this type. According to the report, "Tier 1 Competitors" are blocked from buying certain ads and employees are allegedly instructed to "mark any discussion of this practice . . . with 'privileged and confidential' to evade regulators."[1769]

In March 2020, Amazon announced that it would begin temporarily delaying shipments of all non-essential products from its warehouses, regardless of whether they were sold by Amazon or by competing third-party sellers.[1770] The company claimed it was doing so to better serve customers in need while also helping to ensure the safety of warehouse workers. The effect of this change was to block third-party sellers of items that Amazon designated "non-essential" from shipping new inventory using fulfillment by Amazon.

Amazon reportedly excepted itself from this policy and continued to ship non-essential items sold by Amazon Retail from its warehouses. According to a survey of Amazon workers conducted by Change to Win between April 29 and May 9, 2020, workers reported that Amazon had "continued to ship non-essential items such as hammocks, fish tanks, sex toys, and pool floaties."[1771] More than two-thirds of fulfillment center workers reported that 50% or more of the items they handled during this period were non-essential. Based on the survey results, Change to Win concluded that "Amazon has continued to place workers in danger of contracting COVID-19 in order to ship non-essential goods."[1772] A number of market participants that Subcommittee staff interviewed also indicated that

---

[1767] *Id.* at AMAZON-HJC-00065094 (May 28, 2009) (on file with Comm.).

[1768] *Id.*

[1769] Dana Mattioli, et al., *Amazon Restricts How Rival Device Makers Buy Ads on Its Site*, WALL ST. J. (Sept. 22, 2020), https://www.wsj.com/articles/amazon-restricts-advertising-competitor-device-makers-roku-arlo-11600786638.

[1770] CEO Hearing Transcript at 7–8 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.)

[1771] CHANGE TO WIN, AMAZON COVID-19 WORKER SURVEY DATA BRIEF 3 (2020), https://static1.squarespace.com/static/5d374de8aae9940001c8ed59/t/5ec67b15a155792a0f9ef435/1590065963743/Amazon-Worker-COVID-19-Data-Brief.pdf.

[1772] *Id.*

**App. 359**

Amazon prioritized shipping its own items over those sold by third-party sellers.[1773] Amazon confirmed that it did give preferential treatment to its own products for a period of time, but claimed it was "unintentional."[1774]

      6) <u>Tying and Bundling – Fulfillment by Amazon and Advertising</u>

         a) Fulfillment by Amazon

There is a strong link between Amazon Marketplace and Fulfillment by Amazon (FBA), Amazon's paid logistics service. Amazon uses its dominance in each of these markets to strengthen and reinforce its position in the other.

Amazon's FBA program combines warehousing, packing, and shipping services, and most importantly, access to Prime customers.[1775] For a seller's products to get the Prime badge, which is essential to making sales on the platform, a seller must either qualify for Amazon's Seller Fulfilled Prime (SFP) program or use Amazon's FBA service. On August 18, 2020, Amazon informed sellers of changes to Seller Fulfilled Prime which render it an entirely impractical option for most sellers.[1776] Even before this change, only a very small percentage of sellers could meet the onerous eligibility requirements for Seller Fulfilled Prime.[1777] This means FBA is functionally the only way for sellers to get the Prime badge for their product listings.[1778] A document setting forth draft Q&A before a 2018 earnings call for Amazon Chief Financial Officer Brian Olsavsky explained the connection between Prime and FBA: "Prime and FBA reinforce each other – they are inextricably linked. FBA adds Prime eligible selection. Prime member growth and purchasing habits attract sellers to FBA."[1779]

---

[1773] *See, e.g.*, Submission from Source 91, to H. Comm. on the Judiciary (Sept. 16, 2020) ("When we looked at Amazon private-label products during April/early May, they were almost all available for immediate Prime delivery, while comparable national brands were not able to get the same shipment times. Definitely preference was given to many Amazon private-label products during times of "essential"/"non-essential" classification."); Interview with Source 152 (Sept. 18, 2020).

[1774] CEO Hearing at 8 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.) ("After instituting these changes, Amazon became aware that shipments of certain Amazon devices that did not fall into the priority categories had been inadvertently included in the list of products with faster delivery promises. This was unintentional.").

[1775] *Fulfillment by Amazon*, AMAZON, https://sell.amazon.com/fulfillment-by-amazon.html (last visited Oct. 4, 2020).

[1776] Pascal, The Seller Fulfilled Prime Team, *Important Updates to Seller Fulfilled Prime*, AMAZON SERVICES SELLER FORUMS (Aug. 18, 2020), https://sellercentral.amazon.com/forums/t/important-updates-to-seller-fulfilled-prime/682240.

[1777] *See, e.g.*, Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) ("It used to be possible, but hard, to be a Seller Fulfilled Prime seller. There were only 200 sellers that were able to meet the requirements. What's changing recently is that they used to allow you to have the Prime badge in certain regions, but now they say you need the Prime badge nationally, i.e., you need to have multiple warehouses across the country plus ship on Saturdays, etc.").

[1778] Regan McPhee, *How to Sell on Amazon Prime in 2020*, JUNGLESCOUT (May 27, 2020), https://www.junglescout.com/blog/how-to-sell-on-amazon-prime/.

[1779] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00186643 (July 23, 2018) (on file with Comm.).

**App. 360**

Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon. More than 73% of all Marketplace sellers worldwide reportedly rely on FBA services.[1780] Numerous third-party sellers told the Subcommittee that they feel they have no choice but to pay for FBA to maintain a favorable search result position, to reach Amazon's more than 112 million Prime members, and to win the Buy Box—through which the vast majority of Amazon sales are made.[1781] A recent consumer survey indicated that 75% of Amazon Prime customers specifically search for products flagged as Prime-eligible.[1782] As a result, as the Online Merchant's Guild told Subcommittee staff, many sellers will "say that without Prime you are dead."[1783]

In response to concerns about Amazon tying a seller's ability to make sales on its platform to participation in FBA, Amazon has offered contradictory statements. In the Subcommittee's second hearing, Representative Lucy McBath (D-GA) asked Amazon's Associate General Counsel Nate Sutton whether Amazon "privileged vendors who use Amazon Fulfillment Services over those who chose not to."[1784] Mr. Sutton asserted that Amazon "do[es] not favor . . . products that use FBA over others."[1785] He also indicated that Fulfillment by Amazon is not a factor in Amazon's ranking algorithm.[1786]

At the Subcommittee's sixth hearing, Representative Mary Gay Scanlon (D-PA) asked Mr. Bezos about whether there is a connection between a seller's use of FBA and its ability to win the Buy Box.[1787] In response, Mr. Bezos said, "I'm not sure if it's direct, but, indirectly, I think the Buy Box does favor products that can be shipped with Prime."[1788] Given that FBA is effectively the only way for sellers to get a Prime badge, this indicates that Amazon does favor sellers who use FBA over those who do not for both its search rankings and the Buy Box. Amazon claims that it favors sellers who use FBA because it is in the best interest of consumers and that it "does not consider profitability as part of the Featured Merchant Algorithm."[1789] Documents reviewed by Subcommittee staff, however, suggest

---

[1780] *See* J. Clament, *Fulfillment by Amazon (FBA) Usage Among Top Marketplace Sellers Worldwide 2017–2018*, STATISTA (Jan. 7, 2020) https://www.statista.com/statistics/1020046/global-fba-usage-top-amazon-sellers/.

[1781] *See, e.g.*, Submission from Source 43, to H. Comm. on the Judiciary, 30 (Oct. 26, 2019) (on file with Comm.).

[1782] FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 10 (2019), https://fv.feedvisor.com/CN_2019_Amazon-Consumer-Behavior-Report.html.

[1783] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 7 (Oct. 23, 2019) (on file with Comm.).

[1784] Innovation and Entrepreneurship Hearing Transcript at 53 (question of Rep. Lucy McBath (D-GA), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1785] *Id.*

[1786] *Id.* at 3 (response to Questions for the Record of Nate Sutton, Associate Gen. Counsel, Competition, Amazon.com, Inc.).

[1787] CEO Hearing Transcript at 175 (question of Rep. Mary Gay Scanlon (D-PA), Vice Chair, H. Comm. on the Judiciary).

[1788] *Id.* (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1789] CEO Hearing at 3 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

**App. 361**

that Amazon has used profitability—also referred to internally as "contribution profit" or "CP"—as a factor in awarding the Buy Box.[1790]

Furthermore, Amazon's own documents show that it has considered FBA participation for purposes of determining the Buy Box winner.[1791] An Amazon document that sets forth pricing rules for a pilot program appears to favor third-party sellers that use FBA over those who do not for awarding the Buy Box.

**Internal Pricing Strategy Document**[1792]



| From: | Wales, Chance |
| To: | VanDuine, Jason |
| Sent: | 3/25/2010 11:26:35 AM |
| Subject: | RE: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy |

ok

From: VanDuine, Jason
Sent: Thursday, March 25, 2010 9:46 AM
To: Wales, Chance
Cc: VanDuine, Jason
Subject: SIGN OFF REQUESTED: Pre-WBR Follow-up: Healthcare Pricing Strategy
Chance – please sign off (or provide fdbk) before I send to Doug.
Jason
Doug,
You had asked me to help you understand the 'size of the issue' with regards to diverted product as well as clarification on pricing rules/matching for the image competitor simulation in the Healthcare category. Some current data (from February):
    1. The top 25 negative CP ASINs in Health & Beauty (all Image ASINs) accounted for $265k in negative CP, 46k units and $1.6M in product revenue.
    2. The diverted product ASINs (8 of the top 25) accounted for $109k in negative CP (41% of ttl), 14k units (31% of ttl) and $366k (21% of ttl) in product revenue.
    3. Babycare products accounted for 14 of the top 25 ASINs (13 diaper and 1 wipe ASIN) and the remaining 3 ASINs are vendor or operational cost issues that are being addressed.
    4. The image competitor pilot in Healthcare will address 6 of the 8 ASINs referenced in #2 (it will not address Align and Alli – both in Nutrition & Wellness)
We do not plan any manipulation to pricing rules in the Healthcare category other than the setting of number of Image ASINs to zero.
Use cases (for Pricing Rules): using Prilosec as the example (CP neutral = $27)

| Ref # | Use Case | Amazon Landed Cost | Comp Box Price | Comp Shipping Cost | Comp Landed Price | Amazon Match Price | Non-Prime (1% pad to FBA, 2% pad to 3P) | Prime (5% pad) |
|---|---|---|---|---|---|---|---|---|
| 1 | Walmart (Image Competitor) | $27.00 | $28.00 | $0.97 | $28.97 | $28.00 | Amzn wins buy box | Amzn wins buy box |
| 2 | DAB Nutrition (3P) + FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | 3P wins buy box | Amzn wins buy box |
| 3 | DAB Nutrition (3P) + no FBA | $27.00 | $26.50 | $0.00 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |
| 4 | AllTheTimeWholesale + no FBA | $27.00 | $22.00 | $4.50 | $26.50 | $27.00 | Amzn wins buy box | Amzn wins buy box |

The primary change coming is that we will now lose the buy box if 3P merchants continue to price below CP neutral (we will stop at CP neutral unless matching an image competitor). As long as Prilosec is priced below $27 landed price (excluding buffers), we will lose the buy box. Currently, the lowest landed is under $20.
Estimated impact (based on simulation completed by the Pricing team) is a 6% negative impact on Healthcare category growth and a $.74/unit positive impact on CP. Using OP2 as the base, this would translate to ($750k) in revenue loss and ($775k) gain in CP. We will begin the pilot in April and will measure results on a weekly basis (with highlights in the pre-WBR as appropriate).
If you have any further questions, please let me know.
Jason

One third-party seller provided the Subcommittee with anecdotal evidence that Amazon favors sellers who participate in Amazon's fulfillment program over sellers who do not. The seller set up an experiment where he sold the same product, one self-fulfilled and the other fulfilled through FBA, and ran different test cases.[1793] The seller found that "Even when the consumer price of the self-fulfilled

---

[1790] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00141750 (Mar. 25, 2010) (on file with Comm.).

[1791] Id. at AMAZON-HJC-00142724.

[1792] Prepared by Subcomm. based on Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00141750 (Mar. 25, 2010) (on file with Comm.).

[1793] Submission from Source 43, to H. Comm. on the Judiciary, 29 (Oct. 26, 2019) (on file with Comm.).

**App. 362**

order was reduced and sold for a lower price (7% lower) than the FBA offer, the FBA still 'won' the 'Buy Box.'"[1794] The seller indicated that, without this favorable treatment for FBA, they would not choose to use FBA, as they found Amazon's fulfillment service was often slower and less reliable than self-fulfillment.[1795]

Although Jeff Bezos told the Subcommittee that Fulfillment by Amazon "is probably the greatest invention that we ever created for sellers," and that "it's working for sellers," information that Subcommittee staff reviewed suggests that it has significant shortfalls.[1796] One third-party seller told Subcommittee staff, "We use both FBA and self-fulfillment, all of our negative comments are on items shipped through FBA."[1797] According to another seller that uses FBA, at one point, Amazon decided to change the packaging on her products from cardboard boxes to padded envelopes, causing damage to her products in transit. When the damaged items started arriving at her customers' homes in a damaged state, this caused a surge of negative reviews and requests for returns. When she asked Amazon to remove these bad reviews, which were caused by FBA's shipping methods, Amazon refused.[1798]

A competing online marketplace described how Amazon effectively forcing sellers into its FBA program makes it more difficult to compete with Amazon for sellers, stating, "[T]hrough anticompetitive strategies and practices by Amazon, many . . . sellers are being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner that makes them not only less independent but directly dependent on Amazon."[1799] It further explained that because of Amazon's dominance in online commerce, "Even sellers who sell on other marketplaces are pushed into FBA, because it is the only practicable way to obtain sales on the Amazon marketplace.[1800] In addition to the Subcommittee's investigation, antitrust enforcement agencies are currently investigating Amazon for tying these two services together.[1801]

---

[1794] Id.

[1795] Id; see also Interview with Source 920 (July 14, 2020); Interview with Source 100 (July 24, 2020).

[1796] CEO Hearing Transcript at 174 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1797] Interview with Source 89 (July 22, 2020).

[1798] Interview with Source 149 (Feb. 26, 2020).

[1799] Submission from Source 11, to H. Comm. on the Judiciary, 1 (Oct. 14, 2019) (on file with Comm.).

[1800] Id. at 2.

[1801] See. e.g., Press Release, Ital. Competition Auth., Amazon: Investigation Launched on Possible Abuse of a Dominant Position in Online Marketplaces and Logistic Services (Apr. 15, 2019), https://en.agcm.it/en/media/press-releases/2019/4/A528 (announcing launch of investigation into whether "Amazon would unduly exploit its dominant position in the market for e-commerce platforms intermediary services in order to significantly restrict competition in the e-commerce logistics market, as well as - potentially - in the e-commerce platform market, to the detriment of final consumers").

**App. 363**

b) Advertising

Consistent with public reporting,[1802] evidence that Subcommittee staff reviewed suggests that Amazon may require sellers to purchase their advertising services as a condition of making sales on the platform. Because 44% of consumers tend to only look through the first two search pages when shopping on Amazon, a seller is practically invisible if it does not show up on one of the first two pages.[1803] Amazon's Sponsored Products and Sponsored Brand tools allow sellers to ensure they are prioritized in search results for specific key terms. A 2020 survey of large brands found that at least 73% used Amazon's advertising services, with 65% spending at least $40,000 a month on advertising on the site.[1804] In just one year, the number of brands with this monthly advertising spend increased by 33%.[1805] A recent report issued by the Institute for Local Self-Reliance explained:

> Sellers that decline to advertise risk losing their place in Amazon's organic search results, no matter how many glowing customer reviews they have. That's because the Amazon algorithm that delivers the search results favors products with more sales. As more orders are driven by ads, sellers than don't advertise lose out on those sales and, as their share of sales declines, they also slip in the search rankings, further reducing their sales in a negative cycle.[1806]

Similarly, the Online Merchants Guild told the Subcommittee in a submission, "[i]t is now common belief in the Amazon seller community that the only way to sell on Amazon is through Amazon's Pay-Per-Click ('PPC') offering." The submission describes the situation as "pay-to-play," adding that "[Pay-Per-Click advertising] has become a major point of frustration for many sellers, with many sellers left feeling as if they are paying a mandatory fee, and have even described [Pay-Per-Click] as a way for Amazon to increase their seller fees without looking like they are increasing their seller fees."[1807]

At the same time that advertising services have become "less of an option and more of a requirement for sellers to compete" on the platform, Amazon's ads have also become more

---

[1802] *See, e.g.*, Shira Ovide, Amazon Advertising Is Just a Toll in Disguise, BLOOMBERG (July 15, 2019), https://www.bloomberg.com/opinion/articles/2019-07-15/amazon-advertising-is-just-a-toll-in-disguise.

[1803] FEEDVISOR, THE 2019 AMAZON CONSUMER BEHAVIOR REPORT 5 (2019), https://fv.feedvisor.com/CN_2019_Amazon-Consumer-Behavior-Report.html.

[1804] FEEDVISOR, BRANDS AND AMAZON IN THE AGE OF E-COMMERCE, 2020 EDITION 12 (2020), https://fv.feedvisor.com/CN_2020_Brands-and-Amazon-in-the-Age-of-E-Commerce.html.

[1805] *Id.*

[1806] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 9 (2020), https://ilsr.org/amazons_tollbooth/.

[1807] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.); *see also* Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020) ("Pay-Per-Click is now mandatory.").

**App. 364**

expensive.[1808] The ads' costs are determined by reverse auction—businesses bid on keywords that customers may use to search for a given product. In just a year, "the cost-per-click for sponsored ads increased by about 15% on average," and for some, by as much as 127%.[1809] A former third-party seller told Subcommittee staff that this harms both sellers and consumers, adding that "the good old days before [Pay-Per-Click], products would rise on the merits."[1810] Similarly, the Online Merchants Guild said, "[i]n the past, the belief was more reviews would create a trending product."[1811]

In response to concerns about tying, Amazon claims that it provides non-discriminatory access to the Buy Box and that participation in fulfillment by Amazon and its pay-per-click advertising program is voluntary.[1812] Amazon's revenue from these sources is increasing, however, and sellers continue to raise concerns that increased fees for compulsory fulfillment and advertising services are squeezing their business.

### 7)   Strategic Platform Management and Mismanagement

During the investigation, the Subcommittee also heard concerns that Amazon engages in strategic mismanagement of its platform by: (1) allowing the proliferation of counterfeit and unsafe goods; (2) using its ability to control the flow of counterfeits as leverage; and (3) putting in place ineffective counterfeit prevention tools that result in the suspension of a large number of innocent sellers.[1813]

As Amazon's dominance in e-commerce has grown, so has the proliferation of dangerous and counterfeit products on its marketplace.[1814] A 2019 *Wall Street Journal* investigation found that

---

[1808] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.).

[1809] STACY MITCHELL, RON KNOX & ZACH FREED, INST. OF LOCAL SELF-RELIANCE, REPORT: AMAZON'S MONOPOLY TOLLBOOTH 10 (2020), https://ilsr.org/amazons_tollbooth/.

[1810] Interview with Jason Boyce, Founder & CEO, Avenue7Media, LLC (Sept. 15, 2020).

[1811] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.).

[1812] *See, e.g.*, CEO Hearing Transcript at 134 (statement of Jeff Bezos, CEO, Amazon.com, Inc.) ("I think what you're referring to is the fact that we offer an advertising service basically for third party sellers to drive additional promotion to their products. That is a voluntary program. Some sellers use it. Some don't.").

[1813] During the investigation, the Committee also heard concerns about Amazon using "brand gating" to block competitors from selling certain products on its platform. *See, e.g.*, Submission from Source 5, to H. Comm. on the Judiciary (Sept. 15, 2020) (on file with Comm.) (raising concerns about "brand gating," which allows Amazon, on its own, or in concert with "a trademark owner/manufacturer/seller, who is registered on the Brand Registry, to block other third party sellers from selling a particular brand, unless certain conditions are met"); Source 100, to H. Comm. on the Judiciary (Jan. 10, 2020) (on file with Comm.) (raising concerns that Amazon "gates" a brand when it decides that it wants to source items directly from the manufacturer and limit competition from third-party sellers and stating, "[w]e have lost literally millions of dollars on [inventory from] brands that Amazon has gated, purchases directly from manufacturers and we are no longer able to sell on Amazon").

[1814] Alexandra Berzon, Shane Shifflett & Justin Scheck, *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, WALL ST. J. (Aug. 23, 2019), https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.

Amazon had active listings for over 4,000 items "that have been declared unsafe by federal agencies [and] are deceptively labeled or are banned by federal regulators."[1815] In the worst cases, these products have even caused bodily injury or even death to unsuspecting consumers.[1816] As recently as September 2020, CNN released a report describing multiple instances in which Amazon's own private-label products, such as a phone charging cable, have caught fire while in use by consumers.[1817]

The spread of counterfeit products also has serious consequences for vendors and brand manufacturers who rely on consumer trust and their reputation to maintain successful businesses. Amazon's marketplace platform is designed in a way that makes it difficult for consumers to identify counterfeit products. As the Retail Industry Leaders Association (RILA) noted in a submission to the Subcommittee, "Where a platform both obfuscates the origin or source and provides fulfillment services, a seller of counterfeits is harder for consumers to uncover because the item appears to have the backing of the platform."[1818]

Although it claims to take its counterfeit problem seriously, Amazon's business model incentivizes it to do less, not more. Because Amazon's profits increase with the number of sales on the platform, the company has an incentive to turn a blind eye to counterfeit products that contribute to its increased sales volume. Regardless of the source, more sales generally result in more profits for Amazon because it typically "profits twice from a sale through purchase and fulfillment[,] and potentially three times through advertising."[1819]

For example, Subcommittee staff uncovered evidence during the investigation that Amazon has used its ability to police counterfeits more or less aggressively as leverage in contract negotiations with brands who attempt to resist Amazon pressure to sell on its platform—referred to internally at Amazon as "holdouts."[1820] This recently occurred when it agreed to increase efforts to crack down on counterfeit Apple products as part of Apple agreeing to establish a wholesale relationship with Amazon Retail.[1821] Documents received by the Subcommittee suggest that Apple was dissatisfied with Amazon's anti-counterfeiting program and sought the following as a condition of selling Apple

---

[1815] *Id.*

[1816] *Id.*

[1817] Blake Ellis & Melanie Hicken, *Dozens of Amazon's Own Products Have Been Reported As Dangerous – Melting, Exploding or Even Bursting Into Flames. Many Are Still on the Market*, CNN Bus. (Sept. 10, 2020), https://www.cnn.com/2020/09/10/business/amazonbasics-electronics-fire-safety-invs/index.html.

[1818] Submission from Retail Industry Leaders Ass'n, to H. Comm. on the Judiciary, 9 (July 16, 2019) (on file with Comm.).

[1819] *Id.*

[1820] Competitors Hearing Transcript at 2–3 (statement of David Barnett, CEO & Founder, Popsockets LLC); *see also* Laura Stevens & Sara Germano, *Nike Thought It Didn't Need Amazon – Then the Ground Shifted*, Wall St. J. (June 28, 2017), https://www.wsj.com/articles/how-nike-resisted-amazons-dominance-for-years-and-finally-capitulated-1498662435.

[1821] Jouzas Kaziukenas, *Amazon's Apple Moment*, Marketplace Pulse (Nov. 27, 2018), https://www.marketplacepulse.com/articles/amazon-apple-moment.

**App. 366**

products wholesale to Amazon: "Amazon must proactively monitor platform for counterfeits/knockoffs and cooperate with Apple to remove and prevent them."[1822]

At the Subcommittee's field hearing in Colorado, PopSockets founder David Barnett testified that "Amazon was aware that large quantities" of counterfeit PopSockets products were selling on its platform, but that Amazon allowed the problem to continue until PopSockets agreed to spend nearly two million dollars on Amazon marketing services.[1823] Mr. Barnett further testified that Amazon was not just facilitating the sale of counterfeit PopSockets products, but that Amazon itself was engaged in selling knockoffs. Representative Ken Buck (R-CO) and Representative Henry C. "Hank" Johnson, Jr. (D-GA) confronted Mr. Bezos on Amazon's behavior towards PopSockets at the Subcommittee's sixth hearing. Mr. Bezos responded, "if those are the facts and if someone somewhere inside Amazon said, you know, 'Buy X dollars in ads, and then we'll help you with your counterfeit problem,' that is unacceptable. And I will look into that, and we'll get back to your office with that." To date, however, Amazon has not followed up with the Subcommittee to provide additional information.

In response to criticism and negative publicity about the proliferation of counterfeit products on its platform, Amazon announced several initiatives to combat fake products.[1824] During the Subcommittee's sixth hearing, Mr. Bezos testified that Amazon "invest[s] hundreds of millions of dollars in systems" that police counterfeits.[1825] However, Amazon's approach appears to be ineffective, resulting in suspensions of many innocent, third-party sellers, with devastating effects on some sellers' businesses.[1826]

For example, Subcommittee staff interviewed a former Amazon employee and current consultant for Amazon sellers who described recent unfair changes in Amazon's treatment of sellers suspected of being counterfeiters. He said that, in the past, Amazon would only suspend accounts and withhold funds from third-party sellers it confirmed were selling counterfeit goods.[1827] However, increasingly, "Amazon rejects invoices or fails to verify suppliers without any justification or basis as to why . . . and they are using that as a reason to hold funds indefinitely."[1828]

---

[1822] *See* Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00190195 (Feb. 15, 2018) (on file with Comm.) ("We understand Apple's IP team may not be happy with elements of our anti-counterfeiting program.").

[1823] Competitors Hearing Transcript at 2–3 (statement of David Barnett, CEO & Founder, PopSockets LLC).

[1824] *See, e.g.*, Press Release, Amazon, Amazon Establishes Counterfeit Crimes Unit to Bring Counterfeiters to Justice (June 24, 2020), https://press.aboutamazon.com/news-releases/news-release-details/amazon-establishes-counterfeit-crimes-unit-bring-counterfeiters.

[1825] CEO Hearing Transcript at 132 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1826] *See, e.g.*, Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00173394 (Sept. 6, 2016) (on file with Comm.) ("Additional gating requirements were put in place to reduce counterfeit and improve product safety, but did not have the right processes in place to limit the number of false negatives (declining Seller applications despite the seller's ability to provide the correct documentation).").

[1827] Interview with Chris McCabe, Founder, ecommerceChris, LLC (June 12, 2020).

[1828] *Id.*

**App. 367**

One third-party seller told the Subcommittee that Amazon blocked some of her listings, citing a number of her products as "inauthentic."[1829] The seller provided evidence to Amazon that, not only were her vendor's products authentic, but Amazon actively sold the same products, sourced from the same vendor, through its first-party sales.[1830] Despite elevating the issue to Amazon executives in July 2020, this issue has still not been resolved as of September 2020.[1831]

### ii.  Most-Favored-Nation and Price Parity Provisions

Amazon also uses its dominant position in e-commerce as leverage with other businesses to require most-favored-nation (MFN) clauses or similar price parity provisions to guarantee that it will always receive the best prices and most favorable terms. While these clauses are not inherently anticompetitive, Amazon has a history of using MFN clauses to ensure that none of its suppliers or third-party sellers can collaborate with an existing or potential competitor to make lower-priced or innovative product offerings available to consumers.

The anticompetitive effects of Amazon's use of MFN clauses are particularly pronounced in the book market. According to a book publisher, Amazon used its market power in print and e-book sales to force a price MFN on it and other book publishers.[1832] As the publisher explained, the result has been that "publishers are completely handcuffed from stimulating platform competition because Amazon's price MFN causes publishers to incur significant financial penalties if they offer Amazon's rivals better pricing."[1833] Another publisher told the Subcommittee that "Amazon always has and still does require MFNs."[1834] According to this publisher, the MFN provisions prevent publishers from partnering with any of Amazon's competitors and reinforces Amazon's "stranglehold" and "control" over book distribution.[1835] Although Amazon has changed the name and specific mechanisms over the years, it appears that the company continues to impose contract provisions that effectively function as MFNs on book publishers.

In a joint letter to Subcommittee Chairman Cicilline following the Subcommittee's sixth hearing, a group of organizations representing authors, publishers, and booksellers wrote that Amazon's use of MFNs has "stifle[d] the emergence and growth of competitive alternatives in the

---

[1829] Submission from Source 100, to H. Comm. on the Judiciary (Sept. 18, 2020) (on file with Comm.).

[1830] *Id.*

[1831] *Id.*

[1832] Submission from Source 17, to H. Comm. on the Judiciary, 9 (Nov. 15, 2019) (on file with Comm.).

[1833] *Id.* at 10 (Nov. 15, 2019).

[1834] Interview with Source 155 (Sept. 29, 2020).

[1835] *Id.*

**App. 368**

book distribution marketplace."[1836] When Amazon entered the e-book market through its release of the Kindle and Kindle Store in 2007, it unseated incumbent booksellers in market position by offering steep discounts on best-selling books.[1837] Over a decade later, Amazon's dominance in e-books and its anticompetitive application of price parity clauses to its business relationships in this market "eliminate[s] the ability of rivals or new entrants to gain any meaningful competitive advantage relative to Amazon."[1838] Essentially, Amazon disrupted this market, dominated it, and now wields its immense power to effectively guarantee that no competitor could possibly do the same.

Amazon also aggressively enforces price parity rules on Amazon marketplace's third-party sellers. It imposed MFN provisions on U.S. sellers until 2019. In response to antitrust scrutiny, the platform replaced those provisions with a "Fair Pricing Policy," which has the same effect of blocking sellers from offering lower prices to consumers on other retail sites.[1839] To enforce the policy, Amazon uses "computer software to regularly scan listings on competitors' websites, and pressuring their sellers to change their price if their Amazon price is substantially higher."[1840] A violation, or even a perceived violation, of the policy can lead to suspension of a seller's account, with dire consequences for the seller. A former third-party seller explained that Amazon uses "Buy Box Suppression," where Amazon will remove a seller's ability to win the Buy Box, as a way to penalize sellers that offer products at a lower price on competing sites.[1841]

One of Amazon's competitors told the Subcommittee that "as Amazon raises the costs to sellers, and requires that Amazon have the lowest prices available, for a seller to be able to make significant sales on its marketplace, these sellers will raise the price on competitor sites to match Amazon's price."[1842] Amazon's "Fair Price Policy," which has been described as a "thinly-veiled MFN

---

[1836] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 2 (Aug. 17, 2020), https://publishers.org/wp-content/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf.

[1837] George Packer, *Cheap Words*, NEW YORKER (Feb. 10, 2014), https://www.newyorker.com/magazine/2014/02/17/cheap-words (last visited Oct. 4, 2020) (noting that in 2007, the prices of e-books on Kindle were "below wholesale in some cases, and so low that [they] represented a serious threat to the market . . . By 2010, Amazon controlled ninety per cent of the market in digital books—a dominance that almost no company, in any industry, could claim.").

[1838] Letter from Maria A. Pallante, Pres. & CEO, Ass'n of Am. Publishers, Mary E. Rasenberger, Exec. Dir., Authors Guild, Allison K. Hill, CEO, Am. Booksellers Ass'n, to Hon. David. N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Aug. 17, 2020), https://publishers.org/wp-content/uploads/2020/08/Joint-Letter-to-Rep-Cicilline-081720.pdf.

[1839] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 7 (Oct. 29, 2019) (on file with Comm.).

[1840] *Id.* at 8.

[1841] Submission from Jason Boyce, Founder & CEO, Avenue7Media (Sept. 25, 2020) (on file with Comm.).

[1842] Submission from Source 11, to H. Comm. on the Judiciary, 4 (Oct. 14, 2019) (on file with Comm.); *see also* Submission from Jason Boyce, Founder & CEO, Avenue7Media (Sept. 25, 2020) (on file with Comm.) ("Amazon prohibiting sellers from offering lower prices on other online retail platforms clearly hurts consumers if the only way for

**App. 369**

restriction," is likely anticompetitive with respect to blocking competition from other marketplaces, and does not result in lower prices for consumers as Amazon has claimed.[1843]

### iii. Predatory Pricing

As part of its business strategy, Amazon has historically placed a higher premium on long-term growth at the expense of short-term profitability. As noted earlier in this Report, Amazon did not post its first full-year profit until 2003—a decade after the company was founded.[1844] Consistent with this trend, Amazon has adopted a predatory-pricing strategy across multiple business lines at various stages in the company's history.[1845]

Because of the nature of its marketplace business, Amazon's below-cost prices on products and services tend to lock customers into Amazon's full marketplace ecosystem. As a former Amazon employee told the Subcommittee, "[A]bove all else, Amazon's goal is to keep the customer shopping on Amazon."[1846] Once a customer is locked in, they are less likely to change their behavior even when Amazon's pricing is not competitive.

### 1) Prime

The most prominent example of Amazon's use of strategic losses to lock customers into the platform's ecosystem is its popular membership program, Amazon Prime. As of August 2020, a Prime membership costs $119 per year, up from its original $79 at its launch in February 2005 and $99 from March 2014 to April 2018. An Amazon executive wrote in 2013, in reference to pricing Prime, "the better course is to let the existing Prime program grow . . . and then raise prices later assuming a lower elasticity in future years,"[1847] once customers are locked in.

An Amazon internal document describes the rationale behind Amazon Prime and its other membership programs: "Membership programs are created with a long-term, company-wide perspective with the goal of increasing loyalty and cross-category shopping behavior. The programs do

---

sellers to regain their listing on Amazon is to raise their prices on other platforms or remove their listings all together, therefore limiting competition.").

[1843] Submission from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union, Service Employees Int'l Union & Change to Win, to H. Comm. on the Judiciary, 4 (March 10, 2020) (on file with Comm.).

[1844] Saul Hansen, *Technology; Amazon Reports First Full-Year Profit*, N.Y. TIMES (Jan. 28. 2004), https://www.nytimes.com/2004/01/28/business/technology-amazon-reports-first-full-year-profit.html.

[1845] In this Report, the term "predatory pricing" should be understood in its broadest sense to refer to any situation where a dominant firm prices a good or service below cost in a way that is harmful to competition.

[1846] Submission from Source 91, to H. Comm. on the Judiciary (Sept. 22, 2020) (on file with Comm.).

[1847] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00216088 (Oct. 28. 2013) (on file with Comm.).

**App. 370**

not optimize for short-term gain or profitability in a single category."[1848] Another internal Amazon document describes these membership programs as, "[d]oubl[ing] down on 'Big Moats,'" aiming to create an impenetrable barrier around its dominant position.[1849]

Despite Amazon Prime's popularity and wide membership base, it is a loss-leader for the company. Many industry analysts have estimated Amazon's Prime losses over the years, finding that it is unprofitable, and that Amazon is willing to spend significant amounts of money to prop up the program.[1850] In 2016, a Forrester Research analysis estimated that Prime costs Amazon $1 billion per year.[1851] In 2019, J.P. Morgan estimated that, though priced at $119, a Prime subscription is valued at about $860, up 10% from its estimated value in 2018.[1852] A Prime membership also includes access to Prime Video, its library of digital video content, and Amazon Music, its music streaming service.

The Artists Rights Alliance, an advocacy group for the digital rights of music creators, raised concerns that Amazon's inclusion of a streaming music services in its Prime program poses a severe risk of "driv[ing] down royalties in an uncompetitive way."[1853] According to its submission:

> Amazon's ongoing efforts to launch a streaming music service as part of its Prime family of products should be carefully scrutinized . . . . [W]e are concerned about the dangers of predatory/sub-market pricing in a service that Amazon operates as a "loss leader." In general, creators need an economy that more accurately sees and values their work; not one with cut-rate prices that entangles music even more deeply in a web of soulless data collection and 'content distribution' operations.[1854]

Although Amazon Prime is a loss leader for the company, it is one of Amazon's most effective drivers of growth. Amazon Prime members account for 65% of Amazon shoppers as of Q4 2019.[1855]

---

[1848] *Id.* at AMAZON-HJC-00068510 (Sept. 8, 2010).

[1849] *Id.*; *see also* AMAZON-HJC-00184863 (May 7, 2015) ("The value differentiation for Prime members accelerates the Prime flywheel creating an additional reason to become a Prime member and concentrate household spend with Amazon.").

[1850] *See, e.g.*, Stu Woo, *Amazon 'Primes' Pump for Loyalty*, WALL ST. J. (Nov. 14, 2011), http://www.wsj.com/articles/SB10001424052970203503204577036102353359784.

[1851] Nanette Byrnes, *How Amazon Loses on Prime and Still Wins*, MIT TECH. REV. (July 12, 2016), https://www.technologyreview.com/2016/07/12/158869/how-amazon-loses-on-prime-and-still-wins/ (last visited Oct. 4, 2020).

[1852] J.P. MORGAN, RETAIL VS. AMAZON: LIFE IN A POST COVID-19 WORLD (June 11, 2020), https://markets.jpmorgan.com/research/email/-lbk68f4/Alp1kP9tQUPS29jlzW_bOg/GPS-3397412-0; Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00184863 (May 7, 2015) (on file with Comm.).

[1853] Submission from Artist Rights Alliance, to H. Comm. on the Judiciary, 5 (July 31, 2019) (on file with Comm.).

[1854] *Id.*

[1855] Fareeha Ali, *Amazon Prime Has 112 Million Members in the U.S.*, DIG. COMMERCE 360 (Jan. 24, 2020) https://www.digitalcommerce360.com/article/amazon-prime-membership/.

**App. 371**

While the average Amazon customer spends about $600 per year on Amazon.com, Prime members reportedly spend more than double that—an average of $1400 per year.[1856]

In 2010, Amazon started its Amazon Mom program, now called Amazon Family, another membership service that offers discounts on diapers and other items associated with parenthood.[1857] At the outset, Amazon was willing to lose money to ensure the success of this program. A 2010 document outlining the lead-up to the official launch of Amazon Mom included a plan to discount diapers and wipes at a rate that would "put [their] product below cost."[1858] And selling diapers was not the goal of this program—instead Amazon recognized that "a long-lasting, sticky relationship" with Amazon Mom members was the source of its true value.[1859] Additionally, an internal presentation observed that "[e]arly results from our Amazon Mom program" showed that "[n]ew Amazon customers, whose first purchase included diapers, spend over three times as much ($292 vs. $91) during their first year as the average new Amazon customer."[1860]

Some of Amazon's rivals view this dynamic as harmful to competition, saying that Amazon is "[u]nderpricing Prime to consumers to build a huge and highly targetable share of ecommerce demand."[1861] Once consumers have paid the yearly fee for Prime, they are incentivized to use it as much as possible to maximize return on their investment, "whereas they might otherwise multisource."[1862]

### 2)  Diapers.com

The Amazon Mom program served another important function and had a central role in one of Amazon's early applications of its predatory-pricing strategy. In 2009, Bezos and other Amazon executives noticed and began discussing the rise of Diapers.com, a competitor in the baby and personal-care product markets.[1863] What followed was a year-long price war, ending in Amazon's eventual acquisition of Quidsi, the parent company of Diapers.com.

---

[1856] Jack Houston & Irene Anna Kim, *How Amazon Gets You to Spend More Money*, BUS. INSIDER (Sept. 17, 2020), https://www.businessinsider.com/amazon-prime-members-spend-more-money-sneaky-ways-2019-9.

[1857] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00130737 (Aug. 31, 2010) (on file with Comm.).

[1858] *Id.* at AMAZON-HJC-00159560 (Apr. 2010).

[1859] *Id.* at AMAZON-HJC-00035545 (July 20, 2010) ("[W]e can see that Moms . . . have a favorable year one downstream value relative to the average customer.").

[1860] *Id.* at AMAZON-HJC-00154656.

[1861] Submission from Source 11, to H. Comm. on the Judiciary, 2 (Oct. 14, 2019) (on file with Comm.).

[1862] *Id.* at 3.

[1863] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00151723 (Feb. 9, 2009) (on file with Comm.).

**App. 372**

At the Subcommittee's hearing, Mr. Bezos testified that Amazon was always a price follower in its war with Diapers.com.[1864] However, Amazon's "'plan to win' against [D]iapers.com" explicitly included price-leading on diapers.[1865] Recognizing that Diapers.com was the company's "#1 short term competitor," Amazon executives decided that going after them required a "need to match pricing . . . no matter what the cost."[1866] Amazon internal documents indicate that Amazon was willing to lose $200 million in one month alone on products in the relevant competitive categories.[1867] Offering 30% cash back on diapers and a free year's worth of Prime membership to Amazon Mom members, an Amazon executive predicted in November 2010 that it would seriously wound Quidsi, stating, "[T]hey expect to lose lots of money over the nxt [sic] few yrs [sic]-this will make it worse."[1868] Quidsi explicitly identified "Predatory Pricing" as a "Near-Term Risk" in a 2009 presentation.[1869] In November 2010, Amazon acquired its self-described "largest and fastest growing competitor in the on-line diaper and baby care space."[1870]

3)   <u>"Can't Realize Any Profit"</u>

Once Amazon succeeds in trapping enough customers in its "flywheel" to secure dominant position across varied markets, it can then raise prices or remove incentives or allowances for Marketplace sellers to sell products at favorable prices for consumers. One example of the latter is Amazon's treatment of "CRAP," a term coined internally which refers to products on which Amazon "Can't Realize Any Profit."[1871] CRAP products are low-priced items that are heavy and expensive to ship—often consumables, like packs of bottled water.[1872]

These items were integral to Amazon's pursuit of dominance in the e-commerce market. But once Amazon began to switch its focus from pure growth to profitability, it reversed course on these products, engaging in an ongoing "CRAP-Out Process," by which Amazon attempts to make CRAP profitable through a variety of methods, such as raising delivery fees or requiring vendors to repackage products.[1873] This increases costs for sellers and brands, who have no choice but to acquiesce to the

---

[1864] CEO Hearing Transcript at 83 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1865] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00132026 (June 8, 2010) (on file with Comm.).

[1866] *Id.* at AMAZON-HJC-00151722 (Feb. 9, 2009).

[1867] *Id.* at AMAZON-HJC-00057007 (Apr. 5, 2010).

[1868] *Id.* at AMAZON-HJC-00009716 (Sept. 21, 2010).

[1869] *Id.* at AMAZON-HJC-00009596 (Nov. 2, 2010).

[1870] *Id.* at AMAZON-HJC-00142833 (May 12, 2009).

[1871] *Id.* at AMAZON-HJC-00167480.

[1872] Laura Steven, Sharon Terlep & Annie Gasparro, *Amazon Targets Unprofitable Items, with a Sharper Focus on the Bottom Line*, WALL ST. J. (Dec. 16, 2018), https://www.wsj.com/articles/amazon-targets-unprofitable-items-with-a-sharper-focus-on-the-bottom-line-11544965201.

[1873] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00167484  (on file with Comm.) ("How to deal with CRAP.").

**App. 373**

changed shipping and packaging rules given their dependence on Amazon for e-commerce sales. Amazon executives acknowledged that CRAP was an element of its plan for growth, noting in a strategy session that, "We want to ensure that if despite all our efforts to improve our cost structure, we lose money on an ASIN [Amazon Standard Identification Number] it is for the long term strategic growth of Amazon."[1874]

Amazon documents provided in response to the Committee's requests show the extent to which Amazon was committed to below-cost pricing. A 2010 review of its baby formula business identified Amazon's "most frequently matched internal competitor" as ABCBabyFormula, which "typically [ ] price[d] 15-20% below [Amazon's] cost."[1875] Identifying this company as the most significant influence on Amazon's baby formula profit loss, the document notes of ABCBabyFormula that "[m]anufacturers do not sell to them directly and believe they are sourcing black market stolen goods."[1876] Amazon frequently price-matched, at significantly below-cost, a competitor that it had reason to believe was sourcing baby formula from illegal and potentially dangerous sources— indicating the lengths to which Amazon was willing to go to ensure product selection and, in turn, growth.

### 4) Amazon Devices

Finally, Amazon sells its own branded hardware devices on its Marketplace and has often priced those devices below cost in an attempt to corner the market for those devices and adjacent markets. In Amazon's effort to "own the smart home," for example, Amazon sometimes prices its Echo Speaker below-cost. Market estimates suggest that Amazon's Echo Dot third generation materials cost is $37.68,[1877] while the company listed it at $22 during its 2019 Prime Day.[1878] Other market research of Amazon products found that Amazon Echo products are on sale as often as they are at full price.[1879] Illustrating how low prices may not always be in consumers' best interest, Patrick Spence, the CEO of Sonos, testified before the Subcommittee that these pricing habits "hamstring[] those companies that have better products that cannot be sold at a loss."[1880] At the Subcommittee's

---

[1874] *Id.*

[1875] *Id.* at AMAZON-HJC-0014302 (Sept. 30, 2010).

[1876] *Id.*

[1877] Submission from Source 38, to H. Comm. on the Judiciary, 19 (Sept. 1, 2019) (citing TECHINSIGHTS).

[1878] *Id.*; *see also* Samantha Gordon, *Prime Day is Almost Over—These Are the Best Deals You Can Still Get*, USA TODAY (July 15, 2019), https://www.usatoday.com/story/tech/reviewedcom/2019/07/15/prime-day-2019-best-amazon-deals-you-can-get-during-massive-sale/1683589001/ (last visited Oct. 4, 2020) ("Echo Dot—$22").

[1879] Sean Hollister, *Amazon Doesn't Sell Echo Speakers at a Loss, Says Bezos — Unless They're on Sale*, THE VERGE (July 29, 2020), https://www.theverge.com/2020/7/29/21347121/amazon-echo-speaker-price-undercut-rivals-loss-sale-antitrust-hearing.

[1880] Competitors Hearing at 4–5 (statement of Patrick Spence, CEO, Sonos, Inc.).

**App. 374**

hearing, Representative Jamie Raskin (D-MD) raised this concern with Mr. Bezos.[1881] In response, Mr. Bezos responded that the Amazon Echo is "often on promotion, and sometimes when it's on promotion it may be below cost."[1882]

3.   Fulfillment and Delivery

   a.   Market Power

   As Amazon's e-commerce business has grown, it has also developed a significant logistics business surrounding fulfillment and delivery of third-party orders with its Fulfillment by Amazon (FBA) program. More than 73% of all Amazon Marketplace sellers reportedly rely on this program to fulfill their orders.[1883] Because of this, a trade association that represents third-party sellers refers to Amazon's fulfillment operation "as the railroad of [e-commerce]."[1884] In addition to its fulfillment operation, Amazon is also one of the largest shippers in the world. The company provides global shipping services for its own products and independent sellers that sell on Amazon.com, as well as other e-commerce sites.[1885]

   Amazon's ground shipping infrastructure consists of "trucks, trailers, intermodal containers, and delivery vehicles."[1886] Its truck fleet consists of more than 10,000 trailers.[1887] It also has its own freight airline, Amazon Air, with about 50 leased aircraft,[1888] and plans to expand its fleet to 70 by 2021.[1889] Amazon has also built hundreds of package sorting and delivery centers across the United

---

[1881] CEO Hearing Transcript at 107 (question of Rep. Jamie Raskin (D-MD), Member, Subcomm. On Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1882] *Id.* (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1883] *See Fulfillment by Amazon Usage Among Top Sellers Worldwide 2017–2018*, STATISTA, https://www.statista.com/statistics/1020046/global-fba-usage-top-amazon-sellers/ (last visited Oct. 4, 2020).

[1884] Submission from Online Merchants Guild, to H. Comm. on the Judiciary, 8 (Oct. 23, 2019) (on file with Comm.).

[1885] *Fill Orders from Other Sales Channels (Multi-Channel Fulfillment)*, AMAZON SELLER CENTRAL, https://sellercentral.amazon.com/gp/help/external/200332450#:~:text=Multi%2DChannel%20Fulfillment%20(MCF),ships%20them%20to%20your%20customers (explaining that "Multi-Channel Fulfillment (MCF) is a program within Fulfillment by Amazon (FBA)," that fills orders from sales channels placed on sites other than Amazon.com) (last visited Oct. 4, 2020).

[1886] Innovation and Entrepreneurship Hearing at 19 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1887] Press Release, Amazon, Continued Growth for Amazon's Air Network (June 28, 2019), https://press.aboutamazon.com/news-releases/news-release-details/continued-growth-amazons-air-network-expand-prime-fast-free.

[1888] Innovation and Entrepreneurship Hearing at 19 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1889] Press Release, Amazon, Continued Growth for Amazon's Air Network (June 28, 2019), https://press.aboutamazon.com/news-releases/news-release-details/continued-growth-amazons-air-network-expand-prime-fast-free.

**App. 375**

States and has established its own network of contracted delivery providers exclusively dedicated to delivering packages for Amazon.[1890]

In recent years, the size and scope of Amazon's delivery services network have grown significantly. When Amazon first launched Fulfillment by Amazon, it stored products and packed orders in its warehouses, but relied on other carriers to handle shipping and delivery. Today, Amazon ships a growing number of products itself. In 2019, "Amazon delivered about half of its own packages, up from 15 percent just two years before."[1891] Amazon has also lessened its use of large delivery companies during this time, using "800 small, independent contractors [which] are now responsible for around 48 percent of Amazon's last mile deliveries."[1892] These smaller providers are economically-dependent on Amazon, and "many are in fact reliant on Amazon for 100 percent of their business."[1893]

Parcel volume handled by Amazon's delivery service now rivals the top carriers, including UPS, FedEx, and the U.S. Postal Service. "In 2019, Amazon delivered 2.5 billion parcels, or about one-fifth of all e-commerce deliveries,"[1894] and anticipates growth. In a July 2020 investor call, Amazon CFO Brian Olsavsky stated that Amazon "expect[s] a meaningfully higher year-over-year square footage growth of approximately 50%," which includes "strong growth in new fulfillment center space as well as sort centers and delivery stations."[1895]

An analysis by Morgan Stanley concluded that Amazon will overtake UPS and FedEx in market share for delivery by 2022. Amazon has already surpassed the U.S. Postal Service, which has been downsized dramatically under its current leadership.[1896] Last year, the U.S. Postal Service had a decrease in parcel volume for the first time in nearly a decade.[1897]

---

[1890] INST. FOR LOCAL SELF-RELIANCE, AMAZON'S MONOPOLY TOLLBOOTH 8 (2020), https://cdn.ilsr.org/wp-content/uploads/2020/07/ILSR_Report_AmazonTollbooth_Final.pdf.

[1891] *Id.*

[1892] Submission from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union, Service Employees Int'l Union & Change to Win, to H. Comm. on the Judiciary, 13 (March 10, 2020) (on file with Comm.).

[1893] *Id.* at 14.

[1894] INST. FOR LOCAL SELF-RELIANCE, AMAZON'S MONOPOLY TOLLBOOTH 8 (2020), https://cdn.ilsr.org/wp-content/uploads/2020/07/ILSR_Report_AmazonTollbooth_Final.pdf.

[1895] Rachel Premack, *Amazon Is Piling Up Fulfillment Center Square Footage, and It Shows Bezos Thinks the Pandemic-Driven Online Shopping Surge Is Here to Stay*, BUS. INSIDER: MKTS. (Jul 31, 2020), https://markets.businessinsider.com/news/stocks/amazon-fulfillment-center-growth-reveals-pandemic-online-ordering-surge-2020-7-1029456709# (last visited Oct. 4, 2020).

[1896] INST. FOR LOCAL SELF-RELIANCE, AMAZON'S MONOPOLY TOLLBOOTH 8 (2020), https://cdn.ilsr.org/wp-content/uploads/2020/07/ILSR_Report_AmazonTollbooth_Final.pdf.

[1897] *Id.*

**App. 376**

b. <u>Monopsony Power</u>

Amazon exercises monopsony power in labor markets directly and indirectly. As one of the largest employers in America, Amazon exercises direct power over hundreds of thousands of workers across the United States.[1898] Amazon employees make up 22% of the U.S. labor market in warehousing and storage, excluding seasonal workers.[1899] There has been a growing amount of public reporting in recent years regarding Amazon's treatment of warehouse employees, including strenuous working conditions, unforgiving packing and sorting quotas, and unfair firings.[1900] Amazon warehouses also have a tendency to depress wages when they enter a local labor market. For example, since Amazon opened a warehouse in Lexington County, South Carolina in 2011, the county has seen average annual wages for warehouse workers fall more than 30%, from $47,000 to $32,000 annually.[1901]

Indirectly, Amazon has wage-setting power through its ability to set route fees and other fixed costs for independent contractors in localities in which it dominates the delivery labor market. These entities are dependent on Amazon for a large majority—or even 100%—of their delivery business.[1902] As a result, they have little choice but to "submit to Amazon's prices and other terms."[1903] Amazon's dominance also enables it to compel logistics employees to quit their jobs and instead act as independent contractors, removing employment protections. A group of labor unions stated in their submission to the Subcommittee, "By virtue of its size and power as a buyer of delivery services, Amazon can impose monopolistic restraints on the treatment of workers within its supply chain while, at the same time, avoiding legal responsibility for their fair treatment."[1904]

Despite the loss of jobs and economic activity in the wake of the COVID-19 pandemic, Amazon's monopsony power has likely increased. In response to higher demand for goods and

---

[1898] Submission from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union, Service Employees Int'l Union & Change to Win. to H. Comm. on the Judiciary, 12 (March 10, 2020) (on file with Comm.).

[1899] *What Amazon Does to Wages*, THE ECONOMIST (Jan. 20, 2018), https://www.economist.com/united-states/2018/01/20/what-amazon-does-to-wages.

[1900] *See, e.g.*, Colin Lecher, *How Amazon Automatically Tracks and Fires Warehouse Workers for 'Productivity,'* THE VERGE (Apr. 25, 2019), https://www.theverge.com/2019/4/25/18516004/amazon-warehouse-fulfillment-centers-productivity-firing-terminations.

[1901] *What Amazon Does to Wages*, THE ECONOMIST (Jan. 20, 2018), https://www.economist.com/united-states/2018/01/20/what-amazon-does-to-wages.

[1902] Submission from Int'l Bhd. Of Teamsters, Commc'n Workers of Am., United Food & Commercial Workers Int'l Union, Service Employees Int'l Union & Change to Win, to H. Comm. on the Judiciary, 14 (March 10, 2020) (on file with Comm.).

[1903] *Id.*

[1904] *Id.* at 13.

**App. 377**

services, Amazon hired 175,000 temporary workers in March and April of 2020, making 125,000 of those jobs permanent in May 2020.[1905]

### 4.   Alexa's Internet of Things Ecosystem

#### a.   Overview

Amazon has significant investments in the Internet of Things ecosystem, centering its strategy around Amazon's voice assistant, Alexa. In 2014, Amazon launched the Alexa-enabled Echo smart speaker.[1906] Since then, Amazon has built the largest ecosystem of devices and applications connected to the Internet of Things,[1907] creating a broad portfolio of services, development tools, and devices for its Alexa platform. Amazon's research and development team, Lab126, leads the development of Amazon's Internet of Things hardware expansion, including the development of Amazon Echo and Fire TV.[1908] These devices represent a "critical touchpoint that generates insights into user behavior, which can then be used to deepen the relationship with consumers and expose them to new products through personalized recommendations."[1909] Amazon encourages consumers to use Alexa through its Echo smart speakers and other Alexa compatible devices, ranging from smart microwaves to its Echo Frames.[1910]

In 2015, Amazon launched a kit for independent developers to access Alexa in the cloud and create new Alexa apps, which Amazon refers to as "skills."[1911] Two years later, in an effort to expand its ecosystem of devices, Amazon launched Alexa Voice Service. This suite of services allows manufacturers of hardware with microphones and speakers to receive and respond to Alexa voice

---

[1905] Sebastian Herrera, *Amazon to Keep Most of the Jobs It Added During Pandemic*, WALL ST. J. (May 28, 2020). https://www.wsj.com/articles/amazon-to-keep-most-of-the-jobs-it-added-during-pandemic-11590661802.

[1906] *See e.g.*, Chris Welch, *Amazon just surprised everyone with a crazy speaker that talks to you*, THE VERGE (Nov. 6, 2014), https://www.theverge.com/2014/11/6/7167793/amazon-echo-speaker-announced; Nick Statt, *Amazon wants Alexa to be the operating system for your life*, THE VERGE (Sept. 27, 2018), https://www.theverge.com/2018/9/27/17911300/amazon-alexa-echo-smart-home-eco-system-competition.

[1907] *See infra* Section IV.

[1908] *Amazon Jobs, Lab126*, AMAZON, https://amazon.jobs/en/teams/lab126/ (last visited Sept. 29, 2020).

[1909] *See* Johanna Ambrosio, *Amazon smart devices to expand in homes and businesses*, TECHTARGET (Mar. 23, 2020), https://searchaws.techtarget.com/feature/Amazon-smart-devices-to-expand-in-homes-and-businesses

[1910] *Echo Frames – Eyeglasses with Alexa – Black – A Day 1 Editions product*, AMAZON, https://www.amazon.com/dp/B07W72XKPJ. *See also AmazonBasics Microwave, Small, 0.7 Cu. Ft, 700W, Works With Alexa*, AMAZON, https://www.amazon.com/dp/B07894S727 (last visited Sept. 29, 2020).

[1911] David Isbitski, *Introducing the Alexa Skills Kit, Enabling Developers to Create Entirely New Voice Driven Capabilities*, AMAZON DEVELOPER (June 25, 2015), https://developer.amazon.com/blogs/post/Tx205N9U1UD338H/Introducing-the-Alexa-Skills-Kit-Enabling-Developers-to-Create-Entirely-New-Voic.

**App. 378**

commands, making the device "Alexa-enabled,"[1912] or "Alexa built-in."[1913] Additionally, Amazon oversees Works with Alexa, an Alexa-compatible device certification program for devices that receive commands through an Alexa-enabled device, such as a smart speaker.[1914] Amazon does not charge third-party device manufacturers for access to its integration services, which promotes rapid adoption of Alexa in a larger number of devices, which, in turn, drives greater adoption by consumers.[1915]

These programs indicate that Amazon is focused on expanding Alexa's reach rather than short-term profitability, consistent with the early stages of its marketplace strategy. Amazon CFO Brian Olsavsky confirmed this in an earnings call in July 2019, saying that the company's "emphasis is around expanding the reach of Alexa and the usefulness."[1916] He added that at the time, Alexa had "over 45,000 skills" and was in "over 13,000 smart home devices from 2,500 unique brands."[1917]

Lastly, Amazon's Alexa ecosystem is a major source of consumer data; it tracks if the home owner's lights are off and the events on their calendar.[1918] Amazon is also building a series of devices that allow people to have "Alexa in [their] ears, on [their] eyes, and around [their] fingers."[1919]

b.  Market Power

Amazon's Alexa represents one of three emerging voice assistant platforms domestically, along with Google Assistant and Apple's Siri, but has a more expansive collection of integrated devices and voice applications than its competitors.[1920] The Echo collection of smart speakers—the hub of Alexa's ecosystem—captures over 60% of the smart speaker market in the U.S.[1921]

---

[1912] Satish Iyer, *Introducing the Alexa Voice Service Device SDK for Commercial Device Makers*, AMAZON ALEXA (Aug. 17, 2017), https://developer.amazon.com/blogs/alexa/post/7a72f14e-66d6-42fb-b369-c60af364489a/introducing-the-alexa-voice-service-avs-device-sdk-for-commercial-device-makers.

[1913] *What are Alexa Built-in Devices?*, AMAZON ALEXA, https://developer.amazon.com/en-US/alexa/devices/alexa-built-in (last visited Sep. 29, 2020).

[1914] *Works with Alexa Program*, AMAZON ALEXA, https://developer.amazon.com/en-US/alexa/connected-devices/launch/works-with-alexa (last visited Sept. 29, 2020).

[1915] Class Action Complaint at 8, B.F. v. Amazon.com, Inc., No. 2:19-cv-910 (W.D. Wash., June 11, 2019).

[1916] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00200464 (July 26, 2018) (on file with Comm.).

[1917] *Id*.

[1918] Innovation and Entrepreneurship Hearing at 40 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1919] Daniel Newman, *Opinion: Amazon's Alexa is about to become even more of a fixture in our lives*, MARKETWATCH (Sept. 30, 2019), https://www.marketwatch.com/story/amazons-alexa-is-about-to-become-even-more-of-a-fixture-in-our-lives-2019-09-27.

[1920] *See infra* Section IV.

[1921] Submission from Source 38, to H. Comm. on the Judiciary, 7 (Sept. 1, 2019).

**App. 379**

As of September 2019, there were 85,000 Works with Alexa devices available for consumers to purchase.[1922] The current network of Alexa-enabled devices includes companies like Sonos, Hewlett-Packard, and BMW.[1923] The U.S.-based Alexa Skills Store as of January 2020 includes 70,729 skills.[1924] In comparison, as of December 2019, Google's voice application ecosystem had just over 18,826 Google Actions.[1925]

The voice assistant market has strong entry barriers due to the significant investments required to compete in the market. These include investments in artificial intelligence, voice-enabled hardware, and cloud computing infrastructure, which are critical inputs Amazon has been developing for years. Amazon's Alexa Voice Service is also hosted on Amazon Web Services, allowing it to bind products and developers to its cloud platform.[1926] In turn, this relationship gives Amazon a potential head-start on turning its Alexa business partners into customers through the cross-sale of Amazon Web Services and other Amazon products and services down the line.

Voice assistants collect significant amounts of personal data and learn users' preferences over time. For example, when Alexa users add more devices that integrate with Alexa, they often manage the settings for these devices through mobile applications and websites that are tied to their Amazon credentials, thereby creating a robust user profile.[1927] As Amazon continues to expand Alexa's reach, this customization of features allows Amazon to better "understand" its users, which may affect their willingness to retrain a new voice assistant.[1928] In addition to the cost of replacing their devices, this friction—retraining a new voice assistant—may increase costs associated with switching to another voice assistant ecosystem.

c.  Merger Activity

Amazon has expanded its voice assistant ecosystem by acquiring artificial intelligence companies to strengthen Alexa's functionality and voice-enabled device manufacturers to expand

---

[1922] Kyle Wiggers, *The Alexa Skills Store now has more than 100,000 voice apps*, VENTUREBEAT (Sept. 25, 2019), https://venturebeat.com/2019/09/25/the-alexa-skills-store-now-has-more-than-100000-voice-apps/.

[1923] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00200465 (July 26, 2018) (on file with Comm.).

[1924] H. Tankovska, *Total number of Amazon Alexa skills in selected countries as of January 2020*, STATISTA (Aug. 27, 2020), https://www.statista.com/statistics/917900/selected-countries-amazon-alexa-skill-count/.

[1925] Shanhong Liu, *Number of Google Assistant Actions Worldwide 2019, by Language*, STATISTA (June 17, 2020), https://www.statista.com/statistics/1062722/worldwide-google-action-disappearance-by-language.

[1926] *Build the future of the connected home with AWS IoT and Amazon Alexa*, AWS, https://aws.amazon.com/iot/solutions/connected-home/iot-and-alexa/ (last visited Sept. 29, 2020).

[1927] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172104 (Mar. 9, 2018) (on file with Comm.).

[1928] Submission from Source 39, to H. Comm. on the Judiciary, Source 39-00000098 at 19 (Sept. 16, 2019) (on file with Comm.).

**App. 380**

Alexa's reach.[1929] In 2011, Amazon acquired Yap, a speech recognition platform.[1930] The next year, in 2012, Amazon acquired Evi, a technology for understanding natural language.[1931] Over the years, Amazon has continued to acquire other businesses engaged in natural language processing, machine learning, and other related technologies in support of its continued efforts to improve Alexa's artificial intelligence functionality.[1932]

One of Amazon's strategic goals for Alexa has been to use its voice assistant to reinforce the company's dominance in e-commerce and strengthen its presence in offline retail. In 2017, Amazon acquired Graphiq, a technology company that collects and organizes details about "products, places, and people to simplify online research."[1933] This acquisition appears to have been part of Amazon's effort to improve Alexa's overall search capabilities, most notably product search, as the technology includes "features to tailor comparisons around individual preferences."[1934]

In 2017, Amazon purchased Blink, followed by Ring in 2018—both to solidify its position in the home security market.[1935] In an internal document, Amazon recognized that security could "feed our flywheels (Prime, Alexa) while being a large, profitable business in its own right."[1936] Prior to these acquisitions Jeff Helbling, Vice President at Amazon, emailed a group of Amazon executives, recapping a discussion on the transactions he had with Mr. Bezos. There, he detailed the twin justification for the acquisitions, saying that "two senses matter—eyes and ears."[1937] Amazon had already locked down "ears" through its continued development of Alexa. Ring and Blink would act as Amazon's "eyes" right outside the home.

Amazon's internal documents show that, in large part, it purchased Ring to capture the company's share of the smart home security market. In December 2017, Mr. Bezos wrote to Dave Limp, the Senior Vice President of Devices & Services, that Amazon was really "buying market

---

[1929] *See infra* Appendix.

[1930] Sam Byford, *Amazon Acquires Yap, move into Speech Recognition?,* THE VERGE (Nov. 9, 2011), https://www.theverge.com/2011/11/9/2550764/amazon-acquires-yap-speech-recognition-siri.

[1931] Emma Bryce, *How Amazon's Alexa was 'born' and where voice-controlled tech will take us next,* WIRED (Feb. 14, 2017), https://www.wired.co.uk/article/amazon-alexa-ai-evi.

[1932] *See infra* Appendix.

[1933] Paresh Dave, *Amazon acquires Santa Barbara start-up Graphiq to try to bolster Alexa,* L.A. TIMES (July 20, 2017), https://www.latimes.com/business/technology/la-fi-tn-graphiq-amazon-20170719-story.html.

[1934] *Id.*

[1935] Jacob Kastrenakes, *Amazon buys smart camera and doorbell startup Blink,* THE VERGE (Dec. 22, 2017), https://www.theverge.com/circuitbreaker/2017/12/22/16810516/amazon-blink-acquisition-smart-camera-doorbell-company; *see also* Samuel Gibbs, *Amazon buys video doorbell firm Ring for over $1bn,* THE GUARDIAN (Feb. 28, 2018), https://www.theguardian.com/technology/2018/feb/28/amazon-buys-video-doorbell-ring-smart-home-delivery.

[1936] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00169702 (Mar. 9, 2018) (on file with Comm.).

[1937] *Id.* at AMAZON-HJC-00170877 (Oct. 11, 2017).

**App. 381**

position" by acquiring Ring.[1938] During the Subcommittee's sixth hearing, Representative Jamie Raskin (D-MD) asked Mr. Bezos about this exchange.[1939] Mr. Bezos responded:

> Sir, market position is valuable in almost any business, and it's one of the primary things that one would look at in an acquisition. There are multiple reasons that we might buy a company. Sometimes we're trying to buy some technology or some IP. Sometimes it's a talent acquisition. But the most common case is market position, that the company has traction with customers, they've built a service, maybe they were the first mover. There could be any number of reasons why they have that market position. But that's a very common reason to acquire a company.[1940]

This response suggests that adding Ring's users to the Alexa ecosystem quickly was also important to Amazon's rationale.

A 2017 internal memorandum further explains Amazon's strategy behind these acquisitions. As the memorandum notes, while acquiring each company independently would make Amazon stronger, acquiring both "would put us in a meaningfully better position than we are today (and we would not want to stake our chances in the segment on closing any one opportunity)."[1941] Douglas Booms, the Vice President of Corporate Development at Amazon, sent an email summarizing the thoughts of other senior executives at the company, which included: "I don't know how we can get big fast in that segment without an [sic] acquiring someone."[1942]

The documents and other relevant information reviewed by Subcommittee staff demonstrate that Amazon acquiring Ring and Blink was in part to expand and reinforce its market power for its other business lines. Internally, Amazon executives discussed how home surveillance acquisitions would help them implement unattended package delivery. Similarly, they discussed the idea that the acquisitions would help Amazon develop its Alexa Doorbell application program interface, an AWS service that allows Alexa Skills developers to build apps that respond to a ringing doorbell.[1943] Amazon referred to this strategy as an "integration approach" to "remove impediments to future growth." [1944]

---

[1938] *Id.* at AMAZON-HJC-00173560 (Dec. 15, 2017).

[1939] CEO Hearing Transcript at 108 (question of Rep. Jamie Raskin (D-MD), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1940] *Id.* (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1941] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00169706 (Mar. 9, 2018) (on file with Comm.).

[1942] *Id.* at AMAZON-HJC-00170869 (Nov. 1, 2017).

[1943] *Id.* at AMAZON-HJC-00169706 (Mar. 9, 2018); *Alexa.DoorbellEventSource Interface*, AMAZON ALEXA, https://developer.amazon.com/en-US/docs/alexa/device-apis/alexa-doorbelleventsource.html (last visited Sept. 30, 2020).

[1944] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172104 (Mar. 9, 2018) (on file with Comm.).

**App. 382**

More recently, Amazon purchased Eero, a mesh networking company, for $97 million in 2019.[1945] The purchase was part of Amazon's strategy to offer "frustration-free setup" for smart home devices in the Alexa ecosystem, another move aimed at removing impediments to growing the platform's presence in the home.[1946] "Amazon Wi-fi Simple Setup" scans the user's Eero network during initial set-up of an Alexa-enabled device, applying the user's stored credentials to automatically connect to other smart devices, such as outlets and Fire TV devices.[1947] To achieve this, Eero must continually understand which devices are connected to the network, including the IP addresses of those devices.[1948] This acquisition gives Amazon access to another important input for consumer data.[1949]

### d.  Conduct

During the Subcommittee's investigation, market participants raised concerns about Amazon's business practices in the smart home market. As these market participants note, Amazon uses Alexa to favor its own goods and services, including AmazonBasics and Prime Music. Amazon has also imposed barriers to entry for other voice-enabled device manufacturers through predatory pricing of Alexa-enabled devices, and through its dominance as a leading distribution channel for smart home devices.

### i.  Self-Preferencing

Amazon has the largest voice application "store" of third-party skills, as well as first-party services that represent popular voice assistant applications, such as Amazon Music and an e-commerce platform that it can favor over third-party applications.[1950] Amazon favors its services in Alexa by making them defaults for common voice commands. For example, Amazon.com is the default store for

---

[1945] Lisa Eadicicco & Alexei Oreskovic, *Amazon paid $97 million to acquire Eero in a fire sale deal that left some shareholders with practically nothing, according to leaked documents*, BUS. INSIDER (Apr. 5, 2019), https://www.businessinsider.com/amazon-paid-97-million-to-acquire-eero-in-fire-sale-leaked-documents-2019-4.

[1946] *See* Lisa Eadicicco, *A year after selling to Amazon for $1 billion, the chief inventor of the Ring video doorbell explains how he's bringing his entrepreneurial spirit to the online retailer*, BUS. INSIDER (Apr. 9, 2019), http://static7.businessinsider.com/ring-founder-jamie-siminoff-life-after-amazon-acquisition-2019-4 (quoting Jamie Siminoff, Founder of Ring, describing the importance of Eero and his support of Amazon's acquisition, "[Ring is] a product that requires great Wi-Fi connectivity. We use a lot of bandwidth so we're certainly very sensitive to Wi-Fi networks.").

[1947] *Amazon Frustration-Free Setup Frequently Asked Questions,* AMAZON, https://www.amazon.com/gp/help/customer/display.html?nodeId=GMPKVYDBR223TRPY (last visited Oct. 4, 2018).

[1948] *Legal: Privacy policy for eero Devices, Applications and Services*, EERO, https://eero.com/legal/privacy (last visited Sept. 29, 2020); *Legal: Privacy policy for eero Websites*, EERO, https://eero.com/legal/privacy-website (last visited Sept. 29, 2020).

[1949] Innovation and Entrepreneurship Hearing at 41 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1950] Competitors Hearing at 4 (statement of Patrick Spence, CEO, Sonos, Inc.).

**App. 383**

basic voice commands related to shopping. "Alexa, add milk to my cart," adds milk to the user's Amazon shopping cart.[1951]

Besides favoring Amazon services with default voice commands, Alexa also allows Amazon to favor its retail products over products offered by third-party sellers. When users shop via voice command, they are presented with one spoken offer and an option for a follow-up question, which is distinct from an online user interface that shows the additional offers ranked. This increases the importance of being Alexa's featured offer.[1952]

For example, *The New York Times* reported in 2018 that when a user says, "Alexa, buy batteries," Alexa responds with the AmazonBasics option.[1953] Similarly, a study conducted by Bain & Company found that for categories in which Amazon offered a private-label product, Alexa recommended those products 17% of the time, despite its private-label goods representing only about 2% of total volume sold.[1954] During the Subcommittee's sixth hearing, Representative Jamie Raskin (D-MD) asked Mr. Bezos "[H]as Alexa ever been trained to favor Amazon products when users shop by voice?"[1955] Mr. Bezos responded that he didn't "know if it's been trained in that way," but "it wouldn't surprise me if Alexa sometimes does promote our own products."[1956]Amazon chooses the products Alexa suggests based on a range of features, including products that "customers frequently purchase based on their past orders" and Amazon's Choice designation.[1957] Amazon's method for determining "Amazon's Choice" is opaque.[1958]

Amazon minimizes concerns about favoring its first-party goods through voice shopping by highlighting how rare it is for people to purchase goods through Alexa.[1959] Reporting suggests, however, that there is an increasing number of queries from users who expect to hear product

---

[1951] *Do more with Alexa*, AMAZON, https://www.amazon.com/alexa-voice-shopping/b?ie=UTF8&node=14552177011 (last visited Sept. 30, 2020).

[1952] Submission from Source 39, to H. Comm. on the Judiciary, Source 39-00000097 at 19 (Sept. 16, 2019) (on file with Comm.).

[1953] Julie Creswell, *How Amazon Steers Shoppers to Its Own Products*, N.Y. TIMES (June 23, 2018), https://www.nytimes.com/2018/06/23/business/amazon-the-brand-buster.html.

[1954] Aaron Cheris, Darrell Rigby & Suzanne Tager, *Dreaming of an Amazon Christmas*, BAIN & CO. (Nov. 9, 2017), https://www.bain.com/insights/retail-holiday-newsletter-2017-issue-2/.

[1955] CEO Hearing Transcript at 120 (question of Rep. Jamie Raskin (D-MD), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1956] *Id.* at 121 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1957] CEO Hearing at 5 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.); *see also* Aaron Cheris, Darrell Rigby & Suzanne Tager, *Dreaming of an Amazon Christmas*, BAIN & CO. (Nov. 9, 2017), https://www.bain.com/insights/retail-holiday-newsletter-2017-issue-2/.

[1958] Aaron Cheris, Darrell Rigby & Suzanne Tager, *Dreaming of an Amazon Christmas*, BAIN & CO. (Nov. 9, 2017), https://www.bain.com/insights/retail-holiday-newsletter-2017-issue-2/.

[1959] Innovation and Entrepreneurship Hearing at 39 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

**App. 384**

information or to complete a transaction while interacting with a voice assistant.[1960] Amazon also justified the fact that third-party sales through Alexa are lower than third-party sales on Amazon.com—42% compared to 58%—by saying that "customers disproportionately use Alexa to order household consumable items (like paper towels or batteries) for which Amazon's offers are particularly competitive."[1961] This demonstrates the problem, however, given that voice shopping is most useful for products in which consumers do not have to do much research or engage in price comparison. Alexa's algorithm, in conjunction with the AmazonBasics business model, provides a convenient avenue for Amazon to favor first-party products.

Although it is technically possible for Alexa users to voice shop at other stores, there is significant friction. Users must first enable the shopping skills for other online retailers, which then requires the user to set up a completely separate billing profile, even though it contains similar information to their Amazon user profile.[1962] Alexa-enabled devices are tied to the user's Amazon account, which populates the user's saved credit card and shipping information for use during general shopping commands.[1963]

### ii. Predatory Pricing and Bundling

Amazon uses a predatory pricing strategy to increase its sales of smart home devices by pricing its products below cost.[1964] It is common for Amazon to sell these products in bundles at steep discounts. Several smart home device manufacturers told the Subcommittee that when Amazon sells certain devices in a bundle or at a steep discount, it makes it nearly impossible for companies who specialize in making one piece of voice-assistant enabled hardware to compete on its merits.[1965] Furthermore, as described earlier in this Report, aggressive pricing of smart home devices—specifically "hubs" such as the Echo—has created a significant barrier to entry for companies that want to compete with the leading voice assistant platforms.

---

[1960] Khari Johnson, *Voicelabs ditches analytics service to launch Alpine.ai for ecommerce voice apps*, VENTUREBEAT (Jan. 29, 2018), https://venturebeat.com/2018/01/29/voicelabs-ditches-analytics-service-to-launch-alpine-ai-for-ecommerce-voice-apps/.

[1961] CEO Hearing at 5 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[1962] *See Alexa Skills: Shopping,* AMAZON, https://www.amazon.com/s/ref=lp_13727921011_nr_n_16?fst=as%3Aoff&rh=n%3A13727921011%2Cn%3A21137279 22011%2Cn%3A14284862011&bbn=13727922011&ie=UTF8&qid=1600864849&rnid=13727922011 (last visited Sept. 30, 2020).

[1963] *Set Up Your Echo*, AMAZON, https://www.amazon.com/gp/help/customer/display.html?nodeId=GKFJXZCLQ83HGHQZ (last visited Oct. 3, 2020).

[1964] *Id.* at 119 (statement of Jeff Bezos, CEO, Amazon.com, Inc.).

[1965] Competitors Hearing at 3–4 (statement of Patrick Spence, CEO, Sonos, Inc.).

**App. 385**

### iii. Use of Gatekeeper Power

Amazon Marketplace is an important distribution channel for voice-enabled electronics in its Alexa ecosystem. Amazon decides the availability and placement of products on its site. As a result, Amazon can use the threat of delisting a product on its marketplace to ensure that Alexa is enabled on other company's devices or to secure other favorable contractual terms.

In an interview with Subcommittee staff, a seller that sells a significant number of its device on Amazon.com said that during contract negotiations, Amazon repeatedly refers to its power to delist the company's product if Amazon's services are not prominent enough on the device.[1966] In 2017, Amazon also reportedly informed one of its main home security competitors—the Google-owned smart home company Nest—that it would not list any of its recently announced products, including its latest smart thermostat and home security system.[1967] Notwithstanding its own market power, Google's internal communications describe Amazon as having "changed the dynamics," observing that there is a "built in incentive to partner with Alexa, since [Amazon] will pull you from their store if you don't support it."[1968]

Additionally, Amazon controls the prominence of competing voice-enabled devices on its marketplace and promotes its first-party voice-enabled devices on Amazon.com. In an internal memorandum to Amazon executives about the Ring acquisition, Michael Deal, Amazon's Vice President and Associate General Counsel, said that Amazon "can promote Ring's products and subscription plans heavily on our sites as we do with our current [first-party] devices."[1969]

Relatedly, Amazon can also use advertisement placement as leverage during negotiations with other device manufacturers. In interviews with Subcommittee staff and submissions to the Subcommittee, several market participants said that ad placement was used as leverage in negotiations. In one instance, Amazon placed a competing brand's ad beneath the product of the firm it was negotiating with "to influence negotiations."[1970] Additionally, Subcommittee staff heard from a voice-enabled device manufacturer that offers a competitive product to Amazon's first-party devices that it was prohibited from buying ads on Amazon.com.[1971] The competitor expressed concern about the

---

[1966] Interview with Source 148 (Aug. 26, 2020).

[1967] Steve Kovach, *Amazon Will Stop Selling Nest Smart Home Devices, Escalating Its War With Google*, BUS. INSIDER (Mar. 2, 2018), https://www.businessinsider.com/amazon-wont-sell-nest-products-from-google-2018-3.

[1968] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC- 04258793–993 (Jan. 29, 2019) (on file with Comm.).

[1969] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00172104 (Mar. 9, 2018) (on file with Comm.).

[1970] Submission from Source 38, to H. Comm. on the Judiciary, 27 (Sept. 1, 2019) (on file with Comm.).

[1971] Interview with Source 148 (Aug. 26, 2020).

**App. 386**

harm this causes consumers, who may be confused or deceived when they receive ads promoting Amazon products even when they specifically search for a competitor's product on Amazon.com.[1972]

Even Google, which ranks just behind Amazon in online shopping queries, believes it has a disadvantage with Amazon. In an internal email about smart speakers, a Google employee noted that "fighting Amazon with a very-hard-to-differentiate product and a channel disadvantage and a huge economic disadvantage (due to channel mix margin differences) is already like fighting a shark on a surfboard."[1973]

### iv.   Misuse of Data

Amazon has access to information about consumer use of third-party applications on Alexa-enabled devices and uses its dominant position in the voice assistant market to collect more data from within the Alexa ecosystem.

Amazon has insight into which Alexa skills are invoked by Alexa users and the frequency of usage.[1974] Considering Amazon's use of third-party seller's data in e-commerce and cloud customer's data on Amazon Web Services, Amazon may use the same tactics with other firms' voice application data to determine which voice assistant skills it should invest in.

Additionally, Amazon uses its market power to collect third-party voice application data. According to a July 2020 report by the *Wall Street Journal*, Amazon told Vivint, a manufacturer of smart-home devices that, "it would only allow the company to remain on the Echo if Vivint agreed to give it not only the data from its Vivint function on Echo, but from every Vivint device in those customers' homes at all times."[1975]

Amazon has also faced civil suits related to its storage of voice data. [1976] When Alexa hears a "wake" word— such as "Alexa" or "Echo"—it records the user's voice command, including conversations in the background, and saves a permanent recording of the user's voice to its own servers, as opposed to temporary storage for artificial intelligence training purposes.[1977]

---

[1972] *Id.*

[1973] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04261582–85 (Nov. 27, 2018) (on file with Comm.).

[1974] Innovation and Entrepreneurship Hearing at 40 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[1975] Dana Mattioli & Cara Lombardo, *Amazon Met With Startups About Investing, Then Launched Competing Products*, WALL ST. J. (July 23, 2020), https://www.wsj.com/articles/amazon-tech-startup-echo-bezos-alexa-investment-fund-11595520249.

[1976] *See* Tice v. Amazon.com, Inc., No. 5:10-cv-1311 (C.D. Cal., Mar. 25, 2020); C.O. v. Amazon.com, Inc., No. C19-910 (W.D. Wash., Sept. 23, 2019).

[1977] *Id.*

**App. 387**

v.   Copying Nascent Competitors Technology

The Subcommittee's investigation produced evidence consistent with public reporting that Amazon uses information collected through Alexa Fund investments to inform and improve Amazon's smart home ecosystem. When Amazon invests in a startup, it obtains access to the company's non-public financial information, strategic plans, and other proprietary information.[1978] According to a recent *Wall Street Journal* report, eight months after Alexa Fund invested in Nucleus, Amazon announced the Echo Show, a very similar Alexa-enabled video-chat device.[1979] This report described several other examples, including Vocalife, the inventors of a "speech-detection technology," which filed a lawsuit against Amazon alleging it improperly used proprietary technology.[1980] At the Subcommittee's sixth hearing, Representative Ken Buck (R-CO) said that allegations that Amazon incorporated features demonstrated to it by Vocalife's founders during an investment meeting "are serious, especially because the size and scope of these practices couldn't happen without Amazon's monopolistic control of the marketplace."[1981]

Prior to Amazon's acquisition of Ring, Amazon invested in Ring through the Alexa Fund, and internal emails about meetings during this time demonstrate how Amazon is able to obtain crucial insights into young companies. Amazon was able to learn about Ring's "roadmap, future products, [and] two acquisitions they have done."[1982] While Amazon often denies public reporting that it steals and copies technology from young startups, Amazon's emails suggest that it does replicate some of the startups it meets with or invests in. An email out of Amazon's Lab 126 regarding Ring indicated that Amazon "could easily replicate all of their hardware to be better, [and] operate in a more secure and robust infrastructure, for a LOT less than [the] cost of buying them."[1983] In the same email chain, Amazon employees wondered, "[I]f we move forward with due diligence, then decide not to buy [Ring], could we have legal issues if we go into the market by ourselves as a competitor and materially impact their business?"[1984]

---

[1978] Dana Mattioli & Cara Lombardo, *Amazon Met With Startups About Investing, Then Launched Competing Products*, WALL ST. J. (July 23, 2020), https://www.wsj.com/articles/amazon-tech-startup-echo-bezos-alexa-investment-fund-11595520249.

[1979] *Id.*

[1980] *Id.*

[1981] CEO Hearing Transcript at 102 (statement of Rep. Ken Buck (R-CO), Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[1982] Production from Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00214240 (Oct. 18, 2017) (on file with Comm.).

[1983] *Id.* at AMAZON-HJC-00220705 (Nov. 4, 2017).

[1984] *Id.* at AMAZON-HJC-00220703 (Nov. 4, 2017).

**App. 388**

5.  <u>Amazon Web Services</u>

    a.  <u>Overview</u>

       Amazon Web Services (AWS) is considered the pioneer of cloud computing and has sustained a first-mover advantage for over a decade.[1985] AWS officially launched in 2006, featuring two of its core IaaS offerings, Simple Storage Service (S3) and Elastic Compute Cloud (EC2).[1986] While Amazon.com was AWS's first customer, in the early 2000s AWS began creating cloud offerings for third-party merchants, who could use AWS to "build online shopping sites on top of Amazon's e-commerce engine."[1987] For AWS, meanwhile, this partnership with third parties gave the company experience in creating well-documented APIs for internal developers.[1988] Over the next few years, AWS rolled out additional programs to expand its network of third-party software vendors and implementation partners, including AWS Marketplace[1989] and the AWS Partnership Network (APN) in 2012.[1990]

       Over the last decade, AWS has also secured significant government contracts. Most notably, in 2014, AWS signed a $600 million Commercial Cloud Services (C2S) contract to build the AWS Secret Region, a cloud offering tailored for the U.S. intelligence community.[1991] The deal marked the largest cloud infrastructure contract at the time and signaled the government's shift from investing in on-premise server capacity to cloud services.[1992] Today, AWS boasts work "with over 6,500 government agencies" and states that Amazon has been "among the first to solve government compliance challenges facing cloud computing," while also "consistently help[ing] our customers navigate procurement and policy issues related to adoption of cloud computing."[1993]

       AWS contributes immense value to Amazon's overall business. In each quarter since Amazon began publicly reporting its financials for cloud, AWS has accounted for an outsized share of

---

[1985] Ron Miller, *How AWS Came To Be*, Techcrunch (July 2, 2016), https://techcrunch.com/2016/07/02/andy-jassys-brief-history-of-the-genesis-of-aws/.

[1986] *What's New,* Amazon Web Services (Oct. 4, 2006), https://aws.amazon.com/about-aws/whats-new/2006/.

[1987] *Id.*

[1988] Ron Miller, *How AWS Came To Be*, Techcrunch (July 2, 2016), https://techcrunch.com/2016/07/02/andy-jassys-brief-history-of-the-genesis-of-aws/.

[1989] *Introducing AWS Marketplace*, Amazon Web Services (Apr. 19, 2012), https://aws.amazon.com/about-aws/whats-new/2012/04/19/introducing-aws-marketplace/.

[1990] Jeff Barr, *Announcing the AWS Partner Network*, AWS News Blog (Apr. 17, 2012), https://aws.amazon.com/blogs/aws/announcing-the-aws-partner-network/. (in beta).

[1991] Frank Konkel, *Federal Cloud Spending Trends Toward All-Time High*, Nextgov (Sept. 12, 2018), https://www.nextgov.com/it-modernization/2018/09/federal-cloud-spending-trends-toward-all-time-high/151221/.

[1992] *Id.*

[1993] *The Trusted Cloud for Government*, Amazon Web Services, https://aws.amazon.com/government-education/government/ (last visited Sept. 30, 2020).

**App. 389**

Amazon's operating profits. While AWS contributes to less than 15% of Amazon's annual revenue, it consistently accounts for over 50% of the company's operating income. In 2017, AWS accounted for over 100% of Amazon's operating income, due to losses in the company's international business.[1994] In the first quarter of 2020, AWS accounted for 13.5% of Amazon's total revenues but 77% of its operating income.[1995]

### Contributions to Amazon's Revenue and Operating Profit over Time[1996]



Profits earned through its cloud services enable Amazon to invest heavily in expanding its cloud operation, as well as to support its other lines of business. Several market participants expressed concerns to Subcommittee staff that Amazon uses its high and steady profits from AWS to subsidize

---

[1994] Amazon.com, Inc., Annual Report (Form 10-K) 26 (Feb. 1, 2018), https://s2.q4cdn.com/299287126/files/doc_financials/annual/Amazon_AR.PDF.

[1995] Amazon.com, Inc., Quarterly Report (Form 10-Q) 17 (Apr. 30, 2020), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/708a19c5-7d8c-4fc9-ab37-bfaa7a31629b.pdf.

[1996] Prepared by the Subcomm. based on Amazon.com, Inc., Annual Report (Form 10-K) (2015–2019), https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm

**App. 390**

these other lines of business, including its retail operation.[1997] In an internal document produced in response to the Committee's requests for information, Amazon instructs its employees to rebut this claim by referring to it as a "myth."[1998] However, Amazon failed to produce the financial data that would have enabled Subcommittee staff to make an independent assessment.[1999]

b.  Market Power

As discussed earlier in this Report, AWS is the largest provider of cloud computing services, capturing approximately 24% of the U.S. spend in 2018 on cloud computing services, including IaaS, PaaS, and SaaS.[2000] AWS represents close to half of global spending on cloud infrastructure services, with three times the market share of Microsoft, its closest competitor.[2001] Its growth continues to soar. In the first quarter of 2020, AWS crossed $10 billion in quarterly revenue while growing 33% on an annualized basis.[2002]

Amazon has a "lion's share of the government cloud infrastructure market."[2003] Exact data on AWS's share of government cloud expenditure is opaque because most of AWS's public sector revenue comes through subcontracts, which are harder to track, and contracts related to the intelligence community, which are listed as classified spending and are rarely reported. Market participants, however, emphasize that AWS is considered a major player in federal cloud contracts.[2004]

In its submissions to the Subcommittee, Amazon describes itself as a relatively small player representing "less than 1% of IT spending globally and less than 2% in the United States."[2005] Amazon

---

[1997] Submission from Source 48, to H. Comm. on the Judiciary, 8 (Nov. 8, 2019) (on file with Comm.).

[1998] Production of Amazon, to H. Comm on the Judiciary, AMAZON-HJC-00216209 (Aug. 24, 2018) (on file with Comm.).

[1999] Letter from Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, to Jeff Bezos, CEO, Amazon.com, Inc., 2 (on file with Comm.).

[2000] Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 6 (July 26, 2019) (on file with Comm.).

[2001] *Id.*; Press Release, Katie Costello, Gartner, *Gartner Forecasts Worldwide Public Cloud Revenue to Grow 17.5 Percent in 2019* (Apr. 2, 2019), https://www.gartner.com/en/newsroom/press-releases/2019-04-02-gartner-forecasts-worldwide-public-cloud-revenue-to-g.

[2002] Jordan Novet, *AWS Tops $10 Billion in Quarterly Revenue for the First Time,* CNBC (Apr. 30, 2020) https://www.cnbc.com/2020/04/30/aws-earnings-q1-2020.html.

[2003] David Ramel, *AWS vs. Azure Heats Up in Federal Market,* WASH. TECH. (Sept. 14, 2018) https://washingtontechnology.com/articles/2018/09/14/aws-vs-azure-public-sector.aspx.

[2004] Interview with Source 31 (May 27, 2020).

[2005] Letter from David Zapolsky, Gen. Counsel, Amazon.com, Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 6 (July 26, 2019) (on file with Comm.).

**App. 391**

states that AWS competes with a large array of offerings including on-premise computing.[2006] In other contexts, however, Amazon has highlighted its leading position, describing itself as the "largest cloud software marketplace" and the "only cloud provider with existing classified infrastructure."[2007]

Through a careful review of Amazon's internal documents and other evidence during the investigation, Subcommittee staff found that Amazon has a dominant position in cloud computing. Amazon's dominance in cloud computing traces in part to its first-mover advantage and the high fixed costs and economies of scale associated with this market.[2008] But evidence suggests that Amazon has also taken steps to lock in and extend this dominance in ways that risk harming customers, businesses, and the broader public.

Network effects incentivized Amazon to build out AWS offerings quickly. As with other sectors of the digital economy, the value of Amazon's cloud offerings increases with the number of businesses and customers that use it. Introducing more services and partnership programs draws more customers, attracts more developers and implementation partners, which, in turn, draws additional customers.[2009]

AWS is considered to have the largest collection of cloud offerings. Its AWS Management Console and supporting technologies span many categories, including storage and computing, databases, migration services, and machine learning tools.[2010] Many of these products are based on open-source software or on the technology of companies that Amazon acquired.[2011] In addition to selling cloud offerings directly, AWS also runs a cloud marketplace where third-party vendors can list their products. The AWS Marketplace enjoys over 1,300 vendors as of 2018, and over 9,000 products, functioning as the largest cloud marketplace in the sector.[2012]

The widespread adoption of AWS's developer certification programs, partner networks, and student programs has meant that there are far more engineers familiar with AWS technology than with any other platform.[2013] Several market participants listed the availability of AWS-trained engineers as a

---

[2006] *Id.*

[2007] Complaint at 5, Amazon Web Servs, Inc. v. United States, 147 Fed. Cl. 146 (2020) (No. 1:19-cv-01796), https://www.courthousenews.com/wp-content/uploads/2019/12/amazon-trump-cafc.pdf.

[2008] *See infra* Section IV.

[2009] Production of Google, to H. Comm. on the Judiciary, GOOG-HJC-04260401 (Aug. 25, 2016) (on file with Comm.).

[2010] *AWS Marketplace*, AMAZON WEB SERVICES, https://aws.amazon.com/marketplace (last visited Sept. 30, 2020).

[2011] CEO Hearing at 6 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[2012] *AWS Marketplace*, AMAZON WEB SERVICES, https://aws.amazon.com/marketplace (last visited Sept. 30, 2020); Brad Lyman, *See What's New for AWS Marketplace Sellers*, AWS PARTNER NETWORK BLOG (Mar. 9, 2018), https://aws.amazon.com/blogs/apn/see-whats-new-for-aws-marketplace-sellers.

[2013] Interview with Source 736 (June 10, 2020).

reason for selecting AWS over other cloud vendors and as a barrier for switching platforms or attempting to multi-cloud.[2014]

High switching costs reinforce Amazon's dominance in the cloud market.[2015] A cloud-based application company interviewed by Subcommittee staff explained these costs:

> We've looked at other services (Google, Microsoft, Oracle) but we've relied on AWS for so long that we couldn't just flip a switch, and we've run down a lot of engineering problems with AWS . . . There are other providers we could go to, but it would take work. We could also build some functionality internally, but that would also take a lot of work.[2016]

For cloud-based application developers, whose entire product is dependent on AWS, the fears of lock-in are even greater. One marketplace participant said:

> "[A]ny transition of the cloud services currently provided by AWS to another cloud service provider would be difficult to implement and would cause us to incur significant time and expense and could disrupt or degrade our ability to deliver our products and services. Our business relies on the availability of our services for [users] and advertisers.[2017]

Amazon has also taken steps to lock-in its position, including through long-term contracts, volume minimums, and the use of fees to move data to other cloud providers, which are also known as egress fees. In submissions to the Subcommittee, numerous market participants noted that AWS often seeks multi-year contracts during negotiations.[2018] These contracts are also commonplace in companies' investor statements. For example, according to Lyft's 2020 investor filing, they agreed to pay "an aggregate of at least $300 million between January 2019 and December 2021 on AWS services."[2019] According to Slack's investor filling, in 2018 it committed to a five-year contract with minimum annual commitments of $50 million.[2020]

---

[2014] Interview with Source 126 (June 29, 2020).

[2015] *See infra* Section IV.

[2016] Interview with Source 111 (Apr. 6, 2020).

[2017] Submission from Source 32, to H. Comm. on the Judiciary, Source 32-000009 (Oct. 29, 2019) (on file with Comm.).

[2018] *Id.* at Source 32-000017.

[2019] Lyft, Annual Report (Form 10-K) 7 (Feb. 28, 2020), https://investor.lyft.com/static-files/981ad93a-5d97-4f7f-8937-5682ca83cba7.

[2020] Slack, Registration Statement (Form S-1) 90 (Apr. 26, 2019), http://d18rn0p25nwr6d.cloudfront.net/CIK-0001764925/b6da15ae-25c5-4447-ba38-c287bf11e624.pdf.

**App. 393**

Subcommittee staff also uncovered evidence that Amazon sometimes requires a volume agreement when a large company seeks to negotiate lower prices. In an internal email discussion on this topic, a senior executive at AWS wrote that Amazon has "a private rate card which has a commit level for bandwidth pricing. Rates at or above the private rate card are pre-approved. Anything below that has to be first approved by me and then the price goes to service GM." [2021]

When an Amazon customer chooses to move data to another cloud provider, they are charged an egress fee. Market participants told Subcommittee staff that they view these fees less as a cost for Amazon to transport data and more as friction imposed by Amazon for switching providers, noting that Amazon charges egress fees even when data is staying locally within the same data center. [2022]

The COVID-19 pandemic has underscored the centrality of cloud computing to the functioning of an increasing swath of businesses—highlighting how cloud services have come to resemble critical infrastructure. Reporting by *The Information* in April 2020 discussed how the major cloud providers are facing requests from many customers for financial relief, while the demand for cloud computing has increased. [2023] As this reporting noted, "AWS has been the least willing to offer flexible terms on customer bills, according to numerous customers. That stands in contrast to Microsoft and Google which have shown some flexibility, partners say." [2024]

c.   Merger Activity

Amazon has acquired a significant number of cloud computing firms over the past decade. Although a full discussion of this activity is beyond the scope of this Report, Amazon's acquisition activity in the cloud market appears to be part of a broader trend among dominant cloud providers to make serial acquisitions, any one of which may seem insignificant but which collectively serve to solidify and expand their dominance. [2025] In some instances AWS has acquired cloud technologies that previously integrated with multiple clouds, only for AWS to make it an AWS-specific product after acquisition, foreclosing competitors and increasing consumers' switching costs. [2026]

---

[2021] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00206893 (May 11, 2017) (on file with Comm.).

[2022] Interview with Source 170 (May 27, 2020).

[2023] Kevin McLaughlin & Amir Efrati, *AWS Holds the Line on Cloud Bills as Customers Ask for Relief*, THE INFO. (Apr. 17, 2020) https://www.theinformation.com/articles/aws-holds-the-line-on-cloud-bills-as-customers-ask-for-relief.

[2024] *Id.*

[2025] *See infra* Section IV.

[2026] Ron Miller, *Update: Amazon Has Acquired Israeli Disaster Recovery Service CloudEndure for Around $200M*, TECHCRUNCH (Jan. 8, 2019), https://techcrunch.com/2019/01/08/amazon-reportedly-acquired-israeli-disaster-recovery-service-cloudendure-for-around-200m/. *See also CloudEndure deprecation*. GOOGLE CLOUD, https://cloud.google.com/compute/docs/deprecations/cloudendure (last visited Oct. 4, 2020).

**App. 394**

d.  Competitive Significance of AWS to Amazon's Other Lines of Business

Amazon's dual role as a dominant provider of cloud infrastructure and as a dominant firm in other markets creates a conflict of interest that Amazon has the incentive and ability to exploit.

Amazon's dominance in cloud computing alongside its integration across an array of businesses—online retail, music and video, and smart home devices—creates a core conflict of interest. Cloud computing customers like Netflix and Target are in the position of competing with Amazon while also relying on AWS. Firms in their position effectively have to choose between switching to one of the alternative cloud infrastructure providers or funding their primary competitor.[2027] One venture capitalist described Amazon as "useful but dangerous" because "it's hard to predict what Amazon wants to get into . . . you can't know."[2028] Similarly, a business-to-business application developer told Subcommittee staff that they felt pressure to switch their entire product to Microsoft Azure because of its client's concerns with Amazon's anticompetitive conduct in the online retail sector.[2029]

Amazon acknowledges that its cloud customers which are also its competitors are wary of using AWS. One internal document had guidance on how to discuss the issue with customers. One FAQ sheet listed, "What do you say to customers who are worried that using AWS services will support Amazon's competitive growth in the retail space?" Amazon's sample answer stated, "How can you afford to not compete with the best possible tools in such a tough market like retail?"[2030]

Subcommittee staff also spoke with market participants that expressed concern about how this conflict of interest shapes Amazon's behavior in its other lines of business. For example, in 2015, Amazon kicked Google Chromecast and Apple TV—direct competitors with the Amazon Fire Stick and Fire TV cube—out of its retail store.[2031] AWS is also positioned to use customer and seller data from one line of business to inform decisions in other lines of business, analogous to its conduct in Amazon Retail. At least one market participant who spoke with Subcommittee staff had evidence that AWS engaged in this cross-business data sharing.[2032] In another internal document with guidance for staff on "AWS Competitive Messaging," employees were advised to offer the following response:

---

[2027] Christina Farr & Ari Levy, *Target Is Plotting a Big Move Away From AWS As Amazon Takes Over Retail*, CNBC (Aug. 29, 2017), https://www.cnbc.com/2017/08/29/target-is-moving-away-from-aws-after-amazon-bought-whole-foods.html); *See also Netflix on AWS,* AMAZON WEB SERVICE, https://aws.amazon.com/solutions/case-studies/netflix/ (last visited Sept. 30, 2020).

[2028] Interview with Source 146 (May 28, 2020).

[2029] Interview with Source 126 (June 29, 2020).

[2030] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00216210 (Aug. 24, 2018) (on file with Comm.).

[2031] Barb Darrow, *Why Cloud Users Should Care That Amazon Just Kicked Apple TV to the Curb*, FORTUNE (Oct. 2, 2015), http://fortune.com/2015/10/02/why-aws-users-should-care-that-amazon-nixed-apple-tv/.

[2032] Interview with Source 126 (June 29, 2020).

**App. 395**

Q.    Walmart is warning its suppliers that they don't want them to be running on AWS because they don't want Amazon.com, a competitor of Walmart's, to have access to their data. How are you addressing that?

A:    Even though Amazon's consumer business has no access to any customer data in AWS, I can understand why Walmart would be paranoid in making sure that their data is private. So, I think it's a pretty reasonable expectation for them to ask their suppliers to encrypt that data in AWS.[2033]

Engineers and market participants have also raised concerns that AWS employees may have access to Amazon's Key Management Services (KMS), which customers can use to store encryption keys.[2034] If an employee were able to access a customer's encryption keys, they could potentially see the contents of a customer's application, including proprietary code, business transactions, and data on their users. In response to questions from the Subcommittee, Amazon said that the company's "policies prohibit employees from accessing and reading customer keys in KMS. KMS is designed such that customer keys in the service cannot be retrieved in plain text (unencrypted) form by anybody, including AWS employees."[2035] Even if AWS employees can never access the content of their customers applications, AWS tracks a host of commercially sensitive metrics, including any changes in demand for storage and compute services, the components of their application's architecture, the requests to a specific database per second, database size, and the types of requests.[2036] One industry expert told Subcommittee staff:

They don't need to see the encrypted content of a movie to see that there are a ton of requests to particular data. If Netflix announced five new movies this weekend and there's a ton of data to five new objects. So, you don't need all the information to know what's happening.[2037]

Finally, AWS provides Amazon with unparalleled insights into the trajectory of startups using its services, information that it can use to guide acquisitions and replicate promising technology. Data that AWS collects on cloud computing customers can provide unique business intelligence, information that investors, other firms, and entrepreneurs lack.

---

[2033] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00216213 (Aug. 24, 2018) (on file with Comm.).

[2034] Interview with Source 146 (May 28, 2020).

[2035] CEO Hearing at 17 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[2036] Interview with Source 146 (May 28, 2020); Innovation and Entrepreneurship Hearing at 44 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[2037] Interview with Source 146 (May 28, 2020).

**App. 396**

A report from 2011 published in *Reuters,* profiling the AWS Start-up Challenge, describes cases where AWS has used insights gleaned from its cloud computing service to inform its venture capital investment decisions.[2038] Adam Selipsky, then Vice President of AWS, told *Reuters,* "AWS has great relationships with many young companies and there have been cases where we've been able to help with investment opportunities."[2039] Today, one way Amazon leverages AWS is through relationships with startups. The AWS Activate program provides startups with free credits, technical support, and training.[2040]

Subcommittee staff interviewed a startup and beneficiary of AWS Activate that had engaged in partnership conversations with Amazon. During these discussions, the startup shared information about how its product was built with AWS. Within a few years, the startup learned that Amazon had introduced a replica product. This company said that Amazon "had so many incentives. Rate cuts, and free services. Not having a lot of resources, it's hard to turn that down. But fast forward, we basically helped them build their offering that they copied from us."[2041]

As part of its investigation, the Subcommittee asked Amazon whether it uses or has ever used AWS usage patterns or data to inform its investment decisions. Amazon responded:

> AWS uses data on individual customers' use of AWS to provide or improve the AWS services and grow the business relationship with that customer. This data may inform AWS's decisions about how AWS invests in infrastructure, such as data centers, edge networks, hardware, and related software solutions in order improve the customer experience.[2042]

Amazon's response leaves unclear whether it would view it appropriate to use a firm's AWS data to develop products competing with that firm, so long as Amazon could identify some benefit to the broader "customer experience."

Prior to 2017, Amazon also required that AWS customers agree "not to assert any intellectual property claim against any AWS service used by that customer."[2043] Amazon removed that condition from the AWS online customer agreement on June 28, 2017.[2044]

---

[2038] Alistair Barr, *Amazon Finds Startup Investments in the 'Cloud,'* REUTERS (Nov. 9, 2011), http://www.reuters.com/article/amazon-cloud-idUSN1E7A727Q20111109.

[2039] *Id.*

[2040] *AWS Activate*, AMAZON WEB SERVICES, https://aws.amazon.com/activate/ (last visited Sept. 30, 2020).

[2041] Interview with Source 126 (June 29, 2020).

[2042] Innovation and Entrepreneurship Hearing at 45 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[2043] *Id.* at 43.

[2044] *Id*. at 42.

**App. 397**

In addition to creating a significant information advantage for Amazon, AWS may also reinforce its market power in other ways. Because startups often rely heavily on AWS, Amazon is a natural choice when pursuing a sale or seeking investment. In an internal email produced to the Subcommittee, Peter Krawiec, Amazon's Vice President of Worldwide Corporate Development, recapped a meeting with a recently acquired company, noting that the company was, "[s]uper excited about Amazon and relieved that Walmart will not be the buyer. Engineering team thrilled that they won't have to unplug from AWS under a Walmart world."[2045]

e.   Conduct

The leading position AWS enjoys in the market traces in part to its first-mover advantage, network effects, and steep investments that the company made in building out the physical infrastructure on which cloud resides. However, AWS has also engaged in a series of business practices designed to maintain its market dominance at the expense of choice and innovation. Through a combination of self-preferencing, misappropriation, and degradation of interoperability, Amazon has sought to eliminate cross-platform products with Amazon-only products. Amazon's conduct has already led several open-source projects to become more closed, a move driven by a need for protection from Amazon's misappropriation. If unchecked, Amazon's tactics over the long-term risk solidifying lock-in and diminishing the incentive to invest. Because cloud is the core infrastructure on which the digital economy runs, ensuring its openness and competitiveness is paramount.

i.   Misappropriation of Data

As described earlier in this Report, cloud platform vendors compete by expanding their first-party cloud offerings, such as those offered through the AWS Management Console.[2046] Market participants note that one way AWS has expanded its offerings is by creating proprietary versions of products that have been developed under open-source licenses.[2047]

Open-source licenses allow software to be freely used, modified, and shared.[2048] Open-source software can run on any infrastructure, local machine, server room, or on the cloud, reducing lock-in to a specific hardware vendor.[2049] Companies based on open-source software bring in revenue by selling

---

[2045] Production of Amazon, to H. Comm. on the Judiciary, AMAZON-HJC-00225832 (June 15, 2018) (on file with Comm.).

[2046] *See infra* Section IV.

[2047] Interview with Source 152 (Apr. 15, 2020).

[2048] *Open Source Licenses by Category*, OPEN SOURCE INITIATIVE, https://opensource.org/licenses/category (last visited Sept. 30, 2020).

[2049] Nicholas Loulloudes et al., *Enabling Interoperable Cloud Application Management Through an Open Source Ecosystem*, 19 IEEE INTERNET COMPUTING 54 (2015), https://ieeexplore.ieee.org/document/7111887.

**App. 398**

additional features under proprietary licenses or services.[2050] In recent years, open-source development has been a leading model for software development, attracting significant venture capital investment.[2051]

Market participants note that the rise of cloud computing services has led to a shift in the way open-source software is delivered and used. Many open-source software companies allowed engineers to download free versions of their software from their website, often without collecting any personal data about their users. As engineers outgrew the functionality of the free version, they would purchase more powerful versions.[2052] As cloud computing grew in popularity, open-source software vendors began offering versions of their software on the AWS Marketplace, where application developers could easily integrate the software. Market participants explain that AWS was able to use the data collected on their customers, including usage metrics, to learn which third-party software was performing well and ultimately to create their own proprietary version offered as a managed service. Creating a "knock-off" version of software was particularly easy when the product was using an open-source license, which provides more visibility to the underlying code.[2053]

In interviews with Subcommittee staff, market participants repeatedly said that AWS relied on innovations from open-source software communities to gain dominance. A venture capitalist told Subcommittee staff that "open-source is critical for AWS getting market power. They're standing on the shoulders of giants and they're not paying the giants."[2054] A long-time cloud vendor likewise said that "Amazon never built a database, never built cloud services, never built any of their AWS offerings. They took open source and offered it out on cloud. At the time that was innovative."[2055]

AWS has developed many of its offerings using this practice and has created products that are only accessible as first-party offerings through the AWS Management Console.[2056] An example frequently cited by market participants is Amazon Elasticsearch Service (AESS), a tool for searching and analyzing data, and a first-party product listed on the AWS Management Console.[2057] According to public reporting and interviews with market participants, this product is a copy of Elastic's,

---

[2050] Max Schireson & Dharmesh Thakker, *The Money in Open-Source Software*, TECHCRUNCH (Feb. 9, 2016), https://techcrunch.com/2016/02/09/the-money-in-open-source-software/.

[2051] Interview with Source 152 (Apr. 15, 2020).

[2052] *Id.*

[2053] *Id.*

[2054] Interview with Source 146 (May 28, 2020).

[2055] Interview with Source 31 (May 27, 2020).

[2056] *What Is the AWS Management Console*, AMAZON WEB SERVICES, https://docs.aws.amazon.com/awsconsolehelpdocs/latest/gsg/getting-started.html#learn-whats-new (last visited Sept. 30, 2020).

[2057] Daisuke Wakabayashi, *Prime Leverage: How Amazon Wields Power in the Technology World,* N.Y. TIMES (Dec. 16, 2019), https://www.nytimes.com/2019/12/15/technology/amazon-aws-cloud-competition.html. *See also* Interview with Source 152 (Apr. 15, 2020).

**App. 399**

Elasticsearch open-source product that was available for purchase on the AWS Marketplace.[2058] According to public reporting, within a year of introducing the product, Amazon was generating more money from its replica of Elasticsearch than Elasticsearch itself was generating. One key advantage that Amazon's "knock-off" had was that Amazon had given it superior placement in AWS Management Console.[2059] Additionally, as described in the *Elasticsearch vs Amazon* case, AWS can name their open-source "knock-off" products in a way that can mislead customers into believing that the "knock-off" product is sponsored by the open-source software vendor.[2060]

   The Subcommittee's investigation uncovered evidence relating to numerous instances in which Amazon has offered proprietary managed services based on knock-offs of open-source code. One open-source market participant interviewed by Subcommittee staff said that because of this conduct, the benefits of open source "weren't accruing to [the] open-source community. People were feeling, we develop all this work and then some large company comes and monetizes that."[2061] MongoDB, a document-based database, has similarly commented that "once an open source project becomes interesting, it is too easy for large cloud vendors to capture all the value but contribute nothing back to the community."[2062]

   When the Subcommittee inquired about this practice, Amazon responded, that "Projects where AWS has developed distributions on top of OSS [open-source software], like Open Distro for Elasticsearch and Amazon Corretto, add to, not supplant, the set of capabilities provided by the upstream open-source projects… it allows them to move between deploying OSS themselves and using managed services for open-source."[2063] Market participants told Subcommittee staff, however, that in the instances when AWS creates a "knock-off" version of an open-source software by adding "additional developments," those additional developments often only work with AWS infrastructure and are no-longer cross-platform—heightening the risk of lock-in.[2064] As one third-party explains, "So, the earlier benefits of open-source go out the window as Amazon takes over each of these product areas."[2065]

   For example, while MongoDB is an open-source document-based database project, Amazon offers a proprietary product called Amazon DocumentDB. According to AWS, DocumentDB

---

[2058] *Id.*

[2059] *Id.*

[2060] Complaint at 2, Elasticsearch, Inc. v. Amazon.com, Inc., No. 4:19-cv-06158 (N.D. Cal., Sept. 27, 2019), http://ipcasefilings.com/wp-content/uploads/2019/10/ElasticSearch_Amazon.pdf.

[2061] Interview with Source 144 (Apr. 17, 2020).

[2062] *Server Side Public License FAQ*, MONGODB, https://www.mongodb.com/licensing/server-side-public-license/faq (last visited Sept. 30, 2020).

[2063] CEO Hearing at 6 (response to Questions for the Record of Jeff Bezos, CEO, Amazon.com, Inc.).

[2064] Interview with Source 152 (Sept. 24, 2020).

[2065] *Id.*

**App. 400**

implements the open-source MongoDB API and is designed to "emulate the responses that a MongoDB client expects from a MongoDB server."[2066] When a cloud customer chooses to build an application using DocumentDB they are tied to AWS's infrastructure. If they ever wanted to switch to another provider they would have to extensively re-engineer their product in another software, whereas, had they built their application using MongoDB—on AWS or any other cloud provider's infrastructure—their applications could move to other platforms.[2067]

ii.   Harms to Innovation

Amazon's practice of offering managed service versions of open-source software has prompted open-source software companies to make defensive changes, such as closing off advanced features and changing their open-source license to be less permissive.[2068] One open-source vendor that recently started offering premium closed-sourced features said they were "paranoid" in light of Amazon cloning Elastic's features, noting that if this had happened to them they "would not have a business."[2069] Amazon's conduct has also reduced the availability of features in open-source software. Confluent,[2070] Redis Labs,[2071] and CochroachDB,[2072] along with several other open-source software vendors, have made similar license and business model changes, reducing the level of access to their software.[2073]

Market participants believe these changes significantly undermine innovation. Several noted that more closed-off licenses will result in fewer free, open-source features available to startups building prototypes and research labs that cannot afford access to paid features.[2074] Subcommittee staff also spoke with cloud computing customers in the public sector who worry about the changes and ambiguity in open-source licenses. One cloud computing customer told Subcommittee staff that three

---

[2066] Jeff Barr, *New-Amazon DocumentDB (with MongoDB Compatibility): Fast, Scalable, and Highly Available*, AMAZON WEB SERVICES: AWS NEWS BLOG (Jan. 9, 2019*), https://aws.amazon.com/blogs/new-amazon-documentdb-with-mongodb-compatibility-fast-scalable-and-highly-available/.

[2067] Interview with Source 152 (Sept. 24, 2020).

[2068] *Open Source Licenses by Category*, OPEN SOURCE INITIATIVE, https://opensource.org/faq#permissive (last visited Sept. 30, 2020) ("A 'permissive' license is simply a non-copyleft Open source license – one that guarantees the freedoms to use, modify, and redistribute, but that permits proprietary derivative works.").

[2069] Interview with Source 144 (Apr. 17, 2020).

[2070] *Confluent Community License FAQ*, CONFLUENT, https://www.confluent.io/confluent-community-license-faq/ (last visited Sept. 30, 2020).

[2071] Frederic Lardinois, *Redis Labs Changes Its Open-Source License – Again*, TECHCRUNCH (Feb. 21, 2019), https://techcrunch.com/2019/02/21/redis-labs-changes-its-open-source-license-again/.

[2072] Tom Krazit, *Another Open-Source Database Company Will Tighten Its Licensing Strategy, Wary of Amazon Web Services*, GEEKWIRE (Jun. 4, 2019), https://www.geekwire.com/2019/another-open-source-database-company-will-tighten-licensing-strategy-wary-amazon-web-services/.

[2073] Interview with Source 152 (Apr. 15, 2020).

[2074] Interview with Source 146 (May 28, 2020).

**App. 401**

pieces of open-source software that they use underwent license changes in the last year and that, due to strict "open source only" policies, they are "now stuck using older versions of the software [from] before the license change which requires additional work to improve the code base, implement the same functionality in-house or switch to a competitive product."[2075]

### iii. Self-Preferencing

According to market participants, once a product—based on open source or otherwise—is available in the AWS Management Console, it becomes an easier choice for existing AWS customers relative to purchasing a managed service from a third-party vendor or self-managing open-source software. In an interview with Subcommittee staff, one startup said they purchased software services through the AWS Management Console as opposed to identical or nearly identical software from a third-party vendor because they were a small company and "instead of us managing everything, it was hit a button . . . they are all in one, it was easier."[2076] As with all cloud services offered through the AWS Management Console, customers benefit from a single sign-on with billing information already in place.[2077]

Market participants also note that Amazon makes certain functionality available to its first-party products that it doesn't make available to the companies managing the original version of the open-source software.[2078] For example, AWS services can run inside Amazon's Virtual Private Could (Amazon VPC) offering, which allows users to provision an "isolated section of the AWS Cloud," but third-party services cannot do so.[2079]

While Amazon failed to provide the Subcommittee with financial data identifying what AWS makes in revenue from individual cloud offerings, many marketplace participants believe that AWS makes more from managed versions of open-source software than the third-party vendors and managers of the software. In 2019, *The New York Times* reported that the Chief Executive of MariaDB, an open-source relational database company, estimated that "Amazon made five times more revenue from running MariaDB software than his company generated from all of its businesses."[2080] Market participants suggest this multiple of difference in income is likely for other AWS products based on open-source projects.[2081]

---

[2075] Interview with Source 49 (May 20, 2020).

[2076] Interview with Source 126 (June 29, 2020).

[2077] Interview with Source 146 (May 28, 2020).

[2078] Interview with Source 152 (Sept. 24, 2020).

[2079] *Amazon Virtual Private Cloud*, AMAZON WEB SERVICES, https://aws.amazon.com/vpc/ (last visited Sept. 30, 2020).

[2080] Daisuke Wakabayashi, *Prime Leverage, How Amazon Wields Power in the Technology World,* N.Y. TIMES (Dec. 16, 2019), https://www.nytimes.com/2019/12/15/technology/amazon-aws-cloud-competition.html.

[2081] Interview with Source 146 (May 28, 2020).

D.      Apple

1.  <u>Overview</u>

Apple was incorporated in 1977 and is headquartered in Cupertino, California.[2082] Apple was an early pioneer in designing and marketing mass-produced personal computers.[2083] Today, the company "designs, manufacturers, and markets smartphones, personal computers, tablets, wearables, and accessories, and sells a variety of related services."[2084] Apple's hardware products include the iPhone, iPad, Mac, Apple TV, and AirPods; its Services business segment includes the App Store, iCloud, AppleCare, Apple Arcade, Apple Music, Apple TV+, and other services and software applications.[2085] Apple tightly integrates its services and software applications with its products to ensure a seamless experience for consumers.[2086]

---

[2082] Apple Inc., Annual Report (Form 10-K) 1 (Sept. 28, 2019), https://s2.q4cdn.com/470004039/files/doc_financials/2019/ar/_10-K-2019-(As-Filed).pdf.

[2083] *See* Angelique Richardson & Ellen Terrell, *Apple Computer, Inc.*, Lɪʙ. ᴏꜰ Cᴏɴɢʀᴇss (Apr. 2008), https://www.loc.gov/rr/business/businesshistory/April/apple.html.

[2084] Apple Inc., Annual Report (Form 10-K) 1 (Sept. 28, 2019), https://s2.q4cdn.com/470004039/files/doc_financials/2019/ar/_10-K-2019-(As-Filed).pdf.

[2085] *Id*. at 1–2.

[2086] *See* Apple, *Apple: Distinctive Products with a Seamless, Integrated User Experience* 1 (July 13, 2020) (on file with Comm.)

**App. 403**

**Apple's Ecosystem: Hardware, Software Infrastructure, Apple & Third-Party Apps**[2087]



Apple reports financial information for two business categories: Products and Services.[2088] For Fiscal Year 2019, Apple reported total revenue of approximately $260 billion, down 2% from 2018, but up nearly 13.5% from 2017.[2089] Apple's margins totaled 37.8%, with profits of $98.3 billion.[2090] As of September 2020, Apple is the most valuable public company in the world and, in August 2020, became the first publicly traded U.S. firm to be valued at $2 trillion.[2091] Apple's stock rose by 60% in the first 8 months of 2020.[2092]

---

[2087] *Are domestic investors missing out?*, SWELL, (June 22, 2018), https://swellasset.com.au/2018/06/domestic-investors-missing/.

[2088] Apple Inc., Annual Report (Form 10-K) 19 (Sept. 28, 2019), https://s2.q4cdn.com/470004039/files/doc_financials/2019/ar/_10-K-2019-(As-Filed).pdf.

[2089] *Id.* at 17–19; *see also Apple's 1 Crazy Number Key to $800 Billion in Stock Growth*, FORBES (July 13, 2020), https://www.forbes.com/sites/greatspeculations/2020/07/13/how-did-apple-add-800-billion-in-value-over-3-years/#5b9250df20f8.

[2090] *Id. at* 21, 29.

[2091] Jessica Bursztynsky, *Apple becomes first U.S. company to reach a $2 trillion market cap*, CNBC (Aug. 19, 2020), https://www.cnbc.com/2020/08/19/apple-reaches-2-trillion-market-cap.html.

[2092] Kif Leswing, *Apple's $2 trillion value is proof that Tim Cook's services plan worked*, CNBC (Aug. 19, 2020), https://www.cnbc.com/2020/08/19/apples-2-trillion-value-proof-that-tim-cooks-services-plan-worked.html.

**App. 404**

Apple is the leading smartphone vendor in the U.S., accounting for approximately 45% of the domestic market,[2093] with more than 100 million iPhone users nationwide.[2094] Apple's iOS is also one of two dominant mobile operating systems—the other operating system, Android, is discussed elsewhere in this Report. iOS runs on more than half of U.S. smartphones and tablets.[2095] Globally, Apple accounts for less than 20% of the smartphone market, and roughly 25% of smartphones and tablets run on iOS worldwide.[2096] In 2018, Apple sold its 2 billionth iOS device and is projected to sell its 2 billionth iPhone by 2021.[2097]

Apple also owns and operates the App Store for iOS devices. Launched in 2008, Apple highlights that the App Store allows app developers to reach consumers in 155 countries, and that more than 27 million app developers have published millions of apps in the App Store. Apple credits the App Store with creating 1.5 million jobs in the United States and more than $120 billion in worldwide revenue for app developers.[2098] According to Apple, the App Store ecosystem, including direct sales of apps, sales of goods and services inside of apps, and in-app advertising, facilitated more than $138 billion in economic activity in the U.S. last year.[2099]

---

[2093] *See* S. O'Dea, *Manufacturers' market share of smartphone sales in the United States from 2016 to 2020*, STATISTA (Sept. 3, 2020), https://www.statista.com/statistics/620805/smartphone-sales-market-share-in-the-us-by-vendor/; S. O'Dea, *Manufacturers' market share of smartphone subscribers in the United States from 2013 and 2019, by month\**, STATISTA (June 9, 2020), https://www.statista.com/statistics/273697/market-share-held-by-the-leading-smartphone-manufacturers-oem-in-the-us/; *US Smartphone Market Share: By Quarter*, COUNTERPOINT RES. (Aug. 17, 2020), https://www.counterpointresearch.com/us-market-smartphone-share/; S. O'Dea, *Share of smartphone users that use an Apple iPhone in the United States from 2014 to 2021*, STATISTA (Sept. 10, 2020), https://www.statista.com/statistics/236550/percentage-of-us-population-that-own-a-iphone-smartphone/.

[2094] S. O'Dea, *Share of smartphone users that use an Apple iPhone in the United States from 2014 to 2021*, STATISTA (Sept. 10, 2020), https://www.statista.com/statistics/236550/percentage-of-us-population-that-own-a-iphone-smartphone/.

[2095] *See* S. O'Dea, *Subscriber share held by smartphone operating systems in the United States from 2012 to 2020*, STATISTA (Aug. 17, 2020), https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/; *Mobile Operating System Market Share United States of America Aug. 2019 – Aug. 2020*, GLOBALSTATS (on file with Comm.).

[2096] *See Global Smartphone Market Share: By Quarter*, COUNTERPOINT RES., (Aug. 18, 2020), https://www.counterpointresearch.com/global-smartphone-share/; *Mobile Operating System Market Share Worldwide Aug. 2019 – Aug. 2020*, GLOBALSTATS (on file with Comm.).

[2097] Malcolm Owen, *How Apple has hit 2 billion iOS devices sold, and when it will hit 2 billion iPhones*, APPLE INSIDER (Sept. 13, 2018), https://appleinsider.com/articles/18/09/13/how-apple-has-hit-2-billion-ios-devices-sold-and-when-it-will-hit-2-billion-iphones.

[2098] *See* Letter from Kyle Andeer, Vice Pres. Legal & Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 2 (Oct. 14, 2019) (on file with Comm.); Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Sept. 21, 2020) (on file with Comm.).

[2099] Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F.

**App. 405**

In addition to the Subcommittee's investigation of Apple's market power and conduct, federal antitrust authorities are investigating the company for potential violations of the U.S. antitrust laws. In June 2019, *The New York Times* and the *Wall Street Journal* reported that the Justice Department had opened investigations into potential violations of the antitrust laws by Apple.[2100] Apple is also under investigation by multiple international competition authorities for antitrust violations and anticompetitive practices,[2101] in addition to facing private antitrust lawsuits in the U.S.[2102]

Previously, the Justice Department and Attorneys General of 33 states sued Apple for orchestrating a conspiracy to fix prices in the eBooks market in 2012.[2103] Apple was found to have violated state and federal antitrust laws and was forced to pay $450 million.[2104] In 2010, Apple settled an antitrust complaint with the Department of Justice that it conspired with several other technology

---

James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 2 (Sept. 21, 2020) (on file with the Subcomm.) (citing JONATHAN BORCK ET AL., ANALYSIS GRP., HOW LARGE IS THE APPLE APP STORE ECOSYSTEM: A GLOBAL PERSPECTIVE FOR 2019, 4 (2020), https://www.apple.com/newsroom/pdfs/app-store-study-2019.pdf).

[2100] *See* Celia Kang et al., *Antitrust Troubles Snowball for Tech Giants as Lawmakers Join In*, N.Y. TIMES (June 3, 2019), https://www.nytimes.com/2019/06/03/technology/facebook-ftc-antitrust.html; Brent Kendall & John McKinnon, *Congress, Enforcement Agencies Target Tech*, WALL ST. J. (June 3, 2019), https://www.wsj.com/articles/ftc-to-examine-how-facebook-s-practices-affect-digital-competition-11559576731.

[2101] *See e.g.*, Press Release, Eur. Comm'n, Antitrust: Commission opens investigation into Apple practices regarding Apple Pay (June 16, 2020), https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075; Foo Yun Chee, *Apple in Dutch Antitrust Spotlight for Allegedly Promoting Own Apps*, REUTERS (Apr. 11, 2019), https://www.reuters.com/article/us-apple-antitrust-netherlands/apple-in-dutch-antitrust-spotlight-for-allegedly-promoting-own-apps-idUSKCN1RN215; *Italy Antitrust Opens Inquiry into Google, Apple, Dropbox on Cloud Computing*, REUTERS (Sept. 7, 2020), https://www.reuters.com/article/us-google-italy-antitrust/italy-antitrust-opens-inquiry-into-google-apple-dropbox-on-cloud-computing-idUSKBN25Y0YM; Tim Hardwick, *Apple and Amazon Under Investigation By Italian Watchdog for Alleged Price Fixing*, APPLE INSIDER (July 22, 2020), https://www.macrumors.com/2020/07/22/apple-amazon-italy-alleged-price-fixing/.

[2102] *See e.g.*, Nick Statt, *Epic Games is suing Apple*, THE VERGE (Aug. 13, 2020), https://www.theverge.com/2020/8/13/21367963/epic-fortnite-legal-complaint-apple-ios-app-store-removal-injunctive-relief; Reed Albergotti, *Apple suppressed competitors in its App Store – until it got caught, a lawsuit alleges*, WASH. POST (Dec. 20, 2019), https://www.washingtonpost.com/technology/2019/12/20/apple-suppressed-competitors-its-app-store-until-it-got-caught-lawsuit-alleges/; Bob Van Voris & Peter Blumberg, *Apple App Developers Jump on Silicon Valley Antitrust Bandwagon*, BLOOMBERG (June 4, 2019), https://www.bloomberg.com/news/articles/2019-06-04/apple-inc-sued-by-app-developers-claiming-antitrust-violations; David G. Savage & Suhauna Hussain, *Supreme Court Rules Apple can face antitrust suits from iPhone owners over App Store sales*, L.A. TIMES (May 13, 2019), https://www.latimes.com/politics/la-na-pol-supreme-court-apple-smart-phone-20190513-story.html.

[2103] *See* Complaint, United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y., Apr. 11, 2012) (No. 12-02826-UA).

[2104] *See* United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd by* United States v. Apple Inc., 791 F.3d 209 (2d Cir. 2015); Dawn Chmielewski, *Apple to Pay $450 Million E-Book Settlement After Supreme Court Waves Off Case*, VOX: RECODE (Mar. 7, 2016), https://www.vox.com/2016/3/7/11586748/apple-to-pay-450-million-e-book-settlement-after-supreme-court-waves; *see also* Hr'g Tr. at 17:1-6, United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y., August 27, 2013) (No. 12-cv-2826) ("The record at trial demonstrated a blatant and aggressive disregard at Apple for the requirements of the law. Apple executives used their considerable skills to orchestrate a price-fixing scheme that significantly raised the prices of E-books. This conduct included Apple lawyers and its highest level executives."); Philip Elmer-Dewitt, *'I'd do it again,' says the man at the center of Apple's e-book case*, FORTUNE (Dec. 2, 2014), https://fortune.com/2014/12/02/id-do-it-again-says-the-man-at-the-center-of-apples-e-book-case/.

**App. 406**

companies to eliminate competition in hiring for employees.[2105] It later entered into a $415 million joint settlement agreement in a class-action lawsuit by affected employees.[2106]

## 2. iOS and the App Store

### a. Market Power

Apple has significant and durable market power in the market for mobile operating systems and mobile app stores, both of which are highly concentrated.[2107] Apple's iOS mobile operating system is one of two dominant mobile operating systems, along with Google's Android, in the U.S. and globally.[2108] Apple installs iOS on all Apple mobile devices and does not license iOS to other mobile device manufacturers. More than half of mobile devices in the U.S. run on iOS or iPadOS, an iOS derivation for tablets introduced in 2019.[2109] Apple's market power is durable due to high switching costs, ecosystem lock-in, and brand loyalty. It is unlikely that there will be successful market entry to contest the dominance of iOS and Android.

As a result, Apple's control over iOS provides it with gatekeeper power over software distribution on iOS devices. Consequently, it has a dominant position in the mobile app store market and monopoly power over distribution of software applications on iOS devices.[2110]

---

[2105] Press Release, U.S. Dep't of Justice, Department Requires Six High Tech Companies to Stop Entering into Anticompetitive Employee Solicitation Agreements (Sept. 24, 2010), https://www.justice.gov/opa/pr/justice-department-requires-six-high-tech-companies-stop-entering-anticompetitive-employee.

[2106] Dawn Chmielewski, *Silicon Valley Companies Agree to Pay $415 Million to Settle "No Poaching" Suit*, VOX: RECODE (Jan. 15, 2015), https://www.vox.com/2015/1/15/11557814/silicon-valley-companies-agree-to-pay-415-million-to-settle-no.

[2107] *See* Stigler Report at 78 ("[T]he evidence thus far does suggest that current digital platforms face very little threat of entry. … [T]he key players in this industry remained the same over the last two technology waves, staying dominant through the shift to mobile and the rise of AI. In the past, dominant businesses found it difficult to navigate innovation or disruption waves. By contrast, Facebook, Google, Amazon, Apple, and even Microsoft were able to ride these waves without significant impact on market share or profit margins. This indirect evidence corroborates the argument that these companies are facing few competitive threats.").

[2108] *See infra* Section IV.

[2109] *See* S. O'Dea, *Subscriber share held by smartphone operating systems in the United States from 2012 to 2020*, STATISTA (Aug. 17, 2020), https://www.statista.com/statistics/266572/market-share-held-by-smartphone-platforms-in-the-united-states/; *Mobile Operating System Market Share United States of America Aug. 2019 – Aug. 2020*, GLOBALSTATS (on file with Comm.); Jason Cipriani, *iPad turns 10: Why did it take a decade for Apple's tablet to get its own operating system*, ZDNET (Jan. 24, 2020), https://www.zdnet.com/article/a-decade-old-device-why-did-it-take-nine-years-for-the-ipad-to-get-its-own-operating-system/.

[2110] *See infra* Section IV.

**App. 407**

Apple's App Store is the only method to distribute software applications on iOS devices.[2111] It does not permit installation of alternative app stores on iOS devices, nor does it permit apps to be sideloaded. As discussed earlier in this Report, consumers have a strong preference for native apps to web apps,[2112] and Apple has acknowledged key differences between them. Developers have explained that Apple actively undermines the open web's progress on iOS "to push developers toward building native apps on iOS rather than using web technologies."[2113] As a result, Apple's position as the sole app store on iOS devices is unassailable. Apple fully controls how software can be installed on iOS devices, and CEO Tim Cook has explained that the company has no plan to permit an alternative app store.[2114] The former director of the app review team for the App Store observed that Apple is "not subject to any meaningful competitive constraint from alternative distribution channels."[2115]

In response to these concerns, Apple has not produced any evidence that the App Store is not the sole means of distributing apps on iOS devices and that it does not exert monopoly power over app distribution. Apple says it does not create—nor is it aware of third-party data—that tracks market share in the app distribution market.[2116] Apple claims the App Store competes in a larger software distribution market that includes other mobile app stores as well as the open internet, personal computers, gaming consoles, smart TVs, and online and brick-and-mortar retail stores.[2117] While consumers can access software and developers can distribute software through those platforms, none of those platforms permit consumers to access apps on an iOS device or developers to distribute apps to iOS devices.

Apple's monopoly power over software distribution on iOS devices appears to allow it to generate supranormal profits from the App Store and its Services business. Apple CEO Tim Cook set a goal in 2017 to rapidly double the size of the Services business by the end of 2020.[2118] Apple met this goal by July 2020, six months ahead of schedule.[2119] The Services business accounted for nearly 18%

---

[2111] CEO Hearing Transcript at 50 (statement of Tim Cook, CEO, Apple Inc.) (responding to question about whether Apple alone determines whether apps are admitted to the App Store Mr. Cook replied "If it's a native app, yes, sir. If it's a web app, no.").

[2112] *See infra* Section IV.

[2113] Owen Williams, *Apple Is Trying to Kill Web Technology*, ONEZERO (Nov. 7, 2019), https://onezero.medium.com/apple-is-trying-to-kill-web-technology-a274237c174d.

[2114] CEO Hearing Transcript at 3 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2115] Phillip Shoemaker, *Apple v. Everybody*, MEDIUM (Mar. 29, 2019), https://medium.com/@phillipshoemaker/apple-v-everybody-5903039e3be.

[2116] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-000008 (Oct. 14, 2019) (on file with Comm.).

[2117] *See* CEO Hearing Transcript at 52, 164 (statement of Tim Cook, CEO, Apple Inc.); *see also* Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-000012–13 (Oct. 14, 2019) (on file with Comm.).

[2118] Anita Balakrishnan, *Tim Cook: Goal is to double Apple's services revenue by 2020*, CNBC (Jan. 31, 2017), https://www.cnbc.com/2017/01/31/tim-cook-on-apple-earnings-call-double-services-revenue-by-2020.html.

[2119] *See Apple (AAPL) Q3 2020 Earnings Call Transcript*, MOTLEY FOOL (July 31, 2020), https://www.fool.com/earnings/call-transcripts/2020/07/31/apple-aapl-q3-2020-earnings-call-transcript.aspx.

**App. 408**

of total revenue in Fiscal Year 2019, about $46.2 billion. Services grew faster than Products in recent years, increasing by more than 41% since 2017.[2120] The Services category is also Apple's highest margin business at 63.7% in Fiscal Year 2019 and 67.2% for the quarter ending in June 2020.[2121]



**Annual Revenue by Segment[2122]**

Industry observers credit Apple's successful focus on growing the Services business with its rising valuation and future long-term.[2123] Apple has attributed the growth of Services as a driver of the firm's profits from sales and an important factor supporting Apple's overall margins as hardware sales

---

[2120] Apple Inc., Annual Report (Form 10-K) 19 (Sept. 28, 2019), https://s2.q4cdn.com/470004039/files/doc_financials/2019/ar/_10-K-2019-(As-Filed).pdf.

[2121] *Id.* at 21; Apple Inc., Quarterly Report (Form 10-Q) 28 (June 27, 2020), https://s2.q4cdn.com/470004039/files/doc_financials/2020/q3/_10-Q-Q3-2020-(As-Filed).pdf.

[2122] Prepared by the Subcomm. based on Apple Inc., Annual Report (Form 10-K) (2017–2019), https://www.sec.gov/Archives/edgar/data/320193/000032019318000145/a10-k20189292018.htm.

[2123] *See e.g.*, Kif Leswing, *Apple's $2 trillion value is proof that Tim Cook's services plan worked*, CNBC (Aug. 19, 2020), https://www.cnbc.com/2020/08/19/apples-2-trillion-value-proof-that-tim-cooks-services-plan-worked.html; Anne Sraders, *As Apple stock tops $500, bulls cite these key reasons it could still go higher*, FORTUNE (Aug. 24, 2020), https://fortune.com/2020/08/24/apple-stock-tops-500-can-it-go-higher/.

**App. 409**

slowed or declined.[2124] The company has consistently credited the App Store, licensing sales, and AppleCare for the success of Services.[2125]

b. Merger Activity

In 2019, Apple CEO Tim Cook told CNBC that Apple buys a new company every 2 to 3 weeks, focusing on acquiring "talent and intellectual property."[2126] In July 2020, Mr. Cook explained that Apple's "approach on acquisitions has been to buy companies where we have challenges, and IP, and then make them a feature of the phone."[2127] An Apple submission to the Subcommittee explains that it:

> [H]as not embarked on a strategy of acquiring nascent competitors in service of its growth and market position. Instead, Apple's acquisitions generally are meant to complement its product business by accelerating innovation and building out new features and technologies for Apple's hardware and software offerings.[2128]

In 2020, Apple continued acquiring small firms, including artificial intelligence and virtual reality startups, an enterprise software maker, a contactless payment startup, and a weather application,

---

[2124] Apple Inc., Annual Report (Form 10-K) 22, 26 (Sept. 29, 2018), https://www.sec.gov/Archives/edgar/data/320193/000032019318000145/a10-k20189292018.htm; Apple Inc., Annual Report (Form 10-K) 22, 26 (Sept. 30, 2017), https://www.sec.gov/Archives/edgar/data/320193/000032019317000070/a10-k20179302017.htm.

[2125] Apple Inc., Annual Report (Form 10-K) 19 (Sept. 28, 2019), https://s2.q4cdn.com/470004039/files/doc_financials/2019/ar/_10-K-2019-(As-Filed).pdf.; Apple Inc., Annual Report (Form 10-K) 25 (Sept. 29, 2018), https://www.sec.gov/Archives/edgar/data/320193/000032019318000145/a10-k20189292018.htm; Apple Inc., Annual Report (Form 10-K) 25 (Sept. 30, 2017), https://www.sec.gov/Archives/edgar/data/320193/000032019317000070/a10-k20179302017.htm. AppleCare is Apple's extended warranty products for Apple devices. *See* Jason Cross, *AppleCare+: Everything you need to know about Apple's extended warranty program*, MACWORLD (Sept. 16, 2020), https://www.macworld.com/article/3227045/applecare-warranty-faq.html. In addition to the markets discussed in this section, the Committee sought information and continues to investigate competition and conduct in the resale and repair markets for Apple products.

[2126] Lauren Feiner, *Apple buys a company every few weeks, says CEO Tim Cook*, CNBC (May 6, 2019), https://www.cnbc.com/2019/05/06/apple-buys-a-company-every-few-weeks-says-ceo-tim-cook.html.

[2127] Kif Leswing, *Tim Cook says Apple buys innovation, not competitors*, CNBC (July 31, 2020), https://www.cnbc.com/2020/07/31/tim-cook-contrasts-apple-ma-with-other-big-tech.html.

[2128] Apple, *Apple: Distinctive Products with a Seamless, Integrated User Experience* 2 (July 13, 2020) (on file with Comm.).

**App. 410**

among others.[2129] One of Apple's largest transactions occurred in 2019 when it paid $1 billion to acquire Intel's smartphone modem business.[2130]

Apple has also recently acquired software companies to create a foundation from which it could launch new apps. For example, after purchasing the digital magazine subscription service Texture in 2018, Apple integrated most of Texture's functionality into its own Apple News+ service, which debuted the following year.[2131] Similarly, one of Apple's largest purchases to date—its $3 billion acquisition of Beats Electronics in 2014—was instrumental to the 2015 launch of Apple Music.[2132] Apple sought to grow Apple Music quickly after its introduction. Apple pre-installed the service on iPhones and made it the only music service accessible through Siri, Apple's virtual assistant. Apple also offered Apple Music with a free month trial period and made it available on Android devices. The strategy saw Apple gain 10 million paying subscribers within six months.[2133] Apple supplemented its music services business in 2018 by acquiring the music recognition app Shazam, and most recently, by acquiring podcast app Scout FM in 2020.[2134]

It is common for Apple to integrate apps it purchases into its own pre-existing apps or into the iOS mobile operating system. Examples of this include the 2014 acquisition of Swell, a podcast app, and the 2013 acquisition of HopStop, a transit navigation app.[2135]

---

[2129] *See* Jordan Novet, *Apple buys an A.I. start-up that came from Microsoft co-founder Paul Allen's research lab*, CNBC (Jan. 15, 2020), https://www.cnbc.com/2020/01/15/apple-acquires-xnor-ai-startup-that-spun-out-of-allen-institute.html; Mark Gurman, *Apple Acquires AI Startup to Better Understand Natural Language*, BLOOMBERG (Apr. 3, 2020), https://www.bloomberg.com/news/articles/2020-04-03/apple-acquires-ai-startup-to-better-understand-natural-language; Kif Leswing, *Apple buys virtual reality company NextVR*, CNBC (May 14, 2020), https://www.cnbc.com/2020/05/14/apple-buys-virtual-reality-company-nextvr.html; Kif Leswing, *Apple buys Fleetsmith, a company making it easier to deploy iPhones and Macs at workplaces*, CNBC (June 24, 2020), https://www.cnbc.com/2020/06/24/apple-acquires-device-management-company-fleetsmith.html; Jessica Bursztynsky, *Apple buys popular weather app Dark Sky and plans to shut down Android versions*, CNBC (Mar. 31, 2020), https://www.cnbc.com/2020/03/31/apple-buys-popular-weather-app-dark-sky.html; Mark Gurman, *Apple Buys Startup to Turn iPhones Into Payment Terminals*, BLOOMBERG (July 31, 2020), https://www.bloomberg.com/news/articles/2020-08-01/apple-buys-startup-to-turn-iphones-into-payment-terminals.

[2130] Press Release, Apple, Apple to acquire the majority of Intel's smartphone modem business (July 25, 2019), https://www.apple.com/newsroom/2019/07/apple-to-acquire-the-majority-of-intels-smartphone-modem-business/.

[2131] Anita Balakrishnan, *Apple buys Texture, a digital magazine subscription service*, CNBC (Mar. 12, 2018), https://www.cnbc.com/2018/03/12/apple-buys-texture-a-digital-magazine-subscription-service.html.

[2132] Billy Steele, *Apple's $3 billion purchase of Beats has already paid off*, ENGADGET (May 28, 2019), https://www.engadget.com/2019-05-28-apple-beats-five-years-later.html.

[2133] Neth. Auth. For Consumers & Mkts. Study at 62.

[2134] Press release, Apple, *Apple acquires Shazam, offering more ways to discover and enjoy music* (Sept. 24, 2018), https://www.apple.com/newsroom/2018/09/apple-acquires-shazam-offering-more-ways-to-discover-and-enjoy-music/; Mark Gurman, *Apple Buys Startup That Creates Radio-Like Stations for Podcasts*, BLOOMBERG (Sept. 24, 2020), https://www.bloomberg.com/news/articles/2020-09-24/apple-buys-startup-that-creates-radio-like-stations-for-podcasts.

[2135] Chris Gayomali, *Swell Shuts Down Following Apple Acquisition*, FAST CO. (July 29, 2014), https://www.fastcompany.com/3033698/swell-shuts-down-following-apple-acquisition; Andrew Nusca, *Apple Maps vs. Google Maps heats up as Apple shuts down HopStop*, FORTUNE (Sept. 12, 2015), https://fortune.com/2015/09/12/hopstop-apple-shutdown/.

**App. 411**

Apple has followed a similar strategy for integrating the Dark Sky weather app. Apple shut down Dark Sky's Android app in August 2020 and plans to integrate the app's features with the iPhone's Weather widget on iOS 14.[2136] In addition to its app, Dark Sky supplied data to independent weather apps, like Carrot, Weather Line, and Partly Sunny. As a result of Apple's takeover of Dark Sky, independent weather apps will lose access to the inexpensive, hyper-local weather data that Dark Sky supplied, leading some weather apps to shut down and others to rely on higher-priced suppliers for forecast data.[2137]

### c.   Conduct

#### i.   Commissions and In-App Purchases

The Committee sought information regarding Apple's policy of collecting commissions from apps sold through the App Store and purchases made in iOS apps. Apple charges a 30% commission on paid apps—those that charge a fee for users to download—downloaded from the App Store. It also takes a 30% fee for in-app purchases (IAP) of "digital goods and services."[2138] For app subscriptions, Apple charges a 30% commission for the first year and a 15% commission for subsequent years.[2139] Apps are not permitted to communicate with iOS users that the app may be available for purchase at a lower price outside the App Store, provide links outside of the app that may lead users to find alternative subscription and payment methods, or offer their own payment processing mechanism in the app to avoid using Apple's IAP.[2140] Apps that violate Apple's policies can be removed from the App Store, losing access to the only means of distributing apps to consumers with iOS devices.[2141]

---

[2136] Hannah Klein, *The Dark Sky Android App Is Officially Kaput*, SLATE (Aug. 4, 2020), https://slate.com/technology/2020/08/dark-sky-app-android-shuts-down.html.

[2137] Jared Newman, *Apple's Dark Sky acquisition could be bad news for indie weather apps*, FAST CO. (Apr. 2, 2020), https://www.fastcompany.com/90485131/apples-dark-sky-acquisition-could-be-bad-news-for-indie-weather-apps; *but see* CEO Hearing Transcript at 9 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.) (noting Dark Sky will "continue to make its API available to Dark Sky's existing customers until the end of 2021").

[2138] *App Store: Dedicated to the best store experience for everyone*, APPLE, https://www.apple.com/ca/ios/app-store/principles-practices/ (last visited Oct. 4, 2020).

[2139] *Id*.

[2140] *See* Innovation and Entrepreneurship Hearing at 1–2 (response to Questions for the Record of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.); Submission from ProtonMail, to H. Comm. on the Judiciary, 5 (Aug. 22, 2020) (on file with Comm.); Interview with Source 143 (Aug. 27, 2020).

[2141] *See e.g.*, Sara Morrison, *Apple's Fortnite ban, explained*, VOX: RECODE (Sept. 8, 2020), https://www.vox.com/recode/2020/8/20/21373780/fortnite-epic-apple-lawsuit-app-store-antitrust; Nick Statt, *Apple doubles down on controversial decision to reject email app Hey*, THE VERGE (June 18, 2020), https://www.theverge.com/2020/6/18/21296180/apple-hey-email-app-basecamp-rejection-response-controversy-antitrust-regulation.

**App. 412**

Apple describes its policies as standard industry practice and says that other app stores charge the same fees.[2142] In 2020, Apple funded a study that concluded that other software distribution platforms run by Google, Amazon, Samsung, Microsoft, and others charge identical or similar commissions on software downloads and transactions, and that commissions are common in other digital markets.[2143] Apple also highlighted that its commissions are lower than the cost of software distribution by brick-and-mortar retailers, which dominated the marketplace prior to the introduction of the App Store.[2144] The Apple-commissioned study explained Apple funds the App Store through a $99 annual fee it charges to developers and $299 for developers building enterprise apps, as well as the commission and fees collected on apps and in-app purchases.[2145]

Apple also noted that 84% of all apps distributed through the App Store pay no commissions or fees.[2146] Apple does not take a commission on purchases from apps like Uber or Etsy that sell "physical goods or services that will be consumed outside the app."[2147] Apple also makes some exceptions to its rules and may change or update its rules.[2148] For example, Apple has an exception for "Reader" apps such as Netflix and Kindle that permit users to access content purchased outside the

---

[2142] Innovation and Entrepreneurship Hearing at 2 (response to Questions for the Record of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.); *see also* Mark Gurman, *Apple Defends App Store Revenue Take Ahead of Antitrust Hearing*, BLOOMBERG (July 22, 2020), https://www.bloomberg.com/news/articles/2020-07-22/apple-defends-app-store-revenue-cut-ahead-of-antitrust-hearing; David Pierce & Emily Birnbaum, *Apple defends its App Store tax ahead of antitrust hearings*, PROTOCOL (July 22, 2020), https://www.protocol.com/apple-app-store-commission-study.

[2143] *See* JONATHAN BORCK ET AL., ANALYSIS GRP., APPLE'S APP STORE AND OTHER DIGITAL MARKETPLACES: A COMPARISON OF COMMISSION RATES 2, 5–6 (2020), https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf.

[2144] *See* CEO Hearing Transcript at 30 (statement of Tim Cook, CEO, Apple Inc.); Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nader, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Sept. 21, 2020) (on file with Comm.).

[2145] *See* JONATHAN BORCK ET AL., ANALYSIS GRP., APPLE'S APP STORE AND OTHER DIGITAL MARKETPLACES: A COMPARISON OF COMMISSION RATES 4, n.5, Appendix A-3 (2020), https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf.

[2146] *See e.g.*, Innovation and Entrepreneurship Hearing at 68 (statement of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.); Letter from Timothy Powderly, Apple Inc., to Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (July 15, 2019).

[2147] *App Store Review Guidelines 3.1.3(e): Goods and Services Outside of the App*, APPLE, https://developer.apple.com/app-store/review/guidelines/#goods-and-services-outside-of-the-app (last visited Sept. 27, 2020).

[2148] *See e.g.*, Sarah Perez & Anthony Ha, *Apple revises App Store rules to permit game streaming apps, clarify in-app purchases and more*, TECHCRUNCH (Sept. 11, 2020), https://techcrunch.com/2020/09/11/apple-revises-app-store-rules-to-permit-game-streaming-apps-clarify-in-app-purchases-and-more/; Phillip Shoemaker, *Apple v. Everybody*, MEDIUM (Mar. 29, 2019), https://medium.com/@phillipshoemaker/apple-v-everybody-5903039e3be.

**App. 413**

app, but do not allow for in-app subscriptions or purchases.[2149] Apple also makes exceptions for "third-party premium video apps" that integrate with Apple TV and other Apple services.[2150] Mr. Cook explained, "[t]oday, there are over 130 apps that participate in this program," and "[t]he reduced 15% commission is available to all developers offering premium video content on the same terms as Amazon Prime Video, with the same qualification criteria."[2151] Amazon Prime Video, Altice One, and Canal+ have been publicly confirmed as participants.[2152]

During the investigation, the Subcommittee received evidence from app developers regarding Apple's commissions and fees for IAPs. ProtonMail, a secure email provider, explained that Apple's justification of its 30% commission overlooks the dynamics of the marketplace for distributing software to consumers with iOS devices—conflating practices that may be unremarkable in competitive markets but abusive in monopoly markets.[2153]

For example, personal computer (PC) users can install software from app stores run by Microsoft, Google, Amazon, and others or download software directly from the software developer's website and bypass app stores altogether. Similarly, Apple's Mac App Store is one of many options for Mac users to download software. While Samsung is a global leader in smartphones, the Samsung Galaxy Store is one of several app stores available on Samsung's mobile devices. Google's Play Store dominates app distribution on Android devices and is the most apt comparison to the App Store, but Google permits some competition via sideloading and alternative app stores.[2154]

In contrast, Apple owns the iOS operating system as well as the only means to distribute software on iOS devices. Using its role as an operating system provider, Apple prohibits alternatives to the App Store and charges fees and commissions for some categories of apps to reach customers. It responds to attempts to circumvent its fees and commissions with removal from the App Store.[2155] Because of this policy, developers have no other option than to play by Apple's rules to reach customers who own iOS devices. Owners of iOS devices have no alternative means to install apps on

---

[2149] *App Store Review Guidelines 3.1.3(a): "Reader" Apps*, APPLE, https://developer.apple.com/app-store/review/guidelines/#reader-apps (last visited Sept. 27, 2020).

[2150] CEO Hearing Transcript at 8 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2151] *Id.*

[2152] Nick Statt, *Apple now lets some video streaming apps bypass the App Store cut*, THE VERGE (Apr. 1, 2020), https://www.theverge.com/2020/4/1/21203630/apple-amazon-prime-video-ios-app-store-cut-exempt-program-deal. *See also*, Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-015111 (Nov. 1, 2016) (showing details of negotiations between Eddy Cue, Senior Vice Pres., Internet Software and Services, Apple Inc., and Jeff Bezos, CEO, Amazon.com, Inc.) (on file with Comm.).

[2153] *See* Submission from ProtonMail, to H. Comm. on the Judiciary, 11–12 (Aug. 22, 2020) (on file with Comm.).

[2154] *See id*. Apple has pointed to these as benchmarks for the App Store. *See* JONATHAN BORCK ET AL., ANALYSIS GRP., APPLE'S APP STORE AND OTHER DIGITAL MARKETPLACES: A COMPARISON OF COMMISSION RATES 4–6 (2020), https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf.

[2155] *See* Submission from ProtonMail, to H. Comm. on the Judiciary, 5 (Aug. 22, 2020) (on file with Comm.).

**App. 414**

their phones. Apple notes that its 30% commission has remained static for most apps for more than a decade.[2156] A group of developers that filed a lawsuit against Apple challenging this policy argue that the persistence of Apple's 30% rate over time, "despite the inevitable accrual of experience and economies of scale," indicates there is insufficient competition.[2157] Additionally, as previously noted, there is little likelihood for new market entry in the mobile operating system or mobile app store markets to compel Apple to lower its rates.[2158]

Industry observers have also challenged Apple's implicit claim that the iPhone was the start of the online software distribution market. For example, Mac and iOS developer Brent Simmons remarked that "when the App Store was created, developers were selling and distributing apps over the web, and it worked wonderfully," noting that he began distributing software over the internet in the 1990s.[2159] Software designer and technology writer John Gruber agreed, explaining that in the mid-1990s there was "a thriving market for software sold directly over a thing called 'The Internet,'" and that Apple's omission of the fact that "direct downloads and sales over the web" pre-dated the iPhone by more than a decade "is flat-out dishonest."[2160]

Many developers have stressed that, because Apple dictates that the App Store is the only way to install software on iOS devices and requires apps offering "digital goods and services" to implement the IAP mechanism, Apple has illegally tied IAP to the App Store.[2161] Consumers with iOS devices account for a disproportionately high amount of spending on apps—spending twice as much as Android users.[2162] Further, iOS users seldom switch to Android.[2163] Thus, developers cannot abandon

---

[2156] *See* CEO Hearing Transcript at 52 (statement of Tim Cook, CEO, Apple Inc.); Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nader, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Sept. 21, 2020) (on file with Comm.).

[2157] Class Action Complaint at 2, Cameron v. Apple Inc., No. 5:19-cv-3074 (N.D. Cal., June 4, 2019).

[2158] *See infra* Section IV.

[2159] *See* Rob Pegoraro, *What Tim Cook Left Out Of His Version of App Store History*, FORBES (July 29, 2020), https://www.forbes.com/sites/robpegoraro/2020/07/29/what-tim-cook-left-out-of-his-version-of-app-store-history/.

[2160] John Gruber, *Parsing Tim Cook's Opening Statement from Today's Congressional Antitrust Hearing*, DARING FIREBALL (July 29, 2020), https://daringfireball.net/2020/07/parsing_cooks_opening_statement.

[2161] *See e.g.*, Submission from Source 711, to H. Comm. on the Judiciary, Appendix A at 4–8 (Oct. 15, 2019) (on file with Comm.); Submission from Source 202, to H. Comm. on the Judiciary, 22–41 (Oct. 18, 2018); Submission from Source 736, to H. Comm. on the Judiciary, 6–10 (Oct. 31, 2019) (on file with Comm.).

[2162] *See Global App Revenue Grew 23% Year-Over-Year Last Quarter to $21.9 Billion*, SENSORTOWER (Oct. 23, 2019), https://sensortower.com/blog/app-revenue-and-downloads-q3-2019; Prachi Bhardwaj & Shayanne Gal, *Despite Android's growing market share, Apple users continue to spend twice as much money on apps as Android users*, BUS. INSIDER (July 6, 2018), https://www.businessinsider.com/apple-users-spend-twice-apps-vs-android-charts-2018-7.

[2163] *See Mobile Operating System Loyalty: High and Steady*, CONSUMER INTEL. RES. PARTNERS (Mar. 8, 2018), http://files.constantcontact.com/150f9af2201/4bca9a19-a8b0-46bd-95bd-85740ff3fb5d.pdf; *iPhone vs. Android – Cell Phone Brand Loyalty Survey 2019*, SELLCELL (Aug. 20, 2019), https://www.sellcell.com/blog/iphone-vs-android-cell-phone-brand-loyalty-survey-2019/; *see also* MORNINGSTAR EQUITY ANALYST REPORT, APPLE INC 3 (Aug. 6, 2020) (on file

**App. 415**

the App Store—it is where the highest value customers are and will remain. As a result, developers say that Apple abuses control over its valuable user base by prohibiting alternative payment processing options to compete with Apple's IAP mechanism.

Developers further argue that Apple's 30% commission from IAP is a "payment processing" fee and not a distribution fee.[2164] In a submission to the Committee, Match Group said, "Apple distorts competition in payment processing by making access to its App Store conditional on the use of IAP for in-app purchases, thus excluding alternative payment processors. IAP eventually becomes the vessel through which Apple extracts its extraordinary commissions."[2165] Two app developers that offer services that compete with Apple explained that IAP is a payment processing fee and not a distribution fee. Both pointed out that Apple does not charge apps for distribution, evidenced by the fact Apple admits distributing most apps for free. Instead, Apple generates revenue by adding a 30% processing fee on transactions in the App Store and using IAP.[2166] Apple's Developer Program website explains that Apple does charge for distribution—it requires enrollment in the Apple Developer Program and payment of a $99 fee to distribute apps on the App Store.[2167]

Apple responded that its "commission is not a payment processing fee" and that it "reflects the value of the App Store as a channel for the distribution of developers' apps and the cost of many services" it incurs to maintain the App Store.[2168] It said that "[t]he commission also enables Apple to

---

with Comm.) ("Recent survey data shows that iPhone customers are not even contemplating switching brands today. In a December 2018 survey by Kantar, 90% of U.S.-based iPhone users said they planned to remain loyal to future Apple devices."); Martin Armstrong, *Most iPhone Users Never Look Back*, STATISTA (May 22, 2017), https://www.statista.com/chart/9496/most-iphone-users-never-look-back/.

[2164] *See e.g.*, Competitors Hearing at 9 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp); Interview with Source 143 (Aug. 27, 2020); Submission from Match Group, to H. Comm. on the Judiciary, MATCH-GRP_00000168 (July 1, 2019) (on file with Comm.); Submission from Source 482, to H. Comm. on Judiciary, 9 (Oct. 15, 2019) (on file with Comm.).

[2165] Submission from Match Group, to H. Comm. on the Judiciary, MATCH_GRP_00000238 (Nov. 1, 2019) (on file with Comm.).

[2166] *See* Submission from ProtonMail, to H. Comm. on the Judiciary, 11 (Aug. 22, 2020) (on file with Comm.); Submission from Spotify, to H. Comm. on the Judiciary, Appendix A at 7–8 (Oct. 15, 2019) (on file with Comm.).

[2167] *See Apple Developer Program, How the Program Works*, APPLE, https://developer.apple.com/programs/how-it-works/ (last visited Sept. 27, 2020) ("If you're new to development on Apple Platforms, you can get started with our tools and resources for free. If you're ready to build more advanced capabilities and distribute your apps on the App Store, enroll in the Apple Developer Program. The cost is 99 USD per membership year.").

[2168] Letter from Kyle Andeer, Vice Pres., Corp. Law & Chief Compliance Officer, Apple Inc. to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Feb. 17, 2020), https://docs.house.gov/meetings/JU/JU05/20200117/110386/HHRG-116-JU05-20200117-SD004.pdf; *see also* Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Sept. 21, 2020) (on file with Comm.).

**App. 416**

realize a return on its investment in the App Store and in Apple's intellectual property, and to fund future App Store innovation."[2169] Similarly, a study commissioned by Apple in 2020 explained that the annual fees paid by developers, commissions, and charges for in-app purchases fund investments in the App Store ecosystem, such as app review, developer tools, marketing, search functionality, application program interfaces, and software development kits.[2170] Apple has also argued that its App Store Developer Guidelines—including its requirement to use Apple's in-app purchase mechanism—is "designed to keep the store safe for our users."[2171]

Apple's rationale for its commissions and fees has evolved over time. Its recent explanations of the basis for its 30% commission differs significantly from its explanation of its fee and revenue expectations in the early years of the App Store. Prior to the App Store's debut in 2008, then-Apple CEO Steve Jobs explained, "We don't intend to make any money off the App Store . . . . We're basically giving all the money to the developers and the 30 percent that pays for running the store, that'll be great."[2172] In 2011, Apple's Chief Financial Officer Peter Oppenheimer explained to Apple's shareholders that Apple runs the App Store "just a little over break even."[2173]

Apple's financial reports indicate that the App Store is faring far better than the modest business Apple originally contemplated. According to a 2019 market analysis, Apple's net revenue from the App Store is projected to be $17.4 billion for Fiscal Year 2020.[2174] CNBC estimated the App Store had total sales of nearly $50 billion in 2019, generating "about $15 billion in revenue for Apple."

---

[2169] Apple, *Apple: Distinctive Products with a Seamless, Integrated User Experience* 14 (July 13, 2020) (on file with Comm.)*; see also* Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nader, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Sept. 21, 2020) (on file with Comm.).

[2170] *See* JONATHAN BORCK ET AL., ANALYSIS GRP., APPLE'S APP STORE AND OTHER DIGITAL MARKETPLACES: A COMPARISON OF COMMISSION RATES 2–3 (2020), https://www.analysisgroup.com/globalassets/insights/publishing/apples_app_store_and_other_digital_marketplaces_a_comparison_of_commission_rates.pdf; *see also* Letter from Kyle Andeer, Vice Pres., Corp. Law & Chief Compliance Officer, Apple Inc. to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 2 (Feb. 17, 2020) (on file with Comm.), https://docs.house.gov/meetings/JU/JU05/20200117/110386/HHRG-116-JU05-20200117-SD004.pdf.

[2171] Kif Leswing, *Apple sued by Fortnite maker after kicking the game out of the App Store for payment policy violations*, CNBC (Aug. 13, 2020), https://www.cnbc.com/2020/08/13/apple-kicks-fortnite-out-of-app-store-for-challenging-payment-rules.html.

[2172] Peter Cohen, *'App Store' will distribute iPhone software*, MACWORLD (Mar. 6, 2008), https://www.macworld.com/article/1132402/appstore.html.

[2173] Daniel Eran Dilger, *Inside Apple's shareholder meeting and Q&A with Tim Cook*, APPLE INSIDER (Feb. 23, 2011), https://appleinsider.com/articles/11/02/23/tim_cook_presides_over_annual_apple_shareholder_meeting.

[2174] Eric J. Savitz, *App Stores Could Be Ripe for Regulation. Here's Who Benefits if Commissions Fall*, BARRONS (July 25, 2019), https://www.barrons.com/articles/news-updates-51599747657.

**App. 417**

With $50 billion in annual sales, CNBC explained, "the App Store alone would be no. 64 on the Fortune 500, ahead of Cisco and behind Morgan Stanley."[2175] An analytics firm concluded that Apple likely made $15.5 billion from the App Store in 2018, and estimated $18.8 billion for 2022. *Bloomberg* reported that analysts forecasting Apple's third-quarter 2020 performance predicted growth from Services "up 15% from a year earlier," and that growth would largely be attributable to the App Store and licensing, not new services.[2176] In addition to Apple's commissions and fees for IAP, App Store revenue also includes $2.67 billion Apple would make through the $99 annual fee paid by Apple's 27 million iOS developers.[2177] Apple also reportedly made $9 billion in 2018 and $12 billion in 2019 to set Google as the default search engine on the Safari browser.[2178] Revenue from setting Google as Safari's default search engine is attributed to Apple's Services business, which is the business unit that includes the App Store.[2179]

In an interview with Subcommittee staff, Phillip Shoemaker, Apple's former Senior Director of App Store Review, estimated that Apple's costs for running the App Store are less than $100 million. Other analysts estimate that the App Store has significantly higher profits. A gaming developer explained that the fees it pays Apple's add up to millions of dollars—or even tens or hundreds of millions of dollars for some developers—far in excess of the developer's estimate of Apple's costs of reviewing and hosting those apps.[2180] Although only estimates, these figures indicate that as the mobile app economy has grown, Apple's monopoly power over app distribution on iPhones permits the App Store to generate supra-normal profits. These profits are derived by extracting rents from developers, who either pass on price increases to consumers or reduce investments in innovative new services. Apple's ban on rival app stores and alternative payment processing locks out competition, boosting Apple's profits from a captured ecosystem of developers and consumers.[2181]

---

[2175] Kif Leswing, *Apple's App Store had gross sales around $50 billion last year, but growth is slowing*, CNBC (Jan. 8, 2020), https://www.cnbc.com/2020/01/07/apple-app-store-had-estimated-gross-sales-of-50-billion-in-2019.html.

[2176] Mark Gurman, *Apple's New Services Off to a Slow Start in First Year*, BLOOMBERG (July 28, 2020), https://www.bloombergquint.com/business/apple-s-new-services-off-to-a-slow-start-in-first-year.

[2177] *See* Letter from Kyle Andeer, Vice Pres., Corp. Law and Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Jim Jordan, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Sept. 21, 2020) (on file with Comm.) ("[T]here are more than 1.8 million apps on the App Store, and a thriving community of more than 27 million iOS developers."); *Developer Support, Purchase and Activation*, APPLE, https://developer.apple.com/support/purchase-activation/ (last visited Sept. 27, 2020) ("The Apple Developer Program annual fee is $99 USD and the Apple Developer Enterprise Program annual fee is $299 USD.").

[2178] *See* Lisa Marie Segarra, *Google to Pay Apple $12 Billion to Remain Safari's Default Search Engine in 2019: Report*, FORTUNE (Sept. 29, 2018), https://fortune.com/2018/09/29/google-apple-safari-search-engine/.

[2179] *See* Mark Gurman, *Apple's New Services Off to a Slow Start in First Year*, BLOOMBERG (July 28, 2020), https://www.bloombergquint.com/business/apple-s-new-services-off-to-a-slow-start-in-first-year.

[2180] Interview with Source 143 (Aug. 27, 2020).

[2181] Dr. Carl Shapiro of the University of California, Berkeley—the former top economist for the Justice Department's Antitrust Division during the Obama Administration—has noted that persistently high corporate profits that are not eroded by competitive forces over time are an indicator of market power. It also suggests the rise of incumbency rents, or the earning of excess profits "by firms whose positions are protected by high barriers to entry." Carl Shapiro, *Antitrust in a*

**App. 418**

To address this concern without compromising the security or quality of the App Store, some developers argue in favor of allowing third-party payment processors like PayPal, Square, and Stripe to compete in the App Store. They explain that the most likely competitors are already trusted and widely used for e-commerce transactions.[2182] David Heinemeier Hansson, Cofounder and CTO of Basecamp, testified at the Subcommittee's fifth hearing that Apple's market power allows it to keep fees "exorbitantly high." [2183] By comparison, he noted that other markets, such as credit card processes, are "only able to sustain a 2 percent fee for merchants. Apple, along with Google, has been able to charge an outrageous 30 percent for years on end."[2184] Several other firms observed that Apple's control over app distribution allows it to extract high fees on a minority of apps, and that competition for processing payments would drive prices down. For example, developers explain that payment processing typically costs less than 5% of the transaction value.[2185] Before the App Store, one developer reportedly explained that "[w]e typically paid about 5%—not 30%—to a payment processor," and it "worked just as well for small developers as for large."[2186]

Other developers have noted that alternative payment processing providers charge significantly lower rates than Apple's fee for IAP. Match Group estimates that Apple's expenses related to payment processing "justify charging no more than 3.65% of revenue."[2187] Some app developers would prefer to implement in-house payment processing. In August 2020, Epic Games introduced a direct payment option in its Fortnite app, allowing gamers to elect to use Apple's IAP or pay Epic directly. Epic's payment processing option that charged consumers 10%—a 20% discount from purchases using IAP.[2188] In response, Apple disabled updates for Fortnite for violating the App Store Guidelines.[2189]

---

*Time of Populism*, 61 INT'L J. INDUS. ORG. 714, 733–37 (2018), https://faculty.haas.berkeley.edu/shapiro/antitrustpopulism.pdf.

[2182] Submission from ProtonMail, to H. Comm. on the Judiciary, 13 (Aug. 22, 2020) (on file with Comm.).

[2183] Competitors Hearing at 8 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp); *see also* Interview with Source 88 (May 12, 2020).

[2184] Competitors Hearing at 8 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp); *see also* Interview with Source 873 (May 12, 2020).

[2185] *See e.g.*, Competitors Hearing at 8 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp); Submission from Source 202, to H. Comm. on the Judiciary, 15 (Oct. 18, 2018) (on file with Comm.).

[2186] Rob Pegoraro, *What Tim Cook Left Out Of His Version of App Store History*, Forbes (July 29, 2020), https://www.forbes.com/sites/robpegoraro/2020/07/29/what-tim-cook-left-out-of-his-version-of-app-store-history/.

[2187] Submission of Match Group, to H. Comm. on the Judiciary, 6 (Oct. 31, 2019) (on file with Comm.).

[2188] *See* Andrew Webster, *Epic offers new direct payment in Fortnite on iOS and Android to get around app store fees*, THE VERGE (Aug. 13, 2020), https://www.theverge.com/2020/8/13/21366259/epic-fortnite-vbucks-mega-drop-discount-iphone-android.

[2189] Nick Statt, *Apple just kicked Fortnite off the App Store*, THE VERGE (Aug. 13, 2020), https://www.theverge.com/2020/8/13/21366438/apple-fortnite-ios-app-store-violations-epic-payments.

**App. 419**

Developers have also detailed that Apple attempts to lock in its fees by preventing apps from communicating with customers about alternatives. Under the App Store Guidelines, apps may not provide any information "that direct[s] customers to purchasing mechanisms other than in-app purchase."[2190] They also cannot communicate with iOS app customers about purchasing methods other than IAP.[2191]

In an interview with Subcommittee staff, one developer that offers a "freemium" app—a popular business model where the app is available for free but users can purchase upgrades—recalled that it sent an email to customers with iOS devices with information about how to upgrade to a paid subscription, including a link to the service's website where customers could upgrade their subscription. Apple responded by threatening to remove the app from the App Store and blocked its updates, including security patches.[2192] A game developer described Apple's rules as reaching outside the App Store itself to police the communications that an app can have with its own customers, including communications intended to improve customer experience and offer discounts.[2193]

In his questions for the record for the Subcommittee's second hearing, Representative W. Gregory Steube (R-FL) asked Apple about banning communications to customers by app providers. Apple responded that its restrictions on communications between apps and customers are to ensure Apple can collect commissions and "prevent free-riding."[2194] Apple explained that it restricts developers from using the iOS ecosystem to "direct customers they have acquired through Apple to purchase content elsewhere for the purpose of avoiding Apple's rightful commission."[2195] The company described its policy as a prohibition "on developers promoting, via the App Store, transactions outside the App Store," and said Apple's policies were no different than most other retailers.[2196]

In June 2020, the European Commission announced that it had opened a formal antitrust investigation of Apple's App Store rules and conduct, including "the mandatory use of Apple's own

---

[2190] *App Store Developer Guidelines 3.1.1: In-App Purchase*, APPLE, https://developer.apple.com/app-store/review/guidelines/#in-app-purchase (last visited Sept. 27, 2020).

[2191] *Apple, App Store Developer Guidelines 3.1.3: Other Purchase Methods*, APPLE, https://developer.apple.com/app-store/review/guidelines/#other-purchase-methods (last visited Sept. 27, 2020).

[2192] Submission from ProtonMail, to H. Comm. on the Judiciary, 5 (Aug. 22, 2020) (on file with Comm.).

[2193] Interview with Source 143 (Aug. 27, 2020).

[2194] Innovation and Entrepreneurship Hearing at 2 (response to Questions for the Record of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.).

[2195] *Id.* at 1.

[2196] *Id.* at 1–2.

**App. 420**

proprietary in-app purchase system and restrictions on the availability of developers to inform iPhone and iPad users of alternative cheaper purchasing possibilities outside of apps."[2197]

As Apple has emphasized growing its Services business, app developers and technology writers have observed Apple is increasingly insistent that apps implement IAP—cutting Apple in on revenue from more developers—and threatening apps that do not comply with expulsion from the App Store.[2198] In June 2020, HEY, an email app developed by Basecamp, was approved by the App Store and then abruptly told it would have to implement Apple in-app purchasing or face removal from the platform.[2199] While HEY's app updates were eventually allowed, Apple did force it to create a free trial option for iOS customers.[2200] Basecamp Cofounder and CTO David Heinemeier Hansson observed that Apple threatened and abused small app developers for years, and that the conflict with HEY amounted to a "shakedown."[2201] In August 2020, Apple denied WordPress the ability to update its app unless it implemented IAP, even though the WordPress app does not sell anything. Apple ultimately backed off its demands only after the issue received negative attention on social media.[2202] ProtonMail told the Subcommittee that its privacy-focused email app competes with an Apple's email app, and after being in the App Store for two years, Apple demanded the ProtonMail implement IAP or be removed from the App Store. ProtonMail complied to avoid damage to its business.[2203]

Internal Apple communications reviewed by Subcommittee staff indicate that Apple has leveraged its power over the App Store to require developers to implement IAP or risk being thrown

---

[2197] Press Release, Eur. Comm'n, Antitrust: Commission opens investigations into Apple's App Store rules (June 16, 2020), https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1073.

[2198] See e.g., Jeremy Howitz, *Apple's antitrust woes stem from its obsessions with control and money*, VENTURE BEAT (Aug. 7, 2020), https://venturebeat.com/2020/08/07/apples-antitrust-woes-stem-from-its-obsessions-with-control-and-money/ ("Apple might act like it's too large to care about money, but the company has recently sniped at developers who have succeeded on iOS without paying Apple anything, while doing as much as possible to push other developers — and users — into coughing up recurring subscription fees for both apps and games.").

[2199] See e.g., Nilay Patel, *Apple approves Hey email app, but the fight's not over*, THE VERGE (June 22, 2020), https://www.theverge.com/2020/6/22/21298552/apple-hey-email-app-approval-rules-basecamp-launch; Rob Pegoraro, *Apple To Basecamp's Hey: Expect to Pay Us If You Want To Sell Privacy*, FORBES (June 17, 2020), https://www.forbes.com/sites/robpegoraro/2020/06/17/apple-to-basecamps-hey-expect-to-pay-us-if-you-want-to-sell-privacy/.

[2200] Chaim Gartenberg, *Hey opens its email service to everyone as Apple approves its app for good*, THE VERGE (June 25, 2020), https://www.theverge.com/2020/6/25/21302931/hey-email-service-public-launch-apple-approves-app-fight-policy-price.

[2201] *Apple v. Hey*, HEY, https://hey.com/apple/ (last visited Sept. 27, 2020).

[2202] See Sean Hollister, *WordPress founder claims Apple cut off updates to his completely free app because it wants 30 percent*, THE VERGE (Aug. 21, 2020), https://www.theverge.com/2020/8/21/21396316/apple-wordpress-in-app-purchase-tax-update-store; Sean Hollister, *Apple apologizes to WordPress, won't force the free app to add purchases after all*, THE VERGE (Aug. 23, 2020), https://www.theverge.com/2020/8/22/21397424/apple-wordpress-apology-iap-free-ios-app.

[2203] Submission from ProtonMail, to H. Comm. on the Judiciary, 5 (Aug. 22, 2020) (on file with Comm.).

**App. 421**

out of the App Store.[2204] Then-Apple CEO Steve Jobs once explained, "there will be some roadkill because of it. I don't feel guilty" when confronted with developer complaints about Apple's commission and requirement to use IAP.[2205] The Netherlands Authority for Consumers and Markets has noted that some app developers attribute Apple's inconsistent application of its rules to inattention to apps that are infrequently updated, and that Apple likely focuses on requiring IAP for high revenue-generating apps.[2206]

In response to the COVID-19 pandemic, some businesses moved physical events online, often booking through an app and holding the event through a video chat application. Educators have also shifted resources online, including through apps. *The New York Times* reported that Apple demanded a 30% commission from these virtual class offerings. As a result, one company stopped offering virtual classes to users of its iOS app. The *Times* reported that Apple threatened Airbnb that it would remove its app from the App Store if Airbnb did not comply with Apple's demand for a share of its revenues.[2207]

In interviews with Subcommittee staff, multiple app developers confirmed *The New York Times*' reporting.[2208] Airbnb spoke with Subcommittee staff and described conversations with the App Store team in which Apple said it had observed an uptick in the number of apps offering virtual classes in lieu of in-person classes due to the COVID-19 pandemic. As a result, Apple began canvassing the App Store to require app developers implement IAP, entitling Apple to take 30% of in-app sales. Airbnb explained that Apple's commission, plus compliance with Apple's pricing tiers for in-app purchases would ultimately result in a 50-60% price increase for consumers.[2209]

Technology industry observers have reported similar conduct. On June 17, 2020, Ben Thompson, a prominent business analyst, wrote that app developers told him that Apple was demanding 30% commissions from businesses that have had to change their business models from live, in-person events to virtual events as a result of the COVID-19 pandemic. Mr. Thompson quoted one developer who explained that Apple was taking advantage of small businesses in the midst of the ongoing public health crisis.[2210]

---

[2204] *See* Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-014701–02 (Nov. 23, 2010) (on file with Comm.).

[2205] Patrick McGee & Javier Espinoza, *Apple conflict with developers escalates ahead of worldwide conference*, Fin. Times (June 22, 2020) https://www.ft.com/content/733ae8d4-e516-4418-9998-30414c368c6f.

[2206] *See* Neth. Auth. for Consumers & Mkts. at 89, 92–93.

[2207] Jack Nicas & David McCabe, *Their Business Went Virtual. Then Apple Wanted a Cut.*, N.Y. Times (July 28, 2020), https://www.nytimes.com/2020/07/28/technology/apple-app-store-airbnb-classpass.html.

[2208] *See e.g.*, Interview with Airbnb; Interview with Source 147 (Sept. 10, 2020).

[2209] *See* Interviews with Airbnb.

[2210] *See* Ben Thompson, *Xscale and ARM in the Cloud, Hey Versus Apple, Apple's IAP Campaign*, Stratechery (June 17, 2020), https://stratechery.com/2020/xscale-and-arm-in-the-cloud-hey-versus-apple-apples-iap-campaign/.

**App. 422**

At the Subcommittee's sixth hearing, Chairman Jerrold Nadler (D-NY) asked Mr. Cook about the allegations that Apple was canvassing the App Store to extract commissions from businesses that have been forced to change their business model in order to survive during the pandemic. Mr. Cook responded that Apple "would never take advantage" of the pandemic, but justified the conduct, explaining that the app developers were now offering what Apple defined as a "digital service" and Apple was entitled to commissions.[2211] Responding to *The New York Times'* reporting on the matter, Apple defended its conduct, explaining that "[t]o ensure every developer can create and grow a successful business, Apple maintains a clear, consistent set of guidelines that apply equally to everyone."[2212]

App developers affected by these changes said that after Apple's conduct became public it created an exception to its policies until the end of 2020. However, on January 1, 2021, those businesses will be required to implement IAP or remove the ability to book virtual classes in their apps.[2213]

Developers have submitted evidence that Apple's commissions and fees, combined with the lack of competitive alternatives to the App Store and IAP, harm competition and consumers. For instance, Match Group called Apple's fee for IAP "unreasonable," saying that it leads to higher prices for consumers and "an inferior user experience and a reduction of innovation."[2214]

One developer that offers an app that directly competes with Apple told the Subcommittee it was forced to raise prices to pay Apple's commission. As a result, it was less competitive, and fewer iOS users purchased its service. The company said that because apps often have small margins, they cannot absorb Apple's fees, so the price consumers pay for its app is more than 25% higher than it would otherwise be.[2215] Small developers described Apple's 30% cut as "onerous."[2216] Epic Games, which recently filed an antitrust complaint against Apple, has told a federal court that Apple's fees and commissions force developers "to increase the prices they charge in order to pay Apple's app tax. There is no method app developers can use to avoid this tax."[2217] Mac and iOS app developer Brent

---

[2211] CEO Hearing Transcript at 156 (statement of Tim Cook, CEO, Apple Inc.)

[2212] Jack Nicas & David McCabe, *Their Business Went Virtual. Then Apple Wanted a Cut.*, N.Y. TIMES (July 28, 2020), https://www.nytimes.com/2020/07/28/technology/apple-app-store-airbnb-classpass.html.

[2213] Interview with Airbnb (Aug. 31, 2020).

[2214] Submission by Match Group, to H. Comm. on the Judiciary, MATCH_GRP_00000236, MATCH_GRP_00000238 (Oct. 23, 2019) (on file with Comm.).

[2215] Submission from ProtonMail, to H. Comm. on the Judiciary, 6 (Aug. 22, 2020) (on file with Comm.); *see also* Neth. Auth. for Consumers & Mkts. Study at 91.

[2216] Interview with Source 143 (Aug. 27, 2020).

[2217] Complaint at 3, Epic Games, Inc. v. Apple Inc., 4:20-cv-05640 (N.D. Cal., Aug. 13, 2020), https://cdn2.unrealengine.com/apple-complaint-734589783.pdf.

**App. 423**

Simmons explained Apple's fees reduce innovation and lead to fewer apps in the marketplace, observing:

> [T]he more money Apple takes from developers, the fewer resources developers have. When developers have to cut costs, they stop updating apps, skimp on customer support, put off hiring a graphic designer, etc. They decide not to make apps at all that they might have made were it easier to be profitable.[2218]

In Apple's internal documents and communications, the company's senior executives previously acknowledged that the IAP requirement would stifle competition and limit the apps available to Apple's customers. For example, in an email conversation with other senior leaders at Apple about whether to require IAP for e-Book purchases, then-CEO Steve Jobs concluded, "I think this is all pretty simple—iBooks is going to be the only bookstore on iOS devices. We need to hold our heads high. One can read books bought elsewhere, just not buy/rent/subscribe from iOS without paying us, which we acknowledge is prohibitive for many things."[2219]

International competition authorities have also examined the competitive effects of Apple's App Store commissions and fees. The Australian Competition and Consumer Commission (ACCC) observed that Apple's control over app distribution on iOS devices gives it leverage to extract commissions from apps, reducing the revenue that app providers like media businesses can invest in content.[2220] The Netherlands Authority for Consumers and Markets, which completed a comprehensive study of mobile app stores in 2019, noted that developers have increased prices to account for commissions and fees.[2221] The study also remarked that Apple's 30% commission on in-app purchases may distort competition because Apple's requirement to use IAP often applies to apps competing directly against Apple's apps. As a result, app developers with small margins cannot simply absorb the cost of Apple's commission, so they increase their price, which gives Apple's competing service an advantage.[2222] Developers cited in the study "mentioned that it is highly unlikely that it is a coincidence that these digital services that are required to use IAP face competition from Apple's own apps, or possibly will do in the future."[2223]

---

[2218] Brent Simmons, *I Got Teed Off and Went on a Long Rant About This Opinion Piece on the App Store,* Inessential (July 28, 2020), https://inessential.com/2020/07/28/untrue.

[2219] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-014816–18 (Feb. 6, 2011) (on file with Comm.).

[2220] *See* Austl. Competition & Consumer Comm'n at 223, 225 (2019); *see also* Ben Thompson, *Antitrust, the App Store, and Apple*, Stratechery (Nov. 27, 2018), https://stratechery.com/2018/antitrust-the-app-store-and-apple ("Apple makes a huge amount of money, with massive profit margins, by virtue of its monopolistic control of the App Store. It doesn't make the games or the productivity applications or the digital content, it simply skims off 30%, and not because its purchasing experience is better, but because it is the only choice.").

[2221] Neth. Auth. for Consumers & Mkts. Study at 91.

[2222] *See id*. at 7.

[2223] *Id*. at 89.

**App. 424**

    ii.   Pre-Installed Apps, Default Settings, Private App Programming Interfaces (APIs), and Device Functionality

In addition to investigating whether Apple abuses its monopoly power over app distribution to leverage high commissions and fees from app developers, the Subcommittee also examined whether Apple abuses its role as the owner of iOS and the App Store to preference its own apps or harm rivals. The Committee requested information regarding Apple's practice of locking-in Apple's apps as defaults on the iPhone, and Subcommittee Chairman David N. Cicilline (D-RI) requested information from Apple regarding its practice of pre-installing its own apps on the iPhone. Subcommittee Chairman Cicilline also asked whether Apple's policy of reserving certain application programming interfaces (APIs) and access to certain device functionalities for its apps gives Apple's services a competitive advantage.

It is widely understood that consumers usually do not change default options.[2224] This is the case "even if they can freely change them or choose a competitive alternative."[2225] Subcommittee staff reviewed communications between Apple employees that demonstrate an internal understanding that pre-loading apps could be advantageous when competing against third-party apps.[2226]

Apple pre-installs about 40 Apple apps into current iPhone models.[2227] Several of these apps are set as defaults and are "operating system apps" that are "integrated into the phone's core operating system and part of the combined experience of iOS and iPhone."[2228] According to Apple, users can delete most of these pre-installed apps.[2229] Apple does not pre-install any third-party apps, and until the September 2020 release of iOS 14, it did not allow consumers to select third-party web browsers or email apps as defaults.[2230] Apple says that it is making "more than 250,000 APIs available to developers in iOS 14."[2231]

---

[2224] *See e.g.,* Dig. Competition Expert Panel Report at 36 ("[C]onsumers in digital markets display strong preferences for default options and loyalty to brands they know."); Stigler Report at 8, 41 ("Consumers do not replace the default apps on their phones… and take other actions that may look like poor decisions if those consumers like to choose among options and experience competition.").

[2225] JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 19 (2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf.

[2226] *See* Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-011035–36 (Mar. 12, 2019) (on file with Comm.) (noting that Apple pre-loading software products on to iOS devices "would clearly be even more problematic" than "Apple releasing its apps via the App Store").

[2227] CEO Hearing Transcript at 1 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2228] *Id.* at 2.

[2229] *Id.*

[2230] *Id. See also* Press Release, Apple, Apple reveals new developer technologies to foster the next generation of apps (June 22, 2020), https://www.apple.com/newsroom/2020/06/apple-reveals-new-developer-technologies-to-foster-the-next-generation-of-apps/ ("Email and browser app developers can offer their apps as default options, selectable by users.").

[2231] CEO Hearing Transcript at 3 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

**App. 425**

The Netherlands Authority for Consumers and Markets report on mobile app stores observed that app providers believe they "have a strong disadvantage" when competing with Apple's apps due to the fact that those services are often pre-installed on iOS devices.[2232] The study also noted that "pre-installation of apps can create a so-called status-quo bias. Consumers are more likely to use the apps that are pre-installed on their smartphones."[2233] Consumers will download apps that compete with pre-installed apps only when there is a noted quality difference, and even then, lower-quality pre-installed apps will still enjoy an advantage over third-party apps.[2234] The European Commission's 2019 report on competition in digital markets explained that privileging access to APIs can provide an advantage to those with greater access over those with more innovative products.[2235] Public Knowledge concluded that Apple's control of iOS and the App store enables it to advantage its own apps and services by pre-installing them on iOS devices, leading consumers to rely on the pre-installed apps rather than looking for alternatives in the App Store.[2236]

Mobile operating system providers develop APIs to permit apps to access a device's features, such as the microphone, camera, or GPS, or other software programs, and determine what information on the device apps can access.[2237] Public APIs for iOS are made available to app developers to ensure apps are integrated with the device and function as intended. These public APIs also control the services that are opened via default when users click a link to open a webpage or an address to open a map application. Private APIs access functionality that is not publicly released. Apple is permitted to use private APIs on iOS devices, but third-party developers are not.[2238]

Apple's public APIs default to Apple's pre-installed applications. As a result, when an iPhone user clicks on a link, the webpage opens in the Safari Browser, a song request opens in Apple Music, and clicking on an address launches Apple Maps.[2239] With some recent exceptions, iPhone users are

---

[2232] Neth. Auth. for Consumers & Mkts. Study at 5, 15, 85–86.

[2233] *Id.* at 84 (citing Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €4.34 Billion for Illegal Practices Regarding Android Mobile Devices to Strengthen Dominance of Google's Search Engine (July 18, 2018), https://ec.europa.eu/commission/presscorner/detail/en/ip_18_4581).

[2234] *Id.*

[2235] Eur. Comm'n Competition Report at 34.

[2236] JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 20 (2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf. *See also* DIG. COMPETITION EXPERT PANEL, PUBLIC RESPONSES TO CALL FOR EVIDENCE FROM ORGANISATIONS, RESPONSE OF BRITISH BROAD. CORP. 44 (2018), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/785549/DCEP_Public_responses_to_call_for_evidence_from_organisations.pdf ("Apple's control of devices and operating system allows it to pre-load and favour its own services i.e. Apple Podcasts.").

[2237] Competition & Mkts. Auth. Report at 42; Neth. Auth. for Consumers & Mkts. Study at 59.

[2238] *See* Thomas Claburn, *Apple Frees a Few Private API, Makes them Public*, THE REGISTER (June 13, 2017), https://www.theregister.com/2017/06/13/apple_inches_toward_openness/.

[2239] Neth. Auth. for Consumers & Mkts. Study at 59–60.

**App. 426**

unable to change this default setting.[2240] However, they are able to send app-specific links from inside many popular apps. For example, a person can share a link to a song in a third-party music streaming app such that it would open that song in the same app if it is already downloaded on the recipient's smartphone. One app developer has argued, however, that Apple uses its control over iOS to give its own apps and services advantages that are not available to competitors. For example, the developer explained that for years it was barred from integrating with Siri, Apple's intelligent virtual assistant that is built into Apple devices. Although Siri can now integrate with the app, users must explicitly request that Siri launch the third-party app. Otherwise, it will default to launch Apple's service.[2241]

Like setting advantageous defaults and pre-installing its own apps, Apple is also able to preference its own services by reserving access to APIs and certain device functionalities for itself. ACM and technology reporters have both noted that "private APIs have the potential to give Apple apps a competitive advantage," and that "Apple has for a long time favored its own services through APIs."[2242] For example, from the release of iOS 4.3 until iOS 8, "third-party developers had to rely on the UIWebView API to render web pages in iOS apps, while Apple gave its own apps access to a private, faster API," and as a result, "Google's mobile version of Chrome for iOS could not compete with Apple's mobile version of Safari in terms of speed."[2243]

Apple's mobile payments service, Apple Pay, is an example of an in-house app that enjoys an advantage due to its ability to access certain functionalities, such as near-field communication (NFC), on the iPhone that are off-limits to third-party apps. According to Apple, "NFC is an industry-standard, contactless technology" that enables communications between the mobile device and payment terminal.[2244] Apple Pay uses the iPhone's NFC chip to allows users to make contactless payments at retail outlets that use the technology.[2245] However, Apple blocks access for third-party apps. In June 2020, the European Commission opened a formal antitrust investigation into Apple's conduct in the mobile payments market, including "Apple's limitation of access to the Near Field Communication . . . functionality ('tap and go') on iPhones for payments in stores."[2246] In response to questions from

---

[2240] *See* Press Release, Apple, *Apple Reveals New Developer Technologies to Foster the Next Generation of Apps* (June 22, 2020), https://www.apple.com/newsroom/2020/06/apple-reveals-new-developer-technologies-to-foster-the-next-generation-of-apps/ ("Email and browser app developers can offer their apps as default options, selectable by users.").

[2241] Submission from Source 711, to H. Comm. on the Judiciary, Source 711-00000080 at 23 (Oct. 15, 2019) (on file with Comm.).

[2242] Thomas Claburn, *Apple Frees a Few Private API, Makes them Public*, THE REGISTER (June 13, 2017), https://www.theregister.com/2017/06/13/apple_inches_toward_openness/; *see also* Neth. Auth. for Consumers & Mkts. Study at 82.

[2243] Thomas Claburn, *Apple Frees a Few Private API, Makes them Public*, THE REGISTER (June 13, 2017), https://www.theregister.com/2017/06/13/apple_inches_toward_openness/.

[2244] *Apple Pay Security and Privacy Overview*, APPLE, https://support.apple.com/en-us/HT203027 (last visited Oct. 4, 2020).

[2245] *Id.*

[2246] Press Release, Eur. Comm'n, Antitrust: Commission Opens Investigation into Apple Practices Regarding Apple Pay (June 16, 2020) https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075.

**App. 427**

Subcommittee Chairman David N. Cicilline (D-RI) and Representative Kelly Armstrong (D-ND) about Apple's treatment of third-party mobile payment apps and access to the iPhone's NFC chip, Apple said that it limits access to the NFC chip to protect the security of the iPhone and has detailed the differences between Apple's treatment of Apple Pay and third-party mobile payment apps.[2247]

The advantage Apple provides Apple Pay may be heightened during the COVID-19 pandemic. During the pandemic, consumers have accelerated their adoption of contactless payments, with more than half of global consumers preferring contactless payments over cash or traditional credit cards.[2248] In April 2020, MasterCard reported a 40% rise in contactless payments, with the trend expected to continue after the pandemic. MasterCard CEO Ajay Banga explained the trend was driven by shoppers "looking for a quick way to get in and out of stores without exchanging cash, touching terminals, or anything else."[2249]Apple itself has capitalized on the perception that contactless is the safest way to make transactions, marketing Apple Pay as "a safer way to pay that helps you avoid touching buttons or exchanging cash."[2250]

Like Apple Pay, Safari is another pre-installed app that enjoys advantages over rivals. Safari is Apple's default browser on iOS and Mac devices. When someone using an Apple device clicks on a website link, the webpage opens in the Safari browser.[2251] Until the September 2020 release of iOS 14, Apple did not allow consumers to select a third-party web browser as a default.[2252] This was unique to iOS. Other mobile device operating systems allow the user to set a default browser across all applications.[2253]

---

[2247] CEO Hearing Transcript at 1, 3 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2248] *See* DYNATA, GLOBAL CONSUMER TRENDS: COVID-19 EDITION, THE NEW NORMAL, A BREAKTHROUGH FOR CONTACTLESS PAYMENTS 2 (2020), http://info.dynata.com/rs/105-ZDT-791/images/Dynata-Global-Consumer-Trends-COVID-19-The-New-Normal-Breakthrough-for-Contactless-Payments.pdf; *see also* Press Release, Eur. Comm'n, Antitrust: Commission Opens Investigation into Apple Practices Regarding Apple Pay (June 16, 2020) https://ec.europa.eu/commission/presscorner/detail/en/ip_20_1075 ("Executive Vice-President Margrethe Vestager, in charge of competition policy, said: 'Mobile payment solutions are rapidly gaining acceptance among users of mobile devices, facilitating payments both online and in physical stores. This growth is accelerated by the coronavirus crisis, with increasing online payments and contactless payments in stores.'").

[2249] Kate Rooney, *Contactless payments jump 40% as shoppers fear germs on cash and credit cards, Mastercard says*, CNBC (Apr. 29, 2020) https://www.cnbc.com/2020/04/29/mastercard-sees-40percent-jump-in-contactless-payments-due-to-coronavirus.html.

[2250] *Apple Pay*, APPLE, https://www.apple.com/apple-pay/ (last visited Sept. 26, 2020).

[2251] Neth. Auth. for Consumers & Mkts. Study at 59–60.

[2252] *See* Mark Gurman, *Apple's Default iPhone Apps Give It Growing Edge Over App Store Rivals*, BLOOMBERG (Oct. 2, 2019), https://www.bloomberg.com/news/articles/2019-10-02/iphone-ios-users-can-t-change-default-apps-safari-mail-music; Press Release, Apple, Apple reveals new developer technologies to foster the next generation of apps (June 22, 2020), https://www.apple.com/newsroom/2020/06/apple-reveals-new-developer-technologies-to-foster-the-next-generation-of-apps/ ("Email and browser app developers can offer their apps as default options, selectable by users.").

[2253] *See e.g.*, *Google Chrome Help*, GOOGLE https://support.google.com/chrome/answer/95417?co=GENIE.Platform%3DAndroid&hl=en-GB (last visited Sept. 26, 2020); *Support*, MOZILLA, https://support.mozilla.org/en-US/kb/make-firefox-default-browser-android (last visited Sept.

**App. 428**

Apple's policies require alternative browsers apps for iOS (iPhone) to use Apple's WebKit browser engine. As a result, all competing web browser companies must rebuild their product to make it available for iOS users.[2254] Additionally, browser engines are used in other applications that link to web content, such as email applications.[2255] Market participants explained to Subcommittee staff that these guidelines cost significant internal resources and create a hurdle for market entry on iOS. These requirements also make alternative browsers on iOS less technically distinct from Safari, limiting product differentiation.[2256] Further, market participants expressed concern that because Apple mandates the use of WebKit, as opposed to allowing options for developers, WebKit has become slower to innovate and adopt standards.[2257]

At the Subcommittee's second hearing, Chairman David N. Cicilline (D-RI) asked Apple about its policies related to web browser engines. Apple responded, "By requiring use of WebKit, Apple can provide security updates to all our users quickly and accurately, no matter which browser they decide to download from the App Store."[2258] While market participants agree that Apple's WebKit mandates would allow for easier updates to browser apps, there is disagreement about whether WebKit is measurably less secure than other browser engines.[2259]

The Netherlands Authority for Consumers and Markets has noted app providers have limited access to some APIs "that are essential for the functioning of apps. In certain cases, these functionalities are, however, used by Apple for their own apps,"[2260] which may limit competitive alternatives to Apple's products and services.[2261]

---

26, 2020); *Support*, MICROSOFT, https://support.microsoft.com/en-us/help/4028606/windows-10-change-your-default-browser (last visited Sept. 26, 2020).

[2254] *App Store Review Guidelines 2.5.6*, APPLE: DEVELOPER, https://developer.apple.com/app-store/review/guidelines/#software-requirements (last visited Sept. 26, 2020) ("Apps that browse the web must use the appropriate WebKit framework and WebKit Javascript.").

[2255] *See* Michael Krasnov, *Browser Engine Diversity or Internet of Google*, EVERDAY.CODES (Dec. 15 2019), https://everyday.codes/google/browser-engine-diversity-or-internet-of-google/.

[2256] Interview with Source 269 (July 23, 2019) ("Apple prohibits competitors from deploying their own web browsing engines on its mobile operating system. Web browsing engines provide the distinctive features of a web browser. Apple forces competitors to base their web browsers on a reduced version of its own web browser engine, 'WebKit'.").

[2257] *See* Owen Williams, *Apple is Trying to Kill Web Technology*, ONEZERO (Nov. 7, 2019), https://onezero.medium.com/apple-is-trying-to-kill-web-technology-a274237c174d.

[2258] Innovation and Entrepreneurship Hearing at 2 (response to Questions for the Record of Kyle Andeer, Vice Pres., Corp. Law, Apple Inc.).

[2259] *See* Andy Greenberg, *How Safari and iMessage Have Made iPhones Less Secure*, WIRED (Sept. 9, 2019), https://www.wired.com/story/ios-security-imessage-safari/.

[2260] Neth. Auth. for Consumers & Mkts. Study at 85–86.

[2261] *Id.* at 103.

In January 2020, Kirsten Daru, Chief Privacy Officer and General Counsel of Tile, offered testimony to Subcommittee about this dynamic.[2262] Tile is a company that makes hardware and software that helps people find lost items.[2263] Ms. Daru testified that for years Tile successfully collaborated with Apple. However, in 2019 reports surfaced that Apple planned a launch a hardware product to compete with Tile.[2264] Ms. Daru said that Apple's 2019 release of iOS 13 harmed Tile's service and user experience while simultaneously introducing a new pre-installed Apple finder app called Find My.[2265] Changes to iOS 13 made it more difficult for Tile's customers to set up the service, requiring several confusing steps to grant Tile permission to track the phone's location.[2266] Meanwhile, Apple's Find My app was pre-installed on iOS devices and activated by default during iOS installation. Users are unable to opt out of Find My's location tracking "unless they go deep into Apple's labyrinthine menu of settings."[2267] Tile's response to the Subcommittee's Questions for the Record included detailed location permission flow comparisons between Tile and Find My.[2268] Tile explained that as a result of Apple's changes to iOS 13, it saw significant decreases in users and a steep drop-off in users enabling the proper settings on iOS devices.[2269]

A group of app developers wrote to Apple CEO Tim Cook in 2019 arguing that Apple's new location notification permission policies will hurt their businesses and accused Apple of acting anticompetitively by was treating its own services differently:

> The developers conclude their email by asserting that Apple's own apps don't have to jump through similar hoops to get access to user location. An Apple app called Find My for tracking the location of other iPhone users, for example, bypasses the locating tracking requests that apps from outside developers must go through, the email reads.

---

[2262] *See* Competitors Hearing (statement of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

[2263] *Id.* at 1.

[2264] *See* Guilherme Rambo, *Apple revamping Find My Friends & Find My iPhone in unified app, developing Tile-like personal item tracking*, 9TO5MAC (Apr. 17, 2019), https://9to5mac.com/2019/04/17/find-my-iphone-revamp/.

[2265] Competitors Hearing at 2 (statement of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

[2266] *Id.*

[2267] Reed Albergotti, *Apple says recent changes to operating system improve user privacy, but some lawmakers see them as an effort to edge out its rivals*, WASH. POST (Nov. 26, 2019), https://www.washingtonpost.com/technology/2019/11/26/apple-emphasizes-user-privacy-lawmakers-see-it-an-effort-to-edge-out-its-rivals/; *see also* Competitors Hearing at 3 (statement of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

[2268] Competitors Hearing at 4–14 (response to Questions for the Record of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

[2269] Competitors Hearing at 6 (response to Questions for the Record of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.); Interview with Kirsten Daru, Vice Pres. & Gen. Counsel, Tile, Inc. (July 10, 2020).

**App. 430**

Instead, Find My gains location access through a process that occurs as users install the new operating system.[2270]

The app developers—including Tile, Arity, Life360, Happn, Zenly, Zendrive, and Twenty—explained that this gives Apple products that compete against their apps an advantage. "Apple says Find My and other apps are built into iOS and that it doesn't see a need to make location-tracking requests from users for the apps after they install the operating system."[2271] Apple also differentiates Find My by pointing out that "'Find My' stores user location data *locally* on the user's iPhone, and Apple only transmits the location upon the user's request."[2272]

In response to the Subcommittee's questions after its second hearing, Apple explained that the iOS 13 changes give users more control over background location tracking by apps. Apple also explained that turning on location tracking to Apple's Find My service was "essential" for users, and that the disparate treatment between Find My and Tile was due to the fact that data from Find My remains on the device, while Tile stores data externally.[2273] Additionally, during Apple's June 2020 World Wide Developers Conference, Apple announced that the Find My app would work with third-party finder hardware like Tile's.[2274] However, Apple's service would require companies like Tile to abandon their apps and the ability to differentiate their service from Apple's and other competitors.[2275] Apple's solution would continue to put Tile and other apps and hardware developers offering finder services at a competitive disadvantage.[2276]

---

[2270] Aaron Tilley, *Developers Call Apple Privacy Changes Anti-Competitive*, THE INFO. (Aug. 16, 2019), https://www.theinformation.com/articles/developers-call-apple-privacy-changes-anti-competitive.

[2271] *Id.*

[2272] Letter from Kyle Andeer, Vice Pres., Corp. Law & Chief Compliance Officer, Apple Inc., to Hon. Jerrold Nadler, Chairman, H. Comm. on the Judiciary, Hon. Doug Collins, Ranking Member, H. Comm. on the Judiciary, Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary & Hon. F. James Sensenbrenner, Ranking Member, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 3 (Feb. 17, 2020), https://docs.house.gov/meetings/JU/JU05/20200117/110386/HHRG-116-JU05-20200117-SD004.pdf.

[2273] *See id.* at 2.

[2274] *See* Ben Lovejoy, *Comment: This week's keynote quietly tackled five of Apple's antitrust issues*, 9TO5MAC (Jun. 24, 2020), https://9to5mac.com/2020/06/24/apples-antitrust-issues-2/.

[2275] *See* Interview with Kirsten Daru, Vice Pres. & Gen. Counsel, Tile, Inc. (July 10, 2020); APPLE, FIND MY NETWORK ACCESSORY SPECIFICATION, DEVELOPER PREVIEW: RELEASE R1 14 (2020), https://images.frandroid.com/wp-content/uploads/2020/06/Find_My_network_accessory_protocol_specification.pdf (prohibiting "an accessory that supports the Find My network accessory protocol" from "operat[ing] simultaneously on the Find My network and another finder network").

[2276] Interview with Kirsten Daru, Vice Pres. & Gen. Counsel, Tile, Inc. (Jun. 26, 2020). *See* Reed Albergotti, *Amid antitrust scrutiny, Apple makes quiet power moves over developers*, WASH. POST (July 24, 2020), https://www.washingtonpost.com/technology/2020/07/24/apple-find-my-competition/.

**App. 431**

### iii. App Search Rankings

In response to extensive reporting on the subject, Subcommittee staff has also examined the competitive effects of Apple's search rankings in its App Store. In 2019, the *Wall Street Journal* and *The New York Times* both conducted extensive investigations and reported that Apple appeared to be favoring its apps in the App Store search results.[2277] The *Wall Street Journal* explained that "Apple's mobile apps routinely appear first in search results ahead of competitors in its App Store, a powerful advantage that skirts some of the company's rules on search rankings."[2278] *The New York Times* reported that six years of analysis of App Store search rankings found Apple-owned apps ranked first for at least 700 common search terms. "Some searches produced as many as 14 Apple apps before showing results from rivals," although app developers could pay Apple to place ads at the top of the search results.[2279] Searches for the app titles of competing apps even resulted in Apple's apps ranked first.[2280]

Apple's apps "ranked first in more than 60% of basic searches, such as for 'maps'" and "Apple apps that generate revenue through subscriptions or sales, like Music or Books, showed up first in 95% of searches related to those apps."[2281] *The Wall Street Journal* noted that growing revenue from its apps is core to Apple's strategy of offsetting sluggish hardware sales by increasing revenue from its Services business.[2282]

Rival app developers slipped down the search rankings as Apple introduced new services in their product categories. For example, Spotify had long been the top search result for the query "music," but Apple Music quickly became the top search result shortly after it joined the App Store in June 2016. By the end of 2018, eight of Apple's apps appeared in the first eight search results for "music," and Spotify had fallen to the 23rd result. Similarly, Audiobooks.com was the top-ranked result for "audiobooks" for nearly two years but was overtaken by Apple Books shortly after Apple began marketing for Books. Audiobooks explained to *The Wall Street Journal* that losing the top search ranking to Apple "triggered a 25% decline in Audiobooks.com's daily app downloads."[2283]

---

[2277] *See* Tripp Mickle, *Apple Dominates App Store Search Results, Thwarting Competitors*, WALL ST. J (July 23, 2019), https://www.wsj.com/articles/apple-dominates-app-store-search-results-thwarting-competitors-11563897221; Jack Nicas & Keith Collins, *How Apple's Apps Topped Rivals in the App store it Controls*, N.Y. TIMES (Sept. 9, 2019), https://www.nytimes.com/interactive/2019/09/09/technology/apple-app-store-competition.html.

[2278] Tripp Mickle, *Apple Dominates App Store Search Results, Thwarting Competitors*, WALL ST. J (July 23, 2019), https://www.wsj.com/articles/apple-dominates-app-store-search-results-thwarting-competitors-11563897221.

[2279] Jack Nicas & Keith Collins, *How Apple's Apps Topped Rivals in the App store it Controls*, N.Y. TIMES (Sept. 9, 2019), https://www.nytimes.com/interactive/2019/09/09/technology/apple-app-store-competition.html.

[2280] Tripp Mickle, *Apple Dominates App Store Search Results, Thwarting Competitors*, WALL ST. J (July 23, 2019), https://www.wsj.com/articles/apple-dominates-app-store-search-results-thwarting-competitors-11563897221.

[2281] *Id.*

[2282] *Id.*

[2283] *Id.*

**App. 432**

Reporting on App Store search revealed that Apple may also advantage its apps by holding them to a different standard when they appear in the App Store search rankings. Apple told *The Wall Street Journal* "it uses 42 factors to determine where apps rank," and that the four most important factors are "downloads, ratings, relevance, and 'user behavior,'" with user behavior the most important factor because it measures how often users select and download an app.[2284] Approximately 40 of Apple's apps come preinstalled on iPhones. These apps do not have reviews and consumers cannot rate them. Mr. Cook explained at the Subcommittee sixth hearing that Apple's "apps that are integrated into the iPhone are not reviewable by users on the App Store."[2285] Apple has also said that its search algorithm works the same for all apps, including its own.[2286]

Despite the fact that Apple's pre-installed apps do not have ratings or reviews—factors that Apple says are most influential in determining app ranking—many of Apple's pre-installed apps "still tend to be ranked first, even when users search for exact titles of other apps."[2287] For example, Apple Books has no reviews or rankings and appears first in a search for "books," while competing apps have tens-of-thousands of customer reviews and ratings of 4.8 or 4.9 stars on Apple's five-star rating system.[2288] A search by Subcommittee staff of terms "music," "news," "TV," and "podcast" returned Apple Music, News, TV, and Podcasts as top-ranked search results, although those apps do not have any reviews or ranking.[2289]

Despite the lack of reviews or rankings, Apple told the *Wall Street Journal* that "the No. 1 position for Books in a 'books' search is reasonable, since it is an exact name match."[2290] Philip Schiller, Apple's Senior Vice President, Worldwide Marketing, who oversees the App Store, and Eddy Cue, Apple's Senior Vice President Internet and Software Services, said "there was nothing underhanded about the algorithm the company had built to display search results in the store,"[2291] and

---

[2284] *Id.*

[2285] CEO Hearing Transcript at 2 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2286] *See* Tripp Mickle, *Apple Dominates App Store Search Results, Thwarting Competitors*, WALL ST. J (July 23, 2019), https://www.wsj.com/articles/apple-dominates-app-store-search-results-thwarting-competitors-11563897221.

[2287] *Id.*

[2288] Search Results: "books," IOS APP STORE (Sept. 17, 2020).

[2289] Search Results: "music," "news," "TV," "podcast," IOS APP STORE (Sept. 17, 2020).

[2290] Tripp Mickle, *Apple Dominates App Store Search Results, Thwarting Competitors*, WALL ST. J (July 23, 2019), https://www.wsj.com/articles/apple-dominates-app-store-search-results-thwarting-competitors-11563897221.

[2291] Jack Nicas & Keith Collins, *How Apple's Apps Topped Rivals in the App Store it Controls*, N.Y. TIMES (Sept. 9, 2019), https://www.nytimes.com/interactive/2019/09/09/technology/apple-app-store-competition.html.

**App. 433**

that Apple's apps tend to rank highly because they are popular and their generic names like Books and Music closely match common search terms.[2292]

It appears that Apple does not apply the same rule to third-party apps. Documents reviewed by Subcommittee staff show that Apple previously punished non-Apple apps that attempted to "cheat" the app store rankings. Apple determined that at least one third-party app had achieved its high search ranking because its name was a generic name that was also a common search term. Apple's employees determined it was cheating to give an app the name of a common search term.

In February 2018, Apple's App Store search team noted that an app named "Photo Editor— Stylo" was the top-ranked result when users searched the App Store for "photo editor."[2293] In an email thread with Philip Schiller, Apple's Senior Vice President, Worldwide Marketing, an Apple employee wrote that "[s]ince the app name matched a broad query term like 'photo editor' the developer was able to game the query with a direct name match."[2294] The Apple employee explained that "[t]he app has been added to the Search Penalty Box for rank demotion," and the action was labeled as complete.[2295] Additional action was slated to disable the initial boost that new apps are given in the app store if the app name is an "exact match to broad queries."[2296] Here, Apple punished an app for the same conduct it said justified Apple's position atop the App Store rankings.

Apple's position as the provider of iOS enables it to designate the App Store as the sole means for app developers to distribute software to iPhone users. Apple's public statements, including testimony by Mr. Cook that Apple's apps "go through the same rules" as more than 1.7 million third-party apps appear to be inconsistent with Apple's actual practices.[2297] In this case, Apple leveraged its control of iOS and the App Store to give its own apps preferential treatment, and applied a different set of rules than third-party apps, punishing them for the very conduct Apple engaged in. Subcommittee staff did not have access to additional evidence from Apple to determine how widespread this practice is within the company.

iv. Competitively Sensitive Information

In addition to investigating allegations Apple engages in self-preferencing in the App Store, the Committee sought information regarding whether Apple exploits third-party developers that rely on

---

[2292] Id.; see also Apple, Apple: Distinctive Products with a Seamless, Integrated User Experience 23 (July 13, 2020) (on file with Comm.) ("Because many of Apple's apps are named after generic topics (such as Music, Maps, and Podcasts), those apps benefit from functional queries that have essentially become navigational.").

[2293] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-008082–86 (Feb. 9, 2018) (on file with Comm.).

[2294] Id.

[2295] Id.

[2296] Id.

[2297] CEO Hearing Transcript at 176 (statement of Tim Cook, CEO, Apple Inc.).

**App. 434**

distribution in the App Store. Developers have alleged that Apple abuses its position as the provider of iOS and operator of the App Store to collect competitively sensitive information about popular apps and then build competing apps or integrate the popular app's functionality into iOS.[2298] The practice is known as "Sherlocking." The antitrust laws do not protect app developers from competition, and platforms should continue to innovate and improve their products and services. However, Sherlocking can be anticompetitive in some instances.[2299]

Some app developers have complained that Apple leverages its control of iOS and the App Store to glean business intelligence that enables it to better compete against third-party apps.[2300] For example, after a stress relief app called Breathe was Sherlocked in 2016, the app's developers said that Apple used third-party developers "as an R&D arm."[2301] *The Washington Post* reported on the phenomenon, explaining:

> Developers have come to accept that, without warning, Apple can make their work obsolete by announcing a new app or feature that uses or incorporates their ideas. Some apps have simply buckled under the pressure, in some cases shutting down. They generally don't sue Apple because of the difficulty and expense in fighting the tech giant—and the consequences they might face from being dependent on the platform.[2302]

At the Subcommittee's fifth hearing, Subcommittee Vice Chairman Joe Neguse (D-CO) asked Ms. Daru of Tile about how Apple used competitively sensitive information it collects as the owner of the iOS ecosystem to compete against third-party apps. She explained that as an operating system provider and App Store operator, Apple knows who Tile's customers are, the types of apps those customers preferred, and the demographics of iOS users that look at Tile's app or search for similar apps—information that would give Apple a competitive advantage against Tile.[2303] Ms. Daru testified

---

[2298] *See e.g.*, Brian Heater, *The makers of Duet Display and Luna on life after Apple's Sidecar*, TECHCRUNCH (Jun. 7, 2019), https://techcrunch.com/2019/06/07/the-makers-of-duet-display-and-luna-on-life-after-apples-sidecar/.

[2299] *See* JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 21, 58 (2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf.

[2300] *See e.g.*, Reed Albergotti, *How Apple uses its App Store to copy the best ideas*, WASH POST (Sept. 5, 2019), https://www.washingtonpost.com/technology/2019/09/05/how-apple-uses-its-app-store-copy-best-ideas/. *See also* William Gallagher, *Developers talk about being 'Sherlocked' as Apple uses them 'for market research'*, APPLE INSIDER (Jun. 6, 2019), https://appleinsider.com/articles/19/06/06/developers-talk-about-being-sherlocked-as-apple-uses-them-for-market-research; John Patrick Pullen, *Why These People Are Upset About Apple's Latest Updates*, TIME (Jun. 21, 2016), https://time.com/4372515/apple-app-developers-wwdc-sherlock-sherlocked/; Adi Robertson, *Apple restores mail app after developer tries to rally 'Sherlocked' victims*, THE VERGE (Feb. 11, 2020), https://www.theverge.com/2020/2/11/21133023/apple-bluemail-blix-restored-mac-app-store-sherlocking-patent-lawsuit.

[2301] John Patrick Pullen, *Why These People Are Upset About Apple's Latest Updates*, TIME (Jun. 21, 2016), https://time.com/4372515/apple-app-developers-wwdc-sherlock-sherlocked/.

[2302] Reed Albergotti, *How Apple uses its App Store to copy the best ideas*, WASH POST. (Sept. 5, 2019), https://www.washingtonpost.com/technology/2019/09/05/how-apple-uses-its-app-store-copy-best-ideas/.

[2303] Competitors Hearing Transcript at 53 (statement of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.).

**App. 435**

that Apple had harmed Tile's service and user experience while simultaneously introducing a rival app and preparing to launch a rival hardware product.[2304] Blix, developer of email management app BlueMail, has sued Apple in federal court claimed Apple has engaged in Sherlocking and infringed the patents underlying BlueMail:

> Apple frequently takes other companies' innovative features, adds those ideas to Apple's own software products without permission, and then either ejects the original third-party application from the App Store (as it did with Blix's software) or causes the third-party software developer to close its doors entirely.[2305]

In response to the requests for information, Match Group told the Subcommittee that Apple has a history of "closely monitoring the success of apps in the App Store, only to copy the most successful of them and incorporate them in new iPhones" as a pre-installed app.[2306] Phillip Shoemaker, Apple's former Senior Director of App Store Review, similarly told Subcommittee staff that during his time at Apple, an app developer proposed an innovative way to wirelessly sync the iPhone and Mac.[2307] The app did not violate any of Apple's Guidelines, but it was rejected from the App Store nonetheless.[2308] Apple then appropriated the rejected app's feature for its own offerings.[2309]

During the Subcommittee's sixth hearing, Subcommittee Vice Chairman Joe Neguse (D-CO) asked Mr. Cook about Tile's testimony. In particular, he asked if Apple has access to the confidential information of app developers, and whether Apple's Developer Agreement explicitly authorizes Apple to use developers' information to build apps to compete against them.[2310] Mr. Cook's answer was non-responsive regarding allegations of Sherlocking. Instead, he said that Apple does not violate other companies' intellectual property rights.[2311]

---

[2304] *See* Competitors Hearing at 4 (statement of Kirsten Daru, Chief Privacy Officer & Gen. Counsel, Tile, Inc.); Guilherme Rambo, *Apple revamping Find My Friends & Find My iPhone in unified app, developing Tile-like personal item tracking*, 9TO5MAC (Apr. 17, 2019), https://9to5mac.com/2019/04/17/find-my-iphone-revamp/.

[2305] Amended Complaint at 4, Blix Inc. v. Apple Inc., No. 1:19-cv-1869-LPS (D. Del., Dec. 20, 2019).

[2306] Submission from Source 736, to H. Comm. on the Judiciary, Source 736_00000243 (Oct. 23, 2019) (on file with Comm.).

[2307] Interview with Phillip Shoemaker, former Senior Dir., App Store Review, Apple Inc. (Sept. 21, 2020).

[2308] *Id.*

[2309] *Id.*

[2310] CEO Hearing Transcript at 177 (question of Rep. Neguse (D-CO), Vice Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary).

[2311] *Id.* at 177–78 (statement of Tim Cook, CEO, Apple Inc.) ("[Apple] run[s] the App Store to help developers, not hurt them. We respect innovation. It's what our company was built on. We would never steal somebody's IP.").

**App. 436**

In contrast, Apple co-founder and former CEO Steve Jobs once noted that "[w]e have always been shameless about stealing great ideas."[2312] The Apple Developer Agreement, which Apple requires every app developer to agree to, appears to warns developers that in exchange for access to the App Store, Apple is free to build apps that "perform the same or similar functions as, or otherwise compete with" apps in the App Store.[2313] Additionally, "Apple will be free to use any information, suggestions or recommendations you provide to Apple pursuant to this Agreement for any purpose, subject to any applicable patents or copyrights."[2314]

Mr. Cook's statement that Apple's apps play by the same rules as other apps appears contrary to Apple's stated policies. While the Apple Developer Agreement provides Apple the right to replicate third-party apps, Apple's Guidelines direct developers not to "copy another developer's work" and threaten removal of apps and expulsion from the Developer Program for those that do.[2315] Further, the Guidelines instruct developers to "[c]ome up with your own ideas" and admonishes them to not "simply copy the latest popular app on the App Store, or make some minor changes to another app's name or UI and pass it off as your own."[2316] Lastly, Apple differentiates between—rather than conflates or confuses—copycat apps and intellectual property infringement, which are both prohibited in the App Store.[2317]

### v.   Excluding Rival Apps

During the Subcommittee's sixth hearing, Representatives Val Demings (D-FL) and Lucy McBath (D-GA) asked questions regarding Apple's removal of parental control apps from the App Store in 2018 and 2019. In 2018, Apple announced its Screen Time app, a new feature bundled with iOS 12 that helped iOS users limit the time they and their children spent on the iPhone. Thereafter, Apple began to purge many of the leading rival parental control apps from the App Store. Apple explained the apps were removed because they used a technology called Mobile Device Management (MDM). MDM technology allowed parents to remotely take over their children's phones and block

---

[2312] Reed Albergotti, *How Apple uses its App Store to copy the best ideas*, WASH. POST. (Sept. 5, 2019), https://www.washingtonpost.com/technology/2019/09/05/how-apple-uses-its-app-store-copy-best-ideas/.

[2313] *Apple Developer Agreement, Clause 11: Apple Independent Development*, APPLE: DEVELOPER, https://developer.apple.com/terms/apple-developer-agreement/Apple-Developer-Agreement-English.pdf (last visited Sept. 27, 2020).

[2314] *Id.*

[2315] *App Store Review Guidelines: Introduction*, APPLE: DEVELOPER, https://developer.apple.com/app-store/review/guidelines/ (last visited Sept. 27, 2020).

[2316] *App Store Review Guidelines 4.1: Copycats*, APPLE: DEVELOPER, https://developer.apple.com/app-store/review/guidelines/#copycats (last visited Sept. 27, 2020).

[2317] *App Store Review Guidelines 4.1: Copycats, 5.2: Intellectual Property*, APPLE: DEVELOPER, https://developer.apple.com/app-store/review/guidelines/ (last visited Sept. 27, 2020).

**App. 437**

content. Apple noted that MDM could allow the app developer to access sensitive content on the device.[2318]

According to *The New York Times*, the parental control apps using MDM had been offered in the App Store for years, and hundreds of updates to those apps had been approved by Apple.[2319] As a result, many apps were forced to shut down,[2320] although some were given a reprieve.[2321] Two parental control apps filed a complaint with the European Commission, alleging Apple's App Store policies were anticompetitive. The complaint alleged that Apple purged competitors when it introduced Screen Time, pre-installed Screen Time on iOS 12 and activated it by default, and gave Screen Time access to iOS functionalities it denied to competing third-party apps.[2322]

Subcommittee staff reviewed emails from parents who contacted Apple to complain about the removal of one of the purged parental control apps.[2323] They said that Screen Time was a comparably worse option for consumers—and described it as "more complicated" and "less restrictive" than competitors.[2324] In emails to the company reviewed by Subcommittee staff, parents complained about Apple's monopoly power over app distribution on iOS and claimed that self-interest in promoting

---

[2318] *See* Jack Nicas, *Apple Cracks Down on Apps that Fight iPhone Addiction*, N.Y. TIMES (Apr. 27, 2019), https://www.nytimes.com/2019/04/27/technology/apple-screen-time-trackers.html. *See also* Sarah Perez, *Apple puts third-party screen time apps on notice*, TECHCRUNCH (Dec. 5, 2018), https://techcrunch.com/2018/12/05/apple-puts-third-party-screen-time-apps-on-notice/.

[2319] Jack Nicas, *Apple Cracks Down on Apps that Fight iPhone Addiction*, N.Y. TIMES (Apr. 27, 2019), https://www.nytimes.com/2019/04/27/technology/apple-screen-time-trackers.html. *See also* Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-012255–59 (Apr. 28, 2019); HJC-APPLE-013251–53 (Apr. 28, 2019).

[2320] *See e.g.*, Nick Kuh, *Mute App: Startup to Shutdown*, MEDIUM (Oct. 22, 2018), https://medium.com/@nick.kuh/mute-app-startup-to-shutdown-a1db01440c56; Georgie Powell, *In the Kill Zone – Update for Space on iOS*, SPACE (Nov. 6, 2018), https://findyourphonelifebalance.com/news/2018/11/6/in-the-kill-zone-an-update-for-space-on-ios; *Is Apple Systematically Destroying the Time Management Industry?*, KIDSLOX (Nov. 8, 2018), https://kidslox.com/blog/apple-destroying-screen-time-industry/; OurPact, *There Used to Be an App for That*, MEDIUM (May 1, 2019), https://medium.com/@ourpactapp/there-used-to-be-an-app-for-that-41344f61fb6f; Justin Payeur, *Letter to Users About Apple Parental Controls*, BOOMERANG (Jan. 31, 2020), https://useboomerang.com/2020/01/31/letter-users-apple-parental-controls/.

[2321] *See* Nick Kuh, *Apple Called...*, MEDIUM (Oct. 27, 2018), https://medium.com/@nick.kuh/apple-called-a229d86ece30; Georgie Powell, *Space is Back! An Update on our Discussions with Apple.*, SPACE (Nov. 7, 2018), https://findyourphonelifebalance.com/news/2018/11/7/space-versus-apple.

[2322] Press Release, Qustodio & Kidslox File a Complaint Against Apple with the European Commission over Abuse of Dominant Position, GLOBENEWSWIRE (Apr. 30, 2019), https://www.globenewswire.com/news-release/2019/04/30/1812192/0/en/Qustodio-Kidslox-File-a-Complaint-Against-Apple-with-the-European-Commission-over-Abuse-of-Dominant-Position.html#.

[2323] *See e.g.*, Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-012242–43 (May 6, 2019) (on file with Comm.); HJC-APPLE-012245–46 (May 6, 2019); HJC-APPLE-012247–48 (June 5, 2019); HJC-APPLE-013220 (May 14, 2019); HJC-APPLE-013219 (May 5, 2019); HJC-APPLE-013251–53 (Apr. 28, 2019).

[2324] Jack Nicas, *Apple Cracks Down on Apps That Fight iPhone Addiction*, N.Y. TIMES (Apr. 27, 2019), https://www.nytimes.com/2019/04/27/technology/apple-screen-time-trackers.html.

**App. 438**

Screen Time motivated Apple's actions.[2325] In response, Apple's Senior Vice President, Worldwide Marketing, Phil Schiller, explained that Screen Time was "designed to help parents manage their children's access to technology."[2326] He added that Apple would "work with developers to offer many great apps on the App Store for these uses, using technologies that are safe and private for us and our children."[2327]

Internally, Apple's Vice President of Marketing Communications, Tor Myhren, stated,"[t]his is quite incriminating. Is it true?" in response to an email with a link to *The New York Times*' reporting.[2328] Apple's communications team asked CEO Tim Cook to approve a "narrative" that Apple's clear-out of Screen Time's rivals was "not about competition, this is about protecting kids [sic] privacy."[2329]

Developers of the purged apps also contacted Apple, outraged that they had been removed from the App Store while other apps that used MDM remained.[2330] One developer explained it had invested more than $200,000 building its parental control app, then another $30,000 to fix the problem Apple identified, only to be told that Apple would no longer support parental control apps in the App Store.[2331]

Although Apple claimed its conduct was motivated to protect privacy and not intended to clear out competitors to Screen Time, Apple reinstated many of the apps the same day that it was reported the Department of Justice was investigating Apple for potential antitrust violations.[2332] Apple's solution to address privacy concerns was to ask the apps to promise not to sell or disclose user data to third parties, which could have been achieved through less restrictive means and without removing those apps from the App Store.[2333]

---

[2325] *See e.g.*, Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-013210–11 (Apr. 27, 2019) (on file with Comm.); HJC-APPLE-013215 (May 17, 2019); HJC-APPLE-013216 (May 6, 2019); HJC-APPLE-013221–23 (Apr. 29, 2019); HJC-APPLE-013265–66 (Apr. 27, 2019).

[2326] *See e.g.*, *id.* at HJC-APPLE-013210–11 (Apr. 27, 2019) (on file with Comm.); HJC-APPLE-013217 (Apr. 27, 2019); HJC-APPLE-013221–23 (Apr. 29, 2019).

[2327] *Id.* at HJC-APPLE-013221–23 (Apr. 29, 2019).

[2328] *Id.* at HJC-APPLE-013175 (Apr. 27, 2019).

[2329] *Id.* at HJC-APPLE-012223 (June 2, 2019). *See also* CEO Hearing Transcript at 127 (statement of Tim Cook, CEO, Apple Inc.) ("It was that the use of technology called MDM, mobile device management, placed kids' data at risk, and so we were worried about the safety of kids."); CEO Hearing Transcript at 139 (statement of Tim Cook, CEO, Apple Inc.) ("We were concerned, Congresswoman, about the privacy and security of kids.").

[2330] *See, e.g.*, Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-012255–59 (Apr. 28, 2019) (on file with Comm.); HJC-APPLE-012275–79 (Jan. 17, 2019); HJC-APPLE-012286–87 (Jan. 17, 2019).

[2331] *Id.* at HJC-APPLE-012286–87 (Jan. 17, 2019) (on file with Comm.).

[2332] Jack Nicas, *Apple Cracks Down on Apps that Fight iPhone Addiction*, N.Y. Times (Apr. 27, 2019), https://www.nytimes.com/2019/04/27/technology/apple-screen-time-trackers.html.

[2333] *Id. See App Store Review Guidelines 5.5: Mobile Device Management*, Apple, https://developer.apple.com/app-store/review/guidelines/#mobile-device-management (last visited Sept. 27, 2020).

**App. 439**

Developers of parental control apps asked Apple to "release a public API granting developers access to the same functionalities that Apple's native 'Screen Time' uses."[2334] Eventually, Apple did grant some apps access to APIs,[2335] but only after rival app developers were accused of being a risk to children's privacy, removed from the App Store, and forced to incur significant costs.[2336] As one developer noted, Apple's new MDM privacy policies resulted in "really nothing much changing from the developer side as far as the technology goes."[2337]

Here, Apple's monopoly power over app distribution enabled it to exclude rivals to the benefit of Screen Time. Apple could have achieved its claimed objective—protecting user privacy—through less restrictive means, which it ultimately did only after significant outcry from the public and a prolonged period of harm to rivals.[2338] Apple's conduct here is a clear example of Apple's use of privacy as a sword to exclude rivals and a shield to insulate itself from charges of anticompetitive conduct.

Subcommittee staff learned that Apple has engaged in conduct to exclude rivals to benefit Apple's services in other instances. For example, Mr. Shoemaker explained that Apple's senior executives would find pretextual reasons to remove apps from the App Store, particularly when those apps competed with Apple services.[2339]

### vi. Opaque Guidelines and Arbitrary Enforcement

At the Subcommittee's sixth hearing, Representative Henry C. "Hank" Johnson, Jr. (D-GA) asked Mr. Cook about how the App Store Developer Guidelines are interpreted and applied to developers in the App Store. Subcommittee Chairman David N. Cicilline (D-RI) requested similar information about the Guidelines as well, including how they have evolved and whether there are "unwritten rules" developers must comply with.

The Guidelines are the rules with which more than 20 million iOS app developers and more than 1.8 million apps in the App Store must comply to reach "hundreds of millions of people around

---

[2334] Screen Time API, https://screentimeapi.com/ (last visited Sept. 27, 2020).

[2335] See Joe Rossignol, Apple Reverses Course and Allows Parental Control Apps to Use MDM Technology With Stricter Privacy Requirements, MacRumors (Jun. 4, 2019), https://www.macrumors.com/2019/06/04/apple-lets-parental-apps-use-mdm-strict-privacy/.

[2336] See, e.g., Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-012275–79 (Jan. 17, 2019) (on file with the Comm.); HJC-APPLE-013210–11 (Apr. 27, 2019).

[2337] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-012273–74 (June 4, 2019) (on file with Comm.).

[2338] See Damien Geradin & Dimitrios Katsifis, The Antitrust Case Against the Apple App Store 55–56 (Apr. 22, 2020), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3583029.

[2339] Interview with Phillip Shoemaker, former Senior Dir., App Store Review, Apple Inc. (Sept. 21, 2020).

**App. 440**

the world."[2340] Apple notes that the App Store is "highly curated" and that "every app is reviewed by experts."[2341] The introductory section of the Guidelines warns that Apple can create new rules at any time, and explains "[w]e will reject apps for any content or behavior that we believe is over the line. What line, you ask? Well as a Supreme Court Justice once said, 'I'll know it when I see it.' And we think that you will also know it when you cross it."[2342]

App developers the Subcommittee spoke with expressed frustration with Apple's curation of the App Store. Cofounder and Chief Technology Officer of Basecamp, David Heinemeier Hansson, testified before the Subcommittee and explained:

> It's complete tyranny, and the rules are often interpreted differently by different reviewers because they're intentionally left vague. So we live in constant fear we may have violated these vague rules, and that the next update to our applications will be blocked by Apple. There are countless examples where developers large and small have been denied access to publish their applications without explanation for days or even weeks at a time. It's insufferable.[2343]

One social media platform expressed concern that Apple has absolute discretion about whether to approve apps or accept updates.[2344] Developers are frustrated that Apple's interpretation and enforcement of the Guidelines have changed over time, despite prior precedents and the fact developers rely on understanding the Guidelines to operate their businesses. One developer described Apple's Guidelines as "arbitrarily interpreted," and another party called them "opaque and arbitrary."[2345] Internally, after an app was rejected from the App Store, an Apple employee wrote to the leadership of the App Store that Apple's decision "still isn't obvious to people inside the company that work directly on the App Store."[2346]

In 2017, *Gizmodo* reported that iOS app maker Deucks saw its Finder for AirPods app removed from the App Store. The app used the iPhone's Bluetooth signal to locate lost AirPods, helping its users find a missing earbud and save money by not having to purchase replacements. After the app was reviewed and approved, it disappeared from the App Store. Deucks told Gizmodo that Apple's app

---

[2340] *App Store Review Guidelines: Introduction*, APPLE: DEVELOPER, https://developer.apple.com/app-store/review/guidelines/ (last visited Sept. 27, 2020).

[2341] *Id.*

[2342] *Id.*

[2343] Competitors Hearing at 9 (statement of David Heinemeier Hansson, Cofounder & Chief Tech. Officer, Basecamp).

[2344] Submission from Source 247, to H. Comm. on the Judiciary, Source 247_0000000002 (Oct. 14, 2019) (on file with Comm.).

[2345] Submission from Source 736, to H. Comm. on the Judiciary, Source 736_00000236 (Oct. 23, 2019) (on file with Comm.); Interview with Source 88 (May 12, 2020).

[2346] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-014848 (May 30, 2018) (on file with Comm.).

review team "didn't find anything wrong with the app itself, but rather they didn't like the 'concept' of people finding their AirPods and hence [the app] was deemed 'not appropriate for the App Store.'"[2347] At the time, Deucks had several other finder apps, such as Finder for Fitbit and Finder for Jawbone, that remained available in the App Store.[2348]

Developers also say that Apple uses its power over the App Store to change the Guidelines when convenient in ways that benefit Apple. The Guidelines—along with their interpretation and enforcement—all change over time in ways that always appear to benefit Apple.[2349] Spotify noted that "[t]he reality is Apple continues to move the goal posts and change the rules to its advantage and the detriment of developers," and that the company's "selective and capricious enforcement [of its App Store policies] is designed to put companies like [Spotify] at an untenable competitive disadvantage."[2350] ProtonMail explained that it offered a free version of its app in the App Store for years, but then Apple abruptly changed the way it applied its IAP requirement and demanded the app add the ability for consumers to purchase upgraded functionality through the app—giving Apple a 30% cut from those subscriptions. ProtonMail noted that its app competes with an Apple service and that requiring it to implement IAP would increase its customer acquisition costs and make it less competitive, benefitting Apple.[2351] Another third party Subcommittee staff spoke with said that when Apple introduces a new app, developers with rival apps know they may be targeted for a violation of a rule Apple has suddenly decided to interpret or enforce differently.[2352] Another app developer that competes with Apple services noted the Guidelines are constantly shifting, that Apple arbitrarily decides when an app no longer complies with the rules, and those decisions always favor Apple's interests.[2353]

Others have noted that Apple unilaterally determines if, how, and when to apply its Guidelines, and that it also freely makes up "unwritten rules" when convenient.[2354] For example, Apple's

---

[2347] Michael Nunez, *'Finder for AirPods' App Mysteriously Disappears From App Store Without Much Explanation from Apple*, GIZMODO (Jan. 9, 2017), https://gizmodo.com/finder-for-airpods-app-mysteriously-disappears-from-app-1790999059.

[2348] *Id.*

[2349] *See* Dieter Bohn, *Apple's App Store policies are bad, but its interpretation and enforcement are worse*, The VERGE (June 17, 2020), https://www.theverge.com/2020/6/17/21293813/apple-app-store-policies-hey-30-percent-developers-the-trial-by-franz-kafka ("The key thing to know is that the text of this policy is not actually the policy. Or rather, as with any law, the text is only *one* of the things you need to understand. You also need to know how it is *enforced* and how the enforcers *interpret* that text.").

[2350] Kara Swisher, *Is It Finally Hammer Time for Apple and Its App Store*, N.Y. TIMES (June 19, 2020), https://www.nytimes.com/2020/06/19/opinion/apple-app-store-hey.html?referringSource=articleShare.

[2351] Submission from ProtonMail, to H. Comm. on the Judiciary, 5 (Aug. 22, 2020) (on file with Comm.).

[2352] Interview with Source 88 (May 12, 2020).

[2353] Interview with Source 766 (July 2, 2020).

[2354] *See* JOHN BERGMAYER, PUBLIC KNOWLEDGE, TENDING THE GARDEN: HOW TO ENSURE THAT APP STORES PUT USERS FIRST 27 (2020), https://www.publicknowledge.org/wp-content/uploads/2020/06/Tending_the_Garden.pdf; Bapu Kotapati,

**App. 442**

distinction between "business" and "consumer" apps to justify its June 2020 decision to require Basecamp to redesign its app to permit in-app signups—and attempt to require implementation of IAP—was not a distinction that appeared in Apple's Guidelines until an update on September 11, 2020.[2355] Apple said that it has a "set of standard terms for Amazon, and every other video-streaming service that met the criteria, to launch their service on Apple TV and iOS."[2356] One of Apple's business partners told Subcommittee staff that it suspects Amazon receives preferential treatment by being exempt from sharing revenue for some categories of transactions.[2357]

Subcommittee staff reviewed communications between Apple CEO Tim Cook and an executive from Baidu regarding whether Apple would provide Baidu with preferential treatment. At the Subcommittee's sixth hearing, Representative Henry C. "Hank" Johnson, Jr. (D-GA) questioned Mr. Cook about whether Apple differentiates in its treatment of app developers. Representative Johnson also asked if it was true that Apple assigned Baidu two employees to help it navigate the App Store bureaucracy, and whether other app developers receive the same access to Apple personnel. Mr. Cook responded, "we treat every developer the same," and explained the App Store Guidelines "apply evenly to everyone."[2358] He also said, "I don't know about that, sir," in response to Representative Johnson's inquiry about Baidu, adding, "We do a lot of things with developers including looking at their beta test apps regardless of whether they're large or small."[2359]

Communications reviewed by Subcommittee staff show that in 2014 Baidu requested, among other things, that Apple "set up a fast track for the review process for Baidu APPs," along with setting Baidu as the default search and mapping services on "all Apple devices in China."[2360] Mr. Cook solicited feedback from Apple's senior executives regarding these and other requests from Baidu, also noting, "I think we should have someone focus on them as we have done with Facebook. Thoughts?"[2361] Responding to the email thread with Mr. Cook's request that Apple focus on Baidu as it had with Facebook, one executive explained, "Engineering proposal is for extensions to be our path

---

et al., *The Antitrust Case Against Apple*, YALE UNIV., THURMAN ARNOLD PROJECT, DIGITAL PLATFORM THEORIES OF HARM PAPER SERIES: PAPER 2, 22 (2020), https://som.yale.edu/sites/default/files/DTH-Apple-new.pdf.

[2355] *See* Ben Thompson, *Xscale and ARM in the Cloud, Hey Versus Apple, Apple's IAP Campaign*, STRATECHERY (Jun. 17, 2020) https://stratechery.com/2020/xscale-and-arm-in-the-cloud-hey-versus-apple-apples-iap-campaign/; John Gruber, *The Flimsiness of 'Business vs. Consumer' as a Justification for Apple's Rejection of Hey From the App Store for Not Using In-App Purchases*, DARING FIREBALL (June 16, 2020), https://daringfireball.net/2020/06/hey_app_store_rejection_flimsiness; Sarah Perez & Anthony Ha, *Apple revises App Store Rules to permit game streaming apps, clarify in-app purchases and more*, TECHCRUNCH (Sept. 11, 2020), https://techcrunch.com/2020/09/11/apple-revises-app-store-rules-to-permit-game-streaming-apps-clarify-in-app-purchases-and-more/.

[2356] CEO Hearing Transcript at 8 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2357] Interview with Source 77 (Sept. 10, 2020).

[2358] CEO Hearing Transcript at 51 (statement of Tim Cook, CEO, Apple Inc.).

[2359] *Id.*

[2360] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-011082 (June 3, 2015) (on file with Comm.).

[2361] *Id.* at HJC-APPLE-011081 (Aug. 3, 2014).

**App. 443**

for integration," and responded to Baidu's app review fast track request, "I believe we put a lot of work into having a fast review process for all apps."[2362]

Within two weeks, Mr. Cook responded to the Baidu executive's requests. "I'd like Apple to have a deeper relationship with Baidu," Cook wrote, noting that "some of" the Baidu executive's requests were "great starts."[2363] In response to the Baidu executive's request for "APP Review Fast Track," Mr. Cook wrote, "We can set up a process where Baidu could send us a beta app for review and this can often speed up the process."[2364] Mr. Cook then noted he had assigned Baidu two employees from App Store chief Phil Schiller's team to "help manage through Apple."[2365]

When asked about these issues in questions submitted for the record following the hearing, Mr. Cook explained his view that "There is no 'fast track' for App Review special to Baidu," that "any developer can request expedited review from App Review by submitting a formal expedite request," and "[t]he beta app review process I referenced in my email has been available to developers since 2009."[2366] Mr. Cook also noted, "The key contacts referenced in my email were focused on other strategic opportunities outlined by Baidu. Neither individual had responsibility for App Store review."[2367]

In a subsequent interview with Phillip Shoemaker, Apple's former Senior Director of App Store Review, Subcommittee staff asked about Apple's treatment of app developers. Mr. Shoemaker responded that Apple "was not being honest" when it claims it treats every developer the same.[2368] Mr. Shoemaker has also written that the App Store rules were often "arbitrary" and "arguable," and that "Apple has struggled with using the App Store as a weapon against competitors."[2369] He has noted that "Apple has complete and unprecedented power over their customers' devices. The decisions they make with regards to third-party apps needs to be above reproach, and currently are not."[2370]

Mr. Shoemaker also admitted that Apple advantages its own apps over third-party apps. In an interview with Subcommittee staff, he described it as inaccurate to say Apple does not favor its own

---

[2362] *Id.* at HJC-APPLE-011079–80 (Aug. 3, 2014).

[2363] *Id.* at HJC-APPLE-011083 (June 3, 2015).

[2364] *Id.* at HJC-APPLE-011084 (June 3, 2015).

[2365] *Id.*

[2366] CEO Hearing Transcript at 8 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2367] *Id.* at 9.

[2368] Interview with Phillip Shoemaker, former Senior Dir., App Store Review, Apple Inc. (Sept. 21, 2020).

[2369] Phillip Shoemaker, *A Modern Content Store*, MEDIUM (Dec. 12, 2017), https://medium.com/@phillipshoemaker/a-modern-content-store-3344bbe79edc.

[2370] Phillip Shoemaker, *Apple v. Everybody*, MEDIUM (Mar. 29, 2019), https://medium.com/@phillipshoemaker/apple-v-everybody-5903039e3be.

**App. 444**

apps over third-party apps.[2371] He has previously noted that apps that compete against Apple's services often have problems getting through the App Store's review process. For example, Apple's gaming service, Apple Arcade, is a type of app that was "consistently disallowed from the store" when offered by third-party developers, but Apple allowed its own app in the store, "even though it violates existing [App Store] guidelines."[2372] Mr. Shoemaker explained to Subcommittee staff that Apple's new Guideline 3.1.2a, related to streaming game services, was likely written to "specifically exclude Google Stadia," describing the decision as "completely arbitrary."[2373] Similar conduct has been commented on by the courts,[2374] as well as international antitrust authorities.[2375]

Apple disputes that its rules are opaque and arbitrarily applied. In response to questions from Representative Henry C. "Hank" Johnson, Jr. (D-GA), Mr. Cook insisted the Guidelines are "open and transparent" and that Apple "treat[s] every developer the same."[2376] In response to Questions for the Record from Subcommittee Chairman David N. Cicilline (D-RI), Mr. Cook reiterated that "[t]he Guidelines provide transparency and act as a practical guide to help developers better understand the app approval process. . . . Apple attempts to apply the Guidelines uniformly to all developers and all types of apps."[2377]

Apple appears to have recently revised some of its App Store policies under the scrutiny of the Subcommittee, the Department of Justice, and global competition authorities. In June 2020, Apple announced new policies for its App Store review that will allow app developers to appeal decisions by app reviewers and even challenge the Guidelines governing the App Store. Apple also announced that app updates with bug fixes would no longer be held up due to a violation of an App Store guideline. Additionally, on September 11, 2020, Apple changed its App Developer Guidelines to address some of the questions which arose from recent controversies described earlier in this Report.[2378]

---

[2371] Interview with Phillip Shoemaker, former Senior Dir., App Store Review, Apple Inc. (Sept. 21, 2020).

[2372] Phillip Shoemaker, *Apple v. Everybody*, MEDIUM (Mar. 29, 2019), https://medium.com/@phillipshoemaker/apple-v-everybody-5903039e3be.

[2373] Interview with Phillip Shoemaker, former Senior Dir., App Store Review, Apple Inc. (Sept. 21, 2020).

[2374] United States v. Apple Inc., 952 F. Supp. 2d 638, 662 (S.D.N.Y. 2013), *aff'd* 791 F.3d 290 (2d Cir. 2015).

[2375] *See e.g.*, Neth. Auth. for Consumers & Mkts. Study at 5–6, 68, 79; Killian Bell, *Apple Rejects Samsung Pay app for iOS*, CULT OF MAC (Dec. 12, 2016), https://www.cultofmac.com/457916/apple-rejects-samsung-pay-app-ios/; Gil Jaeshik & Park Sora, *Apple Rejects Samsung Pay Mini to Be Registered on Its App Store*, KOREA IT NEWS (Dec. 12, 2016), http://english.etnews.com/20161212200003.

[2376] CEO Hearing Transcript at 61 (statement of Tim Cook, CEO, Apple Inc.).

[2377] *Id.* at 5 (response to Questions for the Record of Tim Cook, CEO, Apple Inc.).

[2378] *See* Sarah Perez & Anthony Ha, *Apple Revises App Store Rules to permit game streaming apps, clarify in-app purchases and more*, TECHCRUNCH (Sept. 11, 2020), https://techcrunch.com/2020/09/11/apple-revises-app-store-rules-to-permit-game-streaming-apps-clarify-in-app-purchases-and-more/.

**App. 445**

3. Siri Intelligent Voice Assistant

   a. Market Power

Apple describes Siri as "an intelligent assistant that offers a faster, easier way to get things done on Apple devices," helping users to "make calls, send text messages or email, schedule meetings and reminders, make notes, search the Internet, find local businesses, get directions, get answers, find facts, and more just by asking."[2379] Apple integrated Siri into iPhone 4S at its release in October 2011. As of January 2018, Apple said Siri was active on over 500 million devices, making Siri one of the most widely used voice assistants in the world.[2380]

In a production to the Committee, Apple stated that it neither creates market share data for Siri nor tracks third-party market share data for integrated voice assistants.[2381] Market research firm FutureSource Consulting found that as of December 2019, Siri was the leading intelligent virtual assistant with a 35% market share globally.[2382] A third-party supplied the Subcommittee with additional market research showing that, in the first half of 2018, Apple's Siri was built into 42% of virtual assistant-enabled devices sold worldwide.[2383] Apple, Google, Amazon, and Microsoft are the leading providers of intelligent virtual assistants.[2384] Siri's success reflects its integration into the iPhone and other Apple hardware, such as the iPad, Mac, Apple Watch, Apple TV, and HomePod.[2385] Siri is the hub of Apple's ecosystem of smart-home devices. Users can control Apple HomeKit-compatible devices using Siri on an Apple device.[2386]

---

[2379] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-000007 (Oct. 14, 2019) (on file with Comm.).

[2380] Press Release, Apple, HomePod arrives February 9, available to order this Friday (Jan. 13, 2018), https://www.apple.com/newsroom/2018/01/homepod-arrives-february-9-available-to-order-this-friday/.

[2381] Production of Apple, to H. Comm. on the Judiciary, HJC-APPLE-000011 (Oct. 14, 2019) (on file with Comm.).

[2382] Press Release, FutureSource Consulting, Virtual Assistants to Exceed 2.5 Billion Shipments in 2023 (Dec. 18, 2019), https://www.futuresource-consulting.com/press-release/consumer-electronics-press/virtual-assistants-to-exceed-25-billion-shipments-in-2023/.

[2383] Submission from Source 918, to H. Comm. on the Judiciary, Source 918-0001578 (Nov. 4, 2019) (on file with Comm.).

[2384] See e.g., Press Release, FutureSource Consulting, Virtual Assistants to Exceed 2.5 Billion Shipments in 2023 (Dec. 18, 2019), https://www.futuresource-consulting.com/press-release/consumer-electronics-press/virtual-assistants-to-exceed-25-billion-shipments-in-2023/; Submission from Source 918, to H. Comm. on the Judiciary, Source 918-0001578 (Nov. 4, 2019) (on file with Comm.).

[2385] See Press Release, FutureSource Consulting, Virtual Assistants to Exceed 2.5 Billion Shipments in 2023 (Dec. 18, 2019), https://www.futuresource-consulting.com/press-release/consumer-electronics-press/virtual-assistants-to-exceed-25-billion-shipments-in-2023/; Juli Clover, *Siri: Everything You Need to Know*, Mac Rumors (July 27, 2020), https://www.macrumors.com/guide/siri/.

[2386] Daniel Wroclawski, *How to Use Siri and Apple HomeKit to Control Your Smart Home*, Consumer Reps. (Oct. 5, 2019), https://www.consumerreports.org/home-automation-systems/how-to-use-siri-to-control-smart-home/.

**App. 446**

b. Merger Activity

The startup Siri, Inc launched the Siri app for iOS in February 2010 based on a prototype developed by Adam Cheyer while working at SRI International Research Lab.[2387] Apple acquired the company two months later.[2388] Apple has followed up on its acquisition of Siri with a series of additional acquisitions to strengthen Siri's underlying technology and natural language processing. For example, in 2019, Apple acquired Laserlike, technology to help Siri improve at delivering personalized results for users.[2389] In 2020, Apple acquired Inductiv, an AI technology for correcting data flaws, Xnor.ai, which specializes in low-power, edge-based artificial-intelligence tools needed for smart home devices, and Voysis, to increase Siri's speech recognition accuracy.[2390]

c. Conduct

As with many of Apple's other products and services, Apple has taken a walled garden approach to the intelligent voice assistant market by, among other tactics, limiting interoperability by restricting how digital voice assistants work on Apple devices and how Siri works with non-Apple devices, and by using Siri to guide users to its own products and services.

Apple does not allow competing digital voice assistants to replace Siri as the default on Apple devices. On iOS devices, the user must download the app for a competing digital voice assistant and then either use Siri to access that voice assistant or use that app directly.[2391] Additionally, Apple does not allow third-party device manufacturers to install a speaker that receives Siri commands; only Apple devices can respond to the "Hey Siri" prompt.[2392] While third-party hardware manufacturers can make their products Siri-compatible through the Works with Apple HomeKit, the voice commands needed to

---

[2387] Catherine Clifford, *Here's how Siri made it onto your iPhone*, CNBC (Jun. 29, 2017), https://www.cnbc.com/2017/06/29/how-siri-got-on-the-iphone.html.

[2388] Jenna Wortham, *Apple Buys a Start-Up for Its Voice Technology*, N.Y. TIMES (Apr. 29, 2010), https://www.nytimes.com/2010/04/29/technology/29apple.html.

[2389] Jeremy Horwitz, *Apple acquires Laserlike, an ML startup that might make Siri smarter*, VENTURE BEAT (Mar. 13, 2019), https://venturebeat.com/2019/03/13/apple-bought-laserlike-an-ml-startup-that-might-make-siri-smarter/.

[2390] *See* Lisa Eadicicco, *Apple just bought another AI startup to help Siri catch up to rivals Amazon and Google*, BUS. INSIDER (May 28, 2020), https://www.businessinsider.com/apple-buys-ai-startup-inductiv-siri-catch-up-amazon-google-2020-5; Mark Gurman, *Apple Acquires AI Startup to Better Understand Natural Language*, BLOOMBERG (Apr. 3, 2020), https://www.bloomberg.com/news/articles/2020-04-03/apple-acquires-ai-startup-to-better-understand-natural-language; Charlie Wood, *Apple has acquired the artificial-intelligence startup Xnor.ai for a reported $200 million*, BUS. INSIDER (Jan. 16, 2020), https://www.businessinsider.com/apple-reportedly-buys-xnor-ai-200-million-2020-1.

[2391] *See, e.g.*, Ben Lovejoy, *Alexa iPhone app can now operate hands-free — with a little help from Siri*, 9TO5MAC (July 8, 2020), https://9to5mac.com/2020/07/08/alexa-iphone-app/; Chris Welch, *Google Assistant just got much better and more convenient on iOS thanks to Siri Shortcuts*, THE VERGE (Nov. 20, 2018), https://www.theverge.com/2018/11/20/18105693/google-assistant-siri-shortcuts-feature-iphone-ios.

[2392] *How 'Hey Siri' works with multiple devices*, APPLE, https://support.apple.com/en-us/HT208472 (last visited Sept. 27, 2020).

**App. 447**

control the smart devices must still be directed to Siri on an Apple device, such as an iPhone or iPad.[2393]

In addition to keeping Siri closely tied to Apple hardware, Apple has used its voice-enabled devices to strengthen consumer engagement with its own services and apps. For example, as of October 2020, by default, requests to Siri to play music open the Apple Music app, requests for directions open the Apple Maps app, and requests for web searches open the Safari app.[2394] To use a competing service through Siri, a user must adjust the device's settings and identify the service in the command to Siri—for example, "Hey Siri, play the National Anthem on Spotify."[2395] For streaming music services, this integration only became possible with the introduction of iOS 13 in 2019.[2396] Previously, even when a user said the name of a third-party streaming service in the voice command, Apple opened an Apple-branded alternative.[2397] In June 2020, Apple announced that it would update its HomePod smart speaker system to support third-party music services.[2398] It remains unclear how seamless the integration will be and if Apple Music will remain the pre-installed default service.[2399]

One app developer that spoke with Subcommittee staff described Siri as a "closed" intelligent virtual assistant that limits the types of voice interactions voice app developers have access to.[2400] The app developer explained that SiriKit, which allows iOS apps to work with Siri, relies on a pre-designed list of basic interactions that third parties can use, such as messaging, calling, or payments. The very limited set of interactions permitted by Apple can make it impossible to launch an app for the third party's services, including those that compete with an Apple service.[2401]

---

[2393] *Homekit*, APPLE, https://developer.apple.com/homekit/ (last visited Oct. 3, 2020).

[2394] *E.g.*, *Use Siri to play music or* podcasts, APPLE, https://support.apple.com/en-us/HT208279 (last visited Sept. 27, 2020); David Phelan, *Apple Mulls Letting You Choose Default iOS 14 Apps: Why it Matters*, FORBES (Fe. 21, 2010) https://www.forbes.com/sites/davidphelan/2020/02/21/apple-mulls-letting-you-switch-default-iphone-apps-in-ios-14/#70330c9c11f8.

[2395] Kate Kozuch, *How to Use Siri to Control Spotify in iOS 13*, TOM'S GUIDE (Oct. 7, 2019), https://www.tomsguide.com/how-to/how-to-use-siri-to-control-spotify-ios-13.

[2396] Jason Cross, *iOS 13 enables Siri support in third party media apps: Spotify, Pandora, Overcast, and much more*, MACWORLD (Jun. 7, 2019), https://www.macworld.com/article/3400881/ios-13-enables-siri-support-in-third-party-media-apps.html.

[2397] *See* Submission from Source 301, to H. Comm. on the Judiciary, Source 301-00000080 at 23 (Oct. 15, 2019) (on file with Comm.)

[2398] Kif Leswing, *Apple will let iPhone users change default mail and browser apps, addressing antitrust concerns*, CNBC (June 22, 2020), https://www.cnbc.com/2020/06/22/apple-allows-users-to-change-default-mail-and-browser-apps-at-wwdc.html.

[2399] Filipe Esposito, *iOS 14 includes option to change default services on HomePod for each user*, 9TO5MAC (July 7, 2020), https://9to5mac.com/2020/07/07/ios-14-includes-option-to-change-default-services-on-homepod-for-each-user/.

[2400] Submission from Source 711, to H. Comm. on the Judiciary, Source 711-00000080 at 6–7 (Oct. 15, 2019) (on file with Comm.).

[2401] *Id.*

These practices have recently come under scrutiny by antitrust authorities. In March 2019, Spotify filed a complaint against Apple before the European Commission, reportedly alleging, among other things, that Apple is restricting Spotify's access to Siri.[2402] In July 2020, the European Commission's antitrust authority announced that it had opened an inquiry into the use of digital assistants and smart home products by Apple, Google, and Amazon, among other companies.[2403] In her statement accompanying the announcement, Margrethe Vestager, the Commission's Executive Vice President, identified interoperability and self-preferencing as areas of concern.[2404]

## VI.   RECOMMENDATIONS

As part of its top-to-bottom review of competition in digital markets, the Subcommittee examined whether current laws and enforcement levels are adequate to address the market power concerns identified through this investigation. In pursuit of this goal, on March 13, 2020, the Subcommittee requested submissions from antitrust and competition policy experts. These experts were chosen on a careful, bipartisan basis to ensure the representation of a full range of views. Throughout the investigation, the Subcommittee received additional submissions and written statements from antitrust enforcers and other leading experts, including Margrethe Vestager, the Executive Vice President of the European Commission, and Rod Sims, the Chair of the Australian Competition and Consumer Commission. Most recently, the Subcommittee held an oversight hearing on October 1, 2020 regarding "Proposals to Strengthen the Antitrust Laws and Restore Competition Online," its seventh and final hearing as part of the investigation.

---

[2402] Thomas Ricker, *Apple to be formally investigated over Spotify's antitrust complaint, says report*, THE VERGE (MAY 6, 2019), https://www.theverge.com/2019/5/6/18530894/apple-music-monopoly-spotify-app-store-europe.

[2403] Margrethe Vestager, Exec. Vice Pres., Eur. Comm'n, Statement by Executive Vice-President Margrethe Vestager on the launch of a Sector Inquiry on the Consumer Internet of Things (July 16, 2020), https://ec.europa.eu/commission/presscorner/detail/en/speech_20_1367.

[2404] *Id.*

Subcommittee Chairman David N. Cicilline (D-RI) requested that staff provide Members of the Subcommittee with a series of recommendations, informed by this investigation, on how to strengthen the antitrust laws and restore competition online. As he noted in remarks to the American Antitrust Institute in June 2019:

> No doubt, other branches of government have a key role to play in the development of antitrust law. But Congress—not the courts, agencies, or private companies—enacted the antitrust laws, and Congress ultimately decides what the law should be and whether the law is working for the American people. As such, it is Congress' responsibility to conduct oversight of our antitrust laws and competition system to ensure that they are properly working and to enact changes when they are not. While I do not have any preconceived ideas about what the right answer is, as Chairman of the Antitrust Subcommittee, I intend to carry out that responsibility with the sense of urgency and serious deliberation that it demands.[2405]

In response to this request, Subcommittee staff identified a broad set of reforms for further examination by the Members of the Subcommittee for purposes of crafting legislative and oversight responses to the findings of this Report. These reforms include proposals to: (1) promote fair competition in digital markets; (2) strengthen laws relating to mergers and monopolization; and (3) restore vigorous oversight and enforcement of the antitrust laws.

Subcommittee staff intends for these recommendations to serve as a complement, not a substitute, to strong enforcement of the antitrust laws. This is particularly true for acquisitions by dominant firms that may have substantially lessened competition or tended to create a monopoly in violation of the Clayton Act. In these cases, Subcommittee staff supports as a policy matter the examination of the full range of remedies—including unwinding consummated acquisitions or divesting business lines—to fully restore competition that was harmed as a result of these acquisitions and to prevent future violations of the antitrust laws.[2406]

## A.  Restoring Competition in the Digital Economy

For more than a century, Congress has addressed the market power of dominant intermediaries using a robust antitrust and antimonopoly toolkit.[2407] The antitrust laws prohibit anticompetitive

---

[2405] Hon. David N. Cicilline, Chairman, Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, Keynote Address at American Antitrust Institute's 20th Annual Policy Conference (June 20, 2019), https://cicilline.house.gov/press-release/cicilline-delivers-keynote-address-american-antitrust-institute%E2%80%99s-20th-annual-policy.

[2406] Due to separation of powers concerns and other relevant considerations, we do not take a position on the outcome of any individual matter before the Justice Department or Federal Trade Commission.

[2407] See, e.g., Subcomm. on Study of Monopoly Power of the H. Comm. on the Judiciary, 81st Cong. 2d Sess., *The Antitrust Laws: A Basis for Economic Freedom* iii (1950) (identifying an extensive list of statutes "dealing directly with the

**App. 450**

mergers and monopolistic conduct in order to promote open markets and prevent undue concentration of economic power. In many critical sectors of the economy—including financial services, telecommunications, and transportation—Congress has also relied on a broad set of policies to create the conditions necessary for fair competition, even when economies of scale may favor concentration.

In a similar vein, the remedies identified in this section seek to restore competition online by addressing harmful business practices as well as certain features of digital markets that tend to tip the market towards concentration.

1.  Reduce Conflicts of Interest Thorough Structural Separations and Line of Business Restrictions

In addition to controlling one or multiple key channels of distribution, the dominant firms investigated by the Subcommittee are integrated across lines of business. When operating in adjacent markets, these platforms compete directly with companies that depend on them to access users, giving rise to a conflict of interest. As discussed earlier in this Report, the Subcommittee's investigation uncovered several ways in which Amazon, Apple, Facebook, and Google use their dominance in one or more markets to advantage their other lines of business, reducing dynamism and innovation.

First, the investigation revealed that the dominant platforms have misappropriated the data of third parties that rely on their platforms, effectively collecting information from customers only to weaponize it against them as rivals. For example, the investigation produced documents showing that Google used the Android operating system to closely track usage trends and growth patterns of third-party apps—near-perfect market intelligence that Google can use to gain an edge over those same apps. Facebook used its platform tools to identify and then acquire fast-growing third-party apps, thwarting competitive threats at key moments. A former Amazon employee told the Subcommittee that Amazon has used the data of third-party merchants to inform Amazon's own private label strategy, identifying which third-party products were selling well and then introducing copycat versions. These and other examples detailed in this Report demonstrate a dangerous pattern of predatory conduct that, if left unchecked, risk further concentrating wealth and power.

Some have suggested that there is little difference between the dominant platforms' access to and use of this data and the way that brick-and-mortar retailers track popular products. The Subcommittee's investigation, however, produced evidence that the platforms' access to competitively significant market data is unique. Specifically, the dominant platforms collect real-time data which, given the scale of their user-base, is akin to near-perfect market intelligence. Whereas firms with a choice among business partners might seek to protect their proprietary data, the platforms' market power lets them compel the collection of this data in the first place.

---

preservation of the American competitive economy" and reflecting the legislative policy that "under no circumstances should [laws] foster the growth of monopoly").

Second, dominant platforms can exploit their integration by using their dominance in one market as leverage in negotiations in an unrelated line of business. For example, evidence produced during the investigation showed that Amazon has leveraged its dominance in online commerce as pressure during negotiations with firms in a separate line of business. Market participants that depend on Amazon's retail platform are effectively forced to accept its demands—even in markets where Amazon would otherwise lack the power to set the terms of commerce.

Third, dominant platforms have used their integration to tie products and services in ways that can lock in users and insulate the platform from competition. Google, for example, required that smartphone manufacturers seeking to use Android also pre-install and give default status to certain Google apps—enabling Google to maintain its search monopoly and crowd out opportunities for third-party developers.

And fourth, these firms can use supra-competitive profits from the markets they dominate to subsidize their entry into other markets. Documents uncovered during the Subcommittee's investigation indicate that the dominant platforms have relied on this strategy to capture markets, as startups and non-platform businesses tend to lack the resources and capacity to bleed billions of dollars over multiple years in order to drive out rivals. For dominant platforms, meanwhile, this strategy appears to be a race to capture ecosystems and control interlocking products that funnel data back to the platforms, further reinforcing their dominance.

By using market power in one area to advantage a separate line of business, dominant firms undermine competition on the merits. By functioning as critical intermediaries that are also integrated across lines of business, the dominant platforms face a core conflict of interest. The surveillance data they collect through their intermediary role, meanwhile, lets them exploit that conflict with unrivaled precision. Their ability both to use their dominance in one market as negotiating leverage in another, and to subsidize entry to capture unrelated markets, have the effect of spreading concentration from one market into others, threatening greater and greater portions of the digital economy.

To address this underlying conflict of interest, Subcommittee staff recommends that Congress consider legislation that draws on two mainstay tools of the antimonopoly toolkit: structural separation and line of business restrictions.[2408] Structural separations prohibit a dominant intermediary from operating in markets that place the intermediary in competition with the firms dependent on its infrastructure. Line of business restrictions, meanwhile, generally limit the markets in which a dominant firm can engage.

---

[2408] *See* Submission from Sally Hubbard, Dir. of Enforcement Strategy, Open Mkts. Inst. et al., to H. Comm. on the Judiciary, 7–8 (Apr. 17, 2020) (on file with Comm.) [hereinafter Hubbard Submission]; Submission from Stacy Mitchell, Co-Dir., Inst. for Local Self-Reliance, to H. Comm. on the Judiciary, 4 (May 4, 2020) (on file with Comm.) [hereinafter Mitchell Submission]; Submission from Zephyr Teachout, Assoc. Prof. of Law, Fordham Univ. Sch. of Law, to H. Comm. on the Judiciary, 6 (Apr. 23, 2020) (on file with Comm.) [hereinafter Teachout Submission]; Submission from Ams. for Fin. Reform, to H. Comm. on the Judiciary, 3–4 (Apr. 17, 2020) (on file with Comm.).

**App. 452**

Congress has relied on both policy tools as part of a standard remedy for dominant intermediaries in other network industries, including railroads and telecommunications services.[2409] In the railroad industry, for example, a congressional investigation found that the expansion of common carrier railroads' into the coal market undermined independent coal producers, whose wares the railroads would deprioritize in order to give themselves superior access to markets. In 1893, the Committee on Interstate and Foreign Commerce wrote that "[n]o competition can exist between two producers of a commodity when one of them has the power to prescribe both the price and output of the other."[2410]

Congress subsequently enacted a provision to prohibit railroads from transporting any goods that they had produced or in which they held an interest.[2411] Congress has legislated similar prohibitions in other markets. The Bank Holding Company Act of 1956 broadly prohibited bank holding companies from acquiring nonbanking companies.[2412] Vertically integrated television networks, meanwhile, were subject to "fin-syn" rules, which prohibited networks from entering production and syndication markets.[2413]

Both structural separations and line of business restrictions seek to eliminate the conflict of interest faced by a dominant intermediary when it enters markets that place it in competition with dependent businesses. In certain cases, structural separations have also been used to prevent monopolistic firms from subsidizing entry into competitive markets and to promote media diversity.[2414]

At a general level, there are two forms of structural separation: (1) ownership separations, which require divestiture and separate ownership of each business; and (2) functional separations, which permit a single corporate entity to engage in multiple lines of business but prescribe the particular organizational form it must take.[2415] Importantly, both forms of structural limits apply on a market-wide basis, while divestitures in antitrust enforcement generally apply to a single firm or merging party.

---

[2409] Mitchell Submission at 4.

[2410] H.R. REP. NO. 52-2278, vii–viii (1893).

[2411] Hepburn Act, Pub. L. No. 59-337, § 1, 34 Stat. 584, 585 (1906).

[2412] Bank Holding Company Act of 1956, Pub. L. No. 84-511, § 2(a), 70 Stat. 133, 133 (codified as amended at 12 U.S.C. § 1841(a) (2012)).

[2413] Competition & Responsibility in Network Television Broad., 23 F.C.C.2d 382, 398, para. 30 (1970) (report and order).

[2414] Mitchell Submission at 4.

[2415] John Kwoka & Tommaso Valletti, *Scrambled Eggs and Paralyzed Policy: Breaking Up Consummated Mergers and Dominant Firms* 22 (forthcoming Oct. 2020) (on file with Comm.).

**App. 453**

A benefit of these proposals is their administrability. By setting rules for the underlying structure of the market—rather than policing anticompetitive conduct on an *ad hoc* basis—structural rules are easier to administer than conduct remedies, which can require close and continuous monitoring.[2416]

The challenges of crafting and implementing structural solutions vary by market and market participants. In response to the Subcommittee's requests for comments on potential reforms, some antitrust experts have cautioned that crafting separations can pose a major cost and challenge, especially in dynamic markets.[2417] Others have responded by identifying certain principles that can make identifying the fault lines easier. In the case of separations undoing vertical mergers, the fault lines designating the separate companies are likely to still be apparent, even in the new structure.[2418] In cases where a firm grew through internal expansion or when the constituent parts are no longer clearly distinguishable, scholars have suggested identifying distinct business operations.[2419] Experts have also noted that business-initiated corporate restructuring and divestitures may in some cases also provide a guide to designing and implementing successful break-ups.[2420]

Several enforcement bodies around the world are exploring the use of structural separations in digital markets. In July 2020, the United Kingdom's Competition and Markets Authority recommended that its digital regulatory body have powers to "implement ownership separation or operational separation," concluding that "there could be significant benefits if there were more formal separation between businesses with market power" in digital advertising markets in particular.[2421] Meanwhile, the OECD in 2001 adopted recommendations to structurally separate vertically integrated regulated firms that operate in concentrated markets.[2422] In its 15-year overview, the OECD concluded that "structural separation remains a relevant remedy" and identified other market areas where it might be adopted.[2423]

---

[2416] OECD, STRUCTURAL SEPARATION IN REGULATED INDUSTRIES: REPORT ON IMPLEMENTING THE OECD RECOMMENDATION 9 (2016), https://www.oecd.org/daf/competition/Structural-separation-in-regulated-industries-2016report-en.pdf ("[S]eparation limits the need for regulation that is difficult and costly to devise and implement, and may be only partly effective; it improves information; and it eliminates the risk of cross-subsidies by the incumbent from its non-competitive to its competitive segments.").

[2417] *See, e.g.*, Submission from Maureen K. Ohlhausen, Partner, Baker Botts L.L.P., to H. Comm. on the Judiciary, 5 (Apr. 17, 2020) (on file with Comm.).

[2418] John Kwoka & Tommaso Valletti, *Scrambled Eggs and Paralyzed Policy: Breaking Up Consummated Mergers and Dominant Firms* 11 (forthcoming Oct. 2020) (on file with Comm.).

[2419] *Id*. at 15.

[2420] *Id*.; Rory Van Loo, *In Defense of Breakups: Administering a 'Radical' Remedy*, 105 CORNELL L. REV (forthcoming 2020), https://ssrn.com/abstract=3646630.

[2421] Competition & Mkts. Auth. Report at 405–06.

[2422] OECD, STRUCTURAL SEPARATION IN REGULATED INDUSTRIES: REPORT ON IMPLEMENTING THE OECD RECOMMENDATION 9 (2016), https://www.oecd.org/daf/competition/Structural-separation-in-regulated-industries-2016report-en.pdf.

[2423] *Id.* at 3.

**App. 454**

2.   Implement Rules to Prevent Discrimination, Favoritism, and Self-Preferencing

As discussed throughout this Report, the Subcommittee identified numerous instances in which dominant platforms engaged in preferential or discriminatory treatment. In some cases, the dominant platform privileged its own products or services. In others, a dominant platform gave preferential treatment to one business partner over others. Because the dominant platform was, in most instances, the only viable path to market, its discriminatory treatment had the effect of picking winners and losers in the marketplace.

Google, for example, engaged in self-preferencing by systematically ranking its own content above third-party content, even when its content was inferior or less relevant for users. Web publishers of content that Google demoted suffered economic losses and had no way of competing on the merits. Over the course of the investigation, numerous third parties also told the Subcommittee that self-preferencing and discriminatory treatment by the dominant platforms forced businesses to lay off employees and divert resources away from developing new products and towards paying a dominant platform for advertisements or other ancillary services. They added that some of the harmful business practices of the platforms discouraged investors from supporting their business and made it challenging to grow and sustain a business even with highly popular products. Without the opportunity to compete fairly, businesses and entrepreneurs are dissuaded from investing and, over the long term, innovation suffers.

In response to these concerns, the Subcommittee recommends that Congress consider establishing nondiscrimination rules to ensure fair competition and to promote innovation online. Nondiscrimination rules would require dominant platforms to offer equal terms for equal service and would apply to price as well as to terms of access. As several experts noted, nondiscrimination has been a mainstay principle for governing network intermediaries, especially those that play essential roles in facilitating transportation and communications.[2424]

The 1887 Interstate Commerce Act, for example, prohibited discriminatory treatment by railroads.[2425] In the century years since, Congress and policymakers have continued to apply nondiscrimination principles to network monopolies, even as technologies have rapidly evolved. Most recently, the Open Internet Order written by the Federal Communications Commission (FCC) in 2015 was effectively a nondiscrimination regime, prohibiting internet service providers from picking

---

[2424] *See, e.g.*, Submission from Harry First, Charles L. Denison Prof. of Law, N.Y.U. Sch. of Law & Eleanor Fox, Walter J. Derenberg Prof. of Trade Reg., N.Y.U. Sch. of Law, to H. Comm. on the Judiciary (Aug. 6, 2020) [hereinafter First & Fox Submission] ("[Google, Amazon, Facebook, and Apple] are akin to essential facilities for many smaller businesses. Many businesses, to do business, must use the platform. They have almost no choice. The GAFA compete with the businesses on their platforms.") (on file with Comm.); Submission from Albert A. Foer, Founder & Sr. Fellow, Am. Antitrust Inst., to H. Comm. on the Judiciary, 1–2 (Apr. 14, 2020) (on file with Comm.) [hereinafter Foer Submission]; Hubbard Submission at 5–7; Remedies Hearing 6–7 (statement of K. Sabeel Rahman, Pres., Demos).

[2425] Hubbard Submission at 4–5.

**App. 455**

winners and losers among content providers and other users.[2426] Other jurisdictions have begun to apply nondiscrimination principles to digital markets. For example, after determining that Google had engaged in illegal self-preferencing, the European Commission required that Google follow "the simple principle of equal treatment."[2427]

Historically, Congress has implemented nondiscrimination requirements in a variety of markets. With railroads, the Interstate Commerce Commission oversaw obligations and prohibitions applied to railroads designated as common carriers.[2428] More recently, the Cable Act of 1992 included a provision requiring the Federal Communications Commission to oversee a nondiscrimination requirement for cable operators.[2429] Some experts have proposed establishing a similar venue to adjudicate discrimination disputes between dominant platforms and the third parties that depend on them.[2430] Others note that the Federal Trade Commission could also use its existing competition rulemaking authority to "require dominant gatekeepers to apply a rule of neutrality in operating their platforms."[2431]

Finally, on several occasions, nondiscrimination rules have been treated as an important complement to divestitures in antitrust enforcement. For example, the Justice Department combined AT&T's divestiture of the Regional Bell Operating Companies with an equal access obligation, requiring AT&T to offer independent long-distance providers access to its network on equal terms of quality and price.[2432] The DOJ argued that requiring equal access without mandating divestiture would be insufficient due to AT&T's incentive and ability to discriminate against local carriers.[2433]

---

[2426] Protecting and Promoting the Open Internet, 30 FCC Rcd. 5601, 5603, para. 4 (2015) ("[C]arefully-tailored rules that would prevent specific practices we know are harmful to Internet openness—blocking, throttling, and paid prioritization—as well as a strong standard of conduct designed to prevent the deployment of new practices that would harm Internet openness.").

[2427] Press Release, Eur. Comm'n, Antitrust: Commission Fines Google €2.42 Billion for Abusing Dominance as Search Engine by Giving Illegal Advantage to Own Comparison Shopping Service (June 27, 2017), https://ec.europa.eu/commission/presscorner/detail/en/MEMO_17_1785.

[2428] Hubbard Submission at 5.

[2429] *See, e.g.*, Submission from Hal Singer, Managing Dir., Econ One Research, to H. Comm. on the Judiciary, 4–5 (Mar. 30, 2020) (on file with Comm.) [hereinafter Singer Submission].

[2430] *Id.*

[2431] First & Fox Submission at 12.

[2432] *See* United States v. AT&T Co., 552 F. Supp. 131 (D.D.C. 1982).

[2433] Mitchell Submission at 4 ("It's important to note here that applying this kind of [nondiscrimination-based] regulatory oversight to the big tech firms will not be effective unless it's done in conjunction with breakups. In the case of Amazon, it's my view that several factors make it virtually impossible to establish a system of oversight and adjudication that would be robust enough to protect competition and fair market access, absent spinning off its shopping platform from its other divisions. These factors include the enormous number of sellers and transactions, the low dollar value of most transactions, and the many subtle and hard-to-detect ways that Amazon can skew outcomes to favor its own interests. Therefore, oversight must be combined with structural separation, which would do much of the work by removing the underlying conflicts of interest, thus allowing for an effective and less bureaucratic system of oversight.").

**App. 456**

3. Promote Innovation Through Interoperability and Open Access

As discussed elsewhere in the Report, digital markets have certain characteristics—such as network effects, switching costs, and other entry barriers—that make them prone to tipping in favor of a single dominant firm. As a result, these markets are no longer contestable by new entrants,[2434] and the competitive process shifts from "competition *in* the market to competition *for* the market."[2435]

This dynamic is particularly evident in the social networking market. As discussed earlier in the Report, Facebook's internal documents and communications indicate that due to strong network effects and market tipping, the most significant competitive pressure to Facebook is from within its own family of products—Facebook, Instagram, Messenger, and WhatsApp—rather than from other social apps in the market, such as Snapchat or Twitter. In the case of messaging apps, Facebook's documents show that network effects can be even more extreme. And because Facebook is not interoperable with other social networks, its users face high costs to switch to other platforms, locking them into Facebook's platform.

High switching costs are also present in other markets. In the smartphone market, switching costs include learning a new operating system, which can discourage users from leaving Google or Apple due to familiarity with their distinct operating systems, as well as the inability to easily port all of their data, such as messages, call history, and photos. In online commerce, sellers have high switching costs associated with their reputation. Sellers can be locked into an incumbent platform for online commerce if they are unable to transfer their reputation—ratings and customer reviews accrued over a long period of time—to a different platform. Switching costs involving data for other services, such as email, can also contribute to user lock-in.[2436] In response to these concerns, Subcommittee staff recommends that Congress consider data interoperability and portability to encourage competition by lowering entry barriers for competitors and switching costs for consumers. These reforms would complement vigorous antitrust enforcement by spurring competitive entry.

a. Interoperability

Interoperability is fundamental to the open internet.[2437] It is present in email, which is an open, interoperable protocol for communicating online regardless of a person's email service or the type of

---

[2434] Competition & Mkts. Auth. Report at 10–11.

[2435] *See* Stigler Report at 29; Michael Kades & Fiona Scott Morton, *Interoperability as a Competition Remedy for Digital Networks*, WASH. CTR. FOR EQUITABLE GROWTH 1 (Sept. 2020) (on file with Comm.) ("The monopolist operates in a market with significant network effects, scale and scope economies, and low distribution costs. Therefore, the competition that matters most is often *for* the market not *within* the market. Anticompetitive conduct is more likely to succeed. And, the harm to consumers greater because the market tends to be winner-take-all, or most.").

[2436] Chris Riley, *A Framework for Forward-Looking Tech Competition Policy*, MOZILLA 10 (2019), https://blog.mozilla.org/netpolicy/files/2019/09/Mozilla-Competition-Working-Paper.pdf.

[2437] *See generally id.* at 18–24.

**App. 457**

device they use to send the email.[2438] It has also been built into numerous other services online[2439] and is a "core technical structure of the Internet."[2440] Interoperability standards are also present in other communications systems, from telephones to telegraphs.[2441] Telecommunications would not work without the ability of users on one carrier's network to interconnect with other carriers.[2442] And in the absence of interoperability, dominant carriers could foreclose new entrants from offering lower prices or better services, reinforcing their monopoly power while harming consumers and competition.[2443]

An interoperability requirement would allow competing social networking platforms to interconnect with dominant firms to ensure that users can communicate across services.[2444] Foremost, interoperability "breaks the power of network effects" by allowing new entrants to take advantage of existing network effects "at the level of the market, not the level of the company."[2445] It would also lower switching costs for users by ensuring that they do not lose access to their network as a result of switching.

The implementation cost of requiring interoperability by dominant firms would be relatively low. Unlike interconnecting in traditional communications markets, there is little direct cost associated with interoperating with dominant platforms.[2446]

---

[2438] Michael Kades & Fiona Scott Morton, *Interoperability as a Competition Remedy for Digital Networks* 14 (Sept. 2020) (on file with Comm.).

[2439] Becky Chao & Ross Schulman, *Promoting Platform Interoperability*, NEW AM. FOUND. (May 13, 2020), https://www.newamerica.org/oti/reports/promoting-platform-interoperability/.

[2440] Chris Riley, *A Framework for Forward-Looking Tech Competition Policy*, MOZILLA 18 (2019), https://blog.mozilla.org/netpolicy/files/2019/09/Mozilla-Competition-Working-Paper.pdf.

[2441] Becky Chao & Ross Schulman, *Promoting Platform interoperability*, NEW AM. FOUND. (May 13, 2020), https://www.newamerica.org/oti/reports/promoting-platform-interoperability/.

[2442] Michael Kades & Fiona Scott Morton, *Interoperability as a Competition Remedy for Digital Networks* 13–14 (Sept. 2020) (on file with Comm.).

[2443] *Id.*

[2444] *Competition in Digital Technology Markets: Examining Self-Preferencing by Digital Platforms: Hearing Before Subcomm. on Antitrust, Competition Policy and Consumer Rights of the S. Comm. on the Judiciary*, 116th Cong. 21 (2020) (statement of Sally Hubbard, Dir. of Enforcement Strategy, Open Mkts. Inst.) ("Interoperability is an anti-monopoly tool that has been used successfully many times to promote innovation by reducing barriers to entering markets.").

[2445] Michael Kades & Fiona Scott Morton, *Interoperability as a Competition Remedy for Digital Networks* 13–14 (Sept. 2020) (on file with Comm.).

[2446] *Id.* at 15 ("Unlike the familiar AT&T example, there would be no cost to interconnection in the digital platform context. The standard is simply a way to present and transfer information that is already being presented and transferred. No wire needs to be connected to achieve it, nor do machines need to be co-located, or special workers employed. Transferring digital files has almost zero cost, but regardless of that cost, Facebook would be transferring those files to serve its users in any case. Facebook might need to pay some costs to redesign the format in which it transfers text and images, but if it has been found liable for monopolization by a court, it is expected that a remedy will have costs. The real cost of ongoing interoperability to Facebook.com is the possibility that it loses customers once the barriers to entry fall. But that risk is what every firm faces in a competitive market and represents a benefit to consumers.").

**App. 458**

Finally, interoperability is an important complement, not substitute, to vigorous antitrust enforcement. As discussed in this Report, Facebook has tipped the social network toward a monopoly, and due to its strong network effects, does not face competitive pressure. On its own, interoperability is unlikely to fully restore competition in the social networking market due to the lack of meaningful competition in the market today. On the other hand, in the absence of pro-competitive policies like interoperability, it is also possible that enforcement alone may provide incomplete relief due to future market tipping.[2447]

### b. Data Portability

Data portability is also a remedy for high costs associated with leaving a dominant platform. These costs present another barrier to entry for competitors and a barrier to exit for consumers. Dominant platforms can maintain market power in part because consumers experience significant frictions when moving to a new product.[2448] Users contribute data to a platform, for example, but can find it hard to migrate that data to a rival platform.[2449] The difficulty of switching tends to keep users on incumbent platforms.[2450] Providing consumers and businesses with tools to easily port or rebuild their social graph, profile, or other relevant data on a competing platform would help address these concerns.[2451] Although complementary to interoperability, data portability alone would not fully address concerns related to network effects since consumers would still need to recreate their networks on a new platform and would not be able to communicate with their network on the incumbent platform.[2452]

---

[2447] *Id.* at 10. ("A divestiture may reduce the existing market power of the dominant network but not eliminate the market power due to network effects that was achieved through anticompetitive conduct. And, alone, divestiture may not prevent future tipping. Thus, on their own, they risk being insufficient to fully restore the lost competition.").

[2448] *See* Joshua Gans, The Hamilton Project, Enhancing Competition with Data and Identity Portability 5 (June 2018), http://www.hamiltonproject.org/assets/files/Gans_20180611.pdf.

[2449] *See id.*

[2450] *See* Josh Constine, *Friend Portability Is the Must-Have Facebook Regulation*, TechCrunch (May 12, 2019), https://technologycrunch.com/2019/05/12/friends-wherever; Chris Dixon, *The Interoperability of Social Networks*, Bus. Insider (Nov. 10, 2010), https://www.businessinsider.com/the-interoperability-of-social-networks-2011-2; Data and Privacy Hearing at 2 (statement of Dina Srinivasan, Fellow, Yale Thurman Arnold Project).

[2451] Submission from Charlotte Slaiman, Competition Policy Dir., Public Knowledge, to H. Comm. on the Judiciary (May 14, 2020) (on file with Comm.); Appendix I at 3–4 (statement of Gene Kimmelman, Sr. Advisor, Public Knowledge) [hereinafter Slaiman Submission].

[2452] *Competition in Digital Technology Markets: Examining Self-Preferencing by Digital Platforms: Hearing Before Subcomm. on Antitrust, Competition Policy and Consumer Rights of the S. Comm. on the Judiciary*, 116th Cong. 21 (2020) (statement of Sally Hubbard, Dir. of Enforcement Strategy, Open Mkts. Inst.) (on file with Comm.). Last year, Senators Mark R. Warner (D-VA), Josh Hawley (R-MO), and Richard Blumenthal (D-CT) introduced S.2648, the "Augmenting Compatibility and Competition by Enabling Service Switching (ACCESS) Act," bipartisan legislation to require that dominant platforms make user data portable and their services interoperable. Additionally, this proposal would also allow users to delegate management of their privacy preferences to a third-party service. Press Release, Sen. Mark R. Warner, Senators Introduce Bipartisan Bill to Encourage Competition in Social Media (Oct. 22, 2019), https://www.warner.senate.gov/public/index.cfm/2019/10/senators-introduce-bipartisan-bill-to-encourage-competition-in-social-media.

**App. 459**

4.  Reduce Market Power Through Merger Presumptions

The firms investigated by the Subcommittee owe part of their dominance to mergers and acquisitions. Several of the platforms built entire lines of business through acquisitions, while others used acquisitions at key moments to neutralize competitive threats. Although the dominant platforms collectively engaged in several hundred mergers and acquisitions between 2000-2019, antitrust enforcers did not block a single one of these transactions. The Subcommittee's investigation revealed that several of these acquisitions enabled the dominant platforms to block emerging rivals and undermine competition.

Despite a significant number of ongoing antitrust investigations, the dominant platforms have continued to pursue significant deal-making. Over the last year, for example, Google purchased Fitbit for $2.1 billion and Looker for $2.6 billion; Amazon purchased Zoox for $1.3 billion; and Facebook acquired Giphy for an undisclosed amount.[2453] Meanwhile, all four of the firms investigated by the Subcommittee have recently focused on acquiring startups in the artificial intelligence and virtual reality space.[2454]

Ongoing acquisitions by the dominant platforms raise several concerns. Insofar as any transaction entrenches their existing position, or eliminates a nascent competitor, it strengthens their market power and can close off market entry. Furthermore, by pursuing additional deals in artificial intelligence and in other emerging markets, the dominant firms of today could position themselves to control the technology of tomorrow.

It is unclear whether the antitrust agencies are presently equipped to block anticompetitive mergers in digital markets. The record of the Federal Trade Commission and the Justice Department in this area shows significant missteps and repeat enforcement failures. While both agencies are currently pursuing reviews of pending transactions, it is not yet clear whether they have developed the analytical tools to challenge anticompetitive deals in digital markets. For example, the Justice Department in February permitted Google's acquisition of Looker, a data analytics and business intelligence startup, despite serious risks that the deal would eliminate an independent rival and could allow Google to cut

---

[2453] Chaim Gartenberg, *Google buys Fitbit for $2.1 billion*, THE VERGE (Nov. 1, 2019), https://www.theverge.com/2019/11/1/20943318/google-fitbit-acquisition-fitness-tracker-announcement; Lauren Feiner & Jordan Novet, *Google cloud boss Thomas Kurian makes his first big move — buys Looker for $2.6 billion*, CNBC (June 6, 2019), https://www.cnbc.com/2019/06/06/google-buys-cloud-company-looker-for-2point6-billion.html; Karen Weise & Erin Griffith, *Amazon to Buy Zoox, in a Move Toward Self-Driving Cars*, N.Y. TIMES (June 26, 2020), https://www.nytimes.com/2020/06/26/business/amazon-zoox.html; Kurt Wagner & Sarah Frier, *Facebook Buys Animated Image Library Giphy for $400 Million*, BLOOMBERG (May 15, 2020), https://www.bloomberg.com/news/articles/2020-05-15/facebook-buys-animated-image-library-giphy-to-boost-messaging.

[2454] *See infra* Appendix.

**App. 460**

off access to rivals.[2455] These concerns are especially acute today, given the combined national health and economic crises, which have widened the gap between the dominant platforms and businesses across the rest of the economy.

     To address this concern, Subcommittee staff recommends that Congress consider shifting presumptions for future acquisitions by the dominant platforms. Under this change, any acquisition by a dominant platform would be presumed anticompetitive unless the merging parties could show that the transaction was necessary for serving the public interest and that similar benefits could not be achieved through internal growth and expansion. This process would occur outside the current Hart-Scott-Rodino Act (HSR) process, such that the dominant platforms would be required to report *all* transactions and no HSR deadlines would be triggered. Establishing this presumption would better reflect Congress's preference for growth through ingenuity and investment rather than through acquisition.

5.  Create an Even Playing Field for the Free and Diverse Press

     The free and diverse press—particularly local press—is the backbone of a healthy and vibrant democracy. But as discussed in this Report, the rise of market power online has corresponded with a significant decline in the availability of trustworthy sources of news.[2456] Through dominating both digital advertising and key communication platforms, Google and Facebook have outsized power over the distribution and monetization of trustworthy sources of news online,[2457] creating an uneven playing field in which news publishers are beholden to their decisions.[2458]

     To address this imbalance of bargaining power, we recommend that the Subcommittee consider legislation to provide news publishers and broadcasters with a narrowly tailored and temporary safe harbor to collectively negotiate with dominant online platforms.

     In April 2019, Subcommittee Chairman Cicilline and Doug Collins (R-GA), the former-Ranking Member of the Committee on the Judiciary, introduced H.R. 2054, the "Journalism

---

[2455] Letter from Diana L. Moss, Pres., Am. Antitrust Inst., to Hon. Makan Delrahim, Assistant Att'y Gen., U.S. Dep't of Justice, Antitrust Div. (July 8, 2019), https://www.antitrustinstitute.org/wp-content/uploads/2019/07/AAI-Ltr-to-DOJ_Google-Looker_7.8.19.pdf.

[2456] Free and Diverse Press Hearing at 3 (statement of David Chavern, Pres. & CEO, News Media Alliance) ("In effect, a couple of dominant tech platforms are acting as regulators of the digital news industry.").

[2457] Submission of Source 52, to H. Comm. on the Judiciary, 12 (Oct. 30, 2019) (on file with Comm.).

[2458] Submission from Source 53, to H. Comm. on the Judiciary, 7 (Oct. 14, 2019) (on file with Comm.). Although Apple News and Apple News Plus are increasingly popular news aggregators, most market participants that the Subcommittee received evidence from during the investigation do not view it as a critical intermediary for online news at this time. Some publishers raised competition concerns about the tying of payment inside Apple's news product.

**App. 461**

Competition and Preservation Act of 2019."[2459] H.R. 2054 would allow coordination by news publishers under the antitrust laws if it: (1) directly relates to the quality, accuracy, attribution or branding, or interoperability of news; (2) benefits the entire industry, rather than just a few publishers, and is non-discriminatory to other news publishers; and (3) directly relates to and is reasonably necessary for these negotiations, instead of being used for other purposes. As Subcommittee Chairman Cicilline noted at the time of the bill's introduction:

> The free press is a cornerstone of our democracy. Journalists keep the public informed, root out corruption, and hold the powerful accountable. This bill will provide a much-needed lifeline to local publishers who have been crushed by Google and Facebook. It's about time we take a stand on this issue.[2460]

Mr. Collins added that the proposed legislation would allow "community newspapers to more fairly negotiate with large tech platforms that are operating in an increasingly anti-competitive space," which would "help protect journalism, promote competition and allow communities to stay informed."[2461]

We recommend the consideration of this legislation as part of a broader set of reforms to address the rise of market power online. This proposed legislation follows a long congressional tradition of allocating coordination rights to individuals or entities that lack bargaining power in a marketplace.[2462] Although antitrust exemptions have been disfavored, at various times lawmakers have created exemptions in order to rectify imbalances of power or to promote non-competition values.[2463] In this instance, the risk associated with antitrust exemptions to preserve the free and diverse press—a bedrock constitutional value—is low, while the benefits of preserving access to high-quality journalism are difficult to overstate. As discussed earlier in the Report, the bill would follow steps that other jurisdictions are similarly taking to rebalance the power between news publishers and the dominant platforms.

### 6.  Prohibit Abuse of Superior Bargaining Power and Require Due Process

By virtue of functioning as the only viable path to market, dominant platforms enjoy superior bargaining power over the third parties that depend on their platforms to access users and markets.

---

[2459] Press Release, Rep. David N. Cicilline, Collins Introduce Bill to Provide Lifeline to Local News (Apr. 3, 2019), https://cicilline.house.gov/press-release/cicilline-collins-introduce-bill-provide-lifeline-local-news.

[2460] *Id.*

[2461] *Id.*

[2462] *See generally* Submission from Sanjukta Paul, Ass't Prof. of Law, Wayne State Univ., to H. Comm. on the Judiciary, 2–4 (Apr. 21, 2020) (on file with Comm.) [hereinafter Paul Submission].

[2463] *See, e.g.*, Clayton Act, 15 U.S.C. § 17 (1914); Capper-Volstead Act, ch. 57, 42 Stat. 388–89 (1922) (codified as amended at 7 U.S.C. §§ 291, 292 (2012)).

**App. 462**

Their bargaining leverage is a form of market power,[2464] which the dominant platforms routinely use to protect and expand their dominance.

Through its investigation, the Subcommittee identified numerous instances in which the dominant platforms abused this power. In several cases, dominant platforms used their leverage to extract greater money or data than users would be willing to provide in a competitive market. While a firm in a competitive market would lose business if it charged excessive prices for its goods or services because the customer would switch to a competitor, dominant platforms have been able to charge excessive prices or ratchet up their prices without a significant loss of business. Similarly, certain dominant platforms have been able to extort an ever-increasing amount of data from their customers and users, ranging from a user's personal data to a business's trade secrets and proprietary content. In the absence of an alternative platform, users effectively have no choice but to accede to the platform's demands for payment whether in the form of dollars or data.

The Subcommittee's investigation found that dominant platforms have also leveraged their market power in negotiations with businesses and individuals to dictate the terms of the relationship. The dominant platforms frequently impose oppressive contractual provisions or offer "take-it-or-leave-it" terms in contract negotiations—even when dealing with relatively large companies represented by sophisticated counsel.[2465] Lacking bargaining power, dependent third parties often find themselves at the whims of the platform's arbitrary decisions. Subcommittee staff encountered numerous instances in which a third party had been abruptly delisted or demoted from a platform, without notice or explanation, and often without a clear avenue for recourse.

The dominant platforms' ability to abuse their superior bargaining power in these ways can cause long-term and far-reaching harm. To address these issues, the Subcommittee recommends that Congress consider prohibiting the abuse of superior bargaining power, including through potentially targeting anticompetitive contracts, and introducing due process protections for individuals and businesses dependent on the dominant platforms.[2466]

---

[2464] Aviv Nevo, Deputy Assistant Att'y Gen. for Econ., U.S. Dep't of Justice, Antitrust Div., Mergers that Increase Bargaining Leverage, Remarks at the Stanford Institute for Economic Policy Research, 7 (Jan. 22, 2014), https://www.justice.gov/atr/file/517781/download ("[A]s a matter of economic theory and case law bargaining leverage is a source of market power.").

[2465] See, e.g., Dig. Competition Expert Panel Report at 45 (noting how a report commissioned by the UK's Department for Digital, Culture, Media & Sport found that as "a consequence of their high market share, ownership of key technologies and strong user data assets, Google and Facebook are, to some extent, able to set their own terms to advertisers and publishers").

[2466] Foer Submission at 2–3; Submission from Marshall Steinbaum, Assistant Prof. of Econ., Univ. of Utah, to H. Comm. on the Judiciary, 8 (Apr. 2020) (on file with Comm.) [hereinafter Steinbaum Submission]. See generally Austl. Competition & Consumer Comm'n Report at 205–79; Competition & Mkts. Auth. Report at 328–49.

**App. 463**

B.        Strengthening the Antitrust Laws

1.   Restore the Antimonopoly Goals of the Antitrust Laws

The antitrust laws that Congress enacted in 1890 and 1914—the Sherman Act, the Clayton Act, and the Federal Trade Commission Act—reflected a recognition that unchecked monopoly power poses a threat to our economy as well as to our democracy.[2467] Congress reasserted this vision through subsequent antitrust laws, including the Robinson-Patman Act of 1936, the Celler-Kefauver Act of 1950, and the Hart-Scott-Rodino Act of 1976.[2468]

In the decades since Congress enacted these foundational statutes, the courts have significantly weakened these laws and made it increasingly difficult for federal antitrust enforcers and private plaintiffs to successfully challenge anticompetitive conduct and mergers.[2469] By adopting a narrow construction of "consumer welfare" as the sole goal of the antitrust laws, the Supreme Court has limited the analysis of competitive harm to focus primarily on price and output rather than the competitive process[2470]—contravening legislative history and legislative intent.[2471] Simultaneously, courts have adopted the view that underenforcement of the antitrust laws is preferable to overenforcement, a position at odds with the clear legislative intent of the antitrust laws, as well as the view of Congress that private monopolies are a "menace to republican institutions."[2472] In recent decades, the Justice Department and the Federal Trade Commission have contributed to this problem by taking a narrow view of their legal authorities and issuing guidelines that are highly permissive of market power and its abuse. The overall result is an approach to antitrust that has significantly diverged from the laws that Congress enacted.

---

[2467] *See generally* First & Fox Submission at 10–11; Steinbaum Submission; Submission from Robert H. Lande, Venable Prof. of Law, Univ. of Balt. Sch. of Law, to H. Comm. on the Judiciary (Apr. 16, 2020) (on file with Comm.) [hereinafter Lande Submission]; Paul Submission at 2–4; Submission from Maurice Stucke, Douglas A. Blaze Distinguished Prof. of Law, Univ. of Tennessee, to H. Comm. on the Judiciary, 2 (Mar. 13, 2020) (on file with Comm.) [hereinafter Stucke Submission].

[2468] Thomas J. Horton, *Rediscovering Antitrust's Lost Values*, 16 U.N.H. L. REV. 179 (2018).

[2469] *See generally* Submission from Tim Wu, Julius Silver Prof.of Law, Columbia Law Sch., to H. Comm. on the Judiciary (Apr. 25, 2020) (on file with Comm.) [hereinafter Wu Submission]; Submission from Spencer Weber Waller, John Paul Stevens Chair in Competition Law, Loyola Univ. Chicago Sch. of Law, to H. Comm. on the Judiciary (Apr. 28, 2020) (on file with Comm.) [hereinafter Waller Submission].

[2470] Jonathan Sallet, *Protecting the "Competitive Process"—The Evolution of Antitrust Enforcement in the United States*, WASH. CTR. FOR EQUITABLE GROWTH (Oct. 31, 2018), https://equitablegrowth.org/competitive-edge-protecting-the-competitive-process-the-evolution-of-antitrust-enforcement-in-the-united-states/.

[2471] Submission from John Newman, Assoc. Prof. of Law, Univ. of Miami Sch. of Law, to the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary, 2 (Apr. 1, 2020) (on file with Comm.) [hereinafter Newman Submission]; Stucke Submission at 2.

[2472] 21 CONG. REC. 3146 (1890) (statement of Sen. Hoar).

**App. 464**

In part due to this narrowing, some of the anticompetitive business practices that the Subcommittee's investigation uncovered could be difficult to challenge under current law.[2473] In response to this concern, this section identifies specific legislative reforms that would help renew and rehabilitate the antitrust laws in the context of digital markets. In addition to these specific reforms, the Subcommittee recommends that Congress consider reasserting the original intent and broad goals of the antitrust laws by clarifying that they are designed to protect not just consumers, but also workers, entrepreneurs, independent businesses, open markets, a fair economy, and democratic ideals.[2474]

## 2. Invigorate Merger Enforcement

Section 7 of the Clayton Act of 1914 prohibits any transaction where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."[2475] In 1950, Congress passed the Celler-Kevauver Anti-Merger Act to broaden the types of transactions covered by the Clayton Act, specifically to include vertical mergers, conglomerate mergers, and purchases of assets.[2476]

As noted above, since 1998, Amazon, Apple, Facebook, and Google collectively have purchased more than 500 companies.[2477] The antitrust agencies did not block a single acquisition. In one instance—Google's purchase of ITA—the Justice Department required Google to agree to certain terms in a consent decree before proceeding with the transaction.[2478]

The Subcommittee's review of the relevant documents revealed that several of these acquisitions lessened competition and increased market power. In several cases, antitrust enforcers permitted dominant platforms to acquire a competitive threat. For example, documents produced during the investigation demonstrate that Facebook acquired Instagram to neutralize an emerging rival, while Google purchased Waze to eliminate an independent provider of mapping data. In other instances, the platform engaged in a series of acquisitions that enabled it to gain a controlling position across an entire supply chain or ecosystem. Google's acquisitions of DoubleClick, AdMeld, and AdMob, for example, let Google achieve a commanding position across the digital ad tech market.

---

[2473] *See* Wu Submission at 2 ("If read broadly, the prohibitions on 'monopolization,' 'unfair means of competition,' and 'restraints on trade' could be used to handle the challenges of our time. But 'broadly' is manifestly not how the laws are read by the judiciary at this point. For the courts have grafted onto these laws burdens of proof, special requirements and defenses that are found nowhere in the statutes, and that have rendered the laws applicable only to the narrowest of scenarios, usually those involving blatant price effects. And it is this that makes the laws inadequate for the challenges presented by digital markets.").

[2474] *See generally* First & Fox Submission at 10–11; Stucke Submission at 2; Wu Submission; Waller Submission.

[2475] Clayton Act, 15 U.S.C. § 18 (1914).

[2476] Celler-Kefauver Anti-Merger Act, 64 Stat. 1125 (1950).

[2477] *See infra* Appendix.

[2478] Stipulation and Order, United States v. Google Inc. & ITA Software Inc., No. 1:11-cv-00688 (D.D.C. 2011).

**App. 465**

In light of this, Subcommittee staff recommends that Congress considers a series of reforms to strengthen merger enforcement.

### a.   Codify Bright-Line Rules and Structural Presumptions in Concentrated Markets

A major change in antitrust enforcement over the last few decades has been the shift away from bright-line rules in favor of "rule of reason" case-by-case analysis. Although the rule of reason approach is said to reduce errors in enforcement through fact-specific analysis, in practice the standard tilts heavily in favor of defendants.[2479] The departure from bright-line rules and presumptions has especially affected merger enforcement, where enforcers seeking to challenge a merger must fully prove that it will have anticompetitive effects, even in cases where the merging parties are dominant firms in highly concentrated markets. Scholarship by Professor John Kwoka of Northeastern University shows that the antitrust agencies acted in only 38% of all mergers that led to price increases, suggesting that the current approach to merger review is resulting in significant underenforcement.[2480]

To respond to this concern, the Subcommittee recommends that Members consider codifying bright-line rules for merger enforcement, including structural presumptions.[2481] Under a structural presumption, mergers resulting in a single firm controlling an outsized market share, or resulting in a significant increase in concentration, would be presumptively prohibited under Section 7 of the Clayton Act.[2482] This structural presumption would place the burden of proof upon the merging parties to show that the merger would not reduce competition. A showing that the merger would result in efficiencies should not be sufficient to overcome the presumption that it is anticompetitive. It is the view of Subcommittee staff that the 30% threshold established by the Supreme Court in *Philadelphia National Bank* is appropriate, although a lower standard for monopsony or buyer power claims may deserve consideration by the Subcommittee.

By shifting the burden of proof to the merging parties in cases involving concentrated markets and high market shares, codifying the structural presumption would help promote the efficient allocation of agency resources and increase the likelihood that anticompetitive mergers are blocked.

---

[2479] Michael A. Carrier, *The Rule of Reason: An Empirical Update for the 21st Century*, 16 GEO. MASON L. REV. 827 (2009).

[2480] JOHN KWOKA, MERGERS, MERGER CONTROL, AND REMEDIES 155 (2014).

[2481] For support of codifying the structural presumption, *see* Submission from John Kwoka, Finnegan Prof. of Econ., Northeastern Univ., to H. Comm. on the Judiciary, 3 (Apr. 17, 2020) (on file with Comm.) [hereinafter Kwoka Submission]; Submission from Michael Kades, Dir., Mkts. & Competition Pol'y, Wash. Ctr. for Equitable Growth et al., to H. Comm. on the Judiciary, 9 (Apr. 30, 2020) (on file with Comm.) [hereinafter Kades Submission]; Lande Submission at 5; Slaiman Submission at 3; Foer Submission at 9. *See also* Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and Burdens of Proof*, 127 YALE L.J. 1996 (2018); Steven C. Salop, *The Evolution and Vitality of Merger Presumptions: A Decision-Theoretic Approach*, 80 ANTITRUST L.J. 269 (2015).

[2482] Although some courts still follow the structural presumption adopted by the Supreme Court in *Philadelphia National Bank*, it is not universally followed, especially given the D.C. Circuit's decision in *United States v. Baker Hughes Inc.*, 908 F.2d 981 (D.C. Cir. 1990).

**App. 466**

b.   Protect Potential Rivals, Nascent Competitors, and Startups

The Subcommittee's investigation produced evidence that several of the dominant platforms acquired potential rivals and nascent competitors. Potential rivals are firms that are planning to enter or could plausibly enter the acquirer's market. Nascent competitors are firms whose "prospective innovation represents a serious future threat to an incumbent."[2483] In digital markets, potential rivals and nascent competitors play a critical role in driving innovation, as their prospective entry may dislodge incumbents or spur competition. For this reason, incumbents may view potential rivals and nascent competitors as a significant threat, especially as their success could render the incumbent's technologies obsolete.

To strengthen the law relating to potential rivals and nascent competitors, Subcommittee staff recommends strengthening the Clayton Act to prohibit acquisitions of potential rivals and nascent competitors. This could be achieved by clarifying that proving harm on potential competition or nascent competition grounds does not require proving that the potential or nascent competitor would have been a successful entrant in a but-for world.[2484] Given the patchwork of cases that are unfavorable to potential and nascent competition-based theories of harm, this amendment should also make clear that Congress intends to override this case law.[2485]

Since startups can be an important source of potential and nascent competition, the antitrust laws should also look unfavorably upon incumbents purchasing innovative startups. One way that Congress could do so is by codifying a presumption against acquisitions of startups by dominant firms, particularly those that serve as direct competitors, as well as those operating in adjacent or related markets.[2486]

Lastly, Subcommittee staff's review of relevant documents produced by the Federal Trade Commission and Justice Department demonstrated that the antitrust agencies consistently underestimated—by a significant margin—the degree to which an acquisition would undermine competition and impede entry. In light of this tendency, Subcommittee staff recommends that Congress consider strengthening the incipiency standard by amending the Clayton Act to prohibit acquisitions that "may lessen competition or tend to increase market power."[2487] Revising the law

---

[2483] Wu Submission at 4–5; *see also* C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. PA. L. REV. (forthcoming 2020); Kades Submission at 14.

[2484] Wu Submission at 6; Kwoka Submission at 6.

[2485] *See, e.g.*, United States v. Marine Bancorporation, Inc., 418 U.S. 602 (1974).

[2486] Submission from Mark Lemley, William H. Neukom Prof. of Law, Stanford Law Sch., to H. Comm. on the Judiciary, 7–8 (Apr. 8, 2020) (on file with Comm.) [hereinafter Lemley Submission].

[2487] Submission from Consumer Reports, to H. Comm. on the Judiciary, 5 (Apr. 17, 2020) (on file with Comm.) [hereinafter Consumer Reports Submission]; Submission from Richard M. Steuer, Adjunct Prof., Fordham Univ. Sch. of Law, to H. Comm. on the Judiciary (Apr. 8, 2020) (on file with Comm.) [hereinafter Steuer Submission]; Peter C. Carstensen &

**App. 467**

would "arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation."[2488]

### c. Strengthen Vertical Merger Doctrine

The Subcommittee's investigation identified several ways in which vertical integration of dominant platforms enabled anticompetitive conduct. For this reason, the Subcommittee recommends that Congress examine proposals to strengthen the law relating to vertical mergers. The current case law disfavors challenges to vertical mergers. Specifically, courts tend to defer to claims from the merging parties that the transaction will yield efficiencies through the "elimination of double marginalization" and are skeptical about claims that the merger will result in foreclosure.

To address this concern, the Subcommittee recommends that Congress explore presumptions involving vertical mergers, such as a presumption that vertical mergers are anticompetitive when either of the merging parties is a dominant firm operating in a concentrated market, or presumptions relating to input foreclosure and customer foreclosure.[2489]

### 3. Rehabilitate Monopolization Law

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."[2490] Over recent decades, courts have significantly heightened the legal standards that plaintiffs must overcome in order to prove monopolization. Several of the business practices the Subcommittee's investigation uncovered should be illegal under Section 2. This section briefly identifies the relevant business practices and the case law that impedes effective enforcement of Section 2 of the Sherman Act.

### a. Abuse of Dominance

---

Robert H. Lande, *The Merger Incipiency Doctrine and the Importance of 'Redundant' Competitors*, 2018 WIS. L. REV. 783 (2018).

[2488] S. REP. NO. 698 (1914) in EARL W. KINTNER, THE LEGISLATIVE HISTORY OF THE FEDERAL ANTITRUST LAWS AND RELATED STATUTES 1744–52 (1978) (noting that the Senate Judiciary Committee report stated that the purpose of the bill was to supplement the Sherman Act "by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation").

[2489] Kades Submission at 5; Jonathan Baker et al., *Five Principles for Vertical Merger Enforcement Policy*, 33 ANTITRUST 3 (2019).

[2490] Sherman Act, 15 U.S.C. § 2 (1890).

**App. 468**

The Subcommittee's investigation found that the dominant platforms have the incentive and ability to abuse their dominant position against third-party suppliers, workers, and consumers. Some of these business practices are a detriment to fair competition, but they do not easily fit the existing categories identified by the Sherman Act, namely "monopolization" or "restraint of trade." Since courts have shifted their interpretation of the antitrust law to focus primarily on the formation or entrenchment of market power, and not on its exploitation or exercise, many of the business practices that Subcommittee staff identified as undermining competition in digital markets could be difficult to reach under the prevailing judicial approach.

To address this concern, Subcommittee staff recommends that Congress consider extending the Sherman Act to prohibit abuses of dominance.[2491] Furthermore, the Subcommittee should examine the creation of a statutory presumption that a market share of 30% or more constitutes a rebuttable presumption of dominance by a seller, and a market share of 25% or more constitute a rebuttable presumption of dominance by a buyer.[2492]

b.   Monopoly Leveraging

The Subcommittee's investigation found that the dominant platforms have engaged in "monopoly leveraging," where a dominant firm uses its monopoly power in one market to boost or privilege its position in another market. For example, Google's use of its horizontal search monopoly to advantage its vertical search offerings is a form of monopoly leveraging. Although monopoly leveraging was previously a widely cognizable theory of harm under antitrust law, courts now require that use of monopoly power in the first market "actually monopolize" the secondary market or "dangerously threaten[] to do so."[2493] The Subcommittee's investigation identified several instances in which use of monopoly power in one market to privilege the monopolist's position in the second market injured competition, even if the conduct did not result in monopolization of the second market. For this reason, Subcommittee staff recommends overriding the legal requirement that monopoly leveraging "actually monopolize" the second market, as set out in *Spectrum Sports, Inc. v. McQuillan.*[2494]

c.   Predatory Pricing

---

[2491] First & Fox Submission at 2; Foer Submission at 2–4; Newman Submission at 7–8; Stucke Submission at 14; Waller Submission at 13.

[2492] Waller Submission at 12.

[2493] 506 U.S. 447 (1993).

[2494] *Id. See also* Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536 (9th Cir. 1991).

**App. 469**

The Subcommittee's investigation identified several instances in which a dominant platform was pricing goods or services below-cost in order to drive out rivals and capture the market. For example, documents produced during the investigation revealed that Amazon had been willing to lose $200 million in a single quarter in order to pressure Diapers.com, a firm it had recognized as its most significant rival in the category. Amazon cut prices and introduced steep promotions, prompting a pricing war that eventually weakened Diapers.com. Amazon then purchased the company, eliminating its competitor and subsequently cutting back the discounts and promotions it had introduced.

Predatory pricing is a particular risk in digital markets, where winner-take-all dynamics incentivize the pursuit of growth over profits, and where the dominant digital platforms can cross-subsidize between lines of business. Courts, however, have introduced a "recoupment" requirement, necessitating that plaintiffs prove that the losses incurred through below-cost pricing subsequently were or could be recouped. Although dominant digital markets can recoup these losses through various means over the long term, recoupment is difficult for plaintiffs to prove in the short term. Since the recoupment requirement was introduced, successful predatory pricing cases have plummeted.[2495]

The Subcommittee recommends clarifying that proof of recoupment is not necessary to prove predatory pricing or predatory buying, overriding the Supreme Court's decisions in *Matsushita v. Zenith Ratio Corp.*,[2496] *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,[2497] and *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*[2498]

d.   Essential Facilities and Refusals to Deal

The Subcommittee's investigation uncovered several instances in which a dominant platform used the threat of delisting or refusing service to a third party as leverage to extract greater value or more data or to secure an advantage in a distinct market. Because the dominant platforms do not face meaningful competition in their primary markets, their threat to refuse business with a third party is the equivalent of depriving a market participant of an essential input. This denial of access in one market can undermine competition across adjacent markets, undermining the ability of market participants to compete on the merits.

To address this concern, the Subcommittee recommends that Congress consider revitalizing the "essential facilities" doctrine, the legal requirement that dominant firms provide access to their

---

[2495] Hubbard Submission at 20; Stucke Submission at 7; Teachout Submission at 12; Christopher R. Leslie, *Predatory Pricing and Recoupment*, 113 COLUM. L. REV. 1695 (2013).

[2496] 475 U.S. 574 (1986).

[2497] 509 U.S. 209 (1993).

[2498] 549 U.S. 312 (2007).

**App. 470**

infrastructural services or facilities on a nondiscriminatory basis.[2499] To clarify the law, Congress should consider overriding judicial decisions that have treated unfavorably essential facilities- and refusal to deal-based theories of harm.[2500]

  e. <u>Tying</u>

  The Subcommittee's investigation identified several instances in which a dominant platform conditioned access to a good or service that the dominant platform controlled on the purchase or use of a separate product or service. This business practice undermines competition on the merits by enabling a firm with market power in one market to privilege products or services in a distinct market.

  Although antitrust law has long treated tying by a monopolist as anticompetitive, in recent decades, courts have moved away from this position. Subcommittee staff recommends that Congress consider clarifying that conditioning access to a product or service in which a firm has market power to the purchase or use of a separate product or service is anticompetitive under Section 2, as held by the Supreme Court in *Jefferson Parish Hosp. Dist. v. Hyde*.[2501]

  f. <u>Self-Preferencing and Anticompetitive Product Design</u>

  The Subcommittee's investigation uncovered several instances in which a dominant platform used the design of its platform or service to privilege its own services or to disfavor competitors. This practice undermines competition by enabling a firm that controls an essential input to distort competition in separate markets. The Subcommittee recommends that Congress consider whether making a design change that excludes competitors or otherwise undermines competition should be a violation of Section 2, regardless of whether the design change can be justified as an improvement for consumers.[2502]

4. <u>Additional Measures to Strengthen the Antitrust Laws</u>

  In response to the Subcommittee's requests for submissions, experts identified other proposals that Subcommittee staff believes warrant review by Congress. These include:

---

[2499] Submission from the Am. Antitrust Inst., to H. Comm. on the Judiciary, 4 (Apr. 17, 2020) (on file with Comm.) [hereinafter AAI Submission]; Waller Submission at 13.

[2500] Verizon Commc'ns Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398 (2004); Pacific Bell Telephone Co. v. LinkLine Commc'ns, Inc., 555 U.S. 438 (2009).

[2501] 466 U.S. 2 (1984).

[2502] This would require overriding *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010).

**App. 471**

- Overriding *Ohio v. American Express* by clarifying that cases involving platforms do not require plaintiffs to establish harm to both sets of customers;[2503]

- Overriding *United States v. Sabre Corp*., clarifying that platforms that are "two-sided," or serve multiple sets of customers, can compete with firms that are "one-sided";[2504]

- Clarifying that market definition is not required for proving an antitrust violation, especially in the presence of direct evidence of market power;[2505] and

- Clarifying that "false positives"—or erroneous enforcement—are not more costly than "false negatives"—or erroneous non-enforcement—and that, in relation to conduct or mergers involving dominant firms, "false negatives" are costlier.[2506]

<center>C.   Strengthening Antitrust Enforcement</center>

1. <u>Congressional Oversight</u>

As discussed earlier in the Report, Congress has a strong tradition of performing vigorous oversight of the enforcement and adequacy of the antitrust laws. Over the last century, Congress at key moments responded forcefully to the courts' narrowing of antitrust laws, the rising tide of economic concentration, or other challenges to the sound and effective administration of the antitrust laws.[2507]

This tradition includes the creation of the Federal Trade Commission and concurrent enactment of the Clayton Antitrust Act in 1914, as both a response to the Supreme Court's narrow construction of the Sherman Act in 1911 and an effort to limit the discretion of the courts.[2508] It also includes Congress's broadening of merger enforcement to cover non-horizontal acquisitions and other transactions in the Celler-Kefauver Anti-Merger Act of 1950 as well as establishing a mechanism for judicial oversight of consent decrees in response to political interference in merger enforcement with

---

[2503] AAI Submission at 4; Submission from Herbert Hovenkamp, James G. Dinan Univ. Prof., Univ. of Pa. Law Sch., to H. Comm. on the Judiciary, 3 (Apr. 17, 2020) (on file with Comm.) [hereinafter Hovenkamp Submission]; Hubbard Submission at 20; Kades Submission at 8.

[2504] United States *v*. Sabre Corp., 452 F. Supp. 3d 97 (D. Del. 2020). *See also* Kades Submission at 10.

[2505] Hovenkamp Submission at 3–4; Newman Submission at 5–6.

[2506] Subcommittee staff believes that Congress could clarify that the views set out by then-Professor Frank Easterbrook in *The Limits of Antitrust*, 63 TEX. L. REV. 1 (1984) do not reflect the views of the Congress in enacting the antitrust laws. *See also* Submission from Bill Baer, Visiting Fellow, Brookings Inst., to H. Comm. on the Judiciary, 3 (May 19, 2020) (on file with Comm.) [hereinafter Baer Submission] ("That is my fundamental concern with the state of antitrust enforcement today. It is too cautious, too worried about adverse effects of "over enforcement" (so called Type I errors).").

[2507] *See generally,* Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 ANTITRUST L.J. 1 (2003).

[2508] Clayton Act, 15 U.S.C. § 12; Fed. Trade Comm'n Act, 15 U.S.C. § 41.

<center>**App. 472**</center>

the Tunney Act of 1974.[2509] Additionally, Congress has regularly investigated the rise and abuse of market power in important markets.[2510] In support of these efforts, Congress dedicated substantial congressional and agency resources to perform the task of identifying and responding to anticompetitive conduct.[2511]

In recent decades, Congress has departed from this tradition, deferring largely to the courts and to the antitrust agencies in the crafting of substantive antitrust policy.[2512] Its inaction has been read as acquiescence to the narrowing of the antitrust laws and has contributed to antitrust becoming "overly technical and primarily dependent on economics."[2513]

In other cases, congressional attention has fallen short as lawmakers tried to address competition problems without sustained efforts to implement enforcement changes, leading some reform efforts in recent decades to misfire.[2514] Responding to these concerns, Congress has increased appropriations and provided modest improvements to the Federal Trade Commission's budget and remedial authority during this period. But these efforts were insufficient without sustained support in the face of "ferocious opposition" from large defendants and businesses lobbying Congress.[2515]

To remedy these broader trends, Subcommittee staff recommends that Congress revive its long tradition of robust and vigorous oversight of the antitrust laws and enforcement, along with its

---

[2509] 5 U.S.C. § 16. *See also Consent Decree Program of the Dep't of Justice: Hearings Before the Subcomm. on Antitrust of the H. Comm. on the Judiciary, 85th Cong.* (1957); REPORT OF THE SUBCOMM. ON ANTITRUST OF THE H. COMM. ON THE JUDICIARY, CONSENT DECREE PROGRAM OF THE DEP'T OF JUSTICE, 86TH CONG., 1ST SESS. (1959).

[2510] In the 1990s, the Committee on the Judiciary conducted significant oversight of competition in the telecommunications market in the wake of the breakup of Ma Bell and through oversight of the 1982 consent decree. These efforts culminated in the passage of H.R. 3626, the "Antitrust and Communications Reform Act," by the House of Representatives in 1994 by a vote of 423 to 5. Chairman Jack B. Brooks introduced this bill—a precursor to the Telecommunications Act of 1996—to address monopolization in the telecommunications market. *See generally* H. REP. NO. 103-559 (1994); Robert M. Frieden, *The Telecommunications Act of 1996: Predicting the Winners and Losers*, 20 HASTINGS COMM. & ENT. L.J. 11, 57 n.8 (1997).

[2511] Submission from Alison Jones & William E. Kovacic, to H. Comm. on the Judiciary, 4 (Apr. 17, 2020) (on file with Comm.) [hereinafter Jones & Kovacic Submission].

[2512] Harry First & Spencer Weber Waller, *Antitrust's Democracy Deficit*, 81 FORDHAM L. REV. 2543, 2556 (2013) ("[D]espite a history of bipartisan congressional support for the importance of the antitrust laws and their enforcement, of late Congress has done little. And when it has done something, it has focused on the micro rather than the macro changes that have occurred in the field.").

[2513] *Id*. at 2559.

[2514] Jones & Kovacic Submission at 4 ("The miscalculation of Congress (and the agencies) about the magnitude of implementation tasks in this earlier period came at a high price. Implementation weaknesses undermined many investigations and cases that the federal agencies launched in response to congressional guidance. The litigation failures raised questions about the competence of the federal agencies, particularly their ability to manage large cases dealing with misconduct by dominant firms and oligopolists. The wariness of the federal agencies since the late 1970s to bring cases in this area—a wariness that many observers today criticize as unwarranted—is in major part the residue of bitter litigation experiences from this earlier period.").

[2515] *Id.* at 6.

**App. 473**

commitment to ongoing market investigations and legislative activity. Additionally, greater attention to implementation challenges will enable Congress to better see its reform efforts through.

2.   Agency Enforcement

Over the course of the investigation, the Subcommittee uncovered evidence that the antitrust agencies consistently failed to block monopolists from establishing or maintaining their dominance through anticompetitive conduct or acquisitions. This institutional failure follows a multi-decade trend whereby the antitrust agencies have constrained their own authorities and advanced narrow readings of the law. In the case of the Federal Trade Commission, the agency has been reluctant to use the expansive set of tools with which Congress provided it, neglecting to fulfill its broad legislative mandate. Restoring the agencies to full strength will require overcoming these trends.

As a general matter, Congress created the FTC to police and prohibit "unfair methods of competition,"[2516] and to serve as an "administrative tribunal" that carefully studied ongoing business practices and economic conditions.[2517] To enable the agency to carry out these functions, Congress assigned the Commission powers to "make rules and regulations for the purpose of carrying out the [FTC Act's] provisions," as well as broad investigative authority to compel business information and conduct market studies.[2518] Notably, Congress established the provision prohibiting "unfair methods of competition" to reach beyond the other antitrust statutes, "to fill in the gaps in the other antitrust laws, to round them out and make their coverage complete."[2519] Lawmakers delegated to the FTC the task of defining what constituted an "unfair method of competition," recognizing that an expert agency equipped to continuously monitor business practices would be best positioned to ensure the legal definition kept pace with business realities.

---

[2516] *See* S. REP. NO. 63-597, 13 (1914) ("The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid [them] . . . or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be better, for the reason . . . that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent others.").

[2517] Neil W. Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act*, 21 B.C. L. REV. 227 (1980); *see also* Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 ANTITRUST L.J. 1 (2003).

[2518] 15 U.S.C. § 46.

[2519] Neil W. Averitt, *The Meaning of "Unfair Methods of Competition" in Section 5 of the Federal Trade Commission Act*, 21 B.C. L. REV. 227, 251 (1980) ("Section 5 is not confined to conduct that actually violates, or that threatens to violate, one of the other antitrust statutes. If it were limited to this extent it would be a largely duplicative provision. The legislative purpose instead assigned to Section 5 a broader role. It was to be an interstitial statute: it was to fill in the gaps in the other antitrust laws, to round them out and make their coverage complete. In addition to overt violations, therefore, Section 5 would reach closely similar conduct that violates the policy or 'spirit' of the antitrust laws, even though it may not come technically within its terms.").

**App. 474**

In practice, however, the Commission has neglected to play this role. In its first hundred years, the FTC promulgated only one rule defining an "unfair method of competition."[2520] In 2015 the Commission adopted a set of "Enforcement Principles," stating that the FTC's targeting of "unfair methods of competition" would be guided by the "promotion of consumer welfare," a policy goal absent from any legislative directive given to the Commission.[2521] Since the adoption of this framework, the FTC has brought only one case under its standalone Section 5 authority.[2522] The agency has also failed to regularly produce market-wide studies, having halted regular data collection in the 1980s.[2523]

Together with the DOJ, the FTC has also chosen to stop enforcing certain antitrust laws entirely. For two decades, neither agency has filed a suit under the Robinson-Patman Act, which Congress passed in order to limit the power of large chain retailers to extract concessions from independent suppliers.[2524] In 2008, the Justice Department issued a report recommending that Section 2 of the Sherman Act be curbed dramatically.[2525] Although the report was subsequently rescinded, the Justice Department has not filed a significant monopolization case in two decades. Meanwhile, both agencies have targeted their enforcement efforts on relatively small players—including ice skating teachers and organists—raising questions about their enforcement priorities.[2526]

The agencies have also been hamstrung by inadequate budgets. In 1981, FTC Chairman Jim Miller won steep budget cuts at the Commission, a drastic rollback from which the agency has not yet recovered. Prior to this Congress, appropriations for both agencies have reached historic lows.[2527] To

---

[2520] Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 16 C.F.R. pt. 412 (1968).

[2521] Fed. Trade Comm'n, Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act (Aug. 13, 2015), https://www.ftc.gov/system/files/documents/public_statements/735201/150813section5enforcement.pdf.

[2522] The one exception is FTC's recent suit against Qualcomm. Fed. Trade Comm'n v. Qualcomm Inc., 411 F. Supp. 3d 658 (N.D. Cal. 2019) (5:17-cv-00220).

[2523] Fed. Trade Comm'n, Bur. of Econ., Annual Line of Business Report 1977 (1985), https://www.ftc.gov/reports/us-federal-trade-commission-bureau-economics-annual-line-business-report-1977-statistical.

[2524] In a memo submitted on behalf of the United States to the OECD, the Justice Department stated that "a shift in emphasis based on economic analysis resulted in a significant reduction in enforcement actions brought by the Agencies under the Robinson-Patman Act. As a result, current enforcement of the Act occurs mainly through private treble damages actions." Note by the United States, Roundtable on "Price Discrimination," OECD (Nov. 2016), https://www.justice.gov/atr/case-document/file/979211/download.

[2525] Thomas O. Barnett & Hill B. Wellford, *The DOJ's Single-Firm Conduct Report: Promoting Consumer Welfare Through Clearer Standards for Section 2 of the Sherman Act* (Sept. 8, 2008), https://www.justice.gov/sites/default/files/atr/legacy/2009/05/11/238599.pdf.

[2526] Sandeep Vaheesan, *Accommodating Capital and Policing Labor: Antitrust in the Two Gilded Ages*, 78 Md. L. Rev. 766 (2019). *See also* Brief for the United States and the Fed. Trade Comm'n as Amicus Curiae in Support of Appellant and in Favor of Reversal, Chamber of Commerce of the United States of America and Rasier, LLC, v. City of Seattle, 890 F.3d 769 (9th Cir. 2018) (No. 17-35640).

[2527] Michael Kades, Wash. Ctr. for Equitable Growth, The State of U.S. Federal Antitrust Enforcement (2019), https://equitablegrowth.org/wp-content/uploads/2019/09/091719-antitrust-enforcement-report.pdf.

**App. 475**

restore the antitrust agencies to full strength, Subcommittee staff recommends that Congress consider the following:

- Triggering civil penalties and other relief for violations of "unfair methods of competition" rules, creating symmetry with violations of "unfair or deceptive acts or practices" rules;

- Requiring the Commission to regularly collect data and report on economic concentration and competition in sectors across the economy, as permitted under Section 6 of the FTC Act;

- Enhancing the public transparency and accountability of the antitrust agencies, by requiring the agencies to solicit and respond to public comments for merger reviews, and by requiring the agencies to publish written explanations for all enforcement decisions;[2528]

- Requiring the agencies to conduct and make publicly available merger retrospectives on significant transactions consummated over the last three decades;

- Codifying stricter prohibitions on the revolving door between the agencies and the companies that they investigate, especially with regards to senior officials;[2529] and

- Increasing the budgets of the Federal Trade Commission and the Antitrust Division.[2530]

## 3.   Private Enforcement

Private enforcement plays a critical role in the nation's antitrust system. The Sherman Act and Clayton Act both include a private right of action. This reflected lawmakers' desire to ensure that those abused by monopoly power have an opportunity for direct recourse.[2531] It also reflected a recognition that public enforcers would be susceptible to capture by the very monopolists that they were supposed to investigate, necessitating other means of enforcement.

Empirical surveys of trends in antitrust enforcement indicate that private enforcement deters anticompetitive conduct and strengthens enforcement overall.[2532] In recent decades, however, courts

---

[2528] Mitchell Submission at 9–10.

[2529] *See* submission from Source 17.

[2530] *See* Baer Submission at 7–8; Kades Submission at 12–13.

[2531] *See, e.g.*, 51 CONG. REC. 9073 (1914) (remarks of Rep. Webb) (stating that private Section 7 remedies "open the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and give the injured party ample damages for the wrong suffered").

[2532] Joshua P. Davis & Robert H. Lande, *Toward an Empirical and Theoretical Assessment of Private Antitrust Enforcement*, 36 SEATTLE U. L. REV. 1269, 1276 (2013).

**App. 476**

have erected significant obstacles for private antitrust plaintiffs, both through procedural decisions and substantive doctrine.

One major obstacle is the rise of forced arbitration clauses, which undermine private enforcement of the antitrust laws by allowing companies to avoid legal accountability for their actions.[2533] These clauses allow firms to evade the public justice system—where plaintiffs have far greater legal protections—and hide behind a one-sided process that is tilted in their favor.[2534] For example, although Amazon has over two million sellers in the United States, Amazon's records reflect that only 163 sellers initiated arbitration proceedings between 2014 and 2019.[2535] This data seems to confirm studies showing that forced arbitration clauses often fail to provide a meaningful forum for resolving disputes and instead tend to suppress valid claims and shield wrongdoing.[2536]

Several other trends in judicial decisions have hampered private antitrust plaintiffs, including in cases involving dominant platforms. To address these concerns, the Subcommittee recommends that Congress consider:

- Eliminating court-created standards for "antitrust injury"[2537] and "antitrust standing,"[2538] which undermine Congress's grant of enforcement authority to "any person . . . injured . . . by reason of anything forbidden in the antitrust laws;"[2539]

- Reducing procedural obstacles to litigation, including through eliminating forced arbitration clauses[2540] and undue limits on class action formation;[2541] and

---

[2533] *Justice Denied: Forced Arbitration and the Erosion of our Legal System: Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm. on the Judiciary*, 116th Cong. 2 (2019) (statement of Myriam Gilles, Paul R. Verkuil Research Chair in Public Law & Prof. of Law, Benjamin N. Cardozo Sch. of Law).

[2534] *Justice Denied: Forced Arbitration and the Erosion of our Legal System*: *Hearing Before the Subcomm. on Antitrust, Commercial and Admin. Law of the H. Comm on the Judiciary*, 116th Cong. 2 (2019) (statement of Deepak Gupta, Founding Principal, Gupta Wessler PLLC).

[2535] Innovation and Entrepreneurship Hearing at 49 (response to Questions for the Record of Nate Sutton, Assoc. Gen. Counsel, Competition, Amazon.com, Inc.).

[2536] Judith Resnik, *Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the Erasure of Rights*, 124 YALE L. J. 2804 (2015).

[2537] Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977).

[2538] Assoc. Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519 (1983).

[2539] Clayton Act, 15 U.S.C. § 15 (1914).

[2540] American Express v. Italian Colors, 570 U.S. 228 (2013); AT&T Mobility v. Concepcion, 563 U.S. 333 (2011).

[2541] Comcast v. Behrend, 569 U.S. 27 (2013).

- Lowering the heightened pleading requirement introduced in *Bell Atlantic Corp. v. Twombly*.[2542]

\* \* \*

---

[2542] 550 U.S. 544 (2007).

# VII.   APPENDIX: MERGERS AND ACQUISITIONS BY DOMINANT PLATFORMS[2543]

## A.  Amazon

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Zoox | 2020 | Autonomous Vehicles, Robotics, Transportation | 1,200,000,000 |
| Health Navigator | 2019 | Health Care | -- |
| Internet Gaming Database (IGDB) | 2019 | Video Games, Content, Media and Entertainment | -- |
| INLT | 2019 | Enterprise Applications, Freight Service, Logistics, SaaS, Shipping, Transportation | -- |
| E8 Storage | 2019 | Cloud Computing, Enterprise Software, Flash Storage, Software | 50,000,000 |
| Bebo | 2019 | Internet, Video Games | 25,000,000 |
| Sizmek Ad Server | 2019 | Advertising, Marketing | -- |
| CANVAS Technology | 2019 | Robotics | -- |
| Eero | 2019 | Internet, IoT, Wireless | 97,000,000 |
| CloudEndure | 2019 | Cloud Computing, Cloud Storage, Enterprise Software, SaaS | 200,000,000 |

---

[2543] Prepared by Subcomm. based on BERKELEY, THE ACQUISITION TAKEOVER BY THE 5 TECH GIANTS, http://people.ischool.berkeley.edu/~neha01mittal/infoviz/dashboard/ (last visited on Sept. 28, 2020); *see also* BIG TECH MERGERS, AMERICAN ECON. LIBERTIES PROJ., https://www.economicliberties.us/big-tech-merger-tracker/ (last visited Oct 4, 2020); *see also* Search: Acquisitions, CRUNCHBASE, https://www.crunchbase.com/ (last visited Oct 4, 2020).

**App. 479**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| TSO Logic | 2019 | Analytics, Cloud Computing, Cloud Management, Data Center, Software | -- |
| Tapzo | 2018 | E-Commerce, Mobile, Software | 40,000,000 |
| PillPack | 2018 | Pharmacy, E-Commerce | 753,000,000 |
| Ring | 2018 | Consumer Electronics, Security, Smart Home | -- |
| Immedia | 2018 | Semiconductors | -- |
| Sqrrl | 2018 | Cybersecurity | 40,000,000 |
| Dispatch | 2017 | Robotics | -- |
| Blink | 2017 | Consumer Electronics, Electronics, Hardware, Security | 90,000,000 |
| Goo Technologies | 2017 | 3D Technology, Internet, Software, Web Development | -- |
| Body Labs | 2017 | 3D Technology, Artificial Intelligence, Computer Vision, Developer APIs, Machine Learning | 50,000,000 |
| Wing | 2017 | Information Technology, Logistics, Mobile, SaaS | -- |
| GameSparks | 2017 | E-Commerce, Mobile, Software | 10,000,000 |
| Graphiq | 2017 | Artificial Intelligence, Big Data, Data Visualization, Market Research, Search Engine, Semantic Web | 50,000,000 |

**App. 480**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Souq.com | 2017 | Consumer Electronics, E-Commerce, Shopping | 580,000,000 |
| Whole Foods | 2017 | Food and Beverage, Grocery, Organic Food | 13,700,000,000 |
| Do.com | 2017 | Internet, Meeting Software, Software | -- |
| Thinkbox Systems | 2017 | Software | -- |
| Colis Privé | 2017 | Shipping & Delivery, Logistics | -- |
| Harvest.ai | 2017 | Artificial Intelligence, Cloud Security, Cyber Security, Predictive Analytics | 19,000,000 |
| Biba Systems | 2016 | Apps, Messaging, Mobile | -- |
| Partpic | 2016 | Photo Recognition | -- |
| Westland | 2016 | Publishing | -- |
| Curse Inc. | 2016 | Digital Media, Gaming, Video Games | -- |
| Cloud9 IDE | 2016 | Cloud Computing, Enterprise Software, Mobile, Open Source, Software | -- |
| Orbeus | 2016 | Artificial Intelligence, Photo Recognition | -- |
| NICE | 2016 | Cloud Infrastructure, Enterprise Software, Power Grid | -- |

**App. 481**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Emvantage Payments | 2016 | Mobile Payments, Payments | -- |
| Elemental Technologies | 2015 | Content Delivery Network, Enterprise Software, Video, Video Streaming | 500,000,000 |
| Safaba Translation Systems | 2015 | Software | -- |
| AppThwack | 2015 | Android, Cyber Security, iOS, Mobile, SaaS, Test and Measurement | -- |
| Shoefitr | 2015 | E-Commerce, Fashion, Personalization, Software | -- |
| ClusterK | 2015 | Software | -- |
| Amiato | 2015 | Analytics, Real Time, Service Industry | -- |
| 2lemetry | 2015 | Cloud Computing, IoT, Software | -- |
| Annapurna Labs | 2015 | Cloud Computing, Cloud Storage, Data Storage | 350,000,000 |
| GoodGame | 2014 | Video Games, Social Media | -- |
| Rooftop Media | 2014 | Content, Digital Entertainment, Audio | -- |
| ComiXology | 2014 | Cloud Data Services, Comics, Digital Entertainment, Digital Media, Reading Apps | -- |
| Twitch | 2014 | Social Media, Video, Video Games, Video Streaming | 970,000,000 |

**App. 482**

| Amazon | | | |
|---|---|---|---|
| Company | Year Acquired | Categories | Acquisition Value (USD) |
| Double Helix Games | 2014 | Developer Platform, PC Games, Video Games | -- |
| TenMarks Education | 2013 | E-Learning, EdTech, Education | -- |
| Liquavista | 2013 | Electronics, Hardware, Manufacturing, Software | -- |
| Goodreads | 2013 | E-Learning, Social Media | -- |
| INOVA Software | 2013 | Software | -- |
| UpNext | 2012 | 3D Mapping | -- |
| Evi | 2012 | Mobile, Search Engine | 26,000,000 |
| Avalon Books | 2012 | Books, Education | -- |
| Kiva Systems | 2012 | Hardware, Mobile, Robotics, Software | 775,000,000 |
| Teachstreet | 2012 | Charter Schools, Education | -- |
| Yap | 2011 | Artificial Intelligence, Audio, Messaging, Mobile, Speech Recognition, Telecommunications | -- |
| Pushbutton | 2011 | Content, Digital Entertainment, TV | -- |
| The Book Depository | 2011 | E-Commerce, Retail | -- |

**App. 483**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Toby Press | 2010 | Books | -- |
| Quidsi | 2010 | Beauty, Child Care, E-Commerce | 545,000,000 |
| BuyVIP | 2010 | E-Commerce, Marketing, Shopping | 96,500,000 |
| Amie Street | 2010 | Media and Entertainment, Music, Music Streaming | -- |
| Woot.com | 2010 | Electronics, Fashion, Wine And Spirits | 110,000,000 |
| Touchco | 2010 | Hardware, Software | -- |
| Zappos | 2009 | E-Commerce, Retail, Shoes | 1,200,000,000 |
| SnapTell | 2009 | Advertising, Marketing, Mobile | -- |
| Lexcycle | 2009 | iOS, Mobile, Software | -- |
| AbeBooks | 2008 | E-Commerce, Marketplace, Shopping | -- |
| Reflexive Entertainment | 2008 | Gaming, Mobile, Video Games | -- |
| Shelfari | 2008 | Social Media | -- |
| Box Office Mojo | 2008 | Analytics, Film, Media and Entertainment | -- |

**App. 484**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Fabric.com | 2008 | E-Commerce, Fashion, Retail | -- |
| LoveFilm | 2008 | Digital Entertainment, Gaming, Internet | 312,000,000 |
| Without A Box | 2008 | Video | -- |
| Audible | 2008 | Audio, Audiobooks, Digital Entertainment, E-Commerce, Media and Entertainment | 300,000,000 |
| Brilliance Audio | 2007 | E-Commerce | -- |
| Digital Photography Review | 2007 | E-Commerce, News, Publishing | -- |
| Text Pay Me | 2006 | Messaging, Payments | -- |
| Shopbop.com | 2006 | E-Commerce, Lifestyle, Shopping | -- |
| CustomFlix | 2005 | Digital Media, DVDs | -- |
| Small Parts Inc. | 2005 | 3D Printing, E-Commerce, Manufacturing, Retail | -- |
| MobiPocket | 2005 | Shopping | -- |
| Createspace | 2005 | Digital Media, Printing, Publishing | -- |
| Joyo.com | 2004 | E-Commerce, Internet, Music, Video | 75,000,000 |

**App. 485**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Egghead.com | 2002 | E-Commerce, Retail | 6,100,000 |
| OurHouse | 2001 | E-Commerce, Retail | -- |
| Leep Technology | 1999 | CRM, Information Technology, Software | -- |
| Back to Basics | 1999 | Internet, Toys, Video Games | -- |
| Tool Crib | 1999 | Tools, E-Commerce | -- |
| Convergence Corp. | 1999 | Enterprise Software, Internet, Wireless | 23,000,000 |
| Accept.com | 1999 | E-Commerce Platforms, Photography, Retail | 101,000,000 |
| Alexa | 1999 | Digital Marketing, SEO, Web Development | 250,000,000 |
| LiveBid | 1999 | Auctions | -- |
| Exchange.com | 1999 | Books, Music | -- |
| MindCorps | 1999 | Web Development, Consulting | -- |
| Bookpages | 1998 | E-Commerce, Internet | -- |
| Internet Movie Database (IMDb) | 1998 | Content, Media and Entertainment, TV | 55,000,000 |

**App. 486**

| Amazon | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Junglee | 1998 | E-Commerce, Retail, Shopping | 250,000,000 |
| PlanetAll | 1998 | Internet, Social Media, Web Development | -- |
| Telebook | 1998 | E-Commerce, Internet | -- |

B.   Apple

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Spaces | 2020 | AR/VR | -- |
| Mobeewave | 2020 | Software | 100,000,000 |
| Fleetsmith | 2020 | Software, Security | -- |
| NextVR | 2020 | AR/VR | 100,000,000 |
| Inductiv | 2020 | AI, Machine Learning, Software | -- |
| Voysis | 2020 | AI, Machine Learning, Software | -- |
| Dark Sky | 2020 | Software, Apps | -- |

**App. 487**

| Apple | | | |
|-------|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Xnor.ai | 2020 | AI, Machine Learning, Software | 200,000,000 |
| Spectral Edge | 2019 | Photography, Software, Artificial Intelligence | -- |
| iKinema | 2019 | Graphics, 3D Animation, Digital Media | -- |
| Intel Smartphone Modem Business | 2019 | Hardware | 1,000,000,000 |
| Drive.ai | 2019 | Autonomous Vehicles | -- |
| Tueo Health | 2019 | Health Care, Information Technology | -- |
| Laserlike | 2019 | Machine Learning | -- |
| Stamplay | 2019 | Cloud Computing, Data Integration, Developer Tools, SaaS, Sales Automation | 5,600,000 |
| DataTiger | 2019 | Marketing | -- |
| PullString | 2019 | Voice Recognition | -- |
| Platoon | 2018 | Talent Search/Acquisition | -- |
| Silk Labs | 2018 | AI, Machine Learning, Software | -- |
| Dialog | 2018 | Semiconductors | 300,000,000 |

415

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Shazam | 2018 | Android, iOS, Music, Audio Recognition | 400,000,000 |
| Akonia | 2018 | Glasses, AR | -- |
| Texture | 2018 | Content, Digital Entertainment, Digital Media | -- |
| Buddybuild | 2018 | Developer Tools, Mobile, Software | -- |
| Pop Up Archive | 2017 | Audio, Podcasts, Software | -- |
| Spektral | 2017 | Photography, Software, AR | 30,000,000 |
| InVisage | 2017 | Photography, Software | -- |
| Vrvana | 2017 | Computer, Hardware, Information Technology, Virtual Reality | 30,000,000 |
| Init.ai | 2017 | Artificial Intelligence, B2B, Developer Platform, Developer Tools, Machine Learning, Messaging, Natural Language Processing, Virtual Assistant | -- |
| PowerbyProxi | 2017 | Consumer Electronics, Industrial, Wireless | -- |
| Regaind | 2017 | Artificial Intelligence, Computer Vision, Photo Sharing, Photography | -- |
| SensoMotoric Instruments | 2017 | Computer Vision, Image Recognition, Psychology, Software | -- |

**App. 489**

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Beddit | 2017 | Fitness, Health Care, Wellness | -- |
| Lattice Data | 2017 | Big Data, Information Technology, Machine Learning | 200,000,000 |
| Workflow | 2017 | Mobile, Productivity Tools, Software | -- |
| RealFace | 2017 | Facial Recognition | -- |
| Indoor.io | 2016 | Mapping Services, Navigation, Service Industry, Internet | -- |
| Tuplejump | 2016 | Analytics, Artificial Intelligence, Big Data, Data Visualization, Machine Learning, Software | -- |
| Turi | 2016 | Analytics, Artificial Intelligence, Big Data, Machine Learning, Software | 200,000,000 |
| Gliimpse | 2016 | Health Care, Information Technology | -- |
| Emotient | 2016 | Artificial Intelligence, Machine Learning, Software, Video | -- |
| LearnSprout | 2016 | Analytics, Big Data, EdTech, Education, Predictive Analytics | -- |
| Flyby Media | 2016 | Augmented Reality, Computer Vision, Internet, Location Based Services, Mobile, Social Media, Video | -- |
| Faceshift | 2015 | Broadcasting, Content Creators, Digital Media, Facial Recognition, Information Technology, Video Conferencing | -- |

**App. 490**

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| LegbaCore | 2015 | Consulting, Information Technology, Security | -- |
| VocalIQ | 2015 | Artificial Intelligence, Audio, Automotive, Machine Learning, Mobile, Wearables | -- |
| Perceptio | 2015 | Artificial Intelligence, Digital Media, Machine Learning | -- |
| Mapsense | 2015 | Geospatial, Location Based Services, Web Hosting | 25,000,000 |
| Coherent Navigation | 2015 | Apps, Software | -- |
| Metaio | 2015 | Advertising, Augmented Reality, Mobile, Software | -- |
| LinX | 2015 | Mobile, Social Media | 20,000,000 |
| Dryft | 2015 | Hardware, Software | -- |
| FoundationDB | 2015 | Analytics, Database, Enterprise Software | -- |
| Camel Audio | 2015 | Audio, Music | -- |
| Semetric | 2015 | Analytics, Content Discovery, Predictive Analytics | 50,000,000 |
| Prss | 2014 | iOS, Publishing | -- |
| Beats Electronics | 2014 | Consumer Electronics, Hardware, Manufacturing, Media and Entertainment, Music, Software | 3,000,000,000 |

**App. 491**

| Apple | | | |
|-------|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| BookLamp | 2014 | Content Discovery, Reading Apps, Software | -- |
| Spotsetter | 2014 | Big Data, Social Media | -- |
| Swell | 2014 | Content Discovery, Machine Learning, Mobile, Personalization | 30,000,000 |
| LuxVue Technologies | 2014 | Consumer Electronics, Hardware, Software | -- |
| Burstly | 2014 | Advertising, Analytics, iOS, Mobile Advertising | -- |
| SnappyLabs | 2014 | Photography | -- |
| Acunu | 2013 | Analytics, Big Data, Software | -- |
| Topsy | 2013 | Analytics, Internet, Real Time, Search Engine, Social Media | 200,000,000 |
| BroadMap | 2013 | Geospatial, Software | -- |
| PrimeSense | 2013 | 3D Technology, Consumer Electronics, Hardware | 345,000,000 |
| Cue | 2013 | Internet, Mobile Apps | 35,000,000 |
| Passif Semiconductor | 2013 | Manufacturing, Semiconductor, Wireless | -- |
| Matcha | 2013 | Content, Online Portals, Video | -- |

**App. 492**

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Embark | 2013 | Mobile, Mobile Apps, Public Transportation | -- |
| AlgoTrim | 2013 | Mobile | -- |
| Catch.com | 2013 | Android, iOS, Mobile | -- |
| Locationary | 2013 | Analytics, Crowdsourcing, Location Based Services | -- |
| HopStop.com | 2013 | Android, iOS, Navigation | -- |
| OttoCat | 2013 | Apps, Internet, Mobile | -- |
| WiFiSlam | 2013 | Location Based Services, Mobile, Wireless | 20,000,000 |
| Novauris Technologies | 2013 | Information Services, Mobile, VoIP | -- |
| Anobit | 2012 | Electronics, Flash Storage, Semiconductor | 390,000,000 |
| Chomp | 2012 | Mobile | 50,000,000 |
| AuthenTec | 2012 | Biometrics, Cyber Security, Identity Management, NFC, Security, Semiconductor, Sensors | 356,000,000 |
| Particle | 2012 | Developer Platform, Mobile, Web Development | -- |
| Redmatica | 2012 | Music, Music Streaming | -- |

420

**App. 493**

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| C3 Technologies | 2011 | Assistive Technology, Enterprise Software, Information Technology | 240,000,000 |
| Quattro Wireless | 2010 | Ad Network, Advertising, Advertising Platforms, Mobile, Publishing | 275,000,000 |
| Intrinsity | 2010 | Manufacturing, Mobile, Semiconductor | 121,000,000 |
| Siri | 2010 | Consumer Electronics, iOS, Software, Virtualization | -- |
| Gipsy Moth Studios | 2010 | App Localization | -- |
| Poly9 | 2010 | Geospatial, Software | -- |
| Polar Rose | 2010 | Internet, Browser Extensions, Image Recognition, Photography | 22,000,000 |
| IMSense | 2010 | Image Recognition, Photography, Software | -- |
| Placebase | 2009 | Database, Developer APIs, Developer Tools | -- |
| Lala | 2009 | Internet, Music, Music Streaming | 17,000,000 |
| P.A. Semi | 2008 | Electronics, Manufacturing, Semiconductor | 278,000,000 |
| Silicon Color | 2006 | Film, Software, Video | -- |
| Proximity | 2006 | Media Asset Management | -- |

**App. 494**

| Apple | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| SchemaSoft | 2005 | Software | -- |
| FingerWorks | 2005 | Hardware, Human Computer Interaction, Software | -- |
| Nothing Real | 2002 | Software | -- |
| Zayante | 2002 | Software | 13,000,000 |
| Emagic | 2002 | Software | 30,000,000 |
| Prismo Graphics | 2002 | Robotics, Software, Video | 20,000,000 |
| Silicon Grail Corp-Chalice | 2002 | Software | 20,000,000 |
| Propel Software | 2002 | Computer, Internet, Software | -- |
| PowerSchool | 2001 | EdTech, Education, SaaS, Software | 62,000,000 |
| Spruce Technologies | 2001 | Information Technology | 15,000,000 |
| Bluebuzz | 2001 | Internet Service Provider | -- |
| Bluefish Labs | 2001 | Database, Mobile Apps, Web Apps | -- |
| Astarte | 2000 | DVD Authoring | -- |

**App. 495**

| Apple | | | |
|-------|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| NetSelector | 2000 | Information Technology, Internet, Software | -- |
| SoundJam MP | 2000 | MP3 Player, Audio Player, Software | -- |
| Raycer Graphics | 1999 | 3D Technology, Graphic Design, Information Technology | 15,000,000 |
| Xemplar Education | 1999 | Education | 5,000,000 |
| NeXT | 1997 | Education, Hardware, Software | 404,000,000 |
| Power Computing Corp. | 1997 | Manufacturing, Software | 100,000,000 |
| Coral Software | 1989 | Artificial Intelligence, Information Technology, Software | -- |
| Nashoba Systems | 1988 | Software | -- |
| Network Innovations | 1988 | Information Technology, Software, Virtualization | -- |
| Orion Network Systems | 1988 | Communications Infrastructure, Satellite Communication | -- |
| Styleware | 1988 | Internet, IoT, Software, Web Hosting | -- |

C.     Facebook

**App. 496**

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Giphy | 2020 | Software | 400,000,000 |
| Ready at Dawn | 2020 | VR, Video Games | -- |
| Mapillary | 2020 | Software, Mapping | -- |
| Sanzaru Games | 2020 | VR, Video Games | -- |
| Scape Technologies | 2020 | AR/VR, Computer Vision, Software | 40,000,000 |
| PlayGiga | 2019 | Digital Media, Video Games | -- |
| Beat Games | 2019 | VR, Video Games | -- |
| Packagd | 2019 | E-Commerce, Shopping | -- |
| GrokStyle | 2019 | Artificial Intelligence | -- |
| CTRL-labs | 2019 | Augmented Reality | -- |
| Servicefriend | 2019 | AI, Messaging | -- |
| Chainspace | 2019 | Apps, Blockchain, Information Technology | -- |
| Vidpresso | 2018 | Broadcasting, Software | -- |

**App. 497**

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Redkix | 2018 | Productivity, Enterprise Collaboration | -- |
| Bloomsbury AI | 2018 | AI, Machine Learning | 30,000,000 |
| Confirm.io | 2018 | Identity Management | -- |
| Tbh | 2017 | iOS, Mobile Apps, Social, Social Media | -- |
| Fayteq | 2017 | Software | -- |
| Source3 | 2017 | Content Rights Management | -- |
| Ozlo | 2017 | Artificial Intelligence, Computer, Information Services, Mobile | -- |
| Zurich Eye | 2017 | AR/VR, Computer Vision, Robotics | -- |
| CrowdTangle | 2016 | Brand Marketing, Non-Profit, Social Media | -- |
| FacioMetrics | 2016 | Machine Learning, Mobile Apps, Social Media, Software | -- |
| InfiniLED | 2016 | Lighting, Hardware | -- |
| Nascent Objects | 2016 | Manufacturing, Product Design, Software | -- |
| Two Big Ears | 2016 | Audio, Consumer Electronics, Software, Virtual Reality | -- |

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Masquerade | 2016 | Consumer Applications, Mobile, Photo Editing | -- |
| Endaga | 2015 | Communications Infrastructure, Impact Investing, Infrastructure, Mobile, Telecommunications | -- |
| Pebbles Interfaces | 2015 | Digital Media, Hardware, Mobile | 60,000,000 |
| Surreal Vision | 2015 | Software | -- |
| TheFind | 2015 | Coupons, E-Commerce, Lifestyle, Local, Mobile, Search Engine, Shopping | -- |
| QuickFire Networks | 2015 | Cloud Data Services, Video | -- |
| Wit.ai | 2015 | Artificial Intelligence, Computer, Developer APIs, Machine Learning, Software | -- |
| WaveGroup Sound | 2014 | Music, Product Design | -- |
| PRYTE | 2014 | Mobile Devices, Emerging Markets | -- |
| PrivateCore | 2014 | Cyber Security, Security | -- |
| LiveRail | 2014 | Advertising, Enterprise Software, Video | 500,000,000 |
| ProtoGeo Oy | 2014 | Mobile | -- |
| Ascenta | 2014 | Aerospace, Manufacturing | 20,000,000 |

**App. 499**

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| WhatsApp | 2014 | Android, Messaging, Mobile, Subscription Service | 19,000,000,000 |
| Oculus VR | 2014 | Augmented Reality, Consumer Electronics, Hardware, Video Games, Virtual Reality, Virtualization | 2,000,000,000 |
| Branch | 2014 | Internet, Messaging, Social | 15,000,000 |
| Little Eye Labs | 2014 | Android, Mobile, Test and Measurement | 15,000,000 |
| SportStream | 2013 | Consumer Electronics, Mobile, Sports | -- |
| Onavo | 2013 | Finance, Mobile, Social Network | -- |
| Jibbigo | 2013 | Apps, Audio, Big Data, Language Learning, Mobile | -- |
| Monoidics | 2013 | Analytics, Enterprise Software, Information Technology | -- |
| Parse | 2013 | Android, Cloud Computing, Enterprise Software, iOS, Mobile, PaaS | 85,000,000 |
| Hot Studio | 2013 | Internet, Social Media, Web Design | -- |
| Spaceport | 2013 | Gaming, Mobile, Mobile Devices, Online Games, Web Development | -- |
| Atlas Solutions | 2013 | Advertising, Advertising Platforms, Internet | 100,000,000 |

**App. 500**

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Osmeta | 2013 | Hardware, Software | -- |
| Storylane | 2013 | Social Media | -- |
| Threadsy | 2012 | Messaging, Social Media, Social Network | -- |
| Spool | 2012 | Enterprise Software, Mobile, Social Bookmarking, Video | -- |
| Acrylic Software | 2012 | Software | -- |
| Karma | 2012 | Gifts, Mobile, Social | -- |
| Face.com | 2012 | Artificial Intelligence, Cloud Storage, Facial Recognition, Machine Learning, Photography, Social Network | 100,000,000 |
| TagTile | 2012 | Direct Marketing, Loyalty Programs, Mobile, Social Media | -- |
| Glancee | 2012 | Android, Dating, iOS, Location Based Services, Mobile, Public Relations, Search Engine | -- |
| Lightbox.com | 2012 | Android, Mobile, Photo Sharing | -- |
| Instagram | 2012 | Mobile, Photo Sharing, Photography, Social Media | 1,000,000,000 |
| Caffeinated Mind | 2012 | File Transfer, Big Data | -- |

**App. 501**

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Gowalla | 2011 | Location Based Services, Photography, Private Social Networking, Travel, Internet | -- |
| Strobe | 2011 | iOS, Mobile, Software, Web Development | -- |
| Friend.ly | 2011 | Blogging Platforms, Social Media | -- |
| Push Pop Press | 2011 | Advertising, Digital Media, Marketing | -- |
| MailRank | 2011 | Email, CRM, Information Technology, Software | -- |
| DayTum | 2011 | Analytics, Big Data, Database | -- |
| Sofa | 2011 | Developer Tools, Software | -- |
| RecRec | 2011 | Computer Vision | -- |
| Beluga | 2011 | Messaging, Mobile, Social Media | -- |
| Rel8tion | 2011 | Advertising, Advertising Platforms | -- |
| Snaptu | 2011 | Mobile | 70,000,000 |
| ShareGrove | 2010 | Real Time, Social Network, Web Hosting | -- |
| Drop.io | 2010 | EdTech, Education, Email, File Sharing, Finance, FinTech, Flash Storage, Mobile | 10,000,000 |

429

| Facebook | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Hot Potato | 2010 | Social, Social Media, Social Media Marketing | 10,000,000 |
| Nextstop | 2010 | Digital Entertainment, Social, Travel | 2,500,000 |
| Chai Labs | 2010 | Software | 10,000,000 |
| Zenbe | 2010 | Android, Email, Location Based Services, Messaging, Mobile, Software, Web Apps | -- |
| Divvyshot | 2010 | Photo Sharing, Social Network, Web Hosting | -- |
| Octazen | 2010 | Enterprise Software, Social Network, Web Browsers | -- |
| FriendFeed | 2009 | Social Media | 47,500,000 |
| ConnectU | 2009 | Social Media | -- |
| Parakey | 2007 | Social Media, Web Browsers, WebOS | -- |
| AboutFace | 2007 | Internet | -- |

**App. 503**

D.    Google

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Stratozone | 2020 | Cloud, Platform Migration | -- |
| North | 2020 | Hardware, Glasses | 180,000,000 |
| Looker | 2020 | Big Data, Analytics | 2,600,000,000 |
| Cornerstone Technology | 2020 | Cloud, Platform Migration | -- |
| AppSheet | 2020 | Enterprise Software | -- |
| Pointy | 2020 | Software, Inventory | 163,000,000 |
| Fitbit | 2019 | User Data, Mobile Devices, Fitness Tracking, Health Care | 2,100,000,000 |
| Typhoon Studios | 2019 | Video Games, Video Streaming | -- |
| CloudSimple | 2019 | Cloud | -- |
| Elastifile | 2019 | Cloud, Storage | -- |
| Nightcorn | 2019 | Internet, Social Media, Video Streaming | -- |
| Alooma | 2019 | Data Integration, Cloud, Platform Migration | -- |

**App. 504**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Superpod | 2019 | Software | 60,000,000 |
| DevOps Research and Assessment | 2018 | Cloud | -- |
| Sigmoid Labs | 2018 | Software | -- |
| Workbench | 2018 | Software, Education | -- |
| Onward | 2018 | AI, Customer Service, Sales | -- |
| GraphicsFuzz | 2018 | Graphics Drivers, Security | -- |
| Velostrata | 2018 | Cloud Migration, Data Centers | -- |
| Cask Data | 2018 | Big Data, Analytics | -- |
| Lytro | 2018 | Photography, Film, Hardware, VR | -- |
| Tenor | 2018 | Messaging, Social Media, Video | -- |
| Socratic | 2018 | AI, Software | -- |
| Xively | 2018 | Enterprise Software, IoT, SaaS | -- |
| Redux | 2018 | Speakers, Mobile Devices | -- |

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| HTC Smartphone Division | 2018 | Consumer Electronics, Manufacturing, Mobile | 1,100,000,000 |
| Banter | 2017 | Mobile Software, Messaging | -- |
| Relay Media | 2017 | Analytics | -- |
| 60db | 2017 | Audio, Media and Entertainment, Social Media, Video Streaming | -- |
| Bitium | 2017 | Cloud Computing, Cyber Security, Identity Management, SaaS, Security, Software | -- |
| AIMatter | 2017 | Artificial Intelligence, Computer Vision, Software | -- |
| Senosis Health | 2017 | Health, Mobile Device, Software | -- |
| Halli Labs | 2017 | Artificial Intelligence, Machine Learning, Software Engineering | -- |
| Owlchemy Labs | 2017 | Gaming, Software Engineering, Virtual Reality | -- |
| Kaggle | 2017 | Analytics, Big Data, Data Mining, News, Predictive Analytics | -- |
| AppBridge | 2017 | Apps, Data Storage, Google | -- |
| Crashlytics | 2017 | Android, iOS, Mobile, SaaS | -- |
| Fabric | 2017 | Cloud Infrastructure, Developer APIs, Developer Tools, Enterprise Software, Mobile Apps, Real Time | -- |

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Limes Audio | 2017 | Audio, Communication Hardware, Telecommunications | -- |
| Cronologics | 2016 | Hardware, Software, Wearables | -- |
| LeapDroid | 2016 | Software | -- |
| Qwiklabs | 2016 | Cloud Computing, Information Technology, Software | -- |
| FameBit | 2016 | Internet, Music, Video | -- |
| Eyefluence | 2016 | Consumer Electronics, Manufacturing, Wearables | -- |
| Apigee | 2016 | Cloud Data Services, Enterprise Software, Information Technology | 625,000,000 |
| Urban Engines | 2016 | Analytics, Big Data, GovTech, Mobile, Software, Transportation | -- |
| Api.ai | 2016 | Natural Language Processing, Voice Recognition | -- |
| Orbitera | 2016 | Analytics, Cloud Computing, E-Commerce, Marketing Automation, SaaS, Software | 100,000,000 |
| Apportable | 2016 | Developer Tools, Enterprise Software, Mobile, iOS | -- |
| Moodstocks | 2016 | Artificial Intelligence, Hardware, Image Recognition, Machine Learning, Mobile, QR Codes, Real Time, Visual Search | -- |

**App. 507**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Anvato | 2016 | Software, Video Conferencing, Video Streaming | -- |
| Kifi | 2016 | Analytics, Artificial Intelligence, Big Data, Content Discovery, Knowledge Management | -- |
| LaunchKit | 2016 | Developer Tools, Mobile Apps | -- |
| Webpass | 2016 | Internet, ISP, Wireless | -- |
| Synergyse | 2016 | Apps, Search Engine, Software, Training | -- |
| BandPage | 2016 | Consumer, Facebook, Marketplace, Music | -- |
| Pie | 2016 | Automotive, Incubators | -- |
| Fly Labs | 2015 | iOS | -- |
| Bebop | 2015 | Business Development, Enterprise, Enterprise Software | 380,000,000 |
| Digisfera | 2015 | Images | -- |
| Oyster | 2015 | Email, Web Design, Web Hosting | -- |
| Jibe Mobile | 2015 | File Sharing, Messaging, Mobile, Social Media | -- |
| Pixate | 2015 | Computer, Enterprise Software, Mobile | -- |

**App. 508**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Timeful | 2015 | Analytics, Artificial Intelligence, Database, Machine Learning, Task Management | -- |
| Pulse.io | 2015 | Apps, Mobile | -- |
| Thrive Audio | 2015 | Audio, 3D Technology | -- |
| Skillman & Hackett | 2015 | Software, Virtual Reality | -- |
| Launchpad Toys | 2015 | Apps, Education, iOS | -- |
| Odysee | 2015 | Enterprise Software, Mobile Apps, Photo Sharing | -- |
| Softcard | 2015 | Apps, Mobile Payments | -- |
| Red Hot Labs | 2015 | Advertising Platforms, Apps, Mobile, Software | -- |
| Granata Decision Systems | 2015 | Analytics, Artificial Intelligence, Machine Learning | -- |
| Vidmaker | 2014 | Collaboration, Social Media, Video | -- |
| Lumedyne Technologies | 2014 | Consumer Electronics, Information Technology, Semiconductors | -- |
| RelativeWave | 2014 | Apps, Developer Tools | -- |
| Agawi | 2014 | EdTech, Gaming, Mobile Apps, Mobile Devices | -- |

**App. 509**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Firebase | 2014 | Cloud Infrastructure, Developer APIs, Developer Tools, Enterprise Software, Mobile Apps, Real Time | -- |
| Dark Blue Labs | 2014 | Artificial Intelligence, Data Visualization, Machine Learning | -- |
| Vision Factory | 2014 | Artificial Intelligence, Computer Vision, Machine Learning, Search Engine, Software | -- |
| Revolv | 2014 | Internet of Things, Smart Home, Software | -- |
| Lift Labs | 2014 | Hardware, Health Care, Medical, Software | -- |
| Polar | 2014 | Fitness, Health Care, Wearables | -- |
| Skybox Imaging | 2014 | Cloud Security, Cyber Security, Enterprise Software, Network Security, Security, Software | 500,000,000 |
| Emu | 2014 | E-Commerce | -- |
| Directr | 2014 | Energy, Solar | -- |
| Jetpac | 2014 | AI, ML | -- |
| Gecko Design | 2014 | Product Design | -- |
| Zync Render | 2014 | Digital Media, Flash Storage, Social Media | -- |
| Dropcam | 2014 | Consumer Electronics, Hardware, SaaS | 555,000,000 |

**App. 510**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Songza | 2014 | Music | -- |
| DrawElements | 2014 | Enterprise Software | -- |
| mDialog | 2014 | Advertising, Information Technology, Video Streaming | -- |
| Aplental Technologies | 2014 | Information Technology, Wireless | -- |
| Baarzo | 2014 | Video, Search | -- |
| Appurify | 2014 | Android, Apps, iOS, Mobile, Test and Measurement | -- |
| Rangespan | 2014 | Analytics, E-Commerce, Supply Chain Management | -- |
| Adometry | 2014 | Advertising, Analytics, SaaS | -- |
| Appetas | 2014 | Network Security, Restaurants, SaaS | -- |
| Stackdriver | 2014 | Apps, Cloud Computing, Enterprise Software, Infrastructure | -- |
| Quest Visual | 2014 | Data Visualization, iOS, Software | -- |
| Gridcentric | 2014 | Software, Virtualization | -- |
| Divide | 2014 | Enterprise Software, Information Technology, Mobile, SaaS, Software | -- |

**App. 511**

| Google | | | |
|--------|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Titan Aerospace | 2014 | Aerospace, Manufacturing | -- |
| GreenThrottle | 2014 | Console Games, Consumer Electronics, Mobile | -- |
| Nest Labs | 2014 | Sensor, Manufacturing, Smart Home | 3,200,000,000 |
| SlickLogin | 2014 | Mobile, Mobile Apps, Security | -- |
| Spider.io | 2014 | Advertising, Analytics, Fraud Detection, Internet, Security | -- |
| Bitspin | 2014 | Apps, Web Development | -- |
| Impermium | 2014 | Security | -- |
| DeepMind Technologies | 2014 | AI, ML | 500,000,000 |
| Flutter | 2013 | Content, Software | 40,000,000 |
| FlexyCore | 2013 | Software | 23,000,000 |
| Calico | 2013 | Biotech, Genetics, Health Care | -- |
| Bump | 2013 | Mobile, Contact Sharing | -- |
| WIMM Labs | 2012 | Hardware, Software, Wearables | -- |

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Waze | 2013 | Mobile Apps, Navigation, Transportation | 966,000,000 |
| Makani Power | 2013 | Energy | -- |
| MyEnergy | 2013 | Clean Energy, Energy Efficiency | -- |
| Behavio | 2013 | Software | -- |
| Wavii | 2013 | ML, AI | 30,000,000 |
| Channel Intelligence | 2013 | Manufacturing, Product Search, Shopping | 125,000,000 |
| DNNresearch | 2013 | AI | -- |
| Talaria Technologies | 2013 | Software, Web Design, Web Development | -- |
| Schaft | 2013 | Hardware, Robotics | -- |
| Industrial Perception | 2013 | AI | -- |
| Redwood Robotics | 2013 | Robotics | -- |
| Meka Robotics | 2013 | Robotics | -- |
| Holomni | 2013 | Mobile, Robots | -- |

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Bot & Dolly | 2013 | Software, Robotics | -- |
| Autofuss | 2013 | Product Design | -- |
| Incentive Targeting | 2012 | Public Relations, Retail | -- |
| BufferBox | 2012 | E-Commerce, Marketplace, Shopping | 17,000,000 |
| Viewdle | 2012 | Analytics, Augmented Reality, Computer Vision, Mobile, Facial Recognition | 45,000,000 |
| VirusTotal.com | 2012 | Security | -- |
| Nik Software | 2012 | Image Recognition, Software | -- |
| Sparrow | 2012 | Email, Messaging | 25,000,000 |
| Wildfire Interactive | 2012 | Consulting, Content, Data Integration, Developer Tools | 450,000,000 |
| Cuban Council | 2012 | Consulting, Consumer Electronics, Search Engine | -- |
| Meebo | 2012 | Internet, Messaging, Web Development | 100,000,000 |
| Quickoffice | 2012 | Enterprise Software, iOS, Mobile | -- |
| TxVia | 2012 | Finance, FinTech, Mobile, PaaS | -- |

**App. 514**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Milk, Inc | 2012 | Apps, Mobile, Software | -- |
| RightsFlow | 2011 | Accounting, Music, Legal | -- |
| Clever Sense | 2011 | ML, AI | -- |
| Apture | 2011 | Advertising | -- |
| Katango | 2011 | Social Media | -- |
| Anthony's Robots | 2011 | Autonomous Vehicles | -- |
| 510 Systems | 2011 | Autonomous Vehicles, Software | -- |
| SocialGrapple | 2011 | Analytics, Social Media | -- |
| Zave Networks | 2011 | Apps, Mobile | -- |
| Zagat | 2011 | Consumer Reviews | 151,000,000 |
| DailyDeal | 2011 | Beauty, Shopping | 114,000,000 |
| Dealmap | 2011 | Coupons, Local, Mobile, Search Engine, Social Media | -- |
| Motorola Mobility | 2011 | Mobile Apps | 12,500,000,000 |

**App. 515**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Punchd | 2011 | Android, iOS, Loyalty Programs, Mobile | -- |
| Fridge | 2011 | Photo Sharing | -- |
| PittPatt | 2011 | Facial Recognition | -- |
| PostRank | 2011 | Analytics, Social Media, Test and Measurement | -- |
| Admeld | 2011 | Advertising, Auctions, Software | 400,000,000 |
| SageTV | 2011 | Digital Entertainment, Events, Media and Entertainment | -- |
| Modu | 2011 | Mobile, Telecommunications, Wireless | -- |
| Sparkbuy | 2011 | Consumer Electronics, E-Commerce, Shopping | -- |
| PushLife | 2011 | Digital Media, E-Commerce, Mobile | 25,000,000 |
| ITA Software | 2011 | Information Technology | 676,000,000 |
| TalkBin | 2011 | Messaging | -- |
| BeatThatQuote.com | 2011 | Auto Insurance, E-Commerce, Price Comparison | 65,000,000 |
| Next New Networks | 2011 | Video, Video Streaming | -- |

**App. 516**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Green Parrot Pictures | 2011 | Digital Media, Enterprise Software, Video | -- |
| Zynamics | 2011 | Security | -- |
| eBook Technologies | 2011 | Content, E-Books | -- |
| SayNow | 2011 | Messaging, Social Network, Telecommunications | -- |
| Phonetic Arts | 2010 | Software | -- |
| Widevine Technologies | 2010 | Digital Entertainment, Digital Media, Video | -- |
| Zetawire | 2010 | Mobile Payments, NFC | -- |
| BlindType | 2010 | Mobile | -- |
| Plannr | 2010 | Mobile | -- |
| Quiksee | 2010 | Digital Media | 10,000,000 |
| MentorWave Technologies | 2010 | Software, 3D Visualization | -- |
| Slide.com | 2010 | Developer Tools, Software | 228,000,000 |
| Jambool | 2010 | Apps, Internet | 70,000,000 |

**App. 517**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Like.com | 2010 | Image Recognition | 100,000,000 |
| Angstro | 2010 | Enterprise Software, Facebook, Social Network | -- |
| SocialDeck | 2010 | Mobile, Social Website | -- |
| Metaweb | 2010 | Database, Infrastructure | -- |
| Invite Media | 2010 | Advertising | 81,000,000 |
| Instantiations | 2010 | Software | -- |
| Global IP Solutions | 2010 | Software | 68,200,000 |
| Simplify Media | 2010 | Digital Entertainment, Digital Media, Mobile | -- |
| Ruba.com | 2010 | Guides, Internet | -- |
| PinkArt | 2010 | Software | -- |
| Agnilux | 2010 | Hardware | -- |
| LabPixies | 2010 | Software | -- |
| BumpTop | 2010 | Software | 30,000,000 |

**App. 518**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Picnik | 2010 | Photosharing | -- |
| DocVerse | 2010 | Document Management | 25,000,000 |
| Episodic | 2010 | Broadcasting, Internet | -- |
| reMail | 2010 | Email, Messaging, Mobile Apps | -- |
| Aardvark | 2010 | Internet, Search Engine, Social | 50,000,000 |
| AdMob | 2009 | Ad Network, Advertising, Apps, Marketing, Mobile | 750,000,000 |
| Gizmo5 | 2009 | Public Relations, VoIP | 30,000,000 |
| Teracent | 2009 | Advertising, Machine Learning | -- |
| AppJet | 2009 | Software, Web Development | -- |
| reCAPTCHA | 2009 | Security | -- |
| On2 | 2009 | Content, Internet, SaaS, Software, Video | 133,000,000 |
| Eluceon Research | 2009 | Internet, Software | -- |
| TNC | 2008 | Google, Web Browsers, Web Hosting | -- |

**App. 519**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Begun | 2008 | Advertising | -- |
| Omnisio | 2008 | File Sharing, Video | 15,000,000 |
| Jaiku | 2007 | Mobile | -- |
| Zingku | 2007 | Digital Media, Social Media, Social Network | -- |
| Postini | 2007 | Cyber Security, Internet, Security | 625,000,000 |
| ImageAmerica | 2007 | Software, Document Scanning | -- |
| FeedBurner | 2007 | Blogging Platforms, Internet, Podcast | 100,000,000 |
| PeakStream | 2007 | Apps, Developer APIs, GPU, Software | -- |
| Zenter | 2007 | Content, E-Commerce, Web Hosting | -- |
| GrandCentral | 2007 | Mobile, Telecommunications, VoIP | 45,000,000 |
| GreenBorder | 2007 | Computer, Internet, Software | -- |
| Panoramio | 2007 | Photo Sharing, Photography, Social Media | -- |
| Crusix | 2007 | Social Networking | -- |

**App. 520**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| DoubleClick | 2007 | Advertising | 3,100,000,000 |
| Tonic Systems | 2007 | Web Development | -- |
| Marratech | 2007 | Software, Video Conferencing | 15,000,000 |
| Trendalyzer | 2007 | Visual Statistics, Data Visualization, Software | -- |
| Adscape | 2007 | Advertising, Digital Media, Marketing | 23,000,000 |
| Endoxon | 2006 | Information Technology | 28,000,000 |
| JotSpot | 2006 | Collaboration, Enterprise Software, Software | -- |
| YouTube | 2006 | Internet, Music, Video | 1,650,000,000 |
| Neven Vision | 2006 | Software | -- |
| 2Web Technologies | 2006 | Software | -- |
| Orion | 2006 | Content, Search Engine, Web Hosting | -- |
| Upstartle | 2006 | Software | -- |
| @Last Software | 2006 | 3D Technology, Developer Tools | -- |

**App. 521**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| Measure Map | 2006 | Advertising, Analytics, Big Data | -- |
| dMarc Broadcasting | 2006 | Advertising, Advertising Platforms, Internet Radio | 102,000,000 |
| Phatbits | 2005 | XML Desktop Applications | -- |
| allPAY GmbH | 2005 | Mobile | -- |
| bruNET GmbH | 2005 | Digital Entertainment, Social Media | -- |
| Skia | 2005 | Graphic Design | -- |
| Akwan Information Technologies | 2005 | Information Technology, IT Management, Search Engine | -- |
| Android | 2005 | Linux, Mobile, Search Engine | 50,000,000 |
| Reqwireless | 2005 | Wireless | -- |
| Dodgeball | 2005 | Mobile Devices, Software | -- |
| Urchin Software Corporation | 2005 | Software | -- |
| Where 2 Technologies | 2004 | Software | -- |
| Keyhole | 2004 | Geospatial, Software | -- |

449

**App. 522**

| Google | | | |
|---|---|---|---|
| **Company** | **Year Acquired** | **Categories** | **Acquisition Value (USD)** |
| ZipDash | 2004 | Automotive, E-Commerce, Mobile, Real Time, Travel | -- |
| Picasa | 2004 | Photos, Photo Editing | -- |
| Ignite Logic | 2004 | Internet, Software, Web Design | -- |
| Sprinks | 2003 | Online Advertising | -- |
| Genius Labs | 2003 | Developer APIs, Developer Tools, Software | -- |
| Neotonic Software | 2003 | CRM, Software | -- |
| Applied Semantics | 2003 | Developer APIs, Enterprise Software, Mobile Apps | 102,000,000 |
| Kaltix | 2003 | SEO, Web Hosting | -- |
| Pyra Labs | 2003 | Blogging Platforms, Developer APIs, Developer Tools, Enterprise Software, Project Management, Social Media | -- |
| Outride | 2001 | Energy, Information Technology, Online Portals | -- |
| Deja | 2001 | Information Technology, Internet, Web Development | -- |

**App. 523**

Sign Up

Email or Phone    Password    Log In

Forgot account?

1. The services we provide

2. How our services are funded

3. Your commitments to Facebook and our community

4. Additional provisions

5. Other terms and policies that may apply to you

  Facebook Ads Controls

  Privacy Basics

  Cookies Policy

  Data Policy

  More Resources
  • View a printable version of the Terms of Service

# Terms of Service

Welcome to Facebook!

Facebook builds technologies and services that enable people to connect with each other, build communities, and grow businesses. These Terms govern your use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software we offer (the Facebook Products or Products), except where we expressly state that separate terms (and not these) apply. These Products are provided to you by Facebook, Inc.

We don't charge you to use Facebook or the other products and services covered by these Terms. Instead, businesses and organizations pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think will be relevant to you and your interests. We use your personal data to help determine which ads to show you.

We don't sell your personal data to advertisers, and we don't share information that directly identifies you (such as your name, email address or other contact information) with advertisers unless you give us specific permission. Instead, advertisers can tell us things like the kind of audience they want to see their ads, and we show those ads to people who may be interested. We provide advertisers with reports about the performance of their ads that help them understand how people are interacting with their content. See Section 2 below to learn more.

Our Data Policy explains how we collect and use your personal data to determine some of the ads you see and provide all of the other services described below. You can also go to your settings at any time to review the privacy choices you have about how we use your data.

Return to top

## 1. The services we provide

Our mission is to give people the power to build community and bring the world closer together. To help advance this mission, we provide the Products and services described below to you:

**Provide a personalized experience for you:**
Your experience on Facebook is unlike anyone else's: from the posts, stories, events, ads, and other content you see in News Feed or our video platform to the Pages you follow and other features you might use, such as Trending, Marketplace, and search. We use the data we have - for example, about the connections you make, the choices and settings you select, and what you share and do on and off our Products - to personalize your experience.

**Connect you with people and organizations you care about:**
We help you find and connect with people, groups, businesses, organizations, and others that matter to you across the Facebook Products you use. We use the data we have to make suggestions for you and others - for example, groups to join, events to attend, Pages to follow or send a message to, shows to watch, and people you may want to become friends with. Stronger ties make for better communities, and we believe our services are most useful when people are connected to people, groups, and organizations they care about.

**Empower you to express yourself and communicate about what matters to you:**
There are many ways to express yourself on Facebook and to communicate with friends, family, and others about what matters to you - for example, sharing status updates, photos, videos, and stories across the Facebook Products you use, sending messages to a friend or several people, creating events or groups, or adding content to your profile. We have also developed, and continue to explore, new ways for people to use technology, such as augmented reality and 360 video to create and share more expressive and engaging content on Facebook.

**Help you discover content, products, and services that may interest you:**
We show you ads, offers, and other sponsored content to help you discover content, products, and services that are offered by the many businesses and organizations that use Facebook and other Facebook Products. Section 2 below explains this in more detail.

**Combat harmful conduct and protect and support our community:**
People will only build community on Facebook if they feel safe. We employ dedicated teams around the world and develop advanced technical systems to detect misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community. If we learn of content or conduct like this, we will take appropriate action - for example, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement. We share data with other Facebook Companies when we detect misuse or harmful conduct by someone using one of our Products.

**App. 525**

**Use and develop advanced technologies to provide safe and functional services for everyone:**
We use and develop advanced technologies - such as artificial intelligence, machine learning systems, and augmented reality - so that people can use our Products safely regardless of physical ability or geographic location. For example, technology like this helps people who have visual impairments understand what or who is in photos or videos shared on Facebook or Instagram. We also build sophisticated network and communication technology to help more people connect to the internet in areas with limited access. And we develop automated systems to improve our ability to detect and remove abusive and dangerous activity that may harm our community and the integrity of our Products.

**Research ways to make our services better:**
We engage in research to develop, test, and improve our Products. This includes analyzing the data we have about our users and understanding how people use our Products, for example by conducting surveys and testing and troubleshooting new features. Our Data Policy explains how we use data to support this research for the purposes of developing and improving our services.

**Provide consistent and seamless experiences across the Facebook Company Products:**
Our Products help you find and connect with people, groups, businesses, organizations, and others that are important to you. We design our systems so that your experience is consistent and seamless across the different Facebook Company Products that you use. For example, we use data about the people you engage with on Facebook to make it easier for you to connect with them on Instagram or Messenger, and we enable you to communicate with a business you follow on Facebook through Messenger.

**Enable global access to our services:**
To operate our global service, we need to store and distribute content and data in our data centers and systems around the world, including outside your country of residence. This infrastructure may be operated or controlled by Facebook, Inc., Facebook Ireland Limited, or its affiliates.

Return to top

# 2. How our services are funded

Instead of paying to use Facebook and the other products and services we offer, by using the Facebook Products covered by these Terms, you agree that we can show you ads that businesses and organizations pay us to promote on and off the Facebook Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.

Protecting people's privacy is central to how we've designed our ad system. This

**App. 526**

means that we can show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data. We allow advertisers to tell us things like their business goal, and the kind of audience they want to see their ads (for example, people between the age of 18-35 who like cycling). We then show their ad to people who might be interested.

We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Facebook. For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We don't share information that directly identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us specific permission. Learn more about how Facebook ads work here.

We collect and use your personal data in order to provide the services described above to you. You can learn about how we collect and use your data in our Data Policy. You have controls over the types of ads and advertisers you see, and the types of information we use to determine which ads we show you. Learn more.

Return to top

# 3. Your commitments to Facebook and our community

We provide these services to you and others to help advance our mission. In exchange, we need you to make the following commitments:

### 1. Who can use Facebook

When people stand behind their opinions and actions, our community is safer and more accountable. For this reason, you must:

- Use the same name that you use in everyday life.

- Provide accurate information about yourself.

- Create only one account (your own) and use your timeline for personal purposes.

- Not share your password, give access to your Facebook account to others, or transfer your account to anyone else (without our permission).

We try to make Facebook broadly available to everyone, but you cannot use Facebook if:

- You are under 13 years old.

- You are a convicted sex offender.

- We've previously disabled your account for violations of our Terms or Policies.

- You are prohibited from receiving our products, services, or software under applicable laws.

**App. 527**

**2. What you can share and do on Facebook**

We want people to use Facebook to express themselves and to share content that is important to them, but not at the expense of the safety and well-being of others or the integrity of our community. You therefore agree not to engage in the conduct described below (or to facilitate or support others in doing so):

1. You may not use our Products to do or share anything:

   - That violates these Terms, our Community Standards, and other terms and policies that apply to your use of Facebook.

   - That is unlawful, misleading, discriminatory or fraudulent.

   - That infringes or violates someone else's rights, including their intellectual property rights.

2. You may not upload viruses or malicious code or do anything that could disable, overburden, or impair the proper working or appearance of our Products.

3. You may not access or collect data from our Products using automated means (without our prior permission) or attempt to access data you do not have permission to access.

We can remove or restrict access to content that is in violation of these provisions.

If we remove content that you have shared in violation of our Community Standards, we'll let you know and explain any options you have to request another review, unless you seriously or repeatedly violate these Terms or if doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; where we are restricted due to technical limitations; or where we are prohibited from doing so for legal reasons.

To help support our community, we encourage you to report content or conduct that you believe violates your rights (including intellectual property rights) or our terms and policies.

We also can remove or restrict access to your content, services or information if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts to Facebook.

**3. The permissions you give us**

We need certain permissions from you to provide our services:

1. Permission to use content you create and share: Some content that you share or upload, such as photos or videos, may be protected by intellectual property laws.

   You own the intellectual property rights (things like copyright or trademarks) in any such content that you create and share on Facebook and the other Facebook Company Products you use. Nothing in these Terms takes away the rights you have to your own content. You are free to share your content with anyone else, wherever you want.

   However, to provide our services we need you to give us some legal

permissions (known as a 'license') to use this content. This is solely for the purposes of providing and improving our Products and services as described in Section 1 above.

Specifically, when you share, post, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This means, for example, that if you share a photo on Facebook, you give us permission to store, copy, and share it with others (again, consistent with your settings) such as service providers that support our service or other Facebook Products you use.This license will end when your content is deleted from our systems.

You can delete content individually or all at once by deleting your account. Learn more about how to delete your account. You can download a copy of your data at any time before deleting your account.

When you delete content, it's no longer visible to other users, however it may continue to exist elsewhere on our systems where:

- immediate deletion is not possible due to technical limitations (in which case, your content will be deleted within a maximum of 90 days from when you delete it);

- your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted); or

- where immediate deletion would restrict our ability to:

  - investigate or identify illegal activity or violations of our terms and policies (for example, to identify or investigate misuse of our Products or systems);

  - comply with a legal obligation, such as the preservation of evidence; or

  - comply with a request of a judicial or administrative authority, law enforcement or a government agency;

in which case, the content will be retained for no longer than is necessary for the purposes for which it has been retained (the exact duration will vary on a case-by-case basis).

In each of the above cases, this license will continue until the content has been fully deleted.

2. Permission to use your name, profile picture, and information about your actions with ads and sponsored content: You give us permission to use your name and profile picture and information about actions you have taken on Facebook next to or in connection with ads, offers, and other sponsored content that we display across our Products, without any compensation to you. For example, we may show your friends that you are interested in an advertised event or have liked a Page created by a brand that has paid us to display its ads on Facebook. Ads like this can be seen only by people who have your permission to see the actions you've

by people who have your permission to see the actions you've taken on Facebook. You can learn more about your ad settings and preferences.

3. Permission to update software you use or download: If you download or use our software, you give us permission to download and install updates to the software where available.

**4. Limits on using our intellectual property**

If you use content covered by intellectual property rights that we have and make available in our Products (for example, images, designs, videos, or sounds we provide that you add to content you create or share on Facebook), we retain all rights to that content (but not yours). You can only use our copyrights or trademarks (or any similar marks) as expressly permitted by our Brand Usage Guidelines or with our prior written permission. You must obtain our written permission (or permission under an open source license) to modify, create derivative works of, decompile, or otherwise attempt to extract source code from us.

Return to top

# 4. Additional provisions

**1. Updating our Terms**

We work constantly to improve our services and develop new features to make our Products better for you and our community. As a result, we may need to update these Terms from time to time to accurately reflect our services and practices. Unless otherwise required by law, we will notify you before we make changes to these Terms and give you an opportunity to review them before they go into effect. Once any updated Terms are in effect, you will be bound by them if you continue to use our Products.

We hope that you will continue using our Products, but if you do not agree to our updated Terms and no longer want to be a part of the Facebook community, you can delete your account at any time.

**2. Account suspension or termination**

We want Facebook to be a place where people feel welcome and safe to express themselves and share their thoughts and ideas.

If we determine that you have clearly, seriously or repeatedly breached our Terms or Policies, including in particular our Community Standards, we may suspend or permanently disable access to your account. We may also suspend or disable your account if you repeatedly infringe other people's intellectual property rights or where we are required to do so for legal reasons.

Where we take such action we'll let you know and explain any options you have to request a review, unless doing so may expose us or others to legal liability; harm our community of users; compromise or interfere with the integrity or operation of any of our services, systems or Products; or

the integrity or operation of any of our services, systems or Products, or
where we are restricted due to technical limitations; or where we are
prohibited from doing so for legal reasons.

You can <u>learn more</u> about what you can do if your account has been
disabled and how to contact us if you think we have disabled your
account by mistake.

If you delete or we disable your account, these Terms shall terminate as
an agreement between you and us, but the following provisions will
remain in place: 3, 4.2-4.5.

### 3. Limits on liability

We work hard to provide the best Products we can and to specify clear
guidelines for everyone who uses them. Our Products, however, are
provided "as is," and we make no guarantees that they always will be safe,
secure, or error-free, or that they will function without disruptions,
delays, or imperfections. To the extent permitted by law, we also
DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED,
INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY,
FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-
INFRINGEMENT. We do not control or direct what people and others do
or say, and we are not responsible for their actions or conduct (whether
online or offline) or any content they share (including offensive,
inappropriate, obscene, unlawful, and other objectionable content).

We cannot predict when issues might arise with our Products.
Accordingly, our liability shall be limited to the fullest extent permitted by
applicable law, and under no circumstance will we be liable to you for any
lost profits, revenues, information, or data, or consequential, special,
indirect, exemplary, punitive, or incidental damages arising out of or
related to these Terms or the Facebook Products, even if we have been
advised of the possibility of such damages. Our aggregate liability arising
out of or relating to these Terms or the Facebook Products will not
exceed the greater of $100 or the amount you have paid us in the past
twelve months.

### 4. Disputes

We try to provide clear rules so that we can limit or hopefully avoid
disputes between you and us. If a dispute does arise, however, it's useful
to know up front where it can be resolved and what laws will apply.

For any claim, cause of action, or dispute you have against us that arises
out of or relates to these Terms or the Facebook Products ("claim"), you
agree that it will be resolved exclusively in the U.S. District Court for the
Northern District of California or a state court located in San Mateo
County. You also agree to submit to the personal jurisdiction of either of
these courts for the purpose of litigating any such claim, and that the
laws of the State of California will govern these Terms and any claim,
without regard to conflict of law provisions.

### 5. Other

1. These Terms (formerly known as the Statement of Rights and
   Responsibilities) make up the entire agreement between you and
   Facebook, Inc. regarding your use of our Products. They supersede
   any prior agreements.

2. Some of the Products we offer are also governed by supplemental

terms. If you use any of those Products, supplemental terms will be made available and will become part of our agreement with you. For instance, if you access or use our Products for commercial or business purposes, such as buying ads, selling products, developing apps, managing a group or Page for your business, or using our measurement services, you must agree to our Commercial Terms. If you post or share content containing music, you must comply with our Music Guidelines. To the extent any supplemental terms conflict with these Terms, the supplemental terms shall govern to the extent of the conflict.

3. If any portion of these Terms is found to be unenforceable, the remaining portion will remain in full force and effect. If we fail to enforce any of these Terms, it will not be considered a waiver. Any amendment to or waiver of these Terms must be made in writing and signed by us.

4. You will not transfer any of your rights or obligations under these Terms to anyone else without our consent.

5. You may designate a person (called a legacy contact) to manage your account if it is memorialized. Only your legacy contact or a person who you have identified in a valid will or similar document expressing clear consent to disclose your content upon death or incapacity will be able to seek disclosure from your account after it is memorialized.

6. These Terms do not confer any third-party beneficiary rights. All of our rights and obligations under these Terms are freely assignable by us in connection with a merger, acquisition, or sale of assets, or by operation of law or otherwise.

7. You should know that we may need to change the username for your account in certain circumstances (for example, if someone else claims the username and it appears unrelated to the name you use in everyday life).

8. We always appreciate your feedback and other suggestions about our products and services. But you should know that we may use them without any restriction or obligation to compensate you, and we are under no obligation to keep them confidential.

9. We reserve all rights not expressly granted to you.

Return to top

# 5. Other terms and policies that may apply to you

- Community Standards: These guidelines outline our standards regarding the content you post to Facebook and your activity on Facebook and other Facebook Products.

<div style="text-align: right"><strong>App. 532</strong></div>

- Commercial Terms: These terms apply if you also access or use our Products for any commercial or business purpose, including advertising, operating an app on our Platform, using our measurement services, managing a group or a Page for a business, or selling goods or services.

- Advertising Policies: These policies specify what types of ad content are allowed by partners who advertise across the Facebook Products.

- Self-Serve Ad Terms: These terms apply when you use self-serve advertising interfaces to create, submit, or deliver advertising or other commercial or sponsored activity or content.

- Pages, Groups and Events Policy: These guidelines apply if you create or administer a Facebook Page, group, or event, or if you use Facebook to communicate or administer a promotion.

- Facebook Platform Policy: These guidelines outline the policies that apply to your use of our Platform (for example, for developers or operators of a Platform application or website or if you use social plugins).

- Developer Payment Terms: These terms apply to developers of applications that use Facebook Payments.

- Community Payment Terms: These terms apply to payments made on or through Facebook.

- Commerce Policies: These guidelines outline the policies that apply when you offer products and services for sale on Facebook.

- Facebook Brand Resources: These guidelines outline the policies that apply to use of Facebook trademarks, logos, and screenshots.

- Music Guidelines: These guidelines outline the policies that apply if you post or share content containing music on Facebook.

- Live Policies: These policies apply to all content broadcast to Facebook Live.

Date of Last Revision: October 22, 2020

English (US)   Español   Français (France)   中文(简体)   العربية   Português (Brasil)   Italiano   한국어   Deutsch   हिन्दी   日本語

Sign Up   Log In   Messenger   Facebook Lite   Watch   People   Pages   Page Categories   Places   Games   Locations   Marketplace   Facebook Pay   Groups
Jobs   Oculus   Portal   Instagram   Local   Fundraisers   Services   Voting Information Center   About   Create Ad   Create Page   Developers   Careers   Privacy
Cookies   Ad Choices   Terms   Help

Facebook © 2021

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD

 Pew Research Center

Search pewresearch.org...

RESEARCH TOPICS ▾    ALL PUBLICATIONS    METHODS    SHORT READS    TOOLS & RESOURCES    EXPERTS    ABC

JANUARY 12, 2021

# News Use Across Social Media Platforms in 2020

*Facebook stands out as a regular source of news for about a third of Americans*

BY **ELISA SHEARER** (HTTPS://WWW.PEWRESEARCH.ORG/STAFF/ELISA-SHEARER) AND **AMY MITCHELL** (HTTPS://WWW.PEWRESEARCH.ORG/STAFF/AMY-MITCHELL)

| How we did this ⊕ |

| Changing the way we measure news consumption on social media ⊕ |



**About half of Americans get news on social media at least sometimes**

*% of U.S. adults who get news from social media ...*

|  |  |  | Don't get digital news |
| Often | Sometimes | Rarely | Never |
| 23% | 30 | 18 | 21 | 7 |

Note: This chart is not comparable to similar questions asked in the past due to question wording changes; see Appendix for more details.
Source: Survey of U.S. adults conducted Aug. 31-Sept. 7, 2020.
"News Use Across Social Media Platforms in 2020"

**PEW RESEARCH CENTER**

(https://www.journalism.org/2021/01/12/news-use-across-social-media-platforms-in-2020/pj_2021-01-12_news-social-media_0-01/) As social media companies struggle to deal with misleading information on their platforms about the election (https://apnews.com/article/social-media-election-misinformation-632a5d93a6cc3ff37311a641d86bf5a1), the COVID-19 pandemic

 **App. 534**

(https://www.washingtonpost.com/technology/2020/12/18/faq-coronavirus-vaccine-misinformation/) and more, a large portion of Americans continue to rely on these sites for news. About half of U.S. adults (53%) say they get news from social media "often" or "sometimes," (https://www.pewresearch.org/fact-tank/2021/01/12/more-than-eight-in-ten-americans-get-news-from-digital-devices/) and this use is spread out across a number of different sites, according to a Pew Research Center survey conducted Aug. 31-Sept. 7, 2020.



**Facebook stands out as regular source of news for Americans**

*% of U.S. adults who ...*

Note: This chart is not comparable to similar questions asked in the past due to question wording changes; see Appendix for more details.
Source: Survey of U.S. adults conducted Aug. 31-Sept. 7, 2020.
"News Use Across Social Media Platforms in 2020"

**PEW RESEARCH CENTER**

(https://www.journalism.org/2021/01/12/news-use-across-social-media-platforms-in-2020/pj_2021-01-12_news-social-media_0-02/) Among 11 social media sites asked about as a regular source of news, Facebook sits at the top, with about a third (36%) of Americans getting news there regularly. YouTube comes next, with 23% of U.S. adults regularly getting news there. Twitter serves as a regular news source for 15% of U.S. adults.

Other social media sites are less likely to be regular news sources. About one-in-ten Americans or fewer report regularly getting news on Instagram (11%), Reddit (6%), Snapchat (4%), LinkedIn (4%), TikTok (3%), WhatsApp (3%), Tumblr (1%) and Twitch (1%).

(https://www.journalism.org/2021/01/12/news-use-across-social-media-platforms-in-2020/pj_2021-01-12_news-social-media_0-03/) These lower percentages for news use are in some cases related to the fact that fewer Americans report using them at all, compared with the shares who use Facebook and YouTube. If we consider news users as a portion of a site's overall user base, some sites stand out as being more "newsy" even if their total audience is relatively small. Twitter, for example, is used by 25% of U.S. adults, but over half of those users get news on the site regularly. And 42% of Reddit users get news regularly on the site, though it overall has a very small user base (15% of U.S. adults say they use Reddit). On the other hand, YouTube, though widely used, sees a smaller portion of its users turning to the site for news regularly (32%).

## Demographics of regular social media news consumers

There are in some cases drastic demographic differences between the people who turn to each social media site for news. For example, White adults make up a majority of the regular news users of Facebook and Reddit but fewer than half of those who turn to Instagram for news. Both Black and Hispanic adults make up about a quarter of Instagram's regular news users (22% and 27%, respectively). People who regularly get news on Facebook are more likely to be women than men (63% vs. 35%), while two-thirds of Reddit's regular news users are men.

The majority of regular news users of many sites – YouTube, Twitter, Instagram, Reddit and LinkedIn – are Democrats or lean Democratic. This may be related to the relatively young age profile (https://www.pewresearch.org/politics/2020/06/02/the-changing-composition-of-the-electorate-and-partisan-coalitions/) of the news user base of these social media sites. No social media site included here has regular news users who are more likely to be Republican or lean Republican.



**Large portion of Twitter users regularly get news on the site**

*% of each social media site's users who **regularly** get news there*

| Site | % |
|------|-----|
| Twitter | 59% |
| Facebook | 54 |
| Reddit | 42 |
| YouTube | 32 |
| Instagram | 28 |
| TikTok | 22 |
| Snapchat | 19 |
| LinkedIn | 15 |
| WhatsApp | 13 |
| Twitch | 11 |

Note: Tumblr not shown due to insufficient sample size.
Source: Survey of U.S. adults conducted Aug. 31-Sept. 7, 2020.
"News Use Across Social Media Platforms in 2020"

**PEW RESEARCH CENTER**

**News on social media sites still seen as inaccurate, as about three-in-ten say it helps them understand current events**

(https://www.journalism.org/2021/01/12/news-use-across-social-media-platforms-in-2020/pj_2021-01-12_news-social-media_0-05/) A majority of the Americans who are getting news on social media continue to question its accuracy. About six-in-ten (59%) of those who at least rarely get news on social media say they expect that news to be largely inaccurate, while 39% expect it to be largely accurate. And though there has been increasing discussion of the information on social media, including congressional hearings in 2019 (https://www.congress.gov/event/116th-congress/house-event/109710) and in 2020 (https://www.washingtonpost.com/technology/2020/10/28/twitter-facebook-google-senate-hearing-live-updates/), this is not a new sentiment among social media news users: Similar portions have said they expected the news to be inaccurate since 2018 (https://www.journalism.org/2018/09/10/news-use-across-social-media-platforms-2018/).

(https://www.journalism.org/2021/01/12/news-use-across-social-media-platforms-in-2020/pj_2021-01-12_news-social-media_0-06/) Most Americans do not say news on social media has helped them better understand current events. The largest segment, 47%, says it doesn't make much of a difference, while 29% say that it has helped their understanding and 23% say it has actually left them more confused. This largely reflects responses to similar questions in 2018 and 2019, when a minority said that social media news helped them better understand current events.

**App. 538**



**Etsy**

Search for anything 🔍

**Sign in**

🛒

## Our House Rules
Get to know Etsy's legal terms and policies

Search our policies 🔍

Our House Rules / Terms of Use

# Terms of Use

Welcome to Etsy. We're so glad you're here. Make yourself comfortable and have a good time, but please follow our house rules.

1. Accepting These Terms
2. Those Other Documents We Mentioned
3. Your Privacy
4. Your Account with Etsy
5. Your Content
6. Your Use of Our Services
7. Termination
8. Warranties and Limitation of Liability (or the Things You Can't Sue Us For)
9. Indemnification (or What Happens If You Get Us Sued)
0. Disputes with Other Users
1. Disputes with Etsy
2. Changes to the Terms
3. Some Finer Legal Points
4. Contact Information

## 1. Accepting These Terms

**This document and the other documents that we reference below make up our house rules, or what we officially call our Terms of Use (the "Terms" for short).**

The Terms are a legally binding contract between you and Etsy. If you live in North America or South America, the contract is between you and Etsy, Inc.; if you live elsewhere, the contract is between you and Etsy Ireland UC, a subsidiary of Etsy, Inc. We'll just refer to Etsy, Inc. and all of its subsidiaries collectively as "Etsy."

**Please note that Section 11. Disputes with Etsy, contains an arbitration clause and class action waiver. By agreeing to the Terms, you agree to resolve all disputes through binding individual arbitration, which means that you waive any right to have those disputes decided by a judge or jury, and that you waive your right to participate in class actions, class arbitrations, or representative actions.** *

This contract sets out your rights and responsibilities when you use Etsy.com, Pattern by Etsy, our mobile apps, and the other services provided by Etsy (we'll refer to all of these collectively as our "Services"), so please read it carefully. By using any of our Services (even just browsing one of our websites), you're agreeing to the Terms. If you don't agree with the Terms, you may not use our Services. Agree with us? Great, read on!

## 2. Those Other Documents We Mentioned

Etsy's Services connect people around the world, both online and offline, to make, sell, and buy unique goods. Here's a handy guide to help you understand the specific rules that are relevant for you, depending on how you use the Services:

**App. 539**

Our House Rules for Everyone. If you use any of our Services, you agree to these Terms, our Privacy Policy, and our Anti-Discrimination Policy.

**Our House Rules for Sellers**. If you list any items for sale through our Services, these policies apply to you. You can read them here.

**Our House Rules for Buyers**. If you use our Services to browse or shop, these policies apply to you. You can read them here.

**Our House Rules for Third Parties**. These policies apply to intellectual property owners, Etsy API users, affiliates, and anyone requesting information from Etsy.

**Search and Advertising Ranking Disclosures.** This is a concise summary of how Etsy organizes search results and advertising results that could include Your Content.

All of these policies are a part of our Terms, so be sure to read the ones that are relevant for you. Of course, you'll still want to read the rest of this document because it applies to everyone!

## 3. Your Privacy

We know your personal information is important to you, so it's important to us. Our Privacy Policy details how your information is used when you use our Services. By using our Services, you're also agreeing that we can process your information in the ways set out in the Privacy Policy, so please read it here.

Both Etsy and sellers process members' personal information (for example, buyer name, email address, and shipping address) and are therefore considered separate and independent data controllers of buyers' personal information under EU law. That means that each party is responsible for the personal information it processes in providing the Services. For example, if a seller accidentally discloses a buyer's name and email address when fulfilling another buyer's order, the seller, not Etsy, will be responsible for that unauthorized disclosure.

If, however, Etsy and sellers are found to be joint data controllers of buyers' personal information, and if Etsy is sued, fined, or otherwise incurs expenses because of something that you did as a joint data controller of buyer personal information, you agree to indemnify Etsy for the expenses it occurs in connection with your processing of buyer personal information. See Section 9. Indemnification (or What Happens If You Get Us Sued) below for more information about your indemnification obligations to Etsy.

## 4. Your Account with Etsy

You'll need to create an account with Etsy to use some of our Services. Here are a few rules about accounts with Etsy:

**A. You must be 18 years or older to use our Services.** Minors under 18 and at least 13 years of age are only permitted to use our Services through an account owned by a parent or legal guardian with their appropriate permission and under their direct supervision. Children under 13 years are not permitted to use Etsy or the Services. You are responsible for any and all account activity conducted by a minor on your account, and there may be commercial products or services available that you may want to consider to limit a minor's access to material online. For more information, see Etsy's Minors Policy.

**B. Be honest with us.** Provide accurate information about yourself. It's prohibited to use false information or impersonate another person or company through your account.

**C. Choose an appropriate name.** If you decide to not have your full name serve as the name associated with your account, you may not use language that is offensive, vulgar, infringes someone's intellectual property rights, or otherwise violates the Terms.

**D. You're responsible for your account.** You're solely responsible for any activity on your account. If you're sharing an account with other people, then the person whose financial information is on the account will ultimately be responsible for all activity. If you're registering as a business entity, you personally guarantee that you have the authority to agree to the Terms on behalf of the business. Also, your accounts are not transferable.

**App. 540**

**E. Protect your password.** As we mentioned above, you're solely responsible for any activity on your account, so it's important to keep your account password secure. Here's a Help article on how to make your account more secure.

**F. Let's be clear about our relationship.** These Terms don't create any agency, partnership, joint venture, employment, or franchisee relationship between you and Etsy.

This detailed Help article should answer any questions you may have about registering an account with Etsy.

## 5. Your Content

Content that you post using our Services is your content (so let's refer to it as "Your Content"). We don't make any claim to it, which includes anything you post using our Services (like shop names, profile pictures, listing photos, listing descriptions, reviews, comments, videos, usernames, etc.).

**A. Responsibility for Your Content.** You understand that you are solely responsible for Your Content. You represent that you have all necessary rights to Your Content and that you're not infringing or violating any third party's rights by posting it.

**B. Permission to Use Your Content.** By posting Your Content through our Services, you grant Etsy a license to use it. We don't claim any ownership to Your Content, but we have your permission to use it to help Etsy function and grow. That way, we won't infringe any rights you have in Your Content and we can help promote it. . For example, you acknowledge and agree Etsy may offer you or Etsy buyers promotions on the Site, from time to time, that may relate to your listings

**C. Rights You Grant Etsy.** (Here's the legalese version of the last section). By posting Your Content, you grant Etsy a non-exclusive, worldwide, royalty-free, irrevocable, sub-licensable, perpetual license to use, display, edit, modify, reproduce, distribute, store, and prepare derivative works of Your Content. This allows us to provide the Services and to promote Etsy, your Etsy shop, or the Services in general, in any formats and through any channels, including across any Etsy Services, our partners, or third-party website or advertising medium. You agree not to assert any moral rights or rights of publicity against us for using Your Content. You also recognize our legitimate interest in using it, in accordance with the scope of this license, to the extent Your Content contains any personal information.

That sounds like a lot, but it's necessary for us to keep Etsy going. Consider these examples: if you upload a photo or video of a listing on your Etsy shop, we have permission to display it to buyers, and we can resize or enhance it so it looks good to a buyer using our mobile app; if you post a description in English, we can translate it into French so a buyer in Paris can learn the story behind your item; and if you post a beautiful photo or video of your latest handmade necklace, we can feature it– often along with your shop name and shop picture– on our homepage, in one of our blogs or even on a billboard to help promote your business and Etsy's.

**D. Reporting Unauthorized Content.** Etsy has great respect for intellectual property rights, and is committed to following appropriate legal procedures to remove infringing content from the Services. If content that you own or have rights to has been posted to the Services without your permission and you want it removed, please follow the steps listed in our Intellectual Property Policy. If Your Content is alleged to infringe another person's intellectual property, we will take appropriate action, such as disabling it if we receive proper notice or terminating your account if you are found to be a repeat infringer. We'll notify you if any of that happens.

**E. Inappropriate, False, or Misleading Content.** This should be common sense, but there are certain types of content we don't want posted on Etsy's Services (for legal reasons or otherwise). You agree that you will not post any content that is abusive, threatening, defamatory, obscene, vulgar, or otherwise offensive or in violation of our Prohibited Items Policy, Community Policy, or any part of our Terms. You also agree not to post any content that is false and misleading or uses the Services in a manner that is fraudulent or deceptive.

## 6. Your Use of Our Services

**License to Use Our Services.** We grant you a limited, non-exclusive, non-transferable, and revocable license to use our Services—subject to the Terms and the following restrictions in particular:

**A. Don't Use Our Services to Break the Law.** You agree that you will not violate any laws in connection with your use of the Services. This includes any local, state, federal, and international laws that may apply to you. For example, it's your responsibility to obtain any permits or licenses that your shop requires, and to meet applicable legal requirements in applicable jurisdiction(s). This includes the sale and delivery of your items, such as age verification upon delivery, where required by law. You may not sell anything that violates any laws; you must comply with our Sanctions Policy, and you may not engage in fraud (including false claims or infringement notices), theft, anti-competitive conduct, threatening conduct, or any other unlawful acts or crimes against Etsy, another Etsy user, or a third party.

**B. Pay Your Bills.** You are responsible for paying all fees that you owe to Etsy. Except as set forth below, you are also solely responsible for collecting and/or paying any applicable taxes for any purchases or sales you make through our Services. For digital items sold to buyers in Australia, Belarus, Chile, the EU, Iceland, India, Indonesia, Japan, Malaysia, Mexico, Moldova, New Zealand, Norway, Quebec (Canada), Russia, Saudi Arabia, Serbia, Singapore, South Africa, South Korea, Switzerland, Taiwan, Turkey, United Arab Emirates or the United Kingdom. Etsy will help collect and remit the correct amount of value-added tax or VAT. Some countries may refer to VAT using other terms, e.g. Goods and Services Tax (GST), but we'll just refer to VAT, GST, and any local sales taxes collectively as "VAT." In addition, Etsy will calculate, collect, and remit sales tax where applicable. Please see this FAQ for more information. Your fees, bills, taxes, and how you can pay them are fully explained in our Fees & Payments Policy.

**C. Don't Steal Our Stuff.** You agree not to crawl, scrape, or spider any page of the Services or to reverse engineer or attempt to obtain the source code of the Services. If you want to use our API, please follow our API Terms of Use.

**D. Don't Try to Harm Our Systems.** You agree not to interfere with or try to disrupt our Services, for example by distributing a virus or other harmful computer code.

**E. Follow Our Trademark Policy.** The name "Etsy" and the other Etsy marks, phrases, logos, and designs that we use in connection with our Services (the Etsy Trademarks), are trademarks, service marks, or trade dress of Etsy in the US and other countries. If you'd like to use our trademarks, please follow our Trademark Policy.

**F. Share Your Ideas.** We love your suggestions and ideas! They can help us improve your experience and our Services. Any unsolicited ideas or other materials you submit to Etsy (not including Your Content or items you sell through our Services) are considered non-confidential and non-proprietary to you. You grant us a non-exclusive, worldwide, royalty-free, irrevocable, sub-licensable, perpetual license to use and publish those ideas and materials for any purpose, without compensation to you.

**G. Talk to Us Online.** From time to time, Etsy will provide you with certain legal information in writing. By using our Services, you're agreeing to our Electronic Communications Policy, which describes how we provide that information to you. It says that we can send you information electronically (such as by email) instead of mailing you paper copies (it's better for the environment), and that your electronic agreement is the same as your signature on paper.

## 7. Termination

**Termination By You.** We'd hate to see you go, but you may terminate your account with Etsy at any time from your account settings. You can find more information in this Help article. Terminating your account will not affect the availability of some of Your Content that you posted through the Services prior to termination. Oh, and you'll still have to pay any outstanding bills.

**Termination By Etsy.** We may terminate or suspend your account (and any accounts Etsy determines are related to your account) and your access to the Services should we have reason to believe you, your Content, or your use of the Services violate our Terms. If we do so, it's important to understand that you don't have a contractual or legal right to continue to use our Services, for example, to sell or buy on our websites or mobile apps. Generally, Etsy will notify you that your account has been terminated or suspended, unless you've repeatedly violated our Terms or we have legal or regulatory reasons preventing us from notifying you.

If you or Etsy terminate your account, you may lose any information associated with your account, including Your Content.

**App. 542**

**We May Discontinue the Services** Etsy reserves the right to change, suspend, or discontinue any of the Services for you, any or all users, at any time, for any reason, including those laid out in Etsy's policies under these Terms of Use. We will not be liable to you for the effect that any changes to the Services may have on you, including your income or your ability to generate revenue through the Services.

**Survival.** The Terms will remain in effect even after your access to the Service is terminated, or your use of the Service ends.

## 8. Warranties and Limitation of Liability (or the Things You Can't Sue Us For)

**Items You Purchase.** You understand that Etsy does not manufacture, store, or inspect any of the items sold through our Services. We provide the venue; the items in our marketplaces are produced, listed, and sold directly by independent sellers, so Etsy cannot and does not make any warranties about their quality, safety, or even their legality. Any legal claim related to an item you purchase must be brought directly against the seller of the item. You release Etsy from any claims related to items sold through our Services, including for defective items, misrepresentations by sellers, or items that caused physical injury (like product liability claims).

**Content You Access.** You may come across materials that you find offensive or inappropriate while using our Services. We make no representations concerning any content posted by users through the Services. Etsy is not responsible for the accuracy, copyright compliance, legality, or decency of content posted by users that you accessed through the Services. You release us from all liability relating to that content.

**People You Interact With.** You can use the Services to interact with other individuals, either online or in person. However, you understand that we do not screen users of our Services, and you release us from all liability relating to your interactions with other users. Please be careful and exercise caution and good judgment in all interactions with others, especially if you are meeting someone in person. This Help article has some good advice about handling in person meetings.

**Third-Party Services.** Our Services may contain links to third-party websites or services that we don't own or control (for example, links to Facebook, Twitter, and Pinterest). You may also need to use a third party's product or service in order to use some of our Services (like a compatible mobile device to use our mobile apps). When you access these third-party services, you do so at your own risk. The third parties may require you to accept their own terms of use. Etsy is not a party to those agreements; they are solely between you and the third party.

**Gift Cards and Promotions.** You acknowledge that Etsy does not make any warranties with respect to your Gift Card balance and is not responsible for any unauthorized access to, or alteration, theft, or destruction of a Gift Card or Gift Card code that results from any action by you or a third party. You also acknowledge that we may suspend or prohibit use of your Gift Card if your Gift Card or Gift Card code has been reported lost or stolen, or if we believe your Gift Card balance is being used suspiciously, fraudulently, or in an otherwise unauthorized manner. If your Gift Card code stops working, your only remedy is for us to issue you a replacement Gift Card code. By participating in a special offer or promotion, you agree that you may not later claim that the rules of that special offer or promotion were ambiguous.

---

**WARRANTIES.** ETSY IS DEDICATED TO MAKING OUR SERVICES THE BEST THEY CAN BE, BUT WE'RE NOT PERFECT AND SOMETIMES THINGS CAN GO WRONG. YOU UNDERSTAND THAT OUR SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY KIND OF WARRANTY (EXPRESS OR IMPLIED). WE ARE EXPRESSLY DISCLAIMING ANY WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, AS WELL AS ANY WARRANTIES IMPLIED BY A COURSE OF PERFORMANCE, COURSE OF DEALING, OR USAGE OF TRADE.

WE DO NOT GUARANTEE THAT: (I) THE SERVICES WILL BE SECURE OR AVAILABLE AT ANY PARTICULAR TIME OR LOCATION; (II) ANY DEFECTS OR ERRORS WILL BE CORRECTED; (III) THE SERVICES WILL BE FREE OF VIRUSES OR OTHER HARMFUL MATERIALS; OR (IV) THE RESULTS OF USING THE SERVICES WILL MEET YOUR EXPECTATIONS. YOU USE THE SERVICES SOLELY AT YOUR OWN RISK. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON IMPLIED WARRANTIES, SO THE ABOVE LIMITATIONS MAY NOT APPLY TO YOU.

LIABILITY LIMITS. TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER ETSY, NOR OUR EMPLOYEES OR DIRECTORS SHALL BE LIABLE TO YOU FOR ANY LOST PROFITS OR REVENUES, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE SERVICES OR THESE TERMS. IN NO EVENT SHALL ETSY'S AGGREGATE LIABILITY FOR ANY DAMAGES EXCEED THE GREATER OF ONE HUNDRED ($100) US DOLLARS (USD) OR THE AMOUNT YOU PAID ETSY IN THE PAST TWELVE

**App. 543**

MONTHS. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATIONS MAY NOT APPLY TO YOU.

## 9. Indemnification (or What Happens If You Get Us Sued)

We hope this never happens, but if Etsy gets sued because of something that you did, you agree to defend and indemnify us. That means you'll defend Etsy (including any of our employees) and hold us harmless from any legal claim or demand (including reasonable attorney's fees) that arises from your actions, your use (or misuse) of our Services, your breach of the Terms, or you or your account's infringement of someone else's rights.

We reserve the right to handle our legal defense however we see fit, even if you are indemnifying us, in which case you agree to cooperate with us so we can execute our strategy.

## 10. Disputes with Other Users

If you find yourself in a dispute with another user of Etsy's Services or a third party, we encourage you to contact the other party and try to resolve the dispute amicably.

**Case System.** Buyers and sellers who are unable to resolve a dispute related to a transaction on our websites or mobile apps may participate in our case system. You can find details about the case system in this Help article. Etsy will attempt to help you resolve disputes in good faith and based solely on our interpretation of our policies, in our sole discretion; we will not make judgments regarding legal issues or claims. Etsy has no obligation to resolve any disputes.

**Release of Etsy.** You release Etsy from any claims, demands, and damages arising out of disputes with other users or parties.

## 11. Disputes with Etsy

If you're upset with us, let us know, and hopefully we can resolve your issue. But if we can't, then these rules will govern any legal dispute involving our Services:

**A. Governing Law.** The Terms are governed by the laws of the State of New York, without regard to its conflict of laws rules, and the laws of the United States of America. These laws will apply no matter where in the world you live, but if you live outside of the United States, you may be entitled to the protection of the mandatory consumer protection provisions of your local consumer protection law.

**B. Arbitration.** You and Etsy agree that any dispute or claim arising from or relating to the Terms shall be finally settled by final and binding arbitration, using the English language, administered by the American Arbitration Association (the "AAA") under its Consumer Arbitration Rules (the "AAA Rules") then in effect (those rules are deemed to be incorporated by reference into this section, and as of the date of these Terms you can find the AAA Rules here), unless otherwise required by law. **Arbitration, including threshold questions of arbitrability of the dispute, will be handled by a sole arbitrator in accordance with those rules. Judgment on the arbitration award may be entered in any court that has jurisdiction.

For EU sellers, if any dispute arises in connection with the Terms, the parties should first try to resolve the dispute through the complaints procedure published here. In addition, the dispute may be referred by either party to the Centre for Effective Dispute Resolution ("CEDR") for mediation. The Parties agree to enter into mediation to settle a good faith dispute and will do so in accordance with the CEDR's mediation procedures. Unless otherwise agreed between the parties within 14 days of notice of the dispute, the mediator will be nominated by CEDR. To initiate the mediation a party must give notice in writing to the other party to the dispute, referring the dispute to mediation. A copy of the referral should be sent to CEDR.

Any arbitration or mediation under the Terms will take place on an individual basis. You understand that by agreeing to the Terms, you and Etsy are each waiving the right to trial by jury or to participate in a class action lawsuit. Class arbitrations shall only be available if requested by either party under its Class Action Arbitration Rules and approved by the arbitration entity. Notwithstanding the foregoing, each party shall have the

**App. 544**

right to bring an action in a court of proper jurisdiction for injunctive or other equitable or conservatory relief, pending a final decision by the arbitrator or mediator. You may instead assert your claim in "small claims" court, but only if your claim qualifies, your claim remains in such court, and your claim remains on an individual, non-representative, and non-class basis.

**C. Costs of Arbitration.** Payment for any and all reasonable AAA filing, administrative, and arbitrator fees will be in accordance with the Consumer Arbitration Rules, and in the case of CEDR, its rules. If the value of your claim does not exceed $10,000 USD, Etsy will pay for the reasonable filing, administrative, and arbitrator fees associated with the arbitration, unless the arbitrator finds that either the substance of your claim or the relief sought was frivolous or brought for an improper purpose. For mediation through CEDR, the parties will pay their share of mediation costs, and under certain conditions such fees may be refundable to you, depending on the outcome of the mediation.

**D. Forum.** We're based in New York, so any legal action against Etsy related to our Services must be filed and take place in New York County, New York. For all actions under the AAA Rules, the proceedings may be filed where your residence is, or in New York, New York, and any in-person hearings will be conducted at a location which is reasonably convenient to both parties taking into account their ability to travel and other pertinent circumstances. For any actions not subject to arbitration or mediation, you and Etsy agree to submit to the personal jurisdiction of a state or federal court located in New York County, New York if your contract is with Etsy, Inc.; if your contract is with Etsy Ireland UC, you and Etsy agree to submit to the personal jurisdiction of the courts of Ireland.

**E. Government Exception.** If you are a government agent or entity in the United States using the Services in your official capacity, and you are legally unable to agree to the clauses in this section, then those clauses do not apply to you. In that case, the Terms and any action related to the Terms will be governed by the laws of the United States (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of New York.

**F. Modifications.** If we make any changes to this "Disputes with Etsy" section after the date you last accepted the Terms, those changes will not apply to any claims filed in a legal proceeding against Etsy prior to the date the changes became effective. Etsy will notify you of substantive changes to the "Disputes with Etsy" section at least 30 days prior to the date the change will become effective. If you do not agree to the modified terms, you may send Etsy a written notification (including email) or close your account within those 30 days. By rejecting a modified term or permanently closing your account, you agree to arbitrate any disputes between you and Etsy in accordance with the provisions of this "Disputes with Etsy" section as of the date you last accepted the Terms, including any changes made prior to your rejection. If you reopen your closed account or create a new account, you agree to be bound by the current version of the Terms.

## 12. Changes to the Terms

We may update these Terms from time to time. If we believe that the changes are material, we'll definitely let you know by posting the changes through the Services and/or sending you an email or message about the changes. That way you can decide whether you want to continue using the Services. Changes will be effective upon the posting of the changes unless otherwise specified. You are responsible for reviewing and becoming familiar with any changes. Your use of the Services following the changes constitutes your acceptance of the updated Terms.

## 13. Some Finer Legal Points

The Terms, including all of the policies that make up the Terms, supersede any other agreement between you and Etsy regarding the Services. If any part of the Terms is found to be unenforceable, that part will be limited to the minimum extent necessary so that the Terms will otherwise remain in full force and effect. Our failure to enforce any part of the Terms is not a waiver of our right to later enforce that or any other part of the Terms. We may assign any of our rights and obligations under the Terms.

## 14. Contact Information

If you have any questions about the Terms, please email us at legal@etsy.com.

\*In some countries you may have additional rights and/or the preceding may not apply to you.

Last updated on Jan 19, 2021

**App. 545**

Yes! Send me exclusive offers, unique gift ideas, and personalized tips for shopping and selling on Etsy.

Enter your email                                    **Subscribe**

**Shop**     **Sell**        **About**   **Help**

Gift cards   Sell on Etsy   Etsy, Inc.   Help Center
Etsy blog   Teams          Policies     Trust and safety
           Forums         Investors    Privacy settings
           Affiliates     Careers
                          Press        **Download the Etsy App**
                          Impact

🇺🇸  **United States**   |   **English (US)**   |   **$ (USD)**        © 2021 Etsy, Inc.  Terms of Use      Privacy      Interest-based ads

**App. 546**



# Twitter Terms of Service

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the Twitter User Agreement comprises these Terms of Service, our Privacy Policy (https://twitter.com/privacy), the Twitter Rules and Policies (https://help.twitter.com/en/rules-and-policies#twitter-rules), and all incorporated policies

**If you live in the European Union, EFTA States, or the United Kingdom,** the Twitter User Agreement comprises these Terms of Service, our Privacy Policy (https://twitter.com/privacy), the Twitter Rules and Policies (https://help.twitter.com/en/rules-and-policies#twitter-rules), and all incorporated policies.

## Twitter Terms of Service

### If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates) (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

## 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with Twitter and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

## 2. Privacy

Our Privacy Policy (https://twitter.com/privacy) (https://www.twitter.com/privacy (https://www.twitter.com/privacy)) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by Twitter and its affiliates.

## 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can

**App. 548**

be found in our Help Center (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations) and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts (https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts)).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.twitter.com/forms/dmca (https://help.twitter.com/forms/dmca)) or contacting our designated copyright agent at:

Twitter, Inc.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca (https://help.twitter.com/forms/dmca)
Email: copyright@twitter.com
(for content on Twitter)

Twitter, Inc.
Attn: Copyright Agent - Periscope
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca (https://help.twitter.com/forms/dmca)Email: copyright@pscp.tv
(for content on Periscope)

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of

the world and to let others do the same. You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by Twitter, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

Twitter has an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant Twitter the license described above.

# 4. Using the Services

Please review the Twitter Rules and Policies (https://help.twitter.com/en/rules-and-policies#twitter-rules) (and, for Periscope, the Periscope Community Guidelines (https://www.pscp.tv/content) at https://www.pscp.tv/content (https://www.pscp.tv/content)), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also

remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for Twitter granting you access to and use of the Services, you agree that Twitter and its third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, Twitter's computer systems, or the technical delivery systems of Twitter's providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. Twitter does not disclose personally-identifying information to third parties except in accordance with our Privacy Policy (https://twitter.com/privacy).

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/docs/twitter-for-websites/overview) (https://developer.twitter.com/docs/twitter-for-websites/overview (https://developer.twitter.com/docs/twitter-for-websites/overview)), Twitter Cards

**App. 551**

(https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started)

[https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started](https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started)), Public API (https://developer.twitter.com/en/docs)[https://developer.twitter.com/en/docs](https://developer.twitter.com/en/docs)), or Sign in with Twitter (https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter)

[https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter](https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter)), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement)

[https://developer.twitter.com/en/developer-terms/agreement](https://developer.twitter.com/en/developer-terms/agreement)) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy)

[https://developer.twitter.com/en/developer-terms/policy](https://developer.twitter.com/en/developer-terms/policy)). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Twitter Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms (https://developer.twitter.com/en/developer-terms). If you are a security researcher, you are required to comply with the rules of the Twitter Vulnerability Reporting Program (https://hackerone.com/twitter)

[https://hackerone.com/twitter](https://hackerone.com/twitter)). The requirements set out in the preceding paragraph may not apply to those participating in Twitter's Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms) [https://ads.twitter.com/terms](https://ads.twitter.com/terms)).

If you use Super Hearts, Coins, or Stars on Periscope, you must agree to our Super Hearts Terms (https://legal.twitter.com/en/periscope/super/terms.html)

[https://legal.twitter.com/en/periscope/super/terms.html](https://legal.twitter.com/en/periscope/super/terms.html)).

# Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Ending These Terms

You may end your legal agreement with Twitter at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account) (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220 (https://help.pscp.tv/customer/portal/articles/2460220)) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies (https://help.twitter.com/en/rules-and-policies#twitter-rules) or Periscope Community Guidelines (https://www.pscp.tv/content), (ii) you create risk or possible legal exposure for

us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: II, III, V, and VI. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended) (https://help.twitter.com/forms/general?subtopic=suspended (https://help.twitter.com/forms/general?subtopic=suspended)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "Twitter Entities" refers to Twitter, its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE TWITTER ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The Twitter Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the Twitter Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE TWITTER ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE TWITTER ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID TWITTER, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE TWITTER ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos (https://twitter.com/en/tos), will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and Twitter. All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of California (excluding choice of law).

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Twitter's failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

These Terms are an agreement between you and Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, CA 94103 U.S.A. If you have any questions about these Terms, please contact us (https://help.twitter.com/forms).

**Effective:** June 18, 2020

Archive of Previous Terms

# Twitter Terms of Service

## If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates (https://help.twitter.com/en/rules-and-policies/twitter-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

**App. 556**

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with Twitter and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old, or in the case of Periscope 16 years old, to use the Services. If you are accepting these Terms and using the Services on behalf of a company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so and have the authority to bind such entity to these Terms, in which case the words "you" and "your" as used in these Terms shall refer to such entity.

# 2. Privacy

Our Privacy Policy (https://twitter.com/privacy) (https://www.twitter.com/privacy (https://www.twitter.com/privacy)) describes how we handle the information you provide to us when you use our Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by Twitter and its affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

**App. 557**

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations (https://help.twitter.com/en/rules-and-policies/twitter-report-violation#specific-violations) and https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts (https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts)).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.twitter.com/forms/dmca (https://help.twitter.com/forms/dmca)) or contacting our designated copyright agent at:

Twitter, Inc.
Attn: Copyright Agent
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca (https://help.twitter.com/forms/dmca)
Email: copyright@twitter.com
(for content on Twitter)

Twitter, Inc.
Attn: Copyright Agent - Periscope
1355 Market Street, Suite 900
San Francisco, CA 94103
Reports: https://help.twitter.com/forms/dmca (https://help.twitter.com/forms/dmca)Email: copyright@pscp.tv
(for content on Periscope)

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating). This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by Twitter, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

Twitter has an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant Twitter the license described above.

# 4. Using the Services

Please review the Twitter Rules and Policies (https://help.twitter.com/en/rules-and-policies#twitter-rules) (and, for Periscope, the Periscope Community Guidelines (https://www.pscp.tv/content) at https://pscp.tv/content (https://www.pscp.tv/content)), which are part of the User Agreement and outline what is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations.

**App. 559**

Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for Twitter granting you access to and use of the Services, you agree that Twitter and its third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. You also agree not to misuse our Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, Twitter's computer systems, or the technical delivery systems of Twitter's providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by Twitter (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with Twitter (NOTE: crawling the Services is permissible if done in accordance with the provisions of the robots.txt file, however, scraping the Services without the prior consent of Twitter is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting, or in any way use the Services to send altered, deceptive or false source-identifying information; or (v) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) enforce the Terms, including investigation of potential violations hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) protect the rights, property or safety of Twitter, its users and the public. Twitter does not disclose personally-identifying information to third parties except in accordance with our Privacy Policy (https://twitter.com/privacy).

**App. 560**

If you use developer features of the Services, including but not limited to Twitter for Websites (https://developer.twitter.com/docs/twitter-for-websites/overview) (https://developer.twitter.com/docs/twitter-for-websites/overview (https://developer.twitter.com/docs/twitter-for-websites/overview)), Twitter Cards (https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started) (https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started (https://developer.twitter.com/docs/tweets/optimize-with-cards/guides/getting-started)), Public API (https://developer.twitter.com/en/docs)(https://developer.twitter.com/en/docs (https://developer.twitter.com/en/docs)), or Sign in with Twitter (https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter) (https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter (https://developer.twitter.com/docs/basics/authentication/guides/log-in-with-twitter)), you agree to our Developer Agreement (https://developer.twitter.com/en/developer-terms/agreement) (https://developer.twitter.com/en/developer-terms/agreement (https://developer.twitter.com/en/developer-terms/agreement)) and Developer Policy (https://developer.twitter.com/en/developer-terms/policy) (https://developer.twitter.com/en/developer-terms/policy (https://developer.twitter.com/en/developer-terms/policy)). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Twitter Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms (https://developer.twitter.com/en/developer-terms). If you are a security researcher, you are required to comply with the rules of the Twitter Vulnerability Reporting Program (https://hackerone.com/twitter) (https://hackerone.com/twitter (https://hackerone.com/twitter)).  The requirements set out in the preceding paragraph may not apply to those participating in Twitter's Vulnerability Reporting Program.

If you use advertising features of the Services, you must agree to our Twitter Master Services Agreement (https://ads.twitter.com/terms) (https://ads.twitter.com/terms (https://ads.twitter.com/terms)).

If you use Super Hearts, Coins, or Stars on Periscope, you agree to our Super Hearts Terms (https://legal.twitter.com/en/periscope/super/terms.html) (https://legal.twitter.com/en/periscope/super/terms.html (https://legal.twitter.com/en/periscope/super/terms.html)).

# Your Account

You may need to create an account to use some of our Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

Twitter gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Twitter, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the Twitter name or any of the Twitter trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain the exclusive property of Twitter and its licensors. Any feedback, comments, or suggestions you may provide regarding Twitter, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Ending These Terms

You may end your legal agreement with Twitter at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account (https://help.twitter.com/en/managing-your-account/how-to-deactivate-twitter-account) (and for Periscope, https://help.pscp.tv/customer/portal/articles/2460220 (https://help.pscp.tv/customer/portal/articles/2460220)) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

**App. 562**

We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies (https://help.twitter.com/en/rules-and-policies#twitter-rules) or Periscope Community Guidelines (https://www.pscp.tv/content), (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: II, III, V, and VI. If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.twitter.com/forms/general?subtopic=suspended) (https://help.twitter.com/forms/general?subtopic=suspended (https://help.twitter.com/forms/general?subtopic=suspended)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that Twitter, its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at twitter.com/tos (https://twitter.com/en/tos), will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Twitter's failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

These Terms are an agreement between you and Twitter International Company (Co. number 503351, VAT number IE9803175Q), an Irish company with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. If you have any questions about these Terms, please contact us (https://help.twitter.com/forms).

**Effective:** June 18, 2020

Archive of Previous Terms

© 2021 Twitter, Inc.

Cookies (https://help.twitter.com/rules-and-policies/twitter-cookies)

Privacy (https://twitter.com/privacy)

Terms and conditions (https://twitter.com/tos)

 **Help Center**

# About your Twitter timeline



## What's in your Home timeline

When you log in to Twitter, you'll land on your Home timeline.

- Your Home timeline displays a stream of Tweets from accounts you have chosen to follow on Twitter. You may see suggested content powered by a variety of signals. You can reply (https://help.twitter.com/en/using-twitter/mentions-and-replies), Retweet (https://help.twitter.com/en/using-twitter/retweet-faqs), or like (https://help.twitter.com/en/using-twitter/liking-tweets-and-moments) a Tweet from within the timeline.

- You can choose between viewing the top Tweets first or the latest Tweets first in your timeline (Twitter for iOS and Android only). Top Tweets are ones you are likely to care

about most, and we choose them based on accounts you interact with most, Tweets you engage with, and much more. You can find instructions on how to toggle between the two timeline views below.

- You may see a summary of the most interesting Tweets you might not have seen, labeled as **In case you missed it**.

- You may also see content such as promoted Tweets (https://help.twitter.comhttps://business.twitter.com/help/how-twitter-ads-work) or Retweets (https://help.twitter.com/en/using-twitter/twitter-timeline) in your timeline.

- Additionally, when we identify a Tweet, an account to follow, or other content that's popular or relevant, we may add it to your timeline. This means you will sometimes see Tweets from accounts you don't follow. We select each Tweet using a variety of signals, including how popular it is and how people in your network are interacting with it. Our goal is to show you content on your Home timeline that you're most interested in and contributes to the conversation in a meaningful way, such as content that is relevant, credible, and safe.

- Clicking or tapping anywhere on a Tweet in your timeline expands the Tweet, so you can see photos, videos, and other information related to that Tweet.

- Use the **Bookmarks** feature from your Twitter for iOS or Android app and mobile.twitter.com to bookmark Tweets you'd like to refer to later. From a Tweet, tap the **share** icon (⬆ on iOS, ⤳ on Android) and select **Add Tweet to Bookmarks**. To view your saved Tweets, tap **Bookmarks** from your **profile** icon menu. To remove a saved bookmark, tap the **share** icon from the Tweet within your bookmark timeline and select **Remove Tweet from bookmarks**. Additionally, you can tap the **more** icon ⋯ at the top of your bookmark timeline to remove all of your bookmarks at once.

- You may see events featured at the top of your timeline labeled as **Happening now**. When available, we'll show you events and topics we think you might be interested in when you open your Twitter for iOS or Android app. Tap the ⌄ icon to view why we think you'll be interested in the event, or to hide the event from your timeline. Tap the photo to view conversation surrounding the event.

## Where you'll see other timelines

- Timelines can also consist of search results (https://help.twitter.com/en/using-twitter/twitter-search.html) or lists (https://help.twitter.comhttps://support.twitter.com/articles/76460-how-to-use-twitter-lists) that you've curated.

Feedback

**App. 566**

- When you perform a search, you'll see a timeline of Tweets, Moments, and events that all match your search terms.

- Similarly, when you click or tap on a list, you will see an aggregated stream of Tweets (a timeline) posted by the accounts included in that list.

View instructions for:

You can toggle between seeing the **top Tweets** first and the **latest Tweets** first by doing the following:

In the top menu, tap the ✨ icon.

1. Tap the **arrows** to switch to the timeline view of your choice.

2. Tap **View content preferences** to go to your settings.

You can toggle between seeing the **top Tweets** first and the **latest Tweets** first by doing the following:

In the top menu, tap the ✨ icon.

1. Tap the **arrows** to switch to the timeline view of your choice.

2. Tap **View content preferences** to go to your settings.

You can toggle between seeing the **top Tweets** first and the **latest Tweets** first by doing the following:

In the top menu, tap the ✨ icon.

1. Tap the **arrows** to switch to the timeline view of your choice.

Feedback

**App. 567**

2. Tap **View content preferences** to go to your settings.

# Was this article helpful?<span style="color:red">*</span>

  



Feedback

# THE NEW GOVERNORS: THE PEOPLE, RULES, AND PROCESSES GOVERNING ONLINE SPEECH

## *Kate Klonick*

INTRODUCTION .................................................................................................1599
I.  SECTION 230, THE FIRST AMENDMENT, AND THE BEGINNINGS OF
    INTERMEDIARY SELF-REGULATION .......................................................1603
    A. *History and Development of § 230*.....................................................1604
    B. *First Amendment Implications* ...........................................................1609
    C. *Internet Pessimists, Optimists, and Realists* .....................................1613
II. WHY GOVERN WELL? THE ROLE OF FREE SPEECH NORMS, CORPORATE
    CULTURE, AND ECONOMIC INCENTIVES IN THE DEVELOPMENT OF CONTENT
    MODERATION...........................................................................................1616
    A. *Platforms' Baseline in Free Speech* ...................................................1618
        1. *Free Speech Norms* ......................................................................1618
        2. *Government Request and Collateral Censorship Concerns* ...................1622
    B. *Why Moderate At All?*........................................................................1625
        1. *Corporate Responsibility and Identity* ...........................................1626
        2. *Economic Reasons* ........................................................................1627
III. HOW ARE PLATFORMS GOVERNING? THE RULES, PROCESS, AND REVISION OF
    CONTENT-MODERATION SYSTEMS ........................................................1630
    A. *Development of Moderation: From Standards to Rules* ........................1631
    B. *How the Rules Are Enforced: Trained Human Decisionmaking*...............1635
        1. *Ex Ante Content Moderation*.........................................................1636
        2. *Ex Post Proactive Manual Content Moderation*................................1638
        3. *Ex Post Reactive Manual Content Moderation* .................................1638
        4. *Decisions, Escalations, and Appeals* ...............................................1647
    C. *System Revision and the Pluralistic System of Influence*......................1649
        1. *Government Requests* .....................................................................1650
        2. *Media Coverage* ............................................................................1652
        3. *Third-Party Influences* ...................................................................1655
        4. *Change Through Process* .................................................................1657
    D. *Within Categories of the First Amendment*..........................................1658
IV. THE NEW GOVERNORS ............................................................................1662
    A. *Equal Access*......................................................................................1665
    B. *Accountability*....................................................................................1666
CONCLUSION ...................................................................................................1669

1598

# THE NEW GOVERNORS: THE PEOPLE, RULES, AND PROCESSES GOVERNING ONLINE SPEECH

## *Kate Klonick*[*]

*Private online platforms have an increasingly essential role in free speech and participation in democratic culture. But while it might appear that any internet user can publish freely and instantly online, many platforms actively curate the content posted by their users. How and why these platforms operate to moderate speech is largely opaque.*

*This Article provides the first analysis of what these platforms are actually doing to moderate online speech under a regulatory and First Amendment framework. Drawing from original interviews, archived materials, and internal documents, this Article describes how three major online platforms — Facebook, Twitter, and YouTube — moderate content and situates their moderation systems into a broader discussion of online governance and the evolution of free expression values in the private sphere. It reveals that private content-moderation systems curate user content with an eye to American free speech norms, corporate responsibility, and the economic necessity of creating an environment that reflects the expectations of their users. In order to accomplish this, platforms have developed a detailed system rooted in the American legal system with regularly revised rules, trained human decisionmaking, and reliance on a system of external influence.*

*This Article argues that to best understand online speech, we must abandon traditional doctrinal and regulatory analogies and understand these private content platforms as systems of governance. These platforms are now responsible for shaping and allowing participation in our new digital and democratic culture, yet they have little direct accountability to their users. Future intervention, if any, must take into account how and why these platforms regulate online speech in order to strike a balance between preserving the democratizing forces of the internet and protecting the generative power of our New Governors.*

## INTRODUCTION

*In a lot of ways Facebook is more like a government than a traditional company. We have this large community of people, and more than other technology companies we're really setting policies.*
     — Mark Zuckerberg[1]

---

[*] Ph.D. in Law Candidate, Yale University, and Resident Fellow at the Information Society at Yale Law School. Research for this project was made possible with the generous support of the Oscar M. Ruebhausen Fund. The author is grateful to Jack Balkin, Molly Brady, Kiel Brennan-Marquez, Peter Byrne, Adrian Chen, Bryan Choi, Danielle Keats Citron, Rebecca Crootof, Evelyn Frazee, Tarleton Gillespie, Eric Goldman, James Grimmelmann, Brad Greenberg, Alexandra Gutierrez, Woody Hartzog, David Hoffman, Gus Hurwitz, Thomas Kadri, Margot Kaminski, Alyssa King, Jonathan Manes, Toni Massaro, Christina Mulligan, Frank Pasquale, Robert Post, Sabeel Rahman, Jeff Rosen, Andrew Selbst, Jon Shea, Rebecca Tushnet, and Tom Tyler for helpful thoughts and comments on earlier versions of this Article. A special thank you to Rory Van Loo, whose own paper workshop inadvertently inspired me to pursue this topic. Elizabeth Goldberg and Deborah Won provided invaluable and brilliant work as research assistants.

[1] DAVID KIRKPATRICK, THE FACEBOOK EFFECT: THE INSIDE STORY OF THE COMPANY THAT IS CONNECTING THE WORLD 254 (2010).

In the summer of 2016, two historic events occurred almost simultaneously: a bystander captured a video of the police shooting of Alton Sterling on his cell phone, and another recorded the aftermath of the police shooting of Philando Castile and streamed the footage via Facebook Live.[2]  Following the deaths of Sterling and Castile, Facebook founder and CEO Mark Zuckerberg stated that the ability to instantly post a video like the one of Castile dying "reminds us why coming together to build a more open and connected world is so important."[3] President Barack Obama issued a statement saying the shootings were "symptomatic of the broader challenges within our criminal justice system,"[4] and the Department of Justice opened an investigation into Sterling's shooting and announced that it would monitor the Castile investigation.[5]  Multiple protests took place across the country.[6]  The impact of these videos is an incredible example of how online platforms are now essential to participation in democratic culture.[7]  But it almost never happened.

Initially lost in the voluminous media coverage of these events was a critical fact: as the video of Castile was streaming, it suddenly disappeared from Facebook.[8]  A few hours later, the footage reappeared, this time with a label affixed warning of graphic content.[9]  In official state-

---

[2] Richard Fausset et al., *Alton Sterling Shooting in Baton Rouge Prompts Justice Dept. Investigation*, N.Y. TIMES (July 6, 2016), http://nyti.ms/2szuH6H [https://perma.cc/Q8T6-HHXE]; Manny Fernandez et al., *11 Officers Shot, 4 Fatally, at Rally Against Violence*, N.Y. TIMES, July 8, 2016, at A1.

[3] Mark Zuckerberg, *Post*, FACEBOOK (July 7, 2016), https://www.facebook.com/zuck/posts/10102948714100101 [https://perma.cc/PP9M-FRTU].

[4] Press Release, White House, President Obama on the Fatal Shootings of Alton Sterling and Philando Castile (July 7, 2016), https://obamawhitehouse.archives.gov/blog/2016/07/07/president-obama-fatal-shootings-alton-sterling-and-philando-castile [https://perma.cc/VUL4-QT44].

[5] Press Release, U.S. Dep't of Justice, Attorney General Loretta E. Lynch Delivers Statement on Dallas Shooting (July 8, 2016), https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-statement-dallas-shooting [https://perma.cc/UG89-XJXW].

[6] Fernandez et al., *supra* note 2; Liz Sawyer, *Protest Results in Brief Closure of State Fair's Main Gate*, STAR TRIB. (Minneapolis) (Sept. 3, 2016, 9:38 PM), http://www.startribune.com/protesters-gather-at-site-where-castile-was-shot/392247781/ [https://perma.cc/8Y4W-VF2Z]; Mitch Smith et al., *Peaceful Protests Follow Minnesota Governor's Call for Calm*, N.Y. TIMES (July 8, 2016), http://nyti.ms/2CqolWM [https://perma.cc/HRQ6-CTUC].

[7] *See* Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. REV. 1, 2 (2004).

[8] *How Did Facebook Handle the Live Video of the Police Shooting of Philando Castile?*, WASH. POST (July 7, 2016, 11:45 AM), http://wapo.st/2ByazET [https://perma.cc/T6ZK-RZRC]; Mike Isaac & Sydney Ember, *Live Footage of Shootings Forces Facebook to Confront New Role*, N.Y. TIMES (July 8, 2016), http://nyti.ms/2CpLI37 [https://perma.cc/ZHR5-FAJE].

[9] Isaac & Ember, *supra* note 8.

ments, Facebook blamed the takedown on a "technical glitch" but provided no further details.[10]  This is not entirely surprising.  Though it might appear that any internet user can publish freely and instantly online, many content-publication platforms actively moderate[11] the content posted by their users.[12]  Yet despite the essential nature of these platforms to modern free speech and democratic culture,[13] very little is known about how or why these companies curate user content.[14]

In response to calls for transparency, this Article examines precisely *what* these private platforms are actually doing to moderate user-generated content and *why* they are doing so.  It argues that these platforms are best thought of as self-regulating[15] private entities, governing

---

[10] William Turton, *Facebook Stands by Technical Glitch Claim, Says Cop Didn't Delete Philando Castile Video*, GIZMODO (July 8, 2016, 1:36 PM), http://gizmodo.com/facebook-stands-by-technical-glitch-claim-says-cop-did-1783349993 [https://perma.cc/3ZWP-7SM9].

[11] I use the terms "moderate," "curate," and sometimes "regulate" to describe the behavior of these private platforms in both keeping up and taking down user-generated content.  I use these terms rather than using the term "censor," which evokes the ideas of only removal of material and various practices of culturally expressive discipline or control.  *See generally* Robert C. Post, *Project Report: Censorship and Silencing*, 51 BULL. AM. ACAD. ARTS & SCI. 32, 32 (1998).  Where I do use "regulate," I do so in a more colloquial sense and not the way in which Professor Jack Balkin uses the term "speech regulation," which concerns government regulation of speech or government cooperation, coercion, or partnership with private entities to reflect government ends.  *See* Jack M. Balkin, *Old-School/New-School Speech Regulation*, 127 HARV. L. REV. 2296, 2299 (2014) (also explaining that the phrase "collateral censorship" is a term of art exempted from this taxonomy).

[12] *See* Catherine Buni & Soraya Chemaly, *The Secret Rules of the Internet: The Murky History of Moderation, and How It's Shaping the Future of Free Speech*, THE VERGE (Apr. 13, 2016), https://www.theverge.com/2016/4/13/11387934/internet-moderator-history-youtube-facebook-reddit-censorship-free-speech [https://perma.cc/PDM3-P6YH]; Adrian Chen, *The Laborers Who Keep Dick Pics and Beheadings Out of Your Facebook Feed*, WIRED (Oct. 23, 2014, 6:30 AM), https://www.wired.com/2014/10/content-moderation/ [https://perma.cc/L5ME-T4H6]; Jeffrey Rosen, *Google's Gatekeepers*, N.Y. TIMES MAG. (Nov. 28, 2008), http://nyti.ms/2oc9lqw [https://perma.cc/YBM8-TNXC].

[13] Packingham v. North Carolina, 137 S. Ct. 1730, 1737 (2017) (holding that a state statute barring registered sex offenders from using online social media platforms was unconstitutional under the First Amendment).  In his majority opinion, Justice Kennedy wrote that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear.  It is cyberspace — the 'vast democratic forums of the Internet' in general, and social media in particular."  *Id.* at 1735 (citation omitted) (quoting Reno v. ACLU, 521 U.S. 844, 868 (1997)).

[14] *See, e.g.*, Marvin Ammori, *The "New"* New York Times: *Free Speech Lawyering in the Age of Google and Twitter*, 127 HARV. L. REV. 2259, 2273–76 (2014); Marjorie Heins, *The Brave New World of Social Media Censorship*, 127 HARV. L. REV. F. 325, 326 (2014) (describing Facebook's internal appeals process as "mysterious at best" and noting, about their internal policies, that "[t]he details of these rules . . . we do not know" and that the censorship "process in the private world of social media is secret").

[15] *See generally* Jody Freeman, *The Private Role in Public Governance*, 75 N.Y.U. L. REV. 543 (2000); Douglas C. Michael, *Federal Agency Use of Audited Self-Regulation as a Regulatory Technique*, 47 ADMIN. L. REV. 171 (1995).

*HARVARD LAW REVIEW* [Vol. 131:1598

speech within the coverage of the First Amendment[16] by reflecting the democratic culture and norms of their users.[17]

Part I surveys the regulatory and constitutional protections that have resulted in these private infrastructures. The ability of private platforms to moderate content comes from § 230 of the Communications Decency Act[18] (CDA), which gives online intermediaries broad immunity from liability for user-generated content posted on their sites.[19] The purpose of this grant of immunity was both to encourage platforms to be "Good Samaritans" and take an active role in removing offensive content, and also to avoid free speech problems of collateral censorship.[20] Beyond § 230, courts have struggled with how to conceptualize online platforms within First Amendment doctrine: as state actors, as broadcasters, or as editors. Additionally, scholars have moved between optimistic and pessimistic views of platforms and have long debated how — or whether — to constrain them.

To this legal framework and scholarly debate, this Article applies new evidence. Part II looks at why platforms moderate so intricately given the broad immunity of § 230. Through interviews with former platform architects and archived materials, this Article argues that platforms moderate content because of a foundation in American free speech norms, corporate responsibility, and the economic necessity of creating an environment that reflects the expectations of their users. Thus, platforms are motivated to moderate by both of § 230's purposes: fostering Good Samaritan platforms and promoting free speech.

Part III looks at how platforms are moderating user-generated content and whether that understanding can fit into an existing First Amendment framework. Through internal documents, archived materials, interviews with platform executives, and conversations with content moderators, this Article shows that platforms have developed a system that has marked similarities to legal or governance systems. This includes the creation of a detailed list of rules, trained human decisionmaking to apply those rules, and reliance on a system of external influence to update and amend those rules. With these facts, this Article

---

[16] *See generally* Balkin, *supra* note 11; Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 HARV. L. REV. 1765 (2004).

[17] *See generally* ROBERT C. ELLICKSON, ORDER WITHOUT LAW (1991); ELINOR OSTROM, CRAFTING INSTITUTIONS FOR SELF-GOVERNING IRRIGATION SYSTEMS (1992); Balkin, *supra* note 7; J.M. Balkin, *Populism and Progressivism as Constitutional Categories*, 104 YALE L.J. 1935, 1948–49 (1995) (reviewing CASS R. SUNSTEIN, DEMOCRACY AND THE PROBLEM OF FREE SPEECH (1993), and defining democratic culture as popular participation in culture); Robert C. Ellickson, *Of Coase and Cattle: Dispute Resolution Among Neighbors in Shasta County*, 38 STAN. L. REV. 623 (1986).

[18] 47 U.S.C. § 230 (2012).

[19] *Id.*

[20] *See* Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997) (noting that the purposes of intermediary immunity in § 230 were not only to incentivize platforms to remove indecent content but also to protect the free speech of platform users).

argues that analogy under purely First Amendment doctrine should be largely abandoned.

Instead, platforms should be thought of as operating as the New Governors of online speech. These New Governors are part of a new triadic model of speech that sits between the state and speakers-publishers. They are private, self-regulating entities that are economically and normatively motivated to reflect the democratic culture and free speech expectations of their users. Part IV explains how this conceptualization of online platforms as governance fits into scholarly concerns over the future of digital speech and democratic culture. It argues that the biggest threat this private system of governance poses to democratic culture is the loss of a fair opportunity to participate, which is compounded by the system's lack of direct accountability to its users. The first solution to this problem should not come from changes to § 230 or new interpretations of the First Amendment, but rather from simple changes to the architecture and governance systems put in place by these platforms. If this fails and regulation is needed, it should be designed to strike a balance between preserving the democratizing forces of the internet and protecting the generative power of our New Governors, with a full and accurate understanding of how and why these platforms operate, as presented here. It is only through accurately understanding the infrastructures and motivations of our New Governors that we can ensure that the free speech rights essential to our democratic culture remain protected.

## I. SECTION 230, THE FIRST AMENDMENT, AND THE BEGINNINGS OF INTERMEDIARY SELF-REGULATION

Before the internet, the most significant constraint on the impact and power of speech was the publisher.[21] The internet ended the speaker's reliance on the publisher by allowing the speaker to reach his or her audience directly.[22] Over the last fifteen years, three American companies — YouTube, Facebook, and Twitter — have established themselves as dominant platforms in global content sharing.[23] These platforms are both the architecture for publishing new speech and the architects of the

---

[21] LAWRENCE LESSIG, CODE 2.0, at 19 (2006).

[22] *Id.*; Balkin, *supra* note 11, at 2306–10.

[23] *Facebook Grows as Dominant Content Sharing Destination*, MARKETING CHARTS (Aug. 24, 2016), https://www.marketingcharts.com/digital-70111 [https://perma.cc/VA4T-LM5Z] (describing Facebook and Twitter as the top content sharing destinations); *Facebook vs. YouTube: The Dominant Video Platform of 2017*, STARK CREW (Jan. 11, 2017), http://starkcrew.com/facebook-vs-youtube-the-dominant-video-platform-of-2017/ [https://perma.cc/5TTA-VJ64] (naming Facebook and YouTube as the dominant platforms for sharing video content online and summarizing their statistics).

institutional design that governs it.[24]  This private architecture is the "central battleground over free speech in the digital era."[25]

## A.  History and Development of § 230

In order to understand the private governance systems used by platforms to regulate user content, it is necessary to start with the legal foundations and history that allowed for such a system to develop.  The broad freedom of internet intermediaries[26] to shape online expression is based in § 230 of the CDA, which immunizes providers of "interactive computer services" from liability arising from user-generated content.[27]  Sometimes called "the law that matters most for speech on the Web," the existence of § 230 and its interpretation by courts have been essential to the development of the internet as we know it today.[28]

Central to understanding the importance of § 230 are two cases decided before its existence, which suggested that intermediaries would be liable for defamation posted on their sites if they actively exercised any editorial discretion over offensive speech.[29]  The first, *Cubby, Inc. v. CompuServe, Inc.*,[30] involved the publication of libel on CompuServe forums.[31]  The court found CompuServe could not be held liable for the defamatory content in part because the intermediary did not review any of the content posted to the forum.[32]  The *Cubby* court reasoned that CompuServe's practice of not actively reviewing content on its site made it more like a distributor of content, and not a publisher.[33]  In determining communication tort liability, this distinction is important because while publishers and speakers of content can be held liable, distributors are generally not liable unless they knew or should have known of the

---

[24] LESSIG, *supra* note 21, at 2–10 (describing the internet as architecture).

[25] Balkin, *supra* note 11, at 2296.

[26] Internet intermediaries are broadly defined as actors in every part of the internet "stack." *See* JAMES GRIMMELMANN, INTERNET LAW 31 (2016).  These include internet service providers, hosting providers, servers, websites, social networks, search engines, and so forth. *See id.* at 31–32.  Within this array, I use "platforms" to refer specifically to internet websites or apps that publish user content — these include Facebook, YouTube, and Twitter.

[27] 47 U.S.C. § 230(c)(2) (2012); *see also* Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997) (blocking claims against AOL under § 230 because AOL was only the publisher, and not the creator, of the tortious content).

[28] Emily Bazelon, *How to Unmask the Internet's Vilest Characters*, N.Y. TIMES MAG. (Apr. 22, 2011), http://nyti.ms/2C3oZL9 [https://perma.cc/55A3-6FAN].

[29] *See* Davis S. Ardia, *Free Speech Savior or Shield for Scoundrels: An Empirical Study of Intermediary Immunity Under Section 230 of the Communications Decency Act*, 43 LOY. L.A. L. REV. 373, 406–09 (2010).

[30] 776 F. Supp. 135 (S.D.N.Y. 1991).

[31] *Id.* at 138; Ardia, *supra* note 29, at 406–07.  CompuServe did not dispute that the statements were defamatory.  *Cubby*, 776 F. Supp. at 138.

[32] *Cubby*, 776 F. Supp. at 140.

[33] *Id.* at 139–41.

defamation.[34]  Though distributor-publisher distinctions were an established analogy in tort liability, the difficulty of using this model for online intermediaries quickly became apparent.  Four years after *Cubby*, in *Stratton Oakmont, Inc. v. Prodigy Services Co.*,[35] a court found that the intermediary Prodigy was liable as a publisher for all posts made on its site because it actively deleted some forum postings.[36]  To many, Prodigy's actions seemed indistinguishable from those that had rendered CompuServe a mere distributor in *Cubby*, but the court found Prodigy's use of automatic software and guidelines for posting were a "conscious choice, to gain the benefits of editorial control."[37]  Read together, the cases seemed to expose intermediaries to a wide and unpredictable range of tort liability if they exercised any editorial discretion over content posted on their sites.  Accordingly, the cases created a strong disincentive for online intermediaries to expand business or moderate offensive content and threatened the developing landscape of the internet.

Thankfully, the developing landscape of the internet was an active agenda item for Congress when the *Stratton Oakmont* decision came down.  Earlier that year, Senator James Exon had introduced the CDA, which aimed to regulate obscenity online by making it illegal to knowingly send or show minors indecent online content.[38]  Reacting to the concerns created by *Stratton Oakmont*, Representatives Chris Cox and Ron Wyden introduced an amendment to the CDA that would become § 230.[39]  The Act, with the Cox-Wyden amendment, passed and was signed into law in February 1996.[40]  In its final form, § 230(c) stated that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"[41] in order to incentivize and protect intermediaries' Good Samaritan blocking of offensive material.[42]  Though, just a little over a year later, the Supreme Court in *Reno v. ACLU*[43] struck down the bulk of the anti-indecency sections of the CDA, § 230 survived.[44]

---

[34] RESTATEMENT (SECOND) OF TORTS § 581(1) (AM. LAW INST. 1977).

[35] 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).

[36] *Id.* at *4.

[37] *Id.* at *5.

[38] *See* Robert Cannon, *The Legislative History of Senator Exon's Communications Decency Act: Regulating Barbarians on the Information Superhighway*, 49 FED. COMM. L.J. 52–53 (1996).

[39] 141 CONG. REC. H8469–70 (daily ed. Aug. 4, 1995) (statements of Reps. Cox, Wyden, and Barton).

[40] *See* Pub. L. No. 104-104, tit. V, 110 Stat. 56, 133–43 (1996) (codified in scattered sections of 18 and 47 U.S.C.); *see also* H.R. REP. NO. 104-458, at 81–91 (1996); S. REP. NO. 104-230, at 187–93 (1996); S. REP. NO. 104-23, at 9 (1995).  For a full and thorough account of the legislative history of § 230, see generally Cannon, *supra* note 38.

[41] 47 U.S.C. § 230(c)(1) (2012).

[42] 141 CONG. REC. H8469–70 (statement of Rep. Cox).

[43] 521 U.S. 844 (1997).

[44] *Id.* at 885.

It soon became clear that § 230 would do more than just survive. A few months after *Reno*, the Fourth Circuit established a foundational and expansive interpretation of § 230 in *Zeran v. America Online, Inc.*[45] Plaintiff Zeran sought to hold AOL liable for defamatory statements posted on an AOL message board by a third party.[46] Zeran argued that AOL had a duty to remove the posting, post notice of the removed post's falsity, and screen future defamatory material.[47] The court disagreed. Instead, it found AOL immune under § 230 and held that the section precluded not only strict liability for publishers but also intermediary liability for distributors such as website operators.[48] This holding also extinguished notice liability for online intermediaries.[49]

While the holdings in *Zeran* were broad and sometimes controversial,[50] it was the court's analysis as to the purposes and scope of § 230 that truly shaped the doctrine. In granting AOL the affirmative defense of immunity under § 230, the court recognized the Good Samaritan provision's purpose of encouraging "service providers to self-regulate the dissemination of offensive material over their services."[51] But the court did not consider § 230 merely a congressional response to *Stratton Oakmont*. Instead, the court looked to the plain text of § 230(c) granting statutory immunity to online intermediaries and drew new purpose beyond the Good Samaritan provision and found that intent "not difficult to discern":

> Congress recognized the threat that tort-based lawsuits pose to *freedom of speech* in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of *intrusive government regulation of speech*.[52]

Thus, while the court reasoned that § 230 lifted the "specter of tort liability" that might "deter service providers from blocking and screening offensive material," it found it was also Congress's design to immunize intermediaries from any requirement to do so.[53] Drawing on these free speech concerns, the court reasoned that the same "specter of tort liability" that discouraged intermediaries from policing harmful content also threatened "an area of such prolific speech" with "an obvious

---

[45] 129 F.3d 327 (4th Cir. 1997).
[46] *Id.* at 328.
[47] *Id.* at 330.
[48] *Id.* at 332.
[49] *Id.* at 333.
[50] *See Developments in the Law — The Law of Cyberspace*, 112 HARV. L. REV. 1574, 1613 (1999) (referring to *Zeran*'s holding as a "broad interpretation of § 230").
[51] *Zeran*, 129 F.3d at 331.
[52] *Id.* at 330 (emphases added).
[53] *Id.* at 331.

chilling effect."[54]  "Faced with potential liability for each message re-published by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted."[55]  In response to the question raised by *Zeran* of subjecting publishers like AOL to notice-based liability, the court again cited its free speech concerns but also recognized the practical realities of distributors: "Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information."[56]

The sheer volume of content to be policed by intermediaries, and their almost certain liability should they be notified and still publish, would lead to either haphazard takedowns at best, or widespread removal at worst.  "Thus, like strict liability, liability upon notice has a chilling effect on the freedom of Internet speech."[57]

*Zeran* is a seminal decision in internet law not only because it gave broad immunity to online intermediaries[58] but also because of its analysis of the purposes of § 230.  The court recognized two distinct congressional purposes for granting immunity under § 230: (1) as a Good Samaritan provision written to overturn *Stratton Oakmont* and "to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material,"[59] and (2)

---

[54]  *Id.*

[55]  *Id.*  The quote continues: "Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect."  *Id.*

[56]  *Id.* at 333.

[57]  *Id.*  Though this free speech purpose might not have been in the plain text of § 230, the *Zeran* court did not invent it.  *See* Cannon, *supra* note 38, at 88–91 (discussing the legislative history indicating that Congress debated the "contest between censorship and democratic discourse," *id.* at 88).

[58]  A number of scholars have criticized the reasoning in *Zeran* and its progeny for this reason.  *See, e.g.*, Susan Freiwald, *Comparative Institutional Analysis in Cyberspace: The Case of Intermediary Liability for Defamation*, 14 HARV. J.L. & TECH. 569, 594–96 (2001); Sewali K. Patel, *Immunizing Internet Service Providers from Third-Party Internet Defamation Claims: How Far Should Courts Go?*, 55 VAND. L. REV. 647, 679–89 (2002); David R. Sheridan, Zeran v. AOL *and the Effect of Section 230 of the Communications Decency Act upon Liability for Defamation on the Internet*, 61 ALB. L. REV. 147, 169–70 (1997); Michael H. Spencer, *Defamatory E-Mail and Employer Liability: Why Razing* Zeran v. America Online *Is a Good Thing*, 6 RICH. J.L. & TECH. 25 (2000); Michelle J. Kane, Note, Blumenthal v. Drudge, 14 BERKELEY TECH. L.J. 483, 498–500 (1999); Brian C. McManus, Note, *Rethinking Defamation Liability for Internet Service Providers*, 35 SUFFOLK U. L. REV. 647, 667–68 (2001); Annemarie Pantazis, Note, Zeran v. America Online, Inc.: *Insulating Internet Service Providers from Defamation Liability*, 34 WAKE FOREST L. REV. 531, 547–50 (1999); David Wiener, Note, *Negligent Publication of Statements Posted on Electronic Bulletin Boards: Is There* Any *Liability Left After* Zeran?, 39 SANTA CLARA L. REV. 905 (1999).

[59]  Batzel v. Smith, 333 F.3d 1018, 1028 (9th Cir. 2003) (first citing 47 U.S.C. § 230(b)(4) (2012); then citing 141 CONG. REC. H8469–70 (daily ed. Aug. 4, 1995) (statements of Reps. Cox, Wyden,

as a free speech protection for users meant "to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce."[60]

Though the exact term is not stated in the text of *Zeran*, the court's concern over service providers' "natural incentive simply to remove messages upon notification, whether the contents were defamatory or not," reflects apprehension of collateral censorship.[61]  Collateral censorship occurs when one private party, like Facebook, has the power to control speech by another private party, like a Facebook user.[62]  Thus, if the government threatens to hold Facebook liable based on what its user says, and Facebook accordingly censors its user's speech to avoid liability, you have collateral censorship.[63]  The court in *Zeran* recognized this concern for the free speech rights of users and counted it among the reasons for creating immunity for platforms under § 230.

But while the dual purposes of § 230 call for the same solution — intermediary immunity — they create a paradox in the applications of § 230.  If § 230 can be characterized as both government-created immunity to (1) *encourage* platforms to remove certain kinds of content, and (2) *avoid* the haphazard removal of certain content and the perils of collateral censorship to users, which interests do we want to prioritize?  That of the platforms to moderate their content or that of users' free speech?

In the last few years, courts have grappled with precisely this dilemma and occasionally broken with the expansive interpretation of the Good Samaritan provision to find a lack of § 230 immunity.[64]  For instance, in two recent district court cases in northern California, the court

---

and Barton); then citing *Zeran*, 129 F.3d at 331; and then citing Blumenthal v. Drudge, 992 F. Supp. 44, 52 (D.D.C. 1998)).

[60] *Id.* at 1027–28 (first citing § 230(b) (policy objectives include "(1) to promote the continued development of the Internet and other interactive computer services and other interactive media; (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation"); then citing *Zeran*, 129 F.3d at 330).

[61] *Zeran*, 129 F.3d at 333.  The court also specifically cited worry about potential abuse between users.  "Whenever one was displeased with the speech of another party conducted [online], the offended party could simply 'notify' the relevant service provider, claiming the information to be legally defamatory." *Id.*; *see also* Christina Mulligan, *Technological Intermediaries and Freedom of the Press*, 66 SMU L. REV. 157, 171 (2013); Felix T. Wu, *Collateral Censorship and the Limits of Intermediary Immunity*, 87 NOTRE DAME L. REV. 293, 317–18 (2011).

[62] The term "collateral censorship" was coined by Professor Michael Meyerson.  Michael I. Meyerson, *Authors, Editors, and Uncommon Carriers: Identifying the "Speaker" Within the New Media*, 71 NOTRE DAME L. REV. 79, 118 (1995).

[63] *Cf.* J.M. Balkin, Essay, *Free Speech and Hostile Environments*, 99 COLUM. L. REV. 2295, 2298 (1999).

[64] For a comprehensive cataloging of § 230 cases with context and commentary, see Eric Goldman, *Ten Worst Section 230 Rulings of 2016 (Plus the Five Best)*, TECH. & MARKETING L.

rejected motions to dismiss for failure to state a claim under § 230 on the basis of plaintiffs' allegations that Google acted in bad faith.[65]  At the same time, other courts have made powerful decisions in favor of broad § 230 immunity and publishers' rights to moderate content.  Notably, in *Doe v. Backpage.com*,[66] the First Circuit expressly held that § 230 protects the choices of websites as speakers and publishers, stating: "Congress did not sound an uncertain trumpet when it enacted the CDA, and it chose to grant broad protections to internet publishers.  Showing that a website operates through a meretricious business model is not enough to strip away those protections."[67]  The continued confusion about § 230's interpretation — as seen in current courts' split on the importance of a business's motivations for content moderation — demonstrates that the stakes around such questions have only grown since the foundational decision in *Zeran*.

## B. *First Amendment Implications*

The debate over how to balance the right of intermediaries to curate a platform while simultaneously protecting user speech under the First Amendment is ongoing for courts and scholars.  Depending on the type of intermediary involved, courts have analogized platforms to established doctrinal areas in First Amendment law — company towns, broadcasters, editors — and the rights and obligations of a platform shift depending on which analogy is applied.

The first of these analogies reasons that platforms are acting like the state, so the First Amendment directly constrains them.  While courts have established that only state action creates affirmative obligations under the First Amendment, determining exactly when a private party's behavior constitutes state action is a more difficult question.[68]  The Supreme Court foundationally addressed this distinction between private and state actors for First Amendment purposes in *Marsh v. Alabama*.[69]  In *Marsh*, a Jehovah's Witness was arrested for criminal trespass for distributing literature on the sidewalk of a company town

---

BLOG (Jan. 4, 2017), http://blog.ericgoldman.org/archives/2017/01/ten-worst-section-230-rulings-of-2016-plus-the-five-best.htm [https://perma.cc/KL48-B6GJ].

[65] Darnaa, LLC v. Google, Inc., No. 15-cv-03221, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016); Spy Phone Labs LLC v. Google Inc., No. 15-cv-03756, 2016 WL 6025469 (N.D. Cal. Oct. 14, 2016); *see also* Eric Goldman, *Google Loses Two Section 230(c)(2) Rulings* — Spy Phone v. Google *and* Darnaa v. Google, TECH. & MARKETING L. BLOG (Nov. 8, 2016), http://blog.ericgoldman.org/archives/2016/11/google-loses-two-section-230c2-rulings-spy-phone-v-google-and-darnaa-v-google.htm [https://perma.cc/TR72-9XZU].

[66] 817 F.3d 12 (1st Cir. 2016).

[67] *Id.* at 29.

[68] *See* Hudgens v. NLRB, 424 U.S. 507, 513–21 (1976).

[69] 326 U.S. 501 (1946).

wholly owned by a corporation.[70]  The Court found that "[e]xcept for [ownership by a private corporation, this town] has all the characteristics of any other American town."[71]  Accordingly, the Court held the town was functionally equivalent to a state actor and obligated to guarantee First Amendment rights.[72]

In the years since *Marsh*, the Court has continued to explore the "public function" circumstances necessary for private property to be treated as public.  Many of these cases have arisen in the context of shopping malls, where the Court has struggled to establish consistent reasoning on when a private individual's First Amendment rights trump the rights of the owner of a private forum.[73]  The most expansive of these was *Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc.*,[74] which held a shopping mall to be the equivalent of the company town in *Marsh* and therefore allowed picketers to protest there.[75]  In overruling *Logan Valley* in *Hudgens v. NLRB*,[76] the Court revised its assessment of a shopping mall as a public square and stated that a business does not qualify as performing a public function merely because it is open to the public.[77]  Instead, in order to qualify as performing a public function, a business must be actually doing a job normally done by the government, as was the case with the company town in *Marsh*.[78]

For a long time, the claim that online intermediaries are state actors or perform a public function and, thus, are subject to providing free speech guarantees, was a losing one.  In establishing platforms as non-state actors, courts distinguished the facts in *Marsh* and its progeny, stating that intermediaries providing services like email, hosting, or search engines do not rise to the level of "performing any municipal power or essential public service and, therefore, do[] not stand in the

---

[70] *Id.* at 502–03.

[71] *Id.* at 502.

[72] *Id.* at 508–09.

[73] *See, e.g.*, Amalgamated Food Emps. Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 318 (1968) (equating a private shopping center to a business district and affirming the right to picket in it), *narrowed by* Lloyd Corp. v. Tanner, 407 U.S. 551, 563–64 (1972) (holding speech in a mall is not constitutionally protected unless there are no other means of communication), *overruled by Hudgens*, 424 U.S. at 518.  The California Supreme Court granted more expansive free speech guarantees than those provided by the First Amendment in *Fashion Valley Mall, LLC v. NLRB*, 172 P.3d 742, 749 (Cal. 2007), and *Robins v. PruneYard Shopping Center*, 592 P.2d 341, 344, 347 (Cal. 1979).  *See also Developments in the Law — State Action and the Public/Private Distinction*, 123 HARV. L. REV. 1248, 1303–07 (2010).

[74] 391 U.S. 308.

[75] *Id.* at 318.

[76] 424 U.S. 507.

[77] *Id.* at 519 (quoting *Lloyd Corp.*, 407 U.S. at 568–69).

[78] *Id.*

shoes of the State."[79]   While these cases have not been explicitly over-turned, the Court's recent ruling in *Packingham v. North Carolina*[80] might breathe new life into the application of state action doctrine to internet platforms.

In *Packingham*, the Court struck down a North Carolina statute barring registered sex offenders from platforms like Facebook and Twitter.[81]   In his opinion for the court, Justice Kennedy reasoned that foreclosing "access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."[82]   Describing such services as a "modern public square," Justice Kennedy also acknowledged their essential nature to speech, calling them "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard."[83]   Though the decision is limited in that it applies only to total exclusion, the sweeping language makes *access* to private online platforms a First Amendment right, leaving open the questions of how robust that access must be or where in the internet pipeline a choke point must lie in order to abridge a First Amendment right.   Future litigation might use *Packingham*'s acknowledgment of a First Amendment right to social media access as a new basis to argue that these platforms perform quasi-municipal functions.

Separate from the issue of state action, *Packingham*'s acknowledgment of platforms as private forums that significantly affect the expressive conduct of other private parties implicates other areas of regulation that are consistent with the First Amendment.   This can be seen in the doctrine around other types of speech conduits, like radio and television broadcasters.   In such cases, the Court has upheld regulation of radio broadcasting, despite the broadcast station's claims that the regulation unconstitutionally infringed on its editorial judgment and speech.[84]   A public right to "suitable access" to ideas and a scarce radio spectrum justified the agency rule that required broadcasters to present public

---

[79] Cyber Promotions, Inc. v. Am. Online, Inc., 948 F. Supp. 436, 442 (E.D. Pa. 1996) (distinguishing AOL's email service from the kind of "municipal powers or public services" provided by a private company town that made it liable as a state actor in *Marsh*); *see also* Green v. Am. Online, 318 F.3d 465, 472 (3d Cir. 2003) (holding that, as a private company and not a state actor, AOL is not subject to constitutional free speech requirements); Langdon v. Google, Inc., 474 F. Supp. 2d 622, 631 (D. Del. 2007) (finding that for the purposes of constitutional free speech guarantees, Google, Yahoo, and Microsoft are private companies, even though they work with state actors like public universities).

[80] 137 S. Ct. 1730 (2017).

[81] *Id.* at 1733, 1738.

[82] *Id.* at 1737.

[83] *Id.*

[84] *See, e.g.*, Red Lion Broad. Co. v. FCC, 395 U.S. 367 (1969).

issues and give each side of those issues fair coverage.[85]  In the years following, the Court has limited this holding,[86] while also extending it to the realm of broadcast television in *Turner Broadcasting System, Inc. v. FCC*.[87]

The question of whether internet intermediaries would fall in the same category as radio or broadcast television was addressed by the Court in *Reno*.  The Court found that the elements that justify television and radio regulation — those mediums' "invasive" nature, history of extensive regulation, and the scarcity of frequencies — "are not present in cyberspace" and explicitly exempted the internet from the doctrine established in *Red Lion Broadcasting Co. v. FCC*[88] and *Turner*.[89]  While it is unclear how the Court would draw the line between the internet functions of concern in *Reno* and the growth of social media platforms, *Packingham*'s emphasis on the right to platform access might revive the concerns over scarcity raised by these cases.

The final First Amendment analogy relevant to online speech reasons that platforms themselves exercise an important expressive role in the world, so the First Amendment actively protects them from state interference.    This draws on the doctrine giving special First Amendment protections to newspapers under *Miami Herald Publishing Co. v. Tornillo*.[90]  There, in a unanimous decision, the Court found a Florida statute that gave political candidates a "right to reply" in local newspapers unconstitutional under the Free Press Clause of the First Amendment.[91]  Though the "right to reply" legislation was akin to FCC fairness regulations upheld in *Red Lion*, the *Tornillo* Court found the statute unconstitutional.[92]  The Court reasoned that the statute was an

---

[85] *Id.* at 400–01 ("In view of the scarcity of broadcast frequencies, the Government's role in allocating those frequencies, and the legitimate claims of those unable without governmental assistance to gain access to those frequencies for expression of their views, we hold the regulations and ruling at issue here are both authorized by statute and constitutional.").

[86] *See, e.g.*, FCC v. League of Women Voters, 468 U.S. 364, 402 (1984) (holding publicly funded broadcasters have First Amendment protections to editorialize); FCC v. Pacifica Found., 438 U.S. 726, 741 n.17 (1978) (stating "it is well settled that the First Amendment has a special meaning in the broadcasting context" and citing *Red Lion*); Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 120–21 (1973) (holding broadcasters are not under an obligation to sell advertising time to a political party).

[87] Turner Broad. Sys., Inc. v. FCC (*Turner II*), 520 U.S. 180, 185 (1997); Turner Broad. Sys., Inc. v. FCC (*Turner I*), 512 U.S. 622, 638–39 (1994).  In these cases the Court dealt with FCC "must carry" regulations imposed on cable television companies.  In *Turner I*, the Court determined that cable television companies were indeed First Amendment speakers, 512 U.S. at 656, but in *Turner II*, it held that the "must carry" provisions of the FCC did not violate those rights, 520 U.S. at 224–25.

[88] 395 U.S. 367.

[89] Reno v. ACLU, 521 U.S. 844, 868–70 (1997).

[90] 418 U.S. 241 (1974).

[91] *Id.* at 247, 258.

[92] *Id.* at 258.

"intrusion into the function of editors"[93] and that "press responsibility is not mandated by the Constitution and . . . cannot be legislated."[94]  As internet intermediaries have become more and more vital to speech, First Amendment advocates have urged courts to apply the holding in *Tornillo* to platforms, granting them their own speech rights.[95]  The Court's new definition in *Packingham* of online speech platforms as forums, however, might threaten the viability of arguments that these companies have their own First Amendment rights as speakers.

### C. Internet Pessimists, Optimists, and Realists

As have the courts, scholars have struggled with the question of how to balance users' First Amendment right to speech against intermediaries' right to curate platforms.  Many look to platforms as a new market for speech and ideas.  In the early days of the internet, Professor Jack Balkin could have been considered an internet optimist.  He saw the internet and its wealth of publishing tools, which enable widespread digital speech, as enhancing the "possibility of democratic culture."[96]  More recently, he has recognized that private control of these tools poses threats to free speech and democracy.[97]  Professor Yochai Benkler could also have been considered an optimist, though a more cautious one.  He has posited looking at the internet as enabling new methods of information production, as well as a move from traditional industrial-dominated markets to more collaborative peer production.[98]  Professor Lawrence Lessig acknowledges that while the internet creates exciting new means to regulate through code, he is concerned about corporations and platforms having great unchecked power to regulate the internet and all interactions that fall under § 230 immunity.[99]  Professors James Boyle, Jack Goldsmith, and Tim Wu have had similar concerns about

---

[93]  *Id.*

[94]  *Id.* at 256.

[95]  *See* Eric Goldman, *Revisiting Search Engine Bias*, 38 WM. MITCHELL L. REV. 96, 108–10 (2011); Eugene Volokh & Donald M. Falk, *First Amendment Protection for Search Engine Search Results*, VOLOKH CONSPIRACY (Apr. 20, 2012), http://www.volokh.com/wp-content/uploads/2012/05/SearchEngineFirstAmendment.pdf [https://perma.cc/U27F-MA6U]. *But see* James Grimmelmann, *Some Skepticism About Search Neutrality*, *in* THE NEXT DIGITAL DECADE: ESSAYS ON THE FUTURE OF THE INTERNET 435 (Berin Szoka & Adam Marcus eds., 2010); Frank Pasquale, *Platform Neutrality: Enhancing Freedom of Expression in Spheres of Private Power*, 17 THEORETICAL INQUIRIES L. 487, 502–03 (2016) (refuting efforts to apply *Tornillo* to internet intermediaries).

[96]  Balkin, *supra* note 7, at 45–46.

[97]  *See* Balkin, *supra* note 11, at 2300–01.

[98]  *See generally* YOCHAI BENKLER, THE WEALTH OF NETWORKS (2006); Yochai Benkler, *Through the Looking Glass: Alice and the Constitutional Foundations of the Public Domain*, 66 LAW & CONTEMP. PROBS. 173, 181–82 (2003).

[99]  *See generally* LESSIG, *supra* note 21; Lawrence Lessig, Commentary, *The Law of the Horse: What Cyberlaw Might Teach*, 113 HARV. L. REV. 501 (1999).

the state coopting private online intermediaries for enforcement.[100]
Professor David Post has argued that the market will resolve corporate
monopolization of speech. He has suggested that such corporate com-
petition between individual online platforms would result in a "market
for rules," which would allow users to seek networks that have speech
and conduct "rule sets" to their liking.[101]

Not quite optimists or pessimists, many internet scholars have fo-
cused their work on the realities of what the internet is, the harms it
does and can create, and the best ways to resolve those harms. Professor
Danielle Keats Citron was an early advocate for this approach. She has
argued for recognition of cyber civil rights in order to circumvent § 230
immunity without removing the benefits of its protection.[102] Professor
Mary Anne Franks has continued this tack, and argues that the nature
of online space can amplify speech harms, especially in the context of
sexual harassment.[103] Online hate speech, harassment, bullying, and
revenge porn have slightly different solutions within these models. Both
Citron and Professor Helen Norton have argued that hate speech is now
mainstream and should be actively addressed by platforms that have
the most power to curtail it.[104] Emily Bazelon argues that the rise of
online bullying calls for a more narrow reading of § 230.[105] Citron and
Franks respectively suggest either an amendment or a court-created
narrowing of § 230 for sites that host revenge porn.[106]

This is where we stand today in understanding internet intermedi-
aries: amidst a § 230 dilemma (is it about enabling platforms to edit their
sites or about protecting users from collateral censorship?), a First
Amendment enigma (what are online platforms for the purposes of
speech — a company town, a broadcaster, or an editor?), and conflicting
scholarly theories of how best to understand speech on the internet.

---

[100] *See generally* JACK GOLDSMITH & TIM WU, WHO CONTROLS THE INTERNET? (2006);
James Boyle, *Foucault in Cyberspace: Surveillance, Sovereignty, and Hardwired Censors*, 66 U.
CIN. L. REV. 177 (1997); *see also* Rory Van Loo, *Rise of the Digital Regulator*, 66 DUKE L.J. 1267,
1267 (2017) (discussing how the state is using online platforms to enforce consumer protection and
generally regulate markets in place of legal rules).

[101] David G. Post, *Anarchy, State, and the Internet: An Essay on Law-Making in Cyberspace*,
1995 J. ONLINE L. art. 3, para. 42. *But see* Frank Pasquale, *Privacy, Antitrust, and Power*, 20
GEO. MASON L. REV. 1009 (2013) (arguing that platforms like Facebook, Twitter, LinkedIn, and
Instagram are complements, not substitutes, for one another).

[102] *See* DANIELLE KEATS CITRON, HATE CRIMES IN CYBERSPACE (2014); Danielle Keats
Citron, *Cyber Civil Rights*, 89 B.U. L. REV. 61, 115–25 (2009).

[103] Mary Anne Franks, *Sexual Harassment 2.0*, 71 MD. L. REV. 655, 678, 681–83 (2012).

[104] Danielle Keats Citron & Helen Norton, *Intermediaries and Hate Speech: Fostering Digital
Citizenship for Our Information Age*, 91 B.U. L. REV. 1435, 1456–68 (2011).

[105] *See generally* EMILY BAZELON, STICKS AND STONES: DEFEATING THE CULTURE OF
BULLYING AND REDISCOVERING THE POWER OF CHARACTER AND EMPATHY (2013);
Bazelon, *supra* note 28.

[106] Danielle Keats Citron & Mary Anne Franks, *Criminalizing Revenge Porn*, 49 WAKE FOREST
L. REV. 345, 359 n.86 (2014).

Missing from the debate around § 230 is the answer to a simple question: given that these platforms have § 230 immunity, *why* are they bothering to edit?  Administrative law scholarship discusses the forces that motivate private actors to voluntarily self-regulate.[107]  Some firms or industries have developed self-regulation alongside government regulation.[108]  Others see self-regulation as an optimal form of business and company management.[109]  And some decide to self-regulate as an attempt to preempt eventual government regulation.[110]  Some of these reasons come to bear on platform motivation, but because of immunity under § 230, most are irrelevant.  Instead, through historical interviews and archived materials, Part II argues that platforms have created a voluntary system of self-regulation because they are economically motivated to create a hospitable environment for their users in order to incentivize engagement.[111]  This self-regulation involves both reflecting the norms of their users around speech as well as keeping up as much speech as possible.  Online platforms also self-regulate for reasons of social and corporate responsibility, which in turn reflect free speech norms.[112]  These motivations reflect both the Good Samaritan incentives and collateral censorship concerns underlying § 230.

A question is also missing from the debate about how to classify platforms in terms of First Amendment doctrine: what are major online intermediaries *actually doing* to regulate content on their sites?  The next Part discusses *why* platforms are making the decisions to moderate along such a fine line, while the following Part demonstrates *how* platforms moderate content through a detailed set of rules, trained human decisionmaking, and reasoning by analogy, all influenced by a pluralistic system of internal and external actors.

---

[107] *See* Freeman, *supra* note 15, at 644–49; Michael, *supra* note 15, at 203–40.

[108] *See, e.g.*, JOSEPH V. REES, HOSTAGES OF EACH OTHER: THE TRANSFORMATION OF NUCLEAR SAFETY SINCE THREE MILE ISLAND 1–2 (1994) (documenting private use of self-regulation in an industrial area following disaster).

[109] *See generally* DENNIS C. KINLAW, CONTINUOUS IMPROVEMENT AND MEASUREMENT FOR TOTAL QUALITY (1992) (describing self-regulation, specifically through the use of total quality management and self-auditing, as the best technique for business management and means of achieving customer satisfaction).

[110] *See* RICHARD L. ABEL, AMERICAN LAWYERS 142–57 (1989) (discussing private actors' decisions to self-regulate in order to avoid potential government regulation).

[111] *See* Citron & Norton, *supra* note 104, at 1454 (discussing how some intermediaries regulate hate speech because they see it as a threat to profits).

[112] *Id.* at 1455 (discussing how some intermediaries regulate hate speech because they see it as a corporate or social responsibility).

## II.  Why Govern Well?  The Role of Free Speech Norms, Corporate Culture, and Economic Incentives in the Development of Content Moderation

In the earliest days of the internet, the regulations concerning the substance and structure of cyberspace were "built by a noncommercial sector [of] researchers and hackers, focused upon building a network."[113] Advances in technology as well as the immunity created for internet intermediaries under § 230 led to a new generation of cyberspace.  It included collaborative public platforms like Wikipedia,[114] but it was also populated largely by private commercial platforms.[115]

As this online space developed, scholars considered what normative values were being built into the infrastructure of the internet.  Lessig ascribed a constitutional architecture to the internet "not to describe a hundred-day plan[, but] instead to identify the values that a space should guarantee. . . . [W]e are simply asking: What values should be protected there?  What values should be built into the space to encourage what forms of life?"[116]  Writing five years later in 2004,[117] Balkin argued that the values of cyberspace are inherently democratic — bolstered by the ideals of free speech, individual liberty, and participation.[118]  Both Lessig and Balkin placed the fate of "free speech values"[119] and the "freedoms and controls of cyberspace"[120] in the hands of code and architecture online.[121]  "[A] code of cyberspace, defining the freedoms and controls of cyberspace, will be built," wrote Lessig.[122]  "About that there can be no debate.  But by whom, and with what values?  That is the only choice we have left to make."[123]

There was not much choice about it, but over the last fifteen years, three American companies — YouTube, Facebook, and Twitter — have

---

[113] LESSIG, *supra* note 21, at 7.

[114] *See generally* Yochai Benkler, *Yochai Benkler on Wikipedia's 10th Anniversary*, THE ATLANTIC (Jan. 15, 2011), https://www.theatlantic.com/technology/archive/2011/01/yochai-benkler-on-wikipedias-10th-anniversary/69642/ [https://perma.cc/2W32-4EFV].

[115] LESSIG, *supra* note 21, at 7 (describing the second generation of the internet as being "built by commerce").

[116] *Id.* at 6.

[117] As calculated from the first distribution of Lessig's book, LAWRENCE LESSIG, CODE AND OTHER LAWS OF CYBERSPACE (1999).

[118] *See* Balkin, *supra* note 7, at 45–49.

[119] *Id.* at 54.

[120] LESSIG, *supra* note 21, at 6.

[121] Specifically, Balkin predicted that free speech values of "participation, access, interactivity, democratic control, and the ability to route around and glom on . . . won't necessarily be protected and enforced through judicial creation of constitutional rights.  Rather, they will be protected and enforced through the design of technological systems — code — and through legislative and administrative schemes of regulation."  Balkin, *supra* note 7, at 54.

[122] LESSIG, *supra* note 21, at 6.

[123] *Id.*

established themselves as dominant platforms in global content sharing and online speech.[124] These platforms are both the architecture for publishing new speech and the architects of the institutional design that governs it. Because of the wide immunity granted by § 230, these architects are free to choose which values they want to protect — or to protect no values at all. So why have they chosen to integrate values into their platform? And what values have been integrated?

It might first be useful to describe what governance means in the context of these platforms. "The term 'governance' is popular but imprecise," and modern use does not assume "governance as a synonym for government."[125] Rather, "new governance model[s]" identify several features that accurately describe the interplay between user and platform: a "dynamic" and "iterative" "law-making process";[126] "norm-generating" "[i]ndividuals";[127] and "convergence of processes and outcomes."[128] This is the way in which this Article uses the term "governance." However, the user-platform relationship departs from even this definition because of its private and centralized but also pluralistically networked nature. And it departs even further from other uses of the term "governance," including "corporate governance" (describing it as centralized management) and public service definitions of "good governance" (describing states with "independent judicial system[s] and legal framework[s]").[129]

This Part explores this question through archived material and a series of interviews with the policy executives charged with creating the moderation systems for YouTube and Facebook. It concludes that three

---

[124] Each of these platforms can of course be thought of differently. Facebook is primarily categorized as a social network site, *see* danah m. boyd & Nicole B. Ellison, *Social Network Sites: Definition, History, and Scholarship*, 13 J. COMPUTER-MEDIATED COMM. 210, 210 (2008); YouTube is seen as video-sharing; and Twitter is seen as both a social network and an RSS newsfeed. But all of these sites have one thing in common: they host, publish, and moderate user-generated content. This Article will look at these platforms in that capacity only.

[125] R. A. W. Rhodes, *The New Governance: Governing Without Government*, 44 POL. STUD. 652, 652 (1996). Indeed, the idea of Facebook as a nation-state or government, in the traditional sense, has been analyzed and dismissed. Anupam Chander, *Facebookistan*, 90 N.C. L. REV. 1807, 1807 (2012) (concluding "regulatory power [over Facebook] is, de facto, dispersed across a wide array of international actors"). Professor Frank Pasquale has described these platforms as "feudal" or "sovereigns," FRANK PASQUALE, THE BLACK BOX SOCIETY 140–68, 187–218 (2015) (arguing that terms of service or contracts are inappropriate or ineffective remedies in an essentially "feudal" sphere, *id.* at 144, and arguing that platforms act as "sovereign[s]" over realms of life, *id.* at 163, 189), while Professor Rory Van Loo has called them "digital regulators," Van Loo, *supra* note 100, at 1267.

[126] Orly Lobel, *The Renew Deal: The Fall of Regulation and the Rise of Governance in Contemporary Legal Thought*, 89 MINN. L. REV. 342, 405 (2004).

[127] *Id.* at 406.

[128] *Id.*

[129] Adrian Leftwich, *Governance, Democracy and Development in the Third World*, 14 THIRD WORLD Q. 605, 610 (1993).

main factors influenced the development of these platforms' moderation systems: (1) an underlying belief in free speech norms; (2) a sense of corporate responsibility; and (3) the necessity of meeting users' norms for economic viability.

## A. Platforms' Baseline in Free Speech

Conversations with the people who were in charge of creating the content-moderation regimes at these platforms reveal that they were indeed influenced by the concerns about user free speech and collateral censorship raised in *Zeran*.

*1. Free Speech Norms.* — For those closely following the development of online regulation, § 230 and *Zeran* were obvious foundational moments for internet speech. But at the time, many online commercial platforms did not think of themselves as related to speech at all. As a young First Amendment lawyer in the Bay Area, Nicole Wong was an active witness to the development of private internet companies' speech policies.[130] In the first few years of widespread internet use, Wong recalled that very few lawyers were focusing on the responsibilities that commercial online companies and platforms might have toward moderating speech.[131] But as most major print newspapers began posting content on websites between 1996 and 1998, the overlap between speech and the internet became more noticeable.[132] Likewise, just as more traditional publishing platforms for speech were finding their place on the internet, new internet companies were discovering that they were not just software companies, but that they were also publishing platforms.[133] At first, Wong's clients were experiencing speech as only a secondary effect of their primary business, as in the case of *Silicon Investor*, a day-trading site that was having issues with the content published on its message boards.[134] Others, like Yahoo, were actively recognizing that online speech was an intractable part of their business models.[135] Despite this reality, the transition to thinking of themselves as speech platforms was still slow. "They had just gone public," Wong said of her representation of early Yahoo. "They had only two lawyers in their legal department. . . . [N]either had any background in First Amendment law or content moderation or privacy. They were corporate

---

[130] Telephone Interview with Nicole Wong, Former Emp., Google (Apr. 2, 2016).

[131] *Id.*

[132] David Shedden, *New Media Timeline (1996)*, POYNTER (Dec. 16, 2004), http://www.poynter.org/2004/new-media-timeline-1996/28775/ [https://perma.cc/M37E-AJHE] (listing examples of new media sites that launched "on the Web" during 1996, including *The New York Times*, *Toronto Star*, *Chicago Tribune*, *Miami Herald*, and *Washington Post*).

[133] Telephone Interview with Nicole Wong, *supra* note 130.

[134] *Id.*

[135] *Id.*

lawyers."[136]  The problem identified by Wong was that these new internet corporations still thought of themselves as software companies — they did not think about "the lingering effects of speech as part of what they were doing."[137]  In facing these new challenges, Wong had become one of the few people not only in Silicon Valley, but also in the United States, capable of advising on these challenges, with her background in First Amendment doctrine, communications, and electronic privacy.[138]

Wong's expertise led her to join Google full time in 2004.  In October 2006, Google acquired YouTube, the popular online video site, and Wong was put in charge of creating and implementing content-moderation policies.[139]  Creating the policies regarding what type of content would be acceptable on YouTube had an important free speech baseline: legal content would not be removed unless it violated site rules.[140]  Wong and her content-moderation team actively worked to try to make sure these rules did not result in overcensorship of user speech.  One such moment occurred in late December 2006, when two videos of Saddam Hussein's hanging surfaced on YouTube shortly after his death.  One video contained grainy footage of the hanging itself; the other contained video of Hussein's corpse in the morgue.  Both videos violated YouTube's community guidelines at the time — though for slightly different reasons.  "The question was whether to keep either of them up," said Wong, "and we decided to keep the one of the hanging itself, because we felt from a historical perspective it had real value."[141]  The second video was deemed "gratuitous violence" and removed from the site.[142]  A similarly significant exception occurred in June 2009, when a video of a dying Iranian Green Movement protestor shot in the chest and bleeding from the eyes was ultimately kept on YouTube because of its political significance.[143]  YouTube's policies and internal guidelines on violence were altered to allow for the exception.[144]  In 2007, a video was uploaded to YouTube of a man being brutally beaten by four men in a cell and was removed for gratuitous violence in violation of

---

[136]  *Id.*

[137]  *Id.*

[138]  For an example of Wong's insight into these issues, see ELECTRONIC MEDIA AND PRIVACY LAW HANDBOOK (Nicole Wong et al. eds., 2003).

[139]  Telephone Interview with Nicole Wong, *supra* note 130; Rosen, *supra* note 12.

[140]  Site rules for impermissible content were related to banning content that was otherwise legal but that contained things like graphic violence or overt sexual activity.  Buni & Chemaly, *supra* note 12; *see also infra* pp. 1632–33.

[141]  Telephone Interview with Nicole Wong, *supra* note 130.

[142]  *Id.*

[143]  Buni & Chemaly, *supra* note 12.

[144]  *Id.*  It is important to make a distinction between "policies," which were the public rules posted for users about what content was allowed, and the internal "rules" that sites used to moderate speech.  As will be shown in section III.A, *infra* pp. 1631–35, platforms' internal rules to moderate content came years before public policies were posted.  The internal rules were also more detailed.

YouTube's community guidelines.[145]  Shortly after, however, it was restored by Wong and her team after journalists and protestors contacted YouTube to explain that the video was posted by Egyptian human rights activist Wael Abbas to inform the international community of human rights violations by the police in Egypt.[146]

At Facebook, there was a similar slow move to organize platform policies on user speech.  It was not until November 2009, five years after the site was founded, that Facebook created a team of about twelve people to specialize in content moderation.[147]  Like YouTube, Facebook hired a lawyer, Jud Hoffman, to head their Online Operations team as Global Policy Manager.  Hoffman recalled that, "when I got there, my role didn't exist."[148]  Hoffman was charged with creating a group separate from operations that would formalize and consolidate an ad hoc draft of rules and ensure that Facebook was transparent with users by publishing a set of "Community Standards."[149]  The team consisted of six people in addition to Hoffman, notably Dave Willner, who had created a first draft of these "all-encompassing" rules, which contained roughly 15,000 words.[150]

At Twitter, the company established an early policy not to police user content, except in certain circumstances, and rigorously defended that right.[151]  Adherence to this ethos led to Twitter's early reputation among social media platforms as "the free speech wing of the free speech

---

[145] Neal Ungerleider, *Why This Ex–White House Tech Honcho Is Now Working on Human Rights*, FAST COMPANY (June 18, 2015), https://www.fastcompany.com/3046409/why-this-ex-white-house-tech-honcho-is-now-working-on-human-rights [https://perma.cc/52F4-JWD8].

[146] Telephone Interview with Nicole Wong, *supra* note 130.

[147] Telephone Interview with Dave Willner, Former Head of Content Policy, Facebook & Charlotte Willner, Former Safety Manager, User Operations, Facebook (Mar. 23, 2016).

[148] Telephone Interview with Jud Hoffman, Former Glob. Policy Manager, Facebook (Jan. 22, 2016).

[149] *Id.*  "Community Standards" is Facebook's term for its *public* content-moderation policies.  It is important to note that the internal rules created by Dave Willner predated the public Community Standards for the site.  The internal rules informed, in part, the creation and substance of Facebook's public policies.

[150] *Id.*

[151] Sarah Jeong, *The History of Twitter's Rules*, MOTHERBOARD (Jan. 14, 2016, 10:00 AM), http://motherboard.vice.com/read/the-history-of-twitters-rules [https://perma.cc/X34U-HF4A]; *see also The Twitter Rules*, TWITTER SUPPORT (Jan. 18, 2009), https://web.archive.org/web/20090118211301/ttp://twitter.zendesk.com/forums/26257/entries/18311 [https://perma.cc/SMM6-NZEU].  Its rules' spartan nature was a purposeful reflection of the central principles and mission of the company.  A preamble that accompanied the Twitter Rules from 2009 to 2016 reads:

> Our goal is to provide a service that allows you to discover and receive content from sources that interest you as well as to share your content with others.  We respect the ownership of the content that users share and each user is responsible for the content he or she provides.

*Id.*  "Because of these principles, we do not actively monitor user's content and will not censor user content, except in limited circumstances . . . ."  *Id.*

party."[152]  It also meant that unlike YouTube and Facebook, which actively took on content moderation of their users' content, Twitter developed no internal content-moderation process for taking down and reviewing content.  The devotion to a fundamental free speech standard was reflected not only in what Twitter did not do to police user content, but also in what it did to protect it.  Alexander Macgillivray joined Twitter as General Counsel in September 2009, a position he held for four years.[153]  In that time, Macgillivray regularly resisted government requests for user information and user takedown.  "We value the reputation we have for defending and respecting the user's voice," Macgillivray stated in 2012.[154]  "We think it's important to our company and the way users think about whether to use Twitter, as compared to other services."[155]

A common theme exists in all three of these platforms' histories: American lawyers trained and acculturated in American free speech norms and First Amendment law oversaw the development of company content-moderation policy.  Though they might not have "directly imported First Amendment doctrine," the normative background in free speech had a direct impact on how they structured their policies.[156]  Wong, Hoffman, and Willner all described being acutely aware of their predisposition to American democratic culture, which put a large emphasis on free speech and American cultural norms.  Simultaneously, there were complicated implications in trying to implement those American democratic cultural norms within a global company.  "We were really conscious of not just wholesale adopting a kind of U.S. jurisprudence free expression approach," said Hoffman.[157]  "[We would] try to step back and focus on the mission [of the company]."[158]  Facebook's mission is to "[g]ive people the power to build community and bring the world closer together."[159]  But even this, Willner acknowledged, is "not a cultural-neutral mission. . . . The idea that the world

---

152 Josh Halliday, *Twitter's Tony Wang: "We Are the Free Speech Wing of the Free Speech Party,"* THE GUARDIAN (Mar. 22, 2012, 11:57 AM), http://www.theguardian.com/media/2012/mar/22/twitter-tony-wang-free-speech [https://perma.cc/QR8B-CW74].

153 Somini Sengupta, *Twitter's Free Speech Defender*, N.Y. TIMES (Sept. 2, 2012) [hereinafter Sengupta, *Twitter's Free Speech Defender*], http://nyti.ms/2GlWiKy [https://perma.cc/VM7K-99RJ]; Somini Sengupta, *Twitter General Counsel Leaves as Company Prepares to Go Public*, N.Y. TIMES: BITS (Aug. 30, 2013, 3:52 PM), https://bits.blogs.nytimes.com/2013/08/30/twitter-general-counsel-leaves-as-company-prepares-to-go-public/ [https://perma.cc/97RM-EB2W].

154 Sengupta, *Twitter's Free Speech Defender*, *supra* note 153.

155 *Id.*

156 Telephone Interview with Jud Hoffman, *supra* note 148.

157 *Id.*

158 *Id.*

159 *About*, FACEBOOK, https://www.facebook.com/pg/facebook/about/ [https://perma.cc/3ZV5-MECX].

should be more open and connected is not something that, for example, North Korea agrees with."[160]

   *2. Government Request and Collateral Censorship Concerns.* — Beyond holding general beliefs in the right to users' free speech, these platforms have also implemented policies to protect user speech from the threat of government request and collateral censorship.[161]

   Twitter's early pushback to government requests related to its users' content is well documented. In his time as General Counsel, Macgillivray regularly resisted government requests for user information and user takedown. In January 2011, he successfully resisted a federal gag order over a subpoena in a grand jury investigation into Wikileaks.[162] "[T]here's not yet a culture of companies standing up for users when governments and companies come knocking with subpoenas looking for user data or to unmask an anonymous commenter who says mean things about a company or the local sheriff," said *Wired* of Twitter's resistance to the gag order.[163] "Twitter deserves recognition for its principled upholding of the spirit of the First Amendment."[164] Despite the victory over the gag order, Twitter was eventually forced to turn over data to the Justice Department after exhausting all its appeals.[165] A similar scenario played out in New York, when a judge ordered Twitter to supply all the Twitter posts of Malcolm Harris, an Occupy Wall Street protester charged with disorderly conduct.[166] There, too, Twitter lost, but not before full resort to the appeals process.[167]

---

[160] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

[161] This is not to say that collateral censorship issues are not a concern with private platforms' content-moderation systems. To the contrary, there are also many well-documented instances where platforms have cooperated with government requests for takedown and raised serious collateral censorship concerns. This section simply tries to give an overview of when platforms have proactively sought to avoid these concerns, even though doing so is costly and not necessary under § 230. *See* Balkin, *supra* note 11, at 2298–99 (explaining how the government can offer both carrots and sticks to entice private entities to cooperate with it regarding speech regulation); *see also, e.g.*, Emma Llansó, *German Proposal Threatens Censorship on Wide Array of Online Services*, CTR. FOR DEMOCRACY & TECH.: BLOG (Apr. 7, 2017), https://cdt.org/blog/german-proposal-threatens-censorship-on-wide-array-of-online-services/ [https://perma.cc/W9QT-5MP9] (discussing the dangers of allowing government units to flag issues for takedown using private content-moderation platforms).

[162] Ryan Singel, *Twitter's Response to WikiLeaks Subpoena Should Be the Industry Standard*, WIRED (Jan. 10, 2011, 7:56 PM), https://www.wired.com/2011/01/twitter-2/ [https://perma.cc/5DV4-6JPN].

[163] *Id.*

[164] *Id.*

[165] Sengupta, *Twitter's Free Speech Defender*, *supra* note 153.

[166] *Id.*

[167] Naomi Gilens, *Twitter Forced to Hand Over Occupy Wall Street Protester Info*, ACLU: FREE FUTURE (Sept. 14, 2012, 5:28 PM), https://www.aclu.org/blog/national-security/twitter-forced-hand-over-occupy-wall-street-protester-info [https://perma.cc/9UUT-F56Y].

Wong also described regularly fighting government requests to take down certain content, collateral censorship, and the problems with applying American free speech norms globally. For example, in November 2006, the Thai government announced that it would block YouTube to anyone using a Thai IP address unless Google removed twenty offensive videos from the site.[168]  While some of the videos "clearly violated the YouTube terms of service," others simply featured Photoshopped images of the King of Thailand with feet on his head.[169]  In Thailand, insulting the King was illegal and punishable by as much as fifteen years in prison.[170]  Nicole Wong was hard pressed to find the content offensive. "My first instinct was it's a cartoon. It's a stupid Photoshop," she stated, "but then it suddenly became a kind of learning moment for me about international speech standards versus First Amendment speech standards and there was a lot more American First Amendment exceptionalism [in that space] than previously."[171]  Wong traveled to Thailand to resolve the dispute and was overwhelmed by the popular love she observed in the Thai people for their King. "You can't even imagine [their love for their King]," she recounted of the trip:

> Every Monday literally eighty-five percent of the people show up to work in a gold or yellow shirt and dress[172] and there's a historical reason for it: the only source of stability in this country is this King . . . They absolutely revere their King. . . . Someone at the U.S. Embassy described him as a "blend of George Washington, Jesus, and Elvis." Some people . . . tears came to their eyes as they talked about the insults to the King and how much it offended them. That's the part that set me back. Who am I, a U.S. attorney sitting in California to tell them: "No, we're not taking that down. You're going to have to live with that."[173]

After the trip, Wong and her colleagues agreed to remove the videos within the geographical boundaries of Thailand, with the exception of critiques of the military.[174]

A few months later, events similar to those in Thailand emerged, but ended in a different result. In March 2007, Turkey blocked access to YouTube for all Turkish users in response to a judge-mandated order.[175] The judgment came in response to a parody news broadcast that jokingly quipped that the founder of modern Turkey, Mustafa Kemal

---

[168]  Rosen, *supra* note 12.

[169]  *Id.*

[170]  *Lese-Majeste Explained: How Thailand Forbids Insult of Its Royalty*, BBC NEWS (Oct. 6, 2017), http://www.bbc.com/news/world-asia-29628191 [https://perma.cc/58GZ-X7YZ].

[171]  Telephone Interview with Nicole Wong, *supra* note 130.

[172]  Yellow is the color associated with the King in Thailand. *Profile: Thailand's Reds and Yellows*, BBC NEWS (July 13, 2012), http://www.bbc.com/news/world-asia-pacific-13294268 [https://perma.cc/K79R-5AWP] (calling yellow "the king's colour").

[173]  Telephone Interview with Nicole Wong, *supra* note 130.

[174]  *Id.*

[175]  Rosen, *supra* note 12.

Atatürk, was gay.[176]  As with the King in Thailand, ridicule or insult of Atatürk was illegal in Turkey.  Though the video had already been voluntarily removed, Turkey had searched and provided Google with a list of dozens of similarly offensive videos and demanded their takedown.[177]  Unwilling to meet the blanket demand, Wong and her colleagues at Google found themselves parsing the intricacies of Turkish law on defamation of Atatürk, measuring those standards against the videos highlighted as offensive by the Turkish government, and then offering compromises to ban in Turkey only those videos that they found actually violated Turkish law.[178]  This seemed to strike an accord for a period of time.[179]  A little over a year later, however, in June 2007, the Turkish government demanded Google ban access to all such videos not only in Turkey, but worldwide.[180]  Google refused, and Turkey subsequently blocked YouTube throughout Turkey.[181]

All three platforms faced the issue of free speech concerns versus censorship directly through platform rules or collateral censorship by government request when a video called *Innocence of Muslims* was uploaded to YouTube.[182]  Subtitled "The Real Life of Muhammad," the video depicts Muslims burning the homes of Egyptian Christians, before cutting to "cartoonish" images that paint Muhammad as a bastard, homosexual, womanizer, and violent bully.[183]  The video's negative depiction of the Muslim faith sparked a firestorm of outrage in the Islamic world and fostered anti-Western sentiment.[184]  As violence moved from Libya to Egypt, YouTube issued a statement that while the video would remain posted on the site because the content was "clearly within [its] guidelines," access to the video would be temporarily restricted in Libya and Egypt.[185]

At Facebook, the debate between violation of platform guidelines versus concerns over collateral censorship also played out.  By the time the video was posted, many of Facebook's difficulties with hate speech had been distilled into a single rule: attacks on institutions (for example,

---

[176] Jeffrey Rosen, *The Delete Squad*, NEW REPUBLIC (Apr. 29, 2013), https://newrepublic.com/article/113045/free-speech-internet-silicon-valley-making-rules [https://perma.cc/XB7Q-BSBA].

[177] Rosen, *supra* note 12.

[178] *Id.*

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *The Anti-Islam-Film Riots: A Timeline*, THE WEEK (Sept. 18, 2012), http://theweek.com/articles/472285/antiislamfilm-riots-timeline [https://perma.cc/V6TK-N8M3].

[183] David D. Kirkpatrick, *Anger over a Film Fuels Anti-American Attacks in Libya and Egypt*, N.Y. TIMES (Sept. 11, 2012), http://nyti.ms/2BxU77K [https://perma.cc/JZJ8-5QUD].

[184] *Id.*

[185] Eva Galperin, *YouTube Blocks Access to Controversial Video in Egypt and Libya*, ELECTRONIC FRONTIER FOUND.: DEEPLINKS BLOG (Sept. 12, 2012), https://www.eff.org/deeplinks/2012/09/youtube-blocks-access-controversial-video-egypt-and-libya [https://perma.cc/Y25N-PESU].

**App. 595**

countries, religions, or leaders) would be considered permissible content and stay up, but attacks on groups (people of a certain religion, race, or country) would be taken down.[186]  In application, this meant that statements like "I hate Islam" were permissible on Facebook, while "I hate Muslims" was not.  Hoffman, Willner, and their team watched the video, found no violative statements against Muslims, and decided to keep it on the site.[187]  A few weeks later, the Obama Administration called on YouTube to reconsider leaving the video up, in part to quell the violence abroad.[188]  Both YouTube and Facebook stuck to their decisions.[189]  Reviewing this moment in history, Professor Jeffrey Rosen spoke to the significance of their decisions for collateral censorship: "In this case . . . the mobs fell well outside of U.S. jurisdiction, and the link between the video and potential violence also wasn't clear. . . . Had YouTube made a different decision . . . millions of viewers across the globe [would have been denied] access to a newsworthy story and the chance to form their own opinions."[190]

The early history and personnel of these companies demonstrate how American free speech norms and concerns over censorship became instilled in the speech policies of these companies.  But they also raise a new question: if all three companies had § 230 immunity and all valued their users' free speech rights, why did they bother curating at all?

## B.  Why Moderate At All?

These online platforms have broad freedom to shape online expression and a demonstrated interest in free speech values.  So why do they bother to create intricate content-moderation systems to remove speech?[191]  Why go to the trouble to take down and then reinstate videos of violence like those Wong described?  Why not just keep them up in the first place?  The answers to these questions lead to the incentives for platforms to minimize online obscenity put in place by the Good Samaritan provision of § 230.  Platforms create rules and systems to curate speech out of a sense of corporate social responsibility, but also, more importantly, because their economic viability depends on meeting users' speech and community norms.

*1.  Corporate Responsibility and Identity.* — Some platforms choose to moderate content that is obscene, violent, or hate speech out of a sense

---

[186] Rosen, *supra* note 176.
[187] *Id.*
[188] Claire Cain Miller, *Google Has No Plans to Rethink Video Status*, N.Y. TIMES (Sept. 14, 2012), http://nyti.ms/2swdwTK [https://perma.cc/DKJ8-VBG4].
[189] *Id.*
[190] Rosen, *supra* note 176.
[191] These systems are discussed in detail in Part III, *infra* pp. 1630–62.

of corporate responsibility.[192]   At YouTube, Wong looked to the values of the company in addition to American free speech norms in developing an approach to content moderation.[193]   "Not everyone has to be a free-wheeling, free speech platform that is the left wing of the left wing party," she said, referring to Twitter's unofficial content-moderation policy:

> But you get to decide what the tone and tenor of your platform look[] like, and that's a First Amendment right in and of itself.   Yahoo or Google had a strong orientation toward free speech, [and] being more permissive of a wide range of ideas and the way those ideas are expressed, they created community guidelines to set what [users] can come here for, because they want the largest possible audience to join.[194]

Like Wong, Hoffman and Willner considered the mission of Facebook — "to make the world more open and connected"[195] — and found that it often aligned with larger American free speech and democratic values.[196]   These philosophies were balanced against competing principles of user safety, harm to users, public relations concerns for Facebook, and the revenue implications of certain content for advertisers.[197]   The balance often favored free speech ideals of "leaving content up" while at the same time trying to figure out new approaches or rules that would still satisfy concerned users and encourage them to connect and interact on the platform.[198]   "We felt like Facebook was the most important platform for this kind of communication, and we felt like it was our responsibility to figure out an answer to this," said Hoffman.[199]

Likewise, Twitter's corporate philosophy of freedom of speech justified its failure to moderate content.[200]   In recent years, Twitter's approach has started to change.   In a *Washington Post* editorial, the new General Counsel of Twitter, Vijaya Gadde, used very different rhetoric

---

[192]   *See* Citron & Norton, *supra* note 104, at 1455 n.119 ("Such decisions may be justified as a matter of corporate law under the social entity theory of the corporation, which permits corporate decision-makers to consider and serve the interests of all the various constituencies affected by the corporation's operation." (citing Lisa M. Fairfax, *Doing Well While Doing Good: Reassessing the Scope of Directors' Fiduciary Obligations in For-Profit Corporations with Non-Shareholder Beneficiaries*, 59 WASH. & LEE L. REV. 409, 412 (2002))).

[193]   Telephone Interview with Nicole Wong, *supra* note 130.

[194]   *Id.*

[195]   *See Note from Mark Zuckerberg*, FACEBOOK (Apr. 27, 2016), https://newsroom.fb.com/news/2016/04/marknote/ [https://perma.cc/E7P5-SZZX].   Facebook changed its mission statement last year to "giv[ing] people the power to build community and bring[ing] the world closer together." Mark Zuckerberg, *Post*, FACEBOOK (June 22, 2017), https://www.facebook.com/zuck/posts/10154944663901634 [https://perma.cc/3PCE-KN9H]; *FAQs*, FACEBOOK: INV. REL., https://investor.fb.com/resources/default.aspx [https://perma.cc/AF3Q-WNFX].

[196]   *See* Telephone Interview with Jud Hoffman, *supra* note 148; *see also* Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

[197]   Telephone Interview with Jud Hoffman, *supra* note 148.

[198]   *Id.*

[199]   *Id.*

[200]   *See supra* pp. 1620–21.

than that of her predecessor: "Freedom of expression means little as our underlying philosophy if we continue to allow voices to be silenced because they are afraid to speak up," wrote Gadde.[201] "We need to do a better job combating abuse without chilling or silencing speech."[202] Over the last two years, the company has slowly made good on its promise, putting a number of policies and tools in place to make it easier for users to filter and hide content they do not want to see.[203]

    *2. Economic Reasons.* — Though corporate responsibility is a noble aim, the primary reason companies take down obscene and violent material is the threat that allowing such material poses to potential profits based in advertising revenue.[204] Platforms' "sense of the bottom-line benefits of addressing hate speech can be shaped by consumers' — i.e., users' — expectations."[205] If a platform creates a site that matches users' expectations, users will spend more time on the site and advertising revenue will increase.[206] Take down too much content and you lose not only the opportunity for interaction, but also the potential trust of users. Likewise, keeping up all content on a site risks making users uncomfortable and losing page views and revenue. According to Willner and Hoffman, this theory underlies much of the economic rationale behind Facebook's extensive moderation policies.[207] As Willner stated, "Facebook is profitable only because when you add up a lot of tiny interactions worth nothing, it is suddenly worth billions of dollars."[208] Wong spoke

---

[201] Vijaya Gadde, Editorial, *Twitter Executive: Here's How We're Trying to Stop Abuse While Preserving Free Speech*, WASH. POST (Apr. 16, 2015), http://wapo.st/1VyRi04 [https://perma.cc/G4BD-BLNC].

[202] *Id.*

[203] Kate Klonick, *Here's What It Would Take for Twitter to Get Serious About Its Harassment Problem*, VOX (Oct. 25, 2016, 10:50 AM), http://www.vox.com/new-money/2016/10/25/13386648/twitter-harassment-explained [https://perma.cc/VA7M-TRTH]. It is important to note that these methods used by Twitter to maximize free speech by shielding the viewer are really just a type of shadow censorship.

[204] *See* Citron & Norton, *supra* note 104, at 1454 n.113 ("[T]he traditional 'shareholder primacy' view . . . understands the corporation's primary (and perhaps exclusive) objective as maximizing shareholder wealth." (first citing Mark J. Roe, *The Shareholder Wealth Maximization Norm and Industrial Organization*, 149 U. PA. L. REV. 2063, 2065 (2001); then citing A. A. Berle, Jr., *For Whom Corporate Managers Are Trustees: A Note*, 45 HARV. L. REV. 1365, 1367–69 (1932))).

[205] *Id.*

[206] Paul Alan Levy, *Stanley Fish Leads the Charge Against Immunity for Internet Hosts — But Ignores the Costs*, PUB. CITIZEN: CONSUMER L. & POL'Y BLOG (Jan. 8, 2011), http://pubcit.typepad.com/clpblog/2011/01/stanley-fish-leads-the-charge-against-immunity-for-internet-hosts-but-ignores-the-costs.html [https://perma.cc/APS9-49BC] (arguing that websites that fail to provide protections against abuse will find "that the ordinary consumers whom they hope to serve will find it too uncomfortable to spend time on their sites, and their sites will lose social utility (and, perhaps more cynically, they know they will lose page views that help their ad revenue)"); *see also* Citron & Norton, *supra* note 104, at 1454 (discussing "digital hate as a potential threat to profits").

[207] Telephone Interview with Jud Hoffman, *supra* note 148; Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

[208] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

of the challenge to meet users' expectations online slightly differently: as platforms attempting to catch up to changing social norms online.[209] Changing expectations about speech are happening both at the platform level, and also at a societal level, said Wong, who referred to the last twenty years of online speech as undergoing a "norm-setting process" that is developing at light speed in comparison to any other kind of publication platform.[210]  "What we're still in the middle of is how do we think about . . . the norms of behavior when what's appropriate is constantly reiterated," said Wong.[211]  "If you layer over all of that the technology change and the cultural, racial, national, [and] global perspectives, it's all just changing dramatically fast.  It's enormously difficult to figure out those norms, let alone create policy to reflect them."[212] Nevertheless, reflecting these rapidly changing norms, and, accordingly, encouraging and facilitating platform interactions — users posting, commenting, liking, and sharing content — is how platforms like Facebook and YouTube have stayed in business and where platforms like Twitter have run into trouble.

Twitter's transformation from internet hero for its blanket refusal to police users' content to internet villain happened relatively swiftly. Though public awareness of online hate speech and harassment was already growing, the GamerGate controversy in 2014 raised new levels of global awareness about the issue.[213]  As the least policed or rule-based platform, much of the blame fell on Twitter.[214]  By 2015, the change in cultural values and expectations began to be reflected in new public standards and policy at Twitter.  The site added new language prohibiting "promot[ing] violence against others . . . on the basis of race, ethnicity, national origin, religion, sexual orientation, gender, gender identity, age, or disability" to the Twitter Rules and prohibited revenge

---

[209] Telephone Interview with Nicole Wong, *supra* note 130.

[210] *Id.*

[211] *Id.*

[212] *Id.*

[213] In August of that year, anonymous users targeted a number of women in the gaming industry — including game developers Zoë Quinn, Brianna Wu, and critic Anita Sarkeesian — in a series of harassment campaigns across multiple platforms, including Twitter.  Jason Schreier, *Thousands Rally Online Against Gamergate*, KOTAKU (Oct. 15, 2014, 10:48 AM), https://kotaku.com/thousands-rally-online-against-gamergate-1646500492 [https://perma.cc/7E49-9KJA].  The harassment efforts included doxing, as well as rape and death threats.  Sarah Kaplan, *With #GamerGate, the Video-Game Industry's Growing Pains Go Viral*, WASH. POST (Sept. 12, 2014), http://wapo.st/2EvoOJ7 [https://perma.cc/C4YH-B7J6].  The widespread and graphic nature of the controversy shifted norms and led to many calls on social media platforms to take a more proactive stance against online harassment and hate speech.  Schreier, *supra*.

[214] Charlie Warzel, *"A Honeypot for Assholes": Inside Twitter's 10-Year Failure to Stop Harassment*, BUZZFEED: NEWS (Aug. 11, 2016, 9:43 AM), https://www.buzzfeed.com/charliewarzel/a-honeypot-for-assholes-inside-twitters-10-year-failure-to-s [https://perma.cc/GQD5-XX97].

**App. 599**

porn.[215]  On December 30, 2015, Twitter published a new set of Twitter Rules — which were largely nothing new, but rather an official incorporation of the separate pages and policies in one place.[216]  In January 2016, one Twitter spokesperson described the changes: "Over the last year, we have clarified and tightened our policies to reduce abuse, including prohibiting indirect threats and nonconsensual nude images. Striking the right balance will inevitably create tension, but user safety is critical to our mission at Twitter and our unwavering support for freedom of expression."[217]

In the mid-1990s, Post presciently wrote about how this interplay between users' norms around speech and content of online platforms would play out.  Post suggested competition between individual online platforms would result in a "market for rules," which would allow users to seek networks that have "rule sets" to their liking.[218]  At least with regard to Twitter, this platform-exit prediction is mostly accurate.  Over the last few years, many users unhappy with the policies of Twitter left the platform and favored other platforms like Facebook, Instagram, and Snapchat.[219]  As Twitter's user growth stagnated, many blamed the site's inability to police harassment, hate speech, and trolling on its site for the slump.[220]  In late 2016, Twitter announced a host of new services for users to control their experience online, block hate speech and harassment, and control trolls.[221]  Post's idea of a "market for rules" is an incredibly useful heuristic to understand the history of online content moderation, with two small updates: (1) the history of Twitter reveals a nuance not fully predicted by Post — that is, rather than exit a platform, some users would stay and expect platforms to alter rule sets and policies reactively in response to user pressure; and (2) the "market for rules"

---

[215] Jeong, *supra* note 151 (alterations in original); *see also* Issie Lapowsky, *Why Twitter Is Finally Taking a Stand Against Trolls*, WIRED (Apr. 21, 2015, 2:14 PM), https://www.wired.com/2015/04/twitter-abuse/ [https://perma.cc/4V7R-43VK].

[216] *See* @megancristina, *Fighting Abuse to Protect Freedom of Expression*, TWITTER: BLOG (Dec. 30, 2015), https://blog.twitter.com/official/en_au/a/2015/fighting-abuse-to-protect-freedom-of-expression-au.html [https://perma.cc/PP5E-KKAE].

[217] Jeong, *supra* note 151.

[218] Post, *supra* note 101, at para. 42.

[219] *See* Jeff Dunn, *Here's How Slowly Twitter Has Grown Compared to Facebook, Instagram, and Snapchat*, BUS. INSIDER (Feb. 10, 2017, 6:14 PM), http://www.businessinsider.com/twitter-vs-facebook-snapchat-user-growth-chart-2017-2 [https://perma.cc/PF6U-GGPC] (assuming arguendo that growth in market alone cannot account for the slow growth of users on Twitter as compared to the growth of users on social media platforms like Snapchat, Instagram, and Facebook).

[220] *See, e.g.*, Sarah Frier, *Twitter Fails to Grow Its Audience, Again*, BLOOMBERG TECH. (July 27, 2017, 7:00 AM), https://bloom.bg/2uF yz3B [https://perma.cc/XN9N-74BH]; Umair Haque, *The Reason Twitter's Losing Active Users*, HARV. BUS. REV. (Feb. 12, 2016), https://hbr.org/2016/02/the-reason-twitters-losing-active-users [https://perma.cc/KH4W-MK7P]; Joshua Topolsky, *The End of Twitter*, NEW YORKER (Jan. 29, 2016), https://www.newyorker.com/tech/elements/the-end-of-twitter [https://perma.cc/VZH3-V94L].

[221] Klonick, *supra* note 203.

paradigm mistakes the commodity at stake in online platforms. The commodity is not just the user, but rather it is the content created and engaged with by a user culture.[222] In this sense there is no competition between social media platforms themselves, as Post suggests, because they are complementary, not substitute, goods.[223]

Whether rooted in corporate social responsibility or profits, the development of platforms' content-moderation systems to reflect the normative expectations of users is precisely what the creation of the Good Samaritan provision in § 230 sought. Moreover, the careful monitoring of these systems to ensure user speech is protected can be traced to the free speech concerns of § 230 outlined in *Zeran*. The answer to the dilemma of what § 230 protects — immunity for good actors creating decency online or protection against collateral censorship — seems not to be an either/or answer. Rather, both purposes seem to have an essential role to play in the balance of private moderation of online speech.

With this new knowledge about the motivations behind platforms' content-moderation systems, we can then ask the next question in the debate over internet intermediaries: how are platforms actually moderating? The answer to this question, explored in the next Part, is essential to understanding how platforms should — or should not — be understood for the purposes of First Amendment law.

## III. HOW ARE PLATFORMS GOVERNING? THE RULES, PROCESS, AND REVISION OF CONTENT-MODERATION SYSTEMS

Much of the analysis over how to categorize online platforms with respect to the First Amendment is missing a hard look at what these platforms are actually doing and how they are doing it. In part, this is because the private content-moderation systems of major platforms like Facebook, Twitter, and YouTube are historically opaque. This Part seeks to demonstrate how these systems actually work to moderate online speech. In doing this, Part III looks at the history of how content-moderation systems changed from those of standards to those of rules, how platforms enforce these rules, and how these rules are subject to change. Many of these features bear remarkable resemblance to heuristics and structures familiar in legal decisionmaking. Despite these similarities, platform features are best thought of not in terms of First

---

[222] *See* Balkin, *supra* note 7, at 4–6.

[223] Moreover, Post's free-market idea of user exit is also challenged by current studies. In an ongoing project, the Electronic Frontier Foundation has worked to document and present evidence of the negative psychological impact that leaving — either by choice or by banning — certain social media platforms can have on users. *See Submit Report*, ONLINECENSORSHIP.ORG, https://onlinecensorship.org/submit-report [https://perma.cc/25NK-LGA2] (offering a platform for users to report erroneous or unjust account deactivations). These studies support the theory Lessig describes in *Code: Version 2.0*, in which he proffers that leaving an internet platform is more difficult and costly than expected. *See* LESSIG, *supra* note 21, at 288–90.

Amendment doctrine — as reflecting the role of a state actor, a broadcaster, or a newspaper editor — but in terms of a private self-regulatory system to govern online speech.

## A. Development of Moderation: From Standards to Rules

When Dave Willner joined a small team to specialize in content moderation in November 2009, no public "Community Standards" existed at Facebook. Instead, all content moderation was based on one page of internal "rules" applied globally to all users. Willner recalled that the moderation policies and guidance for enforcing them were limited.[224] "The [policy] guidance was about a page; a list of things you should delete: so it was things like Hitler and naked people. None of those things were wrong, but there was no explicit framework for why those things were on the list."[225] Willner's now-wife Charlotte was also working at Facebook doing customer service and content moderation and had been there for a year before Dave joined.[226] She described the ethos of the pre-2008 moderation guidelines as "if it makes you feel bad in your gut, then go ahead and take it down."[227] She recalled that the "Feel bad? Take it down" rule was the bulk of her moderation training prior to the formation of Dave's group in late 2008.[228] Wong described a similar ethos in the early days at YouTube, especially around efforts to know when to remove graphic violence from the site. Speaking of reinstating the 2007 video of the Egyptian protestor being brutally beaten,[229] Wong said: "It had no title on it. It wasn't posted by him. . . . I had no way of knowing what it was and I had taken something down that had real significance as a human rights document. So we put it back up. And then we had to create another exception to the no-violence rule."[230]

Though both Wong and the Willners used the term "rule" in describing these prescriptions for takedown, a more precise term for these early guidelines might be "standard." In legal theory, the "rules-standards conflict" describes the battle between two formal resolutions for legal controversy.[231] An example of a standard is "don't drive too fast." An

---

[224] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.
[225] *Id.*
[226] *Id.*
[227] *Id.*
[228] *Id.*
[229] *See supra* pp. 1619–20.
[230] Telephone Interview with Nicole Wong, *supra* note 130.
[231] *See generally* MARK KELMAN, A GUIDE TO CRITICAL LEGAL STUDIES 40–45 (1987); Pierre Schlag, *Rules and Standards*, 33 UCLA L. REV. 379, 381–83 (1985); Anthony J. Casey & Anthony Niblett, *The Death of Rules and Standards* 7–10 (Univ. of Chi. Coase-Sandor Inst. for Law & Econ., Paper No. 738, 2015), https://ssrn.com/abstract=2693826 [https://perma.cc/4WJV-43RM]; Lawrence Solum, *Legal Theory Lexicon: Rules, Standards, and Principles*, LEGAL THEORY BLOG (Sept. 6, 2009, 9:40 AM), http://lsolum.typepad.com/legaltheory/2009/09/legal-theory-lexicon-rules-standards-and-principles.html [https://perma.cc/XR4C-9QT3].

example of a rule is a speed limit set at sixty-five miles per hour. There are trade-offs to picking one as the formal solution over the other. Standards are often "restatements of purpose" or values,[232] but because they are often vague and open ended, they can be "subject to arbitrary and/or prejudiced enforcement" by decisionmakers.[233] This purposive approach, however, can also mean that standards are enforced precisely and efficiently and can be more accommodating to changing circumstances. Rules, on the other hand, have the issues reverse to those of standards. Rules are comparatively cheap and easy to enforce, but they can be over- and underinclusive and, thus, can lead to unfair results.[234] Rules permit little discretion and in this sense limit the whims of decisionmakers, but they also can contain gaps and conflicts, creating complexity and litigation.[235]

Whichever approach is used, a central point is that the principles formalized in rules and standards are rooted in the social norms and values of a community.[236] Standards are more direct analogues of values or purpose but "require[] that the enforcing community . . . come to some consensus on the meaning of a value term."[237] Rules are more distant from the norms they are based on and "do not depend on ongoing dialogue to gain dimension or content . . . even by someone who shares no sense of community with his fellows."[238]

The development at YouTube and Facebook from standards to rules for content moderation reflects these trade-offs. A simple standard against something like gratuitous violence is able to reach a more tailored and precise measure of justice that reflects the norms of the community, but it is vague, capricious, fact dependent, and costly to enforce.

This can be seen at YouTube, which in mid-2006 employed just sixty workers to review all video that had been flagged by users for all reasons.[239] For violations of terms of service, one team of ten, deemed the Safety, Quality, and User Advocacy Department, or SQUAD, worked in shifts "around the clock" to keep YouTube from "becoming a shock site."[240] That team was given a one-page bullet-point list of standards that instructed on removal of things like animal abuse, videos showing blood, visible nudity, and pornography.[241] A few months later, in the

---

[232] KELMAN, *supra* note 231, at 40 (emphasis omitted).
[233] *Id.* at 41.
[234] *Id.* at 40.
[235] *See id.* at 40–47.
[236] *See* Eric A. Posner, *Standards, Rules, and Social Norms*, 21 HARV. J.L. & PUB. POL'Y 101, 107–11 (1997).
[237] KELMAN, *supra* note 231, at 61.
[238] *Id.* at 62.
[239] Buni & Chemaly, *supra* note 12.
[240] *Id.*
[241] *Id.*

fall of 2006, the YouTube list turned into a six-page booklet drafted with input from the SQUAD, Wong, and other YouTube lawyers and policy executives.[242]  Five years later, in 2011, the volume of uploaded video to YouTube had more than doubled in size, making delicate, precise decisions less feasible.[243]  In addition, the content-moderation team had expanded and been outsourced.  Accordingly, the more individually tailored standards against gratuitous violence had slowly been replaced by precise rules, which were easier and less costly to enforce.  Moderators were given a booklet with internal rules for content moderation.  This booklet was regularly annotated and republished with changes to moderation policies and rules.[244]  Many of these new rules were drafted as "exceptions" to rules.  Eventually, a more detailed iterative list of rules and their exceptions largely replaced the standards-based approach of earlier years.

Similar to the experience at YouTube, Facebook eventually abandoned the standards-based approach as the volume of user-generated content increased, the user base diversified, and the content moderators globalized.  Dave Willner was at the helm of this transition.  Though Facebook had been open globally for years, Willner described much of the user base during his early days there as still relatively homogenous — "mostly American college students" — but that was rapidly changing as mobile technology improved and international access to the site grew.[245]  Continuing to do content moderation from a single list of banned content seemed untenable and unwieldy.  Instead, Willner set about changing the entire approach:

> In the early drafts we had a lot of policies that were like: "Take down all the bad things.  Take down things that are mean, or racist, or bullying."  Those are all important concepts, but they're value judgments.  You have to be more granular and less abstract than that.  Because if you say to forty college students [content moderators], "delete all racist speech," they are not going to agree with each other about what's racist.[246]

Eliminating standards that evoked nonobservable values, feelings, or other subjective reactions was central to Willner's new rulebook for moderation.  Instead, he focused on the implicit logic of the existing page of internal guidelines and his experience and extrapolated from them to

---

[242] *Id.*

[243] On May 1, 2009, YouTube had twenty hours of video upload per minute; by May 1, 2011, forty-eight hours of video were uploaded per minute.  *See* Mark R. Robertson, *500 Hours of Video Uploaded to YouTube Every Minute [Forecast]*, TUBULAR INSIGHTS (Nov. 13, 2015), http://tubularinsights.com/hours-minute-uploaded-youtube/ [https://perma.cc/A9Q7-N3VM].

[244] Buni & Chemaly, *supra* note 12.

[245] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147; *see also* Buni & Chemaly, *supra* note 12.

[246] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

create objective rules.[247]   The first draft of these "all-encompassing" rules was written largely by Willner in 2009 and contained roughly 15,000 words.[248]   The end goal was consistency and uniformity: to get the same judgment on a piece of content, regardless of who was moderating it.[249]

Exactly "who" was moderating the content changed significantly in January 2009, when Facebook opened its office in Dublin and first started outsourcing its content moderation through consulting groups. Before then, most moderators worked in Palo Alto and were similar to Facebook's main user base — "homogenous college students."[250]   The shift to outsourced moderation continued when a new community operations team was set up in Hyderabad, India.[251]   Around the same time, Hoffman joined Facebook's team as Global Policy Manager with the goal of formalizing and consolidating the rules Willner had started to draft, and ensuring that Facebook was transparent with users by publishing a set of public rules in the form of "Community Standards."[252]

Hoffman and Willner worked together to transform the early ad hoc abuse standards into operational internal rules for content moderators, a document that today is over eighty pages long.[253]   This movement from standards to rules was "ultimately a form of technical writing," said Willner.[254]   "You cannot tell people to delete photos with ugly clothes in them.   You have to say 'delete photos with orange hats in them.'"[255]   For Willner, some of the hardest parts of defining categories, elements, and distinctions came in moderating art and nudity.[256]   For Hoffman, it was more difficult to create rules around hate speech. "We couldn't make a policy that said 'no use of the N-word at all,'" he recalled, describing the difficulty in policing racial slurs.[257]   "That could be completely insensitive to the African American community in the United States.   But you also don't want it used as hate speech.   So it's

---

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] *Id.*

[251] *Id.*

[252] *Id.* "Community Standards" is Facebook's term for its *public* content-moderation policies.   It is important to note that the internal rules created by Willner predated the public Community Standards for the site.   In fact, it was the internal rules that informed, in part, the creation and substance of Facebook's public policies.

[253] *Id.*

[254] *Id.*

[255] *Id.*

[256] "Art doesn't exist as a property of an image.   There are no art pixels that you can find in images we think are classy or beautiful or uplifting. . . . But what we realized about art was that [moderation] questions about art weren't about art itself, it was about art being an exception to an existing restriction. . . . [S]o the vast majority of art is fine.   It's when you're talking about things that might meet the definition of nudity or racism or violence that people think are important." *Id.*

[257] Telephone Interview with Jud Hoffman, *supra* note 148.

almost impossible to turn that into an objective decision because context matters so much."[258]  The answer was to turn context into a set of objective rules.  In evaluating whether speech was likely to provoke violence, for example, Hoffman and his team developed a four-part test to assess credible threats: time, place, method, and target.[259]  If a post specified any three of these factors, the content would be removed, and if appropriate, authorities notified.[260]

Content moderation at YouTube and Facebook developed from an early system of standards to an intricate system of rules due to (1) the rapid increase in both users and volume of content; (2) the globalization and diversity of the online community; and (3) the increased reliance on teams of human moderators with diverse backgrounds.  The next section discusses enforcement of these rules.

### B.  How the Rules Are Enforced: Trained Human Decisionmaking

Content moderation happens at many levels.  It can happen before content is actually published on the site, as with ex ante moderation, or after content is published, as with ex post moderation.  These methods can be either *reactive*, in which moderators passively assess content and update software only after others bring the content to their attention, or *proactive*, in which teams of moderators actively seek out published content for removal.  Additionally, these decisions can be *automatically* made by software or *manually* made by humans.[261]  The majority of

---

[258] *Id.*
[259] Univ. of Hous. Law Ctr., *UH Law Center and the ADL Present Racists, Bigots and the Law on the Internet*, YOUTUBE (Oct. 10, 2012), https://youtu.be/aqqvYPyr6cI?list=UU3rht1s60KV8PnW1ds47_KQ [https://perma.cc/Q7SF-TYNM] (recording of Jud Hoffman, Glob. Policy Manager, Facebook).
[260] *Id.*  Many situations, however, were lacking in context.  Online bullying was the type of issue that often arose with insufficient background.  As Hoffman described:

> There is a traditional definition of bullying — a difference in social power between two people, a history of contact — there are elements.  But when you get a report of bullying, you just don't know.  You have no access to those things.  So you have to decide whether you're going to assume the existence of some of those things or assume away the existence of some of those things.  Ultimately what we generally decided on was, "if you tell us that this is about you and you don't like it, and you're a private individual not a public figure, we'll take it down."  Because we can't know whether all these other things happened, and we still have to make those calls.  But I'm positive that people were using that function to game the system. . . . I just don't know if we made the right call or the wrong call or at what time.

Telephone Interview with Jud Hoffman, *supra* note 148.  Hoffman's description also demonstrates two major drawbacks to using rules rather than standards.  A blanket rule against bullying can simultaneously result in people manipulating a rule to "walk the line" and also result in permissible content being mistakenly removed.  *Id.*
[261] *See* James Grimmelmann, *The Virtues of Moderation*, 17 YALE J.L. & TECH. 42, 63–70 (2015) (describing how moderation systems operate differently along several lines — automatic or manual, transparent or secret, ex ante or ex post, and centralized or decentralized).  Professor James Grimmelmann's taxonomy, while foundational, speaks more generally to all of internet moderation

this section focuses on ex post *reactive* content moderation, specifically looking at the implementation of rules with respect to human decisionmaking, pattern recognition, and professionalization of judgment.

*1. Ex Ante Content Moderation.* — When a user uploads a video to Facebook, a message appears: "Processing Videos: The video in your post is being processed.  We'll send you a notification when it's done and your post is ready to view."[262]  Ex ante content moderation is the process that happens in this moment between "upload" and publication.[263]  The vast majority of this moderation is an automatic process run largely through algorithmic screening without the active use of human decisionmaking.

An example of content that can be moderated by these methods is child pornography, which can reliably be identified upon upload through a picture-recognition algorithm called PhotoDNA.[264]  Under federal law, production, distribution, reception, and possession of an image of child pornography is illegal, and as such, sites are obligated to remove it.[265]  A known universe of child pornography — around 720,000 illegal images — exists online.[266]  By converting each of these images to grayscale, overlaying a grid, and assigning a numerical value to each

---

[262] *Videos*, FACEBOOK: HELP CTR., https://www.facebook.com/help/154271141375595/ [https://perma.cc/FHD2-4RAY].

[263] Because ex ante content moderation happens before publication takes place, it is the type of prior restraint that scholars like Balkin are concerned with.  *See generally* Balkin, *supra* note 11.  Of the two automatic means of reviewing and censoring content — algorithm and geoblocking — geoblocking is of more concern for the purposes of collateral censorship and prior restraint.  In contrast, algorithms are currently used to remove illegal content like child pornography or copyright violations.  *But see* Rebecca Tushnet, *Power Without Responsibility: Intermediaries and the First Amendment*, 76 GEO. WASH. L. REV. 986, 1003–05 (2008) (noting that the Digital Millennium Copyright Act's notice-and-takedown provisions give platforms no incentive to investigate and therefore "suppress critical speech as well as copyright infringement," *id.* at 1003).

[264] Tracy Ith, *Microsoft's PhotoDNA: Protecting Children and Businesses in the Cloud*, MICROSOFT: NEWS (July 15, 2015), https://news.microsoft.com/features/microsofts-photodna-protecting-children-and-businesses-in-the-cloud/ [https://perma.cc/H7F7-KSB7].

[265] *See* 18 U.S.C. §§ 2251–2252A (2012).  It is important to remember that § 230 expressly states that no internet entity has immunity from federal criminal law, intellectual property law, or communications privacy law.  47 U.S.C. § 230(e) (2012).  This means that every internet service provider, search engine, social networking platform, and website is subject to thousands of laws, including child pornography laws, obscenity laws, stalking laws, and copyright laws.  *Id.*

[266] This "known universe" of child pornography is maintained and updated by the International Centre for Missing and Exploited Children and the U.S. Department of Homeland Security in a program known as Project Vic.  Mark Ward, *Cloud-Based Archive Tool to Help Catch Child Abusers*, BBC NEWS (Mar. 24, 2014), http://www.bbc.com/news/technology-26612059 [https://perma.cc/KX6E-C5R6].

square, researchers were able to create a "hash," or signature, that remained even if the images were altered.[267] As a result, platforms can determine whether an image contains child pornography in the microseconds between upload and publication.[268] Geoblocking is another form of automatic ex ante moderation. Unlike PhotoDNA, which prevents the publication of illegal content, geoblocking prevents both publication and viewing of certain content based on a user's location. As happened in the controversy over the *Innocence of Muslims* video, geoblocking usually comes at the request of a government notifying a platform that a certain type of posted content violates its local laws.[269]

Of course, algorithms do not decide for themselves which kind of content they should block from being posted. Content screened automatically is typically content that can reliably be identified by software and is illegal or otherwise prohibited on the platform. This universe of content that is automatically moderated ex ante is regularly evaluated and updated through iterative software updates and machine learning. For example, in a similar fashion to PhotoDNA, potential copyright violations can be moderated proactively through software like Content ID. Developed by YouTube, Content ID allows creators to give their content a "digital fingerprint" so it can be compared against other uploaded content.[270] Copyright holders can also flag already-published copyright violations through notice and takedown.[271] These two systems work together, with user-flagged copyrighted material eventually added to ContentID databases for future proactive review.[272] This mix of proactive, manual moderation and informed, automatic ex ante moderation is also evident in the control of spam. All three platforms (and most internet companies, generally) struggle to control spam postings on their sites. Today, spam is mostly blocked automatically from publication through software. Facebook, Twitter, and YouTube, however, all feature mechanisms for users to report spam manually.[273] Ex ante screening software is iteratively updated to reflect these flagged spam sources.

---

[267] *Id.*

[268] Ith, *supra* note 264.

[269] *See supra* pp. 1624–25; *see also, e.g.*, Telephone Interview with Nicole Wong, *supra* note 130.

[270] *How Content ID Works*, YOUTUBE: HELP, https://support.google.com/youtube/answer/2797370?hl=en [https://perma.cc/RZ5T-9UPN].

[271] *See, e.g.*, *Submit a Copyright Takedown Notice*, YOUTUBE: HELP, https://support.google.com/youtube/answer/2807622 [https://perma.cc/DAS6-8G3R].

[272] *How Content ID Works, supra* note 270.

[273] *See, e.g.*, *How Twitter Aims to Prevent Your Timeline from Filling Up with Spam*, PANDA MEDIACENTER (Sept. 12, 2014), http://www.pandasecurity.com/mediacenter/social-media/twitter-spam/ [https://perma.cc/8HM8-G63Z]; James Parsons, *Facebook's War Continues Against Fake Profiles and Bots*, HUFFINGTON POST (Mar. 22, 2015, 5:03 PM), http://www.huffingtonpost.com/james-parsons/facebooks-war-continues-against-fake-profiles-and-bots_b_6914282.html [https://perma.cc/3X6E-7AJ7].

2. *Ex Post Proactive Manual Content Moderation.* — Recently, a form of content moderation that harkens to the earlier era of AOL chat rooms has reemerged: platforms proactively seeking out and removing published content. Currently, this method is largely confined to the moderation of extremist and terrorist speech. As of February 2016, dedicated teams at Facebook have proactively removed all posts or profiles with links to terrorist activity.[274] Such efforts were doubled in the wake of terrorist attacks.[275] This is an important new development affecting content moderation, which seeks to strike an ever-evolving balance between competing interests: ensuring national security and maintaining individual liberty and freedom of expression. While a topic worthy of deep discussion, it is not the focus of this paper.[276]

3. *Ex Post Reactive Manual Content Moderation.* — With the exception of proactive moderation for terrorism described above, almost all user-generated content that is published is reviewed *reactively*, that is, through ex post flagging by other users and review by human content moderators against internal guidelines. Flagging — alternatively called reporting — is the mechanism provided by platforms to allow users to express concerns about potentially offensive content.[277] The adoption by social media platforms of a flagging system serves two main functions: (1) it is a "practical" means of reviewing huge volumes of content, and (2) its reliance on users serves to legitimize the system when platforms are questioned for censoring or banning content.[278]

Facebook users flag over one million pieces of content worldwide every day.[279] Content can be flagged for a variety of reasons, and the vast majority of items flagged do not violate the Community Standards of Facebook. Instead content flags often reflect internal group conflicts or disagreements of opinion.[280] To resolve the issue, Facebook created a new reporting "flow" — the industry term to describe the sequence of screens users experience as they make selections — that encourages users to resolve issues themselves rather than report them for review to

---

[274] Natalie Andrews & Deepa Seetharaman, *Facebook Steps Up Efforts Against Terrorism*, WALL ST. J. (Feb. 11, 2016, 7:39 PM), http://on.wsj.com/1TVJNse [https://perma.cc/9CY7-BYD9]. As will be discussed later, corporate censorship of speech at the behest or encouragement of governments raises questions of collateral censorship and state action doctrine. *See infra* pp. 1658–62.

[275] Andrews & Seetharaman, *supra* note 274.

[276] For an excellent, thorough, and cutting-edge discussion of this issue, see Danielle Keats Citron, *Extremist Speech and Compelled Conformity*, 93 NOTRE DAME L. REV. (forthcoming 2018), https://ssrn.com/abstract=2941880 [https://perma.cc/6WM2-H8PY].

[277] Kate Crawford & Tarleton Gillespie, *What Is a Flag For? Social Media Reporting Tools and the Vocabulary of Complaint*, 18 NEW MEDIA & SOC'Y 410, 411 (2016).

[278] *Id.* at 412.

[279] *See* Buni & Chemaly, *supra* note 12; Telephone Interview with Monika Bickert, Head of Glob. Policy Mgmt., Facebook & Peter Stern, Head of Policy Risk Team, Facebook (Jan. 19, 2016).

[280] *The Trust Engineers*, RADIOLAB (Feb. 9, 2015, 8:01 PM), https://www.radiolab.org/story/trust-engineers/ [https://perma.cc/9C4N-SJDW].

Facebook.[281]   Users reporting content first click a button to "Report/Mark as Spam," which then quickly guides users to describe their report in terms like "Hate Speech," "Violence or Harmful Behavior," or "I Don't Like This Post."[282]   Some types of reports, such as harassment or self-harm, guide users to the option of "social reporting" — a tool that "enables people to report problematic content not only to Facebook, but also directly to their friends to help resolve conflicts."[283]   To enhance the response time of content moderation, the reporting flow also has the instrumental purpose of triaging flagged content for review.[284]   This makes it possible for Facebook to immediately prioritize certain content for review and, when necessary, notify authorities of emergency situations like suicide, imminent threats of violence, terrorism, or self-harm. Other content, like possible hate speech, nudity, pornography, or harassment, can be queued into less urgent databases for general review.[285]

After content has been flagged to a platform for review, the precise mechanics of the decisionmaking process become murky.  The "army" of content moderators and "[t]he details of moderation practices are routinely hidden from public view," write Catherine Buni and Soraya Chemaly.[286]   "[S]ocial media companies do not publish details of their internal content moderation guidelines; no major platform has made such guidelines public."[287]   These internal guidelines also change much more frequently than the public Terms of Service or Community Standards.  Focusing largely on Facebook, except where specified, the next section seeks to illuminate this process by integrating previously published information together with interviews of content moderators and platform internal guidelines.  The system of people making the decisions will be examined first followed by a review of the internal guidelines that inform that decisionmaking process.

*(a) Who Enforces the Rules?* — When content is flagged or reported, it is sent to a server where it awaits review by a human content moderator.[288]   At Facebook, there are three basic tiers of content moderators: "Tier 3" moderators, who do the majority of the day-to-day reviewing

---

[281] *Id.*

[282] Alexei Oreskovic, *Facebook Reporting Guide Shows How Site Is Policed (Infographic)*, HUFFINGTON POST (June 19, 2012, 9:38 PM), https://www.huffingtonpost.com/2012/06/20/facebook-reporting-guide_n_1610917.html [https://perma.cc/4LHU-BLGD] .

[283] *Id.*

[284] Univ. of Hous. Law Ctr., *supra* note 259 (Jud Hoffman speaking).

[285] *Id.*

[286] Buni & Chemaly, *supra* note 12.

[287] *Id.*

[288] Skype Interviews with Kumar S. (Jan. 29–Mar. 9, 2016); Skype Interviews with Selahattin T. (Mar. 2–Mar. 11, 2016); Skype Interview with Jagruti (Jan. 26, 2016) [hereinafter Content Moderator Interviews].  These content moderators were Tier 3 workers based in India and Eastern Europe and provided background on what the process looks like from the perspective of a content moderator.

of content; "Tier 2" moderators, who supervise Tier 3 moderators and review prioritized or escalated content; and "Tier 1" moderators, who are typically lawyers or policymakers based at company headquarters.[289]

In the early days, recent college graduates based in the San Francisco Bay Area did much of the Tier 3 content moderation.[290]  Today, most platforms, including Facebook, either directly employ content-moderation teams or outsource much of their content-moderation work to companies like oDesk (now Upwork), Sutherland, and Deloitte.[291]  In 2009, Facebook opened an office in Dublin, Ireland, that had twenty dedicated support and user-operations staff.[292]  In 2010, working with an outsourcing partner, Facebook opened a new office in Hyderabad, India, for user support.[293]

Today, Tier 3 moderators typically work in "call centers"[294] in the Philippines, Ireland, Mexico, Turkey, India, or Eastern Europe.[295]  Within Facebook, these workers are called "community support" or "user support teams."[296]  When working, moderators will log on to computers and access the server where flagged content is awaiting review.[297]  Tier 3 moderators typically review material that has been flagged as a lower priority by the reporting flow.  At Facebook, for example, this includes, in part, reports of nudity or pornography, insults or attacks based on religion, ethnicity, or sexual orientation, inappropriate or annoying content, content that is humiliating, or content that advocates violence to a person or animal.[298]

Tier 2 moderators are typically supervisors of Tier 3 moderators or specialized moderators with experience judging content.  They work both remotely (many live in the United States and supervise groups that

---

[289]  Telephone Interview with J.L., Tier 2 Moderator, Facebook (Mar. 11, 2016).  J.L. was a Tier 2 moderator based in the Eastern United States.

[290]  Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147; Telephone Interview with Sasha Rosse, Manager of Glob. Outsourcing, Facebook (May 16, 2016); Buni & Chemaly, *supra* note 12.

[291]  Telephone Interview with Sasha Rosse, *supra* note 290; Adrian Chen, *Inside Facebook's Outsourced Anti-Porn and Gore Brigade, Where "Camel Toes" Are More Offensive than "Crushed Heads,"* GAWKER (Feb. 16, 2012, 3:45 PM), http://gawker.com/5885714/inside-facebooks-outsourced-anti-porn-and-gore-brigade-where-camel-toes-are-more-offensive-than-crushed-heads [https://perma.cc/HU7H-972C]; Chen, *supra* note 12.

[292]  Telephone Interview with Sasha Rosse, *supra* note 290.

[293]  *Id.*

[294]  Buni & Chemaly, *supra* note 12.

[295]  Content Moderator Interviews, *supra* note 288; Telephone Interview with Sasha Rosse, *supra* note 290; Chen, *supra* note 291; Chen, *supra* note 12.

[296]  Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147; Telephone Interview with Jud Hoffman, *supra* note 148.

[297]  Content Moderator Interviews, *supra* note 288; Telephone Interview with Sasha Rosse, *supra* note 290.

[298]  Telephone Interview with J.L., *supra* note 289.

are internationally based) and locally at call centers.[299]  Tier 2 moderators review content that has been prioritized, like imminent threats of violence, self-harm, terrorism, or suicide.  This content comes to Tier 2 directly through the reporting flow or by being identified and escalated to Tier 2 by Tier 3 moderators.  Tier 2 moderators also review certain randomized samples of Tier 3 moderation decisions.  In order to ensure the accuracy of moderation, Facebook and other platforms have a certain amount of built-in redundancy: the same piece of content is often given to multiple Tier 3 workers.  If the judgment on the content varies, the content is reassessed by a Tier 2 moderator.[300]

Tier 1 moderation is predominantly performed at the legal or policy headquarters of a platform.  At Facebook, for example, a Tier 3 worker could be based in Hyderabad, a Tier 2 supervisor could be based in Hyderabad, or remotely in a place like Dublin, but a Tier 1 contact would be based in Austin, Texas, or the San Francisco Bay Area.  "There were not many levels between the boots-on-ground moderator and Menlo Park," stated one former Tier 2 supervisor who had worked at Facebook until 2012, speaking on the condition of anonymity.[301]  "If I had doubts on something, I'd just send it up the chain."[302]

Recently, issues of scaling this model have led platforms to try new approaches to who enforces the rules.  At YouTube, a new initiative was launched in late 2016 called the Heroes program, which deputizes users to actively participate in the content-moderation process in exchange for perks such as "access to exclusive workshops and sneak preview product launches."[303]  Similarly, after a video of the murder of an elderly man in Cleveland stayed up for over an hour on Facebook, Zuckerberg announced the company would hire 3000 additional content moderators, increasing the size of the content-moderation team by two-thirds.[304]

*(b)  How Are the Rules Enforced?* — As previously discussed, the external policy — or Community Standards — provided to the public is not the same as the internal rulebook used by moderators when trying to assess whether content violates a platform's terms of service.  An analysis of the internal guidelines reveals a structure that in many ways

---

[299] *Id.*; Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

[300] Telephone Interview with J.L., *supra* note 289.

[301] *Id.*

[302] *Id.*

[303] Sarah Perez, *YouTube Enlists Volunteers to Moderate Its Site via a New "YouTube Heroes" Program*, TECHCRUNCH (Sept. 21, 2016), https://techcrunch.com/2016/09/21/youtube-enlists-volunteers-to-moderate-its-site-via-a-new-youtube-heroes-program/   [https://perma.cc/5HJN-K8E2]. *See generally Get Involved with YouTube Contributors*, YOUTUBE: HELP, https://support.google.com/youtube/answer/7124236 [https://perma.cc/6G72-ZUFT].

[304] Alex Heath, *Facebook Will Hire 3000 More Moderators to Keep Deaths and Crimes from Being Streamed*, BUS. INSIDER (May 3, 2017, 10:35 AM), http://www.businessinsider.com/facebook-to-hire-3000-moderators-to-keep-suicides-from-being-streamed-2017-5 [https://perma.cc/5LCM-QG59].

replicates the decisionmaking process present in modern jurisprudence. Content moderators act in a capacity very similar to that of a judge: moderators are trained to exercise professional judgment concerning the application of a platform's internal rules and, in applying these rules, moderators are expected to use legal concepts like relevance, reason through example and analogy, and apply multifactor tests.

*(i) Training.* — Willner and Hoffman's development of objective internal rules at Facebook was a project that became an essential element in the shift to content-moderation outsourcing made in early 2010.[305]  While Facebook's Community Standards were applied globally, without differentiation along cultural or national boundaries,[306] content moderators, in contrast, came with their own cultural inclinations and biases.  In order to ensure that the Community Standards were enforced uniformly, it was necessary to minimize content moderators' application of their own cultural values and norms when reviewing content and instead impose Facebook's.[307]  The key to all of this was providing intensive in-person training on applying the internal rules.  "It all comes down to training," stated Sasha Rosse, who worked with Willner to train the first team in Hyderabad:

> I liked to say that our goal was [to have a training system and rules set] so I could go into the deepest of the Amazon, but if I had developed parameters that were clear enough I could teach someone that had no exposure to anything outside of their village how to do this job.[308]

---

[305]  Facebook outsourced only a small subset of reports in 2010.  Most of the content-moderation work was still being performed by full-time employees and contractors in Hyderabad, Austin, and Palo Alto.  Email from Jud Hoffman, Former Glob. Policy Manager, Facebook (Aug. 18, 2016) (on file with author).

[306]  It is worth noting why Facebook has this policy.  According to Willner, in writing the internal rules and the Community Standards, Facebook:

> realized that the nature of the product made regional rules untenable.  There are no "places" in Facebook — there are just people with different nationalities, all interacting in many shared forums.  Regional rules would make cross-border interactions and communities largely incoherent and moderation very hard if not impossible.  For example, if a Greek user insults Atatürk and a Turkish user reports it, whose rules apply?

Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

[307]  Though often referred to as "neutral," Facebook's values and norms — and the rules that attempted to reflect them — were distinctly American.  *See supra* section II.A, pp. 1618–25.

[308]  Telephone Interview with Sasha Rosse, *supra* note 290.  Despite the internal rules and training, cultural biases still crept into moderation, especially when judging subjective content.  For example, in 2010 and 2011, the Facebook content-policy team was still struggling to refine its guidelines as it simultaneously began to train moderators in India.  Rules on nudity were relatively clearcut because nudity could in large part be reduced to observable characteristics that were either present or not in content.  But harder questions arose regarding the Facebook rules banning certain kinds of sexualized content: a person could be entirely clothed, but in a highly sexual position.  At some point in the training process in India, a group of workers were given a list of observable rules about a picture that made it impermissibly sexual, but at the bottom of the rules there was a more general "Feel Bad" standard: if you feel like something is otherwise sexual or pornographic, take it

Training moderators to overcome cultural biases or emotional reactions in the application of rules to facts can be analogized to training lawyers or judges. In the law, training lawyers and judges through law school and practice bestows a "specialized form of cognitive perception — what Karl Llewellyn called 'situation sense' — that reliably focuses their attention on the features of a case pertinent to its valid resolution."[309] Professor Dan Kahan calls this "professional judgment," but it might also be called "pattern recognition" after Professor Howard Margolis's study of expert and lay assessments of risk,[310] or even likened to the rapid, instinctual categorization used by chicken sexers, expert workers whose entire job is to determine the sex of baby chickens a day or two after the chickens hatch.[311] Regardless of the label, training content moderators involves a repetitive process to "override" cultural and emotional reactions and replace them with rational "valid" resolutions.[312]

Recent studies show that professionalized judgment can thwart cognitive biases, in addition to increasing attention to relevant information and reliable application of rules.[313] In a series of experiments, Kahan asked judges, lawyers, and law students with various political inclinations to assess legal problems that were "designed to trigger unconscious political bias in members of the general public."[314] Despite the presence of irrelevant but polarizing facts, judges, and to a lesser degree, lawyers, were largely in agreement in deciding legal cases presented to them in the study.[315] In contrast, law students and members of the general public reliably made decisions in keeping with their personal political views when presented with politically polarizing information.[316] Replication of the study expanded these findings beyond mere political ideologies to more general "cultural cognition," that is, the "unconscious influence of

---

down. That standard when applied to global content by a small group of moderators was predictably overrestrictive. "Within a day or two, we saw a spike of incorrect decisions," said Hoffman, "where people on this team in India were removing flagged content that portrayed open-mouth kissing." Telephone Interview with Jud Hoffman, *supra* note 148.

[309] Dan M. Kahan et al., *"Ideology" or "Situation Sense"? An Experimental Investigation of Motivated Reasoning and Professional Judgment*, 164 U. PA. L. REV. 349, 354–55 (2016) (quoting KARL N. LLEWELLYN, THE COMMON LAW TRADITION: DECIDING APPEALS 59–61, 121–57, 206–08 (1960)).

[310] *See id.* at 372 (citing HOWARD MARGOLIS, DEALING WITH RISK: WHY THE PUBLIC AND THE EXPERTS DISAGREE ON ENVIRONMENTAL ISSUES (1996)).

[311] *See* RICHARD HORSEY, THE ART OF CHICKEN SEXING (2002), http://cogprints.org/3255/1/chicken.pdf [https://perma.cc/K8J4-GJSV].

[312] Kahan et al., *supra* note 309, at 372.

[313] *Id.* at 374. *See generally* Dan M. Kahan et al., *"They Saw a Protest": Cognitive Illiberalism and the Speech-Conduct Distinction*, 64 STAN. L. REV. 851 (2012) (explaining how cultural cognition shapes interpretations of legally relevant facts).

[314] Kahan et al., *supra* note 309, at 354.

[315] *Id.*

[316] *Id.*

*HARVARD LAW REVIEW* [Vol. 131:1598]

individuals' group commitments on their perceptions of legally conse-quential facts."[317]

The experiments by Kahan and his co-authors demonstrate empiri-cally what Facebook learned through experience: people can be trained in domain-specific areas to overcome their cultural biases and to apply rules neutrally. Just as this truth is an essential part of the legal system, it is an essential part of Facebook's moderation system.

*(ii) Similarities to American Law and Legal Reasoning.* — Before applying law to facts, a judge must first determine which facts are rele-vant. Procedural rules like the Federal Rules of Evidence acknowledge that the inclusion of certain information may unfairly exploit deci-sionmakers' biases and emotions and, thus, provide guidance on how to exclude information from review.[318] At Facebook, the internal rules used by content moderators, or "Abuse Standards," similarly contain ex-tensive guidance on what "relevant" content a moderator should review in assessing a report.[319]

Once a moderator has followed the procedural rules to narrow the relevant content to be reviewed, the actual Abuse Standards — or rules — must be applied. These start with a list of per se bans on con-tent.[320] In Abuse Standards 6.2, these per se bans on content are lists of rules split into nine somewhat overlapping categories.[321] But as is typ-ical of a rules-based approach, these lists contain as many exceptions as they do rules. In "Graphic Content," listed violations include any "[p]oaching of animals" as well as "[p]hotos and digital images showing internal organs, bone, muscle, tendons, etc.," while "[c]rushed heads,

---

[317] Kahan et al., *supra* note 313, at 851.

[318] *See* Kahan et al., *supra* note 309, at 365.

[319] ODESK, ABUSE STANDARDS 6.1, https://www.scribd.com/doc/81863464/oDeskStandards [https://perma.cc/P6ZV-V9ZA] [hereinafter AS 6.1]; ODESK, ABUSE STANDARDS 6.2, https://www.scribd.com/doc/81877124/Abuse-Standards-6-2-Operation-Manual [https://perma.cc/2JQF-AWMY][hereinafter AS 6.2]. These are copies of documents that were leaked from a content moderator working at oDesk (now Upwork) doing content moderation for Facebook. They are not the actual rules of Facebook, but they are oDesk's approximation of Facebook's rules. Charles Arthur, *Facebook's Nudity and Violence Guidelines Are Laid Bare*, THE GUARDIAN (Feb. 21, 2012, 4:36 PM), https://www.theguardian.com/technology/2012/feb/21/facebook-nudity-violence-censorship-guidelines [https://perma.cc/9LNL-L4C6]. For a more current but very similar version of these policies as expressed through content-moderator training documents, see Nick Hopkins, *Revealed: Facebook's Internal Rulebook on Sex, Terrorism and Violence*, THE GUARDIAN (May 21, 2017, 1:00 PM), https://www.theguardian.com/news/2017/may/21/revealed-facebook-internal-rulebook-sex-terrorism-violence [https://perma.cc/U7DY-5VHE].

[320] AS 6.1, *supra* note 319; AS 6.2, *supra* note 319.

[321] Those categories are "Sex and Nudity," "Illegal Drug Use," "Theft Vandalism and Fraud," "Hate Content," "Graphic Content," "IP Blocks and International Compliance," "Self Harm," "Bul-lying and Harassment," and "Credible Threats." AS 6.2, *supra* note 319, at 4. Among the twelve items under "Sex and Nudity," for example, are "[a]ny OBVIOUS sexual activity, even if naked parts are hidden from view by hands, clothes or other objects. Cartoons/art included. Foreplay allowed ([k]issing, groping, etc.) even for same-sex individuals" and "[p]eople 'using the bathroom.'" *Id.*

limbs, etc. are ok as long as no insides are showing."[322]  Likewise, "mere depiction" of some types of content — "hate symbols" like swastikas, or depictions of Hitler or Bin Laden — are automatic violations, "unless the caption (or other relevant content) suggests that the user is not promoting, encouraging or glorifying the [symbol]."[323]

Some more complicated types of speech borrow from American jurisprudence for the structure of their rules.  Under "Hate Content," a chart provides examples of "Protected Categories" and counsels moderators to mark "content that degrades individuals based on the . . . protected categories" as a violation.[324]  A second chart on the page demonstrates how the identification of the type of person — ordinary persons, public figures, law enforcement officers, and heads of state — as well as their membership in a protected group will factor into the permissibility of the content.[325]  All credible threats are to be escalated regardless of the "type of person."[326]  These examples demonstrate the influence of American jurisprudence on the development of these rules.  Reference to "Protected Categories" is similar to the protected classes of the Civil Rights Act of 1964.[327]  The distinction between public and private figures is reminiscent of First Amendment, defamation, and invasion of privacy law.[328]  The emphasis on credibility of threats harkens to the balance between free speech and criminal law.[329]

Beyond borrowing from the law substantively, the Abuse Standards borrow from the way the law is applied, providing examples and analogies to help moderators apply the rules.  Analogical legal reasoning, the method whereby judges reach decisions by reasoning through analogy

---

[322] *Id.*

[323] *Id.* at 8.

[324] *Id.* at 5 (including race, ethnicity, national origin, religion, sex, gender identity, sexual orientation, disability, and serious disease as protected categories).

[325] *Id.*  An empty threat against a public figure like Paul McCartney is permissible, but an empty threat against a head of state like President Barack Obama should be removed.  Any type of content about a law enforcement officer — empty threat, credible threat, negative reference, cyberbullying, and attacks with hate symbols — is a violation under the Abuse Standards, as is any kind of attack based on being a victim of sexual assault.  *Id.*

[326] "For safety and legal reasons, we consider threats credible if they:
    1.  Target heads of state or specific law enforcement officers . . . [;]
    2.  Contain 3/4 details: time, place, method, specific target (not impossible to carry out)[;]
    3.  Target people with a history of assassination attempt/s[;]
    4.  Include non-governmental bounties (promising earthly and heavenly rewards for a target's death)[.]"
*Id.* at 7.

[327] Pub. L. No. 88-352, §§ 201–202, 703, 78 Stat. 241, 243–44, 255–57 (outlawing discrimination based on race, color, religion, sex, or national origin).

[328] *See* RESTATEMENT (SECOND) OF TORTS § 558 (AM. LAW INST. 1977); *see also* Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974) (refusing to extend the *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964), standard for public officials' defamation claims to private individuals).

[329] *See, e.g.*, Brett A. Sokolow et al., *The Intersection of Free Speech and Harassment Rules*, 38 HUM. RTS. 19, 19 (2011).

between cases, is a foundation of legal theory.[330]  Though the use of example and analogy plays a central role throughout the Abuse Standards,[331] the combination of legal rule and example in content moderation seems to contain elements of both rule-based legal reasoning and analogical legal reasoning.  For example, after stating the rules for assessing credibility, the Abuse Standards give a series of examples of instances that establish credible or noncredible threats.[332]  "I'm going to stab (method) Lisa H. (target) at the frat party (place)," states Abuse Standards 6.2, demonstrating a type of credible threat that should be escalated.[333]  "I'm going to blow up the planet on new year's eve this year" is given as an example of a noncredible threat.[334]  Thus, content moderators are not expected to reason directly from prior content decisions as in common law — but the public policies, internal rules, examples, and analogies they are given in their rulebook are informed by past assessments.

In many ways, platforms' evolution from "gut check" standards to more specific rules tracks the evolution of the Supreme Court's doctrine defining obscenity.  In *Jacobellis v. Ohio*,[335] Justice Stewart wrote that he could not "intelligibly" define what qualified something as obscene, but famously remarked, "I know it when I see it."[336]  Both Charlotte Willner, at Facebook, and Nicole Wong, at Google, described a similar intuitive ethos for removing material in the early days of the platforms' content-moderation policies.[337]  Eventually, Facebook's and YouTube's moderation standards moved from these standards to rules.  Likewise, over a series of decisions, the Court attempted to make the criteria for obscenity more specific — in *Miller v. California*,[338] the Court issued a

---

[330] *See* LLOYD L. WEINREB, LEGAL REASON: THE USE OF ANALOGY IN LEGAL ARGUMENT (2005); Edward H. Levi, *An Introduction to Legal Reasoning*, 15 U. CHI. L. REV. 501 (1948). Among philosophers and legal theorists an important distinction can be made between "pure" analogical legal reasoning, which looks exclusively to the similarities and differences between cases without use of legal rules, and "pure" rule-based legal reasoning, which deduces exclusively from rules without case comparison. *See generally* LARRY ALEXANDER & EMILY SHERWIN, DEMYSTIFYING LEGAL REASONING 64–103 (2008); Cass R. Sunstein, Commentary, *On Analogical Reasoning*, 106 HARV. L. REV. 741 (1993).  The Abuse Standards do not clearly point toward a "pure" version of either of these reasoning approaches.

[331] This is especially true in the case of introducing new rules or policies to moderators.  For example, Abuse Standards 6.2 introduces a "fresh policy" on sexually explicit language and sexual solicitation, and lists thirteen examples of content that should be removed or kept up under the policy.  AS 6.2, *supra* note 319, at 6.  In Abuse Standards 6.1, an entire page is devoted to samples of pictures that fall in or out of the various bans on sex and nudity, cartoon bestiality, graphic violence, animal abuse, or Photoshopped images.  AS 6.1, *supra* note 319, at 4.

[332] AS 6.2, *supra* note 319.

[333] *Id.* at 7.

[334] *Id.*

[335] 378 U.S. 184 (1964).

[336] *Id.* at 197 (Stewart, J., concurring).

[337] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147; Telephone Interview with Nicole Wong, *supra* note 130.

[338] 413 U.S. 15 (1973).

three-part test to evaluate whether state statutes designed to regulate obscene materials were sufficiently limited.[339]  None of the tests created by the Court, however, comes close to the specificity of the facts and exceptions used by platforms today.

To summarize, knowledge about the training of content moderators and Abuse Standards 6.1 and 6.2 tells us much about how the rules are enforced in content-moderation decisions.  Content moderators act in a capacity very similar to that of judges: (1) like judges, moderators are trained to exercise professional judgment concerning the application of a platform's internal rules; and (2) in applying these rules, moderators are expected to use legal concepts like relevancy, reason through example and analogy, and apply multifactor tests.

*4. Decisions, Escalations, and Appeals.* — At Facebook, Tier 3 moderators have three decisionmaking options regarding content: they can "confirm" that the content violates the Community Standards and remove it, "unconfirm" that the content violates Community Standards and leave it up, or escalate review of the content to a Tier 2 moderator or supervisor.[340]  The Abuse Standards describe certain types of content requiring mandatory escalations, such as: child nudity or pornography, bestiality, credible threats, self-harm, poaching of endangered animals, Holocaust denial, all attacks on Atatürk, maps of Kurdistan, and burning of Turkish Flags.[341]  If a moderator has decided to ban content, a Facebook user's content is taken down, and she is automatically signed off of Facebook.  When the user next attempts to sign in, she will be given the following message: "We removed the post below because it doesn't follow the Facebook Community Standards."[342]  When she clicks "Continue," the user is told: "Please Review the Community Standards: We created the Facebook Community Standards to help make Facebook a safe place for people to connect with the world around them.  Please read the Facebook Community Standards to learn what kinds of posts are allowed on Facebook."[343]  The user then clicks "Okay" and is allowed to log back in.  At Facebook, users who repeatedly have content removed face a gradual intensification of punishment: two removed posts in a certain amount of time, for example, might mean your account is suspended for twenty-four hours.  Further violations of community standards can result in total bans.  At YouTube, moderators had

---

[339] *Id.* at 24.

[340] AS 6.1, *supra* note 319; AS 6.2, *supra* note 319.

[341] AS 6.2, *supra* note 319, at 4.

[342] Screenshot of Facebook Removal Notice, ME.ME (June 13, 2017, 5:38 AM), https://me.me/i/29-21-01-am-facebook-we-removed-something-you-posted-we-15347765 [https://perma.cc/2BHA-936B].

[343] Screenshot of Facebook Community Standards Notice, ME.ME (May 1, 2017, 1:09 PM), https://me.me/i/7-20-am-pao-94-facebook-please-review-the-community-standards-13463100 [https://perma.cc/LNQ9-HHRV].

a slightly different set of options for each piece of content: "Approve" let a video remain; "Racy" gave the video an 18+ year-old rating; "Reject" allowed a video to be removed without penalizing the poster; and finally, "Strike" would remove the video and issue a penalty to the poster's account.[344]

The ability of an individual user to appeal a decision on content takedown, account suspension, or account deletion varies widely between the three major platforms. Facebook allows an appeal of the removal of only a profile or page — not individual posts or content.[345] To initiate an appeal process, a user's account must have been suspended.[346] Appeals are reviewed by the Community Operations teams on a rolling basis and sent to special reviewers.[347] In contrast, at YouTube, account suspensions, "strikes" on an account, and content removal are all appealable.[348] Video strikes can be appealed only once, and if a decision to strike is upheld, there is a sixty-day moratorium on the appeal of any additional strikes.[349] An appeal also lies if an account is terminated for repeated violations.[350] At Twitter, any form of action related to the Twitter Rules can be appealed.[351] Users follow instructions on the app itself or provided in an email sent to notify users that content has been taken down.[352] Twitter also includes an intermediary level of removal called a "media filter" on content that might be sensitive.[353] Rather than totally remove the content, the platform requires users to click through a warning in order to see the content.[354] Appeals are handled by support teams that, when possible, will use specialized team members to review culturally specific content.[355]

## C. System Revision and the Pluralistic System of Influence

Facebook's Abuse Standards do more than shed light on substantive rules on speech or the mechanisms behind its decisionmaking. They also demonstrate that the internal rules of content moderation are iteratively revised on an ongoing basis, and much more frequently than the external public-facing policy. This can be seen on the first page of Abuse

---

[344] Buni & Chemaly, *supra* note 12.
[345] *How to Appeal*, ONLINECENSORSHIP.ORG, https://onlinecensorship.org/resources/how-to-appeal [https://perma.cc/YM9B-Q2KF].
[346] *Id.*
[347] Telephone Interview with J.L., *supra* note 289.
[348] *How to Appeal*, *supra* note 345.
[349] *Id.*
[350] *Id.*
[351] *Id.*
[352] *Id.*
[353] *Id.*
[354] *Id.*
[355] *Id.*

Standards 6.1, titled "Major changes since A[buse] S[tandards] 6.0," which contains a bulleted list of amendments and alterations to the previous set of rules.[356]   The list is divided into groupings of roughly related policy changes.[357]   "Added sexual language and solicitation policy," states the first bullet.[358]   Halfway down the page after "Sex & Nudity issues clarified" is a bulleted section beginning "Graphic violence policies updated as follows."[359]   In Abuse Standards 6.2, there are fewer updates, summarized broadly under one bullet point, "Policy Changes":

> Graphic Content with respect to animal insides
>
> Threshold and considerations for credible threats
>
> Caricatures of protected categories
>
> Depicting bodily fluids
>
> Screenshots or other content revealing personal information
>
> PKK versus Kurdistan flags
>
> Updated policy on photo-shopped images[360]

The differences between these two versions demonstrate that internal policies and the rules that reflect them are constantly being updated. This is because Facebook is attempting, in large part, to rapidly reflect the norms and expectations of its users.

But how are platforms made aware of these "dramatically fast"[361] changing global norms such that they are able to alter the rules?  This section discusses four major ways platforms' content-moderation policies are subject to outside influence: (1) government request, (2) media coverage, (3) third-party civil society groups, and (4) individual users' use of the moderation process.

This multi-input content-moderation system is a type of pluralistic system.[362]   Under the ideal theory, a pluralistic system consists of many

---

356 AS 6.1, *supra* note 319, at 2.

357 *Id.*

358 *Id.*

359 *Id.* "No exceptions for news or awareness-related context for graphic image depictions [—] confirm all such content; [h]uman/animal abuse subject to clear involvement/enjoyment/approval/encouragement by the poster [should be confirmed]; [e]ven fake/digital images of graphic content should be confirmed, but hand-drawn/cartoon/art images are ok." *Id.* (emphasis omitted).

360 AS 6.2, *supra* note 319, at 2.

361 Telephone Interview with Nicole Wong, *supra* note 130.

362 *See* Jack M. Balkin, *Free Speech in the Algorithmic Society: Big Data, Private Governance, and New School Speech Regulation*, U.C. DAVIS L. REV. (forthcoming 2018), https://ssrn.com/abstract=3038939 [https://perma.cc/9HJS-NUZT]; *cf.* ROBERT A. DAHL, WHO GOVERNS? 197–99 (1961); DAVID HELD, MODELS OF DEMOCRACY 57–64 (2006); Freeman, *supra* note 15, at 559–60 ("In a pluralist 'interest representation' model of administrative law, administrative procedures and judicial review facilitate an essentially political decision-making process: They ensure that interest groups enjoy a forum in which to press their views and that agencies adequately consider those views when making policy choices.").

diverse external factions of equal strength competing to influence a neutral government.[363] In a perfect world, the competition between these minority factional interests serves to maintain equilibrium and representation of ideas in a democratic society.[364] But in practice, pluralism can be far from ideal.[365] This section discusses these interests and their potential democratic conflicts in the context of outside influence on platforms' content-moderation policies.

*1. Government Requests.*[366] — Lessig describes the architecture of the internet — or constitution — as built by an "invisible hand, pushed by government and by commerce."[367] Lessig does not describe these two forces as separate, but rather tandem in their effect. Thus far, this Article has principally focused on the commercial side of this dynamism, but platform architecture has also been informed by and subject to government interference. This interference can be through the more direct need to comply with local laws and jurisdictions, or by the more subtle influences of government lobbying and requests.

The previous examples of the Thai King, Atatürk, and *Innocence of Muslims*[368] illustrate how platforms have either conformed their policies, modified their policies, or rejected policy changes following government request. At YouTube, material would be removed within a country only if it violated the laws of that country — whether or not it was a violation was determined by YouTube's own lawyers.[369] If content was found to be in violation of a country's laws, a new policy would be issued and geoblocks put in place to prevent access to that content

---

[363] HELD, *supra* note 362, at 57–64.

[364] Freeman, *supra* note 15, at 560 ("Although conscious of capture, the theory envisions this pathology as limited to agencies, and as correctable, presumably by democratizing the agency decision-making process to include numerous interest groups. In this sense, interest representation reveals a lingering optimism about the democratic potential of pluralism, when properly structured."). *But see* Richard B. Stewart, *The Reformation of American Administrative Law*, 88 HARV. L. REV. 1667, 1713 (1975) (discussing how some interests like those of a regulated party may be overrepresented in agency government).

[365] *See* Freeman, *supra* note 15, at 560 (discussing the threat capture poses to democratic ideals of pluralism); *see also* Margot E. Kaminski, *When the Default Is No Penalty: Negotiating Privacy at the NTIA*, 93 DENV. L. REV. 925 (2016) (examining instances in which openness to participation by interest groups did not result in meaningful participation); David Thaw, *Enlightened Regulatory Capture*, 89 WASH. L. REV. 329 (2014) (examining instances in which regulatory capture by a concentrated interest group can be beneficial).

[366] For an excellent and more thorough discussion of the potential effects of government requests on online platforms and free speech, see Llansó, *supra* note 161.

[367] LESSIG, *supra* note 21, at 4.

[368] *See* section II.A.1–2, *supra* pp. 1618–25 (detailing how Wong established geoblocking within Thailand for some types of content — determined by YouTube — that ridiculed the King; how Wong established geoblocking within Turkey for some types of content — determined by YouTube — that disparaged Atatürk; and how Facebook and YouTube refused requests of the government to remove *Innocence of Muslims*, and instead kept it up as permissive under their own moderation rules and standards).

[369] Telephone Interview with Nicole Wong, *supra* note 130.

within that country.[370]  Similar agreements were reached regarding depictions of Atatürk in Turkey.[371]  At Facebook, however, content is not geoblocked but removed globally if international compliance requires.[372]  Examples of this include support of the Kurdistan Workers' Party (PKK) or any content supporting Abdullah Ocalan.[373]  Other types of content with specific geographic sensitivities, like Holocaust denial focusing on hate speech, attacks on Atatürk, maps of Kurdistan, and burning of Turkish flags, are required to be escalated.[374]

Twitter maintains a policy that it will take down posts only on request and only if they violate a country's laws.[375]  This policy has occasionally been at odds with Twitter's more unofficial tactic of vigorously and litigiously protecting free speech.[376]  Compromises have been reached, however, without sacrificing one for the other: in 2012, when India demanded Twitter remove a number of accounts that were fueling religious dissent, the company removed roughly half of the problematic accounts, but did so on the grounds that they violated Twitter's own policies for impersonation.[377]  In other contexts, such as the requests for takedown in Egypt and Turkey, particularly during periods of revolution, Twitter has refused to capitulate to any government requests, and governments have consequently blocked the platform.[378]

Recently, however, platforms have been criticized for increasingly acquiescing to government requests, especially in the distribution of user information to police.[379]  Platforms have also begun cooperating more proactively in response to the increased use of social media by the Islamic State of Iraq and Syria (ISIS) to recruit members and encourage terrorism.  Over the last few years, all three sites have agreed to general requests from the United States and the United Nations to remove content related to ISIS or terrorism.[380]  As discussed briefly in section III.B,

---

[370] *Id.*

[371] *Id.*

[372] Telephone Interview with Dave Willner & Charlotte Willner, *supra* note 147.

[373] AS 6.2, *supra* note 319, at 4.

[374] *Id.*

[375] Sengupta, *Twitter's Free Speech Defender*, *supra* note 153.

[376] *Id.*

[377] *Id.*

[378] *See id.*; Sebnem Arsu, *Turkish Officials Block Twitter in Leak Inquiry*, N.Y. TIMES (Mar. 20, 2014), http://nyti.ms/2CpSGoI [https://perma.cc/RJN5-ULWT]; Erick Schonfeld, *Twitter Is Blocked in Egypt Amidst Rising Protests*, TECHCRUNCH (Jan. 25, 2011), https://techcrunch.com/2011/01/25/twitter-blocked-egypt/ [https://perma.cc/P8YD-QQ86].

[379] *See, e.g.*, John Herrman, *Here's How Facebook Gives You Up to the Police*, BUZZFEED: NEWS (Apr. 6, 2012, 5:08 PM), https://www.buzzfeed.com/jwherrman/how-cops-see-your-facebook-account [https://perma.cc/GDK6-KPLT]; Dave Maass & Dia Kayyali, *Cops Need to Obey Facebook's Rules*, ELECTRONIC FRONTIER FOUND.: DEEPLINKS BLOG (Oct. 24, 2014), https://www.eff.org/deeplinks/2014/10/cops-need-obey-facebooks-rules [https://perma.cc/2RTA-8YZS].

[380] *See* Andrews & Seetharaman, *supra* note 274; Joseph Menn & Dustin Volz, *Google, Facebook Quietly Move Toward Automatic Blocking of Extremist Videos*, REUTERS (June 24, 2016, 8:26 PM),

Facebook now maintains a team that is focused on terrorism-related content and helps promote "counter speech" against such groups.[381]  The team actively polices terrorist pages and friend networks on the site.  No posts from known terrorists are allowed on the site, even if the posts have nothing to do with terrorism.  "If it's the leader of Boko Haram and he wants to post pictures of his two-year-old and some kittens, that would not be allowed," said Monika Bickert, Facebook's head of global policy management.[382]  As Facebook has become more adept at and committed to removing such terrorism-related content, that content has moved to less restrictive platforms like Twitter.  In just a four-month period in 2014, ISIS supporters used an estimated 46,000 Twitter accounts, though not all were active simultaneously.[383]  Just before the dissemination of pictures of American journalist James Foley's beheading, the platform in 2015 began taking a different approach.[384]  In early 2016, Twitter reported that it had suspended 125,000 accounts related to ISIS.[385]

　　*2. Media Coverage.* — The media do not have a major role in changing platform policy per se, but when media coverage is coupled with either (1) the collective action of users or (2) a public figure's involvement, platforms have historically been responsive.

　　An early high-profile example of media catalyzing collective action occurred around a clash between Facebook's nudity policy and breast-feeding photos posted by users.  As early as 2008, Facebook received criticism for removing posts that depicted a woman breastfeeding.[386]  The specifics of what triggered removal changed over time.[387]  The changes came, in part, after a campaign in the media and in pages on Facebook itself staged partly by women who had their content removed.[388]  Similar policy changes occurred after public outcry over

---

https://www.reuters.com/article/us-internet-extremism-video-exclusive/exclusive-google-facebook-quietly-move-toward-automatic-blocking-of-extremist-videos-idUSKCN0ZB00M [https://perma.cc/G3AT-J5K6].

[381] Andrews & Seetharaman, *supra* note 274.

[382] Telephone Interview with Monika Bickert & Peter Stern, *supra* note 279.

[383] Julia Greenberg, *Why Facebook and Twitter Can't Just Wipe Out ISIS Online*, WIRED (Nov. 21, 2015, 7:00 AM), http://www.wired.com/2015/11/facebook-and-twitter-face-tough-choices-as-isis-exploits-social-media/ [https://perma.cc/QFU9-2N5V].

[384] J.M. Berger, *The Evolution of Terrorist Propaganda: The Paris Attack and Social Media*, BROOKINGS INST.: TESTIMONY (Jan. 27, 2015), http://www.brookings.edu/research/testimony/2015/01/27-terrorist-propaganda-social-media-berger [https://perma.cc/28QK-HUJU].

[385] Andrews & Seetharaman, *supra* note 274.

[386] Mark Sweney, *Mums Furious as Facebook Removes Breastfeeding Photos*, THE GUARDIAN (Dec. 30, 2008, 8:17 AM), https://www.theguardian.com/media/2008/dec/30/facebook-breastfeeding-ban [https://perma.cc/Y3V4-X4EG].

[387] *See* Soraya Chemaly, *#FreeTheNipple: Facebook Changes Breastfeeding Mothers Photo Policy*, HUFFINGTON POST (June 9, 2014, 6:48 PM), http://www.huffingtonpost.com/soraya-chemaly/freethenipple-facebook-changes_b_5473467.html [https://perma.cc/8TPP-JEGT].

[388] *Id.*

**App. 623**

Facebook's "real name" policy,[389] removal of a gay kiss,[390] censoring of an 1886 painting that depicted a nude woman,[391] posting of a beheading video,[392] and takedown of photos depicting doll nipples.[393]

The vulnerability of platforms to public collective action via the media is an important statement on platforms' democratic legitimacy.[394] The media can serve to lend "civility" to individual speech, and render it more capable of effecting change.[395]   Though, of course, Facebook, Twitter, and YouTube are not democratic institutions, they arise out of a democratic culture.   Thus, users' sense that these platforms respond to collective publicized complaints can impact their trust and use of the company.   In a recent survey of Americans who received some of their news from social media, eighty-seven percent used Facebook and trusted the platform more than YouTube and Twitter.[396]   These numbers held even following reports that Facebook used politically biased algorithms to post news in its "Trending Topics."[397]   While it is impossible to attribute Facebook's high user base and trust entirely to its responsiveness to

---

[389]  Amanda Holpuch, *Facebook Adjusts Controversial 'Real Name' Policy in Wake of Criticism*, THE GUARDIAN (Dec. 15, 2015, 1:15 PM), https://www.theguardian.com/us-news/2015/dec/15/facebook-change-controversial-real-name-policy [https://perma.cc/6H9Q-GF7B].

[390]  Amy Lee, *Facebook Apologizes for Censoring Gay Kiss Photo*, HUFFINGTON POST (Apr. 19, 2011, 10:36 AM), http://www.huffingtonpost.com/2011/04/19/facebook-gay-kiss_n_850941.html [https://perma.cc/9VNK-HECL].

[391]  *Facebook Account Suspended over Nude Courbet Painting as Profile Picture*, THE TELEGRAPH (Apr. 13, 2011, 4:20 PM), http://www.telegraph.co.uk/technology/facebook/8448274/Facebook-account-suspended-over-nude-Courbet-painting-as-profile-picture.html [https://perma.cc/UTS6-YVGA].

[392]  Alexei Oreskovic, *Facebook Removes Beheading Video, Updates Violent Images Standards*, HUFFINGTON POST (Oct. 22, 2013, 8:40 PM), http://www.huffingtonpost.com/2013/10/22/facebook-removes-beheading_n_4145970.html [https://perma.cc/Z457-LHUR].

[393]  Asher Moses, *Facebook Relents on Doll Nipples Ban*, SYDNEY MORNING HERALD (July 12, 2010), http://www.smh.com.au/technology/technology-news/facebook-relents-on-doll-nipples-ban-20100712-106f6.html [https://perma.cc/2PY8-SD7A].

[394]  Jürgen Habermas, *Political Communication in Media Society: Does Democracy Still Enjoy an Epistemic Dimension? The Impact of Normative Theory on Media Research*, 16 COMM. THEORY 411, 419 (2006).

[395]  *See* Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 249 (1974) (describing how the press is "enormously powerful and influential in its capacity to manipulate popular opinion and change the course of events"); Robert Post, *Participatory Democracy as a Theory of Free Speech: A Reply*, 97 VA. L. REV. 617, 624 (2011) ("Public opinion could not create democratic legitimacy if it were merely the voice of the loudest or the most violent. . . . Public opinion can therefore serve the cause of democratic legitimacy only if it is at least partially formed in compliance with the civility rules that constitute reason and debate.").

[396]  *How People Decide What News to Trust on Digital Platforms and Social Media*, AM. PRESS INST. (Apr. 17, 2016, 10:30 AM), https://www.americanpressinstitute.org/publications/reports/survey-research/news-trust-digital-social-media/ [https://perma.cc/SUZ8-4X9D].

[397]  Russell Brandom, *After Trending Topics Scandal, Users Still Mostly Trust Facebook*, THE VERGE (May 18, 2016, 6:00 AM), http://www.theverge.com/2016/5/18/11692882/facebook-public-opinion-poll-trending-topics-bias-news [https://perma.cc/768D-4PP6].

media outcry, the platform's unique history of altering its policies in response to such complaints has likely fostered its user base.

Though ideally democratic, the media can work within this pluralist system to disproportionately favor people with power[398] over the individual users. A series of recent events demonstrate this concept. In September 2016, a well-known Norwegian author, Tom Egeland, posted a famous and historical picture. The photo of a nine-year-old Vietnamese girl running naked following a napalm attack ("Napalm Girl") was a graphic but important piece of photo journalism from the Vietnam War.[399] It also violated the terms of service for Facebook.[400] The photo was removed, and Egeland's account was suspended.[401] In reporting on the takedown, Espen Egil Hansen, the editor-in-chief and CEO of *Aftenposten*, a Norwegian newspaper, also had the picture removed.[402] Norwegian Prime Minister Erna Solberg also posted the image and had it removed.[403] In response, Hansen published a "letter" to Zuckerberg on *Aftenposten*'s front page. The letter called for Facebook to create a better system to prevent censorship.[404] Hours later, COO Sheryl Sandberg stated that the company had made a mistake and promised the rules would be rewritten to allow the photo.[405] The responsiveness of Facebook would have been more admirable if this had been the first instance of the Napalm Girl photo ever being censored on the site. But instead, it was likely only one of thousands of times the photo had been removed.[406] To the best of my knowledge, however, all prior instances had failed to happen to a famous author, political world

---

[398] By this I mean power in every sense: power from money, political clout, media access, access to people that work at platforms, celebrity status, a substantial number of followers or friends, or as a verified user.

[399] Kate Klonick, *Facebook Under Pressure*, SLATE (Sept. 12, 2016, 2:48 PM), http://www.slate.com/articles/technology/future_tense/2016/09/facebook_erred_by_taking_down_the_napalm_girl_photo_what_happens_next.html [https://perma.cc/6A4U-UYC5].

[400] The photo was likely removed because of the nudity, not because it was child pornography. *See* Kjetil Malkenes Hovland & Deepa Seetharaman, *Facebook Backs Down on Censoring "Napalm Girl" Photo*, WALL ST. J. (Sept. 9, 2016, 3:07 PM), http://on.wsj.com/2bYZtNR [https://perma.cc/SP8M-UQ5D].

[401] *Id.*

[402] *See* Espen Egil Hansen, *Dear Mark. I Am Writing This to Inform You that I Shall Not Comply with Your Requirement to Remove This Picture.*, AFTENPOSTEN (Sept. 8, 2016, 9:33 PM), https://www.aftenposten.no/meninger/kommentar/i/G892Q/Dear-Mark-I-am-writing-this-to-inform-you-that-I-shall-not-comply-with-your-requirement-to-remove-this-picture   [https://perma.cc/49QW-EDUT].

[403] Hovland & Seetharaman, *supra* note 400.

[404] *See* Hansen, *supra* note 402.

[405] Claire Zillman, *Sheryl Sandberg Apologizes for Facebook's "Napalm Girl" Incident*, TIME (Sept. 13, 2016), http://time.com/4489370/sheryl-sandberg-napalm-girl-apology [https://perma.cc/Z7N4-WA2P].

[406] Online Chat with Dave Willner, Former Head of Content Policy, Facebook (Sept. 10, 2016).

*THE NEW GOVERNORS*

leader, or the editor-in-chief of a newspaper — and thus, the content had never been reinstated.

Sometimes the speech of powerful people is not just restored upon removal; it is kept up despite breaking the platform policies. In late October, a source at Facebook revealed that Zuckerberg held a Town Hall meeting with employees to discuss why many of then-candidate Donald Trump's more controversial statements had not been removed from the site even though they violated the hate speech policies of the company.[407] "In the weeks ahead, we're going to begin allowing more items that people find newsworthy, significant, or important to the public interest — even if they might otherwise violate our standards," senior members of Facebook's policy team wrote in a public post.[408] Despite that, many employees continued to protest that Facebook was unequally and unfairly applying its terms of service and content-moderation rules.

*3. Third-Party Influences.* — For a number of years, platforms have worked with outside groups to discuss how best to construct content-moderation policies. One of the first such meetings occurred in 2012, when Stanford Law School invited many of these platforms to be part of a discussion about online hate speech.[409] In April of that year, roughly two dozen attendees — including ask.fm, Facebook, Google, Microsoft, Quizlet, Soundcloud, Twitter, Whisper, Yahoo, and YouTube[410] — met to discuss the "challenge of enforcing . . . community guidelines for free speech" between platforms that have "very different ideas about what's best for the Web."[411] The best practices that came out of these meetings were issued at the conclusion of months of meetings of the Working Group on Cyberhate and were published on the Anti-Defamation League's (ADL) website in a new page called "Best Practices for Responding to Cyberhate" in September 2014.[412] The page "urge[d] members of the Internet Community, including providers, civil society, the legal community and academia, to express their support for this effort and to publicize their own independent efforts to counter cyberhate."[413]

Civil society and third-party groups had and continue to have an impact on the policies and practices of major social media platforms.

---

[407] Deepa Seetharaman, *Facebook Employees Pushed to Remove Trump's Posts as Hate Speech*, WALL ST. J. (Oct. 21, 2016, 7:43 PM), http://on.wsj.com/2ePTsoh [https://perma.cc/CH3B-TXF2].

[408] *Id.*

[409] Rosen, *supra* note 176.

[410] Despite the anonymity, the make-up of the group can be estimated from those industry members that signed the best practices at the culmination of the workshops. *See Best Practices for Responding to Cyberhate*, ANTI-DEFAMATION LEAGUE, http://www.adl.org/combating-hate/cyber-safety/best-practices/ [https://perma.cc/KHS4-PZKE].

[411] Rosen, *supra* note 176.

[412] Press Release, Anti-Defamation League, ADL Releases "Best Practices" for Challenging Cyberhate (Sept. 23, 2014), https://www.adl.org/news/press-releases/adl-releases-best-practices-for-challenging-cyberhate [https://perma.cc/XU3D-MAPZ].

[413] *Best Practices for Responding to Cyberhate*, *supra* note 410.

Sit-downs and conversations sponsored by groups like ADL have pushed the creation of industry best practices.  Influence also occurs on a smaller scale.  "We have a relationship with them where if we flag something for them, they tend to know that it's serious, that they should look sooner rather than later," stated a member of one third-party anti-hate speech group speaking anonymously.[414]  But such a relationship isn't exclusive to just organized advocates or established groups.  Reporter and feminist Soraya Chemaly recounts directly emailing Sandberg in 2012 regarding graphic Facebook pages about rape and battery of women.  "She responded immediately," says Chemaly, "and put us in touch with the head of global policy."[415]  Facebook actively encourages this type of engagement with civil society groups, government officials, and reporters.  "If there's something that the media or a government minister or another group sees that they've reported and we haven't taken it down, we want to hear about it," said Bickert.[416]  "We've been very proactive in engaging with civil society groups all over the world so that we can get a better understanding of the issues affecting them."[417]

In terms of impacting policy, the Working Group on Cyberhate, which was formed in 2012 by the Inter-Parliamentary Coalition for Combating Anti-Semitism and the group of industry leaders and stakeholders at Stanford,[418] continues to exert influence on the platforms. The group regularly meets to try to tailor platform guidelines to strike the correct balance between freedom of expression and user safety.[419] Other groups, like the Electronic Frontier Foundation (EFF), have a slightly less amicable working relationship with these platforms and exist as more like watchdogs than policy collaborators.  Launched in 2012, EFF's site, onlinecensorship.org, works to document when user content is blocked or deleted by providing an online tool where users can report such incidents.[420]  "Onlinecensorship.org seeks to encourage companies to operate with greater transparency and accountability toward their users as they make decisions that regulate speech," states the site's

---

[414] Telephone Interview with T.K. (Jan. 26, 2016) (on file with author).

[415] Telephone Interview with Soraya Chemaly, Director, Women's Media Ctr. Speech Project (May 28, 2016); *see also* Christopher Zara, *Facebook Rape Campaign Ignites Twitter: Boycott Threats from #FBrape Get Advertisers' Attention*, INT'L BUS. TIMES (May 24, 2013, 4:26 PM), http://www.ibtimes.com/facebook-rape-campaign-ignites-twitter-boycott-threats-fbrape-get-advertisers-1278999 [https://perma.cc/A5VT-TKCA].

[416] Telephone Interview with Monika Bickert & Peter Stern, *supra* note 279.

[417] *Id.*

[418] *Best Practices for Responding to Cyberhate*, *supra* note 410.

[419] ABRAHAM H. FOXMAN & CHRISTOPHER WOLF, VIRAL HATE: CONTAINING ITS SPREAD ON THE INTERNET 120–21 (2013).

[420] *Who We Are*, ONLINECENSORHSHIP.ORG, https://onlinecensorship.org/about/who-we-are [https://perma.cc/F2L2-YQH6].

**App. 627**

About Page.[421]   "By collecting these reports, we're . . . looking . . . to build an understanding of how the removal of content affects users' lives.  Often . . . the people that are censored are also those that are least likely to be heard.  Our aim is to amplify those voices and help them to advocate for change."[422]   The recent, largely opaque, cooperation be-tween content platforms and government to moderate speech related to terrorism is also an issue of concern for EFF, which has urged such groups "not to 'become agents of the government.'"[423]   EFF's director of International Freedom of Expression, Jillian York, said, "I think we have to ask if that's the appropriate response in a democracy."[424]   "While it's true that companies legally can restrict speech as they see fit, it doesn't mean that it's good for society to have the companies that host most of our everyday speech taking on that kind of power."[425]

*4. Change Through Process.* — Beyond outside influences, much of the change in moderation policy and guidelines comes simply from the process of moderation.  As new situations arise during moderation, plat-forms will both tweak current policy as well as develop new rules.  "Peo-ple will do everything on the internet," said Jud Hoffman.[426]   "Every day you will encounter something new. . . . The difficulty was making sure we were [reacting] fast enough to address the immediate situations that were causing us to consider [changing our approach], but also being thoughtful enough that we weren't flip-flopping on that particular issue every week."[427]   Once the team had come to a conclusion about the "trade-offs" for a new policy, the additions would be disseminated in the new guidelines, which would then be distributed as updates to modera-tors.[428]   Many of these judgments continue to be difficult to make, such as, for example, Nicole Wong's story of removal from YouTube of the beating of an Egyptian dissident.  The video was restored once its po-litical significance was understood.  "You might see an image that at first blush appears disturbing, yet in many cases it is precisely that sort of power image that can raise consciousness and move people to take action and, therefore, we want to consider very, very seriously the pos-sibility of leaving it up," said Peter Stern, head of the Policy Risk Team at Facebook.[429]   "We want people to feel safe on Facebook, but that doesn't always mean they're going to feel comfortable, because they may

---

[421] *What We Do*, ONLINECENSORSHIP.ORG, https://onlinecensorship.org/about/what-we-do [https://perma.cc/8AJK-AV4R].
[422] *Id.*
[423] Andrews & Seetharaman, *supra* note 274.
[424] Greenberg, *supra* note 383.
[425] *Id.*
[426] Telephone Interview with Jud Hoffman, *supra* note 148.
[427] *Id.*
[428] *Id.*
[429] Telephone Interview with Monika Bickert & Peter Stern, *supra* note 279.

be exposed to images that are provocative or even disturbing. We want to leave room for that role to be played as well."[430]

In recent years, Facebook's approach to altering its policy has been less passive than simply waiting for new types of content to filter through the system. "We're trying to look beyond individual incidents where we get criticism, to take a broader view of the fabric of our policies, and make sure that we have mitigated risks arising from our policies as much as we can," said Stern.[431] "This means looking at trends . . . at what people within the company are saying . . . be it reviewers or people who are dealing with government officials in other countries. We regularly take this information and process it and consider alterations in the policy."[432]

### D. Within Categories of the First Amendment

In light of this new information about how platforms work, how would the First Amendment categorize online content platforms: are they state actors under *Marsh*, broadcasters under *Red Lion* and *Turner*, or more like newspaper editors under *Tornillo*?

Of these, only finding platforms to be state actors would confer a First Amendment obligation — a result that is both unlikely and normatively undesirable. In finding state action, the Court in *Marsh* was particularly concerned with who regulated the municipal powers, public services, and infrastructure of the company town — the streets, sewers, police, and postal service.[433] Subsequent courts have concluded that these facts bear on whether "the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'"[434] This Article has detailed how platforms have developed a similar infrastructure to regulate users' speech through detailed rules, active and passive moderation, trained human decisionmaking, reasoning by analogy, and input from internal and external sources. Yet this similarity, while perhaps moving in a direction which might someday evoke *Marsh*, is not yet enough to turn online platforms into state actors under the state action

---

[430] *Id.*

[431] *Id.*

[432] *Id.*

[433] Marsh v. Alabama, 326 U.S. 501, 502–03 (1946).

[434] Blum v. Yaretsky, 457 U.S. 991, 1005 (1982) (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 353 (1974)). This test is known as the exclusive public function test. If the private entity does not exercise such powers, a court must consider whether "the private party has acted with the help of or in concert with state officials." McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 524 (3d Cir. 1994). The final factor is whether "[t]he State has so far insinuated itself into a position of interdependence with [the acting party] that it must be recognized as a joint participant in the challenged activity." Krynicky v. Univ. of Pittsburgh, 742 F.2d 94, 98 (3d Cir. 1984) (quoting Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961)).

doctrine.[435]  In part, this is because while platforms have an incredible governing system to moderate content and perform a vast number of other services which might someday be considered "municipal," they are far from "exclusive" in their control of these rights.[436]  As the presence of three major sites for posting this content demonstrates, Facebook, YouTube, and Twitter do not have sole control over speech generally, only speech on their sites.[437]

The Court's recent ruling in *Packingham*, however, could signal a shift that might change this calculus.  If the Court is concerned with questions of access in order to exercise constitutionally protected rights, these sites' ability to remove speakers — and the lack of procedure or transparency in doing so — might be of central importance.  Still, finding platforms to be state actors seems a long way off and would require a very expansive interpretation of *Marsh*'s current doctrine.  Even should the facts necessary to achieve this interpretation come to pass, the normative implications of such a result make it unlikely.  Interpreting online platforms as state actors, and thereby obligating them to preserve the First Amendment rights of their users, would not only explicitly conflict with the purposes of § 230, but would also likely create an internet nobody wants.  Platforms would no longer be able to remove obscene or violent content.  All but the very basest speech would be explicitly allowed and protected — making current problems of online hate speech, bullying, and terrorism, with which many activists and scholars are concerned, unimaginably worse.[438]  This alone might be all that is needed to keep platforms from being categorized as state actors.

If these platforms are not state actors, the question of defining them under the First Amendment becomes more complicated.  Considering online content providers to be editors like those in *Tornillo*, for instance,

---

[435]  *See, e.g.*, Cable Invs., Inc. v. Woolley, 867 F.2d 151, 162 (3d Cir. 1989) (noting that *Marsh* is "construed narrowly").

[436]  For a list of the extensive roles that social media and content providers play in users' lives, see Brief for Petitioner at 18–19, Packingham v. North Carolina, 137 S. Ct. 1730 (2017) (No. 15-1194), arguing that access to online speech is protected First Amendment activity because users rely on the sites to exercise religion, contact government officials, receive public notices, assemble, express themselves through music and art, "[a]nd watch cat videos," *id.* at 19.  For the assertion that "access to social networking services is indispensable for full participation in the nation's communicative life," see Amicus Curiae Brief of Electronic Frontier Foundation, Public Knowledge, and Center for Democracy & Technology in Support of Petitioner at 8, *Packingham*, 137 S. Ct. 1730 (No. 15-1194) (capitalization omitted).

[437]  *Cf.* Cyber Promotions, Inc. v. Am. Online, Inc., 948 F. Supp. 436, 443–44 (E.D. Pa. 1996) (noting, for purposes of state action, that an advertiser banned from AOL could still reach "members of competing commercial online services," *id.* at 443).

[438]  *See generally* BAZELON, *supra* note 105; CITRON, *supra* note 102; Citron & Franks, *supra* note 106; Citron & Norton, *supra* note 104; Franks, *supra* note 103.  This consequence is of course conditioned on the continued legality of this type of content.

would grant them special First Amendment protection. While platforms' omnipresent role seems to be moving them beyond the world of "editors," *Packingham*'s new labeling of platforms as "forums" makes dismissing this categorization slightly more difficult. In *Tornillo*, the Court held that a newspaper was "more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment."[439] Thus, in order not to "dampen[] the vigor and limit[] the variety of public debate,"[440] the Court found the newspaper in *Tornillo* to have rights equivalent to a speaker under the First Amendment.[441] At first blush, this analogy seems appealing. As seen above, like the *Miami Herald*, Facebook, YouTube, and Twitter are not "passive . . . conduit[s] for news, comment, and advertising." These platforms have intricate systems for controlling the content on their sites. For the content that stays up — like a newspaper determining what space to allot certain issues — platforms also have intricate algorithms to determine what material a user wants to see and what material should be minimized within a newsfeed, homepage, or stream. But a central piece is missing in the comparison to an editorial desk: platforms do not actively solicit specific types of content, unlike how an editorial desk might solicit reporting or journalistic coverage. Instead, users use the site to post or share content independently. Additionally, platforms play no significant role — yet[442] — in determining whether content is true or false or whether coverage is fair or unfair. As Willner summarized: "This works like a Toyota factory, not a newsroom."[443] Accordingly, while platforms might increasingly be compared to editors as their presence continues to expand in online discourse, they are still far from constituting editors under *Tornillo*.[444]

Perhaps the increasingly apt analogy is — even though the Court in *Reno* explicitly excluded it — to compare platforms to broadcasters, and then perhaps even to public utilities or common carriers.[445] In *Reno*,

---

[439] Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 258 (1974).

[440] *Id.* at 257 (citing N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279 (1964)).

[441] *Id.* at 258.

[442] *See, e.g.*, Shannon Liao, *Facebook Now Blocks Ads from Pages that Spread Fake News*, THE VERGE (Aug. 28, 2017, 2:11 PM), https://www.theverge.com/2017/8/28/16215780/facebook-false-viral-hoaxes-trump-malicious-suspicious [https://perma.cc/UZ3D-2BL6].

[443] Klonick, *supra* note 399.

[444] It is worth noting that Wong and others frequently referred to platforms as possessing their own First Amendment rights to create the type of platform they wanted. This argument stems from *Tornillo*, but it is more ambitious than any rights currently reflected in the doctrine.

[445] *See* Kate Klonick, Opinion, *The Terrifying Power of Internet Censors*, N.Y. TIMES (Sept. 13, 2017), http://nyti.ms/2vU9gu9 [https://perma.cc/3V23-2XHV].

the Court explicitly differentiated the internet from broadcast media because the former lacks scarcity, invasiveness, and a history of government regulation.[446]  Excepting the lack of historical regulation around the internet, much has changed online since 1998 in terms of internet scarcity and invasiveness.  In the years since *Reno*, the hold of certain platforms has arguably created scarcity — if not of speech generally, undoubtedly of certain mediums of speech that these platforms provide.  Certainly too, the internet is now more invasive in everyday life than television is — in fact, today, the internet actively threatens to supplant television and broadcasting,[447] and the rise in smartphones and portable electronic technology makes the internet and its platforms ubiquitous.  Perhaps most convincingly, in the underlying *Red Lion* decision, the Court argued that "[w]ithout government control, the medium would be of little use because of the cacaphony [sic] of competing voices, none of which could be clearly and predictably heard."[448]  The recent scourge of online fake news, scamming, and spam makes this seemingly anachronistic concern newly relevant.

As for public utilities or common carriers regulation, the argument has long been applied at the most basic level of the internet to answer concerns over possible politicization of internet service providers[449] that act as content-neutral conduits for speech.  But this argument fails for platforms, because they are inherently *not* neutral — indeed the very definition of "content moderation" belies the idea of content neutrality.  Nevertheless, the "essential" nature of these private services to a public right — and the prominence of a few platforms which hold an increasingly powerful market share — evinces concerns similar to those of the people who are arguing for regulation of telephone or broadband services.

A few other analogies that implicate the First Amendment might also apply, but they all fail to match the scope and scale of the speech happening on online platforms.  Platforms' use of rule sets to govern speech is reminiscent of "speech codes" used by universities to constrain the speech rights of the student body.  But private universities are not truly full-fledged forums — not in the way that California and New Jersey treat shopping malls,[450] and not in the way that platforms have become forums for global public speech.[451]  Forums are incidental to the primary

---

[446] Reno v. ACLU, 521 U.S. 844, 868 (1997).

[447] *See, e.g., Cutting the Cord*, THE ECONOMIST (July 16, 2016), https://www.economist.com/news/business/21702177-television-last-having-its-digital-revolution-moment-cutting-cord [https://perma.cc/N6HC-QE7K].

[448] Red Lion Broad. Co. v. FCC, 395 U.S. 367, 376 (1969).

[449] GOLDSMITH & WU, *supra* note 100, at 72–74.

[450] *See, e.g.*, PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 78 (1980).

[451] Packingham v. North Carolina, 137 S. Ct. 1730, 1735 (2017).

role of the university, which is to act as an educational institution.[452]
The same is true in examining the ability of homeowners' associations
or professional organizations to conscribe the speech of members or in-
dividuals.[453] The special purposes of universities, professional organi-
zations, or homeowners' associations — to confer knowledge, protect a
professional identity, or create a distinct visual community — are dis-
tinct from the motives of online speech platforms. Moreover, the global
scale and essential nature of private governance of online speech sepa-
rate it in kind from the strictures governing individuals within these
isolated organizations.

The law reasons by analogy, yet none of these analogies to private
moderation of the public right of speech seem to precisely meet the de-
scriptive nature of what online platforms are, or the normative results
of what we want them to be. The following Part argues for a new kind of
understanding: seeing these platforms' regulation of speech as governance.

## IV. The New Governors

Thinking of online platforms from within the categories already es-
tablished in First Amendment jurisprudence — as company towns,
broadcasters, or editors — misses much of what is actually happening in
these private spaces. Instead, analysis of online speech is best consid-
ered from the perspectives of private governance and self-regulation.[454]

Analyzing online platforms from the perspective of governance is
both more descriptively accurate and more normatively useful in ad-
dressing the infrastructure of this ever-evolving private space. Platform
governance does not fit neatly into any existing governance model, but

---

[452] For excellent discussions of the role of the university in free speech, see generally ROBERT C.
POST, DEMOCRACY, EXPERTISE, AND ACADEMIC FREEDOM: A FIRST AMENDMENT JURIS-
PRUDENCE FOR THE MODERN STATE (2012); J. Peter Byrne, *Academic Freedom: A "Special
Concern of the First Amendment,"* 99 YALE L.J. 251 (1989); and Robert Post, *The Classic First
Amendment Tradition Under Stress: Freedom of Speech and the University* (Yale Law Sch., Public
Law Research Paper No. 619, 2017), https://ssrn.com/abstract=3044434 [https://perma.cc/B9NH-
YFN6].

[453] *See* Claudia E. Haupt, *Professional Speech*, 125 YALE L.J. 1238, 1241–42 (2016).

[454] *See, e.g.*, PASQUALE, *supra* note 125, at 140–68, 187–218 (arguing that terms of service or
contracts are inappropriate or ineffective remedies in an essentially "feudal" sphere, *id.* at 144, and
that platforms act as "sovereign[s]" over realms of life, *id.* at 163, 189); Freeman, *supra* note 15, at
636–64 (describing the ability of private firms to self-regulate in areas of public interest with and
without government influence); Michael P. Vandenbergh, *The Private Life of Public Law*, 105 COLUM.
L. REV. 2029, 2037–41 (2005) (discussing how private actors play an increasing role in the traditional
government standard-setting, implementation, and enforcement functions through contracts and pri-
vate agreements). On the role of voluntary self-regulation by private actors, see NEIL GUNNINGHAM
ET AL., SMART REGULATION: DESIGNING ENVIRONMENTAL POLICY 167–70 (1998), which ana-
lyzes shortcomings of self-regulation, including lack of transparency and independent auditing, concern
that performance is not being evaluated, and absence of real penalties for recalcitrants.

it does have features of existing governance models that support its categorization as governance. As Parts II and III demonstrated, platforms have a centralized body, an established set of laws or rules, ex ante and ex post procedures for adjudication of content against rules, and democratic values and culture; policies and rules are modified and updated through external input; platforms are economically subject to normative influence of citizen-users and are also collaborative with external networks like government and third-party groups. Another way to conceptualize the governance of online speech by platforms comes from administrative law, which has long implicated the motivations and systems created by private actors to self-regulate in ways that reflect the norms of a community.[455] Perhaps most significantly, the idea of governance captures the power and scope these private platforms wield through their moderation systems and lends gravitas to their role in democratic culture.[456] Changes in technology and the growth of the internet have resulted in a "revolution in the infrastructure of free expression."[457] The private platforms that created and control that infrastructure are the New Governors in the digital era.

How does this new concept of private platform governors normatively fit in our hopes and fears for the internet? For decades, legal scholars have moved between optimistic and pessimistic views of the future of online speech and long debated how — or whether — to constrain it.[458] But the details of the private infrastructure of online speech were largely opaque. Does this new information and conception allay or augment scholarly concerns over the future of digital speech and democratic culture?

The realities of these platforms both underscore and relieve some of these fears. For the optimists, interviews with the architects of these

---

[455] *See* Freeman, *supra* note 15, at 666; Michael, *supra* note 15, at 175–76; Michael P. Vandenbergh, *Order Without Social Norms: How Personal Norm Activation Can Protect the Environment*, 99 Nw. U. L. Rev. 1101, 1116–29 (2005).

[456] Balkin, *supra* note 11, at 2296.

[457] *Id.*

[458] Lessig was an early pessimist about the future of the internet, seeing it as a potential means of regulation and control. He specifically worried about the domination of the internet by commercial forces that could be manipulated and controlled by the state. Lessig, *supra* note 21, at 71. Boyle, Goldsmith, and Wu had similar concerns about the state co-opting private online intermediaries for enforcement. *See* Goldsmith & Wu, *supra* note 100; Boyle, *supra* note 100, at 202–04. In contrast, Balkin has been largely optimistic about the growth of the internet, the growth of platforms, and the ability of these new speech infrastructures to enhance the "possibility of democratic culture." Balkin, *supra* note 7, at 46. But recently he too has become concerned about the future of online speech and democracy, arguing that private platforms and government can together regulate online speech with less transparency, disruption, and obtrusion than ever before. *See* Balkin, *supra* note 11, at 2342. Scholars like Citron, Norton, and Franks have instead long argued for working with private platforms to change their policies. *See* Bazelon, *supra* note 105, at 279–89; Citron, *supra* note 102, at 121–25; Citron & Norton, *supra* note 104, at 1468–84; Franks, *supra* note 103, at 681–88; *cf.* Citron & Franks, *supra* note 106, at 386–90 (discussing the need for governments to craft criminal statutes prohibiting the publication of revenge porn).

platform content-moderation systems show how the rules and procedures for moderating content are undergirded by American free speech norms and a democratic culture.[459]  These ideas are also part of their corporate culture and sense of social responsibility.  But perhaps more compellingly, platforms are economically responsive to the expectations and norms of their users.  In order to achieve this responsiveness, they have developed an intricate system to both take down content their users don't want to see and keep up as much content as possible.  To do this has also meant they have often pushed back against government requests for takedown.[460]  Procedurally, platform content-moderation systems have many similarities to a legal system.  Finally, platforms have a diverse pluralistic group of forces that informs updates of their content-moderation policies and procedures.

Not only is governance the descriptively correct way to understand platform content moderation, but it is also rhetorically and normatively correct.  Historically, speech regulation has followed a dyadic model: a territorial government, with all the power that that invokes, has the boot on the neck of individual speakers or publishers.[461]  The New Governors are part of a new model of free expression: a triadic model.[462]  In this new model, online speech platforms sit between the state and speakers and publishers.  They have the role of empowering both individual speakers and publishers (as well as arguably minimizing the necessity of publishers to speaking and amplification), and their transnational private infrastructure tempers the power of the state to censor.  These New Governors have profoundly equalized access to speech publication, centralized decentralized communities, opened vast new resources of communal knowledge, and created infinite ways to spread culture.  Digital speech has created a global democratic culture,[463] and the New Governors are the architects of the governance structure that runs it.

The system that these companies have put in place to match the expectations of users and to self-regulate is impressively intricate and responsive.  But this system also presents some unquestionable downsides that grow increasingly apparent.  These can be seen in two main concerns: (1) worries over loss of equal access to and participation in speech on these platforms; and correspondingly (2) lack of direct platform accountability to their users.

---

[459] This is good news for Lessig, Balkin, and Benkler, given their concerns.

[460] If this trend continues, it allays much of Balkin's concern over collateral censorship in *Old-School/New-School Speech Regulation*. *See* Balkin, *supra* note 11.

[461] Balkin, *supra* note 362 (manuscript at 4, 41).

[462] *Id.* (manuscript at 41–44).  Balkin refers to this as a "pluralist" model, *id.* (manuscript at 4), and while that term is perhaps more accurate for the world of internet speech as a whole, for my focus here I prefer to use the term "triadic."

[463] *Id.* (manuscript at 41–44).

## A. Equal Access

There is very little transparency from these private platforms, making it hard to accurately assess the extent to which we should be concerned about speech regulation, censorship, and collateral censorship.[464] But separate from the question of secret government interference or collusion, private platforms are increasingly making their own choices around content moderation that give preferential treatment to some users over others.[465] The threat of special rules for public figures or newsworthy events[466] crystallizes the main value we need protected within this private governance structure in order to maintain a democratic culture: fair opportunity to participate.

In some ways, an ideal solution would be for these platforms to put their intricate systems of self-regulation to work to solve this problem themselves without regulatory interference. But the lack of an appeals system for individual users and the open acknowledgment of different treatment and rule sets for powerful users over others reveal that a fair opportunity to participate is not currently a prioritized part of platform moderation systems. In a limited sense, these problems are nothing new — they are quite similar to the concerns to democracy posed by a mass media captured by a powerful, wealthy elite.[467] Before the internet, these concerns were addressed by imposing government regulation on mass media companies to ensure free speech and a healthy democracy.[468] But unlike mass media, which was always in the hands of an exclusive few, the internet has been a force for free speech and democratic participation since its inception.[469] The internet has also made speech less expensive, more accessible, more generative, and more interactive than it had arguably ever been before. These aspects of online speech have led to the promotion and development of democratic culture, writes Balkin, "a form of social life in which unjust barriers of rank

---

[464] These are the concerns expressed by Balkin, Lessig, Tushnet, and Wu. *See* Balkin, *supra* note 11, at 2308–14; LESSIG, *supra* note 21, at 327–29; Tushnet, *supra* note 263, at 1002–15; Wu, *supra* note 61, at 317–18.

[465] In September 2017, Twitter announced that it had a different content-moderation rule set for removing President Trump's tweets. Arjun Kharpal, *Why Twitter Won't Take Down Donald Trump's Tweet Which North Korea Called a "Declaration of War,"* CNBC (Sept. 26, 2017, 2:56 AM), https://www.cnbc.com/2017/09/26/donald-trump-north-korea-twitter-tweet.html [https://perma.cc/LXQ6-LXB9]. In December 2015, Facebook similarly disclosed that it had a different set of rules for removing the speech of then-candidate Trump than it had for other users. Doug Bolton, *This Is Why Facebook Isn't Removing Donald Trump's "Hate Speech" from the Site*, INDEPENDENT (Dec. 15, 2015, 6:39 PM), http://www.independent.co.uk/life-style/gadgets-and-tech/news/donald-trump-muslim-hate-speech-facebook-a6774676.html [https://perma.cc/XX4B-CX3V].

[466] It is important to note that the uses of "public figure" and "newsworthiness" here differ from their meanings in the sense of communications or privacy torts.

[467] Balkin, *supra* note 7, at 30.

[468] *Id.* at 31.

[469] *See* BENKLER, *supra* note 98; LESSIG, *supra* note 21; Balkin, *supra* note 7, at 3–6.

*HARVARD LAW REVIEW* [Vol. 131:1598]

and privilege are dissolved, and in which ordinary people gain a greater say over the institutions and practices that shape them and their futures. What makes a culture democratic, then, is not democratic *governance*, but democratic *participation*."[470]

Equal access to platforms is thus both an effect of a self-regulated and open internet and the cause of it, making regulation of this issue particularly difficult and paradoxical. Legislating one user rule set for all not only seems logistically problematic, but it would also likely reduce platforms' incentives to moderate *well*. Such legislation, if consitutionally valid, would certainly run into many of the concerns raised by those who fear any regulation that might curb the robust power of § 230 immunity. This is why any proposed regulation — be it entirely new laws or modest changes to § 230[471] — should look carefully at how and why the New Governors *actually* moderate speech. Such, if any, regulation should work with an understanding of the intricate self-regulatory structure already in place in order to be the most effective for users.

## B. Accountability

Even without issues of equal access to participation, the central difficulty in simply allowing these systems to self-regulate in a way that takes into account the values and rights of their users is that it leaves users essentially powerless. There is no longer any illusion about the scope and impact of private companies in online platforms and speech.[472] These platforms are beholden to their corporate values, to the foundational norms of American free speech, and to creating a platform where users will want to engage. Only the last of these three motivations for moderating content gives the user any "power," and then only in an indirect and amorphous way.

Moreover, while it initially seems like a positive source of accountability that these systems are indirectly democratically responsive to users' norms, it also creates inherently undemocratic consequences.[473] At first, adaptability appears to be a positive attribute of the system: its ability to rapidly adapt its rules and code to reflect the norms and values of users. But that feature has two bugs: in order to engage with the most users, a platform is (1) disincentivized to allow antinormative content, and (2) incentivized to create perfect filtering to show a user only content

---

[470] Balkin, *supra* note 7, at 35.

[471] *See, e.g.*, Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 FORDHAM L. REV. 401, 414–19 (2017) (proposing limited and narrow revisions to § 230 in order to "not break" the internet).

[472] This was a central concern of Lessig's — that the internet would be captured by large corporations. *See generally* LESSIG, *supra* note 21.

[473] For an excellent discussion of this interplay between corporate power, inequitable markets, and democratic capacity of citizens and users, see generally K. SABEEL RAHMAN, DEMOCRACY AGAINST DOMINATION (2017).

**App. 637**

that meets her tastes. These problems are interchangeably known as the so-called echo-chamber effect, which creates an antidemocratic space in which people are shown things with which they already associate and agree, leading to nondeliberative polarization. "It has never been our ideal — constitutionally at least — for democracy to be a perfect reflection of the present temperature of the people."[474] Whether through algorithmic filtering or new content rules, as platforms regress to the normative mean, users will not only be exposed to less diverse content, but they will also be less able to post antinormative content as external and internal content-moderation policies standardize across platforms.

Since the 2016 American presidential election, the lack of accountability of these sites to their users and to the government in policing fake news,[475] commercial speech,[476] or political speech[477] has come to the fore of public consciousness. In statements directly following the election of Trump as President, Zuckerberg emphatically denied the role of fake news in the result.[478] But due to many of the factors discussed here — media pressure, corporate responsibility, and user expectations — Facebook was forced to start tackling the issue.[479] Yet the power of these new threats to "spread[] so quickly and persuade[] so effectively" might make these indirect systems of accountability unexpectedly slow

---

[474] LESSIG, *supra* note 21, at 331.

[475] Fake news comes in many forms and has notoriously been difficult to define. *See* Claire Wardle, *Fake News. It's Complicated.*, MEDIUM: FIRST DRAFT (Feb. 16, 2017), http://medium.com/1st-draft/fake-news-its-complicated-d0f773766c79 [http://perma.cc/EJ9Y-EP6V].

[476] Most notably, in late 2017 it was revealed that hundreds of thousands of dollars in ads placed on Facebook during the election had actually come from Russia-linked groups. *See* Mike Isaac & Scott Shane, *Facebook's Russia-Linked Ads Came in Many Disguises*, N.Y. TIMES (Oct. 2, 2017), http://nyti.ms/2g4eVIj [https://perma.cc/SES8-X72P]; Carol D. Leonnig et al., *Russian Firm Tied to Pro-Kremlin Propaganda Advertised on Facebook During Election*, WASH. POST (Sept. 6, 2017), http://wapo.st/2C4pdoH [https://perma.cc/BFK8-HSPW].

[477] Following the Russia-linked ads, many platforms have been moving to police more heavily all ad content relating to important issues of political speech. *See, e.g.*, Erik Schelzig, *Twitter Shuts Down Blackburn Campaign Announcement Video*, AP NEWS (Oct. 9, 2017), https://apnews.com/0d8828bd7d204b40af61172628d0a7f6 [https://perma.cc/U97N-37E5] (describing how Twitter blocked an ad by Republican Representative Marsha Blackburn, who was running for the seat being opened by the retirement of Tennessee Senator Bob Corker, in which she boasted that she "stopped the sale of baby body parts," and reporting a Twitter representative's statement that the ad was "deemed an inflammatory statement that is likely to evoke a strong negative reaction").

[478] *See, e.g.*, Olivia Solon, *Facebook's Fake News: Mark Zuckerberg Rejects "Crazy Idea" that It Swayed Voters*, THE GUARDIAN (Nov. 10, 2016, 10:01 PM), https://www.theguardian.com/technology/2016/nov/10/facebook-fake-news-us-election-mark-zuckerberg-donald-trump [https://perma.cc/PKD5-BHRW].

[479] JEN WEEDON ET AL., INFORMATION OPERATIONS AND FACEBOOK (2017), https://fbnewsroomus.files.wordpress.com/2017/04/facebook-and-information-operations-v1.pdf [https://perma.cc/H9DY-MLHH]; *see also* Carla Herreria, *Mark Zuckerberg: "I Regret" Rejecting Idea that Facebook Fake News Altered Election*, HUFFINGTON POST (Sept. 27, 2017, 8:53 PM), https://www.huffingtonpost.com/entry/mark-zuckerberg-regrets-fake-news-facebook_us_59cc2039e4b05063fe0eed9d [https://perma.cc/EY7W-PSNA].

for dealing with such emerging threats and issues.[480]  It also makes clear that some insertion of traditional government agency functions — such as regulation of commercial speech — when matched with an accurate understanding of how these platforms currently moderate content, could provide a potential answer to such issues of accountability.[481]

The lack of accountability is also troubling in that it lays bare our dependence on these private platforms to exercise our public rights.  Besides exit or leveraging of government, media, or third-party lobbying groups, users are simply dependent on the whims of these corporations.  While platforms are arguably also susceptible to the whims of their users, this is entirely indirect — through advertising views, not through any kind of direct market empowerment.  One regulatory possibility might be a type of shareholder model — but this fails not only because Zuckerberg owns controlling shares of Facebook, but also because shareholder values of maximizing company profits are perhaps not well matched with user concerns over equal access and democratic accountability.  One potential nonregulatory solution to this problem would be for these corporations to register as public benefit corporations, which would allow public benefit to be a charter purpose in addition to the traditional maximizing profit goal.[482]

Another avenue would be for platforms to voluntarily take up a commitment to a notion of "technological due process."[483]  In this groundbreaking model for best practices in agency use of technology, Citron advocates for a model that understands the trade-offs of "automation and human discretion," protects individuals' rights to notice and hearings, and gives transparency to rulemaking and adjudication.[484]  Of course, these private platforms have little motivation to surrender power as in a public benefit corporation, or to adopt the rules and transparency ideas of Citron's technological due process requirements — but they

---

[480]  Nabiha Syed, *Real Talk About Fake News: Towards a Better Theory for Platform Governance*, 127 YALE L.J.F. 337, 337 (2017).

[481]  So far private nongovernmental groups have focused on this.  For example, ProPublica has launched a browser attachment to help monitor political ads on online platforms.  *See* Julia Angwin & Jeff Larson, *Help Us Monitor Political Ads Online*, PROPUBLICA (Sept. 7, 2017, 10:00 AM), https://www.propublica.org/article/help-us-monitor-political-ads-online [https://perma.cc/A35R-WHHR].  For an excellent and complete discussion of how potential regulation or change should take into account the realities of platforms and moderation, see Syed, *supra* note 480.

[482]  Kickstarter did this in 2015 in order to make its terms, service, and site more transparent, easier to understand, and easier to access.  *See* Yancey Strickler et al., *Kickstarter Is Now a Benefit Corporation*, KICKSTARTER: BLOG (Sept. 21, 2015), https://www.kickstarter.com/blog/kickstarter-is-now-a-benefit-corporation [https://perma.cc/TJ8V-SQT9].  *See generally* David A. Hoffman, *Relational Contracts of Adhesion*, U. CHI. L. REV. (forthcoming 2018), https://ssrn.com/abstract=3008687 [https://perma.cc/NVG9-SHMH] (describing Kickstarter's reincorporation as a public benefit corporation).

[483]  Danielle Keats Citron, *Technological Due Process*, 85 WASH. U. L. REV. 1249, 1301 (2008); *see also id.* at 1301–13.

[484]  *Id.* at 1301.

might if they fear the alternative would result in more restrictive regulation.[485]  Should these platforms come under agency regulation, however, the concerns detailed by Citron's notion of technological due process combined with an accurate understanding of how such companies self-regulate will be essential to crafting responsive and accurate oversight.

## Conclusion

As the Facebook Live video of Philando Castile's death demonstrates, content published on platforms implicates social policy, law, culture, and the world.[486]  Yet, despite the essential nature of these platforms to modern free speech and democratic culture, very little is known about *how* or *why* the platforms curate user content.  This Article set out to answer these questions.  It began with an overview of the legal framework behind private platforms' broad immunity to moderate content.  This framework comes from § 230, the purposes of which were both to encourage platforms to be Good Samaritans by taking an active role in removing offensive content and to protect users' rights by avoiding free speech problems of collateral censorship.  With this background, this Article explored why platforms moderate despite the broad immunity of § 230.  Through interviews with former platform architects and archived materials, this Article argued that platforms moderate content partly because of American free speech norms and corporate responsibility, but most importantly, because of the economic necessity of creating an environment that reflects the expectations of their users.

Beyond § 230, courts have struggled with how to conceptualize online platforms within First Amendment doctrine: as company towns, as broadcasters, or as editors.  This Article has argued that the answer to how best to conceptualize platforms lies outside current categories in First Amendment doctrine.  Through internal documents, archived materials, interviews with platform executives, and conversations with content moderators, this Article showed that platforms have developed a system of governance, with a detailed list of rules, trained human decisionmaking to apply those rules, and reliance on a system of external influence to update and amend those rules.  Platforms are the New Governors of online speech.  These New Governors are private self-regulating entities that are economically and normatively motivated to

---

485  The window for using governmental threat to produce a voluntary result might be closing as the scope and power of these companies make them increasingly difficult to regulate.  See, for example, Google's lengthy and robust attempts to push back at the European Court of Justice judgment mandating the "Right to Be Forgotten."  *The Right to Be Forgotten (Google v. Spain)*, Electronic Privacy Info. Ctr., https://epic.org/privacy/right-to-be-forgotten/ [https://perma.cc/G3XT-AWR4].

486  While Castile's live-streamed death crystallized the conversation around police brutality and racism in America, it is necessary to note that the officer who shot him was ultimately acquitted.  *See* Mitch Smith, *Minnesota Officer Acquitted in Killing of Philando Castile*, N.Y. Times (June 16, 2017), http://nyti.ms/2C1MkjF [https://perma.cc/8ETE-LLZE].

reflect the democratic culture and free speech expectations of their users. But these incentives might no longer be enough.

The impact of the video of Philando Castile, the public outcry over Napalm Girl, the alarm expressed at the Zuckerberg Town Hall meeting, and the separate Twitter Rules for President Trump all reflect a central concern: a need for equal access to participation and more direct platform accountability to users. These New Governors play an essential new role in freedom of expression. The platforms are the products of a self-regulated and open internet, but they are only as democratic as the democratic culture and democratic particpation reflected in them. Any proposed regulation — be it entirely new laws or modest changes to § 230 — should look carefully at how and why the New Governors *actually* moderate speech. Such, if any, regulation should work with an understanding of the intricate self-regulatory structure already in place in order to be the most effective for users and preserve the democratizing power of online platforms.

# MODERATING CONTENT MODERATION:
# A FRAMEWORK FOR NONPARTISANSHIP
# IN ONLINE GOVERNANCE

EDWARD LEE[*]

*Internet platforms serve two important roles that often conflict. Facebook, Twitter, YouTube, and other internet platforms facilitate the unfettered exchange of free speech by millions of people, yet they also moderate or restrict the speech according to their "community standards," such as prohibitions against hate speech and advocating violence, to provide a safe environment for their users. These dual roles give internet platforms unparalleled power over online speech—even more so than most governments. Yet, unlike government actors, internet platforms are not subject to checks and balances that courts or agencies must follow, such as promulgating well-defined procedural rules and affording notice, due process, and appellate review to individuals. Internet platforms have devised their own policies and procedures for content moderation, but the platforms' enforcement remains opaque—especially when compared to courts and agencies. Based on an independent survey of the community standards of the largest internet platforms, this Article shows that few internet platforms disclose the precise procedural steps and safeguards of their content moderation—perhaps hoping to avoid public scrutiny over those procedures. This lack of transparency has left internet platforms vulnerable to vocal accusations of having an "anti-conservative bias" in their content moderation, especially from politicians. Internet platforms deny such a bias, but their response has not mollified Republican lawmakers, who have proposed amending, if not repealing, Section 230 of the Communications Decency Act*

---

\* Professor of Law, *IIT Chicago-Kent College of Law*, Founder, The Free Internet Project. Many thanks to helpful comments from Kathy Baker, Felice Batlan, Sungjoon Cho, Eric Goldman, Hal Krent, Nancy Marder, Blake Reid, Mark Rosen, Alex Boni-Saenz, Chris Schmidt, Stephanie Stern, Eugene Volokh, and participants of faculty workshops. This Article represents my own views as a legal scholar. They should not be attributed to the nonprofit The Free Internet Project.

913

*to limit the permissible bases and scope of content moderation that qualify for civil immunity under the section. This Article provides a better solution to this perceived problem—a model framework for nonpartisan content moderation (NCM) that internet platforms should voluntarily adopt as a matter of best practices. The NCM framework provides greater transparency and safeguards to ensure nonpartisan content moderation in a way that avoids messy government entanglement in enforcing speech codes online. The NCM framework is an innovative approach to online governance that draws upon safeguards designed to promote impartiality in various sectors, including courts and agencies, clinical trials, peer review, and equal protection under the Fourteenth Amendment.*

## TABLE OF CONTENTS

Introduction ...................................................................................... 915
I.   Online Governance and the Controversies over Election
     Interference, Voter Suppression, and Perceived Political
     Bias of Internet Platforms ...................................................... 927
     A.  Online Governance by Internet Platforms ....................... 928
     B.  Election Misinformation on Social Media in 2016
         and 2020 ............................................................................ 932
     C.  Section 230 of the Communications Decency Act ........... 941
     D.  Accusations of Political Bias and Proposed
         Amendments to Section 230 to Require Political
         Neutrality .......................................................................... 982
II.  Do Internet Platforms' Content Moderation Policies
     Recognize Nonpartisanship or Impartiality as a Stated
     Principle? ................................................................................. 994
     A.  Overview ............................................................................ 994
     B.  Twitter ................................................................................ 998
     C.  Facebook .......................................................................... 1002
     D.  YouTube and Google ....................................................... 1010
     E.  Reddit ................................................................................ 1015
     F.  Snapchat ............................................................................ 1017
     G.  Twitch ............................................................................... 1019
     H.  TikTok ............................................................................... 1020
     I.   Internet Platforms' Internal (Nonpublic) Manuals ....... 1023
III. The Case for Nonpartisanship as a Community Standard
     for Content Moderation of Political Candidates and
     Political Ads ............................................................................ 1024
     A.  Why Nonpartisanship in Content Moderation
         Matters ............................................................................. 1024

   B.  Why Best Practices Are Better Than Bills to Reform
       Section 230................................................................... 1034
IV.  Model Framework for Nonpartisan Content Moderation
     (NCM) of Political Candidates ............................................. 1039
     A.  The Model NCM Framework............................................ 1039
     B.  Other Safeguards to Protect Against Partisan Content
         Moderation ................................................................... 1053
V.   Addressing Concerns with the Proposed NCM Framework... 1055
     A.  Resources and Scalability................................................ 1055
     B.  Timeliness and Effectiveness Concerns ......................... 1056
     C.  Is Content Moderation Better Under the Status Quo
         than the NCM Proposal?................................................ 1058
Conclusion....................................................................................... 1059

*No man is allowed to be a judge in his own cause;*
*because his interest would certainly bias his judgment, and, not*
*improbably, corrupt his integrity.*
—Madison, FEDERALIST NO. 10

*Were there not even these inducements to moderation,*
*nothing can be more ill-judged than that intolerant spirit,*
*which has, at all times, characterized political parties.*
—Hamilton, FEDERALIST NO. 1

INTRODUCTION

In 2020, amidst a pandemic and nationwide protests led by Black
Lives Matter following the brutal police killing of George Floyd,
internet platforms[1] tightened their policies of content moderation—
otherwise known as "community standards"—to stop the spread of

---

   1.  The term "internet platform" is an evolving, even "slippery term." TARLETON
GILLESPIE, CUSTODIANS OF THE INTERNET 18 (2018). I borrow Tarleton Gillespie's
definition: "online sites and services that (a) host, organize, and circulate users' shared
content or social interactions for them, (b) without having produced or commissioned
(the bulk of) that content, (c) built on an infrastructure, beneath that circulation of
information, for processing data for customer service, advertising, and profit." *Id.*

misinformation, hate speech, and voter suppression.[2] The platforms had implemented new policies to curb foreign interference and misinformation that were pervasive in the 2016 U.S. election,[3] but the platforms took a hands-off approach to the content of U.S. politicians and political ads. That changed in 2020. On May 26, 2020, as protests over Floyd's death erupted, Twitter started the sea change by flagging several of President Donald Trump's tweets with labels indicating that his tweets violated Twitter's policies against misinformation, voter suppression, and glorification of violence.[4] Snapchat and Twitch followed suit by announcing their own efforts to moderate or outright suspend Trump's accounts on their respective platforms due to concerns about "amplify[ing] voices who incite racial violence and injustice"[5] and "hateful conduct."[6] Reddit, known for its über-permissiveness, even banned a subreddit, or discussion group, devoted to "r/The Donald"

---

2. *See* Craig Timberg & Elizabeth Dwoskin, *Silicon Valley Is Getting Tougher on Trump and His Supporters over Hate Speech and Disinformation*, WASH. POST (July 10, 2020, 1:53 PM), https://www.washingtonpost.com/technology/2020/07/10/hate-speech-trump-tech; Barbara Ortutay & Tali Arbel, *Social Media Platforms Face a Reckoning over Hate Speech*, AP NEWS (June 29, 2020, 6:00 PM), https://apnews.com/article/6d0b3359ee5379bd5624c9f1024a0eaf.

3. *See infra* Section I.B.1.

4. *See Trump Makes Unsubstantiated Claim that Mail-in Ballots Will Lead to Voter Fraud*, TWITTER (May 26, 2020), https://twitter.com/i/events/1265330601034256384?lang=en; Barbara Sprunt, *The History Behind 'When the Looting Starts, the Shooting Starts*,'NPR (May 29, 2020, 6:45 PM), https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts [https://perma.cc/N4MZ-3E82]; William Mansell & Libby Cathey, *Twitter Flags Trump, White House for 'Glorifying Violence' in Tweets About George Floyd Protests*, ABC NEWS (May 29, 2020, 2:32 PM), https://abcnews.go.com/US/twitter-flags-trump-white-house-glorifying-violence-tweet/story?id=70945228 [https://perma.cc/6Y3C-BYJL]; *Twitter Flags Trump's Tweet of Doctored 'Racist Baby' Video*, AP NEWS (June 19, 2020), https://apnews.com/3499484ab404647b01fcc4a08babff03; Lauren Feiner, *Twitter Flagged Another Trump Tweet for Violating Its Policies*, CNBC (June 23, 2020, 6:27 PM), https://www.cnbc.com/2020/06/23/twitter-labeled-another-trump-tweet-for-violating-its-policies.html [https://perma.cc/VPV8-4KKH]. Some of Trump's tweets were removed due to claims of copyright infringement. *See Twitter Disables Trump Tweet over Copyright Complaint*, REUTERS (July 18, 2020, 11:06 PM), https://www.reuters.com/article/us-usa-trump-twitter/twitter-disables-trump-tweet-over-copyright-complaint-idUSKCN24K02U.

5. *See* Salvador Rodriguez, *Snap Will No Longer Promote Trump Posts Within Snapchat*, CNBC (June 3, 2020, 1:48 PM), https://www.cnbc.com/2020/06/03/snapchat-will-no-longer-promote-trump-posts.html [https://perma.cc/RNX3-7QEM].

6. Kellen Browning, *Twitch Suspends Trump's Channel for 'Hateful Conduct,'* N.Y. TIMES (June 30, 2020), https://www.nytimes.com/2020/06/29/technology/twitch-trump.html.

for violating Reddit's new policy against "promoting hate based on identity or vulnerability."[7] Facebook stepped up its moderation and revised its lax policy after more than 400 companies waged a nationwide ad boycott "Stop Hate for Profit."[8] CEO Mark Zuckerberg said Facebook will add labels to content—including from politicians—that violates its community standards but is allowed to remain on Facebook under a "newsworthiness" exception.[9] Facebook removed a Trump campaign ad that contained a symbol associated with a Nazi symbol.[10] In response, Trump and prominent Republicans decried the "censorship," "election interference," and "anti-conservative bias" of internet platforms.[11] Republican lawmakers also promoted a social media company named Parler, which touted itself as "unbiased" social media, even though it reportedly began removing users with liberal views.[12]

The controversy intensified during and after the 2020 U.S. election. Twitter, Facebook, and other platforms implemented new measures to stop election misinformation, especially false claims of victory and false

---

7. *Update to Our Content Policy*, REDDIT (June 29, 2020), https://www.reddit.com/r/announcements/comments/hi3oht/update_to_our_content_policy [https://perma.cc/QRQ8-KK54]; Mike Isaac, *Reddit, Acting Against Hate Speech, Bans 'The_Donald' Subreddit*, N.Y. TIMES (June 30, 2020), https://www.nytimes.com/2020/06/29/technology/reddit-hate-speech.html.

8. Elizabeth Culliford & Sheila Dang, *Facebook Will Label Newsworthy Posts that Break Rules as Ad Boycott Widens*, REUTERS (June 26, 2020, 12:59 PM), https://www.reuters.com/article/us-facebook-ads-boycott-unilever/facebook-will-label-newsworthy-posts-that-break-rules-as-ad-boycott-widens-idUSKBN23X2FW.

9. *See* Mark Zuckerberg, FACEBOOK (June 26, 2020, 11:25 AM), https://www.facebook.com/zuck/posts/10112048980882521 [https://perma.cc/CBX7-P4ZD]; Rachel Sandler, *In Reversal, Zuckerberg Says Facebook Will Label Newsworthy Posts that Violate Its Rules*, FORBES (June 26, 2020, 5:11 PM), https://www.forbes.com/sites/rachelsandler/2020/06/26/in-reversal-zuckerberg-says-facebook-will-label-newsworthy-posts-that-violate-its-rules/#4bc711407340 [https://perma.cc/3MQ3-CKLJ].

10. *See* Annie Karni, *Facebook Removes Trump Ads Displaying Symbol Used by Nazis*, N.Y. TIMES (June 30, 2020), https://www.nytimes.com/2020/06/18/us/politics/facebook-trump-ads-antifa-red-triangle.html.

11. *See* Brian Fung et al., *Trump Signs Executive Order Targeting Social Media Companies*, CNN (May 28, 2020, 9:22 PM), https://www.cnn.com/2020/05/28/politics/trump-twitter-social-media-executive-order/index.html [https://perma.cc/SQ6A-YRD8].

12. *See* Marina Watts, *Parler, the Ted Cruz-Approved 'Free Speech' App, Is Already Banning Users*, NEWSWEEK (June 30, 2020, 11:22 AM), https://www.newsweek.com/parler-ted-cruz-approved-free-speech-app-already-banning-users-1514358.

claims of voter fraud, including from the candidates.[13] By two days after the election, Twitter had added warning labels to thirty-eight percent of Trump's tweets that claimed both voter fraud and victories for him in several states that had yet to be called; the labels indicated that "[s]ome or all of the content shared in this Tweet is disputed and might be misleading about an election or other civic process."[14]

The coup de grâce came on January 6, 2021, when a group of violent insurrectionists spurred on by Trump[15] broke into the U.S. Capitol in an unsuccessful attempt to stop Congress from certifying the election of Joseph Biden as the next President.[16] Instead of condemning the insurrection, which led to at least five deaths including a Capitol police officer,[17] Trump initially tweeted a video expressing his "love" for the "very special" people, meaning the insurrectionists who attacked the Capitol, while asking them to "go home" and again falsely claiming the election was "stolen" from him.[18] That prompted the sternest response from Facebook, Twitter,

---

13. *See* Ellen P. Goodman & Karen Kornbluh, *How Well Did Twitter, Facebook, and YouTube Handle Election Misinformation?*, SLATE (Nov. 10, 2020, 7:12 PM), https://slate.com/technology/2020/11/twitter-facebook-youtube-misinformation-election.html [https://perma.cc/V9TW-7UCL].

14. *See* Kate Conger, *Twitter Has Labeled 38% of Trump's Tweets Since Tuesday*, N.Y. TIMES (Nov. 5, 2020), https://www.nytimes.com/2020/11/05/technology/donald-trump-twitter.html.

15. *See* Rebecca Ballhaus et al., *Trump and His Allies Set the Stage for Riot Well Before January 6*, WALL ST. J. (Jan. 8, 2021, 8:38 PM), https://www.wsj.com/articles/trump-and-his-allies-set-the-stage-for-riot-well-before-january-6-11610156283; Maggie Haberman, *Trump Told Crowd 'You Will Never Take Back Our Country with Weakness,'* N.Y. TIMES (Jan. 6, 2021), https://www.nytimes.com/2021/01/06/us/politics/trump-speech-capitol.html; Dan Mangan, *Education Secretary Betsy DeVos Resigns over Capitol Riot, Blames Trump Rhetoric*, CNBC (Jan. 7, 2021, 9:05 PM), https://www.cnbc.com/2021/01/07/education-secretary-betsy-devos-resigns-over-capitol-riot-blames-trump-rhetoric.html [https://perma.cc/2LWF-9LNX]; *Trump Promises 'Wild' Protest in DC on Jan. 6, the Day Congress to Count Electoral Votes*, FOX 5 (Dec. 19, 2020), https://www.fox5dc.com/news/trump-promises-wild-protest-in-dc-on-jan-6-the-day-congress-to-count-electoral-votes [https://perma.cc/7R22-SJZC].

16. *See How Pro-Trump Insurrectionists Broke into the U.S. Capitol*, WASH. POST (Jan. 6, 2021), https://www.washingtonpost.com/politics/interactive/2021/video-timeline-capitol-breach.

17. *See* Dartunorro Clark & Frank Thorp V, *Capitol Police Officer Dies from Injuries After Clashing with Pro-Trump Mob*, NBC NEWS (Jan. 8, 2021, 7:15 AM), https://www.nbcnews.com/politics/politics-news/capitol-police-officer-has-died-after-clashing-pro-trump-mob-n1253396 [https://perma.cc/HSV8-ML42].

18. *See 'Go Home. We Love You.': Trump to Protesters*, ABC NEWS, https://abcn

and other platforms that feared further incitement of violence: the removal of Trump's video and suspension of his social media accounts.[19] Trump was forever barred from tweeting, something he did frequently during his presidency.[20]

Even before 2020, content moderation by internet platforms was contentious. In 2016, *Gizmodo* published an article in which unnamed, former Facebook employees alleged that Facebook "prevented stories about the right-wing CPAC gathering . . . and other conservative topics from appearing in the highly-influential [newsfeed on Facebook], even though they were organically trending among the site's users."[21] Tom Stocky, Facebook's Vice President of Search, issued a categorical denial: "There are rigorous guidelines in place for the review team to ensure consistency and neutrality. These guidelines do not permit the suppression of political perspectives."[22] Zuckerberg reiterated the company's policy to incredulous Republican lawmakers at contentious hearings in April 2018[23] and April 2019.[24] Although Facebook's alleged censorship was not the

---

.ws/3nkLqSk; Salvador Rodriguez, *Facebook, Twitter Lock Trump's Account Following Video Addressing Washington Rioters*, CNBC (Jan. 7, 2021, 9:04 AM), https://www.cnbc.com/2021/01/06/twitter-pledges-action-on-any-calls-for-violence-in-capitol-riot.html [https://perma.cc/5YPB-ASV4].

19. *See* Rodriguez, *supra* note 18; James Clayton et al., *Trump Allowed back onto Twitter*, BBC (Jan. 8, 2021), https://www.bbc.com/news/technology-55569604 [https://perma.cc/J6VV-BUYX]; Sara Fischer & Ashley Gold, *All the Platforms that Have Banned or Restricted Trump so far*, AXIOS (Jan. 11, 2021), https://www.axios.com/platforms-social-media-ban-restrict-trump-d9e44f3c-8366-4ba9-a8a1-7f3114f920f1.html [https://perma.cc/RYB9-S4PK].

20. *See* Fischer & Gold, *supra* note 19; *Rate of Tweets (Donald Trump on Social Media)*, WIKIPEDIA, https://en.wikipedia.org/wiki/Donald_Trump_on_social_media#Rate_of_tweets [https://perma.cc/NR64-NFHA] (averaging 34.8 tweets per day from July 20, 2020 to January 8, 2021).

21. Michael Nunez, *Former Facebook Workers: We Routinely Suppressed Conservative News*, GIZMODO (May 9, 2016, 4:10 PM), https://gizmodo.com/former-facebook-workers-we-routinely-suppressed-conser-1775461006.

22. *Id.*; Tom Stocky, FACEBOOK (May 9, 2016), https://www.facebook.com/tstocky/posts/10100853082337958 [https://perma.cc/ERK6-D7KL].

23. *See* Kathleen Chaykowski, *Congressional Leaders Press Zuckerberg on Political Bias, Data Collection at Facebook*, FORBES (Apr. 11, 2018, 5:50 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/04/11/congressional-leaders-press-zuckerberg-on-political-bias-data-collection-at-facebook/#5b8c3e231a95 [https://perma.cc/GLW2-LHXY]; *Facebook, Social Media Privacy, and the Use and Abuse of Data: J. Hearing Before the S. Comm. on Commerce, Science, & Transportation & on the Judiciary*, 115th Cong. (2018).

24. *See* David Shepardson, *Facebook, Google Accused of Anti-Conservative Bias at U.S. Senate Hearing*, REUTERS (Apr. 10, 2019, 5:35 PM), https://www.reuters.com/article/

focus of the 2018 hearing, within a year, anti-conservative bias went from a secondary issue to the main event at the congressional hearing tendentiously titled, "Stifling Free Speech: Technological Censorship and the Public Discourse."[25]

The internet platforms' increase in content moderation of Trump in 2020 provoked swift responses. Trump issued the Executive Order on Preventing Online Censorship[26] that interprets "good faith" in Section 230 of the Communications Decency Act[27] (CDA) to require internet services to avoid moderating user content in a way that is "deceptive, pretextual, or inconsistent with a provider's terms of service," including "deceptive or pretextual actions . . . to stifle viewpoints with which they disagree."[28] If the internet service violates this requirement, it should lose Section 230 immunity,[29] which broadly protects internet services from civil liability based on the content posted by their users or based on the companies' "good faith" screening of "objectionable" content.[30] The Department of Justice (DOJ) issued a review of Section 230 that sets forth recommendations for Congress to consider, including "adding a statutory definition of 'good faith,' which would limit immunity for content moderation decisions to those done in accordance with plain and particular terms of service and accompanied by a reasonable explanation."[31] Meanwhile, Republican lawmakers proposed no fewer than seven bills that would disqualify, by different mechanisms, internet platforms from Section 230 immunity for politically biased content moderation.[32] After losing but continuing to contest the

---

us-usa-congress-socialmedia/facebook-google-accused-of-anti-conservative-bias-at-u-s-senate-hearing-idUSKCN1RM2SJ.

25. Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before the S. Judiciary Comm., 116th Cong. (2019).

26. Exec. Order No. 13,925, 85 Fed. Reg. 34,079 (May 28, 2020).

27. 47 U.S.C. § 230.

28. Executive Order on Preventing Online Censorship, WHITE HOUSE (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship [https://perma.cc/J5YL-VSGB].

29. Exec. Order No. 13,925 § 2(a), 85 Fed. Reg. at 34,080.

30. 47 U.S.C. § 230(c).

31. U.S. Dep't of Just., Section 230—Nurturing Innovation or Fostering Unaccountability? (2020).

32. See Adam Wolfe, Summary of EARN IT and Proposed Bills to Amend Section 230 of CDA Regarding ISP Safe Harbor, FREE INTERNET PROJECT (June 27, 2020), https://thefreeinternetproject.org/blog/summary-earn-it-and-proposed-bills-amend-section-230-cda-regarding-isp-safe-harbor [https://perma.cc/73XH-UG25].

November 2020 election, Trump threatened to veto a defense spending bill if Congress did not repeal Section 230, which Trump decried, in a tweet, as "a serious threat to our National Security & Election Integrity."[33]

Facebook has also been criticized from the opposite end of the political spectrum: for allegedly showing favoritism to conservative politicians, including by Facebook executives reportedly intervening to stop the company's own content moderators from flagging violations by high-profile conservatives.[34] Top executives at Facebook, including Zuckerberg, Facebook's Vice President for Global Public Policy Joel Kaplan, and board member and investor Peter Thiel (Kaplan and Thiel are both Republicans), have been accused of steering, if not skewing, Facebook's content moderation policy to protect the content of conservatives on Facebook.[35] Facebook has a significant business interest in protecting and catering to conservatives: "Facebook's internal data showed that conservative voices are consistently the most popular on the site."[36]

Political bias wasn't the only charge that Facebook and other platforms faced in 2020. The nationwide protests following the killing of George Floyd led to a mass boycott by businesses that stopped all advertising on Facebook until Facebook agreed to engage in *more* content moderation to stop hate, misinformation, and bias, and to remove groups promoting white supremacy, Holocaust denialism,

---

33.  *See* Jaclyn Diaz, *Trump Vows to Veto Defense Bill Unless Shield for Big Tech Is Scrapped*, NPR (Dec. 2, 2020, 6:25 AM), https://www.npr.org/2020/12/02/941019533/trump-vows-to-veto-defense-bill-unless-shield-for-big-tech-is-scrapped [https://perma.cc/P52N-JQRR].

34.  *See, e.g.*, Sarah Frier & Kurt Wagner, *Facebook Needs Trump even More than Trump Needs Facebook*, BLOOMBERG BUSINESSWEEK (Sept. 17, 2020, 5:30 PM), https://www.bloomberg.com/news/features/2020-09-17/facebook-and-mark-zuckerberg-need-trump-even-more-than-trump-needs-facebook (explaining why Facebook may be working to appease President Trump); Olivia Solon, *Sensitive to Claims of Bias, Facebook Relaxed Misinformation Rules for Conservative Pages*, NBC NEWS (Aug. 7, 2020, 3:31 PM), https://www.nbcnews.com/tech/tech-news/sensitive-claims-bias-facebook-relaxed-misinformation-rules-conservative-pages-n1236182 [https://perma.cc/HTD2-QHMS].

35.  *See* Frier & Wagner, *supra* note 34; Solon, *supra* note 34; Emily Glazer et al., *Peter Thiel at Center of Facebook's Internal Divisions on Politics*, WALL ST. J. (Dec. 17, 2019, 5:30 AM), https://www.wsj.com/articles/peter-thiel-at-center-of-facebooks-internal-divisions-on-politics-11576578601; Deepa Seetharaman, *Facebook's Lonely Conservative Takes on a Power Position*, WALL ST. J. (Dec. 23, 2018, 8:00 AM), https://www.wsj.com/articles/facebooks-lonely-conservative-takes-on-a-power-position-11545570000.

36.  *See* Frier & Wagner, *supra* note 34.

vaccine misinformation, and climate denialism.[37] Several Facebook employees quit and others held a virtual walkout to protest the company's failure to address the perceived problem of hate speech on Facebook.[38] The controversy boiled over when Zuckerberg admitted that Facebook made a mistake[39] in not removing a militia group's Facebook page that publicized an event asking for "patriots willing *to take up arms* and defend (Kenosha[, Wisconsin]) *from the evil thugs.*"[40] The call to arms was a response to the protests following a video showing a Kenosha police officer shoot Jacob Blake, a Black man, seven times in the back.[41] On August 25, 2020, traveling from Illinois to Kenosha, 17-year-old Kyle Rittenhouse shot and killed two protesters with an AR-15-style rifle in what his lawyer claims was self-defense; Rittenhouse has been charged with multiple counts of homicide.[42] It's unclear if Rittenhouse saw the militia group's

---

37. *See, e.g., Recommended Next Steps*, STOP HATE FOR PROFIT, https://www.stophateforprofit.org/productrecommendations [https://perma.cc/TZY7-NCE9] (recommending steps for Facebook to take to combat the proliferation of hate speech and misinformation on the platform); Jessica Guynn, *Boycott Facebook: Civil Rights Groups Call on Big Advertisers to Yank Ads over Hate Speech Policies*, USA TODAY (June 18, 2020, 9:25 AM), https://www.usatoday.com/story/tech/2020/06/17/facebook-hate-speech-civil-rights-groups-call-advertising-boycott/3207915001 [https://perma.cc/Z4V7-UK35].

38. *See* Alison Durkee, *Facebook Engineer Resigns, Says Company on 'Wrong Side of History' as Internal Dissent Grows*, FORBES (Sept. 8, 2020, 3:13 PM), https://www.forbes.com/sites/alisondurkee/2020/09/08/facebook-engineer-resigns-company-on-wrong-side-of-history-internal-employee-dissent-grows/#7c74c97d3794 [https://perma.cc/67R6-RF53].

39. *See* Todd Spangler, *Mark Zuckerberg Admits Facebook 'Operational Mistake' in Failing to Pull Wisconsin Militia Group*, VARIETY (Aug. 29, 2020, 6:36 AM), https://variety.com/2020/digital/news/mark-zuckerberg-facebook-operational-mistake-wisconsin-militia-group-1234753545.

40. Katherine Rosenberg-Douglas, *Fledgling Militia Group Put out Call to Arms in Kenosha and 5,000 People Responded. Now It's Banned from Facebook After Fatal Shootings During Protests*, CHI. TRIB. (Aug. 28, 2020, 6:40 AM) (emphasis added), https://www.chicagotribune.com/news/breaking/ct-kenosha-wisconsin-militia-social-media-shooting-20200828-aenx5ropmrfmtca34ezqvhwe7e-story.html.

41. *Id.*; *Jacob Blake: What We Know About Wisconsin Police Shooting*, BBC NEWS (Aug. 31, 2020), https://www.bbc.com/news/world-us-canada-53909766 [https://perma.cc/MN8U-MRFT]. Prosecutors decided not to press charges against the police officer Rusten Sheskey. *See* Robert Chiarito et al., *Jacob Blake Shooting: No Charges Against Officer in Kenosha, Wisconsin*, N.Y. TIMES (Jan. 5, 2021), https://nyti.ms/2Xdq52H.

42. *See* Christina Maxouris et al., *Kenosha Shooting Suspect Faces More Homicide Charges*, CNN (Aug. 27, 2020, 11:26 PM), https://www.cnn.com/2020/08/27/us/kenosha-wisconsin-shooting-suspect/index.html [https://perma.cc/GHT7-49TG]; Phil Helsel, *Kyle Rittenhouse, Charged with Killing 2 Kenosha Protesters, Extradited to*

Facebook page, but many did: "1,000 people responded they were 'going' to the Kenosha event. Another 4,000 said they were 'interested.'"[43] In addition, in what might be perceived as an effort to undermine the protesters, the Department of Homeland Security called upon internet platforms to take "appropriate action . . . against content that promotes, incites, or assists the commission of imminent illegal activities and violence," including "calls to break city curfews, information about which stores or neighborhoods to target for looting or destruction, and coordination of attacks against particular people or groups of people."[44]

It's easy to see how different goals of content moderation may result in decisions that appear "biased" depending on the viewer. Representative Steve King, a Republican from Iowa, tweeted on December 8, 2017: "Diversity is not our strength. Hungarian Prime Minister Victor Orban, 'Mixing cultures will not lead to a higher quality of life but a lower one.'"[45] King has been criticized as supporting white supremacy, even by members of his own party.[46] Yet Twitter didn't moderate King's tweet. Twitter's inaction can be criticized as helping to promote white supremacy on Twitter.[47] However, had Twitter removed the content for violating its community standards, Twitter might have been viewed as biased against conservative politicians. Or consider when Twitter moderated Trump's controversial tweet echoing former police chief Walter Headley's infamous 1967 line:

---

*Wisconsin*, U.S. NEWS (Oct. 30, 2020, 10:36 PM), https://www.nbcnews.com/news/us-news/kyle-rittenhouse-charged-killing-2-kenosha-protesters-extradited-wisconsin-n1245579 [https://perma.cc/GW6N-59B5].

43. Rosenberg-Douglas, *supra* note 40.

44. Lauren Feiner, *DHS Asks Facebook, Twitter and Others to Take Action on Posts Calling for 'Violence' amid Nationwide Protests*, CNBC (June 26, 2020, 6:24 PM), https://www.cnbc.com/2020/06/26/dhs-to-facebook-twitter-take-action-on-posts-calling-for-violence.html [https://perma.cc/3Q9K-LSLU].

45. Steve King (@SteveKingIA), TWITTER (Dec. 8, 2017, 8:00 AM), https://twitter.com/SteveKingIA/status/939117527375990790.

46. *See* Trip Gabriel, *A Timeline of Steve King's Racist Remarks and Divisive Actions*, N.Y. TIMES (Jan. 15, 2019), https://www.nytimes.com/2019/01/15/us/politics/steve-king-offensive-quotes.html.

47. *See* Grace Panetta, *Twitter Reportedly Won't Use an Algorithm to Crack down on White Supremacists Because Some GOP Politicians Could End up Getting Barred too*, BUS. INSIDER (Apr. 25, 2019, 2:19 PM), https://www.businessinsider.com/twitter-algorithm-crackdown-white-supremacy-gop-politicians-report-2019-4 [https://perma.cc/W726-XK2N].

> These THUGS are dishonoring the memory of George Floyd, and I won't let that happen. Just spoke to Governor Tim Walz and told him that the Military is with him all the way. Any difficulty and we will assume control but, when the looting starts, the shooting starts. Thank you![48]

Twitter let Trump's tweet remain on its platform under what it calls (without irony) its "public[] interest" exception,[49] but flagged the tweet with a label that it "violated the Twitter Rules about glorifying violence."[50] Trump decried Twitter's moderation as an "unchecked power to censor": "Twitter ceases to be a neutral public platform."[51] But, had Twitter done nothing, the inaction would have prompted criticism from those who interpret "when the looting starts, the shooting starts" as a racist threat used in the past to commit violence against the Black community.[52] In short, internet platforms are often whipsawed: damned if they do moderate, and damned if they don't.

As is apparent from this firestorm, content moderation is the third rail of internet policy. Staking out any position is likely to elicit criticism, if not condemnation or worse. Debating content moderation has become as charged as the polarized discussions on social media. Yet the internet platforms have done little to defuse the situation. Even though Facebook, Google, and Twitter have denied having a political bias, their community standards—surprisingly—say next to nothing about the goal of nonpartisanship in content moderation of public officials and political candidates, let alone the company's procedures to ensure nonpartisanship.[53]

---

48. *See* Tommy Beer, *Trump Defends Controversial 'Shooting' Tweet, and White House Claims Twitter Admits Mistake*, FORBES (May 29, 2020, 6:59 PM), https://www.forbes.com/sites/tommybeer/2020/05/29/trump-defends-controversial-tweet-sanctioned-by-twitter/#652237d541d7 [https://perma.cc/3ENT-GFAT].

49. *About Public-Interest Exceptions on Twitter*, TWITTER, https://help.twitter.com/en/rules-and-policies/public-interest [https://perma.cc/78K2-4FAL].

50. *See* Donald J. Trump (@realDonaldTrump), TWITTER (May 29, 2020, 12:53 AM), https://twitter.com/realDonaldTrump/status/1266231100780744704.

51. *See* Katherine Faulders, *Trump Signs Executive Order Targeting Social Media Companies*, ABC 7 NEWS (May 29, 2020), https://abc7news.com/trump-signs-executive-order-targeting-social-media-companies/6218710 [https://perma.cc/V28A-LWY7].

52. *See* Michael Wines, *'Looting' Comment from Trump Dates back to Racial Unrest of the 1960s*, N.Y. TIMES (May 29, 2020), https://www.nytimes.com/2020/05/29/us/looting-starts-shooting-starts.html; Beer, *supra* note 48.

53. *See infra* Part II (arguing that internet platforms' stated policies and practices do not adequately explain how they operationalize nonpartisanship as a principle of content moderation).

This Article examines whether internet platforms should adopt, as a matter of best practices, a principle of nonpartisanship in their moderation of content posted by political candidates, with safeguards designed to enforce that principle. Republican lawmakers have asserted that a principle of "political neutrality" exists or should exist under Section 230 of the CDA, which provides internet platforms broad immunity from civil liability.[54] But the conservative editorial board of the *Wall Street Journal* contends that "[t]rying to enforce online 'neutrality' is a fool's errand."[55] Legal scholars contend that Section 230 contains no such requirement of neutrality; the law was meant to encourage internet platforms to engage in moderation of content that is "objectionable, whether or not such material is constitutionally protected."[56]

Neither side is right. Section 230(c)(2)'s meaning of what constitutes "good faith" moderation of "objectionable" material is somewhat unclear.[57] The statute doesn't define either term. The case law, which is sparse and conflicting, has not addressed whether a content moderation decision that is based on partisanship or the political affiliation of the user can qualify as "good faith" moderation of "otherwise objectionable" material.[58] Moreover, some courts have misread Section 230(c)(1), rendering (c)(2) mere surplusage. But a careful reading of Section 230's text shows that an internet platform's removal of content is subject to Section 230(c)(2), not (c)(1). Under Section 230(c)(2), content moderation based solely on the user's political affiliation or party lacks "good faith" because it is not based on anything "objectionable" in the "material." Purely partisan content moderation does not receive any immunity under Section 230.

But, instead of amending Section 230 and imposing greater regulation of the internet, this Article proposes that internet platforms

---

54. Elizabeth Nolan Brown, *Section 230 Is the Internet's First Amendment. Now Both Republicans and Democrats Want to Take It Away.*, REASON (July 29, 2019, 8:01 AM), https://reason.com/2019/07/29/section-230-is-the-internets-first-amendment-now-both-republicans-and-democrats-want-to-take-it-away/printer.

55. Editorial, *The Twitter Fairness Doctrine*, WALL ST. J. (May 28, 2020, 7:23 PM), https://www.wsj.com/articles/the-twitter-fairness-doctrine-11590708199.

56. 47 U.S.C. § 230(c)(2).

57. *See* id.

58. *See infra* Part I (stating that the paucity of case law leaves open the question whether, under Section 230(c)(2), an internet platform does not act in good faith by moderating content it deems "objectionable" because of (1) the content's political viewpoint or (2) the user's political affiliation).

voluntarily adopt, as a matter of best practices, a limited principle of nonpartisanship as a part of their content moderation of politicians. The Article offers a model framework for nonpartisan content moderation (NCM) to implement this important principle.

Part I situates the question of nonpartisanship of internet platforms in moderating politicians' content within the burgeoning literature on online governance. Surprisingly little has been written about the issue of nonpartisan content moderation, despite the contentious public debate over the purported anti-conservative bias of social media companies.[59] Part I analyzes the text of Section 230 and shows how the Ninth Circuit and other courts have misread the provision and the relationship between its two subsections (c)(1) and (c)(2). Under the proper reading, claims based on an internet platform's *publication* of objectionable user content falls within (c)(1), whereas claims based on the *removal* of user content fall within (c)(2), which requires the internet platform to moderate in "good faith." Under the correct interpretation, content moderation based solely on the third party's political affiliation or party lacks "good faith" and falls outside of Section 230 immunity. Part I summarizes the efforts by Republican lawmakers to amend Section 230 to make politically biased moderation a disqualification from its immunity. Conducting an independent review of the community standards of the major internet platforms and their current policies with respect to nonpartisanship or bias, Part II then shows their deficiencies in explaining how nonpartisanship is ensured.

Part III proposes that internet platforms adopt, as a matter of best practices, a principle of nonpartisanship with respect to moderation of content by political candidates and officials holding public office in the United States. As a matter of best practices, internet platforms should publicly commit to a transparent framework that is designed to moderate content of political candidates and political ads in a nonpartisan matter. This approach allows the necessary flexibility to accommodate the various types of internet service providers (ISP) and the fast-changing high-tech industry, which is beset with ever-evolving, large-scale problems, including malevolent, coordinated, inauthentic behavior and foreign interference with elections. Yet, at

---

59. Notable exceptions include Anupam Chander & Vivek Krishnamurthy, *The Myth of Platform Neutrality*, 2 GEO. L. TECH. REV. 400 (2018), and Frank Pasquale, *Platform Neutrality: Enhancing Freedom of Expression in Spheres of Private Power*, 17 THEORETICAL INQUIRIES L. 487 (2016).

the same time, this approach sets forth a transparent NCM framework that companies can tailor to their platforms. This Part defends the approach as better than legislation or the current bills to amend or repeal Section 230.

Part IV then outlines a model procedural framework of three levels of double-blind review for internet platforms to enforce nonpartisanship in content moderation of political candidates and officials. The model NCM framework includes several key elements: (1) a defense of selective enforcement that can be raised on appeal by a political candidate whose content has been moderated, (2) the inclusion of a public advocate as amicus curiae to represent the interests of the public during the appeal and a civil rights advocate as amicus curiae to represent positions protecting civil rights, and (3) review of challenges to both removal *and* non-removal of content of political candidates and public officials. The model framework is not intended as the exclusive way of designing a system to protect nonpartisanship in content moderation. Instead, it provides an example of a process that contains checks and balances to protect content moderation from political bias or partisanship. Other frameworks are encouraged. Part V addresses concerns with the proposal.

This Article should not be taken as an indictment charging that the internet platforms are politically biased in their content moderation. Without access to their internal decisions and undisclosed standards and procedures, there is no way to evaluate the allegation. But, therein lies a problem: internet platforms should be more transparent by explicitly recognizing in their community standards a principle of nonpartisanship in the content moderation of political candidates, and disclosing to the public the safeguards and procedures designed to ensure nonpartisanship.

I.   ONLINE GOVERNANCE AND THE CONTROVERSIES OVER ELECTION INTERFERENCE, VOTER SUPPRESSION, AND PERCEIVED POLITICAL BIAS OF INTERNET PLATFORMS

Part I discusses the charge that Facebook, Twitter, and other internet platforms are politically biased in how they moderate user content.[60]

---

60.   Content moderation is a thankless task. It requires the deployment of many staff along with the constant development of sophisticated algorithmic review to counter bots and coordinated attacks. Yet internet platforms are rarely praised for content moderation—not even for keeping horrible or illegal content (e.g., child

This allegation is best understood within the larger context of the platforms' online governance, and their recent efforts to combat election interference and coordinated campaigns to depress Black voters. The Part clears up the confusion over Section 230 and the misreading by some courts in conflating its two subsections (c)(1) and (c)(2) to both apply to an internet platform's decisions to remove user content. Under the correct interpretation, only (c)(2) applies to these decisions—and it requires that such decisions to remove "otherwise objectionable" material be made in "good faith." However, a decision to remove content based solely on the identity of the user, such as the person's political affiliation, falls outside of Section 230(c)(2) immunity. Section 230 does not protect such purely partisan removal of content.

## A. Online Governance by Internet Platforms

Scholars, policymakers, and theorists have recognized how large internet platforms, such as Facebook, Google, Twitter, and YouTube, govern large swaths of the internet—billions of people—by the rules they set and the practices they impose on a wide range of issues from content moderation, free expression, surveillance, privacy, adult material—and even capitalism.[61] Just as "code is law,"[62] platforms are governments.[63] Platforms govern what people do online in ways far more extensive and direct than most national governments.[64] They

---

pornography, terrorist recruitment, revenge porn, and coordinated foreign attacks) offline.

61. *See, e.g.*, SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM: THE FIGHT FOR A HUMAN FUTURE AT THE NEW FRONTIER OF POWER 93–96 (2019); Jack M. Balkin, *Free Speech in the Algorithmic Society: Big Data, Private Governance, and New School Speech Regulation*, 51 U.C. DAVIS L. REV. 1149, 1180–81 (2018); Julie E. Cohen, *Law for the Platform Economy*, 51 U.C. DAVIS L. REV. 133, 140–53 (2017); Anupam Chander, *Facebookistan*, 90 N.C. L. REV. 1807 (2012); Kate Klonick, *The New Governors: The People, Rules, and Processes Governing Online Speech*, 131 HARV. L. REV. 1598, 1662–64 (2018); Alan Z. Rozenshtein, *Surveillance Intermediaries*, 70 STAN. L. REV. 99, 176–81 (2018).

62. *See* LAWRENCE LESSIG, CODE: VERSION 2.0 5 (2006); Joel R. Reidenberg, *Lex Informatica: The Formulation of Information Policy Rules Through Technology*, 76 TEX. L. REV. 553, 555 (1998).

63. *See* Kristen E. Eichensehr, *Digital Switzerlands*, 167 U. PA. L. REV. 665, 673 (2019).

64. *See* REBECCA MACKINNON, CONSENT OF THE NETWORKED: THE WORLDWIDE STRUGGLE FOR INTERNET FREEDOM 165 (2012) ("[O]ur ability to use these platforms effectively depends on several key factors that are controlled most directly by the new digital sovereigns: they control who knows what about our identities under what circumstances; our access to information; our ability to transmit and share information

act as legislatures enacting broad regulations through their online standards, such as their community standards for content moderation.[65] They act as executives in enforcing those standards.[66] They act as agencies in establishing rules implementing broad legal concepts, such as the European Union's (EU) right to be forgotten.[67] They act as courts in adjudicating and deciding private disputes, such as over copyright claims.[68] As Rebecca MacKinnon identified in 2012, Facebook, Google, and other internet platforms operate like sovereign countries—or even kingdoms, a "Facebookistan," a "Googledom," and "Twitterverse."[69] The sovereigns analogy has even been pushed to advance the notion that internet platforms are or should be neutral akin to "digital Switzerlands."[70]

Though internet platforms govern billions of people every day, the platforms typically do not have a single founding document like the Constitution to establish the institutional structures, with checks and balances, to oversee or limit their governance of people, much less to recognize protected individual rights of their users.[71] Of course, corporate structures are set forth in articles of incorporation and bylaws, and user policies are described in the terms of service agreements and community standards. Yet, unlike the Constitution, individuals have few rights under the terms of service agreements and community standards, which the internet platforms can—and do— change at will.[72] Internet platforms typically include in their terms of

---

publicly and privately; and even whom and what we can know."); Chander, *supra* note 61, at 1815.

    65. *See* Klonick, *supra* note 61, at 1631–32.

    66. *See id.* at 1647.

    67. *See* Edward Lee, *Recognizing Rights in Real Time: The Role of Google in the EU Right to Be Forgotten*, 49 U.C. DAVIS L. REV. 1017, 1066–72 (2016); Rory Van Loo, *The New Gatekeepers: Private Firms as Public Enforcers*, 106 VA. L. REV. 467, 496–97 (2020).

    68. *See* Daphne Keller, *Facebook Restricts Speech by Popular Demand*, ATLANTIC (Sept. 22, 2019), https://www.theatlantic.com/ideas/archive/2019/09/facebook-restricts-free-speech-popular-demand/598462 ("This past week, with some fanfare, Facebook announced its own version of the Supreme Court: a 40-member board that will make final decisions about user posts that Facebook has taken down."); *see also* Rory Van Loo, *The Corporation as Courthouse*, 33 YALE J. ON REG. 547, 551–52 (2016).

    69. MACKINNON, *supra* note 64, at 149.

    70. *See* Eichensehr, *supra* note 63, at 696.

    71. *See* Keller, *supra* note 68.

    72. *See, e.g.*, *Terms of Service*, FACEBOOK, https://www.facebook.com/legal/terms/update/draft2?CMS_BRANCH_ID=1534594943262990 [https://perma.cc/6D88-EFJ5] ("Unless otherwise required by law, we will notify you before we make changes to these Terms and give you an opportunity to review them before they go into effect. Once

service agreements the power to "suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason."[73]

Of course, internet platforms are not state actors.[74] In the United States, they are not bound by the constitutional limitations, such as the First Amendment and separation of powers, which circumscribe what the federal government can do.[75] So, one may wonder why even speak of "governance," a "constitution," "due process," or "separation of powers" when discussing internet platforms.

The reason is power—and the potential for abuse of power. Internet platforms wield enormous, often unfettered power that affects people's online existence—their free speech, their privacy, their political protest, their livelihoods, etc. For example, a business delisted and unfindable on Google does not exist, practically speaking.[76] A political candidate whose account social media companies have suspended would have virtually no chance of reaching voters online, a problem especially harmful to the political chances of a grassroots or unknown candidate.[77] The degree to which internet platforms govern people's online lives raises a set of profound questions. How should internet platforms govern? Should they incorporate practices, standards, and safeguards that exist in public law? Should national governments in turn regulate how platforms govern, or should they be left to their own devices as private corporations, especially given the long-held concern about

---

any updated Terms are in effect, you will be bound by them if you continue to use our Products.").

73. *Twitter Terms of Service,* TWITTER, https://twitter.com/en/tos#:~:text=General-,1.,old%2C%20to%20use%20the%20Services [https://perma.cc/4GW3-WY7F].

74. *See* Klonick, *supra* note 61, at 1611 (discussing *Packingham v. North Carolina,* 137 S. Ct. 1730 (2017)).

75. *See id.*

76. *See, e.g.,* Eric Goldman, *Google Must Answer Lawsuit for Manually Removing Websites from Its Search Index,* FORBES (May 17, 2016, 11:07 AM), https://www.forbes.com/sites/ericgoldman/2016/05/17/google-must-answer-lawsuit-for-manually-removing-websites-from-its-search-index/#64f6878a368b [https://perma.cc/E696-KL29].

77. *Cf.* Niam Yaraghi, *Twitter's Ban on Political Advertisements Hurts Our Democracy,* BROOKINGS INST. (Jan. 8, 2020), https://www.brookings.edu/blog/techtank/2020/01/08/twitters-ban-on-political-advertisements-hurts-our-democracy [https://perma.cc/9CPZ-SB3F] (arguing that social media can help candidates with fewer resources than "candidates with the greatest financial support from corporations and super PACs who can bankroll expensive marketing campaigns").

countries regulating—and restricting—the internet? These questions are not academic. Their answers profoundly affect free expression, elections, political protests, surveillance, and even political revolutions.[78]

This Article begins with the premise that internet platforms must think more systematically about their powers of governing people—and how they can wield those powers in ways consonant with democratic principles, including transparency, due process, and equal protection. Facebook, Twitter, and other platforms should view their responsibilities not just as profit-seeking businesses, but also as framers, like Hamilton and Madison, of the constitution of both (1) governance structures and (2) protections of individual rights on their platforms. Although these companies have already undertaken such governing responsibilities,[79] they need to do more. But it's Pollyannaish to expect corporations will transform themselves in ways that will magically solve the contentious issues of content moderation, surveillance, privacy, election interference, civil rights, etc. If national governments haven't even solved these problems offline, is it reasonable to expect Google to do so online?[80] But that is not to say people should not demand more from internet platforms. We can and should. Given how internet platforms can be weaponized to interfere with and undermine democratic elections, internet platforms must have greater accountability to the people.[81]

This Article tackles a discrete issue within that much larger endeavor: should internet platforms moderate the online content of political candidates and political campaign ads in a nonpartisan

---

78. For more on the use of social media for political protests and revolutions, see ZEYNEP TUFEKCI, TWITTER AND TEAR GAS: THE POWER AND FRAGILITY OF NETWORKED PROTEST 6 (2017), and John T. Jost et al., *How Social Media Facilitates Political Protest: Information, Motivation, and Social Networks*, 39 ADVANCES IN POL. PSYCH. 85 (2018).

79. *See, e.g., Elections Integrity: We're Focused on Serving the Public Conversation.*, TWITTER, https://about.twitter.com/en_us/advocacy/elections-integrity.html [https://perma.cc/NWB9-C2PK] (pledging to continue protecting Twitter against outside manipulation); Nick Clegg, *Welcoming the Oversight Board*, FACEBOOK (May 6, 2020), https://about.fb.com/news/2020/05/welcoming-the-oversight-board [https://perma.cc/ZN9D-QJZA].

80. *See* Keller, *supra* 68 ("But we should not fool ourselves that mimicking a few government systems familiar from grade-school civics class will make internet platforms adequate substitutes for real governments, subject to real laws and real rights-based constraints on their power.").

81. *See generally* S. Select Comm. on Intel., 116th Cong., Rep. on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 2: Russia's Use of Social Media with Additional Views (Comm. Print 2019).

manner? If so, what institutional structures, checks and balances, and individual rights should be established to serve that goal? Although the issue of content moderation of political leaders and political ads is a tiny subset of content moderation on internet platforms, its relationship to political debate and elections make it an issue of double importance: as both an issue of online governance and a critical component of democratic governance related to elections.

### B. Election Misinformation on Social Media in 2016 and 2020

This section explains how internet platforms were vulnerable to foreign interference and election misinformation in the 2016 U.S. election—and how they avoided a repeat of their mistakes in the 2020 U.S. election. But the increased content moderation also sparked controversy.

### 1. Misinformation and voter suppression during the 2016 U.S. election

The internet platforms' concern about content moderation—and how their platforms can be abused—intensified in the aftermath of the 2016 U.S. presidential election. Even before the election, BuzzFeed News conducted an October 2016 study that found "three big right-wing Facebook pages published false or misleading information 38% of the time during the period analyzed, and three large left-wing pages did so in nearly 20% of posts."[82] Shortly following the 2016 U.S. election, Zuckerberg flatly rejected the idea that misinformation on Facebook affected the outcome: "[T]he idea that fake news, of which it's a very small amount of the content, influenced the election in any way is a pretty crazy idea."[83] Later that week, under mounting criticism, Zuckerberg posted on his Facebook page the efforts Facebook was taking to stop misinformation, which he still characterized as "relatively small" on Facebook.[84]

---

82.   *See* Craig Silverman et al., *Hyperpartisan Facebook Pages Are Publishing False and Misleading Information at an Alarming Rate*, BUZZFEED NEWS (Oct. 20, 2016, 12:47 PM), https://www.buzzfeednews.com/article/craigsilverman/partisan-fb-pages-analysis#.pxKOlN4yp [https://perma.cc/9NHJ-JABN].

83.   *See* Adrienne Jane Burke, *Facebook Influenced Election? Crazy Idea, Says Zuckerberg*, TECHONOMY (Nov. 11, 2016, 1:38 PM), https://techonomy.com/2016/11/28196 [https://perma.cc/6FBZ-24CC].

84.   *See* Mark Zuckerberg, FACEBOOK (Nov. 18, 2016), https://www.facebook.com/zuck/posts/a-lot-of-you-have-asked-what-were-doing-about-misinformation-so-i-wanted-to-give/10103269806149061 [https://perma.cc/983G-RVQW].

But it soon came to light that Facebook's potential complicity was far worse than Zuckerberg admitted. In fact, Russian operatives, at the behest of the Russian government, waged a massive misinformation campaign on Facebook, Instagram, and other sites to aid Trump's candidacy and to hurt Hillary Clinton's bid.[85] The U.S. Senate Select Committee on Intelligence examined the intelligence on Russian interference in the 2016 election and issued several volumes of bipartisan reports detailing how the Russian Internet Research Agency ("IRA") "used social media to conduct an information warfare campaign designed to spread disinformation and societal division in the United States."[86] The Committee found: "[T]he IRA sought to influence the 2016 U.S. presidential election by harming Hillary Clinton's chances of success and supporting Donald Trump at the direction of the Kremlin."[87] Even further: "Russia's targeting of the 2016 U.S. presidential election was part of a broader, sophisticated, and ongoing information warfare campaign designed to sow discord in American politics and society."[88]

The Senate Intelligence Committee report is shocking. It provides numerous examples and statistics on the IRA's use of fake accounts, fake ads, and fake content on Facebook, Instagram, Twitter, Google, YouTube, Reddit, Tumblr, LinkedIn, Medium, Pinterest, and other platforms.[89] For example:

> Data provided to the Committee indicates that the IRA used 133 Instagram accounts to publish over 116,000 posts. By comparison, the IRA used Facebook pages to publish over 60,000 posts. Engagement with fellow platform users was also significantly greater on Instagram, where IRA accounts accumulated 3.3 million followers and generated 187 million total engagements. By comparison, the IRA's Facebook page audience of 3.3 million produced 76 million virtual interactions. . . . The IRA's Instagram accounts focused on both the political left and right in America, and exploited the social, political, and cultural issues most likely to incite impassioned response across the ideological spectrum. Significantly, a discernible

---

85. *See* S. Select Comm. on Intel., 116th Cong., Rep. on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 2: Russia's Use of Social Media with Additional Views 4, 6 (Comm. Print 2019).
86. *Id.* at 3.
87. *Id.* at 4.
88. *Id.* at 5.
89. *Id.* at 43–62.

emphasis on targeting African-Americans emerges from analysis of the IRA's Instagram activity.[90]

One of the most troubling aspects of the Russian interference in the 2016 election was its targeting of the Black community in its misinformation campaign designed to cast doubt on the relevance of the election to Black voters and Clinton's concern for Blacks, and to encourage votes for Green Party candidate Jill Stein.[91]

> The [Senate Intelligence] Committee found that no single group of Americans was targeted by IRA information operatives more than African-Americans. By far, race and related issues were the preferred target of the information warfare campaign designed to divide the country in 2016. Evidence of the IRA's overwhelming operational emphasis on race is evident in the IRA's Facebook advertisement content (over 66 percent contained a term related to race) and targeting (locational targeting was principally aimed at African-Americans in key metropolitan areas [ ]), its Facebook pages (one of the IRA's top performing pages, "Blacktivist," generated 11.2 million engagements with Facebook users), its Instagram content (five of the top 10 Instagram accounts were focused on African-American issues and audiences), its Twitter content (heavily focused on hot-button issues with racial undertones, such as the NFL kneeling protests), and its YouTube activity (96 percent of the IRA's YouTube content was targeted at racial issues and police brutality).[92]

Equally troubling is how Cambridge Analytica, a British political consulting firm working for Trump's campaign, was able to scrape personal information of eighty-seven million Facebook users without their permission.[93] Cambridge Analytica then targeted, with psychological profiling, specific impressionable voters in swing states to support Trump.[94] According to former employee and whistleblower

---

90. *Id.* at 48.

91. *See* Janell Ross, *Russia's Election Interference Exposes America's Achilles' Heel: Race*, NBC NEWS (Dec. 19, 2018, 5:16 PM), https://www.nbcnews.com/news/nbcblk/russia-s-election-interference-exposes-america-s-achilles-heel-race-n949796 [https://perma.cc/YHT5-X2UE].

92. S. Select Comm. on Intel., 116th Cong., Rep. on Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 2: Russia's Use of Social Media with Additional Views 6–7.

93. *See* Cecilia Kang & Sheera Frenkel, *Facebook Says Cambridge Analytica Harvested Data of up to 87 Million Users*, N.Y. TIMES (Apr. 4, 2018) https://www.nytimes.com/2018/04/04/technology/mark-zuckerberg-testify-congress.html.

94. *See* Matthew Rosenberg et al., *How Trump Consultants Exploited the Facebook Data of Millions*, N.Y. TIMES (Mar. 17, 2018), https://www.nytimes.com/2018/03/17/

Christopher Wylie, Cambridge Analytica had a program headed by Steven Bannon, who was also an adviser to Trump's campaign, to engage in voter suppression, specifically targeting Black voters.[95]

In the 2016 election, Black voter participation dropped precipitously. As Pew Research Center reported, "The [B]lack voter turnout rate declined for the first time in 20 years in a presidential election, falling to 59.6% in 2016 after reaching a record-high 66.6% in 2012. The 7-percentage-point decline from the previous presidential election is the largest on record for [B]lacks."[96]

Internet platforms were caught off-guard. They engaged in intense soul-searching after the 2016 election—and may still be continuing to do so. Updating their community standards, internet platforms implemented new policies to combat election interference, coordinated inauthentic behavior, misinformation campaigns, and voter suppression, especially of Black voters, on their platforms.[97] The controversial decisions to moderate, starting in May 2020, Trump's social media posts detailed in the Introduction can only be properly understood against this backdrop.[98] But even then, the internet platforms' moderation of Trump's posts leading up to the 2020 election was modest. Most internet platforms did not remove Trump's violating content, but instead added a label of how his

---

us/politics/cambridge-analytica-trump-campaign.html; Carole Cadwalladr, *'I Made Steve Bannon's Psychological Warfare Tool': Meet the Data War Whistleblower*, GUARDIAN (Mar. 18, 2018, 5:44 AM), https://www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump [https://perma.cc/8TJJ-77LN].

95. *See* Devin Coldewey, *Bannon and Cambridge Analytica Planned Suppression of Black Voters, Whistleblower Tells Senate*, TECHCRUNCH (May 16, 2018), https://techcrunch.com/2018/05/16/bannon-and-cambridge-analytica-planned-suppression-of-black-voters-whistleblower-tells-senate [https://perma.cc/M8WS-CGWG].

96. Jens Manuel Krogstad & Mark Hugo Lopez, *Black Voter Turnout Fell in 2016, even as a Record Number of Americans Cast Ballots*, PEW RSCH. CTR. (May 12, 2017), https://www.pewresearch.org/fact-tank/2017/05/12/black-voter-turnout-fell-in-2016-even-as-a-record-number-of-americans-cast-ballots [https://perma.cc/S2N6-J9K4].

97. *See, e.g.*, Guy Rosen et al., *Helping to Protect the 2020 U.S. Elections*, FACEBOOK (Oct. 21, 2019), https://about.fb.com/news/2019/10/update-on-election-integrity-efforts [https://perma.cc/UX5E-43YM]; Del Harvey & Yoel Roth, *An Update on Our Elections Integrity Work*, TWITTER (Oct. 1, 2018), https://blog.twitter.com/en_us/topics/company/2018/an-update-on-our-elections-integrity-work.html [https://perma.cc/RP7P-7GGF]; Leslie Miller, *How YouTube Supports Elections*, YOUTUBE OFF. BLOG (Feb. 3, 2020), https://youtube.googleblog.com/2020/02/how-youtube-supports-elections.html [https://perma.cc/XL45-BK7S].

98. *See supra* notes 2, 6 and accompanying text.

content violated the community standards.[99] These platforms exercised their discretion under what they call a "public interest" or "newsworthiness" exception, which allows the company to decide whether it is in the public interest to leave the violating content online for people to see, but with a label.[100]

### 2. Content moderation and new measures during and after the 2020 U.S. election, including suspension of President Trump's accounts

The internet platforms did a far better job in combating foreign interference in the 2020 U.S. election. The members of Election Infrastructure Government Coordinating Council Executive Committee and the members of the Election Infrastructure Sector Coordinating Council, which included federal and state officials in elections and security, as well as industry and nonprofit representatives, issued a rare joint statement after the election, describing it as "the most secure in American history."[101] They concluded: "While we know there are many unfounded claims and opportunities for misinformation about the process of our elections, we can assure you we have the utmost confidence in the security and integrity of our elections, and you should too."[102]

As the statement indicated, there still were "many unfounded claims" about the election. The source of the election misinformation was not foreign, but domestic: indeed, much from Trump and his allies.[103] On November 7, 2020, Trump declared himself the victor in several tweets.[104] According to the *Times*, from November 3 to 5, 2020,

---

99. *See supra* note 4 and accompanying text.

100. *See, e.g., About Public-Interest Exceptions on Twitter, supra* note 49; Nick Clegg, *Facebook, Elections and Political Speech*, FACEBOOK (Sept. 24, 2019), https://about.fb.com/news/2019/09/elections-and-political-speech [https://perma.cc/MG95-NJBX].

101. *Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election [https://perma.cc/29LH-6CAL].

102. *Id.*

103. *See, e.g.*, Ken Dilanian, *The Russians Have No Need to Spread Misinformation. Trump and His Allies Are Doing It for Them.*, NBC NEWS (Nov. 5, 2020, 5:15 PM), https://www.nbcnews.com/politics/2020-election/russians-have-no-need-spread-misinformation-trump-his-allies-are-n1246653 [https://perma.cc/J95A-SYCU].

104. *See President Trump Claims Victory in Series of Tweets*, WFXR (Nov. 7, 2020, 5:03 PM), https://www.wfxrtv.com/news/your-local-election-hq/president-trump-claims-victory-in-series-of-tweets [https://perma.cc/TE5Q-YVYZ].

Twitter added warning labels to thirty-eight percent of Trump's tweets; some of the labels indicated that the tweets "might be misleading about an election or other civic process."[105] The labels operated as a screen that covered the tweet and allowed the user to click "Learn more" to go to the content that disputed the claim in the tweet, or to click "View" to view the tweet.[106] Facebook added labels to Trump's posts, without the need to click through, and employed a "virality circuit-breaker" that slowed the spread of suspicious content to give more time for fact-checking.[107] Facebook removed the group "Stop the Steal," which organized based on the false claim that the election was being stolen from Trump.[108] Facebook explained: "The group was organized around the delegitimization of the election process, and we saw worrying calls for violence from some members of the group."[109]

Unfortunately, violence erupted on January 6, 2021 when pro-Trump supporters, incited by his calls to "go[] to the Capitol" and "give our Republicans, the weak ones . . . the kind of pride and boldness that they need to take back our country,"[110] attacked the Capitol during Congress's certification of Biden's election as President.[111]

---

105.   Conger, *supra* note 14. Later, Twitter updated the label to indicate "Election officials have certified Joe Biden as the winner of the U.S. Presidential election." *See Twitter Updates Its Warning Labels on Political Tweets to Reflect Biden Certification*, DEADLINE (Dec. 20, 2020, 2:34 PM), https://deadline.com/2020/12/twitter-updates-warning-labels-on-tweets-1234659874 [https://perma.cc/4VYU-L3BU].

106.   *See* Alex Hider, *Twitter Has Put Disclaimers on More than a Dozen Trump Tweets Since Wednesday Morning*, DENVER CHANNEL (Nov. 6, 2020, 11:45 AM), https://www.thedenverchannel.com/news/election-2020/trump-has-tweeted-32-times-since-the-polls-closed-twitter-has-applied-disclaimers-to-13-of-them.

107.   *See* Tiffany C. Li, *Twitter and Facebook's Election Disinformation Efforts May Be Too Little, Too Late*, MSNBC (Nov. 11, 2020, 5:52 PM) https://www.msnbc.com/opinion/twitter-facebook-s-election-disinformation-efforts-may-be-too-little-n1247441 [https://perma.cc/RS8V-VFMN]; Kevin Roose, *On Election Day, Facebook and Twitter Did Better by Making Their Products Worse*, N.Y. TIMES (Nov. 5, 2020), https://www.nytimes.com/2020/11/05/technology/facebook-twitter-election.html.

108.   *See* Barbara Ortutay & David Klepper, *Facebook Bans Big 'Stop the Steal' Group for Sowing Violence*, AP NEWS (Nov. 5, 2020), https://apnews.com/article/election-2020-donald-trump-misinformation-violence-elections-d5c9bd5fe6a799fd627c50521b6cbb36.

109.   *Id.*

110.   David Z. Morris, *'We Will Never Concede': How Donald Trump Incited an Attack on America*, FORTUNE (Jan. 7, 2021, 1:45 PM), https://fortune.com/2021/01/07/trump-speech-capitol-attack-riots-pence-we-will-never-concede-maga-rally [https://perma.cc/PA56-6TDC].

111.   *See How Pro-Trump Insurrectionists Broke into the U.S. Capitol*, *supra* note 16.

Trump's incitement of the insurrectionists by his baseless claims of a "stolen" election, before and after the attack on Congress, led to the internet platforms' most severe measures against Trump, including a complete, indefinite ban from posting on Facebook at least for the remaining two weeks of his presidency and Twitter's termination of Trump's personal account and freezing of the official account for the President.[112] The companies feared Trump's further use of their platforms to incite violence or insurrection, including at the inauguration of President Biden[113]—concerns that appeared justified based on "Stop the Steal" supporters' reported intention to disrupt the inauguration on January 20, 2021.[114] The fear of further insurrection and violence even led tech companies that are not involved in content moderation to act. Google removed the Parler app from its app store for Android phones, and Apple did the same for iPhones because Parler, the new social media platform popular among conservatives, had reportedly failed to moderate calls for violence or insurrection on its platform.[115] Amazon announced it would terminate its web hosting for Parler on January 10, 2021 due to violations of Amazon's rules against calls for violence.[116]

The internet platforms' and tech companies' bold actions against Trump to prevent further insurrection after the attack on the Capitol

---

112. *See* Fischer & Gold, *supra* note 19; Brian Fung, *Facebook Bans Trump from Posting for Remainder of His Term in Office*, CNN (Jan. 7, 2021, 3:37 PM), https://www.cnn.com/2021/01/07/tech/facebook-trump-restrictions/index.html [https://perma.cc/NKQ2-X7SB]; *Permanent Suspension of @realDonaldTrump*, TWITTER (Jan. 8, 2021), https://blog.twitter.com/en_us/topics/company/2020/suspension.html [https://perma.cc/MUR3-DCBQ]; *Twitter Deletes New Trump Tweets on @POTUS, Suspends Campaign Account*, REUTERS (Jan. 8, 2021, 8:58 PM), https://www.reuters.com/article/us-usa-election-trump-twitter-removal/twitter-deletes-new-trump-tweets-on-potus-suspends-campaign-account-idUSKBN29E02H.

113. *See, e.g.*, Mark Zuckerberg, FACEBOOK (Jan. 7, 2021, 7:47 AM), https://www.facebook.com/zuck/posts/10112681480907401; *Permanent Suspension of @realDonaldTrump*, *supra* note 112.

114. *See* Trevor Hughes, *'It Needed to Happen': Trump Supporters Defiant After Capitol Attack, Plan to Do It Again for Biden's Inauguration*, USA TODAY (Jan. 8, 2021, 8:20 PM), https://www.usatoday.com/story/news/nation/2021/01/07/inauguration-day-violence-could-next-after-us-capitol-attack/6584582002 [https://perma.cc/KLG4-JPGD].

115. *See* Jack Nicas & Davey Alba, *Amazon, Apple and Google Cut off Parler, an App that Drew Trump Supporters*, N.Y. TIMES (Jan. 11, 2021, 11:10 AM), https://www.nytimes.com/2021/01/09/technology/apple-google-parler.html.

116. *See* John Paczkowski & Ryan Mac, *Amazon Is Booting Parler off of Its Web Hosting Service*, BUZZFEED NEWS (Jan. 9, 2021, 10:08 PM), https://www.buzzfeednews.com/article/johnpaczkowski/amazon-parler-aws [https://perma.cc/DW8E-K9UV].

were roundly praised and roundly criticized.[117] Legal scholars and attorneys from the ACLU and the Knight First Amendment Institute had various, mixed views on Twitter's eventual decision to permanently suspend Trump's account—also called "deplatforming."[118] Some were "uneasy about the developments, which underscored the enormous power of a handful of social media companies that are largely insulated from accountability and may change positions on what speech is acceptable as executives come and go."[119] This unease cut in both directions, however, with some critics wanting more content moderation and others wanting less.[120] And the controversial decision further inflamed the political debate over Section 230. As Senator Lindsey Graham tweeted: "I'm more determined than ever to strip Section 230 protections from Big Tech (Twitter) that let them be immune from lawsuits."[121]

The January 6, 2021 insurrection and its aftermath will be studied for years to come. One thing is clear: in the current political climate, it is impossible for internet platforms to moderate the content of political candidates without sparking controversy and distrust in some sectors. Indeed, the controversy following the January 6th insurrection was just another example of the ongoing dilemma that internet platforms face. When they moderate content affecting or

---

117. *See, e.g.,* Mike Isaac & Kate Conger, *Facebook Bars Trump Through End of His Term,* N.Y. TIMES (Jan. 8, 2021), https://www.nytimes.com/2021/01/07/technology/facebook-trump-ban.html.

118. *See* Adam Liptak, *Can Twitter Legally Bar Trump? The First Amendment Says Yes,* N.Y. TIMES (Jan. 9, 2021), https://www.nytimes.com/2021/01/09/us/first-amendment-free-speech.html; Kate Conger & Mike Isaac, *Twitter Permanently Bans Trump, Capping Online Revolt,* N.Y. TIMES (Jan. 12, 2021), https://www.nytimes.com/2021/01/08/technology/twitter-trump-suspended.html.

119. *Id.*; *see* Evelyn Douek, *Trump Is Banned. Who Is Next?,* ATLANTIC (Jan. 9, 2021), https://www.theatlantic.com/ideas/archive/2021/01/trump-is-banned-who-is-next/617622. *But see* Kara Swisher, *It's Time for Social-Media Platforms to Permanently Ban Trump,* INTELLIGENCER (Jan. 7, 2021), https://nymag.com/intelligencer/2021/01/its-time-for-social-media-platforms-to-ban-trump-forever.html.

120. *Compare* Ian Sherr, *Trump Showed Facebook, Twitter, YouTube Can't Moderate Their Platforms. That Needs to Change.,* CNET (Jan. 11, 2021, 2:16 PM), https://www.cnet.com/news/trump-showed-facebook-twitter-youtube-cant-moderate-their-platforms-we-need-change [https://perma.cc/XG5B-SX8B], *with* Ward Jolles, *SC's Graham Says Twitter Made 'Serious Mistake' in Banning Trump,* ABC 15 NEWS (Jan. 9, 2021), https://wpde.com/news/local/scs-graham-says-twitter-made-serious-mistake-in-banning-trump [https://perma.cc/M4QH-V6NZ].

121. Lindsey Graham (@LindseyGrahamSC), TWITTER (Jan. 8, 2021, 8:15 PM), https://twitter.com/LindseyGrahamSC/status/1347713461246169089.

related to electoral politics, the candidate or party negatively affected is likely to disagree vehemently.

For example, before the election, in October 2020, Twitter blocked a controversial *New York Post* article, which reported a Ukrainian business man's alleged emails to Hunter Biden indicating a putative meeting with Joe Biden and seeking to use Hunter Biden's "influence."[122] Twitter initially blocked links to the article as a violation of its "hacked content" policy because the emails allegedly came from a laptop repairperson's unauthorized access to the laptop.[123] But, after backlash from Trump and conservatives, Twitter quickly reversed its decision and revised its "hacked content" policy to apply only to instances in which the hacked content comes directly from the hackers or people working with them.[124] Facebook allowed links to the *New York Post* article but downgraded its prominence on users' news feeds on Facebook pending fact-checking.[125] A week before the election, Republican lawmakers on the Senate Committee on Commerce, Science, and Transportation grilled the CEOs of Twitter and Facebook about their alleged censorship of the *New York Post* article and other content.[126] Two weeks after the election, Republicans on the Senate Judiciary Committee did the same.[127] Lawmakers threatened to saddle the internet platforms with regulation.

---

122.   *See* Kate Conger & Mike Isaac, *In Reversal, Twitter Is No Longer Blocking New York Post Article*, N.Y. TIMES (Dec. 28, 2020), https://www.nytimes.com/2020/10/16/technology/twitter-new-york-post.html.

123.   *See* Arjun Kharpal, *Twitter Changes Hacked Material Policy After Backlash over Blocking NYPost Story About Biden's Son*, CNBC (Oct. 16, 2020, 12:50 PM), https://www.cnbc.com/2020/10/16/twitter-changes-hacked-material-policy-after-blocking-posts-biden-story.html [https://perma.cc/6L2H-8T3J]; Camille Caldera, *Fact Check: Laptop Repairman at Center of Biden Saga Is Alive*, USA TODAY (Dec. 15, 2020, 8:40 PM), https://www.usatoday.com/story/news/factcheck/2020/12/15/fact-check-laptop-repairman-center-hunter-biden-saga-alive/3905393001 [https://perma.cc/RLX9-SGR2] .

124.   Kharpal, *supra* note 123.

125.   *See* Shannon Bond, *Facebook and Twitter Limit Sharing 'New York Post' Story About Joe Biden*, NPR (Oct. 14, 2020, 9:14 PM), https://www.npr.org/2020/10/14/923766097/facebook-and-twitter-limit-sharing-new-york-post-story-about-joe-biden [https://perma.cc/6WJ7-PRMV].

126.   *See At Hearing, Republicans Accuse Zuckerberg and Dorsey of Censorship*, N.Y. TIMES (Oct. 28, 2020, 6:28 PM), https://www.nytimes.com/live/2020/10/28/technology/tech-hearing.

127.   *See Zuckerberg and Dorsey Face Harsh Questioning from Lawmakers*, N.Y. TIMES (Jan. 6, 2021, 7:11 PM), https://www.nytimes.com/live/2020/11/17/technology/twitter-facebook-hearings.

### C. Section 230 of the Communications Decency Act

At the center of the debate over content moderation is Section 230, which provides immunity to internet platforms—but the scope of immunity is now contested. Republican lawmakers have proposed several bills to amend Section 230 in various ways to stop the perceived political bias by internet platforms against Trump and conservatives. Facebook also faces charges of favoritism to President Trump and conservatives on Facebook. Before examining these bills, it is important to understand the morass of case law interpreting—and in some cases misinterpreting—the provision. This section summarizes Section 230 and the circuit split, at least in dicta, in how to interpret the relationship between Section 230(c)(1) and (c)(2). Starting with the Ninth Circuit's decision in *Barnes v. Yahoo!, Inc.*,[128] some courts have misread the two provisions to allow immunity for decisions to remove content under (c)(1).[129] This Article offers and defends the correct interpretation—using a straightforward publication test for Section 230(c)(1)—which does not render the two subsections redundant as some courts do. Under this interpretation, civil claims based on an internet platform's *publication* of third-party content are potentially barred under Section 230(c)(1), while civil claims based on a platform's *removal* of such content are potentially barred under Section 230(c)(2). Thus, contrary to what some district courts have allowed, an internet platform's decision to remove or restrict access to third-party content cannot be protected under Section 230(c)(1). The only provision that applies to such removal is Section 230(c)(2). And, under that subsection, an internet platform's alleged political bias in removing content of a user can be disqualifying of civil immunity if the platform lacked "good faith" in the decision to remove "otherwise objectionable" material.

### 1. The confusion and controversy over Section 230

Section 230 is a source of great controversy and confusion. When the *New York Times* tried to explain it in an article on the front page of its business section, it fundamentally misstated the law in its headline, asserting that Section 230 protected hate speech.[130] The *Times* issued

---

128. 570 F.3d 1096 (9th Cir. 2009).

129. *Id.* at 1100–01.

130. *See* Mike Masnick, *NY Times Joins Lots of Other Media Sites in Totally and Completely Misrepresenting Section 230*, TECHDIRT (Aug. 7, 2019, 9:34 AM), https://www.techdirt.com/articles/20190806/20524742733/ny-times-joins-lots-

one of the most embarrassing corrections perhaps in the history of journalism: "An earlier version of this article incorrectly described the law that protects hate speech on the internet. The First Amendment, not Section 230 of the Communications Decency Act, protects it."[131] Even that correction left out the most important point: Section 230(c)(2) protects internet companies' ability to moderate or remove third-party content that is "objectionable," including hate speech. A day later, the *Times* published an op-ed by Jonathan Taplin that also "misstated the law containing a provision providing safe haven to social media platforms": "It is the Communications Decency Act, not the Digital Millennium Copyright Act."[132] Going for the trifecta of embarrassing errors, the *Times* issued the same correction for an article by Andrew Marantz that had the exact same mistake in confusing the Digital Millennium Copyright Act[133] (DMCA) safe harbor with the CDA immunity.[134]

The *Times* wasn't the only prominent news source to misstate Section 230. CNN published an article that erroneously described the law,[135] while both the *Washington Post* and the *Wall Street Journal* published op-eds by conservatives Charlie Kirk and Dennis Prager that legal commentators said were incorrect.[136] Sarah Jeong, a lawyer and member of the *Times* editorial board, wrote an op-ed refuting the view expressed by Republican lawmakers that Section 230 requires "a

---

other-media-sites-totally-completely-misrepresenting-section-230.shtml [https://perma.cc/ZJ68-B7VD].

131.  Daisuke Wakabayashi, *Legal Shield for Websites Rattles Under Onslaught of Hate Speech*, N.Y. TIMES (Aug. 6, 2019), https://www.nytimes.com/2019/08/06/technology/section-230-hate-speech.html.

132.  Jonathan Taplin, *How to Force 8Chan, Reddit and Others to Clean up*, N.Y. TIMES (Aug. 7, 2019), https://www.nytimes.com/2019/08/07/opinion/8chan-reddit-youtube-el-paso.html#click=https://t.co/pUG8F02xnj.

133.  Pub. L. No. 105-304, 112 Stat. 2860 (1998).

134.  *See* Andrew Marantz, Opinion, *Free Speech Is Killing Us*, N.Y. TIMES (Oct. 4, 2019), https://www.nytimes.com/2019/10/04/opinion/sunday/free-speech-social-media-violence.html.

135.  *See* Brian Fung, *White House Proposal Would Have FCC and FTC Police Alleged Social Media Censorship*, CNN (Aug. 10, 2019, 8:15 AM), https://www.cnn.com/2019/08/09/tech/white-house-social-media-executive-order-fcc-ftc/index.html [https://perma.cc/SA3Y-YPUD] ("Correction: An earlier version of this story incorrectly described what content internet companies may be liable for under Section 230 of the Communications Decency Act.").

136.  *See* Matthew Feeney, *WSJ, WaPo, NYT Spread False Internet Law Claims*, CATO INST. (Aug. 7, 2019, 3:24 PM), https://www.cato.org/blog/newspapers-are-spreading-section-230-misinformation [https://perma.cc/GKZ3-SGMC].

neutral public forum" and "political neutrality" to obtain Section 230's immunity.[137] Jeong contended that this political neutrality interpretation of Section 230 is a "myth . . . with no basis in law or even legislative intent."[138] Jeff Kosseff, who wrote a notable book on the history of Section 230, took the same view:

> Misunderstandings of Section 230's history already have framed the current debate, including claims that Section 230 applies only to "neutral platforms" and assumptions that Congress passed the statute to censor speech through private companies. In reality, Congress passed Section 230 so that platforms could choose not to be neutral and to moderate content based on the demands of their users (rather than regulators or judges).[139]

In testimony about the proposed Platform Accountability and Consumer Transparency (PACT) Act[140] before a Senate committee, Chris Cox, the former U.S. representative and Republican who co-sponsored the bill to enact Section 230 in 1996, agreed:

> Section 230 does not require political neutrality, and was never intended to do so. Were it otherwise, to use an obvious example, neither the Democratic National Committee nor the Republican National Committee websites would pass a political neutrality test. Government-compelled speech is not the way to ensure diverse viewpoints. Permitting websites to choose their own viewpoints is. Websites that choose to be politically neutral, and hold themselves out as such, can be held to this standard. When an internet platform promises its customers—through its advertising, published community standards, and terms of service—that its content moderation policy is politically neutral, then that promise can be enforced both by the government and civil litigants under existing federal and state laws. This is far different than a mandate of political

---

137. Sarah Jeong, *Politicians Want to Change the Internet's Most Important Law. They Should Read It First.*, N.Y. TIMES (July 26, 2019), https://www.nytimes.com/2019/07/26/opinion/section-230-political-neutrality.html#click=https://t.co/tLqhw3KfNm.

138. *Id.*

139. Jeff Kosseff, *What's in a Name? Quite a Bit, if You're Talking About Section 230*, LAWFARE (Dec. 19, 2019, 1:28 PM), https://www.lawfareblog.com/whats-name-quite-bit-if-youre-talking-about-section-230 [https://perma.cc/S649-HLSP]; *see also The PACT Act and Section 230: The Impact of the Law that Helped Create the Internet and an Examination of Proposed Reforms for Today's Online World: Hearing Before the Subcomm. on Commc'ns, Tech., Innovation, & the Internet*, 116th Cong. 11 (2020) (testimony of Jeff Kosseff, Assistant Professor, Cyber Sci. Dep't, U.S. Naval Acad.) [hereinafter *PACT Act Hearings*].

140. S. 4066, 116th Cong. (2020).

neutrality, with the judgment of what is and is not "neutral" placed in the hands of political appointees in Washington.[141]

So, who's right? Does Section 230 require political neutrality as a prerequisite to its immunity? As explained below, I believe both sides are overstating what the text of Section 230 says or does not say—as I believe is evident by the Executive Order, DOJ report, and several bills proposed to *clarify* or *revise* Section 230, especially the meaning of "good faith."[142]

Enacted in 1996, Section 230 was drafted before social media existed. Congress had no idea of all the types or sheer scale of user-generated content that ISPs might find worrisome, whether it be disinformation attacks by foreign trolls, white supremacist propaganda, voter suppression, malicious deepfakes, or COVID-19 misinformation. Section 230's immunity is broad enough to encompass an internet company's "good faith" moderation of all these types of content if the company finds them "otherwise objectionable," even though such moderation is not viewpoint neutral. I disagree with the Republican lawmakers to the extent that they argue Section 230 requires internet platforms to be neutral public forums or maintain "viewpoint neutrality" generally for all content moderation.[143] Content moderation inevitably involves making some decisions that are not politically neutral. To take an easy case, there's no doubt Congress was contemplating that ISPs can moderate nudity and sexually explicit material under Section 230(c)(2)—such material provided a primary impetus to Senator James Exon's indecency bill to which Section 230 was proposed as an alternative approach, but was later included as an amendment to Exon's bill.[144] Yet such content moderation of nudity and sexually explicit material is not politically neutral—it discriminates against the nudist movement.[145] Moreover,

---

141. *PACT Act Hearings*, *supra* note 139, at 17 (testimony of Chris Cox, Former Member, U.S. House of Representatives).

142. *See infra* notes 343, 392, 411 and accompanying text.

143. *See* Jeong, *supra* note 137 (noting Senator Ted Cruz's statement that immunity under Section 230 is "predicate[d]" on neutrality).

144. *See* JEFF KOSSEFF, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET 60–62 (2019). Both Exon's bill and Section 230 were enacted, but the Supreme Court struck down the indecency provisions as violating the First Amendment. *See id.* at 75–76.

145. *See* Livia Gershon, *Better Living Through Nudity*, JSTOR DAILY (Oct. 28, 2018), https://daily.jstor.org/better-living-through-nudity [https://perma.cc/4V5S-NLXT].

all content may be viewed as political in some respect.[146] Moderation of any content is, by definition, not neutral, politically or otherwise.

Yet it's a mistake to conclude that Section 230 gives internet platforms carte blanche. I disagree with Jeong, Kosseff, and Cox to the extent that they argue that the issue is foreclosed—that Section 230 precludes any argument that an internet platform's political bias in content moderation might disqualify it from "good faith" and Section 230(c)(2) immunity. To qualify for immunity from civil lawsuits, an internet platform must act in "good faith" to moderate "material" that it finds "otherwise objectionable."[147] As explained below, although courts have not squarely decided the issue, content moderation decisions lack good faith when they are based purely on the moderator's bias against or favoritism to the political party or affiliation of the user who posted the content. Such moderation wouldn't be based on what's in the "material," but simply on who posted it.

### 2.   The circuit split over Section 230 and the misreading of Section 230(c)(1) as providing immunity for decisions to remove third-party content

Before examining Section 230(c)(2), it is important to understand its relationship with Section 230(c)(1), an issue that has bedeviled courts. One reason for all the confusion over Section 230 is that it has two different immunities in subsection (c), which is titled "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material."[148] Unfortunately, in the public debate over Section 230, the provision is often discussed without differentiation or with the focus on only the first immunity, the so-called "twenty-six words that created the [i]nternet" in Kosseff's memorable phrase.[149] But focusing on Section 230(c)(1) has caused some courts and policy makers to misunderstand the section in its entirety.[150] Section 230(c) has 112

---

146.   *See* Stanley Fish, *Is Everything Political?*, CHRON. OF HIGHER EDUC. (Mar. 29, 2002), https://www.chronicle.com/article/is-everything-political [https://perma.cc/8DAK-3394] ("Everything is political in the sense that any action we take or decision we make or conclusion we reach rests on assumptions, norms, and values not everyone would affirm.").

147.   47 U.S.C. § 230(c)(2).

148.   § 230(c).

149.   *See* KOSSEFF, *supra* note 144, at 2.

150.   *See generally* Mont v. United States, 139 S. Ct. 1826, 1833–34 (2019) (quoting Antonin Scalia & Bryan A. Garner, READING LAW 167 (1st ed. 2012)) (noting "that 'the whole-text canon' requires consideration of 'the entire text, in view of its structure' and 'logical relation of its many parts'").

words, not just 26 words—or 129 words if the informative titles and section numbers are included. One must also consider the 25 words in Section 230(e)(3) that preempt state law: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."[151] This subsection makes Section 230(c)(1) an immunity from liability by preempting state law claims, similar to the express immunity in Section 230(c)(2). Thus, at a minimum, one must understand all 137 words of these subsections, plus the 25 words in the last sentence of (e)(3), to understand the two basic immunities Section 230(c) provides. Given the level of complexity among these subsections, it is perhaps not surprising there is a circuit split, at least in dicta, over the relationship between the two immunities and the proper interpretation of Section 230.

The first immunity, titled "Treatment of Publisher or Speaker," overrules the state law approach allowing online service providers to be liable for defamation based on user content posted on their bulletin boards.[152] In *Stratton Oakmont, Inc. v. Prodigy Services Co.*,[153] the state court concluded that a bulletin board operator that exercised some "editorial control," via technology and human review, over the third-party posts on the bulletin board (to make it more "family oriented"), made the operator a publisher, not a mere distributor, of the content under defamation law, thereby exposing the operator to the same standards of defamation liability that newspapers face.[154] As Justice Ain framed the issue: "In short, the critical issue to be determined by this Court is whether the foregoing evidence establishes a *prima facie* case that PRODIGY exercised sufficient editorial control over its computer bulletin boards to render it a publisher with the same responsibilities as a newspaper."[155] The court concluded Prodigy did: Prodigy Services' "content guidelines" required the removal of user content that violated its "community standards."[156] Once the internet platform engaged in any editorial control of any third-party content on its service, the platform apparently lost its status as a mere distributor of *all* content posted by third parties—regardless of whether the platform had ever reviewed

---

151. § 230(e)(3).
152. *See id.* § 230(c)(1).
153. No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).
154. *See id.* at *2–4.
155. *Id.* at *3.
156. *See id.* at *2.

the content in question. In effect, *Stratton Oakmont* was an all-or-nothing rule: a platform that did any moderation lost its status as a distributor for all content posted on its site. The decision created what some critics, including then-Representative Cox, viewed as a perverse result: internet platforms could be held liable if they tried to monitor and remove defamatory or objectionable material, but would not be held liable if they did nothing and had no knowledge of the offending material, a result reached in *Cubby, Inc. v. CompuServe Inc.*[157] There were other ways to analyze the role of internet platforms under the common law of defamation, but *Stratton Oakmont* arguably created a disincentive for platforms to voluntarily monitor their sites to screen objectionable content because doing so would expose them to greater liability.[158]

To avoid this result, Section 230(c)(1) creates a flat rule of immunity: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[159] Courts have interpreted

---

157. *See PACT Act Hearings, supra* note 139, at 3, 6 (testimony of Chris Cox, Former Member, U.S. House of Representatives); KOSSEFF, *supra* note 144, at 50–52. *Compare Stratton Oakmont,* 1995 WL 323710, at \*5 (finding that Prodigy's choice to have editing power made it a publisher and "opened it up" to liability), *with Cubby, Inc. v. CompuServe Inc.,* 776 F. Supp. 135, 141 (S.D.N.Y. 1991) ("Because CompuServe, as a news distributor, may not be held liable if it neither knew nor had reason to know of the allegedly defamatory Rumorville statements, summary judgment in favor of CompuServe on the libel claim is granted.").

158. Eugene Volokh points out that the *Stratton Oakmont* and *Cubby* courts missed a third category of platforms under defamation law who were not treated as publishers. *See* Eugene Volokh, *47 U.S.C. § 230 and the Publisher/Distributor/Platform Distinction,* VOLOKH CONSPIRACY (May 28, 2020, 11:44 AM), https://reason.com/volokh/2020/05/28/47-u-s-c-%C2%A7-230-and-the-publisher-distributor-platform-distinction. By contrast, Benjamin Zipursky contends that the courts could have applied the traditional republication rule from defamation law in which any republication of another person's defamatory statement could expose the republisher to liability. *See* Benjamin C. Zipursky, *Online Defamation, Legal Concepts, and the Good Samaritan,* 51 VAL. U. L. REV. 1, 4–5 (2016).

159. 47 U.S.C. § 230(c)(1); *see* 141 CONG. REC. H8470 (1995) (statement of Rep. Chris Cox) ("Mr. Chairman, our amendment will do two basic things: First, it will protect computer Good Samaritans, online service providers, anyone who provides a front end to the [i]nternet, let us say, who takes steps to screen indecency and offensive material for their customers. It will protect them from taking on liability such as occurred in the Prodigy case in New York that they should not face for helping us and for helping us solve this problem. Second, it will establish as the policy of the United States that we do not wish to have content regulation by the Federal Government of what is on the [i]nternet, that we do not wish to have a

this section broadly to apply beyond defamation claims to any claim predicated on treating the online service provider as the speaker or the publisher of the allegedly offending content.[160] Even though Section 230(c)(1) is not titled as "immunity" and some courts reject that label,[161] in conjunction with Section 230(e)(3), quoted above, the section operates as an immunity by preempting civil claims that would treat online service providers as the speaker or the publisher of the user content.[162] Although this immunity is important to internet platforms as a shield from civil liability, this subsection is a red herring in the current debate over political neutrality in content moderation. Section 230(c)(1) doesn't speak to content removal, much less require "good faith" when an internet service *publishes* (rather than removes or restricts access to) content of users.

Section 230(c)(2) is the relevant subsection for the debate over political neutrality. It states:

> (2) Civil liability. No provider or user of an interactive computer service shall be held liable on account of—
>
> (A) any action voluntarily *taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable,* whether or not such material is constitutionally protected; or
>
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[163]

Importantly, like subsection (c)(1), this civil immunity applies to both providers *and users* of interactive computer services.[164] Section 230 was intended "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate

---

Federal Computer Commission with an army of bureaucrats regulating the [i]nternet because frankly the [i]nternet has grown up to be what it is without that kind of help from the Government.").

160.   *See* KOSSEFF, *supra* note 144, at 5, 92–93.

161.   *See, e.g.*, City of Chicago. v. Stubhub!, Inc., 624 F.3d 363, 365–66 (7th Cir. 2010) (noting that "subsection (c)(1) does not create an 'immunity' of any kind").

162.   *See* Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009) (explaining how Section 230(c)(1) must be read in conjunction with Section 230(e)(3), which states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

163.   § 230(c)(2) (emphasis added).

164.   *Id.*

online material."[165] Section 230 was also meant to encourage ISPs to be "Good Samaritans" by voluntarily engaging in content moderation and *enabling their users* (especially "parents to restrict their children's access to objectionable or inappropriate online material") the ability to do so as well.[166]

Thus, the combination of both subsections of Section 230(c) is that internet platforms can receive double immunity: first, immunity from liability, such as a defamation claim, predicated on treating them as publishers of content posted on the platforms by their users; and, second, immunity from liability for their voluntary removal or restricting access to such content—i.e., "any action voluntarily *taken in good faith* to restrict access to or availability of material *that the provider or user considers* to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."[167]

Dictum in a Ninth Circuit decision might be interpreted as taking a contrary approach. To the extent it does, I believe it is a misreading of the statute. In *Barnes v. Yahoo!, Inc.*, a "revenge porn" case involving nude photos of the plaintiff posted by her ex-boyfriend, the Ninth Circuit held that a negligent undertaking claim against Yahoo! (for allegedly agreeing to remove the nude photos, but failing to do so) was barred by Section 230(c)(1).[168] The court viewed the tort claim for negligent undertaking as based on Yahoo!'s failure to remove published content: "*But removing content is something publishers do*, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove."[169]

This syllogism attempts to provide a method for determining if a claim is barred by Section 230(c)(1) by identifying if the claim is

---

165. *Id.* § 230(b)(4).
166. *Id.*; *see PACT Act Hearings, supra* note 139, at 11 (testimony of Jeff Kosseff, Assistant Professor, Cyber Sci. Dep't, U.S. Naval Acad.).
167. § 230(c)(2)(A) (emphasis added); *see* KOSSEFF, *supra* note 144, at 65–66 ("Taken together, (c)(1) and (c)(2) mean that companies will not be considered to be the speakers or publishers of third-party content, and they will not lose that protection only because they delete objectionable posts or otherwise exercise good-faith efforts to moderate user content.").
168. *See* Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1105 (9th Cir. 2009); *see also* Danielle Keats Citron & Mary Anne Franks, *Criminalizing Revenge Porn*, 49 WAKE FOREST L. REV. 345, 367–68, 389–90 (2014) (explaining how Section 230 does not apply to criminal laws and advocating for criminal prohibitions against revenge porn).
169. *Barnes*, 570 F.3d at 1103 (emphasis added).

predicated on one of several putative functions of a publisher—what I call the functions test. This approach is apparent in the court's later discussion:

> Subsection (c)(1), by itself, shields from liability *all publication decisions*, whether to edit, *to remove*, or to post, with respect to content generated entirely by third parties. Subsection (c)(2), for its part, provides an additional shield from liability, but only for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider . . . considers to be obscene . . . or otherwise objectionable."[170]

This focus on the putative functions of a publisher is similar to dictum in the Fourth Circuit's discussion of Section 230(c)(1) in the first federal appellate decision interpreting the provision, although the Fourth Circuit did not analyze the relationship with Section 230(c)(2) as the Ninth Circuit did.[171] The Ninth Circuit's language about publication involving "decisions . . . whether . . . to remove" third-party content might suggest that a platform's *decisions to remove third-party content* are protected by Section 230(c)(1)—in addition to being protected under (c)(2). But the court's suggestion was mere dictum given that *Barnes* involved a challenge to the failure to remove published content rather than its removal.

The Ninth Circuit does not appear to have decided a case applying *Barnes*'s view of Section 230(c)(1) to an internet service's removal of third-party content (as opposed to its publication) in a precedential decision. However, an unpublished Ninth Circuit decision treated MySpace's decision to remove the plaintiff's profile under Section 230(c)(1) without much analysis.[172] And, following *Barnes*, the District

---

170. *Id.* at 1105 (emphasis added) (citing § 230(c)(2)(A)).

171. *See* Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997) ("Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."); *see also* FTC v. LeadClick Media, LLC, 838 F.3d 158, 174 (2d Cir. 2016) ("'At its core, § 230 bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'" (quoting Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 406 (6th Cir. 2014))).

172. *See* Riggs v. MySpace, Inc., 444 F. App'x 986, 987 (9th Cir. 2011); *see also* Eric Goldman, *MySpace Quietly Won Goofy 230 Ruling in September—Riggs v. MySpace*, TECH. & MKTG. L. BLOG (Nov. 30, 2009), https://blog.ericgoldman.org/archives/2009/11/myspace_quietly.htm [https://perma.cc/EK68-H7X7] ("The court's decision is even more puzzling because 230(c)(2), which immunizes a service provider for filtering

Court for the Northern District of California has interpreted *Barnes* as treating an internet service's decisions to remove third-party content as potentially immunized under *both* (c)(1) and (c)(2).[173] For example, the district court in *Lancaster v. Alphabet*[174] ruled:

> Defendants' decision to "remov[e] content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher." . . . Accordingly, the Court holds that § 230(c)(1) of the CDA precludes as a matter of law any claims arising from Defendants' removal of Plaintiff's videos and GRANTS the motion to dismiss to the extent that Plaintiff seeks to impose liability as a result of said removals.[175]

In a 2020 decision, the Southern District of New York agreed with this approach, while noting a split among district courts.[176]

To add to the confusion, the Seventh Circuit has suggested, in dicta, that Section 230(c)(1) should be read in a way different from *Barnes*: either as a definition (not an immunity) that clarifies that internet platforms "lose the benefit of § 230(c)(2) if it created the objectionable information" or as a bar that "forecloses any liability that depends on deeming the ISP a 'publisher' . . . while permitting the states to regulate ISPs in their capacity as intermediaries."[177] Judge Easterbrook, who advanced this alternative set of interpretations, did so to preserve a way for states to regulate ISPs and "require ISPs to protect third parties who may be injured by *material posted on their services.*"[178]

---

content it subjectively deems 'objectionable,' seems to squarely cover MySpace's deletion of Riggs' account. Could the court have intended to rule for MySpace on 230(c)(2) grounds, not 230(c)(1) grounds, and just got confused?").

173.  *See, e.g.*, Enhanced Athlete Inc., v. Google LLC, No. 19-cv-08260-HSG, 2020 WL 4732209, at *2–4 (N.D. Cal. Aug. 14, 2020); Ebeid v. Facebook, Inc., No. 18-cv-07030-PJH, 2019 WL 2059662, at *5 (N.D. Cal. May 9, 2019); Darnaa, LLC v. Google, Inc., No. 15-cv-03221-RMW, 2016 WL 6540452, at *7–8 (N.D. Cal. Nov. 2, 2016); Lancaster v. Alphabet Inc., No. 15-cv-05299-HSG, 2016 WL 3648608, at *3 (N.D. Cal. July 8, 2016); Sikhs for Justice "SFJ," Inc. v. Facebook, Inc., 144 F. Supp. 3d 1088, 1093–94 (N.D. Cal. 2015); Levitt v. Yelp! Inc., Nos. C-10-1321 EMC, C-10-2351 EMC, 2011 WL 5079526, at *6–7 (N.D. Cal. Oct. 26, 2011), *aff'd on other grounds*, 765 F.3d 1123 (9th Cir. 2014).

174.  No. 15-cv-05299-HSG, 2016 WL 3648608 (N.D. Cal. July 8, 2016).

175.  *Id.* at *3 (quoting *Barnes*, 570 F.3d at 1103).

176.  *See* Domen v. Vimeo, Inc., 433 F. Supp. 3d 592, 601–04 (S.D.N.Y. 2020).

177.  Doe v. GTE Corp., 347 F.3d 655, 660 (7th Cir. 2003).

178.  *Id.* (emphasis added).

Let me first explain why part of Judge Easterbrook's interpretation is a misreading of Section 230 before focusing on the Ninth Circuit's misreading in *Barnes*. The idea that Section 230(c) was meant to preserve a way for state regulation of internet services runs counter to a stated goal of Section 230: "[T]o preserve the vibrant and competitive free market that presently exists for the [i]nternet and other interactive computer services, *unfettered by Federal or State regulation.*"[179] Indeed, it is hard to imagine that Congress's preemption of the conflicting approaches state courts took in defamation cases before Section 230 was meant as an invitation for states to regulate providers of internet services for third-party content. In a later decision, Judge Easterbook defended his interpretation that Section 230(c)(1) should not be read as a "grant of comprehensive immunity from civil liability for content provided by a third party."[180] Judge Easterbook pointed to an internet service's liability for contributory infringement under federal copyright law, such as in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,[181] as an example to support his view.[182] But this example shows the fallacy of the interpretation. Congress added a specific exclusion of intellectual property laws from the immunities in Section 230.[183] This exclusion indicates that Congress understood that the text of Section 230 might otherwise apply to intellectual property claims. By contrast, for Section 230's effect on state laws, Congress expressly preempted "inconsistent" state law claims and liability.[184] As explained below, Judge Easterbook's second interpretation—i.e., that Section 230(c)(1) "forecloses any liability that depends on deeming the ISP a 'publisher'"—is close to the correct interpretation.

To return to *Barnes*, the Ninth Circuit's interpretation is also a misreading of Section 230. It renders (c)(2) mere surplusage of (c)(1).[185] If nearly every decision by a provider of an interactive

---

179. 47 U.S.C. § 230(b)(2) (emphasis added).

180. Chi. Laws.' Comm. for C.R. Under L., Inc. v. Craigslist, Inc., 519 F.3d 666, 670 (7th Cir. 2008).

181. 545 U.S. 913 (2005).

182. *Craigslist, Inc.*, 519 F.3d at 670 (citing *Metro-Goldwyn-Mayer Studios Inc.*, 545 U.S. at 913)).

183. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.").

184. *Id.*

185. *See* TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (detailing the canon against interpreting a statutory provision into mere surplusage).

computer service to remove third-party content falls within (c)(1), there is no need for (c)(2), which has greater requirements for such removal, including a "good faith" requirement that (c)(1) lacks. Providers of interactive computer services wouldn't have to follow (c)(2)'s "good faith" requirement to obtain immunity when removing third-party content; they would automatically receive immunity under (c)(1) simply by virtue of being providers of interactive computer services for third-party content. But this reading of (c)(1) eviscerates (c)(2). As the Middle District of Florida concluded: "But interpreting the CDA this way results in the general immunity in (c)(1) swallowing the more specific immunity in (c)(2). Subsection (c)(2) immunizes only an interactive computer service's 'actions taken in good faith.' If the publisher's motives are irrelevant and always immunized by (c)(1), then (c)(2) is unnecessary."[186]

The *Barnes* court attempts to save (c)(2) from mere surplusage by suggesting that some providers of interactive computer services might fall outside of (c)(1) immunity (e.g., if they were partly responsible for developing the content) but could qualify for (c)(2) immunity if they later restricted access to the content.[187] The court cited its divided en banc opinion in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*[188] as an example of a provider of interactive computer services, Roommates.com, that fell outside of (c)(1) immunity for user profiles on its site because it participated too much in the creation of the user profiles "by helping 'develop' at least 'in part' the information."[189] But, just as in *Barnes, Roommates.com* involved the publication of content, not its removal. So, the *Barnes* court imagines a hypothetical case of content removal to suggest how its reading of (c)(1) does not render (c)(2) mere surplusage.

This hypothetical possibility suggested by *Barnes* is too slender a reed to save (c)(2) from redundancy with (c)(1). When internet platforms, such as Twitter, Facebook, or even the early bulletin boards, remove or restrict access to third-party content, the content typically was created by their users or third parties. It would be odd, if not absurd, for Congress to enact two immunities in (c)(1) and

---

186. e-ventures Worldwide, LLC v. Google, Inc., No. 2:14-cv-646-FtM-PAM-CM, 2017 WL 2210029, at *3 (M.D. Fla. Feb. 8, 2017).

187. *See* Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1103 (9th Cir. 2009).

188. 521 F.3d 1157 (9th Cir. 2008) (en banc).

189. *Id.* at 1165; *see Barnes*, 570 F.3d at 1105 (citing *Roommates.com*, 521 F.3d at 1162–63).

(c)(2) that provided immunity for the *exact* same removal of third-party content. Why would Congress impose, under (c)(2), a "good faith" requirement on internet platforms only when they moderate content they created or developed, as the Ninth Circuit apparently proposes, but not when they moderate third-party content? A "good faith" requirement is only meaningful when platforms remove someone else's content. Indeed, it is hard to conceive of any lawsuit based on an internet platform's removal of its own content unless it was the platform suing itself—an absurdity on its face. If, as *Barnes* suggested, the only circumstance of content removal that (c)(2) covers that (c)(1) does not is when a provider of an interactive computer service is also the information content provider, meaning a creator or developer of the material in question, Congress could have directly stated so in (c)(2).[190] But it didn't.

### 3.    The correct reading of Section 230(c)(1): "publisher" under the publication test

#### a.    Treating as a "publisher" requires user content whose publication (not removal) is the basis of alleged liability

The functions test for "publisher," which treats even decisions to remove content as a function of a publisher and therefore potentially immune under Section 230(c)(1), is unmoored from the common law meaning of publisher, as well as the legislative history of Section 230 as a response to *Stratton Oakmont* and *Cubby*. Section 230(c)(1)'s inclusion of "publisher or speaker" is a nod to defamation.[191] A simpler, more direct interpretation would follow the basic common law meaning of publisher with the added identification of what Section 230(c)(1) was meant to preempt from the prior cases. Benjamin Zipursky recognized this key insight in 2016.[192] Zipursky's

---

190.    *See generally* Azar v. Allina Health Servs., 139 S. Ct. 1804, 1813 (2019) ("So we're left with nothing but the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way.").

191.    *See* Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 686 (4th Cir. 1989) ("Public figures may not recover in a libel action absent clear and convincing proof of actual malice or of reckless disregard of the truth on *the part of the speaker or publisher of the false statements.*") (emphasis added).

192.    *See* Zipursky, *supra* note 158, at 17–18.

analysis is illuminating—and well worth its own consideration—but my framing, focus, and interpretation of Section 230 are different.[193]

Although Section 230's immunity broadly bars claims beyond defamation,[194] the meaning of "publisher" is best understood under its common law meaning from defamation law.[195] To prove defamation, "the plaintiff must demonstrate that: (1) the defendant *published a defamatory statement*; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was *published to a third person*; and (4) the plaintiff's reputation suffered injury as a result of the statement."[196] In other words, a publisher is responsible for a *publication* of the statement. Without a publication, defamation law does not treat the defendant as a publisher, such as in a case in which the defendant did not make an actionable statement to a third party.[197] As the leading torts treatise instructs regarding the common-law meaning of publishers:

> Those who are in the business of making their facilities available to disseminate the writings composed, the speeches made, and the information gathered by others may also be regarded as participating to such an extent in making the books, newspapers, magazines, and information available to others as to be regarded as publishers. They are intentionally making the contents available to others, sometimes without knowing all of the contents—including the defamatory content—and sometimes without any opportunity to ascertain, in advance, the defamatory matter was to be included in the matter published. *The question is to what extent should one who is in the business of making available to the general public what another*

---

193. Zipursky's framing of how to understand the relationship between Section 230(c)(1) and (c)(2) focuses on tort law's recognition of an affirmative duty created based on voluntary undertakings to aid (the so-called "Good Samaritan," which Section 230(c)'s title itself references). *Id.* at 35–40. It goes beyond the scope of this Article to discuss the differences between Zipursky's article and mine.

194. *See* 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

195. *See* Zeran v. Am. Online, Inc., 129 F.3d 327, 331–34 (4th Cir. 1997) (applying common law principles to "publisher"). *See generally* Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.").

196. Cweklinsky v. Mobil Chem. Co., 837 A.2d 759, 763–64 (Conn. 2004) (emphasis added); *see* RESTATEMENT (SECOND) OF TORTS § 558 (AM. L. INST. 1977).

197. *See* Cuellar v. Walgreens Co., No. 13–00–594–CV, 2002 WL 471317, at *4 (Tex. Ct. App. Mar. 28, 2002); Brockman v. Detroit Diesel Allison Div. of Gen. Motors Corp., 366 N.E.2d 1201, 1203 (Ind. Ct. App. 1977).

*writes or says be subject to liability for the defamatory matter that was published.* In this connection, it is necessary to classify participants into three categories: primary publishers, secondary publishers or disseminators, and those who are suppliers of equipment and facilities and are not publishers at all.[198]

Thus, under the common law, to determine if a defendant is a publisher and potentially liable based on a publication, one must examine if (1) there is a publication ("matter that was published" to a third party) and, if so, (2) whether the defendant should be considered a publisher of the publication based on the defendant's involvement in the publication. If there's no publication, the second inquiry drops out. In other words, in the absence of a publication, there's no need to consider if the defendant was a publisher under the common law.

Section 230(c)(1)'s reference to "publisher" must be interpreted against this common law background, but with the added understanding that the provision overrules the prior case law's approach to internet platforms. In short, Section 230 preempts the second inquiry above. In cases involving civil claims based on third-party content, courts do not ask "(2) whether the defendant should be considered a publisher of the publication by the defendant's involvement in the publication." Why not? Because Section 230(c)(1) precludes it: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."[199] Section 230(c)(1) preempts examination of an internet service's involvement in the publication of third-party content online. As long as the defendant is a "provider of an interactive computer service" and the third-party content was "provided by another information content provider," the defendant will not be treated as the publisher. Instead

---

198. W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 113, at 803 (5th ed. 1984) (emphasis added). In the first federal appellate case interpreting Section 230, the Fourth Circuit relied on this common-law understanding of publisher. *See Zeran*, 129 F.3d at 332 (quoting W. PAGE KEETON ET AL., *supra*, § 113, at 803). In explaining how the common law treated distributors of allegedly defamatory content as publishers once they had notice of the alleged defamation, the court described how an internet service, given such notice, "must decide whether to publish, edit, or withdraw the posting," thereby assuming "the publisher role." *Id.* at 332–33. On this basis, the court interpreted Section 230(c)(1) as applying also to what the common law of defamation described as distributors. *Id.* at 330–34

199. 47 U.S.C. § 230(c)(1).

of examining whether the defendant should be considered a publisher by its involvement in the publication as the courts in *Cubby* and *Stratton Oakmont* did, courts examine under Section 230(c)(1) whether the online content was "creat[ed]" or "develop[ed]" by a third-party (i.e., "another information content provider") and not the defendant.[200] This statutory examination of who "creat[ed]" or "develop[ed]" the information in question is a different inquiry than determining who is the publisher under the common law; at least for the term "develop[ed]," courts apply a test of whether the defendant made a "material contribution" to the unlawful aspect of the content beyond its public display.[201] And courts exclude from "creat[ed]" and "develop[ed]" the traditional functions of a publisher, such as making the content publicly available; otherwise, the terms would swallow the rule against treating the internet platform as the publisher of third-party content.[202]

If courts apply this "publication" test to the meaning of "publisher" in Section 230(c)(1), courts have a straightforward inquiry—one that does not render (c)(2) mere surplusage. To determine if the claim is barred by Section 230(c)(1) under what I call the publication test, courts should examine if the claim attempts to hold the internet service liable based in part on the third-party content's *publication or public availability* on the internet service. If so (and the other conditions of (c)(1) are met, including that the content was created or developed "by *another* information content provider"[203]), the claim is barred. The publication does not have to be a formal, prima facie element of the claim, but the claim's proof of liability must involve a publication, thereby effectively treating the defendant as a publisher.[204]

---

200. § 230(f)(3) ("The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the [i]nternet or any other interactive computer service."); *see, e.g.*, Batzel v. Smith, 333 F.3d 1018, 1031 (9th Cir. 2003) ("The 'development of information' therefore means something more substantial than merely editing portions of an e-mail and selecting material for publication."), *superseded in part by statute on other grounds as stated in*, Breazeale v. Victim Servs., Inc., 878 F.3d 759, 766–67 (9th Cir. 2017).

201. *See, e.g.*, Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 410–12 (6th Cir. 2014).

202. *See, e.g.*, O'Kroley v. Fastcase, Inc., 831 F.3d 352, 355 (6th Cir. 2016).

203. 47 U.S.C. §§ 203(c)(1), 203(f)(3).

204. *Cf.* Force v. Facebook, Inc., 934 F.3d 53, 64–65, 64 n.18 (2d Cir. 2019) (discussing "publisher" and relationship to publication in analyzing Section 230(c)(1).

In *Barnes*, the negligent undertaking claim did so. The claim was predicated on the revenge porn's *publication or public availability* on Yahoo!, and Yahoo!'s failure to remove the publication from the site. There's no need for the court to speculate about other putative functions of a publisher. What's essential is the existence of a *publication* of third-party content on the internet service.[205] If the case involved defamatory content instead of revenge porn, the analysis of publisher is even more obvious. Take *Stratton Oakmont*. The plaintiff claimed that the defendant internet service that operated bulletin boards should be held liable for the *publication* of a defamatory post because the defendant "was a 'publisher' of statements concerning Plaintiffs on its . . . computer bulletin board for the purposes of Plaintiffs' libel claims."[206] To determine if the defendant was a "publisher" of the publication in question, the New York state court used the common law meaning of "publisher" and focused on the level of "editorial control" the defendant internet service exercised over the bulletin board.[207] In the part that Section 230(c)(1) later overruled, the court concluded that the defendant exercised enough editorial control in the publications on its bulletin board because the defendant publicly promoted its control and it "actively utilize[ed] technology and manpower to delete notes from its computer bulletin boards on the basis of offensiveness and 'bad taste.'"[208] Section 230(c)(1) now preempts this inquiry.

Instead, under Section 230(c)(1), courts should simply ask if:

(1) the content in question involves a publication created and developed by a third party (i.e., "another information content provider") and not by the internet service (i.e., the "provider of an interactive computer service"), and

(2) does the plaintiff's claim seek to impose liability on the internet service based on the content's publication or public availability on the service ("treated as the publisher")?

If the answer to both questions is yes, the claim is barred under Section 230(c)(1). For example, the *Barnes* "revenge porn" case

---

205. *See, e.g.*, Fields v. Twitter, Inc., 200 F. Supp. 3d 964, 975 (N.D. Cal. 2016) (alteration in original) ("In defamation law, the term 'publication' means 'communication [of the defamatory matter] intentionally or by a negligent act to one other than the person defamed.'" (quoting Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1104 (9th Cir. 2009)).

206. Stratton Oakmont, Inc. v. Prodigy Servs. Co., No. 31063/94, 1995 WL 323710, at *1 (N.Y. Sup. Ct. May 24, 1995).

207. *Id.* at *3.

208. *Id.* at *4.

involved such a scenario,[209] as did *Stratton Oakmont*.[210] Alternatively, if the answer to either question is no, the claim is *not* barred under Section 230(c)(1). For example, *Roommates.com* involved a scenario in which a divided Ninth Circuit found that some of the content was not developed solely by third parties, but also involved the defendant's development, thereby making the defendant an information content provider.[211] In *Erie Insurance Co. v. Amazon.com, Inc.*,[212] the Fourth Circuit held that products liability claims against Amazon as the seller of an allegedly defective headlamp were "not based on the publication of another's speech" and therefore were not barred by Section 230(c)(1).[213]

Falling outside of (c)(1) immunity does not necessarily mean an internet platform has no immunity under Section 230. Section 230(c)(2) provides a second immunity for claims related to removing or restricting access to third-party content, as discussed below. These claims do not seek to impose liability based on a *publication* or the *public availability* of third-party content. Instead, they seek to impose liability based on the exact opposite: the absence or removal of a publication.

The publication test is the correct interpretation of Section 230. Under this approach, Section (c)(1) applies to an internet platform's decisions *not* to remove content published by third parties on the platform—meaning there is a *publication* of third-party content that is the subject of the lawsuit—as was the case in *Barnes*, while (c)(2) applies to a platform's decisions to remove or restrict third-party content.

The two subsections work in tandem, but in a complementary, not a redundant way. Claims based on the failure to remove objectionable content, such as defamation, contained in a third-party publication on an internet service fall within (c)(1). Claims based on the removal of such content fall within (c)(2). Moreover, a platform's decisions to remove some third-party content under (c)(2)—akin to what Prodigy Services did with respect to its bulletin boards—does not transform a

---

209. *See Barnes*, 570 F.3d at 1098–99, 1102–03.

210. *See Stratton Oakmont*, 1995 WL 323710, at *1, *4.

211. Fair Hous. Council of San Fernando Valley v. Roommates.com, 521 F.3d 1157, 1165–66 (9th Cir. 2008) (en banc).

212. 925 F.3d 135 (4th Cir. 2019).

213. *Id.* at 139–40 ("There is no claim made based on the *content of speech published* by Amazon—such as a claim that Amazon had liability as the publisher of a misrepresentation of the product or of defamatory content.").

platform into a publisher of third-party content, a general principle recognized by (c)(1). Thus, (c)(1) protects a platform's publication of third-party content, while (c)(2) gives platforms incentives to engage in some content moderation with the grant of immunity.[214]

Some passages even in *Barnes* support this reading,[215] as do some subsequent Ninth Circuit decisions.[216] Appearing to backtrack from Judge Easterbrook's first interpretation noted above, the Seventh Circuit's discussion in *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*,[217] also appears to follow the publication test.[218] To determine if Section 230(c)(1) barred a Fair Housing Act[219] claim against the website craigslist for publishing allegedly discriminatory ads posted by third parties, the Seventh Circuit simply examined whether the Fair Housing Act claim sought to impose liability on craigslist based

---

214. The *Barnes* court suggested it would be "strange" for Congress to give equal immunity for ISPs that did not remove third-party content and those that did. *Barnes*, 570 F.3d at 1105; *see also* Doe v. GTE Corp., 347 F.3d 655, 659–60 (7th Cir. 2003) (discussing, without deciding, various ways to interpret the interrelationship of Section 230(c)(1) and (c)(2)). But there's nothing strange about this approach, given Congress's stated preference in Section 230 "to preserve the vibrant and competitive free market that presently exists for the [i]nternet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). In other words, Congress chose the carrot of immunity for content moderation, but did not require it.

215. *See Barnes*, 570 F.3d at 1105 ("[S]ubsection (c)(2) also protects [i]nternet service providers from liability not for publishing or speaking, but rather for actions taken to restrict access to obscene or otherwise objectionable content."); *id.* at 1105 n.11 ("It might be more straightforward to narrow the meaning of 'publisher' liability to include only affirmative acts of publication but not the refusal to remove obscene material. That path, however, is closed to us."). This passage seems to indicate that the Ninth Circuit in *Barnes* viewed decisions to remove third-party content as falling under (c)(2), not (c)(1).

216. *See, e.g.*, Kimzey v. Yelp! Inc., 836 F.3d 1263, 1268 (9th Cir. 2016) ("There is likewise no question that Kimzey's claims are premised on Yelp's publication of Sarah K's statements and star rating."); Zango, Inc. v. Kaspersky Lab, Inc., 568 F.3d 1169, 1174–75 (9th Cir. 2009) ("Section 230(c)(1) is directly aimed at the problem created by the *Stratton* decision. Section 230(c)(2)(B), on the other hand, covers actions taken to enable or make available to *others* the technical means to restrict access to objectionable material."). In an unpublished decision, the Ninth Circuit treated Facebook's decision to de-publish and then re-publish the same content the plaintiff sold to a competitor as falling within Section 230(c)(1). Fyk v. Facebook, Inc., 808 F. App'x 597 (9th Cir. 2020). The re-publication aspect of the case makes it fall within Section 230(c)(1), in my view.

217. 519 F.3d 666 (7th Cir. 2008).

218. *Id.* at 670.

219. 42 U.S.C. §§ 3601–19, 3631.

on the content's publication on craigslist.[220] The claim did, according to the court: "[O]nly in a capacity as publisher could craigslist be liable under § 3604(c) [of the Fair Housing Act]," which makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any . . . discrimination based on race, color, religion, sex, handicap, familial status, or national origin."[221] Notice the Seventh Circuit didn't discuss the putative functions of publishers. Instead, the Seventh Circuit applied the publication test: the claim in question was predicated on attributing responsibility of a publication of third-party content to the internet service. In an opinion written by Judge Sutton, the Sixth Circuit took a similar approach.[222]

My proposed interpretation of Section 230 is also consistent with part of Justice Thomas's interpretation in a statement he wrote in a denial of certiorari in *Malwarebytes, Inc. v. Enigma Software Group USA, LLC*.[223] Justice Thomas criticized the functions test elaborated in *Barnes*, which has "curtailed the limits Congress placed on decisions to remove content."[224] As Justice Thomas concluded, "The decisions that broadly interpret § 230(c)(1) to protect traditional publisher functions also eviscerated the narrower liability shield Congress

---

220.  *Craigslist, Inc.*, 519 F.3d at 671.

221.  *Id.* at 668, 671 (quoting § 3604(c)).

222.  *See, e.g.*, O'Kroley v. Fastcase, Inc., 831 F.3d 352, 355 (6th Cir. 2016) (alterations in original) ("If a website displays content that is created entirely by third parties, . . . [it] is immune from claims predicated on that content." (quoting Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 408 (6th Cir. 2014))).

223.  *See* 141 S. Ct. 13, 14 (2020) ("Enacted at the dawn of the dot-com era, § 230 contains two subsections that protect computer service providers from some civil and criminal claims. The first is definitional. It states, 'No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' § 230(c)(1). This provision ensures that a company (like an e-mail provider) can host and transmit third-party content without subjecting itself to the liability that sometimes attaches to the publisher or speaker of unlawful content. The second subsection provides direct immunity from some civil liability. It states that no computer service provider 'shall be held liable' for (A) good-faith acts to restrict access to, or remove, certain types of objectionable content; or (B) giving consumers tools to filter the same types of content. § 230(c)(2). This limited protection enables companies to create community guidelines and remove harmful content without worrying about legal reprisal.").

224.  *Id.* at 17. Justice Thomas also questioned the case law holding that Section 230(c)(1)'s reference to "publishers" was meant to preclude distributor liability. *Id.* at 15–16. This issue is analyzed below.

included in the statute."[225] (As explained later, I disagree with Justice Thomas's additional suggestion that to "be treated as a publisher" does not encompass liability against distributors.)

The publication test provides a better, more straightforward interpretation of "publisher" in Section 230(c)(1) than the functions test that some courts employ. Under the publication test, decisions to remove content do not fall with (c)(1) because liability in such cases are not predicated on a publication. The removal of content involves the absence of a publication, which does not state a legal claim predicated on a publication of offending material.

### b.  Does "publisher" include distributors?

A final issue related to Section 230(c)(1) must be discussed because it affects the publication test discussed above. In his statement in *Malwarebytes*,[226] Justice Thomas suggested an even bigger misreading: that all courts interpreting the provision, starting in 1997 with the Fourth Circuit in *Zeran v. America Online, Inc.*,[227] have misinterpreted "publisher" to include distributors of third-party content.[228] If Justice Thomas's suggestion is correct, then Section 230(c)(1)'s immunity is far narrower than courts have uniformly recognized. Even defamation claims, such as in *Stratton Oakmont*, would be allowed against internet platforms for publishing third-party content if they had actual or constructive knowledge of the defamatory content. Internet platforms would face far greater legal liability than the current understanding of Section 230: *every* civil claim would fall outside of Section 230(c)(1) immunity as long as it has a knowledge requirement. This predicament would likely result in the unintended consequence of far more proactive, if not draconian, removal of user content by internet platforms—which critics decry as censorship. Judge J. Harvie Wilkinson III astutely foresaw this problem back in 1997, when social media didn't even exist.[229] Given the "sheer number of postings on interactive computer services," internet platforms "would have a natural incentive simply to remove messages upon notification, whether the contents were defamatory or not."[230] This problem would be exponentially

---

225.  *Id.* at 16.
226.  *Id.* at 15.
227.  129 F.3d 327 (4th Cir. 1997).
228.  *See Malwarebytes*, 141 S. Ct. at 15.
229.  *See Zeran*, 129 F.3d at 333.
230.  *Id.* (citing Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 777 (1986)).

worse in 2021 as the number of internet users and sheer scale of user-generated content have reached astronomical proportions.[231]

As explained below, I believe *Zeran* reached the correct interpretation of "publisher," given its common law meaning. Section 230(c)(1) bars courts from treating providers of an interactive computer service as "the publisher or speaker" of third-party content in a civil claim.[232] The uniform interpretation of "publisher" among courts that Justice Thomas questioned comes from *Zeran*, in which the Fourth Circuit rejected the plaintiff's argument that Section 230(c)(1) only preempts claims of publisher liability, but not distributor liability.[233] The plaintiff raised a negligence claim based on AOL's failure to remove alleged defamatory content even though he had provided repeated notice to AOL.[234] To avoid the Section 230(c)(1) immunity, the plaintiff argued that that it should be interpreted to allow the approach of *Cubby, Inc. v. CompuServe Inc.*, and to bar only the approach of *Stratton Oakmont*. In *Stratton Oakmont* the court held that the defendant ISP was a publisher akin to a newspaper under defamation law (therefore subject to liability without a requirement of knowledge),[235] whereas in *Cubby* a different court held that the defendant ISP was a distributor akin to a bookseller under defamation law (therefore subject to a knowledge-based requirement for liability).[236]

In rejecting the plaintiff's argument, the Fourth Circuit held that distributor liability "is merely a subset, or a species, of publisher liability, and is therefore also forceclosed by § 230."[237] In other words, "publisher" includes a distributor under the common law. The distinction between distributor and publisher liability "signifies only that different standards of liability may be applied *within* the larger

---

231. In 1997, the internet had 70 million users (or 1.7% of the world's population); in 2020, the number reached 4.8 billion users (or 62% of the world's population). *See Internet Growth Statistics*, INTERNET WORLD STATS, https://www.internetworldstats.com/emarketing.htm [https://perma.cc/MZB3-F98T]. By one estimate, Twitter alone receives 500 million tweets each day and 200 billion tweets each year. *See* David Sayce, *The Number of Tweets per Day in 2020*, DAVID SAYCE, https://www.dsayce.com/social-media/tweets-day [https://perma.cc/U4WD-6LYM].

232. 47 U.S.C. § 230(c)(1).

233. *Zeran*, 129 F.3d at 331–32.

234. *Id.* at 328.

235. Stratton Oakmont, Inc. v. Prodigy Servs. Co., No. 31063/94, 1995 WL 323710, at *5 (N.Y. Sup. Ct. May 24, 1995).

236. *See* Cubby, Inc. v. CompuServe Inc., 776 F. Supp. 135, 141 (S.D.N.Y. 1991).

237. *Zeran*, 129 F.3d at 332.

publisher category, depending on the specific type of publisher concerned."[238] "Because the publication of a statement is a necessary element in a defamation action, *only one who publishes can be subject to this form of tort liability*."[239] In support, the Fourth Circuit quoted a passage from the influential *Prosser and Keeton on the Law of Torts*: "Those who are in the business of making their facilities available to disseminate the writings composed, the speeches made, and the information gathered by others may also be regarded as participating to such an extent in making the books, newspapers, magazines, and information available to others as *to be regarded as publishers*."[240] And, in a passage not quoted by the Fourth Circuit, the *Prosser and Keeton* treatise offers three categories based on this recognition: "primary publishers, *secondary publishers or disseminators*, and those who are suppliers of equipment and facilities and are not publishers at all."[241]

Justice Thomas questioned *Zeran*'s interpretation, however:

> [H]ad Congress wanted to eliminate both publisher and distributor liability, it could have simply created a categorical immunity in § 230(c)(1): No provider "shall be held liable" for information provided by a third party. After all, it used that exact categorical language in the very next subsection, which governs removal of content. § 230(c)(2).[242]

Moreover, given that *Stratton Oakmont* used the terms "publisher" and "distributor"—but without Prosser and Keeton's categorization of distributors as publishers—"one might expect Congress to use the same terms *Stratton Oakmont* used" if Congress meant to preclude both approaches to liability.[243] Indeed, Congress could have just included "distributor" in the phrase "publisher or speaker." Justice Thomas's suggested alternative reading of Section 230(c)(1) has some force.[244] Some early commentary also disagreed with *Zeran*.[245]

---

238.   *Id.*

239.   *Id.* (emphasis added).

240.   *Id.* (emphasis added) (quoting W. PAGE KEETON ET AL., *supra* note 198, § 113, at 803).

241.   W. PAGE KEETON ET AL., *supra* note 198, § 113, at 803 (emphasis added).

242.   Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 16 (2020).

243.   *Id.*

244.   *See id.* Justice Thomas also pointed to Section 223(d) of the Communications Decency Act, 47 U.S.C. § 223(d)(1)(B)), which recognizes criminal liability for individuals who "use[] an interactive computer service" to "'knowingly . . . display' obscene material to children." *Id.* at 15 (quoting § 223(d)(1)(B)). This section of the CDA was from Senator James Exon's bill that prohibited the knowing transmission of "patently offensive" content to minors. *See* Communications Decency Act of 1996, Pub. L. 104-104, 110 Stat. 133, 133–34. The Court struck down the "patently

**App. 693**

On the other hand, *Zeran*'s interpretation of distributor as publisher finds considerable support in the common law and the Supreme Court's own precedents. Section 230(c)(1)'s mention of "publisher or speaker" is a clear reference to the common law of defamation. The Supreme Court recognizes a canon of construction "that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses."[246] And, as Justice Thomas recently reaffirmed, "[i]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."[247]

As *Zeran* noted, the term "publisher" under the common law of defamation applied to distributors of materials. One traditional way

---

offensive" prohibition as a violation of the First Amendment. *See* Reno v. ACLU, 521 U.S. 844, 877–79 (1997). In *Malwarebytes*, Justice Thomas concluded: "It is odd to hold, as courts have, that Congress implicitly eliminated distributor liability in the very Act in which Congress explicitly imposed it." *Malwarebytes*, 141 S. Ct. at 15.

But the answer to Justice Thomas's criticism can be found in the text of Section 230(e)(1), which states: "Nothing in this section shall be construed to impair *the enforcement of section 223* or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute." § 230(e)(1) (emphasis added). Section 230(e)(1) does not bar "the enforcement of section 223," including by civil enforcement against "common carriers" under Section 207, which predicates liability on "provisions of this chapter." § 207. Thus, Section 230 does not eliminate liability created by Section 223(d); instead, Section 230 expressly preserves it. Also, it is unclear whether Section 223(d) even preserves distributor liability. Section 223(d)(1) applies to an individual who knowingly "uses an interactive computer service to display" prohibited content to minors. § 223(d)(1)(B). Section 230, however, distinguishes between a "provider" and a "user" of an interactive computer service. § 230(c)(1). Arguably, one who "uses an interactive computer service" is the user, not the provider. Moreover, Section 223(d)(2) makes it a crime for anyone who "knowingly permits any telecommunications facility under such person's control to be used for an activity prohibited by paragraph (1)," but requires "the intent that it be used for such activity." § 223(d)(2). Intent is a higher standard than the knowledge requirement for distributor liability under defamation law.

245.  *See, e.g.,* Susan Freiwald, *Comparative Institutional Analysis in Cyberspace: The Case of Intermediary Liability for Defamation,* 14 HARV. J.L. & TECH. 569, 637–41 (2001); David R. Sheridan, *Zeran v. AOL and the Effect of Section 230 of the Communications Decency Act upon Liability for Defamation on the Internet,* 61 ALB. L. REV. 147, 168 (1997); *see also* KOSSEFF, *supra* note 144, at 95 (arguing that the more limited reading of "publisher" was one that the Fourth Circuit "could have reasonably adopted").

246.  Universal Health Servs., Inc. v. United States *ex rel.* Escobar, 136 S. Ct. 1989, 1999 (2016) (quoting Sekhar v. United States, 570 U.S. 729, 732 (2013)).

247.  Stokeling v. United States, 139 S. Ct. 544, 551 (2019) (quoting Hall v. Hall, 138 S. Ct. 1118, 1128 (2018)).

of viewing the issue under the common law was that a distributor was treated as a publisher of the defamatory material if the distributor had knowledge of its defamatory content. As the Supreme Court of Minnesota explained in a 1978 decision, "[t]hose who merely deliver or transmit defamatory material previously published by another *will be considered to have published* the material only if they knew, or had reason to know, that the material was false and defamatory."[248] This understanding of distributor-as-publisher was adopted in a noteworthy 1985 federal district court decision in *Dworkin v. Hustler Magazine, Inc.*,[249] and was commonly recognized in law review articles between 1984 and 1996, when the CDA was enacted, including in discussion of how to analyze liability for bulletin boards and online dissemination.[250] Indeed, contemporaneous legal commentary even described *Cubby*, which supposedly involved distributor liability, as involving the approach to "secondary publishers."[251]

The traditional approach of distributor-as-publisher dates back to the English common law, which placed the burden on the defendant: the defendant distributor was presumptively treated as a publisher of defamatory content based on a prima facie case of defamation. As Lord Esher explained in *Emmens v. Pottle*,[252] to rebut the presumption of being a publisher, the distributor had the affirmative burden to show it lacked actual or constructive knowledge of the defamatory content to establish that the distributor "did not publish the libel."[253]

---

248. *See* Church of Scientology of Minn. v. Minn. State Med. Ass'n Found., 264 N.W.2d 152, 156 (Minn. 1978) (emphasis added).

249. *See* 611 F. Supp. 781, 785–86 (D. Wyo. 1985).

250. *See, e.g.*, Jeffrey M. Taylor, *Liability of Usenet Moderators for Defamation Published by Others: Flinging the Law of Defamation into Cyberspace*, 47 FLA. L. REV. 247, 269–70 (1995) (treating distributors as "secondary publishers" under the common law); Loftus E. Becker, Jr., *The Liability of Computer Bulletin Board Operators for Defamation Posted by Others*, 22 CONN. L. REV. 203, 215–16, 226–27 (1989) (same); Robert Charles, Note, *Computer Bulletin Boards and Defamation: Who Should Be Liable? Under What Standard?*, 2 J.L. & TECH. 121, 131 (1987) (same).

251. *See* R. Timothy Muth, *Old Doctrines on a New Frontier: Defamation and Jurisdiction in Cyberspace*, 68 WISC. LAW. 10, 12 (1995) (explaining *Cubby* as based on principle that "'[s]econdary publishers' such as libraries and bookstores are not held liable for statements in the books they offer unless they know, or have reason to know, of the existence of defamatory material in a book").

252. [1885] 16 QBD 354 (Eng.).

253. *See id.* at 357; *see also* Brief of Amici Curiae Amazon.com, Inc. et al. at 23–30, Barrett v. Rosenthal, 40 Cal. 4th 33 (No. S122953), 2004 WL 3256404 (discussing case law regarding distributor liability).

The *Emmens* doctrine (known as the defense of innocent dissemination in the United Kingdom) was influential.[254] For example, in *Vizetelly v. Mudie's Select Library, Ltd.*,[255] the Queen's Bench Division upheld the jury's finding of libel against a library (i.e., a distributor) that circulated a libelous book to the public.[256] The library claimed it had no knowledge of the contents of the book; even though the jury agreed, it rejected the library's defense.[257] On appeal, the court found sufficient evidence for the jury to reject the library's defense on the ground that the library's own negligence was the reason for their lack of knowledge of the libelous book.[258] As Lord Justice Archibald Levin Smith concluded: "That being so, they failed to do what the defendants in *Emmens v. Pottle* succeeded in doing, namely, prove that *they did not publish the libel.*"[259] Thus, *Emmens* framed liability for distributors in terms of whether they should be treated as a publisher: "The question is whether, as such disseminators, *they published the libel.*"[260] For a distributor to be treated as a publisher meant the distributor was liable. Conversely, if the distributor was not treated as a publisher, the distributor was not liable.

Thus, under this traditional common law understanding, to "be treated as the publisher" in Section 230(c)(1) should be interpreted to include distributors. As explained above, before the passage of Section 230 in 1996, a traditional understanding of "publisher" dating back to the English common law was that a distributor who had knowledge of defamatory content was treated as a publisher of the content (indeed, the English common law was even stronger in *presuming* a distributor was a publisher based on a prima facie case of defamation even without proof of knowledge).[261] The 1984 *Prosser and Keeton* treatise recognized this traditional understanding of distributors when classifying distributors as "secondary publishers."[262] In 1971, Prosser summarized the principle in this way: "Likewise *every one* who takes part in the publication, as in the case of the owner, editor, printer,

---

254.   *See* Douglas W. Vick & Linda Macpherson, *An Opportunity Lost: The United Kingdom's Failed Reform of Defamation Law*, 49 FED. COMM. L.J. 621, 630 & n.45 (1997).

255.   [1900] 2 QB 170 (Eng.).

256.   *Id.* at 175.

257.   *Id.* at 176.

258.   *Id.*

259.   *Id.* at 177 (emphasis added).

260.   *Id.* at 175 (emphasis added).

261.   *See supra* notes 253–60 and accompanying text.

262.   *See* W. PAGE KEETON ET AL., *supra* note 198, § 113, at 803.

vendor, or even carrier of a newspaper *is charged with publication*, although so far as strict liability is concerned the responsibility of some of these has been somewhat relaxed."[263] Legal commentary in 1939 recognized the distributor-as-publisher doctrine and its English common law antecedents even more saliently:

> But it is settled by the English decisions and the few American cases on the point that *such secondary publishers who sell, rent, give, or otherwise circulate defamatory matter* originally published by a third person will be excused from liability if they show that there was no reason to know of its defamatory character.[264]

And, if there's any doubt, one need only examine the two cases that prompted Congress to enact Section 230. Even though *Cubby* and *Stratton Oakmont* did not directly discuss the distributor-as-publisher doctrine, the cases they relied on did. In its analysis of liability for distributors, *Cubby* cited[265] as its main authority *Lerman v. Chuckleberry Publishing, Inc.*,[266] which, in turn, relied on *Balabanoff v. Fossani*,[267] a New York state decision that includes as authority two decisions of other state supreme courts that recognize the traditional common-law approach in treating distributors as publishers of defamatory content unless they can show they had no knowledge of it.[268] Indeed, both cases quoted the rule from *Emmens*, the seminal English case that framed the distributor-as-publisher approach.[269] Likewise, *Stratton Oakmont* cited[270] *Cubby* and *Auvil v. CBS 60 Minutes*,[271] which framed the question of conduit liability—that the court likened to liability for book sellers (i.e., distributors)—in the following terms: "The

---

263. WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 113, at 768–69 (4th ed. 1971) (emphasis added) (footnotes omitted).

264. Ralph E. Helper, *Libel and Slander — Privilege of "Fair and Accurate Report" of Judicial Proceedings — Non-Liability of Vendor of Newspaper*, 37 MICH. L. REV. 1335, 1336 (1939).

265. *See* Cubby, Inc. v. CompuServe Inc., 776 F. Supp. 135, 139 (S.D.N.Y. 1991).

266. 521 F. Supp. 228, 235 (S.D.N.Y. 1981) (citing Balabanoff v. Fossani, 81 N.Y.S.2d 732 (N.Y. Sup. Ct. 1948)) ("With respect to distributors, the New York courts have long held that vendors and distributors of defamatory publications are not liable if they neither know nor have reason to know of the defamation.").

267. 81 N.Y.S.2d 732 (N.Y. Sup. Ct. 1948).

268. *Id.* at 733 (citing Bowerman v. Detroit Free Press, 283 N.W. 642, 645 (Mich. 1939); Street v. Johnson, 50 N.W. 395, 396 (Wis. 1891)).

269. *See Bowerman*, 283 N.W. at 645 (citing Emmens v. Pottle, [1885] 16 QBD 354 (Eng.)); *Street*, 50 N.W. at 396 (same).

270. *See* Stratton Oakmont, Inc. v. Prodigy Servs. Co., No. 31063/94, 1995 WL 323710, at *3 (N.Y. Sup. Ct. May 24, 1995).

271. 800 F. Supp. 928 (E.D. Wash. 1992).

threshold inquiry is whether a local broadcaster who serves as a mere conduit 'republishes' by relaying an unedited feed."[272] Like "publishes," "republishes" is a term of art that here refers to the republication rule that holds liable everyone who "republishes" defamatory content.[273] For its discussion of distributor liability, *Auvil* relied on the federal district court's analysis in *Dworkin v. Hustler Magazine, Inc.*[274] Although *Auvil* cited the court's dismissal of the defamation claim against distributor Inland Empire Periodicals,[275] the *Dworkin* court had issued an earlier decision dismissing the claim against distributor Park Place Market.[276] That earlier decision in *Dworkin* relied on Prosser and Keeton's classification of distributors as "secondary publishers": "The general rule for *secondary publishers*, as stated in § 581 of the Second Restatement of Torts, is that 'one who only delivers or transmits defamatory matter published by a third person is subject to liability if, but only if, he knows or has reason to know of its defamatory character.'"[277] Thus, both *Cubby* and *Stratton Oakmont* relied on cases that recognized the distributor-as-publisher doctrine as a part of the common law. Both cases were decided under New York common law, which has used the terms "published" and "publisher" to describe when distributors and conduits are liable as publishers.[278] It's noteworthy the Court of Appeals of New York later agreed with and adopted *Zeran*'s interpretation of Section 230 and "publisher."[279] Had the *Zeran* court's understanding of distributor liability as a subset of

---

272.   *Id.* at 931.

273.   *See* Cianci v. New Times Publ'g Co., 639 F.2d 54, 60–61 (2d Cir. 1980).

274.   634 F. Supp. 727 (D. Wyo. 1986); *see Auvil*, 800 F. Supp. at 931–32 (quoting *Dworkin*, 634 F. Supp. at 729).

275.   *See Dworkin*, 634 F. Supp. at 729.

276.   *See* Dworkin v. Hustler Magazine, Inc., 611 F. Supp. 781, 785–86 (D. Wyo. 1985).

277.   *Id.* at 785 (emphasis added); *see id.* at 785–86 (quoting W. PAGE KEETON ET AL., *supra* note 198, § 113, at 810).

278.   *See, e.g.*, Anderson v. N.Y. Tel. Co., 320 N.E.2d 647, 647 (N.Y. 1974) (adopting the appellate court's dissenting opinion); Anderson v. N.Y. Tel. Co., 345 N.Y.S.2d 740, 751 (N.Y. App. Div. 1973) (Witmer, J., dissenting) (emphasis added) ("The telephone company cannot be liable to plaintiff under the law of defamation *unless it is held that by providing service to Jackson it 'published' his messages* and did so under circumstances such that the 'publication' was not privileged."); Wolfson v. Syracuse Newspapers, 18 N.E.2d 676, 679 (N.Y. 1939) (Rippey, J., dissenting) (per curiam) (emphasis added) (citing Vizetelly v. Mudie's Select Library, Ltd., [1900] 2 QB 170 (Eng.)) ("[I]n the case of a circulating library which bought, sold or rented books as a business for private profit, the proprietors *would be held responsible as publishers*.").

279.   *See* Shiamili v. Real Estate Grp. of N.Y., Inc., 952 N.E.2d 1011, 1016–17 (N.Y. 2011).

publisher liability been contrary to New York common law, the Court of Appeals of New York presumably would have said so.

*Zeran*'s interpretation better promotes an express policy of Section 230 "to preserve the vibrant and competitive free market that presently exists for the [i]nternet and other interactive computer services, unfettered by Federal or State regulation."[280] By contrast, interpreting Section 230 to permit civil claims based on knowledge would invite extensive—potentially conflicting—state regulation of the internet. The ramifications are sweeping: *every* civil claim would fall outside of Section 230(c)(1) immunity as long as it has a knowledge requirement. That result does not square with a "free market" that is "unfettered by Federal or State regulation." Although Justice Thomas appeared to question *Zeran*'s reliance on the express purposes of the statute,[281] a textualist reading of a statute permits consideration of a stated policy in the text of a statute.[282] *Zeran* adopts a categorical approach, which Justice Scalia recommended in interpreting the text of a statute.[283] Moreover, a categorical approach to immunity under Section 230 helps to avoid the potential dormant Commerce Clause problem in which different, possibly conflicting state law approaches create an excessive burden on interstate commerce.[284]

### 4.  Decisions to remove or restrict access to content should be analyzed under Section 230(c)(2)'s immunity

Once we have the correct interpretation of Section 230(c)(1), the key question for content removal decisions is: does Section 230(c)(2)'s requirement of "good faith" moderation of "otherwise objectionable" material mean that internet platforms must avoid political bias or remain politically neutral in content moderation to obtain (c)(2) immunity? As

---

280.  47 U.S.C. § 230(b)(2).

281.  Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 15 (2020) (alteration in original) ("In reaching this conclusion, the court stressed that permitting distributor liability 'would defeat the two primary purposes of the statute,' namely, 'immuniz[ing] service providers' and encouraging 'selfregulation.'").

282.  *See, e.g.*, Rapanos v. United States, 547 U.S. 715, 737 (2006) (Scalia, J.) (examining the Clean Water Act's stated policy in interpreting "waters" under the Act).

283.  *See* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175, 1183 (1989) ("[U]nless such a statutory intent is express or clearly implied, courts properly assume that 'categorical decisions may be appropriate and individual circumstances disregarded when a case fits into a genus in which the balance characteristics tips in one direction.'" (quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 775 (1989))).

284.  *See generally* Pike v. Bruce Church, 397 U.S. 137, 142 (1970).

explained below, "good faith" is not defined by statute, but at least one type of situation lacks good faith: when an internet platform removes the content of a user solely based on the user's political party or affiliation. In such case, the internet platform's decision lacked good faith because it was not even based on the actual "material" or anything "otherwise objectionable" in the content, but simply based on the user's political party. Thus, if an internet platform removed the content of a politician simply because the platform wanted the politician to lose the election, that removal decision is not entitled to Section 230(c)(2) immunity.

### a. "Good faith" is a subjective standard that affords leeway

Courts have interpreted "good faith" to denote a subjective standard.[285] Under a subjective standard, an internet platform has wide latitude to moderate what "*the provider . . . considers . . . otherwise objectionable.*"[286] This favors interpreting Section 230 to contain no general requirement of political neutrality.

For example, Facebook considers a political or religious position taken against same-sex marriage that included an image of a same-sex couple as a violation of its community standard.[287] Facebook says it will remove the violating content.[288] Such content moderation would constitute viewpoint discrimination—against the view that same-sex marriage is wrong. Under a subjective standard of good faith, Facebook's decision falls within Section 230(c)(2). This conclusion is analogous to the one reached by the district court for the Southern

---

285.  *See, e.g.*, Domen v. Vimeo, Inc., 433 F. Supp. 3d 592, 603–04 (S.D.N.Y. 2020) (citation omitted) ("Section 230(c)(2) is focused upon the provider's subjective intent of what is 'obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable.' That section 'does not require that the material actually be objectionable; rather, it affords protection for blocking material "that the provider or user considers to be" objectionable.'" (quoting Zango, Inc. v. Kaspersky Lab, Inc., No. C07-0807-JCC, 2007 WL 5189857, at *4 (W.D. Wash. Aug. 28, 2007))); Levitt v. Yelp! Inc., No. C-10-1321-EMC, C-10-2351-EMC, 2011 WL 5079526, at *7 (N.D. Cal. Oct. 26, 2011) ("That § 230(c)(2) expressly provides for a good faith element omitted from § 230(c)(1) indicates that Congress intended not to import a subjective intent/good faith limitation into § 230(c)(1)."), *aff'd*, 765 F.3d 1123 (9th Cir. 2014).

286.  47 U.S.C. § 230(c)(2)(A).

287.  *See* Monika Bickert, *Hard Questions: Why Do You Leave up Some Posts but Take down Others?*, FACEBOOK (Apr. 24, 2018), https://about.fb.com/news/2018/04/community-standards-examples [https://perma.cc/RR5R-FYUV].

288.  *Id.*

District of New York in *Domen v. Vimeo, Inc.*[289] The court held that Vimeo's removal of Church United's videos that Vimeo found violated its stated policy against content that "promote[s] Sexual Orientation Change Efforts (SOCE)" fell within Section 230(c)(2).[290] Although the plaintiffs argued that Vimeo did not act in good faith, the complaint contained "no facts to support this allegation."[291] The allegations indicated that Vimeo followed its own stated community guidelines in removing the videos.[292] Neither Facebook nor Vimeo was viewpoint neutral in these examples, but both acted in good faith according to their community guidelines to moderate "otherwise objectionable" content.

Further support for this interpretation is provided by Section 230(c)(2)'s extension of immunity to content moderation by a "user" regarding what the "*user considers* to be . . . otherwise objectionable."[293] Congress had envisioned both "the development of technologies which maximize *user control* over what information is received by individuals, families, and schools who use the [i]nternet" and "the development and utilization of blocking and filtering technologies that empower *parents* to restrict their children's access to objectionable or inappropriate online material."[294] Given that Congress wanted to promote technologies that "*maximize user control* over what information" they or their families receive, it is hard to imagine that *maximizing* user-based content moderation would entail *limiting* a user from viewpoint discrimination even though the "*user considers [it] to be . . . otherwise objectionable.*"[295]

Imagine that an internet platform gave users the ability to choose to screen out content that criticized same-sex marriage as unnatural or a sin. If a person or parents subjectively believed such content was objectionable and not appropriate for them or their children to view, presumably their decision to moderate the content they "*consider . . . objectionable*" is taken in good faith. If Congress intended the permissible scope of "good faith" content moderation of "otherwise objectionable"

---

289.   433 F. Supp. 3d 592, 603 (S.D.N.Y. 2020).

290.   *Id.* at 603–04.

291.   *Id.* at 604.

292.   *Id.* ("[W]hat occurred here is that Vimeo applied its Guidelines to remove Plaintiffs' videos, since such videos violated the Guidelines.").

293.   47 U.S.C. § 230(c)(2).

294.   *Id.* § 230(b)(3), (4) (emphasis added).

295.   *Id.* § 230(b)(3), (c)(2)(A) (emphasis added).

material to differ between the "provider" and the "user of an interactive computer service," Congress included no words in Section 230(c)(2) recognizing such a distinction. Perhaps one can argue that the purpose of maximizing user control implies that users should have greater leeway than internet platforms in deciding what constitutes "good faith" content moderation than what constitutes "good faith" moderation by ISPs. However, this interpretation runs up against the canon of construction that recognizes a rebuttable presumption that the same term in a statute has the same meaning;[296] presumably, the canon is even stronger where, as here, it is the exact same term in the same subsection.

### b. Does "otherwise objectionable" limit the permissible bases for content moderation under Section 230(c)(2)?

On the other hand, one might argue that the catchall term "otherwise objectionable" under Section 230(c)(2) should be read narrowly to limit the discretion of internet companies. Judge Conti of the Northern District of California held that the phrase "otherwise objectionable" does not apply to whatever an internet platform subjectively considers to be objectionable; instead, "otherwise objectionable" content must be "offensive."[297] Judge Conti pointed to the section heading, "Protection for 'Good Samaritan' Blocking and Screening of *Offensive* Material," as well as the *eiusdem generis* canon of construction that favors interpreting the catchall "otherwise objectionable" to be similar in kind to the immediately preceding words "obscene, lewd, lascivious, filthy, excessively violent, harassing" in the same phrase.[298] Judge Conti ruled that YouTube's proffered reason—a user improperly inflating the view count for a video on YouTube—did not constitute "otherwise objectionable" content.[299] Judge Conti cited two other district court opinions that ruled that a content moderation policy regarding pricing and cancellation

---

296.   *See* Env't Def. v. Duke Energy Corp., 549 U.S. 561, 574 (2007).

297.   *See* Song fi Inc. v. Google, Inc., 108 F. Supp. 3d 876, 883–84 (N.D. Cal. 2015) ("[T]he fact that the statute requires the user or service provider to subjectively believe the blocked or screened material is objectionable does not mean anything or everything YouTube finds subjectively objectionable is within the scope of Section 230(c).").

298.   *Id.* at 882–83.

299.   *See id.* at 883–84.

information in Google ads online by mobile providers[300] and eBay's content moderation of "an auction of potentially-counterfeit coins"[301] fell outside Section 230(c)(2)'s meaning of "objectionable" content.[302] This narrow interpretation of Section 230 supports the view that an internet platform cannot invoke Section 230(c)(2)'s immunity for content moderation based on an internet platform's disagreement with the political viewpoint of the user; the content itself must be "offensive" in a way similar to "obscene, lewd, lascivious, filthy, excessively violent, [or] harassing" content.[303]

However, this very narrow interpretation of Section 230(c)(2)'s meaning of "objectionable" content is open to criticism. The interpretation ignores the plain meaning of "otherwise" and runs the risk of rendering the catchall phrase "otherwise objectionable" into mere surplusage, denoting the same thing as the other listed categories.[304] The dictionary definition of "otherwise" is "in a *different* way or manner," "in *different* circumstances," and "in *other* respects."[305] Thus, a more plausible reading of the catchall term "otherwise objectionable" is that it refers to things the provider considers objectionable in a *different* way or manner, in *different* circumstances, or in *other* respects than "obscene, lewd, lascivious, filthy, excessively violent, [or] harassing" content. Given the plain meaning of "otherwise," the "*noscitur a sociis*" canon of construction of interpreting a word by the company it keeps does not apply.[306] Indeed, to read "otherwise objectionable" in narrow

---

300. *See* Goddard v. Google, Inc., No. C 08-2738, 2008 WL 5245490, at *6 (N.D. Cal. Dec. 17, 2008).

301. Nat'l Numismatic Certification, LLC. v. eBay, Inc., No. 6:08-CV-42-ORL-19GJK, 2008 WL 2704404, at *25 (M.D. Fla. July 8, 2008). However, the court's decision appears to render the catchall "objectionable" equivalent to and redundant of the other listed categories. *Id.* ("Accordingly, the Court concludes that 'objectionable' content must, at a minimum, involve or be similar to pornography, graphic violence, obscenity, or harassment.").

302. *See Song fi*, 108 F. Supp. 3d at 883.

303. 47 U.S.C. § 230(c)(2)(A).

304. *See, e.g.*, National Numismatic Certification, LLC. v. eBay, Inc, No. 6:08-CV-42-ORL-19GJK, 2008 WL 2704404, at *25 (M.D. Fla. July 8, 2008) ("Accordingly, the Court concludes that 'objectionable' content must, at a minimum, involve or be similar to pornography, graphic violence, obscenity, or harassment.").

305. *Otherwise*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/otherwise [https://perma.cc/V2GB-HYVX].

306. *See* Russell Motor Car Co. v. United States, 261 U.S. 514, 519–20 (1923) ("Rules of statutory construction are to be invoked as aids to the ascertainment of the meaning or application of words otherwise obscure or doubtful. They have no place, as this Court has many times held, except in the domain of ambiguity.").

fashion would contradict one of Section 230's stated goals to "maximize user control" over the content they view.[307] Users might find some content (e.g., white supremacist propaganda, or opposition to same-sex or interracial marriage) to be objectionable—or offensive, for that matter—for reasons completely unrelated to sex, violence, or harassment. As the Ninth Circuit recognized: "If the enumerated categories are not similar, they provide little or no assistance in interpreting the more general category. . . . We think that the catchall was more likely intended to encapsulate forms of unwanted online content that Congress could not identify in the 1990s."[308]

### c.   Removing user content based solely on identity of a user, such as the user's political party or affiliation, falls outside of Section 230(c)(2) immunity

I believe "otherwise objectionable" should be understood as a broad catchall term that does not generally require viewpoint neutrality. However, this approach doesn't give complete discretion to internet platforms. Decisions based solely on the identity of the user—such as the person's political affiliation—fall outside of Section 230(c)(2)'s immunity because they are not based on anything "otherwise objectionable" in the "material." As such, there was no action "taken in good faith to restrict access to or availability of *material* that the provider . . . considers to be . . . otherwise objectionable."[309] Instead, the action was taken against a user whose *identity*—such as political affiliation or party—the internet platform considers to be objectionable. By the plain text of Section 230(c)(2), such a removal decision does not fall within the immunity because the decision was not based on anything "otherwise objectionable" in the "material" itself.

Although no court has considered the precise issue of alleged bias against a user's political affiliation in content moderation,[310] consider

---

307.   *See* 47 U.S.C. § 230(b)(3).

308.   Enigma Software Grp. USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040, 1051–52 (9th Cir. 2019).

309.   § 230(c)(2) (emphasis added).

310.   Other than the text of Section 230, including its several stated purposes, courts have little in the way of legislative history on what constitutes an "action . . . taken in good faith to restrict access to . . . otherwise objectionable" content. *Id.*; *see* 141 CONG. REC. H8470 (1995) (statement of Rep. Chris Cox) ("We can keep away from our children things not only prohibited by law, but prohibited by parents. That is where we should be headed, and that is what the gentleman from Oregon [Mr. Wyden] and I are doing."). Former Representative Cox's later statement before a

the controversy over Facebook's alleged blocking of access to the Facebook page of the nonprofit group Sikhs for Justice (SFJ) in India.[311] SFJ alleged that Facebook took such action without explanation, "'on its own or on the behest of the Government of India,' because of discrimination against Plaintiff and Plaintiff's members on the grounds of race, religion, ancestry, and national origin."[312] Even when SFJ requested an explanation, Facebook allegedly didn't respond.[313] The district court for the Northern District of California ruled that Section 230(c)(1) provided immunity for Facebook's decisions,[314] but the court's ruling is based on the misreading of (c)(1) discussed above. Section 230(c)(2) is the correct provision that governs content moderation. Under (c)(2), SFJ's claims would not be barred, assuming the complaint satisfies the general requirement of pleading sufficient allegations to support the claims.[315] SFJ claimed that Facebook completely blocked SFJ's page based not on the content, but simply on the *religious identity* of SFJ's members who "oppos[ed] the forced conversions of religious minorities to Hinduism that have allegedly taken place in India since the election of Prime Minister Narendra Modi."[316] I agree with Justice Thomas's suggestion in *Malwarebytes* that this case may have been wrongly decided.[317] Assuming there were sufficient allegations of discriminatory animus in the complaint, the alleged conduct would fall outside of Section 230(c)(2) immunity. It is noteworthy that Facebook's content moderation decisions in India have also been questioned as showing favoritism to the ruling party instead of being based on Facebook's

---

Senate Committee in 2020 is considered "[p]ost-enactment legislative history" and, at least to some judges, "not a legitimate tool of statutory interpretation." Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011); *see PACT Act Hearings, supra* note 139, at 17 (testimony of Chris Cox, Former Member, U.S. House of Representatives).

311.  *See* Sikhs for Justice "SFJ," Inc. v. Facebook, Inc., 144 F. Supp. 3d 1088, 1090 (N.D. Cal. 2015), *aff'd*, Sikhs for Justice, Inc. v. Facebook, Inc., 697 F. App'x 526 (9th Cir. 2017).

312.  *Id.* at 1090.

313.  *Id.*

314.  *Id.* at 1096.

315.  *See generally* Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009) ("But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2)) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007))).

316.  *See Sikhs for Justice "SFJ," Inc.*, 144 F. Supp. 3d at 1090.

317.  *See* Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 18 (2020).

own stated policies.[318] If Facebook removes content because of the user's political affiliation, even or especially if at the behest of the ruling political party, such a decision does not fall within Section 230(c)(2). It is a decision based on the identity of the user, not the actual material.

### d. A decision following a company's own stated policies can be evidence of good faith

The more difficult question involves a situation in which an internet platform says it removed user content that violates a stated policy of the company (typically its community guidelines) and explains the reason to the user, but the user contends the reason was pretextual and based instead on a discriminatory reason, such as the user's political party.

*Domen* takes the right approach. An internet platform's removal of user content that violates the platform's stated policies regarding "objectionable" content falls within Section 230(c)(2), absent specific allegations of "bad faith" to satisfy the standards of pleading (and eventual proof at trial).[319] We might call this approach the "stated policy" approach to "good faith" moderation—similar to Cox's interpretation described above.[320] As long as the internet platform has a stated policy addressing such moderation of content, the platform's decision to enforce its stated policy would fall within good faith moderation—absent some evidence that the platform's decision was pretextual and was based instead on an improper reason unrelated to the content itself.

This approach allows internet platforms to engage in viewpoint discrimination, but gives them incentives to provide adequate notice to their users of what content is impermissible to share. For example, in 2019, Facebook expanded its ban on content promoting white supremacy to include white nationalism and white separatism on

---

318. *See, e.g.*, Newley Purnell & Jeff Horwitz, *Facebook Executive Supported India's Modi, Disparaged Opposition in Internal Messages*, WALL ST. J. (Aug. 30, 2020, 1:42 PM), https://www.wsj.com/articles/facebook-executive-supported-indias-modi-disparaged-opposition-in-internal-messages-11598809348; Newley Purnell, *Facebook's Top Public Policy Executive in India Steps down*, WALL ST. J. (Oct. 27, 2020, 12:24 PM), https://www.wsj.com/articles/facebook-s-top-public-policy-executive-in-india-steps-down-11603807845.

319. *See* Domen v. Vimeo, Inc., 433 F. Supp. 3d 592, 603–04 (S.D.N.Y. 2020).

320. *See supra* note 141 and accompanying text.

Facebook.[321] Under the "stated policy" approach, Facebook acts in "good faith" by moderating such content that it considers "objectionable," according to its stated policy, even though it constitutes overt viewpoint discrimination.[322] Conversely, imagine that a new internet platform marketed itself as the "social media for conservatives" and adopted a community standard banning as "objectionable" content promoting Antifa, immigration, or radical left-wing ideas. Under the "stated policy" approach, content moderation enforcing this stated policy would be in "good faith," even though discriminating based on political viewpoint. The lack of a stated policy for a company's decision to remove user content does not necessarily indicate "bad faith," but the internet platform still must explain why it removed the user content with a reason that is not arbitrary.[323]

This approach is consistent with the Section 230(c)(2) case law. For example, a district court in Florida rejected a motion to dismiss by Google and recognized sufficient pleading of bad faith based on the allegations that Google had delisted 231 websites affiliated with the plaintiff's search engine optimization company from Google's search engine "solely based upon the websites' affiliation with e-ventures, which did not fall within any of Google's listed reasons that it would remove a website from its search results."[324] However, courts have rejected arguments to defeat Section 230(c)(2) immunity simply based on the internet platform's "failure to remove all such [violating] content" from its site, which is somewhat akin to a selective enforcement claim.[325] Courts have also been deferential to the internet platforms' "good faith" determination of "objectionable" material.[326] In deciding motions to dismiss, courts have tended to be

---

321. *Standing Against Hate*, FACEBOOK (Mar. 27, 2019), https://about.fb.com/news/2019/03/standing-against-hate [https://perma.cc/YSF7-KQ9C]

322. *See generally PACT Act Hearings*, *supra* note 139, at 17 (testimony of Chris Cox, Former Member, U.S. House of Representatives).

323. *Id.*

324. e-ventures Worldwide, LLC v. Google, Inc., 188 F. Supp. 3d 1265, 1269–71, 1273 (M.D. Fla. 2016). One court held that an internet company's failure to "respond to Plaintiff's repeated requests for an explanation why it continually blocked Plaintiff's outgoing e-mail" might be bad faith. *See* Smith v. Trusted Universal Standards in Elec. Transactions, Inc., No. 09-4567, 2011 WL 900096, at *9 (D.N.J. Mar. 15, 2011); Eric Goldman, *Online User Account Termination and 47 U.S.C. § 230(c)(2)*, 2 U.C. IRVINE L. REV. 659, 665 (2012).

325. *See* Pennie v. Twitter, Inc., 281 F. Supp. 3d 874, 890 (N.D. Cal. 2017).

326. *See, e.g.*, Holomaxx Techs. v. Microsoft Corp., 783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011) (finding that "it is clear from the allegations of the complaint itself

skeptical of "lack of good faith" claims asserted against internet companies with conclusory allegations that do not satisfy the requirement of adequate pleading.[327]

The "stated policy" approach doesn't give internet platforms complete discretion to adopt any content moderation policy to fall within Section 230's immunity. Section 230 is limited to moderation of "material," not users.[328] Content moderation must be based on the actual content posted by the user, as the text of Section 230 indicates ("material that the provider or user considers to be . . . otherwise objectionable").[329] Thus, even if an internet platform had a stated policy of promoting content consistent with a certain religion or political party, the platform's decision to remove "objectionable" content solely based on the person's political affiliation would not qualify as action in "good faith." Internet platforms can suspend or take actions against the accounts of users for repeated or other violations of their policies, such as terrorist groups,[330] but Section 230(c)(2)'s immunity applies only to moderation of "material."

The lines between political affiliation and political viewpoint may get blurred. For example, QAnon is a conspiracy theory about the so-called "deep state."[331] It is not a political party per se, although believers in QAnon are often portrayed as right-wing supporters of Trump.[332] In July 2020, Twitter suspended 7,000 accounts involving "'QAnon' activity" for violations of its policy against content

---

that Microsoft reasonably could conclude that Holomaxx's e-mails were 'harassing' and thus 'otherwise objectionable'").

327.  *See, e.g.*, Domen v. Vimeo, Inc., 433 F. Supp. 3d 592, 603–04 (S.D.N.Y. 2020) (rejecting lack of good faith allegation where complaint merely alleged "that Vimeo applied its Guidelines to remove Plaintiffs' videos, since such videos violated the Guidelines"); e360Insight, LLC v. Comcast Corp., 546 F. Supp. 2d 605, 609 (N.D. Ill. 2008) (finding inadequate pleading of lack of good faith); Donato v. Moldow, 865 A.2d 711, 727 (N.J. Super. Ct. App. Div. 2005) (rejecting the argument of bad faith based on the bare allegation that an operator of a community bulletin board knew the plaintiffs and "published the defamatory statements with actual malice").

328.  47 U.S.C. § 230.

329.  *Id.* § 230(c)(2)(A).

330.  *See About*, GLOBAL INTERNET F. TO COUNTER TERRORISM, https://www.gifct .org/about [https://perma.cc/B3KL-VDEY].

331.  *See* Adrienne LaFrance, *The Prophecies of Q*, ATLANTIC (June 2020), https://www.theatlantic.com/magazine/archive/2020/06/qanon-nothing-can-stop-what-is-coming/610567/?utm_source=newsletter&utm_medium=email&utm_campaign=atlantic-daily-newsletter&utm_content=20200722&silverid-ref=NTg4ODEzMDIzNTA5S0.

332.  *Id.*

potentially leading to offline harm and against coordinated use of multiple accounts.[333] Twitter stated that it would "[n]o longer serve content and accounts associated with QAnon in Trends and recommendations" and would "[b]lock URLs associated with QAnon from being shared on Twitter."[334] Twitter's QAnon decision was controversial.[335] Does Twitter's moderation of QAnon qualify as "good faith" moderation of "objectionable" material? It is difficult to determine without access to the actual content posted by each user. If the content violated Twitter's stated policies, Twitter's removal of the objectionable material falls within Section 230(c)(2). But the decision to terminate a user account for such repeated violations would fall within the terms of service agreement Twitter has with its users, not Section 230(c)(2).

### 5. Lack of immunity does not establish liability

Before turning to the debate over alleged political bias among internet platforms, it is important to recognize that an internet company's "bad faith" removal of third-party content that is not immunized under Section 230(c)(2) does not necessarily spell liability. The third party who created and posted the content still must raise a cause of action. What might that be?

Zipursky suggested one possibility: a voluntary undertaking tort claim, which Section 230(c) itself suggests by the reference in the title to "Good Samaritan," who voluntarily takes on a duty to assist where none existed.[336] The undertaking presumably would be moderating content according to the company's community standards, and the company would have to exercise reasonable care (i.e., a negligence

---

333. *See* Rachel Lerman & Elizabeth Dwoskin, *Twitter Crackdown on Conspiracy Theories Could Set Agenda for Other Social Media*, WASH. POST (July 22, 2020, 5:49 PM), https://www.washingtonpost.com/technology/2020/07/22/twitter-bans-qanon-accounts.

334. *See* Twitter Safety (@TwitterSafety), TWITTER (July 21, 2020, 8:00 PM), https://twitter.com/TwitterSafety/status/1285726277719199746.

335. *See, e.g.*, Evelyn Douek, *Twitter Brings down the Banhammer on QAnon*, LAWFARE (July 24, 2020, 2:56 PM), https://www.lawfareblog.com/twitter-brings-down-banhammer-qanon [https://perma.cc/355L-DZB3] (discussing whether Twitter's policy was less about the content of QAnon tweets and more about Twitter's need for a "good news cycle"); Abby Ohlheiser, *It's Too Late to Stop QAnon with Fact Checks and Account Bans*, MIT TECH. REV. (July 26, 2020), https://www.technologyreview.com/2020/07/26/1005609/qanon-facebook-twitter-youtuube (arguing Twitter's new policy does not limit QAnon as much as it seems).

336. *See* Zipursky, *supra* note 158, at 31–34.

standard) in performing that duty.[337] Because this is not a strict liability standard, such an inquiry would afford an internet platform some leeway to make even mistaken removal decisions, given the sheer scale of third-party content that must be reviewed for content moderation. For example, an automated removal of content through a platform's artificial intelligence might satisfy the standard of reasonable care, even if it resulted in mistaken takedowns, perhaps if the decisions could later be corrected by user appeals as is common among internet platforms.

Another possibility might be a breach of contract claim if the internet platform did not even follow its own terms of service. Although such contractual claims are preempted when Section 230(c)(2) immunity applies,[338] presumably such claims are not preempted when the immunity is inapplicable (e.g., bad faith moderation). This approach may make internet platforms skittish about "over-promising" in their terms of service or community standards regarding content moderation—which might have the unintended consequence of encouraging internet platforms to be even less transparent in their terms of service with users. On the other hand, if the internet platforms have a stated policy for content moderation and simply follow it, their decisions adhering to the stated policy would fall within Section 230(c)(2) immunity.

As noted earlier, the dormant Commerce Clause would bar state law claims against an internet service that resulted in excessive burden on interstate commerce. Even if a cause of action attaches liability to "bad faith" content moderation in one state, such liability might violate the dormant Commerce Clause by burdening commerce in other states that do not recognize such liability.[339] For example, the Second Circuit held that a Vermont statute prohibiting the transfer to minors of any sexually explicit material that was "harmful to minors" violated the dormant Commerce Clause.[340] The court even suggested that the internet may "fall[] within the class of subjects that are protected from State regulation because they

---

337. *See generally* Frye v. Medicare-Glaser Corp., 605 N.E.2d 557, 560–61 (Ill. 1992).

338. *See* Batzel v. Smith, 333 F.3d 1018, 1030 n.14 (9th Cir. 2003); *cf.* Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1106–07 (9th Cir. 2009) (for Section 230(c)(1), recognizing that breach of contract claims, including promissory estoppel, are not barred because they are based on promising, not publishing).

339. *See* Am. Booksellers Found. v. Dean, 342 F.3d 96, 103 (2d Cir. 2003).

340. *Id.* at 103–04.

'imperatively demand[] a single uniform rule.'"[341] Imagine that Texas recognized a claim against an internet platform for "bad faith" moderation of third-party content based on a bias against the user's political affiliation, whereas California allowed such moderation. Although it might be technologically feasible for an internet platform to try to differentiate its website based on which state it is viewed, as some websites do by country, it could create an excessive burden on interstate commerce by subjecting internet companies to a patchwork of state laws and a need to create a balkanized internet for each state, depending on what type of content moderation decisions gave rise to liability.[342]

### D. Accusations of Political Bias and Proposed Amendments to Section 230 to Require Political Neutrality

The prior section established that a proper reading of Section 230 recognizes a potential disqualification from Section 230(c)(2) for a "bad faith" removal of content based solely on the political affiliation of the third-party. Because courts have yet to decide the issue and because alleged "anti-conservative" bias has become a hot-button issue, it is not surprising that Republican lawmakers have proposed several bills to amend Section 230 to require, expressly or in effect, some form of political viewpoint neutrality as a prerequisite for internet platforms to qualify for Section 230 immunity.[343] This Section provides a summary of these bills, as well as Trump's Executive Order and the DOJ's recommendations on Section 230 to Congress. It is unclear which bill, if any, has a realistic chance of enactment by Congress. But it appears likely that the fervor over amending or

---

341. *Id.* at 104 (second alteration in original) (quoting Cooley v. Bd. of Wardens, 53 U.S. (12 How.) 299, 319 (1852)). *But see* Jack L. Goldsmith & Alan O. Sykes, 110 YALE L.J. 785, 786–87 (2001) (criticizing as incorrect the Second Circuit's suggestion).

342. *Am. Booksellers Found.*, 342 F.3d at 103 ("Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" (quoting Healy v. Beer Inst., 491 U.S. 324, 334 (1989))).

343. Congress is considering other amendments to Section 230 (e.g., EARN IT Act, BADS ADS Act) that do not require some form of political neutrality or eliminate the catchall phrase "otherwise objectionable" in Section 230(c)(2). *See, e.g.,* Eliminating Abusive and Rampant Neglect of Interactive Technologies Act of 2020, S. 3398, 116th Cong. (2020); Behavioral Advertising Decisions Are Downgrading Services Act, S. 4337, 116th Cong. (2020). These bills are not discussed.

outright repealing Section 230 will lead to some action in Congress. The following summary of the bills shows the dramatic changes to Section 230 being considered, including greatly limiting the discretion internet platforms have in what content can be removed, requiring greater disclosure to users of the platforms' content moderation policies, imposing a viewpoint neutrality requirement, authorizing FTC oversight over internet platforms' content moderation, defining the "good faith" requirement or "bad faith," and recognizing a private right of action against internet platforms for content moderation that violates a requirement imposed on internet platforms. And a complete repeal of Section 230 is on the table.[344]

### 1.   Limiting Section 230 Immunity to Good Samaritans Act: proscribing intentional selective enforcement of content moderation policy

The Limiting Section 230 Immunity to Good Samaritans Act,[345] introduced by Senator Josh Hawley (R-MO) in June 2020, would amend Section 230(c)(1) immunity by adding a condition for a newly recognized class of large "edge providers" who must write terms of service that "describe any policies of the edge provider relating to restricting access to or availability of material" and promise they "design and operate the provided service in good faith."[346] Good faith is defined as "the provider acts with an honest belief and purpose, observes fair dealing standards, and acts without fraudulent intent."[347] The bill defines lack of good faith to include "the intentionally selective enforcement of the terms of service of the interactive computer service, including the *intentionally selective enforcement of policies of the provider relating to restricting access to or availability of material*," meaning content moderation.[348] Bad faith intentional selective enforcement also applies to algorithmic decisions "if the provider knows, or acts in reckless disregard of the fact, that the algorithm selectively enforces those terms."[349] The bill creates a cause of action for users to sue internet edge providers for intentional selective enforcement and to recover $5,000 in statutory damages or

---

344.  It goes beyond the scope of this Article to provide a full critique of each proposal.
345.  S. 3983, 116th Cong. (2020).
346.  *Id.* § 2.
347.  *Id.*
348.  *Id.* (emphasis added).
349.  *Id.*

actual damages.[350] Edge providers are large interactive computer services that have more than thirty million users in the United States or more than 300 million users worldwide, plus more than $1.5 billion in annual global revenue, but excluding 501(c)(3) nonprofits.[351] Notably, the intentional selective enforcement claim under this bill applies to *all* content moderated by edge providers, not just content posted by political candidates or in political ads.

### 2. *Ending Support for Internet Censorship Act (ESICA): requiring FTC immunity certification of politically unbiased moderation*

Senator Hawley introduced an earlier bill in June 2019 titled Ending Support for Internet Censorship Act.[352] This bill would add a "[r]equirement of politically unbiased content moderation by covered companies" as a prerequisite to immunity under either Section 230(c)(1) or 230(c)(2).[353] Covered companies are interactive computer services, other than 501(c)(3) nonprofits, that in the last twelve-month period had more than thirty million active monthly users in the United States, more than 300 million active monthly users worldwide, or more than $500 million in global revenues.[354] Covered companies are required to obtain "an immunity certification from the Federal Trade Commission" (FTC) lasting for two years by proving, by clear and convincing evidence, "that the provider does not (and, during the 2-year period preceding the date on which the provider submits the application for certification, did not) moderate information provided by other information content providers in a *politically biased manner.*"[355] Politically biased moderation is defined as:

> (I) the provider moderates information provided by other information content providers in a manner that—
>
> (aa) is designed to negatively affect a political party, political candidate, or political viewpoint; or
>
> (bb) disproportionately restricts or promotes access to, or the availability of, information from a political party, political candidate, or political viewpoint; or

---

350. *Id.*

351. *Id.* Representative Tedd Budd introduced the same bill in the House. H.R. 8596, 116th Cong. (2020).

352. S. 1914, 116th Cong. (2019).

353. *Id.* § 2.

354. *Id.*

355. *Id.* (emphasis added).

> (II) an officer or employee of the provider makes a decision about moderating information provided by other information content providers that is motivated by an intent to negatively affect a political party, political candidate, or political viewpoint.[356]

This broad definition appears to recognize both intentional discrimination and disparate impact claims even without discriminatory intent of the provider. The bill recognizes a limited exception for business necessity and for moderation decisions of employees "if the provider, immediately upon learning of the actions of the employee— (aa) publicly discloses in a conspicuous manner that an employee of the provider acted in a politically biased manner with respect to moderating information content; and (bb) terminates or otherwise disciplines the employee."[357] During the certification process, the FTC must establish a process for public participation, including public submissions and attendance at hearings, and the FTC must vote by one more than majority vote (meaning at least four members) for a certification to be approved.[358] In sum, this bill requires an elaborate FTC certification process and a very high burden for internet platforms to prove, by clear and convincing evidence, that their content moderation is not politically biased.

### 3. Stop the Censorship Act (SCA): limiting Section 230(c)(2) to content moderation of unlawful material

The Stop the Censorship Act,[359] introduced by Representative Paul Gosar (R-AZ-4), would repeal the phrase "material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected" in Section 230(c)(2).[360] The bill would then limit immunity to a company's moderation of "unlawful material,"[361] plus "any action taken to provide users with the option to restrict access to any other material, whether or not such material is constitutionally protected."[362] The effect of the bill apparently would be that internet platforms have no immunity for their content moderation of *any* lawful material, including nudity,

---

356. *Id.*
357. *Id.*
358. *Id.*
359. H.R. 4027, 116th Cong. (2020).
360. *Id.* § 2.
361. *Id.*
362. *Id.*

pornography, sexually explicit material, hate speech, misinformation, or harassment that is not unlawful. But it would extend immunity to the platform's actions in providing their users with the ability to restrict access to such materials.[363] Presumably, this immunity would cover a set of filtering options provided for users to screen out sexually explicit material, hate speech, racist speech, conspiracy theories, and misinformation. At least indirectly, SCA would treat viewpoint discrimination by an internet platform as falling outside of Section 230(c)(2) except for moderation involving unlawful material.

### 4. Stopping Big Tech's Censorship Act (SBTCA): requiring content moderation to follow First Amendment-style restrictions, including viewpoint neutrality

The Stopping Big Tech Censorship Act,[364] introduced by then-Senator Kelly Loeffler (R-GA), would require internet platforms to satisfy new prerequisites for Section 230 immunity.[365] First, the bill would require internet platforms to "take[] reasonable steps to prevent or address the unlawful use of the interactive computer service or unlawful publication of information on the interactive computer service," to qualify for the immunity from defamation and other claims based on the content of their users.[366] Second, the bill would allow internet platforms to engage in content moderation of lawful speech—what the bill calls "constitutionally protected material"—only under the following First Amendment-style conditions drawn from various Supreme Court jurisprudence that apply to government restrictions of speech: "(I) the action is taken in a *viewpoint-neutral manner*; (II) the restriction limits only the time, place, or manner in which the material is available; and (III) there is a compelling reason for restricting that access or availability."[367] As the bill indicates, it subjects internet platforms to these conditions "regardless of whether the right is otherwise enforceable against a nongovernmental entity,"[368] presumably indicating the lack of a state action requirement for internet platforms.

---

363. *Id.*

364. S. 4062, 116th Cong. (2020).

365. *See id.* § 2 (detailing some of the new prerequisites for immunity, including how content is restricted and notice requirements).

366. *Id.*

367. *Id.* (emphasis added).

368. *Id.*

5. *Stop Suppressing Speech Act: deleting "otherwise objectionable" from Section 230(c)(2)*

Loeffler proposed a second bill titled Stop Suppressing Speech Act.[369] Similar to Gosar's Stop the Censorship Act, Loeffler's bill eliminates the catchall "otherwise objectionable" material in Section 230(c)(2) and would limit the permissible bases for content moderation to the following:

> any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, or harassing, *that the provider or user determines to be unlawful, or that promotes violence or terrorism,* whether or not such material is constitutionally protected.[370]

6. *Platform Accountability and Consumer Transparency Act (PACT Act): requiring internet platforms to publish "an acceptable use policy" and provide live customer service for content moderation*

One bipartisan-sponsored bill to reform Section 230 is the Platform Accountability and Consumer Transparency Act (PACT Act), sponsored by Senators Brian Schatz (D-HI) and John Thune (R-SD).[371] The PACT Act would require internet platforms to "publish an acceptable use policy . . . in a location that is easily accessible to the user."[372] In addition, the acceptable use policy must "reasonably inform users about the types of content that are allowed" and "explain the steps the provider takes to ensure content complies with the acceptable use policy."[373] The acceptable use policy must also "explain the means by which users can notify the provider of potentially policy-violating content, illegal content, or illegal activity, which shall include" a complaint system and "a live company representative to take user complaints through a toll-free telephone number."[374] The PACT Act sets forth the requirements and decision deadlines for content moderation in great detail.[375] The FTC is given authority to enforce these requirements and treat violations as unfair or deceptive practices under the Federal Trade Commission Act.[376]

---

369. Stop Suppressing Speech Act of 2020, S. 4828, 116th Cong.
370. *Id.* (emphasis added).
371. Platform Accountability and Consumer Transparency Act, S. 4066, 116th Cong. (2020).
372. *Id.* § 5.
373. *Id.*
374. *Id.*
375. *See id.* (outlining the requirements for the acceptable use policy).
376. 15 U.S.C. §§ 41–58; S. 4066 § 5.

Furthermore, the PACT Act would add an additional requirement to
Section 230(c) that would disqualify internet platforms from Section
230 immunities if the platforms had "knowledge of the illegal content
or illegal activity" on their platforms, but failed to remove it "within
24 hours of acquiring that knowledge, subject to reasonable
exceptions based on concerns about the legitimacy of the notice."[377]
The PACT Act does not require political neutrality or address
whether an acceptable use policy can moderate content based on a
political viewpoint that the platform deems objectionable.

7.   *The Online Freedom and Viewpoint Diversity Act (OFVDA): limiting
Section 230(c)(2) to removal of "obscene, lewd, lascivious, filthy, excessively
violent, harassing, promoting self-harm, promoting terrorism, or unlawful"
material*

The Online Freedom and Viewpoint Diversity Act[378] (OFVDA),
introduced on September 8, 2020, is another Republican bill intended
to reform Section 230.[379] It was introduced by Senator Roger Wicker
(R-MS), Chairman of the Senate Committee on Commerce, Science,
and Transportation, and co-sponsored by Senators Lindsey Graham
(R-SC), Chairman of the Senate Committee on the Judiciary, and
Marsha Blackburn (R-TN).[380] This bill is similar in approach to
Senator Gosar's proposed Stop the Censorship Act. OFDVA would
change "otherwise objectionable" material to material "promoting
self-harm, promoting terrorism, or unlawful."[381] The bill also would
change Section 230(c)(1)'s subjective standard (i.e., what the
internet service "considers to be" objectionable content) to require
instead that the internet service "ha[ve] an objectively reasonable
belief" the content in question falls within a listed category of
removable content.[382] The bill adds a provision to clarify that Section
230(c)(1), the first type of immunity, does not apply to content
moderation, which is covered by the second type of immunity in
Section 230(c)(2).[383] As I have explained above, this bifurcation—or
two different immunities—already exists under the current Section

377.  *Id.* § 6.
378.  S. 4534, 116th Cong. (2020).
379.  *Id.*
380.  *Id.*
381.  *Id.* § 2.
382.  *Id.*
383.  *Id.*

**App. 717**

230, notwithstanding some courts' misreading.[384] The bill amends the current definition of "information content provider," who is treated as the publisher or speaker of content under Section 230(c)(1)—typically the user who has posted the material.[385] The bill would expand the definition to include when "a person or entity editorializes or affirmatively and substantively modifies the content of another person or entity."[386] Such editing or modifying would make that person also an information content provider. It is unclear whether this provision is intended to reach instances in which internet platforms add a label or notation to a user's post that it violates the platform's community standard. Sen. Hawley also proposed an amendment to OFDVA to include a private right of action to sue large internet platforms ("edge providers") for moderation of user material "that is not taken in good faith."[387] However, the Senate Judiciary Committee voted against the proposed Hawley amendment.[388] By shrinking the permissible bases for content moderation under Section 230(c)(2) without the catchall for "otherwise objectionable" material, OFDVA would greatly limit the discretion internet platforms have in content moderation. Moderation of any content that does not fall within one of the categories would not receive Section 230 immunity.

8.  *Sunset for and repeal of Section 230 proposed by Senator Graham*

On December 15, 2020, Senator Graham proposed yet another bill to reform Section 230.[389] The bill would create a sunset of January 1, 2023 at which time Section 230 would expire unless Congress enacts a new law for the section during the intervening two-year period.[390] It is the first bill to propose a repeal of Section 230, although it is framed

---

384.  *See* 47 U.S.C. § 230(c)(2)(A); *supra* note 148 and accompanying text (explaining the bifurcation of Section 230 immunity).

385.  *See* Online Freedom and Viewpoint Diversity Act, S. 4534 § 2 (listing the changes to the definition of information content provider the bill proposes).

386.  *Id.*

387.  *See* S. 4632, 116th Cong. (2020).

388.  *See* Steven Overly, *Congress Aims to Avert Shutdown*, POLITICO (Dec. 11, 2020, 10:00 AM), https://www.politico.com/newsletters/morning-tech/2020/12/11/congress-aims-to-avert-shutdown-792228 [https://perma.cc/D5KV-UU5T].

389.  *See* S. 5020, 116th Cong. (2020); Tal Axelrod, *Graham Introduces Bill to Repeal Tech Liability Shield Targeted by Trump*, HILL (Dec. 15, 2020, 5:40 PM), https://thehill.com/homenews/senate/530364-graham-introduces-bill-to-repeal-tech-liability-shield-by-2023 [https://perma.cc/7AER-BC4Q].

390.  *Id.*

with the intention of coming up with an alternative approach. (In a political maneuver in response to Trump's threat to veto an omnibus budget bill that included COVID-relief payments of $600, Senator Mitch McConnell proposed a bill that tied increasing payments to $2,000 to a repeal of Section 230; the bill failed, however.[391])

### 9. President Trump's executive order and FCC's proposed Section 230 rulemaking

Trump's Executive Order on Preventing Online Censorship purports to "clarify" immunity under Section 230.[392] According to the Order,

> the immunity should not extend beyond its text and purpose to provide protection for those who purport to provide users a forum for free and open speech, but in reality use their power over a vital means of communication to engage in deceptive or pretextual actions stifling free and open debate by censoring certain viewpoints.[393]

For the immunity under Section 230(c)(2), the Order states:

> It is the policy of the United States to ensure that, to the maximum extent permissible under the law, this provision is not distorted to provide liability protection for online platforms that—far from acting in "good faith" to remove objectionable content—instead engage in deceptive or pretextual actions (often contrary to their stated terms of service) to stifle viewpoints with which they disagree.[394]

The Order takes the view that an internet platform would not qualify for immunity if it engaged in the "stif[ling] [of] viewpoints."[395]

An Executive Order cannot alter or amend an act of Congress.[396] Some may question the legal authority for the actions directed by Trump's Executive Order. The Order invokes "the Constitution and the laws of the United States of America" as authority, without greater specificity.[397]

---

391. *See* Makena Kelly, *McConnell Ties Full Repeal of Section 230 to Push for $2,000 Stimulus Checks*, VERGE (Dec. 29, 2020, 5:30 PM), https://www.theverge.com/2020/12/29/22204976/section-230-senate-deal-stimulus-talks-checks.

392. Exec. Order No. 13,925 § 2, 85 Fed. Reg. 34,079, 34,080 (May 28, 2020).

393. *Id.* § 2(a).

394. *Id.*

395. *Id.*

396. *See* Chamber of Com. of the U.S. v. Reich, 74 F.3d 1322, 1339 (D.C. Cir. 1996) (holding that an Executive Order that conflicted with the National Labor Relations Act was invalid).

397. Exec. Order No. 13,925 § 1, 85 Fed. Reg. at 34,079.

The Order instructs "the Secretary of Commerce (Secretary), in consultation with the Attorney General, and acting through the National Telecommunications and Information Administration (NTIA), [to] file a petition for rulemaking with the Federal Communications Commission (FCC) requesting that the FCC expeditiously propose regulations to clarify" Section 230.[398] Section 230 does not contain a delegation of rulemaking authority to the FCC, but the section was contained in Title V of the Telecommunications Act of 1996,[399] which amended the Communications Act of 1934,[400] a statute that includes a provision authorizing the FCC to conduct rulemaking for its regulation of common carriers and "the provisions of this chapter."[401] FCC Commissioner Michael O'Rielly, a Republican appointee, expressed "deep reservations" that rulemaking authority under the Communications Act of 1934 extended to the later-added Section 230; afterwards, Trump withdrew his nomination of O'Rielly for another term as FCC Commissioner.[402]

The Executive Order seeks to have the FCC issue regulations interpreting Section 230 so that, effectively, the "good faith" requirement of Section 230(c)(2) also applies to subsection (c)(1).[403] Also, the Order seeks regulations to define "good faith" to exclude content moderation decisions that are "(A) deceptive, pretextual, or inconsistent with a provider's terms of service; or (B) taken after failing to provide adequate notice, reasoned explanation, or a meaningful opportunity to be heard."[404] The Order instructs the Secretary of Commerce, "acting through the [NTIA], [to] file a petition for rulemaking with the [FCC] requesting that the FCC expeditiously propose regulations to clarify" issues related to:

> (i) the interaction between subparagraphs (c)(1) and (c)(2) of [S]ection 230, in particular to clarify and determine the circumstances under which a provider of an interactive computer service that

---

398. *Id.* § 2(b), 85 Fed. Reg. at 34,081.

399. Pub. L. 104-104, 110 Stat. 56 (1996).

400. 47 U.S.C. §§ 151–621.

401. 47 U.S.C. § 201(b) ("The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.").

402. *See* Russell Brandom, *President Trump Withdraws FCC Renomination After 5G Controversy*, VERGE (Aug. 3, 2020, 6:01 PM), https://www.theverge.com/2020/8/3/21353233/orielly-fcc-nomination-withdrawn-trump-ligado-5g-230.

403. *See* Exec. Order No. 13,925 § 2, 85 Fed. Reg. at 34,080–81.

404. *Id.* § 2(b)(ii), 85 Fed. Reg. at 34,081.

> restricts access to content in a manner not specifically protected by
> subparagraph (c)(2)(A) may also not be able to claim protection
> under subparagraph (c)(1)[] . . . [and] (ii) the conditions under
> which an action restricting access to or availability of material is not
> "taken in good faith" within the meaning of subparagraph
> (c)(2)(A) of [S]ection 230.[405]

On July 27, 2020, invoking the delegation of rulemaking authority
under the Communications Act of 1934, the NTIA filed its petition
asking the FCC to conduct a rulemaking on Section 230 along the
lines indicated in Trump's Executive Order.[406] FCC Chairman Pai
later stated his intent "to move forward with a rulemaking to clarity
[Section 230's] meaning."[407] However, after Trump lost the 2020
election, Pai said there was not sufficient time to do so because he
was stepping down on January 20, 2021.[408]

The Executive Order instructs another agency, the FTC, to
investigate large online platforms, such as Twitter and Facebook, for
unfair and deceptive acts related to content moderation.[409] The Order
instructs the Attorney General to establish a "working group regarding the
potential enforcement of State statutes that prohibit online platforms
from engaging in unfair or deceptive acts or practices."[410]

### 10. Department of Justice recommendations on Section 230

In June 2020, the DOJ issued a report on "Section 230—Nurturing
Innovation or Fostering Unaccountability."[411] DOJ recommended
four types of reforms for Congress to consider: (1) "incentivizing
online platforms to address illicit content"; (2) "making [it] clear that

---

405.  *Id.* § 2(b).

406.  National Telecommunications and Information Administration, Petition for
Rulemaking in the Matter of Section 230 of the Communications Act of 1934 (July 27,
2020), https://www.ntia.gov/files/ntia/publications/ntia_petition_for_rulemaking_
7.27.20.pdf [https://perma.cc/M78T-8C7Y], at 1.

407.  *Statement of Chairman Pai on Section 230*, FCC (Oct. 15, 2020), https://
docs.fcc.gov/public/attachments/DOC-367567A1.pdf        [https://perma.cc/V9PX-
7MN6].

408.  *See* Todd Shields & Ben Brody, *FCC Chair Punts Social Media Regulation Trump
Sought to Congress*, BLOOMBERG (Jan. 8, 2021, 1:01 PM), https://www.bloomberg.com/
news/articles/2021-01-08/fcc-chair-says-he-s-dropping-social-media-order-trump-
demanded.

409.  Exec. Order No. 13,925 § 4(c), 85 Fed. Reg. at 34,082.

410.  *Id.* § 5(a).

411.  U.S. Dep't of Just., Section 230—Nurturing Innovation or Fostering
Unaccountability? (2020).

the immunity provided by Section 230 does not apply to civil enforcement [actions brought] by the federal government"; (3) "clarify[ing] that federal antitrust claims are not covered by Section 230 immunity"; and (4) "clarify[ing] the text and original purpose of the statute in order to promote free and open discourse online and encourage greater transparency between platforms and users."[412]

For the first type of reform, DOJ recommended a "Bad Samaritan carve-out" in Section 230 for "online platforms that purposefully promote[], solicit[], or facilitate[] criminal activity by third parties."[413] Similar to the Gosar and Wicker bills discussed above, DOJ recommended that Congress remove the catchall for "otherwise objectionable" material and limit it to "material the platform believes, in good faith, violates federal law or promotes violence or terrorism."[414] DOJ took the view that internet platforms can still moderate content beyond the proposed amended categories as long as they are consistent with their terms of service.[415] DOJ states: "Online platforms are often protected by their terms of service when removing content that violates the platform's rules, whether or not that content falls into the categories of (c)(2)."[416] Yet, unlike other sections in the report, DOJ cites no case law or legal authorities to support this assertion.

Similar to the Executive Order, DOJ recommended that Congress define "good faith" content moderation in Section 230(c)(2) with four principles geared around (1) the disclosure of the content-moderation practices in the company's terms of service, (2) content moderation that is consistent with the terms of service "and with any official representations regarding the platform's content-moderation policies," (3) the company having an "objectively reasonable belief" the content falls with Section 230(c)(2), and (4) "the platform [ ] supply[ing] the provider of the content with a timely notice explaining with particularity the factual basis for the restriction of access, unless the provider reasonably believes that the content relates to criminal activity or notice would risk imminent harm to others."[417] Finally, DOJ proposed that Congress continue to reject the moderator's dilemma created by *Stratton Oakmont* by "adding a

---

412. *Id.* at 3–4.
413. *Id.* at 3, 14.
414. *Id.* at 21.
415. *Id.*
416. *Id.*
417. *Id.* at 22.

provision to make clear that a platform's decision to moderate content either under (c)(2) or consistent with its terms of service does not automatically render it a publisher or speaker for all other content on its service."[418]

The Trump Administration's planned actions regarding Section 230 were preempted with the election of Joe Biden as the next President. However, Biden himself is no fan of Section 230 and has called for its repeal for a reason different from Trump's: Section 230 allows Facebook to "propagat[e] falsehoods they know to be false."[419] Thus, even under Biden's Administration, Section 230 reform seems likely.

## II.   DO INTERNET PLATFORMS' CONTENT MODERATION POLICIES RECOGNIZE NONPARTISANSHIP OR IMPARTIALITY AS A STATED PRINCIPLE?

Given the ongoing fervor to reform or repeal Section 230, one would expect that the internet platforms would undertake new steps to address the concerns raised by lawmakers, DOJ, and the Executive Order, particularly on the charge of political bias. However, Part II shows how the internet platforms' stated policies and practices do not adequately explain how they operationalize nonpartisanship as a principle of content moderation, either generally or specifically for candidates for public office.

### A.   Overview

All internet platforms engage in content moderation, meaning some amount of review of content posted by their users and removal of, or other remedial action for, content that violates the platform's community standards or guidelines.[420] Community standards are a euphemism for the rules that identify the kinds of content users are not permitted to share on the platform.[421] These community

---

418.   *Id.*

419.   Makena Kelly, *Joe Biden Wants to Revoke Section 230*, VERGE (Jan. 17, 2020, 10:29 AM), https://www.theverge.com/2020/1/17/21070403/joe-biden-president-election-section-230-communications-decency-act-revoke.

420.   *See* GILLESPIE, *supra* note 1, at 5 ("There is no platform that does not impose rules, to some degree."); SARAH T. ROBERTS, BEHIND THE SCREEN: CONTENT MODERATION IN THE SHADOWS OF SOCIAL MEDIA 27–28 (2019) ("[T]he content is subject to an ecosystem made up of intermediary practices, policies, and people . . . .").

421.   *See* GILLESPIE, *supra* note 1, at 45–46 (discussing the use of community standards as rules for users).

standards are de facto speech codes. If a user post violates a standard and the internet platform catches it, the violating content is removed or moderated. Content moderation lies in tension with the perception of an "open" platform.[422] When people disagree with content moderation, they often call it "censorship"—as evident in the titles of the Executive Order and three of the Section 230 reform bills.[423] Yet content moderation is essential. As Tarleton Gillespie writes: "Platforms must . . . moderate: both to protect one user from another, or one group from its antagonists, and to remove the offensive, vile, or illegal—as well as to present their best face to new users, to their advertisers and partners, and to the public at large."[424] However, people's ambivalence to content moderation may leave internet platforms in a Catch-22: attacked for moderating too much and too little.

If we examine the community standards of internet platforms posted on their websites, they say little, if anything, about their treatment of politicians, let alone how, if at all, their content moderation of politicians and political campaign ads adheres to nonpartisanship. More generally, the community standards typically do not provide much specific detail about the precise procedures, mechanics, guiding principles, or timetable that content moderators must follow.[425] And none appears to disclose whether high-level executives, such as the CEO, can veto or override the decisions of content moderators who flagged a violation—and if so, by what criteria.[426] It is unclear whether internet platforms have any internal documents or handbooks setting forth such information for their moderators. Indeed, more details about the actual content moderation process arguably can be found in Kate Klonick's *Harvard Law Review* article than on the internet platforms' websites.[427]

---

422. *Id.* at 5.

423. *See supra* notes 352, 359, 364, 392 and accompanying text.

424. GILLESPIE, *supra* note 1, at 5.

425. *See, e.g., Our Approach to Policy Development and Enforcement Philosophy*, TWITTER, https://help.twitter.com/en/rules-and-policies/enforcement-philosophy [https://perma.cc/R9XF-TJE2] (listing only five factors that Twitter says it considers when deciding when to take enforcement action).

426. *See, e.g., Community Standards*, FACEBOOK, https://www.facebook.com/communitystandards/introduction (discussing some of the policy choices that go into Facebook's Community Standards, but not mentioning executive veto power).

427. *See* Klonick, *supra* note 61, at 1639–42 (discussing Facebook's tiered content moderation system).

Below is a summary of the community standards of the large internet platforms. This summary shows that each platform has noticeable gaps in explaining how, if at all, it maintains nonpartisanship or impartiality in the content moderation of political candidates or political campaign ads. An important caveat is that the companies' policies may change, with refinements and updates. Indeed, during the writing of this Article, the policies of several companies changed, making it challenging to review a moving target. For example, both Facebook and Twitter announced that they were rolling back some of the new measures to stop misinformation they implemented during the 2020 election.[428] (For reference, the policies were last examined in December 2020.)

---

428. *See* Sarah Frier, *Facebook, Twitter Reverse Changes Meant to Curb Vote Misinformation*, BLOOMBERG (Dec. 16, 2020, 10:08 PM), https://www.bloomberg.com/news/articles/2020-12-17/facebook-twitter-undo-changes-meant-to-curb-vote-misinformation.

*Table 1. Comparison of Content Moderation Policies*

| Company | Policy recognizes nonpartisanship or impartiality | Policy describes steps in review process | Penalties for violations | Public Interest Newsworthiness Exception | Right of Appeal to User |
|---|---|---|---|---|---|
| **Twitter** | Strives for "uniform consistency." | Some on public interest exception, but not much on violation decisions | 1. tweet less visible<br>2. hiding tweet while awaiting removal<br>3. requiring user to remove tweet<br>4. stop direct messages<br>5. disabling account<br>6. read-only mode<br>7. permanent suspension | Yes | Yes |
| **Facebook** | Apply "consistently and fairly." IFCN "non-partisanship, fairness" in fact-checking | Some | 1. remove content<br>2. warning over content<br>3. disable account<br>4. escalation to external agencies | Yes | Yes |
| **YouTube** | Apply "consistently, without regard to a video's political viewpoint" | Some | 1. remove content<br>2. age-restrict content<br>3. 3-strikes in 90 days results in termination | Yes | Yes |
| **Reddit** | No | Some in 2020 Security Report | 1. request to stop<br>2. temporary or permanent suspension of accounts<br>3. removal of privileges from, or adding restrictions to, accounts<br>4. adding restrictions to communities, such as adding NSFW tags or Quarantining<br>5. Removal of content<br>6. Banning of Reddit communities | Yes | Yes |
| **Snapchat** | Apply "to all … equally" | No | remove the offending content, terminate your account, and/or notify law enforcement. | Yes | Unclear but seems not |
| **Twitch** | "[E]qual protections" v. hateful conduct | Some re: Hateful Conduct policy | 1. removal of content<br>2. strike on the account<br>3. suspension, temporary and permanent | No | Yes |
| **TikTok** | Apply "to everyone … and everything" | Some in 2020 Trans. Report | 1. removal of content<br>2. suspend or ban accounts<br>3. report to authorities | Yes | Yes |

### B.  Twitter

Twitter has sparked the most controversy in moderating President Trump's tweets for violating its community standards.[429] A strength of Twitter's policy is its detailed and organized explanation. Twitter has numerous pages detailing its community standards.[430] Indeed, Twitter has the most detailed explanation of its community standards of all the companies surveyed. In a very helpful post, Twitter explains, at length, its "approach to policy development and enforcement philosophy."[431] Twitter professes that its rules are meant "to help ensure everyone feels safe expressing their beliefs and we strive to enforce them with uniform consistency."[432] Twitter says it "empower[s] people to understand different sides of an issue and encourage[s] dissenting opinions and viewpoints to be discussed openly."[433] Twitter devotes a page to describing its "civic integrity policy" to protect against "attempts to use our services to manipulate or disrupt civic processes," such as elections.[434] A separate page explains Twitter's policy on deceptively "synthetic and manipulated media."[435]

One unique feature of Twitter's remedial action: except for repeat offenders or "egregious" violations, Twitter does not remove violating tweets. Instead, Twitter asks "violators to remove the Tweet(s)" and may take "additional actions like verifying account ownership and/or temporarily limiting their ability to Tweet for a set period of time."[436] Egregious violations "result in the immediate and permanent suspension of an account."[437] Users can appeal enforcement decisions

---

429.  *See supra* note 4 and accompanying text.

430.  *See Twitter Rules and Policies*, TWITTER, https://help.twitter.com/en/rules-and-policies#twitter-rules [https://perma.cc/E33F-7K3P] (linking to Twitter's numerous community standard pages).

431.  *Our Approach to Policy Development and Enforcement Philosophy, supra* note 425.

432.  *Id.*

433.  *Id.*

434.  *Civic Integrity Policy*, TWITTER, https://help.twitter.com/en/rules-and-policies/election-integrity-policy [https://perma.cc/Y7VX-2BKL].

435.  *Synthetic and Manipulated Media Policy*, TWITTER, https://help.twitter.com/en/rules-and-policies/manipulated-media [https://perma.cc/R9XC-7G45].

436.  *Our Approach to Policy Development and Enforcement Philosophy, supra* note 425.

437.  *Id.*; *see also Our Range of Enforcement Options*, TWITTER, https://help.twitter.com/en/rules-and-policies/enforcement-options [https://perma.cc/R3K3-KKQY] ("When we determine that a Tweet violated the Twitter Rules, we require the violator to remove it before they can Tweet again. We send an email notification to the violator identifying the Tweet(s) in violation and which policies have been

at Twitter.[438] Starting in October 2019, Twitter banned paid political ads, as announced in a tweet by CEO Jack Dorsey.[439] Twitter's transparency report of its content moderation from January to June of 2019 does not appear to contain specific categories for moderation of politicians, voter suppression, or election misinformation.[440] However, it does indicate "a 32% increase in the number of accounts actioned for violations of our civic integrity policy during this reporting period."[441] After the 2020 election, Twitter announced that it had added informational labels to 300,000 tweets about the presidential election, which represented a mere 0.2 percent of all tweets about the election.[442]

Despite the extensiveness of Twitter's policy, noticeably absent from Twitter's explanation of its "enforcement philosophy" is a discussion of the actual enforcement procedures—including any safeguards against bias or partisanship—that are used to determine whether a tweet violates its rules. This omission from its website is Twitter's biggest deficiency. The omission starkly contrasts with Twitter's lengthy discussion of its remedial actions once a violation has been found.[443] Twitter's lack of transparency on the procedures for determining violations of its Twitter rules has exposed it to criticism, such as with respect to its termination of 7,000 QAnon accounts for alleged violations.[444] In an April 1, 2020 post related to how Twitter was dealing with COVID-19, Twitter disclosed that it was relying more heavily on automated review of tweets, but that it will not impose permanent suspension of accounts without human review.[445] However, Twitter fails to outline the steps and composition

---

violated. They will then need to go through the process of removing the violating Tweet or appealing our review if they believe we made an error.").

438.   *Our Range of Enforcement Options, supra* note 437.

439.   jack (@jack), TWITTER (Oct. 30, 2019, 4:05 PM), https://twitter.com/jack/status/1189634360472829952.

440.   *See* TWITTER, RULES ENFORCEMENT, https://transparency.twitter.com/en/reports/rules-enforcement.html#2019-jul-dec [https://perma.cc/UQ9P-KHB2].

441.   *Id.*

442.   *See* Kate Conger, *Twitter Says It Labeled 0.2% of All Election-Related Tweets as Disputed*, N.Y. TIMES (Nov. 12, 2020), https://www.nytimes.com/2020/11/12/technology/twitter-says-it-labeled-0-2-of-all-election-related-tweets-as-disputed.html.

443.   *See Our Range of Enforcement Options, supra* note 437.

444.   *See* Douek, *supra* note 335.

445.   @Vijaya & Matt Derella, *An Update on Our Continuity Strategy During COVID-19*, TWITTER (Mar. 16, 2020), https://blog.twitter.com/en_us/topics/company/

of its review of content for violations of its Twitter rules—e.g., what percentage of tweets are moderated by automated process, when do human reviewers get involved, how many human reviewers typically review a tweet before it is determined to be a violation, and can high-level executives veto and override the decisions of content moderators?

To appreciate the lack of transparency in Twitter's process for determining a violation, one only needs to compare it with Twitter's quite detailed page explaining its "public-interest exception."[446] Under this exception, Twitter may take less severe remedial measures in response to a tweet than requiring its removal if the public interest so warrants.[447] This exception may apply to content of elected and government officials that violate the Twitter rules.[448] As shown in Table 1 above, all of the internet platforms, except Twitch, recognize a public interest exception of some kind.[449] Twitter outlines a four-step process for how it determines whether to apply a public-interest exception to an offending tweet of a political candidate.[450] I have inserted labels in brackets identifying the different persons conducting each step of the review process.

> 1. Our global enforcement team will escalate any Tweet that meets the criteria defined above for secondary review by our Trust & Safety team. We will not evaluate Tweets for the public interest exception if they do not violate the Twitter Rules or otherwise fail to meet the criteria above. [*Global Enforcement team*]
>
> 2. Our Trust & Safety team will evaluate the Tweet and prepare a recommendation on whether or not continued access to the Tweet is in the public interest. [*Trust & Safety team*]
>
> 3. The recommendation will be shared with a cross-functional set of leaders across different internal teams with diverse and multidisciplinary backgrounds in government, human rights, journalism, news, technology, and law, as well as in-market teams with an understanding of the cultural context in which the Tweet was posted. [*Cross-functional stakeholders*]

---

2020/An-update-on-our-continuity-strategy-during-COVID-19.html [https://perma.cc/X7AM-M2P3].

446. *About Public-Interest Exceptions on Twitter, supra* note 49.

447. *Id.*

448. *See id.* (listing an account's connection to a "current or potential member of a local, state, national, or supra-national governmental or legislative body" as a necessary requirement to apply Twitter's public interest exception).

449. *See supra* Table 1.

450. *About Public-Interest Exceptions on Twitter, supra* note 49.

4. After informing these cross-functional stakeholders of the recommendation and feedback from the cross-functional team, senior leaders from Trust & Safety will make the final decision to remove the Tweet or apply the notice.[451] [*Senior leaders of Trust & Safety team*]

Unlike Facebook, Twitter does "not consult externally on individual enforcement decisions."[452] Twitter also notes: "As with any enforcement action, our goal is *consistent* and transparent application of the notice, taking into account local context."[453] The page also includes helpful examples or situations in which it is likely to apply (or not) the public interest exception.[454]

Twitter relies on three internal groups to evaluate whether to invoke the public interest exception as a remedy to a violation of the community standard by a political candidate: (1) the frontline Global Enforcement team, (2) the Trust & Safety team, and (3) what Twitter characterizes as "cross-functional stakeholders," i.e., "leaders across different internal teams with diverse and multidisciplinary backgrounds."[455] The use of multilayers of review, in which a content moderation decision can be "escalate[d]" up the chain of review, is a typical approach of large internet platforms.[456] Twitter lists several options for penalties, ranging from removal or making less visible the violating tweet to temporary or permanent suspension of an account.[457] Twitter allows the user to appeal a violation determination.[458]

Although extensive, Twitter's explanation of its "public interest" policy has noticeable gaps. First, Twitter's discussion is framed around the determination of the "public interest" exception (to the remedy or moderation), but not the underlying violation. In other words, how does the global enforcement team determine if there is a violation in the first place, before the team escalates it? Detailed

---

451. *Id.*

452. *Id.*

453. *Id.* (emphasis added).

454. *Id.*

455. *Id.*

456. *See* Klonick, *supra* note 61, at 1647–48 (explaining how Facebook's Tier 3 content moderators can escalate review of content violating Facebook's community standards to Tier 2 moderators, and how Twitter uses "specialized team members" to review culturally-specific content previously flagged for removal).

457. *See Our Approach to Policy Development and Enforcement Philosophy, supra* note 425 (tying severity of punishment to the repetition and perceived egregiousness of the violation).

458. *See Our Range of Enforcement Options, supra* note 437 (linking to a platform interface to file appeals).

information about the process by which Twitter determines whether a violation has occurred would be equally as helpful. Moreover, it is unclear whether Twitter's "secondary review" by the Trust & Safety team or the input of the cross-functional stakeholders can recommend a reversal of the underlying violation determination. Assuming they can, it is also unclear how, if at all, nonpartisanship or impartiality is ensured during the internal process to determine violations. Twitter indicates that the *source* of the content is considered in deciding whether to apply the public interest exception, so the apparent lack of anonymity in the determination might create a risk of bias against the source.[459] Although the page does reiterate "our goal is consistent and transparent application of the [public interest] notice,"[460] consistency in the application of the public interest exception after a violation has already been found does not necessarily ensure that the determination of a violation was nonpartisan.

### C.   Facebook

Facebook's content moderation policy shares some of the same strengths and weaknesses as Twitter's. Starting in April 2018,[461] Facebook has published its internal enforcement guidelines, now referred to as its community standards.[462] Like Twitter, Facebook provides a landing page for its community standards that contains links to more detailed pages about the individual standards.[463] Facebook includes a page for "Understanding the Community Standards Enforcement Report" that explains not only how it prepares its transparency reports for content moderation but also

---

459.   *See Our Approach to Policy Development and Enforcement Philosophy, supra* note 425. ("Some of the factors that help inform our decision-making about content are the impact it may have on the public, the source of the content, and the availability of alternative coverage of an event.").

460.   *About Public-Interest Exceptions on Twitter, supra* note 49.

461.   *See* Monika Bickert, *Publishing Our Internal Enforcement Guidelines and Expanding Our Appeals Process,* FACEBOOK (Apr. 24, 2018), https://about.fb.com/news/2018/04/comprehensive-community-standards [https://perma.cc/Z5QC-N8FJ] (explaining that Facebook has upheld internal community standards "[f]or years").

462.   *Community Standards, supra* note 426.

463.   *See id.* (providing links to Facebook community standards for "[v]iolence and criminal behavio[]r," "[s]afety," "[o]bjectionable content," "[i]ntegrity and authenticity," "[r]especting intellectual property," and "[c]ontent-related requests").

how it detects possible violations and reviews them.[464] Facebook provides more description than Twitter on this important issue. Facebook states:

> We use technology, human review or a combination of the two to determine whether a piece of content violates our policies. If the content is routed to our human review team, then they use *our policies and a step-by-step process to help them make decisions accurately and consistently for the appropriate violation type.* We also provide our reviewers with tools to review the reported content and the available context required to identify the concern and determine whether a piece of content violates a standard.[465]

However, Facebook does not provide specific details about the "step-by-step process" it refers to.[466] Disclosing this step-by-step process, ideally with a diagram of each step, would be helpful to understand how Facebook determines violations. For example, how precisely does Facebook's step-by-step process promote consistent or accurate decisions of violations? Moreover, what "tools to review the reported content" does Facebook give to its reviewers?

Like Twitter, Facebook uses a range of penalties, from a warning to removal of content, and recognizes a right of appeal for a violation decision.[467] In the introduction to its community standards, Facebook recognizes a public interest or newsworthiness exception, similar to Twitter's, by which Facebook "allow[s] content that would otherwise go against our Community Standards—if it is newsworthy and in the public interest."[468]

Because Facebook's explanations of its policy are scattered on various pages, some even outside of its community standards, the average user is likely to have a harder time finding Facebook's policy compared to Twitter's well-organized layout. For example, Facebook's policies regarding election integrity and political ads are not located in or findable on the community standards landing page. Instead, most of Facebook's policies on these important areas are scattered in its

---

464. *Understanding the Community Standards Enforcement Report*, FACEBOOK, https://transparency.facebook.com/community-standards-enforcement/guide.

465. *Id.* (emphasis added).

466. *See id.* (explaining only that, in the event content is routed to human review, such content is reviewed using Facebook's policies and a "step-by-step process").

467. *See id.* (listing as possible actions "removing content," "covering content with a warning," "disabling accounts," and "escalations to external agencies").

468. *Community Standards, supra* note 462.

newsroom blog,[469] Business Help Center,[470] and even Zuckerberg's personal Facebook profile.[471] This scattered placement makes it very difficult to determine precisely Facebook's policy on the important issues of election integrity, misinformation, and paid political ads.

Another complicating factor is that Facebook's policy changed quite dramatically in 2020, but there is no easy way for users to track all the changes. Twitter has the same problem. Ideally, the platforms would provide a fixed page that lists all changes to their content moderation policies by date, as YouTube does for its COVID-19 misinformation policy.[472]

On the controversial issue of whether Facebook will fact-check politicians and review their content for violations of its community standards, it is difficult to identify a clear statement of the policy. At some point during the 2020 election, Facebook started fact-checking the content of politicians for election misinformation. This marked a dramatic change for Facebook. Facebook's prior approach was hands-off. In June 2020, Facebook's Business Help Center page explained the exception Facebook gave at the time to politicians, exempting their posts and political ads from any fact-checking.[473] But that page

---

469. *See, e.g.*, Katie Harbath & Samidh Chakrabarti, *Expanding Our Efforts to Protect Elections in 2019*, FACEBOOK (Jan. 28, 2019), https://about.fb.com/news/2019/01/elections-2019 [https://perma.cc/UJR9-7BV6] (explaining Facebook's "multifaceted" approach to protecting election integrity by blocking or removing fake accounts, identifying and removing "bad actors," limiting fake news, and providing transparency); Guy Rosen et al., *Helping to Protect the 2020 US Elections*, FACEBOOK (Oct. 21, 2019), https://about.fb.com/news/2019/10/update-on-election-integrity-efforts [https://perma.cc/W8RR-GTSU] (highlighting, among others, Facebook's efforts to fight foreign election interference).

470. *About Ads About Social Issues, Elections or Politics*, FACEBOOK (July 2, 2020), https://www.facebook.com/business/help/167836590566506 [https://perma.cc/9SFH-3Z4X]; *Prohibited Ads About Social Issues, Elections or Politics in the United States and Information on the 2020 Restriction Period*, FACEBOOK (Oct. 7, 2020), https://www.facebook.com/business/help/253606115684173 [https://perma.cc/2F82-YEHC]; *Fact-Checking on Facebook*, FACEBOOK (Aug. 12, 2020), https://www.facebook.com/business/help/182222309230722 [https://perma.cc/BV4V-DPYL].

471. *See* Zuckerberg, *supra* note 9 (highlighting Facebook's new policies towards informing users about voting, preventing voter suppression, and combatting hate speech).

472. *See Coronavirus Disease 2019 (COVID-19) Updates*, YOUTUBE, https://support.google.com/youtube/answer/9777243?hl=en&ref_topic=6151248 [https://perma.cc/6YEP-YCD3].

473. *See Over 130 Companies Remove Ads from Facebook in #StopHateforProfit Boycott, Forcing Mark Zuckerberg to Change Lax Facebook Policy on Misinformation and Hate Content*, FREE INTERNET PROJECT (June 27, 2020) [hereinafter *130 Companies Remove Ads*], https://thefreeinternetproject.org/blog/over-130-companies-remove-ads-facebook-

has since been removed and the Facebook "Fact-Checking" page now omits any mention of treatment of political ads or politicians.[474] Earlier in 2020, Zuckerberg defended Facebook's prior approach: "I just believe strongly that Facebook shouldn't be the arbiter of truth of everything that people say online."[475] In September 2019, Facebook Vice President Nick Clegg had explained this prior policy in a blog post: "[F]rom now on we will treat speech from politicians as newsworthy content that should, as a general rule, be seen and heard."[476] However, politicians' ads and posts were still subject to other aspects of Facebook's community standards, including hate speech and incitement of violence.[477] In June 2020, Facebook removed ads for the Trump campaign that included a symbol (red triangle) associated with a Nazi symbol, for example.[478]

Then, on June 26, 2020, Zuckerberg announced substantial changes to Facebook's policy after over 400 companies boycotted the company by removing their ads from Facebook to protest the "hate, bias, and discrimination growing on [Facebook's] platforms."[479] On his personal Facebook page, Zuckerberg said that Facebook would add labels to any violation of Facebook's community standards that remain on Facebook under the newsworthiness exception, including violations by political candidates.[480] Zuckerberg clarified that there is no newsworthiness exception for "[c]ontent that incites violence or

---

stophateforprofit-boycott-forcing-mark-zuckerberg-change [https://perma.cc/DHZ2-4ZMQ] (describing Facebook's since-reversed policy not to fact-check political ads).

474.   *See Fact-Checking on Facebook, supra* note 470.

475.   Rebecca Klar, *Zuckerberg: 'Facebook Shouldn't Be the Arbiter of Truth of Everything that People Say Online,'* HILL (May 27, 2020, 8:46 PM), https://thehill.com/policy/technology/499852-zuckerberg-facebook-shouldnt-be-the-arbiter-of-truth-of-everything-that [https://perma.cc/9FHB-M5AM].

476.   Clegg, *supra* note 100.

477.   *See* Zuckerberg, *supra* note 9 (asserting Facebook's commitment to remove content that is hate speech, incites violence, or suppresses voting, regardless of the source).

478.   Donie O'Sullivan, *Facebook Says It Took down Trump Ads Because They Used Nazi Symbol*, CNN (June 19, 2020, 5:42 AM), https://www.cnn.com/2020/06/18/tech/facebook-trump-ads-triangle-takedown/index.html [https://perma.cc/L8RR-VZJR].

479.   *Calling on Facebook Corporate Advertisers to Pause Ads for July 2020*, COLOR OF CHANGE (June 19, 2020), https://colorofchange.org/stop-hate-for-profit [https://perma.cc/VPX3-8XLN].

480.   *See* Zuckerberg, *supra* note 9 ("We will soon start labeling some of the content we leave up because it is deemed newsworthy . . . .").

suppresses voting," including in posts by political candidates.[481] Facebook tightened its enforcement of voter suppression through false claims about polling conditions, as well as its "ads policy to prohibit claims that people from a specific race, ethnicity, national origin, religious affiliation, caste, sexual orientation, gender identity or immigration status are a threat to the physical safety, health or survival of others."[482] Zuckerberg commented, "There are no exceptions for politicians in any of the policies that I'm announcing here today."[483]

Zuckerberg announced even greater changes on his Facebook page on September 3, 2020, which included nearly a dozen major changes or initiatives Facebook was taking to combat election misinformation, including related to election results.[484] These measures do not appear to be incorporated into Facebook's community standards. Instead, Zuckerberg's post was embedded into a Facebook news release, which is also included in the newsfeed for Facebook's special page "Preparing for Elections."[485] In any event, three of the changes are worth noting. First, Facebook banned political ads starting the week before the election.[486] Second, Facebook said it would remove implicit

---

481. Catherine Thorbecke, *Facebook to Label 'Newsworthy' Posts that Violate Rules as Ad Boycotts Grow*, ABC NEWS (June 26, 2020, 4:48 PM), https://abcnews.go.com/Business/facebook-label-newsworthy-posts-violate-rules-ad-boycotts/story?id=71478554 [https://perma.cc/TE5X-QJUQ].

482. Zuckerberg, *supra* note 9.

483. Shannon Bond, *In Reversal, Facebook to Label Politicians' Harmful Posts as Ad Boycott Grows*, NPR (June 26, 2020, 2:05 PM), https://www.npr.org/2020/06/26/883941796/unilever-maker-of-dove-soap-is-latest-brand-to-boycott-facebook [https://perma.cc/CRP4-EXZV].

484. *See New Steps to Protect the US Elections*, FACEBOOK (Sept. 3, 2020), https://about.fb.com/news/2020/09/additional-steps-to-protect-the-us-elections [https://perma.cc/7UV8-5WTN] (announcing Facebook's policy to add labels to any candidate's premature declaration of electoral victory on the platform); *Mark Zuckerberg: Facebook to Suspend Political Ads Week Before US Election, Add a Label to Premature Election Claims of Victory*, FREE INTERNET PROJECT (Sept. 3, 2020), https://thefreeinternetproject.org/blog/mark-zuckerberg-facebook-suspend-political-ads-week-us-election-add-label-premature-election [https://perma.cc/S2HU-SR6G] (describing each of Zuckerberg's September 3, 2020 Facebook policy changes).

485. *Preparing for Elections*, FACEBOOK, https://about.fb.com/actions/preparing-for-elections-on-facebook [https://perma.cc/2LGR-GT6Z].

486. *5 Things to Remember About Political and Issue Advertising Around the US 2020 Election*, FACEBOOK (Oct. 26, 2020), https://www.facebook.com/business/news/facebook-ads-restriction-2020-us-election [https://perma.cc/52H3-JRRT]. Facebook allowed political ads for the runoff election for the Senate races in Georgia. *See* Emily Glazer & Patience Haggin, *Facebook to Allow Political Ads for Georgia Runoffs*, WALL ST. J.

misrepresentations about the voting process just as it has removed explicit misrepresentations.[487] Third, Facebook announced a new policy of adding "informational label[s]" to posts on Facebook that attempt to "delegitimize the outcome of the election" such as "claiming that lawful methods of voting will lead to fraud."[488] As it turned out, President Trump himself was a main source of false claims of election results that warranted Facebook's informational labels, although one study suggested that the labels had only a modest effect on reducing the sharing of the flagged posts on Facebook.[489]

Facebook has an Elections Operation Center to combat election misinformation, but there is no dedicated webpage for it.[490] Facebook does include a page for its Facebook Protect program for the security of verified accounts of political candidates.[491] But this special program for political candidates is untethered from the content moderation policies that political candidates are expected to follow. Facebook issues a transparency report of its content moderation, but its report in November 2020 does not appear to identify content moderation involving political ads, content of political candidates, election-related misinformation, or voter suppression.[492] However, after the 2020 election, Facebook stated that it had added informational labels to more than 180 million posts containing election misinformation between March and November 3, 2020.[493]

---

(Dec. 15, 2020, 4:38 PM), https://www.wsj.com/articles/facebook-to-allow-political-ads-for-georgia-runoffs-11608062846.

487.  Mike Isaac, *Facebook Moves to Limit Election Chaos in November*, N.Y. TIMES (Sept. 22, 2020), https://www.nytimes.com/2020/09/03/technology/facebook-election-chaos-november.html.

488.  *New Steps to Protect the US Elections*, *supra* note 484.

489.  *See* Craig Silverman & Ryan Mac, *Facebook Knows that Adding Labels to Trump's False Claims Does Little to Stop Their Spread*, BUZZFEED NEWS (Nov. 16, 2020, 8:07 PM), https://www.buzzfeednews.com/article/craigsilverman/facebook-labels-trump-lies-do-not-stop-spread [https://perma.cc/B6YR-FFNP].

490.  *See* Rosen et al., *supra* note 469 (describing abstractly the Elections Operation Center's efforts to remove content that interferes with or suppresses voting).

491.  *Facebook Protect*, FACEBOOK, https://www.facebook.com/gpa/facebook-protect [https://perma.cc/UUY4-NR9V].

492.  *See* FACEBOOK, COMMUNITY STANDARDS ENFORCEMENT REPORT, https://transparency.facebook.com/community-standards-enforcement (last visited Jan. 28, 2021) (omitting these categories from covered policy areas in November 2020 report).

493.  *See* Danielle Abril, *Facebook Reveals that Massive Amounts of Misinformation Flooded Its Service During the Election*, FORTUNE (Nov. 19, 2020, 2:49 PM), https://fortune.com/2020/11/19/facebook-misinformation-labeled-180-million-posts-2020-election-hate-speech-prevalence [https://perma.cc/34B6-9PYL].

Facebook also removed 265,000 posts on Facebook and Instagram as containing voter suppression efforts.[494]

Finally, Facebook says it "work[s] to apply these policies in a way that is fair and consistent to all communities and cultures around the world,"[495] and in a way that is "inclusive of different views and beliefs."[496] Since 2016, Facebook has "partner[ed] with independent third-party fact-checkers globally who are certified through the non-partisan International Fact-Checking Network (IFCN)."[497] IFCN has a Code of Principles that members are to abide by; the first principle is "[a] commitment to Non-partisanship and Fairness," with five criteria for members who fact-check to follow.[498] The IFCN Code of Principles is a step in the right direction. But the Code's status at Facebook is ambiguous. They are not mentioned in Facebook's community standards. Instead, they are located on a separate "Journalism Project," in which Facebook describes what its partner fact-checkers are supposed to abide by.[499] It is unclear whether they also apply to decisions of Facebook employees. Assuming they do, it is still unclear the extent to which the Code of Principles applies to fact-checking the content of politicians.[500] Facebook did *not* fact-check "[p]osts and ads from politicians" under Facebook's policy through the summer of 2020, which apparently was modified by Zuckerberg's September 3, 2020 post to extend some fact-checking to politicians' content.[501] In any event, IFCN itself has faced criticism for having

---

494. *Id.*

495. *Understanding the Community Standards Enforcement Report*, *supra* note 464.

496. *Community Standards*, *supra* note 426.

497. *Facebook's Approach to Misinformation: Partnering with Third-Party Fact-Checkers*, FACEBOOK JOURNALISM PROJECT, https://www.facebook.com/journalismproject/programs/third-party-fact-checking/selecting-partners [https://perma.cc/HY5L-N6NL].

498. *The Commitments of the Code of Principles*, IFCN, https://ifcncodeofprinciples.poynter.org/know-more/the-commitments-of-the-code-of-principles [https://perma.cc/BLF7-JFR9].

499. *See Facebook's Approach to Misinformation: Partnering with Third-Party Fact-Checkers*, *supra* note 497 (requiring partner fact-checkers to commit to "[n]onpartisanship and [f]airness"; "[t]ransparency of [s]ources[,] . . . [f]unding[,] . . . [and m]ethodology"; and "[o]pen and [h]onest [c]orrections").

500. *See About*, IFCN, https://ifcncodeofprinciples.poynter.org/know-more [https://perma.cc/7LJ2-DQU4] (delimiting the application of the principles to organizations that "regularly publish nonpartisan reports on the accuracy of statements").

501. *Compare New Steps to Protect the US Elections*, *supra* note 484 (describing Facebook's post-September 3, 2020 content policy), *with 130 Companies Remove Ads*, *supra* note 473 (describing Facebook's pre-September 3, 2020 content policy).

members whose fact-checking is politically biased.[502] Moreover, Facebook appears to allow high-level executives to intervene to override or reverse the violation determinations by content moderators.[503] According to NBC News, "Facebook employees in the misinformation escalations team, with direct oversight from company leadership, deleted strikes during the review process that were issued to some conservative partners for posting misinformation over the last six months."[504] A similar controversy arose in India where, according to the *Wall Street Journal*, Facebook's "top public-policy executive in the country, Ankhi Das, opposed applying the hate-speech rules to Mr. Singh and at least three other Hindu nationalist individuals and groups flagged internally for promoting or participating in violence."[505] (Facebook denied the allegation, without discussing Das's involvement.[506])

In short, other than a nod to independent IFCN fact-checkers, Facebook fails to explain how nonpartisanship is operationalized or how political bias is avoided during its content moderation of political candidates or political ads, or the creation of its moderation policy (which reportedly was designed with a special concern to avoid negatively affecting conservative content).[507] Such "step-by-step" mechanisms may exist at Facebook, but they are not disclosed.

---

502.  *See* Anton Troianovski, *Fighting False News in Ukraine, Facebook Fact Checkers Tread a Blurry Line*, N.Y. TIMES (July 26, 2020), https://www.nytimes.com/2020/07/26/world/europe/ukraine-facebook-fake-news.html ("Stopfake[, one of Facebook's outside fact-checkers,] has been battling accusations of ties to the Ukrainian far right and of bias in its fact-checking."); Nandini Jammi, *How Did the Daily Caller Become a Facebook Fact-Checker?*, MEDIUM (Oct. 30, 2019), https://medium.com/@nandoodles/how-did-the-daily-caller-become-a-facebook-fact-checker-2a2dd7042c4f [https://perma.cc/77XT-DWV2] (highlighting The Daily Caller's "ties to white supremacists").

503.  *See* Solon, *supra* note 34; Newley Purnell & Jeff Horwitz, *Facebook's Hate-Speech Rules Collide with Indian Politics*, WALL ST. J. (Aug. 14, 2020, 12:47 PM), https://www.wsj.com/articles/facebook-hate-speech-india-politics-muslim-hindu-modi-zuckerberg-11597423346.

504.  Solon, *supra* note 34.

505.  Purnell & Horwitz, *supra* note 503.

506.  *See* Sunil Prabhu, *Decisions not Unilateral: Facebook Defends India Policy Chief Ankhi Das*, NDTV (Sept. 3, 2020, 6:22 PM), https://www.ndtv.com/india-news/not-unilateral-facebook-responds-to-congress-on-policy-decisions-teams-2289950 [https://perma.cc/S2AN-PXPH] (reporting Facebook's position that "[e]nforcing policies on hate speech is 'not [decided] unilaterally by any one person'").

507.  *See* Solon, *supra* note 34 (detailing how conservative Facebook pages "were not penalized for violations of the company's misinformation policies").

### D.   YouTube and Google

YouTube's community standards have some of the same weaknesses as Facebook's. Some important information related to content moderation of political ads and candidates is not contained in the community standards, but is instead scattered across YouTube's official blog and even pages on Google—making it hard to find.

YouTube's community standards have a landing page that organizes the standards by categories over several pages, with very helpful examples of potential violations.[508] Some information related to voter suppression, false claims on political candidate eligibility for office, and manipulated media is buried in the page for "Spam, Deceptive Practices & Scams Policies,"[509] which is perhaps not the most obvious category. Unlike Twitter and Facebook, YouTube did not implement a policy to address election misinformation until after the election on December 9, 2020, to address false content challenging the presidential election results.[510] YouTube "terminated over 8000 channels and thousands of harmful and misleading elections-related videos for violating our existing policies."[511] The community standards added this change: "Presidential Election Integrity: Content that advances false claims that widespread fraud, errors, or glitches changed the outcome of any past U.S. presidential election."[512] YouTube explained that it "remove[s] content that misleads people by alleging that widespread fraud or errors changed the outcome of the 2020 U.S. presidential election uploaded on or after December 9."[513] The move came after YouTube faced criticism

---

508.   *See Community Guidelines*, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines [https://perma.cc/9L8P-WNRZ] (providing links to YouTube's community guidelines on videos involving "[s]pam and deceptive practices," "[s]ensitive content," "[v]iolent or dangerous content," and "[r]egulated goods").

509.   *Spam, Deceptive Practices & Scams Policies*, YOUTUBE, https://support.google.com/youtube/answer/2801973?hl=en&ref_topic=9282365 [https://perma.cc/D8GL-LYWS].

510.   *See Supporting the 2020 U.S. Election*, YOUTUBE (Dec. 9, 2020), https://blog.youtube/news-and-events/supporting-the-2020-us-election [https://perma.cc/2YHP-7MWP].

511.   *Id.*

512.   *Spam, Deceptive Practices & Scams Policies, supra* note 509.

513.   *Id.*

for allowing Trump and the One American News Network to share videos making false claims of victory for Trump.[514]

Before this belated change, YouTube did not appear to have a specific community standard for election misinformation consisting of false claims of victory or false claims of voter fraud; instead, YouTube had categories for voter suppression, manipulated media, and false claims on candidate eligibility. YouTube's blog contains greater explanation of "How YouTube Supports Elections," and its removal policy for "election-related content that violates our policies" with five examples of violations.[515] YouTube's election blog post recognizes a principle of consistency in the enforcement of its rules: "As always, we enforce our policies consistently, without regard to a video's political viewpoint."[516] YouTube's community standards recognize the principle of "consistent" application, but they stop short of using the language in the blog post, "without regard to a video's political viewpoint."[517]

YouTube briefly explains how it detects potential violations through a combination of human and machine review,[518] "task[ing] over 10,000 people with detecting, reviewing, and removing content that violates our guidelines" and allowing users to flag content as well.[519] Without providing much detail of the process, YouTube describes how human reviewers decide violations and "strikes"

---

514. *See* Daisuke Wakabayashi, *Election Misinformation Continues Staying up on YouTube.*, N.Y. TIMES (Nov. 10, 2020), https://www.nytimes.com/2020/11/10/technology/election-misinformation-continues-staying-up-on-youtube.html; David Ingram, *YouTube Says It Wants 'Discussion' of Election Results, even when It's Been Debunked*, NBC NEWS (Nov. 13, 2020, 3:41 PM), https://www.nbcnews.com/tech/social-media/youtube-says-it-wants-discussion-election-results-even-when-it-n1247764 [https://perma.cc/4J9Q-HQMZ].

515. Leslie Miller, *How YouTube Supports Elections*, YOUTUBE (Feb. 3, 2020), https://youtube.googleblog.com/2020/02/how-youtube-supports-elections.html [https://perma.cc/2SF4-AAQE].

516. *Id.*

517. *How Do We Develop New Policies and Update Existing Ones?*, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#developing-policies [https://perma.cc/D8QQ-53F2].

518. *See How Does YouTube Identify Content that Violates Community Guidelines?*, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#detecting-violations [https://perma.cc/3GZD-Q3SN] (explaining how the combined approach allows YouTube to "detect problematic content at scale").

519. *Is There a Way for the Broader Community to Flag Harmful Content?*, YOUTUBE, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#flagging-content [https://perma.cc/CST7-JYBE].

committed by users.[520] Three strikes by a user in ninety days results in termination of the account.[521] The main penalties are removal of a video or age-restricting adult content.[522] YouTube allows the user to appeal a violation, and YouTube's "teams will re-review the decision."[523] YouTube also issues a transparency report of its content moderation, but the report does not appear to identify political ads, content of political candidates, or election-related misinformation.[524]

Similar to Twitter and Facebook, YouTube has a public interest or newsworthiness exception to its community standards. YouTube states: "We might allow videos that depict dangerous acts [if] they're meant to be educational, documentary, scientific, or artistic (EDSA)."[525] At a business conference in September 2019, CEO Susan Wojcicki told the audience that YouTube applies the EDSA exception to politicians.[526] Wojcicki explained that YouTube has an exception for "educational, documentary, scientific or artistic (EDSA)" videos that may remain on YouTube, despite violating a community standard.[527] A YouTube spokesperson later clarified that politicians are still subject to the same community standards, presumably as to what constitutes a violation.[528] Unfortunately, this policy with respect

---

520. *What Action Does YouTube Take for Content that Violates Community Guidelines?*, YOUTUBE https://www.youtube.com/howyoutubeworks/policies/community-guidelines/#enforcing-policies [https://perma.cc/B9D5-B8CD].

521. *Id.*

522. *See id.*

523. *Id.*

524. *See* GOOGLE, YOUTUBE COMMUNITY GUIDELINES ENFORCEMENT, https://transparencyreport.google.com/youtube-policy/removals?hl=en [https://perma.cc/2QSF-FR4B] (listing child safety; spam; nudity of sexual content; violent or graphic material; promotion of violence and violent extremism; harmful or dangerous material; harassment and cyberbullying as grounds for video removal).

525. *Harmful or Dangerous Content Policy*, YOUTUBE, https://support.google.com/youtube/answer/2801964?hl=en [https://perma.cc/3DDP-CJJN].

526. *See* Nina Golgowski, *YouTube CEO Says Politicians Are Exempt from Content Rules*, HUFFPOST (Sept. 25, 2019, 6:54 PM), https://www.huffpost.com/entry/politicians-exempt-from-youtube-rules-ceo-says_n_5d8ba3c4e4b01c02ca627f81 [https://perma.cc/CHE3-R2Y9] ("When you have a political officer that is making information that is really important for the constituents to see, or for other global leaders to see, that is content that we would leave up because we think it's important for other people to see . . . .").

527. *Id.*

528. Steven Overly, *YouTube CEO: Politicians Can Break Our Content Rules*, POLITICO (Sept. 25, 2019, 6:40 PM), https://www.politico.com/story/2019/09/25/youtube-ceo-politicians-break-content-rules-1510919 [https://perma.cc/DN9X-N4HB].

to politicians cannot be found in YouTube's community standards. YouTube allows political ads and reviews them for clear violations of its rules against "'deep fakes' (doctored and manipulated media), misleading claims about the census process, and ads or destinations making demonstrably false claims that could significantly undermine participation or trust in an electoral or democratic process."[529]

Google's search engine is different from the other platforms discussed above in that Google's search engine is not social media and does not disseminate user-generated content. Therefore, Google does not moderate user-generated content like the other platforms.[530] As a result, Google's community standards and code of conduct online are focused on its employees.[531] One of the community guidelines asks Google employees not to "disrupt[] the workday to have a raging debate over politics."[532] Google has a dedicated page to elections, including "Protecting Elections Information Online."[533] Google also has a page outlining its election ads policy.[534] Google has a general ad policy against misrepresentation and some forms of misleading content.[535] Google explains how it verifies U.S. election

---

529. Scott Spencer, *An Update on Our Political Ads Policy*, GOOGLE (Nov. 20, 2019), https://www.blog.google/technology/ads/update-our-political-ads-policy [https://perma.cc/6CJH-98UA].

530. *See* Matt Southern, *Google Doesn't Treat User Generated Content Different from Main Content*, SEARCH ENGINE J. (May 19, 2020), https://www.searchenginejournal.com/ google-doesnt-treat-user-generated-content-different-from-main-content/369168/#close [https://perma.cc/563X-SYJU] ("Google doesn't differentiate between content you wrote and content your users wrote. If you publish it on your site, we'll see it as content that you want to have published. And that's what we'll use for ranking [search results].").

531. *See Community Guidelines*, GOOGLE, https://about.google/community-guidelines [https://perma.cc/JMA7-PUJY] ("The following guidelines . . . apply when you're communicating in the workplace."); *Google Code of Conduct*, ALPHABET, https://abc.xyz/investor/other/google-code-of-conduct [https://perma.cc/Z3SR-T5Y7] ("We expect all of our employees and Board members to know and follow the Code [of Conduct].").

532. Community Guidelines, *supra* note 531.

533. *Protecting Elections Information Online*, GOOGLE, https://elections.google/ #protecting-elections [https://perma.cc/SN6P-5G2M].

534. *See Political Content*, GOOGLE, https://support.google.com/adspolicy/answer/ 6014595?hl=en [https://perma.cc/M7ML-AGLF] (explaining Google's election ads policy extends to ads "for political organizations, political parties, political issue advocacy or fundraising, and individual candidates and politicians").

535. *See Misrepresentation*, GOOGLE, https://support.google.com/adspolicy/answer/ 6020955?hl=en&ref_topic=1626336 [https://perma.cc/N4JZ-WEBH] (noting that Google's misrepresentation policy covers "ads or destinations that deceive users by

advertising.[536] However, Google does not specifically address the extent to which it fact-checks political ads.[537] The *Wall Street Journal* reported that Google rejected ads related to Senator Graham and President Trump that made unsubstantiated claims.[538] It is unclear whether Google applies a "newsworthiness" exception to its elections ad review. Republican lawmakers have accused Google's search of being biased against conservative viewpoints, and a *Wall Street Journal* study revealed a murky process by which Google makes human adjustments to its search algorithms to alter its search.[539] Google is secretive about its search algorithms (which are protected trade secrets) and its process of adjusting search results.[540] Under questioning about anti-conservative bias, CEO Sundar Pichai testified in December 2018, "I can commit to you and I can assure you, we do it without regards to political ideology. Our algorithms do it with no notion of political sentiment."[541] Yet it is unclear how nonpartisanship is ensured in Google search, especially when human refinements are made by Google employees.

---

excluding relevant product information or providing misleading information about products, services, or businesses").

536. *See About Verification for Election Advertising in the United States*, GOOGLE, https://support.google.com/adspolicy/answer/9002729?hl=en&ref_topic=1316596 [https://perma.cc/C4G9-9RVG] (listing Google's verification requirements for running election ads on its platform).

537. *See id.* (indicating only that Google will use verification information merely to "verify your identity and eligibility to run election ads").

538. Patience Haggin & Emily Glazer, *Facebook, Twitter and Google Write Their Own Rules for Political Ads—and What You See*, WALL ST. J. (June 4, 2020, 11:00 AM), https://www.wsj.com/graphics/how-google-facebook-and-twitter-patrol-political-ads.

539. *See* Kirsten Grind et al., *How Google Interferes with Its Search Algorithms and Changes Your Results*, WALL ST. J. (Nov. 15, 2019, 8:15 AM), https://www.wsj.com/articles/how-google-interferes-with-its-search-algorithms-and-changes-your-results-11573823753 (noting Google seldom discloses when or why changes to its search algorithm are made and that Google has interfered with search results to a far greater degree than publicly acknowledged).

540. *Id.*

541. Alina Selyukh, *Google CEO Says He Leads 'Without Political Bias' in Congressional Testimony*, NPR (Dec. 11, 2018, 3:19 PM), https://www.npr.org/2018/12/11/675543073/google-ceo-says-he-leads-without-political-bias-in-congressional-testimony [https://perma.cc/TPJ6-E7BL].

### E.  Reddit

Reddit is a platform that allows wide-ranging discussion forums or communities called "subreddits."[542] Although Reddit has a reputation for no-holds-barred discussions,[543] the platform recognizes eight rules or community standards.[544] Individuals who create a subreddit, called "moderators" or "mods," exercise considerable discretion over removing, approving, and labeling content, according to the rules created for the subreddit, but they are supposed to establish "clear, concise, and consistent guidelines" for the group.[545] The moderators are tasked with enforcing the eight rules of Reddit.[546] This is a unique feature of Reddit, placing more direct responsibility of content moderation and enforcement of community standards on its users. Reddit has employee "admins," who have greater authority in content moderation or rule enforcement.[547] Some moderators have complained that the review process by admins is murky.[548] Reddit allows appeals of suspensions called the "normal appeal flow," but it is unclear whether an appeal is allowed for a removal or quarantining of content.[549]

In its 2020 Security Report, Reddit revealed that it uses automated review to detect content manipulation and scaled attacks by bots on

---

542.  *See, e.g., Subreddits*, REDDIT, https://www.reddit.com/subreddits [https://perma.cc/3U24-X3QZ].

543.  For a history of Reddit's increasing content moderation, see u/spez, *Upcoming Changes to Our Content Policy, Our Board, and Where We're Going from Here*, REDDIT (June 5, 2020, 2:04 PM), https://www.reddit.com/r/announcements/comments/gxas21/upcoming_changes_to_our_content_policy_our_board [https://perma.cc/C7EN-X66R].

544.  *See Reddit Content Policy*, REDDIT, https://www.redditinc.com/policies/content-policy [https://perma.cc/3D8N-QRSA].

545.  *See Moderator Guidelines for Healthy Communities*, REDDIT, https://www.redditinc.com/policies/moderator-guidelines [https://perma.cc/5LBB-TH3T].

546.  *See id.*

547.  *See* Kim Renfro, *For Whom the Troll Trolls: A Day in the Life of a Reddit Moderator*, BUS. INSIDER (Jan. 13, 2016, 12:27 PM), https://www.businessinsider.com/what-is-a-reddit-moderator-2016-1 [https://perma.cc/K6KK-ZYS3].

548.  *See* u/ggAlex, *The Mod Conversations that Went into Today's Policy Launch*, REDDIT (June 29, 2020, 11:58 AM), https://www.reddit.com/r/modnews/comments/hi3nkr/the_mod_conversations_that_went_into_todays [https://perma.cc/MBE2-QLUR].

549.  *See* u/worstnerd, *Improved Ban Evasion Detection and Mitigation*, REDDIT (May 28, 2020, 5:34 PM), https://www.reddit.com/r/redditsecurity/comments/gsgg6k/improved_ban_evasion_detection_and_mitigation [https://perma.cc/E6UL-78ST].

AMERICAN UNIVERSITY LAW REVIEW [Vol. 70:913

Reddit, but human review for each report of abuse.[550] Reddit stated that its admins had removed over seventy-six million posts for content manipulation, including by malicious bots, which could have been intended to interfere with the U.S. election.[551]

Notably, a Reddit moderator can create a subreddit that is politically partisan and that excludes comments that do not conform to the political views or political party adopted in the subreddit's rules.[552] Although Reddit's explanation states that it allows "views across the political spectrum," the community standards do not discuss how Reddit handles content moderation of political candidates.[553] Reddit's ad policy limits political ads to federal office campaigns and subjects each ad to manual review; the general ad policy against "deceptive, untrue, or misleading advertising" also applies to political ads.[554] Reddit recognizes "contextual exceptions" for live video that "technically break these policies, but are nonetheless important,"[555] and also appears to have a general newsworthiness exception for content beyond live videos.[556]

Due to criticisms for allowing hate speech directed at persons of color amidst the nationwide protests of the police killing of George Floyd,[557] Reddit beefed up its policy against hate speech in June 2020

---

550. *See* u/worstnerd, *Reddit Security Report—June 18, 2020*, REDDIT (June 18, 2020, 12:15 PM), https://www.reddit.com/r/redditsecurity/comments/hbiuas/reddit_security_report_june_18_2020 [https://perma.cc/DK3Y-5EWC].

551. *See id.*

552. *See, e.g.*, *r/Republican*, REDDIT, https://www.reddit.com/r/Republican [https://perma.cc/2C2B-YHBL]; *r/democrats/rules*, REDDIT, https://www.reddit.com/r/democrats/about/rules (asking users not to "promote other political parties" or "post material that is anti-Democrat").

553. *See Update to Our Content Policy, supra* note 7; *Reddit Content Policy, supra* note 544.

554. *Changes to Reddit's Political Ads Policy*, REDDIT (Apr. 13, 2020, 4:35 PM), https://www.reddit.com/r/announcements/comments/g0s6tn/changes_to_reddits_political_ads_policy [https://perma.cc/5CNF-32ET].

555. *Reddit Content Policy for Live Video*, REDDIT, https://www.redditinc.com/policies/broadcasting-content-policy [https://perma.cc/5QJK-YTDR].

556. *See, e.g.*, *Do Not Post Violent Content*, REDDIT, https://www.reddithelp.com/hc/en-us/articles/360043513151 [https://perma.cc/GD9D-JSSZ] ("We understand there are sometimes reasons to post violent content (e.g., educational, newsworthy, artistic, satire, documentary, etc.) so if you're going to post something violent in nature that does not violate these terms, ensure you provide context to the viewer so the reason for posting is clear.").

557. *See* Steve Huffman, *Remember the Human—Black Lives Matter*, REDDIT BLOG (June 1, 2020), https://redditblog.com/2020/06/01/remember-the-human-black-lives-matter [https://perma.cc/X65X-BMDV].

with a specific provision outlining what is prohibited with examples.[558] The company also banned the subreddit "r/The_Donald," which was created by third parties (not related to Trump), for violating the hate speech policy.[559] Reddit explained:

> All communities on Reddit must abide by our content policy in good faith. We banned r/The_Donald because it has not done so, despite every opportunity. The community has consistently hosted and upvoted more rule-breaking content than average (Rule 1), antagonized us and other communities (Rules 2 and 8), and its mods have refused to meet our most basic expectations. . . . To be clear, views across the political spectrum are allowed on Reddit—but all communities must work within our policies and do so in good faith, without exception.[560]

Reddit is different from Twitter and YouTube in that Reddit's platform allows politically partisan groups to discriminate based on political viewpoint and party affiliation if the rules for the subreddit so stipulate. (Facebook also allows users to form political, social, or other groups with their own rules for the discussion.) However, if the subreddit's rules have no such restrictions, then it may be hard to ensure political bias does not creep into the content moderation decisions of user-moderators who are charged with a good deal of the responsibility in content moderation. For example, before the 2016 election, some criticized the moderators of the subreddit "r/politics"—a general political discussion group—for "leaning heavily in favor of Hillary Clinton."[561]

### F. Snapchat

Starting in late 2017, Snapchat has offered an alternative form of social media—a section where users interact with their circle of friends ("social") and a different section called Discover where curated media partners of Snap offer content ("media") to users.[562]

---

558. *See Promoting Hate Based on Identity or Vulnerability*, REDDIT, https://www.reddithelp.com/en/categories/rules-reporting/account-and-community-restrictions/promoting-hate-based-identity-or [https://perma.cc/S3BS-4ZCW].

559. *See Update to Our Content Policy, supra* note 7.

560. *Id.*

561. *Make r/politics an Unbiased Subreddit for All Political Parties*, CHANGE.ORG, http://chng.it/6NWmVQQYT5 [https://perma.cc/DX7T-524D].

562. *See* Evan Spiegel, *How Snapchat Is Separating Social from Media*, AXIOS (Nov. 29, 2017), https://www.axios.com/how-snapchat-is-separating-social-from-media-1513307227-64cafea7-db16-4f30-ae8a-2891677d400b.html [https://perma.cc/G54J-CUDZ].

This bifurcated approach minimizes the spread of fake news and misinformation.[563] Snapchat's community standards succinctly explain what content is prohibited.[564] They do not provide details of the review process beyond a brief statement: "We review these reports to determine whether there is a violation of these Guidelines and any action needs to be taken."[565] The community guidelines also indicate that "[m]edia partners in Discover agree to additional guidelines, including the requirement that their content is accurate and where appropriate, fact-checked."[566] In the past, Snapchat's community standards recognized a goal of consistent enforcement: "We will do our best to enforce them consistently and fairly, and ultimately we'll try to do what we think is best in each situation, at our own discretion."[567] Snapchat removed this language in its September 2020 community guidelines, which do recognize a goal of applying the guidelines "to all Snapchatters, equally."[568] CEO Evan Spiegel stated that the company reviews political ads for misinformation.[569] Snapchat recognizes a newsworthiness exception to content moderation.[570] Snapchat's website does not appear to discuss an appeal of its enforcement decisions, but one Change.org petition indicated that Snapchat does not allow appeals.[571] It is unclear from Snap's

---

563. *See* Mike Shields, *Snap Suddenly Has a Leg up on Facebook and Google—but It Still Needs to Do 2 Things to Steal Their Advertisers*, BUS. INSIDER (Oct. 7, 2017, 8:47 AM), https://www.businessinsider.com/snapchats-closed-doors-keep-fake-news-out-2017-10 [https://perma.cc/5Q7Q-LXVN].

564. *See Community Guidelines*, SNAP INC., https://www.snap.com/en-US/community-guidelines [https://perma.cc/9HB7-DS99].

565. *Id.*

566. *Id.*

567. Melissa Chan, *Snapchat's New Guidelines Warn Sexting Teens: 'Keep Your Clothes On!,'* N.Y. DAILY NEWS (Feb. 27, 2015, 10:44 AM), https://www.nydailynews.com/news/national/snapchat-new-guidelines-warn-teens-clothes-article-1.2131544.

568. *See Community Guidelines, supra* note 564.

569. *See* Makena Kelly, *Snapchat CEO Says His Company Fact-Checks Political Ads, Unlike Facebook*, VERGE (Nov. 18, 2019, 1:38 PM), https://www.theverge.com/2019/11/18/20970958/snapchat-evan-spiegel-facebook-political-ads-fact-checks-election.

570. *See Community Guidelines, supra* note 564; *see also* Katie Benner, *Snapchat Discover Takes a Hard Line on Misleading and Explicit Images*, N.Y. TIMES (Jan. 23, 2017), https://www.nytimes.com/2017/01/23/technology/snapchat-discover-takes-a-hard-line-on-misleading-and-explicit-images.html.

571. *See Let Snapchat Users Appeal if Their Account Has Been Wrongfully Locked/Terminated*, CHANGE.ORG, https://www.change.org/p/snap-inc-let-snapchat-users-appeal-if-their-account-has-been-wrongfully-locked-terminated [https://perma.cc/6PCS-VMVV].

community standards how the company ensures its enforcement is consistent or nonpartisan, although the bifurcated approach to Snap's platform may itself reduce any concerns about political bias.

Snapchat has a feature called Discover, which provides users with a feed of content created by publishers selected by Snapchat.[572] Snapchat determines what content is promoted in Discover.[573] In June 2020, Snapchat decided not to allow Trump's account to display his content on Discover because Trump's comments (outside of Snapchat) about the George Floyd protests could be viewed as "incit[ing] racial violence and injustice."[574]

### G.   Twitch

Twitch is a social network in which users livestream themselves, often while playing video games.[575] Its community standards are listed on one page, with links to more extensive discussion of its standards for hateful conduct and harassment, sexual content, and music content.[576] Notably, Twitch may consider taking enforcement action for harassment that occurs off the site if it is directed at a Twitch user.[577] Twitch's community standards do not contain any specific policies for politicians or political ads. When it temporarily suspended the account of Trump for violating its standards for hateful conduct (related to his comments about Mexicans during a Tulsa rally in late June 2020[578]), a Twitch spokesperson explained that Twitch does not have a public interest exception, but applies the same approach to politicians as any other user: "Like anyone else,

---

572.   *See* Josh Constine, *Snapchat Uncovers Discover*, TECHCRUNCH (June 7, 2016, 12:00 PM), https://techcrunch.com/2016/06/07/snapchat-discover-previews [https://perma.cc/PR74-4VE9].

573.   *See* Jordan Wahl, *What Is Snapchat Discover: Fresh Content at Your Fingertips*, G2 (Oct. 10, 2018), https://learn.g2.com/snapchat-discover [https://perma.cc/7U3Y-DL4N].

574.   Cecilia Kang & Kate Conger, *Snap Says It Will No Longer Promote Trump's Account*, N.Y. TIMES (June 3, 2020), https://www.nytimes.com/2020/06/03/technology/snapchat-trump.html.

575.   *See About*, TWITCH, https://www.twitch.tv/p/en/about.

576.   *See Community Guidelines*, TWITCH, https://www.twitch.tv/p/legal/community-guidelines [https://perma.cc/T2V5-4TUQ].

577.   *Id.* ("We may take action against users for hateful conduct or harassment that occurs off Twitch services that is directed at Twitch users.").

578.   *See* Kris Holt, *Twitch Restores Donald Trump's Account After a Two-Week Suspension*, ENGADGET (July 13, 2020), https://www.engadget.com/twitch-donald-trump-suspension-lifted-180048663.html [https://perma.cc/WM26-MWUQ].

politicians on Twitch must adhere to our Terms of Service and Community Guidelines . . . . We do not make exceptions for political or newsworthy content, and will take action on content reported to us that violates our rules."[579] Twitch was the only company surveyed that did not recognize a public interest exception. On December 9, 2020, Twitch announced an updated policy to combat hateful conduct, harassment, and sexual harassment on its platform, including some discussion of how Twitch determines violations.[580]

Twitch's community standards don't mention impartiality or nonpartisan enforcement, but they support "users who express diverse or unpopular points of view."[581] The policy regarding hateful conduct states that it "affords every user globally equal protections under this policy, regardless of their particular characteristics."[582] Twitch explains that the potential penalties for a violation include "removal of content, a strike on the account, and/or suspension."[583] Twitch allows the user to appeal a suspension of an account or a warning it issues.[584]

### H.  TikTok

TikTok is the latest craze in social media, enabling people to share short videos through an internet platform.[585] TikTok is different from the other platforms discussed because it originates from China—a source of controversy due to concerns of data collection.[586] Given its

---

579. Igor Bonifacic, *Twitch Has Suspended Donald Trump's Account*, ENGADGET (June 29, 2020), https://www.engadget.com/twitch-suspends-donald-trump-account-174145621.html [https://perma.cc/N3GF-ZSPK].

580. *See Introducing Our New Hateful Conduct & Harassment Policy*, TWITCH (Dec. 16, 2020), https://blog.twitch.tv/en/2020/12/09/introducing-our-new-hateful-conduct-harassment-policy [https://perma.cc/YPD8-V6AT].

581. *Hateful Conduct and Harassment [NEW]*, TWITCH, https://www.twitch.tv/p/legal/community-guidelines/harassment/20210122 [https://perma.cc/K8XG-NMPZ].

582. *Id.*

583. *Community Guidelines*, *supra* note 576.

584. *See About Account Enforcements and Chat Bans*, TWITCH, https://help.twitch.tv/s/article/about-account-suspensions-dmca-suspensions-and-chat-bans?language=en_US.

585. *See* Claire Pedersen et al., *Inside the TikTok Craze and Why There Are Concerns over Chinese Data Collection, Censorship*, ABC NEWS (Nov. 5, 2019, 8:30 PM), https://abcnews.go.com/Business/inside-tiktok-craze-concerns-chinese-data-collection-censorship/story?id=66768839 [https://perma.cc/GB7Y-F8EY].

586. *See id.* (noting that Tiktok is owned by ByteDance, a Chinese artificial intelligence company).

connection to China, President Trump had attempted to ban TikTok by invoking powers under the International Emergency Economic Powers Act[587] (IEEPA), but two federal judges granted temporary injunctions against the enforcement of the Secretary of Commerce's prohibitions on TikTok, which the courts held likely went beyond the authority provided by IEEPA.[588] It was unclear in January 2021 whether the Biden Administration would take a different approach to TikTok.

TikTok's community standards include, for each standard, a very helpful section instructing "Do not post," with examples of what users should not post.[589] Similar to Twitter, TikTok bans all political ads: "Ads must not reference, promote or oppose a candidate for public office, current or former political leader, political party, or political organization. They must not contain content that advocates . . . (for or against) [ ] a local, state, or federal issue of public importance."[590] But "[c]ause-based advertising or public service announcements from non-profits or government agencies may be allowed, if not driven by partisan political motives."[591] Like YouTube and Twitch, TikTok updated its community guidelines in December 2020; TikTok did so to foster well-being on the platform, for example, to address suicide, self-harm, and distressing content.[592] TikTok's policy against misinformation consisting of "[c]ontent that misleads community members about elections or other civic processes" remained the same.[593] According to one report, TikTok removed videos containing

---

587. 50 U.S.C. §§ 1701–07.

588. *See* TikTok Inc. v. Trump, No. 1:20-cv-02658-CJN, 2020 WL 7233557, at *15, *18 (D.D.C. Dec. 7, 2020); Marland v. Trump, No. 20-4597, 2020 WL 6381397, at *12, *15 (E.D. Pa. Oct. 30, 2020).

589. *See Community Guidelines*, TIKTOK, https://www.tiktok.com/community-guidelines?lang=en [https://perma.cc/QL67-RJMT].

590. *TikTok Advertising Policies—Ad Creatives*, TIKTOK, https://ads.tiktok.com/help/article?aid=9552 [https://perma.cc/UX9L-8RVU]; *see also* Blake Chandlee, *Understanding Our Policies Around Paid Ads*, TIKTOK, https://newsroom.tiktok.com/en-us/understanding-our-policies-around-paid-ads [https://perma.cc/J4VZ-AUDG].

591. *TikTok Advertising Policies—Ad Creatives, supra* note 590.

592. *See* Cormac Keenan, *Refreshing Our Policies to Support Community Well-Being*, TIKTOK (Dec. 15, 2020), https://newsroom.tiktok.com/en-us/refreshing-our-policies-to-support-community-well-being [https://perma.cc/TZZ7-A5JG]; *Community Guidelines*, TIKTOK (last updated Dec. 2020), https://www.tiktok.com/community-guidelines?lang=en [https://perma.cc/VL3A-RD8Q].

593. *See Community Guidelines, supra* note 592.

election misinformation, including QAnon conspiracy theories about ballots, but not before the videos amassed over 200,000 views.[594]

TikTok uses "a mix of technology and human moderation" and invites users to report violations.[595] Based on the H1 2020 Transparency Report, TikTok appears to rely heavily on filtering or moderation via technology.[596] Like most of the other internet platforms, TikTok's community standards do not expressly adopt a principle of nonpartisanship, although they "apply to everyone and to everything on TikTok."[597] TikTok recognizes a public interest exception allowing violating content to remain on TikTok "under certain circumstances, such as educational, documentary, scientific, or artistic content, satirical content, content in fictional settings, counterspeech, and content in the public interest that is newsworthy or otherwise enables individual expression on topics of social importance."[598]

TikTok has undertaken major initiatives to make their procedures more transparent—even beyond other Internet platforms' disclosures. TikTok announced the formation of a Transparency Center in Los Angeles to allow people to examine the company's content moderation.[599] This initiative comes amidst the United States and other countries' concerns about privacy and putative surveillance on TikTok.[600] In March 2020, TikTok announced a Content Advisory

---

594.   *See* Kari Paul, *TikTok: False Posts About US Election Reach Hundreds of Thousands*, GUARDIAN (Nov. 5, 2020, 7:30 PM), https://www.theguardian.com/technology/2020/nov/05/tiktok-us-election-misinformation [https://perma.cc/NV2E-FZR8].

595.   *Community Guidelines*, *supra* note 592.

596.   *See* Michael Beckerman, *Our H1 2020 Transparency Report*, TIKTOK (Sept. 22, 2020), https://newsroom.tiktok.com/en-us/our-h-1-2020-transparency-report [https://perma.cc/6MUD-R8Q4] (noting TikTok "removed 96.4% of these videos before they were reported to us, and 90.3% were removed before they received any views").

597.   *Community Guidelines*, *supra* note 592.

598.   *Id.*

599.   *See* Vanessa Pappas, *TikTok to Launch Transparency Center for Moderation and Data Practices*, TIKTOK (Mar. 11, 2020), https://newsroom.tiktok.com/en-us/tiktok-to-launch-transparency-center-for-moderation-and-data-practices [https://perma.cc/HK4E-2JJE]; Casey Newton, *Three Takeaways from a Visit to TikTok's New Transparency Center*, VERGE (Sept. 11, 2020, 6:00 AM), https://www.theverge.com/interface/2020/9/11/21430822/tiktok-transparency-visit-tour-algorithms-for-you-page.

600.   *See* Christopher Brito, *U.S. "Looking at" Banning TikTok and Other Chinese Social Media Apps, Mike Pompeo Says*, CBS NEWS (July 7, 2020, 3:02 PM), https://www.cbsnews.com/news/tiktok-pompeo-united-states-weighing-ban-chinese-social-

App. 751

Council of independent experts chaired by Professor Dawn Nunziato.[601] The Council will advise TikTok on "critical topics around platform integrity, including policies against misinformation and election interference."[602] These initiatives indicate that TikTok's content moderation is still a work-in-progress. As a company representative said on July 9, 2020, "We're working every day to be more transparent about the violating content we take down and offer our users meaningful ways to have more control over their experience, including the option to appeal if we get something wrong."[603] Then-CEO Kevin Mayer announced on July 29, 2020 that TikTok was launching a "Transparency and Accountability Center for moderation and data practices," premised on the belief that "all companies should disclose their algorithms, moderation policies, and data flows to regulators."[604] TikTok later disclosed its algorithms, a first for any internet platform.[605]

### I. Internet Platforms' Internal (Nonpublic) Manuals

Internet platforms may have internal company manuals that set forth more detailed guidelines, including nonpartisanship or impartiality as a principle for their content moderators.[606] If so, they should publicize the internal standards that content moderators use, as well as the

---

media-apps [https://perma.cc/Z6S6-FXMM] (noting India has already banned TikTok and Australia is considering it).

601.  *See* Vanessa Pappas, *Introducing the TikTok Content Advisory Council*, TIKTOK (Mar. 18, 2020), https://newsroom.tiktok.com/en-us/introducing-the-tiktok-content-advisory-council [https://perma.cc/HRG7-CFLK].

602.  *Id.*

603.  Jonathan Chadwick, *TikTok Deleted Almost 50 MILLION Videos in Just Six Months and Received 500 Legal Requests for User Data from Governments Around the World*, DAILY MAIL (July 10, 2020, 6:49 AM), https://www.dailymail.co.uk/sciencetech/article-8507003/TikTok-removed-49-million-videos-six-months-breaking-content-rules.html [https://perma.cc/HBB4-7VNM].

604.  Kevin Mayer, *Fair Competition and Transparency Benefits Us All*, TIKTOK (July 29, 2020), https://newsroom.tiktok.com/en-us/fair-competition-and-transparency-benefits-us-all [https://perma.cc/TV8L-DRF7].

605.  *See* Sara Fischer, *Inside TikTok's Killer Algorithm*, AXIOS (Sept. 10, 2020), https://www.axios.com/inside-tiktoks-killer-algorithm-52454fb2-6bab-405d-a407-31954ac1cf16.html [https://perma.cc/868A-BU88]; Casey Newton, *TikTok Has a Bold New Plan to Win over Regulators*, VERGE (July 31, 2020, 6:00 AM), https://www.theverge.com/interface/2020/7/31/21348172/tiktok-algorithms-transparency-accountability-review-lawmakers-michael-beckerman-interview.

606.  *See, e.g.*, Klonick, *supra* note 61, at 1633 (describing internal "booklet" for content moderation at YouTube).

exact procedures that are in place to promote nonpartisan content moderation of political candidates and political ads. The lack of transparency allows the allegations of "political bias" to fester. As the above survey shows, the internet platforms all fail to provide much, if any, information explaining how they ensure nonpartisan content moderation of political candidates.

### III.   THE CASE FOR NONPARTISANSHIP AS A COMMUNITY STANDARD FOR CONTENT MODERATION OF POLITICAL CANDIDATES AND POLITICAL ADS

Part III sets forth the affirmative case for why internet platforms should recognize nonpartisanship as a community standard that they follow in moderating the content of political candidates and public officials—and should establish transparent procedures to ensure adherence to this important principle.

#### A.   Why Nonpartisanship in Content Moderation Matters

Large internet platforms that offer themselves as fora for wide open public discussion should adopt a principle of nonpartisanship in moderation of the content of political candidates. This principle is consistent with free and open exchange of speech, particularly on political issues related to elections.

##### 1.   Partisan versus nonpartisan content moderation of politicians' content

This Article does not explore the larger question whether internet platforms should be neutral or nonpartisan in general for all content moderation of the millions of users and the billions of content on their platforms. That question is left for future inquiry.

Instead, this Article focuses on the narrower issue involving the online content of elected officials and political candidates running for office in the United States, as well as political campaign ads by those candidates or political action committees. (Other government employees or non-elected officials are excluded.) The class of political candidates and public officials presents a more finite and limited number of people. If operationalizing a principle of nonpartisanship would require greater staff and resources, then it would be far more realistic for platforms to deal first with potentially 537 federal officials, 18,749 state officials, and 500,396 local officials,

just in the United States.[607] Though that figure is large, it pales in comparison to the 2.7 billion active users on Facebook.[608]

This Article defines the *principle of nonpartisanship* as the review of the content of a political candidate or a political campaign ad, for potential violations of the community standards of an internet platform, without bias or favoritism due to the political party of the candidate or the person or group who posted the campaign ad. Thus, if content moderators find a violation of the community standards because of the candidate's party affiliation, either for or against, that decision would violate the principle of nonpartisanship. Decisions of content moderation should be politically nonpartisan—meaning they should not be based on the moderator's allegiance to one political party or another, nor should they be based on deference or favoritism to the political party in power. The company should not modify its content moderation decisions or policies to curry favor or avoid reprisal from a political leader, either.

Imagine that the CEO of an internet platform is a supporter of Candidate A because the CEO believes Candidate A is better for the platform's business. But an inflammatory post by Candidate A was flagged by the company's regular content moderation procedure because it violated the company's community standard against hate speech. However, knowing the CEO's support of Candidate A, a high-level executive who participates in the final review by its content moderation group reversed the violation decision and let Candidate A's post remain unmoderated for all to see. In short, the company executive knowingly engaged in political favoritism to Candidate A during its content moderation because the CEO politically supports Candidate A. Problematic?

Yes. Under the principle of nonpartisanship, the executive made a content moderation decision based on the CEO's personal preference for a candidate and overrode the violation decision because of a preference for the candidate, as opposed to the actual content in the post. Whatever the company's motivation in preferring a political candidate (e.g., agreement with the candidate's views,

---

607. *How Many Politicians Are There in the USA?*, POLIENGINE, https://poliengine.com/blog/how-many-politicians-are-there-in-the-us [https://perma.cc/QWE8-QA6G].

608. J. Clement, *Facebook: Number of Monthly Active Facebook Users Worldwide 2008–2020*, STATISTA (Aug. 10, 2020), https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide.

belief the candidate is better for the company's business, fear the candidate will retaliate against the company if elected), the preference for the political candidate amounts to political support for the candidate—a factor that is wholly inappropriate to base a decision of content moderation. In short, the content moderation was partisan.[609]

### 2.   Why a principle of nonpartisanship for political candidates should be recognized

#### a.   Allowing voters' information from political candidates relevant to government and elections without political bias

Recognizing the proposed, limited principle of nonpartisanship should not be controversial. Except for Reddit, which allows politically partisan discussion groups to exclude comments from the opposing party consistent with the subreddit's rules, none of the internet platforms analyzed above suggest they allow their own content moderation to be partisan or politically biased. Twitter, Facebook, and YouTube openly tout their goal of consistent, fair, or uniform application of their community guidelines. The limited principle of nonpartisanship proposed by this Article is consistent with that general goal.

The principle of nonpartisanship is founded on the belief that voters benefit from having "political speech in the course of elections, the speech upon which democracy depends."[610] With such information, voters can evaluate the content from political candidates and political campaigns. Such content is critical to people's right to information about their government and their ability to make

---

609.  Some critics question whether there's any evidence of this kind of partisan decision ever happening at social media companies. I am not privy to the internal decisions of internet platforms. However, media reporting has provided evidence of possible irregularities or political bias in content moderation decisions or policy. *See, e.g., supra* notes 34–35, 318, 335; *infra* notes 697, 708–10 and accompanying text; Lauren Frayer, *Facebook Accused of Violating Its Hate Speech Policy in India*, NPR (Nov. 27, 2020, 3:46 PM), https://www.npr.org/2020/11/27/939532326/facebook-accused-of-violating-its-hate-speech-policy-in-india [https://perma.cc/QRS2-NZFS]; Whitney Tesi, *Facebook and Twitter Take Steps to Limit Spread of Controversial New York Post Article*, SLATE (Oct. 14, 2020, 6:31 PM), https://slate.com/technology/2020/10/hunter-biden-new-york-post-twitter-facebook-block.html [https://perma.cc/QDY7-FR5P] (reporting Evelyn Douek, a doctoral student at Harvard Law School, suggested that Twitter's decision on Hunter Biden story did not comport with its own policy on hacked materials).

610.  Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 405 (2000) (Kennedy, J., dissenting).

informed decisions about voting.[611] This justification comports with the Supreme Court's general approach to scrutinizing federal disclosure requirements on campaign ads in federal elections.[612] As Richard Briffault summarizes, "By emphasizing the voter information that disclosure generates, disclosure actually 'further[s] First Amendment values by opening the basic processes of our federal election system to public view,'" under the Court's jurisprudence.[613] This approach is also consistent with Article 19(2) of the International Covenant on Civil and Political Rights, which recognizes: "Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice."[614] The United States ratified this treaty in 1992.[615] Internet platforms can also benefit from incorporation of human rights standards in their content moderation policies, as David Kaye, the former UN special rapporteur on the promotion of the right to freedom of opinion and expression, has advocated.[616]

However, recognizing a principle of nonpartisanship does not mean that internet platforms cannot fact-check political ads or must allow election misinformation, hate speech, or attempts to suppress voters by posts or ads. To the contrary, given the lessons of election interference in the 2016 U.S. election, it would be Panglossian for internet platforms to sit back and allow rampant misinformation and foreign interference without moderation. Indeed, it would be gross negligence for internet platforms to allow their websites to be exploited—or weaponized—to suppress voters or to interfere with

---

611. *See* Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 182 (1968) ("It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them." (quoting A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 224 (1964))).

612. *See* McConnell v. Fed. Election Comm'n, 540 U.S. 93, 196 (2003) (discussing the approach the Court enumerated in *Buckley v. Valeo*, 424 U.S. 1 (1976)).

613. Richard Briffault, *Two Challenges for Campaign Finance Disclosure After* Citizens United *and* Doe v. Reed, 19 WM. & MARY BILL RTS. J. 983, 991 (2011).

614. International Covenant on Civil and Political Rights art. 19(2), Dec. 19, 1966, 999 U.N.T.S. 171.

615. Jimmy Carter, *U.S. Finally Ratifies Human Rights Covenant*, CARTER CTR. (June 28, 1992), https://www.cartercenter.org/news/documents/doc1369.html [https://perma.cc/KZM9-K2E3].

616. *See* DAVID KAYE, SPEECH POLICE: THE GLOBAL STRUGGLE TO GOVERN THE INTERNET 119 (2019).

elections. As long as the internet platform applies its community standards in nonpartisan fashion, it can moderate *everything*, including election misinformation. Nonpartisan treatment is all that is required.

Each internet platform can decide whether to exempt politicians from any of its community standards. Based on the survey in Part I, only Facebook did so by recognizing an exception for politicians and political ads from fact-checking, although Facebook altered its policy in September 2020, as noted above.[617] Facebook applies the same general community standards for hate speech, violence, and voter suppression to politicians and laypeople alike, as do the other internet platforms.[618] Moreover, all of the platforms except for Twitch recognize a "public interest" or "newsworthiness" exception to allow violating content to remain viewable, with a notation of the violation, on its site.[619] This labeling of violations provides a less restrictive alternative to removal of a politician's post, thereby balancing the interests of the general public in receiving the information and the interests of the internet platform in providing a safe forum for all of its users.[620]

### b.  Avoiding the filter bubble

Another reason why a principle of nonpartisanship should be adopted in content moderation is to ward off further entrenchment of filter bubbles among internet platforms. Internet theorist and activist Eli Pariser has warned about the dangers of how internet platforms feed information to their users based on algorithms that lack transparency and that may prioritize what the algorithm thinks the users like: "The danger of these filters is that you think you are getting a representative view of the world and you are really, really not, and you don't know it."[621] If content moderation itself becomes partisan, this problem will only worsen.

---

617.  *See supra* Table 1.

618.  *See Community Standards, supra* note 462.

619.  *See supra* Table 1.

620.  Some question the effectiveness of labels as a way to combat misinformation. *See* Brian Fung, *Social Media Bet on Labels to Combat Election Misinformation. Trump Proved It's Not Enough*, CNN (Dec. 8, 2020, 7:11 AM), https://www.cnn.com/2020/12/08/tech/facebook-twitter-election-labels-trump/index.html [https://perma.cc/XZ85-8PQU].

621.  Jasper Jackson, *Eli Pariser: Activist Whose Filter Bubble Warnings Presaged Trump and Brexit*, GUARDIAN (Jan. 8, 2017, 8:00 AM), https://www.theguardian.com/media/2017/jan/08/eli-pariser-activist-whose-filter-bubble-warnings-presaged-trump-and-

Consider the controversy over Section 230. Republican lawmakers decried the content moderation of Trump by Twitter and other companies as censorship and election interference.[622] They also touted the internet platform Parler as a Twitter-alternative and an "unbiased" platform.[623] But Parler reportedly terminated the accounts of liberal users.[624] Instead of being a more open platform, Parler has become known as a conservative platform.[625] Whether accurate or not, the prospect of enclaves of conservative internet platforms and liberal ones should give us pause. It would effectively create internet fiefdoms or filter bubbles—exposing users to a one-sided feed of content. But, as Pariser warned: "If you only see posts from folks who are like you, you're going to be surprised when someone very unlike you wins the presidency."[626]

### c.  Revitalizing a commitment to common good over factions

Adopting a principle of nonpartisan content moderation can also be a way to revitalize a commitment to a common good in the United States. Internet platforms can effectively set the tone for a healthier debate by and over political candidates. Internet platforms set up basic ground rules for online debate in their community standards—and then moderate in a nonpartisan way.

Madison's famed *Federalist No. 10* sets forth a defense of a republican form of government in the Constitution as a way to counter the dangers of factions that inevitably arise.[627] One of the dangers of factions—what we might call today tribalism[628]—is that people become "divided [ ] into parties, inflamed [ ] with mutual animosity, and rendered [ ] much more disposed to vex and oppress

---

brexit [https://perma.cc/9DD5-PYHE]; *see* ELI PARISER, THE FILTER BUBBLE: WHAT THE INTERNET IS HIDING FROM YOU (2011).

622.  *See* Fung et al., *supra* note 11.

623.  *See* Danielle Abril, *Conservative Social Media Darling Parler Discovers that Free Speech Is Messy*, FORTUNE (July 1, 2020, 3:00 PM), https://fortune.com/2020/07/01/what-is-parler-conservative-free-speech-misinformation-hate-speech-john-matze [https://perma.cc/ANH4-UM2W].

624.  Watts, *supra* note 12.

625.  *See id.*

626.  Jackson, *supra* note 621.

627.  *See* THE FEDERALIST NO. 10 (James Madison).

628.  *See* Joseph Russomanno, *Tribalism on Campus: Factions, iGen and the Threat to Free Speech*, 24 COMMC'N L. & POL'Y 539, 557 (2019).

each other than to co-operate for their common good."[629] In words that still ring true today, Madison identified the pervasiveness of factions: "A zeal for different opinions concerning religion, concerning government, and many other points, as well of speculation as of practice; an attachment to different leaders ambitiously contending for pre-eminence and power; or to persons of other descriptions whose fortunes have been interesting to the human passions . . . ."[630]

Madison's proposed solution was not to eliminate factions, which would require destroying liberty, but to control their pernicious effects, to make them "unable to concert and carry into effect schemes of oppression."[631] Madison believed the republican form of government set forth in the Constitution would provide such a check on factions.[632]

Whether Madison's view is persuasive is open to debate, especially given the rise of partisan politics.[633] Yet Madison's insight about the importance of designing institutions in a way to check oppression and to foster the ability of people to recognize "both the public good and the rights of other citizens" still holds true today.[634] Internet platforms that offer public forums for their users to engage in public discussion and debate should view themselves as architects of public, online spaces. The platforms should design institutional features that promote a common good and respect for all individuals instead of enabling factions to dominate or manipulate the conversation and engagement on a platform. Perhaps this idea sounds utopian. But if it is, our republic may be lost.

Just imagine if Facebook became Foxbook and catered only to conservative viewpoints or YouTube became CNNTube, the video sharing site for liberals. Extending partisanship to even more sectors, including social media, could be harmful to the functioning of democratic government, particularly in today's highly polarized climate. As Gallup senior scientist Frank Newport warns: "[P]olarization and partisan conflict lead to inaction, as 'my way or the highway,'

---

629.  THE FEDERALIST NO. 10, at 59 (James Madison) (Jacob E. Cooke ed., 1961).
630.  *Id.* at 58–59.
631.  *Id.* at 61.
632.  *See id.* at 60.
633.  *See* Michael Gerhardt & Jeffrey Rosen, *How to Revive Madison's Constitution*, ATLANTIC (Dec. 4, 2019), https://www.theatlantic.com/ideas/archive/2019/12/madison-constitution/602929.
634.  THE FEDERALIST NO. 10, *supra* note 629, at 60–61.

ideologically rigid mentalities lower the probability of achieving the compromise that should be at the heart of legislative functioning."[635]

### d. Internet platforms for user-generated content are different from other media and publishers

The most common pushback I have received to my proposal is the argument that internet platforms like Facebook and Twitter should be treated no different from Fox News, CNN, book publishers, and other media, who are under no obligation to be nonpartisan even during elections. By this reasoning, Facebook or Twitter should be allowed to favor the content of a particular politician because it wants that politician to win. For example, one can point to television news networks (e.g., Fox News, CNN, and MSNBC) and newspapers (e.g., *Washington Times*, *Wall Street Journal*, and *New York Times*) as being partisan, to some extent, in presenting the news more favorably to conservative or liberal views.[636]

What this argument ignores is that internet platforms are different from newspapers, TV networks, and book publishers. As an initial matter, internet platforms are the only ones eligible to qualify for Section 230 immunity—which at the very least suggests that Congress viewed them differently. More importantly, internet platforms are open fora to potentially millions, if not billions, of users. Internet platforms reach a much greater audience—Facebook has 190 million users in the United States and Twitter, 68.7 million, while the *New York Times* has six million subscribers and Fox News around four million viewers.[637] Internet platforms also invite their millions of users

---

635. Frank Newport, *The Impact of Increased Political Polarization*, GALLUP (Dec. 5, 2019), https://news.gallup.com/opinion/polling-matters/268982/impact-increased-political-polarization.aspx [https://perma.cc/D6D3-EMWU].

636. *See AllSides Media Bias Chart*, ALLSIDES, https://www.allsides.com/media-bias/media-bias-chart [https://perma.cc/LRK7-U33F] (showing media sources' biases on a scale from progressive to conservative).

637. J. Clement, *Leading Countries Based on Facebook Audience Size as of October 2020*, STATISTA (Nov. 24, 2020), https://www.statista.com/statistics/268136/top-15-countries-based-on-number-of-facebook-users; J. Clement, *Leading Countries Based on Number of Twitter Users as of October 2020*, STATISTA (Oct. 29, 2020), https://www.statista.com/statistics/242606/number-of-active-twitter-users-in-selected-countries; Sarah Scire, *The New York Times' Success with Digital Subscriptions Is Accelerating, Not Slowing down*, NIEMANLAB (May 6, 2020, 4:02 PM), https://www.niemanlab.org/2020/05/the-new-york-times-success-with-digital-subscriptions-is-accelerating-not-slowing-down [https://perma.cc/9V5W-GSDW]; Joseph Wulfsohn, *Fox News Reaches Highest Viewership in Network's History, Topping MSNBC, CNN in 2020*,

to publish user-generated content—typically without any condition that the content must serve a conservative or liberal viewpoint to qualify for publication. Internet platforms operate as a public space for their users to exchange information.[638] This important feature is what makes the media "social."[639] By contrast, television networks, newspapers, and book publishers select everything they publish. None of the television networks, newspapers, or book publishers offer people a platform for user-generated content. They are fundamentally different from internet platforms.

Internet platforms should operate in a way analogous to universities when it comes to political candidates. Under section 501(c)(3) of the Treasury Department regulations for tax-exempt nonprofits, universities lose their tax-exempt status if they "participat[e] or interven[e] in a political campaign on behalf of or in opposition to a candidate includ[ing] . . . the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate."[640] This restriction (also known as the Johnson amendment for then-Senator Lyndon Johnson, who sponsored it) is designed to avoid universities taking on a partisan role while educating students, who may be impressionable and also a captive audience.[641] Universities have traditionally recognized academic freedom and diversity of viewpoints among faculty and students.[642] Allowing universities to stake out partisan positions related to elections would undermine these values. Yet, academic freedom does not mean that universities cannot have campus regulations against hate speech and racist comments, such as in the classroom or dorms.[643] Similarly, internet platforms have traditionally recognized freedom of expression and diversity of viewpoints as important parts of their mission, while also moderating hate

---

FOX NEWS (Feb. 25, 2020), https://www.foxnews.com/media/highest-viewership-network-history-msnbc-cnn-2020 [https://perma.cc/YPC8-725X].

638. *See* GILLESPIE, *supra* note 1, at 18–19.

639. *See id.* at 16–17.

640. Treas. Reg. § 1.501(c)(3)(iii) (2019); *see* 26 U.S.C. § 501(c)(3).

641. *See generally* Michael Fresco, Note, *Getting to "Exempt!": Putting the Rubber Stamp on Section 501(c)(3)'s Political Activity Prohibition*, 80 FORDHAM L. REV. 3015, 3019–21 (2012).

642. *See* David M. Rabban, *A Functional Analysis of "Individual" and "Institutional" Academic Freedom Under the First Amendment*, 53 L. & CONTEMP. PROBS. 227, 232–33 (1990).

643. *See* Melissa Weberman, Note, *University Hate Speech Policies and the Captive Audience Doctrine*, 36 OHIO N.U. L. REV. 553, 575–80 (2010).

speech.[644] Although all internet platforms must moderate illegal and harmful content, engaging in partisan content moderation of political candidates undermines the overarching values of free expression in a democracy.

In the end, it boils down to this: do we really want a country in which Zuckerberg, Dorsey, or other social media executives can steer their platforms to favor the political candidate of their choosing in a partisan manner—and influence the outcome of an election?

### 3. What if content that violates community standard aligns with a political party's positions?

It is important to distinguish partisan content moderation of a political candidate from the general application of the community standards in nonpartisan manner. If an internet platform has a community standard and applies it equally to political candidates regardless of party affiliation, then it is permissible under the principle of nonpartisanship. And if a person repeatedly violates the community standards, the person's account, whether political candidate or not, can be suspended according to the company's policy.[645] The principle of nonpartisanship proposed by this Article is not as broad as "neutrality" touted in some Section 230 reforms.[646] Some of these reforms want to require as a condition of Section 230 that internet platforms must be viewpoint neutral.[647]

The *Wall Street Journal*'s editors identified the problem with this overbroad viewpoint neutrality—it would gut the whole notion of content moderation.[648] As the editors convincingly wrote:

> Do Islamism and white separatism count as "political viewpoints," in which case muting extremists could be counted as "bias"? Could a site be dinged for booting Louis Farrakhan or Alex Jones, the conspiracist who has called the Sandy Hook shooting a hoax? Maybe the courts would be asked to sort it out. The Constitution protects fringe views, but it doesn't require Twitter or Facebook to disseminate them.

---

644.  *See, e.g.*, *Hateful Conduct Policy*, TWITTER, https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy [https://perma.cc/QH9R-TNG3].

645.  *See, e.g.*, *Twitter Bans Account of Former KKK Leader David Duke*, REUTERS (July 31, 2020, 5:15 PM), https://www.reuters.com/article/us-twitter-david-duke/twitter-bans-account-of-former-kkk-leader-david-duke-idUSKCN24W2CD.

646.  *See supra* note 54 and accompanying text.

647.  *See supra* Section I.C.2.b.

648.  *See The Twitter Fairness Doctrine*, *supra* note 55.

> Section 230 was written to empower moderation, to keep the web from becoming a cesspool. Every minute, 500 hours of video are added to YouTube. Every day, Twitter gets something like 500 million tweets and Facebook one billion posts. In the world's worst game of Whac-A-Mole, their systems clobber untold quantities of jihadist propaganda, "revenge porn," snuff videos, attempts to "dox" enemies, and so on.[649]

Indeed, internet platforms perform a necessary screening of endless streams of offensive, dangerous, and illegal content. As the *Wall Street Journal* noted, the First Amendment protects some of this content; if the government were moderating propaganda by suspected terrorist groups or conspiracy theories about school shootings, it would likely violate the First Amendment as impermissible viewpoint discrimination.[650]

The Supreme Court's treatment of neutral laws of general applicability under the Free Exercise Clause is instructive. The Court has recognized "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."[651] The Constitution does not require the government to give special treatment to an individual, invoking religion, to avoid a "valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."[652] By analogy, as long as an internet platform enforces its generally applicable community standards in nonpartisan fashion, it is permissible under the approach outlined here.

### B.   Why Best Practices Are Better Than Bills to Reform Section 230

### 1.   Avoiding government entanglement in speech codes

A reason to prefer internet platforms to self-regulate using best practices is that the alternative of government regulation of online speech is a cure worse than the disease. The solution isn't for the government to start micromanaging content moderation policies or to impose heavy-handed speech codes, such as viewpoint neutrality,

---

649.  *Id.*

650.  *See id.*

651.  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993).

652.  Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494 U.S. 872, 879 (1990) (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982)).

on internet companies. Indeed, in repealing the FCC's net neutrality rules, FCC Chairman Ajit Pai, appointed by President Trump, defended the U.S.'s general policy of avoiding intrusive government regulation of the internet:

> President Clinton got it right in 1996 when he established a free market-based approach to this new thing called the [i]nternet, and the [i]nternet economy we have is a result of his light-touch regulatory vision . . . . We saw companies like Facebook and Amazon and Google become global powerhouses precisely because we had light-touch rules that apply to this [i]nternet. And the [i]nternet wasn't broken in 2015 when these heavy-handed regulations were adopted.[653]

It is important to recognize that Congress could not directly require internet platforms to adopt political viewpoint neutrality (or otherwise to limit their content moderation to only unlawful content) because such a law would violate the internet platforms' own freedom of speech.[654] In an analogous context, district courts have recognized that Google has a First Amendment right to render its search results as editorial judgments and opinions.[655] As Eugene Volokh and Donald Falk explain:

> A speaker is thus entitled to choose to present only the speech that "in [its] eyes comports with what merits" inclusion. And this right to choose what to include and what to exclude logically covers the right of the speaker to choose what to include on its front page, or in any particular place on that page.[656]

Under *Miami Herald Publishing Co. v. Tornillo*,[657] "the freedom to speak necessarily includes the right to choose what to include in one's

---

653.  *See* Laurel Wamsley, *FCC's Pai: 'Heavy-Handed' Net Neutrality Rules Are Stifling the Internet*, NPR (Nov. 22, 2017, 12:10 PM), https://www.npr.org/sections/thetwo-way/2017/11/22/565962178/fccs-pai-heavy-handed-net-neutrality-rules-are-stifling-the-internet [https://perma.cc/3V64-N5P3].

654.  *See supra* notes 74–75 and accompanying text.

655.  *See, e.g.*, Zhang v. Baidu.com Inc., 10 F. Supp. 3d 433, 435 (S.D.N.Y. 2014); Langdon v. Google, Inc., 474 F. Supp. 2d 622, 630 (D. Del. 2007); Kinderstart.com, LLC v. Google, Inc., No. C06–2057, 2007 WL 831806, at *16 (N.D. Cal. Mar. 16, 2007); Search King, Inc. v. Google Tech., Inc., No. CIV-02-1457-M, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003).

656.  Eugene Volokh & Donald M. Falk, *Google: First Amendment Protection for Search Engine Search Results*, 8 J.L. ECON. & POL'Y 883, 887 (2012) (alteration in original) (footnote omitted).

657.  418 U.S. 241 (1974).

speech and *what to exclude.*"[658] Likewise, Congress cannot compel internet companies to publish user content they disagree with.

Some of the proposed bills to amend Section 230 try to avoid this First Amendment problem by making the requirement of political viewpoint neutrality a precondition to qualify for the civil immunity afforded to internet platforms under Section 230.[659] This conditioning of a federal immunity from civil lawsuits (predominantly in state courts) implicates the Supreme Court's unconstitutional conditions doctrine.[660] Sometimes, the Court has described this doctrine broadly: the "overarching principle, known as the unconstitutional conditions doctrine, [ ] vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."[661] The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."[662] However, other times, the Court has viewed this doctrine narrowly, if not inconsistently.[663]

Even assuming Congress has the authority to condition Section 230 immunity on internet platforms' refraining from viewpoint discrimination, it would not be wise policy. Some of the proposed Section 230 bills would entangle the FTC or courts in thorny determinations of whether an internet platform engaged in content moderation in a "politically biased manner," beyond "unlawful material," not "in a viewpoint-neutral manner," or not justified by "a compelling reason for restricting that access or availability."[664] For example, the Ending Support for Internet Censorship Act would require internet platforms to obtain an "immunity certification from the [FTC]" as a prerequisite for the platforms to obtain civil immunity under Section 230.[665] Under the bill, the internet platforms would have to prove, by clear and convincing evidence,

---

658.  Volokh & Falk, *supra* note 656, at 887 (emphasis added) (citing *Miami Herald Publ'g Co.*, 418 U.S. at 258).

659.  *See supra* note 343 and accompanying text.

660.  *See* Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 604 (2013) (explaining the unconstitutional conditions doctrine).

661.  *Id.*

662.  Perry v. Sindermann, 408 U.S. 593, 597 (1972).

663.  *See* Dolan v. City of Tigard, 512 U.S. 374, 407 n.12 (1994) (Stevens, J., dissenting) ("[T]he 'unconstitutional conditions' doctrine has for just as long suffered from notoriously inconsistent application; it has never been an overarching principle of constitutional law that operates with equal force regardless of the nature of the rights and powers in question.").

664.  *See supra* notes 355, 361, 367 and accompanying text.

665.  Ending Support for Internet Censorship Act, S. 1914, 116th Cong. § 2 (2019).

"that the provider does not (and, during the 2-year period preceding the date on which the provider submits the application for certification, did not) moderate information provided by other information content providers in a politically biased manner."[666] The definition of "politically biased moderation" is broad. It covers both discriminatory intent and disparate impact (even without intentional discrimination).[667] Thus, if an internet platform's community standards against hate speech resulted in "disproportionately restrict[ing] . . . access to, or the availability of, information from a political party, political candidate, or political viewpoint," that result presumably would violate the requirement.[668] Under either type of claim, one can easily imagine that the FTC would have to sift through millions of posts on the platform from a two-year period.

Compare this expansive level of mandatory review by the FTC for every internet platform seeking Section 230 immunity (which would be all of them), with the Department of the Treasury (Treasury) regulation requiring universities to avoid political campaign activity for a political candidate for public office.[669] The Treasury regulation is limited to political campaigns; it does not prohibit political viewpoints, such as a university publicly supporting Black Lives Matter.[670] Moreover, unlike the Ending Support for Internet Censorship Act, the Treasury regulation does not require universities to prove, by clear and convincing evidence (or at all), that they have not engaged in political campaign activity for a political candidate for public office.[671] The Treasury Department does not examine most 501(c)(3) organizations for compliance.[672] And it is far easier for

---

666.   *Id.*

667.   *See id.*

668.   *See id.*

669.   *See* Treas. Reg. § 1.501(c)(3) (2019).

670.   *See, e.g.*, *Making a Better World Together*, HARV. COLL., https://college.harvard.edu/about/deans-messages/making-better-world-together [https://perma.cc/9VLZ-R4KP] (statements of Danoff Dean of Harvard College Rakesh Khurana and Dean of Students Katie O'Dair).

671.   *See supra* notes 355–56 and accompanying text.

672.   *See* Staff of the Joint Comm. on Tax'n, 108th Cong., Description of Present Law Relating to Charitable and Other Exempt Organizations and Statistical Information Regarding Growth and Oversight of the Tax-Exempt Sector 37 (Comm. Print 2004) ("The number of exempt organization returns examined by the IRS declined from 12,589 returns in 1993 to 5,754 returns in 2003. During the period 1993 through 2003, the number of returns examined as a percentage of the number of returns filed declined from 2.5 percent to 0.7 percent.").

universities to regulate the speech of their employees to abide by the Treasury regulation than it would be for an internet platform, which must engage in content moderation of millions of posts by millions of users. It might be difficult, if not impossible, for an internet platform to engage in content moderation—such as removing coordinated attacks by bots and content from suspected terrorist groups or white supremacists— without exposing itself to the potential legal claims of viewpoint discrimination under some of the proposed Section 230 bills.[673] Indeed, the bills could open the floodgates to lawsuits against internet platforms. A court would then have to scrutinize whether the content that was moderated was politically neutral—a difficult issue to determine.

### 2.   Internet platforms' need for flexibility

One danger in legislating the parameters of permissible content moderation for internet platforms as a prerequisite to Section 230 immunity is locking in a procrustean approach to the constantly evolving internet.[674] Limiting internet platforms to content moderation of only unlawful content, for example, would hamper the ability of internet platforms' ability to moderate legal content that is harmful or offensive, such as misinformation about COVID-19 that could result in greater deaths of people who believed the misinformation spread on the internet platforms. Likewise, eliminating the "otherwise objectionable" catchall in the current Section 230 would remove an important flexible standard that allows internet platforms to adjust to changing circumstances. Indeed, one of the stated policies of Section 230 is "to preserve the vibrant and competitive free market that presently exists for the [i]nternet and other interactive computer services, unfettered by Federal or State regulation."[675] Another advantage of flexibility is that internet companies can restrict some harmful speech—such as deepfake sex videos that depict real people in simulated sex without their consent—that Congress might not be able to proscribe without violating the First Amendment.[676]

---

673.   *See supra* notes 352–56, 364–66, 392–93 and accompanying text.

674.   *See* Edward Lee, *Rules and Standards for Cyberspace*, 77 NOTRE DAME L. REV. 1275, 1280 (2002) (describing courts' discussions of the rapidly changing nature of the internet).

675.   47 U.S.C. § 230(b)(2).

676.   *See, e.g.*, Cass R. Sunstein, *Falsehoods and the First Amendment*, 33 HARV. J.L. & TECH. 387, 418–23 (2020) (proposing how the government may regulate or ban deepfakes consistent with the First Amendment); Mary Anne Franks & Ari Ezra

## IV.   MODEL FRAMEWORK FOR NONPARTISAN CONTENT MODERATION (NCM) OF POLITICAL CANDIDATES

This Part outlines a model framework for nonpartisan content moderation (NCM) of political candidates, elected public officials, and political ads. The model framework is not intended as the exclusive way internet platforms should handle this issue, much less as the panacea for concerns of political bias in content moderation. Instead, the model NCM framework is offered with the expectation that greater input and deliberation, as well as tailoring for each platform, will be necessary. It also must be underscored that the proposal does not apply to any content beyond political candidates, elected public officials, and political ads.

### A.   The Model NCM Framework

The model NCM framework has the overriding goals of politically nonpartisan content moderation and transparency. To achieve these goals, the NCM framework incorporates an array of features, including (1) a clear statement of the policy and the steps of enforcement, (2) the institution of three levels of double-blind review, which can be streamlined as needed for expedited review, (3) the inclusion of both a public advocate and civil rights advocate in the appeals process, (4) the recognition of a defense of selective enforcement afforded to the politician whose content is at issue, (5) the inclusion of a specific category of content moderation of politicians in transparency reports, and (6) the separation of powers that excludes the company's business and lobbying executives, including the CEO, from any involvement in the content moderation decisions. These features are explained below.

### 1.   Internet platforms' clear statement of NCM policy

Transparency is the starting point. As shown in Part II, internet platforms have disclosed little about the specific procedures they use for content moderation, whether for politicians or regular users, to decide whether a violation has occurred.[677] Many scholars have roundly criticized the opaqueness of content moderation procedures

---

Waldman, *Sex, Lies, and Videotape: Deep Fakes and Free Speech Delusions*, 78 MD. L. REV. 892, 897 (2019) (same).

677.   *See supra* Section II.A (illustrating the limited disclosure of internet platforms and lack of detail in community standards posted online).

and decisions.[678] Perhaps internet platforms hope to keep the "underbelly" of their operations from public scrutiny, including the fact that some companies outsource a good portion of their content moderation overseas to contract workers.[679] This lack of transparency may be changing. As discussed in Section II.B above, Twitter has disclosed more of its content moderation than perhaps any other company, especially for civic integrity and its public interest exception, including a general sketch of the review involved for exercise of the public interest exception.[680] Facebook has likewise publicized its grand plan to establish an independent Oversight Board, funded by a separate trust, that will decide appeals of content removal or "significant and difficult cases" referred by Facebook.[681] The Oversight Board launched its own website outlining the appeals process.[682] Article I of its charter states that the Board members "will exercise neutral, independent judgment and render decisions impartially,"[683] and its code of conduct sets forth rules of independence, impartiality, and the avoidance of conflicts of interest.[684] Yet neither Facebook nor Twitter have disclosed the specific stages of their own internal processes for determining violations of their community standards.

All internet platforms should publish—on a dedicated page in their community standards—a clear statement on how they treat possible violations of the standards by political candidates and elected public officials, as well as in political campaign ads. The internet platforms should express their commitment to *nonpartisan* content moderation of political candidates. The policy should start out with an introduction explaining the goals, such as the following:

---

678. *See, e.g.*, KAYE, *supra* note 616, at 51; GILLESPIE, *supra* note 1, at 115–16; Klonick, *supra* note 61, at 1665.

679. *See* ROBERTS, *supra* note 420, at 105; Adrian Chen, *The Laborers Who Keep Dick Pics and Beheadings out of Your Facebook Feed*, WIRED (Oct. 23, 2014, 6:30 AM), https://www.wired.com/2014/10/content-moderation [https://perma.cc/UPZ9-BRTW].

680. *See supra* Section II.B (discussing Twitter's extensive community standards policy and commitment to civic integrity).

681. *See* Brent Harris, *Preparing the Way Forward for Facebook's Oversight Board*, FACEBOOK (Jan. 28, 2020), https://about.fb.com/news/2020/01/facebooks-oversight-board [https://perma.cc/7Z53-HSR5].

682. *Appealing Content Decisions on Facebook or Instagram*, OVERSIGHT BOARD, https://www.oversightboard.com/appeals-process [https://perma.cc/43VW-RXHD].

683. *Governance: Oversight Board Charter*, OVERSIGHT BOARD, https://www.oversightboard.com/governance [https://perma.cc/VDX3-XP4U].

684. OVERSIGHT BOARD, OVERSIGHT BOARD BYLAWS: CODE OF CONDUCT 38–39 (2020), https://www.oversightboard.com/sr/governance/bylaws [https://perma.cc/TX6K-ZK7T].

### OUR COMMITMENT TO NONPARTISAN CONTENT MODERATION OF POLITICAL CANDIDATES, ELECTED PUBLIC OFFICIALS, AND POLITICAL CAMPAIGN ADS

Elections are vital to democracy. As an internet platform, we understand our platform facilitates political debate among people of all persuasions. We undertake this important responsibility with the utmost concern. At the same time, malicious efforts to interfere with the elections through misinformation, coordinated inauthentic behavior, and voter suppression are a real and constant threat to democracy. That's one important reason we moderate content users post on our site. All users, including politicians and elected public officials, are subject to the same community standards for misinformation, hate speech, coordinated inauthentic behavior, and other harmful content. No user is exempt from or above our community standards.

We recognize, however, that, to make informed decisions, voters benefit from having more information from the candidates, not less. For that reason, we have additional procedures when handling possible violations of our community standards by political candidates and elected officials, or in campaign ads. Using these procedures, we still apply the same community standards of what constitutes a violation, but, if we find a violation, we may apply different remedial actions to allow some offending content by a political candidate or campaign ad to remain on our site that we would have removed had it been posted by a regular user. We recognize a "public interest" exception by which we determine if the public's interest in receiving the content outweighs its potential harm to our community. But we may moderate the violating content with a label or other restrictions. These procedures are designed to ensure our content moderation is nonpartisan and allows free exchange of ideas by political candidates so voters can decide, while at the same time preventing foreign interference, voter suppression, and election misinformation.

This statement begins by recognizing the company's understanding of its important role in allowing political debate related to elections on its platform and its responsibility to protect its community from election interference and violations of its community standards, including misinformation and hate speech. Following the lessons of Russian interference in the 2016 U.S. election, internet companies should take greater responsibility for how their platforms may be exploited in ways that may undermine elections. Of course, internet platforms can decide different goals. For example, some companies (e.g., Twitter, Reddit, TikTok) decided to restrict political ads or

other political content not consistent with their mission or standards.[685] Whatever the policy, the internet platform should provide a clear statement on how it treats content of political candidates, public officials, and campaign ads that potentially violate their community standards.

### 2. *Clear statement of the NCM procedure for violations, penalties, and appeals*

Once the company's goals have been clearly articulated, the statement should explain, step by step, the procedures for how it handles content moderation of political candidates, elected public officials, and campaign ads. It is a tall, if not impossible, task to devise a process that eliminates all possibility of political bias, including implicit bias. Yet courts and agencies routinely make decisions affecting people with the expectation that those decisions are not being made based on the political affiliation of the person involved.

What are the mechanisms to reduce partisanship in content moderation? This Article relies on several components: (1) the selection and training of moderators; (2) the verification and training of political candidates, public officials, and entities purchasing campaign ads; (3) three levels of double-blind review of content, which can be streamlined for expedited reviews; (4) multiple moderators at potentially three levels—initial review, panel review, and appellate board review—all of whom are randomly assigned to review a potential violation and some of whom are independent moderators outside the company; (5) automatic right of appeal if a violation is found; (6) a defense of selective enforcement afforded to the person whose content has been flagged; and (7) automatic appointment of a public advocate for each appeal and appointment of a civil rights advocate in cases involving hate speech, voter suppression, or other civil rights issues. A proposed model procedure is set forth below:

NONPARTISAN CONTENT MODERATION (NCM) PROCEDURE FOR
DETERMINING VIOLATIONS, PENALTIES, AND APPEALS

[1] Our community standards set forth the rules all users must abide by. Users have a responsibility to learn and follow these standards.

---

685. *See supra* notes 439, 554, 591 and accompanying text.

[2] Candidates for political office, elected public officials, and entities promoting a political campaign ad can register with us. They must pass a screening to verify themselves and, if verified, their accounts will have a designation (P) as a political candidate or (PAC) as a political action committee. Such qualification entitles them to the following special procedures for content moderation.

[3] If the content of a verified political account (P) or (PAC) is flagged for possible violation of our community standards, the content is subject to a special system of review by different, randomly assigned moderators to ensure the review is conducted in a nonpartisan manner. The moderators do not know the identity of the user. The content is anonymized during the entire review.

[4] *First level of review.* In the first level of review, three moderators individually review the content and decide whether it violates our community standards. The moderators do not know what any other reviewer has decided. If the first level of review is unanimous in finding a violation, the panel agrees upon the penalty.

[5] *Second level of review.* If the first level of review does not result in a unanimous decision, a second level of review is conducted by a panel of three randomly selected moderators who meet and deliberate about the potential violation and reach a unanimous panel decision.

[6] *Penalties.* If a violation is found, the panel decides what penalty should follow. The penalties include (i) removal of the content, (ii) leaving the content online but with a label noting the violation, (iii) adding a warning screen that a viewer must click to view the content, (iv) downgrading the search ranking of the content on the platform, (v) quarantining the content so it cannot be shared on the platform, and (vi) suspension of the user account due to repeated violations. For the ultimate penalty of account suspension, we generally apply a "3 strikes and you're out" approach. A user found to have violated the community standards on three separate occasions, within the past three years, faces automatic, permanent suspension of the account. One year following such suspension, the user may apply for reinstatement upon the user's acceptance of responsibility for the past violations and commitment to abide by the community standards.

[7] *Public interest exception.* Under the public interest exception, the panel has the discretion to decide to leave the content online after weighing the public's interest in viewing the content versus the potential harm in further dissemination. If the panel decides the public interest outweighs, it will provide an explanation that will be included in a notation as a label next to the content. The notation will indicate that the user has violated our community standards.

[8] *Right of appeal and third level of review.* Verified political accounts (P) and (PAC) can appeal a violation decision to our appeals board. For each appeal, a public advocate is appointed and participates as amicus curiae to present the interests of the public. If the content involves hate speech, voter suppression, or other civil rights issue, a civil rights advocate is also appointed to present the issues from a civil rights perspective.

[9] *Final decision.* The appeals board will decide the appeal on the written submissions and publish a decision explaining its reasons to the user. During the appeal, the penalty will remain in effect, but if the content is still online, a further notation of the appeal will be added. If the appeals board upholds the decision, a further notation will be added with a link to the decision for the public to view.

The first two paragraphs above provide the background to the treatment of political candidates. It begins by stating clearly that every user is held to the community standards, with a link to the standards. Ideally, the company's explanations of the standards would include examples of violations. The second paragraph above then indicates that candidates who seek the special procedures for content moderation must be screened and verified by the company. Each candidate or group must watch a short training video prepared by the company explaining the community standards and the process for political candidates. Each candidate or group must pass a short quiz on the community standards contained in the training video, although it may be taken as many times as necessary to pass. If the user is approved, a "(P)" or "(PAC)" will appear on the user's profile on the internet platform, entitling the candidate or group to the special procedures.

### 3. Selection and training of moderators

The selection of moderators is important. Internet companies should use a combination of employees and outside moderators, all of whom are professionally trained in content moderation. For example, both Google and Facebook have decided to incorporate outside experts—in Google's administration of right to be forgotten claims and in Facebook's content removal subject to the Oversight Board—in some of their review.[686] Thus far, content moderation has been a murky field with a good deal of it outsourced to contract workers, but a portion of it is still reserved for a more professional cadre of moderators.[687] For

---

686. *See* Lee, *supra* note 67, at 1066–72; Harris, *supra* note 681.
687. *See* ROBERTS, *supra* note 420, at 44–47 (describing the various employment conditions for most content moderation workers).

**App. 773**

the content moderation of political candidates, the review should not be outsourced. The review should be assigned to professionals who are well-trained in the issues and who are subject to ethical responsibilities of nonpartisanship and impartiality. Indeed, as a matter of best practices, moderators should be asked to sign a pledge to abide by the ethical responsibilities the company or an outside professional group has identified for content moderation. A promising development in this area is the recent launch of two new organizations, the Trust & Safety Professional Association (TSPA) and the Trust & Safety Foundation Project, to "support[] the global community of professionals who develop and enforce principles and policies that define acceptable behavior and content online."[688] It is also important that the moderators represent a diverse cross-section of society with different areas of relevant expertise and experience, but some common training in the values the company seeks to protect (e.g., free speech, civil rights, free and fair elections, anti-harassment, impartiality).[689] Diversity of workforce can help to curb implicit biases.[690]

### 4. Three levels of randomized double-blind review, and inclusion of public advocate and civil rights advocate

The model framework is based on three levels of randomized double-blind review. Double-blind review means that neither the user nor the moderator will know the identity of each other.[691] Randomized double-blind review is a cornerstone of review of clinical trials and is meant to eliminate the bias that can result if the identity is known.[692] Random assignment of moderators provides a check against selection

---

688. *About*, TR. & SAFETY PRO. ASS'N, https://www.tspa.info [https://perma.cc/2DCC-6E47]; *see About*, TR. & SAFETY FOUND. PROJECT, https://www.tsf.foundation [https://perma.cc/5NWM-KU6R].

689. *See* GILLESPIE, *supra* note 1, at 201–02.

690. *See* Lori Mackenzie & Shelley J. Correll, *Two Powerful Ways Managers Can Curb Implicit Biases*, HARV. BUS. REV. (Oct. 1, 2018), https://hbr.org/2018/10/two-powerful-ways-managers-can-curb-implicit-biases; Vivian Hunt et al., *Delivering Through Diversity*, MCKINSEY & CO. (Jan. 18, 2018), https://www.mckinsey.com/business-functions/organization/our-insights/delivering-through-diversity [https://perma.cc/VT8J-EEFG].

691. *See* Adrian Mulligan et al., *Peer Review in a Changing World: An International Study Measuring the Attitudes of Researchers*, 64 J. AM. SOC'Y FOR INFO. SCI. & TECH. 132, 133 (2012) (explaining double-blind review and its elimination of some biases).

692. *See* Shobha Misra, *Randomized Double Blind Placebo Control Studies, the "Gold Standard" in Intervention Based Studies*, 33 INDIAN J. SEXUALLY TRANSMITTED DISEASES & AIDS 131 (2012) (describing use of randomization in clinical trials).

bias.[693] Applying double-blind review helps to keep partisanship from creeping into content moderation. If a moderator knows the identity of the politician, it may be difficult for the moderator to overcome any implicit bias against the politician the moderator has, no matter how well-intentioned. A 2018 study found that readers of news displayed greater partisanship and distrust of an article when they knew the source (versus not knowing the source).[694] For example, independents lowered their rating of trustworthiness of an article when a "liberal" source was disclosed; likewise, Democrats lowered their rating when it was disclosed the source was Fox News or Breitbart News.[695] While some observers may contend that such discounting of the source is justified for news consumption, in the context of content moderation on internet platforms the source of a post should not determine whether the content violates the community standards. If a moderator knows the identity of the source, then implicit bias might creep in. As Justice Ginsburg noted in a different context, blind auditions by orchestras to hire musicians helped to eliminate implicit bias against female musicians.[696]

A double-blind approach also helps to promote "good faith" moderation decisions under Section 230(c)(2) that are based on the material, and not the user's identity. And it helps to discourage politicians from attempting to curry favor from company executives or subject them to reprisals and intimidation if the politicians know that the executive can pull strings, so to speak, with the content moderators. This is not a hollow concern. Facebook executives have been criticized for their cozy relationships with Trump—and making decisions on content moderation based on the connection between Trump and Facebook executives.[697]

---

693. *See* Daniel Klerman & Greg Reilly, *Forum Selling*, 89 S. CAL. L. REV. 241, 254–55 (2016) (noting that the federal norm is "random assignment among judges within a district"); *cf.* RONALD A. FISHER, THE DESIGN OF EXPERIMENTS 19–21 (8th ed. 1971) (discussing randomization in experiments).

694. *See* KNIGHT FOUND., AN ONLINE EXPERIMENTAL PLATFORM TO ASSESS TRUST IN THE MEDIA 6 (2018), https://knightfoundation.org/wp-content/uploads/2020/02/KnightFoundation_NewsLens1_Client_Report_070918_ab.pdf [https://perma.cc/F6C8-PPMZ].

695. *Id.* at 8.

696. *See* Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 372–73, 373 n.6 (2011) (Ginsburg, J., concurring in part and dissenting in part).

697. *See, e.g.,* Dylan Byers & Ben Collins, *Trump Hosted Zuckerberg for Undisclosed Dinner at the White House in October*, NBC NEWS (Nov. 20, 2019, 11:32 PM), https://www.nbcnews.com/tech/tech-news/trump-hosted-zuckerberg-undisclosed-

**App. 775**

*Figure 1. Three Levels of Blind Review in the NCM Policy*



---

dinner-white-house-october-n1087986   [https://perma.cc/F74V-V9BU];   Elizabeth Dwoskin et al., *Zuckerberg once Wanted to Sanction Trump. Then Facebook Wrote Rules that Accommodated Him.*, WASH. POST (June 28, 2020, 6:25 PM), https:// www.washingtonpost.com/technology/2020/06/28/facebook-zuckerberg-trump-hate.

The use of three levels of review tracks the typical number of levels of courts available in the federal and state systems. Figure 1 above summarizes the three levels of review.

*Level 1: Individual Moderators.* The first level of review is conducted individually by three randomly assigned moderators, as explained in paragraphs 3 and 4 in the model policy above. Each determines if the (anonymized) content violates the community standard. There is no deliberation among the moderators in Level 1. If all three moderators reach the same decision, then a judgment is reached, and the three moderators agree on the penalty.

*Level 2: Panel.* However, if the moderators do not reach the same conclusion, then the case proceeds to Level 2. A new randomly assigned panel of three moderators is formed, as explained in paragraph 5. In Level 2, the review is different: the panel meets to discuss and then decides the case by a unanimous verdict. Although retaining the same moderators from the first level may save some resources, forming a new panel would provide a "second pair of eyes," with moderators who deliberate and discuss the case together before forming a final decision. Thus, the panel of moderators in the second level has no pre-commitment or anchoring bias to a decision the panel already formed. If the panel finds a violation, it decides what penalty to impose and notifies the user of the decision and the right to appeal it within a specified time.

*Penalties.* As Twitter and other platforms have shown, internet platforms have a variety of potential penalties or remedial actions to impose beyond simple removal of content (also known as takedown), which has the potential effect of altering political debate.[698] As evidenced in the controversy over Twitter's permanent suspension and Facebook's indefinite suspension of Trump's accounts following the January 6, 2021 attack on Congress, it behooves internet platforms to set forth, in advance, the precise policy or factors they use to determine when an account should be suspended. The model NCM policy above adopts an automatic rule of "3 strikes and you're out." If a user has committed three violations in the past three years, the user's account is automatically suspended. This categorical rule eliminates potential bias in suspension decisions. It also provides a clear rule—and potentially greater deterrence by putting users on

---

698.   *See supra* notes 436, 446 and accompanying text.

notice.[699] Under the model NCM policy, the suspension is permanent, but the user can apply for reinstatement a year after the suspension if the user accepts "responsibility for the past violations" and "commit[s] to abide by the community standards." This reinstatement process is based on a recognition that a lifetime ban of a user from an internet platform is the ultimate penalty, carrying severe consequences that can affect both free expression and elections.[700]

Like most internet platforms have already done, Paragraph 7 recognizes a "public interest exception," by which the panel can exercise "discretion to decide to leave the content online after weighing the

---

699.  *See generally* Willard K. Tom & Chul Pak, *Toward a Flexible Rule of Reason*, 68 ANTITRUST L.J. 391, 426 (2000) ("The clarity of the rules also makes it easier for the potential violator to conform its conduct to the rule and thereby improves deterrence independent of the severity of the penalties.").

700.  The suspension decisions of Twitter and Facebook have been applauded and condemned. Without access to the internal exchanges between the companies and Trump for violations of their community standards leading up to the suspensions, I cannot fully evaluate the decisions. As discussed above, ideally companies should state the precise factors or rules they apply to determine if a suspension is warranted. Both Twitter and Facebook do so, employing an approach that appears to allow some discretion. *See About Suspended Accounts*, TWITTER, https://help.twitter.com/en/managing-your-account/suspended-twitter-accounts [https://perma.cc/JYJ5-HA7U]; *Terms of Service*, FACEBOOK, https://www.facebook.com/terms [https://perma.cc/5TRS-YS7M]. Once discretion is allowed, it is more difficult to avoid the appearance of possible bias. Jack Dorsey, Twitter's CEO, expressed deep ambivalence and concerns with Twitter's suspension of Trump, but defended the decision as justified due to concerns about public safety. *See* Jack Dorsey (@jack), TWITTER (Jan. 13, 2021, 7:16 PM), https://twitter.com/jack/status/1349510769268850690. Facebook defended its indefinite suspension but referred the decision to the Oversight Board for review. *See* Nick Clegg, *Referring Former President Trump's Suspension from Facebook to the Oversight Board*, FACEBOOK (Jan. 21, 2021), https://about.fb.com/news/2021/01/referring-trump-suspension-to-oversight-board.

By contrast, the proposed NCM policy adopts an automatic rule of suspension if the user violates the policy three times in the preceding three years. This approach provides clearer warning to users when they face suspension of their accounts and eliminates potential bias in discretionary decisions. YouTube adopts a similar "3 strikes" approach, but it limits the window of strikes to just 90 days, meaning it is more forgiving than the proposed NCM policy. *See Community Guidelines Strike Basics*, YOUTUBE HELP, https://support.google.com/youtube/answer/2802032?hl=en [https://perma.cc/NSV3-KJCZ]. Under its policy, YouTube issued Trump a first strike on January 12, 2020, which led to the automatic 7-day suspension of Trump's YouTube channel during which he could not upload new videos. See Jennifer Elias, *Google Suspends Trump's YouTube Account, Barring Uploads and Comments*, CNBC (Jan. 13, 2021, 3:27 PM), https://www.cnbc.com/2021/01/12/google-suspends-trumps-youtube-account-disables-comments.html [https://perma.cc/68MG-DFJ7].

public's interest in viewing the content versus the potential harm in further dissemination." Other remedial actions short of removal include: adding a warning screen that a viewer must click to view the content, downgrading the search ranking of the content on the platform, and quarantining the content so it cannot be shared on the platform. Finally, in cases of repeated violations by the same user, the platform may consider suspension of the user account.

*Level 3: Appeals Board.* All verified political users have the right to appeal. If the user appeals the decision, the appeals board of three members reviews the appeal, deliberates together, and decides whether to affirm or reverse the decision. The user may challenge the finding of a violation of a community standard, such as by disputing that the content violates the standard or what the content means. The user may also raise a defense of selective enforcement as outlined below. During the appeal, a public advocate selected from a list of identified experts known for their professionalism, integrity, and expertise in relevant areas participates as amicus curiae to argue the interests of the public in the dispute. Congress recognized a similar public advocate in reforms to the secret Foreign Intelligence Surveillance Court in 2015.[701] Likewise, a civil rights advocate is also appointed to present the issues from a civil rights perspective in disputes involving hate speech, voter suppression, or other civil rights issues. The appeals board decides the dispute on the written submissions. In exceptional cases of profound public importance, the appeals board can hold an oral argument or public hearing. The appeals board then publishes a decision and the dispute is resolved.

### 5.   *Selective enforcement challenge by political candidate*

This Article proposes a new type of challenge for selective enforcement of content moderation—to my knowledge, never before recognized by internet platforms. Under this defense, the user may challenge the violation based on a claim of selective enforcement due to partisanship or political affiliation. This type of challenge draws upon principles of the Fourteenth Amendment selective enforcement case law but sets forth a new type of defense and different requirements of proof. The model framework does not incorporate the same burden

---

701. *See* Cyrus Farivar, *America's Super-Secret Court Names Five Lawyers as Public Advocates*, ARS TECHNICA (Nov. 28, 2015, 7:00 AM), https://arstechnica.com/tech-policy/2015/11/americas-super-secret-court-names-five-lawyers-as-public-advocates [https://perma.cc/UJ2U-GUCK].

of proof that is required for a claim of selective prosecution under the Fourteenth Amendment, which requires the "a criminal defendant [to] demonstrate that the federal prosecutorial policy 'had a discriminatory effect *and* that it was motivated by a discriminatory purpose.'"[702] For practical reasons, requiring proof of intent in a corporate hearing for content moderation is unhelpful. It would be hard to square with double-blind review because the identities of the moderators might have to be disclosed to the challenger. Moreover, it could slow down the entire process given that the challenger may need discovery from the moderators who made the decision to understand their state of mind.

Instead of discriminatory intent, the following proof is required: the burden falls on the user to show that other verified political candidates or elected officials on the internet platform posted identical or substantially the same content, but were not subject to content moderation at the time the user's content was moderated. The public advocate may express a view on the validity of the user's assertion and may submit supporting or counter-evidence. And the appeals board may obtain from the company further analysis of treatment of similarly situated politicians for substantially the same content (if any). Based on the submissions, the appeals board will decide if the user has provided sufficient evidence of other similarly situated politicians who posted identical or substantially similar content, to prove selective partisan enforcement. If the appeals board finds selective enforcement, then it has two options: (1) allow the content to be reinstated without moderation or (2) moderate the content of both the appellant and the similarly situated politicians whose identical or substantially the same content also violated the community standards. Either way, the result is uniform.

### 6.  *Public advocate can appeal company's non-removal of content by political candidates*

Under the proposed NCM framework, a public advocate will also be appointed when a panel in Level 1 or 2 decides that a political candidate has not violated the community standards. The public advocate will decide whether to appeal that decision to Level 3, and, if so, the political candidate will be afforded the opportunity to

---

702.  United States v. Wallace, 389 F. Supp. 2d 799, 801 (E.D. Mich. 2005) (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)).

participate in the appeal. This system is included because a company's decision not to remove a politician's arguably violating content may spark public scrutiny. Facebook's much ballyhooed Oversight Board is not currently authorized by Facebook to consider challenges to non-removal of content by Facebook, although Facebook suggested the Board's role could expand in the future.[703] This is a mistake, in my view. It results in an asymmetrical review system in which incentives are created for an internet platform to have a lax content moderation policy for political candidates (to avoid the expense of the elaborate procedures outlined above). More importantly, if community standards are to be meaningful and consistent, the same safeguards and procedures should apply to *non-removal* and removal decisions alike.

### 7.   *Comparison with Facebook's content moderation*

The proposed model framework may sound elaborate and costly. However, it resembles some aspects of Facebook's own content moderation, as reported in Klonick's article.[704] Facebook uses three "tiers" of review: Tier 3 moderators from outsourced call centers overseas who make initial decisions, Tier 2 supervisors from the United States and also at the call centers who receive content that is "escalated" for further review or decide cases in which Tier 3 moderators disagreed, and Tier 1 moderators from the legal and policy department who have the final say if a case is escalated all the way up the review chain.[705]

Although the proposed model framework for moderation of political candidates also contains three levels of review, there are several important differences from Facebook's approach. First, every flagged post of a political candidate is guaranteed to receive at least three human moderators (Level 1). Second, none of the review is outsourced to call centers. All of the moderators are either employees or independent moderators chosen for their training, expertise, and integrity, particularly in the handling of politicians' content. Third, the model framework recognizes, in addition to a user's challenge to the determination of the violation, a defense of selective enforcement as a part of the appeals process. Fourth, the model framework requires, for

---

703. *See* Harris, *supra* note 681 ("As we continue to improve and expand the technology that makes appeals to the board possible, we want to also make it possible for people to refer cases where Facebook decided not to remove a piece of content.").

704. *See* Klonick, *supra* note 61, at 1640–42, 1647.

705. *Id.* at 1639–41.

**App. 781**

every appeal, the appointment of an independent public advocate who is to represent the interests of the public before the board. If the content involves potential hate speech, voter suppression, or other civil rights issues, a civil rights advocate is also appointed to present the issues from a civil rights perspective. Fifth, the model framework allows appeals of the company's decisions not to remove content posted by a political candidate or public official that may violate a community standard.

### B.   Other Safeguards to Protect Against Partisan Content Moderation

Internet platforms should consider instituting other checks and balances to ensure nonpartisan content moderation of political candidates and ads.

### 1.   Separation of powers: separation of content moderation from management and lobbying

Another important check on partisan content moderation that internet platforms should adopt is a principle of separation of powers.[706] There should be a figurative "wall" between the employees and executives tasked with content moderation and those responsible for management of the business, especially revenue-generation and lobbying. This is one of the demands sought by Rashad Robinson, President of Color of Change, which is a part of the coalition of civil rights groups leading the ad boycott against Facebook.[707] Importantly, the CEO of the company should not be involved in making content moderation decisions—or vetoing them. Otherwise, one person could undermine the checks and balances built into the multi-member and multi-level review for content moderation. In a court or administrative tribunal, it would be highly irregular for one person to be able to veto or override a decision from the proceedings below. True, a president as the executive has a veto power. But the veto power only applies to legislation. It does not extend to final judgments resolving disputes in our legal system. CEOs are highly

---

706.   *See generally* Evelyn Douek, *Facebook's New 'Supreme Court' Could Revolutionize Online Speech*, LAWFARE (Nov. 19, 2018, 3:09 PM), https://www.lawfareblog.com/facebooks-new-supreme-court-could-revolutionize-online-speech [https://perma.cc/JH6R-CZX3] (characterizing Facebook's Oversight Board as a form of separation of powers).

707.   *See* Sahil Patel, *Facebook Boycott Organizers Want a Civil Rights Expert in the Company's Executive Suite*, WALL ST. J. (July 2, 2020, 6:46 PM), https://www.wsj.com/articles/facebook-boycott-organizers-want-a-civil-rights-expert-in-the-companys-executive-suite-11593730015.

visible, and, if politicians know that CEOs are involved in or can veto content moderation decisions at their companies, the politicians can try to curry favor or even intimidate the CEOs. As noted above, Zuckerberg has been criticized for maintaining a cozy relationship with Trump.[708] Facebook board member and Trump-supporter Peter Thiel reportedly advised Zuckerberg against changing Facebook's policy to fact-check politicians.[709] And Zuckerberg reportedly decided to allow Trump's post about banning Muslims from immigrating to the United States, even though some employees contended that the posts violated Facebook's rule against hate speech.[710] The very appearance of a conflict of interest or partisan favoritism by the CEO in content moderation undermines the entire process. To some extent, Facebook may realize this problem given its willingness to establish the independent Oversight Board that will have the final say on a class of Facebook's content moderation decisions. Zuckerberg will not be able to veto the Board's decisions. In sum, internet platforms should recognize a principle of separation of powers in their community standards.

### 2.   Transparency reports, independent audit, and expert advice

Internet platforms should include a specific section in their transparency reports devoted to content moderation of political candidates' content. Large internet platforms typically publish "transparency reports" online, detailing, with statistics, a host of practices, including their content moderation or community standards enforcement.[711] However, as of November 2020, these transparency reports typically do not identify their content moderation of political candidates or political ads, or, for that matter, election misinformation or voter suppression. Separate categories with statistics should be added for these variables and included in the transparency reports online.

Internet platforms should also consider having their content moderation practices subjected to a periodic, independent audit by a diverse group of relevant experts. Facebook enlisted an independent

---

708.   *See* Byers & Collins, *supra* note 697.

709.   *See* Glazer et al., *supra* note 35.

710.   *See* Deepa Seetharaman, *Facebook Employees Pushed to Remove Trump's Posts as Hate Speech*, Wall St. J. (Oct. 21, 2016, 7:43 PM), https://www.wsj.com/articles/facebook-employees-pushed-to-remove-trump-posts-as-hate-speech-1477075392?mod=e2tw.

711.   *See, e.g.*, Facebook, Facebook Transparency Report, https://transparency.facebook.com; Rule Enforcement, *supra* note 440.

"civil rights" audit led by Laura Murphy, a civil rights and civil liberties expert.[712] In July 2020, after a two-year review of Facebook, the auditors issued a highly critical report:

> While Facebook has built a robust mechanism to actively root out foreign actors running coordinated campaigns to interfere with America's democratic processes, Facebook has made policy and enforcement choices that leave our election exposed to interference by the President and others who seek to use misinformation to sow confusion and suppress voting.[713]

It is unclear whether Facebook will make changes in light of the audit,[714] but internet platforms should be open to doing so. Likewise, even short of conducting an extensive audit, the companies should consider enlisting the advice of a broad and diverse group of experts on issues related to content moderation and nonpartisanship, similar to TikTok's Content Advisory Council.

## V.   ADDRESSING CONCERNS WITH THE PROPOSED NCM FRAMEWORK

This Part addresses some of the major criticisms of the proposed NCM framework. While the concerns raised have some validity, they do not vitiate the overall goal of nonpartisan content moderation of political candidates or the general approach offered by the NCM framework, which is intended as a starting point for internet platforms to devise a more transparent and effective procedure of moderating the content of political candidates than currently exists.

### A.   Resources and Scalability

One concern is scale. As Twitter CEO Jack Dorsey remarked, content moderation "doesn't scale."[715] He was referring to the sheer volume of content on internet platforms. For example, by one estimate, Twitter has 350 thousand new tweets per minute, 500 million new tweets per

---

712. *See* Mike Isaac, *Facebook's Decisions Were 'Setbacks for Civil Rights,' Audit Finds*, N.Y. TIMES (July 8, 2020), https://www.nytimes.com/2020/07/08/technology/facebook-civil-rights-audit.html.

713. FACEBOOK'S CIVIL RIGHTS AUDIT—FINAL REPORT 10 (2020), https://about.fb.com/wp-content/uploads/2020/07/Civil-Rights-Audit-Final-Report.pdf [https://perma.cc/7VQ8-N9W8].

714. *See* Andrew Marino, *How far Will Facebook Go to Address Their Civil Rights Audit?*, VERGE (July 14, 2020, 3:50 PM), https://www.theverge.com/2020/7/14/21323988/vergecast-podcast-interview-rashad-robinson-color-of-change-facebook-ad-boycott.

715. *See* Aaron Beveridge, *Content Moderation "Doesn't Scale"—Jack Dorsey of Twitter*, YOUTUBE (Apr. 13, 2019), https://youtu.be/-w6oU33n_zU?t=71.

day, and 200 billion tweets per year.[716] Internet platforms already devote great resources and number of staff to content moderation. Facebook has 30,000 people devoted to content moderation (half are contract workers); YouTube, 10,000 people; and Twitter, 1,500 people.[717] Each internet platform must decide how best to operationalize additional safeguards to preserve nonpartisanship in the content moderation of political candidates and ads. One possibility is to take an incremental or pilot approach starting first with a smaller pool, such as (1) U.S. federal elections, (2) U.S. federal and state elections, or (3) U.S. federal, state, and local elections. As noted earlier, the number of politicians is 537 at the federal level, 18,749 at the state level, and 500,396 at the local level.[718] Even starting with one political office, such as the presidency, would be worthwhile. If successful, the pilot can be expanded.

### B.  Timeliness and Effectiveness Concerns

Another concern is that the intricate three levels of double-blind review in the NCM framework will be too cumbersome, time-consuming, and, ultimately, ineffective to avoid partisan review. To be sure, adding more due process to content moderation to ensure nonpartisanship will require time. Yet, with a pilot implementation of the NCM framework for a finite group of political candidates, even just starting with the presidency, a company's content moderation team can set forth a schedule to process the review in timely fashion. Moreover, the basic NCM framework is meant to be modular: it can be streamlined to two levels—decision and appeal—for expedited review. By comparison, the internet platforms have agreed to implement the EU's Code of Conduct against hate speech and "commit to reviewing the majority of these requests *in less than 24*

---

716.  *See* Sayce, *supra* note 231.

717.  *See* Elizabeth Dwoskin et al., *Content Moderators at YouTube, Facebook and Twitter See the Worst of the Web—and Suffer Silently*, WASH. POST (July 25, 2019, 1:00 AM), https://www.washingtonpost.com/technology/2019/07/25/social-media-companies-are-outsourcing-their-dirty-work-philippines-generation-workers-is-paying-price; Brian Feldman, *Can 10,000 Moderators save YouTube?*, INTELLIGENCER (Dec. 5, 2017), https://nymag.com/intelligencer/2017/12/can-10-000-moderators-save-youtube.html.

718.  *See supra* note 607 and accompanying text.

**App. 785**

*hours* and to removing the content if necessary, while respecting the fundamental principle of freedom of speech."[719]

Another concern is that the NCM framework will create a disincentive for internet companies to moderate the content of politicians or political ads given the extensive levels of review proposed. Would it be easier just to leave content unmoderated? However, this incentive already exists under the current systems. At least under the NCM framework, users will be given a way to challenge non-removal decisions with the appointment of a public advocate to argue on their behalf. Thus, the NCM framework has a built-in mechanism to avoid an institutional disincentive against moderating content of political candidates. Moreover, given the concerns of election misinformation and voter suppression, internet platforms have reputational interests in not abdicating their responsibility of enforcing their community standards, especially related to content of political candidates and political ads.

A more troubling issue is that some, if not most, of the political candidates' content will contain information from which the moderators can determine the political party of the user who posted the content, as well as potentially even the user's identity. This type of content can be called "self-revealing" content. For example, even if the company removes the disclosure required by federal election law, a content moderator would know that an attack ad on Joe Biden likely originated from a Republican-supporting group. The moderator might even deduce the ad came from the Trump campaign, perhaps even mistakenly if the ad was created by a PAC not approved by Trump. The three levels of blind review in the NCM framework would not likely preserve the anonymity as to which political party the ad supports.

There is no easy way to avoid the problem presented by "self-revealing" content, even when it has been anonymized. Perhaps one additional safeguard to add to the NCM framework is the inclusion of employees who originate from other countries or moderators who do not follow U.S. national politics. (Moderators who do not know the candidates of state and local races would likely be easier to find.) Otherwise, the company must rely on the process (which includes a way for the candidate to raise a selective enforcement claim and the participation of a public advocate and potentially a civil rights advocate), as well as the

---

719. *The Code of Conduct on Countering Illegal Hate Speech Online*, EUROPEAN COMM'N (June 22, 2020) (emphasis added), https://ec.europa.eu/commission/presscorner/detail/en/qanda_20_1135 [https://perma.cc/WL8P-6G2Q].

integrity of the moderators, to mitigate the potential for the biases of moderators to creep into their review of "self-revealing" content. But that is no different from the judicial system relying on the adversarial process and the jury and appeals systems to counteract potential bias tainting a verdict against a well-known defendant. Neither system is perfect.

### C.   Is Content Moderation Better Under the Status Quo than the NCM Proposal?

Finally, ardent supporters of Section 230 steadfastly defend Section 230 as being an important safeguard to the freedom of expression in that it allows user-generated content to be shared without exposing internet platforms to massive liability. Without Section 230, internet platforms would be more restrictive and start "censoring" user-generated content out of fear of being sued, such as for alleged defamation, a claim that is so easy to assert.[720] Or, even worse, platforms will stop publishing user-generated content altogether and switch to professional content.[721]

I share these concerns. But they do not address the main reason lawmakers seek reform of Section 230: the alleged political bias in how internet platforms moderate the content of candidates for public office and others. Strong proponents of Section 230 or the internet platforms may dismiss these allegations out of hand. The claims are either trumped up (where is the evidence of political bias?) or not problematic even if true (Fox News and CNN are just as politically biased). Let's stick with Section 230 and let the internet platforms carry on as usual. Congress is just wrong.

Even the proponents of Section 230 recognize, however, that Congress is poised to reform, if not outright repeal, Section 230. Indeed, Zuckerberg even asked Congress to do so in his testimony before the Senate Commerce Committee in October 2020:

> The debate about Section 230 shows that people of all political persuasions are unhappy with the status quo. People want to know that companies are taking responsibility for combatting harmful

---

720.   *See* Derek E. Bambauer, *How Section 230 Reform Endangers Internet Free Speech*, BROOKINGS (July 1, 2020), https://www.brookings.edu/techstream/how-section-230-reform-endangers-internet-free-speech [https://perma.cc/SHM8-K86R].

721.   *See* Eric Goldman, *An Interview on Why Section 230 Is on the 'Endangered Watch List,'* TECH. & MKTG. L. BLOG (Sept. 15, 2020), https://blog.ericgoldman.org/archives/2020/09/an-interview-on-why-section-230-is-on-the-endangered-watch-list.htm [https://perma.cc/XKQ9-NTA7].

**App. 787**

> content—especially illegal activity—on their platforms. They want to know that when platforms remove content, they are doing so fairly and transparently. And they want to make sure that platforms are held accountable . . . . Changing it is a significant decision. However, I believe Congress should update the law to make sure it's working as intended.[722]

And, as noted above, President Biden is already on record in supporting a complete repeal of Section 230.[723]

Against this political landscape, the proposed NCM framework offers an alternative approach that internet platforms can undertake immediately to address the concerns of political bias—and to stave off Congress from shrinking Section 230's immunity beyond recognition.

## CONCLUSION

The United States faces one of the most polarized moments in its history. This hyper-partisan climate has produced not only division and vitriol, but also a highly politicized attack on internet platforms' content moderation as showing an "anti-conservative bias" or, in the case of Facebook, showing favoritism to conservatives. Internet platforms, including Facebook and Twitter, face the threat of a dramatic reduction in the scope of immunity they can obtain under Section 230 of the Communications Decency Act under bills proposed by Republican lawmakers.[724] The companies categorically deny such a bias, but it is not entirely clear from their stated policies and community standards the precise "step-by-step" mechanisms that ensure nonpartisanship in their content moderation. To address this problem, this Article proposes a model nonpartisan content moderation (NCM) framework for internet platforms to adopt as a matter of best practices. The NCM framework provides greater transparency and institutionalized checks and balances and avoids messy entanglement of government enforcement of speech codes online. And it could help internet platforms avoid a complete overhaul or repeal of Section 230 immunity by Congress, while giving the public greater confidence that internet platforms are nonpartisan in their content moderation of political candidates.

---

722.  Adi Robertson, *Mark Zuckerberg Just Told Congress to Upend the Internet*, VERGE (Oct. 29, 2020, 10:29 AM), https://www.theverge.com/2020/10/29/21537040/facebook-mark-zuckerberg-section-230-hearing-reform-pact-act-big-tech.

723.  *See* Kelly, *supra* note 419.

724.  *See supra* Section I.C.2 (summarizing proposed amendments to Section 230 to require political neutrality in content moderation).



 (https://reclaimthenet.org)

**Defend free speech and individual liberty online.**

**Push back against big tech and media gatekeepers.**

Your email address

Subscribe now

Issue: May 27, 2020

# Facebook soft-censors The Babylon Bee, starts forcing users to confirm that they actually want to share posts

The Babylon Bee has had to deal with its content being censored by Facebook several times over the last few years.

By Tom Parker(https://reclaimthenet.org/author/tomparker/)    Posted 7:13 pm



**If you're tired of cancel culture and censorship subscribe to Reclaim The Net. (https://reclaimthenet.org/subscribe)**

Facebook has started soft-censoring some posts linking to satirical news site The Babylon Bee by asking users to confirm whether they want to share posts after clicking the share button.



*Facebook is asking users "Do you want to share?" when they try to share links to The Babylon Bee website (Facebook – The Babylon Bee)*

This "Do you want to share?" confirmation screen appears after users attempt to share some of The Babylon Bee's posts including this <u>satirical Bernie Sanders post</u> (<u>https://www.facebook.com/TheBabylonBee/posts/remember-you-could-have-it-a-lot-worse-you-could-be-in-america/2718500915046465/</u>).

On most Facebook posts, clicking or tapping the share button brings up the share menu straight away but this additional dialogue box is forcing users to take another action and confirm that they want to share before they can actually get to this menu.

This "Do you want to share?" confirmation screen is likely to cause a notable reduction in the total Facebook shares for The Babylon Bee's website.

Facebook CEO Mark Zuckerberg recently revealed that <u>adding fact-check warnings to content that is deemed to be "misinformation" reduces clicks through to the content by 95%</u> (<u>https://reclaimthenet.org/zuckerberg-defends-censoring/</u>).

When Facebook users attempt to share posts that have been labeled "False" by its fact-checkers, they are also presented with a similar screen which requires them to confirm that they want to share the post.

This isn't the first time The Babylon Bee has had to deal with its content being censored on Facebook.

In 2018, its Facebook page was threatened with suppression and demonetization after one of its satirical articles titled "CNN Purchases Industrial-Sized Washing Machine To Spin News Before Publication" was fact-checked.

Several of The Babylon Bee's other Facebook posts have also been suppressed over the last few years after Snopes fact-checked them (https://reclaimthenet.org/babylon-bee-founder-snopes-dishonest-fact-checking/).

The pushback against Snopes' consistent fact-checks of The Babylon Bee's satirical content resulted in it introducing a controversial "Labeled Satire" rating (https://reclaimthenet.org/snopes-labeled-satire-rating/).

The Babylon Bee's Editor-In-Chief Kyle Mann criticized this rating and said it insinuates that the content "may still fall under some kind of nebulous 'satire but not really' category.

**If you're tired of cancel culture and censorship subscribe to Reclaim The Net. (https://reclaimthenet.org/subscribe)**



**Defend free speech and individual liberty online.**
**Push back against big tech and media gatekeepers.**

| Your email address |
| --- |

| Subscribe now |
| --- |



**Overseas journalists to have movements tracked by GPS at Tokyo Olympics to "strictly manage their behavior" (https://reclaimthenet.org/overseas-journalists-gps-tracking-tokyo-**



TAKE A SURVEY

We want to hear from you. Take part in this short survey to help shape The Wall Street Journal. **Take Survey**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/facebook-has-no-sense-of-humor-11603315866

OPINION | COMMENTARY

# Facebook Has No Sense of Humor

Its algorithms mistake a Monty Python joke for a threat of violence.

By Kyle Mann
Oct. 21, 2020 5:31 pm ET



Graham Chapman and his co-stars in 'Monty Python and the Holy Grail,' 1974.
PHOTO: FILMPUBLICITYARCHIVE/UNITED ARCHIVES VIA GETTY IMAGES

 Listen to Article (3 minutes)                           Queue

G.K. Chesterton believed reality would one day kill satire. He wrote in 1911: "Satire has weakened in our epoch for several reasons, but chiefly, I think, because the world has become too absurd to be satirised."

That's even truer in 2020. No satirical article is so absurd that people won't believe it to be true. Snopes has fact-checked articles as bizarre as the Onion's "Shelling From Royal Caribbean's M.S. 'Allure' Sinks Carnival Cruise Vessel That Crossed Into Disputed Waters" and the Babylon Bee's "Ocasio-Cortez Appears on 'The Price Is Right,' Guesses Everything Is Free."

But there's a new threat to satire that Chesterton couldn't have foreseen: social media. As Facebook and Twitter desperately try to prevent a repeat of 2016, in which some believe Russian propaganda spread unchecked on their platforms, the social-media giants are cracking down hard on sites that report on politics. That includes humor sites, as we at the Babylon Bee have discovered.

Advertisement - Scroll to Continue

Last week we posted the satirical headline: "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch." It's a reference to "Monty Python and the Holy Grail"—not a particularly believable joke, nor an original one (we did something similar during the Mueller investigations). But because we included the Pythonesque line "We must burn her," Facebook accused us of "inciting violence" and deleted our post. The platform demonetized our page and gave us an ominous warning of future repercussions should we commit further violations. We attempted to appeal the violation. Facebook declined our appeal.

In what world does a joke lovingly appropriated from Monty Python constitute incitement to violence? These kinds of mistakes happen because Facebook relies more and more on algorithms to catch potentially offensive content. What's strange is that the social media giant stands by its humorless AI filter's judgment.

Comedy suffers under "community standards," as Facebook calls its algorithm-driven rules that can't tell the difference between comedy and a threat of violence. "There is simply no money in making comedy online anymore," writer Matt Klinman tweeted in 2018. "Facebook has completely destroyed independent digital comedy."

At the Babylon Bee, my primary question when considering a headline should be, "Is it funny?" Instead, I often ask myself things like: "Will Facebook kill this joke for mentioning the election?" "Should we say the word 'pandemic' in the headline here, or will that run afoul of the algorithm?" "Facebook kills clickbait. Does this headline sound too

clickbaity?" Instead of writing jokes for the audience, we're writing jokes for a robot with ever-changing standards that can only be identified through painful trial and error as headline after headline gets shot down.

Chesterton might as well have been writing about Facebook's robotic response to satire when he observed that "it is impossible to caricature that which caricatures itself." Indeed, we're having trouble coming up with a satirical headline more absurd than "Satire Site Demonetized for Telling Joke About Weighing Judge Against a Duck to See if She Is a Witch."

*Mr. Mann is editor in chief of the Babylon Bee.*

*Appeared in the October 22, 2020, print edition as 'Facebook Has No Sense Of Humor.'*

## UPCOMING EVENTS

June
**24**
2021

**11:00 AM - 5:00 PM EDT**

Global Food Forum

---

June
**30**
2021

**1:00 PM - 1:45 PM EDT**

WSJ Pro Cybersecurity Webinar: Aligning IT and Cybersecurity

---

June
**30**
2021

**7:00 PM - 7:45 PM EDT**

WSJ+ Live: Daniel Kahneman and His Co-Authors on the Crisis of 'Noise'

---

**ADD TO CALENDAR**

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.



HOURLY NEWS

WKNO

ON Air On Air Now

PLAYLIST

   

DONATE

TECHNOLOGY

# Facebook And Twitter Limit Sharing 'New York Post' Story About Joe Biden

October 14, 2020 · 6:49 PM ET



SHANNON BOND



Twitter and Facebook said their decisions to limit sharing of a *New York Post* article were meant to slow the spread of potentially false information.

*Denis Charlet/AFP via Getty Images*

**Updated at 9:14 p.m. ET**

Case 4:21-cv-00220-RH-MAF Document 106-1 Filed 06/21/21 Page 809 of 896

Facebook and Twitter took action on Wednesday to limit the distribution of *New York Post* reporting with unconfirmed claims about Democratic presidential nominee Joe Biden, leading President Trump's campaign and allies to charge the companies with censorship.

Both social media companies said the moves were aimed at slowing the spread of potentially false information. But they gave few details about how they reached their decisions, sparking criticism about the lack of clarity and consistency with which they apply their rules.



**2020 ELECTION: SECURE YOUR VOTE**
'Russia Doesn't Have To Make Fake News': Biggest Election Threat Is Closer To Home

The *New York Post* published a series of stories on Wednesday citing emails, purportedly sent by Biden's son Hunter, that the news outlet says it got from Trump's private attorney, Rudy Giuliani, and former Trump adviser Steve Bannon.

Facebook was limiting distribution of the *Post*'s main story while its outside fact-checkers reviewed the claims, spokesman Andy Stone said. That means the platform's algorithms won't place posts linking to the story as highly in people's news feeds, reducing the number of users who see it. However, the story has still been liked, shared or commented on almost 600,000 times on Facebook, according to data from CrowdTangle, a research tool owned by the social network.

Stone said Facebook sometimes takes this step if it sees "signals" that something gaining traction is false, to give fact-checkers time to evaluate the story before it spreads widely. He did not give more detail on what signals Facebook uses or how often it takes this approach.

Twitter went further. It is blocking users from posting pictures of the emails or links to two of the *New York Post*'s stories referring to them, spokesman Trenton Kennedy said, citing its rules against sharing "content obtained through hacking that contains private information."

**App. 796**

Twitter shows a warning screen to users who clicked on links to a *New York Post* story.

*Screenshot by NPR*

Users who try to share the links on Twitter are shown a notice saying, "We can't complete this request because this link has been identified by Twitter or our partners as being potentially harmful."

If a user clicks on links already posted on Twitter, the user is taken to a warning screen saying, "this link may be unsafe," which they have to click past to read the story. Twitter also required the *New York Post* to delete its tweet about the story.

Twitter said it decided to block the links because it couldn't be sure about the origins of the emails. It said its policy "prohibits the use of our service to distribute content obtained without authorization" and that it doesn't want to encourage hacking by allowing people to share "possibly illegally obtained materials."

**App. 797**

But the company declined to comment on how it had reached that decision or what evidence it had weighed about the emails in the *Post*'s stories.

The company later gave an additional explanation for why it was blocking the stories.

Its safety team said in a tweet that the images of emails in the articles "include personal and private information — like email addresses and phone numbers — which violate our rules" against unauthorized sharing of such details.

CEO Jack Dorsey acknowledged that the company's communication about why it was blocking the articles "was not great." He tweeted that it was "unacceptable" to prevent people from sharing "with zero context as to why we're blocking."

Asked for comment about the social networks' actions, *New York Post* spokeswoman Iva Benson referred NPR to an article by the paper's editorial board.

"Our story explains where the info came from, and a Senate committee now confirms it also received the files from the same source," the editorial said. "Yet Facebook and Twitter are deliberately trying to keep its users from reading and deciding for themselves what it means."

---

2020 ELECTION: SECURE YOUR VOTE
When The Voting Is Done: Facebook, Twitter On 'High Alert' For Post-Election Threats

Twitter and Facebook have been acting more aggressively in recent weeks to curb the spread of false claims and manipulation related to the election as part of efforts to avoid a repeat of 2016 when Russian-linked actors used social media to target American voters.

Facebook has been warning about the possibility of "hack and leak" operations, where stolen documents or other sensitive materials are strategically leaked — as happened in 2016 with hacked emails from the Democratic National Committee and Hillary Clinton's campaign.

But the companies' moves on Wednesday drew criticism from some experts, who said Facebook and Twitter needed to explain more clearly their policies and how often they apply them.

"This story is a microcosm of something that I think we can expect to happen a lot over the next few weeks and, I think, demonstrates why platforms having clear policies that they are prepared to stick to is really important," said Evelyn Douek, a Harvard Law School lecturer who studies the regulation of online speech.

"It's really unclear if they have stepped in exceptionally in this case and, if they have, why they've done so," she said. "That inevitably leads to exactly the kind of outcry that we've seen, which is that they're doing it for political reasons and because they're biased."

Republicans seized on the episode as proof of their long-running assertions that the social networks censor conservative voices. There is no statistical evidence to support those claims.

BUSINESS

Justice Department Proposes Rolling Back Legal Protections For Online Platforms

Trump tweeted that it was "[s]o terrible that Facebook and Twitter took down the story," although Facebook did not remove it from its platform. "REPEAL SECTION 230!!!" he wrote, referring to a long-standing legal shield that protects online platforms from being sued over what people post on them and says they can't be punished for reasonable moderation of those posts. Trump has repeatedly called for Section 230 to be revoked.

Sen. Josh Hawley, R-Mo., sent letters to the CEOs of both Facebook and Twitter on Wednesday pressing them on the decisions to reduce distribution and block the story.

Hawley also sent a letter to the Federal Election Commission saying the companies' actions possibly constituted "egregious campaign-finance violations benefitting the Biden campaign."

**App. 799**

The Senate Republican Conference, which is led by Sen. John Barrasso, R-Wyo., tweeted, "see you soon, @jack," with an image of the *Post*'s story. Dorsey, the Twitter CEO, is scheduled to testify, along with Facebook CEO Mark Zuckerberg and Google CEO Sundar Pichai, before the Senate Commerce Committee on Oct. 28 — six days before the election. The topic: Section 230.

***Editor's note:*** *Facebook is among NPR's financial supporters.*

*NPR's David Folkenflik contributed to this report.*

2020 presidential election    new york post    facebook    social media    twitter

# More Stories From NPR

SPACE
**Where No Plywood Has Gone Before: A Space Agency Will Launch A Tiny, Wooden Satellite**

TECHNOLOGY
**Snapchat Ends 'Speed Filter' That Critics Say Encouraged Reckless Driving**

TECHNOLOGY
**The Father Of The Web Is Selling The Source Code As An NFT**

TECHNOLOGY
**Airlines, Banks And Other Companies Across The World Hit In The Latest Web Outage**

TECHNOLOGY
**Facebook Researchers Say They Can Detect Deepfakes And Where They Came From**

BUSINESS
**Your Pricey Peloton Has Another Problem For You To Sweat Over**

# Popular on NPR.org

BOOK REVIEWS
**Supreme Court Justice Brett Kavanaugh's Rise Continues To Fascinate In 'Dissent'**

**App. 800**

Case 4:21-cv-00220-RH-MAF Document 106-1 Filed 06/21/21 Page 814 of 896

**OPINION**   **EDITORIAL**

# Social media again silences The Post for reporting the news

By Post Editorial Board

April 16, 2021 | 9:54am | Updated

Once more unto the breach.

On Thursday, Facebook decided its users should not be able to share a New York Post article about the property-buying habits of one of the founders of Black Lives Matter.

This is the third time we've tangled with social media giants in the past year. In the early days of the COVID-19 pandemic, we published a column that suggested the virus could have leaked from a Chinese virology lab. Facebook's "fact checkers" decided this was an opinion you weren't allowed to have and blocked the article. Today, it's a commonly discussed theory, with officials from former CDC Director Dr. Robert Redfield to CNN's Sanjay Gupta saying it can't be discounted. Even the head of the World Health Organization (WHO) has said it can't be ruled out.

In October, we published a series of articles about a laptop Hunter Biden left at a Delaware repair shop. Twitter suspended our account. You probably know how that ended. Twitter CEO Jack Dorsey admitted to lawmakers months later it was a "total mistake."

We were right both times. We're right this time, too.



Facebook censored The Post's article on Patrisse Khan-Cullors' property purchases.

Alamy Stock Photo

> **SEE ALSO**
>
> **Marxist BLM leader reportedly raked in big bucks from jail reform initiative**

The $3.2 million real estate spending spree of BLM co-founder Patrisse Khan-Cullors is newsworthy for two reasons. One, she's an avowed Marxist, and as a public figure, it's legitimate to question whether she's practicing what she preaches. Secondly, as the article details, the finances of Black Lives Matter are opaque, a mixture of for-profits and tax-free nonprofits, and they don't reveal how much its executives are paid. Are the people donating to BLM helping to pay for these properties?

We reached out to Khan-Cullors for comment before publication; she didn't respond. After it was posted, her organization put out a statement saying yes, she used to take a salary from BLM but doesn't anymore, and the money she used to buy property came from her private income for book and development deals. Take the organization's word for it. We added the response in full to our online article post-publication.

**App. 801**



A property in California reportedly belonging to BLM founder Patrisse Khan-Cullors.
Realtor.com

Then she accused us of being "abusive" and putting her at risk.

Our article features some pictures of the properties she bought, but includes no addresses, in fact doesn't even say the city in some cases. Our reporter compiled the information from public records.

The Post was censored in February 2020 for suggesting that the coronavirus might have originated in a lab in Wuhan, China.

The Post was censored in February 2020 for suggesting that the coronavirus might have originated in a lab in Wuhan, China.
AP Photo/Ng Han Guan, File

Khan-Cullors' lawyers apparently got a more sympathetic ear at Facebook, however, and five days after the article was published, it suddenly decided that it clashed with its "community standards." "This content was removed for violating our privacy and personal information policy," Facebook writes.

The New York Post's cover for Thursday, October 15, 2020 on the Hunter Biden laptop piece.

The New York Post's cover for Thursday, October 15, 2020, on the Hunter Biden laptop piece.
vmodica

This decision is so arbitrary as to be laughable. Does Facebook know how many newspapers, magazines and Web sites highlight the real estate purchases of the rich and famous? The next time People magazine covers Kim Kardashian's latest mansion purchase, will it violate any community standards? How about running a picture of the resort Ted Cruz is staying at?

No, this rule has not been and will not be applied in any fair manner.

It again highlights just how much power these social media companies have over our lives and our nation. They monopolized the market and became the main aggregators of news.

In public, they claim to be "neutral" and that they aren't making editorial decisions in a cynical bid to stave off regulation or legal accountability that threatens their profits. But they do act as publishers — just very bad ones. While failing abysmally for years to stop the torrent of truly harmful pedophilic, violent, personally abusive, terroristic, wildly inaccurate and hateful content that spews onto their platforms daily, they'll step in to censor and cover for Joe Biden. They'll cover for China. And now they'll cover for Black Lives Matter.



Patrisse Khan-Cullors responded to The Post's story on her properties after the story was published.
Taylor Jewell/Invision/AP

It's too dangerous to let Americans read politically inconvenient but accurate reports and varied opinions and come to a conclusion themselves. Best to tell us what to think.
Well, we'll keep publishing — and let you decide for yourselves.

**FILED UNDER**   <u>**BLACK LIVES MATTER**</u>, <u>**CENSORSHIP**</u>, <u>**EDITORIAL**</u>, <u>**FACEBOOK**</u>, <u>**SOCIAL MEDIA**</u>, <u>**4/16/21**</u>

∞ Smartfeed | ▷

RECOMMENDED 2/5

Get notifications from The New York Post
Click 'Sign Up' then 'Allow'
Dismiss     Sign Up

This Amazon upgrade is even better than Prime
Capital One Shopping - Sponsored

Read More ❯

**App. 803**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/facebooks-lab-leak-about-face-11622154198

OPINION | REVIEW & OUTLOOK

# Facebook's Lab-Leak About-Face

The company acts in tandem with government on speech control.

By [The Editorial Board](#)

May 27, 2021 6:23 pm ET



A smart phone screen displays a new policy on Covid-19 misinformation with a Facebook website in the background.

PHOTO: ANDREW CABALLERO-REYNOLDS/AGENCE FRANCE-PRESSE/GETTY IMAGES

Question: When does "misinformation" stop being misinformation on social media? Answer: When Democratic government authorities give permission.

Witness <u>Facebook</u>'s decision to stop censoring some claims about the origin of Covid-19 the same day President Biden said his Administration will investigate whether a Chinese lab may have been involved.

It's been clear for more than a year that the Wuhan Institute of Virology, which collects and tests coronaviruses, deserved scrutiny over the emergence of the pandemic in Wuhan. Yet Facebook announced in February that it would expand its content moderation

**App. 804**

on Covid-19 to include "false" and "debunked" claims such as that "COVID-19 is man-made or manufactured." Facebook deployed fact-check warnings against an influential Medium post this month on the origins of the virus by science journalist Nicholas Wade.

As long as Democratic opinion sneered at the lab-leak theory, Facebook dutifully controlled it. But ideological bubbles have a way of bursting, and the circumstantial evidence—most of which has been <u>available for months</u>—finally permeated the insular world of progressive public health. This prompted officials like Anthony Fauci to say more investigation is needed, while the White House issued new intelligence directives reflecting lower certainty of a natural emergence.

Advertisement - Scroll to Continue

Facebook acted in lockstep with the government: "In light of ongoing investigations into the origin of COVID-19 and in consultation with public health experts, we will no longer remove the claim that COVID-19 is man-made or manufactured from our apps," it said Wednesday.

The shift is better late than never, but note the apparent implication: While a political or scientific claim is disfavored by government authorities, Facebook will limit its reach. When government reduces its hostility toward an idea, so will Facebook.

YouTube's Covid-19 policy similarly forbids contradicting "health authorities." The Centers for Disease Control and Prevention is run by a political appointee and its evolving guidance is clearly influenced by political considerations. YouTube, owned by Google, used this policy to remove a roundtable on virus response with scientists and Florida Gov. Ron DeSantis.

Perhaps the social-media giants think their censorship carries more legitimacy if they can appeal to government. In fact such coordination makes censorship even more suspect. Free speech protects the right to challenge government. But instead of acting as private

**App. 805**

actors with their own speech rights, the companies are mandating conformity with existing government views.

In 2019 a wiser Mark Zuckerberg, the Facebook CEO, said "I don't think it's right for a private company to censor politicians or the news in a democracy." If he'd stuck to that spirit instead of bending to pressure, he'd have avoided this embarrassment, and the more like it that are sure to come.

*Appeared in the May 28, 2021, print edition.*

## UPCOMING EVENTS

**11:00 AM - 5:00 PM EDT**

June
**24**
2021

Global Food Forum

---

**1:00 PM - 1:45 PM EDT**

June
**30**
2021

WSJ Pro Cybersecurity Webinar: Aligning IT and Cybersecurity

---

**7:00 PM - 7:45 PM EDT**

June
**30**
2021

WSJ+ Live: Daniel Kahneman and His Co-Authors on the Crisis of 'Noise'

---

**ADD TO CALENDAR**

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.



---

**OPINION**   *This piece expresses the views of its author(s), separate from those of this publication.*

# Facebook's Oversight Board ban of Donald Trump is totally arbitrary and ideological

*For Facebook, disputes over moderation decisions are really a choice between profits and progressive ideology.*

**Rachel Bovard** Opinion columnist
Published 6:01 a.m. ET May 5, 2021

Whether Facebook's Oversight Board decides to allow former President Donald Trump back on its platform Wednesday is an exercise in distraction from a far more significant point: the raw power an unaccountable, private platform has to memory-hole a president of the United States.

Facebook, with its 3.45 billion monthly global users across its products, is far and away one of the biggest speech platforms the world has ever seen. What content the company suppresses or amplifies changes the flow of information, opinion formation and the nature of independent thought around the world for billions of people at a time.

This was most recently on display when the company temporarily canceled Australians over a dispute about ad revenue – and in doing so, removed critical hubs for the distribution of news, public health and safety information. It was also demonstrated when the government of Myanmar successfully used Facebook – which in Myanmar is largely indistinguishable from the internet – to perpetuate a genocide.

***USA TODAY Tech:*** *Will Donald Trump's Facebook, Instagram bans stick? Facebook's Oversight Board to issue ruling Wednesday*

In 2018, Facebook conceived of an Oversight Board as means to give its entirely subjective content moderation decisions the veneer of objectivity and expertise. But this board has no real power. Its members are selected and compensated by Facebook, and its decisions cannot stray outside of the content moderation parameters set by the company without input by the board.

**App. 807**

As Big Technology writer Alex Kantrowitz has framed it, the Oversight Board is concerned solely with the company's outputs and very little with the machine, or system, itself.

## Facebook's ideological bias

And the machine is what matters. For the world, Facebook's moderation decisions are a legitimate struggle between the norms of free speech and the consequences of censorship at scale. But for Facebook, this dispute is really a choice between profits and progressive ideology.

***Rachel Bovard:*** *Twitter ban on Donald Trump's account was only the beginning of Big Tech's crackdown*

Facebook is a speech platform, but also a digital ad agency. The company reaps billions from algorithmically juiced viral content, literally profiting from content addiction and polarization. But Facebook is also a global speech platform in the grip of woke employees clearly bent on enforcing ideological rigidity.

According to Facebook, Donald Trump was banned for "actively fomenting a violent insurrection." In March, this was expanded to include any content "in the voice" of Donald Trump, when the company yanked an interview the former president did with his daughter-in-law, Lara Trump.

Yet Islamic State terrorism recruitment propaganda still circulates on Facebook. House Democrats who objected to the 2016 election outcomes have not been similarly de-platformed. The account of Rep. Maxine Waters, D-Calif., who recently took to the Minnesota streets in an already tense political environment to demand protesters "get more confrontational" if Derek Chauvin was not convicted, remains unmolested. Same with the account of Rep. Nancy Pelosi, D-Calif., who openly sought to overturn the election outcome of a 2020 congressional race in Iowa.

That is because none of this is about some objective commitment to norms. It is about enforcing an ideological agenda that protects prominent progressives from criticism while ensuring that Americans – and users around the world – are exposed to only the "correct" kind of groupthink.

## Hand in glove with liberal government

No private platform should have this kind of power. Regardless of what the Oversight Board decides, Facebook has already written the script for authoritarian regimes around the world to balkanize their own internets as a means of silencing political dissent, diverse thought and counternarrative speech.

Despite the repeated bleats of the left that the incumbency of Donald Trump represented fascism on our own shores, private companies working hand in glove with one political ideology is definitionally fascist. And that is what we are seeing, from the outsourcing of censorship to social media companies, to the corporately enforced deflection of criticism of progressive political figures, to the Department of Homeland Security considering deputizing private firms to surveil U.S. citizens online as a means of circumventing constitutional restraints.

***Mark Zuckerberg:*** *Historic Facebook campaign will boost voter registration, turnout and voices*

Regardless of what Facebook's Oversight Board decides, its decision is trivial. Even if it lets the former president back on its platform, the mid-level management at Facebook will not stand for it. Some nontransparent community standard will be magically conjured and retroactively enforced, resulting in Trump's removal once again. Facebook's massive, unaccountable authority over global speech should not be normalized or legitimized solely due to the presence of a self-appointed board of overseers.

The fundamental problem remains unaddressed. The cat-and-mouse game between the corporate overlords – who now represent the most influential speech, thought and news gathering platforms in the world – and an American style of democracy – that depends on pluralism, dissent and the ability to speak and be heard in our global, digital public square – will continue unabated.

*Rachel Bovard is the senior director of policy at the Conservative Partnership Institute and a member of USA TODAY's Board of Contributors. She is co-author of "Conservative: Knowing What to Keep," with former Sen. Jim DeMint of South Carolina, and a senior adviser to the Internet Accountability Project. Follow her on Twitter: @RachelBovard*

**App. 809**

**News**  **Opinion**  **Sport**  **Culture**  **Lifestyle**





<span style="color:red">i</span>

**Baltimore**

🕐 This article is more than **4 years old**

# Facebook deactivated Korryn Gaines' account during standoff, police say

**Baynard Woods** *in Baltimore*

🐦 **@baynardwoods**

Wed 3 Aug 2016 14.34 EDT

In the middle of a five-hour standoff that ended in the death of 23-year-old Korryn Gaines, Facebook granted an emergency request from the Baltimore County police department to take her social media accounts offline, police have said.

Baltimore County police officers shot and killed Gaines on Monday after she barricaded herself inside her Randallstown apartment with her five-year-old son and pointed a shotgun at officers attempting to serve an arrest warrant on charges stemming from a 10 March traffic stop including disorderly conduct and resisting arrest.

**App. 810**

Gaines was using social media to broadcast the standoff, which began when officers showed up on Monday morning to serve a warrant. Police officials asked Facebook and Instagram, which is owned by Facebook, to suspend Gaines' accounts through what police called a "law enforcement portal", a part of the site open to certified law enforcement agencies.

At some point after that, police shot Gaines, killing her.

"We did in fact reach out to social media authorities to deactivate her account, to take it offline, if you will," the Baltimore County police chief, James Johnson, said on Tuesday. "Why? In order to preserve the integrity of the negotiation process with her and for the safety of our personnel [and] her child. Ms Gaines was posting video of the operation as it unfolded. Followers were encouraging her not to comply with negotiators' request that she surrender peacefully."

He added that it took more than an hour from the time police contacted Facebook for the account to be taken down. He said the account had not been deleted and that it would now be used as evidence.

Though Baltimore County has implemented a body camera program, it is only a few weeks into implementation and according to police none of the officers involved were wearing body cameras, meaning the Facebook video could become particularly important. A police spokeswoman, Elise Armacost, said the department was obtaining a warrant to obtain the videos as evidence.

Activists, however, see such video as the only hope of countering the police narrative. "They get on the 11 o'clock news or the Baltimore Sun with the police side and then everyone forgets it," said Duane "Shorty" Davis, a Baltimore activist who regularly films encounters with police. "They control the narrative, but in controlling the narrative they have to control social media, because it's our narrative," he said. "To keep our message from getting out, they're going to take [social media] out."



▲ Maryland police shoot woman after she 'repeatedly threatened officers' Guardian

Control of video footage has been contested in two other recent controversial police shootings. The man who owned the convenience store in Baton Rouge where Alton Sterling was killed by police last month said officers took the surveillance video without a warrant or his consent. He hid the cellphone he used to tape the video of the shooting from the police, and shared it with media organizations.

And Diamond Reynolds – who used used Facebook's live video feature one day later to film her boyfriend, Philando Castile, after he was shot by police in a suburb of St Paul – has claimed that police physically took her phone and deleted the video of Castile dying. "They took my phone. They took over my Facebook," she said. "Everyone who shared my video, they don't want you guys to be a part of this; they don't want us to support each other."

In 2012, when most social media sites were still in their infancy, James MacArthur, a black Baltimore activist and blogger who produces an internet radio show under the name Baltimore Spectator, livestreamed a standoff with police on his show. Like Gaines, MacArthur was publicly critical of police and was legally armed. When officers attempted to serve a failure-to-appear warrant at his home – the same thing that led to Gaines' barricade – MacArthur would not come out and the incident ended in a lengthy standoff with police.

**App. 812**

MacArthur broadcast the entire situation, including his negotiations with police, drawing a large audience. He believes that that online audience is one of the only reasons he is alive today. "I knew that was my only chance," MacArthur said. "What's most noteworthy about my incident was my use of social media and you see that they went immediately after that in this case."

Gaines had filmed police on previous occasions, including during one incident which led to the warrant she was being served with when she was killed. In March, according to police reports, an officer pulled Gaines over because she had a piece of cardboard with writing on it instead of a license plate. "Any government official who compromises this pursuit of happiness and right to travel, will be held criminally responsible and fined, as this is a natural right and freedom," the cardboard plate said.

Gaines told the officer he had no authority to question her. One officer threatened to use a Taser. She said they would have to murder her in order to get her out of the car, in which she had her two children.

In one of at least three videos she took during the incident, she coached one of the children: "Make sure you record everything," as an officer grabbed her by the wrist to pull her from the car.

In captions on Instagram videos of the incident, Gaines said that the officers "threatened to break my limbs".

Gaines said she spent two days "in isolation and being starved nd [sic] with no water", before she was released with charges of disorderly conduct, resisting arrest and littering.

She did not show up to court to face these charges, which resulted in the bench warrant three officers showed up to serve on Monday morning. According to Johnson, the police chief, they were also serving a warrant on her boyfriend, Kareem Courtney, for a domestic violence complaint that Gaines brought against him.

The couple would not allow the officers in and the police got a key from the apartment management. According to Johnson, when they tried to open the door, a security chain kept it from opening all the way. "They could clearly see a female that they believed to be Ms Gaines seated on the floor, a child nearby, who immediately began to wield a shotgun around, bringing it up to ready position, pointing it directly at the officers there to serve the arrest warrant," Johnson said.

Johnson said they immediately summoned tactical and support personnel who obtained a separate warrant charging Gaines with assaulting a police officer.

**App. 813**

At some point, Courtney left with the younger of the two children in the apartment. He has been charged with second-degree assault related to a fight with Gaines and released on his own recognizance.

In one of the videos of the standoff which has remained online, Gaines asks her five-year-old child: "Who is outside?" When he answers that it is the police she asks why. "To kill us," the child says.

Around 3pm, according to Johnson, Gaines "brought the weapon up to the ready position, announced to one or more of the tactical team personnel: 'If you don't leave, I'm going to kill you.'"

Instead of leaving, an officer fired, and Gaines returned the fire. "Our personnel returned three rounds of fire, striking her and killing her," said Johnson.

No officers were injured, but Gaines' child was also shot. He was wounded in the arm and is in a good condition in hospital. "We do not know at this moment in time if the child was struck by our round, her round, shrapnel from our round, shrapnel from her round," Johnson said. He said they did not know where the child was when the shooting occurred.

The names of the officers still have not been released, in accordance with the contract the county has with the police union.

The American Civil Liberties Union (ACLU) of Maryland strongly condemned the action, saying in a statement that police "decided that they needed to use deadly force to execute that warrant, and needed to expose themselves to the known risk of deadly force being used on them, knowing that a five year old child might be in the line of fire".

*The Associated Press contributed to this report*

**INTERNATIONAL**

# Mark Zuckerberg admits Facebook chose to ban foreign pro-life ads in Ireland before abortion vote

By Nancy Flanders | July 3, 2019, 02:22pm



 Facebook   Twitter

 More   588

As Mark Zuckerberg hit the stage at the Aspen Ideas Festival on June 26, 2019, he admitted what was widely already understood to have occurred: Facebook had blocked American pro-life groups from advertising in Ireland leading up to the country's referendum



## ABOUT

Live Action News publishes pro-life news and commentary from a pro-life perspective. Learn More

Do you feel at a loss for words when trying to respond to "Pro-choice" statements?

Start your free "Pro-life Replies" Course now

vote on abortion. Last year's vote landed in favor of legalizing abortion in the previously pro-life country.

"During [Ireland's] election, leading up to that referendum, a bunch of pro-life American groups advertised… to try to influence public opinion there," said Zuckerberg. "And we went to the Irish and asked folks there, 'well how do you want us to handle this? You have no laws on the books that are relevant for whether we should be allowing this kind of speech in your election, and really this doesn't feel like the kind of thing a private company should be making a decision on."

GET YOUR COPY TODAY!
## NOW AVAILABLE



FIGHTING *FOR* LIFE

*BECOMING A FORCE FOR CHANGE IN A WOUNDED WORLD*

LILA ROSE

**ORDER NOW**



Zuckerberg on blocking Americ...

## FEATURED


What you need to know about the COVID-19 vaccines


Mom's photos of 'perfect' 14-week miscarried son have saved other babies


These 10 images may change your mind about abortion

Despite his concerns about the company rather than the country deciding if the ads should run or not, the

Irish government told him they would leave the decision up to Facebook. Ultimately, Facebook decided to ban the pro-life ads — and that decision was a controversial one.

**READ:** *[Facebook COO Sheryl Sandberg gives $1 million to Planned Parenthood… again](#)*

"I'm not sure Irish people ever voted for Mark Zuckerberg to make these types of decision," Gavin Sheridan wrote for **[The Guardian](#)** in May of 2018. […] "We cannot allow private companies to decide what we know or don't know about our own electoral processes and how they should be run. We cannot allow commercial entities to make arbitrary and, indeed, voluntary decisions without a legal framework existing that has been formulated using the rather old-fashioned system of implementing laws via parliament."

For his part, Zuckerberg seems to agree, saying, "I really don't think that as a society we want private companies to be the final word on making these decisions." Then why did Facebook make the decision to suppress pro-life ads?

Facebook is no stranger to squelching pro-life ads on the platform. While Zuckerberg has personally **[expressed](#)** that he wants all





voices to be heard on Facebook, the company has a history of suppressing ads from pro-life groups like **Life Dynamics**, the **Gosnell movie** creators, **local pro-life groups**, and more. Life Site News' Calvin Freiburger reported in late 2018:

> *Choice42, Live Action, and LifeSiteNews are just three of the pro-life, pro-family, and/or center-right voices improperly restricted on [both Facebook and Twitter] since 2016. Others include various Republican* **leaders**, **officeholders***, and* **candidates***; conservative commentator* **Jesse Kelly***; "Activist Mommy" blogger* **Elizabeth Johnston***; theologian* **Dr. Robert A.J. Gagnon***; conservative video bloggers* **Diamond and Silk***; the group* **Americans for Truth About Homosexuality***; the recent film* **Gosnell***; and an* **upcoming film** *about Roe v. Wade.*

Zuckerberg's comments come on the heels of the revelation that Facebook's Chief Operating Officer **Sheryl Sandberg** is donating another $1 million to Planned Parenthood. The first million-dollar donation she gave was back in 2017 after the Trump administration reinstated the Mexico City policy banning international federal funding of abortion.

Zuckerberg has **expressed** that he wants all voices to be heard on Facebook, however, the social media platform's **history** of **suppressing** a number of **pro-life ads** tells **a different story**.

*"Like" Live Action News on Facebook* for *more pro-life news and commentary!*



**What is Live Action News?**

Live Action News is pro-life news and commentary from a pro-life perspective. **Learn More**

**Corrections or Questions**

For corrections, or questions, please contact the editor at **editor@liveaction.org**

**GUEST ARTICLES:** To submit a guest article to Live Action News, email **editor@liveaction.org** with an attached Word document of 800-1000 words. Please also attach any photos relevant to your submission if applicable. If your submission is accepted for publication, you will be notified within three weeks. Thank you for your interest in Live Action News!





# W | THE WESTERN JOURNAL

**Equipping Readers with The Truth**

**Friday, June 18, 2021**

**Trending:**   Coronavirus   LGBT   Abortion   Gun Control   Education   Israel

   

# Confirmed: Facebook's Recent Algorithm Change Is Crushing Conservative Sites, Boosting Liberals

 By George Upper • March 13, 2018 at 11:39am

Facebook's much-publicized demotion of publishers' content in users' news feeds has negatively impacted conservative-leaning publishers significantly more than liberal-leaning outlets, an analysis by The Western Journal has revealed.

Liberal publishers have gained about 2 percent more web traffic from Facebook than they were getting prior to the algorithm changes implemented in early February.

On the other hand, conservative publishers have lost an average of nearly 14 percent of their traffic from Facebook.

This algorithm change, intentional or not, has in effect censored conservative viewpoints on the largest social media platform in the world. This change has ramifications that, in the short-term, are causing conservative publishers to downsize or fold up completely, and in the long-term could swing elections in the United States and around the world toward liberal politicians and policies.



## Example: New York Post vs. New York Daily News

Case in point: Two rival publishers in New York City, the New York Post and the New York Daily News, are similar in many ways, except for their editorial slants. The Post is well-known as a right-leaning outlet, whereas the Daily News has an established left-leaning slant. For example, the Daily News recently ran a headline after the Parkland shooting that read, "Brave Florida survivors plan day of action for gun sanity and to call out 'blood on hands' of NRA puppets."

Headlines like that garnered the Daily News a 24.18 percent increase in traffic from Facebook, while the right-leaning Post's traffic dropped 11.44 percent in the same time period.

These results are similar to the "surprisingly profound and partisan" findings of analysis conducted by The Outline. However, whereas The Outline analyzed user engagement on Facebook itself, The Western Journal looked at actual traffic driven to news websites by Facebook, which directly impacts revenue for these sites.

## Why did Facebook make this change?

Campbell Brown, a former anchor on NBC and CNN who now leads Facebook's news partnerships team, told attendees at a recent technology and publishing conference that Facebook would be censoring news publishers based on its own internal biases:

> *"This is not us stepping back from news. This is us changing our relationship with publishers and emphasizing something that Facebook has never done before: **It's having a point of view**, and it's leaning into quality news. ... We are, for the first time in the*

Based on The Western Journal's analysis — and an overwhelming amount of insider reports from new media publishers — it is clear that Facebook's definition of "quality news" is news with a liberal slant.

# Where does this data come from?

**Related:**   **Shooting Spree Reportedly Targeting Whites Stuns South, Are We Seeing Left's Deadly Obsession with Race Bleed Over Into Real Life?**

To conduct this evaluation, The Western Journal selected 50 publishers known to receive a significant amount of online traffic from Facebook. These publishers include traditional print or television outlets such as The Washington Post, CNN and Fox News, as well as new media outlets like Salon, Vox and The Daily Caller. (The full list of publishers appears in the chart below.)

**Trending:**   **Putin Rips Detention of Jan. 6 Protesters, Accuses US Government of Assassinating Ashli Babbitt**

The Western Journal then assigned each publisher a number between 0 and 100 based on Media Bias / Fact Check News, a third party website that analyzes publishers for political bias and places them on a continuum between "extreme left" and "extreme right."

Next, The Western Journal checked the monthly Facebook traffic for each of these sources using data from global digital market intelligence company SimilarWeb and compared January traffic to traffic from Feb. 4 through Mar. 3, adjusted for the slightly shorter time period. According to available internal data, Facebook began rolling out this major algorithm change on Feb. 6.

**App. 823**



THE WESTERN JOURNAL

The 25 on the liberal side of the scale averaged a 1.86 percent boost in traffic from Facebook, whereas the 25 news organizations on the conservative side averaged a 13.71 percent decrease in traffic.

Based on this analysis, it is clear that liberal news sites are being promoted in Facebook users' news feeds more often than conservative sites.



After removing the 15 publishers with the least traffic from Facebook, the trend becomes even more clear.

Of the remaining 35 news sources, the 12 most liberal sites averaged a boost of 0.21 percent — in other words, they don't appear to have been affected in any meaningful way.

**App. 824**

The 12 most conservatives sites lost an average of 27.06 percent of their traffic from Facebook.

**Do you think Facebook is intentionally targeting conservatives?**

○ Yes   ○ No

Enter your email   Submit

Completing this poll entitles you to The Western Journal news updates free of charge. You may opt out at anytime. You also agree to our Privacy Policy and Terms of Use.

Of the 12 most liberal sites, six saw double-digit decreases in traffic, while four saw double-digit increases and two — The Washington Post and HuffPo — saw single-digit increases. CNN's traffic increased 43.78 percent.

Of the 11 sites in the middle of the scale, nine saw traffic increase. Only two — CBS News and The Atlantic — saw a traffic decrease.

Among those 11, only two — USA Today and The Economist — can truly be considered centrist according to the MSFC News scale. Their traffic increased by 23.16 percent and 1.12 percent, respectively.

Of the 12 most conservative sites, only two benefited from increased Facebook traffic — the Daily Mail with 3.51 percent and Fox News with 31.67 percent.

The other 10 saw decreases ranging from 3.13 percent at Breitbart to a whopping 76.49 percent at Independent Journal Review.  On Feb. 15, IJR announced significant layoffs to an "already skeletal staff," The Daily Caller reported. Rare, a conservative leaning news media

**App. 825**

W THE WESTERN JOURNAL

The average impact per news site with the most desktop sessions from Facebook also varied significantly depending on the political leaning of the site.

Fox News was the only conservative site that saw significant growth in this calculation. If Fox were removed from the group of 12 conservative sites shown above, the average drop would grow to 32.4 percent among the remaining 11.

## Facebook's Response

It is, of course, possible that the benefit to liberals sites and the harm to conservatives is unintentional, a side effect of Facebook's well-known "move fast, break things" attitude. Given Facebook's history of manually suppressing conservative news, and given recent

**App. 826**

platform.

"How this manifests in the coming months is not totally clear to us right now," Campbell admitted at the Recode event. "These are conversations we've just started having with a lot of publishers. But in terms of us taking a big step in that direction, I think, yes, I think this is, I think this is us having a very clear point of view."

Facebook has not responded to a request for comment submitted by The Western Journal last week.

**For the full data set, [visit this public Google Sheet](#).**

*CORRECTION: An earlier version of this article erroneously referred to The Outline as The Outlet.*

## Truth and Accuracy

Submit a Correction →

We are committed to truth and accuracy in all of our journalism. [Read our editorial standards.](#)

| Tags: | **Breitbart, business and money, CBS News, CNN, conservatives, Facebook, Fox News, liberals, NBC, New York Daily News, New York Post, social media, technology, The Washington Post** |
|---|---|





**George Upper**
Editor-in-Chief

App. 827

☰  **LIVE ACTION**     INVESTIGATIVE    HUMAN INTEREST    ISSU  🔍    

**MEDIA**

# Facebook holds Live Action videos, allows Planned Parenthood to promote sex to kids

By **Susan Michelle-Hanson** | June 13, 2018 , 01:57am





 **Facebook**    🐦 **Twitter**

➕ **More**

Live Action has **produced a new docuseries** exposing Planned Parenthood's decades-long cover-up of child sexual abuse, but Facebook is holding ads the pro-life organization is seeking to run and blocking its ability to freely advertise and promote the videos.

**ABOUT**

Live Action News publishes pro-life news and commentary from a pro-life perspective. **Learn More**

**Do you feel at a loss for words when trying to respond to "Pro-choice" statements?**

**Start your free "Pro-life Replies" Course now**

First Name*

Last Name*

Email*

**Start my free course now**

For weeks, Facebook has held Live Action's ads, which it deems "political content," for prolonged policy review, and it did not permit one ad showing how Planned Parenthood covers up child sexual abuse to run for over a week. By preventing the ads to run, the social media giant is suppressing Live Action's ability to advertise the pro-life message.

By contrast, Planned Parenthood appears to have free reign when it comes to ads. As **Live Action News pointed out this week**, Facebook seems happy to take the abortion corporation's money for ads that **violate its own advertising policy**.

Live Action **tweeted on Tuesday**:

> Is **@Facebook** blocking videos exposing Planned Parenthood's cover-up of child sexual abuse?
>
> We placed an ad for this video a week ago.
>
> The ad is STILL pending approval.
>
> Would Facebook have blocked **@PPFA** from advertising?



GET YOUR COPY TODAY!

## NOW AVAILABLE

↑ TO TOP

FIGHTING *FOR* LIFE

*BECOMING A FORCE FOR CHANGE IN A WOUNDED WORLD*

LILA ROSE

**ORDER NOW**

**FEATURED**


What you need to know about the COVID-19 vaccines


Mom's photos of 'perfect' 14-week miscarried son have saved other babies


These 10 images may change your mind about abortion



RETWEET to stand up to Big Media. **#PPCoversUpSexAbuse** **pic.twitter.com/8QTJMttwbL**

— Live Action (@LiveAction) **June 12, 2018**

It also posted on Facebook, and within an hour had almost 1,200 shares and 2,000 reactions:



Post from Live Action, June 12, 2018

Ironically, the social media giant is already **facing myriad accusations of**



**bias** against conservative groups, and last month **announced** it would bringing in outside auditors to help the company avoid that bias. One person says while the company has begun to address some race and gender bias, it has yet to address its biases against conservatives. Free Enterprise Project Director **Justin Danhof, Esq., said**:

> **Facebook has exactly one conservative board member, and he has considered leaving the board because of the company's far-left leanings. That should be evidence enough that the company has a groupthink problem.**

And as **Life Site News reported**:

> **It would not be the first time Facebook bent the rules for a political ally. In March, former Obama for America media director Carol Davidsen revealed that Facebook allowed former President Barack Obama's campaign to take users' personal information because "they were on our side." The social media giant is one of several tech companies currently embroiled in an ongoing scandal over alleged**

**discrimination** against conservative users and groups.

In addition to the influx of accusations showing the lack of conservative ideology at Facebook's headquarters, further ironic is the fact that Facebook recently ran this ad regarding Twitter's efforts to silence the pro-life group:



Only now that it is Facebook doing the blocking, it seems that changes the rules, just like Facebook does for Planned Parenthood. The abortion giant ran a recent ad for sex education, which included condom illustrations such as this one, proclaiming "sex is hot":





Clearly this **violates the terms** Facebook has set forth which restricts the ways in which contraception may be discussed:

> ### 8. Adult Products or Services
>
> **Policy**
> Ads must not promote the sale or use of adult products or services, except for ads for family planning and contraception. Ads for contraceptives must focus on the contraceptive features of the product, and not on sexual pleasure or sexual enhancement, and must be targeted to people 18 years or older.
>
> **Examples**
> ✅ "Free condoms at your local student health center." This example text is compliant, as long as it's targeted to people 18 years or older.
> ✅ "Practice safe sex with our brand of condoms." This text is compliant, as long as it's targeted to people 18 years or older.
> ❌ "Condoms to enhance your pleasure."
> ❌ "Use our gel to dramatically improve your sex life."
> ❌ "Buy our sex toys for your adult pleasure."
> ❌ Sex toys, or products focused explicitly on sexual pleasure.

Part of the **controversy** of the recent "fun condom" pictures and text for sex education in Planned Parenthood ads is that the abortion corporation clearly **targeted these ads** to be appealing to young girls, and got a quarter to a third of its views from minors–at least. Encouraging pre-marital sex for minors with its petition to "Oppose Abstinence-Only-Until-Marriage [school sex education] programs," **Planned Parenthood appears** to be able



to bypass Facebook's roadblocks without effort.

Yet Live Action's attempts to run an ad exposing how Planned Parenthood workers help children to get abortions — even when the child says she is 13 with a 31-year-old boyfriend — gets lodged in limbo, without response, seemingly too controversial for Facebook's ad reviewers to do their jobs.

Clearly, Facebook's efforts to bring in auditors to discern if it has biases against conservatives are a needed tool if the the social media company wants to be an adequate resource for all of its users. And whatever its doing so far, obviously more needs to be done. When a social media powerhouse prevents an ad that would aid in preventing children from being abused, trafficked, or raped, clearly there is a larger issue at play.





**What is Live Action News?**

<u>**NEWS & POLITICS**</u>

# Facebook Blocks Bridget Phetasy's Podcast with Glenn Beck: 'Against Community Standards'

BY **MICHAEL VAN DER GALIEN** SEP 04, 2019 3:32 AM ET

Share     Tweet



*Earlier this summer, Bridget Phetasy also joined Glenn Beck on his radio show. Now Beck returned the favor. Source: The Glenn Beck Radio Show / Screenshot YouTube.*

Popular podcast host Bridget Phetasy was very excited yesterday: this week's guest on her podcast was Glenn Beck. She could share the podcast with all her followers, who could then listen to it… and who would undoubtedly be very happy to hear the two talk about the most important issues. One problem: when she tried to share the podcast on Facebook, the social network blocked it.

"I have firebrand Glenn Beck on the podcast this week and we delve into the value of struggle and overcoming hardship," Bridget wrote in her introduction to the episode. "The cultural celebration of 'victimhood,' how tribalism and the culture wars trick people into thinking that the problem is outside themselves, and the dangers of buying into your own fame."

She went on: "They explore the importance of being able to say 'I don't know,' the loss of compassion that occurs when we stop seeing the humanity of the people we disagree with, Glenn's surprising conversion to Mormonism, and what he found in the depths of his most recent dark night of the soul."

## *The Facebook Employee Who Deleted PragerU Videos as 'Hate Speech' Still Hasn't Been Fired*

That sure sounds great — and not even extremely political in nature. Absolutely no reason for the Trump-hating social media powerhouse to ban it, right? Well, guess what happened:



"WTF," Bridget said on Twitter, "Facebook blocked my podcast with Glenn Beck for going 'against community standards.'"

Glenn Beck responded with shock, outrage, and a kind of fatalism very prominent on the right these days:



"What?! By banning this podcast, Facebook is confirming that their community standards are simple: no opinion or voice of common sense is allowed," Beck wrote. He finished his tweet with an ironic "welcome to my world Bridget" and the hashtag #whostheFascist?

And still, there are those on the right who argue that no action should be taken against Facebook. It has a monopoly position, it routinely abuses its power in an effort to silence conservatives and libertarians, and (with a little help from its friends in high places) its legally protected so those who are silenced can't do anything about it.

Something needs to be done about these crackdowns.

## *Internal Facebook Memo Condemns 'Political Monoculture' That Demonizes Conservatives*

**Editor's Note:** If they can ban Trump, they can ban us. Support conservative journalism and stand up to Big Tech censorship.

Join PJ Media VIP to support our conservative journalism and use the promo code **BIGTECH** to get 25% off VIP membership!



*NEWS*

# Facebook blocks pregnancy site articles on fetal development, abortion pill reversal

*The information was considered a violation of 'Community Standards.'*

Tue Mar 12, 2019 - 4:02 pm EST



SHUTTERSTOCK.COM



*By Calvin Freiburger*

March 12, 2019 (LifeSiteNews) – Facebook is now blocking purely-informational links from a neutral pregnancy website that detail subjects such as early fetal development and present a balanced view on topics such as abortion pill reversal, according to a tip from a concerned reader that LifeSiteNews has independently verified.

The American Pregnancy Association (APA) "seeks to increase awareness of the reproductive and pregnancy needs in our society along with the resources necessary to address these needs," partly via a website that provides information on a wide range of pregnancy-related topics, from fetal development to medical complications to early childcare.

On Monday, LifeSiteNews was forwarded an individual's attempt to send a friend some pregnancy and abortion facts via Facebook Messenger, including an APA article on early prenatal diagnosis and treatment of complications. Among the page's information is the statement that "Between 5 ½ to 6 ½ weeks, a fetal pole or even a fetal heartbeat may be detected by vaginal ultrasound."

Facebook blocked the link from being uploaded with a message stating: "Your message couldn't be shared, because this link goes against our Community Standards. If you think this doesn't go against our Community Standards, let us know."

On Tuesday, LifeSiteNews tested the links and confirmed that while Facebook allows links to APA's main page and some articles, including "Fetal Development: First Trimester" and "Possible Physical Side Effects After Abortion," Facebook blocks the early complications article as well as one on abortion pill reversal from being shared either on a user's wall or via the Messenger app, complete with an unexplained "Community Standards" warning.

The early complications article makes no reference to abortion and is purely informational. The pill reversal piece is overall favorable to the practice, guiding readers to the 24-hour Abortion Pill Reversal Hotline. However, it too is primarily informative and presents the arguments both for and against, with quotes from organizations on both sides of the debate.

Despite being undisputed and readily available in mainstream medical textbooks, disseminating fetal development information tends to be controversial among abortion defenders because it substantiates preborn babies' status as living humans, discouraging women from going through with abortions.

Abortion advocates even more bitterly oppose the relatively young practice of Abortion pill reversal, which consists of administering extra progesterone to counteract the effects of the mifepristone abortion pill (RU-486), ideally within 24 hours of taking the abortion pill.

**App. 839**

Its pioneers credit it with helping more than 400 women save their babies since 2007, and say they have even had successes when the treatment begins within 72 hours of taking the abortion pill. Overall, they say they have seen a 55 percent success rate, meaning that while reversing a chemical abortion is far from certain, it has the capacity to save many babies.

Abortion pill reversal information has been suppressed by other social media platforms such as YouTube, which reversed itself after public outcry. The APA's experience is the latest in a long series of instances of Facebook restricting benign pro-life content. Often in the past, Facebook has reversed itself and blamed such incidents on either isolated human error or the limitations of their content-review algorithms; it remains to be seen whether it will attempt to explain this the same way.

**App. 840**

**The Intercept_**

# Facebook's Ban on Far-Left Pages Is an Extension of Trump Propaganda

Facebook announced a sweep to ban some user groups — and it equated violent white supremacist militias with antiracist organizing.

Natasha Lennard

August 20 2020, 2:30 p.m.

LEIA EM PORTUGUÊS ⟶



The Facebook "like" sign is seen at Facebook's corporate headquarters campus in Menlo Park, Calif., on Oct. 23, 2019. Photo: Josh Edelson/AFP/Getty Images

**On Wednesday,** Facebook announced an expansion of its "Dangerous Individuals and Organizations policy," removing or restricting hundreds of pages associated with groups that it claims promote violence. Nearly 800 QAnon groups, committed to pernicious disinformation and potentially deadly conspiracy theories, have been removed. Facebook also shut down the pages of far-right militias, like the New Mexico Civil Guard, an armed vigilante organization, whose leaders sport swastika tattoos.

Alongside groups openly committed to genocidal white supremacy, which constitute a very real threat to Black and Indigenous communities, as well as other people of color, Facebook also shut down the pages of numerous antifascist, anti-capitalist news, organizing, and information sites. The move follows a pattern now well-established by the Trump administration − and unchallenged by most every mainstream media outlet − that draws indefensible false equivalences between organized, racist fascists, and the antifascists who vigorously oppose them.

Among the pages removed were those of antifascist news and research site, It's Going Down, a media platform that publishes news, analysis, and reports on social struggles, as well as investigative work to expose white supremacist and neo-Nazi networks. Crimethinc, a bastion of left-wing, anarchist publishing and thought since the 1990s, saw its Facebook page removed too. The pages of groups organizing around the ongoing and potent antiracist uprisings were also shut down, including the PNW Youth Liberation Front, a network of youth collectives in the Northwest committed to direct action protest.

**Join Our Newsletter**
**Original reporting. Fearless journalism. Delivered to you.**

**I'm in →**

"Lumping anarchists and anti-fascists together with far-right militias who explicitly support the current administration is a strategic move to muddy the issue," said a statement from Crimethinc in response to the bans. "This is the same operation that William Barr" — the attorney general — "performed in creating a Department of Justice task force focused on 'anti-government extremists' that targets self-proclaimed fascists and anti-fascists alike. In the case of the Department of Justice, this enables them to point to far-right and militia attacks in order to demand resources with which to crack down on those who are on the front lines of defending communities against such attacks."

Both rhetorically and through specific policies, the government has obfuscated and downplayed the threat of white supremacist extremism, while sensationalizing the risks posed by the far left.

With its latest bans, Facebook is following this same playbook.

The demonization of antifascists has become a centerpiece of President Donald Trump's reelection propaganda, which functions both to criminalize dissent and delegitimize Black liberation struggle. Following the intolerable events of the Charlottesville, Virginia, "Unite the Right" rally in 2017, Trump famously praised "very fine" members of the white supremacist coalition and blamed "both sides" for the murderous far-right violence that occurred — a stance that's since been crystallized in his policies.

## With its latest bans, Facebook is following the government's playbook.

Facebook's decision to treat leftist social justice platforms as equivalent to racist militia groups is merely an extension of the government's position. "For months, Donald Trump has demanded this crackdown in a

series of social media posts explicitly blaming anarchists and anti-fascists for the countrywide wave of protests precipitated by persistent police violence in the United States," said the Crimethinc statement.

**Earlier this month**, as I wrote, Sen. Ted Cruz, R-Texas, chaired a farcical Senate Judiciary Subcommittee hearing on "stopping anarchist violence." The senator repeatedly chastised Democrats for failing to condemn "antifa" for a murder that was in fact carried out by the far right — and refused to be corrected. Both It's Going Down and Crimethinc were mentioned during the hearing, within baseless overtures on the threat of the far left.

In the three decades since Crimethinc's founding, the Facebook ban is "the first thing like this that has occurred," said a participant in the collective, who asked for anonymity out of concern for far-right retaliation and state scrutiny. Of course, none of the antifascist groups removed by Facebook expected any better from the social media leviathan. "We ultimately aren't surprised by this move and personally all hate Facebook," the It's Going Down Twitter account said, noting that it was nonetheless a "vehicle to connect with people."

At stake is not the moral standing of Mark Zuckerburg's turpitudinous monopoly, but rather the further entrenching of a false equivalence, which stifles antifascist dissent at a time of emboldened state and movement fascism.

---



Related

**Leaked Documents Show Police Knew Far-Right Extremists Were the Real Threat at Protests, Not "Antifa"**

It bears repeating, ad nauseam, that the far right has carried out 329 murders in the last three decades; none have been attributed to antifa.

Between 2009 and 2018, white supremacist and far-right extremists were responsible for 73 percent of extremist murders in the U.S. And that's not even to mention the state-sanctioned, racist killings carried out by the police.

There's no doubt that a number of the leftist platforms removed in the Facebook sweep advocate for disruptive dissent and protest. Antifa practice certainly involves a willingness to physically confront organized white supremacists in the streets. But Facebook's bans, echoing Trump's myths, equate the "violence" of disruptive antiracist protest with the violence of neo-Nazis murdering immigrants and people of color.

"This line of thinking continues to equate protest disruption and property destruction with far-right movements who fundamentally want to harm and kill large segments of the public," It's Going Down tweeted.

For Facebook to treat even militant, antiracist, antifascist organizing as a violence comparable to that of white supremacist militias is a statement, in no uncertain terms, about which lives it deems to matter.





Blaze Media / News

# Clay Travis to Congress: Facebook censorship removed 68% of Outkick's audience

Travis testified about Facebook's "content-based speech discrimination."

**CHRIS PANDOLFO**  |  March 12, 2021

Kent Nishimura / Los Angeles Times via Getty Images

Like *Blaze News*? Get the news that matters most delivered directly to your inbox.

Your email



Clay Travis, a radio host and the founder of sports media website Outkick.com, testified to Congress on Friday about the power of Big Tech censorship, accusing Facebook of "content-based speech discrimination" against his media company.

**Special:** **Fearless with Jason Whitlock**

Travis was invited by the House Judiciary subcommittee on antitrust, commercial and administrative law to speak to the relationship Big Tech shares with the media as Congress considers legislation that would allow media outlets to collectively negotiate ad rates with tech companies like Google or Facebook.

In his opening statement, Travis provided the subcommittee with examples of how Facebook allegedly punished Outkick's traffic for posting positive coverage of former President Donald Trump and heterodox opinions from medical experts on COVID-19 lockdowns.

On August 11, President Trump was a guest on Travis' radio program, joining the show to discuss the importance of playing college sports in the fall. Articles covering what the president said about the NBA, the NFL, and college sports were published on Outkick's website.

"The day after that interview Facebook tanked our traffic," Travis said. "The next day and over the next week, Facebook removed 68% of our audience, 76% of our new users. That cost my company hundreds of thousands of dollars."

Travis provided documents to the subcom ≡

decline in Outkick's traffic during the timef



"To me, it was clear content-based speech discrimination," Travis said. "Facebook didn't like that we had the president of the United States on our radio program and they also didn't like that the majority of the coverage of that interview was positive, which as a sports fan, it's hard to be negative when the favor of the president is aligned with games actually being played."

He warned Congress of the "overwhelming power" that Big Tech holds over media companies, giving a second example of how he says Facebook discriminated against certain speech.

In February, Outkick published an article covering an op-ed in the Wall Street Journal by Dr. Marty Makary, a professor at Johns Hopkins School of Medicine & Bloomberg School of Public Health. In the op-ed, Makary argued that herd immunity was responsible for COVID-19 cases falling and predicted that the United States would reach herd immunity against the virus sometime in April.

"Certainly some scientists and doctors agree with that, certainly some scientists and doctors disagree with that opinion. We wrote about that editorial opinion on our website," Travis said. "Within a matter of days, we received a notification from Facebook with the downright Orwellian subject, 'Important Notification: Misinformation Violation.' Facebook told us we were not allowed to share the opinion of a doctor on our website because they said it was a fact-checked inaccuracy.

"It was, members of the subcommittee, AN OPINION. An opinion of a reasoned and well-learned doctor. That is what the scientific method is, we argue about what the truth is in this country with an idea that we reach a better conclusion. Facebook's own fact-checkers labeled our article about an opinion to be factually inaccurate, which is an impossibility."

Blaze

He continued: "Who checks the fact-checke      ☰
you can see, as soon as Facebook found this
concerned if the government of the United States was making these kind of
decisions. My concern is all of the Big Tech companies now have the same
power that China has to regulate the internet in its country.

"Instead of the government doing it, we have allowed Big Tech to do it."

## Watch:

> *Here's my opening statement at Capitol Hill today on the massive
> power of big tech and how it impacts @outkick. Als…
> https://t.co/qoV4BwuECd*
>
> *— Clay Travis (@Clay Travis)* *1615577423.0*
>
> *Big tech is so powerful they colluded to ban the president of the United
> States from their platforms. If they can d… https://t.co/2041aD4ir5*
>
> *— Clay Travis (@Clay Travis)* *1615576833.0*

## Around the Web

Ads by Revcontent

⤴ Trending

**Tinnitus? when the Ringing Won't Stop, Do This (Genius!)**

⤴ Trending

**Anna Nicole Smith's Daughter is All Grown**

⤴ Trending

**Always Place a Plastic Bag on Your Car Mirror**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
https://www.djreprints.com.

https://www.wsj.com/articles/facebook-has-made-lots-of-new-rules-this-year-it-doesnt-always-enforce-them-11602775676

◆ WSJ NEWS EXCLUSIVE | TECH

# Facebook Has Made Lots of New Rules This Year. It Doesn't Always Enforce Them.

A Wall Street Journal test showed content that violated guidelines often remained



Facebook said it would take down posts mocking George Floyd's death and wouldn't allow false claims that arsonists affiliated with antifa were behind wildfires in the Western U.S. nor would it allow praise for the man who shot people at a BLM protest in Kenosha, Wis.

PHOTO: FROM LEFT: AP; REUTERS; ZUMA PRESS

*By* *Jeff Horwitz*

Oct. 15, 2020 11:27 am ET

▶ Listen to Article (8 minutes)                                                    ⊕ Queue

<u>Facebook</u> Inc.  this year has made a flurry of new rules designed to improve the discourse on its platforms. When users report content that breaks those rules, a test by The Wall Street Journal found, the company often fails to enforce them.

Facebook allows all users to flag content for review if they think it doesn't belong on the platform. When the Journal reported more than 150 pieces of content that Facebook later confirmed violated its rules, the company's review system allowed the material—some depicting or praising grisly violence—to stand more than three-quarters of the time.



**App. 850**

Facebook's errors blocking content in the Journal's test don't reflect the overall accuracy of its content-moderation system, said Sarah Pollack, a company spokeswoman. To moderate the more than 100 billion pieces of content posted each day to the Facebook platform, the company both reviews user reports and actively screens content using automated tools, Ms. Pollack said.

"Our priority is removing content based on severity and the potential for it going viral," she said.

Amid a contentious election cycle and civil unrest, the social network has made new rules prohibiting false claims that arsonists affiliated with the far-left antifascist protest movement known as antifa were behind catastrophic wildfires in the Western U.S. and banning celebration of the ambush shooting of two Los Angeles deputies. Before that, the company said it wouldn't allow praise for the shooting of three people at a Black Lives Matter protest in Kenosha, Wis. and pledged to take down items mocking George Floyd, whose death set off nationwide protests against police brutality.

Last week, the company announced several measures related to the Nov. 3 presidential election, including a ban on any posts that contain militarized language related to poll-watching operations. On Monday, Chief Executive Mark Zuckerberg said Facebook is banning Holocaust denial on the platform, enhancing the more limited constraints on such content previously in place, because of rising anti-Semitism.



A helicopter carried water last month to the Brattain fire in Fremont National Forest in Paisley, Ore.
PHOTO: ADREES LATIF/REUTERS

Facebook's content moderation gained renewed attention Wednesday when the company limited online sharing of New York Post articles about the son of Democratic presidential

nominee <u>Joe Biden</u>, saying it needed guidance from third-party fact-checkers who routinely vet content on the platform.

On a platform with 1.8 billion daily users, however, making a rule banning content doesn't mean that content always disappears from Facebook.

"Facebook announces a lot of policy statements that sound great on paper, but there are serious concerns with their ability or willingness to enforce the rules as written," said Evelyn Douek, a Harvard University lecturer and researcher at the Berkman Klein Center for Internet & Society who studies social-media companies' efforts to regulate their users' behavior.

RELATED

<u>YouTube Becomes Latest Tech Giant to Curb QAnon</u>

<u>Senate to Subpoena Twitter CEO Over Blocking of Disputed Biden Articles</u>

Over several days in late September, the Journal flagged 276 posts, memes and comments that appeared to break Facebook rules against the promotion of violence and dangerous misinformation.

Facebook took down 32 posts the Journal reported, leaving up false posts about a left-wing arson conspiracy, jokes about the victims of the Kenosha violence imposed over grisly images of their wounds and comments wishing death or lifelong disabilities for Los Angeles sheriff's deputies who survived an unprovoked shooting.

"We know this is not what you wanted, and we thought it might help if we explain how the review process works," read Facebook's standardized response to the posts submitted by the Journal. "Our technology reviewed your report and, ultimately, we decided not to take the content down."

When the Journal contacted Facebook to review the more than 240 posts that the company's moderation system had deemed allowable, the company ultimately concluded that more than half "should have been removed for violating our policies," Ms. Pollack said. The company later removed many of those posts.

 WHAT'S NEWS

# Twitter, Facebook in Spotlight Over Content Restrictions



00:00    1x

SUBSCRIBE

Because Facebook's artificial-intelligence systems are increasingly geared toward identifying content that has the potential to go viral, many of the items the Journal reported—such as comments on news articles or posts in private groups that weren't currently receiving a large volume of views—would have been given low priority for review, Ms. Pollack said.

The decisions highlight both the difficulty Facebook faces in enforcing its policies and the fine distinctions the company makes in defining what content is allowed and what breaks its rules. For example, Facebook's policy against denigrating the victims of tragedies has an exception for statements regarding the victims' criminal histories, even if those statements are false.

Advertisement - Scroll to Continue

Mr. Zuckerberg has warned of risks that the U.S. election could lead to street violence, and announced a series of measures to stop the spread of misinformation and content that incites any kind of violence. The company said it has removed more than 120,000 pieces of content for violating voter-interference policies and displayed warnings on more than 150 million items that had been deemed false by Facebook's fact-checking partners.

**App. 853**

Facebook also faces pressure from users who complain that its content policies are too strict and limit public discourse. In leaked recordings of internal meetings published by the Verge, Mr. Zuckerberg told employees that the most common criticism from users is that the company removes too many posts, which many of those users perceive as a sign of bias against conservative views.

Facebook's content-moderation system relies on both user reports and an automated detection system that seeks to instantly delete violative content or flag potential violations for human review. Facebook algorithms then give priority to what content gets reviewed by its thousands of human moderators, generally contract employees.

Ms. Pollack, the Facebook spokeswoman, said that coronavirus-related business disruptions and improvements to its AI systems have led the company to shift resources toward automated reviews of posts and away from individual users' reports.



A George Floyd mural in Minneapolis.
PHOTO: BRYAN SMITH/ZUMA PRESS

In an August blog post, Facebook said its AI could detect content violations "often with greater accuracy than reports from users" and "better give priority to the most impactful work for our review teams."

The Journal's test found Facebook didn't always handle user reports as quickly as promised. Around half the items the Journal flagged were reviewed within 24 hours, the time frame in which Facebook's system initially said in its automated response messages that it would provide an answer. Some—including posts reported as inciting violence or promoting terrorism—remained outstanding far longer, with a few still awaiting a decision more than two weeks later.

**App. 854**

SHARE YOUR THOUGHTS

*Do you think Facebook can successfully tackle misinformation around the coming U.S. election? Why or why not? Join the conversation below.*

In a conference call with reporters last week, Guy Rosen, Facebook's vice president of integrity, declined to say how long, on average, Facebook takes to review user-reported content.

The reporting system offers users a chance to appeal the company's decision. When the Journal filed such appeals, Facebook a day later sent automated emails stating that Covid-19 resource limitations meant "we can't review your report a second time."

The message suggested hiding or blocking "upsetting" content in lieu of making an appeal, and said that the report would be used to train the platform's algorithms.

**Write to** Jeff Horwitz at <u>Jeff.Horwitz@wsj.com</u>

## UPCOMING EVENTS

June
**24**
2021

**11:00 AM - 5:00 PM EDT**

Global Food Forum

June
**30**
2021

**1:00 PM - 1:45 PM EDT**

WSJ Pro Cybersecurity Webinar: Aligning IT and Cybersecurity

June
**30**
2021

**7:00 PM - 7:45 PM EDT**

WSJ+ Live: Daniel Kahneman and His Co-Authors on the Crisis of 'Noise'

World Socialist Web Site ⬤ WSWS.ORG

# Facebook restores service to socialist pages, claiming the purge was an "automation error"

**Andre Damon**  🐦 @Andre__Damon

🕐 26 January 2021

On Monday, following widespread protests, Facebook restored the page of the International Youth and Students for Social Equality (IYSSE) at the University of Michigan, along with the accounts of leading members of the IYSSE and the Socialist Equality Party (SEP).

In response to inquiries made by the *Financial Times* in Britain, Facebook claimed the removals were the result of an "automation error," adding, "We apologise for the error."

The restoration of service came two days after Facebook disabled these pages without any explanation and without providing any recourse. Among the individual pages deleted were those of IYSSE National Secretary Genevieve Leigh and *World Socialist Web Site* (WSWS) US Managing Editor Niles Niemuth.

Statements on the WSWS denouncing the political purge were shared thousands of times on social media, in addition to a flood of letters and statements of support from workers, young people, journalists and professionals.

The FT reported the controversy in a front-page article titled, "Facebook sparks anger after shutting socialist pages." The newspaper interviewed both David North, the chairman of the WSWS International Editorial Board, and Chris Marsden, the national secretary of the SEP (UK).

"Even though this particular ban has been [reversed], it's a warning we don't know what might come next," the article quoted North as saying. "Social media… is privately owned but to all intents and purposes it's [become] what used to be the market square," Marsden said. "They're using their power in a way that's completely undemocratic."

Facebook's claim that its disabling of the accounts was merely the product of a technical glitch lacks all credibility and is patently dishonest. The social media company had clearly invested time and resources to identifying leading members of the SEP, IYSSE and WSWS.

The claim is belied by the repeated statements of Facebook officials, both in congressional hearings and before military audiences, that Facebook deliberately seeks to combat what it calls "radical"

political viewpoints.

Speaking before an audience of generals and intelligence officials at a NATO conference in 2018, Facebook Chief Security Officer Alex Stamos declared, "Our societies overall are going to have to start to adapt to the idea that not all information is created equal." He warned that millions of "people who feel they have been ignored or oppressed" are using Facebook to "push for radical politics." He called these individuals and organizations "domestic influence operators."

In order to police speech on its platform, Facebook has hired more than 20,000 people to man its security and enforcement team, many of whom have police and intelligence backgrounds, or, like Stamos, work at intelligence-linked think tanks.

The *World Socialist Web Site* demands that Facebook explain why the company purged the accounts of the UM IYSSE and the accounts of leading SEP members.

What individuals were involved in making this decision to remove the pages of members of the SEP? What was the involvement of US government agencies in Facebook's decision? Did Facebook ever discuss the activities of the SEP or any of its members with the US government? Did Facebook come under pressure from the US government to take actions against the SEP?

Without such an explanation, there can be no assurance that further arbitrary and politically motivated actions will not be taken. And Facebook's apology has no meaning unless it can provide assurances that it will not do it again.

The *World Socialist Web Site* thanks the many readers, supporters and principled journalists who publicized Facebook's act of censorship against the IYSSE and SEP and helped overturn it. But the fight is far from over.

We urge our readers to:

1. Send statements demanding an explanation of Facebook's actions to info@support.facebook.com and zuckerberg@fb.com. Send copies of your letters to comments@wsws.org for publication on the *World Socialist Web Site*.

2. Share this statement with your friends and co-workers and on social media, including Facebook, Twitter and other platforms. Include the hashtag #StopCensoringSocialism.

3. Send to the WSWS any information that you have on the censorship of left-wing individuals and publications by Facebook or other social media companies so that we can publicize and oppose these attacks.



🔍

# Facebook Locks Out Ron Paul Following Column Criticizing Big Tech Censorship, Cites 'Error'

A Facebook spokesperson says the restrictions taken on Ron Paul's page were a mistake.

Monday, January 11, 2021



Image Credit: Gage Skidmore from Peoria, AZ, United States of America, CC BY-SA 2.0 , via Wikimedia Commons

 **Jon Miltimore**

Politics   Free Speech   Ron Paul   Alex Jones   Big Tech   Twitter   Facebook

Amazon   Censorship

---

U PDATE: *In an email on Monday night, a Facebook spokesperson told* Reason *that it had mistakenly locked former Rep. Ron Paul's page. "While there were never any restrictions on Ron Paul's page, we restricted one admin's ability to post by mistake. We have corrected the error," the spokesman said.*

**App. 858**

On Monday, Facebook blocked former presidential candidate Ron Paul from his own page. The move came hours after the longtime congressman and libertarian hero shared an article he wrote criticizing Twitter and Facebook for banning President Donald Trump from their platforms.

"Last week's massive social media purges – starting with President Trump's permanent ban from Twitter and other outlets – was shocking and chilling, particularly to those of us who value free expression and the free exchange of ideas," Paul wrote. "The justifications given for the silencing of wide swaths of public opinion made no sense and the process was anything but transparent. Nowhere in President Trump's two 'offending' Tweets, for example, was a call for violence expressed explicitly or implicitly. It was a classic example of sentence first, verdict later."

Paul shared the article on Facebook sometime around 10 a.m. EST. Hours later, on Twitter, Paul said he had been blocked by Facebook.

"With no explanation other than 'repeatedly going against our community standards,' Facebook has blocked me from managing my page," Paul announced on Twitter. "Never have we received notice of violating community standards in the past and nowhere is the offending post identified."

Paul said the only material posted to Facebook on Monday was the article previously noted, his weekly "Texas Straight Talk" column, which he has published every week since 1976.



> **Ron Paul** ✔
> @RonPaul
>
> With no explanation other than "repeatedly going against our community standards," @Facebook has blocked me from managing my page. Never have we received notice of violating community standards in the past and nowhere is the offending post identified.

**App. 859**



12:15 PM · Jan 11, 2021                                      ⓘ

♡ 42.7K        💬 5K        ⬆ Share this Tweet

# The Big Chill on Speech

The question of social media censorship, a phenomenon that has grown steadily in recent years, is a thorny issue, especially for libertarians.

As private companies, Twitter and Facebook have the legal right to decide who and what to allow on their platform. On the other hand, many see the cultural values of free expression and viewpoint diversity as the cornerstones of a liberal (in the classical sense) and tolerant society.

For years, the media generally and libertarians particularly discussed how bans on controversial figures should be handled. The debate began in earnest in the summer of 2016 following the ban of Milo Yiannopoulos, a right-leaning provocateur who had gained an immense following on social media.

Many at the time were shocked to see Yiannopoulos banned following a spat with actress Leslie Jones, but there was general agreement in many circles that Twitter, while wrong on principle, was within its rights.

"Twitter is a private company. It can set its own speech policies, and those policies don't have to be fair. There's no universal human right to own a Twitter account," *Reason's* Robby Soave pointed out. "But if Twitter wants

to live up to its stated commitment to maintaining a public forum where provocative, controversial, and even occasionally rude or hurtful speech is tolerated, then it should consider restoring Yiannopoulos's profile."

Two years later, a similar conversation took place with Alex Jones, the far-right radio show host and conspiracy theorist, who ultimately found himself banned by Twitter and Facebook. The responses were not surprising.

Many left-leaning pundits cheered the move, pointing out Jones was not entitled to First Amendment protection, since Twitter and Facebook were private companies.

"This move is an important step toward setting reasonable, and badly needed, precedent around free speech," wrote *Washington Post* columnist Christine Emba. "Companies don't have to defend the indefensible. Alex Jones can do that all on his own."

The right, however, warned the bans were unlikely to end with Jones.

"Next they're coming for you," Jesse Kelly wrote in *The Federalist*. "Their goal is to silence dissenting voices. Look down at where you're standing at this very moment. That is where you draw your line in the sand. Do not give them another inch."

## The Slippery Slope of Restricting Speech

The censorship was never going to end with Alex Jones and Milo Yiannopoulos, of course. Still, the eagerness with which Big Tech is silencing dissent might have surprised even those who warned it would not end with Jones.

Banning the president of the United States was shocking. Taking action against Ron Paul is horrifying. It is *senseless.* Paul is a man of principle and peace. He is 85 and not active in politics. Paul does not incite violence and

is a threat to no one.

How did we go from banning Alex Jones to taking action against Ron Paul in the space of two years? The answer is not hard to find. It lies in a principle abandoned.

"Once you start making exceptions to a universal principle/general rule, you begin to undermine it; it becomes easier to make further exceptions," FEE's Dan Sanchez pointed out in 2017. "If the hate speech of Nazis are to be restricted, why not the hate speech of traditionalist conservatives? If the violent, seditious rhetoric of Nazis are too dangerous to allow, why should the violent, seditious rhetoric of communists be tolerated, or any fundamental criticism of the government?"

Indeed. Of course, Twitter and Facebook have long since abandoned the notion they are free speech platforms. They openly state it's their mission to keep users "safe," which they do by enforcing "rules" and community standards when and how they choose.

This mission was flawed to begin with. (I don't need Facebook or Twitter to protect me from ideas or discussion, thank you very much, and I suspect most individuals would offer similar sentiments.) But by booting Ron Paul, it becomes clear that "safety" is not the true goal of Big Tech. I suspect it never was.

Paul's deplatforming should anger and perhaps even frighten us. The widespread silencing of dissent is a serious matter; there's no denying that. And matters are further complicated by the fact that Amazon, Google, and Apple have taken steps that will hinder social media platforms competing with Facebook and Twitter.

But what should be done?

As it happens, Paul himself asked this very question in the column that apparently led to his Facebook exile.

**App. 862**

"So what is to be done? Even pro-free speech alternative social media outlets are under attack from the Big Tech/government Leviathan. There are no easy solutions. But we must think back to the dissidents in the era of Soviet tyranny," Paul wrote.

He continued:

> "They had no Internet. They had no social media. They had no ability to communicate with thousands and millions of like-minded, freedom lovers. Yet they used incredible creativity in the face of incredible adversity to continue pushing their ideas. Because no army – not even Big Tech partnered with Big Government - can stop an idea whose time has come. And Liberty is that idea. We must move forward with creativity and confidence!"

Liberty is indeed the idea. And if we're patient, I suspect the market will soon offer a genuine alternative (more on that later) that may soon make Facebook and Twitter regret their authoritarian impulses.



# 1 Million Copies Sold Since 1946

Henry Hazlitt's economics primer is more relevant than ever.

**Check it out!**

App. 863

**Contribute** →

200

News **Opinion** Sport Culture Lifestyle

**Opinion**

🕐 This article is more than **4 months old**

# Facebook is banning leftwing users like me - and it's going largely unnoticed
*Akin Olla*

Fri 29 Jan 2021 08.39 EST



n response to the fascist riot at the US Capitol, Facebook engaged in a flurry of dangerous and misguided corporate authoritarianism. I, along with a number of other leftwing organizers, was deemed a threat to the inauguration of Joe Biden and placed

**App. 864**

I on a restricted list that limited my ability to communicate with others. My account could no longer create Facebook groups or events, two tools that I've used over the last decade to coordinate protests and build entire organizations. I was also banned from commenting in Facebook groups, liking Facebook pages, and messaging Facebook pages. The restriction was to be removed the Saturday after the inauguration, but it only fully ceased apparently after public backlash. This is part of a long history of Facebook treating leftwing activists as if they were far-right extremists, and a pattern of silencing those who speak out against racism and fascism.

Facebook's latest sweep went relatively unnoticed by most media outlets and was simply framed as a restriction of events in and around Washington DC leading up to the inauguration. Gizmodo was one of the first publications to pick up the story but the majority of its article barely mentions the fact that leftwing users in the United States were targeted and effectively silenced. Most of the relevant content of the article was pulled directly from a blogpost from Facebook itself. Gizmodo, like most other outlets that reported on the decision, seemed to imply that these bans were a net positive and, if anything, a little later than it would have preferred.

The lack of in-depth reporting on what was a massive new development in Facebook's struggle to monitor itself is unfortunate. This sweep wasn't as simple as restricting events around a certain location, which should be a troubling development on its own. Facebook targeted users across the US, and while Facebook has publicly claimed it sought out users with past violations, many of the leftwing users targeted had no such violations, according to Facebook itself. Attempts to seek clarity or appeal the decisions have been shut down by Facebook, and the scope of the restrictions have not been made public.

Strictly speaking, this may not be a legal or constitutional infringement on free speech; Facebook, as a private company, sets its own policies about who can use its platform and what opinions they can express. But it sets a dangerous precedent, one made more alarming by Facebook's history of suppressing Black viewpoints and its tendency to see far-left and far-right activists as the same.

In August 2020, Facebook expanded its "Dangerous Individuals and Organizations policy", aimed at removing the presence of far-right extremists from its website. It rid itself of many QAnon groups and far-right militias. But it is also struck at leftwing organizations, seeming to accept Trump's post-Charlottesville "both sides" moral equivalency with little thought. Facebook removed It's Going Down, a platform that has long provided on-the-ground analysis of mass protests. It also removed CrimethInc, an anarchist publication that provided a teenage me with a new lens in

**App. 865**

which to view formative events like the invasion of Iraq and the 2008 economic crisis. While both these sites are keystones of the left, they were quickly disappeared from Facebook with little public attention or reaction.

Facebook has also targeted individuals for merely speaking out against racism or responding to hate crimes. Natasha Marin, a Black anti-racism consultant, was temporarily banned for sharing a screenshot of a racist message she received. In response to Liam Neeson's confession that he once roamed the streets looking for Black men to harm, Carolyn Wysinger, an activist and high school teacher, posted that "White men are so fragile and the mere presence of a Black person challenges every single thing in them." It was a reasonable response to Neeson's remarks and the long history of white men murdering random Black men. Facebook responded by deleting the post and threatening Wysinger with a temporary ban. The list goes on.

While Facebook may place the blame on complicated algorithms that they are working to address, it is clear the problem is deeper than that. In 2018, Mark Luckie, a Black former Facebook employee, illustrated a racist culture at Facebook. He and other Black employees have made frequent complaints about being aggressively accosted by security, dissuaded from joining Black working groups, and being called aggressive or hostile for simply sharing their thoughts in meetings. One employee shared a story in which they were asked to clean up after two white employees, despite being a program manager. In June 2020, Mark Zuckerberg declared that Black Lives Matter. A few months later, he restricted political posts in Facebook's internal employee forum and banned the placement of text on profile pictures, preventing both employees who wanted to "Make America Great Again" or proclaim that "Black Lives Matter" from expressing themselves outside of specific, moderated groups – or through the use of pre-approved profile frames.

The conflation of the far-right with those speaking out and organizing against injustice continues to this day. On top of restricting my profile, and the profiles of others, Facebook has also moved to ban a new slate of leftwing organizations and individuals. The Socialist Equality party and the International Youth and Students for Social Equality were banned earlier this month with no warning or reason. Facebook has recently reversed this decision, but only after inquiries from the Financial Times. And now, Facebook is considering removing posts that critique Zionism.

Facebook has significant power and influence, and decisions like this are a clear argument for the desperate need to regulate the tech behemoths that increasingly decide who and what is heard. While my restriction was temporary, what is stopping Facebook from instating such measures again in the future, particularly during a

moment of mass upheaval? The inauguration was such an event; Black radicals and others had every reason to protest the inauguration, but Facebook determined that any such protests were unacceptable. An organization which finds it so difficult to distinguish fascists from Black leftwing activists should not be trusted to make such decisions.

> Akin Olla is a Nigerian-American political strategist and organizer. He is the host of This is The Revolution podcast

---

... we have a small favour to ask. Through these challenging times, millions rely on the Guardian for independent journalism that stands for truth and integrity. Readers from 180 countries chose to support us financially more than 1.5 million times in 2020.

*"You never act your age, in spirit, outlook, humor or perspective. But you do show the wisdom and sensibility that only 200 years' of extraordinary reporting can bring. One can only imagine what you will continue to grow into!" - Mary Garton, US*

With your help, we will continue to provide high-impact reporting that can counter misinformation and offer an authoritative, trustworthy source of news for everyone. With no shareholders or billionaire owner, we set our own agenda and provide journalism that's free from commercial and political influence. When it's never mattered more, we can investigate and challenge without fear or favour.

Unlike many others, we have maintained our choice: to keep Guardian journalism open for all readers, regardless of where they live or what they can afford to pay. We do this because we believe in information equality, where everyone deserves to read accurate news and thoughtful analysis. Greater numbers of people are staying well-informed on world events, and being inspired to take meaningful action.

We aim to offer readers a comprehensive, international perspective on critical events shaping our world - from the Black Lives Matter movement, to the new American administration, Brexit, and the world's slow emergence from a global pandemic. We are committed to upholding our reputation for urgent, powerful reporting on the climate emergency, and made the decision to reject advertising from fossil fuel companies, divest from the oil and gas industries, and set a course to achieve net zero emissions by 2030.

If there were ever a time to join us, it is now. Every contribution, however big or small, powers our journalism and sustains our future. **Support the Guardian from as little as $1 - it only takes a minute. Thank you.**

☐ WATCH TV LIVE



NEWSMAX    TV TV    HEALTH HEALTH    FINANCE FINANCE    WORLD WORLD

☐
Menu ☐

# NEWSMAX

Sunday June 20, 2021

Search Newsmax 🔍

☐
Search

| Home | Platinum | Newsfront | America | Politics | Opinion | The Wire | Books | Best Lists | Specials | Sci & Tech |

Subscribe

Home | America

Tags: **facebook | black lives matter | censoring**

# Facebook Censors BLM Criticism After Company Co-founder Donated Millions to Activist Group



(Dreamstime)

**By Brian Freeman**    |    Monday, 19 April 2021 09:59 AM



Comment | Print | A A **A**

Facebook's decision last week to censor news articles critical of

**App. 868**

Black Lives Matter leader Patrisse Cullors has been questioned after it was revealed that the social media giant co-founder, Dustin Moskovitz, gave more than $5 million into a network of nonprofits run by Cullors, The Washington Free Beacon has reported.

Facebook blocked its users from posting links to a story in the New York Post about how Cullors, who calls herself a Marxist, spent $3.2 million on high-end real estate as her BLM Global Network Foundation took in millions in donations, saying the reporting violated its "privacy and personal information policy."

News Media Alliance (NMA), a media nonprofit which represents nearly 2,000 American news organizations, criticized Facebook for its "completely arbitrary" decision to block the story about Cullors, with NMA CEO David Chavern saying in a prepared statement that "There is no balance of power between 'media' and 'Big Tech,'" adding that "Facebook has shown that one side gets to make all the rules," according to the New York Post.

The statement emphasized that while the First Amendment prohibits the government from regulating free speech, "major tech platforms certainly do 'regulate' the news business, [as] the recent action by Facebook to block a New York Post story was a clear exercise of that power."

Research by The Washington Free Beacon revealed that the Open Philanthropy fund and Open Philanthropy Project, Moskovitz's grant-making vehicles, donated at least $5.6 million to groups founded by Cullors between 2017 and 2020.

This sum included contributions of $2.8 million to Dignity and Power Now and more than $2.3 million to Reform L.A. Jails, which were both founded and chaired by Cullors. The Justice Teams Network, a group co-founded by Cullors, received $500,000.

The Open Philanthropy Project did not return a Free Beacon request for comment.

Cullors was paid $20,000 a month by Reform L.A. Jails in 2019.

The National Legal and Policy Center, a watchdog group, also slammed Facebook's decision, saying "this, once again, proves

**App. 869**

freedom of speech is an option not a feature across the Facebook platform, where their corporate interests are placed above the interests of their users at every turn."

The Post reported that Cullors bought a $1.4 million home near Malibu, a "custom ranch" in Georgia, and two other California properties worth a total of $3.2 million since 2016.

Hawk Newsome, the head of an unaffiliated group called Black Lives Matter Greater New York, told the Post that these revelations were "really sad because it makes people doubt the validity of the movement and overlook the fact that it's the people that carry this movement."

Neither Facebook nor Cullors responded to Free Beacon requests for comment.

**Related Stories:**

- **Marxist BLM Founder Loves Capitalism. Blacks Should, Too.**
- **BLM Co-Founder Cullors Tells Biden, Harris 'We Want Something for Our Vote'**

© 2021 Newsmax. All rights reserved.

**Special Links:**

- **New Neuropathic Pain Discovery is Leaving Doctors Baffled**
- **Mom is 56, But Looks 25 – Do This Daily**
- **What God Told Trump is A Biblical Bombshell. Watch Now**
- **Arteries Were 70% Blocked – Now They're Normal**
- **Biden: Americans, Report Potential Radicalized Friends/Family**

 **Click Here** to comment on this article

▶**RECOMMENDED**


**Trump Issues Free Gift To All Supporters, (Liberals Are Demanding It Be Banned!)**


**She Has 6 Children with a U.s. President but No One Knew Until Now**


**31 Dubai Photos That Will Make You Think Twice Before Visiting**

**App. 870**

# PM.

🔍    **LOGIN**    **SUBSCRIBE NOW**

**AMERICAN NEWS**   Apr 24, 2021 7:31 PM EST

# Facebook censors and punishes The Babylon Bee for mocking rioters

On Friday, Facebook blocked a post and threatened to demonetize The Babylon Bee's Facebook page (which they did hours later). The post in question was penalized for "promoting crime" when it was obviously a satirical post making fun of rioters' hypocrisy.

ADVERTISEMENT




**James Anthony**
The Post Millennial

April 24, 2021 7:31 PM
1 Mins Reading





On Friday, Facebook blocked a post and threatened to demonetize The Babylon Bee's Facebook page (which they did hours later). The post in question was penalized for "promoting crime" when it was obviously a satirical post making fun of rioters' hypocrisy.

Kyle Mann, the creator of the Bee, tweeted, "Facebook is penalizing @TheBabylonBee for 'coordinating harm and promoting crime' for our satirical post MAKING FUN OF THOSE WHO RIOT. We appealed the decision but were told it was unlikely we'd receive a response."

> **Kyle Mann**
> @The_Kyle_Mann
>
> Facebook is penalizing @TheBabylonBee for "coordinating harm and promoting crime" for our satirical post MAKING FUN OF THOSE WHO RIOT. We appealed the decision but were told it was unlikely we'd receive a response.
>
> 3:55 PM · Apr 23, 2021
>
> ♡ 4.5K     💬 214     ⬆ Share this Tweet

Shortly after that tweet, Mann tweeted the following shocking update: "UPDATE: Since we requested the review, Facebook has INCREASED our level of restriction, moving us from a warning to RESTRICTED MONETIZATION."

> **Kyle Mann** @The_Kyle_Mann · Apr 23, 2021
> Replying to @The_Kyle_Mann
> Drax the Destroyer strikes again

**App. 872**



Facebook Hires Drax The Destroyer To Distinguish Between Satir...
MENLO PARK, CA - Facebook has hired the fierce warrior Drax the Destroyer as its new Head of Satire Detection to help the ...
babylonbee.com

**Kyle Mann**
@The_Kyle_Mann

UPDATE: Since we requested the review, Facebook has INCREASED our level of restriction, moving us from a warning to RESTRICTED MONETIZATION.

10:51 AM · Apr 24, 2021

1.1K 67 Share this Tweet

The post in question was published on Apr. 12, 2021 and, as can be seen below, is obviously satirical in nature, mocking the "mostly peaceful" protestors who go out to commit acts of vandalism and loot stores:

Your post goes against our Community Standards on coordinating harm and promoting crime

Only people who manage The Babylon Bee can see this post.

We have these standards to prevent and disrupt offline harm.

**The Babylon Bee**
April 12 at 12:34 PM ·

Remember 👏 to 👏 riot 👏 safely 👏





Ironically, on the other side of the political spectrum, nowhere on Big Tech-managed social media has there been a single instance of censorship of Rep. Maxine Waters (D-CA) <u>unironically calling for protestors to "get confrontational"</u> when out marching.

As of the time of this writing, the Bee's Facebook account continues to be de-monetized, and no further information has been forthcoming on the subject.

AdChoices ▷                    Sponsored

## Join and support independent free thinkers!

We're independent and can't be cancelled. The establishment media is increasingly dedicated to divisive cancel culture, corporate wokeism, and political correctness, all while covering up corruption from the corridors of power. The need for fact-based journalism and thoughtful analysis has never been greater. When you support The Post Millennial, you support freedom of the press at a time when it's under direct attack. **Join the ranks of independent, free thinkers by supporting us today for as little as $1.**

Case 4:21-cv-00220-RH-MAF Document 106-1 Filed 06/21/21 Page 888 of 896

Login    Archives    Contact Us



## NEWS   OPINION   SPORTS   ABOUT   JOIN   PODCAST

Home › News

# Back at it: Facebook Censors the Babylon Bee

 by **Charles Jackson Paul**  —  8:00 am, Tuesday, May 4th, 2021

Reading Time: 1 min read

👍 **4**    💬 **0**









6/20/2021    Back at it! Facebook Censors the Babylon Bee – The Texas Horn

Case 4:21-cv-00220-RH-MAF   Document 106-1   Filed 06/21/21   Page 889 of 896

VIEWS /

AUSTIN, TX – On Wednesday April 28th, Facebook yet again censored the Babylon Bee, a prominent conservative Christian satire site, for allegedly promoting misinformation. The offending headline "Dr. Fauci Reminds Everyone That We Will Only Have To Wear Masks Until Humans Evolve Organic Face Coverings At Birth" was published on February 23rd. The Babylon Bee declined to provide a comment to The Horn on the contraversey.

This marked the newest episode in a years-long tiff between the Babylon Bee and Facebook, which began in 2018 when Facebook banned, and later apologized for banning, the Babylon Bee over a satirical article entitled "CNN Purchases Industrial-Sized Washing Machine To Spin News Before Publication." Since then, the Bee has been banned from social media several more times, which has played a role in the recent debate among conservatives about further regulating big tech.

Tags:   Babylon Bee   censorship   Facebook



### Charles Jackson Paul

Charles Jackson Paul is the Content Editor for The Texas Horn. He is a first-year student in the McCombs School of Business studying finance. He is also pursuing a certificate in Core Texts and Ideas as a member of the Jefferson Scholars Program. Jackson has a passion for writing and hopes that his work as both a writer and an editor can encourage dialogue about complex issues. Outside of his classes and writing, Jackson enjoys reading, hiking, and spending time with friends.



## Related Posts



# Why is Facebook censoring a conference on Christianity and religious freedom?

**Augusto Zimmermann**



Every day millions of Christians around the world are persecuted for their faith. They are often intimidated, abused and in fear for their lives all because of their commitment to Christ.

The Pew Research Centre Report, which analyses religious freedom in 198 countries and territories, reveals that Christians are the most persecuted religious group in the world today.

Research shows a staggering 11 Christians every hour are being slaughtered for their faith – 100,000 Christian martyrs a year. In the last couple of weeks alone, there were attacks on Christians at a church in Nigeria with 32 deaths; in the Philippines an attack killed more than 20 Christians, not to mention the eight dead in a Somalia market attack and the nine dead in Egypt.

But is intolerance of Christians slowly creeping into our western societies? Is faith being pushed out of public life in countries such as Australia, the UK and America? Is it time Christians took more of a stand to reclaim their rightful place in our society? If so, how should Christians tackle this issue?

This and other correlating issues will be addressed in 'Religious Freedom at the Crossroads – The Rise of Anti-Christian Sentiment in the West' – a timely legal conference to be held at Sheridan College in Perth, Western Australia, from June 14-15.

Facebook, however, believes that material relating to a conference on religious freedom violates their 'community standards, so no one else can see it'. Facebook has arbitrarily censored this significant event.

Consider that this is not just another conference. Our list of speakers includes some our finest legal minds in Australia. This is an important legal event and we intend to publish conference proceedings in *The Western Australian Jurist* law journal, the yearly blind peer-reviewed academic publication of the Western Australian Legal Theory Association (WALTA).

Our list of participants – speakers and moderators –includes some of the finest legal minds in Australia; Christopher Brohier, Martyn Isles, John Steinhoff, among numerous others. Participating as moderators are some of the most distinguished members, both past and present, of the Western Australia parliament, including former speaker Michael Sutherland.

Our keynote speaker is none other than a leading American constitutional lawyer – the Distinguished Professor  Emeritus William Wagner of Western Michigan University, Thomas Cooley Law School.  He is an internationally recognised expert in constitutional law and good governance and a renowned American constitutional lawyer who has received the Beattie Award for Teaching Excellence for making the greatest contribution to student legal education.

Professor Wagner's public service includes serving as a Federal Judge in the United States Courts, legal counsel in the U.S. Senate, senior assistant United States attorney in the Department of Justice, and as an American diplomat. He is the author of numerous articles, books and other publications, including a national best seller; number one in its category.

As lead amicus counsel in many matters before the U.S. Supreme Court, Professor Wagner authored briefs on behalf of various Christian organisations. He also authored written briefs, testimony and evidence in such forums as the Swedish Supreme Court, the U.S. Congress, and the British parliament. He has addressed many executive, legislative, parliamentary, and judicial audiences throughout the world, and presented at various diplomatic forums including the U.N. Human Rights Council in Geneva.

Above all, this eminent legal academic has a special interest in building and preserving environments where Christian people may share the Gospel free from persecution and oppression.

**App. 878**

Despite all these distinguished speakers and moderators, Facebook has just arbitrarily censored our major legal conference.  Indeed, Facebook refuses to allow anyone to post information about this conference. It simply claims that our conference has somehow 'violated community standards'.

For example, a law professor has tried to announce the conference on his Facebook. His announcement was rejected. This is what he wrote in a private message to me: "This Facebook blocking nonsense is appalling.  I tried to share the link on the Facebook page connected to my blog but it came up with an "error"."

The good professor was not the only one facing the censorship of our religious freedom conference.

When one of our speakers posted that it was an honour for him to present a paper at such prestigious conference, Facebook immediately prevented him from doing so Facebook. His message was immediately blocked and our speaker was informed that no such announcement could be made because our conference allegedly 'goes against [Facebook's] Community Standards, so no one can see it'.



This is absolutely appalling and it objectively constitutes an egregious instance of censorship of ideas on social media.

A propos, Facebook was in the international spotlight last year after an investigation by the U.S. Congress on this social media. During his seven-hour testimony at the joint session of the U.S. Senate Commerce and Judiciary committees, Facebook CEO Mark Zuckerberg was asked whether Facebook has been engaged in a pervasive pattern of bias and political censorship. His answer was a rather careful non-answer which made many Christians and

conservatives really wonder whether this could work as evidence that Facebook is a platform for only certain types of ideas.

One might also wonder if all this censoring and removing of conservative and Christian content by social media might not have been aggravated by the recent announcement by the Morrison government that Australia is to become the first country in the world to introduce jail terms and multimillion-dollar fines for social media giants that do not quickly remove so-called 'extremist' material on social media.

Alarmingly, the Prime Minister has manifested his support for the regulation of social media companies if they fail to act against the use of their platforms for spreading so called "extremism".

I am totally unimpressed. This puts enormous pressure on the social media giants, which can obviously result in unreasonable levels of censorship of 'controversial' ideas, including those which are manifested by conservative Christians.

For we know very well that the radical left often labels as 'right wing extremist' anyone who might be situated on the conservative side of the ideological spectrum. This is particularly so when it comes to Christians who dare to express traditional ideas in the political realm.

These Christians are often labelled 'extreme right' for no other reason than advocating for conservative social values, including the sanctity of human life and the traditional definition of marriage.

Facebook has arbitrarily censored our conference. But I guess this only proves the whole point of the conference. There is indeed a considerable rise of anti-Christian sentiment across the globe, including in our western societies.

And I should add it's not just religious freedom that is at stake. It is freedom of speech in general. Freedom of speech is definitely at the crossroads and Facebook has just proven this point beyond any reasonable doubt.

*Dr Augusto Zimmermann is Professor and Head of Law at Sheridan College, Perth; Professor of Law (Adjunct) at the University of Notre Dame Law School, Sydney and President of Western Australian Legal Theory Association, WALTA.*

*Got something to add? Join the discussion and comment below.*

*Got something to add? Join the discussion and comment below.*

*Rolling Stone*

Subscribe

HOME › CULTURE › CULTURE NEWS

SEPTEMBER 13, 2019 11:17AM ET

## Why Did Facebook Take Down a Fact-Check of an Anti-Abortion Video?

**Right-wing politicians accused the platform of political bias — and Facebook quickly caved**

*By* **EJ DICKSON**



Martin Meissner/AP/Shutterstock

Conservatives have long contended that **social media** giants like **Facebook** harbor an anti-right-wing bias. And even though there's basically **zero evidence to support that**, that hasn't stopped the social platforms from taking these concerns seriously — often, to the detriment of acting on its other stated goals, such as curbing inaccurate or outright dangerous information. That appears to have been what happened in the battle over **a video posted by Live Action**, an anti-**abortion** organization founded by activist Lila Rose.

In August, Rose posted a video titled "Abortion is NEVER medically necessary," a recording of a **speech** she gave at a Young America's Foundation event. According to Health Feedback, an independent fact-checking website, the video was shared about 6,000 times before its claims were vetted by a team of three doctors employed by the website. The doctors found that the information contained in the speech, including very title of the video, was false, as there are many conditions, including pre-eclampsia and placenta previa, in which ending a pregnancy via abortion is necessary to save the mother's life. The physicians also pointed out that Rose's video failed to mention that in cases where a mother goes into early labor, doctors will perform an abortion if the fetus has not developed sufficiently to be able to live outside the womb. The doctors concluded the Lila Rose video constituted "false news."

ADVERTISEMENT

App. 881

Subscribe

Become a Rolling Stone subscriber for just $4.99 a month. Subscribe Now

**10 Songs to Put on Your RADAR**

A roundup of ten aux cord-ready gems by artists that should be on your radar for the foreseeable future

Branded Content By 

---

**RELATED**

▸ **Republicans and Democrats Agree: It's Time To Take on Tech Titans**

▸ **Roger Waters Says He Rejected Facebook's Offer to Use 'Another Brick in the Wall' in Ad**

---

On August 30th, as part of a wider effort to combat misinformation and propaganda on the platform, Facebook sent followers of the Live Action and Lila Rose pages a notification saying the video had been determined to contain "false" news. The notification also said that if the page continued to post information that was deemed false, it would see "limited distribution" and its ability to monetize would be "removed." This sent conservatives into a tailspin, with Lila Rose launching a **petition** to get Facebook to "end the suppression of pro-life truth" and Sens. Ted Cruz and Josh Hawley, among others, sending an angry letter to Facebook accusing it of exercising left-wing bias to stifle freedom of expression.

In the **letter** addressed to Mark Zuckerberg, the senators referred to the idea that abortion is never medically necessary as a "widely held view" and argued that the independent fact-checkers it used to assess the video were inherently biased, as they had previously been involved in "abortion-rights organizations" like NARAL and had performed the procedure. "The only thing more astonishing than your claim nonpartisanship is your complete failure to back the claim with proof," the letter said.

Apparently cowed by the letter, Facebook removed the fact-checking notifications from the Lila Rose video. It also told BuzzFeed News that it had contacted the Independent Fact Checkers' Network (IFCN), which accredited Health Feedback as an unbiased third-party fact-checking resource. IFCN has "opened an investigation to determine whether the fact checkers who rated this content did so by following procedures designed to ensure impartiality. While the IFCN investigates, we are removing the relevant fact checks and have communicated this to the members of the U.S. Senate who brought this specific concern to our attention." (Facebook did not immediately respond to *Rolling Stone*'s request for comment.)

For many who track the social media platforms, the battle over the Lila Rose video highlighted the platform's struggle to placate two distinct groups, whose goals are sometimes inherently at odds: those who accuse it of political bias, and those who accuse it of failing to prevent the spread of inaccurate information. In a **tweet**, Natalie Martinez, an extremism and social media researcher at Media Matters for America, accused Facebook of throwing its fact-checkers "under the bus" as a way to prioritize "right-wing interests over

**App. 882**

Subscribe

time, many speculated the policy change was in response to an audit of the platform led by Republican Sen. Jon Kyl, which concluded that Facebook's "policies and their application have the potential to restrict free expression," though the audit was highly **criticized** by both liberals and conservatives for its weak methodology.

ADVERTISEMENT

The removal of the fact-checks was a huge coup for Live Action and Lila Rose, as well as right-wing politicians, who have been levying allegations of left-wing bias against Big Tech for years. The **banning of far-right figures** like former white nationalist GOP candidate Paul Nehlen, former Breitbart editor Milo Yiannopolous, and far-right conspiracy theorist Laura Loomer prompted many on the right to cry censorship, with Donald Trump, Jr. referring to the ban as a "purposeful & calculated silencing of conservatives." In April, Cruz **spoke** at a U.S. Senate Judiciary subcommittee hearing accusing Facebook, Google, and Twitter of anti-conservative bias, saying, "If we have tech companies using the powers of monopoly to censor political speech, I think that raises real antitrust issues." Hawley also appeared at the hearing, saying the lack of transparency regarding social platforms' decision-making processes was "a huge, huge problem."

In response, Facebook has consistently denied harboring any political bias whatsoever, with head of global policy management Monicka Bickert **telling Yahoo Finance earlier this week** that its content moderation guidelines are public and are applied to users on all sides of the political spectrum. "We want people to understand that they're not applying their own subjective beliefs about what they think should be on the site," Bickert said. "They have very granular rules that they have to apply. And those rules are now public for people to see."

In This Article: Abortion, Facebook, Social media

 Want more Rolling Stone? **Sign up for our newsletter.**

**SPONSORED STORIES**

Recommended by                                    |

**[Pics] Alexandria Ocasio-Cortez Is 31 And This Is Her Real Life Partner**
https://yummypress.com

**21 Famous People Who Went Missing And Were Never Found To This Day**
Definition

**This Japanese Toilet Might Be Coming To Your City Next**
Investing.com

**[Gallery] Delta Burke Is So Thin Now And Looks Like A Barbie**
DomesticatedCompanion

**How are fiduciaries better?**
Schwab Advisor Services

**[Gallery] Oops! Most Awkward Celebrity Moments On Red Carpet**
DailyStuff