UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF FLORIDA

TALLAHASSEE DIVISION

| NetChoice et al. | |
|---|---|
| *Plaintiffs*, | |
| v. | Case **4:21-cv-00220-RH-MAF** |
| | ***AMICUS CURIAE* BRIEF IN** |
| | **SUPPORT OF THE DEFENDANTS** |
| | |
| MOODY, in her | **Hon. Robert L. Hinkle** |
| official capacity as Attorney General | |
| of the State of Florida, et al. | |
| | |
| *Defendants* | |

**BRIEF OF LEONID GOLDSTEIN**

**AS AMICUS CURIAE IN SUPPORT OF DEFENDENTS IN OPPOSITION**

**TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

*Individual, pro se*

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ 2
INTEREST OF THE AMICUS CURIAE ............................................................................... 3
Definitions and Abbreviations ................................................................................................. 4
SUMMARY OF ARGUMENT ................................................................................................ 4
    Plaintiffs Lack of Standing ................................................................................................. 4
    Other Points ......................................................................................................................... 6
ARGUMENT ............................................................................................................................ 7
    Introduction ......................................................................................................................... 7
    twitter is a telecommunication utility ................................................................................. 9
    CDA Section 230 .............................................................................................................. 10
    Big Tech Demands Nearly Absolute Power ..................................................................... 12
    Medical Advice and Information ...................................................................................... 13
    Preliminary Injunction ...................................................................................................... 15
CONCLUSION ...................................................................................................................... 15

# INTEREST OF THE AMICUS CURIAE

Leonid Goldstein ("The Amicus"), moves for leave to file the attached brief as *amicus curiae* in support of the Defendants in opposition to Plaintiffs' motion for a preliminary injunction in the above-captioned case.

The Amicus is a US citizen and an editor of *defyccc.com*, publishing research and commentary on the intersection of science and technology with public policy[1]. His professional career comprises more than 20 years of technical and business experience in computer software and networks, in a wide range of positions, from an engineer to Chief Technology Officer. For some time, he worked for a small social media company in California. That equips the Amicus with technical and business knowledge of the underlying subjects.

Significant part of the Amicus' audience is in Florida. Amicus' interest is in being able to reach it through the telecommunications services, provided by members of the plaintiffs without censorship, deplatforming, and harassment, conducted by them and their employees as state actors and unregistered agents of foreign governments (in violation of *18 U.S. Code § 951*), and in violation of other US and States' laws. The

---

[1] No counsel for a party authored this brief in whole or in part. No party, no party's counsel, and no person other than Amicus made a monetary contribution intended to fund the preparation or submission of this brief.

Amicus is also interested in receiving communication from individuals, media enterprises, and public figures in Florida.

Finally, the Amicus feels moral duty to do all he can to stop malicious interference by certain plaintiffs' members with medical information about treatment and prophylaxis of COVID-19, which causes daily loss of life in Florida and elsewhere and leads to proliferation of dangerous variants of the coronavirus, which might lead to catastrophic consequences in the fall or winter 2021-2022.

## Definitions and Abbreviations

The Act – The Florida Bill 7072

LSMP (a large social media platform) – a social media or Internet search provider above certain size, as defined in the Act.

LSMP-MP – an existing LSMP which is member of either or both plaintiffs.

The Big Tech – the LSMP-MP collectively, especially stressing Google, Facebook, and Twitter.

## SUMMARY OF ARGUMENT

Plaintiffs Lack of Standing

The Supreme Court defined requirements for a trade association to bring a suit on behalf of its members:

*"An association has standing to bring suit on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members"* – *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977)

Neither plaintiff meets the requirements (2) and (3) in its second part ("relief requested"). NetChoice members, represented in this suit, include[2]:

**Alibaba** (BABA, market capitalization - $577 Billions) – An instrumentality of the Government of China and an Internet superstore. Headquartered in Hangzhou, China.

**Alphabet** (GOOGL, 1.64 Trillions) – google search, youtube, DoubleClick etc.

**Facebook** (FB, $935 Billions) – facebook, instagram, WhatsApp etc.

**TikTok** (private, the valuation is ~ $50-200 Billions) – An instrumentality of the Government of China and a video-oriented social media platform. Headquartered in Beijing, China.

**Twitter** (TWTR, $49B) – twitter.

It requires a particular brazenness for Trillion-dollar companies to send a trade association without assets to demand a preliminary injunction and/or temporary

---

[2] https://netchoice.org/about/

restraining order against the state of Florida, while causing it the loss of life and financial damages that run in Billions of dollars per day.

