## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization;
and COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a CCIA, a
501(c)(6) non-stock Virginia corporation,

        Plaintiffs,

   v.

ASHLEY BROOKE MOODY, in her official
capacity as Attorney General of the State of
Florida; JONI ALEXIS POITIER, in her
official capacity as Commissioner of the Florida
Elections Commission; JASON TODD
ALLEN, in his official capacity as
Commissioner of the Florida Elections
Commission; JOHN MARTIN HAYES, in his
official capacity as Commissioner of the Florida
Elections Commission; KYMBERLEE
CURRY SMITH, in her official capacity as
Commissioner of the Florida Elections
Commission; and PATRICK GILLESPIE, in
his official capacity as Deputy Secretary of
Business Operations of the Florida Department
of Management Services,

        Defendants.

**Civil Action No.:**
 4:21-cv-00220-RH-MAF

---

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ...............1

    A.      The State Cannot Evade Strict Scrutiny................................1

        *Editorial Judgments Are Protected Speech*...........................1

        PruneYard *and* FAIR *Are Not On Point*. ...............................3

        Turner *Confirms Strict Scrutiny Is Required*. ......................5

        *The "Common Carrier" Theory Fails*. ................................6

    B.      The Act Fails Even Intermediate Scrutiny. ..........................8

        i.      *The Act Does Not Advance Any Substantial Interest.* ................9

        ii.     *The Act Lacks Any Tailoring.*....................................11

    C.      The Act's Vagueness Exacerbates the Burden on Speech.................12

    D.      The Act is Preempted by Section 230. ...............................13

II.     THE EQUITABLE FACTORS FAVOR AN INJUNCTION......................14

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Arizona Free Enter. Club v. Bennett*,
   564 U.S. 721 (2011)..................................................................................10

*Biden v. Knight First Amend. Inst. at Columbia Univ.*,
   141 S. Ct. 1220 (2021)...............................................................................7

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
   518 U.S. 727 (1996)....................................................................................8

*Divino Grp. LLC v. Google LLC*,
   2021 U.S. Dist. LEXIS 3245 (N.D. Cal. Jan. 6, 2021)......................................13

*FCC v. Midwest Video Corp.*,
   440 U.S. 689 (1979)....................................................................................7

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
   901 F.3d 1235 (11th Cir. 2018) ...........................................................2

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
   515 U.S. 557 (1995).............................................................................*passim*

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974)................................................................................1, 9

*Murphy v. Twitter, Inc.*,
   60 Cal. App. 5th 12 (2021) ...........................................................13

*NAACP v. Button*,
   371 U.S. 415 (1963).................................................................................12

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*,
   533 F.2d 601 (D.C. Cir. 1976)..........................................................7

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018)...........................................................................8, 11

*Otto v. City of Boca Raton*,
   981 F.3d 854 (11th Cir. 2020) ...........................................................2

*Pac. Gas & Elec. Co. v. CPUC*,
    475 U.S. 1 (1986)................................................................................4, 8

*PruneYard Shopping Ctr. v. Robins*,
    447 U.S. 74 (1980)..............................................................................3, 4

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)................................................................................5

*Rumsfeld v. FAIR*,
    547 U.S. 47 (2006)..........................................................................3, 4, 5

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)..........................................................................2, 10

*Turner Broadcasting Systems v. FCC*,
    512 U.S. 622 (1994)..................................................................5, 6, 8, 11

*Vigue v. Shoar*,
    494 F. Supp. 3d 1204 (M.D. Fla. 2020)..............................................14

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) ...................................................11, 12

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)................................................................................8

*Zhang v. Baidu.com*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ....................................................6

## Other Authorities

U.S. CONST., amend. I .................................................................*passim*

The State defends a law very different from the one Florida actually enacted. The Act does not regulate the "conduct" of "common carriers" or impose only "incidental" burdens on speech. It overrides online services' protected editorial judgments, interfering with the messages those judgments express and making the State the ultimate arbiter of private companies' speech. Florida cannot mandate such "enforced access"—even in the name of "enhanc[ing]" speech, promoting "fairness," or addressing supposedly "vast accumulations of unreviewable power in the modern media empires." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 245, 250-51 (1974). Technology changes, but the First Amendment endures. The Act should be enjoined.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. The State Cannot Evade Strict Scrutiny.

