**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE, FLORIDA**

NETCHOICE, LLC d/b/a               )
NETCHOICE, a 501(c)(6)             )
District of Columbia               )
organization; and                  )
COMPUTER & COMMUNICATIONS          )
INDUSTRY ASSOCIATION d/b/a         )
CCIA, a 501(c)(6)                  )
non-stock Virginia corporation,    )
                                   )
            Plaintiffs,            ) *Case No:  4:21-cv-220-RH*
v.                                 )
                                   ) *Tallahassee, Florida*
ASHLEY BROOKE MOODY, in her        ) *June 28, 2021*
official capacity                  ) *1:30 P.M.*
as Attorney General of the         )
State of Florida;                  )
JONI ALEXIS POITIER, in her        )
official capacity as               )
Commissioner of the Florida        )
Elections Commission;              )
JASON TODD ALLEN, in his           )
official capacity                  )
as Commissioner of the             )
Florida Elections Commission;      )
JOHN MARTIN HAYES, in his          )
official capacity as               )
Commissioner of the Florida        )
Elections Commission;              )
KYMBERLEE CURRY SMITH, in          )
her official capacity as           )
Commissioner of the Florida        )
Elections Commission; and          )
PATRICK GILLESPIE,                 )
in his official capacity as        )
Deputy Secretary                   )
of Business Operations of the      )
Florida Department                 )
of Management Services,            )
                                   )
            Defendants.            )
_____)



**TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION MOTION
BEFORE THE HONORABLE ROBERT L. HINKLE,
UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES VIA ZOOM</u>:

```
  For the Plaintiffs:    Wilson Sonsini Goodrich & Rosati, P.C.
                         By:  BRIAN M. WILLEN
                              Attorney at Law
                         1700 K Street NW
                         Washington, D.C.  20006

                         DLA Piper, LLP
                         By:  PETER KARANJIA
                              ILANA EISENSTEIN
                              Attorneys at Law
                         500 Eighth Street, NW
                         Washington, D.C.  20004

  For the Defendants:    Cooper & Kirk, PLLC
                         By:  BRIAN W. BARNES
                              Attorney at Law
                         1523 New Hampshire Avenue, NW
                         Washington, D.C.  20036

  For the               Office of the Attorney General
  Defendants:           By:  BLAINE H. WINSHIP
                              Chief Assistant Attorney General
                         PL-01 The Capitol
                         Tallahassee, Florida 32399
```

P R O C E E D I N G S

1

2          THE COURT:  Good afternoon.  This is Judge Hinkle.

3          It's the plaintiffs' motion.  We'll hear from the

4   plaintiffs first.  Before we start let me note this:

5          The parties and the attorneys are participating by

6   video.  It's a public hearing.  There are members of the

7   public who have access by telephone, so they have audio

8   access, not video.  That's our attempt to comply with the

9   policy of the Judicial Conference of the United States which

10  provides for proceedings in district courts not to be

11  broadcast by video.  Also as part of that policy, there are

12  not to be rebroadcast or recording of proceedings.  My request

13  is that all of those that are on the video or audio feed

14  comply with the Judicial Conference policy in that respect.

15         It's, as I said, the plaintiffs' motion so I'll hear

16  from the plaintiffs first.  Start by telling me who is going

17  to speak first, and then I'll hear anything you have to say.

18         I guess I should also tell you, I have read all of

19  your papers, I've been through the appendix and all of the

20  affidavits, the other materials, so I think I'm up to speed.

21         MR. WILLEN:  Sure.  Good afternoon, Your Honor.  My

22  name is Brian Willen.  I'm going to be taking the lead for the

23  plaintiffs.  I'm planning on going for around 20 or 30 minutes

24  and then turning things over to my colleagues at DLA Piper,

25  Mr. Karanjia and Ms. Eisenstein, who are going to address some

1  additional issues in particular relating to common carrier,

2  vagueness, the standard for intermediate scrutiny.  I'm going

3  to be focusing on the main First Amendment issues with the

4  court's indulgence and obviously happy to answer any questions

5  Your Honor has.

6          It's a pleasure to be with you.  Thank you.

7          Your Honor, Florida's new law is a sweeping attack on

8  core First Amendment rights.  The social media platforms that

9  this Act targets are private companies whose businesses

10 revolve around hosting and presenting speech.  Every day these

11 companies are called on to make complex and often subjective

12 value judgments about what content they want to host and how

13 they want to present that content to the world.  These

14 judgments are highly expressive.  They both define and

15 articulate the norms of their specific online communities.

16         These judgments are vital.  They are vital in

17 protecting users from all manner of horrific, abusive, and

18 illegal content from terrorist propaganda to pornography,

19 fraudulent schemes, everyday spam.  A long line of precedent

20 establishes that this kind of editorial control and judgment

21 is speech firmly protected by the First Amendment.  *Tornillo*

22 is the most obvious example but many other cases, including an

23 unbroken line of decisions specifically involving online

24 services, agree.

25         Under these established principles the First

1     Amendment problems with Florida's law are clear as day.

2            First, the Act directly suppresses protected

3     editorial speech.  It declares that some editorial judgments

4     are categorically unlawful and subjects them to draconian

5     penalties.

6            Second, the Act makes the State the arbitrator of

7     private editorial standards.  It lets the State investigate

8     and punish private companies whenever it thinks their

9     editorial speech is unfair or inconsistent measured across

10    some nebulous standard.

11           Third, the Act chills protected speech, including by

12    saddling a vast array of editorial judgments with detailed and

13    onerous compelled notice obligations.

14           These are not incidental burdens nor is this the mere

15    regulation of conduction.  The Act expressly restricts speech,

16    and it does so on a massive and unprecedented scale.  The

17    stakes here could hardly be higher.  As our unrebutted

18    declarations explain, the effects of this law will be

19    catastrophic.  The Act will force private online services to

20    disseminate all manner of content that they find haunt and

21    highly objectionable whether that's racist-infective, election

22    disinformation, harmful personal attacks, gross invasions of

23    privacy.

24           It will also make it legally terrorist to do the kind

25    of everyday curation and moderation that helps make these

1   services usable and user friendly.  The collateral damage from

2   all of this will be families, children and others who want

3   protection from harmful or age-inappropriate content, or those

4   who just want to find useful information online without facing

5   a barrage of abusive attacks or annoying spam.  No case has

6   ever approved such a frontal assault on editorial speech.

7         *PruneYard*, *FAIR*, and *Turner*, which are the cases

8   primarily that the State relies on, involve nothing at all

9   like this.  And *Tornillo* and *Hurley* squarely reject the idea

10  that the State has anything like the power it now asserts.

11        In short, Florida's blatant intrusion into the

12  function of editors violates the First Amendment.

13        Now, the State doesn't even pretend this law could

14  satisfy strict scrutiny, but there is just no evading that

15  standard here.  The Supreme Court has told us that the

16  content-based laws, no matter what their purpose, face strict

17  scrutiny.  That's *Reed versus Town of Gilbert* among many other

18  cases.  It's telling that in their opposition brief the State

19  doesn't even cite, much less address, the *Reed* case.

20        And the key provisions of this Act are facially

21  content-based.  That includes the provisions that deal with

22  journalistic enterprises and political candidates; it also

23  includes the provision requiring consistent moderation and the

24  compelled notice provisions, which are content-based under the

25  Supreme Court's decisions in *Riley* and *NIFLA versus Becerra*,

1    among many other cases.

2            But even apart from the various facially

3    content-based restrictions that the law imposes, the Act as a

4    whole is subject to strict scrutiny.  That's because this Act

5    singles out a particular group of media entities, what it

6    terms as "social media platforms," for special speech

7    regulation.  Under established law this kind of speaker-based,

8    singling out is presumptively unconstitutional.  The

9    defendants in their brief don't even mention or discuss the

10   cases involve like *Minneapolis Star* and *Arkansas Writers'*

11   *Project*, which we cited in our opening brief and explained

12   that proposition.  The State also largely ignores the *Sorrell*

13   decision which invalidated a law that, quote, disfavored

14   specific speakers.

15           As the Supreme Court explained in the *NIFLA* case,

16   these kind of speaker-based laws -- and this is a quote -- run

17   the risk that the State has left unburdened those speakers

18   whose messages are in accord with its own views, close quote.

19           That's exactly what we have here.  We have an Act

20   that inexplicitly carves out social media entities that have a

21   connection to theme parks.  We have a definition of social

22   media platforms that is based on arbitrary size and revenue

23   criteria that don't seem to have been based on any sort of

24   legislative factfinding or analysis.  So, as in *NIFLA*, these

25   unexplained speaker-based distinctions suggest that the

1   State's true purpose was to, quote, disfavor a particular

2   speaker or viewpoint.

3          But here we don't actually have to speculate about

4   that.  The Act supporters told us why this law was enacted.

5   It was to punish what they call "Big Tech" for its editorial

6   judgments, judgments that some state officials think reflect

7   political viewpoints that they disfavor.  The governor himself

8   said in his official Signing Statement, quote, If Big Tech

9   censors enforce rules inconsistently to discriminate in favor

10  of the dominant Silicon Valley ideology, they will now be held

11  accountable.  And this viewpoint-based hostility is infused

12  throughout the Act, embodied in all of its provisions and its

13  findings.

14         Indeed, this improper purpose is expressly

15  acknowledged in the State's own brief.  On page 39 of their

16  opposition, they say that the Act is necessary because those

17  doing content moderation, quote, could be biased and pursuing

18  their own political agendas, close quote.

19         Well, saying that a law aims to stop private parties

20  from pursuing their own political agendas is as close as you

21  can get to an admission that the law violates the First

22  Amendment.

23         So strict scrutiny clearly applies here, and the

24  State has no argument that the statute meets it.  But what

25  they offer as the Act's purposes only confirm that the Act

 1  can't pass any level of scrutiny.  There is simply no valid

 2  government purpose that this law advances that the State has

 3  articulated.  Let me just talk about a couple of things that

 4  they say.

 5       So, the first argument that they make is that the

 6  statute is necessary to defend free speech or to bring about a

 7  more diverse collection of information sources online.  Well,

 8  of course, with respect to free speech, the State's claim to

 9  be standing up for the First Amendment just averts the

10  relevant First Amendment interest here.  The State doesn't and

11  can't cite a single case in which the First Amendment has ever

12  been applied to limit private editorial discretion.  Of

13  course, *Halleck* and *Prager* and many other cases make clear

14  that private entities may exercise editorial discretion

15  without violating anyone's free speech.

16       The State in its brief gestures at Section 230 is

17  somehow making online services state actors or public forums.

18  This argument totally understands -- excuse me.  This argument

19  totally misunderstands Section 230, and it's been repeatedly

20  rejected.  We cited the case *Divino versus YouTube.*  Just on

21  Thursday of last week another decision called *Newman versus*

22  *YouTube* rejected exactly the same argument on the authority of

23  *Divino*.  That's a case from the Northern District of

24  California.

25       So the argument that 230 somehow affects the -- gives

1    the State ability to regulate that it otherwise wouldn't have

2    is just completely backwards.

3            Now, the more generic claim that the State is acting

4    to ensure, quote, diverse information sources or to protect

5    journalists or political candidates can't sustain this law

6    either.  So even if in theory those are important interests,

7    the Act simply doesn't advance them in a proper way.

8            The Supreme Court in *Bennett* I think said it best.

9    This is a quote:

10           *Restricting the speech of some elements of our*

11   *society in order to enhance the relative voice of others is*

12   *wholly foreign to the First Amendment.*

13           And that's exactly what their own rationale would do.

14   The Supreme Court has made very clear that you cannot do the

15   kind of speech balancing that this law seeks to do.  In fact,

16   the rationale that they articulate about diverse information

17   sources is precisely the rationale that the State of Florida

18   offered for the right of reply law in *Tornillo*.  You can read

19   the Supreme Court description of all of the purposes that the

20   State offered for that law.  It was, of course, rejected

21   because you can't burden the First Amendment rights of private

22   editors in order to advance these kinds of interests.  So the

23   rationale in *Tornillo* was no more persuasive here.

24           Now, if the State really wanted to enhance the

25   availability of diverse views online, it can certainly do that

1    in many, many ways.  Most obviously the State can start its

2    own online forums and let people post whatever they want.  But

3    what it can't do is advance that goal by suppressing and

4    seeking to chill the editorial speech of private social media

5    services.

6          The other big argument that the State makes in favor

7    of the law is that they say the law is necessary to stop what

8    they say is inconsistent or unfair moderation.

9          Now, let me start by saying that in no meaningful way

10   is this any sort of consumer protection law.  This law doesn't

11   prohibit false or misleading statements about content

12   moderation.  Florida, of course, already has laws that do

13   that, and the State doesn't even try to explain why those laws

14   are insufficient.  Instead, what the Act is trying to do is

15   simply to override or regulate moderation decisions that it

16   considers to be inconsistent or unfair.  But that's just

17   another way of saying that the State disapproves of the

18   editorial speech of certain services and it wants to correct

19   it and make it better.  *Tornillo* and many other cases make

20   clear that this kind of editorial speech is constitutionally

21   protected whether it's fair or unfair.  Insisting on the

22   fairness of private speech is simply not a valid state

23   interest.  *Hurley* is especially eloquent on that point.

24          For similar reasons the State's power or asserted

25   power -- excuse me -- to determine whether certain private

1   editorial rules are being applied correctly or consistently is

2   equally invalid.  It's very important to understand that the

3   rules that we're talking about here, and certainly their

4   enforcement, these rules are incredibly variant.  These are

5   matters of opinion and judgment.  Different services have

6   different standards and they understand their rules

7   differently.  That's very clearly reflected in the

8   declarations that we've cited including from Etsy and YouTube

9   and Facebook.  It's clear if you just look at the different

10   acceptable use policies or community guideline standards that

11   different services have.

12         So, if an individual service believes that certain

13   content is hate speech or cyberbullying, under its policy it's

14   defined and understands those terms, the State doesn't have a

15   right to come in and punish that company simply because the

16   State disagrees with that opinion, disagrees with the way that

17   the service applies its own rules.  And the State's examples

18   of what they say are content moderation gone wrong, at page 36

19   of their brief and in the lengthy appendix of sort of

20   cherry-picked news articles that they cited only underscores

21   the problem with its position.

22         If you look at those examples, they show you how

23   complicated, how complexed, how valuated, and how subjective

24   some of these judgments are.  These are not cases where there

25   are clear right and wrong answers, and that's exactly why the

1    First Amendment reserves these judgments for private parties

2    not for the government.

3              So in short, under the First Amendment, the State

4    simply cannot be the arbitrator of the consistency, accuracy,

5    or fairness of private editorial judgments.  That's the power

6    Florida now seeks, and it's manifestly unconstitutional.

7              So, even if there were a proper purpose here, there

8    is just no tailoring at all in this law.  This Act is a series

9    of broad and blunt requirements unsupported by any evidence.

10   Frankly, it doesn't appear that the State considered any

11   alternatives or tried any way to minimize the burden on

12   protected speech.

13             Now, I don't want to run through all of the

14   provisions, but I do want to just give the example of the

15   compelled notice provisions because I think it illustrates the

16   problem.

