## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

NETCHOICE, LLC, et al.,

      Plaintiffs,

v.                                Case No. 4:21-cv-220-RH/MAF

ASHLEY MOODY, in her official
capacity as Attorney General of the
State of Florida, et al.,

      Defendants.

_____/

## DEFENDANTS' MOTION FOR PARTIAL
## JUDGMENT ON THE PLEADINGS

Plaintiffs ask this Court to pass on the facial validity of a dozen different statutory provisions governing widely varying entities across multiple industries. But "courts are not roving commissions assigned to pass judgment on the validity of" entire statutory schemes, unmoored from the factual context of how distinct provisions are applied on the ground. *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973).

As the Supreme Court made clear in this very case, sweeping claims like Plaintiffs' may be considered only in truly exceptional circumstances. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024). Because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being

implemented in constitutional ways," "facial challenges [are] hard to win." *Id.* (quotation omitted). Plaintiffs' challenges would require fact-specific analyses of each provision of Florida's law and its effect on each regulated entity—yet not a single regulated internet platform is a party to the case. This Court need not—and cannot—engage in that boundless inquiry. Plaintiffs' facial First Amendment and Section 230 preemption claims must be dismissed for several reasons. *See* Fed. R. Civ. P. 12(c).

First, Plaintiffs lack standing. Associations like Plaintiffs may sue on behalf of their members only if "neither the claim asserted nor the relief requested requires the participation of individual members of the association in the lawsuit." *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). Here, by contrast, Plaintiffs' First Amendment and Section 230 claims do require the participation of their members because—as the Supreme Court made clear—the resolution of the claims depends on the circumstances of individual internet platforms. Separately, Plaintiffs lack standing for their Section 230 preemption claim also because they failed to adequately allege a certainly impending, credible threat that Defendants will enforce Florida's law in a way that is barred by Section 230. Plaintiffs made no allegations suggesting that the Attorney General, the Florida Elections Commission, or the Department of Management Services will flout their statutory duty to abstain

from enforcement that is "inconsistent with . . . 47 U.S.C. s. 230(e)(3)." Fla. Stat. § 501.2041(9).

But standing is not the only problem with Plaintiffs' sweeping claims. Even if Plaintiffs could establish standing, Section 1983 does not provide them a cause of action to assert the rights of third-party internet platforms. For one thing, Section 1983 permits only the "party injured" to bring "an action at law" or "suit in equity." 42 U.S.C. § 1983. For another, Congress did not intend for Section 230 to be enforced through Section 1983.

Finally, even if Plaintiffs' claims survived those fatal defects, they fail on the merits under a proper facial analysis. The First Amendment challenge fails because Plaintiffs did not allege that an as-applied claim would provide inadequate redress— a prerequisite to challenging a statute as overbroad. And the facial Section 230 preemption challenge fails because Florida's law is consistent with Section 230 in at least some applications.

In sum, Counts I and V of Plaintiffs' complaint, which raise the facial challenges, must be dismissed. *See* DE1 at 44, 64.

## BACKGROUND

Plaintiffs are "trade associations of online businesses." DE1 at 2. Their members are diverse—they include "online social media platforms," such as "Facebook" and X (formerly "Twitter"); "online marketplaces," such as

"Amazon.com," "Airbnb," "eBay," and "Etsy"; and "online businesses," such as "Google," "Yahoo!," "AOL," and "Fluidtruck." DE1 ¶ 20 & n.23. Plaintiffs "bring this suit on behalf of their members" against the Attorney General of Florida, the Florida Elections Commission, and the Department of Management Services. DE1 ¶ 27.

Plaintiffs facially challenge S.B. 7072, which regulates internet platforms that do "business in" Florida and have either "annual gross revenues in excess of $100 million" or "at least 100 million monthly individual platform participants globally." Fla. Stat. § 501.2041(1)(g). S.B. 7072 establishes a comprehensive regulatory scheme, comprising multiple statutes and a dozen provisions, which range from a requirement that platforms apply their policies consistently, to a provision regulating political candidates' access to platforms during election season, to various disclosure requirements. *NetChoice v. Att'y Gen.*, 34 F.4th 1196, 1232 (11th Cir. 2022) (listing the law's regulations).

Plaintiffs claim, among other things, that S.B. 7072 is facially invalid under (1) the First Amendment because it "impose[s] content-based, viewpoint-based, and speaker-based restrictions and burdens" on platforms, DE1 ¶ 77; and (2) the Supremacy Clause because it conflicts with 47 U.S.C. § 230 by "treat[ing]" platforms as "publisher[s]" or "speaker[s]." DE1 ¶ 136. Section 230 affords platforms immunity from liability for "'Good Samaritan' blocking and screening of

4

offensive material." 47 U.S.C. § 230(c). Congress enacted it in 1996 to "overrule" state court defamation decisions that "treated [platforms] as publishers or speakers of content that [wa]s not their own" merely because they screened content on their websites. *Fair Hous. Council v. Roommates.com*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc).

In their complaint, Plaintiffs allege that this Court has jurisdiction over their claims because they have "associational standing." DE1 ¶ 27. According to Plaintiffs, they can sue in place of their members because "[t]he claims and relief sought do not require proof specific to particular members and, in any event, Plaintiffs are able to provide evidence about [S.B. 7072]'s impact on the companies they represent." DE1 ¶ 27. In their answer, Defendants denied those allegations, DE118 ¶ 27, and stated that "Plaintiffs lack standing to bring [their] claims on behalf of their members." DE118 at 23.

