# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC; and COMPUTER &
COMMUNICATIONS INDUSTRY
ASSOCIATION,

    *Plaintiffs*,

v.

ASHLEY BROOKE MOODY, in her
official capacity as Attorney General of
the State of Florida; CHAD MIZELLE,
in his official capacity as Commissioner
of the Florida Elections Commission;
JONI ALEXIS POITIER, in her official
capacity as Commissioner of the Florida
Elections Commission; KYMBERLEE
CURRY SMITH, in her official capacity
as Commissioner of the Florida Elections
Commission; JOHN MARTIN HAYES,
in his official capacity as Commissioner
of the Florida Elections Commission;
CARLOS LOPEZ-CANTERA, in his
official capacity as Commissioner of the
Florida Elections Commission; MARVA
PRESTON, in her official capacity as
Commissioner of the Florida Elections
Commission; and RICK JOYCE, in his
official capacity as Commissioner of the
Florida Elections Commission,

    *Defendants*.

Case No. 4:21-cv-0220-RH-MAF

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      The Internet is home to everything from political discourse and friendly banter to incitement and obscenity.  Given the sheer volume of content on the Internet, websites like Facebook and YouTube have no realistic choice but to exercise editorial discretion over the expression they disseminate.  Their users—who otherwise would be flooded with irrelevant or toxic content—demand nothing less.

2.      Websites, no less than other media, sometimes face criticism for how they choose to exercise that editorial discretion.  That is to be expected in a nation committed to the First Amendment, which encourages more speech as the remedy for controversial speech and editorial judgments.

3.      Florida, however, has taken a different tack.  In 2021, it enacted Senate Bill 7072 ("S.B.7072"), a law that seeks to punish select private parties for exercising editorial discretion in ways the state disfavors.

4.      Florida made no secret of the law's motivation and aim:  to combat what it perceived to be a concerted effort by so-called "big tech oligarchs in Silicon Valley" to silence "conservative" speech on their websites.  To ensure that the state's preferred messages reach a broad audience, S.B.7072 singles out a handful of popular websites and requires them to publish or promote a wide range of third-party speech that they do not want to publish or promote.  The law applies to websites like Facebook and YouTube, but it spares websites with a different perceived ideological

bent like Truth Social, Rumble, and Gab. And it requires covered websites to disseminate virtually all speech by the state's preferred speakers, no matter how blatantly or repeatedly the speakers violate the website's terms of use.

5.   Until now, the state has principally defended S.B.7072 on the theory that websites like Facebook and YouTube do not engage in First Amendment activity when they make decisions about what content to disseminate and how to arrange and organize it. But the Supreme Court has now laid that argument to rest. *See Moody v. NetChoice, LLC*, 144 S.Ct. 2383 (2024). As the Court made clear, when websites "decide which third-party content" they "will display, or how the display will be ordered and organized, they are making expressive choices." *Id.* at 2406. And "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Id.* at 2401. In short, when the government regulates websites' "choices about the views they will, and will not, convey," it "interfere[s] with protected speech." *Id.* at 2405.

6.   Florida is of course free to criticize websites for their decisions about what content to disseminate, remove, demote, or restrict. But the First Amendment prohibits the state from overriding those editorial judgments and substituting its own. Just as Florida may not tell the Miami Herald what opinion pieces to publish or Fox News what interviews to air, it may not tell Facebook and YouTube what content to

publish or promote.  When it comes to disseminating speech, decisions about what messages to include, exclude, promote, or demote are for private parties—not the government—to make.  Indeed, any supposed governmental interest in "correct[ing] the mix of speech that the major social-media platforms present," or in "better balanc[ing] the speech market," is an interest "related to the suppression of free expression"—which is "not [a] valid, let alone substantial," interest.  *Id.* at 2407.

7.    Florida has identified no other interest that could justify S.B.7072, and the provisions of the law at issue here are not remotely tailored to any interest it might come up with.  The Supreme Court's decision thus eliminates any doubt that those provisions are unconstitutional as applied to websites operated by Plaintiffs' members when they curate and disseminate compilations of third-party speech posted on their services.  *Id.* at 2409.[1]  Although the Court's decision focused in particular on Facebook's Feed and YouTube's homepage, its reasoning applies *whenever* a website exercises editorial judgment "to filter, alter, or label [its] users' posts," *id.* at 2397—in other words, whenever a website curates and disseminates compilations of third-party speech posted on it.  All of that activity is protected by

---

[1]  For purposes of the amended complaint, "curating and disseminating compilations of third-party speech" refers to "collect[ing] speech created by third parties" and posted on their services and "mak[ing] that speech available to … individuals who have chosen to 'follow' the 'post'-er or members of the general public."  *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1203-04 (11th Cir. 2022), *vacated by Moody*, 144 S.Ct. at 2409.

the First Amendment, regardless of which NetChoice or Computer & Communications Industry Association (CCIA) member engages in it. So the law is equally unconstitutional as applied to any member when it does.

8.      While the Supreme Court's decision resolves this case as to S.B.7072's "heartland applications," *id.* at 2398, the Court remanded so that this Court (and the Eleventh Circuit) could reconsider Plaintiffs' facial challenges. That requires deciding, for each of the provisions Plaintiffs challenge, whether "a substantial number" of its "applications are unconstitutional, judged in relation" to any "plainly legitimate sweep" the provision may have. *Id.* at 2397.

9.      Each challenged provision is facially unconstitutional under that standard. Florida has never claimed any interest in enforcing S.B.7072 against anything other than the "heartland applications" of the law that the parties have spent so much time litigating in this case. Indeed, it could not have done so, as those "heartland applications" "*are* the principal things regulated, and should have just that weight in the facial analysis." *Id.* at 2398. In fact, they are the *only* thing regulated by S.B.7072, so the challenged provisions' constitutionality stands and falls on their constitutionality as applied to them. Because Florida cannot meet its burden of proving that the challenged provisions are constitutional as applied to websites when they curate and disseminate compilations of third-party speech posted on their services, they are unconstitutional in all their applications.

10.    Florida cannot save any of the provisions from facial invalidation by belatedly hypothesizing that they may apply to ride-sharing apps like Uber, payment services like PayPal, or email providers like Gmail, as those services are not covered by S.B.7072's definition of "social media platform."   But even if that definition could be read to reach beyond the Act's heartland applications, the challenged provisions would still be unconstitutional on their face.   No matter how broad the definition may be, those provisions by their terms apply (and indeed make sense) only when a website curates and disseminates compilations of third-party speech posted on the website—in other words, only when it engages in protected First Amendment activity—and so are unconstitutional in all their applications.   And even if some of the challenged provisions might conceivably have a few other hypothetical (and unintended) applications that could pass constitutional muster, all would still "prohibit[] a substantial amount of protected speech relative to" any "legitimate sweep" they may have.  *Id.* at 2397.

11.    But at a bare minimum, the challenged provisions are plainly unconstitutional as applied to websites operated by NetChoice and CCIA members when they curate and disseminate compilations of third-party speech posted on their services.   So while the challenged provisions should not stand at all, their enforcement must at the very least be enjoined in the only circumstances where the state has ever expressed any interest in enforcing them.   Certain provisions are also

unconstitutionally vague and preempted by federal law, which broadly protects the editorial judgments of websites and bars enforcement of state laws that, like S.B.7072, conflict with and stand as an obstacle to that important federal policy.

12.    Although the Supreme Court has now settled the governing First Amendment law in Plaintiffs' favor, the stakes here remain high.  The efforts NetChoice and CCIA members undertake to keep out potentially harmful, offensive, and unlawful material—including terrorist propaganda, child sexual abuse material, fraudulent schemes, and bullying—are designed to keep the Internet useful and safe. Florida might disagree with some of those decisions.  But the First Amendment does not permit it to "control the expression of ideas, promoting those it favors and suppressing those it does not."  *Id.* at 2409.

## THE PARTIES

13.    Plaintiff NetChoice is a nonprofit trade association for Internet companies.  NetChoice's members include (among others) Google LLC (which operates YouTube), Meta Platforms, Inc. (which operates Facebook and Instagram), Pinterest, Inc., and X Corp. (formerly known as Twitter).  These (and potentially other) NetChoice members are directly regulated by S.B7072:  They satisfy the statutory definition of "social media platform," *see* Fla. Stat. §501.2041(1)(g), and engage in the exact kinds of editorial activity that the Act restricts and/or prohibits. A full list of NetChoice's members is located here: https://tinyurl.com/4zkv5nu8.

14.    NetChoice's mission is directly related to this lawsuit:    The association's purpose is to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses to make the Internet more accessible and useful.  NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that S.B.7072 undermines.  NetChoice members are harmed whenever Florida interferes with their editorial discretion to curate and disseminate compilations of third-party speech posted on their services, making their individual participation as parties to this lawsuit unnecessary.  Accordingly, NetChoice has standing to vindicate their rights under the First and Fourteenth Amendment and Section 230 and to prevent the economic and other injuries S.B.7072 will cause them absent judicial relief.

15.    Plaintiff Computer & Communications Industry Association (CCIA) is a nonprofit membership association representing a broad cross-section of companies in the computer, Internet, information technology, and telecommunications industries.  CCIA's members include (among others) Google LLC, Meta Platforms, Inc., Pinterest, Inc., and X Corp.  These (and potentially other) CCIA members are directly regulated by S.B.7072:  They satisfy the statutory definition of "social media platform," *see* Fla. Stat. §501.2041(1)(g), and engage in the exact kinds of editorial

activity that the Act restricts and/or prohibits.  A full list of CCIA's members is located here: https://tinyurl.com/mvh4tv2n.

16.    CCIA's mission is directly related to this lawsuit:  For more than 50 years, CCIA has promoted open markets, open systems, and open networks.  CCIA serves the interests of its members, which share a commitment to the vital First Amendment protections that S.B.7072 undermines.  CCIA members are harmed whenever Florida interferes with their editorial discretion to curate and disseminate collections of third-party speech posted on their services, making their individual participation as parties to this lawsuit unnecessary.  Accordingly, CCIA brings this action to vindicate their rights under the First and Fourteenth Amendments and Section 230 and to prevent the economic and other injuries that S.B.7072 will cause them absent judicial relief.

