# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA

NETCHOICE, LLC, et al.,

     Plaintiffs,

v.                            Case No. 4:21-cv-220-RH/MAF

ASHLEY MOODY, in her official
capacity as Attorney General of the
State of Florida, et al.,

     Defendants.

_____/

## MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendants move to dismiss the amended complaint for lack of jurisdiction and failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6).

Defendants previously moved for judgment on the pleadings in part because Plaintiffs' first complaint failed for lack of associational standing. *See* DE166 at 11-21. Instead of curing that defect, the amended complaint worsens it. While the first complaint raised only a facial challenge, Plaintiffs' amended complaint advances both facial and *as-applied* First Amendment claims on behalf of their members. DE171 ¶ 55. Because those claims are fact-intensive and require "the participation of" the members, Plaintiffs do not have associational standing. *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003); *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 422 (3d Cir. 2020) (holding that the plaintiff lacked

associational standing for as-applied First Amendment claims because the claims "require[d] an individualized inquiry for each . . . member").

The claims require a host of factual determinations about the members and their platforms. The Supreme Court already made clear that Plaintiffs' facial challenge depends on the individual circumstances of covered platforms. *Moody v. NetChoice*, 144 S. Ct. 2383, 2398 (2024). That is all the more true for their as-applied claims. Plaintiffs allege that various statutory provisions violate the First Amendment "as applied to websites operated by [their members] when th[e] websites curate and disseminate" user speech. DE 171 ¶ 55. To resolve those claims, this Court would have to determine the "functions" on all the platforms operated by each member, *Moody*, 144 S. Ct. at 2393; whether each function "curate[s] and disseminate[s]" user speech such that it falls within the scope of Plaintiffs' as-applied claims, DE171 ¶ 55; the "level[] of editorial choice" that each function involves, *Moody*, 144 S. Ct. at 2398; the extent to which each statutory provision "intrud[es] on" each function's "protected editorial discretion," *id.*; and whether each provision satisfies First Amendment scrutiny as applied to each function.

But standing is not the only problem with the amended complaint. It is a shotgun pleading, committing several sins that the Eleventh Circuit has "railed against." *Dunn v. Shoppes at Edgewater*, No. 5:19-cv-76, 2019 WL 13162434, at *1 (N.D. Fla. May 1, 2019) (Hinkle, J.). Plaintiffs have not stated a claim under the

First Amendment, the Fourteenth Amendment, or Section 230 of the Communications Decency Act. Nor have Plaintiffs stated a claim for injunctive relief for all their members.

Consequently, Counts I, II, and IV of the amended complaint must be dismissed for lack of jurisdiction and Count III for failure to state a claim. Alternatively, the amended complaint should be dismissed as a shotgun pleading, or all counts should be dismissed for failure to state a claim. At a minimum, Plaintiffs' claims for injunctive relief must be dismissed to the extent they seek relief beyond Google, Meta, and X.

## MEMORANDUM OF LAW

After the Supreme Court expressed skepticism about Plaintiffs' sweeping facial challenge to S.B. 7072, Plaintiffs amended their complaint. Their case is still riddled with holes. They continue to press their blunderbuss, indiscriminate challenge to Florida's law, attacking nearly a dozen statutory provisions, both facially and as applied. And rather than even one internet platform joining this action, the platforms—which would be subject to the federal rules' demanding party-discovery provisions—continue to hide behind their trade associations. The platforms have thus staked their entire case on those associations having standing to pursue fact-intensive claims on behalf of their members. They do not. For that reason, and many others, the amended complaint should be dismissed.

## BACKGROUND

Plaintiffs are "Internet trade associations." DE171 ¶ 23. Their members are diverse—they include "online social media platforms" like "Facebook" and "X"; "online marketplaces" like "Amazon.com," "Airbnb," "eBay," and "Etsy"; and "online businesses" like "Google," "Yahoo!," and "AOL." DE1 ¶ 20 & n.23; DE171 ¶¶ 13, 15. Plaintiffs sue the Attorney General of Florida and the Florida Elections Commission to "vindicate the[] rights" of those companies under the First Amendment, 47 U.S.C. § 230, and the Fourteenth Amendment. DE171 ¶¶ 14, 16.

**A.** Plaintiffs challenge Sections 106.072 and 501.2041, Florida Statutes, which regulate "any information service, system, Internet search engine, or access software provider" that does "business in" Florida and has either "annual gross revenues in excess of $100 million" or "at least 100 million monthly" users. Fla. Stat. § 501.2041(1)(g). Those statutes impose three types of requirements on such platforms: neutrality provisions, hosting provisions, and disclosure obligations.

Under the neutrality provisions, platforms must consistently apply the standards that they use for managing their users' activities. Section 501.2041(2)(b) provides that platforms "must apply censorship, deplatforming, and shadow banning standards in a consistent manner among [their] users." To prevent evasion of that requirement through constantly shifting standards, Section 501.2041(2)(c) prohibits platforms from changing their "rules, terms, and agreements . . . more than once every 30 days." Platforms also must allow users to "opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." *Id.* § 501.2041(2)(f).

The hosting provisions require platforms to permit certain individuals and organizations to access their services. Sections 106.072 and 501.2041 direct that a platform may not "deplatform a candidate" for public office and "may not apply or use post-prioritization or shadow banning algorithms for content and material posted by or about a user who is known by the social media platform to be a

candidate." *Id.* §§ 106.072(2), 501.2041(2)(h). Nor may a platform "censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." *Id.* § 501.2041(2)(j).

Last, Section 501.2041(2)(a) and (2)(c) impose general-disclosure requirements. They require a covered platform to, among other things, "publish the standards" it employs "for determining how to censor, deplatform, and shadow ban" its users, *id.* § 501.2041(2)(a), and to "inform each user about any changes to its user rules, terms, and agreements." *Id.* § 501.2041(2)(c).

These provisions apply to a variety of platforms and functions. At least one private citizen, for example, has sued Google, alleging that Gmail disabled her email account "in violation of Fla. Stat. § 501.2041." Complaint at 10, *Perez-Poveda v. Google*, No. 3:24-cv-0900 (M.D. Fla. Aug. 30, 2024), ECF No. 1.

