**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

NETCHOICE, LLC; and COMPUTER
& COMMUNICATIONS INDUSTRY
ASSOCIATION,

     *Plaintiffs*,

v.

ASHLEY BROOKE MOODY, et al.,

     *Defendants*.

Case No. 4:21-cv-0220-RH-MAF

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................ i

TABLE OF AUTHORITIES ................................................. ii

INTRODUCTION ............................................................. 1

BACKGROUND ............................................................... 3

    A.   Factual Background ............................................. 3

    B.   Procedural History ............................................. 5

ARGUMENT ................................................................... 8

I.    The Amended Complaint Is Not A "Shotgun Pleading." .............. 8

II.   Plaintiffs Have Associational Standing. ......................... 11

    A.   Plaintiffs Have Associational Standing to Bring Their First Amendment Claims. ............................................. 11

    B.   Plaintiffs Have Associational Standing to Bring Their §230 Claim. ....................................................... 21

    C.   Florida's Other Associational Standing Arguments Lack Merit. ...................................................... 24

III.  The Amended Complaint States A Claim. ........................... 27

    A.   Plaintiffs Have a Cause of Action to Seek Declaratory and Injunctive Relief for Violations of Their Members' Rights. .............. 27

    B.   Plaintiffs Plausibly Allege §230 and Vagueness Claims. .................... 31

    C.   Florida's Argument About the Scope of Injunctive Relief Is Premature. ................................................... 35

CONCLUSION ............................................................... 35

# TABLE OF AUTHORITIES

## Cases

*All. for Open Soc'y Int'l v. USAID*,
  651 F.3d 218 (2d Cir. 2011) ................................................................11, 12

*All. of Auto. Mfrs. v. Jones*,
  897 F.Supp.2d 1241 (N.D. Fla. 2012) ........................................................13

*Almeida v. Amazon.com*,
  456 F.3d 1316 (11th Cir. 2006)....................................................................28

*Am. Airlines v. Wolens*,
  513 U.S. 219 (1995)......................................................................................30

*Armstrong v. Exceptional Child Ctr.*,
  575 U.S. 320 (2015)......................................................................................27

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*,
  627 F.3d 547 (5th Cir. 2010)........................................................................12

*Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity*,
  950 F.2d 1401 (9th Cir. 1991)......................................................................25

*Backpage.com v. Cooper*,
  939 F.Supp.2d 805 (M.D. Tenn. 2013) ........................................................30

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989)......................................................................................20

*Borrero v. United Healthcare of N.Y.*,
  610 F.3d 1296 (11th Cir. 2010)................................................................ 2, 12

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011)......................................................................................28

*Cannon v. Univ. of Chi.*,
  441 U.S. 677 (1979)......................................................................................29

*Charles v. Front Royal Volunteer Fire & Rescue Dep't*,
  21 F.Supp.3d 620 (W.D. Va. 2014)..............................................................35

*Club Madonna v. City of Miami Beach*,
  42 F.4th 1231 (11th Cir. 2022)......................................32

*Culverhouse v. Paulson & Co.*,
  813 F.3d 991 (11th Cir. 2016)......................................23

*Ex parte Young*,
  209 U.S. 123 (1908).............................................. 2, 27

*Fla. Auto. Dealers Ass'n v. Ford Motor Co.*,
  2024 WL 836384 (N.D. Fla. 2024)...............................24

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008).....................................13

*Free Speech Coal. v. Att'y Gen.*,
  974 F.3d 408 (3d Cir. 2020).........................................19

*Ga. Cemetery Ass'n v. Cox*,
  353 F.3d 1319 (11th Cir. 2003).....................................19

*Gardner v. Mutz*,
  962 F.3d 1329 (11th Cir. 2020).....................................23

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002).............................................. 28, 30

*Greater Birmingham Ministries v. Sec'y of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ...................................13

*Harris v. McKee*,
  448 U.S. 297 (1980).................................................19

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
  599 U.S. 166 (2023).................................................29

*Hosp. Council of W. Pa. v. City of Pittsburgh*,
  949 F.2d 83 (3d Cir. 1991).........................................13

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977).................................................11

iii

*Moody v. NetChoice*,
603 U.S. 707 (2024).............................................................................. *passim*

*Moore v. Urquhart*,
899 F.3d 1094 (9th Cir. 2018)....................................................................27

*Morales v. Trans World Airlines*,
504 U.S. 374 (1992)....................................................................................30

*Murphy v. Twitter*,
274 Cal.Rptr.3d 360 (Cal. Ct. App. 2021) ............................................ 22, 32

*Nat'l Mar. Union of Am. v. Commander, Mil. Sealift Command*,
824 F.2d 1228 (D.C. Cir. 1987) ................................................................25

*NetChoice v. Att'y Gen.*,
34 F.4th 1196 (11th Cir. 2022).....................................................................5

*NetChoice v. Bonta*,
2024 WL 5264045 (N.D. Cal. Dec. 31, 2024)............................................19

*NetChoice v. Moody*,
546 F.Supp.3d 1082 (N.D. Fla. 2021) ................................................. *passim*

*Pa. Psychiatric Soc'y v. Green Spring Health Servs.*,
280 F.3d 278 (3d Cir. 2002)............................................................. 3, 13, 18

*Retired Chi. Police Ass'n v. City of Chicago*,
7 F.3d 584 (7th Cir. 1993).............................................................................12

*Sekhar v. United States*,
570 U.S. 729 (2013)....................................................................................25

*Solomon v. City of Gainesville*,
763 F.2d 1212 (11th Cir. 1985)....................................................................32

*SRSNE Site v. Advance Coatings*,
2014 WL 671317 (D. Conn. Feb. 21, 2014)................................................34

*Stratton Oakmont v. Prodigy*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995).........................................26

*Sw. Suburban Bd. v. Beverly Area Plan.*,
830 F.2d 1374 (7th Cir. 1987)......................................................24

*TransUnion v. Ramirez*,
594 U.S. 413 (2021)..................................................................22

*UAW v. Brock*,
477 U.S. 274 (1986)................................................ 2, 18, 20, 25

*United Food & Com. Workers Union v. Brown Grp.*,
517 U.S. 544 (1996)..................................................................11

*United States v. Levy*,
379 F.3d 1241 (11th Cir. 2004).................................................18

*Virginia v. Am. Booksellers' Ass'n*,
484 U.S. 383 (1988).......................................................... 23, 28

