## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC, et al.,

      Plaintiffs,

v.                                                    Case No. 4:21-cv-220-RH/MAF

JAMES UTHMEIER, in his official
capacity as Attorney General of the
State of Florida, et al.,

      Defendants.

_____/

## MOTION TO COMPEL DISCOVERY

When the Supreme Court considered this case, it noted that "the record is underdeveloped." *Moody v. NetChoice*, 603 U.S. 707, 726 (2024). Defendants have attempted to develop the factual record by serving discovery requests on Plaintiffs about their members' content-moderation policies and practices. Plaintiffs, however, refused to provide answers regarding many of their members and declined to produce information and documents in their possession, custody, or control unless such information is already publicly available on the members' websites. Such a curtailed approach to discovery is inconsistent with the federal rules. Defendants ask the Court to resolve five discovery issues.

The first is that Plaintiffs limited their responses to "Covered Members," which Plaintiffs defined as "Plaintiffs' association members that Plaintiffs understand may be covered by both the definition of 'social media platform' and the challenged provisions of the Statute." Pls.' Resp. to Interrogatories, Ex. 1 at 2; Pls.' Resp. to Requests for Production, Ex. 2 at 3. Plaintiffs have refused to identify the entities that Plaintiffs excluded information about in their Responses, and they answered discovery requests subject to this limitation.

The second issue is that Plaintiffs have refused to produce a variety of relevant documents and information regarding their members' content-moderation, censorship, and deplatforming policies and practices, producing instead only materials that members have already posted online for the general public to see. This means, for example, that Plaintiffs have refused to produce internal policies and nonpublic materials regarding content moderation, censorship, and deplatforming or regarding the impact of the Florida law on Plaintiffs' members.

The third issue is that Plaintiffs have refused to provide documents and information regarding the algorithms, machine learning, and artificial intelligence that their members use to moderate, curate, and remove content beyond what the members publicly "post on their websites." Pls.' Resp. to Requests for Production at 25. Plaintiffs refuse to provide these materials despite Justice Barrett expressly flagging that the "First Amendment implications of the Florida" law "might be

different" depending on the "kind of algorithm," including how it was designed and functions. *Moody*, 603 U.S. at 745-46 (Barrett, J., concurring).

The fourth issue is that Plaintiffs objected to stating whether their members are subject to foreign ownership or control in their content-moderation decisions or engage foreign employees or contractors in some aspect of content-moderation efforts. Plaintiffs' objection that such information is "irrelevant" and "harassing," Pls.' Resp. to Interrogatories at 74, is impossible to square with Justice Barrett raising the question of "foreign ownership and control over . . . content-moderation decisions" in her separate writing. *Moody*, 603 U.S. at 747.

The fifth issue is that Plaintiffs have imposed arbitrary time limitations for certain requests that would prohibit discovery of materials regarding content-moderation policies and practices before May 21, 2021, a mere six days before Plaintiffs filed suit. Defendants request that the Court order Plaintiffs to supplement their responses to Interrogatory No. 6 and Requests for Production Nos. 11, 12, 13, 14, and 15 to include materials from January 1, 2018, to the present.

## MEMORANDUM OF LAW

The Court should grant Defendants' motion to compel on each of the five issues. Plaintiffs purportedly have information and documents regarding their trade association members. Defendants seek such material to defend themselves from Plaintiffs' indiscriminate facial and as-applied challenge to S.B. 7072. The federal

rules do not allow the trade associations to shield materials about their members' content-moderation policies, activities, and decisions and their algorithms from discovery or to hide the extent foreign entities, employees, or contractors control content-moderation efforts. Providing information about the policies and practices of Plaintiffs' members dating back little more than three years before Plaintiffs filed suit is not unduly burdensome to Plaintiffs. If the Court does not dismiss this case due to lack of jurisdiction and Plaintiffs' failure to state a claim, *see* Mot. to Dismiss, DE173, then the Court should compel Plaintiffs to provide the requested discovery.

## BACKGROUND

Plaintiffs are "Internet trade associations." DE171 ¶ 23. Their members include "online social media platforms" like "Facebook" and "X"; "online marketplaces" like "Amazon.com," "Airbnb," "eBay," and "Etsy"; and "online businesses" like "Google," "Yahoo!," and "AOL." DE1 ¶ 20 & n.23; DE171 ¶¶ 13, 15. Plaintiffs sue the Attorney General of Florida and the Florida Elections Commission to "vindicate the[] rights" of those companies under the First Amendment, 47 U.S.C. § 230, and the Fourteenth Amendment. DE171 ¶¶ 14, 16.

Plaintiffs challenge Sections 160.072 and 501.2041, Florida Statutes, which regulate "any information service, system, Internet search engine, or access software provider" that does "business in" Florida and has either "annual gross revenues in excess of $100 million" or "at least 100 million monthly" users. Fla. Stat.

§ 501.2041(1)(g). Those statutes impose three types of requirements on such platforms: neutrality provisions, hosting provisions, and disclosure obligations. *See* Mot. to Dismiss Am. Compl., DE173 at 5-6 (explaining these provisions).

Last year, the Supreme Court explained that "the proper facial analysis" in this case requires considering "[w]hat activities, by what actors," Florida's law regulates, and then examining the nature of each "covered platform" and "function," assessing whether applying the law to each function "intrud[es] on protected editorial discretion." *Moody*, 603 U.S. at 724-25 (majority). That is a fact-intensive inquiry, the Supreme Court observed, because different platforms and functions "involve different levels of editorial choice." *Id.* at 725-26. Even after identifying each application of the law that intrudes on editorial discretion, additional fact-intensive analysis is required to "weigh" the law's "constitutionally permissible" applications against its constitutionally impermissible applications. *Id.* at 744.

In concurring opinions, five Justices echoed that Plaintiffs' facial challenge requires a fact-intensive analysis specific to each covered platform. *Id.* at 745-47 (Barrett, J., concurring); *id.* at 748-49 (Jackson, J., concurring in part and in the judgment); *id.* at 786-93 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment).

