### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

NETCHOICE, LLC et al.,

      Plaintiffs,

v.                       CASE NO. 4:21cv220-RH-MAF

JAMES UTHMEIER et al.,

      Defendants.

_____/

### ORDER DENYING THE MOTIONS TO
### DISMISS AND TO COMPEL DISCOVERY

The State of Florida has adopted legislation that imposes sweeping requirements on "social media platforms." Now pending are two motions that are impacted by the meaning of that term—by whether the term applies to providers of social media as that term is commonly understood or more broadly to all manner of internet services. This order addresses this statutory-construction issue, denies the defendants' motion to dismiss for lack of standing and failure to state a claim on which relief can be granted, and denies without prejudice the defendants' motion to compel discovery.

## I. Background

The plaintiffs are NetChoice, LLC and Computer & Communications Industry Association. Both are trade associations whose members include some that are, and some they say are not, subject to the legislation at issue. The defendants are the Attorney General of Florida and the members of the Florida Elections Commission, all in their official capacities. The defendants have a role in enforcement of the provisions at issue and are proper defendants under *Ex parte Young*, 209 U.S. 123 (1908).

The plaintiffs challenge parts of Senate Bill 7072 as adopted by the 2021 Florida Legislature. The legislation created three new Florida statutes: § 106.072, § 287.137, and § 501.2041. The legislation also included findings and a severability clause. The statutes were scheduled to take effect on July 1, 2021, but a preliminary injunction in this case blocked implementation of §§ 106.072 and 501.2041. *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082 (N.D. Fla. 2021). The Eleventh Circuit affirmed in part and vacated and remanded in part. *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196 (11th Cir. 2022). The Supreme Court vacated the Eleventh Circuit decision and remanded. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). The Eleventh Circuit in turn remanded the action to this court. *See* ECF No. 149.

Back in this court, the plaintiffs filed an amended complaint challenging Florida Statutes § 106.072(2), § 501.2041(2)(a), (b), (c), (d), (e), (f), (g), (h), and (j), and § 501.204(3). The amended complaint asserts an as-applied First Amendment claim (count 1), a facial First Amendment claim (count 2), a vagueness claim under the First, Fifth, and Fourteenth Amendments (count 3), and a preemption claim based on the Supremacy Clause and 47 U.S.C. § 230(c) (count 4). The as-applied claim is explicitly limited to "websites operated by NetChoice and CCIA members when those websites curate and disseminate collections of third-party speech posted on their services." Am. Compl., ECF No. 171 at 29 ¶ 55.

The defendants have moved to dismiss. They contend the amended complaint is a shotgun pleading, that the plaintiffs lack standing to assert some of the claims, and that, in some respects, the amended complaint fails to state a claim on which relief can be granted. The defendants have also moved to compel discovery, asserting the plaintiffs' responses to specific discovery requests are insufficient. The motions have been fully briefed and orally argued. The motions are ripe for a decision.

## II. Shotgun pleading

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." The defendants say the amended complaint is a "shotgun pleading," but it is not. *See*

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1324 (11th Cir. 2015).
The amended complaint sets out with commendable clarity what the plaintiffs
claim and why. Whatever else one might say about the status of this litigation, the
battle lines are drawn.

### III. The meaning of "social media platform" as used in the statutes

#### A. Terminology

At the outset, a word is in order about terminology. This order uses the term
"traditional social-media provider" to refer to what most people would probably
understand that term to mean—so Facebook, Instagram, YouTube, X, and dozens
of smaller but similar providers. The distinguishing characteristic is perhaps this:
the primary function of a traditional social-media provider, or at least *a* primary
function, is to receive content from users and in turn to make the content available
to other users, usually allowing those other users to respond. *See, e.g.*, *Moody v.
NetChoice*, 603 U.S. at 719. This is hardly a precise definition, but none is needed;
the term is used only for purposes of this order. The term "traditional social-media
provider," as used in this order, is intentionally *not* a description of the providers
who are covered by the challenged statutes.

The challenged statutes, in contrast, use a different term, "social media
platform." *See* Fla. Stat. § 501.2041(1)(g). Regardless of which side is correct
about the proper construction of that term's statutory definition, it is clear that not

all traditional social-media platforms are covered; to be covered, an entity must meet minimum revenue or participant requirements. *See id.* § 501.2041(1)(g)4. There is no significance to this order's use of "provider" instead of "platform." It is just an effort to further distinguish two different sets of entities: traditional social-media providers, on the one hand, and the social media platforms covered by the statute, on the other hand.

### B. The statutory definition

The statutes impose requirements on any "social media platform." This is a defined term:

> "Social media platform" means any information service, system, Internet search engine, or access software provider that:
>
> 1. Provides or enables computer access by multiple users to a computer server, including an Internet platform or a social media site;
>
> 2. Operates as a sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity;
>
> 3. Does business in the state; and
>
> 4. Satisfies at least one of the following thresholds:
>
> a. Has annual gross revenues in excess of $100 million, as adjusted in January of each odd-numbered year to reflect any increase in the Consumer Price Index.
>
> b. Has at least 100 million monthly individual platform participants globally.

Fla. Stat. § 501.2041(1)(g).

### C. *Statutory construction*

In Florida, as elsewhere, statutory construction starts with the statutory text. *See, e.g.*, *DeSantis v. Dream Defenders*, 389 So. 3d 413, 418 (Fla. 2024) (citing *Alachua Cnty. v. Watson*, 333 So. 3d 162, 169 (Fla. 2022)). Here the text of the "social media platform" definition is broad. On any fair reading, almost any facility or application allowing multiple users to communicate with a given entity over the internet is an "information service." This extends well beyond traditional social-media providers. The text of the definition limits this only in subparagraphs 2, 3, and 4, but those subparagraphs include nothing that would limit the definition to traditional social-media providers.

