**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

NETCHOICE, LLC; and COMPUTER
& COMMUNICATIONS INDUSTRY
ASSOCIATION,

    *Plaintiffs*,

v.

JAMES UTHMEIER, et al.,

    *Defendants*.

Case No. 4:21-cv-0220-RH-MAF

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**AMENDED MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 3

    A.    Content Moderation by Member Websites ......................................... 3

    B.    Florida's Effort to Regulate Websites' Editorial Judgments ............... 9

    C.    Procedural History............................................................................ 11

ARGUMENT .................................................................................................. 14

I.     S.B.7072 Is Unconstitutional As Applied To Plaintiffs' Members When They Curate And Disseminate Third-Party Speech Posted On Their Services ...................................................................................... 14

    A.    The First Amendment Protects Plaintiffs' Members' Curation and Dissemination of Third-Party Speech Posted on Their Services.......................................................................................... 14

    B.    Each of the Challenged Provisions Burdens Members' Curation, Recommendation, and Dissemination of Speech............... 22

    C.    Each of the Challenged Provisions Triggers Strict Scrutiny. ............ 29

    D.    None of the Challenged Provisions Can Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny .............................. 32

    E.    *Zauderer* Does Not Apply, But Even If It Did, the Detailed-Explanation Provision Fails *Zauderer* Scrutiny Too ........................ 35

II.    Many Of The Challenged Provisions Are Unconstitutional On Their Face........................................................................................................ 39

III.   S.B.7072 Is Unconstitutionally Vague ....................................................... 53

CONCLUSION ............................................................................................... 55

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)................................................................................45

*Baggett v. Bullitt*,
377 U.S. 360 (1964)...............................................................................53

*Castronuova v. Meta Platforms, Inc.*,
2025 WL 1914860 (N.D. Cal. June 10, 2025)................................................51

*Chamber of Com. v. Lierman*,
151 F.4th 530 (4th Cir. 2025) ................................................................40, 41, 44

*Children's Health Def. v. Meta Platforms, Inc.*,
112 F.4th 742 (9th Cir. 2024) ...................................................................51

*City of Austin v. Reagan Nat'l Advert. of Austin*,
596 U.S. 61 (2022)...............................................................................31

*FCC v. Fox Television Stations*,
567 U.S. 239 (2012)...............................................................................53

*Frazier ex rel. Frazier v. Winn*,
535 F.3d 1279 (11th Cir. 2008) ...............................................................41, 52

*Hopson v. Google, LLC*,
2023 WL 2733665 (W.D. Wis. Mar. 31, 2023) ....................................44, 46

*Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995).........................................................................30, 35, 36

*In re R.M.J.*,
455 U.S. 191 (1982)...........................................................................36, 37

*McCullen v. Coakley*,
573 U.S. 464 (2014)...............................................................................32

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)...........................................................................28, 39

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010).................................................................................36

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024).............................................................................*passim*

*Murphy v. Twitter*,
    60 Cal. App. 5th 12 (2021) ..................................................................51

*NAACP v. Button*,
    371 U.S. 415 (1963)..............................................................................53

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*,
    585 U.S. 755 (2018)...................................... 29, 35, 37, 38, 52, 53

*NetChoice LLC v. Att'y Gen.*,
    34 F.4th 1196 (11th Cir. 2022) ............................................*passim*

*NetChoice v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025)...........................................................14

*NetChoice v. Fitch*,
    134 F.4th 799 (5th Cir. 2025) ............................................................14

*NetChoice, LLC v. Moody*,
    546 F.Supp.3d 1082 (N.D. Fla. 2021) .................................*passim*

*Packingham v. North Carolina*,
    582 U.S. 98 (2017).................................................................................32

*PG&E v. Public Utilities Comm'n of California*,
    475 U.S. 1 (1986)..............................................................................31, 32

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..........................................................................30, 31

*Riley v. Nat'l Fed'n of the Blind of North Carolina*,
    487 U.S. 781 (1988)..........................................................................29, 35

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025).................................................................................32

iii

*Turner Broad. Sys., Inc. v. FCC*,
     512 U.S. 622 (1994)...........................................................................31

*United States v. Alvarez*,
     567 U.S. 709 (2012)...........................................................................48

*United States v. Hansen*,
     599 U.S. 762 (2023)......................................................................40, 44

*United States v. United Foods, Inc.*,
     533 U.S. 405 (2001)...........................................................................36

*United States v. Williams*,
     553 U.S. 285 (2008)...........................................................................53

*Wash. State Grange v. Wash. State Republican Party*,
     552 U.S. 442 (2008)...........................................................................50

*Wollschlaeger v. Governor*,
     848 F.3d 1293 (11th Cir. 2017) (en banc) .......................................41

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
     471 U.S. 626 (1985)...........................................................35, 36, 37, 38

*Zhang v. Baidu.com Inc.*,
     10 F.Supp.3d 433 (S.D.N.Y. 2014) ..................................................44

**Statutes**

47 U.S.C. §230 .......................................................................................11

S.B.7072 §1(5) ........................................................................................34

Fla. Stat.

     §106.072(2) .........................................................1, 2, 11, 25, 44, 55

     §501.2041(1)(b) ..............................................................10, 24, 45, 48

     §501.2041(1)(c) ...........................................................................10, 49

     §501.2041(1)(e) ................................................................10, 43, 48, 54

     §501.2041(1)(f)............................................................................10, 43

§501.2041(1)(g) ............................................................................................9

§501.2041(1)(h) ............................................................................................9

§501.2041(2)(a) ............................................................................................2

§501.2041(2)(b) ............................................... 1, 2, 10, 23, 31, 39, 50, 54, 55

§501.2041(2)(c) ................................................................................2, 11, 26, 55

§501.2041(2)(d) ..................................................... 2, 11, 28, 39, 52, 55, 56

§501.2041(2)(e) ............................................................................................2

§501.2041(2)(f) ...................................................... 2, 11, 27, 39, 45, 55, 56

§501.2041(2)(g) ..................................................... 2, 11, 27, 39, 45, 55, 56

§501.2041(2)(h) ............................................... 1, 2, 10, 24, 30, 39, 42-45, 54, 55

§501.2041(2)(j) ..................................................... 2, 11, 25, 31, 39, 46-48, 55, 56

§501.2041(3) ...................................................... 2, 11, 28, 39, 52, 55, 56

§501.2041(3)(c) ..........................................................................................11

§501.2041(3)(d) ..........................................................................................11

## Other Authorities

X, *Enforcement Philosophy*, https://perma.cc/ZHR2-Y952 (last visited
Aug. 22, 2025) ..............................................................................5, 16

Etsy, *Creativity Standards*, https://perma.cc/J9EZ-XTZL (last updated
June 10, 2025)....................................................................................6

X, *For You Timeline*, https://perma.cc/942V-8TD4 (last visited Aug.
22, 2025) ..........................................................................................20

Ron DeSantis, *Governor Ron DeSantis Signs Bill to Stop the
Censorship of Floridians by Big Tech* (May 24, 2021),
https://perma.cc/Y6RN-VDCR.........................................................31

**INTRODUCTION**

For over two years, Florida principally defended S.B.7072 on the theory that websites like Facebook and YouTube do not engage in First Amendment activity when they decide what content to disseminate and how to arrange and organize it.[1] The Supreme Court has now laid that argument to rest. As *Moody v. NetChoice* made clear, "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." 603 U.S. 707, 731 (2024). That holding confirms that S.B.7072 is unconstitutional as applied to websites operated by Plaintiffs' members when they curate and disseminate compilations of third-party speech posted on their services. Indeed, in denying Florida's motion to dismiss, this Court already noted that "[s]ome of these challenged provisions, as applied to some of the plaintiffs' members, are almost surely unconstitutional." Dkt.209 ("MTD.Op.") at 42.

The discovery record only confirms that Plaintiffs are entitled to summary judgment on their as-applied claims.[2] And because the challenged provisions are

---

[1] While most members offer various interfaces, in addition to websites (including mobile apps), to access their platforms or other services, this brief refers to all these interfaces collectively as "websites" or "services." *See* Schruers.Decl.¶9.

[2] Specifically, the Court should grant summary judgment to Plaintiffs on their as-applied claims as to the consistency provision, §501.2041(2)(b), the provision addressing posts by or about political candidates, §501.2041(2)(h), the candidate-deplatforming provision, §106.072(2), the journalistic-enterprise provision,

unconstitutional as applied to Plaintiffs' members when they are curating and disseminating third-party speech, it follows that many of S.B.7072's provisions are facially unconstitutional too.[3]  While this Court has held that S.B.7072's definition of "social media platform" sweeps more broadly than that phrase is traditionally understood, many of the challenged provisions can be applied *only* when a covered website is engaged in protected expression by curating and disseminating collections of third-party speech posted on its service.  And for others, any conceivable applications that would *not* involve curating and disseminating third-party speech are far outweighed by the "substantial amount of protected speech" that their "heartland applications" restrict.  *Moody*, 603 U.S. at 723-24.  In short, because the core, if not full range of, applications of each challenged provision are to regulate

---

§501.2041(2)(j), the rule-change provision, §501.2041(2)(c), the user opt-out provisions, §§501.2041(2)(f)-(g), and the detailed-explanation provisions, §§501.2041(2)(d), (3).    While Plaintiffs maintain that the standards (§501.2041(2)(a)) and view-count (§501.2041(2)(e)) provisions are unconstitutional as applied to Plaintiffs' members when they curate and disseminate third-party speech posted on their services, they do not move for summary judgment on those as-applied claims here.

[3] Specifically, the Court should grant summary judgment to Plaintiffs on their facial claims as to the consistency provision, §501.2041(2)(b), the  provision addressing posts by or about political candidates, §501.2041(2)(h), the journalistic-enterprise provision, §501.2041(2)(j), the user opt-out provisions, §§501.2041(2)(f)-(g), and the detailed-explanation provisions, §501.2041(2)(d), (3).  While Plaintiffs maintain that the candidate-deplatforming (§106.072(2)), rule-change (§501.2041(2)(c)), standards (§501.2041(2)(a)), and view-count (§501.2041(2)(e)) provisions are unconstitutional on their face, they do not move for summary judgment on those facial claims here.

