# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION,

    *Plaintiffs*,

v.

JAMES UTHMEIER, et al.,

    *Defendants*.

Case No. 4:21-cv-0220-RH-MAF

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF <u>SECOND MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND ................................................................................................. 2

      A.    Factual Background.................................................................... 2

      B.    Procedural History..................................................................... 5

ARGUMENT ...................................................................................................... 5

I.     The View-Count Provision Violates The First Amendment As Applied To Plaintiffs' Members When They Curate And Disseminate Third-Party Speech Posted On Their Services .......................... 5

      A.    The First Amendment Protects Websites' Curation and Dissemination of Third-Party Speech Posted on Their Services and Their Right Not To Speak Regarding Those Editorial Decisions ................................................................ 5

      B.    The View-Count Provision Is a Content-Based Compelled Speech Mandate That Burdens Members' Editorial Discretion ................................................................................. 9

      C.    The View-Count Provision Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny ............................... 15

II.    *Zauderer* Does Not Apply, But Even If It Did, The View-Count Provision Fails *Zauderer* Scrutiny Too ....................................................... 18

CONCLUSION .................................................................................................. 26

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Am. Meat Inst. v. USDA*,
760 F.3d 18 (D.C. Cir. 2014)................................................................16

*Borgner v. Brooks*,
284 F.3d 1204 (11th Cir. 2002) ............................................................21

*CCIA v. Uthmeier*,
2025 WL 1570007 (N.D. Fla. June 3, 2025) ........................................17

*Chiles v. Salazar*,
2026 WL 872307 (U.S. Mar. 31, 2026)................................................19

*City of Austin v. Reagan Nat'l Advert. of Austin*,
596 U.S. 61 (2022)........................................................................ 14, 15

*CTIA – The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) ...............................................................20

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
515 U.S. 557 (1995)........................................................ 8, 14, 19, 21

*In re R.M.J.*,
455 U.S. 191 (1982).............................................................................20

*Int'l Dairy Foods Ass'n v. Amestoy*,
92 F.3d 67 (2d Cir. 1996) ....................................................................16

*McCullen v. Coakley*,
573 U.S. 464 (2014).............................................................................15

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)................................................................... *passim*

*Milavetz, Gallop & Milavetz P.A. v. United States*,
559 U.S. 229 (2010).............................................................................21

*Moody v. NetChoice*,
603 U.S. 707 (2024)................................................................... *passim*

*Nat'l Ass'n of Mfrs. v. SEC*,
   800 F.3d 518 (D.C. Cir. 2015)......................................................................20

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
   272 F.3d 104 (2d Cir. 2001) ......................................................................16

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018)........................................................... *passim*

*NetChoice, LLC v. Att'y Gen.*,
   34 F.4th 1196 (11th Cir. 2022) ..................................... 9, 13, 16

*NetChoice, LLC v. Bonta*,
   152 F.4th 1002 (9th Cir. 2025) ..................................... 9, 12, 14, 23

*Packingham v. North Carolina*,
   582 U.S. 98 (2017)......................................................................15

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
   487 U.S. 782 (1988)........................................................... *passim*

*TikTok Inc. v. Garland*,
   604 U.S. 56 (2025)......................................................................15

*United States v. United Foods*,
   533 U.S. 405 (2001)......................................................................21

*Wooley v. Maynard*,
   430 U.S. 705 (1977)......................................................................8, 23

*X Corp. v. Bonta*,
   116 F.4th 888 (9th Cir. 2024) ..................................... 16, 22

*Zauderer v. Off. of Disciplinary Counsel of Sup. Ct. of Ohio*,
   471 U.S. 626 (1985)..................................... 19, 20, 23

**Statutes**

Fla. Stat. §501.1736(1)(e) ......................................................................16

Fla. Stat. §501.1736(2)-(4)......................................................................16

Fla. Stat. §501.2041(1)(b) ......................................................................4

Fla. Stat. §501.2041(1)(c) ................................................................4

Fla. Stat. §501.2041(1)(f) ................................................................4

Fla. Stat. §501.2041(2)(b) .................................................. 4, 12, 14

Fla. Stat. §501.2041(2)(e) ...................................................... *passim*

Fla. Stat. §501.2041(6) ..................................................... 4, 12, 14

**Other Authority**

Fla.Op.Br., *CCIA v. Uthmeier*, No. 25-11881 (11th Cir. Aug. 13, 2025) ...............17

# INTRODUCTION

As detailed in Plaintiffs' Amended Motion for Summary Judgment, S.B.7072's core restrictions on editorial discretion are unconstitutional as applied to websites operated by Plaintiffs' members when they curate and disseminate compilations of third-party speech posted on their services, and many are unconstitutional on their face to boot.[1]  *See* Dkt.282-1 ("Am.MSJ.").

