# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

NETCHOICE, LLC; and COMPUTER
& COMMUNICATIONS INDUSTRY
ASSOCIATION,

    *Plaintiffs*,

v.

JAMES UTHMEIER, et al.,

    *Defendants*.

Case No. 4:21-cv-0220-RH-MAF

## PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY FROM DEFENDANTS' PROPOSED EXPERT RAVI BAPNA AND SUPPORTING MEMORANDUM OF LAW

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 4

ARGUMENT...................................................................................................11

I.   Legal Standard...................................................................................11

II.  Dr. Bapna's Opinions Fail to Meet the Standards Required by *Daubert* and Must Be Excluded Under Rule 702. ......................................................12

    A.   Dr. Bapna's Opinions About Expressive Choice and Editorial Decision Making Should Be Excluded...........................................12

        1.   Dr. Bapna Offers Impermissible Legal Opinions. ...................12

        2.   Dr. Bapna Is Not Qualified to Render Legal Opinions on Expressive Choice................................................................14

    B.   Dr. Bapna's Opinions That Recommendation Algorithms Focus Only On Engagement Lack Reliable Methodology and Are Legally Irrelevant..............................................................................16

        1.   Dr. Bapna's Opinions About Engagement Algorithms Are Not Based On Any Reliable Expert Method....................17

        2.   Dr. Bapna's Opinions Are Legally Irrelevant and Thus Unhelpful...............................................................................26

CONCLUSION .............................................................................................32

**TABLE OF AUTHORITIES**

**CASES**

*Ala. State Conf. of the NAACP v. Marshall*,
        746 F. Supp. 3d 1203 (N.D. Ala. 2024)......................................................13

*Bray & Gillespie Plaza, LLC v. Lexington Ins. Co.*,
        2010 WL 11453162 (M.D. Fla. Jan. 27, 2010)...........................................12

*Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*,
        402 F.3d 1092 (11th Cir. 2005).....................................................11, 12, 26

*Culliver v. BP Exploration & Prod., Inc.*,
        2024 WL 1478659 (N.D. Fla. Apr. 3, 2024) ..............................................26

*D.H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC*,
        526 F. Supp. 3d 1360 (N.D. Ga. 2021).......................................................22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
        509 U.S. 579 (1993)................................................................................11, 27

*Davis v. Lockheed Martin Corp.*,
        705 F. Supp. 3d 1345 (M.D. Fla. 2023)......................................................21

*Demboske v. Autry Greer & Sons, Inc.*,
        740 F. Supp. 3d 1172 (N.D. Fla. 2024) ......................................................14

*Gen. Elec. Co. v. Joiner*,
        522 U.S. 136 (1997)..............................................................................17, 18

*Goldman v. Bracewell & Patterson, L.L.P.*,
        2005 WL 5740234 (M.D. Fla. Sept. 13, 2005) ...........................................16

*In re Deepwater Horizon Belo Cases*,
        2022 WL 17721595 (N.D. Fla. Dec. 15, 2022) ..........................................21

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
        892 F.3d 624 (4th Cir. 2018)......................................................................24

*In re Zantac (Ranitidine) Prods. Liab. Litig.*,
644 F. Supp. 3d 1075 (S.D. Fla. 2022)..............................................14, 16, 24

*Kallas v. Carnival Corp.*,
2009 WL 901507 (S.D. Fla. Mar. 30, 2009).................................................26

*Knepfle v. J-Tech Corp.*,
48 F.4th 1282 (11th Cir. 2022)....................................................................17

*Konikov v. Orange Cnty., FL*,
290 F. Supp. 2d 1315 (M.D. Fla. 2003).......................................................14

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)................................................................................17, 18

*Lorente-Garcia v. Giraldo-Navarro*,
2025 WL 2271614 (S.D. Fla. July 9, 2025).............................................18, 31

*McDowell v. Brown*,
392 F.3d 1283 (11th Cir. 2004)...................................................................18

*Montgomery v. Aetna Cas. & Sur. Co.*,
898 F.2d 1537 (11th Cir. 1990)...................................................................12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)...............................................................................1, 3, 13,
27, 28, 31

*Moore v. Intuitive Surgical, Inc.*,
995 F.3d 839 (11th Cir. 2021)....................................................................14

*Ocasio v. C.R. Bard, Inc.*,
2015 WL 2062611 (M.D. Fla. May 4, 2015)..............................................12

*One Wisconsin Now v. Kremer*,
354 F. Supp. 3d 940 (W.D. Wis. 2019).......................................................14

*Plott v. NCL Am., LLC*,
786 F. App'x 199 (11th Cir. 2019)..............................................................12

*Prosper v. Martin*,
989 F.3d 1242 (11th Cir. 2021)...........................................................17, 26, 27

*Rink v. Cheminova, Inc.*,
    400 F. 3d 1286 (11th Cir. 2005)....................................................................11

*United States v. Delatorre*,
    308 F. App'x 380 (11th Cir. 2009)............................................................14

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004)......................................... 11, 17, 19, 27, 31

## RULES

Fed. R. Evid. 702 ...................................................................................... *Passim*

Fed. R. Evid. 702(c)...................................................................................3, 17

Fed. R. Evid. 702(d)............................................................................ 3, 4, 17, 31

Plaintiffs NetChoice, LLC and Computer & Communications Industry Association ("Plaintiffs") move, pursuant to Federal Rule of Evidence 702, to exclude the testimony of Defendants' expert witness Dr. Ravi Bapna.

