**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

NETCHOICE, LLC, et al.,

      Plaintiffs,

v.

JAMES UTHMEIER, in his official

capacity as Attorney General of the
State of Florida, et al.,

      Defendants.

_____/

Case No. 4:21-cv-220-RH/MAF

**PUBLIC REDACTED**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

<u>**Page**</u>

TABLE OF AUTHORITIES .......................................................................................iii

BACKGROUND...................................................................................................2

LEGAL STANDARD .............................................................................................6

ARGUMENT ..................................................................................................... 6

I.    Plaintiffs Lack Associational Standing for their First Amendment
      Challenges. ...............................................................................................6

      A.  Member Participation Is Required. ................................................6

      B.  Plaintiffs' Members Lack Article III Injuries. ..............................14

II.   Defendants Are Entitled to Judgment on Plaintiffs' Purported As-Applied
      Challenges Because They Are Quasi-Facial Challenges, and Plaintiffs Cannot
      Carry Their Burden for a Quasi-Facial Challenge. ................................17

III.  Plaintiffs' Purported As-Applied Challenges Also Fail Because Many Provisions
      Are Constitutional in All Applications. ....................................................29

      A.  The Consistency Provision Is Constitutional in All Applications............29

      B.  The Candidate-Deplatforming Provision Is Constitutional in All
          Applications. ..............................................................................34

      C.  The Limit on Censoring, Deplatforming, or Shadowbanning Journalistic
          Enterprises Is Constitutional in All Applications. ....................................36

      D.  The Opt-Out Provision Is Constitutional in All Applications. ................37

      E.  The Individualized-Disclosure, Standards, and View Count Provision
          Are Constitutional in All applications.........................................................38

      F.  The Rules-Change Provision is Constitutional in All Applications. ........41

IV.   Defendants Are Entitled to Judgment on Plaintiffs' Facial Challenges. .............44

V.    Defendants Are Also Entitled to Judgment on Plaintiffs' First Amendment
      Challenges Because Plaintiffs' Members Are Common Carriers. ......................45

VI.   Defendants Are Entitled to Judgment on Plaintiffs' Vagueness Challenges......47

A. Plaintiffs' Vagueness Challenge to the Consistency Provision Fails. .......47

B. Plaintiffs' Vagueness Challenge to the Ban on the Use of Post-Prioritization Algorithms for Posts by or about Candidates Fails. ..........49

VII.   Plaintiffs Lack Associational Standing for Their Section 230 Challenges...........50

VIII.   Defendants Are Entitled to Judgment on All of Plaintiffs' Section 1983 Claims Because They Lack a Cause of Action. ...................................................................52

CONCLUSION ..............................................................................................................53

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023) .................................................................................. 45, 46

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
    591 U.S. 430 (2020) ...........................................................................................9

*All. of Auto. Mfrs. v. Jones*,
    897 F. Supp. 2d 1241 (N.D. Fla. 2012) ........................8, 9, 10, 11, 12, 13, 51, 52

*Bischoff v. Osceola County*,
    222 F.3d 874 (11th Cir. 2000) .........................................................................14

*Borrero v. United Healthcare of N.Y., Inc.*,
    610 F.3d 1296 (11th Cir. 2010) ................................................................... 8, 14

*CBS, Inc. v. FCC*,
    453 U.S. 367 (1981) .........................................................................................35

*City of Austin v. Reagan Nat'l Advert. of Aust., LLC*,
    596 U.S. 61 (2022) .............................................................................36, 37, 43

*City of South Miami v. Governor*,
    65 F.4th 631 (11th Cir. 2023) ...................................................................... 14, 15

*Cohen v. Cowles Media Co.*,
    501 U.S. 663 (1991) .........................................................................................30

*DA Mortg., Inc. v. City of Miami Beach*,
    486 F.3d 1254 (11th Cir. 2007) .........................................................................11

*Edenfield v. Fane*,
    507 U.S. 761 (1993) .........................................................................................33

*Fair Hous. Council of San Fernando Valley v. Roomates.com, LLC*,
    521 F.3d 1157, (9th Cir. 2008) .........................................................................51

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) .........................................................................................47

*FCC v. Midwest Video Corp.*,
    440 U.S. 689 (1979) .........................................................................................46

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019).................................................................................52

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018)..........................................................................34

*Free Speech Coal. v. Paxton*,
606 U.S. 461 (2025) ..................................................................................38

*Free Speech Coal. v. Sessions*,
314 F. Supp. 3d 678 (E.D. Pa. 2018) ..........................................................9

*Ga. Cemetery Ass'n v. Cox*,
353 F.3d 1319 (11th Cir. 2003) ..................................................................8

*Harris v. McRae*,
448 U.S. 297 (1980) ............................................................................ 11, 12

*Harris v. Mexican Specialty Foods, Inc.*,
564 F.3d 1301(11th Cir. 2009) ...................................................................7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bost.*,
515 U.S. 557 (1995) ............................................................................ 31, 32

*Indigo Room, Inc. v. City of Fort Myers*,
710 F.3d 1294 (11th Cir. 2013) .....................................................47, 48, 49

*Jencks v. Coleman*,
13 F. Cas. 442 (C.C.D.R.I 1835) ..............................................................46

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ............................................................................ 17, 18

*Leathers v. Medlock*,
499 U.S. 439 (1991) ..................................................................................42

*Lexmark Int'l v. Static Control Components*,
572 U.S. 118 (2014) ..................................................................................52

*McGuire v. Marshall*,
50 F.4th 986 (11th Cir. 2022)...............................................................17, 18

*Milavetz, Gallop & Milavetz P.A. v. United States*,
559 U.S. 229 (2010) ..................................................................................39

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ................................. 1, 3, 9, 18, 19, 26, 27, 30, 41, 42, 44, 51

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) ..................................................................6

*NetChoice, LLC v. Att'y Gen. of Fla.*,
34 F.4th 1196 (11th Cir. 2022).......................................................3, 33, 34

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025)..................................................1, 7, 8, 51

iv

*NetChoice, LLC v. Att'y Gen. of Fla.*,
  34 F.4th 1196 (11th Cir. 2022) ................................................................. 3, 37

*NetChoice, LLC v. Bonta*,
  No. 25-2366, __ F.4th __, 2026 WL 694471 (9th Cir. Mar. 12, 2026) ................. 45

*NetChoice, LLC v. Moody*,
  546 F. Supp. 3d 1082 (N.D. Fla. 2021) ..........................................................3

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*,
  50 F.4th 1126 (11th Cir. 2022) ............................................................. 42, 43

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) .............................................................. 34, 35

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ............................................................................ 35, 36

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................30

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ................................................................................37

*Rowan v. U.S. Post Off. Dep't*,
  397 U.S. 728 (1970) .......................................................................... 37, 38

*Rubenstein v. Fla. Bar*,
  72 F. Supp. 3d 1298 (S.D. Fla. 2014) ...................................................... 17, 18

*Rumsfeld v. FAIR, Inc.*,
  547 U.S. 47 (2006) .................................................................................34

*SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*,
  40 F.4th 1320 (11th Cir. 2022) ......................................................... 47, 48, 50

*TikTok, Inc. v. Garland*,
  604 U.S. 56 (2025) ....................................................... 32, 33, 35, 36, 37, 43

*Tracy v. Fla. Atl. Univ. Bd. of Trs.*,
  980 F.3d 799 (11th Cir. 2020) ..................................................................48

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) .......................................................................... 19, 35

*U.S. Telecom Ass'n v. FCC*,
  855 F.3d 381 (D.C. Cir. 2017) ........................................................ 30, 31, 46

*United States v. Williams*,
  553 U.S. 285 (2008) ...............................................................................48

v

*Vote.org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) .................................................................................52

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ...............................................................................................32

*Webster v. Fall*,
   266 U.S. 507 (1925) ...............................................................................................52

*Wilson v. State Bar of Ga.*,
   132 F.3d 1422, (11th Cir. 1998) ..................................................................... 14, 15

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) ........................................................................................ 38, 40

## Constitutional Provisions, Statutes and Regulations

U.S. CONST. amend XIV, § 1 ...............................................................................................48

42 U.S.C. § 1988 ...................................................................................................................52

47 U.S.C.
   § 230(c)(1) ...............................................................................................................51
   § 230(c)(2)(A) ...........................................................................................................51
   § 230(f)(3) ................................................................................................................51

FLA. STAT.
   § 106.072(2) ................................................... 6, 14, 15, 17, 27, 29, 34, 44, 45, 46, 50
   § 501.2041(1)(e) ......................................................................................................49
   § 501.2041(1)(g) .........................................................................................................2
   § 501.2041(1)(g)(1) .....................................................................................................2
   § 501.2041(2)(a) ...............................................................6, 7 , 17, 29, 38, 39, 44, 46
   § 501.2041(2)(b) ........................................... 6, 17, 29, 31, 44, 45, 45, 46, 47, 48, 50
   § 501.2041(2)(c) .................................................6, 13, 14, 16, 17, 27, 29, 41, 44, 45, 46, 51
   § 501.2041(2)(d)(1) ..................................... 6, 12, 14, 16, 17, 29, 38, 44, 45, 46, 51
   § 501.2041(2)(d)(3) ..................................... 6, 12, 14, 16, 17, 29, 38, 44, 45, 46, 51
   § 501.2041(2)(e) ........................................... 6, 7, 17, 29, 38, 39, 44, 45, 46
   § 501.2041(2)(f) ......................................................................................... 27, 49
   § 501.2041(2)(f)(2) ..............................................6, 13, 14, 17, 29, 37, 44, 45, 46, 51
   § 501.2041(2)(h) ................................................................... 6, 17, 27, 44, 46, 47, 51
   § 501.2041(2)(j) ............................................... 6, 14, 15, 16, 17, 29, 36, 44, 45, 46, 51
   § 501.2041(3)(d) ............................................................................................. 38, 39

