# EXHIBIT 6

proprietary.

BY MR. HILDABRAND:

Q    Do you have any proprietary information about Meta's content moderation practices?

MR. WILLEN:  Objection to the form.

THE WITNESS:  No, not as far as I know.

BY MR. HILDABRAND:

Q    All right.  If you want to go to -- I think we marked as Exhibit 3 the 2024 deposition transcript.

A    I'm sorry.  You said Exhibit 3?

Q    Yes, Exhibit 3.

A    Where are we looking?

Q    Pages 52 to 53, and when I'm using the page number here, I'm talking about the page number written in black ink on the top here, not the docket on the top.

A    Okay.  Understood.  52 and 53, yes.

Q    All right.  Let's turn to page 53.  Do you see -- I'm going to read out here.  Let me know if this reflects what you see as well.

Starting at line 3, "Question:  What are inputs or considerings that Meta uses to make editorial decisions for, for its technological processes?"  Objection.  The answer:  "I have -- sorry.  I have no specific information about these

Page 134

BY MR. HILDABRAND:

Q   Glad to clarify.  So are you in any -- are you in possession of any nonpublic information about Google's trust and safety operations?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Not that I'm aware of.

BY MR. HILDABRAND:

Q   Is there any other -- is there, is there any nonpublic information about Google that you're in possession of?

MR. WILLEN:  Objection to the form.

Objection; outside the scope.

THE WITNESS:  Again, not that I'm aware of.

BY MR. HILDABRAND:

Q   Do you have any nonpublic information about algorithms used by CCIA's members?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I think there's a lot of -- there is potentially some ambiguity in the usage of "algorithm" there, but irrespective of that, I don't think it changes the answer, which is no, to the best of my knowledge, I'm not.

BY MR. HILDABRAND:

Q   Have you reviewed any coding or algorithms used by CCIA's members?

Page 135

MR. WILLEN:  Objection to the form.

THE WITNESS:  As far as I recall, the only code that I have reviewed is the source code that any user can view on a website when you use a browser to reveal source.

BY MR. HILDABRAND:

Q    Does Meta use algorithms to direct content to users based upon other content that the user has looked at?

MR. WILLEN:  Objection to the form.

THE WITNESS:  This may depend on the definition of the term "algorithm," but I think I can maybe answer the question by saying there are machine-driven automated processes that, that influence what, what content a user may, may view.  Those processes have all been developed by people, of course, but insofar as that satisfies the question, I think that would mean the answer is yes.

BY MR. HILDABRAND:

Q    How do you know that those processes have all been developed by people?

A    Well, first, because I have seen, at various points, Meta representatives represent as much; individuals, you know, who I believe know what they're

Page 145

answer -- to respond to inputs.

Q    And so similar to what I asked earlier about Google and Meta, do you know how Pinterest uses artificial intelligence in its content moderation practices?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I am aware that there are services that provide inputs to the, the curatorial effect of the, you know, Pinterest website or application that are automated and might be described as AI or machine-learning in form.

I have a general sense that there are inputs that are used, for example, to achieve particular trust and safety outcomes, but again all those choices are being made by humans.

BY MR. HILDABRAND:

Q    Is any of your understanding about Pinterest's content moderation practices based on nonpublic or proprietary information?

A    Not to the best of my knowledge, no.  If there's something specific you have in mind, an announcement, for example, or something, I'm happy to comment on that, but I can't, I can't be that much more precise in the abstract.

Page 202

look at paragraph 19?  It goes from page 11 to page 12 in your declaration.

A    I'm sorry.  Where are we?

Q    Paragraph 19, pages 11 and 12.

A    Yeah, okay.  Yes.  I think this is a generally reliable statement in most contexts, yes.

Q    Are there any contexts in which the statement is not reliable?

A    Well, where a content moderation action is being taken because it's compelled by law, it will not reflect a normative judgment, and it might, in fact, contradict normative judgment.  Indeed, the whole concern about jawboning -- generally speaking, when a state actor harasses a digital service into making an editorial choice -- is, is an example of that, and, you know, that's whether the service is being harassed about a particular piece of content or through legislation, as is the case here.

Q    Are there any pieces of legislation enacted by states or governments other than the state of Florida that jawbone CCIA members?

MR. WILLEN:  Objection to the form, also outside the scope of the 30(b)(6) deposition.

THE WITNESS:  Yes, there are.  I'm not certain I'm in a position to give a comprehensive