**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

NETCHOICE, LLC; and COMPUTER
& COMMUNICATIONS INDUSTRY
ASSOCIATION,

     *Plaintiffs*,

v.

JAMES UTHMEIER, et al.,

     *Defendants*.

Case No. 4:21-cv-0220-RH-MAF

<u>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

      A.    Factual Background............................................................................. 4

      B.    Procedural History ............................................................................. 5

ARGUMENT ........................................................................................................... 5

I.     Plaintiffs Have Associational Standing ........................................................ 5

      A.    Excessive Member Participation Is Not Needed to Prove Plaintiffs' First Amendment Claims ...................................................... 6

      B.    Plaintiffs Have Associational Standing to Bring Their §230 Claim .................................................................................................. 14

      C.    Plaintiffs' Members Have Article III Standing ................................. 16

II.    Florida Is Not Entitled To Judgment On Plaintiffs' As-Applied Claims ....................................................................................................... 19

      A.    S.B.7072's Challenged Provisions Are Content-Based Speech Restrictions That Burdens Members' Editorial Discretion ................ 19

      B.    S.B.7072 Cannot Survive Any Level of Heightened Scrutiny........... 23

      C.    Florida's Contrary Arguments Lack Merit ........................................ 26

III.   Defendants Are Not Entitled To Judgment On Plaintiffs' Facial Claims ....................................................................................................... 40

IV.   S.B.7072 Is Unconstitutionally Vague ......................................................... 49

      A.    The Consistency Provision Is Unconstitutionally Vague ................... 49

      B.    The Candidate Post-Prioritization Provision Is Unconstitutionally Vague ................................................................... 52

V.      Defendants' Remaining Arguments Lack Merit ........................................... 54

      A.      Defendants' Common Carrier Argument Lacks Merit ....................... 54

      B.      Plaintiffs Have a Valid §1983 Cause of Action ................................. 57

CONCLUSION ............................................................................................... 59

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*303 Creative v. Elenis*,
600 U.S. 570 (2023)................................................................................55

*Am. Orient Express Ry. v. Surface Transp. Bd.*,
484 F.3d 554 (D.C. Cir. 2007) ...............................................................56

*Angelilli v. Activision Blizzard*,
781 F.Supp.3d 691 (N.D. Ill. 2025) ........................................................30

*Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*,
627 F.3d 547 (5th Cir. 2010)....................................................................7

*Borrero v. United Healthcare*,
610 F.3d 1296 (11th Cir. 2010) ..........................................................6, 57

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)................................................................................58

*Buehrle v. Key West*,
813 F.3d 973 (11th Cir. 2015).................................................................36

*Carafano v. Metrosplash.com*,
339 F.3d 1119 (9th Cir. 2003) ................................................................33

*Castronuova v. Meta Platforms*,
2025 WL 1914860 (N.D. Cal. June 10, 2025)........................................34

*Chamber of Com. v. Lierman*,
151 F.4th 530 (4th Cir. 2025)..................................................................42

*Children's Health Def. v. Meta Platforms*,
112 F.4th 742 (9th Cir. 2024)..................................................................34

*City of Austin v. Reagan Nat'l Advert.*,
596 U.S. 61 (2022)..................................................................................23

*Denver Area Educ. Telecomms. Consortium v. FCC*,
518 U.S. 727 (1996)................................................................................54

*Ex parte Young*,
    209 U.S. 123 (1908)...............................................................................59

*FCC v. Fox Television Stations*,
    567 U.S. 239 (2012)..............................................................................50

*FCC v. Midwest Video Corp.*,
    440 U.S. 689 (1979)..............................................................................56

*Fla. Preborn Rescue v. City of Clearwater*,
    161 F.4th 732 (11th Cir. 2025)............................................................43

*Force v. Facebook*,
    934 F.3d 53 (2d Cir. 2019) ...................................................................15

*Galvin v. Hay*,
    374 F.3d 739 (9th Cir. 2004)................................................................10

*Green v. Miss USA*,
    52 F.4th 773 (9th Cir. 2022)................................................................31

*Harris v. McRae*,
    448 U.S. 297 (1980)..............................................................................13

*Hosp. Council v. City of Pittsburgh*,
    949 F.2d 83 (3d Cir. 1991)......................................................................7

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)................................................................................5

*Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp.*,
    515 U.S. 557 (1995)....................................................................... 10, 23

*Iancu v. Brunetti*,
    588 U.S. 388 (2019).......................................................................41, 42

*Indigo Room v. City of Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013).............................................................50

*Int'l Dairy Foods Ass'n v. Amestoy*,
    92 F.3d 67 (2d Cir. 1996).......................................................................25

*Johnson v. United States*,
  576 U.S. 591 (2015)...............................................................................50

*M.P. v. Meta Platforms*,
  127 F.4th 516 (4th Cir 2025) ................................................................15

*McCullen v. Coakley*,
  573 U.S. 464 (2014)...............................................................................24

*McGuire v. Marshall*,
  50 F.4th 986 (11th Cir. 2022).......................................................... 26, 27

*Miami Herald Publ'g v. Tornillo*,
  418 U.S. 241 (1974)........................................................................ *passim*

*Milavetz, Gallop & Milavetz v. United States*,
  559 U.S. 229 (2010)...............................................................................38

*Moms for Liberty v. Brevard Pub. Schs.*,
  118 F.4th 1324 (11th Cir. 2024).............................................................58

*Moody v. NetChoice*,
  603 U.S. 707 (2024)........................................................................ *passim*

*Murthy v. Missouri*,
  603 U.S. 43 (2024)..................................................................................34

*NetChoice v. Att'y Gen.*,
  34 F.4th 1196 (11th Cir. 2021) ....................................................... *passim*

*NetChoice v. Bonta II*,
  152 F.4th 1002 (9th Cir. 2025)...............................................................12

*NetChoice v. Bonta III*,
  170 F.4th 744 (9th Cir. 2026)................................................................43

*NetChoice v. Fitch*,
  134 F.4th 799 (5th Cir. 2025)...................................................................7

*NetChoice v. Moody*,
  546 F.Supp.3d 1082 (N.D. Fla. 2021).............................................. 21, 43

*NIFLA v. Becerra*,
   585 U.S. 755 (2018)......................................................................... *passim*

*Packingham v. N.C.*,
   582 U.S. 98 (2017).......................................................................24

*Peace Ranch v. Bonta*,
   93 F.4th 482 (9th Cir. 2024) ........................................................19

*PG&E v. Pub. Utils. Comm'n*,
   475 U.S. 1 (1986).........................................................................23

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015)................................................................. 23, 35

*Rehberg v. Paulk*,
   566 U.S. 356 (2012).....................................................................58

*Riley v. Nat'l Fed'n of the Blind*,
   487 U.S. 782 (1988)...................................................................8, 31

*S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund*,
   326 F.3d 919 (7th Cir. 2003)........................................................58

*Snyder v. Phelps*,
   562 U.S. 443 (2011).....................................................................52

*Sorrell v. IMS Health*,
   564 U.S. 552 (2011)................................................................ 27, 57

*Speech First v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) ............................................... 16, 19

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)................................................................ 18, 19

*TikTok v. Garland*,
   604 U.S. 56 (2025).................................................................11, 24

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994).....................................................................56

*U.S. Telecom Ass'n v. FCC*,
  855 F.3d 381 (D.C. Cir. 2017) ...............................................................56

*UAW v. Brock*,
  477 U.S. 274 (1986) .................................................................................3

*United Food & Com. Workers Union v. Brown Grp.*,
  517 U.S. 544 (1996) .................................................................................6

*United States v. Hansen*,
  599 U.S. 762 (2023) ...............................................................................40

*United States v. Levy*,
  379 F.3d 1241 (11th Cir. 2004) ...............................................................6

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ...............................................................................23

*United States v. Stevens*,
  559 U.S. 460 (2010) ...............................................................................41

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988) ...............................................................................58

*Vote.Org v. Callanen*,
  89 F.4th 459 (5th Cir. 2023) ...................................................................58

*W. Union Tel. v. James*,
  162 U.S. 650 (1895) ...............................................................................56

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...............................................................................58

*Whitfield v. Spiller*,
  76 F.4th 698 (7th Cir. 2023) ...................................................................31

*Wollschlaeger v. Governor*,
  848 F.3d 1293 (11th Cir. 2017) ..............................................................51

*Zauderer v. Off. of Disciplinary Couns.*,
  471 U.S. 626 (1985) ...............................................................................38

*Zeran v. Am. Online*,
  129 F.3d 327 (4th Cir. 1997) ........................................................... 14, 15

**Statutes**

47 U.S.C. §223(e)(6) .............................................................................. 56

47 U.S.C. §230 ...................................................................................... 56

47 U.S.C. §230(c)(2) ......................................................................... 14, 15

Fla. Stat.

  §501.2041(1) .................................................................................... 15

  §501.2041(1)(b) ............................................................................... 48

  §501.2041(1)(c) ............................................................................... 48

  §501.2041(1)(e) ............................................................................... 53

  §501.2041(1)(f) ................................................................................ 48

  §501.2041(2)(a) ............................................................................... 38

  §501.2041(2)(b) .......................................................................... 23, 45

  §501.2041(2)(c) ............................................................................... 36

  §501.2041(2)(d) ......................................................................... 38, 45

  §501.2041(2)(e) ......................................................................... 38, 48

  §501.2041(2)(f)-(g) .......................................................................... 45

  §501.2041(2)(h) ..................................................................... 23, 45, 53

  §501.2041(2)(j) .......................................................................... 23, 45

  §501.2041(3) .............................................................................. 38, 45

S.B.7072 §1(3)-(4) ................................................................................ 47

Telegraph Lines Act, 25 Stat. 382 (1888) ............................................... 56

**Rule**

Fed. R. Evid. 602 ........................................................................................31

**Other Authorities**

E.U. Digital Services Act,
    Reg.2022/2065, 2022 O.J. (L277) ......................................................39

*Gov. DeSantis Signs Bill to Stop the Censorship of Floridians*
    (May 24, 2021), https://perma.cc/3L3Y-7C6A...................................47

## INTRODUCTION

The Supreme Court's decision in this very case underscores that "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude." *Moody v. NetChoice*, 603 U.S. 707, 731 (2024).    As Plaintiffs' summary-judgment motions explain, *see* Dkt.282-1 ("Am.MSJ."); Dkt.288 ("Supp.MSJ."), that holding confirms that S.B.7072 is unconstitutional facially and as applied to websites operated by Plaintiffs' members when they curate and disseminate compilations of third-party speech posted on their services.[1]

Although this Court has had no trouble understanding *Moody*'s implications here, Dkt.209.at.42 ("MTD.Op."), Florida is not content to treat the Supreme Court's decision as the final word.    Its summary-judgment motion instead insists that S.B.7072 does not implicate the First Amendment even when it countermands how Plaintiffs' members curate and disseminate third-party speech posted on their services (the universe of activities covered by Plaintiffs' as-applied claims).    That is wrong—indeed, borderline frivolous.    As Florida cannot help but acknowledge, Plaintiffs' members engage in "curation and dissemination activities," Dkt.292.at.1

---

[1] While most members operate applications and other services in addition to websites, this brief collectively refers to all their services as "websites."

