# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

NETCHOICE, LLC, et al.,

     Plaintiffs,

v.

JAMES UTHMEIER, in his official
capacity as Attorney General of the
State of Florida, et al.,

     Defendants.

_____/

Case No. 4:21-cv-220-RH/MAF

**PUBLIC REDACTED**

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY FROM DR. RAVI BAPNA

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION ...........................................................................................................1

LEGAL STANDARD .......................................................................................................3

ARGUMENT..................................................................................................................6

I.  Dr. Bapna Is Qualified to Opine on Social Media Algorithms and Machine-Learning Systems and How They Compare to Human Expression. ..........................................6

    A.  Dr. Bapna Does Not Offer Impermissible Legal Opinions..............................8

    B.  Dr. Bapna Is Qualified to Offer His Opinions About Whether Algorithmic and Machine-Learning Systems Resemble Human Expression.......................13

II.  Dr. Bapna's Opinions Are Reliable.........................................................................15

III. Dr. Bapna's Testimony Is Helpful and Relevant.......................................................28

CONCLUSION .............................................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Ala. & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*,
    817 F. Supp. 1319 (E.D. Tex. 1993) ........................................................................10

*Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*,
    555 F.3d 1331 (11th Cir. 2009) ..............................................................4, 15, 16, 20

*Bray & Gillespie Plaza, LLC v. Lexington Insurance Co.*,
    No. 6:07-cv-222, 2010 WL 11453162 (M.D. Fla. Jan. 27, 2010) .........................12

*Burns v. Town of Palm Beach*,
    999 F.3d 1317 (11th Cir. 2021) ....................................................................9, 10, 11

*Cook ex rel. Est. of Tessier v. Monroe Cnty. Sheriff*,
    402 F.3d 1092 (11th Cir. 2005) ...............................................................................8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .......................................................................... 3, 4, 5, 8, 15, 24

*Hendrix v. Evenflo Co.*,
    255 F.R.D. 568 (N.D. Fla. 2009) ...........................................................................3

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ...................................................................................... 9, 29

*In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*,
    No. 4:22-md-03047-YGR, 2026 WL 775421
    (N.D. Cal. Mar. 17, 2026) ........................................................................17, 18, 25

*ISKCON Miami, Inc. v. Metropolitan Dade County*,
    147 F.3d 1282 (11th Cir. 1998) .............................................................................10

*J.L. Spoons, Inc. v. Ohio Dep't of Pub. Safety*,
    31 F. Supp. 3d 933 (N.D. Ohio 2014) ....................................................................10

*Knepfle v. J-Tech Corp.*,
    48 F.4th 1282 (11th Cir. 2022) ..............................................................................30

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................ 3, 4, 5, 16, 24

*Montgomery v. Aetna Casualty & Surety Co.*,
    898 F.2d 1537 (11th Cir. 1990) ........................................................................ 11, 12

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ........................................................................................2, 28, 29

*Moore v. Intuitive Surgical, Inc.*,
  995 F.3d 839 (11th Cir. 2021) ...................................................................................8

*NetChoice, LLC v. Bonta*,
  152 F.4th 1002 (9th Cir. 2025) ......................................................................... 28, 29

*One Wisconsin Now v. Kremer*,
  354 F. Supp. 3d 940 (W.D. Wis. 2019) ...................................................................12

*Plott v. NCL America, LLC*,
  786 F. App'x 199 (11th Cir. 2019) .........................................................................11

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ........................................................ 2, 5, 6, 22, 28

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) .................................................................................3

*Smith v. BMW N.A., Inc.*,
  308 F.3d 913 (8th Cir. 2002) ...................................................................................14

*United States v. Bedford*,
  536 F.3d 1148 (10th Cir. 2008) .................................................................................9

*United States v. Brown*,
  415 F.3d 1257 (11th Cir. 2005) ................................................................2, 3, 5, 6, 28

*United States v. Frazier*,
  387 F.3d 1244 (11th Cir. 2004) ........................................................... 4, 5, 15, 16, 30

*United States v. Graham*,
  123 F.4th 1197 (11th Cir. 2024) .................................................................9, 21, 22

*United States v. Milton*,
  555 F.2d 1198 (5th Cir. 1977) ...................................................................................9

*United States v. Thoma*,
  726 F.2d 1191 (7th Cir. 1984) .................................................................................10

## Statutes, Rules, and Legislative Materials

FED. R. EVID.
  702.......................................................................................................................3, 5, 16
  702(a) .................................................................................................................5, 11, 15
  702 advisory committee's note to 2000 amendments....................... 4, 5, 16, 23, 26

**INTRODUCTION**

Plaintiffs ask this Court to exclude the testimony of Defendants' expert witness, Dr. Ravi Bapna, one of the nation's leading scholars in the fields of artificial intelligence, machine learning, and engagement prediction in digital platforms. Dr. Bapna was retained to provide expert opinion on technical questions at the heart of this case: how do social media algorithms actually work, and what role do humans play in determining what content appears in individual users' feeds? Those questions are squarely within Dr. Bapna's extensive technical expertise, and his testimony will help the Court, in its capacity as the factfinder, understand the complex technological systems at the center of this litigation. Plaintiffs' motion should be denied.

Plaintiffs' motion rests on three flawed premises. First, Plaintiffs contend that Dr. Bapna may not testify about the relationship between algorithmic and machine-learning systems and human expression. But Rule 702 and Dr. Bapna's years of research and teaching experience permit him to describe how those systems are designed and function in terms that are helpful to the trier of fact.

Second, Plaintiffs attack Dr. Bapna's testimony as unreliable, seizing on unremarkable deposition testimony in which he explained that his opinions were based on experience and analytical reasoning. To generate his opinions, Dr. Bapna synthesized 25 years of expertise, textbook principles of algorithms and machine learning, and his review of publicly available literature and internal documents from Plaintiffs' members. For technical opinion based on expertise, that methodology is not only reliable but is

1

also the same methodology that Plaintiffs' rebuttal expert Dr. Christopher Bail used. If anything, Dr. Bapna's methodology was *more* rigorous because he did not, as Dr. Bail did, first decide what to opine and then farm out the task of finding supporting citations to support staff. Plaintiffs apply a blatant double standard.

