**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

NETCHOICE, LLC, et al.,

     Plaintiffs,

v.

JAMES UTHMEIER, in his official
capacity as Attorney General of the State
of Florida, et al.,

     Defendants.

_____/

Case No. 4:21-cv-220-RH/MAF
**PUBLIC REDACTED**

**DEFENDANTS' OMNIBUS MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................iii

LEGAL STANDARD...........................................................................................................3

ARGUMENT .......................................................................................................................3

I.    Plaintiffs Are Not Entitled to Judgment on Their First Amendment
Challenges Because They Lack Associational Standing. ....................................... 3

    A.  Member Participation Is Required. .............................................................. 3

    B.  Plaintiffs' Members Lack Article III Injuries. ............................................ 9

II.   Plaintiffs Are Not Entitled to Judgment on Their Purported As-
Applied Challenges Because They Are Quasi-Facial Challenges, and
Plaintiffs Cannot Carry Their Burden for a Quasi-Facial Challenge................. 12

III.  Plaintiffs Are Not Entitled to Judgment on Their Purported As-
Applied Challenges Because Many Provisions Are Constitutional in All
Applications. ........................................................................................................ 20

    A.  The Consistency Provision Is Constitutional in All Applications........... 21

    B.  The Candidate-Deplatforming Provision Is Constitutional in All
Applications. ............................................................................................. 26

    C.  The Limit on Censoring, Deplatforming, or Shadowbanning
Journalistic Enterprises Is Constitutional in All Applications................ 29

    D.  The Opt-Out Provision Is Constitutional in All Applications. .............. 32

    E.  The Individualized-Disclosure Provision Is Constitutional in All
Applications. ............................................................................................. 33

    F.  The Rules-Change Provision Is Constitutional in All Applications........ 37

    G.  The View-Count Provision Is Constitutional in All Applications. ......... 40

IV.   Plaintiffs Are Not Entitled to Judgment on Their Facial Challenges................. 48

V.    Plaintiffs Are Not Entitled to Judgment on Their First Amendment
Challenges Because Their Members Are Common Carriers............................... 51

VI.    Plaintiffs Are Not Entitled to Judgment on Their Vagueness Challenges. ....... 52

    A.  Plaintiffs' Vagueness Challenge to the Consistency Provision Fails. ...... 52

    B.  Plaintiffs' Vagueness Challenge to the Ban on the Use of Post-
       Prioritization Algorithms for Posts by or about Candidates Fails. ......... 55

VII.   Plaintiffs Are Not Entitled to Judgment on Any Section 1983 Claim Because
    They Lack a Cause of Action. ............................................................................. 57

CONCLUSION ...................................................................................................... 58

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                   **<u>Page(s)</u>**

*303 Creative LLC v. Elenis,*
  600 U.S. 570 (2023) ...................................................................................... 51

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  591 U.S. 430 (2020) ........................................................................................ 5

*All. of Auto. Mfrs. v. Jones,*
  897 F. Supp. 2d 1241 (N.D. Fla. 2012) ............................................... 4, 5, 7

*Am. Meat Inst. v. USDA,*
  760 F.3d 18 (D.C. Cir. 2014) ....................................................................... 46

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................ 20, 30

*Anderson v. City of Atlanta,*
  No. 24-13509, slip op. (11th Cir. Apr. 15, 2026) ....................................... 9

*Bolger v. Youngs Drug Prods. Corp.,*
  463 U.S. 60 (1983) ................................................................................. 34, 40

*Borrero v. United Healthcare of N.Y., Inc.,*
  610 F.3d 1296 (11th Cir. 2010) .................................................................... 3

*CBS, Inc. v. FCC,*
  453 U.S. 367 (1981) .................................................................................. 3, 28

*Chiles v. Salazar,*
  146 S. Ct. 1010 (2026) ........................................................................... 34, 36

*City of Austin v. Reagan Nat'l Advert. of Aus., LLC,*
  596 U.S. 61 (2022) ................................................................................. 30, 38

*City of South Miami v. Governor,*
  65 F.4th 631 (11th Cir. 2023) ...................................................... 1, 9, 10, 12

*Cohen v. Cowles Media Co.,*
  501 U.S. 663 (1991) ...................................................................................... 21

*Counterman v. Colorado,*
  600 U.S. 66 (2023) ....................................................................................... 54

*CTIA-The Wireless Ass'n v. City of Berkeley,*
  928 F.3d 832 (9th Cir. 2019) ....................................................................... 35

*DA Mortg., Inc. v. City of Miami Beach,*
    486 F.3d 1254 (11th Cir. 2007)................................................................... 4

*Edenfield v. Fane,*
    507 U.S. 761 (1993).............................................. 25, 26, 39, 46, 47

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012)................................................................. 53

*FCC v. Midwest Video Corp.,*
    440 U.S. 689 (1979)................................................................. 51

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,*
    901 F.3d 1235 (11th Cir. 2018)................................................. 27

*Free Speech Coal. v. Paxton,*
    606 U.S. 461 (2025)................................................................. 32

*Free Speech Coal. v. Sessions,*
    314 F. Supp. 3d 678 (E.D. Pa. 2018) ........................................ 7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995)........................................................... 22, 23

*Indigo Room, Inc. v. City of Fort Myers,*
    710 F.3d 1294 (11th Cir. 2013)....................................... 53, 54, 55

*International Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996) ........................................................ 46

*Jencks v. Coleman,*
    13 F. Cas. 442 (C.C.D.R.I 1835) ......................................... 51, 52

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010)................................................................. 13

*Larimore v. State,*
    2 So. 3d 101 (Fla. 2008)........................................................... 44

*Leathers v. Medlock,*
    499 U.S. 439 (1991)................................................................. 37

*Lewis v. Fulton Cnty. Sheriff,*
    166 F.4th 107 (11th Cir. 2026) ............................................. 3, 15

*Lexmark Int'l v. Static Control Components,*
    572 U.S. 118 (2014)................................................................. 57

*McGuire v. Marshall,*
    50 F.4th 986 (11th Cir. 2022) ........................................................... 13

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974)........................................................................ 41

*Milavetz, Gallop & Milavetz P.A. v. United States,*
    559 U.S. 229 (2010)............................................................34, 36, 43

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)..................................... 1, 2, 4, 5, 13, 14, 22, 25, 36, 37, 50, 51

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) ......................................................... 46

*Nat'l Rifle Ass'n v. Bondi,*
    133 F.4th 1108 (11th Cir. 2025) ...................................................... 3

*National Institute of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018)............................................................34, 41, 42

*NetChoice, LLC v. Bonta,*
    152 F.4th 1002 (9th Cir. 2025) ......................................1, 4, 9, 47

*NetChoice, LLC v. Bonta,*
    170 F.4th 744 (9th Cir. 2026) ................................................ 50, 51

*Netchoice, LLC v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) ......................................................... 8

*NetChoice, LLC v. Fla. Att'y Gen.,*
    34 F.4th 1196 (11th Cir. 2022) ......................................25, 27, 32, 33, 41

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health,*
    50 F.4th 1126 (11th Cir. 2022) ...................................................... 38

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020)........................................................ 27

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)....................................................................28, 29

*PG&E v. Public Utilities Commission of California,*
    475 U.S. 1 (1986)........................................................................23, 24

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)........................................................................ 22

v

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)...................................................................... 30

*Riley v. National Federation of the Blind of North Carolina*,
    487 U.S. 781 (1988)...................................................................... 41

*Rowan v. U.S. Post Off. Dep't*,
    397 U.S. 728 (1970)................................................................ 32, 33

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006)........................................................................ 27

*SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*,
    40 F.4th 1320 (11th Cir. 2022) .............................................2, 53, 54, 56

*TikTok, Inc. v. Garland*,
    604 U.S. 56 (2025)............................................24, 25, 26, 28, 29, 31, 39

*Tracy v. Fla. Atl. Univ. Bd. of Trs.*,
    980 F.3d 799 (11th Cir. 2020).................................................... 53, 54

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)...................................................................... 13

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994).................................................................. 14, 27

*U.S. Telecom Ass'n v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017) .................................................. 22, 52

*United States v. Supreme Court of New Mexico*,
    839 F.3d 888 (10th Cir. 2016)...................................................... 13

*United States v. Williams*,
    553 U.S. 285 (2008)...................................................................... 54

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)...................................................................... 55

*Vote.org v. Callanen*,
    89 F.4th 459 (5th Cir. 2023) ........................................................ 57

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)...................................................................... 24

*Webster v. Fall*,
    266 U.S. 507 (1925)...................................................................... 57

*Wilson v. State Bar of Ga.*,
132 F.3d 1422 (11th Cir. 1998)....................................................................1, 9, 10, 12

*X Corp. v. Bonta*,
116 F.4th 888 (9th Cir. 2024) ........................................................................... 46

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
471 U.S. 626 (1985)...................................................................33, 34, 35, 40, 42, 47

## Constitutional Provisions, Statutes and Regulations

U.S. CONST. amend XIV, § 1 ...................................................................................... 54

FLA. STAT.
§ 106.072(2)......................................................................9, 10, 18, 20, 26, 50
§ 501.2041(1)(e) .................................................................................... 55
§ 501.2041(2)(b)..............................................2, 20, 21, 23, 47, 48, 49, 50, 52, 53
§ 501.2041(2)(c) ......................................................8, 9, 11, 18, 20, 37, 52
§ 501.2041(2)(d)(1) ........................................... 8, 9, 11, 20, 33, 48, 50, 52
§ 501.2041(2)(d)(3) ........................................... 8, 9, 11, 20, 33, 48, 50, 52
§ 501.2041(2)(e) ................................................... 8, 9, 11, 20, 40, 52
§ 501.2041(2)(f).........................................................................18, 48, 55
§ 501.2041(2)(f)(2) ........................................... 8, 9, 11, 20, 31, 49, 50, 52
§ 501.2041(2)(g) .......................................................................18, 48, 49
§ 501.2041(2)(h)...........................................................3, 18, 48, 49, 52, 55
§ 501.2041(2)(j) ...................................9, 10, 11, 20, 29, 30, 48, 49, 50, 52
§ 501.2041(3)(c) ...................................................................................... 34
§ 501.2041(3)(d)...................................................................................... 34

## Other Authorities

*2022 Annual Report: Oversight Board Reviews Meta's Changes to Bring Fairness and
Transparency to Its Platforms*, OVERSIGHT BD. (June 6, 2023),
https://perma.cc/5GNG-NZ9L............................................................................. 35

*Appeal a Community Guidelines Strike or Video Removal*, YOUTUBE
HELP, https://perma.cc/7YHT-EJU4................................................................ 35

*Appealed Content*, META TRANSPARENCY CTR., https://perma.cc/EH2G-TK9H ....... 35

Appellant's Br., *Off. of the Att'y Gen., State of Fla., Dep't of Legal Affs. v. Snap, Inc.*,
No. 25-12814 (11th Cir. Sep. 24, 2025)................................................................ 45

Catalina Botero-Marino et al., *Oversight Board Demands More Transparency from Facebook*, OVERSIGHT BD., (Oct. 21, 2021), https://perma.cc/3L6Y-BZSS ................................................................ 34, 35

Br. for the United States as Amicus Curiae Supporting Respondents, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Dec. 7, 2023) .................................... 22

Br. of Amici Curiae the Babylon Bee & Not the Bee, *Moody v. NetChoice LLC, et al.*, Nos. 22-277, 22-555 (U.S. Jan 22, 2024) ........................................ 31

*Chapeau*, The Santa Clara Principles on Transparency and Accountability in Content Moderation, https://perma.cc/4UDC-253R ........................................ 35

*Consistent*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/G8HW-K4CW ....... 53

Gennie Gebhart, *Who Has Your Back? Censorship Edition 2019*, ELEC. FRONTIER FOUND. (June 12, 2019), https://perma.cc/7QZX-A39E .................................. 35

Joel Kaplan, *More Speech and Fewer Mistakes*, META (Jan. 7, 2025), https://perma.cc/6AZ9-XSD7 .................................... 6, 17, 18, 25

Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 2299 (2021) .............................................................. 51

Elon Musk (@elonmusk), X (Nov. 25, 2022, at 5:51pm ET), https://perma.cc/FP35-WMZP ................................................................ 21, 22, 25

### DEFENDANTS' OMNIBUS MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs' motions for summary judgment reflect the same fundamental flaw that the Supreme Court identified the first time this case reached it: failure to make the individualized showing that their claims require. The most revealing feature of Plaintiffs' motions is the slippage between their purported as-applied and facial challenges. Plaintiffs label their as-applied challenges as such, but they are really quasi-facial challenges as they seek to enjoin the enforcement of the provisions across a broad swath of functions, features, and members under the convenient label of curation and dissemination. First Am. Compl. ¶¶63-72, DE171 (Nov. 1, 2024); *see also* Cleland Tr.144:4-15, DE293-8 (remedy NetChoice seeks is "the same for every member").