Neither plaintiff meet the requirement of the first part of (3), because all of their members are affected differently by the Act, or not affected at all, so each asserted claim requires participation of each member considering itself aggrieved. Thus, the lack of standing is sufficient ground for the dismissal of the suit with prejudice and appropriate penalties. Nevertheless, I will outline some other grounds against challenges of the Act.

Other Points

The Act outlaws a range of bad behaviors by LSMPs, from fraud on consumers to (in violation of *18 U.S. Code § 1589 Forced Labor*) to foreign elections interference to trade monopolization to illegal medical practice in Florida. Some of these behaviors were already illegal, but hard to enforce on LSMPs. If the villains think they are targeted narrowly, it is because most of them are monopolies. It also grants the Florida government necessary tools to deal with LSMP monopolies.

The Act does not affect speech or other First Amendment activities by LSMP-MPa members of the plaintiffs, because it applies only to the telecommunications and computational services (including, but not limited to, common carrier services) they provide to their users.

Most Floridians, using LSMP services, use them for communication with other residents or businesses in the Florida, i.e., for intrastate communications. Florida, as other states,

have "*statutorily conferred authority to regulate intrastate communications*", including the Internet. (*Mozilla Corp. v. FEDERAL COMMUNICATIONS COMMISSION, 940 F. 3d 1 - Court of Appeals, District. of Columbia Circuit 2019 at 86*).

Plaintiffs' members, including Google, Facebook, and Twitter, has enormously benefitted from the COVID-19 pandemic, which they greatly aggravated by deplatforming and shadow-banning prominent doctors successfully treating COVID-19 patients, and deleting information about effective treatment and prophylaxis. In Florida alone, they caused more than 30,000 deaths by hiding information and spreading disinformation about Hydroxychloroquine-based treatment, and by intimidating hospitals and doctors using it. They continue doing the same to other effective and cheap drugs, such as Ivermectin[3]. Every day they are allowed to do business as usual (like if their motion for preliminary injunction is granted) costs hundreds of lives in the US, and many more internationally.

## ARGUMENT

Introduction

Twitter, Inc. is selected here as an example of LSMP. Twitter does not exercise its free speech rights when it provides and/or operates its service eponymous service. It is not

---

[3] E.g., https://taibbi.substack.com/p/why-has-ivermectin-become-a-dirty

Twitter's speech. Twitter provides a but telecommunications utility or network for the speech of its users. Twitter is neither religion nor political assembly.

To distinguish between them, Twitter's service is referred here as *twitter* (with low-case *t*). Twitter has marketed its service as a telecommunication utility, not an editorial publication. Twitter explicitly disclaimed any possible role as a speaker, editor, or publisher by maintaining publicly that is operating under Section 230 of the Telecommunications Act. If Twitter were held as a speaker, publisher, or media outlet, it would have been liable for all illegal content on twitter, from defamation to child sexual exploitation, to incitement to genocide. It is impossible to believe that 70 million US Twitter users[4] consented to give Twitter virtually unlimited rights to moderate their communications with each other. Obviously, most twitter users created accounts and invested in them, under the belief that Twitter operates and would continue to operate its service as a telecommunications utility. Further, the users of Twitter and other Big Tech companies have relied and continue to rely on protection from their state legislatures and enforcement against possible depredation of these huge corporations, as customary provided.

Social media platforms (as the term is generally understood) are just hosting or presenting content or expressive speech (the "media") created by others. The same is

---

[4] https://www.statista.com/statistics/242606/number-of-active-twitter-users-in-selected-countries/

true regarding search engines, which leads to regulating them under the same law. Thus, consumers of social media companies are also their labor, which requires protecting them both as consumers and laborers. That does not interfere with the speech of these companies. They speak all the time through their executives and public relations specialists appearing on TV, radio, and third-party websites. They also speak on their platforms as much as they want. The Act only restricts their abuse of their consumers / free laborers.

LSMPs pass information from or to its customers. As a relevant comparison, FedEx delivers letters, newspapers, books, DVDs, and other media on behalf of its customers. This does not make it a First Amendment speaker for the content of this media.

twitter is a telecommunication utility

Twitter promised its users, potential users, and government regulators that it would operate twitter as a telecommunications utility. This promise remains in force. Jack Dorsey, Twitter's CEO (emphasis here and in other quotes is added):

> *"Twitter succeeds when it's not talked about so much, blurs into the background, & is used as **a utility. Like electricity.**"* [5],[6]

---

[5] https://twitter.com/jack/status/1587314254; remains unchanged since first posted in 2009.
[6] Also remarkable is someone's reply to this tweet: "*.@jack the water utility doesn't shut off my water if I stick a #MAGA mug in the dishwasher.*" (https://twitter.com/fuzzytoad/status/838733293189222400)