Defendants do not seriously dispute that the Act's core provisions are content-based. Nor do they dispute that the Act singles out particular speakers for burdens while privileging others. These features alone warrant strict scrutiny (PI 23-32), and Defendants' efforts to evade that standard fail.

***Editorial Judgments Are Protected Speech.*** Defendants are wrong in suggesting that the only speech implicated here is that of the online services' *users*. Opp. 18-19, 22-23. The First Amendment limits government, not private actors, and Florida is restricting *the services*' protected speech—their editorial judgments about

whether and how to display user content. PI 21-23. "[P]resentation of an edited compilation of speech generated by other persons … fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995). It is those editorial judgments that the Act not only burdens, but flatly proscribes.

The State is equally wrong in claiming that the Act regulates conduct, not speech. Opp. 30-31. "Labeling certain … communications 'speech' and others 'conduct' is unprincipled and susceptible to manipulation." *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020). That is especially so here, where the editorial functions have long been recognized as speech, and the Act both prohibits posting addenda and compels sweeping disclosures. "Both on its face and in its practical operation, [Florida's] law imposes a burden based on the content of speech and the identity of the speaker." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

Enforcing standards about subjects like hate speech, pornography, or disinformation expresses a message about the nature of the online community and what its moderator finds objectionable. No additional speech is needed for such expression to be protected. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243-45 (11th Cir. 2018). That such editorial judgments

may take place behind the scenes (Opp. 31) is irrelevant—just as it is when newspapers reject op-eds.

It is also untrue that only "highly selective" newspapers or "parades" expressing a "common theme" enjoy constitutional protection. Opp. 21-23. "[A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message." *Hurley*, 515 U.S. at 569-70. Newspaper op-ed pages, for example, have no "common theme"—they collect disparate perspectives. Similarly, that some online services choose to host a wide range of views and topics is no basis for curtailing their First Amendment rights. That choice itself embodies a protected editorial judgment; making it does not forfeit the right to rule certain speech off-limits or to prioritize some messages over others. A contrary rule would encourage online services to allow *less* speech, not more.

**PruneYard *and* FAIR *Are Not On Point*.** Defendants' reliance on *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), is misplaced. TechFreedom Br. 21-24.

*PruneYard* arose from a California case holding that the public had a state-law right to engage in "petitioning, reasonably exercised" in a shopping mall that prohibited "any publicly expressive activity … not directly related to its commercial purposes." *Id*. at 77-78. But the mall was nothing like a "social media platform."

3

It did not host speech, transmit speech, or make editorial judgments; it was a place to buy goods. That is why "intrusion[s] into the function of editors" were "not present." *Id*. at 88. Later cases confirm the point: "Notably absent from *PruneYard* was any concern that access to this area might affect the shopping center owner's exercise of his own right to speak: the owner did not even allege that he objected to the content of the pamphlets; nor was the access right content based." *Pac. Gas & Elec. Co. v. CPUC*, 475 U.S. 1, 12 (1986); *accord Hurley*, 515 U.S. at 579-80. The Act, by contrast, is a textbook example of how forced hosting of objectionable content burdens protected editorial decisions.

Defendants note the public was unlikely to attribute the leafletters' beliefs to the mall's owner in *PruneYard*. 447 U.S. at 87. This case is different. Fairly or unfairly, people view Plaintiffs' members as approving of the content they host. Szabo ¶¶8-11, 14-15. Indeed, the idea that those companies' editorial choices reflect disagreement with excluded viewpoints was *the Governor's stated justification* for signing S.B. 7072. PI 9. And such associations are all the more likely under the Act, which hobbles services' ability to post disclaimers. *Cf. PruneYard*, 447 U.S. at 87 (mall owner could "expressly disavow any connection with the message").