17             So, these provisions apply to virtually every kind of

18   moderation action that can conceivably be taken including

19   decisions to post addenda to user content, any decision to

20   restrict or limit or moderate content in any way, shape, or

21   form.  The State hasn't explained why it would be remotely

22   necessary to apply the same highly burdensome and onerous

23   notice requirements to billions and billions and billions of

24   judgments; nor has it explained why it's necessary in every

25   single one of those instances to include, quote, a thorough

1  rationale of the reason, a precise and thorough explanation of

2  how the platform became aware of the censored content, and on

3  top of that, quote, a thorough explanation of the algorithms

4  used.

5          So just to make this a little bit more concrete, in

6  the YouTube declaration that we submitted -- this is

7  paragraph 17 of the Veitch declaration -- she says that

8  YouTube in the last quarter of 2021 removed one billion

9  comments, user comments, most of those removed as spam.

10 That's just in three months.  On top of removing millions and

11 millions of videos.

12         So this provision would require you to provide

13 detailed notice to each of those spammers, and if it doesn't

14 it faces liability, statutory damages, state enforcement

15 action.

16         Now, whatever could be said about this, this is the

17 least restrictive means.  In fact, it's so monumentally

18 burdensome and overbroad that it could only be understood as

19 an effort to chill moderation or in the first place to

20 basically saddle every decision of this obligation so at the

21 margins services decide that they rather not moderate lest

22 they run the risk of getting hit with a state enforcement

23 action or private right of action.

24         Not only that, this provision is quite harmful in

25 terms of what it portends.  So by forcing disclosure of

 1   confidential information, including algorithmic

 2   decision-making, it compels services to give that kind of

 3   information to a host of very, very bad actors, including

 4   spammers, fraudsters, and sex traffickers, information that

 5   could help them evade these companies' algorithms and continue

 6   to abuse their services.  So this is just one example of the

 7   way in which this law seems to have been designed without any

 8   thought to considerations on the other side.

 9          The Supreme Court has said that the areas of free

10   speech, precision of regulation is necessary.  The broad

11   prophylactic rules are not appropriate.  That's *NAACP versus*

12   *Button* and many other cases.  That's the antithesis of what

13   the State has done here.

14          Just to kind of close up, Your Honor, and then I'll

15   turn it over to my colleagues:

16          Florida's law is blatantly unconstitutional, and it

17   will have profound consequences, fundamentally disrupting the

18   vital efforts that online services make to keep their

19   communities safe, useful, and enjoyable.  The plaintiffs

20   respectfully request that the court grant the preliminary

21   injunction.

22          I'm happy to answer --

23          THE COURT:  Let me ask you a couple of questions

24   before I let you get away, a couple of them just pretty basic.

25          First, there's a reference here to mathematical

1     algorithms.  Are all algorithms mathematical?

2          MR. WILLEN:  Well, I'm not a computer engineer.  That

3     may be a philosophical question.  The algorithms are

4     essentially computer software programs.  So in that sense,

5     they have a mathematical logic to them.  Now, of course,

6     algorithms are ultimately designed and created by human

7     beings, and they're designed specifically to effectuate human

8     judgments, especially in the context of moderation.  So the

9     algorithmic moderation works hand in hand with the human

10    moderation that occurs on the services.

11         THE COURT:  All right.  I understand, and I'm not a

12    computer engineer either, and I'm probably the oldest guy on

13    the call.  I can tell you that, when I took computer

14    programming in college, we took little punch cards over to the

15    building with the computer that was as big as the room.

16         The antitrust provisions in the statute, I take it,

17    those really are not on the table today.  That's not something

18    you're asking for relief today about.  Do I have that right?

19         MR. WILLEN:  Well, I think we are in the sense that

20    we're asking for an injunction enjoining the State while the

21    case is proceeding from enforcing the statute as a whole, and

22    in part that is based on the same principles that they've sort

23    of arbitrarily singled out particular entities for particular

24    regulation that is not justified.  And the antitrust

25    provisions, while they haven't been the main focus of our

1   briefing, are part and parcel of that same enterprise.  In

2   fact, they are, you know, they're particularly a nice

3   illustration of it, and the State hasn't really explained why,

4   even assuming that the State has an interest in limiting the

5   people that it contracts with based on their antitrust

6   activity, why it makes sense to only apply that set of rules

7   to this specific category of social media websites as opposed

8   to any other antitrust violator or alleged antitrust violator.

9   So, you know, those provisions, you know, I think right now

10  are not front and center of what we are talking about, but I

11  do think they are subject to the same basic problems that

12  infect the entire statute.

13          THE COURT:  If you win, how big a bond do you think

14  you should have to post?

15          MR. WILLEN:  Honestly, we haven't thought about that,

16  Your Honor.  It's something we would be happy to talk to the

17  State about.  But, you know, I think given -- I think it would

18  be a matter of what the State wanted to propose.  I don't

19  think there's a huge number necessary, but we would put up

20  whatever is appropriate.

21          THE COURT:  Then finally, the government's ability to

22  regulate is different for the telephone company providing

23  basic telephone service or for the telegraph company before

24  that, as opposed to more modern telephone companies that

25  provide a whole bunch of other stuff, but certainly the

1   government can regulate more extensively just the telephone

2   part of the service, user to user, just connecting, carrying a

3   message without regard to its content.  In fact, the telephone

4   company doesn't even find out what the content is.

5        Some of these social media providers do provide a

6   little bit of that service; I mean, the messaging app and some

7   of, for example, Facebook, there is an element of that in it.

8   Can the government at least regulate that element more closely

9   to the telephone company than to the Miami Herald?

10       MR. WILLEN:  Yeah.  Let me address that.  So, first

11   of all, with respect to all of the members of plaintiffs'

12   organizations and obviously the ones that are the focus of

13   this case, which are really, you know, the social media

14   platforms, we put in declarations from Etsy and from YouTube

15   and from Facebook in particular.  So those companies, as those

16   declarations explain, are nothing like conduits, nothing like

17   common carriers.  They have from their beginning and until now

18   done very extensive individualized moderation.  They are not

19   pipelines, they are not just telecommunication services.  So I

20   think that's true pretty much of all of the members.

21       I think there are questions that are talking about

22   pure internet conduit services about where the government's

23   ability to regulate those platforms lies, and to some degree

24   that was the focus of the discussion or some of the discussion

25   in the net neutrality regulation in the D.C. Circuit decision.

```
 1          But I would say even there -- so the FCC obviously
 2   recognized that none of these social media websites were
 3   telecommunication services.  That was the presumption of the
 4   net neutrality rules, that they did not apply to any service
 5   that was actually like these.  And even with respect to
 6   services that provide email or text messaging, those would be
 7   considered information services and not telecommunication
 8   services.
 9          So it would be a very, you know, you'd be having a
10   different conversation if this bill were focused on a narrower
11   set of services that didn't do the things that our members do.
12   I think there would still be very significant First Amendment
13   problems with the way in which the State has gone about doing
14   these regulations, including for some of the reasons that I
15   have talked about, but I think with respect to our members and
16   our clients, we're talking about core information services,
17   non-conduits, services that are defined by and do extensive
18   editorial judgment and control, and that is the First
19   Amendment problem in a nutshell.
20          THE COURT:  All right.  And then you were turning it
21   over.  Tell me who the next speaker is.
22          MR. WILLEN:  Yes.  I think that will be Mr. Karanjia.
23          THE COURT:  All right.
24          MR. KARANJIA:  Thank you, Your Honor.  Thank you for
25   giving us this time.
```

1        So just building on that colloquy, there is actually

2   extensive federal case law on the common carrier issue; and,

3   as you might imagine, the FCC is preeminent in this area as

4   the federal regulator of intrastate communication services.

5   And the FCC has held that telephone companies essentially are

6   indifferent to the content of service as Your Honor was

7   indicating, and there are a number of federal decisions

8   picking up on the definitions the FCC has applied.  Both sides

9   in fact cite the same case law on this.  I won't repeat it

10  because it's in the brief.  But you will see actually that

11  there is really no daylight between both sides of this case on

12  what is the core attribute of a common carrier.  And the core

13  attribute of a common carrier, as the FCC has said, as the

14  Supreme Court has said, as the D.C. Circuit has said, is the

15  indifference of service on the one hand, and the polar

16  opposite of that, Your Honor, is individualized

17  decision-making.

18        And in the case Mr. Willen was alluding to involving

19  the net neutrality rules that the FCC has since repealed,

20  that's *U.S. Telecom*, and it's cited by the state, there the

21  court said, well, we are going to look at these ISPs, at least

22  as far as the FCC understood what they were doing, and we

23  think they are very much like telephone companies.  And the

24  reason for that was -- and I'm going to quote from the

25  decision -- *they are neutral indiscriminate platforms for*

 1   *transmission of speech of any and all users.*

 2            And, Your Honor, that is the exact opposite of what

 3   we have here with respect to these services, and I'm talking

 4   about the core attributes of these services which go way

 5   beyond just private messaging or exchanging messages.  And in

 6   fact this whole statute, the Florida statute was built around

 7   a recognition that they engage in moderation, that they make

 8   individual judgments, otherwise the State felt no need to

 9   enact this legislation.  So I think the very Act itself

10   recognizes the non-common-carrier attributes of these

11   services.

12            And, yes, the State added a finding kind of at the

13   eleventh hour, but even the finding didn't declare they were

14   common carriers.  They said, well, we think they should be

15   treated, quote, similarly to common carriers, and that's a

16   very different thing.

17            So the first point, Your Honor, is they are nothing

18   like common carriers.

19            The second point is, this actually isn't even a

20   common carrier statute.  You know, the common carrier

21   statutes, Your Honor may be familiar with, often do things

22   like regulate prices, they impose nondiscrimination rules.

23   This statute, in fact, is quite the opposite.  It imposes a

24   favoritism rule, which is one of the core reasons why we have

25   impermissible viewpoint discrimination.

1          So the second rationale is this is nothing like a

2   common carrier statute.

3          The third one is I think the one that Mr. Willen

4   touched on, which is, even if you sort of have the magic words

5   "common carrier," that doesn't make the First Amendment

6   problem go away, and I think perhaps the best precedent on

7   that is the *Pacific Gas* case from the Supreme Court where, if

8   you look at footnote 14 of that decision, the court expressly

9   recognizes -- there was an argument that this was a regulated

10   utility, Pacific Gas, and that somehow that diluted the

11   entity's First Amendment rights and the court emphatically

12   rejected that argument.  Of course, neither a public utility

13   but they still have their First Amendment rights.

14          And I know the State cites some solo opinions from

15   Justice Thomas, but actually somewhat ironically, if you look

16   at Justice Thomas's earlier opinions, and we cite an opinion

17   from the Denver area case where he was talking about an FCC

18   regime what is called leased access, which is a bit like the

19   must-carry rules at issue in *Turner*, somewhat different

20   nuances on how they operate, but Justice Thomas looked at

21   those and he said, look, you know, even if you could somehow

22   put a common carrier construct on these FCC access rules, that

23   does not in my view change the First Amendment analysis.  And

24   he found First Amendment problems with that.  So even Justice

25   Thomas there is saying, look, common carrier doesn't really

1  make a difference for the First Amendment analysis.

2          Just going back to a couple of the First Amendment

3  points that Mr. Willen comprehensively explained why -- all of

4  the reasons why strict scrutiny applies, but as we pointed out

5  in the reply brief, even if the court somehow thought

6  intermediate scrutiny applied to any aspects of the Act, the

7  Act still fails under that standard.  The principal reason is

8  there is no valid, much less substantial, government interest

9  here.

10         The State tries to shoehorn what is in fact improper

11 viewpoint discrimination into this rationale from the *Turner*

12 case about promoting multiplicity of information sources, but

13 actually that's not what the State relied on.  And Mr. Willen

14 pointed you to I think page 39 of the State's brief which is

15 quite telling on this issue.

16         In addition, we, of course, have the Signing

17 Statement, we have the press release from the governor.  But I

18 would go beyond that and direct the court to the hearing on

19 this legislation which the State points and cherry-picks

20 portions of the hearing which is online, there is a video of

21 the hearing.  And if you go to -- this is the Senate

22 Appropriations Committee Hearing on April 19.  If you go to

23 that and hear the lead sponsor of this statute complaining

24 that social media were relying on Section 230 and, quote,

25 taking down things they don't agree with.  That's at 3 hours

1   and one minute and 58 seconds.  And I think that that just

2   speaks volumes to the real purpose here.

3          It was a disagreement, a difference of opinion with

4   what the sponsors of this legislation perceived the operators

5   to be doing, and that is slightly unconstitutional.  There are

6   enumerable Supreme Court cases saying that's just not a valid

7   government interest.

8          So, in fact the interests the State is invoking here

9   are precisely the things forbidden by the First Amendment, and

10  that's why not only strict scrutiny but any level of

11  intermediate scrutiny would fail.

12         Then finally just one point on some of the other

13  provisions.  I do think the antitrust provision, while it

14  wasn't the central focus of this case, fails for the same

15  reasons.

16         Number one, viewpoint discrimination infects the

17  entire statute.  That goes -- the antitrust provision is part

18  and parcel of this statute.  The State thought it was a

19  significant component of the statute.  That's why it enacted

20  all of these provisions in tandem, they operate in tandem; and

21  the viewpoint discrimination infects that provision just as

22  the others.

23         The second point we have a *Minnesota Star* problem,

24  which is the targeting of the select so-called social media

25  platforms.  If Your Honor remembers, *Minnesota Star* involved a

1    tax statute.  At one level one might think what does that have

2    to do with speech, and yet the court said, well, if you're

3    targeting entities that engage in speech and they are

4    newspapers, and you're not targeting other entities, well,

5    then we do have a First Amendment problem, and the court

6    struck down that statute.  And the *Ragland* case is another

7    instance of that.

8         So I would say the second defect that implicates the

9    antitrust provision in addition to the rest is the *Minnesota*

10   *Star* issue which is unavoidable.

11        Now, the third issue is we have an overarching

12   definition of social media platforms, and that applies to

13   every single obligation and requirement and restriction under

14   this statute, and that goes for the antitrust provision.  So

15   there is really no way to take that out and look at it in a

16   vacuum because it's completely tied up with how the statute

17   operates.  Everything flows from the definition of social

18   media platform.  And as we have identified that has serious

19   problems of both over-inclusiveness and under-inclusiveness.

20        One of them, of course, is the egregious in part

21   operator exemption, but it's not limited to that.  At

22   paragraph 92 of the complaint, Your Honor, we point to a

23   number of other respects in which it's under-inclusive.  Just

24   to pick one example, there is no explanation in here anywhere

25   in the legislative history of why it would be inappropriate to

1    apply these rules to more traditional media versus digital

2    media where they may have the same number of subscribers, they

3    may have the same revenues.  There's no explanation or defense

4    even in the State's brief of why the revenue thresholds and

5    user thresholds somehow call for a different analysis of the

6    regulation.