Shortly after Defendants filed their answer, this Court stayed this action pending Defendants' appeal of the Court's preliminary injunction, which was based on Plaintiffs' First Amendment and Section 230 preemption claims. DE129. The Eleventh Circuit affirmed the injunction in part and vacated it in part. *NetChoice*, 34 F.4th at 1231. It vacated the injunction as to Florida Statutes "§§ 106.072(4), 501.2041(2)(a), (c), (e)," finding that those provisions do not likely violate the First Amendment or Section 230. *Id.* at 1231 & n.26. The Eleventh Circuit held that the

remaining provisions likely violate the First Amendment, so it did not consider Section 230.

The Supreme Court then granted certiorari and "vacate[d]" the Eleventh Circuit's "decision[] for reasons separate from the First Amendment merits, because" the decision did not "properly consider[] the facial nature of [Plaintiffs'] challenge." *Moody v. NetChoice*, 144 S. Ct. 2383, 2394 (2024). The Court explained that Plaintiffs' decision to "litigate th[is] case[] as [a] facial challenge[] . . . comes at a cost." *Id.* at 2397. Because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways," "facial challenges [are] hard to win." *Id.* (quotation omitted). In First Amendment cases, the plaintiff must establish that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.*

In the district court and the Eleventh Circuit, the Supreme Court concluded, "the focus was on how [S.B. 7072] applied to Facebook's News Feed and YouTube's homepage." *Id.* Neither court "address[ed] the full range of activities the law[] cover[s], and measure[d] the constitutional against the unconstitutional applications." *Id.* at 2397–98. Instead, Plaintiffs' challenge was "treated . . . more like" an "as-applied" challenge than a "facial one[]." *Id.* at 2398.

The Court then provided guidance on the proper analysis for determining whether Plaintiffs are likely to succeed on their facial challenge, but it concluded

that on the current record, it could not perform that analysis. *Id.* at 2398–99. Even putting aside that the Supreme Court is a court "of review, not of first view," "the record is underdeveloped," the Court explained. *Id.* at 2399 (quotation omitted). To decide the merits of Plaintiffs' First Amendment challenge, it is necessary to determine "[w]hat activities, by what actors," the law regulates, and then examine the nature of each "covered platform" and "function," assessing whether applying the law to each function "intrud[es] on protected editorial discretion." *Id.* at 2398.

That is a fact-intensive inquiry, the Court observed, because different platforms and functions "involve different levels of editorial choice." *Id.* "Curating a [news]feed" and "transmitting direct messages," for example, may "involve different levels of editorial choice, so that one creates an expressive product and the other does not." *Id.* In a controlling concurring opinion, Justice Barrett observed that even different newsfeeds might not have the same degree of editorial choice. A newsfeed that "just presents automatically to each user whatever [its] algorithm thinks the user will like" is different from a newsfeed that "remove[s] posts promoting a particular political candidate or advocating some position on a public-health issue." *Id.* at 2410 (Barrett, J., concurring).

Even after identifying each application of the law that intrudes on editorial discretion, additional fact-intensive analysis is required. The appropriate level of First Amendment scrutiny must be applied to every application that intrudes on

editorial discretion, and after all the applications that do not satisfy scrutiny are identified, the "constitutionally impermissible and permissible" applications of the law must be "compare[d]." *Id.* at 2398 (majority op.).

In concurring opinions, five Justices echoed that even at the preliminary-injunction stage, Plaintiffs' facial challenge requires a fact-intensive analysis specific to each covered platform, as well as further record development. *See id.* at 2411 (Jackson, J., concurring in part and in the judgment) ("With these records and lower court decisions, we are not able to adequately evaluate whether the challenged state laws are facially valid."); *id.* at 2435–36 (Alito, J., concurring in the judgment, joined by Thomas and Gorsuch, JJ.) ("NetChoice has not developed the record . . . . [And] [a] court cannot invalidate the challenged laws if it has to speculate about their applications."); *id.* at 2410–11 (Barrett, J., concurring) (stating that the "analysis" of a platform's "functions" is "fact intensive" and requires a "more thorough[]" record).

Finally, Justice Thomas expressed "serious doubts" that Plaintiffs have "standing to vicariously assert a member's injury." *Id.* at 2418 n.2 (Thomas, J., concurring in the judgment). "There is . . . not a single party in" this case, he noted, "that is actually regulated by the challenged statutes and can explain how specific provisions will infringe on their First Amendment rights." *Id.*

After the Supreme Court issued its mandate, the Eleventh Circuit "remanded in full to" this Court "for further proceedings consistent with the Supreme Court's opinion." DE149 (cleaned up).

## STANDARD OF REVIEW

"Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). The complaint should be "dismissed" if the plaintiff "can prove no set of facts . . . which would entitle him to relief." *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998) (quotation omitted). This Court must "accept the facts in the complaint as true and . . . view them in the light most favorable to the nonmoving party." *Id.*

It is Plaintiffs' burden to establish associational standing. *See Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). If they fail to do so, this Court lacks jurisdiction, and their claims must be dismissed. *See id.* (providing that associational standing is necessary to establish Article III standing); *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996) (explaining that even if associational standing is "prudential," it is a "limit[] on the exercise of federal jurisdiction").