17.    Defendant Ashley Brooke Moody is the Attorney General of Florida. She is the state's chief law enforcement officer and representative in "all suits or prosecutions, civil or criminal or in equity," brought or opposed by Florida.  Fla. Stat. §§16.01, et. seq.  In her official capacity, Defendant Moody oversees the Florida Department of Legal Affairs, which is responsible for enforcing Section 4 of S.B.7072.  Section 4 expressly authorizes the Attorney General to "investigate" a "suspect[ed] violation" of that section of the Act and "to bring a civil or administrative action under this part."  S.B.7072 §4(5).  NetChoice and CCIA sue

Defendant Moody for declaratory and injunctive relief in her official capacity as the Attorney General of the State of Florida.

18. Defendant Chad Mizelle is a Commissioner of and the Chair of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act.[2] NetChoice and CCIA sue Defendant Mizelle for declaratory and injunctive relief in his official capacity as Commissioner and Chair of the Florida Elections Commission.

19. Defendant Joni Alexis Poitier is a Commissioner of and the Vice Chair of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act. NetChoice and CCIA sue Defendant Poitier for declaratory and injunctive relief in her official capacity as Commissioner and Vice Chair of the Florida Elections Commission.

---

[2] The terms of service for some of the Commissioners of the Florida Elections Commission have expired. The named individuals, however, are still serving as Commissioners and will continue to do so until the Governor makes new appointments to their positions.

20.    Defendants Kymberlee Curry Smith, John Martin Hayes, Carlos Lopez-Cantera, Marva Preston, and Rick Joyce are Commissioners of the Florida Elections Commission, which is the administrative agency charged with enforcing, among other things, Chapter 106 of Florida's Election Code and thus has jurisdiction under Florida law to investigate and determine violations of Section 2 of the Act. NetChoice and CCIA sue Defendants Smith, Hayes, Lopez-Cantera, Preston, and Joyce for declaratory and injunctive relief in their official capacities as Commissioners of the Florida Elections Commission.[3]

## JURISDICTION AND VENUE

21.    NetChoice's and CCIA's causes of action arise under 42 U.S.C. §1983, this Court's equitable jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908), and the United States Constitution.  The Court therefore has jurisdiction under 28 U.S.C. §1331.

22.    Venue is proper in this District under 28 U.S.C. §1391 because Defendants perform their official duties in the Northern District of Florida and are therefore considered to reside in this District as a matter of law.

---

[3] Some of the Commissioners that Plaintiffs originally sued are no longer Commissioners.  Plaintiffs have substituted the current Commissioners as Defendants.  *See* Fed. R. Civ. P. 25(d).

# BACKGROUND

23.    NetChoice and CCIA are Internet trade associations whose members operate a variety of popular websites on which users can share and interact with content, including Facebook, Instagram, Pinterest, X (formerly known as Twitter), and YouTube.[4]  The content that users seek to share on these websites is diverse and substantial:  It is generated by billions of users located throughout the world, it is uploaded in a variety of formats and languages, and it spans the entire range of human thought—from the creative, humorous, and political to the offensive, dangerous, and illegal.

24.    Given the sheer volume and breadth of material users seek to share on their websites, NetChoice and CCIA members have invested extensive resources into developing policies and standards for editing, curating, arranging, displaying, and disseminating content in ways that reflect their unique values and the distinctive communities they hope to foster.

25.    Facebook, for example, "wants people to be able to talk openly about the issues that matter to them."    Meta, *Facebook Community Standards*, https://tinyurl.com/34fm6vna (last visited Oct. 31, 2024).  But it also recognizes that

---

[4] While most members operate mobile applications and other services in addition to websites, this complaint collectively refers to all of their services as "websites." As used here, the term "website" includes any "social media platform" subject to S.B.7072, regardless of how it is accessed by users.

"the internet creates new and increased opportunities for abuse." *Id.* It therefore restricts several categories of content that it finds objectionable, such as hate speech, bullying, and harassment. *Id.*

26.    Pinterest's policies advise that "Pinterest isn't a place for antagonistic, explicit, false or misleading, harmful, hateful, or violent content or behavior." Pinterest, *Community Guidelines*, https://tinyurl.com/4rjsevbp (last visited Oct. 31, 2024). Pinterest therefore reserves the right to "remove, limit, or block the distribution of such content and the accounts, individuals, groups and domains that create or spread it based on how much harm it poses." *Id.*

27.    X, for its part, seeks to "empower people to understand different sides of an issue and encourage dissenting opinions and viewpoints to be discussed openly." X, *Help Center, Our Approach to Policy Development and Enforcement Philosophy*, https://tinyurl.com/bdfyxdty (last visited Oct. 31, 2024). So rather than take a heavy handed approach to speech it finds objectionable, X prefers to "promote[] counterspeech: speech that presents facts to correct misstatements or misperceptions, points out hypocrisy or contradictions, warns of offline or online consequences, denounces hateful or dangerous speech, or helps change minds and disarm." *Id.* X also prohibits, among other things, (1) various kinds of "hateful conduct," X, *Help Center, Hateful Conduct*, https://tinyurl.com/77mejuv5 (last visited Oct. 31, 2024); (2) "hoping for others to die, suffer illnesses, tragic incidents,

or experience other physically harmful consequences," X, *Help Center, Violent Content*, https://tinyurl.com/32jc5fzb (last visited Oct. 31, 2024), and (3) "[p]osts that include manifestos or other similar material produced by perpetrators [of violent acts] . . . , even if the context is not abusive," X, *Help Center, Perpetrators of Violent Attacks*, https://tinyurl.com/mu6uvnn3 (last visited Oct. 31, 2024).

28.    YouTube's policies likewise "aim to make YouTube a safer community while still giving creators the freedom to share a broad range of experiences and perspectives."   YouTube, *Community Guidelines*, https://tinyurl.com/55mzk979 (last visited Oct. 31, 2024).   YouTube thus prohibits pornography, violent and graphic content, and more. *Id.*

29.    Pursuant to their policies, NetChoice and CCIA members make all manner of editorial choices about the speech that users post on their websites. Members remove content that they do not wish to display.  They decide how to rank or prioritize third-party speech, including by reducing or broadening the reach of content in accordance with their respective policies.  They may determine that certain users have violated their community standards in sufficiently egregious ways that they should be suspended from posting altogether.  Members may also attach labels to certain posts to warn users that the content may be sensitive or disturbing, or to help ensure that users have more precise information to help them judge what to read, trust, and share.  Whatever form they take, these editorial choices reflect the

judgments of NetChoice and CCIA members about how the compilations of user-speech they present to their users "most reflect[] [their] own views and priorities." *Moody*, 144 S.Ct. at 2394. These choices represent efforts by members to eliminate objectionable content from their services and to ensure that users find and engage with third-party content that is relevant, useful, and interesting to them.

30. ***Content Removal.*** NetChoice and CCIA members may remove content that violates their policies. Objectionable material may fall within a wide variety of categories, generally described by members' content policies and guidelines (referenced above). For example, in 2019, several members removed video footage of the mass shootings targeting two mosques in Christchurch, New Zealand that the gunman posted online. Members also frequently remove terrorist propaganda, content promoting fraudulent schemes, sexually graphic content, and material that encourages or glorifies self-harm or other dangerous conduct.

31. NetChoice and CCIA members must make these decisions on a vast scale. For example, in the second quarter of 2024, Facebook flagged or removed 7.8 million pieces of "bullying and harassment content," 725,000 pieces of "organized hate content," and 7.2 million pieces of "hate speech content." *See* Meta, *Community Standards Enforcement Report, Q2 2024 Report*, https://tinyurl.com/2u9a4uu9 (last visited Oct. 31, 2024) ("*Q2 2024 Report*"). Instagram flagged or removed 10.1 million pieces of "bullying and harassment

content," 199,800 pieces of "organized hate content," and 7.7 million pieces of "hate speech content" in that same quarter.  *See id.*  Between October and December 2023, Pinterest took down 809,727 distinct images containing adult content, which amounted to more than 77 million pins.  Pinterest, *Transparency Report*, https://tinyurl.com/5n7kep7y (last visited Oct. 31, 2024).  Between April and June 2024, YouTube removed more than 3.2 million channels and nearly 8.5 million videos (the majority of which had no recorded views); most of those removals were under YouTube's child safety policies.  Google Transparency Report, *YouTube Community Guidelines Enforcement*, https://tinyurl.com/7ks3hmr6 (last visited Oct. 31, 2024).

32.    ***Prioritization and De-prioritization of Content***.  Sometimes members stop short of removing content, instead opting to place some content more prominently than other content.  "Of the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do.  The selection and ranking is most often based on a user's expressed interests and past activities.  But it may also be based on more general features of the communication or its creator."  *Moody*, 144 S.Ct. at 2403. For instance, in 2019, YouTube changed its recommendation systems to reduce the spread of "Borderline Content," which encompasses content that may not violate the

15

Community Guidelines, but comes close. That led to a 70% drop in the watch time of such borderline content in the United States in that year.

33.    NetChoice and CCIA members may also choose to prioritize content based on a user's expected interests, preferences, or location—often with the aim of helping users find content that may particularly interest them from the vast sea of material posted on their websites. For example, YouTube suggests videos that users may wish to watch via recommended videos on its homepage and through its "Up Next" feature. As YouTube explains, such recommendations "play an important role in how we maintain a responsible platform. They connect you to relevant, timely, and high-quality information, and at the same time complement the work done by our Community Guidelines, which define what isn't allowed on YouTube." YouTube, *Recommended Videos*, https://tinyurl.com/2h2prwks (last visited Oct. 31, 2024). Meta has similarly developed systems for Facebook that rank content based on what it believes users are most likely to find relevant and meaningful, as well as based on Facebook's Recommendation Guidelines. Under those Guidelines, content may not be eligible for recommendation if, for example, it: (1) impedes Meta's ability to foster a safe community, including violent content, sexually suggestive content, content that discusses or trivializes self-harm or depression, and content promoting certain regulated products; (2) is sensitive or low-quality content about health or finance; or (3) is false or misleading content that

includes claims that have been found to have been false by independent fact-checkers.  Meta, *Recommendation Guidelines*, https://tinyurl.com/y558f3zs (last visited Oct. 30, 2024).