**B.** In 2021, this Court entered a preliminary injunction against the Attorney General, the Elections Commission, and the Florida Department of Management Services, concluding that Plaintiffs were likely to succeed on their facial First Amendment and Section 230 preemption claims. DE113. The Eleventh Circuit affirmed in part and vacated in part. *NetChoice v. Att'y Gen.*, 34 F.4th 1196, 1231 (11th Cir. 2022). It vacated the injunction as to Florida Statutes "§§ 106.072(4), 501.2041(2)(a), (c), (e)," holding that those provisions do not likely violate the First

Amendment or Section 230. *Id.* at 1231 & n.26. It held that the remaining provisions likely violate the First Amendment and so did not consider Section 230.

The Supreme Court "vacate[d]" the Eleventh Circuit's "decision[] for reasons separate from the First Amendment merits, because" the decision did not "properly consider[] the facial nature of [Plaintiffs'] challenge." *Moody*, 144 S. Ct. at 2394. "[T]he proper facial analysis," the Court explained, necessitates determining "[w]hat activities, by what actors," Florida's law regulates, and then examining the nature of each "covered platform" and "function," assessing whether applying the law to each function "intrud[es] on protected editorial discretion." *Id.* at 2398.

That is a fact-intensive inquiry, the Court observed, because different platforms and functions "involve different levels of editorial choice." *Id.* "Curating a [news]feed" and "transmitting direct messages," for example, may "involve different levels of editorial choice, so that the one creates an expressive product and the other does not." *Id.* And as Justice Barrett noted, even different newsfeeds might vary in degree of editorial choice. A newsfeed that "just presents automatically to each user whatever [its] algorithm thinks the user will like" is different from a newsfeed that "remove[s] posts promoting a particular political candidate or advocating some position on a public-health issue." *Id.* at 2410 (Barrett, J., concurring).

Even after identifying each application of the law that intrudes on editorial discretion, additional fact-intensive analysis is required. The appropriate level of First Amendment scrutiny must be applied to each application, and the "constitutionally impermissible and permissible" applications of the law must be "compare[d]." *Id.* at 2398 (majority op.).

In concurring opinions, five Justices echoed that Plaintiffs' facial challenge requires a fact-intensive analysis specific to each covered platform. *See id.* at 2411 (Jackson, J., concurring in part and in the judgment); *id.* at 2435-36 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment); *id.* at 2410-11 (Barrett, J., concurring).

**C.** After the Supreme Court entered judgment, the Eleventh Circuit remanded to this Court without vacating the preliminary injunction (relief that Defendants had not requested). DE149; DE154 at 2. Defendants then moved for judgment on the pleadings, DE166, and Plaintiffs amended their complaint instead of responding to the motion. DE171. In the amended complaint, Plaintiffs sue only the Attorney General and the Elections Commission, challenging "Fla. Stat. § 106.072(2) and §§ 501.2041(2)(a), (b), (c), (d), (e), (f), (g), (h), (j), and (3)," DE171 at 68 n.6, and now raising both as-applied and facial First Amendment claims; facial vagueness claims; and facial Section 230 preemption claims. Plaintiffs bring their as-applied

claims on behalf of "Google," "Meta," "X," and "potentially other" unspecified members of the associations. DE171 ¶¶ 13, 55.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

It is Plaintiffs' burden to establish associational standing. *See Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). If they do not, this Court lacks jurisdiction, and their claims must be dismissed. *See id.*; *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551 (1996) (noting that associational standing is a "limit[] on the exercise of federal jurisdiction," even though it is "prudential" in the sense that it can be altered by Congress).

## ARGUMENT

The amended complaint must be dismissed for several reasons. It is a shotgun pleading. Plaintiffs lack standing for their First Amendment and Section 230 preemption claims. On the merits, Plaintiffs do not have a cause of action under 42 U.S.C. § 1983 to assert the First Amendment, Section 230, or Fourteenth Amendment rights of third-party companies. Plaintiffs' Section 230 and Fourteenth

Amendment claims fail in any event. And Plaintiffs have failed to state a claim for injunctive relief for all their members.

## I.   THE AMENDED COMPLAINT IS A SHOTGUN PLEADING.

The amended complaint commits several shotgun-pleading "sin[s]" that require dismissal. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). For starters, Count II "carr[ies] all that came before" it, *id.* at 1321, by "re-alleg[ing] and incorporat[ing] by reference" Count I's allegations. DE171 ¶ 86. Other counts incorporate every factual allegation in the complaint indiscriminately. Count IV, for instance, incorporates every allegation, including paragraph 52, which addresses S.B. 7072's "View Counts" requirement, DE171 ¶ 114, yet Count IV does not even challenge that requirement. *See Clifford v. Federman*, 855 F. App'x 525, 529 (11th Cir. 2021) (concluding that the complaint was a shotgun pleading in part because each count indiscriminately incorporated every factual allegation).

Next, the amended complaint does "not separat[e] into a different count each cause of action or claim for relief." *Weiland*, 792 F.3d at 1323. Counts I and II both include at least nine claims for relief—they allege that nine sets of "restrictions" violate the First Amendment and request injunctions barring enforcement of each. DE171 ¶¶ 63-72, 100-08. Counts I and II also nest claims within claims; in a couple paragraphs challenging a "provision," Plaintiffs in fact attack multiple, distinct

statutory provisions. *See* DE171 ¶¶ 69, 105 (challenging Section 501.2041(2)(f)'s opt-out requirement and Section 501.2041(2)(g)'s notice requirement). Count III appears to level two vagueness challenges against two unrelated provisions. DE171 ¶¶ 109-13. Count IV includes at least six claims for relief, seeking injunctions of six different statutory "restrictions" based on the Supremacy Clause. DE171 ¶¶ 123-28.

Finally, the amended complaint "assert[s]" all its "claims against multiple defendants without specifying which of the defendants . . . [each] claim is brought against." *Weiland*, 792 F.3d at 1323. Adding to the confusion, even though Plaintiffs acknowledge in the complaint that the Attorney General and the Elections Commission are each "authorize[d]" to enforce only *some* of the challenged provisions, DE171 ¶¶ 17-20, Plaintiffs seek to enjoin all Defendants from enforcing *any* of the challenged provisions. DE171 ¶ 132.