*Voicenet Commc'ns v. Corbett*,
2006 WL 2506318 (E.D. Pa. Aug. 30, 2006) .............................28

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023)......................................................27

*Warth v. Seldin*,
422 U.S. 490 (1975)..................................................................28

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008)..................................................................17

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
792 F.3d 1313 (11th Cir. 2015)................................................8, 9

*Wollschlaeger v. Governor*,
848 F.3d 1293 (11th Cir. 2017).................................................33

*Wooden v. Bd. of Regents*,
247 F.3d 1262 (11th Cir. 2001).................................................22

*Zeran v. Am. Online*,
129 F.3d 327 (4th Cir. 1997)............................................. 21, 31

**Statutes**

42 U.S.C. §1983...........................................................27, 28

47 U.S.C. §230...........................................................21, 29

Fla. Stat. §106.072 ..........................................................4

Fla. Stat. §501.2041 ................................................ *passim*

Fla. Stat. §5041 ........................................................21, 22

**Rule**

Fed. R. Civ. P. 54............................................................35

**Other Authorities**

CCIA & NetChoice Amicus Br., *Anderson v. TikTok*,
   No. 22-3061 (3d Cir. Oct. 8, 2024)...............................26

CCIA & NetChoice Amicus Br., *Gonzalez v. Google*,
   598 U.S. 617 (2023) (No. 21-1333) ................................26

NetChoice & CCIA Br., *NetChoice v. Paxton*,
   No. 22-555 (U.S. Nov. 30, 2023)....................................26

**INTRODUCTION**

For over two years, Florida principally defended S.B.7072 on the theory that websites like Facebook and YouTube do not engage in First Amendment activity when they decide what content to disseminate and how to arrange and organize it. The Supreme Court has now laid that argument to rest. As *Moody v. NetChoice* made clear, "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." 603 U.S. 707, 731 (2024). That holding confirms that S.B.7072's provisions are unconstitutional as applied to websites operated by Plaintiffs' members when they curate and disseminate compilations of third-party speech posted on their services. While the Supreme Court remanded for this Court to reconsider Plaintiffs' facial challenge, each challenged provision violates the First Amendment on its face because it principally—indeed, for many if not all provisions, exclusively—regulates the "heartland applications" as to which the Supreme Court has already held the law unconstitutional. *Id.* at 726.

With little left to say about the merits of Plaintiffs' First Amendment claims, Florida offers a slew of new threshold objections, attacking everything from the way Plaintiffs organized their Amended Complaint to whether Plaintiffs have a cause of action to enjoin the enforcement of an unconstitutional statute. Florida's arguments

are meritless. It makes zero sense to dismiss Plaintiffs' complaint because its discussion of Plaintiffs' facial First Amendment claim incorporates allegations from their as-applied First Amendment claim (as it obviously should), or because it addresses nominally distinct provisions that operate hand-in-glove in one paragraph instead of two. And the notion that trade organizations that represent the intended targets of a speech restriction lack a cause of action to enjoin a blatant First Amendment violation is foreclosed by a long line of precedent. *E.g.*, *Ex parte Young*, 209 U.S. 123 (1908).

Nor is there any merit to Florida's claims that Plaintiffs lack associational standing to pursue their First Amendment and §230 claims. None of Plaintiffs' claims requires the participation of individual members; the state argues otherwise only by "misconstru[ing] the nature of [the] claims." *UAW v. Brock*, 477 U.S. 274, 287 (1986). Indeed, a challenge to the constitutionality of a statute that affects multiple members of a trade association and seeks only injunctive relief is precisely the sort of case where associational standing makes sense. At any rate, the Eleventh Circuit has made clear that it is generally "premature" to dismiss an organization's claims "at the pleadings stage" based on questions about how much member-specific proof may be needed. *Borrero v. United Healthcare of N.Y.*, 610 F.3d 1296, 1306 n.3 (11th Cir. 2010). With rare exceptions, an organization's "suit should not be dismissed before it is given the opportunity to establish the alleged violations

without significant individual participation." *Pa. Psychiatric Soc'y v. Green Spring Health Servs.*, 280 F.3d 278, 286 (3d Cir. 2002). There is no reason to depart from that settled approach here.

Florida's challenges to the merits of Plaintiffs' §230 and vagueness claims fare no better. Florida ignores that §230 broadly protects the editorial judgments of the websites that S.B.7072 regulates, and its effort to clarify S.B.7072's consistency and post-prioritization requirements only underscores that they are impermissibly vague.

The Court should deny Florida's motion.

## BACKGROUND

### A.    Factual Background

NetChoice and CCIA are Internet trade associations whose members operate a variety of popular websites on which users can share and interact with content, including Facebook, Instagram, X, and YouTube.[1] In May 2021, Florida enacted S.B.7072, which aims to punish select websites for exercising their editorial discretion over the content on their websites in ways the state disfavors. S.B.7072 imposes a slew of requirements that commandeer how covered websites exercise editorial discretion:

- ***Consistency.*** S.B.7072 requires a "social media platform" to "apply

---

[1] While most members operate apps and other services in addition to websites, this brief collectively refers to all their services as "websites."

censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." Fla. Stat. §501.2041(2)(b).

- ***Posts by or about political candidates.*** "A social media platform may not apply or use post-prioritization or shadow banning algorithms for content and material posted by or about … a candidate." *Id.* §501.2041(2)(h).

- ***Deplatforming political candidates.*** S.B.7072 prohibits a "social media platform" from "willfully deplatform[ing] a candidate for office." *Id.* §106.072(2).

- ***Journalistic enterprises.*** "A social media platform may not take any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." *Id.* §501.2041(2)(j).

- ***Rule changes.*** "A social media platform must inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days." *Id.* §501.2041(2)(c).

- ***User opt-out.*** A "social media platform" must allow users to opt out of its "post-prioritization" and "shadow banning" algorithms annually. *Id.* §501.2041(2)(f), (g). For users who opt out, material must instead be displayed in "sequential or chronological" order. *Id.*

S.B.7072 also contains several provisions that compel websites to provide information designed to facilitate enforcement of its restrictions on editorial discretion:

- ***Detailed explanation.*** The detailed-explanation provision prohibits a "social media platform" from "deplatform[ing]," "censor[ing]," or "shadow ban[ning]" a user without "notifying the user who posted or attempted to post the content or material." *Id.* §501.2041(2)(d). The notice must include both "a thorough rationale explaining the reason that the social media platform censored the user" and "a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the

user's content or material as objectionable." *Id.* §501.2041(3).