After the Supreme Court entered judgment and the Eleventh Circuit remanded to this Court, Defendants served on Plaintiffs a First Set of Interrogatories, Ex. 3, and First Set of Requests for Production, Ex. 4. Plaintiffs responded to these discovery requests on, respectively, November 21, 2024, and December 9, 2024. On January 2, 2025, Defendants notified Plaintiffs in writing of deficiencies in Plaintiffs' discovery responses. Jan. 2, 2025 Letter, Ex. 5. In that letter, Defendants raised each of the issues that are the subject of this motion: (1) Plaintiffs improperly "limit[ed] the definition of [their] members" based on "assumptions about the meaning and operation of the State's statute," *id.* at 2; (2) Plaintiffs improperly objected to the production of material about their members' content-moderation policies, practices, and decisions, *id.* at 1-3; (3) Plaintiffs improperly objected to producing information about how their members' use algorithms to moderate, curate, and remove content, *id.* at 1-3; (4) Plaintiffs improperly objected to Interrogatory No. 16 about "members' foreign ownership and control as 'irrelevant' and 'harassing,'" *id.* at 2-3; and (5) Plaintiffs attempted to impose "arbitrary limitations" on the time period for some responses, *id.* at 3.

Defendants met and conferred with Plaintiffs regarding these issues on January 24, 2025, and January 28, 2025. *See* Feb. 6, 2025 Letter, Ex. 6 (documenting discussions). The parties have not been able to resolve their disagreements despite Defendants' good faith efforts. *See id.*; Feb. 25, 2025 Letter, Ex. 7.

## LEGAL STANDARD

Rule 26 provides that parties to litigation "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). And Rule 33 provides that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Fed. R. Civ. P. 33(b)(3). "The objecting party typically bears the burden to substantiate its objections." *Gulbronson v. Anderson*, No. 1:19-cv-156, 2020 WL 13837217, at *2 (N.D. Fla. Aug. 12, 2020). "[O]bjecting to an interrogatory but answering subject to the objection is not one of the choices permitted under Rule 33, and courts often refuse to sustain such objections." *Slate v. Kamau*, No. 4:21-cv-390, 2023 WL 5668028, at *2 (N.D. Fla. May 3, 2023) (Walker, C.J.).

## ARGUMENT

### I. PLAINTIFFS IMPROPERLY LIMITED THEIR RESPONSES TO "COVERED MEMBERS."

Plaintiffs improperly objected to Defendants' Interrogatories Nos. 1-16 and Defendants Requests for Production Nos. 1, 2, and 10-15 by limiting their responses to what Plaintiffs claim are "Covered Members" instead of, as Defendants requested, all of Plaintiffs' trade association members. Plaintiffs have not identified the entities they do not consider "Covered Members" and refuse to explain why such entities

are not "Covered Members." Plaintiffs even appear to have excluded members' websites that Plaintiffs represented to the Supreme Court were covered by the law.

Consistent with Local Rule 26.1(D), the following are the Interrogatories in dispute for this issue, *see* Ex. 3:

- **Interrogatory No. 1:** "Describe in detail the internal content moderation policies and practices of each of your Members."

- **Interrogatory No. 2:** "Describe in detail the internal deplatforming policies and practices of each of your Members."

- **Interrogatory No. 3:** "Describe any and all changes in each of your Members' efforts and policies relating to the deplatforming of political candidates or journalistic enterprises from the inception of their respective Platforms to the present day."

- **Interrogatory No. 4:** "Describe in detail how each of your Members utilizes machine learning algorithms to moderate and curate content on their respective Platforms."

- **Interrogatory No. 5:** "Describe in detail how each of your Members utilizes human moderators to moderate and curate content on their respective Platforms."

- **Interrogatory No. 6:** "State the total number of posts and overall percentage of content on each of your Members' respective Platforms that has been restricted or censored under each of your Members' respective content moderation policies."

- **Interrogatory No. 7:** "State the total number of user accounts that have been restricted or censored annually from 2021 to 2024 on each of your Members' respective Platforms."

- **Interrogatory No. 8:** "State the total number of user accounts that have been deplatformed annually from 2021 to 2024 on each of your Members' respective Platforms."

8

- **Interrogatory No. 9:** "State the total number of messages that have been restricted or censored annually from 2021 to 2024 on each of your Members' respective Platforms."

- **Interrogatory No. 10:** "State whether each of your Members is the publisher or speaker of their respective content moderation algorithms."

- **Interrogatory No. 11:** "State the error rate for each of your Members' respective algorithm-led content moderation efforts."

- **Interrogatory No. 12:** "State the error rate for each of your Members' respective human-led content moderation efforts."

- **Interrogatory No. 13:** "Identify which, if any, of your Members, in censoring content on their respective Platforms, discriminates on the basis of political viewpoint."

- **Interrogatory No. 14:** "Describe in detail the individual discretion each of your Members provides to human moderators."

- **Interrogatory No. 15:** "State the degree to which each of your Members applies their content moderation policies consistently."

- **Interrogatory No. 16:** "State whether each of your Members is subject to foreign ownership or control in its content moderation decisions and/or engages any foreign employees or contractors who engage in some aspect of the Member's content moderation efforts."

The following are the Requests for Production in dispute for this issue, *see*

Ex. 4:

- **Request for Production No. 1:** "All communications between you and your members about this lawsuit."

- **Request for Production No. 2:** "All communications between you and your members about Florida S.B. 7072."

- **Request for Production No. 10:** "All documents related to the 'impact' that Florida S.B. 7072 has had or may have on your members. DE1 ¶ 27."

- **Request for Production No. 11:** "All documents related to your members' content-moderation activities, including how they 'arrange and curate content,' DE1 ¶ 51, and errors in content moderation."

- **Request for Production No. 12:** "All documents related to whether and how your members use algorithms to prioritize or remove content, how any such algorithms work, or whether and to what extent human beings decide which content any such algorithms prioritize or remove."

- **Request for Production No. 13:** "All documents related to the internal deplatforming policies and practices of each of your members."

- **Request for Production No. 14:** "All documents related to whether and how your members notify users of content-moderation policies and content-moderation decisions."

- **Request for Production No. 15:** "All documents related to whether and how your members use machine-learning and artificial intelligence to moderate, arrange, or curate content."