This does not, however, end the inquiry. Context matters, too. *See, e.g.*, *Dream Defenders*, 398 So. 3d at 418–19 ("To determine [statutory text's] best reading, we exhaust all the textual and structural clues that inform its meaning.") (internal citations and quotation marks omitted); *see also Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022) (stating that in interpreting statutes courts should consider the statutory context and any canons of construction that may shed light on the interpretive issues).

Here the primary targets of the statutes' substantive provisions are traditional social-media providers. Many of the provisions make sense only when applied in that context. And the formally adopted legislative findings also focus on social

media. *See* Fla. SB 7072, § 1 (2021). In addition, other things being equal, a definition usually should be construed consistently with the ordinary meaning of the defined term. *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 228 (2012); *see also Bond v. United States*, 572 U.S. 844, 861–62 ("In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition."). The defined term "social media platform" would commonly be understood to refer to traditional social-media providers, not the broader array of entities that the language of the statutory definition encompasses when viewed in isolation.

So there is something to be said on each side of this critical statutory-construction issue. On balance, the text of the statutory definition carries the day, resolving the dispute in the defendants' favor. And the clincher is the source of that text.

Beyond any question, the statutory text derived from a preexisting federal statute, 47 U.S.C. § 230, which was enacted "to promote the continued development of the Internet and other interactive computer services and other interactive media." *Id*. § 230(b)(1). The statute defines "interactive computer services" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server,

including specifically a service or system that provides access to the Internet." *Id*.

§ 230(f)(2). The statute defines "access software provider" broadly. *See id*.

§ 230(f)(4).

The breadth of the § 230(f)(2) definition is clear: it extends to any system that allows multiple users access to or over the internet. An apparently unbroken line of decisions, starting long before SB 7072 was adopted, supports this view. *See, e.g.*, *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *2 (11th Cir. June 12, 2023) (holding Amazon is an "interactive computer service"); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (noting that, as was uncontested, Google is an "interactive computer service"); *Chi. Laws.' Comm. for Civ. Rts. Under L., Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008) (treating Craigslist as an "interactive computer service" without discussion); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 419 (1st Cir. 2007) (holding a finance message-board website host was an "interactive computer service"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (holding a commercial internet dating-service website was an "interactive computer service").

The similarity of the § 230(f)(2) language to the Florida definition of "social media platform" is not coincidental. The drafting process that led to the initial versions of this bill in the Florida Senate, SB 7072, and the House of Representatives, HB 7013, plainly started with the federal definition—or with

something derived from it—and marked it up. The markup did nothing to narrow the definition in any relevant respect. Quite the contrary. The drafters added "search engine" to the terms "information service, system, or access software provider," and otherwise left those terms alone. A traditional social-media provider would not typically be called a search engine, so the drafters' addition of that term indicates the definition was intended to apply more broadly than just to traditional social-media providers.

The drafters also changed the language "including specifically a service or system that provides access to the Internet," as used in the federal statute, to "including an Internet platform or a social media site." The likely explanation is this: the drafters wished to make doubly clear that a "social media site" was included—as both sides agree it is—and otherwise thought "a service or system that provides access to the Internet" could be shortened to "Internet platform" without changing the meaning. That seems right. A system that provides "access to the Internet," and so is explicitly covered by the federal definition, could just as readily be called an "Internet platform," and so be explicitly covered by the state definition.

The progress of the legislation through the Florida Legislature confirms the breadth of the definition. At a Senate hearing, the sponsor of the bill proposed what he called a "technical" amendment intended to "clarify the intent of the bill," but

he also said the amendment would "narrow" the bill so that it would "only apply to platforms that operate as public forums" and would not "capture every entity that does business on the Internet." *See* Fla. S. Comm. on Gvmt. Oversight & Accountability, recording of hearing 28:40–29:15 (Fla. April 6, 2021), available at https://thefloridachannel.org/videos/4-6-21-senate-committee-on-governmental-oversight-and-accountability/. The intent, he said, was for the bill to apply to social-media companies. *Id.* at 29:03. Under the amended definition, a "social media platform" would have been "any technology platform or access software provider that does business in the state and provides or enables computer access by multiple users in a public digital forum for the primary purpose of connecting with other users and creating and sharing user generated content over the Internet," so long as it met the same size requirements included in the original bill. Fla. S. Comm. on Gvmt. Oversight & Accountability, Amendment No. 82884 to SB 7072 (Fla. Apr. 6, 2021), available at https://www.flsenate.gov/Session/Bill/2021/7072/Amendment/828884/PDF.

Had the amendment been accepted by the House, the coverage of the legislation would be substantially narrower. But the House did not accept the amendment, and the enacted bill retained the broader definition derived from § 230(f)(2). *See* Fla. H.R., Amendment No. 942955 to SB 7072 (Fla. Apr. 26, 2021), available at

https://www.flsenate.gov/Session/Bill/2021/7072/Amendment/942955/PDF; *see
also* Fla. S. Comm. on Gvmt. Oversight & Accountability, House Message
Summary on House Amendment 942955 to SB 7072 (Fla. Apr. 28, 2021),
available at
https://www.flsenate.gov/Session/Bill/2021/7072/Analyses/2021s07072.hms.PDF.

One could perhaps draw competing inferences: that the Senate sponsor was
right that the intent was to reach only traditional social-media providers, and the
amendment failed because others thought it unnecessary or just didn't engage with
the issue; or that the adopted definition was broader and the amendment that would
have narrowed it failed to pass, confirming the Legislature's choice of the broader
definition.

The controlling definition is of course the definition that was enacted into
law, not the description the Senate sponsor provided in support of a proposed
amendment that failed. The inescapable fact is that the adopted language derived
from § 230(f)(2). When context and all appropriate considerations are factored in,
the adopted definition still means what it says.

In sum, both § 230(f)(2) and Florida Statutes § 501.2041(1)(g) apply not just
to traditional social-media providers but also to a wide variety of other applications
that provide multiple users access to or over the internet.