2

the editorial judgments of websites when they are curating and disseminating collections of third-party speech posted on their services, those protected judgments are "the principal things regulated" by the statute, and they "should have just that weight in the facial analysis." *Id.* at 726. Under *Moody*, those provisions are facially unconstitutional.

## BACKGROUND

### A.    Content Moderation by Member Websites

NetChoice and CCIA are trade associations whose members operate a variety of popular websites on which users can share and interact with content, including Etsy, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Threads, X, and YouTube. Dkt.280-1¶5 ("Schruers.Decl."); Dkt.280-2¶5 ("Cleland.Decl."); Dkt.280-3¶¶3-4 ("Veitch.Decl."); Dkt.280-4¶¶4-6 ("Potts.Decl."); Dkt.280-5¶¶4-11 ("Duba.Decl."); Dkt.280-6¶¶4-5 ("Vasquez.Decl."); Dkt.280-7¶4 ("Callaway.Decl."); Dkt.280-8¶¶6-7 ("Fernandez.Decl."). The content users seek to share on these websites is diverse and substantial: It is generated by billions of users located throughout the world, it is uploaded in a variety of formats and languages, and it spans the entire range of human thought—from the creative, humorous, and political to the offensive, dangerous, and illegal. Schruers.Decl.¶¶9-10; Cleland.Decl.¶8.

Given the sheer volume and breadth of material users seek to share on their websites, Plaintiffs' members have developed robust standards for editing, curating,

3

arranging, displaying, and disseminating content in ways that reflect their unique values and the distinctive communities they foster. These standards prohibit certain kinds of material from being disseminated via their websites, and empower Plaintiffs' members to remove, restrict, and/or warn users about all manner of potentially objectionable or harmful content. *See* Schruers.Decl.¶¶11-12; Cleland.Decl.¶15; Veitch.Decl.¶¶4-5; Potts.Decl.¶¶10, 20; Vasquez.Decl.¶¶7, 16; Callaway.Decl.¶¶8-9; Duba.Decl.¶¶12, 30-32, 39-42; Fernandez.Decl.¶¶8-13; Dkt.280-9 at 11-19 ("Interrog.Resp.").

For example, Meta tries to balance its users' free expression with "dignity and authenticity" and "safety and privacy," to "give people a platform they enjoy using." Dkt.280-11.28:16-25 ("Potts.Depo."); *accord* Potts.Decl.¶¶3-6. To that end, Meta's Community Standards restrict several categories of content that Meta finds objectionable, such as hate speech, bullying, and harassment. Dkt.280-28; Dkt.280-30 (explaining Meta's distinct approach to harassment related to public figures).

YouTube's policies likewise "aim to make YouTube a safer community while still giving creators the freedom to share a broad range of experiences and perspectives." YouTube, *Community Guidelines*, Dkt.280-26. It thus prohibits "pornography, incitement to violence, harassment, or hate speech," among other kinds of content. Dkt.280-24; Veitch.Decl.¶¶11-12; Dkt.280-10.91:14-21 ("Veitch.Depo."); *see also* Dkt.280-23 (hate speech policy).

4

X seeks to "empower people to understand different sides of an issue and encourage dissenting opinions and viewpoints to be discussed openly." X, *Enforcement Philosophy*, https://perma.cc/ZHR2-Y952; Fernandez.Decl.¶¶7, 13; Interrog.Resp.17-18. So rather than take a more active approach to content it finds objectionable, X prefers to "promote[] counterspeech: speech that presents facts to correct misstatements or misperceptions, points out hypocrisy or contradictions, warns of offline or online consequences, denounces hateful or dangerous speech, or helps change minds and disarm." X, *Enforcement Philosophy*, *supra*. X nevertheless may "remove or reduce the visibility of Violent Content," e.g., "to ensure the safety of [its] users." Dkt.280-16 at 2. Pinterest, which is a "visual search and discovery engine" that wants to ensure that its "users feel safe and that the experiences are positive," prohibits categories of content, such as misinformation, hate speech, conspiracy theories, and harassment, given their inclusion on its service would undermine Pinterest's mission "to bring everyone the inspiration to create a life they love." Vasquez.Decl.¶¶3, 15-18; Dkt.280-13.155:3-6 ("Vasquez.Depo."); Interrog.Resp.28-30.

Other members focus on more specific audiences and exercise editorial discretion accordingly. For example, Etsy, in its effort to "Keep Commerce Human," requires any item listed on the Etsy marketplace to be made, designed, handpicked, or sourced by a seller. Etsy, *Creativity Standards*,

5

https://perma.cc/J9EZ-XTZL; Duba.Decl.¶14. Etsy also has "House Rules" that are "designed to protect [its] community," Dkt.280-22, which prohibit spam, content "promot[ing], support[ing], or glorify[ing] hatred, misinformation," and more. Dkt.280-20. Reddit, for its part, seeks "to empower communities and make their knowledge accessible to everyone." Callaway.Decl.¶3. Accordingly, content on Reddit is "moderated through a unique, layered, and community-driven approach," as Reddit allows users to create and moderate subcommunities, called subreddits, where users can develop bespoke rules reflecting their community's unique interests. *Id.* ¶¶7-10; Interrog.Resp.30-32. Reddit's site-wide "Content Policy" sets forth several "principles-based rules that apply to the entire Reddit platform." Dkt.280-35 at 2.

Collectively, Plaintiffs' members make billions of editorial decisions each day. Those decisions include choosing whether to block or remove objectionable content or users, whether to display content with additional context or warnings, and a wide range of other nuanced judgments about how to arrange, restrict (such as by the age of the user), or prioritize content on their websites. *See* Schruers.Decl.¶¶11-12, 15-16; Cleland.Decl.¶9; Veitch.Decl.¶¶13, 24; Veitch.Depo.159:3-17; Dkt.280-27 (explaining YouTube Restricted Mode); Potts.Decl.¶¶20, 28; Potts.Depo.177:9-178:25, 235:4-12; Dkt.280-17 (Meta restricts minor users from accessing graphic violence); Vasquez.Decl.¶¶31-32; Vasquez.Depo.127:24-128:2;

6

Callaway.Decl.¶¶8-10;    Duba.Decl.¶¶23-25,    39-47;    Fernandez.Decl.¶¶18-20; Interrog.Resp.19-37.    A user who visits Instagram, YouTube, or Pinterest, for example, sees "a curated and edited compilation of content from the people and organizations that she follows." *NetChoice LLC v. Att'y Gen.*, 34 F.4th 1196, 1204 (11th Cir. 2022).    The website will have "removed posts that violate its terms of service or community standards." *Id.*  And it "will have arranged available content by choosing how to prioritize and display posts—effectively selecting which users' speech the viewer will see, and in what order, during any given visit to the site." *Id.*; *see* Schruers.Decl.¶¶15-16; Cleland.Decl.¶¶10-13; Veitch.Decl.¶5; Potts.Decl.¶¶23-26;    Vasquez.Decl.¶¶8-9;    Callaway.Decl.¶12;    Duba.Decl.¶¶30-32; Fernandez.Decl.¶10; Interrog.Resp.8-19.

Websites are aided in those endeavors by "the use of algorithms," which they design to sift through "the billions of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list" and "prioritiz[e] … content" likely of interest to users. *Moody*, 603 U.S. at 734.  Like newspaper editors and booksellers, "platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Id.* at 738. While Plaintiffs' members take users' interests into account when curating and disseminating content, they do not "respond solely to how users act online—giving them the content they appear to want, without any regard to independent content

7

standards." *Id.* at 736 n.5.  Rather, members have crafted nuanced content policies about what speech they will permit on their services and by whom it may be seen, which they enforce using a combination of algorithms, automated tools, and human review.   *See*  Schruers.Decl.¶¶15-17;  Cleland.Decl.¶¶15-17;  Veitch.Decl.¶¶4-7; Potts.Decl.¶¶15-16;         Vasquez.Decl.¶¶23-24;         Callaway.Decl.¶¶8-10; Duba.Decl.¶¶12-15, 23-29; Fernandez.Decl.¶¶13-17; Interrog.Resp.19-36.

In practice, that means that YouTube, for example, which does not want to recommend what it deems "low-quality content," uses its algorithm to "demot[e] borderline content in recommendations." Dkt.280-25 at 6-8.  Meta, for its part, has crafted its "Recommendation Guidelines" to downrank content that may not violate Community Standards, but which "some people may consider … sensitive or offensive."  Dkt.280-31 at 6-7.  Etsy's search function considers "value alignment of listings" when deciding what content to disseminate to users.  Dkt.280-12.146:12-15 ("Duba.Depo.").  Likewise, Pinterest organizes its feeds based partly on its "editorial judgments" about what will be "relevant, inspiring, and personal" for users. Vasquez.Decl.¶7.  Reddit tries to ensure that "content with sensitive themes" is not recommended unless a user specifically expresses interest in it.  Dkt.280-36 at 2.  Nextdoor uses machine learning to "automatically detect[] offensive language that may violate [its] Community Guidelines," and then takes steps to "slow[] people

8

down and combat[] bias."  Dkt.280-19 at 3.  And X may hide or choose not to recommend posts for "Rule enforcement reasons."  Dkt.280-18 at 8.

In short, Plaintiffs' members' content policies shape not just what material is generally disseminated on their websites, but also what they choose to have appear (or not appear) in users' individual feeds, and in what order.[4]

## B.    Florida's Effort to Regulate Websites' Editorial Judgments

Given the expressive nature of those editorial decisions, it is inevitable that some will criticize them.  Some will say too much speech is disseminated; others will say too little.  That is all to be expected in a nation that values the First Amendment and its commitment to more speech as the remedy for speech with which people disagree.  But in 2021, Florida lawmakers embraced a different approach: They enacted S.B.7072, which aims to punish select websites for exercising their editorial discretion in ways the state disfavors.