As this motion shows, S.B.7072's view-count provision, Fla. Stat. §501.2041(2)(e), is likewise unconstitutional.[2]  By its very terms, the provision is triggered when a website "provide[s] or show[s]" third-party content to others—*viz.*, when websites are curating and disseminating such third-party content.  And it forces those websites to disclose details about the results of their editorial choices when they otherwise would not do so.  The view-count provision's compelled-speech mandate thus "exacts a penalty" on websites' decision to provide or show third-party content to its users, substantially burdening their editorial choices.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974).  Indeed, the whole point of the

---

[1] While most members offer various interfaces in addition to websites (including mobile apps) to access their platforms or other services, this brief refers to all of them collectively as "websites" or "services."  *See* Dkt.280-1¶9 ("Schruers.Decl.").

[2] Although not addressed in either the Amended Motion for Summary Judgment or this motion, Plaintiffs maintain that the standards provision (§501.2041(2)(a)) is unconstitutional as applied to Plaintiffs' members when they curate and disseminate third-party speech posted on their services and that the candidate-deplatforming (§106.072(2)), rule-change (§501.2041(2)(c)), standards (§501.2041(2)(a)), and view-count (§501.2041(2)(e)) provisions are unconstitutional on their face.

view-count provision is to help the state (and private parties) enforce the unconstitutional consistency provision, *see* Am.MSJ.30-35, 50-52, by encouraging users to search for purported inconsistencies in how websites exercise their editorial discretion. That is not a justifiable end for the state to pursue. The "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Moody v. NetChoice*, 603 U.S. 707, 734 (2024). Because the view-count provision aims to do just that, it triggers and flunks strict scrutiny. Moreover, considering it serves no other plausible purpose while also imposing considerable burdens on covered websites, it fails any other form of scrutiny as well. The Court should grant summary judgment on Plaintiffs' as-applied claim challenging that provision.

## BACKGROUND

### A. Factual Background

As explained in more detail in NetChoice and CCIA's principal summary judgment motion, *see* Am.MSJ, NetChoice and CCIA members operate a variety of popular websites on which users can share and interact with content, including Etsy, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Threads, X, and YouTube. Schruers.Decl.¶5; Dkt.280-2¶5 ("Cleland.Decl."); Dkt.280-3¶¶3-4 ("Veitch.Decl."); Dkt.280-4¶¶4-6 ("Potts.Decl."); Dkt.280-5¶¶4-11 ("Duba.Decl."); Dkt.280-6¶¶4-5 ("Vasquez.Decl."); Dkt.280-7¶4 ("Callaway.Decl."); Dkt.280-

8¶¶6-7 ("Fernandez.Decl.").  Plaintiffs' members have developed robust standards for curating, arranging, displaying, and disseminating content in ways that reflect their unique values and the distinctive communities they foster.  *See* Am.MSJ.3-9. These standards prohibit certain kinds of material from being disseminated via their websites and empower Plaintiffs' members to remove, restrict, and/or warn users about all manner of potentially unwanted or harmful content.  *See* Schruers.Decl.¶¶11-12; Cleland.Decl.¶15; Veitch.Decl.¶¶4-5; Potts.Decl.¶¶10, 20; Vasquez.Decl.¶¶7, 16; Callaway.Decl.¶¶8-9; Duba.Decl.¶¶12, 30-32, 39-42; Fernandez.Decl.¶¶8-13; Dkt.280-9 at 11-19 ("Interrog.Resp.").  Through these content policies, websites shape not just what material is generally disseminated on their websites, but also how broadly that material is shared with others based on whether it appears in users' individual feeds.  *See* Schruers.Decl.¶¶15-17; Cleland.Decl.¶¶15-17; Veitch.Decl.¶¶4-7; Potts.Decl.¶¶15-16; Vasquez.Decl.¶¶23-24; Callaway.Decl.¶¶8-10; Duba.Decl.¶¶12-15, 23-29; Fernandez.Decl.¶¶13-17; Interrog.Resp.19-36.

Despite the fact that the First Amendment protects Plaintiffs' members' editorial decisions regarding what content they choose to disseminate on their websites, Florida enacted S.B.7072 to punish select websites for exercising their editorial discretion in ways the state disfavors.  The law imposes a slew of requirements that commandeer how covered websites exercise editorial discretion

over the content on their websites and restrict their ability to make those editorial choices. S.B.7072's consistency provision, for example, requires a "social media platform" to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users." §501.2041(2)(b).[3]

Several other provisions were designed to facilitate enforcement of those restrictions on editorial discretion. The view-count provision (at issue here) requires "social media platform[s]" to provide users "a mechanism … to request the number of other individual platform participants who were provided or shown the user's content or posts," and to provide users "upon request" the "number … who were provided or shown content or posts." §501.2041(2)(e). In other words, this provision, where it applies, requires covered websites to provide information about the results of their editorial decisions whether to disseminate certain content or posts to others, even if they would not otherwise supply this information. And given that the view-count provision cannot be directly enforced via a private right of action (§501.2041(6)), it has no apparent justification or purpose, other than to potentially

---

[3] S.B.7072 defines "[c]ensor" as actions covered websites take to "delete, regulate, restrict, edit, alter, inhibit the publication or republication of[] … any content or material posted by a user" or "inhibit the ability of a user to be viewable by or to interact with another user." §501.2041(1)(b). It defines "[d]eplatform[ing]" as "the action or practice by a social media platform to permanently delete or ban a user" or to do so "for more than 14 days." §501.2041(1)(c). And it defines "[s]hadow ban" as any action to "limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform." §501.2041(1)(f).

give users ammunition to second guess a website's editorial decisions by claiming that the website applied its standards in an inconsistent manner.