## INTRODUCTION

Plaintiffs challenge a Florida statute that restricts social media platforms' "choices about whether and how to display user-generated content to the public." *Moody v. NetChoice, LLC*, 603 U.S. 707, 720 (2024). Defendants have designated Dr. Bapna as their sole expert witness. Dr. Bapna does not dispute that social media companies develop and enforce policies about what kinds of content are allowed to remain on their sites, and that those policies, effectuated via both human review and algorithmic tools, inform the curation of feeds offered on those websites.[1] The Supreme Court has held that those decisions reflect editorial judgments that the First Amendment protects.

Nevertheless, Defendants retained Dr. Bapna to offer expert opinion "on the current state of social media algorithms" and "how this relates to the idea of expressivity and editorial choice as interpreted in the First Amendment." Ex. 1, Expert Report of Ravi Bapna, PhD ("Bapna Report") ¶ 2. Dr. Bapna asserts that "the

---

[1] While most members offer various interfaces, in addition to websites (including mobile apps), to access their platforms or other services, this brief refers to all these interfaces collectively as "websites" or "services." *See* Dkt. 280-1 ("Schruers.Decl.") ¶ 9.

algorithmic manner by which social media platforms decide what appears in an individual's feed is systematically different from what we think of as human expressivity in editorial choice." *Id.* ¶ 15. According to Dr. Bapna, social media recommendation algorithms "function less like editors and more like mirrors, reflecting back to the users content that aligns with their past behaviors that they are most likely to engage with." *Id.* Dr. Bapna's testimony does not satisfy the requirements of Rule 702 and should be excluded for several reasons.

First, Dr. Bapna's opinions about what constitutes "expressivity and editorial choice[s]"—presumably in service of an argument that the First Amendment should not apply to social media feeds—are improper legal conclusions. *Id.* ¶ 2; *see also id.* ¶¶ 3(e), 15, 27, 47, 58-60, 66; Ex. 2, Supplement to Expert Report of Ravi Bapna, PhD ("Bapna Supplement") ¶ 1(g). Insofar as Dr. Bapna offers *factual* opinions on this topic, he is not qualified to do so. He concedes that "speech is a common term" and he does not "have to be an expert in speech" to offer his opinions. Ex. 3, Deposition of Ravi Bapna ("Bapna Depo") 40:25-41:6. Indeed, Dr. Bapna has no formal education or experience in what constitutes editorial choice, human expressivity, or protected speech, he has not published on that topic, and has offered no reliable principle or method to opine on what is or is not an expressive editorial choice.

Second, Dr. Bapna's opinion that social media recommendation algorithms seek simply to "maximize engagement" with the social media website or application, Bapna Report ¶¶ 3(b), 15, 18, 56, 58; Bapna Supplement ¶¶ 1(a), (f), 6(g), 8-10, is not the "product of reliable principles and methods." Fed. R. Evid. 702(c). Dr. Bapna applied no actual scientific or otherwise viable methodology in analyzing how social media algorithms supposedly function. He admitted as much at his deposition, testifying that his expert report is "not a research paper, so there is no, you know, methodology" other than his "analytical thinking." Bapna Depo 54:17-55:8, 55:12-19. Instead, he cites out of context quotes from cherry picked documents from Plaintiffs' members' productions, and ran Google Searches to find non-peer reviewed articles that were "relevant for the sort of narrative that [he] had" (*id.* 203:19-23)—in the process ignoring other documents and statements that did not support his preordained opinion. This is not the kind of reliable methodology that Rule 702 demands.

Finally, beyond being unreliable, Dr. Bapna's opinions about engagement-promoting algorithms are simply not legally relevant. Fed. R. Evid. 702(d). As a matter of law, the use of algorithms to "select[] and rank[]" content, "based on a user's expressed interests and past activities," along with "the platform's preferences," are expressive under the First Amendment. *Moody*, 603 U.S. at 710, 734-35. While the Supreme Court reserved judgment on "feeds whose algorithms

3

respond *solely* to how users act online," "without any regard to independent content standards," *id*. at 736 n.5, even if Dr. Bapna's opinions were credited, that simply is not what we have here. Dr. Bapna concedes that the feeds at issue are informed by websites' content moderation policies and standards and that algorithms used to curate those feeds both enforce and reflect those content preferences. *E.g.*, Bapna Report ¶¶ 28, 31, 32, 40, 41. That does not change even if the main goal of recommendation algorithms is to boost engagement, which is another term for boosting speech that is most likely to be of interest or value to users and with which they are likely to interact. Thus, even accepting Dr. Bapna's opinions as true, they would have no bearing on the core First Amendment issues presented in this case. Because those opinions would not be helpful under Rule 702(d), they should be excluded.

## BACKGROUND

### A.     Bapna's Proposed Expert Opinion and Lack of Methodology

On October 31, 2025, Defendants disclosed Dr. Ravi Bapna as their expert witness and submitted a Rule 26 expert report. *See* Bapna Report. Dr. Bapna submitted a supplement to his expert report on January 28, 2026. *See* Bapna Supplement. Dr. Bapna is a professor of Business Analytics and Information Systems at the Carlson School of Management, University of Minnesota. Bapna Report ¶ 8.  His research focuses on "social influence and engagement, analytics,

artificial intelligence and machine learning, digital transformation, and the economics of information systems." *Id.* ¶ 9. He has never taught classes about content moderation, published on that topic, or worked with social media companies on their content moderation practices. Bapna Depo 32:9-33:15, 70:19-24; Ex. 4, Bapna CV.