Regulation (EU) 2022/2065 of the European Parliament of the Council of 19
   October 2022 on Single Market for Digital Services (Digital Services Act), art.
   17, 2022 O.J. (L 277) 1.........................................................................................41

## Other Authorities

*2022 Annual Report: Oversight Board Reviews Meta's Changes to Bring Fairness and Transparency to Its Platforms*, OVERSIGHT BD. (June 6, 2023), https://perma.cc/5GNG-NZ9L ...................................................................................40

*Appeal a Community Guidelines Strike or Video Removal*, YOUTUBE HELP, https://perma.cc/7YHT-EJU4 .......................................................... 40, 41

*Appealed Content*, META TRANSPARENCY CTR., https://perma.cc/EH2G-TK9H ................................................................ 40, 41

Catalina Botero-Marino et al, *Oversight Board Demands More Transparency from Facebook*, OVERSIGHT BD, (Oct. 21, 2021), https://perma.cc/3L6Y-BZSS .......................39

Br. for the United States as Amicus Curiae Supporting Respondents, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Dec. 7, 2023) .....................................................30

*Chapeau*, THE SANTA CLARA PRINCIPLES ON TRANSPARENCY AND ACCOUNTABILITY IN CONTENT MODERATION, https://perma.cc/4UDC-253R ............................40

*Consistent*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/G8HW-K4CW ........48

Gennie Gebhart, *Who Has Your Back? Censorship Edition 2019*, ELEC. FRONTIER FOUND. (June 12, 2019), https://perma.cc/7QZX-A39E ..................................40

Joel Kaplan, *More Speech and Fewer Mistakes*, META (Jan. 7, 2025), https://perma.cc/6AZ9-XSD7 ........................................................ 10, 33

Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 229 (2021)...........................................................................................................46

Elon Musk (@elonmusk), X (Nov. 25, 2022, at 5:51pm ET), https://perma.cc/FP35-WMZP.......................................................................................... 30, 33

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

Despite a trip to the Supreme Court, Plaintiffs have committed the same fault a second time around. Plaintiffs seek another shortcut in purporting to bring as-applied First Amendment challenges on behalf of their members. Plaintiffs' members use proprietary algorithmic and machine-learning systems to moderate content and recommend that content to users. These systems are "unique" to each member, so the "participation of individual members" is required to adjudicate Plaintiffs' "'fact intensive' claims about all of [their] members' algorithms and the appropriate relief." *NetChoice, LLC v. Bonta* ("*Bonta I*"), 152 F.4th 1002, 1014 (9th Cir. 2025) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 747 (2024) (Barrett, J., concurring)). Once again, Plaintiffs' shortcut is a dead end.

In any event, Plaintiffs' as-applied challenges are as-applied in name only, as they concern a widely varied range of curation and dissemination activities, not application of the law to a particular function or feature. Within that realm, Plaintiffs cannot establish that the purported unconstitutional applications of S.B.7072 outweigh the constitutional ones. User engagement is the north star for Plaintiffs' members. In their pursuit of engagement, Plaintiffs' members' use of automated systems saps their curation and dissemination of human expression and replaces it with an ███████ ████████████████████████████████████████████ ███████████████████████████████████ For that reason,

1

and because Plaintiffs have again failed to develop the evidentiary record necessary to satisfy their burden, their facial challenges fail too.

Plaintiffs' other challenges fare no better. The provisions that Plaintiffs challenge as void for vagueness have a readily discernible core to anyone of reasonable intelligence. And Plaintiffs' Section 230 challenges are plagued by the same member participation issue that dooms their as-applied First Amendment challenges.

This Court should dismiss Plaintiffs' First Amendment and Section 230 challenges for lack of standing and enter judgment for Defendants on Plaintiffs' vagueness challenges. Alternatively, this Court should enter judgment for Defendants on the merits of Plaintiffs' challenges.

## BACKGROUND

In 2021, Florida enacted S.B.7072, codified principally at Florida Statutes §501.2041 and §106.072(2), to combat inconsistent and unfair treatment of users by social-media companies. The law applies to an internet platform that does "business in the state" and has either "annual gross revenues in excess of $100 million" or "at least 100 million monthly individual platform participants globally." FLA. STAT. §501.2041(1)(g). Covered platforms include not only social-networking platforms but also any platforms that "enable[] computer access by multiple users to a computer server" and that also satisfy either the user or revenue threshold. §501.2041(1)(g)(1).

Plaintiffs NetChoice, LLC and the Computer & Communications Industry Association, trade associations representing social media companies, challenged the law

2

shortly after its enactment. This Court preliminarily enjoined parts of the law. *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1084 (N.D. Fla. 2021). The Eleventh Circuit affirmed in part and reversed in part. *NetChoice, LLC v. Att'y Gen. of Fla.*, 34 F.4th 1196, 1203 (11th Cir. 2022). But the Supreme Court vacated the preliminary injunction and remanded for "proper[]" consideration of the "facial nature of NetChoice's challenge." *Moody*, 603 U.S. at 717 (majority op.).

On remand, Plaintiffs amended their complaint and purported to bring as-applied challenges to numerous provisions of the law, alleging that the various provisions interfere with Plaintiffs' members' curation and dissemination of speech on their platforms. First Am. Compl. ¶¶54-85, DE171 (Nov. 1, 2024). Plaintiffs also brought facial challenges to those provisions, ¶¶86-108, challenged two provisions as void for vagueness, ¶¶109-13, and challenged several provisions as preempted by Section 230 of the Communications Decency Act, ¶¶114-28.

Defendants then retained Dr. Ravi Bapna to provide his expert opinion on the "current state of social media algorithms, their objectives and operations, what determines a user's content feed, the underlying principles of personalizing content, the role of humans in shaping these activities, and ultimately on how this relates to the idea of expressivity and editorial choice." Expert Report of Ravi Bapna ¶2, attached hereto as Exhibit 1 ("Bapna Report").

As Defendants' expert explains, generally, the "algorithmic manner by which social media platforms decide what appears in an individual's feed is best characterized

3

as a complex system aimed at maximizing engagement." Supp. to Expert Report of Dr. Ravi Bapna ¶1.a, attached hereto as Exhibit 2 ("Supp. Bapna Report"); *accord* Bapna Report ¶¶54-64. "Algorithms, particularly algorithms designed and implemented using principles of machine-learning and artificial intelligence, function less like editors and more like mirrors, reflecting back to the users content that aligns with their past behaviors that they are most likely to engage with." Bapna Report ¶15; *accord id.* ¶58; Supp. Bapna Report ¶¶1.b, ███ These algorithms "generally do not signify the content preferences of human employees of the social media companies, such as when algorithms produce unpredictable outcomes." Supp. Bapna Report ¶1.c; *accord* Bapna Report ¶¶24-29. "[T]he nature of these complex adaptive systems is that they do not operate in a deterministic or tightly bounded manner." Supp. Bapna Report ¶1.c; *accord* Bapna Report ¶¶15, 43-47. "Machine learning and AI based approaches tend to form the bedrock" of "algorithms" used for "content analysis and categorization, content moderation of harmful content, and feed determination." Supp. Bapna Report ¶1.d; *accord* Bapna Report ¶¶59-64. But the use of this technology is unpredictable and inconsistent: the "recommendation systems can rapidly and unpredictably show content far removed from the users' original inputs" or inconsistent with a platform's policies, Bapna Report ¶26; *accord id.* ¶25; *accord* ███████████████ and the moderation systems "can result in temporary or even permanent action being taken against content that may or may not violate the platform's stated policies," Bapna Report ¶32.

4

As with the preliminary injunction proceedings, Plaintiffs produced declarations from employees from a few of their members. These declarations agree that YouTube, Meta, Etsy, Reddit, Pinterest, and X each use algorithmic systems and machine learning to moderate or recommend content. Duba Decl., DE232-3 ¶¶11, 34, 42, 55, 75 (Aug. 27, 2025); Vasquez Decl., DE232-5 ¶¶6-8, 22-24 (Aug. 20, 2025); Fernandez Decl., DE232-7 ¶¶8, 10, 14-17 (Aug. 20, 2025); Veitch Decl., DE232-8 ¶¶7, 17-18, 24, 37 (Aug. 26, 2025); Potts Decl., DE232-4 ¶¶16, 21 (Sep. 2, 2025); *see also* Callaway Dep. Ex. 8, attached hereto as Exhibit 35. Defendants then obtained documents from some of Plaintiffs' members—with internal documents coming primarily from Meta, YouTube, and Pinterest—

Defendants' expert Dr. Bapna reviewed all of the internal documents that Plaintiffs' members produced in discovery. This review confirmed that

5

████████████████████████

████████████████████████

█████████████████

Following discovery, Plaintiffs filed an amended motion for partial summary judgment, and Defendants now cross-move for summary judgment.

## LEGAL STANDARD

Summary judgment is proper if, construing all facts in the nonmovant's favor, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1113-14 (11th Cir. 2025) (en banc).