("Fla.MSJ."), and S.B.7072's entire goal is to override those decisions. The First Amendment does not countenance such interference with protected editorial judgments. Even if Plaintiffs' as-applied claims are better considered "quasi-facial," the same result attains: When S.B.7072 interferes with members' First-Amendment-protected activity of curating and disseminating third-party content, it violates the First Amendment. Florida offers no evidence, much less undisputed evidence, that could carry its burden of showing otherwise.

Florida's assault on Plaintiffs' facial challenges similarly fails. Many of S.B.7072's provisions can be applied *only* when covered websites are curating and disseminating collections of third-party speech—the core activities *Moody* held the First Amendment protects. And for others, any conceivable applications that would *not* involve such editorial activities are far outweighed by the "substantial amount of protected speech" that their "heartland applications" restrict. *Moody*, 603 U.S. at 723-24. Florida (tellingly) offers virtually no evidence, and indeed nothing to carry its burden of showing that S.B.7072 has a meaningful number of real-world constitutional applications. Because the editorial judgments of websites engaged in curating and disseminating third-party content "*are* the principal things [S.B.7072] regulate[s]," they "should have just that weight in the facial analysis." *Id.* at 726. Florida's vagueness arguments fare no better—its effort to clarify S.B.7072's

2

consistency and post-prioritization requirements only underscores that they are impermissibly vague.

With no viable arguments on the merits, Florida rehashes the same threshold objections that failed at the motion-to-dismiss stage.  None works.

Florida's attempt to avoid Plaintiffs' First Amendment and §230 claims on associational-standing grounds has not improved this go around.  As this Court observed, the nature of Plaintiffs' claims does not render any particular member indispensable.  MTD.Op.12-23.  Nothing has changed to disturb that conclusion.  Plaintiffs have identified some member evidence—supplying the requisite "understanding of member circumstances," MTD.Op.13—but nothing about their case makes members' participation indispensable.  Florida argues otherwise only by (again) "misconstru[ing] the nature of [the] claims," *UAW v. Brock*, 477 U.S. 274, 287 (1986), and ignoring this Court's prior ruling.  So too for Florida's contentions that Plaintiffs' lack a §1983 cause of action and that their members are "common carriers."  This Court already rejected the first, and the second lost at all levels of this litigation.  Rightly so, affixing the label "common carrier" to an entity making editorial judgments does not strip it of First Amendment protection.  *NetChoice v. Att'y Gen.*, 34 F.4th 1196, 1220-21 (11th Cir. 2021).

Because Florida's bid for summary judgment is flawed from start to finish, the Court should deny its motion.

## BACKGROUND

### A.    Factual Background

As Plaintiffs' summary-judgment motions detail, *see* Am.MSJ.; Supp.MSJ., NetChoice and CCIA are trade associations whose members operate websites on which users can share and interact with content, including Etsy, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Threads, X, and YouTube.  Dkt.280-1¶5 ("Schruers.Decl."); Dkt.280-2¶5 ("Cleland.Decl."); Dkt.280-3¶¶3-4 ("Veitch.Decl."); Dkt.280-4¶¶4-6 ("Potts.Decl."); Dkt.280-5¶¶4-11 ("Duba.Decl."); Dkt.280-6¶¶4-5 ("Vasquez.Decl."); Dkt.280-7¶4 ("Callaway.Decl."); Dkt.280-8¶¶6-7 ("Fernandez.Decl.").  Plaintiffs' members have developed robust standards for curating, arranging, displaying, and disseminating content in ways that reflect their unique values and the distinctive communities they foster.  Am.MSJ.3-9.

These standards prohibit certain kinds of material from being disseminated via their websites and empower Plaintiffs' members to remove, restrict, and/or warn users about all manner of potentially unwanted or harmful content.  Supp.MSJ.2-3. Websites are aided in those endeavors by "algorithms," which sift through "the billions of posts" on their services and "prioritiz[e] … content" that is likely to be of interest.  *Moody*, 603 U.S. at 734.  But at bottom, members' nuanced content policies ultimately shape what material is generally disseminated on their websites and whether it appears in various curated feeds.  Am.MSJ.6-8.

Florida enacted S.B.7072 to punish select websites for exercising that editorial discretion in ways it disfavors.  The specific provisions laid out in more detail in Plaintiffs' summary-judgment motions, Am.MSJ.10-11; Supp.MSJ.4-5; Fla. Stat. §501.2041(2)(a) ("social media platform[s]" must "publish the standards … used for determining how to censor, deplatform, and shadow ban"), underscore that S.B.7072 imposes several requirements that commandeer these editorial decisions and compel burdensome disclosures about them.

## B.    Procedural History

Plaintiffs' principal summary-judgment motion details this case's procedural history.  Am.MSJ.11-13.  After Plaintiffs moved for summary judgment, Defendants filed a summary-judgment motion of their own, raising a slew of arguments, many of which reprise failed contentions from their motion to dismiss.

## ARGUMENT

## I.    Plaintiffs Have Associational Standing.

Florida's associational-standing arguments lack merit.  To have associational standing, Plaintiffs must demonstrate that (1) at least one member has Article III standing; (2) the interests they seek to protect are germane to their purposes; and (3) neither the claims asserted nor relief requested require participation of individual members.  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  Florida does not challenge the second prong—devoting most of its briefing to the

member-participation prong and only belatedly contesting members' Article III standing to challenge certain provisions.  Florida's arguments misconstrue the law.

### A.    Excessive Member Participation Is Not Needed to Prove Plaintiffs' First Amendment Claims.

Start with Florida's primary contention that Plaintiffs lack associational standing because too much member participation is required to prove their First Amendment as-applied claims.[2]  That argument fails at every turn.

1. The third prong of the associational-standing test is "prudential," not constitutional, and is "best seen as focusing on … matters of administrative convenience and efficiency."  *United Food & Com. Workers Union v. Brown Grp.*, 517 U.S. 544, 556-57 (1996).  As this Court has recognized, associational standing is not defeated just because *some* member participation is needed; the question is whether resolving the organization's claims will "require *excessive* participation by individual members," *Borrero v. United Healthcare*, 610 F.3d 1296, 1306 (11th Cir. 2010) (emphasis added), rendering the "participation of *each … indispensable*," MTD.Op.13.  So long as the claims "can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry, the participation of

---

[2] Defendants conclusorily assert that Plaintiffs lack associational standing to pursue their facial claims.  Fla.MSJ.7.n.1.  That undeveloped contention supplies no reason to disturb this Court's prior determination that Plaintiffs have associational standing to press those claims because they would require the same proof if individual members pursued them.  MTD.Op.15-16.  Any contrary argument in reply would be tardy.  *United States v. Levy*, 379 F.3d 1241, 1244 (11th Cir. 2004).

6

those individual members will not thwart associational standing." *Ass'n of Am. Physicians & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010); *NetChoice v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *contra* Fla.MSJ.6 (claiming "member participation" alone defeats associational standing).

As the record confirms, that is the case here.  Plaintiffs seek declaratory and injunctive relief, which the "Supreme Court has repeatedly held" are not the kind of requests that traditionally "require participation by individual association members." *Hosp. Council v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (Alito, J.). Plaintiffs' as-applied claims are no exception.  They contend that the challenged provisions flunk First Amendment scrutiny "as applied to websites operated by members when they engage in particular functions protected by the First Amendment—*i.e.*, when they curate and disseminate collections of third-party speech posted on their services." Am.MSJ.14.n.5; Am.Compl.¶55.  But "[d]eciding on the third-party speech that will be included in or excluded from a compilation— and then organizing and presenting the included items—*is* expressive activity." *Moody*, 603 U.S. at 731 (emphasis added).  Hence, Plaintiffs' as-applied claims challenge S.B.7072 *only* when it implicates protected expressive activity.  Member-specific proof is unnecessary to resolve whether S.B.7072 impermissibly burdens members' ability to make editorial judgments—the Supreme Court has already answered that question in the affirmative.  As this Court observed, after *Moody*,

7

"[o]ne need not have individual participation by members to know that requiring a traditional social-media provider to publish content it does not wish to publish … runs afoul of the First Amendment."  MTD.Op.21.

Against that backdrop, the sole member-specific evidence Plaintiffs needed to proffer (and have) is confirmation that members engage in those protected editorial decisions when curating and disseminating third-party content posted on their services.  Plaintiffs have done so in spades, Am.MSJ.14-22, supplying evidence that demonstrates that members "maintain[] and enforce[] detailed content[-]moderation policies that inform what content can appear on the website and in the feeds displayed to users"—all First-Amendment-protected editorial activity, Am.MSJ.16. While members have different editorial approaches—based on what third-party content they choose to allow, what they promote or restrict access to, and how they design their algorithms to best effectuate those policies (Am.MSJ.16-21)—those variations just underscore the expressive nature of the editorial activities.  "The First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 782, 790-91 (1988).  Any variation makes no difference.  Fox News might exercise its editorial judgments differently than MSNBC.  But if Florida tried overriding cable news networks' editorial judgments, the First Amendment analysis would not turn on precisely how Fox News or MSNBC exercised their editorial

discretion; Florida's actions would be unconstitutional either way. Likewise, the Court does not need "specific details about each member's automated systems," Fla.MSJ.12; it simply needs to know that Plaintiffs' members engage in editorial decision-making when using such tools. Plaintiffs' representative evidence does precisely that. *See* Schruers.Decl.¶¶4-8; Cleland.Decl.¶¶4-7.[3]

The Court likewise does not need "excessive" member-specific information to determine whether S.B.7072 can survive First Amendment scrutiny as applied to that protected activity. As Plaintiffs' motion explains, whether strict or intermediate scrutiny applies turns on whether S.B.7072 is content-, speaker-, and viewpoint-based—not on member details. Am.MSJ.23-26. So too for whether those provisions can satisfy heightened scrutiny. Florida has not identified any legitimate (let alone significant or compelling) justification for interfering with protected editorial judgments, and the challenged provisions burden substantially more speech than is necessary to achieve any valid interest it might invoke. Am.MSJ.26-29. Florida has principally defended and continues to try to justify S.B.7072 based on its interest in ensuring that Floridians have equal access to competing viewpoints. *See infra* Part

---

[3] Though Plaintiffs occasionally reference member-specific evidence produced *at Florida's insistence*, such evidence does not defeat associational standing. None of that evidence is necessary to show that Plaintiffs' members maintain and enforce content-moderation standards that reflect their unique editorial judgments.

II. That is not a justifiable end to pursue. *Moody*, 603 U.S. at 741. Associational standing is proper here.

    2.    Florida resists that conclusion on the theory that because Plaintiffs' algorithms are "unique," member participation is required to "understand how each … is purportedly injured." Fla.MSJ.7-8. In its view, that there is variation in the particular designs of members' algorithms means there is also variation in the First Amendment protection they receive. That is incorrect. It does not matter that members employ different methods "to tailor the[ir] speech" and advance their unique values; those distinct approaches receive First Amendment protection just the same. *Hurley v. Ir.-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 573 (1995); *Galvin v. Hay*, 374 F.3d 739, 750 (9th Cir. 2004) (First Amendment protects "individual choice of both … message and manner of presentation").