Third, Plaintiffs argue that Dr. Bapna's opinions are legally irrelevant because, even if credited, any level of content moderation renders all their activities expressive. That argument defies *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). And it also ignores the crucial role that the factual record plays in First Amendment challenges. The key question in this case is whether different functions of social media platforms are expressive. Dr. Bapna's testimony speaks directly to that question by explaining the complex algorithmic and machine-learning systems that Plaintiffs' members use to recommend content.

Plaintiffs' motion also contains many thinly veiled attempts to persuade the Court to overstep its role under Rule 702 and weigh the persuasiveness of Dr. Bapna's testimony before it reaches the merits. The Eleventh Circuit has cautioned against "mak[ing] ultimate conclusions as to the persuasiveness" at this stage. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Plaintiffs have their own expert and will have ample opportunity to challenge Dr. Bapna's opinions through cross-examination and contrary evidence. Moreover, this will be a bench trial, not a jury trial. "There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir.

2005). After hearing Dr. Bapna's testimony, the Court is more than capable of deciding what weight to give that testimony.

## LEGAL STANDARD

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. A proponent of expert testimony bears the burden to establish three elements necessary for the admission of that testimony by a "preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

First, an expert must possess the "knowledge, skill, experience, training, or education," FED. R. EVID. 702, necessary to "testify competently regarding the matters he intends to address," *Rink*, 400 F.3d at 1291 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The "standard for determining an expert's qualifications to testify on a given topic is not stringent." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009). If the witness "is minimally qualified, objections to 'the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Id.* (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997)).

Second, expert testimony must be reliable. *Daubert*, 509 U.S. at 589. Expert testimony is reliable if it is "based on sufficient facts or data," is the "product of reliable principles and methods," and "reflects a reliable application" of those principles and methods. FED. R. EVID. 702. A district court must ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the

3

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Not every kind of expert testimony lends itself to consideration of factors such as testing, peer review, and error rates that *Daubert* identified as potential indicia of reliability. *Id.* at 151. District courts retain "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. The factors that *Daubert* identified were "illustrative, not exhaustive," and may be, but need not be, useful for "evaluating the reliability of proffered expert opinion." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (en banc). To be sure, those factors may be salient for evaluating "scientific" testimony that "represents *a process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" through the "scientific method." *Id.* at 1261 n.14 (quoting *Daubert*, 509 U.S. at 590). But "[s]tandards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony." *Am. Gen. Life Ins. Co. v. Schoenthal Fam., LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009).

For "non-scientific, experience-based testimony," "other questions may be more useful." *Frazier*, 387 F.3d at 1262. A district court "may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'" *Schoenthal Fam.*, 555 F.3d at 1338 (quoting *Kumho Tire*, 526 U.S. at 150). An expert need only "explain *how* that experience leads to the conclusion reached, why that experience is a sufficient

basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendments).

Third, expert testimony must be relevant. *Daubert*, 509 U.S. at 589. Expert testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person," *Frazier*, 387 F.3d at 1262, and will aid the factfinder "in deciding the particular issues in the case." *Kumho Tire*, 526 U.S. at 156 (quoting 4 J. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE ¶702.05[1], pp. 702-33 (2d ed. 1998)).

Importantly, a district court's gatekeeping role under *Daubert* is not a license to exclude testimony merely because the opposing party disagrees with the expert's opinion. This role "is not intended to supplant the adversary system or the role of the" factfinder. *Quiet-Tech.*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. "[C]onsistent with the 'liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony,'" *Brown*, 415 F.3d at 1268 (quoting *Daubert*, 509 U.S. at 588), the "barriers" to such testimony "are even more relaxed in a bench trial situation, where the judge is serving as factfinder and we are not concerned about

5

'dumping a barrage of questionable scientific evidence on a jury,'" *id.* (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999)). Conclusions about the "persuasiveness of the proffered evidence" do not bear on its admissibility. *Quiet Tech.*, 326 F.3d at 1341.

## ARGUMENT

### I. Dr. Bapna Is Qualified to Opine on Social Media Algorithms and Machine-Learning Systems and How They Compare to Human Expression.

Dr. Bapna is a leading scholar in the fields of artificial intelligence, machine learning, engagement prediction, and algorithmic personalization on digital platforms. Dr. Bapna is qualified to offer opinions on these issues, and Plaintiffs' argument to the contrary cannot be squared with his credentials.

Dr. Bapna earned his Ph.D. in Information Systems at the University of Connecticut and currently serves as the Curtis L. Carlson Chair Professor in Business Analytics and Information Systems at the University of Minnesota's Carlson School of Management. Bapna Report ¶8, DE293-1; Bapna CV 1, DE290-4. The discipline of information systems studies "how computing and computing technologies interact with organizational and human factors." Bapna Tr.25:10-14, attached hereto as Exhibit A.

Dr. Bapna is a leader in this field: the INFORMS Information Systems Society recognized Dr. Bapna as a Distinguished Fellow, and he also served as President of the society; Dr. Bapna has served as a Senior Editor of *MIS Quarterly*, currently serves as a Senior Editor of *Information Systems Research*, and has served as a reviewer for over a

6

dozen publications; and Dr. Bapna has spent over 25 years researching, publishing, and teaching in areas directly relevant to this case. Bapna Report ¶8, DE293-1; Bapna CV 2-9, 18-19, DE290-4.

Many of Dr. Bapna's publications concern social influence and engagement, analytics, AI and machine learning, digital transformation, and the economics of information systems. Bapna CV 4-6, DE290-4; Bapna Report ¶9, DE293-1. He has published 45 refereed journal articles in top tier academic journals such as *Management Science*, *Information Systems Research*, and *MIS Quarterly*, Bapna Report ¶8, DE293-1, and contributed to others including a paper on user content generation, Bapna CV 10, DE290-4. He is the co-author of a peer-reviewed, award-winning book published by MIT Press on the impact of AI on human well-being. Bapna Report ¶10, DE293-1; Bapna CV 4, DE290-4.