Plaintiffs' First Amendment challenges suffer from a threshold fatal flaw. Plaintiffs lack associational standing because their claims require member participation to evaluate each platform's proprietary systems. That inquiry is "fact intensive" and varies "from platform to platform." *NetChoice, LLC v. Bonta* (*Bonta I*), 152 F.4th 1002, 1014 (9th Cir. 2025) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 747 (2024) (Barrett, J., concurring)). For some provisions, Plaintiffs' members also lack the requisite Article III injury to support standing because Plaintiffs lack specific evidence of those injuries that is more than just hypothetical fears of future harm. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1427 (11th Cir. 1998); *City of South Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023).

1

When it comes to carrying their burden to establish that any unconstitutional applications of the challenged provisions substantially outweigh the constitutional ones, Plaintiffs utterly fail. Under the Supreme Court's decision in this case, mere "dissemination" is not expressive, and "curation" is expressive only when it reflects expressive, content-based judgments made by humans. *See Moody*, 603 U.S. at 731, 736 n.5 (majority op.). Plaintiffs use algorithmic and machine-learning systems for much of their curation and dissemination and have not established that that activity is expressive. To the contrary, substantial evidence—Dr. Ravi Bapna's expert analysis, internal documents produced by Plaintiffs' members, and deposition testimony—establishes that Plaintiffs' members content-moderation and recommendation systems are engagement-driven, unpredictable, and disconnected from human editorial judgment because they largely respond to user preferences rather than convey a message on behalf of platforms. The challenged provisions have substantial *constitutional* applications to those systems. So that evidence defeats both Plaintiffs' quasi-facial and facial challenges. As does the fact that many provisions are constitutional even as applied to curation and dissemination that is expressive.

Plaintiffs' two facial vagueness challenges fail too. The consistency provision, FLA. STAT. §501.2041(2)(b), possesses a readily discernible core to persons of reasonable intelligence, *SisterSong Women of Color Reprod. Just. Collective v. Gov. of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022), as employees of Plaintiffs' members testified that users expect ███████████ to apply their standards consistently, Callaway

Tr.144:8-11, DE293-4; ██████████████████████ Likewise, when the ban on the use of post-prioritization and shadowbanning algorithms for posts by or about candidates, FLA. STAT. §501.2041(2)(h), is read in context of the broader statutory scheme, it too possesses a readily discernible core that prohibits algorithms from arranging candidate-related content in any non-chronological way.

Plaintiffs' motions for summary judgment should be denied in full.

**LEGAL STANDARD**

Summary judgment is proper if, construing all facts in the nonmovant's favor, there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1113-14 (11th Cir. 2025) (en banc). A genuine dispute of material fact exists if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party. *Lewis v. Fulton Cnty. Sheriff*, 166 F.4th 107, 113 (11th Cir. 2026).

**ARGUMENT**

I. **Plaintiffs Are Not Entitled to Judgment on Their First Amendment Challenges Because They Lack Associational Standing.**

A. **Member Participation Is Required.**

Plaintiffs are not entitled to summary judgment on their First Amendment challenges because they lack associational standing. Member participation is required if the "claim asserted" or "relief requested requires the participation of individual members." *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1305 (11th Cir. 2010) (cleaned up). In contrast, member participation is not required if members are injured

3

in the "same manner" and "there is no need for each [m]ember to separately establish" how it is injured. *All. of Auto. Mfrs. v. Jones*, 897 F. Supp. 2d 1241, 1254 (N.D. Fla. 2012).

For Plaintiffs' purported as-applied challenges, the need for member participation is apparent.[1] Because an as-applied challenge involves only a litigant's own rights, *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007), the nature of the purported injury is central to the merits of the challenge, so whether each member is injured in the "same manner" is central to the standing inquiry, *Jones*, 897 F. Supp. 2d at 1254. Whether Plaintiffs' members suffer any injury in their curation and dissemination of third-party speech, *see* DE171 ¶¶63-72, depends on whether application of the challenged provisions to Plaintiffs' members' proprietary systems regulates expressive conduct. And whether any of those systems is expressive is a "fact intensive" inquiry that varies "from platform to platform." *Bonta I*, 152 F.4th at 1014 (quoting *Moody*, 603 U.S. at 747 (Barrett, J., concurring)). As the Ninth Circuit explained, "whether an algorithmic feed is expressive … requires review of *each* member's algorithm and how it functions." *Id.* And the "more an algorithm implements human editorial directions, the more likely it is to be expressive for First Amendment purposes." *Id.*

---

[1] Defendants respectfully disagree with this Court's prior ruling and still maintain that Plaintiffs lack associational standing for their facial challenges for the reasons set forth in Defendants' motion to dismiss. Mot. to Dismiss Am. Compl., DE173:13-18 (Nov. 15, 2024).

The differences in how Plaintiffs' members' curate and disseminate means Plaintiffs are not purportedly injured in the "same manner." *Jones*, 897 F. Supp. 2d at 1254. Reddit, for example, uses a multilayered community-driven approach in which user-moderators "set and enforce their community's rules," Callaway Decl. ¶10, DE232-6, and the most popular content "will rise to the top" based on votes of "each community member," *Id.* ¶12. That approach differs drastically from the centralized algorithmic and machine-learning systems of other platforms that are proprietary in nature, *see* Defs.' Mem. in Supp. of Mot. for Summ. J. at 17-28, DE292 (Apr. 3, 2026) ("Defs.' MSJ"), so "we cannot know for sure how these models are developed or operate without seeing the model building and evaluation steps in detail," Bapna Rep. ¶23, DE293-1. Nor can we know how many of Reddit's user-moderators are protected by the First Amendment, *see Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 436 (2020); *see also Moody*, 603 U.S. at 747 (Barrett, J., concurring), because Reddit "does not know the percentage of subreddit moderators who are or are not American citizens or residents," Callaway Decl. ¶5, DE293-36.

As Defendants argued in support of their motion for summary judgment, Defs.' MSJ at 10-11, the need for member participation is further confirmed by the evolving practices of Plaintiffs' members and Plaintiffs' carousel-like membership rosters. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████ Meta

ended its factchecking program after the filing of the amended complaint. ███

█████████████████ *accord* Joel Kaplan, *More Speech and Fewer Mistakes*, META (Jan.

7, 2025), https://perma.cc/6AZ9-XSD7. Likewise, Reddit joined NetChoice after the

filing of the amended complaint. Cleland Tr.87:1-2, DE293-8; DE171. And TikTok left

NetChoice in 2024 but apparently rejoined after the close of fact discovery. Cleland

Tr.63:11-16, DE293-8; Cleland Decl. ¶5, DE280-2.

Further adding to the confusion, Plaintiffs attempt to smuggle Nextdoor into

their purported as-applied arguments. Pls.' Mem. in Supp. of Am. First Mot. for Summ.

J. at 30, 38, DE282-1 (Mar. 20, 2026) ("Pls.' Am. First MSJ"); Pls.' Mem. in Supp. of

Second Mot. for Summ. J. at 13, 24, DE288 (Apr. 3, 2026) ("Pls.' 2d MSJ"). But

nowhere in Plaintiffs' complaint did they mention Nextdoor or purport to bring as-

applied claims on its behalf. *See generally* DE171. Plaintiffs have not provided any witness

for Nextdoor. Instead, the entirety of their evidence specific to Nextdoor consists of

one public document and a handful of paragraphs from the NetChoice representative's

declaration. *See* Pls.' Am. First MSJ at 8-9, 30; Pls.' 2d MSJ at 13, 24; Cleland Decl. ¶¶11,

18, 24, 34, DE280-2; Nextdoor Transparency Report 2022, DE280-19. But the

NetChoice representative acknowledged at his deposition that his knowledge of

Nextdoor is based solely on what he can see publicly on its website and "a generic

understanding of software and algorithms," that he has not reviewed Nextdoor's

algorithms, that he does not know the identities of Nextdoor's community moderators,

6

and that (similar to Reddit) his understanding is that Nextdoor's community moderators are "largely volunteer." Cleland Tr.115:2-118:20, attached as Exhibit 1.

With no one able to testify about how Nextdoor's algorithms actually operate or who the volunteer moderators are, Plaintiffs cannot succeed on their belated attempt to purportedly bring an as-applied First Amendment claim on Nextdoor's behalf. Plaintiffs are merely speculating about whether the provisions of the law would be "unduly burdensome" on Nextdoor. Pls.' Am. First MSJ at 38.

Plaintiffs are likewise speculating when they discuss other members and platforms such as Uber, Venmo, and Gmail, *id.* at 46, 49, 52, as Plaintiffs have presented *no* evidence about how those platforms operate, including whether they use algorithms. In any event, Plaintiffs disclaimed bringing purported as-applied challenges on behalf of direct messaging, email, payment processing, and ridesharing platforms in their amended complaint. DE171:28 n.5. So the Court should disregard those arguments. But, if it does not, those platforms worsen an already severe member-participation problem.

In sum, the evolving nature of Plaintiffs' claims and their members' practices exacerbates the common-injury problem and cries out for member participation. *See Jones*, 897 F. Supp. 2d at 1254. "Generalized statements" or rank speculation about curation and dissemination or undue burdens "cannot replace the individualized inquiry required." *Free Speech Coal. v. Sessions*, 314 F. Supp. 3d 678, 698 (E.D. Pa. 2018) (cleaned up).