1   An electrical utility cannot shut off service to a customer because the company
2   disagrees with the customer's politics or writings. In 2018, Twitter publicly disavowed
3   content and opinion-based editorializing:

4       *"We acknowledge the growing concern people have of the power held by*
5       *companies like Twitter.* ***We believe it's dangerous to ask Twitter to regulate***
6       ***opinions or be the arbiter of truth.*** *We'd rather be judged by the impartiality of*
7       *outcomes ..."*

8   In 2009, Twitter CEO, Evan Williams, called Twitter's service a ***"communication***
9   ***network"***[7]. Twitter co-founder, Biz Stone, also said on ABC News: *"I think of Twitter*
10  *first as a **communication network**"*[8].

11  CDA Section 230

12  By their own election, Twitter and other Big Tech companies conduct content
13  moderation under *47 U.S. Code, Section 230* ("CDA Section 230").

14  CDA Section 230(c)(1) states:

15      *"No provider or user of an interactive computer service shall be treated as the*
16      *publisher or speaker of any information provided by another information content*
17      *provider."*

---

[7] https://www.ted.com/talks/evan_williams_the_voices_of_twitter_users/transcript
[8] ABC News, https://archive.is/HFoHx

10

CDA Section 230 is not an amendment to the First Amendment. It is a selective option for internet services providers. Twitter and other Big Tech companies made an election to be not speakers and not publishers of third-party content, both regarding liability and to First Amendment protections. They retain all the First Amendment rights regarding their own content (unless they conceal their own content as a third-party information subject to CDA Section 230(c)(1)).

CDA Section 230(c)(2) allows internet services providers to moderate the information from the third parties (subject to some conditions, including good faith and voluntarily) without becoming a speaker or publisher of it. Their privileges under clause are not even related to the First Amendment. This said, the temptation to cross the line is obvious.

Twitter announced its choice to operate under Section 230 many times, in its public statements and in legal actions. Twitter used this choice as a defense in multiple lawsuits, alleging that twitter bears no responsibility for aiding and abetting terrorism, child sexual exploitation, human trafficking[9], etc.

> *"Under CDA § 230, internet platforms are immune from suit based on the failure to remove offensive third-party content."*

---

[9] Eg., JOHN DOE A MINOR CHILD v. Twitter Inc., 3:21-cv-00485, CAND

Then FBI Director, James Comey, was quoted[10] saying: "*Twitter works as a way to sell books, as a way to promote movies, and it works as a way to **crowdsource terrorism - to sell murder***".

Twitter was of enormous aid to the terrorist organization ISIS, by allowing it to use its services for recruitment, intimidation, and propaganda[11]. ISIS militants praised Allah for the gift of Twitter[12]. When Twitter suspended a single ISIS account, following the fall of Mosul in June 2014, it was an extraordinary event[13]. In fact, ISIS militants used twitter so much that, in 2017, ISIS leadership ordered them to use it less[14], due to fears of information collection by governments without Twitter's consent. Twitter's actions were tolerated by the law only law because of the expansive interpretations of CDA Section 230 and Twitter claims it does not exercise editorial control on twitter. Neither the legal landscape, nor the legal status of Twitter have changed since then, but now Twitter claims that it does exercise the editorial control.

Big Tech Demands Nearly Absolute Power

Most people use twitter and other Big Tech services for many aspects of their lives - communication with friends and family, business, meetings scheduling etc. People chit-

---

[10] https://news.sky.com/story/is-using-twitter-to-crowdsource-terrorism-10335769
[11] https://www.theatlantic.com/international/archive/2014/06/isis-iraq-twitter-social-media-strategy/372856/
[12] https://zeenews.india.com/news/world/thank-god-for-twitter-militants-tweet-after-taking-iraqs-mosul_938707.html
[13] https://slate.com/technology/2014/06/isis-twitter-suspended-how-attempts-to-silence-terrorists-online-could-backfire.html
[14] https://www.independent.co.uk/news/world/middle-east/isis-ban-facebook-youtube-twitter-instagram-social-media-fighters-spying-dissent-islamic-state-a7803406.html

chat on it with friends, not always recognizing that this "chatting" is public. As such, people make plans, set dates, ask friends for emergency help, provide advice, etc.

People also use these services to seek health care advice from doctors (not from Twitter, Google/Youtube, or Facebook), sometimes even in life and death situations.

Under the First Amendment, editorial powers are nearly absolute. Thus, claiming editorial rights on users' communications, Big Tech demands nearly absolute control over lives of many of its users.