Similarly, *FAIR* had nothing to do with editorial judgments. The "equal access" law there—unlike the content- and speaker-based law here—simply required schools to allow any military employers to recruit on campus. As the Court

explained, "accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions." 547 U.S. at 64. But online services *are* engaged in protected speech when they make editorial judgments, and the Act restricts those judgments. Congress itself has acknowledged the special nature of those judgments in Section 230—and it is not surprising that there is no equivalent of that protection for law schools or shopping malls.

**Turner *Confirms Strict Scrutiny Is Required*.** *Turner Broadcasting Systems v. FCC*, 512 U.S. 622 (1994), does not lower the applicable scrutiny standard. *Turner* applied intermediate scrutiny because the challenged "must-carry" rules were neither content-based nor "designed to favor or disadvantage speech of any particular content." *Id.* at 642-52. The Act is both. PI 24-29. The State's claim that the Act has a content-neutral purpose is both irrelevant and untrue. Irrelevant because *Reed* (which the State ignores) holds that a "law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas' contained in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165-66 (2015). Untrue because the Act was designed to punish the targeted services for the perceived content of their editorial decision-making. PI 9-10, 29-32. The State cannot shrug

off the Governor's signing statement, Opp. 42-43, and has no meaningful defense for the Act's carveout for theme-park owners, *id.* n.7.

*Turner* also turned on cable operators' unique physical attributes—the "bottleneck" control they exercised over programming. 515 U.S. at 656. "[S]imply by virtue of its ownership of the essential pathway for cable speech, a cable operator [could] prevent its subscribers from obtaining access to programming it chooses to exclude." *Id.* Not so with "social media platforms." While their editorial decisions may impact what content can be viewed on their *own* services, they cannot prevent end-users from accessing content from countless other online and traditional media outlets. Defendants' argument about "vast economic power" (Opp. 33) misses the point of *Turner*. Online services "lack the physical power to silence anyone's voices, no matter what their alleged market shares may be." *Zhang v. Baidu.com*, 10 F. Supp. 3d 433, 437, 441 (S.D.N.Y. 2014).

Finally, the must-carry provisions in *Turner* were "not activated by any particular message spoken by cable operators" and did not cause them to "conclude that the safe course is to avoid controversy." 512 U.S. at 654-55. But the Act's restrictions are triggered precisely by service providers' editorial speech—discouraging them from making potentially controversial judgments.

**The "Common Carrier" Theory Fails.** Nor can Defendants circumvent the First Amendment by positing that "social media platforms" are "*akin to* common

carriers," Opp. 24 (emphasis added) (quoting *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring)), or "should be treated *similarly to* common carriers," Act § 1(6) (emphasis added). Under settled law, these companies are nothing like "common carriers"—and Defendants cannot avoid the First Amendment problem by labeling them as such.

"[I]t is the practice of [providing] indifferent service that confers common carrier status." *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976); Opp. 25. "A common carrier does not 'make individualized decisions, in particular cases, whether and on what terms to deal.'" *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979). Plaintiffs' members, however, have never been "indifferent" about which speakers they host or how third-party speech is presented on their platforms. PI 5-8. Nor do they merely "distribut[e] the speech of the broader public." *Knight*, 141 S. Ct. at 1224 (Thomas, J.). Rather, they make individualized, context-specific judgments about what users and content are permitted under their policies. Congress recognized as much in Section 230, and Florida cannot ignore that these companies bear no resemblance to conduits that carry all comers without regard to content. PI 36-37. Nor is the Act anything like common-carrier regulation: instead of requiring nondiscrimination, it exempts favored speakers from the rules that apply to everyone else.

Regardless, labeling Plaintiffs' members "common carriers" cannot deprive them of their "right to be free from state regulation that burdens [their] speech." *PG&E*, 475 U.S. at 17-18 & n.14 (addressing "a regulated utility"). As Justice Thomas himself has recognized: "Labeling [access requirements] a common carrier scheme has no real First Amendment consequences. It simply does not follow from common carrier status that cable operators may not, with Congress' blessing, decline to carry indecent speech on their leased access channels." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 824-26 (1996) (Thomas, J., concurring in part and dissenting in part).