7         So there are fatal under-inclusive issues that go

8    beyond the theme park exemption infecting the social media

9    platform definition which, as we said, in turn applies to

10   everything else.  So there really is no way to I think look at

11   that antitrust provision separately, and then just --

12        THE COURT:  I wasn't necessarily suggesting the

13   contrary, but there's no immediate harm from the antitrust

14   provisions.  I guess that was my question.  In terms of

15   preliminary injunction, the focus is on all these other

16   requirements.  You're a long way from anybody being debarred,

17   and in fact if ultimately it turns out that the rest of the

18   statute falls, then the antitrust provisions fall because

19   there's no predicate on which to base them.  That was my only

20   question.

21        MR. KARANJIA:  Understood, Your Honor.  I do think

22   that that is exactly right; that if the rest falls, there

23   would be no basis for the antitrust provision.

24        On the point of the immediacy, we do have a

25   significant concern about how this might be applied,

1   especially given what the State itself has said.  I mean, they

2   made no bones about extremely aggressive enforcement.  That's

3   something the governor has touted himself.  So there is a real

4   concern about chilling effects here, and I do think in First

5   Amendment cases the analysis of ripeness issues are somewhat

6   unique because the courts are so mindful of chilling effects.

7   In other words, even if a statute hasn't been implemented yet,

8   if there's a risk of chill expression, if that causes

9   self-censorship, if that causes businesses to run their

10  affairs in a different way than they would otherwise, then

11  that's a real concern and the court needs to act.

12         I do think the other aspect of Your Honor's question

13  is well taken which is, you know, the purpose here of the

14  preliminary injunction is to just preserve the status quo.  So

15  we would respectful submit that it makes sense to preserve the

16  status quo while this case moves forward on the merits.  I

17  think both sides have indicated a real interest in moving

18  expeditiously in coming to a final resolution.

19         Look, frankly, the State wants to know what is going

20  to be the outcome of this litigation, we want to know what is

21  going to be the outcome of this litigation.  There is another

22  aspect of this, Your Honor, which is compliance is not just a

23  flick of a switch on and off.  These companies, if they were

24  to try to comply with some of these rules, which are

25  incredibly burdensome and in some instances I think frankly

1    impossible to comply with, you need a lot of lead time in

2    order to do that.  This is not something you can just

3    overnight come into compliance.  There's a whole, for example,

4    notification scheme in place where you have to send these

5    extraordinarily burdensome justifications of moderation

6    decisions.  That doesn't just happen magically.  These

7    companies don't have the infrastructure and systems in place

8    to do that.

9          So I do think it makes a lot of sense to just say

10   let's do what the purpose of an injunction in equity is; and,

11   that is, to preserve things while the litigation moves

12   forward.

13         If Your Honor would like to hear any more about it, I

14   know my colleagues and Ms. Eisenstein was prepared to address

15   either the vagueness issue or some of the other procedural

16   questions, but if Your Honor thinks that is not necessary, we

17   can reserve our time.

18         THE COURT:  It's up to you.  I gave you an hour, you

19   can use it any way you wish.  You're at 38 minutes.  So you

20   tell me what you want to do.

21         MR. KARANJIA:  Thank you.  Ms. Eisenstein, why don't

22   you just maybe touch on those points.

23         MS. EISENSTEIN:  Your Honor, very briefly.  Ilana

24   Eisenstein here on behalf of the plaintiffs.

25         Your Honor, just a brief word about vagueness, which

1    I think hasn't been touched on so far by my colleagues.  As we

2    argued in our briefs, the Act is unconstitutionally vague in a

3    number of problematic ways which the Eleventh Circuit in

4    *Wollschlaeger versus Governor* says it's particularly

5    problematic in the First Amendment context where it allows

6    administrative officials to act effectively to decide for

7    themselves what activities -- expressed activities to permit

8    and which they wouldn't.  And this Act is really squarely

9    afoul of that admonition.

10            You know, in that vein, the consistency provision,

11   which we haven't talked about yet today, the State focuses on

12   that provision in that what they're seeking to do is to have

13   these companies adhere to their announced standards, but, of

14   course, that is, as Mr. Willen discussed, that underlie that

15   contents moderation activity.  Similarly, provisions are

16   entirely unfair.  How those can put content --

17            THE COURT:  Let me get you to slow down a little bit.

18   I'm not getting a great transmission, so if you go a little

19   bit slower, I'll be able to hear you.

20            MS. EISENSTEIN:  Does that sound better now?

21            THE COURT:  I don't know that that was better, but if

22   it's slower it will be better.

23            MS. EISENSTEIN:  So on the consistency provision, I

24   was saying that it ignores the violative judgment that

25   underlie the content moderation.  So we gave examples in our

 1   reply brief of how it could be that, for example, artistic

 2   evaluations could be some sort of, quote, unquote, consent,

 3   which is one of the things the State relied on in its brief.

 4          On the opt out and post prioritization provision,

 5   those require that users opt out, that material is put not

 6   ahead, below, or more or less --

 7          THE COURT:  I'm really having difficulty with the

 8   transmission.  I don't know if there's any way you can -- I

 9   don't know why it's not working.  I told you I used to go to

10   the big building with the big computer, so I can't help you.

11   We are getting a lot of feedback.  I don't know if there are

12   papers between the microphone and you or --

13          MS. EISENSTEIN:  Are others hearing okay or is it

14   just -- no, I'm not coming through at all.

15          Let me switch to the other microphone.

16          Is that better, Your Honor?

17          THE COURT:  I think so.

18          MS. EISENSTEIN:  Okay.  On the opt out piece, and

19   then I'll conclude on the vagueness component, it's unclear

20   how you implement the requirement that materials cannot be

21   ahead of, below, in a more or less prominent position when it

22   comes to a fee or a service that is inherently ordered and

23   prioritized in accordance with the content moderation

24   provision.

25          On the vagueness component, it really strikes at the

1   heart of the subjective editorial policies that plaintiff

2   members engage in.

3          I just wanted to say one more thing about the

4   injunction bond that Your Honor asked Mr. Willen about.

5   Courts have regularly waived injunction bonds in the context

6   of the First Amendment.  Under Rule 65 the court has

7   discretion to waive an injunction bond when there is no danger

8   that the other side will incur damages pending the injunction.

9   And as my colleague said when talking about whatever

10  government interest is at issue here, it is clear that they do

11  not have a valid interest in advancing the statute much less

12  one that would lead them to incur damages pending the

13  resolution of this case.

14          THE COURT:  Thank you.

15          Then for the defense.

16          MR. BARNES:  Good afternoon, Your Honor.  My name is

17  Brian Barnes from Cooper & Kirk.  I represent just Defendant

18  Gillespie, but I'm going to speak to the issues -- all of the

19  issues on behalf of both defendants this afternoon, if that's

20  all right.

21          I would like to start with a case that probably won't

22  surprise the court that the plaintiffs just barely touched on

23  during their presentation which is the *Rumsfeld v. FAIR* case,

24  and we really view that case as the controlling precedent in

25  this case.  And one thing I note about *Rumsfeld* is I think

1   it's just definitively disproved sort of a central theory that

2   the plaintiffs are advancing on the First Amendment, which is

3   that there is this categorical First Amendment right to engage

4   in -- they call it editorial judgment, but I guess I would

5   characterize it as silencing particular voices that the First

6   Amendment always protects, and, you know --

7          THE COURT:  Let me ask you.  I've gone back and read

8   the decision, and I understand it's certainly one of the

9   decisions we need to be talking about.  If the law school put

10  a sign up outside the office that it made available to the

11  military recruiter and it says, we disagree with the

12  military's policy on gays, the law school would have been

13  perfectly free to do it --

14         MR. BARNES:  That's correct.

15         THE COURT:  -- but Facebook or one of these other

16  social media companies cannot do it under this statute.  I've

17  got that right, don't I?

18         MR. BARNES:  Not quite.  I think Your Honor is

19  referring to the definition of censorship which does have this

20  prohibition on adding an addendum to the posts of users.  I

21  don't think the statute would include within its definition of

22  censorship, for instance, a disclaimer put at the top of the

23  page that somebody maintains something like that, as opposed

24  to --

25         THE COURT:  You think it would be --

1          MR. BARNES:  I'm sorry, Your Honor?

2          THE COURT:  You think it would be perfectly okay for

3     Twitter, for example, to append to the post, put right there

4     with the post, when somebody posts something and it says, ABC,

5     some message that may be Russian disinformation, maybe

6     information on how to cure COVID, it's just not true, and

7     Twitter wants to put a tag on it that says this is contrary to

8     scientific evidence, or we think this came from the Russians.

9     You think it's okay for Twitter to append that to the message?

10          MR. BARNES:  I don't.  The distinction I'm trying to

11     draw here is between on the one hand, for instance, if

12     somebody went to the Facebook homepage or their Twitter

13     homepage, Twitter would be free under the statute to put a

14     disclaimer at the top of the page or wherever it wants on the

15     page saying whatever it wants on behalf of Twitter.  What

16     Twitter would not be free to do is to attach to the individual

17     post of the specific user, or at least that would qualify as

18     censorship under the statute, an addendum there.

19          And I guess the comparison I would draw, thinking

20     about the facts of the *PruneYard* case, in that case, you know,

21     obviously the California Supreme Court had recognized this

22     right of people to engage in certain types of political and

23     other speech on private premises, and the analogy I would draw

24     is, if in the facts of that case the shopping center had said,

25     well, you're allowed to come on to our shopping center and

1    engage in this speech, but anybody who does that has to wear a

2    dunce cap.  And the reason that that's something that the

3    shopping center could not have done, I think the right way to

4    analyze that is the time, place and manner restriction.

5          THE COURT:  Sure.  But the shopping center could put

6    up a big sign that said we disagree with this petition.

7          MR. BARNES:  Correct.

8          THE COURT:  Right there where anybody is looking,

9    coming up to the petition booth could see the sign that says,

10   owner of this shopping center disagrees with the petition.

11   The State didn't tell the shopping center one thing it could

12   not say, didn't tell them anything about where they could put

13   it or how they could put it, it restrained the shopping

14   center's speech not at all.

15         MR. BARNES:  That's correct.  Your Honor is

16   absolutely correct about that, and again the distinction I'm

17   drawing is between the shopping center putting up a sign next

18   to the protesters versus the shopping center effectively

19   changing the speech of the protesters themselves, and I think

20   that's the line that the court should draw.

21         One other thought here --

22         THE COURT:  I got it.  So you say the tag on the

23   tweet that says, this is disinformation, that's like wearing

24   the dunce cap.

25         MR. BARNES:  Exactly right.

1          THE COURT:  Got it.

2          MR. BARNES:  And one other thought on the addendum

3    provision while we are on it:

4          Obviously the statute has a severability provision,

5    and so to the extent the court concludes that that is a

6    constitutionally problematic provision of the statute, I would

7    urge the court to just strike down that provision and enjoin

8    the enforcement of that element of the definition of

9    censorship rather than taking the approach that the plaintiffs

10   are proposing which is basically to throw out the whole

11   statute.

12         So I think the court has identified, you know, a

13   unique set of issues that are specific to this one element of

14   the definition of censorship, but the problems the court is

15   pointing to don't infect the rest of the statute; in other

16   words, the other provisions of the law ought to stand to the

17   extent that the court is only convinced that the prohibition

18   on adding addendum to a post is constitutionally problematic.

19         Let me, if I may, return to *Rumsfeld* more generally.

20   And one of the key points I want to make here is that I think

21   *Rumsfeld* just definitively disproves really the central thesis

22   of the plaintiffs' theory of the case which is that there is

23   this per se rule that anytime anyone selectively chooses what

24   someone else will say, and they characterize this as editorial

25   judgments, but however you want to characterize it, that that

1   is just per se subject to strict scrutiny.

2        The thing to keep in mind about *Rumsfeld* is that the

3   law schools in that case, they were selectively trying to

4   limit, you know, the speech of recruiters who came onto

5   campus, and the blend of speakers that would come onto campus

6   and recruit their students in a way that reflected the law

7   school's values and their editorial judgments.  So too in

8   *PruneYard*, you know, that's the case where the shopping

9   center, there's all kinds of speech going on in the shopping

10  center, most of it is commercial speech, but that is a place

11  where the general public can come into and there's tons of

12  speech going on.  And the shopping center is saying, well, in

13  our editorial judgment, the kind of environment that we want

14  to create, the kind of community we want to build in this

15  place, we don't want to have this type of speech here.  And,

16  nevertheless, in both of those cases, the Supreme Court says,

17  there is no First Amendment problem because the host that is

18  being compelled to post these third parties, their speech is

19  not affected by that.

20        And so that leads me to what I think is a basic

21  analytical error that the plaintiffs are making in their legal

22  analysis, which is they want to say that the critical thing

23  for these purposes is just focus on whether or not somebody is

24  engaged in some type of editorial decision-making, and that's

25  not right at all.  The critical thing in cases like *Tornillo*

1    and *Hurley* is that at the end of the editing process, there is

2    a speech product that comes out of that process.  In *Tornillo*

3    it's the publication of a newspaper.  It's not editorial

4    judgment, it is the publication of a newspaper that is the

5    expressive activity that the First Amendment is protecting.

6    In *Hurley* it's the presentation of a parade.  It's not the

7    editorial judgment, the editorial judgment that triggers First

8    Amendment protection.

9            So the question the court has to focus on is not are

10   these social media platforms engaging in something that looks

11   like the editorial judgment of a newspaper, the question is

12   are they speaking, are they producing a speech product of

13   their own separate and distinct from --

14           THE COURT:  And that was part of the reason for my

15   question to the other side about, is part of this more like

16   the telephone that's just carrying content without regard to

17   what the content is, anybody can carry it.

18           Let me ask you the same kind of thing.  Can't I

19   divide up what these platforms are doing into two different

20   components, one closer to what a common carrier does, all

21   users can post material, but surely they are also speaking.  I

22   mean, when they put the tag on that says this is Russian

23   disinformation, that's speech, isn't it?

24           MR. BARNES:  I agree with you with respect to the

25   addendum, yeah.  So when Twitter adds an addendum to

1    somebody's post, that is speech.  So that's why we think that

2    that specific provision of the law has to be analyzed as to

3    time, place and manner restriction.  I will note that --

4            THE COURT:  That's a time, place and manner

5    restriction?  You've got to read what it says.  Isn't that

6    kind of --

7            MR. BARNES:  The analogy I would draw is to somebody,

8    you know, there's a speaker who is giving a speech in front of

9    a podium and somebody else leaps up in front of the podium and

10   prevents the listeners from hearing.  That's the kind of

11   limitations that this is.

12           THE COURT:  One of the provisions in the statute

13   applies to content that is by or about candidates.  That's

14   content-based, is it not?  Isn't that provision subject to

15   strict scrutiny because it's content-based under *Reed versus*

16   *Town of Gilbert*?

17           MR. BARNES:  Yeah.  So you only get there -- the

18   court only gets there if it concludes that the First Amendment

19   rights of the platforms are triggered, right?

20           So our position is that, under *Rumsfeld* and

21   *PruneYard*, there's not a First Amendment right.  So I guess to

22   try to put this in the rubric of *PruneYard*, again, if I could,

23   think about the facts of *PruneYard* and suppose there is a law

24   that says, you know, anyone can come onto the property for

25   purposes of speech about the political issues but not any

1    other types of issues.  So they turn the shopping center into

2    sort of a limited public forum in that way.