# ARGUMENT

## I.   PLAINTIFFS DO NOT HAVE STANDING.

A plaintiff "generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Associational standing is a "narrow exception" to that rule. *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004). It allows an organization to press a claim "solely as the representative of its members." *Students for Fair Admissions*, 600 U.S. at 199 (quotation omitted). "To invoke [associational standing], an organization must demonstrate" that (1) its members themselves would have standing to sue, (2) "the interests it seeks to protect are germane to [its] purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* (quotation omitted). These requirements are met only "where the organization seeks a purely legal ruling" that will remedy its members' injuries. *Bano*, 361 F.3d at 714; *see also Int'l Union v. Brock*, 477 U.S. 274, 287 (1986) (finding associational standing because the "suit raise[d] a pure question of law"); *Council of Ins. Agents & Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1308 n.3 (N.D. Fla. 2003) (Hinkle, J.) ("Member participation is not required where . . . the question presented is purely legal.").

Plaintiffs lack standing for their First Amendment and Section 230 preemption claims because the claims require the participation of their individual

members. Plaintiffs additionally lack standing for their Section 230 claim because they have not alleged that their members face a "credible threat" that Defendants will enforce Florida's law against them in ways inconsistent with Section 230. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

### A. Plaintiffs' claims require the participation of individual internet platforms.

A claim requires the participation of individual members if it "depend[s] upon the [individual] circumstances of" the members. *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003); *Free Speech Coal., Inc. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("[C]onferring associational standing is improper for claims requiring a fact-intensive-individual inquiry."). For example, Free Exercise claims under the First Amendment "ordinarily require[] individual participation," even where plaintiffs seek an injunction of a statute, because courts must examine how the challenged law "operates against [particular individuals] in the practice of [their] religion." *Harris v. McRae*, 448 U.S. 297, 321 (1980). Courts, in other words, must make factual determinations about individuals' religious practices, which makes the individuals' participation necessary to resolve the case. *See id.*; *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018, 1023 (10th Cir. 1992) (holding that the plaintiffs lacked associational standing to seek an injunction of a

state law because their claims required the court to determine whether the law had a "detrimental effect on" individual entities).

Plaintiffs' facial First Amendment and Section 230 preemption claims require the participation of their members, which are widely diverse internet platforms. Under "the proper facial analysis," *Moody*, 144 S. Ct. at 2398, this Court must examine how Florida's law "operates against" each covered platform, assessing whether it intrudes on expression and whether it holds the platform liable as a publisher. *Harris*, 448 U.S. at 321. Because those inquiries require this Court to make factual determinations about individual platforms, Plaintiffs lack associational standing.

**1.** As the Supreme Court has already explained, whether and how S.B. 7072 and the First Amendment apply will vary platform to platform. *See Moody*, 144 S. Ct. at 2398. Because the First Amendment analysis depends on the specifics of each platform's operations, the analysis will look different as to "Facebook" than as to "Gmail," "Etsy," "Venmo," or "Uber." *Id.* Even within a single platform like Facebook, the analysis will vary depending on the platform's specific "services," such as "News Feed[s]," "direct messaging," "events management," and "marketplace[s]." *Id.*

Thus, "at trial," this Court "necessarily would have to inquire into the nature of operations of individual" platforms and make extensive factual determinations

about those operations. *Kan. Health Care Ass'n*, 958 F.2d at 1023. The Court would have to determine (1) the different functions on covered platforms, (2) the "level of editorial choice" that each function on each platform involves, and (3) whether and how Florida's law "intru[des] on" each function. *Moody*, 144 S. Ct. at 2398. Those are individualized, platform-specific questions, which depend on the nuances of the "algorithms" that the platforms use, *id.* at 2403; *id.* at 2410 (Barrett, J., concurring); whether the functions "exclude[]" certain types of content, *id.* at 2402 (majority op.); the extent to which each function "compile[s]" and "convey[s]" content, *id.* at 2406; the "corporate structure and ownership" of the platform, *id.* at 2410 (Barrett, J., concurring); and so on.[1]

Under similar circumstances, the Supreme Court, the Eleventh Circuit, and other circuits have concluded that organizations lacked associational standing. Take the Supreme Court's decision in *Harris*. The plaintiff-associations "sought to enjoin the enforcement of" a federal "funding restriction on abortions," alleging that the restriction violated the Free Exercise Clause. 448 U.S. at 303–05. That claim required the plaintiffs to show that the restriction had a "coercive effect" on the religious practices of individuals. *Id.* at 321. The Supreme Court held that the

---

[1] Even before the Supreme Court's decision, Plaintiffs recognized that evidence particular to individual platforms is critical to the merits; in support of their request for a preliminary injunction, Plaintiffs submitted declarations from Facebook, Etsy, and YouTube. DE25-1; DE26-1; DE29-1.

plaintiffs lacked associational standing because their members had a "diversity of [religious] view[s]," and so examining whether the restriction burdened them required an individualized inquiry. *Id.* (quotation omitted). So too here. Plaintiffs' members offer a diversity of services (e.g., messaging, email, marketplaces, digital pin boards, newsfeeds, user-driven product reviews), and so examining whether S.B. 7072's regulation of those services infringes on individual platforms' expression requires an individualized inquiry—this Court must make factual determinations about the operations of each platform. *Moody*, 144 S. Ct. at 2398; *see also id.* at 2435 (Barrett, J., concurring) ("Social-media platforms are diverse.").