34.    ***Family Friendly Experiences.***  NetChoice and CCIA members also curate the content users post on their websites to provide safer experiences for users.  Those tools can be used by adults to protect their children, or by entities (such as universities or public libraries) that want to limit the use of certain services on their network, while still allowing adults and others to find a wide range of content.  One way to achieve this is via "age-gating," which is used by various members to restrict access to certain types of content.  For example, age-gating might be used to restrict access to videos about a cannabis dispensary, material featuring people in sexually provocative poses, content using vulgar language, and videos with violent or gory imagery.  YouTube, for example, offers a feature called "Restricted Mode," which is an optional setting users can activate to limit the content that will be displayed to them.  Libraries, schools, and public institutions also frequently use this feature.  Videos containing adult content such as drug or alcohol use, sexual situations, or violence are not shown to users who have activated Restricted Mode.  *See* YouTube, *Your YouTube Content & Restricted Mode*, https://tinyurl.com/4kc2zs74 (last visited Oct. 31, 2024).

35.    *Labels.* Members may also attach warning labels, disclaimers, or general commentary to content on their platforms.  For example, Facebook adds "warning screens" over potentially sensitive content such as violent or graphic imagery, nudity, and posts related to suicide or suicide attempts.  Meta, *Providing Context on Sensitive or Misleading Content* (updated Apr. 2, 2024), https://tinyurl.com/2s38mp7r.  X may place sensitive media—such as adult content or graphic violence—behind warnings so that users will know that they may see sensitive content if they click through.  X, *Help Center*, *Notices on X and What They Mean*, https://tinyurl.com/ykrj8zy6 (last visited Oct. 31, 2024).  YouTube adds labels to content by state-supported media channels, including on videos sponsored by the Russian government.  *See* Geoff Samek, *Greater Transparency for Users Around New Broadcasters*, YouTube Official Blog (Feb. 2, 2018), https://tinyurl.com/yc2bkhsz.  Facebook does too.  *See* Nathaniel Gleicher, *Labeling State-Controlled Media on Facebook*, Meta (June 4, 2020) https://tinyurl.com/yczecafd.  X adds "community notes" to misleading posts to provide additional context.  *See* X, Community Notes, *Introduction – Community Notes Guide*, https://tinyurl.com/5d9m2tvb (last visited Oct. 31, 2024).

36.    *Termination or Suspension of Users.*  When a user account has repeatedly posted improper material or otherwise violated the website's rules, the website may decide to "bar[] a specific user from posting on the provider's site.  This

can happen, for example, when a user violates the provider's standards by engaging in fraud, spreading a foreign government's disinformation, inciting a riot or insurrection, providing false medical or public-health information, or attempting to entice minors for sexual encounters." *NetChoice, LLC v. Moody*, 546 F.Supp.3d 1082, 1086 (N.D. Fla. 2021). For example, shortly after Russia invaded Ukraine, YouTube blocked Russian state-sponsored news channels. Mike Isaac & Sheer Frenkel, *Meta and YouTube Crack Down on Russian Media Outlets*, N.Y. Times (Sept. 17, 2024), https://tinyurl.com/24ztbnuu. Likewise, Facebook removed dozens of Chinese accounts that, while posing as members of U.S. military families, targeted American audiences with military-themed content and attempted to undermine U.S. support for Taiwan. *See* Ben Nimmo et al., Meta*, Adversarial Threat Report, Fourth Quarter 2023*, at 18-19 (Feb. 2024), https://tinyurl.com/yzf7c9e6.

## SENATE BILL 7072

37.    Given the expressive nature of these kinds of editorial decisions, it is inevitable that some will disagree with and criticize them. Others will agree with and praise them. Some will say too much speech is disseminated; others will say too little. That is all to be expected in a nation that values the First Amendment and its commitment to more speech as the remedy for speech with which people disagree. But in May 2021, Florida lawmakers embraced a different—and dangerous—

approach: They enacted S.B.7072, which aims to punish select websites for exercising their editorial discretion in ways the state disfavors.

38.     Florida was not coy about the law's motivation and aim.  Upon signing the bill, the Governor announced in his official public statement that the state was taking "action to ensure that 'We the People'—real Floridians across the Sunshine State—are guaranteed protection against the Silicon Valley elites" and to check the "Big Tech censors" that "discriminate in favor of the dominant Silicon Valley ideology."  Ron DeSantis, News Release, Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://tinyurl.com/4fwf9788 ("Gov. News Release").  That same official statement quotes the Lieutenant Governor as saying:  "What we've been seeing across the U.S. is an effort to silence, intimidate, and wipe out dissenting voices by the leftist media and big corporations …Thankfully in Florida we have a Governor that fights against big tech oligarchs that contrive, manipulate, and censor if you voice views that run contrary to their radical leftist narrative."  *Id.*  One of the law's sponsors in the Florida legislature added: "Day in and day out, our freedom of speech as conservatives is under attack by the 'big tech' oligarchs in Silicon Valley.  But in Florida, we said this egregious example of biased silencing will not be tolerated."  *Id.*

39.    The text of S.B.7072 confirms that Florida passed the law to target certain entities "because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).    The formal legislative findings declare that "[s]ocial media platforms have *unfairly* censored, shadow banned, deplatformed, and applied post-prioritization algorithms," and that the state "has a substantial interest in protecting its residents from inconsistent and *unfair* actions" by those "social media platforms."    S.B.7072 §§1(9)-(10) (emphases added).

40.    Confirming that the state's concerns did not extend to all websites commonly thought of as "social media platforms"—but only the largest ones with a perceived "unfair" "leftist" bent—the law limits the definition of "[s]ocial media platform" to services with at least 100 million monthly users or $100 million in gross annual revenue, thus singling out the largest websites for disfavored treatment.    Fla. Stat. §501.2041(1)(g)(4).    The full definition states that the term "[s]ocial media platform" means "any information service, system, Internet search engine, or access software provider" that "[p]rovides or enables computer access by multiple users to a computer servicer, including an Internet platform or social media site," "[o]perates as a … legal entity," "[d]oes business in the state," and generates at least $100 million in annual revenue or has at least 100 million monthly users.    *Id.* §501.2041(1)(g).    That definition captures websites such as Facebook, Instagram, and YouTube.    But it excludes websites such as Rumble, Gab, and Truth Social—

i.e., websites perceived as exercising their editorial discretion in a manner that the state prefers.

41.    It was equally clear that the state's aim in enacting S.B.7072 was to target websites that host and disseminate third-party speech—websites that in the state's view are akin to "the new public town square."  S.B.7072, §1(4).  The law's supporters never suggested that S.B.7072 would apply to other kinds of websites, such as those offering private messaging functionality or email services, or websites on which users sell various goods or services, arrange for ride sharing, or make payments.  Instead, the clear focus of S.B.7072 and its proponents was on limiting and burdening the editorial judgments of typical "social media"—i.e., websites that, "[a]t their core, … collect speech created by third parties—typically in the form of written text, photos, and videos, which we'll collectively call 'posts'—and then make that speech available to others, who might be either individuals who have chosen to 'follow' the 'post'-er or members of the general public."  *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1203-04 (11th Cir. 2022), *vacated by Moody*, 144 S.Ct. at 2409.

42.    S.B.7072 imposes a slew of requirements that commandeer how those websites exercise editorial discretion over what content they disseminate and how:

43.    ***Consistency.***  S.B.7072 requires a "social media platform" to "apply censorship, deplatforming, and shadow banning standards in a consistent manner

22

among its users on the platform." Fla. Stat. §501.2041(2)(b). Although "censorship" typically refers to governmental efforts to restrict speech, S.B.7072 defines "censor" as "any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user." *Id.* §501.2041(1)(b). "Deplatform" is defined as "the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days." *Id.* §501.2041(1)(c). "Shadow ban" is defined as "action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform," and "includes acts of shadow banning by a social media platform which are not readily apparent to a user." *Id.* §501.2041(1)(f). The law does not define "consistent manner." But whatever that phrase may mean, this provision empowers Florida to punish websites for removing content or users, displaying content less prominently, and putting labels on third-party content if the state (or a jury) determines that they acted in an "inconsistent" manner.

44. ***Posts by or about political candidates.*** "A social media platform may not apply or use post-prioritization or shadow banning algorithms for content and material posted by or about … a candidate." *Id.* §501.2041(2)(h). The law defines

"[c]andidate" to include anyone who "files qualification papers and subscribes to a candidate's oath." *Id.* §106.011(3)(e). This provision empowers Florida to punish websites for their editorial decisions about how prominently to display speech by or about any candidate.

45.    ***Deplatforming political candidates.*** S.B.7072 prohibits a "social media platform" from "willfully deplatform[ing] a candidate for office." Fla. Stat. §106.072(2). The provision forces websites to allow all candidates to continue using their services no matter how egregiously the candidate violates their content rules or terms of use.

46.    ***Journalistic enterprises.*** A "social media platform may not take any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." *Id.* §501.2041(2)(j). The term "[j]ournalistic enterprise" is defined broadly to include any entity doing business in Florida that (1) publishes in excess of 100,000 words online and has at least 50,000 paid subscribers or 100,000 monthly users, (2) publishes 100 hours of audio or video online and has at least 100 million annual viewers, (3) operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable subscribers, or (4) operates under an FCC broadcast license. *Id.* §501.2041(1)(d). As with the candidate provisions, this provision prohibits websites from exercising their editorial discretion by removing or displaying less prominently the content of

24

any "journalistic enterprise," no matter how egregiously that enterprise may violate their terms of use.

47.     ***Rule changes.***  A "social media platform must inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days."  *Id.* §501.2041(2)(c).  This provision hamstrings the ability of websites to exercise editorial discretion by restricting or removing new and unanticipated forms of content that they wish to display less prominently or not at all.  Moreover, it imposes an onerous compelled-speech mandate on websites' exercise of editorial judgment, as it requires websites that seek to change their editorial policies to speak in the form of a highly burdensome individualized notice with no guidance about how that is to be accomplished.