## II. PLAINTIFFS LACK STANDING FOR THEIR FIRST AMENDMENT AND SECTION 230 PREEMPTION CLAIMS.

"To invoke [associational standing], an organization must demonstrate" that (1) its members would have standing, (2) "the interests it seeks to protect are germane to [its] purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions*, 600 U.S. at 199. But Plaintiffs' First Amendment and Section 230 preemption claims require the participation of their members because this Court must make platform-specific factual findings to resolve them. Moreover, Plaintiffs

have not established that their members would have standing to bring the Section 230 claims.

## A. The claims require the participation of individual platforms.

A claim requires the participation of members if it "depend[s] upon [their individual] circumstances." *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003); *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("[C]onferring associational standing is improper for claims requiring a fact-intensive-individual inquiry."). For example, Free Exercise claims under the First Amendment "ordinarily require[] individual participation," even where plaintiffs seek an injunction of a statute, because courts must examine how the challenged law "operates against [particular individuals] in the practice of [their] religion." *Harris v. McRae*, 448 U.S. 297, 321 (1980). Courts, in other words, must make factual determinations about individuals' religious practices, which makes their participation necessary to resolve the case. *Id.*; *see also Int'l Union v. Brock*, 477 U.S. 274, 287-88 (1986) (finding associational standing only because the "suit raise[d] a pure question of law"); *Kan. Health Care Ass'n v. Kan. Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018, 1023 (10th Cir. 1992) (plaintiffs lacked associational

standing to seek an injunction of a state law because their claims required the court to determine whether the law had a "detrimental effect on" individual entities).

Similarly, the Court here must make factual determinations about individual platforms. Under "the proper facial" and as-applied "analysis," *Moody*, 144 S. Ct. at 2398, this Court must examine how Sections 106.072 and 501.2041 "operate[] against" each covered platform. *Harris*, 448 U.S. at 321. Plaintiffs therefore lack associational standing for their as-applied and facial First Amendment claims and their facial Section 230 claims.

### First Amendment Claims

**1.** Plaintiffs allege that various provisions in Sections 106.072 and 501.2041 are facially unconstitutional, and unconstitutional as applied to "Google," "Meta," "X," and "potentially other" unnamed companies whenever they "curate and disseminate" user speech. DE171 ¶¶ 13, 55. Both types of claims require factual determinations about those companies' operations.

As the Supreme Court has already explained, whether and how Florida's law and the First Amendment apply varies platform to platform. *See Moody*, 144 S. Ct. at 2398. S.B. 7072 applies only to platforms that meet certain user or revenue thresholds, Fla. Stat. § 501.2041(1)(g)4., so whether a platform is even covered by

the law is a fact-specific question.[1] And even then, the First Amendment analysis depends on the specifics of each platform's operations—the analysis differs as to "Facebook," "Gmail," "Etsy," "Venmo," and "Uber." *Moody*, 144 S. Ct. at 2398. Even within a single platform like Facebook, the analysis varies depending on the platform's specific "services," such as "News Feed[s]," "events management," and "marketplace[s]." *Id.*

So "at trial," this Court "necessarily would have to [analyze] the nature of operations of individual" platforms and make extensive factual determinations about those operations. *Kan. Health Care Ass'n*, 958 F.2d at 1023. For Plaintiffs' as-applied claims, the Court would have to determine all the functions on the platforms operated by "Google," "Meta," "X," and "potentially other" members, DE171 ¶ 13; whether each function "curate[s] and disseminate[s]" third-party speech such that it falls within the scope of Plaintiffs' as-applied challenge, DE171 ¶ 55; the "level[] of editorial choice" that each function involves, *Moody*, 144 S. Ct. at 2398; and whether and how each challenged provision "intru[des] on" each function, *id.* Similarly, for Plaintiffs' facial claims, the Court would have to determine all the platforms that Sections 106.072 and 501.2041 cover; the different functions on the platforms; the

---

[1] Remarkably, Plaintiffs are not even sure which members they bring claims on behalf of or which ones S.B. 7072 regulates. DE171 ¶¶ 13, 15 (naming Google, Meta, X, "and *potentially other*[*s*]" (emphasis added)). Plaintiffs appear content to leave that to Defendants and this Court to figure out by simply seeking an injunction for their "members who are covered by the Act." DE171 ¶ 131.

"level[] of editorial choice" that each function involves; and whether and how each provision "intru[des] on" each function. *Id.*

Those are all platform-specific questions that depend on the nuances of the "algorithms" that the platforms use, *id.* at 2403; *id.* at 2410 (Barrett, J., concurring); whether the functions "exclude[]" certain types of content, *id.* at 2402 (majority op.); the extent to which each function "compile[s]" and "convey[s]" content, *id.* at 2406; the "corporate structure and ownership" of the platform, *id.* at 2410 (Barrett, J., concurring); and so on. It matters, for instance, if an algorithm "respond[s] solely to how users act online," or if the algorithm incorporates "a wealth of user-agnostic judgments" about the kinds of speech it wants to promote. *Id.* at 2404 n.5 (majority op.); *see also id.* at 2410 (Barrett, J., concurring). "[T]he same covered actor might [even] use a different algorithm . . . on different covered services." *NetChoice v. Paxton*, ___ F.4th ___, 2024 WL 4704574, at *3 (5th Cir. Nov. 7, 2024). "For example, it might be true that X is a covered actor and that both its 'For You' feed and its 'Following' feed are covered services." *Id.* "But it might also be true that X moderates content differently or that its algorithms otherwise operate differently across those two feeds." *Id.*

On top of all that, after this Court identifies the functions that Sections 106.072 and 501.2041 affect, it would have to determine and then apply the appropriate level of scrutiny to each application of each challenged provision.

"Given the diversity of circumstances presented by" the covered platforms, that too is an "individualized inquiry." *Free Speech Coal.*, 974 F.3d at 422. The provisions might be sufficiently tailored "for one association member" but not for another. *Id.*; *see also Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 482-83 (1989) (for as-applied claims, scrutiny analysis depends on the specific "acts" of the covered party).