- ***Standards.*** S.B.7072 requires a "social media platform" to "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." *Id.* §501.2041(2)(a).

- ***View counts.*** S.B.7072 requires "social media platform[s]" to provide "a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts," and provide "upon request" the "number of other individual platform participants who were provided or shown content or posts." *Id.* §501.2041(2)(e).

## B.    Procedural History

Soon after Florida passed S.B.7072, Plaintiffs challenged the law in this Court. This Court preliminarily enjoined Florida from enforcing S.B.7072's principal provisions, holding that S.B.7072 likely violates the First Amendment and that 47 U.S.C. §230 preempts some of its provisions. *See NetChoice v. Moody*, 546 F.Supp.3d 1082 (N.D. Fla. 2021). The Eleventh Circuit affirmed in substantial part, agreeing with this Court's conclusion that S.B.7072's candidate, journalistic-enterprise, consistency, 30-day restriction, user opt-out, and detailed-explanation provisions likely violate the First Amendment. *See NetChoice v. Att'y Gen.*, 34 F.4th 1196 (11th Cir. 2022).

The Supreme Court vacated the Eleventh Circuit's judgment on the ground that it did not properly consider "the facial nature of NetChoice's challenge." *Moody*, 603 U.S. at 717. The Court explained that the Eleventh Circuit "mainly addressed what the parties had focused on" in their briefing and arguments below,

5

i.e., the laws' application to the "curated feeds offered by the largest and most paradigmatic social-media platforms"—such as Facebook and YouTube. *Id.* at 717-18. But the Court expressed concern that "the law[] might apply to, and differently affect, other kinds of websites and apps." *Id.* at 718. And in "a facial challenge, that could well matter," because "the question in such a case is whether a law's unconstitutional applications are substantial compared to its constitutional ones." *Id.* The Court acknowledged that "[m]aybe the parties treated the content-moderation choices reflected in Facebook's News Feed and YouTube's homepage as the law['s] heartland application[] because they *are* the principal things regulated, and should have just that weight in the facial analysis." *Id.* at 726. But the Court was not certain whether there may be "a sphere of other applications—and constitutional ones—that would prevent the laws' facial invalidation." *Id.* at 726. Because those questions were not the focus of the proceedings below, the Court vacated the Eleventh Circuit's decision and remanded the case for consideration of those issues.

At the same time, the Court went out of its way to explain how the First Amendment applies to the services "that were the focus of the proceedings below." *Id.* at 734. The Court explained that, when websites like YouTube and Facebook "use their Standards and Guidelines to decide which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices" that "receive First Amendment protection." *Id*. at 740. Thus,

6

when laws like S.B.7072 are applied "to prevent Facebook (or YouTube) from using its content-moderation standards to remove, alter, organize, prioritize, or disclaim posts in its News Feed (or homepage)," they "prevent[] exactly the kind of editorial judgments this Court has previously held to receive First Amendment protection." *Id.* at 718. And that infringement of First Amendment rights cannot be justified as necessary "to balance the mix of speech on Facebook's News Feed and similar platforms." *Id.* After all, the "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Id.* at 734.

Following remand, Plaintiffs filed an Amended Complaint. Count I alleges that each of the challenged provisions of S.B.7072 violates the First Amendment "as applied to websites operated by [Plaintiffs'] members when those websites curate and disseminate collections of third-party speech posted on their services." Am.Comp.¶55. Count II alleges that each challenged provision violates the First Amendment on its face because the core, if not sole, application of each provision is to regulate the editorial judgments of websites when they are curating and disseminating collections of third-party speech. Am.Compl.¶99. Count III alleges that S.B.7072's consistency provision and prohibition on applying "post-prioritization" and "shadow banning algorithms" to content "by or about" a political "candidate" are unconstitutionally vague. Am.Compl.¶¶109-13. And Count IV

alleges that 47 U.S.C. §230 preempts several of S.B.7072's provisions. Am.Compl.¶¶114-28.

The Amended Complaint seeks a declaration that each challenged provision is unconstitutional on its face, or, in the alternative, "as applied to websites operated by [Plaintiffs'] members when they curate and disseminate collections of third-party speech posted on their services." Am.Compl.¶129. The Amended Complaint also seeks a declaration that 47 U.S.C. §230 preempts the challenged provisions, and a preliminary and permanent injunction enjoining Defendants from enforcing them against services operated by Plaintiffs' members covered by S.B.7072. Am.Compl.¶¶130-34.

## ARGUMENT

### I. The Amended Complaint Is Not A "Shotgun Pleading."

Florida begins by claiming the Amended Complaint is a "shotgun pleading." MTD.10-11. That is frivolous. A "shotgun pleading" is a pleading that violates "the spirit, if not the letter" of Rules 8(a)(2) and 10(b) by failing "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320-23 (11th Cir. 2015). Plaintiffs' 70-page complaint is anything but that. Although Florida nitpicks aspects of the Amended Complaint, it does not (and cannot) claim that it lacks notice of the claims against it or the grounds on which they rest. Indeed,

Florida's own motion confirms that the Amended Complaint is more than "informative enough" for it to respond. *Id.* at 1326.

Florida's quibbles do not undermine that conclusion. Florida complains that Count II (Plaintiffs' facial First Amendment challenge) incorporates the allegations in Count I (Plaintiffs' as-applied First Amendment challenge). MTD.10. But explaining why S.B.7072 violates the First Amendment as applied to Plaintiffs' members when they curate and disseminate third-party speech posted on their services helps inform why "a substantial number" of S.B.7072's "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723. It would make little sense for Count II *not* to incorporate Count I, as Count II would otherwise have to reproduce all the same discussion of those applications found in Count I.

Florida likewise complains that Count IV incorporates paragraph 52. MTD.10. But paragraph 52 is part of the background section describing S.B.7072's requirements. Am.Compl.¶¶42-53. It again would make little sense for Count IV *not* to incorporate that description. Florida also criticizes Plaintiffs for grouping their challenges to S.B.7072's individual provisions by challenge (i.e., First Amendment, Due Process, etc.) instead of provision (i.e., consistency provision, journalistic-enterprise provision, etc.). MTD.10-11. But Florida does not argue that this commonplace organizational choice prevented it from understanding the claims.

Florida is aware of what challenges Plaintiffs are bringing to which provisions. The pleading rules require nothing more.