Defendants defined "Member" to "mean[] any entity that is part of Your trade association," Interrogatories at 2, and to "mean[] any business that is part of Plaintiffs' trade associations," Requests for Production at 2.

Plaintiffs objected generally and to those specific Interrogatories and Requests by stating that such a definition of "Members" was "vague," "overbroad and unduly burdensome," and sought production regarding members "irrelevant to this lawsuit." *E.g.*, Pls.' Resp. to Interrogatories at 2; Pls.' Resp. to Requests for Production at 3.

In both sets of responses, Plaintiffs directed Defendants to "lists of" Plaintiffs' "actual association members" which "can be found on their respective websites. *See* NetChoice, About Us, https://netchoice.org/about/#association-members; Computer & Communications Industry Association, Members, https://ccianet.org/about/members/." Pls.' Resp. to Interrogatories at 2; Pls.' Resp. to Requests for Production at 3. Plaintiffs then stated that they would "construe the term 'Member' to refer to Plaintiffs' association members that Plaintiffs understand may be covered by both the definition of 'social media platform' and the challenged provisions of the Statute (hereinafter 'Covered Members')." Pls.' Resp. to Interrogatories at 2; Pls.' Resp. to Requests for Production at 3.

Plaintiffs responded to Interrogatories Nos. 1, 2, 4, 5, 6, 7, 8, and 16 and to each disputed Request for Production despite their objections to the term "Members," although their responses to Requests for Production Nos. 1, 2, 10, and 15 merely stated "Plaintiffs are willing to meet and confer with Defendants about the scope of" the Requests. Pls.' Resp. to Interrogatories at 5-31, 34-58, 73-75; Pls.' Resp. to Requests for Production at 5-9, 18-33.

After the parties met and conferred regarding Defendants' responses to Plaintiffs' discovery requests, Plaintiffs' counsel provided a letter purporting to identify Plaintiffs' members as of February 4, 2025, that did not correspond to the

lists on Plaintiffs' websites at the beginning of January 2025. *See* Pls.' Feb. 4, 2025 Letter, Ex. 8 at 2 & nn.1-2; Pls.' Feb. 11, 2025 Letter, Ex. 9 at 2.

Plaintiffs improperly attempted to limit their responses to what they claimed are "Covered Members." These requests were not "vague." Plaintiffs know the entities that are members of their trade associations. Rather than even identifying in writing which trade association members Plaintiffs are and are not responding about, they simply directed Defendants to websites that display company logos. Those website pages are not static. Since Plaintiffs served their discovery responses, they have apparently altered their websites—without any notice to Defendants—to remove and add logos. *See* Feb. 6, 2025 Letter at 1 (explaining that Plaintiff NetChoice appeared to have removed "Oath: A Verizon Company" and "Lime" from its website and added "EarnIn" and that Plaintiff CCIA appeared to have removed "Red Hat" to its website); Pls.' Feb. 11, 2025 Letter (neither disputing that Plaintiffs did so nor explaining these alterations).

Neither are Defendants' requests for information and documents regarding Plaintiffs' members overbroad, unduly burdensome, or irrelevant to this lawsuit. For discovery, "[c]ourts construe relevancy 'broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case.'" *Kelly v. Davis*, No. 3:10-cv-392, 2012 WL 12871663, at *2 (N.D. Fla. Sept. 19, 2012) (second alteration in original) (quoting *Oppenheimer*

*Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Materials regarding Plaintiffs' members and their activities are relevant and proportional to the needs of this litigation because they will assist this Court in determining which of Plaintiffs' members Florida's law covers, what functions on each of Plaintiffs' members' websites the law covers, and whether each provision of the law does or does not satisfy First Amendment scrutiny as applied to each function of those websites. *See Moody*, 603 U.S. at 724-26.

Despite bringing a facial challenge "dealing with a broad swath of varied platforms and functions," *id.* at 745 (Barrett, J., concurring), Plaintiffs have not explained why each of the unidentified members are not "Covered Members." When Defendants asked for further explanation, Plaintiffs' counsel objected that such information was privileged. *See* Feb. 6, 2025 Letter at 2.

Nevertheless, Plaintiffs' objection appears to be based on a cramped reading of the statute that is not even consistent with the positions Plaintiffs took before the Supreme Court. Plaintiff NetChoice itself represented to the Supreme Court that "S.B. 7072 also covers . . . Gmail, Uber, and other e-commerce websites," none of which Plaintiffs have provided responses about. *Moody*, 603 U.S. at 786 (Alito, J., concurring in the judgment); *see also id.* at 788. Plaintiffs might now dispute whether Florida's law applies to "an email provider like Gmail filter[ing] incoming messages" or "an online marketplace like Etsy display[ing] customer reviews," *id.*

13

at 725 (majority), but discovery bearing on whether and how Florida's law applies to Plaintiffs' members is surely relevant.

To grant Plaintiffs the relief they seek in this litigation, this Court must "determine what [the law] covers." *Id.* at 725 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). Florida's law "appear[s] to apply beyond Facebook's News Feed and its ilk," and the Court cannot preemptively "confine[]" its focus to a limited range of Plaintiffs' trade association members. *Id.* at 724. Determining whether the law violates the First Amendment requires additional fact-intensive determinations for each entity and function. For the content-moderation provisions, for example, the Court will need to determine "whether there is an intrusion on protected editorial discretion." *Id.* at 725. The Court "must explore the laws' full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Id.* at 726. This is "a daunting" task precisely because Plaintiffs chose to bring a facial challenge to Florida's law. *Id.* at 745 (Barrett, J., concurring). Shielding most of Plaintiffs' members from discovery based on Plaintiffs' assumptions about the law would prevent this Court from answering the "complex, fact-specific questions" that Plaintiffs raised with their facial challenge. *Id.* at 761 (Thomas, J., concurring in the judgment).

Further weighing against Plaintiffs' assertion of proportionality and undue burden, the "issues at stake in the action" are exceedingly important; Plaintiffs are

the parties with exclusive access to the "relevant information" about all their members' identities; and Plaintiffs have ample resources to collect and produce such materials. Fed. R. Civ. P. 26(b)(1); *see also J.S. v. Edgewater Beach Resort, L.L.C.*, No. 5:18-cv-89, 2019 WL 13162852, at *1 (N.D. Fla. April 22, 2019) (granting motion to compel despite proportionality and undue burden objections).