## IV. Associational standing

Associational standing is governed by a three-prong test. An association has standing to sue on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right;" (2) "the interests it seeks to protect are germane to the organization's purpose;" and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The defendants assert the plaintiffs' First Amendment claims fail prong (1) and their § 230 claim fails prongs (1) and (3).

### A. Participation of individual members

The defendants assert the plaintiffs' claims require participation of individual members because of the factual issues that inhere in the claims— especially the facial First Amendment claim, which, as the Supreme Court has made clear, requires a comparison of a provision's unconstitutional applications to the provision's plainly legitimate sweep. *See Moody v. NetChoice*, 603 U.S. at 723–26.

That some member participation will be required does not defeat standing. In *Hospital Council of Western Pennsylvania v. City of Pittsburgh*, 949 F.2d 83 (3d Cir. 1991), the court, speaking through Judge (now Justice) Alito, traced *Hunt*'s

member-participation provision back to *Warth v. Seldin*, 422 U.S. 490 (1975).

*Hospital Council* quoted this statement from *Warth*, 422 U.S. at 511:

> [S]o long as the nature of the claim and of the relief sought does not make the individual participation of *each injured party indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction.

*Hosp. Council*, 949 F.2d 89 (emphasis by the court in *Hospital Council*). The court added: "[t]he Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members." *Id.*; *see also S. River Watershed All. v. Dekalb Cnty.*, 69 F.4th 809, 820 (11th Cir. 2023). The case at bar presents just such a request by associations for declaratory and injunctive relief.

In *every* associational standing case, some understanding of member circumstances is essential, if only to confirm that at least one member would have standing in its own right. The case at bar will surely involve more analysis of member circumstances than some, but there is no reason to believe, at least at this time, that the litigation will require member "participation"—that is, excessive member involvement—within the meaning of *Hunt*. It cannot be said that participation of *each* member is *indispensable*.

Indeed, in one respect the breadth of the issues on the facial First Amendment challenge cuts just the other way. The explanation of this has three

parts. First, in *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555–56 (1996), the Supreme Court explained the purpose of *Hunt*'s third prong—the member-participation prong. Second, in *UAW v. Brock*, 477 U.S. 274, 289 (1986), the Court noted associations often have more, not less, ability to marshal the facts and provide needed expertise. Third, in opposing standing here, the defendants either misunderstand what a member would have to prove in its own case or the defendants assert, in effect, that the Supreme Court was wrong in *UAW* when it noted that associations sometimes have superior litigating capability.

So the explanation starts with *United Food*. There the Court said *Hunt*'s third prong is not constitutionally mandated but instead prudential; Congress can change it. *United Food*, 517 U.S. at 555–56. In cases that meet *Hunt*'s first two prongs, a representative ordinarily can litigate its members' claims with the required "adversarial vigor." *Id*. at 556. The third prong is "best seen as focusing on . . . matters of administrative convenience and efficiency"—promoting "adversarial intensity," which is present here in spades, and "guard[ing] against the hazard of litigating a case to the damages stage only to find the plaintiff lacking detailed records or the evidence necessary to show the harm with sufficient specificity," a risk not present here because there is no claim for damages. *Id*. at 556–57.

In *UAW*, the Court said an "association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital." *UAW*, 477 U.S. at 289. The Court added: "Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." *Id*. (internal citation omitted).

That brings us to the defendants' misunderstanding of what a member would have to prove in its own case or the defendants' disagreement with the Supreme Court's analysis in *UAW*. In attacking associational standing, the defendants emphasize the requirement to compare the challenged provisions' unconstitutional applications to their plainly legitimate sweep—the comparison the Supreme Court put at the forefront of the facial First Amendment analysis. This, the defendants say, requires participation of the associations' members. But the comparison involves not just the affected members of the plaintiff associations but all the affected entities, whether or not they are members of the associations. And the comparison would be required even if the challenge was brought not by an association but by an individual member of the association or any other individual social media platform.

If, for example, a single platform brought a facial First Amendment challenge to a provision affecting that platform, the court still would be required to compare the unconstitutional applications of the provision to its plainly legitimate

sweep. If a single affected platform brought the case, it would make no sense to say the platform lacked standing. For such a claim, however, an association might be better able, not less, to marshal the facts about multiple providers and provide the expertise needed for proper analysis of the facial challenge. This is both self-evident and consistent with what the Supreme Court said in *UAW*. That the facial challenge in this case will involve facts about many entities will present no greater difficulty than would a similar facial challenge brought by a single regulated entity. The defendants do not deny—and could not plausibly deny—that the plaintiffs can be counted on to litigate this case with the required adversarial vigor.

In any event, Eleventh Circuit caselaw supports standing here. In *Borrero v. United Healthcare of New York, Inc.*, 610 F.3d 1296 (11th Cir. 2010), the plaintiffs included associations whose members were healthcare providers. They claimed an insurer failed to pay the amounts due under the providers' various subscriber agreements. Even though the providers had their own contracts, the Eleventh Circuit rejected the defendants' assertion that their individual participation in the action was required.

Among the authorities relied on in *Borrero* was *Pennsylvania Psychiatric Society v. Green Spring Health Services., Inc.*, 280 F.3d 278 (3d Cir. 2002). *Pennsylvania Psychiatric* in turn relied heavily on *Hospital Council*. This does not

make *Hospital Council* the law of the Eleventh Circuit, but there is no reason to
believe the law of the Eleventh Circuit is any different.

*Borrero*'s reliance on *Pennsylvania Psychiatric* is significant in another
respect as well. Citing *Pennsylvania Psychiatric*, *Borrero* said this: "[S]hould the
actual litigation of the medical associations' claims involve excessive individual
participation, the district court retains discretion to consider the associations'
standing at that later time. But, at the pleadings stage, we think dismissal is
premature." *Id.* at 1306 n.3. The same is true here. *See also* 13A C. Wright, A.
Miller, & E. Cooper, *Federal Practice and Procedure* § 3531.9.5 (3d ed., Supp.
2023) ("Organization standing may be recognized tentatively if the complaint
advances theories that do not seem to require individual participation, even as it is
recognized that subsequent development of the action for trial may show that
organization standing should be rejected.").