S.B.7072 imposes a slew of requirements that commandeer how covered websites exercise editorial discretion over the content on their websites.  As relevant

---

[4] Though it makes no difference to the application of the First Amendment—including because S.B.7072 applies only to companies that do business in Florida and regulates only editorial decisions that impact Florida residents, *see* §501.2041(1)(g)-(h)—the record makes clear that the members at issue here are U.S.-based companies that develop and manage their content-moderation operations in the United States. Schruers.Decl.¶6; Cleland.Decl.¶6; Veitch.Depo.48:22-49:1 (YouTube); Potts.Depo.198:16-199:18, 202:8-10 (Meta); Duba.Depo.136:12-18 (Etsy); Callaway.Depo.163:1-14 (Reddit).

here, S.B.7072 restricts what it calls "censorship," "deplatforming," "post-prioritization," and "shadow banning."

- **Censorship.** S.B.7072 defines "censor" as "any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform." Fla. Stat. §501.2041(1)(b).

- **Deplatforming.** S.B.7072 defines "deplatform" as "the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days." §501.2041(1)(c).

- **Post-prioritization.** S.B.7072 defines "post-prioritization" as "action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." §501.2041(1)(e).

- **Shadow ban.** S.B.7072 defines "shadow ban" as "action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform. This term includes acts of shadow banning by a social media platform which are not readily apparent to a user." §501.2041(1)(f).

S.B.7072's substantive provisions restrict covered websites' ability to engage in those editorial choices in several ways:

- **Consistency.** S.B.7072 requires a "social media platform" to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." §501.2041(2)(b).

- **Posts by or about political candidates.** "A social media platform may not apply or use post-prioritization or shadow banning algorithms for content and material posted by or about … a candidate." §501.2041(2)(h).

10

- ***Deplatforming political candidates.***  S.B.7072 prohibits a "social media platform" from "willfully deplatform[ing] a candidate for office." §106.072(2).

- ***Journalistic enterprises.***  "A social media platform may not take any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." §501.2041(2)(j).

- ***Rule changes.***  "A social media platform must inform each user about any changes to its user rules, terms, and agreements before implementing the changes and may not make changes more than once every 30 days." §501.2041(2)(c).

- ***User opt-out.***  A "social media platform" must allow users to opt out of its "post-prioritization" and "shadow banning" algorithms annually. §§501.2041(2)(f)-(g).  For users who opt out, material must instead be displayed in "sequential or chronological" order. *Id.*

- ***Detailed explanation.***  The detailed-explanation provision prohibits a "social media platform" from "deplatform[ing]," "censor[ing]," or "shadow ban[ning]" a user without "notifying the user who posted or attempted to post the content or material." §501.2041(2)(d).  The notice must include both "a thorough rationale explaining the reason that the social media platform censored the user" and "a precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable." §§501.2041(3)(c), (d).

### C.   Procedural History

Plaintiffs immediately challenged S.B.7072 in this Court, which preliminarily enjoined Defendants from enforcing S.B.7072's principal provisions, holding that S.B.7072 likely violates the First Amendment and that 47 U.S.C. §230 preempts some of its provisions. *NetChoice, LLC v. Moody*, 546 F.Supp.3d 1082 (N.D. Fla. 2021).  The Eleventh Circuit affirmed in substantial part, agreeing that S.B.7072's candidate, journalistic-enterprise, consistency, 30-day restriction, user opt-out, and

11

detailed-explanation provisions likely violate the First Amendment. *NetChoice*, 34 F.4th 1196.

The Supreme Court vacated the Eleventh Circuit's judgment because it did not properly consider "the facial nature of NetChoice's challenge." *Moody*, 603 U.S. at 717. It explained that the Eleventh Circuit "mainly addressed what the parties had focused on" in their briefing and arguments below, i.e., the law's application to the "curated feeds offered by the largest and most paradigmatic social-media platforms"—such as Facebook and YouTube. *Id.* at 717-18. But the Court expressed concern that "the law[] might apply to, and differently affect, other kinds of websites and apps." *Id.* at 718. And in "a facial challenge, that could well matter," because "the question in such a case is whether a law's unconstitutional applications are substantial compared to its constitutional ones." *Id.* The Court acknowledged that "[m]aybe the parties treated the content-moderation choices reflected in Facebook's News Feed and YouTube's homepage as the law['s] heartland application[] because they *are* the principal things regulated, and should have just that weight in the facial analysis." *Id.* at 726. But it was uncertain whether there was "a sphere of other applications—and constitutional ones—that would prevent the law['s] facial invalidation." *Id.* Because those questions were not a focus of the proceedings below, the Court vacated and remanded for consideration of those issues.

At the same time, the Court went on to explain how the First Amendment applies to the services "that *were* the focus of the proceedings below." *Id.* at 734 (emphasis added). And the Court concluded that the Eleventh Circuit "saw the First Amendment issues much as we do." *Id.* at 727. As the Court explained, when websites like YouTube and Facebook "use their Standards and Guidelines to decide which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices" that "receive First Amendment protection." *Id.* at 740. Thus, when laws like S.B.7072 are applied "to prevent Facebook (or YouTube) from using its content-moderation standards to remove, alter, organize, prioritize, or disclaim posts in its News Feed (or homepage)," they "prevent[] exactly the kind of editorial judgments this Court has previously held to receive First Amendment protection." *Id.* at 718. And curbing those expressive choices cannot be justified as necessary "to balance the mix of speech" on such websites. *Id.* After all, the "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Id.* at 734.

On remand, Plaintiffs amended their Complaint to add as-applied claims, and they now seek summary judgment that particular provisions of S.B.7072 are unconstitutional, as applied and/or on their face.

13

## ARGUMENT

**I.    S.B.7072 Is Unconstitutional As Applied To Plaintiffs' Members When They Curate And Disseminate Third-Party Speech Posted On Their Services.**[5]

### A.    The First Amendment Protects Plaintiffs' Members' Curation and Dissemination of Third-Party Speech Posted on Their Services.

The Supreme Court has now reaffirmed that when a private party curates and disseminates compilations of third-party speech, it engages in speech activity fully protected by the First Amendment. "Deciding on the third-party speech that will be

---

[5] As was true at the motion-to-dismiss stage, there are no threshold issues preventing the Court from resolving Plaintiffs' claims. Plaintiffs have associational standing for all the reasons this Court explained in its prior opinion, MTD.Op.13-23, as confirmed by the summary-judgment record. *See* Schruers.Decl.¶¶4-8; Cleland.Decl.¶¶4-7. Plaintiffs argue that the challenged provisions are unconstitutional as applied to websites operated by members when they engage in particular functions protected by the First Amendment—i.e., when they curate and disseminate collections of third-party speech posted on their services. Comprehensive member-specific proof is not necessary to show that S.B.7072 unconstitutionally burdens members' ability to make such editorial judgments. *See Moody*, 603 U.S. at 731. All that matters is that Plaintiffs' members do in fact make such judgments, *contra NetChoice v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025) (construing First Amendment claim challenging restrictions on providing personalized feeds to minors as turning on how certain algorithms operated), which Plaintiffs' evidence confirms that members do. That evidence thus simply supplies the requisite "understanding of member circumstances" needed in "*every* associational standing case." MTD.Op.13; *NetChoice v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025) (association's claims "can be proven by evidence from representative injured members," whose participation "does not thwart associational standing"). The same is true of Plaintiffs' facial challenge. *See* MTD.Op.15-16. The challenged provisions are facially unconstitutional because they apply overwhelmingly—and, for most, *only*—when websites engage in the same protected editorial decisions covered by Plaintiffs' as-applied challenge. *See infra* Part II.

14

included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity." *Moody*, 603 U.S. at 731. And when a private entity engages in that expressive activity, the First Amendment protects its editorial choices about what speech to display and how to display it. "When the government interferes with such editorial choices—say, by ordering the excluded to be included—it alters the content of the compilation." *Id.* at 731-32. "And in so doing—in overriding a private party's expressive choices—the government confronts the First Amendment." *Id.* at 732.

Applying those principles to Facebook's Feed and YouTube's homepage, the Supreme Court held that the First Amendment protects Meta's and YouTube's editorial choices—not just about what third-party content to display, but how to arrange and display that content. *Id.* at 733-40. "When the platforms use their Standards and Guidelines to decide which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices." *Id.* at 740. And that is so even when they use "algorithms to implement those standards." *Id.* at 735. When the government "alters the platforms' choices about the views they will, and will not, convey," it "interfere[s] with protected speech," triggering First Amendment scrutiny. *Id.* at 737-38.

The Court focused on Facebook and YouTube (whose exercise of editorial discretion in applying their content-moderation policies and organizing individual

15

feeds is confirmed by the more developed summary-judgment record, *supra* p.4; *infra* pp.18-19) because those were among the principal applications that the parties contested in their briefing. *See Moody*, 603 U.S. at 726. But *Moody*'s reasoning applies just the same to *all* websites and applications when they curate and disseminate collections of third-party speech posted on their services, including websites operated by other NetChoice and CCIA members. Schruers.Decl.¶37; Cleland.Decl.¶35; Vasquez.Decl.¶¶34-35; Callaway.Decl.¶¶15-17; Duba.Decl.¶¶32, 78; Fernandez.Decl.¶21; Interrog.Resp.11-19.

1. As discussed above, each website maintains and enforces detailed content moderation policies that inform what content can appear on the website and in the feeds displayed to users. Like Facebook and YouTube, those members enforce their policies to remove, restrict, and make other editorial judgments about content that they do not want users (or some users) to see.

For example, X uses a combination of machine learning and human review to enforce its rules, and it relies on human moderators to use "important context to make decisions about potential violations." Dkt.280-18 at 3. X also "promotes counterspeech" via addenda dubbed "community notes" that "correct misstatements" and "point[] out hypocrisy." X, *Enforcement Philosophy*, *supra*; *accord* Fernandez.Decl.¶¶13, 20; Interrog.Resp.17-18, 33-34.

16

Pinterest too has developed robust content and editorial policies to determine the content published on its website and selected for its feeds.  Pinterest reserves the right to "remove, limit, or block the distribution of such content and the accounts, individuals, groups and domains that create or spread it based on how much harm it poses."  Pinterest, *Community Guidelines*, Dkt.280-33.  Pinterest's automated tools "use a combination of signals to identify and take action against potentially violating content."  Dkt.280-34 at 3. On Reddit, which is organized in numerous content-based message boards (called subreddits), "content curation and sorting is driven by the rules set by that community, and by users' upvotes and downvotes on content within the community."  Callaway.Decl.¶13.  But Reddit also enforces its site-wide Content Policy, which prohibits certain content from appearing on any subreddit, and is enforced by Reddit admins who remove violative content using a combination of automated detection and human review.     Dkt.280-35   at   6;   *accord* Callaway.Decl.¶¶8-10,       13;       Dkt.280-14.153:5-9       ("Callaway.Depo"); Interrog.Resp.15-17, 30-33.