## B. Procedural History

Plaintiffs' principal summary judgment motion details the procedural history of this case. Am.MSJ.11-13. In that motion, Plaintiffs have sought summary judgment on their claims that S.B.7072's principal restrictions on editorial discretion are unconstitutional both on their face and as applied to websites when they are engaged in the activity of curating and disseminating third-party speech posted on their services. This motion likewise seeks summary judgment that the view-count provision is unconstitutional as applied to Plaintiffs' members when they curate and disseminate third-party speech posted on their services.

## ARGUMENT[4]

**I. The View-Count Provision Violates The First Amendment As Applied To Plaintiffs' Members When They Curate And Disseminate Third-Party Speech Posted On Their Services.**

**A. The First Amendment Protects Websites' Curation and Dissemination of Third-Party Speech Posted on Their Services and Their Right Not To Speak Regarding Those Editorial Decisions.**

1. As set forth in Plaintiffs' Amended Motion for Summary Judgment, *see* Am.MSJ.14-22, Plaintiffs' members receive First Amendment protection when they

---

[4] As Plaintiffs explained in more detail in their earlier summary-judgment motion, there are no threshold issues preventing the Court from resolving Plaintiffs' claim. *See* Am.MSJ.14 n.5. Plaintiffs have associational standing for all the reasons this Court explained in its prior opinion, Dkt.209 at 12-23, as confirmed by the

engage in editorial decisions regarding how to curate and disseminate third-party content posted on their services—including decisions that govern how widely such content is shared with others and thus implicate the view-count provision. *See* §501.2041(2)(e). As the Supreme Court has reaffirmed, "[d]eciding on the third-party speech that will be included in or excluded from a compilation … is expressive activity." *Moody*, 603 U.S. at 731. "When the government interferes with such editorial choices—say, by ordering the excluded to be included—it alters the content of the compilation." *Id.* at 731-32. "[I]n overriding a private party's expressive choices—the government confronts the First Amendment." *Id.* at 732.

As the Supreme Court explained in *Moody* (and as the summary-judgment record confirms), those principles safeguard the editorial choices of Meta and YouTube—the websites that were the principal focus of the Court's decision. *See id.* at 733-40; *see* Am.MSJ.14-16, 18-19. But those same First Amendment protections apply equally to the editorial decisions of *all* websites when they curate and disseminate collections of third-party speech posted on their services— including websites operated by Plaintiffs' other members. *See* Schruers.Decl.¶37;

---

summary-judgment record. *See* Schruers.Decl.¶¶4-8; Cleland.Decl.¶¶4-7. And because this motion focuses on the constitutionality of the view-count provision as applied to websites operated by members only when they engage in editorial activity, comprehensive member-specific proof is not necessary to show that it unconstitutionally burdens members' ability to make such editorial judgments. *See Moody*, 603 U.S. at 731.

Cleland.Decl.¶35; Vasquez.Decl.¶¶34-35; Callaway.Decl.¶¶15-17; Duba.Decl.¶¶32, 78; Fernandez.Decl.¶21; Interrog.Resp.11-19. And as Plaintiffs' prior motion explains in more detail, those other members, including Pinterest, X, Reddit, and Etsy, all engage in the same editorial decisions about whether to disseminate third-party content and if so, how widely to share that content with other users. *See*Am.MSJ.16-21.

Put simply, the summary-judgment record makes clear that members exercise considerable editorial discretion over whether and how they will disseminate third-party speech, including in deciding which third-party content to disseminate to others. "[I]n making millions of those decisions each day, [Plaintiffs' members] produce their own distinctive compilations of expression." *Moody*, 603 U.S. at 716. These editorial decisions reflect each member's judgments about what content they each want (or do not want) on their services and what material may be most relevant and appropriate for users (or set of users). That is all expressive activity that is fully protected by the First Amendment. *Id*. at 736, 738.

2. But the First Amendment's protections do not just safeguard websites' exercise of their editorial discretion. It also protects the decision of covered websites *not* to speak about those decisions and *not* to disclose how widely they choose to disseminate third-party content. Indeed, the First Amendment's guarantee of free speech "includes both the right to speak freely and the right to refrain from speaking

7

at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). In "the context of fully protected expression," the "constitutional equivalence of compelled speech and compelled silence" is well "established." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 782, 796-97 (1988). The protection against compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). Because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," *Riley*, 487 U.S. at 795, compelled speech requirements typically trigger strict scrutiny, *see Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766-67 (2018).[5]

For example, in *NIFLA*, the Supreme Court held that a California law requiring clinics to provide patients with a "script about the availability of state-sponsored services" was content based because it "compel[led] individuals to speak a particular message," "alter[ing] the content" of the clinics' own speech. *Id.* at 766. Similarly, in *Riley*, the Court held that a law requiring professional fundraisers to disclose specific information to potential donors was content based. 487 U.S. at 795. "Mandating speech that a speaker would not otherwise make," the Court explained,

---

[5] There is a narrow exception to this general rule that applies to compelled-speech mandates aimed at correcting misleading commercial advertising—but that exception has no application here. *See infra* Part II.