Dr. Bapna was asked to render opinions on the "current state of social media algorithms, their objectives and operations, what determines a user's content feed, the underlying principles of personalizing content, the role of humans in shaping these activities, and ultimately how this relates to the idea of expressivity and editorial choice as interpreted in the First Amendment." Bapna Report ¶ 2. His reports focus on social media companies' use of algorithms to generate users' feeds, and he opines that the "algorithmic manner by which social media platforms decide what appears in an individual's feed is systematically different from what we think of as human expressivity in editorial choice," that algorithms "function less like editors and more like mirrors" and "do not signify the content preferences of human employees" of social media companies. *Id.* ¶ 15. Though he acknowledges that social media companies "exclud[e] content that … violate[s] Community Standards," and "demote problematic content," *id.* ¶¶ 40-41, Dr. Bapna nonetheless concludes that their algorithms aim solely to "maximiz[e] engagement," *id.* ¶ 15. In the supplement to his report, Dr. Bapna states that a review of internal documents

from YouTube, Pinterest, and Meta "affirmed not only the broad characterization of social media algorithms" in his opening report, "but also the specific and substantive aspects[.]" Bapna Supplement ¶ 2.

Neither of Dr. Bapna's reports identify a methodology that guided his opinions. He asserts that content moderation is "jointly done by human moderators and traditional AI based machine learning algorithms," Bapna Report ¶ 32, and describes Meta's process for ranking content for users' feeds as "incorporat[ing] negative signals to demote problematic content," *id* ¶ 41. He says that "[c]ontent moderation and recommendation systems designed to maximize user engagement … function less like editors and more like mirrors," but it is "difficult to determine the exact nature of such optimization" without "analyzing the algorithms" themselves. *Id.* ¶ 58. He did not review any social media company's recommendation algorithms when formulating his opinions. Bapna Depo 110:10-16.

Dr. Bapna's supplement discusses several internal documents concerning

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■

**B.      Dr. Bapna's Deposition Admissions**

At his deposition, Dr. Bapna conceded that he did not use any methodology to arrive at his opinions. He said he was asked to "establish what is the underlying process by which social media recommended systems work," but testified that "it's not a research paper, so there is no, you know, methodology associated with an opinion, expert opinion out here." Bapna Depo 54:17-55:8. He added that "at a high level" he used his "analytical thinking. I mean that's the methodology." *Id* 55:12-19.

Dr. Bapna said that decisions about what sources and documents to review were informed by his experience "in this field for 25 years," attending conferences, "talk[ing] to people," and "teach[ing] executives who are building these kinds of systems." *Id.* 56:1-18. Later, he said he found an online article about YouTube's recommender system by searching "[d]escriptions of how YouTube algorithm works" on Google. *Id.* 190:13-25. He reviewed other search results, chose the one he found "most relevant" and "most credible," but did not keep a list of rejected articles from those Search results. *Id.* 191:1-10. Dr. Bapna said he did not address

YouTube's policy to allow violating content if it serves an Educational, Documentary, Scientific or Artistic (EDSA) purpose because it was not "relevant for the sort of narrative that I had[.]" *Id.* 203:15-23.

Dr. Bapna acknowledged that social media companies have policies that set out what kinds of content they permit on their websites, and that these policies are written by humans. *Id.* 60:20-61:9. He agreed that content moderation is "jointly done by human moderators" and "AI-based machine learning algorithms." *Id.* 73:8-16. He also agreed that recommendation algorithms include steps for ranking and re-ranking content based on the websites' content guidelines. *Id.* 101:16-22. Despite this, he disagreed with the statement in a source he himself relied upon that no social media service "optimizes solely for engagement," calling that an "extreme statement." *See* Ex. 5, Thorburn, *How Platform Recommenders Work* (Jan. 20, 2022) at 6; Bapna Depo 102:1-25. Despite his insistence that all social media companies optimize solely for engagement, he conceded that Meta was "probably not" doing so when it included "equity considerations to increase the visibility" of certain content. Bapna Depo 122:13-19.

Dr. Bapna said that he is not a lawyer and does not "have to be an expert in speech to have an opinion on whether – or to explain the process by which content is presented" on social media. *Id.* 39:17-41:6. Nevertheless, he claims to be an expert on free speech "to the extent it applies in this context," and says he is offering an

opinion about what constitutes speech. *Id.* 40:10-41:12. He also asserted that algorithms do not implement human editorial judgments because they make too many errors, but did not offer an opinion about the error rate of these algorithms. *Id.* 247:25-248:17.

**C.  Dr. Bail's Rebuttal Report Highlights Dr. Bapna's Deficient Methods.**

On February 24, 2026, Plaintiffs disclosed Dr. Christopher Bail as their rebuttal expert. Ex. 6, Rebuttal Expert Report of Christopher A. Bail, PhD ("Bail Report"). Dr. Bail is a Professor of Sociology, Computer Science, Political Science, and Public Policy at Duke University, where he also directs the Polarization Lab and the Society-Centered AI Initiative. Bail Report ¶ 1. He has published numerous books and articles within the field of computational social science, focusing on the impact of social media on political polarization, and his research has "directly influenced the creation of products for content moderation at Twitter and Nextdoor." *Id.* ¶ 4; Ex. 7, Bail Report App'x A ("Bail CV").