## ARGUMENT

I.    **Plaintiffs Lack Associational Standing for their First Amendment Challenges.**

A.  **Member Participation Is Required.**

Because member participation is required, Plaintiffs lack associational standing for their purported as-applied challenges under the First Amendment to the following provisions: (1) consistency provision, FLA. STAT. §501.2041(2)(b); (2) ban on the use of post-prioritization or shadowbanning algorithms for posts by or about candidates, §501.2041(2)(h); (3) candidate-deplatforming provision, §106.072(2); (4) limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j); (5) opt-out provision, §501.2041(2)(f)(2); (6) individualized-disclosure provision, §501.2041(2)(d)(1), (3); (7) rules-change provision, §501.2041(2)(c); (8) standards

6

provision, §501.2041(2)(a); and (9) view-count provision, §501.2041(2)(e). Although this Court previously rejected Defendants' argument that associational standing is lacking for Plaintiffs' *facial* challenges, Order Denying Mots. to Dismiss & to Compel Disc., DE209:15 (May 22, 2025),[1] that ruling has no bearing on Plaintiffs' purported as-applied challenge, which "asserts that a statute cannot be constitutionally applied in particular circumstances" and thus "necessarily requires the development of a factual record for the court to consider it." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009).

Here, the "particular circumstances," *id.*, to which these provisions apply are Plaintiffs' members' algorithmic and machine-learning systems that recommend and moderate content because the basis of Plaintiffs' claims is their curation and dissemination of third-party speech, DE171 ¶¶63-72. These systems "occupy a central role in the operation of modern social-media platforms." Bapna Report ¶16. And these systems are "unique" to each member, so the "participation of individual members" is required to adjudicate Plaintiffs' "'fact intensive' claims about all of [their] members' algorithms and the appropriate relief." *Bonta I*, 152 F.4th at 1014 (quoting *Moody*, 603 U.S. at 747 (Barrett, J., concurring)).

---

[1] Defendants respectfully disagree with this Court's prior ruling and maintain that Plaintiffs still lack associational standing for their facial challenges for the reasons set forth in Defendants' motion to dismiss. Mot. to Dismiss Am. Compl., DE173:13-18 (Nov. 15, 2024).

Member participation is required if the "claim asserted" or "relief requested" requires the participation of individual members." *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1305 (11th Cir. 2010) (cleaned up). In contrast, member participation is not required if members are injured in the "same manner" and "there is no need for each [m]ember to separately establish" how it is injured. *All. of Auto. Mfrs. v. Jones*, 897 F. Supp. 2d 1241, 1254 (N.D. Fla. 2012); *see also Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003) (holding that member participation was required "because the economic impact" of the challenged provisions "will vary depending upon the economic circumstances of each of [the association's] members").

To understand how each of Plaintiffs' members is purportedly injured, this Court must decide, as a threshold matter, whether each covered platform is engaged in expression when it curates and disseminates third-party speech, and that is a "fact intensive" inquiry that varies "from platform to platform." *Bonta I*, 152 F.4th at 1014 (quoting *Moody*, 607 U.S. at 747 (Barrett, J., concurring)). "[W]hether an algorithmic feed is expressive . . . requires review of *each* member's algorithm and how it functions." *Id.* "[T]he unique design of each platform and its algorithm affects whether the algorithm at issue is expressive" because the "more an algorithm implements human editorial directions, the more likely it is to be expressive for First Amendment purposes." *Id.* Indeed, as Defendants' expert explained, "each social media company uses its own proprietary machine learning models and . . . we cannot know for sure how these models are developed or operate without seeing the model building and

8

evaluation steps in detail." Bapna Report ¶23. So, "[g]eneralized statements" about curation and dissemination "cannot replace the individualized inquiry required." *Free Speech Coal. v. Sessions*, 314 F. Supp. 3d 678, 698 (E.D. Pa. 2018).

Plaintiffs' members differ in how they "curate and disseminate." Reddit, for example, uses a unique multilayered content-moderation approach that includes moderation decisions made by individual users in specific communities. Callaway Decl., DE232-6 ¶¶7-10 (Aug. 18, 2025). Specifically, "Reddit is a community of thousands of smaller communities, referred to as 'subreddits,' that are created and moderated by Reddit users themselves (referred to as 'Redditors')." ¶4. Subreddit moderators "set and enforce their community's rules." ¶10; *accord* Callaway Tr.38:12-22, attached hereto as Exhibit 4. The most popular content in a subreddit "will rise to the top" based on the votes of "each community member." DE232-6 ¶12. These forms of content moderation and recommendation differ drastically from the centralized algorithmic and machine-learning approaches of other platforms. *See infra* II. Moreover, it is unknown how many of the community-level moderators reside in the United States, Callaway Decl. ¶5 (Oct. 29, 2025) ("Reddit does not collect information about the citizenship of its users, and thus does not know the percentage of subreddit moderators who are or are not American citizens or residents."), attached hereto as Exhibit 36, and foreign control over content moderation alters the First Amendment analysis, *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020); *see also Moody*, 603 U.S. at 747 (Barrett, J., concurring). These differences in how Plaintiffs' members moderate

9

content require "each [m]ember to separately establish" how it is injured and thus preclude associational standing. *Jones*, 897 F. Supp. 2d at 1254.[2]

Even during this litigation, Plaintiffs' members have shifted how they "curate and disseminate" content. ███████████████████████████████████████ ████████ For example, the amended complaint alleges that Facebook might not recommend content that "includes claims that have been found to have been false by independent fact-checkers." DE171 ¶33. But Meta has since ended the factchecking program, █████████████████████████████████████████████████ ████████████████████████████████████████████; *accord* Joel Kaplan, *More Speech and Fewer Mistakes*, META (Jan. 7, 2025), https://perma.cc/6AZ9-XSD7. The sunsetting of Meta's factchecking program—and that program's delegation of authority to third parties—are additional examples of how the nature of Plaintiffs' members' curation and dissemination turns on fine details that vary from platform to platform and evolve with each platform's business decisions.

Adding to the confusion, the members on behalf of which Plaintiffs bring their purported as-applied challenges are far from clear. For one thing, the paragraphs of the

---

[2] Although Plaintiffs purport not to seek as-applied relief on behalf of their foreign members, *see* Schruers Tr.109:1-8, 110:1-111:20, 149:12-19, attached hereto as Exhibit 7, member-specific discovery about foreign ownership and decisionmaking, such as at TikTok, would be necessary before Plaintiffs could obtain any as-applied relief on behalf of such members.

amended complaint about the as-applied challenges mention only select members. DE171 ¶¶54-85. Companies such as Reddit joined NetChoice months after Plaintiffs filed their amended complaint. Cleland Tr.87:1-2, attached hereto as Exhibit 8; DE171. At a minimum, Plaintiffs should not be able to obtain as-applied relief for Reddit or any members not specifically referenced in the complaint. For another thing, TikTok left NetChoice in 2024. Cleland Tr.63:11-16 (Ex. 8). But TikTok apparently rejoined after the close of fact discovery. *See* Cleland Decl., DE280-2 ¶5 (Mar. 19, 2026). TikTok's departure from NetChoice for the fact discovery period meant that Defendants resolved the third-party dispute with then non-member TikTok by agreeing to the production of just two documents. Even so, that limited discovery revealed that TikTok's ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Any further analysis of TikTok's algorithms is not possible in this case. And the indeterminate scope of Plaintiffs' purported as-applied challenges cries out for member participation.

When the standing inquiry is focused on Plaintiffs' purported as-applied challenges as opposed to their facial challenges, the Supreme Court's decision in *Harris v. McRae*, 448 U.S. 297 (1980), cannot be distinguished. *Cf.* DE209:18-19. Because an as-applied challenge involves only a litigant's own rights, *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007), the nature of the purported injury is central to the merits of the challenge, so whether each member is injured in the "same manner"

11

is central to the standing inquiry, *Jones*, 897 F. Supp. 2d at 1254. Accordingly, just as "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion," *Harris*, 448 U.S. at 321 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 223 (1963)), it is necessary for Plaintiffs' as-applied challenges to show the effect of the challenged provisions on *expressive* curation and dissemination—which Plaintiffs may only establish with specific details about each member's automated systems.

Member participation is required for Plaintiffs' purported as-applied challenges to a few provisions for additional, provision-specific reasons. First, the individualized-disclosure provision, which requires platforms to notify users of certain actions taken against them or their content and explain those actions, FLA. STAT. §501.2041(2)(d)(1), (3), affects Plaintiffs' members in different ways depending on the notice that they currently provide users. Some of Plaintiffs' members already notify users about content-moderation decisions in a variety of ways. █████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Why Plaintiffs' members might not notify users of their violations may vary from platform to platform. Likewise, the extent of the explanation provided may vary from platform to platform. These fine distinctions bear on the analysis—particularly whether compliance with the individualized-disclosure provision places an undue burden on Plaintiffs' members. And those fine distinctions mean that Plaintiffs' members need to

12

separately establish how they are injured because they are not necessarily injured in the same way. *Jones*, 897 F. Supp. 2d at 1254.

Second, the rules-change provision, which requires platforms to inform users of changes to their rules and bars changes more than once every 30 days, FLA. STAT. §501.2041(2)(c), will not affect all of Plaintiffs' members in the same way and thus Plaintiffs' members do not share a common injury from that provision. *Jones*, 897 F. Supp. 2d at 1254. ████████████████████████████████████████

████████████████ So the extent to which, if at all, the notification requirement would injure Plaintiffs' members varies from platform to platform. So too for the 30-day limit.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Because the frequency with which platforms change their policies and the reasons for those changes are platform specific, the rules-change provision would not affect Plaintiffs' members in the same way.