Defendants thus cannot explain, e.g., why a U.S.-based company like Reddit would lose First Amendment protection, Fla.MSJ.9-10, for its editorial approach of setting site-wide community standards while delegating to user-moderators the ability to apply subreddit-specific standards that serve their bespoke communities. Callaway.Decl.¶3.[4] Nor can it explain why the analysis is impacted by changes

---

[4] Florida also suggests that foreign control over members' content-moderation may affect the analysis. Fla.MSJ.9-10.n.2. That ignores Plaintiffs' evidence that various members manage content-moderation decisions domestically and that S.B.7072 applies only to companies doing business in Florida, who make editorial

Plaintiffs' members make over time to how they implement their editorial judgments; the First Amendment applies regardless of how they are enforced. *See* Fla.MSJ.10. That there have been changes in Plaintiffs' membership during this lawsuit does not necessitate member participation, either. *See* Fla.MSJ.10-11. Who happens to be members (and the exact methods used to effectuate their editorial judgments) does not negate the fact that, if they are covered by Plaintiffs' as-applied claims, they are necessarily engaged in protected expressive activity. MTD.Op.21.

Florida claims that the First Amendment analysis necessitates a member-by-member inquiry because members' algorithms operate independent from human editorial discretion. Fla.MSJ.8-9. That sweeping claim is belied by the record. Even Florida's own (purported) expert had no problem acknowledging that the algorithmically curated feeds at issue here are all influenced by members' content-moderation policies about what content to allow on their services and how to curate and disseminate it to others—choices that reflect editorial judgments indisputably made by humans. Dkt.290-1.¶¶30-32 ("Bapna.Rep."); Dkt.290-3.61:11-25, 183:22-

choices that impact Floridians. Am.MSJ.9.n.4. Given S.B.7072's domestic focus, there are no meaningful applications that (even arguably) fall outside the First Amendment's geographic scope. S.B.7072 is neither designed nor tailored to address "foreign control," in contrast to the statute at issue in *TikTok v. Garland*, 604 U.S. 56 (2025). So even if "foreign control" mattered here (it does not), those incidental applications would not save S.B.7072 from facial invalidation.

11

184:3 ("Bapna.Depo.").  That is precisely the kind of editorial activity that *Moody* held the First Amendment protects.  *See infra* pp.19-22, 27-31.

*NetChoice v. Bonta II* does not change the analysis.  There, the Ninth Circuit found that the district court did not abuse its discretion in concluding the plaintiff lacked associational standing to press as-applied challenges to a law restricting minors' access to "addictive feeds."  152 F.4th 1002, 1012, 1014 (9th Cir. 2025).  But (*contra* Fla.MSJ.7-8) the statute at issue did not, by its terms, regulate content-moderation judgments to achieve better expressive balance; it limited the circumstances where minors could access personalized feeds.  *Id.*  Here, S.B.7072's substantive obligations limit the very activity that *Moody* held is constitutionally protected—*e.g.*, engaging in "post prioritization," "shadow banning," and "censoring" third-party content—to achieve a better expressive balance.  *See* AM.MSJ.39-53.  S.B.7072 thus limits member-driven (and First-Amendment-protected) editorial activity regarding the curation and dissemination of third-party content.  *See infra* pp.19-22, 27-31; Am.MSJ.22-29, 39-40.  Namely, S.B.7072 by its terms targets protected expressive activity (and only protected expressive activity), obviating member-specific inquiries.

The variations among members that Florida highlights are therefore irrelevant.  What matters for the First Amendment analysis is that they make those editorial choices.  *Moody*, 603 U.S. at 740.  So unlike the plaintiffs in *Harris v.*

*McRae*, who had to show that each member was coerced "in the practice of their religion," which depended on "the conscience of the individual before God," 448 U.S. 297, 321 & n.24 (1980), no highly individualized inquiry is necessary here. *Contra* Fla.MSJ.11-12. "When the platforms use their Standards and Guidelines" to curate and disseminate third-party content, "*they are making [protected] expressive choices*." *Moody*, 603 U.S. at 740 (emphasis added).

Shifting gears, Florida disputes Plaintiffs' associational standing to challenge specific provisions. But its arguments boil down to the idea that because some members have partially complied with some of S.B.7072's provisions, the First Amendment burdens vary by website. Fla.MSJ.12-13 (Etsy and Pinterest sometimes notify users about violative content; some members notify users about rule changes; and some allow users to view some content chronologically). Even if some websites *voluntarily* inform users about certain enforcement actions, provide notices about changes to content-moderation standards, or allow users to view some content chronologically, that does not mean Florida can *mandate* that they do so—much less that members lack standing to challenge provisions that bind them and that proscribe editorial activities they intend to engage in. Veitch.Decl.¶¶35-36; Potts.Decl.¶19; Fernandez.Decl.¶¶24-25; Schruers.Decl.¶29b; Cleland.Decl.¶32.n.36. The state-mandated alteration to members' editorial activities is thus problematic even if

13

members partially comply—rendering "excessive" member participation unnecessary. Members' editorial rights are burdened all the same.

Because S.B.7072 burdens members' First Amendment rights *whenever* they curate and disseminate third-party content (the focus of Plaintiffs' as-applied claims), and Plaintiffs' proof that members engage in those protected editorial judgments supplies the requisite "understanding of member circumstances" needed in "*every* associational standing case," Plaintiffs easily satisfy the third prong of the associational-standing test. MTD.Op.13.

### B.    Plaintiffs Have Associational Standing to Bring Their §230 Claim.

For similar reasons, "excessive" member participation is not needed to resolve Plaintiffs' §230 claims. Plaintiffs claim that §230(c)(1) preempts several provisions of S.B.7072 because they "seek[] to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997). Plaintiffs also claim that §230(c)(2) preempts those provisions because they impose liability for "action[s] voluntarily taken in good faith to restrict access to or availability of material" websites deem "objectionable." 47 U.S.C. §230(c)(2)(A).

Resolving those claims turns primarily on statutory text. By their terms, several provisions restrict the ability of "social media platforms" to "censor,"

14

"deplatform," "shadow ban," and apply "post-prioritization" algorithms to, e.g., "content or material posted by a user." Fla. Stat. §501.2041(1). This Court need not know precisely how or how often members engage in those activities to conclude that those provisions impose liability for websites' "exercise of a publisher's traditional editorial functions," *Zeran*, 129 F.3d at 330, and "good faith" decisions to "restrict access to or availability of" "objectionable" content, 47 U.S.C. §230(c)(2)(A). As with Plaintiffs' First Amendment claims, the Court just needs to know that some members engage in those activities, which the record confirms. Am.MSJ.14-22.

Florida disputes none of this—instead repackaging arguments it levied against Plaintiffs' associational standing to raise their First Amendment claims. Fla.MSJ.51-52. But Florida's arguments misunderstand the associational-standing test and fail on their own terms. *See supra* Section I.A. True, §230 would not preempt state-law liability for disseminating content created by the website. But (*contra* Fla.MSJ.51-52) §230 protects members when they use algorithms to "recommend certain third-party content to specific users," because they engage in "traditional editorial functions of publishers." *M.P. v. Meta Platforms*, 127 F.4th 516, 526 (4th Cir 2025); *Force v. Facebook*, 934 F.3d 53, 65-66 (2d Cir. 2019). The challenged provisions plainly interfere with members' exercise of "traditional *editorial* functions," which §230 protects. *Zeran*, 129 F.3d at 330 (emphasis added).

15

Because *that* is the core conflict between S.B.7072 and §230, "excessive" member participation is not needed.

### C.    Plaintiffs' Members Have Article III Standing.

Florida next suggests that Plaintiffs' members lack Article III standing to challenge several provisions.  This argument is new for good reason.  The notion that the parties directly regulated by S.B.7072 lack pre-enforcement standing to challenge the burdens it imposes on their First Amendment rights strains credulity.

In the pre-enforcement context, Plaintiffs must show that at least some members have "an intention to engage in a course of conduct arguably affected with a constitutional interest" that is "arguably proscribed" by S.B.7072, and that they face "a credible threat of enforcement" for doing so.  *Speech First v. Cartwright*, 32 F.4th 1110, 1119 (11th Cir. 2022).  Florida's sole argument against standing is that Plaintiffs have not shown that members intend to engage in conduct S.B.7072 "arguably proscribe[s]."  Nonsense.  S.B.7072's avowed purpose is to regulate websites' editorial decisions.  And Florida never contests that Plaintiffs have shown that members have content-moderation policies they intend to continue enforcing, and have identified instances where those policies conflict with the challenged provisions.

For example, as Plaintiffs' evidence shows, X could not enforce its content-moderation standards against a political candidate's account even if she used it to

16

threaten to shoot police or engage in fraud. Fernandez.Decl.¶24. Nor is that situation fanciful—X (then-Twitter) "deplatformed" a candidate over his threats against federal officials shortly before a 2022 Florida primary. *See* Cleland.Decl.¶32.n.36. Although the journalistic provision does not prevent removal of truly "obscene" content, Fla.MSJ.16, it nevertheless would "prohibit a child-friendly platform like YouTube Kids from removing" or age-gating movie clips containing short-of-obscene "soft-core pornography posted by PornHub," which arguably qualifies as a "journalistic enterprise," or removing or appending a graphic-violence warning to "a video of a mass shooter's killing spree" if reposted by a "journalistic enterprise." *NetChoice*, 34 F.4th at 1229 & n.23. Again, these concerns are not hypothetical—X's recent decision to restrict access to news posts with gory pictures of a tragic accident would have been forbidden by the journalistic-enterprise provision. Fernandez.Decl.¶25. Similarly, the rule-change provision limits how quickly members can change their moderation standards, even though they occasionally do so multiple times a month to address changing circumstances and emerging threats. *E.g.*, Veitch.Decl.¶¶35-36 (YouTube "made multiple updates" to its policies "in the same month" in 2025). Hence, it would have prevented Meta, which made *multiple* changes to how it approached content moderation in the first few weeks of the Russia-Ukraine war, from responding to the war as it did. Potts.Decl.¶19; Schruers.Decl.¶29b (discussing concrete examples of

17

dangerous and viral content, like "the Tide Pod challenge" and "deepfakes," that require quick responses from members).  That evidence suffices to demonstrate pre-enforcement standing.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162-63 (2014).

Florida characterizes these assertions as "speculative events" and insists Plaintiffs must identify specific instances in which they actually "intend to violate" S.B.7072. Fla.MSJ.15.  But as the record underscores, the effects of these provisions on members' editorial decisions are not speculative—they concretely impact real-world judgments members make every day.  Moreover, Florida's demand for additional evidence runs headlong into *Driehaus*.  There, a pro-life group's criticism of candidates' voting records was arguably proscribed by an Ohio law—not because the group identified precisely what statements it would make in future elections, but because it intended to "continue to engage in comparable electoral speech" previously flagged as unlawful.  573 U.S. at 162-63.  Just so here.  Plaintiffs do not need to identify explicit third-party content that members in their editorial discretion would restrict but cannot under S.B.7072.  Plaintiffs need only explain that their members intend to engage in the kind of editorial activities S.B.7072 proscribes, *id.*—precisely what Plaintiffs have done.  Am.MSJ.23-29; *see supra* pp.7-9.  So while that evidence may not "confess[] that [members] will in fact violate"

18

S.B.7072, the record confirms that their intended course of conduct is "arguably proscribed." 573 U.S. at 163. Nothing more is required.