He also has given numerous lectures on AI, machine learning, and online social influence and engagement including "Competing in the Age of AI and Machine Learning," "Marketing in the Age of AI: The New 4 Ps: Participation, Platform, Personalization, Prediction," and "Explorations of Online Social Influence and Engagement." Bapna CV 7-9, DE290-4. He has taught numerous courses on leveraging social media for business and marketing, which "involves explaining how . . . these platforms operate, what the underlying technology is, and then how businesses can use it." Bapna Tr.29:1-19, 30:10-14 (Ex. A); Bapna CV 19-20, DE290-4. And he has taught

executive education programs on AI, machine learning, and analytics for organizations including Google, 3M, Optum, and Ameriprise. Bapna CV 19, DE290-4.

Dr. Bapna is qualified to testify for the "task at hand," *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (quoting *Daubert*, 509 U.S. 597), which is to help the factfinder understand how the algorithms and machine learning function, what signals they optimize, how engagement prediction works, and what role human judgment plays in algorithmic feed determination. Dr. Bapna's expertise in AI, machine learning, engagement prediction, and information systems places him squarely at the center of these questions. This is not a case in which an expert seeks to testify about a subject unrelated to his training. Dr. Bapna is being asked to opine on the technological systems he has studied, taught, and published about for his entire career.

Plaintiffs nevertheless assert that portions of Dr. Bapna's testimony are outside his bailiwick and thus should be excluded because they are either (a) impermissible legal opinions or (b) outside the scope of his expertise. Both arguments fail.

### A. Dr. Bapna Does Not Offer Impermissible Legal Opinions.

First, Dr. Bapna does not offer impermissible legal opinions about the connection between algorithmic and machine-learning systems and human expression. *See* Pls.' Mot. to Exclude Expert Testimony 12-14, DE289 (Apr. 3, 2026) ("Mot."). Although an expert may not present a "purely legal conclusion . . . without any supporting factual basis," *Cook ex rel. Est. of Tessier v. Monroe Cnty. Sheriff*, 402 F.3d 1092, 1113 (11th Cir. 2005), an "expert may . . . refer to the law in expressing his or her

opinion," *United States v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (quoting *A.E. ex rel. Evans v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991)).

"The provinces of judge, [factfinder] and expert witness are not cartographically immutable and precise," so district courts "must accommodate to the expertise that the [factfinder] must receive from those who possess it, lest the [factfinder] flounder in confusion begotten by the arcane." *United States v. Milton*, 555 F.2d 1198, 1204-05 (5th Cir. 1977). For that reason, the old-Fifth Circuit held that a district court did not err in admitting expert testimony that certain bookmaking activities established that a criminal defendant, who was charged with conducting an "illegal gambling business," *id.* at 1199 & n.1 (quoting 18 U.S.C. § 1955(a)), was "part of the gambling business" because the expert "was interpreting an otherwise obscure transcript and drawing upon his experience in the field to give some content to the role of the commissioned bookmaker," *id.* at 1204. And the Eleventh Circuit recently reaffirmed that "[j]ust because" something "has a legal definition (or prescribed legal parameters) does not . . . transform[] [it] into a question of law." *United States v. Graham*, 123 F.4th 1197, 1269 (11th Cir. 2024).

Expert testimony about the expressive nature of regulated conduct is commonplace in First Amendment litigation. The "reaches of the First Amendment are ultimately defined by the facts it is held to embrace." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 567 (1995). Accordingly, courts have relied on expert testimony to answer First Amendment questions regarding the expressive nature of

9

architecture, *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1333 (11th Cir. 2021); the expressive significance of cultural practices, *Ala. & Coushatta Tribes of Tex. v. Trs. of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1333 (E.D. Tex. 1993); the effectiveness of designated expression zones, *ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1290 (11th Cir. 1998); and the expressive nature of nude dancing, *J.L. Spoons, Inc. v. Ohio Dep't of Pub. Safety*, 31 F. Supp. 3d 933, 939-40 (N.D. Ohio 2014). Indeed, in some obscenity prosecutions expert testimony is *necessary* for the government to prove its case. *See United States v. Thoma*, 726 F.2d 1191, 1200 (7th Cir. 1984) ("[A]bsent some expert guidance as to how such violence appeals to the prurient interest of a deviant group, there is no basis upon which a trier of fact could deem such material obscene."). In each of these cases, the expert testimony addressed issues of constitutional fact intimately connected with whether certain activity was protected by the First Amendment. Dr. Bapna's testimony about the connection between human expression and algorithmic and machine-learning systems does the same.

What is more, the Eleventh Circuit has *faulted* a litigant for failing to produce expert testimony that connected conduct to human expression. In *Burns*, the Eleventh Circuit considered whether the architectural design of a residence implicated the First Amendment and explained that the record contained "no evidence that residential architecture has been used over the millennia to convey a message." 999 F.3d at 1344. Although one expert "said that a custom design enhanced the expressive nature of a house" and another "chronicled the development of architecture as an art form," the

10

Eleventh Circuit sought more: "evidence that residential architecture, specifically, has a historical association with communicative elements that would put a reasonable observer on notice of a message from [the litigant's] house." *Id.* at 1344-45. It cannot be that Dr. Bapna's testimony on the connection between human expression and algorithmic and machine-learning systems constitutes impermissible legal opinion when the Eleventh Circuit has required the very same kind of testimony with respect to architecture.

Dr. Bapna's opinions go to the factual issue of the expressive nature of Plaintiffs' algorithmic and machine-learning systems. *See* Bapna Report ¶¶2, 3(e), 15, 27, 47, 58, 60, 66, DE293-1; Suppl. Bapna Report ¶1(g), DE293-2. He does not opine on the legal meaning of the First Amendment, define the boundaries of protected speech, or purport to instruct the Court on constitutional doctrine. He instead explains, based on his technical expertise, how social media systems select, rank, and display content to users; the role that user engagement and humans play in that process; and how the outputs of these systems compare to traditional human editorial curations. Dr. Bapna's testimony on these technical issues is admissible because it will "help the trier of fact to understand the evidence." FED. R. EVID. 702(a).