Provision-specific differences further confirm the need for member participation. The individualized-disclosure, FLA. STAT. §501.2041(2)(d)(1), (3), and view-count, §501.2041(2)(e), provisions affect Plaintiffs' members in different ways depending on the notice that they currently provide users regarding content-moderation decisions and views. Defs.' MSJ at 12; *see* Duba Tr.127:12-25, attached as Exhibit 2; ██████████████████████ Veitch Decl. ¶41, DE280-3; Fernandez Decl. ¶30, 280-8; GOOG-NTCHFL7072-00001482 at -84-85, attached as Exhibit 3; GOOG-NTCHFL7072-00001489 at -90-91, attached as Exhibit 4; GOOG-NTCHFL7072-00001499 at -1500, attached as Exhibit 5. Nor will the rules-change provision, FLA. STAT. §501.2041(2)(c), affect all members in the same way because the frequency with which platforms change their policies and the reasons for those changes are platform specific. Defs.' MSJ at 13; *see* Duba Tr.66:16-20, 157:3-15 (Ex. 2); ████████████ ████████████ And the opt-out provision, FLA. STAT. §501.2041(2)(f)(2), has no effect on members that already allow chronological viewing, at least for some functions. Defs.' MSJ at 13; *see* Callaway Tr.74:2-9, DE293-4; ██████████████████████

Plaintiffs' reliance on *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025), is misplaced. *See* Pls.' Am. First MSJ at 14 n.5. The law at issue in *Fitch* required, among other things, age verification on platforms that host certain kinds of content and is very different from S.B.7072. 134 F.4th at 803. *Fitch* thus has no bearing on the associational standing analysis in this action because it never discussed application of the law at issue to proprietary systems that moderate and recommend content. Instead, S.B.7072 is

8

more similar to the law at issue in *Bonta I*, which regulated recommendation algorithms and personalized feeds. 152 F.4th at 1013-14. As with *Bonta I*, the differences in how Plaintiffs' members moderate and recommend content are precisely the kind of member-specific variations that require member participation. *Id.*

### B. Plaintiffs' Members Lack Article III Injuries.

For the independent reason that their members lack Article III injuries, Plaintiffs are not entitled to summary judgment on their First Amendment challenges to the candidate-deplatforming provision, FLA. STAT. §106.072(2), rules-change provision, §501.2041(2)(c), limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j), opt-out provision, §501.2041(2)(f)(2), individualized-disclosure provision, §501.2041(2)(d)(1), (3), and view-count provision, §501.2041(2)(e).

At summary judgment, Plaintiffs "can no longer rest on their allegations, but must set forth by affidavit or other evidence specific facts which for the purpose of summary judgment will be taken as true." *Wilson*, 132 F.3d at 1427 (cleaned up). Plaintiffs "must prove by affidavit or other evidence … that every challenged provision affects [them]." *Anderson v. City of Atlanta*, No. 24-13509, slip op. at 7 (11th Cir. Apr. 15, 2026) (cleaned up). A "highly attenuated chain of possibilities—which rest[s] on speculation about the decisions of independent actors" cannot support standing. *City of South Miami*, 65 F.4th at 637 (cleaned up). Nor are "fears of hypothetical future harm" sufficient. *Id.* at 638 (cleaned up).

9

Plaintiffs' members lack Article III injuries because Plaintiffs cannot establish with "specific facts," *Wilson*, 132 F.3d at 1427 (cleaned up), that they intend to violate the provisions listed above or that their standing does not rest on a series of speculative hypotheticals about independent actors. For the candidate-deplatforming provision, FLA. STAT. §106.072(2), employees of Plaintiffs' members testified that they did not know of any situation in which Plaintiffs' members have deplatformed a Florida candidate during an election nor of an intention to do so in the future other than for an unspecified, hypothetical violation of platform rules. Defs.' MSJ at 15; Callaway Tr.129:25-130:6, DE293-4; ███████████████████████ Duba Tr.123:1-124:3 (Ex. 2); ███████████████████████ A chain of highly speculative events would have to occur to implicate this provision: a user who is a Florida candidate would have to violate a platform's rules during an election, and a platform would have to decide to deplatform the candidate as a consequence (rather than take some lesser action). That is not enough to support standing. *See City of South Miami*, 65 F.4th at 637.

There is likewise a lack of "specific facts" establishing standing to challenge other provisions. For the limit on censoring, deplatforming, and shadowbanning journalistic enterprises, FLA. STAT. §501.2041(2)(j), employees of Plaintiffs' members testified that they did not know if any journalistic enterprises had accounts on their employers' platforms. Defs.' MSJ at 15-16; Duba Tr.124:4-23 (Ex. 2); ███████████████████████ ███████████████████████ Callaway Tr.130:8-131:4, DE293-4. And hypothetical concerns about being unable to act against pornography posted by

10

Pornhub are premised on a misreading of the statute. Defs.' MSJ at 16; *see* Duba Tr.150:16-151:8 (Ex. 2); FLA. STAT. §501.2041(2)(j). For the individualized-disclosure, FLA. STAT. §501.2041(2)(d)(1), (3), and view-count, §501.2041(2)(e), provisions, Plaintiffs cannot establish the extent to which, if at all, the provision would affect current practices with vague testimony about the operational burdens of increasing the amount of notice that Plaintiffs' members provide, Duba Tr.151:9-152:5 (Ex. 2); ███████████████████████████ especially when that testimony comes from employees who do not understand the extent to which their employers already give users notice of content-moderation decisions, Duba Tr.128:16-20 (Ex. 2); ████████ ████████████████████████████████ Defs.' MSJ at 16-17. And for the opt-out provision, FLA. STAT. §501.2041(2)(f)(2), some members already allow chronological viewing, at least for some functions, ██████████████████████ Callaway Tr.74:2-9, DE293-4, and thus cannot be injured to the extent that the opt-out provision has no effect on their existing behavior.

For the rules-change provision, FLA. STAT. §501.2041(2)(c), the most Plaintiffs muster for a potential Article III injury is vague testimony and hypotheticals about how the provision limits their members' ability to respond to emergencies. Although a YouTube government affairs staffer[2] stated in a declaration that YouTube has changed

---

[2] While this individual's declaration describes her as "the Senior Director of Public Policy for the Americas at YouTube," Veitch Decl. ¶1, DE280-3, ████████████

11

its policies more than once a month in 2025, Veitch Decl. ¶35, DE280-3, that statement is unreliable, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ The other cited declarations are even further afield—they speak in vague terms or hypotheticals, Vasquez Decl. ¶41, DE280-6 (provision "*could* impede" Pinterest's ability to adapt (emphasis added)); Callaway Decl. ¶18, DE280-7 (subreddit rules "often change" without specifying how "often"); Fernandez Decl. ¶26, DE280-8 (hypothesizing about a policy on "AI-generated deepfake videos promoting scam cryptocurrencies")—which are insufficient to establish standing at summary judgment. *See Wilson*, 132 F.3d at 1427; *City of South Miami*, 65 F.4th at 637-38.

## II. Plaintiffs Are Not Entitled to Judgment on Their Purported As-Applied Challenges Because They Are Quasi-Facial Challenges, and Plaintiffs Cannot Carry Their Burden for a Quasi-Facial Challenge.

Even if they have standing for their purported as-applied challenges, Plaintiffs are not entitled to judgment on those challenges because they are quasi-facial, not as-applied, and Plaintiffs cannot satisfy the standard for a quasi-facial challenge.

As Defendants argued in support of their motion for summary judgment, Defs.' MSJ at 17-18, Plaintiffs' as-applied challenges are actually quasi-facial because Plaintiffs seek to enjoin the challenged provisions as applied to a broad swath of curation and

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

dissemination of third-party speech. DE171 ¶¶63-72. To be sure, Plaintiffs' challenges are as applied in that they do "not seek to strike" the challenged provisions "in all … applications" but rather "only to the extent" they interfere with curation and dissemination. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). But Plaintiffs' challenges are facial in that they are "not limited to [a] particular case, but challenge[] application of the [provision] more broadly to" all curation and dissemination by platforms. *Id.* That makes the challenges quasi-facial, and Plaintiffs must "satisfy the standard for a facial challenge to the extent" of the challenges' "reach[]." *McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022) (cleaned up).

Although Plaintiffs are likely to protest that courts have sometimes looked at whether the relief sought extends beyond the parties to determine whether a challenge is quasi-facial, *e.g.*, *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 914 (10th Cir. 2016), the hallmark of a quasi-facial challenge cannot be whether a plaintiff seeks relief that goes beyond the parties because federal courts possess only the authority to "administer complete relief *between the parties*," *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (citation omitted). And it cannot be seriously maintained that Plaintiffs may obtain relief that extends to all their curation and dissemination if only a fraction of that activity is constitutionally protected. To conclude otherwise would impermissibly elevate labels over substance. *See Reed*, 561 U.S. at 194.

To prevail on their broad quasi-facial challenges, Plaintiffs must establish that any "unconstitutional applications" of the challenged provisions to platforms when

they curate and disseminate "substantially outweigh … constitutional ones." *Moody*, 603 U.S. at 724 (majority op.). Plaintiffs cannot do so because mere "dissemination" is not expressive, and "curation" is expressive only when it reflects expressive, content-based judgments made by humans. *See id.* at 731 ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own."); *see also id.* at 736 n.5 ("We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards.").

In support of their motion for summary judgment, Defendants presented substantial evidence, Defs.' MSJ at 19-27, that Plaintiffs' members' algorithmic or machine-learning systems "just present[] automatically to each user whatever the algorithm thinks the user will like," which "attenuate[s] the connection between content-moderation actions … and human beings' constitutionally protected right to '*decide for [themselves]* the ideas and beliefs deserving of expression, consideration, and adherence.'" *Moody*, 603 at 746 (Barrett, J., concurring) (quoting *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994)). When Plaintiffs' members hand over decisionmaking to such systems, they "serve as 'passive receptacle[s]' of third-party speech or as 'dumb pipes.'" *Id.* at 782 (Alito, J., joined by Thomas and Gorsuch, JJ., concurring in the judgment) (quoting *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting)).

14

The evidence that Defendants presented in support of their motion for summary judgment is more than sufficient to defeat Plaintiffs' motions for summary judgment on their purported as-applied claims.[3] Plaintiffs' own declarations confirm that their members use algorithmic systems and machine learning to moderate or recommend content. Duba Decl. ¶¶11, 34, 42, 55, 75, DE232-3; Vasquez Decl. ¶¶6-8, 22-24, DE232-5; Fernandez Decl. ¶¶8, 10, 14-17, DE232-7; Veitch Decl. ¶¶7, 17-18, 24, 37, DE232-8; Potts Decl. ¶¶16, 21, DE232-4; *see also* Callaway Dep. Ex. 8, DE293-35. Internal documents produced by Plaintiffs' members provide, at a minimum, sufficient evidence for a reasonable factfinder to find that Plaintiffs' members use nonexpressive automated system to moderate and recommend content. *See Lewis*, 166 F.4th at 113. There are substantial *constitutional* applications of the challenged provisions to curation and dissemination using those nonexpressive systems, which is sufficient to defeat Plaintiffs' motions on their quasi-facial challenges.

Defendants' expert Dr. Ravi Bapna reviewed all of the internal documents that Plaintiffs' members produced in discovery. ████████████████████ ███████████████████████████████████ ██████████ *See* Suppl. Bapna Rep. ¶¶1.a, 1.f, ████ DE293-2; *see also* META3047MDL-020_00342152, DE293-13; ██████████████████████████████

---

[3] Defendants incorporate by reference their arguments and the materials cited in support of their motion for summary judgment. Defs.' MSJ at 17-28.