Medical Advice and Information

Medical practice is state regulated. For Big Tech, COVID-19 was an opportunity to launch unlicensed medical advice all over the US, including Florida. They are not only unlicensed, but also incompetent and conflicted. They are interested in continuation of lockdowns, which increase their users' screen time and their profits and power. They are not interested in treating patients. Thus, they announced that there is no cure for COVID-19 and suppressed information about the cures[15].

---

[15] https://dryburgh.com/richard-urso-md-needless-deaths-youtube-censorship/ (https://archive.is/GtITt) Site editor's interview with Dr. Urso. Dr. Urso: *"Every time I present something on YouTube or anything, if I just said what I just said to you, that's infection, inflammation, respiratory distress, and blood clots. And we need a multi-drug cocktail. Censored. So I think that as we go forward, the elephant in the room is early treatment works and prevention works."*

The editor summarizes: *"Big tech has been engaged in a year-long campaign of censoring, shadow banning and deplatforming. Both doctors at the bleeding-edge of COVID-19 treatment and eminent scientists striving to advance the science around it. Big tech 'coincidentally' went rogue at the very start of the 'pandemic'. Wherein they collectively and unilaterally decided in lockstep, through some non-transparent means, that the unelected bureaucratic World Health Organization (WHO) would be the 'gold standard' of science. An organization with a substantial history of catastrophic errors and significant allegations of corruption. In effect, big tech colluded in spring 2020, to 'ban' and restrict at the 'narrative' meta-level, regardless of science. Science would be permitted but only if it fit the 'approved' narratives.*

They also defamed these treatments, decreasing mortality five times (80%), as conspiracy theory. Hydroxychloroquine[16] + Azithromycin + Zinc was the preferred anti-viral treatment from April to some mid-fall of 2020, then Ivermectin became the top choice as the basis for COVID-19 early (anti-viral) treatment[17]. They have also de-platformed doctors who recommended these protocols, and those who repeated these recommendations, and so on. Some of them also funded and promoted pseudo-science, trying to discredit these treatments, and politicization of COVID-19. Human beings do not behave this way, but Big Tech operates as if no humans are at helm. So far it was working for them. Twitter has almost doubled its valuation compared with the January 1, 2020 (pre-pandemic).

In their motion for preliminary injunction, the plaintiffs admitted that their members intend to continue to deplatform doctors and suppress medical information that they do not like.

---

*'Incidentally' big tech has greatly profited from the 'pandemic', in particular the Western pseudo emulation of the purported Chinese lockdown of Wuhan."*

[16] Examples:
https://academic.oup.com/aje/article/189/11/1218/5847586,
https://c19hcq.com,
https://hcqmeta.com,
https://jacksoncoker.com/about/in-the-news/physician-poll-on-covid-19-chloroquine-and-hydroxychloroquine/,
https://www.sermo.com/press-releases/sermo-reports-week-3-results-globally-17-point-increase-in-covid-treaters-who-have-used-hydroxychloroquine-33-50-and-azithromycin-41-58/,
https://public-cdn.sermo.com/covid19/72/2314/1447ce/47ce8d4abd94b5da7124cb64fe/wave-2-sermo-covid-19-global-analysis.pdf

[17] https://covid19criticalcare.com/ - Front Line COVID-19 Critical Care Alliance,
https://c19ivermectin.com/ - a meta-analysis of Ivermectin studies,
https://vimeo.com/490351508 - Dr. Pierre Kory testifies before the US Senate

Preliminary Injunction

The status quo in the need of preserving is the freedom of Floridians to communicate with each, receive medical advice, debate political issues, and to access their data controlled by LSMPs. This is especially important in the pandemic. This interest is represented by the Defendants. The balance of equities is also favoring the Defendants, because they represent interests of tens of millions of Floridians, whose First Amendment rights are threatened by LSMPs.

This Act is not self-executing. Except for Section 3, citizens and/or Attorney General would have to sue individual LSMPs to defend their rights under the Act, and each of them will be able to bring up specific allegations regarding its Constitutionality. There is a procedure to challenge decisions of the Florida government under Section 3, and the discontent LSMPs will be able to contest the decision in the courts.

The Amicus apologizes for grammar mistakes, chaotic and unfinished presentation caused by lack of time.

CONCLUSION

For the foregoing reasons, the Court should deny the plaintiffs' motion for a preliminary injunction.

Dated: June 21, 2021

Respectfully Submitted,

By: _____

Leonid Goldstein

*pro se*


4400 Troup Hwy

Apt. 508

Tyler, TX 75703

Leo5533@att.net

Phone: (408) 921-1110