**B.    The Act Fails Even Intermediate Scrutiny.**

Because Defendants do not argue that the Act satisfies strict scrutiny, the Court need go no further. But even under intermediate scrutiny, Defendants cannot show that the Act advances a "substantial" interest "unrelated to the suppression of free expression," or that its restrictions on speech are "no greater than is essential" to furthering that interest. *Turner*, 512 U.S. at 662.[1]

---

[1] *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) (Opp. n.1), applies "more deferential review to some laws that require professionals to disclose factual, noncontroversial information" where the disclosure is not "unjustified or unduly burdensome." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) ("*NIFLA*"). Like those invalidated in *NIFLA*, the Act's onerous disclosure provisions go well beyond simple factual disclosures; they demand "precise and thorough explanation[s]" of editorial decisions and disclosure of proprietary information. *Id*. at 2372, 2377-78.

### i.    *The Act Does Not Advance Any Substantial Interest.*

"Multiplicity of Information Sources."  While the State claims that the Act advances "values central to the First Amendment" (Opp. 34-35), it fails to identify *any* case where a comparable private party was subjected to constraints that the First Amendment imposes *on the government*.  PI 33.

The State also ignores *Tornillo*.  There, Florida defended an enforced-access law on the theory that the "First Amendment interest of the public in being informed" was "in peril because the 'marketplace of ideas'" was "a monopoly controlled by the owners of the market."  418 U.S. at 250-51.  The Court unanimously disagreed that this allowed Florida to compel newspapers "to publish that which 'reason' tells them should not be published."  *Id.* at 256.  Similarly here, supposedly promoting access to "a multiplicity of information sources" (Opp. 34-35) cannot justify restricting private speech.

"Unfair Practices."  Nor can Defendants recast the Act as protecting against "unfair or deceptive acts."  Opp. 35-43.  The Act is *not* a fraud regulation: instead, it purports to dictate that editorial judgments must be "consistent" and "fair."  But the "very idea that a noncommercial speech restriction [could] be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment."  *Hurley*, 515 U.S at 579.  Defendants' reliance on cherry-picked anecdotes of supposedly inconsistent or misguided editorial decisions only

underscores that such judgments are often complex and normative, with no objective "right" answer. The State has no legitimate interest in "correct[ing]" subjective judgments based on a "difference of opinion." *Sorrell*, 564 U.S. at 579.

Protecting Candidates and Journalists. Defendants do not even try to explain how the candidate provisions promote "the integrity of elections." Opp. 41-42. Moreover, the provisions work in a plainly improper way—by elevating the supposed right of candidates (and those speaking about candidates) above the services' right to enforce their editorial rules. The Supreme Court has "repeatedly rejected the argument that the government has a compelling state interest in 'leveling the playing field' that can justify undue burdens on political speech." *Arizona Free Enter. Club v. Bennett*, 564 U.S. 721, 749-50 (2021).

Likewise, the State's only defense of the "journalistic enterprise" provisions is that, without them, "the platforms could endlessly cast these entities' content as against the platforms' guidelines." Opp. 45. But this too merely highlights that the Act impairs the services' right to enforce their editorial standards. That approach—"restrict[ing] the speech of some elements of our society in order to enhance the relative voice of others"—is "wholly foreign to the First Amendment." *Bennett*, 564 U.S. at 741-42.

### ii. *The Act Lacks Any Tailoring.*

Even if Defendants could identify some important interest unrelated to suppressing speech, there is a fundamental "disconnect between [the Act's] stated purpose and its actual scope." *NIFLA*, 138 S. Ct. at 2376. That is true of not just particular provisions, but the Act as a whole, which proscribes a massive amount of speech, subjects billions of editorial judgments to liability, "imposes an unduly burdensome disclosure requirement that will chill … speech," and is "wildly underinclusive." *Id.* at 2375, 2378; PI 30-31, 38-41.