3           I think in that situation, there might be a question

4    about, you know, are the limitations on the use of the forum

5    unconstitutional, but the people who would be asserting a

6    First Amendment right there would be other people who have

7    been prevented from coming into the shopping center to express

8    themselves, right?  It wouldn't be the shopping center itself

9    because we've learned from *PruneYard* that in those

10   circumstances the shopping center just doesn't have a First

11   Amendment right.

12          So I think that's the right way to analyze the

13   provisions that relate to candidates or speech by or about a

14   candidate is -- you know, these plaintiffs just don't have a

15   First Amendment right to basically object to the restrictions

16   that the State is imposing.

17          Just to -- well, we talked a little bit about

18   *Rumsfeld*.  Let me try to -- the parties here are maybe a

19   little bit like ships passing in the night, and let me try to

20   take on the other side's best case, which I think is *Tornillo*,

21   and speak directly to sort of the newspaper analogy that they

22   are trying to draw, if I could.

23          So I think that a newspaper -- editing a newspaper is

24   fundamentally different from the kind of conduct that is being

25   regulated on the part of social media platforms here, and it's

1  different in a few ways.  One, when you pick up a newspaper,

2  there's an understanding that the editors of the paper in some

3  sense stand behind the articles and the editorials in the

4  paper.  Obviously not every op-ed that's run by The New York

5  Times is something that the people, the editors of The New

6  York Times agree with, but at a minimum they are signaling

7  that the stuff in our paper is stuff that's worthy of

8  consideration, you know, that reasonably educated people know

9  about, is material that is worthy of thought at an absolute

10  minimum.

11        There's a fundamental difference here when we're

12  talking social media platforms because unlike a paper that in

13  some sense adopts as its own all of the material in the

14  newspaper, that is not true at all for these social media

15  platforms.  And we quote in our brief, and the other side

16  tellingly say nothing about it, the terms of service of these

17  social media platforms, every one of them, says something to

18  the effect of:  We are not responsible for the stuff on our

19  platform.  The Twitter one even goes further than some of the

20  other ones and says:  We may not even have reviewed the stuff

21  that's on our platform, don't hold us accountable for the

22  material that we are hosting.

23        And, you know, that is really the fundamental

24  difference between the social media platforms and the

25  newspaper, and I think it's very hard for these plaintiffs to

1    claim on the one hand that they have this, you know, this core

2    First Amendment interest in the material that's on the

3    platform, while on the other their members are actively

4    dissociating themselves from the material that they host.  So

5    that's a critical point, and the other side hasn't responded

6    to it.

7              Another difference between a newspaper and a social

8    media platform that I think is relevant here is --

9              THE COURT:  Let me get you to hold that thought.  Let

10   me ask this:

11             It seems to me that -- you're absolutely right.

12   That's a substantial difference between a newspaper and a

13   typical social media site.  But I don't think it's a hundred

14   percent on each side the way you suggest it.  You're right,

15   any newspaper worth its salt runs some material from the other

16   side or at least pretends to give the other side something, so

17   maybe it's -- I mean, it's probably a hundred percent content

18   chosen by the newspaper, but it's maybe 98 percent that we

19   agree with and two percent that we don't agree with at all.

20             On the social media site on the other hand, it's not

21   a hundred percent stuff provided by the users.  The social

22   media sites do have some of their own material, and they

23   curate it, so maybe it's 98 percent user driven and two

24   percent, but there is an element on each side.

25             Where do you think the line is and how should a court

1    decide?  Is it majority, is it -- how would I decide?

2            MR. BARNES:  I think the line to draw is between -- I

3    would draw a sharp line between material that the platform

4    itself has produced versus material that the platform is just

5    hosting that other users have produced.  I think that's the

6    sort of constitutionally relevant distinction.  And, you know,

7    I think that turns out in the *Turner I* decision where one of

8    the things that the cable operators there were objecting to

9    was the fact that -- they were basically saying, by having to

10   carry these network broadcast channels, we have some of our

11   own content, like our own channels that we own or we're

12   affiliated with that we now cannot run.  And I haven't heard

13   the plaintiffs saying that.  In other words, the mere fact

14   that they would be required under some circumstances to host

15   speech that they object to, I haven't heard them say that that

16   prevents them from presenting other speech the way it did in

17   *Turner I*.  And that makes it right because a newspaper or a

18   cable operator, at least a cable operator back in the '90s,

19   they were subject to these physical limitations on the

20   capacity of the medium that they were dealing with.  It's key

21   to *Tornillo* that -- the must-carry provision, the paper was

22   going to leave material that they otherwise would have

23   included in the paper on the cutting room floor.

24           THE COURT:  I thought part of -- maybe I had it

25   wrong.  It's been a few days since I've read it, but I thought

1 part of what the court said was, yeah, this may cause them to

2 leave out content but the decision would be the same either

3 way.  Didn't the court say that?

4      MR. BARNES:  It's been a couple of days since I've

5 read it myself, so I would have to go back --

6      THE COURT:  Fair enough.

7      MR. BARNES:  Certainly, at a minimum, that's a key

8 element in *Turner I* of the legal analysis.

9      THE COURT:  One thing *Tornillo* did clearly say is,

10 don't go telling us that the nature of providing information

11 to the public has changed since the First Amendment was

12 adopted, the argument that there are few newspapers and it's

13 an entirely different market than it was, that doesn't have

14 anything to do with it, right?

15      MR. BARNES:  *Tornillo* does say that.  I think

16 *Tornillo* has got to be read through the lens of *Turner I* which

17 uses a more modest form of First Amendment scrutiny because of

18 the bottleneck position that the cable operators had.  I think

19 the court has put its finger on a way in which *Turner I* may

20 have shifted the law a little bit on this, but obviously I

21 think *Turner I* is the controlling precedents on this point.

22      THE COURT:  One thing -- I'm going to interrupt you a

23 little bit, but I'll give you time, and I'm going to have some

24 more detailed questions later.

25      One thing that surfaces in some of the comments

1    during the legislative process, at least, is these people are

2    monopolies, they control.  Facebook controls what people get,

3    Twitter controls what people get.  And I kind of scratch my

4    head at that, I'm thinking, compare during a campaign, not for

5    President or for statewide election, but for mayor of Miami,

6    compare the amount of the Miami Herald's control over news

7    about that election to Facebook's control over the news of a

8    Miami mayoral election today.  And my suggestion to you is:

9    The Miami Herald had a multiple of what Facebook has in terms

10   of control over the information that gets to voters in Miami.

11        MR. BARNES:  Your Honor, I think that's a question of

12   fact.  You know, we do have material in the appendix that says

13   that it's something like 70 percent of people that get their

14   news through social media platforms.

15        THE COURT:  I read those things and it's probably

16   scary for all of us.  But I don't think it said that 70

17   percent of people get their news only through Facebook or

18   social media sites, not all Facebook.  But for those that do,

19   some of that news that they get through Facebook started with

20   the Miami Herald.  So it's hard to know.

21        I guess I go back and vote the privilege of age.  I

22   was alive back then, and I can tell you that in Tallahassee,

23   this right to reply thing was kind of a big deal, because

24   there was one newspaper in Tallahassee, and if you were

25   running for office and got that newspaper's endorsement, it

1   probably gave more control than you would have with Facebook

2   today.

3            MR. BARNES:  I don't know.  This may be something the

4   parties need to explore through discovery depending on where

5   the court goes on some of these legal issues.  I guess all I

6   can say is my understanding of it is that the social media

7   platforms are profoundly important to the ability of a

8   political candidate or just anybody who is trying to get the

9   word out about anything, a profoundly important way of

10  reaching the public.  And we may have a factual dispute about

11  that but, you know, I think that's certainly the State's

12  position, at least, you know, pending development through

13  discovery.

14           If I could, there is one point I wanted to highlight.

15  I think the court averted to it, trying to get back to my list

16  of differences between social media platforms and the

17  newspaper.

18           One of them is that the editors of a paper

19  affirmatively select the stuff that goes into the newspaper,

20  and the social media platforms they don't do that.  They

21  passively allow the public to post material on to their

22  platforms and then it's subject to content moderation.  And I

23  think that's an important distinction between these two media,

24  and the reason it is important is because the editors of a

25  newspaper have essentially total control over what's in a

1    paper.  In contrast, if you're looking at the material on a

2    social media platform, you know, Twitter says in its terms and

3    service they don't even necessarily review everything that's

4    up there.  And so, if I'm just from the perspective of a

5    reader or a reviewer of these materials on the social media

6    platform, the extent to which I can infer some message that's

7    being communicated by the platform as opposed to the

8    individual user who posted material on the platform is very,

9    very different from what we're talking about with a newspaper.

10         Another difference between social media platforms and

11   newspapers is:  I would describe a newspaper as a single

12   speech product.  And what I mean by that is you can pick up a

13   newspaper and read it cover to cover, and hopefully if the

14   editors are doing a good job, the articles and op-eds will be

15   sort of in dialogue with each other and there's an

16   overarching, coherent idea or set of ideas or themes that the

17   paper presents.  That's just not true for the universe of

18   material that appears on a social media platform.

19         I looked it up.  I think there's something like two

20   and a half billion Facebook pages in the world, and the idea

21   that that universe of material posted by all kinds of people

22   about all kinds of things across time, that the idea that that

23   universe of material is somehow expressing a message on behalf

24   of Facebook, I think is wrong.  And that's a critical,

25   critical difference between the social media platforms on the

1    one hand and a newspaper on the other.

2         And the final point I'll make, and we talked about

3    this a little, is the fact that the newspaper was subject to

4    the physical limitations of physical media.  And, you know,

5    there is no suggestion that, if the social media platforms are

6    required to carry a particular post or a particular candidate

7    page, or whatever it is, that that is going to somehow prevent

8    them from carrying other material that they want to carry much

9    less their own material.  So that's another big difference

10   between the newspaper on the one hand and the social media

11   platform on the other.

12        One other point I want to make I guess on the

13   plaintiffs' broader theory that editorial judgments are just

14   per se protected by the First Amendment and subject to strict

15   scrutiny, even apart from the fact that *FAIR* and *PruneYard* I

16   think just forecloses that theory of the case, you know, let

17   me point back to net neutrality.  Here's the hypothetical that

18   if I were the court I would put to the other side:

19        Let's say AT&T decides to exercise its editorial

20   judgment by blocking internet users access to Facebook.  Does

21   AT&T have a categorical First Amendment right to exercise its

22   editorial judgment that way?

23        The other side, somewhat to my surprise, they suggest

24   that these common carrier analyses is just not a thing with

25   respect to the First Amendment.  There's not a lower degree of

1    First Amendment scrutiny that common carriers receive; but, if

2    that's right, then it seems to me that the D.C. Circuit's

3    decision in *U.S. Telecom Association* was wrong.  And I don't

4    think that's a position that most of the entities in this

5    industry would actually defend.

6        Let me say a few words, unless the court has more

7    questions on the newspaper, let me shift gears, if I could,

8    and just say a few words about what this law does and what it

9    doesn't do because I think a lot of the arguments we heard

10   from the plaintiffs really attack a strawman.

11       This law does not prohibit content moderation.  It's

12   just not something the law does.  It requires social media

13   platforms to announce in advance what their content moderation

14   rules are and then to apply those rules in a consistent

15   manner.  But it doesn't, you know, allowing this law to go

16   into force doesn't mean social media platforms at all have to

17   just abandon the work of filtering content.  They just have to

18   do it in a way that is consistent, and that's something that a

19   lot of them purport to do already.

20       THE COURT:  Doesn't it block content moderation if

21   the speaker is a journalistic enterprise or if the content is

22   by or about a candidate?

23       MR. BARNES:  It does -- well, with respect to speech

24   by or about a candidate, I don't actually think there is a

25   prohibition on censorship per se.  So there's a prohibition on

1  deplatforming the candidate, and there's also limitations on

2  the ability to basically post prioritize and shadow ban the

3  candidate, but I don't think censorship itself is prohibited

4  with respect to the candidate.

5         So for post by or about a candidate, at least as I

6  understand the law, as long as the social media platform had

7  rules that it announced in advance and applied the rules in a

8  consistent manner, I think the normal rules would go.

9         With respect to the journalistic enterprise, which

10  the court is right that content moderation there is limited,

11  and I guess I would just say there, you know, one thing to

12  note about that provision of the law is that it does -- it

13  only restricts pulling down a journalistic enterprise's

14  material based on the content of the material.  So some of the

15  scary-sounding hypotheticals that show up in the declarations

16  suggest, well, we're going to have these foreign agents that

17  are, you know, journalistic enterprises, they have an FCC

18  license to operate a cable channel and they have a hundred

19  thousand users, or whatever it is, they qualify as a

20  journalistic enterprise.  And actually the way I read the law,

21  if, you know, Twitter wanted to ban a journalistic enterprise

22  not because of the content of its speech but because with its

23  affiliations with a foreign government, I think it could do

24  that.  So that's another way in which the other side I think

25  is exaggerating the consequences of the law that Florida has

1  passed.

2          THE COURT:  But if it was just repeating, out of

3  ignorance or whatever, disinformation sponsored by a foreign

4  government, Twitter would be forbidden from taking it down,

5  true?

6          MR. BARNES:  Twitter would be forbidden from taking

7  it down.  I don't think Twitter -- well, one thing to note

8  here is, none of these provisions prevent a user from opting

9  out of information.  Another one of the examples that the

10  declarations use is, you know, say YouTube sets up some sort

11  of, you know, optional opt-in arrangement for children where

12  you can make sure that, you know, your children will be able

13  to view only, you know, videos that are on YouTube that are

14  approved for kids.  I don't think there would be any problem

15  with that at all under the statute, even with respect to the

16  journalistic enterprise provision.  I think it would be easy

17  enough for -- the correct reading of the statute would allow

18  YouTube to say, if you want, you know, to set up your account

19  in a way that opts out exposure to this or that category of

20  journalistic enterprise because the material is going to be

21  viewed by children or just because you don't want to see it as

22  a user, that would be totally fine.

23          THE COURT:  But how do you square that with the other

24  user who produces the bad content telling Twitter do not post

25  prioritize, shadow ban my filing?  The other user who produces

1    the bad content gets to opt out of these protective devices,

2    doesn't that user?

3         MR. BARNES:  That's not how I read the statute.  I

4    don't understand the journalistic enterprise to have a right

5    to opt out.

6         THE COURT:  I'm just talking about any other user.

7    I'm talking about bad guy that wants to groom a child for

8    sexual exploitation.  Let me tell you, I preside over those

9    cases, so it happens.  Candidly, I used to be concerned

10   sometimes when it was an FDLE agent, law enforcement agent

11   that was online that maybe we were catching people that

12   wouldn't do it otherwise, but then I started presiding over

13   the cases where it was real kids and an effort to hookup, and

14   so that stuff goes on.

15        So you've got bad guy that wants to groom a child,

16   and bad guy says to social media platform do not post

17   prioritize, shadow ban, censor my stuff.  They can't say that?