Next, the Eleventh Circuit's decision in *Georgia Cemetery Association* is also on-point. The plaintiff-association brought a facial challenge under the Takings Clause against a Georgia law that capped the fees that private cemeteries could charge. 353 F.3d at 1322. To resolve that facial challenge, it was necessary to consider how the law "economically impact[ed] the 'distinct investment backed expectations' of" all covered cemeteries. *Id.* That doomed associational standing, the Eleventh Circuit held, because "the economic impact" on the cemeteries "depend[ed] upon" their individual "economic circumstances." *Id.*; *see also Greater Atl. Home Builders Ass'n, Inc. v. City of Atlanta*, 149 F. App'x 846, 848–49 (11th Cir. 2005) (denying associational standing based on *Georgia Cemetery Association*). Likewise, Plaintiffs' facial First Amendment challenge requires this Court to

14

consider the "impact" that S.B. 7072 has on the "protected editorial discretion" of the covered platforms—a question that "will vary depending upon" each platform's "circumstances." *Ga. Cemetery Ass'n*, 353 F.3d at 1322; *Moody*, 144 S. Ct. at 2398.

On top of that, after this Court identifies all the covered platforms and their functions that S.B. 7072 impacts, it must then apply the appropriate level of First Amendment scrutiny to each function. "Given the diversity of circumstances presented by" the covered platforms, that too is an "individualized inquiry." *Free Speech Coal.*, 974 F.3d at 422 (denying associational standing on an as-applied First Amendment claim). S.B. 7072, for example, might be sufficiently tailored "for one association member" but not for another. *Id.*

That Plaintiffs bring a facial, rather than an as-applied, challenge does not make individual participation of platforms any less necessary. *See Ga. Cemetery Ass'n*, 353 F.3d at 1322 (holding that participation of individual members was required even in a facial challenge). Under the Supreme Court's decision in this case, Plaintiffs' challenge requires an individualized analysis: This Court must examine how Florida's law applies to each covered platform and assess the constitutionality of each application. *Moody*, 144 S. Ct. at 2398. Because that analysis requires the Court to make factual determinations about individual platforms—no different than in an as-applied case—Plaintiffs lack associational standing.

Indeed, this facial analysis, which Plaintiffs have invited by bringing a pre-enforcement challenge to an entire regulatory scheme, is "a daunting, if not impossible, task." *Id.* at 2409 (Barrett, J., concurring). That is all the more true when none of the regulated entities are even parties to the case. *See id.* at 2418 n.2 (Thomas, J., concurring in the judgment). Conducting the facial analysis would be a Sisyphean task without any platforms as parties to "explain how" their functions work and how "specific provisions" of S.B. 7072 intrude on their expression. *Id.* The parties' preliminary-injunction litigation is telling. This Court was forced to rely on secondhand representations from Plaintiffs about how their members operate, DE23–24, and on testimony from a couple platform personnel whom Plaintiffs handpicked to submit declarations. DE25–26. The lack of any direct involvement of any regulated platform contributed to the "underdeveloped" and "incomplete" record that led to the Supreme Court's vacatur, *Moody*, 144 S. Ct. at 2399, 2403—the very situation the individual-participation requirement is intended to prevent.[2]

In short, Plaintiffs cannot establish associational standing for their facial First Amendment challenge because it requires this Court to make factual determinations specific to individual internet platforms. As this Court has pointed out, member

---

[2] To defend against Plaintiffs' claims, moreover, Defendants will have to engage in extensive third-party discovery. They will have to subpoena platforms based in other states and countries, which inevitably will result in delays and discovery disputes, and will ensnare district courts in jurisdictions where the platforms are located. *See* Fed. R. Civ. P. 45(c).

participation is required except "where individualized proof is unnecessary, the plaintiff seeks no money damages, and the question presented is purely legal." *Council of Ins. Agents & Brokers*, 287 F. Supp. 2d at 1308 n.3. But Plaintiffs' challenge both requires individualized proof and presents fact-specific, rather than purely legal, questions.

**2.** Plaintiffs' facial Section 230 preemption claim likewise requires the participation of individual platforms. Plaintiffs argue that S.B. 7072 is facially unconstitutional under the Supremacy Clause because it "impose[s] liability on 'social media platforms' . . . for taking actions protected by Section 230(c)(1) and (c)(2)." DE1 ¶ 141. In Plaintiffs' view, those provisions shield platforms from any law that "interfere[s]" with their decisions to "display certain content." Br. for Appellees at 50, *Moody v. NetChoice*, No. 21-12355, 2021 WL 5238982 (11th Cir. Nov. 8, 2021).

That misunderstands Section 230. It does not override every law that affects platforms' hosting, recommendation, or content decisions; instead, it immunizes platforms from "claim[s] . . . based on content provided by *another* information content provider." *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *2 (11th Cir. June 12, 2023); *Anderson v. TikTok, Inc.*, ___ F.4th ___, 2024 WL 3948248, at *2 (3d Cir. Aug. 27, 2024) (Section 230 "immunize[s]" platforms "only if they are

sued for someone else's expressive activity or content"). But even under Plaintiffs' broad construction of Section 230, they lack associational standing.

Similar to their First Amendment challenge, Plaintiffs' Section 230 preemption claim requires this Court to examine all the "circumstances" to which S.B. 7072 applies. *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (quotation omitted) (applying the facial-challenge standard in *United States v. Salerno*, 481 U.S. 739 (1987) to a preemption claim). If S.B. 7072 is consistent with Section 230 in at least some of its applications, then it is not facially preempted.[3]

That analysis requires the participation of individual platforms. Whether and how S.B. 7072 regulates a platform depends on the platform's functions and "circumstances." *Ga. Cemetery Assoc.*, 353 F.3d at 1322; *see also Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024) (Section 230 "requires case-specific, and indeed claim-specific, analysis"). Consider the provisions of S.B. 7072 directing that a platform may not "deplatform a candidate" for public office during election season or deplatform a "journalistic enterprise" "based on the content of its publication or broadcast." Fla. Stat. §§ 106.072(2), 501.2041(2)(j). If a social-