48.     ***User opt-out.***  A "social media platform" must allow users to opt out of its "post-prioritization" and "shadow banning" algorithms. *Id.* §501.2041(2)(f).  For users who opt out, material must instead be displayed in "sequential or chronological" order.  *Id.*  Users must be offered the opportunity to opt out annually.  *Id.* §501.2041(2)(g).  This provision gives users the right to unilaterally override the editorial decisions of the websites they choose to use.  Moreover, given the way S.B.7072 defines the term "user," this provision could be read to allow users to demand that websites exempt their own content from their editorial policies.  *See*

*NetChoice*, 546 F.Supp.3d at 1088 ("It is not clear how a social media platform would display content posted by multiple users who all opt out—a wild west of content on which the platform would be prohibited from using an algorithm.").

49.    S.B.7072 also contains several provisions that compel websites to provide information designed to facilitate enforcement of its restrictions on editorial discretion:

50.    ***Detailed explanation.***  S.B.7072 prohibits a "social media platform" from "deplatform[ing]," "censor[ing]," or "shadow ban[ning]" a user without "notifying the user who posted or attempted to post the content or material." *Id.* §501.2041(2)(d).  The notice must be in writing, be delivered within seven days, and include both a "thorough rationale explaining the reason that the social media platform censored the user" and a "precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable." *Id.* §501.2041(3).  The evident purpose of this exceedingly burdensome compelled-speech requirement is to try to smoke out potential violations of the "consistency" provision.  And the provision has the practical effect of providing bad-faith users with a roadmap for circumventing algorithms that detect violations of a website's terms of service, and of chilling the speech of those who flag violations for the website.

51.    *Standards.*  S.B.7072 requires a "social media platform" to "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." *Id.* §501.2041(2)(a).  Again, this burdensome compelled-speech requirement appears designed to facilitate claims that covered websites are not exercising their editorial discretion sufficiently "consistently."  It requires detailed public disclosure of the editorial standards used by private platforms to carry out their First Amendment right to "make choices about what speech to display and how to display it." *Moody*, 144 S.Ct. at 2393.

52.    *View counts.*  S.B.7072 requires "social media platform[s]" to provide "a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts," and provide "upon request" the "number of other individual platform participants who were provided or shown content or posts." *Id.* §501.2041(2)(e).  Yet again, the apparent purpose of this compelled-speech mandate is to determine whether and how a covered website is exercising its editorial discretion.

53.    S.B.7072 imposes steep penalties.  On top of exposing violators to civil and administrative actions by the Florida Attorney General, *id.* §501.2041(5), the law creates a private cause of action that allows individual users to sue to enforce the "consistency" and "notice" mandates and authorizes awards of up to $100,000 in statutory damages for each claim, as well as actual damages, equitable relief,

punitive damages, and in some cases attorneys' fees. *Id.* §501.2041(6). The law also authorizes the Florida Elections Commission to impose significant fines for violating the candidate "deplatforming" provision ($250,000 per day for candidates for state office; $25,000 per day for candidates for other offices). *Id.* §106.072(3). And it appears to contemplate potential criminal penalties as well. *Id.* §106.27(1).

## CLAIMS FOR RELIEF

### COUNT ONE
### FIRST AMENDMENT – AS APPLIED
### (42 U.S.C. §1983)

54.     NetChoice and CCIA re-allege and incorporate by reference the preceding allegations as though fully set out herein.

55.     Each of the challenged provisions of S.B.7072 violates the First Amendment as applied to websites operated by NetChoice and CCIA members when those websites curate and disseminate collections of third-party speech posted on their services.[5]

56.     The Supreme Court reaffirmed earlier this year that, when a private party curates and disseminates compilations of third-party speech, it engages in speech activity fully protected by the First Amendment. "Deciding on the third-

---

[5] To be clear, Plaintiffs' as-applied challenge does not extend to websites when they operate direct messaging or email services. Nor does it extend to websites when they facilitate services like ride sharing (e.g., Uber and Lyft) and payment processing (e.g., PayPal and Square).

party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity." *Moody*, 144 S.Ct. at 2402. And when a private entity engages in that expressive activity, the First Amendment protects its editorial choices about what speech to display and how to display it. "When the government interferes with such editorial choices—say, by ordering the excluded to be included—it alters the content of the compilation." *Id.* "And in so doing—in overriding a private party's expressive choices—the government confronts the First Amendment." *Id.*

57.    Those principles apply with full force to speech disseminated over the Internet. Just as a newspaper, cable television provider, or parade organizer engages in speech when disseminating works created by others, a website engages in speech when disseminating curated compilations of third-party speech posted on the website. And just as the First Amendment protects the editorial decisions made by a newspaper, cable television provider, or parade organizer about what third-party speech to disseminate and how to do so, the First Amendment protects the editorial decisions made by websites about what third-party speech to display and how to display it. *Id.* at 2402-03.

58.    Applying those principles to Facebook's Feed and YouTube's homepage, the Supreme Court held that the First Amendment protects Facebook's and YouTube's editorial choices about what third-party content to display and how

to arrange and display it. *Id.* at 2403-06. "When the platforms use their Standards and Guidelines to decide which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices. And because that is true, they receive First Amendment protection." *Id.* at 2406. So when the government "alters the platforms' choices about the views they will, and will not convey," it "interfere[s] with protected speech," triggering First Amendment scrutiny. *Id.* at 2405.

59.    The Court focused on Facebook's Feed and YouTube's homepage because those are among the principal applications that the parties contested in their briefing. *See id.* at 2397. But the Court's reasoning applies just the same to *all* websites when they curate and disseminate collections of third-party speech posted on their services, including other websites operated by NetChoice and CCIA members.

60.    X, for example, makes all sorts of editorial choices when it filters, alters, and labels third-party speech on its "For You" and "Following" feeds, including by providing users with curated compilations of posts based in part on X's judgment that it should be "easier and faster to find content that contributes to the conversation in a meaningful way, such as content that is relevant, credible, and safe." X, *Help Center*, *About Your For You Timeline on X*, https://tinyurl.com/pnpx5kub (last visited Oct. 31, 2024). X also "promotes

counterspeech" via addenda dubbed "community notes" that "correct misstatements" and "point[] out hypocrisy." *See* X, *Help Center*, *Our Approach to Policy Development and Enforcement Philosophy*, https://tinyurl.com/bdfyxdty (last visited Oct. 31, 2024).

61.    Pinterest publishes curated feeds of user content, including through its "Home" and "Today" tabs.  "Home" is a feed of Pins (images submitted by users) that have been picked for the user based on the boards the user creates, Pins the user engages with, and things the user has searched for on Pinterest.  The "Today" tab is a curated collection of ideas based on what is trending on Pinterest.  Pinterest, *Help Center*, *Explore the Home Feed*, https://tinyurl.com/564ezznm (last visited Oct. 31, 2024).  To help determine the content selected for these feeds and otherwise published on its platform, Pinterest has robust content and editorial policies and reserves the right to "remove, limit, or block the distribution of such content and the accounts, individuals, groups and domains that create or spread it based on how much harm it poses."  Pinterest, *Community Guidelines*, https://tinyurl.com/4rjsevbp (last visited Oct. 31, 2024).

62.    These and other members engage in First Amendment expression when they exercise editorial discretion over whether and how they will disseminate third-party speech to their users.  All "make choices about what third-party speech to display and how to display it" and, "in making millions of those decisions each day,

produce their own distinctive compilations of expression." *Moody*, 144 S.Ct. at 2393. And each of the challenged provisions of S.B.7072 "limits their power to do so," "interfer[ing] with protected speech." *Id.* at 2404-05.

63. ***Consistency requirement—Fla. Stat. §501.2041(2)(b).*** The consistency requirement directly interferes with editorial choices of websites when they curate and disseminate third-party speech posted on their services. While S.B.7072 does not define the phrase "consistent manner," it appears to force a website to disseminate speech against its will whenever it has disseminated speech that the state (or a jury) deems sufficiently similar. Conversely, the consistency requirement would seemingly prevent a website from disseminating speech that it *wants* to disseminate if it has declined to disseminate comparable speech in the past. For example, the requirement would appear to prohibit YouTube from applying its hate speech policy to suspend a user if the state (or a jury) thinks that YouTube has failed to suspend other users for similar activity. And it imposes the same restrictions on a website's ability to choose whether to display third-party speech more or less prominently.

64. On top of that, the consistency requirement restricts the ability of websites to engage in their own speech about the third-party content they disseminate, as S.B.7072's definition of "censor" includes "post[ing] an addendum to any content or material posted by a user." Fla. Stat. §501.2041(2)(b). The

provision thus appears to prohibit X, for example, from posting an addendum to any content or material posted by a user under its manipulated media policy if the state (or jury) determines that X failed to add an addendum to a similar post in the past.

65.    ***Posts by or about political candidates—Fla. Stat. §501.2041(2)(h).*** The prohibition on applying "post-prioritization" or "shadow banning algorithms" on content posted "by or about" a political candidate directly interferes with the editorial decisions of websites when they curate and disseminate the third-party speech posted on their services.   It prohibits websites from deprioritizing or restricting *any* speech posted "by or about" a candidate—no matter how dangerous, defamatory, or obscene—thus forcing them to disseminate everything from threats to deepfakes to adult content.   *Cf.* Kat Frederick, *Twitter Bans Florida Candidate Luis Miguel Over Call to Shoot FBI, IRS, ATF Agents*, N.Y. Post (Aug. 19, 2022), https://tinyurl.com/4vtm6hhu; Nicholas Nehamas, *DeSantis Campaign Uses Apparently Fake Images to Attack Trump on Twitter*, N.Y. Times (June 8, 2023), https://tinyurl.com/yd3kcutd; Sara Filips, *'Let's Go Kill Some Judges': Florida Man Accused of Threatening Officials on Facebook*, WFLA (Feb. 24, 2024), https://tinyurl.com/4tcby8k9.

66.    ***Deplatforming political candidates—Fla. Stat. §106.072(2).***   The candidate-deplatforming provision directly interferes with the editorial decisions made by websites when they curate and disseminate third-party speech posted on

their services.  It prohibits websites from suspending or removing a candidate no matter what the candidate posts, or how blatantly or repeatedly the candidate violates the website's terms of use.  *See, e.g.*, Frederick, *supra*.