Under similar circumstances, the Supreme Court and the Eleventh Circuit have rejected associational standing. Take the Supreme Court's decision in *Harris*. The plaintiff-associations there "sought to enjoin the enforcement of" a federal "funding restriction on abortions," alleging that the restriction violated the Free Exercise Clause. 448 U.S. at 303-05. That claim required the plaintiffs to show that the restriction had a "coercive effect" on the religious practices of individuals. *Id.* at 321. The Supreme Court held that the plaintiffs lacked associational standing because their members had a "diversity of [religious] view[s]," and so examining whether the restriction burdened them required individualized factual determinations. *Id.* Same here. Plaintiffs' members "operate a variety" of platforms, from Facebook to Pinterest to X, DE171 ¶ 23, and so examining whether the challenged provisions burden individual platforms' expression requires this Court to make factual determinations about the operations of each platform. *Moody*, 144 S. Ct. at 2398; *see also id.* at 2435 (Barrett, J., concurring).

The Eleventh Circuit's decision in *Georgia Cemetery Association* is also on-point. The plaintiff-association in that case brought a facial challenge under the Takings Clause against a Georgia law that capped private-cemetery fees. 353 F.3d at 1322. To resolve that facial challenge, it was necessary to consider how the law "economically impact[ed] the 'distinct investment backed expectations' of" all covered cemeteries. *Id.* That doomed associational standing, the Eleventh Circuit held, because "the economic impact" on the cemeteries "depend[ed] upon" their individual "economic circumstances." *Id.*; *see also Greater Atlanta Home Builders Ass'n v. City of Atlanta*, 149 F. App'x 846, 848-49 (11th Cir. 2005). Likewise, Plaintiffs' facial and as-applied First Amendment claims require this Court to consider the "impact" that Sections 106.072 and 501.2041 have on the "protected editorial discretion" of the covered platforms—a question that "will vary depending upon" each platform's "circumstances." *Ga. Cemetery Ass'n*, 353 F.3d at 1322; *Moody*, 144 S. Ct. at 2398.

Plaintiffs thus lack associational standing for their facial and as-applied First Amendment claims. As this Court has pointed out, member participation is required except "where individualized proof is unnecessary, the plaintiff seeks no money damages, and the question presented is purely legal." *Council of Ins. Agents & Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1308 n.3 (N.D. Fla. 2003) (Hinkle, J.).

Plaintiffs' claims both require individualized proof and present fact-intensive questions.

**2.** Even if this Court were to dismiss Plaintiffs' as-applied challenges but hold that Plaintiffs have associational standing to assert their First Amendment facial claims, those claims would still face dismissal. Those challenges rely on the overbreadth doctrine, *see Moody*, 144 S. Ct. at 2397, and it is well settled that courts should not pass on an overbreadth challenge without first adjudicating whether the statute is valid as applied to the injured party. *Fox*, 492 U.S. at 484-85.

Overbreadth is "strong medicine," to be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). It is "a departure from traditional rules of standing," permitting a plaintiff to mount a facial challenge when "necessary" to "vindicat[e] [his] own right not to be bound by a statute that is unconstitutional." *Fox*, 492 U.S. at 484-85. Therefore, a plaintiff can typically "proceed to an overbreadth" challenge only after "it is determined that the statute would be valid as applied" to him. *Id.* at 484-85; *see also Renne v. Geary*, 501 U.S. 312, 324 (1991) ("It is not the usual judicial practice . . . to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied."). That rule not only guards against "gratuitous wholesale attacks upon state . . . laws" but also serves judicial "efficiency" because "the overbreadth question is . . . difficult to resolve." *Fox*, 492 U.S. at 485.

This is the exact sort of case where the rule should be applied. Adjudicating Plaintiffs' facial claims will be "a daunting, if not impossible, task" because they implicate "a broad swath of varied platforms and functions." *Moody*, 144 S. Ct. at 2409 (Barrett, J., concurring). The Court should not wade into that thicket unnecessarily. Rather than passing on Plaintiffs' overbreadth challenges without first considering an as-applied claim, the proper course is to dismiss the challenges without prejudice, which would allow any of Plaintiffs' members to bring as-applied claims on their own behalf. Only if "it is determined that the statute would be valid as applied" should a court undertake the herculean task of adjudicating the sweeping overbreadth challenges that Plaintiffs advance. *Fox*, 492 U.S. at 485.

### *Section 230 Claims*

Plaintiffs' facial Section 230 claims also require the participation of individual platforms. Plaintiffs argue that Sections 106.072(2) and 501.2041(2)(b)-(d), (2)(f)-(h), (2)(j), (3) are facially unconstitutional under the Supremacy Clause because they "punish members for their editorial decisions about third-party content." DE171 ¶ 123. In Plaintiffs' view, Section 230 shields platforms from any law that "interfere[s]" with their decisions to "display certain content." Br. for Appellees at 50, *Moody v. NetChoice*, No. 21-12355, 2021 WL 5238982 (11th Cir. Nov. 8, 2021).

That misunderstands Section 230. It does not override every law that affects platforms' hosting, recommendation, disclosure, and content decisions; instead, it

immunizes platforms from "claim[s] . . . based on content provided by *another information content provider.*" *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *2 (11th Cir. June 12, 2023); *Anderson v. TikTok, Inc.*, 116 F.4th 180, 183 (3d Cir. 2024) (Section 230 "immunize[s]" platforms "only if they are sued for someone else's expressive activity or content"). But even under Plaintiffs' broad construction of Section 230, they lack associational standing.