Florida's remaining criticisms are even more trivial. It complains that paragraph 69 attacks "multiple, distinct statutory provisions, MTD.11, but that is because those provisions operate hand-in-glove to restrict editorial discretion. They even cross reference each other. Section 501.2041(2)(g) requires covered websites to "provide users with an annual notice on the use of algorithms for post-prioritization and shadow banning and reoffer annually the opt-out opportunity *in subparagraph (f)2*," and §501.2041(2)(f)2 in turn requires them to "[a]llow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." It would therefore impede clarity to challenge one without referencing the other. Finally, Florida claims that Plaintiffs failed to specify "which of the defendants each claim is brought against." MTD.11. But it acknowledges in the very next sentence that the Amended Complaint identifies which defendants are responsible for enforcing which provisions, which is all that is needed to answer that question.

## II. Plaintiffs Have Associational Standing.

Florida's standing argument fares no better.

### A. Plaintiffs Have Associational Standing to Bring Their First Amendment Claims.

To invoke associational standing, an organization must demonstrate that (1) at least one of its members has standing to sue; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Florida does not dispute that some NetChoice and CCIA members have standing to bring First Amendment claims. *See* Am.Compl.¶¶13-15. Nor does it deny that the interests Plaintiffs seek to protect are germane to their purposes. *See id.* Florida instead argues that Plaintiffs lack associational standing to bring their First Amendment claims because resolving those claims requires participation by individual members. That argument is flawed at every turn.

As the Supreme Court has explained, the third prong of the associational standing test is "prudential," not constitutional, and is "best seen as focusing on … matters of administrative convenience and efficiency." *United Food & Com. Workers Union v. Brown Grp.*, 517 U.S. 544, 556-57 (1996). "[D]istrict courts possess a degree of discretion in applying it." *All. for Open Soc'y Int'l v. USAID*, 651 F.3d 218, 229 (2d Cir. 2011). And they often permit associational standing even

when *some* member participation is needed, particularly when it serves "judicial economy." *Id.* Indeed, courts have expressly rejected the idea that "the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 601-02 (7th Cir. 1993). As "long as resolution of the claims benefits the association's members and the claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry, the participation of those individual members will not thwart associational standing." *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). As the Eleventh Circuit has explained, the question is whether resolving the organization's claims will "require *excessive* participation by individual members." *Borrero*, 610 F.3d at 1306. So long as the claims "can be proved with the limited participation," the "organization has standing to assert them." *Id.*

The Eleventh Circuit has made clear, moreover, that it is typically "premature" to dismiss an organization's claims "at the pleadings stage" based on arguments about member-specific proof. *Id.* at 1306 n.3. After all, "should the actual litigation of the … claims involve excessive individual participation, the district court retains discretion to consider the associations' standing at that later time." *Id.* So with rare exceptions, an organization's "suit should not be dismissed before it is given the

opportunity to establish the alleged violations without significant individual participation." *Pa. Psychiatric*, 280 F.3d at 286.

This case is not that rare exception. Plaintiffs seek forward-looking injunctive and declaratory relief that a state law is unconstitutional—not damages or any other remedy that requires individualized participation. In such cases, "individual participation of the organization's members is 'not normally necessary,'" *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008), as it "can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured," *All. of Auto. Mfrs. v. Jones*, 897 F.Supp.2d 1241, 1254 (N.D. Fla. 2012). That is precisely why the "Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members." *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (Alito, J.); *accord Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1316 & n. 29 (11th Cir. 2021) ("prospective relief weighed in favor of finding … associational standing").

That is certainly true of the claims here. Plaintiffs' as-applied claim alleges that "[e]ach of the challenged provisions of S.B.7072 violates the First Amendment as applied to websites operated by [Plaintiffs'] members *when those websites curate and disseminate collections of third-party speech posted on their services*,"

Am.Compl.¶55—i.e., when they engage in activity that the Supreme Court has now held is protected by the First Amendment. As the Court explained,"[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity." *Moody*, 603 U.S. at 731. And "[w]hen the government interferes with such editorial choices—say, by ordering the excluded to be included," it "confronts the First Amendment." *Id.* at 731-32.

The only member-specific information this Court needs to resolve that as-applied claim is whether Plaintiffs have members that engage in the protected activity of employing editorial standards about whether and how they will disseminate third-party content. It is not even clear that Florida disputes that proposition, but it certainly will not require "excessive" member participation to establish. And as long as Plaintiffs have members who engage in that protected activity, then the challenged provisions intrude on those members' First Amendment rights, regardless of whether they do or do not intrude on those members' rights when they may be engaged in *other* activities. This Court thus does not need to master the "nuances" of every member's "algorithms" or the "specifics of each platform's operations," MTD.14-15, to determine whether S.B.7072 implicates the First Amendment when applied in the specific context of "when those websites

curate and disseminate collections of third-party speech posted on their services," Am.Compl.¶55.

Nor does the Court need "excessive" member-specific information to determine whether S.B.7072 can survive First Amendment scrutiny as applied to that protected conduct. MTD.15-16. Whether strict or intermediate scrutiny applies turns on whether S.B.7072 is content-, speaker-, and viewpoint-based—not on details about Plaintiffs' members. And the Court needs no member-specific facts to determine that Florida has not identified any legitimate (let alone significant or compelling) justification for interfering with protected editorial judgments. After all, Florida has principally justified S.B.7072 based on its interest in ensuring that the public has equal access to competing viewpoints. But "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741.

As for Plaintiffs' facial claim, that claim alleges that each challenged provision is unconstitutional on its face because its core (if not sole) application is to override editorial choices when websites curate and disseminate collections of third-party speech posted on their services. Am.Compl.¶99. "The first step in the proper facial analysis is to assess the state law['s] scope"—i.e., to determine "[w]hat activities, by what actors" S.B.7072 "prohibit[s] or otherwise regulate[s]." *Moody*, 603 U.S. at 724. That is principally a question of statutory interpretation. The

Supreme Court remanded the case because it was uncertain whether "the content-moderation choices reflected in Facebook's News Feed and YouTube's homepage" "*are* the principal things regulated," or if S.B.7072 reaches entirely different kinds of conduct. *Id.* at 726. If it is the former, the Court's opinion largely resolves this case.

The Amended Complaint lays out why it is the former. As it explains, "all manner of contextual clues confirm that S.B.7072's definition of 'social media platform' is 'limited to providers of social media within the common understanding,'" Am.Compl.¶90 (quoting *NetChoice*, 546 F.Supp.3d at 1086)—e.g., "websites and applications where users share content and interact with content shared by others," not "ride-sharing services, payment services, direct messaging apps, or email providers," Am.Compl.¶92. Even if the definition applied more broadly, moreover, the challenged provisions themselves apply exclusively, or at the very least predominantly, when websites engage in the common social-media function of "curating and disseminating collections of third-party speech posted on their services." Am.Compl.¶¶99-108.