Moreover, Plaintiffs improperly "[o]bject[ed] but answer[ed] subject to the objection" all of the Requests for Production and half of the disputed Interrogatories. *Mann v. Island Resorts Dev.*, No. 3:08-cv-297, 2009 WL 6409113, at *3-4 (N.D. Fla. Feb. 27, 2009). That "is not one of the allowed choices" under the Federal Rules. *Id.* The "responding party is given only two choices: to answer or to object." *Id.*; *see also Slate*, 2023 WL 5668028, at *2 ("[O]bjecting to an interrogatory but answering subject to the objection is not one of the choices permitted under Rule 33, and courts often refuse to sustain such objections."). Answering requests for production or interrogatories in "this manner does little to further the purposes of discovery and leaves the opposing party 'uncertain as to whether the request has actually been fully answered or whether only a portion of the question has been answered.'" *Slate*, 2023 WL 5668028, at *2 (quoting *Hermosilla v. Coca-Cola Co.*, 10-21418-CIV-MOORE, 2010 WL 5437258, at *7 (S.D. Fla. Dec. 27, 2010)).

Accordingly, Defendants ask the Court to compel Plaintiffs to fully respond regarding each of their trade association members.

## II.    PLAINTIFFS IMPROPERLY REFUSED TO PRODUCE MATERIALS REGARDING CONTENT MODERATION, CENSORSHIP, AND DEPLATFORMING.

Plaintiffs improperly objected to Defendants' Interrogatories Nos. 1-3, 5-9, and 12-15 and Requests for Production Nos. 1, 2, 10, 11, 13, and 14 by refusing to produce a variety of relevant documents and information regarding trade association members' content-moderation, censorship, and deplatforming policies and practices, producing instead only materials that Plaintiffs' members have already posted online for the general public to see.

Consistent with Local Rule 26.1(D), the following are the Interrogatories in dispute for this issue, *see* Ex. 3:

- **Interrogatory No. 1:** "Describe in detail the internal content moderation policies and practices of each of your Members."

- **Interrogatory No. 2:** "Describe in detail the internal deplatforming policies and practices of each of your Members."

- **Interrogatory No. 3:** "Describe any and all changes in each of your Members' efforts and policies relating to the deplatforming of political candidates or journalistic enterprises from the inception of their respective Platforms to the present day."

- **Interrogatory No. 5:** "Describe in detail how each of your Members utilizes human moderators to moderate and curate content on their respective Platforms."

- **Interrogatory No. 6:** "State the total number of posts and overall percentage of content on each of your Members' respective Platforms that has been restricted or censored under each of your Members' respective content moderation policies."

- **Interrogatory No. 7:** "State the total number of user accounts that have been restricted or censored annually from 2021 to 2024 on each of your Members' respective Platforms."

- **Interrogatory No. 8:** "State the total number of user accounts that have been deplatformed annually from 2021 to 2024 on each of your Members' respective Platforms."

- **Interrogatory No. 9:** "State the total number of messages that have been restricted or censored annually from 2021 to 2024 on each of your Members' respective Platforms."

- **Interrogatory No. 12:** "State the error rate for each of your Members' respective human-led content moderation efforts."

- **Interrogatory No. 13:** "Identify which, if any, of your Members, in censoring content on their respective Platforms, discriminates on the basis of political viewpoint."

- **Interrogatory No. 14:** "Describe in detail the individual discretion each of your Members provides to human moderators."

- **Interrogatory No. 15:** "State the degree to which each of your Members applies their content moderation policies consistently."

The following are the Requests for Production in dispute for this issue, *see*

Ex. 4:

- **Request for Production No. 1:** "All communications between you and your members about this lawsuit."

- **Request for Production No. 2:** "All communications between you and your members about Florida S.B. 7072."

- **Request for Production No. 10:** "All documents related to the 'impact' that Florida S.B. 7072 has had or may have on your members. DE1 ¶ 27."

17

- **Request for Production No. 11:** "All documents related to your members' content-moderation activities, including how they 'arrange and curate content,' DE1 ¶ 51, and errors in content moderation."

- **Request for Production No. 13:** "All documents related to the internal deplatforming policies and practices of each of your members."

- **Request for Production No. 14:** "All documents related to whether and how your members notify users of content-moderation policies and content-moderation decisions."

Besides the "Covered Member" objection addressed above, *see supra* Part I, Plaintiffs objected that these requests were disproportionate; overbroad; unduly burdensome; sought irrelevant and confidential information; attempted to impose undue, disproportionate burdens on the purported First Amendment rights of Plaintiffs and their members; and were vague and ambiguous. *See* Pls.' Resp. to Interrogatories at 5-34, 40-60, 64-73; Pls.' Resp. to Requests for Production at 5-9, 18-23, 25-30.

Plaintiffs responded to Interrogatories Nos. 1, 2, 5, 6, 7, and 8 and to each disputed Request for Production, although their responses to Requests for Production Nos. 1, 2, and 10 merely stated "Plaintiffs are willing to meet and confer with Defendants about the scope of" the Requests. Pls.' Resp. to Interrogatories at 5-31, 40-58; Pls.' Resp. to Requests for Production at 5-9, 18-23, 25-30.

Plaintiffs' objections are meritless. Defendants are *not* seeking attorney-client privileged discussions or materials, nor indeed can they under Rule 26(b)(1), but *are* seeking information and documents that would shed light on how Plaintiffs'

18

members moderate content, censor, and deplatform users and how Florida's law has impacted or may impact Plaintiffs' members.

Those categories of materials are relevant and proportional to the needs of the case under Rule 26(b)(1). The Supreme Court indicated that, "[b]efore a court can do anything else with [Plaintiffs'] facial challenges, it must address" how the provisions of Florida's law cause the content-moderation policies and practices of Plaintiffs' members "to change." *Moody*, 603 U.S. at 725 (majority). After all that analysis is complete, the law would not be facially unconstitutional under the First Amendment unless "the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 723-24 (majority).