Other Eleventh Circuit cases, too, support associational standing here.

Thus, for example, in *Moms for Liberty - Brevard County v. Brevard Public
Schools*, 118 F.4th 1324 (11th Cir. 2024), the Eleventh Circuit upheld associational
standing to pursue both facial and as-applied First Amendment claims, labeling the
defendants' standing defense "borderline frivolous." *Id.* at 1330. To be sure, there
are differences between that case and this one. There the association wasn't the
only plaintiff; some of its members joined the suit. There the defendants apparently

rested their standing defense only on lack of injury, not the need for member participation, and the scope of the factual issues was different. Still, the Eleventh Circuit's ringing endorsement of associational standing in that First Amendment case is consistent with the view that the plaintiffs have standing here. And the decision is flatly inconsistent with any assertion that an association never has standing to pursue an as-applied First Amendment claim on behalf of its members.

Other decisions supporting associational standing here include *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), which upheld associational standing to bring a First Amendment challenge without parsing whether it was facial or as-applied, and *National Rifle Association v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) (en banc), which adjudicated an association's Second Amendment as-applied claim on the merits without questioning standing. Decisions of other circuits rejecting arguments like the defendants' here include *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599–603 (7th Cir. 1993), and *Playboy Enterprises v. Public Service Commission of Puerto Rico*, 906 F.2d 25, 34–36 (1st Cir. 1990).

In support of their contrary view, the defendants emphasize three decisions that said individual participation was required, but none carries the day.

First, in *Harris v. McRae*, 448 U.S. 297, 321 (1980), the Supreme Court held an organization lacked standing to pursue its members' Free Exercise Clause

challenge to part of the Hyde Amendment—the statute prohibiting expenditure of federal funds on abortions. The Court said individual participation of members was required because a Free Exercise claim requires a showing of the coercive effect of the challenged provision on an individual's religious practice.

This was consistent with the statement in *Hospital Council* that the need for individual participation defeats standing only when "*each injured party*" is "*indispensable.*" *Hosp. Council*, 949 F.2d at 89. In any event, that the ruling in *Harris* was limited to the unique nature of a Free Exercise claim is confirmed by the Court's simultaneous adjudication on the merits of the organization's other claims—its claims under the Establishment, Due Process, and Equal Protection Clauses.

Moreover, while it probably seemed unlikely there that any individual member of the association felt *compelled by her religion* to have an abortion, the same is not true here, where the coercive effect of the challenged provisions, with their unyielding mandates and extraordinary sanctions, could not be more clear.

Second, in *Georgia Cemetery Association v. Cox*, 353 F.3d 1319 (11th Cir. 2003), an association representing for-profit cemetery providers asserted facial Equal Protection and Takings Clause challenges to a state statute that regulated the industry but provided exemptions for cemeteries operated by governments, churches, and some others. One provision—apparently the only target of the

Takings Clause claim—imposed a $50 cap on the price a cemetery could charge to site a monument or transfer burial rights. The district court granted summary judgment for the defendant on the merits of the Equal Protection claim and dismissed the Takings Clause claim for lack of standing.

The Eleventh Circuit upheld the rejection of the Equal Protection claim on the merits. On the Takings Clause claim, the court said the proper analysis would be the same—and the claim would fail—"[w]hether viewed as a standing argument or a merits argument." *Id.* at 1322. The court noted that members who did not charge more than $50 for siting or transfers were unaffected. The court's cryptic discussion said that "either standing or a successful facial challenge" required participation of members to show whether they were impacted. *Id*. The defendants' suggestion that this means an association always lacks standing when only some of its members will be affected by a challenged provision and the court will have to figure out which ones is flatly inconsistent with the Supreme Court's decision in *UAW*.

*Georgia Cemetery* provided, at most, an alternative holding that the association lacked standing to assert a *facial* challenge under the *Takings Clause*— a constitutional provision that, when applied to regulation of a business rather than a physical taking, turns on the economic impact of the regulation on a specific

party. *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. 383, 392–93 (2017) (discussing the Court's Takings Clause jurisprudence as it relates to regulatory burdens).

That *Georgia Cemetery* does not apply beyond the Takings Clause context is confirmed by the court's simultaneous adjudication of the association's Equal Protection claim on the merits. And any assertion that the decision precludes an association from pursuing a facial First Amendment challenge, let alone an as-applied First Amendment challenge, is inconsistent with *Moms for Liberty*. One need not have individual participation by members to know that requiring a traditional social-media provider to publish content it does not wish to publish or prohibiting a traditional social-media provider from adding comments to posts to convey information it chooses to convey runs afoul of the First Amendment. The plaintiff associations plainly have standing to pursue those claims, and while standing is not distributed in gross, the associations also have standing to pursue their First Amendment claims to each of the other challenged provisions.

Third, the defendants rely on *Free Speech Coalition, Inc. v. Attorney General*, 974 F.3d 408 (3d Cir. 2020). There two associations and ten of their members asserted as-applied First Amendment challenges to federal statutes imposing age-verification, recordkeeping, and labeling requirements on participants in the pornography industry. The court said the requirement for narrow tailoring of such requirements presented a fact-intensive individual inquiry making

member participation necessary, thus defeating associational standing. In the case at bar, in contrast, the plaintiff associations' claims may be resolved on other grounds before reaching any narrow-tailoring issue. And if the defendants assert *Free Speech Coalition* suggests an association never has standing to assert an as-applied First Amendment claim, *Moms for Liberty* establishes that the law of the Eleventh Circuit, as opposed to the Third, is to the contrary.