Etsy has "rules to ensure that items that don't align with [its] values and [its] mission are prohibited from the site," and a content moderation team that "take[s] down things that don't align with that mission."  Duba.Depo.55:25-56:6, 137:13-18. In addition to removing violative content, Etsy also arranges the results of product searches based on a number of factors, including Etsy's assessment of the relevance

17

of a given product listing to the interests of a user and Etsy's "judgments about what belongs on Etsy."    Duba.Depo.51:4-9;  Duba.Decl.¶¶33-34;  Cleland.Decl.¶10; Dkt.280-21.

2.    As the summary-judgment record confirms, these decisions are based on protected editorial judgments, even when the members' decisions impact not only what content can generally be accessed on members' websites, but also the particular content that members present users in their individual feeds.    *See, e.g.*, Duba.Depo.141:4-16, 146:21-147:1 (Etsy "will remove [violating] content and, as a result, it will not … show up in search."); Potts.Depo.212:22-24 ("if we remove [content], it's not on the platform and thus would not show up in the user's feed"); Veitch.Depo.87:21-88:13 (similar); Vasquez.Decl.¶10 (similar).

YouTube, for example, "demote[s] in recommendations" it makes to users videos that it classifies as "borderline" because YouTube deems such content not "time well spent" on its service.  Dkt.280-25 at 6-8.  YouTube's personalized feeds are thus necessarily based in part on decisions it has made about what to "prioritize or de-emphasize."  Veitch.Depo.333:14-19.

Similarly, Meta has "Recommendation Guidelines" for "posts that don't necessarily break [its] rules[.]"  Dkt.280-29 at 2.  Meta's content-ranking algorithm downranks borderline content, e.g., "content depicting violence," because Meta "aim[s] to not recommend" such content to users.  Dkt.280-31 at 6-7.  It also demotes

18

"spam, clickbait" and other "sensationalized" content, Potts.Depo.204:12-18, that Meta "believe[s] should not be seen as much by people, regardless of if it gives value to the user." Dkt.280-32.

Instagram and Threads also offer personalized curated feeds that are shaped by Meta's content policies. Instagram's feeds prioritize photos and videos that Meta thinks the user cares most about and demote posts that violate Meta's "Recommendation Guidelines," such as content depicting violence or the use of certain regulated products. Dkt.280-31 at 6-7; Potts.Decl.¶25; Schruers.Decl.¶10. On Threads, which allows users to share short text-based messages, photos, videos, and more, Meta seeks to "enable positive, productive conversations," including by "elevat[ing] and emphasiz[ing] unique perspectives." Potts.Decl.¶26. Across these services, Meta uses ranking systems to organize and highlight content based on Meta's content policies, community standards, and the experience it seeks to create for users. *Id.*¶¶20-27; Potts.Depo.207:2-210:8; *accord* Potts.Decl.¶16; Potts.Depo.202:18-203:4 (Meta's algorithms and enforcement tools "always go back to the community standards" and are an "extension [of] human choices … decided as a content policy team[.]").

The same is true for other members' services. For example, X makes editorial choices whenever it filters, alters, and labels third-party speech on its "For You" and "Following" feeds, including by providing users with curated compilations of posts

19

based in part on X's judgment that it should be "easier and faster to find content that contributes to the conversation in a meaningful way, such as content that is relevant, credible, and safe." X, *For You Timeline*, https://perma.cc/942V-8TD4. X thus "may not [] recommend[] or amplif[y]" particular posts for "Rule enforcement reasons." Dkt.280-18 at 8.

Pinterest likewise publishes curated feeds of user content, including through its "Home" and "Today" tabs, that are organized based in part on Pinterest's "editorial judgments" about the kind of "speech that Pinterest is trying to foster." Vasquez.Decl.¶8-10; *accord id.*¶¶14-16, 21-23; Interrog.Resp.15, 28-30.

Reddit also offers personalized feeds, which display "content from the communities [users]have joined or visited in addition to recommendations that Reddit provides based on the content they have viewed, upvoted, and downvoted." Callaway.Decl.¶13.    Reddit's process for recommending content includes "filter[ing] out stuff [users] shouldn't have to deal with, such as spam, content you've seen before, or content you've blocked." Dkt.280-36.  Etsy, in its community-based Forums and Groups features, likewise boosts certain posts coming from users who have earned badges and higher ranks, which signify the positive contributions users have made to those communities.    Cleland.Decl.¶10; Interrog.Resp.12; *see also* Duba.Depo.147:7-9 ("We don't want to surface things that violate our policies."). On the flip side, Etsy also considers whether content is

20

"policy violative" when considering what content to recommend to its users. Duba.Depo.147:4-9.

In short, the summary-judgment record makes clear that members exercise considerable editorial discretion over whether and how they will disseminate third-party speech—both what material is disseminated on their websites, and also in how they curate and organize content for users' personalized feeds. All of these websites "make choices about what third-party speech to display and how to display it" and, "in making millions of those decisions each day, produce their own distinctive compilations of expression." *Moody*, 603 U.S. at 716. Indeed, even when members operating covered services take account of users' interests and preferences in deciding what content to recommend and how to organize individualized feeds, these members nonetheless "make a wealth of user-agnostic judgments about what kinds of speech … are not worthy of promotion." *Id.* at 736 n.5. These editorial decisions reflect each member's judgments about what content they want (or do not want) on their services and what material may be most relevant and appropriate for users (or set of users). This is all expressive activity that is fully protected by the First Amendment. *Id*. at 736, 738.

Given this record, the Supreme Court's decision not to address the First Amendment protection that applies to "feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any

21

regard to independent content standards" has no bearing on the analysis here. *Id.* at 736 n.5. Just as Facebook and YouTube "unabashedly control the content that will appear to users [on News Feed and homepage], exercising authority to remove, label or demote messages they disfavor," *id.* at 736, the feeds offered by other members, even those feeds curated with the help of algorithms, are informed by members' "independent content standards," such that none "respond[s] solely to how users act online." But even assuming that such content-agnostic user-centric feeds were at issue here (which they are not), the First Amendment would nevertheless protect a website's editorial judgments predicting what content users would find engaging based on "how users [have previously] acted." *Id.* at 736 n.5. If a bookseller recommends a new mystery novel based solely on a customer's previous Sherlock Holmes purchases, that is no less protected speech than if she recommends a book because she likes it (or because it is a bestseller). A state could no more forbid the first recommendation than the second.

> **B.    Each of the Challenged Provisions Burdens Members' Curation, Recommendation, and Dissemination of Speech.**

S.B.7072 runs headlong into these established First Amendment principles. As applied to the members' websites at issue here, various provisions of S.B.7072 directly limit those websites' ability to apply their content standards as they see fit, thus "interfer[ing] with protected speech." *Id.* at 738.

22

*Consistency requirement—§501.2041(2)(b).*   The consistency requirement directly interferes with editorial choices made by websites when they curate and disseminate third-party speech posted on their services.  Indeed, that is its whole point.  While S.B.7072 does not define the phrase "consistent manner," it appears to force websites to disseminate speech against their will whenever they have previously disseminated speech that Florida (or a jury) deems sufficiently similar.  Conversely, the consistency requirement would seemingly forbid a website from disseminating speech that it *wants* to disseminate if it has declined to disseminate comparable speech previously.  For example, the requirement would appear to prohibit Etsy from removing a product listing that it considers dangerous if the state (or jury) thinks that Etsy has previously failed to remove a similar listing.  Duba.Depo.142:22-143:5.  And it imposes the same restrictions on a website's ability to choose whether to display third-party speech more or less prominently, such that YouTube could not use recommendations to discourage teen girls from consuming fitness videos at scale, if they would not make the same recommendations to an adult male.  *See* Veitch.Depo.164:6-165:13.  That is a blatant and intentional interference with protected editorial judgment.  *See* Veitch.Decl.¶¶30-31;  Veitch.Depo.335:9-24;  Potts.Decl.¶37;  Potts.Depo.223:22-224:23;  Vasquez.Decl.¶37;  Callaway.Decl.¶18;  Callaway.Depo.158:24-159:9;  Duba.Decl.¶58; Duba.Depo.148:8-149:3; Fernandez.Decl.¶22.

On top of that, the consistency requirement restricts the ability of websites to engage in their own speech about the third-party content they disseminate, as S.B.7072's definition of "censor" includes "post[ing] an addendum to any content or material posted by a user."   §501.2041(1)(b).   The provision thus appears to prohibit Instagram, for example, from taking down or posting an addendum to content glorifying terrorism if the state (or jury) determines that Instagram failed to take down or add an addendum to a similar post in the past.   That is nothing less than an effort to substitute the state's editorial judgment for that of Instagram.

***Posts by or about political candidates—§501.2041(2)(h).***  The prohibition on applying "post-prioritization" or "shadow banning algorithms" on content posted "by or about" a political candidate directly interferes with the editorial decisions made by websites when they curate and disseminate the third-party speech posted on their services.  It prohibits websites from deprioritizing or restricting *any* speech posted "by or about" a candidate—no matter how dangerous, defamatory, or obscene—thus forcing them to disseminate (and indeed give special prominence to) everything from threats to deepfakes to adult content.  Again, that is an undeniable and unapologetic interference with protected editorial discretion to curate, arrange, and present speech on their websites as they see fit, rather than as Florida directs. *See* Veitch.Decl.¶33; Veitch.Depo.337:3-17; Potts.Decl.¶34; Potts.Depo.226:14-

227:16;    Vasquez.Decl.¶38;    Duba.Decl.¶60;    Duba.Depo.149:10-24; Fernandez.Decl.¶23; Callaway.Decl.¶19; Callaway.Depo.160:17-161:9.