8

"necessarily alters the content of the speech." *Id.* So too here. Plaintiffs' various members have made specific choices about "when and where to display metrics like view counts." Veitch.Decl.¶42. Some track and display the number of times another user has viewed or reacted to some (but not all) posts, while others have chosen not to comment on how widely they have disseminated (*i.e.*, "provided or shown") such third-party content to others. Schruers.Decl.¶34a. Those various choices by members about whether to speak or remain silent—*viz.*, whether and when to communicate with users about how often they disseminate third-party content—all constitute protected expression under the First Amendment. *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016 (9th Cir. 2025) (sharing "the *number* of likes" a post received is speech, as it constitutes "a website's [own] description of a post").

**B.     The View-Count Provision Is a Content-Based Compelled Speech Mandate That Burdens Members' Editorial Discretion.**

The view-count provision violates these First Amendment principles. As applied to Plaintiffs' members when they are curating and disseminating third-party speech posted on their services, it directly burdens their editorial decisions about how widely to disseminate third-party content, thereby "interfer[ing] with protected speech." *Moody*, 603 U.S. at 738; *see NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1223 (11th Cir. 2022). Indeed, the provision by its terms applies only when a website is actively disseminating (*i.e.*, "provid[ing] or show[ing]," §501.2041(2)(e)) third-party content to users, which is protected expressive activity under the First

Amendment. *See Moody*, 603 U.S. at 736. And it compels websites to speak in burdensome ways about the results of those editorial decisions for no good reason, other than to provide users with fodder to pursue unconstitutional claims that a website's protected editorial choices are inconsistent with or otherwise in violation of S.B.7072. The provision thus triggers strict scrutiny several times over.

1. Requiring websites to disclose, upon request, "the number of other individual platform participants who were provided or shown" the user's "content or posts," §501.2041(2)(e), both compels speech and imposes a significant burden on the editorial choices of websites when they curate and disseminate third-party speech posted on their services. *Miami Herald Publishing Co. v. Tornillo* is instructive. There, the Supreme Court concluded that the right-of-reply statute burdened the exercise of editorial discretion because the obligation for a newspaper to run opposing views if it chose to criticize a political candidate—*i.e.*, "to print that which it would not otherwise print"—"exact[ed] a penalty on the basis" of the newspaper's exercise of its editorial discretion. *See* 418 U.S. at 256-58. The view-count provision operates in an analogous fashion. It forces websites to share how widely they disseminate third-party content simply because those websites have chosen to exercise their editorial discretion to "provide[] or show[]" third-party content to users of their services.

While S.B.7072 does not specify what it means by "content or posts," read literally, the requirement imposes burdens that are plainly substantial. Users generate billions of pieces of content each day, and not every website tracks the number of times users "were [merely] provided or shown" every given instance of such content. *See* Schruers.Decl.¶34b; Vasquez.Decl.¶45. It would be exceedingly difficult for websites to reconfigure their systems to generate and supply, upon request, view counts for virtually all third-party-generated content that they choose to display on their services—be it a comment on a YouTube video or a "like" on an Instagram post. *E.g.*, Veitch.Decl.¶¶41-42 ("implementing real-time view tracking for every comment would be a massive undertaking"); Fernandez.Decl.¶30 ("providing counts for any content, including replies or direct messages, … would require significant system reconfiguration"); Dkt.286-1.146:14-18 ("Vasquez.Depo.") (view count provision would "mandate developing this new functionality which does not currently exist.").

Nor are those simply financial burdens hampering members' ability to provide services that their users want to utilize. They constitute substantial penalties on their ability to exercise editorial discretion as they see fit. Plaintiffs' members have made judgment calls about "when and where to display metrics like view counts" based on their individual assessments about when such disclosures about views aligns with the types of user experiences members want to cultivate on their services. *E.g.*,

11

Veitch.Decl.¶42; *see also Bonta*, 152 F.4th at 1016 (holding that "the *number* of likes" a post received is a website's own speech). And how many other viewers are "provided or shown" content is directly governed by how members have exercised their editorial discretion—whether they choose to remove the content, restrict its dissemination, or otherwise promote it. Imposing on members the costs of identifying the view count for all such content burdens their ability to make protected editorial decisions regarding how they share third-party content.[6]

The core purpose of the view-count provision is to force members to disclose details about their editorial decision-making (*i.e.*, the extent to which certain content is disseminated to others), for no clear reason other than to facilitate users' ability to identify and then sue covered websites for perceived inconsistencies in how they exercise their editorial discretion, *see* §501.2041(2)(b). Given the risk that such view-count data will be used in a private action seeking to recover substantial penalties for purported violations of the consistency provision, §501.2041(6), and the sheer cost of identifying the view count for all conceivable third-party content