Dr. Bail explains that Dr. Bapna's focus on recommendation algorithms ignores the "screening and moderation of content" on social media services, which reflects the judgments and preferences of those services, and directly impacts what content is shown to users. Bail Report ¶¶ 14(b)-(c), 21-22, 24-29, 31-32. Dr. Bail also explains that social media services recommend content based on not only "user preferences and the quality of the content," but also "human judgment" about "which

9

signals an algorithm will consider," how much weight to give each signal, and what kinds of content will be valuable to users, all of which is informed by the services' preferences and content standards. *Id.* ¶¶ 23, 44-46. Dr. Bail explains that "[e]ven if one assumes algorithms are often used to increase user engagement to some degree, neither the Bapna Reports nor the facts of this case support the idea that the composition of users' feeds is driven solely by information about users and is independent of social media website or application's content moderation decisions." *Id.* ¶¶ 14(c), 28, 44. And he points out that Dr. Bapna's "highly selective account that draws upon anecdotes, speculates using research that is not peer-reviewed," and "cherry picks a scant few examples," ignores social media companies' stated preferences about what content they want to allow and recommend to users. *Id.* ¶¶ 14(d)-(e), 49-51, 54-57.

At his deposition, Dr. Bail described that "content moderation can occur at multiple stages in the process" of creating user feeds, and that content moderation and recommendation systems are "highly interdependent." Ex. 8, Deposition of Christopher Bail ("Bail Depo") 76:12-22, 78:10-17. Dr. Bail also elaborated on the methodological deficiencies in Dr. Bapna's report, such as cherry picking anecdotal evidence and relying on non-peer-reviewed sources with limited external validity. *Id.* 187:5-194:7. He also said that while "engagement is an important factor that … most social media companies consider, … it's certainly not the only one," *id.* 296:19-

10

297:22, and that the decision to increase engagement by recommending content a user is likely to enjoy is itself a "kind of editorial judgment," *id.* 301:20-302:10.

## ARGUMENT

### I. Legal Standard.

The admission or exclusion of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. "Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F. 3d 1286, 1291 (11th Cir. 2005). This gatekeeping function is a "critical" one whose importance "cannot be overstated." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

Applying these standards, district courts must "conduct an exacting analysis" of an expert's opinion before allowing any part of it into evidence. *Id.* In this analysis, courts must determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink*, 400 F.3d at 1291-92 (citation omitted). The proponent of the expert's testimony "has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* at 1292; *accord Cook ex rel. Est. of Tessier v.*

*Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005). For several reasons, Defendants cannot meet their burden of showing that Bapna's proposed testimony meets these criteria.

**II.   Dr. Bapna's Opinions Fail to Meet the Standards Required by *Daubert* and Must Be Excluded Under Rule 702.**

**A. Dr. Bapna's Opinions About Expressive Choice and Editorial Decision Making Should Be Excluded.**

1. <u>Dr. Bapna Offers Impermissible Legal Opinions.</u>

As an initial matter, Dr. Bapna's opinions about how social media algorithms "relate[] to the idea of expressivity and editorial choice as interpreted in the First Amendment" are legal conclusions that should be excluded. Bapna Report ¶ 2; *see also id.* ¶¶ 3(e), 15, 27, 47, 58, 60, 66; Bapna Supplement ¶ 1(g).

"It is well-established that a testifying expert may not offer legal conclusions." *Ocasio v. C.R. Bard, Inc.*, 2015 WL 2062611, at *8 (M.D. Fla. May 4, 2015) (citing *Cook*, 402 F.3d at 1112 n.8). The Eleventh Circuit has held that a witness "may not testify to the legal implications of conduct." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (district court abused discretion by allowing witness to testify about scope of legal duty). Courts routinely exclude expert opinions that amount to legal opinions. *See Plott v. NCL Am., LLC*, 786 F. App'x 199, 203-04 (11th Cir. 2019) (whether conduct was reasonable); *Bray & Gillespie*

*Plaza, LLC v. Lexington Ins. Co.*, 2010 WL 11453162, at \*3 (M.D. Fla. Jan. 27, 2010) (whether a contract was formed).

Dr. Bapna says he was "asked to render opinions on the current state of social media algorithms," how those algorithms contribute to what content shows up in users' personalized feeds, and "ultimately on how this relates to the idea of expressivity and editorial choice as interpreted in the First Amendment." Bapna Report ¶ 2; *see also id.* ¶ 3(e) ("This opinion addresses … [h]ow this process relates to expressivity and editorial choice."). He concludes that the "algorithmic manner by which social media platforms decide what appears in an individual's feed is systematically different from what we think of as human expressivity in editorial choice." *Id.* ¶ 15. He says that algorithmic recommendations "stand[] in contrast to clear, bounded and deterministic human expression of editorial choice." *Id.*; *see also id.* ¶ 27.

"What constitutes speech that falls within the ambit of the First Amendment is a question of law." *Ala. State Conf. of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1236 n.11 (N.D. Ala. 2024). The Supreme Court has held that the "First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Moody*, 603 U.S. at 731. What constitutes "expressive activity" is part and parcel with the First Amendment question, and Dr.

Bapna cannot provide an answer. Insofar as he purports to answer a core legal question in this case—whether social media algorithms construct feeds that are expressive and the product of editorial choice—he offers improper legal opinions that should be excluded under Rule 702. *See One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 942 n.1 (W.D. Wis. 2019) (giving no weight to expert opinion about whether public officials' social media feeds amount to "government speech"); *Demboske v. Autry Greer & Sons, Inc.*, 740 F. Supp. 3d 1172, 1181-82 (N.D. Fla. 2024) ("An expert 'may not testify as to his opinion regarding ultimate legal conclusions.'") (quoting *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009)).