Third, for the opt-out provision, which requires platforms to permit users to opt out of post-prioritization and shadowbanning algorithms and instead view content chronologically, FLA. STAT. §501.2041(2)(f)(2), some of Plaintiffs' members already allow chronological viewing, at least for some functions. ██████████████████ Callaway Tr.74:2-9 (Ex. 4). Although those members may lack an Article III injury, *infra* I.B, at a minimum, the differences between platforms regarding the present availability of chronological viewing reflects the need for member participation.

13

## B. Plaintiffs' Members Lack Article III Injuries.

For the independent reason that their members lack an Article III injury, Plaintiffs lack associational standing for their purported as-applied challenges to the following provisions: candidate-deplatforming provision, FLA. STAT. §106.072(2), the rules-change provision. §501.2041(2)(c), limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j), opt-out provision, §501.2041(2)(f)(2), and individualized-disclosure provision, §501.2041(2)(d)(1), (3).

Associational standing requires that members "otherwise have standing to sue in their own right." *Borrero*, 610 F.3d at 1305 (cleaned up). "[S]tanding exists at the summary judgment stage when the plaintiff has submitted evidence indicating an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of enforcement." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (cleaned up). At summary judgment, Plaintiffs "can no longer rest on their allegations, but must set forth by affidavit and other evidence specific facts which for the purpose of summary judgment will be taken as true." *Id.* at 1427 (cleaned up); *accord Bischoff v. Osceola County*, 222 F.3d 874, 878 (11th Cir. 2000). A "highly attenuated chain of possibilities—which rest[s] on speculation about the decisions of independent actors" cannot support standing. *City of South Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023) (cleaned up). Nor are "fears of hypothetical future" harm sufficient. *Id.* at 638 (cleaned up).

14

Plaintiffs' members lack an Article III injury because Plaintiffs cannot establish with "specific facts," *Wilson*, 132 F.3d at 1427 (cleaned up), that they intend to violate the provisions listed above, *id.* at 1428, or that their standing does not rest on a series of speculative hypotheticals about independent actors, *City of South Miami*, 65 F.4th at 637. For the candidate-deplatforming provision, which prohibits deplatforming a candidate for office during an election, FLA. STAT. §106.072(2), employees of Plaintiffs' members testified that they did not know of any situation in which Plaintiffs' members have deplatformed a Florida candidate during an election nor of an intention to do so in the future other than for an unspecified, hypothetical violation of platform rules. ███████████████████████████████ Callaway Tr.129:25-130:6 (Ex. 4); ████████████████ A chain of highly speculative events thus would have to occur to implicate the candidate-deplatforming provision: a user who is a Florida candidate would have to violate a platform's rules during an election, and a platform would have to decide to deplatform the candidate as a consequence (rather than take some lesser action against the candidate). That is not enough to support standing. *See City of South Miami*, 64 F.4th at 637.

There is likewise a lack of "specific facts" establishing standing to challenge other provisions. *Wilson*, 132 F.3d at 1427 (cleaned up). For the limit on censoring, deplatforming, and shadowbanning journalistic enterprises, which prohibits certain actions against a journalistic enterprise because of its independent broadcast or publication, FLA. STAT. §501.2041(2)(j), employees of Plaintiffs' members testified that

15

they did not know if any journalistic enterprises had accounts on their employers' platforms. ; Callaway Tr.130:8-131:4 (Ex. 4). But that hypothetical concern is premised on a misreading of the limit, which expressly does not apply to "obscene" "content or material." FLA. STAT. §501.2041(2)(j).

Similarly, the most Plaintiffs could muster for the rules-change provision, which requires platforms to notify users of rule changes and bar rule changes more than once every 30 days, §501.2041(2)(c),

.

Likewise, for the individualized-disclosure provision, which requires platforms to notify and explain to users actions taken against them or their content, FLA. STAT. §501.2041(2)(d)(1), (3), Plaintiffs have

So it is not clear

16

to what extent, if at all, the individualized-disclosure provision would affect current practices.

And for the opt-out provision, which requires platforms to permit users to opt out of post-prioritization and shadowbanning algorithms and instead view content chronologically, FLA. STAT. §501.2041(2)(f)(2), some members already allow chronological viewing, at least for some functions, ████████████████ Callaway Tr.74:2-9 (Ex. 4), and thus cannot be injured to the extent that the opt-out provision has no effect on their existing behavior.

## II.   Defendants Are Entitled to Judgment on Plaintiffs' Purported As-Applied Challenges Because They Are Quasi-Facial Challenges, and Plaintiffs Cannot Carry Their Burden for a Quasi-Facial Challenge.

Plaintiffs' purported as-applied challenges to the following provisions are actually quasi-facial challenges that fail because Plaintiffs cannot carry their burden: (1) consistency provision, FLA. STAT. §501.2041(2)(b); (2) ban on the use of post-prioritization or shadowbanning algorithms for posts by or about candidates, §501.2041(2)(h); (3) candidate-deplatforming provision, §106.072(2); (4) limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j); (5) opt-out provision, §501.2041(2)(f)(2); (6) individualized-disclosure provision, §501.2041(2)(d)(1), (3); (7) rules-change provision, §501.2041(2)(c); (8) standards provision, §501.2041(2)(a); and (9) view-count provision, §501.2041(2)(e).

Plaintiffs' purported as-applied challenges are "quasi-facial" challenges—not as applied. *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022). How a plaintiff

17

"label[s]" a claim "is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010); *accord Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1310 (S.D. Fla. 2014) (holding that despite the plaintiffs' "designation" of their claim, it was "quasi-facial" (cleaned up). Plaintiffs do not challenge these provisions as applied to a "particular" set of "facts." *McGuire*, 50 F.4th at 1003 (cleaned up). Instead, they seek to enjoin them as applied to all sorts of circumstances and functions: anytime a provision interferes with how platforms curate and disseminate third-party speech. DE171 ¶¶63-72; *see also* Cleland Tr.144:4-15 (Ex. 8) (remedy NetChoice seeks is "the same for every member").

To be sure, Plaintiffs' challenges are as applied in that they do "not seek to strike" the challenged provisions "in all . . . applications" but rather "only to the extent" they interfere with curation and dissemination. *Reed*, 561 U.S. at 194. But Plaintiffs' challenges are facial in that they are "not limited to [a] particular case, but challenge[] application of the [provision] more broadly to" all curation and dissemination by platforms. *Id.* That makes the challenges quasi-facial, and Plaintiffs must "satisfy the standard for a facial challenge to the extent" of the challenges' "reach[]." *McGuire*, 50 F.4th at 1003 (cleaned up). Even if Plaintiffs' requested relief extends only to certain members, it cannot be that Plaintiffs may obtain relief that extends to all their curation and dissemination if only a fraction of that activity is constitutionally protected. Accordingly, Plaintiffs must establish that any "unconstitutional applications" of the challenged provisions to platforms when they curate and disseminate "substantially outweigh . . . constitutional ones." *Moody*, 603 U.S. at 724.

18

Plaintiffs cannot satisfy that standard because their premise that curation and dissemination is invariably expressive is incorrect. *See* DE171 ¶¶63-72. Under *Moody*, mere "dissemination" is not expressive, and "curation" is expressive only when it reflects expressive, content-based judgments made by humans. *See* 603 U.S. at 731 ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own."); *see also id.* at 736 n.5 ("We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards."). Accordingly, algorithmic or machine-learning systems that "just present[] automatically to each user whatever the algorithm thinks the user will like . . . . attenuate[s] the connection between content-moderation *actions* . . . and human beings' constitutionally protected right to '*decide for [themselves]* the ideas and beliefs deserving of expression, consideration, and adherence.'" *Id.* at 746 (Barrett, J., concurring) (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994)). And when platforms hand over decisionmaking to such systems, they "serve as 'passive receptacle[s]' of third-party speech or as 'dumb pipes.'" *Id.* at 782 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment) (quoting *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting)).

██████████████████████████████████████████

███████████████████████████████████████████

████████████████ Indeed, a Meta employee stated that its ███████

19

███████████████████████████████████████████████

████████████████████████████████ Similarly, TikTok—which left NetChoice in 2024, Cleland Tr.63:11-16 (Ex. 8), but apparently rejoined after the close of fact discovery, DE280-2 ¶5—uses an ██████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████

For example, Meta internally described Instagram as "a drug" (making Meta "basically pushers") and compared Instagram and other apps with a "reward pattern optimized to keep you engaged as much as possible" to gambling and slot machines. META3047MDL-020_00342152, attached hereto as Exhibit 13. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

No wonder then that ███████████ Meta used ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ YouTube describes

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ For example, YouTube employees ████████████████

███████████████████████████████████████████████████

21



Facebook employees described

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ For example,

Meta's ███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███

██████████████████████████████████████████████

████████████████████████████████ An "upstream-downstream" approach to

recommendations uses a "small number of large-scale 'upstream' models (themselves

products of machine learning) [to] process vast amounts of user data—such as past

clicks, likes, shares, and demographic information—to create compact mathematical

representations of each user." Bapna Report ¶60. "These representations are then fed

into various 'downstream' production models (which themselves could be created via

machine learning) that perform specific tasks, such as determining which posts appear

in a user's Instagram Story feed, which advertisements to display, or which accounts to recommend following." *Id.* █████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ Bapna Report ¶38;

███████████████████████████████████████████████████████████

████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ An embedding, which is a "way of converting complex information—like a word, a user's identity, or a piece of content—into a list of numbers that a computer can mathematically process," helps algorithms connect things that "appear in similar contexts and have related meanings." Bapna Report ¶61. For example, a "user who frequently engages with cooking videos might have an embedding with certain numerical values, while recipe posts would have embeddings with similar values, allowing the system to mathematically identify good matches." *Id.* ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

"Humans are unlikely to have any role in reviewing any specific matches." Bapna Report ¶61. ████████████████████████████████████████████

████████████████████████████████████████████ In sum, these recommender algorithms "respond in real-time to local decisions beyond the model

24

creator's control" and do not function like "decision makers weighing in on who to include in a parade set to begin at a particular time and for a particular purpose decided by the parade organizer." Bapna Report ¶24.