That leaves Florida's contention that members, who purportedly (partially) comply with the individualized-disclosure and opt-out provisions, lack standing because "it is not clear to what extent" those provisions "affect current practices." Fla.MSJ.16-17. But Florida has not argued that any member actually complies with either provision. Its "briefing diligently avoids taking a stance" on that question, which is fatal. *Peace Ranch v. Bonta*, 93 F.4th 482, 490 (9th Cir. 2024). Unless and until Florida is willing to say that Plaintiffs' members are actually complying, they will remain subject to an impending threat of enforcement, exposing them to serious fines if Florida later deems explanations regarding their editorial choices insufficiently detailed, or takes issue with their refusal to allow users to view all third-party content chronologically. Because members' current editorial activities "would [arguably] get [them] crossways with" Florida, their Article III standing is clear. *Cartwright*, 32 F.4th at 1122.

## II.     Florida Is Not Entitled To Judgment On Plaintiffs' As-Applied Claims.

### A.     S.B.7072's Challenged Provisions Are Content-Based Speech Restrictions That Burdens Members' Editorial Discretion.

1.     As Plaintiffs have explained in detail, Am.MSJ.14-22, their members receive First Amendment protection when they engage in editorial decisions regarding how to curate and disseminate third-party content posted on their services.

19

"Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity." *Moody*, 603 U.S. at 731. "When the government interferes with such editorial choices," "it alters the content of the compilation" and must "confront[] the First Amendment." *Id.* at 731-32. Those principles safeguard the editorial choices of not only Meta and YouTube—the principal focus of the Court's decision, *see id.* at 733-40; Am.MSJ.14-16, 18-19—but *all* websites when they curate and disseminate third-party speech posted on their services, including websites operated by Plaintiffs' other members, like Pinterest, X, Reddit, and Etsy. Am.MSJ.16-21; Schruers.Decl.¶37; Cleland.Decl.¶35; Dkt.280-9.at.11-19.

Members' editorial decisions reflect their unique value judgments about what third-party content they want on their services and what may be most relevant and appropriate for users. Each challenged provision "limits their power" to make those decisions, thus "interfer[ing] with protected speech," *Moody*, 603 U.S. at 710. Am.MSJ.22-29; Supp.MSJ.10-13. For instance, the consistency requirement appears to force members to disseminate speech (or refrain from doing so) whenever they previously took similar editorial actions against speech that Florida (or a jury) deems sufficiently similar. Veitch.Decl.¶¶29-31; Potts.Decl.¶¶36-37; Vasquez.Decl.¶37; Callaway.Decl.¶18; Duba.Decl.¶58; Fernandez.Decl.¶22. The provision related to posts "by or about" political candidates prohibits websites from

20

deprioritizing or restricting *any* speech posted "by or about" a candidate. Veitch.Decl.¶33; Potts.Decl.¶¶34-35; Vasquez.Decl.¶38; Callaway.Decl.¶19; Duba.Decl.¶60; Fernandez.Decl.¶23. The candidate-deplatforming provision prohibits websites from suspending or removing candidates no matter what they post—conscripting them to disseminate objectionable material at Florida's behest. Am.MSJ.25. The journalistic-enterprise provision prevents websites from removing, restricting, or adding disclaimers to certain posts. Veitch.Decl.¶¶34, 43; Fernandez.Decl.¶25; Vasquez.Decl.¶40. The rule-change provision's arbitrary monthly cap on modifying editorial policies forces websites to disseminate content they do not want to disseminate unless they already have rules covering that content. Veitch.Decl.¶¶35-36; Vasquez.Decl.¶41; Callaway.Decl.¶18; Fernandez.Decl.¶26. And the opt-out provision forces websites to display content in a "sequential or chronological" order even if they would prefer a different order. *NetChoice v. Moody*, 546 F.Supp.3d 1082, 1088 (N.D. Fla. 2021); Veitch.Decl.¶¶37-38; Vasquez.Decl.¶42.

The compelled-speech provisions likewise burden members' protected editorial activities. The detailed-explanation requirement imposes onerous burdens, requiring websites to provide detailed explanations for every single editorial decision they make. Veitch.Decl.¶¶39-40; Vasquez.Decl.¶43; Callaway.Decl.¶17; *accord Miami Herald Publ'g v. Tornillo*, 418 U.S. 241, 256-57 (1974). The view-

21

count provision penalizes members for exercising their editorial discretion by compelling them to disclose the results of those editorial choices (*i.e.*, how many individuals were "provided or shown" content) to encourage users to identify purported inconsistencies in how websites apply their standards.  Supp.MSJ.10-13. By compelling members to make burdensome disclosures regarding their editorial policies, including proprietary aspects, the standards provision intrudes on their editorial judgments, while providing bad actors with a roadmap to evade members' content-moderation efforts.  *Tornillo*, 418 U.S. at 257; Veitch.Decl.¶40; Vasquez.Decl.¶44.

2.      Moreover, each provision discriminates on the basis of content, speaker, and viewpoint, triggering strict scrutiny many times over.  Am.MSJ.29-32. Laws that compel speakers to "alter[] the content of [their] speech" are necessarily "content based."  *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018).  S.B.7072 does precisely that.  Just as Facebook and YouTube clearly convey a message about the speech they find acceptable and the communities they hope to foster when they curate and disseminate content, *Moody*, 603 U.S. at 738, so do Pinterest, X, Etsy, Nextdoor, and Reddit when they do the same.      Vasquez.Decl.¶21; Fernandez.Decl.¶20;      Duba.Decl.¶¶32,      78;      Callaway.Decl.¶¶8-10; Cleland.Decl.¶¶18, 24.  S.B.7072's various provisions require websites to include speech they do not want to include or present it in ways they would rather not, which

22

alters the content of members' messages. *Hurley*, 515 U.S. at 572-73. That alone triggers strict scrutiny.

But that is not all. Several provisions "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The political-candidate provision prohibits companies from deprioritizing posts "about" political candidates. §501.2041(2)(h). The journalistic-enterprise provision prohibits the exercise of editorial judgment regarding posts by "journalistic enterprises" "based on" their "content." §501.2041(2)(j). The consistency provision (§501.2041(2)(b)) seeks to amplify content websites would otherwise not disseminate, which is a content-based purpose. *PG&E v. Pub. Utils. Comm'n*, 475 U.S. 1, 12-13 (1986); Am.MSJ.30-32. Indeed, S.B.7072's entire purpose is to burden editorial choices the state disfavors—"an impermissible [content-based] purpose" triggering strict scrutiny. *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 76 (2022).

## B.    S.B.7072 Cannot Survive Any Level of Heightened Scrutiny.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions" by "rebut[ting] th[e] presumption" that the "[c]ontent-based regulation[] [is] presumptively invalid." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 816-17 (2000). Because strict scrutiny applies, Florida must show that S.B.7072 is "the least restrictive means of achieving a

compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  Even under intermediate scrutiny, S.B.7072 must be "narrowly tailored to serve a significant governmental interest," *Packingham v. N.C.*, 582 U.S. 98, 105-06 (2017), "unrelated to the suppression of free expression," *TikTok*, 604 U.S. at 73.  Florida comes nowhere close to meeting either standard.

Florida has not identified a legitimate, let alone significant or compelling, justification for interfering with members' protected editorial judgments.  It claims that S.B.7072 is necessary to prevent websites from discriminating against speech in ways *Florida* deems "inconsistent," Fla.MSJ.31-32, or "retaliat[ory]," Fla.MSJ.37.  It likewise insists S.B.7072 is needed to "enhanc[e] public access to candidates," Fla.MSJ.35-36, and prevent websites from "prioritiz[ing] unwanted material" in their curated compilations of third-party speech, Fla.MSJ.37-38.  The Supreme Court has already rejected these interests—they all reflect Florida's impermissible goal of forcing members to strike a more appropriate "balance" of speech on their websites.  *Moody*, 603 U.S. at 741.  While "States (and their citizens) are of course right to want an expressive realm in which the public has access to a wide range of views," "the First Amendment achieves that goal [] by preventing *the government* from 'tilt[ing] public debate in a preferred direction.'"  *Id.*  Without a valid interest, S.B.7072 flunks heightened scrutiny.

24

Though Florida claims the detailed-explanation, view-count, and standards provisions prevent misleading commercial advertising, Fla.MSJ.39-40, they also fail heightened scrutiny. Just as California "point[ed] to nothing suggesting that pregnant women do not already know that the covered facilities are staffed by unlicensed medical professionals" in *NIFLA*, 585 U.S. at 777, Florida has not identified any purported misleading member advertising requiring correction, let alone anything suggesting that consumers are misled about members' editorial policies. Instead, Florida effectively claims that it may compel members' speech simply to satiate its belief that consumers' "wish to know" details about those policies. Courts have roundly rejected that mere "desire" as an "insufficient" interest to justify compelled-speech mandates. *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 74 (2d Cir. 1996). And they are particularly insufficient here, as these compelled-disclosure mandates just make it easier for users to identify and sue websites for perceived inconsistencies in how they exercise their editorial discretion. Am.MSJ.36-37; Supp.MSJ.21-23. That interest is not unrelated to the suppression of speech; it is an offshoot of Florida's impermissible goal of attaining a "better expressive balance." *Moody*, 603 U.S. at 734.

Besides, Florida offers no evidence that could remotely carry its burden of showing that the challenged provisions are narrowly tailored to advance any interest it asserts. The consistency requirement mandates consistency for the entire universe

25

of editorial judgments. The journalistic-enterprise and candidate provisions prohibit or severely restrict editorial discretion over virtually all material posted by journalistic enterprises and candidates. The rule-change provision bars changes to editorial policies even when bad actors exploit existing loopholes. Complying with the detailed-explanation and view-count provisions would be extremely burdensome undertakings, given the millions of posts that websites remove, restrict, or deprioritize each day. And the standards provision compels burdensome disclosures of even the proprietary aspects of members' editorial decision-making. Florida never explains why such sweeping and draconian restrictions are necessary—unless its objective is to punish so-called "Big Tech" for speech it disfavors. When it comes to members' protected activity of curating and disseminating third-party speech, S.B.7072 burdens too much and furthers too little.

### C. Florida's Contrary Arguments Lack Merit.

1. Florida dedicates a substantial portion of its briefing to arguing that Plaintiffs' as-applied claims constitute "quasi-facial challenges" that cannot satisfy the facial standard. Fla.MSJ.17-28 (citing *McGuire v. Marshall*, 50 F.4th 986 (11th Cir. 2022)). That is wrong at every turn.

As *McGuire* explains, a claim is quasi-facial if "the plaintiff contends that the law cannot be constitutionally applied to a defined subset of people the law covers, which includes herself." 50 F.4th at 1003. There, it makes sense that parties must

26

meet the facial standard "to the extent that [their] claim 'reach[es] *beyond* [their] particular circumstances.'" *Id.* at 1003-04 (emphasis added). Here, however, Plaintiffs' as-applied claims do not reach beyond members; they cover members only when they are engaged in curating and disseminating third-party content. Because those claims implicate other websites only in the way *every* as-applied challenge incidentally implicates similarly-situated third parties (*i.e.*, *stare decisis*), the facial standard is irrelevant. *Contra* Fla.MSJ.18. Plaintiffs just need to demonstrate that S.B.7072 violates the First Amendment when it interferes with members' editorial judgments as applied to their curation and dissemination of third-party content—a burden they have satisfied.