The authorities on which Plaintiffs rely also do not help them. Indeed, *Montgomery v. Aetna Casualty & Surety Co.* supports the admission of Dr. Bapna's opinion as it explained an "expert may testify as to his opinion on an ultimate issue of fact." 898 F.2d 1537, 1541 (11th Cir. 1990). Unlike the expert there who testified that a litigant had a

11

particular legal duty, *id.*, Dr. Bapna's testimony does not answer a pure question of law and instead addresses the factual nature of social-media platforms systems. Similarly, in *Plott v. NCL America, LLC*, the expert opined on whether conduct was reasonable under the law, a pure question of law. 786 F. App'x 199, 203-04 (11th Cir. 2019). In *Bray & Gillespie Plaza, LLC v. Lexington Insurance Co.*, the expert testified about whether a contract was formed, again a question of law. No. 6:07-cv-222, 2010 WL 11453162, at *3 (M.D. Fla. Jan. 27, 2010).

Nor does *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 942 n.1 (W.D. Wis. 2019), carry the weight that Plaintiffs ascribe to it. *One Wisconsin Now* excluded testimony that "simply describe[d] caselaw in a way that is neither helpful to the court, nor within Culver's area of expertise" or "opine[d] on ultimate legal questions" but admitted testimony that "use[d] the law as a framework for discussing specific features of Twitter," including how the expert's "understanding as to how Twitter activities can constitute political speech" informed her "opinions concern[ing] how citizens can use Twitter to engage in political discussions." *Id.* at 942-43.

Had Dr. Bapna opined that Plaintiffs' algorithmic and machine-learning systems were unprotected by the First Amendment, his testimony would venture into the territory of legal conclusions. But he does no such thing. Dr. Bapna instead explains how those systems work, the role of user engagement and humans in their operation, and how that compares to forms of human expression understood by laypersons. The Court retains full authority to determine what legal significance, if any, those facts carry.

**B. Dr. Bapna Is Qualified to Offer His Opinions About Whether Algorithmic and Machine-Learning Systems Resemble Human Expression.**

Second, Plaintiffs' related argument that Dr. Bapna is not qualified to give testimony that compares algorithmic and machine-learning systems to human expression also fails. *See* Mot. 14-16. Plaintiffs' argument is a linguistic sleight of hand that divorces Dr. Bapna's expertise in algorithms and machine-learning systems from his descriptions of those systems as they relate to human expression.

At its core, Plaintiffs' argument faults Dr. Bapna for using his expertise in algorithmic and machine-learning systems to "help the trier of fact" as Rule 702 requires. FED. R. EVID. 702(a). Dr. Bapna offers opinions about how the use of algorithms and machine-learning systems at social media companies "relates to the idea of expressivity and editorial choice as interpreted in the First Amendment." Bapna Report ¶2, DE293-1. In offering those opinions, Dr. Bapna describes—based on design, function, and inputs and outputs, among other things—how and why algorithmic and machine-learning systems fail to reflect content preferences of human beings at social media companies and those human beings' deliberate curative choices. *Id.* ¶¶15, 17, 47, 58, 60, 66. Those opinions are squarely within Dr. Bapna's area of expertise because they are simply descriptive observations about how algorithmic and machine-learning systems work, drawn from Dr. Bapna's research and experience. Dr. Bapna can identify the absence of those expressive characteristics precisely because he is an expert in algorithmic and machine-learning systems whereas an expert in human

13

expression—assuming there is such a thing—would be utterly incapable of identifying those flaws because that person would lack understanding of these complex systems. Dr. Bapna was spot on when he testified that he did not need to be an expert in speech to describe the process by which content is presented to users on social media platforms. Bapna Tr.41:2-6 (Ex. A).

It is an abuse of discretion to exclude expert testimony simply because it touches on adjacent areas of expertise. *See Smith v. BMW N.A., Inc.*, 308 F.3d 913, 919-20 (8th Cir. 2002). Indeed, the Eighth Circuit held that a district court abused its discretion when it excluded the testimony of a forensic pathologist about the cause of a decedent's injuries because the pathologist was not "an expert in biomechanics, physics, or engineering." *Id.* Just because "experts in other fields might also be able to form opinions regarding the cause of [the] injury and would base those opinions on factors other than those used" by the forensic pathologist did not disqualify the forensic pathologist "from offering testimony that would be helpful to the jury" because he "based [his] opinion on information that fell within his field." *Id.* at 919.

Dr. Bapna's testimony about how algorithmic and machine-learning systems relate to human expression is like the testimony of the forensic pathologist. Like the forensic pathologist who explained why certain injuries suggested that the decedent was injured in a particular way, *id.*, Dr. Bapna relies on information within his area of expertise, i.e., algorithmic and machine-learning design and function and principles of content personalization, Bapna Rep. ¶¶15, 17, 58, 60, 66, to opine on an issue relevant

14

to Plaintiffs' challenges to S.B.7072 in a way that ordinary persons can understand. In a real sense, and contrary to Rule 702, Plaintiffs fault Dr. Bapna for opining in a way that "help[s] the trier of fact." FED. R. EVID. 702(a).

## II. Dr. Bapna's Opinions Are Reliable

Dr. Bapna's opinions are reliable because they are based on his two-and-a-half decades of teaching and research experience in information systems, AI, machine learning, and engagement. Dr. Bapna explained how that experience and basic principles from his field inform his opinions about Plaintiffs' members' algorithmic and machine-learning systems. He cited authorities for numerous assertions in his reports. And he considered contrary evidence, both in materials he located in his own research and in internal documents from Plaintiffs' members that he reviewed. Plaintiffs' various attempts to undermine his reliability all fail.

Plaintiffs' reliability arguments proceed from a flawed premise: Dr. Bapna's testimony must satisfy *Daubert* factors designed for scientific testimony. Plaintiffs invoke testing, peer review, and general acceptance and latch onto a quote about methodology from Dr. Bapna's deposition. Mot. 18-19, 22. But those are indicia of reliability that *Daubert* prescribed for scientific testimony that "represents *a process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" through the "scientific method." *Frazier*, 387 F.3d at 1261 n.14 (quoting *Daubert*, 509 U.S. at 590). "Standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony." *Schoenthal*

15

*Fam.,* 555 F.3d at 1338. For other kinds of expert testimony, "personal knowledge or experience" may establish reliability. *Kumho Tire*, 526 U.S. at 150.