Suppl. Bapna Rep. ¶¶1.a-1.b, ████ DE293-2; *see also* ████

████ Suppl. Bapna Rep. ¶1.c, DE293-2; *see also id.* ████

████ Suppl. Bapna Rep. ¶¶1.a, 1.c, █ DE293-2; *see also* ████

16

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████ Bapna Rep. ¶¶38, 60, DE293-1;

███████████████████████████████████████████████████

Plaintiffs' members also use "embeddings," or lists of numbers that algorithms can mathematically process to connect things that "appear in similar contexts and have related meanings." Bapna Rep. ¶61, DE293-1; *see also* ██████████████████

██████████████ But "[h]umans are unlikely to have any role in reviewing specific matches." Bapna Rep. ¶61, DE293-1; *see also* ████████████████████ In sum, ████████████████████████████████ "respond in real-time to local decisions beyond the model creator's control" and do not function like "decision makers weighing in on who to include in a parade set to begin at a particular time and for a particular purpose decided by the parade organizer." Bapna Rep. ¶24, DE293-1.

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ *see also* ████████████████████████████████ Plaintiffs' members' use of algorithms and machine-learning models for content moderation results in mistakes that are not in keeping with stated policies.██████████████

███████████████████████████████████████████████████

17

████████████████████    Kaplan, *supra*; Veitch Decl. ¶¶18-19, DE232-8;    ████

████████████████████████████████████████████████████

A few provision-specific points further confirm why Plaintiffs have failed to carry their burden on their quasi-facial challenges. The ban on post-prioritization and shadowbanning algorithms for posts by or about candidates, FLA. STAT. §501.2041(2)(h), and the opt-out provision, §501.2041(2)(f), (g), are textually limited in application to the use of "algorithms." These provisions apply only when platforms have enlisted automated systems to recommend or moderate content. Within that narrow realm, the provisions have plainly legitimate sweep as the evidence establishes the nonexpressive nature of Plaintiffs' members' algorithms. Plaintiffs' argument that these provisions apply only when platforms engage in "post-prioritization" or "shadow banning," Pls.' Am. First MSJ at 42-46, thus works against them: it is precisely within that algorithmic realm that the evidence establishes Plaintiffs' members' practices are nonexpressive. For the candidate-deplatforming provision, FLA. STAT. §106.072(2), deplatforming that occurs in response to governmental jawboning is nonexpressive. *See* Schruers Tr.202:9-18, DE293-7; ████████████████████    And for the rules-change provision, FLA. STAT. §501.2041(2)(c), application of that provision to "rules, terms, and agreements" that do not bear on the kinds of content allowed on platforms is undoubtedly constitutional, such as fixing a typo. Duba Tr.66:21-67:5 (Ex. 2). Coupled with the evidence about Plaintiffs' nonexpressive automated systems, Plaintiffs cannot

18

establish that any unconstitutional applications of these provisions substantially outweigh their constitutional applications.

Finally, Plaintiffs' failure to present competent witnesses to testify regarding their members' content moderation and recommendation practices, at a minimum, creates a question for trial regarding the credibility of those witnesses' statements about the expressive nature of Plaintiffs' members' curation and dissemination. Some of the few witnesses that Plaintiffs presented were government relations or marketing executives who have no further insight to offer regarding algorithms or recommendation systems. ██████████████████████████████████████████████████ Callaway Tr.32:3-18, DE293-4; Fernandez Decl. ¶¶1-3, DE280-8. Employees of Plaintiffs and their members repeatedly testified to their lack of personal knowledge about algorithms and machine learning, the creation and operation of these systems, and the involvement of human beings in content-moderation and recommendation decisions. *E.g.,* Cleland Tr.106:2-6, 106:8-16, 110:16-111:1, DE293-8; Schruers Tr.130:3-6, 134:2-6, 134:24-135:5, 145:18-25, DE293-7; ██████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████ Callaway Tr.42:1-44:24, 46:15-20, 59:14-18, 73:12-20, 76:6-15, 76:19-23, DE293-4; Callaway Tr.52:16-18, 90:10-22, attached as Exhibit 9; ████████████████████████████ Reddit's witness even admitted she had never visited subreddits described in the declaration Plaintiffs submitted for her. Callaway Tr.88:18-91:4, 97:15-98:17 (Ex. 9); Callaway Decl. ¶¶5, 17, DE293-4.

19

As this Court has recognized, Plaintiffs' "fail[ure] to marshal the facts or resist discovery of them … will undermine [their] position on … the merits." DE209:42. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are" the province of the factfinder, not a court "ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In light of the evidence that Plaintiffs' witnesses are ill-informed regarding the expressive nature of Plaintiffs' members' content-moderation and recommendation practices, Defendants are, at a minimum, entitled to have the witnesses' credibility tested at trial. Self-serving declarations and testimony about expression are insufficient to grant summary judgment on Plaintiffs' quasi-facial challenges.

## III.   Plaintiffs Are Not Entitled to Judgment on Their Purported As-Applied Challenges Because Many Provisions Are Constitutional in All Applications.

Even as applied to curation and dissemination that is expressive, Plaintiffs are not entitled to judgment on their purported as-applied challenges because the following provisions are constitutional in all applications: (1) consistency provision, FLA. STAT. §501.2041(2)(b);  (2) candidate-deplatforming  provision,  §106.072(2);  (3) limit  on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j); (4) opt-out  provision,  §501.2041(2)(f)(2);  (5) individualized-disclosure  provision, §501.2041(2)(d)(1), (3); (6) rules-change provision, §501.2041(2)(c); and (7) view-count provision, §501.2041(2)(e).

20

### A. The Consistency Provision Is Constitutional in All Applications.

The consistency provision requires platforms to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." §501.2041(2)(b). It is constitutional in all applications because it does not trigger heightened scrutiny, and even if it did, it is content neutral and satisfies intermediate scrutiny.

The consistency provision does not trigger heightened scrutiny because it simply requires platforms to adhere to their representations about their products. Platforms must enforce their "standards in a consistent manner," applying them to all users and taking action against only those users who violate them. *Id.* Under the provision, a platform may "curate and disseminate" whatever content it wants, but it must be honest with users. It may not induce them to enter commercial contracts by promising one type of platform but delivering something else through selective enforcement. In *Cohen v. Cowles Media Co.*, 501 U.S. 663, 665 (1991), the Supreme Court held that a newspaper can be liable under state promissory estoppel law for publishing information it had promised not to publish. So even though a state may not generally prohibit a newspaper from publishing information, it can hold a newspaper to its representations. *See id.* at 672 ("[T]he First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law ….").

All the consistency provision requires is that platforms adhere to their representations about what content they will host. *Cf.* Bapna Rep. ¶33, DE293-1; Elon

21

Musk (@elonmusk), X (Nov. 25, 2022, at 5:51pm ET), https://perma.cc/FP35-WMZP. Platforms are free to make "choices [that] rest on a set of beliefs about which messages are appropriate and which are not." *Moody*, 603 U.S. at 738 (majority op.). The consistency provision regulates conduct, not expression; it bars platforms from inconsistently applying their own standards "because of the action it entails"—deceiving consumers—not because of any "ideas" expressed. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992). The provision resembles the federal government's net-neutrality regulations, which forbade internet-service providers from holding themselves out to customers as offerors of neutral, indiscriminate access but then discriminating against disfavored content. *See* Br. for the United States as Amicus Curiae Supporting Resps., *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Dec. 7, 2023). Just as the "First Amendment poses no obstacle to holding the provider to its representation," *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 392 (D.C. Cir. 2017) (Srinivasan, J., concurring in the denial of rehearing en banc), it poses no obstacle to holding platforms to their representations about the content that they host. Even more, the consistency provision permits platforms to discriminate against any kind of content that they wish if they do so according to their declared standards. Plaintiffs' members, like YouTube, already purport to hold users to declared standards. ████████████████ Veitch Dep. Ex. 3, ¶¶3-4, DE293-34. That fact renders the consistency provision even less intrusive than traditional nondiscrimination obligations that do not violate the First Amendment. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S.

22

557, 572 (1995) (explaining that nondiscrimination provisions "do not, as a general matter, violate the First or Fourteenth Amendments").

Plaintiffs' challenge to the consistency provision is premised on their misreading of it. Plaintiffs contend that the provision requires a platform to "disseminate speech against [its] will whenever [it] ha[s] previously disseminated speech that Florida (or a jury) deems sufficiently similar." Pls.' Am. First MSJ at 23. But the provision bars only inconsistent application of a platform's "standards." FLA. STAT. §501.2041(2)(b). It does not impose a freestanding duty to ensure that all viewpoints receive equal airtime. If a platform adopts a standard that prohibits speech praising terrorist groups (or requires an addendum to be posted to such speech), Pls.' Am. First MSJ at 24, the consistency provision allows that platform to disseminate speech criticizing the terrorist group, decline to post an addendum to speech criticizing the terrorist group, and censor or post an addendum to speech praising the terrorist group. In this context, the provision only prevents a platform that represents to users that it prohibits praise of terrorist groups from selectively enforcing that rule such that some users are allowed to praise terrorist groups and others are not. It is a nondiscrimination provision. For that reason, the consistency provision undoubtedly could be constitutionally applied to situations in which Plaintiffs' members inconsistently apply their standards based on a user's race or sex. *See Hurley*, 515 U.S. at 572; Callaway Tr.118:17-127:3, DE293-4.

Plaintiffs' reliance on *PG&E v. Public Utilities Commission of California*, 475 U.S. 1 (1986), is part and parcel of this misreading. Plaintiffs contend that the consistency

23

provision, like the access order in *PG&E*, forces platforms to "disseminate hostile views." Pls.' Am. First MSJ at 31 (quoting *PG&E*, 475 U.S. at 14). But *PG&E* involved forced inclusion of a hostile third party's speech in a utility's billing envelope and was thus a mandate to carry another speaker's message. 475 U.S. at 4. The consistency provision does nothing of the sort. It does not require platforms to carry anyone's message against their will. It requires only that platforms apply their own chosen standards consistently.

Even if the consistency provision triggers heightened scrutiny, it is content neutral and satisfies intermediate scrutiny because it serves Florida's substantial interest in preventing consumer deception "in a direct and effective way." *TikTok, Inc. v. Garland*, 604 U.S. 56, 77 (2025) (cleaned up). The consistency provision leaves platforms with freedom to choose what kind of content to permit and even to discriminate against certain viewpoints. Accordingly, the provision is content neutral because it does not reflect "disagreement with the message" of a platform's speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). It instead requires only that platforms apply their chosen standards consistently. Any effect that the consistency provision has on "some speakers or messages but not others" is purely "incidental" and depends entirely on a platform's representations of what kinds of content it permits. *Id.* The "justification" for the consistency provision "ha[s] nothing to do with content" because its aim is to hold platforms to their representations about the service that they offer consumers. *Id.* at 792 (quoting *Boos v. Barry*, 485 U.S. 312, 320 (1988) (op. of O'Connor, J.)). Contrary

24

to Plaintiffs' misreading of the provision, it does not require dissemination of hostile views and is not content based. *See* Pls.' Am. First MSJ at 31.