Defendants offer no evidence that the Act's blunderbuss restrictions will actually advance its asserted interests "in a direct and material way." *Turner*, 512 U.S. at 664; *accord Wollschlaeger v. Governor*, 848 F.3d 1293, 1314 (11th Cir. 2017) (courts "may not … discover new evidence … that might support" speech-restrictive law). They cannot explain why the State must ban *all* "deplatforming" of candidates (and algorithmic sorting of candidate material), ban *all* "censorship" of non-obscene journalistic content, or require the same burdensome notice for *all* editorial decisions. These provisions plainly "burden substantially more speech than is necessary to further" any purported state interest. *Turner*, 512 U.S. at 665. Nor have Defendants explained why Florida's existing consumer protection laws are

insufficient. *Wollschlaeger*, 848 F.3d at 1314.[2] "Broad prophylactic rules in the area of free expression are suspect"; the Act lacks the "precision of regulation" the First Amendment demands. *NAACP v. Button*, 371 U.S. 415, 438 (1963).

### C. The Act's Vagueness Exacerbates the Burden on Speech.

Defendants claim that the Act's consistency requirement is sufficiently clear because it "requires only that social media platforms adhere to their *own* announced content moderation standards." Opp. 47. This interpretation is unsupported by the Act's text, but regardless, it cannot cure the vagueness problem. Defendants claim that online services can make any "'educational, scientific, or artistic evaluations,' … they choose *so long as they do so 'in a consistent manner.'*" *Id*. (emphasis added). That does nothing to answer the endless questions raised by this provision. PI 42-43. Plaintiffs' members invest great effort in applying their policies fairly and rationally, but what the State will deem sufficiently "consistent" on such inherently normative questions is anyone's guess.

Defendants only highlight the First Amendment problem. Requiring private moderators to "publish" their editorial standards—and then using that compelled speech to override their subjective, value-laden judgments and penalize companies

---

[2] Similarly for the Act's antitrust provisions, the State has neither shown that its existing antitrust laws are insufficient nor justified treating the covered entities differently from other entities. PI 30.

for supposedly "misinterpreting" their own rules—is itself an unconstitutional restriction on editorial speech. Internet Ass'n Br. 11-13.

### D. The Act is Preempted by Section 230.

While invoking constitutional avoidance (Opp. 3), the State's approach does not avoid the constitutional issue: It uses the same supposed constitutional concerns to urge a "narrow" reading of Section 230. Opp. 11. But there is no escaping the conflict between the Act and Section 230.

Citing Section 230(c)(2)(A)'s "good faith" language, Defendants say the Act simply bars "bad faith" judgments. Opp. 9-10. Yet the Act's sweeping rules for candidates and journalistic enterprises and insistence on "consistent" decisions apply regardless of intent, purpose, or state of mind. And inconsistency is not the same as bad faith. PI 48. Defendants also argue that Section 230(c)(1), which contains no good faith limitation, is inapplicable. But courts have applied that provision to a wide range of editorial judgments (PI. 47-48), and recent cases squarely reject the State's crabbed reading. *E.g.*, *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 33 n.9 (2021). Justice Thomas' observations (Opp. 5-7)—in a case where this issue was neither presented nor briefed—are no answer to this wealth of precedents.

Finally, the notion that Section 230 might somehow transform private services into state actors (Opp. 11-13) is baseless. *Divino Grp. LLC v. Google LLC*, 2021 U.S. Dist. LEXIS 3245, at *15-22 (N.D. Cal. Jan. 6, 2021) (rejecting same argument

because Section 230 "does not require private entities to do anything"). Section 230 codifies online services' First Amendment rights to engage in "private blocking and screening of offensive material." PI 45-46. Congress's recognition of those rights cannot be used to save the very state regulations that federal law—and the First Amendment itself—prohibit.