18        MR. BARNES:  No, that's not how I read the statute.

19   My interpretation of the statute is that it's the viewer who

20   is entitled to opt out of the post prioritization stuff, it's

21   not the person who posts.  You know, admittedly, the statute

22   will emit more than one reading, but I think that's the best

23   construction.  And I think the other side suggests that there

24   is a void for vagueness problem here, but all we really have

25   identified here is an ambiguity not a vagueness.  There are a

1    couple of different ways of reading this, and our reading is

2    that the viewer can opt out of post prioritization in the

3    material that is produced, you know, that's shown to them, but

4    the person who posts material cannot.

5            THE COURT:  Let me walk through -- I don't want to

6    cut you off.  I don't know how far you are.  I've got some

7    real nitty-gritty kind of questions that -- I have asked

8    several questions, you're very helpful in your response.

9    Frankly, that's the biggest reason why I have these hearings,

10   sometimes it very much helps to raise an issue and get a

11   response.  I've got some of these.

12           MR. BARNES:  I'd much prefer to answer the court's

13   questions than just talk at length about things that the court

14   is not interested in.

15           THE COURT:  All right.  Journalistic enterprise with

16   the different treatment includes CBS but those things don't

17   apply to ABC.  You say in your brief in a footnote, well, that

18   survives intermediate scrutiny but you don't say how.  And I'm

19   just saying:  How can this statute apply to CBS and NBC and

20   Fox News and not ABC?  Explain that to me.

21           MR. BARNES:  I guess I would say two things:

22           One is we don't have or I haven't seen evidence with

23   respect to this theme park exception.  I haven't seen evidence

24   that entities that operate theme parks also have social media

25   platforms that are subject to the problems that --

```
 1              THE COURT:  Well, you know ABC does.
 2              MR. BARNES:  What is the social media platform that
 3  ABC has?
 4              THE COURT:  Well, you go on to ABC's website, and you
 5  read what they say, you post things, you post comments, you
 6  exchange stuff.  Doesn't every one of those stations, networks
 7  have a social media platform?
 8              MR. BARNES:  I guess I'm not certain of the answer to
 9  that.  At least to the best of my knowledge, there's nothing
10  in the record suggesting that any entity that operates a theme
11  park has a social media platform of the sorts that we are
12  really focused on with the statute much less that it operates
13  a social media platform that's been subject to the problems
14  that we point to as sort of the rationale of the law.  So I
15  guess that's my answer on intermediate scrutiny.
16              But the other thing I would emphasize, and I think we
17  say this in footnote two, but that provision is severable.  If
18  the court is persuaded that the theme park exception is
19  problematic, then the proper remedy is to strike the
20  exception, it's not to strike down the whole law.
21              THE COURT:  Well, why is that?  Explain that to me.
22  Why is the answer -- I mean, you've got an equal protection
23  problem.  You've got two entities, they are exactly the same,
24  one is subject to this statute and one is not.  With a
25  severability provision, how do I know whether the right answer
```

1    is strike the exception or to strike the rest of the statute?

2    You've got to make it equal somehow.  How do I know which way

3    to go?

4         MR. BARNES:  Yeah, this is the problem, sort of

5    leveling up versus leveling down.

6         THE COURT:  Exactly.

7         MR. BARNES:  And I think the right answer is, you

8    have to draw an inference about what the legislature would

9    have wanted.  I mean, that's kind of the MO of severability

10   analysis.  Here, I don't frankly think that's a close

11   question.  I don't think the passage of the whole law turns on

12   this tiny exception that the other side likes to focus on.

13        THE COURT:  You don't think?  Everybody who saw this

14   had to know, had to know, that this was a major constitutional

15   issue, and yet even in the face of this major constitutional

16   issue, they did not vote to make Disney, Universal, Disney

17   thus ABC, subject to this law, and you want to infer that they

18   would be willing to put Disney and Universal Studios under

19   this law even though nobody voted to do it?  I'm going to make

20   this apply to somebody that no legislator has ever said should

21   be subject to these requirements?

22        MR. BARNES:  I don't understand there to be any per

23   se rule that says you always level down rather than leveling

24   up in this type of situation.  The point the court is making I

25   think would apply equally in every situation where this

1    problem comes up.  And, you know, again, if you think about

2    this exception in the context of the broader law and the

3    broader issues that the law is seeking to address, and couple

4    that with the fact that, at least to my knowledge, there is

5    not any evidence out there that, you know, these requirements

6    really have meaningful application in that ABC or Universal

7    Studios does.  I mean, I think all that together, it's clear

8    that the exception should fall rather than the rest of the

9    law.

10            THE COURT:  Let's work on some of this nitty-gritty.

11   I now have my definition of "user" in front of me.  I think

12   the bad guy that's trying to groom the minor is plainly a

13   user.  "User means a person who resides or is domiciled in

14   this state and who has an account on a social media platform

15   regardless of whether the person posts or has posted content

16   or material to the social media platform."

17            Now, how is my hypothetical bad guy not a user?

18            MR. BARNES:  I'm sorry.  I'm going to go off camera

19   to grab my copy of the statute if I may.

20            THE COURT:  Please.  Good.  Thank you.

21            MR. BARNES:  I think you're right.  I think the court

22   is correct that the bad guy is a user.

23            THE COURT:  And so the bad guy can tell the social

24   media platform, don't censor my stuff, don't post prioritize

25   my stuff, don't shadow ban me.

1          MR. BARNES:  Right.  You know, I guess I would say

2    there, it's important to construe this provision in a way that

3    makes it coherent, basically.  And you can't -- it wouldn't be

4    possible to honor sort of both at the same time, right?  In

5    other words, the person who is posting says, I don't want this

6    post prioritized and the person who is viewing says I do want

7    it post prioritized.

8          THE COURT:  But there is nothing in this statute that

9    gives the one that does want it prioritized the authority to

10   insist on that.  The only thing the statute says, a user can

11   forbid it, it doesn't say a user can require it.

12         MR. BARNES:  Right.  Again, our reading of this

13   provision is that the provision only applies to the viewer as

14   opposed to the person who is engaged in the post.

15         THE COURT:  I hear you.  Let me tell you one problem

16   I think you have with this, and we're going to work through

17   the rest of these.

18         The Florida Supreme Court, maybe more than any court

19   in the history of American jurisprudence, says, just read the

20   words, don't talk to me about context, don't talk to me about

21   legislative purpose, don't talk to me about legislative

22   history, don't talk to me about what makes sense, just read

23   the words.

24         Let me go to the next one.  Social media platform.  I

25   need you to explain to me what is and is not a social media

 1   platform.  This is the same statute.  It's one above.  You

 2   were looking at (1)(h), now you're looking at -- yeah, it's

 3   501.2041(1)(h) and now we're going to (1)(g), social media

 4   platform.

 5          I want to talk about a retailer, and we can just go

 6   up the street here and go right down the row:  Walmart,

 7   Target, Hobby Lobby, Home Depot, Lowe's, PetSmart, one right

 8   after the next.  They all have a website.  You can go on the

 9   website, you can do a search, try to find stuff in their store

10   that they can sell you, you buy their stuff, you can post

11   comments.

12          My first proposition to you -- and, if I'm wrong, you

13   need to explain it to me -- take any one of those, call it XYZ

14   Retailer.  Why isn't their website a social media platform as

15   defined in this statute?

16          MR. BARNES:  I think it might be, but the thing I

17   would note there is the substantive provisions -- the great

18   majority of the substantive provisions of the law are tied to

19   a social media platform's treatment of users.  And as the

20   court was just looking at that definition, a user is somebody

21   who has to have I think an account and, you know, at least as

22   I understand the definition, it also involves the user has the

23   capacity to post, even if maybe they haven't posted, they have

24   the capacity to post.  We're talking about the Home Depot

25   website, I'm not sure that that's going to click that bar.  I

1   don't think the Home Depot website is presenting user posts in

2   any particular order in a way that would trigger the

3   substantive provisions of the law.

4          THE COURT:  Well, let me tell you some of the things

5   they do have.  You do have accounts.  I don't do a lot of

6   shopping but I've got accounts at these places, and I go on

7   and order stuff and get it.  They will save my credentials,

8   they'll save my credit card, I don't usually let them to do

9   that, but they can do all that, and they do let you post

10  comments about their stuff.  And they do a lot of moderation

11  because when I go on and search for a ladder, they are going

12  to get me to a ladder, and I may be able to put in other

13  criteria, and they will get me to the product I want.

14         Let me take it one farther.  Not the XYZ Retailer's

15  public website where customers go on and order equipment,

16  let's talk about the company's intranet.  They've all got

17  intranet, the executives talk to each other.  They certainly

18  post content back and forth.  Why isn't that a social media

19  platform?  What part of this definition does the intranet not

20  meet?

21         MR. BARNES:  Again, I think my answer is the same as

22  the one I gave with respect to the XYZ Corp, which I don't

23  think most of these substantive provisions -- the substantive

24  provisions of the law, even if the intranet qualifies as the

25  social media platform under the strict terms of the definition

1    of the phrase, I don't think the substantive provisions of the

2    law would have force with respect to that intranet.

3           If I could on the ladder for just a moment.  The

4    ladder is material that has been posted by Home Depot or XYZ

5    Corp on the page as opposed to it being posted by a user, and

6    so I don't think the presentation of the ladder on the website

7    is actually going to be regulated.

8           THE COURT:  That's probably right.

9           So now we're on the intranet.  One of the executives

10   says, you need to vote for this candidate, and the people

11   that -- the company says, we're not going to use our intranet

12   for that kind of politicking back and forth.  Now they have

13   to, right?  Now they can't take it down.

14          MR. BARNES:  Well, I think I'm still resisting the

15   premise that the intranet is subject to this law; but, if the

16   company has a policy that says, even accepting the premise, if

17   the company has the policy that says we don't have political

18   stuff on our intranet, I think they can consistently enforce

19   that rule.

20          THE COURT:  Well, I'm not sure.  Let me ask you

21   another one.

22          Suppose they've got a person who works there and

23   decides, I'm going to run for office, I'm going to run for the

24   town council; and, by the way, I'm going to come out strongly

25   pro choice.  It turns out the company is privately held and

1  very much antiabortion, has let it be known publicly we are

2  antiabortion, we are against the contraceptive mandate, we've

3  taken strong positions.  And this employee now is going to

4  come out and say, I'm an employee of this company and I'm pro

5  choice and I disagree with the company.

6          I don't want to put you on the spot by saying, can

7  that company fire the employee, but you probably don't like

8  it, I suppose they can fire him or the person quits, the

9  candidate quits, and -- but then says, I want to get to my

10  stuff on the intranet for the next 60 days, you cannot delist

11  me, you cannot take me off of the intranet for 60 days,

12  because that's what this statute says.  You've got to give

13  this person access to all of his stuff.  I don't know a

14  company in America that lets somebody have access to their

15  intranet for 60 days after they leave their employment.  Might

16  even go to work for a competitor.  Really?  Why are we doing

17  this?

18          MR. BARNES:  I guess the place I get off the bus in

19  that hypothetical is I'm not sure the intranet employee has an

20  account, at least as I would understand that term under the

21  definition of user.  I think it's reasonable to read the

22  statute as not applying in that scenario.  The other --

23          THE COURT:  You think it would be unfair to say you

24  have an account on your firm's intranet.

25          MR. BARNES:  I don't think it would be unfair to say

1    that, but I also don't think it would be unfair to say that an

2    employee's access to the intranet is not an account on a

3    social media platform.

4         THE COURT:  But that depends on what a social media

5    platform is.  That's what we just went through.

6         I guess the premise of the question is this:

7         It just seems to me that you can only make sense out

8    of this statute if you know what the legislature must have

9    meant not what it said, and I think that's a hard argument in

10   Florida where the court says just read the words.

11        MR. BARNES:  I guess one thought on this I guess

12   general topic is this is ultimately a question for the Florida

13   courts, obviously, how to answer these questions.  I'm doing

14   my best to deal with the court's hypotheticals, but these are

15   questions that presumably will be litigated in state court if

16   the law was permitted to go into effect.  I'm not burdened

17   with the extensive knowledge of Florida statutory

18   interpretation case law but I'm sure the court is, but, you

19   know, I would submit that there is a fair argument that the

20   sort of absurd applications that the court is identifying

21   wouldn't be held to fall within the statute.

22        THE COURT:  Fair enough.  Fair enough.

23        MR. BARNES:  I don't know if the court has other

24   questions.  I'm happy to talk about some of the other issues

25   in the case.  As I say, I want to be as useful as I can.

```
 1          THE COURT:  Let me look at my list of things I wanted
 2   to make sure I asked you about.
 3          Here's my other -- and the answer may be the same
 4   thing, that this can't possibly be what the legislature meant,
 5   but one of my professors used to say, when in doubt, read the
 6   statute so I started by reading the statute.
 7          I go to Orlando and I need to find somewhere to eat.
 8   So I go on the app that I use to find a restaurant, and what I
 9   would like is an Italian restaurant, and, of course, I want it
10   as close to me as it can be, but the hamburger stand on the
11   other end of town has told the app, the social media platform,
12   do not post prioritize my stuff.  Can the app still give me
13   the close-by Italian restaurant or does it have to give me the
14   more recently posted hamburger stand piece?
15          MR. BARNES:  Again, my answer is the same as the
16   hypotheticals with child molester that it's up to the viewer
17   as opposed to the poster.  The poster doesn't have a right to
18   opt out of the post prioritization, it's the viewer that does.
19          THE COURT:  As the viewer, do I have to tell the app
20   that I want my stuff based on closest?  I never tell this app
21   anything, I just download the app and go.
22          MR. BARNES:  That's a great question.  The way I
23   understand the requirement under the statute, it would be
24   something you would opt out of, the post prioritization; and I
25   think, just as a factual matter, a lot of these platforms do
```

1   allow you to present search results in a particular way.  So,

2   you know, just to use an example, you know, specific to the

3   post prioritization, if you go to Twitter or if you go to

4   YouTube and you run a search, I believe that one of the

5   options there is to have the search results return to you in

6   chronological order, which is how we understand the post

7   prioritization requirements.

8        And that actually points to I guess the broader theme

9   of this law, I would submit, which is basically giving the

10  user more control.  And, you know, if people don't want to see

11  the bad material to the extent it has to be put up under this

12  law, I think it's a much more limited extent than the other

13  side suggests, the user always has the ability to say, I don't

14  want to see posts from this entity anymore, I don't want

15  material like this on my news feed that is presented to me any

16  longer, and that's perfectly fine under the statute.

17       THE COURT:  I'm wondering how that would work

18  practically.  And one example that occurred to me, you know,

19  there was a time a lot of years ago now, happily, ISIS was at

20  its heyday, and as I understand it there were Americans who

21  were decapitated and shows posted.  I don't want to see that.

22       How would I know -- how would I make sure that that

23  doesn't show up in my feed?  Because I guarantee you there's

24  got to be a journalistic enterprise that is willing to put

25  that stuff up if only to prove that it has the right to put

1    that stuff up.  And how am I going to make sure that doesn't

2    show up?  I don't know who to say keep off of my feed.  How am

3    I going to do that?

4         MR. BARNES:  The platform can give you an option to

5    opt out.