---

[3] In *Club Madonna Inc. v. City of Miami Beach*, the Eleventh Circuit indicated that *Salerno* does not require a plaintiff to establish that the challenged law is invalid in all applications. 42 F.4th 1231, 1256 (11th Cir. 2022). But since then, the Supreme Court has reaffirmed that under *Salerno*, that is indeed a plaintiff's burden: He must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024); *Moody*, 144 S. Ct. at 2397.

media platform is constructed so that the public can view all the content (e.g., pictures, posts, videos) posted by any user with an account, then those provisions might implicate Section 230 under Plaintiffs' reading by forcing the platform to publish candidate and journalistic-enterprise content that it views as objectionable. But if a platform is constructed so that a user can have an account and access the platform's services, such as direct messages and viewing others' content, without the public viewing all the content generated by the user, then those provisions would not in any way interfere with the platform's decisions about what content to "display" publicly. Br. for Appellees, *supra*, at 50. The platform would have to afford candidates and journalistic enterprises access to its services, but it could still screen objectionable material.

And that is just the tip of the iceberg. Plaintiffs' facial challenge will require this Court to look beyond standard social-media platforms and consider platforms like Uber, Gmail, and Yahoo!, which do not appear to host or display large amounts of user-generated content. Section 230 likely applies quite differently, if at all, to such platforms' hosting, content-moderation, recommendation, and disclosure decisions.

Just like Plaintiffs' First Amendment challenge, then, their facial Section 230 preemption claim demands a fact-intensive, individualized inquiry. This Court

must examine the nature of each covered platform, how S.B. 7072 interacts with its functions, and how Section 230 applies.

**3.** Last, Plaintiffs also lack associational standing for their First Amendment and Section 230 claims because the claims raise an "intraorganizational conflict of interest." *Fla. Auto. Dealers Ass'n, Inc. v. Ford Motor Co.*, 2024 WL 836384, at *2 (N.D. Fla. Jan. 25, 2024) (explaining that a circuit split exists as to whether a conflict of interest can "defeat" associational standing). While the First Amendment protects an internet platform's own expressive activity, Section 230 does "not immunize[]" a platform if it is "sued for [its] own expressive activity." *TikTok*, 2024 WL 3948248, at *2. That creates conflicting interests for Plaintiffs' members. Some will have an interest in a broad swath of platform functions being considered "expressive activity," so that the First Amendment protects more of their conduct from State action. Others will have an interest in a narrow conception of "expressive activity," so that Section 230 immunizes more of their conduct from tort liability. Take Meta and Etsy. Meta is embroiled in tort litigation and may therefore have an interest in expansive Section 230 immunity, while Etsy does not have that problem and may prefer to argue for more expansive First Amendment protection. *See, e.g.*, *In re: Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 22-md-03047 (N.D. Cal.).

20

At the very least, those diverging interests are further reason for this Court not to permit associational standing. The complex, first-of-their-kind questions in this case should be litigated by individual platforms who can ensure their interests are represented. An exception—like associational standing—to the rule against organizations litigating the rights of others should not be applied unless the organization has "the appropriate incentive[s]" and will protect the rights "with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

### B.  Plaintiffs' members would not have standing to assert the Section 230 preemption claim.

Even if participation of individual platforms were unnecessary, Plaintiffs lack standing for their Section 230 preemption claim because their members would not have standing to bring the claim themselves. *See Students for Fair Admissions*, 600 U.S. at 199. To establish standing in a pre-enforcement challenge, a plaintiff must show (1) that it intends to engage in protected conduct, (2) that the conduct is arguably prohibited by the challenged statute, and (3) that it faces a "credible threat of enforcement" from the defendant. *Driehaus*, 573 U.S. at 161–62. Plaintiffs have not sufficiently alleged that any of their members faces a credible threat of enforcement from Defendants for engaging in conduct protected by Section 230.

Plaintiffs' complaint contains no allegations articulating a "*certainly impending*," credible threat that the Attorney General, the Florida Elections

Commission, or the Department of Management Services will take enforcement action that is inconsistent with Section 230. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiffs simply provided a general description of Section 230, a summary of S.B. 7072's substantive provisions, and a conclusory assertion that those provisions allow for enforcement inconsistent with Section 230. *See* DE1 ¶¶ 131–43. But alleging a credible threat of enforcement requires "more than generalizations." *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010). Plaintiffs had to make "specific[]" allegations that evince "an actual and well-founded fear that" the particular defendants here will enforce S.B. 7072 against Plaintiffs' members in a manner barred by Section 230. *Id.* at 1220–21 (quotation omitted); *see also Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1203 (11th Cir. 2021) (finding no standing in part because the plaintiffs failed to show that "the Attorney General either threatened to enforce [the challenged statute] against the[m] or otherwise g[ave] any indication that enforcement is likely").

That required Plaintiffs to plausibly allege that Defendants are likely to violate S.B. 7072's provision that *prohibits* them from enforcement that is "inconsistent with . . . 47 U.S.C. s. 230(e)(3)." Fla. Stat. § 501.2041(9); DE1 ¶ 12 (acknowledging that any applications of S.B. 7072 that conflict with Section 230 are "unenforceable under the Act itself"). Under that provision, Defendants are duty-bound not to take enforcement action against Plaintiffs' members for conduct protected by Section

230. *See* Fla. Stat. § 112.311(6) (state officials are duty-bound to follow state law). In the face of that legal duty, Plaintiffs' allegations fall well short of establishing a credible threat. They pleaded no "factual content" from which this Court could make a "reasonable inference" that the Attorney General, the Florida Elections Commission, or the Department of Management Services will imminently subject their members to liability that is inconsistent with Section 230. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations, in other words, do not overcome the presumption that Defendants will act in good faith and comply with their statutory directive. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies."); *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, we presume the government is acting in good faith.").