67.    ***Journalistic enterprises—Fla Stat. §501.2041(2)(j).***  The prohibition on "censoring," "deplatforming," and "shadow banning" a journalistic enterprise "based on the content of its publication or broadcast" also directly interferes with the editorial decisions made by websites when they curate and disseminate the third-party speech posted on their services.  That provision requires websites to allow any entity with the requisite content and users to post anything it wants short of true obscenity.  And because of the law's broad definition of "censor," it even prohibits websites from appending their own speech to that content, such as a disclaimer or warning.  The provision would seemingly "prohibit a child-friendly platform like YouTube Kids from removing—or even adding an age-gate to—soft-core pornography posted by PornHub," which arguably qualifies as a "journalistic enterprise" because it posts more than 100 hours of video and has more than 100 million viewers per year.  *NetChoice*, 34 F.4th at 1229.  It also would seemingly prohibit X from removing or appending a disclaimer to a post by The Crusader (a Ku Klux Klan-affiliated newspaper), which arguably qualifies as a journalistic enterprise under S.B.7072.  And it would seemingly prohibit Facebook from removing a post revealing sensitive materials stolen by foreign hackers, so long as

the materials were posted by a journalistic enterprise. *See* Kevin Collier, *Independent Journalist Publishes Trump Campaign Document Hacked by Iran Despite Election Interference Concerns*, NBC News (Sept. 26, 2024), https://tinyurl.com/26aukz8r.

68. ***Rule changes—Fla. Stat. §501.2041(2)(c).*** The provision restricting a website's ability to change its rules, terms, and agreements also directly interferes with editorial choices of websites when they curate and disseminate third-party speech posted on their services. Websites update their rules frequently, and they often must do so very quickly to respond to new and changed circumstances and unforeseen threats. Yet this provision prohibits them from making any changes more than once every 30 days, and prohibits them from implementing any change, no matter how minor or how pressing, before they have been able to notify every user. This provision thus forces websites to disseminate content they do not want to disseminate unless they have already adopted rules covering that content. It also imposes an onerous compelled-speech mandate on members' exercise of editorial judgment, as it requires members that seek to change their editorial policies to speak in the form of a highly burdensome individualized notice.

69. ***User opt-out—Fla. Stat. §501.2041(2)(f)-(g).*** The user opt-out provision likewise interferes with the editorial choices websites make when they curate and disseminate third-party speech posted on their services. It requires them

to display content in a "sequential or chronological" order even if they would prefer to present it in a different manner. *See NetChoice*, 546 F.Supp.3d at 1088 (explaining that, "[o]n its face," this provision "allows a user who posts content to insist it be shown to other users in chronological order—not in the order the recipient has otherwise specified or the order that, based on the recipient's profile and history, the social media platform believes would be most preferred by or useful to the recipient"). Just as telling a newspaper what constitutes front-page news countermands editorial judgments, so too does telling a website what third-party speech to give pride of place.

70.    ***Detailed explanation—Fla. Stat. §501.2041(2)(d), (3).*** The detailed-explanation requirement both compels speech by and burdens the editorial choices of websites when they curate and disseminate third-party speech posted on their services. Much like the right-of-reply statute burdened the exercise of editorial discretion in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), by requiring newspapers to run opposing views if they chose to criticize a political candidate, *see id.* at 256-57, the detailed explanation requirement imposes onerous burdens on covered websites to explain the often complex editorial judgments they make in choosing to arrange or limit the dissemination of third-party speech. Indeed, a member "could be slapped with millions, or even billions of dollars in statutory damages if a Florida court were to determine that it didn't provide sufficiently

'thorough' explanations when removing posts." *NetChoice*, 34 F.4th at 1230-31. "Faced with the penalties that would accrue" should its explanation be deemed insufficient, a website "might well conclude that the safe course is to avoid controversy" by not exercising editorial discretion at all. *Tornillo*, 418 U.S. at 257. This provision thus has the purpose and effect of "chill[ing] platforms' protected speech." *NetChoice*, 34 F.4th at 1230.

71.   ***Standards—Fla. Stat. §501.2041(2)(a).***  For similar reasons, requiring a website to publish the "standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban" both compels speech by and burdens the editorial choices of websites when they curate and disseminate third-party speech posted on their services.  Websites that choose to curate and disseminate third-party speech are forced to make burdensome and "detailed" disclosures about all their editorial "standards" for doing so, even if aspects of the standards are proprietary.  Just as requiring newspapers to disclose the details of their editorial standards for accepting op-eds or letters to the editor would burden the exercise of protected editorial judgments, requiring websites to disclose the details of their editorial standards intrudes on their exercise of editorial judgments.  Again, "[f]aced with the penalties that would accrue" should it refuse to do so, a website "might well conclude that the safe course is to avoid controversy" by not exercising editorial discretion at all.  *Tornillo*, 418 U.S. at 257.

72. ***View counts—Fla Stat. §501.2041(2)(e).*** Requiring websites to disclose, upon request, "the number of other individual platform participants who were provided or shown" the user's "content or posts" both compels speech and imposes a significant burden on the editorial choices of websites when they curate and disseminate third-party speech posted on their services. The law does not specify what it means by "content or posts," but to the extent it applies to all user-generated content, the requirement is extremely burdensome. Users generate billions of pieces of content each day, and not every website tracks the number of times users "were provided or shown" every given instance of such content. It would be exceedingly difficult for websites to reconfigure their systems to generate and supply upon request view counts for virtually all third-party-generated content that they choose to display on their services, be it a comment on a YouTube video or a "like" on an Instagram post.

73. Because each of the challenged provisions interferes with editorial discretion that is protected by the First Amendment, they are at the very least subject to intermediate scrutiny. But they also discriminate on the basis of content, speaker, and viewpoint, triggering strict scrutiny multiple times over.

74. Laws that compel speakers to "alter the content[] of [their] speech" are necessarily "content based." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) ("*NIFLA*"); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,

487 U.S. 781 (1988).  That alone is enough to trigger strict scrutiny, as all of the challenged provisions alter the content of speech as applied to websites when they curate and disseminate collections of third-party speech posted on their services.

75.    But that is far from the only problem; several provisions are shot through with other content-based distinctions too.  The political-candidate provision prohibits companies from deprioritizing posts "about" political candidates, but not other topics.  Fla. Stat. §501.2041(2)(h).  The journalistic-enterprise provision prohibits the exercise of editorial judgment over posts by a so-called journalistic enterprise "based on" its "content." *Id.* §501.2041(2)(j).  S.B.7072 thus "singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015).  That is "about as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 619 (2020) (plurality op.).  And the consistency provision requires comparing the content and the viewpoint of the posts that websites "censor" or "shadow ban" against the content and the viewpoint of the posts they did not to determine whether a violation has occurred, which makes it content based as well.

76.    Making matters worse, S.B.7072 singles out a select group of websites for disfavored treatment.  Courts are deeply skeptical of laws that "distinguish[] among different speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).  After all, a speaker and her speech are so often "interrelated" that "[s]peech restrictions

based on the identity of the speaker are all too often simply a means to control content." *Id.* That principle has especial force when a law singles out for disfavored treatment some but not all of those in the business of disseminating speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987); *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983). Laws that "discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns" because they create very real "dangers of suppression and manipulation" of the medium and risk "distort[ing] the market for ideas." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659-61 (1994). Thus, unless the "differential treatment" can be "justified by some special characteristic" of those singled out, such laws trigger strict scrutiny. *Id.* at 659-60.

77. On its face, S.B.7072's definition of "social media platform" discriminates between speakers, singling out a subset of websites and saddling them—and only them—with a slew of onerous burdens. The law's size and revenue requirements are carefully crafted to target so-called "Big Tech," while exempting smaller services with a different perceived ideological bent.

78. The reason for that speaker-based distinction is undeniable and undisguised: The state does not like the viewpoint it perceives so-called "Big Tech" to espouse. One of S.B.7072's key premises is the perception that certain large websites exercise their editorial discretion in an "ideologically biased" manner. That

view leaps off the legislative record.  S.B.7072's official findings complain that certain websites have exercised their editorial judgment "unfairly"—i.e., in ways Florida does not like.  S.B.7072 §1(9).  The Governor's official signing statement left even less to the imagination:  He proclaimed that the state was enacting the law to provide "protection against the Silicon Valley elites" and to check the "Big Tech censors" that "discriminate in favor of the dominant Silicon Valley ideology."  Gov. News Release, *supra.*  And the official statement quotes one of the law's sponsors as saying:  "Day in and day out, our freedom of speech as conservatives is under attack by the 'big tech' oligarchs in Silicon Valley.  But in Florida, we said this egregious example of biased silencing will not be tolerated."  *Id.*  Viewpoint discrimination does not get clearer than that.

79.  The law also triggers strict scrutiny by drawing speaker-based distinctions that mandate preferential treatment for the speech of the state's preferred groups.  In particular, the "candidate" and "journalistic enterprises" provisions limit the right of websites to apply their editorial standards to certain political candidates and an arbitrarily defined category of "journalistic enterprises," mandating that platforms publish and promote these favored speakers' messages.  Fla. Stat. §106.072; *id.* §501.2041(2)(h), (j).  These blatant speaker-based preferences trigger strict scrutiny because they burden or impede the exercise of protected editorial

judgment by websites in ways designed to advance the state's favoritism for speech generated by this hand-selected group of preferred speakers.

80.    Because strict scrutiny applies, Florida bears the heavy burden of demonstrating that S.B.7072 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Indeed, even under intermediate scrutiny, Florida would have to prove that S.B.7072 is "narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017). Florida cannot come close to doing so.

81.    Florida has not identified a legitimate, let alone significant or compelling, justification for interfering with protected editorial judgments. Nor has it identified any legitimate justification for doing so in a content-, speaker-, and viewpoint-based manner. To the extent the state seeks to justify S.B.7072 on the theory that it has an interest in ensuring that the public has equal access to competing viewpoints, that effort is foreclosed by Supreme Court precedent. As the Court has now made clear, "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 144 S.Ct. at 2407. While "States (and their citizens) are of course right to want an expressive realm in which the public has access to a wide range of views," "the way the First Amendment achieves that goal is by preventing *the government* from 'tilting the public debate in a preferred direction.'" *Id.* (brackets omitted). "On the spectrum of dangers to free expression,

there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* That is why the Court has repeatedly emphasized that "the government may not 'restrict the speech of some elements of our society in order to enhance the relative voice of others.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (per curiam)).