Like their First Amendment challenges, Plaintiffs' Section 230 claims require this Court to examine all the "circumstances" to which the challenged provisions apply. *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (applying the facial-challenge standard in *United States v. Salerno*, 481 U.S. 739 (1987) to a preemption claim). If the provisions are consistent with Section 230 in at least some of their applications, then they are not facially preempted.[2]

That analysis requires the participation of individual platforms. Whether and how the provisions regulate a platform depends on the platform's functions and "circumstances." *Ga. Cemetery Assoc.*, 353 F.3d at 1322; *see also Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024) (Section 230 "requires case-

---

[2] In *Club Madonna Inc. v. City of Miami Beach*, the Eleventh Circuit indicated that *Salerno* does not require a plaintiff to establish that the challenged law is invalid in all applications. 42 F.4th 1231, 1256 (11th Cir. 2022). But the Supreme Court has since made clear that a non-First Amendment facial challenge requires a plaintiff to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024); *Moody*, 144 S. Ct. at 2397.

specific, and indeed claim-specific, analysis"). Consider Sections 106.072(2) and 501.2041(2)(j), which direct that a platform may not "deplatform a [political] candidate" during election season or deplatform a "journalistic enterprise" "based on the content of its publication or broadcast." If a website is constructed so that every user with an account can post content, then those provisions might implicate Section 230 under Plaintiffs' reading. But if a website is constructed so that a user with an account can access the platform's services, such as sending direct messages and viewing others' content, without publishing his own content, then those provisions would not in any way interfere with the platform's decisions about what content to "display." Br. for Appellees, *supra*, at 50. The platform would have to afford candidates and journalistic enterprises access to its services but could still screen objectionable material.

And that is just the tip of the iceberg. Plaintiffs' facial challenge would require this Court to look beyond standard social-media platforms and consider platforms like Uber, Gmail, and Yahoo!, which do not appear to display large amounts of user-generated content. Section 230 likely applies quite differently, if at all, to such platforms' hosting, content-moderation, recommendation, and disclosure decisions.

Plaintiffs are wrong that Sections 106.072 and 501.2041 "cover[] only providers of social media within the common understanding, not" platforms like

Uber, Gmail, and Yahoo!. DE171 ¶ 91 (cleaned up). When Plaintiffs first filed this suit, they took the view that the provisions apply even to platforms that are not traditional social-media companies. *See* DE29-1 at 6 (asserting that S.B. 7072 will "force Etsy to host content"); DE30 at 20 (citing "Pinterest" and "Etsy" as examples of platforms that S.B. 7072 affects). Now, Plaintiffs claim that the provisions reach only platforms like Facebook and X. *See* DE171 ¶ 98. But under the "supremacy-of-text principle," which governs the interpretation of Florida statutes, *Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021), Sections 106.072 and 501.2041 cannot be read to cover only "providers of social media within the common understanding." DE171 ¶ 91. They cover all platforms that satisfy the statutory definition of "social media platform"—"any information service, system, Internet search engine, or access software provider" that does "business in" Florida and has either "annual gross revenues in excess of $100 million" or "at least 100 million monthly" users. Fla. Stat. § 501.2041(1)(g). That statutory definition controls. *Deloatch v. State*, 360 So. 3d 1165, 1169 (Fla. Dist. Ct. App. 2023) ("When a statute includes an explicit definition, [courts] must follow that definition, even if it varies from that term's ordinary meaning."); *see also Dep't of Ag. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 50-51 (2024) (applying same principle to a federal statute). Under Sections 106.072 and 501.2041, Gmail has no greater license to terminate the accounts or censor the speech of political candidates and

journalistic enterprises than any other "information service, system, Internet search engine, or access software provider." Fla. Stat. § 501.2041(1)(g).[3]

In short, just like Plaintiffs' First Amendment claims, their Section 230 claims require this Court to make factual determinations about individual platforms. Plaintiffs therefore lack associational standing.

### First Amendment and Section 230 Claims

Plaintiffs additionally lack associational standing for their First Amendment and Section 230 claims because the claims raise an "intraorganizational conflict of interest." *Fla. Auto. Dealers Ass'n v. Ford Motor Co.*, 2024 WL 836384, at *2 (N.D. Fla. Jan. 25, 2024) (noting that a circuit split exists as to whether a conflict of interest can "defeat" associational standing). Because of the relationship between Section 230 and First Amendment-protected activity, some of Plaintiffs'

---

[3] Citing this Court's preliminary-injunction order, Plaintiffs say that Defendants previously "took [the] position" that the "definition of 'social media platform' is limited to" platforms like Facebook and X. DE171 ¶ 90. That misstates Defendants' position. Defendants agreed with this Court that "the strict terms of the definition" are broader. DE112 at 57-59. Instead, Defendants only recognized that S.B. 7072's provisions do not reach all functions on every covered platform. *See* DE112 at 57 ("the great majority of the substantive provisions of the law are tied to [the] platform's treatment of users" and so do not reach certain functions); DE112 at 59 (content "posted by Home Depot or XYZ Corp." on its platform is not regulated because it is not "posted by a user"); Oral Arg. Tr. 11-25, *Moody v. NetChoice*, No. 22-277 (U.S.S.C.) (the provisions do not "regulate the goods Etsy is offering"). But Defendants have indeed asserted that many provisions reach functions well beyond "newsfeeds" and other "typical[]" social-media functions. *Contra* DE171 ¶ 88; *see* Pet. Br. 34-35, *Moody*, No. 22-277.

members will have an interest in this Court holding that many platform functions are expressive, while other members will not. The First Amendment protects a platform's own expressive activity, but Section 230 does "not immunize[]" a platform if it is "sued for [its] own expressive activity." *TikTok*, 116 F.4th at 183. So if this Court rules that a broad swath of functions involve expressive activity, some members' Section 230 immunity could be imperiled. That creates an intraorganizational conflict. Some members will have an interest in the First Amendment protecting more of their conduct from State action. Others will have an interest in a narrow conception of expressive activity, so that Section 230 immunizes more of their conduct from tort liability. Take Meta and Etsy. Meta is embroiled in tort litigation and may therefore have an interest in expansive Section 230 immunity, while Etsy does not have that problem and may prefer to argue for more expansive First Amendment protection. *See, e.g.*, *In re: Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 22-md-03047 (N.D. Cal.).