Whether or how the First Amendment may apply to Plaintiffs' members' other activities is largely beside the point. If (as Plaintiffs have alleged) the challenged provisions apply only, or least overwhelmingly, when websites curate and disseminate collections of third-party speech posted on their services, then they are

facially unconstitutional regardless of whether the state may be able to conjure up a handful of more difficult hypotheticals. After all, "[i]n determining whether a law is facially invalid, [courts] must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). But even if the state could hypothesize some conceivable legitimate applications of some provisions, it would not require excessive member participation for the Court to decide whether those rare hypothetical applications outweigh the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 603 U.S. at 744.

Rather than confront the allegations and arguments actually laid out in the complaint, Florida proceeds on the assumption that this case cannot be resolved without far-reaching fact development into every activity of each and every one of Plaintiffs' members (or at least those who meet S.B.7072's user and revenue thresholds). But it fails to explain why that is so.

The Amended Complaint details why neither the term "social media platform" nor the challenged provisions themselves covers anything other than the "heartland applications" of S.B.7072 that the Supreme Court addressed. Am.Compl.¶¶88-108. While Florida briefly takes issue with Plaintiffs' proffered definition of "social media platform," MTD.21, it does not seriously engage with any of their textual and

contextual arguments about how to interpret it. It instead just woodenly insists that the "statutory definition controls," without explaining exactly what it thinks that definition covers. MTD.22. And Florida does not engage *at all* with Plaintiffs' lengthy argument as to why the challenged provisions apply *only* when websites are curating and disseminating collections of third-party speech posted on their services. Am.Compl.¶¶63-72, 100-08.[2] To the contrary, Florida tries to explain away its own past representations about S.B.7072's scope as reflecting its "recogni[tion] that S.B.7072's provisions do *not* reach all functions on every covered platform." MTD.23.n.3.

As the Supreme Court has made clear, parties may not contest associational standing by "misconstru[ing] the nature of [the plaintiffs'] claims." *Brock*, 477 U.S. at 287. Florida must take Plaintiffs' claims as they are and give Plaintiffs every "opportunity to establish" them "without significant individual participation." *Pa. Psychiatric*, 280 F.3d at 286. The complaint explains what functions Plaintiffs think the challenged provisions regulate. If Plaintiffs are right, then hardly any member-specific information is needed to resolve this case. If Florida thinks its law reaches something more, then it is incumbent on the state to explain what more it reaches and why. It is, after all, Florida's law. Florida cannot avoid defending that law by

---

[2] By not meaningfully addressing what it thinks S.B.7072 covers in its motion, Florida cannot do so in reply. *See United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).

refusing to take any position on what it regulates, let alone by insisting that members must participate to address fact questions it is not even willing to definitively say matter.

The cases that Florida cites are therefore inapposite.  The challenges brought in those cases required far greater member-specific proof than Plaintiffs' challenges require.  In *Harris v. McRae*, the claims required the plaintiffs to show that each member had been coerced "in the practice of their religion," which depended on "the conscience of the individual before God." 448 U.S. 297, 321 & n.24 (1980).  In *Georgia Cemetery Association v. Cox*, the claim required the plaintiffs to show the specific economic impact the state action had on each member.  353 F.3d 1319, 1322 (11th Cir. 2003).  And in *Free Speech Coalition v. Attorney General*, the association attempted to bring a claim on behalf of "about 800 members" of the adult film industry "ranging from directors, producers, writers, cameramen, and lighting technicians, to sellers of sexually explicit depictions farther down the 'stream of commerce.'"  974 F.3d 408, 422 (3d Cir. 2020).

Here, by contrast, Plaintiffs assert that S.B.7072 is unconstitutional on its face and as applied to websites operated by Plaintiffs' members "when those websites curate and disseminate collections of third-party speech posted on their services."

Am.Compl.¶55.[3]  No one disputes that some members curate and disseminate third-party speech.  And no individualized factual inquiry is necessary to establish that the challenged provisions unconstitutionally burden protected expression in virtually all their applications.  There is thus no need to develop the kind of member-specific facts at issue in the cases Florida invokes.[4]

---

[3] That suffices to distinguish this case from *NetChoice v. Bonta*, 2024 WL 5264045 (N.D. Cal. Dec. 31, 2024).  There, the district court found that NetChoice lacked associational standing to seek a preliminary injunction as applied to "five members" because NetChoice's challenge to the specific California law at issue required "factual inquiries into … how each of those members' feeds work" to determine whether those feeds are "expressive." *Id.* at *18.  That decision is wrong, and NetChoice is currently appealing it.  It is also distinguishable.  Here, no factual inquiry into any particular feed is necessary to resolve Plaintiffs' as-applied challenge for the additional reason that Plaintiffs have limited their as-applied challenge to websites operated by Plaintiffs' members "*when those websites curate and disseminate collections of third-party speech posted on their services.*" Am.Compl.¶55.

[4] The state's "overbreadth" argument, MTD.18-19, once again "misconstrue[s] the nature of [Plaintiffs'] claims." *Brock*, 477 U.S. at 287.  Plaintiffs are not invoking the strand of "overbreadth" doctrine under which "persons who are themselves unharmed by the defect in a statute nevertheless … challenge that statute on the ground that it may conceivably be applied unconstitutionally to others." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484 (1989).  Plaintiffs allege that S.B.7072 *is* unconstitutional as applied to their members when their "websites curate and disseminate collections of third-party speech posted on their services." Am.Compl.¶¶55, 100-08.  The Amended Complaint includes a facial challenge because that infirmity dooms all (or substantially all) applications of the challenged provisions, not because Plaintiffs maintain that the law would still be facially unconstitutional even if it were constitutional as applied to all their members.

**B.     Plaintiffs Have Associational Standing to Bring Their §230 Claim.**

1. For similar reasons, resolving Plaintiffs' §230 claim does not require "excessive participation" by members.  Plaintiffs argue that §230(c)(1) preempts several provisions of S.B.7072 because those provisions "seek[] to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997).  The complaint also asserts that §230(c)(2) preempts the same provisions because they impose liability on websites for "action[s] voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be … otherwise objectionable."  47 U.S.C. §230(c)(2)(A).