Materials about how frequently Plaintiffs' members err in moderating content and in censoring and deplatforming political candidates or other users would assist the Court in making that determination. If the members' platforms frequently moderate content, censor, and deplatform in a manner inconsistent with their own policies, then such errors are not expressing the members' "own editorial choices about the mix of speech" they "want[] to convey." *Id.* at 734. The State has an interest in protecting Floridians from such erroneous content moderation, censorship, and deplatforming. And since Plaintiffs brought only facial Section 230 claims, they must show that *every* application of each provision of the law violates Section 230. *Id.* at 723.

19

Defendants' requests are proportional "to the needs of the case." Fed. R. Civ. P. 26(b)(1). Plaintiffs seek permanent facial and as-applied injunctions of a law enacted by the Florida legislature. Should Plaintiffs' amended complaint survive Defendants' motion to dismiss, the Court's "analysis is bound to be fact intensive" and "will surely vary from function to function and platform to platform." *Moody*, 603 U.S. at 647 (Barrett, J., concurring).

Defendants and the Court do not have to simply take Plaintiffs' word that their members' content-moderation policies and practices operate exactly how the members describe them in documents that Plaintiffs' members have already made available to the general public. That is not how discovery works. Indeed, as executives of Plaintiffs' own members have admitted, members' websites are all too often failing to comply with their own public policies. *See, e.g.*, Elon Musk, Twitter (4:51 PM, Nov. 25, 2022), https://x.com/elonmusk/status/1596275526259425280 (acknowledging that Twitter committed "a grave mistake in banning" President Trump's account, "despite no violation of the law or terms of service"); Joel Kaplan, Meta Platforms, Inc. (Jan. 7, 2025) https://about.fb.com/news/2025/01/meta-more-speech-fewer-mistakes/ (acknowledging "too many mistakes and too much content being censored that shouldn't have been").

Plaintiffs' burdensomeness objection is particularly meritless because, as Plaintiffs confirmed during conference, Plaintiffs are responding to the State's

discovery requests on behalf of Plaintiffs themselves and not on behalf of their trade association members. *See* Feb. 6, 2025 Letter at 2. "Plaintiffs are not pulling information or documents from trade association members' internal databases, other than to the extent Plaintiffs know such information or documents are publicly available online" for anyone to see. *Id.*; *see* Feb. 25, 2025 Letter at 1. Defendants simply ask Plaintiffs to produce nonpublic information and documents in the possession, custody, or control of the Plaintiff trade associations.

Nor do Plaintiffs and their trade association members have a First Amendment associational privilege to sue Defendants and, after launching a blunderbuss attack against Florida's law, shield from production all documents and communications regarding the members' content-moderation policies and practices. Like all assertions of privilege, such a First Amendment privilege "must be strictly construed." *Trammel v. United States*, 445 U.S. 40, 50 (1979). The party invoking a First Amendment associational privilege is required to make a "*prima facia* showing of infringement." *Fla. State Conf. of Branches & Youth Units of NAACP v. Lee*, 568 F. Supp. 3d 1301, 1307 (S.D. Fla. 2021). Plaintiffs have failed to do so.

Plaintiffs have not demonstrated how the factual information that Defendants request would subject Plaintiffs' "members to threats, harassment, or reprisals from the Government or private individuals." *Id.* (quotation omitted). Factual information about the members' content-moderation policies and practices and the impact of

Florida's law on content moderation is material "not of the sort 'typically covered by the associational privilege.'" *Boe v. Marshall*, No. 2:22-cv-184, 2023 WL 2646437, at *4 (M.D. Ala. Mar. 27, 2023) (quoting *Lee*, 568 F. Supp. at 1307). Indeed, Plaintiffs *already* purport to publicly disclose the identities of their members online. *See id.* And Defendants have consistently expressed willingness to limit these requests to materials regarding the members' "final *policies*, not internal deliberations" subject to debate and change. Jan. 2, 2025 Letter at 2.

Even if Plaintiffs could make a prima facia showing of a blanket First Amendment privilege for all nonpublic documents, which they cannot, the factual materials Defendants seek are highly relevant to this litigation, as Defendants and members of the Supreme Court have already explained. To the extent Plaintiffs are "concerned about the production of any specific documents," *Lee*, 568 F. Supp. at 1307, Defendants long ago expressed their willingness to discuss a protective order, *see* Jan. 2, 2025 Letter at 3 (Defendants "conveyed that to Plaintiffs months ago"); *see also Boe*, 2023 WL 2646437, at *4 (agreeing a protective order could quell such concerns); *X Corp. v. Media Matters for Am.*, No. 4:23-cv-1175, 2024 WL 4416887, at *11 (N.D. Tex. Sept. 27, 2024) (same). The parties have now agreed in principle to entry of a protective order, and Plaintiffs circulated a draft protective order on March 20, 2025. That resolves any concern Plaintiffs might have about their supposed First Amendment associational privilege.

Additionally, even if these objections had merit, Plaintiffs improperly "[o]bject[ed] but answer[ed] subject to the objection" to Interrogatories Nos. 1, 2, 5, 6, 7, and 8 and each disputed Request for Production. *Mann*, 2009 WL 6409113, at *3. That "is not one of the choices" that the federal rules permit. *Slate*, 2023 WL 5668028, at *2. Plaintiffs have thus waived their objections to such requests.

Accordingly, the Court should grant Defendants' motion to compel production of nonpublic factual materials regarding the content-moderation, censorship, and deplatforming policies and practices of Plaintiffs' members.

## III.  PLAINTIFFS IMPROPERLY OBJECTED TO PRODUCING MATERIALS REGARDING ALGORITHMS THAT MEMBERS USE TO MODERATE CONTENT.

Plaintiffs improperly objected to Defendants' Interrogatories Nos. 4, 10, and 11 and Requests for Production Nos. 12 and 15 in an attempt to shield from production all documents and information regarding the algorithms that trade association members use to moderate, curate, and remove content beyond materials their members have already posted online for the general public.

Consistent with Local Rule 26.1(D), the following are the Interrogatories in dispute for this issue, *see* Ex. 3:

- **Interrogatory No. 4:** "Describe in detail how each of your Members utilizes machine learning algorithms to moderate and curate content on their respective Platforms."

- **Interrogatory No. 10:** "State whether each of your Members is the publisher or speaker of their respective content moderation algorithms."