Finally, the defendants say this: "As this Court has pointed out, member participation is required except 'where individualized proof is unnecessary, the plaintiff seeks no money damages, and the question presented is purely legal.' *Council of Ins. Agents & Brokers v. Gallagher*, 287 F. Supp. 2d 1302, 1308 n.3 (N.D. Fla. 2003) (Hinkle, J.)." Defs.' Mot. to Dismiss, ECF No. 173 at 17. This is not what the opinion in that case said—the quotation is accurate, but "except" is not. The opinion held the association that brought that case had standing—that an association has standing when individualized proof is unnecessary, the plaintiff seeks no money damages, and the question presented is purely legal. The opinion did not say an association has standing only in those circumstances. When one says the Endangered Species Act protects the Florida panther, it does not mean the Act does not also protect the giant panda. So when an opinion says associational standing exists when the question presented is "purely legal" and other conditions are met, it does not mean associational standing cannot exist when the question

presented is not "purely legal" but instead includes a factual component. *Council of Insurance Agents & Brokers* casts no light on the issues in this case.

In sum, the member-participation prong of the test for associational standing does not defeat standing at this time.

### B. Imminent threat of prosecution

The first prong of the *Hunt* test provides that an association has standing to assert its members' rights only if a member would itself have standing. The defendants say the plaintiffs' members would lack standing to assert a § 230 claim in their own right because they do not face an imminent threat that the challenged provisions will be enforced in a way that contravenes § 230. Paradoxically, the defendants also cite a case in which a user is currently suing a member for allegedly violating a challenged provision. *See* Mot. to Dismiss, ECF No. 173 at 6 (citing *Perez-Poveda v. Google, LLC*, No. 3:24cv900-RJC (M.D. Fla. Aug. 30, 2024)).

The Eleventh Circuit has embraced the common-sense view that when a state has recently adopted a statute, it is reasonable to infer the state intends to enforce it. *See HM Florida-ORL, LLC v. Gov. of Fla.*, __ F.4th __, No. 23-12160, 2025 WL 1375363 at *4 (11th Cir. May 13, 2025). This view is particularly apt here. The circumstances make this clear, and the Governor's signing statement further confirms it. According to the amended complaint, the Governor said the

state took "action" to protect "real Floridians" from the "Silicon Valley elites." Am. Compl., ECF No. 171 at 21 ¶ 38. This hardly suggests the state intends to do nothing.

The defendants also note that Florida Statutes §§ 501.2041(9) and 106.072(5) say the Florida provisions cannot be enforced to the extent inconsistent with federal law and 47 U.S.C. § 230(e)(3). But this does not solve the problem. If the state correctly understood the First Amendment and § 230, some of the Florida provisions would not have been adopted at all.

Thus, for example, on the initial appeal to the Eleventh Circuit, the defendants did not even try to defend the statute's post-prioritization provisions. *See NetChoice v. Att'y Gen.*, 34 F.4th at 1206 n.3. And at oral argument on the current motion, the defendants repeatedly acknowledged that there are First Amendment problems with some of the provisions. *See* Hr'g Tr., ECF No. 206 at 4 ("[W]e acknowledge that there are significant First Amendment questions with respect to some applications of this statute."); *id*. at 8 ("And as I said at the beginning, we acknowledge that there are some First Amendment problems with some aspects of this law."); *id*. at 25 ("[A]gain, I acknowledge, Your Honor, there are some First Amendment issues that we will have to contend with in litigation where they are properly presented."). Even so, the state has done nothing to repeal or amend those provisions.

In sum, the plaintiffs have plausibly alleged an imminent threat that the state will attempt to enforce the challenged statutes in violation of the First Amendment and § 230. The assertion that the risk of enforcement is not sufficiently impending—that there is no reason to believe the state will attempt to enforce the provisions it recently enacted—ignores reality.

### C. Intra-association conflict

The defendants say the plaintiffs lack standing because the issues present conflicts of interest among the plaintiffs' own members, primarily regarding the proper construction of the statutory term "social media platform." The defendants say a broader definition would provide greater § 230 protection, a narrower definition less, and the defendants speculate that some of the plaintiffs' members would prefer greater § 230 protection.

There is a circuit split on whether an intra-association conflict defeats associational standing. *See Fla. Auto. Deals Ass'n, Inc. v. Ford Motor Co.*, No. 4:24cv282, 2024 WL 836384, at *2–3 (N.D. Fla. Jan. 25, 2024) (noting the conflict and citing cases on both sides). The Eleventh Circuit has not weighed in.

Here the alleged conflict is more theoretical than real. One might reasonably doubt that any of the plaintiffs' members—or anyone else—would really prefer to subject themselves to SB 7072's regulatory burdens and the risk of sanctions. The plaintiffs' members might well all prefer that the challenged statutes just go away.

Moreover, this order's construction of "social media platform" renders the issue moot, or nearly so, at least in this court. The alleged conflict does not defeat the plaintiffs' standing.

### D. The appellate treatment of this very case

This order would uphold the plaintiffs' standing, at least as of now, for the reasons set out above, even without considering the failure of the Eleventh Circuit and Supreme Court to question the plaintiffs' standing in this very case. But that failure is fully consistent with this result.

The Eleventh Circuit has insisted that it must consider standing on its own, even when a defendant has made the conscious, deliberate decision not to raise the issue in the district court. *See, e.g.*, *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). But in the initial appeal in this case, the Eleventh Circuit questioned the plaintiffs' standing not at all. To be sure, it was only later that the defendants discovered the standards governing facial challenges and their possible impact on standing. But the core merits issues remain, and the Eleventh Circuit apparently had no trouble recognizing the plaintiffs' standing to address those issues.

The Supreme Court, too, addressed the merits in substantial respects, explicitly providing guidance to the courts on remand, without questioning the plaintiffs' standing. The Court could not have overlooked the issue; it was raised in

a separate opinion. *See Moody v. NetChoice*, 603 U.S. at 760 n.2 (Thomas, J., concurring in the judgment). The defendants say the Court's failure to challenge standing was just a "drive-by" ruling that should be ignored. Perhaps so. But it was a drive-by ruling in this very case.