***Deplatforming political candidates—§106.072(2).*** The candidate-deplatforming provision directly interferes with the editorial decisions made by websites when they curate and disseminate third-party speech posted on their services. It prohibits websites from suspending or removing candidates no matter what they post, or how blatantly or repeatedly they violate the website's terms of use. The provision would, for example, prevent X from suspending the account of someone running for office even if that candidate had used her account to threaten to shoot police, sexually exploit minors, or engage in fraud, Fernandez.Decl.¶24, or bar Etsy from removing the account of a candidate who is selling weapons or mass-produced items, rather than individually sourced merchandise, Duba.Depo.150:3-15. Plaintiffs' members should not be conscripted by the state to associate with (and disseminate objectionable or harmful material from) bad actors just because they are running for office. That is yet another egregious effort to override editorial judgments about whose speech to disseminate.

***Journalistic enterprises—§501.2041(2)(j).*** The prohibition on "censoring," "deplatforming," and "shadow banning" a journalistic enterprise "based on the content of its publication or broadcast" also directly interferes with the editorial decisions made by websites when they curate and disseminate third-party speech

25

posted on their services.  That provision requires websites to allow any entity with the requisite content and users to post anything it wants short of true obscenity.  And because of S.B.7072's broad definition of "censor," it even prohibits websites from appending their own speech to that content, such as a disclaimer or warning.  Section 501.2041(2)(j) thus would "prohibit a child-friendly platform like YouTube Kids from removing—or even adding an age gate to—soft-core pornography posted by PornHub," which arguably qualifies as a "journalistic enterprise" because it posts more than 100 hours of video and has more than 100 million annual viewers. *NetChoice*, 34 F.4th at 1229; Veitch.Decl.¶¶34, 43; Duba.Depo.150:22-151:8.  It also would prohibit X from removing or appending a disclaimer to posts by The Crusader (a Ku Klux Klan-affiliated newspaper), which arguably qualifies as a journalistic enterprise under S.B.7072.  *See* Fernandez.Decl.¶25; Vasquez.Decl.¶40; Potts.Depo.186:13-187:5.  This provision restricts websites' ability to foster online communities as they wish.  Callaway.Depo.160:17-161:9.

*Rule changes—§501.2041(2)(c).*  The aspect of the provision restricting when websites can change their rules, terms, and agreements likewise interferes with editorial choices made by websites when they curate and disseminate third-party speech.  Websites update their editorial policies frequently, and they often must do so very quickly to respond to new and changed circumstances and unforeseen threats.  Yet §501.2041(2)(c) prohibits them from making any changes more than

26

once every 30 days, and prohibits them from implementing any change, no matter how minor or how pressing, before they notify every user. The provision thus forces websites to disseminate unwanted content unless they have already adopted rules covering that content—while giving bad actors a playbook for how to circumvent these rules and continue posting objectionable content. Duba.Depo.153:9-154:7; Veitch.Decl.¶¶35-36; Vasquez.Decl.¶41; Callaway.Decl.¶18; Callaway.Depo.162:14-22; Fernandez.Decl.¶26. It also makes users less safe, as it would limit websites' ability to adapt to evolving threats. Veitch.Depo.340:2-341:7. Dkt.280-34 at 2.

*User opt-out—§§501.2041(2)(f)-(g).* The user opt-out provision likewise interferes with the editorial choices made by websites when they curate and disseminate third-party speech posted on their services. It requires them to display content in a "sequential or chronological" order even if they would prefer to present it in a different manner. "On its face," this provision "allows a user who posts content to insist it be shown to other users in chronological order—not in the order the recipient has otherwise specified or the order that, based on the recipient's profile and history, the social media platform believes would be most preferred by or useful to the recipient." *NetChoice*, 546 F.Supp.3d at 1088. Just as telling a newspaper what should be front-page news countermands editorial judgments, so does telling websites what third-party speech to give pride of place. Veitch.Decl.¶¶37-38;

Veitch.Depo.342:1-17;    Vasquez.Decl.¶42;    Duba.Depo.155:1-18    (Opt-out requirement would render Etsy "unable to show users … what we think is brand-aligned and value-aligned.").

***Detailed explanation—§§501.2041(2)(d), (3).***    The detailed-explanation requirement both compels speech and burdens the editorial choices made by websites when they curate and disseminate third-party speech posted on their services.    Much like the right-of-reply statute burdened the exercise of editorial discretion in *Miami Herald Publishing Co. v. Tornillo* by requiring newspapers to run opposing views if they chose to criticize a political candidate, *see* 418 U.S. 241, 256-57 (1974), the detailed-explanation requirement imposes onerous burdens on covered websites to explain the often-complex editorial judgments they make in choosing to arrange or limit the dissemination of third-party speech.    Indeed, a member "could be slapped with millions, or even billions, of dollars in statutory damages if a Florida court were to determine that it didn't provide sufficiently 'thorough' explanations when removing posts." *NetChoice*, 34 F.4th at 1230-31. "Faced with the penalties that would accrue" should its explanation be deemed insufficiently "thorough," a website "might well conclude that the safe course is to avoid controversy" by not exercising editorial discretion at all. *Tornillo*, 418 U.S. at 257.    This provision thus has the purpose and effect of "chill[ing] platforms' protected speech."    *NetChoice*, 34 F.4th at 1230; Veitch.Decl.¶¶39-40;

28

Veitch.Depo.338:9-339:8;      Vasquez.Decl.¶43;      Duba.Depo.151:16-152:21; Callaway.Decl.¶17;  Callaway.Depo.161:21-162:3;  Potts.Depo.182:8-23,  228:12-230:10.

### C.    Each of the Challenged Provisions Triggers Strict Scrutiny.

Because each of the provisions described above interferes with protected editorial discretion, each is subject to at least intermediate scrutiny.  But each also discriminates on the basis of content, speaker, and viewpoint, triggering strict scrutiny many times over.

Laws that compel speakers to "alter the content[] of [their] speech" are necessarily "content based." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766 (2018).  In *NIFLA*, the Court held that a California law requiring clinics to provide patients with a "script about the availability of state-sponsored services," was content based because it "compel[led] individuals to speak a particular message," "alter[ing] the content" of the clinics' own speech.  *Id.* Similarly, in *Riley v. National Federation of the Blind of North Carolina*, the Court held that a law requiring professional fundraisers to disclose specific information to potential donors was content based.  487 U.S. 781, 795 (1988).  "Mandating speech that a speaker would not otherwise make," the Court explained, "necessarily alters the content of the speech."  *Id.*

29

Applying those principles, S.B.7072 is plainly content based. Just as Facebook and YouTube convey a message about the speech that they find acceptable and the community that they hope to foster when they curate and disseminate third-party speech to their users, *Moody*, 603 U.S. at 738, so do Pinterest, X, Etsy, Nextdoor, and Reddit when they do the same. Vasquez.Decl.¶21; Fernandez.Decl.¶20; Duba.Decl.¶¶32, 78; Dkt.280-22 ("Etsy's policies … exist to help keep our marketplace safe, fair, and creative."); Callaway.Decl.¶¶8-10; Cleland.Decl.¶¶18, 24; Dkt.280-19 at 4 ("Nextdoor's Community Guidelines are designed to keep interactions on the platform safe and productive."). "Since every participating unit affects the message conveyed," requiring websites to include speech they do not want to include or present speech in ways they would rather not necessarily alters the content of their messages. *Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 572-73 (1995).

That alone triggers strict scrutiny. But S.B.7072 is shot through with other content-based distinctions too. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Multiple provisions of S.B.7072 do just that. The political-candidate provision, for example, prohibits companies from deprioritizing posts "about" political candidates, but not other topics. §501.2041(2)(h). And the journalistic-enterprise provision prohibits

30

the exercise of editorial judgment over posts by a so-called journalistic enterprise "based on" its "content."  §501.2041(2)(j).  S.B.7072 thus "singles out specific subject matter for differential treatment."  *Reed*, 576 U.S. at 169.

The consistency provision, §501.2041(2)(b), is also content based because its entire purpose is to compel and amplify content that websites would otherwise not disseminate.  *See City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 76 (2022).  In *PG&E v. Public Utilities Commission of California*, the access order was content based because its "acknowledged purposes" were "to offer the public a greater variety of views in appellant's billing envelope, and to assist groups … that challenge appellant in the Commission's ratemaking proceedings in raising funds."  475 U.S. 1, 12-13 (1986) (plurality op.).  The order thus forced PG&E to "contend with the fact that whenever it speaks out on a given issue, it may be forced … to help disseminate hostile views."  *Id.* at 14.

Here, too, the acknowledged purpose of the consistency requirement is to "grant access to" speakers "on the ground that the content of" their speech "will counterbalance the messages" that websites voluntarily disseminate.  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 655 (1994); *see* Ron DeSantis, *Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech* (May 24, 2021), https://perma.cc/Y6RN-VDCR.  If Reddit disseminates speech criticizing the terrorist organization ISIS, the consistency requirement would seemingly require it

31

to disseminate speech praising ISIS, even if it prefers not to "disseminate hostile views." *PG&E*, 475 U.S. at 14. It would also seemingly prohibit Facebook from terminating accounts promoting terrorism if Facebook did not terminate an account that posted similar content in the past. In other words, it mandates Florida's view of the proper balance among the views expressed and the content disseminated by private websites. The consistency requirement is thus content based for the same reasons that the access order in *PG&E* was content based. *Moody*, 603 U.S. at 719 (It "is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences.").

**D.    None of the Challenged Provisions Can Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny.**

Because strict scrutiny applies, Florida bears the heavy burden of demonstrating that S.B.7072 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Indeed, even under intermediate scrutiny, Florida would have to prove that S.B.7072 is "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017), that is "unrelated to the suppression of free expression," *TikTok Inc. v. Garland*, 604 U.S. 56, 73 (2025). It cannot come close to meeting either standard.

32

First, Florida has not identified a legitimate, let alone significant or compelling, justification for interfering with protected editorial judgments, much less in a content-, speaker-, and viewpoint-based manner. If Florida seeks to justify S.B.7072 based on an interest in ensuring that the public has equal access to competing viewpoints, that effort is squarely foreclosed by the Supreme Court precedent. As the Court explained, "a State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*, 603 U.S. at 741. "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Id.* at 741-42. In short, "the government may not 'restrict the speech of some elements of our society in order to enhance the relative voice of others.'" *Id.* at 742.