---

[6] Moreover, bad actors could use the compelled disclosures regarding the number of views a piece of content has to test different ways to circumvent websites' policies and countermand their editorial decisions by continuing to post objectionable content that reaches the broadest range of users. *See, e.g.*, Dkt.280-10.338:23-339:4 ("[T]here are situations in which we are intentionally high level or intentionally vague to prevent providing a … roadmap that could be reverse[] engineered and then cause harm."). That reality further confirms that the view-count provision severely burdens covered websites' ability to exercise their editorial discretion as they see fit.

posted on a covered website, this provision has the evident purpose and effect of "chill[ing] platforms' protected speech." *Att'y Gen.*, 34 F.4th at 1230; *accord Tornillo*, 418 U.S. at 257 ("Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy.").

2. The view-count provision triggers strict scrutiny because it is a content-based compelled speech mandate. The Supreme Court has made clear that laws that compel speakers to "alter[] the content[] of [their] speech" are necessarily "content based." *NIFLA*, 585 U.S. at 766. The view-count provision does just that: It dictates the content of the website's speech by requiring them to disclose specific information about a specific topic that the website would not otherwise provide.

Indeed, just as Facebook and YouTube convey a message about the speech that they find acceptable and the community that they hope to foster when they curate third-party content and make decisions about how widely to disseminate such content to their users, *Moody*, 603 U.S. at 738, so do Pinterest, X, Etsy, Nextdoor, and Reddit when they do the same. Vasquez.Decl.¶21; Fernandez.Decl.¶20; Duba.Decl.¶¶32, 78; Dkt.280-22 ("Etsy's policies … exist to help keep our marketplace safe, fair, and creative."); Callaway.Decl.¶¶8-10; Cleland.Decl.¶¶18, 24; Dkt.280-19 at 4 ("Nextdoor's Community Guidelines are designed to keep

interactions on the platform safe and productive."). Likewise, just as the First Amendment protects a website's right to supply a "description of a [third-party] post," such as "the *number* of likes … that the post has received," *Bonta*, 152 F.4th at 1016, it also protects the website's choice not to do so, *see Riley*, 487 U.S. at 797. After all, the "constitutional equivalence of compelled speech and compelled silence" is well "established." *Id.* Hence, requiring websites to include speech— even "statements of fact the speaker would rather avoid," such as the extent to which users' "content or posts" have been seen by or shared with others—necessarily alters the content of their messages. *Hurley*, 515 U.S. at 572-73.

That alone triggers strict scrutiny. But that is not all. A speech regulation is also content based if "an impermissible [content-based] purpose or justification underpins" it. *See City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 76 (2022). As explained, the view-count provision cannot be disentangled from S.B.7072's other content-based speech restrictions like the consistency provision (§501.2041(2)(b)). The entire purpose of compelling members to share the number of views any content has received is to inform users about how Plaintiffs' members exercise their editorial discretion. *See infra* p.16 n.7. That, in turn, facilitates users' ability to sue members when there are perceived inconsistencies in how they have exercised their discretion. *See* §501.2041(6). But S.B.7072's provisions that compel members to amplify content they would otherwise not disseminate and penalize

14

them for doing so in ways that the state dislikes are plainly content based. *See* Am.MSJ.29-32; *Moody*, 603 U.S. at 719 (It "is no job for government to decide what counts as the right balance of private expression."). Since the view-count provision is designed to facilitate the state's suppression of editorial decisions via S.B.7072's other provisions, it has an impermissible, content-based purpose and triggers strict scrutiny for this reason as well. *See Reagan*, 596 U.S. at 76.

**C.  The View-Count Provision Cannot Survive Any Level of Heightened Scrutiny, Let Alone Strict Scrutiny.**

Because strict scrutiny applies, Florida must show that the view-count provision is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Indeed, even under intermediate scrutiny, Florida would have to prove that the provision is "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017), that is "unrelated to the suppression of free expression," *TikTok Inc. v. Garland*, 604 U.S. 56, 73 (2025). It cannot come close to meeting either standard.

Florida has not identified a legitimate, let alone significant or compelling, justification for interfering with and burdening protected editorial judgments. It plainly cannot justify the view-count provision on the theory that it helps the state enforce S.B.7072's other editorial-discretion-suppressing provisions. The Supreme Court has squarely foreclosed that reasoning: "[A] State may not interfere with private actors' speech to advance its own vision of ideological balance." *Moody*,