    2.  <u>Dr. Bapna Is Not Qualified to Render Legal Opinions on Expressive Choice.</u>

Even if Dr. Bapna's opinions about what constitutes "expressivity and editorial choice" were not improper legal opinions, he is not qualified to offer them. A witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Qualification is "assessed in reference to the matter to which the expert seeks to testify—*i.e.*, 'to the task at hand.'" *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1102 (S.D. Fla. 2022) (quoting *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021)). General or tangential expertise does not suffice. *Konikov v. Orange Cnty., FL*, 290

F. Supp. 2d 1315, 1317 (M.D. Fla. 2003) ("the witness must have special knowledge about the discrete subject on which he or she is to testify").

Dr. Bapna claims to have expertise in "social influence and engagement, analytics, artificial intelligence and machine learning, digital transformation, and the economics of information systems," Bapna Report ¶ 9, as well as "online… auctions, human capital in IT services industries, grid computing, … [the] business value of IT, … [s]trategies for the digital economy, digital marketing, [and] IT outsourcing," Bapna Depo 37:2-18. Notably, none of this expertise lies in online editorial choice, and in his reports, Dr. Bapna does not offer opinions about any of these fields.

At his deposition, Dr. Bapna seemed unsure whether he was actually offering an expert opinion about whether social media content moderation by algorithms constitutes expressive speech. Asked about his expertise on whether something constitutes speech, Dr. Bapna said that "speech is a common term, right? I don't have to be an expert in speech to have an opinion on whether – or to explain the process by which content is presented in front of users [on] social media platforms." *Id.* 40:25-41:6. Even so, he purports to offer an opinion in this case about whether something constitutes speech. *Id.* 41:8-12 ("Yes. I'm offering an opinion, yes.").

But Dr. Bapna has no specialized knowledge about what constitutes "human expressivity" or "editorial choice." He has no formal education in human expressivity or editorial curation, has not taught any courses about the nature of

human expressivity or editorial curation, and has no publications that focus on those topics. *Id.* 42:25-44:7. Dr. Bapna cannot even offer a full-throated claim that his supposed expertise applies to this subject matter. *Id.* 40:13-20 ("[B]ecause I understand the process by which this content is generated and presented, that expertise of mine sort of carries over in the context of speech, yeah.").

That does not satisfy the qualification prong. Expertise "in one field does not qualify a witness to testify about others." *In re Zantac*, 644 F. Supp. 3d at 1102. Dr. Bapna cannot "carr[y] over" whatever experience he may have to an area in which he has no formal education, training, or relevant experience. Dr. Bapna has no "special knowledge" about the "discrete subject" of what constitutes expressive speech or editorial choice, and his opinions about those subjects, even assuming they were not inadmissible legal opinions, should be excluded. *Goldman v. Bracewell & Patterson, L.L.P.*, 2005 WL 5740234, at *2 (M.D. Fla. Sept. 13, 2005).

**B.** **Dr. Bapna's Opinions That Recommendation Algorithms Focus Only On Engagement Lack Reliable Methodology and Are Legally Irrelevant.**

Beyond his opinions about expressivity and editorial choice, Dr. Bapna also offers opinions about the nature of social media recommendation algorithms— opining that they function only to promote engagement by effectively mirroring user's interests. *See* Bapna Report ¶¶ 3(b), 15, 18, 56, 58; Bapna Supplement ¶¶ 1(a), (f), 6(g), 8-10. These opinions are inadmissible for two different reasons: first, they

simply are not the product of reliable principles and methods; second, even if credited, these opinions would not change the First Amendment's application to the social media feeds at issue in this case, making Dr. Bapna's opinions legally irrelevant and unhelpful. Fed. R. Evid. 702(c)-(d).

1. Dr. Bapna's Opinions About Engagement Algorithms Are Not Based On Any Reliable Expert Method.

Rule 702 requires that expert testimony be "the product of reliable principles and methods" "reliabl[y] appli[ed]" to the facts of the case to be admissible. *Id.* The Court must undertake a "thorough inquiry" into, among other things, "whether the expert's theory can be and has been tested…" *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1294 (11th Cir. 2022) (quoting *Frazier*, 387 F.3d at 1262). The Supreme Court has explained:

> The objective of [*Daubert's* gate-keeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *accord Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021). An expert's opinion is not the product of reliable principles and methods where "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires

a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

Defendants cannot meet their burden to show that Dr. Bapna's "theory can be and has been tested" or that his "technique is generally accepted in the scientific community." *Lorente-Garcia v. Giraldo-Navarro*, 2025 WL 2271614, at \*6 (S.D. Fla. July 9, 2025) (citation omitted); *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) (An "expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions"). Dr. Bapna's reports say nothing about the methodology he employed, and at deposition he conceded that his report is "not a research paper, so there is no, you know, methodology associated with an opinion, expert opinion out here." Bapna Depo 55:5-8. By asserting that his report is "not a research paper," Dr. Bapna *admits* he did what *Kumho Tire* precludes: employing a lower "level of intellectual rigor." *Kumho Tire*, 526 U.S. at 152.

When pressed for *any* sort of methodology, Dr. Bapna testified that "at a high level" he used his "analytical thinking. I mean that's the methodology." Bapna Depo 55:17-19. Dr. Bapna decided what sources or documents to review for this case based on his "25 years" in "this field," attending conferences, "talk[ing] to people," and "teach[ing] executives." *Id.* 56:1-57:3. But he does not explain "*how* that experience leads to the conclusion[s] reached, why that experience is a sufficient

18

basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). Without being able to offer these explanations, his opinions lack proper grounding and should be excluded.