25



Public statements

further establish the disconnect between stated policies and content-moderation mistakes that automated systems make. *E.g.*, Kaplan, *supra*; DE232-8 ¶¶18-19 (YouTube);

In short, the use of algorithmic and machine-learning systems to moderate content fails to execute platforms' stated policies.

This evidence shows that Plaintiffs cannot establish that any unconstitutional applications of the challenge provisions to curation and dissemination substantially outweigh the constitutional applications. In many if not all instances, Plaintiffs' members' use of algorithmic and machine-learning systems to recommend and moderate content is nonexpressive because it fails to reflect expressive, content-based judgments made by humans—and often promotes material antithetical to the avowed policies of Plaintiffs' members. *See Moody*, 603 U.S. at 731, 736 n.5 (majority op.). Plaintiffs' members' systems largely "just present[] automatically to each user whatever

26

the algorithm thinks the user will like" in pursuit of engagement. *Id.* at 746 (Barrett, J., concurring). Rather than executing "human beings' constitutionally protected right to '*decide for [themselves]* the ideas and beliefs deserving of expression, consideration, and adherence,'" *id.* (quoting *Turner*, 512 U.S. at 641), these systems serve as "dumb pipes," *id.* at 782 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment) (quoting *Am. Broad. Cos.*, 573 U.S. at 458 (Scalia, J., dissenting)). So, within the realm of curation and dissemination, there are many *constitutional* applications of the challenged provisions, and that is enough to defeat Plaintiffs' challenge.

A few provision-specific points further confirm why Plaintiffs cannot carry their burden on their quasi-facial challenges. The ban on post-prioritization and shadowbanning algorithms for posts by or about candidates and the opt-out provision, which are textually limited in application to the use of "algorithms," FLA. STAT. §501.2041(2)(f), (h), apply only when platforms have enlisted automated systems to recommend or moderate content. Within that narrow realm, the provisions have plainly legitimate sweep as the evidence establishes the nonexpressive nature of Plaintiffs' members' algorithms. For the candidate-deplatforming provision, §106.072(2), deplatforming that occurs in response to governmental jawboning is nonexpressive. *See* Schruers Tr.202:9-18 (Ex. 7); ███████████████████ And for the rules-change provision, FLA. STAT. §501.2041(2)(c), application of that provision to "rules, terms, and agreements" that do not bear on the kinds of content allowed on platforms—██ ██████████████████████████████—is undoubtedly constitutional

27

because it imposes not even an incidental burden on expression. Coupled with the evidence about Plaintiffs' nonexpressive automated systems, Plaintiffs cannot establish that any unconstitutional applications of these provisions substantially outweigh their constitutional applications.

Finally, Plaintiffs cannot rebut this overwhelming evidence that their content recommendation and moderation practices, which are driven by algorithmic and machine-learning systems, are nonexpressive. Plaintiffs presented no witnesses from a majority of their members. Some of the few witnesses that Plaintiffs presented were government relations or marketing executives from whom the Court will gain no further insight into algorithms or recommendation systems. ████████████ ████████████████████████; Callaway Tr.32:3-18 (Ex. 4). And employees of Plaintiffs and their members repeatedly testified to their lack of personal knowledge about algorithms and machine learning, the creation and operation of these systems, and the involvement of human beings in content-moderation and recommendation decisions. *E.g.*, Cleland Tr.106:26, 106:8-16, 110:16-111:1 (Ex. 8); Schruers Tr.130:3-6, 134:26, 134:24-135:5, 145:18-25 (Ex. 7); ████████████████████ ███████████████████████████████████████████████ ███████████████████████; Callaway Tr.42:1-44:24, 46:15-20, 52:16-18, 59:14-18, 73:12-20, 76:6-15, 76:19-23 (Ex. 4); ███████████████ ██. As this Court has recognized, Plaintiffs' "fail[ure] to marshal the facts or resist discovery of them . . . will undermine [their] position on . . . the merits." DE209:42.

28

### III.   Plaintiffs' Purported As-Applied Challenges Also Fail Because Many Provisions Are Constitutional in All Applications.

Even as applied to curation and dissemination that is expressive, Plaintiffs' purported as-applied challenges fail because the following provisions are constitutional in all applications: (1) consistency provision, FLA. STAT. §501.2041(2)(b); (2) candidate-deplatforming provision, §106.072(2); (3) limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j); (4) opt-out provision, §501.2041(2)(f)(2); (5) individualized-disclosure provision, §501.2041(2)(d)(1), (3); (6) rules-change provision, §501.2041(2)(c); (7) standards provision, §501.2041(2)(a); and (8) view-count provision, §501.2041(2)(e).

#### A. The Consistency Provision Is Constitutional in All Applications.

The consistency provision requires platforms to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." §501.2041(2)(b). It is constitutional in all applications because it does not trigger heightened scrutiny, and even if it did, it is content neutral and satisfies intermediate scrutiny.

The consistency provision does not trigger heightened scrutiny because it simply requires platforms to adhere to their representations about their products. Platforms must enforce their "standards in a consistent manner," applying them to all users and taking action against only those users who violate them. *Id.* Under the provision, a platform may "curate and disseminate" whatever content it wants, but it must be honest

29

with users. It may not induce them to enter commercial contracts by promising one type of platform but delivering something else through selective enforcement. In *Cohen v. Cowles Media Co.*, 501 U.S. 663, 665 (1991), the Supreme Court held that a newspaper can be liable under state promissory estoppel law for publishing information it had promised not to publish. So even though a state may not generally prohibit a newspaper from publishing information, it can hold a newspaper to its representations. *See id.* at 672 ("[T]he First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law . . . .").

All the consistency provision requires is that platforms adhere to their representations about what content they will host. *Cf.* Bapna Report ¶33; Elon Musk (@elonmusk), X (Nov. 25, 2022, at 5:51pm ET), https://perma.cc/FP35-WMZP. Platforms are free to make "choices [that] rest on a set of beliefs about which messages are appropriate and which are not." *Moody*, 603 U.S. at 738. The consistency provision regulates conduct, not expression; it bars platforms from inconsistently applying their own standards "because of the action it entails"—deceiving consumers—not because of any "ideas" expressed. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992). The provision resembles the federal government's net-neutrality regulations, which forbade internet-service providers from holding themselves out to customers as offerors of neutral, indiscriminate access but then discriminating against disfavored content. *See* Br. for the United States as Amicus Curiae Supporting Respondents, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Dec. 7, 2023). Just as the "First Amendment poses no obstacle

30

to holding the provider to its representation," *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 392 (D.C. Cir. 2017) (Srinivasan, J., concurring in the denial of rehearing en banc), it poses no obstacle to holding platforms to their representations about the content that they host. Even more, the consistency provision permits platforms to discriminate against any kind of content that they wish if they do so according to their declared standards. Plaintiffs' members, like YouTube, for example, already purport to hold users to declared standards. ██████████████████████ Veitch Dep. Ex. 3, ¶¶3-4, attached hereto as Exhibit 34. That fact renders the consistency provision even less intrusive than traditional nondiscrimination obligations that do not violate the First Amendment. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bost.*, 515 U.S. 557, 572 (1995) (explaining that nondiscrimination provisions "do not, as a general matter, violate the First or Fourteenth Amendments").

Plaintiffs' challenge to the consistency provision is premised on their misreading of it. They say that it requires a platform to "disseminate speech against its will whenever it has disseminated speech that the state (or a jury) deems sufficiently similar." DE171 ¶63. But the provision bars only inconsistent application of a platform's "standards." FLA. STAT. §501.2041(2)(b). It does not impose a freestanding duty to ensure that all viewpoints receive equal airtime. If a platform adopts a standard barring speech praising terrorist groups, the consistency provision allows it to disseminate speech criticizing the terrorist group and censor speech praising it. In this context, the provision only prevents a platform that represents to users that it prohibits praise of terrorist groups

31

from selectively enforcing that rule such that some users are allowed to praise terrorist groups and others are not. It is a nondiscrimination provision. For that reason, the consistency provision undoubtedly could be constitutionally applied to situations in which Plaintiffs' members inconsistently apply their standards based on a user's race or sex. *See Hurley*, 515 U.S. at 572; Callaway Tr.118:17-127:3 (Ex. 4).

Even if the consistency provision triggers heightened scrutiny, it is content neutral and satisfies intermediate scrutiny because it serves Florida's substantial interest in preventing consumer deception "in a direct and effective way." *TikTok, Inc. v. Garland*, 604 U.S. 56, 70 (2025) (citation omitted). As explained, the consistency provision leaves platforms with freedom to choose what kind of content to permit and even to discriminate against certain viewpoints. Accordingly, the provision is content neutral because it does not reflect "disagreement with the message" of a platform's speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). It instead requires only that platforms apply their chosen standards consistently. Any effect that the consistency provision has on "some speakers or messages but not others" is purely "incidental" and depends entirely on a platform's representations of what kinds of content it permits. *Id.* The "justification" for the consistency provision thus "ha[s] nothing to do with content" because its aim is to hold platforms to their representations about the service that they offer consumers. *Id.* at 792 (quoting *Boos v. Barry*, 485 U.S. 312, 320 (1988) (op. of O'Connor, J.)).