Even if Plaintiffs' as-applied claims were "quasi-facial," Defendants still would not be entitled to summary judgment. Florida cannot explain why S.B.7072 can constitutionally be applied to *any* website when it engages in curation and dissemination of third-party content. After all, *Moody* has placed the issue beyond debate: "presenting a curated and 'edited compilation of [third-party] speech' is itself protected speech." 603 U.S. at 744. Florida persists in claiming that "curation and dissemination is [not] invariably expressive." Fla.MSJ.19; *but see Sorrell v. IMS Health*, 564 U.S. 552, 570 (2011). Doubtful—but even assuming there were some universe of unprotected curation-and-dissemination activities, that just underscores why this is not a "quasi-facial" challenge. Plaintiffs are seeking relief from S.B.7072

27

only when it applies to *their members*' curation-and-dissemination activities, which they have proven *are* invariably expressive.  Whenever S.B.7072 countermands editorial choices about whether to disseminate content and how to arrange and display it (*i.e.*, the universe of activity covered by Plaintiffs' as-applied claims), Florida violates the First Amendment.  *Moody*, 603 U.S. at 732-33.  Attaching the "quasi-facial" label is thus irrelevant.

2.    Florida resists that conclusion by noting that *Moody* reserved judgment on whether the First Amendment protects "feeds whose algorithms respond *solely* to how users act online," "without any regard to independent content standards," *id.* at 736 n.5, and claiming that "members' use of algorithm[s]" "fits this nonexpressive mold," Fla.MSJ.19-28.  That does not work.

Florida does not dispute *Moody*'s holding that the First Amendment fully protects Facebook and YouTube feeds (and others that operate similarly).  Nor does it identify any member feeds that fall outside *Moody*'s scope.  Plus, Florida never disputes that Plaintiffs' members all have unique, detailed policies reflecting their editorial judgments about the content they believe should be posted on their websites and communities they wish to foster.  Am.MSJ.14-22.  And it admits that members use algorithms to help implement those policies with respect to curating and disseminating the billions of pieces of third-party content on their services.  Fla.MSJ.25.  From those points, it necessarily follows that the First Amendment

28

protects members when they curate and disseminate third-party content, including when using algorithms to aid in effectuating those judgments. *Moody*, 603 U.S. at 735, 740; Am.MSJ.18-22. Indeed, when members decide "which signals [like user preferences] an algorithm will consider," how much weight to give each signal, and what kinds of content is valuable to users, they make editorial judgments about what content to allow on their services and how to arrange and disseminate it. Dkt.290-6.¶¶21-23, 44-46 ("Bail.Rep.").

Florida's multi-page exegesis of cherry-picked, internal documents discussing ways in which members' systems increase user engagement, Fla.MSJ.19-25, thus is beside the point. None of that evidence suggests that members merely give users "the content they appear to want, without any regard to independent content standards." *Moody*, 603 U.S. at 736 n.5. To the contrary, as even Florida's proffered expert concedes, members' content-moderation policies play a critical role in determining what content they will display and how to organize and arrange it—even if their algorithms increase users' "engagement" by delivering content that websites think users will find valuable. Dkt.295.at.28-30 ("Daubert.Mot.") (noting Dr. Bapna's concession that websites use algorithms to moderate content that violates content-moderation guidelines); Bail.Rep.¶47 (members often remove or de-prioritize potentially engaging material under their policies); Bapna.Depo.100:22-101:4, 183:22-184:10, 236:2-15.

29

Moreover, a website using its editorial discretion to pursue user engagement, including by accounting for user preferences, is itself engaged in expressive activity. "A system that indicates to a user they are likely to find a post or video relevant, valuable, or interesting, communicates a message … about what [the website] believes the user would like." Bail.Rep.¶48; *see* Daubert.Mot.30-31; *accord Angelilli v. Activision Blizzard*, 781 F.Supp.3d 691, 701 (N.D. Ill. 2025) (when speech is "engaging," "First Amendment protection should be at its zenith"). If a bookseller recommends a new mystery novel based on a customer's previous Sherlock Holmes purchases, or because it is a bestseller, that is no less protected speech than if she recommends a book because she personally likes it. A state could no more forbid the first or second recommendation than the third. To be sure, websites do this on a larger scale and use technological features (*e.g.*, clicks, likes, and shares) to track user preferences to predict what content users might find valuable. Fla.MSJ.23-25. But that does not change the reality that they "are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering"—all protected expressive activities. *Moody*, 603 U.S. at 738.

Florida half-heartedly suggests that websites are not really engaged in editorial activity because they sometimes make mistakes when curating third-party

30

content under their editorial policies. Fla.MSJ.25-27.[5]  That just underscores that members are making First-Amendment-protected judgments about what content to display in the first place.  *See Moody*, 603 U.S. at 738 ("decisions made [regarding] content"—"fair or unfair"—"constitute the exercise of editorial" judgment).  The notion that the government can "correct" supposedly mistaken editorial decisions is exactly what *Moody* held the First Amendment forecloses.  *Id.* at 742.  Plus, speech does not lose First Amendment protection just because the state deems it not "true [or] accurate," *Whitfield v. Spiller*, 76 F.4th 698, 709-10 (7th Cir. 2023) (collecting cases)—"perceived inconsistenc[ies]" cannot defeat the First Amendment's protections, *Green v. Miss USA*, 52 F.4th 773, 784 & n.11 (9th Cir. 2022).  It is not the government's role to second guess websites' expressive activities; any 'errors' (perceived or real) in how members exercise their editorial discretion are beyond Florida's authority to fix.  *See Riley*, 487 U.S. at 791.

    2.    Florida's defense of the individual provisions likewise fails.

---

[5] Florida attempts to bolster this assertion by claiming that members' witnesses "lack" "personal knowledge" about members' algorithms.  Fla.MSJ.28.  But those witnesses have attested to their personal knowledge that members' content-moderation policies reflect their editorial judgments and are implemented using algorithms.  Schruers.Decl.¶3; Cleland.Decl.¶1; Veitch.Decl.¶2; Potts.Decl.¶¶1-2; Vasquez.Decl.¶2; Callaway.Decl.¶2; Duba.Decl.¶2; Fernandez.Decl.¶¶3, 5.  That is all that is required for them to competently testify about such details, *see* Fed. R. Evid. 602, and supply the requisite evidence that members engage in First-Amendment-protected activity.

***Consistency.***  Florida claims that the consistency provision does not implicate the First Amendment at all as applied to members' curation and dissemination of third-party content.  That is bizarre.  Telling websites how they must curate and disseminate content is an effort to dictate how to exercise their editorial discretion. *NetChoice*, 34 F.4th at 1222.  Florida's new-fangled claim that the provision simply holds members to "their representations," Fla.MSJ.29-31, is hard to square with its text:  It does not merely require websites to follow their own rules; it forces them to exercise their editorial discretion "in a consistent manner," allowing for state policing of all moderation decisions.  Regardless, the First Amendment does not empower the state to strip members of editorial discretion because they have made "representations" about how they intend to exercise it.  The New York Times proudly proclaims it includes "All the News That's Fit to Print," but a law purporting to empower any newsmaker whose event was left uncovered to sue would constitute censorship.  The First Amendment bars such government efforts to copyedit editors' judgments, no matter the label used.

Florida's suggestions that the provision can survive heightened scrutiny are equally unavailing.  The entire point of the provision is to give *Florida* the power to decide when websites have inconsistently exercised their editorial discretion, penalizing members for curating and disseminating content in ways Florida thinks lack consistency.  That gives the lie to the assertion that the consistency provision is

32

a content-neutral speech restriction furthering valid governmental interests in consumer protection or non-discrimination. Fla.MSJ.32-33. By overriding members' editorial choices, the provision "alter[s] the content of [websites'] speech," triggering strict scrutiny, *NIFLA*, 585 U.S. at 766, and impermissibly tries to achieve what Florida deems a "better expressive balance." *Moody*, 603 U.S. at 734. Just as the non-discrimination rule in *Hurley* could not override a parade organizer's "paradoxical" choice to exclude third parties from its parade, 515 U.S. at 562-63, Florida cannot use S.B.7072 to override members' purportedly inconsistent decisions "to exclude [third-party] message[s] [they] d[o] not like from" the curated compilations they disseminate. *Moody*, 603 U.S. at 730.

***Candidate-Deplatforming.*** Florida insists the prohibition on "deplatform[ing]" candidates as applied to websites when they curate and disseminate content does not implicate the First Amendment because it grants candidates "access to an account" but does not "force platforms to disseminate candidates' posts." Fla.MSJ.34. That argument falls apart.

For starters, creating an account is itself speech—an account is a personalized profile containing information the user chooses to present. *See Carafano v. Metrosplash.com*, 339 F.3d 1119, 1124 (9th Cir. 2003). Foreclosing websites' ability to remove accounts overrides their editorial discretion regarding that third-party content. Plus, Florida's explanation for the provision is nonsensical. A law that

33

forces websites to give candidates accounts they cannot use to post content would accomplish nothing.  Users create accounts to post and interact with content on members' websites—precisely why Florida privileges these preferred users' access in the first place.  So just as members engage in protected editorial activities when they decide to restrict a user's content item by item, they are equally protected when they choose not to disseminate her content at all.  *See Castronuova v. Meta Platforms*, 2025 WL 1914860, at *5 (N.D. Cal. June 10, 2025) (citing *Children's Health Def. v. Meta Platforms*, 112 F.4th 742 (9th Cir. 2024), and noting the First Amendment protects websites' editorial choices to "remove a user's account or content").  Removing the ability to suspend or terminate candidates' accounts from members' editorial toolkit thus intrudes on their editorial discretion.[6]  It also confirms that the provision is content-based, by forcing websites to publish and associate with candidates' third-party content they would rather avoid.  *NIFLA*, 585 U.S. at 766; *contra* Fla.MSJ.34-35.  So while Florida lauds its promotion of "democratic process[es]," Fla.MSJ.35-36, ensuring candidates can access members'

---

[6] Nor is there any support for Florida's claim that deplatforming decisions somehow become "nonexpressive" when made in response to "governmental jawboning."  Fla.MSJ.27.  To the extent "jawboning" does not cross the First Amendment line, that is only because "[government]-induced" content moderation still constitute "independent content[-]moderation" decisions.  *Murthy v. Missouri*, 603 U.S. 43, 72-73 (2024).  Conversely, to the extent "jawboning" is so aggressive as to override those independent decisions entirely, then it violates the First Amendment.  Either way, the point does nothing to help Florida.

34

"'enviable vehicle[s]' for expression" is an impermissible attempt to override their speech "to enhance the relative voice of others." *Moody*, 603 U.S. at 741-42.

   ***Journalistic-Enterprises.***    Florida's arguments regarding the journalistic-enterprise provision are equally mystifying.  It concedes that the provision implicates the First Amendment but theorizes that it is a content-neutral, non-discrimination rule that survives heightened scrutiny because "it singles out no 'substantive message.'" Fla.MSJ.36-37.  True, the provision burdens websites' editorial activities when they curate and disseminate content from entities across the political spectrum (everything from Slate to the Daily Wire).  But the burdens on websites' editorial decisions are not any less content-based.  *See Reed*, 576 U.S. at 169 ("regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter").  The right-of-reply statute in *Tornillo* forced newspapers to disseminate candidates' speech whether the newspaper criticized conservative or liberal candidates.  418 U.S. at 244.  But it nonetheless "exact[ed] a penalty on the basis of the [newspaper's] *content*" by countermanding its editorial decision.  *Id.* at 256 (emphasis added).  *That* is a textbook content-based distinction.   Here, too, forcing websites to disseminate posts by journalistic enterprises when they otherwise would not "exacts a penalty on the basis of the[ir] content," triggering strict scrutiny.  *Id.*  Though this provision triggers (and fails) strict scrutiny, it also flunks intermediate scrutiny.  Florida openly admits that it aims

35

to rebalance the marketplace for ideas by "prevent[ing] platforms from leveraging" their editorial power "against disfavored press outlets." Fla.MSJ.37. That is constitutionally impermissible. *Moody*, 603 U.S. at 741.