Contrary to Plaintiffs' efforts to hold Dr. Bapna to scientific standards, Dr. Bapna's testimony is based on experience. Dr. Bapna does not propose a scientific theory subject to empirical testing. Indeed, as Dr. Bail himself has written, "[l]arge-scale experiments" in this area would be "limited by the corporate interests of social media platforms and the risks such experiments may pose to human subjects." Bail Dep. Ex. 18 at 2, attached hereto as Exhibit B; Bail Dep. Tr.283:4-284:20, attached hereto as Exhibit C. Dr. Bapna instead draws on 25 years of teaching and research experience in information systems, AI, machine learning, and engagement, Bapna Report ¶9, DE293-1, to explain how recommendation algorithms and machine-learning systems function. For this kind of testimony, the relevant question is whether Dr. Bapna "explain[s] *how* that experience leads to the conclusion [he] reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendments).

Dr. Bapna's testimony satisfies that standard. His report reflects knowledge accumulated through "25 years" in the field of information systems; "attend[ing] conferences where people present work, [and] recommend the systems"; "teach[ing] executives who are building these kind of systems"; "teach[ing] classes"; and publishing refereed and peer-review works regarding social influence and engagement, analytics,

16

AI and machine learning, digital transformation, and the economics of information systems. Bapna Tr.56:1-18, 58:6-13 (Ex. A); Bapna CV 4-6, DE290-4; Bapna Report ¶9, DE293-1. Dr. Bapna explained why that experience is a sufficient and reliable basis for his opinion about the use of algorithmic and machine-learning systems at social media platforms when he testified that the process by which content is presented to users turns on "fundamental machine learning principles" derived from the "CRISP-DM methodology which is common knowledge" in his field and "textbook material" that "would be the first thing that [he] would teach in an executive MBA course or any course actually, even to undergrads." Bapna Tr.58:10-21 (Ex. A). Dr. Bapna further explained that his knowledge of that commonly accepted methodology is how he explains "the process by which . . . social media content is generated." *Id.* 58:21-59:1.

A federal district court recently applied the same test to testimony from a former Meta employee and denied a motion to exclude his testimony. *In re Soc. Media Adolescent Addiction/Pers. Injury Prods. Liab. Litig.*, No. 4:22-md-03047-YGR, 2026 WL 775421, at *17-18 (N.D. Cal. Mar. 17, 2026). Like Dr. Bapna, the employee had substantial experience in the areas in which he would opine. *Id.* And like Dr. Bapna the employee "explained how he applied the same methods used throughout his career . . . to the issues upon which he s[ought] to opine." *Id.* at *17. The court explained that the employee "need not offer analysis of academic literature nor a peer-reviewed scientific methodology for those opinions based on his relevant industry experience" and noted that "practical and hands-on experience" is "[s]ometimes" "more persuasive than the

purely scientific." *Id.* Save for the fact that Dr. Bapna gained his experience working in academia rather than industry[1]—though he has taught programs on AI and machine learning for organizations including Google, 3M, Optum, and Ameriprise, Bapna CV 20, DE290-4—the reliability of his testimony is no different.

Dr. Bapna's report bolsters his testimony about the basis for and reliability of his opinions. Dr. Bapna cited authorities to support his opinions that social media platforms are increasingly relying on algorithms that use AI or machine learning,[2] that social media platforms rank for engagement,[3] that the CRISP-DM framework provides a "standardized" process for building and evaluating predictive models,[4] that those models "are best characterized as complex social systems,"[5] that social media

[1] At the insistence of Plaintiffs' members, the Protective Order Regarding Non-Party Discovery limited Defendants' ability to choose experts from the social media industry because they could not share protected materials with current employees of a "Party, the Producing Non-Party, a company that Plaintiffs identified [as] a potential witness in their July 3, 2025 disclosures, TikTok, Inc., Snap Inc., or a competitor of the Producing Non-Party" or with a person "anticipated to become an employee" of one of those entities. Protective Order re Non-Party Discovery ¶2.5, DE276 (Jan. 27, 2026).

[2] Bapna Report ¶34, DE293-1 (citing Oversight Board, Content Moderation in a New Era for AI and Automation (Sep. 2024), https://www.oversightboard.com/wp-content/uploads/2024/09/Oversight-Board-Content-Moderation-in-a-New-Era-for-AI-and-Automation-September-2024.pdf, and Meta, *Training AI to detect hate speech in the real world* (Nov. 19, 2025), https://ai.meta.com/blog/training-ai-to-detect-hate-speech-in-the-real-world/).

[3] Bapna Report ¶18, DE293-1 (citing Luke Thorburn, *How Platform Recommenders Work, Understanding Recommenders* (Jan. 20, 2022), https://medium.com/understanding-recommenders/how-platform-recommenders-work-15e260d9a15a).

[4] Bapna Report ¶19, DE293-1 (citing Wirth, R., & Hipp, J. (2000, April). *CRISP-DM: Towards a standard process model for data mining.*, Proceedings of the 4th International Conference on the Practical Applications of Knowledge Discovery and Data Mining (Vol. 1, pp. 29-39)).

[5] Bapna Report ¶24, DE293-1 (citing Narayanan, A. (2023). *Understanding Social Media Recommendation Algorithms*, Knight First Amendment Institute (Mar. 9, 2023), https://knightcolumbia.org/content/understanding-social-mediarecommendation-algorithms.). Dr. Bail himself acknowledges that Dr. Narayanan is well respected in academia. Bail Tr. 290:3-16 (Ex. A). Indeed, Dr. Bail recently attended a Duke AI conference where Dr. Narayanan was the keynote speaker. *Id.* 290:17-22.

algorithms are unpredictable,[6] and that what spreads on social media is the result of users' probabilistic responses to engagement prediction models.[7]

Dr. Bapna's statements that his report is "not a research paper" and that he used "analytical thinking" to arrive at his opinions do not reflect any deficiency in those opinions. Bapna Tr.55:5-19 (Ex. A). True, Dr. Bapna's report is not a research paper that tests a specific hypothesis through an empirical methodology to contribute new knowledge to scholarly literature. It is instead an explanation of how complex technological systems that power social media platforms are designed and function.