Plaintiffs' view that Florida has no legitimate interest to support the challenged provisions is incorrect. *Id.* at 33-34. The consistency provision serves Florida's "substantial" "interest in ensuring the accuracy of commercial information in the marketplace." *Edenfield v. Fane*, 507 U.S. 761, 769 (1993). Platforms "require users, as preconditions of access, to accept their terms of service and abide by their community standards." *NetChoice, LLC v. Fla. Att'y Gen.*, 34 F.4th 1196, 1220 (11th Cir. 2022), *vacated and remanded sub nom.*, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). In other words, platforms induce users to engage in commercial transactions based on the content standards that they offer. The consistency provision holds platforms to their word about their products consistent with user expectations. *See* Kaplan, *supra*; Musk, *supra*; Callaway Tr.55:8-11, DE293-4; ███████████████████

Nor does the consistency provision "burden substantially more speech than necessary to further that interest." *TikTok*, 604 U.S. at 73-74. Florida's interest "would be achieved less effectively absent" the consistency provision because platforms could otherwise selectively enforce their standards and leave users to wonder whether a platform is honoring its end of the bargain or making content-moderation decisions based on some other unstated basis. Although Plaintiffs complain that S.B.7072 is underinclusive, Pls.' Am. First MSJ at 34-35, that argument goes nowhere because intermediate scrutiny imposes "no freestanding underinclusiveness limitation," and the

25

government "need not address all aspects of a problem in one fell swoop." *TikTok*, 604 U.S. at 76 (cleaned up). Even so, despite Plaintiffs complaining about the size and revenue requirements, Pls.' Am. First MSJ at 34-35, CCIA itself "encourage[s] companies to adhere to industry best practice" for offering "consumer-facing digital services" which is tailored based on "the organization's size and scale," including revenue and "average monthly active registered users over the past 12 months." Schruers Tr.225:21-230:8, attached as Exhibit 10. Plaintiffs' argument that S.B.7072 is overinclusive, Pls.' Am. First MSJ at 34, likewise fails because it is premised on Plaintiffs' view of S.B.7072 and ignores the "substantial" interest that the consistency provision serves—accurate commercial information. *Edenfield*, 507 U.S. at 769. That interest is served by application of the consistency provision to entities like Etsy and Pinterest all the same because users of those platforms are engaged in commercial transactions subject to those platforms' terms just like any other platform. Etsy and Pinterest users are entitled to accurate information about what terms govern their use of those platforms.

## B. The Candidate-Deplatforming Provision Is Constitutional in All Applications.

The candidate-deplatforming provision prohibits platforms from "willfully deplatform[ing] a candidate for office who is known by the social media platform to be a candidate" during an election. FLA. STAT. §106.072(2). It is constitutional in all

26

applications because it does not implicate the First Amendment, and even if it did, it is content neutral and satisfies intermediate scrutiny.

The provision does not trigger heightened scrutiny because it does not require platforms to alter their curation and dissemination of speech. The provision requires platforms only to abstain from denying political candidates access to an account during election season. The First Amendment protects "only…conduct that is inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006). The mere act of allowing a political candidate to maintain a social media account is not conduct that conveys "some sort of message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (cleaned up). The candidate-deplatforming provision does not force platforms to disseminate candidates' posts in feeds or transmit candidates' messages. It does not prohibit platforms from removing posts by candidates that violate their standards. It thus does not affect any expressive choice that a platform might make and does not implicate the First Amendment.

But even if it did, it is "obviously content-neutral," *NetChoice*, 34 F.4th at 1226, and subject to intermediate scrutiny at most. The provision is content neutral because it does not turn on "what is said," *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020), nor does it require platforms to "alter their own messages" to comply, *Turner*, 512 U.S. at 655. Regardless of a candidate's party or platform, the provision prohibits platforms from denying a candidate access to an account.

27

The provision also satisfies intermediate scrutiny. It serves Florida's interest in "enhancing the ability of candidates to present, and the public to receive, information necessary for the effective operation of the democratic process." *CBS, Inc. v. FCC*, 453 U.S. 367, 396 (1981). The Supreme Court has described social media as the "modern public square," *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017), so the candidate-deplatforming provision "makes a significant contribution to freedom of expression" by prohibiting platforms from denying political candidates access to these important fora during election season, *CBS*, 453 U.S. at 396. Nor does the provision "burden substantially more speech than necessary." *TikTok*, 604 U.S. at 73-74. Indeed, the provision imposes almost no burden on speech because it does not require platforms to alter their curation and dissemination. The provision does not require platforms to disseminate candidate posts in feeds or preclude platforms from removing posts that violate their content standards. In that sense, the provision is like the law at issue in *CBS*, which did "not impair the discretion of broadcasters to present their views on any issue or to carry any particular type of programming." 453 U.S. at 397. And Florida's interest in enhancing public access to candidates would be "achieved less effectively absent the regulation," *TikTok*, 604 U.S. at 76 (cleaned up), because platforms could otherwise totally bar candidate access and thus prevent citizens from gathering any information about candidates in the "modern public square," *Packingham*, 582 U.S. at 107.

As with the consistency provision, *supra* III.A, Plaintiffs' underinclusive-and-overinclusive argument fails for the candidate-deplatforming provision. *See* Pls.' Am. First MSJ at 34-35. There is "no freestanding underinclusiveness limitation" for intermediate scrutiny. *TikTok*, 604 U.S. at 76 (cleaned up). As for Plaintiffs' complaint that S.B.7072 is overinclusive because it covers Etsy and Pinterest, that argument goes nowhere for the candidate-deplatforming provision because platforms such as Etsy ██ ████ allow political content, ███████████████████ *see* Duba Tr.149:4-18 (Ex. 2) (discussing how Etsy did not promote political content on its home page to avoid "suggest[ing] that we supported any specific political candidate or any specific political party" but did not ban the content from Etsy); *see also* Cleland Tr.221:5-223:4 (Ex. 1) (discussing political item on Etsy), so the provision promotes Florida's interest in ensuring that candidates can access the "modern public square" even on those platforms, *Packingham*, 582 U.S. at 107. In other words, Florida's interest is served by application of the provision to any covered platform where a candidate might communicate with voters, the public might learn about candidates, or candidates might learn about voters' views.

## C. The Limit on Censoring, Deplatforming, or Shadowbanning Journalistic Enterprises Is Constitutional in All Applications.

The limit on censoring, deplatforming, or shadowbanning journalistic enterprises, FLA. STAT. §501.2041(2)(j), is constitutional in all applications because, at most, intermediate scrutiny applies, and the limit satisfies that scrutiny.

The limit prohibits platforms from "tak[ing] any action to censor, deplatform, or shadow ban a journalistic enterprise based on the content of its publication or broadcast." *Id.* The limit is an anti-discrimination and anti-retaliation measure. Although the limit applies to actions taken by platforms "based on the content of [a journalistic enterprise's] publication or broadcast," *id.*, that phrase does not render it content based. Instead, that phrase identifies the motivation for discrimination or retaliation by a platform—not any particular message on the platform that is regulated. The limit thus simply prevents platforms from gatekeeping disfavored press outlets, regardless of those outlets' viewpoints. Because the limit applies irrespective of any particular topic, idea, or message that a journalistic enterprise posts on a platform, it singles out no "substantive message" and is thus content neutral. *City of Austin v. Reagan Nat'l Advert. of Aus., LLC*, 596 U.S. 61, 71 (2022). That is, like enforcement of a content-neutral sign code that "requires only" that a court "determine that a sign is a general advertising sign," *Anderson*, No. 24-13509, slip op. at 9, the limit turns not on the content of a journalistic-enterprise's post but on the underlying motivation, i.e., retaliation against the enterprise, for taking action against the post. Indeed, the limit is more content agnostic than the sign code because the limit's application turns not on a platform's reaction to the post but on the platform's reaction to the enterprise's independent "publication or broadcast." FLA. STAT. §501.2041(2)(j). And because the limit is content neutral, it is not an impermissible speaker-based distinction either. *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015).

30

The limit satisfies intermediate scrutiny. It serves Florida's substantial interest in preventing discrimination against disfavored businesses "in a direct and effective way." *TikTok*, 604 U.S. at 77 (cleaned up). Platforms remain free to curate or disseminate content, including posts by journalistic enterprises, unless they do so in retaliation against a journalistic enterprise because of the enterprise's independent publication or broadcast. All the limit requires is that platforms apply the same standards they apply to the content of other users on the platform. *Cf.* Br. of Amici Curiae the Babylon Bee & Not the Bee at 7-12, *Moody v. NetChoice LLC*, Nos. 22-277, 22-555 (U.S. Jan. 22, 2024). For that reason, the limit does not "burden substantially more speech than necessary" to achieve its anti-discrimination and anti-retaliation objectives that prevent platforms from leveraging their market power against disfavored press outlets. *TikTok*, 604 U.S. at 73-74; *cf.* ██████████████████████████████████████ ██████████████████████████████████████

As with other provisions, *supra* III.A-B, Plaintiffs' underinclusive-and-overinclusive argument fails for the limit on censoring, deplatforming, or shadowbanning journalistic enterprises. There is "no freestanding underinclusiveness limitation" for intermediate scrutiny. *TikTok*, 604 U.S. at 76 (cleaned up). And Plaintiffs' overinclusiveness argument with respect to Etsy and Pinterest lack evidentiary support because Etsy ████████ employees testified that they did not know whether or not journalistic enterprises maintained accounts of their platforms. Duba Tr.124:4-23 (Ex. 2); ██████████████████████

31

### D. The Opt-Out Provision Is Constitutional in All Applications.

The opt-out provision permits users to "opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." FLA. STAT. §501.2041(2)(f)(2). It is constitutional in all applications because, at most, intermediate scrutiny applies as the provision is "obviously content-neutral," *NetChoice*, 34 F.4th at 1226, and it satisfies intermediate scrutiny. The opt-out provision applies without regard to the content that a platform's algorithm shows or hides from users. And it serves Florida's interest in empowering consumers to decline to receive unwanted material, *see Rowan v. U.S. Post Off. Dep't*, 397 U.S. 728, 736 (1970), by allowing users to decide whether a platform's algorithm is feeding them content that they do not wish to view and do something to fix that problem. Nor can "it … be said that a substantial portion of the burden that [the provision] imposes fails to advance [that] goal[]." *Free Speech Coal. v. Paxton*, 606 U.S. 461, 498 (2025) (cleaned up). By giving users the choice, the opt-out provision affects a platform only when a user determines that the feed is prioritizing unwanted material.

As with other provisions, *supra* III.A-C, Plaintiffs' underinclusive-and-overinclusive argument fails for the opt-out provision. There is "no freestanding underinclusiveness limitation" for intermediate scrutiny. *TikTok*, 604 U.S. at 76 (citation omitted). As with the consistency provision, *supra* III.A, Plaintiffs' overinclusiveness argument ignores the significant interest that the opt-out provision serves—empowering consumers to decline to receive unwanted algorithmic content. *See Rowan*,

32

397 U.S. at 736. It cannot be seriously maintained that the opt-out provision is overinclusive in its coverage of Etsy and Pinterest, Pls.' Am. First MSJ at 34, when those platforms algorithmically recommend content to users. Duba Decl. ¶¶11, 34, 42, 55, 75, DE232-3; Vasquez Decl. ¶¶6-8, DE232-5.

### E. The Individualized-Disclosure Provision Is Constitutional in All Applications.

The individualized-disclosure provision, FLA. STAT. §501.2041(2)(d)(1), (3), is constitutional in all applications under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). Under *Zauderer*, a commercial speaker has a "minimal" First Amendment interest in withholding from consumers "purely factual and uncontroversial information about the terms under which [its] services will be available." *Id.* at 651. States may mandate disclosure of such information if the requirement is "reasonably related to the State's interest in preventing deception of consumers" and not "unduly burdensome." *Id.*

Plaintiffs contend that *Zauderer* is limited to the "commercial advertising context." Pls.' Am. First MSJ at 35. But the Eleventh Circuit has already applied *Zauderer* to S.B.7072's disclosure requirements, including the individualized-disclosure provision, *NetChoice*, 34 F.4th at 1230, when it concluded that *Zauderer* is "broad enough to cover" those requirements, "which, as the State contends, provide users with helpful information that prevents them from being misled about platforms' policies," *id.* at 1227. The Supreme Court also recently described *Zauderer* in broader terms than

33

Plaintiffs: "[C]ourts generally deploy less searching review when faced with laws that require[] speakers to disclose only factual, noncontroversial information in 'commercial speech.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1022 (2026) (quoting *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 768 (2018)). Speech about what platforms allow is commercial speech because it (1) proposes the terms of a commercial transaction with the user, (2) refers to the specific product a platform offers, and (3) arises from a platform's economic motivation to enlist or retain users. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983).