## II.     THE EQUITABLE FACTORS FAVOR AN INJUNCTION.

The State insists its "infringement on platforms' rights is exceedingly small" (Opp. 51), ignoring both (1) the *per se* irreparable harm resulting from *any* First Amendment violation, and (2) detailed evidence of chilled speech, compliance costs, and reputational harm in Plaintiffs' declarations. PI 49-50. The legislature's decision to carve out a small group of favored entities underscores that these harms are real. And despite having held legislative hearings, the State offers no contrary evidence, or evidence of genuine harm to *its* interests, from a preliminary injunction.

Defendants' attempts to dismiss the Act's grave public-interest harms are equally unconvincing. Defendants never meaningfully dispute that this law will open the floodgates to all kinds of objectionable and unlawful content. PI 45-49, 52-53; Chamber of Progress Amicus Br. x-xxiv.

Finally, because the Act's defective definitions govern the entire statute, which singles out particular media entities, the State cannot request to sever and "save" certain provisions. *E.g.*, *Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1230 (M.D.

Fla. 2020) (severability unavailable where "the unconstitutional provision is the crux of the statute"). Root and branch, the Act is unconstitutional.

## LOCAL RULE 7.1(F) CERTIFICATION

Counsel for Plaintiffs certifies that the above Reply contains 3,199 words, not including the Table of Contents and Table of Authorities.

Respectfully submitted,

Date: June 24, 2021

Brian M. Willen
  (admitted *pro hac vice*)
Steffen N. Johnson
  (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
1700 K St NW
Washington, DC 20006
Phone: (202) 973-8800
Email: bwillen@wsgr.com
      sjohnson@wsgr.com

Lauren Gallo White
  (admitted *pro hac vice*)
Meng Jia Yang
  (admitted *pro hac vice*)
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
Phone: (415) 947-2000
 Email: lwhite@wsgr.com
      mjyang@wsgr.com

*/s/ Christopher G. Oprison*
Christopher G. Oprison
  Florida Bar No. 0122080
J. Trumon Phillips
  Florida Bar No. 84568
**DLA PIPER LLP (US)**
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Phone: 305-423-8500
Fax: 305-675-6366
Email: chris.oprison@dlapiper.com
      trumon.phillips@dlapiper.com

Peter Karanjia (admitted *pro hac vice*)
James J. Halpert (*pro hac vice* forthcoming)
**DLA PIPER LLP (US)**
500 Eighth Street, NW
Washington, DC 20004
Phone: 202-799-4000
Fax: 202-799-5000
Email: peter.karanjia@dlapiper.com
      jim.halpert@dlapiper.com

Douglas L. Kilby
  Florida Bar No. 0073407
Glenn Burhans, Jr.
  Florida Bar No. 0605867
Bridget Smitha
  Florida Bar No. 0709581
Christopher R. Clark
  Florida Bar No. 1002388
**STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.**
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
Phone: (850) 580-7200
Email:  dkilby@stearnsweaver.com
       gburhans@stearnsweaver.com
       bsmitha@stearnsweaver.com
       cclark@stearnsweaver.com

*Attorneys for Plaintiff
Computer & Communications Industry
  Association*

Ilana H. Eisenstein (admitted *pro hac vice*)
Ben C. Fabens-Lassen (admitted *pro hac vice*)
Danielle T. Morrison (admitted *pro hac vice*)
Jonathan Green (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA  19103-7300
Phone:  215-656-3300
Fax:  215-656-3301
Email: ilana.eisenstein@dlapiper.com
      ben.fabens-lassen@dlapiper.com
      danielle.morrison@dlapiper.com
      jonathan.green@dlapiper.com

*Attorneys for Plaintiff NetChoice, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 24, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System. I also certify that the foregoing document is being served this day via electronic mail on all parties listed on the attached Service List.