6         THE COURT:  Of what?

7         MR. BARNES:  So just as with, you know, the material

8    that YouTube presents to children, I think if the user chooses

9    to opt in to some kind of additional limitations on the

10   material that they are going to be presented in, the user has

11   the right to do that, or certainly there's nothing in the law

12   that prevents the social media platform from allowing an user

13   to do that.

14        THE COURT:  They can do it, and if I knew about it I

15   could find it and I could somehow flag in advance something

16   that would cover this.

17        MR. BARNES:  Right, right.

18        THE COURT:  Wouldn't it be better if I can just go on

19   Facebook and not have to worry about seeing something like

20   that?

21        MR. BARNES:  Well, I think the court's questions,

22   they mostly focus on this post prioritization element of the

23   law.  It is important to keep in mind that there are several

24   categories of activity by the social media platforms that are

25   regulated here, right?  So a lot of the sort of absurd results

1    that the court is identifying, they go specifically to how

2    material is algorithmically presented.  But it's important to

3    keep in mind that the law also regulates basically the ability

4    of a social media platform to completely remove a user or to

5    completely remove material.  And I don't think that the

6    hypotheticals the court is identifying would be sort of

7    equally applicable to those other types of activities that are

8    regulated.  And again, I just point the court back to the fact

9    that there is a severability clause in the statute.

10          THE COURT:  Fair enough.  Tell me about the 30-day

11   requirement.  All of a sudden there is the beheading and maybe

12   the rule doesn't quite get it, and they need to stop this

13   before it gets out, but they're only seven days into the cycle

14   so they have to wait 23 days before they change the rule and

15   take it down.  What legitimate purpose does that serve?

16          MR. BARNES:  I'm quite confident that in the real

17   world these platforms will have rules, I mean they already do,

18   written rules that cover the kind of beheading video that the

19   court is talking about.  And the statute is only mandating

20   that those rules be applied in a consistent manner.

21          I don't really understand -- the premise of a lot of

22   the things that are said in the declarations, I guess, I've

23   never been able to wrap my head around is that every time

24   there is some new type of really problematic content, they've

25   got to go and change their content moderations.  I don't know

1    why that has to be true.  And I think the beheading videos are

2    a perfect illustration of that.  I'm quite confident that even

3    before the first of those horrific videos came out that all of

4    these platforms had some kind of written rule that would have

5    covered that and allowed them to take it down.

6              THE COURT:  Let me ask another question and see how

7    they are supposed to deal with this.

8              There are two posts.  Both say there is no COVID,

9    it's all a hoax.  Does the social media platform treat them

10   the same?  Two different people posting.  It seems an obvious

11   question, yes, except that one of the people that posted is a

12   candidate.  Now what do they do?

13             MR. BARNES:  Well, again, I don't understand the -- I

14   don't think the Act regulates candidate censorship.  That's

15   just not -- I think to the extent that the social media

16   platform was pulled down, censors that material consistent

17   with its existing rule from an individual who is not a

18   candidate, I think they can do the same with a candidate.

19             THE COURT:  All right.  Fair enough.  Removing it

20   entirely is not post prioritization.

21             MR. BARNES:  Right.  That would qualify as

22   censorship.

23             THE COURT:  So they can't put the candidate's post

24   ahead or below or in a more or less prominent position than

25   others.  They could do that to the other user.

1          MR. BARNES:  That's correct.

2          THE COURT:  If they can't put it ahead of, below, or

3     in a more or less prominent position, where can they put it?

4          MR. BARNES:  Yeah.  So we read that language to

5     basically mandate chronological presentation.  So if, you

6     know, Candidate X is in the universe of people whose material,

7     you know, you are normally presented with as a user, and as

8     soon as the material is presented or posted by the candidate,

9     it would show up at the top of your news feed, or whatever is

10    presented, you know, the thing is that the platform is showing

11    the user.  And then from that point forward, the candidate's

12    post would -- basically it could be placed behind any more

13    recently created material that the algorithm says is going to

14    be of greater interest to the user.

15         THE COURT:  And I know that because that just makes

16    sense even though it's not what the statute says.

17         MR. BARNES:  Well, I don't think what I just said is

18    inconsistent with what the statute says, but I -- the way I

19    read that language, it's basically saying you can't treat

20    their -- this type of post in a special way that's different

21    from other posts.  So that's our understanding of it at least.

22         I have a couple of other points that I would like to

23    make if I could.

24         THE COURT:  Yes, please.  I have taken all of your

25    time.

1            MR. BARNES:  I don't want to burden the court with a

2      broad recitation of the stuff we say in our briefs, so let me

3      hit a few points that, you know, maybe weren't fully developed

4      in the brief we filed or in our response.

5            THE COURT:  All right.

6            MR. BARNES:  So one thing before we move off entirely

7      from just the right way to interpret the statute, I think it's

8      very significant, thinking about the consistency requirement,

9      that the statute uses the phrase "consistent manner" as

10     opposed to just "consistent," and the way we understand that,

11     you know, some of the declarations suggest that this law just

12     imposes strict liability for any error that is made of any

13     sort in content moderation.  So you leave -- you pull down 999

14     beheading videos and you accidently leave one up, well, you

15     just violated the statute 999 times.  That's not how we

16     understand the statute at all, and the reason is because of

17     that word "manner."

18            And the way we understand "consistent manner" is

19     basically it's saying that the process that the social media

20     platform has has to be sort of aimed at consistent and

21     faithful application of the previously disclosed rules.

22            And so a scenario where that might be violated is if

23     you've got somebody who says in their content moderation

24     department of one of these social media platforms, yeah, I

25     know what the rules say, but, you know, any posts that use the

1   F-word, even though the F-word is against our rules, any post

2   that uses the F-word and criticizes President Biden, they have

3   to stay up, we're not going to take those downs.  So, if you

4   have a pattern or practice or a policy like that that deviates

5   from the written rules, that's when you have a violation of

6   the statute.  It's not every time someone makes any sort of

7   mistake in terms of their content moderation.  You've got to

8   have a process that is aimed at faithfully applying the rules.

9          You know, one maybe helpful point of analogy here is

10  to the way that judges interpret statutes.  You know, there's

11  a set of principles that courts apply when they're engaged in

12  statutory interpretation.  And in the individual application

13  of those principles people can disagree, there are lots of

14  edge cases and hard questions of statutory interpretation.

15  But if everyone can agree on the manner in which a statute

16  should be interpreted and, you know, faithfully applies that

17  in a good-faith effort to kind of apply the rules the way that

18  they are written, you know, that's -- on our reading of

19  consistent manner, that's good enough, there is not a

20  violation of the statute.

21         THE COURT:  I'm pleased to say that every time I get

22  it wrong, and I do from time to time, nobody says I owe a

23  quarter million dollars.

24         MR. BARNES:  And I don't think anyone would say the

25  fact that the courts, you know, the different judges disagree

1   on the application of the particular statutory interpretation

2   means that the courts are not applying the rules of statutory

3   interpretation in a consistent manner.  There are just hard

4   cases and edge cases, and that doesn't -- that fact by itself

5   isn't enough to trigger a violation of the statute.

6         Another thought on the common carrier issue.  I'm

7   happy to go and talk at length about this common carrier

8   issue, but one point I do want to make is, the other side,

9   their principal argument on the common carrier issue is they

10  say, well, to be a common carrier you have to hold yourself

11  out as open to, you know, the public at-large.  And we don't

12  do that, we have never done that, so we can't be common

13  carriers.  That's kind, at least as I understand it, the

14  thrust of the argument.

15        And I just direct the court to a 1976 D.C. Circuit

16  opinion.  It's cited both in our brief and in the reply brief.

17  It's called the *National Association of Regulatory Utility

18  Commissioners*, and the D.C. Circuit there, it articulates the

19  standard pretty much the way the plaintiffs are articulating

20  it, and then they apply it, and in the application here's what

21  they say:

22        *We don't need to decide whether the industry at issue*

23  *here as a matter of law hold itself out as being available to*

24  *the public because there is an FCC regulation that requires*

25  *them to do so.*

1          And so I think what that shows is that this is a

2     regulatory classification that the government is permitted to

3     impose.  It's not as though industries that historically have

4     been treated as common carriers were -- would have been at

5     some point in history free to just opt out of common carriage

6     by engaging in this discrimination or individualized

7     decision-making about whose material to carry and whose not to

8     carry.

9          THE COURT:  I think that is absolutely right, but the

10    key point for us here today is, common carriage, under the

11    regulatory regime, is a different question than First

12    Amendment rights as the *PG&E* case shows.  Just because you are

13    a common carrier, doesn't mean you are not impacted by the

14    First Amendment and vice versa.  It's just kind of an analogy

15    that says, look, clearly the government can regulate certain

16    kinds of businesses, and you can regulate the telephone

17    company, and the fact that you're doing it is not a First

18    Amendment problem.

19         MR. BARNES:  Right.  I agree with part of what the

20    court said there and I disagree with part of it.  The part

21    that I agree with is that it's important for us to keep

22    straight the distinction between the regulatory classification

23    as a common carrier under like federal law or even state law

24    on the one hand versus the First Amendment analysis on the

25    other, and so I agree with that.

1    But where I think I disagree is with the idea that

2  common carriage and regulatory classification as a common

3  carrier is not important to the First Amendment analysis.

4  It's a plurality opinion, but Justice Breyer's opinion in the

5  Denver area, educational telecommunications consortium, it

6  does make reference to the diminished First Amendment interest

7  of common carriers.  The other point --

8    THE COURT:  I probably said it wrong.  I think it's

9  not controlling, you're right, it's certainly relevant.

10    MR. BARNES:  Yeah.  And the other opinion that I

11  point the court to on this is Justice O'Connor's concurring

12  opinion in *Turner I*.  You know, we're all fighting I guess

13  about what Justice Thomas thinks about that, but he joined

14  that opinion and, you know, one thing to note about Justice

15  O'Connor's opinion is she says the cable operators in that

16  case should have had more constitutional protection under the

17  First Amendment than the majority gave them, so she wants to

18  apply strict scrutiny, but she also says, well, this would be

19  a different case if the cable operators had been classified as

20  common carriers.  And so that's another I think data point

21  with respect to the intersection of common carriers on the one

22  hand and the First Amendment on the other.

23    And then there's the *U.S. Telecom Association*

24  decision, the D.C. Circuit opinion on net neutrality, and the

25  linchpin for its First Amendment analysis is the idea that

1    common carriage is different, and common carriers don't have

2    the same kind of First Amendment protections that other

3    entities have.  And I dare the plaintiffs to say that that

4    decision was wrongly decided, because I think it's a decision

5    very much in the plaintiffs' interest.  So that's another

6    point in our favor on common carriage.

7            If there are other points that the court --

8            THE COURT:  There is one I failed to ask about.  What

9    business is the state of Florida have in dealing with the post

10   by a Florida domiciliary who is living in Norway or

11   Pennsylvania?

12           MR. BARNES:  I don't think this law has

13   extraterritorial application any more than if you read a, you

14   know, the Florida prohibition on murder, there's statute that

15   prohibits murder, that has to be interpreted not to apply to

16   murders that happen in New Jersey.  So, if the user, wherever

17   they are domiciled, if the user is not physically in the state

18   of Florida, I don't think the statute applies.

19           THE COURT:  How would the social media platform know

20   whether to apply the statute then or not?  It doesn't matter

21   who's the Florida domiciliary or resident to begin with.

22           MR. BARNES:  It absolutely does know whether they are

23   in Florida or not.  The whole business model of these entities

24   is microtargeting ads, and they know within a block of where

25   you are and they are giving you advertisements.

1          THE COURT:  At least the ones that are the main

2     targets, and we go back to who is really governed by this.  I

3     understand, Facebook and Google know where you are.

4          So, if the post originates in Florida, even if it's a

5     Georgia domiciliary and resident who is just visiting Florida,

6     it still applies?

7          MR. BARNES:  I apologize.  I may not have followed

8     the hypothetical.

9          THE COURT:  A post is made by somebody who is not a

10    Florida resident or domiciliary but the post is made in

11    Florida.  This statute applies to it?

12         MR. BARNES:  No, I don't think it does because the

13    person is not a Florida domiciliary.  The territorial

14    application of this, I think the right way to think about it,

15    it applies basically when the viewer is in the state of

16    Florida and is a Florida domiciliary.

17         THE COURT:  But it doesn't apply to a viewer who is

18    not a resident or domiciliary, doesn't apply to a poster who

19    is not a Florida --

20         MR. BARNES:  Correct, yeah.  So, if you are --

21         THE COURT:  That's just not what it says.  Why

22    doesn't it say that instead of saying it the way it says it?

23    It says it applies to -- a user is a person that resides or

24    domiciled in the state.  What you really mean is a user who is

25    in the state at the time.

1        MR. BARNES:  Well, I think those resides in or

2   domiciles in elements, they absolutely are requirements for

3   application of the statute.  But my point is, probably every

4   Florida statute has to be read with a background understanding

5   that the statute doesn't apply extraterritorially.

6        THE COURT:  That's fair enough.  But if a Georgia

7   resident comes to Florida and commits a murder, the statute

8   does apply.  This one seems not to.

9        MR. BARNES:  And I think it doesn't, is what I'd say,

10  but -- you know, I don't dispute that that maybe is an odd

11  result, maybe not.  I'm sure there are aspects of Florida law

12  that are keyed in to whether somebody is a Florida

13  domiciliary, and there's also a question about personal

14  jurisdiction here obviously.

15       THE COURT:  Apparently somebody didn't read the

16  recent Supreme Court cases on general jurisdiction.  I just --

17  I won't put you on the spot by asking if you ever dealt with a

18  statute that was more poorly drafted.

19       MR. BARNES:  I think I have actually, but I've had to

20  deal with some interesting ones over the years.

21       One other thing, if I could, with the court's

22  indulgence, I want to say a word about Section 230.

23       Obviously, the plaintiffs have focused most of their

24  attention on the First Amendment, but at least, as I

25  understand it, the canon of constitutional avoidance and this

1    principle of judicial restraint that the federal courts should
2    avoid striking down a state statute on constitutional grounds
3    if there is a basis for invalidating a statute on
4    nonconstitutional grounds, that's mandatory.  I think this
5    court is required to start with the statutory arguments that
6    the plaintiffs are presenting.

7         And it's obviously -- I need to win on both of these
8    things.  It's my burden to convince you that we are right
9    about Section 230 and we're right about the constitution, but
10   I think it's a mistake for us to just gloss over Section 230
11   and only talk about the First Amendment as though Section 230
12   is an afterthought, because that's, you know, the court has to
13   start with Section 230.

14        THE COURT:  I agree.  I think that's exactly right.

15        MR. BARNES:  One thing I'll note about the other
16   side's response with respect to what we argued on Section 230
17   is, definitely with respect to the preemption claim and I
18   think also with respect to the First Amendment claim, because
19   this is a pre-enforcement facial challenge, they have to show
20   that there is no set of circumstances under which the statute
21   can be permissibly applied.