For the same reason, the Eleventh Circuit held that the organizational plaintiffs in *City of South Miami* lacked standing. *See City of South Miami v. Governor of Fla.*, 65 F.4th 631, 643 (11th Cir. 2023). Those plaintiffs raised an equal protection challenge to a Florida statute, which had a provision "explicitly prohibit[ing] discriminat[ory]" enforcement. *Id.* But they did not offer any specific evidence that the State defendants would flout their "obligation to follow" that provision and engage in discriminatory enforcement. *Id.* The plaintiffs, the Court concluded, therefore failed to establish standing. *Id.*; *see also Clapper*, 568 U.S. at

406 & n.3, 410, 414 (holding that the plaintiffs lacked standing to challenge a statute on Fourth Amendment grounds and finding it "critical[]" that the statute expressly required enforcement "consistent with the . . . Fourth Amendment"); *Blum v. Holder*, 744 F.3d 790, 798–99 (1st Cir. 2014) (holding that the plaintiffs lacked standing to challenge a statute under the First Amendment in part because the statute "inhibit[ed] prosecution of First Amendment activities" by containing "explicit rules of construction" that exempted First Amendment-protected activity).

Because Plaintiffs' allegations do "not establish that it is likely that" Defendants will imminently bring enforcement actions that "would violate [S.B. 7072] itself," *City of South Miami*, 65 F.4th at 643, Plaintiffs' members would not have standing to assert this Section 230 preemption claim, and Plaintiffs cannot assert it on their behalf.

## II. PLAINTIFFS DO NOT HAVE A CAUSE OF ACTION UNDER SECTION 1983.

Even if Plaintiffs had associational standing, their First Amendment and Section 230 preemption claims fail because they do not have a cause of action under Section 1983. DE1 at 44, 64 (raising both claims under "42 U.S.C. § 1983").

### A. Plaintiffs do not have a cause of action under Section 1983 because they do not allege a deprivation of their own First Amendment or Section 230 rights.

To enjoy a cause of action under Section 1983, a plaintiff must belong to the "particular class of persons" on which it confers a "right to sue." *See Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (quotation omitted). And the only class of persons on which Section 1983 confers a right to sue is those who have personally suffered a deprivation of federal rights. Section 1983 states: "Every [state actor who] subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to *the party injured* in an action at law[.]" 42 U.S.C. § 1983 (emphasis added). The statute thus grants only "the party injured" the right to bring "an action." *Id.*

But Plaintiffs do not claim that they stand to suffer a deprivation of rights under the First Amendment or Section 230. Instead, their claims are premised on their third-party members suffering deprivations of rights. Section 1983 by its plain terms does not give them that sort of derivative cause of action. *Vote.org v. Callanen*, 39 F.4th 297, 304–05 (5th Cir. 2022) (concluding that the plaintiff-association lacked "statutory standing" because the text of Section 1983 "precludes an action premised on the deprivation of another's rights"); *Vote.org v. Byrd*, 700 F. Supp. 3d 1047, 1052 (N.D. Fla. 2023) (finding this textual analysis of Section 1983 "persuasive"); *but see Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023).[4]

---

[4] In the past, the Eleventh Circuit has considered Section 1983 claims alleging a violation of another's rights, but in those cases, it did not consider whether Section 1983's text affords a cause of action. *See, e.g.*, *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1032 (11th Cir. 2008). Those "drive by" cases are not

Finally, Plaintiffs do not have a cause of action under Section 1983 regardless of whether they have associational standing. Associational standing allows an organization to satisfy Article III and prudential limitations on jurisdiction. It does not allow organizations to assert every cause of action that their members could assert. Whether an organization has standing and whether a statute confers on it a cause of action are "distinct" questions. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019) ("Whether a plaintiff has Article III standing is a question distinct from whether she has a statutory cause of action.").

## B. In any event, Congress did not intend for Section 1983 to be available to enforce Section 230.

Even if Plaintiffs could assert their members' Section 1983 causes of action, their Section 230 claim would fail because Section 1983 does not provide a "right of action" for Section 230 preemption. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107–08 (1989). "Given the variety of situations in which preemption claims may be asserted, in state court and in federal court, it [is] incorrect to assume that a federal right of action pursuant to [Section] 1983 exists every time a federal rule of law preempts state regulatory authority." *Id.* Because the Supremacy Clause is not itself a source of rights, Section 1983 can serve as the vehicle for a preemption claim only if the allegedly preemptive statute "unambiguously" confers

controlling here. *See Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1325 n.2 (11th Cir. 2020) (quotation omitted).

rights *and* Congress "intend[ed] that [Section] 1983 be available to enforce those rights." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 186 (2023) (quotation omitted). If, for example, the statute provides for "a specific means of judicial enforcement," it "suggests" that Congress "intended to preclude other[]" means, such as a Section 1983 action. *In re Wild*, 994 F.3d 1244, 1259 (11th Cir. 2021) (en banc) (quotation omitted).

Even if Section 230 could be said to clearly create individual rights for internet platforms, Congress did not intend that Section 1983 "be available to enforce those rights." *Talevski*, 599 U.S. at 186. Section 230 contains its own comprehensive enforcement mechanism that is inconsistent with Section 1983 enforcement; it allows platforms to enforce their immunity by raising it as an affirmative defense "within the confines of a preexisting proceeding." *See Wild*, 994 F.3d at 1259.