82.    Florida has not advanced any other interest that might justify the challenged provisions of law, but even if it could identify one, those provisions burden far more speech than could be necessary to achieve any permissible state interest.  The consistency requirement mandates consistency for the entire universe of editorial judgments, from routine application of clear rules to delicate and context-dependent value judgments.  The journalistic enterprise and candidate provisions prohibit or severely restrict editorial discretion over virtually all material posted by journalistic enterprises and candidates, no matter how blatantly it violates a website's rules.  The rule-change provision bars changes to editorial policies even in the face of rapidly evolving challenges, and even when bad actors exploit loopholes in a website's current rules.  The detailed-explanation requirement is practically impossible to satisfy given the millions of posts that websites remove, restrict, or deprioritize each day.  The standards provision mandates burdensome disclosures of all editorial policies and rule changes, no matter how proprietary the policy and no matter how minor the change.  And the view-count provision requires websites to

43

turn over counts for *all* "content or posts"—an extremely burdensome undertaking given the sheer amount of "content or posts" on many websites. Florida does not and cannot explain why such sweeping and draconian restrictions are necessary to achieve its objectives—unless the goal is simply to punish so-called "Big Tech" for speech the state disfavors.

83.    S.B.7072 is also underinclusive as measured by virtually any goal other than that impermissible one, as Florida has no explanation for the arbitrary size and revenue requirements that exempt websites that are not meaningfully different in the core services they offer, save for their perceived ideological bent. "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 585 U.S. at 774 (brackets omitted). In short, the challenged provisions burden too much and further too little, and thus fail any level of heightened scrutiny.

84.    While that analysis suffices to doom all the challenged provisions, the same conclusion would follow even if S.B.7072's compelled-speech provisions (the detailed-explanation, rule-change, standards, and view-count provisions) were analyzed under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). At the outset, *Zauderer* is not the right standard for any of the provisions, as *Zauderer* is limited to efforts to "combat the problem of

inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010). S.B.7072's compelled-speech requirements have nothing to do with "commercial speech," let alone with preventing misleading commercial speech; they are just efforts to make it easier to sue websites for perceived inconsistencies in how they exercise their editorial discretion. Nor do they mandate disclosure of "purely factual and uncontroversial information about the terms under which ... services will be available." *NIFLA*, 585 U.S. at 768. They instead require websites to disclose all manner of sensitive information about their editorial policies and judgments. *Zauderer* thus does not apply here at all.

85.    But even if it did, all provisions would still violate the First Amendment because each imposes undue burdens, and none is reasonably related to preventing consumer deception. Once again, each provision simply burdens far too much and furthers far too little.

## COUNT TWO
### FIRST AMENDMENT – FACIAL CHALLENGE
### (42 U.S.C. §1983)

86.    NetChoice and CCIA re-allege and incorporate by reference the preceding allegations as though fully set out herein.

87.    Because the challenged provisions are unconstitutional as applied to websites when they curate and disseminate collections of third-party speech posted

on their services, they are unconstitutional on their face, as S.B.7072's definition of "social media platform" covers only "providers of social media within the common understanding," *NetChoice*, 546 F.Supp.3d at 1086, like Facebook, YouTube, Pinterest, and X.  But to the extent that definition might be read to reach some other types of services, the challenged provisions would still be facially unconstitutional, as those provisions cover "social media platforms" only when they are curating and disseminating collections of third-party speech posted on their services, and all "prohibit[] a substantial amount of protected speech relative to" any "legitimate sweep" they may have.  *Moody*, 144 S.Ct. at 2397.

88.    To be sure, the Supreme Court observed that there were open questions about whether S.B.7072's definition of "social media platform" might cover services that do not typically curate and disseminate collections of third-party speech posted on their services, like Uber.  *See id.* at 2398.  And it raised questions about whether S.B.7072 might cover services like direct messaging, email, electronic payments, or events management.  *See id.*  But the correct reading of the statute is that it does not.

89.    S.B.7072 defines "[s]ocial media platform" as "any information service, system, Internet search engine, or access software provider" that "[p]rovides or enables computer access by multiple users to a computer server, including an Internet platform or social media site," "[o]perates as a … legal entity," "[d]oes business in the state," and generates at least $100 million in annual revenue or has

at least 100 million monthly users.  Fla. Stat. §501.2041(1)(g).  While that language at first blush could be read to cover "systems nobody would refer to as social media," *NetChoice*, 546 F.Supp.3d at 1086, the "ordinary meaning" of a statute "must be read and interpreted in [its] context, not in isolation."  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (quotation marks omitted); *see also Conage v. United States*, 346 So.3d 594, 598 (Fla. 2022) (same).  After all, "[a]dhering to the *fair meaning* of the text (the textualist's touchstone) does not limit one to the hyperliteral meaning of each word in the text."  A. Scalia & B. Garner, *Reading Law* 356 (2012).

90.    Here, all manner of contextual clues confirm that S.B.7072's definition of "social media platform" is "limited to providers of social media within the common understanding."  *NetChoice*, 546 F.Supp.3d at 1086.  In fact, the state took that very position in both this Court and in the Eleventh Circuit.  *See id.* ("The State says the definition should nonetheless be understood to be limited to providers of social media within the common understanding—the State says this comports with the statutory findings and the statutes' obvious purpose."); Appellant.Br. 4 n.1, *NetChoice LLC v. Att'y Gen.*, 34 F.4th 1196 (11th Cir. 2022) (No. 21-12355), Dkt.23 ("The District Court erroneously posited that this definition 'also applies to systems nobody would refer to as social media.'").  And in the Supreme Court, the state maintained that the law applies to websites only when they are "uploading user-generated conduct."  Oral.Arg.Tr.11:14-25, *Moody v. NetChoice, LLC*, 144 S.Ct.

2383 (2024) (No. 22-277); *see also id.* ("It doesn't limit what goods Etsy can …

limit its marketplace to.").

91.    The state took that position for good reasons.  The statutory findings

describe "social media platforms" as "the new public town square."  S.B.7072 §1(4).

They note that "Floridians increasingly rely on social media platforms to express

their opinions."  *Id.* §1(3).  And they state that "[s]ocial media platforms hold a

unique place in preserving first amendment protections for all Floridians."  *Id.* §1(6).

That makes clear that S.B.7072 covers only "providers of social media within the

common understanding," *NetChoice*, 546 F.Supp.3d at 1086, not ride-sharing apps

like Uber, payment services like PayPal, or email services like Gmail.  After all, no

one would describe Uber, PayPal, or Gmail as the modern "town square."

92.    The "meaning of the definition," moreover, "is almost always closely

related to the ordinary meaning of the word being defined."  Scalia & Garner, *supra*,

at 228; *see also, e.g.*, *Bond v. United States*, 572 U.S. 844, 861 (2014) (considering

"the ordinary meaning of a defined term" to determine the "fair reading" of the

statute).  And the phrase "social media platform" is commonly understood to refer

to websites and applications where users share content and interact with content

shared by others.  Facebook and X, for example, are "social media platforms" in

ordinary parlance because users share content on those services and interact with

content shared by others.  By contrast, no one would describe ride-sharing services,

payment services, direct messaging apps, or email providers as "social media platforms"—and understandably so, as they are not "platforms" for "social" interaction with "media."

93.    That reading is reinforced by S.B.7072's other definitional provisions, which make sense only when applied to websites on which users share content and interact with content posted by other users. The Act defines "censor" to include "any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum *to any content or material posted by a user*," or to "inhibit the ability of a user *to be viewable by or to interact with another user* of the social media platform." Fla. Stat. §501.2041(1)(b) (emphases added); *see* PI.Hr'g.Tr., Dkt.112 at 57:19-24 (explaining that the definition of "user" presupposes that the user has the "capacity to *post*" content on the website, *see* Fla. Stat. §501.2041(1)(h)). It defines "post prioritization" to mean "action by a social media platform to place, feature, or prioritize *certain content or material* ahead of, below, or in a more or less prominent position than others *in a newsfeed, a feed, a view, or in search results*." *Id.* §501.2041(1)(e) (emphases added). It defines "shadow ban" to mean "action by a social media platform … to limit or eliminate the exposure of a user or *content or material posted by a user* to other users of the social media platform." *Id.* §501.2041(1)(f) (emphasis added). Those provisions make sense only as applied to

websites that are actually disseminating third-party content that could be "censored," "prioritized," or "shadow banned"—not websites like Uber, PayPal, or Gmail.

94.    So too with S.B.7072's substantive provisions.  For example, the candidate provision prohibits post-prioritization or shadow banning of "*content and material posted* by or about" a candidate.  *Id.* §501.2041(2)(h) (emphasis added).  The consistency provision requires "social media platform[s]" to "apply *censorship*, *deplatforming*, and *shadow banning* standards in a consistent manner."  *Id.* §501.2041(2)(b) (emphases added).  The journalistic-enterprise provision prohibits censorship, deplatforming, and shadow banning of any journalistic enterprise "based on the *content of its publication or broadcast*."  *Id.* §501.2041(2)(j) (emphasis added).  And the law's restrictions on "deplatforming" a "user" contemplate websites on which a user can post content.  Again, those provisions make sense only when applied to services on which candidates and journalistic enterprises post content and interact with content posted by others.  No one would refer to the termination of a user's Uber or PayPal account as a "deplatforming."  And no one would describe sending a direct message or email on Gmail as "post[ing]" "content or material."  Users (let alone political candidates and journalistic enterprises) do not typically post content on ride sharing or payment services for other users to see.  And those services do not typically engage in the sort of "censorship," "shadow banning," or "post prioritization" that the law targets.