Plaintiffs' belated attempt to save their facial challenge by narrowly construing S.B. 7072's definition of "social media platform" magnifies that conflict. DE171 ¶¶ 87-98. The definition is lifted almost verbatim from Section 230's definition of "interactive computer service." *Compare* Fla. Stat. § 501.2041(1)(g)1., *with* 47 U.S.C. § 230(f)(2). A decision narrowly interpreting that text would be against the interests of Plaintiffs' members who seek Section

230 immunity but do not operate platforms "commonly underst[oo]d as social media services."

At the very least, those diverging interests are further reason for this Court not to permit associational standing. Associational standing should not be granted unless an organization has "the appropriate incentive[s]" and will protect *all* its members' interests "with the necessary zeal." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

## B. Plaintiffs' members would not have standing to assert the Section 230 claims.

Even if participation of Plaintiffs' members were unnecessary, Plaintiffs lack standing for their Section 230 claims because their members would not have standing to bring the claims. *See Students for Fair Admissions*, 600 U.S. at 199. To establish standing in a pre-enforcement challenge, a plaintiff must show that it faces a "credible threat of enforcement" from the defendant. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014). Yet Plaintiffs have not sufficiently alleged that any of their members faces a credible threat of enforcement for engaging in conduct protected by Section 230.

Just like their first complaint, *see* DE166 at 21, Plaintiffs' amended complaint contains no allegations articulating a "*certainly* impending," credible threat that the Attorney General or the Elections Commission will take enforcement action that is inconsistent with Section 230. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013).

Plaintiffs simply assert that the Attorney General and the Commission are "authorized" to enforce Sections 106.072 and 501.2041, and then generally allege that those statutes allow for enforcement inconsistent with Section 230. *See* DE171 ¶¶ 17-18, 114-28. But alleging a credible threat of enforcement requires "more than generalizations." *Dermer v. Miami-Dade County*, 599 F.3d 1217, 1220 (11th Cir. 2010). Plaintiffs must make "specific[]" allegations that evince "an actual and well-founded fear that" Defendants will enforce the challenged provisions against Plaintiffs' members in a manner barred by Section 230. *Id.* at 1220-21; *see also Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1203 (11th Cir. 2021) (finding no standing in part because the plaintiffs failed to show that "the Attorney General either threatened to enforce [the statute] against the[m] or otherwise g[ave] any indication that enforcement is likely").

That required Plaintiffs to plausibly allege that Defendants are likely to violate S.B. 7072's provision that *prohibits* them from enforcement that is "inconsistent with . . . 47 U.S.C. s. 230(e)(3)." Fla. Stat. § 501.2041(9). Under that provision, Defendants are duty-bound not to take enforcement action against Plaintiffs' members for conduct protected by Section 230. In the face of that legal duty, Plaintiffs' allegations fall well short of establishing a credible threat. They pleaded no "factual content" from which this Court could make a "reasonable inference" that the Attorney General or the Commission will imminently subject their members to

liability that is inconsistent with Section 230. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint does not include any specific allegations about future enforcement, let alone sufficient allegations to overcome the presumption that Defendants will act in good faith and comply with their statutory directive. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies."); *City of South Miami v. Governor of Fla.*, 65 F.4th 631, 643 (11th Cir. 2023) (finding that the plaintiffs lacked standing because they did not show that the defendants would disregard a provision "explicitly prohibit[ing] discriminat[ory]" enforcement); *Blum v. Holder*, 744 F.3d 790, 798-99 (1st Cir. 2014) (similar).

Finally, that failure dooms not only Plaintiffs' standing but also their reliance on *Ex Parte Young*. DE171 ¶ 21. *Ex Parte Young* applies only when the defendant state official has "threaten[ed] and [is] about to commence proceedings" such that "enforcement actions are imminent." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Because Plaintiffs have not established that Defendants will imminently take enforcement action that is inconsistent with Section 230, they have not shown that *Ex Parte Young* applies, and sovereign immunity bars the claims.

## III.    PLAINTIFFS FAIL TO STATE A CLAIM.

### A. Plaintiffs do not have a cause of action under Section 1983 to assert the First Amendment, Section 230, or Fourteenth Amendment rights of third-party companies.

**1.** Plaintiffs lack a cause of action under Section 1983 because they do not allege a deprivation of their own First Amendment, Section 230, or Fourteenth Amendment rights. *See* DE171 at 28, 45, 60, 62 (raising the claims under "42 U.S.C. §1983"). To enjoy a cause of action under Section 1983, a plaintiff must belong to the "particular class of persons" on which the statute confers a "right to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). And the only class of persons on which Section 1983 confers a right to sue is those who have personally suffered a deprivation of federal rights. Section 1983 states: "Every [state actor who] subjects . . . any citizen . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to *the party injured* in an action at law [or] a suit in equity[.]" 42 U.S.C. § 1983 (emphasis added). The statute thus grants only "the party injured" the right to bring "an action." *Id.*

But Plaintiffs do not claim that they stand to suffer a deprivation of rights under the First Amendment, Section 230, or the Fourteenth Amendment. Instead, their claims are premised on their third-party members' suffering a deprivation. Section 1983 by its plain terms does not give them that sort of derivative cause of action. *Vote.org v. Callanen*, 39 F.4th 297, 304-05 (5th Cir. 2022) (concluding that

the plaintiff-association lacked "statutory standing" because the text of Section 1983 "precludes an action premised on the deprivation of another's rights"); *Vote.org v. Byrd*, 700 F. Supp. 3d 1047, 1052 (N.D. Fla. 2023) (finding this textual analysis of Section 1983 "persuasive"); *but see Vote.org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023).[4]

**2.** Even if Plaintiffs could assert their members' Section 1983 causes of action, their Section 230 claims would fail because Section 1983 does not provide a "right of action" for Section 230 preemption. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107-08 (1989). "Given the variety of situations in which preemption claims may be asserted, . . . it [is] incorrect to assume that a federal right of action pursuant to [Section] 1983 exists every time a federal rule of law pre-empts state" law. *Id.* Because the Supremacy Clause is not itself a source of rights, Section 1983 can serve as the vehicle for a preemption claim only if the allegedly preemptive statute "unambiguously secures rights" *and* Congress "intend[ed] that [Section] 1983 be available to enforce those rights." *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 186 (2023). If, for example, the statute provides for "a specific means of judicial enforcement," it "suggests" that Congress "intended to preclude other[]"

---

[4] The Eleventh Circuit has considered Section 1983 claims alleging a violation of another's rights without considering whether Section 1983's text affords a cause of action. *See, e.g.*, *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1032 (11th Cir. 2008). Those "drive-by" holdings are not controlling here. *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1325 n.2 (11th Cir. 2020).

means, such as a Section 1983 or equitable action. *In re Wild*, 994 F.3d 1244, 1259 (11th Cir. 2021) (en banc).