Resolving those claims turns primarily on the statutory text.  By their terms, several S.B.7072 provisions restrict the ability of "social media platforms" to "censor," "deplatform," "shadow ban," and apply "post-prioritization" algorithms to, e.g., "content or material posted by a user," Fla. Stat. §5041(1). Am.Compl.¶¶123-28.  This Court need not know precisely how or how often individual members engage in those activities to conclude that the challenged provisions seek to impose liability on websites for their "exercise of a publisher's traditional editorial functions," *Zeran*, 129 F.3d at 330, and their "good faith" decisions to "restrict access to or availability of … otherwise objectionable" content,

47 U.S.C. §230(c)(2)(A).  It just needs to know that at least some members engage in those activities, which Florida does not and cannot deny is true.

Florida claims that §230 does not preempt laws that "affect[] platforms' hosting, recommendation, disclosure, and content decisions," but rather only "immunizes platforms from claims based on content provided by *another*." MTD.20.  That argument "conflates the merits of the case … with standing." *Wooden v. Bd. of Regents*, 247 F.3d 1262, 1281 (11th Cir. 2001).  It is also beside the point.  As Florida admits elsewhere, MTD.23.n.3, most of the challenged provisions apply to decisions to curate and disseminate "content or material posted by *a user*." Fla. Stat. §5041(1)(b).  In all events, courts have repeatedly concluded that §230 applies to all manner of decisions about third-party content.  *E.g.*, *Murphy v. Twitter*, 274 Cal.Rptr.3d 360, 370-71 (Cal. Ct. App. 2021).

Florida insists that "Section 230 likely applies quite differently, if at all," to "platforms like Uber, Gmail, and Yahoo."  MTD.21.  But whether the challenged provisions impose liability on Uber, Gmail, and Yahoo for their "exercise of a publisher's traditional editorial functions," or their "good faith" decisions to "restrict access to or availability of … otherwise objectionable" content, turns on the text of S.B.7072—not any facts about Uber, Gmail, or Yahoo, much less any facts that would require their participation as parties.  Am.Compl.¶¶123-28.

2.  Shifting gears, Florida argues that Plaintiffs lack associational standing to assert their §230 arguments because no member has Article III standing to assert those arguments in its own right.  That argument is nothing short of bizarre.  Standing requires: an injury in fact that (1) is concrete, particularized, and actual or imminent; (2) is traceable to the challenged action of the defendant; and (3) would likely be redressed by judicial relief.  *See TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021).  Plaintiffs plausibly allege that S.B.7072 directly regulates and imposes compliance costs on some NetChoice and CCIA members.  Am.Compl.¶¶13-16.  That injury is "imminent"; after all, Florida "has not suggested that the … law will not be enforced," and there is "no reason to assume otherwise."  *Virginia v. Am. Booksellers' Ass'n*, 484 U.S. 383, 393 (1988).  The injury is directly traceable to S.B.7072.  And an order enjoining state officials from enforcing S.B.7072 will redress it.  Article III requires nothing more.

Indeed, Florida does not dispute that some of Plaintiffs' members have Article III standing to pursue their First Amendment and Due Process claims.  It just insists that no member has Article III standing to make the §230 arguments because S.B.7072 forbids Florida from "tak[ing] enforcement action that is 'inconsistent with … 47 U.S.C. s.230(e)(3).'"  MTD.26 (quoting Fla. Stat. §501.2041(9)).  But that again "conflate[s] the standing and merits inquiries," *Gardner v. Mutz*, 962 F.3d 1329, 1337 (11th Cir. 2020), and begs the question.  By contending that state officials

will enforce S.B.7072 consistent with §230, Florida presupposes that S.B.7072 *can* be enforced consistent with §230—a conclusion about the merits of Plaintiffs' §230 argument. But "in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016).

At any rate, states cannot evade pre-enforcement review simply by including a general provision prohibiting the statute from being enforced illegally. Were it otherwise, states could always evade affirmative judicial review, even of blatantly unconstitutional statutes, simply by adding a proviso requiring the statute to be interpreted consistently with federal law. That result would be particularly untenable here, where S.B.7072's whole point is to regulate websites' decisions about which third-party content to display—exactly what §230 is designed to protect. That Florida might lose an enforcement action where S.B.7072's application conflicts with §230 does not mean Plaintiffs' members lack a credible fear of facing such an action—which is all that they need to have standing to bring this claim. In short, S.B.7072's carveout neither defeats standing nor insulates it from judicial review.

## C. Florida's Other Associational Standing Arguments Lack Merit.

Finally, Florida argues that Plaintiffs lack associational standing to raise their First Amendment and §230 arguments "because the claims raise an

'intraorganizational conflict of interest.'" MTD.23. Florida does not cite a single case that denies associational standing on that ground.[5] For good reason: As the D.C. Circuit has explained, the Supreme Court has already "decided" that "associational standing does not necessarily depend upon harmony of member interests." *Nat'l Mar. Union of Am. v. Commander, Mil. Sealift Command*, 824 F.2d 1228, 1232-33 (D.C. Cir. 1987) (citing *Brock*, 477 U.S. at 288-90); *see also Associated Gen. Contractors of Cal. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1409 (9th Cir. 1991) ("[A]n organization's internal conflicts properly should be resolved through its own internal procedures, not through limitations on standing."). That precedent governs here.

Even if "interorganizational conflict" could in extreme cases justify denying associational standing, no such conflict exists here. Florida manufactures a conflict on the theory that the "First Amendment protects a platform's own expressive activity, but Section 230 does 'not immunize[]' a platform if it is 'sued for [its] own expressive activity.'" MTD.24. On that basis, Florida claims that some members like "Etsy" have an interest in "expansive First Amendment protection" (and

---

[5] Some courts have "recognized that an intraorganizational conflict of interest may defeat" associational standing, *see Fla. Auto. Dealers Ass'n v. Ford Motor Co.*, 2024 WL 836384, at *2 (N.D. Fla. 2024) (citing cases), but only when "the intraorganizational conflict was extreme"—i.e., "some of the association's members were plaintiffs, and others were defendants," *id.* at *2 (citing *Sw. Suburban Bd. v. Beverly Area Plan.*, 830 F.2d 1374 (7th Cir. 1987)).

therefore narrow §230 immunity), while others like "Meta" have an interest in "expansive Section 230 immunity" (and therefore narrow First Amendment protection).