- **Interrogatory No. 11:** "State the error rate for each of your Members' respective algorithm-led content moderation efforts."

The following are the Requests for Production in dispute for this issue, *see* Ex. 4:

- **Request for Production No. 12:** "All documents related to whether and how your members use algorithms to prioritize or remove content, how any such algorithms work, or whether and to what extent human beings decide which content any such algorithms prioritize or remove."

- **Request for Production No. 15:** "All documents related to whether and how your members use machine-learning and artificial intelligence to moderate, arrange, or curate content."

Besides the "Covered Member" objection, *see supra* Part I, Plaintiffs objected that these requests were disproportionate, overbroad, unduly burdensome, sought irrelevant and confidential information, attempted to impose undue, disproportionate burdens on the purported First Amendment rights of Plaintiffs and their members, and were vague and ambiguous. *See* Pls.' Resp. to Interrogatories at 34-40, 60-64; Pls.' Resp. Requests for Production at 23-25, 30-33.

Plaintiffs responded to Interrogatory No. 4 and to both disputed Requests for Production, although their responses to Requests for Production No. 15 merely stated "Plaintiffs are willing to meet and confer with Defendants about the scope of" the Request. Pls.' Resp. to Interrogatories at 34-40; Pls.' Resp. to Requests for Production at 23-25, 30-33.

24

Plaintiffs' objections once again lack merit. Defendants are not seeking attorney-client privileged discussions or attorney work product but *are* seeking information and documents that would shed light on how Plaintiffs' members use algorithms, machine learning, and artificial intelligence to moderate, curate, and remove content.

Those categories of materials are highly relevant and proportional to the needs of the case. The Supreme Court acknowledged that "prioritization of content" is often "achieved through the use of algorithms." *Moody*, 603 U.S. at 734 (majority). "Moreover, one of the principal factual deficiencies in the current record, according to the Supreme Court, concerns the algorithms used by plaintiffs' members." *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 499 (5th Cir. 2024).

Algorithms are not all the same. *See Moody*, 603 U.S. at 734-35. Justice Barrett expressly flagged that the "First Amendment implications of the Florida" law "might be different" depending on the "kind of algorithm." *Id.* at 745-46 (Barrett, J., concurring). "[M]aking this determination involves more than meets the eye" from general statements by Plaintiffs' members in limited, public-facing materials. *Id.* at 745; *see also id.* at 767 (Alito, J., concurring in the judgment) (declining to "unreflectively assume[] the truth of NetChoice's unsupported assertion that" using algorithms to moderate content is "just as expressive as the newspaper editors who marked up typescripts in blue pencil 50 years ago").

25

According to Justice Barrett, the Court will need to consider both how the algorithms are developed and how they function. Technology such as artificial intelligence or machine learning "may attenuate the connection between content moderation *actions* (e.g., removing posts) and human beings' constitutionally protected" First Amendment rights." *Moody*, 603 U.S. at 746 (Barrett, J.); *see also id.* at 770 (Alito, J., concurring in the judgment) (noting "it is likely that" platforms "will increasingly rely on artificial intelligence (AI), a machine learning tool that arranges, deletes, and modifies content and learns from its own choices"). And the "First Amendment implications of the Florida" law "might be different for" an algorithm that "just presents automatically to each user whatever the algorithm thinks the user will like." *Id.* at 746 (Barrett, J.).

As Defendants have explained, *see supra* Part II, the error rates of content-moderation efforts are of course relevant. If the algorithms frequently censor or deplatform political candidates or other users in a manner inconsistent with members' policies, then that would support the idea that the algorithms are not expressing the members' "own editorial choices about the mix of speech" they "want[] to convey." *Id.* at 734 (majority). Plaintiffs will be hard pressed to explain how algorithms created via artificial intelligence or machine learning represent their members' speech if the members do not even understand how the algorithms are actually going to moderate content.

Plaintiffs cannot establish the blunderbuss claims they chose to bring against Florida's law merely by pointing Defendants to general information that Plaintiffs' members publicly "post on their websites." Pls.' Resp. to Requests for Production at 25; *see also* Pls.' Resp. to Interrogatories at 36-40. As Defendants have explained in addressing Plaintiffs' similar objections regarding the content-moderation requests, *see supra* Part II, these requests are proportional to the needs of the case; seek only materials in the trade associations' possession, custody, and control; and do not run afoul of purported First Amendment privileges of the trade associations or their members. To the extent Plaintiffs supposedly need to protect members' trade secrets (which would be odd for members to circulate to competitors in the associations), Defendants have already agreed in principle to entry of a protective order.

Nor are the terms and phrases in these requests vague or ambiguous. Indeed, despite Plaintiffs' objections to terms such as "machine learning" and "artificial intelligence," Pls.' Resp. to Requests for Production at 32, their "Covered Members post on their websites information about whether and how they use machine-learning and artificial intelligence to moderate, arrange, or curate content." *Id.* at 33; *see also* Pls.' Resp. to Interrogatories at 16, 37-40, 44 (using those terms).

Once again, even if Plaintiffs' objections had merit, Plaintiffs improperly "[o]bject[ed] but answer[ed] subject to the objection" to Interrogatory No. 4 and both disputed Requests for Production. *Mann*, 2009 WL 6409113, at *3. That "is not one

of the choices" that the federal rules permit. *Slate*, 2023 WL 5668028, at \*2. Pointing to general public-facing websites and providing answers that members "*may* use automated tools, including algorithms, to help curate and moderate third-party content posted on their platforms" and that algorithms "reinforce and implement the editorial judgments reflected in" members' content-moderation policies, leaves Defendants and the Court in the dark about the actual details of those algorithms and whether they in fact represent the editorial speech of those members. Pls.' Resp. to Interrogatories at 36 (emphasis added). Plaintiffs have thus waived their objections to such requests.

Accordingly, the Court should grant Defendants' motion to compel production of nonpublic factual materials regarding how Plaintiffs' members use algorithms, artificial intelligence, and machine-learning to moderate content.