The appellate mandates did not limit this court's ability—indeed, its obligation—to address standing on remand. So the issue is open here. Still, it would be hard to fault a district court for addressing the merits of a case on remand precisely as directed by the Supreme Court.

The plaintiffs have standing.

## V. Failure to state a claim

The motion to dismiss apparently does not contend that the plaintiffs have failed to state a First Amendment claim on which relief can be granted. The Supreme Court and Eleventh Circuit opinions in the first round of appeals would have made any such contention untenable. The defendants do, however, contend the amended complaint fails to state a claim in other respects.

### A. Applicability of § 1983 to an association

The defendants note that 42 U.S.C. § 1983 provides a cause of action for the "party injured." The defendants say this means an association that is not itself injured cannot sue to protect the rights of its injured members.

Even aside from § 1983, relief from state action that contravenes federal law is available under longstanding equitable principles and *Ex parte Young*, 209 U.S. 123 (1908). *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."). Declaratory relief is also available. *See* 28 U.S.C. § 2201.

This makes it unnecessary to determine at this time whether § 1983 also applies in these circumstances. When a complaint states a claim on which relief can be granted—as this one does—a district court is not required, in response to a Federal Rule of Civil Procedure 12(b)(6) motion, to parse each of the complaint's allegations in search of errors, especially those that may never make a difference.

On the merits, the issue presents a circuit split. *Compare Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) ("It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have interpreted the rights § 1983 secures to be personal to those purportedly injured.") (cleaned up), *with Vote.Org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023) (holding an association could assert a claim under § 1983 and noting § 1983 plaintiffs "often have been allowed to vindicate the rights of

others"). Among the cases cited in *Vote.Org* were *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988), and *Craig v. Boren*, 429 U.S. 190 (1976).

The Eleventh Circuit, like the Supreme Court and Fifth Circuit, has allowed associations to assert their members' rights under § 1983. *See Moms for Liberty - Brevard Cnty. v. Brevard Pub. Schs.*, 118 F.4th 1324, 1330 (11th Cir. 2024) (holding an organization's § 1983 claim based on members' allegedly suppressed speech was not moot because § 1983 permits nominal damages); *Church of Scientology of Cal. v. Cazares*, 638 F.2d 1272 (5th Cir. 1981) (holding a church had standing to assert its members' rights in a § 1983 action), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989)*; see also Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1339 (N.D. Ga. 2023). *Church of Scientology* predated *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

The amended complaint cannot be dismissed on this basis.

### B.  Applicability of § 1983 to § 230

By its terms, § 1983 provides a cause of action for deprivation of "any rights, privileges, or immunities secured by the Constitution and laws." Beyond question, § 230 is a federal law that creates rights, and even more clearly immunities, for covered social media providers. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183–84 (2023) (addressing creation of

rights); *see also 31 Foster Children v. Bush*, 329 F.3d 1255, 1269–70 (11th Cir. 2003) (same). And § 230 would be enforceable in equity, even aside from § 1983, as set out above. *See also Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020) ("When a plaintiff challenges a state official's action on federal grounds, *Ex Parte Young* allows the plaintiff to seek prospective injunctive relief.").

The defendants note, though, that § 1983 does not provide a cause of action to enforce a statute when Congress has created a "comprehensive enforcement mechanis[m] for protection of" the federal right or immunity at issue. *Golden State Transit. Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989) (quoting *Smith v. Robinson*, 468 U.S. 992, 1005 n.9 (1984)). The defendants say § 230 creates just such a comprehensive enforcement mechanism—a defense to any prohibited lawsuit against the provider.

The defendants are of course correct that § 230 explicitly provides a defense to claims based on a provider's hosting of materials or curating decisions; the statute does not expressly create a cause of action. But that is not at all the kind of comprehensive enforcement mechanism that forecloses a § 1983 action. *See id*. at 107 (noting § 1983 applies unless the defendant carries the burden of showing a § 1983 action "would be inconsistent with Congress' carefully tailored scheme" and adding: "We do not lightly conclude that Congress intended to preclude

reliance on § 1983 as a remedy for the deprivation of a federally secured right.")
(cleaned up); *see also Talevski*, 599 U.S. at 184 (if a statutory provision secures
§ 1983-enforceable rights, "rights so secured are deemed 'presumptively
enforceable' under § 1983.") (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284
(2002)).

A hypothetical may help explain just how far the defendants' position strays
from the proper analysis. Suppose a state passed a statute saying a social-media
provider could be held liable for damages based on any defamatory material posted
on its site—precisely the result § 230 was enacted to prohibit—and that each
posting of defamatory material would result in a substantial fine levied against the
provider, regardless of whether the provider was even aware of the defamatory
material. Any assertion that a provider who hosted millions of postings each day
could not seek prospective relief under § 1983 or equitable principles would be, in
the language of *Moms for Liberty*, borderline frivolous. Or perhaps not just
borderline.

### C.  § 230 merits

Count four of the amended complaint alleges § 230 preempts specific parts,
not all, of Florida Statutes §§ 106.072 and § 501.2041. The claim is labeled neither
facial nor as-applied; it is simply a preemption claim.

The defendants treat count four as facial and assert it fails to state a claim on which relief can be granted. They base the assertion on the standard that ordinarily governs facial challenges not involving the First Amendment: "a plaintiff cannot succeed on a facial challenge unless he establishes that no set of circumstances exists under which the law would be valid, or he shows that the law lacks a plainly legitimate sweep." *Moody v. NetChoice*, 603 U.S. at 723 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987), and *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (cleaned up)). This principle is often identified with *Salerno*.

This is not, however, the proper analysis of a preemption claim, whether labeled facial or as-applied or, as here, not labeled as either. The proper analysis of a preemption claim is more nuanced.