Florida has not advanced any other interest that might justify the challenged provisions, so that should be the end of the matter regardless of which level of scrutiny applies. But even if it could posit a permissible state interest, the challenged provisions burden far more speech than could be necessary to achieve it. The consistency requirement mandates consistency for the entire universe of editorial judgments, from routine application of clear rules to delicate and context-dependent value judgments. The journalistic-enterprise and candidate provisions prohibit or severely restrict editorial discretion over virtually all material posted by journalistic

33

enterprises and candidates, no matter how blatantly they violate a website's rules. The rule-change provision bars changes to editorial policies even in the face of rapidly evolving challenges, and even when bad actors exploit loopholes in a website's rules. And the detailed-explanation requirement is practically impossible to satisfy given the millions of posts that websites remove, restrict, or deprioritize each day. Florida does not and cannot explain why such sweeping and draconian restrictions are necessary to achieve its objectives—unless the goal is simply to punish so-called "Big Tech" for speech it disfavors.

Moreover, S.B.7072 is both overinclusive and underinclusive. It is overinclusive because the definition of "social media platform" sweeps in entities regardless of whether they disseminate the kinds of speech with which Florida purports to be concerned or (like Etsy) curate and disseminate user-fashioned artwork and other hand-crafted goods or (like Pinterest) allow users to express themselves via collections of images that showcase their creative interests and style. Florida has never explained what interest it has in restricting the editorial choices of websites that no one would consider to be places for "conveying public opinion." S.B.7072 §1(5). And it is underinclusive because Florida cannot explain the arbitrary size and revenue requirements that exempt websites that are not meaningfully different in the core services they offer—save for their perceived ideological bent. "Such '[u]nderinclusiveness raises serious doubts about whether

34

the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"  *NIFLA*, 585 U.S. at 774 (citation omitted).  In short, the law burdens too much and furthers too little, and thus fails any level of heightened scrutiny.

### E.    *Zauderer* Does Not Apply, But Even If It Did, the Detailed-Explanation Provision Fails *Zauderer* Scrutiny Too.

The foregoing analysis suffices to doom all of the challenged provisions.  But the same conclusion would follow even if S.B.7072's detailed-explanation provision were analyzed under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).

At the outset, while the Eleventh Circuit applied *Zauderer* to that provision the first time this case reached it, *Zauderer* is not the right standard.  The Supreme Court has made clear that laws that compel speech are generally treated no differently than laws that prohibit speech.  *See Riley*, 487 U.S. at 797; *Hurley*, 515 U.S. at 573.  *Zauderer* provides a narrow exception to that rule for compelled disclosures in the commercial advertising context.  There, the Court upheld a requirement that attorneys who advertise their willingness to represent clients for a contingency fee must disclose whether the client would have to pay court costs in the event of a loss.  *See* 471 U.S. at 639-53.  It declined to apply traditional heightened scrutiny to that requirement, reasoning that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the

35

value to consumers of the information such speech provides," an advertiser has only "minimal" interest in withholding "purely factual" information necessary to avoid misleading consumers. *Id.* at 651.

The Supreme Court has never applied *Zauderer* to uphold a speech mandate outside the context of correcting misleading advertising. To the contrary, it has consistently and repeatedly described *Zauderer* as limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); *see Hurley*, 515 U.S. at 573 (describing *Zauderer* as permitting the government to "requir[e] the dissemination of 'purely factual and uncontroversial information'" only in the context of "commercial advertising"); *United States v. United Foods, Inc.*, 533 U.S. 405, 416 (2001) (declining to apply *Zauderer* where compelled subsidy was not "necessary to make voluntary advertisements nonmisleading for consumers"); *In re R.M.J.*, 455 U.S. 191, 205 (1982) (similar).

There is thus no reason to apply *Zauderer* here—and every reason not to. The detailed-explanation requirement has nothing to do with preventing misleading advertising. The point of the requirement is to make it easier for parties to sue websites for perceived inconsistencies in how they exercise their editorial discretion. It is one thing to require a commercial entity that voluntarily advertises its services to include information that makes the advertisement non-misleading. Because the

36

government can *ban* misleading advertisements without running afoul of the First Amendment, *see R.M.J.*, 455 U.S. at 203, it follows that it may preclude misleading commercial advertisements by requiring disclosures to ensure accuracy. *See Zauderer*, 471 U.S. at 651. But it is very different, and entirely unjustified, to compel speech in furtherance of more government regulation of the speech—particularly when the entity is not engaged in any advertising at all, let alone misleading advertising. Nor does the detailed-explanation requirement mandate disclosure of "purely factual and uncontroversial information about the terms under which ... services will be available." *NIFLA*, 585 U.S. at 768 (citation omitted). It instead requires websites to disclose all manner of sensitive information about their editorial policies and judgments. Had Florida required the Miami Herald to give "a thorough rationale explaining" why it chose not to run Tornillo's op-ed, that compelled speech would still violate the First Amendment and could not have been justified as a benign effort to stop misleading claims about the paper's op-ed policies. *Zauderer* does not apply here.

In all events, the detailed-explanation requirement cannot withstand *Zauderer* scrutiny either, as the Eleventh Circuit correctly concluded. *NetChoice*, 34 F.4th at 1230-31. *Zauderer* puts the burden on the state to prove that its disclosure requirements are "neither unjustified nor unduly burdensome." *NIFLA*, 585 U.S. at 776. Here, Florida has never explained how the detailed-explanation requirement is

37

"reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651.  Nor has Florida pointed to anything to suggest that the websites have misled consumers about their editorial policies.  Just as California "point[ed] to nothing suggesting that pregnant women do not already know that the covered facilities are staffed by unlicensed medical professionals" in *NIFLA*, 585 U.S. at 777, Florida has pointed to nothing suggesting that consumers do not know that websites exercise editorial discretion.

Nor has Florida even tried to demonstrate that the detailed-explanation requirement is not unduly burdensome vis-à-vis any legitimate interests they may serve.  Websites like Etsy, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Threads, X, and YouTube remove millions of posts per day that violate their policies, and they make countless more decisions about how to prioritize and arrange third-party speech on their websites.  *Supra* pp.3-9.  For example, Etsy has style editors who identify content to promote because they think the product listings are "value-aligned" and exemplify Etsy's "mission to keep commerce human." Duba.Depo.45:20-24.  And Pinterest deactivates hundreds of millions of pins each year for violating its adult content policy.  Dkt.280-34 at 5.  S.B.7072 would require them to provide a "precise and thorough" explanation for each one of those decisions.  Not only would that be paralyzingly burdensome, but S.B.7072 could expose websites to significant statutory damages if a Florida court were to determine

38

that they did not provide sufficiently thorough explanations. "Faced with the penalties that would accrue," on top of the already significant compliance burdens (including the disclosure of proprietary algorithms), websites "might well conclude that the safe course is to avoid controversy" by not exercising editorial discretion at all. *Tornillo*, 418 U.S. at 257.

*   *   *

In sum, each challenged provision violates the First Amendment rights of Plaintiffs' members when they are engaged in curating and disseminating third-party speech—exemplified here by Meta, YouTube, Pinterest, X, Reddit, and Etsy. Plaintiffs thus are entitled to summary judgment on their as-applied claims.

## II.    Many Of The Challenged Provisions Are Unconstitutional On Their Face.

Once it becomes clear that each of the provisions discussed above is unconstitutional as applied to Plaintiffs' members when they curate and disseminate third-party speech, it follows that many of them are facially unconstitutional as well. Indeed, many of the provisions—including the provision regulating posts by or about political candidates, §501.2041(2)(h), the user opt-out provision, §§501.2041(2)(f)-(g), the consistency provision, §501.2041(2)(b), the journalistic-enterprise provision, §501.2041(2)(j), and the detailed-explanation provisions, §§501.2041(2)(d), (3)—apply *only* when websites are engaged in the First

39

Amendment activity of curating and disseminating third-party speech posted on their services, which suffices to render them unconstitutional in *all* their applications.[6]

Even if Florida could gin up some "realistic, not fanciful," applications of those provisions that could pass constitutional muster, *United States v. Hansen*, 599 U.S. 762, 770 (2023), the fact that a statute has *some* legitimate sweep will not defeat Plaintiffs' facial challenge. "In First Amendment cases," the standard for a facial challenge is "less demanding": the question is whether a "'substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moody*, 603 U.S. at 723-24 (citations omitted). And in answering that question, the Court must proceed on a provision-by-provision basis, not by looking at S.B.7072 as a whole. As the Fourth Circuit recently explained, "Plaintiffs *may* direct facial challenges at whole statutes, but that does not mean they must." *Chamber of Com. v. Lierman*, 151 F.4th 530, 542 (4th Cir. 2025). So "[t]he question is not whether the whole statute has constitutional applications but whether the [challenged] provision[s] do[]." *Id.* That is why courts routinely find some provisions of a law facially unconstitutional while determining that other provisions

---

[6] Although this Court previously rejected Plaintiffs' arguments that S.B.7072 (including its definition of "social media platforms") governs only providers of social media services as that term is commonly understood, *see* MTD.Op.4-11, Plaintiffs reserve the right to re-raise those arguments, including on appeal, in support of their First Amendment challenges. For present purposes, Plaintiffs' arguments are premised on the Court's prior rulings about the scope of S.B.7072.

40

of the same law are not. In *Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017) (en banc), for example, the Eleventh Circuit held that several provisions of Florida's Firearm Owners' Privacy Act were facially unconstitutional under the First Amendment while sustaining others against a facial First Amendment challenge. *Id.* at 1309.

Even *within* a single provision, some requirements may be facially unconstitutional while others are not. In *Frazier ex rel. Frazier v. Winn*, for instance, the Eleventh Circuit addressed a facial challenge to a provision of a Florida law that required students to both obtain parental consent to be excused from reciting the pledge of allegiance and "stand[] at attention" during the pledge. 535 F.3d 1279, 1281 (11th Cir. 2008). While the Court upheld the parental-consent requirement against a facial First Amendment challenge, it held that the "stand[] at attention" requirement was facially unconstitutional even though it appeared in the same statutory provision. *Id.* at 1282-84; *accord Lierman*, 151 F.4th at 542 ("[P]laintiffs don't even have to challenge an entire statutory act; they can train their fire on just one offending word.").