15

603 U.S. at 741. Nor can Florida invoke user transparency to justify the provision. *See Att'y Gen.*, 34 F.4th at 1230 (noting only that the state might have a "legitimate" interest in "fully inform[ing]" users about view counts). As the Supreme Court explained when rejecting a similar argument in *Riley*, the state's "interest" in "informing donors how the money they contribute is spent" is "not as weighty as the State asserts." 487 U.S. at 798. That is why other courts have held that transparency for its own sake—a listener's "desire" or "wish to know"—is an "insufficient" state interest to justify a compelled-speech mandate. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996); *see Am. Meat Inst. v. USDA*, 760 F.3d 18, 23 (D.C. Cir. 2014); *accord Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 n.6 (2d Cir. 2001); *cf. X Corp. v. Bonta*, 116 F.4th 888, 902 (9th Cir. 2024). Besides, the transparency demanded under the view-count provision is transparency about *how* members exercise their editorial discretion. *See supra* pp.4-5, 12, 14-15. That proves that any asserted "transparency" interest is not unrelated to the suppression of speech; it is instead directly tied to furthering Florida's impermissible goal of attaining what it deems a "better expressive balance." *Moody*, 603 U.S. at 734.[7]

---

[7] On top of all that, any attempt by the state to defend the view-count provision on transparency grounds would be particularly disingenuous because a different provision of Florida law restricts the ability for some of the very same websites to inform users about how popular certain content is. *See* Fla. Stat. §501.1736(1)(e)4.c, (2)-(4) (burdening users' access to covered websites that "[d]isplay personal interactive metrics" or the "number of times other[s] … react[] to content or have shared or reposted" it); *CCIA v. Uthmeier*, 2025 WL 1570007, at *1-2 (N.D. Fla.

16

As Florida has not advanced any other interest that might validly justify the view-count provision, that should be the end of the matter. But even if it could posit a permissible state interest, the view-count provision burdens far more speech than could be necessary to achieve it. It forces websites to supply view counts for *all* "content or posts"—an extremely burdensome undertaking given the sheer volume of third-party content on Plaintiffs' members' websites. For example, the view count provision arguably applies to comments on YouTube videos, reviews of the various products or sellers on Etsy, a user's response to the creator of a "Pin" on Pinterest, and even direct messaging on Instagram. Florida cannot explain why such a sweeping and costly disclosure obligation is necessary to achieve its objectives, unless its goal is simply to punish so-called "Big Tech" for speech it disfavors.

Moreover, S.B.7072 is both overinclusive and underinclusive. As Plaintiffs pointed out in their earlier summary-judgment motion, the definition of "social media platform" sweeps in entities regardless of whether they disseminate the kinds

---

June 3, 2025). Florida has defended that latter restriction on the theory that displaying metrics about the popularity of particular content is a "design feature" that "facilitate[s] addiction." Fla.Op.Br.36-37, *CCIA v. Uthmeier*, No. 25-11881 (11th Cir. Aug. 13, 2025) (claiming a significant interest in restricting the use of such a feature), ECF.No.23. The inherent contradiction in Florida law only highlights that Florida's goal cannot truly be about improving user transparency. Rather, as detailed above, the entire goal of the view-count provision and compelling websites to disclose how widely a user's content is disseminated to others is to reveal each website's editorial choices and encourage Floridians to second guess whether websites are exercising their editorial discretion "fairly." The First Amendment does not countenance such an effort to suppress speech.

of speech with which Florida purports to be concerned. *See* Am.MSJ.34. And Florida has also never bothered to explain why covered services must disclose view counts for *every* conceivable piece of third-party content posted on their websites—be it a video a user posts on her channel on YouTube, a review someone shares for a seller on Etsy, or even just a direct message on Instagram. Compelling Plaintiffs' members to engage in substantial amounts of speech about the billions of posts and third-party content added to their websites daily cannot reasonably be characterized as narrowly tailored toward advancing transparency—even if user transparency *qua* transparency were a permissible end to pursue. On top of all that, the view-count provision is underinclusive. As was the case for the other challenged provisions, *see* Am.MSJ.34-35, Florida cannot explain the arbitrary size and revenue requirements that exempt websites that are not meaningfully different in the core services they offer—save for the goal of imposing extremely costly and burdensome disclosure requirements on websites for exercising their editorial discretion in ways that the state disfavors. *NIFLA*, 585 U.S. at 774.

Because it compels a breathtaking amount of speech while also penalizing editorial discretion, the view-count provision fails any level of heightened scrutiny.

## II. *Zauderer* Does Not Apply, But Even If It Did, The View-Count Provision Fails *Zauderer* Scrutiny Too.

As the foregoing underscores, S.B.7072's view-count provision triggers and flunks strict scrutiny under traditional compelled-speech principles. But the same

18

conclusion would follow even if it were analyzed under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).

As Plaintiffs explained in more detail in their earlier summary-judgment motion, though the Eleventh Circuit applied *Zauderer* to the view-count provision the first time this case reached that court, that is not the right standard. *See* Am.MSJ.35-37. The Supreme Court has reaffirmed time and again that, in "the context of fully protected expression," the "constitutional equivalence of compelled speech and compelled silence" is well "established." *See Riley*, 487 U.S. at 797; *Hurley*, 515 U.S. at 573. That said, the Court has articulated a narrow exception to this rule that is limited to "laws that require speakers to disclose only factual, noncontroversial information in 'commercial speech.'" *Chiles v. Salazar*, 2026 WL 872307, at *8 (U.S. Mar. 31, 2026).