Dr. Bapna certainly did not conduct an empirical analysis of any actual social media feeds or curation systems. Nor did he conduct any kind of systematic evaluation of the literature or documentation discussing social media recommendation algorithms, and he ignored the vast majority of the member companies' own statements about their algorithms, including their regularly published transparency reports and many technical internal documents produced in discovery in this case that were available for Dr. Bapna to review. Bapna Depo 50:3-52:4; 110:2-16, 127:1-14, 134:10-135:1. Dr. Bapna's reports do not even include any "materials considered" section, and the only documents he apparently relied on are the 29 public documents (plus ███████████████████) cited in the endnotes to the original Report and the handful of internal member company documents cited in his Supplemental Report. *See generally* Bapna Report; Bapna Supplemental Report.

*Original Report.* Notably, the 29 public documents cited by Dr. Bapna in his original Report do not include *any* peer-reviewed articles, or any actual academic, scientific or technical literature addressing social media recommendation systems.

Instead, Dr. Bapna resorted to haphazardly looking for isolated statements in random sources that he thought supported the conclusion he hoped to reach. For example, he relied on blog posts that he found through Google searches—such as searching for "[d]escriptions of how YouTube algorithm works" and selecting the article he "felt was the most relevant." Bapna Depo 190:13-191:25.

Even so, many of the documents Dr. Bapna cited through this process actually undermine his opinion, by making clear that social media algorithms do more than just promote engagement. For example, Dr. Bapna cites Thorburn's *How Platform Recommenders Work,* which explains that in a "typical recommender pipeline," the "first stage is moderation, in which undesirable items are removed from the pool or flagged for special treatment." Ex. 5, Thorburn 2022 at 3; *See* Bapna Report ¶¶ 18, 38. It says that "[m]ost platforms also have policies (such as those of Facebook, YouTube, or Twitter) to filter out content that is believed to cause harm, such as nudity, coordinated inauthentic behavior, or public health misinformation." Ex. 5, Thorburn 2022 at 3. The authors note that while a primary metric in ranking is how likely a user is to interact with that content, ranking models also typically factor in "integrity signals" based on "flag[s] during the moderation stage," and that "no real platform optimizes solely for engagement." *Id.* at 5-6; *accord* Bail Report ¶¶ 44-46 (discussing public and internal documents from Plaintiffs' members that describe recommendation guidelines).

Another document Dr. Bapna relies on (Bapna Report ¶¶ 24, 28) similarly dispels Bapna's own opinion about recommendation systems, explaining that they include mechanisms that are not designed to boost engagement but instead to limit the spread of undesirable content: "[d]emotion, downranking, reduction, or suppression, often colloquially called shadowbanning, is a 'soft' content moderation technique in which content deemed problematic is shown to fewer users, but not removed from the platform." Ex. 9, Narayanan, *Understanding Social Media Recommendation Algorithms* at 12-13. This article goes on to say: "Posts may get algorithmically demoted based on [normative evaluations of posts]—that is, their reach will be limited. This blurs the line between content moderation and algorithmic recommendation." *Id*. at 19. Yet even as he cites these documents, Dr. Bapna ignores these statements, which undermine the very opinion he tries to give. *See* Bail Report ¶ 47 ("Dr. Bapna fails to consider evidence that recommendation systems implement content moderation policies by limiting the reach or recommendation of content, including content that might boost engagement, a point he conceded in his deposition.").

"This methodology—pick the [quotes] that agree with you … and ignore the ones that disagree with you … is essentially the definition of an unreliable 'it's true because I said so' opinion." *Davis v. Lockheed Martin Corp.*, 705 F. Supp. 3d 1345, 1351 (M.D. Fla. 2023); *see also In re Deepwater Horizon Belo Cases*, 2022 WL

21

17721595, at \*22 (N.D. Fla. Dec. 15, 2022) (excluding witness who "cherry picked a favorable analysis from the … study, while disregarding the analyses that undermined his ultimate opinion").

Beyond that, Dr. Bapna's report is replete with generalizations based on selective, anecdotal evidence without any methodological underpinning. For example, Dr. Bapna points to two random instances of Meta and Twitter supposedly making content moderation "mistakes" to generalize that social media companies writ large may be "inconsistently or improperly categorizing content." Bapna Report ¶ 33. He also opines that social media algorithms are too unpredictable to be influenced by humans' editorial judgments, but again points to just two examples, relating to one company. *Id.* ¶ 25; *see* Bail Report ¶¶ 30, 55-57. And he cites just one (non-peer reviewed) article about one service, using a small sample size and short time period, to make generalizations about how *all* social media algorithms function. Bapna Report ¶ 26; *see* Bail Report ¶¶ 51-52.

In short, Dr. Bapna offers no reliable methodology for generating his opinions. Instead, he simply asserts his opinions and offers only isolated examples supposedly to support them with no explanation as to how those examples are representative or generalizable. *D.H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC*, 526 F. Supp. 3d 1360, 1372 (N.D. Ga. 2021) (excluding expert whose "methodology, to the extent there is one, appear[ed] to entail his examination of

various databases followed by him reaching some conclusions based on his observations").

***Supplemental Report.*** Dr. Bapna's supplemental report is even more deficient. As noted, this report focuses on internal company documents, but Dr. Bapna employed no methodology for addressing these materials. He made no attempt to systematically analyze the internal documents Plaintiffs' members produced or evaluate them in total. Indeed, it does not appear that he even *reviewed* (and certainly did not cite) most of the documents that were produced.