32

The consistency provision serves Florida's "substantial" "interest in ensuring the accuracy of commercial information in the marketplace." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993). Platforms "require users, as preconditions of access, to accept their terms of service and abide by their community standards." *NetChoice*, 34 F.4th at 1220. In other words, platforms induce users to engage in commercial transactions based on the content standards that they offer. The consistency provision serves Florida's interest in ensuring the accuracy of commercial information in the marketplace because it holds platforms to their word about their products. If a platform promises not to allow praise of terrorist groups, the consistency provision prohibits the platform from selectively enforcing that promise thus leaving users confused about the standards to which they are held. The provision aligns with the expectations of platforms and their users regarding how those platforms enforce their policies. *See* Kaplan, *supra*; Musk, *supra*; ██████████████████ Callaway Tr.55:8-11 (Ex. 4).

Nor does the consistency provision "burden substantially more speech than necessary to further that interest." *TikTok*, 604 U.S. at 73-74 (cleaned up). Florida's interest "would be achieved less effectively absent" the consistency provision because platforms could otherwise selectively enforce their standards and leave users to wonder whether a platform is honoring its end of the bargain or making content-moderation decisions based on some other unstated basis.

33

**B. The Candidate-Deplatforming Provision Is Constitutional in All Applications.**

The candidate-deplatforming provision prohibits platforms from "willfully deplatform[ing] a candidate for office who is known by the social media platform to be a candidate" during an election. FLA. STAT. §106.072(2). It is constitutional in all applications because it does not implicate the First Amendment, and even if it did, it is content neutral and satisfies intermediate scrutiny.

The provision does not trigger heightened scrutiny because it does not require platforms to alter their curation and dissemination of speech. The provision requires platforms only to abstain from denying political candidates access to an account during election season. *Id.* The First Amendment protects "only . . . conduct that is inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006). The mere act of allowing a political candidate to maintain a social media account is not conduct that conveys "*some sort of message.*" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018). The candidate-deplatforming provision does not force platforms to disseminate candidates' posts in feeds or transmit candidates' messages. It does not prohibit platforms from removing posts by candidates that violate their standards. It thus does not affect any expressive choice that a platform might make and does not implicate the First Amendment.

But even if it did, it is "obviously content-neutral," *NetChoice*, 34 F.4th at 1226, and subject to intermediate scrutiny at most. The provision is content neutral because

34

it does not turn on "what is said," *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020), nor does it require platforms to "alter their . . . message to comply," *Turner*, 512 U.S. at 655. Regardless of a candidate's party or platform, the provision prohibits platforms from denying a candidate access to an account.

The provision also satisfies intermediate scrutiny. It serves Florida's interest in "enhancing the ability of candidates to present, and the public to receive, information necessary for the effective operation of the democratic process." *CBS, Inc. v. FCC*, 453 U.S. 367, 396 (1981). The Supreme Court has described social media as the "modern public square," *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017), so the candidate-deplatforming provision "makes a significant contribution to the freedom of expression" by prohibiting platforms from denying political candidates access to these important fora during election season, *CBS*, 453 U.S. at 370. Nor does the provision "burden substantially more speech than necessary." *TikTok*, 604 U.S. at 73-74. Indeed, the provision imposes almost no burden on speech because it does not require platforms to alter their curation and dissemination. The provision does not require platforms to disseminate candidate posts in feeds or preclude platforms from removing posts that violate their content standards. In that sense, the provision is like the law at issue in *CBS, Inc. v. FCC*, which did "not impair the discretion of broadcasters to present their views on any issue or to carry any particular type of programming." 453 U.S. at 397. And although the provision leaves platforms with significant authority, Florida's interest in enhancing public access to candidates would be "achieved less effectively

35

absent the regulation," *TikTok*, 604 U.S. at 76 (cleaned up), because platforms could otherwise totally bar candidate access and thus prevent citizens from gathering any information about candidates in the "modern public square" or stop candidates from hearing the concerns of citizens in those fora. *Packingham*, 582 U.S. at 107.

## C. The Limit on Censoring, Deplatforming, or Shadowbanning Journalistic Enterprises Is Constitutional in All Applications.

The limit on censoring, deplatforming, or shadowbanning journalistic enterprises, FLA. STAT. §501.2041(2)(j), is constitutional in all applications because, at most, intermediate scrutiny applies, and the limit satisfies that scrutiny.

The limit prohibits platforms from "tak[ing] any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." *Id.* The limit is an anti-discrimination and anti-retaliation measure. Although the limit applies to actions taken by platforms "based on the content of [a journalistic enterprise's] publication or broadcast," *id.*, that phrase does not render it content based. Instead, that phrase identifies the *motivation* for discrimination or retaliation by a platform—not any particular message on the platform that is regulated. The limit thus simply prevents platforms from gatekeeping disfavored press outlets, regardless of those outlet's viewpoints. Because the limit applies irrespective of any particular, topic, idea, or message that a journalistic enterprise posts on a platform, it singles out no "substantive message" and is thus content neutral. *City of Austin v. Reagan Nat'l Advert.*

36

*of Aust., LLC*, 596 U.S. 61, 71 (2022). For the same reason, it is not an impermissible speaker-based distinction. *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015).

The limit satisfies intermediate scrutiny. It serves Florida's substantial interest in preventing discrimination against disfavored businesses "in a direct and effective way." *TikTok*, 604 U.S. at 70 (citation omitted). Platforms remain free to curate or disseminate content, including posts by journalistic enterprises, unless they do so in retaliation against a journalistic enterprise because of the enterprise's independent publication or broadcast. All the limit requires is that platforms apply the same standards they apply to the content of other users on the platform. For that reason, the limit does not "burden substantially more speech than necessary" to achieve its anti-discrimination and anti-retaliation objectives that prevent platforms from leveraging their market power against disfavored press outlets. *Id.* at 73-74; *cf.* ███████████████████

███████████████████████████████████

### D. The Opt-Out Provision Is Constitutional in All Applications.

The opt-out provision permits users to "opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." FLA. STAT. §501.2041(2)(f)(2). It is constitutional in all applications because, at most, intermediate scrutiny applies as the provision is "obviously content-neutral," *NetChoice*, 34 F.4th at 1226, and it satisfies intermediate scrutiny. The opt-out provision applies without regard to the content that a platform's algorithm shows or hides from users. And it serves Florida's interest in empowering consumers to decline to receive

37

unwanted material, *see Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 736 (1970), by allowing users to decide whether a platform's algorithm is feeding them content that they do not wish to view and do something to fix that problem. Nor can "it . . . be said that a substantial portion of the burden that [the provision] imposes fails to advance [that] goal[]." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 498 (2025) (cleaned up). By giving users the choice, the opt-out provision affects a platform only when a user determines that the feed is prioritizing unwanted material.

### E. The Individualized-Disclosure, Standards, and View-Count Provisions Are Constitutional in All Applications.

The individualized-disclosure, FLA. STAT. §501.2041(2)(d)(1), (3), standards, §501.2041(2)(a), and view-count, §501.2041(2)(e), provisions are constitutional in all applications under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). Under *Zauderer*, a commercial speaker has a "minimal" First Amendment interest in withholding from consumers "purely factual and uncontroversial information about the terms under which [its] services will be available." *Id.* at 651. States may mandate disclosure of such information if the requirement is "reasonably related to the State's interest in preventing deception of consumers" and not "unduly burdensome." *Id.*

These provisions compel disclosure only of "purely factual and uncontroversial information about the terms under which [a platform's] services will be available." *Id.* Under the individualized-disclosure provision, a platform must provide a prompt,

written notice to each user it censors setting forth the "rationale" for the censorship and an "explanation of how the [covered] platform became aware of the censored content or material." FLA. STAT. §501.2041(3)(d). Under the standards provision, a platform must "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." §501.2041(2)(a). And under the view-count provision, a platform must "[p]rovide a mechanism that allows a user to request the number of other individual platform participants who were provided or shown the user's content or posts" and provide that information upon request. §501.2041(2)(e).