**Opt-Out.** Florida's defense of the opt-out provision is also untenable. It claims that forcing covered websites to allow users to opt out of "post-prioritization" and "shadow-banning" algorithms is content-neutral. Nonsense: The provision directs Plaintiffs' members to disseminate different content, in a different order, than they would prefer. *See supra* p.21. "[E]mpowering" users to override members' curatorial decisions because the *user* thinks members are "prioritizing unwanted material," Fla.MSJ.37-38, is a naked attempt to "achieve [Florida's] own conception of speech nirvana." *Moody*, 603 U.S. at 741.

**Rule-Changes.** Florida next claims that the rule-changes provision "does not implicate the First Amendment because it governs deceptive commercial practices," "not speech." Fla.MSJ.41-42. Not so. This provision concededly regulates members' "standards about what third-party speech" they allow on their services and how they curate and disseminate such content. Fla.MSJ.42. And it bars them from making changes more than once a month or "implementing [any] changes" to those policies without first notifying users. §501.2041(2)(c). That is no mere conduct regulation, Fla.MSJ.42-43. *Buehrle v. Key West*, 813 F.3d 973, 977 (11th Cir. 2015) (government cannot restrict protected activity by "proceed[ing] upstream and

36

dam[ming] the source"). It is a direct effort to constrain members' protected editorial judgments.

Florida's arguments regarding heightened scrutiny likewise fail. It claims that the provision advances a valid interest in user "transparency," Fla.MSJ.43, but that is plainly insufficient, *see supra* p.25. Moreover, Florida "is [directly] regulating the content-moderation policies" themselves "to change the speech that will be displayed" on their websites—an interest not unrelated to the suppression of speech. *Moody*, 603 U.S. at 743. As the Eleventh Circuit observed, "there is likely no governmental interest sufficient to justify prohibiting a platform from changing its content-moderation policies—*i.e.*, … changing the messages it expresses—more than once" a month. *NetChoice*, 34 F.4th at 1229. Thus, while Florida gives lip service to preserving websites' "ability to adjust to changing circumstances," Fla.MSJ.43, the provision effectively forces websites to disseminate objectionable content for which they lack pre-existing editorial rules if they made changes to their policies earlier that month. The First Amendment does not allow Florida to so "substitute 'governmental regulation' for the 'crucial process' of editorial choice." *Moody*, 603 U.S. at 729.

***Detailed-Explanation, Standards, and View-Count.*** That leaves Florida's defense of S.B.7072's various compelled-speech provisions, which it claims clear the standard set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626

37

(1985). Fla.MSJ.38-41. Florida never explains why *Zauderer* applies; as explained, it does not. Am.MSJ.35-37; Supp.MSJ.18-23. *Zauderer* is limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz v. United States*, 559 U.S. 229, 250 (2010). Nothing about S.B.7072's attempt to compel members' disclosures regarding their editorial decisions—be it their overall content-moderation policies (§501.2041(2)(a)), specifics as to how they exercised editorial discretion over certain content (§501.2041(2)(d), (3)), or how widely content was disseminated (§501.2041(2)(e))—addresses, let alone relates to, misleading advertising. Am.MSJ.35-37; Supp.MSJ.18-23. Florida offers no evidence to that effect. Each provision is instead aimed at forcing websites to explain how they curate and disseminate third-party content to make it easier for users to sue over perceived inconsistencies in their editorial choices. Schruers.Decl.¶¶31-34.

Florida is not coy about that. It proudly proclaims that these provisions help "users [] assess whether" members' editorial discretion "is consistent[ly]" applied and not "at odds" with how users (or Florida) believe members should be curating and disseminating content. Fla.MSJ.39-40. That end goal is unmoored from *Zauderer*'s misleading-advertising foundations, Supp.MSJ.19-21, and a recipe for Florida to control all manner of editorial decisions to boot. It thus blinks reality for the state to claim these provisions simply force websites to disclose only

38

"uncontroversial information about the terms under which ... services will be available." *NIFLA*, 585 U.S. at 768.  While Florida asserts (without evidentiary support) that these obligations are not "unduly burdensome," Fla.MSJ.40-41, it ignores Plaintiffs' evidence explaining why complying would be paralyzingly burdensome, given the billions of editorial decisions members make every day, Am.MSJ.38-39; Supp.MSJ.24-25.  Those burdens fall far afield from the easy-to-apply commercial disclosure requirements upheld under *Zauderer*, so websites "might well conclude that the safe course" is not to disseminate user-generated posts. *Tornillo*, 418 U.S. at 257.

Finally, Florida briefly alludes to the European Union's Digital Services Act (DSA).  That attempt to hide behind jurisdictions unconstrained by the First Amendment does not work.  Even if S.B.7072 mirrored the DSA, S.B.7072 imposes *new* burdens by compelling detailed explanations to all users *in Florida*.  Moreover, the DSA is materially different and, in fact, less burdensome.  While the DSA requires explanations that are "as precise and specific as reasonably possible under the given circumstances," Reg.2022/2065, art.17, 2022 O.J. (L277), S.B.7072 requires a precise and thorough explanation every time, no matter how infeasible. The DSA likewise includes nothing akin to S.B.7072's private right of action, which permits any Floridian to seek up to $100,000 in statutory damages per violation without having to show actual damages.

39

Florida's various efforts to square S.B.7072 with the First Amendment thus fall short.  S.B.7072 is designed to intrude on editorial rights, so each challenged provision violates the First Amendment rights of Plaintiffs' members when they curate and disseminate third-party speech.

## III.    Defendants Are Not Entitled To Judgment On Plaintiffs' Facial Claims.

Defendants next train their fire on Plaintiffs' facial claims.  But they do not grapple with Plaintiffs' explanation why many provisions are facially unconstitutional, let alone identify "realistic, not fanciful," applications of the others that could pass constitutional muster.  *United States v. Hansen*, 599 U.S. 762, 770 (2023).  Instead, Florida offers a meager three paragraphs by way of explanation, which does not identify (much less support with evidence) any actual constitutional applications of S.B.7072.  That does not cut it, especially because it leans heavily on its meritless arguments levied against Plaintiffs' as-applied claims, Fla.MSJ.44-45. *See supra* Part II.  Florida instead asserts that Plaintiffs need to, but did not, "develop a 'detailed [factual] record'" of "*all* of [S.B.7072's] applications."  Fla.MSJ.45. Florida grossly mischaracterizes the facial standard.

1.    As *Moody* explains, when confronted with a facial challenge under the First Amendment, courts must address whether a "substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  603 U.S. at 723-24.  "[E]ven a law with 'a plainly legitimate sweep' may

be struck down in its entirety" if its "unconstitutional applications substantially outweigh its constitutional ones." *Id.* If a law's "heartland applications" are unconstitutional, they should be given "just that weight in the facial analysis." *Id.* at 726. Importantly, *Moody* did not hold that Plaintiffs must develop a detailed *evidentiary* record to that end. Instead, the Court, drawing on its prior cases, simply instructed parties to explain "what [the law] covers." *Id.* at 725.

*United States v. Stevens* shows how this is done. There, the Court began by "constru[ing] the challenged [animal-cruelty] statute" to ascertain its scope and analyze the various unconstitutional applications that the defendant had identified (*e.g.*, as applied to "hunting-related depictions"). 559 U.S. 460, 474-77 (2010). Though the government argued that certain constitutional applications (*i.e.*, animal-crush videos) could save the law from facial invalidation, the Court did not require the defendant to make an in-depth evidentiary showing about the exact size of "the market for other [lawful] depictions, such as hunting magazines," or hypothesize all potential constitutional applications before holding the law facially invalid. *Id.* at 481-82. That the defendant identified a universe of unconstitutional applications that "far outnumber[ed] any permissible" constitutional applications sufficed. *Id.*

*Stevens* does not stand alone. In *Iancu v. Brunetti*, the Court struck down the Lanham Act's prohibition on "immoral or scandalous" trademarks on its face. 588 U.S. 388, 394-98 (2019). The government tried to save the statute from facial

41

invalidation by insisting that it had "constitutionally permissible applications," *e.g.*, "to lewd, sexually explicit, or profane marks." *Id.* at 398. But the Court rejected that argument. Just as was the case in *Stevens*, it did not require the challenger to create a comprehensive record of all possible impermissible and permissible applications of the statute. The "immoral or scandalous" bar's unconstitutional applications were "'substantial' relative to 'the statute's plainly legitimate sweep'" because there are "great many immoral and scandalous ideas in the world" and the Lanham Act, by its terms, "covers them all.'" *Id.* at 398-99.

Courts have applied the same approach post-*Moody*. Take *Chamber of Commerce v. Lierman*. There, the Fourth Circuit analyzed a law banning internet companies from disclosing to digital advertisers how a state tax affected pricing. 151 F.4th 530, 534 (4th Cir. 2025). The court did not need a comprehensive record about online digital advertising to hold that the challenged law regulated speech and flunked heightened scrutiny. *Id.* at 540-42. Facial relief was warranted because plaintiffs identified numerous unconstitutional applications of the statute, and Maryland failed to carry its burden of identifying any constitutional applications that could save it from facial invalidation. As the court explained, the lack of a "connection to the interest Maryland invoke[d]" meant the challenged law had "no plainly legitimate sweep"—the constitutional deficiencies were "present in every case." *Id.* at 542. That tracks the Eleventh Circuit's recognition that if a statute is

42

"insufficiently narrowly tailored," facial invalidity necessarily follows, as the law "cannot be constitutionally applied to *anyone*, even if a more narrowly tailored statute might still capture a plaintiff's conduct." *Fla. Preborn Rescue v. City of Clearwater*, 161 F.4th 732, 739 n.2 (11th Cir. 2025).

These cases underscore that *Moody* did not fundamentally reimagine the facial analysis, let alone create some impossible-to-surmount evidentiary obligation, as Florida suggests. If Florida passed a law banning access to all books, a challenger would not have to produce a massive evidentiary record about every book the law covers and how many contain protected versus unprotected content. It would suffice to show that the law bans a substantial universe of protected books, thus rendering it an impermissible effort to "burn the house to roast a pig." *NetChoice*, 546 F.Supp.3d at 1095. Under the First Amendment, that kind of overbreadth is a constitutional *vice*—not a basis for saving the statute from facial invalidity.