Similarly, Plaintiffs' critique of Dr. Bapna's quote about "methodology," Mot. 18-19, takes that quote out of its context as part of a garbled line of questioning. Dr. Bapna initially thought that counsel for Plaintiffs was asking him about CRISP-DM, a methodology for building predictive models discussed in his report. Bapna Tr.52:12-53:7 (Ex. A); Bapna Report ¶20, DE293-1. Counsel for Plaintiffs then stated that he was instead "interested in the methodology [Dr. Bapna] used when formulating [his] opinions" that he offered in his reports, but then asked something different: "So did you use CRISP-DM Cross-Industry Standard Process for Data Mining, as the methodology for formulating the opinions you're offering in this case?" Bapna Tr.54:4-15 (Ex. A). As Dr. Bapna had already explained, CRISP-DM is the "methodology by

---

[6] Bapna Report ¶26, DE293-1 (citing Regehr, K., Shaughnessy, C., Zhao, M., & Shaughnessy, N. (2024). *Safer scrolling: How algorithms popularise and gamify online hate and misogyny for young people.* Association of School and College Leaders (ASCL) & University College London, *available at* https://www.ascl.org.uk/ASCL/media/ASCL/Help%20and%20advice/Inclusio n/Safer-scrolling.pdf.).

[7] Bapna Report ¶28, DE293-1 (citing Narayanan, *supra*).

which . . . data mining and machine learning and predictive modeling is conducted." *Id.* 53:3-7; Bapna Report ¶20, DE293-1. And in answering the question about whether he used CRISP-DM to form his opinions, Dr. Bapna responded "there is no . . . methodology associated with an opinion" and then stated that he was "not totally clear on your question actually." Bapna Tr.55:5-10 (Ex. A). This jumbled line of questioning does not establish that Dr. Bapna had no basis for his opinions. In any event, Plaintiffs' argument about Dr. Bapna's lack of "methodology" is akin to criticizing a mechanic who has worked on cars for 25 years for basing his opinions on how a car engine works on his experience rather than conducting an empirical study of car engines or testing his hypotheses with the scientific method. Rule 702 requires no such thing to establish reliability. *See Schoenthal Fam.,* 555 F.3d at 1338.

If anything, Plaintiffs' critique is even more inapposite because they have chosen to bring facial and quasi-facial challenges on behalf of a fluid set of members whose algorithms and functions change over time. *See* Bail Tr.181:20-182:2 (Ex. C) ("[T]here's many different ways that engagement occurs across different platforms according to the affordances provided by the platform and the design of the platform, and those things significantly change over time."); Rebuttal Report of Christopher Bail ¶51, DE290-6 ("Bail Report") (criticizing Dr. Bapna for citing an analysis of "non-member" TikTok even though NetChoice once again claims TikTok as a member). This case is not about a single product made by a single company using the same parameters for years. Dr. Bapna can use his experience and deep knowledge in the field to reliably

20

opine on social media platforms and algorithms without conducting empirical studies of each social media platform's algorithms and processes for each function.

Plaintiffs' methodological critique is further undermined by the fact that their own expert Dr. Bail—whose report Plaintiffs cite extensively in support of their motion to exclude Dr. Bapna's testimony, Mot. 9-10, 20, 22, 30—used materially the same process as Dr. Bapna. Dr. Bail reviewed publicly available materials, academic literature, and internal company documents and then synthesized those materials through the lens of his professional expertise to reach conclusions about how social media algorithms function. *See* Bail Report ¶11, DE290-6. The vast majority of materials reviewed by Dr. Bail were not peer reviewed. *See* Bail Report App'x B, attached hereto as Exhibit D. Dr. Bail did not even know which of the few "academic literature" items he cited were peer reviewed. Bail Tr.35:12-36:8 (Ex. C). And Dr. Bail repeatedly relied on his experience and knowledge about social media platforms. *See, e.g., id.* ▮▮▮▮▮▮, 97:8-98:3, 99:7-19, 103:16-104:7, ▮▮▮▮▮ 170:5-22, 185:11-186:9, ▮▮▮▮▮.

Some of Dr. Bail's opinions also confirm the propriety of Dr. Bapna's opinions. Dr. Bail testified that "engagement is an important factor that I think most social media companies consider." Bail Tr.297:5-7 (Ex. C). He also testified about the connection between recommending content to increase engagement and editorial judgment. *Id.* 302:6-10. That Plaintiffs champion Dr. Bail's literature-review and experience-based process while arguing that Dr. Bapna's use of the same approach warrants exclusion reveals a double standard. "In the law, what's sauce for the goose is normally sauce for

21

the gander," and the Eleventh Circuit has "applied this commonsense principle of equal treatment in the context of expert witnesses." *Graham*, 123 F.4th at 1266 (quoting *United States v. Knowles*, 889 F.3d 1251, 1257-58 (11th Cir. 2018)). The double standard indicates that Plaintiffs' true objection is not to the reliability of Dr. Bapna's approach but to his conclusions. Yet disagreement with an expert's conclusions is a matter of weight and persuasiveness, not admissibility. *Quiet Tech.*, 326 F.3d at 1341. And while Plaintiffs criticize Dr. Bapna for describing how social media platforms' algorithms operate like mirrors, *see* Mot. 16-17, the analogy is comparable to the central theory of Dr. Bail's book about "the prism-like impact of social media" as it "refracts or reflects" user behavior and thus leads "people to incorrectly perceive other people," Bail Tr.46:17-47:4 (Ex. C).