The individualized-disclosure provision compels disclosure only of "purely factual and uncontroversial information about the terms under which [a platform's] services will be available." *Zauderer*, 471 U.S. at 651. Under the provision, a platform must provide prompt, written notice to each user it censors setting forth the "rationale" for the censorship and an "explanation of how the [covered] platform became aware of the censored content or material." FLA. STAT. §501.2041(3)(c)-(d). This requirement is reasonably related to Florida's interest in preventing "inherently misleading commercial" conduct—platforms' enforcing content policies that are not disclosed to consumers or in ways that are at odds with stated policies. *Milavetz, Gallop & Milavetz P.A. v. United States*, 559 U.S. 229, 250 (2010). As Meta's Oversight Board once determined, Meta does not always achieve its stated goals, and "users [are] left guessing" as to what standards platforms are enforcing. Catalina Botero-Marino et al., *Oversight Board Demands More Transparency from Facebook*, OVERSIGHT BD. (Oct. 21, 2021),

34

https://perma.cc/3L6Y-BZSS. So the justification is "reasonable enough to support" the "requirement that information regarding [content moderation] be disclosed." *Zauderer*, 471 U.S. at 653. And the information disclosed is uncontroversial because the provision does not force platforms to "convey a message fundamentally at odds" with their missions. *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019).

Nor is the individualized-disclosure provision unduly burdensome. In response to Meta's Oversight Board's concerns over consumer confusion, Meta implemented the Board's recommendation to explain why content was removed and how it was reviewed. *2022 Annual Report: Oversight Board Reviews Meta's Changes to Bring Fairness and Transparency to Its Platforms*, OVERSIGHT BD. (June 6, 2023), https://perma.cc/5GNG-NZ9L. Facebook, Instagram, Reddit, and YouTube endorsed the Santa Clara Principles. Gennie Gebhart, *Who Has Your Back? Censorship Edition 2019*, ELEC. FRONTIER FOUND. (June 12, 2019), https://perma.cc/7QZX-A39E, which would require platforms to "provide notice to each user whose content is removed" about "the reason for the removal," *Chapeau*, THE SANTA CLARA PRINCIPLES ON TRANSPARENCY AND ACCOUNTABILITY IN CONTENT MODERATION, https://perma.cc/4UDC-253R. Meta, YouTube, Etsy, and ███████ offer appellate review of content-moderation decisions. *Appealed Content*, META TRANSPARENCY CTR., https://perma.cc/EH2G-TK9H; *Appeal a Community Guidelines Strike or Video Removal*, YOUTUBE HELP, https://perma.cc/7YHT-EJU4; Duba Tr.125:17-19 (Ex. 2); ████████

35

███████████████████████ The European Union already requires platforms to provide EU users subject to content moderation a "clear and specific statement" explaining the reasons for the moderation decision. Regulation (EU) 2022/2065 of the European Parliament and of the Council of 19 October 2022 on a Single Market for Digital Services (Digital Services Act), art. 17, 2022 O.J. (L 277) 1, 51-52. As Justice Alito noted in *Moody*, "many platforms are already providing similar disclosures pursuant to the European Union's Digital Services Act" and "complying with that law does not appear to have unduly burdened each platform's speech." 603 U.S. at 797-98 (Alito, J., concurring in the judgment). Plaintiffs lack evidence that would explain how platforms have the technological capability to act on so much content but not the technological capability to disclose and explain those same actions to Florida users.

As with other provisions, *supra* III.A-D, Plaintiffs' underinclusive-and-overinclusive argument fails for the individualized-disclosure provision. Intermediate scrutiny does not impose an underinclusiveness limitation, so this "less searching review," *Chiles*, 146 S. Ct. at 1022, does not either. Nor does coverage of platforms like Etsy and Pinterest render the individualized-disclosure provision overinclusive. *See* Pls.' Am. First MSJ at 34. Once again, that argument ignores the interest that the provision serves: preventing "inherently misleading commercial" conduct. *Milavetz*, 559 U.S. at 250. And, in any event, Etsy ████████ moderate content, *see* Duba Tr.125:17-19 (Ex. 2) (discussing appellate review of content moderation decisions); ███████████

36

███████████████████████, so requiring disclosure of the reasons for their decisions serves that interest.

### F. The Rules-Change Provision Is Constitutional in All Applications.

The rules-change provision requires platforms to "inform each user about any changes to its user rules, terms, and agreements before implementing the changes" and precludes "changes more than once every 30 days." FLA. STAT. §501.2041(2)(c). This provision does not implicate the First Amendment because it governs deceptive commercial practices, but even if it did, it is content neutral and satisfies intermediate scrutiny.

The rules-change provision does not trigger heightened scrutiny because it is "directed at," *Leathers v. Medlock*, 499 U.S. 439, 453 (1991), a deceptive commercial practice—elusive terms and conditions, *cf.* Veitch Dep. Ex. 3, ¶¶3-4, DE293-34—not speech. "Nothing about" the rules-change provision "has ever suggested an interest in censoring the expressive activities" of social media platforms. *Leathers*, 499 U.S. at 453. Were that the objective, the provision would instead dictate the content of platforms' rules. Moreover, the mere act of establishing standards about what third-party speech a platform will purportedly allow is not itself expressive. A platform must then "organiz[e] and present[] the included items" to constitute "expressive activity of its own." *Moody*, 603 U.S. at 731 (majority op.). The rules-change provision does not prohibit the presenting and organizing of content in accordance with a platform's standards. It instead prohibits the deceptive conduct of changing the rules so frequently

as to confuse users about what kind of platform they have agreed to use and then requires platforms to notify users of changes to the terms that govern their commercial agreements with those platforms.

Heightened scrutiny does not apply simply because the rules-change provision imposes a modest one-month limitation on how frequently platforms may change their rules. Any effect of that limitation is "incidental[]" on Plaintiffs' members' expression. *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022). Plaintiffs' members remain free to allow or prohibit whatever content they wish and to change their minds up to twelve times a year. Importantly, the 30-day limit applies only to *changing* the rules—it does not prevent platforms from *enforcing* their existing rules against new threats. A platform that has adopted a standard barring hate speech or graphic violence can enforce that standard against any new content at any time. The provision thus does not leave platforms unable to respond to emergencies; it simply requires that any wholesale change to the rules wait until the next 30-day window. Because the rules-change provision targets deceptive conduct and has only an incidental effect, if any, on expression, it does not implicate the First Amendment.

But even if the rules-change provision implicates the First Amendment, it is content neutral and satisfies intermediate scrutiny. The rules-change provision singles out no "substantive message" because, as with the consistency provision, *supra* III.A, platforms are free to set whatever standards they wish. *City of Austin*, 596 U.S. at 71. It

38

also serves Florida's substantial interest in preventing consumer deception, *Edenfield*, 507 U.S. at 769, "in a direct and effective way." *TikTok*, 604 U.S. at 77 (citation omitted). Its notification requirement demands transparency in the terms of commercial agreements that platforms make with users. And its limitation on the frequency of rules changes prevents platforms from changing the rules so frequently that users are unsure of what kinds of content their agreements with the platforms will allow them to post and to view. Nor does the rules-change provision "burden substantially more speech than necessary to further that interest." *Id.* at 73-74. The notification requirement is easily satisfied by sending notifications to users or posting a banner alerting users to the changes. And the 30-day requirement leaves platforms free to change their content standards up to twelve times a year, giving users ample time to learn of rule changes while preserving platforms' ability to adjust to changing circumstances.

As with other provisions, *supra* III.A-D, Plaintiffs' underinclusive-and-overinclusive argument fails for the rules-change provision. There is "no freestanding underinclusiveness limitation" for intermediate scrutiny. *TikTok*, 604 U.S. at 76 (citation omitted). Plaintiffs' argument that S.B.7072 is overinclusive, Pls.' Am. First MSJ at 34, likewise fails because it is premised on Plaintiffs' view of S.B.7072 and ignores the "substantial" interest that the rules-change provision serves—accurate commercial information. *Edenfield*, 507 U.S. at 769. And Etsy and Pinterest, like other platforms, subject users to rules that govern what they may post and view on the platforms. Duba Decl. ¶13, DE232-3; Vasquez Decl. ¶17, DE232-5.

39

**G. The View-Count Provision Is Constitutional in All Applications.**

The view-count provision, FLA. STAT. §501.2041(2)(e), requires platforms to provide users, on request, the number of other users who were "provided or shown" the user's "content or posts." The provision is constitutional in all applications because it compels disclosure of "purely factual and uncontroversial information about the terms under which [a platform's] services will be available," and is reasonably related to Florida's substantial interest in preventing inherently misleading commercial conduct. *Zauderer*, 471 U.S. at 651.

*Zauderer* applies because disclosure of views is part and parcel with platforms' speech about how they treat different kinds of content as part of the terms that govern their commercial relationships with users. Speech about how platforms handle content, embodied in their content policies to which users are bound, is commercial speech because it (1) proposes the terms of a commercial transaction with the user, (2) refers to the specific product a platform offers (i.e., a platform of user-generated content subject to declared standards) and (3) arises from a platform's economic motivation to enlist or retain users. *See Bolger*, 463 U.S. 66-67. Like the individualized-disclosure and rules-change provisions, the view-count provision holds platforms to those representations by requiring that platforms disclose "purely factual and uncontroversial information about the terms under which" the platform's services are available. *Zauderer*, 471 U.S. at 651. If a platform promises to demote or hide only certain kinds of content, the view-count provision aids users in ascertaining whether those

40

representations are accurate by allowing them to see how many users have seen their posts. Accordingly, the Eleventh Circuit has already held that the view-count provision fits comfortably in *Zauderer*'s framework. *NetChoice*, 34 F.4th at 1227.

Plaintiffs nevertheless invoke *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988), and *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 585 U.S. 755 (2018), to argue for strict scrutiny. Pls.' 2d MSJ at 7-8, 10. Those decisions do not fit. *Tornillo* invalidated a "statute granting a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper" because "any such compulsion to publish that which reason tells them should not be published is unconstitutional." 418 U.S. at 243, 256 (cleaned up). The view-count provision compels nothing of the kind. It does not require platforms to host, amplify, or disseminate any third-party speech and thus does not impose a substantial burden on editorial discretion. It requires only that, on user request, a platform report the number of other users that were provided or shown that user's own content.

*Riley* is no closer. The Supreme Court there applied strict scrutiny to a rule requiring charitable fundraisers to disclose, while soliciting donations, the percentage of receipts retained from prior solicitations, because the mandated disclosure was "inextricably intertwined with otherwise fully protected speech," namely, the solicitation itself. *Riley*, 487 U.S. at 784, 796. The view-count provision is not intertwined with any noncommercial expression. The speech with which the view-count

41

provision *is* intertwined is a platform's commercial representations to users about how it treats their content, which is precisely why *Zauderer* applies.