/s/ *Christopher G. Oprison*
Attorney

Blaine H. Winship
Glenn A. Bassett
Daniel W. Bell
Office of the Florida Attorney General
The Capitol
400 S Monroe St., Ste PL-01
Tallahassee, FL 32399-6536
Phone:  850-414-3300
Fax:  850-488-4872
Email:blaine.winship@myfloridalegal.com
      glen.bassett@myfloridalegal.com
      complexlitigation.eservice@myfloridalegal.com
      daniel.bell@myfloridalegal.com
      jenna.hodges@myfloridalegal.com
*Counsel for Defendants Ashley B. Moody, in her official capacity as Florida Attorney General, and for Joni Alexis Poitier, Jason Todd Allen, John Martin Hayes, and Kymberlee Curry Smith, in their official capacities as Commissioners of the Florida Elections Commission*

Brian W. Barnes (admitted *pro hac vice*)
Charles J. Cooper
David H. Thompson
Joseph O. Masterman
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036
Phone:  202-220-9600
Email:bbarnes@cooperkirk.com
      ccooper@cooperkirk.com
      dthompson@cooperkirk.com
      jmasterman@cooperkirk.com
-and-

James W. Uthmeier
Raymond F. Treadwell
Executive Office of Governor Ron DeSantis
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
Phone: 850-717-9310
Email:james.uthmeier@eog.myflorida.com
       ray.treadwell@eog.myflorida.com
       gov.legal@eog.myflorida.com
*Counsel for Defendant Patrick Gillespie, in his official capacity as Deputy Secretary of Business Operations, Florida Department of Management Services*

Lawrence G. Walters
WALTERS LAW GROUP
195 W. Pine Avenue
Longwood, FL 32750
Phone: 407-975-9150
Email:larry@firstamendment.com
       paralegal@firstamendment.com
-and-
Berin M. Szoka (admitted *pro hac vice*)
TechFreedom
110 Maryland Ave. NE, Suite 205
Washington, DC 20002
Phone: 202-803-2867
Email:mail@techfreedom.org
*Counsel for TechFreedom*

Nury Siekkinen
ZWILLGEN PLLC
1900 M Street NW, Suite 250
Washington, DC 20036
Phone: 202-296-3585
Fax: 202-706-5298
Email:nury@zwillgen.com
*Counsel for Chamber of Progress, Connected Commerce Council, CTA Engine Advocacy, Information Technology & Innovation Foundation, National Black Justice Coalition, Progressive Policy Institute, TechNet, Washington Center for Technology Policy Inclusion*

Christopher B. Hopkins
McDONALD HOPKINS LLC
505 S. Flagler Drive, Suite 300
West Palm Beach, FL  33401
Phone: 561-847-2346
Fax: 561-472-2122
Email:chopkins@mcdonaldhopkins.com
-and-
Aaron Mackey (admitted *pro hac vice*)
David Greene (admitted *pro hac vice*)
Kurt Opsahl (admitted *pro hac vice*)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA  94109
Phone: 415-436-9333
Fax: 415-436-9993
Email:amackey@eff.org
        davidg@eff.org
        kurt@eff.org
*Counsel for Electronic Frontier Foundation and Protect Democracy Project, Inc.*

Deanna K. Shullman
SHULLMAN FUGATE PLLC
2101 Vista Parkway
Suite 4006
West Palm Beach, FL  33411
Phone: 561-429-3619
Email:dshullman@shullmanfulgate.com
*Counsel for The Reporters Committee for Freedom of the Press, American Civil Liberties Union, American Civil Liberties Union of Florida, Authors Guild Inc., Center for Democracy and Technology, Media Law Resource Center, Inc. and Pen American Center, Inc.*

Peter W. Homer
HOMER BONNER
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, FL  33131
Phone: 305-350-5139
Fax:  305-372-2738
Email:phomer@homerbonner.com
-and-
Paul R.Q. Wolfson (admitted *pro hac vice*)
Patrick J. Carome (admitted *pro hac vice*)
Ari Holtzblatt (admitted *pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Phone: 202-663-6000 (main)
          202-633-6390 (Wolfson/Holtzblatt)
          202-633-6611 (Carome)
Email:paul.wolfson@wilmerhale.com
          patrick.carome@wilmerhale.com
          ari.holtzblatt@wilmerhale.com
*Counsel for Internet Association*

Leonid Goldstein *Pro Se*
4400 Troup Hwy., Apt. 508
Tyler, TX  75703
Phone:  408-921-1110
Email:leo5533@att.net