22        THE COURT:  Didn't the Supreme Court do away with
23   that standard?  I want to say *Johnson* 2015.  I may have the
24   name of the case wrong, I often do, and I may have the year
25   wrong.  But didn't the Supreme Court recently say, yeah,

*1*   people said that a lot of times but that's just not right?

*2*          MR. BARNES:  That's not my understanding.  I had a

*3*   complaint dismissed from the Southern District of New York on

*4*   this basis where I was on the plaintiffs' side a few months

*5*   ago, so I still think this is --

*6*          THE COURT:  Maybe it's limited to the First Amendment

*7*   context, but I think the Supreme Court -- let me see if I can

*8*   find my note about this.  I saw that language in your brief.

*9*          MR. BARNES:  There are definitely cases that say in

*10*  overbreadth challenges that the facial analysis is a little

*11*  different with respect to the First Amendment.  But I don't

*12*  know -- let's focus for a moment on preemption, right?  That

*13*  is not a First Amendment overbreadth challenge, at least as I

*14*  understand the law, the other side still has to satisfy the

*15*  *Salerno* any-set-of-circumstances standard, but whatever the

*16*  standard is --

*17*         THE COURT:  All that would mean is, if I jumped past

*18*  230, then we get back to the First Amendment.

*19*         MR. BARNES:  That's right.  I have to win on both of

*20*  these things.  I don't dispute that.  Let me just make a point

*21*  on (c)(2).  And I think it buttresses the *Salerno* standard,

*22*  but it's not dependent on it, which is that the plaintiffs

*23*  don't dispute that Section 230(c)(2) only applies when the

*24*  social media platform pulls materials down and does so in a

*25*  way that it's acting in good faith.  We may have a

1   disagreement about what that means, to act in good faith, but

2   I think everybody is on the same page that good faith is,

3   whatever that means, is an element of the (c)(2) defense.  And

4   I think that by itself, the fact that everybody agrees about

5   that, is reason enough not to find that the statute is

6   preempted under (c)(2), because there's at least some

7   applications where a social media platform is basically not

8   acting in good faith where the law could be applied consistent

9   with (c)(2).

10          And so I think where the main sort of dispute among

11  the parties is really with respect to (c)(1).  And obviously

12  we understand (c)(1) to only apply when a social media

13  platform is publishing material, is putting material -- is

14  leaving material up, basically, as opposed to taking material

15  down, which is what (c)(2) is primarily concerned with.  I

16  think, obviously, there are some -- a couple of court appeals

17  opinions that disagree with that, but it's an open question in

18  the Eleventh Circuit, and I think that a much better reading

19  of the statutory text goes our way on that.

20          So, you know, the other side's interpretation of

21  (c)(1) largely reads (c)(2) out of the statute, and there is

22  very little if anything left of (c)(2) if you accept the

23  premise that (c)(1) applies when we're talking about both

24  leaving material up and pulling it down.  And the other side's

25  reading is also I think inconsistent with the overarching

*1*  purpose of Subsection (c) here which was to respond to the

*2*  *Stratton Oakmont* decision.  It was a New York trial court's

*3*  decision that basically created this big disincentive for

*4*  platforms to moderate content if they moderated it

*5*  imperfectly.  And this case is really concerned with something

*6*  very different from sort of vicariously holding a platform

*7*  liable for material that is left up on its platform.  This is

*8*  about the activities of the platform itself is what the State

*9*  is regulating.  I think we are very far afield from sort of

*10*  the underlying rationale for this provision, and so for that

*11*  reason as well, we don't think that Section 230(c)(1) preempts

*12*  the law.

*13*      THE COURT:  How would it work?  I mean, what the

*14*  state of Florida apparently believes is that we will have a

*15*  completely different internet or social media in Florida than

*16*  everywhere else.  They will have to provide a different

*17*  platform in Florida, yes?

*18*      MR. BARNES:  These platforms already do comply with

*19*  state-specific regulations.  One thing, I don't think Florida

*20*  has done it, but there are a number of states around the

*21*  country that have passed these data privacy protection laws,

*22*  and those laws regulate how a platform can use data in

*23*  targeting ads and the options that a user has to be given when

*24*  citing how much data to share with the platform or how the

*25*  platform can use the data.  Those are state-specific laws.  I

1   think this may be another topic where, depending on how the

2   case progresses, we may need discovery.  But, you know, the

3   platforms are complying with those laws, those state-specific

4   laws, and I don't see any reason they couldn't comply with

5   this one as well.

6           THE COURT:  All right.  Good.  Thank you.

7           MR. BARNES:  Unless the court has other questions for

8   me, I mean, I can talk about this stuff until I'm blue in the

9   face but --

10          THE COURT:  Yes, I have kept my status as the worst

11  timekeeping in the federal judiciary.  But I asked you a lot

12  of questions, and I appreciate you answering them.

13          The *Johnson* case I mentioned to you is 135 -- well,

14  I'll give you the U.S. cite.  It's 576 U.S. 591.  It's a 2015

15  decision that talks about that principle.

16          MR. BARNES:  Again, you know --

17          THE COURT:  It may not be good law in the Southern

18  District of New York.

19          MR. BARNES:  It may not be, and I don't know if the

20  *Johnson* case is a First Amendment overbreadth case or not, but

21  I do think that that overbreadth, First Amendment cases get

22  treated a little bit differently than others.

23          THE COURT:  They do.  They talk about spitting on the

24  sidewalk here, a number of things.  I think it's actually --

25  it may be a criminal case, maybe that's the difference.

1          All right.  Thank you.

2          The other side saved some time for rebuttal.  I don't

3    know that I'm going to give you equal time because I asked

4    Mr. Barnes a whole lot more questions, so you already got to

5    say your peace more than he did, but I'll hear anything you

6    have to say in rebuttal.

7          MR. WILLEN:  Thank you, Your Honor.  I will try to be

8    as brief as possible.

9          In addition to *Johnson*, you can also look at *United*

10   *States versus Stevens*, which clearly says that the standard

11   for --

12         THE COURT:  Oh, wait.  Let me stop you there.

13   Mr. Winship may have wanted to speak, and I didn't call on

14   Mr. Winship first.  That was Mr. Willen talking last.

15         Mr. Winship, I used up all of your time with

16   Mr. Barnes, but if you have something you want to tell me,

17   I'll certainly listen.

18         MR. WINSHIP:  I actually did, Your Honor, but I will

19   be very, very brief, and I really appreciate you giving me

20   some time because I know you've got a limited amount today.

21         I only wanted to address very briefly a couple of

22   things that I thought could be helpful to the court.

23         One of them is, when you're assessing the definition

24   of the social media platform under our law, I know it's

25   tempting to kind of look in a microscopic fashion far down

1    into the Act and look at the definitions there, but since we

2    know that these statutes are supposed to be read holistically,

3    I just wanted to bring to Your Honor's attention what they

4    have in Section 1 of this Act, which I think really kind of

5    sets the context, if you will, out and explains why the Home

6    Depot -- listen, I like Home Depot, I'm saying nothing against

7    them, but I don't think they qualify as a social media

8    platform under the Act.

9           And if you look at that, you'll see the findings the

10   legislature makes among other things about reliance of

11   Floridians on social media platforms to express their

12   opinions, about social media platforms having transformed into

13   the new public town square, about how they become as important

14   for conveying public opinion as public utilities are for

15   supporting modern society, that they hold a unique place in

16   preserving First Amendment protections.  I think all of that

17   informs the concept of what the court -- what the legislature

18   is getting at in this Act, and none of that would apply to

19   more of your commercial buy and sell kind of things, places

20   like Home Depot, even though there are obviously some

21   interactive facets of it.  I just wanted to bring that to your

22   attention.

23          THE COURT:  I will say this, too, though, there were

24   amendments in the process that would have changed the

25   definition, as the sponsor said, to get the retailers out from

1  under this, and the amendments didn't get adopted.

2  MR. WINSHIP:  Well, it's hard to say why those things

3  happen, as we all know when you try to delve into the minds of

4  legislators in a collective sense, but I would suggest that a

5  good possibility why that happened was that there was a sense

6  that the contours who were well enough defined at the outset

7  as to what it was the legislation was aiming to get at, and

8  then perhaps there was just, you know, not a necessity to go

9  through with a scalpel and kind of say it's not going to apply

10 to this and it's not going to apply to that.  But I thought

11 that would be useful for Your Honor in assessing the statute

12 as a whole.

13 THE COURT:  It is.  Thank you.

14 MR. WINSHIP:  I wanted to mention as well about the

15 newspaper versus social media giants that we're talking about

16 here.

17 I found what you had to say about Miami Herald to be

18 interesting because I lived in Miami, and also about Tampa,

19 and I would say, by the way back then, if you go back to the

20 halcyon days of newspapers, a lot of Tampa readers looked at

21 the St. Pete Times for their news instead of Tampa, and that

22 was even before the St. Pete Times came over and officially

23 opened a Tampa edition.

24 Apart from that, what we have seen over the years, as

25 we all know, is the decline of the newspapers.  A whole of

1    them have gone out of business over the decades.  And what we

2    have seen is an ascension, and I won't say that they are

3    adversely correlated because, frankly, I think where the

4    social media are now exceeds where the newspapers really

5    probably ever were, but they have an enormous amount of

6    followers, number of followers, and an enormous I think

7    potential impact on the course of events in this country,

8    which I think underscores why the Florida legislature said

9    what it said in its findings.

10         And I think that segues nicely into this discussion

11   about Section 230, 42, U.S. Code, Section 230.  I think it's

12   instructive as well, Your Honor, to take a look at what the

13   findings are that congress has made there about the internet,

14   and these were findings that go back now several years when

15   230 was first enacted, but it talks about the internet as a

16   forum for true diversity of political discourse.  You wouldn't

17   be saying that about Home Depot.  Increasing the Americans who

18   rely on interactive media for a variety of political,

19   educational, cultural, and entertainment services.  So there

20   is a policy and the policy portion of Section 230, which is

21   Subsection (b), Your Honor, about preserving a competitive

22   free market for the internet.  And that I think is central to

23   what this Act is aiming to do.

24         I want to note as well that, when we talk about

25   Section (c)(2), a lot of the evils that are complained of by

1    plaintiffs actually have no moment at all because they are

2    protected under (c)(2) with regard to good faith efforts to

3    restrict access to obscene, lewd, lascivious kinds of

4    materials, and I would note that I would characterize those

5    kinds of matters as content-oriented rather than

6    viewpoint-oriented, and I think it's important for the court

7    to keep in mind when this was done, when congress passed this

8    Act and put this protection in (c)(2), note they are talking

9    about lewd, lascivious, filthy, excessively violent,

10   harassing, or otherwise objectionable.  These are all the

11   kinds of areas of speech that under the First Amendment had

12   either no protection, no recognized protection, or they were

13   really marginal.  And what this does is to say, hey, listen,

14   maybe you're going to make a mistake in excluding some of

15   these things, but we're going to give you the benefit of the

16   doubt if you are acting in good faith.  That was the point of

17   this.

18          If this provision had said, lewd, lascivious, filthy,

19   harassing, or objectionable to the platform because of

20   political considerations that the platform doesn't like

21   political views, I would submit to Your Honor, there is no way

22   this Section 230 would ever have gotten passed.  If you look

23   at the nature of the kind of content that it is trying to

24   allow the platforms to protect the public against being

25   exposed to, you look back as well under the policy exception,

1    Subsection 4, and within that Subsection 4 and 5 about

2    objection -- empowering parents to restrict children's access

3    to objectionable or inappropriate online material, and

4    Subsection 5, obscenities, stalking, harassment.  This is the

5    kind of thing that Section 230 was designed to try to protect

6    against.

7            The Florida statute is quite explicit in embracing

8    Section 230 and trying to do what we believe Section 230

9    allows us to do without in any way impinging on the platforms'

10   ability to make the kind of good-faith discriminations that

11   Section 230 envision.

12           And that was it, Your Honor.  Listen, thank you very

13   much for allowing me that time.

14           THE COURT:  So you think if something is protected by

15   this language in 230, then it's also okay under the Florida

16   statute, the Florida statute doesn't interfere with it?

17           MR. WINSHIP:  I think the answer, based on the

18   supremacy clause, would have to be yes, that Section 230

19   insofar as it applies would take precedents.  And that's the

20   point -- the only point I was trying to make that insofar as

21   we are trying to figure out where Section 230 begins and ends

22   in terms of this analysis, after which we turn to the First

23   Amendment arguments that you spent a great deal of time

24   talking to Mr. Barnes about.

25           THE COURT:  But in good faith in Section 230 doesn't

1   mean the same thing as good faith in the Florida statute.

2   What 230 means is a question of federal law, true?

3           MR. WINSHIP:  Well, that's true, but I think what

4   good faith means there is circumscribed by the examples that

5   are given.

6           THE COURT:  "Otherwise objectionable," that's pretty

7   broad, isn't it?

8           MR. WINSHIP:  I don't think it was intended to be

9   read so broadly as to allow these internet behemahs to be able

10  to go and basically try to engage in the viewpoint

11  discrimination that I think is very much the point of the

12  Florida statute.  And so I think Section 230 is -- I don't

13  think we have any problem with Section 230 with regard to this

14  Act for those reasons.

15          THE COURT:  All right.  Thank you.

16          Mr. Willen?

17          MR. WILLEN:  Thank you, Your Honor.  There was a lot

18  said there.  I'm going to try to be as brief as possible in

19  responding to the most important ones.

20          Let me just start with what Mr. Winship said because

21  I think it puts the finger on exactly the problem here.  So he

22  says, well, if you look at the findings of the Act and look at

23  what the Act is trying to do, it's going after these

24  particular platforms because they are engaged in what the

25  State believes is political viewpoint discrimination.

1        Well, that's exactly the problem.  That's exactly why

2   the Act is subject to strict scrutiny, that's exactly what the

3   State can't do, is target a select group of media entities

4   because it disagrees with the political viewpoints that they

5   think are being suppressed through their moderation judgments.

6        That takes me to what I think is the fundamental

7   misunderstanding of the First Amendment that my friend on the

8   other side articulated.

9        So the suggestion that the First Amendment doesn't

10  apply to editorial judgment is just flatly inconsistent with

11  *Tornillo*.  And I think Your Honor referenced the passage where

12  the court said that it's not simply about whether the content

13  of the newspaper is altered, it is the protection of the First

14  Amendment that applies for editorial judgment itself, and this

15  is on page 258 of the *Tornillo* decision, and I think this is

16  what Your Honor was alluding to, and this is a quote:

17        *Even if a newspaper would face no additional costs to*

18  *comply with the compulsory access law, it would not be forced*

19  *to forgo publication of user opinion by the inclusion of a*

20  *reply, the Florida statute fails to clear the barriers of the*

21  *First Amendment because of its intrusion into the function of*

22  *editors.*

23        That's what the Supreme Court said in *Tornillo,* so --

24  and it's not just *Tornillo*, the court said in Denver area,

25  Justice Breyer, the editorial function itself is an aspect of

1    speech, that's a quote in *Turner*, exercising editorial

2    discretion over which stations or programs to include in its

3    repertoire is speech.