Section 230 specifies that it is a shield to be used only when a "cause of action [is] brought" or "liability [is] imposed under any State or local law that is inconsistent with" its provisions. 47 U.S.C. § 230(e)(3). Subsection (c) of the statute establishes "Good Samaritan" immunity for computer service providers that "block[] and screen[] . . . offensive material," *id.* § 230(c), and subsection (e)(3) explains how that immunity is enforced. Just like other Good Samaritan laws and immunity statutes, Section 230 is enforced in a preexisting proceeding as a defense against a "cause of action" or "liability." *Id.* § 230(e)(3); *Klayman v. Zuckerberg*,

753 F.3d 1354, 1357 (D.C. Cir. 2014) ("Preemption under the Communications Decency Act is an affirmative defense.").[5] Section 230 permits no other enforcement mechanism: "Good-Samaritan law[s]" "exempt[]" a person "from liability"—they are not understood to allow a person to bring an action and impose liability on another. *Good-Samaritan Law*, Black's Law Dictionary (12th ed. 2024); *Wild*, 994 F.3d at 1257 (holding that a federal law foreclosed a private right of action because the law used a term that was not "commonly understood to denote a vehicle for initiating a new . . . lawsuit"). It would strain credulity to suggest that Congress conferred on platforms a statutory *defense* on the understanding that it would be asserted *offensively* through Section 1983.

Other subsections underscore that Section 230 contemplates enforcement only in a preexisting proceeding. For example, subsection (e)(5), which elaborates on the scope of the statute's immunity, focuses on preexisting proceedings. It states that "[n]othing" in Section 230 "other than subsection (c)(2)(A) shall be construed to impair or limit" "any claim in a civil action" or "any charge in a criminal prosecution brought" under a sex-trafficking law. 47 U.S.C. § 230(e)(5). And subsection (c)(2)

---

[5] *See also, e.g.*, *McIntyre v. Ramirez*, 109 S.W.3d 741, 742 (Tex. 2003) ("The Good Samaritan statute provides an affirmative defense."); *People v. Morrison*, 939 N.W.2d 728, 732 (Mich. 2019) ("the Good Samaritan law" is an "affirmative defense"); *Breazeal v. Henry Mayo Newhall Mem'l Hosp.*, 234 Cal. App. 3d 1329, 1337 (1991) ("[T]he evidence established the defendants' affirmative defense of Good Samaritan immunity.").

states that no platform "shall be held liable" in a "civil" case, which is language that courts have interpreted as creating only a defense to liability. *See, e.g.*, *Edwards v. Niagara Credit Sols., Inc.*, 584 F.3d 1350, 1352 (11th Cir. 2009) (explaining that the language "may not be held liable" in the Fair Debt Collection Practices Act creates an "affirmative defense"); *Pub. Health Tr. of Miami-Dade Cnty. v. Rolle*, 88 So. 3d 191, 193–94 (Fla. 3d DCA 2011) (similarly interpreting Florida's Good Samaritan Act, which states that individuals "shall not be held liable for any civil damages").

Plaintiffs' contrary view of Section 230 not only "distort[s]" the statutory scheme that Congress created but also departs from how Section 230 was interpreted after its enactment. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 127 (2005). First, permitting internet platforms and their trade associations to sue state and local governments under Section 1983 would transform Section 230 from a mechanism for protecting platforms from civil liability into a tool to chill state and local regulation. Under Section 1983, "the successful plaintiff may recover . . . reasonable attorney's fees and costs," and "[l]iability for attorney's fees would have a particularly severe impact in the [Section 230] context, making . . . governments liable for the (often substantial) legal expenses of large commercial interests for the misapplication of a . . . novel statutory scheme." *Id.* at 123. Second, in the years after Congress enacted Section 230, it was used principally as a defense in preexisting

proceedings.[6] *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 476 (2022) ("longstanding practice" is probative of the meaning of text).

Thus, Section "230 precludes courts from entertaining claims" against a computer service provider, *McCall*, 2023 WL 3946827, at *2 (quotation omitted)— and that is all it can be used for. Plaintiffs cannot repurpose Section 230 as a statute granting freestanding rights that they can enforce through Section 1983. Nor can they save their Section 230 challenge by reformulating it as an equitable cause of action; because Congress has made clear its "intent to foreclose" Section 230 enforcement actions, equity provides no cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–29 (2015).[7]

## III. PLAINTIFFS' CLAIMS FAIL UNDER THE PROPER FACIAL ANALYSIS.

Even assuming that Plaintiffs could establish standing and that they have a cause of action under Section 1983, their allegations are insufficient to support their facial First Amendment or Section 230 preemption claims. The First Amendment

---

[6] *See, e.g.*, *Zeran v. Am. Online*, 129 F.3d 327, 328 (4th Cir. 1997); *Blumenthal v. Drudge*, 992 F. Supp. 44, 51 (D.D.C. 1998); *Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Libr.*, 24 F. Supp. 2d 552, 561 (E.D. Va. 1998); *Doe v. Am. Online*, 718 So. 2d 385, 386 (Fla. 4th DCA 1998); *Ben Ezra, Weinstein, & Co. v. Am. Online*, 206 F.3d 980, 983 (10th Cir. 2000).