95.    S.B.7072's disclosure provisions similarly underscore that its definition of "social media platform" is limited to "providers of social media within the common understanding," *NetChoice*, 546 F.Supp.3d at 1086.  The law does not require "social media platforms" to disclose *all* their standards, rules, and terms of use.  It requires them to disclose their "standards" for "*determining how to censor, deplatform, and shadow ban*" content uploaded and posted by users.  *Id.* §501.2041(2)(a) (emphasis added).  Likewise, the law does not require "social media platforms" to display view counts of their *own* posts.  It requires them to display view counts of "the *user's* content or posts." *Id.* §501.2041(2)(e) (emphasis added). The notice requirement applies only when the "social media platform" "deplatform[s]," "censor[s]," or "shadow ban[s]" the user.  And it requires an explanation "of how the social media platform became aware of *the censored content or material*, including a thorough explanation of the algorithms used, if any, to identify or flag *the user's content or material as objectionable*." *Id.* §501.2041(3)(d) (emphases added).  None of that makes sense if the statute covers services that do not disseminate third-party content at all.

96.    If any doubt remained, "the statutes' obvious purpose" confirms that the phrase "social media platform" is "limited to providers of social media within the common understanding." *NetChoice*, 546 F.Supp.3d at 1086.  The state has never been shy about the fact that the entire point of S.B.7072 is to punish websites like

Facebook, Instagram, and YouTube that have (in the state's view) "unfairly censor[ed], shadow ban[ned], deplatform[ed], and appl[ied] post-prioritization algorithms to Florid[ians]." *Id.* §1(7). Upon signing the bill, the Lieutenant Governor announced in the official public statement that "Florida is taking back the virtual public square as a place where information and ideas can flow freely." Gov. News Release, *supra*. And after claiming that "[s]ocial media platforms have morphed into the town square," the Speaker of the House described the law as an effort to "stand up to these technological oligarchs and hold them accountable." *Id.*

97.    All that makes clear that the law covers only services "providers of social media within the common understanding." *NetChoice*, 546 F.Supp.3d at 1086. The law does not regulate "how a payment service like Venmo manages friends' financial exchanges" or "how a ride-sharing service like Uber runs." *Moody*, 144 S.Ct. at 2398. Nor does it apply to email and other private communications that are not "social media," do not publish content "posted by" users, and do not in any way resemble a modern "town square." And the operative provisions of the statute simply do not fit the operations of those kinds of services.

98.    Because S.B.7072's definition of "social media platform" does not regulate anything *other* than what people would commonly understand as "social media" services, the challenged provisions are unconstitutional on their face for the reasons described in Count I. All actual applications of the challenged provisions,

when the statute is read correctly and consistently with the state's intent, are unconstitutional because they impermissibly interfere with protected editorial judgments and/or compel speech.

99.    But even if the definition could be read to apply more broadly than the "heartland applications" of the law, each of the challenged provisions would still be facially unconstitutional, either because the provision itself covers websites only when they are curating and disseminating collections of third-party speech posted on their services, or because any conceivable legitimate applications of the provision to other services or functions would be outweighed by the "substantial amount of protected speech" that its heartland applications restrict. *Moody*, 144 S.Ct. at 2397. In short, because the core, if not sole, application of each challenged provision is to regulate the editorial judgments of websites when they are curating and disseminating collections of third-party speech posted on their services, those protected judgments are "the principal things regulated" by the statute, and they "should have just that weight in the facial analysis." *Id.* at 2398.  Each provision violates the First Amendment on its face.

100.    ***Consistency—Fla. Stat. §501.2041(2)(b).***    The consistency requirement applies only when "social media platforms" "censor" (i.e., "delete, regulate, restrict, edit, alter," etc.) and "shadow ban" (i.e., "limit or eliminate the exposure of") "content or material posted by a user" or "deplatform" a user (i.e., ban

the user altogether)—in other words, only when they engage in protected First Amendment expression under *Moody*.  Because the provision applies only when a covered website is engaged in that constitutionally protected activity, it is unconstitutional whenever it applies to *any* service engaged in that activity, be it Facebook, YouTube, X, Uber, Venmo, PayPal, Etsy, or Gmail.  But even if there were some conceivable legitimate applications of the provision to services that are not engaged in that activity, those rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict.  *Moody*, 144 S.Ct. at 2397.

101.  ***Posts by or about candidates—Fla. Stat. §501.2041(2)(h).***  The provision restricting the use of "post-prioritization" (i.e., action to "place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results") and "shadow-banning" (i.e., action to "limit or eliminate the exposure of a user or content or material posted by a user to other users") of content posted by or about a political candidate is facially unconstitutional.  Because that provision applies only when a website is exercising editorial discretion about whether and how to display third-party content posted on its services, it too is unconstitutional whenever it applies to *any* service.  But even if there were some conceivable legitimate applications of the provision to services that are not engaged in that activity, those rare hypothetical

applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 144 S.Ct. at 2397.

102.   ***Deplatforming political candidates—Fla. Stat. §106.072(2).***   The candidate deplatforming provision is likewise unconstitutional on its face.  For the reasons already explained, it is unconstitutional as applied to websites when they are curating and disseminating compilations of third-party speech posted on their services.  And even if the provision might conceivably apply to, e.g., a decision by Uber to suspend the account of a candidate who has violated its terms of service (for example, by using abusive language with a driver or failing to pay for the service), it is hard to see how the state would have even a rational basis for forcing such services to provide special treatment to candidates for office, exempting them from the rules that apply to all other users when it comes to the termination or suspension of accounts (which is itself powerful evidence that the law does not cover them in the first place).  In all events, any such rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 144 S.Ct. at 2397.

103.   ***Journalistic enterprises—Fla Stat. §501.2041(2)(j).***   Prohibiting a "social media platform" from taking any action to "censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast" is unconstitutional on its face.  The provision is unconstitutional as applied to websites

when they are curating and disseminating compilations of third-party speech posted on their services. And even assuming that the "deplatforming" prong might conceivably apply to a wider range of websites, it would still be unconstitutional, because the state would not have even a rational basis for singling out "journalistic enterprises" for special protection against the suspension or termination of their accounts on ride-sharing apps like Uber or electronic payment services like PayPal. In all events, any such rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 144 S.Ct. at 2397.

104. ***Rule changes—Fla. Stat. §501.2041(2)(c).*** S.B.7072's restrictions on changing rules, terms, and agreements are unconstitutional on their face. They compel "social media platforms" to disseminate content they do not want to disseminate every time they wish to change their rules, terms, or agreements. And they restrict "social media platforms" from changing their rules, terms, or agreements more than once every 30 days—thus directly restricting editorial discretion. That compelled speech mandate and direct restriction on editorial discretion is unconstitutional in all its applications, because there is "no governmental interest sufficient to justify prohibiting a platform from changing its content-moderation policies … more than once every 30 days." *NetChoice*, 34 F.4th at 1229. Even if the requirement could be constitutionally applied to rules, terms, or

agreements of services like Uber or PayPal in situations that do not involve disseminating speech, those applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 144 S.Ct. at 2397.

105. ***User opt-out—Fla. Stat. §501.2041(2)(f)-(g).*** Requiring "social media platforms" to allow users to opt out of their "post prioritization" and "shadow banning" algorithms is facially unconstitutional. Again, this provision cannot be applied to any website that is not engaging in "post prioritization" and "shadow banning" of content—i.e., curating and disseminating compilations of third-party speech posted on its services. This provision likewise is unconstitutional *whenever* it applies, as there is "no governmental interest sufficient to justify forcing platforms to show content to users in a 'sequential or chronological' order—a requirement that would prevent platforms from expressing messages through post-prioritization and shadow banning." *NetChoice*, 34 F.4th at 1229 (citation omitted). But even if there were some conceivable legitimate applications to services that are not engaged in that activity, those rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 144 S.Ct. at 2397.

106. ***Detailed explanation—Fla. Stat. §501.2041(2)(d), (3).*** Requiring "social media platforms" to give a "thorough rationale explaining" every

"censorship" decision, along with a "precise and thorough explanation" of how the website "became aware of the censored material," is facially unconstitutional as well. Because the detailed-explanation requirement compels speech, it implicates the First Amendment in all its applications. And by its terms, it singles out for explanation the precise conduct that *Moody* says is protected by the First Amendment—namely, decisions about what content to disseminate and how to arrange and organize it. And it imposes the same significant burdens on every website to which it applies. Because it is "unduly burdensome and likely to chill platforms' protected speech," *NetChoice*, 34 F.4th at 1230, the provision is thus unconstitutional in every scenario in which it could actually apply. But even if there were some conceivable legitimate applications to services that are not engaged in that activity, those rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 144 S.Ct. at 2397.

107. ***Standards—Fla. Stat. §501.2041(2)(a).*** Requiring a covered service to publish all "standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban" is likewise facially unconstitutional. Because the requirement is a compelled-speech mandate, it implicates the First Amendment in all its applications. And by its terms, it demands burdensome "detailed" disclosures of the standards used when a "social media

platform" is engaged in protected expression under *Moody*.   It is therefore unconstitutional on its face for the same reasons that it is unconstitutional as applied to websites when they curate and disseminate compilations of speech posted on their services.   But even if there were some conceivable legitimate applications to services that are not engaged in that activity, those rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict.  *Moody*, 144 S.Ct. at 2397.

108.   ***View counts—Fla Stat. §501.2041(2)(e).***    Requiring websites to disclose view counts for all of a user's "content or posts" at the request of the user is facially unconstitutional.   Once again, that compelled-speech mandate has no evident real-world application beyond services that "receive content from users and in turn … make the content available to other users," *NetChoice*, 546 F.Supp.3d at 1085-86, and it is unconstitutional as applied to those services for the reasons already explained.   But even if there were some conceivable legitimate applications to services that are not engaged in that activity, those rare hypothetical applications still would not pass constitutional muster and in all events would be outweighed by the "substantial amount of protected speech" that the law's "heartland applications" restrict.  *Moody*, 144 S.Ct. at 2397.

## COUNT THREE
## UNCONSTITUTIONAL VAGUENESS IN VIOLATION OF FIRST, FIFTH, AND FOURTEENTH AMENDMENTS
## (42 U.S.C. §1983)

109.   NetChoice and CCIA re-allege and incorporate by reference the allegations in paragraphs 1-53 as though fully set out herein.