Even if Section 230 clearly created individual rights for platforms, Congress did not intend that Section 1983 "be available to enforce those rights." *Talevski*, 599 U.S. at 186. Section 230 contains its own comprehensive enforcement mechanism that is inconsistent with Section 1983 enforcement; it provides an immunity affirmative defense that is enforceable "within the confines of a preexisting proceeding." *Wild*, 994 F.3d at 1259.

Section 230 specifies that it is a shield to be used only when a "cause of action [is] brought" or "liability [is] imposed under any State or local law that is inconsistent with" its provisions. 47 U.S.C. § 230(e)(3). Section 230(c) establishes "Good Samaritan" immunity for computer service providers that "block[] and screen[] . . . offensive material," *id.* § 230(c), and Section 230(e)(3) explains how that immunity is enforced. Just like other Good Samaritan laws and immunity statutes, Section 230 is enforced in a preexisting proceeding as a defense against a "cause of action" or "liability." *Id.* § 230(e)(3); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) ("Preemption under the Communications Decency Act is an affirmative defense[.]").[5] Section 230 does not permit private enforcement

---

[5] *See also, e.g.*, *McIntyre v. Ramirez*, 109 S.W.3d 741, 742 (Tex. 2003) ("The Good Samaritan statute provides an affirmative defense[.]"); *People v. Morrison*, 939 N.W.2d 728, 732 (Mich. 2019) ("the Good Samaritan law" is an "affirmative

actions: "Good-Samaritan law[s]" "exempt[]" a person "from liability"—they are not understood to allow a person to bring an action and impose liability on another. *Good-Samaritan Law*, Black's Law Dictionary (12th ed. 2024); *Wild*, 994 F.3d at 1257 (holding that a federal law foreclosed a private right of action because the law used a term that was not "commonly understood to denote a vehicle for initiating a new" lawsuit). It would strain credulity to suggest that Congress conferred on platforms an affirmative *defense* on the understanding that it would be enforced *offensively* through Section 1983.

Other subsections underscore that Section 230 contemplates enforcement only in a preexisting proceeding. Subsection (e)(5), which elaborates on the scope of the statute's immunity, focuses on preexisting proceedings. It states that "[n]othing" in Section 230 "other than subsection (c)(2)(A) shall be construed to impair or limit" "any claim in a civil action" or "any charge in a criminal prosecution brought" under a sex-trafficking law. And subsection (c)(2) states that no platform "shall be held liable" in a "civil" case, which is language that courts have interpreted as creating only a defense to liability. *See, e.g.*, *Edwards v. Niagara Credit Sols., Inc.*, 584 F.3d 1350, 1352 (11th Cir. 2009) (explaining that the language "may not be held liable" in the Fair Debt Collection Practices Act creates an "affirmative defense"); *Pub.*

_____

defense"); *Breazeal v. Henry Mayo Newhall Mem'l Hosp.*, 234 Cal. App. 3d 1329, 1337 (1991) ("[T]he evidence established the defendants' affirmative defense of Good Samaritan immunity[.]").

*Health Tr. of Miami-Dade Cnty. v. Rolle*, 88 So. 3d 191, 193-94 (Fla. Dist. Ct. App. 2011) (similarly interpreting Florida's Good Samaritan Act, which states that individuals "shall not be held liable for any civil damages").

Thus, Section 230 "precludes courts from entertaining claims" against a computer service provider, *McCall*, 2023 WL 3946827, at *2—and that is all it does. Plaintiffs cannot repurpose it as a statute granting freestanding rights that they can enforce through Section 1983. Nor can they save their Section 230 challenge by reformulating it as an equitable cause of action; because Congress has made clear its "intent to foreclose" Section 230 enforcement actions, equity provides no cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-29 (2015).[6]

**B. Plaintiffs fail to plausibly allege Section 230 and Fourteenth Amendment claims.**

**1.** Even under Plaintiffs' view of Section 230, their claims fail under "the proper facial analysis" because there are circumstances in which the challenged provisions are plainly consistent with Section 230. *Moody*, 144 S. Ct. at 2398. Throughout this case, Plaintiffs have sought to invalidate S.B. 7072 by "focus[ing] on hypothetical scenarios where [the law] might raise constitutional concerns" under the Supremacy Clause. *United States v. Rahimi*, 144 S. Ct. 1889, 1903 (2024). But

---

[6] Plaintiffs also request relief for their Section 230 claims under the Declaratory Judgment Act, DE171 at 8-10, 62, but the Act requires an "underlying cause of action," which is absent here. *Rebuild Nw. Fla. v. Fed. Emergency Mgmt. Agency*, 2018 WL 7351690, at *1 & n.6 (N.D. Fla. July 12, 2018).

in a facial challenge, the focus must instead be on "the circumstances in which [the law is] most likely to be constitutional." *Id.* There are many such circumstances.

All the law's neutrality and hosting provisions can be enforced against platform actions taken in bad faith because Section 230 protects only "good faith," or "Good Samaritan," actions. 47 U.S.C. § 230(c); *see also e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *3 (M.D. Fla. Feb. 8, 2017) (concluding that Section 230 might not apply because the plaintiff presented evidence of bad faith). That alone defeats Plaintiffs' facial challenges to Sections 106.072(2) and 501.2041(2)(b)-(d), (f)-(h), (j), (3).