That argument "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). As Plaintiffs have repeatedly explained, there is no "conflict" between expansive First Amendment protections and broad §230 protections. *E.g.*, NetChoice & CCIA Br. at 33-34, *NetChoice v. Paxton*, No. 22-555 (U.S. Nov. 30, 2023); CCIA & NetChoice Amicus Br. at 7-11, *Anderson v. TikTok.*, No. 22-3061 (3d Cir. Oct. 8, 2024). That is why Plaintiffs have repeatedly advocated for both. *E.g.*, CCIA & NetChoice Amicus Br. at 22-24, *Gonzalez v. Google*, 598 U.S. 617 (2023) (No. 21-1333). Recognizing that websites engage in First Amendment-protected editorial judgments in deciding whether and how to display third-party speech does not somehow turn that third-party speech into the website's own speech, let alone eliminate §230's protections. To the contrary, Congress enacted §230 to encourage websites to exclude problematic third-party content by effectively overruling a case that held that, so long as a website exercised "editorial control over the content of messages posted on its" site, it could be held liable for publishing the third-party speech that escaped the editor's pen. *Stratton Oakmont v. Prodigy*, 1995 WL 323710, at *2 (N.Y. Sup. Ct. May 24, 1995). If Florida were correct that

websites lose §230 protection whenever they exercise "editorial judgment" over the third-party content on their services, then §230 accomplished nothing.

## III.    The Amended Complaint States A Claim.

### A.    Plaintiffs Have a Cause of Action to Seek Declaratory and Injunctive Relief for Violations of Their Members' Rights.

1. Florida next contends the complaint must be dismissed because "Plaintiffs lack a cause of action under Section 1983." MTD.28. At the outset, Florida ignores that Plaintiffs assert claims not just under §1983, but under the Court's equitable powers too. Am.Compl.¶21 (citing *Ex parte Young*, 209 U.S. 123 (1908)). Plaintiffs thus "do not need a statutory cause of action" to obtain "declaratory and injunctive relief" against Defendants in their official capacities, as "the judge-made cause of action recognized in *Ex parte Young* … permits courts of equity to enjoin enforcement of state statutes that violate the Constitution or conflict with other federal laws." *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (citing *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015)).

In all events, Florida's §1983 argument is wrong. Section 1983 provides that state actors who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. §1983. Florida insists that §1983 is available only to the parties whose rights were violated—i.e., Plaintiffs' members. MTD.28-29. But the text of §1983 says no such

thing; it provides only that liability or relief must flow from the state actors sued to the "party injured."  Nothing in §1983 forecloses suits by organizations on behalf of their members seeking relief for violations of their members' constitutional or statutory rights.  As the Fifth Circuit put it in rejecting the same argument: "Section 1983 is an appropriate vehicle for third-party claims." *Vote.Org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023).  Examples abound.  *See id.* (collecting cases); *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789-80 (2011); *Am. Booksellers*, 484 U.S. at 393.

2.  Florida maintains that even if Plaintiffs could assert their members' rights under §1983, they cannot enforce §230 under §1983.  Florida is wrong again.  Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. §1983.  As other courts have recognized, §230 creates both "rights" and "immunities" that may be enforced under §1983.  *Voicenet Commc'ns v. Corbett*, 2006 WL 2506318, at *2 (E.D. Pa. Aug. 30, 2006).

Starting with "immunities," Florida acknowledges that §230 "exempt[s]" certain parties "from liability" for certain lawsuits—the hallmark of "immunity."  MTD.31; *see also Almeida v. Amazon.com*, 456 F.3d 1316, 1321 (11th Cir. 2006) (describing §230 as an "immunity").  Indeed, it spends several pages affirmatively

arguing that §230 confers an "immunity." MTD.28-32. It just uses an ellipses to omit "immunities" from the list of things §1983 protects. MTD.28.

While that alone suffices to defeat Florida's argument, §230 confers "rights" too. Whether a statute confers "rights" enforceable under §1983 turns on whether it uses "rights-creating" language. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-84 (2002). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Id.* at 284. For example, a statute that says "*[n]o person* in the United States shall … be subjected to discrimination" on the basis of race creates an individual right to be free from race discrimination. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 685 n.5, 688-89 (1979). Likewise, a statute that requires nursing homes to "protect and promote … *[t]he right* to be free from … any physical or chemical restraints imposed for purposes [other than] … treat[ing] *the resident's* medical symptoms" creates a right to be free from such restraints. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 184 (2023).

Like the statutes in *Cannon* and *Talevski*, §230 speaks "in terms of the persons benefited," and has an "unmistakable focus on the benefited class." *Id.* at 186. Section 230(c)(1) specifies that "*[n]o provider or user of an interactive computer service* shall be treated as the publisher or speaker of any information provided by another information content provider." And §230(c)(2)(A) provides that "*[n]o provider or user of an interactive computer service* shall be held liable on account

of … any action" to remove objectionable content in good faith. Section 230 thus unmistakably confers rights upon providers and users of interactive computer services.

3. Florida argues that "[e]ven if Section 230 clearly created individual rights for platforms, Congress did not intend that Section 1983 'be available to enforce those rights.'" MTD.30. But "[o]nce a plaintiff demonstrates that a statute confers an individual right" (or immunity), the right (or immunity) "is presumptively enforceable by §1983." *Gonzaga*, 536 U.S. at 284. While Florida "may rebut this presumption by showing that Congress 'specifically foreclosed a remedy under §1983,'" such as by "creating a comprehensive enforcement scheme that is incompatible with individual enforcement under §1983," *id.* at 284 n.4, it has not come close to doing so. Florida principally argues that "Section 230 contains its own comprehensive enforcement mechanism"—namely, "an immunity affirmative defense that is enforceable 'within the confines of a preexisting proceeding.'" MTD.31-32. But virtually every preemption provision in the U.S. Code can be invoked "as a defense" in a "preexisting proceeding," yet courts have never understood that to suffice to displace the remedy provided by §1983 (or *Ex parte Young*). *E.g.*, *Am. Airlines v. Wolens*, 513 U.S. 219 (1995) (defensive use of the express-preemption provision); *Morales v. Trans World Airlines*, 504 U.S. 374 (1992) (offensive use of same provision). Indeed, parties have repeatedly sued to

enjoin state officials from enforcing state laws preempted by §230, and no court has ever suggested such suits are implicitly precluded simply because §230 can be invoked defensively too. *E.g.*, *Backpage.com v. Cooper*, 939 F.Supp.2d 805, 817 (M.D. Tenn. 2013). Florida identifies no reason for this Court to depart from that consensus.