## IV. PLAINTIFFS IMPROPERLY REFUSED TO PROVIDE INFORMATION REGARDING MEMBERS' FOREIGN OWNERSHIP AND CONTROL.

Plaintiffs improperly responded to Defendants' Interrogatory No. 16 by failing to state whether trade association members are subject to foreign ownership or control in their content-moderation decisions or engage foreign employees or contractors in some aspect of content-moderation efforts.

Consistent with Local Rule 26.1(D), there is a single Interrogatory in dispute for this issue, *see* Ex. 3:

- **Interrogatory No. 16:** "State whether each of your Members is subject to foreign ownership or control in its content moderation decisions and/or engages any foreign employees or contractors who engage in some aspect of the Member's content moderation efforts."

Besides the "Covered Member" objection addressed above, *see supra* Part I, Plaintiffs objected to this interrogatory as vague, ambiguous, overbroad, irrelevant, harassing, and violative of the First Amendment, *see* Pls.' Resp. to Interrogatories at 73-75. Despite objecting, Plaintiffs "construe[d] this Interrogatory as inquiring whether Members are majority-owned by a non-U.S. entity that has operational control over their content-moderation policies" and responded that "they are not aware of any Covered Members that are majority-owned by a non-U.S. entity that has operational control over their content-moderation policies." *Id.* at 74-75.

In misconstruing the Interrogatory, Plaintiffs answered a different, narrower question about operational control that would be limited to companies "majority-owned by a non-U.S. entity." *Id.* That is not the interrogatory that Defendants requested Plaintiffs to answer. As Plaintiffs are aware, Justice Barrett pointed out in her concurrence that "foreign persons and corporations located abroad do not" possess First Amendment rights themselves. *Moody*, 603 U.S. at 747 (Barrett, J., concurring) (citing *Agency for Int'l Dev. v. All. for Open Soc. Int'l, Inc.*, 591 U.S. 430, 433-36 (2020)); *see also TikTok v. Garland*, 145 S. Ct. 57, 66 n.2 (2025) ("To the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, the activity is not protected by the First Amendment.").

29

Both "a social-media platform's foreign ownership *and* control over its content-moderation decisions might affect whether laws overriding those decisions trigger First Amendment scrutiny." *Moody*, 603 U.S. at 747 (emphasis added). The extent to which foreign companies and "foreign executives," employees, and contractors influence members' content-moderation efforts is relevant to the inquiries Justice Barrett raised in her concurrence. *Id.*

Contrary to Plaintiffs' reliance on *Agency for International Development v. Alliance for Open Society International*, 570 U.S. 205 (2013), Plaintiffs' members cannot obtain First Amendment protection for the activities of foreign organizations that they contract with abroad. *See Agency for Int'l Dev.*, 591 U.S. at 436. That principle applies even to "foreign affiliates" of American organizations or to foreign organizations that American companies contract with by "their own choice." *Id.* at 438-39. Thus, obtaining discovery about how foreign entities, employees, and contractors engage in the content-moderation efforts of Plaintiffs' members is highly relevant and proportional to the needs of the case.

Defendants are not "harassing" Plaintiffs in seeking information about Plaintiffs' members that Justice Barrett herself identified as important for the resolution of this litigation. Pls.' Resp. to Interrogatories at 74. Plaintiffs' complaint about burdensomeness also fails to account for the importance of this litigation, Plaintiffs' greater relative access to the relevant information, and Plaintiffs'

extensive resources. *See* Fed. R. Civ. P. 26(b)(1). Plus, Plaintiffs are answering merely with information in their own possession, custody or control.

Even if these objections had merit, Plaintiffs improperly "[o]bject[ed] but answer[ed] subject to the objection[s]" to Interrogatory No. 16. *Mann*, 2009 WL 6409113, at *3. That "is not one of the choices" that the federal rules permit. *Slate*, 2023 WL 5668028, at *2. Plaintiffs have thus waived their objections to Interrogatory No. 16 and must provide a full response to it**.**

## V. PLAINTIFFS IMPROPERLY IMPOSED ARBITRARY TIME LIMITATIONS ON CERTAIN REQUESTS.

Plaintiffs have imposed arbitrary time limitations for Interrogatory No. 6 and Requests for Production Nos. 11, 12, 13, 14, and 15 to shield from discovery materials before May 21, 2021.

Consistent with Local Rule 26.1(D), there is a single Interrogatory in dispute for this issue, *see* Ex. 3:

- **Interrogatory No. 6**: "State the total number of posts and overall percentage of content on each of your Members' respective Platforms that has been restricted or censored under each of your Members' respective content moderation policies."

The following are the Requests for Production in dispute for this issue, *see* Ex. 4:

- **Request for Production No. 11:** "All documents related to your members' content-moderation activities, including how they 'arrange and curate content,' DE1 ¶ 51, and errors in content moderation."

31

- **Request for Production No. 12:** "All documents related to whether and how your members use algorithms to prioritize or remove content, how any such algorithms work, or whether and to what extent human beings decide which content any such algorithms prioritize or remove."

- **Request for Production No. 13:** "All documents related to the internal deplatforming policies and practices of each of your members."

- **Request for Production No. 14:** "All documents related to whether and how your members notify users of content-moderation policies and content-moderation decisions."

- **Request for Production No. 15:** "All documents related to whether and how your members use machine-learning and artificial intelligence to moderate, arrange, or curate content."

Besides the objections addressed above, Plaintiffs specifically claimed to limit their responses to Interrogatory No. 6 "to the period from May 21, 2021 to the date of" their response. Pls.' Resp. to Interrogatories at 46. Despite that assertion, Plaintiffs did cite some publicly available documents from Meta dating back to October 2017, from Pinterest dating back to 2013, from X dating back to July 2019, and YouTube dating back to June 2018. *Id.* at 46-48. Plaintiffs generally objected to all Requests for Production as overbroad and unduly burdensome to the extent Defendants sought documents and communications before May 21, 2021. Pls.' Resp. to Requests for Production at 5.