The controlling law of the circuit is set out in *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231 (11th Cir. 2022). There the court squarely rejected the assertion that a defendant can prevail on a preemption claim simply by showing the challenged provision can sometimes be properly applied. *Id.* at 1256–57. *Salerno*, the court said, does not require that result. *See id.*

As *Madonna* recognizes, preemption can be express, conflict, or field. *Id.* at 1253. "Express preemption occurs when 'the text of a federal statute explicitly manifests Congress's intent to displace state law.' " *Id.* (quoting *United States v.*

*Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012)). "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law." *Id.* (quoting *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)). "Field preemption occurs when a congressional legislative scheme is so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it." *Id.*

*Madonna* said two considerations are critical to the analysis: first, Congress's purpose in enacting the law, and second, the assumption that the state's historic police powers are not to be superseded unless that was the clear and manifest purpose of Congress. *Id.* at 1253 (quoting *Alabama*, 691 F.3d at 1282). The analysis also requires examination of the federal statutory text, its regulatory framework, and legislative history if necessary. *Id*. at 1253–54. Because the state statute at issue there conflicted with Congress's purpose in enacting a federal statute, the state statute was preempted. This was so even though the state statute could sometimes be applied consistently with the federal statute. The no-set-of-circumstances standard did not dictate a different outcome. *See also Arizona v. United States*, 567 U.S. 387 (2012) (holding a state law preempted even though the state law sometimes aligned with federal law).

*Madonna* controls the analysis on the current motion to dismiss. Count four plausibly alleges both express and conflict preemption of the challenged provisions. The provisions are not invalid in all their applications; indeed, the Eleventh Circuit said some of the provisions likely do not violate § 230. But the statute challenged in *Madonna* also was not invalid in all its applications.

The motion to dismiss makes no effort to engage with *Madonna* or to apply its analysis. Instead, the defendants address *Madonna* in a footnote, asserting with little analysis that the decision is no longer good law. *See* Mot. to Dismiss, ECF No. 173 at 20 n.2. The assertion is wrong and runs afoul of the Eleventh Circuit's prior-panel rule. The rule binds later Eleventh Circuit panels and, just as clearly, district courts in the circuit. "Under that rule, a prior panel's holding is binding on all subsequent panels"—and on all district courts within the circuit—"unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by [the Eleventh Circuit] sitting en banc." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

No Supreme Court or Eleventh Circuit en banc decision—and not even any later Eleventh Circuit panel—has questioned the continuing vitality of *Madonna*. But the defendants say two later Supreme Court cases have undermined *Madonna*. Neither comes close to meeting the circuit's stringent standard for abrogation of a prior panel's decision.

First, the defendants cite *Moody v. NetChoice*, the Supreme Court's decision in this very case, as quoted above. But there the Court did not even mention preemption. The reason, as a separate opinion recognized, was that the issue was not before the Court. *See Moody v. NetChoice*, 603 U.S. at 772 n.8 (Alito, J., concurring in the judgment). *Moody v. NetChoice* says nothing about the proper analytical approach to a preemption issue or the interplay between that analysis and *Salerno*.

Second, the defendants cite *United States v. Rahimi*, 602 U.S. 680 (2024). There the Court rejected a defendant's Second Amendment challenge to his conviction for possessing a firearm while subject to a domestic-violence injunction. There was no preemption issue; the word is not even in the opinion. *Rahimi* says nothing about the proper analytical approach to a preemption issue.

In sum, *Madonna* is still the law of the circuit. In due course, count four will require a searching, provision-by-provision analysis. But in their motion to dismiss, the defendants have not undertaken that analysis, nor have the plaintiffs in their response. The motion to dismiss does not present any well-founded basis to dismiss count four for failure to state a claim.

### D. Vagueness

A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or is "so standardless that it

authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also HM Florida-ORL, LLC v. Gov. of Fla.*, __ F.4th __, No. 23-12160, 2025 WL 1375363, at *12–13 (11th Cir. May 13, 2025); *Keister v. Bell*, 29 F.4th 1239, 1258–59 (11th Cir. 2022). The amended complaint plausibly alleges some of the challenged provisions are unconstitutionally vague.

Thus, for example, Florida Statutes § 501.2041(2)(h) prohibits a social media platform from using post-prioritization algorithms for content "posted by or about a user" who is known by the platform to be a candidate for office. Florida Statutes § 501.2041(1)(e) defines post-prioritization as "action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results."

The statute does not define "about" a candidate. On its face, § 501.2041(2)(h) may suggest a post by or about a candidate must always go to the top of every other user's feed unless a person—not an algorithm—says otherwise. But even placing the post at the top meets the literal definition of post-prioritization, thus prohibiting that placement, too. And if the statute requires placement of all a candidate's posts at the top, a candidate would apparently have a statutory right to flood the zone, making it difficult or impossible for users to

receive their preferred content. The Legislature could not have intended this. But if the provision cannot or will not be applied literally, a social media platform is left with no way to determine what the provision really requires.

The defendants have not attempted to explain what these provisions really mean or how they would be applied. Nor have the defendants offered any theory under which a state can preclude this kind of curating without violating the First Amendment. *See NetChoice v. Att'y Gen.*, 34 F.4th at 1206 n.3 (noting the defendants chose not to defend the post-prioritization provisions on the appeal in this case). Count three adequately alleges that some of the statutory provisions are vague.

The defendants say, though, that a statute can be held unconstitutionally vague only if it is vague in all its applications. The Supreme Court has explicitly rejected that formulation. *See Johnson v. United States*, 576 U.S. 591, 602–03 (2015); *see also Henry v. Sheriff of Tuscaloosa Cnty.*, No. 24-10139, 2025 WL 1177671, at *44 (11th Cir. Apr. 23, 2025) (discussing *Johnson*'s rejection of the vague-in-all-applications test and stating: "As it explained, the 'supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its application (and never mind the reality).'") (quoting *Johnson*, 576 U.S. at 593–94).