Applying those principles, several of S.B.7072's provisions are unconstitutional on their face. Most of those provisions apply *only* to the same conduct covered by Plaintiffs' as-applied challenge. For these provisions, therefore, core content-moderation choices made by publishers of curated compilations in fact

41

"*are* the principal things regulated, and should have just that weight in the facial analysis." *Moody*, 603 U.S. at 718.  And to the extent a few provisions may be read to have a few hypothetical applications that are a closer constitutional call, those would be vastly outweighed by the "substantial amount of protected speech" that the "heartland applications" of the provisions restrict.  *Id.* at 723-24.[7]

***Posts by or about candidates—§501.2041(2)(h).***  To begin, the provision restricting the use of "*post-prioritization* or *shadow banning* algorithms for *content and material posted by or about … a candidate*" is facially unconstitutional. §501.2041(2)(h) (emphasis added).  By its terms, that provision applies *only* when a website is engaging in "post prioritization" or "shadow banning."  S.B.7072 defines "post prioritization" as "action by a social media platform *to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results*."

---

[7] Moreover, many of the provisions cannot be severed from other provisions.  For instance, as explained, *see supra* pp.36-37, the whole point of the disclosure requirements is to make it easier to sue websites for perceived inconsistencies in how they exercise their editorial discretion.  Those provisions thus would no longer serve their evident purpose without the unconstitutional restrictions on editorial discretion, which means they must necessarily fall together.  Indeed, S.B.7072's provisions are interlocking requirements that work as a whole to further Florida's unconstitutional goal of promoting equal access to differing viewpoints.  To the extent the Court disagrees with the analysis below and holds only some of the challenged provisions facially unconstitutional, Plaintiffs reserve the right to address severability in future briefing to show that such interwoven provisions must still be declared unconstitutional and enjoined.

42

§501.2041(1)(e) (emphasis added).  It defines "shadow ban" to mean "action by a social media platform … *to limit or eliminate the exposure of a user or content or material posted by a user to other users* of the social media platform." §501.2041(1)(f) (emphasis added).  The provision thus applies *only* when a website is engaged in activity that the Supreme Court has already held is constitutionally protected.  By prohibiting covered websites from arranging certain content by or about political candidates ahead of (or below) other content in a newsfeed, a feed, a view, or in search results ("post prioritization") and limiting dissemination (i.e., reach or exposure) of user posts to others ("shadow banning"), the provision "interferes with" those websites' "editorial choices" in "[d]eciding on the third-party speech that will be included in or excluded from a compilation" and how to "organiz[e] and present[] the included items."  *Moody*, 603 U.S. at 731-32.

Because Section 501.2041(2)(h) applies to "social media platforms" *only* when they exercise editorial discretion about whether and how to display third-party content posted on their services, it does not matter that S.B.7072's definition of "social media platform" sweeps more broadly than the typical understanding of "social media."  MTD.Op.4-11.  To the extent "Craigslist," "finance message-board[s]," "dating-service website[s]," *id.* at 8, or any of the other myriad services that may be covered by S.B.7072 are not engaging in "post prioritization" or "shadow banning" (i.e., making editorial judgments about whether and how to

43

disseminate third-party speech), they fall outside the scope of Section 501.2041(2)(h) and do not factor into the facial analysis. *Lierman*, 151 F.4th at 542-43 ("We agree that the pass-through prevents neither of these kinds of speech[.] … But that just means these kinds of speech are not 'applications' … [s]o these give us no reason at all to think that the pass-through provision has constitutional applications."). But when those websites *are* engaging in that protected activity, Section 501.2041(2)(h) is unconstitutional in the only context in which it could ever apply to them. *See, e.g.*, *Zhang v. Baidu.com Inc.*, 10 F.Supp.3d 433, 438-39 (S.D.N.Y. 2014) (holding that First Amendment protects a search engine's decisions about what search results to include and how to arrange and display those results); *Hopson v. Google, LLC*, 2023 WL 2733665, at *3 (W.D. Wis. Mar. 31, 2023).

Simply put, there is no circumstance in which the state may permissibly force a private website to disseminate candidate-related speech or to give it more prominence, regardless of which specific websites may fall within the statute's broader definition of "social media platform." Indeed, the state has never even tried to come up with some "realistic, not fanciful," *Hansen*, 599 U.S. at 770, applications of Section 501.2041(2)(h) that would not be unconstitutional.[8] But even if it could,

---

[8] Section 501.2041(2)(h) would not cover this Court's hypothetical of an internet service provider shutting down a candidate's service on the eve of election, *see* MTD.Op.42; that would instead be covered (if at all) only by the separate provision prohibiting "deplatforming" a candidate. *See* §106.072(2). Nor would Section 501.2041(2)(h) cover the Court's hypothetical of prohibiting an email or text

44

those hypothetical applications would be outweighed by the "substantial amount of protected speech" restricted by the law's "heartland applications." *Moody*, 603 U.S. at 723-24. The principal (if not sole) application of Section 501.2041(2)(h) is to override protected editorial discretion, and on the basis of content to boot. *See supra* pp.10, 24, 30-31. That makes it exactly the sort of provision as to which "a facial challenge is appropriate." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

*User opt-out—§§501.2041(2)(f)-(g).* For the same reasons, the user opt-out provisions are facially unconstitutional. Those provisions require "social media platforms" to "categorize algorithms used for *post-prioritization* and *shadow banning*" and give users an annual opportunity to "opt out of *post-prioritization* and *shadow banning* algorithm categories *to allow sequential or chronological posts and content*." §§501.2041(2)(f)-(g) (emphasis added). Like the provision addressing posts by or about political candidates, the user opt-out provisions apply *only* when a "social media platform" is engaging in "post prioritization" and "shadow banning"—i.e., when it is curating and disseminating compilations of third-party

---

provider from "attaching the provider's own unfavorable comments to a candidate's messages in the run-up to an election," MTD.Op.42, as Section 501.2041(2)(h) does not prohibit "censoring," which is the only aspect of S.B.7072 that addresses "post[ing] an addendum to any content or material posted by a user," §501.2041(1)(b).

speech.  The user opt-out provisions are therefore unconstitutional *whenever* they apply, as there is "no governmental interest sufficient to justify forcing platforms to show content to users in a 'sequential or chronological' order…a requirement that would prevent platforms from expressing messages through post-prioritization and shadow banning." *NetChoice*, 34 F.4th at 1229.

Again, it makes no difference that S.B.7072's definition of "social media platform" sweeps broadly.  If the likes of Uber, Venmo, etc., are not engaged in what S.B.7072 describes as "post prioritization" and "shadow banning," then they are not within the scope of the user opt-out provision.  But if they are engaged in that activity—i.e., deciding whether to disseminate third-party content and how to organize it—then the user-opt out provisions cannot constitutionally be applied to them when they are, as it overrides their editorial discretion about what content to display and how to present it.  *Hopson*, 2023 WL 2733665, at *3.  That likely explains why Florida has never bothered to try to identify any application of the user opt-out provision that would be "plainly legitimate."  Even if it could, any such rare hypothetical applications would be outweighed by the "substantial amount of protected speech" that the provision's "heartland applications" restrict.  *Moody*, 603 U.S. at 723-24.

***Journalistic enterprises—§501.2041(2)(j).***    The journalistic-enterprise provision prohibits a "social media platform" from acting to "*censor*, *deplatform*, or

46

*shadow ban* a journalistic enterprise *based on the content of its publication or broadcast*" (so long as the content is not obscene). §501.2041(2)(j) (emphasis added). Each aspect of that provision is facially invalid.

First, the prohibition on "*shadow ban[ning]*" a journalistic enterprise "*based on the content of its publication or broadcast*" is facially unconstitutional for all the reasons explained above. As with the similar candidate provision, that prohibition can realistically apply to websites only when they are engaged in the First Amendment protected activity of disseminating "distinctive compilations of expression" through "choices about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716. In every case where it applies, this is a content- and speaker-based ban on limiting or eliminating the exposure of particular speech that Florida disfavors. It thus directly restricts the editorial discretion of websites for no reason other than "to enhance the relative voice of others" in violation of the First Amendment. *Id.* at 742.

Second, the prohibition on "*censor[ing]*" a journalistic enterprise "*based on the content of its publication or broadcast*" is facially unconstitutional for similar reasons. S.B.7072 defines "censor" to "include[] any action taken by a social media platform to *delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum* to any *content or material posted by a user*" or "to *inhibit the ability of a user to be viewable*

47

*by or to interact with* another user of the social media platform." §501.2041(1)(b)

(emphasis added).  In other words, the text focuses on restrictions of published

speech—in the form of *posted* content—and, like the shadow-banning provision, its

prohibitions thus apply *only* when a website is either "[d]eciding on the third-party

speech that will be included in or excluded" and how to "organiz[e] and present[]"

that speech, *Moody*, 603 U.S. at 731, or disseminating speech of its own via "an

addendum."[9]  Not only that, but these restrictions apply *only* when a website makes

those decisions "*based on the content*" of the journalistic enterprise's publication.

§501.2041(2)(j) (emphasis added).  The principal (if not the sole) applications of the

prohibition on "censoring" a journalistic enterprise provision are therefore to direct

websites "to accommodate messages [they] would prefer to exclude" because of

their content, or to refrain from engaging in their own speech about the messages

---

[9] To the extent this Court suggested that "attaching the provider's own unfavorable comments to a" user's email or text messages might qualify as "censorship," MTD.Op.42, that is incorrect.  S.B.7072's definition of "censor" applies only to content that is "posted." §501.2041(1)(b).  That is not a term used in ordinary parlance to cover sending user-to-user messages like texts or emails, and that is not how S.B.7072 uses the term either. *See, e.g.*, §501.2041(1)(e) (defining "post-prioritization" as activity relating to content made available to users via "a newsfeed, a feed, a view, or in search results").  At any rate, it is hard to see how the government could ban an email or text provider from engaging in its own speech about third-party speech—whether that speech comes from a candidate, a journalistic enterprise, or anyone else—without running afoul of the First Amendment. *E.g.*, *United States v. Alvarez*, 567 U.S. 709 (2012).

they choose to include. *Moody*, 603 U.S. at 731. All such applications are unconstitutional.