*Zauderer* itself delimits the scope of this narrow exception. There, the Court upheld a requirement that attorneys who advertise their willingness to represent clients for a contingency fee must disclose whether the client would have to pay court costs in the event of a loss. 471 U.S. at 639-53. The Court declined to apply strict scrutiny, reasoning that while "commercial speech" (*i.e.*, speech that "propose[s] a commercial transaction") is "entitled to the protection of the First Amendment," it is entitled to "protection somewhat less extensive than that afforded 'noncommercial speech.'" *Id.* at 637. "Because the extension of First Amendment

protection to commercial speech is justified principally by the value to consumers of the information such speech provides," an advertiser has only "minimal" interest in withholding information necessary to avoid misleading consumers. *Id.* at 651. And because the government can ban misleading advertising outright, *see In re R.M.J.*, 455 U.S. 191, 203 (1982), it follows that it may preclude misleading commercial advertisements by requiring disclosures of "purely factual and uncontroversial information" to "prevent[] deception of consumers," *Zauderer*, 471 U.S. at 651. Such disclosures constitute "one of the acceptable less restrictive alternatives to actual suppression of speech." *Id.* at 651 & n.14.

Given those doctrinal foundations, the Supreme Court has strictly circumscribed *Zauderer*'s application. Rather, it has "emphatically and, one may infer, intentionally" confined *Zauderer* to the context of advertising. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 522-24 (D.C. Cir. 2015) (holding that *Zauderer* does not reach "compelled disclosures that are unconnected to advertising or product labeling at the point of sale").[8] Indeed, neither the Supreme Court nor even the Eleventh Circuit (other than in its now-vacated decision in this case) has ever applied

---

[8] To be sure, some courts have extended *Zauderer*'s reach and applied it to "health and safety warnings," *see CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 844 (9th Cir. 2019), which are justified by their historical pedigree, *NIFLA*, 585 U.S. at 775. But there is no corresponding historical pedigree supporting the state's authority to compel speech in service of penalizing a speaker's exercise of her editorial discretion. *See Tornillo*, 418 U.S. at 256-57.

*Zauderer* outside that context. *See Borgner v. Brooks*, 284 F.3d 1204, 1214 (11th Cir. 2002). To the contrary, the Supreme Court has consistently described *Zauderer* as limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz P.A. v. United States*, 559 U.S. 229, 250 (2010); *see also Hurley*, 515 U.S. at 573 (describing *Zauderer* as permitting government to "requir[e] the dissemination of 'purely factual and uncontroversial information'" only in the context of "commercial advertising"). And it has repeatedly declined to apply *Zauderer* when the required disclosure is not "necessary to make voluntary advertisements nonmisleading for consumers." *United States v. United Foods*, 533 U.S. 405, 416 (2001).

There is accordingly no basis for applying *Zauderer* here. The view-count provision has nothing to do with advertising, much less precluding misleading advertisements. The state has not identified any misleading advertisements by covered websites about how they decide what content to disseminate and how widely to do so. Nor could it—Plaintiffs' members expressly disclose that they curate and disseminate third-party content and thus control whether and when to share such material with other users. *E.g.*, Dkt.280-18 at 8 (X "may not … recommend[] or amplif[y]" particular posts for "Rule enforcement reasons"); Dkt.280-21 at 1 (Etsy may "restrict a listing f[or] some or all members" depending on "the nature and

21

severity of the violation" of Etsy's policies); Dkt.280-25 at 6-8 (YouTube "demote[s] in recommendations" videos that it classifies as "borderline"); Dkt.280-31 at 6-7 (Meta's content-ranking algorithm downranks borderline content, such as "content depicting violence"); Dkt.280-33 at 1 (Pinterest reserves the right to "remove, limit, or block the distribution of such content and the accounts, individuals, groups and domains that create or spread it based on how much harm it poses."); Dkt.280-36 at 1 (Reddit "filter[s] out stuff [users] shouldn't have to deal with, such as spam, content you've seen before, or content you've blocked"). Instead, the view-count provision is designed to make it easier for users to sue websites for perceived inconsistencies in their editorial choices. *See* Schruers.Decl.¶34b. That does not work. The state cannot compel speech to further its other impermissible efforts to regulate editorial discretion—especially when the entity is not engaged in any advertising at all, let alone any misleading advertising. It strains credulity to claim that a provision impelling websites to share details about their editorial decisions mandates disclosure of "purely … uncontroversial information about the terms under which ... services will be available." *NIFLA*, 585 U.S. at 768 (citation omitted); *cf. X Corp.*, 116 F.4th at 902-03 (declining to apply *Zauderer* to law compelling disclosure of websites' content-moderation standards and noting that strict scrutiny generally governs "[e]ven a pure 'transparency' measure").