Instead, Dr. Bapna cherry picked a small number of those documents, apparently cited only because they have statements that he thinks support his opinions. In doing so, Dr. Bapna simply ignored the many other internal documents available to him that undermine his opinion. For example, Dr. Bapna did not review

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████

██████████████████████████

Each of these documents shows that the ranking systems Plaintiffs' members use consider more than just engagement, but Dr. Bapna's analysis simply does not account for them. He explained that he omitted such documents because he did not think they were "relevant for the ***sort of narrative that I had***." Bapna Depo 203:15-23 (emphasis added). The import of this testimony is astounding: Dr. Bapna *admits* he had a pre-existing "narrative" and he only looked at documents that supported his narrative. Usually the district court, in its gatekeeping role, has to suss out such unreliability; here, Dr. Bapna said the quiet part out loud. He admitted the exact sort of result-driven methodology that Rule 702 flatly precludes. *See, e.g.*, *In re Zantac*, 644 F. Supp. 3d at 1158-59 ("Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.") (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018)).

Even in the few documents he does cite, Dr. Bapna's admitted lack of any reliable methodology leads him to take quotes out of context and ignore portions of the same documents that contradict his conclusion about engagement. *See* ███

██████████████████████████████

24

Similarly, Dr. Bapna asserts that ███████████████████████████

██████████████████████████████████████

████████████████████████████

In short, Dr. Bapna does not offer any coherent methodology supporting his opinion about the goal and operation of social media algorithms, and he does not even try to explain how to account for the wealth of evidence—both in the materials he actually cited and those he inexplicably chose to ignore—that contradicts his opinions. There is "simply too great an analytical gap between the data and the opinion proffered." *Cook ex rel. Est. of Tessier*, 402 F.3d at 1111 (citation omitted); *see also Culliver v. BP Exploration & Prod., Inc.*, 2024 WL 1478659, at *7 (N.D. Fla. Apr. 3, 2024) (excluding expert who "cherry picked both the sources he considered, as well as the findings from those sources"); *Kallas v. Carnival Corp.*, 2009 WL 901507, at *6 (S.D. Fla. Mar. 30, 2009) (finding an "analytical gap, indeed an analytical chasm, between the concept set forth in [a cited article] and [the expert's] conclusion").

2. Dr. Bapna's Opinions Are Legally Irrelevant and Thus Unhelpful.

Finally, even apart from all the profound methodologic flaws, Dr. Bapna's opinions regarding engagement-promoting algorithms should be excluded because they do not offer any opinion that is legally relevant and helpful. The "touchstone" of the helpfulness inquiry "is the concept of relevance." *Prosper*, 989 F.3d at 1249. "Expert testimony which does not relate to any issue in the case is not relevant and,

ergo, non-helpful." *Id.* (quoting *Daubert*, 509 U.S. at 591). Even if it is relevant, to be helpful, testimony must "concern[] matters that are beyond the understanding of the average lay person." *Id.* (quoting *Frazier*, 387 F.3d at 1262). Defendants presumably are offering Dr. Bapna's opinions to argue that some social media platforms' feeds fall outside of what the Supreme Court said in *Moody* is covered by the First Amendment. But that will not work: Dr. Bapna himself acknowledges that the feeds his reports discuss incorporate and are informed, at least in part, by the websites' content-moderation standards—precisely what the *Moody* Court held was protected. That acknowledgement means that Dr. Bapna's opinions about the algorithms' efforts to boost engagement are legally irrelevant to Plaintiffs' First Amendment challenge in this case.

In *Moody*, the Supreme Court held that Facebook's and YouTube's feeds, which "present users with a continually updating, personalized stream of other users' posts," are expressive compilations under the First Amendment. 603 U.S. at 710. The Court explained that the "key to the scheme is prioritization of content, achieved through the use of algorithms," which "select[] and rank[]" content, "most often based on a user's expressed interests and past activities," but "may also be based on other factors, including the platform's preferences." *Id.* at 710, 734-35. And the platforms also "write algorithms to implement those standards," which may promote or suppress content in accordance with those preferences. *Id.* at 735. In short, the

27

governing Supreme Court decision in this case expressly holds that the feeds at issue—which are personalized through algorithms that look at both "user's expressed interests and past activities" as well as the "platform's preferences"—are protected by the First Amendment.

It is true that *Moody* reserved judgment on a narrow issue: how the First Amendment might apply to feeds constructed "without any regard to independent content standards," but instead by algorithms that "respond solely to how users act online." *Id.* at 736 n.5. But this limited reservation does not create a lane for Dr. Bapna's opinions about engagement. Even if his opinions were credited, they would not take the social media feeds or algorithms at issue here fall outside of *Moody*'s First Amendment holding and into the question reserved in footnote 5. To the contrary, Dr. Bapna's own reports, testimony, and the documents he relies on all confirm that those feeds use algorithms that implement independent content standards when they moderate and recommend content—just as the Supreme Court understood.

To start, Dr. Bapna concedes that all the social media services he discusses have content moderation policies written by humans, that these policies reflect human judgments about what kinds of content should appear on those services, that companies enforce those policies—including through algorithms—and that such enforcement informs what appears in users' feeds and how content is ranked within

those feeds. Bapna Report ¶¶ 31, 32, 34-38, 40-42; Bapna Depo 61:11-25, 66:3-9, 73:8-74:15, 118:11-119:8, 183:22-184:3, 205:25-206:8. Dr. Bapna's Opening Report thus acknowledges that social media websites use algorithms to "detect and moderate hate speech, lewd content, and other types of content that are in violation of their content guidelines," Bapna Report ¶ 31, and that content moderation is "jointly done by human moderators and traditional AI based machine learning algorithms," *id.* ¶ 32. Dr. Bapna also agreed that once violating content is removed, it is not available to users and will not be recommended in their feeds. Bapna Depo 89:19-90:8. In each case, human judgments shape what users see in their feeds.