These requirements are reasonably related to Florida's interest in preventing "inherently misleading commercial" conduct—platforms' enforcing content policies that are not disclosed to consumers or in ways that are at odds with stated policies. *Milavetz, Gallop & Milavetz P.A. v. United States*, 559 U.S. 229, 250 (2010). Social-media platforms attract a large, diverse usership by assuring consumers that they may speak about anything they want on their platforms, subject only to the platforms' written content policies. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████ But as Meta's Oversight Board once determined, Meta does not always achieve those goals, and "[u]sers [are] left guessing" as to what standards platforms are enforcing. Catalina Botero-Marino et al, *Oversight Board Demands More Transparency from Facebook*, OVERSIGHT BD. (Oct. 21, 2021), https://perma.cc/3L6Y-BZSS. So the

justification for these requirements is "reasonable enough to support . . . requirement[s] that information regarding [content moderation] be disclosed." *Zauderer*, 471 U.S. at 653. The view-count provision, specifically, serves that objective because it permits users to determine whether a platform is demoting a post, so the user can assess whether the demotion is consistent with representations the platform has made about its product. *Cf.* █████████████████████████████████████████████████ █████████████████████████████████████

These requirements are not unduly burdensome. ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

In response to Meta's Oversight Board's concerns over consumer confusion, Meta implemented the Board's recommendation to explain why content was removed and how it was reviewed. *2022 Annual Report: Oversight Board Reviews Meta's Changes to Bring Fairness and Transparency to Its Platforms*, OVERSIGHT BD. (June 6, 2023), https://perma.cc/5GNG-NZ9L. Facebook, Instagram, Reddit, and YouTube endorsed the Santa Clara Principles, Gennie Gebhart, *Who Has Your Back? Censorship Edition 2019*, ELEC. FRONTIER FOUND. (June 12, 2019), https://perma.cc/7QZX-A39E, which would require platforms to "provide notice to each user whose content is removed" about "the reason for the removal," *Chapeau,* THE SANTA CLARA PRINCIPLES ON TRANSPARENCY AND ACCOUNTABILITY IN CONTENT MODERATION, https://perma.cc/4UDC-253R. Meta, YouTube, ████████████ offer appellate

review of content-moderation decisions. *Appealed Content*, META TRANSPARENCY CTR., https://perma.cc/EH2G-TK9H; *Appeal a Community Guidelines Strike or Video Removal*, YOUTUBE HELP, https://perma.cc/7YHT-EJU4; ████████████████████████ ████████████████████████████████ The European Union already requires platforms to provide EU users subject to content moderation a "clear and specific statement" explaining the reasons for the moderation decision. Regulation (EU) 2022/2065 of the European Parliament of the Council of 19 October 2022 on Single Market for Digital Services (Digital Services Act), art. 17, 2022 O.J. (L 277) 1, 51-52. As Justice Alito noted in *Moody*, "many platforms are already providing similar disclosures pursuant to the European Union's Digital Services Act" and "complying with that law does not appear to have unduly burdened each platform's speech." 603 U.S. at 797-98 (Alito, J., concurring in the judgment). ████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████ Plaintiffs lack evidence that would explain how platforms have the technological capability to act on so much content but not the technological capability to disclose and explain those same actions to Florida users.

### F. The Rules-Change Provision is Constitutional in All Applications.

The rules-change provision is constitutional in all applications. The rules-change provision requires platforms to "inform each user about any changes to its rules, terms, and agreements before implementing the changes" and precludes "changes more than once every 30 days." FLA. STAT. §501.2041(2)(c). This provision does not implicate the

First Amendment because it governs deceptive commercial practices, but even if it did, it is content neutral and satisfies intermediate scrutiny.

The rules-change provision does not trigger heightened scrutiny because it is "directed at," *Leathers v. Medlock*, 499 U.S. 439, 453 (1991), a deceptive commercial practice—elusive terms and conditions, *cf.* ███████████████████████ Veitch Dep. Ex. 3, ¶¶3-4 (Ex. 34)—not speech. "Nothing about" the rules-change provision "has ever suggested an interest in censoring the expressive activities" of social media platforms. *Leathers*, 499 U.S. at 453. Were that the objective, the provision would instead dictate the content of platforms' rules. Moreover, the mere act of establishing standards about what third-party speech a platform will purportedly allow is not itself expressive. A platform must then "organiz[e] and present[] the included items" to constitute "expressive activity of its own." *Moody*, 603 U.S. at 731. The rules-change provision does not prohibit the presenting and organizing of content in accordance with a platform's standards. It instead prohibits the deceptive conduct of changing the rules so frequently as to confuse users about what kind of platform they have agreed to use and then requires platforms to notify users of changes to the terms that govern their commercial agreements with those platforms.

Heightened scrutiny does not apply simply because the rules-change provision imposes a modest one-month limitation on how frequently platforms may change their rules. Any effect of that limitation is "incidental[]" on Plaintiffs' members' expression. *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126,

42

1135 (11th Cir. 2022). Plaintiffs' members remain free to allow or prohibit whatever content they wish and to change their minds up to twelve times a year. Because the rules-change provision targets deceptive conduct and has only an incidental effect, if any, on expression, it does not implicate the First Amendment.

But even if the rules-change provision implicates the First Amendment, it is content neutral and satisfies intermediate scrutiny. The rules-change provision singles out no "substantive message" because, as with the consistency provision, platforms are free to set whatever standards they wish. *City of Austin*, 596 U.S. at 71. It also serves Florida's substantial interest in preventing consumer deception "in a direct and effective way." *TikTok*, 604 U.S. at 70 (citation omitted). Its notification requirement demands transparency in the terms of commercial agreements that platforms make with users. And its limitation on the frequency of rules changes prevents platforms from changing the rules so frequently that users are unsure of what kinds of content their agreements with the platforms will allow them to post and to view. Nor does the rules-change provision "burden substantially more speech than necessary to further that interest." *Id.* at 73-74. The notification requirement is easily satisfied by sending notifications to users or posting a banner alerting users to the changes. And the 30-day requirement leaves platforms free to change their content standards up to twelve times a year, giving users ample time to learn of rule changes while preserving platforms' ability to adjust to changing circumstances.

43

## IV.    Defendants Are Entitled to Judgment on Plaintiffs' Facial Challenges.

As explained with respect to Plaintiffs' quasi-facial challenges, *supra* II, Plaintiffs' facial challenges to the following provisions fail because Plaintiffs cannot carry their burden to establish that any unconstitutional applications of those provisions substantially outweigh their constitutional applications to nonexpressive algorithmic and machine-learning recommendation and moderation: (1) consistency provision, FLA. STAT. §501.2041(2)(b); (2) ban on the use of post-prioritization or shadowbanning algorithms for posts by or about candidates, §501.2041(2)(h); (3) candidate-deplatforming provision, §106.072(2); (4) limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j); (5) opt-out provision, §501.2041(2)(f)(2); (6) individualized-disclosure provision, §501.2041(2)(d)(1), (3); (7) rules-change provision, §501.2041(2)(c); (8) standards provision, §501.2041(2)(a); and (9) view-count provision, §501.2041(2)(e). DE171 ¶¶100-08.

Moreover, as this Court has explained, "[g]iven the proper construction of 'social media platform' as set out in th[e] [motions to dismiss and compel] order, it is clear that [S.B. 7072's] provisions have a plainly legitimate sweep." DE209:41. The broad definition of "social media platform" encompasses entities—like e-commerce platforms, search engines, and other online services—that plainly do not engage in expressive curation of third-party speech or that are foreign controlled. *See* DE209:7-9. Plaintiffs must show that the provision's unconstitutional applications are "substantial compared to its constitutional ones." *Moody*, 603 U.S. at 718. But Plaintiffs have made

44

no effort in discovery to survey the provision's full range of applications even though this Court has already found "plainly legitimate sweep." DE209:41. In discovery, Plaintiffs "treat the law as having certain heartland applications, and mostly confine the battle to that terrain." *NetChoice, LLC v. Bonta*, No. 25-2366, ___ F.4th ___, 2026 WL 694471, at *9 (9th Cir. Mar. 12, 2026) (cleaned up). But they bear the burden to develop a "detailed record" that would permit this Court to "consider how the . . . provision works in '*all* of its applications.'" *Id.* at *13 (quoting *Moody*, 603 U.S. at 744). Their failure to do so is fatal to their facial challenges.

For the reasons set forth above, *supra* III, the consistency provision, FLA. STAT. §501.2041(2)(b), candidate-deplatforming provision, §106.072(2), limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j), opt-out provision, §501.2041(2)(f)(2), individualized-disclosure provision, §501.2041(2)(d)(1), (3), standards provision, §501.2041(2)(a), view-count provision, §501.2041(2)(e), and rules-change provision, §501.2041(2)(c), are constitutional in all applications, so Plaintiffs' facial challenges to those provisions also fail on that ground.

## V.   Defendants Are Also Entitled to Judgment on Plaintiffs' First Amendment Challenges Because Plaintiffs' Members Are Common Carriers.

Alternatively, Plaintiffs' facial and purported as-applied challenges to all provisions fail because Plaintiffs' members are common carriers. Since before the Founding, the government regulated businesses that "hosted or transported others" as common carriers, including by precluding them from discriminating against their

customers. *303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023). The common-carrier doctrine has long extended to those who "disseminate" or facilitate the speech of others. *See* Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 229, 2320 & nn.103-05 (2021). The First Amendment thus permits common-carrier regulation for platforms that have opened their facilities to all speakers and speech. Like common carriers Plaintiffs' members do not "make individualized decisions, in particular cases, whether and on what terms to deal." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979) (citation omitted); *see supra* II. So similar to traditional common carriers, they make decisions for the "due accommodation" of their users and "for the due arrangements of their business." *Jencks v. Coleman*, 13 F. Cas. 442, 443 (C.C.D.R.I. 1835) (Story, J.). The standards provision, FLA. STAT. §501.2041(2)(a), view-count provision, §501.2041(2)(e), individualized-disclosure provision, §501.2041(2)(d)(1), (3), rules-change provision, §501.2041(2)(c), consistency provision, §501.2041(2)(b), and opt-out provision, §501.2041(2)(f)(2), are consumer-protection measures that require platforms to adhere to their representations of their policies akin to similar measures that have long governed common carriers. The "First Amendment poses no obstacle to holding the provider to its representation." *U.S. Telecom Ass'n*, 855 F.3d at 392 (Srinivasan, J., concurring in the denial of rehearing en banc). Similarly, the limit on censoring, deplatforming, and shadowbanning journalistic enterprises, FLA. STAT. §501.2041(2)(j), candidate-deplatforming provision, §106.072(2), and ban on post-prioritization and shadowbanning algorithms for posts by or about political

candidates, §501.2041(2)(h), protect against discrimination when platforms are generally open to all manner of journalistic and political expression consistent with their chosen business models. Because all provisions regulate Plaintiffs' members as common carriers to either preclude discrimination or hold platforms to their representations, they do not regulate inherently expressive conduct and are consistent with the First Amendment.