*Moody* is in accord. The Court remanded for further consideration of S.B.7072's scope because no one had explored "the laws' full range of applications" and compared which may be constitutional and unconstitutional. 603 U.S. at 718, 726; *cf. NetChoice v. Bonta III*, 170 F.4th 744, 761-63 (9th Cir. 2026) (remanding facial claims because challenged provision by its terms "d[id] not necessarily impact protected speech in … even most applications" and parties had not "develop[ed]" arguments about its scope). But as *Stevens*, *Iancu*, and other cases confirm, once the

43

challenger demonstrates the law on its face impermissibly burdens speech in many applications (especially its "heartland applications"), it is the government's burden to identify a substantial universe of realistic, non-fanciful applications that would be constitutional.  Of course, plaintiffs bear the ultimate burden to show that the unconstitutional applications substantially outweigh the constitutional ones.  But nothing in *Moody* requires them to compile a comprehensive record of every possible hypothetical application or speculate about their potential constitutional applications just to facially challenge the law.  *Contra* Fla.MSJ.44-45.

Here, Plaintiffs have shown that the "heartland applications" of each challenged provision violates the First Amendment—and they "should have just that weight in the facial analysis."  *Moody*, 603 U.S. at 726.  Florida cannot save S.B.7072 from facial invalidation with hand-waving references to hypothetical applications to "e-commerce platforms, search engines, and other online services," Fla.MSJ.44, that are not and have never been the focus of the law.  To the extent those entities are even covered, that is only an incidental result of overbroad drafting; S.B.7072 was plainly intended to (unconstitutionally) restrict editorial decisions of "social media" websites that curate and disseminate third-party speech.

2.   Once *Moody*'s facial-analysis framework is properly understood, several of S.B.7072's provisions clearly are facially unconstitutional.  Am.MSJ.41-

44

53. By their terms, those provisions apply *only* to the same conduct covered by Plaintiffs' as-applied claims.

The provision addressing posts by or about candidates, §501.2041(2)(h), regulates only how covered entities arrange candidate-related content displayed in users' feeds ("post-prioritization") and to what extent they disseminate such content ("shadow ban"). Am.MSJ.42-45. So to the extent the provision applies beyond traditional "social media" companies, it unconstitutionally "interferes with" their "editorial choices," too. *Moody*, 603 U.S. at 731-32. The same is true of the opt-out provision, §501.2041(2)(f)-(g), which focuses on websites' editorial activities when they arrange and disseminate content in newsfeeds or search results or limit their reach or exposure. Am.MSJ.45-46. And of the consistency (§501.2041(2)(b)) and journalistic-enterprise (§501.2041(2)(j)) provisions: By their terms, they seek to override websites' editorial decisions to limit or eliminate the exposure of third-party speech or decide how to organize and arrange it. Am.MSJ.47-51. Their prohibition on "delet[ing] or ban[ning]" ("deplatforming") accounts of "journalistic enterprises" based on their "content" or doing the same for other users whose content is purportedly subject to inconsistent editorial treatment likewise denies websites their right to decide whether to disseminate content. Am.MSJ.49-52. Moreover, the detailed-explanation provisions (§501.2041(2)(d), (3)), which are compelled-disclosure requirements, always trigger the First Amendment and unconstitutionally

45

impel websites to make burdensome disclosures about their editorial decisions regarding what content to disseminate and how to arrange and organize it. Am.MSJ.52-53; *NIFLA*, 585 U.S. at 776-79.

Because the text of these provisions underscores that the entire set of real-world applications involves protected editorial activity, the facial analysis is easy. *Moody*, 603 U.S. at 726. That these provisions are unconstitutional as applied to Plaintiffs' members when they curate and disseminate third-party speech, *see supra* Part II, means they are necessarily facially unconstitutional too. At a minimum, Florida needed to come forward with clear examples, supported by argument and evidence, of non-fanciful, constitutional applications of these provisions. It does not try to do so. But even if such applications exist, they would be vastly outweighed by the "substantial amount of protected speech" that the provisions' "heartland applications" restrict. *Moody*, 603 U.S. at 723-24.

In short, just as no detailed factual record is needed to show that a blanket book ban violates the First Amendment in all (or most) of its applications, no detailed factual record is needed to show these provisions impermissibly regulate editorial activities and override those expressive decisions in all (or most) of their applications. *Contra* Fla.MSJ.44-45. That is obvious from S.B.7072's face, and Florida has offered no evidence of any constitutional applications of the challenged provisions to rebut that showing. It is not the Plaintiffs' burden to do that for them.

46

3.    As for the provisions that Plaintiffs facially challenged but have not sought summary judgment on (*i.e.*, candidate-deplatforming, rule-changes, view-counts, and standards provisions), Defendants' motion should be denied.  Properly understood, these provisions apply only to the kind of social-media services that were S.B.7072's obvious targets.  In every such application, they unconstitutionally burden protected editorial discretion.

In enacting S.B.7072, the Florida legislature aimed squarely at traditionally understood "social media" websites that curate and disseminate third-party speech. Am.Compl.¶¶40-41.   S.B.7072 describes "social media platforms" as the "new public town square" that Floridians use "to express their opinions," S.B.7072 §1(3)-(4)—a point Florida's Lieutenant Governor echoed:  S.B.7072 was meant to take "back the virtual public square" and "fight[] against big tech oligarchs that contrive, manipulate, and censor if you voice views that run contrary to their radical leftist narrative." *Gov. DeSantis Signs Bill to Stop the Censorship of Floridians* (May 24, 2021), https://perma.cc/3L3Y-7C6A.  Those descriptions are not properly levied at websites that offer private messaging, email services, ride-sharing arrangements, or payment processing; they aptly describe traditional "social media" websites that are "in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 738.

47

S.B.7072's text is in accord.  The term "deplatform" implies the service provides users with the ability to share content with others.  §501.2041(1)(c); *Moody*, 603 U.S. at 774 n.10 (Alito, J., concurring) ("'deplatform' means 'to remove and ban a registered user from a mass communication medium'").  It would be passing strange to describe a user as being "deplatformed" from a ride-sharing app or mobile-payment service.  Likewise, "censor" refers to actions taken regarding "content or material posted by a user."  §501.2041(1)(b).  And "shadow ban" refers to actions that "limit or eliminate the exposure of a user or content or material posted by a user."  §501.2041(1)(f).  These definitions were plainly written to cover actions regarding publicly available speech posted to covered websites.  §501.2041(2)(e)(1) (view-count obligation triggered by "provid[ing] or show[ing]" third-party content).

That confirms that S.B.7072 as a whole—and the provisions at issue— regulates only websites that facilitate the dissemination of third-party speech and enforce rules about what content to curate and disseminate.  Armed with that interpretation, it becomes clear that the candidate-deplatforming, rule-changes, view-counts, and standards provisions regulate predominantly, if not exclusively, protected expressive activities—burdening First Amendment protected speech, with little if any plainly legitimate sweep.  Am.MSJ.22-29; Supp.MSJ.10-15.

Admittedly, this Court adopted a broader interpretation of "social media platform" that sweeps in more services than the Legislature intended.  MTD.Op.6-

48

7.[7]    But even under that construction, summary judgment is unwarranted. Defendants fail to carry their burden of showing that there is no triable issue of fact whether any constitutional applications of those provisions are substantially outweighed by the unconstitutional applications. *Moody*, 603 U.S. at 723-24. They instead cursorily assert that some hypothetical applications (not contemplated by the Legislature) pass constitutional muster and call it a day. Fla.MSJ.44-45. "[E]ven a law with 'a plainly legitimate sweep' may be struck down in its entirety." *Moody*, 603 U.S. at 723. And Defendants' limited argument and evidence do not disprove that S.B.7072's core (intended) applications—to websites curating and disseminating third-party content—are unconstitutional, Am.MSJ.22-29, let alone that such heartland applications dwarf any marginal applications to entities not engaged in expressive activity.

## IV.    S.B.7072 Is Unconstitutionally Vague.

### A.    The Consistency Provision Is Unconstitutionally Vague.

Defendants' defense of the consistency provision stumbles immediately. They claim that Plaintiffs must show that it is vague in all applications. Fla.MSJ.47-48. But as Plaintiffs' motion shows, Am.MSJ.53, and this Court recognized, MTD.Op.37-38, that is not the standard. The Supreme Court expressly rejected the

---

[7] Plaintiffs reserve the right to re-raise their argument that S.B.7072 (including its definition of "social media platform") governs only providers of social media services as that term is commonly understood. Am.MSJ.40.n.6.

49

"supposed requirement of vagueness in all applications" in *Johnson v. United States*:

its "*holdings* squarely contradict the theory that a vague provision is constitutional

merely because there is some conduct that clearly falls within the provision's grasp."

576 U.S. 591, 603 (2015).  That is especially true given "[t]he vagueness of [a

content-based regulation of speech] raises special First Amendment concerns

because of its obvious chilling effect."  *FCC v. Fox Television Stations*, 567 U.S.

239, 254-55 (2012).  Defendants' citation to *Indigo Room v. City of Fort Myers*, 710

F.3d 1294 (11th Cir. 2013), thus does not help them.  *Indigo Room* is likely no longer

good law after *Johnson* and readily distinguishable to boot—it addressed an

ordinance that did "not chill constitutionally protected conduct."  *Id.* at 1301.

Plaintiffs' motion explains why S.B.7072's "consistency" provision flunks the

proper standard.  Am.MSJ.53-55.  Yet, Florida insists it is not vague because it

purportedly has a "readily discernible core":  Citing the dictionary, Florida claims

that "consistent" means treating users equally "free from variation or contradiction."

Fla.MSJ.48, 50.  The problem is not that the word "consistent" is obscure.  It is that

the legal mandate to exercise editorial discretion over third-party speech "in a

consistent manner" is so hopelessly subjective that it invites arbitrary enforcement

and chills First-Amendment-protected activity.   Florida's new definition only

illustrates the problem.  What counts as "free from variation" when two posts involve

the same topic but different speakers, contexts, potential harms, and intended

50

audiences? Is it inconsistent to remove images of uncovered female breasts but allow pictures of breast-feeding? Is it inconsistent to remove depictions of violence but allow news reports from combat zones? Neither S.B.7072 itself, nor Defendants' attempt to illuminate it, supplies meaningful guidance. "In this quintessential First Amendment area," Florida "may not hinge liability on a phrase so ambiguous in nature." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1323 (11th Cir. 2017) (en banc).

Defendants' effort to compare the consistency provision to the Equal Protection Clause only deepens the problem. Set aside that the Clause binds only the government. The phrase "equal protection" is a legal term of art with a deep historical pedigree whose meaning has developed over decades. S.B.7072's phrase "in a consistent manner" is anything but: It does *not* use established constitutional language; it is *not* a term of art; and it has *no* accumulated meaning. Moreover, there is no support for the idea that a statutory term survives a vagueness challenge merely by loosely resembling constitutional language.

Defendants' supposedly "easy cases" thus confirm why the provision cannot survive. Fla.MSJ.48-49. Florida suggests, *e.g.*, that the same "meme[s]" should be moderated the same way. But why would requiring consistency preclude *any* consideration of context? If a meme depicts negative racial stereotypes, it might well matter whether the user is endorsing the stereotype, criticizing the bigotry the meme conveys, or simply reporting on it. Likewise, what counts as "slurs" or "hate

51

speech," Fla.MSJ.49—and what to consider to make those determinations—is deeply contentious, adding further uncertainty to how the provision should apply. If YouTube removes a racial slur in a comment, must it remove all music videos using the same? If Facebook removes images saying, "Thank God for Dead Soldiers," or "God Hates Fags," must it remove the text of *Snyder v. Phelps*, 562 U.S. 443 (2011)? If Pinterest removes images calling for genocide, must it do the same for anti-Zionist slogans? These are neither "margin[al]" cases nor "speculat[ion]." Fla.MSJ.48-49. As the record confirms, they illustrate the real-world, practical editorial judgments companies make every day, Veitch.Decl.¶¶44-45; Dkt.280-10.335:9-336:1; Potts.Decl.¶18; Vasquez.Decl.¶37; Duba.Decl.¶49; Dkt.280-12.148:8-149:3; Fernandez.Decl.¶¶32-34—and reflect the hot-button editorial judgment calls that are most likely to prompt an enforcement of S.B.7072's consistency mandate.