Plaintiffs unsuccessfully continue their attacks on the weight and persuasiveness of Dr. Bapna's opinions with a charge that Dr. Bapna "haphazardly look[ed] for isolated statements in random sources." Mot. 20. For support, Plaintiffs point to quotes from Thorburn's *How Platform Recommenders Work* that they contend establish that "social media algorithms do more than just promote engagement" and thus render Dr. Bapna's opinions unreliable. *Id.* But Dr. Bapna's reports do not opine that platforms optimize solely for engagement. He describes a system in which engagement prediction is the primary driver of feed composition while content moderation operates as a separate, upstream filter. Bapna Report ¶¶38-42, 58, DE293-1. That description is consistent with Thorburn's statement that moderation is the "first stage." Mot. Ex. 5 at 3

22

(Thorburn 2022 article), DE290-5. Even Plaintiffs acknowledge, consistent with Dr. Bapna's opinion, that Thorburn "note[d] that . . . a primary metric in ranking is how likely a user is to interact with . . . content." Mot. 20. Plaintiffs also contend that Narayanan's *Understanding Social Media Recommendation Algorithms* reveals that recommendation systems "include mechanisms that are not designed to boost engagement but instead to limit the spread of undesirable content." Mot. 21. Yet Dr. Bapna describes the ranking algorithm process as "incorporat[ing] negative signals to demote problematic content." Bapna Report ¶41, DE293-1.

Plaintiffs' accusation that Dr. Bapna failed to acknowledge certain points by relying only on favorable quotes attacks a straw man. Dr. Bapna acknowledged that social media companies develop content moderation policies, that those policies are written by humans, that companies enforce them through both human moderators and algorithmic tools, and that content violating those policies is excluded from recommendation. *Id.* ¶¶31-32, 38-41; Bapna Tr.60:20-61:9, 73:8-16 (Ex. A). Accounting for contrary evidence or alternative explanations is an indicator of reliability. FED. R. EVID. 702 advisory committee's note to 2000 amendments. So these acknowledgments refute Plaintiffs' unfounded contention that Dr. Bapna is unreliable because he ignored contrary evidence. *See* Mot. 21-22.

Plaintiffs' other quibbles with Dr. Bapna's methodology are no basis to exclude his testimony. Plaintiffs critique Dr. Bapna for locating sources through Google searches. Mot. 20. Plaintiffs cite no authority for the proposition that an expert cannot

23

rely on search engines to locate sources, and Dr. Bapna explained in his deposition that in searching for information about YouTube's algorithm he evaluated the relevance and credibility of the source that he selected. Bapna Tr.191:7-10 (Ex. A). In fact, Dr. Bail himself used Google searches to identify supporting materials and, unlike Dr. Bapna, even relied on an uncertain roster of support staff to conduct unknown searches for additional supporting materials. Bail Tr.21:4-22:5, 65:2-7 (Ex. C). Indeed, Dr. Bail's support staff "prepared most of the footnotes" for his rebuttal report. *Id.* 59:13-16. Plaintiffs also suggest that Dr. Bapna should have cited peer-reviewed articles, Mot. 19, but there is no requirement that experts cite peer-reviewed literature, *see Daubert*, 509 U.S. at 594 (peer review is a "relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised"); *see also* Bail Tr.41:4-14 (Ex. C) (explaining how Dr. Bail at one point cited "a popular technology blog," not a peer-reviewed source). Plaintiffs' insistence on peer-reviewed materials also ignores the context of this case, which involves proprietary systems that are best described by company publications and internal documents, which social media companies generally do not make available to academic researchers. *See Kumho Tire*, 526 U.S. at 150 ("Too much depends upon the particular circumstances of the particular case at issue.").

Plaintiffs also mischaracterize Dr. Bapna's reference to "anecdotal evidence" and "isolated examples." Mot. 22. For example, Plaintiffs contend that Dr. Bapna used two examples of content moderation mistakes to "generalize that social media companies

24

writ large may be 'inconsistently or improperly categorizing content.'" *Id.* (quoting Bapna Report ¶33, DE293-1). But Dr. Bapna instead explained that the "degree to which social media platforms are inconsistently or improperly categorizing content is difficult to determine based purely on publicly disclosed information and would require thoroughly examining the millions of categorization decisions that platforms make each day." Bapna Report ¶33, DE293-1. That quote also serves as another example of Dr. Bapna acknowledging limitations on his opinions despite Plaintiffs' unfounded protestations that he failed to do so. *See* Mot. 21-22. Similarly, Plaintiffs assert that Dr. Bapna "points to just two examples, relating to one company" to opine that "social media algorithms are too unpredictable to be influenced by humans' editorial judgments." *Id.* at 22. But those examples were just that: examples that help to illustrate Dr. Bapna's broader opinion that algorithms are unpredictable, which he supported with citations to other authorities, including a study of the "unpredictable trajectory of social media algorithms." Bapna Report ¶¶24-28, DE293-1.

Plaintiffs' attacks on Dr. Bapna's supplemental report likewise fail. "An expert may analyze company documents and opine on whether they are consistent with the rest of the expert's analysis." *In re Soc. Media*, 2026 WL 775421, at *3. That is what Dr. Bapna did here. Suppl. Bapna Report ▮▮▮, DE293-2. In doing so, he reviewed all the internal social media company documents produced in this case, which is obviously more internal documents than just those cited in his supplemental report. Bapna Tr.270:14-20 (Ex. A). Plaintiffs cite no authority for the proposition that the reliability

25

of an expert's opinion turns on whether he discusses every document produced in a case. *Compare* Bail Report, DE290-6, *with* Bail Report App'x B (Ex. D) ███████████ ███████████████████████████████████████████████████████████ ████████).

Plaintiffs again attack a straw man of Dr. Bapna's opinions, asserting that he failed to discuss evidence that algorithmic content recommendation accounts for factors other than engagement. Mot. 23-24. But Dr. Bapna acknowledged that an internal Meta document, ██████████████████████████████████████ ███████████████████████████████████████████████ Suppl. Bapna Report ███ DE293-2. He also acknowledged that ███████████████████████████████████████████████████████ ████████████████████ Suppl. Bapna Report ███ DE293-2, and that ███████ ████████████████████████████████████████ *id.* ███ And he acknowledged ██████████████████████████████████████ *Id.* ███ That Dr. Bapna did not cite the exact same documents as Plaintiffs to support these acknowledgments does not change that those acknowledgments bolster the reliability of Dr. Bapna's approach. *See* FED. R. EVID. 702 advisory committee's note to 2000 amendments (listing "[w]hether the expert has adequately accounted for obvious alternative explanations" as an indicator of reliability).