Likewise, the law at issue in *NIFLA* did not require disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." 585 U.S. at 768 (quoting *Zauderer*, 471 U.S. at 651). That law instead required pregnancy crisis centers to speak a hostile message and "inform women how they can obtain state-subsidized abortions" while those centers were "try[ing] to dissuade women from choosing that option." *Id.* at 766. That requirement was neither related to the centers' services nor uncontroversial. Pregnancy crisis centers do not provide abortions, so the "notice in no way relate[d] to the services" they provided. *Id.* at 769. Social media platforms, however, offer users places to post that other users can see subject to certain standards. The number of other users who have seen that content is plainly related to a social media platform's service. The *NIFLA* law also required the centers to speak in a way that was antithetical to the views they otherwise espoused. The disclosure of view counts is not antithetical to any views that platforms are otherwise espousing, other than some platforms' naked desire not to disclose that fact about their services to users.

Turning to the application of *Zauderer*, the view-count provision satisfies that test for many of the same reasons as the rules-change and individualized-disclosure provisions. *See supra* III.E-F. The view-count provision is reasonably related to Florida's interest in preventing "inherently misleading commercial" conduct—platforms

42

enforcing content policies that are not disclosed to consumers or in ways that are at odds with stated policies. *Milavetz*, 559 U.S. at 250. Platforms attract users by representing that content will be moderated according to declared standards; the view-count provision allows users to determine whether a platform has in fact demoted or restricted a given post, and to assess whether that decision squares with the platform's representations. *Cf.* ████████████████████████████████████████

████████████████████████████████████████████████████

The view-count provision also is not unduly burdensome. *See supra* III.E-F. Plaintiffs' members already use sophisticated systems to track, classify, and act upon user content at staggering scale. *See supra* II. They cannot plausibly maintain that they have the technological capability to make billions of moderation decisions each day and to incorporate the number of user views into the algorithms that drive recommendations, Bapna Rep. ¶¶40-41, DE293-1; ████████████████████

██████████████████████████████ but lack the capability to count the users to whom they have disseminated a given post. Indeed, YouTube and X already display view counts for some posts. Veitch Decl. ¶41, DE280-3; Fernandez Decl. ¶30, 280-8. YouTube also prepares detailed reports for users who post videos that show view counts and can show for every second of a video what viewer retention is. GOOG-NTCHFL7072-00001482 at -84-85 (Ex. 3); GOOG-NTCHFL7072-00001489 at -90-91 (Ex. 4); GOOG-NTCHFL7072-00001499 at -1500 (Ex. 5). Moreover, several witnesses from Plaintiffs' members hold government relations or marketing roles and

43

lack the knowledge to testify to the technical feasibility of collecting view counts.

███████████████████████████████████████████ Callaway

Tr.32:3-18, DE293-4. For example, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ And Plaintiffs' theory that bad actors could use the view counts for

nefarious purposes likewise fails as it is supported only by speculative testimony about

another provision. Pls.' 2d MSJ at 12 n.6; *see* Veitch Tr.337:19-339:8, DE280-10

(discussing individualized disclosure).

Nor does the provision sweep so broadly as to capture "even just a direct

message on Instagram." Pls.' 2d MSJ at 18. Florida law requires courts to construe

statutes on the same subject in light of one another. *Larimore v. State*, 2 So. 3d 101, 107

(Fla. 2008). And a related social-media statute in the same chapter the Florida Statutes,

Section 501.1736, uses the terms "posting" and "content" while expressly

distinguishing "posting publicly" from "direct messaging," which that statute does not

cover. The Legislature's distinction between posting, content, and direct messaging in

that provision informs the parallel use of "post" and "content" in the view-count

provision and establishes that those terms do not sweep as broadly as Plaintiffs contend.

Plaintiffs' remaining arguments also fail. Plaintiffs first charge that Florida's

defense of Section 501.1736, a statute that addresses the deleterious effects of certain

44

addictive features, including the display of personal interactive metrics (e.g., likes) on adolescents, exposes the consumer-protection justification for view-count provision as disingenuous. Pls.' 2d MSJ at 16-17 n.7. The two statutes address distinct harms in harmonious ways. As Florida explained in defending Section 501.1736, a 2023 advisory from the U.S. Surgeon General under then-President Biden found that the "current body of evidence indicates . . . that social media can . . . have a profound risk of harm to the mental health and well-being of children and adolescents," and identified "displaying popularity (i.e., 'likes')" among the features "designed to maximize user engagement, which ha[ve] the potential to encourage excessive use and behavioral dysregulation." Appellant's Br. at 6-7, *Off. of the Att'y Gen., State of Fla., Dep't of Legal Affs. v. Snap, Inc.*, No. 25-12814 (11th Cir. Sep. 24, 2025), ECF No. 15 (citations omitted). The view-count provision concerns whether a platform is adhering to its representations and does so in a way that is consistent with Section 501.1736. For one thing, the view-count provision calls for disclosure of views, only upon request, not likes, which might convey other users' normative judgment about a user's content. For another, Section 501.1736 prohibits 13-year-olds from holding accounts on platforms that use the addictive features and permits 14- and 15-year-olds to hold accounts with parental consent. Section 501.1736 does not regulate exposure of more mature individuals to personal interactive metrics.

Plaintiffs next assemble a small group of out-of-circuit decisions for the proposition that "transparency" interests cannot support the view-count provision's

45

disclosure requirement. Pls.' 2d MSJ at 16. None controls or persuades. *International Dairy Foods Ass'n v. Amestoy* held only that a bare "wish to know" whether a product came from hormone-treated cattle could not support disclosure where the State produced no evidence that the information "bears on a reasonable concern for human health or safety or some other sufficiently substantial governmental concern." 92 F.3d 67, 74 (2d Cir. 1996); *accord Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 n.6 (2d Cir. 2001). But another of Plaintiffs' cited authorities recognized that "demonstrated consumer interest" can combine with other factors to make a disclosure interest "substantial." *Am. Meat Inst. v. USDA*, 760 F.3d 18, 23 (D.C. Cir. 2014). Here, there is more than a desire to know as there is evidence that Plaintiffs members do not handle content in ways that are consistent with stated policies. Kaplan, *supra*; Veitch Decl. ¶¶18-19, DE232-8; ███████████████████████████████████████ ████████████████ Florida's interest in preventing consumer deception is substantial. *Edenfield*, 507 U.S. at 769. And the value of this information to users is apparent as a YouTube guide for users about "Reach Reports" describes "views" as a "key metric[]" that is "key to understanding how viewers find your content." GOOG-NTCHFL7072-00001489 at -90 (Ex. 4). Finally, *X Corp. v. Bonta* is wholly unlike this case and akin to *Riley* and *NIFLA*: the California law there required "every covered social media company to reveal its policy opinion about contentious issues," 116 F.4th 888, 899 (9th Cir. 2024), not purely factual information about how often material is viewed.

46

Plaintiffs also fail to recognize a critical distinction between the view-count provision and one provision at issue in the Ninth Circuit's decision in *Bonta I*. *See* Pls.' 2d MSJ at 23. The Ninth Circuit applied strict scrutiny to a provision that *prohibited* disclosure of view counts. *Bonta I*, 152 F.4th at 1016. But in the commercial-speech context, "disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech." *Zauderer*, 471 U.S. at 651. The view-count provision is thus materially dissimilar to the provision at issue in *Bonta I*.

The view-count provision is also neither overinclusive nor underinclusive. Pls.' 2d MSJ at 17-18. Requiring view counts (in whatever form the platform chooses to present it) directly serves Florida's substantial interest in policing the gap between stated and enforced content policies, which apply across the platform. *See Edenfield*, 507 U.S. at 769. And Etsy and Pinterest, like other platforms, subject users to rules that govern what they may post and view on the platforms, so coverage of them does not render the provision overinclusive. Duba Decl. ¶13, DE232-3; Vasquez Decl. ¶17, DE232-5.

That leaves Plaintiffs' theory that the view-count provision must fall with the consistency provision, §501.2041(2)(b), because compelled disclosure of view counts has the "evident purpose" of facilitating enforcement of the consistency provision. Pls.' 2d MSJ 11-15. That theory presupposes that the consistency provision is itself unconstitutional. It is not. *Supra* III.A. The consistency provision is content neutral, does not trigger heightened scrutiny, and serves Florida's substantial interest in preventing consumer deception. A disclosure rule that aids enforcement of a valid,

content-neutral consumer-protection statute does not become content based by association.

## IV.   Plaintiffs Are Not Entitled to Judgment on Their Facial Challenges.

Plaintiffs' facial challenges to the following provisions fail for multiple independent reasons: (1) consistency provision, FLA. STAT. §501.2041(2)(b); (2) ban on the use of post-prioritization or shadowbanning algorithms for posts by or about candidates, §501.2041(2)(h); (3) limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j); (4) opt-out provision, §501.2041(2)(f)-(g); and (5) individualized-disclosure provision, §501.2041(2)(d)(1), (3).[4]

First, as explained with respect to Plaintiffs' quasi-facial challenges, *supra* II, these provisions have substantial *constitutional* applications to nonexpressive algorithmic and machine-learning recommendation and moderation systems like those that Plaintiffs' members use. Plaintiffs contend that the challenged provisions "apply *only* when websites are engaged in the First Amendment activity of curating and disseminating third-party speech." Pls.' Am. First MSJ at 39-40. But Plaintiffs ignore that their members' algorithmic and machine-learning content moderation and recommendation is nonexpressive and thus not protected by the First Amendment. *See supra* II. So Defendants need not "gin up some 'realistic, not fanciful' applications of those

---

[4] Plaintiffs reserved the right to address severability if this Court holds that some provisions are facially unconstitutional. Pls.' Am. First MSJ at 42 n.7. Defendants reserve the same right.

provisions," Pls.' Am. First MSJ at 40 (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)), because application of those provisions to Plaintiffs' members, supported by evidence that much of Plaintiffs' members curation and dissemination is nonexpressive, more than suffices. *See supra* II. Indeed, even Plaintiffs acknowledge the overlap: "Most of those provisions apply *only* to the same conduct covered by Plaintiffs' as-applied challenge." Pls.' Am. First MSJ at 41. Accordingly, for the same reason that Plaintiffs' purported as-applied challenges fail, so too do their facial challenges.

Plaintiffs' argument that certain provisions apply only when platforms engage in post-prioritization or shadowbanning further cuts against them. The ban on post-prioritization and shadowbanning algorithms for posts by or about candidates, FLA. STAT. §501.2041(2)(h), and the opt-out provision, §501.2041(2)(f)(2), (g), are textually limited in application to the use of "algorithms." That textual limitation gives those provisions substantial legitimate sweep in light of the evidence of the nonexpressive nature of such algorithms. *See supra* II. For the limit on censoring, deplatforming, and shadowbanning journalistic enterprises, FLA. STAT. §501.2041(2)(j), and consistency provision, which requires consistent application of "censorship, deplatforming, and shadow banning standards," §501.2041(2)(b), evidence again establishes that platforms enlist algorithms to perform those kinds of actions. Duba Decl. ¶¶11, 34, 42, 55, 75, DE232-3; Vasquez Decl. ¶¶6-8, 22-24, DE232-5; Fernandez Decl. ¶¶8, 10, 14-17, DE232-7; Veitch Decl. ¶¶7, 17-18, 24, 37, DE232-8; Potts Decl. ¶¶16, 21, DE232-4; *see*

49

*also* Callaway Dep. Ex. 8, DE293-35. So those provisions cover substantial *nonexpressive* activity too.