4            So what we have here is a fundamental

5    misunderstanding of what the First Amendment protects.  Of

6    course, the First Amendment protects the act of speaking or

7    posting content, but it also protects the choices and the

8    editorial decisions that are made by moderators and form

9    operators with respect to what speech is and is not going to

10   be allowed on their service.

11           So that's the fundamental proposition that is

12   important here, and there is a good reason for that because

13   the judgments and the views that are expressed through those

14   editorial choices are incredibly expressive.  They articulate

15   the standards for the platform, what is and is not acceptable,

16   what judgment, what values, what opinions that platform has

17   about speech that it's going to tolerate and not tolerate.

18   That's fundamentally what we're talking about and that is

19   fundamentally what this statute overrides.

20           So that takes me to *FAIR versus Rumsfeld*, which

21   Mr. Barnes said was dispositive of our First Amendment

22   argument or controlling.  But, of course, *FAIR* has nothing at

23   all to do with editorial speech or with the choices the law

24   schools were making about how to display and present speech.

25   *FAIR* was about access to campus for military recruiting, and

1   that's exactly why the Supreme Court said that the Solomon

2   Amendment didn't impair or burden the law school's speech.

3          Now, *FAIR* would have been a completely different case

4   if the government had purported to say that the law schools

5   were required to post certain content on law-school message

6   boards, or if the case involved choices that the law schools

7   made about what speakers could come and talk to students about

8   public issues.  If law schools had standards for acceptable

9   and unacceptable speech, and the government came in and said

10  no, no, no, you can't enforce those standards, and we're going

11  to override them, *FAIR* is a completely different case.  It's

12  also the case that the nature of the burden there was totally

13  different.  The Solomon Amendment was an equal access

14  provision.  If you allow access to other recruiters, you have

15  to allow the military to recruit.

16         This statute is providing special protections,

17  special rights for candidates, for journalists, and it's

18  involving the State in minute and direct day-to-day

19  supervision over the editorial judgments and choices that

20  these platforms make.

21         So, you know, *FAIR*, with respect, is just a

22  completely different case and a completely different analysis.

23         Let me just say one other thing.  So consistent with

24  what I just said, it is particularly objectionable, of course,

25  that this law prohibits the platforms from posting addenda to

 1   content.  That is obviously a regulation of our speech.  But

 2   you can't just excise that provision and pretend that without

 3   it there's no constitutional problem because what the statute

 4   fundamentally does is prohibit our ability to engage in a

 5   whole manner of editorial speech, editorial judgments that are

 6   squarely protected by the First Amendment.  And so wiping away

 7   that provision doesn't solve the problem.

 8          Just finally, Mr. Barnes said that the law doesn't

 9   prohibit content moderation.  That's just not true.  The whole

10   purpose of the candidate and journalistic entities provision

11   is to prohibit content moderation.  So if, in the example that

12   Your Honor gave, if there are two identical videos posted on

13   YouTube of ISIS beheadings, one posted by a regular user, the

14   other posted by somebody that qualifies as a journalistic

15   enterprise which could include Al-Qusayr or any number of news

16   networks, under this law we are categorically prohibited from

17   doing anything, not just to remove that post but to make it

18   harder for users to see.  So the idea that this doesn't

19   prohibit content moderation and doesn't do it at volume and

20   scale is just -- you would have to be reading a different

21   statute.

22          And, you know, just the final thing that I'll say is,

23   the very long and interesting colloquy that you were having

24   about the meaning of individual provisions, you know, this is

25   exactly the problem, I mean, this is a statute that I think,

1   as Your Honor recognized, is just incredibly poorly drafted,

2   it is incredibly broad, it is incredibly unclear what is

3   prohibited and what is not, and this is a beanbag.  I mean, we

4   are talking about a statute that has very significant

5   penalties attached to it where the State gets to launch

6   complicated and burdensome investigations that has a private

7   right of action that allows anybody to show up and ask for a

8   hundred thousand dollars in damages per violation, and this is

9   the point that I made about *NAACP versus Button*.  The

10  precision of regulation in this context is vital, and I think

11  the discussion that you had with my friend on the other side

12  suggests that this statute is just not drafted with anything

13  like that precision.

14       So I will stop there.  I think my colleague,

15  Mr. Karanjia, has a few things that he would like to add.

16  Thank you very much, Your Honor.

17       THE COURT:  Thank you.

18       MR. KARANJIA:  Thank you, Your Honor.  I will keep it

19  very brief.

20       One point I would just like to reenforce because I

21  think it's so fundamental here is that the State is in a sense

22  propounding a view of the First Amendment that is stuck in the

23  cleavage of the era.  This whole argument that, well, you're

24  not exactly like a newspaper in all relevant respects just

25  misses the point that the First Amendment principles apply in

1   the same way, and we know that from, first of all, the Supreme

2   Court's decision in *Reno v. ACLU*, that's cited at page 22 of

3   our brief.  And in that case the court said, look, this is

4   clear, we will apply the same principles to online speech,

5   there is no lesser protection for online speech.

6          In addition I would note the State kind of casually

7   glosses over a whole series of cases we cite at pages 22 of 23

8   of the opening brief that specifically involves online

9   moderation decisions and the First Amendment protection courts

10  have afforded to those decisions.  And to be clear, just as

11  Mr. Willen said, that is not just speaking to the affirmative

12  speech.  So, in other words, in this instance, this is not

13  just about the disclaimers.  Many, many courts, including

14  courts deciding cases involving Google and Facebook and other

15  internet publishers, internet entities that engage in

16  moderation, they have all said, look, these same First

17  Amendment principles apply, they apply when you are moderating

18  user-generated content.  So I think that's just a fundamental

19  point, that the First Amendment right does not stop at the

20  affirmative disclaimers.  There is equal First Amendment

21  protection when moderating user-generated content.  That's a

22  critical point that I just think that the State hasn't

23  grappled with.

24          Now the second point on the standard of review, the

25  no-set-of-circumstances case just doesn't apply here, Your

1    Honor.  You can look at many, many cases cited in the briefs

2    where content-based restrictions on speech are involved that

3    the court -- goes directly to strict scrutiny.  If strict

4    scrutiny is not met, the court invalidates the entire statute.

5    That is shown in *Reed*, that's shown in *Tornillo*.  There is

6    another case cited in the brief, *R.A.V. versus City of St.*

7    *Paul*.  And then you have even cases applying them to

8    intermediate scrutiny where the courts has invalidated the

9    statute, an example of that would be the *Sorrell* case.

10         So there's just no question, for purposes of the

11   First Amendment claim, you don't have to meet a

12   no-set-of-circumstances test.  The analysis we have set forth

13   is the one that the courts apply, and I think that's yet

14   another reason why there really is nothing to this whole

15   constitutional avoidance argument.

16         I think it's pretty clear that the State would rather

17   talk about Section 230, which is why it obviously spent many

18   pages in the front of its briefs speaking of 230, but that's

19   not going to circumvent any analysis because the court ends up

20   with the First Amendment anyway given, among other things, the

21   fact that the State leans on supposed constitutional

22   considerations to argue for a narrow construction of 230.  So

23   however you look at it, we think the court has to address the

24   First Amendment.

25         Now, the final point I will just make is there was

1    some discussion earlier on, and I think this came up in the

2    context of the *FAIR* discussion about whether users really

3    would attribute what posters say on social media to the social

4    media themselves.  And one can have an abstract debate about

5    that, but I would submit that's beside the point because we

6    have evidence in this case, and we have a number of

7    declarations, and I would point for example to the NetChoice

8    declaration, where the declarant, Mr. Szabo, points to

9    specific incidents, these were real events where a great deal

10   of concern was expressed, for example, by civil rights

11   organizations about certain content that despite efforts made

12   by some social media platforms to purge this content,

13   nevertheless some of it showed up, and they said, look, you

14   advertisers, you need to get your act together and take

15   actions to show we need these off these sites.

16           So there is unrefuted evidence in this case that,

17   whether fair or not, users advertises the public, they do

18   associate what appears on a social media website with what

19   that alleged site decides to host.  So I don't think it's a

20   forcible defense to say, well, let's not speculate about what

21   people may or may not attribute and let's looks at the terms

22   and conditions.  Of course, in the terms and conditions, the

23   website is going to try to preserve all rights, but that's not

24   necessarily the reality, and in this instance it's not the

25   reality.

1        THE COURT:  But the fact that some advertisers don't

2   want to advertise when you hosted somebody else's

3   objectionable speech doesn't suggest at all that the

4   advertiser actually thought that was the platform's speech.

5   The advertisers are way more sophisticated than that.  It may

6   be that some user out there is confused, but the advertisers

7   certainly are not.

8        MR. KARANJIA:  Well, I understand where Your Honor is

9   coming from on that, but I think what it does show the

10   advertisers, as the question indicated, are very attuned to

11   what users think, and they are well aware of the association

12   users will draw because they have to be responsive to their

13   clients.  So I think, you know, whether or not you first look

14   at advertisers, the fact is you have unrefuted evidence

15   directly on point that the users will attribute, and I think

16   that --

17        THE COURT:  You know, some people boycott a state

18   when they pass a statute that they don't like.  It's not that

19   they think that the hotel they're not going to shares that

20   view, they are just using their economic power to try to put a

21   view across.  But I get it.  I hear what you say.

22        MR. KARANJIA:  Thank you, Your Honor.

23        And then just finally on common carrier.  Mr. Barnes

24   was making some points about the *U.S. Telecom* decision.  I

25   think it comes back to what Your Honor said.  We have *PG&E*,

1     that's the Supreme Court case.  You have the plurality

2     opinion, but it's a Supreme Court case, and it said just the

3     fact that someone is a public utility doesn't mean the First

4     Amendment problem goes away.  And at the end of the day,

5     that's our real argument here.

6          To just go back to the highlighted picture, our first

7     argument is they are nothing like common carriers; our second

8     argument is this is nothing like a common carrier statute; and

9     then our third argument is, even if it were, that doesn't make

10    it --

11         THE COURT:  I missed the last part.  You kind of

12    froze on me.

13         MR. KARANJIA:  The last point -- sorry, Your Honor --

14    that, even if they were common carriers, which they are not,

15    even if this were a common carrier statute, which it's not,

16    that would not make the First Amendment problem go away, and

17    that principle is clear from the Pacific Gas, the *PG&E* case.

18         So for all of those reasons, we think that the common

19    carrier argument really is a distraction here, and however one

20    looks at it we have to grapple with the First Amendment.  We

21    think that the only sensible way of giving the protection that

22    is due to the First Amendment rights is to preserve the status

23    quo, especially given the harms which are very severe, the

24    courts are very mindful of chilling effects in First Amendment

25    cases, and issue a preliminary injunction to preserve the

1    status quo.

2          Thank you.

3          THE COURT:  All right.  Thank you.  I neglected to

4    ask Mr. Winship or Mr. Barnes:  If I agree with the plaintiffs

5    and issue the injunction, the plaintiffs say don't make us

6    post a bond.  How big a bond do you want to have posted?

7          MR. BARNES:  Frankly, Your Honor, this is not

8    something I've discussed with my clients, and I'm not sure of

9    the answer.  I think it's unlikely we will insist on a bond,

10   but -- would it be acceptable to the court if we assume that

11   the State doesn't want a bond, but I will file something short

12   later this afternoon if that --

13         THE COURT:  Yes, and if you don't want to do it this

14   afternoon, I don't know what the outcome is going to be, but

15   if it's grant of a preliminary injunction, I'll deal with it

16   in the wording of the order.  I can draft around the problem.

17   I thought I'd give you a chance to address it, but I can --

18         MR. BARNES:  I apologize for not having talked to my

19   client about that.

20         THE COURT:  The one thing I routinely suggest to

21   people in preliminary injunction situations is this:

22         The companies that sell bonds charge very impressive

23   premiums for the bonds.  When you have people on both sides of

24   the case that have enough money to meet a requirement,

25   sometimes the undertaking is much better than a bond.  So an

1    undertaking for security up to a certain amount can be done,

2    and then, if they got the injunction, you got reversed, and

3    you claim you actually had damage -- I'm not sure what that

4    would be -- but, if you did, then you would have the ability

5    to come to court and say, NetChoice and other plaintiffs, give

6    us x-dollars, as opposed to calling on the security firm.

7    And, you know, if they have to buy a bond, they pay a premium,

8    and then if they ultimately win the case, you have to pay them

9    back the premium.  It just works for everybody not to buy a

10   bond.

11           I appreciate your input.  I did have some questions,

12   you've answered them, that's been helpful to me.  I appreciate

13   it.

14           I'm going to do everything I can to get you an order

15   by the end of the day on June 30, and I've tried to get the

16   rest of my docket at bay as best as I can, so I only have a

17   few other things to deal with, and I've got a lot of work to

18   do on this.  I'll do my best.

19           What I will try to do is to get you a decision and

20   explain it.  I am not going to try to write 120 pages that

21   somebody could write on this topic.  These are good lawyer

22   issues, you can spill a lot of ink on this.  But as you all

23   know, I write a decision, the Eleventh Circuit rules, and once

24   the Eleventh Circuit rules, nobody cares anymore what I said.

25   So you really don't -- I'll get you an explanation for my

1  ruling, and that's the best I'll do.

2        Let's talk about where we go going forward.  We

3  can -- I can do this as quickly or as slowly, whatever you

4  want to do.  Have you given thought where we go?  I didn't

5  look back.  I suspect I put off the 26(f) conference until

6  after this ruling, and maybe all you have to do is just have a

7  26(f) conference after you get a ruling.

8        MR. BARNES:  I think the court -- I don't have the

9  exact date in front of me, I think it's mid July is when the

10 26(f) conference is due, and when we need to file an answer as

11 well.  So I think probably the sensible next step is the

12 parties will see how the court rules on the preliminary

13 injunction, we will have a chance to digest that, we can get

14 together offline and figure out if there's a mutually

15 agreeable way for the case to proceed.

16        THE COURT:  All right.  I would be very receptive to

17 what you say, you can talk to each other about how much record

18 you do or don't need, what the best way to go with it is.  The

19 decision that I will issue here in the next few days will of

20 course be immediately appealable.  So you can talk about how

21 much more record you need, whether to consolidate, but how you

22 want to do it.  Talk about all of those things.  I'll be

23 receptive to what input you have.

24        What else, if anything, can we accomplish today?

25 Mr. Willen, anything on your side?

1    MR. WILLEN:  Nothing from our end, Your Honor.  We

2  really appreciate your time, so we have nothing further.

3    THE COURT:  All right.  Mr. Barnes, on your side,

4  anything further?

5    MR. BARNES:  Nothing here.  Thank you for the court's

6  time.

7    THE COURT:  All right.  Mr. Winship?

8    MR. WINSHIP:  Nothing, Your Honor.  Again, I

9  appreciate it.  Thank you.

10    THE COURT:  All right.  Thank you all.  I'll get you

11  something as quickly as I can.  We are adjourned.

12    (*The proceedings adjourned at 4:07 p.m.*)

13              *   *   *   *   *   *   *   *

14

15

16

17  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.  Any
18  redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy are noted within the
19  transcript.

20

21

22  *Judy A. Gagnon*                        *6/29/2021*
    Judy A. Gagnon, RMR, FCRR               Date
23  Registered Merit Reporter

24

25