[7] In their complaint, Plaintiffs also requested relief for their Section 230 claim under the "Declaratory Judgment Act," DE1 at 64, but the Act requires an "underlying cause of action," which is absent here. *Rebuild Nw. Fla., Inc. v. Fed. Emergency Mgmt. Agency*, 2018 WL 7351690, at *1 & n.6 (N.D. Fla. July 12, 2018) (quotation and emphasis omitted).

challenge fails because Plaintiffs did not allege that an as-applied challenge would provide their members inadequate relief—a prerequisite to pursuing a First Amendment facial overbreadth claim. And their Section 230 preemption challenge fails because, even accepting their allegations, S.B. 7072 has applications that are plainly consistent with Section 230.

**A.** The Supreme Court held that Plaintiffs' facial First Amendment challenge is governed by the First Amendment overbreadth standard. *See Moody*, 144 S. Ct. at 2397. Overbreadth is "strong medicine," to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Its use is generally limited to plaintiffs subject to an overbroad statute who cannot obtain relief on an as-applied claim because the statute happens to constitutionally apply to them. *See N.Y. State Club Ass'n v. New York*, 487 U.S. 1, 11 (1988). But plaintiffs must first pursue an as-applied claim or at the very least "demonstrate that" an as-applied claim would provide them no relief. *Id.* Only then should a court consider whether a statute is unconstitutionally overbroad. *See Renne v. Geary*, 501 U.S. 312, 324 (1991) ("It is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied.").

That requirement ensures that courts do not "short circuit the democratic process" and unnecessarily "prevent[] duly enacted laws from being implemented in

constitutional ways." *Moody*, 144 S. Ct. at 2397. If a plaintiff's injury can be remedied on an as-applied claim, it cannot forgo an as-applied challenge and skip straight to overbreadth simply to "mount [a] gratuitous wholesale attack[] upon [a] state . . . law[.]" *Geary*, 501 U.S. 324. After all, "[e]ven in the First Amendment context, facial challenges are disfavored." *Moody*, 144 S. Ct. at 2409.

Yet that is what Plaintiffs seek to do. They do not allege that an overbreadth challenge is necessary because S.B. 7072 constitutionally applies to their members but nonetheless has a substantial number of unconstitutional applications. To the contrary, they allege that S.B. 7072 does *not* constitutionally apply to their members. Therefore, Plaintiffs have not established that the "strong medicine" of overbreadth invalidation can be administered here. *Broadrick*, 413 U.S. at 613. Instead, they must challenge S.B. 7072 as applied.

**B.** Plaintiffs also failed to plausibly allege that Section 230 facially preempts S.B. 7072. Nothing in S.B. 7072 holds platforms liable "for someone else's expressive activity or content," which is all that Section 230(c)(1) and (2) prohibit. *TikTok, Inc.*, 2024 WL 3948248, at *2. Taken together, those provisions "allow[] [platforms] to perform some editing on user-generated content without thereby becoming liable"—as a publisher would at common law—"for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Roommates.com*, 521

F.3d at 1163; *but see NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1090 (N.D. Fla. 2021).

But even under Plaintiffs' expansive view of Section 230, their claim fails under "the proper facial analysis" because there are circumstances in which S.B. 7072 is plainly consistent with Section 230. *Moody*, 144 S. Ct. at 2398. Throughout this case, Plaintiffs have sought to invalidate Florida's law by "focus[ing] on hypothetical scenarios where [the law] might raise constitutional concerns" under the Supremacy Clause. *United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024). But in a facial challenge, the focus must instead be on "the circumstances in which [the law is] most likely to be constitutional." *Id.* There are many such circumstances.

For starters, all S.B. 7072's provisions regulating censorship and deplatforming can be enforced against platform actions taken in bad faith, because Section 230 protects only "good faith," or "Good Samaritan," actions. 47 U.S.C. § 230(c); *see also e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *3 (M.D. Fla. Feb. 8, 2017) (concluding that Section 230 might not apply because the plaintiff presented evidence of bad faith).

And that aside, there are a variety of circumstances in which S.B. 7072 does not "interfere[]" with any "editorial discretion." Br. of Appellees, *supra*, at 50. Consider again the provisions directing that a platform may not "deplatform a candidate" for public office during election season or deplatform a "journalistic

enterprise" "based on the content of its publication or broadcast." Fla. Stat. §§ 106.072(2), 501.2041(2)(j). As applied to a provider of email services, such as Gmail or Yahoo!, those provisions neither "treat" the provider like a "publisher" or "speaker" nor stop it from "restrict[ing] access to or availability of material" that is "objectionable." 47 U.S.C. § 230(c). The provision might prevent the provider from denying a candidate or journalistic enterprise an email account, but it would not force the provider to make publicly available any objectionable content generated by the candidate or journalistic enterprise.

Those applications alone are enough to defeat Plaintiffs' facial preemption challenge.

## CONCLUSION

This Court should dismiss Counts I and V of Plaintiffs' complaint for lack of standing or lack of cause of action. Alternatively, the Court should enter judgment on the pleadings in favor of Defendants on the claims.

Dated: September 23, 2024

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
DANIEL W. BELL
  *Chief Deputy Solicitor General*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
DARRICK W. MONSON
  *Assistant Solicitor General*

CHARLES J. COOPER
DAVID H. THOMPSON
BRIAN W. BARNES
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

This motion and memorandum of law complies with Local Rule 7.1(F) because it has 7,886 words.

Because this motion will "determine the outcome of a . . . claim," no attorney conference was required. L.R. 7.1(D).

*/s/ Kevin A. Golembiewski*
Counsel for Defendants

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of September, 2024, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ Kevin A. Golembiewski*
Counsel for Defendants