110.   "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).   A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).   "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.   After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

111.   Multiple provisions of S.B.7072 fail to provide a person of ordinary intelligence with fair notice of what is prohibited or required.   The Act is also riddled

with such vague terms that it invites arbitrary and discriminatory enforcement, including the arbitrary imposition of draconian civil penalties.

112. S.B.7072 imposes a requirement that a "social media platform" exercise its editorial discretion "in a consistent manner among its users on the platform." Fla. Stat §501.2041(2)(b). Yet it contains no explanation of what "a consistent manner" means, and it is impossible to understand—especially with the kind of clarity the First Amendment demands—what this provision requires. A vague consistency requirement would chill any number of judgment calls that depend on context or require educational, scientific, or artistic evaluations. For example, imagine two posts containing the same "threatening" language, where one is a direct comment and the other takes the form of song lyrics. Would it violate the Act to remove the former but not the latter? If a website permits commentary critical of immigration, can it still remove comments attacking immigrants? Must it apply its hate-speech rules to gender-based content in the same way as it does to posts about race or religion? Countless similar examples abound, and the Act sheds no light on any of the endless real-world choices that websites confront every day.

113. S.B.7072 prohibits applying or using any "post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a candidate." *Id.* §501.2041(2)(h). The definition of "post-prioritization" covers any "action by a social media platform to place,

feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." *Id.* §501.2041(1)(e). It is impossible to understand what this provision allows and does not allow. According to its terms, the provision would suggest that a search function is forbidden from placing content "by or about" a political candidate ahead of—or below—any other content. And it would forbid placing such content in a more prominent position—or a less prominent position—than other content. The Constitution does not allow the state to impose such a paradoxical, self-defeating, and incomprehensible prohibition.

**COUNT FOUR**
**PREEMPTION**
**(42 U.S.C. §1983; SUPREMACY CLAUSE; 28 U.S.C. §2202)**

114. NetChoice and CCIA re-allege and incorporate by reference the allegations in paragraphs 1-53 as though fully set out herein.

115. Plaintiffs may assert federal preemption under 42 U.S.C. §1983 and *Ex parte Young*, 209 U.S. 123 (1908).

116. Under 47 U.S.C. §230, it is federal policy "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. §230(b)(1), (2).

117.    Congress enacted Section 230 for two core purposes.  First, Section 230 aims "to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  Second, Section 230 aims "to encourage interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material, so as to aid parents in limiting their children's access to such material."  *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003).  In short, the "statute is designed at once 'to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.'"  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099-1100 (9th Cir. 2009).

118.    For purposes of Section 230, an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C §230(f)(2).  An "access software provider" includes "a provider of software … or enabling tools" that "filter, screen, allow or disallow content," "pick, choose, analyze, or digest content," or "transmit, receive, display, forward, … organize, reorganize, or translate content."  *Id.* §230(f)(4).  A "provider" of such a service includes those who own or operate websites, such as "social media platforms," so the provision covers Plaintiffs' members who are subject to S.B.7072.

119.   Section 230(c)(1) states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* §230(c)(1).   Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran*, 129 F.3d at 330).   Under Section 230(c)(1), laws or claims that "seek[] to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran*, 129 F.3d at 330; *accord Dowbenko v. Google Inc.*, 582 Fed. App'x 801, 805 (11th Cir. 2014) (per curiam) (quoting *Zeran*, 129 F.3d at 330).

120.   Section 230(c)(2) states that "[n]o provider or user of an interactive computer service shall be held liable on account of ... any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." 47 U.S.C. §230(c)(2).

121.   Section 230(e)(3) expressly states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* §230(e)(3).   This provision expressly preempts

inconsistent state laws that seek to hold online service providers liable for engaging in content moderation covered by Section 230(c). Preemption applies equally to private causes of action and public enforcement actions.

122. Section 230 preempts the following S.B.7072 provisions, both because they conflict with the mandates of Section 230 and because the Florida law stands as an insurmountable obstacle to the federal policy enacted by Section 230 to "encourage service providers to self-regulate the dissemination of offensive material over their services." *Zeran*, 129 F.3d at 331.

123. ***Consistency requirement—Fla. Stat. §501.2041(2)(b).*** The consistency requirement empowers Florida to punish members for their editorial decisions about third-party content. It applies to nearly every conceivable class of editorial decisions, including regulating, restricting, editing, inhibiting the publication of content—or even limiting its exposure or posting an addendum to it. Fla. Stat. §501.2041(2)(b). This provision unlawfully "treats" websites "as the publisher or speaker of … information provided by another information content provider," 47 U.S.C. §230(c)(1), and imposes liability on websites for their "action[s] voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," *id.* §230(c)(2)(A).

"[C]laims based on alleged inconsistency of a platform's removal of some posts but not others are preempted." *NetChoice*, 546 F.Supp.3d at 1090.

124. ***Candidate provisions—Fla. Stat. §§106.072(2), 501.2041(2)(h).*** The candidate provisions prohibit websites from prioritizing, de-prioritizing, or shadow banning content posted by or about a political candidate, Fla. Stat. §501.2041(2)(h), as well as "willfully deplatform[ing]" a political candidate, *id.* §106.072(2). Those provisions, by their terms, hold websites liable for their decisions to remove third-party content and accounts, to "place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others," *id.* §501.2041(1)(e), and to "limit or eliminate the exposure of a user or content … posted by a user." *id.* §501.2041(1)(f). That conflicts with Section 230 and frustrates a core purpose of the statute. *See NetChoice*, 546 F.Supp.3d at 1090 ("[D]eplatforming a candidate restricts access to material the platform plainly considers objectionable within the meaning of 47 U.S.C. §230(c)(2).").

125. ***Journalistic enterprises—Fla Stat. §501.2041(2)(j).*** Prohibiting a "social media platform" from taking any action to "censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast" would impermissibly hold websites liable as publishers of third-party content, 47 U.S.C. §230(c)(1), and impose liability on them for their "action[s] voluntarily taken in good faith to restrict access to or availability of material that the provider or user

considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," *id*. §230(c)(2)(A).  This provision conflicts with Section 230 and frustrates a core purpose of the statute.

126.  ***User opt-out—Fla. Stat. §501.2041(2)(f)-(g).***    The user opt-out provision requires websites to display content in a "sequential or chronological order." Fla. Stat. §501.2041(2)(f)-(g).  But Section 230(c)(1) protects members from liability based on "choices about what content can appear on the website and in what form," as these are "editorial choices that fall within the purview of traditional publisher functions."  *Jane Doe No. 1. v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016); *accord Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (Section 230 bars liability based on "arranging and distributing third-party information.").  This provision conflicts with Section 230 and frustrates a core purpose of the statute.

127.  ***Detailed explanation—Fla. Stat. §501.2041(2)(d), (3).***    Prohibiting "social media platforms" from exercising their editorial discretion to "deplatform," "censor," or "shadow ban" user content unless they provide certain explanations impermissibly seeks to hold them liable as publishers of third-party content, *id*. §230(c)(1), and for "action[s] voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," *id*. §230(c)(2)(A).  That conflicts with Section 230 and frustrates a core purpose of the

federal statute.  *See NetChoice*, 546 F. Supp. 3d at 1090 (detailed-explanation provision is preempted by Section 230 because it "purport[s] to impose liability for … decisions to remove or restrict access to content").

128.  ***Rule changes—Fla. Stat. §501.2041(2)(c).***  The rule-change provision prohibits websites from enforcing their content-moderation "rules, terms, and agreements" insofar as those provisions change more than once within a 30-day period.  Fla Stat. §501.2041(2)(c).  This provision conflicts with Section 230 and frustrates a core purpose of the federal statute.

## PRAYER FOR RELIEF

NetChoice and CCIA pray for the following relief from the Court:

129.  A declaration, pursuant to 28 U.S.C. §2202, that each of the challenged provisions[6] on its face violates the United States Constitution and is therefore void and unenforceable, or, in the alternative, that each of the challenged provisions is unconstitutional as applied to websites operated by NetChoice and CCIA members when they curate and disseminate collections of third-party speech posted on their services.

130.  A declaration, pursuant to 28 U.S.C. §2202, that 47 U.S.C. §230 preempts each of the challenged provisions.

---

[6] Specifically, Fla. Stat. §106.072(2) and §§501.2041(2)(a), (b), (c), (d), (e), (f), (g), (h), (j), and (3).

131.    A preliminary injunction enjoining Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing the challenged provisions of S.B.7072 against online services operated by NetChoice and CCIA members who are covered by the Act.

132.    A permanent injunction enjoining Defendants, as well as all officers, agents, and employees subject to their supervision, direction, or control, from enforcing the challenged provisions of S.B.7072 against online services operated by NetChoice and CCIA members who are covered by the Act.

133.    Such costs and reasonable attorneys' fees to which NetChoice and CCIA may be entitled by law, including under 42 U.S.C. §1988.

134.    Any further relief that the Court deems just and proper.[7]

---

[7] Plaintiffs previously asserted Equal Protection and Commerce Clause claims against S.B.7072.  While they have not included those claims in this amended complaint, they reserve the right to raise those claims in future litigation, including as a defense to any enforcement action.

Dated: November 1, 2024

Respectfully submitted,

/s/ *Douglas L. Kilby*

Paul D. Clement
Erin E. Murphy
James Y. Xi
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com

Brian M. Willen
Steffen N. Johnson
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K Street NW
Washington DC 20006
(202) 973-8800
bwillen@wsgr.com
sjohnson@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

Douglas L. Kilby
Florida Bar No. 0073407
Glenn Burhans, Jr.
Florida Bar No. 0605867
Bridget Smitha
Florida Bar No. 0709581
Christopher R. Clark
Florida Bar No. 1002388
Hannah E. Murphy
Florida Bar No. 1032759
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Ave, Suite 700
Tallahassee, FL 32301
Phone: (850) 580-7200
dkilby@stearnsweaver.com
gburhans@stearnsweaver.com
bsmitha@stearnsweaver.com
crclark@stearnsweaver.com
hmurphy@stearnsweaver.com

*Counsel for Plaintiffs NetChoice and CCIA*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 1st day of November, 2024.

<u>*s/Douglas L. Kilby*</u>
Douglas L. Kilby