But even as to "good faith" actions, there are a variety of circumstances in which Sections 106.072 and 501.2041 do not "interfere[]" with any "editorial discretion." Br. of Appellees, *supra*, at 50. Consider again the provisions directing that a platform may not "deplatform a candidate" for public office during election season or deplatform a "journalistic enterprise" "based on the content of its publication or broadcast." Fla. Stat. §§ 106.072(2), 501.2041(2)(j). As applied to a provider of email services, such as Gmail or Yahoo!, those provisions neither "treat[]" the provider like a "publisher" or "speaker" nor stop it from "restrict[ing] access to or availability of material" that is "objectionable." 47 U.S.C. § 230(c). The provisions might prevent the provider from denying a candidate or journalistic

enterprise an email account, but they would not force the provider to make available any objectionable content the user generates.

**2.** Plaintiffs also fail to plausibly allege that Section 501.2041(2)(b) and (2)(h) are unconstitutionally vague on their face. Plaintiffs detail how those provisions affect their members, even going as far as claiming that the provisions *clarify* the meaning of other parts of Florida's law, DE171 ¶¶ 63-65, 93-94, yet Plaintiffs nevertheless assert that the phrases "in a consistent manner" and "post-prioritization" in the provisions are "impossible to understand." DE171 ¶¶ 112-13.

But Plaintiffs offer no allegations suggesting that subsections (2)(b) and (2)(h) are "impermissibly vague in all . . . applications." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018). "[A] plaintiff who engages in some conduct that is clearly proscribed" by a statute cannot challenge the statute on vagueness grounds—even if the statute might be vague as to other conduct. *Id.* Plaintiffs do not dispute that their members engage in some conduct that is clearly regulated by subsections (2)(b) and (2)(h). That they engage in such conduct and that the First Amendment protects the conduct is the entire premise of their First Amendment claims. The vagueness claims fail for that reason alone. *See id.*

In any event, the amended complaint comes nowhere near plausibly alleging that subsections (2)(b) and (2)(h) are "so vague that persons of ordinary intelligence [must] guess at [their] meaning." *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d

1254, 1271 (11th Cir. 2007). As for subsection (2)(b), nobody need guess at what it means for a platform to "apply [its] standards in a consistent manner among its users." Fla. Stat. § 501.2041(2)(b). By setting platforms' *own standards* as the baseline, the provision simply requires platforms to enforce their policies as written and refrain from selective enforcement. Plaintiffs' members themselves describe this concept to their users with similar terminology—an odd choice if they believe it incomprehensible. *See, e.g.*, *Our Approach to Policy Development and Enforcement Philosophy*, X Help Center, https://tinyurl.com/5n85jx3h (describing how X aims to enforce its standards with "uniform consistency").

Plaintiffs assert that subsection (2)(h)'s prohibition on using "post-prioritization . . . algorithms for content and material posted by or about a" political candidate, Fla. Stat. § 501.2041(2)(h), is "paradoxical, self-defeating, and incomprehensible." DE171 ¶ 113. That claim is similarly unavailing. Plaintiffs focus entirely on the statute's definition of "post-prioritization" and ignore its definition of "algorithm," which makes clear that a "post-prioritization algorithm" is one that orders content in some way other than "using published time or chronological order." Fla. Stat. § 501.2041(1)(a). Subsection (2)(h) thus requires only that content by or about a candidate appear "in a newsfeed, a feed, a view, or in search results" using published time or chronologically. *Id.* § 501.2041(1)(e).

Because Plaintiffs offer only conclusory assertions of incomprehensibility and a few hypotheticals they believe would pose difficult questions, they fail to state facial vagueness claims. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 n.15 (1972) (A statute is not vague just because "the fertile legal imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question").

## C. Plaintiffs fail to state a claim for injunctive relief as to all their members.

Even if Plaintiffs' amended complaint survived its many defects, Plaintiffs at minimum fail to state a claim for the sweeping relief they seek. To state a claim for relief for a constitutional violation, a plaintiff must allege that it suffered "a violation of a specific . . . right," *Robertson v. Hecksel*, 420 F.3d 1254, 1256 (11th Cir. 2005), and allege facts sufficient to support the remedy sought. The remedy must be limited to redressing the asserted violation. *See Farrar v. Hobby*, 506 U.S. 103, 115 (1992) ("Whatever the constitutional basis for substantive liability, damages awarded in a § 1983 action must always be designed to *compensate injuries* caused by the constitutional deprivation."); *Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("[A] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). For example, a plaintiff cannot succeed on a claim for injunctive relief without showing both that a "legal right has been infringed" and

that the relief it seeks is necessary to avoid "irreparable injury." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005).

Here, the amended complaint at most alleges only that "Google," "Meta," and "X" will suffer a deprivation of rights, DE171 ¶ 13, yet Plaintiffs request injunctive relief for all "members who are covered by the Act." DE171 ¶¶ 131-32. By failing to identify those additional members—let alone plausibly allege that they have suffered a violation of their rights or face irreparable harm—Plaintiffs fail to state a claim for injunctive relief on their behalf. The claims for injunctive relief must be dismissed at least to the extent they seek relief beyond Google, Meta, and X.[7]

## CONCLUSION

This Court should dismiss the amended complaint.

---

[7] Plaintiffs have not stated a claim for injunctive relief as to all their members regardless of whether they have associational standing. Associational standing allows an organization to satisfy Article III and prudential limitations on jurisdiction. It does not allow organizations to bypass the requirements for injunctive relief. *Cf. Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019).

Dated: November 15, 2024

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Kevin A. Golembiewski*
Henry C. Whitaker
  *Solicitor General*
Daniel W. Bell
  *Chief Deputy Solicitor General*
Kevin A. Golembiewski
  *Senior Deputy Solicitor General*
Darrick W. Monson
  *Assistant Solicitor General*
Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Defendants*

Charles J. Cooper
David H. Thompson
Brian W. Barnes
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

This motion complies with Local Rule 7.1(F) because it has 475 words, and the memorandum of law complies with the rule because it has 7,953 words.

Because this motion will "determine the outcome of a . . . claim," no attorney conference was required. L.R. 7.1(D).

*/s/ Kevin A. Golembiewski*
Counsel for Defendants

## CERTIFICATE OF SERVICE

I certify that on this 15th day of November, 2024, the foregoing motion and memorandum of law were served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ Kevin A. Golembiewski*
Counsel for Defendants