### B. Plaintiffs Plausibly Allege §230 and Vagueness Claims.

1. When Florida finally turns to the merits of Plaintiffs' claims, it has little to say. Although the Amended Complaint alleges that both §230(c)(1) and (c)(2) expressly preempt multiple provisions of S.B.7072, *see* Am.Compl.¶¶123-28, Florida ignores (c)(1) altogether. MTD.32-34. That is unsurprising. It is hard to imagine a scenario where, e.g., punishing a website for applying "post-prioritization" and "shadow banning" algorithms does *not* "seek[] to hold a service provider liable for its exercise of a publisher's traditional editorial functions." *Zeran*, 129 F.3d at 330; *see also* Am.Compl.¶¶123-28 (similar analysis for other provisions).

Likewise, though the Amended Complaint alleges that §230 impliedly preempts various provisions of S.B.7072, Florida has nothing to say about that argument either. Am.Compl.¶¶117-28. That too is unsurprising. Punishing websites for how they filter and organize content on their services poses an obvious obstacle to Congress's effort to encourage websites to self-police third-party content on the

internet. Am.Comp.¶¶117-28. Even if Florida could identify some hypothetical scenarios where the challenged provisions would not obstruct §230's objectives (and it has not tried), the Eleventh Circuit has squarely held that obstacle preemption arguments cannot be defeated by "conjur[ing] up … hypothetical factual scenario[s] in which implementation of the state law would not directly interfere with federal law." *Club Madonna v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). And rightly so, as state laws can still "obstruct[] federal law" even if they "align[] with federal objectives" in "some instance[s]." *Id.* at 1256.

Rather than address those arguments, Florida focuses exclusively on §230(c)(2), emphasizing that it protects only "good faith" decisions. MTD.33. But this Court already recognized that the Act interferes with providers' editorial decisions across the board, regardless of whether they are taken in good faith. *See NetChoice*, 546 F.Supp.3d at 1089-90. Florida claims that hypothetical applications of some (but not all) provisions (in particular, S.B.7072's restrictions on "deplatforming") may not interfere with websites' ability to "restrict access to or availability of material" that is "objectionable." MTD.33. But even Florida's cherry-picked example is preempted. When covered services terminate or suspend a user's account, they have restricted access to third-party content that they deem objectionable. *See Murphy*, 274 Cal.Rptr.3d at 370-71 (collecting cases holding that

§230 prohibits liability for denying users access or deleting their accounts).  That is exactly what §230(c)(2) says they may not be held liable for doing.

2.  Florida's attack on Plaintiffs' vagueness claim is equally meritless.  The consistency provision fails to provide a person of ordinary intelligence fair notice of what is prohibited.  The key statutory term ("consistent manner") is "in no way defined."  *Solomon v. City of Gainesville*, 763 F.2d 1212, 1215 (11th Cir. 1985).  S.B.7072 does not provide even minimum guidance about how to interpret this nebulous mandate, leaving covered providers to choose between risking unpredictable and arbitrary enforcement (backed by penalties of $100,000 per violation and punitive damages) or refraining from exercising their editorial discretion.  Indeed, this Court has already noted that this provision is "especially vague," which "presents heightened concern in a statute that, like this one, trenches on First Amendment interests."  *NetChoice*, 546 F.Supp.3d at 1095.  "In this quintessential First Amendment area, the State may not hinge liability on a phrase so ambiguous in nature."  *Wollschlaeger v. Governor*, 848 F.3d 1293, 1323 (11th Cir. 2017) (en banc).

The state insists that the consistency provision "simply requires platforms to enforce their policies as written and refrain from selective enforcement."  MTD.35.  How that helps, Florida does not explain.  Imagine two posts containing the same "threatening" language, where one is a direct comment and the other takes the form

of song lyrics. Would it violate S.B.7072 to remove the former under the website's policy against threats, but not the latter? Would it be "consistent" for a website to remove content posted by an ordinary citizen, but not the same content reposted by a political candidate? *See* Fla. Stat. §501.2041(2)(h). Countless examples abound. Florida's belated effort to clarify the provision sheds no light on the endless real-world choices that websites confront every day.

S.B.7072's definition of "post prioritization" is similarly vague. It covers any "action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." *Id.* §501.2041(1)(e). What that means is anyone's guess. *See NetChoice*, 546 F.Supp.3d at 1095. By its terms, the provision suggests that a search function cannot place content "by or about" a political candidate ahead of—or below—any other content. Florida insists that the provision (when read in light of other provisions) simply mandates that certain content appear "chronologically." MTD.35. But displaying posts "by or about political candidates" chronologically would still require those posts to appear "ahead of" or "below" other content, in seeming violation of the provision's commands. Florida's attempt to clarify what it means only underscores its vagueness.

## C.    Florida's Argument About the Scope of Injunctive Relief Is Premature.

Finally, Florida argues that "Plaintiffs fail to state a claim for injunctive relief" on behalf of anyone other than Google, Meta, and X.  MTD.37.  That is an argument about the appropriate scope of relief, not a basis for dismissing Plaintiffs' claims. "At the motion to dismiss stage, plaintiffs need not prove that they are entitled to each form of relief sought, so long as they have adequately ple[d] the underlying claim."  *SRSNE Site v. Advance Coatings*, 2014 WL 671317, at *2 (D. Conn. Feb. 21, 2014).  So "the nature of the relief included in the demand for judgment is immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted."  *Charles v. Front Royal Volunteer Fire & Rescue Dep't*, 21 F.Supp.3d 620, 629 (W.D. Va. 2014); *see* Fed. R. Civ. P. 54(c).  Florida's argument is thus premature.

## CONCLUSION

The Court should deny Florida's motion.

Respectfully submitted,

Paul D. Clement
Erin E. Murphy
James Y. Xi
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com

Brian M. Willen
Steffen N. Johnson
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K Street NW
Washington DC 20006
(202) 973-8800
bwillen@wsgr.com
sjohnson@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

/s/ *Douglas L. Kilby*
Douglas L. Kilby
Florida Bar No. 0073407
Hannah E. Murphy
Florida Bar No. 1032759
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com

*Counsel for Plaintiffs NetChoice and CCIA*

January 8, 2025

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

This response in opposition to defendants' motion to dismiss Plaintiffs' amended complaint complies with Local Rule 7.1(F) because it has 8,000 words.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 8th day of January, 2025.

/s/ *Douglas L. Kilby*
Douglas L. Kilby