At conference, Defendants proposed January 1, 2018, as a reasonable time limitation as that would include both the 2018 election of statewide executive officers and the 2020 presidential election. *See* Feb. 6, 2025 Letter at 3. Plaintiffs'

counsel stated they would take the proposal to their clients, and Defendants expressed willingness to consider potential counterproposals, such as a January 1, 2020 start date. *Id.*; *see also* Feb. 25, 2025 Letter at 2. Instead, Plaintiffs acted as if January 2020 was the only date discussed and insisted anyway that materials from the year before the law's enactment were irrelevant "historical information." Pls.' Feb. 11, 2025 Letter at 3-4. After Defendants pointed out that Plaintiffs misstated the discussion, Feb. 25, 2025 Letter at 2, Plaintiffs waited over a month to respond by saying the 2018 timeframe was "wildly overbroad and unduly burdensome" and repeating an already discussed objection to Request for Production No. 15 not raised in Plaintiffs' February 11, 2025 Letter. Pls.' Mar. 28, 2025 Letter, Ex. 10 at 3-4.

The Court should reject Plaintiffs' attempt to arbitrarily exclude from these responses all materials from before May 21, 2021, a mere six days before Plaintiffs originally filed suit. *See* Compl., DE1.

First, Plaintiffs improperly "[o]bject[ed] but answer[ed] subject to the objection[s]" to Interrogatory No. 6. *Mann*, 2009 WL 6409113, at *3. That "is not one of the choices" that the federal rules permit. *Slate*, 2023 WL 5668028, at *2. Plaintiffs' response here leaves Defendants particularly "uncertain as to whether the request has been fully answered or whether only a portion of the question has been answered" because Plaintiffs provided some responses for certain trade association members that significantly predate May 21, 2021. *Id.* (quoting *Hermosilla*, 2010 WL

5437258, at \*7). For example, Plaintiffs are unclear whether their response regarding Meta is complete going back to October 2017. Pls.' Resp. to Interrogatories at 46. And Plaintiffs' response regarding X appears to have a gap between December 2021 and January 2024. *Id.* at 48. Plaintiffs have thus waived their objections to Interrogatory No. 6 and must provide a full response to it**.**

Second, Plaintiffs improperly attempted to generally object to production of all documents before May 21, 2021, as "overbroad and unduly burdensome." *See* Pls.' Resp. to Requests for Production at 5. Local Rule 26.1(C) and the federal rules do not allow such a practice. *See All. Laundry Sys., LLC v. Adams*, No. 3:23-cv-22130, 2024 WL 3831409, at \*1-2 (N.D. Fla. Aug. 15, 2024) ("'General Objections' are akin to no objection at all and fail to provide a basis for refusing to provide . . . the requested discovery."); *Otto Brands, LLC v. Otto's Express Car Wash, LLC*, No. 3:19-cv-572, 2020 WL 5845739, at \* (N.D. Fla. Feb. 19, 2020) ("[B]oilerplate objections are not proper."); *FDIC v. Brudnicki*, 291 F.R.D. 669, 674 n.4 (N.D. Fla. 2013) ("While the Court recognizes that it may be a common practice to raise boilerplate objections and then produce documents subject to the objection[,] the practice is prohibited."). Plaintiffs' general objection to the timeframe for the disputed Requests for Production was improper and thus provided no basis for limiting Plaintiffs' responses.

Third, providing content-moderation materials from little more than three years before Plaintiffs initially filed suit does not unduly burden Plaintiffs. *See McCloud v. Fortune*, No. 4:05-cv-101, 2005 WL 8162758, at *1-2 (N.D. Fla. June 3, 2005) (rejecting burdensomeness argument for "investigatory or case files created in the five years preceding the events alleged in the complaint"). Plaintiffs have *already* provided some information regarding certain members dating back to 2013 (Pinterest), October 2017 (Meta), and July 2019 (X). Pls.' Resp. to Interrogatories at 46-48. Information from 2018 to May 20, 2021, is not mere historical information. The Supreme Court has tasked this Court to consider *all* of the law's "applications, and weigh the unconstitutional as against the constitutional ones." *Moody*, 603 U.S. at 726 (majority). How the law would apply to the content-moderation practices of Plaintiffs' members a week before they filed suit or during the immediately preceding presidential and statewide executive elections is surely relevant and proportional to that inquiry.

Accordingly, Defendants request that the Court order Plaintiffs to supplement their responses to Interrogatory No. 6 and Requests for Production Nos. 11, 12, 13, 14, and 15 to include materials from January 1, 2018, to the present, which would include materials from the time of the 2018 election of statewide executive officers and the 2020 presidential election. If the Court views such a time period as too burdensome, then Defendants alternatively request that the Court order Plaintiffs to

supplement their responses to those discovery requests to include materials from

January 1, 2020, to the present.

## CONCLUSION

The Court should grant Defendants' motion to compel.


Dated: March 31, 2025                        Respectfully submitted,

                                             JAMES UTHMEIER
                                               *Attorney General of Florida*

                                             */s/ Kevin A. Golembiewski*
                                             JEFFREY P. DESOUSA
                                               *Acting Solicitor General*
                                             DAVID M. COSTELLO
CHARLES J. COOPER                              *Chief Deputy Solicitor General*
DAVID H. THOMPSON                            KEVIN A. GOLEMBIEWSKI
BRIAN W. BARNES                                *Senior Deputy Solicitor General*
COOPER & KIRK, PLLC                          DARRICK W. MONSON
1523 New Hampshire Ave., N.W.                  *Assistant Solicitor General*
Washington, DC 20036                         WILLIAM H. STAFFORD III
                                               *Special Counsel*
                                             Office of the Attorney General
                                             The Capitol, PL-01
                                             Tallahassee, Florida 32399
                                             (850) 414-3300

                                             *Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

This motion complies with Local Rule 7.1(B) because Defendants' counsel attempted in good faith to resolve the discovery disputes through meaningful conferences with attorneys for the adverse parties. The conferences were conducted via videoconference on January 24, 2025, and January 28, 2025. The parties were unable to resolve their disputes during those conferences or via subsequent written communications.

*/s/ Kevin A. Golembiewski*
Counsel for Defendants

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

This motion and memorandum comply with Local Rule 7.1(F) because they have a total of 7,926 words.

*/s/ Kevin A. Golembiewski*
Counsel for Defendants

## CERTIFICATE OF SERVICE

I certify that on this 31st day of March, 2025, this motion, memorandum of law, and the attached exhibits were served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

*/s/ Kevin A. Golembiewski*
Counsel for Defendants