In asserting the contrary, the defendants rely on *Stardust 3007, LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018). There the court addressed a city ordinance and first held it did not violate the plaintiff's First Amendment rights. The court then addressed vagueness without any First Amendment overlay. The court rejected the vagueness claim because the ordinance clearly applied to the plaintiff; in that respect the ordinance was not vague at all. That makes the case different from the case at bar, in which, at least for purposes of the motion to dismiss, the challenged provisions *do* implicate the plaintiffs' members' First Amendment rights and *are* vague in their application to the members.

In dictum, *Stardust* cited an older Supreme Court decision and repeated the no-set-of-circumstances formula that *Johnson* squarely rejected. That dictum, sandwiched between the Supreme Court's decision in *Johnson* and the Eleventh Circuit's discussion in *Henry*, does not revive the no-set-of-circumstances formula that *Johnson* rejected. Dictum "is not binding on anyone for any purpose." *United States v. Garcia*, 405 F.3d 1260, 1274 (11th Cir. 2005) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring)).

The amended complaint states a vagueness claim on which relief can be granted.

### E. Scope of injunctive relief

The defendants correctly note that injunctive relief must be tailored to the violation at issue. If the plaintiffs prevail, that will be done. This is not, however, a basis for dismissal of the amended complaint.

## VI. Motion to compel discovery

The defendants propounded interrogatories and production requests, including some that were burdensome, even if relevant. The plaintiffs answered some of the interrogatories and produced some of the requested documents but stood on objections to others. The defendants have moved to compel. The motion lists five categories of discovery requests in dispute, but three are moot because the plaintiffs say—and the defendants do not now contest—that for those three categories, the plaintiffs have answered interrogatories to the extent of their knowledge and produced all documents within their custody or control.

The first remaining area of dispute involves detailed requests about the plaintiffs' many individual members. The plaintiffs provided discovery for members covered under the plaintiffs' now-rejected definition of "social media platform"—the only members for whom the plaintiffs seek relief on their as-applied claims. The plaintiffs did not provide discovery for other members who, under the definition of that term adopted by this order, are also covered. This order

refers to those members—the ones this order holds are covered but the plaintiffs said were not—as "other covered members."

Evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Information about covered members, including other covered members, is relevant. Information about members who are not covered even under the definition adopted by this order, if there are any, is not relevant, absent other circumstances. At oral argument, the defendants apparently acknowledged this.

That evidence is relevant does not necessarily mean it is within the scope of discovery. Under Federal Rule of Civil Procedure 26(b)(1), the scope of discovery, unless further limited by court order, is this:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Some of the listed considerations support broad discovery in this case. The stakes are high, the amount in controversy is substantial, the constitutional and public-policy implications are even more substantial, and both sides have abundant resources.

Even so, the detailed information the defendants seek about other covered members will almost surely make no difference in resolving the issues. The information will have little or no bearing on the plaintiffs' as-applied claims; indeed, the information may not even be relevant to those claims. The information is relevant to the facial claims because it may bear on the required comparison of the unconstitutional application of the challenged provisions, on the one hand, to the provisions' plainly legitimate sweep, on the other hand. *See Moody v. NetChoice*, 603 U.S. at 723–26. But it is already overwhelmingly likely that the facial claims will not survive that comparison. Given the proper construction of "social media platform" as set out in this order, it is clear that the provisions have a plainly legitimate sweep.

Consider, for example, the prohibition on ending a candidate's access to a social-media platform. Telling a traditional social media provider it must publish content it does not wish to publish ordinarily violates the First Amendment, as *Moody v. NetChoice* makes clear. But surely a state can prohibit taking down a candidate's access to the internet—closing the candidate's account with an internet service provider—on the eve of an election, at least without a legitimate basis for doing so. A legitimate basis for doing so might include failure to pay for the service or introduction of malware but probably not political opposition to the candidate. Similarly, it seems likely that a state can prohibit an email or text

provider who consistently transmits messages without curation from attaching the provider's own unfavorable comments to a candidate's messages in the run-up to an election. Obtaining detailed information from the ISP or email provider—anything more than a basic description of the service—is unlikely to affect this analysis.

It bears noting, too, that the plaintiffs have the burden of proof on the comparison between the challenged provisions' unconstitutional applications and their plainly legitimate sweep. If the plaintiffs fail to marshal the facts or resist discovery of them, it will undermine the plaintiffs' position on both standing and the merits. The defendants have little to fear from the plaintiffs' opposition to the discovery at issue.

The Supreme Court's discussion of the plaintiffs' facial claims and the breadth of the inquiry those claims will require has understandably triggered every good litigator's best, or perhaps worst, instinct: to turn over every rock, to catalog every fact, to explore every nuance. But this litigation need not be nearly that complicated. Some of these challenged provisions, as applied to some of the plaintiffs' members, are almost surely unconstitutional; at oral argument, the defendants came close to acknowledging this. With "social media platform" now properly construed and the required facial-challenge methodology now settled by the Supreme Court, the plaintiffs' facial challenge to SB 7072, and perhaps even to

its various provisions viewed in isolation, is likely to fail—and the disputed

discovery, if allowed, would almost surely make no difference. Discovery that

imposes a significant burden and is almost sure to make no difference is ordinarily

beyond the properly defined scope of discovery; it fails the proportionality test. If,

as the litigation progresses, it turns out this is incorrect—if it turns out the facial

challenge is more substantial than this order suggests and that additional discovery

might enhance the defendants' ability to fully present their position—the discovery

issue can be revisited.

As of now, the disputed discovery seems unlikely to make a difference. This

order thus denies the motion to compel without prejudice.

## VII.   Conclusion

For these reasons,

IT IS ORDERED:

1. The motion to dismiss, ECF No. 173, is denied.

2. The motion to compel discovery, ECF No. 191, is denied.

SO ORDERED on May 22, 2025.

s/Robert L. Hinkle_____
United States District Judge