The same is true of the prohibition on "*deplatform[ing]*" a journalistic enterprise provision based on the content of its publication or broadcast. As explained, *see supra* pp.25-26, 30-31, 33-34, that prohibition is plainly unconstitutional as applied to websites when they curate and disseminate third-party speech posted on their services. Preventing websites like Facebook, YouTube, and Reddit from "delet[ing] or ban[ning]" the likes of The Crusader or the Ku Klux Klan-affiliated online forum Stormfront "based on the content" of their publications overrides their protected editorial discretion through and through. §§501.2041(1)(c), (2)(j). To be sure, the "deplatforming" aspect of the provision may theoretically apply to services like Uber as well. MTD.Op.4-11. But to the extent it does, it would apply *only* when such a website bans a journalistic enterprise "based on the content of its publication or broadcast," §501.2041(2)(j)—not if, say, Uber deplatformed a journalist for treating its drivers poorly. And it is not at all clear that the government could prohibit Uber from deplatforming, e.g., employees of Fox News "based on the content" of its publications.

Even if it could, those strained theoretical applications of the provision could not save the deplatforming ban from facial invalidation. "In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial

49

requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008). Moreover, even a "*plainly* legitimate sweep"—which it is far from certain such hypothetical applications would be—is not enough if a "substantial number of the law's applications are unconstitutional." *Moody*, 603 U.S. at 723-24 (emphasis added) (cleaned up). As Florida has repeatedly explained, the principal focus of this provision is to prevent websites like Facebook, YouTube, and X (then-Twitter) from deplatforming "conservative" news entities like the Babylon Bee or the New York Post. *See* Pet.App.109a-135a, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Sept. 21, 2022). The state has never pointed to *any* examples of, e.g., ride-sharing services banning "journalistic enterprises" from hailing rides, let alone provided any reason to think such unlikely scenarios happen with sufficient frequency to outweigh the "substantial amount of protected speech" that the law's "heartland applications" restrict. *Moody*, 603 U.S. at 723-24.

*Consistency—§501.2041(2)(b).* The consistency provision requires a "social media platform" to "apply *censorship*, *deplatforming*, and *shadow banning* standards in a consistent manner among its users on the platform." §501.2041(2)(b) (emphasis added). As discussed, each aspect of that provision is unconstitutional in its core applications. Indeed, because the "*censorship*" and the "*shadow banning*" aspects of the provision can be applied *only* when a covered website is engaged in

the constitutionally protected activity of curating and disseminating third-party speech posted on their services or appending its own speech, they are unconstitutional in every application regardless of how broadly the definition of "social media platform" sweeps.

To be sure, the "*deplatforming*" aspect of the provision might theoretically apply to situations where websites are not curating and disseminating third-party speech. For example, it might require Uber to apply its "deplatforming" standards consistently when deciding who to ban or suspend from its ride sharing service. But again, as Florida has consistently explained in this case, the principal (and undoubtedly most common) application of this provision is to prevent the likes of Facebook, YouTube, and X (then-Twitter) from treating certain users differently from others when deciding who to ban or suspend from websites that curate and disseminate speech. Pet.App.109a-135a, *Moody*, No. 22-277. As discussed, *see supra* pp.23, 25, 31-32, that interferes with quintessential editorial decisions by denying websites the right to decide for themselves whether to disseminate content from a particular user. *See Castronuova v. Meta Platforms, Inc.*, 2025 WL 1914860, at \*5 (N.D. Cal. June 10, 2025) (citing *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742 (9th Cir. 2024), for the proposition that the First Amendment protects the editorial discretion websites exercise when they "remove a user's account or content"); *cf. Murphy v. Twitter*, 60 Cal. App. 5th 12, 26 (2021). So even

51

if Florida could identify some examples of websites like Uber applying their "deplatforming" standards inconsistently, such rare hypothetical applications would be outweighed by the "substantial amount of protected speech" restricted by the law's "heartland applications." *Moody*, 603 U.S. at 723-24.[10]

***Detailed explanation—§§501.2041(2)(d), (3).*** Requiring "social media platforms" to give notice every time they "*censor* or *shadow ban* a user's content or material or *deplatform* a user from the social media platform," as well as a "thorough rationale explaining" every "*censorship*" decision, along with a "precise and thorough explanation" of how the website "became aware of the *censored* … material," is facially unconstitutional as well. Because the detailed-explanation requirement compels speech, it implicates the First Amendment in each of its applications. *See NIFLA*, 585 U.S. at 766. And by its terms, it singles out for explanation the precise conduct that *Moody* says is protected by the First Amendment—namely, decisions about what content to disseminate and how to arrange and organize it. It imposes the same significant burdens on *every* website to which it applies, be it Facebook, YouTube, Nextdoor, Uber, Venmo, or Gmail. Because it is "unduly burdensome and likely to chill platforms' protected speech,"

---

[10] Even if the Court is not persuaded that the "deplatforming" aspect of the consistency provision is facially unconstitutional, the "censorship" and "shadow banning" aspects most certainly are. And the Court is free to invalidate the latter in whole even if it invalidates the former only in part. *See Frazier*, 535 F.3d at 1281.

*NetChoice*, 34 F.4th at 1230, the provision is thus unconstitutional in every scenario in which it applies. *See NIFLA*, 585 U.S. at 776-79 (holding disclosure requirements facially unconstitutional because they were unduly burdensome in all applications).

## III.    S.B.7072 Is Unconstitutionally Vague.

Finally, the Court should grant summary judgment on Plaintiffs' vagueness claim.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012).   A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).  "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.  After all, vague laws risk chilling would-be speakers by forcing them "to 'steer far wider of the unlawful zone'" than they would "if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). For that reason, laws touching on speech must themselves speak "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 433 (1963).

Multiple provisions of S.B.7072 fail to provide a person of ordinary intelligence with fair notice of what is prohibited or required.  Most obviously, the

consistency provision (§501.2041(2)(b)) contains no explanation of what "a consistent manner" means, and it is impossible to understand (especially with the kind of clarity the First Amendment demands) what that provision requires. That vague mandate chills any number of judgment calls that depend on context or require educational, scientific, or artistic evaluations. Imagine, for example, two posts containing the same "threatening" language, where one is a direct comment and the other takes the form of song lyrics. Would it violate S.B.7072 to remove the former but not the latter? Likewise, if a website permits commentary condemning terrorist attacks, can it still remove comments praising the same attack? Must it apply its hate-speech rules to debates about transgender issues just as it does to posts about race or religion? Countless examples abound, and S.B.7072 sheds no light on any of the endless real-world choices that websites confront every day. *See, e.g.*, Veitch.Decl.¶¶44-45; Veitch.Depo.335:9-336:1; Potts.Decl.¶18; Vasquez.Decl.¶37; Duba.Decl.¶49; Duba.Depo.148:8-149:3; Fernandez.Decl.¶¶32-34.

The provision addressing posts by or about a political candidate (§501.2041(2)(h)) is also unconstitutionally vague. The definition of "post-prioritization" covers any "action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." §501.2041(1)(e). As this Court recognized, it is impossible to understand what this

54

provision does and does not allow.  MTD.Op.36; *see also, e.g.*, Potts.Decl.¶40; Vasquez.Decl.¶¶38-39; Duba.Decl.¶¶73-74; Fernandez.Decl.¶35; Veitch.Decl.¶33. According to its terms, that provision would suggest that a search function is forbidden from placing content "by or about" a political candidate ahead of—or below—any other content.  And it would forbid placing such content in a more prominent position—or a less prominent position—than other content.  The Constitution does not allow Florida to impose such a paradoxical, self-defeating, and incomprehensible prohibition.

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment on:

- Plaintiffs' as-applied claims as to the consistency provision, §501.2041(2)(b), the provision addressing posts by or about political candidates, §501.2041(2)(h), the candidate-deplatforming provision, §106.072(2), the journalistic-enterprise provision, §501.2041(2)(j), the rule-change provision, §501.2041(2)(c), the user-opt out provisions, §§501.2041(2)(f)-(g), and the detailed-explanation provisions, §§501.2041(2)(d), (3).

- Plaintiffs' facial claims as to the consistency provision, §501.2041(2)(b), the provision addressing posts by or about political candidates, §501.2041(2)(h), the journalistic-enterprise provision,

56

§501.2041(2)(j), the user-opt out provisions, §§501.2041(2)(f)-(g), and the detailed-explanation provisions, §§501.2041(2)(d), (3).

- Plaintiffs' vagueness claims.

The Court should permanently enjoin Florida from enforcing all these provisions.

Respectfully submitted,

s/Erin E. Murphy

Brian M. Willen
Steffen N. Johnson
Paul N. Harold
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K Street NW
Washington DC 20006
(202) 973-8800
bwillen@wsgr.com
sjohnson@wsgr.com
pharold@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

Benjamin S. Hewitt
WILSON SONSINI GOODRICH &
ROSATI, P.C.
31 West 52nd Street
Fifth Floor
New York, NY 10019
(212) 453-2804
bhewitt@wsgr.com

Paul D. Clement
Erin E. Murphy
James Y. Xi
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Douglas L. Kilby
Florida Bar No. 0073407
Hannah E. Murphy
Florida Bar No. 1032759
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com

*Counsel for Plaintiffs NetChoice, LLC and Computer & Communications Industry Association*

March 20, 2026

57

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Plaintiffs' Memorandum in Support of their Motion for Partial Summary Judgment has 12,698 words, which is fewer than the 12,750 words that Plaintiffs requested in their concurrently filed unopposed motion to enlarge the word count pursuant to Local Rules 7.1(F) and (G).

March 20, 2026                                    s/Erin E. Murphy
                                                  Erin E. Murphy


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 20th day of March, 2026.

March 20, 2026                                    s/Erin E. Murphy
                                                  Erin E. Murphy