The Ninth Circuit's decision in *NetChoice v. Bonta* is illustrative. There, California attempted to prohibit regulated websites from disclosing "the *number* of likes or feedback that [a user's] post has received." 152 F.4th at 1016. The *Bonta* court had no difficulty concluding that strict scrutiny applied. Because California had restricted what websites could communicate regarding users' posts, it had engaged in "content discrimination." *Id.* Given that the Supreme Court has repeatedly emphasized the "constitutional equivalence of compelled speech and compelled silence in the context of fully protected expression," nothing in law or logic supports the conclusion that attempting to compel disclosure of similar information regarding how many people viewed a user's posts should be subject to a lesser standard of scrutiny. *Riley*, 487 U.S. at 797. To claim otherwise would be to treat the right not to speak as less constitutionally valuable than the right to speak. *Contra Wooley*, 430 U.S. at 714. *Zauderer* accordingly does not apply.

In all events, the view-count provision could not withstand even *Zauderer* scrutiny. *Zauderer* still requires the state to prove that its disclosure requirements are "neither unjustified nor unduly burdensome." *NIFLA*, 585 U.S. at 776. Florida has never explained how the view-count provision is "reasonably related to the State's interest in preventing deception of consumers." *Zauderer*, 471 U.S. at 651. And Florida has not pointed to anything suggesting that the websites have misled consumers about how their editorial policies might generally affect whether and how

23

widely a user's post might be disseminated, *see supra* pp.21-22. *See NIFLA*, 585 U.S. at 777.

Nor has Florida even tried to demonstrate that the view-count provision is not unduly burdensome vis-à-vis any legitimate interest it may serve. The amount of content that is posted to websites like Etsy, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Threads, X, and YouTube is staggering: On Etsy, there are product listings for over 100 million unique items for sale; users upload over 100 million photos to Instagram each day; Nextdoor has over 100 million verified users; there are approximately 550 million monthly users of X; approximately 1.8 million Pins are saved by Pinterest's nearly 578 million active global users every week; users post billions of pieces of content to Reddit, nearly 6 billion in the second half of 2024 alone; and users upload over 500 hours of content to YouTube *every minute*. Schruers.Decl.¶11; Bartlett.Decl.¶8; Duba.Decl.¶23; Vasquez.Decl.¶¶6, 11. S.B.7072 would require all of these websites to supply view counts—on demand— for every single piece of content that those millions upon millions of third-party users post on their services.

Given the billions of posts that are added to Plaintiffs' members' websites each day, that undertaking would not only be substantial—it would be paralyzingly burdensome. That is especially true given several websites would need to reconfigure their systems just to generate and share the number of times a user has

24

been provided or shown third-party content. *See* Schruers.Decl.¶34; Vasquez.Decl.¶41. Even for websites that track the viewership of some content, they would still need to devote substantial resources to develop the capabilities to generate a view count for the countless other third-party content not already tracked. *See* Veitch.Decl.¶¶41-42; Fernandez.Decl.¶30. And on top of all that, the view-count provision does not have any time limit—for example, by limiting view counts to the number of users "provided or shown" a post within just the first 48 hours. Instead, websites are expected to dynamically update the view counts every time the website, in its editorial discretion, chooses to disseminate that third-party content to another user. "[I]mplementing [such] real-time view tracking for every comment would be a massive undertaking" and extremely burdensome. Veitch.Decl.¶¶41-42; *see* Vasquez.Depo.161:25-162:8 (complying with the view count provision "would impose additional product build out and engineering which we do not currently have developed").

Those significant compliance burdens are far afield from the straightforward and easy-to-apply commercial disclosure requirements that have been upheld under *Zauderer*. Websites accordingly "might well conclude that the safe course is to avoid controversy" by not disseminating such user-generated posts at all. *Tornillo*, 418 U.S. at 257.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment on Plaintiffs' as-applied claim regarding the view-count provision, §501.2041(2)(e), and permanently enjoin Florida from enforcing it against Plaintiffs' members— exemplified here by Meta, YouTube, Pinterest, X, Reddit, and Etsy—when they are engaged in curating and disseminating third-party speech.

Respectfully submitted,

s/Erin E. Murphy

Brian M. Willen
Steffen N. Johnson
Paul N. Harold
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K Street NW
Washington DC 20006
(202) 973-8800
bwillen@wsgr.com
sjohnson@wsgr.com
pharold@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

Benjamin S. Hewitt
WILSON SONSINI GOODRICH &
ROSATI, P.C.
31 West 52nd Street
Fifth Floor
New York, NY 10019
(212) 453-2804
bhewitt@wsgr.com

Paul D. Clement
Erin E. Murphy
James Y. Xi
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Douglas L. Kilby
Florida Bar No. 0073407
Hannah E. Murphy
Florida Bar No. 1032759
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com

*Counsel for Plaintiffs NetChoice, LLC and Computer & Communications Industry Association*

April 3, 2026

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1**

Plaintiffs' Memorandum in Support of their Second Motion for Partial Summary Judgment complies with the type-volume limitation of Local Rule 7.1(F) and (I) because it contains 6,084 words.

April 3, 2026                                    s/Erin E. Murphy
                                                 Erin E. Murphy


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 3rd day of April, 2026.

April 3, 2026                                    s/Erin E. Murphy
                                                 Erin E. Murphy