Dr. Bapna's own discussion of recommender systems similarly makes clear that those algorithms incorporate the websites' content moderation policies and judgments. He agreed that recommender systems may downrank borderline content, *id.* 100:22-101:2, and acknowledged that one of the signals in Facebook's feed ranking is "[w]hether the post likely contains … Community Standards violation[s]." *Id.* 236:2-15; *see also id.* 183:22-184:10 (similar, as to YouTube). His Opening Report even includes an illustration of a "typical recommender pipeline" that includes steps for content "moderation" and "re-ranking," both of which Dr. Bapna acknowledges reflect human editorial judgments. Bapna Report ¶ 38, Fig. 1; Bapna Depo 97:9-102:25. Using Meta as an "illustrative" example, Dr. Bapna writes that Meta "exclud[es] content that is moderated because it is somehow determined

to violate Community Standards," "ensur[es] a balanced mix of content," and ranks content based in part on "actor attributes," which include "Community Standards violations." Bapna Report ¶¶ 39-41. Dr. Bapna further asserts that Meta's algorithm "incorporates negative signals to demote problematic content," limits content it deems "'inappropriate, disrespectful, or offensive' but not violative of the Community Standards," and increases visibility of content based on "'equity' considerations." *Id.* ¶¶ 41-42; *accord* Bapna Depo 117:21-118:3, 122:12-19.

While Dr. Bapna still insists that algorithms are designed "with the sole objective of maximizing engagement," Bapna Depo 114:22-25, it is important to understand that "engagement" here does not mean *content-agnostic* or selected without regard to independent content standards. It just means content that a user is expected to enjoy, react to in some way, or want to spend time viewing. Bapna Report ¶¶ 60, 62; *see* Bail Report ¶ 48 ("A system that indicates to a user they are likely to find a post or video relevant, valuable, or interesting, communicates a message to that user from the social media website or application about what it believes the user would like to see."); Ex. 5, Thorburn 2022 at 6 (discussing metrics and weights of evaluating engagement, which "can be selected in a variety of ways"). An engagement-based system thus still reflects content-based preferences and choices.  Bail Depo 300:5-302:10; Bail Report ¶ 28.

In short, even accepting Dr. Bapna's opinion that ranking algorithms primarily aim to generate engagement, that would do nothing to suggest that the social-media feeds at issue are legally distinguishable from the paradigmatic Facebook and YouTube feeds discussed by the Supreme Court in *Moody* or somehow fall outside First Amendment protection. Dr. Bapna is not actually opining (nor could he) that the feeds at issue are merely giving users "the content they appear to want, without any regard to independent content standards." *Moody*, 603 U.S. at 736, n.5. To the contrary, Dr. Bapna acknowledges that social media services, in constructing those feeds, "make a wealth of user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion." *Id.* Because Dr. Bapna's opinions would not change the First Amendment's application to those feeds, those opinions are legally irrelevant and unhelpful under Federal Rule of Evidence 702(d).[2]

---

[2] Even if Dr. Bapna's opinions are relevant, they are not helpful because they are well within the understanding of the average lay person. Dr. Bapna has not seen any of the models or algorithms he characterizes. Bapna Report ¶ 23. His opinions about what these social media algorithms are designed to do, who designs them, and what signals are used as inputs, are all based on cherry picked quotes from selectively chosen documents. Reviewing and making conclusions based on documents is the type of analysis that the trier of fact can undertake. Dr. Bapna's testimony would offer "nothing more than what lawyers for the parties can argue in closing arguments." *Lorente-Garcia*, 2025 WL 2271614, at *7 (quoting *Frazier*, 387 F.3d at 1262-63).

## CONCLUSION

For these reasons, Plaintiffs respectfully ask the Court to exclude all opinions of Dr. Bapna that concern expressivity, editorial choice, and algorithms maximizing engagement, from all pending motions and at any trial.

Respectfully submitted this 3rd day of April, 2026.

/s/ *Erin E. Murphy*
Paul D. Clement
Erin E. Murphy
James Y. Xi
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Brian M. Willen
Steffen N. Johnson
Paul N. Harold
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K Street NW
Washington DC 20006
(202) 973-8800
bwillen@wsgr.com
sjohnson@wsgr.com
pharold@wsgr.com

/s/ *Douglas L. Kilby*
Douglas L. Kilby
Florida Bar No. 0073407
Hannah E. Murphy
Florida Bar No. 1032759
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com

Lauren Gallo White
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

Benjamin S. Hewitt
WILSON SONSINI GOODRICH &
ROSATI, P.C.
31 West 52nd Street, 5th Floor
New York, NY 10019
(212) 453-2804
bhewitt@wsgr.com

*Counsel for Plaintiffs NetChoice, LLC and
Computer & Communications Industry Association*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Plaintiffs' Memorandum in Support of their Motion to Exclude Testimony from Defendants' Proposed Expert Ravi Bapna complies with the type-volume limitation of Local Rule 7.1(F) and (I) because it contains 7412 words.

*s/Douglas L. Kilby*
Douglas L. Kilby

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)

Plaintiffs' counsel attempted to confer with counsel for Defendants to obtain their position as to the relief requested in their Motion to Exclude Testimony from Defendants' Proposed Expert Ravi Bapna, but has not received a response as to Defendants' position.

*s/Douglas L. Kilby*
Douglas L. Kilby

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 3rd day of April, 2026.

*s/Douglas L. Kilby*
Douglas L. Kilby