## VI.    Defendants Are Entitled to Judgment on Plaintiffs' Vagueness Challenges.

### A. Plaintiffs' Vagueness Challenge to the Consistency Provision Fails.

Plaintiffs' vagueness challenge to the consistency provision, §501.2041(2)(b), also fails. DE171 ¶112. Plaintiffs do not specify the nature of their challenge, but it is best understood as a facial challenge because Plaintiffs complain that a "vague consistency requirement would chill any number of judgment calls." *Id.* Plaintiffs cannot satisfy the standard for facial vagueness.

"The vagueness doctrine is concerned principally with notice and arbitrary enforcement." *SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022). "Vagueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (cleaned up). If protected expression is involved, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). "Facial vagueness occurs when a statute is utterly devoid of a standard of

47

conduct so that it simply has no core and cannot be validly applied to any conduct." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir. 2013) (cleaned up).

The consistency provision, which requires platforms to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among [their] users," FLA. STAT. §501.2041(2)(b), is not facially vague. "A person of reasonable intelligence is capable of understanding that the core meaning of the provision," *SisterSong*, 40 F.4th at 1328 (cleaned up), requires platforms to treat users equally in the application of their standards, *see Consistent*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/G8HW-K4CW ("free from variation or contradiction"); *see also Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020) (looking to "ordinary meaning" to resolve vagueness challenge). It cannot be seriously maintained that a provision that requires equal treatment is so vague as to be incomprehensible. *Cf.* U.S. CONST. amend XIV, §1 (Equal Protection). Indeed, a Reddit employee testified that users' "expectation typically is that Reddit moderators currently apply the rules of their communities consistently," Callaway Tr.144:8-11 (Ex. 4), so consistency is evidently something that people of "reasonable intelligence" are perfectly capable of understanding, *SisterSong*, 40 F.4th at 1328.

Nor does it matter that "close cases can be envisioned." *United States v. Williams*, 553 U.S. 285, 305 (2008). Plaintiffs' amended complaint speculates about "judgment calls that depend on context." DE171 ¶112. But easy cases are easy to envision too. For example, it would violate the consistency provision to remove a meme posted in

48

response to the same post by one user but not another user. And a platform that bans racial hate speech would violate the consistency provision if it only removed racial slurs directed at members of certain races but not racial slurs directed at members of other races. So regardless of whether the consistency provision has closer calls at the margins, it certainly has a core that renders it facially valid. *Indigo Room*, 710 F.3d at 1302.

**B. Plaintiffs' Vagueness Challenge to the Ban on the Use of Post-Prioritization Algorithms for Posts by or about Candidates Fails.**

Plaintiffs' vagueness challenge to the ban on the use of post-prioritization for posts by or about candidates, FLA. STAT. §501.2041(2)(h), likewise fails. DE171 ¶113. Although Plaintiffs focus only on the post-prioritization part of the ban and related definition of "post-prioritization," as with the consistency provision, *supra* VI.A, Plaintiffs do not challenge the ban in a specific application and instead generally question "what this provision allows and does not allow." DE171 ¶113.

Plaintiffs cannot establish that the ban "simply has no core and cannot be validly applied to any conduct." *Indigo Room*, 710 F.3d at 1302 (cleaned up). The definition of "[p]ost-prioritization" covers any "action . . . to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." FLA. STAT. §501.2041(1)(e). In light of the opt-out provision, which permits users to opt-out of "post-prioritization" in favor of "sequential or chronological posts and content," §501.2041(2)(f), the definition of post-prioritization plainly covers efforts to show users posts in an order other than

49

the order in which those posts were made. In the context of the ban, that definition means that platforms cannot use algorithms to show users posts "by or about" a candidate if those algorithms arrange the posts in a way that is not chronological. "A person of reasonable intelligence is capable of understanding that the core meaning of the provision," *SisterSong*, 40 F.4th at 1328 (cleaned up), prohibits platforms from algorithmically showing users posts "by or about" a candidate in their feeds unless those posts are shown in the order in which they were posted.

Although the existence of this readily discernible core is sufficient to defeat Plaintiffs' facial vagueness challenge, Plaintiffs' allegations regarding the difficulty of operating compliant search functions fare no better. DE171 ¶113. For one thing, the ban would not prevent promotion or demotion of posts "by or about" candidates in a search function if that search function was not based on an algorithm. For another thing, Plaintiffs' allegations about search functions suggest that Plaintiffs' themselves understand the ban to prohibit algorithmically placing "content 'by or about' a political candidate ahead of—or below—any other content." *Id.* That compliance might be unappealing to Plaintiffs does not make the ban vague.

## VII.    Plaintiffs Lack Associational Standing for Their Section 230 Challenges.

Plaintiffs lack associational standing for their challenges to the following provisions on the grounds that Section 230(c)(1) or Section 230(c)(2)(A) of the Communications Decency Act preempts them: consistency provision, FLA. STAT. §501.2041(2)(b), candidate-deplatforming provision, §106.072(2), ban on the use of

50

post-prioritization or shadowbanning algorithms for posts by or about candidates, §501.2041(2)(h), limit on censoring, deplatforming, or shadowbanning journalistic enterprises, §501.2041(2)(j), opt-out provision, §501.2041(2)(f)(2), individualized-disclosure provision, §501.2041(2)(d)(1), (3), and rules-change provision, §501.2041(2)(c). DE171 ¶¶123-28.

Plaintiffs lack associational standing for these challenges because member participation is required. *See supra* I.A. Whether Section 230(c)(1) or Section 230(c)(2)(A) conflicts with any of the challenged provisions depends on facts specific to each provision's application to Plaintiffs' members. Both parts of Section 230 apply only to an "interactive computer service." 47 U.S.C. §230(c)(1), (c)(2)(A). They do not apply to an "information content provider," which is an "entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." §230(f)(3); *see also Fair Hous. Council of San Fernando Valley v. Roomates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008). But just as a First Amendment challenge is a "fact intensive" inquiry that varies "from platform to platform," *Bonta I*, 152 F.4th at 1014 (citation omitted), and function to function, *Moody*, 603 U.S. at 732 n.4, a "website may be immune [under Section 230] from liability for some of the content it displays to the public but be subject to liability for other content," *Roomates.com*, 521 F.3d at 1162-63. Because of the different ways in which Plaintiffs' members present content on their platforms, *see supra* I.A, II, each member must "separately establish" how application of the challenged

51

provisions conflicts with Section 230. *Jones*, 897 F. Supp. 2d at 1254. That disaggregation is critical because the use of "algorithms to create and communicate [a platform's] own message: that it thinks you, the reader—you, specifically—will like this content," is not protected by Section 230. *Force v. Facebook, Inc.*, 934 F.3d 53, 82 (2d Cir. 2019) (Katzmann, C.J., concurring and dissenting in part).

## VIII. Defendants Are Entitled to Judgment on All of Plaintiffs' Section 1983 Claims Because They Lack a Cause of Action.

As Defendants argued in their motion to dismiss, DE173:28-29, Plaintiffs lack a cause of action under Section 1983 because they are not part of a class of persons who have personally suffered a deprivation of federal rights. *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 127 (2014). This Court should now resolve that question because Plaintiffs seek attorney's fees under 42 U.S.C. §1988; DE171 ¶133.

The cases Plaintiffs cited in response to Defendants' motion to dismiss do not refute that analysis. None but *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), even addressed whether Section 1983 bars associations from pursuing members' rights. *See Webster v. Fall*, 266 U.S. 507, 511 (1925). And *Callanen* did not grapple with the text of Section 1983. It determined that "Section 1983 is an appropriate vehicle for third-party claims" simply because such claims "have been allowed" in other cases that also did not address the cause-of-action problem. *Callanen*, 89 F.4th at 473. That is no reason to neglect statutory text.

**CONCLUSION**

For the reasons set forth above, Defendants respectfully request that this Court dismiss Plaintiffs' First Amendment and Section 230 challenges for lack of standing and enter judgment for Defendants on Plaintiffs' vagueness challenges. Alternatively, Defendants respectfully request that this Court enter judgment for Defendants on all Plaintiffs' challenges.

Dated: April 3, 2026                                        Respectfully submitted,

                                                           JAMES UTHMEIER
                                                           *Attorney General of Florida*

                                                           /s/William H. Stafford, III
Charles J. Cooper                                          William H. Stafford, III
David H. Thompson
Brian W. Barnes                                            Office of the Attorney General
Clark L. Hildabrand                                        The Capitol, PL-01
Jack Tucker                                                Tallahassee, Florida 32399-1050
COOPER & KIRK, PLLC                                        (850) 414-3694
1523 New Hampshire Ave., NW                                (850) 410-2672 (fax)
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

                     *Counsel for Defendants*

53

**CERTIFICATE OF COMPLIANCE**

I hereby certify that Defendants Memorandum in Support of their Motion for Summary Judgment contains 12,733 words, excluding the parts exempted by N.D. Fla. R. 7.1(F), and thus complies with the limit of 12,750 words set by this Court. DE283:1.

/s/William H. Stafford, III
William H. Stafford, III

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 3rd day of April, 2026.

/s/William H. Stafford, III
William H. Stafford, III