The idea that covered entities will readily know what "consistency" means when making these (and countless other) nuanced and highly contentious decisions is fanciful. The provision invites arbitrary enforcement and is calculated to chill websites' First Amendment rights.

### B. The Candidate Post-Prioritization Provision Is Unconstitutionally Vague.

Defendants' bid for summary judgment on the post-prioritization candidate provision likewise falls short. While "vague in all its applications" remains the wrong standard, this provision is incomprehensible. It prohibits any action to

prioritize candidate-related content "ahead of, below, or in a more or less prominent position than others." §501.2041(1)(e), (2)(h). *All* arrangements of content place it either "in a more or less prominent position than" other content. As this Court explained, the provision is self-defeating and nonsensical: if it "cannot or will not be applied literally, a social media platform is left with no way to determine what the provision really requires." MTD.Op.36-37.

Defendants offer no basis for departing from that analysis—especially since discovery confirms members cannot comprehend the provision. Potts.Decl.¶40; Vasquez.Decl.¶¶38-39; Duba.Decl.¶¶73-74; Fernandez.Decl.¶35; Veitch.Decl.¶33. Defendants posit that, under the provision, "platforms cannot use algorithms to show users posts 'by or about' a candidate if those algorithms arrange the posts in a way that is not chronological." Fla.MSJ.50. But that rule (while reinforcing the provision's First Amendment problems, *see supra* pp.20-26) cannot be drawn from the text, which prohibits placing content "above" or "below" other content and says nothing about chronological sorting. Compounding matters, even when an entity orders material chronologically, it must choose whether to place new posts at the top or the bottom of a feed—the very choice the provision purportedly proscribes.

Even under Defendants' atextual reading, questions abound: If algorithms do not arrange posts chronologically, can they exclude posts by or about a candidate, or is that another violation? If such posts must be included, must *all* feeds on *all*

53

covered services be chronologically listed because a candidate-related post might slip in?  Must candidate posts be placed in chronological order atop an otherwise non-chronological feed?  Beyond directly violating the First Amendment, this provision is hopelessly vague.  Defendants have no viable way to save it.

## V.    Defendants' Remaining Arguments Lack Merit.

### A.    Defendants' Common Carrier Argument Lacks Merit.

Defendants next revive their common-carrier argument.  Fla.MSJ.45-47.  But that argument was rejected expressly by the Eleventh Circuit, *NetChoice*, 34 F.4th at 1220-22, and implicitly by the Supreme Court.  For good reason:  The government cannot evade First Amendment scrutiny by purporting to regulate a private party as a "common carrier."  *Id.* at 1221.  "Labeling" a regulation that overrides editorial discretion "a common carrier scheme has no real First Amendment consequences" because, however one characterizes it, "the net effect is the same: operators' speech rights are restricted to make room for" others.  *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 825 (1996) (Thomas, J., concurring in judgment).  So whether one calls S.B.7072 a common-carrier regulation, an editorial-discretion regulation, or something else, what matters is that it intrudes on websites' First-Amendment-protected activity.

At any rate, the record belies Florida's (unsupported) assertion that members "do not 'make individualized decisions, in particular cases, whether and on what

54

terms to deal.'"  Fla.MSJ.45-46.  The record is replete with evidence that Plaintiffs' members make (and publicize that they make) individualized editorial decisions regarding third-party content posted to their services.  Am.MSJ.3-9.  S.B.7072 exists because Florida lawmakers admittedly did not like how members exercised their editorial discretion.  Florida thus is not regulating Plaintiffs' members because they *are* common carriers; it seeks to convert them *into* common carriers that must disseminate content from Florida's preferred users.  That is just another way to describe an impermissible effort to override the editorial policies of websites that curate and disseminate third-party content.  The First Amendment forbids such efforts. *Moody*, 603 U.S. at 728; *303 Creative v. Elenis*, 600 U.S. 570, 578, 590, 592 (2023) ("deploy[ing]" public accommodations law "to compel speech" violates First Amendment, even though it "grow[s] from nondiscrimination rules … imposed on common carriers").

History reinforces that conclusion.  Though the common law imposed a duty on "common carriers" and "traditional public accommodations" like innkeepers, ferries, and stagecoaches to serve the public without discrimination, *id.* at 590-91, there is no comparable tradition of imposing common-carrier-like regulations on parties making editorial decisions.  Such regulations were anathema to the Framers: At the Founding, "[t]he Federal Government could not compel book publishers to accept and promote all books on equal terms or to publish books from authors with

different perspectives."  *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 427 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).

So too here.  Websites like Plaintiffs' members are not mere "conduit[s] for the speech of others," transmitting it on an "unedited basis" from point A to point B, *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 629 (1994), nor "passive receptacle[s] or conduit[s] for news, comment, and advertising," *Tornillo*, 418 U.S. at 258.  They do not hold their websites out as being available on an indiscriminate or neutral basis. *See FCC v. Midwest Video Corp.*, 440 U.S. 689, 701-02 (1979).  And as their editorial policies confirm, Am.MSJ.3-9, their entire business depends on making decisions about which speech to disseminate and how.  *Cf. Am. Orient Express Ry. v. Surface Transp. Bd.*, 484 F.3d 554, 557 (D.C. Cir. 2007).  Plus, Congress has gone out of its way to enable websites to weed out objectionable content, *see* 47 U.S.C. §230, and expressly disclaimed any intent to treat them as common carriers, *id.* §223(e)(6), confirming that they are nothing like traditional common carriers.

Furthermore, *contra* Fla.MSJ.46-47, S.B.7072 looks nothing like a traditional common-carrier regulation.  The hallmark of common-carrier regulation is a duty on all involved to provide services to all comers without impermissible discrimination. *E.g.*, Telegraph Lines Act, ch.772, §2, 25 Stat. 382, 383 (1888); *W. Union Tel. v. James*, 162 U.S. 650, 651 (1895).  That is decidedly not what S.B.7072 requires. Rather than regulate all those who operate certain websites, it singles out only the

largest websites based on perceived ideological bent.  Rather than require regulated entities to serve all comers, S.B.7072 seeks to control how websites exercise their editorial discretion through novel burdens like the detailed-explanation requirement. And far from demanding non-discrimination, it requires websites to favor certain content (candidate-related material) and speakers (candidates and journalistic enterprises).

As both the Eleventh Circuit and Supreme Court have confirmed, that is not common-carrier regulation; it is an unadorned effort to "burden the speech of others … to tilt public debate in a preferred direction."  *Sorrell*, 564 U.S. at 578-79.

### B.  Plaintiffs Have a Valid §1983 Cause of Action.

That leaves Defendants' §1983 argument, Fla.MSJ.52—another recycled contention this Court rejected because "[t]he Eleventh Circuit, like the Supreme Court and Fifth Circuit, has allowed associations to assert their members' rights under §1983," MTD.Op.29 (collecting cases).  There is no reason to revisit that well-considered holding.

Tellingly, Florida does not dispute that Plaintiffs' members have a cause of action under §1983.  And "an organization has standing to sue to redress [members'] injuries" without its own injury or "a statute explicitly permitting associational standing."  *Borrero*, 610 F.3d at 1305.  Hence, courts routinely permit associations to sue on behalf of their members in §1983 cases.  *Virginia v. American Booksellers*

*Ass'n* was a §1983 case brought by "organizations with memberships consisting of national and Virginia booksellers." 484 U.S. 383, 388 n.3 (1988); *see Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789-90 (2011). Likewise, *Moms for Liberty v. Brevard Public Schools*, allowed the plaintiff association to seek "nominal damages" under §1983 on behalf of its "members." 118 F.4th 1324, 1330 (11th Cir. 2024). Indeed, modern associational-standing doctrine *started* with a §1983 case. *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975). The upshot is that §1983 "is an appropriate vehicle for third-party claims." *Vote.Org v. Callanen*, 89 F.4th 459, 473 (5th Cir. 2023).

Despite this mountain of authority, Florida protests that none "grapple[d] with" §1983's text. Fla.MSJ.52. But "Congress intended [§1983] to be construed in the light of common-law principles." *Rehberg v. Paulk*, 566 U.S. 356, 362-63 (2012). Associational standing "rests on the premise that" particular relationships "rebut the background presumption … that litigants may not assert the rights of absent third parties." *Brown Grp.*, 517 U.S. at 557. So while "Congress can withdraw the right to sue," courts do not presume that it has vitiated associational standing merely because it declines to expressly recognize it when specifying who may invoke a cause of action. *E.g., S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund*, 326 F.3d 919, 922 (7th Cir. 2003). There is no reason to treat §1983 differently.

Moreover, the only practical effect of Defendants' argument relates to the availability of attorney's fees. Fla.MSJ.52. Plaintiffs' entitlement to declaratory and injunctive relief would be unaffected, MTD.Op.28, given relief from state action that violates federal law is independently available under longstanding equitable principles and *Ex parte Young*, 209 U.S. 123 (1908). Attorneys' fees are not presently at issue, so Defendants' (meritless) argument is at best premature. It does not entitle them to summary judgment on the substance of Plaintiffs' claims.

## CONCLUSION

The Court should deny Defendants' motion.

59

Respectfully submitted,

s/Erin E. Murphy
Paul D. Clement
Erin E. Murphy
James Y. Xi
Mitchell K. Pallaki
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
mitchell.pallaki@clementmurphy.com

Brian M. Willen
Steffen N. Johnson
Paul N. Harold
WILSON SONSINI GOODRICH &
ROSATI, P.C.
1700 K Street NW
Washington DC 20006
(202) 973-8800
bwillen@wsgr.com
sjohnson@wsgr.com
pharold@wsgr.com

Lauren Gallo White
WILSON SONSINI GOODRICH &
ROSATI, P.C.
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA 94105
(415) 947-2000
lwhite@wsgr.com

Douglas L. Kilby
Florida Bar No. 0073407
Hannah E. Murphy
Florida Bar No. 1032759
STEARNS WEAVER MILLER
WEISSLER ALHADEFF &
SITTERSON, P.A.
Highpoint Center
106 East College Avenue, Suite 700
Tallahassee, FL 32301
(850) 580-7200
dkilby@stearnsweaver.com
hmurphy@stearnsweaver.com

Benjamin S. Hewitt
WILSON SONSINI GOODRICH &
ROSATI, P.C.
31 West 52nd Street
Fifth Floor
New York, NY 10019
(212) 453-2804
bhewitt@wsgr.com

*Counsel for Plaintiffs NetChoice, LLC and Computer & Communications
Industry Association*

May 1, 2026

60

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment has 12,749 words, which is fewer than the 12,750 words that this Court authorized by this Court's Order on Summary-Judgment Procedures (ECF No. 283).

May 1, 2026                                     s/Erin E. Murphy
                                               Erin E. Murphy


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 1st day of May, 2026.

May 1, 2026                                     s/Erin E. Murphy
                                               Erin E. Murphy