Plaintiffs also pluck out of context a quotation about Dr. Bapna's decision not to discuss ████████████████████████████████████████████████████

26

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████ Mot. 23-24. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Ex. A); *see* Suppl.

Bapna Report ████ DE293-2. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Plaintiffs oddly

seem to argue that Dr. Bapna could not opine about recommendation systems at all

unless he first undertook the impossible task of discussing every single aspect ██

████████████████████████████████████ *See* Bail Tr.84:6-85:8 (Ex. C) ("I don't think it's

possible for any single person to count the total number of nonpublic content

moderation policies" ████████.). ████████████████████████████

████████████████████████████████ somehow relates to subsequent "ranking

systems," Mot. at 24. ████████████████████████████████████

████████████████████████████████████████████████████████████████

Finally, Plaintiffs' arguments that they ▇▇▇▇▇ have a better interpretation of other documents go to the persuasiveness of Dr. Bapna's opinions, not their admissibility. *See* Mot. 24-26. Although it is not the Court's role under Rule 702 "to make ultimate conclusions as to the persuasiveness of the proffered evidence," *Quiet Tech.*, 326 F.3d at 1341, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See* Mot. 25-26. Cross-examination and presentation of contrary evidence are the proper ways to resolve that dispute, not a motion to exclude Dr. Bapna's testimony, *see Quiet Tech.*, 326 F.3d at 1341, especially when the case will be tried before the Court, *Brown*, 415 F.3d at 1268-69.

## III.  Dr. Bapna's Testimony Is Helpful and Relevant.

Much like large portions of their reliability arguments, *supra* II, Plaintiffs' final argument that Dr. Bapna's opinions are legally irrelevant is a merits argument dressed as a motion to exclude. Plaintiffs contend that Dr. Bapna's testimony about engagement-driven algorithms is constitutionally immaterial because Dr. Bapna acknowledges that content moderation exists. Mot. 27. That argument rests on Plaintiffs' faulty assumption that the presence of content moderation policies renders all algorithmic content curation protected by the First Amendment. But whether specific functions of a social media platform are expressive is a "fact intensive" question, *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025) (quoting *Moody*,

603 U.S. at 747 (Barrett, J., concurring)), and Dr. Bapna's testimony is useful for resolving that question.

The existence of content moderation does not bring all the activities of social media platforms within the scope of the First Amendment. The First Amendment covers only curation and dissemination that reflects expressive, content-based judgments made by humans. *See Moody*, 603 U.S. at 731 (majority op.) ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own."); *see also id.* at 736 n.5 ("We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards."). And an "entity engaged in expressive activity when performing one function may not be when carrying out another" function. *Id.* at 732 n.4. Content moderation and recommendation are not the same function. So the proper analysis requires "asking, as to every covered platform or function, whether there is an intrusion on protected editorial discretion." *Id.* at 725. Conducting that inquiry requires careful consideration of the facts because the "reaches of the First Amendment are ultimately defined by the facts it is held to embrace." *Hurley*, 515 U.S. at 567. As explained, *supra* I.A, whether activity is expressive is a constitutional fact, and courts routinely permit experts to elucidate whether an activity possesses characteristics that bring it within the scope of the First Amendment.

Dr. Bapna's testimony will "help the trier of fact to understand the evidence" as it relates to the expressive nature of Plaintiffs' members' algorithmic and machine-learning systems and thus satisfies Rule 702. Expert testimony is helpful if it goes "beyond the understanding of the average lay person." *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1294 (11th Cir. 2022) (quoting *Frazier*, 387 F.3d at 1262). Dr. Bapna's testimony would do just that because algorithmic and machine-learning systems are not something that the average layperson understands. To be sure, Plaintiffs argue otherwise. Mot. 31 n.2. But their own expert, Dr. Bail, seemingly would disagree with them as he testified that whether "recommendations to users are primarily driven by algorithms" "is a very complex question," Bail Tr.119:12-14 (Ex. C), and referred to a question about whether a "major purpose of algorithms is often to increase user engagement" as "highly complex," *Id.* 179:19-180:1.

Looking for another shortcut, Plaintiffs also try to dismiss the usefulness of Dr. Bapna's testimony by equating optimization for engagement with editorial expression, but that effort only further highlights the need for Dr. Bapna's testimony. *See* Mot. 30. Algorithmic engagement prediction is a fundamentally different process from human editorial curation. It is a mathematical operation that measures similarity between user and content embeddings and ranks content by predicted likelihood of interaction. Bapna Report ¶¶60-64, DE293-1. The same engagement-prediction framework can produce dramatically different content for different users, or even different content for the same user at different times, without any change in human editorial judgment. *Id.*

30

¶¶43-44. Whether that process is legally equivalent to a newspaper editor selecting stories for the front page is a question for the Court on the merits, but it is a question that Dr. Bapna's testimony illuminates rather than obscures.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion to exclude Dr. Bapna's testimony.

Dated: May 1, 2026

Respectfully submitted,

JAMES UTHMEIER
*Attorney General of Florida*

/s/William H. Stafford, III

Charles J. Cooper
David H. Thompson
Brian W. Barnes
Clark L. Hildabrand
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036

William H. Stafford, III

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3694
(850) 410-2672 (fax)

*Counsel for Defendants*

31

## CERTIFICATE OF COMPLIANCE

I hereby certify that Defendants' Opposition to Plaintiffs' Motion to Exclude Testimony from Dr. Ravi Bapna complies with the word limit established by N.D. Fla. R. 7.1(F) because it contains 7,929 words, excluding the parts exempted by that rule.

/s/William H. Stafford, III<br>
William H. Stafford, III

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 1st day of May, 2026.

/s/William H. Stafford, III
William H. Stafford, III