Second, for the provisions that Defendants have shown are constitutional in all applications, *supra* III, Plaintiffs' facial challenges necessarily fail on that independent ground too: consistency provision, FLA. STAT. §501.2041(2)(b), candidate-deplatforming provision, §106.072(2), limit on censoring, deplatforming, and shadowbanning journalistic enterprises, §501.2041(2)(j), opt-out provision, §501.2041(2)(f)(2), and individualized-disclosure provision, §501.2041(2)(d)(1), (3).

Third, as this Court has explained, "[g]iven the proper construction of 'social media platform' as set out in th[e] [motions to dismiss and compel] order, it is clear that [S.B. 7072's] provisions have a plainly legitimate sweep." DE209:41. The broad definition of "social media platform" encompasses entities like e-commerce platforms, search engines, and other online services that plainly do not engage in expressive curation of third-party speech or that are foreign controlled. *See* DE209:7-9. Plaintiffs must show that the provisions' unconstitutional applications are "substantial compared to [their] constitutional ones." *Moody*, 603 U.S. at 718. But Plaintiffs have made no effort in discovery to survey the provisions' full range of applications (aside from their unsuccessful efforts to cabin the scope of those provisions to what Plaintiffs deem expressive curation and dissemination). Plaintiffs "treat the law as having certain heartland applications," i.e., curation and dissemination, and "mostly confine the battle to that terrain." *NetChoice, LLC v. Bonta* (*Bonta II*), 170 F.4th 744, 758 (9th Cir. 2026)

50

(cleaned up). Plaintiffs bore the burden to develop a "detailed record" that would permit this Court to "consider how the … provision[s] work[] in '*all* of [their] applications.'" *Id.* at 763 (quoting *Moody*, 603 U.S. at 744). Instead, they chose to effectively collapse their facial and as-applied challenges into sets of overlapping quasi-facial challenges related to curation and dissemination. Their failure to carry their facial challenge burden is fatal.

## V.    Plaintiffs Are Not Entitled to Judgment on Their First Amendment Challenges Because Their Members Are Common Carriers.

Alternatively, Plaintiffs' facial and purported as-applied challenges fail because Plaintiffs' members are common carriers. Since before the Founding, the government regulated businesses that "hosted or transported others" as common carriers, including by precluding them from discriminating against their customers. *303 Creative LLC v. Elenis*, 600 U.S. 570, 590 (2023). The common-carrier doctrine has long extended to those who "disseminate" or facilitate the speech of others. *See* Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 2299, 2320 & nn.103-05 (2021). The First Amendment thus permits common-carrier regulation for platforms that have opened their facilities to all speakers and speech. Like common carriers Plaintiffs' members do not "make individualized decisions, in particular cases, whether and on what terms to deal." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979) (cleaned up); *see supra* II. So similar to traditional common carriers, they make decisions for the "due accommodation" of their users and "for the due arrangements of their

business." *Jencks v. Coleman*, 13 F. Cas. 442, 443 (C.C.D.R.I. 1835) (Story, J.). The individualized-disclosure provision, FLA. STAT. §501.2041(2)(d)(1), (3), rules-change provision, §501.2041(2)(c), view-count provision, §501.2041(2)(e), consistency provision, §501.2041(2)(b), and opt-out provision, §501.2041(2)(f)(2), are consumer-protection measures that require platforms to adhere to their representations of their policies akin to similar measures that have long governed common carriers. The "First Amendment poses no obstacle to holding the provider to its representation." *U.S. Telecom Ass'n*, 855 F.3d at 392 (Srinivasan, J., concurring in the denial of rehearing en banc). Similarly, the limit on censoring, deplatforming, and shadowbanning journalistic enterprises, FLA. STAT. §501.2041(2)(j), candidate-deplatforming provision, §106.072(2), and ban on post-prioritization and shadowbanning algorithms for posts by or about political candidates, §501.2041(2)(h), protect against discrimination when platforms are generally open to all manner of journalistic and political expression consistent with their chosen business models. Because all provisions regulate Plaintiffs' members as common carriers to either preclude discrimination or hold platforms to their representations, they do not regulate inherently expressive conduct and are consistent with the First Amendment.

## VI. Plaintiffs Are Not Entitled to Judgment on Their Vagueness Challenges.

### A. Plaintiffs' Vagueness Challenge to the Consistency Provision Fails.

Plaintiffs' vagueness challenge to the consistency provision, §501.2041(2)(b), also fails. Plaintiffs do not specify the nature of their challenge, but it is best understood as

a facial challenge because Plaintiffs complain that the consistency provision "chills any number of judgments calls that depend on context or require educational, scientific, or artistic evaluations." Pls.' Am. First MSJ at 54. Plaintiffs cannot satisfy the standard for facial vagueness.

"The vagueness doctrine is concerned principally with notice and arbitrary enforcement." *SisterSong*, 40 F.4th at 1327. "Vagueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (cleaned up). If protected expression is involved, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012). "Facial vagueness occurs when a statute is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1302 (11th Cir. 2013) (cleaned up).

The consistency provision, which requires platforms to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among [their] users," FLA. STAT. §501.2041(2)(b), is not facially vague. "A person of reasonable intelligence is capable of understanding that the core meaning of the provision," *SisterSong*, 40 F.4th at 1328 (cleaned up), requires platforms to treat users equally in the application of their standards, *see Consistent*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/G8HW-K4CW ("free from variation or contradiction"); *see also Tracy*

53

*v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020) (looking to "ordinary meaning" to resolve vagueness challenge). It cannot be seriously maintained that a provision that requires equal treatment is so vague as to be incomprehensible. *Cf.* U.S. CONST. amend XIV, §1 (Equal Protection). Indeed, a Reddit employee testified that users' "expectation typically is that Reddit moderators currently apply the rules of their communities consistently," Callaway Tr.144:8-11, DE293-4; *see also* ██████████ ██████████ so consistency is evidently something that people of "reasonable intelligence" are perfectly capable of understanding, *SisterSong*, 40 F.4th at 1328.

Plaintiffs speculate about "judgment calls that depend on context," such as whether a platform may remove a direct threat but not the same language in song lyrics. Pls.' Am. First MSJ at 54. But it does not matter that "close cases can be envisioned." *United States v. Williams*, 553 U.S. 285, 305 (2008). Easy cases are easy to envision too. For example, it would violate the consistency provision to remove a meme posted in response to the same post by one user but not another user. And a platform that bans racial hate speech would violate the consistency provision if it only removed racial slurs directed at members of certain races but not racial slurs directed at members of other races. Plaintiffs' hypotheticals about edge cases do not render the consistency provision "utterly devoid of a standard of conduct" such that it has "has no core." *Indigo Room*, 710 F.3d at 1302 (cleaned up). Difficult cases are not vagueness problems but rather ordinary challenges of applying any legal standard to specific facts. *Cf. Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (discussing distinction between true threats and "jests,

54

'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow"). So regardless of whether the consistency provision has closer calls at the margins, it certainly has a core that renders it facially valid. *Indigo Room*, 710 F.3d at 1302.

### B. Plaintiffs' Vagueness Challenge to the Ban on the Use of Post-Prioritization Algorithms for Posts by or about Candidates Fails.

Plaintiffs' vagueness challenge to the ban on the use of post-prioritization and shadowbanning algorithms for posts by or about candidates, FLA. STAT. §501.2041(2)(h), likewise fails.

Plaintiffs cannot establish that the ban "simply has no core and cannot be validly applied to any conduct." *Indigo Room*, 710 F.3d at 1302 (cleaned up). The definition of "[p]ost-prioritization" covers any "action … to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." FLA. STAT. §501.2041(1)(e). It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (cleaned up). And in light of the opt-out provision, which permits users to opt out of "post-prioritization" in favor of "sequential or chronological posts and content," FLA. STAT. §501.2041(2)(f), the definition of post-prioritization plainly covers efforts to show users posts in an order other than the order in which those posts were made. In the context of the ban, that definition means that

55

platforms cannot use algorithms to show users posts "by or about" a candidate if those algorithms arrange the posts in a way that is not chronological. "A person of reasonable intelligence is capable of understanding that the core meaning of the provision," *SisterSong*, 40 F.4th at 1328 (cleaned up), prohibits platforms from algorithmically showing users posts "by or about" a candidate in their feeds unless those posts are shown in the order in which they were posted.

Plaintiffs contend that the provision is "paradoxical" and "self-defeating" because it would forbid placing candidate content "ahead of—or below—any other content" and in a "more prominent position—or a less prominent position—than other content." Pls.' Am. First MSJ at 55. But that reading ignores the statutory context. As explained, read alongside the opt-out provision, the definition of post-prioritization refers to any departure from chronological ordering. So the ban prohibits algorithms from arranging candidate-related content in any non-chronological way—whether by promoting it or demoting it. That is a coherent prohibition, not a paradoxical one. Although this Court preliminarily observed that it was difficult to understand what this provision means, DE209:36-37, that observation preceded full briefing. Reading the provision in context with the opt-out provision, as the statutory structure requires, resolves the lack of clarity.

Although the existence of this readily discernible core is sufficient to defeat Plaintiffs' facial vagueness challenge, Plaintiffs' allegations regarding the difficulty of operating compliant search functions fare no better. For one thing, the ban would not

56

prevent promotion or demotion of posts "by or about" candidates in a search function if that search function was not based on an algorithm. For another thing, Plaintiffs themselves appear to understand the ban to prohibit algorithmically placing "content 'by or about' a political candidate ahead of—or below—any other content." Pls.' Am. First MSJ at 55. That compliance might be unappealing to Plaintiffs does not make the ban vague.

## VII.   Plaintiffs Are Not Entitled to Judgment on Any Section 1983 Claim Because They Lack a Cause of Action.

As Defendants argued in their motion to dismiss, DE173:28-29, Plaintiffs lack a cause of action under Section 1983 because they are not part of a class of persons who have personally suffered a deprivation of federal rights. *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 127 (2014). This Court should now resolve that question because Plaintiffs seek attorney's fees under 42 U.S.C. §1988. DE171 ¶133.

The cases Plaintiffs cited in response to Defendants' motion to dismiss do not refute that analysis. None but *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), even addressed whether Section 1983 bars associations from pursuing members' rights. *See Webster v. Fall*, 266 U.S. 507, 511 (1925). And *Callanen* did not grapple with the text of Section 1983. It determined that "Section 1983 is an appropriate vehicle for third-party claims" simply because such claims "have been allowed" in other cases that also did not address the cause-of-action problem. *Callanen*, 89 F.4th at 473. That is no reason to neglect statutory text.

57

## CONCLUSION

For the reasons set forth above, this Court should deny Plaintiffs' motions for summary judgment.

Dated: May 1, 2026

Respectfully submitted,

JAMES UTHMEIER
*Attorney General of Florida*

/s/*William H. Stafford, III*
William H. Stafford, III

Charles J. Cooper
David H. Thompson
Brian W. Barnes
Clark L. Hildabrand
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3694
(850) 410-2672 (fax)

*Counsel for Defendants*

58

## CERTIFICATE OF COMPLIANCE

I hereby certify that Defendants' Omnibus Memorandum in Opposition to Plaintiffs' Motions for Summary Judgment contains 13,956 words, excluding the parts exempted by N.D. Fla. R. 7.1(F), and thus complies with the limit of 18,272 words set by this Court. DE303:2.

/s/*William H. Stafford, III*
William H. Stafford, III

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served on all counsel of record via the CM/ECF system on this 1st day of May, 2026.

/s/*William H. Stafford, III*
William H. Stafford, III